CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 02 2018

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

RLI INSURANCE COMPANY,      )
                            )
        Plaintiff,          )
                            )        Civil Action No. 5:18-CV-00066
v.                          )
                            )
NEXUS SERVICES, INC.,       )
                            )        By:    Michael F. Urbanski
        Defendant,          )        Chief United States District Judge
                            )
v.                          )
                            )
JUAN VALOY, et al.,         )
                            )
        Intervenors.        )

## MEMORANDUM OPINION

This matter is before the court on a motion for preliminary injunction filed by plaintiff RLI Insurance Company ("RLI"). ECF No. 4. RLI seeks an order enforcing provisions of a Commercial Surety General Indemnity Agreement (the "Indemnity Agreement") entered into with defendant Nexus Services, Inc. ("Nexus") on January 20, 2016, specifically obligating Nexus to provide RLI access to Nexus' books, records and accounts. The matter has been fully briefed, and the court held an evidentiary hearing on April 27, 2018. Per the parties' request, the court held its order in abeyance through May 17 to allow for settlement discussions. Following court-ordered mediation on May 30 and June 1, the court held a second evidentiary hearing to set an appropriate bond on June 7. For the reasons stated below, the court finds that: (1) the law and facts clearly favor RLI's position, and RLI is likely to succeed on the merits of some portion of its breach of contract action;

(2) RLI is likely to suffer irreparable harm in the absence of a preliminary injunction; (3) the balance of the equities supports a preliminary injunction; and (4) a preliminary injunction is in the public interest. Accordingly, RLI's motion for preliminary injunction is **GRANTED in part** and **DENIED in part**, and Nexus is **PRELIMINARILY ENJOINED** from restricting RLI's access to the books, records and accounts specified below and in the accompanying order.

## I.

This is a breach of contract dispute arising from an indemnity agreement between two corporations servicing immigration bonds. On January 20, 2016, RLI, an Illinois corporation, entered into the Indemnity Agreement as the surety with Nexus, a Virginia corporation. See Commercial Surety General Indemnity Agreement, Ex. A to Compl., ECF No. 1–2. The Indemnity Agreement served as consideration for RLI's agreement to issue immigration bonds, which included bonds conditioned upon delivery of an alien, bonds conditioned upon voluntary departure of alien, and order of supervision bonds.[1] Pursuant to ¶ 3(c) of the Indemnity Agreement:

> Until Surety has been furnished with conclusive evidence of its discharge without loss from any Bonds, and until Surety has been otherwise fully indemnified as hereunder provided, <u>Surety shall have the right of access to the books, records and accounts of the Indemnitor(s) for the purpose of examining and copying them.</u> The Indemnitor(s) hereby authorize third parties, including but not limited to depositories of funds of the

---

[1] Edgar Alfredo Ramos-Ramos, Marcelino Ramirez-Sanchez, Cesar Augusto Gramajo, and Gerson Castro Segeda have asked to intervene as defendants ("Intervenors") in this action. The court asked counsel for the Intervenors to address whether a conflict existed given counsel's potential relationship with Nexus. In an e-mail to the court, counsel for the Intervenors stated that the Intervenors intended to seek additional counsel and would contact the court to set a hearing on the motion to intervene. Intervenors did not appear at the preliminary injunction hearings on April 27, 2018 or June 7, 2018. Counsel entered an appearance on behalf of the Intervenors after the hearing on June 7. ECF No. 47.

> Indemnitor(s), to furnish to Surety any information requested by Surety in connection with any transaction. Surety may furnish any information, which it now has or may hereafter acquire concerning the Indemnitor(s), to other persons, firms or entities for the purpose of procuring co-suretyship or reinsurance or of advising such persons, firms, or entities as it may deem appropriate.

ECF No. 1-2, at 3 (emphasis added). Illinois law governs the Indemnity Agreement. See id., at 3. RLI alleges issuing more than 2,400 bonds in reliance upon the Indemnity Agreement, with at least 2,197 bonds remaining in force at the time of the April 27, 2018 hearing.

Approximately one year after signing the Indemnity Agreement, RLI asked Nexus for access to its records for the first time. Through multiple letters and e-mails, RLI requested meetings to review Nexus' records of immigration bonds and expressed concerns about notices from Department of the Treasury ("Treasury") about past due invoices for the bonds. On March 13, 2017, after receiving no response to its record review request, RLI demanded full bond discharge or collateral pursuant to Paragraph 3.d of the Indemnity Agreement. Nexus subsequently agreed to provide access to its documents for review during a meeting with RLI on May 26, 2017. While Nexus provided some records, not all records were provided and RLI claims that it lacked sufficient information to close its corresponding bond files. The parties again met on December 12, 2017, and Nexus informed RLI that it would only provide access to records pursuant to a confidentiality agreement. Without waiving its rights, RLI agreed to negotiate a confidentiality agreement with Nexus. Because the parties could not agree to a set of terms, Nexus continued to deny access.

During these negotiations, the business relationship worsened. RLI claims Nexus failed to contemporaneously inform them of dealings with Department of Homeland

Security ("DHS"), provide conclusive evidence of discharge without loss from bonds, or comply with specific requests for information. The Treasury notified RLI of past due payments and made monetary demands with interest on outstanding bonds. Although the parties dispute whether RLI should have made the payments, RLI paid $83,874.14 for unsatisfied bond claims because Nexus allegedly failed to demonstrate that it had paid the claims. RLI states that these notices have been increasing in frequency. As a result of these Treasury notices and late payments, RLI fears that its relationship with the government has been undermined. Specifically, RLI worries that similar demands for past due payments will continue based on the higher-than-expected number of bonds remaining outstanding, and its reputation will be harmed because continued delinquencies could be reported to the Treasury or ultimately the Department of Justice's collection department. RLI is not aware of any repercussions from the Treasury to date. However, RLI claims that its concerns are bolstered by the multiple investigations into Nexus by state attorneys general, and by Nexus' repayment schedule for another surety's bonds that require payments of $30,000 to $35,000 per day by certified check. Nexus asked RLI if it was interested in engaging in a similar repayment plan, which caused RLI to question the number of its bonds in breach and Nexus' solvency.

Nexus, for its part, claims that it is willing to comply with the Indemnity Agreement, but needs to protect the privacy of its immigration clients. Nexus also claims that it is financially viable and that RLI should not be concerned, stating that its financial arrangements with other sureties are standard business practice. RLI, in Nexus' view, has been unreasonable in its demands to review books, records and accounts and for collateral.

RLI brought suit against Nexus on April 12, 2018, seeking injunctive relief, specific performance, and breach of indemnity agreement. ECF No. 1. On the same day, RLI moved for a preliminary injunction on the grounds that Nexus defaulted under the Indemnity Agreement by refusing to comply with RLI's requests to inspect Nexus' books and records for more than a year. ECF No. 4–1. RLI claims irreparable injury through the denial of its bargained-for contractual right to inspect documents, which prevents it from assessing and protecting itself against the outstanding bond liability, and the loss of goodwill that follows from Nexus' continued failure to make timely bond payments. RLI now seeks access to Nexus' books, records and accounts, and those of its related entities, within seven days. RLI requests an extensive assortment of documents, including all records related to the immigration bonds, financial records, tax notices, historical data about bonds, and information about the bonded aliens.

