# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

RLI INSURANCE COMPANY,

        Plaintiff/Counterclaim Defendant,

v.

NEXUS SERVICES, INC., et al.,

        Defendants /Counterclaim Plaintiffs.

Case No.:
5:18-cv-66-MFU-JCH

**DEFENDANTS' EXPERT REPORT PURSUANT TO FED. R. CIV. P. 26**

I.    **INTRODUCTION AND SCOPE**

In connection with the referenced matter, I was asked to provide expert opinions about issues relating to the appropriate industry approach to the construction of the indemnity agreement ("CSGIA") that was part of the surety bond program between the parties. In particular, I was asked to render opinions about the provisions of the contracts, which included the CSGIA along with a Collateral Security Agreement ("Collateral Agreement") which was executed by the parties contemporaneously therewith. The specific questions asked were:

(1) What are the collateral security rights and obligations of the parties under Section 2.a.(ii) of the CSGIA?

(2) What are the collateral security rights and obligations of the parties under Section 3.d of the CSGIA?

This Report sets forth my opinions on these topics. I base my opinion upon the reasoning set forth below and my nearly 13 years of experience litigating construction and meaning of insurance products including surety bonds, my nearly 13 years of experience in house managing

and advising on insurance and surety programs, and my research, writing, and education on these topics.

## II.    FACTS AND DATA PROVIDED AND CONSIDERED IN FORMING MY EXPERT OPINIONS

In developing the opinions and conclusions set forth in this Report, I have reviewed and considered the following materials:

- Commercial Surety General Indemnity Agreement dated January 20, 2016, ECF 231-1
- Collateral Agreement and Receipt dated January 20, 2016, ECF 138-3
- Transcript of 30(b)(6) Deposition of Donald J. Driscoll (RLI) from November 26, 2018
- Rough Transcript of Deposition of Greg B. Chilson (RLI) from February 25, 2020
- Emails between Dave Sandoz and Mike Donovan dated June 9, 2016
- Expert Report of Lynn M. Schubert dated February 18, 2020
- Declaration of David Sandoz dated February 24, 2020
- Letter from RLI to Michael Donovan dated March 13, 2017, ECF 13-7 (also 231-5)
- RLI Agreement of Indemnity dated May 7, 2014
- RLI's Amended Complaint dated May 1, 2019, ECF 231
- Email from Ira Sussman to Mike Donovan dated March 6, 2017, ECF 231-4
- Immigration Bond Form, ECF 231-2
- Letter from RLI to Michael Donovan dated March 3, 2017, ECF 231-3
- Letter from Katsantonis to Peters dated June 1, 2017, ECF 231-6
- Letter from Harris to Peters dated June 19, 2019, ECF 231-7
- Letter from Katsantonis to Peters dated March 19, 2018, ECF 231-8
- Email from Peters to Katsantonis dated March 28, 2018, ECF 231-9
- Letter from ICE to RLI and Big Marco dated December 12, 2017, ECF 231-10
- Email from Sussman to Nexus dated March 28, 2018, ECF 231-11
- The Code of Federal Regulations 8 C.F.R. § 103; 8 C.F.R. § 213.1
- Safeco Ins. Co. of Am. v. M.E.S. Inc., No. 09-CV-3312, 2010 WL 3928606 (E.D.N.Y. Oct. 4, 2010)
- American Motorists Ins. Co. v. United Furnace Co., Inc., 876 F.2d 293, 209-300 (2d Cir. 1989)

## III.    MY EXPERT OPINIONS

If called upon testify, I am prepared to offer the following opinions:

(1) Under Section 2.a.(ii) of the CSGIA, I am of the opinion that RLI may properly demand collateral security for payment of all "claims," which only arise when a breach notice ripens into a "claim" due to final administrative determination by the

2

government that a breach under the bond occurred, as long as such claims have not been paid by either RLI or Nexus.

(2) Under Section 3.d of the CSGIA, collection of collateral security is limited to exposure under bonds for which nonappearance notices have been received.

## IV.  ANALYSIS OF FACTS AND DATA AS APPLIED TO MY EXPERT KNOWLEDGE

My opinions are based upon the following rationale.

First, in my experience, the insurance and surety agreements at issue, including those at issue in this case, are always governed by their precise terms, which are determined by reference to the contractual language chosen by the parties.

Here, the plain meaning of the CSGIA, which is always the starting point of construing contracts, supports my opinion(s).

