**IN THE UNITED STATES DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

|  |  |
|---|---|
| RLI INSURANCE COMPANY, |  |
| Plaintiff, |  |
| v. | Case No.: 5:18-cv-00066-MFU |
| NEXUS SERVICES, INC., et al., |  |
| Defendants. |  |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF**
**RLI INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

In accordance with Local Rule 56, Plaintiff RLI Insurance Company ("RLI") hereby sets forth the following Undisputed Facts ("RLI UF") in support of its Motion for Summary Judgment against Nexus Services, Inc. ("Nexus Services"), Libre by Nexus, Inc. ("Libre") and Homes by Nexus, Inc. ("Homes").

**A.    Facts Establishing Diversity Jurisdiction**

1.    Plaintiff RLI Insurance Company ("RLI") is an Illinois corporation with its principal place of business located in Illinois.  ECF No. 231 ¶ 2; ECF No. 240 ¶ 4.

2.    When this action was initiated, each of the Defendants was a Virginia corporation with its principal place of business in Virginia.  ECF Nos. 231 & 239 ¶ 3; ECF Nos. 231 & 247 ¶¶ 4-5.

3.    This action involves disputes far in excess of $75,000.  *See, e.g.*, ECF No. 240 ¶ 153.

**B.    The Three Defendants Are for All Purposes a Single Entity**

4.    For all purposes of this lawsuit, it is stipulated that Nexus Services, Libre and Homes, as alter egos of one another, shall be treated as a single entity (collectively referred to herein, as "Nexus"), and will be jointly and severally liable for any damages or remedies awarded against

any of them in this case. *See* Stipulation in 2/27/20 Moore Dep. Tr. at 65:18-66:7, attached hereto as **Exhibit 1**.[1]

C.      **The Indemnity Agreement – Consideration and Inducement for RLI's Bonds**

5.    On or about January 20, 2016, Nexus, as "Indemnitor," by its President and CEO, Micheal Donovan ("Donovan"), executed and entered a three-page Commercial Surety General Indemnity Agreement (the "Indemnity Agreement") in favor of RLI, as "Surety," a true and correct copy of which is attached as Exhibit A to RLI's initial Complaint.  ECF Nos. 1 & 25 ¶ 6; ECF No. 1-2; ECF Nos. 231 & 239 ¶ 8; Req. Admit Nos. 1 and 31, attached hereto as **Exhibit 2**; ECF No. 240 ¶ 3.

6.    By its express terms, the Indemnity Agreement was executed by Nexus "for the purpose of indemnifying [RLI], as Surety…from all losses and costs of any kind incurred by Surety, in connection with any" immigration bond provided by RLI at Nexus' request.  ECF No. 1-2 at 2.[2]

7.    The Indemnity Agreement sets forth a myriad of Nexus obligations (and corresponding RLI rights and remedies) that Nexus expressly agreed to "[i]n consideration of the execution of any such" immigration bonds by RLI and "as an inducement to such execution by Surety." ECF No. 1-2; *see also* 2/26/20 Donovan Dep. Tr. at 461:2-464:15, attached hereto as **Exhibit 3**.

8.    In issuing bonds requested by Nexus, RLI required and relied upon Nexus' agreement to the obligations it undertook by executing the Indemnity Agreement, as Donovan acknowledged in deposition:

Q    …And you're executing this agreement as inducement for RLI to issue bonds, right?

---

[1] To assist the Court in its review, RLI has added highlighting to many of its attached exhibits, which, unless noted otherwise, does not appear in the original document.
[2] Page numbers of docketed materials cited herein refer to the numbers electronically assigned by the ECF system unless otherwise stated.

> **A**  **We in the agreement are agreeing to stand in front of the principal for RLI.**
>
> Q  Right.
>
> **A**  **So yeah, that obviously is important to RLI in the determination to issue the bonds.**

Ex. 3 at 464:3-15; *see also id.* at 106:2-15; 122:13-123:9.[3]

9.  The Indemnity Agreement is only executed by the Indemnitor(s), here Nexus, and <u>not</u> by the Surety, here RLI.  ECF No. 1-2 at 4; *see also* Ex. 3 (Donovan) at 461:2-18.

10. The Indemnity Agreement imposes express obligations <u>only</u> upon <u>Nexus</u>, as the Indemnitor.  ECF No. 1-2; *see also* Ex. 3 (Donovan) at 461:16-18 ([Q] And the agreement sets forth your obligations, Nexus' obligations, right?  [**A**] **Sure.**); 463:9-13 ("**…Everything about this [Indemnity] agreement relates to responsibilities that we [*i.e.*, Nexus] have related to bonds that the surety posts.**")

11. In contrast, the Indemnity Agreement does <u>not</u> impose any express obligations upon RLI.  *Id.*

12. RLI's issuance of immigration bonds at Nexus' request supplied consideration for Nexus' agreement to undertake the obligations set forth in the Indemnity Agreement, as Donovan acknowledged in deposition:

> Q  …So RLI issues the bonds and you [*i.e.*, Nexus] undertake these obligations set forth in the indemnity agreement, correct?
>
> **A**  **Correct.**

Ex. 3 at 464:12-15.

13. As Nexus further admits, the Indemnity Agreement gave RLI the right to stop issuing immigration bonds at any point in time.  *See infra* para. 29 (citing ECF No. 1-2 at ¶ 3.b); Ex. 3

---

[3] Due in part to the improperly excessive frequency with which Nexus' counsel interposed objections throughout certain of RLI's deposition examinations, RLI has omitted such objections, and related exchanges and interruptions of counsel, in quoting from deposition transcripts herein.

(Donovan) at 462:7-8 ("**[The Indemnity Agreement] certainly gives the surety the right to stop issuing bonds.**"); 3/3/20 30(b)(6) Dep. Tr. at 370:18-371:9, attached hereto as **Exhibit 4** ("**Nothing in the agreement compelled them [RLI] to continue posting bonds … Sure. I mean yeah, they could have stopped writing at any point in time.**").

**D.      The Indemnity Agreement – RLI Seeks to Enforce Unique Surety Rights**

14. RLI seeks in this action, *inter alia*, to enforce by specific performance or injunction, three unique rights and remedies under the Indemnity Agreement of: (i) access to books, records and accounts; (ii) exoneration; and (iii) collateral security.  ECF No. 231 at ¶¶ 101-109.

15. RLI separately seeks in this action to enforce by a judgment for damages, its ultimate right and remedy to be indemnified for unreimbursed losses incurred by RLI.  ECF No. 231 at ¶¶ 110-117.

**E.      The Indemnity Agreement – RLI's Right to Books, Records and Accounts**

16. Paragraph 3.c of the Indemnity Agreement provides, in part:

> Until Surety has been furnished with conclusive evidence of its discharge without loss from any Bonds, and until Surety has been otherwise fully indemnified as hereunder provided, Surety shall have the right of access to the books, records and accounts of the Indemnitor(s) for the purpose of examining and copying them. …

ECF No. 1-2 at ¶ 3.c. *See* Ex. 4 at 339:4-9 ("Q: Under the indemnity agreement, paragraph 3C, you understand that RLI has the right to access the books, records, and accounts of the indemnitors for examining and copying them, correct?  **A: Yes**.").

17. As the Court previously determined, the Indemnity Agreement places no limitation on RLI's access to Nexus' records, which is <u>not</u> limited to "financial" records but rather extends broadly over Nexus' records made in the ordinary course of its business.  ECF No. 59 at 13-14.

18. Even under the narrow scope of a preliminary injunction, the Court has determined that the right to books, records and accounts entitles RLI to unfettered access to, among other things,

all books, records and accounts that bear on (i) Nexus' financial condition; (ii) Nexus' ability to satisfy its obligations under the Indemnity Agreement; or (iii) the status of any RLI bonds, including related breaches, cancelations, forfeitures or penalties.  ECF No. 60 ¶ 1.

**F.     The Indemnity Agreement – RLI's Right of Exoneration**

19.  Paragraph 3.d of the Indemnity Agreement requires Nexus to exonerate RLI. Specifically: "Surety shall have every right, defense and remedy allowed by law including the rights of exoneration and subrogation."  ECF No. 1-2.

20. In accordance with its obligations under the Indemnity Agreement to exonerate RLI from its Bond obligations (as that term is defined in RLI UF ¶ 31, *infra*) Nexus is obligated, in the first instance, to meet each Bond's performance obligation, including in particular by delivering the Bond Principals as required upon receipt of a Notice to Deliver[4].  *Id.*; *see also* 2/20/20 Schneider Dep. Tr. at 211:6-19, attached hereto as **Exhibit 5**; Ex. 3 (Donovan) at 464:3-15 ("**We in the agreement are agreeing to stand in front of the principal for RLI"**).

21. In accordance with its obligations under the Indemnity Agreement to exonerate RLI from its Bond obligations, Nexus is further obligated, in the event of a breach of the Bond's performance obligation, to pay Bond Breach Invoices[4] as they become due in accordance with their terms and the corresponding Bond Breach Notices[4] from DHS.  ECF No. 1-2 at ¶ 3.d; *see also* Ex. 4 at 141:16–19 ("**A: At the end of the day, if a bond breaches you pay a certain sum. Q:  After the bond breaches?  A:  Right.**"); *id.* at 219:9–17 ("Q. Isn't the payment terms [of the Bond Breach Invoice form] saying that penalties will be due if you don't pay within the 30 days but that the bill is due and payable upon receipt?  A. Yeah, I think it very clearly says that you're supposed to comply with the dates on the invoice.").

---

[4] The terms "Notice to Deliver", "Bond Breach Invoices", and "Bond Breach Notices" are defined herein in *infra*.

22. Further, with regard to satisfying Bond obligations, the Indemnity Agreement, Paragraph 2.a., provides, in part:

> Indemnitor(s) agree to pay to Surety upon demand:
>
> …
>
> (ii) an amount sufficient to discharge any claim made against Surety on any Bond.  This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any Bond.

ECF No. 1-2 at ¶ 2.a.

## G.      The Indemnity Agreement – RLI's Right to Collateral Security

23. The Indemnity Agreement also sets forth RLI's rights to collateral security.  Paragraph 3.d of the Indemnity Agreement provides:

> Indemnitor(s) will, upon the request of the Surety, procure the discharge of Surety from any Bond and all liability by reason thereof.  If such discharge is unattainable, Indemnitor(s) will, if requested by Surety, either deposit collateral with Surety, acceptable to Surety, sufficient to cover all exposure under such Bond or Bonds, or make provisions acceptable to Surety for the funding of the bonded obligation(s). …

ECF No. 1-2 at ¶ 3.d.

24. Paragraph 3.e of the Indemnity Agreement provides, in part:

> Indemnitor(s) [*i.e.*, Nexus] consent and agree that any and all collateral deposited with Surety shall be available at the Surety's sole discretion as collateral security on any or all Bonds heretofore or hereafter executed for or at the request of the Indemnitor(s). … Any cash provided as collateral will be available, in the Surety's sole discretion, to pay any of the obligations arising hereunder. … The Indemnitor(s) grant to Surety a security interest or lien on any collateral…now or hereafter deposited with Surety.

ECF No. 1-2 at ¶ 3.e.

25. Paragraph 3.f of the Indemnity Agreement provides, in part:

> Liability of Indemnitor(s) shall not be affected by:
>
> …
>
> (ii)   any claim that other indemnity or security was to have been obtained;
>
> …
>
> (iv)   the return of or exchange of any collateral that may have been obtained.

6

ECF No. 1-2 at ¶ 3.f.

**H.**     **The Indemnity Agreement – RLI's Ultimate Right to Indemnity**

26. With regard to the obligation of indemnity, Paragraph 2.a of the Indemnity Agreement

provides, in part:

Indemnitor(s) agree to pay to Surety upon demand:

(i) all losses, costs, damages, attorneys' fees and expenses of whatsoever kind or nature which arise by reason of, or in consequence of, the Surety having executed any Bond on behalf of the Principal, or in enforcing this agreement against any of the Indemnitor(s) or in procuring or attempting to procure its release from liability or a settlement under any Bond.

