IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

|  |  |  |
|---|---|---|
| RLI INSURANCE COMPANY, | ) | Civil Action No. 5:18cv66 |
|     Plaintiff, | ) | |
|     Counterclaim Defendant, | ) | |
| | ) | By:    Michael F. Urbanski |
| v. | ) | Chief United States District Judge |
| | ) | |
| NEXUS SERVICES INC, et al., | ) | |
| | ) | |
|     Defendants, | ) | |
|     Counterclaim Plaintiffs. | ) | |

## MEMORANDUM OPINION

This breach of contract case concerns the relatively straightforward obligations of a bond surety, RLI Insurance Company ("RLI"), and an indemnitor, Nexus Services, Inc. ("Nexus")[1], under the terms of a standard Commercial Surety General Indemnity Agreement ("Indemnity Agreement"). See Ex. A to Compl., ECF No. 1-2. This case is before the court on cross motions for summary judgment. See Nexus's Motion for Partial Summary Judgment, ECF No. 422, and RLI's Motion for Summary Judgment, ECF No. 423. The court heard argument on the cross motions for summary judgment on April 10, 2020.

Unlike the familiar bond dispute in the construction or other commercial context in which the surety and principal relationship is relatively easy to quantify and define, the wrinkle in this case is that it involves nearly 2,500 immigration bonds concerning individual immigrant detainees. As such, this is not a case about a handful of bonds and bond principals as to which

---

[1] Although it took some time to sort out, Nexus Services, Inc. has acknowledged a unity of interest with two other entities, Libre by Nexus, Inc. ("Libre") and Homes by Nexus, Inc. ("Homes"). Dep. of Richard Moore, ECF No. 428-1, at 65-66. These entities are referred collectively herein as "Nexus."

breach and liability are readily ascertainable. Rather, this case involves thousands of individual bonds issued to secure the appearance of individual immigrant detainees at Department of Homeland Security ("DHS") immigration proceedings and Nexus's obligations under the Indemnity Agreement  to indemnify RLI for losses it sustains associated with breaches of those bonds by the individual principals and to provide collateral security to protect RLI against claims and exposure on those bonds.[2]

There are four sets of issues the court must address at summary judgment. First, the court must address issues of contract interpretation, principally concerning Nexus's obligations to provide collateral security. Second, the court must determine whether there is any genuine issue of material fact as to Nexus's breach of the Indemnity Agreement. Third, the court must address the legal sufficiency of Nexus's affirmative defense and counterclaim for breach of the implied covenant of good faith and fair dealing. Fourth, the court must assess RLI's claim for damages.

In summary fashion, the court concludes that RLI has established that Nexus materially breached the Indemnity Agreement and that it is entitled to specific performance; Nexus's affirmative defense and counterclaim as to the implied covenant of good faith and fair dealing do not meet the rigorous standard required by Illinois law; and an evidentiary hearing is necessary to permit the court to order specific performance.[3] For specific performance

---

[2] This line of surety business is termed "miscellaneous" or "transactional," involving bonds with lower penalty value and high in transaction count. See RLI Rule 30(b)(6) deposition of Greg B. Chilson, ECF No. 422-8, at 14. Barton W. Davis, RLI's Vice President of Surety, responsible for miscellaneous surety, testified that "[w]hat characterizes the business would be volumes of transactions, numbers of obligations, individual bonds. So a high volume of bonds being issued, typically, with lower penal or values or bond amounts." Davis Dep., ECF No. 422-7, at 13.

[3] Because the court finds the terms of the Indemnity Agreement to be plain and unambiguous, extrinsic evidence is unnecessary. As such, the court need not address the dueling expert witness motions file by RLI

purposes, an evidentiary hearing is necessary to quantify the reasonable amount of collateral security to be deposited under ¶ 3.d. and the reasonable amount to be paid RLI for losses under ¶ 2.a.(i) and claims under ¶ 2.a.(ii) of the Indemnity Agreement.

Accordingly, the court **GRANTS in part** and **DENIES in part** each side's motions for summary judgment. ECF Nos. 422 and 423.

- As detailed herein, the court **GRANTS** RLI's motion for summary judgment on its breach of contract claim and specific performance of ¶¶ 2.a.(i), 2.a.(ii), and 3.c. of the Indemnity Agreement. The court will determine the reasonable amount of RLI's "losses, costs, damages, attorneys' fees and expenses at an evidentiary hearing.[4]

- As regards ¶ 3.d. of the Indemnity Agreement, the court **GRANTS** RLI specific performance of ¶ 3.d. of the Indemnity Agreement for collateral security sufficient to cover its exposure for the immigration bonds issued for participants in the Nexus program in a reasonable amount to be determined at the evidentiary hearing. The court **DENIES** RLI's request to order the deposit of $10 million in collateral security as the court cannot conclude, based on the record developed to date, that such an amount is reasonable.

---

and Nexus, which are **DENIED as moot**. See Nexus's Motion to Strike RLI's Responsive Expert Reports and Testimonies, ECF No. 414; Nexus's Motion for Order to Show Cause Why RLI's Responsive Expert Reports Should Not Be Struck, ECF No. 416; RLI's Motion to Strike the Expert Report and Testimony of Robert E. Frankel, Esq., ECF No. 446.

[4] Because specific performance of the Indemnity Agreement is ordered, the preliminary injunctions issued in this case, ECF Nos. 60, 139 and 215, will be dissolved by order following the evidentiary hearing. RLI's pending motion for sanctions, ECF No. 452, will be addressed at the evidentiary hearing.

The court **GRANTS** RLI's motion for summary judgment as to Nexus's counterclaim, ECF No. 240, which is dismissed.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This is a breach of contract dispute over an Indemnity Agreement concerning immigration bonds. Immigration bonds are provided to the United States government, through the DHS, as security for the release of a detained alien from custody. Each immigration bond typically guarantees that the alien will be delivered to DHS custody upon demand. In this case, at Nexus's request, RLI issued thousands of bonds securing the delivery of individual immigrant principals. As surety, RLI was the obligor on the bonds to the obligee, DHS, assuring the delivery of the bond principal to DHS. Should a bond principal fail to appear as noticed, RLI was required to pay DHS a penal sum, averaging around $10,000 per bond. RLI had no prior experience with immigration bonds[5] and it contends that it took on this new line of business in reliance on Nexus's track record of monitoring and delivering immigrant bond principals. In particular, RLI asserts that Nexus represented that it had a bond failure rate of less than 2 percent, and that it employed proven tools to mitigate the risk of breach, including GPS monitoring and highly selective screening and scoring of bond applicants. See RLI June 5, 2015, June 26, 2015, Nov. 6, 2015 and Feb. 11, 2016 emails, ECF Nos. 428-22, 428-23, 428-25 and 428-24. In all, RLI issued 2,486 bonds for Nexus program participants, with approximately 1,769 bonds still in force. ECF No. 423, at 4. The aggregate penal sum of the bonds issued exceeded $30 million, $22 million of which remains extant. Id.

---

[5] David Sandoz, RLI's former Vice President of Miscellaneous Surety, was principally responsible for the underwriting of the Nexus program, which he termed "unusual." Sandoz Dep., ECF No. 422-6, at 75.

As consideration for the issuance of these bonds, Nexus paid RLI roughly $2.6 million in premiums, and RLI required Nexus to indemnify if from all loss associated with the bonds. Nexus and RLI executed both the Indemnity Agreement and a Collateral Agreement on January 20, 2016.[6]

RLI claims breach of three provisions of the Indemnity Agreement regarding Nexus's obligations to provide access to its books and records, indemnify its losses and deposit collateral security. The relevant provisions of the Indemnity Agreement are as follows:

2. INDEMNITY

    a. Indemnitor(s) agree to pay Surety upon demand:

    (i) all losses, costs, damages, attorneys' fees and expenses of whatever kind or nature which arise by reason of, or in consequence of, the Surety having executed any Bond on behalf of the Principal, or in enforcing this agreement against any of the Indemnitor(s) or in procuring or attempting to procure its release from liability or a settlement under any Bond.

    (ii) an amount sufficient to discharge any claim made against Surety on any Bond. This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any Bond.

3. GENERAL PROVISIONS

    c. Until Surety has been furnished with conclusive evidence of its discharge without loss from any Bonds, and until Surety has been otherwise fully indemnified as hereunder provided, Surety shall have the right of access to the books, records and accounts of the Indemnitor(s) for the purpose of examining and copying them. The Indemnitor(s) hereby authorize third parties, including but not limited to depositories of funds of the Indemnitor(s), to

---

[6] Although a significant aspect of this case concerns the issue of collateral security, RLI's asserts breach, <u>inter alia</u>, of the collateral security provisions of the Indemnity Agreement, rather than the ancillary Collateral Agreement and Receipt. <u>See</u> ECF No. 428-27.

furnish to Surety any information requested by Surety in connection with any transaction. Surety may furnish any information, which it now has or may hereafter acquire concerning the Indemnitor(s), to other persons, firms or entities for the purpose of procuring co-suretyship or reinsurance or of advising such persons, firms, or entities as it may deem appropriate.

d. Surety shall have every right, defense, and remedy allowed by law including the rights of exoneration and subrogation. Indemnitor(s) will, upon the request of the Surety, procure the discharge of Surety from any Bond and all liability by reason thereof. If such discharge is unattainable, Indemnitor(s) will, if requested by Surety, either deposit collateral with Surety, acceptable to Surety, sufficient to cover all exposure under such Bonds or Bonds, or make provisions acceptable to Surety for the funding of the bonded obligations(s).

ECF No. 1-2, at 2-3. The Indemnity Agreement provides that it is governed by Illinois law. Id. at 3.

While the parties differ as to what the Indemnity Agreement requires, the facts regarding RLI's various demands that Nexus deposit collateral security are not in dispute. At the time RLI and Nexus entered into the Indemnity Agreement, they signed a separate Collateral Agreement and Receipt. Chilson Dep., ECF No. 422-8, at 20; see ECF No. 428-27. Initially, Nexus agreed to deposit $500,000 in collateral in five monthly installments under the Collateral Agreement. Id. On June 20, 2015, Nexus's Rick Nagel emailed RLI's David Sandoz stating "[w]e are willing to put up the 500k in collateral, however, we would like to make five installments of 100k over the course of five months. We would also like to revisit the terms after twelve months and at that time would ask if we could regain 250k of the 500k collateral or have all collateral eliminated altogether as you suggested." ECF No. 428-14.

