

# Transcript of Richard Moore

**Date:** February 27, 2020
**Case:** RLI Insurance Company -v- Nexus Services, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Richard Moore
Conducted on February 27, 2020

1 (1 to 4)

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE WESTERN DISTRICT OF VIRGINIA
3              Harrisonburg Division
4   ----------------------------x
5   RLI INSURANCE COMPANY,      :
6              Plaintiff, :
7   v.                         : Case No.:
8   NEXUS SERVICES, INC., et al.,: 5:18-cv-00066-MFU
9              Defendants.:
10  ----------------------------x
11
12      Video deposition of RICHARD MOORE
13            McLean, Virginia
14      Thursday, February 27, 2020
15              11:42 a.m.
16
17              VOLUME 1
18
19  Job No.: 288372
20  Pages: 1 - 169
21  Reported by: Judith E. Bellinger, RPR, CRR
22
```

**Page 2**

```
1       Video deposition of RICHARD MOORE held at the
2   offices of:
3
4
5         WATT, TIEDER, HOFFAR & FITZGERALD, LLP
6         1765 Greensboro Station Place
7         Suite 1000
8         McLean, VA 22102
9         703.749.1000
10
11
12
13      Pursuant to notice, before Judith E.
14  Bellinger, Registered Professional Reporter,
15  Certified Realtime Reporter, and Notary Public in
16  and for the Commonwealth of Virginia.
17
18
19
20
21
22
```

**Page 3**

```
1          A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF:
3      VIVIAN KATSANTONIS, ESQUIRE
4      CHRISTOPHER HARRIS, ESQUIRE
5      WATT, TIEDER, HOFFAR & FITZGERALD, LLP
6      1765 Greensboro Station Place
7      Suite 1000
8      McLean, VA 22102
9      703.749.1000
10
11  ON BEHALF OF THE DEFENDANTS:
12      MARY DONNE PETERS, ESQUIRE
13      GORBY PETERS & ASSOCIATES, LLC
14      1175 Peachtree Street
15      Suite 1000
16      Atlanta, GA 30361
17      404.239.1150
18
19
20
21
22
```

**Page 4**

```
1      A P P E A R A N C E S   C O N T I N U E D
2
3          CHRIS K. KOWALCZUK, ESQUIRE
4          ATTORNEY AT LAW
5          P.O. Box 11971
6          Roanoke, VA 24022
7          540.345.0101
8
9          JOHN M. SHOREMAN, ESQUIRE
10         MCFADDEN & SHOREMAN
11         1050 Connecticut Avenue, NW
12         Suite 1000
13         Washington, D.C. 20036
14         202.772.3188
15
16  ALSO PRESENT:
17      Jeremy Dineen, Videographer
18      Mario Williams
19      Micheal Donovan
20      Aaron Houchens
21      Henry Kass
22
```

Transcript of Richard Moore
Conducted on February 27, 2020

---

5

C O N T E N T S

EXAMINATION OF RICHARD MOORE                    PAGE

                                                 12

E X H I B I T S

(Attached to the transcript)

Moore Deposition Exhibits:                      PAGE

Exhibit 1  Organizational chart, Bates No.       16
           NEXUS0106983

Exhibit 2  Nexus Services, Inc. Profit and Loss  40
           January - June, 2018, Bates Nos.
           NEXUS0199649 -9656

Exhibit 3  Nexus Services, Inc. Standard         49
           Operating Procedures Manual, Bates Nos.
           NEXUS0335712 - 5799

Exhibit 4  Total Revenue By Month - 2017 Bates   72
           Nos. ESCM_NEXUS_014665

Exhibit 5  Total Revenue By Month - 2017, Bates  79
           Nos. ESCM_NEXUS_014668

Exhibit 6  Email from Hazzar Perdomo to Erik     124
           Schneider and Mike Donovan dated
           1/14/2019, Bates No. NEXUS0284027

---

6

E X H I B I T S   C O N T I N U E D

Exhibit 7  Email from Richard Moore to Mike      138
           Donovan dated 8/19/2018, Bates Nos.
           NEXUS0210996, with attachments

Exhibit 8  Nexus Services, Inc. (Old) Profit     147
           and Loss January - December 2018, Bates
           Nos. Eckert_Nexus_027806

---

7

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins Disc No. 1 in the videotaped deposition of Richard Moore in the matter of RLI Insurance Company v. Nexus Services, Inc., et al., in the U.S. District Court for the Western District of Virginia, Harrisonburg Virginia, Case No. 518-CV 00066MFU.

Today's date is February 27th, 2020.

The time on the video monitor is 11:42.

The videographer today is Jeremy Dineen representing Planet Depos.  This video deposition is taking place at 1765 Greensboro Station Place in McLean, Virginia.

Would counsel please voice-identify themselves and state whom they represent?

MS. KATSANTONIS:  Vivian Katsantonis on behalf of RLI Insurance.

MR. HARRIS:  Christopher Harris on behalf of RLI Insurance.

MS. KATSANTONIS:  We have with us Henry Kass who's our consultant.

MS. PETERS:  Mary Donne Peters on

---

8

behalf of Nexus Services, Inc., Libre by Nexus, Inc. and Homes by Nexus, Inc.

MR. HOUCHENS:  Aaron Houchens, pro hac, on behalf of Rich Moore.

MR. WILLIAMS:  Mario Williams here for John Shoreman and I'm probably going to make a notice of appearance on behalf of the Defendants.

MR. HARRIS:  We'd just like to note, Mr. Williams, that you made that representation yesterday.  We're going to object to your appearance without entering a notice of appearance.  And yesterday we asked you not to speak on the record, act as counsel in this deposition, and I'm going to renew that request today.

MR. WILLIAMS:  Okay.  Let me ask you something.  Do you have a notice of appearance or is he a consultant?

MR. HARRIS:  He's a consultant.  But he's not going to be speaking today.

MR. WILLIAMS:  But does he have a notice of appearance on the record?

**9**

1     MR. HARRIS:  No.  He's not a --
2     MR. WILLIAMS:  So are we objecting to
3 him being in the room?
4     MR. HARRIS:  No.  You're an attorney
5 who is speaking on the record and interrupting the
6 discovery process and you should be subject to
7 sanctions if you're improperly interfering with
8 the deposition.  You should enter an appearance.
9     MR. WILLIAMS:  But what I'm asking is
10 that do you have somebody in the room that's not
11 on record?
12     MS. KATSANTONIS:  We've noted his
13 appearance as a consultant.  He's not required to
14 file a notice of appearance with the court.
15     MR. WILLIAMS:  All right.
16     THE VIDEOGRAPHER:  The court reporter
17 today is Judy Bellinger representing Planet Depos.
18 Would the reporter please swear in the witness.
19
20
21
22

**10**

1 Whereupon,
2         RICHARD MOORE,
3 being first duly sworn or affirmed to testify to
4 the truth, the whole truth, and nothing but the
5 truth, was examined and testified as follows:
6     MS. PETERS:  Ms. Katsantonis, as a
7 preliminary matter, obviously we have a protective
8 order entered into this case; by allowing the
9 witness to testify and without interrupting your
10 deposition flow, we want to note that we reserve
11 the right to designate portions of this transcript
12 as confidential pursuant to the protective order,
13 as necessary, and that we will do so at the
14 conclusion of the deposition so that we do not
15 interfere or impede your questioning.
16     MS. KATSANTONIS:  Thank you.  All
17 right.
18     MR. HARRIS:  One more matter for the
19 record.  I understand we're going to have more
20 appearances from Nexus counsel who's not in the
21 room right now.  We've been held to a very tight
22 just clock in our timing and I don't want to have

**11**

1 that time charged against the witness.  We should
2 only be counting time for the time that the
3 witness is being examined.
4     MS. PETERS:  I don't understand what
5 you just said.
6     MR. HARRIS:  Well, we're going to take
7 up time now, because your attorneys are outside
8 the room, to enter their appearances on the record
9 and I don't want that time to be charged against
10 the seven hours of examination against Mr. Moore
11 since you guys have held us to a very tight
12 seven-hour deadline.
13     MR. KOWALCZUK:  I'm sorry.  We're back.
14     MS. KATSANTONIS:  Yep, thank you.
15     MS. PETERS:  We're on the record.
16 We're on the video record.  The clock has started.
17     MS. KATSANTONIS:  All right.  Have
18 they --
19     MR. HARRIS:  No, the clock has not
20 started.
21     MS. KATSANTONIS:  No, the clock has not
22 started because we are entering the names of the

**12**

1 attorneys who just walked into the room.
2     MS. PETERS:  All right.
3     MR. SHOREMAN:  Just me.  Am I holding
4 you up?
5     MS. KATSANTONIS:  Yes, if you could
6 just voice.
7     MR. SHOREMAN:  John Shoreman on behalf
8 of Defendants here with my associate attorney
9 Mario Williams who will soon enter an appearance
10 in the case.
11     MR. KOWALCZUK:  Chris Kowalczuk on
12 behalf of the Defendants.
13     MS. KATSANTONIS:  And Mr. Donovan is
14 present as the corporate representative, I assume.
15     MR. SHOREMAN:  Yes.
16     MS. KATSANTONIS:  Okay.  So we can
17 begin now as far as our time.
18 DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF
19 BY MS. KATSANTONIS:
20     Q   All right.  Mr. Moore, can you please
21 state your name and address for the record.
22     A   Richard Everette Moore, 47 South

Transcript of Richard Moore
Conducted on February 27, 2020

---

13

1  Windsong Court, Fishersville, Virginia, 22939.
2      Q    Mr. Moore, have you ever gone by
3  another name?
4      A    No.
5      Q    Okay.
6      A    I mean maybe like Rich, but, yeah.
7      Q    Okay.  And just briefly what is your
8  level of educational background?
9      A    Sure.  In '96 I left high school, got
10 my GED and then I went to college.  I'm still
11 actually enrolled in college now through Walden
12 University.
13     Q    Okay.  All right.  And when -- prior to
14 your roles at Nexus, can you give me a brief
15 background of what jobs you had?
16     A    Sure.  A brief background I worked in
17 retail, I worked in lobbying as well, I did some
18 political consulting as well.
19     Q    Okay.  And did you work in the bail
20 bond area prior to the formation of Nexus?
21     A    Not as a bail bondsman, no.  But I did
22 lobbying.  I deal with criminal justice issues

---

14

1  including bail bonding.
2      Q    Okay.  And so with -- as a lobbyist?
3      A    Yes.
4      Q    Okay.  What about as far as any role
5  and responsibility in GPS tracking devices for
6  criminals or...
7           MS. PETERS:  Object to form.
8      A    When Nexus was smaller, we did some GPS
9  tracking for criminals, but that was it.  We also
10 had some offender reentry programs like online
11 programs we could offer people, stuff like that.
12     Q    And what time frame would that have
13 been, roughly?
14     A    I would say prior to 2014.
15     Q    Okay.  For a year or two years?
16 Just...
17     A    I honestly wouldn't be able to tell you
18 the exact time frame.
19     Q    Okay.  And what entity existed prior to
20 Nexus Services, Inc.?
21           MS. PETERS:  Object to the form to the
22 extent it calls for a legal conclusion.

---

15

1      A    A lot of entities.  Can you be more
2  specific in what we're talking about?
3      Q    Well, the entities that you were
4  affiliated with that you --
5      A    That were Nexus related?
6      Q    Yes?
7      A    Nexus Programs.
8      Q    Okay.
9      A    And then there was the Criminal Justice
10 Reform Coalition before that.
11     Q    Okay.  And what was your position with
12 Nexus Programs?
13     A    I guess I was a vice president at that
14 point with it.
15     Q    Okay.  And do you know what years Nexus
16 programs operated?
17     A    No, I do not.
18     Q    Okay.  And what about this coalition
19 you mentioned?
20     A    That would have been, I guess early,
21 maybe 2011, 2012.  I can't give you an exact date,
22 unfortunately.

---

16

1      Q    Okay.  And Nexus Services, Inc., was
2  formed on or about December 30th, 2013; is that
3  correct?
4      A    I don't have the article in front of me
5  so I can't verify exact date.
6      Q    Okay.  I'm going to just hand you -- we
7  looked at this yesterday with Mr. Donovan -- an
8  organizational chart.
9           MS. KATSANTONIS:  And mark this.
10     A    To clarify, when you throw it over
11 there I give it to her, right?
12     Q    Yeah, I'm sorry.
13     A    I want to make sure I'm doing my part.
14     Q    I'm only throwing it because I can't
15 reach.
16     A    I understand.  I'm here to help.
17     Q    Thank you.
18          (Moore Exhibit 1 marked for
19 identification and attached to the transcript.)
20     A    Do you want me to show this to my
21 counsel?
22     Q    No, she already has a copy from

---

Transcript of Richard Moore
Conducted on February 27, 2020

17

1  yesterday.
2      **A   Okay.**
3          MS. PETERS:  I'll pull my copies from
4  yesterday.
5      Q   So in reviewing this organizational
6  chart that was provided by Nexus in this
7  litigation, you can take a few minutes to review
8  it.
9          Does this accurately reflect your
10 understanding of Nexus Services and the entities
11 it owns?
12         MS. PETERS: Object to the form of the
13 question to the -- what time frame are you
14 referring to?  This document was produced to you
15 over two years ago, as far as I know.
16     **A   So without knowing the date that this**
17 **was produced, I would not be able to tell you if**
18 **this is accurate or not.**
19     Q   Well, as of today, is it accurate?
20     **A   As of today, it is not accurate.**
21     Q   Okay.  Tell me why.
22     **A   Because Nexus retail brand was**

18

1  dissolved.
2      Q   And when was that dissolved?
3      **A   Unfortunately I don't have the date.**
4      Q   Was it within the last year, the last
5  two years?
6      **A   It would have been, I believe, in 2018,**
7  **at the end of 2018.**
8      Q   Okay.
9      **A   And then I do not -- Nexus**
10 **Investigations Security, I am unsure how that -- I**
11 **have nothing to do with that at all.  I'm unsure**
12 **of how that fits into anything.**
13     Q   Okay.  Is there any other errors that
14 you note?
15         MS. PETERS:  Object to form in that you
16 are calling them "errors."  This document was
17 accurate when it was created.
18         MS. KATSANTONIS:  That's representation
19 from counsel.
20     Q   Is there anything, sitting here today,
21 that you believe is inaccurate?
22         MS. PETERS:  Object to form.

19

1      **A   I would say that I believe that Secure**
2  **by Nexus is a dormant company but I think**
3  **everything else is -- is accurate.**
4      Q   Are there other companies and entities
5  for which Nexus Services has an ownership interest
6  that's not reflected on this sheet?
7      **A   No.**
8      Q   Are there any other companies or
9  entities for which these other wholly owned
10 subsidiaries have an interest that are not listed?
11         MS. PETERS: Object to form.
12         Can you repeat the question, madam
13 court reporter.
14         (The requested text was read by the
15 reporter as follows:  "Are there any other
16 companies or entities for which these other wholly
17 owned subsidiaries have an interest that are not
18 listed?")
19         MS. PETERS: Object to form.
20     **A   No.**
21     Q   Okay.  There's another company called
22 Gamer Oasis.

20

1      **A   Yes.**
2      Q   And who owns Gamer Oasis?
3      **A   Entlest Brands.**
4      Q   And who owns Entlest Brands?
5      **A   I do.**
6      Q   And when was Entlest Brands created?
7      **A   In 2018.**
8      Q   Okay.  And are you the 100 percent
9  owner of Entlest?
10     **A   Yes.**
11     Q   Okay.  And from where does Entlest
12 derive its revenue?
13     **A   Well, with all due respect, you just**
14 **asked me about a video game store, Gamer Oasis.**
15 **So that would be where Entlest derives revenue**
16 **from.**
17     Q   Okay.  And then the Gamer Oasis is a
18 video store.
19     **A   Video game store.**
20     Q   Uh-huh.  And how was the video game
21 store purchased?
22     **A   It was purchased from Nexus.**

Transcript of Richard Moore
Conducted on February 27, 2020

---

**21**

1    Q    So Nexus owned Gamer Oasis?

2    **A    Under Nexus retail brand Nexus bought**

3    **8bit Oasis for $5,000 and then I -- when Nexus**

4    **made a decision to either sell it or to close it,**

5    **I made the decision to buy it.**

6    Q    And did you use personal funds to buy

7 it?

8    **A    Yes.**

9    Q    Did you take any loan funds from Nexus

10 Services to purchase it?

11    **A    No.  I made monthly payments to Nexus**

12 **for it.**

13    Q    So you -- so Nexus financed the

14 purchase of it through you?

15    MS. PETERS:  Object to form.

16    **A    It wasn't financing.  I made monthly**

17 **payments to Nexus to pay it off.**

18    Q    Okay.  How much were your monthly

19 payments?

20    **A    10,000 down and then 5,000 a month.**

21    Q    For how many?

22    **A    I don't have exact purchase price of**

---

**22**

1 it.

2    Q    You don't recall the purchase price?

3    **A    No.  I believe it was $30,000.**

4    Q    Okay.  Is there a sales contract?

5    **A    I'm sure there would have been, yes.**

6    Q    Who would be the parties to that sales

7 contract?

8    **A    I would have signed on behalf of --**

9    MS. PETERS:  Object to form.  Which

10 sales contract?  He's identified two different

11 sales transactions.

12    MS. KATSANTONIS:  No, he has not.

13    **A    Actually, I have.  Do you mean the**

14 **purchase by Nexus or the purchase where I**

15 **purchased it from Nexus?**

16    Q    Your purchase from Nexus.

17    **A    I would have signed for Entlest and I**

18 **don't remember who signed for -- for Nexus -- I**

19 **would have signed for Entlest.  I don't know who**

20 **signed for Nexus.**

21    Q    So there is a contract is what you're

22 saying?

---

**23**

1    **A    Yes.**

2    Q    Okay.  And so Nexus --

3    MS. KATSANTONIS:  So I would ask for a

4 copy of that.  Mary Donne.

5    MS. PETERS:  I'd ask you to put it in

6 writing, please.

7    MS. KATSANTONIS:  I'm asking you right

8 now.

9    MS. PETERS:  I'm telling you --

10    MS. KATSANTONIS:  You're taking notes,

11 you can write it down.

12    MS. PETERS:  I'm not your personal

13 secretary.

14    MS. KATSANTONIS:  Okay.  You can

15 maintain that position.  We'll see how --

16    MS. PETERS:  I would ask you as a

17 professional courtesy to please put any request in

18 writing in a letter to Mr. Shoreman copying all

19 counsel so that we may address it in a timely --

20    MS. KATSANTONIS:  I have done that in

21 discovery requests that you just haven't answered.

22    MS. PETERS:  I disagree.

---

**24**

1    MS. KATSANTONIS:  Okay.  All right.

2 Let's move on.

3    Q    Are there any other acquisitions or

4 purchases you've made from any of the entities

5 listed on this sheet?

6    **A    No.**

7    Q    Okay.  What, if any, interest do you

8 have related to Dog the Bounty Hunter?

9    ███████████████████████████████

10    ███████████████████████████████  **It**

11    ███████████████████████████████

12    ███████████████████████████████

13    ███████████████████████████

14    ███████████████████  **And before**

15    ███  **she asked me to help Dog.  We met in May**

16 **before, last year, and Beth asked --**

17 ████████  **and asked me to, you know, just do**

18 **what you can to help him stay straight and get him**

19 **where he needs to be and help him survive.**

20    Q    Do you have -- and I'm sorry, I didn't

21 mean to get into the personal issues.  But I

22 wanted to know did you have any business

Transcript of Richard Moore
Conducted on February 27, 2020

25

1 relationship with Dog the Bounty Hunter?
2    **A    Yes.**
3    Q    And what is the business relationship?
4    **A    I —**
5    MS. PETERS: Object to form. I want to
6 make sure that we designate the entire portion of
7 that last question/answer session because he's
8 going into personal medical histories of close
9 friends.
10    MS. KATSANTONIS: That's fine.
11    MS. PETERS: I should have objected so
12 we need to make sure that that is noted for the
13 video and electronic deposition transcript.
14    Q    Sorry. Anyway, can you tell me the
15 business relationship?
16    **A    Sure. I helped facilitate what's**
17 **called The Bounty Store, which is his -- the fan**
18 **merchandise side of it. I also serve a role as**
19 **his personal advisor on many different things.**
20 **Again, I'm also the voice of reason with him.**
21 **Beth and Dog owned a —**
22    MS. PETERS: Objection. I'm going to

26

1 ask the witness to just answer business-related
2 questions.
3    THE WITNESS: Sure. Okay.
4    **A    Beth and Dog owned a production company**
5 **which Dog has ceded part of the ownership to me.**
6    Q    Okay. And have you purchased -- so did
7 you make purchase transactions with them?
8    **A    What do you -- I'm sorry.**
9    Q    You just said Dog ceded some of the
10 business operation to you. So I'm trying to
11 understand. Did you make a purchase of part of a
12 business or anything like that?
13    **A    No, I did not.**
14    Q    Okay. And do -- on these business
15 ventures with Dog the Bounty Hunter, are your
16 transportation and lodging and other expenses paid
17 by Nexus Services?
18    **A    Usually not. If I'm visiting him in**
19 **Denver and I'm visiting the office in Denver, I**
20 **may go have dinner with him. But it's not**
21 **Nexus -- the dinner's on Nexus expense but if I'm**
22 **doing an office visit and I happen to visit a**

27

1 **friend then it would be a business expense.**
2    Q    Have you -- you said usually but are
3 there expenses that you've incurred related to
4 that business relationship that have been paid by
5 Nexus Services?
6    **A    No.**
7    MS. PETERS: Object to form.
8    Q    Okay. Is your interest through -- with
9 regard to the Dog the Bounty Hunter businesses, is
10 that through you personally or through Entlest?
11    **A    The Bounty Store side of it is through**
12 **Entlest, but the other side of it is personal.**
13    Q    All right. Who is your -- what is your
14 position at Nexus?
15    **A    Executive vice president.**
16    Q    Okay. And who signs your paycheck?
17    **A    A computer does.**
18    Q    Okay. Out of what account is your
19 paycheck?
20    **A    The account number or...**
21    Q    Well, just is it a Nexus account? Is
22 it a Libre account?

28

1    **A    It's a Nexus Services account.**
2    Q    Okay. And the Nexus Services account
3 is funded through revenue received by Libre by
4 Nexus; is that correct?
5    **A    By several — by several different**
6 **entities, yes, including Homes.**
7    Q    Okay. Is there anyone else besides
8 Libre by Nexus and Homes that funds that operating
9 account?
10    **A    No.**
11    Q    You said several entities. Is there
12 other entities that fund revenues?
13    MS. PETERS: Object to form.
14 Impreciase.
15    **A    I would say that looking at your chart,**
16 **or this chart, if there's rental revenue from**
17 **Nexus properties or One Fish, Two Fish, that some**
18 **of that -- there's payroll costs involved in that,**
19 **like we have Homes employees who maintain the**
20 **properties, that it's possible that it came from**
21 **that as well.**
22    Q    Is all payroll paid from Nexus Services

Transcript of Richard Moore
Conducted on February 27, 2020

29

1 accounts?
2 **A Yes.**
3 Q And that would be all payroll for Libre
4 by Nexus, Homes, One Fish, Two Fish, correct?
5 **A Yes.**
6 Q Okay. Have you taken out loans from
7 Nexus or Libre?
8 MS. PETERS: Object to form.
9 **A Years ago I believe that -- I wouldn't**
10 **characterize them as loans, I would say that**
11 **things were billed to executive and then were paid**
12 **back to the company.**
13 Q Okay. They were billed to executive,
14 meaning that you would keep track of them under
15 the executive --
16 **A Our finance team had an executive**
17 **section in QuickBooks that they put stuff in.**
18 Q And then you were charged for that down
19 the road?
20 **A Yes.**
21 Q Okay. And were those loans or expenses
22 distinguished between -- anything between -- that

30

1 you were doing on behalf of Nexus verse Libre?
2 MS. PETERS: Object to form. Vague.
3 **A I don't know how they would classify**
4 **them in accounting.**
5 Q All right. And what is your title at
6 Libre by Nexus?
7 **A Executive vice president.**
8 Q Okay. Generally what is your role and
9 responsibility as executive vice president of
10 Nexus?
11 MS. PETERS: Object to form.
12 **A All the employees, with the exception**
13 **of Mike Donovan, report to me.**
14 Q Okay.
15 **A So my largest role is to deal with all**
16 **field issues and vendors.**
17 Q Okay. And what about with regard to
18 Libre by Nexus? What is your role and
19 responsibility as far as -- in your capacity as
20 executive vice president?
21 MS. PETERS: Object to form.
22 Overbroad.

31

1 **A I interact with all employees.**
2 **Occasionally client issues, but very, very rarely.**
3 **I also make sure that the offices are maintained**
4 **properly and work with landlords and vendors.**
5 Q Okay. What about -- what is your title
6 at Homes?
7 MS. PETERS: Objection. Asked and
8 answered.
9 **A I guess in context, my title would be**
10 **the same.**
11 Q Okay. And with regard to Homes, what
12 is your responsibilities?
13 **A I talk to them. I work with the**
14 **property managers and I guess that would be really**
15 **it.**
16 Q Okay. With regard to Gamer Oasis when
17 you purchased that, did you pay by check or wire?
18 **A By check.**
19 MS. PETERS: Object to form. Are you
20 referring to the first or second transaction?
21 Q You just said by check. Which
22 transaction were you referencing?

32

1 **A When I purchased -- because at the time**
2 **of the purchase -- I purchased Gamer Oasis from**
3 **Nexus by check.**
4 Q Okay. And do you know which -- who do
5 you direct payment to?
6 MS. PETERS: Object to form.
7 **A Nexus Services.**
8 Q Okay. And do you know into which
9 account the payment went?
10 **A No.**
11 Q Who would know that?
12 MS. PETERS: Object to form. Calls for
13 speculation.
14 **A I could find out and get back to you on**
15 **that.**
16 Q Okay. Thank you.
17 Do you have any way to differentiate
18 the work hours you work for Nexus verse Libre?
19 MS. PETERS: Object to form.
20 **A Can you be more specific?**
21 Q Right. Do you keep track of any of the
22 hours you work for Libre versus hours you work for

Transcript of Richard Moore
Conducted on February 27, 2020

---

33

1  Nexus?
2      **A    Well, I would say I'm a salaried**
3  **employees that work probably a hundred hours a**
4  **week.  So I would say that I can guarantee that**
5  **under -- under federal law I probably work**
6  **full-time at both positions so I've never bothered**
7  **to track the time.**
8      Q    Okay.  Is Homes run by Tim Donovan?
9          MS. PETERS: Object to form.
10     **A    Tim Donovan manages the facilities for**
11 **Homes.**
12     Q    All of the facilities?
13     **A    Yes.  And --**
14         MS. PETERS: Object.  Object to form.
15     **A    And for Nexus as well.**
16     Q    Okay.  Are you involved in real estate
17 transactions with Homes?
18         MS. PETERS: Object to form.
19     **A    I sign paperwork.**
20     Q    What paperwork?
21     **A    If we are purchasing property, then --**
22 **or even, I guess, property insurance, I would sign**

---

34

1  **the paperwork.**
2      Q    And are all of the homes -- well, who
3  has title to the homes?
4          MS. PETERS: Object to form to the
5  extent it calls for a legal conclusion.
6      **A    What do you mean who has title of the**
7  **homes?**
8      Q    Are the homes -- who are the -- right.
9  Right.
10         Homes by Nexus -- there's properties
11 that are listed under Homes by Nexus, Inc.; is
12 that right?
13     **A    No.**
14     Q    Okay.
15         MS. PETERS: Object to form.
16     Q    So Homes by Nexus, Inc., where are the
17 properties -- who are -- the properties are the
18 assets of Nexus Services; is that correct?
19         MS. PETERS: Object to form.  Object to
20 form.
21     **A    No.**
22     Q    They're not assets of Nexus?

---

35

1      **A    The properties are the asset to the**
2  **LLCs.**
3      Q    Which LLC?
4          MS. PETERS: Object to form.
5      **A    Nexus Properties, One Fish, Two Fish,**
6  **and Nexus Commercial Ventures.**
7      Q    Okay.  And are they the only three LLCs
8  that own the properties?
9          MS. PETERS: Object to form.
10     **A    I believe so.**
11     Q    Did Gentry Locke create a series of
12 LLCs for the properties?
13     **A    They did, but I'm not sure if they are**
14 **transferred over or not to the LLCs.**
15     Q    Okay.  So as of now, today, you believe
16 that the properties remain titled to Nexus
17 Properties LLC, One Fish, Two Fish, LLC or Nexus
18 Commercial Ventures, LLC?
19         MS. PETERS: Object to form.
20     **A    I don't recall any paperwork that says**
21 **otherwise.**
22     Q    So to the best of your knowledge they

---

36

1  are maintained by those three LLCs?
2          MS. PETERS: Object to form.
3      **A    Yes, ma'am.**
4      Q    All right.  And -- it was represented
5  in this litigation that Nexus was making an effort
6  to break out Homes into its own separate
7  QuickBooks.
8          Are you familiar with that?
9      **A    Yes.**
10     Q    Okay.  When was that process initiated?
11     **A    I do not recall the date.**
12     Q    Can you give me an approximate time
13 frame?
14     **A    I cannot.  I do know that it has been**
15 **done.**
16     Q    Okay.  And what -- what was done to
17 separate Homes?  What transactions were separated
18 out?
19     **A    I have no idea.**
20     Q    Okay.  Who did the trans -- the legwork
21 or, you know, the actual transitioning of entries
22 from Nexus Services into a separate Homes

---

Transcript of Richard Moore
Conducted on February 27, 2020

37

1  QuickBooks?
2      **A   I would not be able to answer that**
3  **question as I don't know who actually transferred**
4  **over or separated it out.  I know who maintains it**
5  **now but I don't know who — I don't — I wasn't —**
6      Q    Who directed it?
7          MS. PETERS:  Object to form.
8      Q    Who directed that it be separated out?
9          MS. PETERS:  You've interrupted the
10  witness.
11         MS. KATSANTONIS:  I'm sorry.
12     **A   I directed that it be separated out.**
13     Q    Okay.  And who did you direct to do
14  that work?
15     **A   I would have spoke to the finance team**
16  **at the time about it.**
17     Q    Okay.  And who do you remember speaking
18  to?
19     **A   I don't remember who it was at the**
20  **time.**
21     Q    So your testimony is you can't recall
22  whether that was done in 2019 or 2018?

38

1          MS. PETERS:  Object to form.
2      **A   No.**
3      Q    All right.  Have you personally been a
4  party to any real estate transactions involving
5  any of the real estate assets that have been
6  listed in Nexus Services financial statements over
7  the past three years?
8          MS. PETERS:  Object to form to the
9  extent it calls for a legal conclusion.
10     **A   Can you clarify your question?**
11     Q    Sure.  I mean, I don't know what you
12  need clarified.  But on Nexus Services' balance --
13     **A   Well, let's pretend I'm not a lawyer,**
14  **ma'am.**
15     Q    No, no, I'm sorry.  So -- and I
16  apologize, I didn't mean it in that sense.
17         But you know that all the properties
18  are listed in Nexus Services' profit and loss
19  statements or in the balance sheets, right?
20         MS. PETERS:  Object to form.
21     **A   Yes.**
22     Q    Okay.  And so with regard to the

39

1  properties that are listed there, have you
2  personally been involved in any real estate
3  transaction related to those properties in the
4  last three years?
5          MS. PETERS:  Object to form.
6      **A   I would have to see the list.**
7      Q    Okay.  I can show you that.
8          MS. PETERS:  While she's gathering the
9  list, I'd like counsel to -- never mind.  I'll
10  withdraw.
