

# Transcript of Micheal Paul Donovan

**Date:** February 26, 2020
**Case:** RLI Insurance Company -v- Nexus Services, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF VIRGINIA
 3               Harrisonburg Division
 4   ---------------------------x
 5   RLI INSURANCE COMPANY,      :
 6               Plaintiff, :
 7     v.                       : Case No.:
 8   NEXUS SERVICES, INC., et al.,: 5:18-cv-00066-MFU
 9               Defendants.:
10   ---------------------------x
11
12       Video deposition of MICHEAL PAUL DONOVAN
13               McLean, Virginia
14          Wednesday, February 26, 2020
15                  10:33 a.m.
16
17
18
19   Job No.: 288370
20   Pages: 1 -
21   Reported by: Judith E. Bellinger, RPR, CRR
22
```

**Page 2**

```
 1       Video deposition of MICHEAL PAUL DONOVAN held
 2   at the offices of:
 3
 4
 5          WATT, TIEDER, HOFFAR & FITZGERALD, LLP
 6          1765 Greensboro Station Place
 7          Suite 1000
 8          McLean, VA 22102
 9          703.749.1000
10
11
12
13       Pursuant to notice, before Judith E.
14   Bellinger, Registered Professional Reporter,
15   Certified Realtime Reporter, and Notary Public in
16   and for the Commonwealth of Virginia.
17
18
19
20
21
22
```

**Page 3**

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3       VIVIAN KATSANTONIS, ESQUIRE
 4       CHRISTOPHER HARRIS, ESQUIRE
 5       WATT, TIEDER, HOFFAR & FITZGERALD, LLP
 6       1765 Greensboro Station Place
 7       Suite 1000
 8       McLean, VA 22102
 9       703.749.1000
10
11   ON BEHALF OF THE DEFENDANTS:
12       MARY DONNE PETERS, ESQUIRE
13       GORBY PETERS & ASSOCIATES, LLC
14       1175 Peachtree Street
15       Suite 1000
16       Atlanta, GA 30361
17       404.239.1150
18
19
20
21
22
```

**Page 4**

```
 1        A P P E A R A N C E S   C O N T I N U E D
 2
 3          CHRIS K. KOWALCZUK, ESQUIRE
 4          ATTORNEY AT LAW
 5          P.O. Box 11971
 6          Roanoke, VA 24022
 7          540.345.0101
 8
 9          JOHN M. SHOREMAN, ESQUIRE
10          MCFADDEN & SHOREMAN
11          1050 Connecticut Avenue, NW
12          Suite 1000
13          Washington, D.C. 20036
14          202.772.3188
15
16   ALSO PRESENT:
17       Jeremy Dineen, Videographer
18       Mario Williams
19       Richard Moore
20
21
22
```

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

5

C O N T E N T S

EXAMINATION OF MICHEAL PAUL DONOVAN          PAGE

23

E X H I B I T S

(Attached to the transcript)

Donovan Deposition Exhibits:          PAGE

Exhibit 1   Org chart, Bates No. NEXUS0106983   51

Exhibit 2   Email from Rick Nagel to Dave        71
            Sandoz dated 5/1/2015, Bates Nos.
            NEXUS0315201 - 5202

Exhibit 3   Email chain.  Top email from Dave    97
            Sandoz to Rick Nagel dated June 11,
            2015

Exhibit 4   Email from Mike Donovan to Rick      110
            Nagel dated 6/17/2015, Bates Nos.
            NEXUS0315177 - 5178

Exhibit 5   Email chain.  Top email from Dave    136
            Sandoz to Mike Donovan dated 20 Jan
            2016, Bates Nos. RLI_0000330478 - 0479

7

E X H I B I T S   C O N T I N U E D

Exhibit 14  Sales Lines document, Bates No.      262
            NEXUS0265155

Exhibit 15  Email from Marco LiMandri to         302
            Richard Moore, Bates No.
            RLI_0000331292

Exhibit 16  Email from Marco LiMandri to         325
            Moore@nexushelps.com, Bates No.
            RLI_0000331290

Exhibit 17  Email from Marco LiMandri to         325
            Richard Moore, Bates No.
            RLI_0000331291

Exhibit 18  Email chain.  Top email from Erik    327
            Schneider to Dave Sandoz dated
            12/22/2016, Bates Nos. NEXUS0225584 -
            5590

Exhibit 19  Email chain.  Top email from Dave    333
            Sandoz to Laura Piispanen dated
            12/29/2016, Bates Nos. NEXUS0224761 -
            4762

6

E X H I B I T S   C O N T I N U E D

Exhibit 6   Email chain.  Top email from Dave    137
            Sandoz to Mike Donovan dated 9 Feb
            2016, Bates Nos. RLI_0000330592 - 0593

Exhibit 7   Email chain.  Top email from Mike    137
            Donovan to Dave Sandoz dated 9 Feb
            2016, Bates Nos. RLI_0000330586 - 0591

Exhibit 8   Email chain.  Top email from Mike    168
            Donovan to Rick Nagel dated 10 Feb
            2016, Bates Nos. RLI_0000330600 - 0603

Exhibit 9   Email chain.  Top email from Dave    171
            Sandoz to Rick Nagel dated March 28,
            2016, Bates Nos. RLI_0000334765 - 4766

Exhibit 10  Email chain.  Top email from Dave    185
            Sandoz to Rev. Mike Donovan dated June
            9, 2016, Bates Nos. RLI_0000334770

Exhibit 11  Email from Dave Sandoz to Mike       191
            Donovan dated 12/7/2016, Bates Nos.
            NEXUS0227559

Exhibit 12  Contract                             215

Exhibit 13  Immigration Bond                     229

8

E X H I B I T S   C O N T I N U E D

Exhibit 20  Email chain.  Top email from Bart    339
            Davis to mdonovan@nexushelps.com,
            Bates Nos. RLI_000000284 - 0285

Exhibit 21  Email from Mike Donovan to Bart      340
            Davis, Bates Nos. RLI_000000287 - 0294

Exhibit 22  Email chain.  Top email from         347
            Richard Moore to Laura Piispanen,
            Bates Nos. RLI_000000296 - 0297

Exhibit 23  Email chain.  Top email from         348
            Richard Moore to Laura Piispanen and
            others, Bates Nos. RLI_000000310 -
            0316

Exhibit 24  Email chain.  Top email from Bart    349
            Davis to mdonovan@nexushelps.com,
            Bates Nos. RLI_000000318 - 0327

Exhibit 25  Email from Jody Prescott to Laura    355
            Piispanen dated February 13, 2017,
            Bates Nos. RLI_000019667 - 9673

9

```
   E X H I B I T S   C O N T I N U E D
Exhibit 26  Letter dated March 3, 2017 to        361
            Micheal Donovan from Ira Sussman
Exhibit 27  Email chain.  Top email from Ira     372
            Sussman to mdonovan@nexushelps.com
Exhibit 28  Letter dated March 13, 2017 to       375
            Micheal Donovan from Ira Sussman
Exhibit 29  Email chain.  Top email from Erik    434
            Schneider to Mike Donovan dated
            1/11/2019, Bates Nos. NEXUS0242615 -
            2618
Exhibit 30  Email from Hazzar Perdomo to Erik    435
            Schneider dated 1/14/2019, Bates No.
            NEXUS0284027 with attachments
```

10

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins Disc No. 1 in the videotaped deposition of Micheal Donovan in the matter of RLI Insurance Company v. Nexus Services, Inc., et al., in the United States District Court for the Western District of Virginia, Harrisonburg Division, Case No. 518 CV 00066MFU.

Today's date is February 26th, 2020. The time on the video monitor is 10:33.  The videographer today is Jeremy Dineen representing Planet Depos.  This video deposition is taking place at 1765 Greensboro Station Place, in McLean, Virginia.

Counsel please voice-identify themselves and state whom they represent.

MS. KATSANTONIS:  Vivian Katsantonis on behalf of RLI Insurance Company and with me is my partner Chris Harris.

MS. PETERS:  Mary Donne Peters, Gorby Peters and Associates from Atlanta, Georgia, and I represent the defendants in the case, Nexus

11

Services, Inc., Libre by Nexus, and Homes by Nexus.

MR. KOWALCZUK:  Chris Kowalczuk, attorney, Roanoke, Virginia, and I also represent the Defendants Nexus and Homes and Libre.

MR. SHOREMAN:  John Shoreman.

MR. WILLIAMS:  Mario Williams on behalf of the Defendants.  And also we have a corporate representative, Richard Moore.

THE VIDEOGRAPHER:  The court reporter today is Judy Bellinger representing Planet Depos. Will the court reporter please swear in the witness.

MS. KATSANTONIS:  Before swearing in the witness, I think we skipped over Mr. Mario Williams is in the room.

MR. WILLIAMS:  No, I announced.

MS. KATSANTONIS:  Can we have a representation as to Mr. Williams' role with regard to this litigation.

MR. SHOREMAN:  He's assisting.  He's actually associated with me.  We work with the

12

same firm.

MS. KATSANTONIS:  Mr. Williams is -- I recall that, and correct me if I'm wrong that Mr. Williams at some point advised that he was representing individuals and was denied admission for this matter.

Do you recall that?

MR. SHOREMAN:  Mr. Williams is not representing individuals in this case.  He's representing --

MR. WILLIAMS:  So I know Judge Urbanski.  I'll talk.  So you're talking about when you were saying stuff about the motion in limine, right?

MS. KATSANTONIS:  Uh-huh.

MR. WILLIAMS:  So that's wrong.  I'm not representing any third parties or anything like that.  This is not to gather information for some type of collateral or intervention or anything.  I'm here with John, we're associated with the same attorney.  We're covered by the same privilege.  At least that's my understanding.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

13

1    MS. KATSANTONIS: So you are a member
2 of McFadden & Shoreman law firm?
3    MR. SHOREMAN: No, no, no. McFadden &
4 Shoreman is associated with a law firm NDH out of
5 Atlanta. We're associated in terms we have the
6 same privilege. We have the same clients.
7    MR. HARRIS: Who's his client?
8    MR. SHOREMAN: His clients are the
9 Defendants.
10    MR. WILLIAMS: We're probably going to
11 make that as a notice of appearance in the case.
12    MR. SHOREMAN: But you haven't yet,
13 correct.
14    MS. KATSANTONIS: Who is your client?
15    MR. WILLIAMS: The Defendants.
16    MS. KATSANTONIS: Who?
17    MR. WILLIAMS: The Defendants.
18    MR. SHOREMAN: He's my associated
19 attorney. We're working together on details.
20    MR. WILLIAMS: Did y'all want to get
21 Urbanski on the phone or something. I mean,
22 because this is not -- we're taking up 15 minutes.

14

1    MS. KATSANTONIS: No, I just want to
2 understand your involvement since you haven't --
3 because you just intervened and that had been
4 denied. And then, you know, you -- this is the
5 first time you appeared and I was unaware of any
6 relationship between the law firms.
7    MR. SHOREMAN: Yeah. They're --
8    MS. KATSANTONIS: So NDH, what does
9 that stand for?
10    MR. KOWALCZUK: What does NDH stand
11 for? I don't know. It's just NDH. It's
12 registered as NDH.
13    MS. KATSANTONIS: Was that related to
14 Derechos Humanos?
15    MR. WILLIAMS: If you look on my web
16 page I credit Mike with finding the law firm and
17 stuff like that. It's just NDH. It's registered
18 as NDH. It's not a doing business as or anything.
19    MS. KATSANTONIS: Nexus Derechos
20 Humanos, NDH?
21    MR. WILLIAMS: Like I just told you,
22 it's registered as NDH. So if we want to get

15

1 Urbanski on the phone we can; if not, we need to
2 start the deposition.
3    MS. KATSANTONIS: No, I just wanted to
4 make sure on the record I understood.
5    MR. WILLIAMS: Now you do.
6    MS. KATSANTONIS: All right. We'll
7 note an objection just until an appearance is
8 made.
9    MS. PETERS: And Vivian, just so that
10 we can put on it the record, I mentioned it to you
11 before we started, Mr. Donovan is not feeling well
12 today. We didn't want to delay or suspend the
13 deposition. I'm just letting you know he doesn't
14 feel well today.
15    THE WITNESS: So if I could. I
16 appreciate your hospitality. If there's any way
17 to turn up the heat just a little bit because I'm
18 running a small temperature this morning I have
19 been for a couple days. I feel okay but I may
20 have to take more breaks than I normally would.
21    MS. KATSANTONIS: Absolutely.
22    THE WITNESS: Normally I wouldn't take

16

1 a break at all. So I may very well need to take
2 breaks today and my lawyers have cautioned me to
3 do that because otherwise I'm just, you know,
4 feeling off, so --
5    MS. KATSANTONIS: No, absolutely.
6    THE WITNESS: -- you understand.
7    MS. KATSANTONIS: Chris will ask right
8 now that we turn up the heat which is always good
9 with me, I like it warm in the room anyway.
10    THE WITNESS: No pun intended, right?
11    MS. KATSANTONIS: Exactly. We have no
12 problem turning up the heat.
13    MS. PETERS: Much of the testimony will
14 be, I anticipate, covered by the protective order
15 entered in this case. I'm going to note an
16 objection at the beginning. If you're planning to
17 use information regarding financial records in a
18 proceeding rather than go through and object to
19 every single question, may I have an objection at
20 the outset of the deposition so that I don't
21 interrupt the flow of your examination?
22    MS. KATSANTONIS: Sure. You can have

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

17

1 an objection as to the financial records. I think
2 Judge Urbanski already ruled on that when we were
3 having the preliminary injunction hearings that --
4         MS. PETERS: Not in the protective
5 order though. The protective order is broader
6 than --
7         MS. KATSANTONIS: You're welcome to put
8 your objection on the record and I respect that.
9 I don't agree with it but I --
10         MS. PETERS: Do I need to object to
11 questions that go into matters that are covered by
12 the protective order or when the deposition
13 transcript is presented, I can at least flag for
14 you what I believe that was the statement in
15 Mr. Okonski's? I don't want to interrupt your
16 flow of the deposition.
17         MS. KATSANTONIS: Only as to the
18 financial records. If there's other areas you
19 think are protected I'd want to know at the time.
20 I don't believe there's any other areas that would
21 be in -- put into question, but I'm happy to hear
22 it.

18

1         MS. PETERS: Let me make sure I
2 understand. You agree as to the financial
3 records?
4         MS. KATSANTONIS: That you have an
5 objection. I don't agree to the propriety of it.
6         MS. PETERS: All right. We can agree
7 to disagree.
8         MS. KATSANTONIS: Right.
9         MS. PETERS: I'm just making sure that
10 I'm not accused of interrupting your deposition
11 flow. If I can avoid that, I'd like to do it and
12 try to make that objection at the beginning.
13         MS. KATSANTONIS: For the financials.
14         MS. PETERS: For financial and anything
15 that may inadvertently come up, although I don't
16 expect it to, but it might, about an individual
17 program participant or maybe an HR issue. HR
18 issues are confidential. But we have a protective
19 order in this case and I want you to be able to
20 cross-examine the witness as you choose.
21         MS. KATSANTONIS: Okay. Thank you.
22         MS. PETERS: Subject to the

19

1 cross-examination being protected by the
2 privileges --
3         MS. KATSANTONIS: Right.
4         MS. PETERS: Not privileges but
5 protections of the protective order.
6         MS. KATSANTONIS: Okay. We're also
7 going to put on the record that we still have not
8 received significant documents that we've
9 requested and that includes the full Capsule
10 documents. You gave us a thumb drive at
11 Mr. Schneider's deposition. During the deposition
12 it became apparent that the only documents
13 provided were the call notes rather than the
14 entire Capsule files, and so we've asked for
15 those, haven't still received them. So we're
16 going to reserve our rights to this deponent and
17 any other depositions as a matter of these
18 documents being produced late.
19         In addition, we were supposed to
20 receive last night additional documents, including
21 the second production -- sorry, including the
22 final installment of emails and updated financial

20

1 records, which we've asked for quite some
2 time. And so, again, we're going to reserve our
3 rights with regard to depositions on those
4 documents that haven't been received.
5         MS. PETERS: I understand that a link
6 was sent to you and that inadvertently when the
7 link was sent to you, you were unable to access
8 it. And I believe that communications have been
9 made to the counsel that prepared that link so
10 that you'll have those informations -- that
11 information available to you.
12         We apologize for any confusion in that
13 area. Certainly it was inadvertent.
14         MS. KATSANTONIS: Well, there's a lot
15 of documents and we'll give you that we haven't
16 been produced. Reports from LiteSpeed that
17 witnesses have started to testify regarding.
18 Certain other reports that are transmitted weekly
19 regarding bond breaches. There's been a few of
20 those produced but not all of them.
21         MS. PETERS: I've asked you to identify
22 in writing anything that you contend -- we've

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

21

1  produced about a million pages of records. If
2  there's something that you believe that has not
3  been produced, please just send me an email,
4  Ms. Katsantonis.
5          MS. KATSANTONIS:  Your witnesses have
6  testified --
7          MS. PETERS:  And we'll address it.
8          MS. KATSANTONIS:  -- to the documents
9  and we requested them in document requests.  So
10 we'll deal with that off the record.
11         MR. SHOREMAN:  Let me just put
12 something in the record because I just -- I
13 inquired about the link for the documents --
14         MR. HARRIS:  Sure.
15         MR. SHOREMAN:  -- yesterday.  I don't
16 know -- I don't know if you received this but I
17 just received Meredith Hurst will send you a link
18 in the additional production.  You got that yet?
19         MR. HARRIS:  No.  So --
20         MR. SHOREMAN:  Via share file.
21         MR. HARRIS:  Right.  So we've made
22 three requests starting last night for the

22

1  correction of the nonworking link.  It's 10:43
2  this morning and the latest communication we have
3  from the firm who apparently is the only counsel
4  who can resolve this, who is not here, just told
5  us that they're going to, in the future, provide
6  us a fix for the link.  So we still don't have it.
7          MR. SHOREMAN:  All right.  Well,
8  apparently Meredith Hurst is sending it to you.
9          MS. PETERS:  Can we please take up
10 discovery matters at the breaks --
11         MS. KATSANTONIS:  Yes.
12         MS. PETERS:  -- so that the witness
13 who --
14         MS. KATSANTONIS:  Absolutely.
15         MS. PETERS:  -- doesn't feel good can
16 be done with today.
17         MR. HARRIS:  Certainly.
18         MS. KATSANTONIS:  Yes.  And in that
19 regard, going back to that, Mr. Donovan,
20 absolutely please let me know -- oops.
21
22

23

1  Whereupon,
2              MICHEAL PAUL DONOVAN,
3  being first duly sworn or affirmed to testify to
4  the truth, the whole truth, and nothing but the
5  truth, was examined and testified as follows:
6    DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF
7  BY MS. KATSANTONIS:
8      Q   Thank you.  And I'm going to ask, also,
9  that the running clock for time starts now.
10         And prior to Mr. Donovan being sworn
11 in, we were advised Mr. Donovan isn't feeling
12 particularly well today so, again, I just want to
13 ask that you know if you're not feeling well at
14 any time please take the breaks you need, let us
15 know.
16         That being said, there's nothing that
17 will prevent you from truthfully and fully
18 answering the questions I ask you today?
19     A   No.
20     Q   Okay.  Thank you.
21         And Mr. Donovan, you've been deposed
22 before, right?

24

1      A   I have not.
2      Q   You've not?
3      A   My first time, Vivian, it's exciting.
4      Q   Lucky you.  Okay.
5      A   I get to work with Vivian Katsantonis
6  my first time ever.  I mean that.
7      Q   So you know how depositions obviously
8  go, right?
9      A   Yep.
10     Q   So we'll ask you a series of questions.
11 I sometimes ask them inartfully so if you don't
12 understand my question please just ask me to
13 rephrase it.  Sometimes when we start engaging in
14 a conversation we might start overlapping each
15 other --
16     A   I can't imagine.
17     Q   -- so we'll both try.
18     A   That will never happen.
19     Q   I know I will be mindful and please be
20 mindful --
21     A   I will be mindful.
22     Q   -- so that this court reporter can take

25

1  our testimony --
2      A   I literally just did it.
3      Q   -- your testimony.
4      A   Did you see that?  But I'll be mindful.
5      Q   So can you please just state your name
6  and address for the record?
7      A   Sure, Micheal Paul Donovan, 47 South
8  Windsong Court, Fisherville, Virginia, 22039.
9      Q   Okay.  And Mr. Donovan, can you spell
10 your name for the record?
11     A   M-I-C-H-E-A-L, P-A-U-L, D-O-N-O-V-A-N.
12     Q   Okay.  So you said E-A-L but I see that
13 there's documents that you sign with A-E-L?
14     A   So my name is spelled E-A-L but
15 sometimes --
16     Q   Is that your legal time?
17     A   That's my legal name.  Sometimes
18 documents show up as A-E-L.  I mean people
19 misspell my name.  I generally try not to misspell
20 my name but sometimes people do.  The common
21 spelling of Micheal is A-E-L, so I get that a lot.
22     Q   So E-A-L has always been the spelling

26

1  of your name?
2      A   That's the one on my driver's license.
3      Q   That's on your driver's license today.
4  But have you always spelled your name E-A-L?
5      A   I have always spelled my name E-A-L.
6      Q   And that's always been the legal
7  spelling of your name?
8      A   Correct.
9      Q   Okay.  And you understand we're here
10 regarding the litigation between RLI Insurance
11 against Nexus Services, Inc., Libre by Nexus, and
12 Homes by Nexus Inc.?
13     A   Yes, ma'am.
14     Q   And if I use terms like RLI Company,
15 Nexus, Libre, and Homes, do you understand what
16 I'm referring to?
17     A   I do.  And if I don't I'll make sure I
18 ask a clarifying question.
19     Q   Great.  And did you prepare for this
20 deposition?
21     A   Sort of.  Yeah, I guess so.  Yeah.
22     Q   Okay.  What did you do to prepare?

27

1      A   I got here yesterday.  I came here this
2  morning.  I got lost in your parking garage which
3  is very confusing by the way.  But I have met with
4  lawyers for a couple hours yesterday.
5      Q   Okay.  And did you review some
6  documents to refresh your recollection?
7      A   I did review a few documents.
8      Q   Okay.  So I just want to generally get
9  an understanding.  I seem to recall that you went
10 to law school so I want to get an understanding of
11 your background, your educational background.  Can
12 you let me what that is?
13     A   Sure.  I have a Bachelor's degree in
14 business management from Western Governors
15 University.  I have -- I did not graduate law
16 school.  I finished my -- in my second year almost
17 done.  And maybe one day I'll go back and finish
18 that.  Although I've been busy.  So it's been
19 difficult to get on that bucket list, you know,
20 but I am going to do it one day.
21     Q   Where did you go to law school?
22     A   Charlotte School of Law.  This is one

28

1  of the reasons why I didn't finish because the
2  school shut down.
3      Q   Where is that located?
4      A   It's in Charlotte, North Carolina.
5      Q   Okay.
6      A   So when it shut down there was a
7  teach-out program.  I was doing it sort of
8  part-time.  The teach-out program would have
9  required people to move to like Phoenix and do the
10 full-time.  It just didn't make sense.
11     Q   Right.  So what year did you receive
12 your bachelor's degree?
13     A   2000 and -- I don't know.  I'm not
14 sure.  I'm not a hundred percent certain.  I don't
15 want to provide a wrong answer.
16     Q   And what year did you attend the two
17 years of law school?
18     A   I -- it was in the 2000 and teens but I
19 don't want to give you -- I just don't want to
20 provide the wrong -- you know what I mean?  I'm
21 not a hundred percent sure.
22     Q   Uh-huh.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

29

1    A    I apologize.
2    Q    What year did you graduate from high
3  school?
4    A    I got my GED -- I received my GED in
5  1996.
6    Q    And you're also a minister; is that
7  correct?
8    A    I am.
9    Q    Licensed?
10    A    I am.
11    Q    Okay.  And do you have any other
12 certifications or professional qualifications?
13    A    No.
14    Q    All right.  When did you form Nexus
15 Services, Inc.?
16    A    Nexus Services, Inc., was formed, I
17 believe, in 2014, 2000 -- it was between 2013 and
18 2014.
19    Q    Okay.  And prior to forming Nexus, can
20 you give me a general understanding of what was
21 your employment, let's say, since starting in the
22 2000s?

30

1    A    Sure.  I have done ministry both in
2  jail, prison ministry, you know, ministry of
3  homeless, ministry of individuals who are trapped
4  in sort of, you know, that cycle.  So those types
5  of things.  So I've done that kind of work.  I've
6  done lobbying work.  I've done retail work.
7    Q    Okay.  As far as -- so when did you
8  start forming -- was Nexus Services your first
9  formation of a business to get into the business
10 of facilitating immigration bonds?
11    A    Yes.  Yeah.
12    Q    Okay.  So prior to that were you in any
13 sort of business regarding bail bonds?
14       MS. PETERS: Object to form.
15    A    So I -- in two ways; one, I had a
16 program that was designed -- the way Nexus started
17 was a program that was working with criminal
18 defendants, some of whom were pre-entry or on
19 bond, some of whom were coming out of custody that
20 were reentering society.  So that may be what
21 you're talking about because I think we've had a
22 conversation about that before.

31

1       The other thing is I have done some
2  lobbying work related to bail bond issues.  So
3  those two things I would say.
4    Q    So when you say pre or -- I don't know
5  that area very well --
6    A    Oh, sure.
7    Q    -- so excuse me for my ignorance.
8    A    No, please.
9    Q    But when I say pre -- you know, you
10 were doing some work with the prebail bond.
11    A    Uh-huh.
12    Q    I'm just trying to understand.  Like
13 did you ever work for or were affiliated with any
14 bail bond company?
15    A    So as I --
16       MS. PETERS: Object to form.
17    A    As I told you, I did -- I'm sorry.
18       MS. PETERS: Would you two allow each
19 other to have a brief pause between the question
20 and answer.  You both speak very rapidly and
21 you're talking over each other.
22       MS. KATSANTONIS: Sure.

32

1    A    We enjoy talking, that's the problem.
2  But could you repeat the question?
3    Q    So I'm just trying to understand what
4  you did with regard -- did you have any
5  affiliation or connection with any kind of bail
6  bond company or services program for bail bonds?
7    A    Like in posting bonds?
8    Q    Or GPS, or any services that relates
9  to --
10       MS. PETERS: Object to form.
11    A    No.  I mean, I've done lobbying.  So I
12 did lobbying work for a company called Bail USA,
13 lobbying work for individuals in the bail space.
14 But I don't -- I don't know what you're talking --
15 I don't know what you're referring to.  I would
16 have to say no unless --
17    Q    You did --
18    A    -- you were more specific.
19       MS. KATSANTONIS: You did lobbying --
20       MS. PETERS: Object to form.  Please
21 let him finish his answer before you start the
22 question.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

33

1       MS. KATSANTONIS:  Sure.
2    Q   I'm just trying to understand prior to
3 Nexus Services, what involvement you had with --
4 your testimony is that in 2014 when you formed
5 Nexus Services that was the first -- your first,
6 for lack of a better word foray into immigration
7 bond services?
8    A   Right.
9       MS. PETERS:  Object to form.
10   Q   So prior to that, I'm just trying to
11 understand, you know, how did that come to be --
12   A   I understand.
13   Q   -- and your involvement in the bail
14 bond community.
15   A   I understand.  Well, again, as I
16 indicated a lot of that work was legislative,
17 right, so there were some legislative issues in a
18 few different states that I worked on vis-à-vis
19 the bail bond industry.  All of those issues
20 related to pretrial detention, you know, bond
21 amounts or the qualifications of individuals
22 applying for pretrial release and what pretrial

34

1 release agencies could do and couldn't do in those
2 individual communities.
3       So that work was — you learn a lot
4 about obviously the subject matter when you're
5 working in that — in that way.  And so I
6 certainly learned a lot about the issue and then
7 became aware of how unfair the immigration, for
8 lack of a better word, justice system is, even
9 more unfair than the criminal justice system
10 vis-à-vis individuals entering or preentering
11 because those individuals are faced with very high
12 bond amounts that they have to pay and there are
13 bonds that are required to be secured.  So the
14 chances of these individuals, many of them are
15 indigent so they don't have the ability.  And so I
16 became acutely aware of a lot of the pain and
17 suffering that was happening as a result of
18 that —
19   Q   Okay.
20   A   — area.
21   Q   But with regard to criminals who were
22 perhaps --

35

1    A   Criminal defendants.
2    Q   Criminal defendants who were out on
3 bail, did you have any involvement in that
4 process?
5       MS. PETERS:  Object to form.
6    A   We -- as I told you, when we did the
7 pre-entry program we were working with people that
8 were released on bond, yes.
9    Q   That were what?
10   A   That were released on bond under the
11 criminal --
12   Q   So what pre-entry program?  What are
13 you talking about?
14   A   Well, we called it Project Nexus so it
15 has the same name and it is the genesis really of
16 it and the idea, which is around the idea of how
17 do people perform in criminal bond situations,
18 right?
19   Q   Okay.
20   A   Well, you asked.  I want to make sure
21 because --
22   Q   I know, but I don't --

36

1    A   But it's my deposition.  I really want
2 to make sure you have my answer, right?  In the
3 criminal bond space what we decided was that
4 people who — when we look at it, people who fail
5 to appear, fail to appear because — not because
6 they decided they weren't going to come to court
7 but something happened in the process.  And so
8 what we believed is if you could provide strategic
9 support to individuals in crisis through that
10 process, they'd comply, which is better for
11 everybody and ultimately better for them.
12   Q   So that's Project Nexus?
13   A   Right.
14   Q   Is that a company?
15   A   It was.  Yeah, it was —
16   Q   And when was --
17   A   It was a nonstock.  It was designed to
18 be a charitable.  We were trying to run it as sort
19 of an opportunity for people to get help.  It
20 wasn't really started as a business initiative.
21   Q   And what year were -- what years were
22 you doing Project Nexus?

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

10 (37 to 40)

37

1    A    I'm not a hundred percent.  It was
2  around 2010 but I'm not a hundred percent sure.
3    Q    Okay.  But were you at any point in
4  time, prior to 2014, providing either bail bonds
5  or GPS tracking services for criminal defendants?
6    A    Yes.  GPS tracking services for people
7  on the pre-entry program, some of them, yes.
8    Q    On the pre-entry program.  They had to
9  sign up with program Nexus?  Is that what you're
10 saying?
11   A    Right.  Yeah, they had to -- so --
12 well, sometimes it was individuals who were
13 ordered on bond and the bond included a condition
14 for GPS and there was no one in the Hampton Roads
15 area, for example, which is where we were doing
16 that, that could do the GPS.  So there just wasn't
17 a private company.
18   Q    So you provided GPS --
19       MS. PETERS:  Object.  Object to form.
20 Please let him finish his answer.
21       MS. KATSANTONIS:  I think I did.
22   Q    So you provided GPS services to

38

1  criminal defendants, GPS tracking services for
2  criminal defendants?
3    A    Right.  We did.
4    Q    Okay.  And was that local?  Was that
5  all in Virginia or was there other places you did
6  that?
7    A    I would say it's almost all Virginia,
8  but I can't tell you that there weren't a couple
9  of people.  I mean, yeah.
10   Q    Okay.  And was that all in the name of
11 Project Nexus or was there another company or
12 affiliate name?
13   A    We were doing lobbying under the
14 Criminal Justice Reform Coalition, and that's kind
15 of how it started.  So the offices that that was
16 ran out of were the Criminal Justice Reform
17 Coalition offices.
18       MS. PETERS:  Guys, I'm going to ask you
19 to please slow your speech down because the court
20 reporter is really struggling to get the
21 testimony, I believe.
22       MS. KATSANTONIS:  Okay.

39

1        MS. PETERS:  Given the heavy sigh.
2    Q    So there's no other company or
3  corporation that you did that work under?
4    A    Not that I can recall.
5    Q    Okay.  And then who are you employed
6  by?
7    A    Nexus —
8        MS. PETERS:  Object to form.
9    A    Nexus Services, Inc.
10   Q    Okay.  And who signs your paychecks?
11   A    I don't know.
12   Q    Could your paychecks be on Libre by
13 Nexus checks?
14   A    It could be.  I haven't gotten a
15 paycheck in a while.  I haven't physically
16 received a paycheck and deposited it in a really
17 long time.
18   Q    Did the payments come out of a Nexus
19 Services account or Libre by Nexus account?
20       MS. PETERS:  Object to form.
21   A    I don't know.  I don't handle payroll.
22   Q    Who handles payroll?

40

1    A    Our HR department.
2    Q    Who in HR?
3    A    Lisa -- Lisa Breeden is our director of
4  human resources and she's responsible for the
5  day-to-day operations there.
6    Q    Are you salaried?
7    A    I am.
8    Q    And what's your salary?
9    A    I'm a little embarrassed to say that I
10 don't know.  I took a pay cut as part of an effort
11 to streamline costs and prepare for litigation
12 budgets, et cetera, et cetera, so I honestly don't
13 remember what it is.  I apologize.  I can
14 certainly check.  I don't want to be -- obfuscate,
15 I just don't know and I don't want to tell you the
16 wrong thing.
17   Q    How many employees does Nexus Services
18 have?
19   A    I also don't know exactly.  I think
20 we're between a hundred and 150.  But to be honest
21 with you, it's a moving number.
22   Q    Where are those employees located?

41

1     MS. PETERS:  Object to form.
2     Are you asking about Nexus or Libre?
3     MS. KATSANTONIS:  I asked for Nexus.
4     Q    So a hundred to 150 employees for Nexus
5 Services?
6     A    Well, Nexus Services is a common
7 paymaster so all the payroll is operated out of a
8 common paymaster, and that's an arrangement that
9 we had worked with our former tax attorney at
10 Gentry Locke to set up.
11     So when I say hundred and 150, I
12 thought you were talking about payroll, and I was
13 just answering the number of people that are on
14 payroll.  That would be for multiple companies.
15 Obviously, they're employees of Homes, et cetera.
16     Q    So the hundred to 150 employees include
17 Libre by Nexus and Homes and other companies?
18     A    Correct.  You asked about payroll and
19 so I was responding in that way.
20     Q    Okay.  And do you know how to divide
21 up, how many employees work for Nexus Services,
22 Inc.?

42

1     A    Well, sure.  I mean, I guess I — first
2 of all, on our employee roster the company is
3 listed.  So a very easy way to do that would be to
4 pull the employee roster and sort by company.  I
5 could also go through a list of our employees and
6 probably tell you.
7     Q    Okay.
8     A    I would hope.
9     Q    Okay.  And what is your title at Nexus
10 Services?
11     A    President and CEO.
12     Q    And very generally what are your roles
13 and responsibilities?
14     A    Very generally, being responsible for
15 everything.  And in handling crises and putting
16 out fires.
17     Q    Okay.
18     A    Not unlike a lawyer.
19     Q    And what is your title at Libre by
20 Nexus?
21     A    So I am the president and CEO of Libre
22 as well.

43

1     Q    Okay.  Same roles and responsibilities
2 generally?
3     A    Correct.  Well, same roles.  Quite
4 different responsibilities.
5     Q    What's the difference in the
6 responsibilities at Libre verse Nexus?
7     A    Well, Libre is client facing.  And so
8 you are dealing with clients all the time.  It is
9 the passion I have for the work that we do, so
10 naturally that is hugely important to me.  Being
11 able to make a difference in people's lives is
12 really, really incredible.
13     Q    Do you distinguish work hours for Libre
14 verse Nexus?
15     A    Well, I work all the time, Vivian, so I
16 don't really distinguish work hours versus nonwork
17 hours, to be honest with you.
18     Q    Right.  What is your title at Homes?
19     A    Same.
20     Q    Okay.  And what are your roles and
21 responsibilities at Homes?
22     A    Generally speaking, the same.  We have

44

1 property management.  So, you know, I'll deal with
2 issues or crises.  I'm very fortunate to have
3 wonderful employees and a great team of people who
4 handle the operational day-to-day.  So, you know,
5 I'm pleased and proud of that team.
6     Q    Do you receive any compensation from
7 Homes?
8     A    No.  I don't -- I don't receive any
9 direct compensation from Homes.
10     Q    Okay.  Do you -- what are the assets of
11 Homes?
12     A    Well, I don't know off the top of my
13 head.  So I want to be careful not to answer a
14 question based on what I think I know.
15     Q    Are the properties that are listed in
16 the Nexus balance sheets or profit and loss
17 statements, are those properties Homes assets or
18 Nexus assets?
19     A    Well, the properties are encapsulated,
20 for the most part, in LLCs.  That is pretty common
21 in a property management situation, I understand.
22 That was advice of counsel that I followed.  So I

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

12 (45 to 48)

45

1    don't really understand the difference.
2        I mean, you know, these are properties
3    that are managed by Homes, right, they're managed
4    by Homes, Homes is a property management company.
5    Many of the properties were acquired by Nexus
6    Properties, LLC or other LLCs and many of the
7    properties exist in an LLC denoting the name of
8    the property.
9        Q   And are the LLCs who own the property,
10   are you an individual owner of the LLCs?
11       A   No, I'm a manager.
12       Q   You have no ownership in the LLCs who
13   own the properties?
14       A   I'm a manager. I have to -- I have to
15   probably admit that your understanding of
16   corporate law and mine probably very much a delta.
17   So I'm a manager of the LLC, and I can tell you
18   that. What that means legally...
19       Q   Right. Well, do you know whether or
20   not you have an ownership interest in any of the
21   LLCs?
22       A   I know that I'm a manager --

46

1        MS. PETERS: Objection.
2        A   -- of the LLCs.
3        Q   So you don't know whether or not you
4    have an ownership interest?
5        MS. PETERS: Object to form.
6        A   I do know that I'm a manager. I assume
7    that that obviously -- I know that there are
8    managers of the LLC, and I know that can be as an
9    ownership interest. I don't know the legality of
10   that and I'm not going to comment on it because
11   I'm not -- I don't know, so...
12       Q   Right. Well, the owner of an LLC is
13   typically called a member.
14       A   Uh-huh.
15       Q   And then you have a managing member.
16       So do you know if you're a member of
17   the LLCs?
18       MS. PETERS: Object to form to the
19   extent that it calls for a legal conclusion.
20       MS. KATSANTONIS: Sure.
21       A   I am a member of the LLC.
22       Q   Okay.

47

1        A   And perhaps I was inartfully using the
2    word manager and member.
3        Q   Right. Are you a member of every LLC
4    that owns the properties?
5        MS. PETERS: Object to form.
6        A   I believe so.
7        Q   And do you know what percentage member
8    you are?
9        A   I don't.
10       Q   Is it more than 50 percent?
11       A   I don't know.
12       Q   Who are the other members of the LLCs?
13       A   I know Richard Moore is a member of the
14   LLC. I don't know for sure the others and so I
15   don't want to -- I don't -- I don't know for sure.
16       Q   Okay. Is it possible that besides you
17   and Mr. Moore there's no other members of the
18   LLCs?
19       MS. PETERS: Object to form.
20       A   It's -- I guess it's possible since
21   I -- I don't know.
22       Q   Who would know that?

48

1        MS. PETERS: Object to form.
2        A   I could look at the records and get
3    back to you.
4        Q   Okay. And those LLCs, those were
5    formed by Gentry Locke?
6        A   That's correct.
7        Q   Okay. And Gentry Locke has since
8    resigned as the registered agent for those LLCs;
9    is that correct?
10       MS. PETERS: Object to form.
11       A   We've switched registry agents, that's
12   correct.
13       Q   Who is the replacement registered
14   agent?
15       A   I'm not a hundred percent certain.
16       Q   Well, who do you believe it to be?
17       MS. PETERS: Object to form.
18       A   I believe it to be CT or Corporation
19   Service.
20       Q   Okay. Does Nexus Services receive rent
21   for Homes?
22       MS. PETERS: Object to form.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

49

1    **A    Does Nexus Services receive rents from**
2 **Homes?  No.**
3    Q    Does Nexus Services receive rents
4 directly for the properties?
5    **A    No.  That -- no.  And to be clear, I**
6 **mean, that's no.  Homes by Nexus receives rent for**
7 **properties —**
8    Q    Okay.
9    **A    — that Homes manages.  Which is very**
10 **typical of a property management company.**
11    Q    And who pays the bills for the
12 mortgages?
13    MS. PETERS:  Object to form.
14    **A    I don't know.  I would assume our**
15 **finance team.**
16    Q    At Nexus?
17    **A    We have a finance team at Homes and a**
18 **finance team at Nexus.**
19    **How those checks are cut on a daily**
20 **basis or a monthly basis, I don't know.**
21    Q    Is it accurate that the vast majority
22 of revenue that comes in to Nexus Services is

50

1 through Libre by Nexus?
2    MS. PETERS:  Object to form.
3    **A    Yes, I would say that's true.**
4    Q    Right?  And so other than perhaps rent
5 from Homes, is there any other revenue stream to
6 Nexus Services?
7    MS. PETERS:  Object to form.
8    **A    No.**
9    Q    And was the revenue stream that was
10 obtained through Libre by Nexus used to purchase
11 the homes?
12    MS. PETERS:  Object to form.
13    **A    I would assume.  I don't know the**
14 **exact — I would assume so.**
15    Q    All right.  If there is a -- well, with
16 regard to the bills for the mortgages of the home
17 properties, are those paid by Libre by Nexus or
18 Nexus Services fund?
19    **A    I don't know for sure, but I assume —**
20 **I assume so.**
21    MS. PETERS:  Object to form.
22    Q    Okay.

51

1    **A    And, Vivian, I apologize for the — I**
2 **just want to answer your questions directly --**
3    Q    No.  I --
4    **A    -- and understand you.**
5    Q    -- I appreciate it.
6    **A    I appreciate you.**
7    Q    All right.  I'm going to show you,
8 we're going to mark this as Exhibit 1.
9    (Donovan Exhibit 1 marked for
10 identification and attached to the transcript.)
11    Q    We have to let her mark it first.
12    **A    Oh, sure.**
13    Q    This is a document that was presented
14 to RLI.  It was used in a 30(b)(6) deposition in
15 November of 2018.
16    **A    Okay.**
17    Q    And so I guess my first question will
18 be in looking at this document, you can take a
19 quick look, does that adequately depict the Nexus
20 Services companies --
21    MS. PETERS:  Object to form.
22    Q    -- and owner --

52

1    MS. PETERS:  Object.
2    Q    -- and ownership?
3    MS. PETERS:  Sorry.  Didn't mean to
4 interrupt.
5    Object to form to the extent that it
6 calls for a legal conclusion.
7    **A    Can you give me a moment just to --**
8    Q    Absolutely.  There's a lot on there.
9    **A    I appreciate it.  And the yellow boxes**
10 **are difficult.  It looks correct with the**
11 **exception of Nexus retail brands.  We — Nexus is**
12 **not in the retail business.  We were going to be**
13 **in the retail business and made a decision that it**
14 **was not part of our core mission and didn't align**
15 **with what we were doing.  So that is no longer a**
16 **part of our operations, but everything else is**
17 **correct.  It looks correct.**
18    Q    As far as there's dates under them --
19    **A    Yes, ma'am.**
20    Q    -- as to when they were formed.
21    Are those dates that you can confirm?
22    **A    Unfortunately, I can't independently**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

53

1  confirm any of those dates because I just -- you
2  know, my memory -- I just wouldn't know.  They
3  look correct, but I wouldn't be able to confirm
4  exactly.
5      Q    All right.  And we talked about that
6  the revenue that goes to Nexus Services, Inc., I'm
7  trying to use a word that you're -- the vast
8  majority is funds received from Libre by Nexus,
9  right?
10     A    Right.
11     Q    And the funds received by Libre by
12 Nexus is the, again, vast majority of the revenue
13 received by Libre by Nexus payments from program
14 participants?
15         MS. PETERS:  Object to form.
16     A    So you're asking if the majority of our
17 payments are payments that are made to Libre by
18 program participants?  I think that's a fair thing
19 to say, sure.
20     Q    Right.  The source of revenue --
21     A    Yeah.
22     Q    -- for Libre by Nexus?

54

1      A    Yeah.  Because the clients are making
2  payments.
3      Q    Right.  Is there any other revenue
4  source for Libre by Nexus other than the program
5  participant payments?
6      A    No.
7      Q    And I guess --
8      A    Not that I'm aware of.
9      Q    Right.  Let me just ask one more
10 because I know there's -- the -- the rents that
11 are received from Homes, do you know where those
12 payments go to?  You think they go to Homes?
13         MS. PETERS:  Object to form.
14     A    So ultimately -- so they do go to Homes
15 and then ultimately I think bubbles up to -- you
16 know, so there's a -- there may be -- I don't know
17 how that process works so I want to be cautious
18 not to say something that's just inaccurate or
19 inartful.
20     Q    Okay.  So why was Libre by Nexus formed
21 as a separate entity?
22         MS. PETERS:  Object to form.

55

1      Q    Than Nexus Services?
2      A    You know, I -- we were having -- I'm
3  trying to remember that conversation with counsel
4  at the time.
5          MS. PETERS:  Object to form.  To the
6  extent that you are communicating legal advice
7  that Mr. Gust or your then corporate counsel would
8  have been communicating with you, Ms. Katsantonis
9  does not want to ask you, nor should you
10 provide --
11     A    Right.
12         MS. PETERS:  -- that information.
13         THE WITNESS:  Absolutely.
14     A    You know, the -- from my perspective,
15 we -- there are direct services that we provide to
16 clients, and then there are services, support
17 services that are provided to field personnel.
18 They're very different roles, right?
19         And in the Nexus Services environment,
20 you have individuals that are serving, you know,
21 field personnel, internal customers, if you will.
22         And on the Libre side, you have

56

1  individuals that are serving clients.  And in my
2  mind it made sense that there be a separation and
3  a distinction because the work is completely
4  different.
5          And I feel, as a CEO, I think it bears
6  out that people are better when they are better
7  performers, when they know exactly what's expected
8  of them and they understand what they're supposed
9  to do and any decisions that we made in that
10 regard, Vivian, were designed to make sure that
11 our employees were focused on the work that they
12 were doing so that they could do the best work
13 possible for our clients.
14     Q    Okay.  So distinguishing -- so the work
15 that's done, I just want to make sure, I might
16 have gotten it confused.  So Libre is doing the
17 work with the program participants?
18     A    Correct.
19     Q    And Nexus Services is doing more work
20 with the management, you know, like the case
21 managers, et cetera, for the program
22 participants --

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

15 (57 to 60)

57

1        MS. PETERS:  Object to form.

2      Q    -- or what's the distinction?

3        MS. PETERS:  Object to form.

4      A    Yeah, so Nexus Services is doing more
5   work related to sort of supporting Libre.  So
6   if -- Nexus Services is a support company for
7   Libre.  And it's a support -- you know, as one
8   company then would support another.  That's I
9   think the best way I can describe it.

10     Q    Okay.  But they share funds, right?

11       MS. PETERS:  Object to form.

12     A    I don't know.  I don't know that I
13  would say that they share funds.  I think that
14  that -- I don't think that the companies share
15  funds.  I think that it's possible that funds go
16  from one company to another and that, you know,
17  would be -- I don't necessarily want to agree with
18  that statement because I don't think I agree with
19  the way you've said it.

20     Q    Well, all the funds are coming into
21  Libre.

22     A    I think the concern is the word "share"

58

1   and I just don't want to agree.  Something tells
2   me you may mean something different than me, and I
3   just don't -- well, maybe, but maybe, and I just
4   want to be careful not --

5      Q    Right.

6      A    -- to agree to a word that I am
7   uncomfortable with.  So the word "share" makes --
8   I don't think that word is what I would use but I
9   certainly do believe that Nexus Services
10  ultimately ends up receiving revenue that Libre
11  receives from clients.  I think that's absolutely
12  true.  So if that's what you're asking.

13     Q    Right.  I mean, there -- and Libre,
14  there's a Libre operating account, right?

15     A    I believe so.

16     Q    And from that operating account funds
17  are transferred to other accounts or, first of
18  all, they're transferred to other Nexus or Libre
19  accounts?

20       MS. PETERS:  Object.

21     Q    Or Homes accounts, right?

22       MS. PETERS:  Object to form.

59

1      A    There are transfers.

2      Q    Right.

3      A    Speaking specifically, I don't -- I
4   don't -- I can't speak specifically to something
5   that's not specific.  I'm sure there are
6   transfers, for sure.

7      Q    And there's transfers even to -- at one
8   point Caridades, which is a law firm, right?

9        MS. PETERS:  Object to form.

10     A    So Caridades is a program for pro bono
11  legal assistance.  At one time a firm called Nexus
12  Caridades Attorneys existed, but the Caridades
13  program existed before that firm and exists after
14  it.

15     Q    Right.  So let me get back.  The Nexus
16  Services we talked about, they have no source of
17  revenue other than from Libre by Nexus?

18       MS. PETERS:  Object to form.  Misstates
19  prior testimony.

20     A    I think they have a source of revenue
21  from Libre by Nexus.  I would again say it
22  slightly differently.

60

1      Q    Well, okay.  What source of revenue
2   does Nexus have independent of revenue from Libre
3   by Nexus or --

4      A    Oh, I didn't say --

5      Q    To the extent they get rent from Homes.

6      A    I didn't say they have other, I just --
7   I'm answering the question.  I want to make sure I
8   don't want to agree to words I don't think --

9      Q    Sure.  I'm not trying to be -- I'm
10  sometimes inartful.

11     A    No, it's a hundred percent.

12     Q    Yeah, let's just go with -- so Nexus
13  Services has no source of revenue independent of
14  Libre or Homes?

15     A    I think that's right, yeah.

16     Q    Okay.  And Nexus Services expenses are
17  all paid from those funds?

18       MS. PETERS:  Object to form.

19     A    To the extent that those funds are
20  received from Libre to Nexus and then used to pay
21  expenses, sure, I think that's -- I think that's
22  correct, yeah.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

61

1      Q     And that would include all obligations
2  of Nexus, all surety obligations for immigration
3  bonds?
4           MS. PETERS: Object to form to the
5  extent that it calls for a legal conclusion.
6  Vague.
7      A     Nexus Services is the party on the
8  general indemnification agreement with your client
9  and Nexus Services does pay when necessary, as you
10 know.
11     Q     Right. And those payments are coming
12 from the funds received from Libre or Homes --
13          MS. PETERS: Object.
14     Q     -- correct?
15          MS. PETERS: Object to form of the
16 question.
17     A     Well, those payments are coming from
18 funds we receive, yes, which is -- yeah.
19     Q     Derived from Libre or Homes, correct?
20          MS. PETERS: Object to form.
21     A     Well, yes.
22     Q     Okay.

62

1           MS. PETERS: Is this a good time to
2  take a short break?
3           THE WITNESS: I think a bio break would
4  be good.
5           THE VIDEOGRAPHER: We are going off the
6  record at 11:20.
7           (Recess taken.)
8           THE VIDEOGRAPHER: We are back on the
9  record at 12:11.
10 BY MS. KATSANTONIS:
11     Q     Okay. Prior to the break we had looked
12 at the corporate formation sheet, which was one of
13 the exhibits.
14     A     Yes, ma'am, I have it right here.
15     Q     Okay. And Libre by Nexus says it was
16 formed in June of 2014.
17     A     That's what it says, yep.
18     Q     Right. So around the time Libre was
19 formed, is it at that point that it began
20 providing the services you talked about earlier to
21 program participants?
22     A     Right. Yeah. We would have formed it

63

1  for that. So they would -- that would have
2  started it right after or shortly after.
3      Q     Okay. And is that --
4      A     And I would say that, you know, I'm
5  going to tell you that this date looks right. I
6  don't have any independent con -- you know what I
7  mean?
8      Q     Right.
9      A     Like I --
10     Q     We could look at the --
11     A     Sure. I could look at --
12     Q     -- formation document.
13     A     Of course, yes.
14     Q     Okay. And would that be true as far as
15 would it have been at this date or shortly
16 thereafter that Libre by Nexus began collecting
17 the revenue we talked about from program
18 participants?
19     A     Right. Because it didn't exist before.
20 So it wouldn't have been collecting it before. It
21 would have started collecting it when it existed.
22 I think it probably would have started operating

64

1  very quickly after its -- after its creation,
2  yeah.
3      Q     Okay. So to the best of your
4  knowledge, shortly after its creation Libre by
5  Nexus started receiving the revenue from program
6  participants?
7      A     Correct.
8      Q     Is that correct?
9           MS. PETERS: Object.
10          MS. KATSANTONIS: Sorry.
11     Q     That was correct, right?
12     A     That is correct.
13     Q     Okay.
14          MS. PETERS: Object to form.
15     Q     And --
16     A     I'm going the pause when I answer.
17     Q     All right. And so do you recall that
18 Nexus Services' first introduction with RLI was
19 probably sometime around April of 2015?
20          MS. PETERS: Object to form.
21     A     I don't -- I don't recall but that
22 sounds right.

---

**65**

1    Q    Okay.  And prior to contacting RLI, who
2  was issuing immigration surety bonds at Nexus'
3  request?
4    A    There were multiple companies.  I'm not
5  a hundred percent sure who was immediately
6  preceding.
7    Q    What are the multiple companies that
8  Nexus was working with prior to RLI?
9    A    There was AIA, and I believe Financial
10 Casualty.  Although I'm just not a hundred percent
11 sure of the dates so I don't want to tell you
12 wrong.
13   Q    And what about when you say "Financial
14 Casualty" is that Financial Casualty Surety?
15   A    I believe that's what it's called,
16 yeah.
17   Q    What about International Fidelity,
18 IFIC?
19   A    That's AIA.  So AIA is Allegheny,
20 International Fidelity Associated Bond.  I don't
21 know, the name is like 20 times — 20 names long.
22   Q    Okay.  And that includes IFIC?

**66**

1    A    Correct.  I use AIA and IFIC
2  interchangeably.
3    Q    And then what about -- what bond agents
4  were you working with?
5        MS. PETERS:  Object to form.  During
6  what period of time?
7    Q    Prior to working with RLI.
8    A    We worked with Marco LiMandri.  We may
9  have worked with another bail agent but again I'm
10 not sure of the dates so I want to be -- I know
11 that we worked with Marco.
12   Q    Is Marco the primary agent that Nexus
13 worked with?
14   A    He is.
15       MS. PETERS:  Object to form.
16   Q    And when did you first form a
17 relationship with Mr. LiMandri?
18   A    I don't recall.
19   Q    Would it have been prior to the
20 formation of Nexus Services, Inc.?
21   A    Likely.
22   Q    Okay.  Did you do bail bond work with

**67**

1  Mr. LiMandri?
2        MS. PETERS:  Object to form.  Vague.
3    A    What do you mean by "bail bond work"?
4    Q    Well, any type of bail bond services,
5  GPS, et cetera, with Mr. LiMandri.
6        MS. PETERS:  Object to the form of the
7  question to the extent that it's vague.
8    A    Do you mean in addition to the work
9  that we do with immigration bond securitization or
10 are you talking about this work too?  Because
11 obviously we did this work with him but we've
12 never done any, like — I don't want to search for
13 the question.
14   Q    Yeah.  So you've never done any
15 criminal bail bond or GPS tracking services
16 through him?
17       MS. PETERS:  Object to form of the
18 question.  Track, it is a compound question.
19   Q    Prior to the immigration.
20       MS. PETERS:  Same objection.
21   A    No.  There might have been a client who
22 he had, that he needed GPS.  I don't know that —

**68**

1  we may have let him use a GPS bracelet or
2  something like that for one of his clients but it
3  would have been a one-off and it's not a service
4  that we provided.
5    Q    And how did you come to know
6  Mr. LiMandri?
7    A    I knew of him in the — he was an
8  officer, he's an officer with the Professional
9  Bail Agents of the United States and everybody
10 that has any understanding of bail knows
11 Mr. LiMandri.
12   Q    And was your relate -- your
13 relationship formed -- did you approach him for a
14 business relationship with regard to bonding?
15   A    I had a conversation with him about
16 immigrants and detention.  He was an agent that
17 wrote immigration bonds.  And our initial
18 conversations I think started around tell me how
19 we can make this work from what people.
20   Q    Okay.  Do you know prior to the
21 formation of the relationship with RLI how many
22 bonds had been issued with other -- how many

---

**69**

1  immigration bonds had been issued with other
2  sureties?
3      **A   I don't know.**
4      MS. PETERS:  Object to form.
5      Q    Do you have an idea of range?  Was it
6  1,000, 2,000, 3,000 bonds?
7      MS. PETERS:  Object to form.  Calls for
8  speculation.
9      **A   I don't recall.  But I could certainly**
10 **verify and find out for you.**
11     Q    What records would you look at to
12 verify?
13     **A   I'm not immediately certain.  I think I**
14 **would probably look at Capsule and search for**
15 **people that signed up during certain times.  Does**
16 **that make sense?**
17     Q    Yes.  Okay.  And prior to your
18 relationship with RLI with these other sureties,
19 did you generally have kind of the same business
20 model or protocol?  In your words, were you
21 providing monitoring services of the immigrants?
22     MS. PETERS:  Object to form.  Compound

---

**70**

1  question.
2      **A   So I think that our company, as all**
3  **companies do, your programs get better so we're**
4  **constantly evolving.  So I can't say that it's the**
5  **same, but the same general services, the idea that**
6  **individuals generally speaking want to do the**
7  **right thing, Vivian, so if you give them the tools**
8  **and the resources to do the right thing generally**
9  **they will.  And that's what we believe and that's**
10 **what we do.**
11     Q    And why were you looking for a new
12 surety in the early 2015 time frame?
13     MS. PETERS:  Object to form.
14     **A   As I remember, we had been introduced**
15 **to RLI through a law firm that we were working**
16 **with, and those -- I don't remember the -- the**
17 **details of those conversations but I do remember**
18 **that we were -- we initially had made the**
19 **introduction through them, began discussing what**
20 **with Dave Sandoz opportunities.  Ultimately when**
21 **we went to RLI, we went to RLI because we believed**
22 **that RLI would be a good partner.  Dave Sandoz**

---

**71**

1  **seemed like he would be a good partner.  He was**
2  **very interested.  RLI seemed interested in the**
3  **business.  They seemed to want to do it.  So we**
4  **thought, you know, this was a good partner.**
5      Q    Was there a particular reason you were
6  looking for another surety other than the two that
7  you already had?
8      MS. PETERS:  Object to form.
9      **A   I don't recall any specific.  I don't**
10 **recall a specific reason of saying hey, you know,**
11 **we always look for vendors to partner with, new**
12 **vendor opportunities.**
13     Q    Okay.  All right.  I'm going to mark
14 this Exhibit 2.
15     (Donovan Exhibit 2 marked for
16 identification and attached to the transcript.)
17     Q    And this is a document dated May 1st,
18 2015, from Rick Nagel to Dave Sandoz and you're
19 copied on it.
20     **A   Okay.**
21     MS. PETERS:  Take a moment to read the
22 entire document.

---

**72**

1      Q    Do you recognize this document?
2      MS. PETERS:  Object to form.
3      **A   I don't recognize it meaning I don't**
4  **remember it, but it appears that there's an email**
5  **with my email address on it.**
6      Q    Okay.  And is that your signature on
7  the second page at the bottom of the phone
8  conference?
9      **A   It would be, yeah.  It looks like my**
10 **signature.**
11     Q    And who is Rick Nagel?
12     **A   He was our director of government**
13 **affairs.**
14     Q    And how long did Mr. Nagel remain
15 employed by Nexus?
16     **A   I don't recall.**
17     Q    Do you know when Mr. Nagel ceased
18 working with Nexus?
19     **A   I don't recall specifically.**
20     Q    Do you know the circumstances of why
21 Mr. Nagel stopped working with Nexus?
22     **A   I do.**

---

73

1    MS. PETERS:  I'm going to object to the
2 form of the question to the extent it calls for
3 confidential HR information subject to the
4 protective order.
5    MS. KATSANTONIS:  Okay.
6    MS. PETERS:  But we'll allow the
7 witness to answer reserving our right under the
8 protective order.
9    Q    For what reason did Mr. Nagel leave
10 Nexus, to your understanding?
11    **A  I need to consult with counsel.  And**
12 **the issue is — and let me just be clear.  I have**
13 **a — I want to make sure that a non-disparagement**
14 **clause doesn't get violated.  I want to make sure**
15 **I can answer.  That's what I'm — so I'd like**
16 **to —**
17    Q    All right.  Let's move on for now --
18    **A  Sure.**
19    Q    -- and we can come back to it.
20    **A  Sure.**
21    Q    All right.  So looking at this phone
22 conference, it says this call is the second

---

74

1 contact between Nexus Services and RLI.
2    Do you see that at the beginning?
3    **A  Yes.**
4    Q    Okay.  And it says, "Mr. Donovan
5 answered many questions about the business
6 structure and program performance and provided
7 information related to the program's success."
8    Do you see that?
9    **A  I do.**
10    Q    So do you recall having a discussion
11 with Mr. Sandoz where you explained to him the
12 Nexus Services program in an effort to form a
13 business relationship with RLI?
14    MS. PETERS:  Object to form.
15    **A  I remember conversations.  I don't**
16 **remember — I don't recall the specific**
17 **conversation, it's five years ago, and I have a**
18 **lot of conference calls, to be honest.  But it**
19 **appears that I was involved in it obviously and I**
20 **signed the paperwork.**
21    Q    Right.  And you understood you were
22 providing information to Mr. Sandoz in part to

---

75

1 form the basis of a business relationship between
2 the two entities?
3    MS. PETERS:  Object to form.
4    **A  I knew that we were having a**
5 **conversation about potentially working together,**
6 **yes.**
7    Q    Okay.  And then it says, "Specifically
8 Mr. Donovan confirmed that the program has
9 approximately 2,174 participants."  Right?
10    **A  That's what it says.**
11    Q    Okay.  And you signed this document?
12 Do you have any reason to question the accuracy of
13 it?
14    **A  I just don't recall it.**
15    MS. PETERS:  Object to form.
16    **A  I'm sorry.  I mean I don't have any**
17 **reason here to say I don't recall.  Because I**
18 **don't recall.**
19    Q    Right --
20    **A  I don't have a reason —**
21    Q    -- but you don't have a reason to
22 question the accuracy of this document that you

---

76

1 signed, right?
2    **A  Right —**
3    MS. PETERS:  Object to form.
4    **A  — other than the fact that I don't**
5 **recall it.  So I can't recall specific things**
6 **about the call.  That's the only —**
7    Q    Sure.  I understand that.
8    MS. PETERS:  Object to form.
9    Q    Okay.  And then it says, "Mr. Donovan
10 confirmed that the program has a success rate
11 defined as compelling respondent to appear in
12 immigration court of 99.7 percent."
13    MS. PETERS:  Object to form.
14    Q    Do you see that?
15    **A  I do see that.**
16    Q    Okay.  So to the best of your
17 recollection was that an honest statement at the
18 time?
19    MS. PETERS:  Object to form.
20    **A  I certainly don't make dishonest**
21 **statements.**
22    Q    Okay.  And under "Next Steps," you

---

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

77

1 provided that Nexus would like to invite you and
2 members of your team to the corporate headquarters
3 in Verona, Virginia to observe our operations.
4          MS. PETERS: I'm going to object to the
5 form of the question to the extent it says you
6 provided. It has not been established that
7 Mr. Donovan wrote this document.
8          MS. KATSANTONIS: Mr. Donovan approves
9 the document, correct?
10          MS. PETERS: He did.
11          MS. KATSANTONIS: Okay. So I'm asking
12 Mr. Donovan.
13     Q    When you signed approved by,
14 Mr. Donovan, right, you're agreeing to the content
15 of the recap of the conversation, correct?
16          MS. PETERS: Object to form.
17     **A    I think when I signed this, I would**
18 **have been approving the next steps. I mean, so**
19 **honestly this is a recap of a call. So I don't —**
20 **I don't think in the normal course of business I**
21 **signed confirmation statements about conference**
22 **calls. I think — and I don't recall, but I think**

78

1 **if this were put in front of me today and asked**
2 **did I sign it, I would assume that I am confirming**
3 **the invitation and asking them to come and moving**
4 **forward with the relationship. But, you know, I**
5 **don't remember the actual document so I can't —**
6     Q    Right. But certainly if you thought
7 there was any misstatement you would have advised?
8          MS. PETERS: Object to form.
9     **A    I certainly wouldn't have agreed to**
10 **something that wasn't accurate.**
11     Q    Okay. All right. And do you recall
12 that Mr. Sandoz did come visit the Verona campus?
13     **A    I do believe that happened, yes.**
14     Q    Okay. And during that visit, do you
15 recall advising Mr. Sandoz that Nexus had a
16 scoring system to select detainees that are
17 willing to work with -- excuse me, a scoring
18 system to select the detainees that Nexus is
19 willing to work with?
20          MS. PETERS: Object to form.
21     **A    Do I remember having that conversation**
22 **with Dave Sandoz?**

79

1     Q    Right.
2     **A    No.**
3     Q    Is that an accurate representation that
4 Nexus maintained a scoring system to select the
5 detainees they were willing to work with --
6          MS. PETERS: Object.
7     Q    -- in June of 2015?
8          MS. PETERS: And I'm going to object to
9 the form of the question. You're using the word
10 "Nexus." By "Nexus" do you mean Nexus Services,
11 Inc., or Libre by Nexus, Inc.? You haven't
12 defined the term.
13          MS. KATSANTONIS: Okay.
14     Q    For purposes of the questions, I'm
15 going to ask Nexus or -- when I say "Nexus" from
16 here forward, if you're comfortable with it, it'll
17 include both Nexus and Libre. If you have a
18 problem with that distinction you can make the
19 distinction.
20          MS. PETERS: I'm going to object to
21 that. If you mean Nexus or Libre, I don't object.
22 To the extent you say Nexus and Libre, this

80

1 witness would not waive any defenses currently
2 pending in the case to your claims.
3     Q    Well, if you can make a distinction, go
4 ahead.
5          Did -- was there -- do you have any
6 reason to doubt that the representation was made
7 that Nexus or Libre has a scoring system to select
8 the detainees they're willing to work with?
9     **A    No, I don't believe that I have any**
10 **reason -- I do believe that that was stated.**
11 **Under our old contract we did have such a metric**
12 **of a scoring sheet, if you will.**
13     Q    Okay. And would that have been Libre
14 or Nexus doing the scoring sheet?
15     **A    Libre.**
16     Q    Okay. And it says -- and then did you
17 also advise that Libre or Nexus would be looking
18 at immigrants that have been in the country for a
19 long time, has family in the U.S., and has a job
20 making income to support the family?
21          MS. PETERS: Object to form. Compound
22 question.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

**81**

1    Q    Do you recall?
2    **A    I don't recall.**
3    Q    Okay.  Would that be an accurate
4  statement of what Nexus Services did at the time
5  of June 2015 in selecting detainees --
6         MS. PETERS:  Object --
7    Q    -- to issue -- to facilitate bonds?
8         MS. PETERS:  Object to form.
9    **A    I think --**
10        MS. PETERS:  Misstates prior -- please
11 let me finish the objection.
12        THE WITNESS:  Okay.
13        MS. PETERS:  Misstates prior testimony
14 and a compound question.
15   **A    I'm going to ask you to repeat it.  I'm**
16 **so sorry, Vivian.**
17   Q    No, that's fine.
18        Do you -- or do you know whether
19 -- strike that.
20        Did Nexus or Libre advise Mr. Sandoz
21 that they selected immigrants for whom to provide
22 the bonding for, those -- which would be

**82**

1  immigrants who had been in the country for a long
2  time, had family there, and had a job making
3  income to support the family?
4         MS. PETERS:  Object to the form of the
5  question.
6    **A    I don't recall.  I don't recall that**
7  **conversation.  I don't recall those statements.**
8    Q    If Mr. Sandoz wrote that, do you have
9  any reason -- wrote that down as a contemporaneous
10 note, do you have any reason to doubt that?
11        MS. PETERS:  Object to the form of the
12 question.  It was a compound question and I'd like
13 to have the question read back to the witness.
14        MS. KATSANTONIS:  You can read the
15 question back.
16        (The requested text was read by the
17 reporter as follows: "If Mr. Sandoz wrote that, do
18 you have any reason -- wrote that down as a
19 contemporaneous note, do you have any reason to
20 doubt that?")
21        MS. PETERS:  I meant the question
22 beforehand, where you're saying what the witness

**83**

1  said since you haven't put the piece of paper in
2  front of the witness that you're reading from.
3  I'd like to have the question that that relates
4  to, the statement that that relates to read to me.
5         MS. KATSANTONIS:  You're really
6  interrupting my deposition, Mary Donne.  Let me
7  just -- I asked the question.  If Mr. Donovan
8  didn't understand it, that's him.  You're doing
9  some, I don't even know, lawyering on the side
10 that's irrelevant.
11        So I'm asking him -- Mr. Donovan has
12 already testified and I'm asking him do you have
13 any reason to believe if Mr. Sandoz wrote down
14 contemporaneously that he was advised that Nexus
15 selects immigrants that have been in the country
16 for a long time, has family there, and has a job
17 making income to support that family, do you have
18 any reason to doubt that that statement was made
19 to Mr. Sandoz.
20        MS. PETERS:  Object to form.
21   **A    I don't think that that statement, as**
22 **it was read, would have been made to him.  But I**

**84**

1  **don't recall.**
2    Q    And why do you not think so?
3    **A    Because our clients don't typically**
4  **have jobs.  Our clients typically are awaiting**
5  **work authorizations.  So it just doesn't sound**
6  **like -- it doesn't sound like it makes sense.  But**
7  **that being said, I don't remember the**
8  **conversation.  I certainly don't remember saying**
9  **that to him.**
10   Q    Okay.  Did you advise Mr. Sandoz that
11 the detainees have no criminal background?
12        MS. PETERS:  Object to form.
13   **A    No.  I told Mr. Sandoz, as I tell most**
14 **people, that part of the tragedy of the American**
15 **immigration system is that the vast majority of**
16 **immigrants held in what is called civil detention**
17 **waste away for months if not years based on a**
18 **civil hold that has nothing to do with any**
19 **allegation of criminality whatsoever, A.**
20        **And B that the vast majority of**
21 **immigrants in this country, some 500,000 people a**
22 **day that we lock in concentration camps, the vast**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

---

85

1 **majority of them have never had a criminal**
2 **conviction. And that's also true. That's what I**
3 **would have said.**
4    Q    Okay. And so if Mr. Sandoz recorded
5 that you advised that the immigrants for which you
6 provide -- you request a bond be issued for has no
7 criminal background but simply came into the
8 country and didn't go through the right process to
9 become a legal citizen, you don't believe that's a
10 truthful statement?
11       MS. PETERS: Object to form of the
12 question.
13    **A    Can you repeat that, Vivian?**
14    Q    Uh-huh.
15       That no criminal -- that the immigrants
16 for whom you've requested a bond have no criminal
17 background but simply came into the country and
18 didn't go through the right process to become a
19 legal citizen.
20       MS. PETERS: Object to form of the
21 question. Are you asking him if Mr. Sandoz wrote
22 that down or are you asking him if --

86

1       MS. KATSANTONIS: That's an accurate --
2       MS. PETERS: -- that is a true
3 statement?
4       MS. KATSANTONIS: Right.
5    **A    Yeah, I think that's the problem. And**
6 **with all due respect, I think that that's where**
7 **I'm having a hard time. I'm having a hard time**
8 **with the question just because I have no idea what**
9 **he wrote down. When you ask the question I think**
10 **my mind's going there. I don't know what he wrote**
11 **down, right?**
12    Q    Right.
13       MS. PETERS: And for the record --
14    Q    Is that a truthful statement?
15    **A    So, again, I would say that if this --**
16 **if I had a conversation like this with Mr. Sandoz**
17 **or anybody else, it would be based on what is**
18 **happening in the American immigration system**
19 **because that's representative of our clients.**
20    Q    Well, but --
21    **A    So I might -- I might have -- and again**
22 **what was the specific?**

87

1       MS. PETERS: Object to form. Please
2 show the witness the document if you're going to
3 read statements from the document.
4       MS. KATSANTONIS: Mary Donne, I'm going
5 to conduct my deposition my way and you're happy
6 to ask him any other questions.
7       MS. PETERS: That's just patently
8 unfair and I'm objecting to that.
9    Q    That the immigrant has no criminal
10 background but simply came into the country and
11 didn't go through the right process to become a
12 legal citizen?
13       MS. PETERS: Object to the form of the
14 question. Are you asking him again if that's what
15 Mr. Sandoz wrote or what he said?
16       MS. KATSANTONIS: Mary Donne, you're
17 being so obstreperous in this deposition.
18 Mr. Donovan and I have had a conversation. He
19 understands. He asked me to read it back to him.
20 So let me deal with taking the testimony from
21 Mr. Donovan and not you.
22       MS. PETERS: It's just unfair to read a

88

1 snippet of a document that you're not giving him.
2    Q    Do you have any reason to believe,
3 Mr. Donovan, that if Mr. Sandoz advised that he
4 was told that the immigrants for whom bonds would
5 be issued has no -- have no criminal background
6 but simply came into the country and didn't go
7 through the right process to become a legal
8 citizen, that that's a true statement?
9       MS. PETERS: Object to the form of the
10 question.
11    **A    I think it's —**
12    Q    Do you have any reason to doubt that?
13    **A    I think it's a true statement that the**
14 **vast majority of immigrants don't have criminal**
15 **histories. I think if I made a statement like**
16 **that, I would have been making a statement that**
17 **immigrants in detention largely don't have**
18 **criminal histories.**
19    Q    Okay.
20    **A    That would have been my statement.**
21    Q    And you --
22       MS. PETERS: And I'm going to object.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

89

1   Unless you put that document in front of him, I
2   can't tell whether you're reading it accurately or
3   in context.  And I'm not going to have this
4   witness speculate.  It is patently unfair.  If
5   you're going to introduce a document through
6   verbal testimony, snippets of it, I'm asking you
7   to give it to counsel and give it to the witness.
8       MS. KATSANTONIS:  Okay.  I'm asking him
9   whether the statement -- these representations
10  were made by Nexus and whether they're accurate.
11      MR. SHOREMAN:  That's a good question.
12      MS. KATSANTONIS:  So that's the
13  question.
14      Q   During Mr. Sandoz -- well, let me ask
15  you this:  Isn't it true that Nexus records
16  meetings held in conference rooms or boardrooms at
17  its Nexus campus?
18      MS. PETERS:  Object to form.
19      A   I don't think it's generally true that
20  we record meetings.  I think that there are
21  cameras in the office and that from time to time
22  meetings get recorded, but there's no policy that

90

1   says we record meetings in the office.
2       Q   Okay.  Is it generally Nexus' practice
3   to keep recordings and surveillance of the
4   hallways and entry doorways at the Verona campus?
5       MS. PETERS:  Object to form.  At what
6   point in time?
7       A   There are cameras on the -- in the
8   Verona campus.  They do collect video and then
9   that video is available for a certain period of
10  time, as is most surveillance systems.
11      Q   And the video also captures sound and
12  discussions?
13      MS. PETERS:  Object to form.
14      A   The cameras do capture sound and so if
15  you're walking by and having a conversation, it
16  might catch a snippet.
17      Q   And do you have any recordings of any
18  meetings with Mr. Sandoz?
19      A   I do not.
20      Q   Okay.  Have you gone back to look to
21  see if you have any recordings of any meetings
22  with Mr. Sandoz?

91

1       A   I have not.
2       Q   Okay.  So it's possible they exist?
3       A   No.
4       MS. PETERS:  Object to form.
5       Q   Why not?
6       A   Because those security camera footage
7   recycles after 30 days I believe, as is the
8   general policy of Nest or whatever the company is.
9   So, no, I don't think so.  I didn't have any
10  meetings with Mr. Sandoz in the last 30 days.
11      Q   Okay.  And do you have any video or
12  recordings of any meetings with RLI or counsel or
13  consultants for RLI?
14      A   I do not.
15      Q   Okay.  And have you gone back to look
16  for those?
17      A   I have not.
18      Q   So is it possible they exist?
19      MS. PETERS:  Object --
20      A   Again, 30-day -- I haven't met with
21  him.
22      MS. PETERS:  Mr. Donovan wouldn't know,

92

1   but counsel came to the campus for a document
2   production and a document inspection and Nexus
3   made the representation to you and to the special
4   master that the cameras in the room where you
5   would be sitting would be turned off, and that was
6   in fact done.
7       MS. KATSANTONIS:  Okay.  Well, that's
8   not what my question is.
9       MS. PETERS:  Okay.
10      MS. KATSANTONIS:  I was asking a much
11  broader question.
12      MS. PETERS:  Okay.
13      Q   My question was, do you have any videos
14  or recordings of any meetings with RLI, any
15  representative of RLI's, any counsel of RLI's, any
16  consultants of RLI's?
17      A   Not that I know of.
18      Q   And do you have the capability to
19  download and save those videos, notwithstanding
20  that you're saying that they're deleted after 30
21  days?
22      A   I don't have the capability but it's a

93

1  technological deficiency.  I think that we have to
2  have the capability as a company.
3      Q    And do you know whether that was done?
4      A    I don't believe so.
5      Q    Okay.  So when Mr. Sandoz was visiting
6  you in Verona, do you -- did Nexus advise that it
7  monitored immigrants using GPS tracking devices?
8          MS. PETERS:  Object to the form of the
9  question.  At what point?  Do we have a year?
10         MS. KATSANTONIS:  We're at the visit of
11 Dave Sandoz in June of 2015.
12         MS. PETERS:  Thank you.
13     A    I don't recall.  But we do use GPS
14 tracking devices.
15     Q    Okay.  And so if Mr. Sandoz reported
16 that you advised that you used GPS monitoring of
17 immigrants, to the best of your knowledge, that
18 would be a correct statement?
19         MS. PETERS:  Object to the form of the
20 question.  You're not putting the document in
21 front of the witness.
22     A    I don't know anything about that

94

1  statement or that conversation, but it is
2  certainly true that we issue GPS.
3      Q    And do you use GPS 24 hours a day, 7
4  days a week?
5          MS. PETERS:  Object to the form of the
6  question.
7      Q    For immigrants.
8          MS. PETERS:  Overbroad.
9      A    Clients have the GPS units and when
10 they're worn, they're worn 24 hours a day.  That
11 would be a true statement.  In other words, they
12 can't just take them off.  They're, like, locking.
13     Q    Okay.  And do you recall advising
14 Mr. Sandoz that the average size bond is $10,000?
15         MS. PETERS:  Object to the form.
16     A    I don't recall.  Vivian?  Vivian?
17 Could we break at 12:30?  That would give me a
18 chance to — I think that was an hour from when we
19 started.  There's lunch out there.  I just want to
20 make sure that —
21     Q    It's 12:40.
22     A    Oh, can we break at 1:00?

95

1      Q    Yes.
2      A    Thank you.  Obviously I'm paying
3  attention to my watch.
4      Q    Do you recall Mr. Sandoz advising that
5  for issuing immigration bonds he wanted to work
6  directly with Nexus and not through a bonding
7  agent?
8          MS. PETERS:  Object to form.
9      A    I don't remember that.
10     Q    Okay.  Does Nexus or Libre prescreen
11 detainees before requesting a bond to assess the
12 risk of a bond breach?
13         MS. PETERS:  Object to form.
14     A    Yes.
15     Q    Okay.  And did you convey that fact to
16 Mr. Sandoz?
17         MS. PETERS:  Object to form.  At what
18 point in time?
19     A    I don't recall.
20     Q    And is criminal -- is the criminal
21 history of a detainee something that's considered
22 in that prescreening process?

96

1          MS. PETERS:  Object to form.
2      A    It was.
3      Q    And why is that?
4      A    At the time, it was — it was on the —
5  we adopted the Virginia pretrial risk assessment
6  instrument, and it was part of the data that was
7  collected on that instrument and it was part of
8  the data that we naturally started collecting when
9  we started using it.
10     Q    I'm going to -- does -- does the
11 criminal history increase the likelihood of a bond
12 breach risk?
13         MS. PETERS:  Object to form.
14     A    In a Virginia pre — in a criminal case
15 I think it does, yeah.
16     Q    In a criminal case?  What do you mean
17 by that?
18     A    I mean in a criminal case where an
19 individual is facing criminal charges and
20 ultimately a sentencing if they're convicted, a
21 criminal history compounds the likelihood of a
22 longer sentence.

97

1       So I think it's true that when you
2  consider likely reappearance in court for a
3  criminal defendant that criminal history is a
4  significant consideration.
5       (Donovan Exhibit 3 marked for
6  identification and attached to the transcript.)
7       MR. HARRIS:  This is 3?
8       MS. KATSANTONIS:  Yes.
9       MR. HARRIS:  Thank you.
10      MS. KATSANTONIS:  Do you want another
11 copy?
12  Q    This is a document dated June 11th,
13 2015, and it's between Dave Sandoz and Rick Nagel.
14      And looking at the second page, so in
15 this email Mr. Sandoz is writing to Mr. Nagel
16 after his trip and he's asking for some initial
17 items, or reviewing some initial items.  Do you
18 see that?
19  A    Are we on the second page?  Let me ask
20 you a question, Vivian.
21  Q    Sure.
22  A    Since you put this document in front of

98

1  me, it is a multipage document, do you have any
2  objection to me reading it before I ask -- answer
3  questions?  Because I want to understand the
4  context of the document.  It's a multipage
5  document.
6       MS. PETERS:  You have that right.
7  Q    Yeah, you absolutely can look through
8  it.  I would say that --
9  A    It means a lot.  So I don't want to be
10 disrespectful of your time, but, you know, I do
11 want to make sure I get a chance to read it.
12  Q    Right.
13  A    I guess our time.
14  Q    So if you would like, I can walk you
15 back through the back.  It starts with --
16  A    Yeah, I guess --
17  Q    At the end it starts with your synopsis
18 of the conference call which we looked at earlier,
19 right?  And then the next email talks about --
20      MS. PETERS:  I'm going to object to the
21 form.  What page are you on?
22      MS. KATSANTONIS:  Well, I'm starting

99

1  from the back.
2       MS. PETERS:  Okay.  Can you identify it
3  by Bates label, please?
4       MS. KATSANTONIS:  On RLI 330013.
5       MS. PETERS:  And --
6  A    Got it.
7       MS. PETERS:  -- your question was?
8       MS. KATSANTONIS:  I'm not asking a
9  question yet.  I was just trying to walk
10 Mr. Donovan through the emails so we could try to
11 go a little bit quicker.
12  A    Although, Vivian, if I could, I will
13 just say that you represented that that was the
14 conference call synopsis that I sent.  It was a
15 conference call synopsis that looks like Rick
16 Nagel sent to Dave that was copied --
17      MS. PETERS:  That was my objection.
18  A    I just want to make sure.
19  Q    Sure.  Well, I'm just trying to be
20 quick.  I'm not asking a specific question.
21      We can go backwards on this.
22  A    Going backwards is probably the easier

100

1  way to do that.
2  Q    Right.
3       So looking at the page ending in 12 --
4  A    Well, actually so I am on 13.  I am
5  going to read back.  I would like the time to do
6  that, though.
7  Q    Sure.
8  A    I just want to make --
9  Q    Go ahead.
10  A    -- sure I understand the document.
11  Q    So Mr. Donovan, I'm --
12      MS. PETERS:  He's asked for a moment to
13 read.
14      MS. KATSANTONIS:  No, I know.  I know.
15 What I would like to do instead because we have
16 limited time is I'll ask the question and if you
17 are more comfortable answering the question by
18 reading all of it, that's fine.
19  A    Sure.
20  Q    Okay?  But I think some of it -- this
21 is going to happen during the deposition and my
22 questions are going to be much simpler than

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

101

1  reading the whole document.  So, for example, in
2  this instance, my question to you is looking at
3  the second page, 06 --
4      A   (The witness complies.)
5      Q   -- do you recall whether or not
6  Mr. Sandoz advised that Nexus would be required to
7  execute an indemnity agreement as part of any
8  relationship for RLI to issue bonds?
9      MS. PETERS:  Object to form.
10     A   I don't recall that specifically.  I
11 mean, if I read the document, I might recall it.
12     Q   You don't recall that?
13     A   I mean I'm sure it happened.  I just
14 don't recall the specific conversation.  Like I
15 don't recall these emails.  I might recall them if
16 I read them but I don't recall them.  So I can't
17 tell you that I recall the email even if it's --
18     Q   Okay.  I'm just asking did you under --
19     MS. PETERS:  Can you let him read the
20 document, please?  This is just --
21     MS. KATSANTONIS:  Sure.
22     A   Yeah, I think I need to read it.

102

1      Q   Sure.
2      A   I think I'm uncomfortable answering
3  questions about a 14-page document that I haven't
4  read.  Does that make sense?
5      Q   Right.  Okay.  I'm going to try to
6  short-circuit this again, Mr. Donovan.
7      Did you understand that in order to --
8      MR. WILLIAMS:  He just wants to read
9  the document.
10     MS. KATSANTONIS:  Okay.
11     MR. WILLIAMS:  That's the risk you bear
12 when you give a document to somebody that's long
13 is that they're going to want to read it.  You've
14 got to let him read that document.
15     MS. KATSANTONIS:  I do but I'm not
16 interested in --
17     MR. WILLIAMS:  It doesn't matter what
18 you're interested in.
19     MS. KATSANTONIS:  It does.  This is my
20 deposition, Mr. Williams.
21     MR. WILLIAMS:  No, it's his deposition.
22     MS. KATSANTONIS:  No, it --

103

1      MR. HARRIS:  Mr. Williams, we objected
2  to your presence at this deposition.
3      MR. WILLIAMS:  Okay, that's fine.
4      MR. HARRIS:  We're not going to have a
5  bunch of different lawyers objecting to every
6  question.
7      MR. WILLIAMS:  Conduct the deposition
8  in a proper way.
9      A   I'll tell you what, guys.  Listen, I'm
10 going to make this easy.  This doesn't have to be
11 a lawyer argument.  I'm going to read this
12 document before I answer any of your questions,
13 and it's not a disrespectful thing.  You put the
14 document in front of me -- I want to be as
15 helpful --
16     Q   That's fine.
17     A   -- as I can be.
18     Q   That's fine.
19     A   And so I want to read the document.
20 Thank you.
21     MS. PETERS:  Ms. Katsantonis, some of
22 these may not be connected to each other.

104

1      Is this a -- it is a composite exhibit
2  or is this an email chain in its native format?
3  Because Mr. Donovan is not copied on some of these
4  emails, but he is on others.
5      MS. KATSANTONIS:  My understanding is
6  this is one email chain.
7      MS. PETERS:  In its native format
8  print?
9      MS. KATSANTONIS:  As far as I know.
10     MS. PETERS:  I'm not sure how that
11 would happen, then.  And in fact it appears that
12 there's an email missing, potentially, out of page
13 14.
14     MS. KATSANTONIS:  Mary Donne, you can
15 use it on your own redirect.  Okay?  I have one
16 simple question that really doesn't even need this
17 document for, okay?
18     Q   So my question is, and you can hear the
19 question, Mr. Donovan, while you're reading, is
20 did you understand that RLI required Nexus to
21 execute an indemnity agreement as a condition to
22 issuing bonds at the request of Nexus?

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

105

1      MS. PETERS: Object to form. If you're
2  asking him that question in the context of this
3  document.
4      MS. KATSANTONIS: I'm not. I'm just
5  asking the question.
6      Q   Did you understand that?
7      A   I'm two pages away from being done and
8  we could all be over. I'm two pages.
9      Q   Okay.
10     A   It's going to be very quick. I promise
11 I'll work really fast.
12     Q   That's fine.
13     A   Oh, here it is.
14     Q   MS. PETERS: Was any portion of this
15 exhibit redacted, Ms. Katsantonis?
16     MS. KATSANTONIS: Not to my knowledge.
17     MS. PETERS: When you do redactions are
18 they via black or white out?
19     MS. KATSANTONIS: Any redactions would
20 be on our privilege log, Ms. Peters.
21     A   Okay, I finished.
22     Q   Okay. Did you understand that Nexus --

106

1  excuse me.
2      Did you understand that RLI required
3  Nexus to execute an indemnity agreement in order
4  to issue bonds at the request of Nexus?
5      A   I see it referenced here. I don't
6  remember this email. I don't know if I was copied
7  on it and I can't identify from the document
8  whether I was. But I certainly see it here and I
9  also signed an indemnity agreement.
10     Q   All right. So you understand that that
11 was a requirement for issuing bonds?
12     MS. PETERS: Object to form.
13     A   I would assume that we would have to
14 have a contract before we start working together,
15 yes.
16     Q   And you also understood that Mr. Sandoz
17 requested collateral at the initiation of the
18 relationship, correct?
19     MS. PETERS: Object to form.
20     A   I do remember having conversations with
21 Mr. Sandoz about collateral.
22     Q   All right. And Mr. Sandoz also

107

1  requested that Nexus provide year-end financial
2  statements; is that correct?
3      MS. PETERS: Object to form.
4      A   I see that reference in the email, yes.
5      Q   And to the best of your knowledge, that
6  was correct?
7      MS. PETERS: Object to form.
8      A   To the best of my knowledge, that he
9  asked for it?
10     Q   Right.
11     A   Yes. I believe. I mean, I'm reading
12 it here, so...
13     Q   All right. And --
14     A   But I don't know that I was on this
15 email so I can't confirm the email. But it
16 certainly read -- reads it here.
17     And if we could watch that 1:00 I just
18 want to make sure I eat because being ill I
19 don't --
20     MS. PETERS: You know what, you've
21 raised that two times. You look awfully pale. If
22 you're -- if you need lunch, we will take a lunch

108

1  break right now. We don't have to wait until 1:00
2  because she's in between questions.
3      A   Okay. Let's do that. I think that
4  would be good. Everybody could use lunch anyway,
5  right?
6      THE VIDEOGRAPHER: We are going off the
7  record at 12:55.
8      (Recess taken.)
9      THE VIDEOGRAPHER: We are back on the
10 record at 13:55.
11 BY MS. KATSANTONIS:
12     Q   All right. So --
13     A   Vivian, can I just tell you for the
14 record that during lunch I did get sick, so I from
15 time to time may either cover the microphone or
16 remove it from my body because I'm having stomach
17 reactions that I don't want to cause embarrassment
18 by showing up on a video. So if you see me do
19 this or remove you'll understand why. Okay?
20     Q   Okay. If you need to take a break,
21 obviously just let me know.
22     A   I will use that liberally. You don't

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

109

1 want that to happen here.
2     Q    All right.  So prior to the break we
3 were talking about the formation of the
4 relationship between RLI and Nexus.  And we talked
5 about the agreement of indemnity.
6         And did you also understand that RLI
7 requested financial information and financial
8 statements from Nexus to review as a basis for
9 forming the relationship?
10    A  Oh, I see -- I see it on the email.
11    Q    Right.  So you understood that RLI was
12 reviewing the financials of Nexus as part of -- in
13 order to form a basis to form the relationship
14 with RLI and issue bonds, correct?
15     MS. PETERS:  Object to form.
16    A  So I know that Dave Sandoz was
17 interested in having a relationship and was going
18 through a process to start that relationship.  I
19 do see in this email specifically mentioning
20 financial statements.  I don't know that I was
21 copied on this email.  It doesn't look like I was.
22 But I certainly am aware of it and I certainly

110

1 have read the email.
2     Q    Right.  And you -- but, in fact, you
3 provided financials to RLI pursuant to their
4 request to look at the financial condition of
5 Nexus in order to make a determination to issue
6 bonds on Nexus' behalf, correct?
7     MS. PETERS:  Object to form.
8    A  Correct.
9     Q    Okay.  And I'm going to mark this as an
10 exhibit.
11         (Donovan Exhibit 4 marked for
12 identification and attached to the transcript.)
13     Q    This document dated June 17th, 2015,
14 and it's attaching three-year financials.
15         Do you recognize this document?
16     MS. PETERS:  Object to the form.
17 Misstates the record.
18    A  I don't recommend -- I don't recognize
19 the document off the top of my head but I'm
20 looking at it and reading it.
21     Q    Okay.  Did you provide financials to
22 Mr. Nagel to provide to RLI?

111

1     MS. PETERS:  Object to form.
2    A  It certainly appears that this email is
3 me providing financials to Mr. Nagel.
4 I haven't read it.  I haven't had an
5 opportunity to read it.  So as the context of who
6 it was provided for, I would like a chance to read
7 it real quick.  It's a lot shorter than the other
8 one, so.
9     MS. PETERS:  And I'm going to object to
10 the form of the question in that it does not --
11 the document itself does not include the word
12 "financials."
13     MS. KATSANTONIS:  Mary Donne, I'm not
14 doing your --
15     Q    This email --
16     MS. KATSANTONIS:  -- deposition but it
17 says financials attached at the bottom.  The
18 attachment says three-year financials.
19    A  So I want to -- I want to raise -- I
20 want to raise a real red flag here.  This email
21 says that it's from me, but it's clearly not,
22 because I wouldn't be talking about appointing

112

1 agencies.
2         I don't know what you've given me, but
3 this doesn't -- you're -- you've given me an email
4 with the header with my name is on it and then an
5 email that's written by I would assume Dave Sandoz
6 but someone else.  And that gives me great concern
7 because if you're giving me documents that have
8 cut and pasted data on it, I mean, I have -- I'm
9 entrusting that the documents are correct.  Now I
10 have a real concern that every other document that
11 you've given me might not be correct, right?
12     Q    Okay.  This is a document in the
13 bottom -- do you see the Bates stamp Nexus in the
14 bottom right-hand corner?
15    A  Yes.
16     Q    That means it's a document that has
17 been produced from your files.  And there's
18 paginations and then it's stamped on the left.
19 That's the stamp that Nexus has used for its
20 document productions.
21    A  Well, I'm saying agency set up we are
22 ready to appoint you when you are ready.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

113

1    Q    I agree that the body of the email is
2 from Mr. Sandoz to Rick.
3    **A    What I'm telling you this is not my**
4 **email. I can tell you that this is not my email**
5 **because I wouldn't be appointing agencies. What**
6 **you've --**
7    Q    No, no, I agree --
8    **A    -- asked me to read. This is not my**
9 **email.**
10    Q    I agree that the body of the email
11 isn't what you wrote. But did you not, in
12 response, forward to Mr. Nagel the financials?
13    **A    Well, perhaps. But I accepted this --**
14 **when you handed this to me, I accepted that this**
15 **was an email from me. And then I'm reading it and**
16 **it's not. So what I'm telling you is I can't**
17 **confirm anything on this email because this --**
18    Q    Okay. Do you --
19    **A    -- doesn't appear to be accurate.**
20    Q    Do you know that Nexus provided this
21 three-year profit and loss projection to RLI?
22    **A    I don't know. I'm sure we did, if**

114

1 **that's what we did. You know, I don't have an**
2 **independent recollection of this document and --**
3    Q    And you have no --
4    **A    -- I would really like to know what**
5 **email it was attached to because, again, I have**
6 **real concerns about that.**
7    Q    Okay. It says there's an attachment
8 with three-year financials. When it says from
9 Mike Donovan to Rick Nagel, attachment Nexus
10 three-year financials, right?
11    MS. PETERS: Object to form.
12    **A    It does say that.**
13    Q    And at the bottom it says financials
14 attached.
15    **A    But at the top it says, "Hi, Rick. I**
16 **am back from some travel so I'm meeting this week**
17 **with some folks who will be involved" --**
18    Q    No, we're talking about the body of the
19 email.
20    **A    With all due respect, Vivian, the**
21 **question is about the email.**
22    Q    It's about -- does Mr. Nagel forward

115

1 you emails?
2    **A    Not now. He doesn't work here.**
3    Q    Did he forward you emails back in 2015?
4    **A    As I'm sure everybody -- yeah. It**
5 **would be a normal course of --**
6    Q    Sure.
7    **A    -- business, for sure.**
8    Q    And then you would respond back to
9 Mr. Nagel and perhaps attach -- send attachments
10 in your response to Mr. Nagel?
11    **A    Perhaps.**
12    MS. PETERS: Object to form.
13    **A    I just have to be very clear that this**
14 **is not my email. I just need to be very clear**
15 **that this is not my email. That's what I'm trying**
16 **to say. Like, I can't answer questions about this**
17 **email because I don't know what this document is**
18 **but I know it's not mine.**
19    Q    You're talking about the body of the
20 email. But at the top did you forward these
21 three-year financials to Mr. Nagel?
22    MS. PETERS: Object to form.

116

1    **A    Not in this email. I don't -- I don't**
2 **know. I mean, I'm not saying I didn't, I'm just**
3 **saying I don't know and I certainly didn't on this**
4 **email because this email's not from me.**
5    Q    Okay. Does anybody else at Nexus have
6 authority to send emails on your behalf?
7    MS. PETERS: Object to form.
8    **A    No. Not at that time, anyway.**
9    Q    Right. And it says from Mike Donovan
10 on behalf of Mike Donovan at the top, right?
11    MS. PETERS: Object to form.
12    **A    Yeah. I don't know that I've ever seen**
13 **my email say on behalf of. So that's odd. I mean**
14 **maybe normally it says that. When I remember**
15 **reading printouts of email chains I'm not sure.**
16 **So that's odd.**
17    Q    All right.
18    **A    But what I do know is that the body of**
19 **this email is not something I wrote.**
20    Q    Right. Do you have any reason to
21 dispute that this is a three-year profit and loss
22 projection provided by Nexus to RLI?

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

117

1      MS. PETERS:  Object to form.
2      **A   I have several reasons to dispute this**
3  **email because it's not accurate.  I don't know**
4  **about the financial statement.**
5      Q   You don't know about the financial
6  statement?
7      **A   I don't remember it.  I don't recall it**
8  **specifically is what I'm saying.**
9      Q   But you recall that RLI asked Nexus to
10  provide financial statements, correct?
11     **A   Yes.  And in fact saw that on the last**
12  **email.**
13     Q   Okay.  And so you don't have any --
14  you're not aware of any evidence to dispute that
15  this is a three-year profit and loss projection
16  that was provided to -- to RLI on Nexus' behalf?
17     MS. PETERS:  Object to the form of the
18  question.
19     **A   Can you repeat the question?**
20     Q   You don't have any documentation or
21  evidence to dispute that this is a three-year
22  profit and loss projection that was provided to

118

1  RLI on behalf of Nexus in response to its request
2  for financial information?
3      MS. PETERS:  Object to the form of the
4  question.
5      **A   Only insofar as much as you've handed**
6  **me an email that purports to be an attachment that**
7  **is an email that says it's from me and it's not.**
8  **And I raise again that it's not.  And I'm**
9  **concerned about the document that you attached --**
10  **or that you've given me because this is not**
11  **accurate.**
12     Q   All right.
13     **A   I'm going to take a quick break.  I**
14  **would like to consult with counsel.**
15     MS. KATSANTONIS:  Okay.
16     THE VIDEOGRAPHER:  We are going off the
17  record at 14:04.
18     (Recess taken.)
19     THE VIDEOGRAPHER:  We are back on the
20  record at 14:13.
21  BY MS. KATSANTONIS:
22     Q   All right.  Mr. Donovan.  Prior to the

119

1  break, we were looking at a document and my
2  question to you is, is this a financial profit and
3  loss statement that you provided to RLI in
4  response to a request for financial documents?
5      MS. PETERS:  Object to the form of the
6  question.  Misstates and misrepresents the
7  document.
8      **A   The document is titled a profit and**
9  **loss projection and that would say that it was a**
10  **projection statement.  It certainly appears to be**
11  **a document that I provided.  I do remember working**
12  **on that request.  I don't remember this document**
13  **specifically and I certainly don't remember the**
14  **email.**
15     Q   Okay.  And at the -- looking at the
16  financial document at the top, it says 2015
17  includes actual through May 31st, 2015,
18  projections through December 31st.
19     Is that correct?
20     **A   That's what it says, yes.**
21     Q   All right.  Okay.
22     **A   Yes, ma'am.**

120

1      Q   And so it reflects actuals profit and
2  loss for 2013, '14, and through May 2015, correct?
3      MS. PETERS:  Objection.
4      **A   Well, I think it says 2015 includes**
5  **actual through 5/31/2015.  My guess would be that**
6  **that's based on LiteSpeed revenue reports.**
7      Q   Right.  And that 2013 and '14 would
8  also include actual information, correct?
9      MS. PETERS:  Object to the form of the
10  question.
11     **A   Presumably.  But, you know, 2013, for**
12  **example, these are whole numbers so they're**
13  **rounded numbers so they're obviously based on, you**
14  **know, based on projections or based on what the**
15  **revenue was.  Like $195,000 for travel with your**
16  **sense doesn't seem -- like it sounds like that's**
17  **probably a rounded number.  So I just want to be**
18  **clear.  Total operating income, 1.8 million,**
19  **0000000 I just want to be clear.**
20     Q   But you're representing that this is
21  information that is derived from actual data,
22  correct?

**121**

1      A   Well --
2          MS. PETERS:  Object to the form of the
3  question.
4      A   And it is.  It would be based on actual
5  data.  I just want to be clear what the data is.
6      Q   And you understood that RLI was
7  requesting this information in order to -- as a
8  bases for issuing bonds on behalf of RLI?
9          MS. PETERS:  Object.
10     A   Well --
11     Q   I mean on behalf of Nexus.
12         MS. PETERS:  Object to the form.
13     A   I understand that Dave Sandoz was
14  asking for this information.  Dave Sandoz wanted
15  to work with us.  He wanted this program at RLI,
16  and I was working with him.  He was my contact
17  with RLI, so...
18     Q   Right.  Well, you understood, though,
19  that he was asking for the indemnity agreement,
20  the collateral agreement, and financial statements
21  in order for -- that those were required
22  components necessary in order for RLI to issue

**122**

1  bonds on behalf of Nexus, correct?
2          MS. PETERS:  Object to the form of the
3  question.
4      A   I know we had conversations about those
5  things.  I will say that Dave was incredibly
6  supportive and collaborative in helping us sort
7  of, you know, navigate this process.  We were a
8  young company at the time.  So I mean he was very
9  helpful.  He explained what we needed.  We got
10  together, worked together, had him come to the
11  campus, did a visit and then ultimately signed
12  that indemnity agreement.
13     Q   Right.  But you understood and -- you
14  understood that before RLI could issue -- I had it
15  right here -- before RLI could issue bonds it was
16  going to require a signed indemnity agreement, a
17  signed collateral agreement, and financial
18  statements from Nexus, correct?
19         MS. PETERS:  Object to the form.
20     A   The signed indemnity agreement and
21  signed collateral agreement, yes.  I'm not a
22  hundred percent sure if financial statements were

**123**

1  provided before the beginning of the business.  I
2  don't know.  I know that that was something that
3  we worked with Dave on.  I'm not saying that they
4  weren't, I just don't know.  So you're asking me
5  do I understand and I'm telling you yes on the two
6  things, the indemnity agreement and the collateral
7  agreement.  I do remember signing those before any
8  business was conducted.  I don't know about the
9  other.
10     Q   Okay.  Well, we'll go through that
11  because there's documents that will show you that
12  those were required before they would issue bonds.
13  But you don't recall that?  Is that your
14  testimony?
15     A   I don't recall.
16         MS. PETERS:  Object to the form.
17     Q   Okay.  But you recall that you sent
18  these financial documents back in June 2015 in
19  response to Mr. Sandoz's request to complete my
20  file for the indemnity, we would like to see your
21  year-end financial statements?
22         MS. PETERS:  Object to the form.

**124**

1      A   And when is this?
2      Q   That's in the email provided to you at
3  the bottom.
4      A   As I've said, the email provided to me
5  I don't recognize and I'm not prepared to testify
6  to any of its contents because I don't know what
7  it is.  It appears to be -- I don't know.  I don't
8  recognize it.  I can't confirm the email.  I
9  certainly can't confirm that I sent this email
10  because as I told you before, I don't know that I
11  did.
12        So I can't confirm that I sent this
13  email.  If this question is specifically related
14  to this email, my answer has to be I don't know,
15  because I don't know what this email is.
16     Q   Okay.  But you do -- you do confirm
17  that Nexus sent this three-year profit and loss
18  statement to RLI?
19        MS. PETERS:  Object to the form.
20     A   The projection, yes.
21     Q   Okay.  And so with regard to an email
22  that's been produced by Nexus that says from Mike

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

125

1  Donovan, how do you know whether or not that
2  has -- an email of yours?
3        MS. PETERS: Object to the form.
4        A    Well, good question.  So I immediately
5  am troubled with on behalf of Mike Donovan under
6  the "From: Mike Donovan."  I don't recollect
7  seeing that on my emails typically when they're
8  printed.  That makes me nervous.  It makes me
9  think that maybe someone is using a relay client
10 or an Outlook or something like that.  I don't
11 know.
12        So that's the first thing that makes me
13 nervous.  And for the record, the individual
14 employee on this email is a person who we've been
15 in litigation with.  I think I have to be careful
16 what I stay because there are some agreements
17 that -- nondisparagement agreements there but
18 there are concerns about this email.
19       Q    How are we in general going to know --
20 if an email says from Mike Donovan or to Mike
21 Donovan, is it your contention that you don't know
22 if any of these emails are from you or not?

126

1        MS. PETERS: Object to the form of the
2  question.  Argumentative.
3        A    With all due respect, you put one email
4  in front of me.
5        Q    No, I know.  But I'm asking you how am
6  I supposed to know which emails are yours or not?
7        MS. PETERS: Object to the form of the
8  question.  That is argumentative.  If there's
9  something that you want to put in front of him in
10 particular.  He's testified that he questions this
11 one.
12       Q    Is there a way that you can tell by
13 looking at a document whether it's an email you
14 sent or not?
15       MS. PETERS: Object to the form.
16       A    I would be concerned about any email
17 that says from and then on behalf of underneath
18 just because I'm not used to seeing that.  I would
19 be concerned about any email that purports to be
20 from me but then has text from other people.  I
21 would be concerned about that.  For those reasons,
22 I am very, very concerned about this email, but

127

1        Vivian, I promise you I'm not trying to be
2  argumentative.  I just want to redline the fact
3  that I'm not comfortable testifying to anything
4  related to this email.  I'm just telling you.
5  Because I don't recognize it.  I don't know what
6  it is.  And it's confusing enough.
7        Q    Are you aware of any incident where
8  anyone has sent a fraudulent email under your
9  name?
10       A    No.
11       Q    And --
12       A    Well, actually, yes.  We have -- I have
13 maybe 12 or 13 individuals who claim that they
14 were hired by Nexus.  We later found out that
15 those were fraudulent emails.  They were
16 individuals in foreign companies that were
17 contacted online.  But it wasn't my email address.
18 But you asked the question I want to be very
19 honest.  We did have that situation.
20       Q    But you're not aware of any fraudulent
21 emails from your email address?
22       MS. PETERS: Object to the form.

128

1        A    I'm not.
2        Q    Okay.  And you mentioned your
3  relationship with Mr. Sandoz.  During the process
4  of forming a relationship with RLI, is it fair to
5  say you had a good relationship with Mr. Sandoz?
6        A    I think that is fair, yeah.
7        Q    Okay.
8        A    He's a very nice guy.
9        Q    And do you continue to have a
10 relationship with Mr. Sandoz?
11       A    I do.  I still think he's a nice guy.
12       Q    Okay.  And what is your current
13 relationship with Mr. Sandoz?
14       A    You know, I -- I count on him as a
15 friend really.  I mean, just as a former
16 colleague.  We've worked together.  We did this
17 work together.  So, you know, he's a good person.
18       Q    And do you have any reason to doubt --
19 or have you ever had any reason to doubt any
20 statements made by Mr. Sandoz?
21       MS. PETERS: Object to the form.
22       Q    As to whether --

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

---

129

1      MS. PETERS:  Vague.
2      Q    -- they were accurate or not?
3      MS. PETERS:  Vague.
4      **A    I don't know.  He's always been honest**
5    **with me it seems.**
6      Q    Okay.  Are you aware of any instance
7    where Mr. Sandoz has lied or said something false
8    to you?
9      MS. PETERS:  Object to form.
10     **A    Not off the top of my head, no.**
11     Q    Are you aware of any instance where
12   Mr. Sandoz lied or said anything false to anybody
13   else?
14     MS. PETERS:  Object to form.
15     **A    Not that I'm aware of.**
16     Q    Okay.  Do you recall that Mr. Sandoz
17   advised that Nexus would be required to post
18   500,000 in collateral in order for RLI to begin
19   issuing bonds on behalf of Nexus?
20     **A    I do believe that that was where the**
21   **conversation began, that it would be 500,000.**
22     Q    And isn't it true that you requested --

---

130

1    Nexus requested Mr. Sandoz initially to reduce
2    that amount and Mr. Sandoz said he could not and
3    required 500,000 at the time of entering into the
4    relationship with RLI and Nexus?
5      MS. PETERS:  Object to form.
6      **A    I don't recollect that.  I recollect**
7    **Mr. Sandoz reducing the collateral amount to**
8    **250,000 and offering to send it back to us at the**
9    **end of the year.  I do remember that.**
10     Q    That was after the relationship had
11   been formed quite some time, right?
12     MS. PETERS:  Object to form.
13     **A    Perhaps.  I don't have the documents in**
14   **front of me --**
15     Q    Okay.
16     **A    -- but I -- yeah, but I remember that**
17   **one, Vivian.  I don't remember --**
18     Q    Okay.
19     **A    That's what I remember.**
20     Q    And do you recall that -- or that Nexus
21   agreed to provide 500,000 in collateral in five
22   monthly installments of a hundred thousand each?

---

131

1      MS. PETERS:  Object to the form.
2      **A    I believe that was a discussion.  I**
3    **believe that ultimately we settled on a $250,000**
4    **collateral amount.  I believe it was 250,000.  And**
5    **that it was going to be refunded after the year.**
6      MS. PETERS:  Can I ask the videographer
7    how much time we've used so far.
8      THE VIDEOGRAPHER:  About 1:40.
9      MS. PETERS:  1:40?
10     Q    And do you recall that in about June of
11   2015, Mr. Sandoz forwarded you the indemnity
12   agreement for you to complete to indemnify but
13   that you didn't enter into a relationship for
14   another eight months?
15     Do you recall that time lag?
16     MS. PETERS:  Object to form.
17     **A    I don't recall.  I don't challenge it,**
18   **I just don't recall.**
19     Q    Okay.  And prior to RLI issuing any
20   bonds, you executed an indemnity agreement,
21   correct?
22     MS. PETERS:  I don't remember.

---

132

1      **A    Could you repeat the question?  I'm**
2    **sorry.**
3      Q    Prior to RLI issuing any bonds at the
4    request of Nexus, you issued an indemnity
5    agreement, correct?
6      MS. PETERS:  Object to form.
7      **A    I didn't issue an indemnity agreement.**
8    **I signed --**
9      Q    Executed?
10     **A    You mean -- executed.  Yes, I executed.**
11     Q    Did I say that wrong?
12     **A    I think you said issue, but I may be**
13   **wrong.  I just don't want to answer the wrong**
14   **question so I want to make sure.**
15     Q    Right.
16     **A    Forgive me, I'm not trying to be**
17   **difficult here.**
18     Q    Not at all.
19     And did you also execute a collateral
20   agreement prior to RLI issuing any bonds on behalf
21   of -- or at the request of Nexus?
22     **A    Yes, and in fact an indemnity agreement**

---

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

133

1 and a collateral agreement were together and I
2 understand operate together.
3    Q    What do you mean you understand operate
4 together?
5    A    Well, my expectation was that the
6 indemnity agreement and the collateral agreement
7 was the expectation of Nexus' performance, right?
8 So I understood what that performance expectation
9 was based on what those documents said.
10    Q    So you understood your performance was
11 you were obligated to comply with the indemnity
12 agreement, correct?
13        MS. PETERS: Object to form.
14    Q    Nexus was obligated to comply with the
15 indemnity agreement, correct?
16    A    Well, I think we were obligated to
17 comply with the indemnity agreement. I'm not sure
18 you and I would agree on what the indemnity
19 agreement actually says. So I want to be very
20 careful to say yes, I do believe we were required
21 to comply with the indemnity agreement but it
22 seems we are in some disagreement over what

134

1 complying means.
2    Q    Right. And you understood that the
3 collateral agreement, it's a separate agreement,
4 right?
5    A    I don't think it was separate. I think
6 it's together. I mean the collateral agreement
7 and the indemnity, how could they be separate?
8    Q    Does the indemnity agreement reference
9 the collateral agreement?
10        MS. PETERS: Object to form.
11    A    I don't recall.
12    Q    It doesn't, does it?
13    A    I don't -- I don't recall.
14        MS. PETERS: Object to form.
15    Q    And is the collateral agreement
16 similarly an obligation you understood you were
17 required to comply with?
18        MS. PETERS: Object to form to the
19 extent it calls for a legal conclusion.
20    A    I would think I would be required to
21 comply with anything I signed. I would say,
22 Vivian, if I could offer, you know, our contracts

135

1 in understanding contracts, you know, our clients
2 sign a contract, it may have multi-parts, and my
3 experience would be that those parts function
4 together when we're talking about the same
5 business. So forgive me when I say they function
6 together. I mean they're about the same thing,
7 right?
8        THE WITNESS: Could I get some water?
9        MS. PETERS: Yes, you may.
10        THE WITNESS: Thank you. Thank you,
11 sir.
12        MR. HARRIS: Sure.
13        THE WITNESS: I appreciate it.
14        MS. PETERS: Can we have just a moment.
15        THE VIDEOGRAPHER: We are going off the
16 record at 14:30.
17        (Recess taken.)
18        THE VIDEOGRAPHER: We are back on the
19 record at 14:40.
20 BY MS. KATSANTONIS:
21    Q    All right. And we were talking about
22 financial statements earlier, and you couldn't

136

1 recall what was required.
2        I'm going to show you and mark this as
3 an exhibit.
4        (Donovan Exhibit 5 marked for
5 identification and attached to the transcript.)
6    Q    So this is an email chain between Dave
7 Sandoz and you. And on January 20th, Mike [sic]
8 Sandoz advises that he needs you to initial and
9 date the last page of the general indemnity
10 agreement.
11        Do you see that?
12    A    Yes.
13    Q    Okay. And -- then Mr. Sandoz, for
14 collateral says, "Please insert in the collateral
15 agreement how you are funding the collateral pool,
16 i.e., five equal installments of a hundred
17 thousand dollars to be received by surety on or
18 before February 1st, March 1st, April 1st,
19 May 1st."
20        MS. PETERS: Object to form. Misstates
21 what the document actually says.
22    Q    Do you recall that?

137

1      A   Yeah, I do recall initially having a
2   conversation about $500,000 in collateral.  When I
3   talked to you about the 250, that was a later
4   revision from Mr. Sandoz.  But I do remember that
5   as a topic of conversation.
6      Q   Right.  And under financial statements
7   do you see that Mr. Sandoz was advising that he
8   needed the year end balance sheet and any
9   schedules which will show me the company's net
10  worth with schedules explaining various items?
11     A   I do see that.
12     Q   Okay.  And then --
13         (Donovan Exhibit 6 marked for
14  identification and attached to the transcript.)
15     Q   Oh, let me -- let me show you -- mark
16  two documents to have in front of you on
17  February 9th.
18         (Donovan Exhibit 7 marked for
19  identification and attached to the transcript.)
20         MS. PETERS:  Is this Exhibit 6?
21         THE COURT REPORTER:  That's 7.
22     Q   So on February 9th you transmitted to

138

1   Mr. Sandoz the executed indemnity agreement,
2   right?
3      A   It appears so, yeah.
4      Q   And a collateral agreement, correct?
5      A   It appears so, yes.
6      Q   Okay.  And are those your initials and
7   signatures on the bottom of the indemnity
8   agreement?
9      A   They appear to be, yes.
10     Q   And is that your signature on the
11  collateral agreement?
12     A   Yes, it appears to be.
13     Q   Okay.  And for the collateral
14  agreement, there's written 500,000, a hundred
15  thousand paid monthly by check to RLI.  Do you see
16  that?
17     A   Yes.
18     Q   Whose handwriting is that?
19     A   It appears to be mine.
20     Q   Okay.  So at the time that you executed
21  the indemnity agreement you also executed a
22  collateral agreement, agreeing to pay 500,000 in

139

1   collateral, correct?
2      A   I think that specifically is exactly
3   what Mr. Sandoz instructed me to write on the
4   agreement, if I remember correctly from the prior
5   email.  So I did that.  And then, of course, you
6   know, he was gracious enough to lower the amount
7   of collateral necessary and offered to refund it,
8   which was really nice.
9      Q   Well, you're talking many months later.
10     A   I don't remember how many months.  I do
11  know that he came to us and said that we didn't
12  need to post the $500,000 collateral, that things
13  were going well.  That he thought that any
14  collateral we did post we would be able to get
15  back by the end of the year.
16     Q   We're going to get to that but that was
17  months later.  We're talking now at the time that
18  you entered into the agreement.
19     A   I'm not sure of the dates.  I'm just
20  explaining to you.
21     Q   Sure.  Okay.  And then did you
22  understand that Mr. Sandoz advised that in order

140

1   to start issuing bonds, he needed the balance
2   sheet from you, correct?
3      A   I see that in this email.
4          MS. PETERS:  Object to form.
5      Q   And do you recall that you sent him the
6   balance sheet?
7          MS. PETERS:  Object to form.
8      A   I don't know.  Is that what that says?
9   I'm not -- I don't see this attachment.  But I
10  see -- I see a document that references an
11  attachment.
12     Q   Okay.
13     A   But I don't see the attachment.
14         MS. KATSANTONIS:  Mark this.
15         MS. PETERS:  Is that 8?
16         THE COURT REPORTER:  This is 8.
17         MS. KATSANTONIS:  Here you go, Mary
18  Donne.
19     Q   So this is an email again between Mike
20  Donovan, you, and Dave Sandoz.  In the middle it
21  says, "All looks good.  Just need the balance
22  sheet of your 12/31/15 year-end financial

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

36 (141 to 144)

---

141

1  statement."
2      Do you see that on February 9th from
3  Dave Sandoz to you in the middle of the front
4  page?
5      **A   I do see that note from Dave Sandoz,**
6  **yes.**
7      Q   He said, "We should be able to start
8  tomorrow if I can get that for the file."
9      Do you see that?
10     **A   I do see that, yes.**
11     Q   Okay.  So did you have an understanding
12 that RLI would not issue bonds on behalf of Nexus
13 without obtaining the balance sheet for Nexus
14 first?
15     MS. PETERS: Object to form.
16     **A   I think the email -- I mean I read the**
17 **email as it reads.  Dave was asking for that and**
18 **we were starting a business.  I mean, yes, he**
19 **asked for the balance sheet.**
20     Q   Yeah, he says, "We should be able to
21 start tomorrow if I can get this -- that for the
22 file."  Right?

---

142

1      MS. PETERS: Object to form.
2      **A   No, it says "just need the balance**
3  **sheet of your 12/31/15 year-end financial**
4  **statement."**
5      Q   Right.  Looking at the third sentence
6  down, "We should be able to start tomorrow if I
7  can get that for the file."
8      **A   Right.**
9      MS. PETERS: Object to form.
10     Q   Right?
11     **A   That's what it says.**
12     Q   Okay.  And so you understood that was
13 required before RLI would issue bonds on -- at the
14 request of Nexus, correct?
15     MS. PETERS: Object to the form.
16     **A   Well, I recognize the email as an email**
17 **from me.  I don't recall the email.  So it's hard**
18 **for me to say in 2016 on the 10th of February**
19 **exactly how I was feeling or how I read this.  But**
20 **obviously I understood, based on reading the**
21 **email, that he wanted the financial statement and**
22 **that we were beginning the project the next day,**

---

143

1  so all of that's in there.
2      Q   Well, and you attached -- in fact you
3  responded and you provided a balance sheet, right?
4      MS. PETERS: Object to form.
5      Q   In the email I just handed you.
6      MS. PETERS: Object to form.
7      **A   Right.  That's -- yeah, that's what**
8  **this appears to be, yes.**
9      Q   On February 10th, 2015, you forwarded
10 to Mr. Sandoz --
11     **A   So this is -- this is another copy of**
12 **the same email, Vivian, right?**
13     Q   Sorry.
14     **A   I just want to make sure.  Or is it**
15 **not?**
16     Q   On February 10th of 2016, you forwarded
17 to Dave Sandoz a year end 2015 balance sheet,
18 right?
19     MS. PETERS: Object to form.
20     Q   The balance sheet is -- you said,
21 "Please find attached our year end '15 balance
22 sheet."

---

144

1      Correct?
2      **A   Right, it does say that, yes.**
3      Q   And then attached is a balance sheet
4  that's dated January 1st, 2016, correct?
5      **A   I see that.**
6      MS. PETERS: Object to form.
7      Q   And this form provides that Nexus
8  Services has total capital of $10,881,761; is that
9  correct?
10     MS. PETERS: Object to form.
11     **A   That's what it says on the form,**
12 **yeah -- on the sheet.**
13     Q   All right.  And on the Nexus Services
14 balance sheet, the cash and the accounts
15 receivable, those are funds that would have been
16 received from Libre by Nexus, correct?
17     MS. PETERS: Object to form.
18     **A   Yeah.  But these are -- these are whole**
19 **numbers.  So, again, they're obviously rounded**
20 **numbers.  I mean that's pretty clear.**
21     Q   Right.  But I'm saying that the assets
22 that are listed on the balance sheet, the cash,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

145

1  is -- and the accounts receivable, those are funds
2  from Libre by Nexus, correct?
3       MS. PETERS: Object to form.
4       A   They would be funds from Libre and to
5  the extent that any Homes revenue was, you know,
6  realized up. I don't know the specifics. I mean,
7  I would assume so, based on a general
8  understanding of, yes. But specifically, I don't
9  know. It's been a long time.
10      Q   Right.
11      A   And again I apologize to qualify all my
12 answers, Vivian, but I just want to be as direct
13 and helpful as possible.
14      Q   I appreciate it.
15      A   If I don't remember something I'm going
16 to tell you.
17      Q   Right. And in your email you say, "Can
18 we plan to submit the bonds tomorrow."
19      Correct?
20      A   It appears so, yes.
21      Q   And you also advised, "We have
22 processed the first installment of the

146

1  collateral."
2       Correct?
3       A   I see that, yeah.
4       Q   Okay. And was that a truthful
5  statement when you made it, that the first
6  installment of collateral had been processed?
7       MS. PETERS: Object to form.
8       A   I would certainly assume so. I mean, I
9  wrote it. I don't -- I don't remember this email.
10 I don't remember the -- I don't remember what was
11 happening and so I can't -- I can't independently
12 right now tell you I remember on this day. But I
13 wrote it so I would assume so.
14      Q   Okay. And let's look at the indemnity
15 agreement that you executed.
16      A   Oh, and Vivian, I will say just because
17 I remembered it when we talked before. You had
18 asked me whether I thought the agreements were
19 connected and I told you they were and then you
20 asked if the agreements referenced one another.
21 So my read of 3 d. related on the indemnity
22 agreement related -- it's all about collateral,

147

1  which of course is the subject of the collateral
2  agreement.
3       So I mean I certainly read them
4  together. I certainly understood they were
5  together. But I just wanted to make that point.
6       Q   Okay.
7       A   Because I was trying to remember what
8  it was when you had asked.
9       Q   Right. But there's no reference to
10 collateral agreement in the general indemnity
11 agreement, correct?
12      MS. PETERS: Object to form. Misstates
13 his prior testimony.
14      A   I think when it says Indemnitors will,
15 upon the request of the Surety, procure the
16 discharge of the Surety from any Bond,
17 unattainable. And then there's will, if requested
18 by the Surety, either deposit collateral with
19 Surety, acceptable to the Surety submission.
20      So I think that is obviously
21 referencing the collateral agreement. I mean, I
22 think a plain reading. I would have read it that

148

1  way. I did read it that way. That's my
2  understanding.
3       MS. PETERS: I would ask the witness to
4  please go a little slower --
5       THE WITNESS: I'm so sorry.
6       MS. PETERS: -- for the court reporter.
7       THE WITNESS: I feel horrible. I'll
8  blame it on my illness.
9       MS. PETERS: No, you talk fast.
10      THE WITNESS: I talk fast all the time.
11 That's true.
12      Q   All right. So looking at the --
13      A   I'm going to have to take a biologic
14 break. I'm sorry.
15      MS. KATSANTONIS: All right.
16      THE VIDEOGRAPHER: We are going off the
17 record at 14:55.
18      (Recess taken.)
19      THE VIDEOGRAPHER: We are back on the
20 record at 14:59.
21 BY MS. KATSANTONIS:
22      A   For what it's worth, if we have to go

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

149

1  back off again I'm going to try to say bio break
2  and ask you to cut -- I don't want -- the visual
3  of me running off camera doesn't look good.
4      Q   Sure.
5      A   I just don't want that. You know what
6  I mean?
7      Q   Yeah, that won't --
8      A   So I am going to try to say bio break
9  and like raise my hand and that will be like my
10 cue because, you know.
11     Q   No problem, sorry.
12     A   I apologize.
13     Q   No, I apologize. I feel bad you're not
14 feeling well.
15     A   I'd be having more fun, Vivian.
16     Q   So we just looked at the general
17 indemnity agreement that you executed and the
18 collateral agreement that you executed, correct?
19     A   Correct.
20     Q   Now, to the best of your knowledge and
21 belief, did Nexus Services fully comply with the
22 indemnity agreement?

150

1          MS. PETERS: Object to the form to the
2  extent it calls for a legal conclusion.
3      A   I'm proud to say we stood in front of
4  RLI and paid funds as required. I know we have
5  had some disagreement over when but I think that
6  if we look at the record we have complied with the
7  general indemnity agreement and that we have stood
8  as an indemnitor for RLI.
9      Q   Okay. So -- and I appreciate that. So
10 you're -- so to the best of your knowledge and
11 belief, Nexus fully complied with the terms of the
12 indemnity agreement?
13     A   I believe we have. I know that we had
14 conflict -- conflict's the wrong word -- well,
15 maybe not. I know we had conflict over
16 confidentiality provisions. So understanding that
17 we had serious conversations about that and that
18 did delay the inspection of books and records,
19 it's just, you know, an issue. But I believe that
20 we complied.
21         I believe that I attempted to have a
22 good faith compliance. I wish we could have done

151

1  this a long time ago. I wish we could have signed
2  a confidentiality agreement a long time ago. I
3  think, you know, ultimately things would have been
4  better.
5      Q   And to the best of your knowledge and
6  belief, did Nexus fully comply with the collateral
7  agreement and receipt?
8      A   I do believe we did as it relates to
9  the abridged version of collateral that Mr. Sandoz
10 said that we had to provide, although I do
11 understand that there is a disagreement between
12 RLI and Nexus about how much collateral is being
13 held.
14     Q   What do you mean the abridged version?
15     A   I mean when he said that we didn't have
16 to post the 500,000.
17     Q   Okay. So what is your understanding of
18 what Mr. Sandoz said you did have to post?
19     A   I believe it was 250,000 that would be
20 returned at the end of the year.
21     Q   Okay.
22     A   And I believe that portions of that

152

1  were going to be -- portions of that were related
2  to monies that were owed to the agent for
3  exonerations, or something like that. But that
4  was my understanding of Mr. Sandoz's email.
5      Q   Okay. But you -- you never executed
6  any other agreement with regard to collateral,
7  correct?
8      A   Correct. Well, I took that as
9  direction from Mr. Sandoz. He was of course -- he
10 is RLI to us until -- until we stopped working
11 with RLI, then we met a bunch of RLI people. But
12 until that time he was RLI to us.
13     Q   Right.
14     A   And RLI was telling us they didn't want
15 the full 500,000, they only wanted half of that
16 and that they were going to take that from
17 commissions to the agent and then at the end of
18 the year we'd get it all back.
19     Q   Well, we're going to get to that in a
20 little bit more detail. That's months later. But
21 with regard to even a request for 250,000 in
22 collateral, that wasn't all going to come from

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

153

1  commissions from an agent, was it?
2        MS. PETERS: Object to form.
3        A  I believe that there's an email that
4  specifies a certain amount comes from it.  It
5  was an email from Mr. Sandoz, not from me.  I
6  don't want to recall it because of course I won't
7  be able to recall it fully and I wouldn't be able
8  to do it service.  If you have it we can talk
9  about it later, we can draw from it specifically.
10       Q  Right.  Did -- why would an agent
11  provide collateral on behalf of Nexus?  Does that
12  make any sense to you?
13       MS. PETERS: Object to form.
14       A  It didn't make a lot of sense to me,
15  although because -- the reason it made sense to me
16  is because he was talking about refunding the
17  entire amount at the end of the year anyway.  So I
18  just assumed that that's what was ultimately going
19  to happen.
20       Q  Do you have -- does Nexus or Libre or
21  Homes or any of your Nexus entities, or you
22  personally or Mr. Moore personally, have any

154

1  interest in any business or entity that
2  Mr. LiMandri also owns an interest?
3        MS. PETERS: Object to form.
4        A  No.  I don't think so.  No, I'm sure we
5  don't.
6        Q  Okay.
7        A  I'm just trying to think.  No, no.
8        Q  And you have no agreement --
9        A  He's an officer of the Professional
10  Bail Agents of the United States.  We have
11  contributed to it.  That would be the closest that
12  we'd come.
13       Q  Okay.
14       A  To be clear.
15       Q  You have no agreement or understanding
16  with Marco LiMandri or Big Marco --
17       A  LiMandri.
18       Q  What is it?
19       A  LiMandri.
20       Q  LiMandri.
21       A  Yes.  You're really trying to make it
22  Italian.  It's already Italian.

155

1        Q  Or Big Marco.  Or Big Marco.
2        A  Big Marco.
3        Q  We'll just call him Big Marco.  Is that
4  good?
5        A  Sure.
6        Q  Nexus or Libre or Homes or you
7  personally or Mr. Moore personally have no
8  agreement with Big Marco whereby Big Marco is
9  responsible for liabilities of Nexus, Libre,
10  Homes, you or Mr. Moore; is that true?
11       MS. PETERS: Object to the form.  Can
12  you read that sentence back, please.
13       (The requested text was read by the
14  reporter as follows: "Nexus or Libre or Homes or
15  you personally or Mr. Moore personally have no
16  agreement with Big Marco whereby Big Marco is
17  responsible for liabilities of Nexus, Libre,
18  Homes, you or Mr. Moore; is that true?")
19       MS. PETERS: Object to form.
20       A  I don't think that's true.
21       Q  Okay.  So what agreement do you have
22  with Big Marco in which he's responsible for the

156

1  liability?
2        A  It's not an agreement that we have with
3  him.  But I'm referenced on the I-352 as the
4  individual who at -- request the bonds.
5  Mr. LiMandri is a co-obligor on the I-352.  I
6  don't think I can honestly answer that he doesn't
7  have liability because in the government's eyes he
8  has liability.  So in an effort to be completely
9  transparent and make sure I don't answer anything
10  inappropriately, I don't think I can say that.
11       I can say that we don't have -- he
12  doesn't have a direct liability to us but he would
13  have a liability on the bonds.
14       Q  Okay.
15       A  As a co-obligor.
16       Q  So other than on the bonds, does he
17  have any responsibility to pay collateral or any
18  such liability of Nexus or Libre or Homes?
19       A  He's jointly --
20       MS. PETERS: Object to form.
21       A  I'm so sorry.  He's jointly and
22  severally liable for the bonds pursuant to the

157

1  I-352.
2      Q    Sure.
3      A    Other than that he has no
4  independent -- there's no agreement with us and
5  Marco that makes him liable to us.
6      Q    Right.  And there's no reason he would
7  pay your collateral to RLI, correct?
8          MS. PETERS: Object to form.
9      A    I think that -- again, I don't know why
10 Dave Sandoz suggested that we do that.  It made
11 sense given the fact that he was going to refund
12 it at the end of the year.  I assumed that that
13 money was going to go to Marco at that time.  And
14 I believe actually --
15     Q    So Big Marco --
16     A    I believe -- and I'm so sorry, I don't
17 mean to interrupt you, but I do believe -- I -- I
18 believe those commissions -- that that money
19 wasn't going to be paid to Marco until the end of
20 the first year anyway.  So I think the way that
21 the timing worked when the money was going to be
22 refunded, when the collateral was going to be

158

1  refunded it would have been paid to Marco for the
2  first time at that point anyway.  So I think -- I
3  don't know, RLI held that money, I didn't hold
4  that money.  RLI was responsible for that.  I
5  wasn't responsible for that money.  So I didn't
6  really think it's -- I don't think it's fair for
7  me to have to testify to what happened with that
8  money.  RLI was the company --
9      Q    What money are you referencing?
10     A    Whatever the money is that Dave Sandoz
11 said he was going to, you know -- that the
12 commission part that he was going to place in
13 collateral hold.
14         I -- that was an email that came from
15 your company.  I don't -- I don't know.  I
16 can't --
17     Q    Right.  You don't have an agreement to
18 that, correct?
19     A    Correct.  Just that I have that in
20 writing from the only person at RLI that I ever
21 did any business with, who was the person who
22 entered the agreement with us.

159

1      Q    Does Nexus Services have any written
2  agreements with Big Marco at all related to
3  immigration bonds?
4          MS. PETERS: Object to form.
5      A    Yes, I believe we do.
6      Q    Okay.  What kind of agreements do you
7  have?
8      A    You know, this has been a -- a
9  conversation where -- I know that we have an
10 agreement that was entered into.  The only problem
11 is I don't know that it was executed,
12 counterexecuted.  And so I'm not -- I'm not going
13 to say that it was because I'm not sure.  I know
14 that we had a verbal agreement, an understanding
15 of how the process was going to work when we first
16 started.  And I know that we have the GIA,
17 obviously, with RLI and then subsequent surety.
18     Q    Okay.
19         MS. KATSANTONIS: So we've asked
20 counsel for that agreement so we'll ask again for
21 it.
22     Q    Now, with regard to the indemnity

160

1  agreement that you executed, let's take a look at
2  the language of the indemnity agreement.
3      A    (The witness complies.)
4      Q    So did you review the terms of the
5  indemnity agreement prior to executing?
6      A    I'm sure I did, yes.
7      Q    Okay.  And you understood the terms
8  when you executed the agreement?
9      A    I believe I did.
10     Q    Okay.  And did you understand that the
11 purpose of the indemnity agreement was to ensure
12 against any loss to RLI by having executed the
13 bond for an immigrant detainee at the request of
14 Nexus Services, Inc.?
15         MS. PETERS: Object to the form of the
16 question to the extent that it calls for a legal
17 conclusion.
18         MS. KATSANTONIS: Sure, I'm asking for
19 his understanding.
20     A    I'm going to have to ask you -- I'm
21 sorry, I didn't hear that.  Could you please
22 repeat?

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

41 (161 to 164)

161

1     Q   No problem.
2         Did you understand that the purpose of
3   the indemnity agreement was to ensure against any
4   loss to RLI by having executed bonds for an
5   immigrant detainee at the request of Nexus
6   Services?
7         MS. PETERS: Objection to the form of
8   the question to the extent it calls for a legal
9   conclusion.
10    A   So --
11    Q   I'm looking at the second or third
12  sentence.
13    A   I got you. Can we just pause for a
14  second?
15    Q   Sure.
16    A   Right now because I'm having some --
17  I'm kind of battling another occurrence. You're
18  asking a very technical question related to this
19  document and I'm -- I'm having a difficult time
20  because I'm trying not to throw up. So what I
21  would like to do is break so that I can take a
22  walk around the other room and get myself composed

162

1   so that I don't have to run out again.
2     Q   Okay.
3     A   And then I can address your question
4   with a fresh mind. Is that possible?
5     Q   Sure.
6         THE VIDEOGRAPHER: We are going off the
7   record at 15:12.
8         (Recess taken.)
9         THE VIDEOGRAPHER: We are back on the
10  record at 15:22.
11  BY MS. KATSANTONIS:
12    Q   Okay. Prior to the break we had also
13  talked about the collateral agreement that you
14  executed. And you had some testimony about an
15  email from Mr. Sandoz.
16        What was your understanding of -- well,
17  strike that.
18        Did you ever provide any -- and by you
19  I mean Nexus, Libre, or Homes, provide any form of
20  cash collateral to RLI?
21    A   Yes, I believe so. Although I don't
22  know how much or when.

163

1     Q   Well, what makes you think you did?
2     A   We had a -- I believe that we had
3   identified $50,000 that was paid. I'm not a
4   hundred percent sure of that. I'd have to look
5   for the record. We were investigating this when
6   the issue came up earlier in litigation.
7     Q   Right. Isn't it true that you -- Nexus
8   has not provided any evidence of any cash payment
9   ever made to RLI?
10        MS. PETERS: Object to form.
11    A   I don't know. Because I haven't
12  actually been providing you anything. So many,
13  many people have and I can't speak to what they've
14  provided you or what they've not provided you.
15        I do know that I would have to look for
16  that and, you know, I'm happy to do that.
17    Q   And didn't you retain counsel to look
18  for that to answer that during this litigation?
19        MS. PETERS: Object to form.
20    A   I retained counsel because you sued me,
21  Vivian. Not specifically to look for a document.
22    Q   Well, did you request counsel to track

164

1   down whether any collateral payments have been
2   made and -- and I believe in particular was
3   Mr. Mullin, who was not able to identify any
4   records to verify any cash payments made by Nexus
5   to RLI?
6         MS. PETERS: Object to the form of the
7   question. Nexus has provided --
8         MS. KATSANTONIS: No speaking
9   objections.
10        MS. PETERS: -- thousands of pages of
11  bank records.
12        MS. KATSANTONIS: Okay.
13    A   I would —
14        MS. KATSANTONIS: Leading the witness,
15  Mary Donne --
16    Q   Can you repeat the question?
17        MS. KATSANTONIS: -- and inappropriate.
18    A   I'm sorry. No worries.
19    Q   Isn't it -- isn't it --
20    A   I didn't hear your question. Can you
21  repeat it for me, please?
22    Q   Isn't it true that you -- that Nexus

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

42 (165 to 168)

165

1 has not been able to identify or produce any
2 documentation that evidences that it paid any cash
3 to RLI as collateral?
4        MS. PETERS:  Object to form.
5    A   Again, I don't know.
6    Q   And who would know that answer?
7        MS. PETERS:  Object to form.
8    A   I would guess our finance team.  I
9 would have to -- I would have to check and see.  I
10 would have to run a check to see and I'm happy to
11 do that.  I'm happy to search for canceled checks
12 for RLI and do those independents searches.
13 You're asking me --
14   Q   Well, haven't you done that search --
15   A   I haven't.
16   Q   -- in response to our discovery
17 requests?
18   A   I didn't do it personally.  You're
19 asking me a direct question, I want to answer it
20 directly.  And so what I would say is I would have
21 to go perform that search which I'm happy to do.
22   Q   Through your finance team?

166

1    A   Right.
2    Q   And Mr. Moore is the head of your
3 finance team?
4    A   No.  Mr. Moore is the executive vice
5 president of our company so I guess in a sense
6 he's the head of everything, as I am.  But we have
7 people that work in those teams.
8    Q   And who does the finance team report
9 to?
10   A   To Mr. Moore.
11   Q   Okay.  And --
12   A   Ultimately.
13   Q   Well, you made a statement about 50,000
14 so I'm trying to understand where you got that.
15   A   That was what I -- that was what I
16 understood.
17   Q   From whom?
18   A   I believe -- I believe it was a
19 conversation -- I believe I had a conversation
20 with Mr. Sandoz that confirmed that they had
21 received an installment.  And that's what I was
22 referring to.  But I don't -- I have to research

167

1 it.  I was under the impression that we had sent
2 $50,000.  Mr. Sandoz is asking for more.
3        My recollection is that when we were
4 about to provide more, Mr. Sandoz came back and
5 said we are actually not going to require this.
6 We're going to take these monies, which was an
7 offer that Mr. Sandoz and RLI made, not one that
8 we requested.  And I accepted it.
9    Q   Okay.  As you sit here today, you're
10 not aware of any record which evidences cash
11 collateral paid by Nexus, Libre, or Homes to RLI,
12 correct?
13       MS. PETERS:  Object to form.
14   A   I'm not aware of a specific record.
15   Q   Okay.  And we saw -- are you aware of
16 any collateral that any of the defendants provided
17 to RLI?
18       MS. PETERS:  Object to form.
19   A   I'm not specifically aware of any
20 transactions, but also wouldn't normally be unless
21 I did them and I don't typically cut checks or do
22 that, so...

168

1    Q   We looked at your email of
2 February 10th right before the bonds were issued.
3 Were you advised that you were processing the
4 first installment of the collateral, correct?
5    A   Which one was that?
6    Q   It was dated February 10th, 2016.
7    A   Oh, yeah.  I had to get it.
8    Q   The top of the email.
9    A   Right.
10   Q   It says, "We processed the first
11 installment of the collateral."
12       Correct?
13   A   It does say that.
14       (Donovan Exhibit 8 marked for
15 identification and attached to the transcript.)
16       MS. PETERS:  Can you tell me what
17 exhibit it is?
18       THE WITNESS:  Exhibit 8.
19       MS. PETERS:  Okay.  Is it the first or
20 second page of Exhibit 8?
21       THE WITNESS:  First page.
22   A   I found it now.

169

1        MS. PETERS: Got it.
2     Q     And isn't it true that that collateral
3   payment, that would have been the
4   hundred-thousand-dollar payment, it's true that
5   that was not processed, right?
6        MS. PETERS: Object to form.
7     A   Well, no, it's not true.  If I have
8   said it was true.  You probably need to understand
9   that at this point in time, it's 2006, we're still
10  a relatively small and rapidly growing company.
11  Processed in my mind can be I sent an email or I
12  walked by someone's office and said hey, process
13  this, right?
14         And when I say we have processed the
15  first installment, it could very well be that I
16  gave direction for the check to be cut or the
17  transfer to be made.  I don't know that because I
18  don't remember but I just want to provide some
19  context.
20    Q   But you know -- you know that in fact
21  it was not processed, correct, that it was not --
22  a cut was not -- a check was not cut and no

170

1   payment was made to RLI for the hundred thousand
2   dollars, correct?
3        MS. PETERS: Object to form.
4     A   I don't know that a $50,000 payment
5   wasn't made.  So I don't want to say that.  I
6   don't know that it wasn't.  I believe that it was.
7     Q   Do you know --
8     A   That being said, I do not agree with
9   any -- with any assertion that you would make that
10  I had been untruthful, because I wasn't.
11    Q   I'm not making an assertion.  I'm
12  saying that a hundred thousand dollars that you
13  had committed to pay pursuant to the collateral
14  agreement was not paid, correct?
15        MS. PETERS: I'm going to object to the
16  form of the question as misstating other prior
17  documents.
18    Q   Is that correct?
19    A   To the extent that it wasn't when Dave
20  Sandoz reached back out to us and told us not to
21  worry about it, that would -- I mean, I understand
22  your concern about it.  I'm just saying that, you

171

1   know, I received a communication from him that
2   said that we didn't have to pay any more
3   collateral.
4     Q   To the best of your knowledge, you
5   never sent a payment -- Nexus never sent the
6   payment to RLI for a hundred thousand as an
7   installment for the collateral?
8     A   I do not believe that we paid a hundred
9   thousand dollars.
10    Q   Okay.
11        MS. KATSANTONIS: Mark this document.
12        (Donovan Exhibit 9 marked for
13  identification and attached to the transcript.)
14
15    A   But we did write business for RLI.
16    Q   All right.  I'm showing you an email
17  chain.  And if you look at the page marked
18  000334767 at the top, that's your email that says,
19  "We have also processed the first installment of
20  the collateral."
21        Do you see that at the top of that
22  page?

172

1     A   I'm actually going to read this real
2   quick, if you don't mind.
3     Q   Uh-huh.
4        MS. PETERS: Has this been marked as
5   Exhibit 9?
6     A   Okay.  Yeah, I've read it.
7     Q   Okay.  So we were looking at the page
8   that was 334767 at the top, which was the email
9   that you had written saying, "We have also
10  processed the first installment of the
11  collateral."
12        Correct?
13    A   I see that here, yes.
14    Q   Okay.  And on March 3rd, almost a month
15  later, Mr. Sandoz writes back and says, "Last
16  month you indicated the first installment of the
17  collateral was processed but it hasn't apparently
18  been submitted yet."
19        Right?
20    A   I see that, yep.
21    Q   Right.  And so as of March 3rd, Nexus
22  had not made the promised collateral installment

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

44 (173 to 176)

173

1  payment, correct?
2      A   It appears that on March 3rd he was
3  looking for the installment payment, that's right.
4      Q   And Nexus had not made it yet.
5      A   He indicates that it hadn't been
6  received —
7      Q   Right.
8      A   — in the email, yeah.
9      Q   And that's correct, right?
10        MS. PETERS: Object to form.
11     A   I don't have any reason — I don't have
12 any reason to believe he's lying for sure, no.
13     Q   Right.  And on March 7th, you write
14 back and I'm looking in the middle of your email,
15 "Thanks for the heads-up about the check and the
16 willingness to start with the collateral payments
17 on March 1st.  I will make sure that is taken care
18 of."
19        Is that right?
20        MS. PETERS: Object to form.  Misstates
21 what the document says.
22     A   Yeah, I think I'm responding to him

174

1  when he suggests we start in March.  When I say
2  "the willingness to start," I'm referring to
3  something that he said in the email that I'm
4  replying to.  And it does say that I'll try to
5  track down the February check, which must be the
6  first installment —
7      Q   Well, doesn't --
8      A   — that I sent — had been sent.
9      Q   Well, your March 7th email says, "and
10 the willingness to start with the collateral
11 payments in March" -- in March, right?
12     A   That's right.  Because he says in his
13 email in replying to you, "Why don't we start this
14 month and use early March as the first installment
15 for the collateral?"
16        I'm just responding to him saying,
17 "Thank you for stating that."
18        He states that in the email of
19 March 3rd if you'll look right under my March 3rd
20 email, March 7th, he states, "Why don't we start
21 this month and use early March as the first
22 installment for the collateral."

175

1        I respond and say, "Thanks for the
2  willingness to start with the collateral payments
3  in March."
4        I was just responding --
5      Q   Right.
6      A   — to what he said.
7      Q   Right.  Because you had not processed
8  the payment on February 10th as you had advised in
9  your February 10th email, correct?
10        MS. PETERS: Object to form.
11     A   I think you're trying to — what I said
12 was —
13     Q   No, what I'm -- all I'm trying.
14     A   Hold on because I want to make sure I'm
15 clear.
16     Q   Sure.
17     A   What I said was he said that the check
18 hadn't been received.  He said why don't we go
19 ahead and start in March, right?
20     Q   Early March.
21     A   Right.  I said we'll try to find the
22 check and thanks for your willingness to start in

176

1  March.  It was simply a reply to his statement of
2  hey, we'll go ahead and start in March.
3      Q   Right.  And you understood that the
4  collateral payment had not been made at that time,
5  correct?
6        MS. PETERS: Object to the form of the
7  question.  Misstates.
8      A   No, I don't think that's true.
9      Q   So you believe that a collateral
10 payment of a hundred thousand dollars had been
11 made to RLI?
12     A   I don't think —
13        MS. PETERS: Object to form.
14     A   I don't think I would have said I'm
15 going to try to track down the check if I
16 didn't — if I knew that it hadn't been cut.  If
17 you read the email, I said I'm going to track down
18 the February check.
19     Q   Did you ever track it down?
20     A   I don't remember.
21        MS. PETERS: Object to form.
22     A   Probably not.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

177

1     Q     And in fact it wasn't made, right?
2          MS. PETERS: Object to form.
3     A     I wasn't able to confirm that a
4 February payment was made, as I recall.
5     Q     Right.  And in fact Mr. Sandoz follows
6 up on March 23rd and says, "I haven't received the
7 first installment of the collateral and it's
8 coming close to the end of the month.  This is a
9 reminder that the first installment has to be here
10 in the office by March 31st."
11        Right?
12    A     I see that, yeah.
13    Q     So as of March 31st, Nexus had not
14 provided the first installment of the collateral
15 to RLI, correct?
16        MS. PETERS: Object to form.
17    A     I don't know.  It says — this email
18 chain doesn't end on March 31st, it ends on
19 March 28th.  Are you asking me in relation to this
20 email chain because it looks like —
21    Q     Right.  You know --
22    A     — as of March 8th no one has —

178

1     Q     Well, you know it hasn't, right,
2 because look at the email from -- the March 28th
3 email?
4     A     Vivian.
5     Q     "I talked with Mike regarding the
6 collateral.  He's so happy we got off to a great
7 start and apologizes for the day -- for the delay.
8 We've had an internal issue with our CFO.  We're
9 conducting an audit.  Mike wants to know if the
10 3/31 collateral payment can be submitted on
11 April 15th and then submit the May 1st payment on
12 time."
13        Right?
14    A     I see that, yeah.
15    Q     Okay.  So in fact Nexus had not
16 submitted the collateral payment pursuant to the
17 collateral agreement at least as of March 28th,
18 correct?
19        MS. PETERS: Object to form.
20    A     It appears that as of March 28th, that
21 was the status of this email communication.  That
22 being said, Vivian, as I've indicated before in a

179

1 previous answer I do believe a payment was made.
2 So I'm not going to agree with you in a statement
3 that no payment was made.
4     I will say that as of March 28th, it
5 appears the topic of conversation is they hadn't
6 received a payment and I was responding to it.  I
7 will confirm that.  I can read that from the
8 email.  But what I'm not willing to say is to
9 contradict what I've already said, which is I
10 believe a payment was made.
11    Q     You don't have any fact -- when you say
12 "a payment was made," what are you talking about?
13    A     I believe a $50,000 collateral payment
14 was made.  I think we've made that assertion.
15    Q     But that was -- that was months later,
16 right --
17        MS. PETERS: Object to form.
18    Q     -- that you're asserting it was made?
19        MS. PETERS: Object to form.
20    A     I don't — I don't know what you mean.
21    Q     Well, this --
22    A     I mean it's years later now.

180

1     Q     Well, this agreement -- this agreement,
2 the collateral agreement you executed required the
3 first installment to be in the amount of a hundred
4 thousand, right?
5          MS. PETERS: Object to form.
6     A     That was the initial agreement.
7     Q     Right.  And then when you said the
8 first installment is being processed, you were
9 referencing the hundred thousand dollars, correct?
10        MS. PETERS: Object to form.
11    A     I was referencing — I referenced the
12 fact that there was an install — that we were
13 processing it.
14    Q     The first installment?
15    A     I didn't reference the amount.  I
16 believe that the amount — as I said, I believe
17 that we paid $50,000.  I understand that you've
18 asked for that to be substantiated.  I understand
19 that that may not be something that we can
20 substantiate.  We're very — it's a very, very
21 busy time.
22    Q     Right, but you don't have any

---

**181**

1  evidence --
2      A    But what I will say -- I'm sorry.
3          MS. PETERS: Object to form.
4      Q    Sorry.
5      A    I'm sorry.
6          MS. PETERS: Please let him finish his
7  answer.
8      A    That being said, I think it's important
9  to note that RLI through this process was very,
10 very accommodating, I think because they wanted to
11 be in this business, clearly, and willing to work
12 with us. And I really appreciate that. And that
13 ultimately culminated in Dave saying, "Don't worry
14 about the collateral," which I think is a very
15 important part of this conversation.
16     Q    When did Dave tell you "Don't worry
17 about the collateral"?
18     A    There was an email that said that the
19 commissions that RLI pays to the bail agent were
20 going to be used for that, as I understood it, and
21 then paid to Marco.
22     Q    As of the time of this email you're

---

**182**

1  referencing, isn't it true that Nexus had made no
2  collateral payments whatsoever to RLI?
3          MS. PETERS: Object to form.
4      A    You did that again. See, I'm not
5  going — I told you that I believe we did make a
6  payment and I'm not going to —
7      Q    Prior to Mr. Sandoz's email. I'm
8  trying to put it in context of time.
9      A    Oh, I'm not sure. I don't know when
10 that payment was made.
11     Q    That's what I'm trying to understand.
12     A    Yeah, I'm sorry. I didn't understand
13 that. I apologize.
14     Q    So the emails we're looking at is as of
15 March 28th, on March 28th, Nexus, you know, the
16 subject is first collateral installment, right?
17     A    Uh-huh.
18     Q    So it would -- you would agree that
19 that likely is the first -- that RLI had not
20 received any collateral payments as of
21 March 28th --
22         MS. PETERS: Object to form.

---

**183**

1      Q    -- 2016?
2          MS. PETERS: Object to form.
3      A    I can't tell you that RLI didn't
4  receive a payment before March 28th, because I
5  believe we did make a payment and I don't know
6  when we made it. That being said, I consider that
7  the term, that that is the subject line of the
8  email and that the content of the email is as you
9  described it. And it speaks for itself. That
10 being said, I can't tell you under oath that a
11 payment was made before or after a certain date
12 because, as I've told you, I don't remember.
13         MS. PETERS: How much time on the tape?
14         MS. KATSANTONIS: We've got five hours.
15         THE VIDEOGRAPHER: 233.
16         MS. PETERS: Pardon?
17         THE VIDEOGRAPHER: 233.
18         MS. PETERS: We do not have five hours.
19         MS. KATSANTONIS: Four and a half.
20         MS. PETERS: Four and a half.
21         THE WITNESS: I'm sure it will be five
22 with breaks. Speaking of, I'm going to take this

---

**184**

1  opportunity since you're getting some documents
2  ready I'm going to go. I'll be right back.
3          MS. KATSANTONIS: Okay.
4          THE VIDEOGRAPHER: We are going off the
5  record at 15:43.
6          (Recess taken.)
7          THE VIDEOGRAPHER: We are back on the
8  record at 15:57.
9  BY MS. KATSANTONIS:
10     Q    Okay. We were -- before we broke, we
11 were talking about this March 28th, 2016 email
12 that as set forth in the email as of about
13 March 28th, 2016, to the best of -- based on the
14 information you know, Nexus had not provided any
15 collateral to RLI, correct?
16         MS. PETERS: Object to the form.
17     A    I don't — for the reasons I just
18 explained in my prior answers, I will say that
19 based on this email, it looks like we were trying
20 to figure out when that first installment was
21 going to be paid. I don't know whether we paid
22 anything before that.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

47 (185 to 188)

185

1        I do know that it's clear that Dave was
2   saying they didn't receive it.  I just want to be
3   clear, I'm not prepared to tell you that we didn't
4   pay it before that because I believed that we did.
5       Q    Well, not -- you believe you paid at
6   some point but you don't know whether it was
7   before that?
8       A    I don't know.  But because I don't
9   know -- because if I knew it was before that, then
10  I could say.  But since I know when it was I can't
11  say.  I don't know when it was.
12      Q    Okay.  Well, I'm going to --
13          MS. KATSANTONIS:  Let's mark this.
14          (Donovan Exhibit 10 marked for
15  identification and attached to the transcript.)
16      Q    So this is an email dated June 9th,
17  2016.  Is it accurate to say prior to June 9th,
18  2016, Nexus, Libre, or Homes had not provided any
19  collateral to RLI?
20          MS. PETERS:  Object to form.
21      A    I don't believe that that's true.  I
22  can't say that that's true because, as I told you

186

1   before, I think we did make a payment.  I'm not
2   sure that we didn't.  And I don't, you know -- I
3   had assumed that we -- I thought we made a $50,000
4   payment.
5          This email from Dave Sandoz sets out a
6   future expectation that we pay 50,000 by
7   June 15th, 50,000 by July 15th, and then that he
8   uses the year end contingency to refund the
9   remainder of the collateral account.  I do see
10  that and that's what the email says.
11      Q    That's the email you've been
12  referencing, right?
13      A    It doesn't -- it doesn't change the
14  fact that I don't know when that payment was made
15  and I can't tell that we didn't make the payment
16  before then.  I believe we did make a $50,000
17  payment.  I thought it was at the inception or at
18  the beginning of the relationship.
19      Q    Based on what?
20      A    Based on my recollection.  So I'm just
21  not prepared to tell you that we didn't because I
22  don't know that and I think it's consistent with

187

1   what I believe happened.  I can't -- I can't
2   produce a document to show you and that's true.
3   But I -- I do believe that we made an initial
4   payment when we began the program and that's what
5   I based that on and that's what I thought we did.
6   And if we didn't, it was an error and I thought we
7   did.
8       Q    You provided -- you sitting here today
9   don't know of any evidence that you have provided
10  a 50,000 payment to RLI, correct?
11      A    Correct.
12          MS. PETERS:  Object to form.
13      Q    And in fact, when you kept referencing
14  a reduced collateral amount, that's -- the email
15  you're referencing is this June 9th, 2016 email;
16  is that correct?
17      A    I think there was another one.  I seem
18  to recollect another one.  This is certainly one
19  of them that mentions the contingency.
20      Q    Okay.  What basis do you have to recall
21  another one?
22      A    Just a general recollection.

188

1       Q    How do you know it's different than
2   this one?
3       A    I don't.  That's why I said I think
4   there's a second one.
5       Q    Right.  Can you give me the best
6   recollection you have with regard to another
7   email?
8       A    Can I give you the best recollection I
9   have?
10      Q    Right.
11      A    What do you mean?
12      Q    Well, you said you believed there could
13  have been another email.  I'm trying to understand
14  why.
15      A    I think -- I believe I remember another
16  email.  I think it was one that was only to me.
17  This addresses me and Rick.  But I don't -- I
18  don't independently know.  I can't show it to you.
19  I believe that there was --
20      Q    Okay.
21      A    -- a subsequent or a prior
22  communication.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

189

1    Q    And can you give me all the details of
2 the other email that you recall?
3    **A    Just that the contingency would be used**
4 **to find the collateral account and that it would**
5 **be refunded at the end of the year. Which is in**
6 **here. So, again, I'm not telling you I'm sure**
7 **there's a second one, I'm telling you I think that**
8 **there is and I'm trying to be — I want to be**
9 **completely transparent.**
10    Q    Okay.
11    **A    And testify accurately.**
12    Q    And with regard to this email, there
13 was -- there's no other signed agreement between
14 RLI, Nexus, Libre, Homes, or you personally
15 regarding any revised collateral amount; is that
16 correct?
17        MS. PETERS: Object to form.
18    **A    We never signed another collateral**
19 **agreement.**
20    Q    Okay. And isn't it true that in fact
21 there was another demand by RLI to you asking for
22 a million 250,000 in collateral?

190

1    **A    I don't know. I don't recollect that.**
2 **That doesn't mean it isn't true.**
3    Q    Right.
4    **A    RLI made several demands for collateral**
5 **since the cessation of the program but I don't**
6 **remember that specifically.**
7    Q    Do you recall after June 9th of 2016
8 RLI started receiving bond breach notices?
9    **A    I don't recall. But that would make**
10 **sense.**
11    Q    Right.
12    **A    Sometimes the immigration bonds will**
13 **breach.**
14    Q    And do you recall that in the --
15 starting from the summer 2016 through the end of
16 the year, RLI had received several breach notices
17 on bond claims and they reached out to you to
18 discuss those?
19    **A    I don't recollect that. But that**
20 **doesn't surprise me that there would be breaches**
21 **on immigration bonds because sometimes they**
22 **breach.**

191

1    Q    Okay. And --
2        MS. KATSANTONIS: Mark that.
3        MS. PETERS: 11?
4        (Donovan Exhibit 11 marked for
5 identification and attached to the transcript.)
6    Q    So I've handed you as Deposition
7 Exhibit 11, I believe, an email from Dave Sandoz
8 to you, copying Mr. Chilson. I'll note that these
9 are from your records as well, and I'll note that
10 it says from Dave Sandoz on behalf of Dave Sandoz.
11 So perhaps there's something with your computer
12 system that does that.
13    **A    Perhaps on the reprinting. I've never**
14 **seen it. So it doesn't appear when I look at the**
15 **computer but your point's well taken, it is on**
16 **here, so that's true.**
17    Q    So this email of December 7, 2016, is
18 summarizing a conference call that you had several
19 weeks prior to with Mr. Sandoz and Mr. Chilson.
20        Do you recall that?
21    **A    No, but it's a large block of text.**
22 **Let me read it real quick and then I'll answer**

192

1 **you.**
2    Q    Sure.
3        So I've handed you this summary of a
4 conference call a few weeks ago. Do you recall
5 conducting a conference call with Mr. Sandoz and
6 Mr. Chilson?
7    **A    I don't recall the call, but I do**
8 **recall this email now that I've had an opportunity**
9 **to read it.**
10    Q    Okay. So you recall that by
11 December 7th, 2016, Nexus and RLI had discussed
12 that Nexus would be transitioning its work to a
13 different surety, its bonds to a different surety?
14    **A    That's correct.**
15    Q    Okay. And so you understood that as of
16 December 7th, 2016, that RLI intended to stop
17 issuing immigration bonds to Nexus?
18    **A    That's correct.**
19    Q    Okay. And --
20    **A    Well, that it had a request for**
21 **additional collateral or a willingness for an**
22 **amount of time for us to find a new surety. That**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

49 (193 to 196)

193

1  was what I specifically recollect from this email.
2       Q    Well, the email says the collateral's
3  not tied to -- looking at the beginning, it
4  says -- it's wondering whether Evergreen National
5  has reached out to you?
6       A    But it also says, "We know that it
7  takes some time to replace the program and we
8  assume that's the more preferrable route so the
9  goal we have set is to have the program moved to a
10 better fit for you by 2/28/17 and if the program
11 is replaced by that date it is not necessary to
12 provide the collateral."
13      Q    Right.
14      A    That's what I was referring to.
15      Q    Right.  They were -- so RLI was making
16 a demand for a million 250 on Nexus to provide
17 collateral to continue issuing bonds through
18 February 28th, 2017, correct?
19      A    No.  I've never read a demand letter
20 that starts with you don't have to pay this if
21 you're — like, my understanding was that we were
22 removing the business.  This letter says that we

194

1  didn't have to pay the collateral if we removed it
2  by 2/28/17.  So I didn't take it as a demand to
3  pay collateral.
4       Q    Okay.  So you didn't take this letter
5  that says, "RLI's current exposure is" -- I'm
6  sorry, let me go back two lines.  "We are going to
7  need collateral amounting to 5 percent of the
8  total exposure RLI has outstanding at any point in
9  time."
10            MS. PETERS:  Object to form.
11      A    I do see that but I don't think you can
12 read that without reading the line that follows
13 that says that if you do replace the program by
14 2/28/17, it is — and it says, I quote, "Is not
15 necessary to provide the collateral."
16      Q    Well, there --
17      A    I mean, what kind of demand says you
18 don't have to do something?
19      Q    Okay.  Well, they were talking about a
20 continuing -- they were going to review the
21 collateral periodically.  Do you see that about
22 halfway up?

195

1            MS. PETERS:  Object to form.  Misstates
2  the document.
3       A    I think the document -- well, I mean
4  it's interesting because I remember this email and
5  the way that I read this email and the way that I
6  remember the communication surrounding this
7  email -- and I don't remember a conference call
8  with Mr. Chilson, but I assume he was on it
9  because it says that.  So I don't remember that
10 call.  But my understanding was that RLI was
11 saying if we continue in this business beyond
12 2/28/17, we're going to need a million $250,000
13 collateral.  If you move the business by then
14 we're not going to need it.  That's what it says.
15            So that's exactly what I read.
16 That's exactly what I understood.  And that
17 further solidifies my understanding of quite
18 frankly the contract and why I'm confused why
19 we're here.  Because, again, RLI we stand, we
20 indemnify RLI, right?  So that means that if RLI
21 has to pay something, we pay them or we exonerate
22 RLI which means we pay it before RLI has to pay.

196

1  Now, as long as we do that -- in this email saying
2  you need 1.25 million if you continue the program,
3  if we didn't continue the program they didn't want
4  any more.
5       Q    Well, you haven't -- you didn't always
6  exonerate or indemnify RLI, did you, throughout
7  the program?
8       A    I think we have either exonerated or
9  indemnified RLI, yes.
10      Q    Right.
11      A    I do believe we have done that.
12      Q    But you understood that RLI had to go
13 to court to obtain preliminary injunctions in
14 order to get Nexus to start making exoneration
15 payments?
16            MS. PETERS:  Object to form.
17      A    Well, no, Vivian, I don't think that's
18 true or fair because I sat in this conference room
19 next door and told you that I would give you all
20 that information you were looking for if your
21 client would sign a confidentiality agreement and
22 your client would not sign a confidentiality

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

197

1  agreement.
2         You got that information after the
3  court where you filed a lawsuit, entered a
4  protective order that gave our clients that
5  protection.  I care about our clients and their
6  confidentiality more than I can tell you.  More
7  than I can say in spoken words.  Very nearly I
8  almost went to jail to protect that information
9  and I will take this opportunity to say please,
10 please, that's incredibly sensitive information, I
11 trust that you'll follow the protective order and
12 that you'll protect those people.  But --
13     Q   Isn't it true that RLI did provide you
14 with a confidentiality agreement to execute?
15         MS. PETERS:  Object to form.
16     A   I do not believe that the
17 confidentiality agreement that RLI provided was in
18 any way sufficient to protect the consumers
19 because as I remember the information that was
20 protected was trade secret information, which
21 would be normally what a company would care about
22 I understand.  But we were much more concerned

198

1  about the client confidentiality.  And you may
2  remember we had many conversations about this.
3     Q   When you signed the indemnity
4  agreement, it provides for RLI to have access to
5  Nexus' books and records, correct?
6     A   Correct.
7     Q   And in the indemnity agreement it
8  doesn't provide any conditions to providing that
9  access, correct?
10        MS. PETERS:  Object to form.
11     A   Perhaps not.  But you have to
12 understand my perspective.  We do business with
13 RLI for a year and they never want to see a book
14 or a record.  We stop doing business with RLI and
15 they want to see books and records but they don't
16 want to sign a confidentiality agreement to --
17     Q   Wasn't RLI --
18     A   -- guarantee the protection of our
19 clients.
20        MS. PETERS:  I'm going to object to
21 this line of questions because as counsel well
22 knows, the primary participant data in Libre

199

1  records.
2         MS. KATSANTONIS:  Not relevant.
3         MS. PETERS:  It absolutely is relevant.
4  You had to add Libre to have access to any Capsule
5  records in this case, Ms. Katsantonis.
6         MS. KATSANTONIS:  That's completely
7  false, Ms. Donne Peters, but you're not
8  testifying.
9     A   But it is true that the indemnity
10 agreement was with Nexus Services and I believe
11 that was addressed with Judge Urbanski and that's
12 why you filed the amendment – you filed an
13 amended complaint to bring Libre into it.
14     Q   That's not --
15     A   I think at the time we were having the
16 conversations, we were having the conversations
17 prelitigation and I told you that I would give you
18 all the records if your client would sign a
19 confidentiality agreement to protect the consumers
20 and they wouldn't.
21     Q   Let me ask you -- no, that's not true.
22        MS. PETERS:  Object to form.

200

1     Q   RLI provided with you a confidentiality
2  agreement, right?
3     A   The confidentiality agreement – with
4  all due respect, Ms. Katsantonis, the
5  confidentiality agreement that you provided was
6  for business trade secret information.  I have
7  clients that have exposed to us in the interest of
8  trying to get out of jail and be successful things
9  that could harm them.  Could even kill them if
10 it's exposed.  And I take very, very seriously
11 protecting that information.  One of the –
12     Q   You've since provided those records.
13        MS. PETERS:  Object to form.  Please
14 let him finish his --
15     A   One of the things that's so frustrating
16 to me is that even in the inception of this
17 litigation you guys filed, you know, documents
18 from asylum seekers with identifying information
19 on it.  I think that shows that my effort to try
20 to get you guys to agree to a confidentiality
21 agreement was wise and appropriate.
22     Q   And have you, to date, provided RLI

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

51 (201 to 204)

201

1 with all of the Capsule files that are related to
2 the RLI bonded principals?
3      **A   We have made a production —**
4      Q   But not all of the documents?
5      **A   You are going to let me finish —**
6      Q   Sorry.
7      **A   — Vivian.**
8      Q   Well, you were saying we've made a
9 production.
10     **A   No, but you — I'm still — but I'm**
11 **still —**
12     Q   Okay.
13     **A   — finishing my sentence.**
14     Q   Sorry.
15     **A   Maybe you'll like what I say, maybe**
16 **not.  But you'll at least understand —**
17     Q   Okay.
18     **A   — the full aspect of what I'm saying.**
19 **What I'm saying is that we made a production of**
20 **the Capsule records that we could produce.  As**
21 **I — I really want you to understand, this is**
22 **perhaps the first time I'm saying it to you and**

202

1 **not counsel, you can come, you can pull up and**
2 **print out what you want.  But you have to**
3 **understand something, there's no way — the**
4 **process of screenshotting, screen by screen by**
5 **screen takes months.**
6      Q   No.
7      **A   What we did is we exported note data**
8 **which is what you wanted, the client summary,**
9 **which is what I thought you wanted.**
10     Q   Well, you can export --
11     MS. PETERS:  Object to form.
12     Q   You can also export --
13     MS. PETERS:  Mr. Donovan, have you
14 finished?
15     **A   I'm done.**
16     Q   You can also provide us on a thumb
17 drive all of the files in the Capsule database for
18 principal, right?
19     **A   No.**
20     Q   And why not?
21     **A   Because I would have to screenshot**
22 **them.  It would take months.**

203

1      Q   Can you provide us access by giving us
2 log-in information?
3      **A   No.**
4      Q   Why not?
5      **A   With all due respect, I — based on**
6 **filing and open court records information about**
7 **asylum seekers that are fleeing certain death and**
8 **you filed their confidential information in a**
9 **public filing.  So I'm sorry, but I have**
10 **significant concerns about our clients and their**
11 **safety.**
12     MS. PETERS:  And I'm going to object to
13 the question insofar as the court has specifically
14 said you're not entitled to any other program
15 participant Capsule data other than the RLI
16 program.
17     MS. KATSANTONIS:  We're asking about
18 RLI program participants at this point.
19     MS. PETERS:  You asked about log in.
20     **A   But the problem is that a log in, I**
21 **couldn't segregate it.  You would have access to**
22 **all —**

204

1      Q   We could give you -- we could give
2 assurances that we're just looking at RLI.
3      **A   You could come to our office and print**
4 **it out and then we would know because we're there.**
5 **Why not do that?  That would be --**
6      Q   Have you ever given another surety or
7 agent access to the Capsule files via remote log
8 in?
9      **A   Not unrestricted.**
10     Q   And what does that mean?
11     **A   I have never given an individual access**
12 **where it's unrestricted.  I have given individuals**
13 **access to go in at a time certain when I knew that**
14 **they were going in when I can review what they're**
15 **doing and when they come out.  I've never given an**
16 **individual access for that.**
17     Q   Okay.  So you could do the same to RLI,
18 right, you could give us access so that you could
19 see when we get in, what we look at?
20     MS. PETERS:  To the extent --
21     **A   Well, I would have to send someone --**
22 **I'd have to either send someone or we'd have to do**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

52 (205 to 208)

205

1  a remote desktop sharing because the only way for

2  me to see is --

3      Q    Right.  What other --

4      A    -- for you to do it in front of me.

5      Q    -- individuals or sureties have you

6  given remote Capsule access to?

7      A    Marco.

8      Q    Anybody else?

9      A    I believe Dave Sandoz at one point.

10     Q    Okay.  Anyone else?

11     A    No.  Not that I -- not that I can

12  recollect.

13     Q    Anybody at AIA Surety?

14     A    No.

15     Q    No.  And anybody at Evergreen surety.

16     A    No.

17     Q    Okay.

18     A    Well, let me be clear.  If Dave Sandoz

19  had it, it might have been for an Evergreen surety

20  bond.  So let me be clear.  I want to be clear.  I

21  don't know which bond or which principal that was.

22     Q    And Nexus previously -- Nexus

206

1  previously produced Capsule documents to RLI in

2  this litigation that included contract documents,

3  Libre sales receipt printouts, and information

4  like that for each RLI bond principal, right?

5      A    That is correct.  I believe those were

6  from a regulatory agency production.

7      Q    Well, you produced another hundred

8  files, right, that in those -- that we randomly

9  selected, that RLI randomly selected, right?

10     A    I believe that's true.

11     Q    And there's a hundred -- of those

12  hundred files you included in the production from

13  the Capsule files the contract documents, the

14  sales, Libre sales form, and the risk assessment

15  form, right?  Those were included in the Capsule

16  file, correct?

17         MS. PETERS:  I need to object to the

18  form of the question.  The documents that you are

19  referring to and we have advised you were produced

20  redacted.  That redaction process cost over

21  $200,000 to perform.

22         MS. KATSANTONIS:  Ms. Donne Peters,

207

1  again, we don't want -- we're not asking for your

2  testimony.  I'm asking Mr. Donovan about what the

3  documents contained.  I didn't ask you about what

4  you produced and how much you --

5         MS. PETERS:  It is absolutely --

6         MS. KATSANTONIS:  -- you are saying it

7  cost you.

8         MS. PETERS:  -- relevant because the

9  court's order in this case said we could produce

10  those documents in the same form as were

11  previously produced --

12         MS. KATSANTONIS:  You don't have to.

13         MS. PETERS:  -- to the regulatory --

14         MS. KATSANTONIS:  You don't have to.

15         MS. PETERS:  -- entity.

16         MS. KATSANTONIS:  You don't have to,

17  Ms. Donne Peters.  There's no requirement that you

18  do it in a certain way.  That's your choice.

19         MS. PETERS:  Over $200,000 spent to

20  redact that information, Ms. Katsantonis.

21     Q    Pursuant to the court record, do you

22  understand -- does RLI under -- I mean, does Nexus

208

1  understand it produced the full Capsule files the

2  same as were produced in the other hundred files?

3      A    Are you asking me?

4         MS. PETERS:  Redacted.

5         MS. KATSANTONIS:  That's your decision

6  to redact.  We have a protective order in place.

7  So we'll move on.

8      A    Ms. Katsantonis, I've not reviewed that

9  submission.  Meaning I haven't read it.  So I

10  can't tell you what's in it exactly.

11     Q    Other than the 181 Capsule files that

12  have been produced so far, is it accurate to say

13  Nexus has not produced the full Capsule files for

14  all RLI bond principals?

15         MS. PETERS:  Object to form.

16     A    I don't -- again, what we haven't done

17  is print out the attachments and the screenshots

18  and that's because we didn't have time to do it.

19  We received the -- as I understood it, we received

20  the order of full Capsule production a week before

21  a hearing that said we had to do it right away.

22  There was no way to get it done.  It takes -- it

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

53 (209 to 212)

209

1  takes five to ten minutes, 15 minutes to print
2  out -- well, I want to make sure.
3      Q    I'm listening.
4      A    No, I want to make sure.  Because it's
5  important.  I'm not trying to be disrespectful,
6  I'm just going to pause because I want to make
7  sure you hear me.
8      Q    I'm listening.
9      A    It takes 15 minutes to print out one
10 client.  There's no way.  If we had started with a
11 team of 10 people when we got Judge Urbanski's
12 order ECF up until the date it was due, it
13 wouldn't have been possible because of the amount
14 of work involved.
15          We crafted a solution by going to,
16 literally, you know, going to the vendor and
17 saying help us because we want to accommodate you.
18 I did that.  And I'll tell you something, Vivian,
19 I didn't want to give you those files at all.  And
20 not at all because they hurt our case.  In fact, I
21 think they help our case.  I didn't want to give
22 you those files because I have made a commitment

210

1  to those people that I'm going to protect them as
2  best I could.
3          I feel as if I failed them, to be
4  honest, by giving you what I've given you.  And
5  the idea that it isn't enough is shocking.
6      Q    Okay.
7      A    Because the information that is
8  included in those files and those summaries is
9  extensive.
10     Q    Can't you simply go to the Libre -- to
11 the LiteSpeed database and print up the
12 information for each RLI bond principal of what
13 payments they've made?
14     A    We would have to pull each of those
15 principals up.
16     Q    Right.
17     A    So it would take some time.
18     Q    But it's not --
19     A    There's no way to export it and just
20 sort it.
21     Q    But it's not a very cumbersome thing to
22 go to that database and pull up the RLI bond

211

1  principals.
2      A    So you just want the LiteSpeed data?
3  Because my understanding if you want screenshotted
4  Capsule, that's still going to take --
5      Q    I'm just --
6      A    -- 15 to 20 minutes per file.
7      Q    I want the whole Capsule files but
8  there's a way to do that.
9      A    Right.  So I've told you what the way
10 is and I've invited you to do it.  You understand
11 I've given you a -- when I say we provided a
12 significant production, I need you to understand I
13 have significant concerns about the fact that we
14 made that production.  Significant concerns
15 because I think it -- it --
16     Q    When did you invite us to come look at
17 the Capsule files?
18     A    I'm still talking.
19     Q    Sorry.
20     A    You've been to our office.  Like,
21 you've been there.
22     Q    When have you invited us to be -- to go

212

1  into the Capsule files?
2      A    I instructed Mr. Shoreman to make that
3  statement in a hearing before Judge Hoppe and I
4  believe he did.  I believe he told you that you
5  could come and we'd log you in to Capsule and you
6  could print Capsule files.  And if he didn't tell
7  you that, I'm telling you right now.
8      Q    Okay.
9      A    If you want to come and print Capsule
10 files, I'll put someone there with you and we will
11 print Capsule files all day and all night until
12 you're done.
13     Q    But today we can all agree we have not
14 been provided with all of the Capsule files for
15 the RLI bond principals?
16          MS. PETERS:  Object to form.
17     A    I just --
18     Q    Well, we haven't been provided with the
19 contracts for all the RLI bond principals that are
20 in the Capsule files, right?
21     A    But Vivian, during that hearing you
22 were invited to come to campus.  You haven't been

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

### 213

1 to campus, you haven't set up a meeting to come to
2 a computer where you can print that stuff out. I
3 would say when we made that offer we did comply.
4    Q  Okay.
5    A  And if you want to come tomorrow, you
6 can.
7    Q  Okay. That's fine.
8      And isn't it true that without a surety
9 issuing a bond for these immigrants, Nexus would
10 have no program, right?
11      MS. PETERS: Object to form.
12    A  It would be a different program. I
13 mean, the program that helps immigrants post bond
14 and secures that bond so they don't have to pay
15 critical would certainly be effective by not
16 having a surety to post bond.
17      There are a lot of services that Nexus
18 provides, that Nexus would continue to provide to
19 clients if we didn't have a surety. So I don't
20 think it's accurate to say that Nexus would shut
21 without a surety but it would certainly change our
22 business model.

### 214

1    Q  Isn't the source of revenue from Libre
2 by Nexus payments in large part by program
3 participants for the bond and for GPS monitoring
4 services?
5    A  Absolutely not.
6      MS. PETERS: Object to form.
7    Q  That's not the largest --
8    A  We do not charge —
9    Q  -- source to have revenue.
10    A  — people for a bond. And I think it's
11 a — it's a misstatement and one that leads to,
12 you know, potential — I think it's in — I'm sure
13 you don't mean it to be inflammatory but I believe
14 it's an inflammatory statement. I don't think
15 it's accurate.
16      There are program fees and the majority
17 of our revenue is derived from program fees. And
18 those program fees are for a monitoring
19 supervision program that's far bigger than a bond
20 or a GPS tracking device.
21      MS. KATSANTONIS: Mark this document.
22      THE WITNESS: I'm going to facilitate

### 215

1 this way. See, I can do that. I feel like I'm
2 being useful.
3      (Donovan Exhibit 12 marked for
4 identification and attached to the transcript.)
5    Q  Okay. Do you recognize this document?
6    A  I do.
7    Q  Okay. Is this a copy of a contract
8 that is typically entered into with program
9 participants?
10      MS. PETERS: Object to form.
11    A  No. This is a copy of a program
12 because of a contract. But it is not currently
13 used.
14    Q  Okay. When did it stop being used?
15    A  2017.
16    Q  Okay. What time -- what date in 2017?
17    A  It varies. Regionally was rolled out
18 so I can't give you a specific date.
19    Q  So now you have a different contract?
20    A  That is correct.
21    Q  Okay. And are many of the same
22 components in the contract?

### 216

1    A  It is a very different contract. It is
2 the same program of course.
3    Q  Okay. What's different about the
4 contract?
5    A  Shorter. It's fully translated. There
6 are — we believe that it's clearer and it's a
7 better agreement. It's a representative of what
8 happens when a company grows, gets better.
9    Q  Okay. And looking at this document,
10 the second page, that's the risk assessment
11 instrument?
12    A  That's correct.
13    Q  Correct?
14      And that's a point system to determine
15 whether the immigrants are at a high risk of
16 breaching the bond obligations?
17    A  Correct.
18    Q  Okay. And I guess we talked about this
19 earlier. And there's significant points related
20 to criminal convictions, correct?
21    A  That is correct.
22    Q  Okay. And then there's an agreement

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

217

1  regarding the conditions of monitoring?
2      A   Correct.
3      Q   And what percentage of immigrants are
4  being monitored by GPS?
5          MS. PETERS: Object to form.
6      Q   Of your bond principals?
7          MS. PETERS: Object to form.
8      A   I'm not sure.
9      Q   Do you have an idea as to percentage?
10         MS. PETERS: Object to form.
11     Q   Are we talking more than 50 percent,
12 less?
13     A   We're certainly talking about less than
14 50 percent, but I don't know.
15     Q   Okay.
16     A   The amount.  I can get it for you and
17 get it back to you.
18     Q   Okay.  How would you get that
19 information?
20     A   I would have to look at our total
21 universe of clients and I would look at the total
22 number of people that are currently being

218

1  monitored by GPS and I would make a simply
2  mathematical calculation.  That's probably the
3  easiest way.
4      Q   How do you know who is currently being
5  monitored on GPS?
6      A   I would have to look at the GPS system
7  and see who is currently signed up for GPS.
8      Q   What is the system?
9      A   It's a system I think it's called
10 Eagle.  It's not a system that I use every day.
11     Q   Okay.  But you have access to Eagle
12 daily, right?
13     A   Well, I'm sure I have access to it.  I
14 would have to call IT and say, hey do I have a log
15 in to this and get it.  But I don't know it off
16 the top of my head, but I'm sure as president of
17 the company if I don't have access to it I could
18 get it.
19     Q   For the RLI bond principals, is Buddi
20 the monitoring company?
21         MS. PETERS: Object to form.
22     A   At this point, Buddi is the monitoring

219

1  company we use.
2      Q   Are they the only company you use?
3          MS. PETERS: Object to form.
4      A   That is correct.
5      Q   And --
6      A   At this point.
7      Q   -- what does Buddi do to monitor the
8  RLI bond principals?
9          MS. PETERS: Object to form.
10     A   Well, Buddi re — you know, is a
11 provider of a device that provides GPS tracking.
12     Q   Right.  And who's actually doing the
13 monitoring of the GPS tracking?
14     A   We have a monitoring center.  So when
15 it comes to like battery alerts and communication
16 alerts, our individual call center takes care of
17 notifying clients and addressing issues like that.
18     Q   How is there a communication alert?
19     A   A communication alert would occur
20 perhaps in a building like this where a person
21 goes to work, they work in a building that's old,
22 it has concrete walls, like your cell phone

220

1  doesn't work in some buildings, right?  Same thing
2  with the GPS.  It's basically a cell phone
3  strapped to your ankle, right?
4          So if it's not getting a signal, it's
5  going to give us a communication alert, kind of
6  like you'd see on your cell phone if it says no
7  signal or whatever.  So when it's not connecting,
8  it basically sends a signal to the system and the
9  system will alert and it will say hey, this person
10 has no communication.
11         Now, because that's generally being
12 inside a building, you don't really get alerted.
13 You know, that's an alert but it's one that you
14 sort of understand because it's going to happen
15 and oftentimes reoccurs.
16     Q   Okay.  And with regard to actually
17 knowing the locational information of the
18 immigrant, do you have that information -- you
19 know, is there some sort of electronic -- I get
20 that you're getting signals the battery is low,
21 okay.
22     A   Uh-huh.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

56 (221 to 224)

221

1    Q    But do you, Nexus, are you keeping
2  track of where that individual is specifically?
3    A    No.
4        MS. PETERS:  Object to form.
5    Q    Okay.  Is Buddi keeping track of where
6  that individual is specifically?
7    A    I should say yes in the sense that the
8  information is available, right.  So if a person
9  is on a Buddi GPS leg or wrist device, I can see
10 where they are.  But it is not our company's
11 policy to track people all the time and know where
12 they are all the time because that is not what
13 causes people to perform to go to court to do what
14 they're supposed to do.
15        You know, they were already in jail,
16 right?  But they don't need to be in electronic
17 jail.  What they need is a program that helps them
18 understand what the responsibilities are, to
19 understand that court doesn't have to be a scary
20 thing.  To be able to get referrals to resources
21 that they need to be able to move forward with
22 their lives.  That's what we do.

222

1    Q    Okay.
2    A    The GPS is there to provide information
3  when necessary to be able to determine the
4  stability of the client and hopefully move them
5  off of more onerous monitoring systems.
6    Q    Is there a different fee structure?  In
7  other words, if you wanted to know where an
8  immigrant was every day, you'd have to pay more
9  money to Buddi to do that kind of monitoring?
10   A    No.  See, because the only party that
11 benefits from any GPS monitoring is Nexus, right?
12 I mean, no client, no program participant ever
13 calls Nexus and says where was I Friday because
14 they know where they were Friday.  The only party
15 that benefits from the GPS tracking is Nexus,
16 right?
17        Nexus, therefore, will oftentimes tell
18 people that they're no longer subject to
19 monitoring.  In fact we're very, very proud as a
20 company of getting people off of the monitoring
21 device within eight months, as is our average.  We
22 want people off the monitoring devices because,

223

1  Vivian, if a person is on bond for three years,
2  which is with the new administration the way
3  things are going, who wants to wear an ankle
4  monitor for three years.  And if you wore -- I
5  mean, it would be onerous, right?  So the whole
6  point is to get these people to less onerous
7  monitoring systems, if you will.  And so what we
8  want to do is to maintain stability.
9    Q    All right.  So if Buddi advised that
10 they were monitoring out of the outstanding nearly
11 2,500 RLI bonds, if Buddi advised they were
12 monitoring or had GPS monitoring on less than a
13 hundred of those RLI bond principals, would that
14 sound about accurate to you?
15   A    Actually, it surprised me that we have
16 that many.  Because the RLI program ended in 2017
17 and it's 2020.  So when I realized that we had
18 those people still on the monitoring, I
19 discontinued monitoring for all of them because I
20 do not believe that it is appropriate to have
21 people monitoring that long.  So I was actually
22 surprised that we had that many.

224

1    Q    Do you know when you discontinued
2  monitoring the RLI bond principals?
3    A    It was a couple weeks ago.
4    Q    Is there a document that records that?
5    A    I suppose it is.  I – I – I think
6  I – I probably had – no, I think I communicated
7  verbally that we were going to – I was trying to
8  figure out if I sent an email.  I think –
9    Q    Who would you have communicated to?
10   A    I told Richard and I told Evan Aijin
11 who is our vice president of operations, that we
12 were going to discontinue monitoring our RLI
13 bonded principals because they had been on the
14 program for three years and the fact that we had
15 any of them still being monitored was a failure of
16 this program, to get them off of monitoring quickly.
17   Q    Aren't you incurring significant
18 breaches still on RLI bonds?
19   A    I --
20        MS. PETERS:  Object to form.
21   A    I think that our breach performance
22 with RLI is the worst.  And part of that is that

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

225

1  we do not have permission to ask for
2  reconsiderations.  RLI has withheld that from us.
3  No other surety has done that --
4      Q   Well, the re --
5      A   -- and that has --
6          MS. PETERS: Object to form.  Please
7  let him finish his answer.
8      A   That has caused a higher rate of bond
9  breaches with RLI.  But I don't believe --
10     Q   A reconsideration has nothing --
11     A   I'm sorry, I'm not --
12     Q   Sorry.
13     A   I don't believe that RLI's
14 unwillingness to allow us to seek a
15 reconsideration should result in a hundred
16 immigrants having to wear an ankle monitor for
17 three years, right?  So I don't -- while I'm
18 concerned about the RLI bond breach rate, I'd much
19 rather manage that through, you know, proactive
20 supervision and assistance of our clients than
21 tethering them with an ankle bracelet because RLI
22 won't allow us to contest breaches that are

226

1  inappropriate.
2      Q   What unwillingness of reconsideration
3  are you referring to?
4      A   Well, as you may remember, we asked for
5  a letter allowing us to ask bond unit supervisors
6  to reconsider breaches and your client said that
7  they would consider them on a case-by-case basis.
8  We requested them multiple times.  Each time we
9  were denied.
10     Q   Do you have any facts or evidence to
11 support that?
12     A   I know there's an email from Ira
13 Sussman denying one that I reviewed a couple weeks
14 ago.  So I know that email exists and I'll find
15 that for you.
16     Q   What was the basis of the denial?
17     A   I think it was arbitrary and
18 capricious.
19     Q   What was the basis of the dispute for
20 appeal?
21     A   As I remember, and I need to be careful
22 because I want to be accurate, as I remember, I

227

1  believe it was an individual who was breached
2  inaccurately.  I believe it was a breach that
3  occurred in the jail when the person had been
4  released.  My understanding was that the person
5  was still complying, meaning they were still going
6  to immigration court.  So they, you know, they
7  still had their court case, but they had an
8  inappropriate — or an anomaly breach.  In those
9  instances, it doesn't make any sense to appeal
10 that breach to the AAO because the person that's
11 ultimately going to make that decision is the bond
12 unit supervisor who's going to check the file and
13 go, oh, jeez, we screwed up.
14         But see, I can't go to the bond unit
15 supervisor with a request for reconsideration
16 because RLI won't let me.  So I have to go and
17 appeal these to the AAO, which is why we have a
18 higher number of AAO cases that are treated as
19 reconsiderations and granted.
20     Q   Other than that one --
21     A   But it would be more if we could
22 actually go to the bond unit manager and say we

228

1  need you to reconsider this and I would say for
2  the purposes of that I'd still really appreciate
3  your client's cooperation in that because we could
4  do a lot better.
5      Q   First of all, doesn't that request for
6  reconsideration happen after a bond has already
7  been breached, right?
8      A   Of course, yes.
9      Q   Right.
10     A   Otherwise there's nothing to
11 reconsider.
12     Q   So RLI has -- the fact that there are
13 significant bond breaches have nothing to do with
14 actions or inactions by RLI, correct?
15         MS. PETERS: Object to form.
16     A   No, I disagree.  I think that --
17     Q   For the initial bond breach.
18     A   I disagree.  I think that there are --
19 we're talking two different things.  I'm talking
20 about paying bond breaches versus breaches that
21 set aside or reconsidered.  What I'm suggesting is
22 that there are a significant number of breaches

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

58 (229 to 232)

229

1 that we've paid for RLI program participants that
2 could have been set aside had RLI granted us the
3 authority to do that.
4     Q    Okay. Isn't your obligation -- isn't
5 the obligation under the bond to deliver the alien
6 for hearings or upon demand of Department of
7 Homeland Security?
8         MS. PETERS: Objection to form. Whose
9 responsibility?
10    A    I don't believe it's my responsibility
11 to —
12    Q    Isn't the obligation of the bond. You
13 asked RLI to issue bonds, right?
14    A    Uh-huh.
15    Q    And you're familiar with what the bonds
16 look like, right?
17    A    I am.
18    Q    Okay. Let's get a sample bond.
19        (Donovan Exhibit 13 marked for
20 identification and attached to the transcript.)
21    Q    So looking at the bond form
22 instructions, doesn't it say the bond is posted as

230

1 security for performance and fulfillment of the
2 bonded alien's obligations to the government,
3 right?
4     A    Yes.
5     Q    And then looking at the third sentence
6 down it says, "The obligor guarantees the
7 performance of the conditions of the bond."
8     A    Right.
9     Q    Right? And those obligations are to
10 appear upon demand, right?
11        MS. PETERS: Object to form.
12    A    Well, yeah, but if you read — like,
13 just the sentence that you read, "The obligor
14 guarantees the performance of the conditions of
15 the bond," if you read the sentence before that it
16 says, "The surety is the obligor; the bonded alien
17 is the principal; DHS is the beneficiary of all
18 bonds it authorizes." That indicates —
19        MR. KOWALCZUK: Slow down, please.
20        MS. PETERS: Slow down, please.
21    A    I'm so sorry. Beneficiary meaning that
22 if the person doesn't appear that there's — and

231

1 there's a breach, and then there's a final claim
2 determination, then that gets paid. And I believe
3 that the bond requirements are that the immigrant
4 appear or the obligor pay. I believe that's what
5 this document says.
6     Q    Let's look at page 5 of 5, paragraph G.
7     A    (The witness complies.)
8     Q    So for delivery bond, the condition
9 is --
10    A    Which one are we looking at?
11    Q    G.
12    A    G?
13    Q    G1.
14    A    Yep.
15    Q    Okay. For delivery bond it says, "The
16 obligor hereby furnishes such bond with the
17 following conditions."
18        And looking at 1 in that subheading,
19 the --
20        MS. PETERS: I'm sorry, I'm not
21 following you. Which paragraph?
22        MS. KATSANTONIS: G1.

232

1         MS. PETERS: G1 you're in the middle of
2 the page?
3         MS. KATSANTONIS: Right.
4         MS. PETERS: In the middle of a
5 sentence?
6         MS. KATSANTONIS: Uh-huh.
7     Q    "The obligor shall cause the alien to
8 be produced or to produce himself."
9     A    Hold on, I'm on G1 on this page. Is
10 this not where you are?
11        MS. PETERS: She's reading in the
12 middle of a sentence --
13    Q    Right here.
14        MS. PETERS: -- in the middle of the
15 paragraph.
16    A    I gotcha. I naturally started at
17 beginning of the paragraph.
18    Q    You can read the whole thing, that's
19 fine.
20    A    Yeah.
21        MS. PETERS: Why don't you take a
22 moment and read the whole thing.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

233

1    A   Okay.
2    Q   Okay.
3    A   I've read section G1 in that first
4 paragraph 1, 1, and 2.  Public charge, voluntarily
5 departure and order of supervision.  If you're
6 going to ask me questions about those, I'm going
7 to need to take some time to read this.  But I
8 didn't want to take —
9    Q   No, I'm not going to ask you about
10 that.
11   A   I didn't think so.
12   Q   Right.  So did you understand that the
13 obligation is to produce the alien to an
14 immigration officer, immigration judge as
15 specified in the appearance notice?
16       MS. PETERS: Object to form.  States --
17 misstates the document.
18   A   So the document clearly states that the
19 bond is conditioned upon the delivery of the
20 alien, Ms. Katsantonis, I would agree.  But the
21 bond also states that if the individual isn't
22 delivered, that the bond becomes due and payable.

234

1 Again, the bond and the whole purpose of the
2 bond --
3    Q   Well, it says --
4        MS. PETERS: Object.
5    Q   Sorry, go ahead.
6        MS. PETERS: Please let him finish.
7    A   -- is to compel attendance.  And in
8 this manner, the way that it does that is it
9 creates a financial incentive or a financial
10 disincentive as you might say.
11       But clearly the bond is either delivery
12 or payment.  And as is evidenced by the fact that
13 we've paid an awful lot, and so, you know, that --
14 and that's true because in RLI's case we haven't
15 been able to contest bond breaches.  And so we've
16 had more bond breaches we've had to pay with RLI
17 because RLI has refused to give us the information
18 to seek reconsideration.  So we've had to appeal
19 those cases and it's -- it's been crazy.
20       MS. PETERS: And Ms. Katsantonis, I'm
21 going to object to the line of the testimony to
22 the extent it suggests that Libre or Nexus would

235

1 be the obligor.
2    A   Right.  Yeah, that's certainly correct.
3 We are just the indemnitor.
4    Q   All right.  Looking at the language,
5 okay, the obligation is to produce the alien,
6 right?  And then it says if the obligor fails to
7 surrender, while the bond remains in effect, the
8 full amount of the bond becomes due and payable,
9 right?
10       MS. PETERS: Object to form.
11   Q   Isn't that what the language says?
12   A   I'm sorry, can you repeat that?
13   Q   It says if -- so the obligation of the
14 bond is to deliver the alien to the immigration
15 officer, immigration judge?
16   A   Uh-huh.
17   Q   Right?
18       MS. PETERS: Object to form.
19   Q   And then -- so that's correct, right,
20 that's what the obligation says?
21       MS. PETERS: Object to form.
22   Q   Correct?

236

1        MS. PETERS: Are you asking him to read
2 the contract or are you asking him to give the
3 full obligations under the bond?
4        MS. KATSANTONIS: I'm asking him
5 pursuant to paragraph G, the obligation under the
6 bond is to deliver the alien to the immigration
7 officer, immigration judge as specified.
8    A   Sure.  That is written there in the
9 first sentence there.
10   Q   Right, and that's what the obligation
11 is, correct?
12       MS. PETERS: Object to form.
13   A   That is an obligation of the bond, yes.
14   Q   Right.  And it says if the obligor
15 fails to surrender the alien while the bond
16 remains in effect, the full amount of the bond
17 becomes due and payable?
18   A   Right.  See but the obligor is not me.
19   Q   Right.  But that's not the question.
20 You've asked Nexus to execute the bonds, correct?
21       MS. PETERS: Object to form.
22   A   Well, Nexus has asked RLI.

237

1    Q    I'm sorry, Nexus -- I'm sorry, you're
2 right.
3    **A    It's only twice.**
4    Q    Nexus has asked RLI to issue these
5 bonds, right?
6    **A    That's right.  That's right.**
7    Q    And the obligation is to have these
8 immigrants appear pursuant to these notices that
9 are given, correct?
10    MS. PETERS: Object to form.  Misstates
11 his prior testimony.  You keep saying "the" and he
12 said "an."
13    Q    Okay.
14    **A    I think it's -- I think it's -- or pay,**
15 **right?  I think --**
16    Q    It doesn't say "or pay" anywhere in
17 this agreement, does it?
18    **A    Actually I think it does.  I think it**
19 **says right here that it becomes due and payable.**
20 **That would be the third, fourth --**
21    Q    It says if you fail to comply with the
22 obligation.

238

1    **A    Right, either/or.  You deliver or you**
2 **pay.  You deliver or you pay.**
3    Q    It doesn't say that.  It says --
4    **A    It says that.**
5    Q    -- your obligation is to deliver and if
6 you fail your obligation while the bond remains in
7 effect, you pay the full amount.
8    MS. PETERS: Object to form.  Arguing
9 with the witness.
10    **A    What do you mean the bond remains in**
11 **effect?**
12    Q    It says while the bond remains in
13 effect, doesn't it?
14    **A    But Ms. Katsantonis, when we pay a**
15 **breach they don't still expect you to deliver the**
16 **alien?**
17    Q    Let me ask you -- well, if you pay a
18 bond breach that doesn't mean the alien still
19 doesn't have an obligation to appear or be taken
20 into custody, right?
21    **A    The alien's obligation is independent.**
22 **As a co-obligor you certainly don't have an**

239

1 **obligation to go round them up.  And quite**
2 **frankly, if you did after paying the breach it**
3 **would be entirely inappropriate.  Entirely**
4 **inappropriate.  And I hope that you won't do that**
5 **with the information that we provided from the**
6 **Capsule files.**
7    Q    Looking at the face of the bond itself.
8    **A    Uh-huh.**
9    Q    And looking at paragraph C?
10    MS. PETERS: Object to form.  Which
11 face, which page?
12    MS. KATSANTONIS: Page 3 of 6.
13    **A    Yes.**
14    MS. PETERS: 3 of 6 or 3 of 7?
15    MS. KATSANTONIS: 3 of 6.
16    ATTORNEY A: Next page.  Oh, sorry.
17    MS. PETERS: Sorry, looking at --
18    Q    Sorry, if you're looking at C when it
19 talks about the amount being paid, doesn't it
20 refer to them as liquidated damages and not as a
21 penalty?
22    MS. PETERS: Object to form.

240

1    **A    Are you talking about C?**
2    Q    Yes.
3    MS. PETERS: I'm going to object to
4 form to the extent that it calls for a legal
5 conclusion.
6    MS. KATSANTONIS: Fine.
7    **A    It says that they agree to be bound to**
8 **the United States in the sum of blank unless the**
9 **guarantee of the bond is that the alien shall not**
10 **become a public charge or violate.  So you are**
11 **going to ensure delivery or pay the money.**
12    Q    Well, it says -- do you think -- so
13 it's your understanding that the United States
14 government is okay with picking one or the other
15 when they release -- when they allow you -- when
16 they allow Nexus Services and RLI, when they allow
17 the release of an immigrant, they do so thinking
18 you don't have to make them come back, you could
19 just pay them 15,000 or $25,000?
20    MS. PETERS: Object.
21    Q    Is that your understanding?
22    MS. PETERS: Object to the form of the

241

1 question.
2      A   My understanding, Ms. Katsantonis, of
3 the bond is what the bond says which is you
4 deliver or you pay.
5      Q   Where does it say --
6      A   I will say -- hold on.  I've told you.
7 I actually pointed out the sentence for you.  You
8 just -- you disagree but I showed you where it --
9      Q   Well, it doesn't say the word "or."
10      A   That being said -- well, it's that --
11          MS. PETERS:  Object to form.
12      A   -- or that.
13          MS. PETERS:  Please don't interrupt
14 while he's --
15      Q   Go ahead --
16          MS. PETERS:  -- answering.
17      Q   -- please.
18      A   That being said, you asked me do I
19 think the government.  Let me tell you something.
20 I have been in immigration courts where I've seen
21 immigration judges nearly dance a jig when five of
22 six people don't show up and it means they clear

242

1 the docket faster.  I'm telling you that the
2 government is just as happy to accept the money
3 than it is to accept the body.  That's
4 unfortunate --
5      Q   It's your understanding that --
6      A   -- but that's my experience.
7      Q   It's your understanding that -- I mean
8 don't -- doesn't the government require a hundred
9 percent posting of collateral for an immigrant to
10 be released if it's not with the bond?  Don't they
11 require the immigrant to post a hundred percent
12 collateral?
13      A   Right.
14      Q   Okay.  But that means the immigrant
15 still has to appear.
16      A   Right.  But if the immigrant doesn't
17 appear they take the money.
18      Q   But the -- it doesn't mean that if they
19 take the money they're never going to continue to
20 pursue the immigrant, right?
21      A   Well, it would mean that -- there would
22 no longer be an appearance date.  See, so there's

243

1 an appearance date.  There would still be
2 presumably a warrant issued by the attorney
3 general that could be executed against this
4 person.  But many of our clients, Ms. Katsantonis,
5 are from prior orders of deportation.  I've seen
6 people come and those prior orders exist but
7 they're not being looked for.  There's no active,
8 like -- and then they get picked up again and then
9 they get released.
10      Q   Is it your testimony that you procure
11 bonds with the thought that the sureties will have
12 to just pay the bond amounts?
13          MS. PETERS:  Object to form.
14      A   Well, Ms. Katsantonis, since I've paid
15 the bond amounts for RLI, you know that that's not
16 an accurate statement and I think it's
17 inflammatory.  I don't think that's -- I don't
18 think that's at all what I'm saying.  I think that
19 what I said was we have an obligation, meaning --
20 and I want to be clear, the obligor, which is your
21 client, has an obligation.  We have stood in the
22 shoes of the principal to say we are going to meet

244

1 that obligation and we meet it by paying it if the
2 person isn't delivered.
3          By the way, we have no authority
4 whatsoever to go arrest an immigrant and take them
5 to a hearing.  We go to people's homes and say,
6 let's go, we're going to take you to this hearing
7 and we convince them to come along.  That's what
8 we do.  That's our authority.
9      Q   Okay.
10      A   And it's a better way to do it to be
11 honest with you.  While I wish we didn't have to
12 pay breaches and I wish that no bonds ever
13 breached, I'm still proud of the work that we do.
14 I'm proud of what we've been able to accomplish as
15 a company and I'm proud of every single program
16 participant that makes it through this ridiculous
17 onerous process that the government has
18 established.  I'm sorry.
19      Q   So if a bonded principal is escorted,
20 as required by notice to deliver, you know, does
21 that discharge the obligation of the bond?
22          MS. PETERS:  Object to the form of the

245

1  question.
2      Q    If the bond --
3          MS. PETERS:  Can I ask that it reads --
4          MS. KATSANTONIS:  Yeah, I'm going to
5  say it again.
6      Q    If the bonded principal is escorted to
7  Department of Homeland Security, the immigration
8  court, or wherever they're required to be
9  produced, as required by the notice to deliver,
10  does that discharge the bond?
11          MS. PETERS:  Object to the form of the
12  question.
13      A    It can.  It doesn't necessarily.
14      Q    Okay.  Under what circumstances would
15  it not?
16      A    If the individual's case is not
17  finished.  Oftentimes a 9340 will be issued for
18  purpose of an interview or law enforcement
19  purposes, law enforcement wants to talk to
20  somebody.  There are many number of reasons why a
21  notice to deliver can be issued.  If the notice to
22  deliver is issued based on a final order of

246

1  deportation, the person walks in, they're hooked
2  up, ICE takes them into custody, they cancel the
3  bond.  But if they come in and it's an interview
4  or a law enforcement thing and the case continues
5  then the bond isn't canceled and the conditions
6  continue.
7      Q    All right.  Isn't it true that the vast
8  majority of notices to deliver that you receive
9  are issued in connection with an order of removal?
10      A    I would say the majority, but I don't
11  know that I would say vast majority.  We get a lot
12  of law enforcement contacts especially in this
13  administration.
14      Q    Okay.  Let me ask you, going back to
15  the contract document that we had been looking
16  at --
17      A    Yeah.
18      Q    -- the Libre document.  And looking
19  at -- I'm going to think of the easiest way to do
20  this -- page 13 of 23 on the bottom, it's page
21  269.
22      A    Uh-huh.

247

1      Q    This is a GPS monitoring disclosure
2  statement.
3          When you were using this form of
4  agreement in -- so you used this form of agreement
5  in 2016 and 2017; is that correct?
6      A    A portion of 2017, yes.
7      Q    Okay.  So during the time RLI bonds
8  were being issued, correct?
9      A    I'm sorry.  Would you repeat that?
10      Q    During the time that RLI bonds were
11  being issued?
12      A    That's correct.  I'm going to take a
13  biology break so that we can --
14      Q    Sure.
15      A    Because I can see that this is going --
16          THE VIDEOGRAPHER:  We are going off the
17  record at 16:58.
18          (Recess taken.)
19          THE VIDEOGRAPHER:  We are back on the
20  record another 17:19.
21  BY MS. KATSANTONIS:
22      Q    We don't even care what that says

248

1  anymore.  It says what it says.  Okay.
2      A    Well, I care what it says because it
3  said what I said it said.  So that works for me.
4      Q    All right.  We were looking at the
5  contract and I was looking at page, it's in the
6  right-hand -- it's 269.  It's the GPS monitoring
7  disclosure statement.
8      A    Okay.  269.  Oh, yeah.  I was already
9  pulled to it.
10      Q    So in looking at that agreement, the
11  top of the agreement says Libre by Nexus, right?
12      A    That's correct.
13      Q    Okay.  And when you read the agreement,
14  this agreement -- this disclosure statement and
15  agreement is entered into between respondent and
16  Nexus Services, Inc.; is that correct?
17      A    That is correct.
18          MS. PETERS:  Object to form.
19      Q    So the GPS statement -- and it also
20  defines Nexus Services as also Nexus Programs; is
21  that correct?
22      A    It does say Nexus Services, or Nexus

249

1  Programs, yes.
2      Q   Okay.  And so to the extent Nexus
3  Programs is referenced, that would be in reference
4  to Nexus Services, correct?
5      A   That is correct, according to this,
6  yes.
7      Q   And these documents are maintained in
8  the Capsule database, correct?
9      A   The contracts will be uploaded into the
10 Capsule database.  Let me just be very clear,
11 though.  In a prior answer when you said Nexus
12 program refers to Nexus Services that is true in
13 this document.  I don't necessarily want to say
14 that that's true in other documents but this
15 document specifically says hereafter collectively
16 Nexus Services or Nexus programs.
17     Q   Well, and in fact let's say if you look
18 on, for example, page 262.
19     A   But see in this document I would
20 concur.  So anything in this document that
21 references —
22     Q   Okay.  All right.

250

1      A   I just don't want -- you know, if you
2  pull out an email from, like, three years ago --
3      Q   Okay.
4      A   -- what about this, Mike, I'm going to
5  be --
6      Q   Well, because there's other references
7  to Nexus programs so I just want to be sure --
8      A   And the reason, Nexus Programs was an
9  entity.  So I just want to be very -- and it's
10 talking about this because, you know, they may
11 have documentation that says Nexus Services or
12 Nexus Programs and we're being inclusive, so.
13     Q   Okay.  And so you agree that Nexus
14 Services is part of these contract agreements,
15 correct?
16     MS. PETERS:  Object to form.
17     A   That's correct.  And in fact, that is
18 because Nexus Services is the indemnitor, and that
19 was we -- when we -- that is true with RLI.  And
20 when we engaged with Dave Sandoz, RLI's preference
21 was to have Nexus Services perform the
22 indemnification.  So it would be consistent that

251

1  the disclosures and the arbitration agreements and
2  those types of things would reference Nexus
3  Services because Nexus Services was indemnifying
4  the body.
5      Q   Okay.  And in reference to, let's --
6  looking at page 274, there's a contract for
7  immigration bond securitization and indemnity
8  agreement, right?
9      A   Right.
10     Q   And what is the purpose of this
11 document?
12     MS. PETERS:  Object to the form
13 question to the extent that it seeks a legal
14 opinion.
15     A   I would say that this document sets out
16 the expectations of what Libre and Nexus Services
17 are going to do and vis-à-vis the contracts for
18 bond securitization and the indemnification of
19 their bond.
20     Q   Okay.  And there's reference in this
21 agreement to the surety, right?
22     A   There is.

252

1      Q   And it provides rights and -- that the
2  surety can take in addition to Nexus, correct?
3      A   What are you —
4      MS. PETERS:  Object to form.
5      A   What are you referring to specifically?
6      Q   Well, for example --
7      A   I'll read the whole —
8      Q   -- compromise will say securitize or
9  and/or surety shall have the right to pay or
10 compromise any claim, paragraph 3.
11     MS. PETERS:  Can you tell me what --
12     Q   Paragraph 4 --
13     MS. KATSANTONIS:  I'm just reading a
14 few examples.
15     Q   Paragraph 4 --
16     MS. PETERS:  Can you be specific where
17 you're reading so that I can track with you where
18 you are?
19     MS. KATSANTONIS:  I'm on page 274.
20     MS. PETERS:  And paragraph number?
21     MS. KATSANTONIS:  3 and 4 --
22     MS. PETERS:  Thank you.

253

1    MS. KATSANTONIS: -- for example.
2    MS. PETERS: Okay.
3    Q   Right?  There are certain rights that
4  are extended to the surety as well, correct?
5    MS. PETERS: Object to form.
6    A   I don't know that this extends rights
7  to the surety since the surety is not a party.
8  But I think it specifies to the client that the
9  surety has certain rights.
10   Q   Okay.  And then looking at page 278.
11   A   (The witness complies.)
12   Q   And I'm looking at the last "I
13 understand" paragraph.
14   A   Uh-huh.
15   Q   Before "in witness whereof."
16      "I understand that information provided
17 to Libre by Nexus is likewise provided to the
18 license surety who posts the bond in the
19 respondent's case."
20      Do you see that?
21   A   Uh-huh.
22   Q   So did -- did you understand that the

254

1  immigrants who executed these agreements agreed
2  that the information could be provided to the
3  surety?
4    MS. PETERS: Object to form.
5    A   What information?
6    Q   The information they provided.
7    MS. PETERS: Object to form.
8    Q   To Libre by Nexus.
9    MS. PETERS: Object to form.
10   A   Well, we provided -- so what this means
11 is that when Libre by Nexus indemnifies a bond, we
12 provide the client's personal identifying
13 information for the posting of the bond to the
14 bail agent.  And this specifically states, if you
15 read this, it specifically has the qualifier that
16 they understand that providing false information
17 would constitute a crime.
18      The reference is not as a cautionary
19 tale to the client that their information is going
20 to be provided to the surety, it is a statement
21 that they should not provide false information.
22 The information that's provided to the surety is

255

1  the application information that's required to be
2  posted to be able to generate the I-352.  And the
3  bail agents does that.
4    Q   That's not explained anywhere in this
5  document, right?
6    MS. PETERS: Object to form.
7    Q   It just says, "I understand the
8  information provided to Libre is likewise provided
9  to the surety to post the bond."
10      Correct?
11   MS. PETERS: Object to form.
12   A   Yeah, the application information.  I
13 think it's made clear to the program participant
14 that we provide application information.  It's
15 also made clear to the program participant, that
16 we do not provide Capsule information, that we do
17 not provide contemporaneous notes.  After their
18 bond has been posted, they know that those
19 communications are protected, or that we will try
20 to protect them.
21   Q   Protected as against whom?
22   A   That we will try to protect them, which

256

1  we have, both in this litigation and in others.
2    Q   Well, it doesn't say that vis-à-vis the
3  surety, right?
4    MS. PETERS: Object to form.
5    A   I don't know what you mean.  What do
6  you mean?
7    Q   The document doesn't provide that -- it
8  provides the exact opposite, that the information
9  will be shared with a surety.
10   MS. PETERS: Object to form.
11   Q   Correct?
12   MS. PETERS: Object to form.
13   A   I disagree.  The information necessary
14 to post the bond will be provided to the surety
15 and they understand that providing false
16 information in the application constitutes fraud.
17 I don't understand how you could read that and not
18 understand that the first sentence responds -- or
19 the second sentence responds to the first.  Read
20 the -- read it.  I mean, I'm not trying to be
21 argumentative because I understand it.
22   Q   Well, I'm trying to understand.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

65 (257 to 260)

257

1    A    I understand that —
2    Q    Isn't the second part --
3    A    It says I understand the information
4 provided to Libre by Nexus is likewise provided to
5 the licensed surety who posts the bond in the
6 respondent's case.  Because to post the bond they
7 have to have the information.  I understand that
8 providing false information in our Nexus
9 application constitutes fraud against Nexus and
10 may result in criminal prosecution.
11   Q    Uh-huh.
12   A    Vivian, I think if you want to disagree
13 with me about what that means then you can do
14 that.  But I think it's reasonable to assume,
15 based on the words, the plain language that what
16 this is talking about is information provided in
17 the application for the posting of the bond.  And
18 I think it's fair to say that because that's
19 exactly what it says.  And it says —
20   Q    So all of this information --
21   A    — that if you provide false
22 information —

258

1    Q    -- is provided --
2    A    I'm sorry.
3    Q    Isn't all of this information provided
4 for the posting of the bond?
5        MS. PETERS: Object to form.
6    A    There is certain information that's
7 provided to the posting of the bond and that's the
8 information that we provide to the surety.
9    Q    Isn't this the application that the
10 immigrant has to provide in order for a bond to be
11 posted?
12       MS. PETERS: Object to form.
13   A    It was at the time.
14   Q    Okay.  And on page 264 in the lease
15 agreement, is that an agreement to provide the
16 electronic monitoring of the individual?
17       MS. PETERS: Object to form.
18   A    This is a lease agreement template that
19 we were given by the company that we rented GPS
20 bracelets from, our first company.  It found its
21 way into this agreement and then lived until 2017.
22 The revision of the contract specified, you know,

259

1 what we always explained to people which is that
2 the lease agreement specifies their duties to not
3 damage and to return property that is provided to
4 them.
5    Q    And the lease agreement provided
6 that -- that they would have payments of $420; is
7 that correct?
8    A    It does say that here, yes.
9    Q    And in the LiteSpeed database there's a
10 sales line form that can be printed or is -- let
11 me say that a different way.
12       There's a sales line form that's
13 included in the Capsule files for each of the
14 individual program participants; is that correct?
15       MS. PETERS: Object to form.
16   A    You said the — in the LiteSpeed
17 there's a -- can you say that again?  I'm sorry, I
18 misunderstood you.
19   Q    I probably said it wrong.  But thank
20 you for saying that.
21   A    Or I might have misunderstood.
22   Q    From LiteSpeed --

260

1    A    We'll get it, guys.
2    Q    -- you can print a sales line report
3 for each program participant which itemizes the
4 payments they have made to Nexus or Libre?
5        MS. PETERS: Object to form.
6    A    I believe —
7    Q    Is that correct?
8    A    I believe you can run a report that
9 shows payment history.  If that's what you're
10 asking, right?
11   Q    Yes.
12   A    Okay.  Yes.
13   Q    And that -- by immigrant?
14   A    By individual.
15   Q    By individual?
16   A    Yeah.
17   Q    Okay.  And for each individual that
18 information is also included in the Capsule files,
19 correct?
20       MS. PETERS: Object to form.
21   A    Per — not in the same way.  In other
22 words, you're talking about exporting a report in

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

66 (261 to 264)

261

1  LiteSpeed.  If that was ever uploaded into Capsule
2  then it would be there but it wouldn't be there
3  for every Capsule -- it wouldn't be in every
4  Capsule filing.  You're looking at me weird so I
5  may have misunderstood you again.
6      Q   Well, isn't one of these sales line
7  reports --
8      A   Can I see the report?
9      Q   Sure.
10     A   I mean, it might be helpful.
11     Q   Sure.
12     A   Then I'll know what you're talking
13 about.
14         So you're asking me if this is in every
15 Capsule file?
16     Q   For each individual participant.
17     A   No.
18     Q   In the vast majority of them isn't it
19 included?
20     A   I think what we're — so what is
21 included in the vast majority may be a receipt of
22 a transaction.  I do not believe that sales lines

262

1  are in the vast majority of Capsule files.  This
2  would seem like a one-off to me, that it would be
3  odd that this would be in a Capsule file.  It
4  would have been placed there for some reason that
5  would have been, you know, outside the norm.  I'll
6  give this back.
7      Q   No, we'll go ahead and mark it.
8         (Donovan Exhibit 14 marked for
9  identification and attached to the transcript.)
10        THE WITNESS:  Here you go.  Did you get
11 a copy of this, Mary?
12        MS. PETERS:  I did.
13     Q   So in the document we're looking at
14 there's a bond payment of $1,125, correct?
15     A   Uh-huh.
16     Q   And it says to be forwarded to bond
17 company.
18        MS. PETERS:  Object to form as a
19 question.
20     Q   Is that correct?
21     A   That's what it says.
22     Q   Okay.  And is the -- is this payment

263

1  that was received from this bond participant, is
2  that amount forwarded to the surety who issued the
3  bond?
4         MS. PETERS:  Object to the form of the
5  question.
6      A   So Nexus, as RLI, for example RLI's
7  customer pays RLI the negotiated premium and
8  purchases a bond, right, this -- and that we do at
9  the request of the surety.  Specifically RLI
10 requested Nexus Services, not Brian
11 Castillo-Moreno, indemnify Mr. Moreno's bond.  So
12 it would be normal for Nexus to pay that premium.
13     Q   Okay.  But so are you saying that Nexus
14 paid the premium separately from any amount they
15 received from the program participant?
16        MS. PETERS:  Object to the form of the
17 question.  Misleading.
18     A   I would say that in the vast majority
19 of the cases, Ms. Katsantonis, yes, because if you
20 could imagine an immigrant or a -- not an
21 immigrant because they'd be in jail, but like a
22 family member paying at 10:00 on a Tuesday, you

264

1  know, Nexus isn't going to receive that money for
2  days.  It's going to go to a merchant account,
3  it's going to sit there and it's going to be
4  transferred but we'd be paying that very next day.
5  So, yes, typically it is separated.  It's just,
6  you know, we don't typically wait until merchant
7  account -- merchant accounts, what do you say, not
8  consolidate, when they deposit.  We don't
9  typically wait until the deposits come in to do
10 that so...
11     Q   And isn't it true that the amounts that
12 Nexus or Libre collects for a program participant
13 towards the bond payment are not forwarded to
14 Nexus or Libre, right?  Because in addition --
15        MS. PETERS:  Objection to form.
16        MS. KATSANTONIS:  I'm sorry, to RLI.
17        MS. PETERS:  Object to the form of the
18 question.
19     A   I don't understand the question.
20 Sorry.  Could you repeat.
21     Q   It says here to be forwarded to bond
22 company.  But that's not a true statement, right?

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

---

265

1    MS. PETERS:  May I interject --
2    MS. KATSANTONIS:  No.
3    MS. PETERS:  -- an objection?  I'm
4  objecting to the form of the question because
5  you're --
6    MS. KATSANTONIS:  No, I don't want to
7  hear because.
8    MS. PETERS:  I'm objecting to the form
9  of the question to the extent that it assumes
10 facts not in evidence.  You're asking him --
11   MS. KATSANTONIS:  Now you're going to
12 testify, Mary Donne, so I'd caution you against
13 that.
14   MS. PETERS:  I'm objecting --
15   MS. KATSANTONIS:  Mr. Donovan has
16 already testified.
17   MS. PETERS:  He's reading to how a form
18 categorizes certain payments.  He is not
19 testifying --
20   MS. KATSANTONIS:  You're testifying.
21   MS. PETERS:  -- regarding the
22 difference between an initial payment that is

266

1  collected and a monthly program fee.
2    MS. KATSANTONIS:  So right, you're
3  trying to testify.
4    **A   Vivian, with all due respect let me say**
5  **this, okay:  I think that what I said to you**
6  **specifically was that we didn't cause immigrants**
7  **to sit in jail longer waiting for merchant**
8  **accounts to consolidate and transfer before we**
9  **paid RLI and got them out of jail.  That's what I**
10 **said —**
11   Q   Right, but --
12   **A   — and that's my testimony.**
13   Q   Right.  My question is this:  So you
14 might have on this sheet $1,125.  Whether it's the
15 exact 1,000, that's not the exact amount that you
16 necessarily pay the bonding company, correct?
17   MS. PETERS:  Object to form.
18   **A   Oh, sure it is.  That references the**
19 **amount of the premium that Nexus paid for the**
20 **bond.**
21   Q   So this first one that says 1,125, it's
22 your testimony that if it says bond payment, that

267

1  that amount exactly is always forwarded to the
2  bonding company?
3    **A   You handed me —**
4    MS. PETERS:  Object to form.
5    **A   You handed me a sheet of paper.  I**
6  **haven't done any independent analysis of this.  If**
7  **what you're asking me is do we pay the premium,**
8  **yes.**
9    Q   No, I'm not asking whether you pay the
10 premium on your bond.
11   **A   We pay the premium —**
12   MS. PETERS:  Objection.
13   **A   — and that amount is what's entered**
14 **into the payment worksheet for the payment of**
15 **premium.  It's whatever the premium costs.**
16   Q   Isn't it true that program participants
17 continue to make other bond payments over the
18 course of -- over time?
19   MS. PETERS:  Object to form.
20   **A   Other bond payments?**
21   Q   For -- they're making other payments
22 toward their bond amount.

268

1    MS. PETERS:  Object to form.
2    **A   I don't — they make program payments,**
3  **Ms. Katsantonis, and those program payments are**
4  **for the program not for the bond.  And you know**
5  **that because RLI is not getting money from us.**
6  **And if we were collecting — RLI would certainly**
7  **want its share.  RLI knows and knew when we**
8  **entered this program what our program was.**
9  **Mr. Sandoz knew it extensively and understood it.**
10 **And to say now to sort of -- your questions cast**
11 **aspersions on whether — it just is wrong.**
12   Q   I'm not casting aspersions, I'm asking
13 you a question.  I don't even understand what
14 you're saying in that regard.
15   **A   Well, you —**
16   Q   Let me ask you -- let me ask you a
17 different way so maybe --
18   **A   What you asked me was —**
19   Q   Maybe you're misunderstanding.
20   **A   — whether this amount was accurate.**
21 **And what I'm telling you is what we — what our**
22 **people are trained to do, what we do every time,**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

269

1  is there's a worksheet and the amount of money
2  that we have to pay for the premium is calculated
3  to be that amount.
4       Now I can't tell you that there's never
5  been a mistake or something like that, I don't
6  know.
7       Q    No, let me --
8       A    I don't want to testify to something
9  like that.  But I would say that --
10      Q    Let me re --
11      A    -- this is our policy.
12      Q    Let me ask you this question another
13  way.
14      A    Uh-huh.
15      Q    So you're a program participant and you
16  know you have a $20,000 bond, right?
17      A    Uh-huh.
18      Q    And so how much of that 20,000 bond do
19  you collect up front as a bond payment?
20      MS. PETERS:  Object to form.
21      Q    What percentage?
22      MS. PETERS:  Object to form.

270

1       A    Whatever percentage is charged by the
2  surety that we're posting the bond with.
3       Q    What does RLI charge?
4       MS. PETERS:  Object to form.
5       A    I believe it was 12 and then
6  10 percent.  I believe we started at 12 and went
7  to 10, but it might have been started at 10, I'm
8  not sure.
9       Q    All right.  So let's just go with
10  10 percent for now.  10 percent.  So that's the
11  initial amount that the program participant paid,
12  $2,000?
13      MS. PETERS:  Object --
14      Q    For a 20,000 bond, correct?
15      MS. PETERS:  Object to form.
16      A    It would depend on the amount.  Are you
17  talking about this client?
18      Q    No, I'm just asking --
19      A    All right.
20      Q    -- if there's a $20,000 bond?
21      A    Because I haven't seen this file.
22      Q    Right.

271

1       A    Right.
2       MS. PETERS:  Object to form.
3       A    If there's a 20,000 bond that amount
4  would be consistent with whatever the surety was
5  charging.  And if it were RLI and they were
6  charging 10 percent, then it would be 10 percent.
7       Q    So it would be 2,000.  So my question
8  is:  Are there instances where the program
9  participant, in addition to monthly fees, pays
10  other amounts towards the bond amount, the $20,000
11  bond amount?
12      MS. PETERS:  Object to form.
13      A    Are you talking about -- so there
14  are -- I'm trying to understand your question.
15      Are you talking --
16      Q    If I'm a program --
17      A    -- about this document?
18      Q    No.  I'm asking you a question with
19  program participants.
20      A    Uh-huh.
21      Q    So if a program participant has a
22  $20,000 bond.

272

1       A    Right.
2       Q    You collect the $2,000 up front, which
3  is the premium that you pass on to the bonding
4  company.
5       A    That we pay to the surety.
6       Q    Right.  And I'm saying if the program
7  participant wants to con -- are there instances
8  where the program participant makes additional
9  payments to Libre or Nexus on -- to go towards
10  that bond amount of $20,000?
11      A    Okay.  You're talking about performance
12  promised payments, I think.  Those are payments
13  that would have -- if they reached a certain
14  amount they could have -- they could be removed
15  from the active monitoring program.  I think
16  that's what you're talking about.  I'm sorry, I
17  just didn't understand and I wanted to make sure I
18  answered.  If that's what you're talking, then
19  yes.  There are performance promise payments under
20  the contract.
21      Q    And those are -- when they reach what
22  amount can the person be -- is it when a program

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

273

1 participant reaches a certain amount they then no
2 longer have to pay monthly fees to Libre?
3        MS. PETERS:  Object to form.
4    **A   That's correct.  The idea is to ensure**
5 **that program participants aren't paying their, you**
6 **know, double or triple their bond amounts in fees.**
7    Q    And what is the --
8        MS. PETERS:  Object to form of the
9 question.
10   Q    What is the threshold that the program
11 participant has to reach before they can be
12 removed from making further payments?
13   **A   Under the old contract it was**
14 **80 percent.**
15   Q    Okay.
16   **A   However, Nexus reserved the right to do**
17 **it earlier and often.**
18       MS. PETERS:  I want to make sure that
19 you're talking apples to apples.  You're talking
20 about performance promise payments versus program
21 payments.
22   **A   What we're talking about -- I'm talking**

274

1 **about performance promise payments just to be**
2 **clear.**
3    Q    I understand what you're talking about.
4    **A   Yeah, I just want to make sure we're**
5 **clear.**
6    Q    All right.  So for the exhibit I gave
7 you the first number that says bond payment, that
8 would be for RLI, let's say, it would be the 10 or
9 12 percent, the amount that the surety is charging
10 for a premium, correct?
11   **A   Correct.**
12   Q    All right.  And the performance promise
13 payment at the bottom, that would be an amount
14 that the program participant is paying towards
15 their full bond amount in an effort to eventually
16 be released from the program?
17   **A   Right.**
18   Q    Okay.  Those performance promise
19 payments, those are maintained by Libre, right?
20   **A   That's correct.**
21   Q    And they're not forwarded to the
22 bonding company, correct?

275

1    A    That's correct.
2    Q    Okay.  And where does Libre maintain
3 those funds?  Is there a separate account or is it
4 collected in the operating and distributed in the
5 normal course?
6        MS. PETERS:  Object to the form.
7    **A   And we specify in our contract that our**
8 **performance promise payments are not segregated.**
9 **One of the biggest issues with performance promise**
10 **payments is that we -- oftentimes those are --**
11 **when a person fails to appear we've got to use**
12 **that to pay a breach or if they failed to make**
13 **promise payments, make program payments sometimes**
14 **those have to be converted to program payments if**
15 **they're unable to make payments. So there are**
16 **different things that can happen.  But ultimately**
17 **if there's a breach, then obviously Nexus stands**
18 **in the place of the respondent and pays either**
19 **before or after.**
20   Q    Okay.  The collateral service and
21 general consulting fee, what is that?
22   **A   That is for lack of a better term, the**

276

1 **startup fee.  There's a lot of work that goes into**
2 **collecting information and confirming information,**
3 **verifying information.  And that is the charge for**
4 **that process.**
5    Q    And then the new program participant
6 setup fee, what is that?
7    **A   Those are also setup fees for the**
8 **program.  There are fees to, you know, encompasses**
9 **going to get the person, you know, providing**
10 **direct service to the individual when they're**
11 **released, you know, providing whatever we need to**
12 **do in relation to a hotel.  Travel fees are**
13 **separate for airport, airline, and that kind of**
14 **thing.  But the hotel that they would be in for**
15 **the first night of their release is covered there**
16 **as well.**
17   Q    Okay.  And that's a one-time fee also?
18   **A   That's correct.**
19   Q    And then the full program payment of
20 420, what is that?
21   **A   That's the monthly program fee.**
22   Q    And what does that cover?

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

70 (277 to 280)

277

1    A    It covers all the services that Nexus
2  provides.
3    Q    And doesn't it -- doesn't that amount
4  match the GPS amount in the lease agreements?
5        MS. PETERS: Object to form.
6    A    Well, I mean it does — it does — it
7  does match the amount in the old contract that
8  you're talking about.
9    Q    Uh-huh.
10   A    It does.  Under the new contract there
11 are multiple levels of payments.
12   Q    Okay.  Earlier we talked about --
13 sorry, I got them.
14   A    You're fine.  Hey Vivian, take your
15 time.  My clock's ticking.
16   Q    Yeah, the more the better.  We talked
17 about the indemnity agreement and the collateral
18 agreement, the two agreements that you executed,
19 right?
20   A    Yeah.  I'm trying to figure out which
21 of these groups that is.  Great.  Oh, my gosh.
22 I'm losing my mind.

278

1    Q    We'll find them.  But let me ask you
2  are you aware of any other written contracts or
3  agreement between any one or more of the
4  defendants on one side and RLI on the other?
5        MS. PETERS: Object to the form of the
6  question to the extent that he has not otherwise
7  testified about here today.  Because he testified
8  to emails with Mr. Sandoz.
9        MS. KATSANTONIS: Mary Donne,
10 seriously, that's --
11   A    Are you saying — are you saying — are
12 you saying agreements that we have with RLI —
13   Q    Yes.
14   A    — or program participants?  I think
15 when you say --
16   Q    No, now we're --
17   A    I'm sorry, I was —
18   Q    -- leaving the program --
19   A    I said defendants.  I got you.
20   Q    -- participants behind now.
21   A    Okay.  We are going to the —
22   Q    We're going back to --

279

1    A    That's why you said that.  I got you.
2    Q    Right.  We're going back to us.
3    A    I'm sorry.
4    Q    So we talked earlier about the
5  indemnity agreement and the collateral agreement.
6  Are you aware of any other written contracts or
7  agreements between any one or more of the
8  defendants on one side and RLI on the other?
9        MS. PETERS: Object to form.
10   A    I'm not aware of any contracts that we
11 signed other than the ones that we've covered,
12 although I will say that there was a continuing
13 and developing expectation of what was going to
14 happen with the book of business with the
15 collateral, for example, that was clarified in
16 emails by Mr. Sandoz.
17       So, you know, I will say that my
18 understanding of what was required changed as it
19 relates to those emails.  But there -- I don't
20 believe we signed any additional agreements.
21   Q    Right.  And you're not -- you're not
22 aware of any -- I mean, there's no binding

280

1  agreement between you and RLI, and by "you" I mean
2  Nexus, Libre, Homes, other than the indemnity
3  agreement and the collateral agreement --
4        MS. PETERS: Object to the --
5    Q    -- correct?
6        MS. PETERS: -- form of the question to
7  the extent that it calls for a legal conclusion
8  and misstates his prior testimony.
9    A    Well, I would disagree.  I would say
10 that we -- that assertions that RLI made to us
11 through that time period do matter and the
12 direction on the collateral for example I think
13 does matter from Mr. Sandoz.  So I would disagree.
14 But, you know, I --
15   Q    I want to you -- I want you to be very
16 specific.
17   A    I'm not a lawyer, so...
18   Q    Because it is important, right?
19   A    Uh-huh.
20   Q    We're here for breach of contracts,
21 right?  So I need to know exactly what agreement
22 or contract do you think exists other than those

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

281

1  two?

2          MS. PETERS:  Object to form.

3      Q    Specifically.

4          MS. PETERS:  Object to the form.

5      A    I don't think that we're here for

6  breach of contract.  I would say that I don't

7  think we breached our contract.  I think we've

8  stood and performed under the contract.

9      Q    Okay.

10     A    But that being said, I do understand

11 the seriousness of it and I appreciate that.

12 That's why I'm here when I'm ill because I want to

13 be here because I respect the process.

14         That being said, I'm not prepared to

15 say that Mr. Sandoz's direction to us on

16 collateral wasn't a binding or be resetting the

17 expectation.  I think it was both.  And my

18 expectation was not only did I have to pay less

19 collateral, but that as referenced by Mr. Sandoz,

20 we'd be getting it back.

21         So I do believe -- I mean, I certainly

22 took that as communication from a party that I was

282

1  in privity with that we're saying we're going to

2  do this.  I certainly took that.

3      Q    Do you think -- so when do you think

4  there was an agreement formed between you and

5  RLI --

6      A    Well, you know I'm not a lawyer.

7      Q    -- with regard to collateral?

8      A    Right?  And so --

9      Q    Well, you've gone to law school.

10     A    I only finished my second — I didn't

11 even finish my second year.  But to be honest, I

12 mean I do believe that if I tell — if I tell one

13 of my program participants I'm going to do this

14 and I say it in email, could I come back next week

15 say it's not in this contract, program

16 participant?  I could.  But that would make me a

17 bad partner because I told them I'd do something.

18 So if I tell someone I'm going to do something I'm

19 going to do it and I expect that my business

20 partners operate the same way.

21     Q    I just want to know specifically -- I'm

22 just trying to understand specifically what you

283

1  understand to be the agreements between the

2  defendants and RLI.

3      A    I believe when Mr. Sandoz sent the

4  modified email related to collateral, that that

5  modified the collateral agreement pursuant to his

6  email, as I testified.  If I made a reference

7  based on -- on behalf of Nexus Services to a

8  client, I would tell -- I would -- I would tell

9  the truth and I would keep my word.  And if I made

10 a statement that was in -- that was not correct,

11 in other words, if I abridged the contract if I

12 changed the contract, let's say I went to a

13 program participant and I said, "You know what

14 you're supposed to pay this 420 a month, but I'm

15 not going to make you pay anymore because you've

16 been on the program so long."  They do totally

17 fine, they're not doing anything wrong.  I come

18 back next month because I decide I want money and

19 I say hey, I'm going to take those payments, that

20 would be wrong.

21         So similarly I think that it's wrong

22 for RLI to come and say we're going to take less

284

1  collateral and then for you to say that that was

2  not an agreement and it wasn't binding.  It was

3  your officer, the only person from RLI that I ever

4  dealt with that told me that this was the

5  expectation.  Why wouldn't I not have assumed that

6  that's what RLI wanted?

7      Q    Okay.  Other than the indemnity

8  agreement, the collateral agreement, and then this

9  email agreement, in your mind, are there any

10 other --

11     A    I do like you.  I really, really do.

12     Q    Are there any other agreements --

13     A    In my mind.

14     Q    -- that you -- that the defendants had

15 with RLI?

16     A    I would only say that any of the

17 continuing promises, assertions that were made I

18 would count some as agreements but specifically I

19 would point to the indemnity agreement, the

20 collateral agreement and that email because those

21 have been put in front of me today to say that

22 those are what I would identify.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

72 (285 to 288)

285

1        I don't know, maybe there's another
2  email from Dave Sandoz that said we'll do this
3  specific thing or that specific thing that I'm not
4  aware of that I would also countenance as
5  direction.  But that's, you know -- this is --
6  based on what we have in front of us I will
7  identify those things.
8        Q    Right.  Well, he had another email to
9  you asking for a million 250 in collateral but you
10  didn't take that as an agreement?
11        A    I did.  We complied.
12        Q    Well, you said --
13        A    We moved the book of business as I
14  indicated when I testified about that.  Remember,
15  the line that said if you move the business by
16  2/28 you do not have to pay the collateral.
17        Q    Well --
18        A    Hold on, Ms. Katsantonis.  Because I
19  think this is important.  I think maybe this is
20  where we're missing one another.  When you say you
21  have -- you have -- it's $500,000 in collateral.
22        Q    Uh-huh.

286

1        A    RLI told Nexus pay less and we'll give
2  it back to you.  Then RLI said pay more or remove
3  the business.  Nexus did exactly what RLI directed
4  in those instances.  We paid less and waited and
5  then when they said move the business or pay
6  1.25 million, we did that.  And that is precisely
7  why I filed a bad faith counterclaim against your
8  client because every single time your client says
9  something I do it and it's not good enough.  Never
10  is it good enough.
11        And it's a little frustrating, to be
12  honest, because I feel like we've worked really
13  hard to comply and every -- the ground shifts.
14  You know, the ground shifts and then it's not what
15  was in the original agreement.  So I thought that,
16  you know -- I thought that the collateral
17  expectation was lowered per Mr. Sandoz's email.  I
18  thought that we complied and performed.  I'm sad
19  that this business relationship is where it is.
20        Q    Well, the -- okay.  We talked about the
21  collateral agreement, the indemnity agreement and
22  the email.  And you made a general statement.  So

287

1  I just want to know are you aware of any other
2  specific agreement between any of the defendants
3  and RLI other than those three?
4        MS. PETERS:  Object to form.
5        A    Can you give me a second?
6        Q    Sure.
7        A    I need to give some time --
8        Q    Of course.
9        A    -- to think about that.
10        I mean, obviously there's an agreement
11  in the email with Mr. Chilson connect -- cc'd that
12  says -- and I won't find it now.  That says that
13  if we move -- if we take -- if we find a new
14  surety by 2/28, then we don't have to pay the
15  1.25 million collateral.  So I would countenance
16  that as an agreement.
17        I would point out again, shortly after
18  that -- so that was in December.  Your client says
19  pay us 1.25 million in collateral on a book of
20  business they never lost a dollar on or find a new
21  home for your program.  We find a new home for the
22  program, your client turns around and sends us a

288

1  demand for $10 million in collateral.  Hence, the
2  essence of my bad faith claim.
3        I did exactly what you asked me to do.
4  You asked me to move the business to another
5  surety.  You gave me time to do it.  I did it.  I
6  moved the business to another surety.  Your email,
7  your direction said do that or pay the
8  1.25 million.
9        And then specifically in the sentence
10  after said if you do that, you do not have to pay
11  the collateral.  I did exactly what RLI asked me
12  to do, which is consistent through the entire life
13  of this contract.  And it wasn't good enough.
14  Because after I moved the business, thereby not
15  having to pay the collateral, you send me a letter
16  demanding $10 million in collateral after I did
17  exactly what RLI did and, by the way, without any
18  losses to RLI in the interim.
19        So you can kind of understand my
20  concern.  I feel like the ground shifts all the
21  time and I feel like we've done what we're
22  supposed to do.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

73 (289 to 292)

289

1    Q    Okay.  You understood in Mr. Sandoz's
2  December 7th, 2016 email, he advised that -- that
3  they were -- that they understood that the term of
4  the bond would be much shorter in length than it
5  was; is that correct?
6        MS. PETERS: Object to form.
7    A  I do see that in the email.
8    Q    Right.  And in addition, Mr. Sandoz
9  advises to date only 19 bonds had been exonerated;
10 is that correct?
11       MS. PETERS: Object to form.
12   A  That's what it says in the email, yeah.
13   Q    Right.  And did you also understand
14 that as of December 7th, 2016, RLI had started
15 receiving bond breach notice?
16       MS. PETERS: Object to form.
17   A  Yeah, and as I said, that's not
18 unusual.  What I am confused about, though,
19 Vivian, is that in the motion for preliminary
20 injunction, which you won, our assessment, who
21 works for your client, testified that the bond
22 breach manual said that the average length of the

290

1  bond was 18 months and he was complaining that it
2  was longer than that.  This email says six months.
3  So I would say that at least some people in RLI
4  obviously knew it was longer.  And the reality is
5  that before Trump, the length of time was, you
6  know, 12 to 18 months pursuant -- and you can find
7  that in the bond management handbook.  That's not
8  me.
9    Q    Mr. Sussman wasn't talking about his --
10   A  That has --
11       MS. PETERS: Object to form.
12   A  I'm sorry.  That has changed as this
13 administration has incarcerated a lot more people
14 and so those time periods or those cases have
15 gotten a lot longer.  But we couldn't control
16 that.
17   Q    Okay.  Let's -- let's --
18   A  You do see the part where it says it is
19 not necessary to provide the collateral if we
20 get -- by 2/28/17 if the program is replaced by
21 that date it is not necessary to provide the
22 collateral.  We did that.  And then the next month

291

1  you sent me a demand letter for $10 million.
2    Q    Let's talk about what was happening.
3  Well, that's inaccurate, right?  The first demand
4  for collateral of $10 million was in March, right?
5    A  Isn't that what I said?  This is --
6    Q    December.
7    A  -- it says March.  Well, okay.  Listen,
8  because I think this is really important.  I want
9  to make sure you're understanding.  I'm not trying
10 to develop a -- look at this, it says if -- this
11 is the date, right?  If you get the program moved
12 by 2/28/17 and it's replaced then you will not
13 have to provide the collateral.
14   Q    Right.
15   A  So that's what it says.  Now, when I
16 say --
17   Q    Is this to replace --
18   A  I'm sorry, I just want to make sure I
19 finish --
20   Q    All right.
21   A  -- because otherwise I'll forget what
22 I'm saying.

292

1        So when I said that it was the next
2  month what I said was that in December,
3  December 7th, you, your client, asked me for
4  $1.25 million to continue writing the program past
5  March 1st or that I find --
6    Q    It's not --
7    A  It absolutely is in here.  I mean, it's
8  in plain language in here as a matter of fact.
9  And it says that if I find a new home for the
10 program, it's right here, we know that it takes
11 time to replace the program, we assume that's the
12 more preferable route so the goal we have set is
13 to have the program moved to a better fit for you
14 by 2/28/17 and if the program is replaced by that
15 date, it is not necessary to provide the
16 collateral.
17       That's what I did and then the very
18 next month, maybe even several days later, I get a
19 demand letter for $10 million.  That's bad faith.
20 You can't tell me on February -- on December 7th
21 that on February 28th if I move this program
22 you're not going to charge me this $1.25 million

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

293

1 collateral and then seven days letter send me a
2 demand for 10 million.  It doesn't make sense.
3     Q   Mr. Donovan, isn't it true that what
4 was being contemplated through this email was a
5 replacement of the RLI bonds by another surety?
6     A   Oh, no —
7         MS. PETERS:  Object.
8     A   — that's not on here.  Where do you
9 see that?
10    Q   Isn't that what was being discussed?
11    A   No, I don't think that's true at all.
12    Q   Weren't you working with Mr. Sandoz to
13 think about getting another surety to take over
14 all of the RLI bonds?
15        MS. PETERS:  At what point,
16 Ms. Katsantonis?
17    A   Hold on.  No, that was — with all due
18 respect, that's something you and I discussed and
19 that's something that we said we would do as we
20 were talking about the confidentiality agreement.
21 Do you remember?
22    Q   And it's your testimony that

294

1 Mr. Sandoz --
2     A   Ma'am, you're —
3     Q   Sure, go ahead.
4     A   You've interrupted me several times.
5     Q   Go ahead.
6     A   And I understand that's part of our
7 term talking to each other.  But this is really
8 important.  This is my deposition.  These are
9 my — these are the facts.
10    Q   Right.
11    A   It's my opportunity to tell the facts.
12 I'm answering —
13    Q   Your version of the facts.
14    A   — your question.  No, the facts.
15        MS. PETERS:  Object to form.
16    Q   Okay.
17        MS. PETERS:  You're arguing with the
18 witness.
19    A   The facts.  I mean, you know — yeah,
20 you're interrupting me.  You're arguing with me.
21    Q   Okay.
22    A   It's insane.  This document is very,

295

1 very clear.  And what it says is that we're not
2 going to continue -- I mean, you can read it,
3 right?  So they're not going to continue to post
4 bonds after February 28th.  And what does it say?
5 I mean, again, let's just read it.
6     Q   I'm listening.
7     A   I'm sorry, I'm so late in summarizing
8 the conference call we had -- we three had a bit
9 ago.  Not sure if Tracy Tucker of Evergreen
10 National has reached out to you yet but I hope he
11 has and you are on your way to establishing a
12 long-term relationship with this company.  We will
13 do all that we can to help you in the transition
14 so it works well for everyone.  Initially we
15 agreed to underwrite the program.  We thought the
16 bond terms would be much shorter than we currently
17 realized.  Preferred majority of our business and
18 transaction surety to be short tail obligations.
19 Since we had no prior knowledge of this line of
20 surety business, we initially started the program
21 asking for $500,000 in collateral, later revised
22 the requirement and in a subsequent meeting and

296

1 interested in coming to the point where we wanted
2 to assess the program as a whole to determine our
3 future involvement.
4     Q   So my question --
5     A   So it goes RLI's current exposure is
6 approximately $25 million to the collateral
7 requirement and must be met as 1.2 million.
8 Collateral can be in the form of cash or in a
9 revocable letter of credit.  We know that it takes
10 time to replace the program.  We assume that is
11 the more preferable route.  So goal we have set is
12 to have the program moved to a better fit for you
13 by 2/28/17 and if the program is replaced by that
14 date it is not necessary to provide the
15 collateral.  We will just hold back the
16 contingency cancellation money that you will earn
17 if you qualify for the contingency.
18        Again, Ms. Katsantonis, how can you
19 state that this email suggests that we're moving
20 all the business when the very next sentence after
21 that says that you're going to continue to hold
22 the contingency.  It clearly didn't contemplate

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

297

1 moving the business. It clearly contemplated that
2 on February 28th we'd find another surety to issue
3 bonds and if we did we would not have to pay
4 1.25 million in collateral.
5     I did that. I did exactly what your
6 client asked. Days later you send me a request —
7 or a demand, not a request, for $10 million in
8 collateral and that precipitates this suit which
9 has cost both our companies millions and millions
10 of dollars and it's absolutely ridiculous. On its
11 face this document proves what I'm saying is true.
12     Q    Doesn't the document say that you are
13 going to assign people to exonerate the bonds?
14         MS. PETERS: Object to form.
15     Q    And they — and —
16         MS. PETERS: Will you define the term
17 "exonerate"?
18         MR. KOWALCZUK: Yes.
19     A    Where does it say that? I want to
20 understand that you're talking about.
21     Q    The last sentences.
22         MS. PETERS: Can you define your --

298

1         MS. KATSANTONIS: I'm not being deposed
2 right now.
3     A    You continue to put some folks on the
4 task of getting exonerations on our bonds. Yeah,
5 we've done that. We do that.
6     Q    Okay. And is it your -- it's your
7 testimony that as of December 7th, there had not
8 been discussions about having another surety
9 replace the RLI bonds in existence?
10         MS. PETERS: Object to form.
11     Q    Transferring them over to another
12 surety?
13         MS. PETERS: Object to form.
14     A    I don't know.
15     Q    Is that your testimony?
16     A    I don't know that —
17         MS. PETERS: Object to form.
18     A    I don't know that it was discussed or
19 that it wasn't discussed.
20     Q    Okay.
21     A    But what I do know —
22     Q    Okay.

299

1     A    — is that this document specifically
2 says that if we find — if we move the program to
3 a better fit by 2/28 that we don't have to provide
4 the collateral and that you'll just hold the
5 contingency cancellation money. Now, if you were
6 going — if this was predicated on the idea that I
7 was going to transfer all the business why would
8 you need to hold anything? Clearly, that's not
9 what --
10     Q    Until the transfer is complete.
11     A    — the email says. That's not what the
12 email says. And the transfer --
13     Q    That's your --
14     A    — would be complete —
15     A    This is your -- your understanding --
16         MS. PETERS: Object to the form.
17     Q    -- of an email written by Mr. Sandoz --
18         MS. PETERS: Objection.
19     Q    -- correct?
20         MS. PETERS: Object to form.
21     A    To your point —
22         MS. PETERS: Object to form.

300

1     A    Your employee.
2     Q    Okay.
3     A    This is your company. Your client
4 wrote this email.
5     Q    All right. We're going to keep going,
6 Mr. Donovan, and we'll see what happened, right?
7     So after December 7th, weren't there
8 additional bond breaches --
9         MS. PETERS: Object to form.
10     Q    -- of the RLI issued bonds?
11     A    Well, probably. As I indicated --
12     Q    Right.
13     A    -- immigration bonds sometimes breach.
14     Q    And weren't -- didn't you receive
15 notices from RLI that they were being threatened
16 to Treasury as a result of bond breaches in
17 December?
18     A    We may have received -- we received a
19 lot of communication from RLI misunderstanding
20 that process. So that may have been. There was
21 confusion about what a referral to Treasury meant,
22 how long you had. You know, I think some people

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

301

1  in RLI didn't even understand what a claim was.
2      Q    Let me show --
3      A    Wait, let me finish.  Because it's very
4  specific.  A claim is a bond that's breached and
5  that isn't just specific in the contract which I
6  think it is clear, it's also specific in the CFR.
7  So when a bond breach is under appeal it is not a
8  final invoice and therefore it's not a claim.
9      Q    We'll talk about that in a moment.  But
10 let me ask you, was -- were you not being informed
11 by RLI that the receiving notice from DHS before
12 they initiate legal action.
13         Do you recall that?
14         MS. PETERS:  Object to form.
15     A    When was that?  Do you have a date?
16     Q    December 19th.
17         MS. PETERS:  Object to form.
18     A    So it was 12 days after they told me if
19 I get a new surety that I don't have to pay the
20 collateral.  I'm assuming.  I don't know.  I
21 haven't seen that email but I'll be happy to look
22 at it and confirm it.

302

1      Q    Sure.  Here.  We can mark several,
2  there were several.  Sorry.  This is one dated
3  December 19th for Guillermo Mendoza.  I'm not
4  going to read the whole name.
5      A    Did you want her to --
6      Q    And --
7      A    -- mark that one, Ms. Katsantonis?
8         MS. PETERS:  What exhibit number is
9  that?
10     Q    Pardon?
11     A    Did you want her to tag that one?
12     Q    Yeah.
13     A    I can give it to her.  I just --
14     Q    Yes.
15     A    I just didn't want to give her the
16 direction.
17         MS. PETERS:  You guys have to stop.
18         (Recess taken.)
19         (Donovan Exhibit 15 marked for
20 identification and attached to the transcript.)
21         THE VIDEOGRAPHER:  We are back on the
22 record at 18:23.

303

1  BY MS. KATSANTONIS:
2      Q    Okay.  Before we took a break, we were
3  talking about the December 7th email from
4  Mr. Sandoz, correct?
5      A    Yes, ma'am.
6      Q    And you testified -- I asked whether
7  you recall whether prior to December 7th there
8  were discussions between you and Mr. Sandoz or
9  with RLI regarding moving RLI's books -- book of
10 business, basically transferring RLI's bonds to
11 another surety or insurance company.
12         MS. PETERS:  Object.
13     Q    Do you recall that question?
14     A    I do recall —
15         MS. PETERS:  Object to form.
16     A    I do recall that question.
17     Q    Right.  And I believe you said you
18 can't recall.
19     A    I don't.
20         MS. PETERS:  Object to form.
21     A    Yeah, I don't recall.  I think what I
22 said to you was that that wasn't what was being

304

1  discussed in this email and then I read you the
2  line after that proved that.  But I don't know
3  if -- I mean we may have had conversations about
4  that, I don't know.
5      Q    Right.  And I'm not going to argue with
6  you about that proved that.  At the end of
7  that email certainly there's discussions about
8  the -- RLI's desire to have their bonds canceled?
9         MS. PETERS:  Object to form.
10     A    Well, I don't -- I don't -- I don't see
11 that.  I mean, cancellation of bonds happens every
12 time.  I see getting exonerations, which means
13 that I pay breaches, which we've done.  I either,
14 you know, exonerate by paying a breach before you
15 pay it or I indemnify it by paying a breach after
16 you pay it.
17     Q    Do you understand exoneration to mean
18 that you accept the obligations or stand in front
19 of the obligations of another?
20         MS. PETERS:  Object to form.
21     A    Sure.  Obligations meaning claims that
22 are made against bonds.  When bonds breach they're

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

77 (305 to 308)

305

1 claims. I can exonerate them by paying it before
2 RLI does or I can indemnify RLI by paying it after
3 RLI does.
4     Q    Or you can deliver the alien which is
5 the obligation of the bond, correct?
6     A    The obligation --
7         MS. PETERS: Object to form.
8     A    -- of the obligor. I am not the
9 obligor.
10    Q    But you --
11    A    I can and do go -- not me. Well, I
12 have. I can and do go to clients' houses and say
13 hey, we're going to go today because you have this
14 hearing and it's in your best interest. You've
15 got a good shot of coming home if you go and
16 explain what's going on. But I don't drive a van
17 up to their house and roll them in the back and
18 put handcuffs on them and take them in.
19    Q    But --
20    A    When you talk about delivery, I do
21 encourage people to go and when they don't go, we
22 pay. We either exonerate RLI by paying a breach,

306

1 a claim, a breach, when we get notice of it or
2 I'll indemnify RLI by paying it after.
3     Q    Right. And when you approached RLI to
4 issue bonds, you sold them on this program you had
5 which is based on monitoring participants and
6 ensuring that they show up for their court
7 appearances, right?
8         MS. PETERS: Object to form.
9     A    I sold them -- I explained the program.
10 I mean, Mr. Sandoz was excited about the program
11 and I think you can see that in the email. So it
12 wasn't like I was doing a hard sell and you can
13 read the emails and see that Mr. Sandoz is
14 interested. As you pointed out, there was some
15 time between when we initially started talking and
16 when we started doing the business anyway.
17    Q    Right.
18    A    So I don't think that I was creating
19 some sort of hard sell, I was explaining how the
20 program worked.
21    Q    Right. But the -- what you brought to
22 the table, Nexus, what you were offering or

307

1 advising RLI about is hey, you know, we have a
2 program in place to ensure that these program
3 participants meet their obligations under the bond
4 which is to show up at court appearances, right?
5         MS. PETERS: Object to form.
6     A    I told RLI that we have a program in
7 place that helps ensure immigrants show up for
8 their court appearances and if they don't that we
9 will exonerate by paying a breach when it is a
10 final claim or indemnify by paying after you pay
11 it.
12        New, let's talk about that, because I
13 did what I agreed to do and continue to. RLI said
14 several things. Even in the course of this email
15 that we were talking about, and then did the
16 opposite.
17    Q    Okay. We're going to talk about that
18 in a minute.
19        So you agree that you advised RLI that,
20 you know, you have GPS tracking of these people,
21 so if an issue arises you know where the bond
22 participant will be, right?

308

1         MS. PETERS: Object to form.
2     A    I did inform Dave Sandoz that we do GPS
3 monitoring. He also knew that a significant
4 number of our people weren't monitored, we were
5 very clear about that, that we only do monitoring
6 for a short period of time. We were very clear
7 about that. Again --
8     Q    You would --
9     A    I don't think that it's -- it's
10 certainly not -- it's certainly not correct to say
11 that Nexus misrepresented RLI. I think it is
12 absolutely correct to say that I feel like RLI
13 misrepresented things to Nexus. For example, when
14 I signed this indemnity agreement and the
15 collateral agreement I signed an agreement that I
16 would pay certain monies. I didn't sign an
17 agreement that I would pay the total amount of the
18 bonds. Why would I do that? I would have just
19 bonded the people with cash.
20    Q    Well, you --
21    A    I agreed to pay exonerations or
22 indemnify RLI. And I've done that.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

78 (309 to 312)

309

1     Q    And what was --
2     A    I've done that every step of the way
3  because even your expert says that exonerate means
4  take them in, deliver them.  Even your expert
5  report says that.  Your expert report doesn't
6  agree with the premise of your case.  It says that
7  exonerate is to take the person in.  And even if
8  you countenanced our duty to pay collateral at the
9  notice state, it's still nowhere near the
10 $10 million you demanded.  In fact, it's probably
11 not even a million dollars.
12    Q    Did you pay the $10 million?
13         MS. PETERS:  Object to form.
14    A    What?
15    Q    Have you paid the $10 million?
16    A    I just told you it was a completely
17 erroneous and inappropriate demand.
18    Q    You've never --
19    A    Why would I have paid it?
20    Q    Right.
21    A    I did everything RLI asked me to do
22 until I literally went somewhere else and brought

310

1  the program and didn't ask for any more bonds,
2  brought the program to another surety as requested
3  by RLI.
4     Q    But RLI facilitated --
5     A    RLI -- I'm sorry --
6     Q    -- you going to another surety --
7     A    -- I'm talking.
8     Q    -- didn't they?
9     A    Please.
10    Q    Okay.
11    A    So when we moved to using another
12 surety, again, I did exactly what RLI asked me to
13 do.
14    Q    What surety did you move to?
15    A    Evergreen.  It's listed -- it's
16 referenced in here.
17    Q    Right.  Didn't RLI facilitate those
18 discussions?
19    A    Dave Sandoz facilitated those
20 discussions.
21    Q    And Greg Chilson, right?  Wasn't he the
22 first person to reach out to Evergreen on behalf

311

1  of RLI --
2     A    I wouldn't know that.
3     Q    I mean of Nexus?
4     A    I wouldn't know that.
5     Q    Okay.
6     A    I don't remember ever speaking to Greg
7  Chilson so I certainly don't know any
8  conversations he's had on my behalf.
9     Q    Okay.  And isn't it true that by
10 December 7th you knew Mr. Sandoz was leaving RLI,
11 correct?
12    A    I don't remember when I found out but I
13 think that's right, yeah.
14    Q    Okay.  And isn't it true prior to
15 December 7th, you were having discussions with
16 Mr. Sandoz about a new surety venture?
17    A    That is true.
18    Q    Right?
19    A    Well, I wouldn't -- I would say a new
20 surety partner, perhaps.  You know, I --
21    Q    Who would be the partner?  Who was the
22 new partner you were having discussions with

312

1  Mr. Sandoz about?
2     A    Well, Mr. Sandoz would be the partner.
3     Q    He'd be -- right.  So you were having
4  discussions before Mr. Sandoz left RLI that he
5  would form a new company to service Nexus?
6     A    Well, my understanding was that RLI
7  didn't want to be in the business anymore.  So I
8  mean if you're -- I don't know if that's a
9  negative thing.  I know that we had conversations
10 which we just talked about, and about moving the
11 business, this conversation and --
12    Q    Right.
13    A    -- we -- I know that we had
14 conversations and had conversations prior to this
15 but I don't recollect them specifically.
16    Q    Right.  And didn't that -- didn't those
17 conversations include that the Nexus -- excuse me.
18 That the RLI-issued bonds would be moved to this
19 new operation?
20         MS. PETERS:  Object to form.
21    A    No, I don't think so.  We may have
22 discussed it, but it was never a requirement.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

313

1  Certainly wasn't mentioned in this email that says
2  I don't have to pay the 1.2.
3      Q    Sure.
4      A    That I don't have to pay the $1.25
5  million in collateral demanded if I find a new
6  home for the program which I did.  And then I got
7  a $10 million demand.
8      Q    Well, we don't agree with your reading
9  of that email.  So I understand --
10     A    Can you tell me what --
11     Q    I'm not going to get into an argument
12 with you about it.  It's your deposition.
13     A    Well, I'm sorry, with all -- with all
14 due respect, I can't -- I literally do not
15 understand how could you read it different.  If
16 you -- would you please tell me what this email
17 says if it says something different because I -- I
18 mean I looked at --
19     Q    Do you believe -- do you believe
20 that -- your reading is that RLI was going to hang
21 on to its 25 million in exposure?
22     A    Well, yeah, because it says right

314

1  here --
2      Q    And that it would hang on to its 25
3  million --
4      A    Hold on.  You asked me a question and I
5  start answering it.  It says right here and again
6  we -- to have the program moved to a better fit
7  for you by 2/28/17 and if the program is replaced
8  by that date it is not necessary to provide the
9  collateral.  We will just hold back the
10 contingency cancellation money that you earn if
11 you qualify for contingency.
12        Now, that's -- why would you do that if
13 you were requiring all the business to be moved?
14 That doesn't make any sense.  There would be no
15 reason for a contingency.  The reason you were
16 holding the contingency was because the liability
17 remained.  And if you wanted me to move, if
18 Mr. Chilson or Mr. Sandoz wanted that business to
19 be moved as a condition to this, then shouldn't it
20 have been in this email?  Again, I have complied
21 with everything your client has asked me to.
22     Q    Well, we're going to agree to disagree,

315

1  Mr. Donovan.
2      A    We can do that.
3      Q    And obviously I don't believe you're
4  reading the full email.
5      A    Can you tell me where it says something
6  different?
7      Q    I can show you several places --
8      A    Where?
9      Q    -- but that's up to you to create your
10 different arguments once I show them to you.  But
11 let me get back to asking you --
12     A    Are you going to tell me where in this
13 email it says something different?  Where does it
14 say in this email that I'm supposed to move this
15 book of business?  You show me that.
16     Q    Well, the word "replace" is used.
17     A    Replacing RLI?
18     Q    Right.  Its 25 million exposure, right?
19     A    Okay.  So RLI's current exposure is
20 approximately 25 million.  So the collateral
21 permit that must be --
22     Q    Right.  So there create -- let me just

316

1  ask you this:  Isn't the 1 million 250 based on
2  their 25 million exposure?
3          MS. PETERS:  Object to form.
4      A    Certainly seems to be what this email
5  is suggesting.
6      Q    Right.  And so your contention is that
7  the 25 million exposure would continue to remain
8  after February and yet they wouldn't need
9  collateral?
10     A    And that we would --
11         MS. PETERS:  Object to form.
12     A    And that we would continue to manage
13 the cancellation of their bonds?  It's in here.
14 Vivian, it's all in here.
15     Q    So the 25 million exposure wouldn't go
16 away but somehow they would not need collateral?
17         MS. PETERS:  Object to form.
18     A    Did your client receive premium for
19 that?  Do you understand that you got paid to
20 write those bonds?  Do you understand --
21     Q    Can you understand that the premium --
22     A    I'm sorry, I'm not done.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

317

1    Q    -- is earned --
2    **A    Vivian.**
3    Q    -- the day --
4    **A    Vivian.**
5    Q    -- you signed the indemnity --
6    **A    Vivian.**
7    Q    -- agreement?
8    **A    Vivian, please.**
9        MR. KOWALCZUK:  You both have to slow
10 down.
11       MS. PETERS:  Yeah, you can't talk over
12 each other, please.
13   **A    You can talk for seven hours and I'll**
14 **sit here and that will be the best deposition**
15 **anyone ever had.  But what I'm tying to do is**
16 **answer your question.**
17   Q    Okay.
18   **A    What I'm saying to you is that there's**
19 **absolutely nothing in this email that compelled me**
20 **to move the business.  You can't point to it**
21 **because it doesn't exist.  And in fact they still**
22 **wanted me to do it, to manage the cancellation**

318

1  **exoneration.  Exoneration which means paying**
2  **breaches —**
3    Q    Mr. --
4    **A    — right?**
5    Q    Mr. Donovan --
6    **A    So this is all contemplated in this**
7  **email.**
8    Q    You can -- you can -- you can -- I
9  mean, obviously it's your prerogative to stick
10 with your interpretation of the email and RLI
11 clearly has another one.  But clearly in the
12 middle of the email it says, "It looks like the
13 length of exposure runs more than one year as our
14 records only show 19 bonds exonerated to date.
15 Due to late average length of exposure runs more
16 than one year."  Right?  "Due to the average --
17 "length of the average bond remains in force, we
18 will need more collateral than the 500,000
19 initially anticipated to remain on the program
20 through the first few months of 2017."
21       Do you see that?
22   **A    Uh-huh.**

319

1    Q    Okay.  So they're asking for collateral
2  already anticipating that they're not going to
3  continue past 2000 -- the first few months of
4  2017, right?
5    **A    Okay.  Keep reading.**
6    Q    And then the collateral amount is based
7  on an exposure, 25 million, right?
8    **A    That's what it says.**
9    Q    Right.  So why would -- in your
10 reading, why would RLI not need collateral if it
11 maintained the 25 million in exposure?
12   **A    Well, let's read.  The collateral can**
13 **be in the form — because we need to read the**
14 **whole thing.**
15   Q    But --
16   **A    No, hold, please.**
17   Q    Uh-huh.
18   **A    Please.  The collateral can be in the**
19 **form of cash or an irrevocable letter of credit.**
20 **I'm just reading it all because I don't want to**
21 **be — go IOC route and continue instructions on**
22 **the method of collateral.  We know that it takes**

320

1  **time to replace the program and we assume that's**
2  **the more preferable route, the more preferable**
3  **route to replace, the program than pay the**
4  **collateral.**
5    Q    Uh-huh.
6    **A    So the goal we have set is to have the**
7  **program moved to better fit for you by 2/28/17 and**
8  **if the program is replaced by that date it is not**
9  **necessary to provide the collateral.**
10       **I will say this --**
11   Q    Right.
12   **A    -- I won't argue with you about this**
13 **email anymore but I'm quite confident that a jury**
14 **would understand that that means when you say that**
15 **I don't have to pay the collateral if I move the**
16 **program by 2/28, I moved the program --**
17   Q    But don't you think they --
18   **A    -- by 2/28.**
19   Q    Don't you think they mean that you
20 remove and move their exposure --
21   **A    No.  I think that --**
22   Q    -- by replacing them?

321

1    Why would --
2    **A    First of all —**
3    Q    -- they not need collateral if they
4    still maintain the exposure?
5    **A    Because in this —**
6    MS. PETERS: Object to form.
7    **A    In the subsequent sentence that you**
8    **don't want to acknowledge it says that it's going**
9    **to continue to hold collateral.  The only reason**
10   **to hold collateral would be because you were**
11   **continuing to have exposure.  Now, look --**
12   Q    And doesn't this --
13   **A    — we can —**
14   Q    -- email also talk about they're going
15   to continue to review their exposure over time?
16   **A    Exactly my point.**
17   Q    Okay.
18   **A    Thank you for making it.  Why would**
19   **they continue to review their exposure over time**
20   **if there was no exposure left?  Thank you.**
21   Q    As of December 7th.  Well, they're
22   saying here they're expecting that you're going to

322

1    have their program replaced by --
2    **A    You know what, Vivian —**
3    Q    -- February?
4    **A    You know what?  You're right.  We**
5    **should read the rest of it.  "We'd also like to do**
6    **anything we can to help manage the cancellation of**
7    **our bonds.  You mentioned you would put some folks**
8    **on the task of getting exonerations on our bonds**
9    **and we'd like to know the progress."**
10   **Again, why would you want to work on**
11   **cancellation of the bonds if you're removing the**
12   **bonds?**
13   Q    We're on December 7th --
14   **A    The whole point -- right.**
15   Q    -- and you have two and a half more
16   months.
17   **A    That's right.**
18   Q    Right?
19   **A    And we only have to pay the collateral**
20   **if we don't find a new surety.  That's what it**
21   **says.**
22   Q    All right.  To take over our bonds.

323

1    **A    It doesn't say that.**
2    Q    Okay.
3    **A    It actually —**
4    Q    In December --
5    **A    — doesn't say that.**
6    Q    In December weren't you having
7    discussions with Mr. Sandoz about another surety
8    operation to take over RLI bonds?
9    **A    It would have —**
10   MS. PETERS: Object to form.
11   **A    It would have been — it would be sort**
12   **of my preference to have those consolidated so I**
13   **might have, as a natural course of conversation,**
14   **said hey, if we have a new surety partner this**
15   **would be an idea.**
16   Q    Right.  And you talked about --
17   **A    It certainly wasn't —**
18   MS. PETERS: Object to form.
19   **A    It certainly wasn't something I agreed**
20   **to do.**
21   Q    And in December weren't you having
22   discussions with Mr. Sandoz to move the RLI bonds

324

1    to this other surety, this new operation and also
2    move those -- a portion of the surety premiums?
3    MS. PETERS: Object to form.
4    **A    I remember having conversations — we**
5    **had conversations about that.  So I do remember**
6    **having conversations about that.  However, I never**
7    **committed to doing that.  We never got there.  And**
8    **it's not mentioned in this email —**
9    Q    Okay.  But it's --
10   **A    — at all.**
11   Q    But you agree that that is -- that was
12   being discussed in December of 2016?
13   MS. PETERS: Object to form.
14   **A    I — I don't know.  Do you have a name?**
15   **Are you reading from — you're reading from**
16   **something I am trying to recall from five years**
17   **ago.  If you want to put an email in front of me**
18   **I'll confirm it, but I'm not going to step out and**
19   **say — I'm not going to agree with you.  I have no**
20   **idea what you're reading.  The last time you put**
21   **an email in front of me it wasn't even from me.**
22   **Not the last time but one of the times earlier.**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

325

1  **So I really want to make sure — I would like to**
2  **see it before I comment on it any further.**
3      Q   In December of 2019, wasn't -- sorry,
4  December '16.  In December of '16,
5  December 19th -- we were marking an exhibit prior
6  to our break -- didn't RLI send to you past due
7  notices it was receiving for bond breaches?
8      **A   It may have been.  I think this was it,**
9  **yeah, this is 15.  Thank you.**
10     Q   And do you recall that there were -- it
11 was at that time -- may I see what I handed you?
12     **A   Here you go.  Did you want that one**
13 **marked as well?**
14     Q   I'm looking to make sure I get all
15 three.
16     **A   Gotcha.**
17         MS. KATSANTONIS:  Okay.  So let's mark.
18 You have Exhibit 15, 16, and 17.
19         (Donovan Exhibits 16 and 17 marked for
20 identification and attached to the transcript.)
21         MS. PETERS:  Vivian, do you have a copy
22 for me?

326

1          MS. KATSANTONIS:  I do.  I'm not sure
2  which ones you have.  Mary Donne, do you have the
3  3?
4          MS. PETERS:  I just have two.  I've got
5  31, last three digits 292 and 290.  So I'm missing
6  291.
7          MS. KATSANTONIS:  Thank you.
8          MS. PETERS:  Thank you.
9      Q   All right.  And in -- on or about
10 December 19th, 2016, did you receive notices of
11 past due invoices on breached bonds from RLI?
12     **A   It looks like I received.  These are**
13 **emails from Marco LiMandri.**
14     Q   Right.
15     **A   Yeah.**
16     Q   And so you were advised in December of
17 2016 that DHS was asserting past due notices and
18 that payment needed to be made as soon as possible
19 to avoid DHS legal action, right?
20     **A   Right.  I'm sure we did pay these if**
21 **they were in fact due.**
22     Q   All right.  And you can see the -- and

327

1  I'm not going to read into the record, but you see
2  who the three names are on these subject lines?
3  You can do --
4      **A   I do.**
5      Q   Right?  OR, DM, and -- yeah, GR.  I
6  don't remember.
7      **A   I'm not going to independently remember**
8  **the initials you said —**
9      Q   All right.  But --
10     **A   -- so why don't you just come back to**
11 **them.**
12     Q   They'll be the same three invoices.
13     **A   If you have a question, yeah, let me**
14 **know because otherwise I'll get confused.**
15     Q   Okay.
16         MS. KATSANTONIS:  And go ahead and mark
17 this exhibit.
18         (Donovan Exhibit 18 marked for identifi
19 cation and attached to the transcript.)
20     Q   And I'm going to turn to the second
21 page of this exhibit.  You're on the -- if you
22 look at the bottom of the front -- well, if you

328

1  look at the front page you're copied on this
2  chain.
3      **A   Okay.**
4      Q   And you can look -- you're copied
5  throughout.
6      **A   I see that.**
7      Q   All right.  So this is an email chain
8  of RLI requesting payment for these invoices.  And
9  I'm looking at the middle of the second page, the
10 page being 225585.  Mr. Sandoz writes to Nexus
11 advising that, you know, these past due invoices
12 need to be remedied.  And it says, "We can't have
13 a relationship with Treasury jeopardized so this
14 has to get resolved very quickly."
15         Do you see that?
16         MS. PETERS:  Object to form.
17     **A   I do see that, yeah.**
18     Q   Okay.  So did you understand that RLI
19 was concerned that the failure to pay these bond
20 invoices was jeopardizing their relationship with
21 the government and Treasury?
22     **A   I think RLI was much, much, much more**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

329

1 concerned about money than a person's life in this
2 case. I think you can be concerned about a
3 person's life and still be okay financially. And
4 I think we were because we were able to resolve
5 the matter, obviously. And this person, this
6 client, thank God, a co-obligor didn't roll up and
7 deliver her, right? Because it doesn't look like
8 this was her fault. I haven't spent a lot of time
9 in this file but it appears --
10     Q    What do you mean it doesn't look like
11 it wasn't [sic] her fault?
12         MS. PETERS: If you'd give him a moment
13 to read through the entire document.
14     A    So it looks like -- yeah, it looks like
15 she appeared, that she appeared in the wrong
16 docket, she was in the wrong docket which
17 typically happens when a person is bonded in
18 Dallas and Houston. It can happen. And what the
19 indication is is that, you know, we're trying to
20 get her in compliance. That's what we normally
21 do. I don't know -- I don't have this client's
22 file so I can't testify as to what happened unless

330

1 I look at the file in its entirety.
2         But I can say that this is a relatively
3 normal situation where we would put the life of a
4 person before money and say, look, we're going to
5 take some time to help get this person's situation
6 straight before we have to pay and abridge this
7 person's right, right? Which is why we've always
8 said to your client we'd very much like to walk to
9 the end of this time period, not because we can't
10 pay or don't want to pay before, but because
11 during this time period these types of things can
12 be rescinded and this person could be okay, and
13 that's important.
14     Q    So didn't you advise RLI that you were
15 going to pay?
16         MS. PETERS: Object to form.
17     A    I'm sorry?
18     Q    Didn't you advise RLI that you were
19 going to pay that bond breach?
20     A    You're talking about this specific
21 breach?
22     Q    Sure.

331

1     A    So what I'm talking about is generally.
2 As I told you --
3     Q    Okay.
4     A    -- I have to look at the file to be
5 able to speak specifically about this client.
6     Q    Right.
7     A    All I can speak to is the document you
8 have in front of me because I don't know this
9 client individually.
10     Q    Okay. So you don't recall that you
11 advised RLI you were going to pay that?
12         MS. PETERS: Object to form.
13     A    Is it in here?
14     Q    Copy of a check.
15         MS. PETERS: Why don't you take a
16 moment to read the document. It's a multipage
17 document.
18     Q    There's nothing further that --
19         MS. PETERS: There's -- I'm --
20     A    Yeah, let me read it. So that's a good
21 point. I should. Anytime I get a multipage
22 document, I should read it so...

332

1     Q    While you're looking at that I'm going
2 to move on to the next exhibit.
3     A    I'm going to read this first --
4     Q    You're welcome to.
5     A    -- and answer any questions on it. I
6 want to make sure that I get a chance to read it
7 before we move on.
8     Q    I think the next exhibit goes to the
9 issue.
10         MS. PETERS: Objection.
11     A    But I want to read this one first --
12     Q    Sure.
13     A    -- because you put it in my hands. And
14 then I'll read that one.
15     Q    All right. I'm not going to ask you
16 any further questions about the document so I
17 think we can move on.
18     A    But I do believe I answered questions
19 about this document and I may want to qualify them
20 because I hadn't read it yet so I would like to
21 finish reading it.
22     Q    You can do that on redirect with

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

333

1 counsel.

2    **A   You put this in my hand and --**

3    Q   I know, but I don't have --

4    **A   -- I would like to do that.**

5    Q   I don't have to -- we need to move on

6 because of the time.

7    **A   I'm going to finish reading it. It's**

8 **two pages and I'm going to read it.**

9    MS. KATSANTONIS: Can you mark this,

10 Court Reporter, as the next exhibit?

11    MS. PETERS: What's the one that's in

12 his hand? Mr. Donovan, is that 18 that's in your

13 hand?

14    THE WITNESS: It is 18, yes.

15    (Donovan Exhibit 19 marked for

16 identification and attached to the transcript.)

17    MS. PETERS: Thank you.

18    Q   Was there any qualification you want to

19 make after having read 18?

20    MS. PETERS: He didn't say he finished.

21    **A   Yeah, I have finished. I still want to**

22 **look at the file. Obviously I do remember. As I**

334

1 **read, I do remember the situation where this was a**

2 **client who had actually been taken in on a I-348**

3 **to a different field office, so...**

4    Q   Right. And there's still an amount

5 owed for the bond breach, right? It was mitigated

6 but there's still 12,500 owed on that bond breach.

7    **A   Right. That's what it says, yeah.**

8    Q   Right. So there was still an amount

9 that was due to DHS pursuant to the terms of the

10 bond.

11    **A   Are you suggesting -- did we not pay**

12 **that? Are you suggesting that that's the balance**

13 **that we owe? I'll write you a check right now.**

14    Q   Okay.

15    **A   If that's a breach and we didn't pay it**

16 **from 2016, I'll write you a check right now.**

17    Q   All right.

18    **A   I would have assumed that it would have**

19 **been on a demand that you would have brought us --**

20    Q   Well, we asked you to pay it and you

21 didn't.

22    **A   So you're saying we never paid that?**

335

1    Q   You did not in December.

2    **A   I'm sorry. Did we pay it?**

3    Q   Did you -- I'm not being deposed.

4 We're going to go through the records.

5    So looking at what I just handed you,

6 Dave Sandoz writes to Mr. Schneider and copies you

7 and advises, "I have to make sure everyone knows

8 our back is now against the wall and these three

9 bonds have been called. Demands made and date to

10 pay has passed and there is no more time to argue

11 each case."

12    And Mr. Sandoz asks, "What is Nexus'

13 intentions of paying the amounts demanded with

14 checks going out no later than January 4th to

15 clear these three bonds so RLI is not in danger of

16 losing their relationship if not more with the

17 federal government?"

18    Do you see that?

19    **A   I'm reading it. Okay.**

20    Q   All right. So you understood that RLI

21 was concerned that these payments had not been

22 made and that they were in jeopardy of losing

336

1 their relationship if not more with the federal

2 government, correct?

3    MS. PETERS: Object to form.

4    **A   It's definitely in the email that Dave**

5 **Sandoz signed, yes.**

6    Q   And so you knew it was very important

7 to RLI to ensure that these three bonds got paid

8 immediately, right?

9    **A   Sure. It was very important to me as**

10 **well. Also that the people that were the subject**

11 **of the bonds weren't harmed in that process and**

12 **that they were taken care of. And I think we've**

13 **accomplished all of that. I mean, I think we were**

14 **able to pay the bonds and, you know, ensure that,**

15 **you know, this person had an opportunity to -- the**

16 **individual that went to the wrong office, as your**

17 **email states, we tried to help them. You guys**

18 **even tried to help them. So --**

19    Q   RLI --

20    **A   -- I think that's what we did. I mean,**

21 **it's --**

22    Q   RLI was demanding immediate payment

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

337

1  which they had been asking since the previous
2  email and the payment had not been made yet as of
3  December 29th, correct?
4      A   Right.  It says if you have had any
5  success in working with the obligee we have tried
6  to help too, or have been granted more time to
7  resolve the issues.
8          So I think we were trying to help the
9  program participant while continually
10 acknowledging that we had a duty to perform.  And
11 I believe we did perform.  We may have in this
12 case indemnified you if you paid it first, I don't
13 know.  But, again, I will say that --
14     Q   It's your obligation to pay them,
15 right?
16     A   If you're saying that we haven't paid
17 it, then I'll pay it.
18     Q   Right.  Aren't you supposed to make
19 payments upon demand by RLI under the indemnity
20 agreement?
21     A   So I can --
22         MS. PETERS:  Object to form.

338

1      A   So my understanding is that I can
2  exonerate when a claim is made, which means when a
3  bond is breached, then a claim is made.  When that
4  claim is made, I can exonerate RLI by paying it at
5  that time or I can indemnify RLI by paying it if
6  you pay it.  I believe in every case we've done
7  that and if in these three cases we haven't,
8  please tell me and I will pay it.
9      Q   Well, I'm telling you that we -- RLI
10 made a demand in December for you to pay and Nexus
11 did not pay in December of 2016, right?
12     A   Did Nexus pay or do we still owe that
13 money?
14     Q   Well, I'm asking you.  Nexus did not
15 pay in December, correct?
16     A   I don't recollect.  I mean, I'm
17 recollecting based on the email.
18     Q   All right.
19     A   So I can't answer that question.  I
20 believe we paid.  And, again, I'll ask you if we
21 didn't pay, please let me know so I can pay it.
22     Q   Okay.

339

1      A   We wouldn't want to have an obligation
2  that was sitting out there I would have assumed
3  that you would have told me if I haven't paid it.
4          MS. KATSANTONIS:  I'm going to mark
5  this.
6          (Donovan Exhibit 20 marked for
7  identification and attached to the transcript.)
8      Q   So as of January 10th, 2017, now, you
9  received an email from Bart Davis at RLI saying we
10 need help on this, we need evidence that these
11 were paid by your organization.
12         Oh, I'm sorry.
13     A   I was thinking like when's she going to
14 give me the paper.
15     Q   I apologize.
16     A   Thank you so much.
17     Q   Right.  So again just to get the record
18 clear, this is an email from Bart Davis of RLI to
19 you on January 10th, correct, of 2016?
20     A   That's what --
21     Q   '17, sorry.
22     A   Right.  That's what it says.

340

1      Q   Okay.  It says, "We need help on this
2  ASAP.  We need evidence that these were paid by
3  your organization on the 5th."
4          Right?
5      A   That's correct.
6      Q   Okay.  And so as of January 10th, 2017,
7  these invoices still had not been paid, correct?
8      A   Well, I don't know.  As of
9  January 10th, he's saying that we need some help
10 ASAP and then evidence of the payments.  That's
11 what it says.
12     Q   All right.  Let me show you this email.
13         MS. KATSANTONIS:  Mark this.  Oops,
14 sorry.
15         (Donovan Exhibit 21 marked for
16 identification and attached to the transcript.)
17         MS. PETERS:  Do you have an extra?
18     Q   This is an email from you to Mr. Davis
19 on January 10th --
20     A   Okay.
21     Q   -- saying, "I have confirmed that these
22 checks were cut and sent.  I'm having the finance

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

341

1  team pull copies of the checks."
2       Do you see that?
3    **A   I see that.**
4    Q    And you also say, "I'm going to
5  designate another person to the POC," point of
6  contact, "for immediate communication."
7       Right?
8    **A   Uh-huh.**
9    Q    So you recognized that there was a
10 problem with communication between RLI and Nexus
11 with regard to bond breaches; is that correct?
12       MS. PETERS: Object to form.  Misstates
13 the document.
14   **A   I recognized that Bart was concerned**
15 **and was looking for help ASAP.  And I recognize**
16 **that Laura Piispanen's communications with Erik**
17 **were breaking down.  And so I indicated that I**
18 **would establish another POC for Bart and did that**
19 **just to make sure that he was able to get his**
20 **information.**
21   Q    Let me ask you something else.  Can you
22 go back to the previous email, the one from Bart

342

1  to you?
2    **A   Uh-huh.**
3    Q    On the bottom of that email there's an
4  email from Laura that says, "I just called Marco.
5  He checked the database and there is no record of
6  checks being cut."
7       Do you see that?
8    **A   I do see that, yeah.**
9    Q    Okay.  And so does Big Marco have
10 access to a Nexus database?
11   **A   No.**
12   Q    Okay.
13   **A   I'm assuming he's looking at whether**
14 **he -- his office sent them money.  That would be**
15 **what I would guess.**
16   Q    Okay.  And looking at your email, your
17 email is, "I have confirmed that the checks were
18 cut and sent."
19       Do you recall that?
20   **A   I see that.**
21   Q    Do you recall what steps you took to
22 confirm that the checks were cut and sent?

343

1    **A   I don't recall.  I mean, I see the**
2  **email.**
3    Q    Okay.  And is it your testimony that if
4  you wrote that they were cut and sent that they
5  were sent on January 10th, 2017?
6       MS. PETERS: Object to form.
7    **A   My testimony is if I wrote on**
8  **January 10th that I confirmed that the checks were**
9  **cut and sent, that that's exactly what it means,**
10 **that on January 10th I confirmed that the checks**
11 **were cut and sent.  And I probably would have done**
12 **that with a conversation with somebody to confirm**
13 **whether the checks were cut and sent.  And I think**
14 **I specified that I was going to have the finance**
15 **team pull copies of the checks.  You know, so I'm**
16 **sure that I got some kind of verbal communication**
17 **that that had been done.**
18   Q    Right.  And you were saying that the
19 checks in your email were processed on
20 January 5th; is that correct?
21   **A   That's what the email says here.**
22   Q    And by process it could be anything, it

344

1  could mean just a conversation with someone down
2  the hall?
3    **A   No.**
4    Q    Or were you tying to advise that the
5  checks were actually cut and sent on January 5th?
6    **A   So I guess to answer that, the best way**
7  **to say that is to say if I confirmed that we**
8  **processed the following checks that means I'm**
9  **going to say to a person, hey, do this.  Did we**
10 **get it done?  That's what I'm going to say.**
11 **And/or did you do this already?  Or something of**
12 **that effect.**
13       **But I don't recollect this particular**
14 **instance, so I don't know specifically but I'm**
15 **sure that's what I mean.**
16   Q    And isn't it true that a week later on
17 January 17th, RLI still did not have evidence of
18 any checks being sent for these three checks?
19   **A   I would have no idea what RLI thought**
20 **or knew on January 17th in 2017.**
21   Q    Okay.  At this time in January 2017,
22 were checks handwritten or computer generated?

345

1      A    Probably both.

2      Q    Okay.  And did Nexus or Libre have a --
3  routinely write checks but hold them and not send
4  them?

5          MS. PETERS:  Object to form.

6      A    Routinely?  What do you mean?

7      Q    Was it an occurrence that happened
8  regularly where Libre or Nexus would write checks
9  but not send them?

10         MS. PETERS:  Object to form.

11     Q    For any amount of time?

12         MS. PETERS:  Object to form.

13     A    Well, no.  I mean not intentionally.  A
14 person might order a check cut and that might
15 happen on a Tuesday and it might not end up, you
16 know, in shipping until Thursday or Friday.  That
17 would be pretty normal.  But, no, I wouldn't say
18 that it's normal to say hey, we're going to write
19 a check and hold it.  That being said, I mean, I
20 can't say that that hasn't ever happened because
21 there might be a time when it would be
22 appropriate.  I just — I don't know.

346

1      Q    And, you know, again these checks were
2  important to RLI because of their fear of Treasury
3  referral at this time, right?

4          MS. PETERS:  Object to form.

5      A    Right.  Which I'm happy to see didn't
6  happen.

7      Q    And -- well, in fact, you said -- you
8  confirmed that the checks had been cut and mailed,
9  right?

10         MS. PETERS:  Object to form.

11     A    Right.  And I assume that you're going
12 to tell me that they did in fact receive them or
13 you're going to tell me that I need to pay them.
14 Because, as I said, if they're still owed I'll
15 happily pay them.  I didn't realize that we had
16 any balances from bonds that were due to RLI from
17 2017.  And if we do, I'll pay them right now.  Are
18 you saying we owe $52,000?  Are you asking for
19 that?

20     Q    Sorry.  Not at this time.

21     A    Am I sending this to you?  I'm assuming
22 I'm sending it to you.  Not at this time?

347

1          MS. PETERS:  Is there a copy for me?

2          MS. KATSANTONIS:  Yep.

3          (Donovan Exhibit 22 marked for
4  identification and attached to the transcript.)

5      Q    So reviewing this email on
6  January 17th, Laura is reaching out, again, to
7  Nexus advising that she hadn't received copies of
8  the checks and Mr. Moore advises I've been out of
9  town for the last two weeks.  I'm make sure you
10 get copies ASAP.

11         So as of January 17th, do you know --
12 do you have any reason not to -- to question the
13 fact that Nexus -- that RLI still did not have
14 evidence of any payments to DHS of these invoices?

15     A    Well, it does — it certainly does look
16 like Laura sent an email.  I don't know when this
17 Laura email is because for — oh, yeah, it's on
18 the 17th as well.  Okay.  So she sends an email.
19 And then Richard responds to the email and says
20 he's been out of town.

21         I would note that that email is a week
22 after the last one.  So I don't know if Richard

348

1  was responding to say oh, this didn't get done,
2  I'm going to do it or he just got back into town,
3  was catching up on his emails and said hey, let me
4  work on this.  I don't know.

5          MS. KATSANTONIS:  Mark that.

6      A    But that would be my guess on account
7  of the fact that he oftentimes catches up with
8  emails when he comes back in town from out-of-town
9  trips.

10         (Donovan Exhibit 23 marked for
11 identification and attached to the transcript.)

12     Q    So on January 20th, Mr. Moore
13 represents to RLI that these checks had been
14 issued, correct?

15         MS. PETERS:  Object to form.

16     A    Yes, his email says here's the original
17 scan, let's try this.  But that's what I read.  I
18 mean specifically what his email says is here's
19 the original scan, let's try this.  But I would
20 assume that that's showing documentation that the
21 checks were written.

22

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

88 (349 to 352)

349

1          (Donovan Exhibit 24 marked for
2   identification and attached to the transcript.)
3       Q   All right.  I'm forwarding you an email
4   chain dated January 30th, 2017.  And on the bottom
5   it's an email internally of RLI that says Libre
6   was to have sent the checks below to the
7   Department of Homeland Security.  Laura made
8   several requests.  Laura received communication
9   today from the Department of Homeland Security
10  that these payments have not been received.
11      Do you see that?
12      **A   Yes, I see that.**
13      Q   And you received a communication from
14  RLI that advised because Nexus had not paid these
15  claims as agreed, that RLI was going to be forced
16  to do so and that as a result of Nexus' failure to
17  meet its obligations under the program and the
18  indemnity agreement, Mr. Davis was going to
19  suspend your authority to execute any further
20  bonds on behalf of RLI effective February 1st.
21      Do you see that?
22      **A   I do.**

350

1       Q   Okay.  And you understood that RLI, by
2   this time, had been gravely concerned.  They
3   advised back in December that these invoices would
4   have to be paid or it would jeopardize their
5   relationship with Treasury, right?
6       MS. PETERS:  Object to form.
7       **A   I don't know gravely concerned since**
8   **they continued to issue new bonds.  I'm not sure**
9   **how grave the concern was.  I think that they**
10  **understood that we were working with them.  I**
11  **think they understood that we were communicating**
12  **with them and, as I told you, if these had been**
13  **paid I will say, and obviously as you can see they**
14  **were paid, and if they haven't been paid I'll pay**
15  **them now.**
16      Q   And isn't it true that they weren't
17  paid until after you received this communication
18  from Mr. Davis?
19      **A   I honestly don't recollect any of this**
20  **other than reading the emails.  So Vivian, I've**
21  **asked you multiple times if the bonds were paid or**
22  **if I need to pay them and you haven't answered me.**

351

1   So I'm assuming they have been paid.  And I'm
2   assuming that they were paid when I represented
3   that they were paid because if I represented that
4   they were paid that's because they were paid or
5   someone told me that the checks were cut and sent.
6       Q   You represented that they were paid as
7   of January 5th.  But that's not accurate, right?
8       MS. PETERS:  Object to form.
9       **A   I just testified -- what do you mean**
10  **it's not accurate?**
11      Q   They had not been sent to the
12  Department of Homeland Security until after
13  January 30th.
14      **A   I don't know.  What I do know --**
15      Q   But you did say in your email that they
16  had been sent.
17      MS. PETERS:  Object to form.
18      **A   I said that I had confirmed that they**
19  **had been processed.**
20      Q   And sent?
21      **A   Yeah, absolutely.**
22      Q   Right.  But they had not been, right?

352

1       **A   I don't know that.**
2       Q   Okay.  And you don't recall --
3       **A   You still haven't answered --**
4       Q   -- that they were --
5       **A   -- my question as to whether they were**
6   **paid.**
7       Q   Do you not recall -- they were
8   eventually paid.  Do you not recall --
9       **A   Okay.  Do you have any doc -- when were**
10  **they made?  Do you have documentation that shows**
11  **they were paid at a different time?**
12      Q   This is your deposition and I want to
13  ask you isn't it true that Nexus did not send out
14  these payments until at least January 30th, of
15  2017?
16      MS. PETERS:  Object to form.
17      **A   No, I don't think that's true.  I don't**
18  **recollect this specifically.  But that doesn't**
19  **make any sense.  And I've testified based on these**
20  **documents what the documents say must be true.  I**
21  **don't know what more you want me to say other**
22  **than, you know, obviously they were paid, right?**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

353

1 Ultimately the government did receive payments. I
2 will tell you that, you know, when we send appeal
3 documents sometimes we don't get 790Cs back for
4 three or four months.
5     Q    What I'm saying is that -- so you're
6 blaming it on the government, maybe they lost it?
7     A    I'm saying that what I said to the best
8 of my knowledge is true because I don't lie. What
9 I said was that we sent -- I confirmed that these
10 were processed and sent.
11     Q    And your representation was that they
12 were sent on January 5th, correct?
13         MS. PETERS: Object to form.
14     A    My representation is that I confirmed
15 they were processed and sent on January 5th. I
16 wouldn't process them and I wouldn't send them so
17 I clearly would have gotten that from somebody. I
18 would have confirmed that from someone.
19     Q    You understood it was important to RLI,
20 right?
21         MS. PETERS: Object to form.
22     Q    I mean, Mr. Davis was reaching out to

354

1 you.
2     A    I don't even remember talking to
3 Mr. Davis. I certainly understand that it's
4 important based on the emails and it's important
5 to me as well. Also important to me is protecting
6 the lives of these program participants, my
7 clients who I care about. I think we can do both.
8 I think we have done both. I think Nexus does a
9 really good job of doing both which is why we have
10 met our contractual responsibilities to your
11 client by exonerating based on claims that are
12 made or indemnifying based on claims that are
13 made.
14     Q    Isn't it true that the checks were not
15 mailed until January 30th of 2017?
16         MS. PETERS: Object to form.
17     A    I just told you that under my
18 understanding based on the email that I have,
19 that's what it is. I don't remember this
20 situation so how could I possibly tell you -- I'm
21 sorry. How could I possibly confirm to you when I
22 don't remember the situation? I'm answering

355

1 questions based on the emails.
2     Q    Right. But --
3     A    So based on this email -- you showed me
4 an email on January 5th that said I had confirmed
5 it. So I'm telling you if I said that I must
6 have. I don't remember.
7     Q    Right. And you understood that to be a
8 very important issue to RLI at the time?
9         MS. PETERS: Object to form.
10     A    I understood that it was important.
11     Q    And that they made demand those
12 payments be made prior to January 5th?
13     A    Which is why I'm sure -- which is why
14 we paid them.
15         (Donovan Exhibit 25 marked for
16 identification and attached to the transcript.)
17     Q    And on -- I'm showing you what's been
18 marked as Exhibit 25. It's from Mr. Prescott to
19 Laura Piispanen and it provides documentation.
20 And if you look, you can see there are certified
21 mail documents showing -- certified mail envelopes
22 showing that checks were mailed from Verona on

356

1 January 30th, 2017, correct?
2     A    I do see that.
3     Q    Okay. All right. Following
4 Mr. Davis's email --
5     A    It looks like there's two checks on
6 here. Is there a third check that was received by
7 by ICE because if that third check was received
8 earlier it would certainly count against -- it
9 would cut against your argument.
10         So check 10050 was, presuming that this
11 envelope is connected to that, was postmarked on
12 January 30th. And then check No. 10049, assuming
13 that's the envelope attached to it two pages back
14 is January 30th. But what about the other check?
15 That would be check No. 100051 in the amount of
16 20,043.89. When did that one -- when did we -- I
17 wasn't on this. But when did Laura get
18 confirmation that Jody received that one?
19     Q    January 31st.
20     A    January 31st. Can I see that?
21     Q    I'm not going to mark it. But you can
22 see it in the middle of the page.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

357

1      MS. PETERS:  I'd like to have you do
2  that.
3      MS. KATSANTONIS:  I can read you the
4  page number.
5      A  Do we have a --
6      MS. PETERS:  I would like to see a copy
7  of the document you handed him.
8      A  The problem is, though, that -- where
9  is the copy of the envelope?  Because you've got a
10 copy of the envelope for these two.  Why wouldn't
11 he have sent you a copy of the envelope for that
12 one if it's later?  I mean, how do I know that
13 that one didn't come earlier?  He may be marking
14 it but he received --
15     Q  We can through -- I can go through the
16 whole email chain but this was the first time he
17 had confirmed on the 30th that it hadn't been
18 received which is -- if you look back at the
19 emails I showed you, which is why Mr. Davis sent
20 you the email, right --
21     A  So the first time --
22     Q  -- that nobody had received anything on

358

1  January 30th?
2      A  So you're saying --
3      MS. PETERS:  Object to form.
4      A  -- the first time Jody confirmed that
5  they received it was the 31st?
6      Q  That's correct.
7      A  And you're saying that this certified
8  mail was -- so you're saying that the first time
9  he acknowledged receiving it was the 31st?  Did he
10 say that they didn't receive it before then?  Or
11 is the first time -- what you're saying is he
12 acknowledged receipt on -- that the first time he
13 acknowledged receipt was the 31st.
14     Q  Well, you can look through the
15 documents another time, Mr. Donovan --
16     A  What I'm saying is --
17     Q  -- but I can tell you -- I can tell you
18 to the best of my knowledge he confirmed nothing
19 had been received as of January 30th on any of the
20 three checks.
21     A  Right.  So there's a missing envelope.
22 I don't know when the envelope was postmarked.  I

359

1  would really like to see that.
2      Q  Okay.  Following this time frame, and
3  Mr. Davis sent you that email, and you understood
4  that RLI -- you understood under the agreement of
5  indemnity RLI had the right to stop issuing bonds
6  at any time; is that correct?
7      A  Yes.
8      Q  All right.
9      A  I believe that's true.
10     Q  And so by the end of February RLI had
11 stopped issuing bonds on behalf of Nexus, correct?
12     A  Right.  Because we -- as we were asked
13 to do, we found a new home for the program.
14     Q  Well --
15     A  That was our option --
16     Q  -- I won't quibble --
17     A  -- to do that versus paying the
18 1.25 million in collateral.
19     Q  Okay.  Well, I'm not going to -- that's
20 your testimony.  If that's what you want to say in
21 your testimony that's okay.
22     A  I understand that it doesn't help your

360

1  case but it is what was said in the email and it's
2  the direction that we got from RLI and it's what
3  we followed.
4      Q  You can stick with that.  If that's
5  your testimony, that's fine.
6      A  It's what is in your client's email.
7      Q  Okay.  That's fine.
8      So on March 3rd, 2017, after this time
9  frame that we had Mr. Davis's email the end of
10 January, RLI stopped issuing bonds in February.
11 Do you have an understanding of how many bond
12 breach notices RLI had received as of
13 February 2017?
14     A  I don't recollect that, no.
15     MS. PETERS:  Objection.
16     Okay.  Is it an appropriate time for a
17 break?
18     A  I think it's probably a good idea.
19 Let's take a five-minute.
20     THE VIDEOGRAPHER:  We are going off the
21 record at 19:21.
22     (Recess taken.)

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

361

1    THE VIDEOGRAPHER: We are back on the
2 record at 19:47.
3 BY MS. KATSANTONIS:
4    Q    All right. Mr. Donovan, do you recall
5 on March 3rd of 2017 RLI sent you a correspondence
6 regarding their concerns with recently received
7 bond breaches and delays in deficiencies and
8 Nexus' responses to RLI's request for records and
9 information?
10    A    I don't recollect it specifically.
11 It's just the demand letter for collateral or was
12 this before that?
13    Q    Before that.
14    A    Okay. I don't recollect it.
15    (Donovan Exhibit 26 marked for
16 identification and attached to the transcript.)
17    MS. PETERS: This is 26?
18    THE COURT REPORTER: Yes.
19    MS. PETERS: Thank you.
20    Q    Mr. Donovan, this is a copy dated -- of
21 a correspondence dated March 3rd, 2017, addressed
22 to your attention from RLI.

362

1    And in this document, RLI, if you look
2 in the middle, talks about one of the causes of
3 concerns is past due invoices received from the
4 Department of Homeland Security on six separate
5 immigration bonds.
6    Do you see that?
7    A    I do.
8    Q    Okay. And RLI advises you that it
9 considers a timely response to any immigration
10 bond demand or invoice to be essential, correct?
11    A    I do see that, yeah.
12    Q    Okay. And RLI advised that past due
13 invoices increase RLI's exposure, correct?
14    A    I do. I did notice that, yeah.
15    Q    And --
16    A    Which is interesting because exposure
17 is an element on the indemnity agreement on the
18 collateral and that specifically says if the past
19 due invoice increases RLI's exposure. I agree
20 with Mr. Davis. I think that the exposure
21 references breach bonds and I think that
22 references that.

363

1    Q    Isn't the fact that Mr. -- that RLI
2 references additional exposure here?
3    A    I'm sorry, Mr. Sussman.
4    Q    Right.
5    A    I got the wrong person. I apologize.
6    Q    Additional exposure which would be
7 penalties and interest, right?
8    A    Yeah, let me -- let me read it. You
9 know what? Let me read it because now I'm trying
10 to find -- and I don't want to do that because
11 then I'm not able to answer your questions
12 directly. So let me just read it. Okay.
13    Q    All right. So as of March 3rd, this is
14 titled "Request for meeting records regarding
15 immigration bonds," right?
16    A    That is what it's titled, yes.
17    Q    And you understood RLI was requesting a
18 meeting with Nexus and requesting access to books
19 and records, correct?
20    A    That's what's in here, yes, ma'am.
21    Q    Okay. And RLI advised you that your
22 attention was needed to this urgent matter,

364

1 correct?
2    A    Correct.
3    Q    All right. And it also confirmed that
4 it stopped issuing immigration bonds as of
5 February 28th, 2017, correct?
6    A    That's right. It says, "As you know,
7 RLI has stopped issuing immigration bonds as of
8 February 28th, 2017." I think that's really
9 important to understand in the same letter
10 Mr. Sussman says that the exposure is growing. I
11 just want to be clear that exposure clearly means
12 the invoice of breach bonds not new bonds because
13 there's no new bond being written. So it's not
14 possible --
15    Q    Well, you don't --
16    A    -- to say -- I just want to make sure
17 we're clear on that. It's clear that Mr. Sussman
18 is saying that exposure relates to breached bonds
19 which is what I'm saying, which is why I think we
20 have complied with the indemnity agreement.
21    Q    Mr. Sussman will be able to testify to
22 what he meant. But when you say breached bonds,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

365

1  do you understand that when a -- when do you
2  believe the bond is in breach?
3     A   I believe a bond is in breach when a
4  final claim is made.  We'll look at the CFR that
5  specifically states that a claim against a
6  government -- a claim on an immigration bond for
7  the government is when there is a breach and that
8  breach has not been appealed or the appeal has
9  been adjudicated.
10    Q   Isn't a notice to deliver a claim on
11 bond saying your bond principal has not shown up
12 pursuant to the request to appear?
13    A   I understand that argument.  I read
14 your expert report.  I understand that your expert
15 says that a claim is when there's a notice to
16 deliver.  I believe a claim is when there's a
17 breach.  But even if the claim is when there's a
18 notice to deliver there's no way you can
19 substantiate a $10 million demand based on that
20 because we've never had $10 million in there to
21 deliver.  Probably haven't had a million dollars
22 sitting there just to deliver.  So I'm just saying

366

1  that I know whether that -- I'm glad we can agree
2  that it's either --
3     Q   Well, we can't agree.
4     A   -- breaches or notice.  Well, you
5  just --
6     Q   No.  I mean, you can't agree -- I'm
7  not -- you're going to have to ask Mr. Sussman
8  what his understanding is and I'm getting your
9  understanding.  So there's no agreement taking
10 place here.
11    A   I assume we're deposing Mr. Sussman.
12    Q   We're trying to get your understanding.
13    A   Sure.
14    Q   Okay.  And here Mr. Sussman advises
15 that there were six separate immigration bonds
16 that were -- that we had received past due
17 invoices, correct?  That RLI, right?
18    A   It says that.  I don't see the invoices
19 so I'm looking at the words.  He said several past
20 due invoices.
21    Q   Right.  And that means that -- by the
22 time RLI receives a past due invoice, that means a

367

1  notice to deliver has been issued, an invoice has
2  been issued and now a past due invoice is being
3  issued, correct?
4     A   So what would be the -- that would be
5  the time -- the temporal understanding.
6     Q   Right.
7     A   But, of course you understand that if
8  there's an appeal, then there's -- that's not a
9  final claim because that breach is not determined,
10 right?  So if there's --
11    Q   Well, that's your -- that's your -- do
12 you understand that an invoice isn't to be issued
13 until after the appeal period has run?
14    A   I do understand that.  Which is one of
15 the very frustrating realities that we are
16 continuing to have to pay your client breaches
17 that are not -- that are still under appeal and
18 that those are abridging our clients' rights.
19    Q   Okay.  Did you --
20    A   That's one of the things I was
21 concerned about.
22    Q   Did you understand that RLI had a

368

1  broader concern with delays and deficiencies in --
2  in Nexus' responses to RLI's request for records
3  and information?
4     A   I understand that's what Mr. Sussman
5  wrote.  I also understood that Mr. Sussman could
6  have executed a confidentiality agreement and had
7  access to books and records demand.
8     Q   Mr. Donovan, this is a March 3rd email
9  and he also asks for Nexus' financial statements
10 and bank records, correct --
11    A   I should -- I don't know if we had
12 presented the -- let me be clear.  I don't know if
13 we presented the confidentiality agreement
14 proposal to him at that point --
15    Q   Exactly.
16    A   -- because we had just -- but
17 realistically we had just stopped, everything was
18 going great until December and then we're going to
19 have to pay more collateral unless we replace --
20    Q   Well, that's not true.
21    A   -- and then we replace --
22    Q   You knew back in September --

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

369

1    A   — and we still have —
2    Q   Didn't you know back in September,
3 October of 2016 that -- didn't Mr. Sandoz advise
4 you that RLI was going to stop issuing bonds?
5    **A   In October?  I don't know.  I mean, I**
6 **don't recollect that.  Perhaps.**
7    Q   Right.
8    **A   You know, I don't remember that**
9 **conversation.**
10   Q   All right.  So Mr. Sussman gives --
11 tells you that RLI wants access to your financial
12 statements and then also lists additional
13 documents and information that Mr. Sussman is
14 asking to receive by March 10th, correct?
15   **A   You know what, Vivian, that's right.**
16 **This is the letter that precipitated our**
17 **conversation around a confidentiality agreement.**
18 **So it was this letter that precipitated us saying**
19 **okay, we need you to sign —**
20   Q   Okay.  Let me just --
21   **A   — a confidentiality agreement.**
22   Q   All right.  He's asking you to provide

370

1 documents no later than March 10th, correct?
2    **A   That's correct.  That's what is in the**
3 **email.**
4    Q   And he says this is critical
5 information.  It's critical to -- well, he says,
6 "We expect the foregoing is critical to Nexus'
7 business operations and therefore readily
8 available."
9        Right?
10       MS. PETERS:  Objection.
11   **A   It does say that.**
12   Q   Right.  And he also says to the extent
13 one or more categories can't be available, explain
14 why, right, and provide us with the balance on the
15 documents, correct?
16   **A   That's what it says.**
17   Q   Okay.  And he advises you that the
18 records and information are essential to RLI's
19 ability to evaluate its exposure and protect its
20 interest, right?
21   **A   That's what it says.**
22   Q   Right.  And did you respond to this

371

1 letter on or before March 10th?
2    **A   I don't remember my — I don't have**
3 **recollection of my response.  I do know that the**
4 **reason -- I was surprised that RLI wasn't**
5 **interested in entering a confidentiality agreement**
6 **when this email asserted that this was very**
7 **important information.  But it wasn't important**
8 **enough to enter a simple confidentiality**
9 **agreement.**
10   Q   Mr. Donovan, wasn't the -- do you
11 recall having a discussion with Mr. Sussman prior
12 to the issuance of the March 3rd letter?
13   **A   I don't recall off the top of my head.**
14 **It's possible.  I'm certain I had a conversation**
15 **with him before the 28th, but I don't -- I don't**
16 **know when.**
17   Q   Okay.  And on March 6th, Mr. Sussman
18 writes to you again.  Let me mark this.
19       MS. PETERS:  Can I ask you a question,
20 was this document also transmitted by email on or
21 about March 10th?
22       MS. KATSANTONIS:  Ms. Peters, it's not

372

1 my deposition.  I'd have to look at that.
2        (Donovan Exhibit 27 marked for
3 identification and attached to the transcript.)
4    Q   Okay.  This is an email dated
5 March 6th, from Mr. Sussman to you and it's,
6 "Following up.  It's been almost a week since we
7 spoke where you agreed to provide dates for a
8 meeting with us at your office in Virginia and I
9 still have not heard back from you.  Please review
10 the attached letters.  The concerns that I
11 expressed are growing."
12       And then at the bottom it says, "Please
13 comply with the request no later than this Friday
14 so that we can prepare to meet with you.  If
15 there's some reason you cannot get us this
16 information, please let me know."
17       Do you recall receiving this email from
18 Mr. Sussman on March 6th?
19   **A   I don't recall it, but I certainly see**
20 **it and it looks like it was — well, yeah, it**
21 **looks like it was sent to me.  I was looking at**
22 **the email header.**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

---

373

1    Q    Mr. Sussman had communicated with you
2 by phone prior to March 3rd, right?  And then he
3 sent you the letter on March 3rd and then he
4 followed again -- followed up again on March 6th
5 about the concerns and he still had not received a
6 response by you by March 6th, correct?
7        MS. PETERS:  Object to form.
8    **A    Where's the March 3rd email?  See, I**
9 **think the issue is you, know, you've given me this**
10 **letter but I don't have an email cover.  This**
11 **letter has an email cover.  This letter was -- the**
12 **March 6th email was sent at 3:35 p.m. on Monday,**
13 **March 6th.  The March 3rd email, therefore, would**
14 **have been sent on Friday.  The idea that there is**
15 **some long lapse of time, we're talking about a**
16 **weekend.  So I don't think it's unreasonable if he**
17 **did send this email on the 3rd, and I'm looking at**
18 **the date on the letter, if he sent this email on**
19 **the 3rd and I got it Friday afternoon and I didn't**
20 **respond by Monday afternoon, that isn't unusual.**
21 **Sometimes I have lots of emails to respond to.**
22    Q    Right.

---

374

1    **A    So I just don't -- I would have to**
2 **see -- it just doesn't seem like an unreasonable**
3 **amount of time.**
4    Q    But this is an unusual letter for you
5 to receive from a surety, right?  Did you -- were
6 you concerned when you received this?
7    **A    I was concerned.  Well, I don't**
8 **remember receiving it.  I'm sure I was concerned.**
9 **I think at that point -- I know that at some point**
10 **in that process we began exploring the need for a**
11 **confidentiality agreement.  I was probably doing**
12 **that with counsel internally at that point**
13 **although I don't know.**
14    Q    You don't know the timing --
15    **A    I don't know.**
16    Q    -- of any confidentiality agreement
17 request.
18    **A    I know that it was an extensive request**
19 **and you know because we've had many conversations**
20 **about it.**
21    Q    You don't know whether in March of
22 2017 --

---

375

1    **A    I don't remember exactly.**
2    Q    -- that issue was even raised?
3    **A    I don't remember exactly.**
4    Q    Okay.  So I'm going to show you a
5 letter dated March 13th, 2017.
6        (Donovan Exhibit 28 marked for
7 identification and attached to the transcript.)
8        MS. PETERS:  And I'm going to object to
9 you showing him letters without the cover emails.
10    Q    This is a letter dated March 13th,
11 2017, to you from Mr. Sussman.  Do you recall this
12 letter?
13    **A    I do believe I recall this one.**
14    Q    And Mr. Sussman says, "This follows my
15 letter to you dated March 3rd and accompanying
16 email dated March 6th requesting that Nexus
17 provide by no later than March 10th specific
18 records and information as well as available
19 meeting dates."
20        Right?
21    **A    Yes.  I'm going to read it real quick.**
22 **Hold on a second.**

---

376

1    Q    All right.  Have you reviewed the
2 letter?
3    **A    I'm almost done.  All right.**
4    Q    Mr. Donovan, have you reviewed that
5 letter?
6    **A    I have.**
7    Q    Okay.  So Mr. Sussman advises in his
8 letter that he received no response at all from
9 Nexus to his March 3rd letter, his March 6 this --
10 or his March 6th email; is that correct?
11    **A    It does say that, yeah.**
12    Q    Why didn't you respond?
13        MS. PETERS:  Object to form.
14    **A    I don't recall.  I believe that we —**
15 **at that point I began having conversations with**
16 **counsel about what we needed to do to protect the**
17 **information that was going to be provided.  I do**
18 **remember I was concerned that I did business with**
19 **these people for a year, your clients were fine,**
20 **we had an issue at the end where they wanted us to**
21 **find another partner.  They gave us time.  They**
22 **said if we paid $1.2 million in collateral we**

---

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

377

1 could have an indeterminate amount of time, that's
2 what they said. And we said -- so we said no,
3 we're going to move the business. We're not going
4 to do that, we're going do move the business. And
5 then you demand $10 million.
6          And I notice that there was a March 3rd
7 letter followed by a March 6th letter followed by
8 a March 10th letter. In a year of working
9 together, we went months without communicating and
10 now that you're not receiving premium on a daily
11 basis I'm getting three letters in a week. I
12 think that has a lot to do with why RLI took the
13 action it took. All I was trying to do was to
14 protect my client information. I would have
15 given --
16     Q   Did you respond them -- did you respond
17 to RLI any time --
18          MS. PETERS: Excuse me. You
19 interrupted his answer.
20     Q   That's okay.
21     A   Is it?
22          MS. PETERS: No, it is not okay,

378

1 Ms. Katsantonis.
2     A   I wouldn't interrupt you. I respect
3 you and I don't want to do that.
4     Q   Okay, sorry. I apologize. Go ahead.
5     A   I appreciate it. I really do and I do
6 respect you. I'm just answering honestly and
7 trying to -- you know, I --
8     Q   But are you, Mr. Donovan? You just
9 brought up that they -- you keep referencing this
10 new argument that you've created today, as best I
11 can tell, about the December 7th email. You just
12 referenced it again in your answer.
13     A   What do you mean --
14          MS. PETERS: Object to the form.
15     A   -- "my new argument"?
16     Q   Have you ever -- when did -- Nexus --
17     A   Can you --
18     Q   -- Nexus has --
19     A   What are you --
20     Q   -- a counterclaim in this action.
21     A   What are you talking about? You said
22 that I brought a new argument. I want to

379

1 understand what you're talking about.
2     Q   You today at several times have
3 discussed your interpretation of an email dated
4 December 7th, right?
5     A   Oh, you mean about asking for
6 collateral or that we find another surety, yes.
7     Q   Your interpretation of that, right?
8 And do you think that was -- that email was a
9 significant event?
10          MS. PETERS: Object to form.
11     A   I think that email is a significant
12 event because it shows RLI's bad faith.
13     Q   Okay. So is there some reason that was
14 not included in your counterclaim for bad faith?
15          MS. PETERS: Object to form.
16     A   I wasn't the lawyer who drafted it.
17     Q   And in fact we've asked you for
18 interrogatories to list all the bases of your bad
19 faith and that email's not mentioned in any of
20 your interrogatory responses, right?
21          MS. PETERS: Object to form.
22     Q   Isn't that true?

380

1          MS. PETERS: Object to form.
2     A   I don't know. I'm assuming so. I
3 don't think you'd lie --
4     Q   All right.
5     A   -- about that.
6     Q   And when did you and Nexus have an
7 understanding based on the December 7th email?
8 When's the first time you had any understanding?
9     A   Well, you have to understand --
10          MS. PETERS: Object to form.
11     A   -- Vivian, as I told you, I recollected
12 the December 7th email when you showed it to me
13 today. So what I recollect from my memory of it
14 then and reading it, I think I showed -- I read it
15 and I showed you, Vivian, hey, look at this, this
16 email. You know, I said -- I read the email and I
17 said hey Vivian, look, this email says something.
18 Look at what this email says.
19     Q   You didn't --
20     A   I did that today.
21     Q   Right.
22     A   I did that with you today.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

381

1    Q    Yeah, today.
2    A    Uh-huh.
3    Q    You didn't believe it back in March of
4  2017 that that email had any significance, did
5  you?
6    A    Oh, absolutely --
7        MS. PETERS: Objection.
8    A    I believed it. That's why I found a
9  new surety partner so that I could fulfill the
10 request of RLI, as --
11   Q    In March --
12   A    I'm sorry, I'm not finished.
13   Q    Sure.
14   A    As I have from the beginning of this
15 relationship, I have done what RLI has asked me to
16 do.
17   Q    Okay. Mr. Donovan --
18   A    I'm sorry. I'm not finished. Every
19 single time, and RLI changes the rules at the very
20 end to get more or to get something different --
21   Q    Okay.
22   A    -- that's what RLI does every time.

382

1    Q    Mr. Donovan, when RLI asked you in
2  March of 2017 to discharge its obligations under
3  the bond and if no discharge is attainable to
4  deposit $10 million in collateral, did you ever
5  respond and say, "I didn't understand Nexus will
6  owe you any more collateral because of a
7  December 7th email"?
8        MS. PETERS: Object to form.
9    A    I would say this entire litigation has
10 been a response.
11   Q    Did you ever --
12   A    Hold on a second. Our answering
13 counterclaim has been a response, Vivian.
14   Q    Just answer my --
15   A    We're here because of the response. I
16 answered your question.
17   Q    No, you didn't.
18   A    I did.
19   Q    My answer -- my question to you is did
20 you ever raise the December 7th email in response
21 to a demand for collateral?
22       MS. PETERS: Object to form.

383

1    A    I don't know what we -- I mean, we were
2  communicating via counsel. We had meetings. I
3  don't know if we raised it or not.
4    Q    To the best of your knowledge you did
5  not, correct?
6        MS. PETERS: Object to the form.
7    A    It doesn't change what the December 7th
8  email says, Vivian.
9    Q    That's not my question. To the best of
10 your knowledge, has Nexus ever raised an
11 understanding of the December 7th, 2016 email as a
12 basis of its bad faith claim?
13       MS. PETERS: Object to the form of the
14 question.
15   A    I told you I don't recollect what we
16 have -- please, you're already starting to
17 interrupt me. I don't know what we provided. But
18 my point is it doesn't change the fact that the
19 email says what the email says. And I understand
20 it doesn't work --
21   Q    To the best of your knowledge --
22   A    I understand that it doesn't work for

384

1  your case theory but it is what your client said
2  to me. And I took it -- I took it at face --
3    Q    If this wasn't in --
4    A    I took it at face value. I believed
5  that your client was being honest. I believed
6  that they were going to follow through. I found
7  another surety and then they demanded --
8    Q    I understand this is --
9    A    -- the $10 million.
10   Q    You keep repeating the same story,
11 Mr. Donovan.
12       MR. HARRIS: Objection --
13   Q    I appreciate it --
14       MS. PETERS: -- to the form of the
15 question.
16   Q    -- and it's already on the record but I
17 just want an answer to my questions.
18   A    I was just answering the question.
19   Q    So if RLI -- if Nexus believed that
20 this email had any significance, certainly -- or
21 that it had a basis for bad faith, wouldn't you
22 have raised it prior to today?

385

1        MS. PETERS:  Object to the form of the
2    question.  We haven't even have the 30(b)(6)
3    witness on the question of bad faith.
4        MS. KATSANTONIS:  Mary Donne, you can
5    testify --
6        A   This is -- you're --
7        Q   I'm asking --
8        MS. PETERS:  Discovery is --
9        MS. KATSANTONIS:  I'm asking
10   Mr. Donovan's understanding.  You listed him in an
11   interrogatory with the person with personal
12   knowledge.  So I'm asking Mr. Donovan.
13       A   Can you repeat the question?
14       Q   Yes.
15           If Nexus believed the December 7th,
16   2006 email formed any bases for bad faith,
17   wouldn't it have raised that issue prior to today?
18       MS. PETERS:  Object to the form.
19       A   I don't -- I'm telling you that that
20   email clearly is evidence of bad faith, ma'am.
21       Q   You keep --
22       A   Ma'am, I'm finishing an answer.  I am

386

1    telling you that that email absolutely indicates
2    bad faith and I believe everybody at this table
3    knows it does.  And that's why you're argue -- the
4    only argument you're making now is I didn't raise
5    it before.
6        Q   Well, I disagree with you.  Nobody at
7    this table thinks anything of the sort.
8        A   I think many people do.
9        Q   If anybody --
10       A   Well, raise your hand.
11       Q   If at any time -- at any time before
12   today did Nexus communicate this position to
13   anyone at RLI?
14       A   I don't know.
15       MS. PETERS:  Object to form.
16       A   Well, actually, no, no, no.  I believe
17   there was an absolute understanding with Dave
18   Sandoz that we would not have to pay collateral if
19   we removed that -- if we found a new provider.
20   Absolutely.
21       Q   Okay.  Did you document anywhere that
22   you believed that the December 7th, 2016 email

387

1    somehow formed the basis of your understanding
2    with regard to collateral?
3        A   Honestly, Vivian --
4        MS. PETERS:  Object to form.
5        A   Honestly, Vivian, I've recollected one
6    email you've put in front of me today.  So I
7    don't --
8        Q   So the answer is no?
9        A   -- recollect any of the other --
10       Q   Right.
11       A   -- emails about the situation.
12       MS. PETERS:  Object to form.
13       Q   And to the best of your knowledge -- to
14   the best of your knowledge in -- prior to today,
15   Nexus has never raised to RLI the issue that the
16   December 7th, 2016 email somehow forms the bases
17   for a claim of bad faith; is that true --
18       MS. PETERS:  Object to form.
19       Q   -- to the best of your knowledge?
20       MS. PETERS:  Object to form.
21       A   I disagree.  I think it's very obvious.
22       Q   So you're saying that to the best of

388

1    your knowledge you believe Nexus raised, before
2    today, the fact that -- or a contention that the
3    December 7th, 2016 email formed a basis for bad
4    faith?
5        MS. PETERS:  Object to form.
6        A   My -- I'm sorry.  My testimony is that
7    that email forms evidence of bad faith.  My
8    testimony is that RLI engaged in bad faith through
9    this agreement and that email is evidence of it.
10   Because RLI said that they were going to give me
11   until 2/28 and that after 2/28 I could continue to
12   post bonds for an indeterminate period of time if
13   I posted a 1.25-million-dollar collateral or what
14   they defined as probably my preferred option is
15   find a new provider and that's what I did.
16           And after providing -- finding the new
17   provider I get three rapid emails.  I'm glad you
18   point out the temporal issue here.  Three rapid
19   emails increasingly more threatening and
20   completely out of scope with the prior
21   communications.  I think that's bad faith.
22       Q   Okay.  And why didn't you relay that

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

389

1  position to RLI at any time prior to today?
2       MS. PETERS: Object to form.
3       **A    I – I don't – I haven't been**
4  **communicating with RLI about this since the**
5  **lawyers got involved, right?  So we got – the**
6  **lawyers got involved --**
7       Q    Well, do you review the pleadings?
8       MS. PETERS: Object to the form.
9       Q    That have been filed on behalf of
10  Nexus?
11      **A    There have been a lot of pleadings.**
12      Q    Yeah.
13      **A    I do review most of them.**
14      Q    Okay.  And do you --
15      MS. PETERS: I'm going to object to
16  this line of questioning as discovery is still
17  open and outstanding.  And I believe that the
18  bases for the bad faith claim has been articulated
19  as is required by the Federal Rules of Civil
20  Procedure.
21      MS. KATSANTONIS: Okay.
22      Q    Well, we've asked in interrogatories to

390

1  detail each and every bases which form the claims
2  for bad faith and in those interrogatory responses
3  this argument's never been raised.  Is that
4  correct, to the best of your knowledge?
5       **A    I don't know.**
6       MR. SHOREMAN: Wait, wait, wait.  Let
7  me make a statement as the replacement of Eckert
8  Seamans, the lead counsel in this case.  We are
9  reviewing all of the discovery responses and we
10  will supplement if necessary.
11      MS. KATSANTONIS: Great.  You can
12  change your argument.  Go ahead.
13      MS. PETERS: Object to the form of the
14  question.
15      MS. KATSANTONIS: But that's the whole
16  point.  You're making new arguments, right?
17      MR. WILLIAMS: Interrogatory --
18      MR. SHOREMAN: We changed counsel.
19      MR. WILLIAMS: Stop for a minute.
20      MR. SHOREMAN: You can -- you can make
21  the argument that we can't bring in evidence.
22      MR. WILLIAMS: No.  You can supplement

391

1  it with interrogatories.
2       MS. KATSANTONIS: I want to know -- I'm
3  just going to go ahead and ask.
4       Q    Mr. Donovan, can you just list each and
5  every basis for which you believe RLI has acted in
6  bad faith?  I want to know each and every one.
7       **A    Each and every one?**
8       MR. KOWALCZUK: To the best of your
9  recollection.
10      Q    Uh-huh.
11      **A    So I will say that RLI's entire**
12  **behavior through this process, once they decided**
13  **that they didn't want to be in this business**
14  **anymore --**
15      Q    When was that?
16      **A    -- and it's --**
17      Q    When did RLI decide?
18      **A    I'm not done.  Please let – listen --**
19      Q    Sorry.
20      **A    – I respect you.  I still do.  I like**
21  **you.  I still do but please let me answer.**
22      Q    Answer the question.

392

1       **A    You ask a question, I start answering,**
2  **you interrupt me.  I start answering that, you**
3  **interrupt me.  We're five questions in.  I never**
4  **get back to the original question.  It's not fair.**
5  **Vivian, it's not fair.**
6       Q    All right.  I'm sorry.  Please go
7  ahead.
8       **A    Thank you.  I think that littered**
9  **through this entire relationship is indicia of**
10  **RLI's bad faith that started with RLI really**
11  **wanting to be in this business and courting us.**
12  **We agree, we join and we say we're going to do**
13  **this.  And we do.  And then everything's great.**
14  **RLI reduces its collateral requests and then says**
15  **we don't have to pay any more, then randomly**
16  **increases it, now asks for $1.25 million, says we**
17  **can continue writing bonds indeterminately if we**
18  **pay it.  Then – or we can find another surety for**
19  **the program and not pay the collateral, exactly**
20  **those words.**
21      **So we find a new surety instead of**
22  **paying the collateral and then on March 3rd and**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

99 (393 to 396)

393

1  March 6th and March 10th, we get precipitously
2  more threatening communications from RLI now that
3  they aren't receiving daily premiums. So they're
4  no longer getting paid.
5       So now -- now there is definitely a
6  ratcheted up concern. My issue is RLI got paid
7  premium for those bonds. RLI was paid premiums
8  for those bonds. And RLI's a surety. It knows
9  what posting bonds means.
10      RLI decided it didn't want to be in
11 this business any more as -- who writes this
12 letter. Ira points on that the new presidential
13 administration, things are getting longer. RLI is
14 concerned. I think RLI's bad faith is evidence in
15 its communications. I think RLI wanted out of
16 this and decided that, you know, when we said
17 okay, we'll stop, then they decided that wasn't
18 good enough and wanted more. I think that's bad
19 faith. I think when you negotiate knowing that
20 the things that you're offering aren't the things
21 that you're going to stand behind, I call that bad
22 faith.

394

1       Q   What are the things that they were
2  offering that they weren't going to stand behind?
3       A   They said that if I found a new surety
4  partner by February 28th of 2017, then the
5  $1.25 million collateral demand wouldn't have to
6  be paid. So on March 3rd, March 6th, and
7  ultimately March 10th we received successive
8  communications that result in a $10 million
9  collateral demand.
10      Q   Okay. And what time frame --
11      A   And -- and --
12      Q   What time frame when you say throughout
13 this entire relationship I think evidences their
14 bad faith behavior, what time frame are you saying
15 that RLI exhibited bad behavior?
16      A   Well, at the end. But when I say it's
17 littered through what I'm talking about is the
18 difference. You see RLI's interaction with Nexus
19 when it's getting premiums every day and making
20 money.
21      Q   So what specific --
22      A   You see RLI's reaction to Nexus when it

395

1  finds out that its surety VP is leaving, right?
2  So when this decision is made, also Mr. Sandoz is
3  leaving. You pointed that out to me, right, that
4  he -- so obviously at that point he knew he was
5  leaving, right?
6       So yeah, I don't know why RLI decided
7  that it wanted to purge this business. I don't
8  know why RLI decided that this litigation, you
9  know, cutthroat litigation and this kind of -- you
10 know, was the right move. But it wasn't the right
11 move.
12      We have continued to perform under the
13 general indemnity agreement as we had committed.
14 And we have continued to do that in the face of
15 blistering attacks, of unnecessary --
16      Q   Okay.
17      A   -- litigation --
18      Q   We can't --
19      A   -- and discovery. It's --
20      Q   All right. I'm going to have to --
21      A   All of it's bad faith. It's all bad
22 faith, Vivian.

396

1       Q   So all of RLI's actions have been bad
2  faith?
3       A   All of RLI actions in saying one thing
4  and doing another in the last two to three months
5  of this relationship is absolutely in bad faith
6  and you have put emails in front of me that prove
7  it. You have put documents in front of me that
8  prove it.
9       Q   Okay. So that fact that you said that
10 you would pay bond breaches but didn't pay them
11 for two months proves RLI's bad faith?
12      MS. PETERS: Object to form.
13      A   I believe we did pay bond breaches.
14 We've continued --
15      Q   Two months later.
16      A   -- to perform under the general
17 indemnity agreement.
18      Q   Right, two months later based on --
19      A   No, I told you --
20      Q   -- the documents I showed you?
21      A   -- that I don't -- first of all, I
22 don't even know where the other check is. You

397

1  haven't even been able to show me the other
2  envelope.
3      Q   Okay.  I showed you the --
4      A   I believe -- and that document you
5  showed me, by the way, which I read a little bit
6  of that you didn't want to put into evidence said
7  that there were different -- that there was a
8  timing issue with the receipt of those checks.
9  You want to read that.  I'd love to see that other
10 envelope.  Did that other envelope arrive earlier
11 because if it did --
12     Q   Mr. Donovan --
13     A   -- then it completely undercuts your
14 argument.
15     Q   Okay.  Let me ask you something.  I'm
16 not trying to make arguments, I'm trying to get
17 the facts.  So I want to know the facts not your
18 argument.  So I want to know is it your -- what
19 facts are you contending that RLI -- so you're
20 saying that RLI's behavior in the last two months
21 of the relationship was bad faith; is that right?
22     A   Vivian --

398

1      Q   Is there a particular --
2      A   -- I've answered the question.  Read
3  your exhibits.
4      Q   Okay.
5      A   I've answered --
6      Q   Is there anything else?
7      A   I've answered the question.
8      MS. PETERS:  Did you want the
9  previous --
10     A   I've answered the question
11 specifically.
12     Q   All right.
13     A   Do you have it?
14     MS. PETERS:  Yes, she handed it to me.
15     MR. WILLIAMS:  Are we going to put that
16 into evidence or not?
17     THE WITNESS:  Yeah, I think we should.
18     MS. KATSANTONIS:  What document?
19     MS. PETERS:  The one you wouldn't mark.
20     A   So this is from Jody Prescott.  "The
21 other two checks, 1042 and 1049" -- the 1049 is
22 the one I was talking about -- "have arrived and

399

1  will be posted.  I propose that the information
2  you were given, these were actually sent 30
3  January not 25 January.  What's the 25 January
4  date?  I don't even know what that is.  So there's
5  obviously stuff in here that I -- you've shown me
6  documents but --
7      Q   Isn't it true that --
8      A   -- then you aren't showing me these
9  documents which say that they arrived separately.
10 So I don't know.  Again, maybe that's bad faith.
11     MS. PETERS:  I would --
12     Q   Mr. Donovan, I showed --
13     MS. PETERS:  -- like to have that
14 document marked.
15     Q   I showed you --
16     MS. KATSANTONIS:  You can do that in
17 your redirect.  I showed you -- I'm not wasting my
18 time.
19     Q   I showed you the two checks that had a
20 postmark of January 30th.  Do you have any reason
21 to believe that those two postmarked envelopes
22 were erroneous?

400

1      MS. PETERS:  Object to form.
2      A   You showed me two checks and two
3  envelopes --
4      Q   Right.
5      A   -- that you were stapled to it.
6      Q   My question is --
7      A   I said --
8      Q   -- do you have any reason --
9      A   What I'm saying to you is the fact that
10 it's not --
11     Q   Okay.
12     A   I'm answering your question, Vivian.
13 The fact that it's not a full record and the fact
14 that you're not willing to put certain things in
15 evidence does make me question.  And I'm not --
16 and I do want to see it all before --
17     Q   All right.
18     A   Because I don't recollect it.
19     Q   Okay.
20     A   So I'm being sneaked on --
21     Q   Mr. Donovan, okay, I -- I need to --
22     A   -- emails that you're putting in front

Case 5:18-cv-00066-MFU-JCH   Document 496-2   Filed 08/21/20   Page 102 of 195   Pageid#: 12184
Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

101 (401 to 404)

401

1 of me.
2    Q    I do need to cut you off because I only
3 have limited time and if we're going to keep
4 talking like this, I -- that is not okay --
5    A    I'm just —
6    Q    -- with my deposition.
7    A    — answering your question.
8    Q    No, you're not. I asked you one
9 question. Did you have any evidence or reason to
10 believe that those postmarked dates on the
11 envelope were incorrect?
12    A    And I answered.
13    Q    That's a yes or no.
14    A    Yes. Yes, I don't have the —
15    Q    All right.
16    A    — full complement —
17    Q    Mr. Donovan --
18    A    I don't have the third envelope —
19    Q    Mr. Donovan, let me ask you --
20    A    — and this email says something
21 different.
22    Q    Getting back to the breach of duty of

402

1 good faith and fair dealing or bad faith. Are
2 there any other facts that you're aware of that
3 RLI acted in bad faith?
4    A    I believe I've answered that question.
5 I think there are many instances of RLI acting in
6 bad faith. And even now --
7    Q    So sitting here --
8    A    — even still —
9    Q    -- today I want to know exactly -- I
10 need to know specifically. Today you've given me
11 the recitation, I have it. Are there any other
12 facts sitting here today that you believe were RLI
13 acting in bad faith?
14        MS. PETERS: Object to form.
15    A    You mean other than RLI lying in its
16 December 7th email and then lying again when it
17 said we didn't have to post collateral if we found
18 a new surety partner and then demanding
19 $10 million in collateral days after we find a new
20 surety partner? You mean other than that?
21        I think there are plenty of instances
22 of indicia of bad faith and that's what I'm saying

403

1 to you. I believe I've answered that question.
2    Q    Okay. So other than that which you've
3 repeated several times, is there anything else?
4    A    I believe I've answered the question.
5        MS. PETERS: Object to form.
6    Q    Okay. So sitting here today there's
7 nothing else you can add to that, correct?
8    A    I believe I've answered the question
9 fully.
10    Q    Okay.
11        MS. PETERS: And I'm going to -- are
12 you asking the witness before the March date or
13 after the March date?
14        MS. KATSANTONIS: Ms. Donne Peters,
15 I've already asked my question. Thank you. You
16 can ask him whatever you want on redirect.
17    Q    What is the current financial condition
18 of Libre and Nexus? Are you operating at a profit
19 or a loss?
20        MS. PETERS: Object to form.
21    A    I don't know.
22    Q    And so is it fair to say you don't

404

1 know, sitting here today, whether Nexus Services
2 or Libre is operating at a 5 million profit or a
3 5 million loss, for example? Within that range
4 you don't know?
5    A    I think that we are close to a
6 breakeven point which is what we would anticipate.
7 I don't know because the process of this
8 litigation and the compulsions on the discovery --
9 or the injunctive orders, you completely -- it
10 made it very difficult. We had a lot of work to
11 do to get QuickBooks up to date, which is what you
12 wanted to see. So we -- we put a lot of work in
13 it. So we are working with Grant Thornton, who
14 we've hired and another accountant to get our
15 financial books and records in a better place.
16    Q    When was the -- do you know what your
17 financial condition is as of -- was as of 2017?
18    A    Not off the top of my head.
19    Q    Do you have documents that would
20 evidence what the financial condition is of Nexus
21 or Libre as of 2017?
22        MS. PETERS: Object to the form of the

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

405

1  question.
2      A   I don't know off the top of my head.
3      Q   Do you know -- so you don't know
4  whether you even have documents that evidence
5  the -- an accurate depiction of the financial
6  condition of Nexus or Libre in 2017?
7      A   I'm saying I don't —
8          MS. PETERS:  Object.
9      A   — know.  And I'm saying I don't know
10 because I don't know.  And if I say I'm sure we
11 do, you're going to say point me to the document.
12 And since I don't know, I can't point you to a
13 specific document.  My answer has to be I don't
14 know.
15     Q   As president of Nexus and president of
16 Libre, do you know whether Nexus or Libre was
17 operating at a profit or loss in 2017?
18         MS. PETERS:  Object to form.
19     A   I'm — off the top of my head I'm not
20 sure.  I'd have to consult the records.
21     Q   So you, sitting here today, can't say
22 whether Nexus or Libre was operating off a profit

406

1  of 5 million or a loss of 5 million sitting here
2  today?
3      A   I don't have any records --
4          MS. PETERS:  Object to the form.
5      A   -- in front of me and I can't tell you
6  two years or three years or four years ago at a
7  specific time what the company's financial --
8  specific financial condition was, but I could look
9  at records and hopefully get that information for
10 you.
11     Q   Okay.  And which records would you look
12 at?
13     A   I would look at Lite -- I would look
14 at -- at this point I would look at QuickBooks
15 because we have rebuilt QuickBooks pursuant to the
16 discovery orders, not really injunctive orders,
17 and I would look at our KPIs, I would look at our
18 LiteSpeed totals and I would make -- then we would
19 make a determination based on what income we had
20 and what expenses we have.
21     Q   So is it true that sitting here today
22 you do not have any accurate profit and loss

407

1  statement or balance sheet for the year 2017?
2      A   It is true —
3          MS. PETERS:  Object to form.
4      A   — sitting here today that I do not
5  have that information in front of me and I can't
6  quote it.
7      Q   Well, but you're saying that you do
8  have records that show an accurate depiction of
9  Nexus' financial condition?
10     A   No.
11     Q   Or Libre's as of 2017?
12         MS. PETERS:  Object to the form.
13     A   I specifically didn't say that.
14     Q   Okay.  So you don't have records
15 sitting here today -- as of today, you do not have
16 accurate records of the financial condition of
17 Libre or Nexus as of 2017?
18         MS. PETERS:  Object to form.
19     A   Sitting here today I do not have those
20 records in front of me.  Sitting here today I do
21 not know what records exist.  I would have to
22 consult the records.  I would have to look to see

408

1  what is and I'm not going to tell you something I
2  don't know for sure.  So I have to tell you I
3  don't know.
4      Q   Okay.  So you don't know sitting here
5  today whether or not Nexus or Libre has an
6  accurate 2017 profit and loss statement or an
7  accurate balance sheet?
8      A   I don't know.
9          MS. PETERS:  Object to the form of the
10 question.
11     Q   Okay.  And the same for 2018.  Sitting
12 here today you do not have an understanding as to
13 whether or not Nexus and Libre has an accurate
14 profit and loss statement or an accurate balance
15 sheet?
16     A   I'd have —
17         MS. PETERS:  Object to form of the
18 question.
19     A   I'd have to review the records.
20     Q   Okay.  So sitting -- what records would
21 you review of 2018?
22     A   I would have to review what records

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

409

1  there are to review and then review them. I don't
2  know.
3      Q   Well, you've produced profit and loss
4  statements and balance sheets in this litigation,
5  right, to RLI?
6          MS. PETERS: Object to the form.
7      **A   Yes, but I haven't produced them so —**
8      Q   Well, Nexus has, right?
9      **A   Let's be clear.  I mean, you're asking**
10 **me what I know.**
11     Q   Okay.
12     **A   I'm testifying to my personal**
13 **knowledge.  I want to be very clear.**
14     Q   Are the balance sheets and profit and
15 loss statements provided by Nexus to RLI in this
16 litigation accurate?
17         MS. PETERS: Object to form.
18     **A   The balance — yeah, the material were**
19 **projections.  I think that it says projections.**
20 **The balance sheet was based on — yeah, I think**
21 **that they were —**
22     Q   I'm talking about throughout the

410

1  litigation.  I'm sorry, I don't want to confuse
2  you.
3      **A   Oh, got you.  Okay.  I appreciate it.**
4      Q   All right.  I'm talking about
5  throughout all the litigation.
6      **A   I thought you were taking me back to**
7  **the beginning.**
8      Q   No, no, I'm sorry.
9      **A   Okay.**
10     Q   I'm talking about throughout the
11 litigation Nexus has produced a series of profit
12 and loss statements and balance sheets for Libre
13 by Nexus or Nexus Services.  And my question to
14 you is: Has Nexus or Libre provided accurate
15 profit and loss statements or balance sheets for
16 their company for the years 2017 or 2018?
17         MS. PETERS: I'm going to object to the
18 form of the question.  You asked for reports to be
19 run.  That's not the same thing.
20         MS. KATSANTONIS: Ms. Donne Peters, I
21 know you're trying to coach him and that's fine.
22         MS. PETERS: That's not true.

411

1  BY MS. KATSANTONIS:
2      Q   I'm trying to ask whether or not you
3  have an understanding whether accurate financial
4  statements have been provided to RLI.
5          MS. PETERS: Object to form.
6      **A   We certainly would never provide**
7  **inaccurate statements on purpose.  That being**
8  **said, I think we know that there have been**
9  **revisions to financial statements.  So I can't sit**
10 **here and tell you that every statement that you**
11 **received is accurate if I provided a revised**
12 **financial statement.  What I can tell you is that**
13 **we would never provide erroneous information on**
14 **purpose.**
15     Q   Okay.  Do you -- do you have an
16 understanding as to whether Nexus or Libre
17 operated at a profit or loss in 2018?
18         MS. PETERS: Object to form.
19     **A   Sitting here right now I can't tell**
20 **you.**
21     Q   And what document would you need to
22 tell me?

412

1          MS. PETERS: Object to form.
2      **A   I would probably look in QuickBooks.  I**
3  **would go to my finance team and sit down.  I would**
4  **go through QuickBooks and try to determine, again,**
5  **revenue and what our expenses were and make sure**
6  **that those were -- that those files were**
7  **reconciled and find out.**
8      Q   So if Nexus or Libre has provided
9  QuickBooks statements to RLI in this litigation
10 for the period of 2018, is it your testimony that
11 those statements are accurate?
12         MS. PETERS: Object to form.
13     **A   I think my testimony is clear.  We**
14 **would never provide inaccurate statements.  I**
15 **can't tell you that there weren't mistakes.  I**
16 **can't tell you that they weren't revised.  I can't**
17 **tell you -- because you know, you well know, you**
18 **sat through the special master situation so you**
19 **understand that we were inputting and reconciling**
20 **records.  So it's sort of a trick question.  I**
21 **can't tell you -- oh, it is because I can't tell**
22 **you -- I can't tell you yes, because you're going**

413

1  to say well, wait a second.  I can tell you that
2  we would never provide a false and misleading.  We
3  would never want to do that.
4      Q   You understand that RLI has asked for
5  what your financial condition is, right,
6  throughout this litigation of Nexus and Libre?
7  Right?
8          MS. PETERS:  Object to form.
9      A   I do understand.  That would -- it
10 surprised me because there's nothing in the
11 general indemnity agreement that says anything
12 about solvency or the right to compel obligations
13 just because a company has a -- there's nothing in
14 there.  So I was a little surprised.  But yes, I
15 do know that they've asked.
16     Q   Right, and they've been ordered to be
17 produced.
18         MS. PETERS:  Object to form.
19     Q   Correct?
20     A   We are --
21         MS. PETERS:  Object to form.
22     A   -- under an injunction.  And we have

414

1  provided access to the books and records.  And
2  that injunction said that we provide you access to
3  books and records as they exist not as you want
4  them to exist.
5      Q   Right.  So my question is as they
6  exist, are they as accurate -- are the financial
7  statements provided off your QuickBooks an
8  actual -- an accurate depiction of the financial
9  condition of Nexus and Libre?
10         MS. PETERS:  Object to the form.  Vague
11 as to time.  And he's also stated they were under
12 accounting review.
13     A   I think that we have -- what I've
14 stated is that we would not provide misleading
15 information on purpose and that any revisions of
16 information have been because we found new
17 information or we were inputting or reconciling
18 information.
19     Q   So you can't answer my question.  You
20 just --
21     A   I just did.
22     Q   So you don't know whether or not you've

415

1  provided accurate statements to RLI.  Is that
2  true?
3      A   There have been --
4          MS. PETERS:  Object to form.
5      A   -- hundreds of thousands of pages
6  transmitted in this litigation.  For me to sit
7  here and tell you that a hundred thousand plus
8  pages are a hundred percent accurate because no
9  one ever made a human error would be silly.  So I
10 cannot tell --
11     Q   To the best of your --
12     A   The question that you're --
13     Q   To the best of your --
14     A   I'm not finished.
15         MS. PETERS:  You're interrupting him.
16     A   The question that you're asking is
17 impossible.
18     Q   To the best of your --
19     A   I am answering it as best I can.
20     Q   To the best of your understanding,
21 when, if ever, have you provided RLI with accurate
22 reports or financial statements of the condition

416

1  of Nexus and Libre?
2      A   Anytime --
3          MS. PETERS:  Object to form.
4      A   Anytime we've provided RLI
5  documentation it's been accurate or accurate at
6  the time or accurate as we know it to be accurate.
7  We obviously have been supplementing our
8  production under this litigation as you well know.
9  And that obviously things that -- when the data
10 from reconciliation of QuickBooks changed
11 QuickBooks, as you well know because you were
12 there when we did the special master --
13     Q   Have you filed 2017 tax returns?
14     A   We -- I do not believe we've filed 2017
15 tax returns.
16     Q   Okay.  Why not?
17     A   We were engaged -- well, this
18 litigation and the injunctive order required us to
19 completely revisit and do a -- redo our QuickBooks
20 at the middle of the year.  It was incredibly
21 destructive for us as we indicated.
22     Q   Didn't you advise RLI that you would be

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

417

1  doing --
2      A   I'm not done.  I'm actually not —
3          MS. PETERS:  You interrupted him again.
4          MS. KATSANTONIS:  I don't care.  We
5  don't have much time.
6          (Numerous people speaking at once.)
7      A   But you can't start interrupting me
8  just because —
9          MS. PETERS:  You can't cut him off.
10 That's the --
11         MR. KOWALCZUK:  Wait a minute.  Hold on
12 a second.  I haven't said anything all day, okay.
13 For most of the day it's been pretty good.  Now, I
14 know it's late and everyone's tired, but if you're
15 going to sit here and say on record that you don't
16 care if you're interrupting the witness, then
17 we're just going to stop and leave.
18         MS. KATSANTONIS:  Well, there --
19         MR. KOWALCZUK:  He's going to finish
20 his answer.
21         MS. KATSANTONIS:  I hear you,
22 Mr. Kowalczuk but there's -- there's a -- I'm also

418

1  entitled to short answers --
2          MR. KOWALCZUK:  Where does it say that
3  in the rules?
4          MS. KATSANTONIS:  -- to my questions.
5  I'm -- I'm -- I'm also entitled to a answer that
6  goes to the scope of my question and doesn't
7  increase the scope.  Okay?  We have limited time.
8  And so I hear what you're saying and I certainly
9  do not mean any disrespect to you.  I certainly do
10 not.  And --
11     A   And Vivian, I'm going to tell —
12     Q   But I'm trying to get, you know, the
13 evidence I need before our time.
14     A   Well, I appreciate that.
15     Q   Okay.
16     A   I want you to hear me too, okay?  I
17 don't mean to disrespect you either.  But this is
18 a deposition.  I'm under oath.  You're asking me
19 questions.  I'm answering them.  And this
20 deposition will exist long after this case.  I am
21 going to answer these questions.  I am going to
22 give you my answers and if you interrupt me, I am

419

1  going to pause you and I am going to continue the
2  answer —
3      Q   That's fine.
4      A   -- because that is my right and I am
5  going to take it.
6      Q   Okay.  So sitting here today, is it
7  your testimony that you do not -- you have no
8  understanding of whether or not -- we already
9  talked about this -- Nexus or Libre operated at a
10 profit or loss in 2019?
11     A   I don't think I — I don't think no
12 understanding is an incorrect use of the term.  I
13 can't tell you right now because I don't have the
14 documents in front of me.  I don't have the
15 numbers in front of me so I can't — I can't
16 confirm that.
17     Q   What is your general understanding?
18 Did Nexus or Libre operate at a profit or loss in
19 2019?
20     A   I believe —
21         MS. PETERS:  Object to form.
22     A   I believe we operated at a small loss.

420

1      Q   Okay.  A small loss meaning?
2      A   I don't know.  As I've told you,
3  without the information I can't possibly tell you.
4      Q   Okay.  And what about 2018?
5      A   I think that 2018 is probably similar.
6  But I don't know.
7      Q   Okay.  And did you file tax returns for
8  2018?
9      A   No.
10     Q   Okay.  And --
11         MS. KATSANTONIS:  Let's take a break
12 for one second.  Can you tell me how much time is
13 left?
14         THE VIDEOGRAPHER:  We are going off the
15 record at 20:38.
16         (Recess taken.)
17         THE VIDEOGRAPHER:  We are back on the
18 record at 20:56.
19     Q   Okay.  And prior to getting off the
20 record, we were talking about the financials of
21 the company and I think we talked about your
22 understanding of whether or not the company has

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

421

1  operated on a profit or loss.  We're talking about
2  2019, '18.  What about 2017?
3      A   I don't know.
4      Q   Okay.  And it's true that you have no
5  audited financial statements for 2017, '18, or
6  '19?
7      A   That is correct.
8      Q   And it's true that you haven't filed
9  any tax returns for 2017, '18, and '19; is that
10 correct?
11     A   That's correct.
12     Q   Okay.
13     A   Vivian, I'm sorry.  Could I get some
14 coffee.  Richard, could you grab me a coffee.
15 Thank you so much.  I'm so sorry.
16     Q   No, no problem.
17         And can you tell me whether the income,
18 the revenue stream from 2018 to 2019, has that
19 increased or decreased?
20     A   I don't know without looking at the
21 records.  I'm sorry.
22     Q   Do you have a general understanding

422

1  whether you believe it's increased or decreased at
2  all?
3         MS. PETERS:  Object to form.
4      A   I don't have a general understanding
5  and I would want to answer specifically not
6  generally anyway.  So without a specific answer I
7  can't -- I can't say.
8      Q   Do you know whether or not you're on
9  track from 2019 to -- well, I guess we're just
10 into February.
11     A   2020, right.
12     Q   All right.  So I'll scratch that for
13 now.
14     A   Okay.  Ask me in a few months.  June
15 perhaps.
16     Q   Do you have an understanding that in
17 2019 at least there have been significant bond
18 breaches on the RLI bonds?
19     A   As I indicated before, significant
20 breaches on the RLI bonds that I believe are part
21 and parcel to us not being able to contest, you
22 know, breaches at a level of asking for them to be

423

1  reconsidered.
2      Q   Okay.  And I'm going to show you -- I'm
3  going to mark this.
4      A   Which, by -- was another element of bad
5  faith in not allowing us to do that.  That was
6  another thing that we had raised before.  I wanted
7  to make sure I mentioned that to you.
8      Q   Which --
9      A   There were a lot of other elements to
10 the bad faith now that I think about it.  Because
11 one of the things that we had talked about was
12 RLI's arbitrary denial of allowing us to contest
13 breaches.  They were making it more likely that
14 the breaches would have to be paid.  So that
15 wasn't -- I just remember there were a couple
16 more.
17     Q   They didn't -- RLI advised -- they
18 didn't -- I'm sorry.  They didn't deny you -- I
19 mean, the breaches come when they come, right?
20 RLI has nothing to do with that, correct?
21         MS. PETERS:  Object to form.
22     A   Every surety that we've ever had gives

424

1  us the right to contest because it doesn't harm
2  anybody, it doesn't harm the surety.  The only
3  surety that hasn't given us the right to contest
4  is RLI.
5      Q   Do you have an --
6      A   And those -- and those -- contesting
7  them with the local bond unit office is the
8  easiest and most effective way to get them
9  canceled because that's the actual officer that's
10 doing it.
11     Q   But you have an understanding under the
12 indemnity agreement RLI has the exclusive right to
13 determine whether to appeal any claim?
14     A   Which is why I am exercising and
15 complying with the indemnity agreement even though
16 I think it's bad faith that RLI is withholding
17 those because --
18     Q   Aren't --
19     A   I am still -- I am still complying with
20 the indemnity agreement which is why I'm surprised
21 that we're in this litigation.
22     Q   Aren't you appealing RLI bond breaches

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

425

1  without RLI's authority?
2      MS. PETERS: Object to form.
3      A   No. Well, no, the co-obligor is
4  appealing bond breaches based on the co-obligor's
5  authority.
6      Q   Right. So -- that's Big Marco, right?
7      A   That's correct.
8      Q   And hasn't Nexus requested that Big
9  Marco issue those appeals?
10     A   We definitely communicate with Marco.
11 And when the case is that there's a bond breach
12 that should be appealed, we tell him that there
13 are issues and he knows that. And, so, yeah, we
14 have communications about the cases. He
15 understands if there are issues that require an
16 appeal, we work with counsel. We have counsel
17 that works with him.
18     Q   And you -- right. It's counsel that
19 you have --
20     MS. PETERS: Object.
21     Q   -- that works on the appeals, correct?
22     MS. PETERS: Object.

426

1      A   We provide counsel, that's sure.
2      Q   Right.
3      A   Yeah, we have plenty of lawyers.
4      Q   And isn't it -- and how are those
5  appeals being paid for?
6      MS. PETERS: Object to form.
7      A   What are you talking about?
8      Q   Who pays for the appeal?
9      A   The appeal fee?
10     Q   Uh-huh.
11     A   We pay the appeal fee.
12     Q   Okay. And who's paying for the legal
13 services for the appeal?
14     A   We — as I said, we have plenty of
15 lawyers and including them.
16     Q   Okay. And isn't it -- what percentage,
17 roughly, of bond breaches are being appealed by
18 Nexus?
19     MS. PETERS: Object to form.
20     A   I don't know.
21     Q   Would it be true to say that a large
22 majority of all of the bond breaches are being

427

1  appealed by Nexus?
2      MS. PETERS: Object to form.
3      A   I don't know that that would -- I think
4  it would be true given the fact that we appealed a
5  large number of bonds related to the Supreme Court
6  Pereira decision. So I think that if you look at
7  it just a snapshot you'd probably say yes, because
8  there's a significant number of those bonds,
9  almost all of them, were appealed because they
10 didn't have dates on the NTA. But for bonds that
11 do have dates on the NTA, you know, the analysis
12 of whether to appeal or not is different and, you
13 know, we don't appeal.
14     Q   And didn't RLI advise you that it would
15 consider appeals on a case-by-case basis if Nexus
16 or Libre provided documentation?
17     A   Mr. Sussman told me that he would
18 provide us -- he would provide us a letter to
19 contest because we -- already the co-obligor can
20 appeal. So Marco's ability to appeal is without
21 question.
22     So what we had asked for was a letter

428

1  to allow us to contest. And what Mr. Sussman — I
2  believe it was Mr. Sussman said is that he would
3  give us that letter on a case-by-case basis.
4  We've gone to him. We went to him multiple times
5  to request it. The attorney went to him to
6  request it. Each time he denied it. And we
7  believe those denials were arbitrary and —
8      Q   How many -- how many times?
9      A   I don't know.
10     MS. PETERS: Object to form.
11     Q   Is it more than -- more than -- more
12 than three?
13     MS. PETERS: Object to form.
14     A   I'm not sure how many times.
15     Q   Is it in writing, the times that Nexus
16 approached RLI?
17     A   At least one of them's in writing.
18     Q   Okay. Do you know if any other one
19 other than that one that's in writing?
20     A   But —
21     MS. PETERS: Object to the form.
22     A   I don't, but that doesn't mean that

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

---

429

1  there weren't.  I know that there's one.
2      Q    Okay.  Did you understand that
3  Mr. Sussman was requiring a written description of
4  the basis of the appeal?
5          MS. PETERS:  Object to form.
6      A    Of the basis of the reconsideration
7  request?
8      Q    Sure.
9      A    Because that's different.  I do believe
10 that he was asking for the basis of the
11 reconsideration request.  And I do believe that
12 the email that he was sent that I remember, at
13 least some of, provided a basis for why we were
14 trying to reconsider that.
15     Q    Right.  But other than the one, you
16 don't know of any other instance where Nexus
17 provided him that information in writing, correct?
18         MS. PETERS:  Object to form.
19     A    Of 20 emails you put in front of me I
20 recollect one.  Just because I don't recollect
21 them doesn't mean they didn't go out.  We have
22 asked — why would — we would definitely want to

430

1  be able to do this because see, we have been
2  paying RLI breaches, right?
3      Q    Okay.
4      A    So we would rather have fewer breaches
5  so we would rather be able to contest these bonds
6  at the bond breach manager level —
7      Q    Mr. Donovan —
8      A    — because the bond breach manager is
9  the person who ultimately decides if the bond
10 is — breached.
11     Q    This is —
12     A    — if there are —
13     Q    This is exactly —
14     A    I'm —
15     Q    I'm sorry.
16     A    I'm trying to finish —
17     Q    But this —
18     A    — my answer.
19     Q    No, this is —
20     A    If there are —
21     Q    — this is — the question was —
22     A    If there are —

---

431

1      Q    No, exactly —
2      A    I'm going to finish my answer.
3      Q    No.  Mr. —
4      A    I'm going to let you finish.
5      Q    Then we're going to go over seven
6  hours.  I'm going to tell you that right now.
7      A    I'm not going to go over —
8      Q    Yes.
9      A    — the seven hours.  I'm going to leave
10 at seven hours.
11     Q    Well, I'm telling you —
12     A    Because I'm telling this isn't fair.
13 I'm going to —
14     Q    I'm asking you —
15     A    — answer the question.
16     Q    — a question.  My question was, other
17 than the one do you have any evidence of any other
18 requests for —
19     A    Ms. —
20     Q    — in writing?
21     A    Ms. Katsantonis —
22     Q    It's a simple question.

432

1      A    Ms. Katsantonis, you just asked me the
2  same question after interrupting my answer to the
3  question.  That is insane.  I can't — I can't
4  answer questions you tell me to stop —
5      Q    Well, I'm not asking you to —
6      A    — answering and you ask me the —
7      Q    Okay, but I'm asking —
8      A    — same question again.
9      Q    I need facts, not we would have or why
10 it's important but did you or did you not?  Do you
11 have any evidence of any other requests in
12 writing?
13     A    I told you —
14         MS. PETERS:  Object to form.
15     A    — that I remember one specific one.  I
16 told you that that doesn't mean that there aren't
17 others.  I told you —
18     Q    But that sitting here today you don't
19 know of any other?
20     A    And — and obviously, we have asked
21 multiple times because we want to not have to pay
22 breaches, we'd rather those breaches be rescinded.

---

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

433

1 **The contesting them with the bond unit manager or**
2 **the bond officer is the easiest way to get them**
3 **rescinded because the bond unit officer is the one**
4 **who handled the case.  And so if there's an error,**
5 **like a person went to the wrong place or they**
6 **didn't get transferred their case or something,**
7 **the bond unit officer is the best person to handle**
8 **it —**
9     Q    Okay.
10    **A    — because they handle the file.**
11    Q    And I'm taking it that as you don't
12 know of any other written document today other
13 than the one?
14    **A    So what you're doing is —**
15         MS. PETERS:  Object to the form.
16    **A    — you're asking me — listen, I want**
17 **to understand.  You're asking me a question, I'm**
18 **giving you an answer and then you're restating my**
19 **answer in a completely separate way to fit your**
20 **narrative.  That's not okay with me.**
21    Q    I'm just asking you if you are —
22 you -- you testified --

434

1    **A    I answered the question.**
2    Q    -- you're familiar with one.
3    **A    I testified that I know of one in**
4 **writing.**
5    Q    Okay.
6    **A    I didn't say that there aren't others.**
7        (Donovan Exhibit 29 marked for
8 identification and attached to the transcript.)
9    Q    Showing you a document dated
10 January 11th, 2019.  The bottom of the document is
11 from Hazzar Perdomo to Mr. Schneider, and
12 Mr. Schneider forward that document to you.  Do
13 you recognize this document?
14    **A    I don't.  I don't remember the email,**
15 **but I see it here and I see my email is on it.**
16    Q    And this document provides that as of
17 January 11th, 2019, that there are 75 RLI invoices
18 with a total of $894,395.50 that Libre by Nexus
19 has a record that is outstanding.  Is that
20 correct?
21    **A    I do see that.**
22    Q    Okay.  And do you have any reason to

435

1 believe this information is inaccurate?
2    **A    I don't have any reason to believe it's**
3 **inaccurate based on the email that you've handed**
4 **me.**
5    Q    All right.
6    **A    I will also say that these have been**
7 **paid, I'm sure.**
8         MS. KATSANTONIS:  Mark this document.
9         (Donovan Exhibit 30 marked for
10 identification and attached to the transcript.)
11        MS. PETERS:  What was that one marked?
12        THE WITNESS:  That was 29.
13    Q    I'm going to -- then this is document
14 dated January 14th, 2019.  It's, again, from
15 Hazzar Perdomo to Mr. Schneider -- oh, I'm sorry.
16 Yes, and it's sent to Mr. Schneider and also you.
17 Correct?
18    **A    That is correct.**
19    Q    And this -- as of January 14th, 2019,
20 Ms. Perdomo is advising that she has gathered the
21 Excel sheets of the breach invoices that are
22 currently due, correct?

436

1    **A    That's correct.**
2    Q    And based on her Excel sheet, she's
3 advising that for AIA Surety there are 55 invoices
4 due totaling $471,269.71, correct?
5    **A    That's what it says.**
6    Q    And that as of January 14th, 2019,
7 there are 294 invoices due for bonds issued by
8 FCS, and the total amount is -- owed is
9 3,700,941.93, correct?
10   **A    No, it looks like there's a**
11 **typographical error there, but yes, I think it is**
12 **saying what you had read I would assume.**
13   Q    Then with regard to RLI it lists the 75
14 invoices totaling $894,395.50, correct?
15   **A    That's what it says, yes.**
16   Q    Okay.  And do you have any reason to
17 dispute the accuracy of these numbers?
18   **A    I don't have any reason to dispute the**
19 **accuracy of these numbers since they're reported.**
20 **However, that doesn't mean that these were, you**
21 **know, paid versus canceled versus rescinded.  I**
22 **don't know what the result of that is.  So I can**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

437

1 tell you that this email looks correct and I don't
2 have any reason to doubt it.
3     Q    All right.  I want to go back and look
4 at the indemnity agreement.
5     A    Okay.  You'll have to give me a second.
6         MS. PETERS:  What's the number, Mike?
7         THE WITNESS:  I don't know.  I still
8 haven't found it, to be honest with you.
9     Q    Do you mind if I look through this
10 stack with you?
11     A    No, please, go right ahead.  It's all
12 the stuff you handed me anyway.  There at the
13 bottom you could have figured that.  All right,
14 I'm here at 330587.
15     Q    Right.  And I know we looked at this
16 earlier today.
17         MR. KOWALCZUK:  Where are you looking
18 at?  I'm sorry.
19     Q    Under paragraph -- well, first of all
20 looking at the big paragraph before you get to
21 definitions.
22     A    Uh-huh.

438

1     Q    And the last sentence.  It says, "In
2 consideration of the execution of any such bonds
3 for principal, and as an inducement to such
4 execution by surety, the Indemnitors jointly and
5 severally agree as follows."
6 Right?
7     A    I see that, yep.
8     Q    And so you understood that the
9 indemnity agreement was being executed in
10 consideration for RLI issuing bonds which Nexus
11 requested that it issue, correct?
12     A    Correct.
13         MS. PETERS:  Object to form.
14     Q    All right.  And with regard to
15 paragraph 2, you understood Nexus has an
16 obligation to indemnify RLI, correct?
17     A    I understand that Nexus has a
18 responsibility to indemnify RLI related to final
19 claims, payment of the bonds that RLI has paid for
20 the indemnification, right?
21     Q    The indemnity agreement 2 a. says,
22 "Indemnitor agrees to pay to Surety upon demand,"

439

1 right?
2     A    That's right.
3     Q    So did you understand that you were to
4 pay the surety whenever it requested that you do
5 so?
6     A    Well, no --
7         MS. PETERS:  Object to form.
8     A    -- because -- no, because there are
9 three subparagraphs.  I mean, you can't just --
10 indemnitors agree to pay surety upon demand and
11 then end it there is open.  What does it mean?  It
12 says there are three sub -- "All losses, costs,
13 damages, attorneys' fees and expenses of whatever
14 kind or nature or is by reason of or in
15 consequence of the surety having executed any bond
16 on behalf of the principal" --
17         MR. KOWALCZUK:  Mike, you have to slow
18 down when you're reading.
19         MS. KATSANTONIS:  Yeah, don't --
20         MR. KOWALCZUK:  She can't possibly --
21         MS. KATSANTONIS:  Let's now read --
22 maybe not let's read out loud so she doesn't have

440

1 to take it all down.
2     A    I understand but the problem -- here's
3 the -- the problem is that's not what -- you know,
4 what you read isn't what it says and I don't want
5 the record to be confused.
6     Q    Did you understand that you were to pay
7 to the surety upon demand an amount sufficient to
8 discharge any claim made against surety on any
9 bond?
10     A    Yes.
11     Q    And did you understand that the sum
12 could be used to pay the claim or held by the
13 surety as collateral security against a loss on
14 any bond?
15     A    My understanding is that if I pay a
16 bond, that I am required to stand in front of the
17 principal.  And so I am either required to pay a
18 bond when it is a final claim when it is breached
19 and I am required to pay that or the surety can
20 demand collateral at a time when a breach is
21 issued.
22     Q    Does the surety --

441

1        MS. PETERS: Object to the form.
2        A    So you have the -- you have the -- you
3    have the ability to demand that I indemnify you,
4    that I pay something that you paid.  You have the
5    ability to say that I have to exonerate you based
6    on a breach.  So if there is a breach and you say
7    I want collateral for that pending whatever
8    happens, then I have to pay that collateral.
9    That's my understanding.
10       Q    And nowhere in the indemnity agreement
11   does it provide that you have a choice to either
12   pay collateral or indemnify the surety, right?
13       MS. PETERS: Object to form.
14       Q    The agreement doesn't provide you with
15   that choice, correct?
16       MS. PETERS: Object to the form.
17       A    Oh, I think it's requiring -- these are
18   responsibilities as I read them, right?  So these
19   are responsibilities --
20       Q    Obligations.
21       MS. PETERS: Object to form.
22       A    I believe that I've met my obligations.

442

1        Q    That's not what I'm asking you.  I'm
2    saying the indemnity agreement doesn't provide you
3    with a choice of whether to exonerate the surety
4    and pay collateral -- or sorry, let me start over.
5        The indemnity agreement doesn't provide
6    you with the choice to either pay collateral or
7    indemnify the surety, right?
8        MS. PETERS: Object to form.
9        A    Well, both provisions are in the
10   contract.  I'm not really sure what -- maybe I'm
11   not understanding what you're asking me.
12       MR. WILLIAMS: Yeah.
13       Q    Well, you keep asserting that you have
14   some sort of choice.
15       MR. HARRIS: Mr. Williams, please, no
16   comments.
17       MR. WILLIAMS: Sorry.
18       Q    The indemnity agreement doesn't provide
19   you with choices, right, it provides you with what
20   your obligations are to the surety upon demand,
21   correct?
22       MS. PETERS: Object to form.

443

1        A    It does provide obligations and I think
2    we've met those obligations.
3        Q    All right.  And one of those
4    obligations is to pay an amount sufficient to
5    discharge any claim made against the bond,
6    correct?
7        A    Where are you?
8        Q    2A little 2.
9        A    Yep, I see that.
10       Q    Okay.  Did you understand that that was
11   an obligation of Nexus?
12       A    Yes.  That I would have to pay an
13   amount sufficient to discharge a claim which is a
14   breach.
15       Q    Right.  And any -- that you would have
16   the obligation to pay any claim made against the
17   bond, correct?
18       MS. PETERS: Object to form.
19       A    Right.  A breach.  Yes.
20       Q    Okay.  And did you understand under
21   2 --
22       A    And I think it's important to

444

1    understand --
2        MS. PETERS: Object to form.
3        A    -- that it's a final claim.
4        MS. PETERS: Object to form.
5        A    A final determination of the breach.
6    That's important.
7        Q    It doesn't say a final determination of
8    a breach, does it?
9        A    It says claim and claim is defined in
10   CFR in the context of immigration bond as a breach
11   with a final determination.
12       Q    The CFR does not incorporate into the
13   indemnity agreement, correct?
14       MS. PETERS: Object to form.
15       A    It's plain language.
16       Q    There's a section of definitions that
17   claim's not defined in that definition section,
18   right?
19       MS. PETERS: Objection.
20       A    Right, which is why I assume that we
21   just use the legal definition as it relates to the
22   actual business that we're writing.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

445

1    Q   Well, it doesn't --
2    A   I would have -- I'm sorry,
3  Ms. Katsantonis, I would assume that if you wanted
4  claim to mean something different than it reads in
5  the plain language of the statute you would have
6  put it in here under definitions.  Since you
7  didn't, I assume claim means claim.
8    Q   So claim means claim pursuant to the
9  definition of claim, right?
10    MS. PETERS:  Object to form.  He
11 further defined it as the CFR.
12    A   In the CFR related to the issuance of
13 immigration bonds, very specifically.
14    Q   Isn't a claim a demand or request for
15 something that is considered due?
16    A   Black's Law.
17    MS. PETERS:  Objection.
18    A   So, yes, going further specifically as
19 it relates to the issue of immigration bonds, the
20 CFR specifically identifies a claim --
21    Q   So CFR --
22    A   -- as a bond breach with no pending

446

1  appeal.  That's what it says.
2    Q   Does the notice to deliver have a due
3  date?
4    MS. PETERS:  Object to form.
5    Q   For delivery?
6    A   Yes, deliver would have a delivery
7  date.
8    Q   Okay.  And would that provide for a
9  claim under the bond?
10    A   I don't believe so.
11    MS. PETERS:  Object to form.
12    Q   It's your testimony that you don't
13 believe a notice to deliver is a claim under the
14 bond?
15    MS. PETERS:  Object to form.
16    A   I understand that that's when your
17 expert thinks that it starts.  I don't believe
18 that because there's nothing — first of all,
19 there's — all of those aren't even removal
20 orders.
21    Q   Okay.
22    A   So some of those are people who have

447

1  law enforcement interviews and walk right out the
2  door.  How can that be a claim on the bond?  It
3  doesn't make sense.  I mean until we know what
4  happened, until that person is breached.  Until
5  there's an index.  Until we have --
6    Q   There's no -- you didn't include any
7  language.
8    MS. PETERS:  Object to form.  You just
9  interrupted him again, Ms. Katsantonis.
10    MS. KATSANTONIS:  I don't need you to
11 raise your voice, Ms. Donne Peters.  We're having
12 a --
13    MS. PETERS:  It's been all long and
14 you've interrupted him --
15    MS. KATSANTONIS:  It's not proper,
16 okay.
17    MS. PETERS:  What you're doing is an
18 improper examination.  I would ask you to stop
19 interrupting him.
20    MS. KATSANTONIS:  Okay, Ms. Donne
21 Peters.  Let's move on.
22    Q   Under the indemnity agreement you did

448

1  not -- there are no revisions to the indemnity
2  agreement, there's no qualifications of what a
3  claim is or references to the CFR, correct?
4    A   That's why I assumed the legal
5  definition of claim as it relates to immigration
6  bonds would be the one that we would use because
7  if you were going to use a special definition that
8  wasn't part of the legal definition of the claim
9  related to immigration bonds, I would have assumed
10 that you would have identified in the definition
11 section.
12    Q   Or you would have identified it in
13 the --
14    A   Well, no, I would have assumed it was
15 part -- it was consistent with the law and what
16 the CFR says.  That's what I assumed and that's
17 because you didn't identify it as something
18 different.
19    Q   Okay.  All right.  And regarding claims
20 against a surety, did you understand under
21 paragraph 2B little 1 that the surety has the
22 exclusive right for itself and the indemnitor to

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

449

1 determine whether any claim or suit upon a bond
2 shall, on the basis of liability, expediency, or
3 otherwise, be paid, compromised, defended or
4 appealed?
5      MS. PETERS: Object to form.
6   A   I see that, yeah.
7   Q   Did you understand that term?
8   A   I think I do understand that, yeah.
9   Q   And so you understood that at least as
10 between -- let me strike that.
11      You understood that the surety had the
12 right for itself and the indemnitors to make a
13 determination whether to appeal any bond breach,
14 correct?
15      MS. PETERS: Object to form.
16   A   The surety has a right to determine
17 whether the surety is going to appeal the bond
18 beach.  But the co-obligor has an equal right to
19 appeal the bond breach.
20   Q   But I'm talking about for the
21 indemnitor.  The surety had the right as to the
22 indemnitor to make a determination whether or not

450

1 to appeal a bond breach?
2      MS. PETERS: Object to form.
3   A   Right.  And the surety can make that
4 determination.  The co-obligor hasn't — is
5 jointly and severally liable to the government and
6 has that right independent of the indemnitors.  And
7 it's in the fact.  Read it on the I-352.  It says
8 jointly and severally liable.
9   Q   Do you understand under 2B little 3
10 that in any claim or suit hereunder an itemized
11 statement of the aforesaid losses and expenses
12 sworn to by an officer of the surety shall be
13 prima facie evidence of the fact and extent of
14 liability hereunder of the indemnitors.
15      MS. PETERS: Object to form.
16   A   I want to read this because you started
17 halfway into the paragraph.  So let me just —
18 it's little 3, right?
19   Q   Right.
20   A   Okay.  I do see that, yeah.
21   Q   Okay.  And looking at paragraph 3,
22 general provisions.  So I'm sorry, you said you

451

1 see that but you understand that that's a term,
2 correct, that an itemized statement is prima facie
3 evidence of the extent of your liability?
4      MS. PETERS: Object to the form.
5   A   So I see that here.  I think it.  But
6 reading it without the first sentence to the
7 paragraph is I think disingenuous.  It's talking
8 about the surety's rights related to a claim.  As
9 I testified, the co-obligor has -- is jointly and
10 severally liable and has equal rights to file an
11 appeal.  So I would say that this -- certainly the
12 surety has rights.  The co-obligor also has rights
13 related to the bond.
14   Q   Well, you're not here on behalf of the
15 co-obligor, are you?
16   A   Of course not.
17   Q   Right.  So it's irrelevant what rights
18 a co-obligor may have as between RLI and Nexus,
19 correct?
20   A   It's not irrelevant, Ms. Katsantonis,
21 when a woman like the one you put in front of me
22 earlier that went to the wrong office not because

452

1 she went to the wrong office but because she was
2 directed to go to — I'm going to finish.  She was
3 directed to go to a different office.  This is a
4 real person, Vivian, with a child.  She's
5 ████████  This is a real human being, not a
6 building, not a widget.  It's a human being, okay?
7 That human being has human rights.
8      The co-obligor is jointly and severally
9 reliable for the bond.  If the co-obligor wants to
10 appeal, great.  If there's a reason, and there was
11 in that case, I mean that's exactly why the appeal
12 rights are there.
13   Q   And this human being that you were
14 referring to, she was delivered to custody by
15 Nexus, right?
16      MS. PETERS: Object to form.
17   A   No.  We don't arrest people.  We
18 will —
19   Q   You delivered her.
20      MS. PETERS: Object to form --
21   A   We attend with them.  We don't --
22 deliver --

453

1    Q    Right.
2    A    — means that you pick a person up and
3 take them —
4    Q    You escorted -- I'm sorry.  You
5 escorted her to custody, correct?
6        MS. PETERS:  Object to form.
7    A    No, that's absolutely incorrect.  We
8 provide transportation services to meetings.  So
9 it's a different thing to — when you say
10 escorting to custody, you're implying that we pick
11 the person up in handcuffs or something like that.
12 That's absolutely not true.
13    Q    I'm not implying anything.  I'm just
14 saying you escorted --
15    A    I think the implication is there based
16 on the words.  I'm just explaining that that's not
17 what it is.
18    Q    Well, you know what happens, I don't.
19 So I'm just trying to say you escorted --
20    A    Hence, the reason I'm providing the
21 detail because I want to make sure —
22    Q    You transported --

454

1    A    -- my answer isn't misunderstood.
2    Q    You transported her --
3    A    I don't know that we transported her.
4    Q    -- and responded to the delivery.
5    A    I don't know because as I told you
6 before I didn't read that file.  I'm referencing
7 the email that you put in --
8    Q    All right.
9    A    -- front of me.  I'm pointing out that
10 these are real people with real lives and they
11 matter.  And it should matter to RLI too, and it
12 doesn't.  And I understand that which is why the
13 co-obligor cares to appeal because you'd rather
14 pay -- RLI would rather pay the bond and screw
15 that person's ability to be able to get their case
16 reopened to be able to get relief.
17    Q    All right.
18    A    I don't certainly agree with RLI in
19 that case.  I think that people matter.  And I am
20 heartened that Marco thinks that people matter and
21 he's willing to appeal.  I think --
22    Q    Well, thank you.

455

1    A    -- it's a wonderful thing.
2    Q    Thank you.  I'm looking at paragraph 3
3 now of the agreement.  General provisions and I'm
4 looking at paragraph 3B.
5        You understood that the surety had the
6 right at its option and in its sole discretion to
7 decline the execution of any bond; is that
8 correct?
9    A    Uh-huh.
10    Q    All right.  So you understood that RLI
11 could at any time stop writing bonds on behalf of
12 Nexus, correct?
13    A    Oh, sure.  That's why we didn't sue
14 them when they did.  We entered an agreement of
15 course that said that we could do that instead of
16 paying collateral.  So we did that.
17    Q    And in fact --
18        MS. PETERS:  Eight minutes.
19        THE VIDEOGRAPHER:  18.
20        MS. PETERS:  18 minutes.
21    Q    And in fact RLI could stop writing
22 bonds at any time.  It didn't need Nexus to find

456

1 another surety to transfer or to start writing
2 bonds for it, right?
3        MS. PETERS:  Object to form.
4    A    You know, that's a really good point.
5 That's right.  Which is why it's telling that RLI
6 was willing to continue to write this business
7 even though the proverbial roof was on fire as we
8 sit here today.  We're sitting here today talking
9 about how freaked out RLI was but yet they
10 continue to write business.  And you're right,
11 they could have stopped at any time.  They could
12 have but didn't.  You know why?  Because they were
13 continuing to receive premium and they understood
14 that this roof wasn't on fire.
15    Q    Didn't they --
16    A    The roof was only on fire after they
17 stopped --
18    Q    Didn't they give you --
19    A    -- getting premium every day.
20    Q    Didn't they give you notice?
21    A    You're interrupting me again and --
22    Q    Well, I know --

457

1    A    — I can't answer the question —
2    Q    But, Mr. Donovan --
3    A    — if you don't provide me --
4        MS. PETERS:  Object to the form.
5    A    — an opportunity to answer.
6    Q    I thought you were done.
7    A    I wasn't.
8    Q    I thought you were done.
9    A    You'll know I'm not done when I'm
10 continuing to talk, Vivian.  I was continuing to
11 talk.  You couldn't possibly have thought I was
12 done.
13   Q    Go ahead.
14   A    I'm done now.
15   Q    Okay.  So isn't it true that at least
16 as of November -- remember we were looking at that
17 email.  At least as of November of 2016, RLI gave
18 you advance notice and advised that it was going
19 to stop issuing bonds as of February 2017, right?
20   A    I believe the email is on December 7th,
21 but, yes, it was a December email.
22   Q    But it was referencing a discussion

458

1 weeks earlier.  You may recall that.
2    A    I don't recall, but, yeah, maybe.
3    Q    Okay.  So RLI did not need you or
4 require you to get another surety to start writing
5 bonds, correct?
6    A    Well, to exercise their right to stop
7 issuing bonds.
8    Q    Right?
9    A    They certainly wouldn't have had to do
10 that.
11   Q    Exactly.  Isn't it indicative of RLI's
12 desire to work with you to provide you advance
13 notice that it was going to stop issuing bonds on
14 behalf of Nexus?
15       MS. PETERS:  Object to form.
16   A    No.  I don't think so.  I think RLI's
17 interest would have been served and Nexus
18 continuing to be financially healthy.  I think RLI
19 was shrewd enough to understand that and
20 understood that having a new surety partner would
21 be an important aspect of that equation.  So
22 that's what I think but that's just conjecture.

459

1    Q    All right.  Looking at paragraph 3C,
2 provides until surety has been furnished with
3 conclusive evidence of its discharge without loss
4 from any bonds and until surety has been otherwise
5 fully indemnified, surety shall have the right of
6 access to books, records, and accounts.
7        Did you understand that surety had this
8 right to access Nexus' books and records?
9    A    To be honest.
10       MS. PETERS:  Object to form.
11   A    To be honest with you, Ms. Katsantonis,
12 I was surprised to understand what the broad
13 definition of books and records meant.  I was
14 schooled on that definition during our multiple
15 motions for injunctive relief and I do now
16 understand that to be a broader term than I
17 understood it when I signed it.
18   Q    Okay.  And looking at --
19   A    But we've complied.  A millions pages
20 of documents and, you know, anything else you
21 want, just let me know.
22   Q    Okay.  And paragraph 3D provides, and

460

1 I'm looking at the second sentence, "Indemnitors
2 will, upon the request of surety, procure the
3 discharge of surety from any bond and all
4 liability by reason thereof."
5        Do you understand that?
6    A    I do.
7        MS. PETERS:  Object to form.
8    Q    Okay.
9    A    But there's no way that that -- you
10 can't -- you can't read that independently of
11 section 2.  It clearly is talking about bonds
12 where there's a claim.  Because you've hit -- I
13 mean, there are specific indemnity provisions and
14 then there are general provisions.  The general
15 provisions are obviously referencing the specific
16 provisions.  I mean that's certainly how I read it
17 and certainly how I understood Dave Sandoz to mean
18 it.
19   Q    What do you mean Dave Sandoz to mean
20 it?
21   A    Well, he's the person that I signed
22 this agreement with.  He's the person I discussed

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

116 (461 to 464)



461

1  this with.
2      Q    RLI doesn't sign this agreement, do
3  they?
4      MS. PETERS:  Object to form.
5      A    I'm sorry?
6      Q    RLI doesn't sign this agreement, does
7  it?
8      MS. PETERS:  Object to form.
9      A    It's an agreement to RLI.  We would
10 have discussed it significantly before we signed
11 it.
12     Q    It sets forth your obligations, right?
13     A    I'm sorry, I didn't say that Dave
14 Sandoz signed it.  I said that we went over it
15 with Dave Sandoz.  That's what I said.
16     Q    And the agreement sets forth your
17 obligations, Nexus' obligations, right?
18     A    Sure.
19     Q    Right?
20     A    It's a general indemnity agreement,
21 yeah.
22     Q    It doesn't impose any obligations upon

462

1  the surety, does it?
2      MS. PETERS:  Object to form.
3      A    You know, I'm not sure that I agree
4  with that.  Because there would be no general
5  indemnity agreement if the surety wasn't — if
6  there wasn't a partnership, if the surety wasn't
7  executing bonds.  It certainly gives the surety
8  the right to stop issuing bonds.  But, you know,
9  I'm going to refrain from saying that, you know,
10 final —
11     Q    Can you point to an obligation in here
12 that the surety has in the agreement?
13     MS. PETERS:  Object to form.
14     A    Give me a minute to read it again.
15     Q    Sure.
16     A    Okay.
17     MS. PETERS:  And I'm going to object to
18 the form of the question to the extent that it
19 seeks a legal conclusion.
20     A    Okay.
21     Q    Mr. Donovan, you just spent several
22 minutes reviewing the indemnity agreement.  Did

463

1  you come up with anything with regard to the
2  obligation of the surety?
3      A    Can you — what was the specific
4  question again?  You wanted to know if there were
5  obligations of the surety under this agreement?
6      Q    Right.
7      A    So everything about this agreement
8  relates to bonds that the surety posted.  So I'm
9  afraid I don't really understand.  Everything
10 about this agreement relates to responsibilities
11 that we have related to bonds that the surety
12 posts.  So we have no responsibilities to the
13 surety if they weren't posting the bonds.  It
14 doesn't mean that they have a future requirement
15 to continue posting bonds but they posed bonds —
16     Q    Right.
17     A    — under the agreement.
18     Q    Can you point to any provision in this
19 agreement that imposes an obligation on RLI?
20     A    I think I just answered the question.
21 What I'm saying to you is that RLI is issuing
22 bonds that are the subject of this agreement.

464

1  There would be no agreement if RLI wasn't issuing
2  the bonds.
3      Q    Right.  And you're executing the
4  agreement as inducement for RLI to issue bonds,
5  right?
6      MS. PETERS:  Object to the form.
7      A    We in the agreement are agreeing to
8  stand in front of the principal for RLI.
9      Q    Right.
10     A    So yeah, that obviously is important to
11 RLI in the determination to issue the bonds.
12     Q    Right.  So RLI issues the bonds and you
13 undertake these obligations set forth in the
14 indemnity agreement, correct?
15     A    Correct.
16     MS. PETERS:  Object to form.
17     Q    And there's — and there's no other
18 provision in this indemnity agreement that
19 provides --
20     MS. PETERS:  Object to form.
21     Q    Any other --
22     MR. HARRIS:  She hasn't got her

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

117 (465 to 468)

465

1  question out.
2        MS. KATSANTONIS:  I know.  How can you
3  object to form when I say and there's no -- I
4  haven't even finished my question.
5        MS. PETERS:  You know what, I just
6  interrupted you and I apologize.
7        MS. KATSANTONIS:  Okay.
8      Q    And there is not any other provision in
9  this agreement that provides any other obligation
10 upon RLI, correct?
11     A    Oh, I disagree.
12       MS. PETERS:  Object to form.
13     A    I mean, the collateral agreement is not
14 only signed by Bart Davis but there are
15 provisions.  I mean, these agreements are
16 together.  We signed these agreements together.
17 They operate together.  So I don't think we --
18     Q    Let's just take the indemnity
19 agreement.
20     A    Well, I don't think we can do that.
21 Like, I don't think you can just say the general
22 indemnity agreement lies --

466

1      Q    You just spent --
2      A    -- on its own.
3      Q    You just spent several minutes reading
4  the indemnity agreement.
5      A    That's true --
6      Q    And my question is --
7      A    I didn't --
8      Q    -- based on the indemnity agreement do
9  you see any provision --
10     A    I can read the rest of this --
11     Q    -- that provides --
12     A    -- and answer your question
13 specifically.  These agreements go together.  You
14 sent me an -- you showed me an email earlier where
15 I had --
16     Q    I'm going to allow you --
17     A    -- was sent these agreements together.
18 In fact, this is the email you sent earlier with
19 these two agreements stapled together.
20     Q    I'm going to --
21     A    You can't honestly tell me that they're
22 not together.

467

1      Q    I'm going to allow you to take the
2  collateral agreement out for a minute, so you can
3  save that.  But in the indemnity agreement you
4  just read, is there any provision in that
5  agreement that provides for any obligation upon
6  RLI?
7        MS. PETERS:  Object to form.
8      A    So you're asking me if half of the
9  agreement?  If you read the whole agreement
10 together --
11     Q    Okay.
12     A    -- absolutely.
13     Q    I'm asking you as to this indemnity
14 agreement.  You can't point to anything, correct?
15       MS. PETERS:  Object to the form.
16     A    I can point to this entire agreement
17 and the signature from Bart Davis on the
18 agreement.
19     Q    Okay.  Now, looking at -- as far as the
20 first three pages of -- this exhibit.
21       MS. PETERS:  Which exhibit are you
22 talking about?

468

1        MS. KATSANTONIS:  Just hold on.
2      A    Yeah, I don't know what you're talking
3  about, Vivian.
4      Q    All right.  In looking at the
5  commercial surety general indemnity agreement and
6  on your exhibit it's pages 0048914 and 1 of 3, 2
7  of 3, and 3 of 3.  Those three pages you cannot
8  identify any provision that imposes an obligation
9  upon RLI; is that correct?
10       MS. PETERS:  Object to form.
11     A    I disagree with the premise of the
12 question.  The agreements aren't independent of
13 one another.  You presented an email where you
14 showed me that RLI -- I mean, let's go look at the
15 email.  The email said we require these things.
16 And it included --
17     Q    Okay.  You can't point to any
18 provision --
19     A    I just did.
20     Q    -- in the first three pages?
21     A    I pointed to the signature --
22       MS. PETERS:  Object to form.

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

469

1      MR. WILLIAMS:  Excuse me, can I ask a
2  question?
3      Q   No, you cannot, Mr. Williams.  We can
4  talk after we're off the record.
5      MR. WILLIAMS:  Okay.
6      Q   Let me ask you another question.
7  Looking at paragraph 3F, liability of indemnitors.
8  Do you see it says, "Liability of indemnitor shall
9  not be affected by," and I'm looking at little 2,
10 "any claim that other indemnity or security was to
11 have been obtained."
12     Do you see that?
13     MS. PETERS:  Object to form.
14     A   Sure, I see -- I see where --
15     Q   Do you understand that the liability of
16 Nexus would not be affected by any claim that
17 security was to have been obtained?
18     MS. PETERS:  Object to form.
19     A   What do you mean?
20     Q   Did you understand herein that the
21 liability of Nexus would not be affected by any
22 assertion that security was to have been obtained?

470

1      MS. PETERS:  Objection.
2      Q   But was not.
3      MS. PETERS:  Object to form.
4      A   But wouldn't that be related to RLI
5  getting additional security or an indemnitor?  Why
6  would that have anything to do with me, like, I
7  don't even understand what you're asking me.
8      Q   Did you understand that the lability of
9  Nexus would not be affected by the return or
10 exchange of any collateral that may have been
11 obtained?
12     MS. PETERS:  Objection to the form of
13 the question.
14     A   I believe that our liability wouldn't
15 change if RLI got another indemnitor.
16     Q   They're talking about the liability of
17 you, the indemnitor.
18     A   I'm sorry.
19     MS. PETERS:  Object to form.
20     A   The liability of Nexus to RLI would not
21 necessarily change if RLI got a second indemnitor
22 which is what little 2 means which has nothing to

471

1  do with me.  Or if they returned or changed
2  collateral.  I will agree with you that our
3  liability under the agreement is —
4      Q   Nexus' liability?
5      A   -- is set forth.  Our.  I don't work
6  for RLI.  Yes, Nexus.
7      Q   Okay.  Nexus' liability is not affected
8  by the return or exchange of any collateral,
9  correct?
10     MS. PETERS:  Object to the form.  He's
11 asked -- he's asked and answered that.
12     A   Yeah, I think that means if I pay
13 collateral I'm still responsible for the -- if
14 there's a claim that I'm still responsible for
15 that even if --
16     Q   Or if any collateral is returned to you
17 the liability of Nexus is not affected, correct?
18     MS. PETERS:  Object to form.
19     A   When RLI agreed to return all of our
20 collateral at the end of the year I would have
21 still been expected to be responsible and stand as
22 indemnity, yes.

472

1      Q   Right.  And you'd still be responsible
2  under the terms of this agreement, correct?
3      A   And we have been responsible and we
4  have complied which is why this litigation is
5  incredibly surprising and depressing.
6      Q   Okay.  And you -- and when we were
7  looking at the March 3rd demand and the March 10th
8  demand for collateral, you did not respond to
9  RLI's demands prior to March 13th, when they
10 issued you a letter demanding collateral, right?
11     MS. PETERS:  Object to form.
12     A   March 13th?  I believe it was
13 March 10th.  Either way, March 3rd, March 6th,
14 it's a Friday and a Monday, as I previously
15 testified, that's a -- I mean, it's basically the
16 day before and the day after.  You're basically
17 saying he sent me an email on Monday -- Friday and
18 Monday.  I mean --
19     Q   Right.
20     A   -- the chances of me reading Friday's
21 before Monday's are slim to be honest with you.
22     Mr. Sussman requested a response by

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

119 (473 to 476)

473

1 March 10th in his March 3rd and March 6th
2 communications with you, correct?
3     **A   I can appreciate that.  But, you know,**
4 **I apologize that I wasn't able to get back to**
5 **Mr. Sussman in a couple of days.  I apologized**
6 **that the time period that he demanded me to**
7 **respond to him was so short that I wasn't able to**
8 **get back to him.  If I didn't get back to him.**
9 **Again, I don't recollect those conversations.**
10     Q   You understood -- you knew that
11 those -- that that demand was outstanding but you
12 just chose not to respond to Mr. Sussman, correct?
13     MS. PETERS:  Object to form.
14     **A   No.  You have to understand,**
15 **Ms. Katsantonis, I was told by RLI in December**
16 **that they needed $1.25 million in collateral but**
17 **that if I found a new surety by February 28th,**
18 **2017 that I wouldn't have to pay that collateral.**
19     Q   Did you understand that nobody from RLI
20 had been communicating --
21     MR. KOWALCZUK:  Seven hours is up.
22     MS. PETERS:  You're done.

474

1     MR. KOWALCZUK:  Thank you.
2     MS. PETERS:  Thank you.
3     THE WITNESS:  Great.
4     MS. KATSANTONIS:  Okay.  So you're not
5 going to let me finish my question?
6     MS. PETERS:  No, I'm not.
7     MS. KATSANTONIS:  Okay.  I just want to
8 put that on the record.
9     MS. PETERS:  Go right ahead.
10     MS. KATSANTONIS:  Okay.
11     THE VIDEOGRAPHER:  We are now going off
12 the record at 21:44.
13
14
15
16
17
18
19
20
21
22

475

1     ACKNOWLEDGMENT OF DEPONENT
2     I, MICHEAL PAUL DONOVAN, do hereby
3 acknowledge that I have read and examined the
4 foregoing testimony, and the same is a true,
5 correct and complete transcription of the
6 testimony given by me and any corrections appear
7 on the attached Errata sheet signed by me.
8
9 _____   _____
10   (DATE)            (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

476

1     CERTIFICATE OF REPORTER - NOTARY PUBLIC
2     I, JUDITH E. BELLINGER, RPR, CRR, the
3 officer before whom the foregoing deposition was
4 taken, do hereby certify that the foregoing
5 transcript is a true and correct record of the
6 testimony given; that said testimony was taken by
7 me and thereafter reduced to typewriting under my
8 direction; that reading and signing was requested;
9 and that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and
11 have no interest, financial or otherwise, in its
12 outcome.
13     IN WITNESS WHEREOF, I have hereunto set
14 my hand and affixed my notarial seal this 27th day
15 of February, 2020.
16 My Commission Expires:  September 30, 2020
17
18
19 *Judith E. Bellinger*
20 _____
21 NOTARY PUBLIC IN AND FOR
22 THE COMMONWEALTH OF VIRGINIA

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

120

**A**

a-e-1
25:13, 25:18, 25:21
aao
227:10, 227:17, 227:18
ability
34:15, 370:19, 427:20, 441:3, 441:5, 454:15
able
18:19, 43:11, 53:3, 139:14, 141:7, 141:20, 142:6, 153:7, 164:3, 165:1, 177:3, 221:20, 221:21, 222:3, 234:15, 244:14, 255:2, 329:4, 331:5, 336:14, 341:19, 363:11, 364:21, 397:1, 422:21, 430:1, 430:5, 454:15, 454:16, 473:4, 473:7
abridge
330:6
abridged
151:9, 151:14, 283:11
abridging
367:18
absolute
386:17
absolutely
15:21, 16:5, 22:14, 22:20, 52:8, 55:13, 58:11, 98:7, 199:3, 207:5, 214:5, 292:7, 297:10, 308:12, 317:19, 351:21, 381:6, 386:1,

386:20, 396:5, 453:7, 453:12, 467:12
accept
242:2, 242:3, 304:18
acceptable
147:19
accepted
113:13, 113:14, 167:8
access
20:7, 198:4, 198:9, 199:4, 203:1, 203:21, 204:7, 204:11, 204:13, 204:16, 204:18, 205:6, 218:11, 218:13, 218:17, 342:10, 363:18, 368:7, 369:11, 414:1, 414:2, 459:6, 459:8
accommodate
209:17
accommodating
181:10
accompanying
375:15
accomplish
244:14
accomplished
336:13
according
249:5
account
39:19, 58:14, 58:16, 186:9, 189:4, 264:2, 264:7, 275:3, 348:6
accountant
404:14
accounting
414:12
accounts
58:17, 58:19,

58:21, 144:14, 145:1, 264:7, 266:8, 459:6
accuracy
75:12, 75:22, 436:17, 436:19
accurate
49:21, 78:10, 79:3, 81:3, 86:1, 89:10, 113:19, 117:3, 118:11, 129:2, 185:17, 208:12, 213:20, 214:15, 223:14, 226:22, 243:16, 268:20, 351:7, 351:10, 405:5, 406:22, 407:8, 407:16, 408:6, 408:7, 408:13, 408:14, 409:16, 410:14, 411:3, 411:11, 412:11, 414:6, 414:8, 415:1, 415:8, 415:21, 416:5, 416:6
accurately
89:2, 189:11
accused
18:10
acknowledge
321:8, 475:3
acknowledged
358:9, 358:12, 358:13
acknowledging
337:10
acknowledgment
475:1
acquired
45:5
acted
391:5, 402:3
acting
402:5, 402:13
action
301:12, 326:19,

377:13, 378:20
actions
228:14, 396:1, 396:3
active
243:7, 272:15
actual
78:5, 119:17, 120:5, 120:8, 120:21, 121:4, 414:8, 424:9, 444:22
actually
11:22, 100:4, 127:12, 133:19, 136:21, 157:14, 163:12, 167:5, 172:1, 219:12, 220:16, 223:15, 223:21, 227:22, 237:18, 241:7, 323:3, 334:2, 344:5, 386:16, 399:2, 417:2
actuals
120:1
acutely
34:16
add
199:4, 403:7
addition
19:19, 67:8, 252:2, 264:14, 271:9, 289:8
additional
19:20, 21:18, 192:21, 272:8, 279:20, 300:8, 363:2, 363:6, 369:12, 470:5
address
21:7, 25:6, 72:5, 127:17, 127:21, 162:3
addressed
199:11, 361:21
addresses
188:17

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

121

| | | | |
|---|---|---|---|
| **addressing** 219:17 | 347:7, 435:20, 436:3 | **again** 20:2, 23:12, | 68:16, 95:7, 152:2, 152:17, |
| **adequately** 51:19 | **affairs** 72:13 | 33:15, 53:12, 59:21, 66:9, | 153:1, 153:10, 181:19, 204:7, |
| **adjudicated** 365:9 | **affected** 469:9, 469:16, | 86:15, 86:21, 87:14, 91:20, | 254:14 |
| **administration** 223:2, 246:13, | 469:21, 470:9, 471:7, 471:17 | 102:6, 114:5, 118:8, 140:19, | **agents** 48:11, 66:3, 68:9, 154:10, |
| 290:13, 393:13 | **affiliate** 38:12 | 144:19, 145:11, 149:1, 157:9, | 255:3 |
| **admission** 12:5 | **affiliated** 31:13 | 159:20, 162:1, 165:5, 182:4, | **ago** 74:17, 151:1, |
| **admit** 45:15 | **affiliation** 32:5 | 189:6, 195:19, 207:1, 208:16, | 151:2, 192:4, 224:3, 226:14, |
| **adopted** 96:5 | **affirmed** 23:3 | 234:1, 243:8, 245:5, 259:17, | 250:2, 295:9, 324:17, 406:6 |
| **advance** 457:18, 458:12 | **affixed** 476:14 | 261:5, 287:17, 295:5, 296:18, | **agree** 17:9, 18:2, |
| **advice** 44:22, 55:6 | **aforesaid** 450:11 | 308:7, 310:12, 314:5, 314:20, | 18:5, 18:6, 57:17, 57:18, |
| **advise** 80:17, 81:20, | **afraid** 463:9 | 322:10, 337:13, 338:20, 339:17, | 58:1, 58:6, 60:8, 113:1, |
| 84:10, 93:6, 330:14, 330:18, | **after** 59:13, 63:2, | 346:1, 347:6, 371:18, 373:4, | 113:7, 113:10, 133:18, 170:8, |
| 344:4, 369:3, 416:22, 427:14 | 64:1, 64:4, 91:7, 92:20, | 378:12, 399:10, 402:16, 412:4, | 179:2, 182:18, 200:20, 212:13, |
| **advised** 12:4, 23:11, | 97:16, 130:10, 131:5, 183:11, | 417:3, 432:8, 435:14, 447:9, | 233:20, 240:7, 250:13, 307:19, |
| 78:7, 83:14, 85:5, 88:3, | 190:7, 197:2, 228:6, 239:2, | 456:21, 462:14, 463:4, 473:9 | 309:6, 313:8, 314:22, 324:11, |
| 93:16, 101:6, 129:17, 139:22, | 255:17, 275:19, 287:17, 288:10, | **against** 26:11, 160:12, | 324:19, 362:19, 366:1, 366:3, |
| 145:21, 168:3, 175:8, 206:19, | 288:14, 288:16, 295:4, 296:20, | 161:3, 243:3, 255:21, 257:9, | 366:6, 392:12, 438:5, 439:10, |
| 223:9, 223:11, 289:2, 307:19, | 300:7, 301:18, 304:2, 304:15, | 265:12, 286:7, 304:22, 335:8, | 454:18, 462:3, 471:2 |
| 326:16, 331:11, 349:14, 350:3, | 305:2, 306:2, 307:10, 316:8, | 356:8, 356:9, 365:5, 440:8, | **agreed** 78:9, 130:21, |
| 362:12, 363:21, 423:17, 457:18 | 333:19, 347:22, 350:17, 351:12, | 440:13, 443:5, 443:16, 448:20 | 254:1, 295:15, 307:13, 308:21, |
| **advises** 136:8, 289:9, | 360:8, 367:13, 388:11, 388:16, | **agencies** 34:1, 112:1, | 323:19, 349:15, 372:7, 471:19 |
| 335:7, 347:8, 362:8, 366:14, | 402:19, 403:13, 418:20, 432:2, | 113:5 | **agreeing** 77:14, 138:22, |
| 370:17, 376:7 | 456:16, 469:4, 472:16 | **agency** 112:21, 206:6 | 464:7 |
| **advising** 78:15, 94:13, | **afternoon** 373:19, 373:20 | **agent** 48:8, 48:14, | **agreements** 125:16, 125:17, |
| 95:4, 137:7, 307:1, 328:11, | | 66:9, 66:12, | 146:18, 146:20, 159:2, 159:6, |

250:14, 251:1,
254:1, 277:4,
277:18, 278:12,
279:7, 279:20,
283:1, 284:12,
284:18, 465:15,
465:16, 466:13,
466:17, 466:19,
468:12
**agrees**
438:22
**ahead**
80:4, 100:9,
175:19, 176:2,
234:5, 241:15,
262:7, 294:3,
294:5, 327:16,
378:4, 390:12,
391:3, 392:7,
437:11, 457:13,
474:9
**aia**
65:9, 65:19,
66:1, 205:13,
436:3
**aijin**
224:10
**airline**
276:13
**airport**
276:13
**al**
1:8, 10:5
**alert**
219:18, 219:19,
220:5, 220:9,
220:13
**alerted**
220:12
**alerts**
219:15, 219:16
**alien**
229:5, 230:16,
232:7, 233:13,
233:20, 235:5,
235:14, 236:6,
236:15, 238:16,
238:18, 240:9,

305:4
**alien's**
230:2, 238:21
**align**
52:14
**allegation**
84:19
**allegheny**
65:19
**allow**
31:18, 73:6,
225:14, 225:22,
240:15, 240:16,
428:1, 466:16,
467:1
**allowing**
226:5, 423:5,
423:12
**almost**
27:16, 38:7,
172:14, 197:8,
372:6, 376:3,
427:9
**along**
244:7
**already**
17:2, 71:7,
83:12, 154:22,
179:9, 221:15,
228:6, 248:8,
265:16, 319:2,
344:11, 383:16,
384:16, 403:15,
419:8, 427:19
**also**
4:16, 11:4,
11:8, 19:6,
23:8, 29:6,
40:19, 42:5,
80:17, 85:2,
90:11, 106:9,
106:16, 106:22,
109:6, 120:8,
132:19, 138:21,
145:21, 154:2,
162:12, 167:20,
171:19, 172:9,
193:6, 202:12,

202:16, 233:21,
248:19, 248:20,
255:15, 260:18,
276:7, 276:17,
285:4, 289:13,
301:6, 308:3,
321:14, 322:5,
324:1, 336:10,
341:4, 354:5,
364:3, 368:5,
368:9, 369:12,
370:12, 371:20,
395:2, 414:11,
417:22, 418:5,
435:6, 435:16,
451:12
**although**
18:15, 27:18,
65:10, 99:12,
151:10, 153:15,
162:21, 279:12,
374:13
**always**
16:8, 25:22,
26:4, 26:5,
26:6, 71:11,
129:4, 196:5,
259:1, 267:1,
330:7
**amended**
199:13
**amendment**
199:12
**american**
84:14, 86:18
**amount**
130:2, 130:7,
131:4, 139:6,
153:4, 153:17,
180:3, 180:15,
180:16, 187:14,
189:15, 192:22,
209:13, 217:16,
235:8, 236:16,
238:7, 239:19,
263:2, 263:14,
266:15, 266:19,
267:1, 267:13,

267:22, 268:20,
269:1, 269:3,
270:11, 270:16,
271:3, 271:10,
271:11, 272:10,
272:14, 272:22,
273:1, 274:9,
274:13, 274:15,
277:3, 277:4,
277:7, 308:17,
319:6, 334:4,
334:8, 345:11,
356:15, 374:3,
377:1, 436:8,
440:7, 443:4,
443:13
**amounting**
194:7
**amounts**
33:21, 34:12,
243:12, 243:15,
264:11, 271:10,
273:6, 335:13
**analysis**
267:6, 427:11
**ankle**
220:3, 223:3,
225:16, 225:21
**announced**
11:17
**anomaly**
227:8
**another**
38:11, 57:8,
57:16, 66:9,
71:6, 97:10,
131:14, 143:11,
146:20, 161:17,
187:17, 187:18,
187:21, 188:6,
188:13, 188:15,
189:18, 189:21,
204:6, 206:7,
247:20, 269:12,
285:1, 285:8,
285:20, 288:4,
288:6, 293:5,
293:13, 297:2,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

123

| | | | |
|---|---|---|---|
| 298:8, 298:11, 303:11, 304:19, 310:2, 310:6, 310:11, 318:11, 323:7, 341:5, 341:18, 358:15, 376:21, 379:6, 384:7, 392:18, 396:4, 404:14, 423:4, 423:6, 456:1, 458:4, 468:13, 469:6, 470:15 | 398:7, 398:10, 401:12, 402:4, 403:1, 403:4, 403:8, 434:1, 463:20, 471:11 | 398:6, 403:3, 413:11, 417:12, 453:13, 459:20, 463:1, 467:14, 470:6 | 452:10, 452:11, 454:13, 454:21 |

**answer**
28:15, 31:20,
32:21, 36:2,
37:20, 44:13,
51:2, 64:16,
73:7, 73:15,
98:2, 103:12,
115:16, 124:14,
132:13, 156:6,
156:9, 163:18,
165:6, 165:19,
179:1, 181:7,
191:22, 225:7,
249:11, 317:16,
332:5, 338:19,
344:6, 363:11,
377:19, 378:12,
382:14, 382:19,
384:17, 385:22,
387:8, 391:21,
391:22, 405:13,
414:19, 417:20,
418:5, 418:21,
419:2, 422:5,
422:6, 430:18,
431:2, 431:15,
432:2, 432:4,
433:18, 433:19,
454:1, 457:1,
457:5, 466:12

**answered**
74:5, 272:18,
332:18, 350:22,
352:3, 382:16,
398:2, 398:5,

**answering**
23:18, 41:13,
60:7, 100:17,
102:2, 241:16,
294:12, 314:5,
354:22, 378:6,
382:12, 384:18,
392:1, 392:2,
400:12, 401:7,
415:19, 418:19,
432:6

**answers**
145:12, 184:18,
418:1, 418:22

**anticipate**
16:14, 404:6

**anticipated**
318:19

**anticipating**
319:2

**anybody**
86:17, 116:5,
129:12, 205:8,
205:13, 205:15,
386:9, 424:2

**anymore**
248:1, 283:15,
312:7, 320:13,
391:14

**anyone**
127:8, 205:10,
317:15, 386:13

**anything**
12:17, 12:20,
14:18, 18:14,
20:22, 93:22,
113:17, 127:3,
129:12, 134:21,
156:9, 163:12,
184:22, 249:20,
283:17, 299:8,
322:6, 343:22,
357:22, 386:7,

**anytime**
331:21, 416:2,
416:4

**anyway**
16:9, 108:4,
116:8, 153:17,
157:20, 158:2,
306:16, 422:6,
437:12

**anywhere**
237:16, 255:4,
386:21

**apologize**
20:12, 29:1,
40:13, 51:1,
145:11, 149:12,
149:13, 182:13,
339:15, 363:5,
378:4, 465:6,
473:4

**apologized**
473:5

**apologizes**
178:7

**apparent**
19:12

**apparently**
22:3, 22:8,
172:17

**appeal**
226:20, 227:9,
227:17, 234:18,
301:7, 353:2,
365:8, 367:8,
367:13, 367:17,
424:13, 425:16,
426:8, 426:9,
426:11, 426:13,
427:12, 427:13,
427:20, 429:4,
446:1, 449:13,
449:17, 449:19,
450:1, 451:11,

**appealed**
365:8, 425:12,
426:17, 427:1,
427:4, 427:9,
449:4

**appealing**
424:22, 425:4

**appeals**
425:9, 425:21,
426:5, 427:15

**appear**
36:5, 76:11,
113:19, 138:9,
191:14, 230:10,
230:22, 231:4,
237:8, 238:19,
242:15, 242:17,
275:11, 365:12,
475:6

**appearance**
13:11, 15:7,
233:15, 242:22,
243:1

**appearances**
306:7, 307:4,
307:8

**appeared**
14:5, 329:15

**appears**
72:4, 74:19,
104:11, 111:2,
119:10, 124:7,
138:3, 138:5,
138:12, 138:19,
143:8, 145:20,
173:2, 178:20,
179:5, 329:9

**apples**
273:19

**application**
255:1, 255:12,
255:14, 256:16,
257:9, 257:17,
258:9

**applying**
33:22

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

124

appoint
112:22
appointing
111:22, 113:5
appreciate
15:16, 51:5,
51:6, 52:9,
135:13, 145:14,
150:9, 181:12,
228:2, 281:11,
378:5, 384:13,
410:3, 418:14,
473:3
approach
68:13
approached
306:3, 428:16
appropriate
200:21, 223:20,
345:22, 360:16
approved
77:13
approves
77:8
approving
77:18
approximately
75:9, 296:6,
315:20
april
64:19, 136:18,
178:11
arbitrary
226:17, 423:12,
428:7
arbitration
251:1
area
20:13, 31:5,
34:20, 37:15
areas
17:18, 17:20
aren't
224:17, 273:5,
337:18, 393:3,
393:20, 399:8,
424:18, 424:22,
432:16, 434:6,

446:19, 468:12
argue
304:5, 320:12,
335:10, 386:3
arguing
238:8, 294:17,
294:20
argument
103:11, 313:11,
356:9, 365:13,
378:10, 378:15,
378:22, 386:4,
390:12, 390:21,
397:14, 397:18
argument's
390:3
argumentative
126:2, 126:8,
127:2, 256:21
arguments
315:10, 390:16,
397:16
arises
307:21
around
35:16, 37:2,
62:18, 64:19,
68:18, 161:22,
287:22, 369:17
arrangement
41:8
arrest
244:4, 452:17
arrive
397:10
arrived
398:22, 399:9
articulated
389:18
asap
340:2, 340:10,
341:15, 347:10
aside
228:21, 229:2
asked
19:14, 20:1,
20:21, 35:20,
41:3, 41:18,

78:1, 83:7,
87:19, 100:12,
107:9, 113:8,
117:9, 127:18,
141:19, 146:18,
146:20, 147:8,
159:19, 180:18,
203:19, 226:4,
229:13, 236:20,
236:22, 237:4,
241:18, 268:18,
288:3, 288:4,
288:11, 292:3,
297:6, 303:6,
309:21, 310:12,
314:4, 314:21,
334:20, 350:21,
359:12, 379:17,
381:15, 382:1,
389:22, 401:8,
403:15, 410:18,
413:4, 413:15,
427:22, 429:22,
432:1, 432:20,
471:11
asking
41:2, 53:16,
58:12, 77:11,
78:3, 83:11,
83:12, 85:21,
85:22, 87:14,
89:6, 89:8,
92:10, 97:16,
99:8, 99:20,
101:18, 105:2,
105:5, 121:14,
121:19, 123:4,
126:5, 141:17,
160:18, 161:18,
165:13, 165:19,
167:2, 177:19,
189:21, 203:17,
207:1, 207:2,
208:3, 236:1,
236:2, 236:4,
260:10, 261:14,
265:10, 267:7,
267:9, 268:12,

270:18, 271:18,
285:9, 295:21,
315:11, 319:1,
337:1, 338:14,
346:18, 369:14,
369:22, 379:5,
385:7, 385:9,
385:12, 403:12,
409:9, 415:16,
418:18, 422:22,
429:10, 431:14,
432:5, 432:7,
433:16, 433:17,
433:21, 442:1,
442:11, 467:8,
467:13, 470:7
asks
335:12, 368:9,
392:16
aspect
201:18, 458:21
aspersions
268:11, 268:12
asserted
371:6
asserting
179:18, 326:17,
442:13
assertion
170:9, 170:11,
179:14, 469:22
assertions
280:10, 284:17
assess
95:11, 296:2
assessment
96:5, 206:14,
216:10, 289:20
assets
44:10, 44:17,
44:18, 144:21
assign
297:13
assistance
59:11, 225:20
assisting
11:21
associated
11:22, 12:20,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                    125

13:4, 13:5,
13:18, 65:20
**associates**
3:13, 10:21
**assume**
46:6, 49:14,
50:13, 50:14,
50:19, 50:20,
78:2, 106:13,
112:5, 145:7,
146:8, 146:13,
193:8, 195:8,
257:14, 292:11,
296:10, 320:1,
346:11, 348:20,
366:11, 436:12,
444:20, 445:3,
445:7
**assumed**
153:18, 157:12,
186:3, 284:5,
334:18, 339:2,
448:4, 448:9,
448:14, 448:16
**assumes**
265:9
**assuming**
301:20, 342:13,
346:21, 351:1,
351:2, 356:12,
380:2
**assurances**
204:2
**asylum**
200:18, 203:7
**atlanta**
3:16, 10:21,
13:5
**attach**
115:9
**attached**
5:5, 51:10,
71:16, 97:6,
110:12, 111:17,
114:5, 114:14,
118:9, 136:5,
137:14, 137:19,
143:2, 143:21,

144:3, 168:15,
171:13, 185:15,
191:5, 215:4,
229:20, 262:9,
302:20, 325:20,
327:19, 333:16,
339:7, 340:16,
347:4, 348:11,
349:2, 355:16,
356:13, 361:16,
372:3, 372:10,
375:7, 434:8,
435:10, 475:7
**attaching**
110:14
**attachment**
111:18, 114:7,
114:9, 118:6,
140:9, 140:11,
140:13
**attachments**
9:15, 115:9,
208:17
**attacks**
395:15
**attainable**
382:3
**attempted**
150:21
**attend**
28:16, 452:21
**attendance**
234:7
**attention**
95:3, 361:22,
363:22
**attorney**
4:4, 11:4,
12:21, 13:19,
41:9, 239:16,
243:2, 428:5
**attorneys**
59:12, 439:13
**audit**
178:9
**audited**
421:5
**authority**
116:6, 229:3,

244:3, 244:8,
349:19, 425:1,
425:5
**authorizations**
84:5
**authorizes**
230:18
**available**
20:11, 90:9,
221:8, 370:8,
370:13, 375:18
**avenue**
4:11
**average**
94:14, 222:21,
289:22, 318:15,
318:16, 318:17
**avoid**
18:11, 326:19
**awaiting**
84:4
**aware**
34:7, 34:16,
54:8, 109:22,
117:14, 127:7,
127:20, 129:6,
129:11, 129:15,
167:10, 167:14,
167:15, 167:19,
278:2, 279:6,
279:10, 279:22,
285:4, 287:1,
402:2
**away**
84:17, 105:7,
208:21, 316:16
**awful**
234:13
**awfully**
107:21

| B |
| --- |

**b) (6**
51:14, 385:2
**bachelor's**
27:13, 28:12
**back**
22:19, 27:17,

48:3, 59:15,
62:8, 73:19,
82:13, 82:15,
87:19, 90:20,
91:15, 98:15,
99:1, 100:5,
108:9, 114:16,
115:3, 115:8,
118:19, 123:18,
130:8, 135:18,
139:15, 148:19,
149:1, 152:18,
155:12, 162:9,
167:4, 170:20,
172:15, 173:14,
184:2, 184:7,
194:6, 217:17,
240:18, 246:14,
247:19, 262:6,
278:22, 279:2,
281:20, 282:14,
283:18, 286:2,
296:15, 302:21,
305:17, 314:9,
315:11, 327:10,
335:8, 341:22,
348:2, 348:8,
350:3, 353:3,
356:13, 357:18,
361:1, 368:22,
369:2, 372:9,
381:3, 392:4,
401:22, 410:6,
420:17, 437:3,
473:4, 473:8
**background**
27:11, 84:11,
85:7, 85:17,
87:10, 88:5
**backwards**
99:21, 99:22
**bad**
149:13, 282:17,
286:7, 288:2,
292:19, 379:12,
379:14, 379:18,
383:12, 384:21,
385:3, 385:16,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

126

385:20, 386:2,
387:17, 388:3,
388:7, 388:8,
388:21, 389:18,
390:2, 391:6,
392:10, 393:14,
393:18, 393:21,
394:14, 394:15,
395:21, 396:1,
396:5, 396:11,
397:21, 399:10,
402:1, 402:3,
402:6, 402:13,
402:22, 423:4,
423:10, 424:16
**bail**
30:13, 31:2,
31:14, 32:5,
32:6, 32:12,
32:13, 33:13,
33:19, 35:3,
37:4, 66:9,
66:22, 67:3,
67:4, 67:15,
68:9, 68:10,
154:10, 181:19,
254:14, 255:3
**balance**
44:16, 137:8,
140:1, 140:6,
140:21, 141:13,
141:19, 142:2,
143:3, 143:17,
143:20, 143:21,
144:3, 144:14,
144:22, 334:12,
370:14, 407:1,
408:7, 408:14,
409:4, 409:14,
409:18, 409:20,
410:12, 410:15
**balances**
346:16
**bank**
164:11, 368:10
**bart**
8:3, 8:6, 8:15,
339:9, 339:18,

341:14, 341:18,
341:22, 465:14,
467:17
**based**
44:14, 84:17,
86:17, 120:6,
120:13, 120:14,
121:4, 133:9,
142:20, 145:7,
184:13, 184:19,
186:19, 186:20,
187:5, 203:5,
245:22, 257:15,
283:7, 285:6,
306:5, 316:1,
319:6, 338:17,
352:19, 354:4,
354:11, 354:12,
354:18, 355:1,
355:3, 365:19,
380:7, 396:18,
406:19, 409:20,
425:4, 435:3,
436:2, 441:5,
453:15, 466:8
**bases**
121:8, 379:18,
385:16, 387:16,
389:18, 390:1
**basically**
220:2, 220:8,
303:10, 472:15,
472:16
**basis**
49:20, 75:1,
109:8, 109:13,
187:20, 226:7,
226:16, 226:19,
377:11, 383:12,
384:21, 387:1,
388:3, 391:5,
427:15, 428:3,
429:4, 429:6,
429:10, 429:13,
449:2
**bates**
5:8, 5:10,
5:16, 5:20, 6:5,

6:8, 6:11, 6:14,
6:17, 6:19, 7:3,
7:6, 7:9, 7:12,
7:16, 7:20, 8:5,
8:7, 8:10, 8:13,
8:17, 8:20,
9:11, 9:14,
99:3, 112:13
**battery**
219:15, 220:20
**battling**
161:17
**beach**
449:18
**bear**
102:11
**bears**
56:5
**became**
19:12, 34:7,
34:16
**become**
85:9, 85:18,
87:11, 88:7,
240:10
**becomes**
233:22, 235:8,
236:17, 237:19
**before**
2:13, 11:14,
15:11, 23:22,
30:22, 32:21,
59:13, 63:19,
63:20, 95:11,
98:2, 103:12,
106:14, 122:14,
122:15, 123:1,
123:7, 123:12,
124:10, 136:18,
142:13, 146:17,
168:2, 178:22,
183:4, 183:11,
184:10, 184:22,
185:4, 185:7,
185:9, 186:1,
186:16, 195:22,
208:20, 212:3,
230:15, 253:15,

266:8, 273:11,
275:19, 290:5,
301:11, 303:2,
304:14, 305:1,
312:4, 325:2,
330:4, 330:6,
330:10, 332:7,
358:10, 361:12,
361:13, 371:1,
371:15, 386:5,
386:11, 388:1,
400:16, 403:12,
418:13, 422:19,
423:6, 437:20,
454:6, 461:10,
472:16, 472:21,
476:3
**beforehand**
82:22
**began**
62:19, 63:16,
70:19, 129:21,
187:4, 374:10,
376:15
**begin**
129:18
**beginning**
16:16, 18:12,
74:2, 123:1,
142:22, 186:18,
193:3, 232:17,
381:14, 410:7
**begins**
10:2
**behalf**
3:2, 3:11,
10:18, 11:7,
110:6, 116:6,
116:10, 116:13,
117:16, 118:1,
121:8, 121:11,
122:1, 125:5,
126:17, 129:19,
132:20, 141:12,
153:11, 191:10,
283:7, 310:22,
311:8, 349:20,
359:11, 389:9,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

127

439:16, 451:14,
455:11, 458:14
**behavior**
391:12, 394:14,
394:15, 397:20
**behind**
278:20, 393:21,
394:2
**being**
19:1, 19:18,
23:3, 23:10,
23:16, 42:14,
43:10, 84:7,
87:17, 105:7,
107:18, 151:12,
170:8, 178:22,
180:8, 181:8,
183:6, 183:10,
215:2, 215:14,
217:4, 217:22,
218:4, 220:11,
224:15, 239:19,
241:10, 241:18,
243:7, 247:8,
247:11, 250:12,
281:10, 281:14,
293:4, 293:10,
298:1, 300:15,
301:10, 303:22,
324:12, 328:10,
335:3, 342:6,
344:18, 345:19,
364:13, 367:2,
384:5, 400:20,
411:7, 422:21,
426:5, 426:17,
426:22, 438:9,
452:5, 452:6,
452:7, 452:13
**belief**
149:21, 150:11,
151:6
**believed**
36:8, 70:21,
185:4, 188:12,
381:8, 384:4,
384:5, 384:19,
385:15, 386:22

**bellinger**
1:21, 2:14,
11:11, 476:2
**below**
349:6
**beneficiary**
230:17, 230:21
**benefits**
222:11, 222:15
**besides**
47:16
**best**
56:12, 57:9,
64:3, 76:16,
93:17, 107:5,
107:8, 149:20,
150:10, 151:5,
171:4, 184:13,
188:5, 188:8,
210:2, 305:14,
317:14, 344:6,
353:7, 358:18,
378:10, 383:4,
383:9, 383:21,
387:13, 387:14,
387:19, 387:22,
390:4, 391:8,
415:11, 415:13,
415:18, 415:19,
415:20, 433:7
**better**
33:6, 34:8,
36:10, 36:11,
56:6, 70:3,
151:4, 193:10,
216:7, 216:8,
228:4, 244:10,
275:22, 277:16,
292:13, 296:12,
299:3, 314:6,
320:7, 404:15
**between**
14:6, 26:10,
29:17, 31:19,
40:20, 74:1,
75:1, 97:13,
108:2, 109:4,
136:6, 140:19,

151:11, 189:13,
248:15, 265:22,
278:3, 279:7,
280:1, 282:4,
283:1, 287:2,
303:8, 306:15,
341:10, 449:10,
451:18
**beyond**
195:11
**big**
154:16, 155:1,
155:2, 155:3,
155:8, 155:16,
155:22, 157:15,
159:2, 342:9,
425:6, 425:8,
437:20
**bigger**
214:19
**biggest**
275:9
**bills**
49:11, 50:16
**binding**
279:22, 281:16,
284:2
**bio**
62:3, 149:1,
149:8
**biologic**
148:13
**biology**
247:13
**bit**
15:17, 99:11,
152:20, 295:8,
397:5
**black**
105:18
**black's**
445:16
**blame**
148:8
**blaming**
353:6
**blank**
240:8

**blistering**
395:15
**block**
191:21
**boardrooms**
89:16
**body**
108:16, 113:1,
113:10, 114:18,
115:19, 116:18,
242:3, 251:4
**bonded**
201:2, 224:13,
230:2, 230:16,
244:19, 245:6,
308:19, 329:17
**bonding**
68:14, 81:22,
95:6, 266:16,
267:2, 272:3,
274:22
**bono**
59:10
**book**
198:13, 279:14,
285:13, 287:19,
303:9, 315:15
**books**
150:18, 198:5,
198:15, 303:9,
363:18, 368:7,
404:15, 414:1,
414:3, 459:6,
459:8, 459:13
**both**
24:17, 30:1,
31:20, 79:17,
256:1, 281:17,
297:9, 317:9,
345:1, 354:7,
354:8, 354:9,
442:9
**bottom**
72:7, 111:17,
112:13, 112:14,
114:13, 124:3,
138:7, 246:20,
274:13, 327:22,

342:3, 349:4,
372:12, 434:10,
437:13
**bound**
240:7
**box**
4:5
**boxes**
52:9
**bracelet**
68:1, 225:21
**bracelets**
258:20
**brands**
52:11
**breach**
95:12, 96:12,
190:8, 190:13,
190:16, 190:22,
224:21, 225:18,
227:2, 227:8,
227:10, 228:17,
231:1, 238:15,
238:18, 239:2,
275:12, 275:17,
280:20, 281:6,
289:15, 289:22,
300:13, 301:7,
304:14, 304:15,
304:22, 305:22,
306:1, 307:9,
330:19, 330:21,
334:5, 334:6,
334:15, 360:12,
362:21, 364:12,
365:2, 365:3,
365:7, 365:8,
365:17, 367:9,
401:22, 425:11,
430:6, 430:8,
435:21, 440:20,
441:6, 443:14,
443:19, 444:5,
444:8, 444:10,
445:22, 449:13,
449:19, 450:1
**breached**
227:1, 228:7,

244:13, 281:7,
301:4, 326:11,
338:3, 364:18,
364:22, 430:10,
440:18, 447:4
**breaches**
20:19, 190:20,
224:18, 225:9,
225:22, 226:6,
228:13, 228:20,
228:22, 234:15,
234:16, 244:12,
300:8, 300:16,
304:13, 318:2,
325:7, 341:11,
361:7, 366:4,
367:16, 396:10,
396:13, 422:18,
422:20, 422:22,
423:13, 423:14,
423:19, 424:22,
425:4, 426:17,
426:22, 430:2,
430:4, 432:22
**breaching**
216:16
**break**
16:1, 62:2,
62:3, 62:11,
94:17, 94:22,
108:1, 108:20,
109:2, 118:13,
119:1, 148:14,
149:1, 149:8,
161:21, 162:12,
247:13, 303:2,
325:6, 360:17,
420:11
**breakeven**
404:6
**breaking**
341:17
**breaks**
15:20, 16:2,
22:10, 23:14,
183:22
**breeden**
40:3

**brian**
263:10
**brief**
31:19
**bring**
199:13, 390:21
**broad**
459:12
**broader**
17:5, 92:11,
368:1, 459:16
**broke**
184:10
**brought**
306:21, 309:22,
310:2, 334:19,
378:9, 378:22
**bubbles**
54:15
**bucket**
27:19
**buddi**
218:19, 218:22,
219:7, 219:10,
221:5, 221:9,
222:9, 223:9,
223:11
**budgets**
40:12
**building**
219:20, 219:21,
220:12, 452:6
**buildings**
220:1
**bunch**
103:5, 152:11
**business**
14:18, 27:14,
30:9, 30:13,
36:20, 52:12,
52:13, 68:14,
69:19, 71:3,
74:5, 74:13,
75:1, 77:20,
115:7, 123:1,
123:8, 135:5,
141:18, 154:1,
158:21, 171:15,

181:11, 193:22,
195:11, 195:13,
198:12, 198:14,
200:6, 213:22,
279:14, 282:19,
285:13, 285:15,
286:3, 286:5,
286:19, 287:20,
288:4, 288:6,
288:14, 295:17,
295:20, 296:20,
297:1, 299:7,
303:10, 306:16,
312:7, 312:11,
314:13, 314:18,
315:15, 317:20,
370:7, 376:18,
377:3, 377:4,
391:13, 392:11,
393:11, 395:7,
444:22, 456:6,
456:10
**busy**
27:18, 180:21

---
**C**
---

**calculated**
269:2
**calculation**
218:2
**call**
19:13, 73:22,
76:6, 77:19,
98:18, 99:14,
99:15, 155:3,
191:18, 192:4,
192:5, 192:7,
195:7, 195:10,
218:14, 219:16,
295:8, 393:21
**called**
32:12, 35:14,
46:13, 59:11,
65:15, 84:16,
218:9, 335:9,
342:4
**calls**
46:19, 52:6,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                   129

61:5, 69:7,
73:2, 74:18,
77:22, 134:19,
150:2, 160:16,
161:8, 222:13,
240:4, 280:7
**came**
27:1, 85:7,
85:17, 87:10,
88:6, 92:1,
139:11, 158:14,
163:6, 167:4
**camera**
91:6, 149:3
**cameras**
89:21, 90:7,
90:14, 92:4
**camps**
84:22
**campus**
78:12, 89:17,
90:4, 90:8,
92:1, 122:11,
212:22, 213:1
**can't**
24:16, 38:8,
52:22, 59:4,
70:4, 76:5,
78:5, 89:2,
94:12, 101:16,
106:7, 107:15,
113:16, 115:16,
124:8, 124:9,
124:12, 146:11,
158:16, 163:13,
183:3, 183:10,
185:10, 185:22,
186:15, 187:1,
188:18, 208:10,
210:10, 215:18,
227:14, 269:4,
292:20, 303:18,
313:14, 317:11,
317:20, 328:12,
329:22, 330:9,
338:19, 345:20,
366:3, 366:6,
370:13, 390:21,

395:18, 405:12,
405:21, 406:5,
407:5, 411:9,
411:19, 412:15,
412:16, 412:21,
412:22, 414:19,
417:7, 417:9,
419:13, 419:15,
420:3, 422:7,
432:3, 439:9,
439:20, 457:1,
460:10, 466:21,
467:14, 468:17
**cancel**
246:2
**canceled**
165:11, 246:5,
304:8, 424:9,
436:21
**cancellation**
296:16, 299:5,
304:11, 314:10,
316:13, 317:22,
322:6, 322:11
**cannot**
372:15, 415:10,
468:7, 469:3
**capability**
92:18, 92:22,
93:2
**capital**
144:8
**capricious**
226:18
**capsule**
19:9, 19:14,
69:14, 199:4,
201:1, 201:20,
202:17, 203:15,
204:7, 205:6,
206:1, 206:13,
206:15, 208:1,
208:11, 208:13,
208:20, 211:4,
211:7, 211:17,
212:1, 212:5,
212:6, 212:9,
212:11, 212:14,

212:20, 239:6,
249:8, 249:10,
255:16, 259:13,
260:18, 261:1,
261:3, 261:4,
261:15, 262:1,
262:3
**capture**
90:14
**captures**
90:11
**care**
173:17, 197:5,
197:21, 219:16,
247:22, 248:2,
336:12, 354:7,
417:4, 417:16
**careful**
44:13, 58:4,
125:15, 133:20,
226:21
**cares**
454:13
**caridades**
59:8, 59:10,
59:12
**carolina**
28:4
**case**
1:7, 10:7,
10:22, 12:9,
13:11, 16:15,
18:19, 56:20,
80:2, 96:14,
96:16, 96:18,
199:5, 207:9,
209:20, 209:21,
227:7, 234:14,
245:16, 246:4,
253:19, 257:6,
309:6, 329:2,
335:11, 337:12,
338:6, 360:1,
384:1, 390:8,
418:20, 425:11,
433:4, 433:6,
452:11, 454:15,
454:19, 476:10

**case-by-case**
226:7, 427:15,
428:3
**cases**
227:18, 234:19,
263:19, 290:14,
338:7, 425:14
**cash**
144:14, 144:22,
162:20, 163:8,
164:4, 165:2,
167:10, 296:8,
308:19, 319:19
**cast**
268:10
**castillo-moreno**
263:11
**casting**
268:12
**casualty**
65:10, 65:14
**catch**
90:16
**catches**
348:7
**catching**
348:3
**categories**
370:13
**categorizes**
265:18
**cation**
327:19
**cause**
108:17, 232:7,
266:6
**caused**
225:8
**causes**
221:13, 362:2
**caution**
265:12
**cautionary**
254:18
**cautioned**
16:2
**cautious**
54:17

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

130

cc'd
287:11
ceased
72:17
cell
219:22, 220:2,
220:6
center
219:14, 219:16
ceo
42:11, 42:21,
56:5
certain
20:18, 28:14,
48:15, 69:13,
69:15, 90:9,
153:4, 183:11,
203:7, 204:13,
207:18, 253:3,
253:9, 258:6,
265:18, 272:13,
273:1, 308:16,
371:14, 400:14
certainly
20:13, 22:17,
34:6, 40:14,
58:9, 69:9,
76:20, 78:6,
78:9, 84:8,
94:2, 106:8,
107:16, 109:22,
111:2, 116:3,
119:10, 119:13,
124:9, 146:8,
147:3, 147:4,
187:18, 213:15,
213:21, 217:13,
235:2, 238:22,
268:6, 281:21,
282:2, 304:7,
308:10, 311:7,
313:1, 316:4,
323:17, 323:19,
347:15, 354:3,
356:8, 372:19,
384:20, 411:6,
418:8, 418:9,
451:11, 454:18,

458:9, 460:16,
460:17, 462:7
certificate
476:1
certifications
29:12
certified
2:15, 355:20,
355:21, 358:7
certify
476:4
cessation
190:5
cetera
40:12, 41:15,
56:21, 67:5
cfo
178:8
cfr
301:6, 365:4,
444:10, 444:12,
445:11, 445:12,
445:20, 445:21,
448:3, 448:16
chain
5:12, 5:18,
6:3, 6:6, 6:9,
6:12, 6:15,
7:14, 7:18, 8:3,
8:8, 8:11, 8:15,
9:5, 9:9, 104:2,
104:6, 136:6,
171:17, 177:18,
177:20, 328:2,
328:7, 349:4,
357:16
chains
116:15
challenge
131:17
chance
94:18, 98:11,
111:6, 332:6
chances
34:14, 472:20
change
186:13, 213:21,
383:7, 383:18,

390:12, 470:15,
470:21
changed
279:18, 283:12,
290:12, 390:18,
416:10, 471:1
changes
381:19
charge
214:8, 233:4,
240:10, 270:3,
276:3, 292:22
charged
270:1
charges
96:19
charging
271:5, 271:6,
274:9
charitable
36:18
charlotte
27:22, 28:4
chart
5:8
check
40:14, 138:15,
165:9, 165:10,
169:16, 169:22,
173:15, 174:5,
175:17, 175:22,
176:15, 176:18,
227:12, 331:14,
334:13, 334:16,
345:14, 345:19,
356:6, 356:7,
356:10, 356:12,
356:14, 356:15,
396:22
checked
342:5
checks
39:13, 49:19,
165:11, 167:21,
335:14, 340:22,
341:1, 342:6,
342:17, 342:22,
343:8, 343:10,

343:13, 343:15,
343:19, 344:5,
344:8, 344:18,
344:22, 345:3,
345:8, 346:1,
346:8, 347:8,
348:13, 348:21,
349:6, 351:5,
354:14, 355:22,
356:5, 358:20,
397:8, 398:21,
399:19, 400:2
child
452:4
chilson
191:8, 191:19,
192:6, 195:8,
287:11, 310:21,
311:7, 314:18
choice
207:18, 441:11,
441:15, 442:3,
442:6, 442:14
choices
442:19
choose
18:20
chose
473:12
chris
4:3, 10:19,
11:3, 16:7
christopher
3:4
circumstances
72:20, 245:14
citizen
85:9, 85:19,
87:12, 88:8
civil
84:16, 84:18,
389:19
claim
127:13, 231:1,
252:10, 288:2,
301:1, 301:4,
301:8, 306:1,
307:10, 338:2,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                     131

338:3, 338:4,
365:4, 365:5,
365:6, 365:10,
365:15, 365:16,
365:17, 367:9,
383:12, 387:17,
389:18, 424:13,
440:8, 440:12,
440:18, 443:5,
443:13, 443:16,
444:3, 444:9,
445:4, 445:7,
445:8, 445:9,
445:14, 445:20,
446:9, 446:13,
447:2, 448:3,
448:5, 448:8,
449:1, 450:10,
451:8, 460:12,
469:10, 469:16,
471:14
**claim's**
444:17
**claims**
80:2, 190:17,
304:21, 305:1,
349:15, 354:11,
354:12, 390:1,
438:19, 448:19
**clarified**
279:15
**clarifying**
26:18
**clause**
73:14
**clear**
49:5, 73:12,
115:13, 115:14,
120:18, 120:19,
121:5, 144:20,
154:14, 175:15,
185:1, 185:3,
205:18, 205:20,
241:22, 243:20,
249:10, 255:13,
255:15, 274:2,
274:5, 295:1,
301:6, 308:5,

308:6, 335:15,
339:18, 364:11,
364:17, 368:12,
409:9, 409:13,
412:13
**clearer**
216:6
**clearly**
111:21, 181:11,
233:18, 234:11,
296:22, 297:1,
299:8, 318:11,
353:17, 364:11,
385:20, 460:11
**client**
13:7, 13:14,
43:7, 61:8,
67:21, 125:9,
196:21, 196:22,
198:1, 199:18,
202:8, 209:10,
222:4, 222:12,
226:6, 243:21,
253:8, 254:19,
270:17, 283:8,
286:8, 287:18,
287:22, 289:21,
292:3, 297:6,
300:3, 314:21,
316:18, 329:6,
330:8, 331:5,
331:9, 334:2,
354:11, 367:16,
377:14, 384:1,
384:5
**client's**
228:3, 254:12,
329:21, 360:6
**clients**
13:6, 13:8,
43:8, 54:1,
55:16, 56:1,
56:13, 58:11,
68:2, 84:3,
84:4, 86:19,
94:9, 135:1,
197:4, 197:5,
198:19, 200:7,

203:10, 213:19,
217:21, 219:17,
225:20, 243:4,
305:12, 354:7,
367:18, 376:19
**clock**
23:9
**clock's**
277:15
**close**
177:8, 404:5
**closest**
154:11
**co-obligor**
156:5, 156:15,
238:22, 329:6,
425:3, 427:19,
449:18, 450:4,
451:9, 451:12,
451:15, 451:18,
452:8, 452:9,
454:13
**co-obligor's**
425:4
**coach**
410:21
**coalition**
38:14, 38:17
**coffee**
421:14
**collaborative**
122:6
**collateral's**
193:2
**colleague**
128:16
**collect**
90:8, 269:19,
272:2
**collected**
96:7, 266:1,
275:4
**collecting**
63:16, 63:20,
63:21, 96:8,
268:6, 276:2
**collectively**
249:15

**collects**
264:12
**com**
7:9, 8:4, 8:16,
9:6
**come**
18:15, 33:11,
36:6, 39:18,
68:5, 73:19,
78:3, 78:12,
122:10, 152:22,
154:12, 202:1,
204:3, 204:15,
211:16, 212:5,
212:9, 212:22,
213:1, 213:5,
240:18, 243:6,
244:7, 246:3,
264:9, 282:14,
283:17, 283:22,
327:10, 357:13,
423:19, 463:1
**comes**
49:22, 153:4,
219:15, 348:8
**comfortable**
79:16, 100:17,
127:3
**coming**
30:19, 57:20,
61:11, 61:17,
177:8, 296:1,
305:15
**comment**
46:10, 325:2
**comments**
442:16
**commercial**
468:5
**commission**
158:12, 476:16
**commissions**
152:17, 153:1,
157:18, 181:19
**commitment**
209:22
**committed**
170:13, 324:7,

395:13
**common**
25:20, 41:6,
41:8, 44:20
**commonwealth**
2:16, 476:22
**communicate**
386:12, 425:10
**communicated**
224:6, 224:9,
373:1
**communicating**
55:6, 55:8,
350:11, 377:9,
383:2, 389:4,
473:20
**communication**
22:2, 171:1,
178:21, 188:22,
195:6, 219:15,
219:18, 219:19,
220:5, 220:10,
281:22, 300:19,
341:6, 341:10,
343:16, 349:8,
349:13, 350:17
**communications**
20:8, 255:19,
341:16, 388:21,
393:2, 393:15,
394:8, 425:14,
473:2
**communities**
34:2
**community**
33:14
**companies**
41:14, 41:17,
51:20, 57:14,
65:4, 65:7,
70:3, 127:16,
297:9
**company**
1:5, 10:4,
10:18, 26:14,
31:14, 32:6,
32:12, 36:14,
37:17, 38:11,

39:2, 42:2,
42:4, 45:4,
49:10, 57:6,
57:8, 57:16,
70:2, 91:8,
93:2, 122:8,
158:8, 158:15,
166:5, 169:10,
197:21, 216:8,
218:17, 218:20,
219:1, 219:2,
222:20, 244:15,
258:19, 258:20,
262:17, 264:22,
266:16, 267:2,
272:4, 274:22,
295:12, 300:3,
303:11, 312:5,
410:16, 413:13,
420:21, 420:22
**company's**
137:9, 221:10,
406:7
**compel**
234:7, 413:12
**compelled**
317:19
**compelling**
76:11
**compensation**
44:6, 44:9
**complaining**
290:1
**complaint**
199:13
**complement**
401:16
**complete**
123:19, 131:12,
299:10, 299:14,
475:5
**completely**
56:3, 156:8,
189:9, 199:6,
309:16, 388:20,
397:13, 404:9,
416:19, 433:19
**compliance**
150:22, 329:20

**complied**
150:6, 150:11,
150:20, 285:11,
286:18, 314:20,
364:20, 459:19,
472:4
**complies**
101:4, 160:3,
231:7, 253:11
**comply**
36:10, 133:11,
133:14, 133:17,
133:21, 134:17,
134:21, 149:21,
151:6, 213:3,
237:21, 286:13,
372:13
**complying**
134:1, 227:5,
424:15, 424:19
**components**
121:22, 215:22
**composed**
161:22
**composite**
104:1
**compound**
67:18, 69:22,
80:21, 81:14,
82:12
**compounds**
96:21
**compromise**
252:8, 252:10
**compromised**
449:3
**compulsions**
404:8
**computer**
191:11, 191:15,
213:2, 344:22
**con**
63:6, 272:7
**concentration**
84:22
**concern**
57:22, 112:6,
112:10, 170:22,

288:20, 350:9,
368:1, 393:6
**concerned**
118:9, 126:16,
126:19, 126:21,
126:22, 197:22,
225:18, 328:19,
329:1, 329:2,
335:21, 341:14,
350:2, 350:7,
367:21, 374:6,
374:7, 374:8,
376:18, 393:14
**concerns**
114:6, 125:18,
203:10, 211:13,
211:14, 361:6,
362:3, 372:10,
373:5
**conclusion**
46:19, 52:6,
61:5, 134:19,
150:2, 160:17,
161:9, 240:5,
280:7, 462:19
**conclusive**
459:3
**concrete**
219:22
**concur**
249:20
**condition**
37:13, 104:21,
110:4, 231:8,
314:19, 403:17,
404:17, 404:20,
405:6, 406:8,
407:9, 407:16,
413:5, 414:9,
415:22
**conditioned**
233:19
**conditions**
198:8, 217:1,
230:7, 230:14,
231:17, 246:5
**conduct**
87:5, 103:7

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                                 133

conducted
123:8
conducting
178:9, 192:5
conference
72:8, 73:22,
74:18, 77:21,
89:16, 98:18,
99:14, 99:15,
191:18, 192:4,
192:5, 195:7,
196:18, 295:8
confident
320:13
confidential
18:18, 73:3,
203:8
confidentiality
150:16, 151:2,
196:21, 196:22,
197:6, 197:14,
197:17, 198:1,
198:16, 199:19,
200:1, 200:3,
200:5, 200:20,
293:20, 368:6,
368:13, 369:17,
369:21, 371:5,
371:8, 374:11,
374:16
confirm
52:21, 53:1,
53:3, 107:15,
113:17, 124:8,
124:9, 124:12,
124:16, 177:3,
179:7, 301:22,
324:18, 342:22,
343:12, 354:21,
419:16
confirmation
77:21, 356:18
confirmed
75:8, 76:10,
166:20, 340:21,
342:17, 343:8,
343:10, 344:7,
346:8, 351:18,

353:9, 353:14,
353:18, 355:4,
357:17, 358:4,
358:18, 364:3
confirming
78:2, 276:2
conflict
150:14, 150:15
conflict's
150:14
confuse
410:1
confused
56:16, 195:18,
289:18, 327:14,
440:5
confusing
27:3, 127:6
confusion
20:12, 300:21
conjecture
458:22
connect
287:11
connected
103:22, 146:19,
356:11
connecticut
4:11
connecting
220:7
connection
32:5, 246:9
consequence
439:15
consider
97:2, 183:6,
226:7, 427:15
consideration
97:4, 438:2,
438:10
considered
95:21, 445:15
considers
362:9
consistent
186:22, 250:22,
271:4, 288:12,

448:15
consolidate
264:8, 266:8
consolidated
323:12
constantly
70:4
constitute
254:17
constitutes
256:16, 257:9
consult
73:11, 118:14,
405:20, 407:22
consultants
91:13, 92:16
consulting
275:21
consumers
197:18, 199:19
contact
74:1, 121:16,
341:6
contacted
127:17
contacting
65:1
contacts
246:12
contained
207:3
contemplate
296:22
contemplated
293:4, 297:1,
318:6
contemporaneous
82:9, 82:19,
255:17
contemporaneously
83:14
contend
20:22
contending
397:19
content
77:14, 183:8
contention
125:21, 316:6,

388:2
contents
124:6
contest
225:22, 234:15,
422:21, 423:12,
424:1, 424:3,
427:19, 428:1,
430:5
contesting
424:6, 433:1
context
89:3, 98:4,
105:2, 111:5,
169:19, 182:8,
444:10
contingency
186:8, 187:19,
189:3, 296:16,
296:17, 296:22,
299:5, 314:10,
314:11, 314:15,
314:16
continually
337:9
continue
128:9, 193:17,
195:11, 196:2,
196:3, 213:18,
242:19, 246:6,
267:17, 292:4,
295:2, 295:3,
296:21, 298:3,
307:13, 316:7,
316:12, 319:3,
319:21, 321:9,
321:15, 321:19,
388:11, 392:17,
419:1, 456:6,
456:10, 463:15
continued
350:8, 395:12,
395:14, 396:14
continues
246:4
continuing
194:20, 279:12,
284:17, 321:11,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

134

367:16, 456:13, 457:10, 458:18
**contract**
6:21, 80:11, 106:14, 135:2, 195:18, 206:2, 206:13, 215:7, 215:12, 215:19, 215:22, 216:1, 216:4, 236:2, 246:15, 248:5, 250:14, 251:6, 258:22, 272:20, 273:13, 275:7, 277:7, 277:10, 280:22, 281:6, 281:7, 281:8, 282:15, 283:11, 283:12, 288:13, 301:5, 442:10
**contracts**
134:22, 135:1, 212:19, 249:9, 251:17, 278:2, 279:6, 279:10, 280:20
**contractual**
354:10
**contradict**
179:9
**contributed**
154:11
**control**
290:15
**conversation**
24:14, 30:22, 55:3, 68:15, 74:17, 75:5, 77:15, 78:21, 82:7, 84:8, 86:16, 87:18, 90:15, 94:1, 101:14, 129:21, 137:2, 137:5, 159:9, 166:19, 179:5, 181:15, 312:11, 323:13, 343:12, 344:1,

**conversations**
68:18, 70:17, 74:15, 106:20, 122:4, 150:17, 198:2, 199:16, 304:3, 311:8, 312:9, 312:14, 312:17, 324:4, 324:5, 324:6, 374:19, 376:15, 473:9
**converted**
275:14
**convey**
95:15
**convicted**
96:20
**conviction**
85:2
**convictions**
216:20
**convince**
244:7
**cooperation**
228:3
**copied**
71:19, 99:16, 104:3, 106:6, 109:21, 328:1, 328:4
**copies**
335:6, 341:1, 343:15, 347:7, 347:10
**copy**
97:11, 143:11, 215:7, 215:11, 262:11, 325:21, 331:14, 347:1, 357:6, 357:9, 357:10, 357:11, 361:20
**copying**
191:8
**core**
52:14

**corner**
112:14
**corporate**
11:8, 45:16, 55:7, 62:12, 77:2
**corporation**
39:3, 48:18
**correction**
22:1
**corrections**
475:6
**correctly**
139:4
**correspondence**
361:5, 361:21
**cost**
206:20, 207:7, 297:9
**costs**
40:11, 267:15, 439:12
**could**
15:15, 32:2, 34:1, 36:8, 37:16, 39:12, 39:14, 42:5, 48:2, 56:12, 63:10, 63:11, 69:9, 94:17, 99:10, 99:12, 105:8, 107:17, 108:4, 122:14, 122:15, 130:2, 132:1, 134:7, 134:22, 135:8, 150:22, 151:1, 160:21, 169:15, 185:10, 188:12, 200:9, 201:20, 204:1, 204:3, 204:17, 204:18, 207:9, 210:2, 212:5, 212:6, 218:17, 227:21, 228:3, 229:2, 240:18, 243:3, 254:2, 256:17,

263:20, 264:20, 272:14, 282:14, 282:16, 313:15, 330:12, 343:22, 344:1, 354:20, 354:21, 368:5, 377:1, 381:9, 388:11, 406:8, 421:13, 421:14, 437:13, 440:12, 455:11, 455:15, 455:21, 456:11
**couldn't**
34:1, 135:22, 203:21, 290:15, 457:11
**counsel**
10:15, 20:9, 22:3, 23:6, 44:22, 55:3, 55:7, 73:11, 89:7, 91:12, 92:1, 92:15, 118:14, 159:20, 163:17, 163:20, 163:22, 198:21, 202:1, 333:1, 374:12, 376:16, 383:2, 390:8, 390:18, 425:16, 425:18, 426:1, 476:9
**count**
128:14, 284:18, 356:8
**countenance**
285:4, 287:15
**countenanced**
309:8
**counterclaim**
286:7, 378:20, 379:14, 382:13
**counterexecuted**
159:12
**country**
80:18, 82:1, 83:15, 84:21, 85:8, 85:17,

87:10, 88:6
**couple**
15:19, 27:4,
38:8, 224:3,
226:13, 423:15,
473:5
**course**
63:13, 77:20,
115:5, 139:5,
147:1, 152:9,
153:6, 216:2,
228:8, 267:18,
275:5, 287:8,
307:14, 323:13,
367:7, 451:16,
455:15
**court**
1:1, 10:6,
11:10, 11:12,
24:22, 25:8,
36:6, 38:19,
76:12, 97:2,
137:21, 140:16,
148:6, 196:13,
197:3, 203:6,
203:13, 207:21,
221:13, 221:19,
227:6, 227:7,
245:8, 306:6,
307:4, 307:8,
333:10, 361:18,
427:5
**court's**
207:9
**courting**
392:11
**courts**
241:20
**cover**
108:15, 276:22,
373:10, 373:11,
375:9
**covered**
12:21, 16:14,
17:11, 276:15,
279:11
**covers**
277:1

**crafted**
209:15
**crazy**
234:19
**create**
315:9, 315:22
**created**
378:10
**creates**
234:9
**creating**
306:18
**creation**
64:1, 64:4
**credit**
14:16, 296:9,
319:19
**crime**
254:17
**criminal**
30:17, 34:9,
35:1, 35:2,
35:11, 35:17,
36:3, 37:5,
38:1, 38:2,
38:14, 38:16,
67:15, 84:11,
85:1, 85:7,
85:15, 85:16,
87:9, 88:5,
88:14, 88:18,
95:20, 96:11,
96:14, 96:16,
96:18, 96:19,
96:21, 97:3,
216:20, 257:10
**criminality**
84:19
**criminals**
34:21
**crises**
42:15, 44:2
**crisis**
36:9
**critical**
213:15, 370:4,
370:5, 370:6
**cross-examination**
19:1

**cross-examine**
18:20
**crr**
1:21, 476:2
**cs**
353:3
**ct**
48:18
**cue**
149:10
**culminated**
181:13
**cumbersome**
210:21
**current**
128:12, 194:5,
296:5, 315:19,
403:17
**currently**
80:1, 215:12,
217:22, 218:4,
218:7, 295:16,
435:22
**custody**
30:19, 238:20,
246:2, 452:14,
453:5, 453:10
**customer**
263:7
**customers**
55:21
**cut**
40:10, 49:19,
112:8, 149:2,
167:21, 169:16,
169:22, 176:16,
340:22, 342:6,
342:18, 342:22,
343:4, 343:9,
343:11, 343:13,
344:5, 345:14,
346:8, 351:5,
356:9, 401:2,
417:9
**cutthroat**
395:9
**cv**
10:7

**cycle**
30:4

| D |
|---|

**d-o-n-o-v-a-n**
25:11
**daily**
49:19, 218:12,
377:10, 393:3
**dallas**
329:18
**damage**
259:3
**damages**
239:20, 439:13
**dance**
241:21
**danger**
335:15
**data**
96:6, 96:8,
112:8, 120:21,
121:5, 198:22,
202:7, 203:15,
211:2, 416:9
**database**
202:17, 210:11,
210:22, 249:8,
249:10, 259:9,
342:5, 342:10
**date**
10:9, 63:5,
63:15, 136:9,
183:11, 193:11,
200:22, 209:12,
215:16, 215:18,
242:22, 243:1,
289:9, 290:21,
291:11, 292:15,
296:14, 301:15,
314:8, 318:14,
320:8, 335:9,
373:18, 399:4,
403:12, 403:13,
404:11, 446:3,
446:7, 475:10
**dated**
5:10, 5:13,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

136

5:16, 5:19, 6:4,
6:7, 6:10, 6:13,
6:16, 6:19,
7:15, 7:19,
8:19, 9:3, 9:7,
9:10, 9:14,
71:17, 97:12,
110:13, 144:4,
168:6, 185:16,
302:2, 349:4,
361:20, 361:21,
372:4, 375:5,
375:10, 375:15,
375:16, 379:3,
434:9, 435:14

**dates**
52:18, 52:21,
53:1, 65:11,
66:10, 139:19,
372:7, 375:19,
401:10, 427:10,
427:11

**dave**
5:9, 5:12,
5:18, 6:3, 6:7,
6:12, 6:15,
6:18, 7:15,
7:18, 70:20,
70:22, 71:18,
78:22, 93:11,
97:13, 99:16,
109:16, 112:5,
121:13, 121:14,
122:5, 123:3,
136:6, 140:20,
141:3, 141:5,
141:17, 143:17,
157:10, 158:10,
170:19, 181:13,
181:16, 185:1,
186:5, 191:7,
191:10, 205:9,
205:18, 250:20,
285:2, 308:2,
310:19, 335:6,
336:4, 386:17,
460:17, 460:19,
461:13, 461:15

**davis**
8:4, 8:7, 8:16,
339:9, 339:18,
340:18, 349:18,
350:18, 353:22,
354:3, 357:19,
359:3, 362:20,
465:14, 467:17

**davis's**
356:4, 360:9

**day**
27:17, 27:20,
84:22, 91:20,
94:3, 94:10,
142:22, 146:12,
178:7, 212:11,
218:10, 222:8,
264:4, 317:3,
394:19, 417:12,
417:13, 456:19,
472:16, 476:14

**day-to-day**
40:5, 44:4

**days**
15:19, 91:7,
91:10, 92:21,
94:4, 264:2,
292:18, 293:1,
297:6, 301:18,
402:19, 473:5

**deal**
21:10, 44:1,
87:20

**dealing**
43:8, 402:1

**dealt**
284:4

**death**
203:7

**december**
119:18, 191:17,
192:11, 192:16,
287:18, 289:2,
289:14, 291:6,
292:2, 292:3,
292:20, 298:7,
300:7, 300:17,
301:16, 302:3,

303:3, 303:7,
311:10, 311:15,
321:21, 322:13,
323:4, 323:6,
323:21, 324:12,
325:3, 325:4,
325:5, 326:10,
326:16, 335:1,
337:3, 338:10,
338:11, 338:15,
350:3, 368:18,
378:11, 379:4,
380:7, 380:12,
382:7, 382:20,
383:7, 383:11,
385:15, 386:22,
387:16, 388:3,
402:16, 457:20,
457:21, 473:15

**decide**
283:18, 391:17

**decided**
36:3, 36:6,
391:12, 393:10,
393:16, 393:17,
395:6, 395:8

**decides**
430:9

**decision**
52:13, 208:5,
227:11, 395:2,
427:6

**decisions**
56:9

**decline**
455:7

**decreased**
421:19, 422:1

**defendant**
97:3

**defendants**
1:9, 3:11,
10:22, 11:5,
11:8, 13:9,
13:15, 13:17,
30:18, 35:1,
35:2, 37:5,
38:1, 38:2,

167:16, 278:4,
278:19, 279:8,
283:2, 284:14,
287:2

**defended**
449:3

**defenses**
80:1

**deficiencies**
361:7, 368:1

**deficiency**
93:1

**define**
297:16, 297:22

**defined**
76:11, 79:12,
388:14, 444:9,
444:17, 445:11

**defines**
248:20

**definitely**
336:4, 393:5,
425:10, 429:22

**definition**
444:17, 444:21,
445:9, 448:5,
448:7, 448:8,
448:10, 459:13,
459:14

**definitions**
437:21, 444:16,
445:6

**degree**
27:13, 28:12

**delay**
15:12, 150:18,
178:7

**delays**
361:7, 368:1

**deleted**
92:20

**deliver**
229:5, 235:14,
236:6, 238:1,
238:2, 238:5,
238:15, 241:4,
244:20, 245:9,
245:21, 245:22,

246:8, 305:4,
309:4, 329:7,
365:10, 365:16,
365:18, 365:21,
365:22, 367:1,
446:2, 446:6,
446:13, 452:22
**delivered**
233:22, 244:2,
452:14, 452:19
**delivery**
231:8, 231:15,
233:19, 234:11,
240:11, 305:20,
446:5, 446:6,
454:4
**delta**
45:16
**demand**
189:21, 193:16,
193:19, 194:2,
194:17, 229:6,
230:10, 288:1,
291:1, 291:3,
292:19, 293:2,
297:7, 309:17,
313:7, 334:19,
337:19, 338:10,
355:11, 361:11,
362:10, 365:19,
368:7, 377:5,
382:21, 394:5,
394:9, 438:22,
439:10, 440:7,
440:20, 441:3,
442:20, 445:14,
472:7, 472:8,
473:11
**demanded**
309:10, 313:5,
335:13, 384:7,
473:6
**demanding**
288:16, 336:22,
402:18, 472:10
**demands**
190:4, 335:9,
472:9

**denial**
226:16, 423:12
**denials**
428:7
**denied**
12:5, 14:4,
226:9, 428:6
**denoting**
45:7
**deny**
423:18
**denying**
226:13
**department**
40:1, 229:6,
245:7, 349:7,
349:9, 351:12,
362:4
**departure**
233:5
**depend**
270:16
**depict**
51:19
**depiction**
405:5, 407:8,
414:8
**deponent**
19:16, 475:1
**deportation**
243:5, 246:1
**depos**
10:12, 11:11
**deposed**
23:21, 298:1,
335:3
**deposing**
366:11
**deposit**
147:18, 264:8,
382:4
**deposited**
39:16
**deposition**
1:12, 2:1, 5:7,
10:3, 10:12,
15:2, 15:13,
16:20, 17:12,

17:16, 18:10,
19:11, 26:20,
36:1, 51:14,
83:6, 87:5,
87:17, 100:21,
102:20, 102:21,
103:2, 103:7,
111:16, 191:6,
294:8, 313:12,
317:14, 352:12,
372:1, 401:6,
418:18, 418:20,
476:3
**depositions**
19:17, 20:3,
24:7
**deposits**
264:9
**depressing**
472:5
**derechos**
14:14, 14:19
**derived**
61:19, 120:21,
214:17
**describe**
57:9
**described**
183:9
**description**
429:3
**designate**
341:5
**designed**
30:16, 36:17,
56:10
**desire**
304:8, 458:12
**desktop**
205:1
**destructive**
416:21
**detail**
152:20, 390:1,
453:21
**details**
13:19, 70:17,
189:1

**detainee**
95:21, 160:13,
161:5
**detainees**
78:16, 78:18,
79:5, 80:8,
81:5, 84:11,
95:11
**detention**
33:20, 68:16,
84:16, 88:17
**determination**
110:5, 231:2,
406:19, 444:5,
444:7, 444:11,
449:13, 449:22,
450:4, 464:11
**determine**
216:14, 222:3,
296:2, 412:4,
424:13, 449:1,
449:16
**determined**
367:9
**develop**
291:10
**developing**
279:13
**device**
214:20, 219:11,
221:9, 222:21
**devices**
93:7, 93:14,
222:22
**dhs**
230:17, 301:11,
326:17, 326:19,
334:9, 347:14
**difference**
43:5, 43:11,
45:1, 265:22,
394:18
**different**
33:18, 43:4,
55:18, 56:4,
58:2, 103:5,
188:1, 192:13,
213:12, 215:19,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                                138

216:1, 216:3,
222:6, 228:19,
259:11, 268:17,
275:16, 313:15,
313:17, 315:6,
315:10, 315:13,
334:3, 352:11,
381:20, 397:7,
401:21, 427:12,
429:9, 445:4,
448:18, 452:3,
453:9
**differently**
59:22
**difficult**
27:19, 52:10,
132:17, 161:19,
404:10
**digits**
326:5
**dineen**
4:17, 10:11
**direct**
23:6, 44:9,
55:15, 145:12,
156:12, 165:19,
276:10
**directed**
286:3, 452:2,
452:3
**direction**
152:9, 169:16,
280:12, 281:15,
285:5, 288:7,
302:16, 360:2,
476:8
**directly**
49:4, 51:2,
95:6, 165:20,
363:12
**director**
40:3, 72:12
**disagree**
18:7, 228:16,
228:18, 241:8,
256:13, 257:12,
280:9, 280:13,
314:22, 386:6,

387:21, 465:11,
468:11
**disagreement**
133:22, 150:5,
151:11
**disc**
10:3
**discharge**
147:16, 244:21,
245:10, 382:2,
382:3, 440:8,
443:5, 443:13,
459:3, 460:3
**disclosure**
247:1, 248:7,
248:14
**disclosures**
251:1
**discontinue**
224:12
**discontinued**
223:19, 224:1
**discovery**
22:10, 165:16,
385:8, 389:16,
390:9, 395:19,
404:8, 406:16
**discretion**
455:6
**discuss**
190:18
**discussed**
192:11, 293:10,
293:18, 298:18,
298:19, 304:1,
312:22, 324:12,
379:3, 460:22,
461:10
**discussing**
70:19
**discussion**
74:10, 131:2,
371:11, 457:22
**discussions**
90:12, 298:8,
303:8, 304:7,
310:18, 310:20,
311:15, 311:22,

312:4, 323:7,
323:22
**dishonest**
76:20
**disincentive**
234:10
**disingenuous**
451:7
**dispute**
116:21, 117:2,
117:14, 117:21,
226:19, 436:17,
436:18
**disrespect**
418:9, 418:17
**disrespectful**
98:10, 103:13,
209:5
**distinction**
56:3, 57:2,
79:18, 79:19,
80:3
**distinguish**
43:13, 43:16
**distinguishing**
56:14
**distributed**
275:4
**district**
1:1, 1:2, 10:6
**divide**
41:20
**division**
1:3, 10:7
**dm**
327:5
**doc**
352:9
**docket**
242:1, 329:16
**documentation**
117:20, 165:2,
250:11, 348:20,
352:10, 355:19,
416:5, 427:16
**documents**
19:8, 19:10,
19:12, 19:18,

19:20, 20:4,
20:15, 21:8,
21:13, 25:13,
25:18, 27:6,
27:7, 112:7,
112:9, 119:4,
123:11, 123:18,
130:13, 133:9,
137:16, 170:17,
184:1, 200:17,
201:4, 206:1,
206:2, 206:13,
206:18, 207:3,
207:10, 249:7,
249:14, 352:20,
353:3, 355:21,
358:15, 369:13,
370:1, 370:15,
396:7, 396:20,
399:6, 399:9,
404:19, 405:4,
419:14, 459:20
**doing**
14:18, 28:7,
31:10, 36:22,
37:15, 38:13,
52:15, 56:12,
56:16, 56:19,
57:4, 80:14,
83:8, 111:14,
198:14, 204:15,
219:12, 283:17,
306:12, 306:16,
324:7, 354:9,
374:11, 396:4,
417:1, 424:10,
433:14, 447:17
**dollar**
287:20
**dollars**
136:17, 170:2,
170:12, 171:9,
176:10, 180:9,
297:10, 309:11,
365:21
**done**
22:16, 27:17,
30:1, 30:5,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                                                    139

30:6, 31:1,
32:11, 56:15,
67:12, 67:14,
92:6, 93:3,
105:7, 150:22,
165:14, 196:11,
202:15, 208:16,
208:22, 212:12,
225:3, 267:6,
288:21, 298:5,
304:13, 308:22,
309:2, 316:22,
338:6, 343:11,
343:17, 344:10,
348:1, 354:8,
376:3, 381:15,
391:18, 417:2,
457:6, 457:8,
457:9, 457:12,
457:14, 473:22
**donne**
3:12, 10:20,
83:6, 87:4,
87:16, 104:14,
111:13, 140:18,
164:15, 199:7,
206:22, 207:17,
265:12, 278:9,
326:2, 385:4,
403:14, 410:20,
447:11, 447:20
**donovan's**
385:10
**door**
196:19, 447:2
**doorways**
90:4
**double**
273:6
**doubt**
80:6, 82:10,
82:20, 83:18,
88:12, 128:18,
128:19, 437:2
**down**
28:2, 28:6,
38:19, 82:9,
82:18, 83:13,

85:22, 86:9,
86:11, 142:6,
164:1, 174:5,
176:15, 176:17,
176:19, 230:6,
230:19, 230:20,
317:10, 341:17,
344:1, 412:3,
439:18, 440:1
**download**
92:19
**drafted**
379:16
**draw**
153:9
**drive**
19:10, 202:17,
305:16
**driver's**
26:2, 26:3
**due**
86:6, 114:20,
126:3, 200:4,
203:5, 209:12,
233:22, 235:8,
236:17, 237:19,
266:4, 293:17,
313:14, 318:15,
318:16, 325:6,
326:11, 326:17,
326:21, 328:11,
334:9, 346:16,
362:3, 362:12,
362:19, 366:16,
366:20, 366:22,
367:2, 435:22,
436:4, 436:7,
445:15, 446:2
**duly**
23:3
**during**
19:11, 66:5,
69:15, 78:14,
89:14, 100:21,
108:14, 128:3,
163:18, 212:21,
247:7, 247:10,
330:11, 459:14

**duties**
259:2
**duty**
309:8, 337:10,
401:22

## E

**e-a-l**
25:12, 25:14,
25:22, 26:4,
26:5
**each**
24:14, 31:18,
31:21, 103:22,
130:22, 206:4,
210:12, 210:14,
226:8, 259:13,
260:3, 260:17,
261:16, 294:7,
317:12, 335:11,
390:1, 391:4,
391:6, 391:7,
428:6
**eagle**
218:10, 218:11
**earlier**
62:20, 98:18,
135:22, 163:6,
216:19, 273:17,
277:12, 279:4,
324:22, 356:8,
357:13, 397:10,
437:16, 451:22,
458:1, 466:14,
466:18
**early**
70:12, 174:14,
174:21, 175:20
**earn**
296:16, 314:10
**earned**
317:1
**easier**
99:22
**easiest**
218:3, 246:19,
424:8, 433:2
**easy**
42:3, 103:10

**eat**
107:18
**ecf**
209:12
**eckert**
390:7
**educational**
27:11
**effect**
235:7, 236:16,
238:7, 238:11,
238:13, 344:12
**effective**
213:15, 349:20,
424:8
**effort**
40:10, 74:12,
156:8, 200:19,
274:15
**eight**
131:14, 222:21,
455:18
**either**
37:4, 108:15,
147:18, 196:8,
204:22, 234:11,
238:1, 275:18,
304:13, 305:22,
366:2, 418:17,
440:17, 441:11,
442:6, 472:13
**electronic**
220:19, 221:16,
258:16
**element**
362:17, 423:4
**elements**
423:9
**else**
52:16, 86:17,
112:6, 116:5,
129:13, 205:8,
205:10, 309:22,
341:21, 398:6,
403:21, 403:7,
459:20
**email's**
116:4, 379:19

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

140

emails
19:22, 99:10,
101:15, 104:4,
115:1, 115:3,
116:6, 125:7,
125:22, 126:6,
127:15, 127:21,
182:14, 278:8,
279:16, 279:19,
306:13, 326:13,
348:3, 348:8,
350:20, 354:4,
355:1, 357:19,
373:21, 375:9,
387:11, 388:17,
388:19, 396:6,
400:22, 429:19
embarrassed
40:9
embarrassment
108:17
employed
39:5, 72:15,
476:10
employee
42:2, 42:4,
125:14, 300:1
employees
40:17, 40:22,
41:4, 41:15,
41:16, 41:21,
42:5, 44:3,
56:11
employment
29:21
encapsulated
44:19
encompasses
276:8
encourage
305:21
end
98:17, 130:9,
137:8, 139:15,
143:17, 143:21,
151:20, 152:17,
153:17, 157:12,
157:19, 177:8,

177:18, 186:8,
189:5, 190:15,
304:6, 330:9,
345:15, 359:10,
360:9, 376:20,
381:20, 394:16,
439:11, 471:20
ended
223:16
ending
100:3
ends
58:10, 177:18
enforcement
245:18, 245:19,
246:4, 246:12,
447:1
engaged
250:20, 388:8,
416:17
engaging
24:13
enjoy
32:1
enough
127:6, 139:6,
210:5, 286:9,
286:10, 288:13,
371:8, 393:18,
458:19
ensure
160:11, 161:3,
240:11, 273:4,
307:2, 307:7,
336:7, 336:14
ensuring
306:6
enter
131:13, 371:8
entered
16:15, 139:18,
158:22, 159:10,
197:3, 215:8,
248:15, 267:13,
268:8, 455:14
entering
34:10, 130:3,
371:5

entire
19:14, 71:22,
153:17, 288:12,
329:13, 382:9,
391:11, 392:9,
394:13, 467:16
entirely
239:3
entirety
330:1
entities
75:2, 153:21
entitled
203:14, 418:1,
418:5
entity
54:21, 154:1,
207:15, 250:9
entrusting
112:9
entry
90:4
envelope
356:11, 356:13,
357:9, 357:10,
357:11, 358:21,
358:22, 397:2,
397:10, 401:11,
401:18
envelopes
355:21, 399:21,
400:3
environment
55:19
equal
136:16, 449:18,
451:10
equation
458:21
erik
7:14, 9:9,
9:13, 341:16
errata
475:7
erroneous
309:17, 399:22,
411:13
error
187:6, 415:9,

433:4, 436:11
escorted
244:19, 245:6,
453:4, 453:5,
453:14, 453:19
escorting
453:10
especially
246:12
esquire
3:3, 3:4, 3:12,
4:3, 4:9
essence
288:2
essential
362:10, 370:18
establish
341:18
established
77:6, 244:18
establishing
295:11
et
1:8, 10:5,
40:12, 41:15,
56:21, 67:5
evaluate
370:19
evan
224:10
even
34:8, 59:7,
83:9, 101:17,
104:16, 152:21,
200:9, 200:16,
247:22, 268:13,
282:11, 292:18,
301:1, 307:14,
309:3, 309:4,
309:7, 309:11,
324:21, 336:18,
354:2, 365:17,
375:2, 385:2,
396:22, 397:1,
399:4, 402:6,
402:8, 405:4,
424:15, 446:19,
456:7, 465:4,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

141

event 470:7, 471:15
event 379:9, 379:12
eventually 274:15, 352:8
ever 24:6, 31:13, 116:12, 128:19, 158:20, 162:18, 163:9, 176:19, 204:6, 222:12, 244:12, 261:1, 284:3, 311:6, 317:15, 345:20, 378:16, 382:4, 382:11, 382:20, 383:10, 415:9, 415:21, 423:22
evergreen 193:4, 205:15, 205:19, 295:9, 310:15, 310:22
every 16:19, 47:3, 103:5, 112:10, 218:10, 222:8, 244:15, 261:3, 261:14, 268:22, 286:8, 286:13, 304:11, 309:2, 338:6, 381:18, 381:22, 390:1, 391:5, 391:6, 391:7, 394:19, 411:10, 423:22, 456:19
everybody 36:11, 68:9, 108:4, 115:4, 386:2
everyone 295:14, 335:7
everyone's 417:14
everything 42:15, 52:16, 166:6, 309:21, 314:21, 368:17,

everything's 463:7, 463:9
everything's 392:13
evidence 117:14, 117:21, 163:8, 181:1, 187:9, 226:10, 265:10, 339:10, 340:2, 340:10, 344:17, 347:14, 385:20, 388:7, 388:9, 390:21, 393:14, 397:6, 398:16, 400:15, 401:9, 404:20, 405:4, 418:13, 431:17, 432:11, 450:13, 451:3, 459:3
evidenced 234:12
evidences 165:2, 167:10, 394:13
evolving 70:4
exact 50:14, 256:8, 266:15
exactly 16:11, 40:19, 53:4, 56:7, 139:2, 142:19, 195:15, 195:16, 208:10, 257:19, 267:1, 280:21, 286:3, 288:3, 288:11, 288:17, 297:5, 310:12, 321:16, 343:9, 368:15, 375:1, 375:3, 392:19, 402:9, 430:13, 431:1, 452:11, 458:11
examination 5:2, 16:21, 23:6, 447:18

examined 23:5, 475:3
example 37:15, 101:1, 120:12, 249:18, 252:6, 253:1, 263:6, 279:15, 280:12, 308:13, 404:3
examples 252:14
excel 435:21, 436:2
exception 52:11
exchange 470:10, 471:8
excited 306:10
exciting 24:3
exclusive 424:12, 448:22
excuse 31:7, 78:17, 106:1, 312:17, 377:18, 469:1
execute 101:7, 104:21, 106:3, 132:19, 197:14, 236:20, 349:19
executed 131:20, 132:9, 132:10, 138:1, 138:20, 138:21, 146:15, 149:17, 149:18, 152:5, 159:11, 160:1, 160:8, 160:12, 161:4, 162:14, 180:2, 243:3, 254:1, 277:18, 368:6, 438:9, 439:15
executing 160:5, 462:7, 464:3

execution 438:2, 438:4, 455:7
executive 166:4
exercise 458:6
exercising 424:14
exhibit 5:8, 5:9, 5:12, 5:15, 5:18, 6:3, 6:6, 6:9, 6:12, 6:15, 6:18, 6:21, 6:22, 7:3, 7:5, 7:8, 7:11, 7:14, 7:18, 8:3, 8:6, 8:8, 8:11, 8:15, 8:18, 9:3, 9:5, 9:7, 9:9, 9:13, 51:8, 51:9, 71:14, 71:15, 97:5, 104:1, 105:15, 110:10, 110:11, 136:3, 136:4, 137:13, 137:18, 137:20, 168:14, 168:17, 168:18, 168:20, 171:12, 172:5, 185:14, 191:4, 191:7, 215:3, 229:19, 262:8, 274:6, 302:8, 302:19, 325:5, 325:18, 327:17, 327:18, 327:21, 332:2, 332:8, 333:10, 333:15, 339:6, 340:15, 347:3, 348:10, 349:1, 355:15, 355:18, 361:15, 372:2, 375:6, 434:7, 435:9, 467:20, 467:21, 468:6
exhibited 394:15

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                          142

| | | | |
|---|---|---|---|
| **exhibits** 5:7, 62:13, 325:19, 398:3 | **expected** 56:7, 471:21 | 321:20, 362:13, 362:16, 362:19, | **facilitated** 310:4, 310:19 |
| **exist** 45:7, 63:19, 91:2, 91:18, 243:6, 317:21, 407:21, 414:3, 414:4, 414:6, 418:20 | **expecting** 321:22 | 362:20, 363:2, 363:6, 364:10, 364:11, 364:18, 370:19 | **facilitating** 30:10 |
| | **expediency** 449:2 | | **facing** 43:7, 96:19 |
| | **expenses** 60:16, 60:21, 406:20, 412:5, 439:13, 450:11 | **expressed** 372:11 | **fact** 76:4, 92:6, 95:15, 104:11, 110:2, 117:11, 127:2, 132:22, 143:2, 157:11, 169:20, 177:1, 177:5, 178:15, 179:11, 180:12, 186:14, 187:13, 189:20, 209:20, 211:13, 222:19, 224:14, 228:12, 234:12, 249:17, 250:17, 292:8, 309:10, 317:21, 326:21, 346:7, 346:12, 347:13, 348:7, 363:1, 379:17, 383:18, 388:2, 396:9, 400:9, 400:13, 427:4, 450:7, 450:13, 455:17, 455:21, 466:18 |
| **existed** 59:12, 59:13, 63:21 | | **extended** 253:4 | |
| **existence** 298:9 | **experience** 135:3, 242:6 | **extends** 253:6 | |
| **exists** 59:13, 226:14, 280:22 | **expert** 309:3, 309:4, 309:5, 365:14, 446:17 | **extensive** 210:9, 374:18 | |
| **exonerate** 195:21, 196:6, 297:13, 297:17, 304:14, 305:1, 305:22, 307:9, 309:3, 309:7, 338:2, 338:4, 441:5, 442:3 | **expires** 476:16 | **extensively** 268:9 | |
| | **explain** 305:16, 370:13 | **extent** 46:19, 52:5, 55:6, 60:5, 60:19, 61:5, 67:7, 73:2, 77:5, 79:22, 134:19, 145:5, 150:2, 160:16, 161:8, 170:19, 204:20, 234:22, 240:4, 249:2, 251:13, 265:9, 278:6, 280:7, 370:12, 450:13, 451:3, 462:18 | |
| | **explained** 74:11, 122:9, 184:18, 255:4, 259:1, 306:9 | | |
| **exonerated** 196:8, 289:9, 318:14 | **explaining** 137:10, 139:20, 306:19, 453:16 | | |
| **exonerating** 354:11 | **exploring** 374:10 | | |
| **exoneration** 196:14, 304:17, 318:1 | **export** 202:10, 202:12, 210:19 | **extra** 340:17 | **facts** 226:10, 265:10, 294:9, 294:11, 294:13, 294:14, 294:19, 397:17, 397:19, 402:2, 402:12, 432:9 |
| **exonerations** 152:3, 298:4, 304:12, 308:21, 322:8 | **exported** 202:7 | **eyes** 156:7 | |
| **expect** 18:16, 238:15, 282:19, 370:6 | **exporting** 260:22 | **F** | |
| | **exposed** 200:7, 200:10 | **face** 239:7, 239:11, 297:11, 384:2, 384:4, 395:14 | **fail** 36:4, 36:5, 237:21, 238:6 |
| **expectation** 133:5, 133:7, 133:8, 186:6, 279:13, 281:17, 281:18, 284:5, 286:17 | **exposure** 194:5, 194:8, 296:5, 313:21, 315:18, 315:19, 316:2, 316:7, 316:15, 318:13, 318:15, 319:7, 319:11, 320:20, 321:4, 321:11, 321:15, 321:19, | **faced** 34:11 | **failed** 210:3, 275:12 |
| | | **facie** 450:13, 451:2 | **fails** 235:6, 236:15, 275:11 |
| **expectations** 251:16 | | **facilitate** 81:7, 214:22, 310:17 | **failure** 224:15, 328:19, |

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

143

349:16
**fair**
53:18, 128:4,
128:6, 158:6,
196:18, 257:18,
392:4, 392:5,
402:1, 403:22,
431:12
**faith**
150:22, 286:7,
288:2, 292:19,
379:12, 379:14,
379:19, 383:12,
384:21, 385:3,
385:16, 385:20,
386:2, 387:17,
388:4, 388:7,
388:8, 388:21,
389:18, 390:2,
391:6, 392:10,
393:14, 393:19,
393:22, 394:14,
395:21, 395:22,
396:2, 396:5,
396:11, 397:21,
399:10, 402:1,
402:3, 402:6,
402:13, 402:22,
423:5, 423:10,
424:16
**false**
129:7, 129:12,
199:7, 254:16,
254:21, 256:15,
257:8, 257:21,
413:2
**familiar**
229:15, 434:2
**family**
80:19, 80:20,
82:2, 82:3,
83:16, 83:17,
263:22
**far**
30:7, 52:18,
63:14, 104:9,
131:7, 208:12,
214:19, 467:19

**fast**
105:11, 148:9,
148:10
**faster**
242:1
**fault**
329:8, 329:11
**fcs**
436:8
**fear**
346:2
**feb**
6:4, 6:7, 6:10
**february**
1:14, 8:19,
10:9, 136:18,
137:17, 137:22,
141:2, 142:18,
143:9, 143:16,
168:2, 168:6,
174:5, 175:8,
175:9, 176:18,
177:4, 193:18,
292:20, 292:21,
295:4, 297:2,
316:8, 322:3,
349:20, 359:10,
360:10, 360:13,
364:5, 364:8,
394:4, 422:10,
457:19, 473:17,
476:15
**federal**
335:17, 336:1,
389:19
**fee**
222:6, 266:1,
275:21, 276:1,
276:6, 276:17,
276:21, 426:9,
426:11
**feel**
15:14, 15:19,
22:15, 56:5,
148:7, 149:13,
210:3, 215:1,
286:12, 288:20,
288:21, 308:12

**feeling**
15:11, 16:4,
23:11, 23:13,
142:19, 149:14
**fees**
214:16, 214:17,
214:18, 271:9,
273:2, 273:6,
276:7, 276:8,
276:12, 439:13
**few**
20:19, 27:7,
33:18, 192:4,
252:14, 318:20,
319:3, 422:14
**fewer**
430:4
**fidelity**
65:17, 65:20
**field**
55:17, 55:21,
334:3
**figure**
184:20, 224:8,
277:20
**figured**
437:13
**file**
21:20, 123:20,
141:8, 141:22,
142:7, 206:16,
211:6, 227:12,
261:15, 262:3,
270:21, 329:9,
329:22, 330:1,
331:4, 333:22,
420:7, 433:10,
451:10, 454:6
**filed**
197:3, 199:12,
200:17, 203:8,
286:7, 389:9,
416:13, 416:14,
421:8
**files**
19:14, 112:17,
201:1, 202:17,
204:7, 206:8,

**filing**
203:6, 203:9,
261:4
**final**
19:22, 231:1,
245:22, 301:8,
307:10, 365:4,
367:9, 438:18,
440:18, 444:3,
444:5, 444:7,
444:11, 462:10
**finance**
49:15, 49:17,
49:18, 165:8,
165:22, 166:3,
166:8, 340:22,
343:14, 412:3
**financial**
16:17, 17:1,
17:18, 18:2,
18:14, 19:22,
65:9, 65:13,
65:14, 107:1,
109:7, 109:20,
110:4, 117:4,
117:5, 117:10,
118:2, 119:2,
119:4, 119:16,
121:20, 122:17,
122:22, 123:18,
123:21, 135:22,
137:6, 140:22,
142:3, 142:21,
234:9, 368:9,
369:11, 403:17,
404:15, 404:17,
404:20, 405:5,

**feeling** 206:12, 206:13,
208:1, 208:2,
208:11, 208:13,
209:19, 209:22,
210:8, 211:7,
211:17, 212:1,
212:6, 212:10,
212:11, 212:14,
212:20, 239:6,
259:13, 260:18,
262:1, 412:6

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                    144

406:7, 406:8,
407:9, 407:16,
411:3, 411:9,
411:12, 413:5,
414:6, 414:8,
415:22, 421:5,
476:11
**financially**
329:3, 458:18
**financials**
18:13, 109:12,
110:3, 110:14,
110:21, 111:3,
111:12, 111:17,
111:18, 113:12,
114:8, 114:10,
114:13, 115:21,
420:20
**find**
69:10, 143:21,
175:21, 189:4,
192:22, 226:14,
278:1, 287:12,
287:13, 287:20,
287:21, 290:6,
292:5, 292:9,
297:2, 299:2,
313:5, 322:20,
363:10, 376:21,
379:6, 388:15,
392:18, 392:21,
402:19, 412:7,
455:22
**finding**
14:16, 388:16
**finds**
395:1
**fine**
81:17, 100:18,
103:3, 103:16,
103:18, 105:12,
213:7, 232:19,
240:6, 277:14,
283:17, 360:5,
360:7, 376:19,
410:21, 419:3
**finish**
27:17, 28:1,

32:21, 37:20,
81:11, 181:6,
200:14, 201:5,
225:7, 234:6,
282:11, 291:19,
301:3, 332:21,
333:7, 417:19,
430:16, 431:2,
431:4, 452:2,
474:5
**finished**
27:16, 105:21,
202:14, 245:17,
282:10, 333:20,
333:21, 381:12,
381:18, 415:14,
465:4
**finishing**
201:13, 385:22
**fire**
456:7, 456:14,
456:16
**fires**
42:16
**firm**
12:1, 13:2,
13:4, 14:16,
22:3, 59:8,
59:11, 59:13,
70:15
**firms**
14:6
**first**
14:5, 23:3,
24:3, 24:6,
30:8, 33:5,
42:1, 51:11,
51:17, 58:17,
64:18, 66:16,
125:12, 141:14,
145:22, 146:5,
157:20, 158:2,
159:15, 168:4,
168:10, 168:19,
168:21, 169:15,
171:19, 172:10,
172:16, 174:6,
174:14, 174:21,

177:7, 177:9,
177:14, 180:3,
180:8, 180:14,
182:16, 182:19,
184:20, 201:22,
228:5, 233:3,
236:9, 256:18,
256:19, 258:20,
266:21, 274:7,
276:15, 291:3,
310:22, 318:20,
319:3, 321:2,
332:3, 332:11,
337:12, 357:16,
357:21, 358:4,
358:8, 358:11,
358:12, 380:8,
396:21, 437:19,
446:18, 451:6,
467:20, 468:20
**fisherville**
25:8
**fit**
193:10, 292:13,
296:12, 299:3,
314:6, 320:7,
433:19
**fitzgerald**
2:5, 3:5
**five**
74:17, 130:21,
136:16, 183:14,
183:18, 183:21,
209:1, 241:21,
324:16, 392:3
**five-minute**
360:19
**fix**
22:6
**flag**
17:13, 111:20
**fleeing**
203:7
**flow**
16:21, 17:16,
18:11
**focused**
56:11

**folks**
114:17, 298:3,
322:7
**follow**
197:11, 384:6
**followed**
44:22, 360:3,
373:4, 377:7
**following**
231:17, 231:21,
344:8, 356:3,
359:2, 372:6
**follows**
23:5, 82:17,
155:14, 177:5,
194:12, 375:14,
438:5
**footage**
91:6
**foray**
33:6
**force**
318:17
**forced**
349:15
**foregoing**
370:6, 475:4,
476:3, 476:4
**foreign**
127:16
**forget**
291:21
**forgive**
132:15, 135:5
**format**
104:2, 104:7
**formation**
30:9, 62:12,
63:12, 66:20,
68:21, 109:3
**formed**
29:16, 33:4,
48:5, 52:20,
54:20, 62:16,
62:19, 62:22,
68:13, 130:11,
282:4, 385:16,
387:1, 388:3

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

145

former
41:9, 128:15
forming
29:19, 30:8,
109:9, 128:4
forms
387:16, 388:7
forth
184:12, 461:12,
461:16, 464:13,
471:5
fortunate
44:2
forward
78:4, 79:16,
113:12, 114:22,
115:3, 115:20,
221:21, 434:12
forwarded
131:11, 143:9,
143:16, 262:16,
263:2, 264:13,
264:21, 267:1,
274:21
forwarding
349:3
found
127:14, 168:22,
258:20, 311:12,
359:13, 381:8,
384:6, 386:19,
394:3, 402:17,
414:16, 437:8,
473:17
four
183:19, 183:20,
353:4, 406:6
fourth
237:20
frame
70:12, 359:2,
360:9, 394:10,
394:12, 394:14
frankly
195:18, 239:2
fraud
256:16, 257:9
fraudulent
127:8, 127:15,

127:20
freaked
456:9
fresh
162:4
friday
222:13, 222:14,
345:16, 372:13,
373:14, 373:19,
472:14, 472:17
friday's
472:20
friend
128:15
front
78:1, 83:2,
89:1, 93:21,
97:22, 103:14,
126:4, 126:9,
130:14, 137:16,
141:3, 150:3,
205:4, 269:19,
272:2, 284:21,
285:6, 304:18,
324:17, 324:21,
327:22, 328:1,
331:8, 387:6,
396:6, 396:7,
400:22, 406:5,
407:5, 407:20,
419:14, 419:15,
429:19, 440:16,
451:21, 454:9,
464:8
frustrating
200:15, 286:11,
367:15
fulfill
381:9
fulfillment
230:1
full
19:9, 152:15,
201:18, 208:1,
208:13, 208:20,
235:8, 236:3,
236:16, 238:7,
274:15, 276:19,

315:4, 400:13,
401:16
full-time
28:10
fully
23:17, 149:21,
150:11, 151:6,
153:7, 216:5,
403:9, 459:5
fun
149:15
function
135:3, 135:5
fund
50:18
funding
136:15
funds
53:8, 53:11,
57:10, 57:13,
57:15, 57:20,
58:16, 60:17,
60:19, 61:12,
61:18, 144:15,
145:1, 145:4,
150:4, 275:3
furnished
459:2
furnishes
231:16
further
195:17, 273:12,
325:2, 331:18,
332:16, 349:19,
445:11, 445:18
future
22:5, 186:6,
296:3, 463:14

**G**

g1
231:13, 231:22,
232:1, 232:9,
233:3
ga
3:16
garage
27:2

gather
12:18
gathered
435:20
gave
19:10, 169:16,
197:4, 274:6,
288:5, 376:21,
457:17
ged
29:4
general
29:20, 61:8,
70:5, 91:8,
125:19, 136:9,
145:7, 147:10,
149:16, 150:7,
187:22, 243:3,
275:21, 286:22,
395:13, 396:16,
413:11, 419:17,
421:22, 422:4,
450:22, 455:3,
460:14, 461:20,
462:4, 465:21,
468:5
generally
25:19, 27:8,
42:12, 42:14,
43:2, 43:22,
69:19, 70:6,
70:8, 89:19,
90:2, 220:11,
331:1, 422:6
generate
255:2
generated
344:22
genesis
35:15
gentry
41:10, 48:5,
48:7
georgia
10:21
getting
184:1, 220:4,
220:20, 222:20,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

146

268:5, 281:20,
293:13, 298:4,
304:12, 322:8,
366:8, 377:11,
393:4, 393:13,
394:19, 401:22,
420:19, 456:19,
470:5
**gia**
159:16
**give**
20:15, 28:19,
29:20, 52:7,
70:7, 89:7,
94:17, 102:12,
188:5, 188:8,
189:1, 196:19,
199:17, 204:1,
204:18, 209:19,
209:21, 215:18,
220:5, 234:17,
236:2, 262:6,
286:1, 287:5,
287:7, 302:13,
302:15, 329:12,
339:14, 388:10,
418:22, 428:3,
437:5, 456:18,
456:20, 462:14
**given**
39:1, 112:2,
112:3, 112:11,
118:10, 157:11,
204:6, 204:11,
204:12, 204:15,
205:6, 210:4,
211:11, 237:9,
258:19, 373:9,
377:15, 399:2,
402:10, 424:3,
427:4, 475:6,
476:6
**gives**
112:6, 369:10,
423:22, 462:7
**giving**
88:1, 112:7,
203:1, 210:4,

433:18
**glad**
366:1, 388:17
**go**
16:18, 17:11,
24:8, 27:17,
27:21, 42:5,
54:12, 54:14,
57:15, 60:12,
80:3, 85:8,
85:18, 87:11,
88:6, 99:11,
99:21, 100:9,
123:10, 140:17,
148:4, 148:22,
157:13, 165:21,
175:18, 176:2,
184:2, 194:6,
196:12, 204:13,
210:10, 210:22,
211:22, 221:13,
227:13, 227:14,
227:16, 227:22,
234:5, 239:1,
241:15, 244:4,
244:5, 244:6,
262:7, 262:10,
264:2, 270:9,
272:9, 294:3,
294:5, 305:11,
305:12, 305:13,
305:15, 305:21,
316:15, 319:21,
325:12, 327:16,
335:4, 341:22,
357:15, 378:4,
390:12, 391:3,
392:6, 412:3,
412:4, 429:21,
431:5, 431:7,
437:3, 437:11,
452:2, 452:3,
457:13, 466:13,
468:14, 474:9
**goal**
193:9, 292:12,
296:11, 320:6
**god**
329:6

**goes**
53:6, 219:21,
276:1, 296:5,
332:8, 418:6
**gone**
90:20, 91:15,
282:9, 428:4
**good**
16:8, 22:15,
62:1, 62:4,
70:22, 71:1,
71:4, 89:11,
108:4, 125:4,
128:5, 128:17,
140:21, 149:3,
150:22, 155:4,
286:9, 286:10,
288:13, 305:15,
331:20, 354:9,
360:18, 393:18,
402:1, 417:13,
456:4
**gorby**
3:13, 10:20
**gosh**
277:21
**gotcha**
232:16, 325:16
**gotten**
39:14, 56:16,
290:15, 353:17
**government**
72:12, 230:2,
240:14, 241:19,
242:2, 242:8,
244:17, 328:21,
335:17, 336:2,
353:1, 353:6,
365:6, 365:7,
450:5
**government's**
156:7
**governors**
27:14
**gps**
32:8, 37:5,
37:6, 37:14,
37:16, 37:18,

37:22, 38:1,
67:5, 67:15,
67:22, 68:1,
93:7, 93:13,
93:16, 94:2,
94:3, 94:9,
214:3, 214:20,
217:4, 218:1,
218:5, 218:6,
218:7, 219:11,
219:13, 220:2,
221:9, 222:2,
222:11, 222:15,
223:12, 247:1,
248:6, 248:19,
258:19, 277:4,
307:20, 308:2
**gr**
327:5
**grab**
421:14
**gracious**
139:6
**graduate**
27:15, 29:2
**grant**
404:13
**granted**
227:19, 229:2,
337:6
**grave**
350:9
**gravely**
350:2, 350:7
**great**
26:19, 44:3,
112:6, 178:6,
277:21, 368:18,
390:11, 392:13,
452:10, 474:3
**greensboro**
2:6, 3:6, 10:13
**greg**
310:21, 311:6
**ground**
286:13, 286:14,
288:20
**groups**
277:21

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

147

growing
169:10, 364:10,
372:11
grows
216:8
guarantee
198:18, 240:9
guarantees
230:6, 230:14
guess
26:21, 42:1,
47:20, 51:17,
54:7, 98:13,
98:16, 120:5,
165:8, 166:5,
216:18, 342:15,
344:6, 348:6,
422:9
guillermo
302:3
gust
55:7
guy
128:8, 128:11
guys
38:18, 103:9,
200:17, 200:20,
260:1, 302:17,
336:17

**H**

half
152:15, 183:19,
183:20, 322:15,
467:8
halfway
194:22, 450:17
hall
344:2
hallways
90:4
hampton
37:14
hand
149:9, 333:2,
333:12, 333:13,
386:10, 476:14
handbook
290:7

handcuffs
305:18, 453:11
handed
113:14, 118:5,
143:5, 191:6,
192:3, 267:3,
267:5, 325:11,
335:5, 357:7,
398:14, 435:3,
437:12
handle
39:21, 44:4,
433:7, 433:10
handled
433:4
handles
39:22
handling
42:15
hands
332:13
handwriting
138:18
handwritten
344:22
hang
313:20, 314:2
happen
24:18, 100:21,
104:11, 109:1,
153:19, 220:14,
228:6, 275:16,
279:14, 329:18,
345:15, 346:6
happened
36:7, 78:13,
101:13, 158:7,
187:1, 300:6,
329:22, 345:7,
345:20, 447:4
happening
34:17, 86:18,
146:11, 291:2
happens
216:8, 304:11,
329:17, 441:8,
453:18
happily
346:15

happy
17:21, 87:5,
163:16, 165:10,
165:11, 165:21,
178:6, 242:2,
301:21, 346:5
hard
86:7, 142:17,
286:13, 306:12,
306:19
harm
200:9, 424:1,
424:2
harmed
336:11
harris
3:4, 10:19,
13:7, 21:14,
21:19, 21:21,
22:17, 97:7,
97:9, 103:1,
103:4, 135:12,
384:12, 442:15,
464:22
harrisonburg
1:3, 10:7
hazzar
9:13, 434:11,
435:15
head
44:13, 110:19,
129:10, 166:2,
166:6, 218:16,
371:13, 404:18,
405:2, 405:19
header
112:4, 372:22
headquarters
77:2
heads-up
173:15
healthy
458:18
hear
17:21, 104:18,
160:21, 164:20,
209:7, 265:7,
417:21, 418:8,

418:16
heard
372:9
hearing
208:21, 212:3,
212:21, 244:5,
244:6, 305:14
hearings
17:3, 229:6
heartened
454:20
heat
15:17, 16:8,
16:12
heavy
39:1
held
2:1, 84:16,
89:16, 151:13,
158:3, 440:12
help
36:19, 209:17,
209:21, 295:13,
322:6, 330:5,
336:17, 336:18,
337:6, 337:8,
339:10, 340:1,
340:9, 341:15,
359:22
helpful
103:15, 122:9,
145:13, 261:10
helping
122:6
helps
213:13, 221:17,
307:7
hence
288:1, 453:20
here
10:2, 12:20,
22:4, 26:9,
27:1, 62:14,
75:17, 79:16,
105:13, 106:5,
106:8, 107:12,
107:16, 109:1,
111:20, 115:2,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

148

122:15, 132:17,
140:17, 167:9,
172:13, 177:9,
187:8, 189:6,
191:16, 195:19,
232:13, 237:19,
259:8, 262:10,
264:21, 278:7,
280:20, 281:5,
281:12, 281:13,
292:7, 292:8,
292:10, 293:8,
302:1, 310:16,
314:1, 314:5,
316:13, 316:14,
317:14, 321:22,
325:12, 331:13,
343:21, 356:6,
363:2, 363:20,
366:10, 366:14,
382:15, 388:18,
399:5, 402:7,
402:12, 403:6,
404:1, 405:21,
406:1, 406:21,
407:4, 407:15,
407:19, 407:20,
408:4, 408:12,
411:10, 411:19,
415:7, 417:15,
419:6, 432:18,
434:15, 437:14,
445:6, 451:5,
451:14, 456:8,
462:11

**here's**
348:16, 348:18,
440:2

**hereafter**
249:15

**hereby**
231:16, 475:2,
476:4

**herein**
469:20

**hereunder**
450:10, 450:14

**hereunto**
476:13

**hey**
71:10, 169:12,
176:2, 218:14,
220:9, 277:14,
283:19, 305:13,
307:1, 323:14,
344:9, 345:18,
348:3, 380:15,
380:17

**hi**
114:15

**high**
29:2, 34:11,
216:15

**higher**
225:8, 227:18

**himself**
232:8

**hired**
127:14, 404:14

**histories**
88:15, 88:18

**history**
95:21, 96:11,
96:21, 97:3,
260:9

**hit**
460:12

**hoffar**
2:5, 3:5

**hold**
84:18, 158:3,
158:13, 175:14,
232:9, 241:6,
285:18, 293:17,
296:15, 296:21,
299:4, 299:8,
314:4, 314:9,
319:16, 321:9,
321:10, 345:3,
345:19, 375:22,
382:12, 417:11,
468:1

**holding**
314:16

**home**
50:16, 287:21,
292:9, 305:15,

313:6, 359:13

**homeland**
229:7, 245:7,
349:7, 349:9,
351:12, 362:4

**homeless**
30:3

**homes**
11:1, 11:5,
26:12, 26:15,
41:15, 41:17,
43:18, 43:21,
44:7, 44:9,
44:11, 44:17,
45:3, 45:4,
48:21, 49:2,
49:6, 49:9,
49:17, 50:5,
50:11, 54:11,
54:12, 54:14,
58:21, 60:5,
60:14, 61:12,
61:19, 145:5,
153:21, 155:6,
155:10, 155:14,
155:18, 156:18,
162:19, 167:11,
185:18, 189:14,
244:5, 280:2

**honest**
40:20, 43:17,
74:18, 76:17,
127:19, 129:4,
210:4, 244:11,
282:11, 286:12,
384:5, 437:8,
459:9, 459:11,
472:21

**honestly**
40:12, 77:19,
156:6, 350:19,
378:6, 387:3,
387:5, 466:21

**hooked**
246:1

**hope**
42:8, 239:4,
295:10

**hopefully**
222:4, 406:9

**hoppe**
212:3

**horrible**
148:7

**hospitality**
15:16

**hotel**
276:12, 276:14

**hour**
94:18

**hours**
27:4, 43:13,
43:16, 43:17,
94:3, 94:10,
183:14, 183:18,
317:13, 431:6,
431:9, 431:10,
473:21

**house**
305:17

**houses**
305:12

**houston**
329:18

**however**
273:16, 324:6,
436:20

**hr**
18:17, 40:1,
40:2, 73:3

**hugely**
43:10

**human**
40:4, 415:9,
452:5, 452:6,
452:7, 452:13

**humanos**
14:14, 14:20

**hundred**
28:14, 28:21,
37:1, 37:2,
40:20, 41:4,
41:11, 41:16,
48:15, 60:11,
65:5, 65:10,
122:22, 130:22,

136:16, 138:14,
163:4, 170:1,
170:12, 171:6,
171:8, 176:10,
180:3, 180:9,
206:7, 206:11,
206:12, 208:2,
223:13, 225:15,
242:8, 242:11,
415:7, 415:8
**hundred-thousand-**
**-dollar**
169:4
**hundreds**
415:5
**hurst**
21:17, 22:8
**hurt**
209:20

**I**

**ice**
246:2, 356:7
**idea**
35:16, 69:5,
70:5, 86:8,
210:5, 217:9,
273:4, 299:6,
323:15, 324:20,
344:19, 360:18,
373:14
**identifi**
327:18
**identification**
51:10, 71:16,
97:6, 110:12,
136:5, 137:14,
137:19, 168:15,
171:13, 185:15,
191:5, 215:4,
229:20, 262:9,
302:20, 325:20,
333:16, 339:7,
340:16, 347:4,
348:11, 349:2,
355:16, 361:16,
372:3, 375:7,
434:8, 435:10

**identified**
163:3, 448:10,
448:12
**identifies**
445:20
**identify**
20:21, 99:2,
106:7, 164:3,
165:1, 284:22,
285:7, 448:17,
468:8
**identifying**
200:18, 254:12
**ific**
65:18, 65:22,
66:1
**ignorance**
31:7
**ill**
107:18, 281:12
**illness**
148:8
**imagine**
24:16, 263:20
**immediate**
336:22, 341:6
**immediately**
65:5, 69:13,
125:4, 336:8
**immigrant**
87:9, 160:13,
161:5, 220:18,
222:8, 231:3,
240:17, 242:9,
242:11, 242:14,
242:16, 242:20,
244:4, 258:10,
260:13, 263:20,
263:21
**immigrants**
68:16, 69:21,
80:18, 81:21,
82:1, 83:15,
84:16, 84:21,
85:5, 85:15,
88:4, 88:14,
88:17, 93:7,
93:17, 94:7,

213:9, 213:13,
216:15, 217:3,
225:16, 237:8,
254:1, 266:6,
307:7
**immigration**
6:22, 30:10,
33:6, 34:7,
61:2, 65:2,
67:9, 67:19,
68:17, 69:1,
76:12, 84:15,
86:18, 95:5,
159:3, 190:12,
190:21, 192:17,
227:6, 233:14,
235:14, 235:15,
236:6, 236:7,
241:20, 241:21,
245:7, 251:7,
300:13, 362:5,
362:9, 363:15,
364:4, 364:7,
365:6, 366:15,
444:10, 445:13,
445:19, 448:5,
448:9
**implication**
453:15
**implying**
453:10, 453:13
**important**
43:10, 181:8,
181:15, 209:5,
280:18, 285:19,
291:8, 294:8,
330:13, 336:6,
336:9, 346:2,
353:19, 354:4,
354:5, 355:8,
355:10, 364:9,
371:7, 432:10,
443:22, 444:6,
458:21, 464:10
**impose**
461:22
**imposes**
463:19, 468:8

**impossible**
415:17
**impression**
167:1
**improper**
447:18
**inaccurate**
54:18, 291:3,
411:7, 412:14,
435:1, 435:3
**inaccurately**
227:2
**inactions**
228:14
**inadvertent**
20:13
**inadvertently**
18:15, 20:6
**inappropriate**
164:17, 226:1,
227:8, 239:3,
239:4, 309:17
**inappropriately**
156:10
**inartful**
54:19, 60:10
**inartfully**
24:11, 47:1
**inc**
1:8, 10:5,
11:1, 26:11,
26:12, 29:15,
29:16, 39:9,
41:22, 53:6,
66:20, 79:11,
160:14, 248:16
**incarcerated**
290:13
**incentive**
234:9
**inception**
186:17, 200:16
**incident**
127:7
**include**
41:16, 61:1,
79:17, 111:11,
120:8, 312:17,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

150

| | | | |
|---|---|---|---|
| 447:6 | 459:5 | 277:17, 279:5, | indication |
| **included** | **indemnifies** | 280:2, 284:7, | 329:19 |
| 37:13, 206:2, | 254:11 | 284:8, 286:21, | **indicative** |
| 206:12, 206:15, | **indemnify** | 308:14, 317:5, | 458:11 |
| 210:8, 259:13, | 131:12, 195:20, | 337:19, 349:18, | **indicia** |
| 260:18, 261:19, | 196:6, 263:11, | 359:5, 362:17, | 392:9, 402:22 |
| 261:21, 379:14, | 304:15, 305:2, | 364:20, 395:13, | **indigent** |
| 468:16 | 306:2, 307:10, | 396:17, 413:11, | 34:15 |
| **includes** | 308:22, 338:5, | 424:12, 424:15, | **individual** |
| 19:9, 65:22, | 438:16, 438:18, | 424:20, 437:4, | 18:16, 34:2, |
| 119:17, 120:4 | 441:3, 441:12, | 438:9, 438:21, | 45:10, 96:19, |
| **including** | 442:7 | 441:10, 442:2, | 125:13, 156:4, |
| 19:20, 19:21, | **indemnifying** | 442:5, 442:18, | 204:11, 204:16, |
| 426:15 | 251:3, 354:12 | 444:13, 447:22, | 219:16, 221:2, |
| **inclusive** | **indemnitor** | 448:1, 460:13, | 221:6, 227:1, |
| 250:12 | 150:8, 235:3, | 461:20, 462:5, | 233:21, 258:16, |
| **income** | 250:18, 438:22, | 462:22, 464:14, | 259:14, 260:14, |
| 80:20, 82:3, | 448:22, 449:21, | 464:18, 465:18, | 260:15, 260:17, |
| 83:17, 120:18, | 449:22, 469:8, | 465:22, 466:4, | 261:16, 276:10, |
| 406:19, 421:17 | 470:5, 470:15, | 466:8, 467:3, | 336:16 |
| **incorporate** | 470:17, 470:21 | 467:13, 468:5, | **individual's** |
| 444:12 | **indemnitors** | 469:10, 471:22 | 245:16 |
| **incorrect** | 147:14, 438:4, | **independent** | **individually** |
| 401:11, 419:12, | 439:10, 450:14, | 60:2, 60:13, | 331:9 |
| 453:7 | 460:1, 469:7 | 63:6, 114:2, | **individuals** |
| **increase** | **indemnity** | 157:4, 238:21, | 12:5, 12:9, |
| 96:11, 362:13, | 101:7, 104:21, | 267:6, 450:6, | 30:3, 32:13, |
| 418:7 | 106:3, 106:9, | 468:12 | 33:21, 34:10, |
| **increased** | 109:5, 121:19, | **independently** | 34:11, 34:14, |
| 421:19, 422:1 | 122:12, 122:16, | 52:22, 146:11, | 36:9, 37:12, |
| **increases** | 122:20, 123:6, | 188:18, 327:7, | 55:20, 56:1, |
| 362:19, 392:16 | 123:20, 131:11, | 460:10 | 70:6, 127:13, |
| **increasingly** | 131:20, 132:4, | **independents** | 127:16, 204:12, |
| 388:19 | 132:7, 132:22, | 165:12 | 205:5 |
| **incredible** | 133:6, 133:11, | **indeterminate** | **inducement** |
| 43:12 | 133:15, 133:17, | 377:1, 388:12 | 438:3, 464:4 |
| **incredibly** | 133:18, 133:21, | **indeterminately** | **industry** |
| 122:5, 197:10, | 134:7, 134:8, | 392:17 | 33:19 |
| 416:20, 472:5 | 136:9, 138:1, | **index** | **inflammatory** |
| **incurring** | 138:7, 138:21, | 447:5 | 214:13, 214:14, |
| 224:17 | 146:14, 146:21, | **indicated** | 243:17 |
| **indemintors** | 147:10, 149:17, | 33:16, 172:16, | **inform** |
| 449:12 | 149:22, 150:7, | 178:22, 285:14, | 308:2 |
| **indemnification** | 150:12, 159:22, | 300:11, 341:17, | **information** |
| 61:8, 250:22, | 160:2, 160:5, | 416:21, 422:19 | 12:18, 16:17, |
| 251:18, 438:20 | 160:11, 161:3, | **indicates** | 20:11, 55:12, |
| **indemnified** | 198:3, 198:7, | 173:5, 230:18, | 73:3, 74:7, |
| 196:9, 337:12, | 199:9, 251:7, | 386:1 | 74:22, 109:7, |

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

151

118:2, 120:8,
120:21, 121:7,
121:14, 184:14,
196:20, 197:2,
197:8, 197:10,
197:19, 197:20,
200:6, 200:11,
200:18, 203:2,
203:6, 203:8,
206:3, 207:20,
210:7, 210:12,
217:19, 220:17,
220:18, 221:8,
222:2, 234:17,
239:5, 253:16,
254:2, 254:5,
254:6, 254:13,
254:16, 254:19,
254:21, 254:22,
255:1, 255:8,
255:12, 255:14,
255:16, 256:8,
256:13, 256:16,
257:3, 257:7,
257:8, 257:16,
257:20, 257:22,
258:3, 258:6,
258:8, 260:18,
276:2, 276:3,
341:20, 361:9,
368:3, 369:13,
370:5, 370:18,
371:7, 372:16,
375:18, 376:17,
377:14, 399:1,
406:9, 407:5,
411:13, 414:15,
414:16, 414:17,
414:18, 420:3,
429:17, 435:1
**informations**
20:10
**informed**
301:10
**initial**
68:17, 97:16,
97:17, 136:8,
180:6, 187:3,

228:17, 265:22,
270:11
**initially**
70:18, 130:1,
137:1, 295:14,
295:20, 306:15,
318:19
**initials**
138:6, 327:8
**initiate**
301:12
**initiation**
106:17
**initiative**
36:20
**injunction**
17:3, 289:20,
413:22, 414:2
**injunctions**
196:13
**injunctive**
404:9, 406:16,
416:18, 459:15
**inputting**
412:19, 414:17
**inquired**
21:13
**insane**
294:22, 432:3
**insert**
136:14
**inside**
220:12
**insofar**
118:5, 203:13
**inspection**
92:2, 150:18
**install**
180:12
**installment**
19:22, 145:22,
146:6, 166:21,
168:4, 168:11,
169:15, 171:7,
171:19, 172:10,
172:16, 172:22,
173:3, 174:6,
174:14, 174:22,

177:7, 177:9,
177:14, 180:3,
180:8, 180:14,
182:16, 184:20
**installments**
130:22, 136:16
**instance**
101:2, 129:6,
129:11, 344:14,
429:16
**instances**
227:9, 271:8,
272:7, 286:4,
402:5, 402:21
**instead**
100:15, 392:21,
455:15
**instructed**
139:3, 212:2
**instructions**
229:22, 319:21
**instrument**
96:6, 96:7,
216:11
**insurance**
1:5, 10:4,
10:18, 26:10,
303:11
**intended**
16:10, 192:16
**intentionally**
345:13
**intentions**
335:13
**interaction**
394:18
**interchangeably**
66:2
**interest**
45:20, 46:4,
46:9, 154:1,
154:2, 200:7,
305:14, 363:7,
370:20, 458:17,
476:11
**interested**
71:2, 102:16,
102:18, 109:17,

296:1, 306:14,
371:5
**interesting**
195:4, 362:16
**interim**
288:18
**interject**
265:1
**internal**
55:21, 178:8
**internally**
349:5, 374:12
**international**
65:17, 65:20
**interpretation**
318:10, 379:3,
379:7
**interrogatories**
379:18, 389:22,
391:1
**interrogatory**
379:20, 385:11,
390:2, 390:17
**interrupt**
16:21, 17:15,
52:4, 157:17,
241:13, 378:2,
383:17, 392:2,
392:3, 418:22
**interrupted**
294:4, 377:19,
417:3, 447:9,
447:14, 465:6
**interrupting**
18:10, 83:6,
294:20, 415:15,
417:7, 417:16,
432:2, 447:19,
456:21
**intervened**
14:3
**intervention**
12:19
**interview**
245:18, 246:3
**interviews**
447:1
**introduce**
89:5

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

152

**introduced**
70:14
**introduction**
64:18, 70:19
**investigating**
163:5
**invitation**
78:3
**invite**
77:1, 211:16
**invited**
211:10, 211:22, 212:22
**invoice**
301:8, 362:10, 362:19, 364:12, 366:22, 367:1, 367:2, 367:12
**invoices**
326:11, 327:12, 328:8, 328:11, 328:20, 340:7, 347:14, 350:3, 362:3, 362:13, 366:17, 366:18, 366:20, 434:17, 435:21, 436:3, 436:7, 436:14
**involved**
74:19, 114:17, 209:14, 389:5, 389:6
**involvement**
14:2, 33:3, 33:13, 35:3, 296:3
**ioc**
319:21
**ira**
9:4, 9:5, 9:8, 226:12, 393:12
**irrelevant**
83:10, 451:17, 451:20
**irrevocable**
319:19
**issuance**
371:12, 445:12

**issue**
18:17, 34:6, 73:12, 81:7, 94:2, 101:8, 106:4, 109:14, 110:5, 121:22, 122:14, 122:15, 123:12, 132:7, 132:12, 141:12, 142:13, 150:19, 163:6, 178:8, 229:13, 237:4, 297:2, 306:4, 307:21, 332:9, 350:8, 355:8, 373:9, 375:2, 376:20, 385:17, 387:15, 388:18, 393:6, 397:8, 425:9, 438:11, 445:19, 464:4, 464:11
**issued**
68:22, 69:1, 85:6, 88:5, 132:4, 168:2, 243:2, 245:17, 245:21, 245:22, 246:9, 247:8, 247:11, 263:2, 300:10, 348:14, 367:1, 367:2, 367:3, 367:12, 436:7, 440:21, 472:10
**issues**
18:18, 31:2, 33:17, 33:19, 44:2, 219:17, 275:9, 337:7, 425:13, 425:15, 464:12
**issuing**
65:2, 95:5, 104:22, 106:11, 121:8, 129:19, 131:19, 132:3, 132:20, 140:1,

192:17, 193:17, 213:9, 359:5, 359:11, 360:10, 364:4, 364:7, 369:4, 438:10, 457:19, 458:7, 458:13, 462:8, 463:21, 464:1
**it'll**
79:16
**italian**
154:22
**itemized**
450:10, 451:2
**itemizes**
260:3
**items**
97:17, 137:10
**itself**
111:11, 183:9, 239:7, 448:22, 449:12

---

**J**

**jail**
30:2, 197:8, 200:8, 221:15, 221:17, 227:3, 263:21, 266:7, 266:9
**jan**
5:19
**january**
136:7, 144:4, 335:14, 339:8, 339:19, 340:6, 340:9, 340:19, 343:5, 343:8, 343:10, 343:20, 344:5, 344:17, 344:20, 344:21, 347:6, 347:11, 348:12, 349:4, 351:7, 351:13, 352:14, 353:12, 353:15, 354:15, 355:4, 355:12, 356:1, 356:12,

356:14, 356:19, 356:20, 358:1, 358:19, 360:10, 399:3, 399:20, 434:10, 434:17, 435:14, 435:19, 436:6
**jeez**
227:13
**jeopardize**
350:4
**jeopardized**
328:13
**jeopardizing**
328:20
**jeopardy**
335:22
**jeremy**
4:17, 10:11
**jig**
241:21
**job**
1:19, 80:19, 82:2, 83:16, 354:9
**jobs**
84:4
**jody**
8:18, 356:18, 358:4, 398:20
**john**
4:9, 11:6, 12:20
**join**
392:12
**jointly**
156:15, 156:21, 438:4, 450:5, 450:8, 451:9, 452:8
**judge**
12:11, 17:2, 199:11, 209:11, 212:3, 233:14, 235:15, 236:7
**judges**
241:21
**judith**
1:21, 2:13,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

153

476:2
**judy**
11:11
**july**
186:7
**june**
5:13, 6:16,
62:16, 79:7,
81:5, 93:11,
97:12, 110:13,
123:18, 131:10,
185:16, 185:17,
186:7, 187:15,
190:7, 422:14
**jury**
320:13
**justice**
34:8, 34:9,
38:14, 38:16

**K**

**keep**
90:3, 237:11,
283:9, 300:5,
319:5, 378:9,
384:10, 385:21,
401:3, 442:13
**keeping**
221:1, 221:5
**kept**
187:13
**kill**
200:9
**kind**
30:5, 32:5,
38:14, 69:19,
159:6, 161:17,
194:17, 220:5,
222:9, 276:13,
288:19, 343:16,
395:9, 439:14
**knew**
68:7, 75:4,
176:16, 185:9,
204:13, 268:7,
268:9, 290:4,
308:3, 311:10,
336:6, 344:20,

368:22, 395:4,
473:10
**knowing**
220:17, 393:19
**knowledge**
64:4, 93:17,
105:16, 107:5,
107:8, 149:20,
150:10, 151:5,
171:4, 295:19,
353:8, 358:18,
383:4, 383:10,
383:21, 385:12,
387:13, 387:14,
387:19, 388:1,
390:4, 409:13
**knows**
68:10, 198:22,
268:7, 335:7,
386:3, 393:8,
425:13
**kowalczuk**
4:3, 11:3,
14:10, 230:19,
297:18, 317:9,
391:8, 417:11,
417:19, 417:22,
418:2, 437:17,
439:17, 439:20,
473:21, 474:1
**kpis**
406:17

**L**

**label**
99:3
**lability**
470:8
**lack**
33:6, 34:8,
275:22
**lag**
131:15
**language**
160:2, 235:4,
235:11, 257:15,
292:8, 444:15,
445:5, 447:7

**lapse**
373:15
**large**
191:21, 214:2,
426:21, 427:5
**largely**
88:17
**largest**
214:7
**last**
19:20, 21:22,
91:10, 117:11,
136:9, 172:15,
253:12, 297:21,
324:20, 324:22,
326:5, 347:9,
347:22, 396:4,
397:20, 438:1
**late**
19:18, 295:7,
318:15, 417:14
**later**
127:14, 137:3,
139:9, 139:17,
152:20, 153:9,
172:15, 179:15,
179:22, 292:18,
295:21, 297:6,
335:14, 344:16,
357:12, 370:1,
372:13, 375:17,
396:15, 396:18
**latest**
22:2
**laura**
7:19, 8:9,
8:12, 8:18,
341:16, 342:4,
347:6, 347:16,
347:17, 349:7,
349:8, 355:19,
356:17
**law**
4:4, 13:2,
13:4, 14:6,
14:16, 27:10,
27:15, 27:21,
27:22, 28:17,

45:16, 59:8,
70:15, 245:18,
245:19, 246:4,
246:12, 282:9,
445:16, 447:1,
448:15
**lawsuit**
197:3
**lawyer**
42:18, 103:11,
280:17, 282:6,
379:16
**lawyering**
83:9
**lawyers**
16:2, 27:4,
103:5, 389:5,
389:6, 426:3,
426:15
**lead**
390:8
**leading**
164:14
**leads**
214:11
**learn**
34:3
**learned**
34:6
**lease**
258:14, 258:18,
259:2, 259:5,
277:4
**least**
12:22, 17:13,
178:17, 201:16,
290:3, 352:14,
422:17, 428:17,
429:13, 449:9,
457:15, 457:17
**leave**
73:9, 417:17,
431:9
**leaving**
278:18, 311:10,
395:1, 395:3,
395:5
**left**
112:18, 312:4,

321:20, 420:13
**leg**
221:9
**legal**
25:16, 25:17,
26:6, 46:19,
52:6, 55:6,
59:11, 61:5,
85:9, 85:19,
87:12, 88:7,
134:19, 150:2,
160:16, 161:8,
240:4, 251:13,
280:7, 301:12,
326:19, 426:12,
444:21, 448:4,
448:8, 462:19
**legality**
46:9
**legally**
45:18
**legislative**
33:16, 33:17
**length**
289:4, 289:22,
290:5, 318:13,
318:15, 318:17
**less**
217:12, 217:13,
223:6, 223:12,
281:18, 283:22,
286:1, 286:4
**let's**
29:21, 60:12,
73:17, 108:3,
146:14, 160:1,
185:13, 229:18,
231:6, 244:6,
249:17, 251:5,
270:9, 274:8,
283:12, 290:17,
291:2, 295:5,
307:12, 319:12,
325:17, 348:17,
348:19, 360:19,
409:9, 420:11,
439:21, 439:22,
447:21, 465:18,

**letter**
9:3, 9:7,
193:19, 193:22,
194:4, 226:5,
288:15, 291:1,
292:19, 293:1,
296:9, 319:19,
361:11, 364:9,
369:16, 369:18,
371:1, 371:12,
373:3, 373:10,
373:11, 373:18,
374:4, 375:5,
375:10, 375:12,
375:15, 376:2,
376:5, 376:8,
376:9, 377:7,
377:8, 393:12,
427:18, 427:22,
428:3, 472:10
**letters**
372:10, 375:9,
377:11
**letting**
15:13
**level**
422:22, 430:6
**levels**
277:11
**liabilities**
155:9, 155:17
**liability**
156:1, 156:7,
156:8, 156:12,
156:13, 156:18,
314:16, 449:2,
450:14, 451:3,
460:4, 469:7,
469:8, 469:15,
469:21, 470:14,
470:16, 470:20,
471:3, 471:4,
471:7, 471:17
**liable**
156:22, 157:5,
450:5, 450:8,
451:10

**liberally**
108:22
**libre's**
407:11
**license**
26:2, 26:3,
253:18
**licensed**
29:9, 257:5
**lie**
353:8, 380:3
**lied**
129:7, 129:12
**lies**
465:22
**life**
288:12, 329:1,
329:3, 330:3
**likelihood**
96:11, 96:12
**likely**
66:21, 97:2,
182:19, 423:13
**likewise**
253:17, 255:8,
257:4
**limandri**
7:5, 7:8, 7:11,
66:8, 66:17,
67:1, 67:5,
68:6, 68:11,
154:2, 154:16,
154:17, 154:19,
154:20, 156:5,
326:13
**limine**
12:14
**limited**
100:16, 401:3,
418:7
**line**
183:7, 194:12,
198:21, 234:21,
259:10, 259:12,
260:2, 261:6,
285:15, 295:19,
304:2, 389:16
**lines**
7:3, 194:6,

261:22, 327:2
**link**
20:5, 20:7,
20:9, 21:13,
21:17, 22:1,
22:6
**liquidated**
239:20
**lisa**
40:3
**list**
27:19, 42:5,
379:18, 391:4
**listed**
42:3, 44:15,
144:22, 310:15,
385:10
**listen**
103:9, 291:7,
391:18, 433:16
**listening**
209:3, 209:8,
295:6
**lists**
369:12, 436:13
**lite**
406:13
**literally**
25:2, 209:16,
309:22, 313:14
**litespeed**
20:16, 120:6,
210:11, 211:2,
259:9, 259:16,
259:22, 261:1,
406:18
**litigation**
11:20, 26:10,
40:11, 125:15,
163:6, 163:18,
200:17, 206:2,
256:1, 382:9,
395:8, 395:9,
395:17, 404:8,
409:4, 409:16,
410:1, 410:5,
410:11, 412:9,
413:6, 415:6,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

155

littered
392:8, 394:17
little
15:17, 40:9,
99:11, 148:4,
152:20, 286:11,
397:5, 413:14,
443:8, 448:21,
450:9, 450:18,
469:9, 470:22
lived
258:21
lives
43:11, 221:22,
354:6, 454:10
llc
3:13, 45:6,
45:7, 45:17,
46:8, 46:12,
46:21, 47:3,
47:14
llcs
44:20, 45:6,
45:9, 45:10,
45:12, 45:21,
46:2, 46:17,
47:12, 47:18,
48:4, 48:8
llp
2:5, 3:5
lobbying
30:6, 31:2,
32:11, 32:12,
32:13, 32:19,
38:13
local
38:4, 424:7
located
28:3, 40:22
locational
220:17
lock
84:22
locke
41:10, 48:5,
48:7

416:8, 416:18,
424:21, 472:4

locking
94:12
log
105:20, 203:19,
203:20, 204:7,
212:5, 218:14
log-in
203:2
long
39:17, 65:21,
72:14, 80:19,
82:1, 83:16,
102:12, 145:9,
151:1, 151:2,
196:1, 223:21,
283:16, 300:22,
373:15, 418:20,
447:13
long-term
295:12
longer
52:15, 96:22,
222:18, 242:22,
266:7, 273:2,
290:2, 290:4,
290:15, 393:4,
393:13
look
14:15, 36:4,
48:2, 51:19,
53:3, 63:10,
63:11, 69:11,
69:14, 71:11,
90:20, 91:15,
98:7, 107:21,
109:21, 110:4,
146:14, 149:3,
150:6, 160:1,
163:4, 163:15,
163:17, 163:21,
171:17, 174:19,
178:2, 191:14,
204:19, 211:16,
217:20, 217:21,
218:6, 229:16,
231:6, 249:17,
291:10, 301:21,
321:11, 327:22,

328:1, 328:4,
329:7, 329:10,
330:1, 330:4,
331:4, 333:22,
347:15, 355:20,
357:18, 358:14,
362:1, 365:4,
372:1, 380:15,
380:17, 380:18,
406:8, 406:11,
406:13, 406:14,
406:17, 407:22,
412:2, 427:6,
437:3, 437:9,
468:14
looked
62:11, 98:18,
149:16, 168:1,
243:7, 313:18,
437:15
looking
51:18, 70:11,
71:6, 73:21,
80:17, 97:14,
100:3, 101:2,
110:20, 119:1,
119:15, 126:13,
142:5, 148:12,
161:11, 172:7,
173:3, 173:14,
182:14, 193:3,
196:20, 204:2,
216:9, 229:21,
230:5, 231:10,
231:18, 235:4,
239:7, 239:9,
239:17, 239:18,
246:15, 246:18,
248:4, 248:5,
248:10, 251:6,
253:10, 253:12,
261:4, 262:13,
325:14, 328:9,
332:1, 335:5,
341:15, 342:13,
342:16, 366:19,
372:21, 373:17,
421:20, 437:17,

437:20, 450:21,
455:2, 455:4,
457:16, 459:1,
459:18, 460:1,
467:19, 468:4,
469:7, 469:9,
472:7
looks
52:10, 52:17,
63:5, 72:9,
99:15, 140:21,
177:20, 184:19,
318:12, 326:12,
329:14, 356:5,
372:20, 372:21,
436:10, 437:1
losing
277:22, 335:16,
335:22
loss
44:16, 113:21,
116:21, 117:15,
117:22, 119:3,
119:9, 120:2,
124:17, 160:12,
161:4, 403:19,
404:3, 405:17,
406:1, 406:22,
408:6, 408:14,
409:3, 409:15,
410:12, 410:15,
411:17, 419:10,
419:18, 419:22,
420:1, 421:1,
440:13, 459:3
losses
288:19, 439:12,
450:11
lost
27:2, 287:20,
353:6
lot
20:14, 25:21,
33:16, 34:3,
34:6, 34:16,
52:8, 74:18,
98:9, 111:7,
153:14, 213:17,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

156

228:4, 234:13,
246:11, 276:1,
290:13, 290:15,
300:19, 329:8,
377:12, 389:11,
404:10, 404:12,
423:9
**lots**
373:21
**loud**
439:22
**love**
397:9
**low**
220:20
**lower**
139:6
**lowered**
286:17
**lucky**
24:4
**lunch**
94:19, 107:22,
108:4, 108:14
**lying**
173:12, 402:15,
402:16

**M**

**m-i-c-h-e-a-l**
25:11
**ma'am**
26:13, 52:19,
62:14, 119:22,
294:2, 303:5,
363:20, 385:20,
385:22
**made**
15:8, 20:9,
21:21, 52:13,
53:17, 56:2,
56:9, 70:18,
80:6, 83:18,
83:22, 88:15,
89:10, 92:3,
128:20, 146:5,
153:15, 157:10,
163:9, 164:2,

164:4, 166:13,
167:7, 169:17,
170:1, 170:5,
172:22, 173:4,
176:4, 176:11,
177:1, 177:4,
179:1, 179:3,
179:10, 179:12,
179:14, 179:18,
182:1, 182:10,
183:6, 183:11,
186:3, 186:14,
187:3, 190:4,
201:3, 201:8,
201:19, 209:22,
210:13, 211:14,
213:3, 255:13,
255:15, 260:4,
280:10, 283:6,
283:9, 284:17,
286:22, 304:22,
326:18, 335:9,
335:22, 337:2,
338:2, 338:3,
338:4, 338:10,
349:7, 352:10,
354:12, 354:13,
355:11, 355:12,
365:4, 395:2,
404:10, 415:9,
440:8, 443:5,
443:16
**mail**
355:21, 358:8
**mailed**
346:8, 354:15,
355:22
**maintain**
223:8, 275:2,
321:4
**maintained**
79:4, 249:7,
274:19, 319:11
**majority**
49:21, 53:8,
53:12, 53:16,
84:15, 84:20,
85:1, 88:14,

214:16, 246:8,
246:10, 246:11,
261:18, 261:21,
262:1, 263:18,
295:17, 426:22
**make**
13:11, 15:4,
18:1, 18:12,
26:17, 28:10,
35:20, 36:2,
43:11, 56:10,
56:15, 60:7,
68:19, 69:16,
73:13, 73:14,
76:20, 79:18,
80:3, 94:20,
98:11, 99:18,
100:8, 102:4,
103:10, 107:18,
110:5, 132:14,
143:14, 147:5,
153:12, 153:14,
154:21, 156:9,
170:9, 173:17,
175:14, 182:5,
183:5, 186:1,
186:15, 186:16,
190:9, 209:2,
209:4, 209:6,
212:2, 218:1,
227:9, 227:11,
240:18, 267:17,
268:2, 272:17,
273:18, 274:4,
275:12, 275:13,
275:15, 282:16,
283:15, 291:9,
291:18, 293:2,
314:14, 325:1,
325:14, 332:6,
333:19, 335:7,
337:18, 341:19,
347:9, 352:19,
364:16, 390:7,
390:20, 397:16,
400:15, 406:18,
406:19, 412:5,
423:7, 447:3,

449:12, 449:22,
450:3, 453:21
**makes**
58:7, 84:6,
125:8, 125:12,
157:5, 163:1,
244:16, 272:8
**making**
18:9, 54:1,
80:20, 82:2,
83:17, 88:16,
170:11, 193:15,
196:14, 267:21,
273:12, 321:18,
386:4, 390:16,
394:19, 423:13
**manage**
225:19, 316:12,
317:22, 322:6
**managed**
45:3
**management**
27:14, 44:1,
44:21, 45:4,
49:10, 56:20,
290:7
**manager**
45:11, 45:14,
45:17, 45:22,
46:6, 47:2,
227:22, 430:6,
430:8, 433:1
**managers**
46:8, 56:21
**manages**
49:9
**managing**
46:15
**manner**
234:8
**manual**
289:22
**many**
34:14, 40:17,
41:21, 45:5,
45:6, 68:21,
68:22, 74:5,
139:9, 139:10,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

157

163:12, 163:13,
198:2, 215:21,
223:16, 223:22,
243:4, 245:20,
360:11, 374:19,
386:8, 402:5,
428:8, 428:14
**march**
6:13, 9:3, 9:7,
136:18, 172:14,
172:21, 173:2,
173:13, 173:17,
174:1, 174:9,
174:11, 174:14,
174:19, 174:20,
174:21, 175:3,
175:19, 175:20,
176:1, 176:2,
177:6, 177:10,
177:13, 177:18,
177:19, 177:22,
178:2, 178:17,
178:20, 179:4,
182:15, 182:21,
183:4, 184:11,
184:13, 291:4,
291:7, 292:5,
360:8, 361:5,
361:21, 363:13,
368:8, 369:14,
370:1, 371:1,
371:12, 371:17,
371:21, 372:5,
372:18, 373:2,
373:3, 373:4,
373:6, 373:8,
373:12, 373:13,
374:21, 375:5,
375:10, 375:15,
375:16, 375:17,
376:9, 376:10,
377:6, 377:7,
377:8, 381:3,
381:11, 382:2,
392:22, 393:1,
394:6, 394:7,
403:12, 403:13,
472:7, 472:9,

472:12, 472:13,
473:1
**marco**
7:5, 7:8, 7:11,
66:8, 66:11,
66:12, 154:16,
155:1, 155:2,
155:3, 155:8,
155:16, 155:22,
157:5, 157:13,
157:15, 157:19,
158:1, 159:2,
181:21, 205:7,
326:13, 342:4,
342:9, 425:6,
425:9, 425:10,
454:20
**marco's**
427:20
**mario**
4:18, 11:7,
11:15
**mark**
51:8, 51:11,
71:13, 110:9,
136:2, 137:15,
140:14, 171:11,
185:13, 191:2,
214:21, 262:7,
302:1, 302:7,
325:17, 327:16,
333:9, 339:4,
340:13, 348:5,
356:21, 371:18,
398:19, 423:3,
435:8
**marked**
51:9, 71:15,
97:5, 110:11,
136:4, 137:13,
137:18, 168:14,
171:12, 171:17,
172:4, 185:14,
191:4, 215:3,
229:19, 262:8,
302:19, 325:13,
325:19, 327:18,
333:15, 339:6,

340:15, 347:3,
348:10, 349:1,
355:15, 355:18,
361:15, 372:2,
375:6, 399:14,
434:7, 435:9,
435:11
**marking**
325:5, 357:13
**mary**
3:12, 10:20,
83:6, 87:4,
87:16, 104:14,
111:13, 140:17,
164:15, 262:11,
265:12, 278:9,
326:2, 385:4
**master**
92:4, 412:18,
416:12
**match**
277:4, 277:7
**material**
409:18
**mathematical**
218:2
**matter**
10:4, 12:6,
19:17, 34:4,
102:17, 280:11,
280:13, 292:8,
329:5, 363:22,
454:11, 454:19,
454:20
**matters**
17:11, 22:10
**maybe**
18:17, 27:17,
58:3, 116:14,
125:9, 127:13,
150:15, 201:15,
268:17, 268:19,
285:1, 285:19,
292:18, 353:6,
399:10, 439:22,
442:10, 458:2
**mcfadden**
4:10, 13:2,

13:3
**mclean**
1:13, 2:8, 3:8,
10:13
**mdonovan@nexushe-
lps**
8:4, 8:16, 9:6
**meaning**
72:3, 208:9,
227:5, 230:21,
243:19, 304:21,
420:1
**means**
45:18, 98:9,
112:16, 134:1,
195:20, 195:22,
241:22, 242:14,
254:10, 257:13,
304:12, 309:3,
318:1, 320:14,
338:2, 343:9,
344:8, 364:11,
366:21, 366:22,
393:9, 445:7,
445:8, 453:2,
470:22, 471:12
**meant**
82:21, 300:21,
364:22, 459:13
**meet**
243:22, 244:1,
307:3, 349:17,
372:14
**meeting**
114:16, 213:1,
295:22, 363:14,
363:18, 372:8,
375:19
**meetings**
89:16, 89:20,
89:22, 90:1,
90:18, 90:21,
91:10, 91:12,
92:14, 383:2,
453:8
**member**
13:1, 46:13,
46:15, 46:16,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

158

46:21, 47:2,
47:3, 47:7,
47:13, 263:22
**members**
47:12, 47:17,
77:2
**memory**
53:2, 380:13
**mendoza**
302:3
**mentioned**
15:10, 128:2,
313:1, 322:7,
324:8, 379:19,
423:7
**mentioning**
109:19
**mentions**
187:19
**merchant**
264:2, 264:6,
264:7, 266:7
**meredith**
21:17, 22:8
**met**
27:3, 91:20,
152:11, 296:7,
354:10, 441:22,
443:2
**method**
319:22
**metric**
80:11
**mfu**
10:8
**micheal**
1:12, 2:1, 5:2,
9:4, 9:8, 10:3,
23:2, 25:7,
25:21, 475:2
**microphone**
108:15
**middle**
140:20, 141:3,
173:14, 232:1,
232:4, 232:12,
232:14, 318:12,
328:9, 356:22,

362:2, 416:20
**might**
18:16, 24:14,
56:15, 67:21,
86:21, 90:16,
101:11, 101:15,
112:11, 205:19,
234:10, 259:21,
261:10, 266:14,
270:7, 323:13,
345:14, 345:15,
345:21
**mike**
5:15, 5:19,
6:4, 6:6, 6:9,
6:16, 6:18, 8:6,
9:10, 14:16,
114:9, 116:9,
116:10, 124:22,
125:5, 125:6,
125:20, 136:7,
140:19, 178:5,
178:9, 250:4,
437:6, 439:17
**million**
21:1, 120:18,
189:22, 193:16,
195:12, 196:2,
285:9, 286:6,
287:15, 287:19,
288:1, 288:8,
288:16, 291:1,
291:4, 292:4,
292:19, 292:22,
293:2, 296:6,
296:7, 297:4,
297:7, 309:10,
309:11, 309:12,
309:15, 313:5,
313:7, 313:21,
314:3, 315:18,
315:20, 316:1,
316:2, 316:7,
316:15, 319:7,
319:11, 359:18,
365:19, 365:20,
365:21, 376:22,
377:5, 382:4,

384:9, 392:16,
394:5, 394:8,
402:19, 404:2,
404:3, 406:1,
473:16
**million-dollar**
388:13
**millions**
297:9, 459:19
**mind**
56:2, 162:4,
169:11, 172:2,
277:22, 284:9,
284:13, 437:9
**mind's**
86:10
**mindful**
24:19, 24:20,
24:21, 25:4
**mine**
45:16, 115:18,
138:19
**minister**
29:6
**ministry**
30:1, 30:2,
30:3
**minute**
307:18, 390:19,
417:11, 462:14,
467:2
**minutes**
13:22, 209:1,
209:9, 211:6,
455:18, 455:20,
462:22, 466:3
**misleading**
263:17, 413:2,
414:14
**misrepresented**
308:11, 308:13
**misrepresents**
119:6
**missing**
104:12, 285:20,
326:5, 358:21
**mission**
52:14

**misspell**
25:19
**misstatement**
78:7, 214:11
**misstates**
59:18, 81:10,
81:13, 110:17,
119:6, 136:20,
147:12, 173:20,
176:7, 195:1,
233:17, 237:10,
280:8, 341:12
**misstating**
170:16
**mistake**
269:5
**mistakes**
412:15
**misunderstanding**
268:19, 300:19
**misunderstood**
259:18, 259:21,
261:5, 454:1
**mitigated**
334:5
**model**
69:20, 213:22
**modified**
283:4, 283:5
**moment**
52:7, 71:21,
100:12, 135:14,
232:22, 301:9,
329:12, 331:16
**monday**
373:12, 373:20,
472:14, 472:17,
472:18
**monday's**
472:21
**money**
157:13, 157:18,
157:21, 158:3,
158:4, 158:5,
158:8, 158:9,
158:10, 222:9,
240:11, 242:2,
242:17, 242:19,

264:1, 268:5,
269:1, 283:18,
296:16, 299:5,
314:10, 329:1,
330:4, 338:13,
342:14, 394:20
**monies**
152:2, 167:6,
308:16
**monitor**
10:10, 219:7,
223:4, 225:16
**monitored**
93:7, 217:4,
218:1, 218:5,
224:15, 308:4
**monitoring**
69:21, 93:16,
214:3, 214:18,
217:1, 218:20,
218:22, 219:13,
219:14, 222:5,
222:9, 222:11,
222:19, 222:20,
222:22, 223:7,
223:10, 223:12,
223:18, 223:19,
223:21, 224:2,
224:12, 224:16,
247:1, 248:6,
258:16, 272:15,
306:5, 308:3,
308:5
**month**
172:14, 172:16,
174:14, 174:21,
177:8, 283:14,
283:18, 290:22,
292:2, 292:18
**monthly**
49:20, 130:22,
138:15, 266:1,
271:9, 273:2,
276:21
**months**
84:17, 131:14,
139:9, 139:10,
139:17, 152:20,

179:15, 202:5,
202:22, 222:21,
290:1, 290:2,
290:6, 318:20,
319:3, 322:16,
353:4, 377:9,
396:4, 396:11,
396:15, 396:18,
397:20, 422:14
**moore**
4:19, 7:6,
7:12, 8:9, 8:12,
11:9, 47:13,
47:17, 153:22,
155:7, 155:10,
155:15, 155:18,
166:2, 166:4,
166:10, 347:8,
348:12
**moore@nexushelps**
7:9
**more**
15:20, 32:18,
34:9, 47:10,
54:9, 56:19,
57:4, 100:17,
149:15, 152:20,
167:2, 167:4,
171:2, 193:8,
196:4, 197:6,
197:22, 217:11,
222:5, 222:8,
227:21, 234:16,
277:16, 278:3,
279:7, 286:2,
290:13, 292:12,
296:11, 310:1,
318:13, 318:15,
318:18, 320:2,
322:15, 328:22,
335:10, 335:16,
336:1, 337:6,
352:21, 368:19,
370:13, 381:20,
382:6, 388:19,
392:15, 393:2,
393:11, 393:18,
423:13, 423:16,

428:11
**moreno's**
263:11
**morning**
15:18, 22:2,
27:2
**mortgages**
49:12, 50:16
**most**
44:20, 84:13,
90:10, 389:13,
417:13, 424:8
**motion**
12:13, 289:19
**motions**
459:15
**move**
28:9, 73:17,
195:13, 208:7,
221:21, 222:4,
285:15, 286:5,
287:13, 288:4,
292:21, 299:2,
310:14, 314:17,
315:14, 317:20,
320:15, 320:20,
323:22, 324:2,
332:2, 332:7,
332:17, 333:5,
377:3, 377:4,
395:10, 395:11,
447:21
**moved**
193:9, 285:13,
288:6, 288:14,
291:11, 292:13,
296:12, 310:11,
312:18, 314:6,
314:13, 314:19,
320:7, 320:16
**moving**
40:21, 78:3,
296:19, 297:1,
303:9, 312:10
**much**
16:13, 45:16,
92:10, 100:22,
118:5, 131:7,

151:12, 162:22,
183:13, 197:22,
207:4, 225:18,
269:18, 289:4,
295:16, 328:22,
330:8, 339:16,
417:5, 420:12,
421:15
**mullin**
164:3
**multi-parts**
135:2
**multipage**
98:1, 98:4,
331:16, 331:21
**multiple**
41:14, 65:4,
65:7, 226:8,
277:11, 350:21,
428:4, 432:21,
459:14
**must**
174:5, 296:7,
315:21, 352:20,
355:5
**myself**
161:22

**N**

**nagel**
5:9, 5:13,
5:16, 6:10,
6:13, 71:18,
72:11, 72:14,
72:17, 72:21,
73:9, 97:13,
97:15, 99:16,
110:22, 111:3,
113:12, 114:9,
114:22, 115:9,
115:10, 115:21
**name**
25:5, 25:10,
25:14, 25:17,
25:19, 25:20,
26:1, 26:4,
26:5, 26:7,
35:15, 38:10,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

160

38:12, 45:7,
65:21, 112:4,
127:9, 302:4,
324:14
**names**
65:21, 327:2
**narrative**
433:20
**national**
193:4, 295:10
**native**
104:2, 104:7
**natural**
323:13
**naturally**
43:10, 96:8,
232:16
**nature**
439:14
**navigate**
122:7
**ndh**
13:4, 14:8,
14:10, 14:11,
14:12, 14:17,
14:18, 14:20,
14:22
**near**
309:9
**nearly**
197:7, 223:10,
241:21
**necessarily**
57:17, 245:13,
249:13, 266:16,
470:21
**necessary**
61:9, 121:22,
139:7, 193:11,
194:15, 222:3,
256:13, 290:19,
290:21, 292:15,
296:14, 314:8,
320:9, 390:10
**need**
15:1, 16:1,
17:10, 23:14,
73:11, 101:22,

104:16, 107:22,
108:20, 115:14,
139:12, 140:21,
142:2, 169:8,
194:7, 195:12,
195:14, 196:2,
206:17, 211:12,
221:16, 221:17,
221:21, 226:21,
228:1, 233:7,
276:11, 280:21,
287:7, 299:8,
316:8, 316:16,
318:18, 319:10,
319:13, 321:3,
328:12, 333:5,
339:10, 340:1,
340:2, 340:9,
346:13, 350:22,
369:19, 374:10,
400:21, 401:2,
402:10, 411:21,
418:13, 432:9,
447:10, 455:22,
458:3
**needed**
67:22, 122:9,
137:8, 140:1,
326:18, 363:22,
376:16, 473:16
**needs**
136:8
**negative**
312:9
**negotiate**
393:19
**negotiated**
263:7
**neither**
476:9
**nervous**
125:8, 125:13
**nest**
91:8
**net**
137:9
**never**
24:18, 67:12,

67:14, 85:1,
152:5, 171:5,
189:18, 191:13,
193:19, 198:13,
204:11, 204:15,
242:19, 269:4,
286:9, 287:20,
309:18, 312:22,
324:6, 324:7,
334:22, 365:20,
387:15, 390:3,
392:3, 411:6,
411:13, 412:14,
413:2, 413:3
**new**
70:11, 71:11,
192:22, 223:2,
276:5, 277:10,
287:13, 287:20,
287:21, 292:9,
301:19, 307:12,
311:16, 311:19,
311:22, 312:5,
312:19, 313:5,
322:20, 323:14,
324:1, 350:8,
359:13, 364:12,
364:13, 378:10,
378:15, 378:22,
381:9, 386:19,
388:15, 388:16,
390:16, 392:21,
393:12, 394:3,
402:18, 402:19,
414:16, 458:20,
473:17
**next**
76:22, 77:18,
98:19, 142:22,
196:19, 239:16,
264:4, 282:14,
283:18, 290:22,
292:1, 292:18,
296:20, 332:2,
332:8, 333:10
**nexus05584**
7:16
**nice**
128:8, 128:11,

139:8
**night**
19:20, 21:22,
212:11, 276:15
**nobody**
357:22, 386:6,
473:19
**non-disparagement**
73:13
**nondisparagement**
125:17
**nonstock**
36:17
**nonwork**
43:16
**nonworking**
22:1
**norm**
262:5
**normal**
77:20, 115:5,
263:12, 275:5,
330:3, 345:17,
345:18
**normally**
15:20, 15:22,
116:14, 167:20,
197:21, 329:20
**north**
28:4
**nos**
5:10, 5:16,
5:20, 6:5, 6:8,
6:11, 6:14,
7:16, 7:20, 8:5,
8:7, 8:10, 8:13,
8:17, 8:20, 9:11
**notarial**
476:14
**notary**
2:15, 476:1,
476:21
**note**
15:7, 16:15,
82:10, 82:19,
141:5, 181:9,
191:8, 191:9,
202:7, 347:21

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

161

notes
19:13, 255:17
nothing
23:4, 23:16,
84:18, 225:10,
228:10, 228:13,
317:19, 331:18,
358:18, 403:7,
413:10, 413:13,
423:20, 446:18,
470:22
notice
2:13, 13:11,
233:15, 244:20,
245:9, 245:21,
289:15, 301:11,
306:1, 309:9,
362:14, 365:10,
365:15, 365:18,
366:4, 367:1,
377:6, 446:2,
446:13, 456:20,
457:18, 458:13
notices
190:8, 190:16,
237:8, 246:8,
300:15, 325:7,
326:10, 326:17,
360:12
notifying
219:17
notwithstanding
92:19
november
51:15, 457:16,
457:17
nowhere
309:9, 441:10
nta
427:10, 427:11
number
40:21, 41:13,
120:17, 217:22,
227:18, 228:22,
245:20, 252:20,
274:7, 302:8,
308:4, 357:4,
427:5, 427:8,

437:6
numbers
120:12, 120:13,
144:19, 144:20,
419:15, 436:17,
436:19
numerous
417:6
nw
4:11

**O**

oath
183:10, 418:18
obfuscate
40:14
objected
103:1
objecting
87:8, 103:5,
265:4, 265:8,
265:14
objection
15:7, 16:16,
16:19, 17:1,
17:8, 18:5,
18:12, 46:1,
67:20, 81:11,
98:2, 99:17,
120:3, 161:7,
229:8, 264:15,
265:3, 267:12,
299:18, 332:10,
360:15, 370:10,
381:7, 384:12,
444:19, 445:17,
470:1, 470:12
objections
164:9
obligated
133:11, 133:14,
133:16
obligation
134:16, 229:4,
229:5, 229:12,
233:13, 235:5,
235:13, 235:20,
236:5, 236:10,

236:13, 237:7,
237:22, 238:5,
238:6, 238:19,
238:21, 239:1,
243:19, 243:21,
244:1, 244:21,
305:5, 305:6,
337:14, 339:1,
438:16, 443:11,
443:16, 462:11,
463:2, 463:19,
465:9, 467:5,
468:8
obligations
61:1, 61:2,
216:16, 230:2,
230:9, 236:3,
295:18, 304:18,
304:19, 304:21,
307:3, 349:17,
382:2, 413:12,
441:20, 441:22,
442:20, 443:1,
443:2, 443:4,
461:12, 461:17,
461:22, 463:5,
464:13
obligee
337:5
obligor
230:6, 230:13,
230:16, 231:4,
231:16, 232:7,
235:1, 235:6,
236:14, 236:18,
243:20, 305:8,
305:9
observe
77:3
obstreperous
87:17
obtain
196:13
obtained
50:10, 469:11,
469:17, 469:22,
470:11
obtaining
141:13

obvious
387:21
obviously
24:7, 34:4,
41:15, 46:7,
67:11, 74:19,
95:2, 108:21,
120:13, 142:20,
144:19, 147:20,
159:17, 275:17,
287:10, 290:4,
315:3, 318:9,
329:5, 333:22,
350:13, 352:22,
395:4, 399:5,
416:7, 416:9,
432:20, 460:15,
464:10
occur
219:19
occurred
227:3
occurrence
161:17, 345:7
october
369:3, 369:5
odd
116:13, 116:16,
262:3
offer
134:22, 167:7,
213:3
offered
139:7
offering
130:8, 306:22,
393:20, 394:2
office
89:21, 90:1,
169:12, 177:10,
204:3, 211:20,
334:3, 336:16,
342:14, 372:8,
424:7, 451:22,
452:1, 452:3
officer
68:8, 154:9,
233:14, 235:15,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

162

236:7, 284:3,
424:9, 433:2,
433:3, 433:7,
450:12, 476:3
**offices**
2:2, 38:15,
38:17
**often**
273:17
**oftentimes**
220:15, 222:17,
245:17, 275:10,
348:7
**oh**
31:6, 51:12,
60:4, 94:22,
105:13, 109:10,
137:15, 146:16,
168:7, 182:9,
227:13, 239:16,
248:8, 266:18,
277:21, 293:6,
339:12, 347:17,
348:1, 379:5,
381:6, 410:3,
412:21, 435:15,
441:17, 455:13,
465:11
**okonski's**
17:15
**old**
80:11, 219:21,
273:13, 277:7
**once**
315:10, 391:12,
417:6
**one**
26:2, 27:17,
27:20, 27:22,
30:15, 37:14,
54:9, 57:7,
57:16, 59:7,
59:11, 62:12,
68:2, 104:6,
104:15, 111:8,
126:3, 126:11,
130:17, 146:20,
167:7, 168:5,

177:22, 187:17,
187:18, 187:21,
188:2, 188:4,
188:16, 189:7,
200:11, 200:15,
205:9, 209:9,
214:11, 220:13,
226:13, 227:20,
231:10, 240:14,
261:6, 266:21,
275:9, 278:3,
278:4, 279:7,
279:8, 282:12,
285:20, 302:2,
302:7, 302:11,
318:11, 318:13,
318:16, 324:22,
325:12, 332:11,
332:14, 333:11,
341:22, 347:22,
356:16, 356:18,
357:12, 357:13,
362:2, 367:14,
367:20, 370:13,
375:13, 387:5,
391:6, 391:7,
396:3, 398:19,
398:22, 401:8,
415:9, 420:12,
423:11, 428:17,
428:18, 428:19,
429:1, 429:15,
429:20, 431:17,
432:15, 433:3,
433:13, 434:2,
434:3, 435:11,
443:3, 448:6,
451:21, 468:13
**one-off**
68:3, 262:2
**one-time**
276:17
**onerous**
222:5, 223:5,
223:6, 244:17
**ones**
279:11, 326:2
**online**
127:17

**only**
17:17, 19:12,
22:3, 76:6,
118:5, 152:15,
158:20, 159:10,
188:16, 205:1,
219:2, 222:10,
222:14, 237:3,
281:18, 282:10,
284:3, 284:16,
289:9, 308:5,
318:14, 321:9,
322:19, 386:4,
401:2, 424:2,
456:16, 465:14
**oops**
22:20, 340:13
**open**
203:6, 389:17,
439:11
**operate**
133:2, 133:3,
282:20, 419:18,
465:17
**operated**
41:7, 411:17,
419:9, 419:22,
421:1
**operating**
58:14, 58:16,
63:22, 120:18,
275:4, 403:18,
404:2, 405:17,
405:22
**operation**
312:19, 323:8,
324:1
**operational**
44:4
**operations**
40:5, 52:16,
77:3, 224:11,
370:7
**opinion**
251:14
**opportunities**
70:20, 71:12
**opportunity**
36:19, 111:5,

**only**
184:1, 192:8,
197:9, 294:11,
336:15, 457:5
**opposite**
256:8, 307:16
**option**
359:15, 388:14,
455:6
**order**
16:14, 17:5,
17:12, 18:19,
19:5, 73:4,
73:8, 102:7,
106:3, 109:13,
110:5, 121:7,
121:21, 121:22,
129:18, 139:22,
196:14, 197:4,
197:11, 207:9,
208:6, 208:20,
209:12, 233:5,
245:22, 246:9,
258:10, 345:14,
416:18
**ordered**
37:13, 413:16
**orders**
243:5, 243:6,
404:9, 406:16,
446:20
**org**
5:8
**organization**
339:11, 340:3
**original**
286:15, 348:16,
348:19, 392:4
**others**
8:13, 47:14,
104:4, 256:1,
432:17, 434:6
**otherwise**
16:3, 228:10,
278:6, 291:21,
327:14, 449:3,
459:4, 476:11
**out**
13:4, 30:19,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

163

35:2, 38:16,
39:18, 41:7,
42:16, 56:6,
69:10, 94:19,
104:12, 105:18,
127:14, 162:1,
170:20, 184:20,
186:5, 190:17,
193:5, 200:8,
202:2, 204:4,
204:15, 208:17,
209:2, 209:9,
213:2, 215:17,
223:10, 224:8,
241:7, 250:2,
251:15, 266:9,
277:20, 287:17,
295:10, 306:14,
310:22, 311:12,
324:18, 335:14,
339:2, 347:6,
347:8, 347:20,
352:13, 353:22,
388:18, 388:20,
393:15, 395:1,
395:3, 412:7,
429:21, 439:22,
447:1, 454:9,
456:9, 465:1,
467:2

**out-of-town**
348:8

**outcome**
476:12

**outlook**
125:10

**outset**
16:20

**outside**
262:5

**outstanding**
194:8, 223:10,
389:17, 434:19,
473:11

**over**
11:15, 31:21,
105:8, 133:22,
150:5, 150:15,

206:20, 207:19,
267:17, 267:18,
293:13, 298:11,
317:11, 321:15,
321:19, 322:22,
323:8, 431:5,
431:7, 442:4,
461:14

**overbroad**
94:8

**overlapping**
24:14

**owe**
334:13, 338:12,
346:18, 382:6

**owed**
152:2, 334:5,
334:6, 346:14,
436:8

**own**
45:9, 45:13,
104:15, 466:2

**owner**
45:10, 46:12,
51:22

**ownership**
45:12, 45:20,
46:4, 46:9, 52:2

**owns**
47:4, 154:2

**P**

**p-a-u-l**
25:11

**page**
5:2, 5:7,
14:16, 72:7,
97:14, 97:19,
98:21, 100:3,
101:3, 102:3,
104:12, 136:9,
141:4, 168:20,
168:21, 171:17,
171:22, 172:7,
216:10, 231:6,
232:2, 232:9,
239:11, 239:12,
239:16, 246:20,

248:5, 249:18,
251:6, 252:19,
253:10, 258:14,
327:21, 328:1,
328:9, 328:10,
356:22, 357:4

**pages**
1:20, 21:1,
105:7, 105:8,
164:10, 333:8,
356:13, 415:5,
415:8, 459:19,
467:20, 468:6,
468:7, 468:20

**paginations**
112:18

**paid**
50:17, 60:17,
138:15, 150:4,
157:19, 158:1,
163:3, 165:2,
167:11, 170:14,
171:8, 180:17,
181:21, 184:21,
185:5, 229:1,
231:2, 234:13,
239:19, 243:14,
263:14, 266:9,
266:19, 270:11,
286:4, 309:15,
309:19, 316:19,
334:22, 336:7,
337:12, 337:16,
338:20, 339:3,
339:11, 340:2,
340:7, 349:14,
350:4, 350:13,
350:14, 350:17,
350:21, 351:1,
351:2, 351:3,
351:4, 351:6,
352:6, 352:8,
352:11, 352:22,
355:14, 376:22,
393:4, 393:6,
393:7, 394:6,
423:14, 426:5,
435:7, 436:21,

438:19, 441:4,
449:3

**pain**
34:16

**pale**
107:21

**paper**
83:1, 267:5,
339:14

**paperwork**
74:20

**paragraph**
231:6, 231:21,
232:15, 232:17,
233:4, 236:5,
239:9, 252:10,
252:12, 252:15,
252:20, 253:13,
437:19, 437:20,
438:15, 448:21,
450:17, 450:21,
451:7, 455:2,
455:4, 459:1,
459:22, 469:7

**parcel**
422:21

**pardon**
183:16, 302:10

**parking**
27:2

**part**
40:10, 44:20,
52:14, 52:16,
74:22, 84:14,
96:6, 96:7,
101:7, 109:12,
158:12, 181:15,
214:2, 224:22,
250:14, 257:2,
290:18, 294:6,
422:20, 448:8,
448:15

**part-time**
28:8

**participant**
18:17, 54:5,
198:22, 203:15,
222:12, 244:16,

255:13, 255:15,
260:3, 261:16,
263:1, 263:15,
264:12, 269:15,
270:11, 271:9,
271:21, 272:7,
272:8, 273:1,
273:11, 274:14,
276:5, 282:16,
283:13, 307:22,
337:9
**participants**
53:14, 53:18,
56:17, 56:22,
62:21, 63:18,
64:6, 75:9,
203:18, 214:3,
215:9, 229:1,
259:14, 267:16,
271:19, 273:5,
278:14, 278:20,
282:13, 306:5,
307:3, 354:6
**particular**
71:5, 126:10,
164:2, 344:13,
398:1
**particularly**
23:12
**parties**
12:17, 476:10
**partner**
10:19, 70:22,
71:1, 71:4,
71:11, 282:17,
311:20, 311:21,
311:22, 312:2,
323:14, 376:21,
381:9, 394:4,
402:18, 402:20,
458:20
**partners**
282:20
**partnership**
462:6
**parts**
135:3
**party**
61:7, 222:10,

222:14, 253:7,
281:22
**pass**
272:3
**passed**
335:10
**passion**
43:9
**past**
292:4, 319:3,
325:6, 326:11,
326:17, 328:11,
362:3, 362:12,
362:18, 366:16,
366:19, 366:22,
367:2
**pasted**
112:8
**patently**
87:7, 89:4
**paul**
1:12, 2:1, 5:2,
23:2, 25:7,
475:2
**pause**
31:19, 64:16,
161:13, 209:6,
419:1
**payable**
233:22, 235:8,
236:17, 237:19
**paycheck**
39:15, 39:16
**paychecks**
39:10, 39:12
**paying**
95:2, 228:20,
239:2, 244:1,
263:22, 264:4,
273:5, 274:14,
304:14, 304:15,
305:1, 305:2,
305:22, 306:2,
307:9, 307:10,
318:1, 335:13,
338:4, 338:5,
359:17, 392:22,
426:12, 430:2,

455:16
**paymaster**
41:7, 41:8
**payment**
163:8, 169:3,
169:4, 170:1,
170:4, 171:5,
171:6, 173:1,
173:3, 175:8,
176:4, 176:10,
177:4, 178:10,
178:11, 178:16,
179:1, 179:3,
179:6, 179:10,
179:12, 179:13,
182:6, 182:10,
183:4, 183:5,
183:11, 186:1,
186:4, 186:14,
186:15, 186:17,
187:4, 187:10,
234:12, 260:9,
262:14, 262:22,
264:13, 265:22,
266:22, 267:14,
269:19, 274:7,
274:13, 276:19,
326:18, 328:8,
336:22, 337:2,
438:19
**payments**
39:18, 53:13,
53:17, 54:2,
54:5, 54:12,
61:11, 61:17,
164:1, 164:4,
173:16, 174:11,
175:2, 182:2,
182:20, 196:15,
210:13, 214:2,
259:6, 260:4,
265:18, 267:17,
267:20, 267:21,
268:2, 268:3,
272:9, 272:12,
272:19, 273:12,
273:20, 273:21,
274:1, 274:19,

275:8, 275:10,
275:13, 275:14,
275:15, 277:11,
283:19, 335:21,
337:19, 340:10,
347:14, 349:10,
352:14, 353:1,
355:12
**payroll**
39:21, 39:22,
41:7, 41:12,
41:14, 41:18
**pays**
49:11, 181:19,
263:7, 271:9,
275:18, 426:8
**peachtree**
3:14
**penalties**
363:7
**penalty**
239:21
**pending**
80:2, 441:7,
445:22
**people**
25:18, 25:20,
28:9, 35:7,
35:17, 36:4,
36:19, 37:6,
38:9, 41:13,
44:3, 56:6,
68:19, 69:15,
84:14, 84:21,
126:20, 152:11,
163:13, 166:7,
197:12, 209:11,
210:1, 214:10,
217:22, 221:11,
221:13, 222:18,
222:20, 222:22,
223:6, 223:18,
223:21, 241:22,
243:6, 259:1,
268:22, 290:3,
290:13, 297:13,
300:22, 305:21,
307:20, 308:4,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

165

308:19, 336:10,
376:19, 386:8,
417:6, 446:22,
452:17, 454:10,
454:19, 454:20
**people's**
43:11, 244:5
**percent**
28:14, 28:21,
37:1, 37:2,
47:10, 48:15,
60:11, 65:5,
65:10, 76:12,
122:22, 163:4,
194:7, 217:11,
217:14, 242:9,
242:11, 270:6,
270:10, 271:6,
273:14, 274:7,
415:8
**percentage**
47:7, 217:3,
217:9, 269:21,
270:1, 426:16
**perdomo**
9:13, 434:11,
435:15, 435:20
**pereira**
427:6
**perform**
35:17, 165:21,
206:21, 221:13,
250:21, 337:10,
337:11, 395:12,
396:16
**performance**
74:6, 133:7,
133:8, 133:10,
224:21, 230:1,
230:7, 230:14,
272:11, 272:19,
273:20, 274:1,
274:12, 274:18,
275:8, 275:9
**performed**
281:8, 286:18
**performers**
56:7

**perhaps**
34:22, 47:1,
50:4, 113:13,
115:9, 115:11,
130:13, 191:11,
191:13, 198:11,
201:22, 219:20,
311:20, 369:6,
422:15
**period**
66:6, 90:9,
280:11, 308:6,
330:9, 330:11,
367:13, 388:12,
412:10, 473:6
**periodically**
194:21
**periods**
290:14
**permission**
225:1
**permit**
315:21
**person**
125:14, 128:17,
158:20, 158:21,
219:20, 220:9,
221:8, 223:1,
227:3, 227:4,
227:10, 230:22,
243:4, 244:2,
246:1, 272:22,
275:11, 276:9,
284:3, 309:7,
310:22, 329:5,
329:17, 330:4,
330:12, 336:15,
341:5, 344:9,
345:14, 363:5,
385:11, 430:9,
433:5, 433:7,
447:4, 452:4,
453:2, 453:11,
460:21, 460:22
**person's**
329:1, 329:3,
330:5, 330:7,
454:15

**personal**
254:12, 385:11,
409:12
**personally**
153:22, 155:7,
155:15, 165:18,
189:14
**personnel**
55:17, 55:21
**perspective**
55:14, 198:12
**phoenix**
28:9
**phone**
13:21, 15:1,
72:7, 73:21,
219:22, 220:2,
220:6, 373:2
**physically**
39:15
**pick**
453:2, 453:10
**picked**
243:8
**picking**
240:14
**piece**
83:1
**piispanen**
7:19, 8:9,
8:12, 8:19,
355:19
**piispanen's**
341:16
**place**
2:6, 3:6,
10:13, 158:12,
208:6, 275:18,
307:2, 307:7,
366:10, 404:15,
433:5
**placed**
262:4
**places**
38:5, 315:7
**plain**
147:22, 257:15,
292:8, 444:15,

445:5
**plaintiff**
1:6, 3:2, 23:6
**plan**
145:18
**planet**
10:12, 11:11
**planning**
16:16
**pleadings**
389:7, 389:11
**please**
10:15, 11:12,
21:3, 22:9,
22:20, 23:14,
24:12, 24:19,
25:5, 31:8,
32:20, 37:20,
38:19, 81:10,
87:1, 99:3,
101:20, 136:14,
143:21, 148:4,
155:12, 160:21,
164:21, 181:6,
197:9, 197:10,
200:13, 225:6,
230:19, 230:20,
234:6, 241:13,
241:17, 310:9,
313:16, 317:8,
317:12, 319:16,
319:18, 338:8,
338:21, 372:9,
372:12, 372:16,
383:16, 391:18,
391:21, 392:6,
437:11, 442:15
**pleased**
44:5
**plenty**
402:21, 426:3,
426:14
**plus**
415:7
**poc**
341:5, 341:18
**point**
12:4, 37:3,

59:8, 62:19, 90:6, 93:9, 95:18, 147:5, 158:2, 169:9, 185:6, 194:8, 203:18, 205:9, 216:14, 218:22, 219:6, 223:6, 284:19, 287:17, 293:15, 296:1, 299:21, 317:20, 321:16, 322:14, 331:21, 341:5, 368:14, 374:9, 374:12, 376:15, 383:18, 388:18, 390:16, 395:4, 404:6, 405:11, 405:12, 406:14, 456:4, 462:11, 463:18, 467:14, 467:16, 468:17

**point's**
191:15
**pointed**
241:7, 306:14, 395:3, 468:21
**pointing**
454:9
**points**
216:19, 393:12
**policy**
89:22, 91:8, 221:11, 269:11
**pool**
136:15
**portion**
105:14, 247:6, 324:2
**portions**
151:22, 152:1
**posed**
463:15
**position**
386:12, 389:1
**possible**
47:16, 47:20, 56:13, 57:15,

91:2, 91:18, 145:13, 162:4, 209:13, 326:18, 364:14, 371:14
**possibly**
354:20, 354:21, 420:3, 439:20, 457:11
**post**
129:17, 139:12, 139:14, 151:16, 151:18, 213:13, 213:16, 242:11, 255:9, 256:14, 257:6, 295:3, 388:12, 402:17
**posted**
229:22, 255:2, 255:18, 258:11, 388:13, 399:1, 463:8
**posting**
32:7, 242:9, 254:13, 257:17, 258:4, 258:7, 270:2, 393:9, 463:13, 463:15
**postmark**
399:20
**postmarked**
356:11, 358:22, 399:21, 401:10
**posts**
253:18, 257:5, 463:12
**potential**
214:12
**potentially**
75:5, 104:12
**practice**
90:2
**pre**
31:4, 31:9, 96:14
**pre-entry**
30:18, 35:7, 35:12, 37:7, 37:8

**prebail**
31:10
**preceding**
65:6
**precipitated**
369:16, 369:18
**precipitates**
297:8
**precipitously**
393:1
**precisely**
286:6
**predicated**
299:6
**preentering**
34:10
**preferable**
292:12, 296:11, 320:2
**preference**
250:20, 323:12
**preferrable**
193:8
**preferred**
295:17, 388:14
███████████
452:5
**preliminary**
17:3, 196:13, 289:19
**prelitigation**
199:17
**premise**
309:6, 468:11
**premium**
263:7, 263:12, 263:14, 266:19, 267:7, 267:10, 267:11, 267:15, 269:2, 272:3, 274:10, 316:18, 316:21, 377:10, 393:7, 456:13, 456:19
**premiums**
324:2, 393:3, 393:7, 394:19
**prepare**
26:19, 26:22,

40:11, 372:14
**prepared**
20:9, 124:5, 185:3, 186:21, 281:14
**prerogative**
318:9
**prescott**
8:18, 355:18, 398:20
**prescreen**
95:10
**prescreening**
95:22
**presence**
103:2
**present**
4:16
**presented**
17:13, 51:13, 368:12, 368:13, 468:13
**president**
42:11, 42:21, 166:5, 218:16, 224:11, 405:15
**presidential**
393:12
**presumably**
120:11, 243:2
**presuming**
356:10
**pretrial**
33:20, 33:22, 96:5
**pretty**
44:20, 144:20, 345:17, 417:13
**prevent**
23:17
**previous**
179:1, 337:1, 341:22, 398:9
**previously**
205:22, 206:1, 207:11, 472:14
**prima**
450:13, 451:2

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

167

primary
66:12, 198:22
principal
202:18, 205:21,
206:4, 210:12,
230:17, 243:22,
244:19, 245:6,
365:11, 438:3,
439:16, 440:17,
464:8
principals
201:2, 208:14,
210:15, 211:1,
212:15, 212:19,
217:6, 218:19,
219:8, 223:13,
224:2, 224:13
print
104:8, 202:2,
204:3, 208:17,
209:1, 209:9,
210:11, 212:6,
212:9, 212:11,
213:2, 260:2
printed
125:8, 259:10
printouts
116:15, 206:3
prior
23:10, 29:19,
30:12, 33:2,
33:10, 37:4,
59:19, 62:11,
65:1, 65:8,
66:7, 66:19,
67:19, 68:20,
69:17, 81:10,
81:13, 109:2,
118:22, 131:19,
132:3, 132:20,
139:4, 147:13,
160:5, 162:12,
170:16, 182:7,
184:18, 185:17,
188:21, 191:19,
237:11, 243:5,
243:6, 249:11,
280:8, 295:19,

303:7, 311:14,
312:14, 325:5,
355:12, 371:11,
373:2, 384:22,
385:17, 387:14,
388:20, 389:1,
420:19, 472:9
prison
30:2
private
37:17
privilege
12:22, 13:6,
105:20
privileges
19:2, 19:4
privity
282:1
pro
59:10
proactive
225:19
probably
13:10, 42:6,
45:15, 45:16,
63:22, 64:19,
69:14, 99:22,
120:17, 169:8,
176:22, 218:2,
224:6, 259:19,
300:11, 309:10,
343:11, 345:1,
360:18, 365:21,
374:11, 388:14,
412:2, 420:5,
427:7
problem
16:12, 32:1,
79:18, 86:5,
149:11, 159:10,
161:1, 203:20,
341:10, 357:8,
421:16, 440:2,
440:3
procedure
389:20
proceeding
16:18

process
35:4, 36:7,
36:10, 54:17,
85:8, 85:18,
87:11, 88:7,
95:22, 109:18,
122:7, 128:3,
159:15, 169:12,
181:9, 202:4,
206:20, 244:17,
276:4, 281:13,
300:20, 336:11,
343:22, 353:16,
374:10, 391:12,
404:7
processed
145:22, 146:6,
168:10, 169:5,
169:11, 169:14,
169:21, 171:19,
172:10, 172:17,
175:7, 180:8,
343:19, 344:8,
351:19, 353:10,
353:15
processing
168:3, 180:13
procure
147:15, 243:10,
460:2
produce
165:1, 187:2,
201:20, 207:9,
232:8, 233:13,
235:5
produced
19:18, 20:16,
20:20, 21:1,
21:3, 112:17,
124:22, 206:1,
206:7, 206:19,
207:4, 207:11,
208:1, 208:2,
208:12, 208:13,
232:8, 245:9,
409:3, 409:7,
410:11, 413:17
production
19:21, 21:18,

92:2, 201:3,
201:9, 201:19,
206:6, 206:12,
208:20, 211:12,
211:14, 416:8
productions
112:20
professional
2:14, 29:12,
68:8, 154:9
profit
44:16, 113:21,
116:21, 117:15,
117:22, 119:2,
119:8, 120:1,
124:17, 403:18,
404:2, 405:17,
405:22, 406:22,
408:6, 408:14,
409:3, 409:14,
410:11, 410:15,
411:17, 419:10,
419:18, 421:1
program's
74:7
programs
70:3, 248:20,
249:1, 249:3,
249:16, 250:7,
250:8, 250:12
progress
322:9
project
35:14, 36:12,
36:22, 38:11,
142:22
projection
113:21, 116:22,
117:15, 117:22,
119:9, 119:10,
124:20
projections
119:13, 120:14,
409:19
promise
105:10, 127:1,
272:19, 273:20,
274:1, 274:12,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

168

274:18, 275:8,
275:9, 275:13
**promised**
172:22, 272:12
**promises**
284:17
**proper**
103:8, 447:15
**properties**
44:15, 44:17,
44:19, 45:2,
45:5, 45:6,
45:7, 45:13,
47:4, 49:4,
49:7, 50:17
**property**
44:1, 44:21,
45:4, 45:8,
45:9, 49:10,
259:3
**proposal**
368:14
**propose**
399:1
**propriety**
18:5
**prosecution**
257:10
**protect**
197:8, 197:12,
197:18, 199:19,
210:1, 255:20,
255:22, 370:19,
376:16, 377:14
**protected**
17:19, 19:1,
197:20, 255:19,
255:21
**protecting**
200:11, 354:5
**protection**
197:5, 198:18
**protections**
19:5
**protective**
16:14, 17:4,
17:5, 17:12,
18:18, 19:5,

73:4, 73:8,
197:4, 197:11,
208:6
**protocol**
69:20
**proud**
44:5, 150:3,
222:19, 244:13,
244:14, 244:15
**prove**
304:6, 396:6,
396:8
**proved**
304:2
**proverbial**
456:7
**proves**
297:11, 396:11
**provide**
22:5, 28:15,
28:20, 36:8,
55:10, 55:15,
81:21, 85:6,
107:1, 110:21,
110:22, 117:10,
130:21, 151:10,
153:11, 162:18,
162:19, 167:4,
169:18, 193:12,
193:16, 194:15,
197:13, 198:8,
202:16, 203:1,
213:18, 222:2,
254:12, 254:21,
255:14, 255:16,
255:17, 256:7,
257:21, 258:8,
258:10, 258:15,
290:19, 290:21,
291:13, 292:15,
296:14, 299:3,
314:8, 320:9,
369:22, 370:14,
372:7, 375:17,
411:6, 411:13,
412:14, 413:2,
414:2, 414:14,
426:1, 427:18,

441:11, 441:14,
442:2, 442:5,
442:18, 443:1,
446:8, 453:18,
457:3, 458:12
**provided**
19:13, 37:18,
37:22, 55:17,
68:4, 74:6,
77:1, 77:6,
110:3, 111:6,
113:20, 116:22,
117:16, 117:22,
119:3, 119:11,
123:1, 124:2,
124:4, 143:3,
163:8, 163:14,
164:7, 167:16,
177:14, 184:14,
185:18, 187:8,
187:9, 197:17,
200:1, 200:5,
200:12, 200:22,
211:11, 212:14,
212:18, 239:5,
253:16, 253:17,
254:2, 254:6,
254:10, 254:20,
254:22, 255:8,
256:14, 257:4,
257:16, 258:1,
258:3, 258:7,
259:3, 259:5,
376:17, 383:17,
409:15, 410:14,
411:4, 411:11,
412:8, 414:1,
414:7, 415:1,
415:21, 416:4,
427:16, 429:13,
429:17
**provider**
219:11, 386:19,
388:15, 388:17
**provides**
144:7, 198:4,
213:18, 219:11,
252:1, 256:8,

277:2, 355:19,
434:16, 442:19,
459:2, 459:22,
464:19, 465:9,
466:11, 467:5
**providing**
37:4, 62:20,
69:21, 74:22,
111:3, 163:12,
198:8, 254:12,
256:15, 257:8,
276:9, 276:11,
388:16, 453:20
**provision**
463:18, 464:18,
465:8, 466:9,
467:4, 468:8,
468:18
**provisions**
150:16, 442:9,
450:22, 455:3,
460:13, 460:14,
460:15, 460:16,
465:15
**public**
2:15, 203:9,
233:4, 240:10,
476:1, 476:21
**pull**
42:4, 202:1,
210:14, 210:22,
250:2, 341:1,
343:15
**pulled**
248:9
**pun**
16:10
**purchase**
50:10
**purchases**
263:8
**purge**
395:7
**purports**
118:6, 126:19
**purpose**
160:11, 161:2,
234:1, 245:18,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

169

251:10, 411:7,
411:14, 414:15
**purposes**
79:14, 228:2,
245:19
**pursuant**
2:13, 110:3,
156:22, 170:13,
178:16, 207:21,
236:5, 237:8,
283:5, 290:6,
334:9, 365:12,
406:15, 445:8
**pursue**
242:20
**put**
15:10, 17:7,
17:21, 19:7,
21:11, 78:1,
83:1, 89:1,
97:22, 103:13,
126:3, 126:9,
182:8, 212:10,
284:21, 298:3,
305:18, 322:7,
324:17, 324:20,
330:3, 332:13,
333:2, 387:6,
396:6, 396:7,
397:6, 398:15,
400:14, 404:12,
429:19, 445:6,
451:21, 454:7,
474:8
**putting**
42:15, 93:20,
400:22

**Q**

**qualification**
333:18
**qualifications**
29:12, 33:21,
448:2
**qualifier**
254:15
**qualify**
145:11, 296:17,

314:11, 332:19
**questioning**
389:16
**questions**
17:11, 23:18,
24:10, 51:2,
74:5, 79:14,
87:6, 98:3,
100:22, 102:3,
103:12, 108:2,
115:16, 126:10,
198:21, 233:6,
268:10, 332:5,
332:16, 332:18,
355:1, 363:11,
384:17, 392:3,
418:4, 418:19,
418:21, 432:4
**quibble**
359:16
**quick**
51:19, 99:20,
105:10, 111:7,
118:13, 172:2,
191:22, 375:21
**quickbooks**
404:11, 406:14,
406:15, 412:2,
412:4, 412:9,
414:7, 416:10,
416:11, 416:19
**quicker**
99:11
**quickly**
64:1, 224:16,
328:14
**quite**
20:1, 43:3,
130:11, 195:17,
239:1, 320:13
**quote**
194:14, 407:6

**R**

**raise**
111:19, 111:20,
118:8, 149:9,
382:20, 386:4,

386:10, 447:11
**raised**
107:21, 375:2,
383:3, 383:10,
384:22, 385:17,
387:15, 388:1,
390:3, 423:6
**ran**
38:16
**randomly**
206:8, 206:9,
392:15
**range**
69:5, 404:3
**rapid**
388:17, 388:18
**rapidly**
31:20, 169:10
**ratcheted**
393:6
**rate**
76:10, 225:8,
225:18
**rather**
16:18, 19:13,
225:19, 430:4,
430:5, 432:22,
454:13, 454:14
**rd**
177:6
**reach**
272:21, 273:11,
310:22
**reached**
170:20, 190:17,
193:5, 272:13,
295:10
**reaches**
273:1
**reaching**
347:6, 353:22
**reaction**
394:22
**reactions**
108:17
**readily**
370:7
**reading**
83:2, 89:2,

98:2, 100:18,
101:1, 104:19,
107:11, 110:20,
113:15, 116:15,
142:20, 147:22,
194:12, 232:11,
252:13, 252:17,
265:17, 313:8,
313:20, 315:4,
319:5, 319:10,
319:20, 324:15,
324:20, 332:21,
333:7, 335:19,
350:20, 380:14,
439:18, 451:6,
466:3, 472:20,
476:8
**reads**
107:16, 141:17,
245:3, 445:4
**ready**
112:22, 184:2
**real**
111:7, 111:20,
112:10, 114:6,
172:1, 191:22,
375:21, 452:4,
452:5, 454:10
**realistically**
368:17
**realities**
367:15
**reality**
290:4
**realize**
346:15
**realized**
145:6, 223:17,
295:17
**really**
35:15, 36:1,
36:20, 38:20,
39:16, 43:12,
43:16, 45:1,
83:5, 104:16,
105:11, 114:4,
128:15, 139:8,
154:21, 158:6,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

170

181:12, 201:21,
220:12, 228:2,
284:11, 286:12,
291:8, 294:7,
325:1, 354:9,
359:1, 364:8,
378:5, 392:10,
406:16, 442:10,
456:4, 463:9
**realtime**
2:15
**reappearance**
97:2
**reason**
71:5, 71:10,
73:9, 75:12,
75:17, 75:20,
75:21, 80:6,
80:10, 82:9,
82:10, 82:18,
82:19, 83:13,
83:18, 88:2,
88:12, 116:20,
128:18, 128:19,
153:15, 157:6,
173:11, 173:12,
250:8, 262:4,
314:15, 321:9,
347:12, 371:4,
372:15, 379:13,
399:20, 400:8,
401:9, 434:22,
435:2, 436:16,
436:18, 437:2,
439:14, 452:10,
453:20, 460:4
**reasonable**
257:14
**reasons**
28:1, 117:2,
126:21, 184:17,
245:20
**rebuilt**
406:15
**recall**
12:3, 12:7,
27:9, 39:4,
64:17, 64:21,

66:18, 69:9,
71:9, 71:10,
72:16, 72:19,
74:10, 74:16,
75:14, 75:17,
75:18, 76:5,
77:22, 78:11,
78:15, 81:1,
81:2, 82:6,
82:7, 84:1,
93:13, 94:13,
94:16, 95:4,
95:19, 101:5,
101:10, 101:11,
101:12, 101:14,
101:15, 101:16,
101:17, 117:7,
117:9, 123:13,
123:15, 123:17,
129:16, 130:20,
131:10, 131:15,
131:17, 131:18,
134:11, 134:13,
136:1, 136:22,
137:1, 140:5,
142:17, 153:6,
153:7, 177:4,
187:20, 189:2,
190:7, 190:9,
190:14, 191:20,
192:4, 192:7,
192:8, 192:10,
301:13, 303:7,
303:13, 303:14,
303:16, 303:18,
303:21, 324:16,
325:10, 331:10,
342:19, 342:21,
343:1, 352:2,
352:7, 352:8,
361:4, 371:11,
371:13, 372:17,
372:19, 375:11,
375:13, 376:14,
458:1, 458:2
**recap**
77:15, 77:19
**receipt**
151:7, 206:3,

261:21, 358:12,
358:13, 397:8
**receivable**
144:15, 145:1
**receive**
19:20, 28:11,
44:6, 44:8,
48:20, 49:1,
49:3, 61:18,
183:4, 185:2,
246:8, 264:1,
300:14, 316:18,
326:10, 346:12,
353:1, 358:10,
369:14, 374:5,
456:13
**received**
19:8, 19:15,
20:4, 21:16,
21:17, 29:4,
39:16, 53:8,
53:11, 53:13,
54:11, 60:20,
61:12, 136:17,
144:16, 166:21,
171:1, 173:6,
175:18, 177:6,
179:6, 182:20,
190:16, 208:19,
263:1, 263:15,
300:18, 326:12,
339:9, 347:7,
349:8, 349:10,
349:13, 350:17,
356:6, 356:7,
356:18, 357:14,
357:18, 357:22,
358:5, 358:19,
360:12, 361:6,
362:3, 366:16,
373:5, 374:6,
376:8, 394:7,
411:11
**receives**
49:6, 58:11,
366:22
**receiving**
58:10, 64:5,

190:8, 289:15,
301:11, 325:7,
358:9, 372:17,
374:8, 377:10,
393:3
**recently**
361:6
**recess**
62:7, 108:8,
118:18, 135:17,
148:18, 162:8,
184:6, 247:18,
302:18, 360:22,
420:16
**recitation**
402:11
**recognize**
72:1, 72:3,
110:15, 110:18,
124:5, 124:8,
127:5, 142:16,
215:5, 341:15,
434:13
**recognized**
341:9, 341:14
**recollect**
125:6, 130:6,
187:18, 190:1,
190:19, 193:1,
205:12, 312:15,
338:16, 344:13,
350:19, 352:18,
360:14, 361:10,
361:14, 369:6,
380:13, 383:15,
387:9, 400:18,
429:20, 473:9
**recollected**
380:11, 387:5
**recollecting**
338:17
**recollection**
27:6, 76:17,
114:2, 167:3,
186:20, 187:22,
188:6, 188:8,
371:3, 391:9
**recommend**
110:18

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                    171

reconciled
412:7
reconciliation
416:10
reconciling
412:19, 414:17
reconsider
226:6, 228:1,
228:11, 429:14
reconsideration
225:10, 225:15,
226:2, 227:15,
228:6, 234:18,
429:6, 429:11
reconsiderations
225:2, 227:19
reconsidered
228:21, 423:1
record
15:4, 15:10,
17:8, 19:7,
21:10, 21:12,
25:6, 25:10,
62:6, 62:9,
86:13, 89:20,
90:1, 108:7,
108:10, 108:14,
110:17, 118:17,
118:20, 125:13,
135:16, 135:19,
148:17, 148:20,
150:6, 162:7,
162:10, 163:5,
167:10, 167:14,
184:5, 184:8,
198:14, 207:21,
247:17, 247:20,
302:22, 327:1,
339:17, 342:5,
360:21, 361:2,
384:16, 400:13,
417:15, 420:15,
420:18, 420:20,
434:19, 440:5,
469:4, 474:8,
474:12, 476:5
recorded
85:4, 89:22

recordings
90:3, 90:17,
90:21, 91:12,
92:14
records
16:17, 17:1,
17:18, 18:3,
20:1, 21:1,
48:2, 69:11,
89:15, 150:18,
164:4, 164:11,
191:9, 198:5,
198:15, 199:1,
199:5, 199:18,
200:12, 201:20,
203:6, 224:4,
318:14, 335:4,
361:8, 363:14,
363:19, 368:2,
368:7, 368:10,
370:18, 375:18,
404:15, 405:20,
406:3, 406:9,
406:11, 407:8,
407:14, 407:16,
407:20, 407:21,
407:22, 408:19,
408:20, 408:22,
412:20, 414:1,
414:3, 421:21,
459:6, 459:8,
459:13
recycles
91:7
red
111:20
redact
207:20, 208:6
redacted
105:15, 206:20,
208:4
redaction
206:20
redactions
105:17, 105:19
redirect
104:15, 332:22,
399:17, 403:16

redline
127:2
redo
416:19
reduce
130:1
reduced
187:14, 476:7
reduces
392:14
reducing
130:7
reentering
30:20
refer
239:20
reference
107:4, 134:8,
147:9, 180:15,
249:3, 251:2,
251:5, 251:20,
254:18, 283:6
referenced
106:5, 146:20,
156:3, 180:11,
249:3, 281:19,
310:16, 378:12
references
140:10, 249:21,
250:6, 266:18,
362:21, 362:22,
363:2, 448:3
referencing
147:21, 158:9,
180:9, 180:11,
182:1, 186:12,
187:13, 187:15,
378:9, 454:6,
457:22, 460:15
referral
300:21, 346:3
referrals
221:20
referring
26:16, 32:15,
166:22, 174:2,
193:14, 206:19,
226:3, 252:5,

redline
452:14
refers
249:12
reflects
120:1
reform
38:14, 38:16
refrain
462:9
refresh
27:6
refund
139:7, 157:11,
186:8
refunded
131:5, 157:22,
158:1, 189:5
refunding
153:16
refused
234:17
regard
11:20, 20:3,
22:19, 32:4,
34:21, 50:16,
56:10, 68:14,
124:21, 152:6,
152:21, 159:22,
188:6, 189:12,
220:16, 268:14,
282:7, 341:11,
387:2, 436:13,
438:14, 463:1
regarding
16:17, 20:17,
20:19, 26:10,
30:13, 178:5,
189:15, 217:1,
265:21, 303:9,
361:6, 363:14,
448:19
regionally
215:17
registered
2:14, 14:12,
14:17, 14:22,
48:8, 48:13
registry
48:11

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

172

**regularly**
345:8
**regulatory**
206:6, 207:13
**relate**
68:12
**related**
14:13, 31:2,
33:20, 57:5,
74:7, 124:13,
127:4, 146:21,
146:22, 152:1,
159:2, 161:18,
201:1, 216:19,
283:4, 427:5,
438:18, 445:12,
448:9, 451:8,
451:13, 463:11,
470:4, 476:9
**relates**
32:8, 83:3,
83:4, 151:8,
279:19, 364:18,
444:21, 445:19,
448:5, 463:8,
463:10
**relation**
177:19, 276:12
**relationship**
14:6, 66:17,
68:13, 68:14,
68:21, 69:18,
74:13, 75:1,
78:4, 101:8,
106:18, 109:4,
109:9, 109:13,
109:17, 109:18,
128:3, 128:4,
128:5, 128:10,
128:13, 130:4,
130:10, 131:13,
186:18, 286:19,
295:12, 328:13,
328:20, 335:16,
336:1, 350:5,
381:15, 392:9,
394:13, 396:5,
397:21

**relatively**
169:10, 330:2
**relay**
125:9, 388:22
**release**
33:22, 34:1,
240:15, 240:17,
276:15
**released**
35:8, 35:10,
227:4, 242:10,
243:9, 274:16,
276:11
**relevant**
199:2, 199:3,
207:8
**reliable**
452:9
**relief**
454:16, 459:15
**remain**
72:14, 316:7,
318:19
**remainder**
186:9
**remained**
314:17
**remains**
235:7, 236:16,
238:6, 238:10,
238:12, 318:17
**remedied**
328:12
**remember**
40:13, 55:3,
70:14, 70:16,
70:17, 72:4,
74:15, 74:16,
78:5, 78:21,
84:7, 84:8,
95:9, 106:6,
106:20, 116:14,
117:7, 119:11,
119:12, 119:13,
123:7, 130:9,
130:16, 130:17,
130:19, 131:22,
137:4, 139:4,

139:10, 145:15,
146:9, 146:10,
146:12, 147:7,
169:18, 176:20,
183:12, 188:15,
190:6, 195:4,
195:6, 195:7,
195:9, 197:19,
198:2, 226:4,
226:21, 226:22,
285:14, 293:21,
311:6, 311:12,
324:4, 324:5,
327:6, 327:7,
333:22, 334:1,
354:2, 354:19,
354:22, 355:6,
369:8, 371:2,
374:8, 375:1,
375:3, 376:18,
423:15, 429:12,
432:15, 434:14,
457:16
**remembered**
146:17
**reminder**
177:9
**remote**
204:7, 205:1,
205:6
**removal**
246:9, 446:19
**remove**
108:16, 108:19,
286:2, 320:20
**removed**
194:1, 272:14,
273:12, 386:19
**removing**
193:22, 322:11
**rent**
48:20, 49:6,
50:4, 60:5
**rented**
258:19
**rents**
49:1, 49:3,
54:10

**reoccurs**
220:15
**reopened**
454:16
**repeat**
32:2, 81:15,
85:13, 117:19,
132:1, 160:22,
164:16, 164:21,
235:12, 247:9,
264:20, 385:13
**repeated**
403:3
**repeating**
384:10
**rephrase**
24:13
**replace**
193:7, 194:13,
291:17, 292:11,
296:10, 298:9,
315:16, 320:1,
320:3, 368:19,
368:21
**replaced**
193:11, 290:20,
291:12, 292:14,
296:13, 314:7,
320:8, 322:1
**replacement**
48:13, 293:5,
390:7
**replacing**
315:17, 320:22
**reply**
176:1
**replying**
174:4, 174:13
**report**
166:8, 260:2,
260:8, 260:22,
261:8, 309:5,
365:14
**reported**
1:21, 93:15,
436:19
**reporter**
2:14, 2:15,

11:10, 11:12, 24:22, 38:20, 82:17, 137:21, 140:16, 148:6, 155:14, 333:10, 361:18, 476:1

**reports**
20:16, 20:18, 120:6, 261:7, 410:18, 415:22

**represent**
10:16, 10:22, 11:4

**representation**
11:19, 79:3, 80:6, 92:3, 353:11, 353:14

**representations**
89:9

**representative**
11:9, 86:19, 92:15, 216:7

**represented**
99:13, 351:2, 351:3, 351:6

**representing**
10:11, 11:11, 12:5, 12:9, 12:10, 12:17, 120:20

**represents**
348:13

**reprinting**
191:13

**request**
65:3, 85:6, 104:22, 106:4, 110:4, 118:1, 119:4, 119:12, 123:19, 132:4, 132:21, 142:14, 147:15, 152:21, 156:4, 160:13, 161:5, 163:22, 192:20, 227:15, 228:5, 263:9, 297:6, 297:7, 361:8, 363:14,

365:12, 368:2, 372:13, 374:17, 374:18, 381:10, 428:5, 428:6, 429:7, 429:11, 445:14, 460:2

**requested**
19:9, 21:9, 82:16, 85:16, 106:17, 107:1, 109:7, 129:22, 130:1, 147:17, 155:13, 167:8, 226:8, 263:10, 310:2, 425:8, 438:11, 439:4, 472:22, 476:8

**requesting**
95:11, 121:7, 328:8, 363:17, 363:18, 375:16

**requests**
21:9, 21:22, 165:17, 349:8, 392:14, 431:18, 432:11

**require**
122:16, 167:5, 242:8, 242:11, 425:15, 458:4, 468:15

**required**
28:9, 34:13, 101:6, 104:20, 106:2, 121:21, 123:12, 129:17, 130:3, 133:20, 134:17, 134:20, 136:1, 142:13, 150:4, 180:2, 244:20, 245:8, 245:9, 255:1, 279:18, 389:19, 416:18, 440:16, 440:17, 440:19

**requirement**
106:11, 207:17, 295:22, 296:7,

312:22, 463:14

**requirements**
231:3

**requiring**
314:13, 429:3, 441:17

**rescinded**
330:12, 432:22, 433:3, 436:21

**research**
166:22

**reserve**
19:16, 20:2

**reserved**
273:16

**reserving**
73:7

**resetting**
281:16

**resigned**
48:8

**resolve**
22:4, 329:4, 337:7

**resolved**
328:14

**resources**
40:4, 70:8, 221:20

**respect**
17:8, 86:6, 114:20, 126:3, 200:4, 203:5, 266:4, 281:13, 293:18, 313:14, 378:2, 378:6, 391:20

**respond**
115:8, 175:1, 370:22, 373:20, 373:21, 376:12, 377:16, 382:5, 472:8, 473:7, 473:12

**responded**
143:3, 454:4

**respondent**
76:11, 248:15,

275:18

**respondent's**
253:19, 257:6

**responding**
41:19, 173:22, 174:16, 175:4, 179:6, 348:1

**responds**
256:18, 256:19, 347:19

**response**
113:12, 115:10, 118:1, 119:4, 123:19, 165:16, 362:9, 371:3, 373:6, 376:8, 382:10, 382:13, 382:15, 382:20, 472:22

**responses**
361:8, 368:2, 379:20, 390:2, 390:9

**responsibilities**
42:13, 43:1, 43:4, 43:6, 43:21, 221:18, 354:10, 441:18, 441:19, 463:10, 463:12

**responsibility**
156:17, 229:9, 229:10, 438:18

**responsible**
40:4, 42:14, 155:9, 155:17, 155:22, 158:4, 158:5, 471:13, 471:14, 471:21, 472:1, 472:3

**rest**
322:5, 466:10

**restating**
433:18

**result**
34:17, 225:15, 257:10, 300:16, 349:16, 394:8,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

174

436:22
**retail**
30:6, 52:11,
52:12, 52:13
**retain**
163:17
**retained**
163:20
**return**
259:3, 470:9,
471:8, 471:19
**returned**
151:20, 471:1,
471:16
**returns**
416:13, 416:15,
420:7, 421:9
**rev**
6:16
**revenue**
49:22, 50:5,
50:9, 53:6,
53:12, 53:20,
54:3, 58:10,
59:17, 59:20,
60:1, 60:2,
60:13, 63:17,
64:5, 120:6,
120:15, 145:5,
214:1, 214:9,
214:17, 412:5,
421:18
**review**
27:5, 27:7,
109:8, 160:4,
194:20, 204:14,
321:15, 321:19,
372:9, 389:7,
389:13, 408:19,
408:21, 408:22,
409:1, 414:12
**reviewed**
208:8, 226:13,
376:1, 376:4
**reviewing**
97:17, 109:12,
347:5, 390:9,
462:22

**revised**
189:15, 295:21,
411:11, 412:16
**revision**
137:4, 258:22
**revisions**
411:9, 414:15,
448:1
**revisit**
416:19
**revocable**
296:9
**richard**
4:19, 7:6,
7:12, 8:9, 8:12,
11:9, 47:13,
224:10, 347:19,
347:22, 421:14
**rick**
5:9, 5:13,
5:15, 6:10,
6:13, 71:18,
72:11, 97:13,
99:15, 113:2,
114:9, 114:15,
188:17
**ridiculous**
244:16, 297:10
**right-hand**
112:14, 248:6
**rights**
19:16, 20:3,
252:1, 253:3,
253:6, 253:9,
367:18, 451:8,
451:10, 451:12,
451:17, 452:7,
452:12
**risk**
95:12, 96:5,
96:12, 102:11,
206:14, 216:10,
216:15
**rli's**
92:15, 92:16,
194:5, 225:13,
234:14, 250:20,
263:6, 296:5,

303:9, 303:10,
304:8, 315:19,
361:8, 362:13,
362:19, 368:2,
370:18, 379:12,
391:11, 392:10,
393:8, 393:14,
394:18, 394:22,
396:1, 396:11,
397:20, 423:12,
425:1, 458:11,
458:16, 472:9
**rli-issued**
312:18
**roads**
37:14
**roanoke**
4:6, 11:4
**role**
11:19
**roles**
42:12, 43:1,
43:3, 43:20,
55:18
**roll**
305:17, 329:6
**rolled**
215:17
**roof**
456:7, 456:14,
456:16
**room**
11:16, 16:9,
92:4, 161:22,
196:18
**rooms**
89:16
**roster**
42:2, 42:4
**roughly**
426:17
**round**
239:1
**rounded**
120:13, 120:17,
144:19
**route**
193:8, 292:12,

296:11, 319:21,
320:2, 320:3
**routinely**
345:3, 345:6
**rpr**
1:21, 476:2
**ruled**
17:2
**rules**
381:19, 389:19,
418:3
**run**
36:18, 162:1,
165:10, 260:8,
367:13, 410:19
**running**
15:18, 23:9,
149:3
**runs**
318:13, 318:15

---

**S**

**sad**
286:18
**safety**
203:11
**salaried**
40:6
**salary**
40:8
**sales**
7:3, 206:3,
206:14, 259:10,
259:12, 260:2,
261:6, 261:22
**same**
12:1, 12:21,
13:6, 35:15,
43:1, 43:3,
43:19, 43:22,
67:20, 69:19,
70:5, 135:4,
135:6, 143:12,
204:17, 207:10,
208:2, 215:21,
216:2, 220:1,
260:21, 282:20,
327:12, 364:9,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

175

384:10, 408:11,
410:19, 432:2,
432:8, 475:4
**sample**
229:18
**sandoz's**
123:19, 152:4,
182:7, 281:15,
286:17, 289:1
**sat**
196:18, 412:18
**save**
92:19, 467:3
**saw**
117:11, 167:15
**saying**
12:13, 37:10,
71:10, 82:22,
84:8, 92:20,
112:21, 116:2,
116:3, 117:8,
123:3, 144:21,
170:12, 170:22,
172:9, 174:16,
181:13, 185:2,
195:11, 196:1,
201:8, 201:18,
201:19, 201:22,
207:6, 209:17,
237:11, 243:18,
259:20, 263:13,
268:14, 272:6,
278:11, 278:12,
282:1, 291:22,
297:11, 317:18,
321:22, 334:22,
337:16, 339:9,
340:9, 340:21,
343:18, 346:18,
353:5, 353:7,
358:2, 358:7,
358:8, 358:11,
358:16, 364:18,
364:19, 365:11,
365:22, 369:18,
387:22, 394:14,
396:3, 397:20,
400:9, 402:22,

405:7, 405:9,
407:7, 418:8,
436:12, 442:2,
453:14, 462:9,
463:21, 472:17
**scan**
348:17, 348:19
**scary**
221:19
**schedules**
137:9, 137:10
**schneider**
7:15, 9:10,
9:14, 335:6,
434:11, 434:12,
435:15, 435:16
**schneider's**
19:11
**school**
27:10, 27:16,
27:21, 27:22,
28:2, 28:17,
29:3, 282:9
**schooled**
459:14
**scope**
388:20, 418:6,
418:7
**scoring**
78:16, 78:17,
79:4, 80:7,
80:12, 80:14
**scratch**
422:12
**screen**
202:4, 202:5
**screenshot**
202:21
**screenshots**
208:17
**screenshotted**
211:3
**screenshotting**
202:4
**screw**
454:14
**screwed**
227:13

**seal**
476:14
**seamans**
390:8
**search**
67:12, 69:14,
165:11, 165:14,
165:21
**searches**
165:12
**second**
19:21, 27:16,
72:7, 73:22,
97:14, 97:19,
101:3, 161:11,
161:14, 168:20,
188:4, 189:7,
216:10, 256:19,
257:2, 282:10,
282:11, 287:5,
327:20, 328:9,
375:22, 382:12,
413:1, 417:12,
420:12, 437:5,
460:1, 470:21
**secret**
197:20, 200:6
**section**
233:3, 444:16,
444:17, 448:11,
460:11
**secured**
34:13
**secures**
213:14
**securitization**
67:9, 251:7,
251:18
**securitize**
252:8
**security**
91:6, 229:7,
230:1, 245:7,
349:7, 349:9,
351:12, 362:4,
440:13, 469:10,
469:17, 469:22,
470:5

**seeing**
125:7, 126:18
**seek**
225:14, 234:18
**seekers**
200:18, 203:7
**seeks**
251:13, 462:19
**seem**
27:9, 120:16,
187:17, 262:2,
374:2
**seemed**
71:1, 71:2,
71:3
**seems**
129:5, 133:22,
316:4
**seen**
116:12, 191:14,
241:20, 243:5,
270:21, 301:21
**segregate**
203:21
**segregated**
275:8
**select**
78:16, 78:18,
79:4, 80:7
**selected**
81:21, 206:9
**selecting**
81:5
**selects**
83:15
**sell**
306:12, 306:19
**send**
21:3, 21:17,
115:9, 116:6,
130:8, 204:21,
204:22, 288:15,
293:1, 297:6,
325:6, 345:3,
345:9, 352:13,
353:2, 353:16,
373:17
**sending**
22:8, 346:21,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

176

346:22
**sends**
220:8, 287:22,
347:18
**sense**
28:10, 56:2,
69:16, 84:6,
102:4, 120:16,
153:12, 153:14,
153:15, 157:11,
166:5, 190:10,
221:7, 227:9,
293:2, 314:14,
352:19, 447:3
**sensitive**
197:10
**sent**
20:6, 20:7,
99:14, 99:16,
123:17, 124:9,
124:12, 124:17,
126:14, 127:8,
140:5, 167:1,
169:11, 171:5,
174:8, 224:8,
283:3, 291:1,
340:22, 342:14,
342:18, 342:22,
343:4, 343:5,
343:9, 343:11,
343:13, 344:5,
344:18, 347:16,
349:6, 351:5,
351:11, 351:16,
351:20, 353:9,
353:10, 353:12,
353:15, 357:11,
357:19, 359:3,
361:5, 372:21,
373:3, 373:12,
373:14, 373:18,
399:2, 429:12,
435:16, 466:14,
466:17, 466:18,
472:17
**sentence**
96:22, 142:5,
155:12, 161:12,

201:13, 230:5,
230:13, 230:15,
232:5, 232:12,
236:9, 241:7,
256:18, 256:19,
288:9, 296:20,
321:7, 438:1,
451:6, 460:1
**sentences**
297:21
**sentencing**
96:20
**separate**
54:21, 134:3,
134:5, 134:7,
275:3, 276:13,
362:4, 366:15,
433:19
**separated**
264:5
**separately**
263:14, 399:9
**separation**
56:2
**september**
368:22, 369:2,
476:16
**series**
24:10, 410:11
**serious**
150:17
**seriously**
200:10, 278:10
**seriousness**
281:11
**served**
458:17
**service**
48:19, 68:3,
153:8, 275:20,
276:10, 312:5
**services**
1:8, 10:5,
11:1, 26:11,
29:15, 29:16,
30:8, 32:6,
32:8, 33:3,
33:5, 33:7,

37:5, 37:6,
37:22, 38:1,
39:9, 39:19,
40:17, 41:5,
41:6, 41:21,
42:10, 48:20,
49:1, 49:3,
49:22, 50:6,
50:18, 51:20,
53:6, 55:1,
55:15, 55:16,
55:17, 55:19,
56:19, 57:4,
57:6, 58:9,
59:16, 60:13,
60:16, 61:7,
61:9, 62:20,
64:18, 66:20,
67:4, 67:15,
69:21, 70:5,
74:1, 74:12,
79:10, 81:4,
144:8, 144:13,
149:21, 159:1,
160:14, 161:6,
199:10, 213:17,
214:4, 240:16,
248:16, 248:20,
248:22, 249:4,
249:12, 249:16,
250:11, 250:14,
250:18, 250:21,
251:3, 251:16,
263:10, 277:1,
283:7, 404:1,
410:13, 426:13,
453:8
**serving**
55:20, 56:1
**set**
41:10, 112:21,
184:12, 193:9,
213:1, 228:21,
229:2, 292:12,
296:11, 320:6,
464:13, 471:5,
476:13
**sets**
186:5, 251:15,

461:12, 461:16
**settled**
131:3
**setup**
276:6, 276:7
**seven**
293:1, 317:13,
431:5, 431:9,
431:10, 473:21
**several**
117:2, 190:4,
190:16, 191:18,
292:18, 294:4,
302:1, 302:2,
307:14, 315:7,
349:8, 366:19,
379:2, 403:3,
462:21, 466:3
**severally**
156:22, 438:5,
450:5, 450:8,
451:10, 452:8
**shall**
232:7, 240:9,
252:9, 449:2,
450:12, 459:5,
469:8
**share**
21:20, 57:10,
57:13, 57:14,
57:22, 58:7,
268:7
**shared**
256:9
**sharing**
205:1
**sheet**
62:12, 80:12,
80:14, 137:8,
140:2, 140:6,
140:22, 141:13,
141:19, 142:3,
143:3, 143:17,
143:20, 143:22,
144:3, 144:12,
144:14, 144:22,
266:14, 267:5,
407:1, 408:7,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

177

408:15, 409:20,
436:2, 475:7
**sheets**
44:16, 409:4,
409:14, 410:12,
410:15, 435:21
**shifts**
286:13, 286:14,
288:20
**shipping**
345:16
**shocking**
210:5
**shoes**
243:22
**shoreman**
4:9, 4:10,
11:6, 11:21,
12:8, 13:2,
13:3, 13:4,
13:8, 13:12,
13:18, 14:7,
21:11, 21:15,
21:20, 22:7,
89:11, 212:2,
390:6, 390:18,
390:20
**short**
62:2, 295:18,
308:6, 418:1,
473:7
**short-circuit**
102:6
**shorter**
111:7, 216:5,
289:4, 295:16
**shortly**
63:2, 63:15,
64:4, 287:17
**shot**
305:15
**should**
55:9, 141:7,
141:20, 142:6,
221:7, 225:15,
254:21, 322:5,
331:21, 331:22,
368:11, 398:17,

425:12, 454:11
**shouldn't**
314:19
**show**
25:18, 51:7,
87:2, 123:11,
136:2, 137:9,
137:15, 187:2,
188:18, 241:22,
301:2, 306:6,
307:4, 307:7,
315:7, 315:10,
315:15, 318:14,
340:12, 375:4,
397:1, 407:8,
423:2
**showed**
241:8, 355:3,
357:19, 380:12,
380:14, 380:15,
396:20, 397:3,
397:5, 399:12,
399:15, 399:17,
399:19, 400:2,
466:14, 468:14
**showing**
108:18, 171:16,
348:20, 355:17,
355:21, 355:22,
375:9, 399:8,
434:9
**shown**
365:11, 399:5
**shows**
200:19, 260:9,
352:10, 379:12
**shrewd**
458:19
**shut**
28:2, 28:6,
213:20
**sic**
136:7, 329:11
**sick**
108:14
**side**
55:22, 83:9,
278:4, 279:8

**sigh**
39:1
**sign**
25:13, 37:9,
78:2, 135:2,
196:21, 196:22,
198:16, 199:18,
308:16, 369:19,
461:2, 461:6
**signal**
220:4, 220:7,
220:8
**signals**
220:20
**signature**
72:6, 72:10,
138:10, 467:17,
468:21, 475:10
**signature-mig2k**
476:19
**signatures**
138:7
**signed**
69:15, 74:20,
75:11, 76:1,
77:13, 77:17,
77:21, 106:9,
122:11, 122:16,
122:17, 122:20,
122:21, 132:8,
134:21, 151:1,
189:13, 189:18,
198:3, 218:7,
279:11, 279:20,
308:14, 308:15,
317:5, 336:5,
459:17, 460:21,
461:10, 461:14,
465:14, 465:16,
475:7
**significance**
381:4, 384:20
**significant**
19:8, 97:4,
203:10, 211:12,
211:13, 211:14,
216:19, 224:17,
228:13, 228:22,

308:3, 379:9,
379:11, 422:17,
422:19, 427:8
**significantly**
461:10
**signing**
123:7, 476:8
**signs**
39:10
**silly**
415:9
**similar**
420:5
**similarly**
134:16, 283:21
**simple**
104:16, 371:8,
431:22
**simpler**
100:22
**simply**
85:7, 85:17,
87:10, 88:6,
176:1, 210:10,
218:1
**since**
14:2, 29:21,
47:20, 48:7,
83:1, 97:22,
184:1, 185:10,
190:5, 200:12,
243:14, 253:7,
295:19, 337:1,
350:7, 372:6,
389:4, 405:12,
436:19, 445:6
**single**
16:19, 244:15,
286:8, 381:19
**sir**
135:11
**sit**
167:9, 264:3,
266:7, 317:14,
411:9, 412:3,
415:6, 417:15,
456:8
**sitting**
92:5, 187:8,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

178

339:2, 365:22,
402:7, 402:12,
403:6, 404:1,
405:21, 406:1,
406:21, 407:4,
407:15, 407:19,
407:20, 408:4,
408:11, 408:20,
411:19, 419:6,
432:18, 456:8
**situation**
44:21, 127:19,
330:3, 330:5,
334:1, 354:20,
354:22, 387:11,
412:18
**situations**
35:17
**six**
241:22, 290:2,
362:4, 366:15
**size**
94:14
**skipped**
11:15
**slightly**
59:22
**slim**
472:21
**slow**
38:19, 230:19,
230:20, 317:9,
439:17
**slower**
148:4
**small**
15:18, 169:10,
419:22, 420:1
**snapshot**
427:7
**sneaked**
400:20
**snippet**
88:1, 90:16
**snippets**
89:6
**society**
30:20

**sold**
306:4, 306:9
**sole**
455:6
**solidifies**
195:17
**solution**
209:15
**solvency**
413:12
**some**
12:4, 12:19,
20:1, 27:5,
30:18, 30:19,
31:1, 31:10,
33:17, 37:7,
83:9, 84:21,
97:16, 97:17,
100:20, 103:21,
104:3, 114:16,
114:17, 125:16,
130:11, 133:22,
135:8, 150:5,
161:16, 162:14,
169:18, 184:1,
185:6, 193:7,
210:17, 220:1,
220:19, 233:7,
262:4, 284:18,
287:7, 290:3,
298:3, 300:22,
306:14, 306:19,
322:7, 330:5,
340:9, 343:16,
372:15, 373:15,
374:9, 379:13,
421:13, 429:13,
442:14, 446:22
**somebody**
102:12, 245:20,
343:12, 353:17
**somehow**
316:16, 387:1,
387:16
**someone**
112:6, 125:9,
204:21, 204:22,
212:10, 282:18,

344:1, 351:5,
353:18
**someone's**
169:12
**something**
13:21, 21:2,
21:12, 36:7,
54:18, 58:1,
58:2, 59:4,
68:2, 78:10,
95:21, 116:19,
123:2, 125:10,
126:9, 129:7,
145:15, 152:3,
174:3, 180:19,
191:11, 194:18,
195:21, 202:3,
209:18, 241:19,
269:5, 269:8,
282:17, 282:18,
286:9, 293:18,
293:19, 313:17,
315:5, 315:13,
323:19, 324:16,
341:21, 344:11,
380:17, 381:20,
397:15, 401:20,
408:1, 433:6,
441:4, 445:4,
445:15, 448:17,
453:11
**sometime**
64:19
**sometimes**
24:11, 24:13,
25:15, 25:17,
25:20, 37:12,
60:10, 190:12,
190:21, 275:13,
300:13, 353:3,
373:21
**somewhere**
309:22
**soon**
326:18
**sorry**
19:21, 31:17,
52:3, 64:10,

75:16, 81:16,
132:2, 143:13,
148:5, 148:14,
149:11, 156:21,
157:16, 160:21,
164:18, 181:2,
181:4, 181:5,
182:12, 194:6,
201:6, 201:14,
203:9, 211:19,
225:11, 225:12,
230:21, 231:20,
234:5, 235:12,
237:1, 239:16,
239:17, 239:18,
244:18, 247:9,
258:2, 259:17,
264:16, 264:20,
272:16, 277:13,
278:17, 279:3,
290:12, 291:18,
295:7, 302:2,
310:5, 313:13,
316:22, 325:3,
330:17, 335:2,
339:12, 339:21,
340:14, 346:20,
354:21, 363:3,
378:4, 381:12,
381:18, 388:6,
391:19, 392:6,
410:1, 410:8,
421:13, 421:15,
421:21, 423:18,
430:15, 435:15,
437:18, 442:4,
442:17, 445:2,
450:22, 453:4,
461:5, 461:13,
470:18
**sort**
26:21, 28:7,
30:4, 30:13,
36:18, 42:4,
57:5, 122:6,
210:20, 220:14,
220:19, 268:10,
306:19, 323:11,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

179

386:7, 412:20,
442:14
**sound**
84:5, 84:6,
90:11, 90:14,
223:14
**sounds**
64:22, 120:16
**source**
53:20, 54:4,
59:16, 59:20,
60:1, 60:13,
214:1, 214:9
**south**
25:7
**space**
32:13, 36:3
**speak**
31:20, 59:4,
163:13, 331:5,
331:7
**speaking**
43:22, 59:3,
70:6, 164:8,
183:22, 311:6,
417:6
**speaks**
183:9
**special**
92:3, 412:18,
416:12, 448:7
**specific**
32:18, 59:5,
71:9, 71:10,
74:16, 76:5,
86:22, 99:20,
101:14, 167:14,
215:18, 252:16,
280:16, 285:3,
287:2, 301:4,
301:5, 301:6,
330:20, 375:17,
394:21, 405:13,
406:7, 406:8,
422:6, 432:15,
460:13, 460:15,
463:3
**specifically**
59:3, 59:4,

72:19, 75:7,
101:10, 109:19,
117:8, 119:13,
124:13, 139:2,
145:8, 153:9,
163:21, 167:19,
190:6, 193:1,
203:13, 221:2,
221:6, 249:15,
252:5, 254:14,
254:15, 263:9,
266:6, 281:3,
282:21, 282:22,
284:18, 288:9,
299:1, 312:15,
331:5, 344:14,
348:18, 352:18,
361:10, 362:18,
365:5, 398:11,
402:10, 407:13,
422:5, 445:13,
445:18, 445:20,
466:13
**specifics**
145:6
**specified**
233:15, 236:7,
258:22, 343:14
**specifies**
153:4, 253:8,
259:2
**specify**
275:7
**speculate**
89:4
**speculation**
69:8
**speech**
38:19
**spell**
25:9
**spelled**
25:14, 26:4,
26:5
**spelling**
25:21, 25:22,
26:7
**spent**
207:19, 329:8,

462:21, 466:1,
466:3
**spoke**
372:7
**spoken**
197:7
**st**
119:17, 119:18,
177:10, 177:13,
177:18, 356:19,
356:20, 358:5,
358:9, 358:13
**stability**
222:4, 223:8
**stack**
437:10
**stamp**
112:13, 112:19
**stamped**
112:18
**stand**
14:9, 14:10,
195:19, 304:18,
393:21, 394:2,
440:16, 464:8,
471:21
**stands**
275:17
**stapled**
400:5, 466:19
**start**
15:2, 24:13,
24:14, 30:8,
32:21, 106:14,
109:18, 140:1,
141:7, 141:21,
142:6, 173:16,
174:1, 174:2,
174:10, 174:13,
174:20, 175:2,
175:19, 175:22,
176:2, 178:7,
196:14, 314:5,
392:1, 392:2,
417:7, 442:4,
456:1, 458:4
**started**
15:11, 20:17,

30:16, 36:20,
38:15, 63:2,
63:21, 63:22,
64:5, 68:18,
94:19, 96:8,
96:9, 159:16,
190:8, 209:10,
232:16, 270:6,
270:7, 289:14,
295:20, 306:15,
306:16, 392:10,
450:16
**starting**
21:22, 29:21,
98:22, 141:18,
190:15, 383:16
**starts**
23:9, 98:15,
98:17, 193:20,
446:17
**startup**
276:1
**state**
10:16, 25:5,
296:19, 309:9
**stated**
80:10, 414:11,
414:14
**statement**
17:14, 57:18,
76:17, 81:4,
83:4, 83:18,
83:21, 85:10,
86:3, 86:14,
88:8, 88:13,
88:15, 88:16,
88:20, 89:9,
93:18, 94:1,
94:11, 117:4,
117:6, 119:3,
119:10, 124:18,
141:1, 142:4,
142:21, 146:5,
166:13, 176:1,
179:2, 212:3,
214:14, 243:16,
247:2, 248:7,
248:14, 248:19,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

180

**254:20, 264:22,**
**283:10, 286:22,**
**390:7, 407:1,**
**408:6, 408:14,**
**411:10, 411:12,**
**450:11, 451:2**
**statements**
**44:17, 76:21,**
**77:21, 82:7,**
**87:3, 107:2,**
**109:8, 109:20,**
**117:10, 121:20,**
**122:18, 122:22,**
**123:21, 128:20,**
**135:22, 137:6,**
**368:9, 369:12,**
**409:4, 409:15,**
**410:12, 410:15,**
**411:4, 411:7,**
**411:9, 412:9,**
**412:11, 412:14,**
**414:7, 415:1,**
**415:22, 421:5**
**states**
**1:1, 10:5,**
**33:18, 68:9,**
**154:10, 174:18,**
**174:20, 233:16,**
**233:18, 233:21,**
**240:8, 240:13,**
**254:14, 336:17,**
**365:5**
**stating**
**174:17**
**station**
**2:6, 3:6, 10:13**
**status**
**178:21**
**statute**
**445:5**
**stay**
**125:16**
**step**
**309:2, 324:18**
**steps**
**76:22, 77:18,**
**342:21**
**stick**
**318:9, 360:4**

**still**
**19:7, 19:15,**
**22:6, 128:11,**
**169:9, 201:10,**
**201:11, 211:4,**
**211:18, 223:18,**
**224:15, 224:18,**
**227:5, 227:7,**
**228:2, 238:15,**
**238:18, 242:15,**
**243:1, 244:13,**
**309:9, 317:21,**
**321:4, 329:3,**
**333:21, 334:4,**
**334:6, 334:8,**
**338:12, 340:7,**
**344:17, 346:14,**
**347:13, 352:3,**
**367:17, 369:1,**
**372:9, 373:5,**
**389:16, 391:20,**
**391:21, 402:8,**
**424:19, 437:7,**
**471:13, 471:14,**
**471:21, 472:1**
**stomach**
**108:16**
**stood**
**150:3, 150:7,**
**243:21, 281:8**
**stop**
**192:16, 198:14,**
**215:14, 302:17,**
**359:5, 369:4,**
**390:19, 393:17,**
**417:17, 432:4,**
**447:18, 455:11,**
**455:21, 457:19,**
**458:6, 458:13,**
**462:8**
**stopped**
**72:21, 152:10,**
**359:11, 360:10,**
**364:4, 364:7,**
**368:17, 456:11,**
**456:17**
**story**
**384:10**

**straight**
**330:6**
**strapped**
**220:3**
**strategic**
**36:8**
**stream**
**50:5, 50:9,**
**421:18**
**streamline**
**40:11**
**street**
**3:14**
**strike**
**81:19, 162:17,**
**449:10**
**structure**
**74:6, 222:6**
**struggling**
**38:20**
**stuff**
**12:13, 14:17,**
**213:2, 399:5,**
**437:12**
**sub**
**439:12**
**subheading**
**231:18**
**subject**
**18:22, 34:4,**
**73:3, 147:1,**
**182:16, 183:7,**
**222:18, 327:2,**
**336:10, 463:22**
**submission**
**147:19, 208:9**
**submit**
**145:18, 178:11**
**submitted**
**172:18, 178:10,**
**178:16**
**subparagraphs**
**439:9**
**subsequent**
**159:17, 188:21,**
**295:22, 321:7**
**substantiate**
**180:20, 365:19**

**substantiated**
**180:18**
**success**
**74:7, 76:10,**
**337:5**
**successful**
**200:8**
**successive**
**394:7**
**sue**
**455:13**
**sued**
**163:20**
**suffering**
**34:17**
**sufficient**
**197:18, 440:7,**
**443:4, 443:13**
**suggested**
**157:10**
**suggesting**
**228:21, 316:5,**
**334:11, 334:12**
**suggests**
**174:1, 234:22,**
**296:19**
**suit**
**297:8, 449:1,**
**450:10**
**suite**
**2:7, 3:7, 3:15,**
**4:12**
**sum**
**240:8, 440:11**
**summaries**
**210:8**
**summarizing**
**191:18, 295:7**
**summary**
**192:3, 202:8**
**summer**
**190:15**
**supervision**
**214:19, 225:20,**
**233:5**
**supervisor**
**227:12, 227:15**
**supervisors**
**226:5**

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

181

**supplement**
390:10, 390:22
**supplementing**
416:7
**support**
36:9, 55:16,
57:6, 57:7,
57:8, 80:20,
82:3, 83:17,
226:11
**supporting**
57:5
**supportive**
122:6
**suppose**
224:5
**supposed**
19:19, 56:8,
126:6, 221:14,
283:14, 288:22,
315:14, 337:18
**supreme**
427:5
**sureties**
69:2, 69:18,
205:5, 243:11
**surety's**
451:8
**surprise**
190:20
**surprised**
223:15, 223:22,
371:4, 413:10,
413:14, 424:20,
459:12
**surprising**
472:5
**surrender**
235:7, 236:15
**surrounding**
195:6
**surveillance**
90:3, 90:10
**suspend**
15:12, 349:19
**sussman**
9:4, 9:6, 9:8,
226:13, 290:9,

363:3, 364:10,
364:17, 364:21,
366:7, 366:11,
366:14, 368:4,
368:5, 369:10,
369:13, 371:11,
371:17, 372:5,
372:18, 373:1,
375:11, 375:14,
376:7, 427:17,
428:1, 428:2,
429:3, 472:22,
473:5, 473:12
**swear**
11:12
**swearing**
11:14
**switched**
48:11
**sworn**
23:3, 23:10,
450:12
**synopsis**
98:17, 99:14,
99:15
**system**
34:8, 34:9,
78:16, 78:18,
79:4, 80:7,
84:15, 86:18,
191:12, 216:14,
218:6, 218:8,
218:9, 218:10,
220:8, 220:9
**systems**
90:10, 222:5,
223:7

---

**T**

**table**
306:22, 386:2,
386:7
**tag**
302:11
**tail**
295:18
**take**
15:20, 15:22,

16:1, 22:9,
23:14, 24:22,
51:18, 62:2,
71:21, 94:12,
107:22, 108:20,
118:13, 148:13,
152:16, 160:1,
161:21, 167:6,
183:22, 194:2,
194:4, 197:9,
200:10, 202:22,
210:17, 211:4,
232:21, 233:7,
233:8, 242:17,
242:19, 244:4,
244:6, 247:12,
252:2, 277:14,
283:19, 283:22,
285:10, 287:13,
293:13, 305:18,
309:4, 309:7,
322:22, 323:8,
330:5, 331:15,
360:19, 419:5,
420:11, 440:1,
453:3, 465:18,
467:1
**taken**
62:7, 108:8,
118:18, 135:17,
148:18, 162:8,
173:17, 184:6,
191:15, 238:19,
247:18, 302:18,
334:2, 336:12,
360:22, 420:16,
476:4, 476:6
**takes**
193:7, 202:5,
208:22, 209:1,
209:9, 219:16,
246:2, 292:10,
296:9, 319:22
**taking**
10:12, 13:22,
87:20, 366:9,
410:6, 433:11
**tale**
254:19

**talk**
12:12, 148:9,
148:10, 153:8,
245:19, 291:2,
301:9, 305:20,
307:12, 307:17,
317:11, 317:13,
321:14, 457:10,
457:11, 469:4
**talked**
53:5, 59:16,
62:20, 63:17,
109:4, 137:3,
146:17, 162:13,
178:5, 216:18,
277:12, 277:16,
279:4, 286:20,
312:10, 323:16,
419:9, 420:21,
423:11
**talking**
12:12, 30:21,
31:21, 32:1,
32:14, 35:13,
41:12, 67:10,
109:3, 111:22,
114:18, 115:19,
135:4, 135:21,
139:9, 139:17,
153:16, 179:12,
184:11, 194:19,
211:18, 217:11,
217:13, 228:19,
240:1, 250:10,
257:16, 260:22,
261:12, 270:17,
271:13, 271:15,
272:11, 272:16,
272:18, 273:19,
273:22, 274:3,
277:8, 290:9,
293:20, 294:7,
297:20, 303:3,
306:15, 307:15,
310:7, 330:20,
331:1, 354:2,
373:15, 378:21,
379:1, 394:17,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                    182

398:22, 401:4,
409:22, 410:4,
410:10, 420:20,
421:1, 426:7,
449:20, 451:7,
456:8, 460:11,
467:22, 468:2,
470:16
**talks**
98:19, 239:19,
362:2
**tape**
183:13
**task**
298:4, 322:8
**tax**
41:9, 416:13,
416:15, 420:7,
421:9
**teach-out**
28:7, 28:8
**team**
44:3, 44:5,
49:15, 49:17,
49:18, 77:2,
165:8, 165:22,
166:3, 166:8,
209:11, 341:1,
343:15, 412:3
**teams**
166:7
**technical**
161:18
**technological**
93:1
**teens**
28:18
**tell**
38:8, 40:15,
42:6, 45:17,
63:5, 65:11,
68:18, 84:13,
89:2, 101:17,
103:9, 108:13,
113:4, 126:12,
145:16, 146:12,
168:16, 181:16,
183:3, 183:10,

185:3, 186:15,
186:21, 197:6,
208:10, 209:18,
212:6, 222:17,
241:19, 252:11,
269:4, 282:12,
282:18, 283:8,
292:20, 294:11,
313:10, 313:16,
315:5, 315:12,
338:8, 346:12,
346:13, 353:2,
354:20, 358:17,
378:11, 406:5,
408:1, 408:2,
411:10, 411:12,
411:19, 411:22,
412:15, 412:16,
412:17, 412:21,
412:22, 413:1,
415:7, 415:10,
418:11, 419:13,
420:3, 420:12,
421:17, 425:12,
431:6, 432:4,
437:1, 466:21
**telling**
113:3, 113:16,
123:5, 127:4,
152:14, 189:6,
189:7, 212:7,
242:1, 268:21,
338:9, 355:5,
385:19, 386:1,
431:11, 431:12,
456:5
**tells**
58:1, 369:11
**temperature**
15:18
**template**
258:18
**temporal**
367:5, 388:18
**ten**
209:1
**term**
79:12, 183:7,

275:22, 289:3,
294:7, 297:16,
419:12, 449:7,
451:1, 459:16
**terms**
13:5, 26:14,
150:11, 160:4,
160:7, 295:16,
334:9, 472:2
**testified**
21:6, 23:5,
83:12, 126:10,
265:16, 278:7,
283:6, 285:14,
289:21, 303:6,
351:9, 352:19,
433:22, 434:3,
451:9, 472:15
**testify**
20:17, 23:3,
124:5, 158:7,
189:11, 265:12,
266:3, 269:8,
329:22, 364:21,
385:5
**testifying**
127:3, 199:8,
265:19, 265:20,
409:12
**testimony**
16:13, 25:1,
25:3, 33:4,
38:21, 59:19,
81:13, 87:20,
89:6, 123:14,
147:13, 162:14,
207:2, 234:21,
237:11, 243:10,
266:12, 266:22,
280:8, 293:22,
298:7, 298:15,
343:3, 343:7,
359:20, 359:21,
360:5, 388:6,
388:8, 412:10,
412:13, 419:7,
446:12, 475:4,
475:6, 476:6

**tethering**
225:21
**text**
82:16, 126:20,
155:13, 191:21
**th**
10:9, 97:12,
110:13, 136:7,
142:18, 143:9,
143:16, 168:2,
168:6, 175:8,
175:9, 177:19,
178:2, 178:11,
178:17, 178:20,
179:4, 182:15,
182:21, 183:4,
184:11, 184:13,
186:7, 193:18,
292:21, 295:4,
297:2, 301:16,
302:3, 325:5,
326:10, 337:3,
339:8, 339:19,
340:6, 340:9,
340:19, 343:5,
343:8, 343:10,
344:17, 344:20,
347:6, 347:11,
347:18, 348:12,
349:4, 351:13,
352:14, 354:15,
356:1, 356:12,
356:14, 357:17,
358:1, 358:19,
364:5, 364:8,
369:14, 370:1,
371:1, 371:15,
371:21, 375:5,
375:10, 375:17,
377:8, 393:1,
394:4, 394:7,
399:20, 434:10,
434:17, 435:14,
435:19, 436:6,
472:7, 472:9,
472:12, 472:13,
473:1, 473:17,
476:14

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                       183

**thank**
18:21, 23:8,
23:20, 93:12,
95:2, 97:9,
103:20, 135:10,
174:17, 252:22,
259:19, 321:18,
321:20, 325:9,
326:7, 326:8,
329:6, 333:17,
339:16, 361:19,
392:8, 403:15,
421:15, 454:22,
455:2, 474:1,
474:2
**thanks**
173:15, 175:1,
175:22
**them's**
428:17
**themselves**
10:16
**theory**
384:1
**thereafter**
63:16, 476:7
**thereby**
288:14
**therefore**
222:17, 301:8,
370:7, 373:13
**thereof**
460:4
**they'd**
36:10, 263:21
**thing**
31:1, 40:16,
53:18, 70:7,
70:8, 103:13,
125:12, 135:6,
210:21, 220:1,
221:20, 232:18,
232:22, 246:4,
276:14, 285:3,
312:9, 319:14,
396:3, 410:19,
423:6, 453:9,
455:1

**things**
30:5, 31:3,
76:5, 122:5,
123:6, 139:12,
151:3, 200:8,
200:15, 223:3,
228:19, 251:2,
275:16, 285:7,
307:14, 308:13,
330:11, 367:20,
393:13, 393:20,
394:1, 400:14,
416:9, 423:11,
468:15
**thinking**
240:17, 339:13
**thinks**
386:7, 446:17,
454:20
**third**
12:17, 142:5,
161:11, 230:5,
237:20, 356:6,
356:7, 401:18
**thornton**
404:13
**thought**
41:12, 71:4,
78:6, 139:13,
146:18, 186:3,
186:17, 187:5,
187:6, 202:9,
243:11, 286:15,
286:16, 286:18,
295:15, 344:19,
410:6, 457:6,
457:8, 457:11
**thousand**
130:22, 136:17,
138:15, 170:1,
170:12, 171:6,
171:9, 176:10,
180:4, 180:9,
415:7
**thousands**
164:10, 415:5
**threatened**
300:15

**threatening**
388:19, 393:2
**three**
21:22, 223:1,
223:4, 224:14,
225:17, 250:2,
287:3, 295:8,
325:15, 326:5,
327:2, 327:12,
335:8, 335:15,
336:7, 338:7,
344:18, 353:4,
358:20, 377:11,
388:17, 388:18,
396:4, 406:6,
428:12, 439:9,
439:12, 467:20,
468:7, 468:20
**three-year**
110:14, 111:18,
113:21, 114:8,
114:10, 115:21,
116:21, 117:15,
117:21, 124:17
**threshold**
273:10
**through**
16:16, 36:9,
42:5, 50:1,
50:10, 67:16,
70:15, 70:19,
85:8, 85:18,
87:11, 88:7,
89:5, 95:6,
98:7, 98:15,
99:10, 109:18,
119:17, 119:18,
120:2, 120:5,
123:10, 165:22,
181:9, 190:15,
193:17, 225:19,
244:16, 280:11,
288:12, 293:4,
318:20, 329:13,
335:4, 357:15,
358:14, 384:6,
388:8, 391:12,
392:9, 394:17,

**through** (continued)
412:4, 412:18,
437:9
**throughout**
196:6, 328:5,
394:12, 409:22,
410:5, 410:10,
413:6
**throw**
161:20
**thumb**
19:10, 202:16
**thursday**
345:16
**ticking**
277:15
**tied**
193:3
**tieder**
2:5, 3:5
**timely**
362:9
**times**
65:21, 69:15,
107:21, 226:8,
294:4, 324:22,
350:21, 379:2,
403:3, 428:4,
428:8, 428:14,
428:15, 432:21
**timing**
157:21, 374:14,
397:8
**tired**
417:14
**title**
42:9, 42:19,
43:18
**titled**
119:8, 363:14,
363:16
**today**
10:11, 11:11,
15:12, 15:14,
16:2, 22:16,
23:12, 23:18,
26:3, 78:1,
167:9, 187:8,
212:13, 278:7,

284:21, 305:13,
349:9, 378:10,
379:2, 380:13,
380:20, 380:22,
381:1, 384:22,
385:17, 386:12,
387:6, 387:14,
388:2, 389:1,
402:9, 402:10,
402:12, 403:6,
404:1, 405:21,
406:2, 406:21,
407:4, 407:15,
407:19, 407:20,
408:5, 408:12,
419:6, 432:18,
433:12, 437:16,
456:8

**today's**
10:9

**together**
13:19, 75:5,
106:14, 122:10,
128:16, 128:17,
133:1, 133:2,
133:4, 134:6,
135:4, 135:6,
147:4, 147:5,
377:9, 465:16,
465:17, 466:13,
466:17, 466:19,
466:22, 467:10

**told**
14:21, 22:4,
31:17, 35:6,
84:13, 88:4,
124:10, 146:19,
170:20, 182:5,
183:12, 185:22,
196:19, 199:17,
211:9, 212:4,
224:10, 241:6,
282:17, 284:4,
286:1, 301:18,
307:6, 309:16,
331:2, 339:3,
350:12, 351:5,
354:17, 380:11,

383:15, 396:19,
420:2, 427:17,
432:13, 432:16,
432:17, 454:5,
473:15

**tomorrow**
141:8, 141:21,
142:6, 145:18,
213:5

**took**
40:10, 152:8,
281:22, 282:2,
303:2, 342:21,
377:12, 377:13,
384:2, 384:4

**tools**
70:7

**top**
5:12, 5:18,
6:3, 6:6, 6:9,
6:12, 6:15,
7:14, 7:18, 8:3,
8:8, 8:11, 8:15,
9:5, 9:9, 44:12,
110:19, 114:15,
115:20, 116:10,
119:16, 129:10,
168:8, 171:18,
171:21, 172:8,
218:16, 248:11,
371:13, 404:18,
405:2, 405:19

**topic**
137:5, 179:5

**total**
120:18, 144:8,
194:8, 217:20,
217:21, 308:17,
434:18, 436:8

**totaling**
436:4, 436:14

**totally**
283:16

**totals**
406:18

**toward**
267:22

**towards**
264:13, 271:10,

272:9, 274:14

**town**
347:9, 347:20,
348:2, 348:8

**track**
67:18, 163:22,
174:5, 176:15,
176:17, 176:19,
221:2, 221:5,
221:11, 252:17,
422:9

**tracking**
37:5, 37:6,
38:1, 67:15,
93:7, 93:14,
214:20, 219:11,
219:13, 222:15,
307:20

**tracy**
295:9

**trade**
197:20, 200:6

**tragedy**
84:14

**trained**
268:22

**transaction**
261:22, 295:18

**transactions**
167:20

**transcript**
5:5, 17:13,
51:10, 71:16,
97:6, 110:12,
136:5, 137:14,
137:19, 168:15,
171:13, 185:15,
191:5, 215:4,
229:20, 262:9,
302:20, 325:20,
327:19, 333:16,
339:7, 340:16,
347:4, 348:11,
349:2, 355:16,
361:16, 372:3,
375:7, 434:8,
435:10, 476:5

**transcription**
475:5

**transfer**
169:17, 266:8,
299:7, 299:10,
299:12, 456:1

**transferred**
58:17, 58:18,
264:4, 433:6

**transferring**
298:11, 303:10

**transfers**
59:1, 59:6,
59:7

**transition**
295:13

**transitioning**
192:12

**translated**
216:5

**transmitted**
20:18, 137:22,
371:20, 415:6

**transparent**
156:9, 189:9

**transportation**
453:8

**transported**
453:22, 454:2,
454:3

**trapped**
30:3

**travel**
114:16, 120:15,
276:12

**treasury**
300:16, 300:21,
328:13, 328:21,
346:2, 350:5

**treated**
227:18

**trick**
412:20

**tried**
336:17, 336:18,
337:5

**trip**
97:16

**triple**
273:6

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

185

trips
348:9
troubled
125:5
true
50:3, 58:12,
63:14, 85:2,
86:2, 88:8,
88:13, 89:15,
89:19, 94:2,
94:11, 97:1,
129:22, 148:11,
155:10, 155:18,
155:20, 163:7,
164:22, 169:2,
169:4, 169:7,
169:8, 176:8,
182:1, 185:21,
185:22, 187:2,
189:20, 190:2,
191:16, 196:18,
197:13, 199:9,
199:21, 206:10,
213:8, 234:14,
246:7, 249:12,
249:14, 250:19,
264:11, 264:22,
267:16, 293:3,
293:11, 297:11,
311:9, 311:14,
311:17, 344:16,
350:16, 352:13,
352:17, 352:20,
353:8, 354:14,
359:9, 368:20,
379:22, 387:17,
399:7, 406:21,
407:2, 410:22,
415:2, 421:4,
421:8, 426:21,
427:4, 453:12,
457:15, 466:5,
475:4, 476:5
trump
290:5
trust
197:11
truth
23:4, 23:5,

283:9
truthful
85:10, 86:14,
146:4
truthfully
23:17
try
18:12, 24:17,
25:19, 99:10,
102:5, 149:1,
149:8, 174:4,
175:21, 176:15,
200:19, 255:19,
255:22, 348:17,
348:19, 412:4
trying
31:12, 32:3,
33:2, 33:10,
36:18, 53:7,
55:3, 60:9,
99:9, 99:19,
115:15, 127:1,
132:16, 147:7,
154:7, 154:21,
161:20, 166:14,
175:11, 175:13,
182:8, 182:11,
184:19, 188:13,
189:8, 200:8,
209:5, 224:7,
256:20, 256:22,
266:3, 271:14,
277:20, 282:22,
291:9, 324:16,
329:19, 337:8,
363:9, 366:12,
377:13, 378:7,
397:16, 410:21,
411:2, 418:12,
429:14, 430:16,
453:19
tucker
295:9
tuesday
263:22, 345:15
turn
15:17, 16:8,
327:20

turned
92:5
turning
16:12
turns
287:22
twice
237:3
two
28:16, 30:15,
31:3, 31:18,
71:6, 75:2,
105:7, 105:8,
107:21, 123:5,
137:16, 194:6,
228:19, 277:18,
281:1, 322:15,
326:4, 333:8,
347:9, 356:5,
356:13, 357:10,
396:4, 396:11,
396:15, 396:18,
397:20, 398:21,
399:19, 399:21,
400:2, 406:6,
466:19
tying
317:15, 344:4
type
12:19, 67:4
types
30:4, 251:2,
330:11
typewriting
476:7
typical
49:10
typically
46:13, 84:3,
84:4, 125:7,
167:21, 215:8,
264:5, 264:6,
264:9, 329:17
typographical
436:11

**U**

uh-huh
12:15, 28:22,

31:11, 46:14,
85:14, 172:3,
182:17, 220:22,
229:14, 232:6,
235:16, 239:8,
246:22, 253:14,
253:21, 257:11,
262:15, 269:14,
269:17, 271:20,
277:9, 280:19,
285:22, 318:22,
319:17, 320:5,
341:8, 342:2,
381:2, 391:10,
426:10, 437:22,
455:9
ultimately
36:11, 54:14,
54:15, 58:10,
70:20, 96:20,
122:11, 131:3,
151:3, 153:18,
166:12, 181:13,
227:11, 275:16,
353:1, 394:7,
430:9
unable
20:7, 275:15
unattainable
147:17
unaware
14:5
uncomfortable
58:7, 102:2
under
35:10, 38:13,
39:3, 52:18,
73:7, 76:22,
80:11, 101:18,
125:5, 127:8,
137:6, 167:1,
174:19, 183:10,
207:22, 229:5,
236:3, 236:5,
245:14, 272:19,
273:13, 277:10,
281:8, 301:7,
307:3, 337:19,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

186

349:17, 354:17, 359:4, 367:17, 382:2, 395:12, 396:16, 413:22, 414:11, 416:8, 418:18, 424:11, 437:19, 443:20, 445:6, 446:9, 446:13, 447:22, 448:20, 450:9, 463:5, 463:17, 471:3, 472:2, 476:7

**undercuts**
397:13

**underneath**
126:17

**understanding**
12:22, 27:9, 27:10, 29:20, 45:15, 68:10, 73:10, 104:5, 135:1, 141:11, 145:8, 148:2, 150:16, 151:17, 152:4, 154:15, 159:14, 160:19, 162:16, 193:21, 195:10, 195:17, 211:3, 227:4, 240:13, 240:21, 241:2, 242:5, 242:7, 279:18, 291:9, 299:15, 312:6, 338:1, 354:18, 360:11, 366:8, 366:9, 366:12, 367:5, 380:7, 380:8, 383:11, 385:10, 386:17, 387:1, 408:12, 411:3, 411:16, 415:20, 419:8, 419:12, 419:17, 420:22, 421:22, 422:4, 422:16, 424:11, 440:15, 441:9,

442:11

**understands**
87:19, 425:15

**understood**
15:4, 74:21, 106:16, 109:11, 121:6, 121:18, 122:13, 122:14, 133:8, 133:10, 134:2, 134:16, 142:12, 142:20, 147:4, 160:7, 166:16, 176:3, 181:20, 192:15, 195:16, 196:12, 208:19, 268:9, 289:1, 289:3, 335:20, 350:1, 350:10, 350:11, 353:19, 355:7, 355:10, 359:3, 359:4, 363:17, 368:5, 438:8, 438:15, 449:9, 449:11, 455:5, 455:10, 456:13, 458:20, 459:17, 460:17, 473:10

**undertake**
464:13

**underwrite**
295:15

**unfair**
34:7, 34:9, 87:8, 87:22, 89:4

**unfortunate**
242:4

**unfortunately**
52:22

**unit**
226:5, 227:12, 227:14, 227:22, 424:7, 433:1, 433:3, 433:7

**united**
1:1, 10:5, 68:9, 154:10,

240:8, 240:13

**units**
94:9

**universe**
217:21

**university**
27:15

**unless**
32:16, 89:1, 167:20, 240:8, 329:22, 368:19

**unlike**
42:18

**unnecessary**
395:15

**unreasonable**
373:16, 374:2

**unrestricted**
204:9, 204:12

**until**
15:7, 108:1, 152:10, 152:12, 157:19, 209:12, 212:11, 258:21, 264:6, 264:9, 299:10, 309:22, 345:16, 350:17, 351:12, 352:14, 354:15, 367:13, 368:18, 388:11, 447:3, 447:4, 447:5, 459:2, 459:4

**untruthful**
170:10

**unusual**
289:18, 373:20, 374:4

**unwillingness**
225:14, 226:2

**updated**
19:22

**uploaded**
249:9, 261:1

**urbanski**
12:12, 13:21, 15:1, 17:2, 199:11

**urbanski's**
209:11

**urgent**
363:22

**usa**
32:12

**use**
16:17, 26:14, 53:7, 58:8, 66:1, 68:1, 93:13, 94:3, 104:15, 108:4, 108:22, 174:14, 174:21, 218:10, 219:1, 219:2, 275:11, 419:12, 444:21, 448:6, 448:7

**useful**
215:2

**uses**
186:8

**using**
47:1, 79:9, 93:7, 96:9, 125:9, 247:3, 310:11

**V**

**va**
2:8, 3:8, 4:6

**vague**
61:6, 67:2, 67:7, 129:1, 129:3, 414:10

**value**
384:4

**van**
305:16

**varies**
215:17

**various**
137:10

**vast**
49:21, 53:7, 53:12, 84:15, 84:20, 84:22, 88:14, 246:7,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                          187

246:11, 261:18,
261:21, 262:1,
263:18
**vendor**
71:12, 209:16
**vendors**
71:11
**venture**
311:16
**verbal**
89:6, 159:14,
343:16
**verbally**
224:7
**verify**
69:10, 69:12,
164:4
**verifying**
276:3
**verona**
77:3, 78:12,
90:4, 90:8,
93:6, 355:22
**verse**
43:6, 43:14
**version**
151:9, 151:14,
294:13
**versus**
43:16, 228:20,
273:20, 359:17,
436:21
**via**
21:20, 105:18,
204:7, 383:2
**vice**
166:4, 224:11
**video**
1:12, 2:1,
10:10, 10:12,
90:8, 90:9,
90:11, 91:11,
108:18
**videographer**
4:17, 10:2,
10:11, 11:10,
62:5, 62:8,
108:6, 108:9,

118:16, 118:19,
131:6, 131:8,
135:15, 135:18,
148:16, 148:19,
162:6, 162:9,
183:15, 183:17,
184:4, 184:7,
247:16, 247:19,
302:21, 360:20,
361:1, 420:14,
420:17, 455:19,
474:11
**videos**
92:13, 92:19
**videotaped**
10:3
**violate**
240:10
**violated**
73:14
**virginia**
1:2, 1:13,
2:16, 10:7,
10:14, 11:4,
25:8, 38:5,
38:7, 77:3,
96:5, 96:14,
372:8, 476:22
**vis-à-vis**
33:18, 34:10,
251:17, 256:2
**visit**
78:12, 78:14,
93:10, 122:11
**visiting**
93:5
**visual**
149:2
**vivian**
3:3, 10:17,
15:9, 24:3,
24:5, 43:15,
51:1, 56:10,
70:7, 81:16,
85:13, 94:16,
97:20, 99:12,
108:13, 114:20,
127:1, 130:17,

134:22, 143:12,
145:12, 146:16,
149:15, 163:21,
178:4, 178:22,
196:17, 201:7,
209:18, 212:21,
223:1, 257:12,
266:4, 277:14,
289:19, 316:14,
317:2, 317:4,
317:6, 317:8,
322:2, 325:21,
350:20, 369:15,
380:11, 380:15,
380:17, 382:13,
383:8, 387:3,
387:5, 392:5,
395:22, 397:22,
400:12, 418:11,
421:13, 452:4,
457:10, 468:3
**voice**
447:11
**voice-identify**
10:15
**voluntarily**
233:4
**vp**
395:1

| W |
|---|

**wait**
108:1, 264:6,
264:9, 301:3,
390:6, 413:1,
417:11
**waited**
286:4
**waiting**
266:7
**waive**
80:1
**walk**
98:14, 99:9,
161:22, 330:8,
447:1
**walked**
169:12

**walking**
90:15
**walks**
246:1
**wall**
335:8
**walls**
219:22
**wanted**
15:3, 95:5,
121:14, 121:15,
142:21, 147:5,
152:15, 181:10,
202:8, 202:9,
222:7, 272:17,
284:6, 296:1,
314:17, 314:18,
317:22, 376:20,
393:15, 393:18,
395:7, 404:12,
423:6, 445:3,
463:4
**wanting**
392:11
**wants**
102:8, 178:9,
223:3, 245:19,
272:7, 369:11,
452:9
**warm**
16:9
**warrant**
243:2
**washington**
4:13
**waste**
84:17
**wasting**
399:17
**watch**
95:3, 107:17
**water**
135:8
**watt**
2:5, 3:5
**way**
15:16, 27:3,
30:16, 34:5,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

188

41:19, 42:3,
57:9, 57:19,
87:5, 100:1,
103:8, 126:12,
148:1, 157:20,
195:5, 197:18,
202:3, 205:1,
207:18, 208:22,
209:10, 210:19,
211:8, 211:9,
215:1, 218:3,
223:2, 234:8,
244:3, 244:10,
246:19, 258:21,
259:11, 260:21,
268:17, 269:13,
282:20, 288:17,
295:11, 309:2,
344:6, 365:18,
397:5, 424:8,
433:2, 433:19,
460:9, 472:13
**ways**
30:15
**we'll**
15:6, 20:15,
21:7, 21:10,
24:10, 24:17,
73:6, 123:10,
155:3, 159:20,
175:21, 176:2,
208:7, 260:1,
262:7, 278:1,
285:2, 286:1,
300:6, 301:9,
365:4, 393:17
**we're**
12:20, 12:21,
13:5, 13:10,
13:19, 13:22,
19:6, 19:15,
20:2, 26:9,
40:20, 51:8,
70:3, 93:10,
103:4, 114:18,
135:4, 139:16,
139:17, 152:19,
167:6, 169:9,

178:8, 180:20,
182:14, 195:12,
195:14, 195:19,
203:17, 204:2,
204:4, 207:1,
217:13, 222:19,
228:19, 244:6,
250:12, 261:20,
262:13, 270:2,
273:22, 274:4,
278:16, 278:22,
279:2, 280:20,
281:5, 282:1,
283:22, 285:20,
288:21, 295:1,
296:19, 300:5,
305:13, 307:17,
314:22, 322:13,
329:19, 330:4,
335:4, 345:18,
364:17, 366:11,
366:12, 368:18,
373:15, 377:3,
377:4, 382:15,
392:3, 392:12,
401:3, 417:17,
421:1, 422:9,
424:21, 431:5,
444:22, 447:11,
456:8, 469:4
**we've**
19:8, 19:14,
20:1, 20:22,
21:21, 30:21,
48:11, 67:11,
125:14, 128:16,
131:7, 159:19,
178:8, 179:14,
183:14, 201:8,
229:1, 234:13,
234:15, 234:16,
234:18, 244:14,
275:11, 279:11,
281:7, 286:12,
288:21, 298:5,
304:13, 330:7,
336:12, 338:6,
365:20, 374:19,

379:17, 389:22,
396:14, 404:14,
416:4, 416:14,
423:22, 428:4,
443:2, 459:19
**wear**
223:3, 225:16
**web**
14:15
**wednesday**
1:14
**week**
94:4, 114:16,
208:20, 282:14,
344:16, 347:21,
372:6, 377:11
**weekend**
373:16
**weekly**
20:18
**weeks**
191:19, 192:4,
224:3, 226:13,
347:9, 458:1
**weird**
261:4
**welcome**
17:7, 332:4
**went**
27:9, 70:21,
197:8, 270:6,
283:12, 309:22,
336:16, 377:9,
428:4, 428:5,
433:5, 451:22,
452:1, 461:14
**weren't**
36:6, 38:8,
123:4, 293:12,
300:7, 300:14,
308:4, 323:6,
323:21, 336:11,
350:16, 394:2,
412:15, 412:16,
429:1, 463:13
**western**
1:2, 10:6,
27:14

**whatever**
91:8, 158:10,
220:7, 267:15,
270:1, 271:4,
276:11, 403:16,
439:13, 441:7
**whatsoever**
84:19, 182:2,
244:4
**when's**
339:13, 380:8
**whenever**
439:4
**whereby**
155:8, 155:16
**whereof**
253:15, 476:13
**whereupon**
23:1
**wherever**
245:8
**whether**
45:19, 46:3,
81:18, 89:2,
89:9, 89:10,
93:3, 101:5,
106:8, 125:1,
126:13, 128:22,
146:18, 164:1,
184:21, 185:6,
193:4, 216:15,
266:14, 267:9,
268:11, 268:20,
303:6, 303:7,
342:13, 343:13,
352:5, 366:1,
374:21, 404:1,
405:4, 405:16,
405:22, 408:5,
408:13, 411:2,
411:3, 411:16,
414:22, 419:8,
420:22, 421:17,
422:1, 422:8,
424:13, 427:12,
442:3, 449:1,
449:13, 449:17,
449:22

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020                                    189

white
105:18
whole
23:4, 101:1,
120:12, 144:18,
211:7, 223:5,
232:18, 232:22,
234:1, 252:7,
296:2, 302:4,
319:14, 322:14,
357:16, 390:15,
467:9
widget
452:6
williams
4:18, 11:7,
11:16, 11:17,
11:19, 12:2,
12:4, 12:8,
12:11, 12:16,
13:10, 13:15,
13:17, 13:20,
14:15, 14:21,
15:5, 102:8,
102:11, 102:17,
102:20, 102:21,
103:1, 103:3,
103:7, 390:17,
390:19, 390:22,
398:15, 442:12,
442:15, 442:17,
469:1, 469:3,
469:5
willing
78:17, 78:19,
79:5, 80:8,
179:8, 181:11,
400:14, 454:21,
456:6
willingness
173:16, 174:2,
174:10, 175:2,
175:22, 192:21
windsong
25:8
wise
200:21
wish
150:22, 151:1,

244:11, 244:12
withheld
225:2
withholding
424:16
within
222:21, 404:3
without
141:13, 194:12,
213:8, 213:21,
288:17, 375:9,
377:9, 420:3,
421:20, 422:6,
425:1, 427:20,
451:6, 459:3
witness
11:13, 11:15,
15:15, 15:22,
16:6, 16:10,
18:20, 22:12,
55:13, 62:3,
73:7, 80:1,
81:12, 82:13,
82:22, 83:2,
87:2, 89:4,
89:7, 93:21,
101:4, 135:8,
135:10, 135:13,
148:3, 148:5,
148:7, 148:10,
160:3, 164:14,
168:18, 168:21,
183:21, 214:22,
231:7, 238:9,
253:11, 253:15,
262:10, 294:18,
333:14, 385:3,
398:17, 403:12,
417:16, 435:12,
437:7, 474:3,
476:13
witnesses
20:17, 21:5
woman
451:21
won
289:20
wonderful
44:3, 455:1

wondering
193:4
word
33:6, 34:8,
47:2, 53:7,
57:22, 58:6,
58:7, 58:8,
79:9, 111:11,
150:14, 241:9,
283:9, 315:16
words
60:8, 69:20,
94:11, 197:7,
222:7, 257:15,
260:22, 283:11,
366:19, 392:20,
453:16
wore
223:4
work
11:22, 24:5,
30:5, 30:6,
31:2, 31:10,
31:13, 32:12,
32:13, 33:16,
34:3, 39:3,
41:21, 43:9,
43:13, 43:15,
43:16, 56:3,
56:11, 56:12,
56:14, 56:17,
56:19, 57:5,
66:22, 67:3,
67:8, 67:10,
67:11, 68:19,
78:17, 78:19,
79:5, 80:8,
84:5, 95:5,
105:11, 115:2,
121:15, 128:17,
159:15, 166:7,
181:11, 192:12,
209:14, 219:21,
220:1, 244:13,
276:1, 322:10,
348:4, 383:20,
383:22, 404:10,
404:12, 425:16,

458:12, 471:5
worked
33:18, 41:9,
66:8, 66:9,
66:11, 66:13,
122:10, 123:3,
128:16, 157:21,
286:12, 306:20
working
13:19, 30:17,
34:5, 35:7,
65:8, 66:4,
66:7, 70:15,
72:18, 72:21,
75:5, 106:14,
119:11, 121:16,
152:10, 293:12,
337:5, 350:10,
377:8, 404:13
works
54:17, 248:3,
289:21, 295:14,
425:17, 425:21
worksheet
267:14, 269:1
worn
94:10
worries
164:18
worry
170:21, 181:13,
181:16
worst
224:22
worth
137:10, 148:22
wouldn't
15:22, 53:2,
53:3, 63:20,
78:9, 91:22,
111:22, 113:5,
153:7, 167:20,
199:20, 209:13,
261:2, 261:3,
284:5, 311:2,
311:4, 311:19,
316:8, 316:15,
339:1, 345:17,

353:16, 357:10, 378:2, 384:21, 385:17, 394:5, 398:19, 458:9, 470:4, 470:14, 473:18

**wrist**
221:9

**write**
139:3, 171:15, 173:13, 316:20, 334:13, 334:16, 345:3, 345:8, 345:18, 456:6, 456:10

**writes**
172:15, 328:10, 335:6, 371:18, 393:11

**writing**
20:22, 97:15, 158:20, 292:4, 392:17, 428:15, 428:17, 428:19, 429:17, 431:20, 432:12, 434:4, 444:22, 455:11, 455:21, 456:1, 458:4

**written**
112:5, 138:14, 159:1, 172:9, 236:8, 278:2, 279:6, 299:17, 348:21, 364:13, 429:3, 433:12

**wrong**
12:3, 12:16, 28:15, 28:20, 40:16, 65:12, 132:11, 132:13, 150:14, 259:19, 268:11, 283:17, 283:20, 283:21, 329:15, 329:16, 336:16, 363:5, 433:5, 451:22, 452:1

**wrote**
68:17, 77:7, 82:8, 82:9, 82:17, 82:18, 83:13, 85:21, 86:9, 86:10, 87:15, 113:11, 116:19, 146:9, 146:13, 300:4, 343:4, 343:7, 368:5

**Y**

**y'all**
13:20

**yeah**
14:7, 26:21, 30:11, 36:15, 37:11, 38:9, 53:21, 54:1, 57:4, 60:12, 60:15, 60:22, 61:18, 62:22, 64:2, 65:16, 67:14, 72:9, 86:5, 96:15, 98:7, 98:16, 101:22, 115:4, 116:12, 128:6, 130:16, 137:1, 138:3, 141:20, 143:7, 144:12, 144:18, 146:3, 149:7, 168:7, 172:6, 173:8, 173:22, 177:12, 178:14, 182:12, 230:12, 232:20, 235:2, 245:4, 246:17, 248:8, 255:12, 260:16, 274:4, 277:16, 277:20, 289:12, 289:17, 294:19, 298:4, 302:12, 303:21, 311:13, 313:22, 317:11, 325:9, 326:15,

327:5, 327:13, 328:17, 329:14, 331:20, 333:21, 334:7, 342:8, 347:17, 351:21, 362:11, 362:14, 363:8, 372:20, 376:11, 381:1, 389:12, 395:6, 398:17, 409:18, 409:20, 425:13, 426:3, 439:19, 442:12, 449:6, 449:8, 450:20, 458:2, 461:21, 464:10, 468:2, 471:12

**year**
27:16, 28:11, 28:16, 29:2, 36:21, 93:9, 130:9, 131:5, 137:8, 139:15, 143:17, 143:21, 151:20, 152:18, 153:17, 157:12, 157:20, 186:8, 189:5, 190:16, 198:13, 282:11, 318:13, 318:16, 376:19, 377:8, 407:1, 416:20, 471:20

**year-end**
107:1, 123:21, 140:22, 142:3

**years**
28:17, 36:21, 74:17, 84:17, 179:22, 223:1, 223:4, 224:14, 225:17, 250:2, 324:16, 406:6, 410:16

**yellow**
52:9

**yep**
24:9, 62:17,

172:20, 231:14, 347:2, 438:7, 443:9

**yesterday**
21:15, 27:1, 27:4

**young**
122:8

**$**

**$1,125**
262:14, 266:14

**$1.2**
376:22

**$1.25**
292:4, 292:22, 313:4, 392:16, 394:5, 473:16

**$10**
288:1, 288:16, 291:1, 291:4, 292:19, 297:7, 309:10, 309:12, 309:15, 313:7, 365:19, 365:20, 377:5, 382:4, 384:9, 394:8, 402:19

**$10,000**
94:14

**$10,881,761**
144:8

**$195,000**
120:15

**$2,000**
270:12, 272:2

**$20,000**
269:16, 270:20, 271:10, 271:22, 272:10

**$200,000**
206:21, 207:19

**$25**
296:6

**$25,000**
240:19

**$250,000**
131:3, 195:12

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

191

| | | | |
|---|---|---|---|
| **$420** | **0000330592** | **04** | 371:21, 375:17, |
| 259:6 | 6:5 | 118:17 | 377:8, 393:1, |
| **$471,269.71** | **0000330600** | **0479** | 394:7, 472:7, |
| 436:4 | 6:11 | 5:20 | 472:13, 473:1 |
| **$50,000** | **0000331290** | **0591** | **1000** |
| 163:3, 167:2, | 7:10 | 6:8 | 2:7, 3:7, 3:15, |
| 170:4, 179:13, | **0000331291** | **0593** | 4:12 |
| 180:17, 186:3, | 7:13 | 6:5 | **100051** |
| 186:16 | **0000331292** | **06** | 356:15 |
| **$500,000** | 7:7 | 101:3 | **10049** |
| 137:2, 139:12, | **0000334765** | **0603** | 356:12 |
| 285:21, 295:21 | 6:14 | 6:11 | **10050** |
| **$52,000** | **0000334770** | | 356:10 |
| 346:18 | 6:17 | **━━━ 1 ━━━** | **1042** |
| **$894,395.50** | **000033 4767** | **1** | 398:21 |
| 434:18, 436:14 | 171:18 | 94:22, 107:17, | **1049** |
| | **00066** | 108:1, 131:8, | 398:21 |
| **━━━ . ━━━** | 1:8, 10:8 | 131:9 | **1050** |
| **.0101** | **0048914** | **1,000** | 4:11 |
| 4:7 | 468:6 | 69:6, 266:15 | **11** |
| **.1000** | **0106983** | **1,125** | 5:13, 6:18, |
| 2:9, 3:9 | 5:8 | 266:21 | 9:11, 62:6, |
| **.1150** | **0224761** | **1.2** | 62:9, 97:12, |
| 3:17 | 7:20 | 296:7, 313:2 | 191:3, 191:4, |
| **.3188** | **0225584** | **1.25** | 191:7, 434:10, |
| 4:14 | 7:16 | 196:2, 286:6, | 434:17 |
| | **0227559** | 287:15, 287:19, | **110** |
| **━━━ 0 ━━━** | 6:20 | 288:8, 297:4, | 5:15 |
| **00** | **0242615** | 359:18, 388:13 | **1175** |
| 94:22, 107:17, | 9:11 | **1.8** | 3:14 |
| 108:1, 263:22 | **0265155** | 120:18 | **11971** |
| **0000000** | 7:4 | **10** | 4:5 |
| 120:19 | **0284027** | 1:15, 6:10, | **12** |
| **000000284** | 9:15 | 6:15, 10:10, | 6:21, 7:16, |
| 8:5 | **0285** | 22:1, 142:18, | 7:20, 62:9, |
| **000000287** | 8:5 | 143:9, 143:16, | 94:17, 94:21, |
| 8:7 | **0294** | 168:2, 168:6, | 100:3, 108:7, |
| **000000296** | 8:7 | 175:8, 175:9, | 127:13, 140:22, |
| 8:10 | **0297** | 185:14, 209:11, | 142:3, 162:7, |
| **000000310** | 8:10 | 263:22, 270:6, | 215:3, 270:5, |
| 8:13 | **0315177** | 270:7, 270:10, | 270:6, 274:9, |
| **000000318** | 5:17 | 271:6, 274:8, | 290:6, 301:18 |
| 8:17 | **0315201** | 293:2, 339:8, | **12,500** |
| **000019667** | 5:11 | 339:19, 340:6, | 334:6 |
| 8:20 | **0316** | 340:9, 340:19, | **13** |
| **0000330478** | 8:14 | 343:5, 343:8, | 6:22, 8:19, |
| 5:20 | **0327** | 343:10, 369:14, | 9:7, 100:4, |
| **0000330586** | 8:17 | 370:1, 371:1, | 108:10, 118:20, |
| 6:8 | | | |

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

192

127:13, 229:19,
246:20, 375:5,
375:10, 472:9,
472:12
**136**
5:18
**137**
6:3, 6:6
**14**
7:3, 9:14,
102:3, 104:13,
118:17, 118:20,
120:2, 120:7,
135:16, 135:19,
148:17, 148:20,
262:8, 435:14,
435:19, 436:6
**15**
7:5, 13:22,
140:22, 142:3,
143:21, 162:7,
162:10, 178:11,
184:5, 184:8,
186:7, 209:1,
209:9, 211:6,
302:19, 325:9,
325:18
**15,000**
240:19
**150**
40:20, 41:4,
41:11, 41:16
**16**
7:8, 247:17,
325:4, 325:18,
325:19
**168**
6:9
**17**
5:16, 7:11,
110:13, 193:10,
194:2, 194:14,
195:12, 247:20,
290:20, 291:12,
292:14, 296:13,
314:7, 320:7,
325:18, 325:19,
339:21, 344:17,

344:20, 347:6,
347:11, 347:18
**171**
6:12
**1765**
2:6, 3:6, 10:13
**18**
1:8, 7:14,
290:1, 290:6,
302:22, 327:18,
333:12, 333:14,
333:19, 421:2,
421:5, 421:9,
455:19, 455:20
**181**
208:11
**185**
6:15
**19**
7:18, 247:20,
289:9, 301:16,
302:3, 318:14,
325:5, 326:10,
333:15, 360:21,
361:2, 421:6,
421:9
**191**
6:18
**1996**
29:5
**1st**
71:17, 136:18,
136:19, 144:4,
173:17, 178:11,
292:5, 349:20

---
**2**
---
**2,000**
69:6, 271:7
**2,174**
75:9
**2,500**
223:11
**2/7/2016**
6:19
**20**
5:19, 8:3,
62:6, 65:21,

136:7, 211:6,
339:6, 344:20,
348:12, 420:15,
420:18, 429:19
**20,000**
269:18, 270:14,
271:3
**20,043.89**
356:16
**2000**
28:13, 28:18,
29:17, 29:22,
319:3
**20036**
4:13
**2006**
169:9, 385:16
**2010**
37:2
**2013**
29:17, 120:2,
120:7, 120:11
**2014**
29:17, 29:18,
33:4, 37:4,
62:16
**2015**
5:14, 5:16,
64:19, 70:12,
71:18, 79:7,
81:5, 93:11,
97:13, 110:13,
115:3, 119:16,
119:17, 120:2,
120:4, 120:5,
123:18, 131:11,
143:9, 143:17
**2016**
5:20, 6:5, 6:8,
6:11, 6:14,
6:17, 7:16,
7:20, 142:18,
143:16, 144:4,
168:6, 183:1,
184:11, 184:13,
185:17, 185:18,
187:15, 190:7,
190:15, 191:17,

192:11, 192:16,
247:5, 289:2,
289:14, 324:12,
326:10, 326:17,
334:16, 338:11,
339:19, 369:3,
383:11, 386:22,
387:16, 388:3,
457:17
**2017**
8:19, 9:3, 9:7,
193:18, 215:15,
215:16, 223:16,
247:5, 247:6,
258:21, 318:20,
319:4, 339:8,
340:6, 343:5,
344:20, 344:21,
346:17, 349:4,
352:15, 354:15,
356:1, 360:8,
360:13, 361:5,
361:21, 364:5,
364:8, 374:22,
375:5, 375:11,
381:4, 382:2,
394:4, 404:17,
404:21, 405:6,
405:17, 407:1,
407:11, 407:17,
408:6, 410:16,
416:13, 416:14,
421:2, 421:5,
421:9, 457:19,
473:18
**2018**
51:15, 408:11,
408:21, 410:16,
411:17, 412:10,
420:4, 420:5,
420:8, 421:18
**2019**
9:11, 9:14,
325:3, 419:10,
419:19, 421:2,
421:18, 422:9,
422:17, 434:10,
434:17, 435:14,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

193

435:19, 436:6
**202.772**
4:14
**2020**
1:14, 10:9,
223:17, 422:11,
476:15, 476:16
**21**
8:6, 340:15,
360:21, 474:12
**215**
6:21
**22**
7:16, 8:8,
162:10, 347:3
**22039**
25:8
**22102**
2:8, 3:8
**225585**
328:10
**229**
6:22
**23**
5:3, 8:11,
177:6, 246:20,
302:22, 348:10
**233**
183:15, 183:17
**24**
8:15, 94:3,
94:10, 349:1
**24022**
4:6
**25**
8:18, 313:21,
314:2, 315:18,
315:20, 316:2,
316:7, 316:15,
319:7, 319:11,
355:15, 355:18,
399:3
**250**
137:3, 193:16,
285:9, 316:1
**250,000**
130:8, 131:4,
151:19, 152:21,

189:22
**26**
1:14, 9:3,
10:9, 361:15,
361:17
**2618**
9:12
**262**
7:3, 249:18
**264**
258:14
**269**
246:21, 248:6,
248:8
**27**
9:5, 372:2,
476:14
**274**
251:6, 252:19
**278**
253:10
**28**
6:13, 9:7,
177:19, 178:2,
178:17, 178:20,
179:4, 182:15,
182:21, 183:4,
184:11, 184:13,
193:10, 193:18,
194:2, 194:14,
195:12, 285:16,
287:14, 290:20,
291:12, 292:14,
292:21, 295:4,
296:13, 297:2,
299:3, 314:7,
320:7, 320:16,
320:18, 364:5,
364:8, 371:15,
375:6, 388:11,
394:4, 473:17
**288370**
1:19
**29**
7:20, 9:9,
337:3, 434:7,
435:12
**290**
326:5

**291**
326:6
**292**
326:5
**294**
436:7
**2a**
443:8
**2b**
448:21, 450:9

**3**

**3**
373:12
**3,000**
69:6
**3,700,941.93**
436:9
**30**
9:13, 51:14,
91:7, 91:10,
91:20, 92:20,
94:17, 135:16,
349:4, 351:13,
352:14, 354:15,
356:1, 356:12,
356:14, 357:17,
358:1, 358:19,
385:2, 399:2,
399:20, 435:9,
476:16
**302**
7:5
**30361**
3:16
**31**
119:17, 119:18,
120:5, 140:22,
142:3, 177:10,
177:13, 177:18,
178:10, 326:5,
356:19, 356:20,
358:5, 358:9,
358:13
**325**
7:8, 7:11
**327**
7:14

**33**
1:15, 10:10
**330013**
99:4
**330587**
437:14
**333**
7:18
**334767**
172:8
**339**
8:3
**340**
8:6
**347**
8:8
**348**
8:11, 334:2
**349**
8:15
**35**
373:12
**352**
156:3, 156:5,
157:1, 255:2,
450:7
**355**
8:18
**361**
9:3
**372**
9:5
**375**
9:7
**38**
420:15
**3b**
455:4
**3c**
459:1
**3d**
459:22
**3f**
469:7
**3rd**
172:14, 172:21,
173:2, 174:19,
360:8, 361:5,

Transcript of Micheal Paul Donovan
Conducted on February 26, 2020

194

361:21, 363:13,
368:8, 371:12,
373:2, 373:3,
373:8, 373:13,
373:17, 373:19,
375:15, 376:9,
377:6, 392:22,
394:6, 472:7,
472:13, 473:1

**4**

**40**
94:21, 131:8,
131:9, 135:19
**404.239**
3:17
**420**
276:20, 283:14
**43**
22:1, 184:5
**434**
9:9
**435**
9:13
**44**
474:12
**47**
25:7, 361:2
**4762**
7:21
**4768**
6:14
**4th**
335:14

**5**

**5/1/2015**
5:10
**50**
47:10, 217:11,
217:14
**50,000**
166:13, 186:6,
186:7, 187:10
**500,000**
84:21, 129:18,
129:21, 130:3,
130:21, 138:14,

138:22, 151:16,
152:15, 318:18
**51**
5:8
**5178**
5:17
**518**
10:7
**5202**
5:11
**540.345**
4:7
**55**
108:7, 108:10,
148:17, 436:3
**5590**
7:17
**56**
420:18
**57**
184:8
**58**
247:17
**59**
148:20
**5:-cv--mfu**
1:8
**5th**
340:3, 343:20,
344:5, 351:7,
353:12, 353:15,
355:4, 355:12

**6**

**6th**
371:17, 372:5,
372:18, 373:4,
373:6, 373:12,
373:13, 375:16,
376:10, 377:7,
393:1, 394:6,
472:13, 473:1

**7**

**703.749**
2:9, 3:9
**71**
5:9

**75**
434:17, 436:13
**790**
353:3
**7th**
173:13, 174:9,
174:20, 192:11,
192:16, 289:2,
289:14, 292:3,
292:20, 298:7,
300:7, 303:3,
303:7, 311:10,
311:15, 321:21,
322:13, 378:11,
379:4, 380:7,
380:12, 382:7,
382:20, 383:7,
383:11, 385:15,
386:22, 387:16,
388:3, 402:16,
457:20

**8**

**80**
273:14
**8th**
177:22

**9**

**9340**
245:17
**9673**
8:20
**97**
5:12
**99.7**
76:12
**9th**
137:17, 137:22,
141:2, 185:16,
185:17, 187:15,
190:7