

**CONTAINS CONFIDENTIAL PORTIONS**

# Transcript of Micheal Paul Donovan, Corporate Designee

**Date:** March 3, 2020
**Case:** RLI Insurance Company -v- Nexus Services, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**1**

```
1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE WESTERN DISTRICT OF VIRGINIA
3           Harrisonburg Division
4    ----------------------------x
5    RLI INSURANCE COMPANY,      :
6              Plaintiff, :
7      v.              : Case No.:
8    NEXUS SERVICES, INC., et al.,: 5:18-cv-00066-MFU
9              Defendants.:
10   ----------------------------x
11
12       Video deposition of NEXUS SERVICES, INC.
13       By and through its Corporate Designee
14           MICHEAL PAUL DONOVAN,
15       CONTAINS CONFIDENTIAL PORTIONS
16           McLean, Virginia
17          Tuesday, March 3, 2020
18             11:29 a.m.
19
20   Job No.: 290403
21   Pages: 1 - 446
22   Reported by: Judith E. Bellinger, RPR, CRR
```

**2**

```
1       Video deposition of MICHEAL PAUL DONOVAN held
2    at the offices of:
3
4
5           WATT, TIEDER, HOFFAR & FITZGERALD, LLP
6           1765 Greensboro Station Place
7           Suite 1000
8           McLean, VA 22102
9           703.749.1000
10
11
12
13       Pursuant to notice, before Judith E.
14   Bellinger, Registered Professional Reporter,
15   Certified Realtime Reporter, and Notary Public in
16   and for the Commonwealth of Virginia.
17
18
19
20
21
22
```

**3**

```
1           A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3       VIVIAN KATSANTONIS, ESQUIRE
4       CHRISTOPHER HARRIS, ESQUIRE
5       WATT, TIEDER, HOFFAR & FITZGERALD, LLP
6       1765 Greensboro Station Place
7       Suite 1000
8       McLean, VA 22102
9       703.749.1000
10
11   ON BEHALF OF THE DEFENDANTS:
12       MARY DONNE PETERS, ESQUIRE (Telephonic)
13       GORBY PETERS & ASSOCIATES, LLC
14       1175 Peachtree Street
15       Suite 1000
16       Atlanta, GA 30361
17       404.239.1150
18
19
20
21
22
```

**4**

```
1       A P P E A R A N C E S   C O N T I N U E D
2
3           CHRIS K. KOWALCZUK, ESQUIRE
4           ATTORNEY AT LAW
5           P.O. Box 11971
6           Roanoke, VA 24022
7           540.345.0101
8
9           JOHN M. SHOREMAN, ESQUIRE
10          MCFADDEN & SHOREMAN
11          1050 Connecticut Avenue, NW
12          Suite 1000
13          Washington, D.C. 20036
14          202.772.3188
15
16   ALSO PRESENT:
17       Jeremy Dineen, Videographer
18       Mario Williams
19       Spencer Chaszar
20
21
22
```

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

2 (5 to 8)

Page 5

```
            C O N T E N T S
EXAMINATION OF DONOVAN                    PAGE
  By Ms. Katsantonis                        11
  By Mr. Shoreman                          431
  By Ms. Katsantonis                       433

              E X H I B I T S
        (Attached to the transcript)

Donovan Deposition Exhibits:             PAGE
Exhibit 1   Notice of 30(B)(6) Deposition of   11
            Nexus Services, Inc.
Exhibit 2   Summary of Nexus' Contempt by      67
            Delayed Payments of Past Due Invoices
Exhibit 3   Summary of Nexus' Contempt by      85
            Failure to Pay Past Due Invoices
Exhibit 4   Summary of Monthly RLI Bond Demands 88
            & Nexus Responses
Exhibit 5   Email chain.  Top email from Laura  131
            Piispanen to eschneider@nexushelps.com
            dated 10 May 2016, Bates Nos.
            RLY_000000001 -0002
```

Page 6

```
      E X H I B I T S   C O N T I N U E D

Exhibit 6   Email chain.  Top email from Laura  138
            Piispanen to Bonnie Heitman dated June
            23, 2016, Bates Nos. RLI_000018727 -
            8739
Exhibit 7   Email from Laura Piispanen to       156
            bigmarcobonds@gmail.com, and others,
            dated January 21, 2020
Exhibit 8   Email from Laura Piispanen to       158
            bigmarcobonds@gmail.com, and others,
            dated November 13,2019
Exhibit 9   Email from Barb Roberts to          163
            bigmarcobonds@gmail.com dated April 2,
            2018
Exhibit 10  Email chain.  Top email from Laura  216
            Piispanen to
            eschneider@nexushelps.com, and others,
            dated 19 Sep 2016, Bates Nos.
            RLI_000000080 - 0084
Exhibit 11  Exhibit 6                           256
```

Page 7

```
      E X H I B I T S   C O N T I N U E D

Exhibit 12  Nexus Services Inc. Profit and Loss  286
            January - December 2017
Exhibit 13  Nexus Services Inc. (Old) Profit     294
            and Loss January - December 2019,
            Bates No. Eckert_Nexus_027807
Exhibit 14  Nexus Services Inc. (Old) Profit     297
            and Loss January - December 2018,
            Bates No. Eckert_Nexus_027806
Exhibit 15  Email chain.  Top email from Chris   315
            Harris to Stefanie Castalano dated
            March 3, 2020
Exhibit 16  Email chain.  Top email from Ira     322
            Sussman to Juliana Gutierrez dated 28
            Mar 2018
Exhibit 17  Letter dated March 3, 2017, to       339
            Micheal Donovan from Ira Sussman
Exhibit 18  Email from Ira Sussman to            341
            mdonovan@nexushelps.com dated
            3/6/2017, Bates No. NEXUS0222756
```

Page 8

```
      E X H I B I T S   C O N T I N U E D

Exhibit 19  Letter dated March 13, 2017, to      343
            Micheal Donovan from Ira Sussman
Exhibit 20  Email from Mike Donovan to Ira       348
            Sussman, and others, dated 3/15/2017,
            Bates Nos. NEXUS0221609 - 1646
Exhibit 21  Email chain.  Top email from Dave    372
            Sandoz to Mike Donovan dated
            11/9/2016, Bates No. NEXUS0236333
Exhibit 22  Email chain.  Top email from Mike    401
            Donovan to Dave Sandoz dated
            3/22/2018, Bates Nos. NEXUS0253294 -
            3300
Exhibit 23  Letter dated June 1, 2017, to Mary   414
            Donne Peters from Vivian Katsantonis
Exhibit 24  Letter dated March 19, 2018, to      425
            Mary Donne Peters from Vivian
            Katsantonis
Exhibit 25  Email from Mary Donne Peters to      427
            Vivian Katsantonis dated March 28,
            2018
```

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

9

1           P R O C E E D I N G S
2           THE VIDEOGRAPHER:  Here begins
3  Disc No. 1 in the 30(b)(6) deposition of Nexus
4  Services, Inc., Libre by Nexus, Inc. and Homes by
5  Nexus, Inc. by corporate designee Michael Donovan
6  in the matter of RLI Insurance Company v. Nexus
7  Services, Inc., et al., in the United States
8  District Court for the Western District of
9  Virginia, Harrisonburg Division, Case
10 No. 518-CC-00066MFU.
11          Today's date is March 3rd, 2020, the
12 time on the video monitor is 11:29.
13          The videographer today is Jeremy Dineen
14 representing Planet Depos.  This video deposition
15 is taking place at 1765 Greensboro Station Place
16 in McLean, Virginia.  Would counsel please voice
17 identify themselves and state whom they represent.
18          MS. KATSANTONIS:  Vivian Katsantonis on
19 behalf of the Plaintiff RLI Insurance Company.
20          MR. HARRIS:  Christopher Harris, also
21 on behalf of the Plaintiff.
22          MR. SHOREMAN:  John Shoreman on behalf

10

1  of Defendants Nexus Services, Libre by Nexus, and
2  Homes by Nexus.
3          MR. WILLIAMS:  Mario Williams on behalf
4  of the Defendant.
5          MR. KOWALCZUK:  Chris Kowalczuk on
6  behalf of the Defendants and present with me is a
7  college intern, Spencer Chaszar.
8          MS. KATSANTONIS:  On the phone we have
9  Mary Donne for the Defendants.
10         MS. DONNE-PETERS:  Mary Donne-Peters on
11 behalf of the Defendants.
12         THE VIDEOGRAPHER:  The court reporter
13 today is Judy Bellinger representing Planet Depos.
14 Would the reporter please swear in the witness.
15 Whereupon,
16         MICHEAL PAUL DONOVAN,
17 being first duly sworn or affirmed to testify to
18 the truth, the whole truth, and nothing but the
19 truth, was examined and testified as follows:
20
21
22

11

1  DIRECT EXAMINATION BY COUNSEL FOR THE PLAINTIFF
2  BY MS. KATSANTONIS:
3     Q    All right.  Good morning, Mr. Donovan.
4     A    **Good morning, Ms. Katsantonis.  How are**
5  **you?**
6     Q    Good, thank you.
7          We're here this morning for the
8  30(b)(6) deposition of Nexus Services, Inc., Libre
9  by Nexus, and Homes by Nexus.
10    A    **Yes, and I get to be the deponent.  How**
11 **exciting.**
12    Q    All right.  So I'm going to just hand
13 you and we're going to mark this as Exhibit 1.
14         (Donovan Exhibit 1 marked for
15 identification and attached to the transcript.)
16         MR. SHOREMAN:  Thank you.
17         MS. KATSANTONIS:  Sure.
18         MR. SHOREMAN:  Just throw it at me,
19 that's fine.
20    Q    I've marked as Exhibit 1 the 30(b)(6)
21 notice.  This is the one for Nexus Services.
22    A    **Uh-huh.**

12

1     Q    And are you familiar with this
2  document?  Have you reviewed it?
3     A    **I have reviewed it.**
4     Q    Okay.  And there are 25 categories
5  listed as topics to be discussed during the
6  30(b)(6) deposition.  Are you familiar with those
7  topics?
8     A    **I am.**
9     Q    And are you the corporate
10 representative that is providing testimony on
11 behalf of Nexus Services, Inc., Libre by Nexus and
12 Homes by Nexus pursuant to the 30(b)(6) deposition
13 notices?
14    A    **I am.**
15    Q    Okay.  And did you bring documents with
16 you today to assist in your testimony?
17    A    **I did in fact.**
18    Q    Okay.  And those documents have not yet
19 been actually given to counsel for RLI, but we'll
20 proceed and then you can show me the documents
21 you're relying on as we proceed?
22    A    **Sure, and my intention is to leave them**

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

4 (13 to 16)

---

13

1 with you by the way, so I intend to make a
2 production of everything I brought.
3     Q   Okay.
4     MR. SHOREMAN:  Let me just state for
5 the record, some of the documents that he just
6 referred to have already been produced.
7     A   That's correct.
8     Q   Sure.  Generally.  Can you just
9 generally describe the types of documents you've
10 brought with you?
11     A   Sure.  I have the P&L and property list
12 for Homes by Nexus, which covers the properties to
13 kind of go in order.  I have prior P&Ls for the
14 different periods that the categories request
15 information on.  I have general ledger
16 information, I have a disk with that information
17 that I'll provide as well.
18         I have a KPI for Libre by Nexus.  I
19 have the global client list to show the total
20 amount of indemnification that Nexus has been
21 responsible for in the life of its program.  I
22 have the total invoices paid and the total global

---

14

1 fail rate.  I have the fail rate for RLI, reviewed
2 those and reviewed several other documents related
3 to the balance sheets as well.
4     Q   Okay.  Great.
5     A   It was a lot to remember.
6     Q   I can appreciate that fact.  Thank you.
7         So in looking at the 30(b)(6) notice.
8     A   Yes, ma'am.
9     Q   And some of the topics I know there's
10 going to be a little bit of overlap.  But let's
11 talk about, first, the program.
12     A   Okay.
13     Q   And let's start off just getting some
14 sort of historical data information regarding
15 Nexus' program.
16         So you said you brought data with you
17 as to how many program participants Nexus has had.
18 Is that through the entire life of the program?
19     A   Through the entire life of the program.
20     Q   And so what dates would that cover?
21     A   That would cover from January of 2014
22 to present.

---

15

1     Q   And what is the number of program
2 participants?
3     A   So the number of program
4 participants -- would you give me just a second,
5 I'm so sorry.
6     Q   No, no, no.  Just as a clarification.
7 When we use the word "program participants," let's
8 make sure we're talking about are these all
9 immigrants who Nexus has facilitated an
10 immigration bond for their release from custody?
11     A   That's correct.  The program
12 participant would specifically be an immigration
13 bond securitized client.  They're people in
14 Capsule, of course, that you might see that are
15 dealing with other issues but you're not going to
16 find any of those people.  This definition is just
17 for the immigration bond securitization.  And it's
18 roughly about 24,000 people.  The total is 23,000
19 and some change and I've got that on this document
20 that I'm going to give to you.  I'm going to
21 produce it electronically because it's thousands
22 of pages.

---

16

1     Q   Okay.  All right.  So you said that the
2 total number of program participants or immigrants
3 for whom you've requested a bond for is?
4     A   About 24,000.  I can give you the exact
5 number, but, Vivian, you're never going to believe
6 this, the last page of this is missing so I need
7 to pull up the electronic copy which I can at a
8 break and give you the total number.  I thought I
9 was doing so well, too.
10     Q   About 24,000?
11     A   Correct.
12     Q   And how many outstanding program
13 participants exist today whom Nexus has requested
14 a bond for?
15     A   So Nexus doesn't, we don't track the —
16 we don't track when the client is exonerated as
17 sort of coming off the program, when a client's
18 bond is canceled because we're often still
19 providing services to the client.  So the number
20 of active clients, meaning active that they
21 haven't had their bonds canceled just isn't
22 something that we track.  I'm happy to compile it,

---

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

5 (17 to 20)

17

1  but it isn't something that we track as a matter
2  of our record keeping.
3      Q   Okay.  So you don't -- so as you sit
4  here today, you don't know how many active clients
5  or program participants exist who Nexus' requested
6  a bond for?
7      A   Correct.
8      Q   Okay.  So what information do you
9  have -- or what did you collect?  How many bond --
10 participants have -- so you don't know how many
11 have been canceled; is that right?
12     A   That's correct.  And the idea, and I
13 think there's some confusion, there's no benefit
14 in calculating a fail rate by understanding how
15 many bonds have been canceled because bonds can be
16 canceled over the life of the bond and as we know,
17 a claim is when a bond is breached and there's
18 no -- you can't appeal it, it's done.  That's when
19 a claim is made in favor of the government, right?
20     Q   That's Nexus' definition.  I just want
21 to understand what your definition is.
22     A   Yes, and the CFR.

18

1      Q   Well, again --
2          MR. SHOREMAN:  Objection.  He's
3  testifying on behalf of the corporation.
4          MS. KATSANTONIS:  Right.  What Nexus'
5  definition is because it's certainly a legal
6  conclusion.
7          But you're saying that a --
8      A   I'm saying that the number of
9  cancellations has nothing to do with our success
10 or fail rate.
11     Q   Okay.  Don't you believe that the
12 cancellation is an important figure for sureties?
13     A   I think the cancellation was an
14 important figure of sureties before the election
15 of Donald John Trump as president but
16 unfortunately the current administration has
17 exacerbated the immigration court process.  These
18 things take much longer now and there's no way to
19 forecast some of those realities.
20     Q   I'm not asking for forecasting, I'm
21 just saying when a bond is canceled, the surety is
22 no longer -- has exposure for payment of that

19

1  bond, right?
2      A   I mean until there's a claim against
3  the bond you don't have to pay the bond, period,
4  right, so...
5      Q   Just stick with my question.  When a
6  bond is canceled, when an I391 form is issued, the
7  surety is no longer responsible for paying that
8  bond and, therefore, doesn't have any more
9  outstanding exposure on the bond; isn't that
10 correct?
11     A   No, I don't think the surety has a
12 responsibility to pay a bond just because it's
13 outstanding, so I disagree.
14     Q   Wait, I don't understand.
15         MR. SHOREMAN:  No, no, please don't
16 interrupt him.
17     A   What I would say is that there would be
18 no further -- there would be no future chance of
19 any liability, but the idea that an open bond is a
20 liability is wrong.  I mean, just because you have
21 an open bond there's no claim against that bond.
22 That person hasn't failed.  So it's not as if the

20

1  surety owes that money.  It's not as if RLI --
2      Q   You understand what exposure is, right?
3  Exposure is a potential.  Potential liability,
4  right?
5      A   No, I do.  I do absolutely understand
6  what exposure is.
7      Q   Okay?
8      A   But I want to make sure we're clear
9  between this idea that there might be something
10 due one day and what we are talking about which is
11 when things come due because when things comes due
12 Nexus stands in front of RLI and pays them every
13 single time.
14     Q   Let me -- I hear -- I get where
15 you're -- you know, you're asserting Nexus'
16 position and that's fine.  But let me just take it
17 in smaller bits, okay?
18         When a surety receives an I391 form
19 cancellation, okay, the surety, isn't it true,
20 that the surety has no liability -- no further
21 liability on the bond?
22         MR. SHOREMAN:  Objection.  This witness

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

21

1  is here to testify on behalf of Nexus.
2      Q    That's what I mean.
3          MR. SHOREMAN: Not the surety. You're
4  asking him about a surety.
5          MS. KATSANTONIS: I'm asking him about
6  Nexus' understanding of a cancellation.
7          MR. SHOREMAN: That's a different
8  question.
9          MS. KATSANTONIS: No.
10     A    I think a canceled bond means that the
11 case is completely over and there's no chance of
12 any potential future liability. I think that's an
13 appropriate way to say it. I don't believe the
14 existence of a bond creates liability.
15     Q    Yeah, when a surety issues a bond it
16 undertakes an obligation, right?
17     A    Sure, it does.
18     Q    And that's a liability, right?
19     A    But that obligation is only — it only
20 comes to fruition if there's a claim. If there's
21 a breach and the appeal process is exhausted,
22 that's when Nexus has to pay. And we do every

22

1  single time.
2      Q    When the surety -- when it issues a
3  bond, it -- is it your understanding the surety
4  obligates itself to the government to perform the
5  obligations under the bond, which are to have the
6  immigrant appear; is that correct?
7          MR. SHOREMAN: Objection.
8      Q    Or respond to a notice to deliver.
9          MR. SHOREMAN: Objection. Asked and
10 answered.
11     A    I think it's —
12         MS. KATSANTONIS: Not asked and
13 answered.
14     A    — ultimately the immigrant either
15 finishes their case or the surety has to pay the
16 penal amount of the bond.
17     Q    Okay. I got it. When the surety
18 issues a bond, doesn't it promise the government
19 that the immigrant will appear or will respond to
20 a notice to deliver?
21         MR. SHOREMAN: Objection. Asked and
22 answered.

23

1      A    I think that -- no. I think that the
2  surety promises the government that they will help
3  facilitate that or pay the penal amount of the
4  bond if it's breached.
5          I think the face value of the I352 is
6  pretty descriptive of what a bond is and what
7  ultimately happens as a result of it. The vast
8  majority of bonds never breach. So to consider
9  them a liability would be insane much the same way
10 that RLI apportioned, what, a dollar for risk
11 reserve or $3 for risk reserve for these bonds. I
12 mean, clearly you're not expecting -- your
13 client's not expecting them all to breach if
14 they're only reserving a dollar.
15     Q    Mr. Donovan, I'm just getting to the
16 obligation that they've agreed to.
17     A    I understand.
18     Q    So one obligation they've agreed to
19 that you understand is to -- that they advise the
20 government -- the Department of Homeland Security
21 that the immigrant will appear pursuant to a
22 notice to deliver, right?

24

1          MR. SHOREMAN: Objection. This is
2  beyond the scope. The designated areas don't
3  discuss what a surety's obligations may be to the
4  government.
5          MR. WILLIAMS: Are you talking about
6  exoneration, what your expert said? Or what are
7  you talking about?
8          MS. KATSANTONIS: No. I'm talking
9  about -- Mr. Donovan opened up the issue by saying
10 the surety doesn't have liability, so I'm trying
11 to understand his --
12         MR. SHOREMAN: If you want to --
13         MS. KATSANTONIS: He said -- his
14 testimony is the surety doesn't have liability.
15 So I'm trying to get his understanding of what the
16 obligations are under the bond.
17         MR. SHOREMAN: Right.
18         MS. KATSANTONIS: If he's going to
19 make -- if he's going to have that testimony, he
20 needs to explain it.
21         MR. SHOREMAN: Well, if you're going to
22 ask this line of questions at this point as far as

**25**

1 you've gone, he's going to be answering by his
2 personal and not as a corporate representative.
3        MS. KATSANTONIS:  Well, then his answer
4 as to liability is as to his personal knowledge
5 and not as a corporate representative.
6        MR. SHOREMAN:  I don't know.  You wrote
7 out these areas.
8        MS. KATSANTONIS:  It doesn't matter
9 anyways.  He's the president of the company.  Even
10 his personal knowledge is --
11        MR. HARRIS:  You don't need to argue.
12 Just ask your questions.
13        MS. KATSANTONIS:  Okay.  Moving on.
14    Q   Did you understand when the surety
15 issues a bond it undertakes the obligation to the
16 government that it will deliver the immigrant
17 pursuant to a notice to deliver?
18        MR. SHOREMAN:  Objection.  That
19 question's been asked and answered I think three
20 times.
21    A   It's part of the bond.  It's not the
22 end of the bond and the surety may have to pay the

**26**

1 penal amount if the bond breaches.
2    Q   Okay.  But you agree that it's part of
3 the obligation.
4    A   Yeah.  And I think it's important to
5 understand that when I talk — when I said
6 liability, I'm talking about — and you understand
7 what I'm talking about, very specific liability to
8 pay.  And as I've pointed out, RLI's own reserves
9 show that there is not a feeling that these — you
10 know, that there's a need to consider all of these
11 bonds a liability that would have to be paid.  And
12 that was the point I made and I think you
13 understand that, right?
14    Q   Isn't it true that one way to discharge
15 the bond is to deliver the alien as required?
16    A   If an I-340 is requested, is issued,
17 and there is a return date of some sort on an
18 I-340, then, yes.  If you deliver the immigrant,
19 then that will preclude the breach, presumably if
20 the immigrant doesn't show up for that meeting,
21 then there would be a breach.
22    Q   And it will — it can discharge the

**27**

1 bond, right?
2    A   Well, it's the beginning of a process,
3 right?  So a breach can be issued because a person
4 doesn't show up for an I-340 but there are all
5 kinds of defenses and so, you know, there's an
6 opportunity for the individual to seek additional
7 relief.  And the vast — I mean, there are a
8 significant number of bonds that don't — that
9 ultimately breach that aren't — that aren't paid.
10 Even at RLI —
11    Q   We're talking about --
12        MR. SHOREMAN:  Wait a minute.
13    A   — we've have nine successful appeals,
14 for example, and we don't — we don't do a lot —
15 we can't do any contesting with RLI, right.
16    Q   Sure, but we're talking about --
17        MR. WILLIAMS:  Vivian, I think one of
18 the problems is that you're not defining what you
19 mean by discharge.  Discharge from a claim being
20 made, or what are you talking about?
21        MS. KATSANTONIS:  Discharge from the
22 bond.  They have no obligation.

**28**

1        MR. WILLIAMS:  What does discharge
2 mean?
3        MS. KATSANTONIS:  Means that the bond,
4 there's no further obligation under the bond.
5        MR. WILLIAMS:  Obligation to pay after
6 the claim?
7        MS. KATSANTONIS:  Any obligation.  Any
8 obligation at all.
9        MR. WILLIAMS:  Well, then he needs to
10 understand.
11    A   I'm talking about an obligation to pay.
12    Q   Okay.  But I'm saying when the
13 immigrant is delivered pursuant to a notice to
14 deliver, that also can discharge the bond, right?
15    A   No.  No, because just because they —
16 just because they show up for an I-340 doesn't
17 mean that the bond is canceled.  It may be part of
18 their responsibilities but those responsibilities
19 are ongoing.
20    Q   What if it's a notice to remove and the
21 alien is delivered, isn't that a -- and DHS takes
22 custody of the immigrant, isn't that -- doesn't

---

**29**

1  that discharge the bond?

2  **A   Yes, that would discharge the bond**
3  **under that circumstance.  But in many of the**
4  **circumstances where immigrants are delivered they**
5  **are released.  So they are not held.  And if they**
6  **are released it doesn't discharge the liability on**
7  **the bond.**

8  Q   Right.  So one way to discharge the
9  bond is to deliver the alien so that DHS takes the
10 alien in custody; is that correct?

11 **A   I'm going to say -- I'm not going to**
12 **use that.  I'm going to say cancel because I want**
13 **to be consistent with what the government uses.**
14 **So one way to cancel a bond is to have that person**
15 **fulfill their responsibilities.  They can fulfill**
16 **those responsibility by going to court and having**
17 **their case closed.  They can fulfill those**
18 **responsibilities by not, you know, by going into**
19 **an I-340 hearing, for example, and being taken**
20 **into custody.**

21 Q   And when a bond is canceled, the surety
22 has no further obligation under the bond, correct?

---

**30**

1  **A   An obligation to?**

2  Q   Any obligation.  When a bond is
3  canceled, a surety has no further obligation under
4  the bond?

5  **A   Right.  Well, I would say when a bond**
6  **is canceled the immigrant has no further**
7  **obligation.**

8  Q   That's fine.  But what about the
9  surety?

10 **A   Again, as I understand it, the surety,**
11 **RLI certainly doesn't go and pick people up and**
12 **take them to hearings, right, nobody does that**
13 **that's, you know...**

14 Q   Mr. Donovan, it's a simple question.
15 When a surety bond -- when a bond is canceled the
16 surety has no further obligation under the bond,
17 right?

18       MR. SHOREMAN:  Objection.  Objection.
19 Objection.  It may be a simple question but it's
20 not within --

21       MS. KATSANTONIS:  It is.

22       MR. SHOREMAN:  -- the scope of this

---

**31**

1  30(b)(6).

2        MS. KATSANTONIS:  Mr. Shoreman, there's
3  so many bullet points that that goes to as well as
4  Mr. Donovan's own testimony.  It's a simple
5  question.

6        MR. SHOREMAN:  It's not a simple
7  question because you're asking him now -- he can
8  only testify to this on his personal knowledge and
9  not as a corporate representative.

10       MS. KATSANTONIS:  That's fine.

11       MR. SHOREMAN:  If you want to go ahead
12 with that, marking the fact that you took seven
13 hours of this man's deposition last week.

14       MS. KATSANTONIS:  That's okay.

15       MR. SHOREMAN:  It's not okay because
16 we're not just going to go back and replow.

17       MR. HARRIS:  Actually, you're wasting
18 our time and extending this deposition with your
19 lengthy speaking objection.

20       MR. SHOREMAN:  But you told me
21 yesterday, Mr. Harris, that was going to take
22 seven hours.

---

**32**

1        MR. HARRIS:  You can object to form,
2  that's what the rules allow.

3        MR. SHOREMAN:  No.

4        MS. KATSANTONIS:  We're going to go off
5  the record.

6        THE VIDEOGRAPHER:  We are going off the
7  record at 11:48.

8        (Recess taken.)

9        THE VIDEOGRAPHER:  We are back on the
10 record at 11:52.

11 BY MS. KATSANTONIS:

12 Q   Okay.  Mr. Donovan, we took a break, I
13 was asking you your understanding of when a bond
14 is canceled, does the surety have no further
15 obligations under the bond?

16       MR. SHOREMAN:  Objection.  Asked and
17 answered.

18 **A   Yeah, I think I've answered that**
19 **question.  And specifically, the surety's**
20 **obligation is to pay if the bond is breached and**
21 **there are no further appeals, okay?  Now, the**
22 **immigrant has an obligation as a bonded principal,**

---

33

1  and their obligation will stop when their bond is
2  canceled.
3      Q    You testified that an immigrant, one of
4  the conditions of the bond is to deliver the
5  alien, the immigrant, right?
6      A    There is a notice to deliver that can
7  be issued. It's not a condition of every bond,
8  no.
9      Q    Well, it's a condition of a vast
10  majority of the bonds, right, a notice to deliver?
11      A    No. The vast majority of the bonds end
12  without any notice of action whatsoever. No, the
13  vast majority of bonds cancel because people go
14  through the process. The people that get —
15  you're talking about people who --
16          MR. SHOREMAN: Wait a minute, would you
17  mind not interrupting the witness, please.
18          MS. KATSANTONIS: No, I know.
19      A    You're talking about people who have
20  I340s. An I-340 is issued by a bail — by a bond
21  unit officer in the Department of Homeland
22  Security. When there is some kind of issue, there

34

1  might have been, it might be that they didn't go
2  to court, which is a serious issue. It might be
3  that law enforcement wants to talk to them about
4  an issue that's going on. It might be that ICE
5  has a conversation that they want to have with
6  them. It could be any number of things. That
7  I-340 then compels that person to come and meet
8  with an ICE officer. That doesn't happen in every
9  bond.
10      Q    Right.
11      A    It only happens in certain bonds.
12      Q    And what percentage of bonds receive
13  notice to deliver?
14      A    I have no idea. We don't track that.
15      Q    Okay. And what I'm asking you is if an
16  immigrant is delivered and taken into custody, we
17  talked about that, that cancels the bonds, right?
18      A    That would cancel the bond.
19      Q    Right. And in that scenario, if the
20  bond is canceled doesn't that mean the surety has
21  no further obligation?
22      A    Right. But the surety doesn't have an

35

1  obligation anyway because the bond hasn't
2  breached, right?
3      Q    So the surety —
4      A    So the surety —
5          MR. SHOREMAN: Wait a minute,
6  objection.
7          Would you please let this witness
8  finish his answer?
9          MS. KATSANTONIS: I'm just --
10          MR. SHOREMAN: You know, you jumped in.
11  He was in the middle of an answer. And this is --
12      A    My job, pursuant to the contract, is to
13  stand in front of RLI, right? My job is to pay
14  when there's a final bond breach. That's what we
15  do every single time.
16      Q    Okay. So my question is, again, once
17  the bond -- an immigrant is taken into custody and
18  an I391 form bond cancellation is issued, the
19  surety has no further obligation under its bond to
20  your understanding; is that correct?
21      A    Well, the surety wouldn't have any
22  obligation to the bond anyway unless it was

36

1  breached and had to pay.
2      Q    So the answer is yes.
3          MR. SHOREMAN: Objection. Objection.
4  That is not a proper question.
5      Q    Okay. An I-340 notice is a demand on
6  the bond, correct?
7      A    It's a demand for the individual to
8  appear before ICE.
9      Q    It's a demand to deliver, right?
10      A    It's a notice to deliver. A demand is
11  on the individual.
12      Q    And the surety receives a copy of the
13  I-340 notice?
14      A    The surety is the — the obligor or the
15  co-obligor receive it. The only way we get it is
16  if the surety sends it to us.
17      Q    Does an I-340 notice give a co-obligor
18  the right to arrest a principal and turn him or
19  her over to ICE?
20          MR. SHOREMAN: Objection. That calls
21  for a legal conclusion.
22      A    It is — I think it's unclear. The law

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

10 (37 to 40)

---

37

1 is really gray in the area of bounty hunting and
2 arresting individuals and it can vary state by
3 state.  For example, in Florida, if your
4 bond principal is from Florida for example, you
5 would have to hire a bail agent in Florida.  And
6 if the bond was posted by a bail agent not
7 licensed in Florida, you would have no authority
8 because state law would prohibit it.  So there's
9 just a ton of different rules and regulations and
10 it's what makes me thankful that I'm not a bail
11 agent and I never have to worry about doing that.
12     Q    All right.  So in paragraph 50 of
13 Nexus' amended counterclaim, if Nexus stated the
14 only legal effect of an I-340 notice is that it
15 gives the co-obligors the right to arrest the
16 principal and turn him or her over to ICE custody
17 without further notice, that's not an accurate
18 statement?
19     A    Oh, it is.  I'm not a co-obligor.
20     Q    Okay.
21     A    I said we don't — I said thankfully I
22 don't do that.  I'm not a bail agent.  I'm not a

38

1 co-obligor.  I'll never be a co-obligor on these
2 bonds and I will never arrest an individual.
3 There are enough police in this world.  We don't
4 need another one.
5     Q    Is there a standing directive at Nexus
6 that you would not deliver -- arrest or deliver an
7 alien?
8     A    We have a policy at Nexus that if we
9 are — if we receive a request related to an issue
10 involving a remand, for example, a person who we
11 identity is likely not to go to court, or perhaps
12 a person whose family member has requested that
13 something be done because they're afraid for their
14 safety or others.
15         In very limited situations, our policy
16 manual provides a function by which our advisory
17 board will consider on a case-by-case basis
18 individual circumstances.  Only in Nexus' history
19 have we elected to do that only one time.  And it
20 is something that we very much don't want to have
21 to do.  We believe the success of our program is
22 built on convincing people to do the right thing

39

1 for the right reasons.  We're not cops or bounty
2 hunters, and we don't want to be.  And in the
3 instance where it was done, it was bail agents
4 executing it.  The co-obligor was the person
5 responsible.
6     Q    What was the one instance?
7     A    It's a very costly situation that
8 doesn't make sense.
9         The one situation involved a client who
10 had been accused of murdering her husband in her
11 home country.  She comes to the United States and
12 had been released and her family member -- her
13 family members contacted us and said she was an
14 active gang member.
15     Q    Is this the one that you talked about
16 in your deposition on Wednesday?
17     A    Did I talk about it in my deposition on
18 Wednesday, Ms. Katsantonis?
19     Q    I don't know.  Do you know who the name
20 of the --
21     A    I was ill, I don't remember.
22     Q    Do you know who the name of the

40

1 immigrant is?
2     A    ████████████████
3     Q    Okay.  So that's different than one
4 that we talked about on Wednesday.
5         Do you recall that?
6     A    Who were we talking about on Wednesday?
7 Because there's a difference between a person
8 being arrested and someone coming into an I-340
9 meeting, you understand.
10     Q    Don't you escort some of the immigrants
11 to deliver them pursuant to a notice to deliver?
12     A    No, I think that -- and let's -- I'm
13 going to be very clear here.  Please don't
14 misstate my language, especially in this area,
15 it's very offensive.  The idea that you would
16 assert that we, by accompanying an immigrant who's
17 terrified to a meeting like this that we're
18 somehow acting as an agent of arrest is absolutely
19 offensive and reprehensible.
20     Q    What's offensive?  My term as --
21     A    The idea that we would -- we help
22 people come to these meetings and deal with their

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

11 (41 to 44)

---

**41**

1  life situations.  We're not, you know, throwing
2  people in the back of Suburbans and putting
3  handcuffs on them.  So I want to make sure
4  there's -- I want to make sure your question to
5  me, Ms. Katsantonis, was whether or not I remember
6  from my deposition saying that I had done this
7  previously.  And that is an inappropriate
8  restatement of my deposition testimony and I find
9  that offensive.
10      Q    Was it my use of the term escort that
11 offended you?
12      A    No.  It was your implication that I had
13 somehow indicated that we had done this particular
14 thing, which was an arrest.
15      Q    All I asked is did you escort?
16      A    Ms. Katsantonis, now you're
17 interrupting me.  What I said, because I want to
18 be very clear on the record because I don't want
19 there to be a misunderstanding.
20          What I said was that we had, the
21 function of this arrest, it happened one time.
22 Then you said, "Do you remember your deposition

**42**

1  testimony when you told me about someone
2  different?"
3          Now, Ms. Katsantonis, that is an
4  inference that I had testified inappropriately or
5  perhaps lied.  And that's absolutely inappropriate
6  and I'm calling you out on it because it's wrong.
7      Q    Good for you but I'm trying to
8  understand the name -- whether it's the same
9  person.
10          MR. SHOREMAN:  I'm trying.
11      A    I would just appreciate it if you
12 wouldn't restate my testimony in such a way as to
13 misstate it, please.  Thank you.
14          MR. SHOREMAN:  Actually the question
15 that the witness is answering went to the
16 company's policy on remand, which he was
17 describing before the line of questioning about
18 his prior testimony.
19          MS. KATSANTONIS:  Right.  I'm trying to
20 understand, I asked whether or not Nexus escorted
21 immigrants back to DHS pursuant to a notice of
22 deliver.

**43**

1          MR. SHOREMAN:  Okay.
2      A    We frequently appear --
3          MS. KATSANTONIS:  That was my question.
4          MR. SHOREMAN:  Okay.
5      A    We frequently appear with immigrants
6  who are appearing pursuant to an I-340 but they're
7  appearing to an I-340 by their choice.
8      Q    And do you transport them in those
9  situations?
10      A    We do provide travel from time to time
11 when it's requested.
12          I'm going to take a real quick bio
13 break since you're taking a second to look at
14 documents, okay?
15          MS. KATSANTONIS:  Okay.
16          THE VIDEOGRAPHER:  We are going off the
17 record at 12:04.
18          (Recess taken.)
19          THE VIDEOGRAPHER:  We are back on the
20 record at 12:12.
21 BY MS. KATSANTONIS:
22      Q    At the beginning of your deposition we

**44**

1  were talking about how many bonds had been issued
2  for the Nexus Program, and I believe you told me
3  24,000?
4      A    23,234 is the exact number that I have.
5      Q    23,000 --
6      A    According to our records.  23,234.
7      Q    Okay.
8      A    And to just flag it that that's what
9  our system shows.  The reality is there were a few
10 hundred bonds that -- before we started using
11 where you would be able to find them in Capsule
12 and be able to sort them.  So the universe doesn't
13 include those but they'd long be canceled now
14 anyway.
15      Q    So RLI contends that it has issued
16 2,486 bonds.  Yeah.
17          Do you agree with that number?
18      A    That's my understanding.
19      Q    Okay.  All right.  And RLI contends
20 that the aggregate penal sum of the 2,486 bonds
21 issued is 30,222,950.
22          Do you agree with that?

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee          12 (45 to 48)
Conducted on March 3, 2020

45

1     **A     That's my understanding.**
2     Q     How many of RLI's 2,486 bonds has DHS
3   issued one or more formal notice to deliver?
4     **A     I'm going to have to consult records to**
5   **answer that.**
6     Q     That's fine.
7     **A     The challenge is that I think even if I**
8   **can pull the notices, it's going to take some**
9   **time, which I'm happy to do, but it might take --**
10  **I mean, it would be pulling notices out of this**
11  **box so I don't want to take up an hour of your**
12  **deposition time but pulling these.  I don't know**
13  **that I would be able -- because we don't keep**
14  **track of the number of notices per bond, so it's**
15  **not something we keep track of so I would have to**
16  **go and get that data.  I'm happy to do it but I**
17  **don't want to waste your time.**
18    Q     What data would you look at?
19    **A     I have, and in fact I'm going to be**
20  **producing to you, these are the breach binders.**
21  **Do you remember when you did your special master**
22  **visit to the breach office and you had identified**

46

1   **binders that you were interested in receiving?**
2   **These are the binders and they include all the**
3   **notices for the program.  So I could conceivably**
4   **go through it and count them, but I'm just telling**
5   **you that that's going to take a while and I don't**
6   **want to waste your time.**
7     Q     That's fine.
8     **A     If it's that important I'm happy to do**
9   **it.**
10    Q     So sitting here today you don't know
11  the number, correct?
12    **A     It's not something that we track.**
13    Q     And how many of RLI's 2,486 bonds have
14  DHS issued one or more formal bond breach notice
15  or I-340 notice?
16    **A     So, we are reliant upon receiving those**
17  **notices from RLI.  So we have received whatever**
18  **RLI has sent us as it relates to those notices.  I**
19  **don't have the total number off the top of my head**
20  **because it's not something that we track and**
21  **store.  But I can certainly find it for you by**
22  **pulling through the breach notebooks if you'd like**

47

1   me to do that.
2     Q     So sitting here today you don't know
3   how many of the bonds, the RLI bonds, issued
4   have -- that DHS has issued one or more formal
5   bond breach notices, right?
6         MR. SHOREMAN:  Objection.  He can --
7     **A     I do have that --**
8         MR. SHOREMAN:  Objection.  Objection.
9   That information will be provided to you if you
10  would like him to take the time to go through the
11  data he brought with him.
12        MS. KATSANTONIS:  Right.  But I'm
13  saying he said it's going to take him an hour or
14  so to read through it.  And I'm saying sitting
15  here right now he doesn't know the number,
16  correct?
17        MR. SHOREMAN:  Not off the top of his
18  head, no.
19    **A     What I do know is that we've paid 290**
20  **invoices for a total of $3,212,883.67 which is**
21  **consistent with what we track, which is**
22  **performance based on whether there's a final claim**

48

1   **and a bond breach has to be paid.**
2         **So that's what I can tell you.  Those**
3   **are based on numbers that we keep track of.  Now,**
4   **if you need me to get numbers that we don't keep**
5   **track of I can do that but it's going to take a**
6   **little bit of time.  I certainly have the**
7   **information, though.**
8     Q     Well, you have no reason to dispute
9   what numbers RLI has provided?
10    **A     I don't know necessarily — if you have**
11  **something you want to put in front of me from a**
12  **document perspective, I can certainly confirm it.**
13    Q     Well, if I gave you a document that
14  said RLI has received 700 notices to deliver, you
15  don't have any reason to dispute that other than
16  you'd have to go through that binder?
17    **A     I would have to go through that binder**
18  **to check.  Although I certainly would say that we**
19  **have had to pay 290 invoices for RLI and a total**
20  **sum of $3,212,833.67.**
21    Q     Okay.  And so sitting here today you
22  also don't know how many of RLI's bonds DHS has

49

1 issued one or more bond breach invoice for?

2    A   So I do know. I have that information
3 but I would have to calculate it as it's not
4 something that we keep in the normal course of
5 business. I'm happy to do it. I don't want to
6 come to this deposition saying I don't know about
7 anything. So I have the documentation here and if
8 you want me to dig through it I'm happy to do it
9 but it isn't a number that we keep in the normal
10 course of business so I would have to -- I would
11 have to get it for you. But I'm more than happy
12 to do it if you want me to. I'll spend the next
13 three hours digging through a box.

14    Q   So RLI contends that as of March 1st,
15 2020 DHS has issued -- hold on.

16        Okay. So RLI contends that 319 of the
17 bonds have been paid based on breach invoices.

18        Do you understand why there's a
19 difference between the 290 you're stating versus
20 the 319?

21    A   There may be bonds that were refunded
22 or otherwise canceled after they were paid. I

50

1 wouldn't know that since RLI has stopped sending
2 us bond cancellations as of February of 2018. So
3 since we don't get that documentation from your
4 client anymore, I am only relying — I'm relying
5 on the information we get from your client and the
6 information that you process, you know, pursuant
7 to the injunctive order. So we're paying what you
8 represent to us is due, your client, right, as we
9 go along we always do that.

10        What we have record of is 290 invoices
11 for a total of $3,212,883.67. If you have a
12 different record, I'm happy to look at it.

13    Q   If a bond is canceled there's no
14 payment, right?

15    A   Well, that's correct. Yeah, the
16 only -- only after a breach and a final claim is
17 made is -- are you required to pay.

18    Q   Uh-huh.

19        So sitting here today, without going
20 through your binder, spending a couple of hours to
21 go through your binders, you can't tell us how
22 many of the RLI bonds has DHS issued one or more

51

1 invoices?

2    A   Well, considering it seems to be an
3 important part of your examination, I would like
4 to go and look. In other words, I don't want you
5 to ask a question that I can't answer. You've
6 asked me the question in such a way as to say
7 isn't it true I can't answer it; no, it's not, I
8 can answer it and I can try to go through this box
9 as quickly as possible. I just gave you a
10 forewarning that I thought it would be take a
11 little bit of time and I didn't want to take your
12 time. That's all, Ms. Katsantonis.

13    Q   No, I appreciate it. I'm just trying
14 to say you didn't do it -- before sitting here
15 today you haven't done that work yet.

16        MR. SHOREMAN: Objection. This witness
17 testified as to the number of invoices RLI has
18 paid, 290 invoices.

19        MS. KATSANTONIS: That's not the
20 question.

21        MR. SHOREMAN: Well, you're asking him
22 how many --

52

1        MS. KATSANTONIS: How many have we
2 received -- how many -- on the RLI bonds how many
3 invoices have we received.

4        MR. SHOREMAN: How many invoices has
5 RLI received?

6        MS. KATSANTONIS: And Nexus has a
7 record. How many were issued?

8    A   I think it's important to understand
9 this is part of our -- I think this is part of the
10 misunderstanding, you know, there are a lot of
11 misunderstandings. But the idea even that an
12 invoice, you're saying it yourself, you have 319
13 versus 290. You can't possibly explain the
14 discrepancy. You have an injunctive order. It's
15 not as if you would have allowed 29 bonds to go
16 unpaid. So, like, you understand that, you know,
17 from the perspective of the record keeping, what
18 we have is what we have. We keep track of the
19 bonds that we pay because that's how we determine
20 our fail rate.

21    Q   Right?

22    A   We don't keep track of multiple

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

14 (53 to 56)

**53**

1 notices. We don't keep track of how many notices
2 we received on a certain bond book or anything
3 like that. It's just not something that we keep
4 track of, Ms. Katsantonis, but I'm happy to get it
5 for you if you need me to.
6      Q   Okay. I get -- I understand your
7 testimony about what you don't track, okay? So
8 what I'm trying to find out today is, without
9 spending another hour or three hours or whatever
10 it would take, you do not know how many of the RLI
11 bonds DHS has issued one or more bond breach
12 invoices, correct?
13      A   No, I do have that here. I'll get it,
14 okay.
15      Q   No, I said without spending an hour.
16      A   Well, I'll try not to take an hour.
17 But I came prepared to testify. So I'm going to
18 give you your answers. If it's a question that
19 you're asking, I will give you the answer. Just
20 let me —
21      Q   How long do you think it would take you
22 to find out how many invoices have been issued on

**54**

1 an RLI bond?
2      A   15, 20 minutes.
3      Q   Okay. We'll do it at a break then.
4          RLI contends that as of March 1st,
5 2020, the aggregate penal sum of the bonds for
6 which an invoice has been paid is 3.625 million.
7      A   No, that's not my records. My records
8 are 3.212 million.
9      Q   Okay. And which specific records are
10 you relying on for the 290 breached invoices that
11 were paid?
12      A   Our internal records, which I'm
13 producing a copy of today, including a spreadsheet
14 and our breach binders where all the supporting
15 documentation is.
16      Q   And the spreadsheet was prepared when?
17      A   This spreadsheet was prepared — it's
18 maybe March 2nd, so yesterday.
19      Q   And is it based on computer-generated
20 files? Where was the data extracted to create the
21 spreadsheet?
22      A   The breach binders and the electronic

**55**

1 data we have of the breaches that we received.
2          So we have the breach binders, which
3 I've made copies of for you here and we're
4 producing. It is the detail of what you would
5 find in the spreadsheet.
6      Q   Right. So will the breach binders that
7 you have reflect all 290 invoices which you
8 contend have been paid?
9      A   They will.
10      Q   Okay.
11      A   That's where we got them.
12      Q   All right. And what electronic data
13 did you review also for the spreadsheet?
14      A   I believe we reviewed Laura Piispanen's
15 spreadsheets that she has sent over a period of
16 the last few years.
17      Q   Okay.
18      A   I can never say her name. I apologize
19 for butchering her name.
20      Q   Did you review the spreadsheet that was
21 prepared and provided to Erik Schneider during his
22 deposition on February 20th of this year?

**56**

1      A   That was provided by RLI?
2      Q   Uh-huh.
3      A   No. Would you like to —
4      Q   No.
5      A   I'm not a hundred percent sure. What
6 spreadsheet are you talking about? I've reviewed
7 many, many spreadsheets, but I don't know.
8      Q   During the deposition of Mr. Schneider,
9 a spreadsheet was presented to him showing all of
10 the -- showing the status of the RLI's bonds?
11      A   Do you have it? Can I see it?
12      Q   Do you know whether you reviewed that?
13      A   I won't know until I see the document.
14 I don't know off the top of my head, with all due
15 respect.
16      Q   All right. And of the RLI bond breach
17 invoices that were paid, do you know how many of
18 them were paid by Nexus within 30 days of the
19 invoice date?
20      A   No, we don't actually track that. And
21 as a part of that category is concerned the amount
22 of time that it would take for us to go back and

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

15 (57 to 60)

57

1 calculate that was, you know, just — it was
2 impossible given the fact that we'd have to go and
3 actually look for checks, you know, dates on
4 checks to try to match it up.  So I apologize,
5 that isn't something we keep in the normal course
6 of business.
7      Q    Okay.  So you are not prepared to
8 answer questions on how many of the bond breach
9 invoices were paid between, let's say, 31 and 60
10 days of the invoice date, 61-120 days of the bond
11 breach invoice or more than 120 days after the
12 invoice date?
13         MR. SHOREMAN:  Objection.
14      A    I'm prep —
15         MR. SHOREMAN:  Objection.  The witness
16 has testified that the company does not maintain
17 those records.
18         MS. KATSANTONIS:  Yep.
19      A    I'm prepared to testify that we paid
20 290 invoices totaling $3.212 million.
21      Q    Right.  But you can't give me a timing
22 of when those invoices were paid?

58

1      A    We don't keep those records.  We don't
2 keep records based on that.
3      Q    Isn't it -- you don't keep records so
4 you can't tell me sitting here today whether the
5 invoices were paid within 31 or 60, or 90 or 120
6 days from the invoice date; is that correct?
7      A    That's correct.  Because it's
8 inconsequential.  It's a hundred percent based on
9 what is happening in an individual case.
10      Q    Right?
11      A    It's not a metric that we would look
12 to.  It's not a KPI, it's not something we would
13 look at saying oh, we're doing better if we do
14 this.  Because it's dependent upon an individual
15 case.  If a person has a claim of relief and they,
16 you know, they got mixed up and they actually have
17 court and they've got this erroneous breach, you
18 know, they -- we want to make sure we are able to
19 help them, right?
20      Q    Uh-huh.
21         Does Nexus routinely not pay the
22 invoices until at or about the 120-day period

59

1 after an invoice has been issued?
2      A    Nexus typically waits until we are a
3 hundred percent certain that there is no
4 possibility that the person's case may be
5 reopened, that they otherwise may be able to
6 continue on.
7         So we do err on the side of caution to
8 ensure that we don't pay bond breaches that would
9 otherwise then abridge the person's opportunities
10 to be able to proceed on bond with their case,
11 right?
12      Q    So --
13      A    So we are very -- so we pay attention
14 to that, for sure.
15      Q    You're a late pay.
16      A    I don't think we're a late pay.  I
17 think we pay when we have to.  When there is a --
18 I mean, when there is a claim, a final claim on
19 the bond.
20      Q    What do you consider the final claim?
21      A    The final claim is a claim made against
22 the bond when the appellate process has completely

60

1 run.  Right?  So there's no further —
2      Q    Who makes the final claim on the bond
3 after the appellate process?  How is that made?
4      A    It's a claim in favor of the
5 government.  The government —
6      Q    How is the claim made?  What does it
7 look like?
8      A    It's an invoice.
9      Q    So the regular invoice is the final
10 claim on the bond?
11      A    Huh-uh.  A final claim on a bond is a
12 final invoice when all of the appellate process
13 has been exhausted.
14      Q    How does that invoice look?
15      A    And you can consult the CFR if you want
16 to understand what a final claim is.  It's in
17 there.
18      Q    No, I want to understand what the final
19 invoice -- have we --
20      A    My opinion is consistent with the --
21      Q    Have we received any final invoices?
22      A    — CFR.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

---

61

1    Q    Have we received any final invoices on
2  any RLI bonds?
3    A    I believe you've received Treasury
4  referral notices on RLI bonds.
5    Q    Well, is that the final invoice?
6    A    No.  I think there's a whole other
7  process upon Treasury referral that RLI has never
8  been subjected to thanks to Nexus' ability to
9  stand in front of it --
10    Q    No.  I know, but you said --
11    A    I'm sorry, and perform pursuant to the
12  indemnity agreement over the last three or four
13  years, which we have every single time.
14    Q    Well, you said that a claim -- that
15  the -- a claim doesn't have to be paid until you
16  get a final invoice.  So I'm trying to understand
17  what is this final invoice?
18         MR. SHOREMAN:  Objection.
19    Q    What does it look like?  Is it in
20  writing?  What is it?
21         MR. SHOREMAN:  Objection.  You have
22  misstated his testimony.

---

62

1    Q    Okay.
2    A    My concern is that, you know, my
3  testimony is my own and I want to make sure that
4  you ask questions and say isn't it -- do you mean
5  this?  Yes.  I want to be very clear,
6  Ms. Katsantonis, I'm not trying to be rude but if
7  I think that you are misstating my testimony I'm
8  going to stop and back up because I want to make
9  sure we don't do that.
10    Q    Absolutely.  I want you to get Nexus'
11  testimony on the record accurately and to the best
12  of your knowledge and belief and I'm happy to make
13  sure that it's clear.
14    A    So --
15    Q    But you said that it -- that an invoice
16  doesn't have to be paid until there's a final
17  claim and there's a final invoice.  So I'm trying
18  to understand what this is?  What is the final
19  claim?  What does it look like?  What is the
20  invoice that we're all waiting for?
21    A    Right.  A final claim is a breach on a
22  bond where all of the appeal opportunities have

---

63

1  been exhausted.
2    Q    Okay.
3    A    That's a final claim.  In favor of
4  the --
5    Q    And when do you know when all the
6  appeal opportunities have been exhausted?
7    A    So we know that there's a window of
8  time that you have to seek an appeal or a motion
9  to reconsider.  If you file an appeal within 30 --
10  within 30 days, you --
11    Q    Within 30 days of a notice to breach.
12    A    That's right.
13    Q    The breach notice, right?
14    A    Then you have a timely appeal that goes
15  through the process of the AAO.  If you file a
16  nontimely appeal it can be considered by the AAO
17  as a motion to reconsider.  And sometimes they
18  will take those cases on.
19    Q    And sometimes they won't.
20    A    And sometimes they won't.
21    Q    And how do you -- how do you know when
22  a claim becomes final?

---

64

1    A    So, again, a claim is final when
2  there's a breach, a final determination is made on
3  that breach and the appellate process is run.
4  It's a --
5    Q    So how do you know?
6    A    I'm answering the same -- I mean, I'm
7  answering the question the same way.
8    Q    Yeah.
9    A    I don't know what -- what are you
10  asking me?  Because the appeal --
11    Q    When does the appellate process run?
12  How do you know?
13    A    Gotcha.  So it's a certain window after
14  the breach occurs.  So you get a notice of a
15  breach, you have the ability to file an appeal,
16  okay?  You can file an appeal within 30 days and
17  then have a timely filed appeal before the AAO.
18  You can file an appeal that's justified outside of
19  the window and it can be considered as a motion to
20  reopen.
21    Q    Right.  But it cannot be.
22         So my question is when do you know that

---

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

17 (65 to 68)

---

**65**

1 the appeal process is done, it's run and now it's
2 time to pay?
3     A    So if I get a 797C then I know that the
4 AAO has received that appeal and I know pursuant
5 to the CFR that there's no final claim and that
6 that breach isn't due.
7     Q    What do you mean that there's no final
8 claim?
9     A    There's no final claim.  Until the
10 appeal is up --
11    Q    Right.  I'm trying to find out --
12    A    You can't even pay the breach.
13    Q    I'm trying to find out when you know
14 the appeal is up.  How do I know its up?
15    A    You get a notice of action from the
16 AAO.  You can get a notice of action from the AAO.
17    Q    So the AAO denies the appeal, then is
18 the appeal over?
19    A    You can appeal to the district court.
20 So there is an appellate process beyond that.  But
21 my perspective is that once the AAO -- our policy
22 generally is once the AAO dismisses an appeal, we

---

**66**

1 pay it.  And we do that -- in fact, last month we
2 did that to four or five RLI bonds.
3     Q    So once the appeal process is run and
4 there's an AAO decision, then there's no further
5 basis to delay paying an invoice; is that correct?
6     A    If there is a motion to reconsider, if
7 there is a circumstance where an individual is
8 seeking some kind of relief, from time to time,
9 there are one-off situations that we look at.
10    Q    Right, but generally?
11    A    We're glad to say that we always stand
12 and perform personally to the indemnity agreement.
13 We do that every time.
14    Q    So generally, though, once an AAO
15 appeal is denied, then there's no basis not to pay
16 the invoice, correct?
17    A    Then the invoice is due.
18    Q    Okay.
19    A    I won't say that there's no basis not
20 no pay because I think that there are certain
21 circumstances where an individual, a human error
22 is an issue, and we know that it's going to be

---

**67**

1 fixed.  So if we know that they're ultimately
2 going to cancel it or if the judge is going to
3 reopen the case, these are one-off situations.
4 But I just want to be careful.  I want to be
5 consistent and I want to be clear in my testimony.
6     Q    All right.
7          THE VIDEOGRAPHER:  Can you take the
8 mike off and put it back on again.  Okay.
9          MS. KATSANTONIS:  Is that good?
10         THE VIDEOGRAPHER:  That's good.
11         (Donovan Exhibit 2 marked for
12 identification and attached to the transcript.)
13    Q    I'm going to show you an exhibit that
14 was presented to court on January 22nd, 2020.
15 Have you seen this exhibit before, Mr. Donovan?
16    A    I may have reviewed it.  I don't
17 remember exactly.  But I may have seen it.  I
18 believe I have, yes.
19    Q    Okay.
20    A    This was filed at the hearing, right?
21 In advance of the hearing.
22    Q    It was presented and provided as

---

**68**

1 evidence during the hearing.
2     A    Got it.  Okay.  Then I think I have
3 seen it.
4     Q    Okay.  And did you or Nexus endeavor to
5 review these facts to confirm them as true?
6     A    I did not but that's because,
7 Ms. Katsantonis, I couldn't imagine that you would
8 file something with the court that was erroneous,
9 so I'm assuming that this is correct.  And I
10 believe you're a professional and I believe you're
11 a great person so I'm sure you wouldn't have lied
12 to the court, so I would presume this is correct.
13    Q    Thank you.  So as you sit here today,
14 you have no reason to dispute the accuracy of the
15 data in this chart?
16    A    Absolutely no reason to believe that
17 you would put a forged document in front of the
18 court.  No reason at all.
19    Q    All right.  Thank you.
20    A    You're welcome.
21    Q    So I'm looking at it and I'm looking
22 specifically at first --

---

69

1    A    I'm still offended by the title.
2    Q    First --
3         MR. SHOREMAN:  Oh, yeah.
4    Q    Looking at page 2.
5    A    Yes, ma'am.
6    Q    So looking at, like, starting with
7  August, I'm going to start with the ones we know
8  AAO appeal was filed for these invoices?
9    A    Okay.
10   Q    The invoice dates were June 25th and
11 payments weren't received until October or
12 November on the first three, August 9th,
13 September 10th, September 10th.
14        Do you have an understanding as to why
15 those invoices would not have been paid prior to
16 the 120 Treasury referral date?
17   A    So not off the top of my head, but I
18 would have to — so if there is a client who has
19 filed a motion to reopen with their immigration
20 lawyer sometimes we won't file an AAO appeal
21 because once the motion to reopen is granted, the
22 bond unit officer typically reinstates the bond or

70

1  canceled the breach.
2    Q    But you don't have any reason --
3    A    I'm happy to look them up.
4    Q    -- to know that.
5    A    I'm happy to look them up and can
6  probably do that pretty quick.
7    Q    But you don't know right now, correct?
8    A    Not off the top of my head as you
9  pointed out in the three lines on that
10 spreadsheet, no.
11   Q    All right.  So looking starting at the
12 bottom, September 10th.
13   A    Yes, ma'am.
14   Q    So this one is an invoice was
15 July 30th, do you see that the AAO appeal was
16 already dismissed on July 23rd prior to the
17 invoice date being issued?
18   A    I do see that, yeah.
19   Q    Okay.  And so contrary, I think to what
20 you just stated earlier, isn't it that Nexus did
21 not make that payment until almost four months
22 later from the invoice date?

71

1    A    Well, it certainly appears to be
2  correct vis-à-vis the dates on this paper although
3  I think it's important, Ms. Katsantonis, to
4  understand that in these cases where you have an
5  AAO appeal dismissed almost simultaneously with
6  the date that it's due, sometimes if we're not —
7  sometimes it takes a while to get those adverse
8  action notices and we're relying on service of
9  notice from RLI or from the co-obligor.  So what
10 I'm going to tell you is that from time to time we
11 have invoices where we appeal them, the appeal is
12 dismissed, we don't know that the appeal is
13 dismissed and then we get a final invoice or the
14 Treasury referral and we look at it and we go oh,
15 that appeal is dismissed.  This may be that case
16 but I again wouldn't know without going in and
17 looking at the individual client.
18   Q    Well, we can show you, and it was
19 presented at the hearing that, RLI was giving
20 continuous notice to Nexus to pay these bond
21 breaches.  So I don't think that was the scenario.
22   A    Listen, I'm not going to contest that

72

1  RLI gives us continuous notices to pay bond
2  breaches.  What I will say is that if we thought
3  that the breach was appealed, we wouldn't have
4  paid it until we knew that it wasn't appealed.
5  And so if we didn't -- I don't know when we got
6  the notice of action and I'd have to look it up to
7  see when we got the notice of action to be able to
8  answer this question more intelligently.  But
9  certainly I'm telling you that it often happens
10 where if we don't get -- if we don't get notice of
11 the adverse action, we don't know that the appeal
12 is brought in until we get that notice.
13   Q    Well, if RLI had information that the
14 appeal had run, you certainly had the information
15 that the appeal had run, right?  Didn't you
16 provide that information?
17   A    So it depends.  The -- well, and it's
18 frustrating to me, too, because I have to rely on
19 your client to get me data and details from the
20 federal government.  Because while I'm responsible
21 for standing in front of your client, your client
22 is responsible for getting me documents.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

19 (73 to 76)

**73**

1    Q    Okay.  But Mr. --
2    A    We haven't gotten a copy of a bond
3  cancellation since February of 2018.  It is now
4  March of 2020.  You haven't sent us bond
5  cancellations in two years.
6    Q    Mr. Donovan?
7    A    So I'm nervous about answering
8  questions based on what documents we've received
9  when you're not sending me the documents.
10   Q    Aren't these appeals being handled in
11 the name of Big Marco but by your law firm that
12 you pay?
13   A    That's correct.
14   Q    Right.  So you would have that
15 information whether an appeal has run or not.
16   A    So and a notice of action, yes.  We
17 would typically get it.
18   Q    Right.
19   A    Although sometimes they will send
20 information to the obligor because as you well
21 know, Ms. Katsantonis, from your read of the I352,
22 they have the option of serving notice to

**74**

1  either/or.
2    Q    These are appeals that are being filed
3  by Big Marco, right?
4    A    Right.
5    Q    And that Nexus is providing the legal
6  services for these appeals, right?
7    A    Right.
8    Q    So --
9    A    Ms. Katsantonis, I think —
10   Q    And paying for the appeals, correct?
11   A    Okay.  So is that --
12   Q    Is that correct?
13   A    I need to answer your question.
14        MR. SHOREMAN:  There's three questions.
15   A    You've asked multiple questions and I
16 understand what you're doing, you're trying to
17 establish a narrative but it's a false narrative.
18   Q    I'm not trying to establish a
19 narrative.  I'm trying to ask you did Big Marco
20 file those appeals.
21   A    It's a deposition and I think I'm
22 supposed to answer your questions, you've got to let

**75**

1  me.
2        MR. SHOREMAN:  Objection.
3    Q    But you're supposed to answer the
4  questions I ask.
5    A    The way you want them.
6    Q    No.
7        MR. SHOREMAN:  You may not be
8  interested, Ms. Katsantonis.
9        MS. KATSANTONIS:  Go ahead.
10       MR. SHOREMAN:  If you want to ask him
11 questions, you asked him three at a time, which
12 one do you --
13       MS. KATSANTONIS:  He answered one and
14 then I asked the next one.  I said aren't these
15 being filed in the name of Big Marco.  Yes.  And
16 aren't those for Nexus --
17       MR. SHOREMAN:  Let me suggest you let
18 him finish his answer before you ask the next one.
19   A    So what will happen is a bond — let me
20 be very — I'm going to try to break this down to
21 a very basic level because I want to make sure
22 that we're all on the same page.  A bond appeal is

**76**

1  filed, okay?  And I797 fee is issued.  That can be
2  sent and counsel might get that three or four
3  months after it's filed.  It's not always
4  instantaneous.  So when I tell you that we're --
5  we only know what we know based on what we're
6  getting, we don't always get the documentation
7  from government.  The AAO is notoriously slow,
8  okay?  So we will, from time to time, and it has
9  happened, I don't know if it's this case, but I
10 can certainly look, but we have had situations
11 where we have an appeal.  We don't get a notice of
12 action.
13   Q    I'm not talking about a one-off case.
14   A    Ms. Katsantonis, I'm talking.  This
15 happens often?
16   Q    No, I know.
17   A    It may very well be this case.  What
18 happens is an appeal is denied.  We don't get the
19 notice.  RLI gets notice from the government of a
20 referral to Treasury.  You come to us and say, "We
21 have this bond.  It is now referred to Treasury as
22 of this date."

77

1        And I say, "No.  We have an appeal on
2    this bond."
3        And then I go and try to, you know, get
4    the law firm to communicate with the AAO to find
5    out if there's a negative position.
6        Q    Okay.
7        A    And sometimes there is and we didn't
8    get served it.  So what I'm saying is I don't
9    know, based on the facts here, whether that was
10   this case or not but it does happen.
11       Q    Okay.  But in this case you had four
12   and a half months to pay?
13       A    I haven't looked at this case, as I
14   said, Ms. Katsantonis, I'm happy to do it.  If
15   we're going to talk about this case I'm going to
16   look at it and I'm going to talk about this case.
17       Q    I'm not --
18       A    I'm not going to testify as to the
19   delay without being able to testify as to why.
20       Q    My point is, isn't it true that Nexus,
21   and you can flip the page to the next page.
22       A    I think I'd like to review the records

78

1    on that client to answer your question.
2        Q    Well, keep going because there's more.
3    So go to the next page.  There is a whole litany
4    of, right, on page 3 there's one, two, three,
5    four, five, six bonds which the AAO appeal was
6    dismissed months prior to the Nexus' payment,
7    right?
8        A    Again, I don't --
9        Q    According to the chart.
10       A    I don't know the details here.
11       Q    Right.  I'm just asking you --
12       A    What I --
13       Q    Mr. Donovan --
14       A    What I do know is I'm -- as the
15   president and CEO of Nexus Services, I'm proud of
16   the fact that we're sitting here in a deposition
17   and all you can ask me about are payments that
18   were made.  Because as I said before, we stand in
19   front of RLI and this --
20       Q    That's not my question, Mr. Donovan.
21       A    -- indemnity agreement, every single
22   time and that's what we do here.

79

1        Q    But isn't it true, Mr. Donovan --
2        A    We paid these breaches —
3        Q    -- that those breaches weren't --
4        A    You're interrupting me.
5            We paid these breaches when they were
6    referred to Treasury.
7        Q    No.  Right.  But they weren't paid when
8    RLI requested, correct?
9        A    I would have to — I would have to
10   review the record.  Do you have the --
11       Q    Well, you know.  Yeah, I have --
12       A    We ultimately —
13       Q    I have records that show that you did
14   not pay them.
15       A    We did pay them.
16       Q    When they were requested by RLI?
17       A    But we did pay them.
18       Q    Not when requested by RLI, correct?
19       A    But we did pay them when they became —
20   when they were due.
21       Q    You're not answering my question,
22   Mr. Donovan.

80

1        A    We paid them for --
2        Q    Did you pay them at the time RLI
3    requested payments?
4        A    We paid them pursuant to --
5            MR. SHOREMAN:  Are you talking about
6    these three?  Which ones are you talking about?
7    Are you talking about all the bonds?  Or the bonds
8    here?  Be more specific here.
9        Q    Well, let me just start -- let me just
10   break it down.  RLI has repeatedly requested that
11   Nexus pay invoices within 30 days of the invoice,
12   right?
13       A    I believe they have and I've explained
14   to RLI why that's not functionally possible.
15       Q    Right.  So Nexus has not complied with
16   that request, right.
17       A    It's an inappropriate -- improper
18   request.  We have bonds that are on appeal.  We're
19   waiting.
20       Q    Okay.  So improper or not, you have
21   not --
22       A    It's part of our bad faith allegation

81
1 for sure.
2     Q    Okay.  So improper or not, you have not
3 paid invoices when requested by RLI, correct?
4     A    I haven't complied with unreasonable
5 requests from RLI.
6     Q    All right.  Again, you're not -- you're
7 throwing in -- I'm just trying to ask --
8         MR. SHOREMAN:  Objection.
9     Q    We've asked that the invoices be paid
10 in 30 days, correct?
11    A    If the request is erroneous, I'm not
12 going to do it.  And I'm not going to pretend like
13 I've done something wrong by not — you know,
14 destroying some program participants life because
15 RLI wants to get off some perceived liability
16 faster.  It's absolutely insane.  These are
17 people's lives that we're talking about here.
18 Human beings.
19    Q    So Nexus has not paid invoices by the
20 time requested by RLI, correct?
21        MR. SHOREMAN:  In what -- that's --
22 objection.

82
1     A    I —
2         MR. SHOREMAN:  Objection.  Can you --
3 are you referring to the invoices in Exhibit 2?
4         MS. KATSANTONIS:  Any of the invoices.
5     Q    Has Nexus paid the invoices at the time
6 requested by RLI?
7         MR. SHOREMAN:  Asked and answered.
8 Asked and answered.  Go ahead.  Answer it again.
9     A    I'm sure RLI would like us to pay
10 faster in some cases.  But I can say I'm happy to
11 say that we've paid every single time we were
12 supposed to.
13    Q    Right.  But again --
14    A    And RLI has lost no money and yet we're
15 still in year two and a half of this abusive
16 litigation when your client hasn't lost a dollar.
17 Hasn't lost a dollar.
18    Q    Isn't it true, Mr. Donovan, that Nexus
19 has not -- has consistently not paid the RLI
20 invoices upon RLI's request that the invoices be
21 paid?
22        MR. SHOREMAN:  Asked and answered.

83
1     A    Right.  We have paid the invoices.  We
2 may not have paid them immediately upon RLI's
3 demand, in many Instances because RLI's demand was
4 unreasonable.
5     Q    And not within the time that RLI
6 requested that they be paid, correct?
7         MR. SHOREMAN:  Asked and answered.
8     A    I just said that.  I just said that.
9     Q    So that's correct, correct?
10        MR. SHOREMAN:  Object.
11    A    I don't think so.  My answer is my
12 answer.
13        MR. SHOREMAN:  I think that -- correct,
14 correct is a double entendre.
15    Q    The request is very simple.  RLI
16 requests payments be paid within 30 days.  You
17 haven't applied that, correct?
18    A    Yes.  It's an improper request.  I'm
19 not going to pay and just abridge somebody's case
20 and screw somebody's life because RLI wants us to
21 pay an invoice --
22    Q    Right.

84
1     A    — faster.  That's nonsensible.
2     Q    That's all I'm looking for is you to
3 say yes.  You have not paid at RLI's request.
4     A    What I said was we've always paid
5 invoices.  We've absolutely always paid invoices.
6     Q    Right.  But not when requested by RLI?
7         MR. SHOREMAN:  Asked and answered.
8     A    Because those requests are
9 unreasonable.
10    Q    Can you just say yes rather than
11 because?
12    A    Yes.  Because the requests are
13 unreasonable.
14    Q    Thank you.
15    A    Thank you.
16        MR. SHOREMAN:  Thank you.
17    Q    And in fact, there were invoices that
18 the court had ordered to be paid within 60 days
19 and RLI -- and excuse me, Nexus did not pay those
20 on time within the 60 days of an invoice, correct?
21    A    Do you have a list of the ones that
22 you're referring to?  May I see it, please.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

22 (85 to 88)

**Page 85**

1          I'll have her mark it?
2      Q    Yes, thank you.
3          (Donovan Exhibit 3 marked for
4   identification and attached to the transcript.)
5      Q    So this list is a list of invoices that
6   had not been paid by Nexus as of the January 22nd,
7   2020 hearing before Judge Urbanski?
8      A    Are any of these still outstanding?
9      Q    That's not my question.
10     A    No.  I'm asking you.
11     Q    My question -- I'm not going to answer
12  questions.  I'm not being deposed.
13     A    Because they're not, okay?
14     Q    My question is do you have an
15  understanding that the invoices listed on this
16  summary page were not paid as of the January 22nd,
17  '20 hearing?
18     A    My understanding is that these invoices
19  have been paid.
20     Q    No?
21     A    I'm not -- I'm not done,
22  Ms. Katsantonis, please.

**Page 86**

1      Q    Sorry.
2      A    I'm not aware of whether they were paid
3   before the hearing or not, but I am under the
4   impression and knowledge that these are paid and
5   if they aren't you need to let me know that so I
6   can pay them.
7      Q    So you received a copy of this chart
8   after the hearing.
9      A    I'm sure I did, yeah.
10     Q    All right.  And did you review it with
11  your records to ensure it was accurate?
12     A    Yeah.  Although admittedly I review a
13  lot of records.
14     Q    Okay.  And so you have no reason to
15  dispute that these invoices have not been paid as
16  of the January 22nd, 2020 hearing, correct?
17     A    Well, so, you know your prior
18  qualification would certainly apply although I
19  don't know that that's what this spreadsheet
20  represents to the court.  So -- but I'm not sure
21  of the payment date but I don't know.  I'm sure
22  you're not lying to me.  I'm sure you didn't put a

**Page 87**

1   document in front of the court that's improper.
2   What dates the payments were made, I don't know.
3      Q    Right.  But you have no evidence or no
4   reason to dispute the facts set forth in this
5   summary of Nexus' contempt by failure to pay past
6   due invoices?
7      A    Only insofar as the document seems to
8   leave unclear whether the balances have been paid
9   and I think that's an important issue.
10     Q    You mean as of today?
11     A    Correct.
12     Q    But we're using this as of
13  January 22nd, 2020.
14     A    But my biggest concern is that I comply
15  with the provisions of the general indemnity
16  agreement.  So if I am not compliant -- if any of
17  these are outstanding, you need to let me know so
18  I can pay your client and comply with the general
19  indemnity agreement.
20     Q    I'm asking you, though, to the best of
21  your knowledge, you have no reason to dispute that
22  these invoices had not been paid as of

**Page 88**

1   January 22nd, 2020?
2      A    To the best of my knowledge, this
3   spreadsheet is accurate as it's dated as of --
4   dated as of January 21st, 2020, and to the best of
5   my knowledge all of these invoices have been paid.
6      Q    Since?
7          (Donovan Exhibit 4 marked for
8   identification and attached to the transcript.)
9      A    I like the color coding.  I wonder what
10  burnt orange means?  I'm trying to figure out your
11  color coding.
12     Q    There is no reason.  Trying to
13  distinguish them out so we don't get them
14  confused.
15          I handed you another chart that was
16  presented to the court, it was marked Plaintiff's
17  Exhibit 3, and it's the summary of RLI bond
18  demands and Nexus responses.
19          Do you see that?
20     A    I do see that.
21          MR. SHOREMAN:  What exhibit is that to
22  the deposition?

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

23 (89 to 92)

**89**

1      THE WITNESS:  Exhibit 4.
2      MR. SHOREMAN:  This is 4?
3      THE WITNESS:  Yes, sir.
4      Q     And this is another chart that was
5  presented at the January 22nd, 2020 hearing.
6  And -- right.  And as you sit here today, do you
7  have any reason to dispute the facts set forth in
8  this chart that was presented to the court?
9      MR. SHOREMAN:  Ms. Katsantonis, could
10 you explain what this chart is?  I know it's
11 presented to the court but I don't believe this
12 witness has an explanation of what the chart
13 actually relates to.
14     Q     Did you review this chart after the
15 hearing, Mr. Donovan?
16     **A     I think I've seen it.  I'm not -- it**
17 **looks like -- so what we're talking about each**
18 **line is grouping multiple invoices together and**
19 **giving a narrative about what happened with those**
20 **groups of invoices, right.**
21     Q     Well, it's -- right.  It's basically
22 saying here's when RLI issued a demand letter

**90**

1  pursuant to the court order?
2      **A     Right.**
3      Q     And then there's a payment deadline
4  pursuant to the court order.
5      **A     So, yeah, I can -- so based on my**
6  **ability to read the spreadsheet, I can understand**
7  **what it's saying.**
8      Q     Right.
9      **A     I don't have independent knowledge of**
10 **the spreadsheet, but I'm happy to answer questions**
11 **about it.**
12     Q     Right.  But you had an opportunity
13 to -- Nexus had an opportunity to review this
14 information and you have no reason --
15     **A     Correct.  It was filed in court so we**
16 **would have received a copy of it.  I would have**
17 **reviewed it.  I didn't flag it as something that,**
18 **you know...**
19     Q     Right.  And Nexus has no reason to
20 dispute the facts set forth in this chart; is that
21 correct?
22     A     That's correct.  And I believe we've

**91**

1  paid all of these invoices.
2      If I haven't let me know so I can make
3  good on the indemnity agreement.
4      Q     So RLI contends that as of March 1st,
5  2020, DHS has issued formal notices of
6  cancellation on 399 of RLI's 2,486 bonds.
7      Do you dispute that figure?
8      **A     Let me -- can you give me a second?**
9      Q     Sure.
10     **A     Thanks.  I don't have any reason to**
11 **dispute that.**
12     Q     Okay.
13     **A     I would just say that I rely on your**
14 **client to send cancellations and since they**
15 **stopped sending them in February of 2018, there's**
16 **no way for me to know what cancellations we've**
17 **received since.  And so I am a hundred percent**
18 **flying blind and relying on your client's**
19 **representations.**
20     **Although I would very much like to**
21 **continue to receive bond cancellations, so perhaps**
22 **you could pass that on because they are very**

**92**

1  **helpful in understanding, you know, being able to**
2  **communicate to clients that, you know,**
3  **congratulations on success of their case.  We**
4  **don't get those.  We don't know.**
5      Q     So let me ask you, and you stated that
6  Nexus is not keeping track of how many notice of
7  cancellation.  You're relying on RLI's number,
8  right?
9      **A     Well, we don't get them.  There's no**
10 **way for us to keep track.  All we can do is rely**
11 **on you.  When your client doesn't send us the**
12 **cancellations, we're out of luck.**
13     Q     Okay.
14     **A     There's no other way for us to get**
15 **them.**
16     Q     And if RLI contends that the aggregate
17 penal sum of the 399 bonds for which a notice of
18 cancellation was received is 5,219,000, you do not
19 dispute that figure either, correct?
20     **A     It sounds about right based on average**
21 **bond amount.  But, you know, wouldn't know, but**
22 **wouldn't necessarily think it's a lie either.**

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

93

1     Q    Okay.
2     A    But wouldn't know because I don't have
3  the documents.
4     Q    So if we used your number that -- of
5  the bonds that we know the disposition of for RLI,
6  that RLI issued, 290 have been paid, right, using
7  your numbers?
8     A    Right.
9     Q    And 399 have been canceled?
10    A    Right.
11    Q    Right.
12    A    Using those numbers, right?
13    Q    And the remainder we don't know the
14 disposition yet.
15    A    Right.
16    Q    Okay.  So if you -- the ones that we
17 know the disposition of, am I right, if you added
18 the 290 plus the 399 -- 290 plus the 399, that's
19 689 out of the 2,486 RLI bonds that we currently
20 know the disposition of based on Nexus' number,
21 correct?
22    A    Based on Nexus' number of paid.

94

1     Q    Right.
2     A    It's the larger number there is
3  canceled.  And since I'm not getting
4  cancellations, I can't confirm that.
5     Q    Right.  Okay.  But uses Nexus' paid
6  number.
7     A    Right.
8     Q    So if we used your paid number, then
9  since -- then if you said 290 out of the 689 bonds
10 that we know the disposition of, that would equal
11 42 percent of the bonds have been paid for which
12 we know their disposition; is that correct?
13    A    I suppose.  Although I'm not really
14 sure that that number makes any sense.
15         We should -- you know, we're looking
16 at -- I'm not sure why looking at the number of
17 bonds paid versus the number of bonds canceled,
18 when I don't even have an independent
19 understanding of that number because I haven't
20 gotten cancellations for two years.  I don't know
21 that it makes much sense.
22         A fail rate is your failure by the

95

1  number of bonds that are written, not by the
2  number of bonds that are canceled.  And it's
3  especially true given the fact that I don't even
4  get cancellations from your client.
5     Q    Well, you're --
6         MR. SHOREMAN:  Wait, objection.
7         MS. KATSANTONIS:  Sorry.  You're right.
8     A    It's impossible for me to address that.
9  I don't know that bucket of information and have
10 no knowledge of that number.  And B, it doesn't
11 matter.  The two numbers don't relate to each
12 other at all.
13    Q    Well --
14    A    It matters if you're calculating the
15 total number of closed cases.
16    Q    Right.
17    A    And certainly you could calculate that.
18         But that has nothing to do with the
19 failure or success rate of a program.
20    Q    Okay.  So you're taking -- so let's go
21 to the failure rate for a minute --
22    A    Uh-huh.

96

1     Q    -- your failure rate of a program.
2         What is Nexus' failure rate of its
3  program?
4     A    Our failure rate's 2.38 percent.
5     Q    Okay.  And how is that number
6  calculated?
7     A    That's calculated by determining the
8  total liability of bonds that Nexus has secured
9  and the total invoices paid based on that
10 liability.
11    Q    Okay.  So you're saying, for what, for
12 all of the bond programs since 2015.
13    A    Correct.
14    Q    So you're using your -- I don't
15 remember the number, 23,000 number.
16    A    Yeah, right, but it's dollar amount.
17 Dollar amount.  If you're calculating the breach,
18 the fail rate, it really has to be dollar amount
19 because number of bonds, depending on the amount
20 of the bonds.  In other words --
21    Q    Aren't these people?  Why are you
22 counting the dollar amount?

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

25 (97 to 100)

97

1      A   Because that's what ultimately you have
2  to pay.  If you're calculating a fail rate based
3  on dollars and cents, then you would calculate it
4  that way, right?  The fail rate is based on the
5  amount of money that Nexus has to pay for RLI for
6  bonds that breach, right?
7      Q   Okay.  So --
8      A   Why wouldn't you think about dollars?
9  This whole case is about dollars.  If you want to
10 make -- if you want to stop talking about dollars
11 and start talking about people, you're going to
12 have a best friend right here.  Because I'm a
13 hundred percent about that.  This case is about
14 money and it's about money that we are paying.
15 The shocking reality of this case,
16 Ms. Katsantonis --
17     Q   I don't need  --
18     A   -- is that we have stood and done
19 everything that we were supposed to do pursuant to
20 this general indemnity agreement --
21     Q   All right.
22     A   -- for the last three years.  And we're

98

1  in this abusive litigation.  We're talking about
2  dollars and then you ask me are these people not
3  dollars?  Are you kidding me?
4      Q   Okay.
5      A   You just put several spreadsheets in
6  front of me that are all about dollars.
7      Q   I'm just trying to understand how
8  you're calculating.
9      A   And I'm telling you.
10     Q   So let's just go back to that, okay?
11     A   Uh-huh.
12     Q   Let me just understand how you're
13 calculating your fail rate.  I just want to know
14 how you're doing it.  So you're saying that there
15 was 23 -- you took the 23,234 bonds issued and you
16 took the total value of those bonds?
17     A   That's correct.
18     Q   And what is the total value of those
19 bonds?
20     A   $481,928,000.
21     Q   Okay.  So you took the total value of
22 those bonds and then you have deducted how much

99

1  Nexus has paid in bond breaches?
2      A   Right.  The total that we considered
3  was 11,477,712.  The documentation for which is in
4  the bond breach notebooks that I'm producing
5  today.
6      Q   Are there payments that you didn't
7  consider in that number?
8      A   No.  This is representative of Nexus'
9  payments of invoice bonds.
10     Q   All right.  And so you're --
11     A   So these are true dollars.
12     Q   Okay.  So if using your fail rate
13 analogy, how many RLI -- what -- you agree that
14 the penal sum of the RLI bonds was 30 million?
15     A   That's correct.
16     Q   And how many have been paid?
17     A   $3,212,883.67.
18     Q   So then under your calculation of a
19 fail rate, RLI has had at least a 10 percent or
20 more fail rate, correct?
21     A   Which is -- now you'll understand why I
22 have a bad faith claim and I've been screaming for

100

1  your client to allow me --
2      Q   Can you just answer my question?
3      A   Yes.  But your client has refused to
4  allows us to contest these breaches.  Your client
5  has created the crisis that they're now screaming
6  about.  And, oh, by the way, I've stood in front
7  of them, even though they created the crisis and I
8  paid the breaches that they caused by not --
9      Q   What crisis has --
10     A   -- by not allowing -- not allowing us
11 to contest these breaches.  If we had --
12     Q   Isn't Big Marco contesting the
13 breaches?
14     A   No, he's appealing.  Ms. Katsantonis,
15 the surety has to sign a letter for allowing you
16 to contest the breach with the bond unit.
17 Otherwise, the only thing the co-obligor can do is
18 file an appeal with the AAO, which is much longer
19 and much less likely to be successful.
20     Q   How would you -- what do you -- what --
21 give me an example of contesting a breach.
22     A   In fact, I'm making a production of a

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

---

**101**

1  request to Ira Sussman.  We made a request for 47
2  different bonds that we felt we could contest
3  because there were issues.  And so Julie —
4      Q    You're making that different than an
5  appeal?
6      A    You're —
7      Q    No, I'm just trying to understand.
8      A    No, yeah, it is different.
9      Q    I'm trying to understand what your
10 difference -- your distinction is.
11     A    Yes.  See, here's how it works:  You
12 know, a notice to deliver a bond, you know,
13 there's a notice to deliver, the person didn't get
14 the notice.  The bond breaches.  Maybe we don't
15 even have the breach yet, right?
16         But we know the bond breached.  We know
17 there's an issue.  Maybe the person got
18 transferred from one jail to the other and the
19 judge — this happens, it happens in Texas,
20 there's an error, the person got sent home and
21 didn't — wasn't able to go to the court that they
22 were supposed to so they went to the wrong court.

**102**

1  That kind of stuff happens.
2          And in those situations, when you can
3  prove it, you can put that in front of the bond
4  unit officer and they cancel the breach.  But in
5  order to do that, I have to have a letter from the
6  surety, because the bond unit officer doesn't care
7  about the co-obligator, they want the surety to
8  give us permission to contest.  And we asked for
9  permission to contest from RLI, and RLI said —
10 first of all, you refused it entirely.  And then
11 when we sent this letter and said, look, this is a
12 lot of money.  Our breach rate with RLI is higher.
13 We're concerned about it.  We want to be able to
14 contest these breaches and —
15     Q    Did you say that --
16     A    — Mr. Sussman said no every single
17 time.  He never let us contest one.
18     Q    What's the date of that letter?
19     A    I will have to get it for you.  But I
20 can produce it.
21         MR. SHOREMAN:  Pull it out.  You want
22 to get it?  Get it.

**103**

1      Q    Let's see the letter.
2      A    I may have to pull it up
3  electronically.
4          MR. SHOREMAN:  Do whatever you have to
5  do.
6          THE WITNESS:  Okay.
7      Q    All right.  Let's -- Mr. Donovan, are
8  you looking for the letter; is that what you're
9  doing?
10     A    December 19th, 2017.  And I will — it
11 was a letter that Juliana Gutierrez sent to
12 Mr. Sussman, that I will —
13         MR. SHOREMAN:  Can you email it to me
14 and I'll provide it.
15         MS. KATSANTONIS:  We might have that.
16     A    You probably do.
17     Q    But we'll come back to it.  I think
18 it's in one of those boxes.
19         THE WITNESS:  Anyway, John, I'm sending
20 it over to you just to have it.
21         MR. SHOREMAN:  Thank you.
22         THE WITNESS:  Otherwise I'll forget.

**104**

1  I'll never remember to do it.
2      Q    All right.  So getting back to this
3  breach rate.  So you're -- in order to determine
4  the breach rate, you're -- when you use the total
5  amount of bonds issued for a balance calculation,
6  you're just assuming that they're not breached?
7  They'll never be breached, right?
8      A    No, they're not breached.
9      Q    Well, aren't you -- don't you have to
10 take into consideration the fact that some of them
11 will be breached?
12     A    Well —
13     Q    In the future?
14     A    You know, I think that's why you
15 calculate a fail rate so you understand what that
16 fail rate likely is.  I mean, I want to understand
17 what my fail rate is.
18     Q    But --
19     A    So I understand what my fail rate is
20 likely to be.  Is that what you're asking me?
21     Q    Yeah, but that doesn't make any sense.
22 So when you're calculating your fail rate -- I'm

**105**

1  just trying to understand the math.
2      A   Right.
3      Q   When you're calculating the rate,
4  you're using as the denominator all of the
5  outstanding, the penal sum of all of the
6  outstanding bonds, right?
7      A   Of course.  I mean that's how you
8  determine a fail rate.
9      Q   Well, that's how you're calculating it.
10  But you know that some of those bonds are going to
11  be breached and paid?
12      A   And I know the vast majority will never
13  be breached.
14      Q   How do you know that when you don't --
15  you don't know the disposition of those -- you
16  don't know the disposition of those bonds yet.
17      A   Well, no, of course not.  But
18  historical data.  I mean, not everybody -- if
19  everyone breached you would never have gotten into
20  this program, right?  I mean, you guys know that
21  every bond doesn't breach.  And you guys know
22  that --

**106**

1      Q   Mr. Donovan?
2      A   -- the vast majority of bonds don't
3  breach.
4      Q   Mr. Donovan, what is the national --
5  right.  RLI was relying on your representation of
6  an under-2 percent bond breach failure rate,
7  right, when it issued the bonds?
8          MR. SHOREMAN:  Objection.  That assumes
9  a fact not in evidence.
10      A   I think RLI responded to our fail rate
11  which is favorable and as a company is good.  With
12  the RLI business it's not because RLI has acted in
13  bad faith.  RLI has refused to allow us to contest
14  bond breaches.  RLI has continued to act in a way
15  that has only exacerbated the breach --
16      Q   That's not my question.
17      A   We continued to pay them of course
18  because we do that.
19      Q   Mr. Donovan, you don't need to give me
20  a whole recitation of your position with every
21  question.  I'm trying to ask simple questions so
22  we can just keep moving it along.

**107**

1          So my question to you is RLI when
2  issuing its bonds relied on the fact that Nexus
3  said that it had a fail rate of under 2 percent,
4  right?
5          MR. SHOREMAN:  Objection.  Objection.
6  That's -- you're asking this man to speculate as
7  to what RLI believed.
8          MS. KATSANTONIS:  No, I'm asking him as
9  to his understanding of the representation made by
10  Nexus to RLI.
11          MR. SHOREMAN:  No, you're not.  That's
12  not the question.
13      Q   Didn't Nexus advise --
14          MR. SHOREMAN:  That's not the question.
15      Q   Didn't Nexus advise RLI that it had a
16  bond failure rate of less than 2 percent?
17      A   I think that's a legitimate question.
18  And the answer to that legitimate question is yes.
19  But for you to say I don't know what Mr. Sandoz or
20  Mr. Sussman or anybody else relied on more than
21  anything else and so I can't answer that.  But I
22  certainly can tell you that yes we communicated

**108**

1  our fail rate to them.
2      Q   When you're doing you --
3      A   And it's unfortunate that the fail rate
4  for RLI is so high.
5      Q   Right.  But just from a mathematical
6  concept, when you're doing your fail rate the
7  denominator is the full value of all the bonds
8  that have ever been issued, right?
9      A   That's correct.
10      Q   And you're using that large denominator
11  to come up with your 2 percent figure based on how
12  many bonds have been paid?
13      A   Well, math is math, Vivian.
14      Q   Right?
15      A   A percentage of something is a
16  percentage of something.  I don't understand this
17  question.  I'm not going to redefine math.
18      Q   Let me ask you this though, the
19  denominator includes bonds that you know that
20  you'll have to pay.  In that denominator number
21  there are bonds that will be breached and invoices
22  paid, right?

109

1      A   Well, sure.  That's why you calculate a
2 fail rate, right, so you can anticipate what your
3 fail rate is going to be.  Isn't that why you want
4 to know?
5      Q   Well, that's not an accurate fail rate,
6 is it?
7      A   You want to know because you want to
8 put it in your motion for summary judgment that we
9 have a high fail.  But the only place we have a
10 high fail rate is RLI bonds because your client
11 doesn't' allow us to contest, your client stands
12 in the way of our ability to adjudicate these
13 favorably and we have to pay more.
14     Q   Doesn't --
15     A   But that's what we're talking about.
16     Q   What's your fail rate for all your
17 other sureties?
18     A   It's -- as I said, the fail rate is
19 2.38 percent.
20     Q   So that applies for each and every
21 other surety?
22     A   That's everybody.

110

1      Q   No, but I'm asking you, what is your
2 fail rate for other sureties?  Let's say FCS?
3      A   I don't know.  We don't keep that -- we
4 don't keep that data specific to each surety.  The
5 only reason we have it for FSC is because you
6 provided it -- RLI is because you provided it.
7      Q   Right.  So when you say RLI's fail rate
8 is higher than the other sureties, you don't know
9 if that's true?
10     A   You know what, Ms. Katsantonis, you're
11 exactly right.  I will be able to say with
12 absolute assurance that RLI's fail rate is higher,
13 much, much, much higher, more than three times as
14 high as our global fail rate.  But you're quite
15 right.  I can't say that RLI has a higher fail
16 rates than the others because I don't have those
17 calculations.  I can say that it is obviously if
18 RLI's calculation is, you know, three times as
19 much that the other sureties would be much lower.
20 And it's obviously based on the calculations in
21 total that it's much lower.  But I think you're
22 right, what I can say and the appropriate way to

111

1 say that would be that RLI's breach rate is much,
2 much higher than our global breach rate.  That's
3 probably a better way to say it.
4      Q   Again, looking at your -- how you
5 calculate a failure rate, wouldn't you agree that
6 that's erroneous because some of the bonds that
7 you include in the denominator will be breached?
8      MR. SHOREMAN:  Objection.  That's not
9 an appropriate question to a corporate
10 representative.
11     A   I know.
12     MR. SHOREMAN:  Are you asking for his
13 personnel opinion?
14     MS. KATSANTONIS:  I'm asking -- he's
15 giving me what Nexus' failure rate is.
16     MR. SHOREMAN:  Yeah.  You're telling
17 him -- he's given you his corporate policy and
18 you're saying isn't that corporate policy wrong.
19 He's not responsible for defending that corporate
20 policy; he's responsible for telling you what it
21 is.
22     MS. KATSANTONIS:  That's fine.  He can

112

1 explain to me --
2      MR. SHOREMAN:  Go ahead.
3      MS. KATSANTONIS:  If you're going to
4 instruct him not to answer how he calculates.
5      MR. SHOREMAN:  No.  But I want --
6 you're asking him a question that can only go to
7 this witness's personal knowledge.
8      MS. KATSANTONIS:  No.  It's his --
9 Nexus' calculation -- and it doesn't matter, I
10 don't care if it's personal or not.  He's the
11 president of the company.  It doesn't matter.  It
12 binds the company to the same degree.
13     MR. SHOREMAN:  No, that's not -- that's
14 incorrect, Ms. Katsantonis.
15     MS. KATSANTONIS:  I'm not going to
16 argue with you.
17     MR. SHOREMAN:  The issue here is what
18 is the policy of the company not to ask the
19 corporate representative isn't that policy that
20 you just enunciated therefore wrong.
21     MR. HARRIS:  Let's off the record to
22 have this discussion.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

29 (113 to 116)

---

**113**

BY MS. KATSANTONIS:

2  Q   Right.  So in calculating the bond
3  breach ratio, isn't it true that the denominator
4  figure is inaccurate because some of those bonds
5  will be breached and invoiced?  They'll be moved
6  to the numerator at some point, right?
7     MR. SHOREMAN:  Okay.  I object.
8     Go ahead and answer.
9  A   Okay.  So I don't really understand
10 your question and I'll say that I don't understand
11 it not because I need you to repeat it, but
12 because I think we're completely talking about two
13 different things.
14    When I calculate a fail rate, I'm using
15 real numbers.  I'm using them in a very
16 straightforward way and I'm calculating it the way
17 everybody else calculates those numbers.  When you
18 have -- when you have two numbers and you're
19 trying to determine the percentage of one number
20 versus the other.  There's a very basic
21 straightforward mathematical calculation, we all
22 learned it in fourth grade, that enables you to

**114**

1  get that figure.  That's what I've done.  You are
2  asserting that there's got to be some other
3  additional calculation.  No, no.  There is a total
4  universe of bonds and there is a breach rate of
5  those bonds.  You would have to consider those two
6  numbers together to get that in any -- any other
7  way that you would calculate it would be
8  erroneous.
9  Q   Really?  Because if you issued all the
10 bonds on the same day, let's just say you
11 calculated RLI's failure rate, if you calculated
12 RLI's based on the way you're calculating it, if
13 you calculated RLI's failure rate within the first
14 three months of issuing a bond, it would be zero
15 percent, right?
16 A   But that's not what we're doing.
17 Q   But isn't that true?
18 A   Hold on a second?
19 Q   Isn't it true?  Based on your
20 calculations isn't that true?
21 A   Can you stop interrupting?
22 Q   I want the answer to the question.

**115**

1  A   But you want your answer to a question
2  which is wrong.  I mean if you want to testify you
3  can give whatever answer you want.
4  Q   Is it wrong that after three months
5  your failure rate with RLI would have been zero
6  percent?
7  A   I'm not testifying about my failure
8  rate with RLI after three months.  I'm testifying
9  based on a year of business, where it's —
10 Q   Well, it could be --
11 A   — seven percent, where it's three
12 times the other books of business.
13 Q   Right, but based on your calculations,
14 based on if you take the total number of bonds
15 paid versus all the bonds out there, from three
16 months into the program, RLI's bond breach failure
17 rate would have been zero percent, correct?
18 A   Well, sure.
19 Q   Okay.
20 A   But since you have six years' worth of
21 numbers, aren't you kind of proving my point?
22 Q   And --

**116**

1  A   Aren't you basically justifying further
2  my argument that these numbers matter more because
3  there's more of them?  Thank you, Ms. Katsantonis.
4  Q   And if you have six years of numbers on
5  the disposition of those bonds, how many have been
6  canceled versus paid, isn't that accurate data to
7  use?
8  A   No.  The cancellation has nothing to do
9  with the breach rate.
10 Q   It has to do with the rate at which the
11 liability of a surety is terminated, right?
12 A   Yeah.  So the -- any potential future
13 liability would not be there if the bond is
14 canceled.  But that's not -- we're talking about a
15 fail rate, Ms. Katsantonis.  We're talking about a
16 fail rate based on breaches.  You are making this
17 very, very simple issue much more complicated.  At
18 the end of the day, you filed a lawsuit against me
19 because you want money.  You want money based on
20 what you think are potential losses, not real
21 losses because you had no losses.  So this is a
22 lawsuit about money.  And now I'm talking to

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

30 (117 to 120)

117

1  you --
2     Q   I know you keep saying that for the
3  record, but I hope you understand what exoneration
4  is.
5     A   Ms. Katsantonis, I'm trying to answer.
6         MR. SHOREMAN:  Please don't interrupt
7  the witness.
8     A   I'm trying to answer.
9         MS. KATSANTONIS:  He's not answering.
10 He just keeps giving his own lecture.
11        MR. SHOREMAN:  Are you just going to
12 cut off his answer then?
13    Q   Go ahead.
14    A   This is based on money.  It's based on
15 money paid.
16    Q   Then you don't understand the whole
17 lawsuit.
18        MR. SHOREMAN:  Please.  You're arguing.
19    A   I read the Complaint.  And I'd really
20 like to finish my answer, please.
21    Q   I don't --
22    A   You're not interested, but guess what,

118

1  the record is.  I'm going to finish my answer for
2  the record.
3     Q   You can answer --
4     A   Ms. Katsantonis, please.
5     Q   I'm going to let you finish this answer
6  but in the future I'm going to try to direct you
7  to please just answer my questions.  You're going
8  to have your day in court and you can go --
9     A   Yes, I am.
10    Q   -- and talk about everything you would
11 like to talk about in your position and that's
12 great.  But today we're here for me to get answers
13 with regard to our deposition.
14    A   But you ask a question.
15        MR. SHOREMAN:  Object.  Surely,
16 Ms. Katsantonis, you must agree that you want this
17 witness to give full and complete responses,
18 correct?
19        MS. KATSANTONIS:  Let's finish.  I
20 would like him to --
21        MR. HARRIS:  More responsive answers.
22        MR. SHOREMAN:  Let's get it.

119

1         MS. KATSANTONIS:  I don't want to waste
2  any more time on the record.  Let's get off the
3  record.
4         MR. SHOREMAN:  No, we're not going off
5  the record.
6         MS. KATSANTONIS:  All right.  Well,
7  then I don't want this time on my record.
8         MR. SHOREMAN:  Then don't ask him
9  open-ended questions.
10        Go ahead.  Finish your question --
11 finish your answer.
12    A   This is a lawsuit about money.  So when
13 you're asking questions about breach rate and fail
14 rate, why wouldn't I presume you want to know
15 about the money.  So the only way to calculate the
16 breach rate is to take the total dollars of the
17 liability and the total dollars of what has been
18 paid and that's your rate and the rate is
19 2.38 percent and the fact that it's three times
20 that for RLI is a symptom of the bad faith.
21    Q   Do you know what bad faith is?
22    A   Oh, yes.  I've gotten the crash course

120

1  of it in the last couple years.
2     Q   Okay.  And what's your definition of
3  bad faith?
4     A   When RLI engages in an agreement and
5  then does things that cause higher failure rates,
6  for example, that's bad faith.  So for example,
7  when RLI arbitrarily and capriciously denies our
8  ability to contest breaches, you know, knowing
9  that that's going to elevate the breach rate,
10 that's bad faith.
11    Q   What facts and --
12    A   When RLI doesn't send us cancellations
13 for two years, that's bad faith.  When RLI sends
14 us a bill and makes us pay an invoice they know is
15 canceled, that's bad faith.  These are elements of
16 bad faith.  And I'm going to need a bio break.
17        MR. SHOREMAN:  Okay.  Is this lunch or
18 is this a break?
19        THE VIDEOGRAPHER:  We are going off the
20 record at 13:21.
21        (Recess taken.)
22        THE VIDEOGRAPHER:  We are back on the

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

31 (121 to 124)

121

1 record at 14:14.
2 BY MS. KATSANTONIS:
3     Q   Mr. Donovan, before we took a break,
4 you were listing a series of issues that you
5 decided -- where you determined to be bad faith?
6     A   Yes. My answer, yes, ma'am.
7     Q   So just to be clear, what was the first
8 one, arbitrarily and capriciously?
9     A   Well, to ask me to remember the order
10 which I listed them I may fail.
11    Q   I'm sorry.
12    A   But what I said was arbitrarily and
13 capriciously deny our ability to contest bond
14 breaches we know are inaccurate. Which I think
15 shows in the fail rate very clearly.
16        We're paying bonds that we wouldn't
17 have to pay, that we shouldn't have to pay. We
18 have RLI bonded principals who are still going to
19 court on breaches we've paid.
20    Q   Okay.
21    A   Because they were reopened, but we
22 couldn't contest it so we couldn't get the breach

122

1 set aside so we had to pay it.
2     Q   Which bonds principals do you have
3 still going to court?
4     A   I'll get you a list of the bond
5 principals that we have. I think there are four
6 or five of them.
7     Q   You don't know sitting here today?
8     A   There's a gentleman named █████████
9 ██████████████ I'll have to get you his full
10 name, but I've been looking at his case
11 specifically and talking to him. He has a breach.
12 That breach invoiced and he still has immigration
13 court. There was an error in his case, this
14 sometimes happens, and I think that had we had an
15 opportunity to contest his breach we would have
16 done that. If it were a non-RLI breach, we would
17 have contested it with the bond officer and
18 hopefully had it mitigated.
19    Q   Isn't -- in any situation, even if a
20 bond penal sum is paid, can't the DHS continue in
21 its efforts to identify the immigrant and continue
22 with removal proceedings or any other proceedings?

123

1     A   So what you're asking is if -- can you
2 help me understand what your question is?
3        Are you saying a person who doesn't --
4 who breaches and whose bond is paid still has
5 responsibilities? Is that what you're asking me?
6     Q   Right?
7     A   I just want to understand.
8     Q   Right.
9     A   Yes.
10    Q   A person doesn't appear, then there's a
11 notice to deliver to the bonding company. And the
12 immigrant doesn't show up, eventually the bonding
13 company pays the penalty, penal sum of the bond.
14 But isn't -- aren't those proceedings ongoing
15 still?
16    A   So --
17    Q   Doesn't DHS continue?
18    A   Typically a warrant would be issued for
19 the person's arrest at which time they would be
20 brought back into custody and then a new case
21 would be initiated against them.
22    Q   So they could still have proceedings?

124

1     A   They could still have proceedings. And
2 what they would no longer have, though, is an
3 active bond. So if they're at liberty in the
4 proceedings and then the bond is abridged, then
5 they're no longer on bond and that's what can
6 affect them. It makes them susceptible to
7 immediate arrest.
8     Q   Okay. So if a bond breach invoice is
9 mitigated, the result is just that the amount of
10 the payment obligation is reduced, right?
11    A   Correct.
12    Q   So -- right. So it has no impact on
13 the individual's substantive rights in immigration
14 court, right?
15    A   It depends. If it's mitigated, meaning
16 you get a 33 or 66 percent reduction, then, no,
17 there's nothing to do with the individual's case
18 and everything to do with the obligor, co-obligor
19 showing that they substantially complied, meaning
20 that the immigrant substantially complied with
21 their duties.
22        Now, that being said, if it's a -- but

125

1  if it's a situation where the breach was improper
2  and they're rescinding the breach, then it
3  absolutely affects the client.  And the vast
4  majority of cases where we challenge a breach
5  because, you know, with a surety letter, with an
6  authorization letter from a surety, it isn't to
7  get a mitigation, it isn't to get 33 percent or
8  66 percent, it's because the person actually has
9  an active case, there's a real issue and the bond
10 was breached inappropriately and we're asking the
11 bond unit officer to fix it.  It's the most direct
12 way to seek a resolution as we explained to
13 Mr. Sussman when we asked permission to do it.
14        He denied our blanket permission but
15 then told us we could ask for permission for
16 individual bonds.  We asked for permission for
17 dozens, were denied each and every time.  So we've
18 not been able to actually contest breaches that
19 are RLI breaches.
20     Q   So what argument would you make for
21 Hector that would affect his substantive rights in
22 immigration court?

126

1        MR. WILLIAMS:  When you say substantive
2  rights, are you talking about status?
3        MS. KATSANTONIS:  I'm asking him based
4  on what Mr. Donovan's testimony is.
5     A   So I can recognize a legal issue but
6  I'm not a lawyer.  So I can't advise ████ of his
7  rights and I can't advise you of ████ rights.
8     Q   Well, but you just said that somehow,
9  or I think you're implying that those rights are
10 somehow affected if a bond is paid?
11    A   They can be.
12    Q   How specifically?
13        MR. WILLIAMS:  Status rights or what
14 are you --
15        MS. KATSANTONIS:  This is his testimony
16 I'm asking him.  I don't understand it either but
17 I'm trying to figure out how are the immigrants'
18 rights affected if a bond is paid.
19    A   Because if a bond is -- if a bond is
20 breached and it's paid and it's not resolved, then
21 there's a warrant issued for that alien's arrest.
22 Do you understand?

127

1     Q   No.  What do you mean it's not
2  resolved?  You keep -- I mean, you're kind of
3  mixing terms.  I'm just trying to understand.
4     A   Let me be very clear.
5     Q   If a bond is paid, how does that bond
6  payment affect the rights of the immigrant to
7  pursue its rights in immigration court?
8     A   We are talking about a very specific
9  subset of bonds.  What we're talking about are
10 reconsideration requests.  That's what we're
11 talking about.  So you're asking a question on top
12 of that conversation.  So let's get apples to
13 apples, okay?  We're talking about --
14    Q   Reconsideration of what decision?
15    A   Of the breach?
16    Q   Of the bond breach or the notice to
17 appear?
18    A   Of the bond breach.  Which is what we
19 require surety authorization to submit, okay?  So
20 what we're talking about, which doesn't happen in
21 the universe of RLI bonds because your client
22 doesn't permit it.  But what would typically

128

1  happen.
2     Q   That's -- okay?
3     A   That's true.  What typically happens in
4  a case like that is an individual will be
5  breached.  I'll give you an example, by way of
6  example, individuals of ████████, the
7  judge calls the person up, sets a bond, holds them
8  over for a two-week detained calendar docket.  In
9  the middle of those two weeks, they post bond,
10 they go home.  They travel to New York where they
11 live.  In two weeks the judge calls their case,
12 they're not there.  What sometimes happens, and
13 it's a tragedy of justice for sure but it's
14 happened in hundreds of cases, is the judge will
15 order them removed because they're not there.  And
16 that immediately triggers an I-340, immediately,
17 almost, because the bond had just recently been
18 posted.  And in those situations when you can show
19 that the person couldn't have gone to court, you
20 can go to the bond unit officer, who wants to do
21 the right thing.
22    Q   Okay.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

33 (129 to 132)

Conducted on March 3, 2020

129

1    A   And will rescind the bond breach. But
2  if you can't go to that bond unit officer and make
3  such a request then your only option is to appeal
4  it to the AAO. And at that point in time this
5  person's out here, if you pay the bond in the
6  interim then a warrant can be issued for that
7  person's arrest. That person can be brought back
8  into custody. They can be held without bond. And
9  certainly their lives are impacted by such
10 decisions.
11   Q   Is a bond breach notice in itself
12 acting like a warrant?
13   A   No. No.
14   Q   Does the bond breach notice trigger a
15 warrant?
16   A   Not necessarily. A notice — so we're
17 going to apples to apples. From a notice to
18 deliver is more like a warrant for a bail agent,
19 right? Like a co-obligor can use that. You're
20 quite right. A co-obligor can use an I-340 to
21 detain someone. A breach is a record of what
22 happened on the bond, it isn't in and of itself a

130

1  warrant or anything like that.
2    Q   Well, the breach is issued after -- the
3  breach notice is the I323, right?
4    A   Right. It's after the I-340.
5    Q   Right. So, first, you get the I-340,
6  which is the notice to deliver, right?
7    A   It makes sense if they're in
8  subsequential order, wouldn't it, they're not.
9    Q   Yeah. So when you get a notice of
10 breach, the I323, what is breach about?
11   A   The breach indicates that a condition
12 that the immigrant was supposed to keep wasn't
13 kept and that they're in breach of the bond
14 responsibility.
15   Q   Well, it's not a breach of a condition
16 of the immigrant, right? It's the breach of the
17 notice to deliver? Isn't that what issues the
18 I3 --
19   A   No, no, no. The immigrant is the
20 bonded principal.
21   Q   Right, but the I323 is a --
22   A   I think maybe you're confused.

131

1    Q   Isn't the I-340 --
2    A   The subject of the bond is the
3  immigrant, right? So everything -- everything
4  that's required of the person under the bond is
5  required of the immigrant. The immigrant's
6  required to go to court. The immigrant's
7  required —
8    Q   Let me just ask you it this way.
9    A   Maybe I'm misunderstanding you.
10   Q   Yeah, let me just do it a simpler way.
11 When you get a --
12       (Donovan Exhibit 5 marked for
13 identification and attached to the transcript.)
14   Q   So this is a I-340 notice to obligor to
15 deliver alien, right?
16   A   Correct. That's what it looks like.
17   Q   So when we talk about notice to
18 deliver, this is what we're talking about, right?
19   A   That's right. This is an I-340?
20   Q   And it's going to the obligor, right,
21 it's not going to the immigrant, it goes to the
22 obligor and says this is a notice to the obligor

132

1  to deliver the alien, right?
2    A   The notice is to the obligor, although
3  it does go to the alien as well.
4    Q   Right?
5    A   The agent sends it to the alien and in
6  their bond management handbook they actually call
7  it a run letter.
8    Q   Right. But the notice is to the surety
9  saying under the terms of the delivery bond you
10 posted, ICE is making a demand upon you to deliver
11 the alien or have the alien appear at the location
12 below, right?
13   A   Right. But the bond is about the alien
14 following their -- the requirements of going to
15 court and keeping appearances. I mean the alien
16 is the one whose behavior --
17   Q   Right, but I'm going --
18   A   -- bond breaches or not.
19   Q   Right. But once you get a notice to
20 deliver --
21   A   Certainly once there's a notice to
22 deliver, the government communicates to the

**133**

1 obligors and says to the obligors, hey, cause
2 this.
3    Q    Well, they're saying hey obligor, it's
4 your obligation to deliver this alien in
5 accordance to the terms of your bond, right?
6    A    Sure.  It is an element of the bond.
7 You can deliver the alien and depending on what
8 happens in the case that you've just gave me, you
9 see it says purpose interview, so this would not
10 be a removal, so this person would walk out of
11 this office.
12    Q    Okay.  But I'm just -- okay?
13    A    I'm sorry, I'm going to answer.  You
14 walk up to this person's house, you go knock on
15 their door, throw them in the handcuffs, throw
16 them in the back of your van and take them to the
17 ICE office.  When this interview is over, they're
18 walking home.  And if you treated the immigrant
19 that way, they're never going to come back to
20 court.  This is why the idea that the co-obligors
21 are supposed to go out and round people up is
22 foolish.

**134**

1    Q    Mr. Donovan, you're not answering my
2 question.  You keep going.
3    A    If your client did that, none of these
4 people would appear.
5    Q    Okay.  I just want you to answer --
6 today's deposition is about us getting facts,
7 okay, and getting your personal knowledge, okay?
8       MR. SHOREMAN:  It's not about getting
9 his personal knowledge.
10       MS. KATSANTONIS:  Yes.
11       MR. SHOREMAN:  He's a corporate
12 representative.
13       MS. KATSANTONIS:  Yes.
14    Q    So what I'd like to do is limit the
15 answers to my questions and you will have an
16 opportunity to explain the whole process and your
17 thoughts on the whole process at the appropriate
18 time.  But today I'd like you to try to stick to
19 my questions.
20    A    I believe I've answered your questions.
21    Q    Okay.  So my question is --
22    A    And I'll continue to do so.

**135**

1    Q    My question is pretty simple.  This was
2 an I-340 notice and it's to the obligor to deliver
3 the alien, correct?
4    A    It is a notice to the obligor, yes.
5    Q    And the obligor here is being sent to
6 RLI Insurance Company, correct?
7    A    That's right.
8    Q    And it says under the terms of the
9 delivery bond you posted, ICE is making a demand
10 upon you to deliver the alien or have the alien
11 appear, correct?
12    A    Right.  Because the alien is the one
13 who's scheduled to appear.
14    Q    Right?
15    A    Correct.
16    Q    And the deliver bond -- the notice to
17 deliver is telling the obligor to cause the
18 immigrant to appear as set forth in the bond,
19 right?
20    A    Correct.
21    Q    Okay.  And under warning, the bond --
22 the notice provides that failure to deliver or

**136**

1 have the alien appear in accordance with this
2 demand may result in a declaration of breach of
3 the bond, right?
4    A    That's correct.
5    Q    So the breach notice is a notice that
6 the bond obligation to deliver the alien has been
7 breached?
8    A    Right.
9    Q    And then the notice says failure to
10 deliver may result in a breach -- a declaration of
11 breach and a warrant for the arrest of the alien
12 may be issued?
13       MR. SHOREMAN:  Objection.  You're not
14 reading the whole sentence.
15    Q    Well, I can read the whole sentence.
16       MR. SHOREMAN:  Appreciate it.
17    Q    Failure to deliver or have the client
18 appear in accordance with this demand may result
19 in a declaration of a breach of the bond, its
20 forfeiture to the government and a warrant for the
21 arrest of the alien may be issued, right?
22    A    Sure, that's true.  Yeah.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

35 (137 to 140)

137

1    Q    So that even if the bond is forfeited
2  there still may be a warrant for the arrest of the
3  alien issued?
4    **A    The key word is maybe.  So in any of**
5  **these instances where an immigrant has an issue**
6  **that they're communicating to the ICE officer,**
7  **they're not going to issue a warrant.  They**
8  **typically would issue the warrants after that.**
9  **But they certainly could.  At any point in time**
10 **ICE could issue an arrest warrant for any**
11 **immigrant.**
12   Q    Right.
13   **A    I mean, they could certainly do that.**
14   Q    And they advise you -- they advise the
15 obligor specifically in this notice that they --
16 if the alien does not appear, that that may result
17 in a warrant, right?
18   **A    Sure.**
19   Q    And --
20   **A    Are we moving past this one?**
21   Q    Yes.
22   **A    Okay.**

138

1    Q    Thank you.
2        So with regard to a breach notice --
3        (Donovan Exhibit 6 marked for
4  identification and attached to the transcript.)
5    Q    All right.  So looking at the second
6  page of this document, there's an I323 form?
7        THE VIDEOGRAPHER:  Vivian, if you could
8  once again take it off and put it back on.
9        MS. KATSANTONIS:  Yeah, sorry.  It's
10 not on, that's probably why.
11   **A    I will point out that in the cover**
12 **email on this Laura seems to disagree with your**
13 **expert.  Your expert seems to think it happens on**
14 **delivery.  I think on final claim.**
15   Q    Well, what RLI does --
16   **A    The universe is still not $10 million.**
17   Q    Thank you for that edification.  So
18 looking at the I323 form?
19   **A    Yes, ma'am.**
20   Q    This is notice of immigration bond
21 breached?
22   **A    Yes, ma'am.**

139

1    Q    And so it references the condition of
2  the bond has been -- having been violated?
3    **A    Right.**
4    Q    Right.  And it has been determined the
5  bond has been breached, right?
6    **A    Right.  That's why they're making you**
7  **pay it.**
8    Q    Right.  And they say -- and they
9  reference the demand to deliver, correct?
10   **A    They do make that reference, yes.**
11   Q    Okay.  And so when the bond breach
12 notice is delivered from the Department of
13 Homeland Security, it's the result of the
14 obligor's failure to deliver pursuant to the terms
15 of the bond, right?
16   **A    Can you repeat that?  I'm sorry, I just**
17 **kind of got lost in your sentence there.**
18 **Sounded --**
19   Q    The bond breach notice is provided
20 based on the failure of the obligor to comply with
21 the terms of the bond and deliver the immigrant,
22 right?

140

1    **A    In certain circumstances.  As you can**
2  **see on the bond breach, there are multiple**
3  **circumstances under which a bond can be breached.**
4  **But, yes, in this case and in the majority of**
5  **cases the RLI breached bonds is because the demand**
6  **was made and the individual didn't appear.**
7    Q    And so looking back at the -- first of
8  all, so the -- there's not a bond breach notice
9  issued for failure to make a payment, right?
10   **A    Failure to make what payment?**
11   Q    Penal sum of the bond, right?
12   **A    There's not a what issued?**
13   Q    Bond breach notice.
14   **A    No, because you're paying a bond.  So**
15 **how would you --**
16   Q    Right.
17   **A    We would breach a breach.  So you're**
18 **suggesting that you would be breached for not**
19 **paying a breach.**
20   Q    I was trying to understand.  Well, let
21 me just say this again.
22        The obligation is to deliver the alien,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

36 (141 to 144)

141

1  right?

2      A   That is an obligation.

3      Q   Well --

4      A   It is an obligation under the bond, it

5  is not the obligation, there are multiple

6  obligations that the immigrant has.

7      Q   Okay.

8      A   And it's not the first one.  The first

9  one is actually, you know, abiding by the

10  conditions that the judge of the ICE office has

11  set.  The second might be going to hearings.

12  We're talking about an expansive list of

13  conditions.

14      Q   Right.  But none of the conditions are

15  you just pay a sum certain?

16      A   Yeah, at the end of the day if a bond

17  breaches you pay a certain sum.

18      Q   After the bond breaches?

19      A   Right.

20      Q   After the bond breaches.

21      A   Of course.  And thank you.  Exactly,

22  after the bond breaches, after all appeals have

142

1  been made and there's a final claim on the bond,

2  then it's a claim.  Until then, it's not due.

3      Q   Okay.  That's your -- okay.  But I'm

4  getting back -- there's no condition of the bond

5  that you have to pay money instead of delivering

6  an alien or any of the other conditions?

7      A   It is literally the ultimate condition

8  of the bond.  It's literally in the -- in English

9  on the contract.  I don't understand --

10      Q   Let me get back --

11      A   I don't understand this question.

12      Q   Let me get back to it.  There's no bond

13  breach I323 notice issued based on a failure to

14  pay a sum certain, right?

15      A   What sum?

16      Q   Exactly, right?  The reason you get a

17  bond breach notice is for your failure to comply

18  with the terms of the bond?

19      A   It's for the -- the immigrant didn't

20  comply with terms of their bond.  What payment do

21  you think the immigrant has to make?

22      Q   Well, nobody -- I'm asking you.

143

1      A   No, there's --

2      Q   There's no --

3      A   There are filing fees and things like

4  that.  But that's not the breach.  I mean, that's

5  not what the bond is.

6      Q   The bond is you have to satisfy

7  conditions --

8      A   The ultimate condition of the bond is

9  you have to pay if there's a breach and there's a

10  breach with a final determination made.

11          That's what the bond breach is.  You

12  either this or that.

13      Q   Okay.  Can you discharge a bond by

14  paying it at any time?

15      A   Can you discharge a bond by paying it

16  at any time.  No, I don't think you can.

17      Q   Right.  You have to wait for there to

18  be some sort of breach of a condition.

19      A   Otherwise there --

20      Q   Just let me finish my question.  Right?

21  You have to wait --

22          The only time to pay is after the

144

1  conditions set forth in the bond haven't been met

2  and there's a bond breach and it's after that

3  point in time that the penal sum will be required

4  to be paid, right?

5      A   It's the letter of our defense,

6  absolutely.  It's a breach, it's a claim --

7      Q   Okay.  And so there's no --

8          MR. SHOREMAN:  Let him --

9      A   -- and then you pay on the claim after

10  all of the appeals have been exhausted.

11      Q   Right.  So you can't -- I'm correct

12  that you can't simply pay a bond at any point in

13  time to release the obligation under a bond?

14      A   Ms. Katsantonis.

15      Q   Is that correct?

16      A   Ms. Katsantonis --

17          MR. SHOREMAN:  Objection.

18      A   It's an either/or.  You comply or you

19  pay.  You comply or you pay.

20      Q   Well, no.  You never have to pay if you

21  comply, right?

22      A   Right.  That's why you comply or you

145

1  pay.

2      Q    Right.  And you can't pay without the

3  steps of compliance first having taken place,

4  right?

5      A    Then you wouldn't want to, right?  You

6  want the person to be —

7      Q    You can't is my question.

8      MR. SHOREMAN:  Objection.  The question

9  is -- read that question back, please.

10     (The requested text was read by the

11 reporter as follows: " Right.  And you can't pay

12 without steps of compliance first having taken

13 place, right?")

14     MR. SHOREMAN:  I don't understand the

15 question.  Is there a question pending?

16     MS. KATSANTONIS:  No, he already

17 answered it.

18     MR. SHOREMAN:  Okay.

19     Q    And is it Nexus' goal to have the

20 immigrants comply with the terms of the bond

21 before having to pay?

22     A    Always.  Because we want the immigrant

146

1  to do well.  We want them to come out of the

2  shadows and be whole and the best way to do that

3  is to comply with the conditions and be fully a

4  part of the community.

5      Q    Right.  And you also don't want to have

6  to pay bond amounts or bond penalties, right?

7      A    Well, I mean obviously that is a

8  factor.  But the human factor is much more

9  important to me.

10     Q    Sure.  And looking again at the

11 immigration bond breach form?

12     A    Yes, ma'am.

13     Q    After the --

14     MR. SHOREMAN:  Exhibit 6?

15     THE WITNESS:  Yes, sir.

16     Q    Let me see.  After the boxes, doesn't

17 the bond form provide any cash or U.S. bonds

18 pledged as security for the above-referenced bond

19 will be forfeited to the United States or in the

20 case of the surety bond, the surety invoice for

21 the full amount of the bond if the decision is not

22 appealed in accordance with the procedures

147

1  described below?

2      A    That is what it says, yes, ma'am.

3      Q    Okay.  And the bond form provides that

4  the right to appeal would be within 30 days of the

5  notice, correct?

6      A    That's right.  And if you don't appeal

7  then the claim is final.

8      MR. SHOREMAN:  Ms. Katsantonis, if

9  you're finished with that line of questioning, my

10 client did have an opportunity to review those

11 invoices and he can answer those questions that

12 you had prior to lunch.

13     Q    Sure.

14     A    Yeah, the total number of invoices that

15 we've received or that we paid are 1,146.

16     Q    Okay.  Now let's just -- let me just

17 break that down.

18     A    But that's not notices, the I-340,

19 those things that you also asked for, we don't

20 track that so I don't have that, I would have to

21 count those, which would take a little longer than

22 the 30 minutes I had at lunch.

148

1      Q    So you're not prepared to do that

2  today?

3      A    No, because we don't keep those

4  numbers.

5      Q    So, you said and I'm a little confused.

6  Invoices received or paid.  So I'm kind of

7  confused by what that number means.  Is this on

8  all --

9      A    It's across the board.

10     Q    Okay.  And so why do you say received

11 or paid?

12     A    Perhaps I was being inartful.  I meant

13 this is the total number that we received.  This

14 is -- the record that I have that we've received,

15 1,146 notices of invoice.

16     Q    Okay.

17     A    I apologize.

18     Q    Okay.  Is that 1,146 invoices on 1,146

19 different bonds?

20     A    Yes.

21     Q    Okay.

22     MR. SHOREMAN:  Was there a further

149

1 question that you wished him to identity those
2 bonds?
3       MS. KATSANTONIS: We will --
4       Q    And do you know how many of those
5 invoices are RLI's bond?
6       A  Yes, it would be the 290.
7       Q    Well, the 290 is what you've paid. Are
8 there not outstanding invoices?
9       A  I'm sorry. So that wouldn't include
10 the outstanding, yeah.
11      Q    Yeah, I just want to make sure.
12      A  That's right.
13      MR. SHOREMAN: So again
14 Ms. Katsantonis, I want to make sure that we -- to
15 avoid any issue of compliance with this 30(b)(6),
16 is it your question that you want him to identify
17 bonds to each of the 1,146 invoices he just
18 testified to?
19      MS. KATSANTONIS: No, I don't need him
20 to identity all the bonds, the 1,146, but what I'm
21 trying to get an understanding of and I'm a little
22 confused by is --

150

1       Q    Are those invoices received and paid
2 because since it did not include the outstanding
3 RLI invoices, it very well may not include the
4 outstanding invoices for other sureties?
5       A  It would be outstanding invoices
6 received and paid.
7       Q    Received and paid, okay.
8       So do you know how many outstanding
9 invoices -- how many invoices have been received
10 on bonds requested by Nexus in total, whether paid
11 or not?
12      A  Can you give me a minute to try to find
13 out?
14      Q    Sure. I guess we can do that during a
15 break.
16      A  I can.
17      Q    Okay.
18      A  Which, by the way I'm going to need to
19 take one at 3:30. So if I can set expectations
20 that would be awesome. Thank you. Probably
21 another hour.
22      MR. SHOREMAN: Let me write this down.

151

1 You've asked him, Ms. Katsantonis, for a number of
2 bonds that are outstanding?
3       MS. KATSANTONIS: How many invoices
4 have been issued on all of the Nexus bonds?
5       MR. HARRIS: You want me to rephrase it
6 for her since I would be doing that anyway?
7       MR. SHOREMAN: Go ahead.
8       MR. HARRIS: How many bonds have had
9 one or more invoices issued on them?
10      MR. SHOREMAN: Got it.
11      MR. HARRIS: Total and then just unique
12 to RLI.
13      MR. SHOREMAN: That differs from what
14 you just said.
15      A  It would because sometimes invoices get
16 canceled if there's an appeal.
17      MR. HARRIS: And they all haven't been
18 paid either, right?
19      A  The vast majority, I think. How many
20 invoices do we have that are outstanding that are
21 within that 120-day window. Not a lot.
22      MR. SHOREMAN: And unique.

152

1       A  But I understand --
2       MR. SHOREMAN: Thank you.
3 BY MS. KATSANTONIS:
4       Q    All right. So with regard to RLI
5 bonds, RLI contends that the aggregate amount --
6 or do you know how many -- strike that.
7       Sorry. Do you know how many RLI bonds
8 remain outstanding?
9       A  I do have that. But I can't remember
10 and now I'm not going to remember where I found it
11 and I have it somewhere. Do you understand how
12 frustrating that is? That's the thing about
13 30(b)(6) because I'm like I know I saw that.
14 Where did I see it? I literally had that broken
15 up.
16      So approximately 25 million. My
17 understanding is that there are 385 bond
18 cancellations totaling 5 million.
19      Q    I'm sorry, can you say that again
20 slower.
21      A  Yeah. There are 395 bond cancellations
22 in an amount of $5,117,500. So presumably you

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

39 (153 to 156)

---

153

1  would -- you could subtract that amount from the
2  30,227,950.  Which is the total face value of the
3  bonds and that would give us the total.
4      Q   So going through your numbers, you had
5  290 bonds that have been paid, right?
6      A   Right.
7      Q   Do you recall that testimony earlier
8  today?
9      A   Correct.
10     Q   And now you're saying 395 canceled.
11     A   Well, understand your client hasn't
12 given us cancellation for the last two years, so
13 that's a stab in the dark based on what you've
14 produced in response to our interrogatories.
15 Because you've produced numbers in response to our
16 interrogatories of what bonds have been canceled
17 that literally states that certain bonds are
18 canceled but then you say you never received the
19 cancellation.  So I can't make reason of that.
20     Q   Okay.  Earlier --
21     A   So based on the records we have, my
22 understanding is that we've had 395 bond

---

154

1  cancellations but it could be more.
2      Q   Okay.
3      A   Certainly could be.
4      Q   All right.  And that number comes from
5  RLI, the cancellation --
6      A   Correct.
7      Q   -- bond?  Okay.  And you say that Nexus
8  has not received cancellation notices from RLI
9  since when?
10     A   February 2020.
11     Q   2020?
12     A   Sorry, 2018, my apologies.
13     Q   And what is the basis of your
14 understanding?
15     A   What is the basis of my understanding?
16     Q   Yes?
17     A   That we used to received cancellations
18 and we don't anymore.  We used to get copies of
19 the cancellations and we don't get them.
20     Q   When you say "we don't," what is
21 that -- based on what?  Who told you that or what
22 investigation did you do to derive that?

---

155

1      A   I did an investigation of looking for
2  the bond cancellations over the last two years.
3  Laura Piispanen used to send them to us, right, we
4  used to get them from RLI.  I don't have any bond
5  cancellations.  So I don't have the ability to
6  determine who's being -- you know, I have a
7  spreadsheet from you guys that say that bonds are
8  canceled, bonds I've paid breaches on.  And in
9  response to a letter that counsel sent, you guys
10 said you paid it too.  You didn't -- but you sent
11 me a spreadsheet saying it was canceled.  So
12 without having any independent knowledge of what
13 those documents are, that's why we've asked
14 your -- asked you to provide us those documents.
15     Q   Did you make an inquiry of your --
16 either your staff or your counsel as to whether or
17 not Nexus was receiving bond cancellation notices
18 from RLI?
19         MR. SHOREMAN: Objection.  And let me
20 just caution the witness, any communications with
21 counsel would be privileged and you waive that
22 privilege by disclosing that.

---

156

1          MS. KATSANTONIS: I'm just asking him
2  whether he's made an inquiry.
3      A   I have spoken to counsel.
4      Q   Okay.  And so --
5      A   And I'm not going to disclose those.
6      Q   No.  But your testimony is that Nexus
7  has not received bond cancellation notices from
8  RLI since 2018?
9      A   Correct.
10     Q   Okay.
11         MR. SHOREMAN: I think a couple minutes
12 ago it was 2019.
13     A   It's been February 2018.
14         MR. SHOREMAN: '18, okay.
15         MS. KATSANTONIS: I'm going to mark
16 this exhibit.
17         (Donovan Exhibit 7 marked for
18 identification and attached to the transcript.)
19         MR. SHOREMAN: Thank you.
20     Q   So this is an email from
21 Laura Piispanen from RLI to a number of people
22 which includes Erik Schneider at Nexus, Hazzar

---

157

1  Perdomo at Nexus, Richard Moore at Nexus as well
2  as a number of your attorneys, correct?
3        A   I can see that, yes.
4        Q   And isn't RLI providing you with a copy
5  of an immigration bond cancellation?
6        A   I do see an email that I'm not on where
7  there is one cancellation. But we have
8  significant numbers of cancellations that you
9  reference on a spreadsheet that you've produced
10 that don't have cancellations that have been
11 produced to us. So you can show me one. I can
12 show you that there are -- there are -- on your
13 own production, there are bonds that say
14 they're -- that you've received cancellations on
15 that you've never forwarded the cancellations for.
16 That's true. And we have asked that you make that
17 right. We asked that you make it right about the
18 one particular client last week and that you
19 further produce all the records so we would have
20 them. We haven't received, as far as I
21 understand, any of the further production. And so
22 I have a significant number of RLI clients on a

158

1  spreadsheet that you guys produced that say that
2  those bonds are canceled without any detail —
3        Q   Mr. Donovan, I would suggest that
4  you --
5        A   — attached to it and my point is that,
6  I mean, that's a problem.
7        Q   Mark this.
8            (Donovan Exhibit 8 marked for
9  identification and attached to the transcript.)
10       Q   Here's another email communication from
11 Laura Piispanen dated November 13th, 2019,
12 forwarding a notice of immigration bond canceled
13 and that is similarly sent to Mr. Schneider of
14 Nexus, Hazzar Perdomo, and numerous -- Richard
15 Moore, and numerous counsel of Nexus; is that
16 correct?
17       A   And I can certainly see that I'm not on
18 this email and didn't see it before. But what I
19 will tell you is that, again, we have a
20 significant number of bonds that you guys have
21 reported canceled that you've not provided
22 cancellation for.

159

1        Q   How do you know that? How do you know
2  that, Mr. Donovan, when you testified --
3        A   I'm sorry --
4        Q   -- that you haven't received any --
5        A   Are you going to continue to interrupt
6  me or can I answer a question?
7        Q   Yes?
8        A   As you are well aware because you've
9  received correspondence, we have been looking at
10 your discovery responses and your discovery
11 responses tell us that certain bonds are canceled
12 that we paid. Now that's a problem for me, right?
13 And so I've been following up and I would --
14       Q   Which ones?
15       A   -- ask for the documentation.
16       Q   Which one, it was just one you sent a
17 notice.
18       A   There's one specific and then there are
19 a large number of bonds where you guys say they're
20 canceled, we haven't received the cancellations.
21 What we have asked you to do is provide us all the
22 cancellations. Why can't you do that? If you

160

1  have them why not just give them to us?
2        Q   Mr. Donovan, are you not aware that you
3  have been contemporaneously given notice after
4  notice of all the bond cancellation forms?
5        A   I do not believe that's true.
6        Q   Well, are you --
7        A   We have bonds cancellations that are on
8  your spreadsheet —
9        Q   Let's go through a couple more. We'll
10 just keep going through them then.
11       A   Would you give me the one to the client
12 that we produced to you on Friday. The one that
13 we —
14       Q   We gave it to you yesterday.
15       A   But you — why is it you have it listed
16 as canceled, Ms. Katsantonis? Why is it that you
17 have it listed on the canceled in one place,
18 Ms. Katsantonis, and on another you're demanding
19 that we pay it?
20           See, your records don't match and
21 you've got to provide an explanation for that.
22       Q   Mr. Donovan. Mr. Donovan, this is my

161

1 deposition of you not mine -- yours of me.  So
2 let's move forward.
3     **A    Right, but --**
4     Q    Can you mark this, please?
5     **A    I mean, you can continue to throw**
6 **documents in front of me to show me that there's**
7 **been a cancellation here or there that's been**
8 **delivered, but unless you're prepared to show us**
9 **all the cancellations and have them consistent**
10 **with the production that you provided to attorneys**
11 **of the cancellations, then this is just —**
12    Q    I believe your testimony, Mr. Donovan,
13 is that there have been no cancellation notices
14 provided to Nexus in the last two years, wasn't
15 that your testimony?
16    **A    As I was aware.**
17    Q    Right.  But now you realize --
18    **A    What I'm saying —**
19    Q    You realize your testimony was
20 erroneous, right, Mr. Donovan?  That in fact,
21 there were consistent notices of cancellation
22 provided to Nexus?

162

1       MR. SHOREMAN: Objection.  Objection.
2    **A    I disagree.  I don't think this is**
3 **consistent.  One-off emails are not consistent.**
4 **You have —**
5    Q    How many do you see?  I just sent you
6 three.  Would you like me to go get 50 more?
7    **A    I'd like you to go get them all.**
8       MR. SHOREMAN: Objection, again.
9    **A    Bring them all here and let us take**
10 **them.  By the way —**
11    Q    So your testimony was inaccurate,
12 right, Mr. Donovan?
13    **A    No, it's not.**
14    Q    You said no.  You said we haven't
15 received any notices since 2018.
16    **A    Why not —**
17       MR. SHOREMAN: Objection.
18    **A    Why not —**
19       MR. SHOREMAN: Please, please.
20    **A    Why not just be honest?**
21       MR. SHOREMAN: You're being
22 argumentative, Ms. Katsantonis.

163

1    Q    All right.  Let me just --
2       MS. KATSANTONIS: I apologize if you
3 think so.
4    Q    So looking at this 2018 one,
5 Mr. Donovan.
6    **A    I would like to have all of the I340s.**
7 **I would like to have all of the I340s.  I'll**
8 **answer questions about the I340s, I'd like a**
9 **production of them.  I would like them here.**
10    Q    Mr. Donovan, looking at the exhibit in
11 front of you, it's an Exhibit dated April 2nd.
12       (Donovan Exhibit 9 marked for
13 identification and attached to the transcript.)
14    Q    This is one dated April 2nd, 2018, sent
15 to notice at Nexus help.  It's another copy of a
16 notice of immigration bond cancel.  Do you see
17 that, Mr. Donovan?
18    **A    I do.**
19    Q    And do you believe --
20       MR. SHOREMAN: Let me just go off -- I
21 don't want to go off the record, I want to say
22 this on the record.  My client's issue is that

164

1 this should have been produced in response to
2 discovery.
3       MS. KATSANTONIS:  We're going off the
4 record.  This is not appropriate.  This is my
5 deposition.
6       MR. SHOREMAN:  Go on.
7       MS. KATSANTONIS:  I'm not going through
8 a discovery dispute.
9       MR. SHOREMAN:  Well, you are going
10 through a discovery dispute.
11       MS. KATSANTONIS:  I'm addressing
12 Mr. Donovan's testimony.
13       MR. SHOREMAN:  He said he did not
14 receive these in discovery as he should have.
15       MS. KATSANTONIS:  That's not what he
16 said.
17       MR. HARRIS:  That's not what he said.
18 He's not received a notice of cancellation in two
19 years.
20       MR. SHOREMAN:  You put four in front of
21 him.
22       MR. HARRIS:  In two years he hasn't

165

1  received one.
2       MS. KATSANTONIS: Right.
3       MR. SHOREMAN: Okay. Spend the rest of
4  the day on a "gotcha."
5       MS. KATSANTONIS: I'm just trying to
6  make the record clear.
7       THE WITNESS: Well, if you make it --
8       MR. SHOREMAN: The record would be
9  clear if you meet your discovery obligations and
10 provide these documents.
11     Q   Is it true that you did -- isn't it
12 true, Mr. Donovan, that you did receive
13 cancellation notices within the last two years
14 from RLI?
15     MR. SHOREMAN: Objection. The
16 documents don't have any evidence whatsoever that
17 Mr. Donovan received them.
18     MS. KATSANTONIS: He's speaking on
19 behalf of Nexus. They all have Nexus' names on
20 it.
21     MR. SHOREMAN: Then why don't you ask
22 that question.

166

1       MR. HARRIS: It's a 30(b)(6)
2  deposition, so "you" means Nexus. She just did.
3       MS. KATSANTONIS: It's a preliminary
4  question.
5       MR. SHOREMAN: Why don't you ask that
6  question.
7       MS. KATSANTONIS: Mr. Shoreman, please.
8       MR. SHOREMAN: You didn't, you said --
9  BY MS. KATSANTONIS:
10     Q   Mr. Donovan, isn't it true that Nexus
11 received notices of cancellation from RLI over the
12 last -- course of the last two years?
13     A   It appears that Nexus did receive a
14 smattering of notices. Nexus would hope that RLI
15 would produce all of the cancellations so that we
16 could determine which invoices you have improperly
17 collected and not refunded to us.
18     Q   And with regard to -- so when you
19 testified earlier that Nexus had received no
20 notices of cancellation in the last two years,
21 that was inaccurate?
22     A   I missed the four that you put in front

167

1  of me that were not sent to me, yes. That is
2  correct. However, I would renew my request that
3  RLI actually comply with the discovery order and
4  provide all of the cancellations.
5       Q   Is it your testimony that no more than
6  the four that I've provided you were provided from
7  RLI to Nexus?
8       A   I think my testimony was you provided
9  me four.
10     Q   Right?
11     A   I think that's what I said.
12     Q   But do you --
13     A   My testimony is what the words I said
14 are. I mean, that's what I said. I said you
15 provided me four. It would be my hope that you
16 would provide the rest. If you want to do that
17 right now we can do it because I want to see them
18 all.
19     Q   Well --
20     A   Or if you want to give them to me after
21 that's fine too.
22     Q   Mr. Donovan, my testimony -- my

168

1  question to you is based on your testimony. So
2  my -- I'm just trying to get your testimony
3  accurate.
4       A   I think you are testifying.
5       MR. SHOREMAN: Please don't direct my
6  witness, Ms. Katsantonis. Go ahead.
7       MR. HARRIS: Please instruct your
8  witness then to answer the questions instead of
9  asking questions of --
10     MS. KATSANTONIS: Counsel.
11     MR. SHOREMAN: Continue in the vein you
12 are, Mr. Donovan, and answer the question freely
13 and responsively as you are.
14 BY MS. KATSANTONIS:
15     Q   I just want to be clear that you --
16 that you -- do you contend that there are, other
17 than the four that I've shown you, is it your
18 testimony that Nexus received no other notices of
19 bond cancellation forms in the last two years from
20 RLI?
21     A   My testimony is that RLI has not
22 provided all of the bond cancellations as

---

**169**

1  received.  I'm hartened that we have apparently
2  received a few.  If there are more, that's
3  wonderful.
4      Q    So you don't know?
5      A    If you'll produce -- if you can produce
6  a full production of them, I guess this -- you
7  asked a question earlier about bad faith.  This is
8  bad faith.  Hiding the ball, right?  What is RLI
9  trying to hide?  Why not just give us the
10 cancellation.  You're trying to hide the fact that
11 you collected money on top of those cancellations
12 and that you received that money under false
13 pretenses.  That what you're trying to hide.
14 That's what's happening here and you know that.
15      MR. HARRIS:  Can you --
16      MR. SHOREMAN:  Vivian.  No.
17      Q    Do you know sitting here, how many bond
18 cancellation forms Nexus provided to -- RLI
19 provided to Nexus?
20      A    I do not.
21      Q    So you don't know whether or not --
22      A    I know that we —

**170**

1      Q    -- it's four or 100 or 200; is that
2  correct?
3      A    Well, are you going to finish a
4  question so I can answer it, Ms. Katsantonis?  You
5  continue to ask the question after you've asked
6  it.  It's a very confusing thing.
7      Q    Mr. Donovan.  If you could start your
8  answer with yes or no and then if you want to
9  explain why it's a yes or no, that's fine.  But my
10 question to you is do you know how many bond
11 cancellation forms RLI has provided to Nexus in
12 the last two years?
13      A    Yes.  Let me -- I think — so what we
14 have and here's what I know, okay?  I know that
15 there are approximately 395 bond cancellations
16 based on the production that you have made.  That
17 is including actual cancellations and spreadsheet
18 representations.  I want all the cancellations.
19 That's what I'm saying.
20      Q    Okay?
21      A    I want all the cancellations.
22      Q    So aside from discovery, do you know

**171**

1  whether in the last two years how many bond
2  cancellation forms were provided to Nexus from
3  RLI?
4      A    I do not.
5      Q    Okay.  And can you estimate how many
6  bond cancellation forms were provided to Nexus
7  from RLI?
8      A    I cannot.  I know we have that number
9  and I can get it for you.  I'll get it for you at
10 the break.
11      Q    And do you know how many RLI bonds are
12 outstanding?
13      A    I can do the calculation based on what
14 we just talked about, the total number of bonds
15 outstanding versus the total number of
16 cancellations.  But again, it's cancellations as
17 reported by RLI and since we don't have the full
18 data, I don't know that those numbers are
19 accurate.
20      Q    All right.  RLI contends that the
21 aggregate, that there are 1,767 bonds that have
22 not yet been discharged.

**172**

1          Do you know whether that's accurate?
2      A    I would have no way of knowing.
3      Q    Can you dispute that number?
4      MR. SHOREMAN:  Objection.  Objection.
5  You're asking him -- you used the term discharge
6  and it's undefined.  I object to the question.
7          Answer if you can.
8      A    And I'm going to -- so can you repeat
9  the question?
10      Q    Yeah, sure.
11          RLI contends that there are 1,767 RLI
12 bonds that had not -- that have not yet been
13 discharged.
14          Can you dispute that?
15      A    Based on the information I have and the
16 cancellations I've received, I can't dispute that.
17 I wouldn't necessarily want to do that.
18      Q    Okay.  And then RLI --
19      A    I'm sorry.  Really quick, I have a bio
20 break.  It's not going to take long but I'm going
21 to be right back.  Sorry, guys.
22      THE VIDEOGRAPHER:  We are going off the

173

1  record at 15:02.
2        (Recess taken.)
3        THE VIDEOGRAPHER:  We are back on the
4  record at 15:11.
5  BY MS. KATSANTONIS:
6     Q   All right.  And then prior to the
7  break, we were talking about the number of RLI
8  outstanding bonds and so I just had one more
9  question with that.
10       RLI contends that the aggregate amount
11 of those 1,767 bonds that have not yet been
12 discharged is 21,404,950.
13       Do you dispute that figure?
14    **A   I believe that's correct.**
15    Q   Okay.  All right.  Now, we were talking
16 about, and you're much more familiar with this
17 area than I am.
18    **A   And let me apologize -- by the way**
19 **because I know this area and so none of my answers**
20 **are meant to sound like, you know, when I looked**
21 **at you weird, I was just trying to understand your**
22 **question because it didn't make sense to me.  I'm**

174

1  **not trying to be -- you know, I want to be**
2  **respectful.**
3     Q   I appreciate that.
4     **A   Yeah, of course.**
5     Q   In fact, I was going to just say the
6  same thing.  I was going to ask you about appeals
7  and disputes, obviously you know that area better
8  than I do.
9        So I'm just trying to make sure you and
10 I are on the same page when we're talking about
11 something.
12    **A   Of course.  I think that makes sense.**
13    Q   So do you recognize a distinction
14 between bond breach appeals which are submitted
15 within 33 days, you know, 30 days or 33 days of a
16 bond breach notice and decided by DHS's
17 administrative appeals office and disputes of bond
18 breach invoices?  Is there a distinction there?
19    **A   There is a distinction.**
20    Q   Okay.  So can we use the word, you
21 know, as we go forward when we talk about appeals,
22 that's going to be the appeals of the bond breach

175

1  notice to the AAO?
2     **A   Right.**
3     Q   Okay.  And then when we say disputes,
4  we are going to be talking about bond breach
5  invoices?
6     **A   Not necessarily.  Because there's**
7  **another category of disputes we probably have to**
8  **identify and talk about.**
9     Q   Okay.  What is that?
10    **A   And that is when a bond first breaches.**
11 **So there's no invoice, right?  It's just a breach.**
12 **But when you have proof that the breach is**
13 **invalid, that the breach was done incorrectly,**
14 **right, you can submit a dispute to the bond unit**
15 **officer and it requires a letter from the obligor,**
16 **from the surety obligor.  But you can dispute at**
17 **that level and that — when I talk about disputes,**
18 **when I reference disputes that I want to be able**
19 **to make, that's what I'm talking about, Vivian.**
20 **So I just want to make sure we're understanding**
21 **one another.  It is possible if you file an appeal**
22 **and you file the appeal late, it is possible that**

176

1  **that can be considered a dispute, right?**
2        **But it's also possible to dispute a**
3  **breach when it first occurs, before an invoice is**
4  **ever issued.  And that is the dispute process that**
5  **I'm referring to.**
6     Q   Okay.  So you kind of mixed terms there
7  again.  I just want to be careful that I
8  understand it.
9        So you're talking about when a bond
10 breach first happens, so within the 33 days.
11    **A   Correct.**
12    Q   Okay.  Then within that 33 days, rather
13 than actually filing an appeal, you're saying you
14 can go to the bond unit officer?
15    **A   Yeah, the bond manager.**
16    Q   Okay.
17    **A   Each of the ICE officers that process**
18 **bonds have a bond manager.**
19    Q   Right.  And that requires a writing, a
20 letter.
21    **A   The surety has to give permission, yes.**
22    Q   And then how -- yeah, where is that

177

1  procedure outlined?

2      A    In the bond management handbook.

3      Q    Okay?

4      A    The DHS's bond management handbook.
5  I'm sorry, let me be specific.

6      Q    Okay.  And how often -- right.
7          Are there any grounds that you can
8  raise in that procedure that you couldn't also
9  raise in an appeal procedure?

10      A    Yes.

11      Q    What is that?

12      A    Well, you can raise — the appeal
13  feature is largely about questions of law or
14  questions of like notice of defect, those types of
15  things, right?  A dispute is never about notice of
16  defect because that's appropriately taken before
17  the AAO.  A dispute is when there is a — at the
18  pre, I'm talking about the pre-invoice stage of
19  dispute, right?  Because you can also file a late
20  appeal and it called a dispute.  So I want to
21  make sure we're talking about the same thing.  But
22  if you dispute a breach shortly after like what

178

1  we're talking about, right, you can dispute the
2  breach.  You would dispute the breach based on the
3  fact that there is some kind of error.  You
4  typically would use a dispute when there's an
5  error.

6      Q    What kind of error?

7      A    Maybe for example like I told you the
8  person got released and shipped to New York but
9  then they get called into court two days later in
10  the detention center they got released from.  They
11  can't even come back there if they want to so
12  they're obviously not going to be there and
13  they're obviously going to get a notice to deliver
14  for that.  But it's not their fault, you see.  So
15  what you would do is let's say the notice to
16  deliver didn't get served or we didn't know about
17  it or they didn't go and we's a breach, then --
18  in the same situation where are they going to send
19  the notice letter?  They're going to send the
20  notice letter to where the person is.

21      Q    But can you raise that on an appeal?

22      A    You can, but you're much more likely to

179

1  win on a dispute, right?  Because the AAO is
2  looking for a case, you know, a case law.  They're
3  looking for some kind of precedent.  You have a
4  legal issue.  You have a notice issue.  Some kind
5  of defect issue.

6      Q    So my question was what kind of
7  pre-invoice dispute can you not raise on appeal?

8      A    I suppose you could raise the fact that
9  the person had complied and you could raise
10  substantial compliance on appeal.

11          So there isn't anything that you
12  couldn't raise on appeal, but you'd be making the
13  argument on appeal under substantial compliance
14  which is a difficult bar to meet, right?  So it's
15  a difficult thing to do whereas going to the bond
16  manager that oversaw the inappropriate breach and
17  having them fix their mistake is easier than going
18  to an appeal office and waiting months for them to
19  read your brief and hope that they understand what
20  happened to them.

21      Q    Okay?

22      A    It's just a much more direct and easy

180

1  way to do it.

2      Q    On how many RLI -- are you familiar
3  with grounds of an appeal or dispute based on
4  DHS's failure to provide a questionnaire?

5      A    I am aware of that as an issue that has
6  been raised on appeal by obligors.

7      Q    And which of the three proceedings
8  would that most appropriately be raised?

9      A    That would be raised appropriately —
10  well, you can raise it — it would most
11  appropriately be raised in an appeal.

12      Q    And have -- and has DHS rejected those
13  appeals as a -- based on the failure to provide a
14  questionnaire?

15      A    Many of them, yes.

16      Q    Are there any that they have approved
17  or affirmed based on the failure to provide a
18  questionnaire?

19      A    I believe we have had those.  I don't
20  believe any of them are RLI bonds, I have to check
21  but I'm relatively certain that none of them are
22  RLI bonds.

Case 5:18-cv-00066-MFU-JCH   Document 496-3   Filed 08/21/20   Page 47 of 189   Pageid#: 13824

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020
46 (181 to 184)

181

1    Q    Okay.  But you think there are some
2 that have been approved.
3    A    Yes.
4    Q    How many?
5    A    There is one that I know of.  So I
6 can't testify beyond that.  I know of one.  I'll
7 have to look to see if others exist.  I didn't —
8 I might have missed — I didn't — I didn't look
9 at that because I didn't see that in the
10 categories.  I wasn't thinking that we would get
11 to that level but we can certainly — I can pull
12 that for you.
13    Q    That's fine.  As you sit here today,
14 you don't know of any more than the one, correct?
15    A    Correct.
16    Q    Okay.  And --
17    A    But I don't know that more don't exist.
18    Q    Okay.  And with regards -- and do you
19 know how many bond appeals you've issued based on
20 the questionnaire, the failure to provide a
21 questionnaire?
22    A    The failure to provide a questionnaire

182

1 is a — a topic that we routinely assert amongst
2 other issues on appeal.  There is — there is a
3 settlement that ICE reached with a particular
4 surety, and that settlement provides a different
5 series of expectations for ICE officers to provide
6 detail notice to agents of that surety.
7    Q    Is that AmWest?
8    A    It is, the AmWest agreement, yes,
9 ma'am.
10    Q    But how many appeals did you file based
11 on questionnaires?
12    A    We have -- we have raised the
13 questionnaire on appeal and we intend to raise it
14 in a court action to try to make those conditions
15 consistent across the board.
16    Q    Okay.  But how many bonds have you
17 issued an appeal based on failure of DHS to
18 provide a questionnaire?
19    A    I'm not sure of the total amount.  I
20 will find out at a break.
21    Q    Is it hundreds or thousands?
22    A    It's probably thousands.  I mean, any

183

1 appeal that we have filed, we would have filed,
2 likely have filed that as an element of it, not
3 the sole element.
4    Q    Okay.  And with regard -- how many RLI
5 bonds has an appeal of a bond breach determination
6 been submitted to DHS?
7    A    To the AAO?
8    Q    Right.
9    A    Hold on.  And it's the total number of
10 appeals filed, right?
11    Q    Uh-huh.
12    A    Okay.
13    Q    And then also for RLI bonds.
14    A    For RLI, yeah.
15    Q    Overall and then for RLI.
16    A    I'm just doing some adding and I'm
17 having to pull multiple files to do it, so I
18 apologize.  Appreciate your patience.  Okay.  So
19 I — I would like to supplement my answer.  I want
20 to make sure that this is correct because I just
21 counted lines on a spreadsheet and that's not
22 really the best way to give you a qualified answer

184

1 so I'd really like to be able to give you that, if
2 we could -- at my next break I will owe you that,
3 okay?  Because I want to make sure that the number
4 I just added up is correct.
5    Q    Is that --
6    A    The number of appeals, RLI.
7    Q    Just to keep the testimony going --
8    A    Of course.
9    Q    -- can you give me a range?
10    A    We can break and add it up.  I would
11 rather give you a real number.  I just don't want
12 to put something on the record that's not
13 accurate.
14        MR. SHOREMAN:  Don't you have a call at
15 3:30 anyway?
16    A    I do.  Yeah, it's only five minutes.
17        MS. KATSANTONIS:  Three minutes.
18    A    Why don't we break for five and then
19 I'll have that for you.
20        THE VIDEOGRAPHER:  Off the record at
21 15:24.
22        (Recess taken.)

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

47 (185 to 188)

185

1        THE VIDEOGRAPHER:  We are back on the
2   record at 15:42.
3   BY MS. KATSANTONIS:
4        Q    All right.  So before we took our break
5   you were going to, Mr. Donovan, I believe you were
6   going to check the number of invoices --
7        A    Yes, ma'am.
8        Q    -- for which Nexus has caused an appeal
9   to be -- wait, let me strike that.
10        How many -- okay, so, first of all, we
11   were going to ask, right, how many appeals on the
12   Nexus bonds have been filed?
13        A    Right.  And I was able to gather that.
14   So our records indicate that 208 appeals have been
15   filed on RLI bonds that are Nexus secured.
16        Q    And what about program wide?
17        A    Program wide, our figures indicate that
18   1,457 appeals have been filed globally.
19        Q    Okay.  And of the 1,457 appeals filed
20   globally, how many have been successful?
21        A    Perhaps I could have anticipated that.
22   Nine of our RLI appeals have been successful.  I

186

1   have that handy, quite proud to say.  As far as a
2   global appeal successful number, I'll have to get
3   that for you.  But I'll get it for you before we
4   break today, okay?
5        Q    Okay.
6        A    Or I can go look.  But you don't want
7   that.
8        Q    Of the nine RLI bond appeals that were
9   successful, what were the grounds for those nine?
10        A    I believe two, at least one or two of
11   them was the Pereira decision, I believe.  There
12   were no deficiencies, and perhaps the best thing
13   to do would be provide you the nine bonds on a
14   spreadsheet with the reasons.
15        Do you want me to do that?  Because I
16   can absolutely do that.
17        Q    Okay.  Yes, I would like that.  Sitting
18   here today you don't know the basis for each of
19   the nine, correct?
20        A    Not off the top of my head.  But we do
21   have that information readily available.  Happy to
22   get it for you before we leave today.

187

1        Q    Okay.  And Nexus has paid a filing fee
2   for all appeals whether it's RLI or the 1,457
3   appeals?
4        A    That's correct.
5        Q    And of the appeals filed, the Nexus
6   bond appeals, how many of those were based on the
7   Pereira decision?
8        A    Well, many were based on the Pereira
9   decision, at least in part.  We filed appeals for
10   any bond that was the basis, the basis of which
11   was a notice to appear that was issued without a
12   time or date specific on it.
13        Q    Right.  But do you know how many bonds?
14        A    I don't.
15        Q    The vast majority of them or --
16        A    The vast majority did not have the time
17   or place and so the vast majority had Pereira as
18   an element, yes.
19        Q    Okay.  And what about --
20        A    Any that didn't have the time or place
21   on the NTA, right, because that was the basis of
22   the Pereira decision, so if it didn't say a time

188

1   or place it was added under Pereira.  And the vast
2   majority of bonds -- the vast majority of
3   individuals arrested and issued NTAs before the
4   Pereira decision were affected by it.
5        Q    Okay.  And how many of the appeals were
6   based on DHS's failure to include a questionnaire
7   or other paperwork within the bond breach notice?
8        A    That might be an ancillary added
9   element of the appeal.  It would not be your main
10   reason for appeal, but that would be added in any
11   case where we didn't get a spreadsheet -- where we
12   didn't get the appropriate information.
13        Q    So the vast majority?
14        A    The vast majority that we didn't get --
15   yeah, I would say the majority.  I don't know that
16   I would say vast, because we do get
17   spreadsheets -- or worksheets.  But I would say
18   the majority don't have worksheets.
19        Q    So to be clear, the vast majority of
20   the 208 appeals on RLI bonds are based on the
21   Pereira decision?
22        A    In part, yes.

**189**

1    Q    And that would also apply to the 1,457
2  appeals; the vast majority of those appeals were
3  based on the Pereira decision?
4    A    Right.  That's a little more.  I mean,
5  RLI is sort of a snapshot in time, right?  So once
6  that issue is corrected by the federal government
7  there would be no more Pereira appeals on that
8  issue.  So I would say, yes, but that number is,
9  you know, significantly decreasing as a part of
10 the global number because obviously the government
11 has fixed there NTA issue.
12        Does that make sense?
13   Q    Uh-huh.
14        Of the -- whether it's RLI bonds or the
15 1,457 appeals, how many of those bonds were upheld
16 on the Pereira decision grounds, how many of the
17 appeals were granted based on pre?
18   A    I'm going to have to get that number to
19 you.
20   Q    Will you be able to provide that
21 information today?
22   A    Yes.  Of course.

**190**

1    Q    How many submitted appeals of RLI bond
2  breaches have been rejected as untimely?
3    A    I'm sorry, Ms. Katsantonis, can I get a
4  clarification on your prior question?
5    Q    Sure?
6    A    Did you want the number of Pereira
7  granted appeals for RLI or the number of Pereira
8  granted appeals universal or both?
9    Q    Both.  Thank you.
10   A    All right.
11   Q    Because you're also going to give us
12 the figure of how many of the 1,457 appeals were
13 successful?
14   A    That's right.
15   Q    And the basis of those -- right.  And
16 you were going to also give us the basis of each
17 of the nine?
18   A    Each of the --
19   Q    RLI?
20   A    Yours, right.
21   Q    All right.  So then my next question
22 was how many submitted appeals of RLI bond

**191**

1  breaches have been rejected as untimely?
2    A    Okay.  So I'm going to at our next
3  break pull those and provide that information to
4  you.  And Ms. Katsantonis, the spreadsheet that
5  the nine RLI I'm going to provide a spreadsheet
6  with the reasons, the others I'm just going to
7  provide, you know, the numbers.  Because it would
8  probably be too much for me to, you know, come up
9  with that spreadsheet for all of them but I will
10 provide you a spreadsheet of your nine and the
11 reasons.  And then I'll provide you the
12 information -- I'll answer the questions on the
13 other questions.  But I just want to be clear that
14 I'm going to have to get that and it's going to
15 take me a few minutes.  I could do it now or I
16 could do it at a break.
17   Q    Okay.  A break would be fine.  And then
18 along those lines, so I asked you -- and that's --
19 the information you get is how many submitted
20 appeals of RLI have been rejected as untimely?
21   A    Yeah, and the Pereira question.
22   Q    Right.  And do you know how many of RLI

**192**

1  bond breaches appeals were confirmed to have been
2  received by DHS within 33 days of the breach
3  notice?
4    A    Yeah, I can — I can add that up.
5    Q    Okay.
6    A    But I'm going to have to use the same
7  spreadsheet I'm going to use for the other
8  questions so I'll just do that at the break and
9  get you all those answers at once, if that's okay,
10 Ms. Katsantonis.
11   Q    Yes.  Of the nine RLI bond appeals that
12 you state have been sustained, how many of those
13 resulted in a cancellation of the bond as
14 confirmed by DHS's issuance of an I391 notice of
15 cancellation?
16   A    There would either be a re -- there
17 either would be a notice of cancellation or
18 redetermination or reclassification of the bond.
19 I'll get those numbers for you.  So I'll —
20   Q    Okay.
21   A    In the spreadsheet, Ms. Katsantonis, it
22 will say whether it was a cancellation or whether

**193**

1  the breach was reissued — I'm sorry, the bond was
2  reissued.
3      Q    Like a reinstatement of the bond.
4      A    Thank you so much.  There's that
5  inartful communication.  I knew it would catch up
6  to me.
7      Q    Okay.  So Nexus including through
8  Juliana Johnson and payment of the filing fees has
9  worked with Big Marco to submit most of the
10 appeals that have been submitted in RLI bonds,
11 right?
12     A    That is correct.
13     Q    And on how many occasions was Nexus
14 prevented from submitting an appeal by anything
15 that RLI did or did not do?
16     A    An appeal?
17     Q    Uh-huh.
18     A    Your client issued a cease and desist
19 request on appeals.  We clarified that the appeals
20 were being filed by the co-obligor.  My
21 understanding is that RLI has done nothing to
22 prevent the co-obligor from filing appeals, which

**194**

1  we appreciate and he has done so.  But I don't
2  think we filed any appeals directly with RLI.  I
3  think they were all with Big Marco.  I could be
4  wrong about that, but I don't think so.
5      Q    All right.  So there's no specific
6  instance that RLI prevented Nexus from submitting
7  an appeal?
8      A    Not an appeal.  Dispute's a different
9  question.
10     Q    Okay.  So on how many occasions did RLI
11 prevent Nexus from submitting a dispute?  Is that
12 what your contention is?
13     A    47 that I'm aware of.
14     Q    So 47?
15     A    I believe it's 47.
16     Q    And what are you defining as a dispute?
17 47 times what did RLI fail to do?
18     A    So Ms. Johnson requested permission
19 from Mr. Sussman in approximately 47 cases.  There
20 might be a few more, might be a few less.  But
21 there were approximately 47 cases where we had
22 asked for permission to contest the reasoning for

**195**

1  the breach with the bond unit officer and in each
2  of those instances we were denied.
3          At the culmination of that, we stopped
4  requesting because it was clear that there was no
5  circumstance or accommodation of circumstances
6  that would compel RLI to actually give us this
7  right or authority.
8      Q    Are there 47 separate requests?
9      A    I believe it was made in several
10 emails, one of which includes 20 or 30 specific
11 documents related to individual program
12 participants.  I think you have to add them up
13 over the multiple emails.
14     Q    Okay.  All right.  What kind of
15 documents were included for these appeals?
16     A    As I remember —
17     Q    For the disputes.  Let me call them
18 disputes.
19     A    Right.  As I remember based on my
20 recollection of reviewing the documents, it varies
21 depending on the client because there are
22 different documents that would be — that would

**196**

1  matter.  I think there were some documents that
2  indicated that individuals were still in
3  proceedings.  I think there were some documents
4  that indicated that an individual had gone to the
5  wrong — to the wrong court but had been — or
6  wrong ICE office but had been told that they could
7  go to this different ICE office.  They went there,
8  they signed in, they did their meeting and they
9  still got breached.  So, just giving you an — my
10 memory, Vivian, but it's basically like several
11 different situations with different scenarios.
12     Q    But all of these instances -- hold
13 on -- all of these instances are this "dispute"
14 that you talked about, this kind of interim
15 dispute of providing a dispute to the bond unit
16 officer?
17     A    That's correct.  These are the
18 intermediary disputes.  These are disputes when a
19 breach initially occurs.
20     Q    And so these are pre-invoice disputes?
21     A    That is correct.
22     Q    What about post-invoice disputes?  Are

197

1 there any occasions that Nexus was prevented from
2 submitting a post-invoice dispute by anything that
3 RLI did or did not do?
4 **A Yes. RLI has demanded payment on**
5 **invoices where we believe we had post-invoice**
6 **disputes. However, Nexus paid them pursuant to**
7 **our responsibilities. So you were paid for those.**
8 **Those are bonds that we would have liked to have**
9 **had an opportunity to dispute. Many of them we**
10 **would have liked to have had an opportunity to**
11 **dispute pre-invoice, right?**
12 Q Let's just try to talk about --
13 **A I just want to make sure we get there.**
14 Q No, I know. I just want to kind of
15 keep them in buckets a little bit so I can address
16 them.
17 But as far as the post-invoice disputes
18 you're not contending here that Nexus -- excuse
19 me -- that RLI did something that prevented you
20 from submitting an appeal or a dispute
21 post-invoice?
22 **A To the extent that RLI may have paid an**

198

1 **invoice that was on appeal when we had shown RLI**
2 **that it was on appeal, that's the only caveat I'm**
3 **going to say I don't know. I mean, we have had**
4 **conversations about bonds that were on appeal,**
5 **where the government didn't cancel the invoice.**
6 **We've had conversations about this so I know**
7 **you're aware of that. And you know, those are the**
8 **only instances where I'm not sure, right?**
9 Q But otherwise, just so I'm clear,
10 otherwise there are no other post-invoice disputes
11 that Nexus was prevented from submitting by
12 anything that RLI did or did not do?
13 **A Other than the ones that RLI may have**
14 **paid and foreclosed the appeal, that's right.**
15 **Otherwise, no.**
16 Q Okay. And sitting here today, can you
17 list or identify any specific one that RLI paid
18 while there was an appeal? Is that your
19 contention?
20 **A Yeah, I will get that name for you by**
21 **the end of the day. I do have at least one.**
22 Q Okay. And right now you're not aware

199

1 of any more than just the one?
2 **A Right. But I'm going to do a little**
3 **research on my break and make sure I give you a**
4 **full list if I have it.**
5 Q So with regard to the -- with regard to
6 these 47 disputes, pre-invoice disputes, can you
7 give me any and all facts and circumstances that
8 you were aware of?
9 You talked about a couple of emails.
10 Do you know when they were?
11 **A So I could --**
12 Q Who --
13 **A So I could cite you to Juliana's emails**
14 **which I think you guys have because they were to**
15 **our assessment so you would have them as we would.**
16 **And I don't unfortunately have a**
17 **photographic memory so I can't recount those but I**
18 **will produce those emails for you if you want a**
19 **subsequent production, even though I think you**
20 **already have them.**
21 Q No, I'm trying to get an idea of what
22 you know today. So sitting here, do you have an

200

1 understanding of how many emails were issued and
2 when?
3 **A I've read -- I've reviewed between six**
4 **and seven emails. There may have been more that I**
5 **wasn't copied on. These are emails that I was**
6 **copied on.**
7 Q Okay. And do you know the time frame?
8 **A I believe the time frame existed**
9 **between late 2016 to the middle of 2018 -- let**
10 **me -- hold on one second. Let me just -- let me**
11 **just -- when we're talking about a window that**
12 **big, it sounds like a bad idea to speculate. So**
13 **let me get exact.**
14 **So December 2017 through the middle of**
15 **2018.**
16 Q Okay. Is whatever you're reviewing on
17 your phone, does that give you all the dates of
18 the communications?
19 **A So I'm looking at this, and I will**
20 **produce -- I'm going to produce.**
21 **A John, I'm going to send to my counsel,**
22 **this email called disputes and phone conference**

201

1   formally requested to Mr. Sussman.  It provided
2   the basis of the emails that contained the 47
3   some-odd requests.  This is sort of that initial
4   request.
5          So I'll send this because it does have
6   a lot of dates and it may be helpful.
7       Q   Did Mr. Sussman advise that he would
8   consider any disputes or appeals on a case-by-case
9   basis if adequate documentation was provided?
10      A   We were told that he would consider on
11  a case-by-case basis.  He was extremely consistent
12  in his no.
13      Q   Right.  And Mr. Sussman was asking both
14  for the grounds of the appeal and then the facts
15  that supported those grounds, correct?
16      A   I know that Mr. Sussman was having a
17  conversation with an attorney about those -- the
18  attorney that was making those arguments.  I don't
19  know what questions he asked her.
20      Q   You don't know through reviewing the
21  emails that Mr. Sussman was asking for the grounds
22  as well as the facts that supported the grounds

202

1   for any appeals?
2       A   I know that he had asked for the
3   grounds and I know that that was provided.  Any
4   follow-up conversations they may have had I don't
5   know about.  But based on the emails I can
6   certainly know that, yes.
7       Q   And the emails that you reviewed, did
8   the emails provide both the grounds for the appeal
9   and the facts to substantiate those grounds for
10  all 47 of the appeals?
11      A   Can you repeat that, I'm sorry?
12      Q   Of the emails that you reviewed, I
13  think you said there were six or seven perhaps.
14      A   Uh-huh.
15      Q   Did those emails set forth the
16  grounds --
17      A   Some of the grounds.
18      Q   -- for all 47 appeals and the facts
19  that supported those grounds?
20      A   So I was copied on some of those
21  communications, not all of them.  My understanding
22  is that each of those -- each of those cases was

203

1   explained based on what the issue was that we were
2   attempting to resolve through the dispute process.
3          I wasn't a party to any of those
4   communications directly, so I'm only referencing
5   based on my reviewing email communications.  So I
6   apologize I can't be more thorough.
7       Q   Right.
8       A   But my understanding is that -- that we
9   provided an explanation and that we were told that
10  we could not contest them.
11      Q   Isn't it true that some of those emails
12  only provided, for example, an example of an
13  appeal, perhaps, but not setting forth any
14  specific grounds for an RLI bond or the facts that
15  supported an RLI bond appeal or dispute?
16      A   Well, I'm aware of an email
17  communication where Mr. Sussman requested an
18  appeal was -- received one and then -- I need to
19  see that email to fully understand the
20  communication that you're talking about.  My
21  understanding is that a sufficient basis for
22  the -- the seeking to contest the bonds was

204

1   provided.
2       Q   You mean the grounds?
3       A   Yes, that basis based upon the legal
4   conclusions of the attorney that's filing the
5   appeal, right?  So I know that those
6   communications happened.  I wasn't a party to
7   those communications, so I can't repeat them off
8   the top of my head obviously.
9       Q   Okay.  And you can't say, sitting here,
10  how many of those emails -- whether or not those
11  emails set forth the grounds and the facts
12  supporting the grounds for all 47 of these
13  pre-invoice disputes?
14      A   No, no, no.  A case-by-case basis.  I
15  can say that I'm confident that we provided
16  grounds and that I know that RLI never allowed us
17  to contest not one.  It's also important,
18  Ms. Katsantonis, to understand that 47 is the
19  number I think that I have identified.  We would
20  have sought to contest scores more, but
21  unfortunately, you know, after being -- it being
22  made clear that this was not something that was

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

52 (205 to 208)

205

1 ever going to be allowed, it really has impacted
2 our ability to manage this book.
3     Q    Why do you say -- can the co-obligor
4 assert pre-invoice disputes?
5     A    Unfortunately, no.  They require a
6 letter of authorization from the surety.
7     Q    And where are you deriving that
8 information, the requirement from?  The DHS
9 handbook?
10     A    The DHS handbook and what they tell you
11 when you seek.  The DHS handbook says you can file
12 disputes.  It doesn't say you have to have a
13 letter from the surety.  But when you call the
14 bond unit manager and say I'm filing a dispute he
15 says send me the letter from the surety.  So we
16 know that the letter is required.
17     Q    Does the DHS Handbook specifically
18 provide a basis for filing pre-invoice disputes?
19     A    It doesn't provide a specific basis.
20 It gives an indication of what a dispute is.
21     Q    Right?
22     A    And there are certain aspects of a

206

1 dispute that can be either pre-, like I'm talking
2 about with the breach, or post-invoice.
3     Q    And what documentation do you have that
4 evidences that a pre-invoice dispute will only be
5 accepted if a surety letter is provided?
6     A    My own knowledge.
7     Q    Based on what?
8     A    Based on being denied the ability to do
9 it because we did not have a letter from RLI
10 granting same.
11     Q    Okay.  And where did -- who told you --
12 do you have a written correspondence or do you
13 have a verbal communication that said you could
14 not file a pre-invoice dispute without a letter
15 from RLI?
16     A    I know we have a verbal communication.
17 The letter I just forwarded to counsel to produce
18 to you sets more fully out from Juliana what the
19 communication with ICE was and what the needs are
20 from -- from RLI to be able to substantiate the
21 dispute.  And I'll produce that to you.
22     Q    All right.  So your knowledge is based

207

1 on the testimony or evidence from the attorney
2 Juliana?
3     A    Yeah, as a 30(b)(6) witness, a lot of
4 my testimony is based on information that I've
5 been able to study and review in anticipation of
6 this deposition.
7     Q    Right.  But Juliana, is she a Nexus
8 employee?
9     A    She is not.  She's an attorney.  She
10 operated with us via contract.
11     Q    What's her law firm?
12     A    Function via contract.  McNutt Law, I
13 think it's called.
14     MR. SHOREMAN:  For the record, the
15 documents that are -- the emails that the witness
16 just discussed were produced via email to counsel
17 for RLI.
18     Q    With regard to an invoice -- so is one
19 type of pre-invoice dispute to obtain a mitigation
20 reduction?
21     A    It can be.
22     Q    Okay.  And that would be for delivery

208

1 within the 30 days?
2     A    That's correct.  Or within the second
3 window because there are two windows where you can
4 get mitigation at 66 percent and then again at
5 33 percent.
6     Q    And didn't some of RLI invoices get
7 mitigated?
8     A    Oh, sure.
9     Q    And RLI assisted with that process?
10     A    Well, in those instances we had -- so
11 understand in those instances you've got an
12 individual who is a notice to deliver, right?
13 They don't come in.  And then in between the
14 notice to deliver and the breach they go in, okay?
15 So the ICE officer is acutely aware that they're
16 there.  So that kind of dispute's pretty easy.  We
17 don't really need RLI to help us with that because
18 the immigrant's literally in front of the bond
19 unit officer saying, hey, I'm here.  And so
20 typically those will get mitigated based on the
21 fact that the person is there and that the
22 calendar is what the calendar is, you know.

Case 5:18-cv-00066-MFU-JCH   Document 496-3   Filed 08/21/20   Page 54 of 189   Pageid#: 13381

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee          53 (209 to 212)
Conducted on March 3, 2020

209

1    Q    Hasn't RLI make -- didn't RLI make
2  phone calls on behalf of Nexus in order to
3  mitigate bonds?
4    A    It's entirely possible that calls were
5  made in those circumstances. I'm not aware of
6  them but I certainly would appreciate if they did
7  and would expect it.
8    Q    Right?
9    A    So that would make sense.
10    Q    So it wouldn't be a fair statement to
11  say that RLI never assisted Nexus in pre-invoice
12  disputes?
13    A    I think it — I actually do think that
14  it is accurate to say that RLI has never assisted
15  Nexus in pre-invoice disputes understanding that
16  what I'm talking about are not mitigation issues
17  based on when a person came in or was produced.
18  We're talking about — and I think I testified to
19  this pretty specifically. We're talking about
20  instances where there has been a mistake. The
21  person's case is continuing, but there's some kind
22  of faulty breach or a faulty notice.

210

1    Q    So you're saying that there's no
2  instances with RLI?
3    A    I'm sorry?
4    Q    I'm sorry. I did interrupt you and I
5  apologize.
6    A    No, it's our thing. I understand.
7    Q    Are you saying there's no notices where
8  RLI assisted in those cases?
9    A    I'm not suggesting that RLI didn't
10  assist by making phone calls in those cases. I'm
11  suggesting that RLI didn't assist in the specific
12  subset of cases where we needed to show that a
13  person didn't — you know, didn't miss or is
14  continuing to go to court or whatever. In those
15  instances where we've asked RLI, look there's a
16  breach, the breach is wrong, we want to seek a
17  reconsideration with the bond unit officer, we've
18  been denied letters in those cases. That's -- and
19  consistently to the extent that RLI may have made
20  calls about mitigation breaches, well that's great
21  and I appreciate that but it's different than what
22  I'm talking about.

211

1    Q    So you're saying -- it's your testimony
2  that there are instances where you provided RLI
3  with specific information about an immigrant to
4  show that the immigrant was complying with their
5  bond obligations but RLI just ignored it?
6    A    Yes.
7    Q    And can you tell me specifically what
8  those instances were?
9    A    I can't tell you specifically by
10  client, but I will, again, produce the
11  communications that were happening between Juliana
12  and Ira Sussman and you can read it for yourself.
13    Q    Okay. So the basis of the statement
14  you're making is based on the emails that you'll
15  produce?
16    A    The emails that -- that I will produce
17  and communications I have had with Erik Schneider
18  and any additional documentation that I will --
19  that we have. In other words, I want to get you
20  the global list of times that we have asked for
21  it. So I know there's 47. I'll get you that.
22  But if there's more, I'll get you that too.

212

1  That —
2    Q    Did you have an understanding that --
3  that under the terms of the indemnity agreement,
4  RLI had the unilateral right to determine whether
5  to appeal any claim?
6    A    I believe under the indemnity agreement
7  RLI has the unilateral right to determine RLI's
8  appeal decisions. I believe that the co-obligor
9  has independent rights of appeal just as he has
10  joint and several liability.
11    Q    With regard to invoices, by the terms
12  of the invoice is payment due and payable upon its
13  receipt?
14    A    Upon the receipt of the invoice?
15    Q    Uh-huh.
16    A    Do you have a document that you want me
17  to look at that you're talking about? I mean, I
18  just want to make sure I know what you're talking
19  about. Are you talking about any invoice? Are
20  you talking about a specific invoice? Are you
21  talking about a specific client or a specific
22  case?

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

54 (213 to 216)

---

**213**

1    Q    I'm just talking about invoices issued
2  by DHS based on a bond breach.
3       A    So an invoice, once a breach -- a
4  breach occurs, there's a final determination of
5  the breach, the appeal window eclipses.  There's
6  an invoice.  At that point in time the invoice is
7  due.
8            Now, we have, as a matter of function,
9  had several invoices that were rescinded in that
10 process because we've continued to seek relief for
11 the client or the client perhaps has a motion to
12 reopen or something like that that comes through
13 during that dependency at that time.  A lot of
14 times when we're waiting for that 120th day when
15 we have an invoice, it's because we know that that
16 client has a motion to reopen.
17      Q    But that's not what the invoice says on
18 its face, right?  Doesn't the invoice on its face
19 say that it is due and payable on receipt?
20      A    Sure.  And I have a duty to either
21 indemnify you or exonerate you, right?  I
22 indemnify you.  You could pay something and then I

**214**

1  would pay it back, or I pay for you.  We pay for
2  you.  Every single time a breach comes up and
3  there's an invoice issued, we pay it.
4       Q    Well, you don't --
5       A    Every single time.
6       Q    Well, you don't pay it on its due date,
7  right?  The invoice by its face say it's due and
8  payable on receipt, right?
9       A    I understand that.
10      Q    Do you want to see that?
11      A    No, I hear you.  But we pay all of our
12 invoices.
13      Q    You don't pay them upon receipt.
14      A    Point me to an invoice that's
15 outstanding.
16      Q    Mr. Donovan, we've been through
17 extensive litigation, right?
18      A    I know we have.
19      Q    And we've had preliminary injunctions
20 in order to require Nexus to pay, right?
21      A    Which is -- which is really unfortunate
22 because again --

**215**

1       Q    Okay -- but.
2       A    -- because again I think the court
3  has -- it will be interesting to see what the
4  court considers when they see RLI's behavior,
5  right?  I think that's going to be important.
6       Q    And RLI's behavior with regard to what?
7       A    With regard, for example, to the bond
8  that we raised on Friday where you show that it
9  was canceled in the production that you made to us
10 in discovery but we paid it.  You accepted our
11 check, you cashed it and you never refunded it and
12 then you send us back an email saying no, we
13 really did pay it.  Well, did you pay it or is it
14 canceled.  Your records say it was canceled.  I
15 don't have the cancellation.
16      Q    Did you produce to RLI records to
17 support your contention?
18      A    RLI receives the records and produces
19 them to us.
20      Q    Is that a no?  You have not produced to
21 RLI --
22      A    I have asked you for the cancellation.

**216**

1       Q    Didn't RLI provide you with
2  documentation in response to your question
3  yesterday?
4       A    Not the cancellation or an explanation
5  of why that bond was listed canceled?
6       Q    Mr. Donovan, did --
7       A    You're interrupting me.
8       Q    That's okay.  I don't care.
9            Let's just mark this.
10           (Donovan Exhibit 10 marked for
11 identification and attached to the transcript.)
12      Q    Okay.  This is a copy of an invoice
13 receipt for bond breach; is that correct?
14           MR. SHOREMAN:  10.  Do I have 10?
15           MS. KATSANTONIS:  Did you get a copy?
16           MR. SHOREMAN:  No.
17      A    I think that's correct.
18      Q    And is this consistent with all of the
19 invoices typically received for bond breaches?
20      A    No.
21      Q    This is not a typical invoice?
22      A    Well, all the invoices are different.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

55 (217 to 220)

---

**217**

1  The dollars amounts will be different, the names
2  would be different, all that.
3      Q   I mean the form.
4      A   Yes, the form would be the same.
5      Q   Okay.  So with regard to the form,
6  looking at the second page, payment due, doesn't
7  the invoice provide that the bill is due and
8  payable on receipt?
9      A   No.  It says 15 October 2016.
10     Q   I'm looking at the second page, payment
11 due.  Important information regarding this
12 invoice.
13     A   All right.  But it also has a due date.
14     Q   Right.  I'm looking at the terms on
15 important information regarding this invoice.
16     A   Right, but I'm looking at the actual
17 invoice and it has a due date on it.
18     Q   Okay.  Let's look at the second page.
19     A   All right, but do you see the due date
20 on the invoice, there's a due date on the invoice.
21     Q   There's an explanation here --
22     A   On the second page there is a list of

**218**

1  terms.
2      Q   Right.  And it explains those terms,
3  right?
4      A   But what I will say is that this is —
5  this is very specific.  This is a due date on the
6  invoice and this is a general provision, right?
7  Like specific general.  This says that there's a
8  due date.  So there's an invoice date of 15th
9  September and a due date of 15th October.
10     Q   Okay.  That's great.  Now looking at
11 the next page?
12     A   Uh-huh.
13     Q   With regard to important information
14 regarding this invoice, looking at payment due.
15 Doesn't the invoice provide that the bill is due
16 and payable on receipt, correct?
17     MR. SHOREMAN:  No, it doesn't.
18     A   It also says failure to submit the
19 amount shown —
20     MR. SHOREMAN:  Why are you only reading
21 the first sentence?
22     A   Failure to submit the amount shown on

**219**

1  the reverse side within the time specified on the
2  invoice will result in additional charges.
3      Ms. Katsantonis, the line you're
4  quoting literally says follow the date from the
5  invoice.  And if you look at the invoice,
6  Ms. Katsantonis, there is a date of issuance on
7  the invoice and a due date on the invoice.  And
8  they're not the same date.
9      Q   Isn't the payment terms saying that
10 penalties will be due if you don't pay within the
11 30 days but that the bill is due and payable upon
12 receipt?
13     MR. SHOREMAN:  The document speaks for
14 itself.
15     A   Yeah, I think it very clearly says that
16 you're supposed to comply with the dates on the
17 invoice.
18     Q   Well, you don't contest that the
19 invoice says the bill is due and payable on
20 receipt, right?  That language is right there,
21 first line?
22     MR. SHOREMAN:  Ms. Katsantonis.

**220**

1      Q   Is that correct?
2      MR. SHOREMAN:  It speaks.  We do
3  contest that because the following sentence says
4  it must be paid within the due date specified on
5  the invoice.
6      MS. KATSANTONIS:  Mr. Shoreman.
7      MR. SHOREMAN:  Why are we arguing about
8  something as silly as this?
9      MS. KATSANTONIS:  Mr. Shoreman, let's
10 get Mr. Donovan's testimony because your testimony
11 isn't even accurate.
12     MR. SHOREMAN:  I apologize, but it is
13 so obvious that a cat could testify to it.
14     THE WITNESS:  A cat?  The cat thing was
15 funny.  I'm sorry.  Just thinking like a meow or
16 something, I don't know.  Weird.
17     Q   So you agree, Mr. Donovan, the first
18 sentence says that the bill is due on receipt,
19 right?
20     A   I would agree that the first sentence
21 says this bill is due and payable on receipt.
22     Q   Right.  And that the second sentence

---

**221**

1  says failure to submit the amount shown within the
2  time specified on the invoice will result in
3  additional charges?
4      A   Yes, I see that.
5      Q   Okay.  So did you understand that if
6  you didn't pay within 30 days, additional charges
7  would be assessed?
8      A   Right, see I think this is part of the
9  confusion though, Ms. Katsantonis, because like
10 what it's saying is that this bill is due and
11 payable upon receipt.
12     Q   All right.
13     A   This is important and it may help edify
14 you to certain aspects of your case.
15         The breach is not payable upon receipt,
16 right?  As we have articulated, a breach doesn't
17 become due and payable until it's a final claim,
18 right?  So what this invoice --
19     Q   That's --
20     A   I'm sorry.  No, I really want you to
21 understand because if you listen to me you're
22 going to understand this.  This says that now you

**222**

1  can pay this.  Because when it was a breach you
2  couldn't pay it, right, until it's an invoice you
3  can't pay it.  So it's saying you can pay it but
4  you must pay it by the due date.  That's what it
5  says.
6      MR. SHOREMAN:  Meow.
7      Q   And so you're not --
8      THE WITNESS:  The meow thing is just
9  hilarious.  Cats are such weird creatures anyway.
10     MR. SHOREMAN:  I love cats.
11     THE WITNESS:  I've always been a dog
12 person myself.
13     MR. SHOREMAN:  I don't even own a dog.
14     THE WITNESS:  Cats always feel like you
15 don't really -- you don't really own a cat, the
16 cat kind of owns you.
17     Q   You understood, Mr. Donovan, Nexus
18 understood that the consequences of a failure to
19 pay could result in, among other things, the
20 referral of the bonding company, the Department of
21 Treasury or the Department of Justice?
22     A   I understand the Treasury, that offset

**223**

1  program, is a threat if an invoice isn't paid and
2  it's one of the reasons why we're proud to pay our
3  invoices every single time.
4      Q   Well, you don't pay your invoices on
5  the date you receive an invoice, right?
6      A   No, we do not.
7      Q   And you don't pay an invoice within 30
8  days of receipt, do you?
9      A   Not always.
10     Q   Most of time you don't, right?
11     A   Not always.
12     Q   Well, what does "not always" mean?  Do
13 you always pay them within 30 days?
14     A   I don't know.  This is not -- I mean,
15 we don't have, as I told you, we don't track when
16 we pay them as long as we pay them when they are
17 ultimately due.
18     Q   Well, isn't --
19     A   As you have articulated, and I don't
20 mean to raise my voice, Ms. Katsantonis, I just
21 want to make sure I get a chance to finish my
22 answer.

**224**

1          As you have indicated, we have been
2  under injunctive relief orders in this case,
3  right?
4      Q   It's --
5      A   But we have made those payments and we
6  will continue to make payments as we are required.
7      Q   Mr. Donovan, doesn't the invoice on its
8  face say when it's due.
9      A   I think on the invoice has a due date,
10 yes.
11     Q   Right.  And when you talk about when an
12 invoice is due, you're creating a different due
13 date than what's on the invoice, right?
14     A   I'm talking about the referral to
15 Treasury which has been a focus of your client in
16 litigation.
17     Q   No, when you say when an invoice is
18 due, right, you're creating a due date that's
19 different than what's on the face of this
20 document, right?
21     A   I think I'm referring to the date set
22 by the order of preliminary injunction.  I think

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

---

225

1 that may be our confusion. So we have an order
2 for preliminary injunction --
3    Q   Wait a minute?
4    A   Ms. Katsantonis, but you're
5 interrupting me. We have an order for preliminary
6 injunction in this case that says we have to make
7 payments by the 120th day.
8    Q   I'm not talking about the preliminary
9 injunction.
10   A   Well, I am, ma'am. With all due
11 respect and you're continuing to interrupt me. We
12 have an order from a chief judge in a federal
13 district that says this is what it is. So when I
14 refer to that, that's what I'm talking about.
15   Q   When do you believe an invoice is due
16 not with regard to this case and the order of
17 injunction. What is your understanding of when an
18 invoice is due that's been issued by the
19 Department of Homeland Security?
20   A   Barring — yeah, it would be on the due
21 date of the invoice. It's rather straightforward.
22 It's on the front of the invoice.

---

226

1    Q   Okay. So your understanding is that an
2 invoice is due within 30 days or on the due date?
3    A   On the due date of the invoice, right.
4    Q   Okay. And how many bonds have you paid
5 on the due date of an invoice?
6    A   We do -- I don't have that total
7 number, and it's not something that we keep track
8 of. In other words, it's not — it's not a KPI
9 that we track, whether it was paid on that date,
10 before that date or after that date.
11   Q   Can you estimate how many of the bonds
12 that you've paid have you paid on the -- what's
13 your definition of the due date on the face of the
14 invoice?
15   A   I can estimate but not under oath
16 because —
17   Q   Well, how many do you think?
18   A   — that's an estimation I couldn't
19 possibly be swearing to it. I would say maybe
20 half. I think in more than half. Half or more
21 than half the cases we have worked in that invoice
22 period to try to get either relief for the client

---

227

1 so that their bond breach can be canceled and they
2 can continue on. There are many, many, incidents
3 where our risk management folks are active --
4 Ms. Katsantonis it's really important for you to
5 understand that even today, right now as we're
6 talking, we have dozens of risk management
7 professionals in the field working with Libre
8 program participants. This is a -- it is a
9 significant undertaking. And we focus on getting
10 these people to meet and fulfill their
11 obligations.
12   Q   Didn't you have to get a payment
13 schedule with the Department of Homeland Security
14 because you couldn't make your payments, not even
15 on the due date, but months later?
16   A   ███████████████████████████████████
17 ████████████████████████████████████████████████
18 ████████████████████████████████████████████████
19 ████████████████████████████████████████████████
20   Q   ████████████████████████████████████
21 with the ████████████████████████████████████
22   A   We are not.

---

228

1    Q   Okay. And isn't it true that most of
2 the bond payments that you've made over the last,
3 let's start with year, have been at or around 120
4 days after an invoice was issued?
5    A   It's certainly true with RLI bonds,
6 yes. I don't know the — I'm going to have to
7 look at the number, but I would say that more
8 often than not we err on the side of caution to
9 try to bring the person into compliance before we
10 pay the bond and ultimately abridge their rights.
11   Q   And the same thing with 2019?
12   A   I would say that's true, sure.
13   Q   And what about 2018? Same?
14   A   I think so. You have to understand,
15 Ms. Katsantonis, we focus on helping the
16 individual and helping the individual means trying
17 to bring them out of the shadows and into
18 compliance. So we're going to take whatever time
19 we can to be able to do that.
20   Q   So then your estimate would be
21 inaccurate that it's not maybe half of the bonds
22 that you've paid within 30 days, right?

---

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

58 (229 to 232)

229

1    A   No, I don't think so because I think
2 historically it was probably more likely that we
3 were paying earlier before.  So what we have seen
4 is a larger number of breaches, a larger number of
5 people that are being breached for inappropriate
6 reasons, a larger number of rescinding breaches.
7 And that's just a reflection of the federal
8 government's hyperactive approach toward
9 deportation.
10   Q   Well, what year was it that you entered
11 into the payment schedule with DHS?
12   A   I believe it was 2017.
13   Q   Right.  So in 2017 you weren't paying
14 within 30 days.
15   A   In 2017 was the — was a full year into
16 the Trump administration and into the issues
17 involving the extrapolation of increased incorrect
18 breaches.  So I would say yeah we were dealing
19 with that 2016, 2017.  But in 2014, 2015, we
20 weren't.
21   Q   Okay.  So for 2017, '18, and '19 it's
22 true that for most bond breaches you were not

230

1 paying within 30 days, correct?
2    A   That's right.  In the -- what I would
3 call the era of Donald Trump, we have tried to
4 give people as many opportunities as possible to
5 make things right and I'm happy to report many
6 people are able to do that.  There are lives that
7 we've saved as a result of that.
8    Q   In 2018, starting in March, you were
9 paying approximately 30,000 a day in late bond
10 breach payments on a repayment schedule with ICE;
11 is that correct?
12   A   That's correct.
13   Q   And for how many months did you
14 continue on this repayment schedule?
15   A   I'd have to review the documents.
16   Q   You don't know how long you were on --
17   A   I don't remember.  I don't know how,
18 without reviewing documents I'm happy to review
19 documents, but I would have to review documents to
20 determine that.
21   Q   Were you on a repayment schedule for at
22 least a year?

231

1    A   I believe we were on a repayment
2 schedule for a year but I'm not a hundred percent
3 sure.  So again I would have to review documents
4 to answer that question, Ms. Katsantonis.
5    Q   All right.  And at 30,000 a day, even
6 at five days a week, it would be 150,000 a week,
7 at least 600,000 a month, and over 7 million in a
8 year, is that correct?
9    A   Yeah.  And we're still here paying our
10 obligations.  Kind of makes the underlying
11 complaint seem silly, right?
12   Q   All right.  So in 2018 at least on this
13 payment schedule you probably paid over 7 million
14 in bonds breach payments?
15   A   We've paid over $11 million in bond
16 breach payments, Ms. Katsantonis, so that does
17 sound consistent.
18   Q   Okay.  And with regard to the invoice,
19 with regard to disputes, the invoice provides
20 unless a written request disputing the debt is
21 sent to the office indicated above within 30 days
22 of receipt of the invoice, the debt will be

232

1 considered valid and due in full; is that correct?
2    A   That's correct.  I believe that is the
3 representation.
4    Q   And in fact the --
5        MR. WILLIAMS:  Are we taking a break?
6        MS. KATSANTONIS:  No.
7        MR. SHOREMAN:  No, we're still on.
8    Q   So how many written disputes has Nexus
9 submitted in writing to DHS within 30 days of the
10 invoice date for Nexus bonds?  And when I say
11 Nexus bonds --
12   A   Global, right?
13   Q   Yeah.  When I say Nexus bonds, just to
14 be clear on the record, we're talking about bonds
15 for which Nexus --
16   A   Secured.
17   Q   Yep.
18   A   Got it.  You and I are speaking the
19 same language in that regard, Ms. Katsantonis, and
20 I will get that for you, okay?  I will add that to
21 my bucket list of break items.
22   Q   And then the same for RLI bonds as a

233

1 subset of that.

2    **A    Right.  I'm accumulating a lot of break**
3 **work.  We're going to have to start thinking about**
4 **taking that break at some point so I can get you**
5 **these answers.**

6    Q    All right.  I've got a couple more
7 questions here on the disputes.

8    **A    It's your deposition, Ms. Katsantonis.**

9    Q    How many RLI bond breach invoices has
10 DHS reduced due to delivery of a bond principal
11 within 30, 60, or 90 days of delivery date set
12 forth in the notice to deliver?

13    **A    Universal?**

14    Q    Let's do RLI bond breaches.

15    **A    Okay.  I'm going to get both just**
16 **because I know you're going to ask me and I'll get**
17 **that at the break as well.  I'll review documents**
18 **that should be able to answer that question.**

19    Q    And then along the same lines, how many
20 RLI bond breach --

21    **A    You're just giving me homework now,**
22 **aren't you?**

234

1    Q    These are the questions we wanted to
2 ask.  I think it's in the notice.

3         How many RLI bond breach invoices has
4 DHS reduced for any other reason, rather than just
5 delivery of the person?

6    **A    And that doesn't -- you're not talking**
7 **about reduced to zero, you're talking about**
8 **partially reduced, right?**

9    Q    Right.  Any form of mitigation.

10    **A    I'm pretty sure that's a zero, but I'll**
11 **find out for you.**

12    THE VIDEOGRAPHER:  Where you have your
13 phone, can you move it?

14    THE WITNESS:  For sure, yeah.  Is that
15 enough?

16    THE VIDEOGRAPHER:  That's good.

17    MR. WILLIAMS:  3 hours and 38 minutes.

18    MS. KATSANTONIS:  How many?

19    MR. WILLIAMS:  3 hours and 38 minutes.

20    **A    We're more than halfway done.  Unless**
21 **you cut early then we're more than halfway done.**

22    MR. SHOREMAN:  Okay.  You've got a list

235

1 of what you need?

2    **A    Yes.  You let me know when you want me**
3 **to go.  Once you feel like you're at a good place,**
4 **then we'll break and I'll get this stuff for you,**
5 **Ms. Katsantonis, okay?**

6    Q    Sure.  Thank you.

7    **A    You're welcome.**

8    Q    You state in paragraph 42 of your
9 amended complaint that the purpose of an
10 immigration bond is to secure the principal's
11 guarantee that he or she will appear for all
12 hearings and meetings that are required by the
13 United States so that he or she can be released
14 from U.S. Government custody and detention during
15 the year's long immigration process.  Is that an
16 accurate statement?

17    **A    That's correct.  The immigrant does**
18 **have to appear for meetings and hearings, et**
19 **cetera, as dictated by the Department of Homeland**
20 **Security and the Department of Justice.**

21    Q    And you agree that's the purpose of the
22 bond is to secure the principal's guarantee?

236

1    **A    Vis-à-vis the immigrant, yes,**
2 **absolutely.  The whole purpose of the bond is to**
3 **ensure that they appear vis-à-vis the indemnitor**
4 **and the obligors, it's appear or pay, right?  I**
5 **mean, they either appear or they pay.  In other**
6 **words, the immigrant doesn't owe the United States**
7 **Government $20,000 if the bond was posted by a**
8 **surety, right?  So they're going to collect that**
9 **money from the surety and issue a warrant for the**
10 **immigrant.  The immigrant's focus is to appear;**
11 **the surety's focus is to pay if they don't appear.**

12    Q    If an immigrant's not using Nexus'
13 services, can't they post a hundred percent of the
14 bond amount?

15    **A    They can.  They can post it in real --**
16 **real assets to the United States.**

17    Q    Right.  But they're still required to
18 appear and go to their hearings, correct?

19    **A    Well, so no.  An immigrant in detention**
20 **is never going to pay their bond in cash, for what**
21 **are obvious reasons.  They're going to have a**
22 **third-party surety.**

237

1    Q    I'm talking about doesn't the law
2 require, isn't it that an immigrant can post funds
3 for a full amount of its bond or some sort of
4 security, for full amount of its bond, and they're
5 still required to appear for their hearings,
6 right?
7    A    Well, his or her.  I don't want to use
8 the word it.
9    Q    Sorry.  Did I say?
10    A    I know you didn't intend that.  You
11 threw me off with the it.  I'm like, what's she
12 saying.  Can you repeat the question, Vivian, I'm
13 so sorry.  I was so offended I was like what are
14 you talking about.
15    Q    John got me so distracted about cat
16 talk.  I thought he was a dog person but now I'm
17 very distracted.
18    A    I just want to point out instead of
19 responding really nasty and getting offended, I
20 gut-checked myself and asked first so.
21        I will appreciate that, you weren't
22 mean about it.

238

1    Q    Isn't it true that an immigrant without
2 using Nexus' Services, separate and apart, they
3 can post their bond and be released from detention
4 but they're still obligated to make their
5 appearance as required?
6    A    Well, they're obligated to make their
7 appearances if they're released on bond but no, an
8 immigrant in detention can't post his own bond.
9    Q    But the family member could post a
10 bond, let's say.
11    A    A family member standing a surety can
12 post bond for sure.
13    Q    So, if a family member posts the bond
14 and pays the full penal sum, the immigrant is
15 still required to make its appearances as required
16 by the government, right?
17    A    Right.  And that family member standing
18 a surety either has to ensure they go or pay.  The
19 family member is never going to be locked up
20 because they go or thrown in jail because they
21 didn't go.  They're either going to have to pay
22 or — the immigrant goes to court or they pay.

239

1    Q    They don't pay, they just forfeit the
2 funds that they provided to the court.
3    A    Isn't that the same difference?
4    Q    Well, I'm just saying those funds are
5 forfeited but the immigrant still has to appear.
6    A    Well, sure.  Just like in a surety bond
7 situation.
8    Q    Sure?
9    A    The immigrant would ultimately be
10 subject to arrest.  But Ms. Katsantonis, your
11 obligations would end upon the payment of that
12 bond, just like the third-party surety mom,
13 brother, dad, co-worker is going to also — their
14 obligations are going to end when they pay that
15 bond.
16    Q    How many -- do you -- did you monitor,
17 at one point in time each and every RLI bond
18 principal?
19    A    No.  I don't think that we've — well,
20 can you define what you mean by "monitoring"?
21    Q    GPS monitoring.
22    A    No, I don't believe that we've ever

240

1 monitored all of our RLIs.
2    Q    How many of RLI -- yeah, how many of
3 RLI bond principals were not fitted with a GPS
4 device?
5    A    It would be anyone that had a bond less
6 than $5,000 initially.  That amount has raised to
7 $10,000.  But during the life of the RLI program,
8 I believe it would be individuals whose bonds were
9 of a penal value of less than $5,000.
10    Q    Okay.  And --
11    A    And I can certainly get you the number
12 of those bonds but I don't have it off the top of
13 my head.
14    Q    Is every bond principal that gets
15 fitted for a GPS, are they actually monitored as
16 far as through the GPS?
17    A    So we do different types of monitoring,
18 depending on, you know, the issue with the client.
19 So any client that's affixed with a GPS device
20 does have monitoring that's conducted, meaning
21 they always establish a point when the individual
22 is affixed with the device so that we can ensure

241

1   that the GPS device is actually working.
2       Q   Uh-huh?
3       A   But you have to understand --
4       Q   But --
5       A   -- that the GPS is not what makes our
6   program successful.
7       Q   I know that and I've heard.
8       A   It isn't a hugely important part of the
9   program.
10      Q   That's fine.  I want to -- and I
11  understand all of your -- Nexus' with the program
12  and the services are all about.
13      A   I wish.
14      Q   So?
15      A   I wish that were true.  I think if you
16  did understand them you'd be a huge fan, Vivian.
17      Q   I do.
18      A   I do that -- I mean that.
19      Q   I've never said I'm not.
20      A   Well, you're suing me so you're
21  obviously not that huge a fan.
22      Q   My client is in litigation with you.

242

1       A   I understand.
2       Q   So with regard to GPSs?
3       A   Yes.
4       Q   My question is, is with the RLI bond
5   principal who's actually been fitted with a GPS,
6   how many of those bond principals are actually
7   monitored, and I don't mean monitored with we're
8   calling you to see how you're doing, but I mean
9   that the GPS tracking device is being used to
10  identify the locational -- the location of the
11  principal?
12      A   Well, they all would have been when the
13  device was installed, or at some point upon
14  wearing the device.  So if your question is how
15  many --
16      Q   Not at the moment it's installed.  But
17  I'm talking about did you monitor them through GPS
18  tracking?
19      A   What do you mean monitor them?
20      Q   Did you have a service or did you and
21  your office actually -- could, you know, track the
22  whereabouts of these principals?

243

1       A   Any person who had a device affixed to
2   them would have had tracking data at some point
3   for some period of time, absolutely.
4       Q   How much --
5       A   But it's important to understand that
6   we are not -- we're not monitoring sex offenders
7   on bracelets here.  It's not as if we're watching
8   to see if people go near school zones or
9   something.  This is a completely different kind of
10  situation.  So, you know, the reality is that most
11  of the conditions on a bond are very specific to
12  showing up, right?  So it's -- we utilize the GPS
13  as a function of helping clients become stable and
14  secure..
15      Q   Well, let me ask you this.
16      A   Because stability and security is what
17  ultimately leads to compliance.
18      Q   Let me ask you this:  When you have a
19  notice to deliver, how many of the RLI bond
20  principals did you have on GPS monitoring when you
21  received a notice to deliver for them?
22      A   I don't know that I would have records

244

1   of that.  I don't know that those records exist.
2   In other words, I'm thinking now of what I would
3   review to answer that question.  And the -- so can
4   you repeat it?
5       Q   How many of the RLI bond principals
6   were you -- did you have GPS monitoring on when
7   you received a notice to deliver?
8       A   The problem is the historical nature of
9   this.  So I don't -- we didn't -- when we got
10  notices to deliver, we never documented whether
11  the person was on tracking or wasn't on tracking.
12  In other words, it's not like that's something
13  that we kept track of.  So I just don't know
14  that --
15      Q   So a notice to deliver?
16      A   -- I would be able to give you a
17  snapshot in time but I'm not sure if I can get
18  that information.  Maybe I can.  I'm just not
19  thinking about it.  I'm not clear.
20      Q   So it's not part of your practice to
21  receive a notice to deliver and then be able to
22  check the location or whereabouts of that person

---

**245**

1  immediately based on a GPS monitoring?

2      A   No, very typically by the time a notice
3  to deliver is issued in a case, they've been in
4  their immigration case for a year or so.  Many of
5  those instances those people are not going to be
6  GPS monitored anymore.  The average Nexus Program
7  participant is monitored for about eight months,
8  right?  So what we would not do is look for an
9  active tracking point because typically by that
10  point we don't have active tracking points.  What
11  we might look for is historical GPS data to
12  determine where the individual might be, not so
13  that we can roll up and arrest them, but so that
14  we can roll up and make contact with them and help
15  them understand why it would be important for them
16  to do the right thing.

17      Q   When did Nexus implement a policy to
18  only track immigrants for about eight months?

19      A   Well, eight months has always been our
20  average not our policy, right?  We don't have a
21  policy that says we only track for eight months.
22  But it's very nature being an average there are

---

**246**

1  going to be some people that track long.  So I
2  want to make sure that you understand that my
3  testimony is not that we only track for eight
4  months.  The testimony is that on average it's
5  eight months.  And, honestly, if you keep a GPS
6  tracking on a person for an extended period
7  of time, it almost -- it's onerous and it's
8  unpleasant and, you know, we're attempting to
9  provide, you know, services where we can assist a
10  person in bringing them into community.  You can't
11  bring people into community by making them lepers.

12      Q   And as of January 2020, according to
13  records produced by Buddi, they advised that
14  approximately 90 RLI bond principals were on GPS;
15  is that accurate?

16      A   That was accurate at the time.

17      Q   Okay.  So that's 90 out of 70
18  outstanding, let's say, 1,700-plus bonds, right?

19      A   Sure.

20      Q   Okay.  And do you know how many were on
21  GPS in 2019 or 2018?

22      A   It would have been more, but, again, I

---

**247**

1  don't -- all I have is -- I have a snapshot in
2  time I can pull up and show what's on now.  I
3  didn't keep track of that in a way that I can
4  report back.

5      Q   Has Nexus reviewed whether or not
6  there's any correlation between those immigrants
7  not on GPS and those immigrants for whom a bond
8  breach is issued?

9      A   Our analysis of our data indicates that
10  there is not a significant increase in the breach
11  rate for individuals who are not monitored by GPS
12  because they have a smaller bond.  What I don't
13  know, Ms. Katsantonis, is whether that has
14  something to do with the fact that they have a
15  smaller bond and therefore less risk or whether it
16  just doesn't matter.  What we have been able to
17  deduce from our experiences that the GPS doesn't
18  make that much of a difference.  Where the GPS
19  makes a difference is, again, in stability.  It's
20  in bringing the person out, and that's an
21  incredibly important time because they're trying
22  to find work, they're trying to figure out their

---

**248**

1  place in the world and a lot of these folks if
2  they're recent arrivals, they're just trying to
3  find their place, period.

4      Q   Did you recently advise Buddi to cease
5  monitoring of RLI bonds principals?

6      A   I did.

7      Q   When did you do that?

8      A   I did that in the beginning of
9  February, three weeks ago.

10      Q   And why did you do that?

11      A   I had -- when I discovered that we had
12  90 RLI principals on monitoring, I was horrified
13  that we had that many because our RLI program
14  ended in 2017 and it's 2020.  So that's 90 people
15  who have seriously been on the bracelet longer
16  than the eight-month average.  So in and of itself
17  that's a reason to bring those people off.  More
18  importantly I have significant concerns over what
19  RLI might do with data that I have provided to it.
20  And I don't have any requirement under the general
21  indemnity agreement or the collateral agreement to
22  track those people via GPS.  And so I made the

---

249

1 decision to remove that tracking considering the
2 fact that these people have been on the program
3 for more than three years and it's appropriate.
4 It's the appropriate thing to do.
5    Q   Was cost a factor also?
6    A   Was cost a factor?
7    Q   Uh-huh?
8    A   No.  Their safety was a factor and my
9 concern of what your client would do to them, that
10 was the factor.
11    Q   With regard to bond breaches we talked
12 about earlier, if you recall our first preliminary
13 injunction was in November 2018?
14    A   I recall.
15    Q   And at that point, RLI was asserting,
16 amongst other things, that they had paid
17 approximately 72,000 in invoices.
18       Do you recall that?
19    A   I do remember that, yes.
20    Q   And then since that hearing, RLI has
21 also advised you of other bond breach invoices
22 that it has paid, correct?

250

1    A   What are you referring to?
2    Q   That you've had to reimburse RLI but
3 RLI paid those invoices in the first instance,
4 correct?
5    A   Right.  Well, there's an
6 indemnification and exoneration provision, right?
7 So if RLI paid something and then sent a bill to
8 me, of course, I'd pay it.  And have every single
9 time.
10    Q   That's what I'm asking though, you know
11 for a fact that there's instances where RLI has
12 paid bond breach invoices?
13    A   I believe there are instances where RLI
14 chose to pay in advance of Nexus paying, yes.
15    Q   Okay.  So in paragraph 72 of your
16 amended counterclaim, you stated RLI has never
17 been required to pay an invoice itself and has
18 never had cause to use the cash collateral.
19 That's not an accurate statement, correct?
20    A   Sure it is, they didn't have to.  We
21 would have paid it.
22    Q   So you're --

251

1    A   As is evidenced by the fact that we did
2 pay it.
3    Q   So if RLI wanted to pay within 30 days
4 of an invoice, then it has -- it has made payment
5 itself, before Nexus, right?
6    A   Why don't you make note of that,
7 Ms. Katsantonis, because you just asked me a
8 question to give you all the instances where you
9 have abridged the appellate rights of an
10 individual and harmed them.  If you're referring
11 to instances where you paid those early, then you
12 have that list, right?  If you've paid breaches
13 early, knowing that we are trying to help the
14 person, you paid them within 30 days and then
15 asked us to pay it back, then you've abridged the
16 rights of that program participant.  That's the
17 whole point.
18    Q   Paid early pursuant to what
19 requirement?
20    A   Not a requirement, Ms. Katsantonis.
21    Q   The invoice requires it be --
22    A   Information and understanding.

252

1    Q   An invoice requires it be paid within
2 30 days, right?
3    A   But Ms. Katsantonis, if we were able to
4 challenge these -- if your client would give us
5 the ability to challenge these, we wouldn't have
6 the breach rate we have the RLI bonds.  This is --
7 and it's further problematic that I have had to
8 make disclosures to RLI clients that you have
9 sought their personal confidential information,
10 which of course makes it more likely that the
11 people will fail to appear.
12    Q   Well, I'm trying to get an --
13    A   Every turn in this litigation --
14    Q   Mr. Donovan?
15    A   -- RLI has done things to make this
16 harder.
17    Q   Okay.  Mr. Donovan.  You said -- I'm
18 just trying to get your understanding from either
19 what contract document, what DHS book, what
20 document do you have to say that paying an invoice
21 in 30 days is paying it early?
22    A   No, Ms. Katsantonis, you and I have

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

64 (253 to 256)

253

1  already discussed this.  So you have a right to
2  pay an invoice.  It's just going to affect the
3  individual.  I'm telling you that it is and I've
4  testified to that.  Now, you know, you might have
5  a different perspective or may care less than I do
6  but that's just a reality.
7      Q    What specific individual right are you
8  saying I've harmed, or RLI has harmed by paying an
9  invoice on its due date?
10     A    If you pay an invoice that could later
11 be rescinded and the breach reinstated, once that
12 invoice is paid the breach cannot be reinstated
13 and the individual would have to be rebonded.
14     Q    Okay.  And you have not provided any
15 specific -- you don't know, sitting here today,
16 how many instances that's ever happened?
17     A    Any instance that you paid early it
18 could have been happened.
19     Q    No, that it did happen.
20     A    Where an individual was -- how would we
21 possibly know?  In other words, when you pay it,
22 the important distinction there, Ms. Katsantonis,

254

1  is that the breach would have been rescinded but
2  the breach can't be rescinded when you pay it so
3  there's no way for me to calculate that.  I would
4  just be guessing.
5      Q    Okay.  So you don't know.
6      A    That's unfortunate.  Because those are
7  real lives.  Those are real people's lives.
8      Q    I understand.
9      A    Real lives with real kids and families
10 and they matter.
11     Q    Of course.
12     A    But unfortunately --
13     Q    So sitting here today you don't know.
14     A    Because we weren't given the
15 opportunity --
16     Q    It's yes, no, or I don't know.
17     A    No, I can't tell you how many lives
18 were harmed as a result of that policy.
19     Q    Okay.  And sitting here today you can't
20 give me any instance, not one instance in which an
21 immigrant's rights were harmed?
22     A    I didn't -- I don't think I said that.

255

1      Q    Due to the payment of an invoice.
2      A    Let me -- let me supplement my answer
3  at break, okay?
4      Q    Did you receive -- did you review the
5  Department of Homeland Security's response to
6  Nexus' subpoena?
7      A    I may have seen it.  Can you put the
8  document in front of me so I can review it, if you
9  want to ask me questions about it.
10     Q    Well, my one question --
11     A    Oh, and, I'm sorry, Ms. Katsantonis,
12 you had asked me about the identity of a
13 participant who had been harmed.  I think I have
14 that off the top of my head, if you would like it.
15     Q    By payment?  Sure.  By payment of an
16 invoice.
17     A    Juan Valoy.
18     Q    Okay.
19     A    By payment of the invoice.
20     Q    What happened?
21     A    Well, his bond was taken away.  He's
22 still in removal proceedings, quasi removal

256

1  proceedings.  He was an intervenor.  You may have
2  read his pleadings.  If you haven't, they're there
3  and you can review them.  And it sets forth the
4  case involving Mr. Valoy and you'll understand how
5  RLI harmed him.
6      MR. SHOREMAN:  V-A-L-O-Y.
7      A    Right.  I think Judge Urbanski had
8  invited the intervenors to file independent
9  actions.  I'm saddened that Mr. Valoy didn't.
10     Ms. Katsantonis, my owe you list is
11 getting rather long.  So if -- I would like to get
12 some of these answers for you so that I don't
13 forget anything.  So when you're ready and you
14 want to dispatch me for five minutes to go get
15 some answers I'm more than happy to do that, okay?
16     Q    All right.  Let me just ask you one
17 more question and then we can do that.
18     A    Of course.
19     Q    And we can certainly mark this.
20     (Donovan Exhibit 11 marked for
21 identification and attached to the transcript.)
22     MR. SHOREMAN:  Is this 11?

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

65 (257 to 260)

---

257

1       THE COURT REPORTER: Yes.
2       MR. SHOREMAN: Exhibit 11.
3       Q    And this was a copy of the Department
4   of Homeland Security's response to a subpoena
5   issued by Nexus.
6            Did you review their summary of
7   relevant portions of managing federal receivables?
8       A    I'd like an opportunity to review.  I
9   think I have seen this communication but I don't
10  believe that I know it well enough to speak to it
11  but if you'll give me an opportunity to read it,
12  then I'm happy to discuss it.
13      Q    Sure.  And I only have one quick
14  question on it if you want to take the time to
15  read it, you can.  But my quick question, so you
16  know --
17      A    You want to preview your question and
18  I'll tell you whether I feel like jumping in head
19  first.
20      Q    Are you aware that the agency has
21  advised that it's its policy to send delinquent
22  debts to fiscal services as early as possible and

---

258

1   that the agency may refer its debts as early as 61
2   days after the delinquency date?
3       A    I'm going to have to read this,
4   Ms. Katsantonis.
5       Q    All right.  And I'm looking at the
6   third to the last paragraph on page 2.
7       A    Got it.
8            MS. KATSANTONIS: So why don't we take
9   a break and then you can look at that and we
10  can --
11      A    So I'll tell you what.  I will do this,
12  I will take my break time to — because you've
13  given me a bunch.  I have a bunch of questions.
14  So I want to take the break time to do that not
15  necessarily read this and do that because at some
16  point I'll be on break longer than I'll be in
17  deposition, right?  So I'm going to chase down
18  these answers but if you don't mind I want to
19  answer your question before we break.  Is that
20  possible?
21      Q    Sure.
22      A    Okay.  That way we just don't have two

---

259

1   things being held over.
2       Q    I'm going to do it off the record
3   though.
4       A    You want my answer off the record?
5            MR. SHOREMAN: Well, he can't give you
6   the answer off the record.
7       Q    Well, I don't want to take --
8       A    You're not going to throw documents in
9   front of me and I'm going to read them off the
10  record so that you get more time and we'll go back
11  on.  If you want me to read a document in
12  preparation for answering a question then we
13  should stay on the record and then I will read it
14  and answer the question.  If you don't want me to
15  answer the question then withdraw it.
16           MR. SHOREMAN: It's only fair.
17      A    I'm happy to read it and respond to the
18  question.
19           MR. SHOREMAN: Do you want him to read
20  it or not?
21           MS. KATSANTONIS: Let's go off the
22  record.

---

260

1            MR. SHOREMAN: Okay.  Let's go off the
2   record.
3            THE VIDEOGRAPHER: We are going off the
4   record at 16:58.
5            (Recess taken.)
6            THE VIDEOGRAPHER: We are back on the
7   record at 17:37.
8   BY MS. KATSANTONIS:
9       Q    Okay.  Great.  Before we took a break
10  there was some issues that you were going to
11  review.  Did you have an opportunity to do that?
12      A    Yes, ma'am, I did.
13      Q    Okay.  And what did you discover with
14  regard to the RLI bonds?
15      A    Do you want me to just go through the
16  list?
17      Q    Yes, that would be great.
18      A    You asked me how many RLI bonds were
19  granted under the Pereira decision.
20      Q    Uh-huh?
21      A    The answer is five.  That's appeals.
22  You asked me globally how many appeals have been

---

261

1  granted because of the Pereira decision.  That
2  answer is 63.
3        You asked me how many RLI appeals were
4  rejected as untimely, that answer is 17.
5        You asked me globally how many appeals
6  had been rejected as untimely.  That answer is
7  339.
8        You asked me how many appeals have been
9  granted globally -- I'm sorry, with RLI -- and
10 that's nine.
11    Q   Uh-huh.
12    A   You asked me how many appeals have been
13 granted globally, and that's 74.
14        You asked me to identify a participant
15 who I think has been harmed because of the payment
16 of his bond.  I identified Juan Valoy and
17 referenced you to his pleadings in the intervenor
18 motions.
19        You asked me how many requests for
20 mitigation we had with RLI.  We have no record of
21 requested mitigation.  I know you said that you
22 had had people who made phone calls.  I talked to

262

1  my people to try to figure out what bonds those
2  were involved in.  I wasn't able to do that.  So
3  if you've got information about that that you can
4  put in front of me I'll comment on it.  But we
5  didn't have any as it relates to RLI.  We had 234
6  as it relates globally.
7     Q   And how many appeals globally have you
8  filed on the Nexus appeals?
9     A   339.  I'm sorry.  339 have been
10 rejected as untimely.
11    Q   Right, right, right.
12    A   Total filed appeals is 1,457.  Globally
13 208 with RLI.  Sorry about that, Vivian.  It's
14 after 5:00, you know.
15    Q   Right.  I was just looking at those
16 numbers.
17    A   That doesn't work.
18    Q   And can you identity which five of the
19 RLI bond appeals were granted under Pereira?
20    A   I'll have it sent — I'll have it
21 produced by the end of the day, when we're done.
22    Q   Okay.  Thank you.

263

1     A   I mean after.  Because I can't do it
2  right now but as soon as we're done.
3     Q   Other than the --
4        MR. HARRIS:  Counsel, are you okay with
5  that?  Are you going to produce that?
6        MR. SHOREMAN:  Produce, the Pereira
7  documents?
8        MS. KATSANTONIS:  The five RLI bond
9  appeals that were affirmed based on the Pereira
10 decision we asked for copies of that.
11        MR. SHOREMAN:  We can do that today.
12        THE WITNESS:  Yeah, Hazzar will put
13 that list together.
14        MR. SHOREMAN:  Okay.  We'll have it
15 emailed to you today.
16    Q   And other than the one -- well, do you
17 know what the basis of the other four appeals that
18 were affirmed for RLI bonds?
19    A   I believe they were notice deficiencies
20 but I will double-check.  I already promised you
21 that I would give you the nine so I will.  So that
22 will include the five for Pereira and then you'll

264

1  have the others too.  Sound good?
2     Q   Thank you.
3     A   You're welcome.
4     Q   Other than the ██████ bond, are
5  there any other bonds that you're aware of that
6  were -- where the principal was harmed in any way
7  because of a payment of an invoice?
8     A   I -- in order to answer that question
9  more fully, I have A, begun to review other
10 intervenors and I would like to supplement my
11 answer by the end of today as it relates to
12 identification of other people who've been harmed
13 because their bonds have been paid.
14        I also will say that until I have a
15 full complement of the cancellations and
16 understand the difference between the number of
17 cancellations RLI has produced and the number that
18 they say they have, I would need that information
19 to be able to determine if other people were
20 harmed.
21    Q   Okay.  Other than ██████, right now
22 you don't have information of anyone else, though,

---

**265**

1   correct?

2   A   No, I will provide a supplement.

3   Q   All right.

4   A   And I would say one person is too much.

5   Q   As to ▮▮▮▮▮, can you just tell me
6   again briefly how did the payment itself harm him,
7   the payment of the bond?

8   A   We were forced to pay ▮▮▮▮▮ bond
9   because of an RLI demand.

10   Q   How did that --

11   A   However, he had been seeking to reopen
12   his case, as I understand it.  He is now having to
13   reapply for benefits under USCIC separately
14   because -- so when you have a case before the
15   immigration court then you can file for relief
16   under say USCIS provisions, right, benefits under
17   the Immigration and Naturalization Act, right?
18   You can apply for those benefits pursuant to
19   your -- to your case and removal proceedings which
20   is before the Department of Justice.  But the
21   relief that you're seeking is through USCIS.  The
22   Department of Justice doesn't make the decision

---

**266**

1   about whether you get relief.  The citizenship
2   service does and then they communicate it to the
3   Department of Justice and that makes the decision
4   about whether you're removed or not.  Do you
5   understand?

6   Q   Yep.

7   A   So individuals who are in -- and I'm
8   sorry, I'm going to ask you to restate the
9   question because I just don't want to --

10   Q   I want to know how the payment of the
11   bond, of ▮▮▮▮▮, impacted his right?

12   A   So in a case like that --

13   Q   Specifically his case?

14   A   So once his bond is paid, the case is
15   over, he has to go and apply for benefits under
16   USCIS without the protections of a removal
17   proceeding.  So for example, if I'm in removal
18   proceedings --

19   Q   Are you saying the payment of the bond
20   stopped the removal proceedings?

21   A   I'm saying that the payment of the bond
22   closed his case before the Department of Justice.

---

**267**

1   He'll have to be rearrested again and a new case
2   opened or he can apply for benefits under USCIS
3   without the protections of being in removal
4   proceedings.  But the protections of being in
5   removal proceedings are that you're not going to
6   get arrested because the government now knows that
7   you're applying for benefits.  If you apply for
8   benefits under USCIS and you're not in the country
9   legally, you are sort of announcing to the
10   Department of Justice and the Department of
11   Homeland Security that you're here and in many
12   instances, particularly with this administration,
13   there is a negative repercussion to that.

14   So if he loses the protection of the
15   removal proceedings then any benefit that he
16   applies for comes with the risk of being tracked
17   down, arrested, held on a deportation order that
18   isn't valid.

19   Q   What specifically happened in this
20   case?  What right specifically was affected when
21   the bond was paid?

22   A   I'm going to -- I'm going to direct you

---

**268**

1   to the pleadings.  If you'd like me to, I can
2   consult the pleadings before I answer further but
3   I do want to make sure that the testimony I
4   provide is a hundred percent.  I don't want to do
5   it based on all of my recollection.

6   Q   Yeah, I want to know exactly how he --

7   A   I'm not trying to be cute.

8   Q   No, no.

9   A   I don't want to say something that I'm
10   not a hundred percent sure but you know I don't --
11   I need to consult.  It's just so long ago, you
12   know.

13   Q   Right.  Is it your testimony that the
14   payment of the bond closed the removal proceeding?

15   A   Well, it closed its case before the
16   EOIR, yes.

17   Q   And that's precluded the continuation
18   of removal proceeding?

19   A   No, I mean, he would be -- he would
20   be -- he would -- they could reassert removal
21   proceedings under the removal order, right?  So
22   you know --

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

68 (269 to 272)

### 269

1    Q    They would just continue it under the
2 removal order.
3    A    No, that's not how it works.  The EOIR
4 is part of the Department of Justice, right, and
5 so the EOIR opens cases and the Department of
6 Justice runs the EOIR court.  So it's not like —
7 it's not like an Article 3 court, right?
8    Q    But I just want --
9    A    This is like an administrative court.
10 Well, I understand.  And as I told you, I need to
11 review the documents.  No, there's a larger
12 question.  You looked a little confused when I
13 said it doesn't — that the removal proceedings
14 don't go on.  I think it is probably instructive
15 for me to explain that.
16    Q    I'm not interested in it.
17    A    I understand.  But if you did know it
18 might make a difference in how this case goes,
19 right?
20    Q    No, I just want to know specifically
21 what rights were precluded or how the payment of
22 the bond impacted Juan Valoy?

### 270

1    A    Ms. Katsantonis.
2    Q    Specifically?
3    A    You want to know specifically but you
4 don't want to understand how the payment of
5 invoices early affects the bond which is what I'm
6 trying to explain to you --
7    Q    No?
8    A    -- globally.  You want -- you're asking
9 me to pull from my memory of Juan Valoy, which you
10 know I'm reticent to do, thereby not answer the
11 question versus provide you a thorough answer to
12 the larger question of what happens.
13    Q    But I don't --
14    A    -- what happens when a person's in
15 removal proceedings and a bond's paid.  That's
16 what you were asking and I was going to answer it.
17    Q    No.  I want to know exactly what was
18 impacted as you contend.
19    A    Based on ████████████████
20    A    Right.
21    Q    And as I indicated to you that I wanted
22 to read those pleadings but --

### 271

1    Q    We'll move on.
2    A    -- I can provide you a general answer
3 which you're not interested in.  But I'm more than
4 happy to supplement it.  I'll get that -- I'll
5 send you the pleadings.
6    Q    Okay.  So with regard to -- and I'm
7 going to say Nexus, and I mean, Nexus, Libre, and
8 Homes for purposes?
9    A    I gotcha.
10    Q    Okay.  So with regard to the current
11 status of Nexus' financial condition, what is --
12 is Nexus currently operating at a profit or loss?
13    A    Nexus is currently under the process of
14 completing its input of financial data into
15 QuickBooks.  That is a process that is ongoing, as
16 you are aware we have made several productions and
17 those production changes as though processes
18 continue.
19    I can testify to a specific point in
20 time.  I can testify to what's in the records now.
21 I can give you a copy of our KPI and we can talk
22 about performance.

### 272

1    But we need to be clear that we are not
2 a company that manages our day-to-day performance
3 in QuickBooks and we have been responding now to a
4 judicial order to get our books and records into
5 QuickBooks, which we've been working on, as you
6 well know we produced millions of pages of
7 documents.
8    Q    The court didn't order Nexus to get its
9 books into -- to get its finances into QuickBooks,
10 right?  I mean, Nexus advised the court that it
11 was in the process of entering its financial data
12 into QuickBooks, right?
13    A    No, we advised the court that we
14 entered the financial data into QuickBooks at the
15 end of the year.  As you may remember, my
16 understanding of the order and more than happy to
17 go back and rereview it, but my understanding of
18 the order was that it did require us to show you
19 books and records out of QuickBooks even though
20 those weren't where we originally kept our
21 day-to-day management, right?  So we did -- just
22 to be clear, when the first preliminary injunction

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

69 (273 to 276)

273

1  was issued, it had a significant impact on our
2  company because what it did is it stopped
3  everything that we were doing and we had to
4  completely revisit how we were booking — how we
5  were tracking financials.
6      Q   Didn't you advise the court that in
7  2017 you were preparing taxes and getting the
8  finances up to date?
9      A   Yes.
10     Q   Okay.  And that in 2018, you advised
11 that Nexus was entering its data into QuickBooks,
12 right?
13     A   That's correct.
14     Q   And --
15     A   Pursuant to the order of opening our
16 books and records so that you could see them.  My
17 understanding is that you wanted those records in
18 QuickBooks.  I didn't realize that you were
19 willing to look at KPIs.  It might have been
20 easier.
21     Q   I don't believe RLI asked to see your
22 books and records in the manner in which they were

274

1  maintained.  We never specified a way.
2      A   I thought you demanded a login to our
3  QuickBooks.  That's what I seem to remember.
4      Q   I mean, we won't -- it's not an -- it's
5  not worth discussing.
6      A   Okay.  Just based on my memory, Vivian,
7  I'm not trying to be --
8      Q   I know.  But Nexus has contended it's
9  updating its books since 2017.
10     A   Right.
11     Q   And now we're at 2020.  And is it
12 Nexus' testimony that it cannot provide accurate
13 information regarding the status of its financial
14 condition?
15     A   Nexus' testimony is that we have
16 engaged Grant Thornton, we've engaged Fusion CPA
17 professionals in order to input and get a clear
18 picture of where we are financially.
19         When we began this process, the problem
20 that we have is that the amount of money that we
21 make a year makes us an accrual company for
22 accounting purposes and because we earn revenue

275

1  over more than a calendar year under the 606 GAAP
2  accounting rule, we have to segment out our
3  contract -- our contract's based on revenue not
4  based on when we receive revenue, which makes
5  sense, but based on when it's planned to be booked
6  under the new accounting rule.  That has created
7  significant problems because we've had to go back
8  and analyze, you know, life of contract and those
9  types of things.
10         So what we have decided to do is we
11 are -- we are preparing financials and tax returns
12 based on the modified cash accrual method through
13 2018 and then in 2019 we will move to the GAAP
14 compliant 606 rule and then in 2020 we plan to
15 move to audited financials.  So that is our plan
16 and we're quite confident that while this has been
17 a frustrating experience ultimately, you know, the
18 company will grow and be stronger as a result of
19 it.
20     Q   So which company is providing -- so you
21 said you're going to do audited financials in
22 2020?

276

1      A   That's correct.
2      Q   What about 2017, '18, and '19?
3      A   We can't — we can't have audited
4  financial statements in 2017 and 2018 because
5  we're filing and doing them under the accrual cash
6  method, right?  So in order to do audited
7  financials, you have to be GAAP compliant.  In
8  order to be GAAP compliant we have to recognize
9  revenue under rule 606.
10     Q   Okay.
11     A   So I can't do that for 2017 or 2018
12 because it would set us back even further in
13 getting things done.
14     Q   Didn't you say --
15     A   So we're going to do it in 2019 and
16 then in 2020 we move to audited financials.  And
17 that's based on a conversation and decision that I
18 made yesterday in communication with Grant
19 Thornton.
20     Q   Didn't Nexus testify that in
21 November 2018 that it had completed inputting all
22 of its data for 2017?

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

70 (277 to 280)

277

1      A   We had completed inputting data, but we
2  were reconciling data.  As you well know one of
3  the concerns that you've had are items that were
4  booked as revenue of, like, combined client
5  revenue of such and such million, for example.  So
6  while information was inputted into QuickBooks, we
7  have been reconciling QuickBooks, as you know,
8  because you've seen the reports and you've seen
9  the different iterations of them.  So you -- and
10  in fact, you even asked deposition questions about
11  what was transferred from a group number to
12  individuals.  So that's what's happening and it is
13  a process.
14      Q   What I'm trying to understand is I just
15  want to know where you stand financially.
16          So for -- and we had Mr. Moore's
17  deposition that you sat in on last week, right?
18      A   Yes, ma'am.
19      Q   And Mr. Moore testified that for the
20  '17, '18, and '19, that Nexus does not know
21  whether it's operating at a profit or a loss; is
22  that true?

278

1      A   Nexus believes that we'll break even or
2  close to break even for those years.  We are in
3  the process of finalizing the financial statements
4  and as soon as I have them and the tax returns and
5  as soon as I have them, you will.
6      Q   Okay.  I'm not interested in what Nexus
7  believes.  I want to know what facts you have.
8          So does Nexus know whether it operated
9  at a profit or loss for 2017?
10          MR. SHOREMAN:  Asked and answered.
11      A   Yeah, we believe that we broke even or
12  close to broke even.
13      Q   You believe based on what basis?
14      A   And once we have -- once we have the
15  financial statements done I will provide copies to
16  you.
17      Q   No.
18      A   No?  You don't want them?  I won't give
19  them to you then.
20      Q   I asked you not to tell me your belief.
21  I want to know the facts, okay?
22          Do you know whether Nexus operated on a

279

1  profit or loss for 2017?
2          MR. SHOREMAN:  Asked and answered.
3      A   I believe that we broke even.  I don't
4  know what the exact dollar amount is.
5      Q   You don't know?
6          MR. SHOREMAN:  Asked and answered.
7      A   You're asking my personal knowledge?  I
8  don't know.  I don't know.
9      Q   No, I'm asking Nexus' -- today is the
10  day that Nexus is supposed to let me know what its
11  financial condition is.
12      A   I answered the question, Vivian.  You
13  might not like the answer but I answered the
14  question.  We are finalizing our financial
15  statements and you'll have a copy as soon as
16  they're done.
17      Q   So for 2017, you don't know whether
18  Nexus operated at a profit or loss?
19      A   The answer's going to be the same no
20  matter how many times you ask the question.
21      Q   Is the answer no?
22      A   I do not know exact what the profit or

280

1  loss amount was but as soon as those financial
2  statements are done, Ms. Katsantonis, you will
3  have a copy.
4      Q   Okay.
5      A   And 2018, do you know whether Nexus was
6  operating at a profit or loss?
7      A   And as I said, the same answer is going
8  to apply until I have the financial statements.  I
9  don't know what the exact dollar amount is.  I
10  have a sense.  You're not interested in my sense
11  so I will tell you that --
12      Q   I'll talk to you about your sense later
13  and what it's based on.
14      A   I already told you.  I answered that
15  question already.  But based on what -- I don't
16  know what the exact dollar amount is but as soon
17  as we have the financial statements completed,
18  Ms. Katsantonis, you'll have a copy.
19      Q   All right.  And for 2019, you don't
20  know whether Nexus operated at a profit or loss,
21  correct?
22      A   So we -- basically -- I don't know the

281

1  exact dollar amount until we have the financial
2  statements.
3      Q   I'm not asking for the exact dollar
4  amount.
5      A   Sure you are.
6      Q   No, I'm asking whether you operated at
7  a profit or loss.
8      MR. SHOREMAN:  Asked and answered.
9      A   And I don't know until I have the exact
10 dollar amount.
11     Q   So you don't know?
12     MR. SHOREMAN:  Asked and answered.
13     A   Hence my answer.
14     Q   And what role is Grant Thornton taking?
15     A   What do you mean?
16     Q   Well, there was testimony that you've
17 also hired Fusion CPA.
18     A   Uh-huh.
19     Q   So what role is Grant Thornton doing
20 with respect to your financial record?
21     A   Well, that's an easier to answer
22 question.  Grant Thornton is focusing on the GAAP

282

1  compliant standard for 2019 and the audited
2  financials beyond.
3      Q   Okay.  And what -- and what is Fusion
4  CPA doing?
5      A   We also have Grant Thornton looking
6  over the financial statements.  We have Fusion CPA
7  producing the financial statements and then Grant
8  Thornton will be reviewing them.  We will then
9  obviously have the GAAP accounting standard,
10 financial statements for 2019, which Grant
11 Thornton is taking the lead on and then audited
12 financials 2020 and beyond, which Grant Thornton
13 will take the lead on.
14     Q   So Grant Thornton will issue audited
15 financial statements only for 2020 and beyond?
16     A   2019 and beyond.
17     Q   And do you have a time frame in which
18 Grant Thornton is required to provide deliverables
19 to Nexus?
20     A   We expect that the 2019 statements and
21 tax filings will be ready before the -- before
22 September, pursuant to my communication with Grant

283

1  Thornton yesterday.
2      Q   Do you have any specific time before
3  September?
4      A   I don't.  That's when the extension is
5  up so that's the reason it's relevant.  That's why
6  September is relevant.  But we're hoping to get it
7  done before then.
8      Q   And what about with Fusion CPA?
9      A   Fusion CPA is currently working on '17
10 and '18, as I indicated, Grant Thornton is going
11 to review those, they'll naturally have to,
12 Ms. Katsantonis, because of course they're going
13 to have to extrapolate the GPS revenue, the
14 contract revenue, and all of that stuff.  So, you
15 know, with the old -- pursuant to the old
16 contracts and the new contracts it's just a lot to
17 take into consideration.  So they're doing that
18 and then Grant Thornton will get it to a point
19 where it's GAAP compliant.
20     Q   And with regard to the financial
21 condition of Nexus in 2017, at the November 2018
22 preliminary injunction hearing, Nexus represented

284

1  that the financial statement it provided was
2  accurate, correct?
3      A   I think we represented it was accurate
4  at the time with any kind of caveats that it may
5  not be complete.
6      Q   Well, and since then have you had
7  reason to understand that it was not complete?
8      A   I believe I have been clear throughout
9  this entire litigation that it's not complete and
10 that we're completing it.  I think we were very
11 clear about that.
12         Which document are you looking at?  Or
13 do you have a document you want me to look at?
14     Q   No, I was asking you about what was
15 submitted to the court.
16     A   You asked specifically about 2017.
17     Q   Right?
18     A   That's why I was asking is there a
19 document that you want me to review?  I'm happy to
20 look at it.
21     Q   And so at the court hearing Nexus
22 asserted that in 2017 it was operating at a

285

1  profit, right?
2      **A    Do you have -- I mean, I assume that**
3  **you're representing -- you're talking about**
4  **something that we --**
5      Q    Presented to the court.
6      **A    -- a statement, right?  So if you have**
7  **something that you're asking me questions about I**
8  **would ask that you provide it to me so that I know**
9  **what we're talking about.**
10     Q    But you don't know whether or not Nexus
11 advised the court it was operating at a profit in
12 2017?
13     **A    Again, I need to understand what report**
14 **you're talking about.  We made several**
15 **different -- 2017 we were engaged in this**
16 **litigation, you know, pretty heavily.  I just want**
17 **to make sure I know what you're talking about.**
18 **I'm sure you want to -- I'm sure you want me to**
19 **know what you're talking about too.**
20     MR. SHOREMAN:  Thank you.
21     MS. KATSANTONIS:  Let me mark that one,
22 I'm not sure.  Hold on.

286

1      MR. SHOREMAN:  Do you want to have this
2  one marked?  This would be 12.
3      MS. KATSANTONIS:  I think it's the same
4  as this one.  Here, let me mark this one.  It's
5  the same thing but they're in different forms and
6  they have the same number.
7      (Donovan Exhibit 12 marked for
8  identification and attached to the transcript.)
9      MR. SHOREMAN:  This is too wild.
10     **A    This looks completely -- no.**
11     Q    So the back page of this document is
12 dated Monday, November 26th, 2018.
13     Do you see that?
14     MR. SHOREMAN:  Last page?
15     **A    I do.**
16     MR. SHOREMAN:  Excuse me, counsel, the
17 third page of my document has some writing on it.
18 Is that yours?
19     **A    Yeah, mine too.**
20     Q    It's not my writing and we can ignore
21 it.  For purposes of testimony just --
22     **A    Ignore it.**

287

1      Q    -- ignore it.  I don't believe it was
2  presented to the court with the writing.  So for
3  the record this is document 138-20.  That was
4  filed with the court on November 28th, 2018.
5      Q    So Mr. Donovan, are you aware that this
6  profit and loss statement was submitted by
7  Nexus --
8      **A    I can see the case.**
9      Q    -- as a representation of its
10 financials?
11     **A    Yeah, I can see the case detail on the**
12 **top and I believe this is what we provided.**
13     Q    And in fact, reviewing this do you
14 understand now that it's not an accurate profit
15 and loss statement for the January through
16 December 2017 time frame?
17     **A    Well, as we've continued to update our**
18 **financial statements, they have changed and I**
19 **think we've been clear about that.  So I'm sure**
20 **that when it was produced it was accurate as of**
21 **when it was produced with the information that was**
22 **in QuickBooks.  I mean, this is a QuickBooks**

288

1  **profit and loss statement.**
2      **So we have provided -- and you know,**
3  **Ms. Katsantonis, with all due respect, you know**
4  **that there have been several -- you have been**
5  **provided several different updates as Nexus has**
6  **been completing its process.**
7      Q    So --
8      **A    So it's not like you don't know that.**
9  **You guys have been receiving updates extensively.**
10     Q    I'm trying to understand, Mr. Donovan,
11 when all of the data was input, or if it has been
12 inputted for 2017?
13     **A    All of the data has been inputted.**
14 **They were working on reconciliations to ensure**
15 **that -- and a combined client income, for example,**
16 **was extrapolated out to the specific client or**
17 **combined in -- expenses were extrapolated out.**
18     Q    Mr. Donovan, has all the reconciliation
19 for 2017, has all the -- first of all, has all the
20 data input for 2017, is it complete?
21     **A    It's not -- it's not fully reconciled**
22 **or we would have the financial statements for you.**

289

1  And you will have them and you'll have them soon
2  and that will be when it is fully reconciled.
3      Q   Okay.  So as of November 2018, the --
4  QuickBooks was -- did not adequately represent the
5  financial condition of Nexus, correct?
6      A   As of 2018, we were adding data to
7  QuickBooks as we explained to you and the court to
8  ensure that we could produce access to the
9  financial statements that were ordered by the
10  court.
11      Q   I'm just trying to --
12      A   And we --
13      Q   I'm just trying to -- I'm not -- I'm
14  just trying to understand timing of when things
15  were -- and if they're still not accurate as of
16  today that's great.  I'm just trying to understand
17  that.  It's very simple.
18      A   I've answered that question, Vivian.
19  So the data is still being reconciled.  When it is
20  reconciled, we will file the taxes and produce the
21  income statements and submit them to you.  That
22  will happen as soon as it's done.

290

1      Q   Okay.
2      A   And I'm happy to say that will be done
3  soon.  So it's a process.  You know, it's
4  happening.  I will produce those when we file
5  them.
6      Q   All right.  So the profit and loss
7  statements that we have for 2017 are inaccurate as
8  of today, correct?
9      A   They're a work in progress, as we say.
10      Q   They're inaccurate as of today.
11      A   They do not contain all of the
12  information and all of the reconciled information
13  as we have explained throughout this process.
14      Q   And so they don't --
15      A   It's a bit disingenuous to go into
16  court with a club and force people to print
17  documents you know aren't done and then in a
18  deposition hit them for producing documents that
19  aren't done.  Ms. Katsantonis, you know that these
20  financial documents weren't complete when you
21  demanded the productions.  You've known that they
22  weren't reconciled.  You know, perhaps it's nice

291

1  for deposition transcript to look like, you know,
2  but you know, you know that this is a work in
3  progress and you know that they will be produced
4  as soon as it's done.
5      Q   Okay.  So with regard -- and so based
6  on your testimony, I think I know the answer to
7  the question but let me ask it, does Nexus
8  currently maintain or otherwise have access to a
9  balance sheet or other financial statement that
10  accurately sets forth Nexus' assets and
11  liabilities?
12      A   No.  But we are close in that we
13  continue to reconcile data every day and we're
14  much, much closer to having fully producible,
15  printable, and one hundred percent up-to-date
16  documents through QuickBooks.
17      Q   And that's the same for 2017, '18, and
18  '19, correct?
19      A   That's correct.
20      Q   Okay.  And do you have an understanding
21  of what is the current aggregate value of Nexus'
22  assets?

292

1      A   It looks like our most recent profit
2  and loss, which was provided to you from January
3  through December of 2019, list total current
4  assets at $784,088.20.
5      Q   And are you looking at a document Bates
6  Stamped NEXUS027807?
7      A   No.  I'm looking at a document I
8  brought today that I plan to give you.  But it may
9  very well be the same document, I don't know.
10      Q   May I see it, please?
11      A   Of course you may.  Killing trees here.
12      Q   Thank you.
13      A   You're welcome.
14      Q   Do you have an understanding why this
15  is marked "old" on the top?
16      A   I believe it is what was produced.
17      Q   So you don't know why it's marked
18  old -- next to Nexus Services Inc. old balance
19  sheet.
20      A   Let me get the answer to that question.
21      Q   Okay.  If you don't know, let's just
22  keep going and then you can let me know.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

74 (293 to 296)

293

1       A    Sure.  Yeah, absolutely.
2       Q    And in looking at this balance sheet,
3    it does not include any rentals from any of the
4    Homes properties?
5       A    Yeah.
6       Q    Do you have another copy of that?
7       A    I don't.  Sorry.  But this is a copy
8    for you.  At least I brought something to share --
9    or to leave.
10          As you may be aware, we did break Homes
11   P&L out and you are aware of that, of course,
12   because we produced those to you pursuant through
13   the special master production.  So if they're --
14   if there's a -- there may be a reason for that in
15   that they separated out the Homes P&L from Nexus.
16   And we actually have a separate account for Homes.
17      Q    Do you also have with you the alleged
18   2019 profit and loss statement, the most recent
19   one?  I can give you what has been provided to us
20   and you can tell me if this is accurate?
21      A    Please.
22          MS. KATSANTONIS:  Let's mark that.

294

1          (Donovan Exhibit 13 marked for
2    identification and attached to the transcript.)
3          MR. SHOREMAN:  Is this the alleged
4    Exhibit 13?
5       A    This is, what I'm looking at, Vivian,
6    is the same document.
7       Q    Okay.  And so are you basing the
8    answers to your questions on this 2019 profit and
9    loss statement or balance sheet?
10      A    Yes.
11      Q    Okay.
12      A    Between that and the balance sheet,
13   yes, ma'am.
14      Q    Is it your contention that this
15   document is accurate?
16      A    It's my contention that this document
17   is accurate at the time.  As I told you before, we
18   are continuing to reconcile and continuing to add.
19   So I can't tell you that it's a hundred percent
20   accurate.  I can tell you that everything that's
21   in there is accurate.  There may be things that
22   aren't reconciled or things that haven't been

295

1    added, I don't know.
2       Q    Well, if it hasn't been reconciled it
3    can't be accurate, right?
4       A    Well, it can be accurate in that what's
5    in there has been properly inputted.  Before it's
6    reconciled we wouldn't run a financial report
7    until we reconciled it.  We wouldn't file a tax
8    return until we reconciled it.  But we're putting
9    information into QuickBooks every day.  So all of
10   the information is the information you put in.  So
11   at any point in time you could see what
12   information you put into QuickBooks.
13      Q    Right.  These documents are not an
14   accurate reflection of Nexus' financial condition,
15   is that true?
16      A    As I indicated, Ms. Katsantonis, no.
17   Because we are continuing to update them as you
18   well know because you sought an injunctive order
19   against me to make me do it.  So you know we're
20   continuing to do it.  You have walked with us
21   through that process.  It is not done but it's
22   closer than ever and we're excited that we're

296

1    going to be able to get those reports to you very
2    soon.
3       Q    Your contention is that that 2019
4    profit and loss statement is closer than ever to
5    the accurate financial condition of Nexus?
6       A    I would say that it's closer than
7    previous iterations and we're going to continue
8    to — now, of course in 2019, we have not
9    reconciled that year.  So 2018 or 2017's
10   reconciliations will be further along naturally.
11      Q    So 2019 is not an accurate reflection
12   of Nexus' financial condition, the profit and loss
13   statement, correct?
14          MR. SHOREMAN:  Asked and answered.
15      A    The information inputted in the 2019
16   financial statement is absolutely accurate but it
17   may not be full and therefore — and there may not
18   be reconciliations done.
19      Q    I'm just asking.  So it's not --
20   because of those things that you're talking about,
21   it is not an accurate reflection of Nexus'
22   financial condition, right?

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

75 (297 to 300)

297

1      MR. SHOREMAN: Objection. Asked and
2  answered.
3      A   Right. Exactly. We would normally
4  want to reconcile a financial statement before we
5  would file a tax return, for example. So I — we
6  are continuing to reconcile client income, I think
7  that's really one of the major parts of this. And
8  so for that purpose, for that reason it's not
9  accurate now because it doesn't reflect all the
10 income.
11     MS. KATSANTONIS: Mark that.
12     (Donovan Exhibit 14 marked for
13 identification and attached to the transcript.)
14     Q   This is the 2018 profit and loss
15 statement that was also produced to us recently in
16 this litigation.
17     So I'm going to ask you if you compare
18 the two, for example, the 2019 profit and loss
19 statement doesn't include any of the rent from the
20 Homes properties, correct?
21     A   That's correct.
22     Q   And with regard to GPS costs on page 2,

298

1  for example, the 2018 profit and loss sets forth
2  GPS costs at 4.6 million?
3      A   Uh-huh.
4      Q   Do you see that?
5      A   I do.
6      Q   And the 2019 has it at 1.152 million?
7      Do you see that?
8      A   I do.
9      Q   And do you believe that number's
10 accurate?
11     A   I do believe that we need to further
12 reconcile it, but I also do believe that there's a
13 significant reduction in GPS costs for 2019, yes.
14 I don't — yeah, I would want to see the fully —
15 I would want to have an opportunity to fully
16 revise and reconcile our financial statements
17 which our accounting team is doing.
18     Q   Don't you have an account payable for
19 2019 to Buddi of 3-point -- over $3 million?
20     A   There is a balance, yes.
21     Q   And that's not reflected here, right?
22     A   It wouldn't necessarily be because that

299

1  balance may include equipment that has -- once
2  it's returned is offset. So we are going to —
3  we're not going to —
4      Q   I'm just trying to get to the accuracy
5  of this statement.
6      A   I gotcha. And I'm explaining it.
7      Q   You don't think it's accurate, do you?
8      A   Do I think that it could be more
9  accurate? Absolutely. I mean what you're saying
10 is — what I'm not going to let you do,
11 Ms. Katsantonis, is put words in my mouth to
12 somehow say that something we put on a financial
13 statement is inaccurate. It's absolutely
14 incorrect to say that. We were forced to add our
15 financial data to QuickBooks for the purposes of
16 complying with an order in this case. An order
17 you sought. An order you argued for.
18     Q   Mr. Donovan, I'm just trying to ask you
19 whether --
20     A   Articulately, I might add.
21     Q   -- this document, are you contending
22 it's accurate?

300

1      A   And I'm telling you —
2      Q   That's all I want to know.
3      MR. SHOREMAN: Objection.
4      A   — that it is accurate to the extent
5  that the information that is in there is accurate
6  but it may not be the full complement of
7  information. We certainly didn't put anything in
8  here that wasn't accurate or wasn't truthful.
9      Q   But it's not a full --
10     A   It's not a full production of the
11 financial status of the company, correct. But
12 nothing that's in here has been put in
13 incorrectly. I just want to make sure we're
14 clear. We're continuing to add information,
15 continuing to reconcile bank accounts and as we
16 do, we'll get — once we file the tax returns and
17 have the income statements, as I said we'll
18 produce them to you.
19     Q   For 2019 it provides bond breach
20 payment of 978,000; that's not an accurate number,
21 is it?
22     A   It would seem that there are bond

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

76 (301 to 304)

---

301

1 breaches that probably aren't reconciled in this
2 report yet but that would also not surprise me
3 given the fact that we're continuing to work on
4 '17 and '18.
5     Q    Right.  My only point I'm trying to
6 make is that the numbers in this -- you're not
7 relying on this profit and loss statement as an
8 accurate depiction of Nexus' financial condition,
9 correct?
10         MR. SHOREMAN:  Objection.  Asked and
11 answered.
12     A    As I think we said in 2017, we never
13 relied on QuickBooks which is why it was very
14 frustrating that it's pursuant to the order that
15 you argued for in this case, we had to put all
16 that information in there.  It has completely
17 slowed us down and it's the reason that we're in
18 the situation that we're in right now.  We're
19 fixing it, we're getting it done and we'll be
20 stronger as a result of it.
21     Q    So, again, with regard to travel, let's
22 say, the 2018 has 725,000 and the 2019 has

---

302

1 negative $231.  That wouldn't be an accurate --
2     A    Probably would be indicia that it
3 hasn't been reconciled yet.
4     Q    Okay.  And has your payroll -- what is
5 your current payroll?
6     A    Our current payroll a week is now about
7 110,000.
8     Q    So on a yearly basis?
9     A    That would be 52 100,000s, so
10 5.2 million.
11    Q    Okay.
12    A    That was my horrible math so if that's
13 wrong.
14    Q    So on the 2018 statement, it provides
15 payroll at 7.5 and for 2019, it provides payroll
16 at 2.275 million.  Those numbers would not be
17 accurate either, correct?
18    A    Obviously payroll is probably still
19 being reconciled in 2019.
20    Q    Right.
21    A    Do you want to grab the door?  I'm just
22 thinking that that might become --

---

303

1     Q    All right.  And so neither of these
2 profit and loss statements are accurate to fully
3 show the financial condition of Nexus, correct?
4         MR. SHOREMAN:  Asked and answered.
5     A    They're not fully finished, but once
6 they're done, you will have them, promise you.
7         MS. KATSANTONIS:  I want to make sure
8 that Nexus is not relying on these documents?
9     A    I told you we never relied -- I told
10 you we didn't rely on the QuickBooks when you
11 asked us to put it in there two years ago.  No,
12 we're not.  Absolutely not.
13    Q    Well, that -- what led us to it is
14 because I said what is the current aggregate value
15 of Nexus' asset.  So is the answer you don't know?
16    A    The answer, as it relates, I can answer
17 what's on this statement.  I can tell you --
18    Q    I don't want to know that.  I want to
19 know that.
20    A    -- that we're reconciling it.
21    Q    I want to know what the answer is.
22    A    And that's the answer.

---

304

1     Q    What is the current aggregate value of
2 Nexus' assets?  You don't know, is that the
3 answer?
4     A    We're currently reconciling our
5 financial data.  I have what's available.  I can
6 quote you what's on the reports that you have.  I
7 can tell you that we're continuing to reconcile
8 it.
9     Q    Right.  But you just said you're not
10 relying on the report.
11    A    That's all I can tell you.  Right.  We
12 are -- that's why we're reconciling them.
13    Q    Let's put the reports away.  You're not
14 relying on them, right?
15    A    Right.
16    Q    So I want to know what is the current
17 aggregate value of Nexus' assets?
18         MR. SHOREMAN:  Objection.
19    A    And I told you that we're reconciling
20 these reports.  You understand exactly --
21    Q    So you don't know -- can't you just
22 simple advise me that you don't know?

---

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

77 (305 to 308)

305

1      A    I already told you.  How many times
2  have I told you, I do not know exactly as we are
3  continuing to reconcile the financial statements,
4  something you're quite well aware of.
5      Q    Do you know how much Nexus currently
6  has in liquid assets that are presently available
7  to satisfy Nexus' current liabilities?
8      A    I can get that information for you.
9      Q    But you don't know as you sit here
10 today?
11     A    Off the top of my head I don't know
12 what our liquid assets are but I can certainly
13 give it to you by the end of the deposition.
14     Q    What is the aggregate value of Nexus'
15 unencumbered interest in real estate assets?
16         MR. SHOREMAN:  The unencumbered value
17 of real estate assets?
18     Q    Right?
19     A    You're asking for the value of
20 unencumbered real estate or the equity in
21 encumbered real estate?
22     Q    The unencumbered interest in real

306

1  estate assets?
2      A    A dollar amount?
3      Q    Uh-huh.
4      A    I believe it's $36,000 in one piece of
5  property that is fully owned.
6      Q    And what property is that?
7      A    It's -- it's a property in Middlesex
8  County, Virginia.  It's a piece of land, I'll have
9  to get you the detail on it.
10     Q    Okay.  And to what extent are Nexus'
11 real estate assets encumbered by liens or
12 collateral agreements or deeds of trust from other
13 third parties?
14     A    So all of our built properties have
15 mortgages on them so they have deeds of trust.
16 And then some of our properties, like our
17 corporate campus, has a deed of trust to a bail
18 agent as well.
19     Q    And who's the bail agent?
20     A    Statewide Bonding.
21     Q    And is that Marco DiMandri [sic]?
22     A    It is not.  LiMandri.  Big Marco,

307

1  remember?
2      Q    Does Big Marco not have any liens on
3  any of your property?
4      A    He does not.
5      Q    And are there any other liens or
6  collateral agreement that any of the real estate
7  has been encumbered by?
8      A    There were.  However, I believe all of
9  them have been released.  The only one left is
10 the -- the only one left is the corporate campus.
11 But, yes.
12     Q    And you have no equity in the corporate
13 campus?
14     A    Well, we have some equity in the
15 corporate campus but then we have a deed of trust
16 on a second deed of trust so no when you consider
17 that.
18     Q    So it's all encumbered?
19     A    Right.
20     Q    What is the aggregate value of Nexus'
21 interest in accounts receivable?
22     A    We don't track accounts receivable that

308

1  way.  We are unfortunately going to have to under
2  the new accounting rules and so it's a reality
3  that we're facing.  But presently we don't track
4  AR that way and that's because we have a very
5  aggressive payment waiver program.  We're proud to
6  say that over half of our clients don't pay each
7  month, which sounds odd, but we're proud to say
8  that because it's reflective of the service that
9  we provide to a disenfranchised community that
10 needs help, right?  So the fact that more than
11 half of our people don't pay every month is a sign
12 that we're helping people who really need it.
13         MR. WILLIAMS:  Are you asking all these
14 financial questions to see if we can reach bond
15 breach obligations?
16         MS. KATSANTONIS:  Yes.
17         MR. WILLIAMS:  That's what I'm thinking
18 you're trying -- he can answer that.  Just say do
19 you believe that you can financially meet bond
20 breach obligation and he can explain to you
21 exactly why.
22         MS. KATSANTONIS:  I'm trying to find

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

78 (309 to 312)

---

309

1 out what his present financial condition is.
2      MR. WILLIAMS:  Because he's met them
3 all up to date.
4      Q    What is the aggregate value of -- so
5 when you talked about the aggregate value of
6 Nexus' interest and accounts receivable, in your
7 2016 tax report --
8      MR. HARRIS:  No, balance sheet.
9      Q    Sorry, balance sheet, you had an amount
10 for accounts receivable.  Where was that derived
11 from?
12 **A    Can you point me to what you're talking**
13 **about?**
14     Q    No, I don't have that with me.  I just
15 want to know.
16 **A    You're referring to a document that**
17 **you're asking me to review but you're not telling**
18 **me what the document is and you're not providing**
19 **it to me?  Is that what we're talking about**
20 **because I'm not going to answer that if that's**
21 **what we're talking about.  That doesn't make any**
22 **sense.**

---

310

1      Q    Well, do you recall that prior to RLI
2 executing bonds, they asked that Nexus provide a
3 balance sheet?
4 **A    I believe there was communication with**
5 **Mr. Sandoz about a balance sheet, yes.**
6      Q    And in that balance sheet, do you
7 recall that it contained a number for accounts
8 receivable?
9 **A    I believe that balance sheet was an**
10 **estimate and it was something that Mr. Sandoz was**
11 **gracious enough to help us with.  At that point in**
12 **time in our infancy, we were not as sophisticated**
13 **as we would have liked to have been and Mr. Sandoz**
14 **was very helpful.**
15     Q    So the values were just based on an
16 estimate, is that what you're saying?
17 **A    No.  Well, I'm sure it was based on**
18 **what the estimate of our AR was.  If you'll look,**
19 **I think in that balance sheet all of those numbers**
20 **are like whole numbers.**
21     Q    What?
22 **A    I'm going to run to the restroom real**

---

311

1 **quick.  Do a quick bio break.**
2      Q    Sure.
3      THE VIDEOGRAPHER:  We are going off the
4 record at 18:28.
5      (Recess taken.)
6      THE VIDEOGRAPHER:  We are back on the
7 record at 18:58.
8 BY MS. KATSANTONIS:
9      Q    Okay, Mr. Donovan, earlier today you
10 testified regarding requests from Nexus to RLI
11 with regard to pre-invoice disputes.
12 **A    Right.**
13     Q    And does the documents you're relying
14 on you forwarded to your counsel and he forwarded
15 to us, right?
16 **A    The initial email from -- as I told you**
17 **the email that I sent you was a base email from**
18 **Juliana explaining the resolution dispute process.**
19 **But there were several emails where she raised**
20 **different cases.**
21     Q    Well, are these all the emails you're
22 relying on?

---

312

1 **A    Well, that was one of the emails that I**
2 **was relying on that I told you I would forward to**
3 **counsel.**
4      Q    There appears to be --
5 **A    But, yes, I did forward this to**
6 **Mr. Shoreman.**
7      Q    Right.  Well, are these all the emails
8 you're relying on with regard to that testimony?
9 **A    I believe there are other emails from**
10 **Ms. Gutierrez that also seek disputes.  So I think**
11 **you have them.  I think they've been produced**
12 **already.**
13     Q    So there's no other emails sitting here
14 today that you can identify that support the
15 contention that Nexus asked RLI to give an
16 authorization for pre-invoice disputes but failed
17 to do so?
18 **A    That's literally the opposite of what**
19 **my answer was.  I told you that we had produced**
20 **other emails and that there are other emails in**
21 **production.  We've produced a large number of**
22 **emails.**

---

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

79 (313 to 316)

313

1      Q    Okay.  But sitting here --
2      A    So today I have given you this as an
3  example.  But it is not a full complement of.
4      Q    Okay.  And do you have -- do you have
5  an understanding of what the full complement of
6  emails -- I think you said you thought you looked
7  at five or six emails.  And that's why I thought
8  these were the five or six emails you had
9  reviewed?
10     A    I think that -- yeah, I think the thing
11  that you're maybe misunderstanding I understand.
12  This is one email.
13     Q    But they're different dates on it,
14  right?
15     A    No, it's true because there were
16  attachments to it but what I meant is I reviewed
17  multiple emails, right?  So this is one of the
18  emails that I reviewed.
19     Q    So do you recall a single instance
20  where Nexus provided backup documentation and the
21  facts to support a dispute?
22     A    I know -- I know that that occurred.

314

1      Q    How do you know that?
2      A    Because it was represented to me by
3  Juliana Gutierrez by Erik Schneider.
4          MR. SHOREMAN:  Wait a second, Juliana
5  is an attorney, correct?
6          THE WITNESS:  That's correct.
7          MR. SHOREMAN:  If you disclose
8  conversation with an attorney you're waiving
9  attorney-client privilege.
10         THE WITNESS:  Okay.
11     Q    Okay.  So you didn't review any
12  documents that supported that contention, is that
13  correct?
14     A    I'm sorry?
15     Q    You didn't review any documents that --
16  there were no documents that you reviewed or you
17  saw where Nexus provided to RLI supporting
18  documents for the bases for a pre-invoice dispute?
19     A    No.  But based on conversations with my
20  staff I know that those did occur.  I had
21  conversations with both Erik and before Juliana
22  and I know that those conversations occurred.

315

1  They represented to me that those conversations
2  occurred and I'm representing to you that that's
3  my report based on the communication.
4      Q    And can you --
5      A    I will review records.  I'll also talk
6  to staff.
7      Q    But you can't provide a single example
8  sitting here today?
9      A    At this point in time other than the
10  email that I provided, no.  But I'm more than
11  happy to search -- I'm confident that,
12  Ms. Katsantonis, that you already have that
13  production.
14         MS. KATSANTONIS:  We're going to mark
15  that email for the record, please.
16         (Donovan Exhibit 15 marked for
17  identification and attached to the transcript.)
18     A    You get a giant exhibit.
19         MR. SHOREMAN:  I would like mine on
20  bigger paper, please.
21     Q    And you -- as we discussed before, are
22  you aware that RLI requested Nexus to provide it

316

1  with backup documentation to substantiate any
2  dispute, correct?
3      A    I'm aware that RLI did not seriously
4  engage in the process of allowing us to dispute.
5  I'm aware that RLI arbitrarily and capriciously
6  denied our ability to dispute.  And I'm aware that
7  our fail rate with RLI is higher as a result of
8  it.
9      Q    Based on what specific facts?
10         MR. SHOREMAN:  Asked and answered.
11     A    We have never been able to dispute an
12  invoice -- a breach with RLI because you've never
13  given us permission to.
14     Q    Hasn't RLI asked you appropriately for
15  backup documentation prior to submitting a
16  dispute?
17     A    My staff has told me that regardless of
18  what information was provided, RLI was resistant
19  to providing the authorization, every single time
20  it was sought and it became obvious that it would
21  never be granted.
22     Q    And you don't have any documentation,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

80 (317 to 320)

317

1  sitting here today, to support that, right?

2     **A   No more than I've already produced but**

3  **I'm happy to tell you that I'm sure it's in your**

4  **email production.**

5        MR. SHOREMAN:  Would that be the email

6  production that was made last week?

7        THE WITNESS:  That's correct.

8        MR. SHOREMAN:  I want to say for the

9  record that Nexus has produced all of its emails

10 at this point concerning RLI.  So it will be in

11 there.

12       MR. HARRIS:  I appreciate the

13 representation, Mr. Shoreman, but one of our

14 30(b)(6) topics was to have somebody confident and

15 available to testify to the facts regarding any

16 dispute that you contained that RLI didn't give

17 authority to and so.

18       MR. SHOREMAN:  Where do you see that in

19 there?  Where do you see that?

20       MR. HARRIS:  We can discuss it off the

21 record.

22       MS. KATSANTONIS:  Yeah, we can discuss

318

1  it off the record.

2        MR. SHOREMAN:  I want to see where you

3  say in here that --

4        MS. KATSANTONIS:  Well, I'm going to

5  tell you right now because Mr. Donovan is

6  asserting that we acted arbitrarily and

7  capriciously and that it was a basis for bad faith

8  and so if it's a basis for bad faith then we're

9  entitled to explore the bases of that.

10       MR. SHOREMAN:  Mr. Harris just said

11 that there was a specific topic here for backup

12 information for disputes.

13       MS. KATSANTONIS:  I don't want to waste

14 my time on the record.

15       Doesn't that cover it?  The fact that

16 Mr. Donovan is asserting that it was a basis for

17 bad faith?

18       MR. SHOREMAN:  It is a basis for bad

19 faith.

20       MS. KATSANTONIS:  Then let me continue

21 my question.

22       MR. SHOREMAN:  It doesn't say here, as

319

1  Mr. Harris just represented, that he must be

2  prepared to provide all backup documentation for

3  Mr. Sussman's refusal to allow disputes.

4        MS. KATSANTONIS:  Mr. -- all the facts

5  in --

6        MR. SHOREMAN:  If you see in there,

7  just point it out to me.

8        MS. KATSANTONIS:  We're going to go off

9  the record because I'm not going to waste my time

10 with this.  All the facts and circumstances that

11 support his contentions that RLI acted in bad

12 faith.

13       MR. SHOREMAN:  We have provided --

14       MS. KATSANTONIS:  Off the record.  Off

15 the record.

16       THE WITNESS:  Don't go off the record.

17       MR. SHOREMAN:  Don't go off the record.

18       MS. KATSANTONIS:  Then I'm going over

19 as long as you take because I'm not going to spend

20 my time with your argument.

21       MR. SHOREMAN:  I'm saying we provided

22 you every email between RLI and Nexus.

320

1        MS. KATSANTONIS:  I don't know that's

2  true, Mr. Shoreman, and it doesn't matter.

3        MR. SHOREMAN:  And we've provided you

4  further emails today.

5        MS. KATSANTONIS:  Okay, we're not

6  wasting any more time.

7        MR. SHOREMAN:  Well, ask a question

8  then.

9     Q   Mr. Donovan --

10       MR. HARRIS:  Note in response --

11       MR. SHOREMAN:  Wait, wait, wait.

12       MR. HARRIS:  Topic 4, last two Roman

13 numeral at -- there's two i's there, which is

14 inadvertent, but the last two specifically ask for

15 this witness' knowledge and all the facts

16 regarding instances where RLI allegedly did not.

17       MR. SHOREMAN:  All right.  That's all I

18 asked for.  That's all I asked for.  Thank you,

19 Mr. Harris --

20       MR. HARRIS:  You're welcome.

21       MR. SHOREMAN:  -- for being so polite

22 and courteous and cooperative.

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

81 (321 to 324)

---

321

1      Vivian, you can take --

2      MS. KATSANTONIS: Okay. Reviewing --

3      MR. HARRIS: The point for the record

4 is that Mr. Donovan is not able to testify to the

5 specific facts.

6      MR. SHOREMAN: He can testify. He's

7 given you email --

8      MS. KATSANTONIS: I'm adding three

9 minutes to my time. Okay. Three minutes added.

10      MR. SHOREMAN: He's produced emails

11 today and he's testifying about what he's learned

12 from his staff. The idea that he cannot testify

13 to this or has not testified to this is entirely

14 false.

15      MS. KATSANTONIS: Can we proceed,

16 please?

17      MR. SHOREMAN: Thanks to Mr. Harris you

18 can.

19      MS. KATSANTONIS: Okay.

20 BY MS. KATSANTONIS:

21    Q   Reviewing the email we marked dated

22 March 28th, 2018.

---

322

1      Do you have a copy of that?

2    A   **I'm not sure. Let me see.**

3    Q   Did I provide that to you?

4    A   **Also not sure.**

5      MS. KATSANTONIS: Off the record.

6    A   **Which email?**

7    Q   Wait.

8    A   **Oh, it's —**

9      MS. KATSANTONIS: Wait, wait, wait.

10 Sorry.

11      (Donovan Exhibit 16 marked for

12 identification and attached to the transcript.)

13    Q   I'm sorry, we both needed to stop

14 talking.

15    A   **I understand, Vivian. It's a common**

16 **problem we have, the two of us.**

17      MR. SHOREMAN: May I have a copy of

18 that. Am I in the doghouse so I don't get a copy

19 of it?

20      THE WITNESS: You don't even get copies

21 anymore.

22      MS. KATSANTONIS: I threw one at you

---

323

1 earlier, if you need a second one there you go.

2      MR. SHOREMAN: Which exhibit is this?

3 16.

4      MS. KATSANTONIS: I'm definitely adding

5 four minutes.

6    Q   Okay. This is an email between

7 Mr. Sussman and Juliana Gutierrez and you're

8 copied on this email chain?

9    A   **I am.**

10    Q   Okay. And do you see that

11 Ms. Gutierrez advised Mr. Sussman we found an

12 invoice under RLI that is disputable, do you see

13 that?

14    A   **Yeah, I'm going to read this real**

15 **quick.**

16    Q   Have you had an opportunity to review

17 this?

18    A   **I've read Juliana's email which I agree**

19 **with. I'm just reading the top one now. So I've**

20 **read all of the document except this one. Yes,**

21 **I've read it.**

22    Q   Okay. So Mr. Sussman requested

---

324

1 documentation to substantiate Nexus' desire to

2 challenge the invoice, right?

3    A   **It does appear that he did that, yes.**

4    Q   Right. And Ms. Gutierrez's answer

5 didn't provide the backup documentation, right?

6    A   **I think Gutierrez's answer is based on**

7 **an understanding of these situations and maybe**

8 **Mr. Sussman's isn't. There is -- what would one**

9 **produce, right? So you have an ICE officer who**

10 **remanded the person. There's a remand record,**

11 **right? So --**

12    Q   You didn't provide that.

13    A   **No, no, no. Hold on a second. We**

14 **wouldn't necessarily have it but certainly the**

15 **federal government would. So when we say we want**

16 **to file this protest, or this dispute.**

17    Q   Right?

18    A   **It's because the government knows that**

19 **he was -- that he was remanded on December 1st and**

20 **that that information is absolutely available to**

21 **the government. So a paragraph that recites those**

22 **facts when the government can verify them may well**

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

325

1 be enough and we may not have a body receipt on
2 the person.
3     Q    Mr. Donovan, certainly Mr. Sussman's
4 email says my concern is you haven't provided
5 anything to substantiate us -- to substantiate or
6 provide us with backup document.
7     A    We provided the dates.
8     Q    And he says --
9     A    And he's asking for a copy of the past
10 due invoice, we get those from you.
11     Q    What evidence are you going to submit
12 to prove that the individual showed up, right?  He
13 asked for that, right?
14     A    Right.  You have the date and the time
15 and the individuals that were there with them.  I
16 mean, the government certainly would have a record
17 of his remand.
18     Q    Ms. Juliana Gutierrez didn't respond
19 providing --
20     A    I don't have any response.
21     Q    -- what her challenge was, right?
22     A    I don't know if she responded to this

326

1 email.
2     Q    Right.  And Mr. Sussman asked send me
3 what you're proposing to send to the government,
4 right?  He asked her to do that as well, right?
5     A    I think that Ms. Gutierrez provided
6 information sufficient in any -- in a layperson's
7 mind to be able to challenge this for sure.  But
8 certainly sufficient for the government to
9 understand because there are dates on which this
10 person was remanded.
11     Q    Do you know --
12     A    And what I see is Mr. Sussman being
13 incredibly unreasonable understanding that we have
14 the facts and he's just not granting us the
15 authority to -- to be able to get those facts to
16 the right person so that we could have that loss
17 mitigated.  This is why our breach rate is so high
18 with RLI.  This email proves it.  This is exactly
19 what we've been dealing with.  I'm glad you're
20 bringing this into the record.
21     Q    That's great.
22     A    This is awesome.  Thank you.

327

1     Q    That's great, Mr. Donovan.  So this
2 letter is what you think constitutes bad faith on
3 the part of RLI?
4     A    This letter is one --
5     Q    Is that corect?
6     A    -- one small example of the mountain of
7 bad faith that RLI has brought to this deal,
8 absolutely.  You have all the facts in this email
9 from Juliana Gutierrez, a member of the bar,
10 right?
11     Q    Right.
12     A    You have all the facts and Mr. Sussman
13 doesn't care.  Doesn't care about the fact that
14 Nexus is going to have to pay the 10,000 versus
15 the 3400?  Why does Mr. Sussman not care?  Because
16 it's not his money.  That's bad faith.
17     Q    Okay.  Thank you.
18     A    You're welcome.
19     Q    And with regard to Nexus' financials,
20 what lines of credit are available to Nexus to
21 finance its operation other than credit cards?
22     A    We have cash flow assets, we utilize

328

1 our cash flow.  We have --
2     Q    You mean cash flow from --
3     A    We have an American Express account and
4 we utilize the American Express account on a
5 monthly basis.
6     Q    Okay.  So when you say cash flow you're
7 talking about payments made by program
8 participants, right?
9     A    Exactly.
10     Q    So the assets that you have, the
11 revenue streams that you have are payments from
12 program participants and then you have a credit
13 card, American Express?
14     A    Well, and the Home -- Homes revenue,
15 the income revenue.
16     Q    Okay.  And has -- is the revenue stream
17 from program participants, has it been consistent
18 in 2017, '18, and '19, or has it gone up or down?
19     A    The amount of payments that are
20 collected from program participants has gone up.
21 I have a KPI here that's the most recent KPI which
22 I will give you.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

83 (329 to 332)

### 329

1    Q    Okay, thank you.
2    A    You're welcome.
3    Q    And then -- and you can show me what
4 those are.  What was it for 2019?
5    A    Well, sure, for example this is --
6 well, the document I have in front of me is 2020.
7 And so like for February, for example, we're
8 113 percent to our comp performance in payments
9 from clients.
10       So which, you know, makes sense because
11 as your client base grows your payment base grows
12 as well.
13   Q    And how, if at all, is the cease and
14 desist order from California going to impact that
15 revenue stream?
16   A    Well, good news.  I took the time to go
17 out to California and meet with the folks from the
18 insurance commissioner's office and we're working
19 diligently to solve that problem.  The good news
20 is that Libre continues to do business in
21 California under a modified business model.
22   Q    Until April?

### 330

1    A    And we're --
2        MR. SHOREMAN:  Wait.
3    A    You seem excited about this.  I'm
4 actually excited that we're going to be resolving
5 this and other issues.  We are working with
6 regulators when there are issues and trying to
7 resolve them, just like we did Washington State.
8        MR. SHOREMAN:  Let me just say that you
9 interjected and said to April.  And didn't give
10 him a chance to answer.
11       MS. KATSANTONIS:  I know.  I'm going to
12 ask, you're right.  And I apologize.
13   Q    You know, the motion to stay, or the
14 stay order, provides a stay through April,
15 correct, of 2020?
16   A    The cease and desist -- the modified
17 cease and desist under our old business model
18 would expire in April, yes.
19   Q    Right.  And so my question is how is --
20 do you have an understanding as to how that's
21 going to -- after April 2020 -- impact the revenue
22 stream to Nexus?

### 331

8        MR. SHOREMAN:  Let me just interject.
9 What time is the transcript right now?  What time
10 is it on the transcript?
11       THE VIDEOGRAPHER:  We're at 5:13.
12       MR. SHOREMAN:  Okay.  Everything from
13 5:13 back to like concerning California is
14 confidential.
15       MS. KATSANTONIS:  Oh, sure.  Okay.  No
16 problem.
17       And, Mr. Shoreman, just for things
18 later you want to mark, we can discuss it.
19       MR. SHOREMAN:  Okay.  Thank you.
20   Q    Okay.  What about what is the aggregate
21 amount of Nexus' outstanding liabilities?
22   A    The aggrate amount of Nexus'

### 332

1 outstanding liabilities in total?
2    Q    Uh-huh, yes.
3    A    I believe I have a digital copy of our
4 aging report which I will also produce if I can
5 get my phone out of my pocket.
6    Q    I can provide you with one,
7 Mr. Donovan, I don't know if that's the same.
8        MR. SHOREMAN:  We can go off the record
9 while Vivian's looking for that and let you know
10 that Virginia went for Biden.
11       MS. KATSANTONIS:  Off the record.
12       THE VIDEOGRAPHER:  We're going off the
13 record at 19:19.
14       (Recess taken.)
15       THE VIDEOGRAPHER:  We are back on the
16 record at 19:21.
17 BY MS. KATSANTONIS:
18   Q    What is the current aggregate amount of
19 Nexus outstanding liability?
20   A    It is $5,250,415.14.
21   Q    And from where are you deriving that
22 information?

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

84 (333 to 336)

333

1    A    Our most recent aging report.
2    Q    Okay.  And does that include any
3  disputed liability?
4    A    It includes some liability with Buddi
5  that is device related, so when those devices are
6  returned that won't actually be money that's paid.
7  It's related to the value of the device.
8    Q    Okay.  Are there any other disputed
9  liabilities that are not included in that number?
10    A    We have a balance with -- a contested
11  or disputed balance with 3M Attenti that's not on
12  here.
13    Q    Uh-huh.  And how much is that,
14  approximately?
15    A    I do not -- we do not have a bill.  I
16  wasn't able to place my hands on a bill for
17  Attenti related to what we've -- what it is now
18  that we've returned hundreds of devices, right?
19  So it was -- it was a, I think a $2 million
20  balance but we've returned thousands of devices
21  and those are, you know, significant value per
22  device.  So I'll have to -- but I'll certainly

334

1  find out and I'll update you.
2        I can give you the amount that we
3  currently have but I'll give you the updated one.
4    Q    Does that amount include outstanding
5  invoices for bond breaches?
6    A    So we -- we consider -- let me just
7  check something real quick.
8        So bond breach liability is not here.
9    Q    Okay.  And what is the aggregate amount
10  of bond breach invoices outstanding now?
11    A    I will get that to you before I leave,
12  okay?
13    Q    Okay.
14    A    Before you let me go.
15    Q    And do you -- other than the bond
16  breach invoices, what are Nexus' five largest
17  categories of liability, if you know generally?
18    A    You're not going to score me on whether
19  I rank them in order, right?
20    Q    Right?
21    A    Payroll is a significant cost.  GPS
22  cost would be a significant cost, travel is a very

335

1  significant cost when you consider the fact that
2  we're traveling clients and employees, and, you
3  know, rents.  We have offices across the country
4  where we serve people.  So when you're operating a
5  multiunit operation across the United States, it
6  can get very expensive just to run the business.
7    Q    Does Nexus have any outstanding
8  promissory note liabilities?
9    A    Only insofar as each of our contracts
10  with FCS include a promissory note provision on
11  the bond indemnification agreement unlike the
12  general indemnity agreement, so, you know, just
13  parking lot that.  Otherwise, no.
14    Q    Do you know the total of how much Nexus
15  owes on outstanding, like, mortgages, loans, or
16  other real estate transactions?
17    A    I think I might.  How exciting.
18    Q    While you're looking for that, does
19  McGuireWoods have unpaid invoices outstanding with
20  Buddi?
21    A    Yes.
22    Q    How much?

336

1    A    It looks like -- you want an exact
2  number because I'm going to have to --
3    Q    No, roundabout.
4    A    Okay.  So roughly the $220,000.
5    Q    What about Eckert Seaman?
6    A    Eckert Seaman is about 550,000, but
7  that's about a month and a half of this litigation
8  cost so that's not a lot at the time.
9    Q    Does Nexus currently have sufficient
10  assets to satisfy its current liabilities?
11    A    It does.
12    Q    Is Nexus currently without sufficient
13  liquid assets to pay off its liabilities to Buddi?
14    A    It does not.
15    Q    You do not have sufficient liquid
16  assets to pay off your liabilities to Buddi?
17    A    My liabilities to Buddi include devices
18  which we wouldn't pay for, we would either return
19  and then get credit for.  So we are able to meet
20  our obligations to Buddi and the arrangements that
21  we've made with Buddi.
22    Q    Is Nexus currently without sufficient

337

1 liquid assets to pay all outstanding bond breach
2 invoices?
3     A   We are not without sufficient assets.
4 It's a weird way to ask that question.  Let me
5 make sure.  We have sufficient assets to pay bond
6 breaches.
7     Q   How do you know you have sufficient
8 liquid assets to pay all outstanding bond breach
9 invoices?
10    A   Based on our KPI, our understanding of
11 the revenue that we're collecting, past
12 performance, it is -- this company has paid
13 $11 million plus in bond breaches and we will pay
14 breaches as we need to pursuant to the agreements
15 we have.  Just as we always have.
16    Q   But you don't have an understanding as
17 to what your liquid assets are sitting here today,
18 correct?
19    A   I don't have the specifics, the level
20 of which I would like and the level of which I'm
21 sure you would like.  But I am confident in our
22 ability to meet our liabilities.

338

1     Q   Do you have an order of magnitude as to
2 what your current liquid assets are?
3     A   Well, I answered pursuant to the
4 balance sheet earlier, and I think that I'm going
5 to reassert that answer because it's based on the
6 documents that I have, right?  So I read you the
7 assets based on the balance sheet, the 2019
8 balance sheet.
9     Q   But you also said that that balance
10 sheet was not accurate.
11    A   I said that it was being reconciled,
12 right?  We were talking about assets.  You asked
13 me about assets --
14    Q   You can't -- you can't rely on that
15 balance sheet, can you?
16    A   I don't rely on that balance sheet to
17 tell me what -- whether I can meet our liabilities
18 or not.  You asked a very base -- a very specific
19 question and I'm providing a very specific answer.
20    Q   Okay.  RLI throughout -- since 2016 to
21 the present, has made various requests for access
22 to Nexus' books, records, and accounts, correct?

339

1     A   Various.
2         (Donovan Exhibit 17 marked for
3 identification and attached to the transcript.)
4     Q   Yes.  And under the indemnity
5 agreement, paragraph 3C, you understand that RLI
6 has the right to access the books, records, and
7 accounts of the indemnitors for examining and
8 copying them, correct?
9     A   Yes.
10    Q   Okay.  And RLI made further demand on
11 March 3rd, 2017.
12        Do you recall that?
13    A   Further demand for access to books,
14 records, and accounts?
15    Q   Right?
16    A   I don't remember it specifically but
17 I'm sure it happened.  There were several requests
18 and conversations about confidentiality, as you
19 may remember.  Are we marking this?
20    Q   Yes, thank you.
21    A   It feels warmer so thank you.
22 Appreciate it.  I was getting a little worried, I

340

1 was really cold.
2     Q   So this is a March 3rd letter written
3 to you, or to Nexus, from RLI, correct?
4     A   That is correct.
5     Q   And in this, RLI expresses concerns,
6 some of which they summarize below, right?  And we
7 went through this letter in your deposition last
8 week, right?
9     A   Did we?
10    Q   Yes.
11    A   Okay.
12    Q   And do you recall that RLI requested to
13 review financial documents and other documents
14 related to the immigration bond program in this
15 letter, correct?
16    A   That is in the letter, yes, ma'am.
17    Q   And RLI advised that it appreciated
18 your attention -- it appreciated your attention to
19 this urgent matter and asked for a response by
20 March 10th, right?
21    A   That seems to be correct, yes.
22    Q   Okay.  And on March 6th, RLI followed

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

86 (341 to 344)

341

1 up with an email to Nexus, again requesting a
2 response to the letter of March 3rd, correct?
3     Do you recall that?
4    A  Do you have that?
5    Q  Yep?
6    A  So I can review it. Do you want to
7 enter it?
8    Q  Sure.
9    A  Okay.
10     (Donovan Exhibit 18 marked for
11 identification and attached to the transcript.)
12    Q  And RLI requested a response by
13 March 10th, again, in their email of March 6th,
14 correct?
15    A  Yeah. I think this is the Friday to
16 Monday, right? This is what we had talked about
17 in my prior deposition. So if you sent an email
18 on Friday and you sent a follow-up email on
19 Monday. I believe that March 6, 2017 was a
20 Monday. I believe that the first email came in on
21 a Friday, which from a workday perspective is
22 literally the next day.

342

1    Q  But my question is in the March 6th
2 email that he is again reiterating his request for
3 response by March 10th, right, by the Friday?
4    A  By Friday. It mentions Friday.
5    Q  Yeah?
6    A  So that would be --
7    Q  March 10th?
8    A  Yeah.
9    Q  And Nexus did not respond, correct?
10    A  I'm not sure if there was a response.
11 I don't know if I spoke to Ira or not after that.
12 I know I spoke to him on the phone. I think the
13 first letter references our phone call.
14    Q  You don't recall that?
15    A  I don't know that anyone spoke to him
16 between the March 6th letter and the 10th. I
17 certainly don't recollect speaking to him myself
18 personally. I have no record of anybody in the
19 company doing it.
20    Q  Right. We talked about it at your
21 deposition, right? There was no response so RLI
22 issued a March 13th letter, correct?

343

1    A  What I'm saying is I didn't find any
2 response so I'm confirming that.
3    Q  Thank you.
4    A  Of course. I'm assuming we're marking
5 this.
6    Q  Yes?
7    A  I'm assuming you'll tell me we're not
8 if we're not.
9    Q  Thank you.
10    A  You're welcome.
11     (Donovan Exhibit 19 marked for
12 identification and attached to the transcript.)
13    Q  So this March 13th, 2017 we talked
14 about this in your deposition as well, this was a
15 demand for bond discharge or collateral?
16    A  Yes.
17    Q  Okay. And do you recall that in this
18 letter, RLI advised you that it -- that Nexus had
19 not responded, correct?
20    A  I want to review this real quick, it's
21 only two pages and I don't -- you know, the other
22 email I remembered but I want to make sure -- this

344

1 quotes the GIA so I want to make sure I understand
2 what it's saying.
3    Q  Okay. So Nexus advised in this letter
4 that, first of all, it had received no response at
5 all from Nexus, correct?
6    A  That's what it says.
7    Q  Right. And it also advised that Nexus
8 had stopped communicating altogether with RLI's
9 claim personnel, correct?
10    A  Yeah. But I would caution you. It's
11 March 3rd through March 13th. We're talking about
12 a 10-day window. I think that given the fact that
13 RLI did business with us for a year and
14 Mr. Sussman never bothered to talk to us having
15 the communication go from where it went on
16 March 3rd to March 13th is, I think, and
17 additional element of, you know, question of RLI's
18 behavior.
19    Q  Okay. Well, RLI's advising you that
20 there has been no communication with RLI's claim
21 personnel, correct?
22    A  That's what it says.

345

1    Q    All right. And that there had been
2  increased bond breach notices, correct?
3    **A    That's what it says.**
4    Q    And including past due notices,
5  correct?
6    **A    That's what it says.**
7    Q    And that it had received some
8  contradictory representations regarding past and
9  ongoing resolution of bond claims, correct?
10    **A    I have no idea what that's referring**
11 **to.**
12    Q    Well, but you see it says that's RLI's
13 contention, right?
14    **A    Right. RLI's contention in this**
15 **document is ridiculous. I mean, it misstates the**
16 **indemnity agreement, misstates the -- it's a**
17 **ridiculous demand but I don't know what it was**
18 **referring to in that regard, no.**
19    Q    Okay. Where --
20    **A    Like, for example, he says in the third**
21 **paragraph, "Please note that under this provision,**
22 **RLI is expressly entitled to demand and receive**

346

1  **from Nexus collateral an 'sufficient to cover all**
2  **exposure.'"**
3        **That's not what it says. It says**
4  **amount sufficient to cover all exposure under such**
5  **bond or bonds, what bonds, the ones that create a**
6  **liability for the surety, a claim.**
7    Q    Mr. Donovan?
8    **A    Those would be breaches, right?**
9    Q    Okay?
10    **A    So that's not $10 million. We've never**
11 **had $10 million in breaches with RLI and we**
12 **certainly didn't when this demand was made.**
13    Q    Mr. Donovan, you -- I don't need your
14 testimony with regard to the -- let me just --
15    **A    It's my testimony, Ms. Katsantonis.**
16    Q    No, no, no. Let me just -- stop that.
17    **A    I'm sorry.**
18    Q    Excuse me, it's me, it's not my
19 question.
20    **A    I mean.**
21    Q    No, I'm rephrasing my question.
22    **A    I got you. Okay. I thought you were**

347

1  telling me stop it. I was like wait a second.
2    Q    I'm just saying under this letter RLI
3  advised you, right, that, again, that they
4  believed Nexus was a material breach, right?
5    **A    It says that, yeah.**
6    Q    And that Nexus had stopped
7  communicating, correct?
8    **A    Over a period of 10 days it appears**
9  **that. It doesn't specify what the communication**
10 **period was. This letter started on March 3rd and**
11 **end on March 13th in a full demand. So it's 10**
12 **days. I don't know. We had a yearlong working**
13 **relationship and in 10 days everything blows up.**
14 **It doesn't make any sense.**
15    Q    And RLI advised that they're receiving
16 bond claims at an alarmingly increasing rate,
17 correct?
18    **A    Yes, but this hadn't lost any money and**
19 **still haven't.**
20    Q    Okay. And do you know how many bond
21 breaches or bond breach notices RLI had received
22 as of this date?

348

1    **A    All I can reference is what Mr. Sussman**
2  **writes in his letter. I can pull -- he references**
3  **I think what's fixed. But I don't know.**
4        MS. KATSANTONIS: I'm going to mark
5  this.
6        (Donovan Exhibit 20 marked for
7  identification and attached to the transcript.)
8    Q    It's an email dated March 15th from you
9  to Mr. Sussman.
10    **A    Yes.**
11    Q    Okay. And is that your email, correct?
12    **A    It is. It's an email I wrote when I**
13 **was under the impression that Laura Piispanen was**
14 **honest in her email communications. I later**
15 **regretted that.**
16    Q    Mr. Donovan, you stated in your
17 contemporaneous email of March 15th, 2017, that
18 you owed RLI an apology, correct?
19    **A    That's right. I had relied on**
20 **Laura Piispanen's representations about**
21 **communication with our risk management department**
22 **which I acknowledged to Ira was unacceptable. I**

349

1  later learned that there were communications that
2  Ms. Piispanen wasn't necessarily fully honest in
3  her emails and I began to see a -- the fact that
4  my team had been trying to communicate and the 10
5  days between March 3rd and March 13th and the
6  absolute, you know --
7      Q   Mr. Donovan?
8      A   It doesn't even make any sense what RLI
9  did from March 3rd to March 13th.
10     Q   Mr. Donovan, in RLI's letter they
11 weren't talking about a 10-day period, right?
12 They didn't cite a time period of when there had
13 been a lack of communication, right?
14     A   The 10-day period, Ms. Katsantonis, is
15 all about what you've put into the record.  You
16 said there's an email on March 3rd, all the way up
17 to March 13th and there are several
18 communications there.  And what I'm saying is we
19 had a yearlong relationship where everything was
20 fine.
21     Q   Mr. Donovan?
22     A   And when RLI stopped receiving daily

350

1  premium everything blew up within 10 days.  It
2  doesn't make any sense.
3      Q   Let me ask you a question.  In your
4  March 15th email, you're agreeing at this time
5  that there had been no communications between your
6  branch manager and Laura since January 31st,
7  correct?
8      A   That's what I -- I relied on those
9  representations, yes.
10     Q   Whose representations?
11     A   Laura's representations.
12     Q   And when did Laura tell you that she
13 had no communication since January 31st?
14     A   Laura did communicate to me that she
15 had no communications and I'm speaking personally
16 here but I did have a conversation with Laura
17 around and about that time --
18     Q   So you're --
19     A   -- where she did tell me that she did
20 not have communications with our --
21     Q   Your investigation was just to ask
22 Laura?

351

1      A   That's correct.
2      Q   And you didn't ask anybody else.
3      A   I assume that Laura and Ira were being
4  honest.
5      Q   Okay.
6      A   My mistake.
7      Q   Okay.  And so are you saying that --
8  well --
9      A   I'm saying that my team says something
10 different than your team -- than your client's
11 team does.
12     Q   You don't have a letter from your team
13 saying oh, my gosh, I did further investigation
14 and we had been in communication -- communicating
15 with you, right?
16     A   Because after this we, the relationship
17 with RLI spiraled.  We started having
18 conversations about providing documents, access to
19 records.  We wanted to provide --
20     Q   Let's just say no --
21     A   -- access to our records.
22     Q   We have limited time, Mr. Donovan.

352

1      A   We wanted to provide access to our
2  records, we asked you to sign a confidentiality
3  agreement, we asked RLI to sign a confidentiality
4  agreement.
5      Q   Mr. Donovan?
6      A   We are now providing records pursuant
7  to the court order —
8      Q   All right, Mr. Donovan, please just
9  answer my question or --
10     A   You could have agreed to the
11 confidentiality agreement, we could have had these
12 documents shared in 2017.  That's my point.
13     Q   Okay.  Mr. Donovan.
14         So you also provided some data in
15 response to some of the bond breach notices that
16 had been received, right?
17     A   It appears that way, yes.
18     Q   So you agree that RLI was not
19 unreasonable in its assertion that Nexus had
20 stopped communicating, right?
21     A   When I believed Ira and Laura's
22 representations, yes.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

353

1    Q    Okay. And you agree that RLI was not
2 wrong that Nexus did not respond to its March 3rd
3 letter, correct?
4         MR. SHOREMAN: Objection. Question
5 has --
6    A    No, I -- I'm sorry. We're talking
7 about 10 days, right? I was apologizing for a
8 lack of communication that I was represented -- it
9 was represented to me occurred. And so that's
10 what I apologized for. And you know what, that's
11 what professionals do. You have a -- there is
12 a -- there is a problem here with communication.
13 I now believe that the problem lied with as much
14 as with your client as it did with my team. But
15 you know, a professional says hey we're going to
16 restart this. Let's go. And so what I did is I
17 said Ira, look, I'm sorry if you're upset. I'm
18 sorry that this happened but let's figure out a
19 way to move forward. That's what professionals
20 do.
21    Q    All I'm asking you, Mr. Donovan, is at
22 the time you agreed it was not unreasonable that

354

1 Nexus -- for RLI to assert that Nexus had stopped
2 communicating. You agreed with that, correct?
3         MR. SHOREMAN: Asked and answered.
4    A    Based on the miscommunication I had
5 received from Laura, yes. And I now know that
6 wasn't true.
7    Q    And you also agree that RLI was not
8 wrong in stating that Nexus had not responded to
9 it's critical letter dated March 3rd?
10    A    I don't think RLI was wrong in saying
11 that we didn't respond within 10 days. I don't
12 think it's reasonable for RLI to have expected us
13 after doing a year of business and never asking a
14 question, never caring to call, never caring to
15 send a letter.
16    Q    Okay?
17    A    We get this many misses in this short a
18 period of time. I think that's ridiculous. I
19 think it's true that we didn't respond within the
20 10 days of the escalated emails but I don't think
21 it's reasonable to expect that we would respond
22 the way that RLI expected.

355

1    Q    And you also agree that there are bond
2 claims being sent by DHS during this time frame in
3 January, February, and March of 2017?
4    A    Sure. That's the nature of the --
5    Q    Okay.
6    A    -- the program, some people are going
7 to breach.
8    Q    So you made another comment and I want
9 to make sure I understand it. Are you saying that
10 RLI did not communicate with Nexus with regard to
11 the bond program throughout 2016?
12    A    I'm saying that none of the concerns
13 that RLI raised in March of 2017 were raised to us
14 during the process of. There was never a question
15 of whether we would have to post $10 million in
16 collateral. As you well know from my prior
17 deposition, RLI had asked for 1.25 million in
18 collateral or find another surety. We did
19 everything RLI asked us to do every step of the
20 way. The most ridiculous thing about this
21 litigation is we continue to do everything RLI ask
22 us to do and yet we continue to be hit for it,

356

1 ridiculous.
2    Q    Mr. Donovan, just answer my question.
3    A    I did.
4    Q    Is it your testimony that RLI -- I
5 mean, did RLI communicate to Nexus regarding the
6 bond program and breaches throughout 2017?
7         MR. SHOREMAN: Objection. His
8 testimony is what he just testified to.
9    A    Not at all in the same manner that they
10 communicated within the 10-day window that you've
11 described in March, Ms. Katsantonis, no.
12    Q    I'm asking you did they?
13    A    It was completely inconsistent.
14    Q    Did RLI ask you questions about the
15 status of various bonds and payments in 2016?
16    A    Sure. But they never requested
17 $10 million. Never tried to demand until -- they
18 asked for 1.25 million and a continuation of the
19 program or that we find another surety partner.
20    Q    Okay. So you think that was a
21 reasonable request?
22    A    We found another surety -- whether it's

357

1  reasonable or not I complied with it. I found
2  another surety partner.
3      Q   Did you think that was --
4      A   And specifically-
5      Q   Mr. Donovan-
6      A   — I was told by RLI that if I found
7  another surety partner I wouldn't have to pay the
8  $1.2 million.
9      Q   We'll get to that in a moment.
10     A   So I found another surety partner.
11 Whether it's reasonable or not that's what RLI
12 requested and that's what I did.
13     Q   So is it your testimony that the
14 request for collateral in the amount of a million
15 250 was an agreement between you and RLI?
16     A   No. And you know it wasn't an
17 agreement, Ms. Katsantonis. It's not even
18 intellectually honest. You know that I'd never
19 agree to that. You know that I chose to replace
20 the surety. And it's questions like that, quite
21 frankly, in this deposition, Ms. Katsantonis, that
22 make me think you're trying to confuse the record.

358

1  It's not what I said and with all due respect it's
2  not appropriate.
3      Q   I'm trying to understand your
4  testimony, Mr. Donovan.
5          MR. SHOREMAN: No, you're not. You're
6  asking him is it your testimony.
7      A   You're trying to misrepresent my
8  testimony and I'm offended by it.
9          MR. SHOREMAN: Me too.
10     Q   Okay.
11     A   And it's not funny, by the way.
12     Q   Well, I need to understand what you
13 think the agreement was.
14     A   Well, I need to understand why you
15 think that's funny. It's not funny.
16     Q   What do you believe is the agreement on
17 collateral?
18     A   What do I believe is the agreement on
19 collateral?
20     Q   Between RLI and Nexus, what was the
21 agreement?
22     A   $250,000 to -- read it. 500,000

359

1  originally, 250,000 modified by email. Read it,
2  it's there.
3      Q   Okay. So that email in which
4  Mr. Sandoz sent you an email for 250,000
5  collateral that is your contention that that is
6  the agreement between RLI and Nexus for
7  collateral; is that correct?
8      A   That's correct. I believe that under
9  the general indemnity agreement when there is a
10 final claim on a bond, that we have to pay it.
11     Q   Okay. And on what date did you make a
12 payment of any of that collateral pursuant to the
13 agreement between RLI and Nexus?
14     A   So I've answered this question in my
15 personal deposition. We're going to go back to
16 this? I mean. I can refer you to that answer.
17     Q   Do you have a date?
18     A   I told you that I believe that we made
19 a $50,000 payment. We discussed extensively the
20 fact that I can't point to it in the records. We
21 know that there were apportioned commissions that
22 were supposed to be received by Mr. LiMandri that

360

1  Mr. Sandoz apportioned to the collateral. We have
2  asked RLI to tell us how much money that is, RLI
3  has refused to tell us, so I don't know.
4      Q   Under Mr. Sandoz's agreement you were
5  to provide a $50,000 payment on June 15th and
6  July 15th, right?
7      A   And the email agreement? I believe
8  that's correct; I'm not sure.
9      Q   Right. And so do you have any evidence
10 or documents to support the fact that you made any
11 of those $50,000 payments?
12     A   I don't.
13     Q   Okay. And getting back to the
14 contention with regard to the 2016 communications
15 between RLI and Nexus --
16     A   Well, and --
17     Q   -- isn't it true --
18     A   I think it's important to note that you
19 asked me about the communications with RLI. And
20 the communications with RLI between March 3rd and
21 March 13th are very different than any
22 communication -- I mean, you're suggesting why

361

1  didn't — where was the $50,000 check pursuant to
2  Mr. Sandoz's email.
3        What I'm suggesting is that RLI's
4  communication with Nexus was completely
5  inconsistent prior to its stopping doing business
6  with Nexus and after.  And after being the
7  March 3rd, March 6th, March 13th responses.
8      Q    Okay.  So let me ask you, prior to the
9  March 3rd letter, okay, wasn't RLI sending
10 communications to Nexus asking for things like
11 copies of appeals, copies of checks, copies of
12 documents evidencing satisfaction of bond breach?
13     A    That would be the normal course of
14 business and we were providing those things.
15     Q    So is the answer yes?
16     A    Yes.  And we were providing those
17 things, right.
18     Q    And didn't Mr. Sandoz come visit your
19 offices twice in 2016 to understand better the
20 process and procedures?
21     A    He did, and he was very, you know,
22 wonderful to work with?

362

1      Q    And didn't he ask for a packet of
2  documents summarizing the program and the notices
3  in 2016?
4      A    He may have.
5      Q    Okay.  And wasn't RLI constantly
6  requesting phone calls and communications
7  regarding the bond breaches?
8      A    Constantly?
9      Q    Uh-huh.
10     A    I think our breach team was
11 communicating with the RLI team.  I think that
12 there were consistent communications.  I think
13 there were consistent communications back and
14 forth based on the records that I've reviewed.
15     Q    Right.  And Nexus — and RLI was asking
16 about if a claim's rescinded, show us the
17 documents to support that, correct?
18     A    If a claim is rescinded?
19     Q    Yeah.
20     A    What do you mean?
21     Q    If an invoice has been paid or if an
22 invoice has been canceled they were —

363

1      A    Sure.  But part of that is part of our
2  problem, right?  Because you get those, right?  So
3  if like an invoice is canceled, your client gets
4  it.  So your client demanding it from us is silly
5  because we need to get it from your client.
6      Q    And wasn't RLI constantly -- or
7  consistently asking for paperwork on appeals and
8  the list of bonds that had been appealed?
9      A    And I think we were consistently
10 providing that information.
11     Q    So the answer's yes, correct?
12     A    Correct.
13     Q    All right.  And this is all in 2016
14 prior to the March 2017 letter, correct?
15     A    Right.
16     Q    Okay.  And so in your amended
17 counterclaim, and you can look at it if you'd
18 like, paragraph 76, when you state, "from
19 January 1st, 2016, to December 22nd, 2016, RLI did
20 not ask for any communication or update on the
21 status of the immigration bond."
22        That's not true, correct?

364

1      A    Can I see that?
2      Q    Sure.  I have it here somewhere.
3  That's not it.  It has a little sticker on it.
4      A    If I — it's interesting, Vivian, if I
5  draft a document, I can specifically remember.
6  But if it's drafted by people and I read it I
7  don't remember it —
8      Q    I'm the same way.
9      A    — unless I see it in front of me.  You
10 know what I mean?
11     Q    Yep.
12     A    But if I wrote it, I can point letter,
13 line, page number, you know.
14     Q    I know exactly.
15     A    I kind of figured you would.
16     Q    Oh, here we go.
17     A    Thank you.
18     Q    Sure.
19     A    What paragraph did you say?
20     Q    76.
21        Okay.  Did you review that paragraph?
22     A    I have, yes.

365

1   Q   So that's an inaccurate statement,
2  correct?
3      A   No, I don't think it's inaccurate.
4      Q   Okay.  Why is that an accurate
5  statement?
6      A   Because right in the context of the
7  communications in March, what my understanding of
8  this is to say is that RLI, because we had
9  communications -- we had normal communications
10 before claims personnel -- the communication from
11 Mr. Sussman obviously is elevated communication
12 from RLI of a very direct and concerned nature.
13     So I think that when -- when this is
14 drafted -- forgive me, I didn't draft it -- but
15 when I read it, I think that's -- that was
16 certainly what I understood.
17     As I read it now, that's what I'm
18 thinking.  Which is it's an inconsistency in
19 communication.  It isn't to say that we didn't
20 have communications about normal day-to-day stuff.
21 It is to say that the types of questions and
22 concerns that were raised in the March 3rd, March

366

1  6th, March 13th communications were new except for
2  the references herein about Mr. Sandoz sending an
3  email on December 22nd.  I think that's what it
4  does.
5      Q   And Mr. Sussman did have communications
6  in 2016 with Nexus, as we saw, for example, on his
7  correspondences back and forth with Juliana?
8      A   Oh, sure.  Yeah, I think, again, it's
9  relative to the type of communication.  And to the
10 extent that that's not artfully communicated in
11 that paragraph, that's unfortunate.  But it is
12 related to the type of communication.
13     Q   Okay.  And you may recall this from
14 your deposition last week as well.  Isn't it true
15 that RLI advised you back in October, but
16 certainly by November, of 2016, that it would no
17 longer be issuing bonds in 2017?
18     A   While you were asking your question, I
19 thought I heard a child's voice over in the
20 corner, I don't know what that was, but it really
21 freaked me out, and I did not hear the rest of
22 your question.  So can you please repeat it; I'm

367

1  sorry.
2      Q   We talked about this in your last
3  deposition, I just want to confirm.
4      In October of 2016, certainly by early
5  November of 2016, RLI had advised you that it will
6  no longer be issuing bonds for -- at the request
7  of Nexus for immigrants, correct?
8      A   No.  They communicated to us that we
9  could elect to pay a certain amount of money as
10 collateral to continue the program or we could
11 find another surety.
12     Q   Prior to that, though.  Even then I
13 know -- but they told you at all times, starting
14 at least in the beginning of November, if not
15 sooner, that RLI was not planning to continue to
16 write immigration bonds at the request of Nexus?
17     MR. SHOREMAN: Objection.  Objection.
18 Who's "they"?
19     Q   RLI advised you prior -- at the latest,
20 in early November, 2016, that RLI would not be
21 issuing further bonds at the request of Nexus in
22 the coming year, in 2017?

368

1      A   Well, the only problem with that is
2  that they expressly said that they would continue
3  to write bonds for an indeterminate period of time
4  or we could pay the $1.2 million in collateral.
5  And I believe that one of your witnesses testified
6  to that as well, specifically.
7      Q   Okay.  Let me just ask my question
8  again, just answer.
9      Is it your testimony that RLI did
10 not -- I mean, I just want to be clear.
11     A   No, sure, please.
12     Q   Didn't RLI advise you in early
13 November 2016, that RLI was going to stop issuing
14 immigration bonds at the request of Nexus in 2017?
15     A   My understanding was that we had an
16 either/or provision.  We could pay $1.25 million
17 in collateral or we could find an alternative
18 surety for future posting.
19     We elected to find an alternate surety
20 for future posting.  We did that.  And we stopped
21 writing with RLI by February 27th, 2017, as
22 directed, either pay the 1.25 million or find

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

93 (369 to 372)

369

1 another surety. We found another surety and three
2 days later I get this letter from Ira.
3          And I think that's bad faith.
4          THE WITNESS: Hey, can I get some more
5 coffee? Is that at all possible? I just don't
6 want to disconnect.
7          MR. SHOREMAN: Is there a question
8 pending?
9          MS. KATSANTONIS: No.
10          MR. SHOREMAN: I just want to consult
11 with my client.
12          MS. KATSANTONIS: All right. Let's go
13 off the record.
14          THE VIDEOGRAPHER: We are going off the
15 record at 20:01.
16          (Recess taken.)
17          THE VIDEOGRAPHER: We are back on the
18 record at 20:14.
19 BY MS. KATSANTONIS:
20      Q   Okay. Before we took a break I was
21 asking you whether or not RLI communicated to you
22 in early November its intention to stop issuing

370

1 immigration bonds in the upcoming 2017 year?
2      A   And my understanding of that is they
3 communicated an either/or provision; that we could
4 either find a new surety as of February 27, 2017,
5 or we could post $1.25 million in collateral with
6 them. That was my understanding. And we chose to
7 find a new surety partner.
8      Q   But didn't they tell you at all times
9 that they were going to stop issuing immigration
10 bonds in 2017, whether it be in January or
11 February?
12      A   My understanding was that we could --
13 if we had posted the collateral, we could have
14 posted for an indeterminate amount of time. I'm
15 not being clear. I mean, that was my
16 understanding.
17      Q   Okay. So --
18      A   So based on that understanding, also
19 understand, Ms. Katsantonis, that they could have
20 canceled -- they could have stopped posting bonds
21 at any time.
22      Q   Right.

371

1      A   I mean, nothing in the agreement
2 compelled them to continue posting bonds. I think
3 the fact that they continued posting bonds was a
4 sign that the program was working.
5      Q   And that right of RLI's was not
6 contingent upon you finding someone else to write
7 bonds, correct?
8      A   Sure. I mean, yeah, they could have
9 stopped writing at any point in time.
10      Q   Right.
11      A   The fact that they didn't shows that
12 they appreciated the program until they didn't.
13      Q   Right. But they could stop writing
14 regardless of whether or not you provided
15 additional collateral?
16      A   Sure. And so the fact that they
17 didn't, I think is a —
18      Q   Let's mark this.
19      A   Mark it?
20          MR. SHOREMAN: Thank you.
21          (Donovan Exhibit 21 marked for
22 identification and attached to the transcript.)

372

1      Q   So this is an email dated November 8th,
2 on the bottom, Mr. Sandoz to you. And he was
3 requesting a conference call, and he said, "It's
4 related to transitioning the program to a new
5 surety and any progress made in that regard and
6 thoughts we have as the program winds down."
7          Do you see that?
8      A   I do.
9      Q   Okay. So do you recall in early
10 November RLI had advised that it was planning on
11 not issuing further immigration bonds in 2017?
12      A   So, yes. I mean, that was part of our
13 conversation as to whether or not we continued
14 with RLI either posting collateral or if we moved
15 to a new surety.
16          But I do remember this communication,
17 and I think I was clear with Mr. Sandoz that, you
18 know, we would prefer to find a new surety than
19 post $1.25 million.
20      Q   Okay. And looking at paragraph 86 of
21 your amended complaint.
22      A   Uh-huh. I'm glad I got a copy of that.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

94 (373 to 376)

373

1    Q   It states, "Without warning or
2 explanation, RLI declared on February 28th, 2017,
3 that it would no longer issue immigration bonds."
4        That's not an accurate statement,
5 correct?
6    A   Yeah, I think that -- hold on a second.
7 I think that could have been more artfully
8 written. I think that it is -- while certainly
9 RLI's decision, you know, was February 27th, that
10 I think was the last day. But, you know, I think
11 that, obviously, there is communication between me
12 and RLI, meaning Dave Sandoz, about finding a new
13 surety. So we did, obviously. And the record is
14 clear that those communications occurred.
15    Q   Right. And in fact, back in at least
16 December of 2016, RLI was advising you of its plan
17 to cease writing bonds by February of 2017, right?
18    A   Absent the payment of collateral per
19 their request, yes.
20    Q   Well, either way. They were telling
21 you about the February 2017.
22    A   Certainly we were having conversations

374

1 about it, absolutely.
2    Q   Okay.
3        MR. SHOREMAN: I'll note for the record
4 that the amended counterclaim, Exhibit 21, does
5 not appear to be verified and was prepared by
6 counsel.
7        MS. KATSANTONIS: Well, I believe,
8 Mr. -- we won't argue the point here, during the
9 deposition.
10        MR. SHOREMAN: Okay.
11        THE WITNESS: She reserves the right to
12 argue all the time.
13    Q   With regard to collateral, do you have
14 any evidence that Nexus at any time prior to
15 March 13th, 2017, sent a collateral payment to
16 RLI?
17    A   Yes, of sorts. I have a communication
18 from Mr. Sandoz saying that certain commissions
19 related to the immigration bond program that were
20 due to Mr. LiMandri were being credited to the
21 collateral account. I do not know how much that
22 was, and RLI has never responded with a balance,

375

1 so I don't know what the balance is.
2    Q   Why would Mr. LiMandri post Nexus'
3 collateral?
4    A   Well, it was your client's idea, and we
5 reviewed the email in my deposition, you may
6 remember, your client's idea was to take — to use
7 those commissions, as it were, that were owed to
8 Mr. LiMandri for collateral, I think, because they
9 were owed to Mr. LiMandri at the end of the year.
10 Mr. Sandoz had indicated that they would -- that
11 RLI would be refunding all of the collateral at
12 the end of year.
13        So I think -- I don't know. You'd have
14 to ask Mr. Sandoz. I understand he's scheduled
15 for deposition this week.
16    Q   Well, I'm just trying to ask you. Did
17 you have any -- right, it's not a payment that
18 Nexus provided, right? Any --
19    A   What do you mean?
20    Q   -- collateral based on this commission
21 to Mr. LiMandri --
22    A   No. I'm not suggesting — I'm not

376

1 suggesting that RLI should have made that offer.
2 I'm saying RLI did. I have representations of the
3 offer in writing, but no idea of how much it is.
4        You asked me if I had any evidence.
5 And I said, "Yes," and I referenced that email.
6 I'm not suggesting that it was proper. I'm
7 just -- or right or the best idea -- I'm just
8 suggesting that it was an email, I have it, and
9 you've seen it.
10    Q   I understand. What I'm asking you is
11 that any commissions that you think should be
12 credited that were due to Mr. LiMandri's --
13    A   Are absolutely not due to me.
14    Q   -- are not payments that Nexus made,
15 correct?
16    A   We should never receive commissions, so
17 I agree. But my understanding was that based on
18 what RLI had represented, that those monies were
19 going to be placed in that collateral account and
20 then, I presumed, paid to Marco LiMandri as the
21 contract that your client had with him would have
22 provided for.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

95 (377 to 380)

377

1    Q    You don't have any writing of
2  Mr. LiMandri agreeing to post any collateral on
3  behalf of Nexus, right?
4    **A    No.  But I do have your -- your client**
5  **saying this is what we're going to do, and that's**
6  **in an email and you've seen it.  Your client has**
7  **refused to tell us what that email means --**
8    Q    Mr. Donovan --
9    **A    -- and how much money was apportioned**
10 **to collateral.**
11   Q    -- I'm just trying to understand that
12 you're talking about portion of the collateral
13 coming from Mr. LiMandri who has no contractual
14 basis with you to pay collateral to RLI on Nexus'
15 behalf, right?
16   **A    I'm talking --**
17       MR. SHOREMAN:  Objection.  This was
18 asked and answered.  Secondly, he testified it was
19 your client's idea.
20       MS. KATSANTONIS:  Doesn't matter.
21   **A    But it was your client's idea.  And**
22 **the --**

378

1    Q    That's not my question.  My question is
2  just do you have any agreement in writing by
3  Mr. LiMandri to post collateral on behalf of
4  Nexus?
5    **A    No, of course not.**
6    Q    Okay.
7    **A    It's not my collateral -- it's not my**
8  **commission.  It's not my money.**
9    Q    Exactly.
10   **A    It is your client who suggested that it**
11 **was being posted for collateral purposes.**
12   Q    All right.  So --
13   **A    Your client is the one that said that**
14 **that money was being posted, not me.  I didn't ask**
15 **for it, your client offered it.**
16   Q    All right.  And do you have any --
17   **A    You sent me the email.**
18   Q    -- writing in which Mr. LiMandri
19 accepted the term to provide collateral through
20 his commissions on behalf of Nexus?
21   **A    No.  I believe Mr. LiMandri took some**
22 **issue with you not paying his commissions, as I**

379

1  understand it.
2    Q    Okay.  And you have no evidence that
3  Nexus, at any time before March 13th, 2017, sent a
4  collateral payment to RLI?
5    **A    I do not have the documentation of a**
6  **check tendered to RLI, no.**
7    Q    Right.  You don't have check, wire, or
8  any documentation to show that Nexus has sent a
9  collateral payment to RLI?
10   **A    That's correct.  I do not have that**
11 **detail.**
12   Q    Okay.  Isn't it true that --
13   **A    Yeah, you've already covered it.**
14 **Moving on.  Don't ask that.  You'll be thinking**
15 **tonight, you'll be like, "Man, I wish I would have**
16 **asked that.  That was the one place we didn't go**
17 **where we should have."**
18       **And Chris will be like, "I told you**
19 **that."**
20       **Your sugar cookies are really good.  I**
21 **mean, they're okay, compared to the chocolate chip**
22 **cookies.**

380

1    Q    Can you identity any instance in which
2  Nexus offered to provide collateral to RLI?
3    **A    Yes.  I mean, we signed the collateral**
4  **agreement.  That was an offer to provide**
5  **collateral.  We had negotiations with Mr. Sandoz**
6  **about collateral and conversations about**
7  **collateral.  So, yes.**
8        **Do I have record of any of that**
9  **collateral changing hands?  In other words, do I**
10 **have a canceled check or something like that?**
11 **That answer remains no.**
12   Q    Okay.  And are there any other
13 instances than the ones you just mentioned in
14 which Nexus has offered to provide collateral to
15 RLI?
16   **A    Can you repeat the question?**
17   Q    Other than --
18   **A    I want to make sure I heard it.**
19   Q    -- the instances you just mentioned,
20 which was the collateral agreement, the
21 discussions with Mr. Sandoz, are there any other
22 instances in which Nexus offered to provide

---

381

1  collateral to RLI?
2      A   Other than the communications about
3  collateral to Mr. Sandoz and then the agreements,
4  no.
5      Q   Okay.
6      A   Not that I'm aware of.
7      Q   What collateral has Nexus provided to
8  other sureties?
9      A   Nexus has provided deeds of trust to
10 other sureties; Nexus has provided cash collateral
11 to other sureties; Nexus has provided cash
12 collateral to AIA pursuant to an escrow agreement
13 that we have with that surety; and we've provided
14 collateral to FCS.
15     Q   Okay.  The deeds of trust, you said,
16 was to Statewide, right?
17     A   That is correct.
18     Q   Any other bonding company that you
19 provided deed of trust to?
20     A   Action Bail Bonds.
21     Q   And what is that a deed of trust to?
22     A   You know what?  I apologize.  We don't

382

1  have any collateral with Action.  We had — our —
2  Action was the first company that we used, and
3  there were a couple of bonds that were posted
4  there, but all of those bonds have been canceled
5  so there's no current liability; I apologize.
6      Q   How much cash collateral have you
7  posted with FCS?
8      A   I believe it's 650,000, but, Vivian,
9  I'll get you the exact number before I leave
10 today.
11     Q   Okay.  I've seen checks that total 625,
12 so maybe that's...
13     A   You know what?  I think that's exactly
14 right.  But I'm going to confirm it just in case.
15     Q   Okay.  And what about to AIA?
16     A   I'm going to have to confirm that.  I
17 know, I believe it's 213,000 in that account, but
18 that — that agreement allows for them to pay out
19 of that account.  So I have to look at the record
20 to get you the total, but I will do that, okay.
21     Q   Is that a rolling account that you have
22 to replenish?

383

1      A   It's a rolling account that we
2  replenish from time to time, yeah.
3          Ms. Katsantonis, do you mind if I phone
4  a friend on the AIA total escrow balance so I can
5  get that for you real quick?
6      Q   Why don't we do it off the record.
7      A   Yeah, I can do that.
8      Q   Do you want to do that now?
9      A   No, I can wait until we finish.  Let's
10 just get through it, you know.
11     Q   Yeah.  So you testified earlier, and I
12 want to know what facts and circumstances Nexus
13 asserts supports its contention that RLI acted in
14 bad faith or failed to act in good faith?
15     A   We've covered this at some length.  But
16 I will restate several instances where I think
17 that's true.
18     Q   Okay.
19     A   RLI has not permitted us to dispute
20 invoices either pre- -- sorry breaches — either
21 pre-invoice or post that has cost Nexus real
22 money.  Nexus default rates with RLI are higher.

384

1  Part of the issue with that is RLI's unwillingness
2  to sign a confidentiality agreement that required
3  notification of our clients of the pending action
4  in the Western District of Virginia related to the
5  injunction order.  I believe that our noticing
6  clients of that has created some elevated breach
7  activity.  And also having to communicate with RLI
8  clients about the full production of the Capsule
9  data.  Again, now we can communicate and we have
10 sent a copy of the court's protective order to our
11 clients.  But initially we didn't have a
12 confidentiality agreement because RLI wouldn't
13 agree.  So, you know, our initial disclosure to
14 some RLI and Libre participants was that we are
15 potentially going to have to disclose your
16 information.  Thank goodness the court provided a
17 protective order.
18         Had RLI agreed to the confidentiality
19 provisions early on, there would have been no need
20 to go to the court to get an injunction that you
21 literally -- we literally got a more -- a stronger
22 protective order than we had asked you to sign in

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

97 (385 to 388)

385

1 the confidentiality agreement.

2       So, again, I think good faith would

3 have been signing the confidentiality agreement

4 and allowing us to provide access to books and

5 records without threatening the lives of our

6 program participants.

7     Q   With regard to the --

8     A   And there's more.  Do you want me to —

9     Q   Sure.  Give me every basis you're

10 contending.

11        MR. WILLIAMS:  Well, I don't want you

12 think I'm try to -- do you want to go off so I can

13 ask you is there a specific area that you wanted

14 him to cover?

15        MS. KATSANTONIS:  I want him to cover

16 each and every instance which he's asserting that

17 we -- that RLI acted in bad faith.

18        MR. WILLIAMS:  Well, rewriting the

19 contract to cover all bonds, the value of all

20 bonds when that's not what the contract says.

21        THE WITNESS:  I'm going to --

22        MS. KATSANTONIS:  I'm not going to ask

386

1 you to testify, Mr. Williams.  I want Mr. Donovan

2 to give us his understanding.

3        MR. WILLIAMS:  That's what I was trying

4 to --

5     A   What I'd like to do is I'd like to

6 point out that I've answered this question several

7 times, both in this deposition and my last one,

8 and I'm going to countenance my answer as a

9 collective and ask that you look at all of those

10 responses, because there are so many elements of

11 bad faith that I've mentioned so many at different

12 times.

13        What I will say, also, is the demand

14 for $1.25 million in collateral, which was

15 seemingly based on nothing, and then that demand

16 of either pay $1.25 million in collateral or find

17 a different surety to move forward.  So we did

18 that, we found a different surety to move forward,

19 and then on March 3rd we began to get letters from

20 Ira Sussman, March 3rd, March 6th, literally the

21 day after, Friday to Monday.  Then March 13th you

22 go from "Hey, we're a little bit concerned" to

387

1 "Hey, we want $10 million."

2       It's absolutely bad faith.

3     Q   Okay.  Did you -- anything else that

4 you can think of right now?

5     A   As I said, I'll countenance all of my

6 different, you know, portions of my testimony

7 around bad faith, and I think that they've been

8 thoroughly articulated at different points in time

9 between this deposition and my last one.

10    Q   Okay.

11    A   But I'm more than happy to take up the

12 next hour if you'd like.  I think that's all the

13 time we have.

14    Q   Well, let me ask you this:  With regard

15 to the collateral demands, the 1.25 or the

16 10 million, did Nexus -- Nexus did not pay any of

17 those collateral demands, right?

18    A   No.  We exercised the option that RLI

19 gave us, the either/or, which is to find a new

20 surety so that we wouldn't have to pay the

21 collateral demand.

22    Q   Didn't Nexus start writing bonds with a

388

1 new surety months before that December 2016 email?

2     A   Evergreen?  I don't believe that's the

3 truth — I don't believe that's the case.  Nexus

4 may have had a relationship with another surety

5 FCS.

6     Q   Right?

7     A   But understand, Ms. Katsantonis, and

8 this is where I have a real problem, like, we need

9 to be very specific.  This is a deposition.  I

10 need to be — you know, we need to be clear what

11 we're talking about.  So can you repeat the

12 question and let me —

13    Q   Weren't you already issuing and

14 increasing the amount of bonds you were writing in

15 June of 2016 with another surety?

16    A   We did have another surety, and we did

17 write or post or secure bonds with two sureties

18 for a certain period of time, yes.

19    Q   And you were --

20    A   But your question.

21    Q   -- increasing in the June --

22    A   Your question was did we — did we in

**389**

1  fact engage the new surety early. Your line of
2  deposition question before was about Evergreen.
3      Q   I --
4      A   So I want to make sure we're not --
5      Q   I appreciate your being precise.
6      A   I just don't want to be imprecise, yes,
7  exactly.
8      Q   I totally understand what you're saying
9  and I appreciate that.
10         But I'm saying in June of 2016 through
11 December of 2016, didn't Nexus increase the amount
12 of bonds it was writing with FCS?
13     A   We did, have -- yes. I don't know if
14 it would be -- when you say "Increase," do you
15 mean that we did more with FSC than RLI?
16     Q   You were writing a -- well, you were
17 writing a significant amount of bonds more with
18 FCS than RLI, right?
19     A   Over the life cycle of the program,
20 yes. There probably were time where we were
21 writing more the RLI than FCS in that window.
22     Q   No. With FCS than RLI.

**390**

1      A   See how inartful I can be.
2      Q   And Nexus did not respond to the
3  10 million collateral demand from RLI, right?
4      A   No. With all due respect, I thought it
5  was a ridiculous demand. It was not based on
6  reality.
7      Q   Right. And so what, if any, damages
8  has Nexus sustained as a result of the collateral
9  demand?
10     A   Well, as it relates to the bad faith in
11 general, I think that it's important to understand
12 that this starts with the demand for access to
13 books and records and the unwillingness to sign a
14 confidentiality agreement to protect these
15 vulnerable people, which our company then spent a
16 million dollars in legal fees to try to protect.
17         So why don't you ask me the question
18 again. I want to make sure I completely
19 understand.
20     Q   I'm just trying to understand what
21 financial loss --
22         MR. WILLIAMS: Are you talking about

**391**

1  actual loss of potential --
2      Q   Actual loss Nexus has stained.
3          MR. WILLIAMS: Excluding attorneys'
4  fees?
5      Q   -- as a result of RLI's alleged bad
6  faith or not acting in good faith?
7      A   Got it. Thank you, Ms. Katsantonis,
8  and just to be clear, what I heard you say before
9  was the collateral demands. And I want to make
10 sure --
11     Q   Well, I mean both.
12     A   I want to make sure. I want to be
13 clear.
14         So the -- RLI's unwillingness to
15 provide a confidentiality agreement that protected
16 the clients; RLI's demand for 1.25 million or to
17 replace the surety, we replaced the surety as RLI
18 requires, and then RLI demands $10 million.
19         You know, we have an elevated breach
20 rate with RLI that has everything to do with the
21 way that this relationship has existed. And, you
22 know, our communications with clients related to

**392**

1  disclosures have made it more difficult to manage
2  this book. And it's unfortunate.
3          And we -- when you look at the 2.3
4  fault rate versus the 7 percent fault rate with
5  RLI, we're talking about millions of dollars in
6  potential damages. Not to mention the fact that
7  you just put a document in front of me where Ira
8  Sussman refused to allow us to contest and
9  mitigate an invoice that clearly should have been
10 $3,400 and not $10,000. Not to mention the fact
11 that we have the bonds that we referenced on the
12 Friday, which you show that was canceled, and you
13 also billed us for, that we paid for, even though
14 in your production discovery you said you received
15 the cancellation for it.
16     Q   Can you tell me --
17     A   You can add all that up together. And
18 in fact, maybe I can -- maybe I'll put together a
19 damages sheet and send it to you so you'll have
20 it.
21     Q   Sitting here today, you can't
22 identity -- you can quantify the financial losses

393

sustained by Nexus as a result of RLI's failure to act in good faith or acting in bad faith, correct?
**A Oh, absolutely I can.**
Q What is it?
**A I'll do one of two things. I can – we can finish this deposition and I'll get it to you before I leave, or I can pause – I'll take some time right now to get it. Whichever you prefer.**
Q What are the elements of the costs that you were asserting Nexus has incurred?
**A Okay. So I'm going to go to – I'm going to go to documents and review. I'm going to need a few minutes to do that.**
**Do you want to do that or do you want me to finish the deposition and let me get that to you –**
Q What document would you review?
**A I would review the fail rate. I would want to look at the fail rate and what that – if the fail rate with RLI was consistent with our average fail rate, what that would be. I want to look at individual instances where we sought to do**

394

**disputes.**
**So there's a lot of documentation that I want to review. I'm more than happy to provide you a damages sheet, and I can do it tonight, or I can do it now. But I'm going to need some time to go through my documents. That's what I'm saying.**
Q We only have less than an hour left.
**A I'm trying to be respectful.**
Q I'm asking you right now whether you can quantify the damages incurred, any damages incurred by Nexus as a result of RLI's failure to act in good faith or bad faith?
MR. WILLIAMS: He'll amend the initial disclosures. The initial disclosures --
**A Well, no, I'll take the time to do it now.**
Q I don't want you to take the time. I don't have time on my record.
**A You've asked me three times, Ms. Katsantonis. You asked me three times. Now, do you want me to answer the question or not?**
Q I'm asking you right now do you -- have

395

you quantified --
MR. SHOREMAN: Wait a second.
Q -- the amount of damages Nexus has incurred?
**A More than happy to do it right now based on documents. Just give me a few minutes.**
Q Wait a minute. Mr. Donovan, have you done it before right now?
**A There are plenty of instances of the damages. I have to add them together. You're asking me to do that. I'm happy to provide them to you, okay?**
**I can do it now. We can take the time and I can go do it now. I was nice and offered to let you finish this deposition and then do it on my own time, which I don't have to do that. I was being nice –**
MR. HARRIS: Actually you do.
**A – because I'm trying to be respectful.**
MR. WILLIAMS: We'll amend the initial disclosures.
MS. KATSANTONIS: I'm not asking you to

396

amend anything. Today's the deposition.
MR. HARRIS: A specific topic he was supposed to be prepared on the facts and circumstances surrounding the damages.
MR. SHOREMAN: He's prepared. He can do this.
THE WITNESS: Yeah, I will do it.
MS. KATSANTONIS: I'm not --
MR. HARRIS: It's deposition time --
THE WITNESS: Because I'm not going to be accused of not being prepared. Absolutely.
MR. KOWALCZUK: The court reporter cannot transcribe all of you talking at the same time.
MR. SHOREMAN: Then let me talk. We did it -- just calculated --
MS. KATSANTONIS: Mr. Shoreman, I'm not having this deposition as a exercise for Mr. Donovan to get --
THE WITNESS: No, this is an exercise where Mr. Donovan answers your questions. And that's what I'm going to do.

397

1      MR. SHOREMAN: It's not a memory test.
2  It's not a memory test.  He has to refer to his
3  documents.
4      MS. KATSANTONIS: I asked him which
5  categories of documents he's referring to.
6      Q    What are you referring to, Mr. Donovan?
7      MR. SHOREMAN: He's referring to
8  default records.
9      MS. KATSANTONIS: Don't --
10 Mr. Shoreman, please let him testify.
11     **A   I've already answered the question,**
12 **Ms. Katsantonis.  I told you that I wanted to**
13 **review the default rates and understand the**
14 **difference.  I told --**
15     Q    Can you tell me what calculation you're
16 doing?
17     **A   Ma'am, I'm not done.  You're**
18 **interrupting me again.  That's not nice.**
19     **I'm also going to go and look at the**
20 **data.  You just put an email in front of me that**
21 **showed the $6,600 that your client cost us by not**
22 **letting us dispute.  I need to add those up.  It's**

398

1  **a simple mathematical thing.  Let me add them up.**
2      **If you want the total now, give me a**
3  **few minutes, I'll add it up, I'll give it to you.**
4  **If you want the total after, then we'll finish the**
5  **deposition; I'll give it to you after.**
6      **This doesn't have to be -- this is not**
7  **going to be a "gotcha."  If you want to put on the**
8  **record that I don't know, then I'm going to take**
9  **the moments necessary to get you the number.**
10     Q    I think it's obvious that at this
11 moment right now you don't know without taking the
12 time to add it up.
13     **A   I would have to add it up.**
14     **Do you want me to add it up?**
15     MR. SHOREMAN: Objection.
16     Q    No, I want to finish -- I want to
17 continue with my deposition.  I don't have time
18 left.  So let me continue with my questions.
19     One of the things I asked about --
20     MR. SHOREMAN: I want the record to
21 reflect that you denied him the opportunity to
22 answer the question --

399

1      THE WITNESS: Please.
2      MR. SHOREMAN: -- based on the
3  documents he has in front of him.
4      THE WITNESS: That's right.
5      Q    Based on -- one of the issues you
6  stated was the -- a confidentiality agreement,
7  correct?
8      **A   Yes, ma'am.**
9      Q    Is there a confidentiality clause in
10 the indemnity agreement between RLI and Nexus?
11     **A   I'd have to review it.  I don't**
12 **remember every word of it.**
13     Q    You know there's not one in the
14 RLI/Nexus --
15     MR. SHOREMAN: Objection.
16     Q    -- indemnity agreement right?
17     MR. SHOREMAN: Objection.
18     MR. WILLIAMS: Objection.
19     MR. SHOREMAN: Objection.  That's not a
20 proper question.
21     MS. KATSANTONIS: He's answering the
22 question.

400

1      MR. HARRIS: You've made your objection
2  three times.
3      MR. SHOREMAN: Right.  But it wasn't a
4  proper question and you continued.
5      Q    Go ahead.
6      **A   As it relates to protecting Nexus**
7  **Program participants, we felt it was important to**
8  **negotiate additional protections given the**
9  **extensive amount of information RLI was**
10 **requesting.**
11     Q    Okay.  And you -- so in the indemnity
12 agreement between RLI and Nexus, there is no such
13 confidentiality provision, right?
14     **A   Correct.**
15     Q    And, in fact, you have negotiated other
16 indemnity agreements and have added those kind of
17 provisions in those indemnity agreements, correct?
18     **A   I learned from this relationship,**
19 **Ms. Katsantonis.**
20     Q    All right.  Can you just verify --
21 let's mark this exhibit.
22     (Donovan Exhibit 22 marked for

**401**

1 identification and attached to the transcript.)
2  Q   This is a Commercial and Immigration
3 Surety Indemnity Agreement on behalf of
4 Philadelphia Reinsurance Corporation and executed
5 by Nexus Services, Inc., correct?
6  **A   That is correct.**
7  Q   Okay.  And to the best of your
8 knowledge, is this an accurate copy of the
9 indemnity agreement you executed with -- or on
10 behalf of Philadelphia Reinsurance Corporation?
11  **A   To the best of my knowledge, it is.**
12  Q   Okay.  And with regard to -- with
13 regard to the confidentiality agreement, you said
14 that you had to make a disclosure to Libre
15 participants?
16  **A   We did make a few disclosures to Libre**
17 **participants at different times during this case**
18 **with RLI.**
19  Q   How did you make disclosures to Libre
20 participants?
21  **A   We've called.  We've sent messages.**
22 **Mostly called.  We operate a call center so we'll**

**402**

1 call people and advise them.
2  Q   So any calls to Libre participants
3 advising that you were disclosing Capsule
4 documents would be reflected in the notes?
5  **A   Likely.  The only instance where that**
6 **wouldn't be the case is if that was a call that**
7 **was being done by a special group of call center.**
8 **In other words, it isn't done by our Libre call**
9 **center.  We would have brought in — so, for**
10 **example, when we have a disclosure, we have to**
11 **reach a certain number of people.  We'll bring in**
12 **team, we an empower call center team that**
13 **will come in and make calls from time to time, and**
14 **those records may or may not be reflected in**
15 **Capsule.**
16  Q   Did you make -- did you cause anyone
17 specifically?  Did Nexus -- do you have a record
18 that you specifically advised a program
19 participant that there was going to be a
20 disclosure of Capsule documents?
21  **A   We made —**
22  Q   To RLI?

**403**

1  **A   Yes.**
2  Q   Okay.  And how many?
3  **A   Those people — those people have**
4 **independent rights.  As Judge Urbanski said, they**
5 **have a right to —**
6  Q   I'm just asking you how many people did
7 you advise that to?
8  **A   I don't know.  But I'll get you the**
9 **total by the time I leave here today.**
10  Q   Is it more than ten?
11  **A   I'm sure.**
12  Q   And that was all verbal.
13  **A   Correct.**
14  Q   And did --
15  **A   We have sent a copy of the court's**
16 **protective record to clients.  So we have a**
17 **written document that's gone out, and I'll get a**
18 **copy of that to you as well.**
19  Q   Okay.  And did program participants in
20 their contract, don't they agree that all the
21 information provided can be shared with the
22 surety?

**404**

1  **A   No.  Not under RLI's — RLI was under**
2 **the old contract, Ms. Katsantonis.**
3  Q   Right.  And didn't the old contract
4 provide that the information provided could be
5 provided to the surety?
6  **A   Well, I understand, based on my initial**
7 **deposition, that you misunderstand a portion of**
8 **the agreement to say that.**
9  **The new contract does say that certain**
10 **information will be shared with the surety.  But**
11 **the only contract had a privacy provision that**
12 **said specifically that GPS tracking data and other**
13 **personal information wouldn't be.**
14  Q   How many RLI bond -- program
15 participants have executed the new contract?
16  **A   Roughly half.  I will get you the total**
17 **tonight.**
18  Q   Did Nexus sustain any financial damage
19 as a result of RLI's demand for 10 million in
20 collateral?
21   MR. SHOREMAN: Wait.  That was just
22 asked and answered.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

102 (405 to 408)

405

1    A   Yeah.  Well, I mean, we had —
2    Q   Specific to the collateral demand.
3    A   Right.  Well, that collateral demand
4  was part of the successive of series of
5  communications that led us to try to negotiate the
6  confidentiality agreement.  There were significant
7  amounts of money spent trying to compel RLI to
8  just agree not to put these people at risk, right?
9    Q   So you're talking about attorneys'
10 fees.
11   A   I'm talking about attorneys' fees.  I'm
12 also talking about time we spent, you know, trying
13 to make sure that RLI program participants knew
14 what was happening; that they were able to, you
15 know, bring a case, if necessary.  Several RLI
16 Libre program participants, in fact, did file a
17 motion to intervene, as you may remember.
18       So, you know, I mean, those
19 communications were ongoing.  That's how those
20 people found out that they had an opportunity to
21 intervene, right?  We were communicating with
22 them.

406

1    Q   Right.  But as a result of just the
2  collateral demand, do you have any financial
3  damage amount that you've incurred as a result of
4  RLI's demand in March of 2017 that Nexus post
5  10 million in collateral?
6    A   I'll get that dollar amount for
7  you at the end.  I just need to add it up.
8    Q   So you're saying you incurred a
9  pecuniary loss as a result of the $10 million
10 collateral demand?
11   A   I'm saying that we, in response to that
12 letter, and those series of demands, we had to
13 apportion resources to communicating with RLI
14 program participants, to making sure that those
15 participants' information was protected to the
16 extent that I would have to put together what
17 that — what that —
18   Q   I'm talking about the 10 million
19 collateral demand, the financial demand.
20   A   No, I understand what you're talking
21 about.
22   Q   So what does that have to do with

407

1  program participant information?
2    A   Mr. Sussman sent us three letters
3  within ten days with an ever-increasing level of
4  threat.  We needed to ensure that RLI program
5  participants were safe.  We needed to negotiate a
6  confidentiality provision to ensure that they be
7  safe.
8    Q   I'm talking about just the ten million
9  collateral demand, the financial demand?
10   A   Right.  I would need to look at the —
11 I mean, I have an idea.  I need to look at the
12 total number of hours that were spent in response
13 to that.  And I can apportion — I can give you a
14 dollar amount, but I'll have to do it —
15   Q   In response to the $10 million demand?
16   A   Yes.
17   Q   Okay.  And --
18   A   And I'll provide that to you at the end
19 of the deposition.
20   Q   And do you have a written agreement
21 that entitles Nexus to attorneys' fees?
22   A   No.  Not that I'm aware of.

408

1    Q   And do you have -- do you know under
2  what authority Nexus is contending that it's
3  entitled to attorneys' fees?
4    A   I'm not a lawyer, Ms. Katsantonis.
5    Q   So you don't have -- you don't know,
6  sitting here today, the basis to which Nexus would
7  be entitled to attorneys' fees, right?
8    A   I'm not a lawyer, Ms. Katsantonis.
9    Q   So the answer's no, right?
10   A   I'm not a lawyer.  There are certain
11 questions that, you know —
12   Q   I'm just asking you do you know.
13       MR. SHOREMAN:  Objection.  Asked and
14 answered.  You're asking for a legal conclusion.
15 He doesn't understand that.
16       MS. KATSANTONIS:  He hasn't answered.
17   A   I'm not a lawyer.
18   Q   So the answer's no?
19   A   I can't give you the legal conclusion
20 you're looking for because I'm not a lawyer.
21       MR. SHOREMAN:  He doesn't have -- he
22 doesn't have the --

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

409

1    Q    So you don't know the bases by which
2  Nexus would be claiming attorneys' fees?
3    A    I can't provide the legal conclusion
4  you're asking for because I'm not a lawyer.
5    Q    Okay.
6    A    Didn't finish law school yet.  Maybe
7  one day.  Oh, but maybe not.  I'm not sure I could
8  do this every day.  You tether yourself to a table
9  for seven hours.
10        MS. KATSANTONIS:  Can we go off the
11 record for a minute, please.
12        THE VIDEOGRAPHER:  We are going off the
13 record at 20:52.
14        (Recess taken.)
15        THE VIDEOGRAPHER:  We are back on the
16 record at 21:07.
17 BY MS. KATSANTONIS:
18    Q    Okay.  So, Mr. Donovan, we were talking
19 earlier about RLI's request for documents and
20 access to Nexus' books and records in March of
21 2017.
22        And do you recall that after that

410

1  request a meeting was set up in Verona between RLI
2  and Nexus?
3    A    What day was that?
4    Q    It was set up in May 2017.
5    A    Right.  After the letters from Sussman
6  in March?
7    Q    Correct.
8    A    Right.  Yeah, I am aware of that, yes,
9  ma'am.
10    Q    And the purpose of that meeting was so
11 that -- RLI had requested access to Nexus' books
12 and records, right?
13    A    That's correct.  And we had insisted on
14 establishing confidentiality provisions to protect
15 our consumers.
16    Q    Well, you don't have any documents
17 prior to that meeting in which Nexus requested a
18 confidentiality agreement, right?
19    A    Since the beginning of those
20 communications, once the -- once we received those
21 communications from Mr. Sussman, I think we were
22 clear.  And you certainly know that,

411

1  Ms. Katsantonis, because you were involved in many
2  of those conversations.
3        So we were very --
4    Q    Prior to May.
5    A    -- very consistent in our request for a
6  confidentiality agreement when it became obvious
7  to us that RLI intended to gather significant
8  information about our program participants at a
9  time when it no longer was writing business.
10    Q    Let me ask you something.
11    A    It raised concerns that we needed to
12 have our clients protected, and we simply asked
13 that you sign a confidentiality agreement, which
14 you wouldn't do.
15    Q    Prior to May 2017, do you have any
16 document in which Nexus was requesting a
17 confidentiality agreement?
18    A    No.  But, I mean, you're well aware
19 that we were requesting a confidentiality
20 agreement.  We've been consistent in that from the
21 beginning.
22    Q    In the May meeting in 2017, Nexus did

412

1  not provide any documents to RLI, correct?
2    A    That's correct.  You refused to sign a
3  confidentiality agreement.
4    Q    Well, are you saying there was a
5  confidentiality agreement presented at the
6  meeting?
7    A    I'm saying that you refused to engage
8  counsel to sign one.  And certainly between my
9  competent counsel, and you being competent
10 counsel, it could have been happened and should
11 have been happened, and if it had happened, we
12 would have saved millions of dollars in litigation
13 cost.
14    Q    Isn't it true prior to the meeting no
15 confidentiality agreement was provided by Nexus,
16 prior to the May 2017 meeting?
17    A    I'm not sure if a draft was provided or
18 not.  But I don't think it really matters.  I
19 mean, we had significant conversations about the
20 confidentiality agreement.  At every turn we
21 requested that you sign a confidentiality
22 agreement, and every turn your client refused.  I

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

104 (413 to 416)

413

1  think the record is pretty clear on that.
2      Q    Mr. Donovan, I'm trying to be precise
3  in timing.  So prior to May 2017, you're not aware
4  of any confidentiality agreement being provided to
5  RLI, correct?
6      A    **Right.  Prior to the demand for onerous**
7  **access to books and records that would expose**
8  **confidential information from a vulnerable class**
9  **of people, no.**
10     **We did not feel —**
11     Q    Prior to the May meeting?
12     A    **Right.  Prior to the May meeting.  When**
13 **the May meeting it became clear that RLI intended**
14 **to raid data that was specific confidential data**
15 **that was potentially damaging to our program**
16 **participants, it is that point at which we said we**
17 **need a confidentiality agreement.**
18          **Ms. Katsantonis, I thank you for**
19 **pointing that out, because it does belie the fact**
20 **that a hundred percent of the time our focus has**
21 **been on our clients.**
22     Q    Great.

414

1      A    **It hasn't been —**
2      Q    Thank you.  I don't --
3      A    **It's -- and as you well know, when RLI**
4  **initially talked to us about signing a**
5  **confidentiality agreement, they agreed —**
6      Q    Mr. Donovan --
7      A    **— to sign a confidentiality that**
8  **would —**
9      Q    -- this is not --
10     A    **— protect our trade secret**
11 **information.**
12     Q    Mr. Donovan --
13     A    **I said to RLI what I cared about was**
14 **client confidentiality.**
15     Q    Okay, Mr. Donovan, thank you.
16     A    **Thank you.**
17          (Donovan Exhibit 23 marked for
18 identification and attached to the transcript.)
19     Q    Forwarding you correspondence dated
20 June 1st, 2017 --
21     A    **Thank you.**
22     Q    -- from RLI's counsel to Nexus'

415

1  counsel.
2          Do you -- and you're copied on it,
3  correct.
4      A    **I'm cc'd at the end.  Let me read this**
5  **real quick.**
6          **Yep, I've read it.**
7      Q    Okay.  So as of June 1st, 2017, RLI was
8  still requesting information from Nexus Services,
9  Inc., right?
10     A    **Yes.**
11     Q    And Nexus Services still had not
12 provided any books and records to RLI as of
13 June 2017, correct?
14     A    **Nexus Services had the position that we**
15 **needed a confidentiality agreement to protect our**
16 **client-sensitive information.**
17     Q    What sensitive information is being
18 asked for in this letter --
19     A    **Well —**
20     Q    -- that you needed a confidentiality
21 agreement to protect?
22     A    **I340 notices include confidential**

416

1  **information related to program participants.**
2  **I797(c) notices can.**
3      Q    Are those --
4      A    **I210 notices certainly do.  And I391**
5  **notices do as well.**
6          **Other court notices would as well.**
7  **We're talking about addresses.  We're talking**
8  **about individual names.**
9          **Ms. Katsantonis —**
10     Q    Aren't those --
11     A    **-- this is the very information that we**
12 **need to protect.**
13     Q    Okay.  So aren't those notices, notices
14 that RLI would get through the course of the bond
15 program anyway?
16     A    **The I340s, yes.  The I797(c)s, no.  The**
17 **I210s, no.**
18     Q    The I391s?
19     A    **Sure.**
20     Q    Okay.
21     A    **But the I210, which are notices of —**
22     Q    So RLI would already have --

417

1    A   — contain significant additional
2  amounts of information RLI wouldn't have.
3    Q   So RLI would already have the names and
4  personal information --
5    A   You'd have the names.
6    Q   -- and personal information of the
7  bond --
8    A   You'd have the A numbers, yeah.
9    Q   Okay.  And there's no mention in his
10 letter of a confidentiality agreement, right?  It
11 just -- the only mention of confidentiality is to
12 keep the financial information confidential,
13 right?
14    A   Exactly.  RLI seemed willing to keep
15 our financial information confidential, but was
16 resistant to signing a confidentiality agreement
17 to protecting consumer information, which is —
18    Q   You had not --
19    A   Please.  I want you to understand that
20 that was a huge driving point for me to be very
21 suspicious —
22    Q   Okay.

418

1    A   — because RLI wanted — why was RLI
2  willing to agree to confidentiality related to
3  business information —
4    Q   I --
5    A   — but not related to clients?
6        And, Ms. Katsantonis, you signed this
7  letter.  You stated in this letter that you
8  understand the requested financial information is
9  sensitive and confidential and you'll maintain the
10 confidential nature of all information provided —
11    Q   Right.
12    A   I have reviewed --
13    Q   Didn't agree to sign a --
14    A   — I've reviewed an email between David
15 Brigman and you, where he provided you, or he
16 states that he provided you with stolen corporate
17 records.  I have not seen you produce that.
18        I'm going to send, via counsel, the
19 email that I've reviewed today.  And this is,
20 again — I don't understand why you're offering to
21 keep things confidential in this letter, and then
22 you're engaging in absolutely inappropriate

419

1  communication with not just a former employee,
2  but, you know, the former head of a terrorist
3  organization in Virginia, and you're doing it and
4  you're accepting stolen records from him.
5    Q   Mr. Donovan --
6    A   Did you —
7    Q   -- as of this?
8    A   — receive stolen records from
9  Mr. Brigman.  Did you or not?
10    Q   Mr. Donovan, I'm here for your
11 deposition.  It would be appropriate if you allow
12 me to conduct your deposition, okay?
13    A   If you had not, you would say so,
14 Ms. Katsantonis.  So we all know what that means.
15        Continue, please.
16    Q   Mr. Donovan, in the June 1st -- as of
17 June 1st, 2017, Nexus had not provided any
18 confidentiality agreements that it proposed to
19 RLI, correct?
20    A   We asked RLI —
21        MR. SHOREMAN:  Let me object.  Let me
22 note this June 1st, 2017, Exhibit 23, I believe,

420

1  is addressed to Mary Donne Peters.
2        MS. KATSANTONIS:  We've already had
3  testimony on this, Mr. Shoreman.  He's copied on
4  it.
5        MR. SHOREMAN:  Well, I don't want him
6  disclosing any communication he had about this
7  exhibit with his counsel because it would waive
8  his privilege.
9        MS. KATSANTONIS:  That's great.  And
10 I'm only asking him --
11        MR. SHOREMAN:  Or any information he
12 received from his counsel.
13        MS. KATSANTONIS:  -- as a matter of
14 fact.
15    Q   Nexus had not provided, and you don't
16 have any correspondence prior to June 1st, 2017,
17 where Nexus advised RLI a confidentiality
18 agreement had to be executed, correct?
19    A   We were consistent in telling RLI that
20 we needed a confidential agreement.  The letter
21 that you've put in front of me is dated June 1st.
22    Q   Right.

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

106 (421 to 424)

421

1      A    The letter you have put in front of me,
2  which is a letter from you to Mary Donne, doesn't
3  mention a confidentiality agreement.
4         Those things I can testify to because
5  this document's sitting in front of me.
6      Q    And you're not aware of any
7  confidentiality agreement that was provided to RLI
8  prior to June 1st, 2017, correct?
9      A    I wouldn't know.  I know we had
10 conversations about it.
11     Q    Okay.  And isn't it true that RLI did
12 provide a confidentiality agreement sometime later
13 for Nexus to review and consider?
14     A    That's correct.
15     Q    Okay.  And --
16     A    And it was wholly insufficient because
17 it didn't protect the client-confidential
18 information.
19     Q    Mr. Donovan --
20     A    Because your client plans to use that
21 to lock clients up.  We all know that.  That's why
22 your client is unwilling to agree to the

422

1  protections, right?
2      Q    Mr. Donovan, do you have any facts or
3  circumstances to support a contention that RLI is
4  going to lock up program participants?
5      A    Other than your statement in a hearing
6  that you -- your client believes it's their duty
7  to deliver people.
8         How exactly are you going to do that?
9  How exactly are you going to deliver them?  You're
10 going to arrest them, right?  You're going to put
11 handcuffs and you're going to hire bounty hunters
12 and you're going to go into their houses.  You're
13 going to, you know, abuse them in front of their
14 children.  You're going to -- you know, you're
15 going to do the Trump dance, right?  This is what
16 it is.
17        Your insurance company is going to go
18 and try to get rid of its liability by locking
19 these people up.  It's absolutely ridiculous.
20     Q    Can we stick to the facts?  This is
21 what your deposition is about.
22     A    That -- these are the facts.  These are

423

1  the facts.
2      Q    There are no facts to support your
3  statement.
4      A    Did you say that you have a duty to
5  deliver people?  I mean, you said it here.
6      Q    Mr. Donovan, I don't know why you're
7  trying to attack me in the end of this deposition.
8  But right now we're here for your deposition --
9      A    Ms. Katsantonis --
10     Q    -- and I'm only trying to get the
11 facts --
12     A    -- if you'll answer my --
13     Q    -- to your understanding, Mr. Donovan.
14 It is your deposition.
15     A    So did you accept stolen corporate
16 documents from Mr. Brigman, Ms. Katsantonis?  Did
17 you or not?
18     Q    Mr. Donovan --
19     A    That's a yes.
20     Q    -- we're going to ask your counsel --
21        MS. KATSANTONIS:  Counsel, Mr. Shoreman
22 and Mr. Williams, I'm going to ask you both to

424

1  direct your client to stop asking questions of
2  counsel.  It's inappropriate.
3      A    I'd like to direct my counsel to draft
4  a Rule 11 letter.
5         I am tired of people receiving --
6        MS. KATSANTONIS:  Let's go off the
7  record.
8      A    -- receiving stolen --
9        MR. WILLIAMS:  Let's go off the record.
10 Let's take a break.  Let's take a break.
11       MS. KATSANTONIS:  Let's go off the
12 record.
13       THE VIDEOGRAPHER:  We are going off the
14 record at 21:19.
15       (Recess taken.)
16       THE VIDEOGRAPHER:  We are back on the
17 record at 21:24.
18 BY MS. KATSANTONIS:
19     Q    That's the March 19th, 2018 letter.
20     A    Yes, ma'am.
21     Q    So I'm going to show you a document
22 dated March 19th, 2018.

Case 5:18-cv-00066-MFU-JCH   Document 496-3   Filed 08/21/20   Page 108 of 189   Pageid#: 13885

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee          107 (425 to 428)
Conducted on March 3, 2020

425

1    Do you recognize this document you're
2 copied on?
3    A    Let me read it real quick.
4        (Donovan Exhibit 24 marked for
5 identification and attached to the transcript.)
6    A    It's a really long letter.  I'm sort
7 of — I'm remembering it and I'm breezing through
8 it.  But if you ask specific questions, I may need
9 to go back to the document.
10       MR. SHOREMAN:  While you're taking a
11 look at that, let me just note this is obviously a
12 letter from counsel to counsel.  I'll caution the
13 witness any communication he had with counsel
14 concerning this are privileged.  And if you
15 discuss them, you will waive that privilege.
16       THE WITNESS:  Thank you.
17   Q    In March of 2018, RLI made a further
18 demand for access to Nexus Services' records,
19 right.
20   A    It certainly appears that way in this
21 document that was a demand that you made, yes.
22   Q    Okay.  And in the first paragraph of

426

1 the letter RLI demanded that Nexus make its books,
2 records, and accounts available for inspection by
3 RLI at its offices in Verona — at Nexus' office
4 in Verona on March 29th, 2018, correct?
5    A    That's what it says, yes, ma'am.
6    Q    Okay.  And then there's the discussion
7 about the confidentiality agreement.  RLI confirms
8 that it has provided one.
9        And if you look on page 3 of the
10 letter, RLI says to accommodate Nexus'
11 confidentiality concerns, it's willing to execute
12 the confidentiality agreement provided by RLI's
13 counsel, even though RLI's rights under the
14 indemnity agreement are no way conditioned upon
15 its execution of such confidentiality agreement,
16 correct?
17   A    That is the language in the letter,
18 yes.
19   Q    Right.  And RLI advised whether or not
20 Nexus chooses to proceed under the agreement, RLI
21 expected Nexus to cooperate in making its books
22 and records available to it by March 29th, 2018,

427

1 right?
2    A    That's what it says.  What it doesn't
3 say is that the agreement wholly — the
4 confidentiality agreement was wholly insufficient
5 because it didn't address the client-specific
6 issues sufficient enough.
7        (Donovan Exhibit 25 marked for
8 identification and attached to the transcript.)
9    Q    And Nexus didn't respond to that letter
10 until March 28th, one day before RLI was to
11 present itself at the offices of Nexus in Verona,
12 correct?
13   A    I don't think that's a correct
14 representation of what this says.
15   Q    If you look at the bottom of the email.
16   A    I think you wanted to come to the
17 campus on March 29th, right?  I don't think that
18 that appointment was set.
19       And then I think that you, in this
20 communication, said, "I'm coming tomorrow," right?
21   Q    Well, in our letter we said, "We demand
22 that Nexus make its books, records, and accounts

428

1 available on March 29th," right?
2    A    That's true.
3    Q    Right.
4    A    But we didn't — it's not as if we had
5 a meeting that was canceled, right?  We didn't
6 have a meeting on March 29th.  On March 28th you
7 said in an email, "I'm coming tomorrow."  And it
8 was Mary Donne's —
9    Q    Well, on March 19th —
10   A    — response that said, "Don't come
11 tomorrow because we're not going to be there,"
12 right?
13   Q    On March 19th we said — RLI asked
14 Nexus to make its books, records, and accounts
15 available on March 29th, right?
16   A    Yeah.  But we never said you could come
17 to the campus.  I'm just saying —
18   Q    Right.  You never responded.
19   A    — you would have set up an
20 appointment.
21   Q    You didn't respond at all, right?
22   A    You sent an email saying, "Hey, we're

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

108 (429 to 432)

429

1  going to show up tomorrow."
2       And we said, "No, you're not."
3    Q   We didn't send an email saying we were
4  going to show up tomorrow.  We sent a letter on
5  March 19th saying we'll show up on March 28th,
6  correct?  I mean on March 29th.
7    A   It looks like on March 28th, 2018,
8  10:39 a.m. Vivian Katsantonis wrote, "Mary Donne
9  and Amy, We have not received a response to our
10  correspondence on March 19th regarding access to
11  and our review of Nexus Services books and
12  records.  As set forth in our correspondence, we
13  plan to review those records tomorrow, March 29th,
14  at Nexus's offices in Verona, Virginia."
15    Q   Right.  So we had --
16    A   That was not an appointment.  That was
17  you saying, "I'm coming tomorrow."  That's
18  different.
19    Q   Well, we told you on March 19th, that
20  RLI planned to be at your offices on March 29th,
21  right?  That's what the March 19th letter says in
22  the first paragraph.

430

1    A   It certainly — in the March 19th
2  letter it does say that it wants to come and
3  inspect records on March 29th.  That is different
4  than having an appointment to do so.  That was my
5  point.
6    Q   And counsel for Nexus advises that RLI
7  should not come to the offices and the documents
8  are not available and RLI should not appear at the
9  Nexus campus, correct?
10    A   That is what it says, yes.
11       MS. KATSANTONIS:  I have no further
12  questions.
13       THE WITNESS:  Oh, Ms. Katsantonis, I do
14  have the damages.
15       MS. KATSANTONIS:  I have no further
16  questions.
17       THE WITNESS:  So you don't want to the
18  damages?  Because you asked.
19       MS. KATSANTONIS:  Your counsel can do
20  that.
21       MR. SHOREMAN:  We'll do it quickly on
22  redirect.

431

1       EXAMINATION BY COUNSEL FOR THE DEFENDANTS
2  BY MR. SHOREMAN:
3    Q   Mr. Donovan, during Ms. Katsantonis'
4  examination you were asked about damages, bad
5  faith, specifically damages concerning default
6  rates.
7    A   Correct.
8    Q   Did you have an opportunity to review
9  records to calculate those damages?
10    A   Yes.
11    Q   Please tell us what you determined.
12    A   We calculated $2.5 million in loss
13  related to the breach rate of RLI versus the
14  global breach rate, which has been caused by RLI's
15  bad faith.
16       We calculated approximately $2 million
17  in attorneys' fees to fight for the
18  confidentiality protections we ultimately received
19  from Judge Urbanski in his order.
20       And we've calculated about $3 million
21  in reputational damage.
22       MS. KATSANTONIS:  Okay.  Can you -- oh,

432

1  sorry.  I forgot.
2       THE WITNESS:  I can't be mad at you.
3  You're just so charming, even when you're not.
4    Q   You also offered to provide
5  Ms. Katsantonis some additional information on
6  liquid assets?  Did you have an opportunity to
7  review that information?
8    A   I might.  I had committed to providing
9  that at the end of the deposition and I can do
10  that before.  I'll do that, you know, once we
11  break.
12    Q   Do you want to do it now, please?
13    A   I can.  I'm going to estimate our
14  liquid capital at about $3 million.
15    Q   Currently?
16    A   That -- yes.  That includes monthly
17  AR — a monthly AR that is averaged upon
18  collection.
19    Q   All right.  And lastly, you offered to
20  give Ms. Katsantonis some information on
21  unencumbered interest in real estate assets, other
22  than that $3,000 in equity in the one piece of

433

1  property.
2        Do you have information sufficient
3  to --
4        **A    We have no other properties that we own**
5  **full and -- free and clear.**
6        MR. SHOREMAN:  I don't believe there
7  was anything else that was outstanding.
8        MR. WILLIAMS:  Damages.
9        MR. SHOREMAN:  We did the damages.
10       All right.  Thank you very much.  I
11 have no further questions.
12       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
13 BY MS. KATSANTONIS:
14       Q    Briefly on redirect.  With regard to
15 the 3 million in liquid assets, is that all
16 monthly -- is that all based on program
17 participant payments?
18       **A    That's correct.  Cash on hand and**
19 **program participant payments.**
20       Q    So it's based on your -- how much cash
21 do you have on hand right now separate from the
22 program participant revenue?

434

1        **A    $420,000 in cash.**
2        Q    Okay.  And with regard to the 2 million
3  in attorneys' fees to fight the confidentiality
4  agreement, how is that broken down?  How did you
5  determine the 2 million figure?
6        MR. SHOREMAN:  That wasn't raised on
7  redirect.  That's beyond the scope of my redirect.
8        MS. KATSANTONIS:  No.  He said
9  2 million in attorneys' fee for confidentiality
10 agreement.  That was his testimony.
11       MR. SHOREMAN:  I thought we were going
12 to default.
13       THE WITNESS:  No, the 2 million for the
14 confidentiality agreement is certainly in there.
15       MS. KATSANTONIS:  He added that.
16       **A    And that is the estimate of the legal**
17 **fees that were spent specifically on the**
18 **confidentiality agreement.**
19       Q    How would you derive that figure?
20 Based on what?
21       **A    I derived it based on a rough**
22 **calculation of the total hours that were involved**

435

1  **in that versus — and then looking at the legal**
2  **bills.**
3        **Now, I haven't gone to the legal bill**
4  **detail and done it line by line, but I certainly**
5  **can do that.**
6        Q    So it's your testimony that you
7  incurred 2 million in attorneys' fee to negotiate
8  a confidentiality agreement?
9        **A    Well, it was difficult to negotiate**
10 **because you wouldn't agree to it.  And then we**
11 **ultimately ended up having to get a protective**
12 **order issued by the court, right?**
13       Q    And then the two and a half million
14 you're asserting in loss from the breach rate, can
15 you tell me how that's calculated?
16       **A    That's based on what RLI's breach**
17 **amount would be if RLI's breach rate was**
18 **consistent with Nexus' global breach rate.**
19       Q    So just show me the math exactly.
20       **A    Of course, of course, absolutely.**
21       Q    Show me the math.
22       **A    So I'm razzled with my documents.**

436

1  **Everything was together and now everything is not**
2  **together.**
3        **Yeah, so in calculating RLI's breach**
4  **rate as consistent with our global breach rate,**
5  **instead of $3,212,883.67 in breaches, we would**
6  **have had an estimated 737,800 in breaches.**
7        Q    Slow down.  Slow down.  I just want to
8  understand that.
9        **A    Uh-huh.**
10       Q    3 million -- you said 3 million 200 --
11       **A    And 12 thousand 883 dollars and 67**
12 **cents.**
13       Q    That's for all breaches program wide?
14       **A    No.  That's RLI breaches.  Those are**
15 **all RLI's invoices paid?**
16       Q    3,212,000?
17       **A    Correct.**
18       Q    Okay.  So continue with how you
19 calculated it.
20       **A    And it should have been 737,800 if the**
21 **breach rate were consistent.**
22       Q    So you're just saying that your breach

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

110 (437 to 440)

437

1  rate is 2-plus percent, and that the RLI bond
2  breach rate is more than 10 percent.  So you're
3  just coming up with the difference; is that right?
4      A   Well, not quite just like that.  We're
5  applying an understanding that we don't have the
6  ability to dispute the way we do with other
7  sureties.  We had to communicate disclosures to
8  RLI clients related to disclosures of their data
9  without confidentiality provisions.  And all of
10 those things, of course, affect bond performance.
11      So we do have a much higher breach rate
12 with RLI, and there's a reason for that.
13     Q   Well, in quantifying it, you're doing
14 it based upon the difference between the -- your
15 contention of the program-wide breach rate and
16 RLI's breach rate?
17     A   That is correct.
18     Q   And then you're just taking the
19 variance, correct?
20     A   That's correct.
21     Q   All right.  And then how was the
22 3 million in reputational damages calculated?

438

1      A   I think it's much, much worse than
2  that, to be honest.  The attacks that we've
3  experienced in this litigation as a company that
4  has never failed to indemnify or exonerate your
5  client.
6      I mean, you'd think based on the flavor
7  of this litigation that you would be out millions
8  and millions of dollars.  That's not true.  And
9  the reputational damages that Nexus has suffered
10 has been extensive as a result of that.  Not the
11 least of which includes damages, you know, from
12 our reputation, vis-à-vis the government, other
13 sureties, the community at large.
14     Q   Can you tell me exactly how you
15 quantify 3 million in reputational damage?
16     A   It's an estimate.
17     Q   So there's no document or calculation
18 it's based upon.
19     A   No.  The calculation would be scores
20 more.  I was trying to pick a conservative, make a
21 conservative estimate valuation.
22     Q   Have you undertaken any analysis to

439

1  determine a damage incurred as a result of
2  reputational loss?
3      A   I have had communications with counsel
4  that I'm not going to testify to specifically.
5      Q   All right.  Do you, Nexus, have any
6  actual financial calculation to support a request
7  for 3 million in reputational damages?
8      A   And as I said, I think that
9  substantiated amount would be much, much, more.
10     Q   But you have no documents to present to
11 RLI to substantia a 3 million calculation,
12 correct?
13     A   Reputational damage is difficult to
14 assert in documents anyway.  But, no, I do not
15 have that document in front of me.
16      I think I could confidently prove much
17 more than that.
18     Q   And what elements form the bases of the
19 reputational damage?
20     A   What do you mean?
21     Q   How -- yeah, what would you use to
22 substantiate --

440

1      MR. SHOREMAN:  I think that a legal --
2  I think you're seeking a legal conclusion.
3      A   It sounds like a legal conclusion.
4  That's why I'm asking.
5      MR. WILLIAMS:  Are you talking about,
6  like, bank closing or what are you talking about?
7  BY MS. KATSANTONIS:
8      Q   Any document you have, whatsoever, to
9  substantiate the 3 million in reputational loss.
10     MR. SHOREMAN:  You're asking for a
11 legal conclusion because this could be -- like he
12 was saying, you know, there's no --
13     MR. HARRIS:  He just said he could
14 prove it.  We're just wondering what he --
15     MS. KATSANTONIS:  He just said he could
16 prove it.  I'm trying to understand what's --
17     A   I said I think if we pulled it
18 together, it would be a lot more than that.  So I
19 made a conservative estimated valuation of
20 3 million.
21     Q   I'm trying to understand what
22 documents?  What would you look at?  What are you

---

441

1 going to look at to prove that you have
2 reputational damage?
3     A   Well, think about it.  Based alone on
4 the fact that our breach rate is so much higher
5 with RLI-bonded principals, the damage done to our
6 clients -- with our client alone in understanding
7 that we are having a difficult time protecting
8 their confidential information, that a surety
9 wants access to their confidential information and
10 isn't willing to sign a confidentiality agreement.
11    Q   Aren't those damages collected in your
12 2.5 breach rate and your 2 million confidentiality
13 agreement numbers?
14    A   In a sense.  But they're separate
15 numbers altogether than the reputational damage.
16 Unfortunately, when a company like RLI engages in
17 this type of behavior, the damages are extensive.
18    Q   Can you tell me how specifically your
19 reputation was damaged?
20        MR. SHOREMAN:  Asked and answered.
21    A   Have you read your pleadings?
22    Q   Can you tell me specifically how your

---

442

1 reputation was damaged?  What was the damage?
2     A   In this litigation representations have
3 been made in pleadings and in hearings that paint
4 Nexus as an obstructionist, when Nexus has, at any
5 turn, attempted to work with RLI.
6         And I have demonstrated that in the
7 multiple depositions that you've taken of me,
8 where I point out over and over again the points
9 and time of which RLI has done exactly what -- I'm
10 sorry -- Nexus done exactly what RLI asked Nexus
11 to do.
12    Q   Okay.
13    A   So it's clear.
14    Q   All right.  And so -- but sitting here
15 today, you have no documents to quantify that
16 reputational loss, correct?
17    A   I answered that already.  I do not have
18 a document, as I said before.
19    Q   Has Nexus taken an analysis to
20 determine the direct impact of RLI's conduct on
21 the breach rate?
22    A   Only insofar as comparing it to our

---

443

1 average breach rate and understanding that if we
2 didn't have the issues with RLI, we could expect a
3 consistent breach rate.
4         I also wanted to point out,
5 Ms. Katsantonis, that in addition to the damages
6 is the amount of money that was taken for canceled
7 bonds that was ultimately paid by Nexus pursuant
8 to a demand from RLI.  Until you provide the
9 cancellations, I don't know how much that is.  And
10 then whatever the value of those corporate
11 documents that was given to you by Mr. Brigman.
12 So those are also damages, I would say.
13        MR. WILLIAMS:  Oh, Brigman.  He's
14 touted your support.
15    Q   All right.  Any other damages?
16    A   No.
17    Q   No other damages you're seeking in this
18 litigation?
19    A   Not that I'm -- not that I have any
20 information to go into at this point.
21        MS. KATSANTONIS:  Okay.  I have nothing
22 further.

---

444

1         MR. SHOREMAN:  Thank you.  Thank you
2 very much.
3         THE VIDEOGRAPHER:  If there are no
4 further questions, this ends the deposition.  We
5 are going off the record at 21:44.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

112 (445 to 448)

445

1        ACKNOWLEDGMENT OF DEPONENT
2        I, MICHEAL PAUL DONOVAN, do hereby
3   acknowledge that I have read and examined the
4   foregoing testimony, and the same is a true,
5   correct and complete transcription of the
6   testimony given by me and any corrections appear
7   on the attached Errata sheet signed by me.
8
9   _____   _____
10     (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

446

1        CERTIFICATE OF REPORTER - NOTARY PUBLIC
2        I, JUDITH E. BELLINGER, RPR, CRR, the
3   officer before whom the foregoing deposition was
4   taken, do hereby certify that the foregoing
5   transcript is a true and correct record of the
6   testimony given; that said testimony was taken by
7   me and thereafter reduced to typewriting under my
8   direction; that reading and signing was requested;
9   and that I am neither counsel for, related to, nor
10  employed by any of the parties to this case and
11  have no interest, financial or otherwise, in its
12  outcome.
13       IN WITNESS WHEREOF, I have hereunto set
14  my hand and affixed my notarial seal this 4th day
15  of March, 2020.
16  My Commission Expires:  September 30, 2020
17
18
19  _Judith E. Bellinger_
20  _____
21  NOTARY PUBLIC IN AND FOR
22  THE COMMONWEALTH OF VIRGINIA

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

113

| A |
|---|

**aao**
63:15, 63:16,
64:17, 65:4,
65:16, 65:17,
65:21, 65:22,
66:4, 66:14,
69:8, 69:20,
70:15, 71:5,
76:7, 77:4,
78:5, 100:18,
129:4, 175:1,
177:17, 179:1,
183:7
**abiding**
141:9
**ability**
61:8, 64:15,
90:6, 109:12,
120:8, 121:13,
155:5, 205:2,
206:8, 252:5,
316:6, 337:22,
437:6
**able**
44:11, 44:12,
45:13, 58:18,
59:5, 59:10,
72:7, 77:19,
92:1, 101:21,
102:13, 110:11,
125:18, 175:18,
184:1, 185:13,
189:20, 206:20,
207:5, 228:19,
230:6, 233:18,
244:16, 244:21,
247:16, 252:3,
262:2, 264:19,
296:1, 316:11,
321:4, 326:7,
326:15, 333:16,
336:19, 405:14
**above**
231:21
**above-referenced**
146:18

**abridge**
59:9, 83:19,
228:10
**abridged**
124:4, 251:9,
251:15
**absent**
373:18
**absolute**
110:12, 349:6
**absolutely**
20:5, 40:18,
42:5, 62:10,
68:16, 81:16,
84:5, 125:3,
144:6, 186:16,
236:2, 243:3,
293:1, 296:16,
299:9, 299:13,
303:12, 324:20,
327:8, 374:1,
376:13, 387:2,
393:3, 396:11,
418:22, 422:19,
435:20
**abuse**
422:13
**abusive**
82:15, 98:1
**accept**
423:15
**accepted**
206:5, 215:10,
378:19
**accepting**
419:4
**access**
289:8, 291:8,
338:21, 339:6,
339:13, 351:18,
351:21, 352:1,
385:4, 390:12,
409:20, 410:11,
413:7, 425:18,
429:10, 441:9
**accommodate**
426:10
**accommodation**
195:5

**accompanying**
40:16
**accordance**
133:5, 136:1,
136:18, 146:22
**according**
44:6, 78:9,
246:12
**account**
293:16, 298:18,
328:3, 328:4,
374:21, 376:19,
382:17, 382:19,
382:21, 383:1
**accounting**
274:22, 275:2,
275:6, 282:9,
298:17, 308:2
**accounts**
300:15, 307:21,
307:22, 309:6,
309:10, 310:7,
338:22, 339:7,
339:14, 426:2,
427:22, 428:14
**accrual**
274:21, 275:12,
276:5
**accumulating**
233:2
**accuracy**
68:14, 299:4
**accurate**
37:17, 86:11,
88:3, 109:5,
116:6, 168:3,
171:19, 172:1,
184:13, 209:14,
220:11, 235:16,
246:15, 246:16,
250:19, 274:12,
284:2, 284:3,
287:14, 287:20,
289:15, 293:20,
294:15, 294:17,
294:20, 294:21,
295:3, 295:4,
295:14, 296:5,

296:11, 296:16,
296:21, 297:9,
298:10, 299:7,
299:9, 299:22,
300:4, 300:5,
300:8, 300:20,
301:8, 302:1,
302:17, 303:2,
338:10, 365:4,
373:4, 401:8
**accurately**
62:11, 291:10
**accused**
39:10, 396:11
**acknowledge**
445:3
**acknowledged**
348:22
**acknowledgment**
445:1
**across**
148:9, 182:15,
335:3, 335:5
**act**
106:14, 265:17,
383:14, 393:2,
394:12
**acted**
106:12, 318:6,
319:11, 383:13,
385:17
**acting**
40:18, 129:12,
391:6, 393:2
**action**
33:12, 65:15,
65:16, 71:8,
72:6, 72:7,
72:11, 73:16,
76:12, 182:14,
381:20, 382:1,
382:2, 384:3
**actions**
256:9
**active**
16:20, 17:4,
39:14, 124:3,
125:9, 227:3,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

114

245:9, 245:10
**activity**
384:7
**actual**
170:17, 217:16,
391:1, 391:2,
439:6
**actually**
12:19, 31:17,
42:14, 56:20,
57:3, 58:16,
89:13, 125:8,
125:18, 132:6,
141:9, 167:3,
176:13, 195:6,
209:13, 240:15,
241:1, 242:5,
242:6, 242:21,
293:16, 330:4,
333:6, 395:18
**acutely**
208:15
**add**
184:10, 192:4,
195:12, 232:20,
294:18, 299:14,
299:20, 300:14,
392:17, 395:10,
397:22, 398:1,
398:3, 398:12,
398:13, 398:14,
406:7
**added**
93:17, 184:4,
188:1, 188:8,
188:10, 295:1,
321:9, 400:16,
434:15
**adding**
183:16, 289:6,
321:8, 323:4
**addition**
443:5
**additional**
27:6, 114:3,
211:18, 219:2,
221:3, 221:6,
344:17, 371:15,

400:8, 417:1,
432:5
**address**
95:8, 197:15,
427:5
**addressed**
420:1
**addresses**
416:7
**addressing**
164:11
**adequate**
201:9
**adequately**
289:4
**adjudicate**
109:12
**administration**
18:16, 229:16,
267:12
**administrative**
174:17, 269:9
**admittedly**
86:12
**advance**
67:21, 250:14
**adverse**
71:7, 72:11
**advise**
23:19, 107:13,
107:15, 126:6,
126:7, 137:14,
201:7, 248:4,
273:6, 304:22,
368:12, 402:1,
403:7
**advised**
246:13, 249:21,
257:21, 272:10,
272:13, 273:10,
285:11, 323:11,
340:17, 343:18,
344:3, 344:7,
347:3, 347:15,
366:15, 367:5,
367:19, 372:10,
402:18, 420:17,
426:19

**advises**
430:6
**advising**
344:19, 373:16,
402:3
**advisory**
38:16
**affect**
124:6, 125:21,
127:6, 253:2,
437:10
**affected**
126:10, 126:18,
188:4, 267:20
**affects**
125:3, 270:5
**affirmed**
10:17, 180:17,
263:9, 263:18
**affixed**
240:19, 240:22,
243:1, 446:14
**afraid**
38:13
**after**
28:5, 49:22,
50:16, 57:11,
59:1, 60:3,
64:13, 76:3,
86:8, 89:14,
115:4, 115:8,
130:2, 130:4,
137:8, 141:18,
141:20, 141:22,
143:22, 144:2,
144:9, 146:13,
146:16, 160:3,
167:20, 170:5,
177:22, 204:21,
226:10, 228:4,
258:2, 262:14,
263:1, 330:21,
342:11, 351:16,
354:13, 361:6,
386:21, 398:4,
398:5, 409:22,
410:5
**again**
18:1, 30:10,

35:16, 64:1,
67:8, 71:16,
78:8, 81:6,
82:8, 82:13,
111:4, 138:8,
140:21, 146:10,
149:13, 152:19,
158:19, 162:8,
171:16, 176:7,
208:4, 211:10,
214:22, 215:2,
231:3, 246:22,
247:19, 265:6,
267:1, 285:13,
301:21, 341:1,
341:13, 342:2,
347:3, 366:8,
368:8, 384:9,
385:2, 390:18,
397:18, 418:20,
442:8
**against**
19:2, 19:21,
59:21, 116:18,
123:21, 295:19
**agency**
257:20, 258:1
**agent**
37:5, 37:6,
37:11, 37:22,
40:18, 129:18,
132:5, 306:18,
306:19
**agents**
39:3, 182:6
**aggrate**
331:22
**aggregate**
44:20, 54:5,
92:16, 152:5,
171:21, 173:10,
291:21, 303:14,
304:1, 304:17,
305:14, 307:20,
309:4, 309:5,
331:20, 332:18,
334:9
**aggressive**
308:5

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

115

**aging**
332:4, 333:1
**ago**
156:12, 248:9,
268:11, 303:11
**agree**
26:2, 44:17,
44:22, 99:13,
111:5, 118:16,
220:17, 220:20,
235:21, 323:18,
352:18, 353:1,
354:7, 355:1,
357:19, 376:17,
384:13, 403:20,
405:8, 418:2,
418:13, 421:22,
435:10
**agreed**
23:16, 23:18,
352:10, 353:22,
354:2, 384:18,
414:5
**agreeing**
350:4, 377:2
**agreement**
61:12, 66:12,
78:21, 87:16,
87:19, 91:3,
97:20, 120:4,
182:8, 212:3,
212:6, 227:19,
227:20, 248:21,
307:6, 335:11,
335:12, 339:5,
345:16, 352:3,
352:4, 352:11,
357:15, 357:17,
358:13, 358:16,
358:18, 358:21,
359:6, 359:9,
359:13, 360:4,
360:7, 371:1,
378:2, 380:4,
380:20, 381:12,
382:18, 384:2,
384:12, 385:1,
385:3, 390:14,

391:15, 399:6,
399:10, 399:16,
400:12, 401:3,
401:9, 401:13,
404:8, 405:6,
407:20, 410:18,
411:6, 411:13,
411:17, 411:20,
412:3, 412:5,
412:15, 412:20,
412:22, 413:4,
413:17, 414:5,
415:15, 415:21,
417:10, 417:16,
420:18, 420:20,
421:3, 421:7,
421:12, 426:7,
426:12, 426:14,
426:15, 426:20,
427:3, 427:4,
434:4, 434:10,
434:14, 434:18,
435:8, 441:10,
441:13
**agreements**
306:12, 337:14,
381:3, 400:16,
400:17, 419:18
**ahead**
31:11, 75:9,
82:8, 112:2,
113:8, 117:13,
119:10, 151:7,
168:6, 400:5
**aia**
381:12, 382:15,
383:4
**al**
1:8, 9:7
**alarmingly**
347:16
**alien**
26:15, 28:21,
29:9, 29:10,
33:5, 38:7,
131:15, 132:1,
132:3, 132:5,
132:11, 132:13,

132:15, 133:4,
133:7, 135:3,
135:10, 135:12,
136:1, 136:6,
136:11, 136:21,
137:3, 137:16,
140:22, 142:6
**alien's**
126:21
**allegation**
80:22
**alleged**
293:17, 294:3,
391:5
**allegedly**
320:16
**allow**
32:2, 100:1,
106:13, 109:11,
319:3, 392:8,
419:11
**allowed**
52:15, 204:16,
205:1
**allowing**
100:10, 100:15,
316:4, 385:4
**allows**
100:4, 382:18
**almost**
70:21, 71:5,
128:17, 246:7
**alone**
441:3, 441:6
**along**
50:9, 106:22,
191:18, 233:19,
296:10
**already**
13:6, 70:16,
145:16, 199:20,
253:1, 263:20,
280:14, 280:15,
305:1, 312:12,
315:12, 317:2,
379:13, 388:13,
397:11, 416:22,
417:3, 420:2,

442:17
**also**
4:16, 9:20,
28:14, 48:22,
55:13, 146:5,
147:19, 176:2,
177:8, 177:19,
183:13, 189:1,
190:11, 190:16,
204:17, 217:13,
218:18, 239:13,
249:5, 249:21,
264:14, 281:17,
282:5, 293:17,
297:15, 298:12,
301:2, 312:10,
315:5, 322:4,
332:4, 338:9,
344:7, 352:14,
354:7, 355:1,
370:18, 384:7,
386:13, 392:13,
397:19, 405:12,
432:4, 443:4,
443:12
**alternate**
368:19
**alternative**
368:17
**although**
48:18, 71:2,
73:19, 86:12,
86:18, 91:20,
94:13, 132:2
**altogether**
344:8, 441:15
**always**
50:9, 66:11,
76:3, 76:6,
84:4, 84:5,
145:22, 222:11,
222:14, 223:9,
223:11, 223:12,
223:13, 240:21,
245:19, 337:15
**amend**
394:13, 395:20,
396:1

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                    116

**amended**
37:13, 235:9,
250:16, 363:16,
372:21, 374:4
**american**
328:3, 328:4,
328:13
**among**
222:19
**amongst**
182:1, 249:16
**amount**
13:20, 22:16,
23:3, 26:1,
56:21, 92:21,
96:16, 96:17,
96:18, 96:19,
96:22, 97:5,
104:5, 124:9,
146:21, 152:5,
152:22, 153:1,
173:10, 182:19,
218:19, 218:22,
221:1, 236:14,
237:3, 237:4,
240:6, 274:20,
279:4, 280:1,
280:9, 280:16,
281:1, 281:4,
281:10, 306:2,
309:9, 328:19,
331:21, 331:22,
332:18, 334:2,
334:4, 334:9,
346:4, 357:14,
367:9, 370:14,
388:14, 389:11,
389:17, 395:3,
400:9, 406:3,
406:6, 407:14,
435:17, 439:9,
443:6
**amounts**
146:6, 217:1,
405:7, 417:2
**amwest**
182:7, 182:8
**amy**
429:9

**analogy**
99:13
**analysis**
247:9, 438:22,
442:19
**analyze**
275:8
**ancillary**
188:8
**announcing**
267:9
**another**
38:4, 53:9,
88:15, 89:4,
150:21, 158:10,
160:18, 163:15,
175:7, 175:21,
293:6, 355:8,
355:18, 356:19,
356:22, 357:2,
357:7, 357:10,
367:11, 369:1,
388:4, 388:15,
388:16
**answer's**
279:19, 363:11,
408:9, 408:18
**answered**
22:10, 22:13,
22:22, 25:19,
32:17, 32:18,
75:13, 82:7,
82:8, 82:22,
83:7, 84:7,
134:20, 145:17,
278:10, 279:2,
279:6, 279:12,
279:13, 280:14,
281:8, 281:12,
289:18, 296:14,
297:2, 301:11,
303:4, 316:10,
338:3, 354:3,
359:14, 377:18,
386:6, 397:11,
404:22, 408:14,
408:16, 441:20,
442:17

**answering**
25:1, 42:15,
64:6, 64:7,
73:7, 79:21,
117:9, 134:1,
259:12, 399:21
**answers**
53:18, 118:12,
118:21, 134:15,
173:19, 192:9,
233:5, 256:12,
256:15, 258:18,
294:8, 396:21
**anticipate**
109:2
**anticipated**
185:21
**anticipation**
207:5
**anybody**
107:20, 342:18,
351:2
**anymore**
50:4, 154:18,
245:6, 322:21
**anyone**
240:5, 264:22,
342:15, 402:16
**anything**
49:7, 53:2,
107:21, 130:1,
179:11, 193:14,
197:2, 198:12,
256:13, 300:7,
325:5, 387:3,
396:1, 433:7
**anyway**
35:1, 35:22,
44:14, 103:19,
151:6, 184:15,
222:9, 416:15,
439:14
**anyways**
25:9
**apart**
238:2
**apologies**
154:12

**apologize**
55:18, 57:4,
148:17, 163:2,
173:18, 183:18,
203:6, 210:5,
220:12, 330:12,
381:22, 382:5
**apologized**
353:10
**apologizing**
353:7
**apology**
348:18
**apparently**
169:1
**appeal**
17:18, 21:21,
62:22, 63:6,
63:8, 63:9,
63:14, 63:16,
64:10, 64:15,
64:16, 64:17,
64:18, 65:1,
65:4, 65:10,
65:14, 65:17,
65:18, 65:19,
65:22, 66:3,
66:15, 69:8,
69:20, 70:15,
71:5, 71:11,
71:12, 71:15,
72:11, 72:14,
72:15, 73:15,
75:22, 76:11,
76:18, 77:1,
78:5, 80:18,
100:18, 101:5,
129:3, 147:4,
147:6, 151:16,
175:21, 175:22,
176:13, 177:9,
177:12, 177:20,
178:21, 179:7,
179:10, 179:12,
179:13, 179:18,
180:3, 180:6,
180:11, 180:2,
182:13, 182:17,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

117

183:1, 183:5,
185:8, 186:2,
188:9, 188:10,
193:14, 193:16,
194:7, 194:8,
197:20, 198:1,
198:2, 198:4,
198:14, 198:18,
201:14, 202:8,
203:13, 203:15,
203:18, 204:5,
212:5, 212:8,
212:9, 213:5
**appealed**
72:3, 72:4,
146:22, 363:8
**appealing**
100:14
**appeals**
27:13, 32:21,
73:10, 74:2,
74:6, 74:10,
74:20, 141:22,
144:10, 174:6,
174:14, 174:17,
174:21, 174:22,
180:13, 181:19,
182:10, 183:10,
184:6, 185:11,
185:14, 185:18,
185:19, 185:22,
186:8, 187:2,
187:3, 187:5,
187:6, 187:9,
188:5, 188:20,
189:2, 189:7,
189:15, 189:17,
190:1, 190:7,
190:8, 190:12,
190:22, 191:20,
192:1, 192:11,
193:10, 193:19,
193:22, 194:2,
195:15, 201:8,
202:1, 202:10,
202:18, 260:21,
260:22, 261:3,
261:5, 261:8,

261:12, 262:7,
262:8, 262:12,
262:19, 263:9,
263:17, 361:11,
363:7
**appear**
22:6, 22:19,
23:21, 36:8,
43:2, 43:5,
123:10, 127:17,
132:11, 134:4,
135:11, 135:13,
135:18, 136:1,
136:18, 137:16,
140:6, 187:11,
235:11, 235:18,
236:3, 236:4,
236:5, 236:10,
236:11, 236:18,
237:5, 239:5,
252:11, 324:3,
374:5, 430:8,
445:6
**appearance**
238:5
**appearances**
132:15, 238:7,
238:15
**appearing**
43:6, 43:7
**appears**
71:1, 166:13,
312:4, 347:8,
352:17, 425:20
**appellate**
59:22, 60:3,
60:12, 64:3,
64:11, 65:20,
251:9
**apples**
127:12, 127:13,
129:17
**applied**
83:17
**applies**
109:20, 267:16
**apply**
86:18, 189:1,

265:18, 266:15,
267:2, 267:7,
280:8
**applying**
267:7, 437:5
**appointment**
427:18, 428:20,
429:16, 430:4
**apportion**
406:13, 407:13
**apportioned**
23:10, 359:21,
360:1, 377:9
**appreciate**
14:6, 42:11,
51:13, 136:16,
174:3, 183:18,
194:1, 209:6,
210:21, 237:21,
317:12, 339:22,
389:5, 389:9
**appreciated**
340:17, 340:18,
371:12
**approach**
229:8
**appropriate**
21:13, 110:22,
111:9, 134:17,
164:4, 188:12,
249:3, 249:4,
358:2, 419:11
**appropriately**
177:16, 180:8,
180:9, 180:11,
316:14
**approved**
180:16, 181:2
**approximately**
152:16, 170:15,
194:19, 194:21,
230:9, 246:14,
249:17, 333:14,
431:16
**april**
6:14, 163:11,
163:14, 329:22,
330:9, 330:14,

330:18, 330:21
**ar**
308:4, 310:18,
432:17
**arbitrarily**
120:7, 121:8,
121:12, 316:5,
318:6
**area**
37:1, 40:14,
173:17, 173:19,
174:7, 385:13
**areas**
24:2, 25:7
**aren't**
27:9, 73:10,
75:14, 75:16,
86:5, 96:21,
104:9, 115:21,
116:1, 123:14,
233:22, 290:17,
290:19, 294:22,
301:1, 416:10,
416:13, 441:11
**argue**
25:11, 112:16,
374:8, 374:12
**argued**
299:17, 301:15
**arguing**
117:18, 220:7
**argument**
116:2, 125:20,
179:13, 319:20
**argumentative**
162:22
**arguments**
201:18
**around**
228:3, 350:17,
387:7
**arrangements**
336:20
**arrest**
36:18, 37:15,
38:2, 38:6,
40:18, 41:14,
41:21, 123:19,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                118

124:7, 126:21,
129:7, 136:11,
136:21, 137:2,
137:10, 239:10,
245:13, 422:10
**arrested**
40:8, 188:3,
267:6, 267:17
**arresting**
37:2
**arrivals**
248:2
**artfully**
366:10, 373:7
**article**
269:7
**articulated**
221:16, 223:19,
387:8
**articulately**
299:20
**aside**
122:1, 170:22
**asked**
22:9, 22:12,
22:21, 25:19,
32:16, 41:15,
42:20, 51:6,
74:15, 75:11,
75:14, 81:9,
82:7, 82:8,
82:22, 83:7,
84:7, 102:8,
125:13, 125:16,
147:19, 151:1,
155:13, 155:14,
157:16, 157:17,
159:21, 169:7,
170:5, 191:18,
194:22, 201:19,
202:2, 210:15,
211:20, 215:22,
237:20, 251:7,
251:15, 255:12,
260:18, 260:22,
261:3, 261:5,
261:8, 261:12,
261:14, 261:19,

263:10, 273:21,
277:10, 278:10,
278:20, 279:2,
279:6, 281:8,
281:12, 284:16,
296:14, 297:1,
301:10, 303:4,
303:11, 310:2,
312:15, 316:10,
316:14, 320:18,
325:13, 326:2,
326:4, 338:12,
338:18, 340:19,
352:2, 352:3,
354:3, 355:17,
355:19, 356:18,
360:2, 360:19,
376:4, 377:18,
379:16, 384:22,
394:19, 394:20,
397:4, 398:19,
404:22, 408:13,
411:12, 415:18,
419:20, 428:13,
430:18, 431:4,
441:20, 442:10
**asking**
18:20, 21:4,
21:5, 31:7,
32:13, 34:15,
51:21, 53:19,
64:10, 78:11,
85:10, 87:20,
104:20, 107:6,
107:8, 110:1,
111:12, 111:14,
112:6, 119:13,
123:1, 123:5,
125:10, 126:3,
126:16, 127:11,
142:22, 156:1,
168:9, 172:5,
201:13, 201:21,
250:10, 270:8,
270:16, 279:7,
279:9, 281:3,
281:6, 284:14,
284:18, 285:7,

296:19, 305:19,
308:13, 309:17,
325:9, 353:21,
354:13, 356:12,
358:6, 361:10,
362:15, 363:7,
366:18, 369:21,
376:10, 394:9,
394:22, 395:11,
395:22, 403:6,
408:12, 408:14,
409:4, 420:10,
424:1, 440:4,
440:10
**aspects**
205:22, 221:14,
331:2
**assert**
40:16, 182:1,
205:4, 354:1,
439:14
**asserted**
284:22
**asserting**
20:15, 114:2,
249:15, 318:6,
318:16, 385:16,
393:10, 435:14
**assertion**
352:19
**asserts**
383:13
**assessed**
221:7
**assessment**
199:15
**asset**
303:15
**assets**
236:16, 291:10,
291:22, 292:4,
304:2, 304:17,
305:6, 305:12,
305:15, 305:17,
306:1, 306:11,
327:22, 328:10,
336:10, 336:13,
336:16, 337:1,

337:3, 337:5,
337:8, 337:17,
338:2, 338:7,
338:12, 338:13,
432:6, 432:21,
433:15
**assist**
12:16, 210:10,
210:11, 246:9
**assisted**
208:9, 209:11,
209:14, 210:8
**associates**
3:13
**assume**
285:2, 351:3
**assumes**
106:8
**assuming**
68:9, 104:6,
343:4, 343:7
**assurance**
110:12
**atlanta**
3:16
**attached**
5:7, 11:15,
67:12, 85:4,
88:8, 131:13,
138:4, 156:18,
158:5, 158:9,
163:13, 216:11,
256:21, 286:8,
294:2, 297:13,
315:17, 322:12,
339:3, 341:11,
343:12, 348:7,
371:22, 401:1,
414:18, 425:5,
427:8, 445:7
**attachments**
313:16
**attack**
423:7
**attacks**
438:2
**attempted**
442:5

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

119

**attempting**
203:2, 246:8
**attenti**
333:11, 333:17
**attention**
59:13, 340:18
**attorney**
4:4, 201:17,
201:18, 204:4,
207:1, 207:9,
314:5, 314:8
**attorney-client**
314:9
**attorneys**
157:2, 161:10,
391:3, 405:9,
405:11, 407:21,
408:3, 408:7,
409:2, 431:17,
434:3, 434:9,
435:7
**audited**
275:15, 275:21,
276:3, 276:6,
276:16, 282:1,
282:11, 282:14
**august**
69:7, 69:12
**authority**
37:7, 195:7,
317:17, 326:15,
408:2
**authorization**
125:6, 127:19,
205:6, 312:16,
316:19
**available**
186:21, 304:5,
305:6, 317:15,
324:20, 327:20,
426:2, 426:22,
428:1, 428:15,
430:8
**avenue**
4:11
**average**
92:20, 245:6,
245:20, 245:22,

246:4, 248:16,
393:21, 443:1
**averaged**
432:17
**avoid**
149:15
**aware**
86:2, 159:8,
160:2, 161:16,
180:5, 194:13,
198:7, 198:22,
199:8, 203:16,
208:15, 209:5,
257:20, 264:5,
271:16, 287:5,
293:10, 293:11,
305:4, 315:22,
316:3, 316:5,
316:6, 381:6,
407:22, 410:8,
411:18, 413:3,
421:6
**away**
255:21, 304:13
**awesome**
150:20, 326:22

**B**

**b) (6**
5:10, 9:3,
11:8, 11:20,
12:6, 12:12,
14:7, 31:1,
149:15, 152:13,
166:1, 207:3,
317:14
**back**
31:16, 32:9,
41:2, 42:21,
43:19, 56:22,
62:8, 67:8,
98:10, 103:17,
104:2, 120:22,
123:20, 129:7,
133:16, 133:19,
138:8, 140:7,
142:4, 142:10,
142:12, 145:9,

172:21, 173:3,
178:11, 185:1,
214:1, 215:12,
247:4, 251:15,
259:10, 260:6,
272:17, 275:7,
276:12, 286:11,
311:6, 331:13,
332:15, 359:15,
360:13, 362:13,
366:7, 366:15,
369:17, 373:15,
409:15, 424:16,
425:9
**backup**
313:20, 316:1,
316:15, 318:11,
319:2, 324:5,
325:6
**bad**
80:22, 99:22,
106:13, 119:20,
119:21, 120:3,
120:6, 120:10,
120:13, 120:15,
120:16, 121:5,
169:7, 169:8,
200:12, 318:7,
318:8, 318:17,
318:18, 319:11,
327:2, 327:7,
327:16, 369:3,
383:14, 385:17,
386:11, 387:2,
387:7, 390:10,
391:5, 393:2,
394:12, 431:4,
431:15
**bail**
33:20, 37:5,
37:6, 37:10,
37:22, 39:3,
129:18, 306:17,
306:19, 381:20
**balance**
14:3, 104:5,
291:9, 292:18,
293:2, 294:9,

294:12, 298:20,
299:1, 309:8,
309:9, 310:3,
310:5, 310:6,
310:9, 310:19,
333:10, 333:11,
333:20, 338:4,
338:7, 338:8,
338:9, 338:15,
338:16, 374:22,
375:1, 383:4
**balances**
87:8
**ball**
169:8
**bank**
300:15, 440:6
**bar**
179:14, 327:9
**barb**
6:13
**barring**
225:20
**base**
311:17, 329:11,
338:18
**bases**
314:18, 318:9,
409:1, 439:18
**basic**
75:21, 113:20
**basically**
89:21, 116:1,
196:10, 280:22
**basing**
294:7
**basis**
38:17, 66:5,
66:15, 66:19,
154:13, 154:15,
186:18, 187:10,
187:21, 190:15,
190:16, 201:2,
201:9, 201:11,
203:21, 204:3,
204:14, 205:18,
205:19, 211:13,
263:17, 278:13,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

120

302:8, 318:7,
318:8, 318:16,
318:18, 328:5,
377:14, 385:9,
408:6
**bates**
5:20, 6:5,
6:19, 7:7, 7:10,
7:21, 8:7, 8:10,
8:13, 292:5
**became**
79:19, 316:20,
411:6, 413:13
**become**
221:17, 243:13,
302:22
**becomes**
63:22
**before**
2:13, 18:14,
36:8, 42:17,
44:10, 51:14,
64:17, 67:15,
75:18, 78:18,
85:7, 86:3,
121:3, 145:21,
158:18, 176:3,
177:16, 185:4,
186:3, 186:22,
188:3, 226:10,
228:9, 229:3,
251:5, 258:19,
260:9, 265:14,
265:20, 266:22,
268:2, 268:15,
282:21, 283:2,
283:7, 294:17,
295:5, 297:4,
314:21, 315:21,
334:11, 334:14,
365:10, 369:20,
379:3, 382:9,
388:1, 389:2,
391:8, 393:7,
395:8, 427:10,
432:10, 442:18,
446:3
**began**
274:19, 349:3,

386:19
**beginning**
27:2, 43:22,
248:8, 367:14,
410:19, 411:21
**begins**
9:2
**begun**
264:9
**behalf**
3:2, 3:11,
9:19, 9:21,
9:22, 10:3,
10:6, 10:11,
12:11, 18:3,
21:1, 165:19,
209:2, 377:3,
377:15, 378:3,
378:20, 401:3,
401:10
**behavior**
132:16, 215:4,
215:6, 344:18,
441:17
**being**
10:17, 27:19,
29:19, 40:8,
70:17, 73:10,
74:2, 75:15,
77:19, 85:12,
92:1, 124:22,
135:5, 148:12,
155:6, 162:21,
193:20, 204:21,
206:8, 229:5,
242:9, 245:22,
259:1, 267:3,
267:4, 267:16,
289:19, 302:19,
320:21, 322:12,
338:11, 351:3,
355:2, 361:6,
370:15, 374:20,
378:11, 378:14,
389:5, 395:17,
396:11, 402:7,
412:9, 413:4,
415:17

**beings**
81:18
**belie**
413:19
**belief**
62:12, 278:20
**believe**
16:5, 18:11,
21:13, 38:21,
44:2, 55:14,
61:3, 67:18,
68:10, 68:16,
80:13, 89:11,
90:22, 134:20,
160:5, 161:12,
163:19, 173:14,
180:19, 180:20,
185:5, 186:10,
186:11, 194:15,
195:9, 197:5,
200:8, 212:6,
212:8, 225:15,
229:12, 231:1,
232:2, 239:22,
240:8, 250:13,
257:10, 263:19,
273:21, 278:11,
278:13, 279:3,
284:8, 287:1,
287:12, 292:16,
298:9, 298:11,
298:12, 306:4,
307:8, 308:19,
310:4, 310:9,
312:9, 332:3,
341:19, 341:20,
353:13, 358:16,
358:18, 359:8,
359:18, 360:7,
368:5, 374:7,
378:21, 382:8,
382:17, 384:5,
388:2, 388:3,
419:22, 433:6
**believed**
107:7, 347:4,
352:21
**believes**
278:1, 278:7,

422:6
**bellinger**
1:22, 2:14,
10:13, 446:2
**below**
132:12, 147:1,
340:6
**benefit**
17:13, 267:15
**benefits**
265:13, 265:16,
265:18, 266:15,
267:2, 267:7,
267:8
**best**
62:11, 87:20,
88:2, 88:4,
97:12, 146:2,
183:22, 186:12,
376:7, 401:7,
401:11
**better**
58:13, 111:3,
174:7, 361:19
**between**
20:9, 40:7,
49:19, 57:9,
174:14, 200:3,
200:9, 208:13,
211:11, 247:6,
264:16, 294:12,
319:22, 323:6,
342:16, 349:5,
350:5, 357:15,
358:20, 359:6,
359:13, 360:15,
360:20, 373:11,
387:9, 399:10,
400:12, 410:1,
412:8, 418:14,
437:14
**beyond**
24:2, 65:20,
181:6, 282:2,
282:12, 282:15,
282:16, 434:7
**biden**
332:10

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

121

**big**
73:11, 74:3,
74:19, 75:15,
100:12, 193:9,
194:3, 200:12,
306:22, 307:2
**bigger**
315:20
**biggest**
87:14
**bigmarcobonds@gm-ail**
6:8, 6:11, 6:14
**bill**
120:14, 217:7,
218:15, 219:11,
219:19, 220:18,
220:21, 221:10,
250:7, 333:15,
333:16, 435:3
**billed**
392:13
**bills**
435:2
**binder**
48:16, 48:17,
50:20
**binders**
45:20, 46:1,
46:2, 50:21,
54:14, 54:22,
55:2, 55:6
**binds**
112:12
**bio**
43:12, 120:16,
172:19, 311:1
**bit**
14:10, 48:6,
51:11, 197:15,
290:15, 386:22
**bits**
20:17

**blanket**
125:14
**blew**
350:1

**blind**
91:18
**blows**
347:13
**board**
38:17, 148:9,
182:15
**body**
325:1
**bond's**
270:15
**bonded**
32:22, 121:18,
130:20
**bonding**
123:11, 123:12,
222:20, 306:20,
381:18
**bonnie**
6:4
**book**
53:2, 205:2,
252:19, 392:2
**booked**
275:5, 277:4
**booking**
273:4
**books**
115:12, 272:4,
272:9, 272:19,
273:16, 273:22,
274:9, 338:22,
339:6, 339:13,
385:4, 390:13,
409:20, 410:11,
413:7, 415:12,
426:1, 426:21,
427:22, 428:14,
429:11
**both**
190:8, 190:9,
201:13, 202:8,
233:15, 314:21,
322:13, 386:7,
391:11, 423:22
**bothered**
344:14
**bottom**
70:12, 372:2,

427:15
**bounty**
37:1, 39:1,
422:11
**box**
4:5, 45:11,
49:13, 51:8
**boxes**
103:18, 146:16
**bracelet**
248:15
**bracelets**
243:7
**branch**
350:6
**breached**
17:17, 23:4,
32:20, 35:2,
36:1, 54:10,
101:16, 104:6,
104:7, 104:8,
104:11, 105:11,
105:13, 105:19,
108:21, 111:7,
113:5, 125:10,
126:20, 128:5,
136:7, 138:21,
139:5, 140:3,
140:5, 140:18,
196:9, 229:5
**breaches**
26:1, 55:1,
59:8, 71:21,
72:2, 79:2,
79:3, 79:5,
99:1, 100:4,
100:8, 100:11,
100:13, 101:14,
102:14, 106:14,
116:16, 120:8,
121:14, 121:19,
123:4, 125:18,
125:19, 132:18,
141:17, 141:18,
141:20, 141:22,
155:8, 175:10,
190:2, 191:1,
192:1, 210:20,

216:19, 227:16,
229:4, 229:6,
229:18, 229:22,
233:14, 249:11,
251:12, 301:1,
334:5, 337:6,
337:13, 337:14,
346:8, 346:11,
347:21, 356:6,
362:7, 383:20,
436:5, 436:6,
436:13, 436:14
**break**
16:8, 32:12,
43:13, 54:3,
75:20, 80:10,
120:16, 120:18,
121:3, 147:17,
150:15, 171:10,
172:20, 173:7,
182:20, 184:2,
184:10, 184:18,
185:4, 186:4,
191:3, 191:16,
191:17, 192:8,
199:3, 232:5,
232:21, 233:2,
233:4, 233:17,
235:4, 255:3,
258:9, 258:12,
258:14, 258:16,
258:19, 260:9,
278:1, 278:2,
293:10, 311:1,
369:20, 424:10,
432:11
**breezing**
425:7
**brief**
179:19
**briefly**
265:6, 433:14
**brigman**
418:15, 419:9,
423:16, 443:11,
443:13
**bring**
12:15, 162:9,

**butchering**
55:19

---
**C**
---

**calculate**
49:3, 57:1,
95:17, 97:3,
104:15, 109:1,
111:5, 113:14,
114:7, 119:15,
254:3, 431:9

**calculated**
96:6, 96:7,
114:11, 114:13,
396:16, 431:12,
431:16, 431:20,
435:15, 436:19,
437:22

**calculates**
112:4, 113:17

**calculating**
17:14, 95:14,
96:17, 97:2,
98:8, 98:13,
104:22, 105:3,
105:9, 113:2,
113:16, 114:12,
436:3

**calculation**
99:18, 104:5,
110:18, 112:9,
113:21, 114:3,
171:13, 397:15,
434:22, 438:17,
438:19, 439:6,
439:11

**calculations**
110:17, 110:20,
114:20, 115:13

**calendar**
128:8, 208:22,
275:1

**call**
132:6, 184:14,

**bringing**
246:10, 247:20,
326:20

**broke**
278:11, 278:12,
279:3

**broken**
152:14, 434:4

**brother**
239:13

**brought**
13:2, 13:10,
14:16, 47:11,
72:12, 123:20,
129:7, 292:8,
293:8, 327:7,
402:9

**bucket**
95:9, 232:21

**buckets**
197:15

**buddi**
246:13, 248:4,
298:19, 333:4,
336:13, 336:16,
336:17, 336:20,
336:21

**built**
38:22, 306:14

**bullet**
31:3

**bunch**
258:13

**burnt**
88:10

**business**
49:5, 49:10,
57:6, 106:12,
115:9, 115:12,
329:20, 329:21,
330:17, 331:2,
335:6, 344:13,
354:13, 361:5,
361:14, 411:9,
418:3

**195:17, 205:13,**
230:3, 342:13,
354:14, 372:3,
401:22, 402:1,
402:6, 402:7,
402:8, 402:12

**called**
177:20, 178:9,
200:22, 207:13,
401:21, 401:22

**calling**
42:6, 242:8

**calls**
36:20, 128:7,
128:11, 209:2,
209:4, 210:10,
210:20, 261:22,
362:6, 402:2,
402:13

**came**
53:17, 209:17,
341:20

**campus**
306:17, 307:10,
307:13, 307:15,
427:17, 428:17,
430:9

**can't**
17:18, 27:15,
50:21, 51:5,
51:7, 52:13,
57:21, 58:4,
65:12, 94:4,
107:21, 110:15,
122:20, 126:6,
126:7, 129:2,
144:11, 144:12,
145:2, 145:7,
145:11, 152:9,
153:19, 159:22,
172:16, 178:11,
181:6, 199:17,
203:6, 204:7,
204:9, 211:9,
222:3, 236:13,
238:8, 246:10,
254:2, 254:17,
254:19, 259:5,

**263:1, 276:3,**
276:11, 294:19,
295:3, 304:21,
315:7, 331:6,
338:14, 359:20,
392:21, 408:19,
409:3, 432:2

**cancel**
29:12, 29:14,
33:13, 34:18,
67:2, 102:4,
163:16, 198:5

**canceled**
16:18, 16:21,
17:11, 17:15,
17:16, 18:21,
19:6, 21:10,
28:17, 29:21,
30:3, 30:6,
30:15, 32:14,
33:2, 34:20,
44:13, 49:22,
50:13, 70:1,
93:9, 94:3,
94:17, 95:2,
116:6, 116:14,
120:15, 151:16,
153:10, 153:16,
153:18, 155:8,
155:11, 158:2,
158:12, 158:21,
159:11, 159:20,
160:16, 160:17,
215:9, 215:14,
216:5, 227:1,
362:22, 363:3,
370:20, 380:10,
382:4, 392:12,
428:5, 443:6

**cancellation**
18:12, 18:13,
20:19, 21:6,
35:18, 73:3,
91:6, 92:7,
92:18, 116:8,
153:12, 153:19,
154:5, 154:8,
155:17, 156:7,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                                123

157:5, 157:7,
158:22, 160:4,
161:7, 161:13,
161:21, 164:18,
165:13, 166:11,
166:20, 168:19,
169:10, 169:18,
170:11, 171:2,
171:6, 192:13,
192:15, 192:17,
192:22, 215:15,
215:22, 216:4,
392:15
**cancellations**
18:9, 50:2,
73:5, 91:14,
91:16, 91:21,
92:12, 94:4,
94:20, 95:4,
120:12, 152:18,
152:21, 154:1,
154:17, 154:19,
155:2, 155:5,
157:8, 157:10,
157:14, 157:15,
159:20, 159:22,
160:7, 161:9,
161:11, 166:15,
167:4, 168:22,
169:11, 170:15,
170:17, 170:18,
170:21, 171:16,
172:16, 264:15,
264:17, 443:9
**cancels**
34:17
**cannot**
64:21, 171:8,
253:12, 274:12,
321:12, 396:13
**capital**
432:14
**capriciously**
120:7, 121:8,
121:13, 316:5,
318:7
**capsule**
15:14, 44:11,

384:8, 402:3,
402:15, 402:20
**card**
328:13
**cards**
327:21
**care**
102:6, 112:10,
216:8, 253:5,
327:13, 327:15
**cared**
414:13
**careful**
67:4, 176:7
**caring**
354:14
**case**
1:7, 9:9,
21:11, 22:15,
29:17, 58:9,
58:15, 59:4,
59:10, 67:3,
71:15, 76:9,
76:13, 76:17,
77:10, 77:11,
77:13, 77:15,
77:16, 83:19,
92:3, 97:9,
97:13, 97:15,
122:10, 122:13,
123:20, 124:17,
125:9, 128:4,
128:11, 133:8,
140:4, 146:20,
179:2, 188:11,
209:21, 212:22,
221:14, 224:2,
225:6, 225:16,
245:3, 245:4,
256:4, 265:12,
265:14, 265:19,
266:12, 266:13,
266:14, 266:22,
267:1, 267:20,
268:15, 269:18,
270:19, 287:8,
287:11, 299:16,
301:15, 382:14,

388:3, 401:17,
402:6, 405:15,
446:10
**case-by-case**
38:17, 201:8,
201:11, 204:14
**cases**
63:18, 71:4,
82:10, 95:15,
125:4, 128:14,
140:5, 194:19,
194:21, 202:22,
210:8, 210:10,
210:12, 210:18,
226:21, 269:5,
311:20
**cash**
146:17, 236:20,
250:18, 275:12,
276:5, 327:22,
328:1, 328:2,
328:6, 381:10,
381:11, 382:6,
433:18, 433:20,
434:1
**cashed**
215:11
**castalano**
7:12
**cat**
220:13, 220:14,
222:15, 222:16,
237:15
**catch**
193:5
**categories**
12:4, 13:14,
181:10, 334:17,
397:5
**category**
56:21, 175:7
**cats**
222:9, 222:10,
222:14
**cause**
120:5, 133:1,
135:17, 250:18,
402:16

**caused**
100:8, 185:8,
431:14
**caution**
59:7, 155:20,
228:8, 344:10,
425:12
**caveat**
198:2
**caveats**
284:4
**cc'd**
415:4
**cc-mfu**
9:10
**cease**
193:18, 248:4,
329:13, 330:16,
330:17, 373:17
**center**
178:10, 401:22,
402:7, 402:9,
402:12
**cents**
97:3, 436:12
**ceo**
78:15
**certain**
34:11, 53:2,
59:3, 64:13,
66:20, 140:1,
141:15, 141:17,
142:14, 153:17,
159:11, 180:21,
205:22, 221:14,
331:1, 367:9,
374:18, 388:18,
402:11, 404:9,
408:10
**certainly**
18:5, 30:11,
46:21, 48:6,
48:12, 48:18,
71:1, 72:9,
72:14, 76:10,
86:18, 95:17,
107:22, 129:9,
132:21, 137:9,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

124

137:13, 154:3,
158:17, 181:11,
202:6, 209:6,
228:5, 240:11,
256:19, 300:7,
305:12, 324:14,
325:3, 325:16,
326:8, 333:22,
342:17, 346:12,
365:16, 366:16,
367:4, 373:8,
373:22, 410:22,
412:8, 416:4,
425:20, 430:1,
434:14, 435:4
**certificate**
446:1
**certified**
2:15
**certify**
446:4
**cetera**
235:19
**cfr**
17:22, 60:15,
60:22, 65:5
**chain**
5:18, 6:3,
6:16, 7:11,
7:14, 8:8, 8:11,
323:8
**challenge**
45:7, 125:4,
252:4, 252:5,
324:2, 325:21,
326:7
**chance**
19:18, 21:11,
223:21, 330:10
**change**
15:19
**changed**
287:18, 331:1
**changes**
271:17
**changing**
380:9
**charges**
219:2, 221:3,

221:6
**charming**
432:3
**chart**
68:15, 78:9,
86:7, 88:15,
89:4, 89:8,
89:10, 89:12,
89:14, 90:20
**chase**
258:17
**chaszar**
4:19, 10:7
**check**
48:18, 180:20,
185:6, 215:11,
244:22, 334:7,
361:1, 379:6,
379:7, 380:10
**checks**
57:3, 57:4,
361:11, 382:11
**chief**
225:12
**child's**
366:19
**children**
422:14
████████
**chip**
379:21
**chocolate**
379:21
**choice**
43:7
**chooses**
426:20
**chose**
250:14, 357:19,
370:6
**chris**
4:3, 7:11,
10:5, 379:18
**christopher**
3:4, 9:20
**circumstance**
29:3, 66:7,

195:5
**circumstances**
29:4, 38:18,
66:21, 140:1,
140:3, 195:5,
199:7, 209:5,
319:10, 383:12,
396:4, 422:3
**cite**
199:13, 349:12
**citizenship**
266:1
**claim**
17:17, 17:19,
19:2, 19:21,
21:20, 27:19,
28:6, 47:22,
50:16, 58:15,
59:18, 59:20,
59:21, 60:2,
60:4, 60:6,
60:10, 60:11,
60:16, 61:14,
61:15, 62:17,
62:19, 62:21,
63:3, 63:22,
64:1, 65:5,
65:8, 65:9,
99:22, 138:14,
142:1, 142:2,
144:6, 144:9,
147:7, 212:5,
221:17, 344:9,
344:20, 346:6,
359:10, 362:18
**claim's**
362:16
**claiming**
409:2
**claims**
345:9, 347:16,
355:2, 365:10
**clarification**
15:6, 190:4
**clarified**
193:19
**class**
413:8

**clause**
399:9
**clear**
20:8, 40:13,
41:18, 62:5,
62:13, 67:5,
121:7, 127:4,
165:6, 165:9,
168:15, 188:19,
191:13, 195:4,
198:9, 204:22,
232:14, 244:19,
272:1, 272:22,
274:17, 284:8,
284:11, 287:19,
300:14, 368:10,
370:15, 372:17,
373:14, 388:10,
391:8, 391:13,
410:22, 413:1,
413:13, 433:5,
442:13
**clearly**
23:12, 121:15,
219:15, 392:9
**client**
13:19, 15:13,
16:16, 16:19,
39:9, 50:4,
50:5, 50:8,
69:18, 71:17,
72:19, 72:21,
78:1, 82:16,
87:18, 91:14,
92:11, 95:4,
100:1, 100:3,
100:4, 109:10,
109:11, 125:3,
127:21, 134:3,
136:17, 147:10,
153:11, 157:18,
160:11, 193:18,
195:21, 211:10,
212:21, 213:11,
213:16, 224:15,
226:22, 240:18,
240:19, 241:22,
249:9, 252:4,

277:4, 288:15,
288:16, 297:6,
329:11, 353:14,
363:3, 363:4,
363:5, 369:11,
376:21, 377:4,
377:6, 378:10,
378:13, 378:15,
397:21, 412:22,
414:14, 421:20,
421:22, 422:6,
424:1, 438:5,
441:6
**client's**
16:17, 23:13,
91:18, 163:22,
351:10, 375:4,
375:6, 377:19,
377:21
**client-confident-
ial**
421:17
**client-sensitive**
415:16
**client-specific**
427:5
**clients**
16:20, 17:4,
92:2, 157:22,
243:13, 252:8,
308:6, 329:9,
335:2, 384:3,
384:6, 384:8,
384:11, 391:16,
391:22, 403:16,
411:12, 413:21,
418:5, 421:21,
437:8, 441:6
**close**
278:2, 278:12,
291:12
**closed**
29:17, 95:15,
266:22, 268:14,
268:15
**closer**
291:14, 295:22,
296:4, 296:6

**closing**
440:6
**club**
290:16
**co-obligator**
102:7
**co-obligor**
36:15, 36:17,
37:19, 38:1,
39:4, 71:9,
100:17, 124:18,
129:19, 129:20,
193:20, 193:22,
205:3, 212:8
**co-obligors**
37:15, 133:20
**co-worker**
239:13
**coding**
88:9, 88:11
**coffee**
369:5
**cold**
340:1
**collateral**
248:21, 250:18,
306:12, 307:6,
343:15, 346:1,
355:16, 355:18,
357:14, 358:17,
358:19, 359:5,
359:7, 359:12,
360:1, 367:10,
368:4, 368:17,
370:5, 370:13,
371:15, 372:14,
373:18, 374:13,
374:15, 374:21,
375:3, 375:8,
375:11, 375:20,
376:19, 377:2,
377:10, 377:12,
377:14, 378:3,
378:7, 378:11,
378:19, 379:4,
379:9, 380:2,
380:3, 380:5,
380:6, 380:7,

380:9, 380:14,
380:20, 381:1,
381:3, 381:7,
381:10, 381:12,
381:14, 382:1,
382:6, 386:14,
386:16, 387:15,
387:17, 387:21,
390:3, 390:8,
391:9, 404:20,
405:2, 405:3,
406:2, 406:5,
406:10, 406:19,
407:9
**collect**
17:9, 236:8
**collected**
166:17, 169:11,
328:20, 441:11
**collecting**
337:11
**collection**
432:18
**collective**
386:9
**college**
10:7
**color**
88:9, 88:11
**com**
5:19, 6:8,
6:11, 6:14,
6:18, 7:20
**combined**
277:4, 288:15,
288:17
**come**
20:11, 34:7,
40:22, 49:6,
76:20, 103:17,
108:11, 133:19,
146:1, 178:11,
191:8, 208:13,
361:18, 402:13,
427:16, 428:10,
428:16, 430:2,
430:7
**comes**
20:11, 21:20,

39:11, 154:4,
213:12, 214:2,
267:16
**coming**
16:17, 40:8,
367:22, 377:13,
427:20, 428:7,
429:17, 437:3
**comment**
262:4, 355:8
**commercial**
401:2
**commission**
375:20, 378:8,
446:16
████████████
**commissioner's**
329:18
**commissions**
359:21, 374:18,
375:7, 376:11,
376:16, 378:20,
378:22
**committed**
432:8
**commmunications**
349:18
**common**
322:15
**commonwealth**
2:16, 446:22
**communicate**
77:4, 92:2,
266:2, 349:4,
350:14, 355:10,
356:5, 384:7,
384:9, 437:7
**communicated**
107:22, 227:17,
356:10, 366:10,
367:8, 369:21,
370:3
**communicates**
132:22
**communicating**
137:6, 344:8,
347:7, 351:14,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                                           126

352:20, 354:2,
362:11, 405:21,
406:13
**communication**
158:10, 193:5,
203:17, 203:20,
206:13, 206:16,
206:19, 257:9,
276:18, 282:22,
310:4, 315:3,
344:15, 344:20,
347:9, 348:21,
349:13, 350:13,
351:14, 353:8,
353:12, 360:22,
361:4, 363:20,
365:10, 365:11,
365:19, 366:9,
366:12, 372:16,
373:11, 374:17,
419:1, 420:6,
425:13, 427:20
**communications**
155:20, 200:18,
202:21, 203:4,
203:5, 204:6,
204:7, 211:11,
211:17, 348:14,
349:1, 350:5,
350:15, 350:20,
360:14, 360:19,
360:20, 361:10,
362:6, 362:12,
362:13, 365:7,
365:9, 365:20,
366:1, 366:5,
373:14, 381:2,
391:22, 405:5,
405:19, 410:20,
410:21, 439:3
**community**
146:4, 246:10,
246:11, 308:9,
438:13
**comp**
329:8
**company**
1:5, 9:6, 9:19,

25:9, 57:16,
106:11, 112:11,
112:12, 112:18,
123:11, 123:13,
135:6, 222:20,
272:2, 273:2,
274:21, 275:18,
275:20, 300:11,
337:12, 342:19,
381:18, 382:2,
390:15, 422:17,
438:3, 441:16
**company's**
42:16
**compare**
297:17
**compared**
379:21
**comparing**
442:22
**compel**
195:6, 405:7
**compelled**
371:2
**compels**
34:7
**competent**
412:9
**compile**
16:22
**complaint**
117:19, 231:11,
235:9, 372:21
**complement**
264:15, 300:6,
313:3, 313:5
**complete**
118:17, 284:5,
284:7, 284:9,
288:20, 290:20,
445:5
**completed**
276:21, 277:1,
280:17
**completely**
21:11, 59:22,
113:12, 243:9,
273:4, 286:10,

301:16, 356:13,
361:4, 390:18
**completing**
271:14, 284:10,
288:6
**compliance**
145:3, 145:12,
149:15, 179:10,
179:13, 228:9,
228:18, 243:17
**compliant**
87:16, 275:14,
276:7, 276:8,
282:1, 283:19
**complicated**
116:17
**complied**
80:15, 81:4,
124:19, 124:20,
179:9, 357:1
**comply**
87:14, 87:18,
139:20, 142:17,
142:20, 144:18,
144:19, 144:21,
144:22, 145:20,
146:3, 167:3,
219:16
**complying**
211:4, 299:16
**computer-generat-
ed**
54:19
**conceivably**
46:3
**concept**
108:6
**concern**
62:2, 87:14,
249:9, 325:4
**concerned**
56:21, 102:13,
365:12, 386:22
**concerning**
317:10, 331:13,
425:14, 431:5
**concerns**
248:18, 277:3,

331:6, 340:5,
355:12, 365:22,
411:11, 426:11
**conclusion**
18:6, 36:21,
408:14, 408:19,
409:3, 440:2,
440:3, 440:11
**conclusions**
204:4
**condition**
33:7, 33:9,
130:11, 130:15,
139:1, 142:4,
142:7, 143:8,
143:18, 271:11,
274:14, 279:11,
283:21, 289:5,
295:14, 296:5,
296:12, 296:22,
301:8, 303:3,
309:1
**conditioned**
426:14
**conditions**
33:4, 141:10,
141:13, 141:14,
142:6, 143:7,
144:1, 146:3,
182:14, 243:11
**conduct**
419:12, 442:20
**conducted**
240:20
**conference**
200:22, 372:3
**confident**
204:15, 275:16,
315:11, 317:14,
337:21
**confidential**
1:15, 252:9,
331:14, 413:8,
413:14, 415:22,
417:12, 417:15,
418:9, 418:10,
418:21, 420:20,
441:8, 441:9

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                                    127

**confidentiality**
339:18, 352:2,
352:3, 352:11,
384:2, 384:12,
384:18, 385:1,
385:3, 390:14,
391:15, 399:6,
399:9, 400:13,
401:13, 405:6,
407:6, 410:14,
410:18, 411:6,
411:13, 411:17,
411:19, 412:3,
412:5, 412:15,
412:20, 412:21,
413:4, 413:17,
414:5, 414:7,
414:14, 415:15,
415:20, 417:10,
417:11, 417:16,
418:2, 419:18,
420:17, 421:3,
421:7, 421:12,
426:7, 426:11,
426:12, 426:15,
427:4, 431:18,
434:3, 434:9,
434:14, 434:18,
435:8, 437:9,
441:10, 441:12
**confidently**
439:16
**confirm**
48:12, 68:5,
94:4, 367:3,
382:14, 382:16
**confirmed**
192:1, 192:14
**confirming**
343:2
**confirms**
426:7
**confuse**
357:22
**confused**
88:14, 130:22,
148:5, 148:7,
149:22, 269:12

**confusing**
170:6
**confusion**
17:13, 221:9,
225:1
**congratulations**
92:3
**connecticut**
4:11
**consequences**
222:18
**conservative**
438:20, 438:21,
440:19
**consider**
23:8, 26:10,
38:17, 59:20,
99:7, 114:5,
201:8, 201:10,
307:16, 334:6,
335:1, 421:13
**consideration**
104:10, 283:17
**considered**
63:16, 64:19,
99:2, 176:1,
232:1
**considering**
51:2, 249:1
**considers**
215:4
**consistent**
29:13, 47:21,
60:20, 67:5,
161:9, 161:21,
162:3, 182:15,
201:11, 216:18,
231:17, 328:17,
362:12, 362:13,
393:20, 411:5,
411:20, 420:19,
435:18, 436:4,
436:21, 443:3
**consistently**
82:19, 210:19,
363:7, 363:9
**constantly**
362:5, 362:8,

363:6
**constitutes**
327:2
**consult**
45:4, 60:15,
268:2, 268:11,
369:10
**consumer**
417:17
**consumers**
410:15
**contact**
245:14
**contacted**
39:13
**contain**
290:11, 417:1
**contained**
201:2, 310:7,
317:16
**contains**
1:15
**contemporaneous**
348:17
**contemporaneously**
160:3
**contempt**
5:12, 5:14,
87:5
**contend**
55:8, 168:16,
270:18
**contended**
274:8
**contending**
197:18, 299:21,
385:10, 408:2
**contends**
44:15, 44:19,
49:14, 49:16,
54:4, 91:4,
92:16, 152:5,
171:20, 172:11,
173:10
**contention**
194:12, 198:19,
215:17, 294:14,
294:16, 296:3,

312:15, 314:12,
345:13, 345:14,
359:5, 360:14,
383:13, 422:3,
437:15
**contentions**
319:11
**contest**
71:22, 100:4,
100:11, 100:16,
101:2, 102:8,
102:9, 102:14,
102:17, 106:13,
109:11, 120:8,
121:13, 121:22,
122:15, 125:18,
194:22, 203:10,
203:22, 204:17,
204:20, 219:18,
220:3, 392:8
**contested**
122:17, 333:10
**contesting**
27:15, 100:12,
100:21
**context**
365:6
**contingent**
371:6
**continuation**
268:17, 356:18
**continue**
59:6, 91:21,
122:20, 122:21,
123:17, 134:22,
159:5, 161:5,
168:11, 170:5,
224:6, 227:2,
230:14, 269:1,
271:18, 291:13,
296:7, 318:20,
331:4, 355:21,
355:22, 367:10,
367:15, 368:2,
371:2, 398:17,
398:18, 419:15,
436:18
**continued**
106:14, 106:17,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

128

213:10, 287:17,
371:3, 372:13,
400:4
**continues**
329:20
**continuing**
209:21, 210:14,
225:11, 294:18,
295:17, 295:20,
297:6, 300:14,
300:15, 301:3,
304:7, 305:3
**continuous**
71:20, 72:1
**contract**
35:12, 142:9,
207:10, 207:12,
252:19, 275:3,
275:8, 283:14,
376:21, 385:19,
385:20, 403:20,
404:2, 404:3,
404:9, 404:11,
404:15
**contract's**
275:3
**contracts**
283:16, 335:9
**contractual**
377:13
**contradictory**
345:8
**contrary**
70:19
**conversation**
34:5, 127:12,
201:17, 276:17,
314:8, 350:16,
372:13
**conversations**
198:4, 198:6,
202:4, 314:19,
314:21, 314:22,
315:1, 331:7,
339:18, 351:18,
373:22, 380:6,
411:2, 412:19,
421:10

**convincing**
38:22
**cookies**
379:20, 379:22
**cooperate**
426:21
**cooperative**
320:22
**copied**
200:5, 200:6,
202:20, 323:8,
415:2, 420:3,
425:2
**copies**
55:3, 154:18,
263:10, 278:15,
322:20, 361:11
**cops**
39:1
**copy**
16:7, 36:12,
54:13, 73:2,
86:7, 90:16,
157:4, 163:15,
216:12, 216:15,
257:3, 271:21,
279:15, 280:3,
280:18, 293:6,
293:7, 322:1,
322:17, 322:18,
325:9, 332:3,
372:22, 384:10,
401:8, 403:15,
403:18
**copying**
339:8
**corect**
327:5
██████████
**corner**
366:20
**corporate**
1:13, 9:5,
12:9, 25:2,
25:5, 31:9,
111:9, 111:17,
111:18, 111:19,

112:19, 134:11,
306:17, 307:10,
307:12, 307:15,
418:16, 423:15,
443:10
**corporation**
18:3, 401:4,
401:10
**corrected**
189:6
**corrections**
445:6
**correlation**
247:6
**correspondence**
159:9, 206:12,
414:19, 420:16,
429:10, 429:12
**correspondences**
366:7
**cost**
249:5, 249:6,
334:21, 334:22,
335:1, 336:8,
383:21, 397:21,
412:13
**costly**
39:7
**costs**
297:22, 298:2,
298:13, 393:9
**could**
34:6, 46:3,
89:9, 91:22,
95:17, 101:2,
115:10, 123:22,
124:1, 125:15,
137:9, 137:10,
137:13, 138:7,
153:1, 154:1,
154:3, 166:16,
170:7, 179:8,
179:9, 184:2,
185:21, 191:15,
191:16, 194:3,
196:6, 199:11,
199:13, 203:10,
206:13, 213:22,

220:13, 222:19,
238:9, 242:21,
253:10, 253:18,
268:20, 273:16,
289:8, 295:11,
299:8, 326:16,
352:10, 352:11,
367:9, 367:10,
368:4, 368:16,
368:17, 370:3,
370:5, 370:12,
370:13, 370:19,
370:20, 371:8,
371:13, 373:7,
404:4, 409:7,
412:10, 428:16,
439:16, 440:11,
440:13, 440:15,
443:2
**couldn't**
68:7, 121:22,
128:19, 177:8,
179:12, 222:2,
226:18, 227:14
**counsel**
9:16, 11:1,
12:19, 76:2,
155:9, 155:16,
155:21, 156:3,
158:15, 168:10,
200:21, 206:17,
207:16, 263:4,
286:16, 311:14,
312:3, 374:6,
412:8, 412:9,
412:10, 414:22,
415:1, 418:18,
420:7, 420:12,
423:20, 423:21,
424:2, 424:3,
425:12, 425:13,
426:13, 430:6,
430:19, 431:1,
433:12, 439:3,
446:9
**count**
46:4, 147:21
**counted**
183:21

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

129

countenance
386:8, 387:5
counterclaim
37:13, 250:16,
363:17, 374:4
counting
96:22
country
39:11, 267:8,
335:3
county
306:8
couple
50:20, 120:1,
156:11, 160:9,
199:9, 233:6,
382:3
course
15:14, 49:4,
49:10, 57:5,
105:7, 105:17,
106:17, 119:22,
141:21, 166:12,
174:4, 174:12,
184:8, 189:22,
250:8, 252:10,
254:11, 256:18,
283:12, 292:11,
293:11, 296:8,
343:4, 361:13,
378:5, 416:14,
435:20, 437:10
court
1:1, 9:8,
10:12, 18:17,
29:16, 34:2,
38:11, 58:17,
65:19, 67:14,
68:8, 68:12,
68:18, 84:18,
86:20, 87:1,
88:16, 89:8,
89:11, 90:1,
90:4, 90:15,
101:21, 101:22,
118:8, 121:19,
122:3, 122:13,
124:14, 125:22,

127:7, 128:19,
131:6, 132:15,
133:20, 178:9,
182:14, 196:5,
210:14, 215:2,
215:4, 238:22,
239:2, 257:1,
265:15, 269:6,
269:7, 269:9,
272:8, 272:10,
272:13, 273:6,
284:15, 284:21,
285:5, 285:11,
287:2, 287:4,
289:7, 289:10,
290:16, 352:7,
384:16, 384:20,
396:12, 416:6,
435:12
court's
384:10, 403:15
courteous
320:22
cover
14:20, 14:21,
138:11, 318:15,
346:1, 346:4,
385:14, 385:15,
385:19
covered
379:13, 383:15
covers
13:12
cpa
274:16, 281:17,
282:4, 282:6,
283:8, 283:9
crash
119:22
create
54:20, 346:5
created
100:5, 100:7,
275:6, 384:6
creates
21:14
creating
224:12, 224:18

creatures
222:9
credit
327:20, 327:21,
328:12, 336:19
credited
374:20, 376:12
crisis
100:5, 100:7,
100:9
critical
354:9
crr
1:22, 446:2
culmination
195:3
current
18:16, 271:10,
291:21, 292:3,
302:5, 302:6,
303:14, 304:1,
304:16, 305:7,
332:18, 336:10,
338:2, 382:5
currently
93:19, 271:12,
271:13, 283:9,
291:8, 304:4,
305:5, 334:3,
336:9, 336:12,
336:22, 432:15
custody
15:10, 28:22,
29:10, 29:20,
34:16, 35:17,
37:16, 123:20,
129:8, 235:14
cut
117:12, 234:21
cute
268:7
cycle
389:19

**D**

dad
239:13
daily
349:22

damage
404:18, 406:3,
431:21, 438:15,
439:1, 439:13,
439:19, 441:2,
441:5, 441:15,
442:1
damaged
441:19, 442:1
damages
390:7, 392:6,
392:19, 394:4,
394:10, 395:3,
395:10, 396:4,
430:14, 430:18,
431:4, 431:5,
431:9, 433:8,
433:9, 437:22,
438:9, 438:11,
439:7, 441:11,
441:17, 443:5,
443:12, 443:15,
443:17
damaging
413:15
dance
422:15
dark
153:13
data
14:14, 14:16,
45:16, 45:18,
47:11, 54:20,
55:1, 55:12,
68:15, 72:19,
105:18, 110:4,
116:6, 171:18,
243:2, 245:11,
247:9, 248:19,
271:14, 272:11,
272:14, 273:11,
276:22, 277:1,
277:2, 288:11,
288:13, 288:20,
289:6, 289:19,
291:13, 299:15,
304:5, 352:14,
384:9, 397:20,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                    130

404:12, 413:14,
437:8
**date**
9:11, 26:17,
56:19, 57:10,
57:12, 58:6,
69:16, 70:17,
70:22, 71:6,
76:22, 86:21,
102:18, 187:12,
214:6, 217:13,
217:17, 217:19,
217:20, 218:5,
218:8, 218:9,
219:4, 219:6,
219:7, 219:8,
220:4, 222:4,
223:5, 224:9,
224:13, 224:18,
224:21, 225:21,
226:2, 226:3,
226:5, 226:9,
226:10, 226:13,
227:15, 232:10,
233:11, 253:9,
258:2, 273:8,
309:3, 325:14,
347:22, 359:11,
359:17, 445:10
**dated**
5:20, 6:4, 6:9,
6:12, 6:14,
6:19, 7:12,
7:15, 7:17,
7:20, 8:3, 8:6,
8:9, 8:12, 8:15,
8:17, 8:21,
88:3, 88:4,
158:11, 163:11,
163:14, 286:12,
321:21, 348:8,
354:9, 372:1,
414:19, 420:21,
424:22
**dates**
14:20, 57:3,
69:10, 71:2,
87:2, 200:17,

201:6, 219:16,
313:13, 325:7,
326:9
**dave**
8:8, 8:12,
373:12
**david**
418:14
**day**
20:10, 58:22,
114:10, 116:18,
118:8, 141:16,
151:21, 165:4,
198:21, 213:14,
225:7, 230:9,
231:5, 262:21,
279:10, 291:13,
295:9, 341:22,
344:12, 349:11,
349:14, 356:10,
373:10, 386:21,
409:7, 409:8,
410:3, 427:10,
446:14
**day-to-day**
272:2, 272:21,
365:20
**days**
56:18, 57:10,
57:11, 58:6,
63:10, 63:11,
64:16, 80:11,
81:10, 83:16,
84:18, 84:20,
147:4, 174:15,
176:10, 176:12,
178:9, 192:2,
208:1, 219:11,
221:6, 223:8,
223:13, 226:2,
228:4, 228:22,
229:14, 230:1,
231:6, 231:21,
232:9, 233:11,
251:3, 251:14,
252:2, 252:21,
258:2, 347:8,
347:12, 347:13,

349:5, 350:1,
353:7, 354:11,
354:20, 369:2,
407:3
**deadline**
90:3
**deal**
40:22, 327:7
**dealing**
15:15, 229:18,
326:19
**debt**
231:20, 231:22
**debts**
257:22, 258:1
**december**
7:4, 7:6, 7:9,
103:10, 200:14,
287:16, 292:3,
324:19, 363:19,
366:3, 373:16,
388:1, 389:11
**decided**
121:5, 174:16,
275:10
**decision**
66:4, 127:14,
146:21, 186:11,
187:7, 187:9,
187:22, 188:4,
188:21, 189:3,
189:16, 249:1,
260:19, 261:1,
263:10, 265:22,
266:3, 276:17,
373:9
**decisions**
129:10, 212:8
**declaration**
136:2, 136:10,
136:19
**declared**
373:2
**decreasing**
189:9
**deduce**
247:17
**deducted**
98:22

**deed**
306:17, 307:15,
307:16, 381:19,
381:21
**deeds**
306:12, 306:15,
381:9, 381:15
**default**
383:22, 397:8,
397:13, 431:5,
434:12
**defect**
177:14, 177:16,
179:5
**defendant**
10:4
**defendants**
1:9, 3:11,
10:1, 10:6,
10:9, 10:11,
431:1
**defending**
111:19
**defense**
144:5
**defenses**
27:5
**deficiencies**
186:12, 263:19
**define**
239:20
**defining**
27:18, 194:16
**definitely**
323:4
**definition**
15:16, 17:20,
17:21, 18:5,
120:2, 226:13
**degree**
112:12
**delay**
66:5, 77:19
**delayed**
5:13
**delinquency**
258:2
**delinquent**
257:21

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

131

**deliver**
22:8, 22:20,
23:22, 25:16,
25:17, 26:15,
26:18, 28:14,
29:9, 33:4,
33:6, 33:10,
34:13, 36:9,
36:10, 38:6,
40:11, 42:22,
45:3, 48:14,
101:12, 101:13,
123:11, 129:18,
130:6, 130:17,
131:15, 131:18,
132:1, 132:10,
132:20, 132:22,
133:4, 133:7,
135:2, 135:10,
135:16, 135:17,
135:22, 136:6,
136:10, 136:17,
139:9, 139:14,
139:21, 140:22,
178:13, 178:16,
208:12, 208:14,
233:12, 243:19,
243:21, 244:7,
244:10, 244:15,
244:21, 245:3,
422:7, 422:9,
423:5
**deliverables**
282:18
**delivered**
28:13, 28:21,
29:4, 34:16,
139:12, 161:8
**delivering**
142:5
**delivery**
132:9, 135:9,
138:14, 207:22,
233:10, 233:11,
234:5
**demand**
36:5, 36:7,
36:9, 36:10,

83:3, 89:22,
132:10, 135:9,
136:2, 136:18,
139:9, 140:5,
265:9, 339:10,
339:13, 343:15,
345:17, 345:22,
346:12, 347:11,
356:17, 386:13,
386:15, 387:21,
390:3, 390:5,
390:9, 390:12,
391:16, 404:19,
405:2, 405:3,
406:2, 406:4,
406:10, 406:19,
407:9, 407:15,
413:6, 425:18,
425:21, 427:21,
443:8
**demanded**
197:4, 274:2,
290:21, 426:1
**demanding**
160:18, 363:4
**demands**
5:16, 88:18,
387:15, 387:17,
391:9, 391:18,
406:12
**demonstrated**
442:6
**denied**
66:15, 76:18,
125:14, 125:17,
195:2, 206:8,
210:18, 316:6,
398:21
**denies**
65:17, 120:7
**denominator**
105:4, 108:7,
108:10, 108:19,
108:20, 111:7,
113:3
**deny**
121:13
**department**
23:20, 33:21,

139:12, 222:20,
222:21, 225:19,
227:13, 227:17,
227:21, 235:19,
235:20, 255:5,
257:3, 265:20,
265:22, 266:3,
266:22, 267:10,
269:4, 269:5,
348:21
**dependency**
213:13
**dependent**
58:14
**depending**
96:19, 133:7,
195:21, 240:18
**depends**
72:17, 124:15
**depiction**
301:8
**deponent**
11:10, 445:1
**deportation**
229:9, 267:17
**depos**
9:14, 10:13
**deposed**
85:12
**deposition**
1:12, 2:1, 5:9,
5:10, 9:3, 9:14,
11:8, 12:6,
12:12, 31:13,
31:18, 39:16,
39:17, 41:6,
41:8, 41:22,
43:22, 45:12,
49:6, 55:22,
56:8, 74:21,
78:16, 88:22,
118:13, 134:6,
161:1, 164:5,
166:2, 207:6,
233:8, 258:17,
277:10, 277:17,
290:18, 291:1,
305:13, 340:7,

341:17, 342:21,
343:14, 355:17,
357:21, 359:15,
366:14, 367:3,
374:9, 375:5,
375:15, 386:7,
387:9, 388:9,
389:2, 393:6,
393:15, 395:15,
396:1, 396:9,
396:18, 398:5,
398:17, 404:7,
407:19, 419:11,
419:12, 422:21,
423:7, 423:8,
423:14, 432:9,
444:4, 446:3
**depositions**
442:7
**derive**
154:22, 434:19
**derived**
309:10, 434:21
**deriving**
205:7, 332:21
**describe**
13:9
**described**
147:1, 356:11
**describing**
42:17
**descriptive**
23:6
**designated**
24:2
**designee**
1:13, 9:5
**desire**
324:1
**desist**
193:18, 329:14,
330:16, 330:17
**destroying**
81:14
**detail**
55:4, 158:2,
182:6, 287:11,
306:9, 379:11,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

132

435:4
**details**
72:19, 78:10
**detain**
129:21
**detained**
128:8
**detention**
178:10, 235:14,
236:19, 238:3,
238:8
**determination**
64:2, 143:10,
183:5, 213:4
**determine**
52:19, 104:3,
105:8, 113:19,
155:6, 166:16,
212:4, 212:7,
230:20, 245:12,
264:19, 434:5,
439:1, 442:20
**determined**
121:5, 139:4,
431:11
**determining**
96:7
**device**
240:4, 240:19,
240:22, 241:1,
242:9, 242:13,
242:14, 243:1,
246:6, 333:5,
333:7, 333:22
**devices**
333:5, 333:18,
333:20, 336:17
**dhs**
28:21, 29:9,
42:21, 45:2,
46:14, 47:4,
48:22, 49:15,
50:22, 53:11,
91:5, 122:20,
123:17, 180:12,
182:17, 183:6,
192:2, 205:8,
205:10, 205:11,

205:17, 213:2,
229:11, 232:9,
233:10, 234:4,
252:19, 355:2
**dhs's**
174:16, 177:4,
180:4, 188:6,
192:14
**dictated**
235:19
**difference**
40:7, 49:19,
101:10, 239:3,
247:18, 247:19,
264:16, 269:18,
397:14, 437:3,
437:14
**different**
13:14, 21:7,
37:9, 40:3,
42:2, 50:12,
101:2, 101:4,
101:8, 113:13,
148:19, 182:4,
194:8, 195:22,
196:7, 196:11,
210:21, 216:22,
217:1, 217:2,
224:12, 224:19,
240:17, 243:9,
253:5, 277:9,
285:15, 286:5,
288:5, 311:20,
313:13, 331:5,
351:10, 360:21,
386:11, 386:17,
386:18, 387:6,
387:8, 401:17,
429:18, 430:3
**differs**
151:13
**difficult**
179:14, 179:15,
392:1, 435:9,
439:13, 441:7
**dig**
49:8
**digging**
49:13

**digital**
332:3
**diligently**
329:19
**dimandri**
306:21
**dineen**
4:17, 9:13
**direct**
11:1, 118:6,
125:11, 168:5,
179:22, 267:22,
365:12, 424:1,
424:3, 442:20
**directed**
368:22
**direction**
446:8
**directive**
38:5
**directly**
194:2, 203:4
**disagree**
19:13, 138:12,
162:2
**disc**
9:3
**discharge**
26:14, 26:22,
27:19, 27:21,
28:1, 28:14,
29:1, 29:2,
29:6, 29:8,
143:13, 143:15,
172:5, 343:15
**discharged**
171:22, 172:13,
173:12
**disclose**
156:5, 314:7,
384:15
**disclosing**
155:22, 402:3,
420:6
**disclosure**
384:13, 401:14,
402:10, 402:20
**disclosures**
252:8, 392:1,

**digital**
394:14, 395:21,
401:16, 401:19,
437:7, 437:8
**disconnect**
369:6
**discover**
260:13
**discovered**
248:11
**discovery**
159:10, 164:2,
164:8, 164:10,
164:14, 165:9,
167:3, 170:22,
215:10, 392:14
**discrepancy**
52:14
**discuss**
24:3, 257:12,
317:20, 317:22,
331:18, 425:15
**discussed**
12:5, 207:16,
253:1, 315:21,
359:19
**discussing**
274:5
**discussion**
112:22, 426:6
**discussions**
380:21
**disenfranchised**
308:9
**disingenuous**
290:15
**disk**
13:16
**dismissed**
70:16, 71:5,
71:12, 71:13,
71:15, 78:6
**dismisses**
65:22
**dispatch**
256:14
**disposition**
93:5, 93:14,
93:17, 93:20,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                           133

94:10, 94:12,
105:15, 105:16,
116:5
**disputable**
323:12
**dispute**
48:8, 48:15,
68:14, 86:15,
87:4, 87:21,
89:7, 90:20,
91:7, 91:11,
92:19, 164:8,
164:10, 172:3,
172:14, 172:16,
173:13, 175:14,
175:16, 176:1,
176:2, 176:4,
177:15, 177:17,
177:19, 177:20,
177:22, 178:1,
178:2, 178:4,
179:1, 179:7,
180:3, 194:11,
194:16, 196:13,
196:15, 197:2,
197:9, 197:11,
197:20, 203:2,
203:15, 205:14,
205:20, 206:1,
206:4, 206:14,
206:21, 207:19,
311:18, 313:21,
314:18, 316:2,
316:4, 316:6,
316:11, 316:16,
317:16, 324:16,
383:19, 397:22,
437:6
**dispute's**
194:8, 208:16
**disputed**
333:3, 333:8,
333:11
**disputes**
174:7, 174:17,
175:3, 175:7,
175:17, 175:18,
195:17, 195:18,

196:18, 196:20,
196:22, 197:6,
197:17, 198:10,
199:6, 200:22,
201:8, 204:13,
205:4, 205:12,
205:18, 209:12,
209:15, 231:19,
232:8, 233:7,
311:11, 312:10,
312:16, 318:12,
319:3, 394:1
**disputing**
231:20
**distinction**
101:10, 174:13,
174:18, 174:19,
253:22
**distinguish**
88:13
**distracted**
237:15, 237:17
**district**
1:1, 1:2, 9:8,
65:19, 225:13,
384:4
**division**
1:3, 9:9
**division's**
331:5
**docket**
128:8
**document**
12:2, 15:19,
48:12, 48:13,
56:13, 68:17,
87:1, 87:7,
138:6, 212:16,
219:13, 224:20,
252:19, 252:20,
255:8, 259:11,
284:12, 284:13,
284:19, 286:11,
286:17, 287:3,
292:5, 292:7,
292:9, 294:6,
294:15, 294:16,
299:21, 309:16,

309:18, 323:20,
325:6, 329:6,
345:15, 364:5,
392:7, 393:17,
403:17, 411:16,
424:21, 425:1,
425:9, 425:21,
438:17, 439:15,
440:8, 442:18
**document's**
421:5
**documentation**
49:7, 50:3,
54:15, 76:6,
99:3, 159:15,
201:9, 206:3,
211:18, 216:2,
313:20, 316:1,
316:15, 316:22,
319:2, 324:1,
324:5, 379:5,
379:8, 394:2
**documented**
244:10
**documents**
12:15, 12:18,
12:20, 13:5,
13:9, 14:2,
43:14, 72:22,
73:8, 73:9,
93:3, 155:13,
155:14, 161:6,
165:10, 165:16,
195:11, 195:15,
195:20, 195:22,
196:1, 196:3,
207:15, 230:15,
230:18, 230:19,
231:3, 233:17,
259:8, 263:7,
269:11, 272:7,
290:17, 290:18,
290:20, 291:16,
295:13, 303:8,
311:13, 314:12,
314:15, 314:16,
314:18, 338:6,
340:13, 351:18,

352:12, 360:10,
361:12, 362:2,
362:17, 393:12,
394:6, 395:6,
397:3, 397:5,
399:3, 402:4,
402:20, 409:19,
410:16, 412:1,
423:16, 430:7,
435:22, 439:10,
439:14, 440:22,
442:15, 443:11
**dog**
222:11, 222:13,
237:16
**doghouse**
322:18
**doing**
16:9, 37:11,
58:13, 74:16,
98:14, 103:9,
108:2, 108:6,
114:16, 151:6,
183:16, 242:8,
273:3, 276:5,
281:19, 282:4,
283:17, 298:17,
342:19, 354:13,
361:5, 397:16,
419:3, 437:13
**dollar**
23:10, 23:14,
82:16, 82:17,
96:16, 96:17,
96:18, 96:22,
279:4, 280:9,
280:16, 281:1,
281:3, 281:10,
306:2, 406:6,
407:14
**dollars**
97:3, 97:8,
97:9, 97:10,
98:2, 98:3,
98:6, 99:11,
119:16, 119:17,
217:1, 390:16,
392:5, 412:12,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

134

436:11, 438:8
**donald**
18:15, 230:3
**done**
17:18, 38:13,
39:3, 41:6,
41:13, 51:15,
65:1, 81:13,
85:21, 97:18,
114:1, 122:16,
175:13, 193:21,
194:1, 234:20,
234:21, 252:15,
262:21, 263:2,
276:13, 278:15,
279:16, 280:2,
283:7, 289:22,
290:2, 290:17,
290:19, 291:4,
295:21, 296:18,
301:19, 303:6,
395:8, 397:17,
402:7, 402:8,
435:4, 441:5,
442:9, 442:10
**donne**
3:12, 8:16,
8:18, 8:20,
10:9, 420:1,
421:2, 429:8
**donne's**
428:8
**donne-peters**
10:10
**donovan's**
31:4, 126:4,
164:12, 220:10
**door**
133:15, 302:21
**double**
83:14
**double-check**
263:20
**down**
75:20, 80:10,
147:17, 150:22,
258:17, 267:17,
301:17, 328:18,

372:6, 434:4,
436:7
**dozens**
125:17, 227:6
**draft**
364:5, 365:14,
412:17, 424:3
**drafted**
364:6, 365:14
**driving**
417:20
**due**
5:13, 5:15,
20:10, 20:11,
50:8, 56:14,
65:6, 66:17,
71:6, 79:20,
87:6, 142:2,
212:12, 213:7,
213:19, 214:6,
214:7, 217:6,
217:7, 217:11,
217:13, 217:17,
217:19, 217:20,
218:5, 218:8,
218:9, 218:14,
218:15, 219:7,
219:10, 219:11,
219:19, 220:4,
220:18, 220:21,
221:10, 221:17,
222:4, 223:17,
224:8, 224:9,
224:12, 224:18,
225:10, 225:15,
225:18, 225:20,
226:2, 226:3,
226:5, 226:13,
227:15, 232:1,
233:10, 253:9,
255:1, 288:3,
325:10, 345:4,
358:1, 374:20,
376:12, 376:13,
390:4
**duly**
10:17
**during**
12:5, 55:21,

56:8, 68:1,
150:14, 213:13,
235:14, 240:7,
355:2, 355:14,
374:8, 401:17,
431:3
**duties**
124:21
**duty**
213:20, 422:6,
423:4

**E**

**each**
89:17, 95:11,
109:20, 110:4,
125:17, 149:17,
176:17, 186:18,
190:16, 190:18,
195:1, 202:22,
239:17, 308:6,
335:9, 385:16
**earlier**
70:20, 153:7,
153:20, 166:19,
169:7, 229:3,
249:12, 311:9,
323:1, 338:4,
383:11, 409:19
**early**
234:21, 251:11,
251:13, 251:18,
252:21, 253:17,
257:22, 258:1,
270:5, 367:4,
367:20, 368:12,
369:22, 372:9,
384:19, 389:1
**earn**
274:22
**easier**
179:17, 273:20,
281:21
**easy**
179:22, 208:16
**eckert**
336:5, 336:6
**eckert_nexus**
7:7, 7:10

**eclipses**
213:5
**edification**
138:17
**edify**
221:13
**effect**
37:14
**efforts**
122:21
**eight**
245:7, 245:18,
245:19, 245:21,
246:3, 246:5
**eight-month**
248:16
**either**
22:14, 74:1,
92:19, 92:22,
126:16, 143:12,
144:18, 151:18,
155:16, 192:16,
192:17, 206:1,
213:20, 226:22,
236:5, 238:18,
238:21, 252:18,
302:17, 336:18,
368:16, 368:22,
370:3, 370:4,
372:14, 373:20,
383:20, 386:16,
387:19
**elect**
367:9
**elected**
38:19, 368:19
**election**
18:14
**electronic**
16:7, 54:22,
55:12
**electronically**
15:21, 103:3
**element**
133:6, 183:2,
183:3, 187:18,
188:9, 344:17
**elements**
120:15, 386:10,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

135

393:9, 439:18
**elevate**
120:9
**elevated**
365:11, 384:6,
391:19
**else**
107:20, 107:21,
113:17, 264:22,
351:2, 371:6,
387:3, 433:7
**email**
5:18, 6:3, 6:7,
6:10, 6:13,
6:16, 7:11,
7:14, 7:19, 8:5,
8:8, 8:11, 8:20,
103:13, 138:12,
156:20, 157:6,
158:10, 158:18,
200:22, 203:5,
203:16, 203:19,
207:16, 215:12,
311:16, 311:17,
313:12, 315:10,
315:15, 317:4,
317:5, 319:22,
321:7, 321:21,
322:6, 323:6,
323:8, 323:18,
325:4, 326:1,
326:18, 327:8,
341:1, 341:13,
341:17, 341:18,
341:20, 342:2,
343:22, 348:8,
348:11, 348:12,
348:14, 348:17,
349:16, 350:4,
359:1, 359:3,
359:4, 360:7,
361:2, 366:3,
372:1, 375:5,
376:5, 376:8,
377:6, 377:7,
378:17, 388:1,
397:20, 418:14,
418:19, 427:15,

428:7, 428:22,
429:3
**emailed**
263:15
**emails**
162:3, 195:10,
195:13, 199:9,
199:13, 199:18,
200:1, 200:4,
200:5, 201:2,
201:21, 202:5,
202:7, 202:8,
202:12, 202:15,
203:11, 204:10,
204:11, 207:15,
211:14, 211:16,
311:19, 311:21,
312:1, 312:7,
312:9, 312:13,
312:20, 312:22,
313:6, 313:7,
313:8, 313:17,
313:18, 317:9,
320:4, 321:10,
349:3, 354:20
**employed**
446:10
**employee**
207:8, 419:1
**employees**
335:2
**empower**
402:12
**enables**
113:22
**encumbered**
305:21, 306:11,
307:7, 307:18
**end**
25:22, 33:11,
116:18, 141:16,
198:21, 239:11,
239:14, 262:21,
264:11, 272:15,
305:13, 347:11,
375:9, 375:12,
406:7, 407:18,
415:4, 423:7,

432:9
**endeavor**
68:4
**ended**
248:14, 435:11
**ends**
444:4
**enforcement**
34:3
**engage**
316:4, 389:1,
412:7
**engaged**
274:16, 285:15
**engages**
120:4, 441:16
**engaging**
418:22
**english**
142:8
**enough**
38:3, 234:15,
257:10, 310:11,
325:1, 427:6
**ensure**
59:8, 86:11,
236:3, 238:18,
240:22, 288:14,
289:8, 331:3,
407:4, 407:6
**entendre**
83:14
**enter**
227:19, 341:7
**entered**
229:10, 272:14
**entering**
272:11, 273:11
**entire**
14:18, 14:19,
284:9
**entirely**
102:10, 209:4,
321:13
**entitled**
318:9, 345:22,
408:3, 408:7
**entitles**
407:21

**enunciated**
112:20
**eoir**
268:16, 269:3,
269:5, 269:6
**equal**
94:10
**equipment**
299:1
**equity**
305:20, 307:12,
307:14, 432:22
**era**
230:3
**erik**
55:21, 156:22,
211:17, 314:3,
314:21
**err**
59:7, 228:8
**errata**
445:7
**erroneous**
58:17, 68:8,
81:11, 111:6,
114:8, 161:20
**error**
66:21, 101:20,
122:13, 178:3,
178:5, 178:6
**escalated**
354:20
**eschneider@nexus-**
**helps**
5:19, 6:18
**escort**
40:10, 41:10,
41:15
**escorted**
42:20
**escrow**
381:12, 383:4
**especially**
40:14, 95:3
**esquire**
3:3, 3:4, 3:12,
4:3, 4:9
**establish**
74:17, 74:18,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

136

**240:21**
**establishing**
410:14
**estate**
305:15, 305:17,
305:20, 305:21,
306:1, 306:11,
307:6, 335:16,
432:21
**estimate**
171:5, 226:11,
226:15, 228:20,
310:10, 310:16,
310:18, 432:13,
434:16, 438:16,
438:21
**estimated**
436:6, 440:19
**estimation**
226:18
**et**
1:8, 9:7,
235:18
**even**
25:9, 27:10,
45:7, 52:11,
65:12, 94:18,
95:3, 100:7,
101:15, 122:19,
137:1, 178:11,
199:19, 220:11,
222:13, 227:5,
227:14, 231:5,
272:19, 276:12,
277:10, 278:1,
278:2, 278:11,
278:12, 279:3,
322:20, 349:8,
357:17, 367:12,
392:13, 426:13,
432:3
**eventually**
123:12
**ever**
108:8, 176:4,
205:1, 239:22,
253:16, 295:22,
296:4

**ever-increasing**
407:3
**evergreen**
388:2, 389:2
**every**
20:12, 21:22,
33:7, 34:8,
35:15, 61:13,
66:13, 78:21,
82:11, 102:16,
105:21, 106:20,
109:20, 125:17,
214:2, 214:5,
223:3, 239:17,
240:14, 250:8,
252:13, 291:13,
295:9, 308:11,
316:19, 319:22,
355:19, 385:9,
385:16, 399:12,
409:8, 412:20,
412:22
**everybody**
105:18, 109:22,
113:17
**everyone**
105:19
**everything**
13:2, 97:19,
118:10, 124:18,
131:3, 273:3,
294:20, 331:12,
347:13, 349:19,
350:1, 355:19,
355:21, 391:20,
436:1
**evidence**
68:1, 87:3,
106:9, 165:16,
207:1, 325:11,
360:9, 374:14,
376:4, 379:2
**evidenced**
251:1
**evidences**
206:4
**evidencing**
361:12

**exacerbated**
18:17, 106:15
**exact**
16:4, 44:4,
200:13, 279:4,
279:22, 280:9,
280:16, 281:1,
281:3, 281:9,
336:1, 382:9
**exactly**
67:17, 110:11,
141:21, 142:16,
268:6, 270:17,
297:3, 304:20,
305:2, 308:21,
326:18, 328:9,
364:14, 378:9,
382:13, 389:7,
417:14, 422:8,
422:9, 435:19,
438:14, 442:9,
442:10
**examination**
5:2, 11:1,
51:3, 431:1,
431:4, 433:12
**examined**
10:19, 445:3
**examining**
339:7
**example**
27:14, 29:19,
37:3, 37:4,
38:10, 100:21,
120:6, 128:5,
128:6, 178:7,
203:12, 215:7,
266:17, 277:5,
288:15, 297:5,
297:18, 298:1,
313:3, 315:7,
327:6, 329:5,
329:7, 345:20,
366:6, 402:10
**except**
323:20, 366:1
**excited**
295:22, 330:3,

**330:4**
**exciting**
11:11, 335:17
**excluding**
391:3
**excuse**
84:19, 197:18,
286:16, 346:18
**execute**
426:11
**executed**
401:4, 401:9,
404:15, 420:18
**executing**
39:4, 310:2
**execution**
426:15
**exercise**
396:18, 396:20
**exercised**
387:18
**exhausted**
21:21, 60:13,
63:1, 63:6,
144:10
**exhibit**
5:10, 5:12,
5:14, 5:16,
5:18, 6:3, 6:7,
6:10, 6:13,
6:16, 6:21, 7:3,
7:5, 7:8, 7:11,
7:14, 7:17,
7:19, 8:3, 8:5,
8:8, 8:11, 8:15,
8:17, 8:20,
11:13, 11:14,
11:20, 67:11,
67:13, 67:15,
82:3, 85:3,
88:7, 88:17,
88:21, 89:1,
131:12, 138:3,
146:14, 156:16,
156:17, 158:8,
163:10, 163:11,
163:12, 216:10,
256:20, 257:2,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

137

286:7, 294:1,
294:4, 297:12,
315:16, 315:18,
322:11, 323:2,
339:2, 341:10,
343:11, 348:6,
371:21, 374:4,
400:21, 400:22,
414:17, 419:22,
420:7, 425:4,
427:7
**exhibits**
5:9
**exist**
16:13, 17:5,
181:7, 181:17,
244:1
**existed**
200:8, 391:21
**existence**
21:14
**exonerate**
213:21, 438:4
**exonerated**
16:16
**exoneration**
24:6, 117:3,
250:6
**expansive**
141:12
**expect**
209:7, 282:20,
354:21, 443:2
**expectations**
150:19, 182:5
**expected**
354:12, 354:22,
426:21
**expecting**
23:12, 23:13
**expenses**
288:17
**expensive**
335:6
**experience**
275:17
**experienced**
438:3

**experiences**
247:17
**expert**
24:6, 138:13
**expire**
330:18
**expires**
446:16
**explain**
24:20, 52:13,
89:10, 112:1,
134:16, 170:9,
269:15, 270:6,
308:20
**explained**
80:13, 125:12,
203:1, 289:7,
290:13
**explaining**
299:6, 311:18
**explains**
218:2
**explanation**
89:12, 160:21,
203:9, 216:4,
217:21, 373:2
**explore**
318:9
**expose**
413:7
**exposure**
18:22, 19:9,
20:2, 20:3,
20:6, 346:2,
346:4
**express**
328:3, 328:4,
328:13
**expresses**
340:5
**expressly**
345:22, 368:2
**extended**
246:6
**extending**
31:18
**extension**
283:4

**extensive**
214:17, 400:9,
438:10, 441:17
**extensively**
288:9, 359:19
**extent**
197:12, 210:19,
300:4, 306:10,
366:10, 406:16
**extracted**
54:20
**extrapolate**
283:13
**extrapolated**
288:16, 288:17
**extrapolation**
229:17
**extremely**
201:11

**F**

**face**
23:5, 153:2,
213:18, 214:7,
224:8, 224:19,
226:13
**facilitate**
23:3
**facilitated**
15:9
**facing**
308:3
**fact**
12:17, 14:6,
31:12, 45:19,
57:2, 66:1,
78:16, 84:17,
95:3, 100:22,
104:10, 106:9,
107:2, 119:19,
161:20, 169:10,
174:5, 178:3,
179:8, 208:21,
232:4, 247:14,
249:2, 250:11,
251:1, 277:10,
287:13, 301:3,
308:10, 318:15,

327:13, 335:1,
344:12, 349:3,
359:20, 360:10,
371:3, 371:11,
371:16, 373:15,
389:1, 392:6,
392:10, 392:18,
400:15, 405:16,
413:19, 420:14,
441:4
**factor**
146:8, 249:5,
249:6, 249:8,
249:10
**facts**
68:5, 77:9,
87:4, 89:7,
90:20, 120:11,
134:6, 199:7,
201:14, 201:22,
202:9, 202:18,
203:14, 204:11,
278:7, 278:21,
313:21, 316:9,
317:15, 319:4,
319:10, 320:15,
321:5, 324:22,
326:14, 326:15,
327:8, 327:12,
383:12, 396:3,
422:2, 422:20,
422:22, 423:1,
423:2, 423:11
**fail**
14:1, 17:14,
18:10, 52:20,
94:22, 96:18,
97:2, 97:4,
98:13, 99:12,
99:19, 99:20,
104:15, 104:16,
104:17, 104:19,
104:22, 105:8,
106:10, 107:3,
108:1, 108:3,
108:6, 109:2,
109:3, 109:5,
109:9, 109:10,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

138

109:16, 109:18,
110:2, 110:7,
110:12, 110:14,
110:15, 113:14,
116:15, 116:16,
119:13, 121:10,
121:15, 194:17,
252:11, 316:7,
393:18, 393:19,
393:20, 393:21
**failed**
19:22, 312:16,
383:14, 438:4
**failure**
5:15, 87:5,
94:22, 95:19,
95:21, 96:1,
96:2, 96:4,
106:6, 107:16,
111:5, 111:15,
114:11, 114:13,
115:5, 115:7,
115:16, 120:5,
135:22, 136:9,
136:17, 139:14,
139:20, 140:9,
140:10, 142:13,
142:17, 180:4,
180:13, 180:17,
181:20, 181:22,
182:17, 188:6,
218:18, 218:22,
221:1, 222:18,
393:1, 394:11
**fair**
209:10, 259:16
**faith**
80:22, 99:22,
106:13, 119:20,
119:21, 120:3,
120:6, 120:10,
120:13, 120:15,
120:16, 121:5,
169:7, 169:8,
318:7, 318:8,
318:17, 318:19,
319:12, 327:2,
327:7, 327:16,

369:3, 383:14,
385:2, 385:17,
386:11, 387:2,
387:7, 390:10,
391:6, 393:2,
394:12, 431:5,
431:15
**false**
74:17, 169:12,
321:14
**familiar**
12:1, 12:6,
173:16, 180:2
**families**
254:9
**family**
38:12, 39:12,
39:13, 238:9,
238:11, 238:13,
238:17, 238:19
**fan**
241:16, 241:21
**far**
24:22, 157:20,
186:1, 197:17,
240:16
**faster**
81:16, 82:10,
84:1
**fault**
178:14, 392:4
**faulty**
209:22
**favor**
17:19, 60:4,
63:3
**favorable**
106:11
**favorably**
109:13
**fcs**
110:2, 335:10,
381:14, 382:7,
388:5, 389:12,
389:18, 389:21,
389:22
**feature**
177:13

**february**
50:2, 55:22,
73:3, 91:15,
154:10, 156:13,
248:9, 329:7,
355:3, 368:21,
370:4, 370:11,
373:2, 373:9,
373:17, 373:21
**federal**
72:20, 189:6,
225:12, 229:7,
257:7, 324:15
**fee**
76:1, 187:1,
434:9, 435:7
**feel**
222:14, 235:3,
257:18, 413:10
**feeling**
26:9
**feels**
339:21
**fees**
143:3, 193:8,
390:16, 391:4,
405:10, 405:11,
407:21, 408:3,
408:7, 409:2,
431:17, 434:3,
434:17
**felt**
101:2, 400:7
**few**
44:9, 55:16,
169:2, 191:15,
194:20, 393:13,
395:6, 398:3,
401:16
**field**
227:7
**fight**
431:17, 434:3
**figure**
18:12, 18:14,
88:10, 91:7,
92:19, 108:11,
113:4, 114:1,

126:17, 173:13,
190:12, 247:22,
262:1, 353:18,
434:5, 434:19
**figured**
364:15
**figures**
185:17
**file**
63:9, 63:15,
64:15, 64:16,
64:18, 68:8,
69:20, 74:20,
100:18, 175:21,
175:22, 177:19,
182:10, 205:11,
206:14, 256:8,
265:15, 289:20,
290:4, 295:7,
297:5, 300:16,
324:16, 405:16
**filed**
64:17, 67:20,
69:8, 69:19,
74:2, 75:15,
76:1, 76:3,
90:15, 116:18,
183:1, 183:2,
183:10, 185:12,
185:15, 185:18,
185:19, 187:5,
187:9, 193:20,
194:2, 262:8,
262:12, 287:4
**files**
54:20, 183:17
**filing**
143:3, 176:13,
187:1, 193:8,
193:22, 204:4,
205:14, 205:18,
276:5
**filings**
282:21
**final**
35:14, 47:22,
50:16, 59:18,
59:20, 59:21,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                              139

60:2, 60:9,
60:11, 60:12,
60:16, 60:18,
60:21, 61:1,
61:5, 61:16,
61:17, 62:16,
62:17, 62:18,
62:21, 63:3,
63:22, 64:1,
64:2, 65:5,
65:7, 65:9,
71:13, 138:14,
142:1, 143:10,
147:7, 213:4,
221:17, 359:10
**finalizing**
278:3, 279:14
**finance**
327:21
**finances**
272:9, 273:8
**financial**
271:11, 271:14,
272:11, 272:14,
274:13, 276:4,
278:3, 278:15,
279:11, 279:14,
280:1, 280:8,
280:17, 281:1,
281:20, 282:6,
282:7, 282:10,
282:15, 283:20,
284:1, 287:18,
288:22, 289:5,
289:9, 290:20,
291:9, 295:6,
295:14, 296:5,
296:12, 296:16,
296:22, 297:4,
298:16, 299:12,
299:15, 300:11,
301:8, 303:3,
304:5, 305:3,
308:14, 309:1,
340:13, 390:21,
392:22, 404:18,
406:2, 406:19,
407:9, 417:12,

417:15, 418:8,
439:6, 446:11
**financially**
274:18, 277:15,
308:19
**financials**
273:5, 275:11,
275:15, 275:21,
276:7, 276:16,
282:2, 282:12,
287:10, 327:19
**find**
15:16, 41:8,
44:11, 46:21,
53:8, 53:22,
55:5, 65:11,
65:13, 77:4,
150:12, 182:20,
234:11, 247:22,
248:3, 308:22,
334:1, 343:1,
355:18, 356:19,
367:11, 368:17,
368:19, 368:22,
370:4, 370:7,
372:18, 386:16,
387:19
**finding**
371:6, 373:12
**fine**
11:19, 20:16,
30:8, 31:10,
45:6, 46:7,
111:22, 167:21,
170:9, 181:13,
191:17, 241:10,
349:20
**finish**
35:8, 75:18,
117:20, 118:1,
118:5, 118:19,
119:10, 119:11,
143:20, 170:3,
223:21, 383:9,
393:6, 393:15,
395:15, 398:4,
398:16, 409:6
**finished**
147:9, 303:5

**finishes**
22:15
**firm**
73:11, 77:4,
207:11
**first**
10:17, 14:11,
68:22, 69:2,
69:12, 102:10,
114:13, 121:7,
130:5, 140:7,
141:8, 145:3,
145:12, 175:10,
176:3, 176:10,
185:10, 218:21,
219:21, 220:17,
220:20, 237:20,
249:12, 250:3,
257:19, 272:22,
288:19, 341:20,
342:13, 344:4,
382:2, 425:22,
429:22
**fiscal**
257:22
**fitted**
240:3, 240:15,
242:5
**fitzgerald**
2:5, 3:5
**five**
66:2, 78:5,
122:6, 184:16,
184:18, 231:6,
256:14, 260:21,
262:18, 263:8,
263:22, 313:7,
313:8, 334:16
**fix**
125:11, 179:17
**fixed**
67:1, 189:11,
348:3
**fixing**
301:19
**flag**
44:8, 90:17
**flavor**
438:6

**flip**
77:21
**florida**
37:3, 37:4,
37:5, 37:7
**flow**
327:22, 328:1,
328:2, 328:6
**flying**
91:18
**focus**
224:15, 227:9,
228:15, 236:10,
236:11, 413:20
**focusing**
281:22
**folks**
227:3, 248:1,
329:17
**follow**
219:4
**follow-up**
202:4, 341:18
**followed**
340:22
**following**
132:14, 159:13,
220:3
**follows**
10:19, 145:11
**foolish**
133:22
**force**
290:16
**forced**
265:8, 299:14
**forecast**
18:19
**forecasting**
18:20
**foreclosed**
198:14
**foregoing**
445:4, 446:3,
446:4
**forewarning**
51:10
**forfeit**
239:1

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

140

forfeited
137:1, 146:19,
239:5
forfeiture
136:20
forged
68:17
forget
103:22, 256:13
forgive
365:14
forgot
432:1
form
19:6, 20:18,
32:1, 35:18,
138:6, 138:18,
146:11, 146:17,
147:3, 217:3,
217:4, 217:5,
234:9, 439:18
formal
45:3, 46:14,
47:4, 91:5
formally
201:1
former
419:1, 419:2
forms
160:4, 168:19,
169:18, 170:11,
171:2, 171:6,
286:5
forth
87:4, 89:7,
90:20, 135:18,
144:1, 202:15,
203:13, 204:11,
233:12, 256:3,
291:10, 298:1,
362:14, 366:7,
429:12
forward
161:2, 174:21,
312:2, 312:5,
353:19, 386:17,
386:18
forwarded
157:15, 206:17,

311:14
forwarding
158:12, 414:19
found
152:10, 323:11,
356:22, 357:1,
357:6, 357:10,
369:1, 386:18,
405:20
four
61:12, 66:2,
70:21, 76:2,
77:11, 78:5,
122:5, 164:20,
166:22, 167:6,
167:9, 167:15,
168:17, 170:1,
263:17, 323:5
fourth
113:22
frame
200:7, 200:8,
282:17, 287:16,
355:2
frankly
357:21
freaked
366:21
free
433:5
freely
168:12
frequently
43:2, 43:5
friday
160:12, 215:8,
341:15, 341:18,
341:21, 342:3,
342:4, 386:21,
392:12
friend
97:12, 383:4
front
20:12, 35:13,
48:11, 61:9,
68:17, 72:21,
78:19, 87:1,
98:6, 100:6,

102:3, 161:6,
163:11, 164:20,
166:22, 208:18,
225:22, 255:8,
259:9, 262:4,
329:6, 364:9,
392:7, 397:20,
399:3, 420:21,
421:1, 421:5,
422:13, 439:15
fruition
21:20
frustrating
72:18, 152:12,
275:17, 301:14
fsc
110:5, 389:15
fulfill
29:15, 29:17,
227:10
full
108:7, 118:17,
122:9, 146:21,
169:6, 171:17,
199:4, 229:15,
232:1, 237:3,
237:4, 238:14,
264:15, 296:17,
300:6, 300:9,
300:10, 313:3,
313:5, 347:11,
384:8, 433:5
fully
146:3, 203:19,
206:18, 264:9,
288:21, 289:2,
291:14, 298:14,
298:15, 303:2,
303:5, 306:5,
349:2
function
38:16, 41:21,
207:12, 213:8,
243:13
functionally
80:14
funds
237:2, 239:2,

239:4
funny
220:15, 358:11,
358:15
further
19:18, 20:20,
28:4, 29:22,
30:3, 30:6,
30:16, 32:14,
32:21, 34:21,
35:19, 37:17,
60:1, 66:4,
116:1, 148:22,
157:19, 157:21,
252:7, 268:2,
276:12, 296:10,
298:11, 320:4,
339:10, 339:13,
351:13, 367:21,
372:11, 425:17,
430:11, 430:15,
433:11, 443:22,
444:4
fusion
274:16, 281:17,
282:3, 282:6,
283:8, 283:9
future
19:18, 21:12,
104:13, 116:12,
118:6, 368:18,
368:20

| G |
| --- |

ga
3:16
gaap
275:1, 275:13,
276:7, 276:8,
281:22, 282:9,
283:19
gang
39:14
gather
185:13, 411:7
gave
48:13, 51:9,
133:8, 160:14,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

141

387:19
**general**
13:15, 87:15,
87:18, 97:20,
218:6, 218:7,
248:20, 271:2,
335:12, 359:9,
390:11
**generally**
13:8, 13:9,
65:22, 66:10,
66:14, 334:17
**gentleman**
122:8
**getting**
14:13, 23:15,
72:22, 76:6,
94:3, 104:2,
134:6, 134:7,
134:8, 142:4,
227:9, 237:19,
256:11, 273:7,
276:13, 301:19,
339:22, 360:13
**gia**
344:1
**giant**
315:18
**give**
15:4, 15:20,
16:4, 16:8,
36:17, 53:18,
53:19, 57:21,
91:8, 100:21,
102:8, 106:19,
115:3, 118:17,
128:5, 150:12,
153:3, 160:1,
160:11, 167:20,
169:9, 176:21,
183:22, 184:1,
184:9, 184:11,
190:11, 190:16,
195:6, 199:3,
199:7, 200:17,
230:4, 244:16,
251:8, 252:4,
254:20, 257:11,

259:5, 263:21,
271:21, 278:18,
292:8, 293:19,
305:13, 312:15,
317:16, 328:22,
330:9, 334:2,
334:3, 385:9,
386:2, 395:6,
398:2, 398:3,
398:5, 407:13,
408:19, 432:20
**given**
12:19, 57:2,
95:3, 111:17,
153:12, 160:3,
254:14, 258:13,
301:3, 313:2,
316:13, 321:7,
344:12, 400:8,
443:11, 445:6,
446:6
**gives**
37:15, 72:1,
205:20
**giving**
71:19, 89:19,
111:15, 117:10,
196:9, 233:21
**glad**
66:11, 326:19,
372:22
**global**
13:19, 13:22,
110:14, 111:2,
186:2, 189:10,
211:20, 232:12,
431:14, 435:18,
436:4
**globally**
185:18, 185:20,
260:22, 261:5,
261:9, 261:13,
262:6, 262:7,
262:12, 270:8
**goal**
145:19
**goes**
31:3, 63:14,

131:21, 238:22,
269:18
**gone**
25:1, 128:19,
196:4, 328:18,
328:20, 403:17,
435:3
**good**
11:3, 11:4,
11:6, 42:7,
67:9, 67:10,
91:3, 106:11,
234:16, 235:3,
264:1, 329:16,
329:19, 379:20,
383:14, 385:2,
391:6, 393:2,
394:12
**goodness**
384:16
**gorby**
3:13
**gosh**
351:13
**gotcha**
64:13, 165:4,
271:9, 299:6,
398:7
**gotten**
73:2, 94:20,
105:19, 119:22
**government**
17:19, 22:4,
22:18, 23:2,
23:20, 24:4,
25:16, 29:13,
60:5, 72:20,
76:7, 76:19,
132:22, 136:20,
189:6, 189:10,
198:5, 235:14,
236:7, 238:16,
267:6, 324:15,
324:18, 324:21,
324:22, 325:16,
326:3, 326:8,
438:12
**government's**
229:8

**gps**
239:21, 240:3,
240:15, 240:16,
240:19, 241:1,
241:5, 242:5,
242:9, 242:17,
243:12, 243:20,
244:6, 245:1,
245:6, 245:11,
246:5, 246:14,
246:21, 247:7,
247:11, 247:17,
247:18, 248:22,
283:13, 297:22,
298:2, 298:13,
334:21, 404:12
**gpss**
242:2
**grab**
302:21
**gracious**
310:11
**grade**
113:22
**grant**
274:16, 276:18,
281:14, 281:19,
281:22, 282:5,
282:7, 282:10,
282:12, 282:14,
282:18, 282:22,
283:10, 283:18
**granted**
69:21, 189:17,
190:7, 190:8,
260:19, 261:1,
261:9, 261:13,
262:19, 316:21
**granting**
206:10, 326:14
**gray**
37:1
**great**
14:4, 68:11,
118:12, 210:20,
218:10, 260:9,
260:17, 289:16,
326:21, 327:1,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                    142

413:22, 420:9
**greensboro**
2:6, 3:6, 9:15
**grounds**
177:7, 180:3,
186:9, 189:16,
201:14, 201:15,
201:21, 201:22,
202:3, 202:8,
202:9, 202:16,
202:17, 202:19,
203:14, 204:2,
204:11, 204:12,
204:16
**group**
277:11, 402:7
**grouping**
89:18
**groups**
89:20
**grow**
275:18
**grows**
329:11
**guarantee**
235:11, 235:22
**guess**
117:22, 150:14,
169:6
**guessing**
254:4
**gut-checked**
237:20
**gutierrez**
7:15, 103:11,
312:10, 314:3,
323:7, 323:11,
325:18, 326:5,
327:9
**gutierrez's**
324:4, 324:6
**guys**
105:20, 105:21,
155:7, 155:9,
158:1, 158:20,
159:19, 172:21,
199:14, 288:9

**H**

**half**
77:12, 82:15,

226:20, 226:21,
228:21, 308:6,
308:11, 336:7,
404:16, 435:13
**halfway**
234:20, 234:21
**hand**
11:12, 433:18,
433:21, 446:14
**handbook**
132:6, 177:2,
177:4, 205:9,
205:10, 205:11,
205:17
**handcuffs**
41:3, 133:15,
422:11
**handed**
88:15
**handled**
73:10
**hands**
333:16, 380:9
**handy**
186:1
**happen**
34:8, 75:19,
77:10, 127:20,
128:1, 253:19,
289:22
**happened**
41:21, 76:9,
89:19, 128:14,
129:22, 179:20,
204:6, 253:16,
253:18, 255:20,
267:19, 339:17,
353:18, 412:10,
412:11
**happening**
58:9, 169:14,
211:11, 277:12,
290:4, 405:14
**happens**
23:7, 34:11,
72:9, 76:15,
76:18, 101:19,
102:1, 122:14,

128:3, 128:12,
133:8, 138:13,
176:10, 270:12,
270:14
**happy**
16:22, 45:9,
45:16, 46:8,
49:5, 49:8,
49:11, 50:12,
53:4, 62:12,
70:3, 70:5,
77:14, 82:10,
90:10, 186:21,
230:5, 230:18,
256:15, 257:12,
259:17, 271:4,
272:16, 284:19,
290:2, 315:11,
317:3, 387:11,
394:3, 395:5,
395:11
**harder**
252:16
**harm**
265:6
**harmed**
251:10, 253:8,
254:18, 254:21,
255:13, 256:5,
261:15, 264:6,
264:12, 264:20
**harris**
3:4, 7:12,
9:20, 25:11,
31:17, 31:21,
32:1, 112:21,
118:21, 151:5,
151:8, 151:11,
151:17, 164:17,
164:22, 166:1,
168:7, 169:15,
263:4, 309:8,
317:12, 317:20,
318:10, 319:1,
320:10, 320:12,
320:19, 320:20,
321:3, 321:17,
395:18, 396:2,

396:9, 400:1,
440:13
**harrisonburg**
1:3, 9:9
**hartened**
169:1
**hazzar**
156:22, 158:14,
263:12
**he'll**
267:1, 394:13
**head**
46:19, 47:18,
56:14, 69:17,
70:8, 186:20,
204:8, 240:13,
255:14, 257:18,
305:11, 419:2
**hear**
20:14, 214:11,
366:21
**heard**
241:7, 366:19,
380:18, 391:8
**hearing**
29:19, 67:20,
67:21, 68:1,
71:19, 85:7,
85:17, 86:3,
86:8, 86:16,
89:5, 89:15,
249:20, 283:22,
284:21, 422:5
**hearings**
30:12, 141:11,
235:12, 235:18,
236:18, 237:5,
442:3
**heavily**
285:16

████████████
████████████
████████████
████████████

**heitman**
6:4
**held**
2:1, 29:5,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

143

129:8, 259:1,
267:17
**help**
23:2, 40:21,
58:19, 123:2,
163:15, 208:17,
221:13, 245:14,
251:13, 308:10,
310:11
**helpful**
92:1, 201:6,
310:14
**helping**
228:15, 228:16,
243:13, 308:12
**hence**
281:13
**here**
9:2, 11:7,
17:4, 21:1,
40:13, 46:10,
47:2, 47:15,
48:21, 49:7,
50:19, 51:14,
53:13, 55:3,
58:4, 68:13,
77:9, 78:10,
78:16, 78:22,
80:8, 81:17,
89:6, 97:12,
112:17, 118:12,
122:7, 129:5,
135:5, 161:7,
162:9, 163:9,
169:14, 169:17,
181:13, 186:18,
197:18, 198:16,
199:22, 204:9,
208:19, 217:21,
231:9, 233:7,
243:7, 253:15,
254:13, 254:19,
267:11, 286:4,
292:11, 298:21,
300:8, 300:12,
305:9, 312:13,
313:1, 315:8,
317:1, 318:3,

318:11, 318:22,
328:21, 333:12,
334:8, 337:17,
350:16, 353:12,
364:2, 364:16,
374:8, 392:21,
403:9, 408:6,
419:10, 423:5,
423:8, 442:14
**here's**
89:22, 101:11,
158:10, 170:14
**hereby**
445:2, 446:4
**herein**
366:2
**hereunto**
446:13
**hey**
133:1, 133:3,
208:19, 353:15,
369:4, 386:22,
387:1, 428:22
**hide**
169:9, 169:10,
169:13
**hiding**
169:8
**high**
108:4, 109:9,
109:10, 110:14,
326:17
**higher**
102:12, 110:8,
110:12, 110:13,
110:15, 111:2,
120:5, 316:7,
383:22, 437:11,
441:4
**hilarious**
222:9
**hire**
37:5, 422:11
**hired**
281:17
**historical**
14:14, 105:18,
244:8, 245:11

**historically**
229:2
**history**
38:18
**hit**
290:18, 355:22
**hoffar**
2:5, 3:5
**hold**
49:15, 114:18,
183:9, 196:12,
200:10, 285:22,
324:13, 373:6
**holds**
128:7
**home**
39:11, 101:20,
128:10, 133:18,
328:14
**homeland**
23:20, 33:21,
139:13, 225:19,
227:13, 227:18,
227:21, 235:19,
255:5, 257:4,
267:11
**homes**
9:4, 10:2,
11:9, 12:12,
13:12, 271:8,
293:4, 293:10,
293:15, 293:16,
297:20, 328:14
**homework**
233:21
**honest**
162:20, 348:14,
349:2, 351:4,
357:18, 438:2
**honestly**
246:5
**hope**
117:3, 166:14,
167:15, 179:19
**hopefully**
122:18
**hoping**
283:6

**historically**
229:2
**horrible**
302:12
**horrified**
248:12
**hour**
45:11, 47:13,
53:9, 53:15,
53:16, 150:21,
387:12, 394:7
**hours**
31:13, 31:22,
49:13, 50:20,
53:9, 234:17,
234:19, 407:12,
409:9, 434:22
**house**
133:14
**houses**
422:12
**however**
167:2, 197:6,
265:11, 307:8
**huge**
241:16, 241:21,
417:20
**hugely**
241:8
**huh-uh**
60:11
**human**
66:21, 81:18,
146:8
**hundred**
44:10, 56:5,
58:8, 59:3,
91:17, 97:13,
231:2, 236:13,
268:4, 268:10,
291:15, 294:19,
413:20
**hundreds**
128:14, 182:21,
333:18
**hunters**
39:2, 422:11
**hunting**
37:1
**husband**
39:10

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                          144

**hyperactive**
229:8

**I**

**i's**
320:13
**i(c**
416:2
**i(c)s**
416:16
**i3**
130:18
**ice**
34:4, 34:8,
36:8, 36:19,
37:16, 132:10,
133:17, 135:9,
137:6, 137:10,
141:10, 176:17,
182:3, 182:5,
196:6, 196:7,
206:19, 208:15,
230:10, 324:9
**idea**
17:12, 19:19,
20:9, 34:14,
40:15, 40:21,
52:11, 133:20,
199:21, 200:12,
321:12, 345:10,
375:4, 375:6,
376:3, 376:7,
377:19, 377:21,
407:11
**identification**
11:15, 67:12,
85:4, 88:8,
131:13, 138:4,
156:18, 158:9,
163:13, 216:11,
256:21, 264:12,
286:8, 294:2,
297:13, 315:17,
322:12, 339:3,
341:11, 343:12,
348:7, 371:22,
401:1, 414:18,
425:5, 427:8

**identified**
45:22, 204:19,
261:16
**identify**
9:17, 122:21,
149:16, 175:8,
198:17, 242:10,
261:14
**identity**
38:11, 149:1,
149:20, 255:12,
262:18, 312:14,
380:1, 392:22
**ignore**
286:20, 286:22,
287:1
**ignored**
211:5
**ill**
39:21
**imagine**
68:7
**immediate**
124:7
**immediately**
83:2, 128:16,
245:1
**immigrant**
22:6, 22:14,
22:19, 23:21,
25:16, 26:18,
26:20, 28:13,
28:22, 30:6,
32:22, 33:3,
33:5, 34:16,
35:17, 40:1,
40:16, 122:21,
123:12, 124:20,
127:6, 130:12,
130:16, 130:19,
131:3, 131:5,
131:21, 133:18,
135:18, 137:5,
137:11, 139:21,
141:6, 142:19,
142:21, 145:22,
211:3, 211:4,
235:17, 236:1,

236:6, 236:10,
236:19, 237:2,
238:1, 238:8,
238:14, 238:22,
239:5, 239:9
**immigrant's**
131:5, 131:6,
208:18, 236:10,
236:12, 254:21
**immigrants**
15:9, 16:2,
29:4, 40:10,
42:21, 43:5,
126:17, 145:20,
245:18, 247:6,
247:7, 367:7
**immigration**
15:10, 15:12,
15:17, 18:17,
69:19, 122:12,
124:13, 125:22,
127:7, 138:20,
146:11, 157:5,
158:12, 163:16,
235:10, 235:15,
245:4, 265:15,
265:17, 340:14,
363:21, 367:16,
368:14, 370:1,
370:9, 372:11,
373:3, 374:19,
401:2
**impact**
124:12, 273:1,
329:14, 330:21,
442:20
**impacted**
129:9, 205:1,
266:11, 269:22,
270:18
**implement**
245:17
**implication**
41:12
**implying**
126:9
**important**
18:12, 18:14,

26:4, 46:8,
51:3, 52:8,
71:3, 87:9,
146:9, 204:17,
215:5, 217:11,
217:15, 218:13,
221:13, 227:4,
241:8, 243:5,
245:15, 247:21,
253:22, 360:18,
390:11, 400:7
**importantly**
248:18
**impossible**
57:2, 95:8
**imprecise**
389:6
**impression**
86:4, 348:13
**improper**
80:17, 80:20,
81:2, 83:18,
87:1, 125:1
**improperly**
166:16
**inaccurate**
113:4, 121:14,
162:11, 166:21,
228:21, 290:7,
290:10, 299:13,
365:1, 365:3
**inadvertent**
320:14
**inappropriate**
41:7, 42:5,
80:17, 179:16,
229:5, 418:22,
424:2
**inappropriately**
42:4, 125:10
**inartful**
148:12, 193:5,
390:1
**inc**
1:8, 1:12,
5:11, 7:3, 7:5,
7:8, 9:4, 9:5,
9:7, 11:8,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                            145

12:11, 292:18,
401:5, 415:9
**incidents**
227:2
**include**
44:13, 46:2,
111:7, 149:9,
150:2, 150:3,
188:6, 263:22,
293:3, 297:19,
299:1, 333:2,
334:4, 335:10,
336:17, 415:22
**included**
195:15, 333:9
**includes**
108:19, 156:22,
195:10, 333:4,
432:16, 438:11
**including**
54:13, 170:17,
193:7, 345:4
**income**
288:15, 289:21,
297:6, 297:10,
300:17, 328:15
**inconsequential**
58:8
**inconsistency**
365:18
**inconsistent**
356:13, 361:5
**incorrect**
112:14, 229:17,
299:14
**incorrectly**
175:13, 300:13
**increase**
247:10, 389:11,
389:14
**increased**
229:17, 345:2
**increasing**
347:16, 388:14,
388:21
**incredibly**
247:21, 326:13
**incurred**
393:10, 394:10,

394:11, 395:4,
406:3, 406:8,
435:7, 439:1
**indemnification**
13:20, 250:6,
335:11
**indemnify**
213:21, 213:22,
438:4
**indemnitor**
236:3
**indemnitors**
339:7
**indemnity**
61:12, 66:12,
78:21, 87:15,
87:19, 91:3,
97:20, 212:3,
212:6, 248:21,
335:12, 339:4,
345:16, 359:9,
399:10, 399:16,
400:11, 400:16,
400:17, 401:3,
401:9, 426:14
**independent**
90:9, 94:18,
155:12, 212:9,
256:8, 403:4
**indeterminate**
368:3, 370:14
**indicate**
185:14, 185:17
**indicated**
41:13, 196:2,
196:4, 224:1,
231:21, 270:21,
283:10, 295:16,
331:1, 375:10
**indicates**
130:11, 247:9
**indication**
205:20
**indicia**
302:2
**individual**
27:6, 36:7,
36:11, 38:2,

38:18, 58:9,
58:14, 66:7,
66:21, 71:17,
125:16, 128:4,
140:6, 195:11,
196:4, 208:12,
228:16, 240:21,
245:12, 251:10,
253:3, 253:7,
253:13, 253:20,
325:12, 393:22,
416:8
**individual's**
124:13, 124:17
**individuals**
37:2, 128:6,
188:3, 196:2,
240:8, 247:11,
266:7, 277:12,
325:15
**infancy**
310:12
**inference**
42:4
**information**
13:15, 13:16,
14:14, 17:8,
47:9, 48:7,
49:2, 50:5,
50:6, 72:13,
72:14, 72:16,
73:15, 73:20,
90:14, 95:9,
172:15, 186:21,
188:12, 189:21,
191:3, 191:12,
191:19, 205:8,
207:4, 211:3,
217:11, 217:15,
218:13, 244:18,
251:22, 252:9,
262:3, 264:18,
264:22, 274:13,
277:6, 287:21,
290:12, 295:9,
295:10, 295:12,
296:15, 300:5,
300:7, 300:14,

301:16, 305:8,
316:18, 318:12,
324:20, 326:6,
332:22, 363:10,
384:16, 400:9,
403:21, 404:4,
404:10, 404:13,
406:15, 407:1,
411:8, 413:8,
414:11, 415:8,
415:16, 415:17,
416:1, 416:11,
417:2, 417:4,
417:6, 417:12,
417:15, 417:17,
418:3, 418:8,
418:10, 420:11,
421:18, 432:5,
432:7, 432:20,
433:2, 441:8,
441:9, 443:20
**initial**
201:3, 311:16,
384:13, 394:13,
394:14, 395:20,
404:6
**initially**
196:19, 240:6,
384:11, 414:4
**initiated**
123:21
**injunction**
224:22, 225:2,
225:6, 225:9,
225:17, 249:13,
272:22, 283:22,
384:5, 384:20
**injunctions**
214:19
**injunctive**
50:7, 52:14,
224:2, 295:18
**input**
271:14, 274:17,
288:11, 288:20
**inputted**
277:6, 288:12,
288:13, 295:5,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                             146

296:15
**inputting**
276:21, 277:1
**inquiry**
155:15, 156:2
**insane**
23:9, 81:16
**insisted**
410:13
**insofar**
87:7, 335:9,
442:22
**inspect**
430:3
**inspection**
426:2
**installed**
242:13, 242:16
**instance**
39:3, 39:6,
194:6, 250:3,
253:17, 254:20,
313:19, 380:1,
385:16, 402:5
**instances**
83:3, 137:5,
195:2, 196:12,
196:13, 198:8,
208:10, 208:11,
209:20, 210:2,
210:15, 211:2,
211:8, 245:5,
250:11, 250:13,
251:8, 251:11,
253:16, 267:12,
320:16, 380:13,
380:19, 380:22,
383:16, 393:22,
395:9
**instantaneous**
76:4
**instead**
142:5, 168:8,
237:18, 436:5
**instruct**
112:4, 168:7
**instructive**
269:14

**insufficient**
421:16, 427:4
**insurance**
1:5, 9:6, 9:19,
135:6, 329:18,
422:17
**intellectually**
357:18
**intelligently**
72:8
**intend**
13:1, 182:13,
237:10
**intended**
411:7, 413:13
**intention**
12:22, 369:22
**interest**
305:15, 305:22,
307:21, 309:6,
432:21, 446:11
**interested**
46:1, 75:8,
117:22, 269:16,
271:3, 278:6,
280:10
**interesting**
215:3, 364:4
**interim**
129:6, 196:14
**interject**
331:8
**interjected**
330:9
**intermediary**
196:18
**intern**
10:7
**internal**
54:12
**interrogatories**
153:14, 153:16
**interrupt**
19:16, 117:6,
159:5, 210:4,
225:11
**interrupting**
33:17, 41:17,

79:4, 114:21,
216:7, 225:5,
397:18
**intervene**
405:17, 405:21
**intervenor**
256:1, 261:17
**intervenors**
256:8, 264:10
**interview**
133:9, 133:17
**invalid**
175:13
**investigation**
154:22, 155:1,
350:21, 351:13
**invited**
256:8
**invoiced**
113:5, 122:12
**invoices**
5:13, 5:15,
13:22, 47:20,
48:19, 49:17,
50:10, 51:1,
51:17, 51:18,
52:3, 52:4,
53:12, 53:22,
54:10, 55:7,
56:17, 57:9,
57:20, 57:22,
58:5, 58:22,
60:21, 61:1,
69:8, 69:15,
71:11, 80:11,
81:3, 81:9,
81:19, 82:3,
82:4, 82:5,
82:20, 83:1,
84:5, 84:17,
85:5, 85:15,
85:18, 86:15,
87:6, 87:22,
88:5, 89:18,
89:20, 91:1,
96:9, 108:21,
147:11, 147:14,
148:6, 148:18,

149:5, 149:8,
149:17, 150:1,
150:3, 150:4,
150:5, 150:9,
151:3, 151:9,
151:15, 151:20,
166:16, 174:18,
175:5, 185:6,
197:5, 208:6,
212:11, 213:1,
213:9, 214:12,
216:19, 216:22,
223:3, 223:4,
233:9, 234:3,
249:17, 249:21,
250:3, 250:12,
270:5, 334:5,
334:10, 334:16,
335:19, 337:2,
337:9, 383:20,
436:15
**involved**
39:9, 262:2,
411:1, 434:22
**involving**
38:10, 229:17,
256:4
**ira**
7:14, 7:18,
7:19, 8:4, 8:5,
101:1, 211:12,
342:11, 348:22,
351:3, 352:21,
353:17, 369:2,
386:20, 392:7
**issuance**
192:14, 219:6
**issue**
24:9, 33:22,
34:2, 34:4,
38:9, 66:22,
87:9, 101:17,
112:17, 116:17,
125:9, 126:5,
137:5, 137:7,
137:8, 137:10,
149:15, 163:22,
179:4, 179:5,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

147

180:5, 189:6,
189:8, 189:11,
203:1, 236:9,
240:18, 282:14,
373:3, 378:22,
384:1
**issued**
19:6, 26:16,
27:3, 33:7,
33:20, 35:18,
44:1, 44:15,
44:21, 45:3,
46:14, 47:3,
47:4, 49:1,
49:15, 50:22,
52:7, 53:11,
53:22, 59:1,
70:17, 76:1,
89:22, 91:5,
93:6, 98:15,
104:5, 106:7,
108:8, 114:9,
123:18, 126:21,
129:6, 130:2,
136:12, 136:21,
137:3, 140:9,
140:12, 142:13,
151:4, 151:9,
176:4, 181:19,
182:17, 187:11,
188:3, 193:18,
200:1, 213:1,
214:3, 225:18,
228:4, 245:3,
247:8, 257:5,
273:1, 342:22,
435:12
**issues**
15:15, 21:15,
22:2, 22:18,
25:15, 101:3,
121:4, 130:17,
182:2, 209:16,
229:16, 260:10,
330:5, 330:6,
399:5, 427:6,
443:2
**issuing**
107:2, 114:14,

366:17, 367:6,
367:21, 368:13,
369:22, 370:9,
372:11, 388:13
**items**
232:21, 277:3
**iterations**
277:9, 296:7
**itself**
22:4, 129:11,
129:22, 219:14,
248:16, 250:17,
251:5, 265:6,
427:11

---

**J**

**jail**
101:18, 238:20
**january**
6:9, 7:4, 7:6,
7:9, 14:21,
67:14, 85:6,
85:16, 86:16,
87:13, 88:1,
88:4, 89:5,
246:12, 287:15,
292:2, 350:6,
350:13, 355:3,
363:19, 370:10
**jeremy**
4:17, 9:13
**job**
1:20, 35:12,
35:13

**john**
4:9, 9:22,
18:15, 103:19,
200:21, 237:15
**johnson**
193:8, 194:18
**joint**
212:10

**judge**
67:2, 85:7,
101:19, 128:7,
128:11, 128:14,
141:10, 225:12,
256:7, 403:4,
431:19
**judgment**
109:8
**judicial**
272:4
**judith**
1:22, 2:13,
446:2
**judy**
10:13
**juliana**
7:15, 103:11,
193:8, 206:18,
207:2, 207:7,
211:11, 311:18,
314:3, 314:4,
314:21, 323:7,
325:18, 327:9,
366:7
**juliana's**
199:13, 323:18
**julie**
101:3
**july**
70:15, 70:16,
360:6
**jumped**
35:10
**jumping**
257:18
**june**
6:4, 8:15,
69:10, 360:5,
388:15, 388:21,
389:10, 414:20,
415:7, 415:13,
419:16, 419:17,
419:22, 420:16,
420:21, 421:8

**justice**
128:13, 222:21,
235:20, 265:20,
265:22, 266:3,
266:22, 267:10,
269:4, 269:6
**justified**
64:18
**justifying**
116:1

---

**K**

**keep**
45:13, 45:15,
48:3, 48:4,
49:4, 49:9,
52:18, 52:22,
53:1, 53:3,
57:5, 58:1,
58:2, 58:3,
78:2, 92:10,
106:22, 110:3,
110:4, 117:2,
127:2, 130:12,
134:2, 148:3,
160:10, 184:7,
197:15, 226:7,
246:5, 247:3,
292:22, 417:12,
417:14, 418:21
**keeping**
17:2, 52:17,
92:6, 132:15
**keeps**
117:10
**kept**
130:13, 244:13,
272:20
**key**
137:4
**kidding**
98:3
**kids**
254:9
**killing**
292:11
**kind**
13:13, 33:22,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

148

66:8, 102:1,
115:21, 127:2,
139:17, 148:6,
176:6, 178:3,
178:6, 179:3,
179:4, 179:6,
195:14, 196:14,
197:14, 208:16,
209:21, 222:16,
231:10, 243:9,
284:4, 364:15,
400:16
**kinds**
27:5
**knew**
72:4, 193:5,
405:13
**knock**
133:14
**knowing**
120:8, 172:2,
251:13
**knowledge**
25:4, 25:10,
31:8, 62:12,
86:4, 87:21,
88:2, 88:5,
90:9, 95:10,
112:7, 134:7,
134:9, 155:12,
206:6, 206:22,
279:7, 320:15,
401:8, 401:11
**known**
290:21
**knows**
267:6, 324:18
**kowalczuk**
4:3, 10:5,
396:12
**kpi**
13:18, 58:12,
226:8, 271:21,
328:21, 337:10
**kpis**
273:19

L

**lack**
349:13, 353:8

**land**
306:8
**language**
40:14, 219:20,
232:19, 426:17
**large**
108:10, 159:19,
227:16, 312:21,
438:13
**largely**
177:13
**larger**
94:2, 229:4,
229:6, 269:11,
270:12
**largest**
334:16
**last**
16:6, 31:13,
55:16, 61:12,
66:1, 97:22,
120:1, 153:12,
155:2, 157:18,
161:14, 165:13,
166:12, 166:20,
168:19, 170:12,
171:1, 228:2,
258:6, 277:17,
286:14, 317:6,
320:12, 320:14,
340:7, 366:14,
367:2, 373:10,
386:7, 387:9
**lastly**
432:19
**late**
59:15, 59:16,
175:22, 177:19,
200:9, 230:9
**later**
70:22, 178:9,
227:15, 253:10,
280:12, 331:18,
348:14, 349:1,
369:2, 421:12
**latest**
367:19
**laura**
5:18, 6:3, 6:7,

6:10, 6:16,
55:14, 138:12,
155:3, 156:21,
158:11, 348:13,
348:20, 350:6,
350:12, 350:14,
350:16, 350:22,
351:3, 354:5
**laura's**
350:11, 352:21
**law**
4:4, 34:3,
36:22, 37:8,
73:11, 77:4,
177:13, 179:2,
207:11, 207:12,
237:1, 409:6
**lawsuit**
116:18, 116:22,
117:17, 119:12
**lawyer**
69:20, 126:6,
408:4, 408:8,
408:10, 408:17,
408:20, 409:4
**layperson's**
326:6
**lead**
282:11, 282:13
**leads**
243:17
**learned**
113:22, 321:11,
349:1, 400:18
**least**
99:19, 186:10,
187:9, 198:21,
230:22, 231:7,
231:12, 293:8,
367:14, 373:15,
438:11
**leave**
12:22, 87:8,
186:22, 293:9,
334:11, 382:9,
393:7, 403:9
**lecture**
117:10

**led**
303:13, 405:5
**ledger**
13:15
**left**
307:9, 307:10,
394:7, 398:18
**legal**
18:5, 36:21,
37:14, 74:5,
126:5, 179:4,
204:3, 390:16,
408:14, 408:19,
409:3, 434:16,
435:1, 435:3,
440:1, 440:2,
440:3, 440:11
**legally**
267:9
**legitimate**
107:17, 107:18
**length**
383:15
**lengthy**
31:19
**lepers**
246:11
**less**
100:19, 107:16,
194:20, 240:5,
240:9, 247:15,
253:5, 394:7
**let's**
14:10, 14:13,
15:7, 40:12,
57:9, 95:20,
98:10, 103:1,
103:7, 110:2,
112:21, 114:10,
118:19, 118:22,
119:2, 127:12,
147:16, 160:9,
161:2, 178:15,
197:12, 216:9,
217:18, 220:9,
228:3, 233:14,
238:10, 246:18,
259:21, 260:1,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

149

292:21, 293:22,
301:21, 304:13,
351:20, 353:16,
353:18, 369:12,
371:18, 383:9,
400:21, 424:6,
424:9, 424:10,
424:11
**letter**
7:17, 8:3,
8:15, 8:17,
89:22, 100:15,
102:5, 102:11,
102:18, 103:1,
103:8, 103:11,
125:5, 125:6,
132:7, 144:5,
155:9, 175:15,
176:20, 178:19,
178:20, 205:6,
205:13, 205:15,
205:16, 206:5,
206:9, 206:14,
206:17, 327:2,
327:4, 340:2,
340:7, 340:15,
340:16, 341:2,
342:13, 342:16,
342:22, 343:18,
344:3, 347:2,
347:10, 348:2,
349:10, 351:12,
353:3, 354:9,
354:15, 361:9,
363:14, 364:12,
369:2, 406:12,
415:18, 417:10,
418:7, 418:21,
420:20, 421:1,
421:2, 424:4,
424:19, 425:6,
425:12, 426:1,
426:10, 426:17,
427:9, 427:21,
429:4, 429:21,
430:2
**letters**
210:18, 386:19,

407:2, 410:5
**letting**
397:22
**level**
75:21, 175:17,
181:11, 337:19,
337:20, 407:3
**liabilities**
291:11, 305:7,
331:21, 332:1,
333:9, 335:8,
336:10, 336:13,
336:16, 336:17,
337:22, 338:17
**liability**
19:19, 19:20,
20:3, 20:20,
20:21, 21:12,
21:14, 21:18,
23:9, 24:10,
24:14, 25:4,
26:6, 26:7,
26:11, 29:6,
81:15, 96:8,
96:10, 116:11,
116:13, 119:17,
212:10, 332:19,
333:3, 333:4,
334:8, 334:17,
346:6, 382:5,
422:18
**liberty**
124:3
**libre**
9:4, 10:1,
11:8, 12:11,
13:18, 227:7,
271:7, 329:20,
384:14, 401:14,
401:16, 401:19,
402:2, 402:8,
405:16
**licensed**
37:7
**lie**
92:22
**lied**
42:5, 68:11,

353:13
**liens**
306:11, 307:2,
307:5
**life**
13:21, 14:18,
14:19, 17:16,
41:1, 81:14,
83:20, 240:7,
275:8, 389:19
**liked**
197:8, 197:10,
310:13
**likely**
38:11, 100:19,
104:16, 104:20,
178:22, 183:2,
229:2, 252:10,
402:5
**limandri**
306:22, 359:22,
374:20, 375:2,
375:8, 375:9,
375:21, 376:20,
377:2, 377:13,
378:3, 378:18,
378:21
**limandri's**
376:12
**limit**
134:14
**limited**
38:15, 351:22
**line**
24:22, 42:17,
89:18, 147:9,
219:3, 219:21,
364:13, 389:1,
435:4
**lines**
70:9, 183:21,
191:18, 233:19,
327:20
**liquid**
305:6, 305:12,
336:13, 336:15,
337:1, 337:8,
337:17, 338:2,

432:6, 432:14,
433:15
**list**
13:11, 13:19,
84:21, 85:5,
122:4, 141:12,
198:17, 199:4,
211:20, 217:22,
232:21, 234:22,
251:12, 256:10,
260:16, 263:13,
292:3, 363:8
**listed**
12:5, 85:15,
121:10, 160:15,
160:17, 216:5
**listen**
71:22, 221:21
**listing**
121:4
**litany**
78:3
**literally**
142:7, 142:8,
152:14, 153:17,
208:18, 219:4,
312:18, 341:22,
384:21, 386:20
**litigation**
82:16, 98:1,
214:17, 224:16,
241:22, 252:13,
284:9, 285:16,
297:16, 336:7,
355:21, 412:12,
438:3, 438:7,
442:2, 443:18
**little**
14:10, 48:6,
51:11, 147:21,
148:5, 149:21,
189:4, 197:15,
199:2, 269:12,
339:22, 364:3,
386:22
**live**
128:11
**lives**
81:17, 129:9,

230:6, 254:7,
254:9, 254:17,
385:5
**llc**
3:13
**llp**
2:5, 3:5
**loans**
335:15
**location**
132:11, 242:10,
244:22
**locational**
242:10
**lock**
421:21, 422:4
**locked**
238:19
**locking**
422:18
**login**
274:2
**long**
44:13, 53:21,
172:20, 223:16,
230:16, 235:15,
246:1, 256:11,
268:11, 319:19,
425:6
**longer**
18:18, 18:22,
19:7, 100:18,
124:2, 124:5,
147:21, 248:15,
258:16, 366:17,
367:6, 373:3,
411:9
**look**
43:13, 45:18,
50:12, 51:4,
57:3, 58:11,
58:13, 60:7,
60:14, 61:19,
62:19, 66:9,
70:3, 70:5,
71:14, 72:6,
76:10, 77:16,
102:11, 181:7,

181:8, 186:6,
210:15, 212:17,
217:18, 219:5,
228:7, 245:8,
245:11, 258:9,
273:19, 284:13,
284:20, 291:1,
310:18, 353:17,
363:17, 382:19,
386:9, 392:3,
393:19, 393:22,
397:19, 407:10,
407:11, 425:11,
426:9, 427:15,
440:22, 441:1
**looked**
77:13, 173:20,
269:12, 313:6
**looking**
14:7, 68:21,
69:4, 69:6,
70:11, 71:17,
84:2, 94:15,
94:16, 103:8,
111:4, 122:10,
138:5, 138:18,
140:7, 146:10,
155:1, 159:9,
163:4, 163:10,
179:2, 179:3,
200:19, 217:6,
217:10, 217:14,
217:16, 218:10,
218:14, 258:5,
262:15, 282:5,
284:12, 292:5,
292:7, 293:2,
294:5, 332:9,
335:18, 372:20,
408:20, 435:1
**looks**
89:17, 131:16,
286:10, 292:1,
336:1, 429:7
**loses**
267:14
**loss**
7:3, 7:6, 7:9,

271:12, 277:21,
278:9, 279:1,
279:18, 280:1,
280:6, 280:20,
281:7, 287:6,
287:15, 288:1,
290:6, 292:2,
293:18, 294:9,
296:4, 296:12,
297:14, 297:18,
298:1, 301:7,
303:2, 326:16,
390:21, 391:1,
391:2, 406:9,
431:12, 435:14,
439:2, 440:9,
442:16
**losses**
116:20, 116:21,
392:22
**lost**
82:14, 82:16,
82:17, 139:17,
347:18
**lot**
14:5, 27:14,
52:10, 86:13,
102:12, 151:21,
201:6, 207:3,
213:13, 233:2,
248:1, 283:16,
335:13, 336:8,
394:2, 440:18
**love**
222:10
**lower**
110:19, 110:21
**luck**
92:12
**lunch**
120:17, 147:12,
147:22
**lying**
86:22

| M |
| --- |

**ma'am**
14:8, 69:5,

70:13, 121:6,
138:19, 138:22,
146:12, 147:2,
182:9, 185:7,
225:10, 260:12,
277:18, 294:13,
340:16, 397:17,
399:8, 410:9,
424:20, 426:5
**mad**
432:2
**made**
17:19, 26:12,
27:20, 50:17,
55:3, 59:21,
60:3, 60:6,
64:2, 78:18,
87:2, 101:1,
107:9, 140:6,
142:1, 143:10,
156:2, 170:16,
195:9, 204:22,
209:5, 210:19,
215:9, 224:5,
228:2, 248:22,
251:4, 261:22,
271:16, 276:18,
285:14, 317:6,
328:7, 336:21,
338:21, 339:10,
346:12, 355:8,
359:18, 360:10,
372:5, 376:1,
376:14, 392:1,
400:1, 402:21,
425:17, 425:21,
440:19, 442:3
**magnitude**
338:1
**main**
188:9
**maintain**
57:16, 291:8,
418:9
**maintained**
274:1
**major**
297:7

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

151

**majority**
23:8, 33:10,
33:11, 33:13,
105:12, 106:2,
125:4, 140:4,
151:19, 187:15,
187:16, 187:17,
188:2, 188:13,
188:14, 188:15,
188:18, 188:19,
189:2
**make**
13:1, 15:8,
20:8, 24:19,
39:8, 41:3,
41:4, 58:18,
62:3, 62:8,
62:12, 70:21,
75:21, 91:2,
97:10, 104:21,
125:20, 129:2,
139:10, 140:9,
140:10, 142:21,
149:11, 149:14,
153:19, 155:15,
157:16, 157:17,
165:6, 165:7,
173:22, 174:9,
175:19, 175:20,
177:21, 182:14,
183:20, 184:3,
189:12, 197:13,
199:3, 209:1,
209:9, 212:18,
223:21, 224:6,
225:6, 227:14,
230:5, 238:4,
238:6, 238:15,
245:14, 246:2,
247:18, 251:6,
252:8, 252:15,
265:22, 268:3,
269:18, 274:21,
285:17, 295:19,
300:13, 301:6,
303:7, 309:21,
337:5, 343:22,
344:1, 347:14,

349:8, 350:2,
355:9, 357:22,
359:11, 380:18,
389:4, 390:18,
391:9, 391:12,
401:14, 401:16,
401:19, 402:13,
402:16, 405:13,
426:1, 427:22,
428:14, 438:20
**makes**
37:10, 60:2,
94:14, 94:21,
120:14, 124:6,
130:7, 174:12,
231:10, 241:5,
247:19, 252:10,
266:3, 274:21,
275:4, 329:10
**making**
100:22, 101:4,
116:16, 132:10,
135:9, 139:6,
179:12, 201:18,
210:10, 211:14,
246:11, 406:14,
426:21
**man**
107:6, 379:15
**man's**
31:13
**manage**
205:2, 392:1
**management**
132:6, 177:2,
177:4, 227:3,
227:6, 272:21,
348:21
**manager**
176:15, 176:18,
179:16, 205:14,
350:6
**manages**
272:2
**managing**
257:7
**manner**
273:22, 356:9

**manual**
38:16
**mar**
7:16
**march**
1:17, 7:13,
7:17, 8:3, 8:17,
8:21, 9:11,
49:14, 54:4,
54:18, 73:4,
91:4, 230:8,
321:22, 339:11,
340:2, 340:20,
340:22, 341:2,
341:13, 341:19,
342:1, 342:3,
342:7, 342:16,
342:22, 343:13,
344:11, 344:16,
347:10, 347:11,
348:8, 348:17,
349:5, 349:9,
349:16, 349:17,
350:4, 353:2,
354:9, 355:3,
355:13, 356:11,
360:20, 360:21,
361:7, 361:9,
363:14, 365:7,
365:22, 366:1,
374:15, 379:3,
386:19, 386:20,
386:21, 406:4,
409:20, 410:6,
424:19, 424:22,
425:17, 426:4,
426:22, 427:10,
427:17, 428:1,
428:6, 428:9,
428:13, 428:15,
429:5, 429:6,
429:7, 429:10,
429:13, 429:19,
429:20, 429:21,
430:1, 430:3,
446:15
**marco**
73:11, 74:3,

74:19, 75:15,
100:12, 193:9,
194:3, 306:21,
306:22, 307:2,
376:20
**mario**
4:18, 10:3
**mark**
11:13, 85:1,
156:15, 158:7,
161:4, 216:9,
256:19, 285:21,
286:4, 293:22,
297:11, 315:14,
331:18, 348:4,
371:18, 371:19,
400:21
**marked**
11:14, 11:20,
67:11, 85:3,
88:7, 88:16,
131:12, 138:3,
156:17, 158:8,
163:12, 216:10,
256:20, 286:2,
286:7, 292:15,
292:17, 294:1,
297:12, 315:16,
321:21, 322:11,
339:2, 341:10,
343:11, 348:6,
371:21, 400:22,
414:17, 425:4,
427:7
**marking**
31:12, 339:19,
343:4
**mary**
3:12, 8:15,
8:18, 8:20,
10:9, 10:10,
420:1, 421:2,
428:8, 429:8
**master**
45:21, 293:13
**match**
57:4, 160:20
**material**
347:4

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                    152

math
105:1, 108:13,
108:17, 302:12,
435:19, 435:21
mathematical
108:5, 113:21,
398:1
matter
9:6, 17:1,
25:8, 95:11,
112:9, 112:11,
116:2, 196:1,
213:8, 247:16,
254:10, 279:20,
320:2, 340:19,
377:20, 420:13
matters
95:14, 412:18
maybe
54:18, 101:14,
101:17, 130:22,
131:9, 137:4,
178:7, 226:19,
228:21, 244:18,
313:11, 324:7,
382:12, 392:18,
409:6, 409:7
mcfadden
4:10
mcguirewoods
335:19
mclean
1:16, 2:8, 3:8,
9:16
mcnutt
207:12
mdonovan@nexushe-
lps
7:20
mean
19:2, 19:20,
21:2, 23:12,
27:7, 27:19,
28:2, 28:17,
34:20, 45:10,
59:18, 62:4,
64:6, 65:7,
87:10, 104:16,

105:7, 105:18,
105:20, 115:2,
127:1, 127:2,
132:15, 137:13,
143:4, 146:7,
158:6, 161:5,
167:14, 182:22,
189:4, 198:3,
204:2, 212:17,
217:3, 223:12,
223:14, 223:20,
236:5, 237:22,
239:20, 241:18,
242:7, 242:8,
242:19, 263:1,
268:19, 271:7,
272:10, 274:4,
281:15, 285:2,
287:22, 299:9,
325:16, 328:2,
345:15, 346:20,
356:5, 359:16,
360:22, 362:20,
364:10, 368:10,
370:15, 371:1,
371:8, 372:12,
375:19, 379:21,
380:3, 389:15,
391:11, 405:1,
405:18, 407:11,
411:18, 412:19,
423:5, 429:6,
438:6, 439:20
meaning
16:10, 124:15,
124:19, 240:20,
373:12
means
21:10, 28:3,
88:10, 148:7,
166:2, 228:16,
377:7, 419:14
meant
148:12, 173:20,
313:16
meet
34:7, 165:9,
179:14, 227:10,

308:19, 329:17,
336:19, 337:22,
338:17
meeting
26:20, 40:9,
40:17, 196:8,
410:1, 410:10,
410:17, 411:22,
412:6, 412:14,
412:16, 413:11,
413:12, 413:13,
428:5, 428:6
meetings
40:22, 235:12,
235:18
member
38:12, 39:12,
39:14, 238:9,
238:11, 238:13,
238:17, 238:19,
327:9
members
39:13
memory
196:10, 199:17,
270:9, 274:6,
397:1, 397:2
mention
392:6, 392:10,
417:9, 417:11,
421:3
mentioned
380:13, 380:19,
386:11
mentions
342:4
meow
220:15, 222:6,
222:8
messages
401:21
met
144:1, 309:2
method
275:12, 276:6
metric
58:11
michael
9:5

micheal
1:14, 2:1,
7:18, 8:4,
10:16, 445:2
middle
35:11, 128:9,
200:9, 200:14
middlesex
306:7
might
15:14, 20:9,
34:1, 34:2,
34:4, 45:9,
76:2, 103:15,
141:11, 181:8,
188:8, 194:20,
245:11, 245:12,
248:19, 253:4,
269:18, 273:19,
279:13, 299:20,
302:22, 335:17,
432:8
mike
8:5, 8:9, 8:11,
67:8
million
54:6, 54:8,
57:20, 99:14,
138:16, 152:16,
152:18, 231:7,
231:13, 231:15,
277:5, 298:2,
298:6, 298:19,
302:10, 302:16,
333:19, 337:13,
346:10, 346:11,
355:15, 355:17,
356:17, 356:18,
357:8, 357:14,
368:4, 368:16,
368:22, 370:5,
372:19, 386:14,
386:16, 387:1,
387:16, 390:3,
390:16, 391:16,
391:18, 404:19,
406:5, 406:9,
406:18, 407:8,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                    153

407:15, 431:12,
431:16, 431:20,
432:14, 433:15,
434:2, 434:5,
434:9, 434:13,
435:7, 435:13,
436:10, 437:22,
438:15, 439:7,
439:11, 440:9,
440:20, 441:12
**millions**
272:6, 392:5,
412:12, 438:7,
438:8
**mind**
33:17, 258:18,
326:7, 383:3
**mine**
161:1, 286:19,
315:19
**minute**
27:12, 33:16,
35:5, 95:21,
150:12, 225:3,
395:7, 409:11
**minutes**
54:2, 147:22,
156:11, 184:16,
184:17, 191:15,
234:17, 234:19,
256:14, 321:9,
323:5, 393:13,
395:6, 398:3
**miscommunication**
354:4
**misrepresent**
358:7
**miss**
210:13
**missed**
166:22, 181:8
**misses**
354:17
**missing**
16:6
**misstate**
40:14, 42:13
**misstated**
61:22

**misstates**
345:15, 345:16
**misstating**
62:7
**mistake**
179:17, 209:20,
351:6
**misunderstand**
404:7
**misunderstanding**
41:19, 52:10,
131:9, 313:11
**misunderstandings**
52:11
**mitigate**
209:3, 392:9
**mitigated**
122:18, 124:9,
124:15, 208:7,
208:20, 326:17
**mitigation**
125:7, 207:19,
208:4, 209:16,
210:20, 234:9,
261:20, 261:21
**mixed**
58:16, 176:6
**mixing**
127:3
**model**
329:21, 330:17,
331:2
**modified**
275:12, 329:21,
330:16, 359:1
**mom**
239:12
**moment**
242:16, 357:9,
398:11
**moments**
398:9
**monday**
286:12, 341:16,
341:19, 341:20,
386:21
**money**
20:1, 82:14,

97:5, 97:14,
102:12, 116:19,
116:22, 117:14,
117:15, 119:12,
119:15, 142:5,
169:11, 169:12,
236:9, 274:20,
327:16, 333:6,
347:18, 360:2,
367:9, 377:9,
378:8, 378:14,
383:22, 405:7,
443:6
**monies**
376:18
**monitor**
9:12, 239:16,
242:17, 242:19
**monitored**
240:1, 240:15,
242:7, 245:6,
245:7, 247:11
**monitoring**
239:20, 239:21,
240:17, 240:20,
243:6, 243:20,
244:6, 245:1,
248:5, 248:12
**month**
66:1, 231:7,
308:7, 308:11,
336:7
**monthly**
5:16, 328:5,
432:16, 432:17,
433:16
**months**
70:21, 76:3,
77:12, 78:6,
114:14, 115:4,
115:8, 115:16,
179:18, 227:15,
230:13, 245:7,
245:18, 245:19,
245:21, 246:4,
246:5, 388:1
**moore**
157:1, 158:15,

277:19
**moore's**
277:16
**more**
19:8, 45:3,
46:14, 47:4,
49:1, 49:11,
50:22, 53:11,
57:11, 72:8,
78:2, 80:8,
99:20, 107:20,
109:13, 110:13,
116:2, 116:3,
116:17, 118:21,
119:2, 129:18,
146:8, 151:9,
154:1, 160:9,
162:6, 167:5,
169:2, 173:8,
173:16, 178:22,
179:22, 181:14,
181:17, 189:4,
189:7, 194:20,
199:1, 200:4,
203:6, 204:20,
206:18, 211:22,
226:20, 228:7,
229:2, 233:6,
234:20, 234:21,
246:22, 248:17,
249:3, 252:10,
256:15, 256:17,
259:10, 264:9,
271:3, 272:16,
275:1, 299:8,
308:10, 315:10,
317:2, 320:6,
331:6, 369:4,
373:7, 384:21,
385:8, 387:11,
389:15, 389:17,
389:21, 392:1,
394:3, 395:5,
403:10, 437:2,
438:20, 439:9,
439:17, 440:18
**morning**
11:3, 11:4,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

154

11:7
**mortgages**
306:15, 335:15
**most**
125:11, 180:8,
180:10, 193:9,
223:10, 228:1,
229:22, 243:10,
292:1, 293:18,
328:21, 333:1,
355:20
**mostly**
401:22
**motion**
63:8, 63:17,
64:19, 66:6,
69:19, 69:21,
109:8, 213:11,
213:16, 330:13,
405:17
**motions**
261:18
**mountain**
327:6
**mouth**
299:11
**move**
161:2, 234:13,
271:1, 275:13,
275:15, 276:16,
353:19, 386:17,
386:18
**moved**
113:5, 372:14
**moving**
25:13, 106:22,
137:20, 379:14
**much**
18:18, 23:9,
38:20, 91:20,
94:21, 98:22,
100:18, 100:19,
110:13, 110:19,
110:21, 111:1,
111:2, 116:17,
146:8, 173:16,
178:22, 179:22,
191:8, 193:4,

243:4, 247:18,
265:4, 291:14,
305:5, 333:13,
335:14, 335:22,
353:13, 360:2,
374:21, 376:3,
377:9, 382:6,
433:10, 433:20,
437:11, 438:1,
439:9, 439:16,
441:4, 443:9,
444:2
**multiple**
52:22, 74:15,
89:18, 140:2,
141:5, 183:17,
195:13, 313:17,
442:7
**multiunit**
335:5
**murdering**
39:10
**must**
118:16, 220:4,
222:4, 319:1
**myself**
222:12, 237:20,
342:17

**N**

**name**
39:19, 39:22,
42:8, 55:18,
55:19, 73:11,
75:15, 122:10,
198:20
**named**
122:8
**names**
165:19, 217:1,
416:8, 417:3,
417:5
**narrative**
74:17, 74:19,
89:19
**nasty**
237:19
**national**
106:4

**naturalization**
265:17
**naturally**
283:11, 296:10
**nature**
244:8, 245:22,
355:4, 365:12,
418:10
**nd**
67:14, 85:6,
85:16, 86:16,
87:13, 88:1,
89:5, 363:19,
366:3
**near**
243:8
**necessarily**
48:10, 92:22,
129:16, 172:17,
175:6, 258:15,
298:22, 324:14,
349:2
**necessary**
398:9, 405:15
**need**
16:6, 25:11,
26:10, 38:4,
48:4, 53:5,
74:13, 86:5,
87:17, 97:17,
106:19, 113:11,
120:16, 149:19,
150:18, 203:18,
208:17, 235:1,
264:18, 268:11,
269:10, 272:1,
285:13, 298:11,
308:12, 323:1,
337:14, 346:13,
358:12, 358:14,
363:5, 384:19,
388:8, 388:10,
393:13, 394:5,
397:22, 406:7,
407:10, 407:11,
413:17, 416:12,
425:8
**needed**
210:12, 322:13,

407:4, 407:5,
411:11, 415:15,
415:20, 420:20
**needs**
24:20, 28:9,
206:19, 308:10
**negative**
77:5, 267:13,
302:1
**negotiate**
400:8, 405:5,
407:5, 435:7,
435:9
**negotiated**
400:15
**negotiations**
380:5
**neither**
303:1, 446:9
**nervous**
73:7
**never**
16:5, 23:8,
37:11, 38:1,
38:2, 55:18,
61:7, 102:17,
104:1, 104:7,
105:12, 105:19,
133:19, 144:20,
153:18, 157:15,
177:15, 204:16,
209:11, 209:14,
215:11, 236:20,
238:19, 241:19,
244:10, 250:16,
250:18, 274:1,
301:12, 303:9,
316:11, 316:12,
316:21, 344:14,
346:10, 354:13,
354:14, 355:14,
356:16, 356:17,
357:18, 374:22,
376:16, 428:16,
428:18, 438:4
**new**
123:20, 128:10,
178:8, 267:1,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

155

275:6, 283:16,
308:2, 366:1,
370:4, 370:7,
372:4, 372:15,
372:18, 373:12,
387:19, 388:1,
389:1, 404:9,
404:15
**news**
329:16, 329:19
**next**
49:12, 75:14,
75:18, 77:21,
78:3, 184:2,
190:21, 191:2,
218:11, 292:18,
341:22, 387:12
**nexus's**
429:14
**nice**
290:22, 395:14,
395:17, 397:18
**nine**
27:13, 185:22,
186:8, 186:9,
186:13, 186:19,
190:17, 191:5,
191:10, 192:11,
261:10, 263:21
**nobody**
30:12, 142:22
**non-rli**
122:16
**none**
134:3, 141:14,
173:19, 180:21,
355:12
**nonsensible**
84:1
**nontimely**
63:16
**normal**
49:4, 49:9,
57:5, 361:13,
365:9, 365:20
**normally**
297:3
**nos**
5:20, 6:5,

6:19, 8:7, 8:13
**notarial**
446:14
**notary**
2:15, 446:1,
446:21
**note**
251:6, 320:10,
335:8, 335:10,
345:21, 360:18,
374:3, 419:22,
425:11
**notebooks**
46:22, 99:4
**notes**
402:4
**nothing**
10:18, 18:9,
95:18, 116:8,
124:17, 193:21,
300:12, 371:1,
386:15, 443:21
**notices**
12:13, 45:8,
45:10, 45:14,
46:3, 46:17,
46:18, 47:5,
48:14, 53:1,
61:4, 71:8,
72:1, 91:5,
147:18, 148:15,
154:8, 155:17,
156:7, 161:13,
161:21, 162:15,
165:13, 166:11,
166:14, 166:20,
168:18, 210:7,
244:10, 345:2,
345:4, 347:21,
352:15, 362:2,
415:22, 416:2,
416:4, 416:5,
416:6, 416:13,
416:21
**noticing**
384:5
**notification**
384:3

**notoriously**
76:7
**november**
6:12, 69:12,
158:11, 249:13,
276:21, 283:21,
286:12, 287:4,
289:3, 366:16,
367:5, 367:14,
367:20, 368:13,
369:22, 372:1,
372:10
**nta**
187:21, 189:11
**ntas**
188:3
**number**
15:1, 15:3,
16:2, 16:5,
16:8, 16:19,
18:8, 27:8,
34:6, 44:4,
44:17, 45:14,
46:11, 46:19,
47:15, 49:9,
51:17, 92:7,
93:4, 93:20,
93:22, 94:2,
94:6, 94:8,
94:14, 94:16,
94:17, 94:19,
95:1, 95:2,
95:10, 95:15,
96:5, 96:15,
96:19, 99:7,
108:20, 113:19,
115:14, 147:14,
148:7, 148:13,
151:1, 154:4,
156:21, 157:2,
157:22, 158:20,
159:19, 171:8,
171:14, 171:15,
172:3, 173:7,
183:9, 184:3,
184:6, 184:11,
185:6, 186:2,
189:8, 189:10,

189:18, 190:6,
190:7, 204:19,
226:7, 227:16,
228:7, 229:4,
229:6, 240:11,
264:16, 264:17,
277:11, 286:6,
300:20, 310:7,
312:21, 333:9,
336:2, 364:13,
382:9, 398:9,
402:11, 407:12
**number's**
298:9
**numbers**
48:3, 48:4,
48:9, 93:7,
93:12, 95:11,
113:15, 113:17,
113:18, 114:6,
115:21, 116:2,
116:4, 148:4,
153:4, 153:15,
157:8, 171:18,
191:7, 192:19,
262:16, 301:6,
302:16, 310:19,
310:20, 417:8,
441:13, 441:15
**numeral**
320:13
**numerator**
113:6
**numerous**
158:14, 158:15
**nw**
4:11

---
O
---

**oath**
226:15
**object**
32:1, 83:10,
113:7, 118:15,
172:6, 419:21
**objection**
18:2, 20:22,
22:7, 22:9,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

156

22:21, 24:1,
25:18, 30:18,
30:19, 31:19,
32:16, 35:6,
36:3, 36:20,
47:6, 47:8,
51:16, 57:13,
57:15, 61:18,
61:21, 75:2,
81:8, 81:22,
82:2, 95:6,
106:8, 107:5,
111:8, 136:13,
144:17, 145:8,
155:19, 162:1,
162:8, 162:17,
165:15, 172:4,
297:1, 300:3,
301:10, 304:18,
353:4, 356:7,
367:17, 377:17,
398:15, 399:15,
399:17, 399:18,
399:19, 400:1,
408:13
**obligated**
238:4, 238:6
**obligates**
22:4
**obligation**
21:16, 21:19,
23:16, 23:18,
25:15, 26:3,
27:22, 28:4,
28:5, 28:7,
28:8, 28:11,
29:22, 30:1,
30:2, 30:3,
30:7, 30:16,
32:20, 32:22,
33:1, 34:21,
35:1, 35:19,
35:22, 124:10,
133:4, 136:6,
140:22, 141:2,
141:4, 141:5,
144:13, 308:20
**obligations**
22:5, 24:3,

24:16, 32:15,
141:6, 165:9,
211:5, 227:11,
231:10, 239:11,
239:14, 308:15,
336:20
**obligor**
36:14, 73:20,
124:18, 131:14,
131:20, 131:22,
132:2, 133:3,
135:2, 135:4,
135:5, 135:17,
137:15, 139:20,
175:15, 175:16
**obligor's**
139:14
**obligors**
133:1, 180:6,
236:4
**obstructionist**
442:4
**obtain**
207:19
**obvious**
220:13, 236:21,
316:20, 398:10,
411:6
**obviously**
110:17, 110:20,
146:7, 174:7,
178:12, 178:13,
189:10, 204:8,
241:21, 282:9,
302:18, 365:11,
373:11, 373:13,
425:11
**occasions**
193:13, 194:10,
197:1
**occur**
314:20
**occurred**
313:22, 314:22,
315:2, 353:9,
373:14
**occurs**
64:14, 176:3,

196:19, 213:4
**october**
69:11, 217:9,
218:9, 366:15,
367:4
**odd**
308:7
**offended**
41:11, 69:1,
237:13, 237:19,
358:8
**offenders**
243:6
**offensive**
40:15, 40:19,
40:20, 41:9
**offer**
376:1, 376:3,
380:4
**offered**
378:15, 380:2,
380:14, 380:22,
395:14, 432:4,
432:19
**offering**
418:20
**office**
45:22, 133:11,
133:17, 141:10,
174:17, 179:18,
196:6, 196:7,
231:21, 242:21,
329:18, 426:3
**officer**
33:21, 34:8,
69:22, 102:4,
102:6, 122:17,
125:11, 128:20,
129:2, 137:6,
175:15, 176:14,
195:1, 196:16,
208:15, 208:19,
210:17, 324:9,
446:3
**officers**
176:17, 182:5
**offices**
2:2, 335:3,

361:19, 426:3,
427:11, 429:14,
429:20, 430:7
**offset**
222:22, 299:2
**often**
16:18, 72:9,
76:15, 177:6,
228:8
**oh**
37:19, 58:13,
69:3, 71:14,
100:6, 119:22,
208:8, 255:11,
322:8, 331:15,
351:13, 364:16,
366:8, 393:3,
409:7, 430:13,
431:22, 443:13
**old**
7:5, 7:8,
283:15, 292:15,
292:18, 330:17,
404:2, 404:3
**once**
35:16, 65:21,
65:22, 66:3,
66:14, 69:21,
132:19, 132:21,
138:8, 189:5,
192:9, 213:3,
235:3, 253:11,
266:14, 278:14,
299:1, 300:16,
303:5, 410:20,
432:10
**one-off**
66:9, 67:3,
76:13, 162:3
**onerous**
246:7, 413:6
**ones**
69:7, 80:6,
84:21, 93:16,
159:14, 198:13,
346:5, 380:13
**ongoing**
28:19, 123:14,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                        157

271:15, 345:9,
405:19
**only**
21:19, 23:14,
31:8, 34:11,
36:15, 37:14,
38:18, 38:19,
50:4, 50:16,
76:5, 87:7,
100:17, 106:15,
109:9, 110:5,
112:6, 119:15,
129:3, 143:22,
184:16, 198:2,
198:8, 203:4,
203:12, 206:4,
218:20, 245:18,
245:21, 246:3,
257:13, 259:16,
282:15, 301:5,
307:9, 307:10,
335:9, 343:21,
368:1, 394:7,
402:5, 404:11,
417:11, 420:10,
423:10, 442:22
**open**
19:19, 19:21
**open-ended**
119:9
**opened**
24:9, 267:2
**opening**
273:15
**opens**
269:5
**operate**
331:4, 401:22
**operated**
207:10, 278:8,
278:22, 279:18,
280:20, 281:6
**operating**
271:12, 277:21,
280:6, 284:22,
285:11, 335:4
**operation**
327:21, 335:5

**opinion**
60:20, 111:13
**opportunities**
59:9, 62:22,
63:6, 230:4
**opportunity**
27:6, 90:12,
90:13, 122:15,
134:16, 147:10,
197:9, 197:10,
254:15, 257:8,
257:11, 260:11,
298:15, 323:16,
398:21, 405:20,
431:8, 432:6
**opposite**
312:18
**option**
73:22, 129:3,
387:18
**orange**
88:10
**order**
13:13, 50:7,
52:14, 90:1,
90:4, 102:5,
104:3, 121:9,
128:15, 130:8,
167:3, 209:2,
214:20, 224:22,
225:1, 225:5,
225:12, 225:16,
264:8, 267:17,
268:21, 269:2,
272:4, 272:8,
272:16, 272:18,
273:15, 274:17,
276:6, 276:8,
295:18, 299:16,
299:17, 301:14,
329:14, 330:14,
334:19, 338:1,
352:7, 384:5,
384:10, 384:17,
384:22, 431:19,
435:12
**ordered**
84:18, 289:9

**orders**
224:2
**organization**
419:3
**originally**
272:20, 359:1
**other**
14:2, 15:15,
48:15, 51:4,
61:6, 92:14,
95:12, 96:20,
101:18, 109:17,
109:21, 110:2,
110:8, 110:19,
113:20, 114:2,
114:6, 115:12,
122:22, 142:6,
150:4, 168:16,
168:18, 182:2,
188:7, 191:13,
192:7, 198:10,
198:13, 211:19,
222:19, 226:8,
234:4, 236:5,
244:2, 244:12,
249:16, 249:21,
253:21, 263:3,
263:16, 263:17,
264:4, 264:5,
264:9, 264:12,
264:19, 264:21,
291:9, 306:12,
307:5, 312:9,
312:13, 312:20,
315:9, 327:21,
330:5, 333:8,
334:15, 335:16,
340:13, 343:21,
380:9, 380:12,
380:17, 380:21,
381:2, 381:8,
381:10, 381:11,
381:18, 400:15,
402:8, 404:12,
416:6, 422:5,
432:21, 433:4,
437:6, 438:12,
443:15, 443:17

**others**
6:8, 6:11,
6:18, 8:6,
38:14, 110:16,
181:7, 191:6,
264:1
**otherwise**
49:22, 59:5,
59:9, 100:17,
103:22, 143:19,
198:9, 198:10,
198:15, 291:8,
335:13, 446:11
**out**
25:7, 26:8,
42:6, 45:10,
53:8, 53:22,
65:11, 65:13,
70:9, 77:5,
88:10, 88:13,
92:12, 93:19,
94:9, 102:21,
115:15, 126:17,
129:5, 133:10,
133:21, 138:11,
146:1, 150:13,
182:20, 206:18,
228:17, 234:11,
237:18, 246:17,
247:20, 247:22,
262:1, 272:19,
275:2, 288:16,
288:17, 293:11,
293:15, 309:1,
319:7, 329:17,
332:5, 334:1,
353:18, 366:21,
382:18, 386:6,
403:17, 405:20,
413:19, 438:7,
442:8, 443:4
**outcome**
446:12
**outlined**
177:1
**outside**
64:18
**outstanding**
16:12, 19:9,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020
158

19:13, 85:8,
87:17, 105:5,
105:6, 149:8,
149:10, 150:2,
150:4, 150:5,
150:8, 151:2,
151:20, 152:8,
171:12, 171:15,
173:8, 214:15,
246:18, 331:21,
332:1, 332:19,
334:4, 334:10,
335:7, 335:15,
335:19, 337:1,
337:8, 433:7
**over**
17:16, 21:11,
36:19, 37:16,
55:15, 61:12,
65:18, 103:20,
128:8, 133:17,
155:2, 166:11,
195:13, 228:2,
231:7, 231:13,
231:15, 248:18,
259:1, 266:15,
275:1, 282:6,
298:19, 308:6,
319:18, 347:8,
366:19, 389:19,
442:8
**overall**
183:15
**overlap**
14:10
**oversaw**
179:16
**owe**
184:2, 236:6,
256:10
**owed**
348:18, 375:7,
375:9
**owes**
20:1, 335:15
**own**
26:8, 31:4,
62:3, 117:10,

157:13, 206:6,
222:13, 222:15,
238:8, 395:16,
433:4
**owned**
306:5
**owns**
222:16

**P**

**p&l**
13:11, 293:11,
293:15
**p&ls**
13:13
**packet**
362:1
**page**
5:2, 5:9, 16:6,
69:4, 75:22,
77:21, 78:3,
78:4, 85:16,
138:6, 174:10,
217:6, 217:10,
217:18, 217:22,
218:11, 258:6,
286:11, 286:14,
286:17, 297:22,
364:13, 426:9
**pages**
1:21, 15:22,
272:6, 343:21
**paint**
442:3
**paper**
71:2, 315:20
**paperwork**
188:7, 363:7
**paragraph**
37:12, 235:8,
250:15, 258:6,
324:21, 339:5,
345:21, 363:18,
364:19, 364:21,
366:11, 372:20,
425:22, 429:22
**parking**
335:13

**part**
25:21, 26:2,
28:17, 51:3,
52:9, 56:21,
80:22, 146:4,
187:9, 188:22,
189:9, 221:8,
241:8, 244:20,
269:4, 327:3,
363:1, 372:12,
384:1, 405:4
**partially**
234:8
**participant**
15:12, 245:7,
251:16, 255:13,
261:14, 402:19,
407:1, 433:17,
433:19, 433:22
**participants**
14:17, 15:2,
15:4, 15:7,
16:2, 16:13,
17:5, 17:10,
81:14, 195:12,
227:8, 328:8,
328:12, 328:17,
328:20, 384:14,
385:6, 400:7,
401:15, 401:17,
401:20, 402:2,
403:19, 404:15,
405:13, 405:16,
406:14, 406:15,
407:5, 411:8,
413:16, 416:1,
422:4
**particular**
41:13, 157:18,
182:3
**particularly**
267:12
**parties**
306:13, 446:10
**partner**
356:19, 357:2,
357:7, 357:10,
370:7

**parts**
297:7
**party**
203:3, 204:6
**pass**
91:22
**past**
5:13, 5:15,
87:5, 137:20,
325:9, 337:11,
345:4, 345:8
**patience**
183:18
**paul**
1:14, 2:1,
10:16, 445:2
**pause**
393:7
**payable**
212:12, 213:19,
214:8, 217:8,
218:16, 219:11,
219:19, 220:21,
221:11, 221:15,
221:17, 298:18
**paying**
19:7, 50:7,
66:5, 74:10,
97:14, 121:16,
140:14, 140:19,
143:14, 143:15,
229:3, 229:13,
230:1, 230:9,
231:9, 250:14,
252:20, 252:21,
253:8, 378:22
**payment**
18:22, 50:14,
70:21, 78:6,
86:21, 90:3,
124:10, 127:6,
140:9, 140:10,
142:20, 193:8,
197:4, 212:12,
217:6, 217:10,
218:14, 219:9,
227:12, 227:19,
227:20, 229:11,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                                159

231:13, 239:11,
251:4, 255:1,
255:15, 255:19,
261:15, 264:7,
265:6, 265:7,
266:10, 266:19,
266:21, 268:14,
269:21, 270:4,
300:20, 308:5,
329:11, 359:12,
359:19, 360:5,
373:18, 374:15,
375:17, 379:4,
379:9

**payments**
5:13, 69:11,
78:17, 80:3,
83:16, 87:2,
99:6, 99:9,
224:5, 224:6,
225:7, 227:14,
228:2, 230:10,
231:14, 231:16,
328:7, 328:11,
328:19, 329:8,
356:15, 360:11,
376:14, 433:17,
433:19

**payroll**
302:4, 302:5,
302:6, 302:15,
302:18, 334:21

**pays**
20:12, 123:13,
238:14

**peachtree**
3:14

**pecuniary**
406:9

**penal**
22:16, 23:3,
26:1, 44:20,
54:5, 92:17,
99:14, 105:5,
122:20, 123:13,
140:11, 144:3,
238:14, 240:9

**penalties**
146:6, 219:10

**penalty**
123:13

**pending**
145:15, 369:8,
384:3

**people**
15:13, 15:16,
15:18, 30:11,
33:13, 33:14,
33:15, 33:19,
38:22, 40:22,
41:2, 96:21,
97:11, 98:2,
133:21, 134:4,
156:21, 227:10,
229:5, 230:4,
230:6, 243:8,
245:5, 246:1,
246:11, 248:14,
248:17, 248:22,
249:2, 252:11,
261:22, 262:1,
264:12, 264:19,
290:16, 308:11,
308:12, 335:4,
355:6, 364:6,
390:15, 402:1,
402:11, 403:3,
403:6, 405:8,
405:20, 413:9,
422:7, 422:19,
423:5, 424:5

**people's**
81:17, 254:7

**perceived**
81:15

**percent**
56:5, 58:8,
59:3, 91:17,
94:11, 96:4,
97:13, 99:19,
106:6, 107:3,
107:16, 108:11,
109:19, 114:15,
115:6, 115:11,
115:17, 119:19,
124:16, 125:7,
125:8, 208:4,

208:5, 231:2,
236:13, 268:4,
268:10, 291:15,
294:19, 329:8,
392:4, 413:20,
437:1, 437:2

**percentage**
34:12, 108:15,
108:16, 113:19

**perdomo**
157:1, 158:14

**pereira**
186:11, 187:7,
187:8, 187:17,
187:22, 188:1,
188:4, 188:21,
189:3, 189:7,
189:16, 190:6,
190:7, 191:21,
260:19, 261:1,
262:19, 263:6,
263:9, 263:22

**perform**
22:4, 61:11,
66:12

**performance**
47:22, 271:22,
272:2, 329:8,
337:12, 437:10

**perhaps**
38:11, 42:5,
91:21, 148:12,
185:21, 186:12,
202:13, 203:13,
213:11, 290:22

**period**
19:3, 55:15,
58:22, 226:22,
243:3, 246:6,
248:3, 347:8,
347:10, 349:11,
349:12, 349:14,
354:18, 368:3,
388:18

**periods**
13:14

**permission**
102:8, 102:9,

125:13, 125:14,
125:15, 125:16,
176:21, 194:18,
194:22, 316:13

**permit**
127:22

**permitted**
227:18, 383:19

**person**
19:22, 27:3,
29:14, 34:7,
38:10, 38:12,
39:4, 40:7,
42:9, 58:15,
68:11, 101:13,
101:17, 101:20,
123:3, 123:10,
125:8, 128:7,
128:19, 129:7,
131:4, 133:10,
145:6, 178:8,
178:20, 179:9,
208:21, 209:17,
210:13, 222:12,
228:9, 234:5,
237:16, 243:1,
244:11, 244:22,
246:6, 246:10,
247:20, 251:14,
265:4, 324:10,
325:2, 326:10,
326:16

**person's**
59:4, 59:9,
123:19, 129:5,
129:7, 133:14,
209:21, 270:14

**personal**
25:2, 25:4,
25:10, 31:8,
112:7, 112:10,
134:7, 134:9,
252:9, 279:7,
359:15, 404:13,
417:4, 417:6

**personally**
66:12, 342:18,
350:15

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                    160

personnel
111:13, 344:9,
344:21, 365:10
perspective
48:12, 52:17,
65:21, 253:5,
341:21
peters
3:12, 3:13,
8:16, 8:18,
8:20, 420:1
philadelphia
401:4, 401:10
phone
10:8, 200:17,
200:22, 209:2,
210:10, 234:13,
261:22, 332:5,
342:12, 342:13,
362:6, 383:3
photographic
199:17
pick
30:11, 438:20
picture
274:18
piece
306:4, 306:8,
432:22
piispanen
5:19, 6:4, 6:7,
6:10, 6:17,
155:3, 156:21,
158:11, 348:13,
349:2
piispanen's
55:14, 348:20
place
2:6, 3:6, 9:15,
109:9, 145:3,
145:13, 160:17,
187:17, 187:20,
188:1, 235:3,
248:1, 248:3,
333:16, 379:16
placed
376:19
plaintiff
1:6, 3:2, 9:19,

9:21, 11:1,
433:12
plaintiff's
88:16
plan
275:14, 275:15,
292:8, 373:16,
429:13
planet
9:14, 10:13
planned
275:5, 429:20
planning
367:15, 372:10
plans
421:20
pleadings
256:2, 261:17,
268:1, 268:2,
270:22, 271:5,
441:21, 442:3
please
9:16, 10:14,
19:15, 33:17,
35:7, 40:13,
42:13, 84:22,
85:22, 117:6,
117:18, 117:20,
118:4, 118:7,
145:9, 161:4,
162:19, 166:7,
168:5, 168:7,
292:10, 293:21,
315:15, 315:20,
321:16, 345:21,
352:8, 366:22,
368:11, 397:10,
399:1, 409:11,
417:19, 419:15,
431:11, 432:12
pledged
146:18
plenty
395:9
plus
93:18, 246:18,
337:13
pocket
332:5

point
24:22, 26:12,
77:20, 113:6,
115:21, 129:4,
137:9, 138:11,
144:3, 144:12,
158:5, 213:6,
214:14, 233:4,
237:18, 239:17,
240:21, 242:13,
243:2, 245:9,
245:10, 249:15,
251:17, 258:16,
271:19, 283:18,
295:11, 301:5,
309:12, 310:11,
315:9, 317:10,
319:7, 321:3,
352:12, 359:20,
364:12, 371:9,
374:8, 386:6,
413:16, 417:20,
430:5, 442:8,
443:4, 443:20
pointed
26:8, 70:9
pointing
413:19
points
31:3, 245:10,
387:8, 442:8
police
38:3
policy
38:8, 38:15,
42:16, 65:21,
111:17, 111:18,
111:20, 112:18,
112:19, 245:17,
245:20, 245:21,
254:18, 257:21
polite
320:21
portion
377:12, 404:7
portions
1:15, 257:7,
387:6

position
20:16, 77:5,
106:20, 118:11,
415:14
possibility
59:4
possible
51:9, 80:14,
175:21, 175:22,
176:2, 209:4,
230:4, 257:22,
258:20, 369:5
possibly
52:13, 226:19,
253:21
post
128:9, 236:13,
236:15, 237:2,
238:3, 238:8,
238:9, 238:12,
355:15, 370:5,
372:19, 375:2,
377:2, 378:3,
383:21, 388:17,
406:4
post-invoice
196:22, 197:2,
197:5, 197:17,
197:21, 198:10,
206:2
posted
37:6, 128:18,
132:10, 135:9,
236:7, 370:13,
370:14, 378:11,
378:14, 382:3,
382:7
posting
368:18, 368:20,
370:20, 371:2,
371:3, 372:14
posts
238:13
potential
20:3, 21:12,
116:12, 116:20,
391:1, 392:6
potentially
384:15, 413:15

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                                            161

practice
244:20
pre
177:18, 206:1,
383:20
pre-invoice
177:18, 179:7,
196:20, 197:11,
199:6, 204:13,
205:4, 205:18,
206:4, 206:14,
207:19, 209:11,
209:15, 311:11,
312:16, 314:18,
383:21
precedent
179:3
precise
389:5, 413:2
preclude
26:19
precluded
268:17, 269:21
prefer
372:18, 393:8
prel
189:17
preliminary
166:3, 214:19,
224:22, 225:2,
225:5, 225:8,
249:12, 272:22,
283:22
premium
350:1
prep
57:14
preparation
259:12
prepared
53:17, 54:16,
54:17, 55:21,
57:7, 57:19,
148:1, 161:8,
319:2, 374:5,
396:3, 396:5,
396:11
preparing
273:7, 275:11

present
4:16, 10:6,
14:22, 309:1,
338:21, 427:11,
439:10
presented
56:9, 67:14,
67:22, 71:19,
88:16, 89:5,
89:8, 89:11,
285:5, 287:2,
412:5
presently
305:6, 308:3
president
18:15, 25:9,
78:15, 112:11
presumably
26:19, 152:22
presume
68:12, 119:14
presumed
376:20
pretend
81:12
pretenses
169:13
pretty
23:6, 70:6,
135:1, 208:16,
209:19, 234:10,
285:16, 413:1
prevent
193:22, 194:11
prevented
193:14, 194:6,
197:1, 197:19,
198:11
preview
257:17
previous
296:7
previously
41:7
principal
32:22, 36:18,
37:4, 37:16,
130:20, 233:10,

239:18, 240:14,
242:5, 242:11,
264:6
principal's
235:10, 235:22
principals
121:18, 122:2,
122:5, 240:3,
242:6, 242:22,
243:20, 244:5,
246:14, 248:5,
248:12, 441:5
print
290:16
printable
291:15
prior
13:13, 42:18,
69:15, 70:16,
78:6, 86:17,
147:12, 173:6,
190:4, 310:1,
316:15, 341:17,
355:16, 361:5,
361:8, 363:14,
367:12, 367:19,
374:14, 410:17,
411:4, 411:15,
412:14, 412:16,
413:3, 413:6,
413:11, 413:12,
420:16, 421:8
privacy
404:11
privilege
155:22, 314:9,
420:8, 425:15
privileged
155:21, 425:14
probably
70:6, 103:16,
111:3, 138:10,
150:20, 175:7,
182:22, 191:8,
229:2, 231:13,
269:14, 301:1,
302:2, 302:18,
389:20

problem
158:6, 159:12,
244:8, 274:19,
322:16, 329:19,
331:16, 353:12,
353:13, 363:2,
368:1, 388:8
problematic
252:7
problems
27:18, 275:7
procedure
177:1, 177:8,
177:9
procedures
146:22, 361:20
proceed
12:20, 12:21,
59:10, 321:15,
426:20
proceeding
266:17, 268:14,
268:18
proceedings
122:22, 123:14,
123:22, 124:1,
124:4, 180:7,
196:3, 255:22,
256:1, 265:19,
266:18, 266:20,
267:4, 267:5,
267:15, 268:21,
269:13, 270:15
process
18:17, 21:21,
27:2, 33:14,
50:6, 59:22,
60:3, 60:12,
61:7, 63:15,
64:3, 64:11,
65:1, 65:20,
66:3, 134:16,
134:17, 176:4,
176:17, 203:2,
208:9, 213:10,
235:15, 271:13,
271:15, 272:11,
274:19, 277:13,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                                    162

278:3, 288:6,
290:3, 290:13,
295:21, 311:18,
316:4, 331:7,
355:14, 361:20
**processes**
271:17, 331:5
**produce**
15:21, 102:20,
157:19, 166:15,
169:5, 199:18,
200:20, 206:17,
206:21, 211:10,
211:15, 211:16,
215:16, 263:5,
263:6, 289:8,
289:20, 290:4,
300:18, 324:9,
332:4, 418:17
**produced**
13:6, 153:14,
153:15, 157:9,
157:11, 158:1,
160:12, 164:1,
207:16, 209:17,
215:20, 246:13,
262:21, 264:17,
272:6, 287:20,
287:21, 291:3,
292:16, 293:12,
297:15, 312:11,
312:19, 312:21,
317:2, 317:9,
321:10
**produces**
215:18
**producible**
291:14
**producing**
45:20, 54:13,
55:4, 99:4,
282:7, 290:18
**production**
13:2, 100:22,
157:13, 157:21,
161:10, 163:9,
169:6, 170:16,
199:19, 215:9,

271:17, 293:13,
300:10, 312:21,
315:13, 317:4,
317:6, 384:8,
392:14
**productions**
271:16, 290:21
**professional**
2:14, 68:10,
353:15
**professionals**
227:7, 274:17,
353:11, 353:19
**profit**
7:3, 7:5, 7:8,
271:12, 277:21,
278:9, 279:1,
279:18, 279:22,
280:6, 280:20,
281:7, 285:1,
285:11, 287:6,
287:14, 288:1,
290:6, 292:1,
293:18, 294:8,
296:4, 296:12,
297:14, 297:18,
298:1, 301:7,
303:2
**program**
13:21, 14:11,
14:15, 14:17,
14:18, 14:19,
15:1, 15:3,
15:7, 15:11,
16:2, 16:12,
16:17, 17:5,
38:21, 44:2,
46:3, 81:14,
95:19, 96:1,
96:3, 105:20,
115:16, 185:16,
185:17, 195:11,
223:1, 227:8,
240:7, 241:6,
241:9, 241:11,
245:6, 248:13,
249:2, 251:16,
308:5, 328:7,

328:12, 328:17,
328:20, 340:14,
355:6, 355:11,
356:6, 356:19,
362:2, 367:10,
371:4, 371:12,
372:4, 372:6,
374:19, 385:6,
389:19, 400:7,
402:18, 403:19,
404:14, 405:13,
405:16, 406:14,
407:1, 407:4,
411:8, 413:15,
416:1, 416:15,
422:4, 433:16,
433:19, 433:22,
436:13
**program-wide**
437:15
**programs**
96:12
**progress**
290:9, 291:3,
372:5
**prohibit**
37:8
**promise**
22:18, 303:6
**promised**
263:20
**promises**
23:2
**promissory**
335:8, 335:10
**proof**
175:12
**proper**
36:4, 376:6,
399:20, 400:4
**properly**
295:5
**properties**
13:12, 293:4,
297:20, 306:14,
306:16, 433:4
**property**
13:11, 306:5,

306:6, 306:7,
307:3, 433:1
**proposed**
419:18
**proposing**
326:3
**protect**
390:14, 390:16,
410:14, 414:10,
415:15, 415:21,
416:12, 421:17
**protected**
391:15, 406:15,
411:12
**protecting**
400:6, 417:17,
441:7
**protection**
267:14
**protections**
266:16, 267:3,
267:4, 400:8,
422:1, 431:18
**protective**
384:10, 384:17,
384:22, 403:16,
435:11
**protest**
324:16
**proud**
78:15, 186:1,
223:2, 308:5,
308:7
**prove**
102:3, 325:12,
439:16, 440:14,
440:16, 441:1
**proves**
326:18
**provide**
13:17, 43:10,
72:16, 103:14,
146:17, 155:14,
159:21, 160:21,
165:10, 167:4,
167:16, 180:4,
180:13, 180:17,
181:20, 181:22,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                    163

182:5, 182:18,
186:13, 189:20,
191:3, 191:5,
191:7, 191:10,
191:11, 202:8,
205:18, 205:19,
216:1, 217:7,
218:15, 246:9,
265:2, 268:4,
270:11, 271:2,
274:12, 278:15,
282:18, 285:8,
308:9, 310:2,
315:7, 315:22,
319:2, 322:3,
324:5, 324:12,
325:6, 332:6,
351:19, 352:1,
360:5, 378:19,
380:2, 380:4,
380:14, 380:22,
385:4, 391:15,
394:3, 395:11,
404:4, 407:18,
409:3, 412:1,
421:12, 432:4,
443:8
**provided**
47:9, 48:9,
55:21, 56:1,
67:22, 110:6,
139:19, 158:21,
161:10, 161:14,
161:22, 167:6,
167:8, 167:15,
168:22, 169:18,
169:19, 170:11,
171:2, 171:6,
201:1, 201:9,
202:3, 203:9,
203:12, 204:1,
204:15, 206:5,
211:2, 239:2,
248:19, 253:14,
284:1, 287:12,
288:2, 288:5,
292:2, 293:19,
313:20, 314:17,

315:10, 316:18,
319:13, 319:21,
320:3, 325:4,
325:7, 326:5,
352:14, 371:14,
375:18, 376:22,
381:7, 381:9,
381:10, 381:11,
381:13, 381:19,
384:16, 403:21,
404:4, 404:5,
412:15, 412:17,
413:4, 415:12,
418:10, 418:15,
418:16, 419:17,
420:15, 421:7,
426:8, 426:12
**provides**
38:16, 135:22,
147:3, 182:4,
231:19, 300:19,
302:14, 302:15,
330:14
**providing**
12:10, 16:19,
74:5, 157:4,
196:15, 275:20,
309:18, 316:19,
325:19, 338:19,
351:18, 352:6,
361:14, 361:16,
363:10, 432:8
**proving**
115:21
**provision**
218:6, 250:6,
335:10, 345:21,
368:16, 370:3,
400:13, 404:11,
407:6
**provisions**
87:15, 265:16,
384:19, 400:17,
410:14, 437:9
**public**
2:15, 446:1,
446:21
**pull**
16:7, 45:8,

102:21, 103:2,
181:11, 183:17,
191:3, 247:2,
270:9, 348:2
**pulled**
440:17
**pulling**
45:10, 45:12,
46:22
**purpose**
133:9, 235:9,
235:21, 236:2,
297:8, 410:10
**purposes**
271:8, 274:22,
286:21, 299:15,
378:11
**pursuant**
2:13, 12:12,
23:21, 25:17,
28:13, 35:12,
40:11, 42:21,
43:6, 50:6,
61:11, 65:4,
80:4, 90:1,
90:4, 97:19,
139:14, 197:6,
251:18, 265:18,
273:15, 282:22,
283:15, 293:12,
301:14, 337:14,
338:3, 352:6,
359:12, 361:1,
381:12, 443:7
**pursue**
127:7
**put**
48:11, 67:8,
68:17, 86:22,
98:5, 102:3,
109:8, 138:8,
164:20, 166:22,
184:12, 255:7,
262:4, 263:12,
295:10, 295:12,
299:11, 299:12,
300:7, 300:12,
301:15, 303:11,

304:13, 349:15,
392:7, 392:18,
397:20, 398:7,
405:8, 406:16,
420:21, 421:1,
422:10
**putting**
41:2, 295:8

Q

**qualification**
86:18
**qualified**
183:22
**quantified**
395:1
**quantify**
392:22, 394:10,
438:15, 442:15
**quantifying**
437:13
**quasi**
255:22
**question's**
25:19
**questioning**
42:17, 147:9
**questionnaire**
180:4, 180:14,
180:18, 181:20,
181:21, 181:22,
182:13, 182:18,
188:6
**questionnaires**
182:11
**questions**
24:22, 25:12,
57:8, 62:4,
73:8, 74:14,
74:15, 74:22,
75:4, 75:11,
85:12, 90:10,
106:21, 118:7,
119:9, 119:13,
134:15, 134:19,
134:20, 147:11,
163:8, 168:8,
168:9, 177:13,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                    164

177:14, 191:12,
191:13, 192:8,
201:19, 233:7,
234:1, 255:9,
258:13, 277:10,
285:7, 294:8,
308:14, 356:14,
357:20, 365:21,
396:21, 398:18,
408:11, 424:1,
425:8, 430:12,
430:16, 433:11,
444:4

**quick**
43:12, 70:6,
172:19, 257:13,
257:15, 311:1,
323:15, 334:7,
343:20, 383:5,
415:5, 425:3

**quickbooks**
271:15, 272:3,
272:5, 272:9,
272:12, 272:14,
272:19, 273:11,
273:18, 274:3,
277:6, 277:7,
287:22, 289:4,
289:7, 291:16,
295:9, 295:12,
299:15, 301:13,
303:10

**quickly**
51:9, 430:21

**quite**
110:14, 129:20,
186:1, 275:16,
305:4, 357:20,
437:4

**quote**
304:6

**quotes**
344:1

**quoting**
219:4

---
**R**
---

**raid**
413:14

**raise**
177:8, 177:9,
177:12, 178:21,
179:7, 179:8,
179:9, 179:12,
180:10, 182:13,
223:20

**raised**
180:6, 180:8,
180:9, 180:11,
182:12, 215:8,
240:6, 311:19,
355:13, 365:22,
411:11, 434:6

**range**
184:9

**rank**
334:19

**rate**
14:1, 17:14,
18:10, 52:20,
94:22, 95:19,
95:21, 96:1,
96:2, 96:18,
97:2, 97:4,
98:13, 99:12,
99:19, 99:20,
102:12, 104:3,
104:4, 104:15,
104:16, 104:17,
104:19, 104:22,
105:3, 105:8,
106:6, 106:10,
107:3, 107:16,
108:1, 108:3,
108:6, 109:2,
109:3, 109:5,
109:10, 109:16,
109:18, 110:2,
110:7, 110:12,
110:14, 111:1,
111:2, 111:5,
111:15, 113:14,
114:4, 114:11,
114:13, 115:5,
115:8, 115:17,
116:9, 116:10,
116:15, 116:16,

119:13, 119:14,
119:16, 119:18,
120:9, 121:15,
247:11, 252:6,
316:7, 326:17,
347:16, 391:20,
392:4, 393:18,
393:19, 393:20,
393:21, 431:13,
431:14, 435:14,
435:17, 435:18,
436:4, 436:21,
437:1, 437:2,
437:11, 437:15,
437:16, 441:4,
441:12, 442:21,
443:1, 443:3

**rate's**
96:4

**rates**
110:16, 120:5,
383:22, 397:13,
431:6

**rather**
84:10, 176:12,
184:11, 225:21,
234:4, 256:11

**ratio**
113:3

**razzled**
435:22

**rd**
70:16

**reach**
308:14, 402:11

**reached**
182:3

**read**
47:14, 73:21,
90:6, 117:19,
136:15, 145:9,
145:10, 179:19,
200:3, 211:12,
256:2, 257:11,
257:15, 258:3,
258:15, 259:9,
259:11, 259:13,
259:17, 259:19,

270:22, 323:14,
323:18, 323:20,
323:21, 338:6,
358:22, 359:1,
364:6, 365:15,
365:17, 415:4,
415:6, 425:3,
441:21, 445:3

**readily**
186:21

**reading**
136:14, 218:20,
323:19, 446:8

**ready**
256:13, 282:21

**real**
43:12, 113:15,
116:20, 125:9,
184:11, 236:15,
236:16, 254:7,
254:9, 305:15,
305:17, 305:20,
305:21, 305:22,
306:11, 307:6,
310:22, 323:14,
334:7, 335:16,
343:20, 383:5,
383:21, 388:8,
415:5, 425:3,
432:21

**realities**
18:19

**reality**
44:9, 97:15,
243:10, 253:6,
308:2, 390:6

**realize**
161:17, 161:19,
273:18

**really**
37:1, 94:13,
96:18, 113:9,
114:9, 117:19,
172:19, 183:22,
184:1, 205:1,
208:17, 214:21,
215:13, 221:20,
222:15, 227:4,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                           165

**237:19, 297:7,**
308:12, 340:1,
366:20, 379:20,
412:18, 425:6
**realtime**
2:15
**reapply**
265:13
**rearrested**
267:1
**reason**
48:8, 48:15,
68:14, 68:16,
68:18, 70:2,
86:14, 87:4,
87:21, 88:12,
89:7, 90:14,
90:19, 91:10,
110:5, 142:16,
153:19, 188:10,
234:4, 248:17,
283:5, 284:7,
293:14, 297:8,
301:17, 437:12
**reasonable**
354:12, 354:21,
356:21, 357:1,
357:11
**reasoning**
194:22
**reasons**
39:1, 186:14,
191:6, 191:11,
223:2, 229:6,
236:21
**reassert**
268:20, 338:5
**rebonded**
253:13
**recall**
40:5, 153:7,
249:12, 249:14,
249:18, 310:1,
310:7, 313:19,
339:12, 340:12,
341:3, 342:14,
343:17, 366:13,
372:9, 409:22

**receipt**
212:13, 212:14,
213:19, 214:8,
214:13, 216:13,
217:8, 218:16,
219:12, 219:20,
220:18, 220:21,
221:11, 221:15,
223:8, 231:22,
325:1
**receivable**
307:21, 307:22,
309:6, 309:10,
310:8
**receivables**
257:7
**receive**
34:12, 36:15,
38:9, 91:21,
164:14, 165:12,
166:13, 223:5,
244:21, 255:4,
275:4, 345:22,
376:16, 419:8
**received**
46:17, 48:14,
52:2, 52:3,
52:5, 53:2,
55:1, 60:21,
61:1, 61:3,
65:4, 69:11,
73:8, 86:7,
90:16, 91:17,
92:18, 147:15,
148:6, 148:10,
148:13, 148:14,
150:1, 150:6,
150:7, 150:9,
153:18, 154:8,
154:17, 156:7,
157:14, 157:20,
159:4, 159:9,
159:20, 162:15,
164:18, 165:1,
165:17, 166:11,
166:19, 168:18,
169:1, 169:2,
169:12, 172:16,

192:2, 203:18,
216:19, 243:21,
244:7, 344:4,
345:7, 347:21,
352:16, 354:5,
359:22, 392:14,
410:20, 420:12,
429:9, 431:18
**receives**
20:18, 36:12,
215:18
**receiving**
46:1, 46:16,
155:17, 288:9,
347:15, 349:22,
424:5, 424:8
**recent**
248:2, 292:1,
293:18, 328:21,
333:1
**recently**
128:17, 248:4,
297:15
**recess**
32:8, 43:18,
120:21, 173:2,
184:22, 260:5,
311:5, 332:14,
369:16, 409:14,
424:15
**recitation**
106:20
**recites**
324:21
**reclassification**
192:18
**recognize**
126:5, 174:13,
276:8, 425:1
**recollect**
342:17
**recollection**
195:20, 268:5
**reconcile**
291:13, 294:18,
297:4, 297:6,
298:12, 298:16,
300:15, 304:7,

305:3
**reconciled**
288:21, 289:2,
289:19, 289:20,
290:12, 290:22,
294:22, 295:2,
295:6, 295:7,
295:8, 296:9,
301:1, 302:3,
302:19, 338:11
**reconciliation**
288:18
**reconciliations**
288:14, 296:10,
296:18
**reconciling**
277:2, 277:7,
303:20, 304:4,
304:12, 304:19
**reconsider**
63:9, 63:17,
66:6
**reconsideration**
127:10, 127:14,
210:17
**record**
13:5, 17:2,
32:5, 32:7,
32:10, 41:18,
43:17, 43:20,
50:10, 50:12,
52:7, 52:17,
62:11, 79:10,
112:21, 117:3,
118:1, 118:2,
119:2, 119:3,
119:5, 119:7,
120:20, 121:1,
129:21, 148:14,
163:21, 163:22,
164:4, 165:6,
165:8, 173:1,
173:4, 184:12,
184:20, 185:2,
207:14, 232:14,
259:2, 259:4,
259:6, 259:10,
259:13, 259:22,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

166

260:2, 260:4, 260:7, 261:20, 281:20, 287:3, 311:4, 311:7, 315:15, 317:9, 317:21, 318:1, 318:14, 319:9, 319:14, 319:15, 319:16, 319:17, 321:3, 322:5, 324:10, 325:16, 326:20, 332:8, 332:11, 332:13, 332:16, 342:18, 349:15, 357:22, 369:13, 369:15, 369:18, 373:13, 374:3, 380:8, 382:19, 383:6, 394:18, 398:8, 398:20, 402:17, 403:16, 409:11, 409:13, 409:16, 413:1, 424:7, 424:9, 424:12, 424:14, 424:17, 444:5, 446:5

**records**
44:6, 45:4, 54:7, 54:9, 54:12, 57:17, 58:1, 58:2, 58:3, 77:22, 79:13, 86:11, 86:13, 153:21, 157:19, 160:20, 185:14, 215:14, 215:16, 215:18, 243:22, 244:1, 246:13, 271:20, 272:4, 272:19, 273:16, 273:17, 273:22, 315:5, 338:22, 339:6, 339:14, 351:19, 351:21, 352:2, 352:6, 359:20, 362:14, 385:5,

390:13, 397:8, 402:14, 409:20, 410:12, 413:7, 415:12, 418:17, 419:4, 419:8, 425:18, 426:2, 426:22, 427:22, 428:14, 429:12, 429:13, 430:3, 431:9

**recount**
199:17

**redefine**
108:17

**redetermination**
192:18

**redirect**
430:22, 433:14, 434:7

**reduced**
124:10, 233:10, 234:4, 234:7, 234:8, 446:7

**reduction**
124:16, 207:20, 298:13

**refer**
225:14, 258:1, 359:16, 397:2

**reference**
139:9, 139:10, 157:9, 175:18, 348:1

**referenced**
261:17, 376:5, 392:11

**references**
139:1, 342:13, 348:2, 366:2

**referencing**
203:4

**referral**
61:4, 61:7, 69:16, 71:14, 76:20, 222:20, 224:14

**referred**
13:6, 76:21,

79:6
**referring**
82:3, 84:22, 176:5, 224:21, 250:1, 251:10, 309:16, 345:10, 345:18, 397:5, 397:6, 397:7

**reflect**
55:7, 297:9, 398:21

**reflected**
298:21, 402:4, 402:14

**reflection**
229:7, 295:14, 296:11, 296:21

**reflective**
308:8

**refunded**
49:21, 166:17, 215:11

**refunding**
375:11

**refusal**
319:3

**refused**
100:3, 102:10, 106:13, 360:3, 377:7, 392:8, 412:2, 412:7, 412:22

**regard**
118:13, 138:2, 152:4, 166:18, 183:4, 199:5, 207:18, 212:11, 215:6, 215:7, 217:5, 218:13, 225:16, 231:18, 231:19, 232:19, 242:2, 249:11, 260:14, 271:6, 271:10, 283:20, 291:5, 297:22, 301:21, 311:11, 312:8, 327:19, 345:18, 346:14,

355:10, 360:14, 372:5, 374:13, 385:7, 387:14, 401:12, 401:13, 433:14, 434:2

**regarding**
14:14, 217:11, 217:15, 218:14, 274:13, 311:10, 317:15, 320:16, 345:8, 356:5, 362:7, 429:10

**regardless**
316:17, 371:14

**regards**
181:18

**registered**
2:14

**regretted**
348:15

**regular**
60:9

**regulations**
37:9

**regulators**
330:6

**reimburse**
250:2

**reinstated**
253:11, 253:12

**reinstatement**
193:3

**reinstates**
69:22

**reinsurance**
401:4, 401:10

**reissued**
193:1, 193:2

**reiterating**
342:2

**rejected**
180:12, 190:2, 191:1, 191:20, 261:4, 261:6, 262:10

**relate**
95:11

**related**
14:2, 38:9,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

167

195:11, 333:5,
333:7, 333:17,
340:14, 366:12,
372:4, 374:19,
384:4, 391:22,
416:1, 418:2,
418:5, 431:13,
437:8, 446:9
**relates**
46:18, 89:13,
262:5, 262:6,
264:11, 303:16,
390:10, 400:6
**relationship**
347:13, 349:19,
351:16, 388:4,
391:21, 400:18
**relative**
366:9
**relatively**
180:21
**release**
15:10, 144:13
**released**
29:5, 29:6,
39:12, 178:8,
178:10, 235:13,
238:3, 238:7,
307:9
**relevant**
257:7, 283:5,
283:6
**reliant**
46:16
**relied**
107:2, 107:20,
301:13, 303:9,
348:19, 350:8
**relief**
27:7, 58:15,
66:8, 213:10,
224:2, 226:22,
265:15, 265:21,
266:1
**rely**
72:18, 91:13,
92:10, 303:10,
338:14, 338:16

**relying**
12:21, 50:4,
54:10, 71:8,
91:18, 92:7,
106:5, 301:7,
303:8, 304:10,
304:14, 311:13,
311:22, 312:2,
312:8
**remain**
152:8
**remainder**
93:13
**remains**
380:11
**remand**
38:10, 42:16,
324:10, 325:17
**remanded**
324:10, 324:19,
326:10
**remember**
14:5, 39:21,
41:5, 41:22,
45:21, 67:17,
96:15, 104:1,
121:9, 152:9,
152:10, 195:16,
195:19, 230:17,
249:19, 272:15,
274:3, 307:1,
339:16, 339:19,
364:5, 364:7,
372:16, 375:6,
399:12, 405:17
**remembered**
343:22
**remembering**
425:7
**removal**
122:22, 133:10,
255:22, 265:19,
266:16, 266:17,
266:20, 267:3,
267:5, 267:15,
268:14, 268:18,
268:20, 268:21,
269:2, 269:13,

270:15
**remove**
28:20, 249:1
**removed**
128:15, 266:4
**renew**
167:2
**rent**
297:19
**rentals**
293:3
**rents**
335:3
**reopen**
64:20, 67:3,
69:19, 69:21,
213:12, 213:16,
265:11
**reopened**
59:5, 121:21
**repayment**
230:10, 230:14,
230:21, 231:1
**repeat**
113:11, 139:16,
172:8, 202:11,
204:7, 237:12,
244:4, 366:22,
380:16, 388:11
**repeatedly**
80:10
**repercussion**
267:13
**rephrase**
151:5
**rephrasing**
346:21
**replace**
357:19, 391:17
**replaced**
391:17
**replenish**
382:22, 383:2
**replow**
31:16
**report**
230:5, 247:4,
285:13, 295:6,

301:2, 304:10,
309:7, 315:3,
332:4, 333:11
**reported**
1:22, 158:21,
171:17
**reporter**
2:14, 2:15,
10:12, 10:14,
145:11, 257:1,
396:12, 446:1
**reports**
277:8, 296:1,
304:6, 304:13,
304:20
**reprehensible**
40:19
**represent**
9:17, 50:8,
289:4
**representation**
106:5, 107:9,
232:3, 287:9,
317:13, 427:14
**representations**
91:19, 170:18,
345:8, 348:20,
350:9, 350:10,
350:11, 352:22,
376:2, 442:2
**representative**
12:10, 25:2,
25:5, 31:9,
99:8, 111:10,
112:19, 134:12
**represented**
283:22, 284:3,
314:2, 315:1,
319:1, 353:8,
353:9, 376:18
**representing**
9:14, 10:13,
285:3, 315:2
**represents**
86:20
**reputation**
438:12, 441:19,
442:1

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                    168

**reputational**
431:21, 437:22, 438:9, 438:15, 439:2, 439:7, 439:13, 439:19, 440:9, 441:2, 441:15, 442:16
**request**
13:14, 38:9, 80:16, 80:18, 81:11, 82:20, 83:15, 83:18, 84:3, 101:1, 129:3, 167:2, 193:19, 201:4, 231:20, 342:2, 356:21, 357:14, 367:6, 367:16, 367:21, 368:14, 373:19, 409:19, 410:1, 411:5, 439:6
**requested**
16:3, 16:13, 17:5, 26:16, 38:12, 43:11, 79:8, 79:16, 79:18, 80:3, 80:10, 81:3, 81:20, 82:6, 83:6, 84:6, 145:10, 150:10, 194:18, 201:1, 203:17, 261:21, 315:22, 323:22, 340:12, 341:12, 356:16, 357:12, 410:11, 410:17, 412:21, 418:8, 446:8
**requesting**
195:4, 341:1, 362:6, 372:3, 400:10, 411:16, 411:19, 415:8
**requests**
81:5, 83:16, 84:8, 84:12,

127:10, 195:8, 201:3, 261:19, 311:10, 338:21, 339:17
**require**
127:19, 205:5, 214:20, 237:2, 272:18
**required**
26:15, 50:17, 131:4, 131:5, 131:6, 131:7, 144:3, 205:16, 224:6, 235:12, 236:17, 237:5, 238:5, 238:15, 250:17, 282:18, 384:2
**requirement**
205:8, 248:20, 251:19, 251:20
**requirements**
132:14
**requires**
175:15, 176:19, 251:21, 252:1, 391:18
**rereview**
272:17
**rescind**
129:1
**rescinded**
213:9, 253:11, 254:1, 254:2, 362:16, 362:18
**rescinding**
125:2, 229:6
**research**
199:3
**reserve**
23:11
**reserves**
26:8, 374:11
**reserving**
23:14
**resistant**
316:18, 417:16
**resolution**
125:12, 311:18,

345:9
**resolve**
203:2, 330:7
**resolved**
126:20, 127:2
**resolving**
330:4
**resources**
406:13
**respect**
56:15, 225:11, 281:20, 288:3, 358:1, 390:4
**respectful**
174:2, 394:8, 395:19
**respond**
22:8, 22:19, 259:17, 325:18, 342:9, 353:2, 354:11, 354:19, 354:21, 390:2, 427:9, 428:21
**responded**
106:10, 325:22, 343:19, 354:8, 374:22, 428:18
**responding**
237:19, 272:3
**response**
153:14, 153:15, 155:9, 164:1, 216:2, 255:5, 257:4, 320:10, 325:20, 340:19, 341:2, 341:12, 342:3, 342:10, 342:21, 343:2, 344:4, 352:15, 406:11, 407:12, 407:15, 428:10, 429:9
**responses**
5:17, 88:18, 118:17, 159:10, 159:11, 361:7, 386:10
**responsibilities**
28:18, 29:15,

29:18, 123:5, 197:7
**responsibility**
19:12, 29:16, 130:14
**responsible**
13:21, 19:7, 39:5, 72:20, 72:22, 111:19, 111:20
**responsive**
118:21
**responsively**
168:13
**rest**
165:3, 167:16, 366:21
**restart**
353:16
**restate**
42:12, 266:8, 383:16
**restatement**
41:8
**restroom**
310:22
**result**
23:7, 124:9, 136:2, 136:10, 136:18, 137:16, 139:13, 219:2, 221:2, 222:19, 230:7, 254:18, 275:18, 301:20, 316:7, 390:8, 391:5, 393:1, 394:11, 404:19, 406:1, 406:3, 406:9, 438:10, 439:1
**resulted**
192:13
**reticent**
270:10
**return**
26:17, 295:8, 297:5, 336:18
**returned**
299:2, 333:6,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

169

333:18, 333:20
**returns**
275:11, 278:4,
300:16
**revenue**
274:22, 275:3,
275:4, 276:9,
277:4, 277:5,
283:13, 283:14,
328:11, 328:14,
328:15, 328:16,
329:15, 330:21,
337:11, 433:22
**reverse**
219:1
**review**
55:13, 55:20,
68:5, 77:22,
79:10, 86:10,
86:12, 89:14,
90:13, 147:10,
202:6, 207:5,
230:15, 230:18,
230:19, 231:3,
233:17, 244:3,
255:4, 255:8,
256:3, 257:6,
257:8, 260:11,
264:9, 269:11,
283:11, 284:19,
309:17, 314:11,
314:15, 315:5,
323:16, 340:13,
341:6, 343:20,
364:21, 393:12,
393:17, 393:18,
394:3, 397:13,
399:11, 421:13,
429:11, 429:13,
431:8, 432:7
**reviewed**
12:2, 12:3,
14:1, 14:2,
55:14, 56:6,
56:12, 67:16,
90:17, 200:3,
202:7, 202:12,
247:5, 313:9,

313:16, 313:18,
314:16, 362:14,
375:5, 418:12,
418:14, 418:19
**reviewing**
195:20, 200:16,
201:20, 203:5,
230:18, 282:8,
287:13, 321:2,
321:21
**revise**
298:16
**revisit**
273:4
**rewriting**
385:18
**richard**
157:1, 158:14
**rid**
422:18
**ridiculous**
345:15, 345:17,
354:18, 355:20,
356:1, 390:5,
422:19
**rights**
124:13, 125:21,
126:2, 126:7,
126:9, 126:13,
126:18, 127:6,
127:7, 212:9,
228:10, 251:9,
251:16, 254:21,
269:21, 403:4,
426:13
**risk**
23:10, 23:11,
227:3, 227:6,
247:15, 267:16,
348:21, 405:8
**rli's**
26:8, 45:2,
46:13, 48:22,
56:10, 82:20,
83:2, 83:3,
84:3, 91:6,
92:7, 110:7,
110:12, 110:18,

111:1, 114:11,
114:12, 114:13,
115:16, 149:5,
212:7, 215:4,
215:6, 344:8,
344:17, 344:19,
344:20, 345:12,
345:14, 349:10,
361:3, 371:5,
373:9, 384:1,
391:5, 391:14,
391:16, 393:1,
394:11, 404:1,
404:19, 406:4,
409:19, 414:22,
426:12, 426:13,
431:14, 435:16,
435:17, 436:3,
436:15, 437:16,
442:20
**rli-bonded**
441:5
**rlis**
240:1
**rly**
5:21
**roanoke**
4:6
**roberts**
6:13
**role**
281:14, 281:19
**roll**
245:13, 245:14
**rolling**
382:21, 383:1
**roman**
320:12
**rough**
434:21
**roughly**
15:18, 336:4,
404:16
**round**
133:21
**roundabout**
336:3
**routinely**
58:21, 182:1

**rpr**
1:22, 446:2
**rude**
62:6
**rule**
275:2, 275:6,
275:14, 276:9,
424:4
**rules**
32:2, 37:9,
308:2
**run**
60:1, 64:3,
64:11, 65:1,
66:3, 72:14,
72:15, 73:15,
132:7, 295:6,
310:22, 335:6
**runs**
269:6

_____
S
_____

**s**
296:9
**saddened**
256:9
**safe**
407:5, 407:7
**safety**
38:14, 249:8
**said**
14:16, 16:1,
24:6, 24:13,
26:5, 37:21,
39:13, 41:17,
41:20, 41:22,
47:13, 48:14,
53:15, 61:10,
61:14, 62:15,
75:14, 77:14,
78:18, 83:8,
84:4, 94:9,
102:9, 102:11,
102:16, 107:3,
109:18, 121:12,
124:22, 126:8,
148:5, 151:14,
155:10, 162:14,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

170

164:13, 164:16,
164:17, 166:8,
167:11, 167:13,
167:14, 202:13,
206:13, 241:19,
252:17, 254:22,
261:21, 269:13,
275:21, 280:7,
300:17, 301:12,
303:14, 304:9,
313:6, 318:10,
330:9, 338:9,
338:11, 349:16,
353:17, 358:1,
368:2, 372:3,
376:5, 378:13,
381:15, 387:5,
392:14, 401:13,
403:4, 404:12,
413:16, 414:13,
423:5, 427:20,
427:21, 428:7,
428:10, 428:13,
428:16, 429:2,
434:8, 436:10,
439:8, 440:13,
440:15, 440:17,
442:18, 446:6
**same**
23:9, 42:8,
64:6, 64:7,
75:22, 112:12,
114:10, 174:6,
174:10, 177:21,
178:18, 192:6,
206:10, 217:4,
219:8, 228:11,
228:13, 232:19,
232:22, 233:19,
239:3, 279:19,
280:7, 286:3,
286:5, 286:6,
291:17, 292:9,
294:6, 332:7,
356:9, 364:8,
396:13, 445:4
**sandoz**
8:9, 8:12,

107:19, 310:5,
310:10, 310:13,
359:4, 360:1,
361:18, 366:2,
372:2, 372:17,
373:12, 374:18,
375:10, 375:14,
380:5, 380:21,
381:3
**sandoz's**
360:4, 361:2
**sat**
277:17
**satisfaction**
361:12
**satisfy**
143:6, 305:7,
336:10
**saved**
230:7, 412:12
**saw**
152:13, 314:17,
366:6
**saying**
18:7, 18:8,
18:21, 24:9,
28:12, 41:6,
47:13, 47:14,
49:6, 52:12,
58:13, 77:8,
89:22, 90:7,
96:11, 98:14,
111:18, 117:2,
123:3, 132:9,
133:3, 153:10,
155:11, 161:18,
170:19, 176:13,
208:19, 210:1,
210:7, 211:1,
215:12, 219:9,
221:10, 222:3,
237:12, 239:4,
253:8, 266:19,
266:21, 299:9,
310:16, 319:21,
343:1, 344:2,
347:2, 349:18,
351:7, 351:9,

351:13, 354:10,
355:9, 355:12,
374:18, 376:2,
377:5, 389:8,
389:10, 394:6,
406:8, 406:11,
412:4, 412:7,
428:17, 428:22,
429:3, 429:5,
429:17, 436:22,
440:12
**says**
131:22, 133:1,
133:9, 135:8,
136:9, 147:2,
205:11, 205:15,
213:17, 217:9,
218:7, 218:18,
219:4, 219:15,
219:19, 220:3,
220:18, 220:21,
221:1, 221:22,
222:5, 225:6,
225:13, 245:21,
325:4, 325:8,
344:6, 344:22,
345:3, 345:6,
345:12, 345:20,
346:3, 347:5,
351:9, 353:15,
385:20, 426:5,
426:10, 427:2,
427:14, 429:21,
430:10
**scenario**
34:19, 71:21
**scenarios**
196:11
**schedule**
227:13, 229:11,
230:10, 230:14,
230:21, 231:2,
231:13
**scheduled**
135:13, 375:14
**schneider**
55:21, 56:8,
156:22, 158:13,

211:17, 314:3
**school**
243:8, 409:6
**scope**
24:2, 30:22,
434:7
**score**
334:18
**scores**
204:20, 438:19
**screaming**
99:22, 100:5
**screw**
83:20
**seal**
446:14
**seaman**
336:5, 336:6
**search**
315:11
**second**
15:4, 43:13,
91:8, 114:18,
138:5, 141:11,
200:10, 208:2,
217:6, 217:10,
217:18, 217:22,
220:22, 307:16,
314:4, 323:1,
324:13, 347:1,
373:6, 395:2
**secondly**
377:18
**secret**
414:10
**secure**
235:10, 235:22,
243:14, 388:17
**secured**
96:8, 185:15,
232:16
**securitization**
15:17
**securitized**
15:13
**security**
23:20, 33:22,
139:13, 146:18,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                              171

225:19, 227:13,
227:18, 227:21,
235:20, 237:4,
243:16, 267:11
**security's**
255:5, 257:4
**see**
15:14, 56:11,
56:13, 70:15,
70:18, 72:7,
84:22, 88:19,
88:20, 101:11,
103:1, 133:9,
140:2, 146:16,
152:14, 157:3,
157:6, 158:17,
158:18, 160:20,
162:5, 163:16,
167:17, 178:14,
181:7, 181:9,
203:19, 214:10,
215:3, 215:4,
217:19, 221:4,
221:8, 242:8,
243:8, 273:16,
273:21, 286:13,
287:8, 287:11,
292:10, 295:11,
298:4, 298:7,
298:14, 308:14,
317:18, 317:19,
318:2, 319:6,
322:2, 323:10,
323:12, 326:12,
345:12, 349:3,
364:1, 364:9,
372:7, 390:1
**seek**
27:6, 63:8,
125:12, 205:11,
210:16, 213:10,
312:10
**seeking**
66:8, 203:22,
265:11, 265:21,
440:2, 443:17
**seem**
231:11, 274:3,

300:22, 330:3
**seemed**
417:14
**seemingly**
386:15
**seems**
51:2, 87:7,
138:12, 138:13,
340:21
**seen**
67:15, 67:17,
68:3, 89:16,
229:3, 255:7,
257:9, 277:8,
376:9, 377:6,
382:11, 418:17
**segment**
275:2
**send**
73:19, 91:14,
92:11, 120:12,
155:3, 178:18,
178:19, 200:21,
201:5, 205:15,
215:12, 257:21,
271:5, 326:2,
326:3, 354:15,
392:19, 418:18,
429:3
**sending**
50:1, 73:9,
91:15, 103:19,
361:9, 366:2
**sends**
36:16, 120:13,
132:5
**sense**
39:8, 94:14,
94:21, 104:21,
130:7, 173:22,
174:12, 189:12,
209:9, 275:5,
280:10, 280:12,
309:22, 329:10,
347:14, 349:8,
350:2, 441:14
**sensitive**
415:17, 418:9

**sent**
46:18, 55:15,
73:4, 76:2,
101:20, 102:11,
103:11, 135:5,
155:9, 155:10,
158:13, 159:16,
162:5, 163:14,
167:1, 231:21,
250:7, 262:20,
311:17, 341:17,
341:18, 355:2,
359:4, 374:15,
378:17, 379:3,
379:8, 384:10,
401:21, 403:15,
407:2, 428:22,
429:4
**sentence**
136:14, 136:15,
139:17, 218:21,
220:3, 220:18,
220:20, 220:22
**sep**
6:19
**separate**
195:8, 238:2,
293:16, 433:21,
441:14
**separated**
293:15
**separately**
265:13
**september**
69:13, 70:12,
218:9, 282:22,
283:3, 283:6,
446:16
**series**
121:4, 182:5,
405:4, 406:12
**serious**
34:2
**seriously**
248:15, 316:3
**serve**
335:4
**served**
77:8, 178:16

**service**
71:8, 242:20,
266:2, 308:8
**services**
1:8, 1:12,
5:11, 7:3, 7:5,
7:8, 9:4, 9:7,
10:1, 11:8,
11:21, 12:11,
16:19, 74:6,
78:15, 236:13,
238:2, 241:12,
246:9, 257:22,
292:18, 401:5,
415:8, 415:11,
415:14, 425:18,
429:11
**serving**
73:22
**set**
87:4, 89:7,
90:20, 122:1,
135:18, 141:11,
144:1, 150:19,
202:15, 204:11,
224:21, 233:11,
276:12, 410:1,
410:4, 427:18,
428:19, 429:12,
446:13
**sets**
128:7, 206:18,
256:3, 291:10,
298:1
**setting**
203:13
**settlement**
182:3, 182:4
**seven**
31:12, 31:22,
115:11, 200:4,
202:13, 409:9
**several**
14:2, 98:5,
195:9, 196:10,
212:10, 213:9,
271:16, 285:14,
288:4, 288:5,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

172

311:19, 339:17,
349:17, 383:16,
386:6, 405:15
**sex**
243:6
**shadows**
146:2, 228:17
**share**
293:8
**shared**
352:12, 403:21,
404:10
**sheet**
291:9, 292:19,
293:2, 294:9,
294:12, 309:8,
309:9, 310:3,
310:5, 310:6,
310:9, 310:19,
338:4, 338:7,
338:8, 338:10,
338:15, 338:16,
392:19, 394:4,
445:7
**sheets**
14:3
**shipped**
178:8
**shocking**
97:15
**short**
354:17
**shortly**
177:22
**should**
94:15, 164:1,
164:14, 233:18,
259:13, 376:1,
376:11, 376:16,
379:17, 392:9,
412:10, 430:7,
430:8, 436:20
**shouldn't**
121:17
**show**
12:20, 13:19,
26:9, 26:20,
27:4, 28:16,

67:13, 71:18,
79:13, 123:12,
128:18, 157:11,
157:12, 161:6,
161:8, 210:12,
211:4, 215:8,
247:2, 272:18,
303:3, 329:3,
362:16, 379:8,
392:12, 424:21,
429:1, 429:4,
429:5, 435:19,
435:21
**showed**
325:12, 397:21
**showing**
56:9, 56:10,
124:19, 243:12
**shown**
168:17, 198:1,
218:19, 218:22,
221:1
**shows**
44:9, 121:15,
371:11
**sic**
306:21
**side**
59:7, 219:1,
228:8
**sign**
100:15, 308:11,
352:2, 352:3,
371:4, 384:2,
384:22, 390:13,
411:13, 412:2,
412:8, 412:21,
414:7, 418:13,
441:10
**signature**
445:10
**signature-b7fzp**
446:19
**signed**
196:8, 380:3,
418:6, 445:7
**significant**
27:8, 157:8,

157:22, 158:20,
227:9, 247:10,
248:18, 273:1,
275:7, 298:13,
333:21, 334:21,
334:22, 335:1,
389:17, 405:6,
411:7, 412:19,
417:1
**significantly**
189:9
**signing**
385:3, 414:4,
417:16, 446:8
**silly**
220:8, 231:11,
363:4
**similarly**
158:13
**simple**
30:14, 30:19,
31:4, 31:6,
83:15, 106:21,
116:17, 135:1,
289:17, 304:22,
398:1
**simpler**
131:10
**simply**
144:12, 411:12
**simultaneously**
71:5
**since**
43:13, 50:1,
50:3, 73:3,
88:6, 91:14,
91:17, 94:3,
94:9, 96:12,
115:20, 150:2,
151:6, 154:9,
156:8, 162:15,
171:17, 249:20,
274:9, 284:6,
338:20, 350:6,
350:13, 410:19
**single**
20:13, 22:1,
35:15, 61:13,

78:21, 82:11,
102:16, 214:2,
214:5, 223:3,
250:8, 313:19,
315:7, 316:19
**sir**
89:3, 146:15
**sit**
17:3, 68:13,
89:6, 181:13,
305:9
**sitting**
46:10, 47:2,
47:14, 48:21,
50:19, 51:14,
58:4, 78:16,
122:7, 169:17,
186:17, 198:16,
199:22, 204:9,
253:15, 254:13,
254:19, 312:13,
313:1, 315:8,
317:1, 337:17,
392:21, 408:6,
421:5, 442:14
**situation**
39:7, 39:9,
122:19, 125:1,
178:18, 239:7,
243:10, 301:18
**situations**
38:15, 41:1,
43:9, 66:9,
67:3, 76:10,
102:2, 128:18,
196:11, 324:7
**six**
78:5, 115:20,
116:4, 200:3,
202:13, 313:7,
313:8
**slow**
76:7, 436:7
**slowed**
301:17
**slower**
152:20
**small**
327:6

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

173

smaller
20:17, 247:12,
247:15
smattering
166:14
snapshot
189:5, 244:17,
247:1
sole
183:3
solve
329:19
some
13:5, 14:9,
14:13, 15:19,
17:13, 18:19,
26:17, 33:22,
40:10, 45:8,
66:8, 81:14,
81:15, 82:10,
104:10, 105:10,
111:6, 113:4,
113:6, 114:2,
143:18, 178:3,
179:3, 179:4,
181:1, 183:16,
196:1, 196:3,
202:17, 202:20,
203:11, 208:6,
209:21, 233:4,
237:3, 242:13,
243:2, 243:3,
246:1, 256:12,
256:15, 258:15,
260:10, 286:17,
306:16, 307:14,
333:4, 340:6,
345:7, 352:14,
352:15, 355:6,
369:4, 378:21,
383:15, 384:6,
384:14, 393:7,
394:5, 432:5,
432:20
some-odd
201:3
somebody
317:14

somebody's
83:19, 83:20
somehow
40:18, 41:13,
126:8, 126:10,
299:12
someone
40:8, 42:1,
129:21, 371:6
something
16:22, 17:1,
20:9, 38:13,
38:20, 45:15,
46:12, 46:20,
48:11, 49:4,
53:3, 57:5,
58:12, 68:8,
81:13, 90:17,
108:15, 108:16,
174:11, 184:12,
197:19, 204:22,
213:12, 213:22,
220:8, 220:16,
226:7, 243:9,
244:12, 247:14,
250:7, 268:9,
285:4, 285:7,
293:8, 299:12,
305:4, 310:10,
334:7, 351:9,
380:10, 411:10
sometime
421:12
sometimes
63:17, 63:19,
63:20, 69:20,
71:6, 71:7,
73:19, 77:7,
122:14, 128:12,
151:15
somewhere
152:11, 364:2
soon
263:2, 278:4,
278:5, 279:15,
280:1, 280:16,
289:1, 289:22,
290:3, 291:4,

296:2
sooner
367:15
sophisticated
310:12
sorry
15:5, 61:11,
86:1, 95:7,
121:11, 133:13,
138:9, 139:16,
149:9, 152:7,
152:19, 154:12,
159:3, 172:19,
172:21, 177:5,
190:3, 193:1,
202:11, 210:3,
210:4, 220:15,
221:20, 237:9,
237:13, 255:11,
261:9, 262:9,
262:13, 266:8,
293:7, 309:9,
314:14, 322:10,
322:13, 346:17,
353:6, 353:17,
353:18, 367:1,
383:20, 432:1,
442:10
sort
14:14, 16:17,
26:17, 44:12,
143:18, 189:5,
201:3, 237:3,
267:9, 425:6
sorts
374:17
sought
204:20, 252:9,
295:18, 299:17,
316:20, 393:22
sound
173:20, 231:17,
264:1
sounded
139:18
sounds
92:20, 200:12,
308:7, 440:3

speak
257:10, 331:5,
331:6
speaking
31:19, 165:18,
232:13, 342:17,
350:15
speaks
219:13, 220:2
special
45:21, 293:13,
402:7
specific
26:7, 54:9,
80:8, 110:4,
127:8, 159:18,
177:5, 187:12,
194:5, 195:10,
198:17, 203:14,
205:19, 210:11,
211:3, 212:20,
212:21, 218:5,
218:7, 243:11,
253:7, 253:15,
271:19, 283:2,
288:16, 316:9,
318:11, 321:5,
338:18, 338:19,
385:13, 388:9,
396:2, 405:2,
413:14, 425:8
specifically
15:12, 32:19,
68:22, 122:11,
126:12, 137:15,
205:17, 209:19,
211:7, 211:9,
266:13, 267:19,
267:20, 269:20,
270:2, 270:3,
284:16, 320:14,
339:16, 357:4,
364:5, 368:6,
402:17, 402:18,
404:12, 431:5,
434:17, 439:4,
441:18, 441:22
specifics
337:19

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

174

specified
219:1, 220:4,
221:2, 274:1
specify
347:9
speculate
107:6, 200:12
spencer
4:19, 10:7
spend
49:12, 165:3,
319:19
spending
50:20, 53:9,
53:15
spent
390:15, 405:7,
405:12, 407:12,
434:17
spiraled
351:17
spoke
342:11, 342:12,
342:15
spoken
156:3
spreadsheet
54:13, 54:16,
54:17, 54:21,
55:5, 55:13,
55:20, 56:6,
56:9, 70:10,
86:19, 88:3,
90:6, 90:10,
155:7, 155:11,
157:9, 158:1,
160:8, 170:17,
183:21, 186:14,
188:11, 191:4,
191:5, 191:9,
191:10, 192:7,
192:21
spreadsheets
55:15, 56:7,
98:5, 188:17
st
88:4, 350:6,
350:13

stab
153:13
stability
243:16, 247:19
stable
243:13
staff
155:16, 314:20,
315:6, 316:17,
321:12
stage
177:18
stained
391:2
stamped
292:6
stand
35:13, 61:9,
66:11, 78:18,
277:15
standard
282:1, 282:9
standing
38:5, 72:21,
238:11, 238:17
stands
20:12, 109:11
start
14:13, 69:7,
80:9, 97:11,
170:7, 228:3,
233:3, 387:22
started
44:10, 347:10,
351:17
starting
69:6, 70:11,
230:8, 367:13
starts
390:12
state
9:17, 13:4,
37:2, 37:3,
37:8, 192:12,
235:8, 330:7,
363:18
stated
37:13, 70:20,

92:5, 250:16,
348:16, 399:6,
418:7
statement
37:18, 209:10,
211:13, 235:16,
250:19, 284:1,
285:6, 287:6,
287:15, 288:1,
291:9, 293:18,
294:9, 296:4,
296:13, 296:16,
297:4, 297:15,
297:19, 299:5,
299:13, 301:7,
302:14, 303:17,
365:1, 365:5,
373:4, 422:5,
423:3
statements
276:4, 278:3,
278:15, 279:15,
280:2, 280:8,
280:17, 281:2,
282:6, 282:7,
282:10, 282:15,
282:20, 287:18,
288:22, 289:9,
289:21, 290:7,
298:16, 300:17,
303:2, 305:3
states
1:1, 9:7,
39:11, 146:19,
153:17, 235:13,
236:6, 236:16,
335:5, 373:1,
418:16
statewide
306:20, 381:16
stating
49:19, 354:8
station
2:6, 3:6, 9:15
status
56:10, 126:2,
126:13, 271:11,
274:13, 300:11,

356:15, 363:21
stay
259:13, 330:13,
330:14
stefanie
7:12
step
355:19
steps
145:3, 145:12
stick
19:5, 134:18,
422:20
sticker
364:3
still
16:18, 69:1,
82:15, 85:8,
121:18, 122:3,
122:12, 123:4,
123:15, 123:22,
124:1, 137:2,
138:16, 196:2,
196:9, 227:20,
231:9, 232:7,
236:17, 237:5,
238:4, 238:15,
239:5, 255:22,
289:15, 289:19,
302:18, 347:19,
415:8, 415:11
stolen
418:16, 419:4,
419:8, 423:15,
424:8
stood
97:18, 100:6
stop
33:1, 62:8,
97:10, 114:21,
322:13, 346:16,
347:1, 368:13,
369:22, 370:9,
371:13, 424:1
stopped
50:1, 91:15,
195:3, 266:20,
273:2, 344:8,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                    175

347:6, 349:22,
352:20, 354:1,
368:20, 370:20,
371:9
**stopping**
361:5
**store**
46:21
**straightforward**
113:16, 113:21,
225:21
**stream**
328:16, 329:15,
330:22
**streams**
328:11
**street**
3:14
**strike**
152:6, 185:9
**stronger**
275:18, 301:20,
384:21
**study**
207:5
**stuff**
102:1, 235:4,
283:14, 365:20
**subject**
131:2, 239:10
**subjected**
61:8
**submit**
127:19, 175:14,
193:9, 218:18,
218:22, 221:1,
289:21, 325:11
**submitted**
174:14, 183:6,
190:1, 190:22,
191:19, 193:10,
232:9, 284:15,
287:6
**submitting**
193:14, 194:6,
194:11, 197:2,
197:20, 198:11,
316:15

**subpoena**
255:6, 257:4
**subsequent**
199:19
**subsequential**
130:8
**subset**
127:9, 210:12,
233:1
**substantia**
439:11
**substantial**
179:10, 179:13
**substantially**
124:19, 124:20
**substantiate**
202:9, 206:20,
316:1, 324:1,
325:5, 439:22,
440:9
**substantiated**
439:9
**substantive**
124:13, 125:21,
126:1
**subtract**
153:1
**suburbans**
41:2
**success**
18:9, 38:21,
92:3, 95:19
**successful**
27:13, 100:19,
185:20, 185:22,
186:2, 186:9,
190:13, 241:6
**successive**
405:4
**suffered**
438:9
**sufficient**
203:21, 326:6,
326:8, 336:9,
336:12, 336:15,
336:22, 337:3,
337:5, 337:7,
346:1, 346:4,

427:6, 433:2
**sugar**
379:20
**suggest**
75:17, 158:3
**suggested**
378:10
**suggesting**
140:18, 210:9,
210:11, 360:22,
361:3, 375:22,
376:1, 376:6,
376:8
**suing**
241:20
**suite**
2:7, 3:7, 3:15,
4:12
**sum**
44:20, 48:20,
54:5, 92:17,
99:14, 105:5,
122:20, 123:13,
140:11, 141:15,
141:17, 142:14,
142:15, 144:3,
238:14
**summarize**
340:6
**summarizing**
362:2
**summary**
5:12, 5:14,
5:16, 85:16,
87:5, 88:17,
109:8, 257:6
**supplement**
183:19, 255:2,
264:10, 265:2,
271:4
**support**
215:17, 312:14,
313:21, 317:1,
319:11, 360:10,
362:17, 422:3,
423:2, 439:6,
443:14
**supported**
201:15, 201:22,

202:19, 203:15,
314:12
**supporting**
54:14, 204:12,
314:17
**supports**
383:13
**suppose**
94:13, 179:8
**supposed**
74:22, 75:3,
82:12, 97:19,
101:22, 130:12,
133:21, 219:16,
279:10, 359:22,
396:3
**surely**
118:15
**sureties**
18:12, 18:14,
109:17, 110:2,
110:8, 110:19,
150:4, 381:8,
381:10, 381:11,
388:17, 437:7,
438:13
**surety**
18:21, 19:7,
19:11, 20:1,
20:18, 20:19,
20:20, 21:3,
21:4, 21:15,
22:2, 22:3,
22:15, 22:17,
23:2, 24:10,
24:14, 25:14,
25:22, 29:21,
30:3, 30:9,
30:10, 30:15,
30:16, 32:14,
34:20, 34:22,
35:4, 35:19,
35:21, 36:12,
36:14, 36:16,
100:15, 102:6,
102:7, 109:21,
110:4, 116:11,
125:5, 125:6,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                    176

127:19, 132:8,
146:20, 175:16,
176:21, 182:4,
182:6, 205:6,
205:13, 205:15,
206:5, 236:8,
236:9, 236:22,
238:11, 238:18,
239:6, 239:12,
346:6, 355:18,
356:19, 356:22,
357:2, 357:7,
357:10, 357:20,
367:11, 368:18,
368:19, 369:1,
370:4, 370:7,
372:5, 372:15,
372:18, 373:13,
381:13, 386:17,
386:18, 387:20,
388:1, 388:4,
388:15, 388:16,
389:1, 391:17,
401:3, 403:22,
404:5, 404:10,
441:8

**surety's**
24:3, 32:19,
236:11

**surprise**
301:2

**surrounding**
396:4

**susceptible**
124:6

**suspicious**
417:21

**sussman**
7:15, 7:18,
7:19, 8:4, 8:6,
101:1, 102:16,
103:12, 107:20,
125:13, 194:19,
201:1, 201:7,
201:13, 201:16,
201:21, 203:17,
211:12, 323:7,
323:11, 323:22,

326:2, 326:12,
327:12, 327:15,
344:14, 348:1,
348:9, 365:11,
366:5, 386:20,
392:8, 407:2,
410:5, 410:21

**sussman's**
319:3, 324:8,
325:3

**sustain**
404:18

**sustained**
192:12, 390:8,
393:1

**swear**
10:14

**swearing**
226:19

**sworn**
10:17

**symptom**
119:20

**system**
44:9

---

**T**

**table**
409:8

**take**
18:18, 20:16,
30:12, 31:21,
43:12, 45:8,
45:9, 45:11,
46:5, 47:10,
47:13, 48:5,
51:10, 51:11,
53:10, 53:16,
53:21, 56:22,
63:18, 67:7,
104:10, 115:14,
119:16, 133:16,
138:8, 147:21,
150:19, 162:9,
172:20, 191:15,
228:18, 257:14,
258:8, 258:12,
258:14, 259:7,

282:13, 283:17,
319:19, 321:1,
375:6, 387:11,
393:7, 394:15,
394:17, 395:13,
398:8, 424:10

**taken**
29:19, 32:8,
34:16, 35:17,
43:18, 120:21,
145:3, 145:12,
173:2, 177:16,
184:22, 255:21,
260:5, 311:5,
332:14, 369:16,
409:14, 424:15,
442:7, 442:19,
443:6, 446:4,
446:6

**takes**
28:21, 29:9,
71:7

**taking**
9:15, 43:13,
95:20, 232:5,
233:4, 281:14,
282:11, 398:11,
425:10, 437:18

**talk**
14:11, 26:5,
34:3, 39:17,
77:15, 77:16,
118:10, 118:11,
131:17, 174:21,
175:8, 175:17,
197:12, 224:11,
237:16, 271:21,
280:12, 315:5,
344:14, 396:15

**talked**
34:17, 39:15,
40:4, 171:14,
196:14, 199:9,
249:11, 261:22,
309:5, 341:16,
342:20, 343:13,
367:2, 414:4

**tax**
275:11, 278:4,

282:21, 295:7,
297:5, 300:16,
309:7

**taxes**
273:7, 289:20

**team**
298:17, 349:4,
351:9, 351:10,
351:11, 351:12,
353:14, 362:10,
362:11, 402:12

**telephonic**
3:12

**tell**
48:2, 50:21,
58:4, 71:10,
76:4, 107:22,
158:19, 159:11,
205:10, 211:7,
211:9, 254:17,
257:18, 258:11,
265:5, 278:20,
280:11, 293:20,
294:19, 294:20,
303:17, 304:7,
304:11, 317:3,
318:5, 338:17,
343:7, 350:12,
350:19, 360:2,
360:3, 370:8,
377:7, 392:16,
397:15, 431:11,
435:15, 438:14,
441:18, 441:22

**telling**
46:4, 72:9,
98:9, 111:16,
111:20, 135:17,
253:3, 300:1,
309:17, 347:1,
373:20, 420:19

**ten**
403:10, 407:3,
407:8

**tendered**
379:6

**term**
40:20, 41:10,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020

177

**terminated**
116:11
**terms**
127:3, 132:9,
133:5, 135:8,
139:14, 139:21,
142:18, 142:20,
145:20, 176:6,
212:3, 212:11,
217:14, 218:1,
218:2, 219:9
**terrified**
40:17
**terrorist**
419:2
**test**
397:1, 397:2
**testified**
10:19, 33:3,
42:4, 51:17,
57:16, 149:18,
159:2, 166:19,
209:18, 253:4,
277:19, 311:10,
321:13, 356:8,
368:5, 377:18,
383:11
**testify**
10:17, 21:1,
31:8, 53:17,
57:19, 77:18,
77:19, 115:2,
181:6, 220:13,
271:19, 271:20,
276:20, 317:15,
321:4, 321:6,
321:12, 386:1,
397:10, 421:4,
439:4
**testifying**
18:3, 115:7,
115:8, 168:4,
321:11
**testimony**
12:10, 12:16,
24:14, 24:19,
31:4, 41:8,

42:1, 42:12,
42:18, 53:7,
61:22, 62:3,
62:7, 62:11,
67:5, 126:4,
126:15, 153:7,
156:6, 161:12,
161:15, 161:19,
162:11, 164:12,
167:5, 167:8,
167:13, 167:22,
168:1, 168:2,
168:18, 168:21,
184:7, 207:1,
207:4, 211:1,
220:10, 246:3,
246:4, 268:3,
268:13, 274:12,
274:15, 281:16,
286:21, 291:6,
312:8, 346:14,
346:15, 356:4,
356:8, 357:13,
358:4, 358:6,
358:8, 368:9,
387:6, 420:3,
434:10, 435:6,
445:4, 445:6,
446:6
**tether**
409:8

**text**
145:10
**th**
55:22, 69:10,
69:13, 70:12,
70:15, 103:10,
158:11, 213:14,
218:8, 218:9,
225:7, 286:12,
287:4, 321:22,
340:20, 341:13,
342:3, 342:7,
342:16, 342:22,
343:13, 344:11,
344:16, 347:11,

348:8, 348:17,
349:5, 349:9,
349:17, 350:4,
360:5, 360:6,
360:21, 361:7,
366:1, 368:21,
373:2, 373:9,
374:15, 379:3,
386:21, 424:19,
424:22, 426:4,
426:22, 427:10,
427:17, 428:1,
428:6, 428:9,
428:13, 428:15,
429:5, 429:6,
429:7, 429:10,
429:13, 429:19,
429:20, 429:21,
430:1, 430:3
**thank**
11:6, 11:16,
14:6, 42:13,
68:13, 68:19,
84:14, 84:15,
84:16, 85:2,
103:21, 116:3,
138:1, 138:17,
141:21, 150:20,
152:2, 156:19,
190:9, 193:4,
235:6, 262:22,
264:2, 285:20,
292:12, 320:18,
326:22, 327:17,
329:1, 331:19,
339:20, 339:21,
343:3, 343:9,
364:17, 371:20,
384:16, 391:7,
413:18, 414:2,
414:15, 414:16,
414:21, 425:16,
433:10, 444:1
**thankful**
37:10
**thankfully**
37:21
**thanks**
61:8, 91:10,

321:17
**themselves**
9:17
**thereafter**
446:7
**thereby**
270:10
**therefore**
19:8, 112:20,
247:15, 296:17
**they'd**
44:13
**thing**
38:22, 41:14,
100:17, 128:21,
152:12, 170:6,
174:6, 177:21,
179:15, 186:12,
210:6, 220:14,
222:8, 228:11,
245:16, 249:4,
286:5, 313:10,
355:20, 398:1
**things**
18:18, 20:11,
34:6, 113:13,
120:5, 143:3,
147:19, 177:15,
222:19, 230:5,
249:16, 252:15,
259:1, 275:9,
276:13, 289:14,
294:21, 294:22,
296:20, 331:17,
361:10, 361:14,
361:17, 393:5,
398:19, 418:21,
421:4, 437:10
**thinking**
181:10, 220:15,
233:3, 244:2,
244:19, 302:22,
308:17, 365:18,
379:14
**third**
258:6, 286:17,
306:13, 345:20
**third-party**
236:22, 239:12

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

178

**thornton**
274:16, 276:19,
281:14, 281:19,
281:22, 282:5,
282:8, 282:11,
282:12, 282:14,
282:18, 283:1,
283:10, 283:18
**thorough**
203:6, 270:11
**thoroughly**
387:8
**thought**
16:8, 51:10,
72:2, 237:16,
274:2, 313:6,
313:7, 346:22,
366:19, 390:4,
434:11
**thoughts**
134:17, 372:6
**thousand**
436:11
**thousands**
15:21, 182:21,
182:22, 333:20
**threat**
223:1, 407:4
**threatening**
385:5
**three**
25:19, 49:13,
53:9, 61:12,
69:12, 70:9,
74:14, 75:11,
76:2, 78:4,
80:6, 97:22,
110:13, 110:18,
114:14, 115:4,
115:8, 115:11,
115:15, 119:19,
162:6, 180:7,
184:17, 248:9,
249:3, 321:8,
321:9, 369:1,
394:19, 394:20,
400:2, 407:2
**threw**
237:11, 322:22

**through**
1:13, 14:18,
14:19, 33:14,
46:4, 46:22,
47:10, 47:14,
48:16, 48:17,
49:8, 49:13,
50:20, 50:21,
51:8, 63:15,
153:4, 160:9,
160:10, 164:7,
164:10, 193:7,
200:14, 201:20,
203:2, 213:12,
214:16, 240:16,
242:17, 260:15,
265:21, 275:12,
287:15, 291:16,
292:3, 293:12,
295:21, 330:14,
340:7, 344:11,
378:19, 383:10,
389:10, 394:6,
416:14, 425:7
**throughout**
284:8, 290:13,
338:20, 355:11,
356:6
**throw**
11:18, 133:15,
161:5, 259:8
**throwing**
41:1, 81:7
**thrown**
238:20
**tieder**
2:5, 3:5
**timely**
63:14, 64:17
**times**
25:20, 110:13,
110:18, 115:12,
119:19, 194:17,
211:20, 213:14,
279:20, 305:1,
367:13, 370:8,
386:7, 386:12,
394:19, 394:20,

400:2, 401:17
**timing**
57:21, 289:14,
413:3
**tired**
424:5
**title**
69:1
**today**
9:13, 10:13,
12:16, 16:13,
17:4, 46:10,
47:2, 48:21,
50:19, 51:15,
53:8, 54:13,
58:4, 68:13,
87:10, 89:6,
99:5, 118:12,
122:7, 134:18,
148:2, 153:8,
181:13, 186:4,
186:18, 186:22,
189:21, 198:16,
199:22, 227:5,
253:15, 254:13,
254:19, 263:11,
263:15, 264:11,
279:9, 289:16,
290:8, 290:10,
292:8, 305:10,
311:9, 312:14,
313:2, 315:8,
317:1, 320:4,
321:11, 337:17,
382:10, 392:21,
403:9, 408:6,
418:19, 442:15
**today's**
9:11, 134:6,
396:1
**together**
89:18, 114:6,
263:13, 392:17,
392:18, 395:10,
406:16, 436:1,
436:2, 440:18
**told**
31:20, 42:1,

44:2, 125:15,
154:21, 178:7,
196:6, 201:10,
203:9, 206:11,
223:15, 269:10,
280:14, 294:17,
303:9, 304:19,
305:1, 305:2,
311:16, 312:2,
312:19, 316:17,
357:6, 359:18,
367:13, 379:18,
397:12, 397:14,
429:19
**tomorrow**
427:20, 428:7,
428:11, 429:1,
429:4, 429:13,
429:17
**ton**
37:9
**tonight**
379:15, 394:4,
404:17
**took**
31:12, 32:12,
98:15, 98:16,
98:21, 121:3,
185:4, 260:9,
329:16, 369:20,
378:21
**top**
5:18, 6:3,
6:16, 7:11,
7:14, 8:8, 8:11,
46:19, 47:17,
56:14, 69:17,
70:8, 127:11,
169:11, 186:20,
204:8, 240:12,
255:14, 287:12,
292:15, 305:11,
323:19
**topic**
182:1, 318:11,
320:12, 396:2
**topics**
12:5, 12:7,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                                179

14:9, 317:14
**total**
13:19, 13:22,
15:18, 16:2,
16:8, 46:19,
47:20, 48:19,
50:11, 95:15,
96:8, 96:9,
98:16, 98:18,
98:21, 99:2,
104:4, 110:21,
114:3, 115:14,
119:16, 119:17,
147:14, 148:13,
150:10, 151:11,
153:2, 153:3,
171:14, 171:15,
182:19, 183:9,
226:6, 262:12,
292:3, 332:1,
335:14, 382:11,
382:20, 383:4,
398:2, 398:4,
403:9, 404:16,
407:12, 434:22
**totaling**
57:20, 152:18
**totally**
389:8
**touted**
443:14
**toward**
229:8
**track**
16:15, 16:16,
16:22, 17:1,
34:14, 45:14,
45:15, 46:12,
46:20, 47:21,
48:3, 48:5,
52:18, 52:22,
53:1, 53:4,
53:7, 56:20,
92:6, 92:10,
147:20, 223:15,
226:7, 226:9,
242:21, 244:13,
245:18, 245:21,

246:1, 246:3,
247:3, 248:22,
307:22, 308:3
**tracked**
267:16
**tracking**
242:9, 242:18,
243:2, 244:11,
245:9, 245:10,
246:6, 249:1,
273:5, 404:12
**trade**
414:10
**tragedy**
128:13
**transactions**
335:16
**transcribe**
396:13
**transcript**
5:7, 11:15,
67:12, 85:4,
88:8, 131:13,
138:4, 156:18,
158:9, 163:13,
216:11, 256:21,
286:8, 291:1,
294:2, 297:13,
315:17, 322:12,
331:9, 331:10,
339:3, 341:11,
343:12, 348:7,
371:22, 401:1,
414:18, 425:5,
427:8, 446:5
**transcription**
445:5
**transferred**
101:18, 277:11
**transitioning**
372:4
**transport**
43:8
**travel**
43:10, 128:10,
301:21, 334:22
**traveling**
335:2

**treasury**
61:3, 61:7,
69:16, 71:14,
76:20, 76:21,
79:6, 222:21,
222:22, 224:15
**treated**
133:18
**trees**
292:11
**tried**
230:3, 356:17
**trigger**
129:14
**triggers**
128:16
**true**
20:19, 26:14,
51:7, 68:5,
77:20, 79:1,
82:18, 95:3,
99:11, 110:9,
113:3, 114:17,
114:19, 114:20,
128:3, 136:22,
157:16, 160:5,
165:11, 165:12,
166:10, 203:11,
228:1, 228:5,
228:12, 229:22,
238:1, 241:15,
277:22, 295:15,
313:15, 320:2,
354:6, 354:19,
360:17, 363:22,
366:14, 379:12,
383:17, 412:14,
421:11, 428:2,
438:8, 445:4,
446:5
**trump**
18:15, 229:16,
230:3, 422:15
**trust**
306:12, 306:15,
306:17, 307:15,
307:16, 381:9,
381:15, 381:19,

381:21
**truth**
10:18, 10:19,
388:3
**truthful**
300:8
**try**
51:8, 53:16,
57:4, 75:20,
77:3, 118:6,
134:18, 150:12,
182:14, 197:12,
226:22, 228:9,
262:1, 385:12,
390:16, 405:5,
422:18
**trying**
24:10, 24:15,
42:7, 42:10,
42:19, 51:13,
53:8, 61:16,
62:6, 62:17,
65:11, 65:13,
74:16, 74:18,
74:19, 81:7,
88:10, 88:12,
98:7, 101:7,
101:9, 105:1,
106:21, 113:19,
117:5, 117:8,
126:17, 127:3,
140:20, 149:21,
165:5, 168:2,
169:9, 169:10,
169:13, 173:21,
174:1, 174:9,
199:21, 228:16,
247:21, 247:22,
248:2, 251:13,
252:12, 252:18,
268:7, 270:6,
274:7, 277:14,
288:10, 289:11,
289:13, 289:14,
289:16, 299:4,
299:18, 301:5,
308:18, 308:22,
330:6, 349:4,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

180

357:22, 358:3,
358:7, 375:16,
377:11, 386:3,
390:20, 394:8,
395:19, 405:7,
405:12, 413:2,
423:7, 423:10,
438:20, 440:16,
440:21
**tuesday**
1:17
**turn**
36:18, 37:16,
252:13, 412:20,
412:22, 442:5
**twice**
361:19
**two**
73:5, 78:4,
82:15, 94:20,
95:11, 113:12,
113:18, 114:5,
120:13, 128:9,
128:11, 153:12,
155:2, 161:14,
164:18, 164:22,
165:13, 166:12,
166:20, 168:19,
170:12, 171:1,
178:9, 186:10,
208:3, 258:22,
297:18, 303:11,
320:12, 320:13,
320:14, 322:16,
343:21, 388:17,
393:5, 435:13
**two-week**
128:8
**type**
207:19, 366:9,
366:12, 441:17
**types**
13:9, 177:14,
240:17, 275:9,
365:21
**typewriting**
446:7
**typical**
216:21

**typically**
59:2, 69:22,
73:17, 123:18,
127:22, 128:3,
137:8, 178:4,
208:20, 216:19,
245:2, 245:9

**U**

**uh-huh**
11:22, 50:18,
56:2, 58:20,
95:22, 98:11,
183:11, 189:13,
193:17, 202:14,
212:15, 218:12,
241:2, 249:7,
260:20, 261:11,
281:18, 298:3,
306:3, 332:2,
333:13, 362:9,
372:22, 436:9
**ultimate**
142:7, 143:8
**ultimately**
22:14, 23:7,
27:9, 67:1,
79:12, 97:1,
223:17, 228:10,
239:9, 243:17,
275:17, 431:18,
435:11, 443:7
**unacceptable**
348:22
**unclear**
36:22, 87:8
**undefined**
172:6
**under**
22:5, 24:16,
28:4, 29:3,
29:22, 30:3,
30:16, 32:15,
35:19, 86:3,
99:18, 107:3,
131:4, 132:9,
135:8, 135:21,
140:3, 141:4,

144:13, 169:12,
179:13, 188:1,
212:3, 212:6,
224:2, 226:15,
248:20, 260:19,
262:19, 265:13,
265:16, 266:15,
267:2, 267:8,
268:21, 269:1,
271:13, 275:1,
275:6, 276:5,
276:9, 308:1,
323:12, 329:21,
330:17, 331:4,
339:4, 345:21,
346:4, 347:2,
348:13, 359:8,
360:4, 404:1,
408:1, 426:13,
426:20, 446:7
**under-2**
106:6
**underlying**
231:10
**understanding**
17:14, 21:6,
22:3, 24:15,
32:13, 35:20,
44:18, 45:1,
69:14, 85:15,
85:18, 92:1,
94:19, 107:9,
149:21, 152:17,
153:22, 154:14,
154:15, 175:20,
193:21, 200:1,
202:21, 203:8,
203:21, 209:15,
212:2, 225:17,
226:1, 251:22,
252:18, 272:16,
272:17, 273:17,
291:20, 292:14,
313:5, 324:7,
326:13, 330:20,
337:10, 337:16,
365:7, 368:15,
370:2, 370:6,

370:12, 370:16,
370:18, 376:17,
386:2, 423:13,
437:5, 441:6,
443:1
**understood**
222:17, 222:18,
365:16
**undertaken**
438:22
**undertakes**
21:16, 25:15
**undertaking**
227:9
**unencumbered**
305:15, 305:16,
305:20, 305:22,
432:21
**unfortunate**
108:3, 214:21,
254:6, 366:11,
392:2
**unfortunately**
18:16, 199:16,
204:21, 205:5,
254:12, 308:1,
441:16
**unilateral**
212:4, 212:7
**unique**
151:11, 151:22
**unit**
33:21, 69:22,
100:16, 102:4,
102:6, 125:11,
128:20, 129:2,
175:14, 176:14,
195:1, 196:15,
205:14, 208:19,
210:17
**united**
1:1, 9:7,
39:11, 146:19,
235:13, 236:6,
236:16, 335:5
**universal**
190:8, 233:13
**universe**
44:12, 114:4,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                      181

127:21, 138:16
**unless**
35:22, 161:8,
231:20, 234:20,
364:9
**unlike**
335:11
**unpaid**
52:16, 335:19
**unpleasant**
246:8
**unreasonable**
81:4, 83:4,
84:9, 84:13,
326:13, 352:19,
353:22
**until**
19:2, 56:13,
58:22, 59:2,
61:15, 62:16,
65:9, 69:11,
70:21, 72:4,
72:12, 142:2,
221:17, 222:2,
264:14, 280:8,
281:1, 281:9,
295:7, 295:8,
329:22, 356:17,
371:12, 383:9,
427:10, 443:8
**untimely**
190:2, 191:1,
191:20, 261:4,
261:6, 262:10
**unwilling**
421:22
**unwillingness**
384:1, 390:13,
391:14
**up-to-date**
291:15
**upcoming**
370:1
**update**
287:17, 295:17,
334:1, 363:20
**updated**
334:3

**updates**
288:5, 288:9
**updating**
274:9
**upheld**
189:15
**upset**
353:17
**urbanski**
85:7, 256:7,
403:4, 431:19
**urgent**
340:19
**uscic**
265:13
**uscis**
265:16, 265:21,
266:16, 267:2,
267:8
**use**
15:7, 29:12,
41:10, 104:4,
116:7, 129:19,
129:20, 174:20,
178:4, 192:6,
192:7, 237:7,
250:18, 375:6,
421:20, 439:21
**uses**
29:13, 94:5
**using**
44:10, 87:12,
93:6, 93:12,
96:14, 99:12,
105:4, 108:10,
113:14, 113:15,
236:12, 238:2
**utilize**
243:12, 327:22,
328:4

---
**V**
---

**va**
2:8, 3:8, 4:6
**valid**
232:1, 267:18

**valuation**
438:21, 440:19
**value**
23:5, 98:16,
98:18, 98:21,
108:7, 153:2,
240:9, 291:21,
303:14, 304:1,
304:17, 305:14,
305:16, 305:19,
307:20, 309:4,
309:5, 333:7,
333:21, 385:19,
443:10
**values**
310:15
**van**
133:16
**variance**
437:19
**varies**
195:20
**various**
338:21, 339:1,
356:15
**vary**
37:2
**vast**
23:7, 27:7,
33:9, 33:11,
33:13, 105:12,
106:2, 125:3,
151:19, 187:15,
187:16, 187:17,
188:1, 188:2,
188:13, 188:14,
188:16, 188:19,
189:2
**vein**
168:11

**verbal**
206:13, 206:16,
403:12
**verified**
374:5
**verify**
324:22, 400:20
**verona**
410:1, 426:3,
426:4, 427:11,
429:14
**versus**
49:19, 52:13,
94:17, 113:20,
115:15, 116:6,
171:15, 270:11,
327:14, 392:4,
431:13, 435:1
**via**
207:10, 207:12,
207:16, 248:22,
418:18
**video**
1:12, 2:1,
9:12, 9:14
**videographer**
4:17, 9:2,
9:13, 10:12,
32:6, 32:9,
43:16, 43:19,
67:7, 67:10,
120:19, 120:22,
138:7, 172:22,
173:3, 184:20,
185:1, 234:12,
234:16, 260:3,
260:6, 311:3,
311:6, 331:11,
332:12, 332:15,
369:14, 369:17,
409:12, 409:15,
424:13, 424:16,
444:3
**violated**
139:2
**virginia**
1:2, 1:16,
2:16, 9:9, 9:16,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

182

306:8, 332:10,
384:4, 419:3,
429:14, 446:22
**vis-à-vis**
71:2, 236:1,
236:3, 438:12
**visit**
45:22, 361:18
**vivian**
3:3, 8:16,
8:18, 8:21,
9:18, 16:5,
27:17, 108:13,
138:7, 169:16,
175:19, 196:10,
237:12, 241:16,
262:13, 274:6,
279:12, 289:18,
294:5, 321:1,
322:15, 364:4,
382:8, 429:8
**vivian's**
332:9
**voice**
9:16, 223:20,
366:19
**vulnerable**
390:15, 413:8

**W**

**wait**
19:14, 27:12,
33:16, 35:5,
95:6, 143:17,
143:21, 185:9,
225:3, 314:4,
320:11, 322:7,
322:9, 330:2,
347:1, 383:9,
395:2, 395:7,
404:21
**waiting**
62:20, 80:19,
179:18, 213:14
**waits**
59:2
**waive**
155:21, 420:7,

425:15
**waiver**
308:5
**waiving**
314:8
**walk**
133:10, 133:14
**walked**
295:20
**walking**
133:18
**wanted**
234:1, 251:3,
270:21, 273:17,
351:19, 352:1,
385:13, 397:12,
418:1, 427:16,
443:4
**wants**
34:3, 81:15,
83:20, 128:20,
430:2, 441:9
**warmer**
339:21
**warning**
135:21, 373:1
**warrant**
123:18, 126:21,
129:6, 129:12,
129:15, 129:18,
130:1, 136:11,
136:20, 137:2,
137:7, 137:10,
137:17, 236:9
**warrants**
137:8
**washington**
4:13, 330:7
**waste**
45:17, 46:6,
119:1, 318:13,
319:9
**wasting**
31:17, 320:6
**watching**
243:7
**watt**
2:5, 3:5

**way**
13:1, 18:18,
21:13, 23:9,
26:14, 29:8,
29:14, 36:15,
42:12, 51:6,
64:7, 75:5,
91:16, 92:10,
92:14, 97:4,
100:6, 106:14,
109:12, 110:22,
111:3, 113:16,
114:7, 114:12,
119:15, 125:12,
128:5, 131:8,
131:10, 133:19,
146:2, 150:18,
162:10, 172:2,
173:18, 180:1,
183:22, 247:3,
254:3, 258:22,
264:6, 274:1,
308:1, 308:4,
337:4, 349:16,
352:17, 353:19,
354:22, 355:20,
358:11, 364:8,
373:20, 391:21,
425:20, 426:14,
437:6
**we'll**
12:19, 54:3,
103:17, 160:9,
235:4, 259:10,
263:14, 271:1,
278:1, 300:16,
300:17, 301:19,
357:9, 395:20,
398:4, 401:22,
402:11, 429:5,
430:21
**we've**
27:13, 47:19,
73:8, 81:9,
82:11, 84:4,
84:5, 90:22,
91:16, 121:19,
125:17, 147:15,

148:14, 153:22,
155:13, 198:6,
210:15, 210:17,
213:10, 214:16,
214:19, 230:7,
231:15, 239:19,
239:22, 272:5,
274:16, 275:7,
287:17, 287:19,
312:21, 320:3,
326:19, 331:1,
333:17, 333:18,
333:20, 336:21,
346:10, 381:13,
383:15, 401:21,
411:20, 420:2,
431:20, 438:2
**wearing**
242:14
**wednesday**
39:16, 39:18,
40:4, 40:6
**week**
31:13, 157:18,
231:6, 277:17,
302:6, 317:6,
340:8, 366:14,
375:15
**weeks**
128:9, 128:11,
248:9
**weird**
173:21, 220:16,
222:9, 337:4
**welcome**
68:20, 235:7,
264:3, 292:13,
320:20, 327:18,
329:2, 343:10
**went**
42:15, 101:22,
196:7, 332:10,
340:7, 344:15
**weren't**
69:11, 79:3,
79:7, 229:13,
229:20, 237:21,
254:14, 272:20,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

183

290:20, 290:22,
349:11, 388:13
**western**
1:2, 9:8, 384:4
**whatever**
46:17, 53:9,
103:4, 115:3,
200:16, 210:14,
228:18, 443:10
**whatsoever**
33:12, 165:16,
440:8
**whereabouts**
242:22, 244:22
**whereas**
179:15
**whereof**
446:13
**whereupon**
10:15
**whether**
41:5, 42:8,
42:20, 47:22,
56:12, 58:4,
73:15, 77:9,
86:2, 87:8,
150:10, 155:16,
156:2, 169:21,
171:1, 172:1,
187:2, 189:14,
192:22, 204:10,
212:4, 226:9,
244:10, 247:5,
247:13, 247:15,
257:18, 266:1,
266:4, 277:21,
278:8, 278:22,
279:17, 280:5,
280:20, 281:6,
285:10, 299:19,
334:18, 338:17,
355:15, 356:22,
357:11, 369:21,
370:10, 371:14,
372:13, 394:9,
426:19
**whichever**
393:8

**who've**
264:12
**whole**
10:18, 61:6,
78:3, 97:9,
106:20, 117:16,
134:16, 134:17,
136:14, 136:15,
146:2, 236:2,
251:17, 310:20
**wholly**
421:16, 427:3,
427:4
**wide**
185:16, 185:17,
436:13
**wild**
286:9
**williams**
4:18, 10:3,
24:5, 27:17,
28:1, 28:5,
28:9, 126:1,
126:13, 232:5,
234:17, 234:19,
308:13, 308:17,
309:2, 385:11,
385:18, 386:1,
386:3, 390:22,
391:3, 394:13,
395:20, 399:18,
423:22, 424:9,
433:8, 440:5,
443:13
**willing**
273:19, 417:14,
418:2, 426:11,
441:10
**win**
179:1
**window**
63:7, 64:13,
64:19, 151:21,
200:11, 208:3,
213:5, 344:12,
356:10, 389:21
**windows**
208:3

**winds**
372:6
**wire**
379:7
**wish**
241:13, 241:15,
379:15
**wished**
149:1
**withdraw**
259:15
**within**
30:20, 56:18,
58:5, 63:9,
63:10, 63:11,
64:16, 80:11,
83:5, 83:16,
84:18, 84:20,
114:13, 147:4,
151:21, 165:13,
174:15, 176:10,
176:12, 188:7,
192:2, 208:1,
208:2, 219:1,
219:10, 220:4,
221:1, 221:6,
223:7, 223:13,
226:2, 228:22,
229:14, 230:1,
231:21, 232:9,
233:11, 251:3,
251:14, 252:1,
350:1, 354:11,
354:19, 356:10,
407:3
**without**
33:12, 37:17,
50:19, 53:8,
53:15, 71:16,
77:19, 129:8,
145:2, 145:12,
155:12, 158:2,
187:11, 206:14,
230:18, 238:1,
266:16, 267:3,
336:12, 336:22,
337:3, 373:1,
385:5, 398:11,

437:9
**witness**
10:14, 20:22,
33:17, 35:7,
42:15, 51:16,
57:15, 89:1,
89:3, 89:12,
103:6, 103:19,
103:22, 117:7,
118:17, 146:15,
155:20, 165:7,
168:6, 168:8,
207:3, 207:15,
220:14, 222:8,
222:11, 222:14,
234:14, 263:12,
314:6, 314:10,
317:7, 319:16,
320:15, 322:20,
369:4, 374:11,
385:21, 396:7,
396:10, 396:20,
399:1, 399:4,
425:13, 425:16,
430:13, 430:17,
432:2, 434:13,
446:13
**witness's**
112:7
**witnesses**
368:5
**wonder**
88:9
**wonderful**
169:3, 361:22
**wondering**
440:14
**word**
15:7, 137:4,
174:20, 237:8,
399:12
**words**
51:4, 96:20,
167:13, 211:19,
226:8, 236:6,
244:2, 244:12,
253:21, 299:11,
380:9, 402:8

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020                                                184

**work**
51:15, 233:3,
247:22, 262:17,
290:9, 291:2,
301:3, 361:22,
442:5
**workday**
341:21
**worked**
193:9, 226:21
**working**
227:7, 241:1,
272:5, 283:9,
288:14, 329:18,
330:5, 331:2,
347:12, 371:4
**works**
101:11, 269:3
**worksheets**
188:17, 188:18
**world**
38:3, 248:1
**worried**
339:22
**worry**
37:11
**worse**
438:1
**worth**
115:20, 274:5
**wouldn't**
35:21, 42:12,
50:1, 68:11,
71:16, 72:3,
92:21, 92:22,
93:2, 97:8,
111:5, 119:14,
121:16, 130:8,
145:5, 149:9,
172:17, 209:10,
252:5, 295:6,
295:7, 298:22,
302:1, 324:14,
336:18, 357:7,
384:12, 387:20,
402:6, 404:13,
411:14, 417:2,
421:9, 435:10

**write**
150:22, 367:16,
368:3, 371:6,
388:17
**writes**
348:2
**writing**
61:20, 176:19,
232:9, 286:17,
286:20, 287:2,
368:21, 371:9,
371:13, 373:17,
376:3, 377:1,
378:2, 378:18,
387:22, 388:14,
389:12, 389:16,
389:17, 389:21,
411:9
**written**
95:1, 206:12,
231:20, 232:8,
340:2, 373:8,
403:17, 407:20
**wrong**
19:20, 42:6,
81:13, 101:22,
111:18, 112:20,
115:2, 115:4,
194:4, 196:5,
196:6, 210:16,
302:13, 353:2,
354:8, 354:10
**wrote**
25:6, 348:12,
364:12, 429:8

**Y**

**yeah**
21:15, 26:4,
32:18, 44:16,
50:15, 64:8,
69:3, 70:18,
79:11, 86:9,
86:12, 90:5,
96:16, 101:8,
104:21, 111:16,
116:12, 130:9,
131:10, 136:22,

138:9, 141:16,
147:14, 149:10,
149:11, 152:21,
172:10, 174:4,
176:15, 176:22,
183:14, 184:16,
188:15, 191:21,
192:4, 198:20,
207:3, 219:15,
225:20, 229:18,
231:9, 232:13,
234:14, 240:2,
263:12, 268:6,
278:11, 286:19,
287:11, 293:1,
293:5, 298:14,
313:10, 317:22,
323:14, 341:15,
342:5, 342:8,
344:10, 347:5,
362:19, 366:8,
371:8, 373:6,
379:13, 383:2,
383:7, 383:11,
396:7, 405:1,
406:6, 410:8,
417:8, 428:16,
436:3, 439:21
**year**
55:22, 82:15,
115:9, 228:3,
229:10, 229:15,
230:22, 231:2,
231:8, 245:4,
272:15, 274:21,
275:1, 296:9,
344:13, 354:13,
367:22, 370:1,
375:9, 375:12
**year's**
235:15
**yearlong**
347:12, 349:19
**yearly**
302:8
**years**
55:16, 61:13,
73:5, 94:20,

97:22, 115:20,
116:4, 120:1,
120:13, 153:12,
155:2, 161:14,
164:19, 164:22,
165:13, 166:12,
166:20, 168:19,
170:12, 171:1,
249:3, 278:2,
303:11
**yep**
57:18, 232:17,
266:6, 341:5,
364:11, 415:6
**yesterday**
31:21, 54:18,
160:14, 216:3,
276:18, 283:1
**york**
128:10, 178:8
**yourself**
52:12, 211:12,
409:8

**Z**

**zero**
114:14, 115:5,
115:17, 234:7,
234:10
**zones**
243:8

**$**

**$1.2**
357:8, 368:4
**$1.25**
368:16, 370:5,
372:19, 386:14,
386:16
**$10**
138:16, 346:10,
346:11, 355:15,
356:17, 387:1,
391:18, 406:9,
407:15
**$10,000**
240:7, 392:10
**$11**
231:15, 337:13

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

185

**$2**
333:19, 431:16
**$2.5**
431:12
**$20,000**
236:7
**$220,000**
336:4
**$231**
302:1
**$250,000**
358:22
**$3**
23:11, 298:19,
431:20, 432:14
**$3,000**
432:22
**$3,212,833.67**
48:20
**$3,212,883.67**
47:20, 50:11,
99:17, 436:5
**$3,400**
392:10
**$3.212**
57:20
**$36,000**
306:4
**$420,000**
434:1
**$481,928,000**
98:20
**$5,000**
240:6, 240:9
**$5,117,500**
152:22
**$5,250,415.14**
332:20
**$50,000**
359:19, 360:5,
360:11, 361:1
**$6,600**
397:21
**$784,088.20**
292:4

---
**.**
---

**.0101**
4:7

**.1000**
2:9, 3:9
**.1150**
3:17
**.3188**
4:14

---
**0**
---

**00**
262:14
**000000001**
5:21
**000000080**
6:20
**000018727**
6:5
**0002**
5:21
**00066**
1:8, 9:10
**0084**
6:20
**01**
369:15
**02**
173:1
**0221609**
8:7
**0222756**
7:21
**0236333**
8:10
**0253294**
8:13
**027806**
7:10
**027807**
7:7, 292:6
**04**
43:17
**07**
409:16

---
**1**
---

**1,146**
147:15, 148:15,
148:18, 149:17,
149:20

**1,457**
185:18, 185:19,
187:2, 189:1,
189:15, 190:12,
262:12
**1,700**
246:18
**1,767**
171:21, 172:11,
173:11
**1.152**
298:6
**1.25**
355:17, 356:18,
368:22, 387:15,
391:16
**1/9/2016**
8:10
**10**
5:20, 6:16,
69:13, 70:12,
99:19, 216:10,
216:14, 340:20,
341:13, 342:3,
342:7, 342:16,
344:12, 347:8,
347:11, 347:13,
349:4, 349:11,
349:14, 350:1,
353:7, 354:11,
354:20, 356:10,
387:16, 390:3,
404:19, 406:5,
406:18, 429:8,
437:2
**10,000**
327:14
**100**
170:1
**100,000**
302:9
**1000**
2:7, 3:7, 3:15,
4:12
**1050**
4:11
**11**
1:18, 5:3,

**5:10, 6:21,**
9:12, 32:7,
32:10, 173:4,
256:20, 256:22,
257:2, 424:4
**11,477,712**
99:3
**110,000**
302:7
**113**
329:8
**1175**
3:14
**11971**
4:5
**12**
7:3, 43:17,
43:20, 286:2,
286:7, 436:11
**120**
57:10, 57:11,
58:5, 58:22,
69:16, 151:21,
213:14, 225:7,
228:3
**13**
7:5, 8:3,
120:20, 158:11,
294:1, 294:4,
331:11, 331:13,
342:22, 343:13,
344:11, 344:16,
347:11, 349:5,
349:9, 349:17,
360:21, 361:7,
366:1, 374:15,
379:3, 386:21
**13,2019**
6:12
**131**
5:18
**138**
6:3, 287:3
**14**
7:8, 121:1,
297:12, 369:18
**15**
7:11, 8:6,

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

186

54:2, 173:1,
173:4, 184:21,
185:2, 217:9,
218:8, 218:9,
315:16, 348:8,
348:17, 350:4,
360:5, 360:6
**150,000**
231:6
**156**
6:7
**158**
6:10
**16**
7:14, 260:4,
322:11, 323:3
**163**
6:13
**1646**
8:7
**17**
7:17, 260:7,
261:4, 277:20,
283:9, 301:4,
339:2
**1765**
2:6, 3:6, 9:15
**18**
1:8, 7:19,
156:14, 229:21,
276:2, 277:20,
283:10, 291:17,
301:4, 311:4,
311:7, 328:18,
341:10
**19**
6:19, 8:3,
8:17, 103:10,
229:21, 276:2,
277:20, 291:18,
328:18, 332:13,
332:16, 343:11,
424:14, 424:19,
424:22, 428:9,
428:13, 429:5,
429:10, 429:19,
429:21, 430:1
**1st**
49:14, 54:4,

91:4, 324:19,
363:19, 414:20,
415:7, 419:16,
419:17, 419:22,
420:16, 420:21,
421:8

---
**2**
**2,486**
44:16, 44:20,
45:2, 46:13,
91:6, 93:19
**2-plus**
437:1
**2.275**
302:16
**2.3**
392:3
**2.38**
96:4, 109:19,
119:19
**2.5**
441:12
**20**
7:17, 8:5,
54:2, 55:22,
85:17, 195:10,
287:3, 348:6,
369:15, 369:18,
409:13
**200**
170:1, 436:10
**20036**
4:13
**2014**
14:21, 229:19
**2015**
96:12, 229:19
**2016**
5:20, 6:5,
6:19, 200:9,
217:9, 229:19,
309:7, 338:20,
355:11, 356:15,
360:14, 361:19,
362:3, 363:13,
363:19, 366:6,
366:16, 367:4,

367:5, 367:20,
368:13, 373:16,
388:1, 388:15,
389:10, 389:11
**2017**
7:4, 7:17, 8:3,
8:6, 8:15,
103:10, 200:14,
229:12, 229:13,
229:15, 229:19,
229:21, 248:14,
273:7, 274:9,
276:2, 276:4,
276:11, 276:22,
278:9, 279:1,
279:17, 283:21,
284:16, 284:22,
285:12, 285:15,
287:16, 288:12,
288:19, 288:20,
290:7, 291:17,
296:9, 301:12,
328:18, 339:11,
341:19, 343:13,
348:17, 352:12,
355:3, 355:13,
356:6, 363:14,
366:17, 367:22,
368:14, 368:21,
370:1, 370:4,
370:10, 372:11,
373:2, 373:17,
373:21, 374:15,
379:3, 406:4,
409:21, 410:4,
411:15, 411:22,
412:16, 413:3,
414:20, 415:7,
415:13, 419:17,
419:22, 420:16,
421:8
**2018**
6:15, 7:9,
7:16, 8:13,
8:17, 8:22,
50:2, 73:3,
91:15, 154:12,
156:8, 156:13,

162:15, 163:4,
163:14, 200:9,
200:15, 228:13,
230:8, 231:12,
246:21, 249:13,
273:10, 275:13,
276:4, 276:11,
276:21, 280:5,
283:21, 286:12,
287:4, 289:3,
289:6, 296:9,
297:14, 298:1,
301:22, 302:14,
321:22, 424:19,
424:22, 425:17,
426:4, 426:22,
429:7
**2019**
7:6, 156:12,
158:11, 228:11,
246:21, 275:13,
276:15, 280:19,
282:1, 282:10,
282:16, 282:20,
292:3, 293:18,
294:8, 296:3,
296:8, 296:11,
296:15, 297:18,
298:6, 298:13,
298:19, 300:19,
301:22, 302:15,
302:19, 329:4,
338:7
**202.772**
4:14
**2020**
1:17, 6:9,
7:13, 9:11,
49:15, 54:5,
67:14, 73:4,
85:7, 86:16,
87:13, 88:1,
88:4, 89:5,
91:5, 154:10,
154:11, 246:12,
248:14, 274:11,
275:14, 275:22,
276:16, 282:12,

CONTAINS CONFIDENTIAL PORTIONS

Transcript of Micheal Paul Donovan, Corporate Designee

Conducted on March 3, 2020                                     187

| | | | |
|---|---|---|---|
| 282:15, 329:6, 330:15, 330:21, 446:15, 446:16 | **24022** 4:6 | **2nd** 54:18, 163:11, 163:14 | **31** 57:9, 58:5, 350:6, 350:13 |
| **208** 185:14, 188:20, 262:13 | **25** 8:20, 12:4, 69:10, 152:16, 427:7 | **3** | **315** 7:11 |
| **21** 6:9, 8:8, 88:4, 120:20, 332:16, 371:21, 374:4, 409:16, 424:14, 424:17, 444:5 | **250** 357:15 | **3** 150:19, 184:15 | **319** 49:16, 49:20, 52:12 |
| | **250,000** 359:1, 359:4 | **3,212,000** 436:16 | **322** 7:14 |
| **21,404,950** 173:12 | **256** 6:21 | **3-point** 298:19 | **323** 130:3, 130:10, 130:21, 138:6, 138:18, 142:13 |
| **210** 416:4, 416:17, 416:21 | **26** 286:12 | **3.212** 54:8 | |
| | **27** 368:21, 370:4, 373:9 | **3.625** 54:6 | **33** 124:16, 125:7, 174:15, 176:10, 176:12, 192:2, 208:5 |
| **213,000** 382:17 | **28** 7:15, 8:21, 287:4, 311:4, 321:22, 373:2, 427:10, 428:6, 429:5, 429:7 | **3/6/2017** 7:21 | |
| **216** 6:16 | | **30** 5:10, 9:3, 11:8, 11:20, 12:6, 12:12, 14:7, 31:1, 56:18, 63:9, 63:10, 63:11, 64:16, 70:15, 80:11, 81:10, 83:16, 99:14, 147:4, 147:22, 149:15, 150:19, 152:13, 166:1, 174:15, 184:15, 195:10, 207:3, 208:1, 219:11, 221:6, 223:7, 223:13, 226:2, 228:22, 229:14, 230:1, 231:21, 232:9, 233:11, 251:3, 251:14, 252:2, 252:21, 317:14, 446:16 | **3300** 8:14 |
| **22** 8:11, 8:13, 67:14, 85:6, 85:16, 86:16, 87:13, 88:1, 89:5, 363:19, 366:3, 400:22 | **286** 7:3 | | **339** 7:17, 261:7, 262:9 |
| | **29** 1:18, 9:12, 52:15, 426:4, 426:22, 427:17, 428:1, 428:6, 428:15, 429:6, 429:13, 429:20, 430:3 | | **340** 26:16, 26:18, 27:4, 28:16, 29:19, 33:20, 34:7, 36:5, 36:13, 36:17, 37:14, 40:8, 43:6, 43:7, 46:15, 128:16, 129:20, 130:4, 130:5, 131:1, 131:14, 131:19, 135:2, 147:18, 163:6, 163:7, 163:8, 415:22, 416:16 |
| **22102** 2:8, 3:8 | | | |
| **23** 6:5, 8:15, 70:16, 98:15, 414:17, 419:22 | **290** 47:19, 48:19, 49:19, 50:10, 51:18, 52:13, 54:10, 55:7, 57:20, 93:6, 93:18, 94:9, 149:6, 149:7, 153:5 | | |
| **23,000** 15:18, 44:5, 96:15 | | **30,000** 230:9, 231:5 | **3400** 327:15 |
| **23,234** 44:4, 44:6, 98:15 | **290403** 1:20 | **30,222,950** 44:21 | **341** 7:19 |
| **234** 262:5 | **294** 7:5 | **30,227,950** 153:2 | **343** 8:3 |
| **24** 8:17, 184:21, 424:17, 425:4 | **297** 7:8 | **30361** 3:16 | **348** 8:5 |
| **24,000** 15:18, 16:4, 16:10, 44:3 | | | |

CONTAINS CONFIDENTIAL PORTIONS
Transcript of Micheal Paul Donovan, Corporate Designee
Conducted on March 3, 2020

188

**352**
23:5, 73:21
**37**
260:7
**372**
8:8
**38**
234:17, 234:19
**385**
152:17
**39**
429:8
**391**
19:6, 20:18,
35:18, 192:14,
416:4, 416:18
**395**
152:21, 153:10,
153:22, 170:15
**399**
91:6, 92:17,
93:9, 93:18
**3c**
339:5
**3m**
333:11
**3rd**
9:11, 339:11,
340:2, 341:2,
344:11, 344:16,
347:10, 349:5,
349:9, 349:16,
353:2, 354:9,
360:20, 361:7,
361:9, 365:22,
386:19, 386:20

**4**

**4.6**
298:2
**401**
8:11
**404.239**
3:17
**414**
8:15
**42**
94:11, 185:2,

**235:8**
**425**
8:17
**427**
8:20
**431**
5:4
**433**
5:5
**44**
444:5
**446**
1:21
**47**
101:1, 194:13,
194:14, 194:15,
194:17, 194:19,
194:21, 195:8,
199:6, 201:2,
202:10, 202:18,
204:12, 204:18,
211:21
**48**
32:7
**4th**
446:14

**5**

**5**
262:14, 331:11,
331:13
**5,219,000**
92:18
**5.2**
302:10
**50**
37:12, 162:6
**500,000**
358:22
**518**
9:10
**52**
32:10, 302:9,
409:13
**540.345**
4:7
**550,000**
336:6

**58**
260:4, 311:7
**5:-cv--mfu**
1:8

**6**

**60**
57:9, 58:5,
84:18, 84:20,
233:11
**600,000**
231:7
**606**
275:1, 275:14,
276:9
**61**
57:10, 258:1
**625**
382:11
**63**
261:2
**650,000**
382:8
**66**
124:16, 125:8,
208:4
**67**
5:12, 436:11
**689**
93:19, 94:9
**6th**
340:22, 341:13,
342:1, 342:16,
361:7, 366:1,
386:20

**7**

**7.5**
302:15
**700**
48:14
**703.749**
2:9, 3:9
**72**
250:15
**72,000**
249:17
**725,000**
301:22

**737,800**
436:6, 436:20
**74**
261:13
**76**
363:18, 364:20
**797**
65:3, 76:1,
416:2, 416:16

**8**

**85**
5:14
**86**
372:20
**8739**
6:6
**88**
5:16
**883**
436:11
**8th**
372:1

**9**

**90**
58:5, 233:11,
246:14, 246:17,
248:12, 248:14
**978,000**
300:20
**9th**
69:12