The court held a hearing on the motion for preliminary injunction on April 27, 2018. Both parties presented witnesses from their respective companies: RLI Vice President of Claims Ira Sussman and Nexus Vice President of Risk Management Eric Schneider. Although the parties disputed the nature of most of their business relationship, Nexus agreed at the hearing that RLI had a right of access to at least some of its financial documents per the Indemnity Agreement. The court took the motion under advisement for ten days to allow the parties to negotiate the terms of accessing Nexus' records. ECF No. 15. On May 9, 2018, the parties jointly moved the court to hold its preliminary injunction order in abeyance per further negotiations. ECF No. 28. The court granted the request through May 17, 2018. ECF No. 29. On the night of May 17, the parties notified the court that no

agreement had been reached. ECF Nos. 30–31. RLI claimed that Nexus provided no financial records as of 4:00 p.m. on May 17, and solely provided documents that Nexus previously received from RLI or its bond producer. See Letter from Vivian Katsantonis, May 17, 2018, ECF No. 30. Nexus responded that it had provided more than 9,000 documents; nearly 7,000 pages of immigration records were produced on May 14, 2018 and more than 2,000 pages were produced after 4:00 p.m. on May 17, including asset lists, receipts, invoices, general ledgers, payroll account and salary information, profit and loss documents, vendor balance detail, and its 2016 federal tax return. See Letter from Dale G. Mullen, May 17, 2018, ECF No. 31. Upon reviewing the letters from the parties, the court ordered the parties to engage in mediation with the U.S. Magistrate Judge. ECF No. 32. The parties were unable to come to terms.

The court thereafter held an evidentiary hearing on June 7, 2018 for purposes of taking evidence related to an appropriate bond amount. ECF No. 43. The parties did not present evidence for an appropriate bond amount, but provided further argument. RLI introduced new evidence regarding Nexus' solvency through the testimony of Peter Fascia, a forensic accountant at Matson, Driscoll & Damico LLP. Fascia testified that he had difficulty assessing Nexus' financial state based on the information provided to date, explaining how the nearly $44 million in total income for the 2017 calendar year was accounted for through a cryptic notation of $42 million in "combined client income." In addition to this evidence about solvency, RLI expressed concern that Nexus may manipulate its books, records and accounts. Based on representations by Nexus' counsel that they were still preparing records for production, RLI believed that Nexus collectively maintained their

records with the records of Nexus-related entities, such as Libre by Nexus. Nexus countered

that records are being preserved, and that additional information is simply being added into

Nexus' Quickbooks in real time. Nexus contended that access to its records alone could be

provided through a separate logon. After hearing argument, the court gave the parties notice

of potentially appointing a special master to resolve their dispute, either with or without a

preliminary injunction. Both parties consented to the special master, but did so on varying

conditional terms. ECF Nos. 48–49. In its consent, Nexus notified the court of an additional

1,043 pages of documents produced to RLI on June 11, 2018. ECF No. 48, at 2.

## II.

"A preliminary injunction is an extraordinary remedy never awarded as of right."

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); Real Truth About Obama,

Inc. v. Fed. Election Comm'n, 575 F.3d 342, 345 (4th Cir. 2009), vacated on other grounds,

130 S. Ct. 2371 (2010), reinstated in relevant part, 607 F.3d 355 (4th Cir. 2010). It is a

remedy that is "'granted only sparingly and in limited circumstances.'" MicroStrategy, Inc. v.

Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (quoting Direx Israel, Ltd. v. Breakthrough

Med. Corp., 952 F.2d 802, 816 (4th Cir. 1991) (internal quotation marks omitted)). The

Court in Winter explained that in each case, courts "must balance the competing claims of

injury and must consider the effect on each party of the granting or withholding of the

requested relief." Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987). "In exercising

their sound discretion, courts of equity should pay particular regard for the public

consequences in employing the extraordinary remedy of injunction." Weinberger v.

Romero-Barcelo, 456 U.S. 305, 312 (1982); see also Railroad Comm'n of Tex. v. Pullman

Co., 312 U.S. 496, 500 (1941). Therefore, under Winter, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. at 20; see also Real Truth About Obama, 575 F.3d at 347 (noting that, post-Winter, a plaintiff must make a "clear showing" that he is likely to succeed on the merits and is likely to be irreparably harmed absent preliminary relief); Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth., 771 F.3d 201, 207 (4th Cir. 2014).

The Winter elements face a heightened injunctive standard for mandatory, rather than prohibitory, preliminary injunctions. See Pro-Concepts, LLC v. Resh, No. 2:12-CV-573, 2013 WL 5741542, at *4 (E.D. Va. Oct. 22, 2013) ("The demanding standard [for preliminary injunctions] becomes even more exacting when a plaintiff seeks a preliminary injunction *that mandates action*, as contrasted with the typical form of preliminary injunction that merely preserves the status quo pending trial.") (emphasis in original); see also Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015) (noting that a prohibitory injunction preserves the status quo pending trial, while a mandatory injunction mandates action by "order[ing] a responsible party to take action") (internal citations omitted). "Mandatory preliminary injunctions [generally] do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980). Mandatory preliminary injunctions must show that the "law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." Garcia, 786 F.3d at 740.

A preliminary injunction cannot be issued unless all four of these elements are met. See Winter, 555 U.S. at 20; see also League of Women Voters of N. Carolina v. N. Carolina, 769 F.3d 224, 236 (4th Cir. 2014), cert. denied, 135 S. Ct. 1735 (2015).

## III.

In its motion for preliminary injunction, RLI seeks access to Nexus' books, records and accounts, and those of its related entities, within seven days. District courts in Virginia have varied in their determinations of whether requiring a party to perform its contractual obligations is mandatory or prohibitory in nature. Compare Pro-Concepts, LLC v. Resh, No. 2:12CV573, 2013 WL 5741542, at *17 (E.D. Va. Oct. 22, 2013) ("Pro–Concepts claims that Resh's breach of his employment agreement supports a preliminary injunction requiring him to return Pro–Concepts' Risk Radar software immediately. Based on the fact that such injunction mandates action (i.e., the return of the software), the Court will apply the more exacting standard to Count VI."), with W. Indus.-N., LLC v. Lessard, No. 1:12CV177 JCC/TRJ, 2012 WL 966028, at *2 (E.D. Va. Mar. 21, 2012) ("With this principle in mind, the Court will examine the likelihood of success on the merits both as to Plaintiff's conversion claim, which is the basis for the mandatory injunctive sought, as well as its breach of contract claim, which is the basis for the prohibitive injunctive relief sought."). Although RLI argued that its sought relief was prohibitory, RLI has never accessed Nexus' books, records and accounts. A grant of broad access to Nexus' records would alter the factual status quo between the parties and thus is mandatory. However, the court finds the distinction between the standards for mandatory and prohibitory injunctions irrelevant in

this case. RLI has met its burden under either standard because RLI demonstrated that the law and facts clearly favor its position under the Winter test.[2]