In Section 2.a(i) and 2.a.(ii), the CSGIA differentiates between claims paid and claims made, requiring indemnity for claims paid by RLI and collection of moneys either to pay claims or use as collateral security for claims made against RLI for executed bonds under the CSGIA and Collateral Agreement.  Section 2(a)(ii) requires Nexus to pay to RLI:

> an amount sufficient to discharge any claim made against [RLI] on any Bond. The sum may be used by [RLI] to pay such claim or be held by [RLI] as collateral security against loss on any Bond.

The first issue is the meaning of "claim." The term is not defined in the agreements. Under such circumstances, resort to the custom and usage in the industry would be necessary to see if a term has a special meaning in the industry at issue. In the immigration bond context, the government defines a claim as a final adjudicatory demand for the penal sum under a bond. The regulations I reviewed, 8 C.F.R. §213.1, encompass such custom in the industry and define the accrual of a "claim" upon the final administrative determination of a breach of a bond.

3

The dictionary itself supports the immigration industry's usage of the term "claim." The dictionary definition of "claim," in the financial/insurance context makes it clear that a demand for breach must occur to trigger collateral security obligations. Meriam Webster defines "claim" in its principal definition as "a demand for something due or believed to be due." The dictionary on law.com defines "claim" similarly as "the making of a demand (asserting a claim) for money due, for property, from damages or for enforcement of a right."

In fact, RLI's head of underwriting for surety bonds, Greg Chilson, admitted at his deposition that a claim was a "demand for payment under a bond." Such testimony supports the customary usage of the term claim in the industry, the government's definition of the same, and the dictionary definitions.

Thus, unless RLI receives from the government an administratively final determination that a bond has been breached ripening a nonappearance notice into a "claim" in favor of the government, there is no money due or money that could reasonably be believed to be due under the immigration bond. Therefore, a collateral security obligation under Section 2.a.(ii) should not be due and payable absent a "claim" being made by the government to RLI on the bond in accordance with the 8 C.F.R. §213.1.

The second issue is what are the collateral security obligations under Section 3.d of the CSGIA. I am of the opinion that such obligations are limited to bonds on which nonappearance notices have been received which have not ripened into "claims."

Section 3.d of the CSGIA deals with other instances where collateral security may be collected by RLI from Nexus. Section 3.d first states that RLI retains the right to exoneration and subrogation and allows for the collection of collateral security, providing as follows:

> [RLI] shall have every right, defense, and remedy allowed by law including the rights of exoneration and subrogation. [Nexus] will, upon request of [RLI],

4

procure the discharge of [RLI] from any Bond and all liability by reason thereof. If such discharge is unattainable, [Nexus] will, if requested by [RLI], either deposit collateral with [RLI], acceptable to [RLI], sufficient to cover all exposure under such Bond or Bonds, or make provisions acceptable to [RLI] for the funding of the bonded obligation(s).....

The first concept discussed is exoneration. "Exoneration" is not defined in the agreement. Lynne Schubert describes the custom in the industry, stating that "exoneration" means performance as in producing the person ordered to appear and paying the penal sum upon failure to perform. She states that first, the Principal and Indemnitor are required under exoneration to comply with the bond's performance obligations – namely, to deliver the Principal in accordance with the demand of the government. And, second, Ms. Schubert states that exoneration obligates payment of the penal sum upon nonperformance. The dictionary supports the custom in the industry. It defines "exoneration" as "relief" from obligation. RLI can be relieved of the performance obligation by the production of the principal as ordered. And it can be relieved of any payment obligation by paying upon receipt of nonappearance notice before such notice ripens into a "claim."

Reference to exoneration merely underscores the primary performance obligation as the basis for payment of collateral security under Section 3.d. Indeed, the next sentences in Section 3.d states that RLI may request a discharge from any bond and allows for collection of collateral security where a discharge is unattainable.

Again, "discharge" is undefined in the agreement. Meriam Webster defines "discharge" as "to relieve of a charge, load, or burden ... [as in] to release from an obligation [ie.,--] will be *discharged* from further payment...." There are two obligations under the bonds at issue – deliver the principal or, upon failure to deliver, pay the penal sum. The promise to pay the penal sum does not arise unless and until a "claim" accrues and the government makes a final

5

determination of breach. The payment obligation can be discharged earlier than it accrues, but would arise no earlier than a nonappearance notice. Until a principal fails to appear, the payment obligation cannot even theoretically arise. And a payment obligation can always be discharged by paying.