…

ECF No. 1-2 at ¶ 2.a.

27. Paragraph 2.b. of the Indemnity Agreement provides, in part:

… In any claim or suit hereunder, an itemized statement of the aforesaid losses and expenses, sworn to by an officer of the Surety or the vouchers or other evidence of disbursement by Surety shall be prima facie evidence of the fact and extent of the liability hereunder of the Indemnitors.

ECF No. 1-2 at ¶ 2.b.

**I.**     **The Indemnity Agreement – RLI's Exclusive Right to Appeal, Dispute or Pay Claims**

28. Paragraph 2.b. of the Indemnity Agreement provides, in part:

Regarding claims against Surety:

(i) Surety shall have the exclusive right for itself and the Indemnitor(s) to determine whether any claim or suit upon any Bond shall on the basis of liability, expediency or otherwise, be paid, compromised, defended or appealed.

(ii) Surety shall have the right to incur such expenses in handling a claim as it shall deem necessary including but not limited to the expenses for investigative accounting, technical and legal services.

(iii) Surety shall have the foregoing rights irrespective of the fact that the Indemnitor(s) may have assumed or offered to assume the defense of the Surety upon such claim. …

…

ECF No. 1-2 at ¶ 2.b.

7

**J.**     **The Indemnity Agreement – RLI's Unconditional Right to Cease Issuing Bonds**

29. Paragraph 3.b of the Indemnity Agreement provides:

Surety shall have the right, at its option and in its sole discretion, to issue or cancel or decline the execution of any Bond, or renewal thereof.

ECF No. 1-2 at ¶ 3.b.  *See also* Ex. 3 (Donovan) at 462:7-8 (**"[The Indemnity Agreement] certainly gives the surety the right to stop issuing bonds."**); Ex. 4 at 370:18-371:9 (**"Nothing in the agreement compelled them [RLI] to continue posting bonds… Sure.  I mean yeah, they could have stopped writing at any point in time"**).

**K.**     **The Indemnity Agreement – Governed by Illinois Law**

30. Paragraph 3.h of the Indemnity Agreement provides:

Indemnitor(s) consent and agree that the laws of the State of Illinois shall apply to this Agreement.

ECF No. 1-2 at 3.h.

**L.**     **RLI Issued Over $30M in Immigration Bonds Requested by Nexus**

31. Following Nexus' full execution of the Indemnity Agreement, RLI, at Nexus' request, issued 2,486 immigration bonds between February 2016 and February 2017 (each a "Bond," and collectively, the "Bonds").[5]  Ex. 4 at 44:15-18; Ex. 5 at 166:8-10; ECF Nos. 231 & 239 at ¶ 16; ECF No. 240 at ¶ 37.

32. Each Bond was issued in a specific amount or sum – commonly referred to as the Bond's "penal sum" – which is forfeited to the Government, in whole or in part, upon a "breach" of the Bond — *i.e.*, a failure to perform the specific performance obligation(s) guaranteed by the Bond.  *See* ECF No. 1-3.

---

[5] Indeed, RLI had advised Nexus that it would be required to execute the Indemnity Agreement before RLI would issue any Bonds.  Ex. 7 at 51:20–51:4; 58:16–22.

33. The aggregate penal sum exposure of the 2,486 Bonds issued by RLI at the request of Nexus, exclusive of interest, fees and enforcement penalties assessed by the Department of Homeland Security ("DHS"), was $30,222,950.00.  Ex. 4 at 44:19-45:1; Ex. 5 at 191:2-192:2.

34. Commercial sureties like RLI must register and obtain approval from Treasury in order to issue federal surety bonds, and a commercial surety's maintenance of its good standing with Treasury is vital to its ability to maintain its surety business.  Sussman Decl. ¶¶ 5, 17–18, ECF No. 107-1; *see* 31 C.F.R. § 223.18; 31 C.F.R. § 223.20; *see also* 11/28/18 Hearing Tr. at 46:17–47:5, attached hereto as **Exhibit 6**.  Indeed, pursuant to 31 C.F.R. § 223.20, one instance of a delinquent payment can lead to revocation of the surety's authority to issue bonds.  31 C.F.R. § 223.20 (2014).

**M.    The Bonds Require Delivery of the Bonded Principal as Demanded by DHS**

35. Each of the Bonds was issued on DHS' Form I-352.  A copy of DHS' ICE Form I-352 is attached as Exhibit B to RLI's initial Complaint.  *See* ECF No. 1-3.

36. Form I-352 specifies the particular performance obligation undertaken and guaranteed by each Bond.  ECF No. 1-3.

37.  The United States Government, through DHS, is the obligee on of each of the Bonds and, as such, may assert demands to enforce each Bond's performance obligations, as well the monetary forfeitures that result from a breach of the Bond's performance obligation.  *See* ECF No. 1-3.

38. RLI, as Surety, is an "Obligor" on each of the Bonds, and as such, is obligated to the United States Government, through DHS, with respect to each Bond's performance obligation(s), as well as for the full penal amount to be forfeited in the event of a breach of the Bond's performance obligation(s).  *See* ECF No. 1-3.

39. Nearly all of the Bonds, for their performance obligation, are designated as "G-1" or "Bond Conditioned upon the Delivery of an Alien" ("Delivery Bond").[6]  *See* ECF No. 1-3 at 6 ¶ G(1).

40. Delivery Bonds obligate the Surety, as consideration for the release from DHS custody of individual immigrant detainees – each of whom is a named "Principal" on a Bond – to produce, "or deliver," the bonded Principal on the date and at the location specified in a DHS formal demand on the Bond, which DHS issues on its Form I-340, entitled "Notice to Obligor to Deliver Alien" ("Notice to Deliver").  ECF No. 1-3 at 6 ¶ G(1); *see* ECF No. 301-6 at 1 (sample Notice to Deliver) *see also* [Ex. 5 at 371:11-21]; [Ex. 4 at 135:8–20]

41. Specifically, Form I-352 § G-1 provides, in part:

> BOND CONDITIONED UPON THE DELIVERY OF AN ALIEN.   In consideration of the granting of the application of the above alien for release from custody under a warrant of arrest issued by the Attorney General … provided there is furnished a suitable bond … the obligor hereby furnishes such bond with the following conditions if: (1) the alien is released from custody and if the obligor shall cause the alien to be produced or to produce himself/herself to an immigration officer or an immigration judge of the United States, as specified in the appearance notice, upon each and every written request … (2) the said alien is accepted by the DHS for detention or deportation/removal; or (3) the bond is otherwise canceled, this obligation shall terminate.

ECF No. 1-3, p. 6 of 7.

**N.** __The Bonds Require Forfeiture of the Penal Sum upon a Default in Performance__

42. In addition to specifying the performance obligation, Form I-352 also establishes the amount (*i.e.*, the bond's "penal sum") that is forfeited in the event that the Bond's guaranteed performance obligation is breached.  ECF No. 1-3.

---

[6] A small percentage of the Bonds are designated as "G-4" or "Order of Supervision Bond" ("OSUP Bonds"), which, like Delivery Bonds, normally obligate the Surety to deliver the bonded Principal as required by DHS, although OSUP Bonds also typically obligate the Surety to guarantee further conditions of the Principal's release from custody.  ECF No. 240 ¶ 22.

43. Specifically, after establishing the above-quoted performance obligation, Form I-352 § G-1 continues, in part: "If, however, the obligor fails to surrender the alien in response to a timely demand while the bond remains in effect, the full amount of the bond … becomes due and payable." ECF No. 1-3, p. 6 of 7.

44. The Notice to Deliver expressly provides that "[f]ailure to deliver or have the alien appear in accordance with this demand may result in A DECLARATION OF A BREACH OF BOND, its forfeiture to the government…." *See* ECF No. 301-6 at 1; *see* [Ex. 5 at 373:5-17].

45. DHS formally declares a breach of bond through its issuance of a notice on DHS' Form I-323, entitled "Notice – Immigration Bond Breached" ("Bond Breach Notice"). *See* ECF No. 301-6 at 2 (sample Bond Breach Notice).

46. The payment obligation on behalf of the surety arises after a Bond Breach Notice. *See* Ex. 4 at 141:16-19 ("**A: At the end of the day, if a bond breaches you pay a certain sum.** Q: After the bond breaches? **A:  Right.**"); Ex. 5 at 373:10-12 ("Q: And a breach of bond is what triggers a payment obligation on behalf of the surety, right? **A: Yes.**").

47. Under the terms of the Bond Breach Notice and the corresponding provisions of the Code of Federal Regulations ("CFR"), a bond breach determination by DHS is administratively final unless an appeal is received by DHS within 30 days (or 33 days if submitted by mail), from the date of the Bond Breach Notice. *See, e.g.*, ECF No. 301-6 at 2; 8 C.F.R. § 103.3(2)(i); *see also* Ex. 4. at 147:3-7 ("Q:  The bond form provides that the right to appeal would be within 30 days of the notice, correct?  **A:  That's right.  And if you don't appeal then the claim is final.**").

48. If no appeal is filed within the 30-day window, DHS next issues an invoice demanding forfeiture of the Bond's penal sum ("Bond Breach Invoice").  [Ex. 5. at 392:1-7].

49. By its express terms, a Bond Breach Invoice is "due and payable" upon its receipt.  *See,*

*e.g.*, ECF No. 301-6 at 5–6.

**O.      Failure to Timely Pay Invoices Increases RLI's Bond Exposure and Subjects RLI to
Further Consequences with DHS, Department of Treasury and Department of Justice**

50. If a Bond Breach Invoice is not timely paid as provided on the face of the invoice,

additional charges typically accrue, which increases the surety's exposure above its original

undertaking to include additional interest and penalties beyond the penal sum of the issued Bonds.

[Ex. 5 at 386:20-388:1]

51. Additionally, if not timely paid, DHS may, in addition to other penalties and collection

efforts, refer the invoice for further action by the Department of Treasury and, in fact, DHS is

required to do so if the debt is not paid within 120 days of the invoice date.  *See* ECF No. 301-6 at

4 (sample Treasury letter) ("If the bond obligors fail to pay this invoice within 120 days of its

issuance, ICE will refer the debt to the Department of Treasury … pursuant to the Debt Collection

Improvement Act of 1996…."); ECF No. 338-6 at 5 ("Because ICE is an agency that relies on

[Treasury] … ICE must transfer the debts to [Treasury] no later than 120 days delinquent."); *see

also* Ex. 5 at 388:3-389:3.

52. In fact, in response to Nexus' *Touhy* subpoena, DHS provided a narrative factual

response and clarified that while it is *required* to submit invoices to Treasury when they are 120

days past due, DHS should refer delinquent debt as early as possible in the debt collection cycle.

As such, it is DHS policy to refer invoices to Treasury when the invoice has been outstanding for

only sixty (60) days.  *See* ECF No. 338-6.

53. As provided on the face of the Bond Breach Invoice, DHS may also refer the matter to

Department of Justice ("DOJ") counsel for litigation.  *See* ECF No. 301-6 at 6 ("**Consequences of

the failure to pay**. … In addition to referring the debt to the Department of Treasury for collection,

12

DHS may seek to collect amounts owed … by referral to DHS counsel for further collection action or Department of Justice counsel for litigation."); *see also* Ex. 4 at 222:17-223:3.

54. Where a Bond Breach Invoice is not paid within 30 days, DHS often issues a Past Due Notice, which includes an assessment of additional interest against the Bond, above its penal sum. *See* ECF No. 301-6 at 7 (sample Past Due Notice).