David Sandoz, the RLI Vice President responsible for the underwriting of the Nexus program, testified that the initial requests for collateral security were based on RLI's general lack of familiarity with issuing immigration bonds, not based on underwriting risk specific to the Nexus program. Sandoz Dep., ECF No. 422-6, at 31-32, 148. Sandoz considered the initial requests for collateral to be leverage over Nexus until RLI got comfortable with its operations. Nexus did not make the agreed-upon collateral installment payments.[7] In fact, Sandoz did not view the initial collateral requests as the "primary underwriting vehicle," and RLI began issuing bonds for Nexus program participants before it received any collateral. Id. at 148. RLI's Sandoz wanted some collateral "to make sure the program was running right, the Nexus – I had collateral to use and I could have discontinued the program and used that collateral for whatever purpose." Id. at 165-66. Eventually, a reduction in the initial amount of collateral to be deposited was negotiated. Sandoz Dep., ECF No. 422-6, at 110, 164.

RLI began issuing immigration bonds for Nexus program participants shortly after the Indemnity Agreement was signed. While RLI expected that the bonds issued for Nexus program participants would be short-lived (six months or less), by the end of 2016, only 19 had been discharged. See Sandoz Dec. 7, 2016 email to Donovan, ECF No. 428-84.

---

[7] RLI claims that Sandoz made repeated requests for installment payments of collateral under the Collateral Agreement. See, e.g., Sandoz-Nagel emails of March 23 and 28, 2016, ECF No. 428-40. On February 10, 2016, Nexus's CEO Micheal Donovan emailed Sandoz that "[w]e have also processed the first installment of the collateral," ECF No. 428-37, although none was sent. Nexus claims that RLI relaxed its initial collateral demands. Donovan testified that RLI's Sandoz said Nexus "didn't have to post the 500,000," Donovan Dep., ECF No. 428-3, at 151, and that the collateral required would be reduced to "250,000 that would be returned at the end of the year." Id. Donovan testified that Sandoz told him "Don't worry about the collateral." Id. at 181. While there is a dispute over the deposit of initial collateral under the Collateral Agreement, this does not affect the summary judgment ruling as RLI claims breach of the indemnification and collateral security provisions of the Indemnity Agreement, rather than the separate Collateral Agreement.

By the summer of 2016, RLI began receiving notices from DHS of breached immigration bonds. See ECF Nos. 428-46 through 428-48. In particular, DHS issued invoices for three breached bonds in August and September, 2016, see ECF Nos. 428-49 through 428-50, which eventually became past due when they remained unpaid by the invoice deadline. See ECF Nos. 428-51. By December 2016, Nexus's failure to pay these invoices created a firestorm at RLI. Throughout December 2016 and January 2017, the email correspondence between RLI and Nexus leaves no dispute that RLI was increasingly concerned about Nexus's failure to meet its obligations under the Indemnity Agreement by paying these invoices. See ECF Nos. 428-53 through 428-67.

By late 2016, RLI also became dissatisfied with the Nexus program because bond obligations were taking too long to clear. In December 2016, RLI sought to transition the Nexus program to a new surety, and requested $1.25 million in collateral, amounting to five per cent of the estimated $22 million penal value of the outstanding bonds, during the transition. Id. at 208-213. In his December 7, 2016 email to Nexus's Donovan, RLI's Sandoz explained RLI's position as follows.

> When we initially agreed to underwrite the program we thought each bond term would be much shorter in length than currently realized. We are a company which prefers the majority of our business in transactional surety to be short tail obligations. Since we had no prior knowledge of this line of surety business we initially started the program asking for $500k in collateral and later revised the requirement in a subsequent meeting since we were soon coming to the point where we wanted to assess the program as a whole to determine our future involvement. It looks like the average length of exposure runs more than 1 year as our records show only 19 bonds exonerated to date. Due to the length the average bond remains in force we will need more collateral than the $500,000 initially anticipated to remain on the program through the first few months of 2017. We are going to

> need collateral amounting to 5% of the total exposure RLI has
> outstanding at any point in time which will be reviewed
> periodically. RLI's current exposure is approximately $25M so
> the collateral requirement that must be met is $1,250,000. . . . We
> know that it takes time to replace the program and we assume
> that's the more preferable route so the goal we have set is to have
> the program moved to a better fit for you by 2-28-17 and if the
> program is replaced by that date it is not necessary to provide the
> collateral – we will just hold back the contingency/cancellation
> money that you will earn if you qualify for contingency. If it takes
> a bit longer to replace the program the collateral is due by that
> date.

ECF No. 428-84.

On December 12, 2016, the stakes rose for RLI when it received a letter from DHS

stating that payment on the three breached bonds was overdue. The letter warned:

> If payment is not made on these past due invoices by January
> 2012. [sic] FinOps-Burlington may refer the debt to the
> Department of the Treasury (Treasury) for further collection
> efforts. Because this invoice was issued for a validly-breached
> bond, when the debt is over 120 days past due, we are required
> to refer this delinquent debt to the Department of the Treasury
> for centralized debt collection pursuant to the Debt Collection
> Improvement Act of 1996 (DCIA), Pub. L. No. 104-134.

ECF No. 428-9, at 2. Throughout the last two weeks of December 2016, RLI sought

confirmation from Nexus that these invoices were being paid by Nexus. See ECF Nos. 428-

53 and 428-54.

When no payment had been made by Nexus on these three past due bonds by the end of the

year, RLI reached the end of its rope. On December 29, 2016, RLI's Sandoz emailed Donovan

and Erik Schneider, then Nexus's Chief Risk Management Officer, as follows:

> Sorry, Erik, but I have to make sure that everyone knows that
> "our back is now against the wall" and that these three bonds
> have been called (demands made and date to pay has past) and

> there is no more time to argue each case. If you have had any success in working with the oblige (we have tried to help too!) or been granted more time to resolve any of the bonds, please send us evidence of your success for our files. If not, Mike, you have to let RLI know your intentions on paying the amounts demanded with checks going out no later than January 4 to clear these three bonds so RLI is not in danger of losing their relationship, if not more, with the federal government. Just speaking frankly it won't be fun for anyone if RLI has to make these payments early next week.

ECF No. 428-57.  On January 10, 2017, Nexus's Donovan emailed RLI's Davis that "I have confirmed that the checks were cut and sent. I am having o[u]r finance team pull copies of the checks and I will be sending them along to you tomorrow morning." ECF No. 428-60. Ten days later, RLI still had not received copies of the three checks Nexus claims it had mailed DHS. On January 20, 2017, Nexus sent RLI copies of three checks, dated January 5, 2017, made payable to DHS. By January 27, 2017, however, DHS still had not received payment. See ECF Nos. 428-64, 428-65 and 428-66.[8]

Nexus's repeated failure to pay these breached bond invoices in a timely manner was the last straw for RLI. On January 20, 2017, RLI's Davis emailed Nexus's Donovan that because DHS had not received Nexus's payment, RLI would pay DHS the penalty on the three past due bonds itself on February 1, 2017. Davis's email advised Donovan that RLI would no longer issue bonds for the Nexus program.

> Because Nexus has not paid these claims as agreed and contrary to your email to me on January 10 (copy attached titled Nexus Payments), RLI will be forced to do so tomorrow. As a result of your failure to meet your obligations under the program and the Indemnity Agreement you executed with RLI on January 20,

---

[8] The delay was due to the fact that Nexus had not mailed at least two of the checks to DHS until January 30, 2017, in stark contrast to Donovan's January 10 representation that the checks had been "cut and sent." See ECF No. 428-68 (showing January 30, 2017 postmark on Nexus envelopes to DHS).

2016 to guarantee, I will be suspending your authority to execute any further bonds on behalf of RLI effective 2/1/2017. All of the actions can be stopped with your providing the information requested in the email below.

ECF No. 428-67.

Over the next six weeks, despite the increasing incidence of bond breaches, RLI heard little from Nexus. See ECF Nos. 428-70 and 428-71. On March 3, 2017, RLI's Ira Sussman, Vice President, Surety Claims, wrote Nexus's Donovan requesting documents from Nexus concerning the RLI immigration bonds and expressing the following concerns:

> One particular cause for concern arises from our recent receipt, including two since our discussion, of several past due notices from the United States Department of Homeland Security ("DHS") on six separate immigration bonds that RLI issued at Nexus' request. As I explained during our call, RLI's reputation and good standing with the federal government is critical to our business. To that end, RLI considers a timely response to any immigration bond demand or invoice to be essential. Additionally, the past due invoices purport to increase RLI's exposure. As such, it is imperative, going forward, that Nexus copy RLI on all responses to any and all bond demands, whether by payment or appeal, contemporaneously with Nexus' submission thereof to the government.
>
> Relatedly, as we also discussed, RLI has a broader concern with delays and deficiencies in Nexus' responses to RLI's requests for specific records and information. For instance, RLI has encountered difficulties in obtaining complete and timely responses from Nexus to standard requests for copies of specific appeal submissions and records confirming the government's timely receipt of appeals and bond payments. RLI cannot adequately protect its interests and evaluate its exposure without prompt access to such and other reasonably requested records, in accordance with RLI's rights under the Commercial Surety General Indemnity Agreement that Nexus executed on behalf of RLI (the "GIA").

See ECF No. 1-4. On March 6, 2017, Sussman emailed Donovan, enclosing his March 3 letter, noted the still increasing number of breached bond claims filed, and stated that "the level of communication from your group with our claims folks is non-existent." ECF No. 1-5.

Nexus did not respond to RLI's March 3 letter or March 6, 2017 email.

After enduring the payment failures on the first three breached bonds in December and January, encountering radio silence from Nexus for the next six weeks, and ultimately receiving no response to its request to review Nexus's records concerning the bonds RLI had issued, on March 13, 2017, the gloves came off.   RLI wrote Nexus on March 13, 2017, demanding that Nexus discharge it from liability on the immigration bonds it had issued for the Nexus program or provide $10 million in collateral security, which it claimed represented "a fraction of RLI's current exposure" on the outstanding immigration bonds "estimated to exceed $29,000,000." ECF No. 1-6, at 2. The March 13, 2017 letter explained:

> [T]he foregoing demand follows a series of events that have raised and compounded RLI's concerns regarding its exposure on the outstanding immigration bonds. Significantly in this regard, RLI has received no response to its above-referenced correspondence, requesting, among other things, the opportunity to examine Nexus' books, records and accounts under Paragraph 3.c of the GIA, and related available meeting dates. As Nexus was previously advised, RLI cannot adequately protect its interests and precisely determine the full extent of its exposure without immediate access to the requested records and information. Nexus' failure to comply with (much less even to respond to) that request constitutes a material breach of Nexus' express obligations under the GIA, for which RLI stands to suffer irreparable harm.

Id. at 3.

Nexus eventually agreed to provide access to certain documents, but RLI was not satisfied with the level of access permitted. Nexus agreed to provide access to more records,

contingent on the execution of a confidentiality agreement. Without conceding that such an agreement was required or permitted under the Indemnity Agreement, RLI agreed to negotiate one. However, a failure to agree to terms resulted in Nexus continuing to deny access to the documents RLI requested.