11         I remembered my question and I want to
12  wait until you have your documents in front of
13  you, Ms. Katsantonis.  I would ask that counsel
14  clarify when she says "have you personally"
15  whether you mean you personally as an officer of
16  the company or "you" separately, separate from
17  being an officer of the company were involved in a
18  transaction.  Because he's testified earlier that
19  he would have had some responsibilities for Homes
20  as a --
21         MS. KATSANTONIS:  You're testifying --
22         MS. PETERS:  -- an officer.

40

1          MS. KATSANTONIS:  Okay.  You're
2  testifying now, Ms. Donne Peters.  I'd ask that
3  you not do that.
4      Q    Here's a document that has been
5  presented to us as a profit and loss statement
6  from January through June of 2018 as an example.
7      **A   Do I need to give it to her first?**
8      Q    Yes, sorry.  Thank you.
9      **A   I'm learning my role.**
10         (Moore Exhibit 2 marked for
11  identification and attached to the transcript.)
12     **A   I can look at it now?**
13         MS. PETERS:  I'm going to raise an
14  objection.  These documents were produced any
15  Eckert Seamans with certain disclaimers,
16  Ms. Katsantonis, in production.
17         MS. KATSANTONIS:  Okay.
18  Ms. Donne Peters, you said you -- you know,
19  just --
20     Q    All right.  So this is a document --
21         MS. PETERS:  We would also designate it
22  as confidential.  I apologize.

Transcript of Richard Moore
Conducted on February 27, 2020

41

1      MS. KATSANTONIS:  You said you were
2  going to wait until the end of the deposition to
3  do that.  So I'd appreciate if you wouldn't
4  interrupt my deposition.
5      MS. PETERS:  I apologize.
6    Q   So looking at a profit and loss
7  statement January through June 2018 that's been
8  provided by Nexus in this litigation, it lists a
9  series of properties on the first and a little bit
10 on the second page?
11    A   Okay.  Can you repeat the question of
12 what I'm looking for?
13    Q   Sure.
14      So my question is have you been
15 involved personally, have you been a party to any
16 real estate transactions involving any of these
17 real estate assets that are listed in Nexus
18 Services' financial statement?
19      MS. PETERS:  Object to the form of the
20 question.
21    A   Can I ask a clarifying question before
22 I review this?

42

1    Q   Sure.
2    A   So from point of reference, can you
3  define what you mean by me being a "party" to the
4  transaction.
5    Q   Have you been a buyer?  Have you been a
6  seller?  Have you signed deeds of trust?  Have you
7  obtained income from them, are you a lessor or
8  lessee on any of the properties?
9      MS. PETERS:  Again, since the witness
10 is a layperson, I would ask you to designate
11 whether you're talking about him as a private
12 individual or as a -- an officer in the company.
13      MS. KATSANTONIS:  Either.
14      MS. PETERS:  Then I would caution the
15 witness to specify which.
16      MS. KATSANTONIS:  Sure.
17    A   Can you please specify?  Do you mean in
18 the capacity of the company or as capacity as the
19 person?
20    Q   Either one.  And you can tell me which
21 one.
22    A   I believe -- well, I can tell you as

43

1  a -- well, let me look at this one more time.
2      I believe it is likely that on most of
3  these properties I would have signed paperwork
4  involving the closing of the purchase of the
5  properties.
6    Q   And what would you have signed as what?
7  In what capacity?
8    A   I would not be able to recall.  It
9  would -- it would -- I don't know the exact title
10 it would be.  It would be, I think as a member or
11 manager or something.  Because these would be
12 names of the LLCs and I don't recall, like, what
13 you put down after you sign your name for it.
14    Q   Okay.  That would be pursuant to your
15 interest in one of the LLCs as opposed to Nexus
16 Services?
17    A   Yes.
18    Q   Okay.  And what about personally, in
19 your personal capacity?
20    A   I would say from a personal interest I
21 do not see any -- from personal interest I -- can
22 you please clarify the question because I really

44

1  am confused?
2    Q   Well, are you -- do you -- have you
3  personally signed any of these documents as an
4  owner of the property?  Have you signed any
5  documents as a -- you know, that you're leasing
6  any of the properties?  Is there anything that
7  you've signed with regard to any of these specific
8  properties?
9    A   Well --
10      MS. PETERS:  Object to the form of the
11 question.  He's already testified that he signed
12 as a manager member or.  He didn't remember which.
13      MS. KATSANTONIS:  Right.  And now I'm
14 asking him personally not as a member or manager.
15 I'm asking him a separate question now.
16    Q   So do I personally live in one of these
17 properties?
18    Q   Well, do you personally have an
19 ownership in any of the properties, personally?
20    A   Okay.  But if I --
21    Q   In other words, are any of the
22 properties -- are you listed as having an

Transcript of Richard Moore
Conducted on February 27, 2020

12 (45 to 48)

---

45

1  ownership interest in the properties?
2      MS. PETERS:  I'm going to object to the
3  form of the question.  He's already testified that
4  he owns -- he was a part owner in the LLC that
5  owned the entity.
6      **A   Okay.  And I swear to you I'm not being**
7  **difficult.**
8      Q   I know.
9      **A   I'm just trying to answer your question**
10 **but I'm trying to make sure I answer your question**
11 **right.**
12     Q   I appreciate that.
13     **A   And I'm trying to be honest.**
14     Q   I appreciate it.
15     **A   Okay.  There is – okay.  So do you –**
16 **are you asking me whether or not, to clarify, that**
17 **I sign in the capacity as an individual outside of**
18 **LLCs for ownership of anything on this list?**
19     Q   Right.
20     **A   Okay.  I do not believe so.**
21     Q   And then not even with regard to
22 signing, but do you personally, personally have an

---

46

1  ownership interest in any of the listed
2  properties?
3      MS. PETERS:  Object to the form of the
4  question.
5      **A   Can I ask another clarifying question?**
6      Q   Sure.
7      **A   If – and I don't know if it's a**
8  **question I should ask my counsel or not.**
9      MS. PETERS:  If you have some --
10     Q   Why don't --
11     MS. PETERS:  The witness is not a
12 lawyer and he's struggling with --
13     MS. KATSANTONIS:  Well, I'm not even
14 asking a technically law question.
15     Q   Just tell me --
16     **A   Listen.**
17     Q   -- any interest you have.
18     **A   Listen, I know the questions are going**
19 **to be harder from here, okay.  I'm not stupid.**
20 **What I'm trying to do now, I'm trying to figure**
21 **out – so I technically would have an ownership**
22 **interest in the LLCs.**

---

47

1      Q   Sure.
2      **A   Okay?  And I have ownership in Nexus.**
3      Q   I understand that.
4      **A   So that's where I'm really, really**
5  **struggling here.**
6      Q   So I understand that the LLCs own the
7  properties and that you have an ownership interest
8  in the LLCs, right?  The LLCs are owned by you and
9  Mr. Donovan?
10     **A   I know we signed the paperwork, but I**
11 **think Nexus actually owns it but I don't know.  I**
12 **mean, I don't --**
13     Q   Okay.
14     **A   That's --**
15     Q   All right.  And so other than that, put
16 that aside, you personally, do you now or have you
17 ever had a ownership interest in any of the listed
18 properties in your own personal name, capacity,
19 rather than the LLCs?
20     **A   I do not believe so, but I will get**
21 **back to you on that because I would be concerned**
22 **that maybe we signed paperwork that was changed**

---

48

1  later or something.  So I don't want to say
2  without a doubt 100 percent.
3      Q   Okay.  So it's possible that you have
4  an owner interest personally in the properties
5  separate from the LLCs?
6      **A   I don't believe at this current moment**
7  **I do.**
8      Q   Okay.  But it's possible you did at
9  some point.
10     **A   It's possible that paperwork was put --**
11 **we have a lot of properties, sometimes mistakes**
12 **are made on paperwork and when they go to file it,**
13 **they fix it.**
14     Q   Okay.  So you testified that all the
15 employees report to you.
16     MS. PETERS:  Object to form.
17     Q   Other than Mr. --
18     MS. PETERS:  That misstates his prior
19 testimony.
20     Q   Not including Mr. Donovan?
21     **A   That's up for debate, but yes.**
22     MS. KATSANTONIS:  All right.  I'm going

---

Transcript of Richard Moore
Conducted on February 27, 2020

49

1 to mark this.

2    **A    Okay.  I've got it down pat now.**

3        (Moore Exhibit 3 marked for

4 identification and attached to the transcript.)

5        THE WITNESS:  Do you have a copy of

6 this, Mary Donne?

7        MS. PETERS:  I do, thank you.

8        THE WITNESS:  Okay.

9    Q    Do you recognize this document?

10   **A    Yes.**

11   Q    Okay.  And this is a standard operating

12 procedures manual for Nexus Services, Inc.; is

13 that correct?

14   **A    That is what it says.**

15   Q    Okay.  And do you also maintain

16 standard operating procedures manuals for Libre by

17 Nexus and Homes by Nexus?

18       MS. PETERS:  Object to form.

19   **A    As of this date on here, January 18th,**

20 **I do not believe so.**

21   Q    Okay.  And prior to this date, did you

22 have separate standard operating procedure manuals

50

1 for Libre?

2        MS. PETERS:  Object to the form.

3    **A    Can I have one second?**

4    Q    Sure.

5    **A    I'm not going to read the whole thing,**

6 **I swear.**

7        **I believe not.**

8    Q    Okay.  All right.  So this is a

9 Nexus -- this is a Nexus Services standard

10 operating procedures manual.  And is it provided

11 to every employee?

12   **A    Yes.**

13       MS. PETERS:  Object to form.

14   **A    Yes.**

15   Q    And would that include employees, case

16 managers and CEMs?

17       MS. PETERS:  Object to form.

18   **A    Yes.**

19   Q    Okay.  And then looking at this

20 document, it sets forth, you know, various

21 categories of, you know, employment policies and

22 information and employee conduct.  And then

51

1 there's sections on client management, right,

2 Section 6?

3    **A    Yes.**

4    Q    Okay.  And so the client management

5 sets forth information on how the Nexus Services

6 employees are to deal with Nexus clients; is that

7 correct?

8        MS. PETERS:  Object to the form.

9    **A    At the production of this one in 2018,**

10 **yes.**

11   Q    Okay.  And looking at page 65 of the

12 manual, which is Bates-stamped Nexus 335777.

13   **A    What's a Bates stamp?**

14   Q    Well, that's a good question.  See on

15 the bottom it says Nexus.

16   **A    Okay.**

17   Q    That's a Bates stamp.  But you can just

18 go by the 60 -- page 65.

19   **A    That's much easier.  Okay.**

20   Q    So in the Nexus Services standard

21 operating procedures manual it provides a section

22 on Capsule, right?

52

1    **A    Yes.**

2    Q    And it provides what the Capsule policy

3 is for the Nexus Services employees, correct?

4    **A    It provides the Capsule policy for**

5 **anybody who is accessing Capsule.**

6    Q    Right.  And it talks about the

7 importance of using Capsule, correct?

8    **A    For anybody using Capsule, yes.**

9    Q    Right.  And it talks about all -- in

10 6.01, "All interactions and communications

11 regarding Nexus clients, verbal or written, must

12 be documented in the client Capsule file."

13       Is that correct?

14       MS. PETERS:  Object to form.

15   **A    For anybody using Capsule, yes.**

16   Q    Right.  And so the -- and it goes on to

17 talk about how to handle various phone calls and

18 enter that information to Capsule as well?

19   **A    For anybody using Capsule, yes.**

20   Q    Okay.  And then looking at page -- the

21 next page, 67, two pages over, I guess.

22   **A    (The witness complies.)**

Transcript of Richard Moore
Conducted on February 27, 2020

53

1     Q    In paragraph 6.9 there's a completion
2 of Nexus Services, Inc. risk analysis.
3          Do you see that?
4     A    Yes.
5     Q    Okay.  And so that talks about the risk
6 analysis assessment sheet that's used when taking
7 on new Nexus clients, correct?
8          MS. PETERS:  Object to form of the
9 question.
10         Are you asking him what the document
11 says?
12         MS. KATSANTONIS:  I'm asking him...
13         MS. PETERS:  I'm going to object to the
14 form of the question.
15    A    Can you repeat the question?
16         MS. KATSANTONIS:  Can you read back my
17 question.
18         THE WITNESS:  I'm sorry.  I'm supposed
19 to ask you.
20         (The requested text was read by the
21 reporter as follows: "Okay.  And so that talks
22 about the risk analysis assessment sheet that's

54

1 used when taking on new Nexus clients, correct?")
2         MS. PETERS:  Object to form.
3     A    At the time of this production, yes.
4 How the production of this -- I'm sorry, at the
5 time of printing of this standard operating
6 procedure, that would be correct.
7     Q    Okay.  And it talks about the
8 completion of a Nexus Services, Inc. risk
9 analysis, right?
10         MS. PETERS:  Object to form.
11    Q    6.9?
12         MS. PETERS:  Object to form.
13    A    This document does state that.
14    Q    Okay.  And so the -- that would be a
15 Nexus Services, Inc. function to complete that
16 risk analysis form, correct?
17         MS. PETERS:  Object to the form of the
18 question.
19    A    I think that it would depend on where
20 the person actually -- what part of the company
21 the person works in who's doing it.  Because if
22 it's a Libre employee, then Libre would be doing

55

1 it.  Or if it's a Serve -- I believe at the time
2 Serve may have been using the risk assessment as
3 well.
4     Q    Okay.  So a Libre employee would be
5 doing the Nexus Services, Inc. risk assessment.
6         MS. PETERS:  Object to the form of the
7 question.
8     Q    Is that correct?
9         MS. PETERS:  Are you asking about the
10 document or are you asking about the company?
11         MS. KATSANTONIS:  I asked my question.
12    A    So whoever's completing the form would
13 follow the guidelines set forth here.
14    Q    Right.  And you said that it could be a
15 Libre by Nexus employee who's completing the form,
16 correct?
17         MS. PETERS:  Object to form.
18    A    Yes.
19         MS. PETERS:  Misstates.
20    Q    And then so the Libre by Nexus employee
21 is completing the Nexus Services, Inc. risk
22 assessment form, correct?

56

1         MS. PETERS:  Object to the form of the
2 question.
3     A    According to section 6.9 in this SOP,
4 whoever's completing the form would complete it.
5     Q    And that risk assessment form is
6 maintained in the Capsule database, correct?
7     A    I believe, yes, it should be.
8     Q    Looking at 6.12.
9     A    On page 68, correct?
10    Q    Yes.
11    A    Okay.
12    Q    It talks about processing the
13 collateral form for approved clients.
14         Do you see that?
15    A    Yes.
16         MS. PETERS:  Object to form.
17    Q    Okay.  And there's -- what is the
18 separate collateral form?  Can you tell me what
19 that document is?
20         MS. PETERS:  Object to the form of the
21 question.  It doesn't refer to a separate
22 collateral form.

Transcript of Richard Moore
Conducted on February 27, 2020

57

1    A    Allow me a second to please --
2    Q    Sure.
3    A    I'm trying to understand the context of
4  6.12. So this would be -- in regards to 6.12, as
5  listed in this SOP updated in January of 2018, the
6  collateral form would be a form that after the
7  completion of the internal review when Nexus has
8  decided that they're willing to -- to agree to
9  accept the monitoring and assistance of this
10 client, that that would be the form we would
11 submit before anything went forward with notifying
12 the bail bondsman.
13   Q    Okay.  And when collateral is received
14 from a client, where does that money go?
15       MS. PETERS: Object to form.
16   A    Can you please define what you mean by
17 "collateral received from a client"?  This says
18 nothing --
19   Q    Well, processing the collateral form
20 for approved client, right?
21   A    In that particular case right there,
22 that is a process for us to accept a client into

58

1  our program.  So I guess at that point maybe the
2  person would be the collateral in this particular
3  case here because we are accepting them in our
4  program.
5    Q    Okay.  Does Nexus take a fee for
6  accepting a person into the program?
7    A    Yes.
8    Q    And where do those funds go?
9    A    Into the bank.
10   Q    Which bank?
11   A    It depends how the fees are paid.  It
12 could go into a regional bank if paid by a client
13 or go into our main bank.
14   Q    Okay.  It goes into the -- it goes to
15 the Libre by Nexus operating account?
16   A    Again, it depends on how it's paid.
17   Q    Okay.  So if it's paid by cash or
18 check, or is that different?  Is it always cash or
19 credit card?
20       MS. PETERS: Object to form.
21   A    It could be check as well, but it would
22 be -- it depends on where it's paid.

59

1    Q    Okay.  As to -- whether it goes to
2  regional, you know -- the initial receipt of these
3  funds goes to a regional bank, for the most part;
4  is that correct?
5    A    It depends, again, where it's paid.  If
6  you're paying via credit card then it'll go to
7  City National Bank.  If you pay in Verona,
8  Virginia, it goes to National Bank.
9    Q    Okay.  But are all these accounts Libre
10 by Nexus accounts?
11       MS. PETERS: Object to form.
12       What accounts are you referring to,
13 Ms. Katsantonis?
14       MS. KATSANTONIS: The ones just
15 described by the witness.
16       MS. PETERS: You've asked him about
17 accounts, various accounts.
18   A    I -- I don't know what names they're
19 all in, but you have the bank statements.
20   Q    Okay.  So you don't know whether
21 they're -- all the accounts are in the name of
22 Libre by Nexus or Nexus Services or Homes?

60

1        MS. PETERS: Object to the form of the
2  question.  It's vague and unfair.
3        MS. KATSANTONIS: Okay.
4    A    I don't know -- at the time a deposit
5  is made, I don't know where each and every deposit
6  goes to.
7    Q    True.  But aren't they -- don't all of
8  the funds collected by the program participants,
9  don't they all end up in a Libre account, Libre by
10 Nexus operating account, or not always?
11   A    Not always.
12   Q    Okay.  And so do they always end up in
13 a Libre by Nexus account, not even operating, just
14 an account owned by Libre by Nexus?
15   A    As I do not know the exact title of the
16 regional banks, I can't answer that question.
17   Q    Okay.  So do some of the regional -- do
18 some funds by the regional bank go elsewhere, not
19 to a Libre account?
20   A    If you could show me regional bank
21 statements, I could tell you.  But as I don't know
22 what -- what company name the regional banks are

61

1  in I can't answer that question.
2      Q   Do you have one regional bank that --
3  is there, like, particular regional banks that
4  don't funnel money up to Libre operating account?
5      MS. PETERS: Object to the form of the
6  question.
7      **A   In what capacity?  I mean...**
8      Q   Any.  I mean, is it -- is it the -- so
9  let's just go a little broader first.
10     **A   Okay.**
11     Q   So the program participants, they pay
12 various fees into these regional bank accounts,
13 right?  Let's take -- put the credit cards aside
14 for now, but for cash.
15         Is that correct?
16     **A   Yes.**
17     Q   Okay.  And those funds usually go into
18 an account at the regional bank and then they
19 go -- they get pulled and put into a separate
20 account in that same bank every night?
21     MS. PETERS: Object to form.
22     **A   I am — I'm not going to agree to every**

62

1  **night.**
2      Q   Okay.  But routinely?
3      **A   Routinely, yes.**
4      Q   Okay.  And then from that account, do
5  most of the regional banks then transfer those
6  funds to the Libre operating account, the ███████
7  account?
8      **A   I can't with certainty tell you which**
9  **account they could go into but there is most of**
10 **the time a transfer over.**
11     Q   To the ████ account?
12     **A   To City National Bank.**
13     Q   Okay.  So it could be any of several
14 accounts at City National?
15     MS. PETERS: Object to form.
16     **A   Yes.**
17     Q   Okay.  And how many accounts does --
18 and are all those accounts at City National in the
19 name of Libre by Nexus or are they in the name of
20 other entities?
21     **A   We have several accounts at City**
22 **National for several different entities.**

63

1      Q   Okay.  And which different entities do
2  you have accounts for at City National?
3      **A   I cannot tell you with certainty all of**
4  **them.**
5      Q   Okay.  But based on the chart we looked
6  at, which ones do you know?
7      MS. PETERS: Object to the form of the
8  question.
9          Which chart are you referring to?
10     MS. KATSANTONIS: Exhibit 1 we looked
11 at today.
12     MS. PETERS: Exhibit 1 is not a list of
13 the bank accounts, Ms. Katsantonis.
14     MS. KATSANTONIS: Ms. Donne Peters, if
15 the deponent understands my question, please let
16 him answer.  If you don't and you're not
17 following, that's a different issue.  But we --
18     MS. PETERS: Ms. Katsantonis --
19     MS. KATSANTONIS: I didn't --
20     MS. PETERS: -- it's unfair.
21     MS. KATSANTONIS: -- ask him about
22 accounts.

64

1      MS. PETERS: It's unfair.  You did --
2      MS. KATSANTONIS: No, it's not.  You
3  did not --
4      MS. PETERS: -- ask him.
5      MS. KATSANTONIS: You didn't --
6      MS. PETERS: May I ask the court
7  reporter to read the question back, please.
8      THE WITNESS: Can we take a break?
9      MS. KATSANTONIS: Can we -- wait.
10 Since we're in the middle of a question, let's
11 just finish the question.  Because we're in the
12 middle of a question and so it's not appropriate
13 to take a break in the middle of a question.  Read
14 back the question.
15     MS. PETERS: I will like the question
16 read back, please.  Beginning with where she's
17 addressing accounts and then moves to a chart.
18     MS. KATSANTONIS: We're not going back
19 there.  Just go to the last question, please.
20     **A   I'm sorry.**
21     Q   It's not you.
22     (The requested text was read by the

Transcript of Richard Moore

Conducted on February 27, 2020

65

1 reporter as follows: "Okay. And which different
2 entities do you have accounts for at City
3 National?"
4    **A   I know for a fact that Nexus Services**
5 **and Libre by Nexus and Homes have accounts with**
6 **City National. And I cannot, without having**
7 **anything in front of me, verify any other entities**
8 **that have accounts there.**
9    Q   Do you --
10   **A   And now we're going to break.**
11       MS. PETERS: Yes. Thank you very much.
12       MR. HARRIS: And we have our call.
13       THE VIDEOGRAPHER: We are going off the
14 record at 12:44.
15       (Recess taken.)
16       THE VIDEOGRAPHER: We are back on the
17 record at 16:38.
18       MR. KOWALCZUK: Before we begin,
19 Ms. Katsantonis and counsel, Chris Kowalczuk for
20 all three defendants. The parties have agreed to
21 a stipulation which I'm going to now read. The
22 three defendants in this case, Nexus Services,

66

1 Inc., Homes by Nexus, Inc., and Libre by Nexus,
2 Inc., stipulate and agree that for all purposes of
3 this lawsuit the three defendants as alter egos of
4 one another shall be treated as a single entity
5 and that all three defendants will be jointly and
6 severally liable for any damages or remedies
7 awarded against any of them in this case.
8       With that, Ms. Katsantonis, please
9 continue.
10      MS. KATSANTONIS: Thank you.
11      MR. KOWALCZUK: Yes, ma'am.
12 BY MS. KATSANTONIS:
13   Q   All right. Good afternoon, Mr. Moore.
14 Sorry we've had some delays with these court
15 hearings.
16   **A   It still is Thursday, right?**
17   Q   So I'm going to try to pick up what we
18 were -- near where we left off.
19       So one thing we talked about, and I
20 just want to make sure my understanding is
21 correct, was with regard to the -- well, let me
22 back up. I don't want to do that.

67

1       All right. So let's move on.
2       In your role as vice president, right?
3 So what is your role on the day-to-day business of
4 Nexus or Libre with, we're just going to call them
5 Nexus now. For our purposes, we're just going to
6 say Nexus.
7       THE WITNESS: To clarify for counsel
8 when she refers to Nexus, it means to everything
9 as one, correct?
10      MR. KOWALCZUK: Yes.
11      THE WITNESS: Okay.
12   Q   Okay. And that would be Nexus, Homes,
13 and Libre.
14   **A   Okay.**
15   Q   If it's some other entity like One
16 Fish, Two Fish or something, then you need to
17 distinguish.
18   **A   Okay.**
19   Q   Okay. The stipulation is as to the
20 three entities.
21       So with regard to Nexus, on a
22 day-to-day basis, what are your roles and

68

1 responsibilities with regard to the financial side
2 of the business?
3    **A   It varies from day-to-day. It could be**
4 **anything to answering questions to communication**
5 **with vendors or contracts or just any issues that**
6 **somebody has, some of the questions people have**
7 **for me.**
8    Q   Okay. Do you keep track every day as
9 to the income that is being received by the
10 company?
11   **A   I do not personally keep track every**
12 **day of the income being received by the company.**
13   Q   Okay. How often do you keep track of
14 the income that's being received by the company?
15   **A   I personally do not keep track of the**
16 **income being received by the company.**
17   Q   Sure. Is that being tracked on KPI or
18 some other database?
19   **A   There are -- there is a KPI for certain**
20 **parts of the company that is generated on a daily**
21 **basis.**
22   Q   Okay. And the KPI is a point of sale

Transcript of Richard Moore
Conducted on February 27, 2020

18 (69 to 72)

---

69

1   document that keeps track of receipts?
2        A    The KPI is not a point of sale
3   documents.
4        Q    Okay.  What is -- I'm sorry, LiteSpeed
5   is, you're right.
6        A    Yes.
7        Q    So how does the KPI determine receipts?
8        A    The KPI has fields that would show a
9   snapshot for the day of -- previous day of revenue
10  and other key performance indicators.  And it is a
11  partial snapshot of revenue only -- I believe a
12  partially snapshot of revenue.
13       Q    Okay.  Where would the other revenue be
14  derived or how could you see what all of your
15  revenue is, let's say for a given week?
16       A    For the -- for all three entities
17  combined, I don't believe there would be a report
18  that shows one solid report for all three, as
19  Homes is separate.
20       Q    Okay.  So how would you -- if you
21  wanted to know the total revenue for the week that
22  Nexus had available to it, what would you look at?

---

70

1   What do you look at?
2        A    I would look at the KPI for -- to look
3   at income coming in through Libre, but, again,
4   Homes is a separate system altogether.
5        Q    Where would the Homes revenue be
6   maintained or how would you get access to see what
7   that revenue is?
8        A    It would come from Homes.
9        Q    All right.  I'm sorry, are you looking
10  at a certain database or what are you looking at?
11       A    I don't look at a database at all for
12  it.  I would -- the gentleman who runs Homes would
13  have the information.
14       Q    Does he report to you?
15       A    Yes.
16       Q    And is that Tim Donovan?
17       A    No.
18       Q    Okay.  Who is that?
19       A    Ryan.
20       Q    What's his last name?
21       A    Ryan Rowe.
22       Q    Okay.

---

71

1        A    I believe.  I need to double-check that
2   because I don't -- I just tap on Ryan at this
3   point.
4        Q    And does he generate a report that you
5   look at?
6        A    No.
7        Q    So do you verbally communicate or by
8   email or how do you know what the revenue is from
9   Homes?
10       A    It depends on the issue.  A lot of
11  times we don't discuss the revenue for Homes at
12  all because he just pays the bills for Homes.
13       Q    Okay.  Over -- from 2017 the KPI report
14  is one tool.  Does that capture most of the
15  revenue stream to Nexus?
16       A    Yes.
17       Q    All right.  And can you tell me, if you
18  recall, and if not I'll pull out the documents,
19  for 2017 versus '18, versus '19, do you have a
20  general idea of the revenue?  Has it been
21  consistent?  Has it fluctuated?
22       A    I'm going to ask for the documents

---

72

1   because...
2        Q    All right.
3        A    Get your sticker ready.
4             (Moore Exhibit 4 marked for
5   identification and attached to the transcript.)
6             MS. PETERS:  Do you have a copy for
7   counsel?
8             MS. KATSANTONIS:  I'm sorry.
9             MS. PETERS:  Thank you.
10       Q    And reviewing this document, can you
11  advise what the revenue income was for 2017?
12            MS. PETERS: And this is 3?
13            THE COURT REPORTER: 4.
14            MS. PETERS: 4.
15       A    Thank you.
16       Q    It's hot, right?
17       A    Yes.  And I'm fat, too.  It doesn't
18  help.
19       Q    You're not.
20       A    No, I cannot.
21       Q    If you look every month -- you can't --
22  is that not a copy of a KPI report you would have

---

Transcript of Richard Moore
Conducted on February 27, 2020

73

1  reviewed?
2      **A    It is a report, KPI report that I would**
3  **review.**
4      Q    Okay.  And why can't you tell what the
5  revenue was for 2017 from that document?
6      **A    Because this KPI is not complete for**
7  **2017.**
8      Q    What's it missing?
9      **A    If you review the KPI, it is missing**
10 **half the month of December, so, therefore, it's**
11 **impossible for me to give an accurate number based**
12 **on the information provided.**
13     Q    Okay.  Does it have a total for up to
14 the half of the month of December?
15     **A    It does on the front page but not**
16 **the -- actually it does on the bottom here as**
17 **well, yes.**
18     Q    Okay.  And what is that total?
19     **A    1 million -- let me look on the front**
20 **page of this.  235,645.**
21     Q    That wouldn't be the total for the
22 whole year?

74

1      **A    No.  For December, yes.**
2      Q    Right.  Would you just add up every
3  month to get the total?
4          MS. PETERS:  Excuse me.  I'm confused.
5  When you say "to get the total," was December
6  complete or not complete?
7          MS. KATSANTONIS:  Well, I'm talking
8  about the total through -- as of the date of this
9  document.
10         So Mr. Moore has testified he thinks it
11 goes through mid December, so up through mid
12 December.  Sorry.
13     **A    And I do --**
14     Q    Could you just add up -- in the top on
15 the front page --
16     **A    And I never have seen this page before,**
17 **page 2.  I'm not saying that it's not a valid**
18 **page, it just looks a lot more uncool than other**
19 **pages.**
20     Q    Okay.  Let me ask you something.  Look
21 at the front page.  It says "total revenue."
22     **A    Yes.**

75

1      Q    And year to date, 41,421,503.
2      **A    Yes.**
3      Q    Does that appear accurate?
4          MS. PETERS:  Object to form.
5      **A    I did not do the math so I can't verify**
6  **the numbers on here.**
7      Q    Okay.
8      **A    But I'm saying that in a normal format,**
9  **if this was -- I'm not saying I don't know if a**
10 **sale would change something but the numbers sound**
11 **like it could be right.**
12     Q    So this was produced by your counsel.
13 See it says Eckert Nexus?
14     **A    Yes.**
15     Q    I guess what I'm trying to understand
16 is --
17     **A    So --**
18     Q    -- it seems like you're questioning or
19 have an issue with the document.  I just want to
20 understand how is this different than what you
21 would be looking at normally?
22     **A    Because you're asking me under oath to**

76

1  **verify these numbers.  I'm telling you under oath**
2  **that I have not broken a calculator out to verify**
3  **these numbers.**
4      **So if you're asking me, does it look**
5  **like it could be, it's in the ballpark, yes.  It**
6  **could be in the ballpark.  If you're asking me**
7  **under oath is this accurate I'm not going to say**
8  **under oath that this is accurate --**
9      Q    All right.
10     **A    -- because I didn't add all these**
11 **numbers up individually.**
12     Q    And how are these numbers entered into
13 the system to derive this KPI report?
14     **A    It is sent over by Libre leadership**
15 **every morning.  And I believe they garner the**
16 **numbers from LiteSpeed.**
17     Q    So would that be David See who provides
18 information to you or somebody else?
19     **A    It depends on what morning and who at**
20 **Libre leadership does it.**
21     Q    Who else would be besides David See?
22     **A    It could be David See, it could be Nina**

Transcript of Richard Moore
Conducted on February 27, 2020

77

1  Erlandson or it could be Kelly who is their admin.
2      Q    Okay.  So the numbers would be derived
3  from LiteSpeed and then placed into the KPI
4  database; is that right?
5      A    It is placed in the spreadsheet and
6  updated spreadsheet is sent out.
7      Q    Okay.  As of 2019, has there been a
8  decrease in total revenue from program
9  participants?
10     A    I don't have a KPI or any numbers in
11 front of me right now to tell you yes or no.
12     Q    You don't know sitting here today
13 whether or not there's been a decrease in the
14 yearly revenue?