## A.

The first hurdle that RLI must overcome in order to obtain a preliminary injunction is demonstrating a likelihood of success on the merits of its asserted claims. See Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011). "In general, where multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief." Western Indus.-North, LLC v. Lessard, No. 1:12cv177, 2012 WL 966028, at *2 (E.D. Va. Mar. 21, 2012) (citing McNeil–PPC v. Granutec, Inc., 919 F. Supp. 198, 201 (E.D.N.C.1995)). But, "in cases where the request for preliminary relief encompasses both an injunction to maintain the status quo and to provide mandatory relief, as here, the two requests must be viewed separately, with the request for mandatory relief

---

[2] Both parties relied on Fourth Circuit case law in support of the majority of their preliminary injunction arguments, primarily relying on Illinois law for the first Winter prong regarding breach of the Indemnity Agreement, and relying on a mix of Illinois, Virginia, and Fourth Circuit law for the irreparable harm analysis. The Indemnity Agreement has a choice of law provision: "Indemnitor(s) consent and agree that the laws of the State of Illinois shall apply to this Agreement." Ex. A to Compl., ECF No. 1–2, at 3. The Indemnity Agreement does not address whether RLI consents and agrees to Illinois as the choice of law.

The court notes that there is a question of whether state or federal law applies to preliminary injunctions in diversity actions. See, e.g., Puerto Rico Hosp. Supply, Inc. v. Boston Sci. Corp., 426 F.3d 503, 506 (1st Cir. 2005) ("Because preliminary relief is intended to deal with temporary conditions, the district's court decision to apply the federal law standard, given the ambiguous choice-of-law provision, was a reasonable one. The district court thus did not err in applying federal law."). At least one federal court in Virginia has applied Fourth Circuit law in setting the standard for preliminary injunctions and applied the state law of a contract's choice of law provision in assessing the likelihood of success and irreparable harm. See Atl. Diving Supply, Inc. v. Moses, No. 2:14CV380, 2014 WL 3783343, at *11 (E.D. Va. July 31, 2014). The parties have not addressed whether Illinois, Virginia, or federal law applies to the preliminary injunction analysis and its subparts, particularly the likelihood of success and irreparable harm analyses. Cf. Paws With A Cause, Inc. v. Crumpler, 73 F.3d 358 (4th Cir. 1996) ("[U]nder Virginia's choice-of-law rules, Virginia law governs procedure and remedy."); Jones v. R.S. Jones & Assocs., 431 S.E.2d 33, 34 (Va. 1993) (stating that Virginia's choice-of-law rules provide that the court is to apply the substantive law of the forum where the contract was entered, but that Virginia law applies to matters of procedure and remedy).

Given the parties' apparent agreement on the applicable law, and guided by the Eastern District of Virginia's approach in Atl. Diving Supply, Inc. v. Moses, the court applies Fourth Circuit law in setting the standard for the preliminary injunction and applies Illinois law—the apparently agreed-to choice of law per the Indemnity Agreement—to this motion.

being subjected to a more exacting standard of review." Id. (quoting Cornwell v. Sachs, 99 F. Supp. 2d 695, 703 (E.D.Va.2000)). In this case, RLI brings multiple claims, including injunctive relief, specific performance, and breach of indemnity agreement. See Compl., ECF No. 1. The focus of the preliminary injunction briefing and hearing was Nexus' alleged breach of the Indemnity Agreement by failing to provide access to its records for review.

Under Illinois law, which governs the Indemnification Agreement, RLI can state a claim for breach of contract by demonstrating: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff." Gonzalzles v. Am. Exp. Credit Corp., 315 Ill. App. 3d 199, 206, 733 N.E.2d 345, 351 (2000) (citing Gallagher Corp. v. Russ, 309 Ill. App. 3d 192, 199, 242 Ill. Dec. 326, 721 N.E.2d 605 (1999)). The first element is undisputed in this case, as both RLI and Nexus agree that they are bound by the Indemnity Agreement. Similarly, the parties do not dispute the second element—performance by RLI—as RLI has issued immigration bonds at Nexus' request.[3] The only disputes are whether Nexus' refusal to provide record access violates paragraph 3 of the Indemnity Agreement and whether RLI has been injured because of it.

**1.**

In determining whether Nexus has breached the Indemnity Agreement, the court turns first to the plain language of the contract provision in dispute. See Ins. Benefit Grp.,

---

[3] On the night of June 6, 2017, the day before the evidentiary hearing to set an appropriate bond amount, Nexus filed a motion for leave to file a counterclaim and amended answer alleging breach of contract based on the implied duty of good faith and fair dealing. ECF No. 43, at 18–19. Nexus contends that RLI's demands to inspect documents, the discharge of issued bonds, and collateral were not in good faith. The court makes no finding as to the motion for leave to amend, which recently completed briefing. The court notes that there is no dispute between the parties that RLI performed under the contract in issuing the immigration bonds.

Inc. v. Guarantee Tr. Life Ins. Co., 2017 IL App (1st) 162808, ¶ 38, 91 N.E.3d 950, 961, appeal denied, 95 N.E.3d 493 (Ill. 2018) ("The court will first look to the language of the contract itself to determine the parties' intent, and the contract must be construed as a whole, 'viewing each provision in light of the other provisions.'" (quoting Thompson v. Gordon, 241 Ill. 2d 428, 441, 349 Ill. Dec. 936, 948 N.E.2d 39 (2011))). "When the language of the contract is clear and unambiguous, the parties' intent must be determined solely from the language of the contract itself and be given its plain and ordinary meaning." Quality Transportation Servs., Inc. v. Mark Thompson Trucking, Inc., 2017 IL App (3d) 160761, ¶ 25, 90 N.E.3d 485, 490.

In relevant part,[4] the Indemnity Agreement states:

> Until Surety has been furnished with conclusive evidence of its discharge without loss from any Bonds, and until Surety has been otherwise fully indemnified as hereunder provided, Surety shall have the right of access to the books, records and accounts of the Indemnitor(s) for the purpose of examining and copying them. The Indemnitor(s) hereby authorize third parties, including but not limited to depositories of funds of the Indemnitor(s), to furnish to Surety any information requested by Surety in connection with any transaction. Surety may furnish any information, which it now has or may hereafter acquire concerning the Indemnitor(s), to other persons, firms or entities for the purpose of procuring co-suretyship or reinsurance or of advising such persons, firms, or entities as it may deem appropriate.

---

[4] RLI also claimed that Nexus breached the Indemnity Agreement's provision relating to the demand for collateral. See Indemnity Agreement, ECF No. 1–2, at 2. There is some dispute between the parties whether there has been a breach of the agreement's collateral provision. RLI claims that it demanded collateral in March 2017, and Nexus claims to have provided $200,000 in collateral and later offered to provide further collateral, which RLI allegedly refused to accept. RLI notified the court at the June 7 hearing that it did not seek a demand for collateral in its preliminary injunction motion, but that it may return to the court after reviewing Nexus' records. As the court finds that a preliminary injunction is merited based on the inspection of records, and RLI does not demand collateral with this motion, the court does not address the alleged breach regarding collateral at this stage of the litigation.