Section 3.d of the CSGIA allows for the collection of collateral security where a requested discharge is unattainable. As stated above, the promise to pay is never unattainable. Accordingly, the only unattainable discharge must be the failure to deliver the principal as ordered. A promise to deliver upon demand is only unattainable where the nonappearance notice has been received because until such time as a date for appearance has been finally set and production of the person has failed will the discharge not be attainable. In all circumstances where the appearance date has not occurred, the discharge is attainable by production of the principal.

The collateral payment obligations in section 3.d makes clear that the amount of collateral that may be demanded is exposure on all such bonds where nonappearance notices have been received. Upon the failure to deliver a principal, rendering the discharge unattainable, RLI may demand collateral security "sufficient to cover all exposure under such Bond or Bonds…" The resolution of this issue turns upon the meaning of "exposure."

"Exposure" is undefined in the agreements. Meriam Webster defines "exposure" as the "the condition of being at risk of financial loss." There is no risk of financial loss on these bonds absent a nonappearance notice. In fact, until a nonappearance notice is received, there is a performance obligation, which in greater than 95 percent of the cases appears to be complied with. The only reasonable interpretation of "exposure" is one that looks at the realistic expectation of the financial risk of loss on RLI at present. In fact, "exposure" under Section 3.d

6

uses "such" and limits collateral security to exposure to such bonds where discharge is

unattainable.  It does not say all bonds, but expressly limits collateral security to exposure under

"such" bonds under which discharge is unattainable, which are bonds on which nonappearance

notices have been received.

## V.    QUALIFICATIONS AND AUTHORED PUBLICATIONS FOR LAST 10 YEARS

**EXPERIENCE**

*Investments & Wealth Institute f/k/a Investment Management Consultants Association®*
Greenwood Village, Colorado
**General Counsel**, November 2018-Present
**Standards and Legal Counsel**, January 2014-October 2018
**Standards and Legal Manager**, September, 2011-December, 2013
- Oversight of all legal affairs of the organization, including, among other things, advising and counseling senior management on all legal issues, drafting reviewing, and advising on transactions (vendor, affiliation, insurance, and other agreements), drafting, reviewing, and advising on corporate governance matters, managing the relevant intellectual property portfolio, including filings and enforcement, and managing litigation
- Management of the insurance programs and claims arising thereunder for the organization
- Management of governmental and regulatory advocacy on issues germane to the organization
- Management of admissions and disciplinary processes for $CIMA^®$, $CIMC^®$, $CPWA^®$, and $RMA^{(SM)}$ certifications, which includes, among other things, ensuring promulgation of appropriate guidelines, procedures, and rules, conducting internal investigations, understanding regulatory, legal, and compliance issues confronted by financial services professionals, managing hearings and admissions conferences, and drafting written decisions
- Maintenance of standards for the professional certifications, including ensuring continued ANSI accreditation for the CIMA certification
- Managing the organization's complaint process
- Conducting and drafting internal audit reports
- Managing one paralegal and two administrative support staff
- Attained Accredited Investment Fiduciary or $AIF^®$ designation (7/1/15)

*City Attorney's Office*
Colorado Springs, Colorado
**Deputy City Attorney-Employment and Litigation**, January, 2011-September, 2011
- Managed Litigation Division of 6 lawyers and 2 paralegals, including, among other things, overseeing all aspects of their work; setting division and office goals; and designing processes to achieve annual budgets

- Managed all phases of litigation as first chair, including formulating trial/case/appellate strategy; assessing for settlement; drafting pleadings, motions, discovery, and briefs; assisting with document production; attending as first chair mediations, trials, hearings, depositions, arbitrations, and appeals; negotiating deals and settlements; reviewing agreements and other business documents; advising and counseling client
- Responsible for cases and advice in a wide variety of subject matters including personal injury and property damage; insurance; labor and employment; workers compensation; contracts; construction; civil rights; municipal law