55. Additionally, in connection with its issuance of a Bond Breach Invoice, DHS often issues additional correspondence, in the form of a formal letter, further advising RLI, among other things, of (i) the unpaid Bond debt; (ii) some of the consequences that RLI could incur for failing to timely pay the Invoice; and (iii) DHS' intention to refer the Invoice to Treasury if not paid by a specified date. *See* ECF No. 301-6 at 3–4 (sample Treasury letter).

56. More recently, beginning on August 16, 2019, DHS has also, as a courtesy only, begun issuing further correspondence via email (to date, 12 total) warning RLI that referral to Treasury of certain exceedingly past due Bond Breach Invoices is imminent ("Imminent Referral Warning"). *See, e.g.*, ECF No. 301-4 (10/11/19 DHS Imminent Referral Warning).

**P.** **Nexus Approached RLI to Explore the Potential Business Relationship**

57. The relationship between Nexus and RLI began when Nexus, through a law firm with which it had been working, reached out to RLI. Ex. 3 at 70:11-71:4.

58. Nexus introduced RLI to their primary bond agent, Big Marco Insurance & Bonding Services, LLC ("Big Marco"), with whom Nexus had been working since Nexus Services, Inc. was formed. Ex. 3 at 66:3-21; 03/05/20 Sandoz Dep. Tr. at 97:11-13, attached hereto as **Exhibit 7**; 5/1/15 Rick Nagel Summary of Conference Call, attached hereto as **Exhibit 8**.

59. As the bond agent, Big Marco produced and executed each Bond, on behalf of Big Marco, as a "Co-Obligor," and also on behalf of RLI, as the "Obligor." ECF Nos. 231 & 239 ¶ 17; *see also, e.g.*, 12/15/16 DHS Claims 1-3 Correspondence, attached hereto as **Exhibit 9** at 827.

60. RLI limited Big Marco's authority to act on RLI's behalf, essentially to issuing Bonds and collecting premiums, through a Producer Agreement and a limited Power of Attorney.  2/25/20 Chilson Dep. Tr. 125:17-126:22, attached hereto as **Exhibit 10**.

### Q.   RLI Commenced Its Underwriting Prior to Issuing Bonds

61. Prior to agreeing to issue any immigration bonds requested by Nexus, RLI engaged in a prolonged series of discussions and meetings with Nexus, between April 2015 and February 2016, including during an initial telephone conference on May 1, 2015 and a subsequent in-person visit to Nexus' center of operations, in Verona, Virginia on June 3, 2015 to, among other things: (i) explore the potential business relationship with Nexus; (ii) review the programs, operations, staff and technology that Nexus would use to mitigate risks to RLI; and (iii) evaluate Nexus' past performance, including Nexus' success rate in extinguishing bond liability through appearances and cancellations.  Ex. 8; Ex. 11; Ex. 12.

62.   As part of RLI's underwriting prior to issuing any Bonds, RLI also requested Nexus' financial statements, advised Nexus that it was relying upon the accuracy of statements provided, and ultimately required, in addition to profit and loss and income statements, a yearend balance sheet for 2015 before issuing any bonds.  Ex. 12; Ex. 13; Ex. 14; Ex. 15; Ex. 16; Ex. 17; Ex. 18; Ex. 19; Ex. 20; Ex. 21; *see* Ex. 7 at 94:22–95:12; *id.* at 95:22–96:8; *id.* at 110:11–111:1.

63. RLI further requested and obtained information regarding the number and size of the immigration bonds issued by other sureties at Nexus' request, weekly and over the prior year.  Ex. 22; Ex. 8; Ex. 23; Ex. 24.

64. RLI also requested and obtained information regarding the magnitude of bond breach penalties incurred on Nexus-requested bonds issued by other sureties over the prior year.  Ex. 23; Ex. 24.

65. RLI further repeatedly advised Nexus that it would require Nexus to execute an indemnity agreement in RLI's favor, secured Nexus' commitment to do so, and ultimately required Nexus to provide a fully executed copy of the Indemnity Agreement, initialed by Donovan on each of its three pages, before issuing any bonds. Ex. 22; Ex. 12; Ex. 14; Ex. 15; Ex. 25; Ex. 16; Ex. 26; Ex. 17; Ex. 18; Ex. 27; Ex. 24.

66. RLI further advised Nexus on multiple occasions of RLI's expectation that Nexus would pledge a measure of collateral to be held by RLI, which would be re-evaluated and adjusted based on the performance of the program, and obtained Nexus' commitment to provide an initial collateral amount of $500,000.  Ex. 8; Ex. 22; Ex. 12 Ex. 28; Ex. 23; Ex. 15; Ex. 25; Ex. 16; Ex. 24.

67. Prior to issuing any Bonds, RLI advised Nexus that it would require Nexus to provide the collateral security in the amount of $500,000, in five monthly $100,000 installments.  Nexus executed a Collateral Agreement and Receipt memorializing its commitment to provide this initial collateral.  Ex. 14; Ex. 15; Ex. 16; Ex. 26; Ex. 17; Ex. 18; Ex. 27.

68. RLI also requested and obtained information regarding the average life of immigration bonds requested by Nexus.  Ex. 28 ("[o]ne big key for us is the full cycle of these bonds and getting them released by the obligee…we'll monitor the results.");  Ex. 24.

69. RLI further requested and obtained information regarding how the immigration bonds are handled by Nexus and the bonding agent.  Ex. 29; Ex. 24.

70. As part of its pre-program underwriting, RLI also independently gathered third-party information regarding Nexus' financial condition.  *See* Ex. 30.

**R.**    **Nexus Made Significant Representations to Induce RLI to Issue Bonds**

71. In the context of RLI's above-described pre-program underwriting, to induce RLI to issue bonds Nexus made a number of representations regarding its operations, including its

15

historical success rate in mitigating bond losses for other sureties, and its financial capacity and intentions to secure RLI against loss. *See, e.g.*, Ex. 8; Ex. 4 at 106:4–11, 107:15-18; *see also* Ex. 7 at 27:4–9; 56:4–8.

72. A central representation, among others repeatedly proffered by Nexus, and as memorialized in pre-immigration bond program correspondence, was that due to its risk mitigation strategies, Nexus successfully achieved a bond default, or "failure to appear," rate of less than 2%. Ex. 8; Ex. 23; Ex. 31; Ex. 25; Ex. 24; Ex. 3 at 76:9-21; Ex. 4 at 107:15-18 ("Q: Didn't Nexus advise RLI that it had a bond failure rate of less than 2 percent?  **A:  I think that's a legitimate question.  And the answer to that legitimate question is yes."**).

73. Nexus understands that its rate of success in compelling bond principals to appear as required under the bonds is critical to the surety's decision-making as to whether it will issue bonds requested by Nexus. *See* Ex. 5 at 181:15-20 ("Q:  Right.  Because you, you understand that that's important to the Surety, -- **A: Sure**.  Q: -- that you're maintaining a low breach rate.  **A: Yes**."); Ex. 5 at 188:13-16 ("Q: So a surety would certainly be justified in not issuing bonds if it was dissatisfied with the failure rate.  **A: Sure**.").  *See also* Ex. 32 ¶¶ 7,8, 10, 12; Ex. 23.

74. Relatedly, Nexus represented, among other things, that over the immediately preceding year, its prior surety(ies) had written $4 million in premium for immigration bonds (which, at a rate of 10%, equates to bonds with an aggregate penal sum of $40 million) while experiencing less than $50,000 in total bond losses. Ex. 24; Ex. 23.

75. Nexus further represented, among other things, that its ability to achieve a low bond default, or "failure to appear," rate of less than 2% was attributable to its unique technological and other risk mitigation tools and techniques.  Ex. 24; Ex. 8; Ex. 23; Ex. 31; Ex. 25.

76. Nexus attributed its low failure to appear rate to its 24/7 GPS monitoring of bond principals, by which Nexus advised that it always knows the location of bond principals.  The GPS monitor is "worn at all times, even when showering,"  and is described as "the heart of the operation" in a news article – based on an interview with Donovan – that Nexus specifically asked RLI to consider during its pre-program underwriting.  Ex. 31.   The referenced article further provides, in part:

> Immigration bonds require 100 percent collateral, plus a 15 percent non-refundable fee because of the perceived flight risk. Without a home or sufficient cash to collateralize the bond, the immigrant sits in jail.  And so a new Nexus service was born: <u>getting insurance companies to post bonds for detainees</u> with no collateral [*i.e.*, from the detainee], <u>using the ankle bracelets to help assure they won't flee</u>.

> <u>As long as they agree to wear the ankle monitor</u>—clients pay on a sliding scale from $300 to $425 a month—<u>Nexus arranges their release</u> from detention and returns them to their families <u>until their hearing date</u>.

> 'Most of our clients see it as a small price to pay for their freedom,' Donovan said 'Over 99 percent make their court appearances.'

Ex. 31; Ex. 25; *see also* Ex. 7 at 34:4–8; 35:18–21; 83:15–84:6; 124:13–22.

77. Nexus represented that, upon receipt of a bond demand, either the principal voluntarily appears or Nexus jumps in and locates the individual to facilitate the return of the bond principal to detention, thereby discharging bond liability through cancellations.  Ex. 8; Ex. 23; Ex. 25; Ex. 24.

78. Another important risk mitigation technique Nexus identified was its highly selective initial screening and scoring process whereby Nexus represented that it only requested bonds for low risk detainees.  This process included reviewing each applicant's: length of time in the U.S., home plan, family residing in the U.S., work plan, and prior criminal history.  *See* [ECF No. 13-2 at 3, "Risk Assessment Instrument"];  Ex. 22; Ex. 23; Ex. 25; Ex. 24.  *See also* Davis Dep. Tr. at 50:13-51:11, attached hereto as **Exhibit 33**.

79. Nexus represented that it does <u>not</u> request bonds for detainees that have criminal records.  Ex. 22; Ex. 23; Ex. 25.  *See also* Ex. 33 at 50:13-51:11.

80. Relatedly, in response to RLI's "key concern" regarding the life span of the bonds, Nexus further represented that the bonds it requested were resolved in an average of six months, though noting that some such bonds could last for up to 18-24 months if multiple appearances were required.  Ex. 24.

81. Nexus further represented that, through its risk mitigation tools and techniques, the sureties from whom it requests bonds never experience a loss.  Ex. 22 "We expect a zero percent loss ratio"; Ex. 23; Ex. 24.

82. Nexus further represented that its business was sufficiently robust to ensure that, in the relatively few instances where bond forfeiture is required, Nexus pays the claim so that the surety is not required to use its own funds or to incur a loss on the requested bonds.  Ex. 24.

83. To that end, on June 17, 2015, Nexus represented that its operating income for 2014 was $6,006,499, and its net income for 2014 was $1,048,959; and that, based on actual performance through the end of May 2015, its projected net income for 2015 would be $3,286,117. Ex. 34;  Ex. 35.

84. Prior to RLI issuing the Bonds, on January 20, 2016, Nexus represented that its total revenue for 2015 was $33,197,006 and its net income for 2015 was $5,826,328.  Ex. 36.  Further, on February 10, 2016, Nexus provided RLI with a Balance Sheet dated January 1, 2016, which represented Nexus total capital at $10,881,761.  Ex. 37.

85. Nexus advised RLI that it would provide RLI with collateral security and, on February 10, 2016, the day before RLI issued its first immigration bond, further represented through Donovan that Nexus had already processed its first $100,000 monthly installment of collateral

owed to RLI under the Collateral Agreement.  Ex. 37; Ex. 38; Ex. 28; Ex. 31; Ex. 16; Ex. 21; Ex. 24.

**S.      RLI's Underwriting Continued After Its First Issuance of Requested Bonds**

86. Surety underwriting does not stop at the commencement of a bond program but rather continues throughout the period during which the surety issues bonds.  Ex. 33 at 17:8–10 (**"But underwriting doesn't stop at the initiation of a program.  Underwriting continues."**); Ex. 10 at 61:1–17.