Over the course of the next year, RLI grew increasingly concerned about its ability to remain on the Department of Treasury's ("Treasury") list of Certified Companies for Surety Bonds. DHS continued to invoice RLI for bond breaches and issue past due notices, which RLI relayed to Nexus for payment pursuant to the Indemnity Agreement. When Nexus did not respond, RLI was forced to pay DHS itself. For example, on March 30, 2018, RLI paid Treasury $83,874.14 for Nexus program breached bonds. Nexus disagrees that RLI should have made payments to DHS, stating that bond payments foreclose the ability of bonded principals to appeal their immigration cases.

RLI brought suit against Nexus on April 12, 2018, seeking injunctive relief, specific performance, and breach of the Indemnity Agreement. On the same day, RLI moved for a preliminary injunction on the grounds that Nexus breached the Indemnity Agreement's collateral security, indemnification, and right to access provisions, claiming irreparable harm to RLI's financial position and its status as a Treasury certified surety. At the time, RLI requested that the court require Nexus to provide immediate access to its records but reserved the right to pursue collateral security later.

The court held a hearing on the motion for preliminary injunction on April 27, 2018. During the hearing, Nexus agreed that RLI had a right of access to at least some of the financial documents requested under the Indemnity Agreement, and the court took the motion under

advisement for ten days to allow the parties to negotiate access to records and applicable confidentiality agreements. On May 9, 2018, the parties jointly moved the court to hold its preliminary injunction order in abeyance pending further negotiations. The court granted the request through May 17, 2018. On the night of May 17, the parties notified the court that no agreement had been reached.

RLI claimed that Nexus had provided no financial records as of 4:00 p.m. on May 17, 2018 beyond documents Nexus had previously received from RLI. Nexus responded that it had provided more than 9,000 documents; nearly 7,000 pages of immigration records were produced on May 14, 2018 and more than 2,000 pages were produced after 4:00 p.m. on May 17, including asset lists, receipts, invoices, general ledgers, payroll account and salary information, profit and loss documents, vendor balance detail, and its 2016 federal tax return. Upon reviewing the letters from the parties, the court directed the parties to engage in mediation with Magistrate Judge Joel C. Hoppe. The parties were unable to reach a resolution.

After the unsuccessful mediation, Nexus filed a motion for leave to file a counterclaim and amended answer alleging breach of contract based on the implied duty of good faith and fair dealing. Nexus contended that RLI's demands to inspect documents, to be discharged from issued bonds, and to receive collateral in the amount of $10 million were made in bad faith. The court granted Nexus's motion for leave to amend, over RLI's argument that the claim was futile.

The court held an evidentiary hearing on June 7, 2018 to address the extent to which documents had been produced since the last hearing, to resolve the question of whether RLI had in fact incurred any losses on breached bonds, to ascertain the extent to which RLI's

reputation was at risk as a surety based on Nexus's claimed nonperformance, and to determine an appropriate amount for an injunction bond. RLI contended that its irreparable harm was born out of Nexus's failure to pay already breached bonds, but to a greater extent, its potential insolvency as a business, raising the specter of default on all outstanding bonds.

After hearing argument, the court granted in part RLI's request for a preliminary injunction, requiring Nexus to provide full access to its books, records, and accounts, but noted that the injunction did not extend to "other Nexus-related entities." In its order, the court also appointed a Special Master to ensure compliance with the order. From July 2018 to February 2019, the Special Master presided over Nexus's production of more than 170,000 documents to RLI. See Sixth Status Report by Special Master 1–3, ECF No. 191. During this time, the parties raised several discovery disputes related to the reach of RLI's right to disclosure. See, e.g., Order to Provide Access to Quickbooks, ECF No. 79; Order Granting in Part Denying in Part Motion to Quash Subpoenas to 12 Banks, ECF No. 98.

On October 30, 2018, the court denied a motion to intervene filed by five immigration bond principals concerned over the privacy of their data. The court denied the motion to intervene in light of the protective orders issued to limit disclosure of Nexus's documents produced.

On the same day, supported by documents produced pursuant to the first preliminary injunction, RLI filed a motion seeking a second preliminary injunction for indemnification of current losses on breached bonds and collateral security to guard against future losses. ECF No. 106. Specifically, RLI contended that at the time of filing, the penal sum it faced on outstanding bonds for which DHS had issued an invoice had grown to $709,789.37, and it

again sought $10 million in collateral security.[9] After an evidentiary hearing on November 28, 2018, the court granted in part a second preliminary injunction, ordering that Nexus indemnify RLI for the $226,666.28 RLI had paid DHS; that Nexus pay RLI by year's end $484,854.03, representing RLI's exposure for bonds as to which Treasury referral was imminent; and that Nexus pay RLI each month until trial bond penalties invoiced by DHS to prevent their referral to Treasury for collection. The court denied the request for $10 million in collateral as speculative.

In March 2019, Nexus requested that the court clarify the terms of its second preliminary injunction. RLI argued that its surety obligations to DHS were triggered by the issuance of an invoice, and that Nexus should indemnify RLI accordingly. Nexus argued that DHS invoices are not final dispositions, as they are subject to appeal, and therefore it should only be required to pay invoices for which Treasury referral is imminent. In support, it argued that requiring Nexus to pay all breached bonds precludes bonded principals from challenging their deportation under Pereira v. Sessions, 138 S.Ct. 2105 (2018). The court agreed with Nexus, amending Paragraph 4 of the second preliminary injunction to require Nexus make monthly payments only on bonds referred to Treasury for collection. Order, April 11, 2019, ECF No. 215.

As written discovery ensued, Nexus's books and records obligations under the Indemnity Agreement became interwoven with the parties' discovery activities. Principally, the parties disagreed about whether this litigation could reach Nexus-related entities Libre and

---

[9] According to Donald J. Driscoll, RLI Vice President of Claims and Rule 30(b)(6) deponent, at the time RLI made its October 30, 2018 demand for $10 million in collateral security, it had only established a loss reserve of approximately $711,000. Driscoll Dep., ECF NO. 422-4, at 18.

Homes. Based on disclosures made pursuant to the first preliminary injunction and discovery orders, RLI filed a motion to amend the complaint, join new party defendants, amend the scheduling order, and continue the trial. Concurrently, Nexus challenged discovery attempts to reach Libre and Homes.

By memorandum opinion and order dated April 26, 2019, Magistrate Judge Hoppe granted RLI leave to amend the complaint and add Libre and Homes as parties to the suit, finding compelling evidence of RLI's suspicion that the entities serve as alter egos for Nexus and are potentially subject to the terms of the Indemnity Agreement.  Accordingly, RLI filed an amended complaint bringing claims against all three entities. Nexus responded with a counterclaim, alleging RLI breached the implied covenant of good faith and fair dealing in exercising its discretion under the contract. Libre and Homes answered the amended complaint as well, denying that they were alter egos of Nexus.

The new defendants gave rise to a litany of discovery issues around required disclosures and appropriate confidentiality protections. On September 30, 2019, while the discovery disputes were being litigated, RLI filed a motion to enforce the terms of the second preliminary injunction, as amended by the April 11, 2019 Order, and to again order the payment of $10 million in collateral security. Nexus sought a modification of the second preliminary injunction to prohibit RLI from paying a breached bond within 120 days of its invoice by DHS to preserve Nexus's ability to appeal or dispute the bond on behalf of the principal. The court heard argument on January 22, 2020. The court granted RLI's request to require Nexus to indemnify all breached bonds RLI had paid. The court denied RLI's request to require Nexus to make immediate payment on all bond breaches invoiced by DHS, restating that the April

11, 2019 Order only requires payment on bonds "for which Treasury referral was imminent." The court further amended the April 11, 2019 Order to require Nexus to make monthly payments on all breached bonds within 120 days of their date of invoice. The court denied Nexus's request to prohibit RLI from making payments on breached bonds within those 120 days. The court again denied RLI's request for $10 million in collateral security.

After the resolution of additional discovery disputes and objections, discovery concluded on March 20, 2020. The pending motions followed.

## II.    APPLICABLE LAW

Currently before the court are cross motions for summary judgment on RLI's claims for breach of the Indemnity Agreement and Nexus's counterclaim alleging breach of RLI's implied covenant of good faith and fair dealing.

### A.  SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with … [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 562 U.S. 651 (2014) (per curiam)).

Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment

unless there is "no genuine issue as to the inferences to be drawn from" those facts. <u>World-Wide Rights Ltd. P'ship v. Combe Inc.</u>, 955 F.2d 242, 244 (4th Cir. 1992).

## B.  CHOICE OF LAW

A federal court sitting in diversity must apply the choice of law rules of the forum state. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487 (1941); <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 79 (1938). Because this action was filed in Virginia, the court looks to Virginia state law to determine which body of substantive law governs the claims at hand. The contract at issue includes a choice of law provision applying Illinois law, and neither party disputes its applicability. "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances, none of which exist here." <u>Colgan Air, Inc. v. Raytheon Aircraft Co.</u>, 507 F.3d 270, 275 (4th Cir. 2007). The court will apply Illinois substantive law.

## C.  PRINCIPLES OF CONTRACT INTERPRETATION

An indemnity agreement is a contract and is subject to the rules for interpreting contracts. <u>Hanover Ins. Co. v. Smith</u>, 538 N.E.2d 710 (Ill. App. Ct. 1989), <u>aff'd</u>, 561 N.E.2d 14 (Ill. 1990). Contract interpretation is intended to give effect to the intent of the contracting parties. <u>Gallagher v. Lenart</u>, 874 N.E.2d 43, 58 (Ill. 2007). "Where a contract is not ambiguous or uncertain, its meaning must be determined from the words or language used, and the court cannot place a construction on the contract which is contrary to or different from the plain and obvious meaning of the language." <u>Brown v. Miller</u>, 360 N.E.2d 585, 587 (Ill. App. Ct. 1977).

A preliminary question of law a court must answer is whether the contract is "clear and unambiguous." Szilagyi v. Chicago Am. Mfg., LLC (In re Lakewood Eng. & Mfg. Co., Inc.), 459 B.R. 306, 328-29 (Bankr. N.D. Ill. 2011), aff'd sub. nom. Sunbeam Prod., Inc. v. Chicago Am. Mfg., LLC, 686 F. 3d 372 (7th Cir.), cert. denied, 568 U.S. 1076 (2012). Illinois contract law applies the "four corners" rule, which presumes that a written agreement speaks the intention for the parties and "the intention with which it was executed must be determined from the language used . . . not to be changed by extrinsic evidence." Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 884 (Ill. 1999); see also Lease Mgmt. Equip. Corp. v. DFO P'ship, 910 N.E.2d 709, 715 (Ill. App. Ct. 2009).