15         MS. PETERS:  Object to form.
16 Year-over-year?  Since 2017?  Since the beginning
17 of the year?
18         Can you be more specific,
19 Ms. Katsantonis?
20         MS. KATSANTONIS:  I'm asking if he
21 knows from '17 to '18, '18 to '19.
22     A    Okay.  I do not know.  If you have KPIs

78

1  for these other years or anything you want to show
2  me, then I can give you a reasonable assumption
3  looking at those.
4      Q    Well, you know, you just testified that
5  you're not going to verify the accuracy of any
6  documents.
7          MS. PETERS:  Object to form.  That's
8  not his testimony, Ms. Katsantonis.
9      Q    Well, I'm trying to get an
10 understanding as vice president --
11     A    Ms. Katsantonis, you put in front of me
12 a document and asked me is this the correct number
13 for 2017.  However, the document -- I had to point
14 out to you, ma'am, that this is an incorrect --
15 incomplete number for 2017.
16     Q    Okay.
17     A    So you asked me if it's a complete
18 number for 2017, and unfortunately it's not.  Now,
19 if you have a complete KPI for 2017, then I could
20 look at that.
21     Q    All right.  So -- and do you know --
22     A    But I did stipulate this is the correct

79

1  format.
2      Q    Okay.  Well, let me ask you this --
3      A    Sure.
4          (Moore Exhibit 5 marked for
5  identification and attached to the transcript.)
6      Q    Now this document I just handed you
7  says 2017 on the top but do you know whether
8  that's for 2017 data or 2000 -- or is it a
9  different time frame?
10         MS. PETERS:  Excuse me.  Do you have a
11 copy for me?
12         THE WITNESS:  Right there.
13         MS. PETERS:  Thank you.
14     A    These two documents are not the same --
15     Q    Right.
16     A    -- as far as numbers go.
17     Q    Right.  And yet the totals are pretty
18 close, right, for the total revenue?
19         MS. PETERS:  Object to form.
20         Are you referring to December?
21         MS. KATSANTONIS:  I'm referring to the
22 total revenue year to date, front page of each of

80

1  the documents.
2      Q    Does it appear that the second report I
3  gave you has numbers from both 2018 and '17?  It
4  looks kind of like a mixed document, doesn't it?
5  I'm looking at the top of let's say the third
6  page, it says "January 2018" at the top.
7          Do you see that?  Do you see the
8  columns?
9      A    Barely.
10     Q    Right?  But you see what I'm saying,
11 right?
12     A    Yes.
13     Q    It says January 2018.  When you flip
14 the next page it says February 2017.  Then the
15 next page says March 2018, and then it goes on
16 for -- and then in -- I believe in November it
17 reverts back to 2017.
18         Do you see that?
19     A    No, but I'm getting there.  I
20 apologize.  It is a very, very small field.
21     Q    Yeah.  No, I'm just trying to
22 understand the documents that's been produced in

81

1 this litigation.

2   A   I see that there are certain months
3 that are labeled differently.

4   Q   Right.  Do you know, is that how that
5 would be kept in the normal course of business?

6   A   I believe that our team has a
7 spreadsheet that is updated.  And I don't know why
8 these — I say this but I can find out for you.

9   Q   Okay.  Are you the one who is -- well,
10 let me -- just sticking with the documents first.
11 Can you ensure that we get accurate copies of KPI
12 reports that show the revenue for 2017, '18, and
13 '19?

14     MS. PETERS:  Object to form.

15   A   If you can request from our attorneys.

16   Q   Yeah.

17   A   Yes, and that's —

18   Q   I just -- you know, this is what's been
19 produced to us in litigation and they appear to be
20 inaccurate.

21   A   I would love to live in a world where
22 human error doesn't happen from time to time,

82

1 where they don't accidentally mislabel a month.

2   Q   I'm just interested in the results.
3 I'm not trying --

4   A   I understand completely.

5   Q   Okay.  All right.

6   A   Are we done with these?

7   Q   Yes, I believe so.

8     Are you responsible for determining
9 which bills should get paid?

10     MS. PETERS:  Object to form.

11   A   I am part of the process, yes.

12   Q   Who else is involved in the process and
13 can you explain the process?

14   A   Our finance team is.  They -- a lot of
15 times they will communicate with me through either
16 issues on the aging report they see or if there's
17 something urgent that they've missed.

18   Q   Who is your finance team?

19   A   It's going to be currently Tawana
20 Washington and Imani Chapman.

21   Q   And prior to that who was it?

22   A   We had Elizabeth Hurst, Stephanie Cash,

83

1 and Wanda Barnes.  And then we had temps from
2 Randstad.

3   Q   Okay.  And Stephanie Cash, what was her
4 role in the -- on the finance team?

5   A   Stephanie started off as a finance
6 clerk before moving to payroll.

7   Q   And she's no longer with the company?

8   A   No.

9   Q   And did she perform her services
10 properly while she worked for Nexus?

11   A   ████

12   Q   ████

13   A   May I consult counsel for a second?

14     MS. KATSANTONIS:  Sure.

15     THE VIDEOGRAPHER:  Off the record?

16     THE WITNESS:  Yes, please.

17     THE VIDEOGRAPHER:  We are going off the
18 record at 1700.

19     (Recess taken.)

20     THE VIDEOGRAPHER:  We are back on the
21 record at 17:03.

22   A   Can you — ask her to read it back.

84

1   Q   Yeah, I'm sorry.

2   A   Can you repeat the last question?

3     (The requested text was read by the
4 reporter as follows:  "And did she perform her
5 services properly while she worked for Nexus?

6     A. ████

7     Q. ████

8   A   ████

9   ████

10  ████

11   Q   Okay.  But as far as her bookkeeping or
12 that kind of services performed, to the best of
13 your knowledge did she perform them well for
14 Nexus?

15   A   ████

16   ████

17   Q   ████

18   A   ████

19  ████

20  ████

21   Q   Okay.  Who's your accountant that you
22 spoke to?

Transcript of Richard Moore
Conducted on February 27, 2020

85

1    A   We consulted with our primary
2  accountant which is Grant Thornton and we use
3  another firm as well to do a lot of legwork.
4    Q   Did you direct Ms. Cash in her
5  performance of the work?
6    A   No, she did not report directly to me.
7    Q   Who did she report to?
8    A   At the time they worked there she
9  reported to Timothy Okonski and to Human
10  resources.
11    Q   And did Timothy Okonski direct her
12  work?
13    A   Actually I believe she also reported to
14  Elizabeth Hurst as well.
15    Q   Okay.  Did Timothy Okonski direct
16  Ms. Hurst and Ms. Cash?
17    A   He was, at the time, CFO.
18    Q   So the answer's yes?
19    A   Yes.
20    Q   Okay.  What does Grant do for you as an
21  accountant?
22        MS. PETERS:  Object to form.  He

86

1  referred to Grant Thornton.
2        MS. KATSANTONIS:  Grant Thornton, thank
3  you.
4    A   They are our CPAs, and what they do is
5  they are in the process right now of making all of
6  our records GAAP compliant.
7    Q   Okay.  So when you were referencing
8  ███████████████████████████████████
9  ███████, are you talking about information you
10  received today or recently from Grant Thornton?
11    A   Grant Thornton has advised us to be
12  fully GAAP compliant by new rules set out in 2019,
13  that we had to add things to our financials that
14  go back and — from earlier on previous years as
15  well.
16    Q   Okay.  And why do you assert that
17  somehow ████████████████████████████████
18    A   ████████████████████████████████████
19  ████████████████████████████████████████
20    Q   Okay.
21    A   Additionally an internal investigation
22  ████████████████████████████████████████

87

1  providing to a third party.
2    Q   And Mr. Okonski is part of your
3  financial team?
4    A   He was, yes.
5    Q   Okay.  And then you said she reported
6  to Ms. Hurst, right?
7    A   I believe at some point, yes.
8    Q   Okay.  And did Ms. Hurst perform her
9  services well for the company?
10    A   ███████████████████████████████████
11  ███████████████████████████████████████████
12    Q   ████████████████████████████████████
13  ████████████████████████████████████████████
14  ████████████████████████████████████
15    A   ███████████████████████████████████
16  ████████████████████████
17    Q   ████████████████████████████████████████
18  ████████████████████████████████████████████
19  ████████████████████████████████████
20    A   I do not.
21    Q   And why not?
22    A   Because the finance team did not

88

1  perform their jobs to industry standards as a
2  general rule and that's why we're fixing it now.
3    Q   Well, when you say "industry
4  standards," what knowledge do you have as to what
5  are industry standards?
6    A   I go by what our accountants tell us
7  and I look at litigation like yours and learn from
8  it.
9    Q   Okay.  Your accountants, you're talking
10  about Grant Thornton?
11    A   Yes.
12    Q   And when did Grant Thornton advise you
13  that your books and records were not up to
14  industry standards?
15    A   I do not have the exact date but I can
16  get it for you.
17    Q   Can you give me an idea?  Was it this
18  year?
19    A   It wasn't this year.
20    Q   Was it in 2019?
21    A   I am unsure if it was 2019 or 2018.
22    Q   Okay.  And then following Ms. Cash and



89

1  Ms. Hurst, Wanda Barnes was on your finance team,
2  right?
3      A   Yes.
4      Q   And did Ms. Barnes conduct her
5  accounting or bookkeeping roles appropriately for
6  Nexus?
7      A   ████████████████████████████████.
8      Q   I understand that. But I'm asking
9  about the accounting or bookkeeping work she did.
10 Did you think that was proper for Nexus Services?
11     A   ████████████████████████████████
12 ████████████████████████████████
13 ████████████████████████████
14 ████████████████████████████
15 ████████████████████
16     Q   She was not running another business,
17 do you contend?
18     A   ████████████████████████████
19 ████████████████████████████
20     Q   Okay.
21     A   ████████████████████████
22 ███████████

90

1      Q   Okay.
2      A   ████████████
3  ████████████████████████████
4  ████████████████████████████
5  ████████████████████████████
6      Q   ██████████████████
7  ████████████████████████████
8  ████████████████████████████
9  ████████████████████████████
10 ████████████████████████████
11     Q   Okay. All right. So with regard to --
12 putting aside that incident, did you have any
13 other issues with her performance of work?
14     A   I'm sorry, but I -- if you expect me to
15 put aside that incident and say everything else
16 was great, I'm unable to do so. So yes, I would.
17     Q   Prior to that incident, had you ever
18 voiced any concerns with the performance of her
19 work?
20         MS. PETERS: Excuse me. I'm going to
21 object to the form of the question.
22         Are you asking him whether he told her

91

1  or whether he, himself, had some concerns?
2          MS. KATSANTONIS: I think my question
3  was clear.
4      Q   Did you have any concerns with the
5  performance of her work prior to that incident?
6      A   ████████████████
7      Q   Okay. And what concerns did you have?
8      A   ████████████████████████████████
9  ████████████████████████████████████
10 ████████████████████████████████████
11 ████████████
12     Q   Did you relay those concerns to her at
13 any time?
14     A   Ms. Barnes knew that I was coming to
15 Atlanta to meet with Grant Thornton and Ms. Barnes
16 knew that I was going to be there. Ms. Barnes
17 chose not to be there.
18     Q   And that was after Ms. Barnes
19 circulated an email to you and Mr. Donovan and
20 Mr. Okonski with a revised 2017 financial
21 statement, right?
22     A   I'm unsure of the exact timeline.

92

1      Q   It was after that, right? It was the
2  day that you -- the day you flew to Atlanta that
3  ████████████████████████████████
4  ████████████████████████████████
5      A   So --
6          MS. PETERS: Object to form.
7      A   -- I'm sorry, Ms. Katsantonis, I'm not
8  going to play this game with you ████████████████
9  ████████████████████████████████████
10 ████████████████████████████████████
11     Q   I'm not asking about ██████████████
12     A   I know. I know it's very convenient
13 for you not to.
14     Q   Mr. Moore, my question --
15     A   ████████████████████████████
16     Q   Mr. Moore, my question was only on the
17 timing of your visit. It had nothing to do with
18 that.
19     A   It was -- it was before --
20         MS. PETERS: Excuse me. Let's take a
21 moment, answer her question. And I want to make
22 sure you understand what her question is.

Transcript of Richard Moore
Conducted on February 27, 2020                    24 (93 to 96)



93

1       Are you asking him when he set up the
2  meeting with Grant Thornton?
3       MS. KATSANTONIS:  No.  My question to
4  him is, and -- and I'd appreciate you to let me
5  ask my question.
6    Q   My question to you is you said you had
7  ▮▮▮▮▮▮▮▮▮▮▮▮ when you flew to
8  Atlanta for a meeting and she wasn't there, right?
9       And my question to you was when you
10 flew to Atlanta for a meeting, wasn't that after
11 she had transmitted an email to you and
12 Mr. Donovan and Mr. Okonski with the revised 2017
13 profit and loss statement?
14      MS. PETERS:  Object to form.
15   A   I am unsure of exact dates.
16   Q   But isn't it true that the day that you
17 traveled to Atlanta, within that next day is when
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19      MS. PETERS:  You don't remember.
20   A   I flew into Atlanta for a meeting with
21 Grant Thornton.
22   Q   Uh-huh.

94

1    A   And an office visit.  She was not there
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4    Q   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5    A   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮
7    Q   Right.  So clearly she had transmitted
8  the revised P&L statement prior to your trip to
9  Atlanta, right?
10      MS. PETERS:  Object to form.
11   A   She submitted a lot of reports.
12   Q   You don't recall that she had
13 transmitted the revised 2017 profit and loss
14 statement prior to your trip to Atlanta?
15      MS. PETERS:  Object to form.
16   A   My trip to Atlanta had nothing to do
17 with an email from Wanda Barnes.  My trip to
18 Atlanta had to do with the fact that Grant
19 Thornton was willing to meet with us and let us
20 engage their services.
21   Q   Right.  But I'm just trying to ask you,
22 you don't recall -- it's your testimony you don't

95

1  recall that the revised P&L statement that was
2  transmitted by Ms. Barnes occurred prior to your
3  trip to Atlanta?
4    A   I don't --
5       MS. PETERS:  Object to form.
6    A   I don't -- do you have an email you can
7  show me with a date on it?
8    Q   Well, I do and I can show you.  But
9  certainly it wouldn't have been after your trip to
10 Atlanta ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11   A   Okay.  But you're asking me specific
12 questions regarding a timeline from, I guess, over
13 a year ago.
14   Q   All right.  Was the purpose of your
15 trip in any way related to Ms. Barnes?
16   A   Ms. Barnes was not the sole purpose of
17 my visit.
18   Q   Sure.  But was she part of the reason
19 for your visit?
20   A   Well, if I'm meeting -- my main purpose
21 was to visit Grant Thornton but in her role in
22 finance my goal was to meet with the finance team

96

1  to talk to them about the changes we're making and
2  partner with Grant Thornton.
3    Q   Let me ask you this:  When did you fly
4  to Atlanta?  Do you remember the -- was it a
5  Sunday, Monday, Tuesday?
6    A   I do not recall.
7    Q   Who did you fly with?
8    A   I do not recall.  I believe it would
9  have been Tim Okonski and Erik Schneider, I
10 believe.
11   Q   Why were all three of you flying to
12 Atlanta?
13   A   Because in the same building is a risk
14 management office where Erik Schneider had
15 employees and Tim Okonski would have came to me --
16 came with me to meet the finance team.
17   Q   He would have come with you, pardon?
18   A   To meet with the finance team.
19   Q   To meet with the finance team.
20      And was the purpose related to any sort
21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Transcript of Richard Moore
Conducted on February 27, 2020

97

1          MS. PETERS:  Object to form.
2          A   I don't recall.  I believe — and I say
3    that because I don't know if the suspicions were
4    deep rooted before or during my visit.
5          Q   Okay.  So your testimony is that the
6    main purpose of your trip to Atlanta was to meet
7    with Grant Thornton?
8          A   Yes.
9          Q   And that --
10         A   And our finance team of course.
11         Q   Okay.  Your finance team for like a
12   regular meeting or was there a specific purpose?
13         A   Well, we were in the middle of
14   litigation with RLI and we still had temps, I
15   believe, at the time.  And my goal was to see how
16   things were going and to see whether or not any of
17   the temps would be joining our team permanently.
18         Q   Did you communicate with Ms. Barnes by
19   text?
20         A   I believe so.  I would communicate with
21   everybody by text sometimes.
22         Q   And did you communicate with

98

1    Mr. Okonski regarding financial statements via
2    text?
3          A   In regards to Ms. Barnes' situation?
4          Q   With regard to preparing financial
5    statements in general.
6          A   I don't recall.  I mean, it would have
7    been — if someone said do we do a statement?
8    Then, yes.  If you're asking me specifically, I
9    don't — I don't know what you're asking me.
10         Q   Would you text Mr. Okonski details in
11   texts, such as review line item X for, you know,
12   $200,000 and remove from statement?
13         A   No.  Definitely not.  The only times
14   we'd have conversations about stuff like that is
15   if there's a situation where it's — things were
16   mislabeled.  It was never removed, it was always
17   hey, is this categorized properly or something
18   like that, and that's it.
19         Q   Okay.  And those would be communicated
20   by text?
21         A   Or phone call or email.  It just
22   depends on what's happening at that moment.

99

1          Q   Okay.  But it could be in a text,
2    right?
3          A   It seems unlikely, but it could be.
4          Q   Okay.  How often did you communicate
5    with Mr. Okonski?
6          A   I communicated with my senior
7    leadership team probably 20 or 30 times a day.
8          Q   Okay.  And are those communications
9    verbal, email, and text?
10         A   Yes.
11         Q   Okay.  Prior to the preliminary
12   injunction hearing in this matter, Nexus was
13   preparing profit and loss statements, right?
14         MS. PETERS:  Object to form.
15         A   Prior to preliminary injunction
16   hearing, Nexus would have some financial
17   documents.  As to what they were, I mean, I don't
18   have them in front of me so I don't know what we
19   had.
20         Q   Do you not recall that Nexus was
21   preparing profit and loss statements to present to
22   the court for the preliminary injunction hearing?

100

1          MS. PETERS:  Object to form.
2          A   I know we had a team working on stuff
3    in finance, but I did not know what they were
4    working on.  A lot of legal stuff I let the
5    lawyers handle and I'll talk to Okonski and our
6    team about it.
7          Q   All right.  So you didn't -- you
8    weren't aware of the -- what the finance team was
9    doing to prepare profit and loss statements?
10         A   I knew they were — I knew they were
11   generating reports.  As my background is not
12   finance, I just work with our team to facilitate
13   things.
14         Q   What is your background?
15         A   Business, obviously.  Retail.
16         Q   And what about is there a distinction
17   between your finance team and a risk management
18   team?
19         A   Yes.
20         Q   Okay.  And who's your risk management
21   team?
22         A   Those are our risk managers in the

Transcript of Richard Moore
Conducted on February 27, 2020

101

1  field.
2      Q    Okay.  What about for bond breaches?
3  Is there a different group than the finance team
4  who looks at the bond breach notices that come in?
5      A    Yes.
6      Q    Who is that?
7      A    It would be Hazzar Perdomo and Jesus
8  Batista.
9      Q    And prior to Hazzar and Jesus, was
10 there anybody else who would review the bond
11 breach notices?
12     A    Tania Cortes.
13     Q    Did Ms. Hurst or Ms. Cash or anyone
14 else on the finance team ever -- were they ever
15 involved in the risk management?
16     A    No.
17     Q    Okay.  When Nexus decided to put its
18 finances into QuickBooks, do you know when did
19 that start?
20     MS. PETERS:  Object to the form of the
21 question to the extent that it assumes that Nexus
22 decided to.

102

1      A    I'm unable to answer that question
2  because I don't know.
3      Q    Okay.  Who would know that question?
4      MS. PETERS:  Object to form.
5      A    I -- I don't know.
6      Q    So it wasn't you who said let's --
7      A    No, you didn't ask me who made the
8  original decision.  You asked me when was the
9  decision made and who would know.
10         If a conversation took place in regards
11 to, let's use QuickBooks, I was part of that
12 conversation.  But when it happened, I don't know.
13     Q    Okay.  Would you be the one who
14 ultimately determined to proceed by putting --
15 entering your finances into QuickBooks?
16     A    I would be part of the process.
17     Q    Who else would be involved in the
18 process?
19     A    I honestly don't remember.
20     Q    Who would make the -- who made the
21 determination on behalf of Nexus to maintain their
22 finances on QuickBooks?

103

1      A    I don't remember.
2      Q    Were you one of the people who made the
3  decision?
4      A    I don't -- I don't remember if it was
5  my decision.
6      Q    Who else's decision would it be?
7      A    I don't remember.
8      Q    Okay.  Well, you're the vice president
9  of the company, right?
10     A    Yes.
11     Q    So you have authority to make that
12 decision?
13     A    I had the authority to make the
14 decision, yes.
15     Q    Okay.  And you don't know whether you
16 made it or somebody else?
17     A    No.  I do know we used QuickBooks.  I
18 do not know when the decision to do so or who
19 actually made the final decision to do so, whether
20 it was me or somebody else.  I do not recall.
21     Q    Are you responsible for determining
22 which bills get paid?

104

1      MS. PETERS:  Object to form.
2      A    In some situations, yes.
3      Q    What situations?
4      A    If it's a larger bill, or when we had
5  our finance team not as organized as it is getting
6  now, then I would be more involved in the
7  day-to-day operations of it.
8      Q    Okay.  And are you the one who is
9  responsible for determining which bond breach
10 payments get paid?
11     MS. PETERS:  Object to form.
12     A    No.
13     Q    Who makes that decision?
14     A    An email sent from the bond breach
15 chief saying this payment is due.
16     Q    I'm sorry.  That makes -- they make the
17 decision?  Who does?
18     MS. PETERS:  Object to the form.
19     A    An email sent saying that this payment
20 is due, this invoice is due.  And the check is cut
21 for it.
22     Q    Where is an email sent from?

Transcript of Richard Moore
Conducted on February 27, 2020

105

1    A    Husar Perdomo.
2    Q    Okay.  So Husar Perdomo sends an email
3 to you.
4        MS. PETERS:  Object to form.
5    A    To me and several other people.
6    Q    Okay.  Who else would be on that email?
7    A    I — I don't know.
8    Q    Okay.  And says this payment needs to
9 be made, right?
10   A    Yes.
11   Q    And then do you make the decision
12 whether to pay it?
13       MS. PETERS:  Object to form.
14   A    If an invoice is due for an obligation
15 to the government or to one of our sureties, then,
16 yes, we pay it.
17   Q    Now, I'm asking you on a daily basis do
18 you determine which bills to pay?
19       MS. PETERS:  Object to the form of the
20 question.  Asked and answered.
21   A    I believe I've answered that question
22 already.

106

1    Q    So the answer is you don't?
2        MS. PETERS:  Object to the form of the
3 question.
4    A    My answer was that in some cases I'm
5 involved and other cases that our finance team
6 pays invoices based off the aging report.
7    Q    All right.  With regard to bond
8 breaches, aren't you the one who writes to your
9 finance team and says pay this bill today, pay
10 this invoice today?
11       MS. PETERS:  Object to form.
12   A    I am the one when an email comes in, I
13 will forward it to finance saying this is approved
14 or pay this today, yes.
15   Q    And isn't it true that you -- not even
16 when an email comes in.  Aren't you the one who
17 sends out emails to your team saying please pay
18 these two invoices today, let's say?
19       MS. PETERS:  Object to form.
20   A    I would get the information to somebody
21 else saying that they're due.
22   Q    Right, there'd be a whole list.

107

1    A    But that would be — well, if there's
2 different due days and we're not paying all at one
3 time then I would say pay these two now.  Which is
4 the same thing, I got the list from somebody else.
5    Q    Is it your testimony that you pay every
6 invoice on its due date?
7        MS. PETERS:  Object to the form of the
8 testimony.
9    A    I base the due date based on the
10 Treasury referral date after all appeals are
11 optioned out or unless someone from risk tells me
12 hey, listen this is not — this matter is not
13 appealed and this matter needs to be paid.
14   Q    Okay.  So when did you start
15 implementing that you would not pay bond breach
16 invoices until the Treasury date?
17       MS. PETERS:  Object to the form.
18   A    The policy is that in cases where there
19 is an issue where the client has some sort of
20 relief that is possible or their attorney is
21 appealing or something, then those situations are
22 allotted a little more time before we pay the

108

1 invoice.
2    Q    Well, you don't sit there and look into
3 each invoice that you get to see what the
4 circumstances are for each bond breach invoice, do
5 you?
6        MS. PETERS:  Object to form.
7    A    No, I have employees that do that.
8    Q    And when you get -- you just testified
9 that you don't pay invoices until the Treasury
10 date?
11   A    I said —
12       MS. PETERS:  Object to form.
13   A    — in some cases we don't.
14   Q    So in some cases you do and some cases
15 you don't?
16       MS. PETERS:  Object to form.
17   A    It depends on the situation.
18   Q    And what situation is that?
19   A    There are several factors that impact
20 that.
21   Q    What are they?
22   A    Whether or not an appeal is filed.

Transcript of Richard Moore
Conducted on February 27, 2020

109

1 Whether or not the attorney -- the client's
2 attorney is filing a motion to reopen.  Whether or
3 not there is other action the client took.
4 Whether or not the government made a mistake in
5 the situation as well.
6     Q    Okay.  Out of the bond -- is it Nexus',
7 for lack of a better word, standard operating
8 procedure to appeal the vast majority of bonds
9 invoices?
10        MS. PETERS: Object to the form.
11    A    Nexus has no standard operating
12 procedure on appealing the vast majority of
13 invoices.
14    Q    Okay.  Do you -- can you advise as to
15 isn't it true that the vast majority of bond
16 breaches that are received from Nexus -- that are
17 received by Nexus are appealed?
18        MS. PETERS: Object to the form of the
19 testimony.
20    A    I'm unsure of that. I can look into it
21 for you, though, if you'd like.
22    Q    How would you look into it?

110

1    A    I don't know.  I would reach out to our
2 breach team and then reach out to counsel.
3    Q    You don't know sitting here today that
4 a -- that the majority of bond breaches are
5 appealed?
6        MS. PETERS: Object to the form.
7    A    I do not know what percentage of --
8    Q    I'm not asking those --
9    A    Well, you asking the majority which
10 would indicate a percentage more --
11    Q    More than 50 percent?
12    A    More than 50 percent.
13    Q    You don't know?
14    A    I don't know.
15        MS. PETERS: Object to form.  Please
16 let him finish his answer.
17    Q    Okay.  So it's your testimony you don't
18 know whether more than 50 percent of the bond
19 breaches are appealed?
20        MS. PETERS: Object to form.
21    A    No, but I'm more than glad to look into
22 that for you.

111

1    Q    That would be great.  I'd like you to.
2    A    Please notify our counsel so I --
3    Q    Sure.  Absolutely.
4        And getting back to -- in determining
5 which bills should get paid, do you review cash
6 flow or any other -- or bank accounts?  What do
7 you review in order to make a determination to pay
8 an invoice?
9    A    Can you please define what you mean by
10 "invoice"?  Are you talking about a bond invoice
11 or just a general bill?
12    Q    Well, we can take them one at a time
13 but either way.
14    A    The bond invoice we pay when the breach
15 team says this invoice needs to be paid.
16    Q    Who makes the decision that this
17 invoice needs to be paid?
18    A    The invoice, the bond team is notified
19 by the surety of the due date.
20    Q    All right.  So tell me specifically,
21 give me an example.
22        So the surety tells who?  Hazzar or

112

1 Jesus?
2    A    I can follow up with the bond team to
3 give you that exact information if you'd like.
4    Q    Well, who's your bond team?
5    A    I know that you are deposing
6 Ms. Perdomo, maybe this is a question suited for
7 her.
8    Q    Do you know who your bond team is?
9        MS. PETERS: Object to the form.
10    A    I've already answered that question.
11    Q    I don't -- no, I'm asking.
12    A    I've already answered who my breach
13 team was, my bond breach team was already.
14    Q    Is your bond breach team your risk
15 management team?
16        MS. PETERS: Object to form.
17    Q    Or is that different?
18    A    They are in the risk management
19 department but they're a specialized team in the
20 risk management department.
21    Q    Okay.  And who is included in the bond
22 team?

Transcript of Richard Moore
Conducted on February 27, 2020

113

1      A    I've already answered that question
2  already.  Do you want me to answer it again for
3  you?
4      Q    Yes, please.
5      A    Sure.  Hazzar Perdomo and Jesus
6  Batista.
7      Q    All right.  And then before that Tania
8  Cortes?
9      A    Yes.
10      Q    And is it your testimony that they have
11 the authority to determine whether a bond breach
12 should be paid?
13      MS. PETERS:  Object to form.
14      A    They have the authority to communicate
15 that this invoice is due and needs to be paid.
16      Q    Right.  And you're the one who
17 determines whether to pay it or not, correct?
18      MS. PETERS:  Object to form.
19      A    Yes.  After I'm told that it needs to
20 be paid.
21      Q    Well, you're told an invoice is due.
22      A    Yes.

114

1      Q    And then you make the decision whether
2  to pay it or not, correct?
3      A    Yes.
4      MS. PETERS:  Object to the form.
5      Q    And in determining what to pay, do you
6  look at any reports, bank accounts?  What do you
7  look at to make the decision to pay an invoice?
8      MS. PETERS:  Object to form.
9      A    Our normal cash flow operations and we
10 pay invoices -- sometimes we're late.  We try to
11 pay invoices as close on time as we can.
12      Q    Okay.  But getting back to what you
13 look at.  Do you log on to your computer and look
14 up all the bank accounts to see the balances in
15 the bank accounts?
16      A    No.
17      Q    Okay.  What do you?
18      A    I usually go to the KPI and see where
19 we're at.
20      Q    Is there any other documents or reports
21 you look at?
22      A    No.

115

1      Q    Okay.  And if there's not enough
2  revenue in the KPI to pay all the bills, how do
3  you determine what gets paid?
4      MS. PETERS:  Object to form.
5      A    Like all businesses do, we prioritize.
6      Q    Okay.  And how do you prioritize?
7      MS. PETERS:  Object to form.
8  Overbroad.
9      A    Can you please clarify what you mean by
10 how we prioritize?
11      Q    Well, how do you prioritize paying a
12 bond breach, one bond breach payment over another
13 versus an invoice for, I don't know, AT&T?
14      MS. PETERS:  Object to form.
15      A    Well, bond breaches are our first
16 priority.
17      Q    They take priority over paying for GPS
18 services?
19      A    Yes.
20      Q    Okay.  And how do you determine which
21 bond breaches to pay over the next?
22      A    Our bond breach team tells me the dates

116

1  that they're due.
2      Q    And what dates do you use to determine
3  when a bond breach is due?
4      A    In most of the emails I get, there are
5  times where it says that this is the due date and
6  pay it by this date.  I usually don't get the
7  copies of all the invoices.
8      Q    And so who determines the due date to
9  put in the document they send to you?
10      MS. PETERS:  Object to the form --
11      Q    Or the email?
12      MS. PETERS:  -- of the question.  Calls
13 for speculation.
14      A    I believe it's the communication that
15 the bond team has with a surety; but, again, you
16 can follow up with Ms. Perdomo on that question.
17      Q    Well, you said 120 days.  I'm trying to
18 see where you got that from.
19      A    Because 120 days would be the latest a
20 bond can be paid.
21      Q    And what is that understanding based
22 on?

Transcript of Richard Moore
Conducted on February 27, 2020

117

1     A     An email, I believe, from Jody Prescott
2 stating that that's when referral to Treasury are
3 done.
4     Q     So it's your practice to wait until an
5 invoice is being referred to Treasury before you
6 pay?
7     A     Absolutely not.  There are some times
8 where that is necessitated by the needs of the
9 client.
10     Q     What are the needs of the client?
11     A     As stated previously, there are times
12 where the client may be filing an appeal.  Their
13 attorney's filed a motion to reopen.  There are
14 times that they've gone to the wrong location.
15     Q     So is Hazzar and Jesus looking into
16 each one of these files --
17          MS. PETERS:  Object to form.
18     Q     -- to see if a motion to reopen has
19 been filed?