<u>See</u> Indemnity Agreement, ¶ 3(c). The parties disagree as to the meaning of "books, records and accounts of the Indemnitor(s)." RLI argues that "books, records and accounts" plainly means all of Nexus' books, records and accounts, without exception. Nexus counters that the phrase means only Nexus' financial records and does not extend to detailed personal records about bond holders. Based on this theory, counsel for Nexus agreed at the hearing that RLI is entitled to some financial records, including balance sheets, profit and loss statements, and tax returns. As of April 27, the first hearing on this motion, Nexus had not provided financial records to RLI despite this acknowledgement. Nexus provided at least some financial documents in its May 17, 2018 production to RLI. The parties continue to disagree regarding the sufficiency of this production.

Nexus' admission that it is obligated and has failed to provide financial records that it believed were subject to the Indemnity Agreement is evidence of a breach in and of itself. Moreover, the court does not find Nexus' argument persuasive. The plain language of the agreement places no limitation on RLI's access to Nexus' records. The meaning of "books, records and accounts" is not so plainly limited in the Indemnity Agreement or by a common knowledge of these terms. For example, Black's Law Dictionary defines these terms broadly beyond financial documents. "Corporate books", which is comparable to "books" given that Nexus is a corporation, is defined as "[w]ritten records of a corporation's activities and business transactions." Corporate Books, Black's Law Dictionary (10th ed. 2014). "Business record," which again appears appropriate given that Nexus is a business, is defined as "[a] report, memorandum, or other record made usu[ally] in the ordinary course of business." Business Record, Black's Law Dictionary (10th ed. 2014). In reviewing a Northern District

of Illinois action based on the Federal Trade Commission Act, the Seventh Circuit explained, "'books of accounts' and 'records' have reference to serial, continuous, and more permanent memorials of a concern's business and affairs, chronologically and systematically kept and arranged." Cudahy Packing Co. v. United States, 15 F.2d 133, 136 (7th Cir. 1926). The understanding of these terms by Black's Dictionary and the Seventh Circuit extend beyond financial documents.

Nexus is a sophisticated corporate entity and had the capacity to understand and negotiate the terms of the contract it entered into with RLI. Nexus could have bargained for a narrower set of documents available to RLI for access, simply by modifying "books, records and accounts" with the term "financial." Yet Nexus did not do so, and during the April 27 hearing before this court, struggled to suggest any basis to narrow the scope of the corporate documents subject to the right of access.

While the law and facts plainly establish RLI's contractual right of access to Nexus' books, records and accounts, the extension of that right to Nexus-related entities is less clear. While the Indemnity Agreement creates binding obligations between RLI and Nexus, no mention is made of affiliated entities, nor did RLI present evidence to support its claim that Nexus and its related entities are effectively the same business for the purposes of this agreement. At this preliminary stage, therefore, any injunction must be limited to Nexus alone.

## 2.

RLI's alleged breach of contract claim lastly requires demonstration of injury for determining its likelihood of success on the merits. See Gonzalzles, 315 Ill. App. 3d at 206,

733 N.E.2d at 351. RLI points to two primary sources of injury caused by Nexus' failure to allow inspection of its records. First, RLI claims that the denial of its bargained-for contractual right to inspect books and records renders it incapable of evaluating its exposure on the two thousand outstanding bonds and protect itself against the risk of default. Second, RLI cites increased concern over Nexus' performance, including an increase in bond claims paid by RLI, investigations of Nexus by state authorities, and other concerns over its financial condition.

RLI cites a host of cases, in Illinois and other jurisdictions, where courts have found that the denial of interim contractual rights—including the right to inspect records—amount to an injury and therefore merit equitable relief to enforce the contractual right. See Travelers Cas. & Sur. Co. of Am. v. Design Build Eng'rs & Contractors, Corp., 2014 WL 7274803, at *8 (M.D. Fla. Dec. 22, 2014); XL Specialty Ins. Co. v. Truland, No. 1:14CV1058 JCC/JFA, 2014 WL 4230388, at *4 (E.D. Va. Aug. 21, 2014); Ohio Cas. Ins. Co. v. L.H. Eng'r Co., Inc., 2014 WL 12569351, at *2–3 (C.D. Cal. Jan. 2, 2014); Hanover Ins. Grp. v. Singles Roofing Co., Inc., 2012 WL 2368328, at *12–14 (N.D. Ill. June 21, 2012); Developers Sur. & Indem. Co. v. Elec. Serv. & Repair, Inc., 2009 WL 3831437, at *1 (S.D. Fla. Nov. 16, 2009). In Hanover Ins. Grp. v. Singles Roofing Co., Inc., 2012 WL 2368328 (N.D. Ill. June 21, 2012), the district court for the Northern District of Illinois allowed access to books and records because absent the ability to inspect, among other requested relief, the plaintiff could lose its claim to assets as the defendant had previously filed bankruptcy multiple times. Id. at *15. Persuasively, the district court for the Southern District of Florida enjoined a defendant to allow access rights to documents because otherwise the plaintiff would "suffer irreparable

damage and loss because of its likely inability to be secured in advance against claims and losses, and Defendants be left free to sell, transfer, dispose of, lien, secure or otherwise divert or conceal their assets from being used to discharge their obligations to exonerate and indemnify [the plaintiff]." Developers Sur. & Indem. Co., 2009 WL 3831437, at *2.

Nexus attempts to distinguish these cases, arguing that the cases involved only financial records or that the plaintiffs in those actions were able to show that debts were due and the principal, who had solvency issues, refused to pay them. These distinctions are mere window dressing. First, for the past year, RLI has doggedly pursued examination of Nexus' financial records. Prior to the filing of this lawsuit, Nexus refused access. Although Nexus has now provided some financial records since the first preliminary injunction hearing, Nexus still has not given RLI access to its QuickBooks, has not set up a time to allow RLI's forensic accountant to examine its books and records, and has not claimed—at least in any court filings—to have provided all of the financial records that even it believes RLI is obligated to receive per the Indemnity Agreement. Indeed, at the June 7 hearing, the court had an opportunity to view the sort of documents produced by Nexus to date. RLI's forensic accountant testified as to the sparse nature of the few financial records produced. The sanitized documents produced to date do not provide RLI with any meaningful view of Nexus' financial condition or RLI's potential exposure on these bonds. While Nexus has expressed willingness to meets its contractual obligations to allow inspection of books, records and accounts, it has not done so to date.