**Dish Network L.L.C.**
Englewood, Colorado
**Director and Senior Corporate Counsel**, June, 2007-January, 2011

- Managed litigation either personally or through outside counsel (depending upon matter's size, complexity and jurisdiction); oversaw, approved, and directed outside counsel on all phases of litigation; reviewed and approved budgets and invoices; approved reserves set by TPA; formulated trial/case strategy; assessed for settlement; assisted in and drafted pleadings and motions; assisted with document production; attended as both first and second chairs mediations, trials, hearings, depositions, and arbitrations; performed investigations and reported results to senior executives; oversaw subpoena responses; negotiated deals and settlements; reviewed agreements and other business documents; reviewed and drafted new business rules; and advised business leaders at two publicly traded entities
- Responsible for all of Dish Network's insured litigation and claims involving insurance, subrogation, and indemnity
- Experience in wide variety of other cases, including antitrust and competitor matters; piracy; programming; telecommunications-regulatory submissions; insurance recovery and subrogation; marketing and internet; IT, vendor, retailer, and subcontractor disputes; employment; real estate; bankruptcy; workers' compensation; contract and commercial; patent, trademark, and copyright; warranty; taxation; consumer protection, debt collection, and credit reporting; TCPA disputes; customer billing; regulatory and government affairs
- Helped manage a litigation group of 4 lawyers, 3 paralegals, and 2 administrative assistants, including setting goals and designing processes to achieve annual budgets and goals

**Anderson Kill & Olick, P.C.**
Philadelphia, Pennsylvania
**Shareholder**, October, 1994–June, 2007

- Practice concentrated primarily in insurance recovery and bad faith litigation, including work under many kinds of P&C insurance policies and bonds, including general liability, first-party property, business interruption, builders risk, professional liability, D&O liability, EPLI, workers compensation, and fidelity and surety bonds
- Managed, as both first and second chairs, multi-party cases through all phases of litigation, including mediation, arbitration, trial, appeal, settlement, assessment, planning, strategy, research and writing, investigation and analysis, pleadings,

8

written discovery, depositions, motion practice, oral arguments, negotiations, and presentation of evidence
• Extensive writing and public speaking experience on topics in P&C insurance (listed below)

***The Honorable John R. Padova***
U.S. District Court for the Eastern District of Pennsylvania
Philadelphia, Pennsylvania
**Law Clerk**, August, 1992- October, 1994
• Researched and drafted jury charges, memoranda, orders, and opinions involving a variety of criminal and civil issues.
• Attended, prepared the Judge for, and assisted the Judge in conferences, hearings, arguments, sentencings, and trials.
• Acquired skills in motion practice, case management, legal research and writing, and federal procedure.

## EDUCATION

***Loyola Marymount University Law School***
Los Angeles, California
J.D. 1992
• Graduated Order of the Coif; Lloyd Tevis Award in Commercial Law, 1992; St. Thomas More Law Honor Society, 1992; American Jurisprudence Award in Contracts, 1990
• *International and Comparative Law Journal*: Note and Comment Editor, 1991-92; Staff, 1990-91; Author of Comment, *Recognizing Self-Determination In International Law: Kuwait's Conflict With Iraq*, 14 Loy. L.A. Int'l & Comp. L.J. 359 (1992)

***University of California***
Berkeley, California
A.B. Economics, 1989
• Graduated with "special distinction in general scholarship"
• Specialized in Macroeconomics and Public Sector Finance

## BAR MEMBERSHIPS

• Member in good standing of the Bars of the Supreme Courts of California (1/8/93), Colorado (7/28/08), and Pennsylvania (5/18/93), the United States Courts of Appeals for the Third (6/12/95) and Sixth (11/19/96) Circuits, and the United States District Courts for the Eastern District of Pennsylvania (6/30/93) and the District of Colorado (5/18/09)

9

**PUBLICATIONS**

**TREATISES**

- Insurance for Real Estate Related Entities (Fastcase 2019)
(https://www.fastcase.com/store/fcp/insurance-for-real-estate-related-entities/)
- Business Insurance (Fastcase 2019)
(https://www.fastcase.com/store/fcp/business-insurance/)
- Insuring Real Property Businesses (Law Journal Press September 2007)