87. For instance, on February 11, 2016, the same day RLI issued its first Bonds, and continuing thereafter, RLI sought to re-evaluate Nexus and the performance of the immigration bond program, including by immediately (i) requesting another visit to Nexus' Verona campus; and (ii) pursuing additional information, including a packet summarizing the risk mitigation process and the documents reviewed and utilized, that Nexus had promised to assemble and provide regarding Nexus' operations.  Ex. 38; Ex. 39.

88. RLI also continued over the ensuing three to four months to pursue the initial $500,000 collateral in monthly installment payments that Nexus had agreed to provide (but had not paid). Ex. 40.

89. Both before and during the first year of its immigration bond program, RLI also advised Nexus on multiple occasions of its intent to re-evaluate the program and its related underwriting requirements, including the extent to which RLI would adjust its collateral security requirements. Ex. 28.

**T.      The Immigration Bond Program Did Not Perform as Represented by Nexus**

- **The Bonds Extended Beyond an Average of 6 Months**

90. On February 11, 2016, RLI issued its first immigration bonds.  Ex. 41.

91. By the end of March 2016, RLI had issued bonds with an aggregate penal sum of approximately $6,479,500, or over twenty percent of the 2,486 Bonds issued by RLI.  Declaration of David J. Grycz ("Grycz Decl.") ¶ 3.

92. By the end of September 2016, six months later, only 16 Bonds had been cancelled, as confirmed by receipt of a Notice of Cancellation on ICE Form I-391.[7]  Grycz. Decl. ¶ 4.

93. By the end of March 2017, another six months later, only 60 Bonds had been cancelled, as confirmed by receipt of a Notice of Cancellation on Form I-391.  Grycz Decl. ¶ 5.

94. As of March 10, 2020, three years after RLI commenced issuing Bonds, at the request of Nexus, and two years after RLI ceased writing bonds altogether, only 406 (16.3%) of the total 2,486 Bonds issued had been cancelled, as confirmed by receipt of a Notice of Cancellation on Form I-391.  Grycz Decl. ¶ 6.

- **The Failure to Appear/Bond Default Rate Grossly Exceeded 1-2%**

95. By the end of 2016, RLI had received 11 Bond Breach Notices.  Grycz Decl. ¶ 7.

96. By the end of 2016, only 29 of RLI's Bonds had been cancelled by receipt of a Notice of Cancellation on Form I-391.  Grycz Decl. ¶ 7.

97. Thus, as of the end of 2016, the RLI Bonds were breaching at a rate of approximately 27.5%.  Grycz Decl. ¶ 8.

98. Currently, the RLI bonds are breaching at a rate approaching 50%.  RLI UF ¶ 206, *infra*.

- **Nexus' Other Representations were Also Untrue**

99. Nexus is not monitoring RLI Bond Principals.  As of November 2018, Nexus represented that it was GPS monitoring only 60% of RLI Bond Principals.  Schneider 11/26/18

---

[7] When the performance obligation(s) of a Bond has been satisfied or when another event of cancellation as specified on a Bond has occurred, the Government typically cancels the Bond by issuing an Immigration Form I-391.  *See* Ex. 43 (sample Notice of Cancellation); ECF No. 5 at 38.

30(b)(6) Dep. Tr. at 166:14-22, attached hereto as **Exhibit 42.**  In January 2020, Nexus' monitoring vendor, Buddi USA LLC, provided information that only 91 of 1,769 remaining RLI Bond Principals were being monitored.  *See* RLI UF 200, *infra*.  Thereafter, in February 2020, Nexus - without notice to RLI - advised Buddi to cease GPS monitoring of RLI Bonded Principals altogether.  *See* RLI UF 201, *infra*.

100.    In addition, Nexus testified at the second Preliminary Injunction hearing that it has, in some cases, contrary to the Bond performance obligations and without the agreement of RLI as surety on the Bonds, to instead breach and pay Bonds for humanitarian reasons:

Q: And you testified that about 50 percent of the bonds that have been breached and paid over the course of this program, you're saying that **Nexus made the decision to, for humanitarian reasons, to pay those bonds; is that correct?**

**A: Yes.**

[Ex. 6 at 134:21-25].

101.    Contrary to Nexus' representations to RLI when Nexus was convincing RLI to start the immigration bond program, in practice Nexus would not exclude an alien from participating in the program based upon a violent crime conviction:

Q: Well, so Nexus would not exclude somebody from participating in its program based on having a violent crime conviction.  Is that fair?

A: Yeah.

[Ex. 5 at 249:5-20].

102.    Nexus does not keep track of the percentage of bonds that receive Notices to Deliver.

Q: And what percentage of bonds receive notice to deliver?

A: I have no idea.  We don't track that.

21

[Ex. 4 at 34:12-14].

103.    As discussed further *supra*, Nexus does not pay timely as required to ensure that RLI does not have to use its own funds.  *See infra*; *see also* Ex. 6 at 57: 11-15.

104.    Despite providing RLI financial statements represented as demonstrative of Nexus' financial condition, Nexus does not even know whether it is operating at a profit or loss.  *See* RLI UF 188-89.

- **Nexus Failed to Perform and Discharge the Bonded Obligation in Response to the First Three Notices to Deliver, Resulting in Three Bond Breaches by September 2016**

105.    By May 10, 2016, RLI received its first Bond claim, in the form of a Notice to Deliver for a Bond Principal with the initials DMH ("Claim 1") Ex. 44.

106.    On or about June 9, 2016, RLI received its second and third Bond claims, in the form of Notices to Deliver, for Bond Principals with the initials LRV ("Claim 2") and GMR ("Claim 3").  Ex. 45.

107.    On June 23, 2016, RLI received a Bond Breach Notice on Claim 1, indicating that Nexus had failed to deliver Bond Principal DMH on the date and at the location demanded in the corresponding Notice to Deliver.  Ex. 46.

108.    On July 14, 2016, RLI received Bond Breach Notices on Claim 2 and Claim 3, indicating that Nexus had failed to deliver LRV and GMR on the dates and at the locations demanded in their respective Notices to Deliver.  Ex. 47; Ex. 48.

109.    By August 29, 2016, RLI received a Bond Breach Invoice on Claim 1, [Ex. 49], and by September 19, 2016, RLI received Bond Breach Invoices on Claims 2 and 3. Ex. 50.

- **Nexus Failed to Timely Discharge the Bond Forfeiture Obligations Resulting from the First Three Bond Breaches**

110.     On October 24, 2016, RLI received Past Due Notices on Claims 2 and 3, which increased RLI's total aggregate exposure on the Bonds by DHS' assessment of additional interest Ex. 51.

111.     On December 15, 2016, RLI received a Treasury letter from DHS, which, among other things: (i) detailed and documented the history of Claims 1, 2 and 3; (ii) noted that each of their corresponding Bond Breach Invoices was past due, in the combined amount, including additional interest, of $52,587.78; and (iii) further warned RLI that continued failure to pay these three delinquent Bond Breach Invoices could involve a referral to Treasury and to the DOJ.  Ex. 9.

- **Nexus Failed to Provide Access to Requested Records Pertaining to the First Three (and other) Bond Claims**

112.     By email dated October 3, 2016, RLI's Laura Piispanen requested copies of any Bond appeals filed by Nexus (based on her understanding from Nexus that Nexus files appeals as to all Bond claims), or at least a confirmation that an appeal was filed as well as status updates as to all Bonds that receive a Breach Notice or Invoice. Ex. 52.

113.     By emails dated December 15, 2016, RLI's Sandoz further requested that Nexus, as a matter of practice, provide (i) copies of all appeals filed; and (ii) a copy of any check sent to DHS to discharge a Bond Breach Invoice.  Ex. 53.

114.     On December 21, 2016, Piispanen demanded: (i) proof confirming that checks had been cut by Nexus for Claim 1 [Ex. 54] and Claim 2 [Ex. 55]; and (ii) proof confirming the filing of appeals related to six additional invoices.  Ex. 56.

115.     Despite RLI's repeated additional requests for contemporaneous copies of Bond Breach payments and appeals, and related tracking information, both then and over the ensuing

three years, Nexus has ignored or failed to comply with almost all such requests to date.  ECF No. 1-4; Grycz Decl. ¶ 8.

- **Nexus Misrepresented Facts Regarding Its Exceedingly Late Payment of the First Three Bond Breach Invoices**

116.    On December 29, 2016, RLI, again demanding payment on Claims 1-3, advised Nexus of the serious consequences of the delinquent payments, and in particular, of the risk RLI faced of further action by the government (potential Treasury referral) and the danger of losing its relationship, "if not more," with the government.  Ex. 57.

117.    On December 30, 2016, Erik Schneider, Nexus' Vice President of Risk Management, informed RLI via telephone that checks for Claims 1, 2, and 3 would be issued by Nexus on January 5, 2017.  Ex. 58; *see also* Ex. 32 ¶ 4.

118.    On January 10, 2017, RLI requested confirmation that checks for Claims 1, 2, and 3 had been issued, as Nexus represented, on January 5, 2017.  Ex. 59.  Micheal Donovan advised RLI that he had confirmed the checks were cut and sent on January 5, 2017 and promised to have the Nexus finance team pull copies of the checks for RLI's records.  Ex. 60.

119.    When the copies of the three checks that had been promised by Donovan were not received, RLI again requested copies of the checks for Claims 1, 2, and 3 on January 17, 2017.  Ex. 61.  In response on that same date, Richard Moore, Nexus' Executive Vice President, promised to send copies "asap."  Ex. 62; *see also* ECF No. 240 ¶ 3.

120.    After still not receiving copies of the three checks, RLI requested copies again on January 20, 2017.  Ex. 63.  In response, on January 20, 2017, Richard Moore sent scanned copies of three handwritten checks, each of which was dated January 5, 2017.  Ex. 64.

121.    On January 23, 2017, RLI forwarded copies of the three checks to DHS to confirm payment had been received.  Ex. 65.  However, DHS advised on January 27, 2017 that the checks

24

had still *not* been received, more than three weeks after Nexus had advised they were sent.  Ex. 66.

Consequently, on January 30, 2017, Bart Davis, an RLI Vice President, advised Donovan that RLI

would be compelled to pay the 3 bond invoices on February 1, 2017 and advised that RLI would

be suspending the authority for the issuance of additional bonds effective February 1, 2017.  Ex.

67.

122.    On February 3, 2017, DHS confirmed that it had finally received checks from

Nexus for Claims 1, 2, and 3 [Ex. 68], all hand-dated January 5, 2017, but noted (by reference to

the stamps on the applicable mailing envelopes) that at least two of the checks had not actually

been mailed out by Nexus until January 30, 2017, *not* on January 5, 2017 as Nexus had previously

represented to RLI and which RLI told DHS based upon Nexus' representations. Ex. 69.

**U.    Nexus Repeatedly and Materially Breached the Indemnity Agreement by Refusing RLI's Demands for Access to Books, Records and Accounts**

123.    Between February 2016 and February 2017 Nexus consistently refused to comply

with RLI's repeated general and specific demands for routine business records, including in

particular, past and contemporaneous copies of all (i) submitted checks and related tracking

information for payment of invoices; (ii) bond breach appeals or invoice disputes and related

substantiating documentation and tracking information; (iii) I-797C receipts confirming DHS'

receipt of appeals; and (iv) DHS responses to appeals and disputes.  *See, e.g.*, *supra* RLI UF ¶¶

112-122; *see also* ECF No. 59 at 2–3, 13.

124.    On February 28, 2017, RLI's Vice President of Surety, Greg Chilson,  convened a

call with RLI's Vice President, Surety Claims, Ira Sussman, and Nexus' Donovan, and then

followed up with an email further requesting an in-person meeting with Donovan, as soon as

possible, offering any day the next week and 9 additional alternative dates over the ensuing four

weeks, and requested Donovan's available dates. Ex. 70; Ex. 10 at 9:7-9;  ECF 1 at 20 ¶ 1.