"In applying this rule, a court initially looks to the language of a contract alone. If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." Air Safety, 706 N.E.2d at 884 (citations omitted). See Minn. Life Ins. Co. v. Kagan, 724 F. 3rd 843, 849 (7th Cir. 2013) ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent.") (quotation and emphasis omitted). An ambiguous contract is one whose terms are "reasonably or fairly susceptible to more than one construction." Tishman Midwest Mgmt. Corp. v. Wayne Jarvis, Ltd., 500 N.E. 2d 431, 434 (Ill. App. Ct.1986). If the contract is ambiguous, then the court can consider parol evidence to resolve the ambiguity. State Bank of Toulon v. Covey (In re Duckworth), 776 F. 3d 453, 456 (7th Cir. 2014). A contract's silence on a central term can create ambiguity, but the general presumption is that the rights of the parties are limited to the terms expressed in

the contract. <u>Consolidated Bearings Co. v. Ehret-Krohn Corp.</u>, 913 F.2d 1224, 1233 (7th Cir. 1990) (quotation omitted).

Under Illinois law, a "contract is to be construed as a whole, giving meaning and effect to every provision thereof, if possible, since it will be presumed that everything in the contract was inserted deliberately and for a purpose." <u>Martindell v. Lake Shore Nat. Bank</u>, 154 N.E.2d 683, 89 (Ill. 1958). "The intention of the parties is not to be gathered from detached portions of a contract or from any clause or provisions standing by itself, but each part of the instrument should be viewed in the light of the other parts." <u>Id.</u> "It is fundamental in contract construction that, if possible, effect must be given to all of the language so that provisions which appear to be conflicting or inconsistent may be reconciled and harmonized." <u>In re Halas</u>, 470 N.E.2d 960, 964 (Ill. 1984). The general rule is that "[c]ontractual provisions must be read in a manner that makes them consistent with each other." <u>Stone v. Signode Industrial Group, LLC</u>, 943 F.3d 381, 387 (7th Cir. 2019) (quoting <u>Barnett v. Ameren Corp.</u>, 436 F.3d 830, 833 (7th Cir. 2006). "A court is not to interpret an agreement in a way that would nullify any of the provisions in the agreement or render them meaningless." <u>Smith v. Burkitt</u>, 795 N.E.2d 385, 389 (Ill. App. Ct. 2003).

The court must first determine whether the four corners of the contract are unambiguous such that extrinsic evidence is not needed to interpret its terms. In so doing, the court will ascertain whether there is more than one reasonable interpretation of the contract's terms. That the parties disagree as to the interpretation of terms does not render the contract ambiguous. <u>Continental Mobile Tel Co. v. Chicago SMSA Ltd. P'ship</u>, 587 N.E.2d 1169, 1173 (Ill. App. Ct. 1992). The court will first look to the plain language of the contract to assess the

reasonableness of each party's proposed interpretation of the collateral security provision. To the extent it encounters any ambiguities, will strictly construe such language against RLI. Travelers Cas. & Sur. Co. v. A.G. Carlson, Inc., 858 N.E. 2d 491, 500 (Ill. App. Ct. 2006), aff'd in part, vacated in part sub nom. Travelers Cas. & Sur. Co. v. Bowman, 893 N.E.2d 583 (Ill. 2008).

"Courts have found that summary judgment is an appropriate method of resolving disputes concerning indemnification agreements." Hanover Ins. Co. v. Clark, No. 05 C 2162, 2006 WL 2375428, at *3 (N.D. Ill. Aug. 15, 2006) (granting summary judgment for breach of an indemnification agreement involving a surety arrangement and ordering specific performance pursuant to a collateral security provision); see also Advanced Ground Sys. Eng'g, Inc. v. RTW Indus., 388 F.3d 1036, 1038 (7th Cir. 2004) (affirming summary judgment for plaintiff after finding that defendant had a duty to defend and indemnify plaintiff against tort claims). This case is no different. The unambiguous terms of the Indemnity Agreement and the lack of any genuine issue of disputed material fact requires resolution of the case on the pending summary judgment motions.

## III.   INTERPRETATION OF THE INDEMNITY AGREEMENT

### A. Books and Records Provision

RLI's claim for specific performance of the unambiguous books and records provision of the Indemnity Agreement, ¶ 3.c., is readily established. ¶ 3.c. provides that "[u]ntil Surety has been furnished with conclusive evidence of its discharge without loss from any Bonds, and until Surety has been otherwise fully indemnified as hereunder provided, Surety shall have

the right of access to the books, records and accounts the Indemnitor(s) for the purpose of examining and copying them."

The parties disagree as to what, if anything, triggers the right of access and which documents are within scope of its reach. RLI claims that its right to access is evergreen, beginning with the contract's execution and lasting until it is discharged from each of the 2,486 bonds issued. RLI also argues that the plain language of the agreement places no limitation on the scope of RLI's access. Nexus denies that the right grants RLI unfettered access to its records and claims the right is triggered only if Nexus both fails to prove RLI is discharged from a bond and fails to indemnify RLI against loss. The court held in its first order for preliminary injunction that RLI had met its burden of demonstrating likelihood to succeed on a breach of contract claim challenging Nexus's failure to provide access to its books and records. However, it notes the substantial difference between the posture of a court evaluating a motion for preliminary injunction at a litigation's outset to a court's summary judgment analysis at the close of discovery. Accordingly, the court addresses the issue anew.

The court continues to believe that a plain reading of the contract supports an expansive right of access to Nexus's books and records. The provision clearly provides RLI access at any time "***until*** Surety has been furnished with conclusive evidence of its discharge without loss from **any** Bonds, **AND** *until* Surety has been otherwise fully indemnified." Indemnity Agreement, ¶ 3.c. (emphasis added). "Until" implies a continuous right of access. The conditions precedent both involve the continued existence of RLI's liability or exposure under the contract, which suggests that until RLI is fully absolved of any risk of loss pursuant to the agreement, it can demand access to Nexus's books. This further suggests a broad reading

of the provision's scope, permitting RLI access to any material relevant to its risk assessment. Hanover Ins. Grp. v. Singles Roofing Co., No. 10 C 611, 2012 WL 2368328, at *11 (N.D. Ill. June 21, 2012) (ordering specific enforcement of "a viewing of books and records" to ensure defendant could "indemnify or exonerate" plaintiff if plaintiff succeeded on the merits). Nexus repeatedly failed to provide requested access to such documents prior to this litigation's inception, conditioning access on execution of a confidentiality agreement not required by the Indemnity Agreement. Further, Nexus maintained a fictitious narrative throughout discovery that its related entities, Libre and Homes, operated independently such that access to their books and records was unnecessary. In doing so, it materially breached its contractual obligations, contributing to this case's soaring legal fees.

Accordingly, the court grants RLI's motion for summary judgment as to its claim of breach of ¶ 3.c. of the Indemnity Agreement and awards specific performance.[10] Unless and until RLI is discharged, or otherwise indemnified, without loss from any immigration bonds issued for participants in the Nexus program, RLI shall have full and unfettered access to the books, records, and accounts of Nexus, for the period of January 20, 2016 to the present, bearing on its financial condition and ability to satisfy its obligations under the Indemnity Agreement, the immigration bonds themselves, and any and all documents relating to performance, discharge, breach, cancellation, forfeiture or penalties associated with those bonds. RLI may use only this information for the purpose of assuring or obtaining Nexus's

---

[10] Under Illinois law,  to state a cause of action for specific performance, "the plaintiff must allege and prove the following elements: (1) the existence of a valid, binding, and enforceable contract; (2) compliance by the plaintiff with the terms of the contract, or proof that the plaintiff is ready, willing, and able to perform the contract; and (3) the failure or refusal of the defendant to perform his part of the contract." Hoxha v. LaSalle Nat. Bank, 847 N.E.2d 725, 729 (Ill. App. Ct. 2006).

compliance with the Indemnity Agreement. RLI may not disclose information concerning the bonded principals or any third parties to any other party, including government agencies or immigration courts, without further order of the court. The issue of RLI's damages associated with the breach of ¶ 3.c. will be addressed at the evidentiary hearing.

### B. Collateral Security Provisions

Each side seeks summary judgment on the issue of collateral security required by the Indemnity Agreement.[11] Nexus concedes that it is required to provide some measure of collateral security under ¶ 3.d. of the Indemnity Agreement, but disagrees that RLI's ability to demand collateral is unlimited. In seeking $10 million, RLI contends that it has sole discretion to determine when and how much collateral security Nexus must pay. RLI argues that the "sufficient to cover all exposure" language in ¶ 3.d. means it has the right to demand collateral up to the full amount of the penal sum owing for breach of outstanding bonds, at present approximating $22 million. Nexus asserts that the language "sufficient to cover all exposure" under ¶ 3.d. must be limited to some already established risk of "liability" or "exposure" as ¶ 3.d. keys off of those terms. Nexus claims RLI's right to demand collateral security is triggered by the government filing a claim on a bond and the amount of collateral owed is capped by the total value of bonds for which DHS has made claims. Alternatively, Nexus argues that it is obliged to provide collateral only when RLI has "liability" or "exposure" under a bond,

---

[11] At argument, the parties referenced the ancient equitable doctrine of quia timet, translated from Latin as "because he fears." Quia timet, Black's Law Dictionary (10th ed. 2014). Reference to quia timet is not relevant here as Illinois law does not "permit[ ] a surety to use general equitable principles to obtain rights beyond those for which it negotiated in a written indemnity agreement." Fidelity and Deposit Co. of Md.v. Edward E. Gillen Co., 926 F.3d 318, 326 (7th Cir. 2019).

which it argues only arises after an immigrant principal breaches a bond by failing to appear as noticed by DHS.

On March 3, 2017, RLI demanded that Nexus provide access to its books and records by March 10 under ¶ 3.c. of the Indemnity Agreement. Nexus failed to respond to this request, and ten days later, on March 13, 2017, RLI wrote Nexus asserting material breach of the Indemnity Agreement and demanding discharge without loss from all immigration bonds issued by RLI at Nexus's request or, if such discharge was unattainable, the deposit of $10 million "in collateral security with RLI to cover a portion of its estimated exposure under the immigration bonds." ECF No. 1-6.[12]

The Indemnity Agreement contains two provisions directly bearing on the deposit of collateral security. First, ¶ 2.a.(ii) provides that RLI may hold any monies paid by Nexus on unpaid bond claims "as collateral security against loss on any Bond." Next, ¶ 3.d. provides that Nexus will, at RLI's request, "procure the discharge of Surety from any Bond and all liability by reason thereof. If such discharge is unattainable, Indemnitor(s) will, if requested by Surety, either deposit collateral with Surety, acceptable to Surety, sufficient to cover all exposure under such Bond or Bonds." The parties disagree as to whether the collateral security provision in ¶ 3.d. merely restates the same obligations iterated in ¶ 2.a.(ii) or whether ¶ 3.d. imposes broader obligations.