20     A     Absolutely.
21     Q     Okay.  And do you understand that
22 according to the Department of Homeland Security,

118

1 once an invoice is issued that the time for an
2 appeal has already passed?
3          MS. PETERS:  Object to the form of the
4 question to the extent it calls for a legal
5 conclusion.
6     A     I am not an expert on that aspect of
7 it.  So I don't handle the appeals but I can look
8 into that for you.
9     Q     So you don't have an understanding that
10 when an invoice is issued on a bond breach the
11 appeal period has run?
12     A     I'm telling you that you're asking me a
13 legal question I'm not qualified to answer.
14     Q     I'm just asking your understanding.
15          MS. PETERS:  Object to form.  The
16 witness has answered.
17     A     My understanding is that I don't
18 understand the entire process when it comes to
19 appeals.  That's why we hire lawyers for it.
20     Q     Okay.  So you don't know whether or not
21 an invoice is due when it's issued or 30 days
22 later or at the Treasury date; is that right?

119

1          MS. PETERS:  Object to the form of the
2 question to the extent it calls for a legal
3 conclusion.  And this witness has already
4 indicated that he deferred to counsel on that
5 topic.
6          MS. KATSANTONIS:  Well, counsel
7 certainly is not determining when an invoice is
8 due every day.  So that's a ridiculous objection.
9     A     I have been --
10          MS. PETERS:  I will object to that
11 mischaracterization, Ms. Katsantonis.
12          MS. KATSANTONIS:  All right.
13     A     I have been informed by Homeland
14 Security that all invoices need to be paid before
15 the 120th day.  So that is what I take as my drop
16 dead cutoff date.
17     Q     Okay.  And when did you make that
18 determination?
19          MS. PETERS:  Object to the form of the
20 question.
21     A     I didn't make that determination.
22     Q     You just said you've been informed by

120

1 the Department of Treasury.  When were you
2 informed?
3     A     I'm sorry, I said the Department of
4 Homeland Security not Department of Treasury.
5     Q     I'm sorry.
6     A     That's okay.  Too many agencies.
7          I was told that I believe 2017 or '18.
8     Q     Okay.  And so has it been your
9 practices not to pay breach -- bond breaches until
10 the Treasury date since 2017 or '18?
11          MS. PETERS:  Object to the form of the
12 question.
13     A     That is not what I said at all.  As
14 stated previously, though, that it is our practice
15 that -- to look at each situation differently
16 because there are certain situations, again, that
17 the client may have filed an appeal.  There may be
18 motion to reopen filed.  There's a lot of
19 different things.  There are a lot of bond cases
20 that are reopened as well.
21     Q     Isn't it true that you don't have --
22 that there are times you do not have enough cash

Transcript of Richard Moore
Conducted on February 27, 2020

121

1  to pay bills as they become due?
2       MS. PETERS: Object to the form of the
3  question. Vague.
4       A   I think that as a company that's had
5  some challenges we've had in our finance team, we
6  probably could have done a better job of our
7  organization. But we're getting there now, which
8  is great.
9       Q   So that's great. But my question is
10 just very simple. Isn't it true that there are
11 times that you, Nexus, doesn't have enough cash to
12 pay bills as they become due?
13      MS. PETERS: Object to the form of the
14 question. Vague.
15      A   I believe I've already answered the
16 question.
17      Q   Let me ask it again and you can just
18 humor me and answer it again.
19      A   Okay.
20      Q   Isn't it true that sometimes you don't
21 have enough cash to pay bills as they become due?
22      MS. PETERS: Object to the form of the

122

1  question. Vague.
2       A   And I heard the question again.
3       Q   Yep.
4       A   And I humored you to ask the question
5  again and I'll state that I've already answered
6  the question.
7       Q   No. So is the answer yes or no?
8       MS. PETERS: Object to the form of the
9  question.
10      A   My answer is the same as it was when
11 you asked me two minutes ago.
12      Q   Mr. Moore, you're being -- yes or no?
13      MS. PETERS: Object to the form of the
14 question.
15      A   There are times that — yes, there are
16 times that our cash flow is out of whack and we
17 had bills that are due that we do not pay.
18      Q   And hasn't that also resulted in
19 overdraft fees from banks?
20      A   Yes.
21      MS. PETERS: Object to the form.
22      Q   And in fact there are times that the

123

1  overdraft fees may reach as high as 15 or 17,000
2  in a given month?
3       A   I don't have an exact amount.
4       MS. PETERS: Object to form.
5       A   But we're going on a break.
6       MS. KATSANTONIS: Okay.
7       THE VIDEOGRAPHER: We are going off the
8  record at 17:40.
9       (Recess taken.)
10      THE VIDEOGRAPHER: We are back on the
11 record at 17:44.
12      THE WITNESS: Let me apologize to you
13 first. I asked for a break because I was getting
14 a little testy to you and you're just doing your
15 job. I may not like your job right now but you're
16 just doing your job.
17      Q   Thank you.
18      A   So I wanted to break real quick.
19      Q   No, I appreciate it. I want you to be
20 comfortable so take as many breaks as you need.
21      A   You don't mean that. But I'm saying
22 that I was rude to you and all you're trying to do

124

1  is your job and I appreciate that. You are a
2  fierce advocate for your client. While I don't
3  agree with them or you, I respect the fact that
4  you're doing a great job for them.
5       Q   Thank you. And I want you to be
6  comfortable and want you to take breaks whenever
7  you -- you know, and I didn't even ask if you've
8  been deposed before but it's --
9       A   This is my first time.
10      Q   Right.
11      A   It's not fun.
12      Q   No. So I understand totally.
13      A   Next time it's obviously going to be a
14 little lighter than you, but it's okay.
15      Q   Thank you.
16      MS. KATSANTONIS: I'm going to mark as
17 an exhibit. These go together. I can represent
18 that they came from a database together like this.
19      A   Okay.
20      MS. KATSANTONIS: I'll have the court
21 reporter mark it.
22

Transcript of Richard Moore
Conducted on February 27, 2020

32 (125 to 128)

---

125

1          (Moore Exhibit 6 marked for
2    identification and attached to the transcript.)
3        **A    To clarify, are these two exhibits or**
4    **one exhibit?**
5        Q    It's one exhibit.
6        **A    Okay.  I have to put it in a pile**
7    **afterwards so I wanted to make sure we're good to**
8    **go.  We will not do last night today because I**
9    **care.**
10       Q    All right.  So this is a copy of a
11   spreadsheet.  I guess -- and perhaps because of
12   the date maybe you were traveling.  I'm not sure.
13   This is from Hazzar to Mr. Schneider and Mike
14   Donovan.  Does this look like a document that you
15   would routinely receive?
16       **A    Can you give me one second to --**
17       Q    Sure.
18       **A    -- get my bearings straight here.**
19           MS. PETERS:  Would you read back the
20   last question, please.
21           (The requested text was read by the
22   reporter as follows: "All right.  So this is a

---

126

1    copy of a spreadsheet.  I guess -- and perhaps
2    because of the date maybe you were traveling.  I'm
3    not sure.  This is from Hazzar to Mr. Schneider
4    and Mike Donovan.  Does this look like a document
5    that you would routinely receive?")
6           MS. PETERS:  Object to the form of the
7    question.
8        **A    I am not copied on this email so I**
9    **cannot -- and I -- I do not recall ever seeing**
10   **this spreadsheet.**
11       Q    Okay.  And do you recall that in
12   January of 2019 there was a total of 4.3 million
13   due to sureties on outstanding invoices?
14           MS. PETERS:  Object to the form.
15       **A    I do not recall.**
16       Q    Do you have any reason to doubt the
17   accuracy of this document?
18           MS. PETERS:  Object to the form of the
19   question.
20       **A    As I've not seen the document, I can't**
21   **say that I -- I can verify the document.  I'm**
22   **saying that I have no reason to believe that you**

---

127

1    **put a fictitious document in front of me.  So no,**
2    **I'm not saying you lied -- you're lying to me --**
3        Q    Right.
4        **A    -- I'm just saying I don't know.  I've**
5    **never seen it before.**
6        Q    But the amount due of 4.3 million, is
7    that typical of the amounts that would be due on a
8    regular basis for outstanding invoices?
9           MS. PETERS:  Object to the form.
10       **A    I am unsure.**
11       Q    Well, isn't this something that you
12   would do every week, is look at what the
13   outstanding invoices are and pay them?
14           MS. PETERS:  Object to the form.
15       Q    Breach invoices.  Let's just stick to
16   breach invoices.
17       **A    As I said previously, I get an email**
18   **outlining to me what needs to be paid.  There are**
19   **times where I copied on a larger email.  But I**
20   **don't recall seeing this number and I don't**
21   **recall -- I can't speak that routinely this is the**
22   **amount that's due on breach invoices.**

---

128

1        Q    Well, what -- do you know how much
2    Nexus is paying on a weekly basis for bond
3    breaches?
4           MS. PETERS:  Object to the form of the
5    question.
6        **A    I know it varies each week and I don't**
7    **have specific invoices in front of me right now,**
8    **so, no, I don't.**
9        Q    Okay.  But can you give me a range of
10   what they pay every week?
11           MS. PETERS:  Object to the form of the
12   question.
13       **A    As it varies from week to week, then I**
14   **could say, no, I can't give you a range.**
15       Q    Okay.  Well, you're the one responsible
16   for paying them every week, right?
17           MS. PETERS:  Objection.
18       **A    I do not cut the checks.**
19       Q    Well, you approve the payment of the
20   bond breach invoices, right?
21           MS. PETERS:  Object to the form.
22       **A    Yes, I do.**

---

Transcript of Richard Moore
Conducted on February 27, 2020

129

1    Q    Okay.  And so in your experience, since
2    you're the one -- I mean, it's important to know
3    how much money is going out just as important it
4    is to know how much money's coming in to Nexus,
5    right?
6         MS. PETERS:  Object to the form.
7    A    Yes.
8    Q    Right.  And so obviously are the bond
9    breach payments a significant expense that's being
10   incurred by Nexus on a weekly basis?
11   A    The bond breach invoices are an expense
12   that is significant to Nexus.
13   Q    Right.  And so can you give me an idea
14   of range, it doesn't have to be exact, of how much
15   Nexus is paying on, let's go monthly first, on a
16   monthly basis in bond breach payments?
17   A    As this is a fluctuating amount, month
18   to month, as you know, I can't give a range.
19   Q    Okay.  So for 2019, let's narrow it
20   down, in this past year, are the fluctuations from
21   50,000 a month to 500,000 a month or are they
22   larger than that?

130

1    A    The fluctuations do change and as I do
2    not have numbers in front of me I wouldn't feel
3    comfortable with answering the question.
4    Q    So you can't give me any range
5    whatsoever?
6         MS. PETERS:  Object to the form of the
7    question.  Argumentative.
8    A    I can tell you that there's probably a
9    bond breach due every month.  But I can't specify
10   more than that.
11   Q    Do you know the total amount, roughly,
12   of how much Nexus paid in bond breaches in 2019?
13   A    No, I do not.
14   Q    You don't know whether it -- the number
15   is 2 million or 10 million; is that correct?
16   A    I do not.
17   Q    And you can't give me any range
18   whatsoever?
19   A    To answer honestly, no, I cannot.
20   Q    Okay.  And who would have that
21   information?
22   A    I believe the breach department would

131

1    have records of all the invoices paid.
2    Q    Okay.  And can you -- is there a way
3    to, on any of your databases print a document that
4    shows how many breach -- how many bond breach
5    invoices were paid month to month or for the year?
6    A    I believe the breach department would
7    have that.
8    Q    Okay.  And then I believe this has been
9    asked for in litigation.
10        MS. KATSANTONIS:  I'm going to ask your
11   counsel to provide us with that information for
12   the years of since we initiated the program, from
13   2016 to today.
14        MS. PETERS:  You're asking for RLI bond
15   breach payment information?  Wouldn't you have
16   that information, Ms. Katsantonis?
17        MS. KATSANTONIS:  No.  I'm asking for
18   all breaches.  You don't have to give us the names
19   or whatever, but the amounts.  It goes to the
20   financial wherewithal of Nexus.
21        MS. PETERS:  Isn't that contained in
22   the bank records that have already --

132

1         MS. KATSANTONIS:  No.
2         MS. PETERS:  -- been produced,
3    Ms. Katsantonis?
4         MS. KATSANTONIS:  No, it's not.
5         MS. PETERS:  You have a record of every
6    payment made by Nexus.
7         MS. KATSANTONIS:  Are you suggesting
8    that RLI should go through each bank statement
9    page by page and start adding up the bond
10   breaches?
11        MS. PETERS:  With respect to the
12   payments made they're contained in all the bank
13   statements.
14        MS. KATSANTONIS:  No, they're not,
15   Ms. Donne Peters.  We just had a statement from
16   the witness that the information is available on a
17   database.
18        Can you please --
19        MS. PETERS:  He did not testify to
20   that.
21        MS. KATSANTONIS:  Can you please
22   provide that information on the database that he

Transcript of Richard Moore
Conducted on February 27, 2020

34 (133 to 136)

133

1 said the bond breach department would have.
2       MS. PETERS:  Ms. Katsantonis, he did
3 not testify that there's a special database.  He
4 said he --
5       MS. KATSANTONIS:  I didn't say a
6 special database.  I said there was a database.
7 What do you mean special?
8       MS. PETERS:  You just said database and
9 I don't -- let me ask that we read back the
10 witness's answer, the last question/answer.  If I
11 fluctuated on my attention, then forgive me but
12 I'd like to see what he just said, please.
13     A   Are we done with this?
14     Q   No, let's hear what you said.
15       MS. PETERS:  You have to wait a minute.
16       (The requested text was read by the
17 reporter as follows:  "Okay.  And can you -- is
18 there a way to, on any of your databases print a
19 document that shows how many breach -- how many
20 bond breach invoices were paid month to month or
21 for the year?
22       A. I believe the breach department

134

1 would have that.")
2       MS. PETERS:  I'm sorry.  I didn't hear
3 that answer.  If they have it, I'll produce it.
4       MS. KATSANTONIS:  Thank you.
5     A   The breach department would have the
6 records of invoices that are paid.  It's not a
7 special system.  They would have the records.
8     Q   Sure, but you can compile that just how
9 these spreadsheets are prepared, right.
10       MS. PETERS:  Object to the form.
11       Are you asking him to go out --
12       MS. KATSANTONIS:  My gosh --
13       MS. PETERS:  -- and make a database?
14       MS. KATSANTONIS:  -- Mary Donne, please
15 stop interrupting.
16       MS. PETERS:  I'm --
17       MS. KATSANTONIS:  I'm answering -- I'm
18 ask -- he can answer the question and then you can
19 ask your -- we can talk about it afterwards.  I'm
20 asking the witness.
21       MS. PETERS:  Okay.
22     Q   And this information is maintained on a

135

1 database, correct, just as how these sheets are
2 compiled?
3       MS. PETERS:  Object to form.
4     A   This, if I'm not mistaken, would be an
5 Excel spreadsheet.  A database would indicate some
6 kind of software program that is a specific
7 program like a CRM or something.  This -- I
8 believe this is a spreadsheet, correct?
9     Q   I'm asking.  You can generate a report
10 that shows all the payments made for bond breach
11 payments, right?
12     A   I believe so.
13     Q   Right.
14       MS. KATSANTONIS:  So I would ask for a
15 copy of that report.  If you want me to start
16 showing you some of the reports you have, I can do
17 so.
18       MS. PETERS:  If you have the reports,
19 Ms. Katsantonis, then why are you asking me for
20 them again?
21       MS. KATSANTONIS:  I don't have a report
22 for all of the bond breaches per month as I've

136

1 just asked for for the year.
2       MS. PETERS:  Now you're asking him to
3 create a special report.  That's what I'm getting.
4       Are you asking him to create a special
5 report for you?
6       MS. KATSANTONIS:  I'm asking for Nexus
7 to provide us information we've asked for in
8 discovery and that is whether that means they have
9 to generate a report to comply, then the answer is
10 yes.  Okay?
11       MS. PETERS:  I'm going to not discuss
12 discovery in the middle of a deposition and I
13 don't agree with your assertions.  But we'll take
14 it up at the break.
15       MS. KATSANTONIS:  Okay.  The witness
16 has indicated that he could answer the question
17 with the information, and I'm going to ask that
18 the information be provided.
19     A   The witness would clarify the fact that
20 this department would have — should have the
21 information.  Is there a report or database
22 available with all the information on it?  The

Transcript of Richard Moore
Conducted on February 27, 2020

137

1 witness does not know.  But this information would
2 be -- should be available in that department.
3      Q   Right.  And the information can be
4 pulled from the -- from a database to --
5      A   Well --
6      Q   Right?
7          MS. PETERS:  Object to form.  He's
8 speculating.
9      A   Well, what I'm saying is that
10 information should be available in files.  But I
11 don't know whether or not there's a database or a
12 spreadsheet with the information on it.
13     Q   And isn't it true that you have the
14 capability to print out payments by surety and by
15 date?
16         MS. PETERS:  Object to the form.
17 Payments for what?
18     Q   For bond breaches.
19         MS. PETERS:  Objection, form.
20     A   I'm sorry, I'm confused right now.
21 What do you mean by printing out, like, copies?  I
22 mean --

138

1      Q   You can print --
2          MS. KATSANTONIS:  Mark this.
3          MS. PETERS:  Please hand it
4 respectfully, Ms. Katsantonis.
5          MS. KATSANTONIS:  Sure.
6      A   Am I done with this one yet or no, this
7 current one here or should I leave this one out as
8 well?
9      Q   You can be done with it for now.
10     A   Okay.
11         MS. PETERS:  Which exhibit are we on,
12 please?
13         THE WITNESS:  7.
14         (Moore Exhibit 7 marked for
15 identification and attached to the transcript.)
16     Q   So I've handed you an exhibit dated
17 August 19th at the top from Richard Moore to Mike
18 Donovan, RLI payments.
19         So you have the capability, don't you,
20 Mr. Moore, to print out a list of payments made
21 for bond breaches?
22         MS. PETERS:  Object to form.

139

1      A   So in -- there are certain times where
2 invoices, as you are aware, your client is holding
3 money right now, for invoices that we returned to
4 them by Homeland Security.  There are times where
5 an invoice is paid and then the item is refunded
6 back.  So -- because the case is reopened.  As you
7 saw an email between -- the exchange between me
8 and Ms. Piispanen the other day.  So that's why I
9 referred you over to our breach team because they
10 would know whether or not the case is actually
11 closed or not.
12     Q   Okay.  But I'm not asking that
13 question.  What I'm asking is you have available
14 to you from some computer database the ability to
15 print the breaches invoices that have been paid?
16         MS. PETERS:  Object to form.
17     A   By surety?
18         MS. PETERS:  Would you please not raise
19 your voice to my client?
20         MS. KATSANTONIS:  I'm not raising my
21 voice, but thank you.
22     A   Well, this was a spreadsheet put

140

1 together?
2      Q   Okay.  And how is that -- how did you
3 prepare the spreadsheet?
4          MS. PETERS:  Object to the form.
5      A   I did not prepare the spreadsheet.
6      Q   Who prepared the spreadsheet?
7      A   It looks like this was created by --
8 this was forwarded from Elizabeth Hurst.
9      Q   And Ms. Hurst is gathering this
10 information from a database?
11         MS. PETERS:  Object to the form.  Calls
12 for speculation.
13     A   I am unsure where she got this
14 information from.
15     Q   I'm just going to cut -- you know, I'm
16 just trying -- clearly Nexus has the capability,
17 correct, to identity payments made for bond
18 breaches, right?
19     A   Yes.
20     Q   Right.  And so I'm simply asking that
21 Nexus provide to us copies of -- or provide the
22 information of all bond breach payments paid for

Transcript of Richard Moore
Conducted on February 27, 2020

141

1 the last three years.
2         MS. PETERS:  Object to the form.
3         MS. KATSANTONIS:  So I'm asking you to
4 provide that, okay?
5         MS. PETERS:  You made your statement
6 and Nexus will respond as required by court order
7 and the federal rules.
8         MS. KATSANTONIS:  Okay.  Well, I've
9 made my request and if we don't receive the data
10 by next Wednesday we'll bring it to the attention
11 of the court.
12        MS. PETERS:  I'm sure you will.
13     Q    So Mr. Moore, do you know why you were
14 forwarding to Mr. Donovan on August of 2018 a list
15 of the RLI bond breach payments?
16     A    I do not.
17     Q    When you receive information from
18 the -- your bond -- what did you refer them to,
19 your bond group?
20     A    Bond breach team.
21     Q    Okay.  Your bond breach team.  Is it
22 also in a spreadsheet format?

142

1     A    It depends on what information it is
2 and when it is.
3     Q    All right.  And -- well, for bond
4 breaches for sureties, are they -- is there an
5 Excel spreadsheet that's produced and given to you
6 on a daily basis or weekly basis?
7     A    There is not.
8     Q    Okay.
9     A    There are times where I do get
10 spreadsheets but it's not on a daily or weekly
11 basis.
12     Q    How often do you get the spreadsheets?
13     A    I honestly couldn't tell you.
14     Q    Okay.  But you get spreadsheets that
15 list the due dates, the invoices, the bond amounts
16 and the surety?
17     A    I'm copied on several spreadsheets and
18 I — I don't know what each one is until I open
19 it.  And I don't — I don't recall getting that on
20 a regular basis.
21     Q    Okay.  So what document do you get
22 every week to decide what bond breaches to pay?

143

1     A    I get an email saying that this bond
2 breach is due.
3     Q    So do you get an email per invoice or
4 do you get an email that lists a series of
5 invoices?
6     A    It depends.
7     Q    What does it depend on?
8     A    Well, there are times when it's a
9 lovely letter from Watt Tieder that just makes
10 everybody's day with a long list of due dates.
11 You've seen those letters I think.
12     Q    I believe so.
13     A    You've signed a few of those.  So those
14 letters we — you know, it's very clear when
15 they're due.  And I will thank you for that
16 because it's crystal clear.
17        Obviously those have a spreadsheet
18 chart attached and those are done.  And then there
19 are times where it may be one.
20     Q    Then there times, pardon?
21     A    Where it may just be one.
22     Q    Okay.  Isn't it true that the Nexus

144

1 financial statements to date, that have been
2 produced to RLI to date, don't include as a
3 liability bond breach invoices?
4     A    I don't have the financial documents
5 provided to RLI.  Do you have a copy of them you
6 can show me?
7     Q    Sure.  I have plenty of them.  You
8 don't know --
9     A    I figured you would.
10     Q    You don't know, sitting here, that the
11 bond breach invoices are not included on the
12 financial statements until they are paid?
13     A    I did not see any financial documents
14 turned over to RLI.  So if you could just show me
15 so I could refresh myself.
16     Q    Well --
17        MS. PETERS:  Object to the form because
18 that's not her question.
19        THE WITNESS:  Okay.
20     Q    No, but -- yeah.  So my question is not
21 what's been turned over to RLI, but in preparing
22 your profit and loss statement, or your balance

Transcript of Richard Moore
Conducted on February 27, 2020                     37 (145 to 148)

145

1  sheet, up through 2019, isn't it true that the
2  statements do not include as a liability bond
3  breach invoices?
4        MS. PETERS:  Object to the form of the
5  question.  You haven't asked him -- you haven't
6  put a document in front of him.  So I'm going to
7  object to the form of the question.
8        MS. KATSANTONIS:  I'm asking him in
9  general for all of his profit and loss statements
10  and balance sheets.  If he doesn't know that
11  answer, then he can just --
12       MS. PETERS:  Ms. Katsantonis --
13   Q   Do you know the answer to that?
14       MS. PETERS:  Ms. Katsantonis, that's an
15  unfair question.  Object to the form of the
16  question.
17       MS. KATSANTONIS:  Okay.
18   A   I will say that a bond breach is not an
19  invoice.
20   Q   When you receive an invoice -- let me
21  ask you this another way.  Isn't it true that
22  Nexus does not carry on its profit and loss

146

1  statements or balance sheets, at least through
2  2019, any liability for bond breaches until
3  they're actually paid?
4    A   Well, if you have -- obviously you have
5  a document.  If you want to show me the document
6  you're referring to so I can —
7    Q   Well, I can show you one but I won't
8  mark this yet.
9    A   Okay.
10   Q   But I don't think --
11       MS. PETERS:  I'm going to object to the
12  form of the question.
13   Q   This is Eckert Nexus 027806.
14   A   Okay.  And we don't want to mark it
15  yet, right?
16   Q   Right.  I just want you to look at it.
17       MS. PETERS:  Can you tell him when that
18  report was generated, Ms. Katsantonis?
19       MS. KATSANTONIS:  We just received it
20  in discovery.
21       MS. PETERS:  And do you have a copy for
22  me to review?

147

1        MS. KATSANTONIS:  I do somewhere.
2  We'll go ahead and mark it.
3    A   Okay.  Give it to her first.
4        (Moore Exhibit 8 marked for
5  identification and attached to the transcript.)
6    A   You've got a system.
7        MS. PETERS:  Before the witness answers
8  the question, I'm going to object to this line of
9  questioning insofar as in the reports of the
10  special master and in discovery responses to
11  counsel --
12       MS. KATSANTONIS:  Are you going to --
13       MS. PETERS:  Nexus Services has advised
14  counsel that the documents have been continually
15  updated.  This one lists January through December
16  of 2018.
17       MS. KATSANTONIS:  I feel like you're
18  trying to testify.
19       MS. PETERS:  I'm objecting because
20  unless you tell the witness when this was
21  generated, it will not inform him as to what is
22  included in it.

148

1        MS. KATSANTONIS:  Okay.
2  Ms. Donne Peters, this was given to us in
3  discovery.  On the last page it says Tuesday,
4  January 28th, 2020.
5        MS. PETERS:  That tells you when it was
6  printed, Ms. Katsantonis.
7        MS. KATSANTONIS:  Okay.  Well,
8  Ms. Donne Peters these are your financial records
9  not mine.  So how would I know?
10       MS. PETERS:  Object, Ms. Katsantonis.
11       MS. KATSANTONIS:  Well, you're asking
12  ridicu -- please don't interfere with my
13  deposition.
14       MS. PETERS:  We need financial
15  records --
16       MR. KOWALCZUK:  Object to the form.
17       MS. PETERS:  -- that span a period
18  of --
19       MS. KATSANTONIS:  You can object to the
20  form.
21       MS. PETERS:  -- many years.
22       MS. KATSANTONIS:  We don't need your

Transcript of Richard Moore
Conducted on February 27, 2020

149

1  testimony on the record.
2        MS. PETERS: Object to the form of the
3  question.  It is an unfair question to ask this
4  witness.
5        A   I do not see — I do not see a line
6  item on here that specifies bond breaches.
7        Q   Okay.  And do you know when are bond
8  breach invoices recorded in QuickBooks?
9        A   I believe they're recorded — actually,
10 no, I don't know for sure, but I believe they're
11 recorded at the time the check is cut, as there
12 are several times that bond breaches — or bond
13 invoices are rescinded.  As your —
14       Q   And so —
15       A   — client knows as well.
16       Q   -- to the best of your knowledge the
17 liability for bond breaches are not carried on the
18 financial statements of Nexus Services; is that
19 true?
20       MS. PETERS: Object to the form of the
21 question.
22       A   I'm sorry, can you repeat the question.

150

1        (The requested text was read by the
2  reporter as follows: "And so to the best of your
3  knowledge the liability for bond breaches are not
4  carried on the financial statements of Nexus
5  Services; is that true?")
6        MS. PETERS: Object to the form of the
7  question.  The witness has already testified that
8  when a check is cut, it goes on there.
9        MS. KATSANTONIS: Okay.  So now I'm
10 asking it a different way.
11       Q   Can you answer the question?
12       A   I'm sorry.  I'm not — I'm not trying
13 to be difficult.
14       Q   It's not you --
15       A   Can you —
16       Q   -- it's your counsel.
17       A   Can you repeat it one more time?
18       MS. PETERS: Let's be courteous,
19 Ms. Katsantonis.
20       MS. KATSANTONIS: I'm sorry.  But,
21 please, go ahead.
22       Could you read the question.

151

1        (The requested text was read by the
2  reporter as follows: "And so to the best of your
3  knowledge the liability for bond breaches are not
4  carried on the financial statements of Nexus
5  Services; is that true?")
6        A   If the checks are cut in QuickBooks
7  then they would be on the financial statement of
8  Nexus.
9        Q   So only after a check was cut would a
10 liability show up in the financial statements of
11 Nexus; is that correct?
12       A   I'm unsure because it would have to
13 be -- the only way we cut checks is through
14 QuickBooks.  So I'm unsure whether or not they put
15 every -- whether or not the documents that the
16 bond invoice are keyed in QuickBooks or not,
17 beforehand.
18       Q   To the best of your knowledge, they're
19 not included in QuickBooks until a check is cut;
20 is that correct?
21       A   I don't have QuickBooks in front of me,
22 so I do not -- I do not believe they are in

152

1  QuickBooks until said point where a check is cut.
2        Q   Thank you.
3        A   And again, I'm not trying to be
4  difficult with you.  I'm trying to answer
5  honestly.
6        Q   I appreciate that.
7        A   But, again, those invoices, we do
8  receive cancellations for invoices all the time.
9        Q   Okay.  And would Nexus write checks and
10 not deliver them for a period of time?
11       MS. PETERS: Object to form.
12       A   Can you give me — I mean obviously you
13 have something in mind.  Can you give me a
14 specific example?
15       Q   Well, were there times when Nexus would
16 write a check for a payment of something that's
17 due but not deliver that check to the creditor for
18 a period of time?
19       MS. PETERS: I'm going to object to the
20 form of the question to the extent that you put a
21 check in the mail it's not delivered to the
22 creditor timely.

Transcript of Richard Moore
Conducted on February 27, 2020

---

153

1 MS. KATSANTONIS: Okay. Again. That's
2 not an appropriate objection and you know that.
3 MS. PETERS: I disagree.
4 **A There are times where the checks are**
5 **cut on a Friday and mailed out on Monday. There**
6 **are times where, example, your client,**
7 **Ms. Piispanen, had to have Chris Florian search**
8 **the deposit room in Vermont for a check that was**
9 **there that they lost. It wasn't our fault.**
10 Q Okay. I'm asking about at Nexus.
11 Did you -- we can talk about how
12 frequently, okay? But would Nexus write checks,
13 either eChecks or handwritten checks, and hold on
14 to them, and I'm not talking about from Friday to
15 Monday, but not deliver them for a period of time,
16 say, a week or two weeks?
17 **A Nexus does not --**
18 MS. PETERS: Object to form.
19 **A I'm sorry?**
20 MS. PETERS: Object to form. Go ahead.
21 **A Nexus does not do handwritten checks**
22 **anymore.**

154

1 Q At any time has Nexus written checks or
2 created checks or eChecks, generated a payment but
3 due to insufficient funds didn't yet deliver them,
4 mail them?
5 **A If any check was held, it would not be**
6 **because of insufficient funds, it would be just**
7 **because we would cut some checks on a certain time**
8 **and then be released a little later but not**
9 **because of insufficient funds.**
10 Q Why would it be released later?
11 **A There are times that we just -- let's**
12 **say, it's Wednesday and we're cutting all these**
13 **checks on this date. Some of them aren't due**
14 **until later on. And we try to move away from**
15 **cutting checks every day.**
16 Q So it's your testimony that, to your
17 knowledge, Nexus never issued or created a check,
18 eCheck or handwritten check or any sort of check
19 and held on to it due to insufficient funds?
20 MS. PETERS: Object to form. Calls for
21 speculation.
22 **A It's my testimony that there are**

155

1 **different situations that we do that and I can't**
2 **recall one that could tell you that that's the**
3 **reason why.**
4 Q Well, what are all the reasons why the
5 checks would be held?
6 **A Somebody's going on vacation, we cut**
7 **them in advance.**
8 Q But you would hold them?
9 **A The due date's not done. There's**
10 **different reasons, yes.**
11 Q But it's your testimony you've never
12 held -- cut a check, generated a check, prepared a
13 check, but held on to it for a period of time due
14 to insufficient funds?