Second, RLI has raised valid concerns regarding Nexus' ability to satisfy the bond obligation. RLI presented evidence that it recently paid over $80,000, including penalties, for

eight outstanding bond claims. RLI states that it made this payment because Nexus did not provide sufficient paperwork to RLI to verify that payment had been submitted to the government. Nexus' witness, Schneider, stated that he believes these eight claims had been paid, but he could not explain the discrepancy because it was not his department. In addition to bond claims paid by RLI, RLI learned that Nexus had entered into a repayment schedule for unrelated bonds, requiring Nexus to pay the government $30,000 to $35,000 per day in certified funds for another surety's bonds. The repayment plan, including the requirement of certified funds, accentuated RLI's concerns. These concerns about Nexus' solvency are heightened by the reports of multiple ongoing investigations of Nexus by state attorneys general and by the sketchy nature of the financial information provided to RLI and reviewed by RLI's forensic accountant. The evidence presented by RLI of its own past due bond claims, including its payment of claims and penalties, and the terms of repayment required for other sureties' bonds, demonstrates that the harm is not "entirely theoretical" as Nexus claims. In short, without the ability to examine Nexus' books, RLI loses the ability to fulfill its obligations as surety under the bonds, to assess the level of financial risk it faces on the bonds issued to Nexus, and take steps to protect itself against such risk.

Therefore, RLI has demonstrated that the law and facts clearly favor its position that (1) Nexus and RLI entered into a valid contract, (2) RLI has performed its obligations under the contract, (3) Nexus breached the contract by providing access to no documents prior to the preliminary injunction hearing despite acknowledging such an obligation to at least some financial documents, and (4) RLI has been injured by not receiving the benefit of its bargained-for access rights.

## B.

Having found a likelihood that RLI will succeed on its claim for breach of contract, and that the law and facts clearly favor RLI's position, the court will evaluate the remaining preliminary injunction factors as to those claims. In addition to the first Winter element, RLI must also "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." Real Truth About Obama, 575 F.3d at 347. The "key word . . . is irreparable." Va. Chapter, Associated Gen. Contractors, Inc. v. Kreps, 444 F. Supp. 1167, 1182 (W.D. Va. 1978). "A mere possibility of irreparable harm is not enough." Pro-Concepts, LLC v. Resh, No. 2:12CV573, 2013 WL 5741542, at *21 (E.D. Va. Oct. 22, 2013) (internal citations omitted). Preliminary injunctions are meant to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003) (citations omitted), abrogation on other grounds recognized in Bethesda Softworks, LLC v. Interplay Entm't Corp., No. 11–1860, 2011 WL 5084587, at *2 (4th Cir. Oct. 26, 2011). "[G]enerally 'irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'" Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994), abrogated on other grounds by Winter, 555 U.S 7 (2008).

The Court finds that RLI satisfies the "irreparable harm" prong of the preliminary injunction analysis through its loss of bargained-for contractual right to inspect books, records and accounts. The Hanover court, which applied Illinois law, held that subsequent monetary damages are an inadequate remedy for the denial of the interim contractual right to

access rights to books and records, at least where there is a risk of insolvency. See Hanover Ins. Grp. v. Singles Roofing Co., Inc., 2012 WL 2368328, at *14 (N.D. Ill. June 21, 2012). The court explained, "[a]s access to the books and records and the granting of liens both allow Hanover to protect itself from future liability, there would not be an adequate remedy for Hanover if these two provisions were held to be remedied only by subsequent monetary damages, rather than specific performance." Id. The right to access' relationship to the right to protect from future liability is a recurring theme in other federal cases that have ordered access. See Travelers Cas. & Sur. Co. of Am., 2014 WL 7274803, at *8 (finding plaintiff met burden regarding access to financial books and records where defendant failed to post collateral or produce or produce financial statements as required by the indemnification agreement); Developers Sur. & Indem. Co., 2009 WL 3831437, at *1 (ordering production of records for inspection based on evidence of irreparable harm from plaintiff's likely inability to secure against its claims in advance and in recognition that "use of injunctive relief is appropriate to protect the surety's contractual, common-law and equitable rights of exoneration and *quia timet*"). In Ohio Cas. Ins. Co. v. L.H. Eng'g Co., No. SACV1301249CJCANX, 2014 WL 12569351, at *2 (C.D. Cal. Jan. 2, 2014), the district court for the Central District of California clearly explained why loss of a surety's interim rights can be irreparable:

> Ohio Casualty has met its burden of showing that its right to inspect Defendants' books and records will likely be irreparably injured without the requested relief. The provision of the Indemnity Agreement granting Ohio Casualty access to Defendants' books and records is clearly intended to enable Ohio Casualty to fulfill its obligations as surety under the completion and payment bonds for which it receives claims. If Ohio Casualty were required to wait until completion of trial to

access Defendants' books and records, Ohio Casualty would have to respond to the claims without information to which it is contractually entitled.

Nexus has not identified any cases denying a surety the interim right to access books and records. Neither party has pointed to Fourth Circuit law or Virginia law that address preliminary injunctive relief to protect such interim rights, and the court has not found cases on point.[5] However, this trend of courts to preserve a surety's interim contractual rights also is consistent with the law of suretyship. In <u>Travelers Cas. & Sur. Co. v. Ockerlund</u>, No. 04 C 3963, 2004 WL 1794915 (N.D. Ill. Aug. 6, 2004), the district court for the Northern District of Illinois noted, "under the law of suretyship, even if a surety's loss is monetary and only temporary, that it must assume a primary obligor's obligation at all is a harm for which there is no adequate remedy at law." <u>Id.</u> at *5 (requiring the deposit of collateral to a surety pursuant to an indemnity agreement to protect the right to indemnification for losses incurred as a result of issuing bonds).

The persuasive case law from several federal jurisdictions, particularly the <u>Hanover</u> decision in the Northern District of Illinois, convinces the court that a loss of right to review

---

[5] In an action involving an indemnitor's failure to pledge collateral pursuant to an indemnification agreement, the district court for the Eastern District of Virginia entered a temporary restraining order. <u>See</u> XL Specialty Ins. Co. v. Truland, No. 1:14CV1058 JCC/JFA, 2014 WL 4230388, at *5 (E.D. Va. Aug. 21, 2014). Although this action did not involve a surety's right to access records, the court's reasoning in support of a finding of irreparable harm is analogous:

> Plaintiffs are not receiving the benefit of this bargain [of defendant agreeing to pledge collateral], as they are currently facing substantial, uncollateralized exposure from over sixty claims against the bonds. Collateral security is meant to protect against this very risk. Absent enforcement of the collateral security obligation, Plaintiffs would be in the same position as any other unsecured creditor of the Defendants. Ex post money damages are inadequate to protect Plaintiffs' expectancy, as the very essence of collateral is to safeguard the surety from losses before it is required to discharge any claims.