**PERIODICALS**

- Extracurricular Activities:  Complying with The Investment & Wealth Institute's Code of Professional Responsibility, Investments and Wealth Monitor (Investments & Wealth Institute July 2018)
- Common Pitfalls in Ethics-Reporting to IMCA, Investments and Wealth Monitor (IMCA November/December 2016)
- IMCA Code of Professional Responsibility: Moving from One Firm to Another, Investments and Wealth Monitor (IMCA March/April 2015)
- *The Proper Use of IMCA's CIMA®, CIMC®, and CPWA® Marks*, Investments and Wealth Monitor (IMCA July/August 2014)
- *An Overview of the IMCA Disciplinary Process*, Investments and Wealth Monitor (IMCA May/June 2014)
- *Primer on IMCA Standards Enforcement*, Investments and Wealth Monitor (IMCA September/October 2012)
- *Defective Workmanship and Insurance*, Design Green Construction.com (February 6, 2009) (http://www.designgreenconstruction.com/articles/view.php?article_id=1217) or (https://www.associationofconstructionanddevelopment.org/articles/view.php?article_id=10490&page_number=47)
- *Insurance for Landlord-Tenants*, Lorman's Coursebook for Landlord and Tenant Law in Pennsylvania (June, 2008)
- *Insurance Considerations-Property and Business Interruption Insurance*, National Business Institute's Coursebook for Real Estate For the Estate Planning Professional Seminar (November, 2006)
- *Key Issues Affecting D&O and E&O Liability Insurance*, AKO Policyholder Advisor Conference Maximizing Your Insurance Recovery Seminar Coursebook (September 15, 2006) (co-author)
- *Defective Workmanship and Insurance*, Construction Law Supplement to the Pennsylvania Law Weekly (August, 2006)
- *Insurance Recovery for Building and Construction Liabilities*, ICFAI Journal of Insurance Law, Vol. IV, No. 3, at 15-41, July, 2006
- *Insurance Recovery: Advanced Issues in Real Estate-Law*, Real Estate Law: Advanced Issues and Answers (NBI Coursebook July, 2006)
- *Advanced Insurance Recovery Issues for Real Estate-Related Businesses*, Real Estate Law: Advanced Issues and Answers (NBI Coursebook June, 2006)

10

- *Insurance Coverage for Construction Defect Claims*, Real Estate Finance, Vol. 22, No.4, at 20-21, December 2005
- *Volatile Coverage: Professional Liability Insurance for Environmental Professionals*, Environmental Claims Journal at 259-66, Issue 17 (3-4), December 2005 (co-author)
- *An E&O Eye Opener*, Environmental Protection at 41-45, July/August 2005 (co-author)
- *Insurance Coverage For Construction Defect Claims*, AKO Real Estate and Construction Advisor, Summer 2005
- *First-Party Coverage*, Insurance Coverage Law In Pennsylvania (NBI Coursebook May, 2005)
- *Insurance Coverage for Computer Losses*, Corporate Counsel, March 2005
- *Defending Against Your Competitor's Lawsuit: Scope of Insurance Coverage for Antitrust Liabilities*, BNA's Corporate Counsel Weekly, Vol. 20, No. 2, January 12, 2005
- *Professional Liability Insurance for Accountants in the Post-Enron World*, Partner Advisory Advantage, Vol. 2, No. 7, July 2004
- *The "Deemer" Clause: Another Undisclosed Effort To Limit Coverage*, Corporate Counsel, July, 2004 (co-author)
- *MTBE: Coverage for the Oil Industry's "Spreading" Problem*, AKO Policyholder Advisor, April/May 2004 (co-author)
- *We Didn't Really Mean "Intentional": Structural Ambiguity Created By Personal Injury Coverage*, The Insurance Coverage Law Bulletin (Mar. 2004) (co-author)
- *Current Issues In The Litigation Of Loss Control*, (ISO E&S Loss Control Executive Forum Coursebook, November, 2003)
- *Protecting Yourself Post-Enron*, Practical Accountant, September, 2003, at 10, 12 (co-author)
- *Does Your Error-and-Omission Insurance Need A Tune-Up?*, American Banker, June 13, 2003, at 7
- *Do You Have Insurance Coverage For Contractual Liabilities: The Crossroads Of Tort And Contract*, Corporate Counsel, April, 2003 (co-author)
- *What Did You Know -- And When Did You Know It?*, Risk and Insurance, January, 2003, at 23-27
- *Insurance Coverage for Zero-Sum and Other Net Settlements in Construction Defect Litigation*, AKO Real Estate and Construction Advisor, Winter 2003
- *Current Issues in Directors and Officers Liability Insurance*, AKO Insurance Coverage for Financial Institutions Seminar Coursebook (November 14, 2002) (co-author)
- *Policyholders' Tools For Obtaining Coverage For Zero-Sum And Other Net Settlements*, Insurance Coverage Law Bulletin, November, 2002, at 3
- *A Clear And Present Danger*, The Pennsylvania Law Weekly, June 17, 2002, at 12, 18
- *Clear And Present Danger: The Known Loss Doctrine*, The Legal Intelligencer, May 9, 2002, at 6-7