125.     In addition to the foregoing concerns, it was clear by March 2017 that RLI's approximate $30 million in outstanding Bonds both were <u>not</u> going to be resolved within the timeline represented by Nexus and were already breaching with a frequency far in excess of Nexus' represented success rate and annual loss projections.  *See* Ex. 10 at 38:5-39:9; 40:19-42:7; 106:10-108:1.  *See also* Ex. 33 at 36:12-41:3; 42:16-46:4.

126.     By letter dated March 3, 2017, and a related email on March 6, 2017, RLI renewed its demand for a meeting and available dates and issued a formal, "urgent" demand under Paragraph 3.c of the Indemnity Agreement for access to a more complete set of Nexus' books, records and accounts, including documents reflecting Nexus' financial condition as well as critical records and information for each RLI Bond (*e.g.*, all notices of breach of any Bond; all invoices received in connection with any alleged breach of Bond; all payments made in satisfaction of any such invoices; any spreadsheets that track that information; etc.), and requested a response by March 10, 2017.  ECF Nos. 1-4, 1-5.

127.     In its March 3, 2017 letter, RLI specifically alerted Nexus to its further "cause for concern," specifically RLI's (then recent) receipt of several additional past due invoices from DHS on six separate Bonds and which "purport to increase RLI's exposure," and accordingly once again reiterated RLI's request to Nexus that it was "imperative, going forward, that Nexus copy RLI on all responses to any and all bond demands, whether by payment or appeal, contemporaneously with Nexus' submission thereof to the government."  ECF No. 1-4 at 2.  RLI further explained its "broader concern with delays and deficiencies in Nexus' responses to RLI's requests for specific records and information," without which RLI "cannot adequately protect its interests and evaluate its exposure … in accordance with RLI's rights under the [Indemnity Agreement]."  *Id.*

128.     Nexus did not comply with RLI's March 3, 2017 and March 6, 2017 requests and, notwithstanding its receipt of these demands, did not respond at all.  *See* ECF No. 1-6; *see also* ECF No. 59 at 3.

129.     On March 13, 2017, having received no response whatsoever to its March 3, 2017 letter and March 6, 2017 email, RLI issued another letter, which again renewed its request for access to records and a meeting and further issued an additional formal demand, under Paragraph 3.d of the Indemnity Agreement that Nexus either procure RLI's discharge without loss from all bonds or provide $10 million in collateral security to be held by RLI to cover a portion of its continued exposure under the Bonds.  RLI reiterated that a series of foregoing events had compounded RLI's concerns regarding its exposure on the Bonds.  RLI further advised that Nexus' failure to respond to RLI requests for information regarding Bond claims, payments and appeals had "deteriorated to the point that Nexus ha[d] stopped communicating altogether with RLI's claim personnel." ECF No. 1-6.

130.     Nexus confirmed the latter point in an email dated March 14, 2017, in which Donovan apologized to Mr. Sussman for Nexus' prolonged lack of communication, advising, "[i]t is absolutely unacceptable that our RM [Risk Management] department has not been in better contact" given the more than six weeks since Nexus' last communication."  Ex. 71.

131.     As with RLI's March 3 and March 6, 2017 demands, Nexus also did not comply with RLI's March 13, 2017 demand that Nexus either procure RLI's discharge without loss from all bonds or provide $10 million in collateral security to be held by RLI.  In fact, Nexus deemed RLI's demand for collateral to be "ridiculous" and thus did not respond.  *See* Ex. 4 at 390:2–5.

132.     After refusing many RLI requests and demands to visit Nexus' Verona campus to review records, Nexus finally agreed to receive RLI there on May 26, 2017.  However, Nexus did

not permit RLI to review any of its books, records or accounts during that visit.  *See* ECF Nos. 1-7 and 1-8.

133.    As memorialized in subsequent RLI letters dated June 1, 2017 (ECF No. 1-7) and June 19, 2017 (ECF No. 1-8), through which RLI issued further formal demands for access to Nexus' books, records and accounts, Nexus did commit at the meeting to produce to RLI numerous specific categories of its documents, including but not limited to I-340 Notices to Deliver, I-797C Notices (and certified mail receipts and tracking numbers for any appeals filed), copies of any checks paid under the terms of the bonds (and related certified mail receipts and tracking numbers), and updated financial information of Nexus.  ECF No. 1-7.

134.    However, despite RLI's formal follow up demands for production of such records, Nexus did not provide most of them.  *See, e.g.*, ECF No. 1-8.

135.    Rather than produce the promised documents, Nexus began to assert that it would require RLI to execute a confidentiality agreement before it would permit access to any of its books, records or accounts.  *See* Schneider Decl. ¶¶ 29–30, 34–35, ECF No. 13-1; *see also* 4/27/18 Hearing Tr. at 34:21–35:1, attached hereto as **Exhibit 72**.

136.    Although Nexus has included confidentiality provisions in numerous other agreements, including other surety indemnity agreements, Nexus did not negotiate for such a provision in the RLI Indemnity Agreement, which contains no confidentiality agreement.  *See* ECF No. 1-2; Ex. 72 at 40:7–13 ("[Nexus] entered a contract to show them the books and records … and what you want to [*sic*] me to do is change the contract.  You want me to say, 'Oh, well, you know, you have to have a confidentiality agreement now.'  That's not what you contracted for.  And you should be required to show them these documents because you contracted for it."); *see also* Ex. 73.

28

137.    Notwithstanding, although not required by the Indemnity Agreement, when it became clear that Nexus would not comply with its express obligations under the Indemnity Agreement absent execution of a further confidentiality agreement, RLI agreed to review any confidentiality agreement proposed by Nexus and tried to negotiate a protective order, but the parties could not reach an agreement. *See* Ex. 72 at 19:5–22; *id.* at 34:21–35:1; *id.* at 100:7–10; *id.* at 100:18–21; ECF No. 59 at 3.

138.    On April 12, 2018, having not received the demanded access to books, records or accounts or any collateral security from Nexus for more than one year from its March 2017 formal requests under the Indemnity Agreement, and based on other breaches detailed hereafter, RLI filed this action against Nexus further demanding compliance and seeking enforcement by preliminary injunction of such rights.  ECF No. 1.

139.    By Opinion and Order dated July 2, 2018, subsequently clarified by Order dated August 22, 2018, the Court determined that Nexus had breached its obligation under Paragraph 3.c. of the Indemnity Agreement and granted RLI a first preliminary injunction that compelled Nexus to provide RLI with unfettered access to a broad subset of the books, records and accounts that RLI had formally requested under the Indemnity Agreement, including all those bearing on Nexus' financial condition and ability to satisfy its obligations under the Indemnity Agreement and all those relating to the status of the Bonds, including payments, forfeitures, cancelations and penalties  ECF Nos. 59, 60, 79.

140.    As is clearly established in this case's docket, Nexus refused to produce extensive documentation covered under the preliminary injunction order, including for instance, documentation regarding 12 of 15 previously identified non-bank escrow accounts; applications and agreements for RLI Bond program participants (that is, the bonded aliens) and related records

used to mitigate RLI's risk of loss on the Bonds; data reflecting on any tracking spreadsheet and other data and documents for RLI Bond program participants "that pertain to the tracking of breaches, appeals, exposure, liability and the status of RLI Bonds[,]"; GPS monitoring records for former GPS providers used by Nexus; GPS vendor invoices and services agreements; source financial documents bearing on Nexus' financial condition and ability to satisfy its obligations under the Indemnity Agreement, such as (but not limited to) those substantiating revenue streams from (i) monthly program fees, (ii) participant "sign-up" fees; and (iii) rental income receivables and receipts; and invoices to substantiate large categories of expenses on Nexus' financial statements. *See* ECF No. 191 (Sixth [and Final] Status Report by Special Master).

141.    Moreover, Nexus has withheld substantial stores of its books, records and accounts related to both the status of the Bonds and Nexus' financial condition, despite successive Court orders in this case requiring their production.  For instance, as late as February 19, 2020, Nexus confirmed that it had still had not produced extensive documentation regarding 2,280 RLI Bonds from Nexus' Capsule and Lightspeed databases files.  *See* Nexus' Notice, ECF No. 401.

142.    As another example, as of March 12, 2020, Nexus has still not provided comprehensive spreadsheets maintained by Nexus' "bond breach department" that set forth the number of breaches and bonds paid each month. *See* Ex. 1 at 133:16–135:12.

143.    Further, Nexus also has failed, to date, to provide financial documents reflecting its actual financial condition.  *See infra* RLI UF Section AA.

## V.    <u>Nexus Has Repeatedly and Materially Breached the Indemnity Agreement by Refusing to Exonerate RLI</u>

144.    Beginning with its mishandling of the first three Notices to Deliver, Breach Bond Notices, and Invoices, Nexus has failed to comply with its obligation to exonerate RLI by

delivering the bonded principal pursuant to the terms of the Bond, and thereafter failing to pay Bond Breach Invoices.  *See supra* RLI UF Section T.

145.     Since the inception of this immigration bond program, and in accordance with the express terms of the Indemnity Agreement, RLI has repeatedly and unwaveringly demanded that Nexus timely exonerate it with respect to its obligations under the Bonds.  *Id.*  With respect to the timing of the payment of Bond Breach Invoices, Nexus understands that RLI consistently demanded that they be paid when due pursuant to the terms of the Invoice.  *See* Ex. 4 at 56:16–57:6; 213:17–20; 214:6–9.

146.     To that end, for instance, RLI forwarded the Notices to Deliver on the above-referenced Claims 1-3 to Nexus, promptly upon its receipt thereof.  *See, e.g.*, *supra* RLI UF ¶¶ 107-109.

147.     Although Nexus had undertaken the obligation to satisfy the Bonds' performance obligations in response to such Notices to Deliver, Nexus failed to timely do so in each of these first three instances.  *See supra* RLI UF ¶ 109.

148.     Thereafter, over an approximate five-month period, RLI issued numerous demands that Nexus timely pay the three ensuing Bond Breach Invoices that resulted from Nexus' failure to exonerate RLI and comply with the Bonds' performance obligations, but Nexus failed to comply with those demands.  *See supra* RLI UF ¶¶ 112-122; *see also* Grycz Decl. ¶ 9.

149.     Over that timeframe, and with respect to hundreds of Bond Breach Invoices received over the next two years, RLI repeatedly advised Nexus that its failure to timely pay such invoices when due was increasing RLI's exposure beyond the penal sum of the Bonds, negatively impacting RLI's relationship with the federal government, and putting RLI's surety business at

risk by jeopardizing its status with Treasury as a surety approved to issue bonds for the federal government.  *See id.*; Grycz Decl. ¶ 10.

150.    Notwithstanding, since the first three Claims, Nexus has continued to regularly refuse to timely pay invoices as demanded by RLI and as required under the Indemnity Agreement. *See id.*; Grycz Decl. ¶ 11.

151.    For instance, on March 28, 2018, RLI – following up on a March 9, 2018 email regarding various (then) outstanding invoices – advised Nexus that RLI had been required to cut checks for 8 past due invoices that Nexus had failed to pay, and that if Nexus did not provide proof of payment by the close of business the next day, RLI intended to send the 8 checks to DHS.  *See* ECF No. 1-12.

152.    Upon receiving no proof of payment from Nexus, on March 30, 2018, RLI paid $83,872.14 to DHS for the 8 aforementioned bond claim invoices.[8]  *See* Ex. 6 at 76:25–77:20; *see* Plaintiff's 11/28/18 Hearing Ex. 1, ECF No. 138-1.

153.    Upon incurring $83,872.14 in then-unreimbursed bond claim payments, on April 12, 2018, RLI filed its first motion for preliminary injunction.  ECF No. 4; *see also* Piispanen Decl. ¶ 5, ECF No. 107-2.

154.    Only after RLI filed its first motion for preliminary injunction did Nexus reimburse RLI in the amount of $83,872.14, in checks that were received by RLI on May 14, 2018, June 1, 2018, and June 8, 2018.  *See* Ex. 6 at 76:25–77:20.