---

[12] The demand for $10 million in collateral security on March 13, 2017, following closely upon the transitional collateral security demand of $1.25 million of December 7, 2016, is foundational to Nexus's claim that RLI breached the implied covenant of good faith and fair dealing. As Nexus's Donovan explained in deposition, "[y]our client says pay us 1.25 million in collateral on a book of business they never lost a dollar on or find a new home for your program. We find a new home for the program, your client turns around and sends us a demand for $10 million in collateral, Hence, the essence of my bad faith claim." Donovan Dep., ECF No. 428-3, at 287-288.

In interpreting the collateral security provisions of the Indemnity Agreement, the court first notes the general purpose of surety agreements. Fundamentally, a surety guarantees that an individual to whom a duty is owed will be recompensed in the event that a principal fails to perform. In the immigration context, the surety bond allows immigrant detainees to be released with the surety's guarantee that DHS will be paid the penal sum of the bond in the event a bonded principal does not appear when summonsed. In turn, an indemnifier, here Nexus, promises to make the surety whole in the event that the bonded principal does not perform. Simply put, while the bonds issued by RLI obligate it to pay DHS a penal sum in the event a bonded principal fails to appear as noticed, the Indemnity Agreement obligates Nexus to reimburse RLI for its loss. Under this agreement, RLI serves as secondary obligor to DHS, the obligee, for performance by the bonded principal, while Nexus undertakes the ultimate risk of loss should a bonded principal fail to perform. Thus, the contract represents a risk sharing agreement, and the court must honor the parties' intentions in its interpretation.

In this light, the court considers the arguments each side makes as to the nature of the obligations imposed by ¶ 3.d. Each side advances an extreme position, neither of which are reasonable or consistent with the whole of the Indemnity Agreement. For instance, RLI posits that there is no limit on the amount of collateral security it may demand at any time. This is the "all" position. For its part, Nexus argues that the collateral security obligations of ¶ 3.d. are either redundant of those in ¶ 2.a.(ii) or only arise when a principal actually fails to appear. This is the "nothing" position. Each of these extreme arguments are problematic.

First, to interpret ¶ 3.d. as granting RLI the right to demand, at its sole discretion, an amount of collateral security up to the total amount owed on all outstanding bonds runs

contrary to the contract's intended purpose: to distribute risk. RLI's interpretation would permit it to demand as collateral the total value of issued bonds immediately after executing the agreement, offloading entirely its risk under the contract to Nexus, and depriving Nexus of one benefit of its bargain for which it paid approximately $2.6 million in premiums. Nor does the plain language of the contract support such a broad interpretation. RLI specifically uses the language "in its sole discretion" in ¶ 3.b., reserving the right to issue, cancel, or decline the execution of any Bond. But this language is not found in ¶ 3.d. The court is required to give meaning to the words chosen by the parties in the contract, and attributes significance to the fact that ¶ 3.d. does not contain the "sole discretion" language of ¶ 3.b.

Further, ¶ 3.d. only requires Nexus to deposit collateral security for those bonds as to which RLI's demand for discharge is "unattainable." An interesting question exists as to what "unattainable" means in the immigration bond context, as discharge in the immigration bond context is not limited to payment of the bond's penal sum. Indeed, the primary method of discharge of RLI's obligation as surety is to deliver the immigrant bond principal when demanded by DHS. Under its interpretation of ¶ 3.d., RLI believes that it has the right to require Nexus to deposit collateral security equal to the penal sum for every bond issued. But that argument makes little sense when applied to a bond for a principal as to whom DHS has not issued a notice to deliver. As to such a principal, discharge by performance is not "unattainable," but rather the request for discharge is simply not ripe. As such, the court cannot agree that RLI's discretion to require Nexus to deposit collateral security is boundless.

At the same time, however, standard tenets of contract interpretation compel the court to reject Nexus's contention that ¶ 3.d. merely reiterates rights granted to RLI in ¶ 2.a.(ii). A

foundational principle of contract interpretation is that a court must construe a contract as a whole to give meaning to every term and provision in order to effectuate the parties' intentions. River Plaza Homeowner's Ass'n v. Healey, 904 N.E.2d 1102, 1109 (Ill. App. Ct. 2009). See Stone v. Signode Indus. Group, LLC, 943 F.3d 381, 387 (7th Cir. 2019) (quoting Barnett v. Ameren Corp., 436 F. 3d 830 (7th Cir. 2006) ("Contractual provisions must be read in a manner that makes them consistent with each other.")); Grinnell Mut. Reins. Co. v. LaForge, 863 N.E.2d 1132, 1139 (Ill. App. Ct. 2006) ("If those terms have identical meanings, the clause is redundant and thus offends the well-settled principle of contract construction that the provisions of a contract shall not be interpreted in a way that renders other provisions meaningless.").

Moreover, courts addressing contracts with similar collateral security provisions, one requiring payment sufficient to discharge claims and the other requiring collateral "sufficient to cover all exposure," have read them to grant distinct rights. See e.g., Hudson Ins. Co. v. Simmons Const., LLC, No. CV-12-0407-PHX-DGC, 2012 WL 5381487, at *3 (D. Ariz. Nov. 2, 2012) (interpreting a request for $3,900,000 to cover liability arising out of unresolved claims warranted under the contract's "sufficient to cover all exposure" provision, not its indemnification for claims provision); In re E-Z Serve Convenience Stores, Inc., 377 B.R. 491, 494 (Bankr. M.D.N.C. 2007) (finding that the indemnity agreement contemplates two scenarios under which plaintiff could request collateral, for claims made against surety and if defendant is unable to attain discharge for surety from a bond); Ohio Cas. Ins. Co. v. Fratarcangelo, 7 F. Supp. 3d 206, 213 (D. Conn. 2014) (distinguishing contractual rights to collateralization between claims brought against surety and liabilities arising out of a future

event anticipated by the parties, here, surety's issuance of a new instrument). Accordingly, the court cannot accept Nexus's argument that RLI's ability to require Nexus to deposit collateral security under ¶ 3.d. is bounded by claims made by DHS.

Nor is RLI's alternative position, that ¶ 3.d. is only triggered when a principal fails to appear as noticed by DHS, consistent with the entirety of the Indemnity Agreement. No such limiting language appears in ¶ 3.d., and such a construction unreasonably limits RLI's rights under that section to seek reasonable collateral security "sufficient to cover all exposure" and assure the "funding of the bonded obligations." Under Nexus's alternative argument, if review of its books and records under ¶ 3.c. reveals an impending financial collapse, RLI would not be able to protect its bargained-for secured position by requiring collateral security to cover its exposure. Rather, Nexus argues, the collateral security would be limited to the penal sums of the bonds actually breached. Such a crabbed reading renders meaningless the books and records provision of ¶ 3.c. Further, such a reading conflicts with ¶ 3.e., which allows RLI to use all collateral deposited in its sole discretion "as collateral security on any or all Bonds heretofore or hereafter executed for or at the request of [Nexus]." If RLI's ability to require Nexus to deposit collateral security is limited to bonds already in breach, it makes no sense that RLI can use such collateral for any bond under the Nexus program, including future bonds not yet issued, as reflected by the language in ¶ 3.e.

In contrast to the strained litigation positions taken by the parties, the court finds the obligations of RLI and Nexus under ¶¶ 2.a. and 3.d. of the Indemnity Agreement to be plain and unambiguous, each addressing a different category of liability to the surety and concomitant obligation of the indemnitor. In the context of this Indemnity Agreement

concerning immigration bonds, there are three distinct categories of risk facing RLI, and those risks are addressed by the rights granted it under ¶¶ 2.a.(i), 2.a.(ii), and 3.d.

- First, ¶ 2.a.(i) concerns "**losses**," and requires Nexus to pay RLI its "losses, costs, damages, attorneys' fees and expenses" sustained by reason of its execution of the immigration bonds or in enforcing the Indemnity Agreement. This includes, at a minimum, payments made by RLI to DHS for invoiced breached bonds.

- Second, ¶ 2.a.(ii) concerns "**claims**," and requires Nexus to pay RLI "an amount sufficient to discharge any claim made against" RLI on any unpaid immigration bond. RLI may use such payments to pay a bond claim or hold the money as collateral security against loss on any bond. This provision does not apply to bonds for which RLI has made a payment to DHS, as these are losses covered under ¶ 2.a.(i).

- Third, ¶ 3.d. concerns "**exposure**," and requires Nexus to deposit collateral with RLI "sufficient to cover all exposure" on immigration bonds or "make provisions acceptable to [RLI] for the funding of the bonded obligation(s)." This provision more expansively provides RLI protection from exposure, or future liability, in the form of payment, assets, or other provisions to be held in trust.

There is no material dispute in this case as to RLI's entitlement to specific performance of ¶¶ 2.a.(i) and 2.a.(ii). Nexus agrees that the Indemnity Agreement requires it to pay RLI for any losses it has sustained on any immigration bond and discharge RLI for claims made on

breached bonds. As Nexus's Donovan testified: "I understand that Nexus has a responsibility to indemnify RLI related to final claims, payment of the bonds that RLI has paid for indemnification." Donovan Dep., ECF No. 428-3, at 438. "My understanding is that if I pay a bond, that I am required to stand in front of the principal. And so I am either required to pay a bond when it is a final claim when it is breached and I am required to pay that or the surety can demand collateral at a time when a breach is issued." Id. at 440. While there is no dispute that Nexus is obliged to make these payments, the parties vigorously disagree as to when these obligations arise in the context of DHS immigration proceedings. Further, Nexus disputes the amount of RLI's attorney's fees and expenses in enforcing the Indemnity Agreement. The principal area of dispute, as framed by Nexus's motion for partial summary judgment, concerns the third category of risk contemplated in ¶ 3.d.

"Illinois courts and other jurisdictions have routinely granted motions for summary judgment in favor of a surety for specific performance of the collateral security obligation of an indemnity agreement." Hanover Ins. Co. v. Clark, No. 05 C 2162, 2006 WL 2375428, *5 (N.D. Ill. Aug. 15, 2006). See United States Fidelity & Guaranty Ins. Co. v. Cler Constr. Servs., Inc., No. 03–C1405, 2003 WL 1873926 (N.D. Ill. Apr. 11, 2003) (granting preliminary injunction for collateral security provision because surety "can show that debts are due, the principal refuses to pay them, and that, if they refuse to pay or perform, the surety will become liable."); Mountbatten Sur. Co. v. Szabo Contracting, Inc., 812 N.E.2d 90, 101 (Ill. App. Ct. 2004) ("Defendants did not dispute that plaintiff received claims under the bonds. Under the [bond] provisions . . . , receiving a notice of a claim is sufficient to trigger plaintiff's obligations under the bond. Therefore, the undisputed evidence in the record shows that plaintiff was

'exposed' to 'liability, loss, cost, damage and expense of whatever kind' 'by reason of having executed any bond' pursuant to the terms of the agreement. Thus, . . . plaintiff was exposed to liability on a bond, and this validly triggered defendant's obligations under the Agreement.").