15 **A It's my --**
16 MS. PETERS: Object to the form.
17 **A It's my situation that in all the**
18 **checks in the company's history I do not recall**
19 **that situation.**
20 Q Okay. And do you -- is it -- would you
21 agree that it is -- that frequently Nexus was
22 issuing checks that were returned for insufficient

156

1 funds?
2 MS. PETERS: Object to form.
3 **A I would say that while that may happen**
4 **from time to time it is because we had a**
5 **disorganized finance team.**
6 Q So the reason you were getting those
7 notices were for disorganized finance team not
8 because there was insufficient funds?
9 MS. PETERS: Object to form.
10 **A I would say that as we've evolved we've**
11 **changed a lot of our practices.**
12 Q Well, that's not my question. My
13 question is isn't it true that you would have --
14 that checks were returned because of insufficient
15 funds?
16 **A Any --**
17 MS. PETERS: Object to form.
18 **A Those insufficient funds checks were**
19 **always made right.**
20 Q That's -- so the answer's yes?
21 MS. PETERS: Object to the form of the
22 question.

157

1    A    My answer is if any checks were
2    returned insufficient then it would have been
3    reimbursed to the recipient.
4    Q    Would you send a copy of a check to a
5    creditor more than a day or two before actually
6    sending the check out?
7         MS. PETERS: Object to the form of the
8    question.
9    A    I --
10        MS. PETERS: Go ahead.
11   Q    Go ahead.
12   A    I did not send checks out.  And the
13   reason there have been delays is sometimes that
14   finance may have delayed sending them out.
15   Q    Okay.
16        MS. PETERS: Can we take a quick bio
17   break?  We've been going at it about an hour.
18        MR. HARRIS: We just have nine minutes
19   until 6:30.
20        MS. PETERS: Excuse me?
21        MR. HARRIS: We only have nine minutes
22   until 6:30.

158

1         MS. KATSANTONIS: We only have nine
2    minutes until 6:30 which is when you wanted to
3    stop the deposition.
4         MS. PETERS: I'm just saying I need a
5    bio break, if that's acceptable, Ms. Katsantonis.
6         MS. KATSANTONIS: Sure.
7         THE VIDEOGRAPHER: We are going off the
8    record at 18:21.
9         (Recess taken.)
10        THE VIDEOGRAPHER: We are back on the
11   record at 18:27.
12   BY MS. KATSANTONIS:
13   Q    I want to go back and look at the
14   profit and loss statement that I showed you.
15   A    Which exhibit number is that?  Oh, you
16   don't know?
17   Q    I have no idea.  You do, it's right
18   there.
19   A    Okay.  So Exhibit 8.
20   Q    Okay.
21   A    I'll leave them organized.
22   Q    We were talking about returned checks

159

1    and payments, right?
2    A    Uh-huh.
3    Q    Okay.  So I'm looking at this statement
4    and in looking at the second page, there are bank
5    charges for $495,950.
6         Do you know what those charges would be
7    for?
8    A    I do not.
9    Q    Do you know what charges are included
10   in that category?
11   A    I do not.
12   Q    Who would know that?
13        MS. PETERS: Object to the form.  Calls
14   for speculation.
15   A    Our finance team.
16   Q    Who specifically in the finance team
17   would know that?
18        MS. PETERS: Object to the form.
19   A    Whoever keyed them in.
20   Q    Well, if you wanted to explain where
21   those -- the 495,000 charge is, who would you
22   call?  What would you do to find out --

160

1         MS. PETERS: Objection.
2    Q    -- the source of the $495,950 in bank
3    charges?
4         MS. PETERS: Object to the form of the
5    question.
6    A    I'm sorry.
7         MS. PETERS: Is there a question based
8    on the document that he's testified he hasn't
9    reviewed and doesn't know when it was -- it is
10   produced.
11        MS. KATSANTONIS: I'm going to start
12   clocking your time, Ms. Donne Peters, and subtract
13   it from the seven hours.
14   A    Can you repeat the question?
15        (The requested text was read by the
16   reporter as follows: "Well, if you wanted to
17   explain where those -- the 495,000 charge is, who
18   would you call?  What would you do to find out the
19   source of the $495,950 in bank charges?")
20   A    It would be the finance team.  They
21   would have the records.
22   Q    Okay.  Is there a way on QuickBooks to

Transcript of Richard Moore
Conducted on February 27, 2020

161

1 drill down and see what sums make up the $495,950?

2     **A   I think there should be.**

3     Q   Okay.  So if I had an electronic copy

4 of QuickBooks I could drill down and find that

5 information?

6         MS. PETERS: Object to the form of the

7 question.

8     **A   I am unsure.**

9     Q   Okay.  And does the finance team --

10 they respond to you, right?  They work for you?

11        MS. PETERS: Object to the form.

12    **A   At this point, yes.**

13    Q   Okay.  And who determines which charges

14 to include in the various categories on the profit

15 and loss statement?

16        MS. PETERS: Object to the form.

17    **A   The finance team would.**

18    Q   So they make a unilateral decision of

19 what line item or how to categorize expenses.

20        MS. PETERS: Object to form.

21    **A   I would have to ask them.  I don't**

22 **know -- I don't know what their general accounting**

162

1 **procedures are to say how to classify something**

2 **as, let's say, advertising verse job verse media**

3 **resolutions.**

4     Q   So you're not involved at all in the

5 process of determining what expenses will be

6 categorized under a certain line item in the

7 profit and loss statement?

8         MS. PETERS: Object to form.

9     **A   When there is a question or confusion**

10 **or something or like when a vendor raises**

11 **something, then from time to time I'm consulted on**

12 **it --**

13    Q   Did --

14    **A   -- but -- but that's it.**

15    Q   But no?  Your answer's no?

16        MS. PETERS: Object to form.

17    **A   As a general rule I am not involved in**

18 **day-to-day operations of categories in finance.**

19    Q   I'm not asking about day-to-day

20 operations, I'm asking who determines -- do you

21 determine which expenses to include generally

22 under a category?  Do you say let's just have

163

1 these categories of expenses or let's put these

2 type of costs together and call it bank charges --

3         MS. PETERS: Object to the form.

4     Q   -- for example?

5         MS. PETERS: Object to the form.

6 Compound question.  Vague.

7     **A   Yeah, I'm actually going to agree with**

8 **my counsel on this one.  Can you kind of explain**

9 **to me what -- like, what you're talking about**

10 **because I'm a little confused right now.**

11        MR. KOWALCZUK: Before you answer.

12 Counsel, this will be the last question.

13    Q   Did you direct your finance team at any

14 time to group bond breach payments and bond

15 premiums together?

16    **A   I believe there was a conversation but**

17 **I don't recall all the details behind it.**

18    Q   Who would have been involved in that

19 conversation?

20    **A   I don't recall.**

21    Q   Was it you?

22    **A   I believe it was a conversation with**

164

1 **Lynn, a member who was there at the time the**

2 **conversation took place.**

3     Q   Were you the one directing that the --

4 or advising that the payments should be

5 categorized together?

6     **A   I don't believe -- I don't --**

7         MS. PETERS: Object to the form of the

8 question.  We've now gone way, way beyond.

9         MS. KATSANTONIS: He's in the middle of

10 his answer.  Can you let him finish his answer?

11        MALE SPEAKER: Let him answer.  The

12 question's out pending.

13        THE WITNESS: Could you read the

14 question, please?

15        (The requested text was read by the

16 reporter as follows: "Were you the one directing

17 that the -- or advising that the payments should

18 be categorized together?")

19        MS. PETERS: Object to form.

20    **A   And which payments were they again?**

21    Q   Bond premiums and bond payments.

22        MS. PETERS: Object to form.

Transcript of Richard Moore
Conducted on February 27, 2020

165

1      A   I recall a conversation, but I don't
2  recall what the outcome of the conversation was.
3  And I don't recall what the conversation was about
4  combining things.
5      Q   What do you recall about the
6  conversation?
7          MS. PETERS: This is the last question,
8  Ms. Katsantonis.
9          MS. KATSANTONIS: We're on the same
10 topic, okay? Can you just --
11         MS. PETERS: That's the last question.
12         MS. KATSANTONIS: Listen, I've given
13 you guys plenty of leeway. Please just let me
14 finish the line of inquiry.
15     A   I recall the conversation took place
16 and it had to do something with bond
17 categorization and several other categories but I
18 don't remember what was combined and what was
19 parsed out.
20     Q   Right. And who did the conversation
21 take place with?
22     A   I don't recall.

166

1      Q   You don't recall anybody that you were
2  having the conversation with?
3      A   I remember having the conversation in
4  Atlanta.
5      Q   And were you advising your team to
6  group costs together?
7          MS. PETERS: Object to form.
8      A   I was advising my team on several
9  different topics and that was one of the topics.
10     Q   Okay. What were the other topics?
11     A   I believe one of them was uncategorized
12 expense, which I think is what started the whole
13 conversation.
14     Q   Okay. And what was uncategorized
15 expense?
16     A   Uncategorized expense in QuickBooks is
17 a dumping ground and the purpose of it was to
18 actually take it from uncategorized expenses to
19 actually categorize the expense to one of these
20 other topics. Actually I don't think it was
21 called topics. I think they have another proper
22 name for it.

167

1      Q   What would you call it?
2          MS. PETERS: Object to form.
3      A   Categories.
4          MS. KATSANTONIS: Okay.
5          MS. PETERS: May we conclude?
6          MS. KATSANTONIS: Yes. And I just
7  want -- we're going to suspend the deposition and
8  I just would note that's our courtesy that we're
9  doing as well.
10         MS. PETERS: It's 6:30 and thank you
11 very much.
12         THE VIDEOGRAPHER: We are going off the
13 record at 18:35.
14         THE COURT REPORTER: Same order?
15         MS. PETERS: Uh-huh.
16
17
18
19
20
21
22

168

1          ACKNOWLEDGMENT OF DEPONENT
2          I, RICHARD MOORE, do hereby acknowledge
3  that I have read and examined the foregoing
4  testimony, and the same is a true, correct and
5  complete transcription of the testimony given by
6  me and any corrections appear on the attached
7  Errata sheet signed by me.
8
9  _____    _____
10   (DATE)                  (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

169

1     CERTIFICATE OF REPORTER - NOTARY PUBLIC
2        I, JUDITH E. BELLINGER, RPR, CRR, the
3   officer before whom the foregoing deposition was
4   taken, do hereby certify that the foregoing
5   transcript is a true and correct record of the
6   testimony given; that said testimony was taken by
7   me and thereafter reduced to typewriting under my
8   direction; that reading and signing was requested;
9   and that I am neither counsel for, related to, nor
10  employed by any of the parties to this case and
11  have no interest, financial or otherwise, in its
12  outcome.
13       IN WITNESS WHEREOF, I have hereunto set
14  my hand and affixed my notarial seal this 28th day
15  of February, 2020.
16  My Commission Expires:  September 30, 2020
17
18
19  _Judith E. Bellinger_
20  _____
21  NOTARY PUBLIC IN AND FOR
22  THE COMMONWEALTH OF VIRGINIA

Transcript of Richard Moore
Conducted on February 27, 2020

44

**A**

**aaron**
4:20, 8:3
**ability**
139:14
**able**
14:17, 17:17,
37:2, 43:8
**about**
14:4, 15:2,
15:18, 16:2,
20:14, 30:17,
31:5, 37:16,
42:11, 43:18,
52:6, 52:9,
52:17, 53:5,
53:22, 54:7,
55:9, 55:10,
56:12, 59:16,
63:21, 66:19,
74:8, 86:9,
88:10, 89:9,
91:10, 92:11,
96:1, 98:14,
100:6, 100:16,
101:2, 111:10,
134:19, 153:10,
153:11, 153:14,
157:17, 158:22,
162:19, 163:9,
165:3, 165:5
**absolutely**
111:3, 117:7,
117:20
**accept**
57:9, 57:22
**acceptable**
158:5
**accepting**
58:3, 58:6
**access**
70:6
**accessing**
52:5
**accidentally**
82:1
**according**
56:3, 117:22

**account**
27:18, 27:20,
27:21, 27:22,
28:1, 28:2,
28:9, 32:9,
58:15, 60:9,
60:10, 60:13,
60:14, 60:19,
61:4, 61:18,
61:20, 62:4,
62:6, 62:7,
62:9, 62:11
**accountant**
84:21, 85:2,
85:21
**accountants**
84:19, 88:6,
88:9
**accounting**
30:4, 87:13,
87:18, 89:5,
89:9, 161:22
**accounts**
29:1, 59:9,
59:10, 59:12,
59:17, 59:21,
61:12, 62:14,
62:17, 62:18,
62:21, 63:2,
63:13, 63:22,
64:17, 65:2,
65:5, 65:8,
111:6, 114:6,
114:14, 114:15
**accuracy**
78:5, 126:17
**accurate**
17:18, 17:19,
17:20, 18:17,
19:3, 73:11,
75:3, 76:7,
76:8, 81:11,
91:10
**accurately**
17:9
**acknowledge**
168:2
**acknowledgment**
168:1

**acquisitions**
24:3
**act**
8:13
**action**
109:3
**actual**
36:21
**actually**
13:11, 22:13,
37:3, 47:11,
54:20, 73:16,
85:13, 103:19,
139:10, 146:3,
149:9, 157:5,
163:7, 166:18,
166:19, 166:20
**add**
74:2, 74:14,
76:10, 86:13
**adding**
132:9
**additionally**
86:21
**address**
12:21, 23:19
**addressing**
64:17
**admin**
77:1
**admission**
94:5
**admit**
94:2
▮▮▮▮▮▮▮
**advance**
155:7
**advertising**
162:2
**advise**
72:11, 88:12,
109:14
**advised**
86:11, 147:13
**advising**
164:4, 164:17,

166:5, 166:8
**advisor**
25:19
**advocate**
124:2
**affiliated**
15:4
**affirmed**
10:3
**affixed**
169:14
**after**
43:13, 57:6,
91:18, 92:1,
93:10, 94:5,
95:9, 107:10,
113:19, 151:9
**afternoon**
66:13
**afterwards**
125:7, 134:19
**again**
25:20, 42:9,
58:16, 59:5,
70:3, 113:2,
116:15, 120:16,
121:17, 121:18,
122:2, 122:5,
135:20, 152:3,
152:7, 153:1,
164:20
**against**
11:1, 11:9,
11:10, 66:7
**agencies**
120:6
**aging**
82:16, 106:6
**ago**
17:15, 29:9,
95:13, 122:11
**agree**
57:8, 61:22,
66:2, 124:3,
136:13, 155:21,
163:7
**agreed**
65:20

Transcript of Richard Moore
Conducted on February 27, 2020                                    45

**ahead**
147:2, 150:21,
153:20, 157:10,
157:11
**a1**
1:8, 7:5
**all**
9:15, 10:16,
11:17, 12:2,
12:20, 13:13,
18:11, 20:13,
23:18, 24:1,
27:13, 28:22,
29:3, 30:5,
30:12, 30:15,
31:1, 33:12,
34:2, 36:4,
38:3, 38:17,
40:20, 47:15,
48:14, 48:22,
50:8, 52:9,
52:10, 59:9,
59:19, 59:21,
60:7, 60:9,
62:18, 63:3,
65:20, 66:2,
66:5, 66:13,
67:1, 69:14,
69:16, 69:18,
70:9, 70:11,
71:12, 71:17,
72:2, 76:9,
76:10, 78:21,
82:5, 86:5,
90:11, 95:14,
96:11, 100:7,
106:7, 107:2,
107:10, 111:20,
113:7, 114:14,
115:2, 115:5,
116:7, 119:12,
119:14, 120:13,
123:22, 125:10,
125:22, 131:1,
131:18, 132:12,
135:10, 135:22,
136:22, 140:22,
142:3, 145:9,

152:8, 154:12,
155:4, 155:17,
162:4, 163:17
**allotted**
107:22
**allow**
57:1
**allowing**
10:8
**almost**
24:13
**already**
16:22, 44:11,
45:3, 105:22,
112:10, 112:12,
112:13, 113:1,
113:2, 118:2,
119:3, 121:15,
122:5, 131:22,
150:7
**also**
4:16, 14:9,
25:18, 25:20,
31:3, 40:21,
49:15, 85:13,
122:18, 141:22
**alter**
66:3
**altogether**
70:4
**always**
58:18, 60:10,
60:11, 60:12,
98:16, 156:19
**amount**
123:3, 127:6,
127:22, 129:17,
130:11
**amounts**
127:7, 131:19,
142:15
**analysis**
53:2, 53:6,
53:22, 54:9,
54:16
**another**
13:3, 19:21,
46:5, 66:4,

85:3, 89:14,
89:16, 115:12,
145:21, 166:21
**answer**
25:7, 26:1,
37:2, 45:9,
45:10, 60:16,
61:1, 63:16,
92:21, 102:1,
106:1, 106:4,
110:16, 113:2,
118:13, 121:18,
122:7, 122:10,
130:19, 133:10,
134:3, 134:18,
136:9, 136:16,
145:11, 145:13,
150:11, 152:4,
157:1, 163:11,
164:10, 164:11
**answer's**
85:18, 156:20,
162:15
**answered**
23:21, 31:8,
105:20, 105:21,
112:10, 112:12,
113:1, 118:16,
121:15, 122:5
**answering**
68:4, 130:3,
134:17
**answers**
147:7
**any**
14:4, 18:13,
19:8, 19:15,
21:9, 23:17,
24:3, 24:4,
24:7, 24:22,
32:17, 32:21,
35:20, 38:4,
38:5, 39:2,
40:14, 41:15,
41:16, 42:8,
43:21, 44:3,
44:4, 44:6,
44:7, 44:19,

44:21, 46:1,
46:17, 47:17,
61:8, 62:13,
65:7, 66:6,
66:7, 68:5,
77:10, 78:5,
90:6, 90:12,
90:18, 91:4,
91:13, 95:15,
96:20, 97:16,
111:6, 114:6,
114:20, 126:16,
130:4, 130:17,
131:3, 133:18,
144:13, 146:2,
154:1, 154:5,
154:18, 156:16,
157:1, 163:13,
168:6, 169:10
**anybody**
52:5, 52:8,
52:15, 52:19,
101:10, 166:1
**anymore**
153:22
**anyone**
28:7, 101:13
**anything**
18:12, 18:20,
26:12, 29:22,
44:6, 45:18,
57:11, 65:7,
68:4, 78:1
**anyway**
25:14
**apologize**
38:16, 40:22,
41:5, 80:20,
123:12
**appeal**
108:22, 109:8,
117:12, 118:2,
118:11, 120:17
**appealed**
107:13, 109:17,
110:5, 110:19
**appealing**
107:21, 109:12

Transcript of Richard Moore
Conducted on February 27, 2020                                                46

appeals
107:10, 118:7,
118:19
appear
75:3, 80:2,
81:19, 168:6
appearance
8:7, 8:11,
8:12, 8:17,
8:22, 9:8, 9:13,
9:14, 12:9,
91:8, 93:7
appearances
10:20, 11:8
appearing
91:9
apply
90:10
appreciate
41:3, 45:12,
45:14, 93:4,
123:19, 124:1,
152:6
appropriate
64:12, 153:2
appropriately
86:17, 87:19,
89:5
approve
128:19
approved
56:13, 57:20,
106:13
approximate
36:12
area
13:20
aren't
60:7, 106:8,
106:16, 154:13
argumentative
130:7

article
16:4
aside
47:16, 61:13,
90:12, 90:15
asked
8:12, 20:14,
24:15, 24:16,
24:17, 31:7,
55:11, 59:16,
78:12, 78:17,
102:8, 105:20,
122:11, 123:13,
131:9, 136:1,
136:7, 145:5
asking
9:9, 23:7,
44:14, 44:15,
45:16, 46:14,
53:10, 53:12,
55:9, 55:10,
75:22, 76:4,
76:6, 77:20,
89:8, 90:22,
92:11, 93:1,
95:11, 98:8,
98:9, 105:17,
110:8, 110:9,
112:11, 118:12,
118:14, 131:14,
131:17, 134:11,
134:20, 135:9,
135:19, 136:2,
136:4, 136:6,
139:12, 139:13,
140:20, 141:3,
145:8, 148:11,
150:10, 153:10,
162:19, 162:20
aspect
118:6
assert
86:16
assertions
136:13
assessment
53:6, 53:22,
55:2, 55:5,

55:22, 56:5
asset
35:1
assets
34:18, 34:22,
38:5, 41:17
assistance
57:9
associate
12:8
associates
3:13
assume
12:14
assumes
101:21
assumption
78:2
at&t
115:13

3:16,
91:15,
                    93:8,
93:10, 93:17,
93:20, 94:9,
94:14, 94:16,
94:18, 95:3,
95:10, 96:4,
96:12, 97:6,
166:4
attached
5:5, 16:19,
40:11, 49:4,
72:5, 79:5,
125:2, 138:15,
143:18, 147:5,
168:6
attachments
6:5
attention
133:11, 141:10
attorney
4:4, 9:4, 12:8,
107:20, 109:1,
109:2
attorney's
117:13

attorneys
11:7, 12:1,
81:15
august
24:10, 138:17,
141:14
authority
103:11, 103:13,
113:11, 113:14
available
69:22, 132:16,
136:22, 137:2,
137:10, 139:13
avenue
4:11
awarded
66:7
aware
100:8, 139:2
away
24:10, 154:14

B

back
11:13, 29:12,
32:14, 47:21,
53:16, 64:7,
64:14, 64:16,
64:18, 65:16,
66:22, 80:17,
83:20, 83:22,
86:14, 111:4,
114:12, 123:10,
125:19, 133:9,
139:6, 158:10,
158:13
background
13:8, 13:15,
13:16, 100:11,
100:14
bail
13:19, 13:21,
14:1, 57:12
balance
38:12, 38:19,
144:22, 145:10,
146:1
balances
114:14

Transcript of Richard Moore
Conducted on February 27, 2020

47

**ballpark**
76:5, 76:6
**bank**
58:9, 58:10,
58:12, 58:13,
59:3, 59:7,
59:8, 59:19,
60:18, 60:20,
61:2, 61:12,
61:18, 61:20,
62:12, 63:13,
111:6, 114:6,
114:14, 114:15,
131:22, 132:8,
132:12, 159:4,
160:2, 160:19,
163:2
**banks**
60:16, 60:22,
61:3, 62:5,
122:19
**barely**
80:9

83:1, ▮▮▮▮
89:4, 89:7,
89:11, 91:14,
91:15, 91:16,
91:18, ▮▮▮▮
93:18, 94:17,
95:2, 95:15,
95:16, 96:22,
97:18, 98:3
**base**
107:9
**based**
63:5, 73:11,
106:6, 107:9,
116:21, 160:7
**basis**
67:22, 68:21,
105:17, 127:8,
128:2, 129:10,
129:16, 142:6,
142:11, 142:20
**bates**
5:8, 5:11,
5:14, 5:16,

5:18, 5:22, 6:4,
6:7, 51:13,
51:17
**bates-stamped**
51:12
**batista**
101:8, 113:6
**beaches**
149:6
**bearings**
125:18
**became**
24:14
**because**
11:7, 11:22,
16:14, 17:22,
24:11, 25:7,
32:1, 39:18,
43:11, 43:22,
47:21, 54:21,
58:3, 64:11,
71:2, 71:12,
72:1, 73:6,
75:22, 76:10,
86:18, 87:22,
96:13, 97:3,
102:2, 116:19,
120:16, 123:13,
125:8, 125:11,
126:2, 139:6,
139:9, 143:16,
144:17, 147:19,
151:12, 154:6,
154:7, 154:9,
156:4, 156:8,
156:14, 163:10
**become**
121:1, 121:12,
121:21
**been**
10:21, 14:13,
15:20, 18:6,
22:5, 27:4,
36:14, 38:3,
38:5, 39:2,
40:4, 41:7,
41:14, 41:15,
42:5, 55:2,

71:20, 77:7,
77:13, 80:22,
81:18, 84:15,
95:9, 96:9,
98:7, 117:19,
119:9, 119:13,
119:22, 120:8,
124:8, 131:8,
132:2, 139:15,
144:1, 144:21,
147:14, 157:2,
157:13, 157:17,
163:18
**before**
2:13, 15:10,
24:14, 24:16,
41:21, 57:11,
65:18, 74:16,
83:6, 92:19,
97:4, 107:22,
113:7, 117:5,
119:14, 124:8,
127:5, 147:7,
157:5, 163:11,
169:3
**beforehand**
151:17
**begin**
12:17, 65:18
**beginning**
64:16, 77:16
**begins**
7:2
**behalf**
3:2, 3:11,
7:17, 7:19, 8:1,
8:4, 8:7, 12:7,
12:12, 22:8,
30:1, 102:21
**behind**
163:17
**being**
9:3, 10:3,
11:3, 39:17,
42:3, 45:6,
68:9, 68:12,
68:14, 68:16,
68:17, 86:8,

117:5, 122:12,
129:9
**believe**
18:6, 18:21,
19:1, 22:3,
29:9, 35:10,
35:15, 42:22,
43:2, 45:20,
47:20, 48:6,
49:20, 50:7,
55:1, 56:7,
69:11, 69:17,
71:1, 76:15,
80:16, 81:6,
82:7, 85:13,
87:7, 87:18,
96:8, 96:10,
97:2, 97:15,
97:20, 105:15,
116:14, 117:1,
120:7, 121:15,
126:22, 130:22,
131:6, 131:8,
133:22, 135:8,
135:12, 143:12,
149:9, 149:10,
151:22, 163:16,
163:22, 164:6,
166:11
**bellinger**
1:21, 2:14,
9:17, 169:2
**besides**
28:7, 76:21
**best**
35:22, 84:12,
149:16, 150:2,
151:2, 151:18
▮▮▮▮▮▮▮▮



**better**
109:7, 121:6
**between**
29:22, 100:17,
139:7
**beyond**
164:8

Transcript of Richard Moore
Conducted on February 27, 2020

48

**bill**
104:4, 106:9,
111:11
**billed**
29:11, 29:13
**bills**
71:12, 82:9,
103:22, 105:18,
111:5, 115:2,
121:1, 121:12,
121:21, 122:17
**bio**
157:16, 158:5
**bit**
41:9
**bond**
13:20, 101:2,
101:4, 101:10,
104:9, 104:14,
106:7, 107:15,
108:4, 109:6,
109:15, 110:4,
110:18, 111:10,
111:14, 111:18,
112:2, 112:4,
112:8, 112:13,
112:14, 112:21,
113:11, 115:12,
115:15, 115:21,
115:22, 116:3,
116:15, 116:20,
118:10, 120:9,
120:19, 128:2,
128:20, 129:8,
129:11, 129:16,
130:9, 130:12,
131:4, 131:14,
132:9, 133:1,
133:20, 135:10,
135:22, 137:18,
138:21, 140:17,
140:22, 141:15,
141:18, 141:19,
141:20, 141:21,
142:3, 142:15,
142:22, 143:1,
144:3, 144:11,
145:2, 145:18,

146:2, 149:6,