<u>Id.</u> at *4 (internal citations omitted). As part of the temporary restraining order, the court ordered an accounting of the defendant's assets because, without the accountings, "Plaintiffs have no idea whether and what extent Defendants can satisfy their indemnity obligation or whether assets defendant pledged to hold in trust for the Plaintiffs have been transferred." <u>Id.</u> RLI faces similar uncertainties here.

books, records and accounts connotes irreparable harm depriving RLI of the bargained-for ability to fulfill its obligations under the surety bonds, assess its risk, and take steps to protect itself against future liability. RLI's Sussman stated at the April 27 hearing that RLI needed to review Nexus' records in order to determine whether it is sufficiently collateralized to protect RLI from liability. Forensic accountant Fascia stated at the June 7 hearing that RLI has not received sufficient information to date for him to render an opinion about its liability, but expressed concerns about the vague financial information provided. While there is a dispute about whether Nexus met its collateral obligations set forth in the Indemnity Agreement, it is clear to the court that RLI fairly is concerned about Nexus' solvency. RLI's payment of claims and penalties on eight bonds, the increasing trend of notices of late payments, the offer of a repayment plan similar to other sureties that require use of certified checks, and the ongoing investigations by attorneys general validate this concern. Therefore, as money damages alone could deprive RLI of the prejudgment relief to which it is contractually entitled, RLI has clearly demonstrated the risk of irreparable harm.

RLI also claims loss of goodwill and fears its relationship with the Treasury will be damaged by Nexus' continued delinquencies in satisfying the bonds. RLI cites to Fourth Circuit case law supporting damages for a loss of goodwill, but does not cite Illinois law. It is unclear whether damages for loss of goodwill exist under Illinois law. Cf. Dacor Corp. v. Sierra Precision, 753 F. Supp. 731, 733 (N.D. Ill. 1991) ("Due to the speculative nature of such a damage request, loss of goodwill is not compensable in a contract action."); Chrysler Corp. v. E. Shaviz & Sons, 536 F.2d 743, 746 (7th Cir. 1976) (denying recovery for loss of profits resulting from loss of goodwill under Pennsylvania law, and stating that Illinois

courts would hold same way). In any event, RLI has not demonstrated at this stage of the litigation that it faces irreparable reputational damage. While the court is mindful of RLI's argument that late payments to the government and subsequent delinquencies reported to the Treasury could harm its reputation, its claims of reputational harm are too speculative at this stage to support a finding of irreparable harm.[6]

The existence of loss of goodwill damages is not necessary at this preliminary injunction stage given RLI's showing of the irreparable harm of its lost interim rights to review books, records and accounts. RLI clearly has demonstrated irreparable harm through its inability to service the bonds and protect itself against the outstanding bond liability due to Nexus' failure to provide access to its records.

## C.

Next, the court must balance the equities to assess the harms facing both parties. In this case, the court finds that the balance of equities weighs in favor of RLI. As addressed above, RLI has shown the law and facts clearly favor its position for its breach of contract claim. Further, RLI has demonstrated irreparable harm through its loss of interim contractual rights to review books, records and accounts. While the court found reputational harm to be too speculative at this stage to constitute irreparable injury, RLI does face the risk of injury to its business relationship with the government due to its delinquent payments for bond claims.

---

[6] The loss of goodwill or industry reputation "is a well-recognized basis for finding irreparable harm" in the Fourth Circuit. See MicroAire Surgical Instruments, LLC v. Arthrex, Inc., 726 F. Supp. 2d 604, 635 (W.D. Va. 2010). However, courts require specific evidence concerning the actual or potential loss of business or goodwill before finding irreparable injury. See, e.g., Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship, 2009 WL 111603, at *2–5 (E.D. Va. Jan. 14, 2009). A party does not have to establish "specific losses," but "sufficient evidence for the Court to find that it is likely that such losses have occurred or will occur absent preliminary injunctive relief." Pro-Concepts, LLC, 2013 WL 5741542, at *21. To date, RLI has not met its burden under this standard.

Nexus argues that ordering it to provide record access to RLI could severely harm its business because its immigration clients rely on Nexus to maintain their information confidentially. Courts have been reluctant to grant injunctive relief if the defendant's business could not survive the resulting costs. See Wilson-Cook Med., Inc. v. Wiltek Med., Inc., No. 90-2911, 1991 WL 27150, at *2 (4th Cir. Mar. 6, 1991) (per curiam) (affirming denial of an injunction where preliminary relief would have a "death penalty effect" on defendant); F.T.C. v. Verity Int'l, Ltd., 124 F. Supp. 2d 193, 204 (S.D.N.Y. 2000) (noting that courts should be reluctant "to impose what might be a commercial death sentence at an interlocutory stage if there is some reasonable alternative"). Yet, the court concludes that Nexus' fears of irreparable harm from providing information pursuant to a contract are likewise speculative. In any event, the court can protect against the disclosure of Nexus' information through a protective order. Nor has Nexus established that the costs of providing RLI access to its records are prohibitive.

The court recognizes that several parties have moved to intervene as defendants in this action and have not had an opportunity for argument as issues surround their legal representation. To protect their potential interests in this action, the court will limit RLI's access to books, records and accounts to those bearing on Nexus' financial condition and ability to satisfy its obligations under the Indemnity Agreement at this preliminary stage. RLI has not provided sufficient reasons to support its alleged need for personal information about bond holders—such as their current locations, employment status, or criminal charges—in order to protect against irreparable harm, mitigates its losses, or protect its reputation. The risk of disclosure of this sensitive information is great to the parties seeking

to intervene as it could jeopardize their ability to remain in the United States. Based on Sussman's testimony at the April 27 hearing, RLI primarily needs access to financial records to allow a forensic consultant to assess whether RLI is able to meet its obligations under the Indemnity Agreement, including the provision of adequate collateral. Therefore, although this court will require Nexus to produce or provide access to documents, it will limit the scope of non-financial documents and subject all produced or reviewed documents to a protective order.

As such, after comparing the loss of interim contractual rights and reputational harm faced by RLI with Nexus' costs of production and concerns of confidentiality, and considering the other legitimate interests at stake including those of the parties seeking to intervene, the court finds that the balance of equities warrants an injunction.

## D.

Finally, RLI must show that the public interest favors an injunction. The public is best served when courts enforce provisions of valid contracts. See Smithy Braedon Co. v. Hadid, 825 F.2d 787, 790 (4th Cir.1987) ("[T]he most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear."); Superior Performers, Inc. v. Meaike, No. 1:13-CV-1149, 2014 WL 1412434, at *16 (M.D.N.C. Apr. 11, 2014) ("[T]he public interest is served by ensuring that valid contracts are enforced."); JTH Tax, Inc. v. Geraci, No. 2:14-CV-236, 2014 WL 4955373, at *8 (E.D. Va. Oct. 2, 2014) ("[T]he public interest will be served by requiring parties to value the sanctity of contract."); UBS Painwebber, Inc. v. Aiken, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002) ("The public has an interest in ensuring that contracts are enforced.").

Some courts have viewed enforcement of contract provisions through a preliminary injunction as neutral in regards to the public interest. See, e.g., Smith v. Newport News Shipbuilding Health Plan, Inc., 148 F. Supp. 2d 637, 653, 2001 WL 694518 (E.D. Va. 2001). However, Nexus admits its contractual obligation to provide at least some financial records, yet has unilaterally decided to not grant access until the court's involvement. Such a flagrant rejection of its obligations for more than a year cannot be considered neutral or a benefit to the public.