11

- *Deciphering The Undecipherable: Insurance Coverage For Construction Defects*, <u>AKO Construction Trade Insurance Alert</u>, Winter 2001
- *World Trade Center Shutdowns May Trigger Insurance Coverage*, <u>AKO Port Authorities Insurance Alert</u> (Autumn 2001) (co-author)
- *Avoiding, Litigating the Insurance "Bait And Switch,"* <u>The Legal Intelligencer</u>, July 17, 2000, at 7-8
- *A Guide To E&O Insurance*, <u>Risk Management</u>, June, 1998, at 33 (co-author)

## ORAL PRESENTATIONS

- *Tenant Liability Insurance* Webinar (Lorman, On Demand, November 2018)
  http://www.lorman.com/training/property-management/tenant-liability-insurance
- *Subprime and Punishment: Insurance Issues and the Credit Crisis*, Law Journal Newsletter Audio-Conference (May 20, 2009)
- *Insurance Coverage for Shopping Centers*, International Council of Shopping Centers Breakfast Roundtable at the University Shopping Centers Conference (Philadelphia, PA March 6, 2007)
- *First Party Insurance*, National Business Institute's Real Estate For the Estate Planning Professional Seminar (Philadelphia, PA November 14, 2006)
- *Key Issues Affecting D&O and E&O Liability Insurance*, AKO Policyholder Advisor Conference Maximizing Your Insurance Recovery Seminar (Philadelphia, PA September 15, 2006)
- *Insurance 101*, Lorman Education Services' Seminar on AIA Contracts In Pennsylvania (Philadelphia, PA July 14, 2006)
- *Insurance Coverage Issues*, National Business Institute's Real Estate Law: Advanced Issues and Answers (Philadelphia, PA, July 10, 2006)
- *Insurance Coverage For Real Estate-Related Businesses*, National Business Institute's Real Estate Law: Advanced Issues and Answers (Birmingham, AL June 6, 2006)
- *Legal and Insurance Considerations Regarding Construction In America*, World Trade Center Montreal's Construction Industry Mission (Philadelphia, PA May 10, 2006)
- *Insurance Primer for Construction Professionals*, Lorman Education Services' Seminar on Understanding the Construction Bidding Process in Pennsylvania (Philadelphia, PA March 28, 2006)
- *Legal and Insurance Considerations*, Lorman Education Services' Seminar on Understanding the Construction Bidding Process in Pennsylvania (Bethlehem, PA January 26, 2006)
- *First-Party Property And Business Interruption Insurance*, National Business Institute's Seminar on Insurance Coverage Law In Pennsylvania (Harrisburg, PA May 12, 2005)
- *Third-Party Insurance: CGL, D&O, and E&O Coverage*, National Business Institute's Seminar on Insurance Coverage Law In Pennsylvania (Harrisburg, PA May 12, 2005)

12

- *Extra Contractual Liability*, National Business Institute's Seminar on Insurance Coverage Law In Pennsylvania (Harrisburg, PA May 12, 2005)
- *Ethical Considerations in Insurance*, National Business Institute's Seminar on Insurance Coverage Law In Pennsylvania (Harrisburg, PA May 12, 2005)
- *Issues in Pennsylvania Bad Faith Law*, AKO Insurance Coverage for Financial Institutions Seminar (Philadelphia, PA October 20, 2004).
- *Direct Physical Loss or Damage And Collapse*, AKO and AKLA Presents: Properly Handling Property Losses: Strategies for Maximizing Your Recovery (Philadelphia, PA, May 18, 2004)
- *Current Issues in D&O and E&O Liability Insurance*, Turnaround Management Association 2003 Breakfast Seminar (Philadelphia, PA, November 18, 2003)
- *The Sword And The Shield: Current Issues In The Litigation Of Loss Control*, ISO's 2003 Engineering & Safety Loss Control Executive Forum (Anaheim, California November 5, 2003)
- *Responding To Reservations of Rights Letters And Professional Liability Insurance Issues*, AKO 6th Annual Policyholders Advisors Conference (Chicago, IL April 8, 2003)
- *Current Issues in Directors and Officers Liability Insurance*, AKO Insurance Coverage for Financial Institutions Seminar (Philadelphia, PA November 14, 2002)

## VI.   CASES DURING PREVIOUS 4 YEARS IN WHICH I TESTIFIED AT TRIAL OR DEPOSITION

I was deposed recently as a 30(b)(6) witness for Investments and Wealth Institute in *CFA Institute v. American Society of Pension Professionals & Actuaries, et al.*, Case No 19-cv-0012 (W.D. Va.).

## VII.   COMPENSATION TO BE PAID FOR STUDY AND TESTIMONY IN THIS CASE

$600/hour

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Robert E. Frankel, Esq.
March 3, 2020

13