155.    Thereafter, from April 12, 2018 (*i.e.*, the date on which RLI filed its first motion for preliminary injunction) until October 23, 2018 (*i.e.*, the date on which RLI filed its second

---

[8] Because March 30, 2018 was the Good Friday holiday, these 8 RLI checks are sometimes colloquially referred to within the record as the "Good Friday Checks."

motion for preliminary injunction), the amount of accrued, unpaid bond invoices increased to $709,789.37.  *See* Piispanen Decl. ¶ 5, ECF No. 107-2.

156.    Further, beginning on September 6, 2018, Nexus refused to pay *any* Bond claim invoices.  Piispanen Decl. ¶ 5, ECF No. 107-2; *see also* Order at 3, ECF No. 139 (noting "Nexus' history of making payments [on bond invoices] up until September 2018…." (emphasis added)); Ex. 6 at 50:12–15.

157.    Prior to filing its second motion for preliminary injunction, RLI received a concerning letter from DHS, dated September 28, 2018, which, among other things, expressed DHS' expectation that RLI would "uphold its duty to pay invoices issued on legally-valid bond breaches without the Government referring delinquent debts to the Department of Treasury for further collection efforts."  ECF No. 107-2 ¶ 9 & Ex. A.

158.    Thereafter, on October 5, 2018, RLI sent a letter to Nexus demanding exoneration on all (then) outstanding bond breach invoices and attaching a spreadsheet that RLI had received from DHS listing all such invoices, as well as the corresponding amounts due, totaling $709,789.37. ECF No. 107-2 ¶¶ 11–13 & Ex. B.

159.    In a letter dated October 10, 2018, Nexus refused to exonerate RLI for the bonds listed in the October 5, 2018 letter in the aggregate amount of $709,789.37, relying, at least in part, on its representation that certain of "the bond cases at issue are on appeal."  ECF No. 107-2 ¶ 15 & Ex. C.

160.    While RLI has declined Nexus' requests to cede over to Nexus RLI's express exclusive authority under Paragraph 2.b.(i) of the Indemnity Agreement to determine whether to pay, appeal or dispute Bond Breaches and Invoices, RLI has consistently advised Nexus, on several occasions, that RLI would consider submitting Nexus' desired appeals and disputes, on a case-by-

case basis, if Nexus identified meritorious grounds and provided RLI with the supporting documentation. Ex. 74; Grycz Decl. ¶ 12.  Rather than providing back-up documentation, Nexus proceeded to pursue its desired appeals and disputes by collaborating with Big Marco, the co-obligor on the RLI's Bonds, and Nexus admits that nothing RLI did, or did not do, prevented Nexus from pursuing any of its desired appeals or disputes of RLI Bond Breaches or Invoices. *See* Ex. 3 at 425:8–17; Ex. 4 at 193:7–194:4.

161.    On October 23, 2018, RLI filed its second motion for preliminary injunction (ECF No. 106) seeking to enforce, by specific performance and injunction, its rights under Paragraphs 2(a)(ii) and 3(d) of the Indemnity Agreement, by compelling Nexus to (i) exonerate RLI by immediately paying all (then) outstanding breach claims for which DHS had issued invoices, which at that time was 59 in number and in the aggregate amount of $709,789.37; and (ii) secure RLI from anticipated exposure to future bond liability by depositing $10 million in collateral security with RLI.  ECF No. 106.

162.    At the time of the second motion for preliminary injunction, of the 2,486 Bonds issued at Nexus' request, 266 had been cancelled, as evidenced by receipt of a I-391 Notice of Cancellation, and 163 had received Bond Breach Invoices and been paid.  As a result, out of the 429 Bonds for which the disposition was known, 38% resulted in a Bond Breach Invoice that was required to be paid.  Thus, from the life of the program through November 2018, RLI's Bonds were breaching at a rate of 38%.  *See* ECF No. 138-1; Ex. 6 at 43:4–20.

163.    On November 28, 2018, the Court held a full-day evidentiary hearing on RLI's second motion for preliminary injunction and, on November 29, 2018, entered an Order ("Second PI Order") granting, in part, RLI's motion, in which it found, *inter alia*, that RLI "established all elements of the prima facie case for a breach of contract claim" and that RLI "faces irreparable

34

harm in two respects," (Order at 2), and accordingly required Nexus, among other things, to (i) pay $116,540.81 to RLI by November 30, 2018 to satisfy the (then) "remaining balance of the sum already paid by RLI for bond penalties"; (ii) pay $484,854.03 to RLI for "past due bond penalties" by December 24, 2018; and (iii) for "each succeeding month until the time of trial … timely tender to … RLI for submission to DHS, payment for the bond penalties invoices by DHS."  Second PI Order at 4, ECF No. 139.

164.    Moreover, month after month, Nexus continuously did not timely pay in full all bond breach invoices as they became due under the terms of the Second PI Order.  For instance, from January 1, 2019 until entry of the Court's April 11, 2019 Order ("April 11 Order") amending the Second PI Order, RLI, in accordance with the Second PI Order, served monthly demand letters on (i) January 17, 2019, demanding $307,557.26 for 29 invoices, for which Nexus paid only $229,056.50 in January 2019 (*see* Suppl. & Am. Piispanen Decl. ¶ 11, ECF No. 151-1); (ii) February 15, 2019, demanding $44,793 for three invoices as well as an unpaid past due balance from January 2019; and (iii) March 18, 2019 (*see* ECF No. 278-2), demanding $127,000 for 10 invoices, for which Nexus refused to remit payment in full satisfaction and failed to remit payment for 6 of those 10 invoices in the aggregate amount, inclusive of accrued interest, of $78,067.17, until (7 months later) November 2019.  ECF No. 359 ¶¶ 14–15.

165.    Thereafter, under the April 11 Order [ECF No. 215],[9] RLI served upon Nexus monthly letters from May 2019–January 2020 demanding payment of bond breach invoices that were falling due in each such month under the terms of the April 11 Order as follows:

> i.    **May 10, 2019** (ECF No. 278-3) – demanding timely payment of 8 bond invoices in the aggregate amount of $64,066.75;

---

[9] Significantly, the April 11 Order provided Nexus *additional* time past the due date of the Bond Breach Invoice, requiring Nexus to make payment after RLI's receipt of a Treasury letter and a past due notice.  *See* Order, ECF No. 215.

    ii.    **June 10, 2019** (ECF No. 278-5) – demanding timely payment of 6 bond invoices in the aggregate amount of $48,041.34;

   iii.    **July 10, 2019** (ECF No. 278-9) – demanding timely payment of 10 bond invoices in the aggregate amount of $100,086.11;

   iv.    **August 9, 2019** (ECF No. 278-11) – demanding timely payment of 6 bond invoices in the aggregate amount of $80,569.31;

    v.    **September 10, 2019** (ECF No. 278-12) – demanding timely payment of 16 bond invoices in the aggregate amount of $162,659.93;

   vi.    **October 10, 2019** (ECF No. 301-1) – demanding timely payment of 7 invoices in the aggregate amount of $81,570.18;

   vii.    **November 8, 2019** (ECF No. 359-2) – demanding timely payment of 10 invoices in the aggregate amount of $107,141.32;

  viii.    **December 10, 2019** (ECF No. 359-4) – demanding timely payment of 12 invoices in the aggregate amount of $135,116.28; and

   ix.    **January 10, 2020** (ECF No. 359-1) – demanding timely payment of 7 invoices in the aggregate amount of $105,090.41.

166.    As substantiated in documentation filed throughout the course of this litigation, and as summarized in the three spreadsheets admitted, without objection, as exhibits[10] during the January 22, 2020 hearing on RLI's Motion to Enforce the Terms of the Second PI Order as Modified by the April 11 Order, Nexus did not pay the bond obligations when requested by RLI (within 30 days of the Bond Breach Invoice date) and by the corresponding deadlines set forth by the Court's Order, in that by January 22, 2020:

    i.    **May 10 Demand** -- Nexus had failed to timely pay 3 bond breach invoices within 30 days of their respective invoice dates or even by the subsequent respective payment deadlines set by the April 11 Order, in a total value inclusive of assessed delinquent debt interest of $37,031.86;

   ii.    **June 10 Demand** – Nexus had (a) failed to timely pay 3 bond breach invoices within 30 days of their respective invoice dates or even by the subsequent respective payment deadlines set by the April 11 Order, in a total value inclusive of assessed delinquent debt interest of $21,851.38; and (b) still had not paid three bond breach invoices in a total value inclusive of assessed delinquent debt interest of $26,189.96;

---

[10] *See* (i) RLI's Ex. 1 to 1/22/20 Hearing, ECF No. 362-1 ("Summary of Nexus' Contempt by Failure to Pay Past Due Invoices") ("yellow" colored spreadsheet); (ii) RLI's Ex. 2 to 1/22/20 Hearing, ECF No. 362-2 ("Summary of Nexus' Contempt by Delayed Payments of Past Due Invoices") ("green" colored spreadsheet); and (iii) RLI's Ex. 3 to 1/22/20 Hearing, ECF No. 362-3 ("Summary of Monthly RLI Bond Demands & Nexus Responses") ("orange" colored spreadsheet) (sometimes collectively referred to as the "1/22/20 Spreadsheet Summaries").

    iii.   **July 10 Demand** – Nexus had (a) failed to timely pay 6 bond breach invoices within 30 days of their respective invoice dates or even by the subsequent respective payment deadlines set by the April 11 Order, in a total value inclusive of assessed delinquent debt interest of $58,659.13; and (b) still had not paid two bond breach invoices in a total value inclusive of assessed delinquent debt interest of $19,885.04;

    iv.   **August 9 Demand** – Nexus had (a) failed to timely pay one bond breach invoice within 30 days of its respective invoice date or even by the subsequent respective payment deadline set by the April 11 Order, in a total value inclusive of assessed delinquent debt interest of $12,232.33; and (b) still had not paid two bond breach invoices in a total value inclusive of assessed delinquent debt interest of $22,429.27;

    v.   **September 10 Demand** – Nexus had (a) failed to timely pay 5 bond breach invoices within 30 days of their respective invoice dates or even by the subsequent respective payment deadlines set by the April 11 Order, in a total value inclusive of assessed delinquent debt interest of $48,949.35; and (b) still had not paid four bond breach invoices in a total value inclusive of assessed delinquent debt interest of $57,070.88;

    vi.   **October 10 Demand** – Nexus had (a) failed to timely pay 2 bond breach invoices within 30 days of their respective invoice dates or even by the subsequent respective payment deadlines set by the April 11 Order, in a total value inclusive of assessed delinquent debt interest of $27,517.75; and (b) still had not paid two bond breach invoices in a total value inclusive of assessed delinquent debt interest of $27,245.25;

    vii.   **November 8 Demand** – Nexus had (a) failed to timely pay 2 bond breach invoices within 30 days of their respective invoice dates or even by the subsequent respective payment deadlines set by the April 11 Order, in a total value inclusive of assessed delinquent debt interest of $35,659.31; and (b) still had not paid five bond breach invoices in a total value inclusive of assessed delinquent debt interest of $53,020.11; and

    viii.   **December 10 Demand** – Nexus had still had not paid 9 bond breach invoices set forth in RLI's December 10, 2019 Demand Letter, in a total value inclusive of assessed delinquent debt interest of $100,231.12.