Both RLI and Nexus urge the court to apply the holdings of the Eastern District of New York and the Second Circuit Court of Appeals in the multiple <u>Safeco v. Hirani</u> decisions to this case. The indemnity agreement in <u>Safeco</u> was substantially the same as the one at hand:

> INDEMNITY TO SURETY: Undersigned agree to pay to Surety upon demand:
>
> ¶ 1.  All loss, costs and expenses of whatever kind and nature, including court costs, reasonable attorney fees . . . and any other losses, costs or expenses incurred by Surety by reason of having executed any Bond….
>
> ¶ 2. An amount sufficient to discharge any claim made against Surety on any Bond. This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any bond….
>
> ¶ 5. The undersigned will, on request of Surety, procure the discharge of Surety from any Bond and all liability by reason thereof. If such discharge is unattainable, the Undersigned will, if requested by Surety, either deposit collateral with Surety, acceptable to Surety, sufficient to cover all exposure under such bond or bonds, or make provisions acceptable to Surety for the funding of the bonded obligation(s).

<u>Safeco Ins. Co. of Am. v. M.E.S., Inc.,</u> No. 09CV3312ARRALC, 2010 WL 11627203, at *13 (E.D.N.Y. May 19, 2010).

In the series of <u>Safeco</u> decisions, the district court was called upon to interpret nearly identical indemnification and collateral security provisions found in the RLI-Nexus Indemnity

34

Agreement. At the outset, the <u>Safeco</u> court noted that "[t]he terms of the parties' indemnity agreements make clear that they have distinguished actual losses, which trigger the surety's indemnification right, from claims yet to be paid or anticipated, which are included in the agreement's collateral security provisions." <u>Safeco</u>, 2010 WL 3928606 at *1.

With regard to the indemnification provisions, and consistent with the court's reading of ¶¶ 2.a.(i) and 2.a.(ii) of the Indemnity Agreement in this case, the Eastern District of New York noted the salient difference between these provisions as follows:

> Thus, the parties' own agreement makes a distinction between actual loss, such as a payment already made, which would require indemnification, and an unpaid "claim" or future loss, which would entitle the Surety to collect collateral security in that amount to be used to pay the claim.

<u>Id.</u> at *2.

Concerning the same two collateral security provisions at issue in this case, the <u>Safeco</u> court noted that "the cases are clear that specific performance to enforce a collateral security provision is available for losses under a bond that are uncertain but anticipated at some point in the future," and that "the surety is entitled to collateral security for unpaid or future claims." <u>Id.</u> at *3.

The <u>Safeco</u> court found the collateral security provisions in ¶ 5 — indistinguishable from those of ¶ 3.d. of the RLI-Nexus Indemnity Agreement — to be unambiguous.

> Paragraph 5 of the General Provisions provides that, upon demand, the defendants are required to post collateral security sufficient to cover all "exposure" under the bond in the event that discharge is unattainable. "Exposure" is not a term that is defined in the agreement, but that does not render the term ambiguous. Whether a contract is clear or ambiguous is a question of law.

Id. at *2.  The Safeco court distinguished between the surety's right to hold payments for claims as collateral security under ¶ 2 — here ¶ 2.a.(ii) — and the right to collateral security for exposure under ¶ 5 — here ¶ 3.d. — as follows:

> Here, as discussed above, one of the two provisions dealing with collateral security, Paragraph 2 of the Indemnity to Surety section, clearly specifies that collateral security is to be provided by the indemnitor for unpaid claims, not for existing losses already incurred. In light of this clarity, the subsequent use of the term "exposure" in Paragraph 5 of the General Provisions section introduces no ambiguity in to the agreement concerning the parties' intent as to the purpose of collateral security, as it is wholly consistent with the intent of the parties as expressed in paragraph 2. The term "exposure" in Paragraph 5 unambiguously refers to the risk of loss or future loss faced by Safeco, not to the losses already sustained, and the amount of such "exposure," if reasonable, is to be ascertained in calculating collateral security.

Id. at *3.

In Safeco, the Second Circuit affirmed that ¶ 5, parallel to ¶ 3.d. in this case, should be unambiguously interpreted to require collateral sufficient to cover potential losses. Safeco Ins. Co. of Am. v. Hirani/MES, JV, 480 F. App'x 606, 608 (2d Cir. 2012). Acknowledging that "it is impossible to determine ex ante the precise amount of future losses," the court focused on whether, in light of the circumstances of the case and the supporting documentation submitted by the parties, the amount requested was reasonable. Safeco Ins. Co. of Am. v. M.E.S., Inc., No. 09-CV-3312 ARR ALC, 2010 WL 4828103, at *4 (E.D.N.Y. Nov. 22, 2010), aff'd sub nom. Safeco Ins. Co. of Am. v. Hirani/MES, JV, 480 F. App'x 606 (2d Cir. 2012).

In determining the amount of collateral security to be ordered deposited by specific performance, the Safeco court noted that "a collateral security clause is enforceable so long as the amount demanded by a surety is reasonable and that the transaction is "at arm's length

with relative equality of bargaining power" <u>Safeco Ins. Co. of Am. v. M.E.S., Inc.</u>, No. 09CV3312ARRALC, 2010 WL 11627203, at *13. There is no suggestion of inequality of bargaining power in this case.

Following <u>Safeco</u>, the court agrees with RLI that its right to demand collateral security is not limited to claims actually made by DHS to RLI or bond principals who have failed to appear but for whom no claim has yet been filed. The court agrees as well with the holding in <u>Safeco</u> that the amount of the collateral to be deposited must be reasonable. RLI argues that its demand for $10 million in collateral security is reasonable because it is at risk for $22 million, representing the total penal sum of the outstanding immigration bonds indemnified by Nexus, and the fact that the bond breach rate has outpaced expectations. On the other hand, however, while RLI demanded in October 2018 that Nexus deposit $10 million in collateral security, its established loss reserves only approximated $711,000. Earlier, RLI had sought amounts of collateral far less than $10 million in varying amounts, from $500,000, $250,000 and $1.25 million, suggesting a lack of reasonable basis for the $10 million request. Moreover, although a number of Nexus indemnified bonds have been breached, Nexus asserts that it has paid RLI for all bond breaches to date, suggesting that a multimillion dollar deposit of collateral security is unreasonable.

In short, the court rejects the interpretations of ¶ 3.d. offered by both parties and adopts the approach taken by the Eastern District of New York and Second Circuit in <u>Safeco</u>. Under ¶ 3.d., RLI may require Nexus to deposit a reasonable amount of collateral security to cover RLI's exposure on the immigration bonds issued to Nexus program participants. RLI's right to require Nexus to deposit collateral security is not limited by claims made by DHS or

the value of bonds as to which bonded principals have already failed to appear. Nor may it be whatever amount RLI demands. Rather, it must be reasonable. At a minimum, Nexus must deposit collateral with RLI for unpaid breached bonds, but it must also make provisions suitable to RLI to cover RLI's reasonably certain risk of future loss. RLI carries the burden of demonstrating the amount of this exposure in a detailed, itemized format and will be required to substantiate each alleged source of risk as well as the reasonable likelihood of future loss. In so doing, RLI may look beyond performance on bonds to information gleaned from Nexus's books and records such as its financial position and business operations, among other things.

As in <u>Safeco</u>, the court has insufficient evidence to ascertain a reasonable amount of collateral to be deposited. "[B]eyond its basic estimates, Safeco has not explained its future costs in meeting its obligations under the bonds or its anticipated exposure. . . . Accordingly, while I grant summary judgment with respect to plaintiff's right to collateral security under the agreement, I reserve judgment on the amount of collateral security until the plaintiff provides support for the reasonableness of its demand." <u>Safeco Ins. Co. of Am. v. M.E.S., Inc.</u>, No. 09CV3312ARRALC, 2010 WL 11627203, at *13. The court takes the same approach in this case. In order to arrive at a reasonable amount of collateral security to be enforced by specific performance, the court will set an evidentiary hearing to reasonably quantify RLI's exposure.

## C. Indemnification Provisions

In ¶¶ 2.a.(i) and 2.a.(ii), Nexus agrees to indemnify RLI against both loss and liability for claims. An indemnity contract may indemnify against either (1) loss or damage, or (2) liability, or (3) both. See <u>Diaz v. Diaz</u>, 403 N.E.2d 1219, 1220 (Ill. App. Ct. 1980)). "In a

contract of indemnity against loss or damage, the indemnitee cannot recover until he has made payment or otherwise suffered an actual loss; the mere legal liability to pay is insufficient. In a contract of indemnity against liability, the cause of action accrues as soon as the liability of the indemnitee has become fixed, such as by a judgment against him, even though the indemnitee had not sustained any actual loss or paid the judgment." Id. (citing 42 C.J.S. Indemnity § 23 (2006)). The plain language of the Indemnity Agreement in the instant case creates a right to indemnity against loss under ¶ 2.a.(i): "Indemnitor(s) agree to pay to Surety upon demand all losses, costs, damages, attorneys' fees and expenses of whatever kind or nature which arise" by reason of RLI's execution of any bond for a Nexus program participant.

As to indemnity against loss, the parties appear to agree that to date Nexus has reimbursed RLI for any payments RLI has made to DHS for breached bonds. Nevertheless, RLI seeks payment of $2,790,443.64 in "losses, costs, damages, attorneys' fees and expenses" stemming from RLI's execution of the immigration bonds or in enforcing the Indemnity Agreement. See Declaration of Itemized Statement of Unreimbursed Losses and Expenses, ECF No. 425. This amount largely consists of RLI's litigation expenses in this case.

As to indemnity against liability, ¶ 2.a.(ii) provides "[i]ndemnitor(s) shall agree to pay Surety upon demand an amount sufficient to discharge any claim made against Surety on any bond." While Nexus does not dispute its obligation to indemnify RLI for the penal sum due on breached bonds, the parties historically have sparred as to when the obligation to pay bond claims arises.

As mentioned in connection with the issue of collateral security, there is no genuine issue of material fact that RLI is entitled to specific performance of ¶¶ 2.a.(i) and 2.a.(ii) of the

Indemnity Agreement. While RLI claims that Nexus has failed to timely pay RLI, Nexus asserts that RLI is not out of pocket one dollar. Nexus's Donovan testified that "I think we have either exonerated or indemnified RLI." Donovan Dep., ECF No. 428-3, at 196. Donovan explained:

> So my understanding is that I can exonerate when a claim is made, which means when a bond is breached, then a claim is made. When that claim is made, I can exonerate RLI by paying it at that time or I can indemnify RLI by paying it if you pay it. I believe in every case we've done that and if in these three cases we haven't, please tell me and I will pay it.