149:7, 149:12,
149:17, 150:3,
151:3, 151:16,
163:14, 164:21,
165:16
**bonding**
14:1
**bonds**
109:8
**bondsman**
13:21, 57:12
**bookkeeping**
84:11, 87:14,
87:19, 89:5,
89:9
**books**
88:13
**both**
33:6, 80:3
**bothered**
33:6
**bottom**
51:15, 73:16
**bought**
21:2
**bounty**
24:8, 25:1,
25:17, 26:15,
27:9, 27:11
**box**
4:5
**brand**
17:22, 21:2
**brands**
20:3, 20:4,
20:6
**breach**
101:4, 101:11,
104:9, 104:14,
107:15, 108:4,
110:2, 111:14,
112:12, 112:13,
112:14, 113:11,
115:12, 115:22,
116:3, 118:10,
120:9, 127:15,
127:16, 127:22,

128:20, 129:9,
129:11, 129:16,
130:9, 130:22,
131:4, 131:6,
131:15, 133:1,
133:19, 133:20,
133:22, 134:5,
135:10, 139:9,
140:22, 141:15,
141:20, 141:21,
143:2, 144:3,
144:11, 145:3,
145:18, 149:8,
163:14
**breaches**
101:2, 106:8,
109:16, 110:4,
110:19, 115:15,
115:21, 120:9,
128:3, 130:12,
131:18, 132:10,
135:22, 137:18,
138:21, 139:15,
140:18, 142:4,
142:22, 146:2,
149:12, 149:17,
150:3, 151:3
**break**
36:6, 64:8,
64:13, 65:10,
123:5, 123:13,
123:18, 136:14,
157:17, 158:5
**breaks**
123:20, 124:6
**brief**
13:14, 13:16
**briefly**
13:7
**bring**
141:10
**broader**
61:9
**broken**
76:2
**brother**
90:9
**building**
96:13

**business**
24:22, 25:3,
25:15, 26:10,
26:12, 26:14,
27:1, 27:4,
67:3, 68:2,
81:5, 89:14,
89:16, 100:15
**business-related**
26:1
**businesses**
27:9, 115:5
**buy**
21:5, 21:6
**buyer**
42:5

|C|
---
**calculator**
76:2
**call**
65:12, 67:4,
98:21, 159:22,
160:18, 163:2,
167:1
**called**
19:21, 25:17,
166:21
**calling**
18:16
**calls**
14:22, 32:12,
34:5, 38:9,
52:17, 116:12,
118:4, 119:2,
140:11, 154:20,
159:13
**came**
28:20, 96:15,
96:16, 124:18
**can't**
15:21, 16:5,
16:14, 37:21,
60:16, 61:1,
62:8, 72:21,
73:4, 75:5,
126:20, 127:21,
128:14, 129:18,

Transcript of Richard Moore
Conducted on February 27, 2020                                              49

130:4, 130:9,
130:17, 155:1
cancellations
152:8
██████████
cannot
36:14, 63:3,
65:6, 72:20,
126:9, 130:19
capability
137:14, 138:19,
140:16
capacity
30:19, 42:18,
43:7, 43:19,
45:17, 47:18,
61:7
capsule
51:22, 52:2,
52:4, 52:5,
52:7, 52:8,
52:12, 52:15,
52:18, 52:19,
56:6
capture
71:14
card
58:19, 59:6
cards
61:13
care
125:9
carried
149:17, 150:4,
151:4
carry
145:22
case
1:7, 7:7, 10:8,
12:10, 50:15,
57:21, 58:3,
65:22, 66:7,
139:6, 139:10,
169:10
cases
106:4, 106:5,
107:18, 108:13,

108:14, 120:19
cash
58:17, 58:18,
61:14, 82:22,
83:3, 85:4,
85:16, 86:17,
88:22, 101:13,
111:5, 114:9,
120:22, 121:11,
121:21, 122:16
██████████
categories
50:21, 161:14,
162:18, 163:1,
165:17, 167:3
categorization
165:17
categorize
161:19, 166:19
categorized
98:17, 162:6,
164:5, 164:18
category
159:10, 162:22
caution
42:14
ceded
26:5, 26:9
cems
50:16
certain
40:15, 68:19,
70:10, 81:2,
120:16, 139:1,
154:7, 162:6
certainly
95:9, 119:7
certainty
62:8, 63:3
certificate
169:1
certified
2:15
certify
169:4
cfo
85:17

challenges
121:5
change
75:10, 130:1
changed
47:22, 156:11
changes
84:19, 96:1
chapman
82:20
characterize
29:10
charge
159:21, 160:17
charged
11:1, 11:9,
29:18
charges
159:5, 159:6,
159:9, 160:3,
160:19, 161:13,
163:2
chart
5:8, 16:8,
17:6, 28:15,
28:16, 63:5,
63:9, 64:17,
143:18
check
31:17, 31:18,
31:21, 32:3,
58:18, 58:21,
104:20, 149:11,
150:8, 151:9,
151:19, 152:1,
152:16, 152:17,
152:21, 153:8,
154:5, 154:17,
154:18, 155:12,
155:13, 157:4,
157:6
checks
128:18, 151:6,
151:13, 152:9,
153:4, 153:12,
153:13, 153:21,
154:1, 154:2,
154:7, 154:13,

154:15, 155:5,
155:18, 155:22,
156:14, 156:18,
157:1, 157:12,
158:22
chief
104:15
chose
91:17
chris
4:3, 12:11,
65:19, 153:7
christopher
3:4, 7:18
circulated
91:19
circumstances
108:4
city
59:7, 62:12,
62:14, 62:18,
62:21, 63:2,
65:2, 65:6
clarified
38:12
clarify
16:10, 38:10,
39:14, 43:22,
45:16, 67:7,
115:9, 125:3,
136:19
clarifying
41:21, 46:5
classify
30:3, 162:1
clear
91:3, 143:14,
143:16
clearly
94:7, 140:16
clerk
83:6
client
31:2, 51:1,
51:4, 52:12,
57:10, 57:14,
57:17, 57:20,
57:22, 58:12,

Transcript of Richard Moore
Conducted on February 27, 2020                                      50

107:19, 109:3,
117:9, 117:10,
117:12, 120:17,
124:2, 139:2,
139:19, 149:15,
153:6
**client's**
109:1
**clients**
51:6, 52:11,
53:7, 54:1,
56:13
**clock**
10:22, 11:16,
11:19, 11:21
**clocking**
160:12
**close**
21:4, 25:8,
79:18, 114:11
**closed**
139:11
**closest**
24:9
**closing**
43:4
**coalition**
15:10, 15:18
**collateral**
56:13, 56:18,
56:22, 57:6,
57:13, 57:17,
57:19, 58:2
**collected**
60:8
**college**
13:10, 13:11
**columns**
80:8
**combined**
69:17, 165:18
**combining**
165:4
**come**
70:8, 93:18,
96:17, 101:4
**comes**
106:12, 106:16,

118:18
**comfortable**
123:20, 124:6,
130:3
**coming**
70:3, 91:14,
129:4
**commercial**
35:6, 35:18
**commission**
169:16
**committing**
89:11, 92:9,
92:10, 94:2,
94:5
**commonwealth**
2:16, 169:22
**communicate**
71:7, 82:15,
97:18, 97:20,
97:22, 99:4,
113:14
**communicated**
98:19, 99:6
**communication**
68:4, 116:14
**communications**
52:10, 99:8
**companies**
19:4, 19:8,
19:16
**company**
1:5, 7:4, 19:2,
19:21, 26:4,
29:12, 39:16,
39:17, 42:12,
42:18, 54:20,
55:10, 60:22,
68:10, 68:12,
68:14, 68:16,
68:20, 83:7,
87:9, 89:13,
89:15, 89:18,
94:3, 103:9,
121:4
**company's**
155:18
**compile**
134:8

**compiled**
135:2
**complete**
54:15, 56:4,
73:6, 74:6,
78:17, 78:19,
168:5
**completely**
82:4
**completing**
55:12, 55:15,
55:21, 56:4
**completion**
53:1, 54:8,
57:7
**compliant**
86:6, 86:12
**complies**
52:22
**comply**
136:9
**compound**
163:6
**computer**
27:17, 89:15,
89:18, 114:13,
139:14
**concerned**
47:21
**concerns**
90:18, 91:1,
91:4, 91:7,
91:8, 91:9,
91:12
**conclude**
167:5
**conclusion**
10:14, 14:22,
34:5, 38:9,
118:5, 119:3
**conduct**
50:22, 89:4
**confidential**
10:12, 40:22
**confused**
44:1, 74:4,
137:20, 163:10
**confusion**
162:9

**connecticut**
4:11
**consistent**
71:21
**consult**
83:13
**consultant**
7:21, 8:18,
8:19, 9:13
**consulted**
85:1, 162:11
**consulting**
13:18
**contained**
131:21, 132:12
**contend**
89:17
**context**
31:9, 57:3
**continually**
147:14
**continue**
66:9
**contract**
22:4, 22:7,
22:10, 22:21
**contracts**
68:5
**convenient**
92:12
**conversation**
102:10, 102:12,
163:16, 163:19,
163:22, 164:2,
165:1, 165:2,
165:3, 165:6,
165:15, 165:20,
166:2, 166:3,
166:13
**conversations**
98:14
**copied**
126:8, 127:19,
142:17
**copies**
17:3, 81:11,
116:7, 137:21,
140:21

copy
16:22, 23:4,
49:5, 72:6,
72:22, 79:11,
125:10, 126:1,
135:15, 144:5,
146:21, 157:4,
161:3
copying
23:18
corporate
12:14
correct
16:3, 28:4,
29:4, 34:18,
49:13, 51:7,
52:3, 52:7,
52:13, 53:7,
54:1, 54:6,
54:16, 55:8,
55:16, 55:22,
56:6, 56:9,
59:4, 61:15,
66:21, 67:9,
78:12, 78:22,
90:7, 113:17,
114:2, 130:15,
135:1, 135:8,
140:17, 151:11,
151:20, 168:4,
169:5
corrections
168:6
cortes
101:12, 113:8
costs
28:18, 163:2,
166:6
could
12:5, 14:11,
32:14, 55:14,
58:12, 58:21,
60:20, 60:21,
62:9, 62:13,
68:3, 69:14,
74:14, 75:11,
76:5, 76:6,
76:22, 77:1,

78:19, 99:1,
99:3, 121:6,
128:14, 136:16,
144:14, 144:15,
150:22, 155:2,
161:4, 164:13
couldn't
142:13
counsel
7:14, 8:13,
10:20, 12:18,
16:21, 18:19,
23:19, 39:9,
39:13, 46:8,
65:19, 67:7,
72:7, 75:12,
83:13, 110:2,
111:2, 119:4,
119:6, 131:11,
147:11, 147:14,
150:16, 163:8,
163:12, 169:9
counting
11:2
course
81:5, 97:10
court
1:1, 7:6, 9:14,
9:16, 13:1,
19:13, 64:6,
66:14, 72:13,
99:22, 124:20,
141:6, 141:11,
167:14
courteous
150:18
courtesy
23:17, 167:8
cpas
86:4
create
35:11, 136:3,
136:4
created
18:17, 20:6,
140:7, 154:2,
154:17
creating
90:3

credit
58:19, 59:6,
61:13
creditor
152:17, 152:22,
157:5
███████
███████
███████
criminal
13:22, 15:9
criminals
14:6, 14:9
crm
135:7
crr
1:21, 169:2
crystal
143:16
current
48:6, 138:7
currently
82:19
cut
104:20, 128:18,
140:15, 149:11,
150:8, 151:6,
151:9, 151:13,
151:19, 152:1,
153:5, 154:7,
155:6, 155:12
cutoff
119:16
cutting
154:12, 154:15
cv
7:7

D

daily
68:20, 105:17,
142:6, 142:10
damages
66:6
data
79:8, 141:9
database
56:6, 68:18,

70:10, 70:11,
77:4, 124:18,
132:17, 132:22,
133:3, 133:6,
133:8, 134:13,
135:1, 135:5,
136:21, 137:4,
137:11, 139:14,
140:10
databases
131:3, 133:18
date
7:8, 15:21,
16:5, 17:16,
18:3, 36:11,
49:19, 49:21,
74:8, 75:1,
79:22, 88:15,
95:7, 107:6,
107:9, 107:10,
107:16, 108:10,
111:19, 116:5,
116:6, 116:8,
118:22, 119:16,
120:10, 125:12,
126:2, 137:15,
144:1, 144:2,
154:13, 168:10
date's
155:9
dated
5:21, 6:4,
138:16
dates
93:15, 115:22,
116:2, 142:15,
143:10
david
76:17, 76:21,
76:22
day
68:8, 68:12,
69:9, 92:2,
92:3, 93:16,
93:17, 94:2,
95:10, 99:7,
119:8, 119:15,
139:8, 143:10,

154:15, 157:5,
169:14
**day-to-day**
67:3, 67:22,
68:3, 104:7,
162:18, 162:19
**days**
107:2, 116:17,
116:19, 118:21
**dead**
119:16
**deadline**
11:12
**deal**
13:22, 30:15,
51:6
**debate**
48:21
**december**
6:7, 16:2,
73:10, 73:14,
74:1, 74:5,
74:11, 74:12,
79:20, 147:15
**decide**
142:22
**decided**
57:8, 101:17,
101:22
**decision**
21:4, 21:5,
102:8, 102:9,
103:3, 103:5,
103:6, 103:12,
103:14, 103:18,
103:19, 104:13,
104:17, 105:11,
111:16, 114:1,
114:7, 161:18
**decrease**
77:8, 77:13
**deeds**
42:6
**deep**
97:4
**defendants**
1:9, 3:11, 8:7,
12:8, 12:12,

65:20, 65:22,
66:3, 66:5
**deferred**
119:4
**deficiencies**
86:18
**define**
42:3, 57:16,
111:9
**definitely**
98:13
**delayed**
157:14
**delays**
66:14, 157:13
**deliver**
152:10, 152:17,
153:15, 154:3
**delivered**
152:21
**denver**
26:19
**department**
112:19, 112:20,
117:22, 120:1,
120:3, 120:4,
130:22, 131:6,
133:1, 133:22,
134:5, 136:20,
137:2
**depend**
54:19, 143:7
**depends**
58:11, 58:16,
58:22, 59:5,
71:10, 76:19,
98:22, 108:17,
142:1, 143:6
**deponent**
63:15, 168:1
**depos**
7:11, 9:17
**deposed**
124:8
**deposing**
112:5
**deposit**
60:4, 60:5,

153:8
**deposition**
1:12, 2:1, 5:7,
7:3, 7:11, 8:14,
9:8, 10:10,
10:14, 25:13,
41:2, 41:4,
136:12, 148:13,
158:3, 167:7,
169:3
**derive**
20:12, 76:13
**derived**
69:14, 77:2
**derives**
20:15
**described**
59:15
**designate**
10:11, 25:6,
40:21, 42:10
**details**
98:10, 163:17
**determination**
102:21, 111:7,
119:18, 119:21
**determine**
69:7, 105:18,
113:11, 115:3,
115:20, 116:2,
162:21
**determined**
102:14
**determines**
113:17, 116:8,
161:13, 162:20
**determining**
82:8, 103:21,
104:9, 111:4,
114:5, 119:7,
162:5
**devices**
14:5
████████████
**different**
22:10, 25:19,
28:5, 58:18,

62:22, 63:1,
63:17, 65:1,
75:20, 79:9,
101:3, 107:2,
112:17, 120:19,
150:10, 155:1,
155:10, 166:9
**differentiate**
32:17
**differently**
81:3, 120:15
**difficult**
45:7, 150:13,
152:4
**dineen**
4:17, 7:10
**dinner**
26:20
**dinner's**
26:21
**direct**
12:18, 32:5,
37:13, 85:4,
85:11, 85:15,
163:13
**directed**
37:6, 37:8,
37:12
**directing**
164:3, 164:16
**direction**
91:11, 169:8
**directly**
85:6
**disagree**
23:22, 153:3
**disc**
7:3
**disclaimers**
40:15
**discovery**
9:6, 23:21,
136:8, 136:12,
146:20, 147:10,
148:3
**discuss**
71:11, 136:11
**disorganized**
156:5, 156:7

Transcript of Richard Moore
Conducted on February 27, 2020                                    53

dissolved
18:1, 18:2
distinction
100:16
distinguish
67:17
distinguished
29:22
district
1:1, 1:2, 7:5,
7:6
division
1:3
document
17:14, 18:16,
40:4, 40:20,
49:9, 50:20,
53:10, 54:13,
55:10, 56:19,
69:1, 72:10,
73:5, 74:9,
75:19, 78:12,
78:13, 79:6,
80:4, 116:9,
125:14, 126:4,
126:17, 126:20,
126:21, 127:1,
131:3, 133:19,
142:21, 145:6,
146:5, 160:8
documented
52:12
documents
39:12, 40:14,
44:3, 44:5,
69:3, 71:18,
71:22, 78:6,
79:14, 80:1,
80:22, 81:10,
84:9, 86:22,
99:17, 114:20,
144:4, 144:13,
147:14, 151:15
dog
24:8, 24:13,
24:15, 25:1,
25:21, 26:4,
26:5, 26:9,

26:15, 27:9
dog's
24:9
doing
16:13, 26:22,
30:1, 54:21,
54:22, 55:5,
100:9, 123:14,
123:16, 124:4,
167:9
done
23:20, 36:15,
36:16, 37:22,
82:6, 117:3,
121:6, 133:13,
138:6, 138:9,
143:18, 155:9
donne
3:12, 7:22,
23:4, 40:2,
40:18, 49:6,
63:14, 132:15,
134:14, 148:2,
148:8, 160:12
donovan
4:19, 5:21,
6:4, 12:13,
16:7, 30:13,
33:8, 33:10,
47:9, 48:20,
70:16, 91:19,
93:12, 125:14,
126:4, 138:18,
141:14
dormant
19:2
double-check
71:1
doubt
48:2, 126:16
down
21:20, 23:11,
29:18, 43:13,
49:2, 129:20,
161:1, 161:4
drill
161:1, 161:4
drop
119:15

due
20:13, 104:15,
104:20, 105:14,
106:21, 107:2,
107:6, 107:9,
111:19, 113:15,
113:21, 116:1,
116:3, 116:5,
116:8, 118:21,
119:8, 121:1,
121:12, 121:21,
122:17, 126:13,
127:6, 127:7,
127:22, 130:9,
142:15, 143:2,
143:10, 143:15,
152:17, 154:3,
154:13, 154:19,
155:9, 155:13
duly
10:3
dumping
166:17
during
97:4

                    E

each
60:5, 79:22,
108:3, 108:4,
117:16, 120:15,
128:6, 132:8,
142:18
earlier
39:18, 86:14
early
15:20
easier
51:19
echeck
154:18
echecks
153:13, 154:2
eckert
40:15, 75:13,
146:13

eckert_nexus
6:8
educational
13:8
effort
36:5
egos
66:3
either
21:4, 42:13,
42:20, 82:15,
111:13, 153:13
electronic
25:13, 161:3
elizabeth
82:22, 85:14,
140:8
else
19:3, 28:7,
76:18, 76:21,
82:12, 90:15,
101:10, 101:14,
102:17, 103:16,
103:20, 105:6,
106:21, 107:4
else's
103:6
elsewhere
60:18
email
5:20, 6:3,
71:8, 91:19,
93:11, 94:17,
95:6, 98:21,
99:9, 104:14,
104:19, 104:22,
105:2, 105:6,
106:12, 106:16,
116:11, 117:1,
126:8, 127:17,
127:19, 139:7,
143:1, 143:3,
143:4
emails
106:17, 116:4
employed
169:10
employee
50:11, 50:22,

54:22, 55:4,
55:15, 55:20,
84:10
**employees**
28:19, 30:12,
31:1, 33:3,
48:15, 50:15,
51:6, 52:3,
96:15, 108:7
**employment**
50:21, 87:11,
89:7
**end**
18:7, 41:2,
60:9, 60:12
**engage**
94:20
**enough**
115:1, 120:22,
121:11, 121:21
**enrolled**
13:11
**ensure**
81:11
**enter**
9:8, 11:8,
12:9, 52:18
**entered**
10:8, 76:12
**entering**
8:11, 11:22,
102:15
**entire**
25:6, 118:18
**entities**
15:1, 15:3,
17:10, 19:4,
19:9, 19:16,
24:4, 28:6,
28:11, 28:12,
62:20, 62:22,
63:1, 65:2,
65:7, 67:20,
69:16
**entity**
14:19, 45:5,
66:4, 67:15
**entlest**
20:3, 20:4,

20:6, 20:9,
20:11, 20:15,
22:17, 22:19,
27:10, 27:12
**entries**
36:21
**erik**
5:20, 96:9,
96:14
**erlandson**
77:1
**errata**
168:7
**error**
81:22
**errors**
18:13, 18:16
**escm_nexus**
5:17, 5:19
**esquire**
3:3, 3:4, 3:12,
4:3, 4:9
**estate**
33:16, 38:4,
38:5, 39:2,
41:16, 41:17
**et**
1:8, 7:5
**even**
33:22, 45:21,
46:13, 60:13,
106:15, 124:7
**ever**
13:2, 47:17,
90:17, 101:14,
126:9
**everette**
12:22
**every**
50:11, 60:5,
61:20, 61:22,
68:8, 68:11,
72:21, 74:2,
76:15, 107:5,
119:8, 127:12,
128:10, 128:16,
130:9, 132:5,
142:22, 151:15,

154:15
**everybody**
97:21
**everybody's**
143:10
**everything**
19:3, 67:8,
90:15, 91:10
**evolved**
156:10
**exact**
14:18, 15:21,
16:5, 21:22,
43:9, 60:15,
87:15, 88:15,
91:22, 93:15,
112:3, 123:3,
129:14
**examination**
5:2, 11:10,
12:18
**examined**
10:5, 11:3,
168:3
**example**
40:6, 111:21,
152:14, 153:6,
163:4
**excel**
135:5, 142:5
**exception**
30:12
**exchange**
139:7
**excuse**
74:4, 79:10,
90:20, 92:20,
157:20
**executive**
27:15, 29:11,
29:13, 29:15,
29:16, 30:7,
30:9, 30:20
**exhibit**
5:8, 5:10,
5:13, 5:16,
5:18, 5:20, 6:3,
6:6, 16:18,

40:10, 49:3,
63:10, 63:12,
72:4, 79:4,
124:17, 125:1,
125:4, 125:5,
138:11, 138:14,
138:16, 147:4,
158:15, 158:19
**exhibits**
5:7, 125:3
**existed**
14:19
**expect**
90:14
**expense**
26:21, 27:1,
129:9, 129:11,
166:12, 166:15,
166:16, 166:19
**expenses**
26:16, 27:3,
29:21, 161:19,
162:5, 162:21,
163:1, 166:18
**experience**
129:1
**expert**
118:6
**expires**
169:16
**explain**
82:13, 159:20,
160:17, 163:8
**extent**
14:22, 34:5,
38:9, 101:21,
118:4, 119:2,
152:20

**F**
**facilitate**
25:16, 100:12
**facilities**
33:10, 33:12
**fact**
65:4, 94:18,
122:22, 124:3,
136:19

Transcript of Richard Moore
Conducted on February 27, 2020                                    55

factors
108:19
fake
90:3
familiar
36:8
fan
25:17
far
12:17, 14:4,
17:15, 30:19,
79:16, 84:11
fat
72:17
███████
fault
153:9
february
1:14, 7:8,
80:14, 169:15
federal
33:5, 141:7
fee
58:5
feel
130:2, 147:17
fees
58:11, 61:12,
122:19, 123:1
few
17:7, 143:13
fictitious
127:1
field
30:16, 80:20,
101:1
fields
69:8
fierce
124:2
figure
46:20
figured
144:9
file
9:14, 48:12,
52:12

filed
108:22, 117:13,
117:19, 120:17,
120:18
files
117:16, 137:10
filing
109:2, 117:12
final
103:19
finance
29:16, 37:15,
82:14, 82:18,
83:4, 83:5,
86:19, 87:22,
89:1, 95:22,
96:16, 96:18,
96:19, 97:10,
97:11, 100:3,
100:8, 100:12,
100:17, 101:3,
101:14, 104:5,
106:5, 106:9,
106:13, 121:5,
156:5, 156:7,
157:14, 159:15,
159:16, 160:20,
161:9, 161:17,
162:18, 163:13
financed
21:13
finances
101:18, 102:15,
102:22
financial
38:6, 41:18,
68:1, 87:3,
91:20, 98:1,
98:4, 99:16,
131:20, 144:1,
144:4, 144:12,
144:13, 148:8,
148:14, 149:18,
150:4, 151:4,
151:7, 151:10,
169:11
financials
86:13

financing
21:16
find
32:14, 81:8,
159:22, 160:18,
161:4
fine
25:10
finish
64:11, 110:16,
164:10, 165:14
firm
85:3
first
10:3, 31:20,
40:7, 41:9,
61:9, 81:10,
115:15, 123:13,
124:9, 129:15,
147:3
fish
28:17, 29:4,
35:5, 35:17,
67:16
fishersville
13:1
fits
18:12
fitzgerald
2:5, 3:5
fix
48:13
fixing
88:2
flew
92:2, 93:7,
93:10, 93:20
flip
80:13
florian
153:7
flow
10:10, 111:6,
114:9, 122:16
fluctuated
71:21, 133:11
fluctuating
129:17

fluctuations
129:20, 130:1
fly
96:3, 96:7
flying
96:11
follow
55:13, 112:2,
116:16
following
63:17, 88:22
follows
10:5, 19:15,
53:21, 65:1,
84:4, 125:22,
133:17, 150:2,
151:2, 160:16,
164:16
foregoing
168:3, 169:3,
169:4
forgive
133:11
format
75:8, 79:1,
141:22
formation
13:20
formed
16:2
former
84:10
forth
50:20, 51:5,
55:13
forward
57:11, 106:13
forwarded
140:8
forwarding
141:14
found
86:22
frame
14:12, 14:18,
17:13, 36:13,
79:9
frequently
153:12, 155:21

Transcript of Richard Moore
Conducted on February 27, 2020                                    56

friday
153:5, 153:14
friend
27:1
friends
24:10, 25:9
front
16:4, 39:12,
65:7, 73:15,
73:19, 74:15,
74:21, 77:11,
78:11, 79:22,
99:18, 127:1,
128:7, 130:2,
145:6, 151:21
full-time
33:6
fully
86:12
fun
124:11
function
54:15
fund
28:12
funded
28:3
funds
21:6, 21:9,
28:8, 58:8,
59:3, 60:8,
60:18, 61:17,
62:6, 154:3,
154:6, 154:9,
154:19, 155:14,
156:1, 156:8,
156:15, 156:18
funnel
61:4

            G
ga
3:16
gaap
86:6, 86:12
game
20:14, 20:19,
20:20, 92:8

gamer
19:22, 20:2,
20:14, 20:17,
21:1, 31:16,
32:2
garner
76:15
gathering
39:8, 140:9
gave
80:3
ged
13:10
general
71:20, 88:2,
98:5, 111:11,
145:9, 161:22,
162:17
generally
30:8, 162:21
generate
71:4, 135:9,
136:9
generated
68:20, 146:18,
147:21, 154:2,
155:12
generating
100:11
gentleman
70:12
gentry
35:11
getting
80:19, 104:5,
111:4, 114:12,
121:7, 123:13,
136:3, 142:19,
156:6
give
13:14, 15:21,
16:11, 36:12,
40:7, 73:11,
78:2, 88:17,
111:21, 112:3,
125:16, 128:9,
128:14, 129:13,
129:18, 130:4,

130:17, 131:18,
147:3, 152:12,
152:13
given
69:15, 123:2,
142:5, 148:2,
165:12, 168:5,
169:6
glad
110:21
go
26:20, 48:12,
51:18, 57:14,
58:8, 58:12,
58:13, 59:6,
60:18, 61:9,
61:17, 61:19,
62:9, 64:19,
79:16, 86:14,
88:6, 114:18,
124:17, 125:8,
129:15, 132:8,
134:11, 147:2,
150:21, 153:20,
157:10, 157:11,
158:13
goal
95:22, 97:15
goes
52:16, 58:14,
59:1, 59:3,
59:8, 60:6,
74:11, 80:15,
131:19, 150:8
going
8:6, 8:10,
8:14, 8:20,
10:19, 11:6,
16:6, 24:12,
25:8, 25:22,
40:13, 41:2,
45:2, 46:18,
48:22, 50:5,
53:13, 61:22,
64:18, 65:10,
65:13, 65:21,
66:17, 67:4,
67:5, 71:22,

76:7, 78:5,
82:19, 83:17,
90:20, 91:11,
91:16, 92:8,
97:16, 123:5,
123:7, 124:13,
124:16, 129:3,
131:10, 136:11,
136:17, 140:15,
145:6, 146:11,
147:8, 147:12,
152:19, 155:6,
157:17, 158:7,
160:11, 163:7,
167:7, 167:12
gone
13:2, 117:14,
164:8
good
51:14, 66:13,
125:7
gorby
3:13
gosh
134:12
government
105:15, 109:4
gps
14:5, 14:8,
115:17
grant
85:2, 85:20,
86:1, 86:2,
86:10, 86:11,
88:10, 88:12,
91:15, 93:2,
93:21, 94:18,
95:21, 96:2,
97:7
great
90:16, 111:1,
121:8, 121:9,
124:4
greensboro
2:6, 3:6, 7:12
ground
166:17
group
101:3, 141:19,

Transcript of Richard Moore
Conducted on February 27, 2020

57

163:14, 166:6
**guarantee**
33:4
**guess**
15:13, 15:20,
31:9, 31:14,
33:22, 52:21,
58:1, 75:15,
95:12, 125:11,
126:1
**guidelines**
55:13
**guys**
11:11, 165:13

**H**

**hac**
8:3
**half**
73:10, 73:14
**hand**
16:6, 138:3,
169:14
**handed**
79:6, 138:16
**handle**
52:17, 100:5,
118:7
**handwritten**
153:13, 153:21,
154:18
**happen**
26:22, 81:22,
84:20, 156:3
**happened**
102:12
**happening**
98:22
**harder**
46:19
**harris**
3:4, 7:18, 8:8,
8:19, 9:1, 9:4,
10:18, 11:6,
11:19, 65:12,
157:18, 157:21
**harrisonburg**
1:3, 7:7

**hazzar**
5:20, 101:7,
101:9, 111:22,
113:5, 117:15,
125:13, 126:3
**hear**
133:14, 134:2
**heard**
122:2
**hearing**
99:12, 99:16,
99:22
**hearings**
66:15
**held**
2:1, 10:21,
11:11, 154:5,
154:19, 155:5,
155:12, 155:13
**help**
16:16, 24:15,
24:18, 24:19,
72:18, 90:8,
90:9
**helped**
25:16
**henry**
4:21, 7:20
**here**
7:2, 8:5, 12:8,
16:16, 18:20,
46:19, 47:5,
49:19, 55:13,
58:3, 73:16,
75:6, 77:12,
110:3, 125:18,
138:7, 144:10,
149:6
**here's**
40:4
**hereby**
168:2, 169:4
**hereunto**
169:13
**hey**
98:17, 107:12
**high**
13:9, 123:1

**himself**
91:1
**hire**
118:19
**histories**
25:8
**history**
155:18
**hoffar**
2:5, 3:5
**hold**
153:13, 155:8
**holding**
12:3, 139:2
**homeland**
117:22, 119:13,
120:4, 139:4
**homes**
8:2, 28:6,
28:8, 28:19,
29:4, 31:6,
31:11, 33:8,
33:11, 33:17,
34:2, 34:3,
34:7, 34:8,
34:10, 34:11,
34:16, 36:6,
36:17, 36:22,
39:19, 49:17,
59:22, 65:5,
66:1, 67:12,
69:19, 70:4,
70:5, 70:8,
70:12, 71:9,
71:11, 71:12
**honest**
45:13
**honestly**
14:17, 102:19,
130:19, 142:13,
152:5
**hot**
72:16
**houchens**
4:20, 8:3
**hour**
157:17
**hours**
11:10, 32:18,

32:22, 33:3,
160:13
**however**
78:13
**human**
81:22, 85:9
**humor**
121:18
**humored**
122:4
**hundred**
33:3
**hunter**
24:8, 25:1,
26:15, 27:9
██████████
82:22, ██████
85:16, 87:6,
87:8, 87:10,
87:18, 89:1,
101:13, 140:8,
140:9
**husar**
105:1, 105:2

**I**

**idea**
36:19, 71:20,
88:17, 129:13,
158:17
**identification**
16:19, 40:11,
49:4, 72:5,
79:5, 125:2,
138:15, 147:5
**identified**
22:10
**identity**
140:17
**imani**
82:20
**impact**
108:19
**impede**
10:15
**implementing**
107:15
**importance**
52:7

**important**
129:2, 129:3
**impossible**
73:11
**imprecise**
28:14
**improperly**
9:7
**inaccurate**
18:21, 81:20
**inc**
1:8, 5:10,
5:13, 6:6, 7:5,
8:1, 8:2, 14:20,
16:1, 34:11,
34:16, 49:12,
53:2, 54:8,
54:15, 55:5,
55:21, 66:1,
66:2
**incident**
90:12, 90:15,
90:17, 91:5
**include**
50:15, 144:2,
145:2, 161:14,
162:21
**included**
112:21, 144:11,
147:22, 151:19,
159:9
**including**
14:1, 28:6,
48:20
**income**
42:7, 68:9,
68:12, 68:14,
68:16, 70:3,
72:11
**incomplete**
78:15
**incorrect**
78:14