Nexus counters that the public interest is not served by a preliminary injunction because RLI seeks detailed information about the bond holders. Protection of confidential personal information certainly is in the public interest. Cf. Home Funding Grp., LLC v. Myers, No. 1:06CV1400 JCC, 2006 WL 6847953, at *3 (E.D. Va. Dec. 14, 2006) ("[T]he public interest is served by allowing firms to protect trade secrets and confidential information, and by providing a forum to seek temporary injunctive relief to enjoin any further breach or disclosure, potentially causing irreparable harm and destroying incentives to innovate."). However, this information is being shared with a company that Nexus elected to engage in business with and contracted with to provide its "books, records and accounts." It is disingenuous to rely on the public interest in not releasing information despite entering into a contract to do just that. This court can protect the public's interest by limiting the amount of information disclosed and instituting a protective order. The public is not served by barring access to information bargained for by contract and protected by confidentiality per court order. In light of this precedent, the court finds that RLI has met its burden to show that a preliminary injunction would favor the public interest.

RLI has demonstrated all four <u>Winter</u> prongs in support of a preliminary injunction and the court shall order Nexus to provide access to any and all of its books, records and accounts dating from the onset of Nexus' and RLI's business relationship on January 20, 2016 bearing on Nexus' financial condition and ability to satisfy its obligations under the Indemnity Agreement. Nexus must also provide access to the bonds themselves, along with any and all documents relating to the status of any RLI bonds, including documents relating to breach, cancelation, forfeiture, or penalties. Given RLI's concerns that Nexus has changed or will change how their records are maintained, the court orders Nexus to provide access to the books, records and accounts as they were maintained on the date of filing of the motion for preliminary injunction—April 12, 2018.

## IV.

Pursuant to Federal Rule of Civil Procedure 65(c), a district court must fix a bond whenever it grants a preliminary injunction "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." "The purpose of the bond is to provide security for any damages resulting from an improvidently granted injunction." <u>Rauch Indus., Inc. v. Radko</u>, No. 3:07-CV-197C, 2007 WL 3124647, at *8 (W.D.N.C. Oct. 25, 2007). "The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party." <u>Hoechst Diafoil Co. v. Nan Ya Plastics Corp.</u>, 174 F.3d 411, 421 n.3 (4th Cir. 1999). The district court has discretion in fixing the amount for or waiving the security bond. <u>Id.</u>; see also <u>Pashby v. Delia</u>, 709 F.3d 307, 331–32 (4th Cir. 2013). However, a court must be mindful that "an understated bond could cause irreparable harm on the ground that 'the damages for an

erroneous preliminary injunction cannot exceed the amount of the bond.'" Lab. Corp. of Am. Holdings v. Kearns, 84 F. Supp. 3d 447, 466 (M.D.N.C. 2015) (quoting Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000)). Therefore, district judges are "guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for the harm it suffers as a result of an improvidently issued injunction." Hoechst, 174 F.3d at 423 n.3.

At the April 27 hearing, the court asked the parties for argument and evidence regarding an appropriate amount of bond pursuant to Federal Rule of Civil Procedure 65(c). Nexus requested a bond of at least $29 million, which is the amount RLI would have to pay if all of its bonds defaulted per Sussman's testimony. RLI argued that $29 million is unreasonable, particularly given that the purpose of a bond is if the court later finds Nexus did not have a contractual obligation to allow inspection of its books, records and accounts. Without evidence and little argument from either party, and after the parties remained unable to resolve their dispute following court-ordered mediation, the court scheduled an evidentiary hearing for June 7 to set the amount of an appropriate bond. Counsel for RLI argued for a nominal bond because the Indemnity Agreement requires Nexus to provide the books, records and accounts, and because a protective order can protect against their confidentiality concerns. Nexus argued that the bond should be set to the amount it takes to replace RLI as a surety, in the event that Nexus has to replace RLI because of its demand to inspect documents. Neither party put on any evidence as to the amount of bond, including the cost to Nexus to provide RLI access to inspect its books, records and accounts.

The court finds that the costs and damages to Nexus are limited to the costs of complying with producing or providing access to its books, records and accounts to RLI. Nexus' request for a $29 million bond is not based on any evidence and is excessive given that Nexus' only detriment is compliance with the contract it entered into with RLI. Such compliance is not monetarily comparable to RLI's risk with the bonds. The court does not accept Nexus' argument that it may need to obtain a new surety, as Nexus presented no evidence of this possibility at the hearings and RLI has not indicated that it intended to pull out of these bonds. Moreover, a lower bond amount is appropriate given that the law and facts clearly favor RLI's position. Both parties recognize that Paragraph 3 allows for at least some financial documents to be produced. Despite this acknowledgement, and a year's worth of requests, Nexus stonewalled RLI, requiring it to file suit.

Given that the cost to provide access to documents for production is not likely to be great, or at least no evidence of such a cost has been presented, and Nexus is highly unlikely to face harm given that it is contractually obligated to provide such access, the court shall set a nominal amount for the bond. The Fourth Circuit and courts in this district have recognized that a nominal bond suffices where the risk of harm is remote. See Hoechst, 174 F.3d at 421 n.3 (approving district court's fixing bond amount at zero in the absence of evidence regarding likelihood of harm); see also Candle Factory, Inc. v. Trade Assocs. Grp., Ltd., 23 F. App'x 134, 139 (4th Cir. 2001) ("[T]he district court's decision to fix a bond in the sum of $500 was an appropriate exercise of its discretion, and its finding that TAG would suffer little harm if enjoined from further selling its infringing seashell-shaped candles is not clearly erroneous."); S.E.C. v. Dowdell, No. CIV.A. 3:01CV00116, 2002 WL

31357059, at *4 (W.D. Va. Oct. 11, 2002) ("Where the court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may set a nominal bond. Accordingly, the Receiver shall post a bond as security in the amount of $100.00." (internal citation omitted)); cf. Dist. 17, United Mine Workers of Am. v. A & M Trucking, Inc., 991 F.2d 108, 111 (4th Cir. 1993) (noting court's discretion to set a bond amount of zero). Similarly, courts in this district have set bonds closer to a plaintiff's proposed amount where a defendant has not presented specific evidence of damages and proposes a bond amount not based on its potential damages from the injunction. See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc., 904 F. Supp. 2d 530, 536–37 (D. Md. 2012), aff'd, 722 F.3d 591 (4th Cir. 2013) (setting bond amount close to plaintiff's proposal where defendant's "calculations and proposed security amount are not based on enjoining [defendant's] use of [plaintiff's] copyrighted photographs", defendant started to comply by removing photos, and defendant did "not presented any specific evidence of damages sustained due to the removal"). Accordingly, as Nexus is only required to comply with its contractual obligation to allow inspection of its records and has set forth no evidence of the costs of compliance, the court finds that a $10,000 bond is a fair and appropriate security amount given the issues presented in this case and the potential costs of document production. See Hoechst, 174 F.3d at 421 (explaining that a security should cover the potential incidental and consequential costs and either the losses from the defendant being restrained or the adversary being unjustly enriched).[7]

---

[7] At the end of the April 27 and June 7 hearings, Nexus sought a stay of the injunction to allow for an interlocutory appeal to the Fourth Circuit. Neither party substantively argued or presented evidence in support of a stay at the hearings. As such, the court is unwilling to enter a stay at this time. If Nexus desires a stay, the court will review motions submitted pursuant to the Federal Rules of Civil Procedure and its local rules.