167.    Indeed, at the time of the January 22, 2020 hearing, Nexus *still had made no payment at all for* 28 bond breach invoices set forth in RLI's June-December 2019 Demand Letters, in a total value, inclusive of assessed delinquent debt interest, of $306,071.63 -- some of which were more than <u>150 days past due</u> – with an additional $105,090.41 set forth in RLI's January 2020 Demand letter not yet paid and due two days after the January 22 hearing. *See, e.g.*, RLI's Ex. 1 to 1/22/20 Hearing, ECF No. 362-1; *see also* Ex. 4 at 68:13–18; 86:7–13; 90:19–22

(confirming that Nexus has no reason to dispute the accuracy of the data contained in the "green" and "orange" colored summary spreadsheets, ECF Nos. 362-2 & 362-3 and acknowledging that Nexus reviewed the "yellow" summary spreadsheet, ECF No. 362-1, with Nexus' own records to ensure that the data contained therein is accurate).  Moreover, with regard to the Bond Breach Invoices paid late – or not at all – any appeal of the Invoices had been dismissed by the AAO prior to the Invoice date, and often months before the payment deadline established by the Court Order. *See* 1/22/20 Spreadsheet Summaries.

168.    In light of the foregoing failures of Nexus to timely pay or to pay at all bond breach invoices, on September 30, 2019, RLI filed a Motion to Enforce the terms of the April 11 Order ("Motion to Enforce") (ECF No. 278).  On January 29, 2020, the Court issued an Order granting, in part, RLI's Motion to Enforce and found (despite Nexus claiming that it always pays invoices and that RLI never sustained a loss):

> RLI presented evidence establishing that <u>Nexus has both failed to make payments to RLI required by the April [11] Order on time and failed to reimburse RLI in a timely fashion for paying DHS on Nexus's behalf</u>.  ECF No. 359-7.  Since the April [11] Order, RLI has been forced to 'invade its own capital, putting its own funds at risk, and make payments' on past due invoices owed to them by Nexus to DHS 'to avoid certain referral to [the Department of] Treasury.' … <u>Nexus's intransigence in complying with its obligation to indemnify RLI for bond breaches</u> requires continuation of the preliminary injunction.

Jan. 29, 2020 Order, ECF No. 372, at 2–3 (emphasis added).

## W.    <u>Nexus Has Repeatedly and Materially Breached the Indemnity Agreement by Failing to Provide Collateral Security</u>

169.    From the very first discussions between RLI and Nexus, on May 1, 2015, RLI advised Nexus that collateral would be required.  Ex. 75.

170.    On June 18, 2015, RLI again advised Nexus of the requirement for collateral and requested an initial deposit of $500,000.  Ex. 76.

171.    On June 20, 2015, Nexus confirmed its understanding and agreement to provide collateral: "We are willing to put up the 500k in collateral, however, we would like to make five installments of 100k over the course of five months."  Ex. 76.

172.    RLI re-affirmed its request to Nexus that the initial $500,000 in collateral was required prior to the issuance of any of the Bonds, including on June 26, 2015 [Ex. 15] and on November 25, 2015 [Ex. 16].  On January 20, January 29, February 4, and February 9, 2016, RLI again made clear that collateral would be required.  Ex. 17; *see also* Ex. 77; Ex. 78; Ex. 79.

173.    Nexus' collateral security obligations, including RLI's corresponding right to make adjustments as the program progressed, were an essential requirement of the Indemnity Agreement, without which RLI would not have issued the Bonds.  *See* Ex. 10 at 89:17–90:5; 95:12–15.

174.    The request for collateral was not based on outstanding claims.  *See infra*.

175.    On February 10, 2016, the day prior to the first bonds being issued by RLI, Nexus confirmed: "We have also processed the first installment of the collateral." Ex. 37.

176.    Notwithstanding this representation, Nexus never paid the $500,000 initial collateral.  On March 23, 2016, having still not received the agreed-upon collateral, David Sandoz, then of RLI, advised Rick Nagel, Chief Government Affairs Officer of Nexus: "I'm coming to you as you've been my main contact at Nexus and I need your help here.  I haven't received the first installment of the collateral and it's coming close to the end of the month.  This is a reminder that the first installment has to be here in the office by March 31." Ex. 40.  In response, Nexus apologized for the "delay," advised of "internal issues with [its] CFO" and requested a *further* delay until April 15, 2016 to pay the first installment and then until a delay until May 1, 2016 for the second installment.  Ex. 40.

177.    In April 2016, RLI understood and expected that Nexus would pay all losses or RLI would use the anticipated collateral to pay such losses—and if the collateral was used, Nexus would replenish it back to $500,000.  Ex. 80.

178.    Thereafter, in June 2016, there were discussions regarding reducing the collateral amount to $250,000, including Nexus' payments in the amount of $50,000 by June 15, 2016 and $50,000 by July 15, 2016, and that the program would be evaluated again in May 2017 to determine the requisite collateral.  Ex. 81.

179.    By September 30, 2016, and certainly by November 9, 2016, RLI had advised Nexus of its intent to cease issuing Bonds, and there were discussions between the parties regarding transitioning the entire immigration bond program to a new surety.  Ex. 82; Ex. 83.

180.    On December 7, 2016, RLI expressly advised Nexus: "We are going to need collateral amounting to 5% of the total exposure RLI has outstanding at any point in time which will be reviewed periodically.  RLI's current exposure is approximately $25M so the collateral requirement that must be met is $1,250,000."  Ex. 84.

181.    As detailed *supra*, RLI's concerns regarding its exposure under the Bonds greatly increased as a result of, among other things, receipt of past due Bond Breach Invoices, Treasury letters for referral and other government action, Nexus' representations regarding payment of the three Invoices, Nexus' failure to provide books and records, and Nexus' lack of communication with RLI, including its failure to respond to RLI's critical demand for books and records.

182.    On March 13, 2017, RLI requested, under paragraph 3.d of the Indemnity Agreement, that Nexus immediately procure RLI's discharge without loss from all immigration bonds issued by RLI at Nexus' request, or if such discharge is unattainable, to deposit $10M in

collateral security to cover a portion of RLI's estimated exposure under the Bonds. *See* ECF No. 1-6.

183.   Nexus, however, never provided a deposit of collateral security to RLI. Ex. 10. at 96:7–9.

## X.   Nexus Has Repeatedly and Materially Breached the Indemnity Agreement by Refusing to Indemnify RLI for Losses Incurred

184.   As set forth herein, Nexus has repeatedly and materially *breached* the Indemnity Agreement by refusing to indemnify RLI for losses incurred, including, for instance: (i) failing to timely indemnify RLI for the checks that RLI sent to DHS on March 30, 2018, in the aggregate amount of $83,872.14, to satisfy 8 (then) outstanding bond claim invoices, until RLI finally received reimbursement checks from Nexus on May 14, 2018, June 1, 2018, and June 8, 2018, *after* RLI was compelled to file the Complaint initiating this action and first motion for preliminary injunction on April 12, 2018; (ii) beginning on September 6, 2018, refusing to indemnify RLI for *any* Bond claim invoices until the Court's subsequent issuance of the Second PI Order requiring Nexus to do so; and (iii) failing to pay RLI for its losses, costs and expenses, including legal fees incurred as a consequence of RLI having executed the Bonds at the request of Nexus and enforcing the terms of the Indemnity Agreement, in an amount of no less than $2 million. *See supra*; March 12, 2020 Declaration of Itemized Statement of Unreimbursed Losses and Expenses of David J. Grycz ("Itemized Statement").

## Y.   RLI Acted in Accordance with Its Express Rights in Ceasing to Issue Bonds

185.   RLI acted in accordance with its express right under paragraph 3.b of the Indemnity Agreement when in February 2017, RLI exercised its discretion to cease issuing Bonds. *See* ECF No. 1-2 at ¶ 3.b.; Ex. 3 (Donovan) at 462:7-8 ("[The Indemnity Agreement] certainly gives the surety the right to stop issuing bonds."); Ex. 4 at 370:18-371:9 ("Nothing in the agreement

compelled them [RLI] to continue posting bonds...  Sure.  I mean yeah, they could have stopped writing at any point in time").  *See also* Ex. 33 at 36:12-41:3; 42:16-46:4.

## Z.    RLI Acted in Accordance with Its Express Rights in Demanding Collateral

186.    RLI acted in accordance with its express rights under paragraphs 3.d-f and 2.a.ii when, on March 13, 2017, RLI issued a demand that Nexus either obtain RLI's complete discharge from all outstanding Bonds or provide $10 million in collateral security, as well as requesting the collateral security in April 2018 when it filed the instant action.  ECF No. 1-6.

## AA.    RLI Is Justifiably Concerned About Nexus' Financial Records and Condition

187.    RLI is justifiably concerned about Nexus' financial records and condition because, among other reasons as set forth within this subheading, Nexus, after more than three years, still cannot (or will not) produce documents that accurately reflect its financial condition.  *See* 2/28/20 Moore Dep. Tr. at 302:7–305:11, attached hereto as **Exhibit 85**; *see also* ECF No. 59 at 21 ("[I]t is clear to the court that RLI fairly is concerned about Nexus' solvency.").

188.    Indeed, Nexus' Vice President (Richard Moore), the officer to whom Nexus' CFO and Finance Department report, testified two weeks ago, on February 27, 2020, that he has no understanding of the financial condition of Nexus, including currently, and for the years 2017, 2018 and 2019.  Ex. 85 at 307:16–22 ("Q. So sitting here today, despite having Grant Thornton involved and Randstad, it's your testimony that you have no understanding as to the financial status of Nexus for 2017, '18, and '19; is that correct? **A. Yes**."); *id.* at 303:9–19 ("Q. Okay.  So what I want to know is right now do you know, or do your accounts know what the financial condition of Nexus was as of December 31st, 2017?  **A. At this current moment I don't have the finances and I can – I mean the accountants are the ones working on that.**  Q. So you don't know; is that correct? **A. I'm saying right now I do not have the financial records so no, I would not know.**"); *id.* at 304:5–9 ("Q. Okay. What is your understanding as to the financial condition of

Nexus as of December 31st, 2018? **A. I do not have a current understanding what the financial condition was of Nexus in 2018**.").

189.    Further in this regard, Richard Moore does not know whether Nexus operated at a profit or loss in 2018, nor can he even provide a range of whether Nexus was operating at a loss of $10 million or a profit of $10 million for 2018 and 2019.  Ex. 85 at 304:10–305:11; 308:1–10; *see also* Ex. 4 at 277:19–281:13.

190.    Additionally, RLI is justifiably concerned about Nexus' financial condition because the financial statements provided by Nexus have significant variations for the same year for which they purport to reflect.  For instance, the 2017 Profit & Loss ("P&L") Statement printed on November 27, 2018 and presented to this Court by Nexus at the Second PI Hearing provides for Net Income of positive $817,211.58 (*see* ECF No. 138-19), whereas the 2017 P&L Statement printed on January 2, 2019 also shows Net Income of positive $817,211.58, but in contrast to the 2017 P&L printed on November 27, 2018, reflects large variances in individual line items of what is purportedly the same P&L, including but not limited to changing the Branch Deposit of Income entry from $6.9M to $23.9M and inserting an altogether new line item entry entitled "Transfer of Client Deposits" in the amount of $2.7M.  Ex. 86.  Moreover, yet another 2017 P&L Statement printed on March 31, 2019 provides for a negative Net Income of $1,943,058.87, with Branch Deposit of Income increased from the $23.9M (as reflected in the 2017 P&L printed on January 2, 2019) to $37M and the Transfer of Client Deposits similarly reflecting an increase from $2.7 M (as reflected in the 2017 P&L printed on January 2, 2019) to $11M.  Ex. 87.

191.    In similar concerning fashion to the discrepancies described in the immediately preceding paragraph, Nexus produced three different and partially overlapping versions of its 2018 P&L Statement, each of which reflects different Net Income amounts as follows: (i) 2018 P&L

(January-June 2018; printed on February 2, 2019) – Net Income of $668,201.41 Ex. 88; (ii) 2018 P&L (January-July 23, 2018; printed on July 23, 2018) – Net Income of negative -$9,124,981.89 [NEXUS0111147]; and (iii) 2018 P&L (January-October 2018; printed on October 29, 2018) – Net Income of -$16,335,243.89 [Ex. 89].

192.    Likewise, a comparison of the most recently produced January-December 2018 and 2019 P&L Statements, each of which are marked by Nexus as "OLD," shows the following variations: (i) Net Income of negative -$2,423,795.96 for 2018 [Ex. 90] and Net Income of positive $6,937,795.94 for 2019 [Ex. 91]; (ii) Branch Deposit of Income of more than $52M for 2018 [Ex. 90], but only $25M in 2019 [Ex. 91]; and (iii) Bond Breach Payments of more than $3.8M in 2018 [Ex. 90] and only $978,250 for 2019 [Ex. 91].  Further, there are notable differences in expenses that appear on these P&L Statements, such as: (i) $725,413.46 for Employee Travel in 2018 [Ex. 90] and negative -$231.59 for 2019 [Ex. 91]; and (ii) $337,518.78 in 2018 for client benefits – cell phone [Ex. 90] and $770.16 for 2019 [Ex. 91].  *See also* Ex. 4 at 294:14–295:16 ("… Q. Right. These documents are not an accurate reflection of Nexus' financial condition, is that true? A. As I indicated, Ms. Katsantonis, no."); *id.* at 296:19–297:10; *id.* at 299:18–300:11.

193.    In addition, Nexus' Accounts Payable ("A/P") records show that there are significant accounts that continue to increase as to both payments due and age of past due accounts. *See* Ex. 92.  In this regard, the separate records of Buddi US, LLC ("Buddi"), a third-party vendor that provides GPS monitoring equipment and services (which are a fundamental part of Nexus' business) to Nexus, show an accounts receivable balance to Buddi of $661,091.77 due as of January 1, 2019. Ex. 93.  However, the outstanding accounts payable of Nexus to Buddi, as of December 10, 2019, increased in nine months to $3,950,347.38, which Nexus confirmed it does *not* have the ability to pay.  *See* Ex. 93; Ex. 85 at 348:15–349:16; *id.* at 350:4–22 ("... Q. So am I

correct in saying that Nexus does not have the ability at this point to pay the approximate [$]3.9 [million in] payments to Buddi? A. Nexus – A. Nexus doesn't have the ability to pay the [$]3.9 million right now to Buddi.").

194.    Further adding to RLI's justified concern regarding Nexus' financial condition, Nexus' Vice President (Richard Moore) confirmed that Nexus does not include in its financial reports (generated from QuickBooks) the accounts payable for bond breaches until it actually issues payment. *See* Ex. 1 at 149:7–13; *id.* at 151:18–152:1.  Such bond breach payments are a significant expense to Nexus; for example, on January 14, 2019, a Nexus excel spreadsheet for breach invoices currently due for each surety provides: (i) AIA – 55 Invoices due, with a Total amount owed of $471,269.71; (ii) FCS – 294 Invoices due, with a Total amount owed of $ 3,700,941.93; and (iii) RLI – 75 Invoices due, with a Total amount owed of $894,395.50, totaling 424 invoices with an aggregate amount currently due of $4,358,778.32.  Ex. 95.

195.    RLI's concern as to Nexus' financial condition also is heightened by the established fact that Nexus did not timely pay RLI bond breach invoices in accordance with the Court's Order (*see supra* RLI UF section U), as well as Nexus' admitted practices, due to cash flow shortages, of "slow-paying" its creditors and even, in some instances, writing but holding checks before actually mailing them.  *See* Ex. 1 at 114:5-11 ("Q: In determining what to pay, do you look at any reports, bank accounts?  What do you look at to make the decision to pay an invoice?  A: Our normal cash flow operations and pay invoices -- sometimes we're late.  We try to pay invoices as close to on time as we can."); *id.* at 121:4-8 ("I think that as a company that's had some challenges we've had in our finance team, we probably could have done a better job of our organization.  But we're getting there now, which is great."); 2/21/20 Okonski Dep. Tr. at 107:11–13, attached hereto as **Exhibit 96** ("Q. Did Nexus regularly pay vendors late?  A: I would say we're a slow-paying

company."); *id.* at 123:13–16 ("Q. Well, you've told me – we've talked about that we – Nexus routinely pays bills late, right?   A.   Right."); *id.* at 319:14–17 ("Q. Why wouldn't you pay the amount [of a 93-day past due invoice for $391,000 to Buddi US LLC], the full amount right away? A: Because that's a lot and our cash flow wouldn't allow us just to write a check for that."); Ex. 85 at 358:7–359:6 ("Q. Okay.  Have you ever written checks and – I think we talked about this yesterday – and held onto them before mailing them? A. From time to time, due to cash flow, and ebb and flow of the business, there are times when checks are written and not mailed out at the same time.").   Indeed, as reflecting during the November 2018 Second PI Hearing, Nexus negotiated a payment schedule with DHS – on behalf of other sureties – where Nexus agreed to pay on average $35,000 per day for past due invoices.  *See* sealed Exhibit.

## BB.   **State and Federal Investigations Give RLI Further Concerns Regarding Nexus' Ability to Perform**

196.   RLI understands that Nexus is currently the subject of at least <u>eleven</u> discrete investigations by governmental agencies, including, *inter alia*: the California Department of Insurance, the Virginia Attorney General and Bureau of Insurance, the New York Attorney General, the United States Departments of Labor and Justice, and the Consumer Financial Protection Bureau.  *See* Ex. 97.

197.   On December 11, 2019, the California Department of Insurance issued an Order to Cease and Desist, which prevented Nexus from engaging in the sale of immigration bonds within the state and from "collecting or receiving any money, commission, fee, rebate, payment, remuneration, or any other valuable consideration whatsoever, in connection with the sale of insurance of immigration bonds."  (*See* ECF No. 374-4).  The California Department of Insurance later tolled this Cease and Desist Order as to Nexus' then-existing clients until April 19, 2020.  *See* 2/11/20 Order Modifying Cease and Desist Order and Granting Partial Stay, Ex. 98.

198.    Virginia's Bureau of Insurance similarly filed a Rule to Show Cause seeking, among other relief, a cease and desist order that would order Nexus to "cease and desist from violating § 38.2-1822 of the Code and be subject to civil penalties and costs of investigation for such alleged violations." Ex. 99.

**CC.    Nexus' Failure to Monitor the RLI Bond Principals Gives RLI Further Concern Regarding Nexus' Ability to Perform under the Indemnity Agreement**

199.    Notwithstanding RLI's requests for the books and records of Nexus, Nexus did not provide RLI with data reflecting (i) the number of RLI Bond principals that were monitored by GPS at any point in time, and (ii) the length of time for which the Bond principal was monitored. Belatedly, after almost two years of requesting the information and Nexus' recalcitrance that ultimately required a Court Order to compel belated production, on March 6, 2020, Nexus finally produced Capsule files that, according to Nexus, contain some of the monitoring information. Orders, ECF Nos. 391, 408.

200.    In January 2020, Buddi, a third-party vendor that provides GPS monitoring equipment and services to Nexus, provided RLI with information showing that of the 1,769 Bonds outstanding, only 91 Bond principals were being monitored as of January 2020. Ex. 100; *see also* Ex. 4 at 246:12–16.

201.    Nexus was "horrified" that *any* of the RLI Bond principals were being monitored by GPS, and in February 2020, contacted Buddi and advised it to cease monitoring altogether any of the RLI Bond principals. Ex. 4 at 248:4–17.

**DD.    RLI's Demand for Collateral Security Is Commensurate with RLI's Anticipated Exposure to Bond Loss as the Increasing Breach Rate of RLI Bonds Is Approaching Fifty Percent**

202.    As of February 19, 2020, the total number of RLI Bonds that remain in force – *i.e.*, still in force because they have neither been (i) acknowledged by DHS as cancelled, by DHS'

issuance of a I-391 Notice of Cancellation ("Cancelled"); or (ii) paid as required by DHS, following its issuance of one or more breach notices and one or more related invoices ("Breached and Paid") – was 1,769.  Grycz  Decl. ¶ 13.

203.    Currently, a total of 406 of the Bonds have been Cancelled.  Grycz Decl. ¶ 6.

204.    As of February 19, 2020, a total of 319 of the Bonds had been Breached and Paid.  Grycz Decl. ¶ 14.

205.    As of February 19, 2020, of the 1,769 Bonds that had not yet been discharged, an additional 12 were in breach status – *i.e.*, a notice of breach has been issued, but the bond invoice has yet to be paid.  Grycz Decl. ¶ 15.

206.    With regard to the total of 729 Bonds for which the disposition is known (*i.e.*, Bonds that have either been cancelled, paid, are in breach status, or for which Bond Breach Invoices have been received), 344 have been breached, paid, or resulted in the issuance of an Invoice, resulting in a breach ratio of 47%.  Grycz Decl. ¶ 16.

207.    At the second preliminary injunction hearing, 429 bonds had been cancelled or paid, and 163 Bonds had been paid, resulting in a breach ratio of 38%.  *See* RLI UF ¶ 162.

208.    Thus, the ratio of bonds paid has increased, over the last 15 months, from 38% at the time of the second preliminary injunction hearing to 47% currently.  *See also* Ex. 5 at 195:21–197:5 ("It's [the bond breach rate] definitely increased, yes.").

209.    RLI's current exposure on the Bonds is approximately $22 million.  *See* Ex. 3 at 296:5–6; Ex. 10 at 125:13–16.

**EE.    RLI Has Incurred Significant Damages Which Continue to Accrue**

210.    RLI has incurred significant damages which continue to accrue, including attorneys' fees and other legal costs and invoices principally incurred in enforcing its rights under the Indemnity Agreement in an amount of $2,790,443.64.  *See* Itemized Statement ¶ 8.

FF. **Nexus' Breach of Good Faith Claims and Damages**

211.    Nexus contends that RLI breached the implied duty by (i) issuing broad demands for access to books, records and accounts, in the absence of a confidentiality agreement; (ii) refusing to grant Nexus blanket authority to submit appeals and disputes of Bond Breach Notices and Bond Breach Invoices and, instead, paying Bond Breach Invoices before Nexus unilaterally and erroneously considered them to be "finally due"; and (iii) issuing demands for various amounts of collateral security between February 2016 and March 2017.

212.    On March 3, 2020, Nexus disclosed the following three categories of claimed damages: (i) an estimated $3 million in reputational damage; (ii) an estimated $2 million in attorney's fees litigating confidentiality issues; and (iii) an estimated $2.5 million in bond breaches paid on RLI invoices.   Nexus has not produced any meaningful calculations or supporting documents substantiating these newly claimed categories and amounts, but admits that it has no other damages.  *See supra*.

213.    Nexus cannot identify any contractual or statutory basis for claiming attorney's fees. *See* Ex. 4 at 407:20–408:10.

214.    Nexus concedes it has no evidence and has conducted no related analysis that would substantiate that any alleged variance in breach rates between RLI Bonds and bonds from other sureties is, in fact, attributable to anything RLI did or did not do.  *See* Ex. 4 at 442:19–443:3.

215.    Nexus' calculation of its program-wide breach rate is materially different than the calculation RLI has employed to determine the RLI Bond breach rate, upon which Nexus relies. *See* Ex. 4 at 113:1–114:8.

216.    Nexus' breach rate damages estimation presumes, without any supporting analysis or documentation, that $2.5 million of the $3.2 million paid on RLI Bonds would have been saved

if RLI had not denied Nexus' blanket request for authority to appeal or dispute claims.  *See* Ex. 4 at 431:11–15; 442:19–443:3.

217.    Nexus' reputational damages estimate is not based on any calculation or substantiating documentation.  *See* Ex. 4 at 438:14–21; 442:14–18.

218.    Nexus cannot identify documents or specific bond files substantiating its claims regarding successful appeal rates and specific results, either as to RLI or program wide.  *See* Ex. 4 at 186:8–20.

219.    Nexus further admits that RLI, not Nexus, had the sole and exclusive right under the Indemnity Agreement to determine whether to pay or appeal any Bond breaches.  Ex. 3 at 424:11–15; 448:19–449:8.

50