Id. at 338. As required by the second preliminary injunction, as amended, Nexus has been paying certain of these obligations as ordered by the court.[13] Indeed, because of the sheer number of individual bond principals involved in the Nexus program, Nexus's obligations to RLI for payments it has made to DHS for breached bonds and for claims made by DHS for breached bonds under ¶¶ 2.a.(i) and 2.a.(ii) has been a moving target.[14] It is time, however, to narrow our sights and determine, as of the date of the evidentiary hearing, the following: (1) Whether, and if so, to what extent, RLI is out of pocket for any unreimbursed losses for bond breaches already paid DHS; and (2) Whether, and if so, to what extent, RLI is obligated on claims, reflected in a DHS invoice, which remain unpaid. As there is no dispute that Nexus is obligated to RLI for its bond losses and claims under ¶¶ 2.a.(i) and 2.a.(ii), the court will order specific performance of those provisions, and, if applicable, enter judgment for RLI in a sum certain as of the date of evidentiary hearing.

---

[13] As referenced in RLI's pending motion for sanctions, RLI disagrees that Nexus has timely met its payment obligations under the second preliminary injunction. This issue will be addressed at the evidentiary hearing.
[14] As of Donovan's Rule 30(b)(6) deposition, Nexus claims to have paid 290 RLI invoices totaling $3.212 million. Donovan Rule 30(b)(6) Dep., ECF No. 428-4, at 48, 57.

## IV.    NEXUS'S EQUITABLE DEFENSE/COUNTERCLAIM

Nexus raises equitable defenses to RLI's breach of contract claim, seeking to excuse its alleged nonperformance on the grounds that RLI breached an implied covenant of good faith and fair dealing under the contract in (1) demanding discharge without loss from all immigration bonds or $10 million in collateral security; (2) refusing to execute a confidentiality agreement as a condition of access to Nexus's books and records; and (3) thwarting Nexus's efforts to appeal bond breach claims by insisting on payment of DHS invoices. See Donovan Dep., ECF No. 428-3, at 287-288, 379; Donovan Rule 30(b)(6) Dep., ECF No. 428-4, at 385, 390-392, 110, 119-120, and 194-195.

Illinois law treats surety contracts as contracts of insurance. Windowmaster Corp. v. Morse/Diesel, Inc., 722 F.Supp. 1532, 1534 (N.D. Ill.1988); Fisher v. Fidelity & Deposit Co. of Md., 466 N.E.2d 332, 339 (Ill. App. Ct. 1984). Illinois law imputes a heightened duty of "fair treatment" on the insurer "once the insurer's conduct creates a risk that the insured will bear some of the loss under the contract." Windowmaster Corp., 722 F. Supp. at 1534 (citing Cernocky v. Indemnity Ins. Co. of N. Am., 216 N.E.2d 198, 204 (Ill. App. Ct. 1966)). In surety contracts, the indemnitor ultimately bears the risk of loss incurred by the surety, so in determining whether the indemnitor has defaulted, the surety must act in good faith. Id. In exercising discretion in invoking rights under the contract, the surety "must give the interests of the insured equal consideration with its own interests and it must in all respects deal fairly with the insured." Id.

To prove that RLI failed its duty of good faith, Nexus must show that "it exercised its discretion unreasonably, arbitrarily, capriciously, or in a manner inconsistent with the

reasonable expectations of the parties at the time of contracting." Safeco Ins. Co. v. Siciliano, Inc., No. 06-3162, 2009 WL 212081, at *14 (C.D. Ill. Jan. 29, 2009) (citing Continental Mobile Telephone Co., Inc. v. Chicago SMSA Ltd., 587 N.E.2d 1169, 1174 (Ill. App. Ct.1992); see also Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir.1990) ("'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties."). The issue of good faith discretion is a question of fact. Siciliano, 2009 WL 212081, at *14. See e.g. Windowmaster Corp., 722 F. Supp. at 1535; Progressive Ins. Co. v. Universal Cas. Co., 807 N.E.2d 577, 589-90 (Ill. App. Ct. 2004); Powell v. Prudence Mut. Cas. Co., 232 N.E.2d 155, 158 (Ill. App. Ct. 1967). Thus, if Nexus can establish a genuine dispute of material fact as to RLI's alleged bad faith, the court cannot grant summary judgment and the claim must proceed to trial. Id.

As a preliminary matter, Nexus's theory of breach of contract is not colorable under Illinois contract law as a standalone cause of action. "While all Illinois contracts contain an implied obligation to act in good faith, this obligation does not provide a person with a separate, independent cause of action." Hickman v. Wells Fargo Bank N.A., 683 F. Supp. 2d 779, 793 (N.D. Ill. 2010) (citing LaScola v. U.S. Sprint Communications, 946 F.2d 559, 565 (7th Cir. 1991). The Illinois Supreme Court has held that a party may bring a standalone bad faith claim based on this implied covenant only "in the narrow context of cases involving an insurer's obligation to settle with a third party who has sued the policy holder." APS Sports Collectibles, Inc. v. Sports Time, Inc., 299 F.3d 624, 628 (7th Cir. 2002) (citing Voyles v. Sandia Mortg. Corp., 751 N.E.2d 1126, 1131 (Ill. 2001)). Otherwise, alleging breach of the implied

covenant of good faith and fair dealing must be brought as a component of a separate breach of contract claim. Vician v. Wells Fargo Home Mortg., No. 2:05-CV-144, 2006 WL 694740, at *8 (N.D. Ind. 2006) (dismissing plaintiff's claim for breach of Illinois implied covenant of good faith and fair dealing where claim was pled as an independent claim and not as part of the breach of contract count). "The covenant is only an aid to interpretation, not a source of contractual duties or liability under Illinois law." Zeidler v. A & W Restaurants, Inc., 301 F.3d 572, 575 (7th Cir. 2002).

Considering, therefore, Nexus's counterclaim as a breach of contract claim, as opposed to a standalone bad faith claim, such counterclaim fails because of the time-honored principle that a party who materially breaches a contract cannot seek to enforce its terms. The thrust of Nexus's counterclaim is that, in light of the circumstances at the time, RLI's demand for discharge or $10 million in collateral was so unreasonable as to amount to bad faith. Nexus contends that when RLI demanded collateral security pursuant to ¶ 3.d. on March 13, 2017, it did so in bad faith because it was attempting to "cease its involvement in the immigration bond surety business but still wanted to keep its $2.6 million up front, fully paid premiums." Nexus Counterclaim, ECF No. 240, at ¶ 148. However, Nexus's counterclaim and defense that RLI breached the implied covenant of good faith and fair dealing fail at the outset because Nexus was in material breach of the Indemnity Agreement at the time RLI requested discharge of the bonds or deposit of $10 million in collateral. In December 2016 and January 2017, Nexus failed to timely pay DHS past due invoices for three breached bonds, totaling $52,500, risking referral to Treasury for collection in clear breach of ¶ 2.a.(ii) of the Indemnity Agreement. When breached bond claims increased in late 2016 and early 2017, Nexus ignored

RLI's requests to review Nexus's bond files, in clear breach of ¶ 3.c. of the Indemnity Agreement. As to these breaches, there are no genuine issues of material fact in dispute requiring resolution by a jury. "Under general contract principles, a material breach of a contract provision by one party may be grounds for releasing the other party from his contractual obligations." <u>Mohanty v. St. John Heart Clinic, S.C.</u>, 866 N.E.2d 85, 95 (Ill. 2007). <u>See James v. Lifeline Mobile Medics</u>, 792 N.E.2d 461, 464 (Ill. App. Ct. 2003) ("Under contract law, a party in breach may not enforce the contract."); <u>Goldstein v. Lustig</u>, 507 N.E.2d 164, 168 (Ill. App. Ct. 1987) (noting "the rule of law prohibiting a party who has breached a contract from later benefiting from its provisions"). "[A] party suing for breach of contract need only allege and prove that he has substantially complied with all material terms of the agreement." <u>InsureOne Indep. Ins.</u> <u>Agency, LLC v. Hallberg</u>, 976 N.E.2d 1014, 1025 (Ill. App. Ct. 2012). <u>See</u> <u>James</u>, 792 N.E.2d at 464 ("A party who materially breaches a contract cannot take advantage of the terms of the contract that benefit him, nor can he recover damages from the other party to the contract."). "In Illinois only a material breach of a contract provision will justify non-performance by the other party. Whether a breach is material, however, is a question to be decided on the inherent justice of the matter." <u>Israel v. National Canada Corp.</u>, 658 N.E.2d 1184, 1190 (Ill. App. Ct. 1995). "The test of whether a breach is 'material' is whether it is 'so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether failure to perform renders performance of the rest of the contract different in substance from the original agreement. The breach must be so material and important to justify the injured party in regarding the whole transaction at an end." <u>Radiant Star Enterprises, LLC v. Metropolis Condominium Assoc.</u>, 107 N.E.3d 877, 893 (Ill. App. Ct.

2018). See Restatement (Second) of Contracts § 237 (1981) ("[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.").

As previously discussed in evaluating RLI's summary judgment motion, Nexus materially breached the terms of the Indemnity Agreement by failing to timely pay the claims DHS made on RLI and to provide access to Nexus's books and records. Indeed, it took RLI more than a year and a preliminary injunction order from the court to force Nexus to comply with its obligations under this provision. Because of Nexus's prior material breach, it cannot raise a claim that RLI's March 13, 2017 demand of $10 million in collateral security breached the implied covenant of good faith and fair dealing.

Nor does Nexus's bad faith claim otherwise survive. Again, the principal point raised by Nexus is that RLI acted in bad faith when it demanded bond discharge or, failing that, the deposit of $10 million in collateral, after the relationship cratered in March 2017.  In so arguing, Nexus fails to appreciate the high bar for demonstrating bad faith, namely, demonstrating a close connection between an alleged improper motive and the unreasonable behavior. Under Illinois law, this standard requires a party to present evidence from which a jury could conclude that a surety both intended to and did actually attempt to contravene the purpose of the agreement. For example, in Siciliano, the contractor and construction bond obligor "presented evidence from which a jury could conclude that Safeco convinced it to enter into the Joint Trust Account Agreement and pre-sign the default letters in exchange for financial assistance, when it always intended to cut off financial assistance and thereby effect defaults on the

bonded projects. If Safeco did mislead Siciliano into providing it the means to obtain control of the projects, then it acted unreasonably." Siciliano, 2009 WL 212081, at *15 (permitting a bad faith defense when defendant provided evidence that surety had procured pre-signed default letters from indemnitor and subsequently issued those letters unbeknownst to indemnitor). Here, there is no such evidence that RLI acted for an improper motive or in contravention of the purposes of the Indemnity Agreement. It issued the immigration bonds at Nexus's request, and when the wheels began to come off of the Nexus program, sought to assure that it would be indemnified for bond losses under the Indemnity Agreement. Rather than act in contravention of the Indemnity Agreement, RLI's actions were consistent with its purpose to place the ultimate risk of loss for these bonds on Nexus and protect RLI from exposure on the bonds.

The court finds no evidence to support Nexus's claim that RLI engaged in bad faith by demanding indemnification, discharge, or the deposit of collateral security. Although RLI's repeated request for $10 million in collateral security appears steep, it does not rise to the level of bad faith. This is particularly true because any collateral requested merely represents funds held in trust for Nexus, and not for RLI's profit. The court does not agree with Nexus's argument that collateral held in trust, per the terms of a collateral agreement, "would allow RLI to reap one hundred percent of the benefit of the fully paid up front premiums ─ two million six hundred thousand dollars ($2,600,000) ─ without any risk of proof of loss and require Nexus to find and pay a second premium to another surety to guarantee the Immigration Bonds." Nexus Counterclaim, ECF No. 240, at ¶ 100. Nor can RLI's request for discharge from all bond obligations be seen as being in bad faith as it is specifically anticipated

by the contract's terms. ECF No. 340, at 18. <u>See</u> Indemnity Agreement, ECF No. 1-2, at ¶ 3(b) ("Surety shall have the right at its option and in its sole discretion to issue or cancel or decline the execution of any Bond, or renewal thereof."); <u>Id.</u> at ¶ 3(d) ("Indemnitor(s) will, upon the request of Surety, procure the discharge of Surety from any Bond…"). A party does not act in bad faith when it reasonably exercises its contractual right to discharge or request the deposit of collateral to secure against an anticipated risk. <u>See</u> <u>L.A.P.D., Inc. v. General Elec. Corp.</u>, 132 F.3d 402, 403-04 (7th Cir. 1997) (holding that because parties are entitled to enforce the terms of their contracts as written, "[l]itigants may not seek to litigate issues of "good faith" in lieu of abiding by explicit provisions of contracts.").

Nexus further alleges RLI invoked its right to access books and records, including its demand of "the personal information of Principals in the hands of non-parties to the Agreement," in bad faith. Again, Nexus offers no evidence approaching bad faith. As noted previously, RLI appropriately exercised its contractual rights in demanding access to books and records to assess its risk exposure. <u>See</u> First Preliminary Injunction, ECF No. 59. Further, given the nature of the immigration bonds at issue, personal information about principals in Nexus's possession is relevant to RLI's risk assessment, placing it squarely within the terms of the books and records provision. Nexus claims that RLI acted in bad faith by refusing to condition Nexus's compliance with ¶ 3.c. of the Indemnity Agreement on the execution of a confidentiality agreement. But nothing in the Indemnity Agreement conditions RLI's right to examine Nexus's books and records on execution of a confidentiality agreement. Rather, RLI's right to access Nexus's books and records was only predicted upon the existence of

undischarged bonds. As RLI was well within its contractual rights to request access to Nexus's books and records while its immigration bonds remained in force, it did not act in bad faith.

For the same reason, Nexus's claim that RLI acted in bad faith by hindering Nexus's efforts to appeal breached bonds by paying DHS invoices fails.  Paragraph 2.b.(1) of the Indemnity Agreement provides that as regards claims made against RLI, it "shall have the exclusive right for itself and the Indemnitor(s) to determine whether any claim or suit upon any Bond shall on the basis of liability, expediency or otherwise, be paid, compromised, defended or appealed." As RLI had the exclusive right under the Indemnity Agreement to determine whether to pay or appeal bond claims, its decision to pay, rather than appeal bond claims, falls within its express contractual rights and cannot constitute a breach of the implied covenant of good faith and fair dealing.

There is no genuine issue of material fact on the issue of bad faith. RLI's actions, considered in light of its rights under the Indemnity Agreement, do not meet the high standard required under Illinois law to constitute a breach of the implied covenant of good faith and fair dealing. Because the court finds Nexus's allegations of bad faith to be without merit, its affirmative defense and counterclaim fail as a matter of law.

## V.  RLI'S REQUEST FOR DAMAGES

The court turns to RLI's demand for actual losses arising out of Nexus's breach of contract in the amount of $2,790,443.64 pursuant to ¶ 2.a.(i), which provides that Nexus must pay RLI upon demand:

> all losses, costs, damages, attorneys' fees, and expenses of whatever kind or nature which arise of, or in consequence of…
> enforcing this agreement against any of the Indemnitor(s) or in

48

> procuring or attempting to procure its release from liability or a
> settlement under any Bond.

Indemnity Agreement, ECF No. 1-2. In support, RLI proffers the itemized statement of David

Grycz, an officer of RLI, cursorily listing its losses pursuant to ¶ 2.b.(iii) of the Indemnity

Agreement. ¶ 2.b.(iii) provides:

> In any claim or suit hereunder, an itemized statement of…losses
> and expenses, sworn to by an officer of the Surety or the
> vouchers or other evidence of disbursement by the Surety shall
> be prima facie evidence of the fact and extent of the liability
> hereunder of the Indemnitor(s).

Id. Illinois courts have upheld prima facie evidence provisions of indemnity agreements. See,

e.g., Amwest Surety Ins. Co. v. Szabo, 2003 WL 21789033, at *4-5 (N.D. Ill. July 23, 2003);

U.S. Fidelity and Guar. Co. v. Klein Corp., 558 N.E.2d 1047, 1052 (Ill. App. Ct. 1989).

Nexus challenges the sufficiency of the officer statement. A party may establish the

inaccuracy of prima facie evidence provision with "counter affidavits, or other evidence." U.S.

Fidelity and Guar. Co., 558 N.E.2d at 258. Nexus argues that RLI "fails to adequately itemize

the expenses and therefore fails to offer evidence sufficient to identify losses attributed to an

actual breach by the Defendant." Nexus Resp. in Opp'n to RLI Mot. for Summ. J., ECF No.

456, at 14. Nexus also posits that if its interpretation of the Indemnity Agreement prevails,

then "all of RLI's alleged fees and cost associated with pursuing ten million dollars—including

all fees and cost regarding RLI's dogged pursuit of Nexus's financial stability—should be

deemed nonrecoverable." Id.

The court agrees with Nexus that RLI's officer statement is insufficiently itemized to

determine RLI's loss arising out of execution of the immigration bonds for Nexus program

participants or in enforcing the Indemnity Agreement against Nexus. This is especially true where the vast bulk of the damages claimed are sizeable attorneys' fees incurred in litigating this lawsuit.

Accordingly, the court will convene an evidentiary hearing to address the issue of RLI's claimed damages. See e.g., Safeco Ins. Co. of Am. v. M.E.S., Inc., No. 09CV3312PKCVMS, 2017 WL 1194730, at *24 (E.D.N.Y. Mar. 30, 2017), aff'd, 910 F.3d 705 (2d Cir. 2018). Given that the lion's share of losses claimed are litigation expenses, the court urges the parties to anticipate a rigorous evaluation as to the reasonableness of the claimed attorneys' fees. "The party seeking reimbursement of attorneys' fees 'bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.'" Safeco Ins. Co. of Am. v. M.E.S., Inc., 790 F. App'x 289, 291–92 (2d Cir. 2019) (quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)). See also Safeco Ins. Co. of Am. v. M.E.S., Inc., No. 09CV3312PKCVMS, 2018 WL 2766139, at *12 (E.D.N.Y. June 8, 2018), aff'd, 790 F. App'x 289 (2d Cir. 2019) (engaging in an exhaustive review of claimed costs arising from contract enforcement, categorizing legal fees by claim, by hearing, by motion; and evaluating the reasonableness of the fee charge, time claimed, and degree of success achieved).

## VI.    SUMMARY

After review of the motions, exhibits, and relevant case law, the court resolves the legal disputes regarding the terms of the Indemnity Agreement central to this case. As detailed herein, the court **GRANTS in part and DENIES in part** each side's motions for summary judgment. ECF Nos. 422 and 423.

The court **GRANTS** RLI's motion for summary judgment on its breach of contract claim as to ¶¶ 2.a.(i), 2.a.(ii), and 3.c. of the Indemnity Agreement, finding it to be factually undisputed that Nexus breached its obligation to pay RLI's losses and bond claims upon demand and to provide access to books and records. The court **GRANTS** RLI specific performance of ¶¶ 2.a.(i), 2.a.(ii), and 3.c. of the Indemnity Agreement. The court will determine the reasonable amount of RLI's "losses, costs, damages, attorneys' fees and expenses" under ¶ 2.a.(i) at the upcoming evidentiary hearing.

The court **GRANTS in part** and **DENIES in part** each side's motions for summary judgment as regards ¶ 3.d. of the Indemnity Agreement. The court **GRANTS** RLI specific performance of ¶ 3.d. of the Indemnity Agreement for collateral security sufficient to cover its exposure for the immigration bonds issued for participants in the Nexus program in a reasonable amount to be determined at the evidentiary hearing. The court **DENIES** RLI's request to order the deposit of $10 million in collateral security as the court cannot conclude, based on the record developed to date, that such an amount is reasonable.

The court **GRANTS** RLI's motion for summary judgment on Nexus's equitable defense and counterclaim, finding no basis for the claim of breach of the implied covenant of good faith and fair dealing.

The court **DENIES as moot** each party's expert witness motions as they are unnecessary to the resolution of the legal issues in this case.

As the court has resolved the legal disputes concerning Nexus's obligations under the Indemnity Agreement and granted RLI specific performance of its terms, the first and second preliminary injunctions issued in this case, ECF Nos. 60, 139 and 215, will be dissolved by

order following the evidentiary hearing. The pending motion for sanctions, ECF No. 452, also will be addressed at the evidentiary hearing.

The parties are **DIRECTED** to contact the Clerk to set up an evidentiary hearing[15] at which the court will determine:

    a.  The reasonable amount of collateral security to be deposited by Nexus sufficient to cover RLI's exposure on the outstanding immigration bonds;

    b.  The reasonable "losses, costs, damages attorneys' fees and expenses" incurred by RLI as a result of Nexus's breaches; and

    c.  Resolution of the pending sanctions motion.

An appropriate Order will be entered.

Entered: July 3, 2020

Mike Urbanski
cn=Mike Urbanski, o=US Courts,
ou=Western District of Virginia,
email=mikeu@vawd.uscourts.gov, c=US
2020.07.03 14:23:38 -04'00'

Michael F. Urbanski
Chief United States District Judge

---

[15] The Clerk is directed to schedule a two-day evidentiary hearing. If required by the COVID-19 pandemic, such evidentiary hearing may proceed by Zoom.gov.