**incurred**
27:3, 129:10
**indicate**
110:10, 135:5
**indicated**
89:21, 119:4,

136:16
**indicators**
69:10
**individual**
42:12, 45:17
**individually**
76:11
**industry**
84:16, 86:8,
88:1, 88:3,
88:5, 88:14
**inform**
147:21
**information**
50:22, 51:5,
52:18, 70:13,
73:12, 76:18,
86:9, 106:20,
112:3, 130:21,
131:11, 131:15,
131:16, 132:16,
132:22, 134:22,
136:7, 136:17,
136:18, 136:21,
136:22, 137:1,
137:3, 137:10,
137:12, 140:10,
140:14, 140:22,
141:17, 142:1,
161:5
**informed**
119:13, 119:22,
120:2
**initial**
59:2
**initiated**
36:10, 131:12
**injunction**
99:12, 99:15,
99:22
**inquiry**
165:14
**insofar**
147:9
**insufficient**
154:3, 154:6,
154:9, 154:19,
155:14, 155:22,

156:8, 156:14,
156:18, 157:2
**insurance**
1:5, 7:4, 7:17,
7:19, 33:22
**interact**
31:1
**interactions**
52:10
**interest**
19:5, 19:10,
19:17, 24:7,
27:8, 43:15,
43:20, 43:21,
45:1, 46:1,
46:17, 46:22,
47:7, 47:17,
48:4, 169:11
**interested**
82:2
**interfere**
10:15, 148:12
**interfering**
9:7
**internal**
57:7, 84:8,
86:21
**interrupt**
41:4
**interrupted**
37:9
**interrupting**
9:5, 10:9,
134:15
██████████████
**investigations**
18:10, 96:21
**invoice**
104:20, 105:14,
106:10, 107:6,
108:1, 108:3,
108:4, 111:8,
111:10, 111:14,
111:15, 111:17,
111:18, 113:15,
113:21, 114:7,
115:13, 117:5,

118:1, 118:10,
118:21, 119:7,
139:5, 143:3,
145:19, 145:20,
151:16
**invoices**
106:6, 106:18,
107:16, 108:9,
109:9, 109:13,
114:10, 114:11,
116:7, 119:14,
126:13, 127:8,
127:13, 127:15,
127:16, 127:22,
128:7, 128:20,
129:11, 131:1,
131:5, 133:20,
134:6, 139:2,
139:3, 139:15,
142:15, 143:5,
144:3, 144:11,
145:3, 149:8,
149:13, 152:7,
152:8
**involved**
28:18, 33:16,
39:2, 39:17,
41:15, 82:12,
101:15, 102:17,
104:6, 106:5,
162:4, 162:17,
163:18
**involving**
38:4, 41:16,
43:4
**issue**
63:17, 71:10,
75:19, 93:7,
107:19
**issued**
118:1, 118:10,
118:21, 154:17
**issues**
13:22, 24:21,
30:16, 31:2,
68:5, 82:16,
90:13
**issuing**
155:22

Transcript of Richard Moore
Conducted on February 27, 2020

59

**it'll**
59:6
**item**
98:11, 139:5,
149:6, 161:19,
162:6

**J**

**january**
5:11, 6:7,
40:6, 41:7,
49:19, 57:5,
80:6, 80:13,
126:12, 147:15,
148:4
**jeremy**
4:17, 7:10
**jesus**
101:7, 101:9,
112:1, 113:5,
117:15
**job**
1:19, 121:6,
123:15, 123:16,
124:1, 124:4,
162:2
**jobs**
13:15, 88:1
**jody**
117:1
**john**
4:9, 8:6, 12:7
**joining**
97:17
**jointly**
66:5
**judith**
1:21, 2:13,
169:2
**judy**
9:17
**june**
5:11, 40:6,
41:7
**justice**
13:22, 15:9

**K**

**kass**
4:21, 7:21

**keep**
29:14, 32:21,
68:8, 68:11,
68:13, 68:15
**keeps**
69:1
**kelly**
77:1
**kept**
81:5
**key**
69:10
**keyed**
151:16, 159:19
**kind**
80:4, 84:12,
135:6, 163:8
**knew**
91:14, 91:16,
100:10
**knowing**
17:16
**knowledge**
35:22, 84:13,
88:4, 149:16,
150:3, 151:3,
151:18, 154:17
**knows**
77:21, 149:15
**kowalczuk**
4:3, 11:13,
12:11, 65:18,
65:19, 66:11,
67:10, 148:16,
163:11
**kpi**
68:17, 68:19,
68:22, 69:2,
69:7, 69:8,
70:2, 71:13,
72:22, 73:2,
73:6, 73:9,
76:13, 77:3,
77:10, 78:19,
81:11, 114:18,
115:2
**kpis**
77:22

**L**

**labeled**
81:3
**lack**
109:7
**landlords**
31:4
**larger**
104:4, 127:19,
129:22
**largest**
30:15
**last**
18:4, 24:16,
25:7, 39:4,
64:19, 70:20,
84:2, 125:8,
125:20, 133:10,
141:1, 148:3,
163:12, 165:7,
165:11
**late**
114:10
**later**
48:1, 118:22,
154:8, 154:10,
154:14
**latest**
116:19
**law**
4:4, 33:5,
46:14
**lawsuit**
66:3
**lawyer**
38:13, 46:12
**lawyers**
100:5, 118:19
**layperson**
42:10
**leadership**
76:14, 76:20,
99:7
**learn**
88:7
**learning**
40:9

**leasing**
44:5
**least**
146:1
**leave**
138:7, 158:21
**leeway**
165:13
**left**
13:9, 66:18
**legal**
14:22, 34:5,
38:9, 100:4,
118:4, 118:13,
119:2
**legwork**
36:20, 85:3
**lessee**
42:8
**lessor**
42:7
**let's**
24:2, 38:13,
61:9, 61:13,
64:10, 67:1,
69:19, 80:5,
92:20, 102:6,
102:11, 106:18,
127:15, 129:15,
129:19, 133:14,
150:18, 154:11,
162:2, 162:22,
163:1
**letter**
23:18, 143:9
**letters**
143:11, 143:14
**level**
13:8
**liability**
144:3, 145:2,
146:2, 149:17,
150:3, 151:3,
151:10
**liable**
66:6
**libre**
8:1, 27:22,

Transcript of Richard Moore
Conducted on February 27, 2020                                60

28:3, 28:8,
29:3, 29:7,
30:1, 30:6,
30:18, 32:18,
32:22, 49:16,
50:1, 54:22,
55:4, 55:15,
55:20, 58:15,
59:9, 59:22,
60:9, 60:13,
60:14, 60:19,
61:4, 62:6,
62:19, 65:5,
66:1, 67:4,
67:13, 70:3,
76:14, 76:20
**lied**
127:2
**lighter**
124:14
**likely**
43:2
**line**
98:11, 147:8,
149:5, 161:19,
162:6, 165:14
**list**
39:6, 39:9,
45:18, 63:12,
106:22, 107:4,
138:20, 141:14,
142:15, 143:10
**listed**
19:10, 19:18,
24:5, 34:11,
38:6, 38:18,
39:1, 41:17,
44:22, 46:1,
47:17, 57:5
**listen**
46:16, 46:18,
107:12, 165:12
**lists**
41:8, 143:4,
147:15
**litespeed**
69:4, 76:16,
77:3

**litigation**
17:7, 36:5,
41:8, 81:1,
81:19, 88:7,
97:14, 131:9
**little**
41:9, 61:9,
107:22, 123:14,
124:14, 154:8,
163:10
**live**
44:16, 81:21
**llc**
3:13, 35:3,
35:17, 35:18,
45:4
**llcs**
35:2, 35:7,
35:12, 35:14,
36:1, 43:12,
43:15, 45:18,
46:22, 47:6,
47:8, 47:19,
48:5
**llp**
2:5, 3:5
███████████
**loans**
29:6, 29:10,
29:21
**lobbying**
13:17, 13:22
**lobbyist**
14:2
**location**
117:14
**locke**
35:11
**lodging**
26:16
**log**
114:13
**long**
143:10
**longer**
83:7
**look**
40:12, 43:1,

69:22, 70:1,
70:2, 70:11,
71:5, 72:21,
73:19, 74:20,
76:4, 78:20,
88:7, 108:2,
109:20, 109:22,
110:21, 114:6,
114:7, 114:13,
114:21, 118:7,
120:15, 125:14,
126:4, 127:12,
146:16, 158:13
**looked**
16:7, 63:5,
63:10
**looking**
28:15, 41:6,
41:12, 50:19,
51:11, 52:20,
56:8, 70:9,
70:10, 75:21,
78:3, 80:5,
117:15, 159:3,
159:4
**looks**
74:18, 80:4,
101:4, 140:7
**loss**
5:10, 6:7,
38:18, 40:5,
41:6, 93:13,
94:13, 99:13,
99:21, 100:9,
144:22, 145:9,
145:22, 158:14,
161:15, 162:7
**lost**
24:13, 153:9
**lot**
15:1, 48:11,
71:10, 74:18,
82:14, 84:19,
85:3, 94:11,
100:4, 120:18,
120:19, 156:11
**love**
81:21

**lovely**
143:9
**lying**
127:2
**lynn**
164:1

**M**

**ma'am**
36:3, 38:14,
66:11, 78:14
**madam**
19:12
**made**
8:9, 21:4,
21:5, 21:11,
21:16, 24:4,
48:12, 60:5,
102:7, 102:9,
102:20, 103:2,
103:16, 103:19,
105:9, 109:4,
132:6, 132:12,
135:10, 138:20,
140:17, 141:5,
141:9, 156:19
**mail**
152:21, 154:4
**mailed**
153:5
**main**
58:13, 95:20,
97:6
**maintain**
23:15, 28:19,
49:15, 102:21
**maintained**
31:3, 36:1,
56:6, 70:6,
134:22
**maintains**
37:4
**majority**
109:8, 109:12,
109:15, 110:4,
110:9
**make**
8:6, 16:13,

Transcript of Richard Moore
Conducted on February 27, 2020

61

25:6, 25:12,
26:7, 26:11,
31:3, 45:10,
66:20, 92:21,
102:20, 103:11,
103:13, 104:16,
105:11, 111:7,
114:1, 114:7,
119:17, 119:21,
125:7, 134:13,
161:1, 161:18
**makes**
104:13, 104:16,
111:16, 143:9
**making**
36:5, 86:5,
91:10, 96:1
**male**
164:11
**management**
51:1, 51:4,
96:14, 100:17,
100:20, 101:15,
112:15, 112:18,
112:20
**manager**
43:11, 44:12,
44:14
**managers**
31:14, 50:16,
100:22
**manages**
33:10
**manual**
5:14, 49:12,
50:10, 51:12,
51:21
**manuals**
49:16, 49:22
**many**
21:21, 25:19,
62:17, 120:6,
123:20, 131:4,
133:19, 148:21
**march**
80:15
**mario**
4:18, 8:5, 12:9

**mark**
16:9, 49:1,
124:16, 124:21,
138:2, 146:8,
146:14, 147:2
**marked**
16:18, 40:10,
49:3, 72:4,
79:4, 125:1,
138:14, 147:4
**mary**
3:12, 7:22,
23:4, 49:6,
134:14
**master**
147:10
**math**
75:5
**matter**
7:4, 10:7,
10:18, 99:12,
107:12, 107:13
**maybe**
13:6, 15:21,
47:22, 58:1,
112:6, 125:12,
126:2
**mcfadden**
4:10
**mclean**
1:13, 2:8, 3:8,
7:13
**mean**
13:6, 22:13,
24:21, 34:6,
38:11, 38:16,
39:15, 42:3,
42:17, 47:12,
57:16, 61:7,
61:8, 98:6,
99:17, 111:9,
115:9, 123:21,
129:2, 133:7,
137:21, 137:22,
152:12
**meaning**
29:14, 91:9
**means**
67:8, 136:8

**media**
162:2
**medical**
25:8
**meet**
91:15, 94:19,
95:22, 96:16,
96:18, 96:19,
97:6
**meeting**
93:2, 93:8,
93:10, 93:20,
95:20, 97:12
**member**
43:10, 44:12,
44:14, 164:1
**mentioned**
15:19
**merchandise**
25:18
**met**
24:15
**mfu**
7:7
**micheal**
4:19
**mid**
74:11
**middle**
64:10, 64:12,
64:13, 97:13,
136:12, 164:9
**mike**
5:21, 6:3,
30:13, 125:13,
126:4, 138:17
**million**
73:19, 126:12,
127:6, 130:15
**mind**
39:9, 152:13
**mine**
148:9
**minute**
133:15
**minutes**
17:7, 122:11,
157:18, 157:21,

**158:2**
**mischaracterizat-
ion**
119:11
**mislabel**
82:1
**mislabeled**
98:16
**missed**
82:17
**missing**
73:8, 73:9
**misstates**
48:18, 55:19
**mistake**
109:4
**mistaken**
135:4
**mistakes**
48:11
**mixed**
80:4
**moment**
48:6, 92:21,
98:22
**monday**
96:5, 153:5,
153:15
**money**
57:14, 61:4,
129:3, 139:3
**money's**
129:4
**monitor**
7:9
**monitoring**
57:9
**month**
5:16, 5:18,
21:20, 72:21,
73:10, 73:14,
74:3, 82:1,
123:2, 129:17,
129:18, 129:21,
130:9, 131:5,
133:20, 135:22
**monthly**
21:11, 21:16,

Transcript of Richard Moore
Conducted on February 27, 2020                                         62

21:18, 129:15,
129:16
**months**
81:2
**moore**
1:12, 2:1, 5:2,
5:7, 6:3, 7:4,
8:4, 10:2,
11:10, 12:20,
12:22, 13:2,
16:18, 40:10,
49:3, 66:13,
72:4, 74:10,
79:4, 92:14,
92:16, 122:12,
125:1, 138:14,
138:17, 138:20,
141:13, 147:4,
168:2
**more**
10:18, 10:19,
15:1, 32:20,
43:1, 74:18,
77:18, 104:6,
107:22, 110:10,
110:11, 110:12,
110:18, 110:21,
130:10, 150:17,
157:5
**morning**
76:15, 76:19
**most**
43:2, 59:3,
62:5, 62:9,
71:14, 116:4
**motion**
109:2, 117:13,
117:18, 120:18
**move**
24:2, 67:1,
154:14
**moves**
64:17
**moving**
83:6
**much**
21:18, 51:19,
65:11, 128:1,

129:3, 129:4,
129:14, 130:12,
167:11
**must**
52:11
**myself**
144:15

---
N
---

**name**
12:21, 13:3,
43:13, 47:18,
59:21, 60:22,
62:19, 70:20,
166:22
**names**
11:22, 43:12,
59:18, 90:4,
131:18
**narrow**
129:19
**national**
59:7, 59:8,
62:12, 62:14,
62:18, 62:22,
63:2, 65:3, 65:6
**near**
66:18
**necessary**
10:13
**necessitated**
117:8
**need**
25:12, 38:12,
40:7, 67:16,
71:1, 119:14,
123:20, 148:14,
148:22, 158:4
**needed**
84:19
**needs**
24:19, 105:8,
107:13, 111:15,
111:17, 113:15,
113:19, 117:8,
117:10, 127:18
**neither**
169:9

**never**
33:6, 39:9,
74:16, 98:16,
127:5, 154:17,
155:11
**new**
53:7, 54:1,
86:12
**next**
52:21, 80:14,
80:15, 93:17,
94:2, 95:10,
115:21, 124:13,
141:10
**night**
61:20, 62:1,
125:8
**nina**
76:22
**nine**
157:18, 157:21,
158:1
**normal**
75:8, 81:5,
114:9
**normally**
75:21
**nos**
5:11, 5:14,
5:17, 5:19, 6:4,
6:8
**notarial**
169:14
**notary**
2:15, 169:1,
169:21
**note**
8:8, 10:10,
18:14, 167:8
**noted**
9:12, 25:12
**notes**
23:10
**nothing**
10:4, 18:11,
57:18, 92:17,
94:16
**notice**
2:13, 8:7,

8:11, 8:17,
8:22, 9:14
**notices**
101:4, 101:11,
156:7
**notified**
111:18
**notify**
111:2
**notifying**
57:11
**november**
80:16
**number**
27:20, 73:11,
78:12, 78:15,
78:18, 127:20,
130:14, 158:15
**numbers**
75:6, 75:10,
76:1, 76:3,
76:11, 76:12,
76:16, 77:2,
77:10, 79:16,
80:3, 130:2
**nw**
4:11

---
O
---

**oasis**
19:22, 20:2,
20:14, 20:17,
21:1, 21:3,
31:16, 32:2
**oath**
75:22, 76:1,
76:7, 76:8
**objected**
25:11
**objecting**
9:2, 147:19
**objection**
25:22, 31:7,
40:14, 119:8,
128:17, 137:19,
153:2, 160:1
**obligation**
105:14

Transcript of Richard Moore
Conducted on February 27, 2020                                63

obtained
42:7
obviously
10:7, 100:15,
124:13, 129:8,
143:17, 146:4,
152:12
occasionally
31:2
occurred
95:2
offender
14:10
offer
14:11
office
26:19, 26:22,
89:12, 90:5,
94:1, 96:14
officer
39:15, 39:17,
39:22, 42:12,
169:3
offices
2:2, 31:3
often
68:13, 99:4,
142:12
oh
158:15
okonski
85:9, 85:11,
85:15, 87:2,
91:20, 93:12,
96:9, 96:15,
98:1, 98:10,
99:5, 100:5
old
6:6, 84:20
once
118:1
one
10:18, 24:9,
28:17, 29:4,
35:5, 35:17,
42:20, 42:21,
43:1, 43:15,
44:16, 50:3,

51:9, 61:2,
66:4, 66:19,
67:9, 67:15,
69:18, 71:14,
81:9, 102:13,
103:2, 104:8,
105:15, 106:8,
106:12, 106:16,
107:2, 111:12,
113:16, 115:12,
117:16, 125:4,
125:5, 125:16,
128:15, 129:2,
138:6, 138:7,
142:18, 143:19,
143:21, 146:7,
147:15, 150:17,
155:2, 163:8,
164:3, 164:16,
166:9, 166:11,
166:19
ones
59:14, 63:6
online
14:10
only
11:2, 16:14,
35:7, 69:11,
92:16, 98:13,
151:9, 151:13,
157:21, 158:1
open
142:18
operated
15:16
operating
5:14, 28:8,
49:11, 49:16,
49:22, 50:10,
51:21, 54:5,
58:15, 60:10,
60:13, 61:4,
62:6, 109:7,
109:11
operation
26:10
operations
104:7, 114:9,

162:18, 162:20
opposed
43:15
optioned
107:11
order
10:8, 10:12,
111:7, 141:6,
167:14
organization
121:7
organizational
5:8, 16:8, 17:5
organized
104:5, 158:21
original
102:8
other
18:13, 19:4,
19:8, 19:9,
19:15, 19:16,
24:3, 26:16,
27:12, 28:12,
44:21, 47:15,
48:17, 62:20,
65:7, 67:15,
68:18, 69:10,
69:13, 74:18,
78:1, 89:19,
89:21, 90:13,
105:5, 106:5,
109:3, 111:6,
114:20, 139:8,
165:17, 166:10,
166:20
otherwise
35:21, 169:11
out
27:18, 29:6,
32:14, 36:6,
36:18, 37:4,
37:8, 37:12,
46:21, 71:18,
76:2, 77:6,
78:14, 81:8,
86:12, 106:17,
107:11, 109:6,
110:1, 110:2,

122:16, 129:3,
134:11, 137:14,
137:21, 138:7,
138:20, 153:5,
157:6, 157:12,
157:14, 159:22,
160:18, 164:12,
165:19
outcome
165:2, 169:12
outlining
127:18
outside
11:7, 45:17
outstanding
126:13, 127:8,
127:13
over
16:10, 17:15,
35:14, 37:4,
38:6, 52:21,
62:10, 71:13,
76:14, 95:12,
115:12, 115:17,
115:21, 139:9,
144:14, 144:21
overbroad
30:22, 115:8
overdraft
122:19, 123:1
own
35:8, 36:6,
47:6, 47:18,
94:5
owned
19:9, 19:17,
21:1, 25:21,
26:4, 45:5,
47:8, 60:14
owner
20:9, 44:4,
45:4, 48:4
ownership
19:5, 26:5,
44:19, 45:1,
45:18, 46:1,
46:21, 47:2,
47:7, 47:17

Transcript of Richard Moore
Conducted on February 27, 2020

64

owns
17:11, 20:2,
20:4, 45:4,
47:11

**P**

p&l
94:8, 95:1
page
5:2, 5:7,
41:10, 51:11,
51:18, 52:20,
52:21, 56:9,
73:15, 73:20,
74:15, 74:16,
74:17, 74:18,
74:21, 79:22,
80:6, 80:14,
80:15, 132:9,
148:3, 159:4
pages
1:20, 52:21,
74:19
paid
26:16, 27:4,
28:22, 29:11,
58:11, 58:12,
58:16, 58:17,
58:22, 59:5,
82:9, 89:22,
103:22, 104:10,
107:13, 111:5,
111:15, 111:17,
113:12, 113:15,
113:20, 115:3,
116:20, 119:14,
127:18, 130:12,
131:1, 131:5,
133:20, 134:6,
139:5, 139:15,
140:22, 144:12,
146:3
███████
paperwork
33:19, 33:20,
34:1, 35:20,
43:3, 47:10,

47:22, 48:10,
48:12
paragraph
53:1
pardon
96:17, 143:20
parsed
165:19
part
16:13, 26:5,
26:11, 45:4,
54:20, 59:3,
82:11, 84:20,
86:19, 87:2,
95:18, 102:11,
102:16
partial
69:11
partially
69:12
participants
60:8, 61:11,
77:9
particular
57:21, 58:2,
61:3
parties
22:6, 65:20,
169:10
partner
96:2
parts
68:20
party
38:4, 41:15,
42:3, 84:10,
87:1
████████████
past
38:7, 129:20
pat
49:2
pay
21:17, 31:17,
59:7, 61:11,
90:3, 90:7,
105:12, 105:16,

105:18, 106:9,
106:14, 106:17,
107:3, 107:5,
107:15, 107:22,
108:9, 111:7,
111:14, 113:17,
114:2, 114:5,
114:7, 114:10,
114:11, 115:2,
115:21, 116:6,
117:6, 120:9,
121:1, 121:12,
121:21, 122:17,
127:13, 128:10,
142:22
paycheck
27:16, 27:19
paying
59:6, 107:2,
115:11, 115:17,
128:2, 128:16,
129:15
payment
32:5, 32:9,
104:15, 104:19,
105:8, 115:12,
128:19, 131:15,
132:6, 152:16,
154:2
payments
21:11, 21:17,
21:19, 104:10,
129:9, 129:16,
132:12, 135:10,
135:11, 137:14,
137:17, 138:18,
138:20, 140:17,
140:22, 141:15,
159:1, 163:14,
164:4, 164:17,
164:20, 164:21
payroll
28:18, 28:22,
29:3, 83:6
pays
71:12, 106:6
peachtree
3:14

pending
164:12
people
14:11, 68:6,
89:19, 89:22,
103:2, 105:5
percent
20:8, 48:2,
110:11, 110:12,
110:18
percentage
110:7, 110:10
perdomo
5:20, 101:7,
105:1, 105:2,
112:6, 113:5,
116:16
perform
83:9, 84:4,
84:13, 86:17,
87:8, 88:1
performance
69:10, 85:5,
87:13, 90:13,
90:18, 91:5
performed
84:12, 87:18
perhaps
125:11, 126:1
period
118:11, 148:17,
152:10, 152:18,
153:15, 155:13
permanently
97:17
person
42:19, 54:20,
54:21, 58:2,
58:6
personal
21:6, 23:12,
24:21, 25:8,
25:19, 27:12,
43:19, 43:20,
43:21, 47:18
personally
27:10, 38:3,
39:2, 39:14,

39:15, 41:15,
43:18, 44:3,
44:14, 44:16,
44:18, 44:19,
45:22, 47:16,
48:4, 68:11,
68:15
**phone**
52:17, 98:21
**pick**
66:17
**piispanen**
139:8, 153:7
**pile**
125:6
**place**
2:6, 3:6, 7:12,
102:10, 164:2,
165:15, 165:21
**placed**
77:3, 77:5
**plaintiff**
1:6, 3:2, 12:18
**planet**
7:11, 9:17
**play**
92:8
**please**
7:14, 9:18,
12:20, 23:6,
23:17, 42:17,
43:22, 57:1,
57:16, 63:15,
64:7, 64:16,
64:19, 66:8,
83:16, 106:17,
110:15, 111:2,
111:9, 113:4,
115:9, 125:20,
132:18, 132:21,
133:12, 134:14,
138:3, 138:12,
139:18, 148:12,
150:21, 164:14,
165:13
**plenty**
144:7, 165:13
**point**
15:14, 42:2,

48:9, 58:1,
68:22, 69:2,
71:3, 78:13,
87:7, 152:1,
161:12

██████████

**policies**
50:21
**policy**
52:2, 52:4,
107:18
**political**
13:18
**portion**
25:6
**portions**
10:11
**position**
15:11, 23:15,
27:14
**positions**
33:6
**possible**
28:20, 48:3,
48:8, 48:10,
107:20
**practice**
117:4, 120:14
**practices**
120:9, 156:11
**preliminary**
10:7, 99:11,
99:15, 99:22
**premiums**
163:15, 164:21
**prepare**
100:9, 140:3,
140:5
**prepared**
89:19, 134:9,
140:6, 155:12
**preparing**
89:14, 98:4,
99:13, 99:21,
144:21
**prescott**
117:1

**present**
4:16, 12:14,
99:21
**presented**
40:5
**president**
15:13, 27:15,
30:7, 30:9,
30:20, 67:2,
78:10, 103:8
**pretend**
38:13
**pretty**
79:17
**previous**
69:9, 86:14
**previously**
117:11, 120:14,
127:17
**price**
21:22, 22:2
**primary**
85:1
**print**
131:3, 133:18,
137:14, 138:1,
138:20, 139:15
**printed**
148:6
**printing**
54:5, 137:21
**prior**
13:13, 13:20,
14:14, 14:19,
48:18, 49:21,
82:21, 90:17,
91:5, 94:8,
94:14, 95:2,
99:11, 99:15,
101:9
**prioritize**
115:5, 115:6,
115:10, 115:11
**priority**
115:16, 115:17
**private**
42:11
**pro**
8:3

**probably**
8:6, 33:3,
33:5, 99:7,
121:6, 130:8
**procedure**
49:22, 54:6,
109:8, 109:12
**procedures**
5:14, 49:12,
49:16, 50:10,
51:21, 162:1
**proceed**
102:14
**process**
9:6, 36:10,
57:22, 82:11,
82:12, 82:13,
86:5, 102:16,
102:18, 118:18,
162:5
**processing**
56:12, 57:19
**produce**
134:3
**produced**
17:14, 17:17,
40:14, 75:12,
80:22, 81:19,
132:2, 142:5,
144:2, 160:10
**production**
26:4, 40:16,
51:9, 54:3, 54:4
**professional**
2:14, 23:17
**profit**
5:10, 6:6,
38:18, 40:5,
41:6, 93:13,
94:13, 99:13,
99:21, 100:9,
144:22, 145:9,
145:22, 158:14,
161:14, 162:7
**program**
58:1, 58:4,
58:6, 60:8,
61:11, 77:8,

Transcript of Richard Moore
Conducted on February 27, 2020                                        66

131:12, 135:6,
135:7
**programs**
14:10, 14:11,
15:7, 15:12,
15:16
**proper**
89:10, 166:21
**properly**
31:4, 83:10,
84:5, 98:17
**properties**
28:17, 28:20,
34:10, 34:17,
35:1, 35:5,
35:8, 35:12,
35:16, 35:17,
38:17, 39:1,
39:3, 41:9,
42:8, 43:3,
43:5, 44:6,
44:8, 44:17,
44:19, 44:22,
45:1, 46:2,
47:7, 47:18,
48:4, 48:11
**property**
31:14, 33:21,
33:22, 44:4
**protective**
10:7, 10:12
**provide**
131:11, 132:22,
136:7, 140:21,
141:4
**provided**
17:6, 41:8,
50:10, 73:12,
84:9, 136:18,
144:5
**provides**
51:21, 52:2,
52:4, 76:17
**providing**
87:1
**public**
2:15, 169:1,
169:21

**pull**
17:3, 71:18
**pulled**
61:19, 137:4
**purchase**
21:10, 21:14,
21:22, 22:2,
22:14, 22:16,
26:7, 26:11,
32:2, 43:4
**purchased**
20:21, 20:22,
22:15, 26:6,
31:17, 32:1,
32:2
**purchases**
24:4
**purchasing**
33:21
**purpose**
95:14, 95:16,
95:20, 96:20,
97:6, 97:12,
166:17
**purposes**
66:2, 67:5
**pursuant**
2:13, 10:12,
43:14
**put**
23:5, 23:17,
29:17, 43:13,
47:15, 48:10,
61:13, 61:19,
78:11, 90:15,
101:17, 116:9,
125:6, 127:1,
139:22, 145:6,
151:14, 152:20,
163:1
**putting**
90:12, 102:14

**Q**

**qualified**
118:13
**question's**
164:12

**questioning**
10:15, 75:18,
147:9
**questions**
26:2, 46:18,
68:4, 68:6,
95:12
**quick**
123:18, 157:16
**quickbooks**
29:17, 36:7,
37:1, 101:18,
102:11, 102:15,
102:22, 103:17,
149:8, 151:6,
151:14, 151:16,
151:19, 151:21,
152:1, 160:22,
161:4, 166:16

**R**

**raise**
40:13, 139:18
**raises**
162:10
**raising**
139:20
**randstad**
83:2
**range**
128:9, 128:14,
129:14, 129:18,
130:4, 130:17
**rarely**
31:2
**rather**
47:19
**reach**
16:15, 110:1,
110:2, 123:1
**read**
19:14, 50:5,
53:16, 53:20,
64:7, 64:13,
64:16, 64:22,
65:21, 83:22,
84:3, 125:19,
125:21, 133:9,

133:16, 150:1,
150:22, 151:1,
160:15, 164:13,
164:15, 168:3
**reading**
169:8
**ready**
72:3
**real**
33:16, 38:4,
38:5, 39:2,
41:16, 41:17,
123:18
**really**
31:14, 43:22,
47:4
**realtime**
2:15
**reason**
25:20, 87:15,
95:18, 126:16,
126:22, 155:3,
156:6, 157:13
**reasonable**
78:2
**reasons**
155:4, 155:10
**recall**
22:2, 35:20,
36:11, 37:21,
43:8, 43:12,
71:18, 87:15,
94:12, 94:22,
95:1, 96:6,
96:8, 97:2,
98:6, 99:20,
103:20, 126:9,
126:11, 126:15,
127:20, 127:21,
142:19, 155:2,
155:18, 163:17,
163:20, 165:1,
165:2, 165:3,
165:5, 165:15,
165:22, 166:1
**receipt**
59:2
**receipts**
69:1, 69:7

receive
125:15, 126:5,
141:9, 141:17,
145:20, 152:8
received
28:3, 57:13,
57:17, 68:9,
68:12, 68:14,
68:16, 86:10,
109:16, 109:17,
146:19
recently
86:10
recess
65:15, 83:19,
123:9, 158:9
recipient
157:3
recognize
49:9
record
8:13, 8:22,
9:5, 9:11,
10:19, 11:8,
11:15, 11:16,
12:21, 65:14,
65:17, 83:15,
83:18, 83:21,
123:8, 123:11,
132:5, 149:1,
158:8, 158:11,
167:13, 169:5
recorded
149:8, 149:9,
149:11
records
86:6, 88:13,
131:1, 131:22,
134:6, 134:7,
148:8, 148:15,
160:21
reduced
169:7
reentry
14:10
refer
56:21, 141:18
reference
42:2

referencing
31:22, 86:7
referral
107:10, 117:2
referred
86:1, 117:5,
139:9
referring
17:14, 31:20,
59:12, 63:9,
79:20, 79:21,
146:6
refers
67:8
reflect
17:9
reflected
19:6
reform
15:10
refresh
144:15
refunded
139:5
regard
27:9, 30:17,
31:11, 31:16,
38:22, 44:7,
45:21, 66:21,
67:21, 68:1,
90:11, 98:4,
106:7
regarding
52:11, 95:12,
96:21, 98:1
regards
57:4, 84:9,
98:3, 102:10
regional
58:12, 59:2,
59:3, 60:16,
60:17, 60:18,
60:20, 60:22,
61:2, 61:3,
61:12, 61:18,
62:5
registered
2:14

regular
97:12, 127:8,
142:20
reimbursed
157:3
related
15:5, 24:8,
27:3, 39:3,
87:12, 95:15,
96:20, 169:9
relationship
25:1, 25:3,
25:15, 27:4
relay
91:12
released
154:8, 154:10
relief
107:20
remain
35:16
remedies
66:6
remember
22:18, 37:17,
37:19, 44:12,
93:19, 96:4,
102:19, 103:1,
103:4, 103:7,
165:18, 166:3
remembered
39:11
remove
98:12
removed
98:16
renew
8:14
rental
28:16
reopen
109:2, 117:13,
117:18, 120:18
reopened
120:20, 139:6
repeat
19:12, 41:11,
53:15, 84:2,

149:22, 150:17,
160:14
report
30:13, 48:15,
69:17, 69:18,
70:14, 71:4,
71:13, 72:22,
73:2, 76:13,
80:2, 82:16,
85:6, 85:7,
106:6, 135:9,
135:15, 135:21,
136:3, 136:5,
136:9, 136:21,
146:18
reported
1:21, 85:9,
85:13, 87:5
reporter
2:14, 2:15,
9:16, 9:18,
19:13, 19:15,
53:21, 64:7,
65:1, 72:13,
84:4, 124:21,
125:22, 133:17,
150:2, 151:2,
160:16, 164:16,
167:14, 169:1
reports
81:12, 94:11,
100:11, 114:6,
114:20, 135:16,
135:18, 147:9
represent
7:15, 124:17
representation
8:9, 18:18
representative
12:14
represented
36:4
representing
7:11, 9:17
request
8:14, 23:17,
81:15, 141:9
requested
19:14, 53:20,

Transcript of Richard Moore
Conducted on February 27, 2020

68

64:22, 84:3,
125:21, 133:16,
150:1, 151:1,
160:15, 164:15,
169:8
**requests**
23:21
**required**
9:13, 141:6
**rescinded**
149:13
**reserve**
10:10
**resolutions**
162:3
**resources**
85:10, 89:13,
94:3
**respect**
20:13, 124:3,
132:11
**respectfully**
138:4
**respond**
141:6, 161:10
**responses**
147:10
**responsibilities**
31:12, 39:19,
68:1
**responsibility**
14:5, 30:9,
30:19
**responsible**
82:8, 103:21,
104:9, 128:15
**resulted**
122:18
**results**
82:2
**retail**
13:17, 17:22,
21:2, 100:15
**returned**
139:3, 155:22,
156:14, 157:2,
158:22
**returns**
89:14, 89:19

**revenue**
5:16, 5:18,
20:12, 20:15,
28:3, 28:16,
69:9, 69:11,
69:12, 69:13,
69:15, 69:21,
70:5, 70:7,
71:8, 71:11,
71:15, 71:20,
72:11, 73:5,
74:21, 77:8,
77:14, 79:18,
79:22, 81:12,
115:2
**revenues**
28:12
**reverts**
80:17
**review**
17:7, 41:22,
57:7, 73:3,
73:9, 98:11,
101:10, 111:5,
111:7, 146:22
**reviewed**
73:1, 160:9
**reviewing**
17:5, 72:10
**revised**
91:20, 93:12,
94:8, 94:13,
95:1
**rich**
8:4, 13:6
**richard**
1:12, 2:1, 5:2,
6:3, 7:3, 10:2,
12:22, 138:17,
168:2
**ridicu**
148:12
**ridiculous**
119:8
**risk**
53:2, 53:5,
53:22, 54:8,
54:16, 55:2,

55:5, 55:21,
56:5, 96:13,
100:17, 100:20,
100:22, 101:15,
107:11, 112:14,
112:18, 112:20
**rli**
1:5, 7:4, 7:17,
7:19, 97:14,
131:14, 132:8,
138:18, 141:15,
144:2, 144:5,
144:14, 144:21
**road**
29:19
**roanoke**
4:6
**role**
14:4, 25:18,
30:8, 30:15,
30:18, 40:9,
67:2, 67:3,
83:4, 95:21
**roles**
13:14, 67:22,
89:5
**room**
9:3, 9:10,
10:21, 11:8,
12:1, 153:8
**rooted**
97:4
**roughly**
14:13, 130:11
**routinely**
62:2, 62:3,
125:15, 126:5,
127:21
**rowe**
70:21
**rpr**
1:21, 169:2
**rude**
123:22
**rule**
88:2, 162:17
**rules**
86:12, 141:7

**run**
33:8, 118:11
**running**
89:13, 89:16
**runs**
70:12
**ryan**
70:19, 70:21,
71:2

---
**S**
---
**said**
11:5, 26:9,
27:2, 28:11,
31:21, 40:18,
41:1, 55:14,
87:5, 90:9,
93:6, 98:7,
102:6, 108:11,
116:17, 119:22,
120:3, 120:13,
127:17, 133:1,
133:4, 133:6,
133:8, 133:12,
133:14, 152:1,
169:6
**salaried**
33:2
**sale**
68:22, 69:2,
75:10
**sales**
22:4, 22:6,
22:10, 22:11
**same**
24:12, 31:10,
61:20, 79:14,
96:13, 107:4,
122:10, 165:9,
167:14, 168:4
**sanctions**
9:7
**saw**
139:7
**say**
14:14, 19:1,
28:15, 29:10,
33:2, 33:4,

43:20, 48:1,
67:6, 69:15,
74:5, 76:7,
80:5, 81:8,
84:18, 88:3,
89:15, 90:15,
97:2, 106:18,
107:3, 126:21,
128:14, 133:5,
145:18, 153:16,
154:12, 156:3,
156:10, 162:1,
162:2, 162:22
**saying**
22:22, 74:17,
75:8, 75:9,
80:10, 104:15,
104:19, 106:13,
106:17, 106:21,
123:21, 126:22,
127:2, 127:4,
137:9, 143:1,
158:4
**says**
35:20, 39:14,
49:14, 51:15,
53:11, 57:17,
74:21, 75:13,
79:7, 80:6,
80:13, 80:14,
80:15, 105:8,
106:9, 111:15,
116:5, 148:3
**schneider**
5:21, 96:9,
96:14, 125:13,
126:3
**school**
13:9
**seal**
169:14
**seamans**
40:15
**search**
153:7
**second**
31:20, 41:10,
50:3, 57:1,

80:2, 83:13,
125:16, 159:4
**secretary**
23:13
**section**
29:17, 51:2,
51:21, 56:3
**sections**
51:1
**secure**
19:1, 90:8
**security**
18:10, 117:22,
119:14, 120:4,
139:4
**see**
23:15, 39:6,
43:21, 51:14,
53:3, 56:14,
69:14, 70:6,
75:13, 76:17,
76:21, 76:22,
80:7, 80:10,
80:18, 81:2,
82:16, 97:15,
97:16, 108:3,
114:14, 114:18,
116:18, 117:18,
133:12, 144:13,
149:5, 161:1
**seeing**
126:9, 127:20
**seems**
75:18, 99:3
**seen**
74:16, 126:20,
127:5, 143:11
**sell**
21:4
**seller**
42:6
**send**
116:9, 157:4,
157:12
**sending**
157:6, 157:14
**sends**
105:2, 106:17

**senior**
99:6
**sent**
76:14, 77:6,
104:14, 104:19,
104:22
**separate**
36:6, 36:17,
36:22, 39:16,
44:15, 48:5,
49:22, 56:18,
56:21, 61:19,
69:19, 70:4
**separated**
36:17, 37:4,
37:8, 37:12
**separately**
39:16
**september**
169:16
**series**
35:11, 41:9,
143:4
**serve**
25:18, 55:1,
55:2
**services**
1:8, 5:10,
5:13, 6:6, 7:5,
8:1, 14:20,
16:1, 17:10,
19:5, 21:10,
26:17, 27:5,
28:1, 28:2,
28:22, 32:7,
34:18, 36:22,
38:6, 38:12,
38:18, 41:18,
43:16, 49:12,
50:9, 51:5,
51:20, 52:3,
53:2, 54:8,
54:15, 55:5,
55:21, 59:22,
65:4, 65:22,
83:9, 84:5,
84:12, 86:8,
87:9, 87:14,

87:19, 89:10,
90:4, 94:20,
115:18, 147:13,
149:18, 150:5,
151:5
**session**
25:7
**set**
55:13, 86:12,
93:1, 169:13
**sets**
50:20, 51:5
**seven**
11:10, 160:13
**seven-hour**
11:12
**several**
28:5, 28:11,
62:13, 62:21,
62:22, 89:19,
105:5, 108:19,
142:17, 149:12,
165:17, 166:8
**severally**
66:6
**shall**
66:4
**sheet**
19:6, 24:5,
53:6, 53:22,
145:1, 168:7
**sheets**
38:19, 135:1,
145:10, 146:1
**shoreman**
4:9, 4:10, 8:6,
12:3, 12:7,
12:15, 23:18
**should**
9:6, 9:8, 11:1,
25:11, 46:8,
56:7, 82:9,
111:5, 113:12,
132:8, 136:20,
137:2, 137:10,
138:7, 161:2,
164:4, 164:17
**show**
16:20, 39:7,

Transcript of Richard Moore
Conducted on February 27, 2020

70

60:20, 69:8,
78:1, 81:12,
95:7, 95:8,
144:6, 144:14,
146:5, 146:7,
151:10
**showed**
158:14
**showing**
135:16
**shows**
69:18, 131:4,
133:19, 135:10
**side**
25:18, 27:11,
27:12, 68:1
**sign**
33:19, 33:22,
43:13, 45:17
**signature**
168:10
**signature-p1kal**
169:19
**signed**
22:8, 22:17,
22:18, 22:19,
22:20, 42:6,
43:3, 43:6,
44:3, 44:4,
44:7, 44:11,
47:10, 47:22,
143:13, 168:7
**significant**
129:9, 129:12
**signing**
45:22, 169:8
**signs**
27:16
**simple**
121:10
**simply**
140:20
**since**
11:11, 42:9,
64:10, 77:16,
95:10, 120:10,
129:1, 131:12
**single**
66:4

**sit**
108:2
**sitting**
18:20, 77:12,
110:3, 144:10
**situation**
98:3, 98:15,
108:17, 108:18,
109:5, 120:15,
155:17, 155:19
**situations**
104:2, 104:3,
107:21, 120:16,
155:1
**small**
80:20
**smaller**
14:8
**snapshot**
69:9, 69:11,
69:12
**software**
135:6
**sole**
95:16
**solid**
69:18
**some**
13:17, 14:8,
14:10, 26:9,
28:17, 39:19,
46:9, 48:9,
60:17, 60:18,
66:14, 67:15,
68:6, 68:18,
87:7, 91:1,
99:16, 104:2,
106:4, 107:19,
108:13, 108:14,
117:7, 121:5,
135:5, 135:16,
139:14, 154:7,
154:13
**somebody**
9:10, 68:6,
76:18, 90:10,
103:16, 103:20,
106:20, 107:4

**somebody's**
155:6
**somehow**
86:17
**someone**
98:7, 107:11
**something**
8:17, 43:11,
48:1, 67:16,
74:20, 75:10,
82:17, 98:17,
107:21, 127:11,
135:7, 152:13,
152:16, 162:1,
162:10, 162:11,
165:16
**sometimes**
48:11, 97:21,
114:10, 121:20,
157:13
**somewhere**
147:1
**soon**
12:9
**sop**
56:3, 57:5
**sorry**
11:13, 16:12,
24:20, 25:14,
26:8, 37:11,
38:15, 40:8,
53:18, 54:4,
64:20, 66:14,
69:4, 70:9,
72:8, 74:12,
84:1, 90:14,
92:7, 104:16,
120:3, 120:5,
134:2, 137:20,
149:22, 150:12,
150:20, 153:19,
160:6
**sort**
96:20, 107:19,
154:18
**sound**
75:10
**source**
160:2, 160:19

**south**
12:22
**span**
148:17
**speak**
8:13, 127:21
**speaker**
164:11
**speaking**
8:20, 9:5,
37:17, 84:18
**special**
133:3, 133:6,
133:7, 134:7,
136:3, 136:4,
147:10
**specialized**
112:19
**specific**
15:2, 32:20,
44:7, 77:18,
95:11, 97:12,
128:7, 135:6,
152:14
**specifically**
98:8, 111:20,
159:16
**specifies**
149:6
**specify**
42:15, 42:17,
130:9
**speculating**
137:8
**speculation**
32:13, 116:13,
140:12, 154:21,
159:14
**spoke**
37:15, 84:22
**spreadsheet**
77:5, 77:6,
81:7, 125:11,
126:1, 126:10,
135:5, 135:8,
137:12, 139:22,
140:3, 140:5,
140:6, 141:22,

Transcript of Richard Moore
Conducted on February 27, 2020

71

spreadsheets
134:9, 142:10,
142:12, 142:14,
142:17
stamp
51:13, 51:17
standard
5:13, 49:11,
49:16, 49:22,
50:9, 51:20,
54:5, 109:7,
109:11
█████████

start
101:19, 107:14,
132:9, 135:15,
160:11
started
11:16, 11:20,
11:22, 83:5,
166:12
state
7:15, 12:21,
54:13, 122:5
stated
117:11, 120:14
statement
40:5, 41:7,
41:18, 91:21,
93:13, 94:8,
94:14, 95:1,
98:7, 98:12,
132:8, 132:15,
141:5, 144:22,
151:7, 158:14,
159:3, 161:15,
162:7
statements
38:6, 38:19,
59:19, 60:21,
98:1, 98:5,
99:13, 99:21,
100:9, 132:13,
144:1, 144:12,

145:2, 145:9,
146:1, 149:18,
150:4, 151:4,
151:10
states
1:1
stating
117:2
station
2:6, 3:6, 7:12
stay
24:18
stephanie
82:22, 83:3,
83:5, 84:9
stick
127:15
sticker
72:3
sticking
81:10
still
13:10, 66:16,
97:14
stipulate
66:2, 78:22
stipulation
65:21, 67:19
stop
134:15, 158:3
store
20:14, 20:18,
20:19, 20:21,
25:17, 27:11
straight
24:18, 125:18
stream
71:15
street
3:14
struggling
46:12, 47:5
stubs
90:3, 90:7
stuff
14:11, 29:17,
98:14, 100:2,
100:4

stupid
46:19
subject
9:6
submit
57:11
submitted
94:11
subsidiaries
19:10, 19:17
subtract
160:12
suggesting
132:7
█████████

suite
2:7, 3:7, 3:15,
4:12
suited
112:6
sums
161:1
sunday
96:5
supposed
53:18
sure
13:9, 13:16,
16:13, 22:5,
25:6, 25:12,
25:16, 26:3,
31:3, 35:13,
38:11, 41:13,
42:1, 42:16,
45:10, 46:6,
47:1, 50:4,
57:2, 66:20,
68:17, 79:3,
83:14, 91:10,
91:11, 92:22,
95:18, 111:3,
113:5, 125:7,
125:12, 125:17,
126:3, 134:8,
138:5, 141:12,
144:7, 149:10,
158:6

sureties
105:15, 126:13,
142:4
surety
111:19, 111:22,
116:15, 137:14,
139:17, 142:16
survive
24:19
suspend
167:7
suspicions
96:21, 97:3
swear
9:18, 45:6,
50:6
sworn
10:3
system
70:4, 76:13,
84:20, 134:7,
147:6

**T**

take
11:6, 17:7,
21:9, 58:5,
61:13, 64:8,
64:13, 92:20,
111:12, 115:17,
119:15, 123:20,
124:6, 136:13,
157:16, 165:21,
166:18
taken
29:6, 65:15,
83:19, 123:9,
158:9, 169:4,
169:6
taking
7:12, 23:10,
53:6, 54:1
talk
31:13, 52:17,
96:1, 100:5,
134:19, 153:11
talked
66:19

Transcript of Richard Moore
Conducted on February 27, 2020                                          72

**talking**
15:2, 42:11,
74:7, 86:9,
88:9, 111:10,
153:14, 158:22,
163:9
**talks**
52:6, 52:9,
53:5, 53:21,
54:7, 56:12
**tania**
101:12, 113:7
**tap**
71:2
**tawana**
82:19

**team**
29:16, 37:15,
81:6, 82:14,
82:18, 83:4,
86:19, 87:3,
87:22, 89:1,
91:11, 95:22,
96:16, 96:18,
96:19, 97:10,
97:11, 97:17,
99:7, 100:2,
100:6, 100:8,
100:12, 100:17,
100:18, 100:21,
101:3, 101:14,
104:5, 106:5,
106:9, 106:17,
110:2, 111:15,
111:18, 112:2,
112:4, 112:8,
112:13, 112:14,
112:15, 112:19,
112:22, 115:22,
116:15, 121:5,
139:9, 141:20,
141:21, 156:5,
156:7, 159:15,
159:16, 160:20,
161:9, 161:17,
163:13, 166:5,

166:8
**technically**
46:14, 46:21
**tell**
14:17, 17:17,
17:21, 25:14,
42:20, 42:22,
46:15, 56:18,
60:21, 62:8,
63:3, 71:17,
73:4, 77:11,
88:6, 111:20,
130:8, 142:13,
146:17, 147:20,
155:2
**telling**
23:9, 76:1,
118:12
**tells**
107:11, 111:22,
115:22, 148:5
**temps**
83:1, 97:14,
97:17
**terminated**
87:10, 87:16,
89:7
**termination**
87:12
**testified**
10:5, 39:18,
44:11, 45:3,
48:14, 74:10,
78:4, 108:8,
150:7, 160:8
**testify**
10:3, 10:9,
132:19, 133:3,
147:18
**testifying**
39:21, 40:2
**testimony**
37:21, 48:19,
78:8, 94:22,
97:5, 107:5,
107:8, 109:19,
110:17, 113:10,
149:1, 154:16,

154:22, 155:11,
168:4, 168:5,
169:6
**testy**
123:14
**text**
19:14, 53:20,
64:22, 84:3,
97:19, 97:21,
98:2, 98:10,
98:20, 99:1,
99:9, 125:21,
133:16, 150:1,
151:1, 160:15,
164:15
**texts**
98:11
**th**
7:8, 16:2,
49:19, 119:15,
138:17, 148:4,
169:14
**thank**
10:16, 11:14,
16:17, 32:16,
40:8, 49:7,
65:11, 66:10,
72:9, 72:15,
79:13, 86:2,
123:17, 124:5,
124:15, 134:4,
139:21, 143:15,
152:2, 167:10
**themselves**
7:15
**thereafter**
169:7
**therefore**
73:10
**thing**
50:5, 66:19,
107:4
**things**
25:19, 29:11,
86:13, 97:16,
98:15, 100:13,
120:19, 165:4
**think**
19:2, 43:10,

47:11, 54:19,
89:10, 90:9,
91:2, 121:4,
143:11, 146:10,
161:2, 166:12,
166:20, 166:21
**thinks**
74:10
**third**
80:5, 84:10,
87:1
**thornton**
85:2, 86:1,
86:2, 86:10,
86:11, 88:10,
88:12, 91:15,
93:2, 93:21,
94:19, 95:21,
96:2, 97:7
**three**
35:7, 36:1,
38:7, 39:4,
65:20, 65:22,
66:3, 66:5,
67:20, 69:16,
69:18, 96:11,
141:1
**through**
13:11, 21:14,
24:12, 27:8,
27:10, 27:11,
28:3, 40:6,
41:7, 70:3,
74:8, 74:11,
82:15, 132:8,
145:1, 146:1,
147:15, 151:13
**throw**
16:10
**throwing**
16:14
**thursday**
1:14, 66:16
**tieder**
2:5, 3:5, 143:9
**tight**
10:21, 11:11
**tim**
33:8, 33:10,

Transcript of Richard Moore
Conducted on February 27, 2020

73

70:16, 96:9,
96:15
**time**
7:9, 11:1,
11:2, 11:7,
11:9, 12:17,
14:12, 14:18,
17:13, 24:12,
32:1, 33:7,
36:12, 37:16,
37:20, 43:1,
54:3, 54:5,
55:1, 60:4,
62:10, 79:9,
81:22, 85:8,
85:17, 91:13,
97:15, 107:3,
107:22, 111:12,
114:11, 118:1,
124:9, 124:13,
149:11, 150:17,
152:8, 152:10,
152:18, 153:15,
154:1, 154:7,
155:13, 156:4,
160:12, 162:11,
163:14, 164:1
**timeline**
91:22, 95:12
**timely**
23:19, 152:22
**times**
71:11, 82:15,
98:13, 99:7,
116:5, 117:7,
117:11, 117:14,
120:22, 121:11,
122:15, 122:16,
122:22, 127:19,
139:1, 139:4,
142:9, 143:8,
143:19, 143:20,
149:12, 152:15,
153:4, 153:6,
154:11
**timing**
10:22, 92:17
**timothy**
85:9, 85:11,

85:15
**title**
30:5, 31:5,
31:9, 34:3,
34:6, 43:9,
60:15
**titled**
35:16
**today**
7:10, 8:15,
8:20, 9:17,
17:19, 17:20,
18:20, 35:15,
63:11, 77:12,
86:10, 106:9,
106:10, 106:14,
106:18, 110:3,
125:8, 131:13
**today's**
7:8
**together**
124:17, 124:18,
140:1, 163:2,
163:15, 164:5,
164:18, 166:6
**told**
24:16, 90:22,
113:19, 113:21,
120:7
**took**
102:10, 109:3,
164:2, 165:15
**tool**
71:14
**top**
74:14, 79:7,
80:5, 80:6,
138:17
**topic**
119:5, 165:10
**topics**
166:9, 166:10,
166:20, 166:21
**total**
5:16, 5:18,
69:21, 73:13,
73:18, 73:21,
74:3, 74:5,

74:8, 74:21,
77:8, 79:18,
79:22, 126:12,
130:11
**totally**
124:12
**totals**
79:17
**track**
29:14, 32:21,
33:7, 68:8,
68:11, 68:13,
68:15, 69:1
**tracked**
68:17
**tracking**
14:5, 14:9
**trans**
36:20
**transaction**
31:20, 31:22,
39:3, 39:18,
42:4
**transactions**
22:11, 26:7,
33:17, 36:17,
38:4, 41:16
**transcript**
5:5, 10:11,
16:19, 25:13,
40:11, 49:4,
72:5, 79:5,
125:2, 138:15,
147:5, 169:5
**transcription**
168:5
**transfer**
62:5, 62:10
**transferred**
35:14, 37:3
**transitioning**
36:21
**transmitted**
93:11, 94:7,
94:13, 95:2
**transportation**
26:16
**traveled**
93:17

**traveling**
125:12, 126:2
**treasury**
107:10, 107:16,
108:9, 117:2,
117:5, 118:22,
120:1, 120:4,
120:10
**treated**
66:4
**trip**
94:8, 94:14,
94:16, 94:17,
95:3, 95:9,
95:15, 97:6
**true**
60:7, 93:16,
106:15, 109:15,
120:21, 121:10,
121:20, 137:13,
143:22, 145:1,
145:21, 149:19,
150:5, 151:5,
156:13, 168:4,
169:5
**trust**
42:6
**truth**
10:4, 10:5
**try**
66:17, 114:10,
154:14
**trying**
26:10, 45:9,
45:10, 45:13,
46:20, 57:3,
75:15, 78:9,
80:21, 82:3,
94:21, 116:17,
123:22, 140:16,
147:18, 150:12,
152:3, 152:4
**tuesday**
96:5, 148:3
**turned**
144:14, 144:21
**two**
14:15, 17:15,

Transcript of Richard Moore
Conducted on February 27, 2020

74

18:5, 22:10,
28:17, 29:4,
35:5, 35:17,
52:21, 67:16,
79:14, 106:18,
107:3, 122:11,
125:3, 153:16,
157:5
**type**
163:2
**typewriting**
169:7
**typical**
127:7

**U**

**uh-huh**
20:20, 93:22,
159:2, 167:15
**ultimately**
102:14
**unable**
90:16, 102:1
**uncategorized**
166:11, 166:14,
166:16, 166:18
**uncool**
74:18
**under**
21:2, 29:14,
33:5, 34:11,
75:22, 76:1,
76:7, 76:8,
162:6, 162:22,
169:7
**understand**
10:19, 11:4,
16:16, 26:11,
47:3, 47:6,
57:3, 75:15,
75:20, 80:22,
82:4, 89:8,
92:22, 117:21,
118:18, 124:12
**understanding**
17:10, 66:20,
78:10, 87:17,
116:21, 118:9,

118:14, 118:17
**understands**
63:15
**unfair**
60:2, 63:20,
64:1, 145:15,
149:3
**unfortunately**
15:22, 18:3,
78:18
**unilateral**
161:18
**united**
1:1
**university**
13:12
**unless**
107:11, 147:20
**unlikely**
99:3
████
**unsure**
18:10, 18:11,
88:21, 91:22,
93:15, 109:20,
127:10, 140:13,
151:12, 151:14,
161:8
**until**
39:12, 41:2,
107:16, 108:9,
117:4, 120:9,
142:18, 144:12,
146:2, 151:19,
152:1, 154:14,
157:19, 157:22,
158:2
**updated**
57:5, 77:6,
81:7, 147:15
**urgent**
82:17
**use**
21:6, 85:2,
90:6, 102:11,
116:2
**using**
52:7, 52:8,

52:15, 52:19,
55:2, 89:13,
94:3
**usually**
26:18, 27:2,
61:17, 114:18,
116:6

**V**

**va**
2:8, 3:8, 4:6
**vacation**
155:6
**vague**
30:2, 60:2,
121:3, 121:14,
122:1, 163:6
**valid**
74:17
**varies**
68:3, 128:6,
128:13
**various**
50:20, 52:17,
59:17, 61:12,
161:14
**vast**
109:8, 109:12,
109:15
**vendor**
162:10
**vendors**
30:16, 31:4,
68:5
**ventures**
26:15, 35:6,
35:18
**verbal**
52:11, 99:9
**verbally**
71:7
**verify**
16:5, 65:7,
75:5, 76:1,
76:2, 78:5,
126:21
**vermont**
153:8

**verona**
59:7
**verse**
30:1, 32:18,
162:2
**versus**
32:22, 71:19,
115:13
**via**
59:6, 98:1
**vice**
15:13, 27:15,
30:7, 30:9,
30:20, 67:2,
78:10, 103:8
**video**
1:12, 2:1, 7:9,
7:11, 11:16,
20:14, 20:18,
20:19, 20:20,
25:13
**videographer**
4:17, 7:2,
7:10, 9:16,
65:13, 65:16,
83:15, 83:17,
83:20, 123:7,
123:10, 158:7,
158:10, 167:12
**videotaped**
7:3
**virginia**
1:2, 1:13,
2:16, 7:6, 7:7,
7:13, 13:1,
59:8, 169:22
**visit**
26:22, 92:17,
94:1, 95:17,
95:19, 95:21,
97:4
**visiting**
26:18, 26:19
**vivian**
3:3, 7:16
**voice**
12:6, 25:20,
139:19, 139:21

Transcript of Richard Moore
Conducted on February 27, 2020                                                75

| | | | |
|---|---|---|---|
| voice-identify | we'll | whenever | within |
| 7:14 | 23:15, 136:13, | 124:6 | 18:4, 93:17 |
| voiced | 141:10, 147:2 | whereof | without |
| 90:18 | we're | 169:13 | 8:11, 10:9, |
| volume | 8:10, 10:19, | whereupon | 17:16, 48:2, |
| 1:17 | 11:6, 11:13, | 10:1 | 65:6 |
| **W** | 11:15, 11:16, | wherewithal | witness |
| wait | 15:2, 64:10, | 131:20 | 9:18, 10:9, |
| 39:12, 41:2, | 64:11, 64:18, | whether | 11:1, 11:3, |
| 64:9, 117:4, | 65:10, 67:4, | 37:22, 39:15, | 26:1, 26:3, |
| 133:15 | 67:5, 88:2, | 42:11, 45:16, | 37:10, 42:9, |
| walden | 96:1, 107:2, | 59:1, 59:20, | 42:15, 46:11, |
| 13:11 | 114:10, 114:19, | 77:13, 79:7, | 49:5, 49:8, |
| walked | 121:7, 123:5, | 90:22, 91:1, | 52:22, 53:18, |
| 12:1 | 125:7, 154:12, | 97:16, 103:15, | 59:15, 64:8, |
| wanda | 165:9, 167:7, | 103:19, 105:12, | 67:7, 67:11, |
| 83:1, 89:1, | 167:8 | 108:22, 109:1, | 79:12, 83:16, |
| 94:17 | we've | 109:2, 109:4, | 118:16, 119:3, |
| want | 9:12, 10:21, | 110:18, 113:11, | 123:12, 132:16, |
| 10:10, 10:22, | 66:14, 121:5, | 113:17, 114:1, | 134:20, 136:15, |
| 11:9, 16:13, | 136:7, 156:10, | 118:20, 130:14, | 136:19, 137:1, |
| 16:20, 25:5, | 157:17, 164:8 | 136:8, 137:11, | 138:13, 144:19, |
| 39:11, 48:1, | wednesday | 139:10, 151:14, | 147:7, 147:20, |
| 66:20, 66:22, | 141:10, 154:12 | 151:15 | 149:4, 150:7, |
| 75:19, 78:1, | week | whoever | 164:13, 169:13 |
| 92:21, 113:2, | 33:4, 69:15, | 159:19 | witness's |
| 123:19, 124:5, | 69:21, 127:12, | whoever's | 133:10 |
| 124:6, 135:15, | 128:6, 128:10, | 55:12, 56:4 | word |
| 146:5, 146:14, | 128:13, 128:16, | whole | 109:7 |
| 146:16, 158:13, | 142:22, 153:16 | 10:4, 50:5, | words |
| 167:7 | weekly | 73:22, 106:22, | 44:21 |
| wanted | 128:2, 129:10, | 166:12 | work |
| 24:22, 69:21, | 142:6, 142:10 | wholly | 13:19, 31:4, |
| 123:18, 125:7, | weeks | 19:9, 19:16 | 31:13, 32:18, |
| 158:2, 159:20, | 153:16 | wife | 32:22, 33:3, |
| 160:16 | went | 24:9 | 33:5, 37:14, |
| washington | 13:10, 32:9, | williams | 85:5, 85:12, |
| 4:13, 82:20 | 57:11 | 4:18, 8:5, 8:9, | 89:9, 90:13, |
| watt | weren't | 8:16, 8:21, 9:2, | 90:19, 91:5, |
| 2:5, 3:5, 143:9 | 100:8 | 9:9, 9:15, 12:9 | 91:9, 100:12, |
| way | western | willing | 161:10 |
| 32:17, 38:16, | 1:2, 7:6 | 57:8, 94:19 | worked |
| 95:15, 111:13, | whack | windsong | 13:16, 13:17, |
| 131:2, 133:18, | 122:16 | 13:1 | 83:10, 84:5, |
| 145:21, 150:10, | whatever | wire | 85:8 |
| 151:13, 160:22, | 131:19 | 31:17 | working |
| 164:8 | whatsoever | withdraw | 100:2, 100:4 |
| | 130:5, 130:18 | 39:10 | works |
| | | | 54:21 |

Transcript of Richard Moore
Conducted on February 27, 2020

76

**world**
81:21
**wouldn't**
14:17, 29:9,
41:3, 73:21,
95:9, 130:2,
131:15
**write**
23:11, 152:9,
152:16, 153:12
**writes**
106:8
**writing**
23:6, 23:18
**written**
52:11, 154:1
**wrong**
117:14

---
Y
---

**yeah**
13:6, 16:12,
80:21, 81:16,
84:1, 144:20,
163:7
**year**
14:15, 18:4,
24:16, 73:22,
75:1, 77:17,
79:22, 88:18,
88:19, 95:13,
129:20, 131:5,
133:21, 136:1
**year-over-year**
77:16
**yearly**
77:14
**years**
14:15, 15:15,
17:15, 18:5,
29:9, 38:7,
39:4, 78:1,
86:14, 131:12,
141:1, 148:21
**yep**
11:14, 122:3
**yesterday**
8:10, 8:12,

16:7, 17:1, 17:4

---
$
---

**$200,000**
98:12
**$30,000**
22:3
**$495,950**
159:5, 160:2,
160:19, 161:1
**$5,000**
21:3

---
.
---

**.0101**
4:7
**.1000**
2:9, 3:9
**.1150**
3:17
**.3188**
4:14

---
0
---

**00066**
1:8, 7:7
**0106983**
5:9
**014665**
5:17
**014668**
5:19
**0199649**
5:12
**0210996**
6:5
**027806**
6:8, 146:13
**0284027**
5:22
**03**
83:21
**0335712**
5:15

---
1
---

**10**
130:15

**10,000**
21:20
**100**
20:8, 48:2
**1000**
2:7, 3:7, 3:15,
4:12
**1050**
4:11
**11**
1:15, 7:9
**1175**
3:14
**11971**
4:5
**12**
5:3, 65:14
**120**
116:17, 116:19,
119:15
**124**
5:20
**138**
6:3
**14**
5:22
**147**
6:6
**15**
123:1
**16**
5:8, 65:17
**169**
1:20
**17**
77:21, 80:3,
83:21, 123:8,
123:11
**17,000**
123:1
**1700**
83:18
**1765**
2:6, 3:6, 7:12
**18**
1:8, 49:19,
71:19, 77:21,
81:12, 120:7,

120:10, 158:8,
158:11, 167:13
**19**
6:4, 71:19,
77:21, 81:13,
138:17

---
2
---

**20**
99:7
**2000**
79:8
**20036**
4:13
**2011**
15:21
**2012**
15:21
**2013**
16:2
**2014**
14:14
**2016**
131:13
**2017**
5:16, 5:18,
71:13, 71:19,
72:11, 73:5,
73:7, 77:16,
78:13, 78:15,
78:18, 78:19,
79:7, 79:8,
80:14, 80:17,
81:12, 91:20,
93:12, 94:13,
120:7, 120:10
**2018**
5:11, 6:4, 6:7,
18:6, 18:7,
20:7, 37:22,
40:6, 41:7,
51:9, 57:5,
80:3, 80:6,
80:13, 80:15,
88:21, 141:14,
147:16
**2019**
5:22, 37:22,

Transcript of Richard Moore
Conducted on February 27, 2020

77

77:7, 86:12,
88:20, 88:21,
126:12, 129:19,
130:12, 145:1,
146:2
**202.772**
4:14
**2020**
1:14, 7:8,
148:4, 169:15,
169:16
**21**
158:8
**22102**
2:8, 3:8
**22939**
13:1
**235,645**
73:20
**24022**
4:6
**27**
1:14, 7:8,
158:11
**28**
148:4, 169:14
**288372**
1:19

**3**

**30**
16:2, 99:7,
118:21, 157:19,
157:22, 158:2,
167:10, 169:16
**30361**
3:16
**335777**
51:12
**35**
167:13
**38**
65:17

**4**

**4.3**
126:12, 127:6
**40**
5:10, 123:8

**404.239**
3:17
**41,421,503**
75:1
**42**
1:15, 7:9
**44**
65:14, 123:11
**47**
12:22

■■■■■■■

**49**
5:13
**495,000**
159:21, 160:17

**5**

**5,000**
21:20
**50**
110:11, 110:12,
110:18
**50,000**
129:21
**500,000**
129:21
**518**
7:7
**540.345**
4:7
**5799**
5:15
**5:-cv--mfu**
1:8

**6**

**6**
157:19, 157:22,
158:2, 167:10
**6.01**
52:10
**6.12**
56:8, 57:4
**6.9**
53:1, 54:11,
56:3
**60**
51:18

**65**
51:11, 51:18
**67**
52:21
**68**
56:9

**7**

**703.749**
2:9, 3:9
**72**
5:16
**79**
5:18

**8**

**8bit**
21:3

**9**

**96**
13:9
**9656**
5:12