# V.

During the June 7 hearing, the court notified the party of its consideration of appointing a special master, and provided them the opportunity to consent to a special master. The parties filed notices of consent to a special master on June 11. ECF Nos. 48–49. Nexus consented to an accountant reviewing its books, records and accounts every other Wednesday, and agreed to facilitate review of documents from other Nexus-related entities such as Libre by Nexus. The notice sought redaction of attorney and other legal information, required such access to be bound by confidentiality, and required RLI not to use such information to arrest, deport, cause the arrest, or cause the deportation of any bonded individual. ECF No. 48, at 2–4. RLI responded to Nexus' notice and objected to the redaction of financial transactions with attorneys and law firms and Nexus' "attempts to reduce its broad contractual obligations." ECF No. 49, at 3. Despite these objections, RLI consented to a special master subject to the following conditions: (1) the appointment of a special master with expertise in forensic accounting and experience in surety bonds and claims; (2) the special master's ability to proceed diligently and have authorization to examine Nexus' documents, including authorization to investigate, determine, and offer recommendations about the scope of Nexus' books compared to its related entities; (3) the special master's permission to have ex parte communications with the court and submit weekly reports to both the court and the parties; and (4) Nexus compensating the special master. ECF No. 49, at 1–2.

The court hoped that a special master could be appointed in lieu of the entry of a preliminary injunction, but the material terms of the parties' consent varied sufficiently—

specifically RLI's cost-shifting provision and minimum requirements for the special

master—that the court could not view the notices as meeting Federal Rule of Civil

Procedure 53(a)(1)(A)'s allowance of appointment where the special master "perform[s]

duties consented to by the parties." However, the court finds it prudent to appoint a special

master for compliance with the preliminary injunction. The parties largely agreed on the

need for a special master, and given the severe disagreements between the parties to date, the

court finds that Federal Rule of Civil Procedure 53(a)(1)(C) is met because a special master

could "address pretrial and posttrial matters that cannot be effectively and timely addressed

by an available district judge or magistrate judge of the district." The court expects

significant disputes regarding RLI's right to inspect documents from Nexus and/or its

related entities, which a special master, who regularly would be involved in this dispute,

would be in the best position to address expeditiously.

Therefore, pursuant to Federal Rule of Civil Procedure 53, the court appoints

Gregory T. St. Ours, Esq. of Wharton Aldhizer & Weaver, PLC as a special master in this

case to advise and make recommendations to the court and the parties to ensure compliance

with the preliminary injunctive relief ordered by the court and mediate disputes within the

scope of the preliminary injunction order.[8] The special master's duties shall not encompass

making findings of fact or conclusions of law, nor recommendations on motions in this

matter, unless the court modifies such duties following consultation with the parties.

---

[8] RLI recommended the appointment of FTI Consulting or The Vertex Companies to serve as special master. The
dispute about access to Nexus' books, records and accounts sounds in discovery. Mr. St. Ours has extensive experience
in civil litigation in this district, including discovery disputes involving financial documentation. Mr. St. Ours is more
than qualified to serve as special master and is based locally to expeditiously resolve this dispute.

To facilitate making the case file available to the special master, the Court authorizes that he be provided, without charge, access through the Public Access to Court Electronic Records System (PACER). The PACER Service Center is directed to provide the special master with the requisite account and password without charge. Such access is granted for the special master's use solely in this case. The special master shall be compensated at his standard hourly rate, plus reasonable expenses. The special master's fees and reasonable expenses relating to his duties as special master shall be allocated evenly between RLI and Nexus.[9]

## VI.

Having clearly met all the requirements for a preliminary injunction on some portion of its claims for relief, RLI's motion for preliminary injunction, ECF No. 4, is **GRANTED in part** and **DENIED in part**. As set forth in the accompanying Order, Nexus is **PRELIMINARILY ENJOINED** during the pendency of this case, and is hereby **ORDERED** as follows:

1. Nexus, within twenty (20) days from the date RLI posts sufficient bond, shall produce to RLI and/or provide RLI with full and unfettered access to the following books, records and accounts of Nexus Services, Inc. as they were maintained on April 12, 2018:

---

[9] In its letter consenting to the special master, RLI argues that Nexus alone should bear the cost of the special master's services pursuant to the Indemnity Agreement. At this stage of the litigation, the court declines to determine who shall bear the costs per the agreement.

    a. Any and all books, records and accounts of Nexus Services, Inc. for the period of January 20, 2016 to the present, bearing on its financial condition and ability to satisfy its obligations under the Indemnity Agreement;

    b. The Bonds themselves (or copies thereof), including Bond numbers IMM100001 through IMM102497;

    c. Any and all documents relating to the status of any RLI bonds, including documents relating to breach, cancelation, forfeiture, or penalties.

2. To the extent any of the above documents include information of individuals other than the bonded principal, such information must be redacted.

3. Only RLI, its agents, or its consultants shall review the documents produced pursuant to this preliminary injunction order. RLI shall not share these documents or the information learned from these documents to any other parties, including government agencies or immigration courts, without permission of Nexus or this court.

4. RLI shall not use the documents or the information learned from these documents to arrest or cause the arrest of any bond holders or persons identified in the documents.

5. This preliminary injunction does not apply to other Nexus-related entities.

6. RLI shall post a bond in the amount of ten thousand dollars ($10,000) pursuant to Federal Rule of Civil Procedure 65(c).

7. This preliminary injunction shall issue and take effect immediately upon RLI posting a sufficient bond with the Clerk of Court.

8. Gregory T. St. Ours, Esq. of Wharton Aldhizer & Weaver, PLC is appointed as a special master in this case pursuant to Rule 53 of the Federal Rules of Civil Procedure, to advise and make recommendations to the court and the parties to ensure compliance with the preliminary injunctive relief ordered by the court and mediate disputes within the scope of the preliminary injunction order.

9. Mr. St. Ours' duties shall not encompass making findings of fact or conclusions of law, nor recommendations on motions in this matter, unless the court modifies such duties following consultation with the parties.

10. Mr. St. Ours shall file biweekly reports on the docket detailing his findings and any enforcement recommendations regarding compliance with the preliminary injunction. The parties may file objections to these findings and recommendations within seven (7) days, which will be subject to de novo review.

11. To facilitate making the case file available to Mr. St. Ours, the court authorizes that he be provided, without charge, access through the Public Access to Court Electronic Records System (PACER). The PACER Service Center is directed to provide the special master with the requisite account and password without charge. Such access is granted for Mr. St. Ours' use solely in this case.

12. Mr. St. Ours shall be compensated at his standard hourly rate, plus reasonable expenses.

13. Mr. St. Ours' fees and reasonable expenses relating to his duties as special master shall be allocated evenly between RLI and Nexus.

An appropriate Order will be entered this day.

Entered: 07-02-2018

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge