

**Planet Depos**
We Make It *Happen™*

<span style="color:darkred">**CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER**</span>

# Transcript of Erik Schneider

**Date:** February 20, 2020
**Case:** RLI Insurance Company -v- Nexus Services, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

1 (1 to 4)

---

**1**

```
1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE WESTERN DISTRICT OF VIRGINIA
3               Harrisonburg Division
4    ---------------------------X
5    RLI INSURANCE COMPANY,      :
6              Plaintiff,        :
7          - vs. -              :  Case No.:
8    NEXUS SERVICES, INC., et al.,:  5:18-cv-00066-MFU
9            Defendants.         :
10   ---------------------------X
11       CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
12       VIDEOTAPED DEPOSITION OF ERIK SCHNEIDER
13              Harrisonburg, Virginia
14           Thursday, February 20, 2020
15                 11:14 a.m.
16
17
18
19
20   Job No.:  288366
21   Pages:  1 - 409
22   Reported by:  Michelle L. Lonas, RPR, CCR
```

---

**2**

```
1          Videotaped Deposition of ERIK SCHNEIDER,
2    held at the:
3
4         DOUBLETREE BY HILTON HARRISONBURG
5         BOARD ROOM
6         1400 East Market Street
7         Harrisonburg, Virginia  22801
8         (540) 433-2521
9
10            Pursuant to agreement, before Michelle L.
11   Lonas, Registered Professional Reporter, Certified
12   Court Reporter, and Notary Public of the Commonwealth
13   of Virginia.
14
15
16
17
18
19
20
21
22
```

---

**3**

```
1                A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3         CHRISTOPHER M. HARRIS, ESQUIRE
4         VIVIAN KATSANTONIS, ESQUIRE
5         WATT, TIEDER, HOFFAR & FITZGERALD, LLP
6         1765 Greensboro Station Place
7         Suite 1000
8         McLean, Virginia  22102
9         (703) 749-1000
10
11
12   ON BEHALF OF THE DEFENDANTS:
13        MARY DONNE PETERS, ESQUIRE
14        GORBY PETERS LAW
15        1175 Peachtree Street, NE
16        10th Floor, Suite 1000
17        Atlanta, Georgia  30361
18        (404) 239-1150
19
20
21   ALSO PRESENT:  Nika McKagen, Videographer
22
```

---

**4**

```
1                C O N T E N T S
2    WITNESS                              PAGE
3    ERIK SCHNEIDER
4      By Mr. Harris                       13
5
6
7
8                E X H I B I T S
9         (Confidential Pursuant to Protective Order)
10            (Attached to the Transcript)
11   NO.      DESCRIPTION                  PAGE
12   1    Revised Verified Petition        52
13   2    Declaration of Erik Schneider    83
14   3    Affidavit of Erik Schneider in Support  182
15       of Plaintiffs' Emergency Motion for
16       Temporary Restraining Order
17   4    RLI Immigration Bond Disposition  188
18       Status - February 19, 2020, Spreadsheet
19   5    Packet of Libre by Nexus Documents  279
20       (NEXUS0265071 - NEXUS0265091)
21   6    Call Notes                        297
22       (NEXUS0265126 - NEXUS0265150)
```

Case 5:18-cv-00066-MFU-JCH Document 496-4 Filed 08/21/20 Page 3 of 179 Pageid#: 12469
CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

2 (5 to 8)

**5**

E X H I B I T S  (C O N T' D.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Sales Lines (NEXUS0265155) | 326 |
| 8 | Email Chain, February 9 - 11, 2016 (RLI_0000330615 - RLI_0000330617) | 364 |
| 9 | Email Chain between Dave Sandoz and Erik Schneider (NEXUS0331054 - NEXUS0331055) | 367 |
| 10 | Email Chain with Attachment (RLI_000000003 - RLI_000000004) | 369 |
| 11 | Email from Barb Roberts to Bigmarcobonds@gmail.com with Attachments (RLI_000000015 - RLI_000000017) | 374 |
| 12 | Email from Barb Roberts to Bigmarcobonds@gmail.com with Attachments (RLI_000000018 - RLI_000000020) | 375 |
| 13 | Email from Barb Roberts to Bigmarcobonds@gmail.com with Attachments (RLI_000000031 - RLI_000000043) | 376 |

**7**

E X H I B I T S  (C O N T' D.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 20 | Email Chain, October 24, 2016, with Attachments (RLI_000000144 - RLI_000000147) | 392 |
| 21 | Email Chain, December 15, 2016, with Attachments (NEXUS0328814 - NEXUS0328871) | 393 |
| 22 | Email Chain, December 15, 2016, RE: ICE Letter of Dec. 12 (RLI_000000189) | 396 |
| 23 | Email Chain, January 10, 2017, RE: ICE Update (RLI_000000284 - RLI_000000285) | 398 |
| 24 | Email Chain, January 10, 2017, RE: ICE Update (RLI_000000287 - RLI_000000294) | 400 |
| 25 | Email from Richard Moore to Laura Piispanen (RLI_000000296 - RLI_000000297) | 401 |
| 26 | Email Chain with Attachments (RLI_000000318 - RLI_000000327) | 402 |

**6**

E X H I B I T S  (C O N T' D.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 14 | Email from Dave Sandoz to Multiple Recipients (NEXUS0315022) | 380 |
| 15 | Email from Kellie Bane to Bigmarcobonds@gmail.com with Attachments (RLI_0000330796 - RLI_0000330810) | 383 |
| 16 | Email from Kellie Bane to Bigmarcobonds@gmail.com with Attachments (RLI_0000330811 - RLI_0000330824) | 383 |
| 17 | Email from Barb Roberts to Bigmarcobonds@gmail.com with Attachments (RLI_0000331027 - RLI_0000331029) | 384 |
| 18 | Email Chain, September 19, 2016 with Attachments (RLI_0000000073 - RLI_000000079) | 385 |
| 19 | Email Chain between Tania Cortes and Laura Piispanen (RLI_000000103 - RLI_000000106) | 389 |

**8**

E X H I B I T S  (C O N T' D.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 27 | Email from Jody Prescott to Laura Piispanen (RLI_000019658 - RLI_000019661) | 403 |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

3 (9 to 12)

---

9

1  PROCEEDINGS
2      THE VIDEOGRAPHER: Here begins disc number
3  one in the videotaped deposition of Erik Schneider, in
4  the matter of RLI Insurance Company versus Nexus
5  Services, Incorporated., et al., in the United States
6  District Court for the Western District of Virginia,
7  Harrisonburg Division, Case Number 5:18-cv-00066-MFU.
8  Today's date is February 20th, 2020. The time on the
9  video monitor is 11:14 a.m. The videographer today is
10 Nika McKagen, representing Planet Depos. This video
11 deposition is taking place at 1400 East Market Street,
12 Harrisonburg, Virginia, 22801. Would counsel please
13 voice identify themselves and state whom they
14 represent?
15     MR. HARRIS: Christopher Harris from Watt
16 Tieder, representing the plaintiff, RLI.
17     MS. KATSANTONIS: Vivian Katsantonis on
18 behalf of RLI.
19     MS. PETERS: Mary Donne Peters on behalf of
20 the Defendants, Nexus Services, Inc., Libre by Nexus,
21 Inc., and Homes by Nexus, Inc.
22     THE VIDEOGRAPHER: The court reporter today

---

10

1  is Michelle Lonas, representing Planet Depos. Would
2  the reporter please swear in the witness?
3      (Witness was sworn by the reporter.)
4      MS. PETERS: We have one matter to go on
5  the record this morning. Mr. Schneider has a CD of --
6  not a CD,
7      THE WITNESS: Thumb drive.
8      MS. PETERS: -- but a Zip drive of Capsule
9  files that he is now delivering to Ms. Katsantonis.
10 Would you please hand the Zip drive and the evidence
11 custody sheet?
12     MS. KATSANTONIS: Does the Zip drive
13 contain all Capsule files for the RLI bond principals?
14     MS. PETERS: To the best of our
15 understanding, information and belief, and you are
16 free to ask Mr. Schneider about that.
17     MR. HARRIS: Well, let's clarify from
18 counsel, have you withheld anything on the basis of
19 privilege from the Capsule files?
20     MS. PETERS: We have not.
21     MR. HARRIS: Okay.
22     THE WITNESS: Then if you're satisfied,

---

11

1  I've got a copy for you to sign.
2      MR. KATSANTONIS: What do you need me to
3  sign?
4      THE WITNESS: I've got a copy for you to
5  sign, because I didn't know if we'd have a copy
6  machine. These are identical. You can look at them.
7      MS. PETERS: And for counsel, please be
8  advised that these are unredacted. We do intend to
9  redact pursuant to Judge Urbanski's order in this
10 case, and will substitute when those redactions are
11 complete.
12     MR. HARRIS: Okay. Are the docu --
13     MS. PETERS: This information is being
14 provided pursuant to the order of Judge Urbanski in
15 this case. The information is extremely sensitive,
16 and for that reason we are reminding counsel of its
17 obligations under the protective order entered into
18 this case. This information is produced in response
19 to that protective order.
20     MS. KATSANTONIS: Thank you. I have a
21 copy. Let me --
22     THE WITNESS: Do you want me to sign that?

---

12

1      MR. HARRIS: Are the documents Bates
2  stamped --
3      MS. PETERS: They are not.
4      MR. HARRIS: -- on the thumb drive?
5      MS. PETERS: They are not.
6      MR. HARRIS: Okay. So we'll have to
7  discuss the logistics on how the replacement is going
8  to occur. It's certainly not our burden to figure
9  that out, which documents are which.
10     MS. PETERS: I'm advising you in order to
11 get the materials to you in the timeframe that you
12 demanded, realizing that we had --
13     MR. HARRIS: Let's not debate when we
14 demanded it, but --
15     MS. PETERS: -- realizing that we were
16 struggling with technical issues, it is what it is,
17 Mr. Harris.
18     MR. HARRIS: Okay. Thank you.
19     MS. KATSANTONIS: Thank you.
20
21
22

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

4 (13 to 16)

13

1           ERIK SCHNEIDER,
2    having been duly sworn by the reporter, was examined
3              and testified as follows:
4       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
5   BY MR. HARRIS:
6       Q    Good morning, sir. Can you state your name
7   and home address for the record, please?
8       A    **Good morning. Erik Schneider,**
9   **S-C-H-N-E-I-D-E-R,** ██████████████████████
10  ████████████
11      Q    Mr. Schneider, you've had your deposition
12  taken before, correct?
13      A    **Correct.**
14      Q    Okay. I'm just going to go over some quick
15  ground rules to refresh you. This is a question and
16  answer process. We need to get a nice clean record.
17  In order to do that, we have to let each other finish,
18  we can't talk at the same time. So please try to be
19  cognizant of that, and I will do as well. The best
20  way to do that is make sure the other person is
21  finished speaking before you respond.
22           If at any time you don't understand the

14

1   question I'm asking, you can ask me to clarify. Can I
2   count on you to do that today?
3       A    **Yes, sir.**
4       Q    Okay. And you're doing well so far with
5   the verbal answer. Obviously, we do have video here,
6   but we need a written record as well to reflect your
7   responses, so please make your answers verbal.
8       A    **Understood.**
9       Q    Okay. If at any time you need to take a
10  break, just let me know and we'll take a break. But
11  I'd ask that you wait until you've answered a question
12  and not to ask for that break while a question is
13  pending.
14      A    **Understood.**
15      Q    Okay. Is there any reason you're not able
16  to testify fully and truthfully today?
17      A    **No.**
18      Q    Okay. You understand we're here today
19  regarding a litigation between RLI Insurance Company
20  against Nexus Services, Inc., Libre by Nexus, Inc.,
21  and Homes by Nexus, Inc.?
22      A    **I do.**

15

1       Q    Okay. And if I refer to RLI Insurance
2   Company as "RLI," you'll understand I'm referring to
3   the plaintiff?
4       A    **Yes.**
5       Q    Okay. If I refer -- if I just use the term
6   "Libre," you'll understand I'm referring to the
7   defendant, Libre by Nexus, Inc.?
8       A    **Yes.**
9       Q    And if I use the term "Homes," will you
10  understand I'm referring to the defendant, Homes by
11  Nexus, Inc.?
12      A    **Yes.**
13      Q    Okay. What preparation have you done for
14  today's deposition?
15      A    **Very little. I had set aside time, but I**
16  **really spent that time working on that production so I**
17  **could satisfy that need.**
18      Q    Okay. Did you review documents?
19      A    **Not really, no.**
20      Q    Did you review your old testimony given in
21  this case?
22      A    **Briefly.**

16

1       Q    Okay. Is that your deposition testimony,
2   and trial testimony, affidavit testimony, or --
3       A    **My deposition testimony is what I had. I**
4   **haven't gone over my trial testimony and the**
5   **affidavits.**
6       Q    Okay. Okay. So we talked about the three
7   defendants in this case. Who is your current
8   employer?
9       A    **Nexus Services.**
10      Q    Okay. And how long have you been employed
11  by Nexus Services?
12      A    **It will be six years in March.**
13      Q    Have you ever worked or been employed --
14  worked for or been employed by either of the other two
15  defendants?
16      A    **I have not.**
17      Q    Okay. Who signs your paychecks?
18      A    **Richard Moore.**
19      Q    Okay. And are those paychecks written on
20  Nexus Services checks?
21      A    **I'd have to look at one.**
22      Q    Okay. Is it possible they're written on

**17**

1  Libre by Nexus?
2  **A   I'd have to --**
3  MS. PETERS: Object to form.
4  **A   I'd have to look at one. It's not --**
5  **BY MR. HARRIS:**
6  Q   Okay.
7  **A   I really never paid attention.**
8  Q   Would that surprise you if your paycheck
9  was signed by Libre by Nexus, or was on a Libre by
10 Nexus, Inc., account?
11 **A   No. I don't know what the accounts are.**
12 Q   Okay. Do you have a title with Nexus
13 Services, Inc.?
14 **A   Yes.**
15 Q   What is that?
16 **A   Director of Corporate Security.**
17 Q   Okay. And your former title was Director
18 of Risk Management Services; is that correct?
19 **A   Vice President of Risk Management.**
20 Q   Vice President. Are you an officer of
21 Nexus Services, Inc.?
22 **A   I was. I'm a direct -- I'm not sure if a**

**18**

1  **director is an officer the way our corporate structure**
2  **is. I really don't know.**
3  Q   Okay. For how -- well, when did you
4  become, did you say Director of Corporate Security?
5  **A   Yeah.**
6  Q   When did you take that title?
7  **A   September of '19.**
8  Q   Immediately prior to that, were you in that
9  position, Vice President of Risk Management Services?
10 **A   Yes.**
11 Q   And for how long were you in that position?
12 **A   About, I think that was just under two**
13 **years.**
14 Q   So roughly September 2017 to
15 September 2019?
16 **A   Yeah. Yeah, I think.**
17 Q   Is there a current Director of Risk
18 Management Services for Nexus?
19 **A   No. It's an open position.**
20 Q   Okay. Do you know who Carol Taylor is?
21 **A   I do.**
22 Q   And what is her current title with Nexus

**19**

1  Services?
2  **A   She's not with Nexus any longer.**
3  Q   Okay.
4  **A   She's not employed.**
5  Q   Is she employed with any of the other two
6  defendants?
7  **A   No.**
8  Q   When did she become unemployed, or when did
9  her employment end?
10 **A   I think it was about two weeks ago.**
11 Q   What was the basis of that?
12 MS. PETERS: Object to form to the extent
13 that it calls for human resources information. I
14 would say that I'm going to need to inquire further,
15 so I would ask the witness not to answer the question
16 as posed. I think you could ask if she -- if he
17 knows.
18 MR. HARRIS: Well, let me ask another
19 question.
20 BY MR. HARRIS:
21 Q   Do you have an understanding as to any
22 [redacted]

6  Q   Okay. Is there a reason you're no longer
7  the Vice President of Risk Management Services?
8  **A   I took a different position for personal**
9  **reasons, had some family issues. That VP of Risk is a**
10 **lot of travel, time away from home. I've had some,** [redacted] **that**
11 [redacted] **that**
12 **just prevented me from fulfilling that. So I took a**
13 **different position that's just as vital to the company**
14 **that allows me to be centralized at home.**
15 Q   Sorry -- I'm sorry to hear that,
16 Mr. Schneider.
17 **A   It's okay.**
18 Q   Who is filling that very important role of
19 VP of Risk services in the interim?
20 **A   It's open -- well, it's an open position,**
21 **but Risk Department was actually split into three**
22 **separate departments. There's the Breach, the Risk**

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

21

1   and the Security.  I've taken over Security, and Evan
2   Ajin is overseeing the other two at the moment.
3        Q     And that's a temporary position for
4   Mr. Ajin?
5        A     I would assume so.  I don't know.
6        Q     Okay.  And Mr. Ajin succeeded to that
7   position, or at least to that oversight role of Risk
8   and Breach in September of 2019?
9        A     I don't know the date.
10       Q     Okay.
11       A     I don't.  I wasn't consulted on it.  I just
12  know that it happened.
13       Q     Okay.  What was your position prior to
14  September 2017 with Nexus Services, Inc.?
15       A     Chief Risk Management Officer.
16       Q     And how long did you serve in that
17  position?
18       A     It was probably about a year and a half.
19       Q     So, back to about --
20       A     I'm guessing.  I, you know.
21       Q     Halfway, maybe early 2016 --
22       A     Yeah.

22

1        Q     -- to late 2017?
2        A     Yes.  Yeah, it sounds about right.
3        Q     Okay.  And how about prior to that?
4        A     I was Director of Risk Management.
5        Q     And how long were you in that role?
6        A     Um, probably about three months after I
7   started in March of '14, so middle of '14.
8        Q     Through early 2016 roughly?
9        A     Uh-huh, roughly.
10       Q     Okay.
11       A     Very roughly you must understand.
12       Q     For the first three months, what was your
13  position?
14       A     I didn't -- we were trying to figure that
15  out.  The company was brand new.  I was just there.
16       Q     Okay.
17       A     You know, I didn't really have a title.
18       Q     Were you one of the founders of Nexus
19  Services, Inc.?
20       A     I was not.  I was not.  I'm sorry.
21       Q     Who brought you into the company?
22       A     Mike Donovan.

23

1        Q     Okay.  Did you have a prior relationship
2   with Mr. Donovan?
3        A     Yes.
4        Q     What was that?
5        A     I'd known him for several years.  We worked
6   on a -- I used to be a private investigator in
7   Colorado, and I worked on bail lobbying issues, and we
8   worked on a proposition together.  Well, he worked
9   with my boss at the time, and I was assisting in that,
10  so I met him through some legislative endeavors.
11       Q     Okay.  So, I want to focus on your time for
12  now with Nexus Services.  So what were your roles and
13  responsibilities as Director of Risk Management for
14  that first large segment of your employment?
15       A     Similar to what they've always been.  I
16  handled corporate security issues.  I handled HR
17  employee investigations.  I handle and I oversaw
18  the -- see, back then we didn't have Breach Management
19  Department, but it was our Risk Management Department,
20  and I oversaw the risk managers in the field who
21  managed our program participants and all of their
22  needs.

24

1        Q     Okay.  And how, if at all, did your roles
2   and responsibilities change when you took the position
3   of Chief Risk Management Officer in early 2016?
4        A     The responsibilities didn't change.  It
5   just was a larger role with more employees, more
6   participants.
7        Q     Okay.  And then how about when you changed
8   over to VP of Risk Management?
9        A     Same, same thing.  Just as the company
10  grew, my job got harder, and that was natural
11  progression.
12       Q     Okay.  So corporate security issues, can
13  you elaborate on what that entails?
14       A     Sure.  We have -- again, we have physical
15  security.  I mean, Nexus is the target of a lot of
16  hate groups because of what we do, and certain local
17  individuals who are irrationally focused on what we
18  do, um, and so we have physical security, and I, I
19  manage and oversee the armed and unarmed guards.  We
20  have guards on our, on our corporate location in
21  Verona who, you know, like any company, they manage
22  the gate and visitors, and who's coming and going.

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

7 (25 to 28)

25

1  Um, any investigations that are necessary, if we have
2  potential fraud, you know, by an employee or a vendor
3  or something like that, I will, I will investigate
4  that. My role is to interface with law enforcement if
5  necessary.
6      Q   Okay.
7      A   Loss — you know, general loss prevention
8  type things. And the physical security, I mean, down
9  to locks on doors, it's my job to make sure that
10 everybody is safe.
11     Q   Okay. And sorry. So kind of the
12 experience that you listed under Director of Risk
13 Management, do you maintain any of those roles in your
14 current position that you've taken since September?
15     A   I do not.
16     Q   Okay. You mentioned something about HR
17 issues. Can you repeat what that was or explain what
18 that entails?
19     A   It's the way I touched on it. If we have
20 employee conduct issues, potential employee fraud, um,
21 computer security, you know, anything that might
22 become an HR issue where someone could get written up

26

1  or terminated over it, I'm going to put together an
2  investigation for the board so they know what they're
3  dealing with.
4      Q   Okay. And overseeing the Risk Department,
5  what would that entail?
6      A   Um, that was, that was managing the -- not
7  really the schedules for the risk managers in the
8  field, but being available to answer, answer questions
9  about how to handle a particular client situation,
10 making sure that their travel was correct, making sure
11 that they were -- they knew where they needed to be.
12 You know, we're a national footprint and sometimes we
13 have to travel to get to our program participants.
14 Just making sure that that ran smoothly and that the
15 program participants were attended to, and that the,
16 that the employees had all the tools in their toolbox
17 that they needed to do their job.
18     I also oversaw the Breach Department. The
19 Breach Department managed all the notices that came in
20 from the government on bonds that had, that had
21 issues, and interfacing with the government to get, to
22 get invalid invoices and breaches reversed, and

27

1  preparing appeals, and ensuring that the clients were
2  aware of their responsibilities. We -- you know,
3  Breach Department would reach out to the program
4  participants and let them know if they had an
5  appointment, and make sure that they got there, and
6  make sure someone advocated for them so the bond
7  wasn't breached and so they weren't remanded and
8  deported if we could avoid it. And of course
9  security, which I've already spoken about.
10     Q   Okay. So, who currently is -- what
11 individuals currently make up the Breach Department at
12 Nexus?
13     A   Hazaar Pastor-Perdomo. Oh, I just blanked
14 on Jesus's last name. Poor guy's worked there for two
15 years, and I just blanked his last name.
16     Q   Was there a gentleman named Pastrana? Is
17 that Jose Pastrana?
18     A   Yeah, Jose Pastrana has not been there in
19 over a year. ████████ Can I look at my phone
20 for Jesus's name?
21     Q   Sure.
22     A   It doesn't matter. I don't think I have

28

1  it. I think I've got him in --
2      Q   I don't want to waste time.
3      A   I think I've got him in my phone as Jesus.
4      Q   Okay. That's fine.
5      A   No, Pastrana ████████████████
6      Q   So, Hazaar -- I'm just going to cut to
7  Perdomo, if that's okay. And then Jose Past -- well,
8  not Jose. Jesus, whose name we don't have, those are
9  the two people?
10     A   He's going to hate me.
11     Q   We won't show him the videotape if you
12 don't. Is that the entire Breach Department at the
13 moment?
14     A   Um, yeah, at the moment, that's -- those
15 are the two that are working there.
16     Q   What about in September 2019, who formed
17 the Breach Department? About the time that you
18 stepped down from your position, or shifted positions.
19     A   That was the two of them. Jose had already
20 left and there was open positions to be filled.
21     Q   Okay.
22     A   And in September, Hector Perez was in there

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

---

**29**

1  too.

2  Q   Is he still with the company?

3  A   He is, but he's changed positions.

4  Q   Where is -- what position is he in?

5  A   He's a transportation agent.

6  Q   Is that in the field?

7  A   Yeah.  He likes to travel.

8  Q   In your role overseeing the Risk Department

9  and with respect to the Breach Department, um, did you

10  interface with sureties?

11  A   Yes.

12  Q   What about bond agents?

13  A   Um, yes.

14  Q   And who currently forms the Breach

15  Department?  Is that different than -- I think I asked

16  about the Risk Department?  You said there were --

17  A   No, you asked me about the Breach

18  Department.  I said Hazaar and --

19  Q   Oh, did I?  Is there a Risk Department

20  that's separate from the Breach Department?

21  A   Yes.

22  Q   Okay.  Who comprises the Risk Department?

---

**30**

1  A   There are numerous risk managers.  Actually

2  they've added several new ones that I don't know,

3  because I'm not there anymore.  Do you want all the

4  employees' names that I know?

5  Q   How many are there?

6  A   I believe that there are, I want to say

7  eight.

8  Q   Do they work locally in Verona, or are they

9  around the country?

10  A   No.  They are around the country.  We don't

11  have any in Verona at the moment.  They're all out in

12  the field.

13  Q   Okay.

14  A   We have them in strategic locations where

15  our large clients -- large cities, airports, where we

16  have offices.

17  Q   Okay.  Are they kind of like in a

18  supervisory role over the various offices around the

19  country?

20  A   No.

21  Q   Okay.  Who's in the -- who supervises the

22  various offices around the country that Nexus has?

---

**31**

1  A   Libre has managers that supervises the

2  offices.

3  Q   Okay.  Is there one for each office?

4  A   I don't think so.  Some of our offices are

5  very small, they're one-person offices.  They're just

6  there to be a convenient location for program

7  participants to go to if they're in need.

8  Q   So who at Verona would the various Risk

9  Department managers report to?

10  A   David See.

11  Q   Do you know what his title is?

12  A   Chief Operating Officer of Libre.

13  Q   Has he been in that role for a while?

14  A   Number of years.  I think at least three.

15  Q   Okay.  So, sorry to go over this, but this

16  is new information to me.  Mr. Ajin, would he be

17  supervising Hazaar Perdomo and Jesus?

18  A   Yes.

19  Q   Okay.  Would he have any oversight over the

20  various managers in the Risk Department?

21  A   Yes.

22  Q   Okay.  What, is he above David See then?

---

**32**

1  A   Yes.  He's David's, David's direct

2  supervisor.

3  Q   So David would report to Mr. Ajin?

4  A   Yes.

5  Q   And Mr. Ajin is A-J-I-N?

6  A   Yes.

7  Q   Okay.  Do you know if Mr. Ajin would

8  interface directly with sureties and bond agents at

9  this point?

10  A   I don't know.

11  Q   Okay.  But that was part of what you did

12  when you were in your risk management roles?

13  A   Yes.  Yes, I was.

14  Q   And you -- did you previously have

15  oversight over the risk managers in the field did you

16  say?

17  A   Yes.

18  Q   Okay.  So, were you above David See in that

19  hierarchy, or --

20  A   No.  There were separate departments.

21  Q   Okay.  So, we talked about risk managers

22  reporting to David See, and they previously --

---

33

1    A    No, we didn't.

2    Q    We didn't.

3    A    No.

4    Q    Okay.  Who do the risk managers report to

5    in Verona?

6    A    The risk managers would report to Carol

7    Taylor in Verona.  We were talking about Libre offices

8    when you asked me that question.  I'm sorry.

9    Q    Okay.  So let's back up then.  The regional

10   offices are managed by whom?

11   A    We have different regional offices.  We

12   will have a regional risk office.  For instance, in

13   Chicago we have a risk management office that has a

14   risk management officer in there, and he manages that

15   office, because he's the only person there.

16   Q    Okay.

17   A    In Los Angeles we have an office that has

18   numerous employees in there, so it's a Libre office.

19   There would be a Libre manager who would report to

20   David See.  The risk manager works out of that office.

21   That's his home base where he would go to, to restock

22   and when he needs a computer, or, you know, things

34

1    like that.  But Carol, the risk -- the Director of

2    Risk Management wouldn't oversee that office.  It

3    would just be an office where a risk manager worked

4    out of.  So the question is, just needs a little more

5    detail in the answer.  So --

6    Q    Okay.  So, but Carol Taylor is not there

7    anymore, right?

8    A    Right.

9    Q    So is everybody in the field reporting to

10   one person, or is it split somehow?

11   A    All the risk managers in the field would be

12   reporting to Evan Ajin right now.

13   Q    Okay.  So what is the highest position of

14   somebody in the field who's not a risk manager?

15   A    That would be a -- in Risk Management

16   Department, or in the company?

17   Q    In the company.

18   A    Um, that would be, um, the Director of

19   Operations for Libre.

20   Q    And who is that?

21   A    Nina Erlandson.

22   Q    Where does she work?

35

1    A    Los Angeles.

2    Q    Okay.  Who does she report to in Verona?

3    A    David See.

4    Q    Okay.  And she's not in the Risk

5    Management?

6    A    No.

7    Q    So what department is she in?

8    A    Operations.

9    Q    Operations.  Okay.  And what generally is

10   the function of the Operations?

11        MS. PETERS:  Object to form.

12   BY MR. HARRIS:

13   Q    When your counsel objects, unless she

14   instructs you not to answer it, then wait for her to

15   finish and --

16   A    Okay.  Understand.  Operations is, runs

17   Libre.  They're the department that is the -- that

18   handles our program participants from the moment that

19   a loved one contacts Libre to ask for help in securing

20   their bond to handling whatever day-to-day needs the

21   program participant wants.  They pick up the clients

22   from facilities.  They do the contract with the

36

1    clients.  They're -- I mean, they handle everything

2    from the beginning.

3    Q    Okay.  So, part of the Nexus operation is

4    obviously generating revenue?

5    A    Uh-huh.

6    Q    Does that fall under Operations?

7    A    Yes.

8    Q    Okay.

9    A    That's something else, yeah.  That's --

10   Q    In your role as VP of Risk -- what was it,

11   VP of Risk Management?

12   A    VP of Risk Management, yeah.

13   Q    Can I just say VP of Risk?

14   A    Sure.

15   Q    You'll understand I mean that title?  Okay.

16        As VP of Risk, did you have any

17   responsibility for collecting, or did you have

18   oversight responsibility for the collecting of funds

19   from your clients?

20   A    No.

21   Q    Were you ever involved in collecting funds

22   from clients?

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

---

37

1    A    No. As a matter of fact, I was sep -- risk
2    managers were -- risk management are the people that
3    deal with the client when they're in crisis or have a
4    problem or have a compliance issue. We have to keep
5    that completely separate from any financial -- you
6    don't want to be telling someone that they're not
7    doing something correct, and then saying, But give me
8    money. It just doesn't -- it's completely, completely
9    separate, because it's a different, different
10   function, different set of skills, different way to
11   handle a program participant.
12   Q    Does the Nexus companies, or the
13   defendants, do they kind of preserve kind of a line of
14   demarcation between the people who would be involved
15   in collecting funds and those who are managing risk?
16   A    When you say the defendants, um, that
17   wouldn't -- anything with collecting funds wouldn't
18   include Homes. So, I mean --
19   Q    Okay.
20   A    -- that, that has nothing to do with it, so
21   I can't say the defendants have anything.
22   Q    Okay. Let's talk Nexus Libre.

38

1    A    Nexus, yeah, there's a demarcation between,
2    between risk managers and collecting funds. That's an
3    Operations function.
4    Q    Okay. And does all of the operations, does
5    that fall under one of the particular defendants?
6    A    Yeah, Libre.
7    Q    Okay. So, would all of the operations
8    people be Libre employees?
9        MS. PETERS: Object to form.
10   A    I don't know what their -- I could assume,
11   but I don't want to assume, I'm not involved in that.
12   BY MR. HARRIS:
13   Q    Okay. So, by the same token, would you
14   know if all the risk people, employees in the Risk
15   Department, would they all be employed by Nexus
16   Services, Inc.?
17   A    They're Services employees to my knowledge.
18   Q    And just generally --
19   A    At least they were when I --
20   Q    Generally, do you know if, you know,
21   employees say below the officer level work for both
22   Nexus and Libre?

39

1        MS. PETERS: Object to form.
2    A    I don't know.
3    BY MR. HARRIS:
4    Q    Okay. Did you ever perform services on
5    behalf of Libre?
6        MS. PETERS: Object to form, to the extent
7    it calls for a legal conclusion.
8    BY MR. HARRIS:
9    Q    To the best of your knowledge?
10   A    In the first three months that I worked --
11   maybe the first six months, there -- I built the Risk
12   Management Department. We only had 12 employees when
13   I came to the company. So early on, yeah, I would, I
14   would act as a CEM. I had contact with program
15   participants in 2014, um, reminded them that their
16   payment was due, reminded them to charge their GPS. I
17   would personally escort them to ERO and court if we
18   needed to, because we had no one else to do that.
19   But, you know, the company grew and got employees,
20   so I stepped away from that. So that was something --
21   the answer is yes, but very early on in the company.
22   Q    In that three-month initial period roughly?

40

1    A    Six, yeah. I mean, you know --
2    Q    What is a CEM?
3    A    Client Experience Manager. Those are the
4    people that work in our call centers and take calls
5    from program participants and their family or friends,
6    or --
7    Q    And all of those people would you say, to
8    the best of your knowledge, are Libre employees?
9    A    Yes.
10   Q    Okay. And is it as VP of Risk, are any of
11   those related positions we discussed where you had
12   essentially the same roles, did you ever have
13   oversight over the activities going on in the call
14   center?
15   A    Only as it related to employee conduct,
16   not, not as it related to their job as a CEM or how
17   they interfaced. I would have over -- if -- this has
18   never happened, but I mean, if an -- well, let me just
19   say, if a program participant had made a complaint
20   that an employee was rude to them, you know, I would
21   go talk to that employee. Because it's an
22   investigation.

---

Transcript of Erik Schneider
Conducted on February 20, 2020

41

1    Q    Sure.
2    A    I want to be sure that our program
3    participants are being treated right. I had oversight
4    in that arena.
5    Q    Okay.
6    A    But as far as their day-to-day job, I did
7    not. Does that make sense?
8    Q    Yep.
9    A    Okay.
10   Q    So who kind of at your level or above would
11   be, would have oversight over the people working in
12   the call center?
13   A    Nina, David. Nina Erlandson, David See.
14   Q    Nina, Dav --
15   A    Nina Erlandson or David See.
16   Q    Now, the call center is in Verona, correct?
17   A    Yes. Well, one of our call centers is in
18   Verona.
19   Q    Oh, do you have multiple call centers?
20   A    We do.
21   Q    Where are the other ones located?
22   A    Orlando, Puerto Rico, Costa Rica.

42

1    Q    Okay. How long has the Orlando call center
2    been operating?
3    A    About two-and-a-half years.
4    Q    What about Puerto Rico?
5    A    When was the hurricane? Probably about a
6    year and a half, yeah.
7    Q    What about the Costa Rica call center?
8    A    It's brand new. We're setting it up right
9    now.
10   Q    Do you know if that's what Mr. Moore is
11   involved in at the moment?
12   A    Yes.
13   Q    Do you know where he is right now?
14   A    I don't.
15   Q    Do you know if he's in Costa Rica or not?
16   A    I believe. Last time I talked to him he
17   was, but I don't know where he is right now.
18   Q    When was that last conversation?
19   A    Yes -- well, yesterday he was there.
20   Q    And he didn't tell you when he was going to
21   return?
22   A    He doesn't tell me his travel plans.

43

1    Q    Okay. So is there someone in the Verona
2    office who oversees the call center in Verona?
3    A    Do you mean on a -- David See.
4    Q    Okay.
5    A    David See is based out of Verona. That's
6    where his home office is.
7    Q    At that same campus you described with the
8    security?
9    A    Yeah. Yeah.
10   Q    What's the address of that campus?
11   A    113 Mill Place Parkway, Verona, Virginia,
12   24482.
13   Q    And do you have an office there?
14   A    I do.
15   Q    Is that where your primary desk and
16   computer are?
17   A    Yes.
18   Q    Do you have other offices?
19   A    No.
20   Q    Is that campus physically divided at all
21   between Nexus Services and their operations versus
22   Libre by Nexus and their operations?

44

1    A    Yes. There's multiple buildings on the
2    campus.
3    Q    And the call center is in the Libre
4    building? Is that fair?
5    A    Yes.
6    Q    Okay. Where is your office?
7    A    It's in the Libre building. We call it
8    115, building 115. There's a left side and a right
9    side of the building that are divided by magnetic card
10   access. The left side of the building is Libre
11   operations. The right side of the building is
12   everyone else. The Libre employees on the left side
13   of the building have no access to the Services side of
14   the building.
15   Q    Okay. And who, who all have offices on the
16   Nexus side at your level and above?
17   A    Mike Donovan, Richard Moore, Evan Ajin,
18   David See. My level. I don't know what my level is.
19   We have support -- um, Tim Shipe. We have support
20   services over there. Um, Tim Donovan.
21   Q    Did you say --
22   A    Tim Donovan.

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

---

45

1    Q    Tim Donovan.  Who is Tim Donovan?

2    A    He's the Director of Facilities.

3    Q    Okay.

4    A    And, um, Donna Salmons.

5    Q    What's her role?

6    A    I don't know.  I don't know if she's -- I

7  don't know what her title is.  She's not a director,

8  so it wouldn't be my level or above.  I know she

9  works -- she works with, um, tenants for the rental

10 properties.  But I don't know what her title is.

11   Q    Okay.

12   A    That would be it on that side.

13   Q    So all the people you were just naming on

14 that list, starting with Mr. Donovan, they all work on

15 the Nexus side of the Libre building?

16   A    Yes.

17   Q    Okay.  And who works in -- who has an

18 office at your level or above in the Nexus building?

19 We talked about physical division between the Libre

20 building and --

21   A    Do you mean the Risk -- I'm sorry, we call

22 it the Risk building.

---

46

1    Q    Okay.

2    A    It's 111.

3    Q    Okay.

4    A    We refer to them as 103, 111, and 115.

5    Q    So 103 being?

6    A    One oh three would be HR.  HR and IT are in

7  what we call 103, and our Training Department is in

8  103.  Um, 111 is the Risk building.  That's where

9  Breach is.  Um, that's where Carol Taylor's office

10 was.  That would be the only person at my level, but

11 she's not there anymore.  There's no one in that

12 building right now at my level or above.  And then 115

13 is what we just spoke about.

14   Q    Is -- are there Finance or Accounting

15 people over in the 111 building?

16   A    No.  Finance and Accounting is in Atlanta.

17   Q    Okay.  And did Finance and Accounting used

18 to be on the Verona campus?

19   A    Yes.

20   Q    When was the move made?

21   A    Um, boy, I don't know.  Six -- I don't

22 know.  I would guess, guess, six or seven months ago.

---

47

1    Q    Do you know why the move was made?

2    A    Because that's where the people that we

3  were going to hire were.

4    Q    New Finance and Accounting people?

5    A    New Finance and Accounting people, yeah.

6  Just the company started a new department, and Atlanta

7  was where they found the people.

8    Q    What's the new department?

9    A    Finance and Accounting.  Just it's no

10 longer in Verona.

11   Q    Okay.  So when you say they started a new,

12 I don't know what word you used, but you're saying it

13 was a changeover of personnel?

14   A    Staff.  Yeah, changeover of personnel.

15   Q    Who's in charge of the Finance and

16 Accounting?

17      MS. PETERS:  Object to form.

18   A    Right now, I believe it's Tawanna

19 Washington.  But I'm not sure what her title or role

20 is.

21 BY MR. HARRIS:

22   Q    Did she move into the role that was

---

48

1  occupied by Wanda Barnes immediately prior to her, --

2    A    I don't know.

3    Q    -- end of her employment?

4    A    I don't know when that happened.  I really

5  have very limited to do with Accounting.

6    Q    Who does Tawanna Washington report to at

7  Verona?

8      MS. PETERS:  Object to form.

9    A    I believe it's to Richard right now.

10 BY MR. HARRIS:

11   Q    What is Richard Moore's role?

12   A    Executive Vice President.

13   Q    Of which company?

14   A    Just Executive Vice President.  I'm not

15 sure.  He's one of the owners of the company, so —

16   Q    Okay.  Um, is he --

17   A    He's one of the founders of the company.

18   Q    You consider him one of your bosses I

19 assume?

20      MS. PETERS:  Object to form.

21   A    I report directly to Mike Donovan.

22

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

13 (49 to 52)

---

49

BY MR. HARRIS:

1  Q  Okay.

3  **A  But I respect Richard. So, I mean —**

4  Q  Is there a division between Libre and Nexus

5  with respect to the roles that either Richard Moore or

6  Mike Donovan play as you understand it?

7      MS. PETERS: Object to form.

8  **A  I really — I — they own the company, so I**

9  **really don't know. I mean, I don't know if there's,**

10 **if there's an official division. I mean, it is still**

11 **an environment where when something needs to be done,**

12 **the person most capable gets it done. You know,**

13 **everything is tuned to making sure the program**

14 **participants are cared for and preventing loss. So to**

15 **answer a question about is there a division at that**

16 **level? I can't answer that.**

17 **BY MR. HARRIS:**

18 Q  Okay.

19     MS. PETERS: Is this a good time to take a

20 break?

21     MR. HARRIS: I'm okay. Are you okay? I

22 haven't been going that long. It's less than an hour.

---

50

1      MS. PETERS: I'm just -- I saw you segueing

2  back, --

3      MR. HARRIS: Oh no, I'm on a line of

4  questioning.

5      MS. PETERS: -- and I know the witness had

6  asked for breaks approximately once an hour, so I want

7  to respect and honor that.

8      MR. HARRIS: Well, sure. I have a line of

9  questioning that I can conclude probably pretty

10 quickly.

11     MS. PETERS: Okay.

12 **A  I'm okay.**

13 **BY MR. HARRIS:**

14 Q  So you mentioned the company when you were

15 giving that answer. And who do you mean when you say

16 the company?

17     MS. PETERS: Object to form.

18 **A  I just use that as Nexus. I mean, I've**

19 **been around since there was 12 employees, so I will, I**

20 **will say the company. I don't mean anything specific.**

21 **It's just Nexus.**

22

---

51

BY MR. HARRIS:

1

2  Q  So in your mind, do you distinguish Nexus

3  Services, Inc., from Libre by Nexus?

4      MS. PETERS: Object to form.

5  **A  I do. Sorry. No, I do. I understand the**

6  **distinction and I understand the differences in the**

7  **roles. But in my mind as someone who's been familiar,**

8  **sometimes I'll just say Nexus. I mean, that's like**

9  **somebody might say Ford. There's a hundred divisions**

10 **at Ford, but people just say Ford, and no one asks**

11 **them, Well, which part of Ford are you referring to?**

12 **It's just Ford. That's the context with which I'll**

13 **say Nexus.**

14 **BY MR. HARRIS:**

15 Q  All right. I mean, don't the, at least

16 Libre and Nexus Services operate as one company?

17     MS. PETERS: Object to form.

18 **A  As a team.**

19 **BY MR. HARRIS:**

20 Q  Well, they do --

21 **A  For sure.**

22 Q  -- they do business as one entity, correct?

---

52

1      MS. PETERS: Object to form. Calls for a

2  legal speculation.

3  **A  I don't know how to answer that, because**

4  **that's not something -- I don't know the legal answer**

5  **to that. We work as a team. We work together to**

6  **support the program participants. But as far as -- I**

7  **don't really understand what you're asking me.**

8  **BY MR. HARRIS:**

9  Q  Okay. Let me just show you a document here

10 real quick.

11     MR. HARRIS: Mark that, please.

12     (Exhibit 1 was marked for identification

13 and attached to the transcript.)

14 BY MR. HARRIS:

15 Q  Mr. Schneider, the court reporter has

16 handed you an exhibit marked as Exhibit 1 to your

17 deposition. For the record, it has a header on top

18 that says, Filed: New York County Clerk, August 7,

19 2018. It's a, in a pleading style in the matter of

20 the application of Libre by Nexus, Inc., and Nexus

21 Services, Inc., d/b/a Libre by Nexus as the

22 petitioners. The pleading is entitled Revised

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

14 (53 to 56)

---

53

1  Verified Petition.  Do you recognize this document,
2  sir?
3      A    No, I've never seen it before.
4      Q    Okay.
5          MS. PETERS:  Before you answer, could you
6  take a moment and work through the entire --
7  BY MR. HARRIS:
8      Q    I think your counsel is probably directing
9  you to the last page.
10     A    The last page.
11         MS. PETERS:  It's now 18 months ago, and
12 you may have seen it in a different format.
13     A    Six through 20 and 24.  Okay.  So I was
14 looking at the front page.  Oh, okay.
15 BY MR. HARRIS:
16     Q    And to be fair, I mean, these may have been
17 filed as two separate documents that I put together.
18     A    Yeah.  No, I didn't recognize the front,
19 but I recognize paragraphs six through 20, sure.
20     Q    Okay.  So let's look at the last page.
21     A    The last -- very last page?
22     Q    Last page of the Exhibit 1.

---

54

1      A    Okay.
2      Q    So, for the record, this has a different
3  docket number in the same case.  It's dated August 10,
4  2018, and it's entitled Verification.  Do you see
5  that?
6      A    Uh-huh.  Uh-huh.  Yes.
7      Q    And is that your signature at the bottom of
8  the page?
9      A    That is my signature.
10     Q    Okay.  And it's dated August 9, 2018.  Do
11 you see that?
12         MS. PETERS:  I'm going to object to the
13 form.
14     A    Yes.
15 BY MR. HARRIS:
16     Q    Okay.  And you see this is a verification
17 referencing the first part of this exhibit, --
18     A    Yes.
19     Q    -- the revised petition?
20     A    Yes, I do.
21     Q    So does that refresh your recollection as
22 to whether you've seen this pleading before?

---

55

1      A    No, I haven't read this pleading, but I
2  recognize the insert, yeah.  Yes.
3      Q    I'm not sure what I mean by that.  What is
4  the insert that you recognize?
5      A    Okay.  Well, six through 20.  What I --
6  what I verified, paragraphs six through 20, and
7  paragraph 24 I recognize.
8      Q    Are you saying you never read this before
9  you signed that verification, the first part of this
10 document?
11         MS. PETERS:  Object to form.
12     A    I'm sure I did.  I read -- I'm sure I did.
13 I mean, I recognize it now that I see -- I'm sure I
14 did.  This is so long ago.
15 BY MR. HARRIS:
16     Q    Okay.  And if you look at six through --
17 six through 20, um, those are the paragraphs that
18 you're verifying, right?
19     A    Uh-huh.
20     Q    Okay.  And you understand by verifying
21 that, you were attesting to the truthfulness?
22     A    Yeah.  Yeah, I wrote those paragraphs.

---

56

1      Q    So you wrote those -- you authored the
2  paragraphs in six through 20?
3      A    Yes.  Yes.
4      Q    And if you look at paragraph seven, it
5  talks about Nexus's mission is to give hope and help,
6  et cetera?
7      A    Uh-huh.  Yes.
8      Q    Okay.  Who were you referring to when you
9  wrote Nexus's mission?
10         MS. PETERS:  Object to form.  Give him a
11 moment to put it into context.
12     A    It is the same as I just explained about
13 Ford, I was just referring to the company.  I mean,
14 yeah, the company is just Nexus.  I wasn't referring
15 to Libre Operations, Nexus Risk Management.  It was
16 just, like I said, it's the same context as somebody
17 would say Ford under.
18 BY MR. HARRIS:
19     Q    Right.  So your understanding is you work
20 for the company, and by that you mean the Ford, or the
21 Nexus.  Is that fair?
22     A    No.

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

15 (57 to 60)

57

1      MS. PETERS:  Object to form to the extent
2  that it calls for legal conclusion.
3      **A    I understand that I work for Nexus**
4  **Services, but if I'm referring to the mission of the**
5  **company, the mission is --**
6      Q    I'm sorry.
7      **A    That's okay.  Mine's been going off like**
8  **crazy in my pocket.**
9      Q    Maybe that's yours.  Sorry I interrupted.
10     **A    I'm trying not to pull it out.**
11         **I -- I understand who I work for, but if**
12  **I'm talking about the mission and helping people and**
13  **saving lives, um, the mission is different than the**
14  **legal definition of the company.  The mission of Nexus**
15  **is to help people and provide hope.  And that's -- we**
16  **expect everyone in the company to do that.  If you are**
17  **the person that a client is reaching out to, you're**
18  **going to treat them with respect and dignity, and**
19  **you're going to get them to the appropriate person who**
20  **might be able, more suited to fix their individual**
21  **problem.  That's Nexus.**
22     Q    Okay.

58

1      **A    But that's not a distinction of Operations**
2  **Department, or Libre or Services, because it really --**
3  **when you're helping people, it really doesn't matter.**
4      Q    Right.  So as you've described it,
5  Operations would be Libre, and the Risk functions
6  would be Nexus, right?
7      **A    Nexus Services.**
8         MS. PETERS:  Object to form.
9  BY MR. HARRIS:
10     Q    Those are kind of two divisions of the same
11  company.
12         MS. PETERS:  Object to form to the extent
13  it calls for a legal conclusion.
14  BY MR. HARRIS:
15     Q    To your understanding.
16     **A    To my understanding, yeah.**
17     Q    Okay.  And if you look at the first
18  paragraph of the petition, it says, Petitioners Libre
19  by Nexus and Nexus Services, Inc., d/b/a Libre by
20  Nexus -- you understand d/b/a means doing business as?
21     **A    I do.**
22     Q    Okay.  So Libre by Nexus, Inc., and Nexus

59

1  Services, Inc., doing business as Libre by Nexus, and
2  then in parenthesis, hereinafter, collectively
3  referred to as, quote, "Nexus."
4      **A    Uh-huh.**
5      Q    When you're using the term Nexus, you
6  understand you're incorporating that definition in
7  paragraph six?
8         MS. PETERS:  Object -- object to the form
9  of the question to the extent it calls for a legal
10  conclusion.  This witness is not an attorney.  This
11  witness is not qualified to answer any questions about
12  the legal formation of these individual companies.
13         MR. HARRIS:  I'm asking the witness, who
14  said he authored paragraph seven, if in using the term
15  Nexus he's incorporating -- he intended to incorporate
16  the definition set forth here in the first paragraph
17  of the pleading.
18     **A    That was not my intent, no.**
19  **BY MR. HARRIS:**
20     Q    Okay.
21     **A    The intent was to talk about our mission,**
22  **not our corporate structure.**

60

1      Q    Right.  But when you use the term Nexus,
2  you're not distinguishing between Libre or -- and
3  Nexus Services, correct?
4         MS. PETERS:  Object to form.
5      **A    I'm talking about our philosophy.  Nexus,**
6  **the term Nexus encompasses our philosophy.  That's**
7  **what people, that's what our clients understand us as.**
8  **Our program participants don't care what our corporate**
9  **structure is either.  If they want help, they're going**
10  **to reach out to Nexus as the people who care about**
11  **them and are going to help them.  They're not**
12  **concerned about who they're calling.  So my intent was**
13  **not to refer to it as it is here.  I was referring to the**
14  **philosophy of our company for lack of better —**
15  **BY MR. HARRIS:**
16     Q    Well, you're talking about the people who
17  are looking at Nexus.  So are the program
18  participants, are they clients of Nexus as you refer
19  to it as the company?
20         MS. PETERS:  Object to the form of the
21  question.
22     **A    No.  They contract with Libre by Nexus.**

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

---

61

**BY MR. HARRIS:**

1

2    Q    So are they participants of Libre by Nexus

3  and not Nexus Services?

**4    A    They're Libre by Nexus participants.**

5    Q    Are they clients of Nexus Services?

**6    A    They're clients of Libre by Nexus.**

7    Q    Okay.  Are you saying "no"?

**8    A    I think I'm trying to answer your question**

**9  the best I can.  Not telling you yes or no.**

10    Q    Well, you're not telling me whether they're

11  clients of Nexus Services or not.

12         MS. PETERS:  Object to the form of the

13  question, asked and answered.

**14    A    No, they're not.**

**15 BY MR. HARRIS:**

16    Q    They're not clients of Nexus Services.

17 Okay.

18         So in paragraph six, you describe Libre by

19 Nexus as a small for profit business that provides

20 critical services, right?

**21    A    Uh-huh.**

22    Q    And then you start using the term Nexus in

---

62

1  paragraphs seven and eight.  For instance, you talk

2  about across the nation, there are thousands of

3  clients of Nexus in paragraph eight.  Why wouldn't you

4  use the term Libre if you only intended to refer to

5  Libre?

6         MS. PETERS:  Object to the form of the

7  question.

**8    A    It wasn't something that — poor, poor**

**9  writing I guess.  I guess I could have said Libre by**

**10 Nexus in every, in every instance.  I just didn't.  I**

**11 didn't have an intent.  I just said Nexus, because**

**12 that's the way I talk about it.  That's the way I talk**

**13 about it.**

**14 BY MR. HARRIS:**

15    Q    That's fine.

**16    A    And again, I'm not -- I'm not making any**

**17 legal distinction.  I'm not in a position to do that.**

**18 I'm not an attorney.  I just say Nexus.**

19    Q    Can you turn to page 12 of the document,

20 please?

**21    A    Page 12?**

22    Q    Yes.

---

63

1    A    Okay.

2    Q    And this pleading is executed by John M.

3  Shoreman and Mary Donne Peters, who's with us today,

4  correct?

**5    A    Yes.**

6    Q    Okay.  Now did -- to the best of your

7  knowledge, did they review this pleading before it was

8  filed?

**9    A    To the best of my knowledge.**

10         MR. HARRIS:  Okay.  Marry Donne, do you

11 want to take a break?

12         MS. PETERS:  Sure.

13         THE VIDEOGRAPHER:  We're going off the

14 record.  The time is 12:11 p.m.

15         (Recess taken, 12:11 p.m. to 12:23 p.m.)

16         THE VIDEOGRAPHER:  Here begins disc number

17 two in the videotaped deposition of Erik Schneider.

18 We are back on the record at 12:23 p.m.

19 BY MR. HARRIS:

20    Q    Mr. Schneider, we talked about, a lot about

21 Libre and Nexus Services.  I want to talk a second

22 about the third defendant, Homes.  Are you employed at

---

64

1  all by Homes?

**2    A    No.**

3    Q    Okay.  Do you know how many employees Homes

4  has?

**5    A    I think it's six.  Might be five.  I'm not**

**6  sure.**

7    Q    Who would be the highest ranking employee

8  for Homes?

**9    A    Tim Donovan.  I think.**

10    Q    Does he have a specific title with respect

11 to Homes?

12         MS. PETERS:  Object to form.

13 BY MR. HARRIS:

14    Q    As far as you know.

**15    A    He's Director of Facilities.  With respect**

**16 to Homes, I don't.  I don't really get involved a lot**

**17 with org charts and titles.**

18    Q    Okay.

**19    A    It's just not me.**

20    Q    Do you have any involvement in the business

21 of Homes?

**22    A    Only when it involves a tenant who's got**

---

---

**65**

1  conduct problems.
2  Q   Like as a security issue?
3  A   Yeah, as a security issue. Sometimes we
4  have employees that are renting from Homes, and you
5  know, we may have to make sure that they're acting --
6  they're young kids. You know, the whole point of
7  Homes is to give people who otherwise wouldn't have an
8  opportunity to have a home, a home. It's another,
9  another way to help people. So -- but that would be
10 the extent of my involvement.
11  Q   Do you know whether any Nexus employees
12 officers, directors, personnel, own any of the homes
13 that you were just referring to under, quote, unquote,
14 "Homes," the defendant?
15     MS. PETERS: Object -- object to form.
16  A   I don't know the ownership structure of
17 that, the houses.
18 BY MR. HARRIS:
19  Q   So, do you know whether, for instance,
20 Mr. Okonski has been involved in any real estate
21 transactions with Homes?
22     MS. PETERS: Object to form.

---

**66**

1  A   I have no idea.
2  BY MR. HARRIS:
3  Q   Have you personally been involved in any
4  real estate transactions with Homes?
5  A   No.
6  Q   Have you ever had occasion to request or
7  direct funds from revenues generated by Homes, to the
8  best of your knowledge?
9  A   No.
10  Q   Do you have any knowledge about how funds
11 are maintained by the respective defendants?
12  A   I don't. No, I don't deal with accounting.
13  Q   Okay. We talked before about all the
14 people who have their offices on the Nexus side of the
15 Libre building. I don't think you mentioned
16 Mr. Okonski. Where is his office?
17  A   He is -- he doesn't -- home offices.
18  Q   I'm sorry?
19  A   Tim has changed roles. I'm not sure what
20 his role is, but he doesn't work out of the campus
21 anymore.
22  Q   Is he still employed by one of the

---

**67**

1  defendants to the best of your knowledge?
2  A   Yes.
3  Q   Okay. Which employ -- which defendant?
4  A   I'm not sure.
5  Q   Okay. Do you have any knowledge as to at
6  any point in time which of the defendants Mr. Okonski
7  was employed by?
8  A   He was employed -- to the best of my
9  knowledge, it was Services.
10  Q   Okay. Do you know whether he's an officer
11 of any of the defendants?
12  A   I don't know what his role is.
13  Q   Okay. Has he left the company, or no?
14  A   No. He's still working for the company.
15 He's just changed -- he -- he was formerly the CFO,
16 and he's not CFO anymore. But I don't know what he
17 is, what his office structure is, you know.
18  Q   To the best of your knowledge, when was he
19 last in the position of CFO?
20  A   It's been a few months.
21  Q   Do you know if that was for one of the
22 particular defendants that he served as CFO, or was

---

**68**

1  that more the company as you've defined it earlier?
2     MS. PETERS: Object to form.
3  A   I don't really -- I'm sorry. Corporate
4  structure stuff is not me. I don't -- it's just Tim.
5  BY MR. HARRIS:
6  Q   So when he was CFO, where would his office
7  have been located?
8  A   In 115.
9  Q   And that's the Services building?
10  A   Yeah, it's the Services side.
11  Q   Who is the current CFO, to the best of your
12 knowledge?
13  A   I believe it's an open position.
14  Q   Do you know who Mr. Solsrud is?
15  A   Yeah. Yes.
16  Q   He occupied the position of CFO for the
17 company?
18  A   He did.
19  Q   Okay. Do you know if there has been any
20 CFO appointed since the time that Mr. Okonski occupied
21 that position?
22  A   I don't.

---

Transcript of Erik Schneider
Conducted on February 20, 2020

---

69

1    (Unidentified individual entered the room.)
2    MS. KATSANTONIS:  Can we go off?  Can we go
3 off the record?
4    THE VIDEOGRAPHER:  We're going off the
5 record.  The time is 12:28 p.m.
6    (Recess taken, 12:28 p.m.m to 12:31 p.m.)
7    THE VIDEOGRAPHER:  We're back on the
8 record.  The time is 12:31 p.m.
9 BY MR. HARRIS:
10   Q    So, Mr. Okonski, (sic) I believe I asked
11 you before that little break, do you know after
12 Mr. Solsrud was in the position of CFO, if anyone has
13 occupied that position since?
14   A    Not -- not to be -- I'm not trying to be --
15 I'm Mr. Schneider.
16   Q    I'm sorry.
17   A    I just -- I don't want to be a jerk.  I
18 just want to make sure the record's right.
19   Q    I'm sorry.  Mr. Schneider.
20   A    Okay.  I understand where we're at.  I
21 just --
22   Q    A lot of names today.

70

1    A    Yeah, we're cool.  We're cool.
2    Um, no, I don't.
3    Q    Okay.
4    A    I don't know what they're doing with that
5 position.
6    Q    To the best of your knowledge, there has
7 not been one since.
8    A    To the best of my knowledge, no.  And I
9 want to -- can I take a second to back up to the
10 offices question?
11   Q    Sure.
12   A    Because I don't know if -- I know -- I know
13 that because I talked to Tim that he was home
14 officing.
15   Q    Uh-huh.
16   A    I really don't know if he still maintains
17 an office in 115, if he has personal things in a room.
18 I probably shouldn't have answered no, because I just
19 don't know what his office situation is.  I left that
20 off my list because I know he's changed positions and
21 he told me he was home officing.  But if he's still
22 got offices there, I don't know.

71

1    Q    Okay.
2    A    I'll make that clear.
3    Q    When did you have that discussion with
4 Mr. Okonski, your last discussion?
5    A    Well, I talk to him every day.
6    Q    Okay.
7    A    But I mean, that discussion was a couple
8 months ago when he was telling me he was changing
9 positions.
10   Q    And then I'm sorry.  Did you tell me what
11 position he's in now?
12   A    I don't know what his title is.
13   Q    What's his roles and responsibilities, to
14 the best of your knowledge?
15   A    Um, he works -- he works with, um -- he
16 works with the retail.  I don't -- and I don't know
17 what the corporate structure of that is.  There's --
18 there was some Nexus retailer stuff that Richard had,
19 and I know that he works with that.  I don't know --
20   Q    Like another subsidiary company?
21   A    It's not a subsidiary.  I don't -- I don't
22 know the structure.  I know that he's still around,

72

1 but I don't know —
2    Q    Is it related to Gamer Oasis?
3    A    Yeah.
4    Q    And where is the Gamer Oasis?
5    A    Harrisonburg.
6    Q    Is there another location where they've
7 developed, --
8    A    Not that I know of.
9    Q    -- or have the plans to develop?
10   A    Not that I know of.
11   Q    Try to wait until I finish.
12   A    I'm sorry.
13   Q    It's okay.  It's hard for all of us, --
14   A    I'm sorry.  I'm tired.
15   Q    -- but especially for the court reporter.
16   Who else in the Nexus corporate family is
17 involved with Gamer Oasis, to the best of your
18 knowledge?
19   MS. PETERS:  Object to form.
20   A    Nobody that I know of.
21 BY MR. HARRIS:
22   Q    It's just him?

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

19 (73 to 76)

73

1    A    Well, Richard.
2    Q    Do you know if Gamer Oasis generates any
3  revenue?
4        MS. PETERS: Object to form.
5    A    Don't have any idea about their accounting.
6  And I don't believe it's -- I do -- I will say, I
7  don't believe it's part of the Nexus family.
8    Q    Okay.  The Gamer Oasis --
9    A    Yeah.
10    Q    -- is not part of the Nexus corporate
11 family?
12    A    Right.
13    Q    Okay.  So if Mr. Okonski is working for
14 Gamer Oasis, is he no longer with the Nexus -- he's no
15 longer within the Nexus corporate family?
16        MS. PETERS: Object to form.
17    A    I don't know what his role is.
18 BY MR. HARRIS:
19    Q    But you speak to him every day.
20    A    Yeah, but we don't talk about -- we talk
21 about the Chargers and how crappy they are, and the
22 Bears, and, you know.

74

1    Q    Okay.  Uh, going back to the 111 building,
2  where all the Libre call center are, is, I believe you
3  at one point described that as the Libre building, but
4  has the separate wing for the Nexus offices.  On the
5  Libre side, you said there's a divide, right, by a
6  secured door, between the Nexus and the Libre side?
7    A    Yeah, well there's a -- I think you've been
8  there, there's a lobby with a fountain --
9    Q    Yeah, just for the record.
10    A    -- and there's -- the left side is, there's
11 Maglock doors, and the right side there's Maglock
12 doors.
13    Q    And the purpose of those doors is what?
14    A    Security.  Make sure that -- make sure that
15 people don't have access to areas they're not supposed
16 to have access to.
17    Q    So -- okay.  Are those doors kind of, in
18 your mind, a physical demarcation between Nexus
19 Services and Libre?
20        MS. PETERS: Object to form.
21    A    I don't know.  I don't think of it -- I
22 don't really think of it that way.  I mean, they're a

75

1  physical demarcation between where the Libre call
2  center is, and where all the Libre employees work, and
3  then what we call the executive side of the building
4  where they don't work, but --
5  BY MR. HARRIS:
6    Q    So who's the highest ranking person who has
7  an office on the Libre side of the Libre building?
8        MS. PETERS: Object to form.
9    A    There is a manager's office that Evan or
10 David See or Nina will use when they're working on
11 that side of the building.
12 BY MR. HARRIS:
13    Q    You said Nina, Evan.  Did you say somebody
14 else?
15    A    David See.
16    Q    David See.
17    A    The Libre --
18    Q    It's --
19    A    It's kind of one office.  It's one office.
20 They share it.
21    Q    And Nina is the one who's based in
22 California?

76

1    A    Yes.
2    Q    And Evan and David See have their primary
3  offices on the Nexus side of the building, correct?
4    A    Yes.
5    Q    Where -- where would Hazaar and Jesus's
6  offices be on the campus?
7    A    That's in the Risk building, the 111
8  building.
9    Q    Okay.  On the Libre side, or the Nexus
10 side?
11        MS. PETERS: Object to form.
12    A    That's -- there's not a Libre or --
13 BY MR. HARRIS:
14    Q    I'm sorry.
15    A    One eleven is the, is the -- remember the
16 campus?  So 115 is the big building on the hill, 111
17 is the one to the right, and that that's the Risk --
18 that was what we called the Risk Management building.
19    Q    I'm sorry.  One fifteen.  So which one are
20 they in?
21    A    One eleven.
22    Q    Got ya.  Okay.

77

1    So you know who Wanda Barnes is, correct?
2    **A    Oh, yes.**
3    Q    Okay.  And she was employed first as a
4    temp, and then became a full-time employee with Nexus?
5    **A    My understanding is that, is.**
6    Q    Okay.  And which of the defendants did, was
7    she employed by?
8    **A    I do not know.**
9    Q    Okay.  Did she -- she worked for a time in
10   Atlanta for Nexus, correct?
11   **A    Yes.**
12   Q    Okay.  Did she ever relocate to Virginia?
13   **A    Not to my knowledge.**
14   Q    Okay.  So as -- when she became a full-time
15   employee, she worked in Atlanta?
16   **A    Yeah.  As far as I know, she always worked**
17   **in Atlanta.**
18   Q    Okay.  And Ms. Barnes was required to sign
19   a confidentiality agreement, right?
20   **A    I've seen it, yeah.**
21   Q    Well, she was required to sign a
22   confidentiality agreement, right?

78

1    **A    I don't know if she was required.  I didn't**
2    **do it.**
3    Q    Okay.  All right.  Isn't that
4    confidentiality agreement required of all employees of
5    Nexus?
6    **A    It's -- well, it's part of the employment**
7    **contract, so --**
8    Q    Yes?
9    **A    Yeah.  I mean, she signed an employment**
10   **contract.  I don't know if she signed a separate**
11   **confidentiality agreement.**
12   Q    Do you know if Nexus has been in litigation
13   with any ex-employees for breach of the
14   confidentiality agreement?
15   **A    For breach of the confidentiality**
16   **agreement.**
17   Q    Of the employment agreement with respect to
18   the confidentiality agreement?
19   **A    Yes, for breaching the employment**
20   **agreement, yes.**
21   Q    Okay.  Which ex-employees would that be?
22   **A    Well, we were in litigation with Rick**

79

1    **Nagel, Tania Cortes, Dave Briggman.**
2    Q    Anyone else?  Oops?
3    **A    There's -- well, I don't know specifically.**
4    **You're asking for specifically for breach of a -- I**
5    **know who we're in litigation with, but I'm not sure**
6    **it's for specifically what you're asking me.**
7    Q    What about David Quintana?
8    **A    Oh yeah, David Quintana, yes.  He was part**
9    **of that group, yeah.  But that's been settled, so --**
10   Q    What other former employees has Nexus been
11   in litigation with, to the best of your knowledge and
12   memory?
13   **A    There's litigation with Andrea Arroyo right**
14   **now.  There was -- what's her name?  Annette Padilla,**
15   **and -- man, I can't think of his name.  I can picture**
16   **all of them.  Annette Padilla, Mejia, what was Mejia's**
17   **first name?  And Carlos Villaran.  I can't remember**
18   **Mejia's first name for some reason.**
19        MS. PETERS:  Counsel, I'm going to caution
20   the witness that if there is any matter that is
21   subject to Rule 408 or any other confidentiality
22   agreement on behalf of the company, this witness can't

80

1    disclose that.  So --
2         MR. HARRIS:  Well, Rule 408 is not a rule
3    of disclosure.  It's a rule of admissibility.  And we
4    have a protective order in this case, so confidential
5    matters are protected, and we're bound to not to
6    disclose them.
7         MS. PETERS:  If there's a court-ordered
8    confidentiality order then I'm going to pause.  The
9    witness may have an opportunity to explain it later.
10   But rather than violate any other obligation in any
11   other case, I'm letting you know, I don't want to
12   interrupt your testimony flow, but we may put a pause
13   in it.
14        MR. HARRIS:  Sure.  That's fine.  I mean, I
15   assume you know what those confidentiality agreements
16   would be.
17        MS. PETERS:  Or I will take a moment, step
18   out and ask.
19        MR. HARRIS:  Okay.
20   **A    Um —**
21   BY MR. HARRIS:
22   Q    You still thinking of people?

Case 5:18-cv-00066-MFU-JCH   Document 496-4   Filed 08/21/20   Page 22 of 179   Pageid#:
12488
CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020
21 (81 to 84)

---

81

1    A    Yeah, I'm trying to remember Mejia's first
2  name.
3    Q    That's okay.
4    A    It was employment. Those were -- those
5  were ridiculous. I mean, those -- yeah, I don't think
6  those -- not off the top of my head.
7    Q    Okay. Did you give testimony in any of
8  those litigations?
9    A    Um, I -- yeah, I was in -- yes, I did.
10   Q    And that was the first suit with Nagel,
11 Cortes, Briggman?
12   A    Yes.
13   Q    Okay. Was Quintana part of that same suit?
14   A    Well, there was -- there were a couple -- I
15 don't know which suit. If you look them up, there was
16 back and forth. There was a suit. There was a
17 countersuit. Someone was added. So I'm not sure case
18 numbers on them, and then eventually he was, he was
19 dismissed based on the settlement down in Texas. So
20 there was a -- there was a RICO suit with those
21 persons, and then they had filed a suit against Nexus
22 for some ridiculousness. And then I believe Nexus

---

82

1  countered, and there was a RICO that included more
2  people that, that was discovered in looking at the
3  first suit and what happened with them. And then --
4  so when you say the suit, it's kind of a rolling --
5    Q    Somewhere in --
6    A    -- issue.
7    Q    -- between those suits that you described,
8  you gave some testimony.
9    A    Yes. That would be --
10        MS. PETERS: Object. I want to note for
11 the record, because I think I'm obliged to, that
12 anything dealing with current or former litigation,
13 until I can determine that it is -- whether it is
14 subject to disclosure, I want those portions of the
15 transcript marked confidential.
16        MR. HARRIS: Sure.
17        MS. PETERS: So from the beginning of this
18 question-answer phase, those portions of the
19 transcript shall be marked confidential.
20 BY MR. HARRIS:
21   Q    Those suits that you were just describing
22 with those employees we just talked about, Nagel,

---

83

1  Cortes, Briggman, Quintana -- there may have been
2  multiple suits; I understand that -- were those all,
3  to the best of your knowledge, all based out of Texas
4  somewhere, or was there any Virginia suits as well?
5    A    No, the three — only Quintana was in
6  Texas. The other three were Virginia.
7    Q    The other three individuals?
8    A    Yes, the other three individuals were, are
9  Virginia residents.
10        MR. HARRIS: Mark that, please.
11        (Exhibit 2 was marked for identification
12 and attached to the transcript.)
13        MS. PETERS: Mr. Schneider, if you would,
14 take a moment and read, please.
15   A    Yeah, I'll look at it better this time.
16        Can I have it?
17 BY MR. HARRIS:
18   Q    And for the record, we've marked as
19 Exhibit 2 a pleading from this case, RLI versus Nexus
20 Services, et al., entitled Declaration of Erik
21 Schneider. It's got a Docket Number 241-1. It's a
22 four-page declaration with Exhibits A and B attached.

---

84

1  And I'm sorry, there's also an Exhibit C. Do you
2  recognize this document, Mr. Schneider?
3    A    I do.
4    Q    Okay. This is, in fact, a declaration you
5  gave in this case that we're here about today?
6    A    The case that we're here about today.
7    Q    Yes. You understand we're here about RLI
8  versus Nexus?
9    A    Yes. Oh, yes, yes, yes. Sorry.
10   Q    Okay. And you gave this declaration in
11 connection to this case that we're here for today,
12 correct?
13   A    Yes.
14   Q    Okay. And so, in paragraph two, --
15   A    Uh-huh.
16   Q    -- you make some allegations about Wanda
17 Barnes? Do you see that?
18   A    Uh-huh.
19   Q    And then you reference Exhibit A in that
20 same paragraph?
21   A    Right.
22   Q    And then it says, Execution of the

---

**85**

1  confidentiality agreement was a condition of
2  employment.  Do you see that?
3      A    Yes.
4      Q    Okay.
5      A    Yeah, this is an employment contract.
6      Q    Right.  And then paragraph three, you say,
7  On or about December 3rd, 2019, Wanda Barnes became a
8  W-2 employee of Nexus Services, Inc.
9      A    Uh-huh.
10     Q    Is that true, to the best of your
11 knowledge?
12     A    Yeah.  Yes.
13     Q    Okay.  And on page four, that's your
14 signature, correct?
15     A    Yes.
16     Q    Okay.  And the aff -- the declaration is
17 dated May 15, 2019?
18     A    Yes.
19     Q    And is the information set forth in this
20 affidavit true, to the best of your knowledge?
21     A    Yes, it is.
22     Q    Exhibit A, that you referred to in

---

**86**

1  paragraph two, is called a Nondisclosure, Nonuse and
2  Confidentiality Agreement?
3      A    Uh-huh.
4      Q    Okay.  And it purports in the first
5  paragraph to be between Nexus Services, Inc. a
6  Virginia Corporation, on behalf of itself and its
7  affiliated companies, collectively the "Company," and
8  Wanda Barnes.  Do you see that?
9      A    Uh-huh.  Yes, I do.
10     Q    And who would the affiliated companies be?
11 To the best of your knowledge?
12     A    I don't know who the affiliated companies
13 would be in this.
14     Q    Would it include Libre, to the best of your
15 knowledge?
16     A    It could.
17     Q    But you don't know?
18     A    I don't know.
19     Q    Did you sign one of these agreements?
20     A    I don't know.  I'd have to look in my
21 employment file.  It would have been six years ago.
22     Q    Okay.

---

**87**

1      A    I don't -- I -- I signed an employment
2  contract that has a nondisclosure clause.  But I mean,
3  I couldn't tell you if it was identical to this
4  without looking at it.
5      Q    Okay.  Well, Exhibit B is an employment
6  agreement.  Do you recognize that form?
7      MS. PETERS:  I would note for the record
8  that these appear to be incomplete documents.
9      MR. HARRIS:  How so?
10     MS. PETERS:  We have a page four, and there
11 is no final page of this document.
12     MR. HARRIS:  Can you be a little more
13 specific?  There's a bunch of exhibits.  Maybe go by
14 the docket number page?
15     MS. PETERS:  I don't know how it was
16 docketed, but there's -- there appears to be a page
17 missing, the signature page, missing.
18     MR. HARRIS:  Can you refer me to the docket
19 number page at the -- using the lower footer to tell
20 me where you're talking about the missing page?
21     MS. PETERS:  Three six three six.
22     MR. HARRIS:  Okay.  But according to the

---

**88**

1  docket headers, you'd agree that this is a continuous
2  document that was filed with the Court on May 15,
3  2019, right?
4      MS. PETERS:  That's what the header appears
5  to say.  I'm not sure whether something was -- from
6  time to time, as counsel knows, not everything that
7  you upload page by page makes it.  So I'm just
8  pointing that out to you.  That's all.
9      MR. HARRIS:  Yeah.  I just want to make
10 clear for the record that it's not because I omitted a
11 page.  This is the version that exists on the docket,
12 right?
13     MS. PETERS:  It appears so, counsel.
14     MR. HARRIS:  Of the declarations and
15 exhibits, right?
16     MS. PETERS:  It appears so, counsel.
17 BY MR. HARRIS:
18     Q    Okay.  So Exhibit B is an employment
19 agreement, right?
20     A    Yeah, it's an excerpt from — it's -- it's
21 part of that.  It's not complete.  This is part of a
22 contract, which is —

Transcript of Erik Schneider
Conducted on February 20, 2020

---

89

1    Q    All right.  This also seems to be missing
2  every other page.  We can tell that by the pagination
3  at the bottom of this agreement, right?
4    **A    Uh-huh.  Yeah.  It might have been — who**
5  **knows how it was scanned.**
6        MR. HARRIS:  Okay.  But again, for the
7  record, it's a continuous run page number-wise as it
8  was filed in the docket.
9  BY MR. HARRIS:
10   Q    If you look at the opening --
11       MS. PETERS:  This witness wouldn't know
12  what's in the docket.
13       MR. HARRIS:  No, you won't stipulate to
14  that?  I'm talking about the bottom.  I wasn't asking
15  him.  I had made a comment for the record that this is
16  continuous pagination.
17       MS. PETERS:  I just want to make sure that,
18  counsel, that the record's clear.  This witness would
19  not have been involved in uploading something to the
20  ECS.
21       MR. HARRIS:  Sure.  Sure.
22

---

90

1  BY MR. HARRIS:
2    Q    Exhibit B is the beginning of a, at least,
3  the Libre by Nexus Employment Agreement.  Do you see
4  that?
5    **A    Uh-huh.  Yes, I do.  Sorry.**
6    Q    In the opening paragraph, it says
7  Employment Agreement between Nexus Libre, Inc., a
8  Virginia Corporation, and including its subsidiary and
9  affiliate organizations, hereafter, quote, unquote,
10  "Nexus."  Do you see that?
11   **A    I do.**
12   Q    Do you have an understanding of who Nexus
13  Libre, Inc., is?
14   **A    That would be Libre.  That would be Libre**
15  **by Nexus I'm sure.**
16       MS. PETERS:  Where are you referring to?
17       MR. HARRIS:  The first paragraph of Exhibit
18  B.
19       MS. PETERS:  Okay.
20   **A    You know, I can assume.  I mean, I don't**
21  **want to assume.**
22

---

91

1  BY MR. HARRIS:
2    Q    Well, is there a different company that
3  you're aware of called Nexus Libre, Inc.?
4    **A    No, sir.**
5    Q    We established at the beginning of this
6  case that one of the defendants is Libre by Nexus,
7  Inc., right?
8    **A    Right.**
9    Q    And that's who we've been referring to as,
10  quote, unquote, "Libre," right?
11   **A    Right.**
12   Q    Okay.  Is that -- is your testimony that
13  you know or don't know whether that's the same entity
14  as Nexus Libre, Inc.?
15       MS. PETERS:  Object to the form of the
16  question.  At the top of the document it refers to
17  Libre by Nexus.
18       MR. HARRIS:  I understand there's a header.
19  I already read that into the record.  I'm asking him
20  about Nexus Libre, Inc., in the actual text of the
21  agreement.
22   **A    I would have to make an assumption.  I**

---

92

1  **didn't write this.  I don't know what -- your mic just**
2  **fell off.  Sorry.**
3  **BY MR. HARRIS:**
4    Q    Sorry.  Independent of this document, do
5  you have an understanding who Nexus Libre, Inc., is?
6    **A    No, I don't.**
7    Q    Do you know one way or another there's a
8  corporation that goes by the name Nexus Libre, Inc.?
9    **A    I don't know.**
10   Q    Okay.  If you'd turn to page, I guess we'll
11  go by the bottom in blue, since there's pages missing.
12   **A    Uh-huh.  Yes.**
13   Q    Okay.  Page 15 of 18, and we're not to
14  Exhibit C yet, so it indicates to me we're still in
15  your Exhibit B.  There's a signature here on a Nexus
16  Information Technology Receipt Form, and it lists the
17  company as Nexus Services, Inc.  Do you see that?
18   **A    On the first line?**
19   Q    Uh, on page 15 of 18, right next to
20  Wanda -- across from Wanda Barnes's signature?
21   **A    Okay.  Yes.**
22   Q    This indicates it's an agreement with Nexus

93

1 Services, Inc.?

2    **A    Yes, I see that.**

3    Q    And then if you flip to the next page,

4 again, the signatory is Nexus Services, Inc., listing

5 Tim Okonski as its CFO. Do you see that?

6    **A    Yes.**

7    Q    So was Exhibit B with Nexus Services, Inc.?

8        MS. PETERS: Object to form.

9    **A    It would appear so.**

10       MR. HARRIS: Okay. You can put that aside.

11 I'm going to move on.

12       MS. PETERS: And just for the record, it

13 looks like the missing page that we referred to

14 earlier is later in the exhibit, that they somehow

15 were put out of order. So --

16       MR. HARRIS: Again, can you refer to the

17 pagination at the bottom just to clarify for the

18 record?

19       MS. PETERS: I can. I'm flipping over. So

20 the page under 3636, page eight of 18 stops at 7.3 at

21 the bottom, which is a page four. If you go to page

22 15 of 18, you see a 3643, it appears to pick up at 7.4

94

1 at the top. And the next page, which is listed as

2 page 16 of 18, you see a 3644, appears to continue

3 through the signature page.

4       MR. HARRIS: I see.

5       MS. PETERS: Just for purposes of the

6 record, it just appears the pages are slightly out of

7 order.

8       MR. HARRIS: I -- I see it.

9 BY MR. HARRIS:

10    Q    Does that change your testimony,

11 Mr. Schneider?

12    **A    I was confused when you were calling 15 of**

13 **18 an Information Technology Receipt Form. Yeah, but**

14 **I thought you were just --**

15    Q    Yes, I guess I did. I think Mary Donne

16 clarified it for me.

17    **A    Yeah.**

18    Q    So I guess that's not --

19    **A    But that doesn't change my testimony as to**

20 **what I see next to a signature. It says Nexus**

21 **Services, Inc. But I didn't draft or, --**

22    Q    Well, I want --

95

1    **A    -- or complete these, so I can just say**

2 **what I see.**

3    Q    Yeah, I just want to be clear, because you

4 had testified that Exhibit B was an agreement with

5 Nexus Services, Inc. And I want you to take a look

6 based on what your counsel clarified, and react --

7    **A    I did not say Exhibit B was Nexus Services,**

8 **Inc. You had asked me about Nexus Libre, Inc., in**

9 **Exhibit B, and I said that I'd have to make an**

10 **assumption and I didn't know what that meant. So I**

11 **never said that Exhibit B was an agreement with Nexus**

12 **Services, Inc.**

13    Q    Okay. Well, the record speaks for itself,

14 but I'll ask a fresh question. Exhibit B, at least to

15 the extent it refers to this agreement, starting on

16 page nine of 18 of the exhibit, going by the docket

17 numbers, is an agreement with Wanda Barnes. It's an

18 Employment Agreement, right?

19    **A    That's what it says, yes.**

20    Q    And who is Wanda Barnes making an

21 employment agreement with?

22    **A    Nexus Libre, Inc.**

96

1    Q    Okay.

2    **A    That's what it says at the top. And there**

3 **is no signature page with that exhibit.**

4    Q    Okay.

5    **A    To be -- to be clear, when I said the**

6 **agreement was with Nexus Services, that was in**

7 **reference to the Nexus Information Technology Receipt**

8 **question.**

9    Q    And again, the top of the page, as your

10 counsel pointed out, says Libre by Nexus Employment

11 Agreement.

12    **A    That's correct.**

13    Q    Do you know whether Wanda Barnes had an

14 employment agreement with Libre by Nexus?

15    **A    That's what this is.**

16    Q    Okay. So is this, in fact, an agreement

17 with -- between Wanda Barnes and Libre by Nexus?

18       MS. PETERS: Object to form.

19    **A    That's what it would appear to be.**

20 BY MR. HARRIS:

21    Q    Okay. And just to reiterate, paragraph

22 three of your declaration, page two of 18 of the

97

1 exhibit, you affirm that Wanda Barnes became a W-2
2 employee of Nexus Services, Inc., right?
3    A    Yes.
4    Q    Okay. Mr. Schneider, I want to go a little
5 bit through your background. What's your highest
6 level of education achieved?
7    A    Some college, second year.
8    Q    What college was that?
9    A    University of Phoenix.
10   Q    Okay. And where were you taking those
11 classes?
12   A    Denver.
13   Q    And when was the last time, like what years
14 about?
15   A    Probably ninety -- late nineties. I don't
16 know.
17   Q    No college degrees?
18   A    No, no degree.
19   Q    Okay. Do you have any other certifications
20 or professional qualifications that you rely upon or
21 that speak to the roles that you perform through
22 Nexus?

98

1    A    I've got a list of them.
2    Q    Okay. Are you a licensed bail bondsman?
3    A    I am not.
4    Q    Okay. Were you ever?
5    A    No.
6    Q    Okay. Do you hold any licenses,
7 professional licenses?
8    A    Yes.
9    Q    Okay. What are they?
10   A    DCJS Private Investigator.
11   Q    Is that the same thing, DCJS is the private
12 investigator?
13   A    Department of Criminal Justice Services is
14 the licensing authority in Virginia.
15   Q    Okay.
16   A    Private investigator, bail enforcement
17 agent.
18   Q    Okay. That's a license by which --
19   A    DCJS.
20   Q    Do you hold that license just in Virginia?
21   A    It's -- DCJS is a Virginia license, yes.
22 I'm also, I've been a bail enforcement agent, private

99

1 investigator in Colorado. That's a regulatory thing,
2 it's not a license under their laws, but --
3    Q    Okay. Are there any other states in which
4 you hold certifications or licenses to act as a
5 private investigator?
6    A    No.
7    Q    What about bail enforcement agent?
8    A    No.
9    Q    Okay. What is a bail bondsman?
10   A    A bail bondsman is a --
11   Q    Yeah.
12   A    -- person who posts bail. They write power
13 of attorney to make a promise to get someone out of
14 custody.
15   Q    So what is a bail enforcement agent
16 permitted to do under its DCJS license?
17   A    Well, to arrest and remand people who
18 violate the conditions of their bail, or persons who
19 the bail bondsman wishes to revoke bail for.
20 According to -- you know, there's a Supreme Court
21 ruling, Taylor versus Taintor, which I'm sure you've
22 heard of. It's actually where the root of all that

100

1 is. I mean, I couldn't recite that, but --
2    Q    Does Nexus, the company, employ other bail
3 enforcement agents?
4    A    On occasion, yes.
5    Q    Not permanently?
6    A    No, not permanently.
7    Q    By that, I'm talking about all the
8 operations around the country, all the other offices.
9 Are there any permanent employees who are bail
10 enforcement agents?
11   A    Yeah, many -- I'm sorry, I didn't
12 understand what you were asking. Many of our risk
13 managers have the Virginia Bail Enforcement license.
14   Q    Do you know whether being licensed in
15 Virginia permits you to act as a bail enforcement
16 agent in other states?
17   A    There's a reciprocative -- there's a
18 reciprocal list of states that recognize it.
19 Generally, being a bail enforcement agent, with
20 exceptions of Illinois and Kentucky, where there is no
21 bail and it's prohibited, generally there's no
22 problem. And if you're going to go to another

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

26 (101 to 104)

---

101

1  state, you check in with local law enforcement where
2  you're going to be operating and let them know where
3  you are, and most of the time local law enforcement
4  will, will help.  But Kentucky, Illinois, and I
5  thought they added one more -- I think it's Washington
6  state -- where you just, you can't.  And Florida
7  requires you to be the actual licensed bail bondsman,
8  not a --
9      Q   Okay.
10     A   -- not a bail enforcement agent, so --
11     Q   Okay.  Does any -- do any of the defendants
12 employ any bail bondsman?
13     A   No.
14     Q   Okay.  Have they ever, to the best of your
15 knowledge?
16     A   To the best of my knowledge, no, never
17 employed a bail bondsman.
18         MS. PETERS: Counsel, I'm going to object
19 to this line of questioning as irrelevant to any
20 matter at issue in this case.
21         MR. HARRIS: Okay.
22

---

102

1  BY MR. HARRIS:
2      Q   Do you know what a presumption charge is?
3      A   Yes.
4      Q   What is that?
5      A   It's a -- you're -- it's a charge where
6  you'd be not -- presumption against bail.  So it would
7  be a charge where you wouldn't be automatically
8  granted bail.  You'd need to have a bail hearing in
9  front of a judge to have bail set.
10     Q   With respect to the immigration court
11 system, are there specific charges that you are aware
12 of that are presumption charges?
13     A   With respect to the immigration court?
14     Q   Or DHS.
15         MS. PETERS: Object to form to the extent
16 that it calls for a legal conclusion.
17     A   No, I -- I mean, I couldn't be sure.  I
18 don't have that prepared.
19 BY MR. HARRIS:
20     Q   Well, what would be an example of a
21 presumption charge, to the best of your knowledge? you mean
22         MS. PETERS: Object to form.  Do you mean

---

103

1  within the immigration system?  Within the --
2          MR. HARRIS: I already tried to ask that
3  question and he didn't know.  I'm asking -- he said he
4  knew what a presumption charge was, so I'm asking him
5  if he, to the best of his knowledge, can give me an
6  example of one.
7      A   Outside of the immigration system, it
8  depends on the state.  I mean, different states have
9  different statutes and certain things.  You want an
10 example?  I would assume capital murder would be a
11 presumption charge anywhere you go, but, you know --
12 BY MR. HARRIS:
13     Q   Within the immigration system, you don't
14 have an understanding of what a presumption charge is?
15         MS. PETERS: Object to form.
16 BY MR. HARRIS:
17     Q   Or do you?
18     A   I have an understanding of what a
19 presumption charge is.  I can't give you a list of
20 what they are.  Again, you want an example?  Murder.
21     Q   Okay.  So, it's based on the severity of
22 the crime?  Is that your understanding?

---

104

1          MS. PETERS: Object to form.
2      A   Based on statute.
3  BY MR. HARRIS:
4      Q   Okay.  Have you, in your past experience,
5  ever arrested a criminal and returned the criminal to
6  government custody?
7      A   Yes.
8          MS. PETERS: Are you speaking -- I'm sorry,
9  within Nexus, or within --
10         MR. HARRIS: I said any of his past
11 experience.
12     A   Yes, I have.
13 BY MR. HARRIS:
14     Q   Okay.  And have you done that while working
15 for any of the Nexus companies?
16     A   One time.
17     Q   Okay.  Where was that?
18     A   Um, that was in California.
19     Q   Was that a program participant?
20     A   That was a program participant.
21     Q   And did you return that program participant
22 to government custody?

---

105

1    A    We did.

2    Q    We, or -- was it not you?

3    A    Well, I had a local bail enforcement agent

4 with me, and then I had to have a -- we took her to

5 Arizona to the ERO office; that's the office that

6 demanded her, so I had a local law enforcement agent

7 in Arizona with me so that we were doing everything

8 correctly, so --

9    Q    Okay. Have any of the Nexus companies, to

10 your knowledge, ever, aside from that one incident,

11 arrested a program participant and returned them to

12 government custody?

13    A    Arrested?

14    Q    Yes.

15    A    Has a Nexus -- say the question again,

16 please.

17    Q    To the best of your knowledge, has a Nexus

18 employee, or someone retained by Nexus, ever arrested

19 a program participant and returned them to government

20 custody, other than the incident you just described

21 with Cal -- from California to Arizona?

22        MS. PETERS: Object to form of the

106

1 question.

2    A    Nexus, no.

3 BY MR. HARRIS:

4    Q    Okay. Is there a standing directive at

5 Nexus that -- to the effect that you don't arrest

6 program participants and deliver them to DHS custody?

7        MS. PETERS: Object to the form of the

8 question.

9    A    There's not a standing -- is there a

10 standing directive that we not arrest -- Nexus

11 employees don't arrest Nexus clients. We --

12 BY MR. HARRIS:

13    Q    Does Nexus ever retain somebody to arrest

14 program participants?

15    A    I answered that, yes.

16        MS. PETERS: Object to form.

17    A    Yeah, we have hired local bail enforcement

18 agents.

19 BY MR. HARRIS:

20    Q    And do you have -- can you give me any kind

21 of quantification as to the frequency with which Nexus

22 causes a bail enforcement agent to arrest and return a

107

1 program participant to DHS custody or to the courts?

2        MS. PETERS: Object to the form of the

3 question.

4    A    Very infrequently. It's -- it's -- it's

5 not something we need to do generally. I mean, we --

6 Nexus employees bring a lot of our program

7 participants back to the government. When you say

8 arrest, they're noncustodial. We don't knock people

9 down and put handcuffs on them. Most of the time we

10 escort them, we'll take them to the ERO office, and we

11 will advocate for them. About half the time they're

12 arrested by ICE in that situation, and the other half

13 the time they're allowed to return to their homes for

14 a variety of reasons. Attorney assistance, motion to

15 reopen, mistake by the government, needs of the

16 government. I mean, I've taken people to an ERO

17 office where they're just too busy to take them. So

18 the question -- no, we do not arrest our clients.

19 BY MR. HARRIS:

20    Q    Okay. I don't want to get caught up in

21 that term arrest. If -- you used the term escort. Do

22 you ever escort somebody -- with respect to that last

108

1 answer, do you ever escort somebody against their

2 will?

3    A    No. See, it's a huge distinction.

4 Arrest --

5    Q    Oh, sure.

6    A    Not caught up in a distinction. It's a

7 huge distinction between someone who's under arrest --

8    Q    Sure.

9    A    -- and someone who's being escorted, helped

10 to go to their meeting. It's actually a gigantic

11 distinction, not just getting caught up in a term.

12    Q    Understood. In my mind -- and I'll ask if

13 you agree with me, when I was listening to your

14 answer, I thought you meant by arrest it would be

15 involuntary for the program participant, and escort

16 would be a voluntary delivery, if you will.

17    A    Uh-huh. Yes.

18    Q    Is that fair?

19    A    That's fair.

20    Q    Okay.

21    A    Yeah.

22    Q    So getting back to the frequency with which

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

109

1  Nexus has ever caused anybody to be arrested or
2  delivered against their will, how many times would
3  that happen within a year while you were VP of Risk?
4       MS. PETERS:  Object to form.
5       A   Less than six.
6  BY MR. HARRIS:
7       Q   Okay.
8       A   Just wasn't, wasn't something that needed
9  to be done.
10      Q   Okay.  And when you say they -- that Nexus
11  escorts program participants back to custody, how does
12  that occur?
13      A   Typically, Breach Department or risk
14  manager will reach out to them, most of the time they
15  don't even get notice that there is an ERO appointment
16  pending, explain to them they have an appointment,
17  explain to them that they need to go, because the --
18  if they don't go, they'll breach their bond, and if
19  they breach their bond, they're going to end up going
20  back to custody, whether it's that day or six months
21  down the road.  I mean that's -- it's -- it's
22  equivalent to a warrant at that point.  And I tell

110

1  them, you know, some day you're going to run a red
2  light and they're going to see who you are, and you're
3  going to get drug off to immigration custody.  It
4  could be in front of your kids, you know.  So go now
5  and take care of it.  At least if you go with us, you
6  have a chance not to be arrested, and we're pretty,
7  pretty -- like I said it's probably 50, 60 percent of
8  the time we're pretty effective at explaining things
9  to the ERO officer that the program participant would
10  not be able to explain or wouldn't be listened.  So
11  it's like I, like we talked about last time at the
12  deposition, it's relationship based, and you earn
13  their trust.  And not only we earn --
14      Q   We're going to get to that, so I don't mean
15  to cut you off, but you're going way beyond what I
16  asked.
17      A   Okay.  Sorry.
18      Q   You mentioned an ERO appointment?
19      A   Uh-huh.
20      Q   What -- is that a notice to deliver, or is
21  that something else?
22      A   Well, notice to deliver would be a notice

111

1  that said someone needs to go to the ERO office.
2       Q   Right.  So when I say notice to deliver,
3  I'm talking about an I-340.  You know what that is,
4  right?
5       A   Yes.  Yes.
6       Q   Can we agree that a notice to deliver is an
7  I-340?
8       A   Yes.
9       Q   Okay.  So is an ERO appointment different
10  than a notice to deliver?
11      A   Most of the time, no.  They can have an ERO
12  appointment without an I-340.
13      Q   Most -- I'm sorry, most ERO appointments
14  are not accompanied by an I-340?
15      A   Most are accompanied by an I-340.
16      Q   Oh, they are.
17      A   But you can have -- I get verbose in my
18  answer, because it's more complicated than that.  So
19  you can have an I-340 that says show up on
20  January 1st.
21      Q   Sure,
22      A   You show up on January 1st, and the ICE

112

1  officer can say, Come back in two weeks.
2       Q   Uh-huh.
3       A   That's an ERO appointment, or you breach,
4  but you don't get another I-340 for that.  It's an
5  offshoot of the original I-340.
6       Q   Understood.  Yeah.  Because you were saying
7  that, that the program participant wouldn't know about
8  the ERO appointment?
9       A   That's right.
10      Q   So that led me to think you were talking
11  about a notice to deliver, or an I-340.
12      A   Yeah, they wouldn't have gotten their I-340
13  for a variety of reasons.  It could be they moved.  It
14  could be it got lost in the mail.
15      Q   Well, it doesn't go to the program
16  participant, right?  It goes to the --
17      A   It does.
18      Q   The I-340 does?
19      A   Sorry.  The government -- if you look in
20  the handbook, the government calls it a run letter.
21  They tongue-in-cheek call it a run letter.  And it
22  says in the ICE ERO bond management handbook, that

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

29 (113 to 116)

---

113

1  they send the run letter to the alien, because it
2  often causes them to run.  It says that in the
3  handbook.
4      Q    They would send it because it does cause
5  them to run.
6      A    They think it's funny.
7      Q    They think it's funny?
8      A    The government thinks it's funny.
9      Q    Okay.  So you're saying that an I-340 form,
10 to the best of your knowledge, goes to not only the
11 co-obligors on the bond, but also the program
12 participant.
13     A    Yes.
14     Q    Okay.  At the same time?
15     A    Yes.
16         MS. PETERS:  Object to form, subject to his
17 earlier testimony that they don't always get it.
18         MR. HARRIS:  Understood.
19 BY MR. HARRIS:
20     Q    Okay.  And you said if they don't appear,
21 that's equivalent to a warrant, right?
22         MS. PETERS:  Object to form.

---

114

1  BY MR. HARRIS:
2      Q    Do you remember that testimony?
3      A    Yeah.
4      Q    Okay.  So what you were saying there is if
5  a program participant doesn't show up at the date,
6  time and place set forth in the I-340, Notice to
7  Deliver, then that's equivalent to a warrant?
8      A    No, that's not equivalent to a warrant.  If
9  the ICE officer then issues a breach demanding that
10 they -- because the breach demands that they be
11 returned to the government --
12     Q    That's --
13     A    In their mind that's the way to explain it
14 to them.  I can't explain to them what a, what a
15 breach means and all that ramifications, but if you
16 just tell them, Hey, this is like you having a warrant
17 and you're going to get picked up for this, so you can
18 go --
19     Q    No, I'm asking for your understanding.
20     A    Yeah.
21     Q    I think you said it was equivalent to a
22 warrant, right?

---

115

1          MS. PETERS:  Object to form.
2  BY MR. HARRIS:
3      Q    Is that true in your mind?  You think
4  that --
5          MS. PETERS:  Object to form.
6      A    I equate it to a warrant.  But it is not a
7  warrant.
8  BY MR. HARRIS:
9      Q    Oh, I understand.
10     A    It's not legally equivalent to a warrant.
11     Q    But the point is, once the breach notice
12 issues, they can expect that DHS or ICE is coming to
13 pick them up.
14         MS. PETERS:  Object to form.
15     A    Sure.
16 BY MR. HARRIS:
17     Q    Have you had discussions with a program
18 participant -- strike that.  Let me start over.
19     Q    Do program participants ever advise Nexus,
20 to the best of your knowledge, that they're not
21 intending to show up pursuant to a Notice to Deliver?
22         MS. PETERS:  Object to form.

---

116

1      A    That has happened, yes.
2  BY MR. HARRIS:
3      Q    Okay.  How would you, as VP risk officer,
4  respond to that?
5      A    I would have the risk manager sit down and
6  explain to them -- we'll go to the house, most of the
7  time face-to-face, sometimes on the phone, and explain
8  to them that that's a really bad choice, what's going
9  to happen.
10     Q    Right.
11     A    That would be -- that would be one of those
12 very few events that may trigger us to contact the
13 bondsman and hire a bail enforcement agent to go pick
14 them up and take them back.
15     Q    Okay.  Understood.
16     Q    Are there times when you ever don't respond
17 in that manner?  In other words that you are advised
18 that they don't intend to show up pursuant to a Notice
19 to Deliver, and you just ignore it?
20         MS. PETERS:  Object to form.
21 BY MR. HARRIS:
22     Q    And by "you" in that question, I mean

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

---

117

1   Nexus.

2        MS. PETERS:  Object to form.

3    A    We never ignore it, you know.  If the -- if

4   the bond is fully collateralized and there's not going

5   to be a loss, you know, might not take the extra

6   expense and -- you have to pay a bail enforcement

7   agent sometimes a lot of money, so if the client has

8   fully collateralized their bond, yeah, we might just

9   pay the, pay the penalty and not pick them up.

10  BY MR. HARRIS:

11   Q    How would --

12   A    That might -- you know, in those cases,

13  there's probably a low probability of finding them as

14  well.  They may not be --

15   Q    Findable?

16   A    -- available.  Sometimes people leave --

17  sometimes they're not going to go because they leave

18  the country.  We have people who have gone back to

19  their country of origin and aren't going to go.

20   Q    Sure.

21   A    It's not always willful disobedience, you

22  know, with anger as people return.  We'll find them in

---

118

1   another country.  They're not going to come back and

2   go.

3    Q    How would a program participant fully

4   collateralize their bond?

5        MS. PETERS:  Object to form.

6    A    They would submit the, the bond amount, so

7   that it was -- the loss would be covered.

8   BY MR. HARRIS:

9    Q    So if they have a $20,000 bond, they would

10  pay Nexus $20,000?

11   A    Yeah.  Yes.

12   Q    And in your time as VP of Risk manager, are

13  you aware of that ever happening?

14       MS. PETERS:  Object to form.

15   A    Yeah.  Um, sometimes people pay the bond.

16  Sometimes they would pay towards it, build up to that

17  amount.  You know, not a lot of people have $20,000.

18  That's the --

19  BY MR. HARRIS:

20   Q    Okay.

21   A    I moved on to another answer.

22   Q    Sure.  How would -- how would you know, you

---

119

1   or anybody under your supervision, know whether a bond

2   had been fully collateralized?

3    A    There'd be a tag in --

4        MS. PETERS:  Object to form.

5    A    There'd be a tag in Capsule.

6   BY MR. HARRIS:

7    Q    And do you have access to Capsule?

8    A    I do.

9    Q    Do you make entries in Capsule?

10   A    If I need to, yes.

11   Q    Would Hazaar or Jesus or any of the other

12  people that worked under you make entries into

13  Capsule?

14   A    Of course, yes.

15   Q    Okay.  Frequently?

16   A    Capsule's a program our company uses

17  24 hours a day, every day, yes.

18   Q    Okay.  So daily, would you, you and the

19  people working under you, be making entries into

20  Capsule?

21   A    Not me daily, but people, yeah.

22   Q    Okay.

---

120

1    A    Staff would be.

2    Q    Somebody under your responsibility --

3    A    Sure.

4    Q    -- as VP of Risk?  Yes?

5    A    Yes.

6    Q    Okay.  Why would people in the Risk

7   Department be making entries into Capsule?

8    A    Because they're dealing with program

9   participants -- I mean, wide variety of reasons.  It

10  depends on what their job role is.  If a risk manager

11  goes and knocks on somebody's door, and they speak to

12  the person there and the person is at work, they would

13  put, They're at work.  They work at McDonald's.  I'm

14  heading to McDonald's.  It's -- Capsule is our

15  rolling -- it's a client relationship management

16  program.  So part of client relationship is

17  communicating with the clients and logging your

18  communications.

19   Q    Sure.

20   A    So I can't tell you why.  I mean, there's a

21  million reasons they would put a note in Capsule.

22   Q    What about people in the Breach Department,

---

---

121

1  like Hazaar and Jesus, why would they be making
2  entries in Capsule?
3      A    For exactly the same reason,
4  communications.  If they -- if they spoke to a client
5  to talk to them about their breach, if they spoke to
6  an ICE officer about cancelling a breach.  If they
7  transmitted a document to an ICE officer regarding a
8  breach.  I mean, it tracks -- Capsule tracks our
9  communications.
10     Q    Who -- what type of employee would be
11 contacting program participants to follow up on
12 payment obligations?
13     A    CEMs.
14     Q    Remind me what that is again?
15     A    Client Experience Manager.
16     Q    Do those people work at the call centers?
17     A    Yes.
18     Q    Okay.  Including the one in Verona?
19     A    Yeah.  Yes.
20     Q    Does Nexus Services, Inc., monitor the
21 immigrants?
22         MS. PETERS:  Object to form.

---

122

1      A    Nexus monitors, yeah.  It's --
2  BY MR. HARRIS:
3      Q    Well, I'm asking specifically about Nexus
4  Services, Inc.
5      A    Yes, Nexus Services, Inc., monitors
6  immigrants, yes.
7      Q    Does Nexus Services, Inc., ensure
8  compliance of the immigrants with the bond terms?
9         MS. PETERS:  Object to form.
10     A    Yes.
11 BY MR. HARRIS:
12     Q    I'm sorry?
13     A    Yes.  It's a Risk Management function.
14     Q    And do they do that through the call
15 center, Nexus Services, Inc.?
16         MS. PETERS:  Object to form.
17     A    The call center is not -- there is a --
18 there's a -- there's a monitoring center call
19 center --
20 BY MR. HARRIS:
21     Q    Okay.
22     A    -- that monitors the GPSes, and then

---

123

1  there's CEM call centers that we discussed.  So --
2      Q    I see.  So how does Nexus Services, Inc.,
3  monitor the immigrants and ensure their compliance
4  with bond terms?
5         MS. PETERS:  Object to form.
6      A    Well, as we discussed.  The risk managers
7  in the field interface directly with clients who, who
8  need that for whatever reason.  And to ensure their
9  compliance, they will take them when necessary to
10 their appointments and advocate for them.  The -- the
11 monitoring center monitors the GPS and makes calls to
12 program participants to remind them to do things like
13 charge their GPS, troubleshoot issues, schedule --
14 schedule the meetings between the risk managers and
15 those persons to make sure that they have what they
16 need.
17 BY MR. HARRIS:
18     Q    And to the extent the monitoring center
19 calls people about charges on their devices and that
20 sort of thing, those notes would all be entered in
21 Capsule?
22     A    Yep.

---

124

1      Q    Okay.  Where is the monitoring center on
2  the Nexus campus at Verona?
3         MS. PETERS:  Object to form.
4      A    Currently, it's in 115.
5  BY MR. HARRIS:
6      Q    You say currently.
7      A    Currently.
8      Q    Where was it?
9      A    It was in 111, in the Risk Management
10 building, but we're doing some renovation on computers
11 over there, so that --
12     Q    Is it physically separate and apart from
13 the call center that the CEMs are working in?
14     A    It is a -- it's a designated area in that
15 call center for them.  There is not a wall or a door
16 between them, but it's a designated area for them.
17     Q    And what is the title of the people who
18 work in the monitoring center?
19     A    Monitoring technician.
20     Q    Do the monitoring technicians and CEMs ever
21 perform the same services?
22         MS. PETERS:  Object to form.  Can you

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

125

1  define "same services"?

2    A   Yeah.

3  BY MR. HARRIS:

4    Q   Well, CEM people perform one function,

5  right, or a set of services?

6      MS. PETERS:  Object to form.

7    A   Okay.  They would perform the same services

8  in that if a client had a crisis, like both call

9  centers will take a call from a suicidal human being

10  and talk to them and tell them things aren't that bad,

11  or, or escalate that and get them help.  Both call

12  centers will take a call from a mom who doesn't have

13  formula for her baby and get that escalated to one of

14  the executives and see if somebody can buy them

15  something.  The -- as far as the helping human beings,

16  everybody does the same job.

17  BY MR. HARRIS:

18    Q   Sure.

19    A   The question is a little -- I'm trying to

20  answer it the best I can.  The -- as far -- monitoring

21  technicians do not perform CEM duties.  Monitoring

22  technicians don't, don't perform the inception of a

126

1  contract.  They don't talk to cosigners.  If a

2  monitoring center technician receives one of those

3  phone calls, they forward it in the queue to the, to

4  the CEMs.  If a monitoring center person gets a call

5  from a person who wants to submit a payment, they

6  forward that to a CEM.  If a CEM gets a call out of

7  someone who says that they think their charger is not

8  working properly, they forward that to a monitoring

9  center technician.  So they, they do not perform the

10  same basic job functions, but on the human level

11  they -- a monitoring center tech would never say, Oh,

12  excuse me and don't kill yourself while I hand you off

13  to a CEM to handle your call.

14    Q   Is there a manual or set of manuals that

15  delineates the two different types of functions or

16  services that the CEMs versus the monitoring techs do?

17    A   Yes.  Yes, they have separate training

18  manuals.

19    Q   And where are those located?

20      MS. PETERS:  Object to form.

21    A   There's a training manual on every desk so

22  they can refer to it.

127

1      MR. HARRIS:  Mary Donne, do you know if

2  that's been produced in this litigation?

3      MS. PETERS:  I don't know.

4      MS. KATSANTONIS:  They have not.  I don't

5  believe so.

6      MS. PETERS:  If it was requested --

7      MR. HARRIS:  It's certainly been requested.

8  It certainly falls within our requests, so I'm going

9  to reiterate the request on the record.

10      MS. PETERS:  Identify the request that

11  you're referring to, and I'll look to see -- I don't

12  know if you made the request of Nexus Services, if you

13  made the request of Libre.  I don't know what you're

14  referring to, so if you specifically ask for

15  something, of the 500,000 pages of materials that have

16  been produced, I'd be surprised if it hasn't been.

17  But if it hasn't been, I'll look into it for you.

18      MR. HARRIS:  Thank you.  I'm sorry.

19      MS. PETERS:  And Ms. Katsantonis, I believe

20  it has been produced to you.

21      MS. KATSANTONIS:  You do?

22      MS. PETERS:  I believe that when you

128

1  visited the office campus in 2017, or '18, it was

2  produced to you at that time.

3      MS. KATSANTONIS:  Not to my knowledge.

4      MS. PETERS:  I believe it was.

5      MR. HARRIS:  Let's not -- let's not have

6  this debate.

7      MS. KATSANTONIS:  I don't believe we would

8  have been given paper to take out.

9      MR. HARRIS:  Let's not have this debate on

10  the record.  We have limited time with the witness.

11  We'll address it afterwards.

12  BY MR. HARRIS:

13    Q   Nexus advertises a low breach default rate,

14  correct?

15      MS. PETERS:  Object to the form of the

16  question.  To the extent that you use the word

17  "Nexus," are you referring to Nexus Services, Inc., or

18  are you referring to Libre by Nexus, Inc.?

19      MR. HARRIS:  Mary Donne --

20      MS. PETERS:  Both have the word Nexus in

21  the name.

22      MR. HARRIS:  Mary Donne, he's already made

---

**129**

1 clear, and you've instructed him not to have to answer
2 to the distinctions among the different corporations.
3 So if -- are we going to go backwards and ask him to
4 tell me who Mike Donovan works for between Nexus
5 Services and Libre? He's defined it as the company.
6     MS. PETERS: He's not --
7     MR. HARRIS: He's filed affidavits saying
8 Nexus.
9     MS. PETERS: He has not.
10     MR. HARRIS: He's got an understanding of
11 the term Nexus.
12     MS. PETERS: He has not. This is the
13 reason why I'm making this determination. The witness
14 has been very clear to say that they're different
15 companies, that he uses the shorthand term Nexus
16 because he's an old-timer, but he said -- within the
17 company. He also testified that they're different
18 entities.
19     MR. HARRIS: Okay.
20     Ms. PETERS: You are asking a legal
21 question, and I don't want you to confuse the record
22 or the witness.

**130**

1     MR. HARRIS: That's not a legal question.
2 BY MR. HARRIS:
3     Q   Mr. Schneider, do you -- when you use the
4 term "Nexus," you're referring to the, quote, unquote,
5 "the company," as we discussed earlier, correct?
6     MS. PETERS: Object to form. Object to
7 form.
8 BY MR. HARRIS:
9     Q   Can we have an understanding that that's
10 the case?
11     MS. PETERS: Object to form,
12 mischaracterizes his previous testimony of family of
13 entities.
14     **A**   **We have actually defined that, you said**
15 **earlier, the record will show, we've defined that**
16 **multiple ways. One time -- one time in one context I**
17 **defined it as the philosophy of the company, because**
18 **I'm an old-timer and I've been there. Another time, I**
19 **agreed with you that it was the family of companies.**
20 **I've never -- and I say the company in the same vein.**
21 **But I never agreed that it was all one company.**
22

**131**

1 BY MR. HARRIS:
2     Q   Okay. So --
3     **A**   **I told you that I very clearly understand**
4 **the delineation.**
5     Q   Which of the defendants would advertise a
6 low breach default rate?
7     MS. PETERS: Object to form.
8     **A**   **I've never seen that in our advertising, to**
9 **find it in advertising.**
10 BY MR. HARRIS:
11     Q   Okay. Have you ever signed an affidavit
12 talking about having a low default rate?
13     **A**   **Sure I have. Yes, I have.**
14     Q   Would that have been on behalf of Nexus
15 Services, or Libre by Nexus?
16     MS. PETERS: Object to form.
17     **A**   **That would have been in my —**
18     MS. PETERS: If you have something you'd
19 like to show him, Counselor.
20     MR. HARRIS: Excuse me, Mary Donne, we've
21 got limited time, and this is not appropriate
22 objections. You're speaking on the record to at

**132**

1 length.
2     MS. PETERS: I disagree.
3     MR. HARRIS: The witness is fully capable
4 of testifying for himself.
5     MS. PETERS: You're referring to a
6 document, if you are. He has signed multiple
7 declarations. If there's something that you want him
8 to look at, I would ask you to put it in front of him.
9     MR. HARRIS: That's fine, you can make --
10 well, actually, that's improper for you to make that
11 request. I can ask my question if he knows and
12 understands things. It's not for you to dictate how
13 this deposition goes.
14     MS. PETERS: Object to your
15 characterization.
16 BY MR. HARRIS:
17     Q   Sir, have you ever signed an affidavit
18 regarding, or attesting to a low default rate?
19     **A**   **Yes, I have.**
20     Q   On behalf of Nexus Services, or on behalf
21 of Libre by Nexus would you have done that?
22     It wouldn't have had any -- I can't answer

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

133

1 that, because I wasn't, I wasn't thinking about
2 whether I was signing it on behalf of -- I was signing
3 it on behalf of my knowledge of the people we lose.
4 That's --
5     Q    Which of the companies, which of the
6 defendants would be able to represent to a court that
7 it has a low breach default rate?
8         MS. PETERS:  Object to form.  To the extent
9 it calls for a legal conclusion, object to form.
10        MR. HARRIS:  You're making it legal by
11 asking him to distinguish between the two companies.
12        MS. KATSANTONIS:  Don't argue.
13        MS. PETERS:  I'd ask you to calm down,
14 counselor.
15 BY MR. HARRIS:
16    Q    Can we come to an agreement that when I say
17 Nexus, we're referring to Nexus and Libre as the
18 company as we've discussed earlier?
19        MS. PETERS:  Object to form.  Misstates his
20 previous testimony.
21 BY MR. HARRIS:
22    Q    Or are we going to go through this on every

134

1 question?
2     A    I think it depends on, on the context.  If
3 you're talking about the mission, you can say Nexus as
4 the company.  If you're talking about a specific, what
5 you're doing now with which company advertises the
6 breach rate, I really don't know.  Because when I
7 stated the breach rate, I was just stating my
8 knowledge of mathematics that I did.  I wasn't
9 intending to speak on behalf of any particular
10 company.
11    Q    Okay.  What --
12    A    That's -- that's my -- that's what I did.
13 I didn't -- you know, I didn't speak for one or the
14 other.  I was giving a number.  So --
15    Q    Are you able to tell me which of the
16 defendants would be able to attest to a court that you
17 have a low breach rate?
18        MS. PETERS:  Object to form.
19    A    That would -- that would be -- that would
20 be whoever is -- that would be the Risk Management
21 Department.
22

135

1 BY MR. HARRIS:
2     Q    Under which of the defendants would that
3 be?
4     A    My understanding is that the Risk
5 Management Department is under Services, because
6 that's what they do, they provide services.
7     Q    So Libre by Nexus would not be able to then
8 advertise that it has a low breach rate.
9         MS. PETERS:  Object to form.
10    A    I don't see why Libre by Nexus wouldn't be
11 able to talk about a low -- the clients that are
12 breaching are Libre by Nexus.  The human beings that
13 we're discussing are Libre by Nexus program
14 participants.
15 BY MR. HARRIS:
16    Q    Right.  So there's no difference --
17    A    The people managing them are risk managers
18 who are providing a service to the Libre -- to the
19 Libre clients.  It's services provided.  So I guess
20 either one could talk about what the breach rate is,
21 because they both have knowledge.
22    Q    Well, they both have a role in the breach

136

1 rate, right?
2         MS. PETERS:  Object to form.
3     A    Sure.  Every -- every employee has a role.
4 We have to treat our clients with dignity and respect
5 to keep them from wanting to run away.  That's what we
6 do.  We treat people with dignity and respect, and
7 inherent worth and dignity, and provide them the tools
8 they need not to be scared and run away.
9 BY MR. HARRIS:
10    Q    Okay.  But Nexus Services, Inc., has
11 represented to the court -- made certain
12 representations to courts about having a low breach --
13 bond breach rate, right?
14    A    Yes.
15        MS. PETERS:  Object to form.
16 BY MR. HARRIS:
17    Q    Okay.  And in fact, you have made those
18 representations on behalf of Nexus Services, correct?
19    A    Correct.
20        MS. PETERS:  Object to form.
21    Q    Okay  and what is your understanding of, or

137

1  your best approximation of what the bond breach rate
2  is on behalf of either Nexus Services, Inc., or Libre
3  by Nexus, Inc.?
4      A    I have no idea. I have not been in that
5  role in eight months, and I don't know what -- I don't
6  know what it looks like now.
7      Q    But when you were VP of Risk, you would
8  have been in that role that would know that.
9      A    Yes.
10     Q    Okay. So over the lengthy amount of time
11 that you were VP of Risk, what was the -- your best
12 estimate of what the bond breach rate was?
13     A    The breach rate, or the failure rate? The
14 default rate?
15     Q    How are you distinguishing them?
16     A    Well, the breach rate would be the number
17 of breaches that are received, which is -- many of
18 them are improper, invalid, so you can't go off the
19 breach rate, because breaches are rescinded and
20 overturned all the time. So my numbers go off the --
21 sorry. You laughed. I didn't --
22         MS. KATSANTONIS: Sorry, I was laughing at

138

1  something else.
2      A    Okay. Excuse me. Um, our --
3  BY MR. HARRIS:
4      Q    I was asking you to distinguish between
5  breach rate and default rate. So you explained breach
6  rate. Can you tell me how you define default rate?
7      A    Yeah. So a default rate would be actual
8  loss, did we have to pay the court the money for
9  someone who we lost. And that would be -- that would
10 be based on -- so the rate would be figured, what is
11 our, what is our total liability, not just RLI, but
12 the total liability of all the bonds out there, and
13 how much money have we paid out at that time? And --
14     Q    So, do you have an understanding of what
15 the breach rate is for all the Nexus-related bonds?
16         MS. PETERS: Object to form.
17     A    No. Because it's not -- breach rate
18 wouldn't be something -- like I said, breaches get
19 overturned, corrected, motion -- motion to reopen, and
20 people are picked up independent of Nexus. So
21 breaches, people can receive two or three breaches.
22 They can breach, be rescinded, issued -- the same

139

1  person can receive three -- a breach is an I-323, the
2  document from the government. So an individual can
3  actually receive two or three or four breaches over
4  the pendency of their bond. So you can't get an
5  accurate number. If you have one individual who's
6  receiving four breaches, do you count them four times?
7  You can't. So --
8  BY MR. HARRIS:
9      Q    How about if we call, go by individuals and
10 say -- are you able to tell me how many individual
11 bonds received one or more breaches as opposed to
12 bonds that don't company-wide?
13         MS. PETERS: Object to form.
14     A    I would -- yes. I cannot sitting here, but
15 yes, I would be able to tell you how many breaches the
16 company --
17 BY MR. HARRIS:
18     Q    How would you determine that?
19     A    It would -- because they're -- the Breach
20 Management Department tracks those. There's -- and
21 they're tagged in Capsule. If a program participant
22 has a breach, then they get a breach tag so that if

140

1  somebody does talk to them, they're forwarded to
2  the -- we wouldn't want somebody that had a breach
3  just making a payment and going on. When they have a
4  breach tag, that person is referred to a risk manager
5  so they can correct that deficiency and not end up
6  losing the bond.
7      Q    Does Capsule enable you to run a report
8  that would show you how many breach tags are out
9  there?
10     A    We can filter by tags, yes.
11     Q    Okay. And what's your best estimate of, I
12 guess during your time as VP of Risk, what would be
13 your best estimate of --
14     A    I'm sorry. Say that again.
15     Q    During your time as VP of Risk, what would
16 be your best estimate of the rate at which bonds were
17 breached one or more times?
18     A    One or more times?
19     Q    Well, you said any individual can -- any
20 individual bond can receive multiple breaches.
21     A    Right.
22     Q    I want to define this breach rate. You

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

141

1  said you could figure it out by going to Capsule if we
2  just counted how many bonds have gotten one or more
3  breaches. What would that rate be versus ones that
4  didn't get one or more bond breaches?
5      A   A busy -- a busy -- I don't have a total
6  number just sitting here.
7      Q   Rough guess.
8      A   A busy -- a busy week might be 40. A slow
9  week might be ten.
10     Q   How about over the life of the program, as
11 far as -- while you were VP?
12     A   I -- I don't have -- I mean, I can -- I can
13 do it based on busy week might be 40. A slow week
14 might be ten. Some of those might be duplicate
15 breaches. Some of those might be breaches that the,
16 the surety sent that had been sitting on their desk
17 and were already resolved.
18     Q   Are you able --
19     A   So you've --
20     A   Well, I'm not asking you for a -- you're
21 giving me 40 breaches, and I'm asking you a rate
22 versus bonds that have received a breach, one or more

142

1  breaches, on one side of the ratio, and bonds that
2  never received a breach. Are you able to tell me or
3  give me any kind of estimate over the course of your
4  time as VP of Risk what that ratio looks like?
5      MS. PETERS: Object to form.
6      A   I'm giving you an answer. Do you want it
7  expressed as a percentage?
8  BY MR. HARRIS:
9      Q   Yeah.
10     A   I mean, expressed as a percentage,
11 probably --
12     Q   What percentage of overall bonds receive
13 one or more breaches?
14     MS. PETERS: Object to form.
15     A   Um, I'm thinking about that. Um, with the,
16 with the number of program participants, you know, it
17 might be ten, 12 percent receive a breach.
18 BY MR. HARRIS:
19     Q   Okay. And then how about for default rate?
20     A   That's a guess. I mean, I don't have these
21 figures in front of me. You're forcing me to guess,
22 and I, you know --

143

1      Q   Just asking for your best estimate.
2      A   Oh, I know, and that's what I'm giving you.
3  I want to be clear, I don't -- it's an estimate.
4      Q   You've made representations to the Court
5  about the default rate, right?
6      A   Yeah.
7      Q   So, what would the default rate be on your
8  best estimate?
9      A   But we're apples -- we're going into apples
10 and oranges right now.
11     Q   That's fine.
12     A   My default rate is based on dollars, and
13 now you're asking me about individuals. And anytime
14 you talk about individuals where there's less, you're
15 going to end up with a higher percentage because
16 you're dealing with individuals. But not all of those
17 individuals ultimately result in a loss.
18     Q   Okay.
19     A   So it's not a fair sample.
20     Q   So let me redefine it. Let me redefine it.
21 Okay? This is what I want to know. Are you able to
22 give me an estimate, another ratio or percentage like

144

1  I described before, as to the total number of bonds
2  that get, that have to get paid and result in a loss
3  versus total number of bonds that don't?
4      MS. PETERS: Object to form.
5      A   A guesstimate would -- that result in a
6  loss. Um, when, when I was doing it, that ultimately
7  result in a loss was probably about half of that. It
8  wouldn't be -- I was charged to keep it below five
9  percent loss. But we're talking about, we're talking
10 about dollars to liability, not people. So of the
11 bonds, it would probably be -- I don't know. I didn't
12 track it by bonds.
13 BY MR. HARRIS:
14     Q   Would you be able to figure it out by
15 running Capsule searches?
16     MS. PETERS: Object to form.
17 BY MR. HARRIS:
18     Q   Or any other way?
19     A   Across the universe of clients, or --
20     Q   Yeah.
21     A   -- just RLI clients?
22     Q   No, all of them.

145

1    A    I mean, yeah, I'm sure it could be -- you
2  could figure it out, but we would have to -- we'd have
3  to get a baseline number of total breaches, and then
4  go back to do the research to find out how many of
5  those breaches ultimately ended up in a, in a loss,
6  which is a lot, lot less.  I mean, I -- than the
7  actual breaches.  Breaches are going to be a higher
8  number than your loss necessarily.
9    Q    Okay.  How many exercises have you done
10 like that, trying to figure out the rate at which
11 there's a default or a breach or any -- whether by
12 dollars or bonds?
13    A    Very, very few.  Really only -- um, very
14 few, um, if -- if it was requested by Mike or Rich to
15 know where we stand.  It's not something we focus on.
16 We focus on the people.
17    Q    If Mike or Rich wanted that information,
18 they would have gone to you as the VP of Risk?
19    A    At that time, yeah.
20    Q    Okay.  And when was the last time you did
21 any exercise like that?
22    A    Last time -- when did we do the last?  It's

146

1  been over a year.
2    Q    And do you have a recollection of what
3  figures you came up with during that last exercise?
4    A    Not off the top of my head.  I don't know.
5  We were within -- we were within -- we were within our
6  parameters.  But I don't remember what the figures
7  were.
8    Q    You said you were charged with a five
9  percent, and I understand that to be related to
10 dollars, right?
11    A    Uh-huh.
12    Q    Who charged you with that?
13    A    Mike.  Mike Donovan, since he's the one
14 that --
15    Q    Okay.
16    A    -- sets my job parameters.
17    Q    And that's part of your responsibility, to
18 maintain that rate?
19    A    Yeah.
20      MS. PETERS:  Object to form.
21 BY MR. HARRIS:
22    Q    Who evaluates whether you're meeting that

147

1  goal?
2    A    That would be Mike.
3    Q    Okay.  And do you know how Mike would
4  evaluate that metric?
5    A    We would have a meeting to talk about where
6  we're at.  We would talk about what to do about, you
7  know, where to focus resources.  I mean, obviously,
8  if --
9    Q    Well, I'm just asking about the five
10 percent.
11    A    Uh-huh.
12    Q    So, how would Mike go about evaluating
13 whether or not you were achieving your five-percent
14 goal?
15    A    Look at our liability and how much money
16 we're paying.
17    Q    And where would that information be?
18    A    I have no idea.  I mean, in Accounting, but
19 I don't know.
20    Q    Okay.  But you could derive that
21 information from Capsule?
22      MS. PETERS:  Object to form.

148

1  BY MR. HARRIS:
2    Q    Or could you?
3    A    No.  No, Capsule doesn't have accounting
4  information, so I wouldn't know.
5    Q    Got ya.
6    A    You know.
7    Q    But for the breach rate, you would derive
8  that from Capsule.
9    A    Yeah, I could look at who was breach
10 tagged.
11    Q    And you could do an analysis of the breach
12 rate based on Capsule documents limited only to RLI
13 bonds, right?
14      MS. PETERS:  Object to form.
15    A    I mean, yes.  You'd have to -- you'd have
16 to -- yeah, the documents, the notes would be in
17 Capsule, so you'd have a breach and you'd have a note
18 with the discussion with ERO, and whether they
19 intended to void that breach or move forward with that
20 breach.  You'd have -- you'd have notes if that
21 happened.  I mean, it would require a lot, a lot of
22 reading, but it could be done.  I mean --

**149**

1  BY MR. HARRIS:
2  Q  Would Capsule tell you whether or not a
3  breach was paid or not?
4  A  Um —
5  Q  Let me rephrase it.  Would Capsule tell you
6  whether or not there was a loss on — a loss on a bond
7  based on — well, based on a payment, I guess?
8  MS. PETERS:  Object to form.
9  A  Capsule doesn't hold that kind of
10  information.
11  BY MR. HARRIS:
12  Q  Where would — is that tracked anywhere as
13  far as you know?
14  A  It would have to be tracked by Accounting,
15  with the checks that were written.
16  Q  Were you, in your time in VP Risk or
17  otherwise, ever charged with advising Mr. Moore as to
18  which invoices to pay, bond invoices?
19  MS. PETERS:  Object to form.
20  A  Which invoices to pay?
21  BY MR. HARRIS:
22  Q  Yeah.

**150**

1  A  No.
2  Q  Were you ever charged —
3  A  Do you mean —
4  Q  Go ahead.
5  A  I don't understand your question.  You need
6  to rephrase your question, because —
7  Q  Well, uh, who makes the determination
8  within the Nexus family as to whether or not an
9  outstanding invoice would be paid?
10  MS. PETERS:  Object to form.
11  A  That would be something that happened in
12  Accounting.  Breach — okay.  I understand your
13  question.  I didn't understand — I was trying to
14  overthink the word "which."  We would get notices of
15  breaches that were upcoming, invoice dates that needed
16  to be paid, and we would provide Accounting with a
17  list.  These 12 invoices are due by the 31st, and that
18  would go to Accounting.  As far as which ones to pay
19  and when, that had nothing to do with Breach or Risk
20  Management.  So — but our job, our job was to keep
21  the —
22

**151**

1  BY MR. HARRIS:
2  Q  Running?
3  A  — information flowing, because we got
4  those invoices, so we would have a —
5  Q  So you would keep a running log of what,
6  what invoices required payment?
7  A  Yeah.  And if something was voided, we'd
8  let them know, Hey, this — this invoice is no longer
9  valid, Jody cancelled it, and they'd take it off the
10  list.
11  Q  Right.  And who would be responsible for
12  keeping that list or updating it?
13  A  Hazaar.
14  Q  Hazaar.  And what software does she use to
15  maintain that list?
16  A  Excel.
17  Q  And does she update that on the daily
18  basis?
19  A  Yes, mostly daily basis, yeah.
20  Q  And she sends that to whom?
21  A  That would go to Finance and Richard.
22  Richard would get that, and Finance would get that.

**152**

1  Q  How often does she send those —
2  A  And Carol would get that, or I would get
3  that when I was doing it.
4  Q  How often does Hazaar issue those reports
5  or lists?
6  A  I don't know how often, if it's daily or —
7  at least weekly, I would assume.
8  Q  Do those lists identify which surety's
9  bonds are on the list?
10  A  Yes.
11  Q  And does she communicate those via Email to
12  the Finance Department or Richard Moore?
13  A  Yes.
14  MR. HARRIS:  Mary Donne, do you know if
15  those Emails and lists are included in the Email
16  production?
17  MS. PETERS:  Sitting here, I personally
18  don't.
19  MR. HARRIS:  Okay.
20  MS. PETERS:  But I believe —
21  MR. HARRIS:  That is certainly something
22  we've requested.

---

**153**

1    MS. PETERS:  I believe that in the McGuire
2  Woods production, there was -- there were some of
3  those.
4    MR. HARRIS:  Are you referring --
5    MS. KATSANTONIS:  I'm not going to -- I
6  mean, I will say on the record, I've specifically
7  asked for these documents many times.  You have
8  feigned as if you had no idea what we were talking
9  about.
10    MS. PETERS:  I personally don't.  I'm going
11  to --
12    MS. KATSANTONIS:  And they have not been
13  produced to my knowledge.  I'll check your most recent
14  production.
15    MS. PETERS:  I'm not the document person,
16  so I can't tell you, Vivian, from my understanding.
17    MR. HARRIS:  Okay.
18    MS. KATSANTONIS:  I specifically had told
19  you that I saw that sheet on our on-campus review with
20  the Special Master, and where were those documents.
21  We've talked about them.
22    MS. PETERS:  I am going to --

**154**

1    MR. HARRIS:  Uh, Mr. Schneider, I don't
2  know --
3    THE WITNESS:  Sorry.
4    MR. HARRIS:  -- if it's personal, I got it.
5  But if you need to take a break, let me know, but --
6    THE WITNESS:  Can we?
7    MR. HARRIS:  Yeah, sure.
8    MS. PETERS:  It's lunch anyway.
9    THE WITNESS:  He said 1:30.  If we gave him
10  till now, he'd have it by 1:30.
11    MR. HARRIS:  Oh, it's almost two.  Oh gees.
12    THE VIDEOGRAPHER:  We're going off the
13  record.  The time is 1:55 p.m.
14    (Lunch recess taken, 1:55 p.m. to
15  2:50 p.m.)
16    THE VIDEOGRAPHER:  Here begins disc number
17  three in the videotaped deposition of Erik Schneider.
18  We are going back onto the record at 2:50 p.m.
19    MS. PETERS:  Mr. Harris, there was one
20  clarification that Mr. Schneider wanted to make about
21  a question that you had earlier.
22    A    When we were talking about causing program

**155**

1  participants to be remanded, and you said have -- do I
2  do that?
3  BY MR. HARRIS:
4    Q    Correct.
5    A    And I think I -- well, I know that I
6  touched on this in the testimony, but it is -- it's
7  not an, ultimately a decision that I or Nexus makes.
8  I said that.  It would -- it would be one of those
9  rare instances where we would contact the surety to
10  let them know the person needed to be remanded.  In
11  order to remand someone, there has to be permission of
12  the bondsman to do that.  So the, the one instance
13  that I discussed when I said it only happened one
14  time, that was because I made a request.  The
15  person -- my letter, but the company made a request to
16  the ICE office, because this particular person was a
17  clear and present danger.  They had made death threats
18  to their family who was, who was also sponsor.  So I
19  decided they wanted her back.  That's why it's only
20  one time.  And the surety was involved in that
21  decision.  But as far as, as far as hiring bail
22  enforcement agents and making the decision that

**156**

1  someone does need to be arrested, that decision comes
2  from the bondsman.  And --
3  BY MR. HARRIS:
4    Q    Who do you mean by the bondsman?
5    A    Well, it would be --
6    Q    With respect to the RLI relationship.
7    A    Was Marco the bondsman?  Yeah, Marco.  Big
8  Marco's office would have been the one that made the
9  decision to remand the person.  And I don't know what,
10  you know, whatever they base that on if they're not
11  going to remand somebody.  I mean, our job is to
12  indemnify them, but -- and to, and to, and to try to
13  avoid a situation where somebody needs to be remanded.
14  But the ultimate decision is up to the -- the surety
15  is the one that has the authority to actually have
16  someone arrested.  So that's why the one time was a
17  decision that we sent a letter, or I sent a letter to
18  ICE, said, This needs to happen with the surety.  But
19  beyond that, we ask the surety, Here's the situation,
20  here's the person.  Do you want to do that?
21    Q    How many times --
22    A    Paycheck?  No.

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

40 (157 to 160)

157

1    Q    How many times have you ever remanded -- or
2  sorry, strike that.
3        How many times has Nexus, to your
4  knowledge, ever asked permission from a bondsman, like
5  the surety bondsman, to arrest and deliver someone to
6  custody?
7        MS. PETERS: Object to form, misstates the
8  testimony he just gave.
9    A    That would go back to the -- I answered
10 that earlier. Probably, I don't remember what I said,
11 half a dozen times in a year we'll forward something
12 out to a bondsman if there's a case that's just beyond
13 our control.
14 BY MR. HARRIS:
15    Q    Okay. And what do you forward on?
16    A    Um, a description of the problem and ask
17 for a -- there's a form letter that comes from the
18 surety that has their name and authorization and says
19 that the, the bail enforcement agent, whatever it would
20 be, has the authority -- it's a surety arrest letter
21 that says, I, Marco LiMandri, as the surety, authorize
22 blank, for whoever the bondsman -- the bail

158

1  enforcement agent is, to take this person into custody
2  and deliver them to the government. And then there's
3  another letter that Marco signs that says to the ICE
4  facility, I, Marco LiMandri, am the surety on this
5  bond, and I want you --
6        THE REPORTER: I'm sorry?
7    A    Oh, I'm sorry. I'm talking fast. It says,
8  I, Marco LiMandri, as the surety on the bond, with the
9  bond number, and it requests that the ICE facility
10 take the person back into custody.
11 BY MR. HARRIS:
12    Q    Okay. So how many times has Nexus
13 requested that with respect to an RLI bonded program
14 participant?
15        MS. PETERS: Object to form to the word
16 "request." It -- as I believe he testified they take it
17 to the bond agent, and it's the bond agent's decision.
18        MR. HARRIS: Well, let's not testify.
19 Let's let him testify.
20    A    I have no idea specific to RLI. I don't --
21 I mean, it doesn't -- when that's happening, it's not
22 really a -- it's a problem that needs to be solved.

159

1  It's not a --
2  BY MR. HARRIS:
3    Q    Can you think of a single instance where
4  you've -- that Nexus has submitted that form to the
5  bondsman with respect to an RLI bond?
6        MS. PETERS: Object to form.
7    A    Not off the top of my head.
8  BY MR. HARRIS:
9    Q    That form letter that you described
10 earlier?
11    A    Well, no, Marco gives that. We don't
12 submit a form letter. We tell the bondsman that there
13 is a problem, that someone is not going to comply, and
14 the bondsman delivers the form letter for
15 authorization if they decide to do that.
16    Q    But you said you forwarded something along.
17 What do you -- and I asked what you forward along, and
18 you said a form letter.
19    A    No, I didn't say a form letter. I said a
20 description of the problem. Like we would contact
21 Marco's office and talk to somebody there and say, We
22 have Mr. So-and-so, and here's the situation, and we

160

1  think that they need, you know, should --
2    Q    So how many times has Nexus done that
3  exercise with respect to an RLI-bonded principal?
4    A    Same answer, I don't know.
5    Q    Okay. You're not aware of any?
6    A    Not off the top of my head.
7    Q    Do you think it's -- do you think you have
8  done that?
9    A    I wouldn't segregate it by an RLI client.
10 I don't -- I don't know. I'd have to research.
11    Q    Okay. If you were to research, where would
12 you look for the answer?
13    A    Probably have to go to Marco.
14    Q    Okay. Um, so before the break, we were
15 talking about a breach rate. And we had breach rate
16 and default rate, right? And I showed you kind of how
17 do you create a demarcation for a ratio with, on one
18 side being one thing and one the other. You gave me,
19 with respect to a breach rate, ten to 12 percent
20 company-wide, not just RLI. And I guess I want
21 clarification. So on one side we're talking about the
22 number of bonds that have had at least one breach

161

1  notice issued, and on the other side of the equation
2  the number of bonds that have not received a breach,
3  right?
4      A   Necessarily, yeah.  Yes.
5      Q   So you estimated ten to 12.  Now what if we
6  change that second number to number of bonds that have
7  been, received I-391 Notices of Cancelation?  Are you
8  able to calculate the percentage at which bonds breach
9  under that formula?
10      MS. PETERS:  Object to form.
11 BY MR. HARRIS:
12      Q   In other words, I'll restate it.  Can you
13 tell me, if we take -- you know, I'm asking for a
14 ratio where on one side we have the number of bonds
15 that receive one or more breaches as compared to the
16 number of bonds that have received an I-391 Notice of
17 Cancellation.
18      A   You could calculate it, but it wouldn't be,
19 it wouldn't be -- I mean, you can calculate any two
20 numbers.  I could calculate the number of bonds that
21 breach versus the number of people with the first name
22 of George.  You have to use responsible and valid

162

1  integers.  There's no reason to calculate it based on
2  the number of cancellations.  You could do
3  cancellations against total number of bonds.
4      Q   Okay.  I think I mis -- I think we
5  misinterpreted each other.  My question is not are you
6  physically capable of doing it, but as you sit here
7  today, can you give me an estimate of what that
8  percentage would be?
9      A   Oh, no, I haven't -- it's been a year since
10 I've looked at those, or nine months.  I mean, I could
11 not do that.
12      Q   Okay.  Could -- so you can't give me an
13 estimate as to how many bonds are -- over the course
14 of your time as VP of Risk, what the rate of bonds
15 that are, receive a breach versus the number of bonds
16 that get an I-391 cancellation?
17      MS. PETERS:  Object to form.
18      A   No.  Didn't calculate it that -- I mean,
19 just don't know.
20 BY MR. HARRIS:
21      Q   What about, could you give me an estimate
22 over your time as VP of Risk as to what the ratio

163

1  would be between the number of bonds that have
2  received a breach and ultimately been paid as a loss
3  versus the number of bonds that, for which -- I'm get,
4  twisting myself up here -- the number of bonds that,
5  on one side, have received a breach, have been paid,
6  versus the number of bonds that received an I-391
7  Notice of Cancellation?
8      MS. PETERS:  Object to form.
9      A   I have no idea what those numbers are
10 sitting here.  I didn't prepare that, you know.  I
11 don't know.
12 BY MR. HARRIS:
13      Q   Do you recall during one of the hearings in
14 this case, we presented you with data that RLI had
15 produced and presented a calculation at roughly
16 38 percent where we, we did that same analysis and we
17 thought, we calculated that 38 percent of the bonds
18 that had either been paid or cancelled through an
19 I-391 cancellation, it was 38 percent had been paid
20 and sustained a loss versus the balance, which would
21 have been bonds that had been cancelled?  Do you
22 recall that?

164

1      A   I remember that conversation.
2      MS. PETERS:  Object to form.
3      A   I don't remember -- yes.
4  BY MR. HARRIS:
5      Q   Have you gone back and tried to evaluate
6  those numbers since the hearing?
7      A   No.
8      MS. PETERS:  Object to form.
9  BY MR. HARRIS:
10      Q   Okay.  Do you have any reason, as you sit
11 here today, to dispute those numbers?
12      MS. PETERS:  Object to form.  If he hasn't
13 calculated it, how could he --
14      MR. HARRIS:  I'd appreciate the answer from
15 the witness.  He's fully capable of telling me that he
16 hasn't calculated it.
17      MS. PETERS:  I think it's an unfair
18 question.
19      MR. HARRIS:  That's fine.  You can put your
20 objection on the record, but I'd appreciate if you
21 would limit the speaking objections.
22      MS. PETERS:  I disagree.

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

42 (165 to 168)

---

165

1    A    What was the question?

2 BY MR. HARRIS:

3    Q    Have you gone back and -- or do you have

4 any reason to dispute the numbers that were presented

5 to you by RLI that day in court?

6         MS. PETERS:  Object to form.

7 BY MR. HARRIS:

8    Q    As you sit here today.

9    A    I would say yes, 'cause it's an incorrect

10 formula to determine the reality of what goes on with

11 human beings in the program.  You can -- like I said,

12 you could put any two integers together.  You've got

13 to put the right ones together to get a real picture

14 of what's going on.

15   Q    Okay.

16   A    And, you know --

17   Q    But as the ratio was constructed by RLI,

18 you don't dispute the math.

19        MS. PETERS:  Object to form.

20   A    I didn't do the math.  I mean --

21 BY MR. HARRIS:

22   Q    And you don't dispute the numbers of bonds

---

166

1 that were counted as having been breached and paid

2 versus the ones that had received I-391 Notices of

3 Cancellation at that point.

4         MS. PETERS:  Object to form.

5    A    I didn't double-check any of those numbers,

6 so I don't have any basis to even comment on them.

7 BY MR. HARRIS:

8    Q    Okay.  RLI issued 2,486 bonds at Nexus's

9 request?  Is that consistent with your understanding?

10   A    Sounds about right, yeah.

11   Q    Okay.  And of those 2,486 RLI bonds, how

12 many of them have been paid as a loss?

13   A    I have no idea.

14   Q    Okay.

15   A    I wasn't prepared.

16   Q    How would you determine that?

17   A    Through Accounting.  Through -- through

18 the --

19   Q    Accounting would give you the dollars.  How

20 would you do the number of bonds?

21   A    Well, there's no way I could do it sitting

22 here.  I would have to -- I would have to look at the

---

167

1 total number of breaches, how many were appealed, what

2 the outcome of the appeal was, if the invoice was

3 rescinded and re-issued.  I mean, I -- there's --

4 you'd have to go through the whole thing.  I don't

5 know.

6    Q    I'm just asking how many have been paid?

7    A    And I said, I don't know how many have been

8 paid.  I haven't been in that within a year, so I

9 don't know what we've paid in the last year.

10   Q    Who would be in the best position within

11 the Nexus family of companies that would be able to

12 figure that out?

13        MS. PETERS:  Object to form.

14   A    Accounting, somebody in Accounting.

15 Somebody that would be able to count the checks.

16 BY MR. HARRIS:

17   Q    Accounting would be able to give the number

18 of bonds -- okay.  That could count the number of

19 checks?  Okay.  Fair enough.

20        Who within Accounting would be -- if you

21 had to figure that out, who would you go to?

22        MS. PETERS:  Object to form.

---

168

1    A    I gave you Tawanna Washington's in charge,

2 but I don't know if -- I don't know how long she's

3 been doing it.  I don't know.

4 BY MR. HARRIS:

5    Q    Okay.  That's fine.

6    A    I might ask her.  I don't know if she can

7 give me the answer.  I keep saying I don't know.  I'm

8 not trying to be difficult.  I just don't know.

9    Q    Okay.  But the people in the Risk

10 Department wouldn't be able to calculate that from

11 Capsule or anything?

12   A    No.  No.  They don't --

13   Q    Okay.  What about the number, total number

14 of the 2,486 RLI bonds have you received an I-391

15 Notice of Cancellation?  Can you tell me how many that

16 is?

17   A    I haven't looked at those numbers in -- no,

18 I don't know.

19   Q    Who would be in the best position at

20 Nexus --

21   A    Hazaar Pastor.

22   Q    -- to provide that information?

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

169

1      A    **Hazaar tracks that.**
2           MS. PETERS: Object to form.
3   BY MR. HARRIS:
4      Q    Okay. How does she track that?
5      A    **Spreadsheet. I mean, when they come in,**
6   **when they're given to us, they're logged in.**
7      Q    Okay. And what does that -- are you
8   familiar with that spreadsheet, what it looks like?
9      A    **I haven't looked at it in -- no. It looks**
10  **likes a spread -- I mean, I don't say that**
11  **facetiously. I mean, I don't know. I couldn't**
12  **describe it to you.**
13     Q    Sure. Do you remember at your deposition
14  we looked at a spreadsheet that you, your -- that
15  Nexus had produced in this case? Do you recall that?
16     A    **Yes.**
17     Q    Okay. Um, I'm not going to mark it again,
18  but I'm going to just pull it out and show it to you.
19  This is Deposition Exhibit 16.
20          MS. PETERS: Do you have an extra copy?
21          MR. HARRIS: You can have a copy, sure.
22

170

1   BY MR. HARRIS:
2      Q    This is the spreadsheet we looked at at
3   deposition?
4      A    **Yes.**
5      Q    Do you recall that?
6      A    **Yes.**
7      Q    Okay. And this deposition was taken in
8   November of 2018?
9      A    **Yes.**
10     Q    Okay. Is this a living document that gets
11  updated?
12          MS. PETERS: Object to form.
13     A    **My understanding, limited as it may be, is**
14  **that when Carol Taylor took over the department, she**
15  **had changes made to this. I don't know what they are,**
16  **and I'm not the person to ask that of.**
17  BY MR. HARRIS:
18     Q    Okay. When did Carol Taylor take over?
19     A    **September of, what was last year, '19?**
20          MR. HARRIS: Okay. Mary Donne, I'm just
21  going to request on the record that we get an updated
22  copy of whatever, or a copy of whatever Carol Taylor

171

1   keeps in terms of the spreadsheet that --
2           MS. PETERS: She's no longer employed
3   there.
4           MR. HARRIS: Okay. Well, whatever Nexus
5   has or had, we should be produced to us.
6           MS. PETERS: So --
7           MR. HARRIS: This is from November 2018.
8   This is a document that tracks the status of bonds,
9   and I would like an updated copy of this report and
10  any other reports that Carol Taylor might have
11  generated that are different than this.
12          MS. PETERS: So you can -- I will ask that
13  you send me a written reminder, because I have two
14  full days of depositions, and if there's something in
15  particular that you're interested in of the 800,000 or
16  so to be updated, if you'll let me know, --
17          MR. HARRIS: Sure.
18          MS. PETERS: -- then I'll do my best. But
19  I don't want to sit here and tell you that I'll
20  remember to do it following this deposition.
21          MR. HARRIS: Okay. Well, the reference
22  will refer to it as Mr. Schneider's Deposition

172

1   Exhibit 16 for that one, and then anything else. So
2   when you see it in writing, will that jog your memory?
3           MS. PETERS: You need to be very specific
4   because I don't know what she had.
5           MR. HARRIS: Well, neither do I. But you
6   can ask your client.
7   BY MR. HARRIS:
8      Q    I mean, can you describe it? What Carol
9   Taylor had?
10     A    **The current form? No, I can't. I**
11  **wasn't --**
12          MR. HARRIS: Okay. Will you make an
13  inquiry, please?
14          MS. PETERS: I will make an inquiry.
15          MR. HARRIS: Thank you.
16  BY MR. HARRIS:
17     Q    I'd like you to turn back to Exhibit 1. It
18  should be in front of you there. This is your revised
19  affidavit from the New York case that we talked about
20  earlier today.
21     A    **Uh-huh. Yes.**
22     Q    If you'll turn to paragraph 12, please.

173

1     A     Okay.
2     Q     I'm sorry.  I said it was an affidavit.
3   This is the Revised Verified Petition that you
4   attested to the paragraphs from six to 20.  Do you
5   recall that?
6     A     Yes.
7     Q     Okay.  Paragraph 12 says, Nexus's GPS
8   monitoring program has proven to be successful, comma,
9   with a failure-to-appear rate of less than
10  1.3 percent.  This success rate is unheard of in the
11  immigration or criminal bonding industries.  Do you
12  see that?
13    A     Yes.
14    Q     Is that a true statement, as you sit here
15  today, that Nexus's GPS monitoring program has proven
16  to be successful in obtaining a below-average rate in
17  the one percent to two percent range?
18    A     At that time, the way that we calculated
19  it, yes.  I don't know what it is now.
20    Q     Do you think it's roughly the same, or has
21  it changed significantly?
22    A     I have not been involved in any of that in

174

1   a long time.
2     Q     Who would know that information from Nexus?
3           MS. PETERS:  Object to form.
4     A     Probably would have been -- it would have
5   been Carol Taylor.
6   BY MR. HARRIS:
7     Q     Is there anybody at Nexus who can speak to
8   this ratio that you're attesting to in your affidavit?
9     A     Evan has taken over that.  Evan Ajin's
10  taken over that department.  I don't know what he
11  knows.
12    Q     Does he have a new title?
13    A     No.  No.
14    Q     So, how did you calculate the 1.3 percent
15  in order to make this representation to the court?
16    A     That was -- that was based on number of
17  clients that we had that were, I guess what we'd call
18  willful, when you characterized earlier people said
19  they're just not going to go, those number of clients
20  that just willfully disobeyed and just willfully
21  didn't go, and that were ghosted, just lost all, lost
22  all contact, because it was -- if I recall, we

175

1   discussed what a ghost rate was.
2     Q     Well, you have another affidavit that
3   speaks to that, but I'm focusing on this statement
4   right here.  It says with a failure-to-appear rate.
5     A     Uh-huh.
6     Q     It doesn't say somebody who willfully
7   failed to appear, right?
8     A     No, it doesn't say that, but you asked me
9   to explain it.  That's --
10    Q     That's what it's based on.
11    A     Yeah.
12    Q     Okay.  So if that's the numerator, then
13  what's the denominator?  All of the bonds that are in
14  force?
15    A     It would have been all of the bonds, yeah,
16  all of the people.
17    Q     So -- so if, if you're counting the number
18  of people in the numerator who have ghosted to get
19  1.3 percent, the denominator would include bonds that
20  had just been issued that day or day before?
21    A     It would be whatever our total number of
22  bonds were, sure.

176

1     Q     Whether they had been breached, cancelled,
2   or never noticed at all.
3     A     Correct.
4     Q     Okay.  What is the national average for
5   immigration bond, or the industry average for
6   immigration bonds in the same -- calculating it the
7   same way?
8     A     There's -- I don't know that they
9   calculated it in the same way.  I don't know what it
10  would be calculated in the same way.  I know that
11  there's documents, you can Google it and see it's
12  anywhere between 50 and 73 percent, I think.
13    Q     Fifty to 73 percent of total bonds have
14  people willfully not showing up, or ghosting as you
15  call it?
16    A     I'm not sure -- again, apples and oranges.
17  That's -- that's the failure rate in the industry.  I
18  don't know if they call it ghosting or how they
19  calculate it.
20    Q     Well, when you say that's the failure rate
21  in the industry, you're referring to the 50 to
22  73 percent?

177

1      A      That's what you can find if you Google it.
2      Q      So when you're using failure rate there,
3  with respect to Googling the industry average, how's
4  that being calculated?
5      A      They don't say in those articles how they
6  calculate it.  They just say that that's the rate.
7      Q      So you're not sure it's an apples-to-apples
8  comparison with the 1.3 percent figure you put here.
9      A      I can't say, because I don't -- I didn't do
10 that.
11     Q      Well, you're representing to the Court that
12 your success rate is unheard of in the immigration or
13 criminal bonding industries.  On what are you relying
14 to make that representation?
15     A      Well, let's, let's say it was at the
16 38 percent you represented, that's still significantly
17 lower than what the, the Google Scholar advertised
18 rate is across number of scholarly articles, so that
19 would be unheard of in the industry.
20     Q      Okay.
21     A      That's a -- it's just a fair statement.
22     Q      Can you think of -- can you think of a

178

1  source, other than Google searches, can you identify a
2  source that would set forth or support the 50 to
3  73 percent?
4      A      I cannot cite you a URL, but look at like
5  the pretrial services -- what is the national -- is it
6  National Pretrial Services Association?
7      Q      Is that going to cover immigration bonds,
8  or is that criminal as well?
9      A      I don't -- I don't know if they cover
10 immigration bonds.  You can look at AILA might have --
11     Q      How do you spell that?
12     A      A-I-L-A.
13     Q      A-I-L-A?
14     A      Yeah, American Associ -- Immigration
15 Attorneys Association.  I think they have some figures
16 in that range.  If -- if you do a Google search, which
17 everybody does, you'll see sites of that.
18     Q      Okay.
19     A      Numerous sites of that.
20     Q      So the 50 to 73 percent are -- is that your
21 best estimate of what the industry average of failure
22 rate reported through Google is for --

179

1      A      That would be --
2      Q      Is that immigration and criminal, or do
3  they vary?  Do you know?
4      A      That's immigration.  Criminal -- criminal's
5  in the same range, but that -- I would say that that's
6  immigration.  Criminal is -- criminal varies -- those
7  stats vary by state, depending on if they've got a
8  strong pretrial services program, what their statutes
9  are.  I mean, some states are real strong on
10 marijuana.  Some states it's slap on a wrist.  So
11 they'll have higher failure rates for the same crimes.
12 So you really -- with criminal, you've got to go state
13 by state to get that.  I mean, an average would
14 probably be in the same range, but --
15     Q      Okay.  And here in paragraph 12, you're
16 attributing the low failure rate that Nexus is able to
17 achieve to Nexus's GPS monitoring program, right?
18     A      Yeah, our program as --
19         MS. PETERS:  Object to form.
20     A      Yeah, the program as a whole, yes.
21 BY MR. HARRIS:
22     Q      Well, it says here, Nexus's GPS monitoring

180

1  program has proven to be successful with a
2  failure-to-appear rate of less than 1.3 percent.
3      A      Right.  I attribute that to the Nexus
4  program, yes.
5      Q      The Nexus GPS monitoring program.
6         MS. PETERS:  Object to form.
7      A      The Nexus GPS monitoring program, yes.
8  BY MR. HARRIS:
9      Q      And you understand that sureties are
10 interested in Nexus's breach rate, correct?
11     A      No one's asked me.  I don't -- you're
12 telling me that.  I have to take it at face value.
13     Q      Well, isn't it important to Nexus's ability
14 to continue to stay in business that you're able to
15 report a low breach rate?
16         MS. PETERS:  Object to form.
17     A      I've not had to answer that question to
18 anyone.
19 BY MR. HARRIS:
20     Q      Well, what do you think?
21     A      It's certainly one factor, sure.
22     Q      Isn't it true that if Nexus has a high

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

---

181

1 breach rate, it risks losing its relationship with
2 surety companies, and by extension, its business?
3       MS. PETERS:  Object to form.
4     **A    I don't have anything -- I haven't had**
5 **those conversations.  I think our relationships are**
6 **more than one-dimensional like that.**
7 **BY MR. HARRIS:**
8     Q    Okay.  It's not an issue you've ever
9 considered??
10    **A    Well, of course it's an issue I've**
11 **considered.  That's why I was attempting to keep the**
12 **numbers low.  I mean, that's just common, prudent**
13 **business practice to keep your losses as low as**
14 **possible, as any business would do that.**
15    Q    Right.  Because you, you understand that
16 that's important to the surety, --
17    A    Sure.
18    Q    -- that you're maintaining a low breach
19 rate.
20    A    Yes.
21       MS. PETERS:  Is this three?
22       MR. HARRIS:  Yes.

---

182

1       (Exhibit 3 was marked for identification
2 and attached to the transcript.)
3 BY MR. HARRIS:
4     Q    The court reporter has handed you what's
5 been marked as Exhibit 3 to your deposition.  For the
6 record, it purports to be an Affidavit of Erik
7 Schneider in Support of Plaintiff's Emergency Motion
8 for Temporary Restraining Order.  That's filed in the
9 United States District Court for the District of
10 Columbia, in the Statewide Bonding, Inc., et al.
11 versus DHS, et al., Case Number 1:18-cv-02115.  Do you
12 recognize this document, sir?
13    **A    Yes.**
14    Q    Okay.  This is, in fact, an affidavit that
15 you signed for submission to the District Court of
16 District of Columbia, correct?
17    **A    Yes.**
18    Q    Okay.  Paragraph five, it says, second
19 sentence, Upon securing the release of the immigrant,
20 Nexus Services, Inc., monitors the immigrant and
21 ensures compliance with the bond terms.  Do you
22 remember we saw that before?

---

183

1     **A    Yes.**
2     Q    Okay.  Now, if you look down to paragraph
3 seven, These surety companies -- I'm sorry.  We didn't
4 see that before.  Is that a true statement, paragraph
5 five?
6     **A    Yes.**
7     Q    Okay.  Paragraph seven says, These surety
8 companies maintain a record of Nexus Services, Inc.,
9 fail rate.  This rate is the percentage of all bonds
10 guaranteed by Nexus Services that are breached by the
11 government.  Do you see that?
12    **A    Yes.**
13    Q    Okay.  This fail rate is maintained and
14 monitored for the purpose of determining whether and
15 on what terms to do or continue to do business with
16 Nexus Services, Inc., right?
17    **A    I see that.**
18    Q    Okay.  And ten, I'm skipping down to
19 paragraph ten, In essence, this represents Nexus
20 Services, Inc., reputation within the community of
21 surety companies, right?
22    **A    Yes.**

---

184

1     Q    Okay.  And paragraph 12, it says, This
2 damage will be considered by the surety companies in
3 evaluating whether to secure bonds for Nexus Services,
4 Inc.'s clients, threatening Nexus Services, Inc.'s
5 very existence.
6     **A    Yes.**
7     Q    Does that -- does that refresh your
8 recollection as to whether you've had some discussions
9 regarding this issue that we were talking about before
10 we pulled out this document?
11    **A    Yes.**
12    Q    Okay.  And are these true statements as you
13 sit here today?
14    **A    They are true statements.**
15    Q    Okay.  So it is your belief, right, that
16 the failure-to-appear rate is something that a surety
17 would consider in, in deciding whether or not it would
18 issue bonds.
19       MS. PETERS:  Object to form.
20    **A    Right.  And that's what I said, it's**
21 **something they would consider.  It's one, one of the**
22 **factors, and -- I did say that.**

---

---

185

**BY MR. HARRIS:**

2    Q    Okay.  Is that unreasonable for a surety to

3 consider that?

4    **A    No, of course not.**

5    Q    Okay.  Certainly, if you had a high breach

6 rate, the surety would be justified in not wanting to

7 issue bonds, right?

8         MS. PETERS:  Object to form.  Are you

9 referring to breach rate or failure rate?  Because you

10 are flipping back and forth between using those words,

11 and he, the witness, has described them differently.

12 BY MR. HARRIS:

13    Q    Fail rate, as you've discussed it in this

14 affidavit.

15    **A    Say the question again.**

16    Q    Well, you know that the sureties are

17 interested in the failure rate of the bonds, right?

18    **A    Of course.**

19    Q    Okay.  And would a failure rate -- well,

20 what would be the failure rate you're referencing here

21 in this affidavit?

22    **A    The same as the other fail rate, how many**

186

**bonds we ultimately lose forever.**

2    Q    Okay.  The ones that are paid, right?

3    **A    Yes.  Well, no.  Because there's no harm to**

4 **a surety if the bond is paid.  The surety doesn't lose**

5 **anything if the bond is paid.**

6    Q    Okay.  So, why is the surety concerned

7 about the fail rate then?

8    **A    I'm not the surety.  I mean, it's a factor.**

9    Q    Well, you're representing -- I'm sorry.

10    **A    Go ahead.**

11    Q    You're representing to the court that the

12 damage will be considered by the surety companies in

13 evaluating whether to issue bonds.

14    **A    I believe that this document, if I recall**

15 **correctly, was in response to the unnaturally — to a**

16 **different calculation and an unnaturally-high fail**

17 **rate.  I don't recall.  I'm trying to remember this,**

18 **but this is in response to the, whatever the figure**

19 **was, 47.9-percent fail rate that was, that was**

20 **mentioned, that is calculated on a different,**

21 **different basis.  If some third party is saying, Hey,**

22 **this company has a 70-percent fail rate the way we**

---

187

calculate it, then yeah, that might be alarming to a

2 surety.  But the, the -- when you're asking me to, to

3 consider whether or not a surety would continue to do

4 business with a company based on a fail rate, it's

5 not -- it's simply not something I can sit here and

6 say, yes, they will or no, they won't.  There's other

7 factors.  There's relationship.  There's age of

8 business.  There's, um, relationship factors.  I can't

9 tell you yes or no if a, a surety company would or

10 would not do business if the surety rate was, was X.

11 That's what you're asking me to answer, Chris, right?

12 BY MR. HARRIS:

13    Q    I'm just asking you to explain your

14 testimony.

15    A    I can't answer that.

16    Q    So -- and, you know, I don't think, would

17 you agree with me that the truth of these statements

18 doesn't change depending on what you're responding to,

19 does it?

20         MS. PETERS:  Object to form.

21 BY MR. HARRIS:

22    Q    I mean, you were saying -- you were trying

188

to explain that this was in response to another rate.

2    **A    Right.  The truth of these statements**

3 **doesn't change, but it changes depending on how you**

4 **asked me the question, and the answer.**

5    Q    But paragraph ten says in essence, right?

6 This rate represents Nexus's -- Nexus Services, Inc.'s

7 reputation within the community of surety companies.

8    A    Sure.

9    Q    So your failure rate is in essence your

10 reputation with the surety companies.  Isn't that what

11 you're telling the court?

12    **A    Yes, it's what -- yes.**

13    Q    Okay.  So a surety would certainly be

14 justified in not issuing bonds if it was dissatisfied

15 with the failure rate.

16    **A    Sure.  I've already answered that, yes.**

17    Q    Okay.  I'm going to ask you some questions

18 through a demonstrative exhibit that I've prepared.

19         (Exhibit 4 was marked for identification

20 and attached to the transcript.)

21         MR. HARRIS:  And I'll represent that this

22 summ -- oh, sorry.

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

48 (189 to 192)

---

189

1    I'll represent that similar to what we
2 presented at that hearing where we were talking about
3 breach rates, that we were discussing earlier, this
4 was similarly prepared based on the substantive
5 records showing what's been paid, received, et cetera.
6        MS. PETERS:  I'm sorry.  Can you tell me
7 how it was prepared again?  Because that was several
8 questions ago.  What is it comparing?
9        MR. HARRIS:  This spreadsheet is based on
10 breach notices, payment records, and notices of
11 cancellations, as well as the bonds themselves.
12        MS. PETERS:  Are all the bonds listed on
13 this?
14        MR. HARRIS:  Yes, 2,486 of them.
15        MS. PETERS:  Okay.
16 BY MR. HARRIS:
17    Q    Do you see that, Mr. Schneider, we've
18 listed 2,486?
19    A    Uh-huh.
20    Q    Okay.  And I'm sorry that the type is so
21 small.
22        MS. PETERS:  Yeah, I'm having trouble with

190

1 it.
2        MR. HARRIS:  I do have a magnifying glass
3 if anybody needs to --
4        MS. PETERS:  Maybe.  Is this Exhibit 5,
5 Mr. Harris?
6        MR. HARRIS:  I believe it is.
7        MS. PETERS:  Four.  It's Exhibit 4.
8        MR. HARRIS:  I don't know where that
9 magnifying glass is.  It was up here.
10        MS. KATSANTONIS:  Yeah.  I'll get it.
11 BY MR. HARRIS:
12    Q    I believe the sort on this document is by
13 I-391 date, which is a Notice of Cancellation.
14    A    Okay.
15    Q    Okay?  Up in the top right-hand corner we
16 see a summary of, it says, and I'll read it for you,
17 it says, Inception to date, 2,486.  That's the bond
18 count.  And then the column R shows you the combined
19 aggregate penal sum of all those bonds.  Do you see
20 that?
21    A    Uh-huh.
22    Q    Okay.

191

1    A    Yes.
2    Q    Do you have any reason to dispute that the
3 2,486 bonds issued by RLI at Nexus's request, the
4 total aggregate sum of those totalled 30,222 -- I'm
5 sorry, $30,222,950?
6    A    That's the spreadsheet math.  I mean, I'd
7 have to look at all -- I mean, I don't know if all the
8 individual amounts are correct.
9    Q    Does that number seem off to you?
10    A    Um, yeah, it's a little higher than what I
11 had heard in conversation, or even in, even in -- just
12 a little higher than what I thought it was.
13    Q    It's possible it is adjusted for interest,
14 I suppose.
15    A    Uh-huh.
16    Q    If it came from the actual sums paid.
17    A    Sure.
18    Q    We could probably see at the bottom here.
19        So this comes from the penal sum column,
20 column F.
21    A    Sure.
22    Q    All right.  Do you have a reason to, on an

192

1 order of magnitude, to dispute that number?
2    A    No.
3    Q    Okay.  And as you can see, in that summary
4 we've totalled the number of cancelled -- I'm sorry,
5 in the second row there, P -- columns P, Q and R,
6 we've given you the total number of bonds that have
7 basically been put out of circulation, either because
8 they've been paid, or because we've received an I-391
9 Notice of Cancellation.  Do you see that?
10    A    Uh-huh.  Yes.
11    Q    Okay.  And we calculate -- well, this --
12 counted 717 of those, with a penal sum aggregate
13 amount of $8,788,000.  Do you have reason to dispute
14 those figures?
15    A    No.
16    Q    Okay.  And if you look in the blue -- well,
17 sorry.  Out -- the next line, the next row says,
18 Outstanding.  This would be the number of bonds that
19 are, have not been either cancelled or paid.  So, I
20 guess they still have a liability on these.  And the
21 number for that in terms of bond count is 1,769.  And
22 the aggregate penal sum of those bonds is $21,434,950.

---

**193**

1  Do you have reason to dispute those figures?
2      MS. PETERS: Object to form.
3  BY MR. HARRIS:
4      Q    And I'm sorry, if I didn't make that clear,
5  these are as of yesterday, these figures.  Okay?
6      A    Okay.
7      Q    And then the next box down is kind of that
8  exercise we did in court where we took the 717, which
9  is the total, so if we made that the denominator and
10 put first the number of paid bonds at 319, we're able
11 to determine the ratio at which we have a, the number
12 of bonds that are out of circulation, or are no longer
13 in force.  We're able to calculate the breach, what we
14 call the breach rate.  Okay.  Do you understand what
15 I'm comparing there?
16     A    I do.
17     Q    Okay.  So, similarly, when we were in
18 court, we gave you a figure of 38 percent.  It's the
19 same -- the formula's constructed in the same manner.
20 Okay?  Do you understand that?
21     A    Yes.
22     Q    And I'm representing that to you.  Okay?

**194**

1      A    Okay.
2          MS. PETERS: You're not asking if he agrees
3  with the ratios.
4  BY MR. HARRIS:
5      Q    No.  I'm not asking if you agree with the
6  methodology or -- I'm just representing to you I want
7  you to make sure you understand what I'm saying.
8      A    Yes.
9      Q    Okay.  Do you understand how, what I'm
10 saying, how we contract -- constructed those numbers?
11 Okay.  So I calculate, based on the 717
12 that are out of circulation, that 44 percent of them
13 fall into this category of they were breached and
14 ultimately paid, and that 56 percent -- the other
15 56 percent would be bonds that received an I-391
16 cancellation notice.  Do you understand that?
17     A    Yes.
18     Q    Okay.  Do you have a reason to dispute
19 those calculations?
20         MS. PETERS: Object to form.
21 BY MR. HARRIS:
22     Q    Putting math aside.  I mean --

**195**

1          MS. PETERS: Are you saying to put the math
2  aside, or did --
3  BY MR. HARRIS:
4      Q    Well, I'm not asking him to tell me if he
5  understands that 319 divided by 717 equals 44 percent.
6  But do you have a reason to dispute that, based on the
7  numbers here, math aside again, that 44 percent of the
8  bonds that are no longer in force have been breached
9  and paid --
10         MS. PETERS: Object to form.
11 BY MR. HARRIS:
12     Q    -- to date, or to yesterday's date?
13         MS. PETERS: Object to form, to the extent
14 it's asking him for information outside the scope of
15 his duties for the last year.
16 BY MR. HARRIS:
17     Q    Okay.  Do you have a reason to dispute
18 that?
19     A    I don't know what the numbers are.  I mean,
20 yeah, the math works.
21     Q    Well, do you have a separate knowledge that
22 out of the 717 that are no longer in circulation, that

**196**

1  44 percent of them have been paid?
2      A    I don't have any separate knowledge, no.
3      Q    Okay.  Does that number seem out of line
4  with your experience on this project, --
5          MS. PETERS: Object to form.
6  BY MR. HARRIS:
7      Q    -- the RLI-issued bonds program?
8      A    To, to the extent that I worked on it up to
9  a year ago it seems out of line, but I don't have any
10 knowledge of --
11     Q    What do you think it -- when we met in
12 court in November 2018, it was closer to 38 percent,
13 right?
14         MS. PETERS: Object to form.
15     A    That was what you presented, yes.
16 BY MR. HARRIS:
17     Q    Right.  And now it's increased to
18 44 percent.  Is that what you mean when you say it's
19 out of line with your experience?
20         MS. PETERS: Object to form.
21     A    It's definitely increased, yes.
22

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

---

197

1  BY MR. HARRIS:
2      Q    Okay.  Are you surprised that it's
3  44 percent?
4      A    Um, yeah, I'm surprised that – yes, I'm
5  surprised that it's 44 percent.  And I would have to
6  look at all those individual, all those individual
7  cases –
8      Q    Right.
9      A    – to see why they ended up there to be
10 able to speak about it, but –
11     Q    Would you or somebody else, to the best of
12 your knowledge, at Nexus be able to conduct an
13 exercise that would similarly divide the RLI bonds
14 into these three categories?
15     MS. PETERS:  Object to form.
16     A    You can do the math however you want it.
17 We wouldn't – we wouldn't limit it to cancelled
18 divided by paid and come up with a percentage.  I
19 mean, we could, sure.
20 BY MR. HARRIS:
21     Q    Right.  You could do this exercise that
22 we've done, right?

---

198

1      A    Yes.  Yeah.
2      Q    Okay.  And who at Nexus would be the best
3  person to count up these three totals here in the blue
4  box?
5      MS. PETERS:  Object to form.
6      A    That would probably be, be the person that
7  tracks them.  That would be Hazaar.
8  BY MR. HARRIS:
9      Q    Okay.  Anybody else in a position to do
10 that over at --
11     A    Evan is her supervisor.
12     Q    Okay.  But it's an exercise that Nexus is
13 certainly capable of doing.
14     A    Yeah, capable of doing, sure.
15     Q    And what records would Hazaar look at to
16 conduct that exercise?
17     A    Um –
18     MS. PETERS:  Object to form.
19     A    She would look at the I-391's, the 323's,
20 the –
21 BY MR. HARRIS:
22     Q    For the record, can you clarify what a 323

---

199

1  is?
2      A    A breach.
3      Q    That's the breach notice, right?
4      A    Yes.
5      Q    Okay.
6      A    She would have to look at the AP to see
7  what checks went out.  Um, but I don't see why – I
8  mean, that's what they would use, sure.
9      Q    Does Accounting, do you know if they keep
10 copies of the checks that were paid by Nexus or Libre?
11     A    I don't know.  I don't know what they do
12 over there.
13     Q    Okay.  And then I just wanted to -- well,
14 let me just check here.  So, based on my suspicion,
15 and I'm pretty certain this is sorted by column D,
16 which is the I-391 date.
17     A    Uh-huh.
18     Q    You can certainly look through it and tell
19 me if I'm -- maybe -- well, maybe it's not.  No,
20 it's -- never mind.  It's not.
21     A    I don't think so.
22     Q    Okay.

---

200

1      MS. PETERS:  Mr. Harris, does this chart
2  include refunds or rebates?
3      MR. HARRIS:  It does not.  Well, it -- I
4  don't know.  That's a good question.
5      MS. PETERS:  We've never been provided with
6  the rebates that your company has received.
7      MR. HARRIS:  Okay.  Well, I don't know what
8  that means, but I'll --
9      MS. KATSANTONIS:  If it had a rebate, it
10 wouldn't be on the paid list.
11     MR. HARRIS:  I'll address it with Mr. --
12 I'll address it with Mr. Schneider.
13 BY MR. HARRIS:
14     Q    Mr. Schneider, how many bonds, RLI bonds,
15 are you aware of that were entitled to a refund?
16     A    I don't have an exact number.  I know,
17 um -- I -- I absolutely can't give you client names or
18 anything.  I know of RLI bonds that were paid and then
19 subsequently the, the -- either the I-391 was issued
20 or possibly the AAO issued a -- or I mean the ERO
21 issued a reversal of the breach after it was paid, and
22 there are due -- by CRF, those are to be refunded.

---

Transcript of Erik Schneider
Conducted on February 20, 2020

---

201

1  That's something that, again, Breach Department could
2  provide.  And that's -- that's pretty, I'm not going
3  to say common, but it happens often enough where it's
4  a concern, where the government will -- we used to,
5  the company used to, actually receive checks back.
6  And sureties have received checks back.  The
7  government will send large checks back if something
8  was paid that was later reversed.
9      Q    When you used to receive the refunds, is
10 that because you paid a check directly to DHS?
11     A    Yeah, I believe a few years ago, when we
12 were, when we were younger, yeah, we paid directly to
13 DHS.
14     Q    DHS won't accept Nexus or Libre checks
15 anymore, correct?
16     A    I don't -- I believe so, but I don't know,
17 no.
18     Q    Didn't they advise that they would only
19 take a certified or cashier's check from Nexus or
20 Libre?
21         MS. PETERS: Object to form.
22     A    At one point we were sending certified

---

202

1  checks, yes.
2  BY MR. HARRIS:
3      Q    Is that because there was a check bounced?
4          MS. PETERS: Object to form.
5      A    I wasn't involved in that.  I mean, I don't
6  know what the actual reason was.  I never saw
7  anything.
8  BY MR. HARRIS:
9      Q    Okay.  Of all the RLI bonds, how many
10 refunds do you -- give me your best estimate of how
11 many times that the obligor or the payor of that bond
12 breach was entitled to a refund.
13         MS. PETERS: Object to form.
14     A    I have no idea in the last year.  Prior
15 to — prior to that, um, again, Breach Department
16 would be better to answer the question.  Prior to
17 that —
18 BY MR. HARRIS:
19     Q    Who would that be?  Hazaar?
20     A    Hazaar, yeah.
21     Q    Okay.
22     A    Prior to that, I know there was, there was

---

203

1  several.  But the, the number of refunds doesn't
2  equate to the dollar amount either.  I just, I don't
3  know.
4      Q    So some of the sources of refunds would be
5  mitigation of a breach invoice, right, if you --
6      A    Yes.
7      Q    -- delivered somebody early, or delivered
8  somebody back early, right?
9      A    Yes.
10     Q    A successful bond breach appeal to the DHS
11 Administrative Appeals Office, right?
12     A    Yes.
13     Q    Okay.  What else would entitle --
14     A    The ICE officer reversing the breach.  The
15 ICE officer in the field office has the authority to
16 rescind a breach, and re-issue an I-340 or just let it
17 go.  They can do whatever they want.  That's probably
18 the most common reason would be an ICE officer, you
19 know, reversing a decision.
20     Q    Okay.  And is there a form that they use to
21 advise --
22     A    No, we'd usually --

---

204

1      Q    -- the payor?
2      A    -- hear about it through -- I'm sorry.  I'm
3  talking over you.
4      Q    That's all right.
5      A    My apologies.  Long day.  We would usually
6  hear about it through Jody or Chris.  I mean, Vermont
7  would say, This has been turned over.
8      Q    So there would be some documentation coming
9  to you.
10     A    No.  I can think of one instance, again, I
11 can't provide you a check number or anything, but I
12 can think of one instance where a check just magically
13 shows up.
14     Q    All right.  So in the instance where you've
15 mitigated a breach, the refund comes back and you pay
16 a little bit less, right?  Either a 33-percent
17 reduction -- well, 66-percent reduction, 50-percent
18 reduction, or a 30-percent reduction?  Is that right?
19     A    Right.  But that -- that's correct, but
20 that wouldn't happen, because we wouldn't have had to
21 pay anything, because we would've turned the person
22 in.  So they, they reduce the amount that you have to

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

52 (205 to 208)

205

1 pay.

2 Q Oh, right. So that doesn't create a
3 refund.

4 A That doesn't create a refund, no.

5 Q So it's either the ICE officer in the field
6 makes a decision, or you prevail on the appeal in
7 DHS's AAO, right?

8 A Yes.

9 Q Now, most of the time when you prevail on
10 an AAO appeal of a bond breach determination, the bond
11 goes back in force, right?

12 MS. PETERS: Object to form.

13 A It -- the bond -- yeah. Well, they can --
14 they have the option to cancel the bond or to put it
15 back in force. I guess it's fair to say most of the
16 time the bond -- I don't know the number. It's -- it
17 might not be very far off of 50/50. It's not -- when
18 you say most of the time, it's not like 90 percent of
19 the time the bond goes back in force. I don't
20 really -- I don't really have that number.

21 BY MR. HARRIS:

22 Q If our records were to show that RLI bonds

206

1 that received a breach notice had never received a
2 cancellation, would you dispute that?

3 MS. PETERS: I'm sorry. Can you repeat
4 that?

5 BY MR. HARRIS:

6 Q If RLI were to come in and testify that
7 based on its records, no bond that ever received a
8 breach notice has yet received an I-391 Notice of
9 Cancellation, would you have any data to dispute that?

10 A Yeah, I think just recently we had a bond
11 that had breached, and 268 days after -- and it was an
12 RLI bond -- I think it was 268 days after the invoice
13 date, they finally cancelled the bond. So I know of
14 that recently, but I don't have that with me.

15 Q It's all right. Can you -- 268 days after
16 what?

17 A It was 200 -- it was after, after the
18 invoice due date, 268 days after the invoice due date,
19 which means it had been breached, --

20 Q Yeah.

21 A -- so probably close to 300 days after the
22 breach, the ERO, or DHS actually cancelled. Sent an

207

1 I-391.

2 Q And that was an RLI bond?

3 A That was an RLI bond. That was --

4 Q Okay. When did that happen?

5 A That's something Hazaar would have the
6 information of. Talk to her. That was recently, past
7 two months maybe.

8 Q Okay. So after you were in the Risk?

9 A After I was, yeah, out.

10 Q Do you know how Hazaar was advised of that?

11 A I don't.

12 Q Okay. But she told you that?

13 A Yeah, she told me that.

14 Q Did she send you an Email?

15 A No.

16 Q Okay. And we talked at your, at one of the
17 hearings that we've done in this case, I don't
18 remember which of the two, about successful appeals of
19 RLI bonds. And I think I said, you know, did you have
20 knowledge that there were more than one, two, or three
21 appeals that were successful on RLI bonds?

22 A I don't know what the appeal numbers are.

208

1 It wasn't -- it wasn't a very high number back then,
2 but a year has passed since then, and I have no idea
3 what the numbers are.

4 Q Okay. How many successful appeals of RLI
5 bonds -- what would be your best estimate of how many
6 RLI bonds breach notices have been successfully
7 appealed?

8 A I can't give you a best estimate. I don't
9 know. I'm doing a lot of guessing today, and I
10 just -- I want to stop guessing.

11 Q Who would be the best person to know that
12 information?

13 MS. PETERS: Object to form.

14 A That would be the Breach Department.
15 Hazaar.

16 BY MR. HARRIS:

17 Q Hazaar?

18 A Yeah.

19 Q Okay. Can you estimate by a range one to
20 ten?

21 MS. PETERS: Object to form.

22 A It's been an extremely long amount of time,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

53 (209 to 212)

209

1  and a lot of appeals have gone in.  I can't.  I'm not
2  trying to be difficult.  I can't.  I haven't dealt in
3  that.
4  BY MR. HARRIS:
5      Q    Do you have a perception of what the
6  percentage of appeals of Nexus program participant
7  bond breaches are successful?
8          MS. PETERS:  Object to form.
9      A    I haven't dealt in that in a long time.  I
10 don't have a perception of the percentage.  I just
11 haven't been paying -- I haven't been involved in it.
12 BY MR. HARRIS:
13     Q    Who at Nexus would have the best handle on
14 that do you think?
15         MS. PETERS:  Object to form.
16     A    Same -- same answer.  The person who runs,
17 is doing Breach.
18 BY MR. HARRIS:
19     Q    Hazaar?
20     A    Hazaar, right.
21     Q    Okay.  We talked a little bit at one of
22 your hearings, I think it was actually on your

210

1  affidavit, you used the term humanitarian reasons for
2  allowing a bond to breach I guess?
3          MS. PETERS:  Object to form.
4  BY MR. HARRIS:
5      Q    Is that fair?
6          MS. PETERS:  Object to form.
7      A    Yeah, I used that term.  Yeah, I remember
8  that.
9  BY MR. HARRIS:
10     Q    Okay.  What -- can you elaborate on when
11 that humanitarian circumstance would exist that you
12 testified to?
13         MS. PETERS:  Object to form.
14     A    I need a question.  I mean, I can't just
15 elaborate, or we'd be -- I can talk all day.
16 BY MR. HARRIS:
17     Q    Well, Nexus -- Nexus does, in fact, elect
18 to allow bonds to breach sometimes, correct?
19         MS. PETERS:  Object to form.
20     A    No, that's a mis -- either I misstated or
21 it's a mischaracterization of it.  It is up to the
22 bondsman, the person who puts their power of attorney

211

1  up, they decide whether or not a bond's going to be
2  paid.  We -- we, the company, I just say "we," our job
3  is to indemnify the bondsman.  We don't -- it's their
4  bond.  We don't post the bonds.
5  BY MR. HARRIS:
6      Q    Well, you monitor the immigrants with GPS
7  monitoring, right?
8      A    Right.
9      Q    You escort them to the hearings.
10     A    Right.
11     Q    Right?  And that's all designed to mitigate
12 bond breaches and loss, right?
13     A    Right.
14     Q    Okay.  So you do undertake to make sure
15 that the program participants show up, right?
16     A    Right.
17     Q    Okay.  Including in response to a Notice to
18 Deliver on the bond, right?
19     A    Right.
20     Q    Okay.  And it's that -- that's what allows
21 you to maintain a low failure rate, right?
22         MS. PETERS:  Object to form.

212

1      A    Yeah, mitigating risk is a good way to put
2  it, yes.
3  BY MR. HARRIS:
4      Q    Okay.  So, how often does Nexus decide not
5  to undertake to ensure that a program participant
6  shows up in response to a Notice to Deliver?
7          MS. PETERS:  Object to form.
8      A    We never ignore — I mean, Nexus never
9  decides not to try to help a program participant.
10
11 BY MR. HARRIS:
12     Q    Okay.  Well, that was not my question.
13     A    Maybe I don't understand your question.
14     Q    How often does Nexus, and to the best of
15 your knowledge, how often has Nexus elected not to
16 attempt to ensure that a program participant did not
17 appear at their hearing?
18         MS. PETERS:  Object to form.
19         MR. HARRIS:  Did I put too many negatives
20 in there?
21         MS. PETERS:  Object to form.
22

---

**213**

1  BY MR. HARRIS:
2      Q      How often does Nexus --
3      A      **Nexus --**
4      Q      -- has Nexus elected not to ensure that
5  somebody appears as demanded in a Notice to Appear?
6          MS. PETERS:  Object to form.
7      A      **Nexus never elects --**
8  **BY MR. HARRIS:**
9      Q      Notice to Deliver.  I'm sorry.
10          THE REPORTER:  I'm sorry?
11  BY MR. HARRIS:
12     Q      Notice to Deliver.  I'm sorry.
13          MS. PETERS:  I'm going to object to the
14  form of the question.
15     A      **Nexus never elects to ignore a Notice to**
16  **Deliver, or elects to not assist a client.**
17  **BY MR. HARRIS:**
18     Q      So do you recall your testimony about a
19  humanitarian reason to, for a bond to be breached?
20          MS. PETERS:  Object to form.  Misstates his
21  prior testimony.
22

---

**214**

1  BY MR. HARRIS:
2      Q      If I recall -- do you recall whether you
3  gave testimony about a humanitarian reason for bonds
4  breaching?
5      A      **Yeah, I recall that testimony, but what**
6  **was --**
7      Q      What were you trying to say there?
8      A      **Those decisions are not made in a vacuum.**
9  **What I didn't say there, and I should have, what I**
10  **didn't say there is that the surety, the bondsman is**
11  **the one that has the ultimate authority whether or not**
12  **the bond is going to be paid or they're going to hire**
13  **a bail enforcement agent.  We provide services in**
14  **monitoring and mitigating.  We track the client.  But**
15  **it's not my decision, I'm not the person on the power**
16  **of attorney from the surety.  It's the bondsman's**
17  **ultimate decision whether a bond's going to be paid,**
18  **and then Nexus indemnifies that.  That's -- that's how**
19  **it works.**
20     Q      So in the RLI-Nexus relationship, are you
21  referring to Big Marco who would be making those
22  decisions?

---

**215**

1      A      **Yes.**
2      Q      So to the extent that a decision was made
3  for humanitarian reasons not to ensure the appearance
4  of a program participant at a -- in response to a
5  Notice to Deliver, that would be a decision made by
6  Big Marco?
7          MS. PETERS:  Object to form.
8      A      **In conjunction with Big Marco.  He has the**
9  **ultimate decision.**
10  BY MR. HARRIS:
11     Q      Who's the other people in conjunction with
12  Big Marco making that decision?
13     A      **The owners of my company have that ultimate**
14  **decision.**
15     Q      Okay.  Do the owners of your company
16  document their discussions with Big Marco regarding
17  those kind of cases?
18     A      **I can't answer that.  I don't know what**
19  **they do.**
20     Q      Do you have an idea of the volume of bonds
21  that have had that kind of a decision made?
22     A      **It's -- no, it's -- even then would have**

---

**216**

1  been above my --
2      Q      Okay.  So you can't quantify the extent to
3  which a bond was allowed to breach for humanitarian
4  reasons.
5          MS. PETERS:  Object --
6  BY MR. HARRIS:
7      Q      And by that -- and with that question, I
8  mean RLI bonds.
9          MS. PETERS:  Object to the form of the
10  question.  Allowed to breach meaning, are you saying
11  the program participant's decision to fail to appear?
12  I'm not sure what you're asking by the words "allowed
13  to breach."
14  BY MR. HARRIS:
15     Q      Do you understand my question, sir?
16     A      **Well, we never -- we don't have the ability**
17  **to allow something to breach.  But I can't quantify**
18  **the number of RLI bonds to where there was a decision**
19  **to pay the bond.  Now, I testified to this in court,**
20  **and I -- you've got to understand, I've -- talking**
21  **about immigration laws, talking about bail bonding,**
22  **I've been in the industry, I was in the industry for**

217

1  15 years. And it is common practice, you can talk to
2  bail bondsmen, they'll sit in their office and they'll
3  say, We'll just pay that one. Don't -- don't bother
4  going after it. It's too much trouble. We'll just
5  pay the bond. That's -- I'm not talking about us.
6  I'm just talking about the industry, because I know
7  that we talked about the industry. It's a -- it's
8  a -- so, it's a business decision in many cases.
9      Q    But that testimony you gave in court and in
10 your affidavit, that was supposed to be confined to
11 criminal bail bonds? Is that what you're saying?
12         MS. PETERS: Object to form.
13     A    No, but in my testimony we brought it that
14 direction when you were talking about my experience.
15 BY MR. HARRIS:
16     Q    So, I think you said no. So that testimony
17 was designed to address immigration bonds?
18         MS. PETERS: Object to form.
19     A    Well, the testimony was -- I'd have to look
20 at the transcript of what -- I know that we went into
21 the range where I was talking about the industry
22 practices. I think you were hammering me on

218

1  humanitarian, which was probably not the best word to
2  use, but we were running out of time that day and it
3  was going back and forth pretty quickly. But we were
4  talking about standard practices of deciding whether
5  or not to pay a bond, and whether or not it was our
6  decision, as Nexus's decision, to decide whether or
7  not a person got remanded. And it's not. It's the
8  surety's decision, but it's also a business decision.
9  And I know that Judge Urbankski disagreed with me. I
10 remember him yelling at me. But, um -- but I've seen
11 many bondsmen in that situation decide not to remand
12 somebody.
13 BY MR. HARRIS:
14     Q    Who told you that the bondsman has the
15 authority to make that decision?
16     A    It's just been my experience over years and
17 years and years of doing it. I don't know that
18 anybody told me the bondsman has that authority to
19 make the decision.
20     Q    That's just based on your experience?
21     A    I know it's their, it's their bond.
22 They're on the power of attorney. I -- you know,

219

1  maybe Colorado experience is different than -- I mean,
2  that's just the way it's always, it's always been. I
3  know in my experience in Colorado, going to court,
4  seeing a judge sitting on the bench saying -- you
5  know, when a, when a bondsman is doing whatever
6  they're doing, the same thing to mitigate the loss on
7  the bond, there's been many a judge sitting on the
8  bench say, You have to pay. It's the money or the
9  body. It's the money or the body. I've seen judges
10 say that. So that's where --
11     Q    You're relying on your experience for those
12 comments, right?
13     A    Yes. Yes.
14     Q    Okay. Are you relying on anything else
15 than your experience?
16     A    No.
17     Q    Okay. How many times has Nexus advised RLI
18 of a decision to allow a bond to breach?
19         MS. PETERS: Object to the form of the
20 question, and the terminology "allow the bond to
21 breach."
22         MR. HARRIS: That's fine. It's noted.

220

1      A    Yeah, I've said a couple of times that
2  that's not the case. But I don't -- I have no idea
3  about conversations between RLI and Nexus about that.
4  BY MR. HARRIS:
5      Q    Are you aware of RLI ever participating in
6  a decision to allow a bond to breach?
7          MS. PETERS: Object to the form of the
8  question to the extent it mis -- the question itself
9  misstates his prior testimony.
10     A    My personal knowledge? No.
11 BY MR. HARRIS:
12     Q    Okay. You certainly never communicated any
13 discussions that may have been had with Big Marco
14 regarding a decision to allow a bond to breach?
15         MS. PETERS: Object to the form of the
16 question. Counselor, you have to stop asking the
17 when-did-you-stop-beating-your-wife questions.
18         MR. HARRIS: Mary Donne, you can make your
19 objection on the record every time.
20         MS. PETERS: It's just not fair.
21         MR. HARRIS: You're making your record.
22 You don't need to keep --

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

56 (221 to 224)

221

1          MS. PETERS:  It's not fair, Mr. Harris.

2          MR. HARRIS:  Don't tell me how to ask my

3   questions.

4          MS. PETERS:  It's not fair.

5          MR. HARRIS:  The witness clearly

6   understands what I'm asking.

7      A    It wouldn't have happened because we didn't

8   allow a bond to breach.  But it also wouldn't have

9   been my job to talk to RLI about it.  It would have

10  been the surety's job to talk to RLI about it if there

11  was a --

12  BY MR. HARRIS:

13     Q    Well, RLI is the surety, right?

14     A    Well, the bondsman.  Excuse me.

15     Q    Right.  I mean, you understand the

16  distinction?

17     A    Yes.  Words matter.

18     Q    Right.

19     A    Got ya.

20     Q    So in this relationship, RLI is the surety.

21     A    Yes.  It would be the bondsman's.

22     Q    And Big Marco is the bondsman, correct?

222

1      A    Yes.

2      Q    Okay.  And as far as you know, did RLI ever

3   participate in a decision to allow a bond to breach?

4          MS. PETERS:  Object to the form of the

5   question, misstates his prior testimony.

6          MR. HARRIS:  I'm not suggesting he said

7   anything.  I'm asking a question if he knew if RLI

8   ever participated in a decision to allow a bond to

9   breach.

10         MS. PETERS:  Can we agree that the prefix

11  to his answer, when you ask the question as you just

12  did, will always restate his sentence "we didn't make

13  the decision on whether to allow a bond to breach."

14         MR. HARRIS:  Mary Donne, you're testifying

15  for the witness.

16         MS. PETERS:  I'm trying to have a clear

17  record, Mr. Harris.  Because at some point you keep

18  asking the question in a way that is objectionable,

19  and you will specifically point to a place way down

20  the transcript --

21         MR. HARRIS:  You have to make your

22  arguments based on your objections.  Can we proceed,

223

1   please?

2      A    I have no knowledge of any conversations

3   that I didn't have.

4   BY MR. HARRIS:

5      Q    Okay.  Well, that's not really an answer to

6   my question.

7          MS. PETERS:  Object to the form.

8   BY MR. HARRIS:

9      Q    Are you aware of a discussion with RLI

10  regarding a decision to allow a bond to breach?

11     A    No.

12         MS. PETERS:  Object to the form of the

13  question, misstates prior testimony.

14         MR. HARRIS:  Did you get his answer?

15         THE REPORTER:  He said, "No."

16         MR. HARRIS:  Thank you.

17  BY MR. HARRIS:

18     Q    Are you able to say for any time period how

19  many RLI bond principals have had a master hearing

20  scheduled?

21     A    I — I don't know that number.

22     Q    Are you able to say how many RLI bond

224

1   principals have attended a master hearing?

2      A    No.

3      Q    Is it -- would it be possible for you to

4   find that out based on the records that Nexus has?

5      A    Attended a master hearing.  If we got --

6   it's a number -- I didn't prepare that.  I had no idea

7   that that was coming.  I mean, if, if we got notice of

8   a master hearing, there would be a note in Capsule

9   that the client had a master hearing, and if they

10  attended, their case would still be going, because if

11  they didn't attend, they would have been breached,

12  right?  So, I mean, it's possible through the Capsule

13  files, it's possible through the files I turned over

14  that you can figure that number out.

15     Q    Okay.  As you sit here today, do you know

16  whether you'd be able to determine from the Capsule

17  documents, or any other records that Nexus has,

18  whether or not -- or the amount of RLI bond principals

19  who have attended their master hearing?

20         MS. PETERS:  Object to form.

21     A    Isn't that the same -- that's the same

22  question.  Yes.  I mean, you could look -- if we were

225

1 notified of a master hearing and the notes were sent
2 to Capsule --
3 BY MR. HARRIS:
4    Q    Well, you said -- sorry.
5    A    Right, because --
6    Q    Well, do you think that you have enough
7 records to be able to answer that definitively is my
8 question.
9        MS. PETERS:  Object to form.
10   A    I'd have to -- I have not reviewed all 2400
11 records.  I don't know.  It should be -- it should be
12 in there.
13 BY MR. HARRIS:
14   Q    It would be in Capsule.
15   A    Yes.
16   Q    Okay.  Would it be recorded anywhere else
17 whether they attended their master hearing?
18   A    No.  Everything is recorded in Capsule.
19   Q    Okay.  So, taking you back to your -- well,
20 one second.
21        So we discussed a little bit earlier today,
22 and more at length at your last sitting for the

226

1 30(b)(6) deposition, the risk mitigation strategies
2 that Nexus employs to, I guess, try to hit that low
3 failure rate, right?
4    A    Uh-huh.  Yes.
5    Q    And try to keep the loss down below five
6 percent?
7    A    Yes.
8    Q    Okay.  And I think we talked about -- well,
9 one thing you said to me was risk management is crisis
10 management.  Do you recall that?
11   A    It is, yes.
12   Q    Okay.  And you said, you know, those
13 clients are in crisis, and predictably they will stop
14 answering phones or checking in?  Is that true today?
15   A    I would assume it's true.  People are
16 people, and --
17   Q    Okay.  So, the, kind of the three things
18 that we had talked about from my read, and you can add
19 to them certainly, but the risk mitigation strategies
20 were that you maintain contact with bond principals
21 through well-trained people, right?
22   A    Yes.

227

1    Q    You use the GPS monitoring, right?
2    A    Yes.
3    Q    Okay.  And then we also discussed a
4 screening process that you use, right?
5    A    Yes.
6    Q    Okay.  Does that kind of cover the gamut of
7 risk mitigation strategies that Nexus relies on?
8        MS. PETERS:  Object to form.
9    A    Um, there are -- no.  I mean, there's --
10 there's -- there's numerous other methods.  I guess
11 they would fall under keeping contact with a person.
12 But we have a relationship with Nexus Derechos
13 Humanos.  There used to be Nexus Caridades.  The
14 company funded the pro bono legal clinic.  And when,
15 when people have good legal representation, they're
16 much less likely to panic and flee.  And the pro bono
17 legal is a huge, huge tool for keeping people from
18 crisis.
19 BY MR. HARRIS:
20   Q    So that's something Nexus provides?
21   A    That's something Nexus funds.  They're a
22 standalone legal firm, even though they have Nexus

228

1 Derechos Humanos in the title, they're -- no one from
2 the company that you're discussing, Mike, Rich, all of
3 them, is part of that company.  But Nexus does fund
4 them.
5    Q    A hundred percent?
6    A    No, not a hundred percent.  They take on,
7 they take on civil rights issues, and they'll roll
8 like -- if you Google, I hate to say Google, but
9 that's what everybody uses.  If you Google them,
10 they've won some huge cases in hepatitis in prisons.
11   Q    So the funding for that comes from where?
12        MS. PETERS:  Object to form.
13 BY MR. HARRIS:
14   Q    That was my question.  Nexus didn't provide
15 a hundred percent funding, and you told me about some
16 of those cases.
17   A    Well, their, their, their settlements.  As
18 I understand it, --
19   Q    Okay.
20   A    -- their settlements will roll back to the
21 client, and then those go back in to help
22 more litigants.

229

1    Q    Okay.  Putting aside recoveries in those
2 suits, is there any other source of funding as far as
3 you know --
4    A    I don't know.
5    Q    -- for the Nexus-based law firms?
6    A    Yeah, I don't know.  Well --
7    Q    Or Nexus-funded.  I'm sorry.
8    A    Nexus, yeah, sponsored.
9    Q    We'll call them Caridades.
10    A    Yeah.  They're not Nexus-based, because
11 Nexus doesn't have any oversight of them.
12    Q    Fine.  I understand how you described it
13 earlier.  We don't need to --
14    A    Yeah.  Well, I just want to be clear on
15 that, because I don't want --
16    Q    No, I understand.
17    A    You know, they're wholly independent, but I
18 don't know if there's any other --
19    Q    Do you know the lawyers who have worked for
20 Caridades or Humanos?
21    A    Well, I know Mario Williams is in charge of
22 Derechos Humanos now.

230

1    Q    Jessica Sherman Stoltz used to be an
2 attorney?
3    A    Used to be an attorney with Caridades.
4    Q    Wasn't she a managing partner?
5    A    I have no idea.
6    Q    Okay.  What about John Shorman, did he work
7 for Caridades or --
8    A    No, John never worked for Caridades.
9    Q    What about Humanos, Derechos Humanos?
10    A    I don't -- I don't know.  I don't think so,
11 but I, I don't know.  I know he works with Mario a
12 lot, but I don't know what their business relationship
13 is.
14    Q    Okay.  So I want to talk about these risk
15 mitigation strategies.  In terms of maintaining
16 contact, would you agree that being able to locate the
17 bonded principals is important to minimizing the risk
18 of bond loss?
19    A    Of course.
20    Q    Okay.  So conversely, the risk of a bond
21 breach goes up if you can't locate the bond principal,
22 right?

231

1         MS. PETERS:  Object to form.
2    A    It depends on what period of time you're
3 talking about can't locate, --
4 BY MR. HARRIS:
5    Q    Okay.
6    A    -- and where they are -- this is a real
7 answer.
8    Q    Yeah.
9    A    Depends on what period of time you can't
10 locate them and where they are in the lifecycle of
11 their case.  We -- we -- and I testified to this
12 before, we will lose contact with people, and continue
13 to go to their houses and knock on Mom's door, and
14 you, you -- people will come back.  You know, once
15 they're comfortable with you, they will -- I have lost
16 contact with bonded principals for a month.
17    Q    Right.
18    A    And then they just call in, or you go to
19 the house when they happen to be there, and they're
20 sheepish and they're ashamed that they didn't call,
21 but they're not bad people.  And then -- and things
22 will be wonderful for six months, and then we may lose

232

1 them again.  But those are the people that you never
2 ultimately lose because you have that relationship and
3 that trust.  The people -- the people that you lose --
4 the other thing you have to understand about the
5 lifecycle of an immigration bond, and it's similar to
6 criminal, there's a bubble at the front.
7    Q    Uh-huh.
8    A    When people are first bonded, their
9 character is going to show.
10    Q    Uh-huh.
11    A    People -- and especially, this is
12 especially with these RLI bonds.  And this is why your
13 forecast based on the, based on the numbers of
14 cancelled versus breached in your forecast, a lot of
15 those people when they first get released, what
16 they're going to do is what they're going to do.  The
17 people that are in the pipeline now are people that
18 have a vested interest in their case.  They've got
19 legal help.  They've been to a -- they've necessarily
20 been to a couple of hearings so far.  An immigration
21 court is a court of benefits.  It's not a court of
22 punishment.

---

233

1    Q    Uh-huh.
2    A    So they know, they know what's waiting for
3    them at the end and the worst that's going to happen.
4    So those people tend, when we're going to talk about
5    forecasting and tendencies, those people tend to stay
6    the course. Your, your big bubble that you saw there
7    is also probably people that had a problem early on in
8    the bond. When they mature -- so -- so to boil it
9    down to losing contact with somebody definitely
10   increases the risk of a breach, the reason I say
11   that's not true is because every individual situation
12   is different. That's why I have good people in the
13   field, --
14   Q    Sure.
15   A    -- or had, I don't manage them anymore.
16   That's why Nexus has good people --
17   Q    Well, you --
18   A    -- in the field that, that stay on them.
19   Q    Right.
20   A    It's a long answer, but it's an important
21   answer.
22   Q    Well, you inserted the word "definitely,"

234

1    and I don't think I was really trying to pin you down
2    on an every case basis, right?
3    A    I understand that.
4    Q    I think generally speaking, there are
5    factors that would certainly allow you to predict some
6    bond principals are more likely to breach than others,
7    right?
8    A    Yes.
9    Q    As a general proposition we can agree on
10   that, right?
11   A    Yes.
12   Q    Okay. One factor would be you can't find
13   them, they're gone, it's been six months, it's been a
14   year. Wouldn't you agree with me that that would make
15   somebody more likely to breach?
16   A    It's been a --
17        MS. PETERS: Object to form.
18   A    It's been a year, possibly, yeah.
19   BY MR. HARRIS:
20   Q    Six months of no contact would also
21   increase the likelihood, right?
22   A    That might be the beginning of that delta.

235

1    Okay?
2    Q    Okay. So, what about somebody who
3    doesn't -- you talked about a bubble, right?
4    A    Uh-huh.
5    Q    How long does that bubble -- is that -- is
6    there -- can you give me a thumbnail on time-wise how
7    long that bubble lasts?
8    A    Um, well, it's a bub -- RLI is no longer
9    indemnifying bonds, so that bubble is going to stay --
10   Q    Let's talk about -- I'm just saying from
11   one bond. How long is that bubble where you're about
12   to, you know, where something happens or doesn't
13   happen?
14   A    Between -- between bond and master hearing.
15   Q    And how long does that take?
16   A    It takes as long as the government wants.
17   I mean, it's not a snide answer. I mean, usually one
18   to three months.
19   Q    One-and-half months? Okay.
20   A    You know, sometimes their master hearing is
21   almost immediate. But let me, let me, let me
22   pontificate first, let me tell you this, sometimes you

236

1    have a master hearing that takes place a week after
2    they're bonded out, but the master hearing is at the
3    facility they were bonded from, which they're legally
4    barred from re-entering.
5    Q    Uh-huh.
6    A    So they necessarily end up missing that
7    hearing, getting an I-340, and that's a situation
8    where with Nexus, we -- the Nexus employee takes them
9    into the ERO and explains this, and they get another
10   master hearing date, where the person who doesn't have
11   Nexus -- and I know it doesn't matter, because RLI
12   didn't post those bonds -- doesn't get that benefit
13   and they end up being remanded for something that they
14   couldn't, couldn't control. So when you say how long
15   does a bubble last? I mean, I know you understand
16   that there's moving goal posts, --
17   Q    Yeah, sure. We're talking law of averages.
18   A    -- yeah, their master hearing's within the
19   first three months.
20   Q    Okay.
21   A    That's why I said the clients that have
22   matured past that point are much lower risk than the

---

237

1 clients that already passed that time.

2     Q     So not attending the master hearing would

3 be another factor kind of like losing somebody for six

4 months or a year that would increase the likelihood of

5 a bond breach.

6         MS. PETERS:  Object to form.

7     A     **Right.  It would -- it would increase the**

8 **likelihood of a bond breach, but not the likelihood of**

9 **an ultimate loss.  Does that make sense?**

10 BY MR. HARRIS:

11     Q     Sure.  And we don't need to go there.  I'm

12 just interested in breaches at the moment.

13     A     **Got ya.**

14     Q     What about not paying according to the

15 lease agreement?  Would that indicate to you an

16 increase in the likelihood of a bond breach?

17         MS. PETERS:  Object to form.  It's not a

18 lease agreement.  It's a master services agreement.

19 BY MR. HARRIS:

20     Q     So, there's an agreement that clients are

21 to pay a monthly fee.  Are you aware of that?

22     A     **Yes.**

---

238

1     Q     Okay.  What do you want to call that?

2 Counsel's calling it a master services agreement.  Do

3 you want to call it that?

4     A     **Sure.  Yes.**

5     Q     Okay.  Is not paying the monthly fees on a

6 master services agreement, to a risk manager like

7 yourself, would that increase the likelihood, in your

8 mind, on average, that the program participant was

9 likely to breach?

10     A     **In my experience, it has no bearing on**

11 **whether or not they're going to breach.  There have**

12 **been clients that have never been able to pay, you**

13 **know, and -- but they still will go to their -- they**

14 **will still go to their court and they will still, you**

15 **know, they get pro bono legal, but they're, they're an**

16 **immigrant from another country.  They don't have a lot**

17 **of opportunity at that point.**

18     Q     Do you have any idea what percentage of RLI

19 bond principals are asylum seekers?

20     A     **I don't.**

21     Q     Okay.  What about on the program over a

22 whole?  Do you have any -- can you even give a range

---

239

1 as to how many --

2     A     **I can't --**

3     Q     -- bond principals -- sorry -- are asylum

4 seekers?

5     A     **Sorry.  I can't.  I don't know.  It's not**

6 **something I ever tracked.**

7     Q     Who would have that information?

8     A     **Capsule.**

9     Q     Okay.  Where would that be in the Capsule

10 documents?

11     A     **At the beginning of the, the file, when,**

12 **when the CEM is taking the information, it's one of**

13 **the bullets that they try, information that they try**

14 **to get, is why, why are they here.**

15     Q     Okay.  The scoring sheet?

16     A     **It would be -- yes, actually -- I forget if**

17 **it was on the scoring sheet.  It's on the intake form.**

18 **Yeah.  You're calling the scoring sheet the intake**

19 **form.**

20     Q     Second page of the -- I think there's a

21 cover page, and then the second page that has

22 checkmarks and boxes.  That's what I'm calling a

---

240

1 scoring sheet.

2     A     **No, I don't -- I don't know if asylum is on**

3 **there.  It's on the actual application form.**

4     Q     Okay.  Okay.  Well, we'll look at that.

5     A     **Yeah, it's in there.**

6     Q     Okay.  How many RLI bond principals were

7 fitted with a GPS monitoring device at any time?

8         MS. PETERS:  Object to form.

9     A     **I -- I don't have that number.  Um, all --**

10 **when I -- when I was doing Risk Management, we**

11 **didn't -- it's a -- that's a Libre thing.  Libre, the**

12 **CEMs, the intake, that's where the decision -- when**

13 **they're picked up by a transportation agent and**

14 **they're brought to an office, that's when they get a**

15 **GPS installed.**

16 BY MR. HARRIS:

17     Q     Uh-huh.  Well, does everyone get --

18     A     **At the time -- everyone -- everyone -- at**

19 **the time, everyone got a GPS.  There was a $5,000 --**

20 **$4,999 limit.  There was a -- there was a -- if it was**

21 **$4,999 and below, it was based on their score, on**

22 **their risk score.**

241

1    Q    What's the 499,000?
2    A    If their bond amount.  If they had a $5,000
3  bond and up, they got a GPS.
4    Q    Oh, I got ya.  Okay.
5    A    If their bond amount was 5,000, 10,000
6  15,000, 7500, they got -- they just got a GPS.
7    Q    Okay.
8    A    If the bond amount -- sometimes people will
9  get out with a $2500 bond, because they just -- you
10  talk about charges, they just -- you know, you might
11  have somebody who's been in the country for 30 years,
12  they're 55 years old.  They just don't have their
13  papers.  They've got a business.  The judge might give
14  them a $1500 bond.  That person did not get a GPS, but
15  their risk was so low.  This is the first time -- has
16  a house and has lived in their city for 20 years, they
17  didn't get a GPS.  But bonds that were higher than
18  that, it was automatic.  So I would have to look at
19  the bond amounts from them to give you an idea.  I
20  know that 5,000 and below wasn't the -- I mean, you
21  could probably sort that by bond amount.  That doesn't
22  mean a 5,000 and below didn't get a GPS.

242

1    Q    Okay.
2    A    Some of them would depending on their risk
3  factor, but it was -- that was the factor.  But I
4  can't give you a number, but the majority of them.
5    Q    In your role as VP of Risk, didn't you have
6  a role in determining -- or did you have a role in
7  determining which candidates for a bond would be
8  requested from a surety?
9        MS. PETERS:  Object to form.
10    A    It had no role in which would be -- I don't
11  understand what you mean by requested from a surety.
12  BY MR. HARRIS:
13    Q    Well, who would make the determination as
14  to whether or not to request a bond on behalf of the
15  particular bond, bonded principal?
16    A    You mean to approve a bond --
17    Q    No.
18    A    -- to be --
19    Q    So let me ask it a different way.
20        MS. PETERS:  I don't understand your
21  question.
22    A    Yeah.

243

1        MR. HARRIS:  That's all right.  I'm going
2  to ask it a different way.
3  BY MR. HARRIS:
4    Q    Okay.  So, does -- how does Nexus go about
5  identifying candidates for their program?
6        MS. PETERS:  Object to form.
7    A    Well, you're asking how the program works.
8  BY MR. HARRIS:
9    Q    No.  Just how they identify people.
10        MS. PETERS:  Object to form.
11    A    Friends or family would call our call
12  center.
13  BY MR. HARRIS:
14    Q    Okay.
15    A    And they would say -- I'm going to do it in
16  the narrative form, because that's the -- friends or
17  family would call the call center.  A CEM would answer
18  the phone.  They'd say, My cousin, my friend, my
19  employee, got picked up by ICE and they're in
20  such-and-such facility.  The CEM takes the
21  application.  They ask all the questions.  Do they
22  have sponsors, you know, multiple sponsors,

244

1  references?
2    Q    Uh-huh.
3    A    Because we want to make sure there's people
4  that know this person that we could call in case we
5  couldn't get ahold of them.
6    Q    Sure.
7    A    You know, all the basic questions you can
8  imagine.  Are they working?  How long have they been
9  here?  Were there charges?  Do they have any criminal
10  charges, so on and so forth.  That all goes into the
11  risk analysis.  That is -- that's a Libre Operations
12  function.  I had no -- that's -- that's how the
13  potential clients are identified, but I didn't have
14  any say-so as to whether or not those --
15    Q    Does someone at Nexus make a determination
16  as to whether or not they will request a bond on
17  behalf of a particular candidate?
18    A    Yeah.
19        MS. PETERS:  Object to form.
20    A    Right now, I mean, that would be David See
21  or Nina Erlandson, the supervisors of that.

245

1  BY MR. HARRIS:
2     Q    Okay.  Do you know, or do you have an
3  understanding as to whether Nexus ever declines a
4  request for a bond?
5     A    I -- I don't, because that wasn't
6  something -- I -- I only worried about people after
7  they got on the radar because there was something that
8  needed attention.
9     Q    Sure.  Not on the intake side.
10    A    No.
11    Q    Do you -- in your role as VP of Risk, did
12 you ever consult the risk assessment application?  You
13 were talking about them asking questions and filling
14 out information about criminal charges and that sort
15 of thing.  Did you consult that infor -- did you ever
16 consult that information?
17       MS. PETERS:  Object to form.
18    A    You mean -- you mean before they were
19 bonded, or ever?
20 BY MR. HARRIS:
21    Q    No, at any time.  As part of your job.
22    A    Yeah.  I mean, if -- if -- if -- if a

246

1  program participant needed to be gone to be seen, like
2  go to Mom's house and see if he's there because he's
3  not answering the phone, for instance, --
4     Q    Sure.
5     A    -- of course we would necessarily review
6  all of that information to see whose house we were
7  going to knock on the door.  It also helps you -- it
8  helps you know how to speak to them.  I may
9  communicate with you differently than I will
10 communicate with my cousin who is not an attorney.
11 You understand?
12    Q    Uh-huh.  Sure.
13    A    And the way I communicate with you might
14 not sit well with him.
15    Q    Sure.
16    A    So you have to understand who you're going
17 to talk to, understand who their family is.  Again, I
18 keep parroting back that it's relationships, but
19 that's part of building the relationship, is
20 understanding who, who you're going to talk to.
21    Q    So did you consult that information
22 frequently over your course of time as VP of Risk?

247

1     A    Not as a VP of Risk.  I supervised people,
2  but, I mean -- as a VP of Risk, I would assign one of
3  the people in the field to that, and they would review
4  that information.
5     Q    Okay.  That's fine.
6     A    Okay?  But in many cases, I had other
7  things to do than --
8     Q    So you're saying not you personally, but
9  under your scope of authority, you were having other
10 people --
11    A    Yes.
12    Q    -- under the VP of Risk scope look at that.
13    A    Yes, under the Risk Management scope, they
14 would review that information, yes.
15    Q    Do you have any idea about, as to how many
16 of RLI bond principals reported -- or it was reported
17 about them by family members to be violent criminals?
18       MS. PETERS:  Object to form.
19    A    It's such a rare occurrence, and I mean --
20 define violent criminal.
21 BY MR. HARRIS:
22    Q    Well, I'm sorry.

248

1     A    We get outcries from sponsors who happen to
2  be a girlfriend if they're in a fight, and that's the
3  same as anything else, you know, he's being mean to me
4  kind of outcries, but --
5     Q    You understand on the risk assessment form,
6  what I was calling the scoring sheet, there's a box
7  that you check and assign points if somebody has a
8  violent crime conviction.
9     A    Uh-huh.
10    Q    Okay?  And it's a significant number of
11 points added for that criteria, right?
12    A    Yeah.
13    Q    Do you have any sense as to what percentage
14 of program participants have that box checked?
15    A    I -- I have no idea because I haven't
16 looked.  I would only look at the ones that we needed
17 to deal with after the fact.
18    Q    Okay.
19    A    I just -- I don't know.  But I will tell
20 you -- and I don't know where you're getting at with
21 that question.  I'm probably -- you know, I'm going to
22 over-answer here, sorry -- having that box checked,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

63 (249 to 252)

249

1  dealt with people that have had, personally had
2  violent convictions who were nice people. It's not
3  who they are, you understand. So I'm not going to
4  bring --
5      Q    Well, so Nexus would not exclude somebody
6  from participation in the program based on having a
7  violent crime conviction. Is that fair?
8      MS. PETERS: Object to form.
9      A    Yeah. No, Nexus would not exclude someone
10  solely based on having a violent crime conviction in
11  their past. I mean, you can have a violent crime
12  conviction -- we -- I -- people can have a violent
13  crime conviction 30 years prior and nothing since
14  then. So just having that box checked --
15  BY MR. HARRIS:
16      Q    Well, that box doesn't tell you whether
17  it's been 30 years ago, right? So --
18      A    No, it doesn't. But it doesn't tell me it
19  was yesterday either, so that's not exclusionary, that
20  box.
21      Q    Sure. Sure.
22      MS. PETERS: Is it a good time to take a

250

1  break?
2      MR. HARRIS: Sure.
3      THE VIDEOGRAPHER: We are going off of the
4  record. The time is 4:24 p.m.
5      (Recess taken, 4:24 p.m. to 4:37 p.m.)
6      THE VIDEOGRAPHER: Here begins disc number
7  four in the videotaped deposition of Erik Schneider.
8  We are going back onto the record at 4:37 p.m.
9  BY MR. HARRIS:
10      Q    All right. Do you know if there are any
11  factors that would eliminate a candidate for bond
12  consideration?
13      MS. PETERS: Object to form.
14  BY MR. HARRIS:
15      Q    Or eliminate a candidate from bond
16  consideration?
17      A    I don't --
18      MS. PETERS: Object to form.
19      A    I don't know. I mean, I never was on that
20  side.
21  BY MR. HARRIS:
22      Q    Okay. I want to talk about the GPS

251

1  monitoring. Do you have something to say?
2      A    Yeah. Yes. It was something that would
3  eliminate someone from bond consideration would be if
4  they had a, if they had a hold from another agency. I
5  mean, obviously, they wouldn't be eligible to be
6  bonded. We wouldn't -- we wouldn't start a contract,
7  because that would just, that would just cause a
8  refund to have to go back when they didn't get out.
9  But that's something, again, that the bondsman, Big
10  Marco, would find out when they were trying to post
11  the bond. And there may be factors in Ebonds where
12  Ebonds wouldn't process.
13  BY MR. HARRIS:
14      Q    Yeah, I'm really focused more on Nexus and
15  its initial contact with the family members. Is there
16  any kind of factors that would eliminate a candidate
17  from consideration from Nexus's perspective?
18      A    Just financially, would have to pay the --
19  they have to be able to pay the beginning fees to get
20  them out.
21      Q    Okay.
22      A    And, you know, if someone didn't have,

252

1  didn't have a sponsor or references, you can't -- you
2  can't refer someone for a bond if there's nobody
3  that's going to stand behind them. We require three,
4  three -- I say "we," I'm not on that side. I don't do
5  it. It's just, it's hard for me to break that since
6  I've been here six years. A potential candidate is
7  required to have three verifiable references and a
8  sponsor. And the CEMs call those people after they
9  get their names and number to make sure.
10      Q    Okay.
11      A    So if they didn't have that, they might not
12  be able to move forward. I wouldn't say it would
13  reject them from consideration, but they wouldn't be
14  able to move forward until they met all the criteria
15  to secure the, to secure the bond.
16      Q    Okay. So, I understand Nexus is on its
17  third electronic monitoring vendor? Is that fair?
18      A    Fourth.
19      Q    If you consider 3M and Attenti to be the
20  same entity.
21      A    No. In the first year, there was a company
22  called Secure Alert. They -- I wasn't with the

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

64 (253 to 256)

253

1 company then. They only used a couple of GPSes. It
2 was a huge mistake. The thing was, the thing was
3 gigantic and had a two-way microphone on it. It
4 was -- so that --
5   Q   Sure.
6   A   But to be accurate, it would be the fourth.
7   Q   Okay. So it was Omnilink, and then the
8 second entity was 3M, which became Attenti.
9   A   Yes.
10  Q   And then the third entity is Buddi.
11  A   Buddi.
12  Q   Okay. And currently, Buddi is the only
13 provider of electronic monitoring services for Nexus?
14  A   Yes.
15  Q   Okay. Are you familiar with how that
16 system works?
17  A   Yes.
18  Q   Okay. What type of alerts do you get from
19 the GPS monitoring, if any?
20  A   There's a, there's a control panel, and the
21 unit will send strap tamper, low battery, failure to
22 connect. Um, they're characterized as high, medium,

254

1 low. Connection issues, strap tamper, low battery,
2 obviously dead battery.
3   Q   Okay.
4   A   That's it.
5   Q   That's it?
6   A   Yeah.
7   Q   Okay. And how do you -- is there a way
8 that Nexus can interface with Buddi to request
9 information, or is that kind of something that you
10 constantly have access to in the building?
11  A   We -- yeah, the Eagle -- the Buddi Eagle
12 software is the front end. And all of the information
13 that you need about the status of the GPS is, is
14 pushed to that software. If for some reason that,
15 when we needed something it wasn't showing us, they
16 have tech support number, and they have their own
17 duplicate monitoring center where they can verify what
18 we were seeing.
19  Q   So if you wanted to locate somebody where
20 they were physically in realtime, how would you -- is
21 there a button you push, or you enter a name?
22  A   No, you -- yeah, you call up their, their

255

1 file in the Eagle software.
2   Q   On your computer screen?
3   A   Yeah, and it will show their tracking
4 history and where they are.
5   Q   Does it give you a picture of a map, or --
6   A   Yeah. It's -- it's not Google Maps, but
7 it's basically Google Maps. I mean, it just pops up a
8 Google Map. You can go all the way down to a street
9 view in it just like you can on Google Maps. It's
10 Microsoft Maps I think.
11  Q   Is that a program that the VP of Risk or
12 the people working under that Risk Management
13 Department would access frequently?
14  A   Well, the monitoring center used it
15 24 hours a day. Uses it. Sorry. Uses it 24 hours a
16 day. I had access to it. I didn't use it frequently.
17 And oftentimes I would ask the monitoring center to
18 look something up for me if I wasn't sitting -- I'm
19 not often sitting at my desk, so --
20  Q   But you have access to it at your desk?
21  A   Yeah.
22  Q   Okay. Forgive me if I asked this before,

256

1 who's in charge of the monitoring people?
2   A   Her name is Samantha Cushman.
3   Q   How many people does she have working below
4 her in that capacity?
5   A   I don't know what their current staffing
6 is. I -- in Verona, I think we have eight. And there
7 are -- we had four in Puerto Rico, and we had two in
8 Orlando. But I, I'm not sure what the current -- they
9 might have increased, because they're -- and then the
10 new Costa Rica office I think is going to have a
11 monitoring center. That's all just for redundancy. I
12 mean, it was very helpful when we had the hurricanes
13 roll through. When Puerto Rico's down, Orlando's up,
14 and then Orlando's down, Puerto Rico's back up, you
15 know.
16  Q   Yeah.
17  A   Costa Rica's going to do the same.
18  Q   Any other kind of information that is
19 frequently accessed by anyone with Nexus or Libre from
20 the Buddi system?
21     MS. PETERS: Object to form.
22  A   No. The purpose of the Buddi system is the

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

65 (257 to 260)

257

1 tracking and the alert generation.  So, no, we just
2 use the alerts and tracking.
3 BY MR. HARRIS:
4     Q   So, I'll represent to you we have a
5 response in the litigation in discovery that says that
6 Nexus or Libre used 3M, who became Attenti, from
7 July 2015 to March 2018.  Is that consistent with your
8 recollection?
9     A   Probably right around there.  I — I don't
10 know the exact dates, but I could look it up.  But
11 yeah, probably close.
12     Q   Okay.  And I think there was also, part of
13 that answer is there was an overlap because Buddi
14 started in October 2017?  Does that resonate?
15     A   There was an overlap.  We had to get the
16 devices swapped off of the existing clients and onto
17 the new one while we're also installing new Buddi
18 devices on new participants.  So yeah, there's
19 necessary overlap.
20     Q   To what extent were 3M/Attenti devices
21 replaced with Buddi devices with respect to RLI bond
22 principals?

258

1     A   You know, again, I didn't break it down by,
2 by surety.  We — in the first three months of the
3 switchover, we replaced thousands of devices.  We —
4 we got — I don't know the exact numbers.  We — we
5 had at the time about 5,000 total devices.  Um, in
6 the, the first three months, we switched more than
7 half of them over.  I don't know what percentages.
8 Probably, um — RLI was a smaller population of our
9 overall clients, so it would have been a smaller
10 percentage of our overall swaps, but I don't — I
11 just — I can't tell you what percentage of RLI.  We
12 got everyone that we possibly could.  And that, that's
13 an ongoing process.  I mean, we still get 3M devices
14 back from facilities, you know, where somebody was
15 arrested by ICE and they send it back.  So it's not,
16 it's not been a hundred percent.
17     Q   Sure.
18     A   But every, every, um, every client that we
19 have contact with was swapped out.
20     Q   So, as I said, the interrogatory response
21 says, Buddi, you started with them in October 2017.
22 Do you know what the reason for the switch was from 3M

259

1 or the -- 3M/Attenti project?
2     A   Yeah.  There was -- I don't know if I can
3 go into details.  There was deficiencies in the
4 software, didn't like the control panel that 3M was
5 using.  And through, through daily use and through
6 experience, we realized that we weren't getting
7 exactly the, the concurrent information on our people
8 that we required to be able to, to better monitor
9 people.  The 3M devices just -- they also were
10 uncomfortable.  3M had switched from the Gen 2 to the
11 Gen 4, and the Gen 4, the -- most of what we do, when
12 we switch GPS devices, is mostly driven by technology.
13     Q   Okay.
14     A   And comfort.
15     Q   Okay.
16     A   Because if somebody's comfortable with the
17 unit, they're less likely to want to remove the unit,
18 right?
19     A   So that's why we went from Omnilink to 3M.
20 The 3Ms were smaller, and they were round; they didn't
21 have sharp edges.  And then the Gen 4 was, for some
22 reason, was a less comfortable unit.  They got away

260

1 from the rounded edges.  Didn't like the strap.  The
2 straps were kind of a pain to get right.
3     Q   What's the current Buddi device look like?
4     A   Um, the current Buddi device is about this
5 big, (indicating) about that thick, and it's got a
6 curve to it.
7     Q   Okay.
8     A   So it adjusts to the leg.
9     Q   Okay.
10     A   It weighs -- it's about half the size of
11 the 3M device.
12     Q   Okay.
13     A   It weighs probably 70 percent less than the
14 3M device.  The battery life is better.  The strap is
15 more comfortable.  That's not what it looks like, but
16 that's -- I mean, yeah, the Buddi device is a much
17 better, much better device.
18     MS. PETERS:  Counsel, so that you will
19 know, you keep referring to device.  There were
20 different devices, including a wrist device for Buddi.
21     MR. HARRIS:  Okay.  I was asking -- I asked
22 him about the current device.

261

```
1      A   Yeah.
2   BY MR. HARRIS:
3      Q   Are there multiple devices out there from
4   Buddi that you're using?
5      A   Yeah.  There's also a wrist worn unit,
6   which is a, which is a rubber strap with an
7   encapsulated GPS unit and a locking mechanism in that
8   one.  That one is a, interfaces with the phone --
9      Q   Okay.
10      A   -- for the GPS, so it's more comfortable.
11   That --
12      Q   Did one come before the other?
13      A   Yeah, the Buddi, the Tag.  The leg unit is
14   called a Buddi Tag, and that's what we initially, --
15      Q   Okay.
16      A   -- initially got.  Very few of the wrist --
17   and you're going to ask me, I'll just tell you, I
18   don't know what the percentage of RLI clients that got
19   a wrist unit is.  It was something, something that we
20   used on participants that probably had gone long
21   enough where they didn't need to wear the leg unit
22   anymore, but maybe their bond amount was a little bit
```

262

```
1   higher than we were comfortable with, or for some
2   reason we wanted to make sure.  So we would -- it was
3   an upgrade from the leg unit, but they were still GPS
4   monitored.
5      Q   So I heard you say they had worn it long
6   enough?
7      A   Uh-huh.
8      Q   What do you mean by that?
9      A   We try to not have people on GPS longer
10   than eight or nine, eight or nine months.  After,
11   after that amount of time, you've got -- first, the
12   bond is matured like I was explaining before, they've
13   been to some hearings, they've proven they're going to
14   go.  And you've got the data points that you're ever
15   going to need.  When -- when someone's released from
16   custody, they're going to go where they're going to
17   go, their mom's house, girlfriend, their job, favorite
18   store, favorite restaurant.  After a certain point,
19   the GPS just keeps going back to the same places.
20   And, you know, in an effort to balance securing,
21   securing our interests, you have to balance that with
22   society's feelings about long term GPS on people.  Um,
```

263

```
1   and, and just the, the humanity -- I use that word
2   again, you don't like when I say humanity, humanity or
3   humanitarian, but anyway, the humanity of someone
4   being, wearing that thing around for a year,
5   especially when they've proven that they're not the
6   flight risk that somebody on the bubble might have
7   been.
8      Q   Is that policy to try to not have people on
9   monitors longer than eight or nine months documented
10   anywhere?
11      A   I don't know.  I mean -- I --
12      Q   Has that always been the policy, or has
13   that -- has there been a change in that over time?
14      A   As long as I can remember, that's been the
15   policy.
16      Q   So, I think you've told me that you
17   switched over as many RLI people as you could --
18        MS. PETERS:  Object to form, misstates his
19   prior testimony.
20        MR. HARRIS:  Can I get my question out,
21   please?
22
```

264

```
1   BY MR. HARRIS:
2      Q   I believe you said you tried to switch over
3   as many people as you could from the 3M to the Buddi
4   device?
5      A   Uh-huh.
6      Q   When I asked you how many RLI people had
7   monitoring on?
8      A   Yes.
9      Q   Okay.  Did -- is that -- did that, in fact,
10   occur?
11        MS. PETERS:  Object to form.
12      A   What do you mean did that, in fact, occur?
13   BY MR. HARRIS:
14      Q   Did you try to -- did Nexus try to -- when
15   you made the switch from the 3M/Attenti to the Buddi
16   product, did Nexus try to fit as many RLI bond
17   principals with the Buddi device as they could?
18      A   Oh —
19        MS. PETERS:  Object to form.
20      A   — of course.  I'm sorry.  And — and we
21   did.
22
```

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

67 (265 to 268)

265

BY MR. HARRIS:

1  BY MR. HARRIS:
2     Q    How many RLI bond principals are currently
3  fitted with the Buddi -- a Buddi device?
4     A    I don't -- I didn't prepare that, and I
5  don't know.
6     Q    Well, could you estimate?
7     A    I can't, because I've been out of it for a
8  very, very long time.
9     Q    So we have --
10    A    That information's in the Capsule.
11    Q    -- 1,769 bonds outstanding.
12    A    Uh-huh.
13    Q    Based on your experience and time with the
14 company, would you have an expectation as to how many
15 of those people are still wearing a Buddi device?
16       MS. PETERS:  Object to form.
17    A    I can't base it off that number.  Because
18 that number doesn't equate to whether or not
19 somebody's wearing a Buddi device.
20 BY MR. HARRIS:
21    Q    Percentage-wise?
22    A    I can't, Chris.  I mean, it's -- it's --

266

1  you can ask me where you can get the information, it's
2  in Capsule.  But --
3     Q    Well, there's been a representation made in
4  this case by Nexus counsel that less than 100 RLI bond
5  principals are wearing GPS monitoring devices.  Is
6  that consistent with your understanding and
7  experience?
8     A    I would have a -- very clear, I don't know
9  the number, because I haven't been in that department
10 in a long, long time.  But I -- if there's 1769
11 people, I can't imagine that there's less than a
12 hundred wearing a GPS.
13    Q    Okay.
14    A    There -- there'd be a lot more than that
15 wearing a GPS would be my guess.  I haven't looked at
16 it.  I'm not in that department.
17    Q    So how would we go about verifying how many
18 people, or how would you go about verifying how many
19 people are wearing Buddi devices?  From Capsule?
20    A    Yeah, I could -- I could mine it from
21 Capsule.
22    Q    Does Capsule tell you what type of device?

267

1     A    Yes, it does.
2     Q    Okay.  And where is that?  Do you know what
3  document that's on in the Capsule?
4     A    You'd have to go through the notes.
5  Because if a client was originally wearing a 3M and
6  then they were swapped to a Buddi, there would be
7  notes about that visit, or their visit to the office,
8  however it went down, there would be notes about that
9  visit.
10    Q    Are you familiar with the -- well, strike
11 that.
12       Does Nexus keep records as to which
13 specific Buddi device corresponds to a particular
14 individual?
15    A    Yes.
16    Q    Okay.  Are you familiar with a code STL and
17 a number sign with a four-digit code?
18    A    Yes.
19    Q    Okay.  Where does Nexus store that
20 information?
21    A    That's the serial number of the GPS, so
22 it's in Capsule.

268

1     Q    Okay.
2     A    When the GPS is installed, they --
3     Q    That would be in the Capsule notes?
4     A    Yeah.
5     Q    So if there's not an STL number code in the
6  Capsule notes, we can assume safely that that RLI bond
7  principal is not fitted currently with a tracking
8  device?
9        MS. PETERS:  Object to form.
10 BY MR. HARRIS:
11    Q    Or at least a Buddi?
12    A    You can assume they're not wearing a Buddi.
13 I mean, I've, I've had people that -- when I talk
14 about people disappearing for a while and coming back,
15 I've had people come back and, Gees, I'm really sorry
16 I've been out of contact, but my 3M is not -- my
17 device is not charging anymore.  Oh yeah, we'll fix
18 it.  And they're still wearing a 3M.  They're
19 faithfully charging every day.  They just, just were
20 living their life.  They weren't -- they weren't --
21 they weren't ghosting.  They were just living their
22 life.  You can't -- you can't boil it down to simple

Case 5:18-cv-00066-MFU-JCH   Document 496-4   Filed 08/21/20   Page 69 of 179   Pageid#:
12385
CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020
68 (269 to 272)

---

269

1  terms when you're dealing with human beings.  It's
2  just difficult.  Sorry to go anecdotal, but --
3      Q    So if there are RLI bond principals out
4  there who still have a 3M or Attenti device affixed to
5  their bodies, are those still active?  Are you able to
6  glean any information from those devices?
7          MS. PETERS:  Object to form.
8      A    Um, when I was still in Risk, I had
9  received a last point, it was about a -- I guess about
10 a year and a half ago.
11 BY MR. HARRIS:
12     Q    Okay.
13     A    Maybe a little bit sooner than that.  And
14 3M sent me a report of last points on all the GPSes,
15 because we made another effort to go find people and
16 swap GPSes out.  It was very successful at that point.
17 So as long as the person is charging the unit, um,
18 there's potential to get that tracking info, yes.
19 BY MR. HARRIS:
20     Q    You could still get -- or Nexus could still
21 get it by requesting it from 3M?
22     A    It would be if 3M wanted to give it, yeah.

---

270

1      Q    Okay.  Do you know if Nexus has had any
2  disputes with 3M or Attenti, financial disputes, since
3  the end of the relationship?
4      A    I don't know anything about financial.  I
5  mean, um -- I didn't think there was any problems with
6  3M, but I don't know.
7      Q    So the purpose of the GPS monitoring is to
8  be able to locate bond principals, right?
9      A    That's part of it.
10     Q    So it stands to reason, then, that not
11 having a device, law of averages, it would be more
12 difficult to locate the principals if you don't have a
13 GPS device on, right?
14     A    No.  The two do not correspond or cross or
15 correlate to each other.  We have -- we have plenty
16 of -- I can't tell you if they're RLI or -- sitting
17 here I don't know who they are.  We have plenty of
18 program participants that are not wearing GPS, that
19 check in every week, that go to their court.  And
20 having a GPS does not -- if -- and this is across the
21 board.  ICE has this problem.  Criminal defense has
22 this problem.  If somebody wants to go somewhere,

---

271

1  they're going to cut that GPS off and they're going to
2  go, and all I'm going to know is where the GPS is.
3      Q    Right.
4      A    I'm not going to know where that, where
5  that person is.  The GPS is a tool, and it's one tool
6  in the bag.  And the reason I always say we do it
7  better than others is because, um -- I'll tell you
8  this:  ICE in Arizona has someone go to the bus stop
9  and they pick up all the GPSes overnight, because ICE,
10 when people are bonded through ICE, they GPS them,
11 they go to the bus stop, they cut it off, they throw
12 it, and they, they leave.  No one ever knows -- that's
13 a hundred percent loss I promise you, unless they
14 commit a crime and get picked up.
15     Q    Right.
16     A    We in that situation, we have people who go
17 knock on the door that are not police, that are not
18 threatening, that will talk to them and get them back
19 on track.  So having a GPS or not having a GPS has
20 absolutely zero bearing on how hard someone is to
21 find.  Having a GPS gives someone skin in the game.
22 It reminds them of an obligation.  I mean, things --

---

272

1  things are only -- things are as valuable as you make
2  them.  You know this with kids.  You give them
3  something free, they don't appreciate it.  They're not
4  responsible with it.  The GPS, the charging, the
5  calling in -- the calling in weekly trains people that
6  we're a resource that they can reach out to, trains
7  them that we'll talk to them, trains them that we're
8  not a threat.  And at some point, we remove the GPS,
9  people still call in for their weekly check-in.
10 People -- program participants will have their
11 favorite CEM that they'll call.  Sometimes they'll
12 only talk to one person because that's the person they
13 developed a relationship with.  That's something that
14 is drilled in from training, training on.  It's much,
15 much more complicated than having a GPS or not having
16 a GPS makes it harder or not harder to find someone.
17     Q    I'm reading from your deposition testimony
18 from November 26, 2018.  It says, Nexus uses ankle
19 bracelets -- this is a question that I asked.  Nexus
20 uses ankle bracelets or monitoring bracelets to help
21 track and -- track bonded principals and to mitigate
22 the risks of them not showing up.  Is that fair?

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

69 (273 to 276)

---

273

1    And you said, That's a really good way to
2  say it.  Yeah, it's one of the many tools that we use
3  to maintain contact with our program participants.  Is
4  that true?
5    **A    That's what I -- yeah, one of the many**
6  **tools.**
7    Q    But your, your testimony today is that not
8  having a GPS monitoring device has nothing to do with
9  the ability to locate an individual?
10    MS. PETERS:  Object to form.
11   **A    Not -- maybe you didn't understand what I**
12 **said.  Mitigating risk is different than eliminating**
13 **risk.  And you said is not having a -- your question**
14 **was by not having a GPS, does that make them harder to**
15 **find.  That's different --**
16 BY MR. HARRIS:
17   Q    Uh-huh.  And I think your response was one
18 has nothing to do with the other.
19   **A    That's right.  That's different than what's**
20 **there.  It is a tool that we use to mitigate risk,**
21 **especially early in the program.  But when someone has**
22 **been with us nine months and the GPS comes off, that's**

274

1  **not a factor in whether or not we're going to be able**
2  **to find them.  Also --**
3    Q    Okay.
4    **A    -- having people who are trained to**
5  **investigate these things.  Um, the risk managers, I**
6  **told you a lot of them have the bail enforcement**
7  **training.**
8    Q    Uh-huh.
9    **A    They don't have that so they can go out and**
10 **arrest people.  They have that because it's good**
11 **training on how to find people, how to talk to people,**
12 **how to work with witnesses to find people.  So having**
13 **good people out in the field is probably an equal or**
14 **more important mitigating factor.**
15   Q    Okay.
16   **A    But you can't -- you simply can't distill**
17 **the statement down to such a simple form.  It's not**
18 **fair.**
19   Q    Do you recall at your deposition I asked
20 you if you could estimate how many of the RLI bond
21 principals were wearing GPS monitors as of November,
22 2018?

275

1    **A    Uh-huh.  Yes.**
2    Q    And do you recall your response was more
3  than 60, if you had to estimate?
4    **A    Yeah, I said more than 60, less than 70**
5  **probably, but that was a guess.**
6    Q    Okay.
7    **A    And that was based on the age of the**
8  **account.**
9    Q    Right.  So your policy for as long as you
10 could remember is that people don't have to wear
11 bracelets longer than eight to nine months.
12   **A    I didn't say that.  I didn't say people**
13 **don't have to wear the bracelet.  I said we strive to**
14 **find ways to get people off the bracelet in eight or**
15 **nine months.  There are -- there are people who wear**
16 **it for longer than that.**
17   Q    Well, I wrote down, and I could be wrong,
18 but try not to have people longer than eight to nine
19 months.
20   **A    That's exactly.  Try not to is different**
21 **than people don't have to.**
22   Q    So the last bonds in this program were

276

1  written in February 2017 for RLI, right?
2    **A    Okay.**
3    Q    Okay?  So eight to nine months would put
4  you in October?  September, October of 2017?
5    **A    Okay.**
6    Q    And you're trying to not have them wear
7  these GPS devices longer than eight to nine months.
8  So as of November 2018, and more than a full year
9  later, you're still estimating that more than
10 60 percent of the people were wearing GPS monitoring
11 bracelets.
12   **A    It's possible.**
13   Q    Okay.  And then -- why would that be if
14 that's your policy, to try to have, not have people
15 longer than eight to nine months wearing GPS
16 monitoring, that you would estimate over 60 percent
17 were still wearing them more than a year after that
18 term expired?
19   **A    Uh-huh.  It would depend on their**
20 **comportment during the, during the time they were on**
21 **it.  If we were consistently having trouble reaching**
22 **somebody, if we maybe only talked to somebody once**

277

1  every six weeks, then I'm not going to recommend that
2  the GPS comes off until they show they're, they're
3  responsible. We try not to have people on GPS more
4  than that period of time, but I -- if someone is
5  displaying characteristics that would make me think
6  that if I took the GPS off I might have problems with
7  them, I'm not going to recommend the GPS come off.
8  It's not -- it's not making Whoppers. There's not a
9  formula. You're dealing with human beings.
10    Q    Of those 60 percent, thereabouts, more than
11  60 percent I think you said, of RLI bond principals
12  who were wearing GPS devices in November of 2018, how
13  many of them are still wearing the devices?
14    A    I can't -- I don't know. I haven't looked
15  at it in a long time.
16    Q    But as of November 2018, all of those
17  people would have been wearing a Buddi device, with --
18  at least anyone who had a working device was wearing a
19  Buddi device, right?
20      MS. PETERS: Object to form, calls for
21  speculation, and misstates his prior testimony that it
22  was an estimate.

278

1    A    It does somewhat misstate what I said,
2  but --
3  BY MR. HARRIS:
4    Q    I think I got how I misstated. How many of
5  those 60 percent do you think were wearing Buddi
6  devices back in 2018 of November? Or November of
7  2018?
8    A    Well, if it was 60 percent, then it would
9  be all of them, because that was my -- if you're
10  asking me to partake of 60 percent and reduce my
11  number, that's not what it is. But, um --
12    Q    So, if 60 plus percent in November of 2018
13  were wearing GPS monitoring devices from Buddi, that
14  would be discernible or reflected in the --
15  discernable from or reflected in the Capsule
16  documents.
17    A    Yes, it would.
18    Q    Specifically, the call notes.
19    A    Yes.
20    Q    And if the Capsule notes don't show an STL
21  number from Buddi, we can assume they were never
22  fitted with a Buddi device, correct?

279

1    A    We can assume they didn't have a Buddi
2  device, right.
3    Q    Safely assume.
4    A    Safely, yes.
5    Q    Okay.
6      MS. KATSANTONIS: Need this?
7      MR. HARRIS: Yeah.
8      MS. PETERS: Madam Court Reporter, can you
9  tell me how long we've been on the record?
10      THE VIDEOGRAPHER: I can.
11      MS. PETERS: You can? Okay.
12      THE VIDEOGRAPHER: We've been on for four
13  hours and 33 minutes.
14      MS. PETERS: Thank you.
15  BY MR. HARRIS:
16    Q    I'm going to show you some documents from
17  one of the Capsule files that was produced in this
18  litigation.
19      (Exhibit 5 was marked for identification
20  and attached to the transcript.)
21  BY MR. HARRIS:
22    Q    Let me ask you a couple backup questions

280

1  just about Capsule before we go through this exhibit.
2  Um, Capsule is a database, correct?
3    A    Yes.
4    Q    Okay. And it's Cloud based?
5    A    Yes.
6    Q    Okay. So you can log into the program and
7  access information from your desktop computer?
8    A    Yes.
9    Q    Okay. How many individuals that work for
10  Nexus or Libre have access to the Capsule database?
11    A    I'm not the Capsule admin. I don't know.
12  Every CEM, every risk manager, every employee that
13  deals directly with program participants would have
14  Capsule access, plus the executives. I don't know
15  what that number is.
16    Q    Can you give me some -- you know, not
17  super-lengthy, but an overview about kind of how
18  searchable the database is? For instance, is the data
19  stored in such a way that you can enter the name for
20  one individual and have all their records pull up?
21    A    There is a -- there is a search field in
22  top center. We tend to search by A number, because

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

71 (281 to 284)

281

1  it's individual.  There's a lot of people in our
2  database that have similar last names or hyphenated
3  names.  So you can make a search and you'll come up
4  with a lot to choose from.
5      Q   Sure.
6      A   And so we tend to search the database by
7  the A number.  But if you -- you have the A number on
8  the bond documents.  So you punch the A number in,
9  it's going to come up with that person, you double
10 click it, and you're in their file.
11     Q   Okay.  And all of their documents that have
12 been collected or scanned in on with respect to one
13 bond principal would come up in that search; is that
14 fair?
15     A   Yes.
16     Q   Okay.  Does -- do the Capsule, or does the
17 Capsule database allow for kind of a word search?  So
18 if you pull up one client's file and say you search
19 for the word "breach," does it have that kind of
20 searchability?
21     A   Yes.
22     Q   Okay.

282

1      A   But it's -- it's difficult.  For instance,
2  if you were to search STL, which you want to do,
3  you'll get "castle" --
4      Q   Sure.
5      A   -- and any other word that contains S-T-L.
6  It's not like a --
7      Q   It's kind of like what you would do in a
8  PDF that was OCR'd, right?
9      A   Yes.
10     Q   Okay.  The Capsule database contains highly
11 confidential information?
12     A   Very confidential.
13     Q   Okay.  Who's in charge of maintaining the
14 security of that database?
15     A   Capsule.
16     Q   Who from Nexus or Libre would be charged
17 with ensuring that the access was limited?
18     A   Um, well, IT is the one -- our IT
19 Department manages the granting and removing access --
20     Q   Okay.  But --
21     A   -- ultimately.
22     Q   -- IT gets their direction from somebody

283

1  else, right?
2      A   Yeah, it would be -- for instance, if
3  somebody quit or was fired, HR would notify IT to
4  remove their access.  If --
5      Q   Granting access is what I'm interested in.
6      A   Granting access?
7      Q   Uh-huh.
8      A   Um, well, if someone's going through
9  training and they're going to be in a, in a, you know,
10 a CEM, then the training person would send a request
11 to IT.  They -- they know who's going to be in
12 training that week, --
13     Q   Sure.
14     A   -- who's coming for training, so that list
15 goes to IT, and IT inputs the, that access.
16     Q   Okay.  So there's certain job functions or
17 roles, titles, classes of employees who automatically
18 get access based on the requirements of their job?
19     A   Yes.
20     Q   Okay.  Are there other individuals who
21 don't kind of fit into one of those classes that are
22 granted access to Capsule?

284

1      A   Yeah, Inventory.
2      Q   Okay.
3      A   Because the inventory person manages the
4  GPSes, the RMA, return and dissemination of new ones.
5  So they, they will sometimes have to put notes in.  If
6  Inventory replaces someone's charger, they put a note
7  in Capsule that I sent this person a charger, because
8  it comes from Inventory, but we have to make a record
9  of it.
10     Q   Uh-huh.  Other people?  Do you -- I mean --
11     A   Well, our risk managers, CEMs, Breach, our,
12 our auditor.  We have a quality assurance person who
13 listens to phone calls to make sure that -- random
14 sampling of phone calls to make sure that people are
15 treating the program participants correctly.  She has
16 access to Capsule.
17     Q   Is there anybody that you're aware of, to
18 your knowledge, who would've made the determination
19 about which of those people would have been granted
20 access?
21         MS. PETERS:  Object to form.
22

285

1  BY MR. HARRIS:
2    Q    You either know or you don't.  I mean --
3    A    Yeah, I don't know what you mean.  I
4  mean --
5    Q    Who would make the call to allow the
6  inventory person to get a log-in?
7    A    Well, that would come from, when we knew we
8  were hiring them, --
9    Q    Uh-huh.
10   A    -- in training their name would be sent
11 over on the list.  It would come from HR or from the
12 training person.  If someone was to transfer, you
13 know, from one department to another and needed
14 access, HR would tell them, would send the transfer
15 paperwork over to IT and have them add them.
16   Q    Do you ever grant access to any of your
17 other surety clients to Cap -- the Capsule database?
18   A    I don't grant access.
19   Q    Well, does Nexus or Libre ever grant access
20 to any of the surety companies that have issued bonds
21 for program participants?
22   A    I don't know.

286

1    Q    So as far as you know, third parties could
2  have access to Capsule?
3    A    I don't know.  I mean --
4    Q    Okay.  Who would know the answer to that
5  question?
6    A    If it -- if it happened, whoever granted
7  access.  I mean, IT would know if somebody had access.
8    Q    Well, IT doesn't have the authority, right,
9  to just grant?
10   A    IT does not have the authority to just
11 grant access.  The only person that could, could
12 conceivably do that would be one of the owners of the
13 company.
14   Q    Okay.
15   A    But I -- you know, I don't know who would
16 or if they did.  They just -- that would be something
17 that the owners of the company would --
18   Q    By the owners, who are you referring to
19 specifically?
20   A    Mike Donovan, Rich Moore, Evan Ajin.
21   Q    Okay.  So, before you is Deposition Exhibit
22 5.  It's a document we pulled from the Capsule, the

287

1  initial sampling of Capsule documents that was
2  produced.
3    A    Uh-huh.
4    Q    The first page of this document says,
5  Client cover sheet.  And it says Libre by Nexus on the
6  top.  Do you see that?
7    A    Yep.  Yes.
8    Q    Okay.  So we talked about --
9    A    Excuse me.
10   Q    -- where it would indicate in the Capsule
11 documents if somebody was an asylum seeker.  Do you
12 know where that would be?
13       MS. PETERS:  I want to make sure that we're
14 marking this portion of the transcript confidential,
15 because it's dealing with a specific individual.
16   A    Okay.  This is not a Capsule file.  This is
17 a contract.  So, maybe --
18 BY MR. HARRIS:
19   Q    Well, I don't know how you're defining
20 that.  I can tell you that this was represented that
21 it was a document that came out of the Capsule
22 database.

288

1    A    This document came out of Capsule database,
2  but this is not the -- you'll see on the thumb drive,
3  what I gave you with the Capsule files -- this is a
4  contract.  This came out of the Capsule.  These are
5  stored in the Capsule database.  But there's -- this
6  is not where you would see whether they're an asylum
7  seeker or not.  This is just the contract for
8  services.
9    Q    On the documents that you've provided to us
10 today, would this document be included for each
11 individual?
12   A    Um, well we did a -- we did an export.  No,
13 I think we -- I think we, we provided the Capsule
14 files.
15   Q    Well, define for me what the Capsule files
16 are.
17   A    Um, it is what you see when you open
18 Capsule and punch a client's name in and open up
19 their, their Capsule.  I -- I don't know how to
20 explain a Capsule file.  It would be the running
21 narrative of -- it would be all the person's
22 information, and the information on every contact,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

73 (289 to 292)

---

289

1  phone call, visit.

2     Q     So the call notes are in Capsule, correct?

3     A     Yes.

4     Q     Are there other documents that are stored

5  on the Capsule database?

6     A     Um, might be their, their identification, a

7  copy of a bill.

8     Q     What do you mean by their identification?

9     A     If they have an ID, driver's license.

10    Q     Like a picture of a driver's license?

11    A     Yeah.  But that's going to be -- that's

12  going to be a sponsor or a reference driver's license

13  in most cases, which is private information.

14    Q     So, sorry.  Call notes I have, and a

15  picture of an ID, potentially of a sponsor.

16    A     Yeah.  The contract.

17    Q     What else?

18    A     Well, the contract.  Anything --

19    Q     This?

20    A     Yeah.  Anything that's uploaded.  If

21  someone has a medical issue and they send us a

22  doctor's note --

---

290

1     Q     Well, hold on.  I'm hearing two different

2  things.

3     A     No, you're not.

4     Q     I don't know if I'm going crazy.  Is

5  this -- is this in Capsule, or no?  This Exhibit 5?

6     A     Yeah, I told you, this would be -- this

7  came from -- this would have been uploaded to Capsule,

8  but this is -- this is the contract.  This is -- this

9  would be --

10    Q     Well, I don't want to mince words.

11    A     Well, I'm not.

12    Q     Is this document in Cap -- in the Capsule

13  database?  Can you access this document through the

14  Capsule database?

15    A     Yes.

16    Q     Okay.  What you've provided to us today

17  that you represented were the Capsule documents, do

18  they include these client cover sheets and agreements

19  for each individual program participant?

20    A     No.  It's the extract, nor would have

21  whatever the failed one from Capsule.  It's the

22  extract of the notes.  The Capsule -- the Capsule file

---

291

1  is the client entry in Capsule that has all of, all of

2  their information and notes.  These things are

3  uploaded to be stored in Capsule, but these are not --

4  these are stored in Capsule, but they're not part of

5  the -- they're not the Capsule file.  It's the

6  contract.  And I'm not trying to be -- I know you

7  didn't -- this.

8     Q     So --

9     A     This is not -- this is something that's

10  uploaded to be part of the file.  But when you say --

11  when you -- when I extracted the Capsule files, um --

12         MS. KATSANTONIS:  Well, just for the

13  record, for the rest of the RLI bond principals, we'll

14  need not only what is in Capsule, but any documents

15  that are uploaded in Capsule for that bond principal.

16  No.  Yeah, I mean -- she knows --

17         MR. HARRIS:  Yeah, we're all aware.  I -- I

18  think that was ordered --

19         MS. KATSANTONIS:  Do you understand that,

20  Mary Donne?

21         MR. HARRIS:  That was what was ordered to

22  be produced.

---

292

1         MS. PETERS:  As I understand it, once it is

2  uploaded, it becomes part of the Capsule file, so you

3  will have it in the data that you've received.

4     A     Well, let's open one and see.  I did a -- I

5  spent all night with 2400 Capsule files, all night

6  with 2400 files, a whole bunch of people in a call

7  center opening files one at a time and printing the

8  file summary, which is all of the Capsule notes.  I

9  was not in -- you guys are looking at me, I wasn't in

10  all of this discussion.  I was told to -- I was told

11  to extract the Capsule, because that's what we were

12  getting from Capsule that failed.

13  BY MR. HARRIS:

14    Q     Right.

15    A     So I spent all, 12 people for seven hours,

16  just one at a time downloading so you could have them,

17  so it's not something that --

18    Q     You don't need to defend yourself.  We'll

19  deal with this with counsel.

20         MS. KATSANTONIS:  No, no, that's fine.  I'm

21  just saying -- I'm just stating to your counsel we're

22  going to want all of it.

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

74 (293 to 296)

293

1 BY MR. HARRIS:

2    Q   I'm just trying to get clarity.

3    **A**   **Yeah. I don't know -- I -- I don't know if**

4 **this is --**

5    MS. KATSANTONIS: Sounds like it's not.

6    **A**   **I mean, that's not what I was expecting.**

7 **I -- I printed the -- and maybe it's a nomenclature or**

8 **a syntax thing, but when I got the Capsule file, I**

9 **gave you the Capsule files.**

10    MS. KATSANTONIS: We'll deal with this. We

11 want everything that's loaded into Capsule.

12 BY MR. HARRIS:

13    Q   Well, tell me the rest of what would be in

14 your definition of Capsule files.

15    MR. HARRIS: Let's -- I'm trying to -- can

16 we just deal with this later?

17    MS. KATSANTONIS: Yeah, go ahead.

18    **A**   **You mean uploaded, uploaded to Capsule?**

19 **BY MR. HARRIS:**

20    Q   You were saying that this is not a Capsule

21 document, this Exhibit 5. I'm just trying to get

22 clarity. You were there all night. You were

294

1 extracting stuff and putting it on a thumb drive.

2    **A**   **Right.**

3    Q   I want to know the universe of what, in

4 your mind, is a Capsule document that you put on that

5 thumb drive.

6    **A**   **It is the, what is in -- it's -- I don't**

7 **know how to explain it. I've explained it. Maybe you**

8 **have to look at it. It's -- it's the -- it is what**

9 **you would see if you, if you had a password to**

10 **Capsule --**

11    Q   Sure.

12    **A**   **-- and you put in a client and you wanted**

13 **to read about them, it is -- here's 2400 PDF files of**

14 **everything from start to finish of what you would see**

15 **about that client, including, including their personal**

16 **information, the reason that, uh -- the reason that**

17 **it's, was difficult is because it's not redacted, so**

18 **there's information in there that doesn't pertain to**

19 **the client. It may pertain to their mother's**

20 **hysterectomy and why they need to travel somewhere.**

21    Q   I'm not asking about the difficulty. I'm

22 just trying to get the universe of what you've put on

295

1 that thumb drive.

2    **A**   **Well, I'm telling you the universe of**

3 **what's on there so you can be aware of what you might**

4 **run into.**

5    Q   I just need the types of documents. I

6 don't need the substance of medical procedures.

7    **A**   **But that's part of what --**

8    Q   You're saying that there's 125 PDFs for

9 each person that pops up?

10    MS. PETERS: Object to form.

11    **A**   **There's one PDF for each person, and it**

12 **is -- it is what you would see if you opened their**

13 **file and began reading about them. It -- before last**

14 **night and tonight, there's no way to get all of these**

15 **out of there. But there also, what I say is, as far**

16 **as documents that are uploaded, there could be ID**

17 **cards. There could be work authorizations. There**

18 **could be doctor's notes. There could be -- Lord**

19 **knows. Any piece of paper that the client might give**

20 **us for whatever reason is going to be uploaded to**

21 **their Capsule file.**

22

296

1 BY MR. HARRIS:

2    Q   But those documents you just described, the

3 uploaded documents, that list is not on this thumb

4 drive you just gave us.

5    **A**   **That's not what I was -- no, that's not**

6 **what I was told to produce. I was told to produce the**

7 **Capsule file, and that's --**

8    Q   Let me -- I'm just trying to get clarity

9 here.

10    And that was direction from counsel?

11    MS. PETERS: Excuse me? What was the

12 question?

13 BY MR. HARRIS:

14    Q   And that was direction from counsel? He

15 said he did what he was told to do. I'm just asking

16 who told him.

17    MS. PETERS: Object to form.

18    **A**   **That was direction from Mike Donovan,**

19 **because he wanted to make sure we produced everything**

20 **we could today. He said, She needs this. Go ahead**

21 **and get it to her.**

22    MR. HARRIS: Okay.

---

**297**

1      (Exhibit 6 was marked for identification
2  and attached to the transcript.)
3      **A      That's a Capsule file.**
4  **BY MR. HARRIS:**
5      Q      Okay.  So you've been handed what's been
6  marked as Deposition Exhibit 6.
7      **A      Yes.**
8      Q      This is what I refer to as the call notes.
9  I've been using that term.  Is this what you've been
10 thinking I meant by that?
11     **A      Um, yeah.  I understood what you meant by**
12 **call notes, but I call this the Cap -- this is the**
13 **Capsule file.  I mean --**
14     Q      Okay.  So, just to be clear, what you gave
15 us on the thumb drive was, looks like Deposition 6,
16 but for all the different program participants.
17     **A      Twenty-four hundred and seventy-something**
18 **of them.**
19     Q      And no other documents.
20     **A      No other documents.**
21     Q      Okay.  Okay.  Can we go back to Deposition
22 Exhibit 5?

---

**298**

1      **A      Sure.**
2      Q      Look at the second page of the exhibit.
3      **A      Sorry.**
4      Q      Sorry.  Deposition Exhibit 5.
5      **A      Let me go back to where you're -- okay.**
6      Q      This also has the Libre by Nexus header.
7  It says Risk Assessment Instrument?
8      **A      Yes.**
9      Q      I'm sorry.  The reason I keep pointing out
10 the Libre by Nexus header is this, in your view, does
11 that demarcate this as a, or designate this as a Libre
12 document versus a Nexus Service document?
13     **A      This is a Libre document.**
14     Q      Well, I'm asking if the header is what
15 tells you that, or do you have independent basis to --
16     **A      Well, yeah, I know what it is.  I know what**
17 **it is.  It's a Libre document.  I don't -- I don't**
18 **normally pay attention to the header.**
19     Q      Okay.  So, I'm going to use the initials of
20 this individual for the sake of the record.  So we'll
21 call this person BCM.  Is that okay?
22     **A      Uh-huh.  Yes.  Sorry.**

---

**299**

1      Q      All right.  So, this individual on the Risk
2  Assessment Instrument has certain checks.  There's
3  eight categories of criteria here.  Do you see that?
4      **A      I do.**
5      Q      Okay.  And there's a point value assigned
6  to each box within each category that result in a
7  total score at the bottom, right?
8      **A      Yes.**
9      Q      Okay.  And then at the very bottom of the
10 sheet we see that there is, if you score zero to
11 eight points, automatic approval.  What does that
12 mean?
13     **A      Automatic -- I don't know that we ever do**
14 **automatic approval.  Everything needs to be approved**
15 **by a, at least a director.  I think what it intends is**
16 **if they have zero to eight points, they are**
17 **unbelievably low risk.  But they're, to my**
18 **knowledge -- let me be very clear.  I've been here a**
19 **long time, I know what these things are, but this is**
20 **not what I do.  Okay?**
21     Q      Sure.
22     **A      So this is not my document.**

---

**300**

1      Q      That's okay.  No, that --
2      **A      To my understanding, we don't have any**
3  **automatic -- there's no such thing as automatic**
4  **approval.  Everything needs to be reviewed by one of**
5  **the supervisors or directors of Libre, --**
6      Q      Okay.
7      **A      -- which would be David or Nina.**
8  **Nothing -- nothing goes through automatically.  It**
9  **can't.**
10     Q      That's fine.  But you have a general
11 understanding of this form, and in fact, you talked
12 about your risk managers consulting this form.
13     **A      Yeah, I do.**
14     Q      Okay.  And the total point score, that's a
15 risk indicator, right?
16     **A      Yes.**
17     Q      So the higher the total point score, the
18 more risky a proposition is to bond this person.
19     **A      Yes.**
20     Q      Okay.  And we look under say item five,
21 charge information, for a violent offense you get
22 three points added to your score, right?

---

301

1    A    Yes.
2    Q    Okay.  If you're unemployed in item two,
3  you get five points added to your score, right?
4    A    Yes.
5    Q    Okay.  And on number eight here, remember
6  we talked about presumption charge?
7    A    Yes.
8    Q    You get 22 points added for that.
9    A    Yes.
10    Q    Okay.  So having a presumption charge would
11  make you more likely to, or higher risk as a bond --
12  let me strike that.
13          Having a presumption charge would make it
14  more likely that your bond would breach.
15    A    Yeah, in the context of this.
16    Q    Okay.
17    A    Yeah.
18    Q    Okay.  And --
19    A    Well, no.  No.  No.  It doesn't -- I don't
20  think it would make it more likely that your bond -- I
21  can speak from my experience.  I don't know what the
22  intention of this on the operations side of the house.

302

1  I can talk from my experience as a risk manager,
2  having a presumption charge doesn't make it a higher
3  risk that you're going to breach, because everybody's
4  an individual.  I mean, I -- I just don't see it that
5  way.  But --
6    Q    Well, you see at the bottom, it says 22
7  plus points, GPS required for approval.
8    A    Yes.
9    Q    Okay.  And so if you have a presumption
10  charge, you're going to be required to wear a GPS
11  device, right?
12    A    Yes.
13    Q    Okay.  Are you aware of any RLI bond
14  principal who doesn't have the 22 points assigned
15  under the presumption charge category?
16          MS. PETERS:  Object to form.
17    A    I have no, no idea.
18  BY MR. HARRIS:
19    Q    Would it surprise you if there were some
20  that did not have the presumption charge checked?
21    A    I don't review -- I mean, when the bond is
22  started, this isn't -- this doesn't go to me, so I

303

1  don't know.  And I've never looked at all of them.
2    Q    If you could turn to page two -- so I'm
3  going to refer to the Bates number down in the bottom
4  right-hand corner where it says Nexus, 265077?
5    A    Okay.
6    Q    Okay.  This is a document, it says Libre by
7  Nexus, and it's entitled Lease Agreement.  Do you see
8  that?
9    A    Yes.
10          MR. HARRIS:  Okay.  Mary Donne, I just want
11  to clarify your earlier comment.  Is this what you
12  were talking about was the master services agreement?
13          MS. PETERS:  I can tell you that Libre by
14  Nexus considers a package of documents to be the in --
15  prior to October of 2017, a collection of documents
16  would have been the master services agreement.
17          MR. HARRIS:  Okay.
18          MS. PETERS:  They would all be in the
19  master services agreement for all of the clients prior
20  to October of 2017.
21          MR. HARRIS:  All right.  But I asked him a
22  question about a lease agreement, and you interjected

304

1  that there isn't a lease agreement.  Is it your
2  contention that this is not a lease agreement?
3          MS. PETERS:  The words on that page at the
4  top say Lease Agreement.
5          MR. HARRIS:  Okay.
6          MS. PETERS:  The entire contract is a
7  constellation of writings that you will see listed in
8  exhibit whatever it was that was the Libre client
9  cover sheet.
10          MR. HARRIS:  Five.
11          MS. PETERS:  Exhibit 5.
12  BY MR. HARRIS:
13    Q    Okay.  So I want to focus on the document
14  entitled Lease Agreement.  It says under Lessee's
15  Recurring Payment, do you see that section on the
16  right-hand side?
17    A    Uh-huh.  Yes.
18    Q    Okay.  And advance payments, $420 covers
19  30 days, do you see that?
20    A    Yes.
21    Q    And then there's an activation fee of $460?
22    A    Yes.

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

77 (305 to 308)

305

1    Q    Okay.  And totals $880?
2    A    Yes.
3    Q    That's the upfront fee?  You remember you
4  were talking about things that could eliminate
5  somebody from contention?  Is this what you were
6  talking about --
7    A    Yes.
8    Q    -- the upfront cost?
9        Okay.  Do you know if there are other costs
10 required up front of the bond principal?
11   A    Yeah, the bond -- the bondsman's fee.
12   Q    Okay.  Okay.  And if you look on page
13 265080, there's a document with the Libre by Nexus
14 header, it says, Payment Schedule, GPS Lease.  Do you
15 see that?
16   A    Yes, I do.
17   Q    Okay.  And second paragraph it says, You
18 are required to wear a GPS tracking device until one
19 of the following occurs:  And item two under that is,
20 You remit collateral in the amount of $7500 to replace
21 collateral pledged by Nexus programs?
22   A    Uh-huh.

306

1    Q    So, where -- does -- do you know if
2  Nexus -- focusing on the replacing collateral pledged
3  by Nexus programs, does Nexus dispense $7500 or set
4  aside $7500 as collateral?
5        MS. PETERS:  Object to form.
6    A    At what point?
7  BY MR. HARRIS:
8    Q    I don't know.  Do you know?
9    A    No.  I mean --
10   Q    Okay.
11   A    When this contract is signed, do they?
12   Q    I don't know.  And if you look at Bates
13 number 265082, it's a document with the Libre by Nexus
14 header again.
15   A    Uh-huh.
16   Q    Is this a Libre document?
17   A    Are you asking me?
18   Q    Yeah.
19   A    Yes, it's all Libre documents.
20   Q    Okay.  It says, GPS Monitoring Disclosure
21 Statements.  And in the first paragraph, after the
22 heavily bolded paragraph I guess, it says, This

307

1  disclosure statement and agreement is entered into on
2  the day of, and then between, lists the bond principal
3  it refers to as respondent and Nexus Services, Inc.
4  Do you see that?
5    A    Yes.
6    Q    So -- well, I'm sorry, let me read on.  And
7  Nexus Services, Inc., and its successors and assigns
8  hereinafter collectively, quote, "Nexus Services" or
9  "Nexus Programs."  Do you see that?
10   A    Yes.
11   Q    Okay.  So this is an agreement between the
12 bond principal and Nexus Services, Inc., at some
13 level, right?
14       MS. PETERS:  Object to form.
15   A    That's what it says.
16 BY MR. HARRIS:
17   Q    But also Nexus Services in conjunction with
18 its successors and assigns.  Do you know who the
19 successors and assigns are?
20   A    I was just going to say, I don't know what
21 that means.
22   Q    Okay.  Okay.  Do you have an understanding

308

1  of what Nexus Programs is?
2    A    Um, yes.  Nexus Programs was the
3  original -- the --
4    Q    Sorry.
5    A    -- Nexus Programs was the original company
6  that the owners of the company formed, and then it
7  changed from there to Nexus Services.  Why, I don't
8  know.  Date, I don't know.  Um, but that was their
9  original name of the company.
10   Q    Okay.
11       MS. PETERS:  Mr. Harris, have you checked
12 to see if the individual referenced in Exhibit 5 is a,
13 an RLI bonded principal?
14       MR. HARRIS:  It was produced as one of the
15 100 of the initial sampling.
16       MS. PETERS:  Have you crosschecked names?
17       MR. HARRIS:  I'm nearly positive.  I mean,
18 I have no reason to think not.
19       MS. PETERS:  Okay.  Okay.
20       MR. HARRIS:  I don't think it's
21 alphabetized.
22       THE WITNESS:  Huh-uh.

---

309

1      MS. PETERS: I'm just wondering because of
2 the date. It was right when you stopped, maybe a few
3 days after you stopped writing bonds. I'm not sure.
4      MR. HARRIS: Yeah, I --
5      MS. KATSANTONIS: It was produced in
6 discovery, but you all --
7      MS. PETERS: I get it.
8      MS. KATSANTONIS: We gave you the numbers,
9 the A numbers.
10      MR. HARRIS: Right. Yeah.
11      MS. KATSANTONIS: So I assume that the A
12 number matches.
13      MS. PETERS: Yes. So you mean -- if
14 there's -- if there's a a -- I'm just wanting to alert
15 you to a potential for human error on your side or
16 ours, --
17      MS. KATSANTONIS: Sure.
18      MR. HARRIS: Sure.
19      MS. PETERS: -- because the date doesn't
20 really match up.
21      MR. HARRIS: What date are you looking at?
22 Sorry?

310

1      MS. KATSANTONIS: What is the date you are
2 looking at?
3      MS. PETERS: This date is in late
4 January 2017.
5      MR. HARRIS: Okay.
6      MS. PETERS: And I believe that you stopped
7 writing maybe immediately before.
8      MS. KATSANTONIS: No, that makes sense. It
9 would be -- we would stop writing later than that.
10      MS. PETERS: Are you sure?
11      MS. KATSANTONIS: Uh-huh.
12      MR. HARRIS: Uh-huh.
13      MS. PETERS: Okay.
14 BY MR. HARRIS:
15      Q   Okay, so, can we look at -- oh, you already
16 are looking at Deposition Exhibit 6. That's fine.
17      A   Okay.
18      Q   Okay? So this is the same individual that
19 we were just looking at from Deposition Exhibit 5,
20 right?
21      A   Yes.
22      Q   Now, you see the first line, it says,

311

1 Breach collateralized immigration bond, I-340, Risk
2 Management?
3      A   Yes.
4      Q   What does that mean to you?
5      A   Breach would've meant that we received an
6 I-323 at some point. Every single bond in the system
7 says collateralized immigration bond. That was
8 vernacular of a, chose early on. It just means that
9 it was a bond that was posted and collateralized to a
10 bail bondsman, or indemnified to a bail bondsman. It
11 doesn't mean that there's collateral on the bond.
12      Q   Okay. Would every one of the call notes as
13 I call them have that at the top?
14      A   I think every single file in Capsule has
15 collateralized immigration bonds.
16      Q   Well, I mean, in this top line here.
17      A   Yes.
18      Q   Okay.
19      A   Yeah, it's a tag that goes on.
20          I-340 means that we had received an I-340.
21 And Risk Management is a tag that means if anybody
22 outside of Risk Management has contact with this

312

1 client, they need to contact Risk Management, because
2 we need to, we need to talk to them. Because we can
3 have clients that we need to talk to who are talking
4 to the CEM, but they're not answering the phone for
5 someone else, so that's --
6      Q   So you're having -- a risk management tag
7 means the Risk Management Department is having trouble
8 communicating with the bond principal.
9      A   Yeah, or the Risk Management Department
10 needs to talk to them, so if they call in, make sure
11 we know. They know.
12      Q   Okay. So, if you look down about, it says,
13 Bond $7,500. Do you see that?
14      A   Uh-huh. Yes.
15      Q   Okay. And then it says initial payment
16 $2,380?
17      A   Yes.
18      Q   So that's significantly more than the $880
19 initial fee we saw in the lease agreement, right?
20      A   Yes.
21      Q   Okay. And so the balance of that in your
22 understanding is that it, what, it pays for the bond?

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

79 (313 to 316)

---

313

1           MS. PETERS: Object to form.
2      A     The bondsman's fee.  That, and if
3  there's -- in this case it says, Family to pick up
4  client in Colorado, but that may vary.  If there was a
5  client that we were going to fly to another state, the
6  pay the travel fee would go in there as well.
7      Q     Okay.
8      A     Or buy a bus ticket or whatever.  If we
9  were going to ensure that they were going to go
10 somewhere else.  Because some may be released in
11 Arizona and their family lives in Michigan, so they
12 have to get there.
13     Q     So -- okay.
14           On the next page -- well, hold on.  On this
15 page at the bottom it says, Overdue payment.  Do you
16 see that at the bottom?
17     A     Yes.
18     Q     And then on the next page, you can see that
19 it's dated, that note is dated Friday, September 1st,
20 2017?
21     A     Yes.
22     Q     So that date indicates what then?

---

314

1      A     Um, that's a task.  That's someone put a
2  task in for David See, and that task was supposed to
3  have been accomplished on September 1st, 2017.  So
4  what I would understand that that task meant is, This
5  person hasn't made their payment.  David, you need to
6  call them and follow up on the payment.
7      Q     Uh-huh.  So, moving down on the second
8  page, there is a little calendar picture in a circle,
9  and it says, Last contact a year ago.  Do you see
10 that?
11     A     Yes.
12     Q     Would that potentially be the reason that
13 somebody would have tagged this file for Risk
14 Management?
15     A     Yes.
16     Q     Almost certainly, right?
17     A     Almost certainly.
18     Q     And do you see down here below there's a
19 note by Hazaar?
20     A     Yes.
21     Q     Removed tags.  April due, August due, and
22 so on down to September due.  Do you see that?

---

315

1      A     Yes.
2      Q     And why would somebody remove those tags?
3  Well, let me ask a different question.  What do those
4  tags mean that were removed?
5      A     So monthly, every month the program
6  participants have a payment due, and they get a tag
7  for that month that tells the call center to call them
8  for their payment.  So if they collect that payment,
9  this tag would be cleared.  The tag's not cleared, so
10 we obviously lost contact a year ago.  They continued
11 to get monthly due tags.  We didn't have contact with
12 them, so when the Risk Management tag went on, they
13 removed the due tags just to get rid of clutter,
14 because this was probably not someone we were going to
15 get those payments from until a risk manager found
16 them.
17     Q     Don't they remove the tags once they get a
18 breach at the top of the page, of the first page,
19 there's a breach tag?
20     A     I don't believe they remove them for
21 getting a breach, no.  Because we — no.
22     Q     If you look at page 265130, of the call

---

316

1  notes here.
2           MS. PETERS: I'm sorry.  What page?
3           MR. HARRIS: Two six five one three zero.
4  BY MR. HARRIS:
5      Q     The dates are kind of cut off here, but
6  we've tried to count backwards or forward or
7  something, and determined this is October 2017.  So
8  I'll make that representation to you.  It says, No
9  communication, not charging, a note by Carlos?
10     A     Yes.
11     Q     Why would that entry go in the call notes?
12     A     Um, because this particular CEM is doing
13 their job and they're reviewing their clients, this is
14 probably -- this is probably on the board, the
15 software channel is a client with a dead battery, and
16 they daily, on their shifts, go through those alerts
17 on the board and look the client up and contact them
18 regardless of, of whether they reached them last time,
19 they reach them again.
20     Q     So you're talking about, when you say the
21 board, there's a huge screen in the call center,
22 right?

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

80 (317 to 320)

317

1    A    Yeah.  Did you walk through that?
2    Q    We saw it, yes, when we visited.
3    A    Yeah, okay.
4    Q    So what kind of information comes up on
5    that, other than an alert that somebody's not charging
6    or not communicating?
7    A    It would be strap tamper, low battery, dead
8    battery, and communication issue.
9    Q    Okay.  Would the board display whether
10   somebody was making their payments?
11   A    No.  That's not risk management.
12   Q    Okay.  So, the purpose of the board is risk
13   management?
14   A    Yes.
15   Q    Okay.
16   A    Monitoring center.
17   Q    Right.
18   A    GPS monitoring.
19   Q    So on the next page, 265131, there's a note
20   from September 2017, early on the page by Carlos,
21   again, no communication, not charging.  Do you see
22   that?

318

1    A    Yes.
2    Q    Okay.  And you'll see more of those on the
3    next page for September.  And then on the next page,
4    265133, there's a note August 9, 2017, Device is being
5    unassigned per Erik S due to no connection for
6    30 days.  Can you explain what's going on there?
7    A    Yeah.  That was a, when we were -- this is
8    a TD4.  Yeah, this is a 3M device.  If it was clear
9    that, from a long history, it was clear that this
10   person wasn't compliant, we're still paying for that
11   GPS monitoring, something that wasn't being charged,
12   so this, this went to Risk Management.  This was a
13   situation where we were going to have to find,
14   physically find this person.  So we would unassign the
15   GPS from the system so they would stop charging us for
16   a GPS that was clearly not working.
17   Q    So if this individual is still wearing the
18   GPS device, it's not serving any purpose anymore once
19   you deactivate it?
20   A    Oh, if they were wearing it -- it wasn't
21   serving any purpose when it wasn't charged.
22   Q    Okay.

319

1    A    You understand?
2    Q    Sure.
3    A    It's dead.
4    Q    Right.
5    A    If -- if the risk manager had found this
6    person and they were wearing it, we could just call
7    and reactivate it once we got them back into
8    compliance.  This apparently is a really bad, one of
9    the bad cases, but --
10   Q    Right, this person is not charging their
11   device, despite your efforts to get the individual to
12   do it, right?
13   A    Right.  Right.
14   Q    And so you stopped paying for the device at
15   that point, because it's --
16   A    Well, we stopped being charged for the
17   device.
18   Q    Right.  Okay.
19   A    We have no -- it's unassigned.  We don't
20   have to pay for it.  It's not charged.
21   Q    You cancelled the service for that device.
22   A    Cancelled the services, yes.

320

1    Q    And -- because he's a lost cause at this
2    point.
3         MS. PETERS:  Object to form.
4    BY MR. HARRIS:
5    Q    In terms of the bond and the loss, right?
6    A    In terms of the GPS and charging.  I --
7    Q    Well, you said this was one of the bad
8    cases, right?
9    A    It appears there's a very long history of
10   trying to get ahold of him and not getting ahold of
11   him.
12   Q    And when you see a call log like this, with
13   your experience as VP of Risk, you can tell this is a
14   high risk for breach at this point, right, once
15   he's --
16        MS. PETERS:  Object to form.
17   BY MR. HARRIS:
18   Q    You know, as you get into mid 2017?
19   A    This -- this would be what I'm talking
20   about a ghost client, yes.
21   Q    Okay.  Can you tell from this call log --
22   well, don't want to spend too much time hunting

321

1  through it.
2      A     See, here's a note why I wouldn't say it's
3  a lost cause, to go back to your question.
4      Q     Okay.  What page?
5      A     Nine July -- 265139.
6      Q     Okay.
7      A     In the middle of the failures to contact,
8  we have -- 265139.
9      Q     Wait a minute.
10     A     Center of the page, Victor Silva, Client's
11  mother called from a phone number logged regarding
12  missed call.  You know, she said she was out of town,
13  but she'll try to reach him to have him call us.  So
14  it's not a lost -- I mean, it's not a lost cause.
15  We're reaching --
16     Q     Well, he didn't call after that.
17     A     He didn't, but we didn't know that, you
18  know.  That's why we keep -- that's why there's no
19  lost cause.  The reason that there's pages and pages
20  and pages of this call log is because we never stop
21  trying.
22     Q     No, you're still trying to make sure that

322

1  this bond doesn't get breached, right?
2      A     Right.  Yeah.  It's just "lost cause" is a
3  term I wouldn't use.
4      Q     Okay.  Poor choice of words.
5      A     No, it's okay.
6      Q     Where -- so this is the Capsule document
7  you've been referring to in your earlier testimony?
8      A     Yes.
9      Q     So where would this show us if there -- if
10  they're, this is an asylum seeker?
11     A     Um, on -- if he was, there's a note,
12  265148.  I'm sorry, 265148.  I'm tired and talking
13  fast.  I'm sorry.
14     Q     Okay.
15     A     Okay.  This is towards the beginning of the
16  file.  You'll see a note by Iris Arredondo, submitted
17  bond approval -- 265148.
18     Q     Yep.  Yep.  Yep.
19     A     And if he was an asylum seeker, that should
20  definitely appear in this block.
21     Q     Okay.
22     A     Because this is the notes -- this is the

323

1  notes from when someone's first contacting asking for
2  help.
3      Q     Okay.
4      A     And that person is collecting information.
5      Q     Does the information here typically come
6  from the inmate, or family members?  I'm sorry, the
7  immigrant.
8      A     Yeah.  No, typically, not the immigrants.
9  Typically a loved one, or an employer, or a friend.
10     Q     Okay.  Where in this call log does it tell
11  us what device this person was assigned or wearing?
12     A     Um, well, initially, on -- I'm sorry.  I
13  was reading something.  On the very first page, it
14  says GPS unit TD4.
15     Q     Sure.
16     A     That would tell us that it's a 3M
17  Generation 4.  Throughout the notes from the
18  monitoring center, you'll see that on every monitor --
19  just about every monitoring person's call, they --
20  well, at least early on they do.  But you'll see it in
21  the notes, like on 265136, while the battery is still,
22  has some charge, you'll see them listing the type of

324

1  GPS.
2      Q     Okay.  So are all the 3M/Attenti products,
3  do they kind of follow a TD nomenclature, or do you
4  know?
5      A     No.  TD4, the previous ones were, I think
6  it will say Gen 2.  They went from Generation 2 to
7  Generation 4.  I don't know what happened to three.
8      Q     So it wouldn't be TD 2?  It would be Gen 2
9      A     No, it's Gen 2.
10     Q     Okay.
11     A     And that's their nomenclature.  They call
12  it a Gen 2.
13     Q     Any other entries that would indicate a 3M
14  or Attenti product?
15     A     No.  It's going to be on the front.
16     Q     No, but I'm saying besides Gen 2 or TD 4.
17  Is there another --
18     A     It may say 3M, but typically we don't -- we
19  don't re -- typically the monitoring center people
20  don't refer to them by the manufacturer.  They refer
21  to them by the -- because we need to know if it's a
22  Gen 2 or a Gen 4 or, you know, a wrist unit or a Buddi

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

82 (325 to 328)

---

325

1  leg unit or —

2     Q    Okay.  Sure.  So where it says GPS unit, if

3  somebody was assigned a Buddi device, is this where

4  that information would be listed, on the first page?

5     A    Yeah, that would -- that would change and

6  you'd have Buddi information there.

7     Q    And that's where the STL code would be?

8     A    Yes.  Yes.

9     Q    Okay.  So again, if there isn't an STL

10 number on the first page of the call notes, we can

11 safely assume that that individual is not wearing a

12 Buddi.

13       MS. PETERS:  Object to form.  Go ahead.

14    A    I wouldn't safely -- I wouldn't safely

15 assume they're not.  I would read the notes to look

16 and see if there were -- there's a possibility that

17 the person that put the note in put the note in the

18 meat, but did not change that.  You'll also -- I'll

19 tell you now, you'll also see an OBC number.

20 BY MR. HARRIS:

21    Q    Okay.

22    A    OBC is the charger.  It's not a separate

---

326

1  type of GPS unit.  So you'll have an STL number and an

2  OBC on Buddi charger.

3     Q    Okay.  Is there another designation that

4  would appear that would indicate a Buddi device versus

5  a 3M/Attenti device?

6     A    No.

7     Q    There's not a model, or --

8     A    Even the wrist units are an STL.  No.  But

9  all the Buddi devices start with STL.

10    Q    Okay.  And it's followed by a four-digit

11 code, right?

12    A    Yes.

13    Q    And that four-digit code just tells you

14 which actual device it is?

15    A    The serial number, right.

16       MS. PETERS:  Can you tell me how much time

17 we have?

18       THE VIDEOGRAPHER:  I think we've been on

19 for about five-and-a-half.

20       MS. PETERS:  Okay.

21 BY MR. HARRIS:

22    Q    Okay.  If you could tell me --

---

327

1     A    I need to use the restroom when we get to a

2  stopping point.

3     Q    Can we look at one document first?

4     A    Right.  I'm not in an emergency.

5     Q    Well, just because I'm getting ready to

6  shift.

7     A    I'll let you know if it's emergency.

8     Q    Yes, please.  I really just have two

9  questions here, but I can't find the document.

10       (Exhibit 7 was marked for identification

11 and attached to the transcript.)

12       MS. PETERS:  Again, all of the documents,

13 Exhibit 4, Exhibit 5, Exhibit 6, I guess this is

14 Exhibit 7, anything with a program participant name

15 where we're discussing or handling program participant

16 information should be designated Confidential within

17 the record.

18 BY MR. HARRIS:

19    Q    So the court reporter has handed you

20 Exhibit 7 to your deposition.  It's a document that

21 has a date on it, 12/12/2019, but that could be a

22 print date.  It has the individual's name, and the

---

328

1  document's entitled Sales Lines.  Do you see that?

2     A    Yes.

3     Q    Okay.  And is this a document that is part

4  of the Capsule documents as you've defined them, or is

5  this more something that would be uploaded?

6     A    This is not going to be in Capsule.  This

7  is Lightspeed.

8     Q    Okay.  This is a printout from Lightspeed?

9     A    This is a printout from Lightspeed.

10    Q    Okay.

11    A    It says that on top anyway.

12    Q    So can you generate one of these sales

13 lines histories from Lightspeed for each RLI bonded

14 principal?

15    A    Theoretically.  I can't.

16    Q    It's possible.

17    A    Yes.

18    Q    Right.  Okay.  And this shows the payment

19 history of this individual, correct?

20    A    I don't know if it's the complete payment

21 history, but it shows payments, yes.

22    Q    Okay.  And so --

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

83 (329 to 332)

Conducted on February 20, 2020

329

1     A     And a short date.

2     Q     -- on January 28th, the individual made

3  three payments?  One thousand one hundred twenty-five

4  dollars, which is described as bond payment to be

5  forwarded to bond company.  Do you see that?

6     A     Yes.

7     Q     Okay.  Does Nexus or Libre forward that

8  payment to a bond company?

9     A     Yes.

10    Q     Okay.  Who would they forward that payment

11  to?

12    A     Whoever the bondsman -- whatever company

13  posted a bond.  I mean, In RLI's case, it would have

14  been Big Marco.

15    Q     Okay.  And the next item, paid on

16  January 28, 2017, there's a collateral service and

17  general consulting fee of $375.  Do you see that?

18    A     I see that.

19    Q     Okay.  And then there's a third payment,

20  new program participant setup fees.  That's that $880

21  figure we saw on the lease agreement, right?

22    A     Yes.

330

1     Q     Okay.  And then looks like on March 22nd,

2  2017, the individual made a full program payment of

3  $420.  Do you see that?

4     A     Yes.

5     Q     Okay.  Is that the monthly lease payment

6  for the GPS monitoring device?

7     A     That is, yes.

8         MS. PETERS:  Object to form.

9  BY MR. HARRIS:

10    Q     And on March 22nd, 2017, it says

11  performance promise payment, $1,005.  Do you know what

12  that's for?

13    A     I don't know what's that -- what that is

14  for.  They may have -- they may have been paying

15  ahead.  I can't tell you from this what that was for.

16  That would be a question for an operations person.

17        MR. HARRIS:  Okay.  Want to take a break?

18        MS. PETERS:  I do.  I wanted to ask you, I

19  think you misstated when you said that something was a

20  GPS rental.  It's listed as program payment, not

21  rental payment.

22        MR. HARRIS:  Well, Mary Donne, if you want

331

1  to testify, that's fine, but the witness testified to

2  something different, so --

3         MS. KATSANTONIS:  What exhibit number is

4  this?

5         MS. PETERS:  It's --

6         THE REPORTER:  That's seven.

7         MS. PETERS:  Pardon?

8         THE REPORTER:  That's seven.

9         THE VIDEOGRAPHER:  We are going off of the

10  record.  The time is 6:08 p.m.

11        (Recess taken, 6:08 p.m. to 6:17 p.m.)

12        THE VIDEOGRAPHER:  Here begins disc number

13  five in the videotaped deposition of Erik Schneider.

14  We are going back onto the record at 6:17 p.m.

15  BY MR. HARRIS:

16    Q     Mr. Schneider, do you recall at your

17  deposition I asked you one final question to identify

18  all of the bases that Nexus is relying on to assert

19  that RLI has acted in bad faith or breached its duty

20  of good faith and fair dealing?

21        MS. PETERS:  Object to form.

22    A     I remember that.

332

1  BY MR. HARRIS:

2     Q     Okay.  I just wanted to talk about some of

3  those things.  And specifically what -- you were

4  testifying as a 30(b)(6) witness.  I want to

5  understand if you have personal knowledge about some

6  of these things.  One of the things you cited was that

7  RLI made a $10 million demand for collateral.  Do you

8  recall that?

9     A     I do.

10    Q     Okay.  Do you have personal knowledge of

11  that demand?

12    A     I don't.  I haven't seen that.

13    Q     Okay.  Who all did you have personal

14  interaction with from RLI?

15    A     Ira Sussman, Laura Piispanen, um, Dave

16  Sandoz.  I think that's it.

17    Q     Did you ever have any contact with, direct

18  contact with Bart Davis?

19    A     I recognize the name.  Did he -- he may

20  have come out for a tour.  He wasn't somebody I dealt

21  with.  I may have talked to him, but no, it wasn't --

22    Q     How about Greg Josen?

333

1    A    Who?

2    Q    Greg Josen?  Might have been an individual

3    that came out?

4    A    Yeah, I recognize the name, but it wasn't

5    somebody I had contact with, talked to.

6    Q    Do you have a -- well -- so one of the

7    things you mentioned was a, kind of a lack of

8    cooperation or obstruction since, I guess after Dave

9    Sandoz left?  Do you recall that testimony?

10   A    I do.

11   Q    Okay.  And as you sit here today, do you

12   have personal knowledge or opinion about that

13   testimony?

14   A    It was a long time ago.  It wasn't

15   necessarily -- it wasn't close to Sandoz -- it wasn't

16   necessarily after Dave Sandoz left, but it was just

17   towards, towards the latter end of our -- probably

18   towards the latter end of our dealings.  I mean, Laura

19   was very hard to work with, very hard to get along

20   with.  Oftentimes, oftentimes the spreadsheets she

21   would provide would have, would have errors on them.

22   Maybe not necessarily her fault, but we would try to

334

1    schedule calls, I think, and she would -- she would be

2    unavailable, she wouldn't be in the office until, you

3    know, days later, but then, um, I -- there was --

4    there was several times we were supposed to have

5    weekly conference calls to, for status.  And I

6    remember in particular, it was an Email exchange

7    between her and Hazaar, and she just simply said she

8    didn't have time for the call, she didn't think we

9    needed it, and she'd be back in the office on Monday,

10   and left without a status call.  That definitely makes

11   it difficult to do the job we're supposed to do.

12   Q    So weekly communication between you and RLI

13   was important?

14   A    Right.  Yeah, we tried, tried to establish

15   some communication, but it was just -- it was

16   difficult.

17   Q    And her lack of availability or seeming

18   refusal to not be able to keep to scheduled calls and

19   meetings was a basis for asserting that we breached

20   the -- that RLI breached the contract?

21        MS. PETERS:  Object to form.

22   A    It was not the basis.  It was one of the

335

1    contributing factors you're asking me to expound on,

2    and I am.  I mean, her general demeanor made her hard

3    to work with.

4    BY MR. HARRIS:

5    Q    Being hard to work with doesn't rise to the

6    level of a breach of contract, does it?

7        MS. PETERS:  Object to form to the extent

8    that it calls for a legal conclusion.

9    A    It would depend on what support you're

10   needing and not getting.  But, um, you know, and then

11   there was -- there was the, you know, the -- the issue

12   with appeals.  At the time, my understanding, my

13   understanding was -- I'm going back a long time --

14   that the bondsman has the right to appeal.  And -- and

15   RLI was -- RLI was wanting to review all the appeals

16   prior to them going out, which was -- you know, those

17   are time sensitive, time sensitive issues.  And then

18   when RLI would review the appeals, RLI in a couple

19   instances, and I'm trying to remember if that's right

20   or not, RLI would determine it wasn't a good appeal,

21   and they didn't want to do it.

22

336

1    BY MR. HARRIS:

2    Q    I think you've mentioned that Pereira --

3    I'm sorry.

4    A    Maybe it was -- maybe it was disputes.

5    Might have been appeals too.  Appeals and disputes.

6    Disputes are different than appeals.  They didn't want

7    to, I guess, impose on their relationship with Vermont

8    to be doing disputes, even when things were error on

9    the government and they should have been disputed.  So

10   there was --

11   Q    Well, when you say they didn't want to

12   impose on their relationship with the government, is

13   that based on any discussion you had with anyone from

14   RLI or DHS?

15   A    I think -- yeah, it was a -- it was a -- I

16   don't remember if it was a phone call with Ira or with

17   Laura, but the gist of the conversation was we can't

18   keep imposing upon Jody to be looking at these one off

19   and constantly want to be disputing things.  And they

20   deserve -- you know, they deserved to be disputed if

21   there was something that wasn't sent on time.  I mean,

22   you know, with -- this isn't about Vermont, but there

337

1  were things that were incorrectly processed on the
2  government's side, and that could have been disputed,
3  and had been disputed, and -- you know, at one point
4  our relationship with Vermont was really good and Jody
5  would gladly, you know, reverse things in dispute. I
6  think the -- I don't believe that has anything -- I
7  don't know if it has anything to do with RLI or our
8  relationship, but it just at some point, maybe the
9  volume got too much, Jody got tired of it.
10     Q    But my question was did you have a
11  conversation with anyone at DHS or RLI that supports
12  your opinion that RLI wasn't interested in disputing
13  because they wanted to preserve a relationship with
14  DHS?
15     A    Yeah. I'm sorry. Maybe I answered that
16  too verbosely. Yes. There was a conversation, I
17  don't remember if it was with Ira or Laura, where they
18  said that they didn't want to do disputes, because we
19  had to stop bothering Jody with all the disputes.
20     Q    Who said that?
21     A    I don't remember if it was Ira or Laura.
22  It was a long, long, long time ago.

338

1      Q    That's a pretty significant issue, right?
2  It rises to the level of bad faith. You don't
3  remember who said that to you?
4          MS. PETERS: Object to the form of the
5  question to the extent you're asking him about what he
6  would have prepared for his 30(b)(6) deposition.
7          MR. HARRIS: No, I'm not. I'm asking about
8  his personal knowledge.
9      A    And I'm telling you I remember a
10  conversation, but I don't remember -- I don't remember
11  who it was with.
12  BY MR. HARRIS:
13     Q    Was it -- so you know that RLI wrote bonds
14  for a year, right? From roughly February 2016 to
15  February 2017, right?
16     A    Uh-huh.
17     Q    Was this conversation before or after the,
18  RLI stopped issuing bonds? And by that I mean
19  immigration bonds.
20     A    I understand. Um, I -- I don't remember.
21  I -- I wasn't prepared for that question. I don't
22  have anything. I just don't remember. Might be able

339

1  to --
2      Q    Did you shoot them an Email to say that's
3  unreasonable, or did you document it to anybody
4  internally or externally?
5      A    I may have. I mean, I don't know. I'd
6  have to look. I don't know. It was a long time ago.
7      Q    Okay. Was that a monumental event, where
8  they told you they're not going to pursue disputes or
9  appeals?
10     A    It was a big deal.
11     Q    Okay.
12     A    It was a big deal, because that was a --
13  that was something that was potentially going to harm
14  our program participants. It was a right that they
15  had, and it was legitimate dispute.
16     Q    Did you raise that issue to anybody in the
17  company, or the Nexus companies?
18     A    Oh yeah. Of course. I talked to Richard,
19  Mike. I mean, we talked about it.
20     Q    But you didn't put it -- did you put it in
21  writing? You don't know?
22     A    I told you I don't remember. I need to

340

1  look.
2      Q    Okay. And did you -- do you recall issuing
3  an objection or a complaint to RLI based on that phone
4  call?
5      A    It wouldn't have been my -- I didn't.
6      Q    Okay.
7      A    Wouldn't have been my job.
8      Q    So, I want to be clear on disputes and
9  appeals. You've mentioned they're different. The
10  appeal is an appeal of the bond breach notice that you
11  have to file within 33 days, if by mail, of the I-323,
12  correct?
13     A    Yeah. Yes.
14     Q    And when you use the term dispute, you mean
15  a challenge to the invoice itself that you raise after
16  the invoice is issued, correct?
17     A    Yes.
18     Q    Okay. And disputes and appeals both have
19  to be in writing, correct?
20     A    Yes.
21     Q    Okay. Do you recall any instance where you
22  submitted a dispute in writing to RLI where they

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

341

1  refused to forward it to DHS?
2  **A   I didn't do that.  That, at the time, would**
3  **have been Juliana Gutierrez was the attorney, the**
4  **staff attorney, working on them.**
5  Q   Have you ever seen a request by Juliana in
6  writing to have RLI submit a dispute with respect to
7  an RLI bond?
8  **A   She didn't -- she didn't send them to me.**
9  Q   So no?
10 **A   No.**
11 Q   Okay.  Do you know whether RLI ever refused
12 to forward a dispute received from Juliana or anyone
13 else associated with Nexus?
14 **A   I personally do not know.  I know that**
15 **Juliana complained a lot about difficulties in dealing**
16 **with RLI and being allowed to do what she needed to**
17 **do.**
18 Q   Was it Juliana's practice to copy anybody
19 on her Emails to RLI?
20 **A   Not me.  I don't know.**
21 Q   What about appeals?  Do you have any
22 knowledge of RLI ever refusing to submit a written

342

1  appeal?
2  **A   Well, RL -- RLI didn't submit the appeals**
3  **Juliana submitted them on behalf of Big Marco.  But, I**
4  **believe RLI complained that it was their right to --**
5  **to have the right to review them and decide whether or**
6  **not they should be submitted, and I think RLI's -- in**
7  **RLI's vocabulary, the contention, the problem was that**
8  **they weren't getting that; that they were going**
9  **directly from Juliana and Marco to the government.**
10 Q   Well, did they take any action against
11 Nexus based on the fact that Nexus was working with
12 Big Marco to submit appeals?
13 **A   I don't know.  I don't know if there was**
14 **conversations with big Marco about it.  I don't know.**
15 **Nothing came across me.**
16 Q   Juliana was formerly employed by Nexus,
17 correct?
18 **A   For a brief time she was employed by Nexus,**
19 **and then she went out and opened her own firm, but**
20 **Nexus still contracted her to do the -- well, Marco --**
21 **Nexus funded them.  Let me correct that.  Nexus or**
22 **do the appeals.  That has been a, kind of a syntax or**

343

1  nomenclature problem the whole time.  Nexus didn't
2  file any appeals.  Marco contracted with Juliana to
3  file the appeals.  Nexus's involvement was funding,
4  because that was our responsibility to Marco, and the
5  Breach Department would provide information to Juliana
6  that she could use for the appeals.  They would send a
7  notice out, These are the cases which can be appealed,
8  and they would go to Juliana.  Juliana would get the
9  authority from Marco, the signature letter, and
10 Juliana would file it.  So to be clear, Nexus didn't
11 file appeals.  It was Marco and Juliana.
12 Q   Who paid for the filing fees for those
13 appeals?
14 A   Nexus Services paid for the filing fees for
15 the appeals.
16 Q   Okay.  So to some extent, Nexus is making
17 these appeals happen, right?
18      MS. PETERS:  Object to form.
19 A   We were indemnifying Marco for the filing
20 fees.
21 BY MR. HARRIS:
22 Q   Okay.  So, RLI didn't stop any appeals from

344

1  being filed, right?
2       MS. PETERS:  Object to form.
3  **A   Not to my knowledge.**
4  **BY MR. HARRIS:**
5  Q   Right.  Because they were still being filed
6  with Big Marco.
7       MS. PETERS:  Object to form.
8  BY MR. HARRIS:
9  Q   Right?
10 **A   To my knowledge.**
11 Q   And Juliana is drafting these appeals?
12 **A   Juliana is drafting these appeals.**
13 Q   And she's contracted by Nexus to do that?
14      MS. PETERS:  Object to form.
15 **A   I don't know if there was a contract.  I**
16 **think she was contracted by Marco.  I don't know if**
17 **there's a contract with Marco.**
18 **BY MR. HARRIS:**
19 Q   Well, I thought you said she was formerly
20 employed by Nexus, and then you contracted with her
21 afterwards.
22 **A   Then I said let me clear that up, --**

345

1    Q    Okay.

2    A    -- because that was wrong. There was a
3  whole conversation about that. I said let me clear
4  that up. That's not correct. She -- Nexus did not do
5  any appeals. She worked for Marco. Marco and Juliana
6  filed the appeals, and Nexus provided the filing fees.

7    Q    So who pays for Juliana's time?

8    A    Nexus compensated Juliana.

9    Q    Okay. And does Nexus, to your knowledge,
10  have an agreement of indemnity with Big Marco?

11    A    I don't know.

12    Q    But you're indemnifying Big Marco. Why
13  would -- why would Nexus be indemnifying Big Marco if
14  they don't have an indemnity agreement with them?

15         MS. PETERS: Object to form.

16  BY MR. HARRIS:

17    Q    Do you know?

18    A    No. Kindness of --

19    Q    Where does Juliana work?

20    A    McNutt Law Firm in Texas.

21    Q    Okay. You're aware that Mr. Sussman at
22  some point issued an Email to someone from Nexus that

346

1  said -- or maybe Juliana herself, saying that RLI
2  would consider any appeals that they wanted to submit
3  for RLI's consideration for potential forwarding to
4  DHS?

5    A    When? I never saw that Email.

6    Q    Okay. Would that change your opinion as to
7  whether RLI was acting in bad faith or breaching its
8  contractual obligations if you knew that RLI had
9  agreed to consider any appeal that they wanted to
10  send?

11         MS. PETERS: Object to the form of the
12  question. It appears you're now trying to convert the
13  witness from a personal deponent back to a 30(b)(6).
14  He is not here today as a 30(b)(6) representative, and
15  he's not been prepared to be a 30(b)(6) --

16  BY MR. HARRIS:

17    Q    Let me ask a foundational question.

18         MS. PETERS: I object to the question as
19  being grossly unfair.

20  BY MR. HARRIS:

21    Q    Do you have personal knowledge or belief
22  that RLI breached any contractual obligations to

347

1  Nexus?

2         MS. PETERS: Object to the form.

3    A    No, I'm not.

4  BY MR. HARRIS:

5    Q    Are you aware of RLI ever acting in bad
6  faith?

7         MS. PETERS: Object to form.

8    A    I -- yes. Well, I believe that their
9  entire demeanor -- you're asking me to draw a legal
10  conclusion on bad faith, and I'm just telling you my
11  opinions are --

12         MR. HARRIS: So Mary Donne, if you're going
13  to stipulate that he's not going to testify to any bad
14  faith --

15         MS. PETERS: No, --

16         MR. HARRIS: Okay.

17         MS. PETERS: -- I'm not going to stipulate.
18  But if you wanted him to be ready to answer 30(b)(6)
19  questions today, you had an obligation to tell us.

20         MR. HARRIS: This is discovery. This is
21  discovery.

22         MS. PETERS: It is discovery of the witness

348

1  in his personal capacity. This witness can go back
2  and refresh his recollection or be supplied with
3  whatever information he needs to sit as a 30(b)(6)
4  witness. But it is grossly unfair to ask him 18
5  months later to try to recapture the data that he
6  prepared to present 30(b)(6) testimony.

7         MR. HARRIS: All I'm asking for today is
8  his personal knowledge and information and beliefs.

9  BY MR. HARRIS:

10    Q    Sir, do you have a belief that RLI acted in
11  bad faith?

12         MS. PETERS: Object to form.

13    A    My personal opinion? Yeah, I have a -- I
14  have a belief that their demeanor, it was not -- it
15  was not conducive to a good relationship. It was not
16  helpful. You know -- you know, --

17  BY MR. HARRIS:

18    Q    So, so far --

19    A    -- I don't think this needed to end up
20  where we are.

21    Q    Yeah. I just want to get what you're
22  basing that opinion on. And so what I've heard so

---

349

1  far, if I can recap today, is that Laura was difficult
2  to work with. Laura didn't always honor conference
3  call times or participate or make herself available
4  for weekly meetings, right? Those are two of the
5  things you said. And that RLI wouldn't submit
6  disputes or appeals as requested by Nexus. Is that
7  fair?
8    **A    Those are things I said, but I think you're**
9  **making light of the severity of how important some of**
10  **those communications were.**
11   Q    Well, what else do you want to tell me that
12  supports your opinion that RLI acted in bad faith?
13    **A    I did not come prepared to rehash**
14  **everything that I thought back then.**
15   Q    I only want to know what your opinion is
16  today and what it's based on.
17    **A    I told you what my opinion is and what it's**
18  **based on.**
19   Q    So there's nothing else?
20     MS. PETERS: Object to form.
21    **A    No, there's nothing else.**
22

---

350

1  BY MR. HARRIS:
2    Q    Okay. Do you have any personal knowledge
3  as to why RLI stopped issuing immigration bonds?
4    **A    I don't have any personal knowledge. You**
5  **mean did I speak to RLI about that?**
6    Q    I just want to know if you have any
7  personal knowledge.
8    **A    My -- my understanding is -- my**
9  **understanding is that, um, it wasn't profitable for**
10  **them to stay on the bonds. They had already made**
11  **their, their, whatever you call it, their money on the**
12  **front end, and they weren't -- and the bonds had hung**
13  **on longer than they expected they would. They thought**
14  **their liability would clear a lot faster, like it**
15  **would with criminal bonds, and they just no longer**
16  **wanted to have the liability with these bonds for such**
17  **a long amount of time. It was a business decision,**
18  **money decision.**
19   Q    Was it -- do you have any information or
20  belief that it was an improper decision?
21    **A    I -- I have a belief that it's an improper**
22  **decision. I mean, they --**

---

351

1   Q    What's that belief based on?
2    **A    They got -- RLI got paid to be on the**
3  **bonds. They knew -- everything -- everything was fine**
4  **when they were posting bonds and they were making,**
5  **making money, and when -- when they realized -- when**
6  **they realized that the bonds were not exonerating as**
7  **fast as they hoped they would, they decided that they**
8  **wanted to unring the bell. They decided they wanted**
9  **out. I -- my personal belief is that that's, um, that**
10  **started a lot of the problems.**
11   Q    Do you know whether RLI had an obligation
12  to continue issuing more bonds?
13   A    No.
14   Q    Okay. Would that change your opinion that
15  it was an improper decision if they had the right to
16  stop issuing bonds at any time?
17    **A    No, we're not talking about issuing bonds.**
18  **I mean, they had a right to stop issuing bonds. Um,**
19  **it wouldn't change my -- the reason that they decided**
20  **to stop issuing bonds is what I think would be**
21  **improper. It probably would've been okay if they just**
22  **said -- I don't know what the conversation was, so --**

---

352

1   Q    Right. So do you have any personal
2  knowledge, a discussion with RLI, a document you've
3  seen, that would give you insight into what RLI's
4  reasoning was for stopping issuing bonds?
5    **A    No.**
6     MS. PETERS: Object to form. Aside from
7  what he may have reviewed in preparation for his
8  30(b)(6) deposition.
9    **A    I formed my opinion watching testimony. I**
10  **mean, I watched -- I watched Mr. Sussman's testimony,**
11  **as passionate as I can get sometimes, and, you know,**
12  **I -- that's what I said, I felt it was --**
13  BY MR. HARRIS:
14   Q    Is there something he said that got you
15  passionate about this?
16    **A    I -- I can't remember a quote.**
17   Q    A gist?
18    **A    Um, yeah, the gist -- the gist was, and I**
19  **don't remember, I don't remember the questions, but**
20  **the gist was just what I said. The -- RLI made the**
21  **money on the front end, and the bonds were just**
22  **sitting there, and they weren't -- they were, um, um,**

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

89 (353 to 356)

---

353

1  I guess holding down the total liability of the
2  company. They were -- they were sitting there and
3  they were creating a liability, and it was bad on the
4  books to have all these big bonds sitting there, and
5  they just wanted out from under them. They just
6  wanted -- my gist, my feeling, my personal opinion of
7  him testifying is they just wanted out. They weren't
8  good for RLI anymore, and they just wanted out from
9  under them. They wanted them gone.
10     Q    Okay. But how does stopping writing more
11 bonds relate to them wanting to get out of liability
12 for the bonds they had already issued?
13         MS. PETERS: I don't understand the
14 question. Object to form.
15     A    Yeah, I don't understand.
16 BY MR. HARRIS:
17     Q    Well, we started this line of questioning,
18 I said was it improper for them to decide to stop
19 issuing bonds? And you're telling me that you believe
20 it was.
21         MS. PETERS: Object to form,
22 mischaracterizes testimony.

---

354

1      A    As a good business partner, um, you -- so
2  I'm sure quarterback is something that already
3  happened. As a good business partner you --
4  BY MR. HARRIS:
5      Q    I didn't understand that.
6      A    I said -- I'm speculating on what may have
7  happened or how I believe it could have been done
8  better. But when you -- when you look at your books
9  and you realize, Oh boy, I'm not making money on this
10 anymore. It's like -- it's -- and this liability
11 sitting here. You know what? Let's just --
12     Q    I don't think anybody wants you to
13 speculate. Okay?
14     A    Well, that's -- you asked me what I think.
15 That's my belief.
16     Q    I asked you for your personal knowledge. I
17 said, have you seen a document or heard somebody
18 having a discussion with RLI? You mentioned Ira's
19 testimony, and I'm wondering what you're talking
20 about. What are you relying on to form an opinion
21 that RLI's decision to stop issuing bonds at the end
22 of February 2017 was improper?

---

355

1      A    I think I answered that.
2      Q    Do you have anything to rely on other than
3  speculation?
4          MS. PETERS: Object to form.
5      A    No. I had no opportunity to prepare for
6  that.
7  BY MR. HARRIS:
8      Q    Okay. Now, with respect to the appeal
9  issue, appeals continued to get filed, notwithstanding
10 RLI's position about whether they wanted to forward
11 appeals, right?
12         MS. PETERS: Object to form.
13     A    To my knowledge, yes.
14 BY MR. HARRIS:
15     Q    Okay. So nothing RLI did stopped appeals
16 from being filed on RLI bonds, right?
17         MS. PETERS: Object to form.
18     A    Sure. Yes. Right.
19 BY MR. HARRIS:
20     Q    Okay. How many appeals of RLI bonds have
21 been filed?
22     A    I have no idea.

---

356

1      Q    Okay. Do you -- can you estimate the
2  percentage of RLI bonds that have been -- received a
3  breach notice, that have then been appealed to the DHS
4  Administrative Appeals Office?
5      A    You asked me that earlier. I don't know
6  the numbers. I don't have numbers.
7      Q    Do you have a ballpark in your head?
8      A    I -- I don't even want to guess. I've been
9  out of it for a long time.
10     Q    Was there a policy at Nexus or Libre to
11 appeal every bond breach?
12         MS. PETERS: Object to form.
13     A    No, we didn't appeal every -- they didn't
14 appeal, Nexus didn't appeal every bond breach. There
15 had to be a basis. The -- the Pereira decision
16 certainly widened the field on, on bonds that could be
17 appealed, and, and a number of those were granted
18 based on that, those -- that basis, so they weren't
19 frivolous appeals.
20 BY MR. HARRIS:
21     Q    How many RLI bonds have been successfully
22 appealed based on a Pereira decision?

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

357

1    A    Chris, I don't have any numbers for you.
2    Q    But you know some exist?
3        MR. HARRIS: Did you get him?  Oh.  I
4    thought she was mad at me.
5    BY MR. HARRIS:
6    Q    I'm sorry.  Do you know how many successful
7    Pereira appeals have been issued on a Nexus-related
8    bond?
9    A    I don't know.
10    Q    Can you identify even one?
11    A    No, not sitting here.  No.
12    Q    Okay.  Who would know that information?
13    A    Hazaar.
14    Q    Okay.
15    A    She keeps track of that.
16    Q    And does she keep track of that in a
17    document?
18    A    Well, it's probably on one of the
19    spreadsheets.
20    Q    Would it be -- would it be the spreadsheet
21    in some form similar to what we looked at as
22    Deposition 16 from your 30(b)(6)?

358

1    A    I don't know.
2    Q    Okay.
3    A    I haven't seen her spreadsheets in almost a
4    year, so I don't know what they --
5        MR. HARRIS: Okay.  Mary Donne we'll follow
6    up with a written request, but obviously, we would
7    like a copy of that document that she uses to track
8    appeals.
9        MS. PETERS: You're going to have to be
10    very specific in your written request, because I'm not
11    going to be able to remember.
12    BY MR. HARRIS:
13    Q    Okay.  You said a number of Pereira appeals
14    have been granted.  What's the basis of that
15    testimony?  What are you relying on to make that
16    statement under oath?
17    A    Um, Hazaar saying, Yay, we got an appeal
18    granted, and it was a -- you know, what was the
19    grounds?  It was an NTA, Notice to Appear issue.  I
20    know she's told me about it several times.  I didn't
21    read them.  I don't have copies of them.
22    Q    But those appeals are --

359

1    A    Just conversation.
2    Q    Those are appeals of bond breaches to the
3    DHS Administrative Appeals Office?
4    A    Yes.
5    Q    Okay.  And how many times did -- you don't
6    recall how many times she exclaimed, Yay, or however
7    communicated that?
8    A    I don't know how many times over a year.
9    Several.
10    Q    Two a year more or less?
11    A    More than that.  I would say more than
12    that, but I don't know.  I don't have a record of it.
13    I can tell you under oath that I know it happened.
14    You keep reminding me I'm under oath.  I understand
15    that.
16    Q    Okay.  And when a appeal is successfully
17    disposed of, Hazaar gets a notice?
18        MS. PETERS: Object to form.
19    BY MR. HARRIS:
20    Q    Or how does Hazaar know when an appeal has
21    been successfully sustained?
22        MS. PETERS: Object to form.

360

1    A    Sometimes it will come from the attorney if
2    they get notice.  Sometimes the notice goes to the
3    surety and the -- I mean the bondsman, and the
4    bondsman office forwards all of that back.  There's
5    communication between the bonding office.
6    BY MR. HARRIS:
7    Q    So Big Marco would've forwarded that?
8    A    Big Marco, yeah, his office would have
9    forwarded that.
10    Q    Okay.  And Nexus could figure out how many
11    appeals had been filed and how many appeals had been
12    successful, right?
13    A    Yes.
14    Q    And the filing fee for each appeal at this
15    point is $675?
16    A    Yes.
17    Q    Okay.  And Nexus pays that fee for each
18    appeal?
19    A    Yes.
20    Q    Isn't it true that Nexus files hundreds of
21    appeals every year?
22    A    Yes.

361

1    Q    And most of them are based on the Pereira
2  decision?
3    A    I don't know.  I don't know what the — I
4  don't know if it's correct to say most.
5    Q    You have some knowledge about the Pereira
6  decision based appeals, right?
7    A    I —
8        MS. PETERS: Object to form, vague.
9    A    I did a year ago.
10 BY MR. HARRIS:
11   Q    Okay.  You understand that other than
12 changing names and dates and that sort of thing, the
13 Pereira based appeals are essentially the same appeal?
14       MS. PETERS: Object to form.
15   A    It doesn't matter.  I mean, it's the
16 basis — and there's — yeah, it's the same law.  I
17 mean, I would assume they're basically the same if
18 it's a Pereira.
19 BY MR. HARRIS:
20   Q    If you file an appeal within 33 days,
21 doesn't that extend the time with which DHS will seek
22 to issue and enforce an invoice?

362

1    A    It's supposed to.  If it's — I guess my
2  understanding now, if it's received within 33 days.
3  And under the, under the CFR it's supposed to void
4  that invoice, and if the appeal is rejected or denied,
5  then DHS needs to issue a new invoice, but that's not
6  what's happening.
7    Q    And what is happening?
8    A    They're enforcing the original invoice in
9  most cases.
10   Q    Despite an appeal pending?
11   A    Yes.
12   Q    A timely appeal.
13   A    Yes.
14       MS. PETERS: Object to form.
15 BY MR. HARRIS:
16   Q    And by timely appeal, I mean, as you said,
17 one that's been received by DHS within 33 days.
18       MS. PETERS: Object to form.
19   A    I don't know currently.  You know, there
20 was a — there was a — there was some arguing about
21 Mailbox Rule and end delays, and there was — there
22 was some argument with DHS about addresses and them

363

1  changing addresses, so I really don't --
2  BY MR. HARRIS:
3    Q    I just want to be clear, because you made a
4  statement that you thought that DHS was now, now
5  enforcing invoices notwithstanding a timely appeal.
6        MS. PETERS: Object to form.
7  BY MR. HARRIS:
8    Q    I want to make sure, are you going to
9  testify to that, or would you testify to that?
10       MS. PETERS: Object to form.
11   A    Um, no, I think they have to -- I think
12 they have to enforce the invoice if it's -- they have
13 to void the invoice if it's a timely appeal.
14 BY MR. HARRIS:
15   Q    Right.  But if I understood you right, you
16 were saying DHS was no longer rescinding the invoices,
17 but seeking to --
18   A    Misspoke.  I'm not in that department
19 anymore, so I just have to go by what I hear, and
20 that's probably not what I want --
21   Q    Okay.  I want to look at some documents
22 here.

364

1        (Exhibit 8 was marked for identification
2  and attached to the transcript.)
3  BY MR. HARRIS:
4    Q    So the court reporter has handed you
5  Exhibit 8 to your deposition.  For the record it
6  purports to be an Email dated -- or it's an Email
7  chain starting with an Email dated February 11, 2016,
8  from Dave Sandoz to yourself, Erik Schneider, right?
9    A    Yes.
10   Q    Okay.  And the date of this Email is
11 February 11, 2016.  Is that about the time that RLI
12 started issuing immigration bonds, to the best of your
13 recollection?
14   A    Yeah, to the best -- yeah, about that time.
15 After that.
16   Q    Okay.  And the second Email down in the
17 chain is from you to Dave Sandoz -- or sorry, you to
18 Mike Donovan, copying Dave Sandoz.  But if you read
19 the Email it says, Hello Dave, and you're telling Dave
20 you're looking forward to working with him, and
21 introducing yourself with an Email address, right?
22   A    Uh-huh.  Yes.

---

365

1   Q      You ask him to please copy all notices to
2   both addresses, right?
3   A      Yes.
4   Q      Okay.  So -- and by both addresses, you're
5   referring to yourself and Stephanie Nunez?
6   A      Yes.
7   Q      Was Stephanie Nunez kind of a predecessor
8   to Hazaar?
9   A      Yes.
10  Q      Okay.  And then he responds in the Email
11  above that, Thanks, Erik.  Is there a good time I can
12  come out to talk with you and meet Stephanie too?  I
13  just take up an hour of or so of your time making sure
14  I see examples of what you typically get in, and
15  learning a bit more about your process and the team
16  network you use to be so effective.  Do you see that?
17  A      Yes.
18  Q      Okay.  So you understood here he's
19  requesting a visit to come see how the operation works
20  at --
21  A      Yes.
22  Q      -- Nexus, right?

366

1   A      Yes.
2   Q      And if you look down at the bottom Email on
3   the chain -- well, the bottom one on this first page
4   of the exhibit, there's an Email on February 10th,
5   2016.  And it's an Email from Mike Donovan to Dave
6   Sandoz.  It says, Dave, please find attached our year
7   end 15 balance sheet.  Can we plan to submit bonds
8   tomorrow?  We also have processed the first
9   installment of the collateral.  Do you see that?
10  A      Oh, on the back of this.  Okay.
11         MS. PETERS: Object to form.
12  A      I see that.
13  BY MR. HARRIS:
14  Q      Okay.  Do you have any knowledge of whether
15  or not Nexus submitted a first installment of
16  collateral to RLI on or about February of 2016?
17  A      I have no idea.  I wouldn't have been --
18  Q      Okay.  Do you have any knowledge about
19  whether or not Nexus ever submitted any cash
20  collateral to RLI?
21  A      Um, I would need to -- I believe there was
22  a check that was sent at one point.  I don't remember

367

1   what the amount was.
2   Q      Was that before or after the, RLI stopped
3   issuing bonds?
4   A      I don't -- I don't know.  I'm going off,
5   again, what I -- or maybe I'm recalling from testimony
6   I saw in court.  So no, I don't have any personal
7   knowledge.
8          (Exhibit 9 was marked for identification
9   and attached to the transcript.)
10  BY MR. HARRIS:
11  Q      Okay.  So the court reporter has handed you
12  Exhibit 9.  For the record, it's a -- starts with --
13  another Email chain that starts with an Email from
14  Dave Sandoz to yourself dated March 23, 2016.  Do you
15  see that?
16  A      Yes.
17  Q      Okay.  And he's following up here, the
18  prior request.  He says, Hi Erik.  Hope all is well.
19  I just reached out to Rick on an issue and asked him
20  about giving me some times in early May that I can
21  come out for a quick couple-hour visit.  I hope I'll
22  be able to stop in for a few minutes to say "hi" when

368

1   I'm out there.  Do you see that?
2   A      Yes.
3   Q      Okay.  He's following up on his request to
4   come out, right?
5   A      Yes.
6   Q      And he says, When we talked last month, you
7   were hoping to get a packet sent off to me summarizing
8   things from your area, which will help us understand
9   your function better, and help us identify the various
10  documents from the court we will receive related to
11  our principals.  Did you ever send such a packet?
12  A      I don't — I don't remember.  I'd have to
13  look in my Email.
14  Q      If you did send a packet, it would be in
15  your Email?
16         MS. PETERS: Object to form.
17  A      Yeah.  Yes.
18  BY MR. HARRIS:
19  Q      And he's explaining why he's asking for it,
20  right?  He goes on to say, We don't want to do
21  anything that puts things in a bad position for you or
22  us because we didn't understand the process.  Right?

**369**

1    A    I read that.

2    Q    Okay.  And he says, We all know we are to

3  send you any notices we receive, but we would like to

4  understand things better from your perspective.

5  Right?

6    A    Yes.

7    Q    Okay.  And then he gives you an address to

8  where to send the packet.

9    A    I see that.

10    Q    Okay.  As you sit here today, you don't

11  recall submitting any packet, correct?

12    A    I don't re —

13        MS. PETERS:  Object to form.

14    A    That's what I said, I don't recall.

15        MR. HARRIS:  Okay.

16        (Exhibit 10 was marked for identification

17  and attached to the transcript.)

18        MS. PETERS:  This is ten, Madam Court

19  Reporter?  This is 11?  Ten.  So was the document with

20  the Bates label 615, last digits, that would've been

21  eight?  I just want to be sure we're not double

22  labeling.

**370**

1        MR. HARRIS:  Eight is February 11, 2016.

2        MS. PETERS:  Okay.

3  BY MR. HARRIS:

4    Q    You know, in that first year before RLI

5  stopped, decided to stop issuing bonds, was there a

6  point in your mind that sticks out as when the

7  relationship soured?

8    A    From my perspective, um, I think it was

9  around -- from my perspective, it was around the time

10  I was having the difficulties in communicating and

11  getting information to and from Laura.  And I was

12  complaining to Richard, or, you know, consulting with

13  Richard about, you know, what are we going to do?

14    Q    Like her lack of responsiveness?

15    A    Yeah.  Her, you know.

16    Q    And do you know, can you tie that to, say,

17  end of February, 2017, when RLI's elected to stop

18  issuing bonds, whether it was before or after that?

19    A    I'd have to look at the Emails.  A lot of

20  that is actually, is actually in Email.  But I don't

21  know the dates off the top of my head.

22    Q    Okay.  Court reporter's put in front of you

**371**

1  Deposition Exhibit 10.  It's a May 10th, 2016, Email

2  chain starting with, or the latest of which is from

3  Laura to you.  Do you see that?

4    A    Yes.

5    Q    Okay.  She's asking you to give her a call,

6  right?

7    A    Yes.

8    Q    Okay.  And she's forwarding you a Notice to

9  Obligor to Deliver Alien, right?

10    A    Yes.

11    Q    Okay.  If you turn to the next page, the

12  referenced Notice to Obligor to Deliver Alien is

13  attached?

14    A    Yes.

15    Q    Okay.  And this is on Form I-340, correct?

16    A    Yes.

17    Q    Okay.  And this instructs RLI and

18  presumably Big Marco as well, by separate notice, to

19  deliver an alien at a specific date, place, and time,

20  correct?

21    A    Yes.

22    Q    Okay.  Do you have an understanding as to

**372**

1  whether you're allowed to depart, or the bond

2  obligation -- strike that.

3        Do you have an understanding as to whether

4  the bond obligation allows the obligors to deviate

5  from the date, place, and time set forth in this

6  instrument?

7        MS. PETERS:  Object to form.

8    A    It's at the discretion of the ERO officer.

9  This is -- this is something that you would have to

10  have communication with the ERO officer.  I mean, I

11  don't know this particular program participant, but if

12  we -- in other occasions where we had someone who was

13  required to go to Stemmons in Dallas, and they may

14  live in Northern Virginia, we would take them to ICE

15  at 1801 Bell Street up in Arlington, and they would

16  either take them in or they would reset a date.  Some

17  ERO officers don't allow you.  The same thing with the

18  time, as long as you're there before they close,

19  they'll take them in.

20  BY MR. HARRIS:

21    Q    Okay.

22    A    The danger of being there too late is

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

94 (373 to 376)

---

373

1  you're not going to get the advocacy.  If you go too
2  late, they're not going to be willing to listen to
3  your advocacy and the person's going to get remanded.
4  So you want to try to be there on, on their schedule.
5      Q    Okay.  So it says, warning, right?  Below
6  all of that.  Failure to deliver or have the alien
7  appear in accordance with this demand may result in a
8  declaration of a breach of bond, right?
9      A    Uh-huh.
10     Q    And a breach of bond is what triggers a
11  payment obligation on behalf of the surety, right?
12     A    Yes.
13     Q    Okay.  And so it says may result in a
14  declaration of a breach of bond, its forfeiture to the
15  government, and a warrant for the arrest of the alien
16  may be issued, right?
17     A    Yes.
18     Q    Okay.  So we talked about that earlier,
19  right?  A bond breach is -- you said it was the
20  equivalent of a warrant for arrest?
21     A    Yes.
22     Q    Okay.  And that's what's indicated in this

---

374

1  form, correct?
2      A    Yes.
3          MS. PETERS:  Object to form.
4      A    It also says may.
5  BY MR. HARRIS:
6      Q    Sure.
7      A    It's important.  It says may.
8      Q    Sure.  So, the individual in this Notice to
9  Obligor has a name with the initials DM -- DMH.  Okay?
10     A    Yes.
11     Q    And we're going to refer back to this
12  individual.
13         MS. PETERS:  For the record, we want to
14  note that Exhibit 10 needs to be marked confidential
15  pursuant to protective order.
16     (Exhibit 11 was marked for identification
17  and attached to the transcript.)
18  BY MR. HARRIS:
19     Q    Okay.  You've been handed Deposition
20  Exhibit 11.  For the record, it's Email dated June 9,
21  2016.  It says, Please see Notice to Obligor to
22  Deliver Alien, and it references an individual with

---

375

1  the initials LRV.  Do you see that?
2      A    Yes.
3      Q    Okay.  And that Notice to Deliver is
4  attached, right?
5      A    Yes.
6      Q    Okay.
7     (Exhibit 12 was marked for identification
8  and attached to the transcript.)
9  BY MR. HARRIS:
10     Q    Sir, if you could look at Deposition
11  Exhibit 12 the court reporter's handed you.  It's an
12  Email also dated June 9, 2016, forwarding a Notice to
13  Deliver with a different individual of initials GMR.
14  Do you see that?
15     A    Yes.
16     Q    Okay.
17         MS. PETERS:  Again, we'd request that this
18  exhibit be marked confidential pursuant to protective
19  order.
20  BY MR. HARRIS:
21     Q    And all of these, these last three Emails
22  we've looked at are being forwarded from RLI to Nexus,

---

376

1  correct?
2      A    Yes.
3      Q    Okay.  And the reason they're forwarding
4  them to Nexus is because you've undertaken to deliver
5  these people.
6         MS. PETERS:  Object to form.
7  BY MR. HARRIS:
8      Q    Correct?
9      A    Yes.
10     (Exhibit 13 was marked for identification
11  and attached to the transcript.)
12  BY MR. HARRIS:
13     Q    The court reporter has handed you
14  Deposition Exhibit 13.  It starts with an Email dated
15  June 23, 2016, from Barb Roberts with RLI to Big Marco
16  and Nexus.  It says, Please see Notice - Immigration
17  Bond Breached.  Do you see that?
18     A    Yes.
19     Q    And the individual who is on this breach
20  notice is the one we saw first, DMH.  Do you see that?
21     A    Yes.
22     Q    Okay.  And she was -- I don't know if you

---

377

1  recall from the original notice, but it recaps it
2  here, she was supposed to be delivered on June 2,
3  2016, and they're saying no, she was not, correct?
4      **A    They're saying she was not, yes.**
5      Q    Okay.  And that's -- do you have any reason
6  to dispute that she was not delivered --
7          MS. PETERS: Object to form.
8  BY MR. HARRIS:
9      Q    -- on that day?
10     **A    I'd have to look at the notes.  I mean --**
11     Q    As you sit here today.
12     **A    According to this, not.**
13     Q    Okay.  And I want to look, direct your
14  attention to the text at the bottom.  This is ICE Form
15  I-323, right?
16     **A    Yes.**
17     Q    And it says below the last kind of blank
18  line there, Any cash or U.S. bonds pledged as security
19  for the above-described bond will be forfeited to the
20  United States, or in the case of a surety bond, the
21  surety invoiced for the full amount of the bond, if
22  this decision is not appealed in accordance with -- in

378

1  accordance with the procedures described below, right?
2      **A    I see that.**
3      Q    Okay.  And then it says, You have a right
4  to appeal this decision by completing the enclosed
5  Form I-290B "Notice of Appeal" and filing the form
6  together with the appropriate filing fee and a brief
7  written statement setting forth the reasons and the
8  evidence supporting the appeal to the nearest
9  Detention and Removal Office, and it gives you some
10  directions on where that is, within 30 days of the
11  date of this notice.  If no appeal is filed within the
12  time allowed, this decision is final.  You would agree
13  that if you don't file a timely appeal, it becomes
14  administratively final, right?
15         MS. PETERS: Object to form.  Object to
16  form to the extent it asks this witness for a legal
17  conclusion.
18  BY MR. HARRIS:
19     Q    Do you have an understanding as to whether,
20  or at what point in the process a bond breach becomes
21  administratively final?
22     **A    Well, according to this statement, 30 days.**

379

1   **But there's -- in the rules there's caveats to that.**
2   **If a motion to reopen is filed or if an appeal that**
3   **would otherwise substitute as a motion to reopen,**
4   **because there's meritorious reasons why it wasn't**
5   **filed on time, that the AAO has the discretion to**
6   **accept the appeal even if wasn't within the 30 days.**
7      Q    But according to this form, if not filed on
8  time, it becomes administratively final.
9      **A    According to this form, but the reality is**
10  **that doesn't always — I mean, that's what it says,**
11  **but the reality is that doesn't always happen.**
12     Q    Okay.  And who from RLI was responsible for
13  addressing breach notices on or about June of 2016?
14         MS. PETERS: Object to form.
15     **A    Well, looks like it was Barb Roberts.**
16  BY MR. HARRIS:
17     Q    I'm sorry.  Who from Nexus?
18     **A    Oh, uh —**
19         MS. PETERS: You asked about RLI.
20         MR. HARRIS: Okay.
21     **A    Stephanie Nunez.**
22

380

1          (Exhibit 14 was marked for identification
2  and attached to the transcript.)
3  BY MR. HARRIS:
4      Q    Okay.  So, the court reporter has handed
5  you Deposition Exhibit 14.  It's a June 28, 2016,
6  Email from Dave Sandoz to people at RLI, CCing you and
7  Rick Nagel from Nexus.  Do you see that?
8      **A    Say that again?  I don't see Rick Nagel on**
9  **here.**
10     Q    Did I give you the wrong document?  Okay.
11  I think I did.  I was going too fast here.
12         MS. PETERS: Madam Court Reporter, how long
13  have we been going?
14         Thirty minutes left, Counselor.
15         MR. HARRIS: Okay.  Can we remark that?
16  That was an accidental marking.
17         (Exhibit 14 was remarked for identification
18  and attached to the transcript.)
19         MS. PETERS: So this is now Exhibit 14.
20         MR. HARRIS: Fourteen, yeah.  Apologies.
21  BY MR. HARRIS:
22     Q    Okay, sir.  This is a June 28, 2016, Email

---

381

1 from Dave Sandoz to RLI folks copying you and Rich
2 Nagel, right?
3     **A    Yes.**
4     Q    Okay.  And he says, While we were on the
5 call, I received confirmation that Erik would be the
6 one who will keep you updated on any breach notices we
7 receive, and confirm that Nexus has stepped in and
8 addressed any eventual problem.  And he provides
9 Erik's phone number.  Did that information come from
10 Nexus?
11     MS. PETERS:  Object to form.
12     **A    Yes, I was in charge of the new Breach**
13 **Department then.**
14 **BY MR. HARRIS:**
15     Q    Well, and you were in charge with
16 communicating with RLI with respect to breach notices,
17 invoices, notices to deliver, right?
18     MS. PETERS:  Object to form.
19     **A    Yes.  And --**
20     MR. HARRIS:  I'll give you two at once.
21     MS. PETERS:  While you're organizing there,
22 Exhibit 13 should also be marked confidential pursuant

---

382

1 to court order, Exhibit 12, and ten.
2     Okay.  These are our new ones?
3     MR. HARRIS:  Yes.
4     MS. PETERS:  Which one is the next one?
5     MR. HARRIS:  Well, you're making your
6 objection, so we haven't had a chance to mark them.
7     Mary Donne, to save time, I think we can
8 agree that any document that refers to an individual
9 will be -- that portion of the transcript will be
10 designated as confidential pursuant to the protective
11 order.
12     MS. PETERS:  And the exhibit itself will be
13 designated.
14     MR. HARRIS:  Correct.  Well, it's already
15 marked, right?  Well, maybe not.
16     MS. PETERS:  No, it's not.  And these are
17 your documents.
18     MR. HARRIS:  Well, that's -- you're going
19 to designate our documents as confidential?
20     MS. PETERS:  Subject to the court order,
21 because it refers to an individual.  I think the judge
22 was clear.

---

383

1     MR. HARRIS:  I'm going to object to
2 designations of RLI documents as confidential.
3     MS. PETERS:  On what basis?
4     MR. HARRIS:  I'm not going to get into it
5 right now.  We can discuss it afterwards.
6     (Exhibit 15 and 16 were marked for
7 identification and attached to the transcript.)
8     MS. PETERS:  I am going to want to have
9 that discussion on the record.
10     MR. HARRIS:  Mary Donne, she can't work
11 while you're talking.  We can do it at the end and
12 release Mr. Schneider.
13     MS. PETERS:  Okay.
14 BY MR. HARRIS:
15     Q    So the court reporter has handed you
16 Exhibits 15 and 16.  Quickly, see these are breach
17 notices for the other two individuals we saw before,
18 initials LRV and GMR, right?
19     **A    Yes.**
20     Q    And RLI's forwarding these to Nexus as
21 well?
22     MS. PETERS:  Which is which?  Which is 15?

---

384

1 Which is 16?
2     MR. HARRIS:  Fifteen is LRV.
3     So -- strike that.
4     (Exhibit 17 was marked for identification
5 and attached to the transcript.)
6 BY MR. HARRIS:
7     Q    Okay, Mr. Schneider.  The court reporter
8 has handed you Deposition Exhibit 17.  It's an
9 August 29, 2016, Email from Barb Roberts of RLI to Big
10 Marco and Nexus, forwarding an invoice for an
11 individual DMH.  Right?
12     **A    Yes.**
13     Q    Okay.  And this invoice is dated August 25,
14 2016.  Right?
15     **A    Yes.**
16     Q    Okay.  And these invoices, by their terms,
17 are due upon receipt, correct?  Or due, due upon
18 issuance?
19     MS. PETERS:  Object to form.  To the extent
20 it calls for a legal conclusion.
21     **A    They are not due on receipt.  As a matter**
22 **of fact, it says right on the invoices 30 days.  So**

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

97 (385 to 388)

---

385

1  the invoice is dated 25 August.  Its due date is 24
2  September.  They're not due on receipt.
3       (Exhibit 18 was marked for identification
4  and attached to the transcript.)
5  BY MR. HARRIS:
6     Q    Okay.  The court reporter has handed you
7  Exhibit 18.  It's a September 19, 2016, Email from
8  Laura Piispanen to yourself, forwarding an invoice
9  from individual GMR that we saw earlier, correct?
10    A    Yes.
11    Q    Okay.  And if you look, the invoice date is
12 September 15, 2016?
13    A    Yes.
14    Q    And on the face, it has a due date of
15 October 15, 2016.  Do you see that?
16    A    Yes.
17    Q    And on the next page of the exhibit, it
18 sets forth terms that are part of the invoice, right?
19    A    Yes.
20    Q    Okay.  And the first line says, Payment
21 due.  This bill is due and payable on receipt.  Do you
22 see that?

---

386

1     A    I see that.
2     Q    Okay.  So this invoice, notwithstanding
3  that you're permitted 30 days to pay, by its terms, is
4  due and payable on receipt, correct?
5          MS. PETERS:  Object to the form of the
6  question to the extent that it calls for a legal
7  conclusion.
8     A    I mean, I can read, but I see a due date of
9  15 October.
10 BY MR. HARRIS:
11    Q    Okay.  The next line and payment due
12 paragraph says, Failure to remit the amount shown on
13 the reverse side within the time specified on the
14 invoice will result in additional charges as required
15 by the Debt Collection Improvement Act of 1996.  Do
16 you see that?
17    A    Which line?
18    Q    Same paragraph.
19    A    Oh, same line.  Yes.
20    Q    Okay.  So did you understand if an invoice
21 is not timely paid as required on the face of the
22 invoice, that additional charges will accrue?

---

387

1     A    Yes.
2          MS. PETERS:  Object to form to the extent
3  it calls for a legal conclusion.
4  BY MR. HARRIS:
5     Q    If you look down at disputes, review, and
6  decisions, it says, You have 30 days to dispute the
7  validity of this debt or any portion thereof.  Then it
8  says, Unless a written request disputing the debt is
9  sent to the office indicated above within 30 days,
10 et cetera.  We talked about that before, right, a
11 dispute has to be in writing?
12    A    Yes.
13    Q    Okay.  And then the next paragraph,
14 Standards for assessing late charges provides that
15 interest will be assessed monthly if payment is not
16 received within 30 days of the date of the invoice,
17 right?
18    A    Yes.
19    Q    Okay.  So if interest is added to the penal
20 sum, then the exposure on the bond has increased
21 beyond the penal sum of the bond, correct?
22          MS. PETERS:  Object to form.

---

388

1     A    Yes.  It's an additional fee.
2  BY MR. HARRIS:
3     Q    Right.  Okay.  And then the next paragraph
4  says, Consequences of the Failure to Pay, and it lists
5  a bunch of other consequences of a failure to pay,
6  right?
7     A    Yes.
8     Q    Collection efforts, one of them says, first
9  one, With certain exceptions, the Debt Collection
10 Improvement Act of 1996 requires agencies to transfer
11 a debt or claim that has been delinquent 120 days or
12 more to the Department of Treasury for collection.  Do
13 you see that?
14    A    Yes.
15    Q    Okay.  And you're aware, are you not, that
16 RLI expressed a concern about invoices being referred
17 to Treasury?
18          MS. PETERS:  Object to form.
19    A    Yes.
20 BY MR. HARRIS:
21    Q    Right.  They did that, correct?
22    A    Yes.

---

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

98 (389 to 392)

389

1    Q    Okay.  And you knew that was a concern of
2    theirs during this initial year of the program?
3    A    Yes.
4         MS. PETERS:  Object to form.
5    BY MR. HARRIS:
6    Q    Okay.
7         MS. PETERS:  How many minutes remaining?
8         THE VIDEOGRAPHER:  Twenty exactly.
9         MS. PETERS:  Okay.  Thank you.
10        (Exhibit 19 was marked for identification
11   and attached to the transcript.)
12   BY MR. HARRIS:
13   Q    Okay.  The court reporter has handed you
14   Deposition Exhibit 19.  It's an exchange of Emails
15   between Tania Cortes and Laura Piispanen copying you.
16   Top of the chain dated October 3rd, 2016.  Do you see
17   that?
18   A    Yes.
19   Q    Okay.  And this is a discussion, starts
20   with the discussion by Laura where she's wanting to
21   touch base and wanted to summarize her understanding
22   of the process.  And asked for a correction from Nexus

390

1    if she needed to be filled in on anything, right?
2    A    Yes.
3    Q    Okay.  And first thing she says is she
4    clarifies who at Nexus should be copied on any
5    correspondence they received from DHS, right?  That's
6    there at the bottom of the first page?
7         MS. PETERS:  Are you asking him to read
8    what's on the page?
9    A    Yeah, I see that.
10   BY MR. HARRIS:
11   Q    Do you see it?  Okay.  And you see your
12   name there?
13   A    Yes.
14   Q    So Laura understood she was supposed to
15   copy you and Tania Cortes on correspondence with DHS,
16   right?
17   A    Yes.  And Marco.
18   Q    Right.  Okay.  And then she goes on to
19   detail her understanding of the process, that the
20   first notice is a Notice to Deliver, the second thing
21   would be a breach, and the third would be an invoice
22   in those first three paragraphs?  Do you see that?

391

1    A    Yes.
2    Q    And then she says, I believe you told me
3    Nexus always files an appeal.  I'm not clear at what
4    point that happens, and I would like copies if
5    possible, or at least a confirmation that an appeal
6    has been filed.  Do you see that?
7    A    I see that.
8    Q    So you understood, did you not, that Laura
9    was requesting confirmation of any appeal that was
10   filed?
11   A    Yes, I see that.  I don't remember if --
12   this was a long time ago, but I see that now.
13   Q    Okay.  And she concludes at the bottom,
14   Just so we are on the same page, at this time I have
15   four bonds with invoices.  Please advise status.  And
16   we see here that DMH, LRV, and GMR at the bottom are
17   the three bonds we've been looking at, right?
18   A    Yes.
19   Q    Okay.  So she's confirming that she's
20   received at least three invoices as of October 3rd,
21   2016, right?
22   A    Yes.

392

1    Q    Okay.  And after an invoice has been
2    issued, it typically indicates that the time to appeal
3    a breach determination has expired, correct?
4         MS. PETERS:  Object to form.
5         THE REPORTER:  I'm sorry.  I didn't hear
6    your answer.
7    A    Um, yes, according to the, to the invoice.
8    It doesn't mean you still can't send an appeal.
9         (Exhibit 20 was marked for identification
10   and attached to the transcript.)
11   BY MR. HARRIS:
12   Q    Okay.  The court reporter has handed you
13   Deposition Exhibit 20.  It starts with an Email dated
14   October 24, 2016.  It's about this individual GMR, is
15   one of the first three individuals we discussed today,
16   and she's forwarding a past due notice.
17   A    Okay.
18   Q    Do you see that?
19   A    I do.
20   Q    Okay.  And it attaches the past due notice
21   on the next page.  Do you see that?
22   A    Yes.

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

99 (393 to 396)

393

1    Q    Okay.  And it adds -- $17.22 in interest
2 has been added to the invoice, right?
3    A    I see that.
4    Q    So exposure on this bond is now $20,017.22,
5 right?
6    A    That's what it says.
7    Q    And Laura forwarded this to yourself and
8 Tania Cortes at Nexus, correct?
9    A    That's what it says.
10    Q    Okay.  Do you know when the invoice for
11 this individual GMR was paid?
12    A    I would have no idea.
13    Q    Okay.
14        (Exhibit 21 was marked for identification
15 and attached to the transcript.)
16 BY MR. HARRIS:
17    Q    Okay.  Deposition Exhibit 21 has been
18 placed before you.  It's dated December 15, 2016.  Do
19 you see that?
20    A    I do.
21    Q    Okay.  And attached to it is correspondence
22 from DHS to RLI and Big Marco, right?

394

1    A    Yes.
2    Q    Okay.  And it's saying that the three bonds
3 listed on the first page are all past due.  Do you see
4 that?
5    A    I — I guess that's what a — what is a
6 C-O-R-R?
7    Q    I'm sorry?
8    A    I don't know what the term CORR means.
9    Q    Well, our records show that invoice
10 numbers, and it lists three numbers, are past due,
11 right?
12        MS. PETERS:  Object to form.
13    A    Where are you?  Oh, you're looking at the
14 letter.  Okay.  I'm on the wrong page.
15 BY MR. HARRIS:
16    Q    Page 328818.
17    A    Sure.  Yes.
18    Q    Okay.  It's saying that the three invoices
19 referenced in this letter are all past due, right?
20    A    Yes.
21    Q    Okay.  And if you look, there's three
22 exhibits.  Look at page 28822.  This is our individual

395

1 DMH, with a due date on the original invoice of
2 December 9, 2016.  Do you see that?
3    A    No.  What number are you on?
4    Q    Page 328822.  Actually, I'd said original
5 invoice.  I think this was a mitigated invoice, so --
6 but this invoice is dated -- its due date is
7 December 9, 2016.  Do you see that?
8    A    Yes.
9    Q    And that's for our individual DRM.  Or DMH?
10 Sorry.
11    A    Yeah, I see that.  Yes.  I'm sorry.  I was
12 reading.
13    Q    Okay.  And the other two individuals are
14 the other two that we've been talking about?  Invoice
15 on page 328839 for individual LRV.  Do you see that?
16    A    Yes.
17    Q    And that due date is October 15, 2016,
18 right?
19    A    That's what it says.
20    Q    Okay.  And then if you flip to 328856,
21 there's a third invoice dated -- due also on
22 October 15, 2016, for our third individual GMR.  Do

396

1 you see that?
2    A    Yes.
3    Q    Okay.  So, this is being forwarded from
4 Tania Cortes to yourself on December 15, 2016, right?
5 Same day it was received from Laura at RLI?
6    A    Yes.
7    Q    Okay.  So as of December 15, 2016, these
8 invoices are all a couple months past due, right?
9        MS. PETERS:  Object to the form.
10 BY MR. HARRIS:
11    Q    Based on the invoice dates?
12        MS. PETERS:  -- to the extent it calls --
13    A    Yes.
14        MS. PETERS:  And to complete my objection,
15 to the extent that it calls for a legal conclusion.
16        MR. HARRIS:  Sure.
17        (Exhibit 22 was marked for identification
18 and attached to the transcript.)
19 BY MR. HARRIS:
20    Q    The court reporter has handed you
21 Deposition Exhibit 22.  I just want you to -- well, it
22 starts with an Email from Dave Sandoz to Mike Donovan,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020

100 (397 to 400)

---

**397**

1  dated December 15, 2016, but then the next Email is
2  where I want you to look. It's from Dave Sandoz to
3  you December 15th. Dave Sandoz is asking for copies
4  of appeal records again, right? In the event any --
5  it says, Anyway, in conversation today with our Claim
6  Department, we discussed the current process and
7  determined we would like one more step added to the
8  appeal or payment for breach. In the event of any
9  appeal, we would like confirmation from you that you
10 have entered an appeal by receiving a copy of the
11 appeal for our records. Then if it's later determined
12 that the bond is breached and payment to ICE is
13 required, we would like a copy of the check sent to
14 ICE for our records. Do you see that?
15     **A    Yes.**
16     Q    Okay. Was that RLI's practice, to send
17 copies of checks and appeal records as of December 15,
18 2016?
19         MS. PETERS: Object to form.
20     **A    Copies of checks would not have been**
21 **something that would have been something I would have**
22 **done or Breach would have done at that point. That**

**398**

1  **would have been an accounting issue, so I — that's**
2  **what they're asking for in this Email.**
3         MR. HARRIS: How much time do I have?
4         THE VIDEOGRAPHER: Nine minutes.
5         MS. PETERS: Come on, Chris.
6         (Exhibit 23 was marked for identification
7  and attached to the transcript.)
8  BY MR. HARRIS:
9     Q    Okay. The court reporter has handed you
10 Deposition Exhibit 23. It starts with a January 10,
11 2017, Email from Bart Davis to Mike Donovan copying
12 Laura. He's -- well, let's start at the bottom there.
13 So first there's an Email under it from Laura to Bart.
14 And she is saying, I have had no response from Erik.
15 I do not have proof of payment on three checks that
16 were supposed to be cut on January 5th, 2017. Do you
17 see that?
18     **A    Yes.**
19     Q    And again, that's DMH and LRV and GMR.
20 Those are the three invoices we've been talking about.
21     **A    Yes.**
22     Q    Okay. So she's at least telling her team

**399**

1  that she doesn't have copies of those checks on
2  January 10th -- or January 10th, 2017, right?
3     **A    Yes.**
4     Q    Okay. And she has no proof of appeals on
5  the appeals set forth in the next section, right?
6     **A    Yes.**
7     Q    Okay. She says, I just called Marco
8  LiMandri, the bail agent. He checked the database and
9  there is no record of checks being cut. When I told
10 him Erik had assured me they would be cut January 5th,
11 2017, he said he would pull the physical file and call
12 Richard. Do you recall any of that?
13     **A    I don't recall that specifically, but that**
14 **would be what I would do, is call Richard at that**
15 **time.**
16     Q    Okay. Do you have any reason to dispute
17 what Laura is saying in this Email?
18         MS. PETERS: Object to form.
19     **A    Um, I don't.**
20 **BY MR. HARRIS:**
21     Q    So then she says, I reminded Marco these
22 are three files we received a demand from DHS on with

**400**

1  the threat of further action. He said, quote, "Yes,
2  we need to get these paid," right?
3     **A    I see that.**
4     Q    So then Bart takes this Email, forwards it
5  to Mr. Donovan, and says, Mike, we, we need help with
6  this ASAP. We need evidence that these were paid by
7  your organization on the 5th today, right?
8     **A    I see that.**
9         (Exhibit 24 was marked for identification
10 and attached to the transcript.)
11 BY MR. HARRIS:
12     Q    Deposition Exhibit 24 is an Email from
13 Mr. Donovan to Bart Davis responding to that Email we
14 just looked at. It's dated January 10, 2017. He
15 says, Bart, Laura, I have confirmed that these checks
16 were cut and sent. I am having our finance team pull
17 copies of the checks and I will be sending them along
18 to you tomorrow morning. To confirm, we processed the
19 following checks on January 5th, 2017, and it's our
20 same three individuals we've been discussing, right?
21     **A    Yes.**
22     Q    Do you know whether those checks were cut

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

401

1 on January 5, 2017, and sent?

2 **A   I would have no idea.  That wasn't -- that**

3 **wasn't part of my -- I wouldn't have known.**

4 (Exhibit 25 was marked for identification

5 and attached to the transcript.)

6 BY MR. HARRIS:

7 Q   Okay.  You have Deposition Exhibit 25.  On

8 January 17, 2017, Richard Moore is Emailing Laura.

9 Laura, I have been out of the off -- out of town for

10 the last two weeks.  I am back and will make sure you

11 get copies ASAP.  I am so sorry for the delay.  If you

12 look below, Laura -- he's responding to Laura saying,

13 Good morning, Richard.  I just got off the phone with

14 Erik Schneider, and suggested I contact you regarding

15 check copies.  Same three individuals, right?

16 **A   Yes.**

17 Q   So as of January 17, 2017, Laura still

18 doesn't have proof of any payments on January 5, 2017,

19 right?

20 **A   That's what the Email says.**

21 Q   Okay.  Do you have any reason to dispute

22 what she's saying?

402

1 **A   I don't have any.**

2 (Exhibit 26 was marked for identification

3 and attached to the transcript.)

4 BY MR. HARRIS:

5 Q   Deposition Exhibit 26 is an Email chain,

6 the last of which is from Bart Davis to Mike Donovan

7 on January 30, 2017.  You see below on Monday,

8 January 30, 2017, Ira -- or sorry, Bonnie Heitman of

9 RLI Emailed Ira and Bart Davis, copying Laura.  It

10 says, Gentlemen, you may recall Libre by Nexus was to

11 have sent the checks below to the Department of

12 Homeland Security on January 5, 2017.  Then she goes

13 below, Laura received communication today from the

14 Department of Homeland Security that these payments

15 have not been received.

16 And then the upper Email, Bart Davis

17 advises Mike Donovan, Mike, please see the below

18 correspondence.  Because Nexus has not paid these

19 claims as agreed and contrary to your Email to me on

20 January 10th, copy attached titled Nexus Payments, RLI

21 will be forced to do so tomorrow.  As a result of your

22 failure to meet your obligations under this program

403

1 and the Indemnity Agreement you executed with RLI on

2 January 20, 2016, to guarantee, I will be suspending

3 your authority to execute any further bonds on behalf

4 of RLI effective February 1st, 2017.  Do you see that?

5 **A   I do.**

6 Q   Okay.  Do you have any reason to dispute

7 the representation that Laura received communication

8 from DHS that the payments had not been received as of

9 January 30th, 2017?

10 MS. PETERS:  Object to form.

11 **A   No.  This is all accounting stuff, so I've**

12 **not seen it.  I see checks, dated January 5th.**

13 THE VIDEOGRAPHER:  One minute left.

14 MR. HARRIS:  Okay.  One more exhibit.

15 MS. PETERS:  One minute.

16 (Exhibit 27 was marked for identification

17 and attached to the transcript.)

18 BY MR. HARRIS:

19 Q   Okay.  So Deposition Exhibit 27 is an Email

20 from Jody Prescott dated February 3, 2017.  It says,

21 Hi Laura, the two other checks have arrived and will

22 be posted.  Apropos the information you were given,

404

1 they were actually sent January 30th, 2017, not

2 January 25th, 2017.  Do you see that?

3 **A   I read that, yes.**

4 Q   Okay.  And if you look through the chain,

5 they're referring to the same checks that were

6 promised on January 5, 2017.

7 **A   Okay.**

8 Q   So, do you have any reason to dispute that

9 the checks that Mr. Donovan advised had been cut and

10 sent on January 5th, 2017, were not, in fact, actually

11 sent until January 30th, 2017, as represented by

12 Mr. Prescott in this Email?

13 **A   I can read the Email, but all of this is**

14 **outside of anything I deal with, so I don't**

15 **understand.  I mean, I understand what it says, but I**

16 **don't have any reason to dispute it, because I have**

17 **not been involved in it.**

18 MR. HARRIS:  Okay.  Can I put in one more

19 Email?

20 MS. PETERS:  No.  You're done.

21 MS. KATSANTONIS:  Let me see.

22 MS. PETERS:  The witness will reserve the

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

102 (405 to 408)

405

1 right to read and sign his deposition.

2        THE VIDEOGRAPHER:  This marks the end of

3 the videotaped deposition of Erik Schneider.  We're

4 going off of the record at 7:47 p.m.

5        MS. PETERS:  We can be off the video

6 record.  I am disturbed, deeply disturbed, by your

7 communication to me that you do not believe that

8 program participant data held in the custody of RLI is

9 confidential.  Can you elaborate on that, Counselor?

10        MR. HARRIS:  Okay.  So, it was your -- was

11 your request to mark the versions that are attached to

12 the transcript confidential?

13        MS. PETERS:  Yes.

14        MR. HARRIS:  Okay.  I misunderstood.  I

15 thought you were asserting under the protective order

16 that you were going to designate documents from RLI's

17 files subject to the protective order, generally

18 speaking.

19        MS. PETERS:  Generally speaking, Judge

20 Urbanski has indicated that all program participant

21 data is confidential, and that RLI cannot use it to

22 cause individuals to be deported.

406

1        MR. HARRIS:  That's not what he's ordered.

2 RLI maintains its own bond files, and you're not going

3 to put a restriction on RLI's bond files.  The

4 protective order deals with disclosing -- documents

5 that are disclosed to another party that are not

6 already in their possession.  So these are already in

7 RLI's possession.  We're not going to have you

8 designating them as subject to the protective order.

9        Now, the copy that gets attached to the

10 transcript as a deposition exhibit, that's fine.

11 You're within your rights there.  I misunderstood you,

12 so I will rescind my comments to that respect.  But

13 no, we're not going to have you designating RLI's

14 files just because we happen to use them in court to

15 all of a sudden become subject to the protective

16 order.  It doesn't provide that.

17        MS. PETERS:  We'll agree to disagree about

18 what Judge Urbanksi ordered in August of 2019.  But

19 for now, I want to make sure, this is incredibly

20 important to my client, that RLI's treating program

21 participant personally identifiable information as

22 confidential.

407

1        MR. HARRIS:  We were complying with the

2 protective order in all respects.

3        MS. PETERS:  And with federal law I assume.

4        MR. HARRIS:  Just as you are, Mary Donne.

5 Just as you are.

6        MS. PETERS:  I think there is an

7 obligation --

8        MR. HARRIS:  I think we're all complying

9 with the law.

10        MS. PETERS:  -- under federal law, and

11 under California Consumer Privacy Act, and --

12        MR. HARRIS:  Okay.  We're not going to have

13 a legal debate here.  If you want to make a statement

14 for the record, that's fine.  But we're not going to

15 continue to debate this.

16        You finished?

17        MS. PETERS:  We are finished.

18        MR. HARRIS:  Very good.

19        THE REPORTER:  Can I get you to state your

20 transcript orders on the record, please?

21        MS. PETERS:  We would like the electronic

22 version of this deposition with exhibits attached.

408

1 And we would -- when are you getting your copy?.

2        MS. KATSANTONIS:  Not for a while.

3        MS. PETERS:  Like what is a while?

4        MS. KATSANTONIS:  Like -- what is today?

5 Thursday?  Eight to ten days.  Next Friday.

6        MS. PETERS:  I see.

7        MS. KATSANTONIS:  Why?  I mean, do you want

8 it sooner?  Is that what you're saying?  Why did you

9 say "I see" that way?

10        MS. PETERS:  Okay.  So I'm trying to

11 understand --

12        MS. KATSANTONIS:  I said next Friday.

13        MS. PETERS:  Next Friday.  We understand

14 this is the -- I don't want to run up huge legal fees.

15 Do you do rough transcript at an extra cost,

16 electronic transcript?

17        (Discussion was held with reporter

18 regarding transcript production and delivery off the

19 record.)

20        (Off the record, 7:52 p.m.)

21

22

409

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2        I, Michelle L. Lonas, RPR, CCR, the officer

3    before whom the foregoing deposition was taken, do

4    hereby certify that the foregoing transcript is a true

5    and correct record of the testimony given; that said

6    testimony was taken by me stenographically and

7    thereafter reduced to typewriting by me; that reading

8    and signing was requested; and that I am neither

9    counsel for, related to, nor employed by any of the

10   parties to this case and have no interest, financial

11   or otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 24th day of

14   February, 2020, in Shenandoah County, Virginia.

15

16    _Michelle L. Lonas_ _____

17   Michelle L. Lonas, Notary Public #169569

18   Commonwealth of Virginia at Large

19   REGISTERED PROFESSIONAL REPORTER

20   CERTIFIED COURT REPORTER #0313254

21

22   My commission expires on the 31st day of May, 2023.

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

104

**A**

a-i-l-a
178:12, 178:13

a-j-i-n
32:5

aao
200:20, 205:7,
205:10, 379:5

ability
180:13, 216:16,
273:9

able
14:15, 57:20,
110:10, 133:6,
134:15, 134:16,
135:7, 135:11,
139:10, 139:15,
141:18, 142:2,
143:21, 144:14,
161:8, 167:11,
167:15, 167:17,
168:10, 179:16,
180:14, 193:10,
193:13, 197:10,
197:12, 223:18,
223:22, 224:16,
225:7, 230:16,
238:12, 251:19,
252:12, 252:14,
259:8, 269:5,
270:8, 274:1,
334:18, 338:22,
358:11, 367:22

above
31:22, 32:18,
41:10, 44:16,
45:8, 45:18,
46:12, 216:1,
365:11, 387:9

above-described
377:19

absolutely
200:17, 271:20

accept
201:14, 379:6

access
44:10, 44:13,

74:15, 74:16,
119:7, 254:10,
255:13, 255:16,
255:20, 280:7,
280:10, 280:14,
282:17, 282:19,
283:4, 283:5,
283:6, 283:15,
283:18, 283:22,
284:16, 284:20,
285:14, 285:16,
285:18, 285:19,
286:2, 286:7,
286:11, 290:13

accessed
256:19

accidental
380:16

accompanied
111:14, 111:15

accomplished
314:3

accordance
373:7, 377:22,
378:1

according
87:22, 99:20,
237:14, 377:12,
378:22, 379:7,
379:9, 392:7

account
17:10, 275:8

accounting
46:14, 46:16,
46:17, 47:4,
47:5, 47:9,
47:16, 48:5,
66:12, 73:5,
147:18, 148:3,
149:14, 150:12,
150:16, 150:18,
166:17, 166:19,
167:14, 167:17,
167:20, 199:9,
398:1, 403:11

accounts
17:11

accrue
386:22

accurate
139:5, 253:6

achieve
179:17

achieved
97:6

achieving
147:13

across
62:2, 92:20,
144:19, 177:18,
270:20, 342:15

act
39:14, 99:4,
100:15, 386:15,
388:10, 407:11

acted
331:19, 348:10,
349:12

acting
65:5, 346:7,
347:5

action
342:10, 400:1

activation
304:21

active
269:5

activities
40:13

actual
91:20, 101:7,
138:7, 145:7,
191:16, 202:6,
240:3, 326:14

actually
20:21, 30:1,
99:22, 108:10,
130:14, 132:10,
139:3, 156:15,
201:5, 206:22,
209:22, 239:16,
370:20, 395:4,
404:1, 404:10

add
226:18, 285:15

added
30:2, 81:17,

accurate
101:5, 248:11,
300:22, 301:3,
301:8, 387:19,
393:2, 397:7

additional
386:14, 386:22,
388:1

address
13:7, 43:10,
128:11, 200:11,
200:12, 217:17,
364:21, 369:7

addressed
381:8

addresses
362:22, 363:1,
365:2, 365:4

addressing
379:13

adds
393:1

adjusted
191:13

adjusts
260:8

admin
280:11

administrative
203:11, 356:4,
359:3

administratively
378:14, 378:21,
379:8

admissibility
80:3

advance
304:18

advertise
131:5, 135:8

advertised
177:17

advertises
128:13, 134:5

advertising
131:8, 131:9

advise
115:19, 201:18,
203:21, 391:15

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020                                              105

**advised**
11:8, 116:17, 207:10, 219:17, 404:9
**advises**
402:17
**advising**
12:10, 149:17
**advocacy**
373:1, 373:3
**advocate**
107:11, 123:10
**advocated**
27:6
**aff**
85:16
**affidavit**
4:14, 16:2, 85:20, 131:11, 132:17, 172:19, 173:2, 174:8, 175:2, 182:6, 182:14, 185:14, 185:21, 210:1, 217:10
**affidavits**
16:5, 129:7
**affiliate**
90:9
**affiliated**
86:7, 86:10, 86:12
**affirm**
97:1
**affixed**
269:4, 409:13
**after**
22:6, 69:11, 200:21, 206:11, 206:12, 206:15, 206:17, 206:18, 206:21, 207:8, 207:9, 217:4, 236:1, 245:6, 248:17, 252:8, 262:10, 262:11, 262:18, 276:17, 306:21, 309:3,

321:16, 333:8, 333:16, 338:17, 340:15, 364:15, 367:2, 370:18, 392:1
**afterwards**
128:11, 344:21, 383:5
**again**
24:14, 62:16, 89:6, 93:4, 93:16, 96:9, 103:20, 105:15, 121:14, 140:14, 169:17, 176:16, 185:15, 189:7, 195:7, 201:1, 202:15, 204:10, 232:1, 246:17, 251:9, 258:1, 263:2, 306:14, 316:19, 317:21, 325:9, 327:12, 367:5, 375:17, 380:8, 397:4, 398:19
**against**
14:20, 81:21, 102:6, 108:1, 109:2, 162:3, 342:10
**age**
187:7, 275:7
**agencies**
388:10
**agency**
251:4
**agent**
29:5, 98:17, 98:22, 99:7, 99:15, 100:16, 100:19, 101:10, 105:3, 105:6, 106:22, 116:13, 117:7, 157:19, 158:1, 158:17, 214:13, 240:13, 399:8

**agent's**
158:17
**agents**
29:12, 32:8, 100:3, 100:10, 106:18, 155:22
**aggregate**
190:19, 191:4, 192:12, 192:22
**ago**
19:10, 46:22, 53:11, 55:14, 71:8, 86:21, 189:8, 196:9, 201:11, 249:17, 269:10, 314:9, 315:10, 333:14, 337:22, 339:6, 361:9, 391:12
**agree**
88:1, 108:13, 111:6, 187:17, 194:5, 222:10, 230:16, 234:9, 234:14, 378:12, 382:8, 406:17
**agreed**
130:1, 130:21, 346:9, 402:19
**agreement**
2:11, 77:19, 77:22, 78:4, 78:11, 78:14, 78:16, 78:17, 78:18, 78:20, 79:22, 85:1, 86:2, 87:6, 88:19, 89:3, 90:3, 90:7, 91:21, 92:22, 95:4, 95:11, 95:15, 95:17, 95:18, 95:21, 96:6, 96:11, 96:14, 96:16, 133:16, 237:15, 237:18, 237:20, 238:2, 238:6,

**agent's**
158:17
**agreements**
80:15, 86:19, 290:18
**agrees**
194:2
**ahead**
150:4, 186:10, 293:17, 296:20, 325:13, 330:15
**ahold**
244:5, 320:10
**aila**
178:10
**airports**
30:15
**ajin**
21:2, 21:4, 21:6, 31:16, 32:3, 32:5, 32:7, 34:12, 44:17, 286:20
**ajin's**
174:9
**al**
1:8, 9:5, 83:20, 182:10, 182:11
**alarming**
187:1
**alert**
252:22, 257:1, 309:14, 317:5
**alerts**
253:18, 257:2, 316:16
**alien**
113:1, 371:9, 371:12, 371:19, 373:6, 373:15, 374:22

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

106

allegations
84:16
allow
210:18, 216:17,
219:18, 219:20,
220:6, 220:14,
221:8, 222:3,
222:8, 222:13,
223:10, 234:5,
281:17, 285:5,
372:17
allowed
107:13, 216:3,
216:10, 216:12,
341:16, 372:1,
378:12
allowing
210:2
allows
20:14, 211:20,
372:4
almost
154:11, 235:21,
314:16, 314:17,
358:3
along
159:16, 159:17,
333:19, 400:17
alphabetized
308:21
already
27:9, 28:19,
91:19, 103:2,
128:22, 141:17,
188:16, 237:1,
310:15, 350:10,
353:12, 354:2,
382:14, 406:6
also
3:21, 26:18,
84:1, 89:1,
98:22, 113:11,
129:17, 155:18,
218:8, 221:8,
227:3, 233:7,
234:20, 246:7,
257:12, 257:17,
259:9, 261:5,

274:2, 295:15,
298:6, 307:17,
325:18, 325:19,
366:8, 374:4,
375:12, 381:22,
395:21
always
23:15, 77:16,
113:17, 117:21,
219:2, 222:12,
263:12, 271:6,
349:2, 379:10,
379:11, 391:3
american
178:14
among
129:2
amount
118:6, 118:17,
137:10, 192:13,
203:2, 204:22,
208:22, 224:18,
241:2, 241:5,
241:8, 241:21,
261:22, 262:11,
305:20, 350:17,
367:1, 377:21,
386:12
amounts
191:8, 241:19
analysis
148:11, 163:16,
244:11
andrea
79:13
anecdotal
269:2
angeles
33:17, 35:1
anger
117:22
ankle
272:18, 272:20
annette
79:14, 79:16
another
19:18, 65:8,
65:9, 71:20,

72:6, 92:7,
100:22, 112:4,
118:1, 118:21,
130:18, 143:22,
158:3, 175:2,
188:1, 236:9,
237:3, 238:16,
251:4, 269:15,
285:13, 313:5,
324:17, 326:3,
367:13, 406:5
answer
13:16, 14:5,
19:15, 26:8,
34:5, 35:14,
39:21, 49:15,
49:16, 50:15,
52:3, 52:4,
53:5, 59:11,
61:8, 108:1,
108:14, 111:18,
118:21, 125:20,
129:1, 132:22,
142:6, 160:4,
160:12, 164:14,
168:7, 180:17,
187:11, 187:15,
188:4, 202:16,
209:16, 215:18,
222:11, 223:5,
223:14, 225:7,
231:7, 233:20,
233:21, 235:17,
243:17, 257:13,
286:4, 347:18,
392:6
answered
14:11, 61:13,
70:18, 106:15,
157:9, 188:16,
337:15, 355:1
answering
226:14, 246:3,
312:4
answers
14:7
anybody
109:1, 119:1,

174:7, 190:3,
198:9, 218:18,
284:17, 311:21,
339:3, 339:16,
341:18, 354:12
anymore
30:3, 34:7,
46:11, 66:21,
67:16, 201:15,
233:15, 261:22,
268:17, 318:18,
353:8, 354:10,
363:19
anyone
69:12, 79:2,
180:18, 256:19,
277:18, 336:13,
337:11, 341:12
anything
10:18, 25:21,
37:17, 37:21,
50:20, 82:12,
168:11, 172:1,
181:4, 186:5,
200:18, 202:7,
204:11, 204:21,
219:14, 222:7,
248:3, 270:4,
289:18, 289:20,
327:14, 337:6,
337:7, 338:22,
355:2, 368:21,
390:1, 404:14
anytime
143:13
anyway
154:8, 263:3,
328:11, 397:5
anywhere
103:11, 149:12,
176:12, 225:16,
263:10
ap
199:6
apart
124:12
apologies
204:5, 380:20

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

107

**apparently**
319:8
**appeal**
167:2, 203:10,
205:6, 205:10,
207:22, 335:14,
335:20, 340:10,
342:1, 346:9,
355:8, 356:11,
356:13, 356:14,
358:17, 359:16,
359:20, 360:14,
360:18, 361:13,
361:20, 362:4,
362:10, 362:12,
362:16, 363:5,
363:13, 378:4,
378:5, 378:8,
378:11, 378:13,
379:2, 379:6,
391:3, 391:5,
391:9, 392:2,
392:8, 397:4,
397:8, 397:9,
397:10, 397:11,
397:17
**appealed**
167:1, 208:7,
343:7, 356:3,
356:17, 356:22,
377:22
**appeals**
27:1, 203:11,
207:18, 207:21,
208:4, 209:1,
209:6, 335:12,
335:15, 335:18,
336:5, 336:6,
339:9, 340:9,
340:18, 341:21,
342:2, 342:12,
342:22, 343:2,
343:3, 343:6,
343:11, 343:13,
343:15, 343:17,
343:22, 344:11,
344:12, 345:5,
345:6, 346:2,

349:6, 355:9,
355:11, 355:15,
355:20, 356:4,
356:19, 357:7,
358:8, 358:13,
358:22, 359:2,
359:3, 360:11,
360:21, 361:6,
361:13, 399:4,
399:5
**appear**
87:8, 93:9,
96:19, 113:20,
175:7, 212:17,
213:5, 216:11,
322:20, 326:4,
358:19, 373:7
**appearance**
215:3
**appears**
87:16, 88:4,
88:13, 88:16,
93:22, 94:2,
94:6, 213:5,
320:9, 346:12
**apples**
143:9, 176:16
**apples-to-apples**
177:7
**application**
52:20, 240:3,
243:21, 245:12
**appointed**
68:20
**appointment**
27:5, 109:15,
109:16, 110:18,
111:9, 111:12,
112:3, 112:8
**appointments**
111:13, 123:10
**appreciate**
164:14, 164:20,
272:3
**appropriate**
57:19, 131:21,
378:6
**approval**
299:11, 299:14,

300:4, 302:7,
322:17
**approve**
242:16
**approved**
299:14
**approximately**
50:6
**approximation**
137:1
**april**
314:21
**apropos**
403:22
**area**
124:14, 124:16,
368:8
**areas**
74:15
**aren't**
117:19, 125:10
**arena**
41:4
**argue**
133:12
**arguing**
362:20
**argument**
362:22
**arguments**
222:22
**arizona**
105:5, 105:7,
105:21, 271:8,
313:11
**arlington**
372:15
**armed**
24:19
**around**
30:9, 30:10,
30:18, 30:22,
50:19, 71:22,
100:8, 257:9,
263:4, 370:9
**arredondo**
322:16
**arrest**
99:17, 106:5,

106:10, 106:11,
106:13, 106:22,
107:8, 107:18,
107:21, 108:4,
108:7, 108:14,
157:5, 157:20,
274:10, 373:15,
373:20
**arrested**
104:5, 105:11,
105:13, 105:18,
107:12, 109:1,
110:6, 156:1,
156:16, 258:15
**arrived**
403:21
**arroyo**
79:13
**articles**
177:5, 177:18
**asap**
400:6, 401:11
**ashamed**
231:20
**aside**
15:15, 93:10,
105:10, 194:22,
195:2, 195:7,
229:1, 306:4,
352:6
**asked**
29:15, 29:17,
33:8, 50:6,
61:13, 69:10,
95:8, 110:16,
153:7, 157:4,
159:17, 175:8,
180:11, 188:4,
255:22, 260:21,
264:6, 272:19,
274:19, 303:21,
331:17, 354:14,
354:16, 356:5,
367:19, 379:19,
389:22
**asking**
14:1, 52:7,
59:13, 79:4,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    108

79:6, 89:14,
91:19, 100:12,
103:3, 103:4,
114:19, 122:3,
129:20, 133:11,
138:4, 141:20,
141:21, 143:1,
143:13, 147:9,
161:13, 167:6,
187:2, 187:11,
187:13, 194:2,
194:5, 195:4,
195:14, 216:12,
220:16, 221:6,
222:7, 222:18,
243:7, 245:13,
260:21, 278:10,
294:21, 296:15,
298:14, 306:17,
323:1, 335:1,
338:5, 338:7,
347:9, 348:7,
368:19, 371:5,
390:7, 397:3,
398:2
**asks**
51:10, 378:16
**assert**
331:18
**asserting**
334:19, 405:15
**assessed**
387:15
**assessing**
387:14
**assessment**
245:12, 248:5,
298:7, 299:2
**assign**
247:2, 248:7
**assigned**
299:5, 302:14,
323:11, 325:3
**assigns**
307:7, 307:18,
307:19
**assist**
213:16

**assistance**
107:14
**assisting**
23:9
**associ**
178:14
**associated**
341:13
**association**
178:6, 178:15
**assume**
21:5, 38:10,
38:11, 48:19,
80:15, 90:20,
90:21, 103:10,
152:7, 226:15,
268:6, 268:12,
278:21, 279:1,
279:3, 309:11,
325:11, 325:15,
361:17, 407:3
**assumption**
91:22, 95:10
**assurance**
284:12
**assured**
399:10
**asylum**
238:19, 239:3,
240:2, 287:11,
288:6, 322:10,
322:19
**atlanta**
3:17, 46:16,
47:6, 77:10,
77:15, 77:17
**attached**
4:10, 52:13,
83:12, 83:22,
182:2, 188:20,
279:20, 297:2,
327:11, 364:2,
366:6, 367:9,
369:17, 371:13,
374:17, 375:4,
375:8, 376:11,
380:2, 380:18,
383:7, 384:5,

385:4, 389:11,
392:10, 393:15,
393:21, 396:18,
398:7, 400:10,
401:5, 402:3,
402:20, 403:17,
405:11, 406:9,
407:22
**attaches**
392:20
**attachment**
5:9
**attachments**
5:13, 5:17,
5:21, 6:7, 6:11,
6:15, 6:18, 7:4,
7:7, 7:21
**attempt**
212:16
**attempting**
181:11
**attend**
224:11
**attended**
26:15, 224:1,
224:5, 224:10,
224:19, 225:17
**attending**
237:2
**attenti**
252:19, 253:8,
257:6, 257:20,
259:1, 264:15,
269:4, 270:2,
324:2, 324:14,
326:5
**attention**
17:7, 245:8,
298:18, 377:14
**attest**
134:16
**attested**
173:4
**attesting**
55:21, 132:18,
174:8
**attorney**
59:10, 62:18,

99:13, 107:14,
210:22, 214:16,
218:22, 230:2,
230:3, 246:10,
341:3, 341:4,
360:1
**attorneys**
178:15
**attribute**
180:3
**attributing**
179:16
**auditor**
284:12
**august**
52:18, 54:3,
54:10, 314:21,
318:4, 384:9,
384:13, 385:1,
406:18
**authored**
56:1, 59:14
**authority**
98:14, 156:15,
157:20, 203:15,
214:11, 218:15,
218:18, 247:9,
286:8, 286:10,
343:9, 403:3
**authorization**
157:18, 159:15
**authorizations**
295:17
**authorize**
157:21
**automatic**
241:18, 299:11,
299:13, 299:14,
300:3
**automatically**
102:7, 283:17,
300:8
**availability**
334:17
**available**
26:8, 117:16,
349:3
**average**
176:4, 176:5,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020                                    109

177:3, 178:21,
179:13, 238:8
**averages**
236:17, 270:11
**avoid**
27:8, 156:13
**aware**
27:2, 91:3,
102:11, 118:13,
160:5, 200:15,
220:5, 223:9,
237:21, 284:17,
291:17, 295:3,
302:13, 345:21,
347:5, 388:15
**away**
20:10, 39:20,
136:5, 136:8,
259:22

**B**

**b) (6**
226:1, 332:4,
338:6, 346:13,
346:14, 346:15,
347:18, 348:3,
348:6, 352:8,
357:22
**baby**
125:13
**back**
21:19, 23:18,
33:9, 50:2,
63:18, 69:7,
70:9, 74:1,
81:16, 107:7,
108:22, 109:11,
109:20, 112:1,
116:14, 117:18,
118:1, 145:4,
154:18, 155:19,
157:9, 158:10,
164:5, 165:3,
172:17, 185:10,
201:5, 201:6,
201:7, 203:8,
204:15, 205:11,
205:15, 205:19,

208:1, 218:3,
225:19, 228:20,
228:21, 231:14,
246:18, 250:8,
251:8, 256:14,
258:14, 258:15,
262:19, 268:14,
268:15, 271:18,
278:6, 297:21,
298:5, 319:7,
321:3, 331:14,
334:9, 335:13,
346:13, 348:1,
349:14, 360:4,
366:10, 374:11,
401:10
**background**
97:5
**backup**
279:22
**backwards**
129:3, 316:6
**bad**
116:8, 125:10,
231:21, 319:8,
319:9, 320:7,
331:19, 338:2,
346:7, 347:5,
347:10, 347:13,
348:11, 349:12,
353:3, 368:21
**bag**
271:6
**bail**
23:7, 98:2,
98:16, 98:22,
99:7, 99:9,
99:10, 99:12,
99:15, 99:18,
99:19, 100:2,
100:9, 100:13,
100:15, 100:19,
100:21, 101:7,
101:10, 101:12,
101:17, 102:6,
102:8, 102:9,
105:3, 106:17,
106:22, 116:13,

117:6, 155:21,
157:19, 157:22,
214:13, 216:21,
217:2, 217:11,
274:6, 311:10,
399:8
**balance**
163:20, 262:20,
262:21, 312:21,
366:7
**ballpark**
356:7
**bane**
6:5, 6:9
**barb**
5:11, 5:15,
5:19, 6:13,
376:15, 379:15,
384:9
**barnes**
48:1, 77:1,
77:18, 84:17,
85:7, 86:8,
95:17, 95:20,
96:13, 96:17,
97:1
**barnes's**
92:20
**barred**
236:4
**bart**
332:18, 398:11,
398:13, 400:4,
400:13, 400:15,
402:6, 402:9,
402:16
**base**
33:21, 156:10,
265:17, 389:21
**based**
43:5, 75:21,
81:19, 83:3,
95:6, 103:21,
104:2, 110:12,
138:10, 141:13,
143:12, 148:12,
149:7, 162:1,
174:16, 175:10,

187:4, 189:4,
189:9, 194:11,
195:6, 199:14,
206:7, 218:20,
222:22, 224:4,
232:13, 240:21,
249:6, 249:10,
265:13, 275:7,
280:4, 283:18,
336:13, 340:3,
342:11, 349:16,
349:18, 351:1,
356:18, 356:22,
361:1, 361:6,
361:13, 396:11
**baseline**
145:3
**bases**
331:18
**basic**
126:10, 244:7
**basically**
192:7, 255:7,
361:17
**basing**
348:22
**basis**
10:18, 19:11,
151:18, 151:19,
166:6, 186:21,
234:2, 298:15,
334:19, 334:22,
356:15, 356:18,
358:14, 361:16,
383:3
**bates**
12:1, 303:3,
306:12, 369:20
**battery**
253:21, 254:1,
254:2, 260:14,
316:15, 317:7,
317:8, 323:21
**bcm**
298:21
**bearing**
238:10, 271:20
**bears**
73:22

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

110

**became**
77:4, 77:14,
85:7, 97:1,
253:8, 257:6
**become**
18:4, 19:8,
25:22, 406:15
**becomes**
292:2, 378:13,
378:20, 379:8
**before**
2:11, 13:12,
13:21, 53:3,
53:5, 54:22,
55:8, 63:7,
66:13, 69:11,
144:1, 160:14,
175:20, 182:22,
183:4, 184:9,
231:12, 245:18,
255:22, 261:12,
262:12, 280:1,
286:21, 295:13,
310:7, 338:17,
367:2, 370:4,
370:18, 372:18,
383:17, 387:10,
393:18, 409:3
**began**
295:13
**beginning**
36:2, 82:17,
90:2, 91:5,
234:22, 239:11,
251:19, 322:15
**begins**
9:2, 63:16,
154:16, 250:6,
331:12
**behalf**
3:2, 3:12,
9:18, 9:19,
39:5, 79:22,
86:6, 131:14,
132:20, 133:2,
133:3, 134:9,
136:18, 137:2,
242:14, 244:17,

342:3, 373:11,
403:3
**behind**
252:3
**being**
11:13, 26:8,
41:3, 46:5,
100:14, 100:19,
108:9, 125:9,
160:18, 177:4,
230:16, 236:13,
248:3, 263:4,
318:4, 318:11,
319:16, 335:5,
341:16, 344:1,
344:5, 346:19,
355:16, 372:22,
375:22, 388:16,
396:3, 399:9
**beings**
125:15, 135:12,
165:11, 269:1,
277:9
**belief**
10:15, 184:15,
346:21, 348:10,
348:14, 350:20,
350:21, 351:1,
351:9, 354:15
**beliefs**
348:8
**believe**
20:5, 30:6,
42:16, 47:18,
48:9, 68:13,
69:10, 73:6,
73:7, 74:2,
81:22, 127:5,
127:19, 127:22,
128:4, 128:7,
152:20, 153:1,
158:16, 186:14,
190:6, 190:12,
201:11, 201:16,
264:2, 310:6,
315:20, 337:6,
342:4, 347:8,
353:19, 354:7,

366:21, 391:2,
405:7
**bell**
351:8, 372:15
**below**
38:21, 144:8,
226:5, 240:21,
241:20, 241:22,
256:3, 314:18,
373:5, 377:17,
378:1, 401:12,
402:7, 402:11,
402:13, 402:17
**below-average**
173:16
**bench**
219:4, 219:8
**benefit**
236:12
**benefits**
232:21
**besides**
324:16
**best**
10:14, 13:19,
39:9, 40:8,
61:9, 63:6,
63:9, 66:8,
67:1, 67:8,
67:18, 68:11,
70:6, 70:8,
71:14, 72:17,
79:11, 83:3,
85:10, 85:20,
86:11, 86:14,
101:14, 101:16,
102:21, 103:5,
105:17, 113:10,
115:20, 125:20,
137:1, 137:11,
140:11, 140:13,
140:16, 143:1,
143:8, 167:10,
168:19, 171:18,
178:21, 197:11,
198:2, 202:10,
208:5, 208:8,
208:11, 209:13,

212:14, 218:1,
364:12, 364:14
**better**
28:5, 60:14,
83:15, 202:16,
259:8, 260:14,
260:17, 271:7,
354:8, 368:9,
369:4
**between**
5:6, 6:20,
14:19, 37:14,
38:1, 38:2,
43:21, 45:19,
49:4, 60:2,
74:6, 74:18,
75:1, 82:7,
86:5, 90:7,
96:17, 108:7,
123:14, 124:16,
129:4, 133:11,
138:4, 163:1,
176:12, 185:10,
220:3, 235:14,
307:2, 307:11,
334:7, 334:12,
360:5, 389:15
**beyond**
110:15, 156:19,
157:12, 387:21
**big**
76:16, 156:7,
214:21, 215:6,
215:8, 215:12,
215:16, 220:13,
221:22, 233:6,
251:9, 260:5,
329:14, 339:10,
339:12, 342:3,
342:12, 342:14,
344:6, 345:10,
345:12, 345:13,
353:4, 360:7,
360:8, 371:18,
376:15, 384:9,
393:22
**bigmarcobonds@gm-ail**
5:12, 5:16,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                    111

5:20, 6:6, 6:10, 6:14
**bill**
289:7, 385:21
**bit**
97:5, 204:16, 209:21, 225:21, 261:22, 269:13, 365:15
**blank**
157:22, 377:17
**blanked**
27:13, 27:15
**block**
322:20
**blue**
92:11, 192:16, 198:3
**board**
2:5, 26:2, 270:21, 316:14, 316:17, 316:21, 317:9, 317:12
**bodies**
269:5
**body**
219:9
**boil**
233:8, 268:22
**bolded**
306:22
**bond's**
211:1, 214:17
**bonded**
158:13, 230:17, 231:16, 232:8, 236:2, 236:3, 242:15, 245:19, 251:6, 271:10, 272:21, 308:13, 328:13
**bonding**
173:11, 177:13, 182:10, 216:21, 360:5
**bondsman**
98:2, 99:9, 99:10, 99:19,

101:7, 101:12, 101:17, 116:13, 155:12, 156:2, 156:4, 156:7, 157:4, 157:5, 157:12, 157:22, 159:5, 159:12, 159:14, 210:22, 211:3, 214:10, 218:14, 218:18, 219:5, 221:14, 221:22, 251:9, 311:10, 329:12, 335:14, 360:3, 360:4
**bondsman's**
214:16, 221:21, 305:11, 313:2
**bondsmen**
217:2, 218:11
**bonnie**
402:8
**bono**
227:14, 227:16, 238:15
**books**
353:4, 354:8
**boss**
23:9
**bosses**
48:18
**both**
38:21, 125:8, 125:11, 128:20, 135:21, 135:22, 340:18, 365:2, 365:4
**bother**
217:3
**bothering**
337:19
**bottom**
54:7, 89:3, 89:14, 92:11, 93:17, 93:21, 191:18, 299:7, 299:9, 302:6, 303:3, 313:15,

313:16, 366:2, 366:3, 377:14, 390:6, 391:13, 391:16, 398:12
**bounced**
202:3
**bound**
80:5
**box**
193:7, 198:4, 248:6, 248:14, 248:22, 249:14, 249:16, 249:20, 299:6
**boxes**
239:22
**boy**
46:21, 354:9
**bracelet**
275:13, 275:14
**bracelets**
272:19, 272:20, 275:11, 276:11
**brand**
22:15, 42:8
**breached**
27:7, 140:17, 166:1, 176:1, 183:10, 194:13, 195:8, 206:11, 206:19, 213:19, 224:11, 232:14, 322:1, 331:19, 334:19, 334:20, 346:22, 376:17, 397:12
**breaches**
26:22, 137:17, 137:19, 138:18, 138:21, 139:3, 139:6, 139:11, 139:15, 140:20, 141:3, 141:4, 141:15, 141:21, 142:1, 142:13, 145:3, 145:5, 145:7, 150:15, 161:15, 167:1,

209:7, 211:12, 237:12, 359:2
**breaching**
78:19, 135:12, 214:4, 346:7
**break**
14:10, 14:12, 49:20, 63:11, 69:11, 154:5, 160:14, 250:1, 252:5, 258:1, 330:17
**breaks**
50:6
**brief**
342:18, 378:6
**briefly**
15:22
**briggman**
79:1, 81:11, 83:1
**bring**
107:6, 249:4
**brought**
22:21, 217:13, 240:14
**bub**
235:8
**bubble**
232:6, 233:6, 235:3, 235:5, 235:7, 235:9, 235:11, 236:15, 263:6
**buddi**
253:10, 253:11, 253:12, 254:8, 254:11, 256:20, 256:22, 257:13, 257:17, 257:21, 258:21, 260:3, 260:4, 260:16, 260:20, 261:4, 261:13, 261:14, 264:3, 264:15, 264:17, 265:3, 265:15, 265:19, 266:19, 267:6,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

112

267:13, 268:11,
268:12, 277:17,
277:19, 278:5,
278:13, 278:21,
278:22, 279:1,
324:22, 325:3,
325:6, 325:12,
326:2, 326:4,
326:9
**build**
118:16
**building**
44:4, 44:7,
44:8, 44:9,
44:10, 44:11,
44:13, 44:14,
45:15, 45:18,
45:20, 45:22,
46:8, 46:12,
46:15, 66:15,
68:9, 74:1,
74:3, 75:3,
75:7, 75:11,
76:3, 76:7,
76:8, 76:16,
76:18, 124:10,
246:19, 254:10
**buildings**
44:1
**built**
39:11
**bullets**
239:13
**bunch**
87:13, 292:6,
388:5
**burden**
12:8
**bus**
271:8, 271:11,
313:8
**business**
51:22, 58:20,
59:1, 61:19,
64:20, 180:14,
181:2, 181:13,
181:14, 183:15,
187:4, 187:8,

187:10, 217:8,
218:8, 230:12,
241:13, 350:17,
354:1, 354:3
**busy**
107:17, 141:5,
141:8, 141:13
**button**
254:21
**buy**
125:14, 313:8

---
**C**
---
**c**
5:1, 6:1, 7:1,
8:1
**c-o-r-r**
394:6
**cal**
105:21
**calculate**
161:8, 161:18,
161:19, 161:20,
162:1, 162:18,
168:10, 174:14,
176:19, 177:6,
187:1, 192:11,
193:13, 194:11
**calculated**
163:17, 164:13,
164:16, 173:18,
176:9, 176:10,
177:4, 186:20
**calculating**
176:6
**calculation**
163:15, 186:16
**calculations**
194:19
**calendar**
314:8
**california**
75:22, 104:18,
105:21, 407:11
**call**
4:21, 40:4,
40:13, 41:12,
41:16, 41:17,

41:19, 42:1,
42:7, 43:2,
44:3, 44:7,
45:21, 46:7,
74:2, 75:1,
75:3, 112:21,
121:16, 122:14,
122:17, 122:18,
123:1, 124:13,
124:15, 125:8,
125:9, 125:11,
125:12, 126:4,
126:6, 126:13,
139:9, 174:17,
176:15, 176:18,
193:14, 229:9,
231:18, 231:20,
238:1, 238:3,
243:11, 243:17,
244:4, 252:8,
254:22, 272:9,
272:11, 278:18,
285:5, 289:1,
289:2, 289:14,
292:6, 297:8,
297:12, 298:21,
311:12, 311:13,
312:10, 314:6,
315:7, 315:22,
316:11, 316:21,
319:6, 320:12,
320:21, 321:12,
321:13, 321:16,
321:20, 323:10,
323:19, 324:11,
325:10, 334:8,
334:10, 336:16,
340:4, 349:3,
350:11, 371:5,
381:5, 399:11,
399:14
**called**
76:18, 86:1,
91:3, 252:22,
261:14, 321:11,
399:7
**calling**
60:12, 94:12,

238:2, 239:18,
239:22, 248:6,
272:5
**calls**
19:13, 39:7,
40:4, 52:1,
57:2, 58:13,
59:9, 102:16,
112:20, 123:11,
123:19, 126:3,
133:9, 277:20,
284:13, 284:14,
334:1, 334:5,
334:18, 335:8,
384:20, 386:6,
387:3, 396:12,
396:15
**calm**
133:13
**came**
26:19, 39:13,
146:3, 191:16,
287:21, 288:1,
288:4, 290:7,
333:3, 342:15
**campus**
43:7, 43:10,
43:20, 44:2,
46:18, 66:20,
76:6, 76:16,
124:2, 128:1
**can't**
13:18, 37:21,
49:16, 79:15,
79:17, 79:22,
101:6, 103:19,
114:14, 120:20,
132:22, 137:18,
139:4, 139:7,
153:16, 162:12,
172:10, 177:9,
187:8, 187:15,
200:17, 204:11,
208:8, 209:1,
209:2, 210:14,
215:18, 216:2,
216:17, 230:21,
231:3, 231:9,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    113

234:12, 239:2,
239:5, 242:4,
252:1, 252:2,
258:11, 265:7,
265:17, 265:22,
266:11, 268:22,
270:16, 274:16,
277:14, 300:9,
327:9, 328:15,
330:15, 336:17,
352:16, 383:10,
392:8
**cancel**
205:14
**cancelation**
161:7
**cancellation**
161:17, 162:16,
163:7, 163:19,
166:3, 168:15,
190:13, 192:9,
194:16, 206:2,
206:9
**cancellations**
162:2, 162:3,
189:11
**cancelled**
151:9, 163:18,
163:21, 176:1,
192:4, 192:19,
197:17, 206:13,
206:22, 232:14,
319:21, 319:22
**cancelling**
121:6
**candidate**
244:17, 250:11,
250:15, 251:16,
252:6
**candidates**
242:7, 243:5
**cannot**
139:14, 178:4,
405:21
**cap**
285:17, 290:12,
297:12
**capable**
49:12, 132:3,

162:6, 164:15,
198:13, 198:14
**capacity**
256:4, 348:1
**capital**
103:10
**capsule's**
119:16
**card**
44:9
**cards**
295:17
**care**
60:8, 60:10,
110:5
**cared**
49:14
**caridades**
227:13, 229:9,
229:20, 230:3,
230:7, 230:8
**carlos**
79:17, 316:9,
317:20
**carol**
18:20, 19:22,
33:6, 34:1,
34:6, 46:9,
152:2, 170:14,
170:18, 170:22,
171:10, 172:8,
174:5
**case**
1:7, 9:7,
11:10, 11:15,
11:18, 15:21,
16:7, 54:3,
80:4, 80:11,
81:17, 83:19,
84:5, 84:6,
84:11, 91:6,
101:20, 130:10,
157:12, 163:14,
169:15, 172:19,
182:11, 207:17,
220:2, 224:10,
231:11, 232:18,
234:2, 244:4,

266:4, 313:3,
329:13, 377:20,
409:10
**cases**
117:12, 197:7,
215:17, 217:8,
228:10, 228:16,
247:6, 289:13,
319:9, 320:8,
343:7, 362:9
**cash**
366:19, 377:18
**cashier's**
201:19
**castle**
282:3
**categories**
197:14, 299:3
**category**
194:13, 299:6,
302:15
**caught**
107:20, 108:6,
108:11
**cause**
113:4, 165:9,
251:7, 320:1,
321:3, 321:14,
321:19, 322:2,
405:22
**caused**
109:1
**causes**
106:22, 113:2
**causing**
154:22
**caution**
79:19
**caveats**
379:1
**ccing**
380:6
**ccr**
1:22, 409:2
**cd**
10:5, 10:6
**cem**
39:14, 40:2,

40:16, 123:1,
125:4, 125:21,
126:6, 126:13,
239:12, 243:17,
243:20, 272:11,
280:12, 283:10,
312:4, 316:12
**cems**
121:13, 124:13,
124:20, 126:4,
126:16, 240:12,
252:8, 284:11
**center**
40:14, 41:12,
41:16, 42:1,
42:7, 43:2,
44:3, 74:2,
75:2, 122:15,
122:17, 122:18,
122:19, 123:11,
123:18, 124:1,
124:13, 124:15,
124:18, 126:2,
126:4, 126:9,
126:11, 243:12,
243:17, 254:17,
255:14, 255:17,
256:11, 280:22,
292:7, 315:7,
316:21, 317:16,
321:10, 323:18,
324:19
**centers**
40:4, 41:17,
41:19, 121:16,
123:1, 125:9,
125:12
**centralized**
20:14
**certain**
24:16, 103:9,
136:11, 199:15,
262:18, 283:16,
299:2, 388:9
**certainly**
12:8, 127:7,
127:8, 152:21,
180:21, 185:5,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020                               114

188:13, 198:13,
199:18, 220:12,
226:19, 234:5,
314:16, 314:17,
356:16
**certificate**
409:1
**certifications**
97:19, 99:4
**certified**
2:12, 201:19,
201:22, 409:20
**certify**
409:4
**cetera**
56:6, 189:5,
387:10
**cfo**
67:15, 67:16,
67:19, 67:22,
68:6, 68:11,
68:16, 68:20,
69:12, 93:5
**cfr**
362:3
**chain**
5:4, 5:6, 5:9,
6:17, 6:20, 7:3,
7:6, 7:9, 7:12,
7:15, 7:21,
364:7, 364:17,
366:3, 367:13,
371:2, 389:16,
402:5, 404:4
**challenge**
340:15
**chance**
110:6, 382:6
**change**
24:2, 24:4,
94:10, 94:19,
161:6, 187:18,
188:3, 263:13,
325:5, 325:18,
346:6, 351:14,
351:19
**changed**
24:7, 29:3,

66:19, 67:15,
70:20, 173:21,
308:7
**changeover**
47:13, 47:14
**changes**
170:15, 188:3
**changing**
71:8, 361:12,
363:1
**channel**
316:15
**character**
232:9
**characteristics**
277:5
**characterization**
132:15
**characterized**
174:18, 253:22
**charge**
39:16, 47:15,
102:2, 102:5,
102:7, 102:21,
103:4, 103:11,
103:14, 103:19,
123:13, 168:1,
229:21, 256:1,
282:13, 300:21,
301:6, 301:10,
301:13, 302:2,
302:10, 302:15,
302:20, 323:22,
381:12, 381:15
**charged**
144:8, 146:8,
146:12, 149:17,
150:2, 282:16,
318:11, 318:21,
319:16, 319:20
**charger**
126:7, 284:6,
284:7, 325:22,
326:2
**chargers**
73:21
**charges**
102:11, 102:12,

123:19, 241:10,
244:9, 244:10,
245:14, 386:14,
386:22, 387:14
**charging**
268:17, 268:19,
269:17, 272:4,
316:9, 317:5,
317:21, 318:15,
319:10, 320:6
**chart**
200:1
**charts**
64:17
**check**
101:1, 153:13,
199:14, 201:10,
201:19, 202:3,
204:11, 204:12,
248:7, 270:19,
366:22, 397:13,
401:15
**check-in**
272:9
**checked**
248:14, 248:22,
249:14, 302:20,
308:11, 399:8
**checking**
226:14
**checkmarks**
239:22
**checks**
16:20, 149:15,
167:15, 167:19,
199:7, 199:10,
201:5, 201:6,
201:7, 201:14,
202:1, 299:2,
397:17, 397:20,
398:15, 399:1,
399:9, 400:15,
400:17, 400:19,
400:22, 402:11,
403:12, 403:21,
404:5, 404:9
**chicago**
33:13

**chief**
21:15, 24:3,
31:12
**choice**
116:8, 322:4
**choose**
281:4
**chose**
311:8
**chris**
187:11, 204:6,
265:22, 357:1,
398:5
**christopher**
3:3, 9:15
**circle**
314:8
**circulation**
192:7, 193:12,
194:12, 195:22
**circumstance**
210:11
**cite**
178:4
**cited**
332:6
**cities**
30:15
**city**
241:16
**civil**
228:7
**claim**
388:11, 397:5
**claims**
402:19
**clarification**
154:20, 160:21
**clarified**
94:16, 95:6
**clarifies**
390:4
**clarify**
10:17, 14:1,
93:17, 198:22,
303:11
**clarity**
293:2, 293:22,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

115

**classes**
296:8
97:11, 283:17,
283:21
**clause**
87:2
**clean**
13:16
**clear**
71:2, 88:10,
89:18, 95:3,
96:5, 129:1,
129:14, 143:3,
155:17, 193:4,
222:16, 229:14,
266:8, 297:14,
299:18, 318:8,
318:9, 340:8,
343:10, 344:22,
345:3, 350:14,
363:3, 382:22,
391:3
**cleared**
315:9
**clearly**
131:3, 221:5,
318:16
**clerk**
52:18
**click**
281:10
**client**
26:9, 37:3,
40:3, 57:17,
117:7, 120:15,
120:16, 121:4,
121:15, 125:8,
160:9, 172:6,
200:17, 213:16,
214:14, 224:9,
228:21, 258:18,
267:5, 287:5,
290:18, 291:1,
294:12, 294:15,
294:19, 295:19,
304:8, 312:1,
313:4, 313:5,
316:15, 316:17,

**client's**
320:20, 406:20
281:18, 288:18,
321:10
**clients**
27:1, 30:15,
35:21, 36:1,
36:19, 36:22,
60:7, 60:18,
61:5, 61:6,
61:11, 61:16,
62:3, 106:11,
107:18, 120:17,
123:7, 135:11,
135:19, 136:4,
144:19, 144:21,
174:17, 174:19,
184:4, 226:13,
236:21, 237:1,
237:20, 238:12,
244:13, 257:16,
258:9, 261:18,
285:17, 303:19,
312:3, 316:13
**clinic**
227:14
**close**
206:21, 257:11,
333:15, 372:18
**closer**
196:12
**cloud**
280:4
**clutter**
315:13
**co-obligors**
113:11
**code**
267:16, 267:17,
268:5, 325:7,
326:11, 326:13
**cognizant**
13:19
**collateral**
305:20, 305:21,
306:2, 306:4,
311:11, 329:16,
332:7, 366:9,

**collateralize**
366:16, 366:20
118:4
**collateralized**
117:4, 117:8,
119:2, 311:1,
311:7, 311:9,
311:15
**collect**
315:8
**collected**
281:12
**collecting**
36:17, 36:18,
36:21, 37:15,
37:17, 38:2,
323:4
**collection**
303:15, 386:15,
388:8, 388:9,
388:12
**collectively**
59:2, 86:7,
307:8
**college**
97:7, 97:8,
97:17
**colorado**
23:7, 99:1,
219:1, 219:3,
313:4
**columbia**
182:10, 182:16
**column**
190:18, 191:19,
191:20, 199:15
**columns**
192:5
**com**
5:12, 5:16,
5:20, 6:6, 6:10,
6:14
**combined**
190:18
**come**
112:1, 118:1,
133:16, 169:5,
197:18, 206:6,

**comes**
231:14, 261:12,
268:15, 277:7,
281:3, 281:9,
281:13, 285:7,
285:11, 323:5,
332:20, 349:13,
360:1, 365:12,
365:19, 367:21,
368:4, 381:9,
398:5
156:1, 157:17,
191:19, 204:15,
228:11, 273:22,
277:2, 284:8,
317:4
**comfort**
259:14
**comfortable**
231:15, 259:16,
259:22, 260:15,
261:10, 262:1
**coming**
24:22, 115:12,
204:8, 224:7,
268:14, 283:14
**comma**
173:8
**comment**
89:15, 166:6,
303:11
**comments**
219:12, 406:12
**commission**
409:22
**commit**
271:14
**common**
181:12, 201:3,
203:18, 217:1
**commonwealth**
2:13, 409:18
**communicate**
152:11, 246:9,
246:10, 246:13
**communicated**
220:12, 359:7
**communicating**
120:17, 312:8,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                                116

317:6, 370:10,
381:16
**communication**
316:9, 317:8,
317:21, 334:12,
334:15, 360:5,
372:10, 402:13,
403:7, 405:7
**communications**
120:18, 121:4,
121:9, 349:10
**community**
183:20, 188:7
**companies**
37:12, 59:12,
86:7, 86:10,
86:12, 104:15,
105:9, 129:15,
130:19, 133:5,
133:11, 167:11,
181:2, 183:3,
183:8, 183:21,
184:2, 186:12,
188:7, 188:10,
285:20, 339:17
**company**
1:5, 9:4,
14:19, 15:2,
20:13, 22:15,
22:21, 24:9,
24:21, 29:2,
34:16, 34:17,
39:13, 39:19,
39:21, 47:6,
48:13, 48:15,
48:17, 49:8,
50:14, 50:16,
50:20, 51:16,
56:13, 56:14,
56:20, 57:5,
57:14, 57:16,
58:11, 60:14,
60:19, 67:13,
67:14, 68:1,
68:17, 71:20,
79:22, 86:7,
91:2, 92:17,
100:2, 119:16,

129:5, 129:17,
130:5, 130:17,
130:20, 130:21,
133:18, 134:4,
134:5, 134:10,
139:16, 155:15,
186:22, 187:4,
187:9, 200:6,
201:5, 211:2,
215:13, 215:15,
227:14, 228:2,
228:3, 252:21,
253:1, 265:14,
286:13, 286:17,
308:5, 308:6,
308:9, 329:5,
329:8, 329:12,
339:17, 353:2
**company-wide**
139:12, 160:20
**compared**
161:15
**comparing**
189:8, 193:15
**comparison**
177:8
**compensated**
345:8
**complained**
341:15, 342:4
**complaining**
370:12
**complaint**
40:19, 340:3
**complete**
11:11, 88:21,
95:1, 328:20,
396:14
**completely**
37:5, 37:8
**completing**
378:4
**compliance**
37:4, 122:8,
123:3, 123:9,
182:21, 319:8
**compliant**
318:10

**complicated**
111:18, 272:15
**comply**
159:13
**complying**
407:1, 407:8
**comportment**
276:20
**comprises**
29:22
**computer**
25:21, 33:22,
43:16, 255:2,
280:7
**computers**
124:10
**conceivably**
286:12
**concern**
201:4, 388:16,
389:1
**concerned**
60:12, 186:6
**conclude**
50:9
**concludes**
391:13
**conclusion**
39:7, 57:2,
58:13, 59:10,
102:16, 133:9,
335:8, 347:10,
378:17, 384:20,
386:7, 387:3,
396:15
**concurrent**
259:7
**condition**
85:1
**conditions**
99:18
**conducive**
348:15
**conduct**
25:20, 40:15,
65:1, 197:12,
198:16
**conference**
334:5, 349:2

**confidential**
1:11, 4:9,
80:4, 82:15,
82:19, 282:11,
282:12, 287:14,
327:16, 374:14,
375:18, 381:22,
382:10, 382:19,
383:2, 405:9,
405:12, 405:21,
406:22
**confidentiality**
77:19, 77:22,
78:4, 78:11,
78:14, 78:15,
78:18, 79:21,
80:8, 80:15,
85:1, 86:2
**confined**
217:10
**confirm**
381:7, 400:18
**confirmation**
381:5, 391:5,
391:9, 397:9
**confirmed**
400:15
**confirming**
391:19
**confuse**
129:21
**confused**
94:12
**conjunction**
215:8, 215:11,
307:17
**connect**
253:22
**connection**
84:11, 254:1,
318:5
**consequences**
388:4, 388:5
**consider**
48:18, 184:17,
184:21, 185:3,
187:3, 252:19,
346:2, 346:9

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

117

consideration
250:12, 250:16,
251:3, 251:17,
252:13, 346:3
considered
181:9, 181:11,
184:2, 186:12
considers
303:14
consistent
166:9, 257:7,
266:6
consistently
276:21
constantly
254:10, 336:19
constellation
304:7
constructed
165:17, 193:19,
194:10
consult
245:12, 245:15,
245:16, 246:21
consulted
21:11
consulting
300:12, 329:17,
370:12
consumer
407:11
contact
39:14, 116:12,
155:9, 159:20,
174:22, 226:20,
227:11, 230:16,
231:12, 231:16,
233:9, 234:20,
251:15, 258:19,
268:16, 273:3,
288:22, 311:22,
312:1, 314:9,
315:10, 315:11,
316:17, 321:7,
332:17, 332:18,
333:5, 401:14
contacting
121:11, 323:1

contacts
35:19
contain
10:13
contains
282:5, 282:10
contention
304:2, 305:5,
342:7
context
51:12, 56:11,
56:16, 130:16,
134:2, 301:15
continue
94:2, 180:14,
183:15, 187:3,
231:12, 351:12,
407:15
continued
315:10, 355:9
continuous
88:1, 89:7,
89:16
contract
35:22, 60:22,
78:7, 78:10,
85:5, 87:2,
88:22, 126:1,
194:10, 251:6,
287:17, 288:4,
288:7, 289:16,
289:18, 290:8,
291:6, 304:6,
306:11, 334:20,
335:6, 344:15,
344:17
contracted
342:20, 343:2,
344:13, 344:16,
344:20
contractual
346:8, 346:22
contrary
402:19
contributing
335:1
control
157:13, 236:14,

253:20, 259:4
convenient
31:6
conversation
42:18, 164:1,
191:11, 336:17,
337:11, 337:16,
338:10, 338:17,
345:3, 351:22,
359:1, 397:5
conversations
181:5, 220:3,
223:2, 342:14
conversely
230:20
convert
346:12
conviction
248:8, 249:7,
249:10, 249:12,
249:13
convictions
249:2
cool
70:1
cooperation
333:8
copied
390:4
copies
199:10, 358:21,
391:4, 397:3,
397:17, 397:20,
399:1, 400:17,
401:11, 401:15
copy
11:1, 11:4,
11:5, 11:21,
169:20, 169:21,
170:22, 171:9,
289:7, 341:18,
358:7, 365:1,
390:15, 397:10,
397:13, 402:20,
406:9, 408:1
copying
364:18, 381:1,
389:15, 398:11,

402:9
corner
190:15, 303:4
corporate
17:16, 18:1,
18:4, 23:16,
24:12, 24:20,
59:22, 60:8,
68:3, 71:17,
72:16, 73:10,
73:15
corporation
86:6, 90:8,
92:8
corporations
129:2
corr
394:8
correct
13:12, 13:13,
17:18, 26:10,
37:7, 41:16,
51:22, 60:3,
63:4, 76:3,
77:1, 77:10,
84:12, 85:14,
96:12, 128:14,
130:5, 136:18,
136:19, 140:5,
155:4, 176:3,
180:10, 182:16,
191:8, 201:15,
204:19, 210:18,
221:22, 278:22,
280:2, 289:2,
328:19, 340:12,
340:16, 340:19,
342:17, 342:21,
345:4, 361:4,
369:11, 371:15,
371:20, 374:1,
376:1, 376:8,
377:3, 382:14,
384:17, 385:9,
386:4, 387:21,
388:21, 392:3,
393:8, 409:5
corrected
138:19

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    118

correction
389:22
correctly
105:8, 186:15,
284:15
correlate
270:15
correspond
270:14
correspondence
390:5, 390:15,
393:21, 402:18
corresponds
267:13
cortes
6:20, 79:1,
81:11, 83:1,
389:15, 390:15,
393:8, 396:4
cosigners
126:1
cost
305:8, 408:15
costa
41:22, 42:7,
42:15, 256:10,
256:17
costs
305:9
could
15:17, 19:16,
25:22, 27:8,
38:10, 53:5,
62:9, 86:16,
110:4, 112:13,
112:14, 135:20,
141:1, 145:1,
145:2, 147:20,
148:2, 148:9,
148:11, 148:22,
161:18, 161:20,
162:2, 162:10,
162:12, 162:21,
164:13, 165:12,
166:21, 167:18,
191:18, 197:19,
197:21, 201:1,
224:22, 241:21,

244:4, 257:10,
258:12, 263:17,
264:3, 264:17,
265:6, 266:20,
269:20, 274:20,
275:10, 275:17,
286:1, 286:11,
292:16, 295:16,
295:17, 295:18,
296:20, 303:2,
305:4, 319:6,
326:22, 327:21,
337:2, 343:6,
354:7, 356:16,
360:10, 375:10
couldn't
87:3, 100:1,
102:17, 169:11,
236:14, 244:5
counsel
9:12, 10:18,
11:7, 11:16,
13:4, 35:13,
53:8, 79:19,
88:6, 88:13,
88:16, 89:18,
95:6, 96:10,
101:18, 260:18,
266:4, 292:19,
292:21, 296:10,
296:14, 409:9
counsel's
238:2
counselor
131:19, 133:14,
220:16, 380:14,
405:9
count
14:2, 139:6,
167:15, 167:18,
190:18, 192:21,
198:3, 316:6
counted
141:2, 166:1,
192:12
countered
82:1
countersuit
81:17

counting
175:17
country
30:9, 30:10,
30:19, 30:22,
100:8, 117:18,
117:19, 118:1,
238:16, 241:11
county
52:18, 409:14
couple
71:7, 81:14,
220:1, 232:20,
253:1, 279:22,
335:18, 396:8
couple-hour
367:21
course
27:8, 119:14,
142:3, 162:13,
181:10, 185:4,
185:18, 230:19,
233:6, 246:5,
246:22, 264:20,
339:18
court
1:1, 2:13, 9:6,
9:22, 13:9,
39:17, 52:15,
72:15, 88:2,
99:20, 102:10,
102:13, 133:6,
134:16, 136:11,
138:8, 143:4,
165:5, 174:15,
177:11, 182:4,
182:9, 182:15,
186:11, 188:11,
193:8, 193:18,
196:12, 216:19,
217:9, 219:3,
232:21, 238:14,
270:19, 279:8,
327:19, 364:4,
367:6, 367:11,
368:10, 369:18,
370:22, 375:11,
376:13, 380:4,

380:12, 382:1,
382:20, 383:15,
384:7, 385:6,
389:13, 392:12,
396:20, 398:9,
406:14, 409:20
court-ordered
80:7
courts
107:1, 136:12
cousin
243:18, 246:10
cover
178:7, 178:9,
227:6, 239:21,
287:5, 290:18,
304:9
covered
118:7
covers
304:18
crappy
73:21
crazy
57:8, 290:4
create
160:17, 205:2,
205:4
creating
353:3
crf
200:22
crime
103:22, 248:8,
249:7, 249:10,
249:11, 249:13,
271:14
crimes
179:11
criminal
98:13, 104:5,
173:11, 177:13,
178:8, 179:2,
179:4, 179:6,
179:12, 217:11,
232:6, 244:9,
245:14, 247:20,
270:21, 350:15

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

119

| | | | |
|---|---|---|---|
| **criminal's** | 399:9, 399:10, | **dated** | 109:20, 110:1, |
| 179:4 | 400:16, 400:22, | 54:3, 54:10, | 119:17, 165:5, |
| **criminals** | 404:9 | 85:17, 313:19, | 175:20, 204:5, |
| 247:17 | | 364:6, 364:7, | 210:15, 218:2, |
| **crisis** | **D** | 367:14, 374:20, | 255:15, 255:16, |
| 37:3, 125:8, | **daily** | 375:12, 376:14, | 268:19, 307:2, |
| 226:9, 226:13, | 119:18, 119:21, | 384:13, 385:1, | 377:9, 396:5, |
| 227:18 | 151:17, 151:19, | 389:16, 392:13, | 409:13, 409:22 |
| **criteria** | 152:6, 259:5, | 393:18, 395:6, | **day-to-day** |
| 248:11, 252:14, | 316:16 | 395:21, 397:1, | 35:20, 41:6 |
| 299:3 | **dallas** | 400:14, 403:12, | **days** |
| **critical** | 372:13 | 403:20 | 171:14, 206:11, |
| 61:20 | **damage** | **dates** | 206:12, 206:15, |
| **cross** | 184:2, 186:12 | 150:15, 257:10, | 206:18, 206:21, |
| 270:14 | **danger** | 316:5, 361:12, | 304:19, 309:3, |
| **crosschecked** | 155:17, 372:22 | 370:21, 396:11 | 318:6, 334:3, |
| 308:16 | **data** | **dav** | 340:11, 361:20, |
| **current** | 163:14, 206:9, | 41:14 | 362:2, 362:17, |
| 16:7, 18:17, | 262:14, 280:18, | **dave** | 378:10, 378:22, |
| 18:22, 25:14, | 292:3, 348:5, | 5:6, 6:3, 79:1, | 379:6, 384:22, |
| 68:11, 82:12, | 405:8, 405:21 | 332:15, 333:8, | 386:3, 387:6, |
| 172:10, 256:5, | **database** | 333:16, 364:8, | 387:9, 387:16, |
| 256:8, 260:3, | 280:2, 280:10, | 364:17, 364:18, | 388:11, 408:5 |
| 260:4, 260:22, | 280:18, 281:2, | 364:19, 366:5, | **dcjs** |
| 397:6 | 281:6, 281:17, | 366:6, 367:14, | 98:10, 98:11, |
| **currently** | 282:10, 282:14, | 380:6, 381:1, | 98:19, 98:21, |
| 27:10, 27:11, | 285:17, 287:22, | 396:22, 397:2, | 99:16 |
| 29:14, 124:4, | 288:1, 288:5, | 397:3 | **deactivate** |
| 124:6, 124:7, | 289:5, 290:13, | **david** | 318:19 |
| 253:12, 265:2, | 290:14, 399:8 | 31:10, 31:22, | **dead** |
| 268:7, 362:19 | **date** | 32:3, 32:18, | 254:2, 316:15, |
| **curve** | 9:8, 21:9, | 32:22, 33:20, | 317:7, 319:3 |
| 260:6 | 114:5, 190:13, | 35:3, 41:13, | **deal** |
| **cushman** | 190:17, 195:12, | 41:15, 43:3, | 37:3, 66:12, |
| 256:2 | 199:16, 206:13, | 43:5, 44:18, | 248:17, 292:19, |
| **custody** | 206:18, 236:10, | 75:10, 75:15, | 293:10, 293:16, |
| 10:11, 99:14, | 308:8, 309:2, | 75:16, 76:2, | 339:10, 339:12, |
| 104:6, 104:22, | 309:19, 309:21, | 79:7, 79:8, | 404:14 |
| 105:12, 105:20, | 310:1, 310:3, | 244:20, 300:7, | **dealing** |
| 106:6, 107:1, | 313:22, 327:21, | 314:2, 314:5 | 26:3, 82:12, |
| 109:11, 109:20, | 327:22, 329:1, | **david's** | 120:8, 143:16, |
| 110:3, 157:6, | 364:10, 371:19, | 32:1 | 269:1, 277:9, |
| 158:1, 158:10, | 372:5, 372:16, | **davis** | 287:15, 331:20, |
| 262:16, 405:8 | 378:11, 385:1, | 332:18, 398:11, | 341:15 |
| **cut** | 385:11, 385:14, | 400:13, 402:6, | **dealings** |
| 28:6, 110:15, | 386:8, 387:16, | 402:9, 402:16 | 333:18 |
| 271:1, 271:11, | 395:1, 395:6, | **day** | **deals** |
| 316:5, 398:16, | 395:17 | 71:5, 73:19, | 280:13, 406:4 |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

120

**dealt**
209:2, 209:9,
249:1, 332:20
**death**
155:17
**debate**
12:13, 128:6,
128:9, 407:13,
407:15
**debt**
386:15, 387:7,
387:8, 388:9,
388:11
**dec**
7:10
**december**
7:6, 7:9, 85:7,
393:18, 395:2,
395:7, 396:4,
396:7, 397:1,
397:3, 397:17
**decide**
159:15, 211:1,
212:4, 218:6,
218:11, 342:5,
353:18
**decided**
155:19, 351:7,
351:8, 351:19,
370:5
**decides**
212:9
**deciding**
184:17, 218:4
**decision**
155:7, 155:21,
155:22, 156:1,
156:9, 156:14,
156:17, 158:17,
203:19, 205:6,
214:15, 214:17,
215:2, 215:5,
215:9, 215:12,
215:14, 215:21,
216:11, 216:18,
217:8, 218:6,
218:8, 218:15,
218:19, 219:18,

220:6, 220:14,
222:3, 222:8,
222:13, 223:10,
240:12, 350:17,
350:18, 350:20,
350:22, 351:15,
354:21, 356:15,
356:22, 361:2,
361:6, 377:22,
378:4, 378:12
**decisions**
214:8, 214:22,
387:6
**declaration**
4:13, 83:20,
83:22, 84:4,
84:10, 85:16,
96:22, 373:8,
373:14
**declarations**
88:14, 132:7
**declines**
245:3
**deeply**
405:6
**default**
128:13, 131:6,
131:12, 132:18,
133:7, 137:14,
138:5, 138:6,
138:7, 142:19,
143:5, 143:7,
143:12, 145:11,
160:16
**defend**
292:18
**defendant**
15:7, 15:10,
63:22, 65:14,
67:3
**defendants**
1:9, 3:12,
9:20, 16:7,
16:15, 19:6,
20:1, 37:13,
37:16, 37:21,
38:5, 66:11,
67:1, 67:6,

67:11, 67:22,
77:6, 91:6,
101:11, 131:5,
133:6, 134:16,
135:2
**defense**
270:21
**deficiencies**
259:3
**deficiency**
140:5
**define**
125:1, 138:6,
140:22, 247:20,
288:15
**defined**
68:1, 129:5,
130:14, 130:15,
130:17, 328:4
**defining**
287:19
**definitely**
196:21, 233:9,
233:22, 322:20,
334:10
**definition**
57:14, 59:6,
59:16, 293:14
**definitively**
225:7
**degree**
97:18
**degrees**
97:17
**delay**
401:11
**delays**
362:21
**delineates**
126:15
**delineation**
131:4
**delinquent**
388:11
**deliver**
106:6, 110:20,
110:22, 111:2,
111:6, 111:10,

112:11, 114:7,
115:21, 116:19,
157:5, 158:2,
211:18, 212:6,
213:9, 213:12,
213:16, 215:5,
371:9, 371:12,
371:19, 373:6,
374:22, 375:3,
375:13, 376:4,
381:17, 390:20
**delivered**
109:2, 203:7,
377:2, 377:6
**delivering**
10:9
**delivers**
159:14
**delivery**
108:16, 408:18
**delta**
234:22
**demand**
332:7, 332:11,
373:7, 399:22
**demanded**
12:12, 12:14,
105:6, 213:5
**demanding**
114:9
**demands**
114:10
**demarcate**
298:11
**demarcation**
37:14, 38:1,
74:18, 75:1,
160:17
**demeanor**
335:2, 347:9,
348:14
**demonstrative**
188:18
**denied**
362:4
**denominator**
175:13, 175:19,
193:9

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                    121

denver
97:12
depart
372:1
department
20:21, 23:19,
26:4, 26:18,
26:19, 27:3,
27:11, 28:12,
28:17, 29:8,
29:9, 29:15,
29:16, 29:18,
29:19, 29:20,
29:22, 31:9,
31:20, 34:16,
35:7, 35:17,
38:15, 39:12,
46:7, 47:6,
47:8, 58:2,
98:13, 109:13,
120:7, 120:22,
134:21, 135:5,
139:20, 152:12,
168:10, 170:14,
174:10, 201:1,
202:15, 208:14,
255:13, 266:9,
266:16, 282:19,
285:13, 312:7,
312:9, 343:5,
363:18, 381:13,
388:12, 397:6,
402:11, 402:14
departments
20:22, 32:20
depend
276:19, 335:9
depending
179:7, 187:18,
188:3, 242:2
depends
103:8, 120:10,
134:2, 231:2,
231:9
deponent
346:13
deported
27:8, 405:22

depos
9:10, 10:1
deposition
1:12, 2:1, 9:3,
9:11, 13:11,
15:14, 16:1,
16:3, 52:17,
63:17, 110:12,
132:13, 154:17,
169:13, 169:19,
170:3, 170:7,
171:20, 171:22,
182:5, 226:1,
250:7, 272:17,
274:19, 286:21,
297:6, 297:15,
297:21, 298:4,
310:16, 310:19,
327:20, 331:13,
331:17, 338:6,
352:8, 357:22,
364:5, 371:1,
374:19, 375:10,
376:14, 380:5,
384:8, 389:14,
392:13, 393:17,
396:21, 398:10,
400:12, 401:7,
402:5, 403:19,
405:1, 405:3,
406:10, 407:22,
409:3
depositions
171:14
derechos
227:12, 228:1,
229:22, 230:9
derive
147:20, 148:7
describe
61:18, 169:12,
172:8
described
43:7, 58:4,
74:3, 82:7,
105:20, 144:1,
159:9, 185:11,
229:12, 296:2,

329:4, 378:1
describing
82:21
description
4:11, 5:2, 6:2,
7:2, 8:2,
157:16, 159:20
deserve
336:20
deserved
336:20
designate
298:11, 382:19,
405:16
designated
124:14, 124:16,
327:16, 382:10,
382:13
designating
406:8, 406:13
designation
326:3
designations
383:2
designed
211:11, 217:17
desk
43:15, 126:21,
141:16, 255:19,
255:20
desktop
280:7
despite
319:11, 362:10
detail
34:5, 390:19
details
259:3
detention
378:9
determination
129:13, 150:7,
205:10, 242:13,
244:15, 284:18,
392:3
determine
82:13, 139:18,
165:10, 166:16,

193:11, 224:16,
335:20
determined
316:7, 397:7,
397:11
determining
183:14, 242:6,
242:7
develop
72:9
developed
72:7, 272:13
deviate
372:4
device
240:7, 260:3,
260:4, 260:11,
260:14, 260:16,
260:17, 260:19,
260:20, 260:22,
264:4, 264:17,
265:3, 265:15,
265:19, 266:22,
267:13, 268:8,
268:17, 269:4,
270:11, 270:13,
273:8, 277:17,
277:18, 277:19,
278:22, 279:2,
302:11, 305:18,
318:4, 318:8,
318:18, 319:11,
319:14, 319:17,
319:21, 323:11,
325:3, 326:4,
326:5, 326:14,
330:6
devices
123:19, 257:16,
257:18, 257:20,
257:21, 258:3,
258:5, 258:13,
259:9, 259:12,
260:20, 261:3,
266:5, 266:19,
269:6, 276:7,
277:12, 277:13,
278:6, 278:13,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    122

326:9
**dhs**
102:14, 106:6,
107:1, 115:12,
182:11, 201:10,
201:13, 201:14,
203:10, 206:22,
336:14, 337:11,
337:14, 341:1,
346:4, 356:3,
359:3, 361:21,
362:5, 362:17,
362:22, 363:4,
363:16, 390:5,
390:15, 393:22,
399:22, 403:8
**dhs's**
205:7
**dictate**
132:12
**difference**
135:16
**differences**
51:6
**different**
20:8, 20:13,
29:15, 33:11,
37:9, 37:10,
53:12, 54:2,
57:13, 91:2,
103:8, 103:9,
111:9, 126:15,
129:2, 129:14,
129:17, 171:11,
186:16, 186:20,
186:21, 219:1,
233:12, 242:19,
243:2, 260:20,
273:12, 273:15,
273:19, 275:20,
290:1, 297:16,
315:3, 331:2,
336:6, 340:9,
375:13
**differently**
185:11, 246:9
**difficult**
168:8, 209:2,

269:2, 270:12,
282:1, 294:17,
334:11, 334:16,
349:1
**difficulties**
341:15, 370:10
**difficulty**
294:21
**digits**
369:20
**dignity**
57:18, 136:4,
136:6, 136:7
**direct**
17:22, 32:1,
66:7, 332:17,
377:13
**directing**
53:8
**direction**
217:14, 282:22,
296:10, 296:14,
296:18
**directions**
378:10
**directive**
106:4, 106:10
**directly**
32:8, 48:21,
123:7, 201:10,
201:12, 280:13,
342:9
**director**
17:16, 17:17,
18:1, 18:4,
18:17, 22:4,
23:13, 25:12,
34:1, 34:18,
45:2, 45:7,
64:15, 299:15
**directors**
65:12, 300:5
**disagree**
132:2, 164:22,
406:17
**disagreed**
218:9
**disappearing**
268:14

**disc**
9:2, 63:16,
154:16, 250:6,
331:12
**discernable**
278:15
**discernible**
278:14
**disclose**
80:1, 80:6
**disclosed**
406:5
**disclosing**
406:4
**disclosure**
80:3, 82:14,
306:20, 307:1
**discovered**
82:2
**discovery**
257:5, 309:6,
347:20, 347:21,
347:22
**discretion**
372:8, 379:5
**discuss**
12:7, 383:5
**discussed**
40:11, 123:1,
123:6, 130:5,
133:18, 155:13,
175:1, 185:13,
225:21, 227:3,
392:15, 397:6
**discussing**
135:13, 189:3,
228:2, 327:15,
400:20
**discussion**
71:3, 71:4,
71:7, 148:18,
223:9, 292:10,
336:13, 352:2,
354:18, 383:9,
389:19, 389:20,
408:17
**discussions**
115:17, 184:8,

215:16, 220:13
**dismissed**
81:19
**disobedience**
117:21
**disobeyed**
174:20
**dispense**
306:3
**display**
317:9
**displaying**
277:5
**disposed**
359:17
**disposition**
4:17
**dispute**
164:11, 165:4,
165:18, 165:22,
191:2, 192:1,
192:13, 193:1,
194:18, 195:6,
195:17, 206:2,
206:9, 337:5,
339:15, 340:14,
340:22, 341:6,
341:12, 377:6,
387:6, 387:11,
399:16, 401:21,
403:6, 404:8,
404:16
**disputed**
336:9, 336:20,
337:2, 337:3
**disputes**
270:2, 336:4,
336:5, 336:6,
336:8, 337:18,
337:19, 339:8,
340:8, 340:18,
349:6, 387:5
**disputing**
336:18, 337:12,
387:8
**dissatisfied**
188:14
**dissemination**
284:4

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    123

distill
274:16
distinction
51:6, 58:1,
62:17, 108:3,
108:6, 108:7,
108:11, 221:16
distinctions
129:2
distinguish
51:2, 133:11,
138:4
distinguishing
60:2, 137:15
district
1:1, 1:2, 9:6,
182:9, 182:15,
182:16
disturbed
405:6
divide
74:5, 197:13
divided
43:20, 44:9,
195:5, 197:18
division
1:3, 9:7,
45:19, 49:4,
49:10, 49:15
divisions
51:9, 58:10
dm
374:9
dmh
374:9, 376:20,
384:11, 391:16,
395:1, 395:9,
398:19
docket
54:3, 83:21,
87:14, 87:18,
88:1, 88:11,
89:8, 89:12,
95:16
docketed
87:16
doctor's
289:22, 295:18

docu
11:12
document
52:9, 53:1,
55:10, 62:19,
84:2, 87:11,
88:2, 91:16,
92:4, 121:7,
132:6, 139:2,
153:15, 170:10,
171:8, 182:12,
184:10, 186:14,
190:12, 215:16,
267:3, 286:22,
287:4, 287:21,
288:1, 288:10,
290:12, 290:13,
293:21, 294:4,
298:12, 298:13,
298:17, 299:22,
303:6, 304:13,
305:13, 306:13,
306:16, 322:6,
327:3, 327:9,
327:20, 328:3,
339:3, 352:2,
354:17, 357:17,
358:7, 369:19,
380:10, 382:8
document's
328:1
documentation
204:8
documented
263:9
documents
4:19, 12:1,
12:9, 15:18,
53:17, 87:8,
148:12, 148:16,
153:7, 153:20,
176:11, 224:17,
239:10, 278:16,
279:16, 281:8,
281:11, 287:1,
287:11, 288:9,
289:4, 290:17,
291:14, 295:5,

295:16, 296:2,
296:3, 297:19,
297:20, 303:14,
303:15, 306:19,
327:12, 328:4,
363:21, 368:10,
382:17, 382:19,
383:2, 405:16,
406:4
doing
14:4, 37:7,
58:20, 59:1,
70:4, 105:7,
124:10, 134:5,
144:6, 152:3,
162:6, 168:3,
198:13, 198:14,
208:9, 209:17,
218:17, 219:5,
219:6, 240:10,
316:12, 336:8
dollar
203:2
dollars
143:12, 144:10,
145:12, 146:10,
166:19, 329:4
done
15:13, 49:11,
49:12, 104:14,
109:9, 132:21,
145:9, 148:22,
160:2, 160:8,
197:22, 207:17,
354:7, 397:22,
404:20
donna
45:4
donne
3:13, 9:19,
63:3, 63:10,
94:15, 127:1,
128:19, 128:22,
131:20, 152:14,
170:20, 220:18,
222:14, 291:20,
303:10, 330:22,
347:12, 358:5,

382:7, 383:10,
407:4
donovan
22:22, 23:2,
44:17, 44:20,
44:22, 45:1,
45:14, 48:21,
49:6, 64:9,
129:4, 146:13,
286:20, 296:18,
364:18, 366:5,
396:22, 398:11,
400:5, 400:13,
402:6, 402:17,
404:9
door
74:6, 120:11,
124:15, 231:13,
246:7, 271:17
doors
25:9, 74:11,
74:12, 74:13,
74:17
double
281:9, 369:21
double-check
166:5
doubletree
2:4
down
25:8, 28:18,
81:19, 107:9,
109:21, 116:5,
133:13, 183:2,
183:18, 193:7,
222:19, 226:5,
233:9, 234:1,
255:8, 256:13,
256:14, 258:1,
267:8, 268:22,
274:17, 275:17,
303:3, 312:12,
314:7, 314:18,
314:22, 353:1,
364:16, 366:2,
387:5
downloading
292:16

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

124

| | | | |
|---|---|---|---|
| **dozen**<br>157:11<br>**draft**<br>13:9, 94:21<br>**drafting**<br>344:11, 344:12<br>**draw**<br>347:9<br>**drilled**<br>272:14<br>**drive**<br>10:7, 10:8,<br>10:10, 10:12,<br>12:4, 288:2,<br>294:1, 294:5,<br>295:1, 296:4,<br>297:15<br>**driven**<br>259:12<br>**driver's**<br>289:9, 289:10,<br>289:12<br>**drm**<br>395:9<br>**drug**<br>110:3<br>**due**<br>39:16, 150:17,<br>200:22, 206:18,<br>314:21, 314:22,<br>315:6, 315:11,<br>315:13, 318:5,<br>384:17, 384:21,<br>385:1, 385:2,<br>385:14, 385:21,<br>386:4, 386:8,<br>386:11, 392:16,<br>392:20, 394:3,<br>394:10, 394:19,<br>395:1, 395:6,<br>395:17, 395:21,<br>396:8<br>**duly**<br>13:2<br>**duplicate**<br>141:14, 254:17<br>**during**<br>140:12, 140:15, | 146:3, 163:13,<br>276:20, 389:2<br>**duties**<br>125:21, 195:15<br>**duty**<br>331:19<br><br>**E**<br><br>**each**<br>13:17, 31:3,<br>162:5, 270:15,<br>288:10, 290:19,<br>295:9, 295:11,<br>299:6, 328:13,<br>360:14, 360:17<br>**eagle**<br>254:11, 255:1<br>**earlier**<br>68:1, 93:14,<br>113:17, 130:5,<br>130:15, 133:18,<br>154:21, 157:10,<br>159:10, 172:20,<br>174:18, 189:3,<br>225:21, 229:13,<br>303:11, 322:7,<br>356:5, 373:18,<br>385:9<br>**early**<br>21:21, 22:8,<br>24:3, 39:13,<br>39:21, 203:7,<br>203:8, 233:7,<br>273:21, 311:8,<br>317:20, 323:20,<br>367:20<br>**earn**<br>110:12, 110:13<br>**east**<br>2:6, 9:11<br>**ebonds**<br>251:11, 251:12<br>**ecs**<br>89:20<br>**edges**<br>259:21, 260:1<br>**education**<br>97:6 | **effect**<br>106:5<br>**effective**<br>110:8, 365:16,<br>403:4<br>**effort**<br>262:20, 269:15<br>**efforts**<br>319:11, 388:8<br>**eight**<br>30:7, 62:1,<br>62:3, 93:20,<br>137:5, 256:6,<br>262:10, 263:9,<br>275:11, 275:14,<br>275:18, 276:3,<br>276:7, 276:15,<br>299:3, 299:11,<br>299:16, 301:5,<br>369:21, 370:1,<br>408:5<br>**either**<br>16:14, 49:5,<br>60:9, 135:20,<br>137:2, 163:18,<br>192:7, 192:19,<br>200:19, 203:2,<br>204:16, 205:5,<br>210:20, 249:19,<br>285:2, 372:16<br>**elaborate**<br>24:13, 210:10,<br>210:15, 405:9<br>**elect**<br>210:17<br>**elected**<br>212:16, 213:4,<br>370:17<br>**electronic**<br>252:17, 253:13,<br>407:21, 408:16<br>**elects**<br>213:7, 213:15,<br>213:16<br>**eleven**<br>76:15, 76:21<br>**eligible**<br>251:5 | **eliminate**<br>250:11, 250:15,<br>251:3, 251:16,<br>305:4<br>**eliminating**<br>273:12<br>**else**<br>36:9, 39:18,<br>44:12, 72:16,<br>75:14, 79:2,<br>110:21, 138:1,<br>172:1, 197:11,<br>198:9, 203:13,<br>219:14, 225:16,<br>248:3, 283:1,<br>289:17, 312:5,<br>313:10, 341:13,<br>349:11, 349:19,<br>349:21<br>**email**<br>5:4, 5:6, 5:9,<br>5:11, 5:15,<br>5:19, 6:3, 6:5,<br>6:9, 6:13, 6:17,<br>6:20, 7:3, 7:6,<br>7:9, 7:12, 7:15,<br>7:18, 7:21, 8:3,<br>152:11, 152:15,<br>207:14, 334:6,<br>339:2, 345:22,<br>346:5, 346:6,<br>364:7, 364:10,<br>364:16, 364:19,<br>364:21, 365:10,<br>366:2, 366:4,<br>366:5, 367:13,<br>368:13, 368:15,<br>370:20, 371:1,<br>374:20, 375:12,<br>376:14, 380:6,<br>380:22, 384:9,<br>385:7, 392:13,<br>396:22, 397:1,<br>398:2, 398:11,<br>398:13, 399:17,<br>400:4, 400:12,<br>400:13, 401:20,<br>402:5, 402:16, |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                    125

402:19, 403:19,
404:12, 404:13,
404:19
**emailed**
402:9
**emailing**
401:8
**emails**
152:15, 341:19,
370:19, 375:21,
389:14
**emergency**
4:15, 182:7,
327:4, 327:7
**employ**
67:3, 100:2,
101:12
**employed**
16:10, 16:13,
16:14, 19:4,
19:5, 19:22,
38:15, 63:22,
66:22, 67:7,
67:8, 77:3,
77:7, 101:17,
171:2, 342:16,
342:18, 344:20,
409:9
**employee**
23:17, 25:2,
25:20, 40:15,
40:20, 40:21,
64:7, 77:4,
77:15, 85:8,
97:2, 105:18,
121:10, 136:3,
236:8, 243:19,
280:12
**employees**
24:5, 26:16,
30:4, 33:18,
38:8, 38:14,
38:17, 38:21,
39:12, 39:19,
40:8, 44:12,
50:19, 64:3,
65:4, 65:11,
75:2, 78:4,

79:10, 82:22,
100:9, 106:11,
107:6, 283:17
**employer**
16:8, 323:9
**employment**
19:9, 23:14,
48:3, 78:6,
78:9, 78:17,
78:19, 81:4,
85:2, 85:5,
86:21, 87:1,
87:5, 88:18,
90:3, 90:7,
95:18, 95:21,
96:10, 96:14
**employs**
226:2
**enable**
140:7
**encapsulated**
261:7
**enclosed**
378:4
**encompasses**
60:6
**end**
19:9, 48:3,
109:19, 140:5,
143:15, 233:3,
236:6, 236:13,
254:12, 270:3,
333:17, 333:18,
348:19, 350:12,
352:21, 354:21,
362:21, 366:7,
370:17, 383:11,
405:2
**endeavors**
23:10
**ended**
145:5, 197:9
**enforce**
361:22, 363:12
**enforcement**
25:4, 98:16,
98:22, 99:7,
99:15, 100:3,

100:10, 100:13,
100:15, 100:19,
101:1, 101:3,
101:10, 105:3,
105:6, 106:17,
106:22, 116:13,
117:6, 155:22,
157:19, 158:1,
214:13, 274:6
**enforcing**
362:8, 363:5
**enough**
167:19, 201:3,
225:6, 261:21,
262:6
**ensure**
122:7, 123:3,
123:8, 212:5,
212:16, 213:4,
215:3, 313:9
**ensures**
182:21
**ensuring**
27:1, 282:17
**entail**
26:5
**entails**
24:13, 25:18
**enter**
254:21, 280:19
**entered**
11:17, 69:1,
123:20, 307:1,
397:10
**entire**
28:12, 53:6,
304:6, 347:9
**entities**
129:18, 130:13
**entitle**
203:13
**entitled**
52:22, 54:4,
83:20, 200:15,
202:12, 303:7,
304:14, 328:1
**entity**
51:22, 91:13,

252:20, 253:8,
253:10
**entries**
119:9, 119:12,
119:19, 120:7,
121:2, 324:13
**entry**
291:1, 316:11
**environment**
49:11
**equal**
274:13
**equals**
195:5
**equate**
115:6, 203:2,
265:18
**equation**
161:1
**equivalent**
109:22, 113:21,
114:7, 114:8,
114:21, 115:10,
373:20
**erik**
1:12, 2:1, 4:3,
4:13, 4:14, 5:7,
9:3, 13:1, 13:8,
63:17, 83:20,
154:17, 182:6,
250:7, 318:5,
331:13, 364:8,
365:11, 367:18,
381:5, 398:14,
399:10, 401:14,
405:3
**erik's**
381:9
**erlandson**
34:21, 41:13,
41:15, 244:21
**ero**
39:17, 105:5,
107:10, 107:16,
109:15, 110:9,
110:18, 111:1,
111:9, 111:11,
111:13, 112:3,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    126

| | | | |
|---|---|---|---|
| 112:8, 112:22, 148:18, 200:20, 206:22, 236:9, 372:8, 372:10, 372:17 | 208:19, 265:6, 274:20, 275:3, 276:16, 277:22, 356:1 | 105:18, 106:13, 107:22, 108:1, 109:1, 115:19, 116:16, 118:13, 124:20, 131:11, 132:17, 149:17, 150:2, 157:1, 157:4, 181:8, 206:7, 220:5, 222:2, 222:8, 239:6, 245:3, 245:12, 245:15, 245:19, 262:14, 271:12, 285:16, 285:19, 299:13, 332:17, 341:5, 341:11, 341:22, 347:5, 366:19, 368:11 | 294:14, 296:19, 299:14, 300:4, 349:14, 351:3 |
| **error** 309:15, 336:8 | **estimated** 161:5 | | **evidence** 10:10, 378:8, 400:6 |
| **errors** 333:21 | **estimating** 276:9 | | **ex-employees** 78:13, 78:21 |
| **escalate** 125:11 | **et** 1:8, 9:5, 56:6, 83:20, 182:10, 182:11, 189:5, 387:10 | | **exact** 200:16, 257:10, 258:4 |
| **escalated** 125:13 | | | **exactly** 121:3, 259:7, 275:20, 389:8 |
| **escort** 39:17, 107:10, 107:21, 107:22, 108:1, 108:15, 211:9 | **evaluate** 147:4, 164:5 | | **examination** 13:4 |
| | **evaluates** 146:22 | | **examined** 13:2 |
| **escorted** 108:9 | **evaluating** 147:12, 184:3, 186:13 | | **example** 102:20, 103:6, 103:10, 103:20 |
| **escorts** 109:11 | **evan** 21:1, 34:12, 44:17, 75:9, 75:13, 76:2, 174:9, 198:11, 286:20 | **every** 62:10, 71:5, 73:19, 89:2, 119:17, 126:21, 133:22, 136:3, 220:19, 233:11, 234:2, 258:18, 268:19, 270:19, 277:1, 280:12, 288:22, 311:6, 311:12, 311:14, 315:5, 323:18, 323:19, 356:11, 356:13, 356:14, 360:21 | **examples** 365:14 |
| **especially** 72:15, 232:11, 232:12, 263:5, 273:21 | | | **excel** 151:16 |
| | | | **exceptions** 100:20, 388:9 |
| **esquire** 3:3, 3:4, 3:13 | **even** 109:15, 166:6, 191:11, 215:22, 227:22, 238:22, 326:8, 336:8, 356:8, 357:10, 379:6 | | **excerpt** 88:20 |
| **essence** 183:19, 188:5, 188:9 | | | **exchange** 334:6, 389:14 |
| **essentially** 40:12, 361:13 | | | **exclaimed** 359:6 |
| **establish** 334:14 | **event** 339:7, 397:4, 397:8 | **everybody** 25:10, 34:9, 125:16, 178:17, 228:9 | **exclude** 249:5, 249:9 |
| **established** 91:5 | **events** 116:12 | | **exclusionary** 249:19 |
| **estate** 65:20, 66:4 | **eventual** 381:8 | **everybody's** 302:3 | **excuse** 126:12, 131:20, 138:2, 221:14, 287:9, 296:11 |
| **estimate** 137:12, 140:11, 140:13, 140:16, 142:3, 143:1, 143:3, 143:8, 143:22, 162:7, 162:13, 162:21, 178:21, 202:10, 208:5, 208:8, | **eventually** 81:18 | **everyone** 44:12, 57:16, 240:17, 240:18, 240:19, 258:12 | **execute** 403:3 |
| | **ever** 16:13, 36:21, 39:4, 40:12, 66:6, 77:12, 98:4, 101:14, 104:5, 105:10, | **everything** 36:1, 49:13, 88:6, 105:7, 225:18, 293:11, | **executed** 63:2, 403:1 |
| | | | **execution** 84:22 |
| | | | **executive** 48:12, 48:14, |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020                                    127

75:3
**executives**
125:14, 280:14
**exercise**
145:21, 146:3,
160:3, 193:8,
197:13, 197:21,
198:12, 198:16
**exercises**
145:9
**exhibits**
83:22, 87:13,
88:15, 383:16,
394:22, 407:22
**exist**
210:11, 357:2
**existence**
184:5
**existing**
257:16
**exists**
88:11
**exonerating**
351:6
**expect**
57:16, 115:12
**expectation**
265:14
**expected**
350:13
**expecting**
293:6
**expense**
117:6
**experience**
25:12, 40:3,
104:4, 104:11,
121:15, 196:4,
196:19, 217:14,
218:16, 218:20,
219:1, 219:3,
219:11, 219:15,
238:10, 259:6,
265:13, 266:7,
301:21, 302:1,
320:13
**expired**
276:18, 392:3

**expires**
409:22
**explain**
25:17, 80:9,
109:16, 109:17,
110:10, 114:13,
114:14, 116:6,
116:7, 175:9,
187:13, 188:1,
288:20, 294:7,
318:6
**explained**
56:12, 138:5,
294:7
**explaining**
110:8, 262:12,
368:19
**explains**
236:9
**export**
288:12
**exposure**
387:20, 393:4
**expound**
335:1
**expressed**
142:7, 142:10,
388:16
**extend**
361:21
**extension**
181:2
**extent**
19:12, 39:6,
57:1, 58:12,
59:9, 65:10,
95:15, 102:15,
123:18, 128:16,
133:8, 195:13,
196:8, 215:2,
216:2, 220:8,
257:20, 335:7,
338:5, 343:16,
378:16, 384:19,
386:6, 387:2,
396:12, 396:15
**externally**
339:4

**extra**
117:5, 169:20,
408:15
**extract**
290:20, 290:22,
292:11
**extracted**
291:11
**extracting**
294:1
**extremely**
11:15, 208:22

**F**

**face**
180:12, 385:14,
386:21
**face-to-face**
116:7
**facetiously**
169:11
**facilities**
35:22, 45:2,
64:15, 258:14
**facility**
158:4, 158:9,
236:3, 243:20
**fact**
37:1, 84:4,
96:16, 136:17,
182:14, 210:17,
248:17, 264:9,
264:12, 300:11,
342:11, 384:22,
404:10
**factor**
180:21, 186:8,
234:12, 237:3,
242:3, 274:1,
274:14
**factors**
184:22, 187:7,
187:8, 234:5,
250:11, 251:11,
251:16, 335:1
**fail**
183:9, 183:13,
185:13, 185:22,

**extra**
186:7, 186:16,
186:19, 186:22,
187:4, 216:11
**failed**
175:7, 290:21,
292:12
**failure**
137:13, 176:17,
176:20, 177:2,
178:21, 179:11,
179:16, 185:9,
185:17, 185:19,
185:20, 188:9,
188:15, 211:21,
226:3, 253:21,
373:6, 386:12,
388:4, 388:5,
402:22
**failure-to-appear**
173:9, 175:4,
180:2, 184:16
**failures**
321:7
**fair**
44:4, 53:16,
56:21, 108:18,
108:19, 143:19,
167:19, 177:21,
205:15, 210:5,
220:20, 221:1,
221:4, 249:7,
252:17, 272:22,
274:18, 281:14,
331:20, 349:7
**faith**
331:19, 331:20,
338:2, 346:7,
347:6, 347:10,
347:14, 348:11,
349:12
**faithfully**
268:19
**fall**
36:6, 38:5,
194:13, 227:11
**falls**
127:8
**familiar**
51:7, 169:8,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

128

253:15, 267:10,
267:16
**family**
20:9, 20:11,
40:5, 72:16,
73:7, 73:11,
73:15, 130:12,
130:19, 150:8,
155:18, 167:11,
243:11, 243:17,
246:17, 247:17,
251:15, 313:3,
313:11, 323:6
**far**
14:4, 41:6,
52:6, 64:14,
77:16, 125:15,
125:20, 141:11,
149:13, 150:18,
155:21, 205:17,
222:2, 229:2,
232:20, 286:1,
295:15, 348:18,
349:1
**fast**
158:7, 322:13,
351:7, 380:11
**faster**
350:14
**fault**
333:22
**favorite**
262:17, 262:18,
272:11
**february**
1:14, 4:18,
5:4, 9:8, 276:1,
338:14, 338:15,
354:22, 364:7,
364:11, 366:4,
366:16, 370:1,
370:17, 403:4,
403:20, 409:14
**federal**
407:3, 407:10
**fee**
237:21, 304:21,
305:3, 305:11,

312:19, 313:2,
313:6, 329:17,
360:14, 360:17,
378:6, 388:1
**feeling**
353:6
**feelings**
262:22
**fees**
238:5, 251:19,
329:20, 343:12,
343:14, 343:20,
345:6, 408:14
**feigned**
153:8
**fell**
92:2
**felt**
352:12
**few**
67:20, 116:12,
145:13, 145:14,
201:11, 261:16,
309:2, 367:22
**field**
23:20, 26:8,
29:6, 30:12,
32:15, 34:9,
34:11, 34:14,
123:7, 203:15,
205:5, 233:13,
233:18, 247:3,
274:13, 280:21,
356:16
**fifteen**
76:19, 384:2
**fifty**
176:13
**fight**
248:2
**figure**
12:8, 22:14,
141:1, 144:14,
145:2, 145:10,
167:12, 167:21,
177:8, 186:18,
193:18, 224:14,
329:21, 360:10

**figured**
138:10
**figures**
142:21, 146:3,
146:6, 178:15,
192:14, 193:1,
193:5
**file**
86:21, 239:11,
255:1, 281:10,
281:18, 287:16,
288:20, 290:22,
291:5, 291:10,
292:2, 292:8,
293:8, 295:13,
295:21, 296:7,
297:3, 297:13,
311:14, 314:13,
322:16, 340:11,
343:2, 343:3,
343:10, 343:11,
361:20, 378:13,
399:11
**filed**
52:18, 53:17,
63:8, 81:21,
88:2, 89:8,
129:7, 182:8,
344:1, 344:5,
345:6, 355:9,
355:16, 355:21,
360:11, 378:11,
379:2, 379:5,
379:7, 391:6,
391:10
**files**
10:9, 10:13,
10:19, 224:13,
279:17, 288:3,
288:14, 288:15,
291:11, 292:5,
292:6, 292:7,
293:9, 293:14,
294:13, 360:20,
391:3, 399:22,
405:17, 406:2,
406:3, 406:14
**filing**
343:12, 343:14,

343:19, 345:6,
360:14, 378:5,
378:6
**filled**
28:20, 390:1
**filling**
20:18, 245:13
**filter**
140:10
**final**
87:11, 331:17,
378:12, 378:14,
378:21, 379:8
**finally**
206:13
**finance**
46:14, 46:16,
46:17, 47:4,
47:5, 47:9,
47:15, 151:21,
151:22, 152:12,
400:16
**financial**
37:5, 270:2,
270:4, 409:10
**financially**
251:18
**find**
117:22, 131:9,
145:4, 177:1,
224:4, 234:12,
251:10, 269:15,
271:21, 272:16,
273:15, 274:2,
274:11, 274:12,
275:14, 318:13,
318:14, 327:9,
366:6
**findable**
117:15
**finding**
117:13
**fine**
28:4, 62:15,
80:14, 132:9,
143:11, 164:19,
168:5, 219:22,
229:12, 247:5,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

129

292:20, 300:10,
310:16, 331:1,
351:3, 406:10,
407:14
**finish**
13:17, 35:15,
72:11, 294:14
**finished**
13:21, 407:16,
407:17
**fired**
283:3
**firm**
227:22, 342:19,
345:20
**firms**
229:5
**first**
22:12, 23:14,
39:10, 39:11,
54:17, 55:9,
58:17, 59:16,
77:3, 79:17,
79:18, 81:1,
81:10, 82:3,
86:4, 90:17,
92:18, 161:21,
193:10, 232:8,
232:15, 235:22,
236:19, 241:15,
252:21, 258:2,
258:6, 262:11,
287:4, 306:21,
310:22, 315:18,
323:1, 323:13,
325:4, 325:10,
327:3, 366:3,
366:8, 366:15,
370:4, 376:20,
385:20, 388:8,
390:3, 390:6,
390:20, 390:22,
392:15, 394:3,
398:13
**fit**
264:16, 283:21
**fitted**
240:7, 265:3,

268:7, 278:22
**fitzgerald**
3:5
**five**
64:5, 144:8,
146:8, 147:9,
182:18, 183:5,
226:5, 300:20,
301:3, 304:10,
316:3, 331:13
**five-and-a-half**
326:19
**five-percent**
147:13
**fix**
57:20, 268:17
**flee**
227:16
**flight**
263:6
**flip**
93:3, 395:20
**flipping**
93:19, 185:10
**floor**
3:16
**florida**
101:6
**flow**
80:12
**flowing**
151:3
**fly**
313:5
**focus**
23:11, 145:15,
145:16, 147:7,
304:13
**focused**
24:17, 251:14
**focusing**
175:3, 306:2
**folks**
381:1
**follow**
121:11, 314:6,
324:3, 358:5
**followed**
326:10

**following**
171:20, 305:19,
367:17, 368:3,
400:19
**follows**
13:3
**footer**
87:19
**footprint**
26:12
**force**
175:14, 193:13,
195:8, 205:11,
205:15, 205:19
**forced**
402:21
**forcing**
142:21
**ford**
51:9, 51:10,
51:11, 51:12,
56:13, 56:17,
56:20
**forecast**
232:13, 232:14
**forecasting**
233:5
**foregoing**
409:3, 409:4
**forever**
186:1
**forfeited**
377:19
**forfeiture**
373:14
**forget**
239:16
**forgive**
255:22
**format**
53:12
**formation**
59:12
**formed**
28:16, 308:6,
352:9
**former**
17:17, 79:10,

82:12
**formerly**
67:15, 342:16,
344:19
**forms**
29:14
**formula**
125:13, 161:9,
165:10, 277:9
**formula's**
193:19
**forth**
59:16, 81:16,
85:19, 114:6,
178:2, 185:10,
218:3, 244:10,
372:5, 378:7,
385:18, 399:5
**forward**
126:3, 126:6,
126:8, 148:19,
157:11, 157:15,
159:17, 252:12,
252:14, 316:6,
329:7, 329:10,
341:1, 341:12,
355:10, 364:20
**forwarded**
140:1, 159:16,
329:5, 360:7,
360:9, 375:22,
393:7, 396:3
**forwarding**
346:3, 371:8,
375:12, 376:3,
383:20, 384:10,
385:8, 392:16
**forwards**
360:4, 400:4
**found**
47:7, 315:15,
319:5
**foundational**
346:17
**founders**
22:18, 48:17
**fountain**
74:8

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

130

**four**
85:13, 87:10,
93:21, 139:3,
139:6, 190:7,
250:7, 256:7,
279:12, 391:15
**four-digit**
267:17, 326:10,
326:13
**four-page**
83:22
**fourteen**
380:20
**fourth**
252:18, 253:6
**fraud**
25:2, 25:20
**free**
10:16, 272:3
**frequency**
106:21, 108:22
**frequently**
119:15, 246:22,
255:13, 255:16,
256:19
**fresh**
95:14
**friday**
313:19, 408:5,
408:12, 408:13
**friend**
243:18, 323:9
**friends**
40:5, 243:11,
243:16
**frivolous**
356:19
**front**
53:14, 53:18,
102:9, 110:4,
132:8, 142:21,
172:18, 232:6,
254:12, 305:10,
324:15, 350:12,
352:21, 370:22
**fulfilling**
20:12
**full**
171:14, 276:8,

330:2, 377:21
**full-time**
77:4, 77:14
**fully**
14:16, 117:4,
117:8, 118:3,
119:2, 132:3,
164:15
**function**
35:10, 37:10,
38:3, 122:13,
125:4, 244:12,
368:9
**functions**
58:5, 126:10,
126:15, 283:16
**fund**
228:3
**funded**
227:14, 342:21
**funding**
228:11, 228:15,
229:2, 343:3
**funds**
36:18, 36:21,
37:15, 37:17,
38:2, 66:7,
66:10, 227:21
**funny**
113:6, 113:7,
113:8
**further**
19:14, 400:1,
403:3

---
**G**
---

**game**
271:21
**gamer**
72:2, 72:4,
72:17, 73:2,
73:8, 73:14
**gamut**
227:6
**gate**
24:22
**gave**
82:8, 84:5,

84:10, 154:9,
157:8, 160:18,
168:1, 193:18,
214:3, 217:9,
288:3, 293:9,
296:4, 297:14,
309:8
**gees**
154:11, 268:15
**gen**
259:10, 259:11,
259:21, 324:6,
324:8, 324:9,
324:12, 324:16,
324:22
**general**
25:7, 234:9,
300:10, 329:17,
335:2
**generally**
35:9, 38:18,
38:20, 100:19,
100:21, 107:5,
234:4, 405:17,
405:19
**generate**
328:12
**generated**
66:7, 171:11
**generates**
73:2
**generating**
36:4
**generation**
257:1, 323:17,
324:6, 324:7
**gentleman**
27:16
**gentlemen**
402:10
**george**
161:22
**georgia**
3:17
**getting**
108:11, 108:22,
236:7, 248:20,
259:6, 292:12,

315:21, 320:10,
327:5, 335:10,
342:8, 370:11,
408:1
**ghost**
175:1, 320:20
**ghosted**
174:21, 175:18
**ghosting**
176:14, 176:18,
268:21
**gigantic**
108:10, 253:3
**girlfriend**
248:2, 262:17
**gist**
336:17, 352:17,
352:18, 352:20,
353:6
**give**
37:7, 56:5,
56:10, 65:7,
81:7, 103:5,
103:19, 106:20,
142:3, 143:22,
162:7, 162:12,
162:21, 166:19,
167:17, 168:7,
200:17, 202:10,
208:8, 235:6,
238:22, 241:13,
241:19, 242:4,
255:5, 269:22,
272:2, 280:16,
295:19, 352:3,
371:5, 380:10,
381:20
**given**
15:20, 128:8,
169:6, 192:6,
403:22, 409:5
**gives**
159:11, 271:21,
369:7, 378:9
**giving**
50:15, 134:14,
141:21, 142:6,
143:2, 367:20

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020                    131

| | | | |
|---|---|---|---|
| **gladly** | 293:17, 296:20, | **gorby** | 277:3, 277:6, |
| 337:5 | 297:21, 298:5, | 3:14 | 277:7, 277:12, |
| **glass** | 302:22, 313:6, | **gotten** | 278:13, 302:7, |
| 190:2, 190:9 | 313:9, 316:11, | 112:12, 141:2 | 302:10, 305:14, |
| **glean** | 316:16, 321:3, | **government** | 305:18, 306:20, |
| 269:6 | 325:13, 343:8, | 26:20, 26:21, | 317:18, 318:11, |
| **gmr** | 348:1, 363:19, | 104:6, 104:22, | 318:15, 318:16, |
| 375:13, 383:18, | 372:13, 373:1 | 105:12, 105:19, | 318:18, 320:6, |
| 385:9, 391:16, | **goal** | 107:7, 107:15, | 323:14, 324:1, |
| 392:14, 393:11, | 147:1, 147:14, | 107:16, 112:19, | 325:2, 326:1, |
| 395:22, 398:19 | 236:16 | 112:20, 113:8, | 330:6, 330:20 |
| **go** | **goes** | 114:11, 139:2, | **gpses** |
| 10:4, 13:14, | 92:8, 112:16, | 158:2, 183:11, | 122:22, 253:1, |
| 31:7, 31:15, | 113:10, 120:11, | 201:4, 201:7, | 269:14, 269:16, |
| 33:21, 40:21, | 132:13, 165:10, | 235:16, 336:9, | 271:9, 284:4 |
| 69:2, 87:13, | 205:11, 205:19, | 336:12, 342:9, | **grant** |
| 92:11, 93:21, | 230:21, 244:10, | 373:15 | 285:16, 285:18, |
| 97:4, 100:22, | 283:15, 300:8, | **government's** | 285:19, 286:9, |
| 103:11, 108:10, | 311:19, 360:2, | 337:2 | 286:11 |
| 109:17, 109:18, | 368:20, 390:18, | **gps** | **granted** |
| 110:4, 110:5, | 402:12 | 39:16, 123:11, | 102:8, 283:22, |
| 111:1, 112:15, | **gone** | 123:13, 173:7, | 284:19, 286:6, |
| 114:18, 116:6, | 16:4, 117:18, | 173:15, 179:17, | 356:17, 358:14, |
| 116:13, 117:17, | 145:18, 164:5, | 179:22, 180:5, | 358:18 |
| 117:19, 118:2, | 165:3, 209:1, | 180:7, 211:6, | **granting** |
| 129:3, 133:22, | 234:13, 246:1, | 227:1, 240:7, | 282:19, 283:5, |
| 137:18, 137:20, | 261:20, 353:9 | 240:15, 240:19, | 283:6 |
| 139:9, 145:4, | **good** | 241:3, 241:6, | **greensboro** |
| 147:12, 150:4, | 13:6, 13:8, | 241:14, 241:17, | 3:6 |
| 150:18, 151:21, | 49:19, 200:4, | 241:22, 250:22, | **greg** |
| 157:9, 160:13, | 212:1, 227:15, | 253:19, 254:13, | 332:22, 333:2 |
| 167:4, 167:21, | 233:12, 233:16, | 259:12, 261:7, | **grew** |
| 174:19, 174:21, | 249:22, 273:1, | 261:10, 262:3, | 24:10, 39:19 |
| 179:12, 186:10, | 274:10, 274:13, | 262:9, 262:19, | **grossly** |
| 203:17, 228:21, | 331:20, 335:20, | 262:22, 266:5, | 346:19, 348:4 |
| 231:13, 231:18, | 337:4, 348:15, | 266:12, 266:15, | **ground** |
| 237:11, 238:13, | 353:8, 354:1, | 267:21, 268:2, | 13:15 |
| 238:14, 243:4, | 354:3, 365:11, | 270:7, 270:13, | **grounds** |
| 246:2, 251:8, | 401:13, 407:18 | 270:18, 270:20, | 358:19 |
| 255:8, 259:3, | **google** | 271:1, 271:2, | **group** |
| 262:14, 262:16, | 176:11, 177:1, | 271:5, 271:10, | 79:9 |
| 262:17, 266:17, | 177:17, 178:1, | 271:19, 271:21, | **groups** |
| 266:18, 267:4, | 178:16, 178:22, | 272:4, 272:8, | 24:16 |
| 269:2, 269:15, | 228:8, 228:9, | 272:15, 272:16, | **guarantee** |
| 270:19, 270:22, | 255:6, 255:7, | 273:8, 273:14, | 403:2 |
| 271:2, 271:8, | 255:8, 255:9 | 273:22, 274:21, | **guaranteed** |
| 271:11, 271:16, | **googling** | 276:7, 276:10, | 183:10 |
| 274:9, 280:1, | 177:3 | 276:15, 277:2, | **guards** |
| | | | 24:19, 24:20 |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

132

**guess**
46:22, 62:9,
92:10, 94:15,
94:18, 135:19,
140:12, 141:7,
142:20, 142:21,
149:7, 160:20,
174:17, 192:20,
205:15, 210:2,
226:2, 227:10,
266:15, 269:9,
275:5, 306:22,
327:13, 333:8,
336:7, 353:1,
356:8, 362:1,
394:5
**guessing**
21:20, 208:9,
208:10
**guesstimate**
144:5
**gutierrez**
341:3
**guy's**
27:14
**guys**
292:9

**H**

**half**
21:18, 42:6,
107:11, 107:12,
144:7, 157:11,
258:7, 260:10,
269:10
**halfway**
21:21
**hammering**
217:22
**hand**
10:10, 126:12,
409:13
**handbook**
112:20, 112:22,
113:3
**handcuffs**
107:9
**handed**
52:16, 182:4,

297:5, 327:19,
364:4, 367:11,
374:19, 375:11,
376:13, 380:4,
383:15, 384:8,
385:6, 389:13,
392:12, 396:20,
398:9
**handle**
23:17, 26:9,
36:1, 37:11,
126:13, 209:13
**handled**
23:16
**handles**
35:18
**handling**
35:20, 327:15
**happen**
109:3, 116:9,
156:18, 204:20,
207:4, 231:19,
233:3, 235:13,
248:1, 343:17,
379:11, 406:14
**happened**
21:12, 40:18,
48:4, 82:3,
116:1, 148:21,
150:11, 155:13,
221:7, 286:6,
324:7, 354:3,
354:7, 359:13
**happening**
118:13, 158:21,
362:6, 362:7
**happens**
201:3, 235:12,
391:4
**hard**
72:13, 252:5,
271:20, 333:19,
335:2, 335:5
**harder**
24:10, 272:16,
273:14
**harm**
186:3, 339:13

**harrisonburg**
1:3, 1:13, 2:4,
2:7, 9:7, 9:12,
72:5
**hate**
24:16, 28:10,
228:8
**hazaar**
27:13, 28:6,
29:18, 31:17,
76:5, 119:11,
121:1, 151:13,
151:14, 152:4,
168:21, 169:1,
198:7, 198:15,
202:19, 202:20,
207:5, 207:10,
208:15, 208:17,
209:19, 209:20,
314:19, 334:7,
357:13, 358:17,
359:17, 359:20,
365:8
**head**
81:6, 146:4,
159:7, 160:6,
356:7, 370:21
**header**
52:17, 88:4,
91:18, 298:6,
298:10, 298:14,
298:18, 305:14,
306:14
**headers**
88:1
**heading**
120:14
**hear**
20:15, 204:2,
204:6, 363:19,
392:5
**heard**
99:22, 191:11,
262:5, 348:22,
354:17
**hearing**
102:8, 164:6,
189:2, 212:17,

223:19, 224:1,
224:5, 224:8,
224:9, 224:19,
225:1, 225:17,
235:14, 235:20,
236:1, 236:2,
236:7, 236:10,
237:2, 290:1
**hearing's**
236:18
**hearings**
163:13, 207:17,
209:22, 211:9,
232:20, 262:13
**heavily**
306:22
**hector**
28:22
**heitman**
402:8
**held**
2:2, 405:8,
408:17
**hello**
364:19
**help**
35:19, 56:5,
57:15, 60:9,
60:11, 65:9,
101:4, 125:11,
212:9, 228:21,
232:19, 272:20,
323:2, 368:8,
368:9, 400:5
**helped**
108:9
**helpful**
256:12, 348:16
**helping**
57:12, 58:3,
125:15
**helps**
246:7, 246:8
**hepatitis**
228:10
**here**
9:2, 14:5,
14:18, 52:9,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

133

| | | | |
|---|---|---|---|
| 59:16, 60:13, 63:16, 84:5, 84:6, 84:7, 84:11, 92:15, 139:14, 141:6, 152:17, 154:16, 162:6, 163:4, 163:10, 164:11, 165:8, 166:22, 171:19, 173:14, 175:4, 177:8, 179:15, 179:22, 184:13, 185:20, 187:5, 190:9, 191:18, 195:7, 198:3, 199:14, 224:15, 239:14, 244:9, 248:22, 250:6, 252:6, 270:17, 296:9, 299:3, 299:18, 301:5, 311:16, 314:18, 316:1, 316:5, 323:5, 327:9, 331:12, 333:11, 346:14, 354:11, 357:11, 363:22, 365:18, 367:17, 369:10, 377:2, 377:11, 380:9, 380:11, 391:16, 407:13 **here's** 156:19, 156:20, 159:22, 294:13, 321:2 **hereafter** 90:9 **hereby** 409:4 **hereinafter** 59:2, 307:8 **hereunto** 409:12 **herself** 346:1, 349:3 **hey** 114:16, 151:8, | 186:21 **hi** 367:18, 367:22, 403:21 **hierarchy** 32:19 **high** 180:22, 185:5, 208:1, 253:22, 320:14 **higher** 143:15, 145:7, 179:11, 191:10, 191:12, 241:17, 262:1, 300:17, 301:11, 302:2 **highest** 34:13, 64:7, 75:6, 97:5 **highly** 282:10 **hill** 76:16 **hilton** 2:4 **himself** 132:4 **hire** 47:3, 116:13, 214:12 **hired** 106:17 **hiring** 155:21, 285:8 **histories** 328:13 **history** 255:4, 318:9, 320:9, 328:19, 328:21 **hit** 226:2 **hoffar** 3:5 **hold** 98:6, 98:20, 99:4, 149:9, 251:4, 290:1, | 313:14 **holding** 353:1 **home** 13:7, 20:10, 20:14, 33:21, 43:6, 65:8, 66:17, 70:13, 70:21 **homeland** 402:12, 402:14 **homes** 9:21, 14:21, 15:9, 15:10, 37:18, 63:22, 64:1, 64:3, 64:8, 64:11, 64:16, 64:21, 65:4, 65:7, 65:12, 65:14, 65:21, 66:4, 66:7, 107:13 **honor** 50:7, 349:2 **hope** 56:5, 57:15, 367:18, 367:21 **hoped** 351:7 **hoping** 368:7 **hour** 49:22, 50:6, 365:13 **hours** 119:17, 255:15, 279:13, 292:15 **house** 116:6, 231:19, 241:16, 246:2, 246:6, 262:17, 301:22 **houses** 65:17, 231:13 **how's** 177:3 **however** 197:16, 267:8, | 359:6 **hr** 23:16, 25:16, 25:22, 46:6, 283:3, 285:11, 285:14 **huge** 108:3, 108:7, 227:17, 228:10, 253:2, 316:21, 408:14 **huh-uh** 308:22 **human** 19:13, 125:9, 125:15, 126:10, 135:12, 165:11, 269:1, 277:9, 309:15 **humanitarian** 210:1, 210:11, 213:19, 214:3, 215:3, 216:3, 218:1, 263:3 **humanity** 263:1, 263:2, 263:3 **humanos** 227:13, 228:1, 229:20, 229:22, 230:9 **hundred** 51:9, 228:5, 228:6, 228:15, 258:16, 266:12, 271:13, 297:17, 329:3 **hundreds** 360:20 **hung** 350:12 **hunting** 320:22 **hurricane** 42:5 **hurricanes** 256:12 **hyphenated** 281:2 |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                   134

**hysterectomy**
294:20

**I**

**i-'s**
198:19
**i-b**
378:5
**ice**
7:10, 7:13,
7:16, 107:12,
111:22, 112:22,
114:9, 115:12,
121:6, 121:7,
155:16, 156:18,
158:3, 158:9,
203:14, 203:15,
203:18, 205:5,
243:19, 258:15,
270:21, 271:8,
271:9, 271:10,
372:14, 377:14,
397:12, 397:14
**id**
289:9, 289:15,
295:16
**idea**
66:1, 73:5,
137:4, 147:18,
153:8, 158:20,
163:9, 166:13,
202:14, 208:2,
215:20, 220:2,
224:6, 230:5,
238:18, 241:19,
247:15, 248:15,
302:17, 355:22,
366:17, 393:12,
401:2
**identical**
11:6, 87:3
**identifiable**
406:21
**identification**
52:12, 83:11,
182:1, 188:19,
279:19, 289:6,
289:8, 297:1,

327:10, 364:1,
367:8, 369:16,
374:16, 375:7,
376:10, 380:1,
380:17, 383:7,
384:4, 385:3,
389:10, 392:9,
393:14, 396:17,
398:6, 400:9,
401:4, 402:2,
403:16
**identified**
244:13
**identify**
9:13, 127:10,
152:8, 178:1,
243:9, 331:17,
357:10, 368:9
**identifying**
243:5
**ignore**
116:19, 117:3,
212:8, 213:15
**illinois**
100:20, 101:4
**imagine**
244:8, 266:11
**immediate**
235:21
**immediately**
18:8, 48:1,
310:7
**immigrant**
182:19, 182:20,
238:16, 323:7
**immigrants**
121:21, 122:6,
122:8, 123:3,
211:6, 323:8
**immigration**
4:17, 102:10,
102:13, 103:1,
103:7, 103:13,
110:3, 173:11,
176:5, 176:6,
177:12, 178:7,
178:10, 178:14,
179:2, 179:4,

179:6, 216:21,
217:17, 232:5,
232:20, 311:1,
311:7, 311:15,
338:19, 350:3,
364:12, 376:16
**important**
20:18, 180:13,
181:16, 230:17,
233:20, 274:14,
334:13, 349:9,
374:7, 406:20
**impose**
336:7, 336:12
**imposing**
336:18
**improper**
132:10, 137:18,
350:20, 350:21,
351:15, 351:21,
353:18, 354:22
**improvement**
386:15, 388:10
**inc**
1:8, 9:20,
9:21, 14:20,
14:21, 15:7,
15:11, 17:10,
17:13, 17:21,
21:14, 22:19,
38:16, 51:3,
52:20, 52:21,
58:19, 58:22,
59:1, 85:8,
86:5, 90:7,
90:13, 91:3,
91:7, 91:14,
91:20, 92:5,
92:8, 92:17,
93:1, 93:4,
93:7, 94:21,
95:5, 95:8,
95:12, 95:22,
97:2, 121:20,
122:4, 122:5,
122:7, 122:15,
123:2, 128:17,
128:18, 136:10,

137:2, 137:3,
182:10, 182:20,
183:8, 183:16,
183:20, 184:4,
188:6, 307:3,
307:7, 307:12
**inception**
125:22, 190:17
**incident**
105:10, 105:20
**include**
37:18, 86:14,
175:19, 200:2,
290:18
**included**
82:1, 152:15,
288:10
**including**
90:8, 121:18,
211:17, 260:20,
294:15
**incomplete**
87:8
**incorporate**
59:15
**incorporated**
9:5
**incorporating**
59:6, 59:15
**incorrect**
165:9
**incorrectly**
337:1
**increase**
234:21, 237:4,
237:7, 237:16,
238:7
**increased**
196:17, 196:21,
256:9, 387:20
**increases**
233:10
**incredibly**
406:19
**indemnified**
311:10
**indemnifies**
214:18

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

135

indemnify
156:12, 211:3
indemnifying
235:9, 343:19,
345:12, 345:13
indemnity
345:10, 345:14,
403:1
independent
92:4, 138:20,
229:17, 298:15
indicate
237:15, 287:10,
324:13, 326:4
indicated
373:22, 387:9,
405:20
indicates
92:14, 92:22,
313:22, 392:2
indicating
260:5
indicator
300:15
individual
57:20, 59:12,
69:1, 139:2,
139:5, 139:10,
140:19, 140:20,
191:8, 197:6,
233:11, 267:14,
273:9, 280:20,
281:1, 287:15,
288:11, 290:19,
298:20, 299:1,
302:4, 308:12,
310:18, 318:17,
319:11, 325:11,
328:19, 329:2,
330:2, 333:2,
374:8, 374:12,
374:22, 375:13,
376:19, 382:8,
382:21, 384:11,
385:9, 392:14,
393:11, 394:22,
395:9, 395:15,
395:22

individual's
327:22
individuals
24:17, 27:11,
83:7, 83:8,
139:9, 143:13,
143:14, 143:16,
143:17, 280:9,
283:20, 383:17,
392:15, 395:13,
400:20, 401:15,
405:22
industries
173:11, 177:13
industry
176:5, 176:17,
176:21, 177:3,
177:19, 178:21,
216:22, 217:6,
217:7, 217:21
info
269:18
infor
245:15
information
10:15, 11:13,
11:15, 11:18,
19:13, 31:16,
85:19, 92:16,
94:13, 96:7,
145:17, 147:17,
147:21, 148:4,
149:10, 151:3,
168:22, 174:2,
195:14, 207:6,
208:12, 239:7,
239:12, 239:13,
245:14, 245:16,
246:6, 246:21,
247:4, 247:14,
254:9, 254:12,
256:18, 259:7,
266:1, 267:20,
269:6, 280:7,
282:11, 288:22,
289:13, 291:2,
294:16, 294:18,
300:21, 317:4,

323:4, 323:5,
325:4, 325:6,
327:16, 343:5,
348:3, 348:8,
350:19, 357:12,
370:11, 381:9,
403:22, 406:21
information's
265:10
infrequently
107:4
inherent
136:7
initial
39:22, 251:15,
287:1, 308:15,
312:15, 312:19,
389:2
initially
261:14, 261:16,
323:12
initials
298:19, 374:9,
375:1, 375:13,
383:18
inmate
323:6
inputs
283:15
inquire
19:14
inquiry
172:13, 172:14
insert
55:2, 55:4
inserted
233:22
insight
352:3
installed
240:15, 268:2
installing
257:17
installment
366:9, 366:15
instance
33:12, 62:1,
62:10, 65:19,

155:12, 159:3,
204:10, 204:12,
204:14, 246:3,
280:18, 282:1,
283:2, 340:21
instances
155:9, 335:19
instructed
129:1
instructs
35:14, 371:17
instrument
298:7, 299:2,
372:6
insurance
1:5, 9:4,
14:19, 15:1
intake
239:17, 239:18,
240:12, 245:9
integers
162:1, 165:12
intend
11:8, 116:18
intended
59:15, 62:4,
148:19
intending
115:21, 134:9
intends
299:15
intent
59:18, 59:21,
60:12, 62:11
intention
301:22
interaction
332:14
interest
191:13, 232:18,
387:15, 387:19,
393:1, 409:10
interested
171:15, 180:10,
185:17, 237:12,
283:5, 337:12
interests
262:21

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

136

| | | | |
|---|---|---|---|
| **interface** 25:4, 29:10, 32:8, 123:7, 254:8 **interfaced** 40:17 **interfaces** 261:8 **interfacing** 26:21 **interim** 20:19 **interjected** 303:22 **internally** 339:4 **interrogatory** 258:20 **interrupt** 80:12 **interrupted** 57:9 **introducing** 364:21 **invalid** 26:22, 137:18 **inventory** 284:1, 284:3, 284:6, 284:8, 285:6 **investigate** 25:3, 274:5 **investigation** 26:2, 40:22 **investigations** 23:17, 25:1 **investigator** 23:6, 98:10, 98:12, 98:16, 99:1, 99:5 **invoice** 150:9, 150:15, 151:8, 167:2, 203:5, 206:12, 206:18, 340:15, 340:16, 361:22, 362:4, 362:5, 362:8, 363:12, | 363:13, 384:10, 384:13, 385:1, 385:8, 385:11, 385:18, 386:2, 386:14, 386:20, 386:22, 387:16, 390:21, 392:1, 392:7, 393:2, 393:10, 394:9, 395:1, 395:5, 395:6, 395:14, 395:21, 396:11 **invoiced** 377:21 **invoices** 26:22, 149:18, 149:20, 150:17, 151:4, 151:6, 363:5, 363:16, 381:17, 384:16, 384:22, 388:16, 391:15, 391:20, 394:18, 396:8, 398:20 **involuntary** 108:15 **involved** 20:2, 36:21, 37:14, 38:11, 42:11, 64:16, 65:20, 66:3, 72:17, 89:19, 155:20, 173:22, 202:5, 209:11, 404:17 **involvement** 64:20, 65:10, 343:3 **involves** 64:22 **ira** 332:15, 336:16, 337:17, 337:21, 402:8, 402:9 **ira's** 354:18 **iris** 322:16 | **irrationally** 24:17 **irrelevant** 101:19 **issuance** 384:18 **issue** 25:22, 37:4, 65:2, 65:3, 82:6, 101:20, 152:4, 181:8, 181:10, 184:9, 184:18, 185:7, 186:13, 289:21, 317:8, 335:11, 338:1, 339:16, 355:9, 358:19, 361:22, 362:5, 367:19, 398:1 **issued** 138:22, 161:1, 166:8, 175:20, 191:3, 200:19, 200:20, 200:21, 285:20, 340:16, 345:22, 353:12, 357:7, 373:16, 392:2 **issues** 12:16, 20:9, 23:7, 23:16, 24:12, 25:17, 25:20, 26:21, 114:9, 115:12, 123:13, 228:7, 254:1, 335:17 **issuing** 188:14, 338:18, 340:2, 350:3, 351:12, 351:16, 351:17, 351:18, 351:20, 352:4, 353:19, 354:21, 364:12, 367:3, 370:5, 370:18 **item** 300:20, 301:2, 305:19, 329:15 | **itself** 86:6, 95:13, 220:8, 340:15, 382:12 **———— J ————** **january** 7:12, 7:15, 111:20, 111:22, 310:4, 329:2, 329:16, 398:10, 398:16, 399:2, 399:10, 400:14, 400:19, 401:1, 401:8, 401:17, 401:18, 402:7, 402:8, 402:12, 402:20, 403:2, 403:9, 403:12, 404:1, 404:2, 404:6, 404:10, 404:11 **jerk** 69:17 **jessica** 230:1 **jesus** 28:3, 28:8, 31:17, 119:11, 121:1 **jesus's** 27:14, 27:20, 76:5 **██████** 1:20, 24:10, 25:9, 26:17, **████** 40:16, 41:6, 120:10, 125:16, 126:10, 146:16, 150:20, 156:11, 211:2, 221:9, 221:10, 245:21, 262:17, 283:16, 283:18, 316:13, 334:11, 340:7 **jody** 8:3, 151:9, |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

137

204:6, 336:18,
337:4, 337:9,
337:19, 403:20
**jog**
172:2
**john**
63:2, 230:6,
230:8
**jose**
27:17, 27:18,
28:7, 28:8,
28:19
**josen**
332:22, 333:2
**judge**
11:9, 11:14,
102:9, 218:9,
219:4, 219:7,
241:13, 382:21,
405:19, 406:18
**judges**
219:9
**juliana**
341:3, 341:5,
341:12, 341:15,
342:3, 342:9,
342:16, 343:2,
343:5, 343:8,
343:10, 343:11,
344:11, 344:12,
345:5, 345:8,
345:19, 346:1
**juliana's**
341:18, 345:7
**july**
257:7, 321:5
**june**
374:20, 375:12,
376:15, 377:2,
379:13, 380:5,
380:22
**justice**
98:13
**justified**
185:6, 188:14

**K**

**katsantonis**
3:4, 9:17,

10:9, 10:12,
11:2, 11:20,
12:19, 69:2,
127:4, 127:19,
127:21, 128:3,
128:7, 133:12,
137:22, 153:5,
153:12, 153:18,
190:10, 200:9,
279:6, 291:12,
291:19, 292:20,
293:5, 293:10,
293:17, 309:5,
309:8, 309:11,
309:17, 310:1,
310:8, 310:11,
331:3, 404:21,
408:2, 408:4,
408:7, 408:12
**keep**
37:4, 136:5,
144:8, 150:20,
151:5, 168:7,
181:11, 181:13,
199:9, 220:22,
222:17, 226:5,
246:18, 260:19,
267:12, 298:9,
321:18, 334:18,
336:18, 357:16,
359:14, 381:6
**keeping**
151:12, 227:11,
227:17
**keeps**
171:1, 262:19,
357:15
**kellie**
6:5, 6:9
**kentucky**
100:20, 101:4
**kids**
65:6, 110:4,
272:2
**kill**
126:12
**kind**
25:11, 30:17,

37:13, 41:10,
58:10, 74:17,
75:19, 82:4,
106:20, 142:3,
149:9, 160:16,
193:7, 215:17,
215:21, 226:17,
227:6, 237:3,
248:4, 251:16,
254:9, 256:18,
260:2, 280:17,
281:17, 281:19,
282:7, 283:21,
316:5, 317:4,
324:3, 333:7,
342:22, 365:7,
377:17
**kindness**
345:18
**knew**
26:11, 103:4,
222:7, 285:7,
346:8, 351:3,
389:1
**knock**
107:8, 231:13,
246:7, 271:17
**knocks**
120:11
**knowledge**
38:17, 39:9,
40:8, 63:7,
63:9, 66:8,
66:10, 67:1,
67:5, 67:9,
67:18, 68:12,
70:6, 70:8,
71:14, 72:18,
77:13, 79:11,
83:3, 85:11,
85:20, 86:11,
86:15, 101:15,
101:16, 102:21,
103:5, 105:10,
105:17, 113:10,
115:20, 128:3,
133:3, 134:8,
135:21, 153:13,

157:4, 195:21,
196:2, 196:10,
197:12, 207:20,
212:15, 220:10,
223:2, 284:18,
299:18, 332:5,
332:10, 333:12,
338:8, 341:22,
344:3, 344:10,
345:9, 346:21,
348:8, 350:2,
350:4, 350:7,
352:2, 354:16,
355:13, 361:5,
366:14, 366:18,
367:7
**known**
23:5, 401:3
**knows**
19:17, 88:6,
89:5, 132:11,
174:11, 271:12,
291:16, 295:19

**L**

**label**
369:20
**labeling**
369:22
**lack**
60:14, 333:7,
334:17, 370:14
**large**
23:14, 30:15,
201:7, 409:18
**larger**
24:5
**last**
27:14, 27:15,
42:16, 42:18,
53:9, 53:10,
53:20, 53:21,
53:22, 67:19,
71:4, 97:13,
107:22, 110:11,
145:20, 145:22,
146:3, 167:9,
170:19, 195:15,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

138

202:14, 225:22,
236:15, 269:9,
269:14, 275:22,
281:2, 295:13,
314:9, 316:18,
368:6, 369:20,
375:21, 377:17,
401:10, 402:6
**lasts**
235:7
**late**
22:1, 97:15,
310:3, 372:22,
373:2, 387:14
**later**
80:9, 93:14,
201:8, 276:9,
293:16, 310:9,
334:3, 348:5,
397:11
**latest**
371:2
**latter**
333:17, 333:18
**laughed**
137:21
**laughing**
137:22
**laura**
6:21, 7:19,
8:4, 332:15,
333:18, 336:17,
337:17, 337:21,
349:1, 349:2,
370:11, 371:3,
385:8, 389:15,
389:20, 390:14,
391:8, 393:7,
396:5, 398:12,
398:13, 399:17,
400:15, 401:8,
401:9, 401:12,
401:17, 402:9,
402:13, 403:7,
403:21
**law**
3:14, 25:4,
101:1, 101:3,

105:6, 229:5,
236:17, 270:11,
345:20, 361:16,
407:3, 407:9,
407:10
**laws**
99:2, 216:21
**lawyers**
229:19
**learning**
365:15
**lease**
237:15, 237:18,
303:7, 303:22,
304:1, 304:2,
304:4, 304:14,
305:14, 312:19,
329:21, 330:5
**least**
21:7, 31:14,
38:19, 51:15,
90:2, 95:14,
110:5, 152:7,
160:22, 268:11,
277:18, 299:15,
323:20, 391:5,
391:20, 398:22
**leave**
117:16, 117:17,
271:12
**led**
112:10
**left**
28:20, 44:8,
44:10, 44:12,
67:13, 70:19,
74:10, 333:9,
333:16, 334:10,
380:14, 403:13
**leg**
260:8, 261:13,
261:21, 262:3,
325:1
**legal**
39:7, 52:2,
52:4, 57:2,
57:14, 58:13,
59:9, 59:12,

62:17, 102:16,
129:20, 130:1,
133:9, 133:10,
227:14, 227:15,
227:17, 227:22,
232:19, 238:15,
335:8, 347:9,
378:16, 384:20,
386:6, 387:3,
396:15, 407:13,
408:14
**legally**
115:10, 236:3
**legislative**
23:10
**legitimate**
339:15
**length**
132:1, 225:22
**lengthy**
137:10
**less**
49:22, 109:5,
143:14, 145:6,
173:9, 180:2,
204:16, 227:16,
259:17, 259:22,
260:13, 266:4,
266:11, 275:4,
359:10
**lessee's**
304:14
**let's**
10:17, 12:13,
33:9, 37:22,
53:20, 128:5,
128:9, 158:18,
158:19, 177:15,
235:10, 292:4,
293:15, 354:11,
398:12
**letter**
7:10, 112:20,
112:21, 113:1,
155:15, 156:17,
157:17, 157:20,
158:3, 159:9,
159:12, 159:14,

159:18, 159:19,
343:9, 394:14,
394:19
**letting**
80:11
**level**
38:21, 41:10,
44:16, 44:18,
45:8, 45:18,
46:10, 46:12,
49:16, 97:6,
126:10, 307:13,
335:6, 338:2
**liability**
138:11, 138:12,
144:10, 147:15,
192:20, 350:14,
350:16, 353:1,
353:3, 353:11,
354:10
**license**
98:18, 98:20,
98:21, 99:2,
99:16, 100:13,
289:9, 289:10,
289:12
**licensed**
98:2, 100:14,
101:7
**licenses**
98:6, 98:7,
99:4
**licensing**
98:14
**life**
141:10, 260:14,
268:20, 268:22
**lifecycle**
231:10, 232:5
**light**
110:2, 349:9
**lightspeed**
328:7, 328:8,
328:9, 328:13
**likelihood**
234:21, 237:4,
237:8, 237:16,
238:7

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

139

likely
227:16, 234:6,
234:15, 238:9,
259:17, 301:11,
301:14, 301:20
likes
29:7, 169:10
limandri
157:21, 158:4,
158:8, 399:8
limit
164:21, 197:17,
240:20
limited
48:5, 128:10,
131:21, 148:12,
170:13, 282:17
line
37:13, 50:3,
50:8, 92:18,
101:19, 192:17,
196:3, 196:9,
196:19, 310:22,
311:16, 353:17,
377:18, 385:20,
386:11, 386:17,
386:19
lines
5:3, 328:1,
328:13
list
45:14, 70:20,
98:1, 100:18,
103:19, 150:17,
151:10, 151:12,
151:15, 152:9,
200:10, 283:14,
285:11, 296:3
listed
25:12, 94:1,
189:12, 189:18,
304:7, 325:4,
330:20, 394:3
listen
373:2
listened
110:10
listening
108:13

listens
284:13
listing
93:4, 323:22
lists
92:16, 152:5,
152:8, 152:15,
307:2, 388:4,
394:10
litigants
228:22
litigation
14:19, 78:12,
78:22, 79:5,
79:11, 79:13,
82:12, 127:2,
257:5, 279:18
litigations
81:8
little
15:15, 34:4,
69:11, 87:12,
97:4, 125:19,
191:10, 191:12,
204:16, 209:21,
225:21, 261:22,
269:13, 314:8
live
372:14
lived
241:16
lives
57:13, 313:11
living
170:10, 268:20,
268:21
llp
3:5
loaded
293:11
lobby
74:8
lobbying
23:7
local
24:16, 101:1,
101:3, 105:3,
105:6, 106:17

locally
30:8
locate
230:16, 230:21,
231:3, 231:10,
254:19, 270:8,
270:12, 273:9
located
41:21, 68:7,
126:19
location
24:20, 31:6,
72:6
locations
30:14
locking
261:7
locks
25:9
log
151:5, 280:6,
320:12, 320:21,
321:20, 323:10
log-in
285:6
logged
169:6, 321:11
logging
120:17
logistics
12:7
lonas
1:22, 2:12,
10:1, 409:2,
409:17
long
16:10, 18:11,
21:16, 22:5,
42:1, 49:22,
55:14, 168:2,
174:1, 204:5,
208:22, 209:9,
233:20, 235:5,
235:7, 235:11,
235:15, 235:16,
236:14, 244:8,
261:20, 262:5,
262:22, 263:14,

265:8, 266:10,
269:17, 275:9,
277:15, 279:9,
299:19, 318:9,
320:9, 333:14,
335:13, 337:22,
339:6, 350:17,
356:9, 372:18,
380:12, 391:12
longer
19:2, 19:22,
20:6, 47:10,
73:14, 73:15,
151:8, 171:2,
193:12, 195:8,
195:22, 235:8,
262:9, 263:9,
275:15, 275:16,
275:18, 276:7,
276:15, 350:13,
350:15, 363:16
look
11:6, 16:21,
17:4, 27:19,
53:20, 55:16,
56:4, 58:17,
81:15, 83:15,
86:20, 89:10,
95:5, 112:19,
127:11, 127:17,
132:8, 147:15,
148:9, 160:12,
166:22, 178:4,
178:10, 183:2,
191:7, 192:16,
197:6, 198:15,
198:19, 199:6,
199:18, 217:19,
224:22, 240:4,
241:18, 247:12,
248:16, 255:18,
257:10, 260:3,
294:8, 298:2,
300:20, 305:12,
306:12, 310:15,
312:12, 315:22,
316:17, 325:15,
327:3, 339:6,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

140

340:1, 354:8,
363:21, 366:2,
368:13, 370:19,
375:10, 377:10,
377:13, 385:11,
387:5, 394:21,
394:22, 397:2,
401:12, 404:4
**looked**
162:10, 168:17,
169:9, 169:14,
170:2, 248:16,
266:15, 277:14,
303:1, 357:21,
375:22, 400:14
**looking**
53:14, 60:17,
82:2, 87:4,
292:9, 309:21,
310:2, 310:16,
310:19, 336:18,
364:20, 391:17,
394:13
**looks**
93:13, 137:6,
142:4, 169:8,
169:9, 260:15,
297:15, 330:1,
379:15
**lord**
295:18
**los**
33:17, 35:1
**lose**
133:3, 186:1,
186:4, 231:12,
231:22, 232:2,
232:3
**losing**
140:6, 181:1,
233:9, 237:3
**loss**
20:11, 25:7,
49:14, 117:5,
118:7, 138:8,
143:17, 144:2,
144:6, 144:7,
144:9, 145:5,

145:8, 149:6,
163:21, 163:20,
166:12, 211:12,
219:6, 226:5,
230:18, 237:9,
271:13, 320:5
**losses**
181:13
**lost**
112:14, 138:9,
174:21, 231:15,
315:10, 320:1,
321:3, 321:14,
321:19, 322:2
**lot**
20:10, 24:15,
63:20, 64:16,
69:22, 107:6,
117:7, 118:17,
145:6, 148:21,
208:9, 209:1,
230:12, 232:14,
238:16, 266:14,
274:6, 281:1,
281:4, 341:15,
350:14, 351:10,
370:19
**loved**
35:19, 323:9
**low**
117:13, 128:13,
131:6, 131:12,
132:18, 133:7,
134:17, 135:8,
135:11, 136:12,
179:16, 180:15,
181:12, 181:13,
181:18, 211:21,
226:2, 241:15,
253:21, 254:1,
299:17, 317:7
**lower**
87:19, 177:17,
236:22
**lrv**
375:1, 383:18,
384:2, 391:16,
395:15, 398:19

**lunch**
154:8, 154:14

| M |
| --- |

**machine**
11:6
**mad**
357:4
**madam**
279:8, 369:18,
380:12
**made**
40:19, 46:20,
47:1, 89:15,
127:12, 127:13,
128:22, 136:11,
136:17, 143:4,
155:14, 155:15,
155:17, 156:8,
170:15, 193:9,
214:8, 215:2,
215:21, 215:21,
264:15, 266:3,
269:15, 284:18,
314:5, 329:2,
330:2, 332:7,
335:2, 350:10,
352:20, 363:3
**magically**
204:12
**maglock**
74:11
**magnetic**
44:9
**magnifying**
190:2, 190:9
**magnitude**
192:1
**mail**
112:14, 340:11
**mailbox**
362:21
**maintain**
25:13, 146:18,
151:15, 183:8,
211:21, 226:20,
273:3
**maintained**
66:11, 183:13

**maintaining**
181:18, 230:15,
282:13
**maintains**
70:16, 406:2
**majority**
242:4
**make**
13:20, 14:7,
25:9, 27:5,
27:6, 27:11,
41:7, 65:5,
69:18, 71:2,
74:14, 84:16,
88:9, 89:17,
91:22, 95:9,
99:13, 119:9,
119:12, 123:15,
132:9, 132:10,
154:20, 172:12,
172:14, 174:15,
177:14, 193:4,
194:7, 211:14,
218:15, 218:19,
220:18, 222:12,
222:21, 234:14,
237:9, 242:13,
244:3, 244:15,
252:9, 262:2,
272:1, 273:14,
277:5, 281:3,
284:8, 284:13,
284:14, 285:5,
287:13, 296:19,
301:11, 301:13,
301:20, 302:2,
312:10, 316:8,
321:22, 349:3,
358:15, 363:8,
401:10, 406:19,
407:13
**makes**
88:7, 123:11,
150:7, 155:7,
205:6, 272:16,
310:8, 334:10
**making**
26:10, 26:14,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

141

49:13, 62:16,
95:20, 119:19,
120:7, 121:1,
129:13, 133:10,
140:3, 155:22,
214:21, 215:12,
220:21, 277:8,
317:10, 343:16,
349:9, 351:4,
351:5, 354:9,
365:13, 382:5
**man**
79:15
**manage**
24:19, 24:21,
233:15
**managed**
23:21, 26:19,
33:10
**management**
17:18, 17:19,
18:9, 18:18,
20:7, 21:15,
22:4, 23:13,
23:18, 23:19,
24:3, 24:8,
25:13, 32:12,
33:13, 33:14,
34:2, 34:15,
35:5, 36:11,
36:12, 37:2,
39:12, 56:15,
76:18, 112:22,
120:15, 122:13,
124:9, 134:20,
135:5, 139:20,
150:20, 226:9,
226:10, 240:10,
247:13, 255:12,
311:2, 311:21,
311:22, 312:1,
312:6, 312:7,
312:9, 314:14,
315:12, 317:11,
317:13, 318:12
**manager**
33:19, 33:20,
34:3, 34:14,

40:3, 109:14,
116:5, 118:12,
120:10, 121:15,
140:4, 238:6,
280:12, 302:1,
315:15, 319:5
**manager's**
75:9
**managers**
23:20, 26:7,
30:1, 31:1,
31:9, 31:20,
32:15, 32:21,
33:4, 33:6,
34:11, 37:2,
38:2, 100:13,
123:6, 123:14,
135:17, 274:5,
284:11, 300:12
**manages**
33:14, 282:19,
284:3
**managing**
26:6, 37:15,
135:17, 230:4
**manner**
116:17, 193:19
**manual**
126:14, 126:21
**manuals**
126:14, 126:18
**manufacturer**
324:20
**many**
30:5, 64:3,
100:11, 100:12,
109:2, 137:17,
139:10, 139:15,
140:8, 141:2,
145:4, 145:9,
153:7, 156:21,
157:1, 157:3,
158:12, 160:2,
162:13, 166:12,
167:1, 167:6,
167:7, 168:15,
185:22, 200:14,
202:9, 202:11,

208:4, 208:5,
212:19, 217:8,
218:11, 219:7,
219:17, 223:19,
223:22, 239:1,
240:6, 247:6,
247:15, 256:3,
263:17, 264:3,
264:6, 264:16,
265:2, 265:14,
266:17, 266:18,
273:2, 273:5,
274:20, 277:13,
278:4, 280:9,
355:20, 356:21,
357:6, 359:5,
359:6, 359:8,
360:10, 360:11,
389:7
**map**
255:5, 255:8
**maps**
255:6, 255:7,
255:9, 255:10
**march**
16:12, 22:7,
257:7, 330:1,
330:10, 367:14
**marco**
156:7, 157:21,
158:3, 158:4,
158:8, 159:11,
160:13, 214:21,
215:6, 215:8,
215:12, 215:16,
220:13, 221:22,
251:10, 329:14,
342:3, 342:9,
342:12, 342:14,
342:20, 343:2,
343:4, 343:9,
343:11, 343:19,
344:6, 344:16,
344:17, 345:5,
345:10, 345:12,
345:13, 360:7,
360:8, 371:18,
376:15, 384:10,

390:17, 393:22,
399:7, 399:21
**marco's**
156:8, 159:21
**marijuana**
179:10
**mario**
229:21, 230:11
**mark**
52:11, 83:10,
169:17, 382:6,
405:11
**marked**
52:12, 52:16,
82:15, 82:19,
83:11, 83:18,
182:1, 182:5,
188:19, 279:19,
297:1, 297:6,
327:10, 364:1,
367:8, 369:16,
374:14, 374:16,
375:7, 375:18,
376:10, 380:1,
381:22, 382:15,
383:6, 384:4,
385:3, 389:10,
392:9, 393:14,
396:17, 398:6,
400:9, 401:4,
402:2, 403:16
**market**
2:6, 9:11
**marking**
287:14, 380:16
**marks**
405:2
**marry**
63:10
**mary**
3:13, 9:19,
63:3, 94:15,
127:1, 128:19,
128:22, 131:20,
152:14, 170:20,
220:18, 222:14,
291:20, 303:10,
330:22, 347:12,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

358:5, 382:7,
383:10, 407:4
**master**
153:20, 223:19,
224:1, 224:5,
224:8, 224:9,
224:19, 225:1,
225:17, 235:14,
235:20, 236:1,
236:2, 236:10,
236:18, 237:2,
237:18, 238:2,
238:6, 303:12,
303:16, 303:19
**match**
309:20
**matches**
309:12
**materials**
12:11, 127:15
**math**
165:18, 165:20,
191:6, 194:22,
195:1, 195:7,
195:20, 197:16
**mathematics**
134:8
**matter**
9:4, 10:4,
27:22, 37:1,
52:19, 58:3,
79:20, 101:20,
221:17, 236:11,
361:15, 384:21
**matters**
80:5
**mature**
233:8
**matured**
236:22, 262:12
**maybe**
21:21, 39:11,
57:9, 87:13,
190:4, 199:19,
207:7, 212:13,
219:1, 261:22,
269:13, 273:11,
276:22, 287:17,

293:7, 294:7,
309:2, 310:7,
333:22, 336:4,
337:8, 337:15,
346:1, 367:5,
382:15
**mcdonald's**
120:13, 120:14
**mcguire**
153:1
**mckagen**
3:21, 9:10
**mclean**
3:8
**mcnutt**
345:20
**meaning**
216:10
**means**
58:20, 114:15,
200:8, 206:19,
307:21, 311:8,
311:20, 311:21,
312:7, 394:8
**meant**
95:10, 108:14,
297:10, 297:11,
311:5, 314:4
**meat**
325:18
**mechanism**
261:7
███████ 289:21,
295:6
**medium**
253:22
**meet**
365:12, 402:22
**meeting**
108:10, 146:22,
147:5
**meetings**
123:14, 334:19,
349:4
**mejia**
79:16
**mejia's**
79:16, 79:18,

81:1
**member**
20:11
**members**
247:17, 251:15,
323:6
**memory**
79:12, 172:2
**mentioned**
25:16, 50:14,
66:15, 110:18,
186:20, 333:7,
336:2, 340:9,
354:18
**meritorious**
379:4
**met**
23:10, 196:11,
252:14
**methodology**
194:6
**methods**
227:10
**metric**
147:4
**mic**
92:1
**michelle**
1:22, 2:11,
10:1, 409:2,
409:17
**michigan**
313:11
**microphone**
253:3
**microsoft**
255:10
**mid**
320:18
**middle**
22:7, 321:7
**might**
25:21, 51:9,
57:20, 64:5,
89:4, 117:5,
117:8, 117:12,
141:8, 141:9,
141:13, 141:14,

141:15, 142:17,
168:6, 171:10,
178:10, 187:1,
205:17, 234:22,
241:10, 241:13,
246:13, 252:11,
256:9, 263:6,
277:6, 289:6,
295:3, 295:19,
333:2, 336:5,
338:22
**mike**
22:22, 44:17,
48:21, 49:6,
129:4, 145:14,
145:17, 146:13,
147:2, 147:3,
147:12, 228:2,
286:20, 296:18,
339:19, 364:18,
366:5, 396:22,
398:11, 400:5,
402:6, 402:17
**mill**
43:11
**million**
120:21, 332:7
**mince**
290:10
**mind**
51:2, 51:7,
74:18, 108:12,
114:13, 115:3,
199:20, 238:8,
294:4, 370:6
**mine**
266:20
**mine's**
57:7
**minimizing**
230:17
**minute**
321:9, 403:13,
403:15
**minutes**
279:13, 367:22,
380:14, 389:7,
398:4

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                        143

| | | | |
|---|---|---|---|
| **mis** | 226:19, 227:7, | 255:17, 256:1, | **more** |
| 162:4, 210:20, | 230:15 | 256:11, 264:7, | 24:5, 34:4, |
| 220:8 | **model** | 266:5, 270:7, | 57:20, 68:1, |
| **mischaracterizat-** | 326:7 | 272:20, 273:8, | 82:1, 87:12, |
| **ion** | **mom** | 276:10, 276:16, | 101:5, 111:18, |
| 210:21 | 125:12 | 278:13, 306:20, | 139:11, 140:17, |
| **mischaracterizes** | **mom's** | 317:16, 317:18, | 140:18, 141:2, |
| 130:12, 353:22 | 231:13, 246:2, | 318:11, 323:18, | 141:4, 141:22, |
| **misinterpreted** | 262:17 | 323:19, 324:19, | 142:13, 161:15, |
| 162:5 | **moment** | 330:6 | 181:6, 207:20, |
| **missed** | 21:2, 28:13, | **monitors** | 225:22, 228:22, |
| 321:12 | 28:14, 30:11, | 122:1, 122:5, | 234:6, 234:15, |
| **missing** | 35:18, 42:11, | 122:22, 123:11, | 251:14, 258:6, |
| 87:17, 87:20, | 53:6, 56:11, | 182:20, 263:9, | 260:15, 261:10, |
| 89:1, 92:11, | 80:17, 83:14, | 274:21 | 266:14, 270:11, |
| 93:13, 236:6 | 237:12 | **month** | 272:15, 274:14, |
| **mission** | **monday** | 231:16, 315:5, | 275:2, 275:4, |
| 56:5, 56:9, | 334:9, 402:7 | 315:7, 368:6 | 276:8, 276:9, |
| 57:4, 57:5, | **money** | **monthly** | 276:17, 277:3, |
| 57:12, 57:13, | 28:5, 37:8, | 237:21, 238:5, | 277:10, 300:18, |
| 57:14, 59:21, | 117:7, 138:8, | 315:5, 315:11, | 301:11, 301:14, |
| 134:3 | 138:13, 147:15, | 330:5, 387:15 | 301:20, 312:18, |
| **misspoke** | 219:8, 219:9, | **months** | 318:2, 328:5, |
| 363:18 | 350:11, 350:18, | 22:6, 22:12, | 351:12, 353:10, |
| **misstate** | 351:5, 352:21, | 39:10, 39:11, | 359:10, 359:11, |
| 278:1 | 354:9 | 46:22, 53:11, | 365:15, 388:12, |
| **misstated** | **monitor** | 67:20, 71:8, | 397:7, 403:14, |
| 210:20, 278:4, | 9:9, 121:20, | 109:20, 137:5, | 404:18 |
| 330:19 | 123:3, 211:6, | 162:10, 207:7, | **morning** |
| **misstates** | 259:8, 323:18 | 231:22, 234:13, | 10:5, 13:6, |
| 133:19, 157:7, | **monitored** | 234:20, 235:18, | 13:8, 400:18, |
| 213:20, 220:9, | 183:14, 262:4 | 235:19, 236:19, | 401:13 |
| 222:5, 223:13, | **monitoring** | 237:4, 258:2, | **most** |
| 263:18, 277:21 | 122:18, 123:11, | 258:6, 262:10, | 49:12, 101:3, |
| **mistake** | 123:18, 124:1, | 263:9, 273:22, | 107:9, 109:14, |
| 107:15, 253:2 | 124:18, 124:19, | 275:11, 275:15, | 111:11, 111:13, |
| **misunderstood** | 124:20, 125:20, | 275:19, 276:3, | 111:15, 116:6, |
| 405:14, 406:11 | 125:21, 126:2, | 276:7, 276:15, | 153:13, 203:18, |
| **mitigate** | 126:4, 126:8, | 348:5, 396:8 | 205:9, 205:15, |
| 211:11, 219:6, | 126:11, 126:16, | **monumental** | 205:18, 259:11, |
| 272:21, 273:20 | 173:8, 173:15, | 339:7 | 289:13, 361:1, |
| **mitigated** | 179:17, 179:22, | **moore** | 361:4, 362:9 |
| 204:15, 395:5 | 180:5, 180:7, | 7:18, 16:18, | **mostly** |
| **mitigating** | 211:7, 214:14, | 42:10, 44:17, | 151:19, 259:12 |
| 212:1, 214:14, | 227:1, 240:7, | 49:5, 149:17, | **mother** |
| 273:12, 274:14 | 251:1, 252:17, | 152:12, 286:20, | 321:11 |
| **mitigation** | 253:13, 253:19, | 401:8 | **mother's** |
| 203:5, 226:1, | 254:17, 255:14, | **moore's** | 294:19 |
| | | 48:11 | |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

144

**motion**
4:15, 107:14,
138:19, 182:7,
379:2, 379:3
**move**
46:20, 47:1,
47:22, 93:11,
148:19, 252:12,
252:14
**moved**
112:13, 118:21
**moving**
236:16, 314:7
**much**
138:13, 147:15,
217:4, 227:16,
236:22, 260:16,
260:17, 272:14,
272:15, 320:22,
326:16, 337:9,
398:3
**multiple**
6:3, 41:19,
44:1, 83:2,
130:16, 132:6,
140:20, 243:22,
261:3
**murder**
103:10, 103:20
**must**
22:11
**myself**
163:4

**N**

**nagel**
79:1, 81:10,
82:22, 380:7,
380:8, 381:2
**name**
13:6, 27:14,
27:15, 27:20,
28:8, 79:14,
79:15, 79:17,
79:18, 81:2,
92:8, 128:21,
157:18, 161:21,
254:21, 256:2,

280:19, 285:10,
288:18, 308:9,
327:14, 327:22,
332:19, 333:4,
374:9, 390:12
**named**
27:16
**names**
30:4, 69:22,
200:17, 252:9,
281:2, 281:3,
308:16, 361:12
**naming**
45:13
**narrative**
243:16, 288:21
**nation**
62:2
**national**
26:12, 176:4,
178:5, 178:6
**natural**
24:10
**nd**
330:1, 330:10
**ne**
3:15
**nearest**
378:8
**nearly**
308:17
**necessarily**
145:8, 161:4,
232:19, 236:6,
246:5, 333:15,
333:16, 333:22
**necessary**
25:1, 25:5,
123:9, 257:19
**need**
11:2, 13:16,
14:6, 14:9,
15:17, 19:14,
31:7, 102:8,
107:5, 109:17,
119:10, 123:8,
123:16, 136:8,
150:5, 154:5,

156:1, 160:1,
172:3, 210:14,
220:22, 229:13,
237:11, 254:13,
261:21, 262:15,
279:6, 291:14,
292:18, 294:20,
295:5, 295:6,
312:1, 312:2,
312:3, 314:5,
324:21, 327:1,
339:22, 366:21,
400:2, 400:5,
400:6
**needed**
26:11, 26:17,
39:18, 109:8,
150:15, 155:10,
245:8, 246:1,
248:16, 254:15,
285:13, 334:9,
341:16, 348:19,
390:1
**needing**
335:10
**needs**
23:22, 33:22,
34:4, 35:20,
49:11, 107:15,
111:1, 156:13,
156:18, 158:22,
190:3, 296:20,
299:14, 300:4,
312:10, 348:3,
362:5, 374:14
**negatives**
212:19
**neither**
172:5, 409:8
**network**
365:16
**never**
17:7, 40:18,
53:3, 55:8,
95:11, 101:16,
117:3, 126:11,
130:20, 130:21,
131:8, 142:2,

176:2, 199:20,
200:5, 202:6,
206:1, 212:8,
213:7, 213:15,
216:16, 220:12,
230:8, 232:1,
238:12, 250:19,
278:21, 303:1,
321:20, 346:5
**new**
22:15, 30:2,
31:16, 42:8,
47:4, 47:5,
47:6, 47:8,
47:11, 52:18,
172:19, 174:12,
256:10, 257:17,
257:18, 284:4,
329:20, 362:5,
381:12, 382:2
**next**
92:19, 93:3,
94:1, 94:20,
192:17, 193:7,
313:14, 313:18,
317:19, 318:3,
329:15, 371:11,
382:4, 385:17,
386:11, 387:13,
388:3, 392:21,
397:1, 399:5,
408:5, 408:12,
408:13
**nexus's**
56:5, 56:9,
166:8, 173:7,
173:15, 179:17,
179:22, 180:10,
180:13, 188:6,
191:3, 218:6,
251:17, 343:3
**nexus-based**
229:5, 229:10
**nexus-funded**
229:7
**nexus-related**
138:15, 357:7
**nice**
13:16, 249:2

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

145

**night**
292:5, 293:22,
295:14
**nika**
3:21, 9:10
**nina**
34:21, 41:13,
41:14, 41:15,
75:10, 75:13,
75:21, 244:21,
300:7
**nine**
95:16, 162:10,
262:10, 263:9,
273:22, 275:11,
275:15, 275:18,
276:3, 276:7,
276:15, 321:5,
398:4
**nineties**
97:15
**ninety**
97:15
**nobody**
72:20, 252:2
**nomenclature**
293:7, 324:3,
324:11, 343:1
**noncustodial**
107:8
**nondisclosure**
86:1, 87:2
**nonuse**
86:1
**normally**
298:18
**northern**
372:14
**notarial**
409:13
**notary**
2:13, 409:17
**note**
82:10, 87:7,
120:21, 148:17,
224:8, 284:6,
289:22, 313:19,
314:19, 316:9,

317:19, 318:4,
321:2, 322:11,
322:16, 325:17,
374:14
**noted**
219:22
**notes**
4:21, 123:20,
148:16, 148:20,
225:1, 267:4,
267:7, 267:8,
268:3, 268:6,
278:18, 278:20,
284:5, 289:2,
289:14, 290:22,
291:2, 292:8,
295:18, 297:8,
297:12, 311:12,
316:1, 316:11,
322:22, 323:1,
323:17, 323:21,
325:10, 325:15,
377:10
**nothing**
37:20, 150:19,
249:13, 273:8,
273:18, 300:8,
342:15, 349:19,
349:21, 355:15
**notice**
109:15, 110:20,
110:22, 111:2,
111:6, 111:10,
112:11, 114:6,
115:11, 115:21,
116:18, 161:1,
161:16, 163:7,
168:15, 190:13,
192:9, 194:16,
199:3, 206:1,
206:8, 211:17,
212:6, 213:5,
213:9, 213:12,
213:15, 215:5,
224:7, 340:10,
343:7, 356:3,
358:19, 359:17,
360:2, 371:8,

371:12, 371:18,
374:8, 374:21,
375:3, 375:12,
376:16, 376:20,
377:1, 378:5,
378:11, 390:20,
392:16, 392:20
**noticed**
176:2
**notices**
26:19, 150:14,
161:7, 166:2,
189:10, 208:6,
365:1, 369:3,
379:13, 381:6,
381:16, 381:17,
383:17
**notified**
225:1
**notify**
283:3
**notwithstanding**
355:9, 363:5,
386:2
**november**
170:8, 171:7,
196:12, 272:18,
274:21, 276:8,
277:12, 277:16,
278:6, 278:12
**nta**
358:19
**number**
9:2, 9:7,
31:14, 54:3,
63:16, 83:21,
87:14, 87:19,
134:14, 137:16,
139:5, 141:6,
142:16, 144:1,
144:3, 145:3,
145:8, 154:16,
158:9, 160:22,
161:2, 161:6,
161:14, 161:16,
161:20, 161:21,
162:2, 162:3,
162:15, 163:1,

163:3, 163:4,
163:6, 166:20,
167:1, 167:17,
167:18, 168:13,
174:16, 174:19,
175:17, 175:21,
177:18, 182:11,
191:9, 192:1,
192:4, 192:6,
192:18, 192:21,
193:10, 193:11,
196:3, 200:16,
203:1, 204:11,
205:16, 205:20,
208:1, 216:18,
223:21, 224:6,
224:14, 240:9,
242:4, 248:10,
250:6, 252:9,
254:16, 265:17,
265:18, 266:9,
267:17, 267:21,
268:5, 278:11,
278:21, 280:15,
280:22, 281:7,
281:8, 301:5,
303:3, 306:13,
309:12, 321:11,
325:10, 325:19,
326:1, 326:15,
331:3, 331:12,
356:17, 358:13,
381:9, 395:3
**number-wise**
89:7
**numbers**
81:18, 95:17,
137:20, 161:20,
163:9, 164:6,
164:11, 165:4,
165:22, 166:5,
168:17, 181:12,
194:10, 195:7,
195:19, 207:22,
208:3, 232:13,
258:4, 309:8,
309:9, 356:6,
357:1, 394:10

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

146

numerator
175:12, 175:18
numerous
30:1, 33:18,
178:19, 227:10
nunez
365:5, 365:7,
379:21

O

oasis
72:2, 72:4,
72:17, 73:2,
73:8, 73:14
oath
358:16, 359:13,
359:14
obc
325:19, 325:22,
326:2
objection
164:20, 220:19,
340:3, 382:6,
396:14
objectionable
222:18
objections
131:22, 164:21,
222:22
objects
35:13
obligation
80:10, 271:22,
347:19, 351:11,
372:2, 372:4,
373:11, 407:7
obligations
11:17, 121:12,
346:8, 346:22,
402:22
obliged
82:11
obligor
202:11, 371:9,
371:12, 374:9,
374:21
obligors
372:4

obstruction
333:8
obtaining
173:16
obviously
14:5, 36:4,
147:7, 251:5,
254:2, 315:10,
358:6
occasion
66:6, 100:4
occasions
372:12
occupied
48:1, 68:16,
68:20, 69:13
occur
12:8, 109:12,
264:10, 264:12
occurrence
247:19
occurs
305:19
ocrd
282:8
october
7:3, 257:14,
258:21, 276:4,
303:15, 303:20,
316:7, 385:15,
386:9, 389:16,
391:20, 392:14,
395:17, 395:22
offense
300:21
office
31:3, 33:12,
33:13, 33:15,
33:17, 33:18,
33:20, 34:2,
34:3, 43:2,
43:6, 43:13,
44:6, 45:18,
46:9, 66:16,
67:17, 68:6,
70:17, 70:19,
75:7, 75:9,
75:19, 105:5,

107:10, 107:17,
111:1, 128:1,
155:16, 156:8,
159:21, 203:11,
203:15, 217:2,
240:14, 256:10,
267:7, 334:2,
334:9, 356:4,
359:3, 360:4,
360:5, 360:8,
378:9, 387:9
officer
17:20, 18:1,
21:15, 24:3,
31:12, 33:14,
38:21, 67:10,
110:9, 112:1,
114:9, 116:3,
121:6, 121:7,
203:14, 203:15,
203:18, 205:5,
372:8, 372:10,
409:2
officers
65:12, 372:17
offices
30:16, 30:18,
30:22, 31:2,
31:4, 31:5,
33:7, 33:10,
33:11, 43:18,
44:15, 66:14,
66:17, 70:10,
70:22, 74:4,
76:3, 76:6,
100:8
official
49:10
officing
70:14, 70:21
offshoot
112:5
often
113:2, 152:1,
152:4, 152:6,
201:3, 212:4,
212:14, 212:15,
213:2, 255:19

oftentimes
255:17, 333:20
oh
27:13, 29:19,
41:19, 46:6,
50:3, 53:14,
77:2, 79:8,
84:9, 108:5,
111:16, 115:9,
126:11, 143:2,
154:11, 158:7,
162:9, 188:22,
205:2, 241:4,
264:18, 268:17,
310:15, 318:20,
339:18, 354:9,
357:3, 366:10,
379:18, 386:19,
394:13
okonski
65:20, 66:16,
67:6, 68:20,
69:10, 71:4,
73:13, 93:5
old
15:20, 241:12
old-timer
129:16, 130:18
omitted
88:10
omnilink
253:7, 259:19
on-campus
153:19
once
50:6, 115:11,
231:14, 276:22,
292:1, 315:17,
318:18, 319:7,
320:14, 381:20
one's
180:11
one-and-half
235:19
one-dimensional
181:6
one-person
31:5

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

147

ones
30:2, 41:21,
141:3, 150:18,
165:13, 166:2,
186:2, 248:16,
284:4, 324:5,
382:2
ongoing
258:13
only
33:15, 39:12,
40:15, 46:10,
62:4, 64:22,
83:5, 110:13,
113:10, 145:13,
148:12, 155:13,
155:19, 201:18,
245:6, 248:16,
253:1, 253:12,
272:1, 272:12,
276:22, 286:11,
291:14, 349:15
oops
79:2
open
18:19, 20:20,
28:20, 68:13,
288:17, 288:18,
292:4
opened
295:12, 342:19
opening
89:10, 90:6,
292:7
operate
51:16
operating
31:12, 42:2,
101:2
operation
36:3, 365:19
operations
34:19, 35:8,
35:9, 35:10,
35:16, 36:6,
38:3, 38:4,
38:7, 43:21,
43:22, 44:11,

56:15, 58:1,
58:5, 100:8,
244:11, 301:22,
330:16
opinion
333:12, 337:12,
346:6, 348:13,
348:22, 349:12,
349:15, 349:17,
351:14, 352:9,
353:6, 354:20
opinions
347:11
opportunity
65:8, 80:9,
238:17, 355:5
opposed
139:11
option
205:14
oranges
143:10, 176:16
order
1:11, 4:9,
4:16, 11:9,
11:14, 11:17,
11:19, 12:10,
13:17, 80:4,
80:8, 93:15,
94:7, 155:11,
174:15, 182:8,
192:1, 374:15,
375:19, 382:1,
382:11, 382:20,
405:15, 405:17,
406:4, 406:8,
406:16, 407:2
ordered
291:18, 291:21,
406:1, 406:18
orders
407:20
org
64:17
organization
400:7
organizations
90:9

organizing
381:21
origin
117:19
original
112:5, 308:3,
308:5, 308:9,
362:8, 377:1,
395:1, 395:4
originally
267:5
orlando
41:22, 42:1,
256:8
orlando's
256:13, 256:14
other
13:17, 13:20,
16:14, 19:5,
21:2, 41:21,
43:18, 79:10,
79:21, 80:10,
80:11, 83:6,
83:7, 83:8,
89:2, 97:19,
99:3, 100:2,
100:8, 100:16,
105:20, 107:12,
116:17, 119:11,
134:14, 144:18,
160:18, 161:1,
161:12, 162:5,
171:10, 178:1,
185:22, 187:6,
194:14, 215:11,
224:17, 227:10,
229:2, 229:18,
232:4, 247:6,
247:9, 256:18,
261:12, 270:15,
273:18, 282:5,
283:20, 284:10,
285:17, 289:4,
297:19, 297:20,
305:9, 317:5,
324:13, 355:2,
361:11, 372:12,
383:17, 388:5,

395:13, 395:14,
403:21
others
234:6, 271:7
otherwise
65:7, 149:17,
379:3, 409:11
out
12:9, 22:15,
27:3, 30:11,
33:20, 34:4,
43:5, 57:10,
57:17, 60:10,
66:20, 80:18,
83:3, 88:8,
93:15, 94:6,
96:10, 99:13,
109:14, 126:6,
128:8, 138:12,
138:13, 140:8,
141:1, 144:14,
145:2, 145:4,
145:10, 157:12,
167:12, 167:21,
169:18, 184:10,
192:7, 192:17,
193:12, 194:12,
195:22, 196:3,
196:9, 196:19,
199:7, 207:9,
218:2, 224:4,
224:14, 236:2,
241:9, 245:14,
251:8, 251:10,
251:20, 258:19,
261:3, 263:20,
265:7, 268:16,
269:3, 269:16,
272:6, 274:9,
274:13, 287:21,
288:1, 288:4,
295:15, 298:9,
321:12, 332:20,
333:3, 335:16,
342:19, 343:7,
351:9, 353:5,
353:7, 353:8,
353:11, 356:9,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020                    148

360:10, 365:12, 367:19, 367:21, 368:1, 368:4, 370:6, 401:9
**outcome**
167:2, 409:11
**outcries**
248:1, 248:4
**outside**
103:7, 195:14, 311:22, 404:14
**outstanding**
150:9, 192:18, 265:11
**over**
13:14, 16:4, 21:1, 24:8, 26:1, 27:19, 30:18, 31:15, 31:19, 32:15, 40:13, 40:17, 41:11, 44:20, 46:15, 93:19, 115:18, 124:11, 137:10, 139:3, 141:10, 142:3, 146:1, 162:13, 162:22, 170:14, 170:18, 174:9, 174:10, 198:10, 199:12, 204:3, 204:7, 218:16, 224:13, 238:21, 246:22, 258:7, 263:13, 263:17, 264:2, 276:16, 285:11, 285:15, 359:8
**over-answer**
248:22
**overall**
142:12, 258:9, 258:10
**overdue**
313:15
**overlap**
257:13, 257:15, 257:19

**overnight**
271:9
**oversaw**
23:17, 23:20, 26:18
**oversee**
24:19, 34:2
**overseeing**
21:2, 26:4, 29:8
**oversees**
43:2
**oversight**
21:7, 31:19, 32:15, 36:18, 40:13, 41:3, 41:11, 229:11
**overthink**
150:14
**overturned**
137:20, 138:19
**overview**
280:17
**own**
49:8, 65:12, 254:16, 342:19, 406:2
**owners**
48:15, 215:13, 215:15, 286:12, 286:17, 286:18, 308:6
**ownership**
65:16

**P**

**package**
303:14
**packet**
4:19, 368:7, 368:11, 368:14, 369:8, 369:11
**padilla**
79:14, 79:16
**page**
4:2, 4:11, 5:2, 6:2, 7:2, 8:2, 53:9, 53:10,

53:14, 53:20, 53:21, 53:22, 54:8, 62:19, 62:21, 85:13, 87:10, 87:11, 87:14, 87:16, 87:17, 87:19, 87:20, 88:7, 88:11, 89:2, 89:7, 92:10, 92:13, 92:19, 93:3, 93:13, 93:20, 93:21, 94:1, 94:2, 94:3, 95:16, 96:3, 96:9, 96:22, 239:20, 239:21, 287:4, 298:2, 303:2, 304:3, 305:12, 313:14, 313:15, 313:18, 314:8, 315:18, 315:22, 316:2, 317:19, 317:20, 318:3, 321:4, 321:10, 323:13, 325:4, 325:10, 366:3, 371:11, 385:17, 390:6, 390:8, 391:14, 392:21, 394:3, 394:14, 394:16, 394:22, 395:4, 395:15
**pages**
1:21, 92:11, 94:6, 127:15, 321:19, 321:20
**pagination**
89:2, 89:16, 93:17
**paid**
17:7, 138:13, 144:2, 149:3, 150:9, 150:16, 163:2, 163:5, 163:18, 163:19, 166:1, 166:12,

167:6, 167:8, 167:9, 186:2, 186:4, 186:5, 189:5, 191:16, 192:8, 192:19, 193:10, 194:14, 195:9, 196:1, 197:18, 199:10, 200:10, 200:18, 200:21, 201:8, 201:10, 201:12, 211:2, 214:12, 214:17, 329:15, 343:12, 343:14, 351:2, 386:21, 393:11, 400:2, 400:6, 402:18
**pain**
260:2
**panel**
253:20, 259:4
**panic**
227:16
**paper**
128:8, 295:19
**papers**
241:13
**paperwork**
285:15
**paragraph**
55:7, 56:4, 58:18, 59:7, 59:14, 59:16, 61:18, 62:3, 84:14, 84:20, 85:6, 86:1, 86:5, 90:6, 90:17, 96:21, 172:22, 173:7, 179:15, 182:18, 183:2, 183:4, 183:7, 183:19, 184:1, 188:5, 305:17, 306:21, 306:22, 386:12, 386:18, 387:13, 388:3
**paragraphs**
53:19, 55:6,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

149

| | | | |
|---|---|---|---|
| 55:17, 55:22, 56:2, 62:1, 173:4, 390:22 | participants 23:21, 24:6, 26:13, 26:15, 27:4, 31:7, 35:18, 39:15, 40:5, 41:3, 49:14, 52:6, 60:8, 60:18, 61:2, 61:4, 106:6, 106:14, 107:7, 109:11, 115:19, 120:9, 121:11, 123:12, 135:14, 142:16, 155:1, 211:15, 248:14, 257:18, 261:20, 270:18, 272:10, 273:3, 280:13, 284:15, 285:21, 297:16, 315:6, 339:14 | past 28:7, 104:4, 104:10, 207:6, 236:22, 249:11, 392:16, 392:20, 394:3, 394:10, 394:19, 396:8 | 313:15, 314:5, 314:6, 315:6, 315:8, 328:18, 328:20, 329:4, 329:8, 329:10, 329:19, 330:2, 330:5, 330:11, 330:20, 330:21, 373:11, 385:20, 386:11, 387:15, 397:8, 397:12, 398:15 |
| **parameters** 146:6, 146:16 | | **pastor** 168:21 | |
| **pardon** 331:7 | | **pastor-perdomo** 27:13 | |
| **parenthesis** 59:2 | | **pastrana** 27:16, 27:17, 27:18, 28:5 | **payments** 304:18, 315:15, 317:10, 328:21, 329:3, 401:18, 402:14, 402:20, 403:8 |
| **parkway** 43:11 | | **pause** 80:8, 80:12 | |
| **parroting** 246:18 | | **pay** 117:6, 117:9, 118:10, 118:15, 118:16, 138:8, 149:18, 149:20, 150:18, 204:15, 204:21, 205:1, 216:19, 217:3, 217:5, 218:5, 219:8, 237:21, 238:12, 251:18, 251:19, 298:18, 313:6, 319:20, 386:3, 388:4, 388:5 | **payor** 202:11, 204:1 |
| **part** 32:11, 36:3, 51:11, 54:17, 55:9, 73:7, 73:10, 78:6, 79:8, 81:13, 88:21, 120:16, 146:17, 228:3, 245:21, 246:19, 257:12, 270:9, 291:4, 291:10, 292:2, 295:7, 328:3, 385:18, 401:3 | **participate** 222:3, 349:3 | | **pays** 312:22, 345:7, 360:17 |
| | **participated** 222:8 | | **pdf** 282:8, 294:13, 295:11 |
| | **participating** 220:5 | | **pdfs** 295:8 |
| | **participation** 249:6 | | **peachtree** 3:15 |
| **partake** 278:10 | **particular** 26:9, 38:5, 67:22, 134:9, 155:16, 171:15, 242:15, 244:17, 267:13, 316:12, 334:6, 372:11 | | **penal** 190:19, 191:19, 192:12, 192:22, 387:19, 387:21 |
| **participant** 35:21, 37:11, 40:19, 104:19, 104:20, 104:21, 105:11, 105:19, 107:1, 108:15, 110:9, 112:7, 112:16, 113:12, 114:5, 115:18, 118:3, 139:21, 158:14, 209:6, 212:5, 212:9, 212:16, 215:4, 238:8, 246:1, 290:19, 327:14, 327:15, 329:20, 372:11, 405:8, 405:20, 406:21 | **parties** 286:1, 409:10 | **payable** 385:21, 386:4 | **penalty** 117:9 |
| | **partner** 230:4, 354:1, 354:3 | **paycheck** 17:8, 156:22 | **pendency** 139:4 |
| | **party** 186:21, 406:5 | **paychecks** 16:17, 16:19 | **pending** 14:13, 109:16, 362:10 |
| | **passed** 208:2, 237:1 | **paying** 147:16, 209:11, 237:14, 238:5, 318:10, 319:14, 330:14 | **percent** 110:7, 142:17, 144:9, 146:9, 147:10, 160:19, 163:16, 163:17, 163:19, 173:10, 173:17, 174:14, |
| | **passionate** 352:11, 352:15 | | |
| **participant's** 216:11 | **password** 294:9 | **payment** 39:16, 121:12, 126:5, 140:3, 149:7, 151:6, 189:10, 304:15, 305:21, 312:15, | |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                              150

175:19, 176:12,
176:13, 176:22,
177:8, 177:16,
178:3, 178:20,
180:2, 186:19,
186:22, 193:18,
194:12, 194:14,
194:15, 195:5,
195:7, 196:1,
196:12, 196:18,
197:3, 197:5,
204:16, 204:17,
204:18, 205:18,
226:6, 228:5,
228:6, 228:15,
258:16, 260:13,
271:13, 276:10,
276:16, 277:10,
277:11, 278:5,
278:8, 278:10,
278:12
**percentage**
142:7, 142:10,
142:12, 143:15,
143:22, 161:8,
162:8, 183:9,
197:18, 209:6,
209:10, 238:18,
248:13, 258:10,
258:11, 261:18,
356:2
**percentage-wise**
265:21
**percentages**
258:7
**perception**
209:5, 209:10
**perdomo**
28:7, 31:17
**pereira**
336:2, 356:15,
356:22, 357:7,
358:13, 361:1,
361:5, 361:13,
361:18
**perez**
28:22
**perform**
39:4, 97:21,

124:21, 125:4,
125:7, 125:21,
125:22, 126:9
**performance**
330:11
**period**
39:22, 223:18,
231:2, 231:9,
277:4
**permanent**
100:9
**permanently**
100:5, 100:6
**permission**
155:11, 157:4
**permits**
100:15
**permitted**
99:16, 386:3
**person**
13:20, 33:15,
34:10, 46:10,
49:12, 57:17,
57:19, 75:6,
99:12, 120:12,
126:4, 126:5,
139:1, 140:4,
153:15, 155:10,
155:15, 155:16,
156:9, 156:20,
158:1, 158:10,
170:16, 198:3,
198:6, 204:21,
208:11, 209:16,
210:22, 214:15,
218:7, 227:11,
236:10, 241:14,
244:4, 269:17,
271:5, 272:12,
281:9, 283:10,
284:3, 284:7,
284:12, 285:6,
285:12, 286:11,
295:9, 295:11,
298:21, 300:18,
314:5, 318:10,
318:14, 319:6,
319:10, 323:4,

323:11, 325:17,
330:16
**person's**
288:21, 323:19,
373:3
**personal**
20:8, 20:11,
70:17, 154:4,
220:10, 294:15,
332:5, 332:10,
332:13, 333:12,
338:8, 346:13,
346:21, 348:1,
348:8, 348:13,
350:2, 350:4,
350:7, 351:9,
352:1, 353:6,
354:16, 367:6
**personally**
39:17, 66:3,
152:17, 153:10,
247:8, 249:1,
341:14, 406:21
**personnel**
47:13, 47:14,
65:12
**persons**
81:21, 99:18,
123:15
**perspective**
251:17, 369:4,
370:8, 370:9
**pertain**
294:18, 294:19
**petition**
4:12, 53:1,
54:19, 58:18,
173:3
**petitioners**
52:22, 58:18
**phase**
82:18
**philosophy**
60:5, 60:6,
60:14, 130:17
**phoenix**
97:9
**phone**
27:19, 28:3,

116:7, 126:3,
243:18, 246:3,
261:8, 284:13,
284:14, 289:1,
312:4, 321:11,
336:16, 340:3,
381:9, 401:13
**phones**
226:14
**physical**
24:14, 24:18,
25:8, 45:19,
74:18, 75:1,
399:11
**physically**
43:20, 124:12,
162:6, 254:20,
318:14
**pick**
35:21, 93:22,
115:13, 116:13,
117:9, 271:9,
313:3
**picked**
114:17, 138:20,
240:13, 243:19,
271:14
**picture**
79:15, 165:13,
255:5, 289:10,
289:15, 314:8
**piece**
295:19
**piispanen**
6:21, 7:19,
8:4, 332:15,
385:8, 389:15
**pin**
234:1
**pipeline**
232:17
**place**
3:6, 9:11,
43:11, 114:6,
222:19, 236:1,
371:19, 372:5
**placed**
393:18

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

151

places
262:19
plaintiff
1:6, 3:2, 9:16,
13:4, 15:3
plaintiff's
182:7
plaintiffs
4:15
plan
366:7
planet
9:10, 10:1
plans
42:22, 72:9
play
49:6
pleading
52:19, 52:22,
54:22, 55:1,
59:17, 63:2,
63:7, 83:19
please
9:12, 10:2,
10:10, 11:7,
13:7, 13:18,
14:7, 52:11,
62:20, 83:10,
83:14, 105:16,
172:13, 172:22,
223:1, 263:21,
327:8, 365:1,
366:6, 374:21,
376:16, 391:15,
402:17, 407:20
pledged
305:21, 306:2,
377:18
plenty
270:15, 270:17
plus
278:12, 280:14,
302:7
pocket
57:8
point
32:9, 65:6,
67:6, 74:3,

109:22, 115:11,
166:3, 201:22,
222:17, 222:19,
236:22, 238:17,
262:18, 269:9,
269:16, 272:8,
299:5, 300:14,
300:17, 306:6,
311:6, 319:15,
320:2, 320:14,
327:2, 337:3,
337:8, 345:22,
360:15, 366:22,
370:6, 378:20,
391:4, 397:22
pointed
96:10
pointing
88:8, 298:9
points
248:7, 248:11,
262:14, 269:14,
299:11, 299:16,
300:22, 301:3,
301:8, 302:7,
302:14
police
271:17
policy
263:8, 263:12,
263:15, 275:9,
276:14, 356:10
pontificate
235:22
poor
27:14, 62:8,
322:4
pops
255:7, 295:9
population
258:8
portion
287:14, 382:9,
387:7
portions
82:14, 82:18
posed
19:16

position
18:9, 18:11,
18:19, 20:8,
20:13, 20:20,
21:3, 21:7,
21:13, 21:17,
22:13, 24:2,
25:14, 28:18,
29:4, 34:13,
62:17, 67:19,
68:13, 68:16,
68:21, 69:12,
69:13, 70:5,
71:11, 167:10,
168:19, 198:9,
355:10, 368:21
positions
28:18, 28:20,
29:3, 40:11,
70:20, 71:9
positive
308:17
possession
406:6, 406:7
possibility
325:16
possible
16:22, 181:14,
191:13, 224:3,
224:12, 224:13,
276:12, 328:16,
391:5
possibly
200:20, 234:18,
258:12
post
211:4, 236:12,
251:10
posted
311:9, 329:13,
403:22
posting
351:4
posts
99:12, 236:16
potential
25:2, 25:20,
244:13, 252:6,

269:18, 309:15,
346:3
potentially
289:15, 314:12,
339:13
power
99:12, 210:22,
214:15, 218:22
practice
181:13, 217:1,
341:18, 397:16
practices
217:22, 218:4
predecessor
365:7
predict
234:5
predictably
226:13
prefix
222:10
preparation
15:13, 352:7
prepare
163:10, 224:6,
265:4, 355:5
prepared
102:18, 166:15,
188:18, 189:4,
189:7, 338:6,
338:21, 346:15,
348:6, 349:13
preparing
27:1
prescott
8:3, 403:20,
404:12
present
3:21, 155:17,
348:6
presented
163:14, 163:15,
165:4, 189:2,
196:15
preserve
37:13, 337:13
president
17:19, 17:20,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

152

18:9, 20:7,
48:12, 48:14
**presumably**
371:18
**presumption**
102:2, 102:6,
102:12, 102:21,
103:4, 103:11,
103:14, 103:19,
301:6, 301:10,
301:13, 302:2,
302:9, 302:15,
302:20
**pretrial**
178:5, 178:6,
179:8
**pretty**
50:9, 110:6,
110:7, 110:8,
199:15, 201:2,
218:3, 338:1
**prevail**
205:6, 205:9
**prevented**
20:12
**preventing**
49:14
**prevention**
25:7
**previous**
130:12, 133:20,
324:5
**previously**
32:14, 32:22
**primary**
43:15, 76:2
**principal**
160:3, 230:21,
242:15, 268:7,
281:13, 291:15,
302:14, 305:10,
307:2, 307:12,
308:13, 312:8,
328:14
**principals**
10:13, 223:19,
224:1, 224:18,
226:20, 230:17,

231:16, 234:6,
238:19, 239:3,
240:6, 247:16,
257:22, 264:17,
265:2, 266:5,
269:3, 270:8,
270:12, 272:21,
274:21, 277:11,
291:13, 368:11
**print**
327:22
**printed**
293:7
**printing**
292:7
**printout**
328:8, 328:9
**prior**
18:8, 21:13,
22:3, 23:1,
48:1, 202:14,
202:15, 202:16,
202:22, 213:21,
220:9, 222:5,
223:13, 249:13,
263:19, 277:21,
303:15, 303:19,
335:16, 367:18
**prisons**
228:10
**privacy**
407:11
**private**
23:6, 98:10,
98:11, 98:16,
98:22, 99:5,
289:13
**privilege**
10:19
**pro**
227:14, 227:16,
238:15
**probability**
117:13
**probably**
21:18, 22:6,
42:5, 50:9,
53:8, 70:18,

97:15, 110:7,
117:13, 142:11,
144:7, 144:11,
157:10, 160:13,
174:4, 179:14,
191:18, 198:6,
203:17, 206:21,
218:1, 233:7,
241:21, 248:21,
257:9, 257:11,
258:8, 260:13,
261:20, 274:13,
275:5, 315:14,
316:14, 333:17,
351:21, 357:18,
363:20
**problem**
37:4, 57:21,
157:16, 158:22,
159:13, 159:20,
233:7, 270:21,
270:22, 342:7,
343:1, 381:8
**problems**
65:1, 270:5,
277:6, 351:10
**procedures**
295:6, 378:1
**proceed**
222:22
**process**
13:16, 227:4,
251:12, 258:13,
365:15, 368:22,
378:20, 389:22,
390:19, 397:6
**processed**
337:1, 366:8,
400:18
**produce**
296:6
**produced**
11:18, 127:2,
127:16, 127:20,
128:2, 153:13,
163:15, 169:15,
171:5, 279:17,
287:2, 291:22,

296:19, 308:14,
309:5
**product**
264:16, 324:14
**production**
15:16, 152:16,
153:2, 153:14,
408:18
**products**
324:2
**professional**
2:12, 97:20,
98:7, 409:19
**profit**
61:19
**profitable**
350:9
**program**
23:21, 26:13,
26:15, 27:3,
31:6, 35:18,
35:21, 37:11,
39:14, 40:5,
40:19, 41:2,
49:13, 52:6,
60:8, 60:17,
104:19, 104:20,
104:21, 105:11,
105:19, 106:6,
106:14, 107:1,
107:6, 108:15,
109:11, 110:9,
112:7, 112:15,
113:11, 114:5,
115:17, 115:19,
118:3, 119:16,
120:8, 120:16,
121:11, 123:12,
135:13, 139:21,
141:10, 142:16,
154:22, 158:13,
165:11, 173:8,
173:15, 179:8,
179:17, 179:18,
179:20, 180:1,
180:4, 180:5,
180:7, 196:7,
209:6, 211:15,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    153

212:5, 212:9,
212:16, 215:4,
216:11, 238:8,
238:21, 243:5,
243:7, 246:1,
248:14, 249:6,
255:11, 270:18,
272:10, 273:3,
273:21, 275:22,
280:6, 280:13,
284:15, 285:21,
290:19, 297:16,
315:5, 327:14,
327:15, 329:20,
330:2, 330:20,
339:14, 372:11,
389:2, 402:22,
405:8, 405:20,
406:20
**programs**
305:21, 306:3,
307:9, 308:1,
308:2, 308:5
**progression**
24:11
**prohibited**
100:21
**prohibition**
100:22
**project**
196:4, 259:1
**promise**
99:13, 271:13,
330:11
**promised**
404:6
**proof**
398:15, 399:4,
401:18
**properly**
126:8
**properties**
45:10
**proposition**
23:8, 234:9,
300:18
**protected**
80:5

**protective**
1:11, 4:9,
11:17, 11:19,
80:4, 374:15,
375:18, 382:10,
405:15, 405:17,
406:4, 406:8,
406:15, 407:2
**proven**
173:8, 173:15,
180:1, 262:13,
263:5
**provide**
57:15, 135:6,
136:7, 150:16,
168:22, 201:2,
204:11, 214:13,
228:14, 333:21,
343:5, 406:16
**provided**
11:14, 135:19,
200:5, 288:9,
288:13, 290:16,
345:6
**provider**
253:13
**provides**
61:19, 227:20,
381:8, 387:14
**providing**
135:18
**prudent**
181:12
**public**
2:13, 409:1,
409:17
**puerto**
41:22, 42:4,
256:7, 256:13,
256:14
**pull**
57:10, 169:18,
280:20, 281:18,
399:11, 400:16
**pulled**
184:10, 286:22
**punch**
281:8, 288:18

**punishment**
232:22
**purports**
86:4, 182:6,
364:6
**purpose**
74:13, 183:14,
256:22, 270:7,
317:12, 318:18,
318:21
**purposes**
94:5
**pursuant**
1:11, 2:11,
4:9, 11:9,
11:14, 115:21,
116:18, 374:15,
375:18, 381:22,
382:10
**pursue**
339:8
**push**
254:21
**pushed**
254:14
**put**
26:1, 53:17,
56:11, 80:12,
93:10, 93:15,
107:9, 120:13,
120:21, 132:8,
164:19, 165:12,
165:13, 177:8,
192:7, 193:10,
195:1, 205:14,
212:1, 212:19,
276:3, 284:5,
284:6, 294:4,
294:12, 294:22,
314:1, 325:17,
339:20, 370:22,
404:18, 406:3
**puts**
210:22, 368:21
**putting**
194:22, 229:1,
294:1

## Q

**qualifications**
97:20

**qualified**
59:11
**quality**
284:12
**quantification**
106:21
**quantify**
216:2, 216:17
**quarterback**
354:2
**question**
13:15, 14:1,
14:11, 14:12,
19:15, 19:19,
33:8, 34:4,
49:15, 59:9,
60:21, 61:8,
61:13, 62:7,
70:10, 91:16,
95:14, 96:8,
103:3, 105:15,
106:1, 106:8,
107:3, 107:18,
116:22, 125:19,
128:16, 129:21,
130:1, 132:11,
134:1, 150:5,
150:6, 150:13,
154:21, 162:5,
164:18, 165:1,
180:17, 185:15,
188:4, 200:4,
202:16, 210:14,
212:12, 212:13,
213:14, 216:7,
216:10, 216:15,
219:20, 220:8,
220:16, 222:5,
222:7, 222:11,
222:18, 223:6,
223:13, 224:22,
225:8, 228:14,
242:21, 248:21,
263:20, 272:19,
273:13, 286:5,
296:12, 303:22,
315:3, 321:3,
330:16, 331:17,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

154

337:10, 338:5,
338:21, 346:12,
346:17, 346:18,
353:14, 386:6
**question-answer**
82:18
**questioning**
50:4, 50:9,
101:19, 353:17
**questions**
26:8, 59:11,
188:17, 189:8,
220:17, 221:3,
243:21, 244:7,
245:13, 279:22,
327:9, 347:19,
352:19
**queue**
126:3
**quick**
13:14, 52:10,
367:21
**quickly**
50:10, 218:3,
383:16
**quintana**
79:7, 79:8,
81:13, 83:1,
83:5
███ 283:3
**quote**
59:3, 65:13,
90:9, 91:10,
130:4, 307:8,
352:16, 400:1

**R**

**radar**
245:7
**raise**
339:16, 340:15
**ramifications**
114:15
**ran**
26:14
**random**
284:13

**range**
173:17, 178:16,
179:5, 179:14,
208:19, 217:21,
238:22
**ranking**
64:7, 75:6
**rare**
155:9, 247:19
**rate**
128:13, 131:6,
131:12, 132:18,
133:7, 134:6,
134:7, 134:17,
135:8, 135:20,
136:1, 136:13,
137:1, 137:12,
137:13, 137:14,
137:16, 137:19,
138:5, 138:6,
138:7, 138:10,
138:15, 138:17,
140:16, 140:22,
141:3, 141:21,
142:19, 143:5,
143:7, 143:12,
145:10, 146:18,
148:7, 148:12,
160:15, 160:16,
160:19, 162:14,
173:9, 173:10,
173:16, 175:1,
175:4, 176:17,
176:20, 177:2,
177:6, 177:12,
177:18, 178:22,
179:16, 180:2,
180:10, 180:15,
181:1, 181:19,
183:9, 183:13,
184:16, 185:6,
185:9, 185:13,
185:17, 185:19,
185:20, 185:22,
186:7, 186:17,
186:19, 186:22,
187:4, 187:10,
188:1, 188:6,

188:9, 188:15,
193:14, 211:21,
226:3
**rates**
179:11, 189:3
**rather**
80:10
**ratio**
142:1, 142:4,
143:22, 160:17,
161:14, 162:22,
165:17, 174:8,
193:11
**ratios**
194:3
**re-entering**
236:4
**re-issue**
203:16
**re-issued**
167:3
**reach**
27:3, 60:10,
109:14, 272:6,
316:19, 321:13
**reached**
316:18, 367:19
**reaching**
57:17, 276:21,
321:15
**react**
95:6
**reactivate**
319:7
**read**
55:1, 55:8,
55:12, 83:14,
91:19, 190:16,
226:18, 294:13,
307:6, 325:15,
358:21, 364:18,
369:1, 386:8,
390:7, 404:3,
404:13, 405:1
**reading**
148:22, 272:17,
295:13, 323:13,
395:12, 409:7

**ready**
327:5, 347:18
**real**
52:10, 65:20,
66:4, 165:13,
179:9, 231:6
**reality**
165:10, 379:9,
379:11
**realize**
354:9
**realized**
259:6, 351:5,
351:6
**realizing**
12:12, 12:15
**really**
15:16, 15:19,
17:7, 18:2,
22:17, 26:7,
48:4, 49:8,
49:9, 52:7,
58:2, 58:3,
64:16, 68:3,
70:16, 74:22,
116:8, 134:6,
145:13, 158:22,
179:12, 205:20,
223:5, 234:1,
251:14, 268:15,
273:1, 309:20,
319:8, 327:8,
337:4, 363:1
**realtime**
254:20
**reason**
11:16, 14:15,
19:22, 20:6,
79:18, 121:3,
123:8, 129:13,
162:1, 164:10,
165:4, 191:2,
191:22, 192:13,
193:1, 194:18,
195:6, 195:17,
202:6, 203:18,
213:19, 214:3,
233:10, 254:14,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

155

258:22, 259:22,
262:2, 270:10,
271:6, 294:16,
295:20, 298:9,
308:18, 314:12,
321:19, 351:19,
376:3, 377:5,
399:16, 401:21,
403:6, 404:8,
404:16
**reasoning**
352:4
**reasons**
20:9, 107:14,
112:13, 120:9,
120:21, 210:1,
215:3, 216:4,
378:7, 379:4
**rebate**
200:9
**rebates**
200:2, 200:6
**recall**
163:13, 163:22,
169:15, 170:5,
173:5, 174:22,
186:14, 186:17,
213:18, 214:2,
214:5, 226:10,
274:19, 275:2,
331:16, 332:8,
333:9, 340:2,
340:21, 359:6,
369:11, 369:14,
377:1, 399:12,
399:13, 402:10
**recalling**
367:5
**recap**
349:1
**recaps**
377:1
**recapture**
348:5
**receipt**
92:16, 94:13,
96:7, 384:17,
384:21, 385:2,

385:21, 386:4
**receive**
138:21, 139:1,
139:3, 140:20,
142:12, 142:17,
161:15, 162:15,
201:5, 201:9,
368:10, 369:3,
381:7
**received**
137:17, 139:11,
141:22, 142:2,
161:2, 161:7,
161:16, 163:2,
163:5, 163:6,
166:2, 168:14,
189:5, 192:8,
194:15, 200:6,
201:6, 206:1,
206:7, 206:8,
269:9, 292:3,
311:5, 311:20,
341:12, 356:2,
362:2, 362:17,
381:5, 387:16,
390:5, 391:20,
396:5, 399:22,
402:13, 402:15,
403:7, 403:8
**receives**
126:2
**receiving**
139:6, 397:10
**recent**
153:13
**recently**
206:10, 206:14,
207:6
**recess**
63:15, 69:6,
154:14, 250:5,
331:11
**recipients**
6:4
**reciprocal**
100:18
**reciprocative**
100:17

**recite**
100:1
**recognize**
53:1, 53:18,
53:19, 55:2,
55:4, 55:7,
55:13, 84:2,
87:6, 100:18,
182:12, 332:19,
333:4
**recollection**
54:21, 146:2,
184:8, 257:8,
348:2, 364:13
**recommend**
277:1, 277:7
**record**
10:5, 13:7,
13:16, 14:6,
52:17, 54:2,
63:14, 63:18,
69:3, 69:5,
69:8, 74:9,
82:11, 83:18,
87:7, 88:10,
89:7, 89:15,
91:19, 93:12,
93:18, 94:6,
95:13, 127:9,
128:10, 129:21,
130:15, 131:22,
153:6, 154:13,
154:18, 164:20,
170:21, 182:6,
183:8, 198:22,
220:19, 220:21,
222:17, 250:4,
250:8, 279:9,
284:8, 291:13,
298:20, 327:17,
331:10, 331:14,
359:12, 364:5,
367:12, 374:13,
374:20, 383:9,
399:9, 405:4,
405:6, 407:14,
407:20, 408:19,
408:20, 409:5

**record's**
69:18, 89:18
**recorded**
225:16, 225:18
**records**
189:5, 189:10,
198:15, 205:22,
206:7, 224:4,
224:17, 225:7,
225:11, 267:12,
280:20, 394:9,
397:4, 397:11,
397:14, 397:17
**recoveries**
229:1
**recurring**
304:15
**red**
110:1
**redact**
11:9
**redacted**
294:17
**redactions**
11:10
**redefine**
143:20
**reduce**
204:22, 278:10
**reduced**
409:7
**reduction**
204:17, 204:18
**redundancy**
256:11
**refer**
15:1, 15:5,
46:4, 60:13,
60:18, 62:4,
87:18, 93:16,
126:22, 171:22,
252:2, 297:8,
303:3, 324:20,
374:11
**reference**
84:19, 96:7,
171:21, 289:12
**referenced**
308:12, 371:12,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

156

**references** 394:19
**references** 244:1, 252:1, 252:7, 374:22
**referencing** 54:17, 185:20
**referred** 59:3, 85:22, 93:13, 140:4, 388:16
**referring** 15:2, 15:6, 15:10, 51:11, 56:8, 56:13, 56:14, 57:4, 60:13, 65:13, 90:16, 91:9, 127:11, 127:14, 128:17, 128:18, 130:4, 132:5, 133:17, 153:4, 176:21, 185:9, 214:21, 260:19, 286:18, 322:7, 365:5, 404:5
**refers** 91:16, 95:15, 307:3, 382:8, 382:21
**reflect** 14:6
**reflected** 278:14, 278:15
**refresh** 13:15, 54:21, 184:7, 348:2
**refund** 200:15, 202:12, 204:15, 205:3, 205:4, 251:8
**refunded** 200:22
**refunds** 200:2, 201:9, 202:10, 203:1, 203:4
**refusal** 334:18

**refused** 341:1, 341:11
**refusing** 341:22
**regarding** 14:19, 121:7, 132:18, 184:9, 215:16, 220:14, 223:10, 321:11, 401:14, 408:18
**regardless** 316:18
**regional** 33:9, 33:11, 33:12
**registered** 2:12, 409:19
**regulatory** 99:1
**rehash** 349:13
**reiterate** 96:21, 127:9
**reject** 252:13
**rejected** 362:4
**relate** 353:11
**related** 40:11, 40:15, 40:16, 72:2, 146:9, 368:10, 409:9
**relationship** 23:1, 110:12, 120:15, 120:16, 156:6, 181:1, 187:7, 187:8, 214:20, 221:20, 227:12, 230:12, 232:2, 246:19, 270:3, 272:13, 336:7, 336:12, 337:4, 337:8, 337:13, 348:15, 370:7
**relationships** 181:5, 246:18

**release** 182:19, 383:12
**released** 232:15, 262:15, 313:10
**relies** 227:7
**relocate** 77:12
**rely** 97:20, 355:2
**relying** 177:13, 219:11, 219:14, 331:18, 354:20, 358:15
**remaining** 389:7
**remand** 99:17, 155:11, 156:9, 156:11, 218:11
**remanded** 27:7, 155:1, 155:10, 156:13, 157:1, 218:7, 236:13, 373:3
**remark** 380:15
**remarked** 380:17
**remember** 76:15, 79:17, 81:1, 114:2, 146:6, 157:10, 164:1, 164:3, 169:13, 171:20, 182:22, 186:17, 207:18, 210:7, 218:10, 263:14, 275:10, 301:5, 305:3, 331:22, 334:6, 335:19, 336:16, 337:17, 337:21, 338:3, 338:9, 338:10, 338:20, 338:22, 339:22, 352:16, 352:19, 358:11,

366:22, 368:12, 391:11
**remind** 121:14, 123:12
**reminded** 39:15, 39:16, 399:21
**reminder** 171:13
**reminding** 11:16, 359:14
**reminds** 271:22
**remit** 305:20, 386:12
**removal** 378:9
**remove** 259:17, 272:8, 283:4, 315:2, 315:17, 315:20
**removed** 314:21, 315:4, 315:13
**removing** 282:19
**renovation** 124:10
**rental** 45:9, 330:20, 330:21
**renting** 65:4
**reopen** 107:15, 138:19, 379:2, 379:3
**repeat** 25:17, 206:3
**rephrase** 149:5, 150:6
**replace** 305:20
**replaced** 257:21, 258:3
**replacement** 12:7
**replaces** 284:6

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

157

replacing
306:2
report
31:9, 32:3,
33:4, 33:6,
33:19, 35:2,
48:6, 48:21,
140:7, 171:9,
180:15, 269:14
reported
1:22, 178:22,
247:16
reporter
2:12, 2:13,
9:22, 10:2,
10:3, 13:2,
52:15, 72:15,
158:6, 182:4,
213:10, 223:15,
279:8, 327:19,
331:6, 331:8,
364:4, 367:11,
369:19, 376:13,
380:4, 380:12,
383:15, 384:7,
385:6, 389:13,
392:5, 392:12,
396:20, 398:9,
407:19, 408:17,
409:19, 409:20
reporter's
370:22, 375:11
reporter-notary
409:1
reporting
32:22, 34:9,
34:12
reports
152:4, 171:10
represent
9:14, 133:6,
188:21, 189:1,
257:4
representation
174:15, 177:14,
227:15, 266:3,
316:8, 403:7
representations
136:12, 136:18,

143:4
representative
346:14
represented
136:11, 177:16,
287:20, 290:17,
404:11
representing
9:10, 9:16,
10:1, 177:11,
186:9, 186:11,
193:22, 194:6
represents
183:19, 188:6
reputation
183:20, 188:7,
188:10
request
66:6, 127:9,
127:10, 127:12,
127:13, 132:11,
155:14, 155:15,
158:16, 166:9,
170:21, 191:3,
242:14, 244:16,
245:4, 254:8,
283:10, 341:5,
358:6, 358:10,
367:18, 368:3,
375:17, 387:8,
405:11
requested
127:6, 127:7,
145:14, 152:22,
158:13, 242:8,
242:11, 349:6,
409:8
requesting
269:21, 365:19,
391:9
requests
127:8, 158:9
require
148:21, 252:3
required
77:18, 77:21,
78:1, 78:4,
151:6, 252:7,

259:8, 302:7,
302:10, 305:10,
305:18, 372:13,
386:14, 386:21,
397:13
requirements
283:18
requires
101:7, 388:10
rescind
203:16, 406:12
rescinded
137:19, 138:22,
167:3
rescinding
363:16
research
145:4, 160:10,
160:11
reserve
404:22
reset
372:16
residents
83:9
███████
resolved
141:17
resonate
257:14
resource
272:6
resources
19:13, 147:7
respect
29:9, 49:3,
49:5, 50:7,
57:18, 64:10,
64:15, 78:17,
102:10, 102:13,
107:22, 136:4,
136:6, 156:6,
158:13, 159:5,
160:3, 160:19,
177:3, 257:21,
281:12, 341:6,
355:8, 381:16,

406:12
respective
66:11
respects
407:2
respond
13:21, 116:4,
116:16
respondent
307:3
responding
187:18, 400:13,
401:12
responds
365:10
response
11:18, 186:15,
186:18, 188:1,
211:17, 212:6,
215:4, 257:5,
258:20, 273:17,
275:2, 398:14
responses
14:7
responsibilities
23:13, 24:2,
24:4, 27:2,
71:13
responsibility
36:17, 36:18,
120:2, 146:17,
343:4
responsible
151:11, 161:22,
272:4, 277:3,
379:12
responsiveness
370:14
rest
291:13, 293:13
restate
161:12, 222:12
restaurant
262:18
restock
33:21
restraining
4:16, 182:8

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020                                          158

| | | | |
|---|---|---|---|
| restriction | revised | rises | 67:12, 73:17, |
| 406:3 | 4:12, 52:22, | 338:2 | 120:10, 135:22, |
| restroom | 54:19, 172:18, | risks | 136:3, 137:5, |
| 327:1 | 173:3 | 181:1, 272:22 | 137:8, 242:5, |
| result | revoke | risky | 242:6, 242:10, |
| 143:17, 144:2, | 99:19 | 300:18 | 245:11 |
| 144:5, 144:7, | rica | rl | roles |
| 299:6, 373:7, | 41:22, 42:7, | 342:2 | 23:12, 24:1, |
| 373:13, 386:14, | 42:15, 256:10 | rli's | 25:13, 32:12, |
| 402:21 | rica's | 329:13, 342:6, | 40:12, 49:5, |
| retail | 256:17 | 342:7, 346:3, | 51:7, 66:19, |
| 71:16 | rich | 352:3, 354:21, | 71:13, 97:21, |
| retailer | 145:14, 145:17, | 355:10, 370:17, | 283:17 |
| 71:18 | 228:2, 286:20, | 383:20, 397:16, | roll |
| retain | 381:1 | 405:16, 406:3, | 228:7, 228:20, |
| 106:13 | richard | 406:7, 406:13, | 256:13 |
| retained | 7:18, 16:18, | 406:20 | rolling |
| 105:18 | 44:17, 48:9, | rli-bonded | 82:4, 120:15 |
| return | 48:11, 49:3, | 160:3 | room |
| 42:21, 104:21, | 49:5, 71:18, | rli-issued | 2:5, 69:1, |
| 106:22, 107:13, | 73:1, 151:21, | 196:7 | 70:17 |
| 117:22, 284:4 | 151:22, 152:12, | rli-nexus | root |
| returned | 339:18, 370:12, | 214:20 | 99:22 |
| 104:5, 105:11, | 370:13, 399:12, | rli_ | rough |
| 105:19, 114:11 | 399:14, 401:8, | 5:5, 5:10, | 141:7, 408:15 |
| revenue | 401:13 | 5:14, 5:18, | roughly |
| 36:4, 73:3 | rick | 5:22, 6:8, 6:12, | 18:14, 22:8, |
| revenues | 78:22, 367:19, | 6:16, 6:19, | 22:9, 22:11, |
| 66:7 | 380:7, 380:8 | 6:22, 7:5, 7:11, | 39:22, 163:15, |
| reversal | rico | 7:14, 7:17, | 173:20, 338:14 |
| 200:21 | 41:22, 42:4, | 7:20, 7:22, 8:5 | round |
| reverse | 81:20, 82:1, | rma | 259:20 |
| 337:5, 386:13 | 256:7 | 284:4 | rounded |
| reversed | rico's | road | 260:1 |
| 26:22, 201:8 | 256:13, 256:14 | 109:21 | row |
| reversing | rid | roberts | 192:5, 192:17 |
| 203:14, 203:19 | 315:13 | 5:11, 5:15, | rpr |
| review | ridiculous | 5:19, 6:13, | 1:22, 409:2 |
| 15:18, 15:20, | 81:5 | 376:15, 379:15, | rubber |
| 63:7, 153:19, | ridiculousness | 384:9 | 261:6 |
| 246:5, 247:3, | 81:22 | role | rude |
| 247:14, 302:21, | right-hand | 20:18, 21:7, | 40:20 |
| 335:15, 335:18, | 190:15, 303:4, | 22:5, 24:5, | rule |
| 342:5, 387:5 | 304:16 | 25:4, 29:8, | 79:21, 80:2, |
| reviewed | rights | 30:18, 31:13, | 80:3, 362:21 |
| 225:10, 300:4, | 228:7, 406:11 | 36:10, 45:5, | rules |
| 352:7 | rise | 47:19, 47:22, | 13:15, 379:1 |
| reviewing | 335:5 | 48:11, 66:20, | ruling |
| 316:13 | | | 99:21 |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                        159

| | | | |
|---|---|---|---|
| **run** | 217:16, 220:1, | 176:10, 179:5, | 112:6, 113:9, |
| 89:7, 110:1, | 222:6, 223:15, | 179:11, 179:14, | 114:4, 129:7, |
| 112:20, 112:21, | 225:4, 226:9, | 185:22, 193:19, | 168:7, 186:21, |
| 113:1, 113:2, | 226:12, 236:21, | 209:16, 219:6, | 187:22, 194:7, |
| 113:5, 136:5, | 258:20, 264:2, | 224:21, 248:3, | 194:10, 195:1, |
| 136:8, 140:7, | 273:1, 273:12, | 252:20, 256:17, | 216:10, 217:11, |
| 295:4, 408:14 | 273:13, 275:4, | 262:19, 310:18, | 219:4, 235:10, |
| **running** | 275:13, 277:11, | 361:13, 361:16, | 247:8, 292:21, |
| 144:15, 151:2, | 278:1, 296:15, | 361:17, 372:17, | 293:20, 295:8, |
| 151:5, 218:2, | 296:20, 320:7, | 386:18, 386:19, | 324:16, 346:1, |
| 288:20 | 321:12, 330:19, | 391:14, 396:5, | 358:17, 363:16, |
| **runs** | 334:7, 337:18, | 400:20, 401:15, | 377:3, 377:4, |
| 35:16, 209:16 | 337:20, 338:3, | 404:5 | 394:2, 394:18, |
| **S** | 344:19, 344:22, | **sample** | 398:14, 399:17, |
| **s** | 345:3, 346:1, | 143:19 | 401:12, 401:22, |
| 184:4, 188:6, | 349:5, 349:8, | **sampling** | 408:8 |
| 198:19 | 351:22, 352:12, | 284:14, 287:1, | **says** |
| **s-c-h-n-e-i-d-e-r** | 352:14, 352:20, | 308:15 | 52:18, 58:18, |
| 13:9 | 353:18, 354:6, | **sandoz** | 84:22, 90:6, |
| **s-t-l** | 354:17, 358:13, | 5:6, 6:3, | 94:20, 95:19, |
| 282:5 | 362:16, 369:14, | 332:16, 333:9, | 96:2, 96:10, |
| **safe** | 373:19, 395:4, | 333:15, 333:16, | 111:19, 112:22, |
| 25:10 | 399:11, 400:1, | 364:8, 364:17, | 113:2, 126:7, |
| **safely** | 408:12, 409:5 | 364:18, 366:6, | 157:18, 157:21, |
| 268:6, 279:3, | **sake** | 367:14, 380:6, | 158:3, 158:7, |
| 279:4, 325:11, | 298:20 | 381:1, 396:22, | 173:7, 175:4, |
| 325:14 | **sales** | 397:2, 397:3 | 179:22, 182:18, |
| **said** | 5:3, 328:1, | **satisfied** | 183:7, 184:1, |
| 29:16, 29:18, | 328:12 | 10:22 | 188:5, 190:16, |
| 56:16, 59:14, | **salmons** | **satisfy** | 190:17, 192:17, |
| 62:9, 62:11, | 45:4 | 15:17 | 257:5, 258:21, |
| 74:5, 75:13, | **samantha** | **save** | 272:18, 287:4, |
| 95:9, 95:11, | 256:2 | 382:7 | 287:5, 298:7, |
| 96:5, 103:3, | **same** | **saving** | 302:6, 303:4, |
| 104:10, 110:7, | 13:18, 24:9, | 57:13 | 303:6, 304:14, |
| 111:1, 113:20, | 38:13, 40:12, | **saw** | 305:14, 305:17, |
| 114:21, 129:16, | 43:7, 54:3, | 50:1, 153:19, | 306:20, 306:22, |
| 130:14, 138:18, | 56:12, 56:16, | 182:22, 202:6, | 307:15, 310:22, |
| 140:19, 141:1, | 58:10, 81:13, | 233:6, 312:19, | 311:7, 312:12, |
| 146:8, 154:9, | 84:20, 91:13, | 317:2, 329:21, | 312:15, 313:3, |
| 155:1, 155:8, | 98:11, 113:14, | 346:5, 367:6, | 313:15, 314:9, |
| 155:13, 156:18, | 121:3, 124:21, | 376:20, 383:17, | 316:8, 323:14, |
| 157:10, 159:16, | 125:1, 125:7, | 385:9 | 325:2, 328:11, |
| 159:18, 159:19, | 125:16, 126:10, | **say-so** | 330:10, 364:19, |
| 165:11, 167:7, | 130:20, 138:22, | 244:14 | 366:6, 367:18, |
| 173:2, 174:18, | 160:4, 163:16, | **saying** | 368:6, 369:2, |
| 184:20, 207:19, | 173:20, 176:6, | 37:7, 47:12, | 373:5, 373:13, |
| | 176:7, 176:9, | 55:8, 61:7, | 374:4, 374:7, |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

160

374:21, 376:16,
377:17, 378:3,
379:10, 381:4,
384:22, 385:20,
386:12, 387:6,
387:8, 388:4,
388:8, 390:3,
391:2, 393:6,
393:9, 395:19,
397:5, 399:7,
399:21, 400:5,
400:15, 401:20,
402:10, 403:20,
404:15
**scanned**
89:5, 281:12
**scared**
136:8
**schedule**
123:13, 123:14,
305:14, 334:1,
373:4
**scheduled**
223:20, 334:18
**schedules**
26:7
**schneider**
1:12, 2:1, 4:3,
4:13, 4:14, 5:7,
9:3, 10:5,
10:16, 13:1,
13:8, 13:11,
20:16, 52:15,
63:17, 63:20,
69:15, 69:19,
83:13, 83:21,
84:2, 94:11,
97:4, 130:3,
154:1, 154:17,
154:20, 182:7,
189:17, 200:12,
200:14, 250:7,
331:13, 331:16,
364:8, 383:12,
384:7, 401:14,
405:3
**schneider's**
171:22

**scholar**
177:17
**scholarly**
177:18
**scope**
195:14, 247:9,
247:12, 247:13
**score**
240:21, 240:22,
299:7, 299:10,
300:14, 300:17,
300:22, 301:3
**scoring**
239:15, 239:17,
239:18, 240:1,
248:6
**screen**
255:2, 316:21
**screening**
227:4
**seal**
409:13
**search**
178:16, 280:21,
280:22, 281:3,
281:6, 281:13,
281:17, 281:18,
282:2
**searchability**
281:20
**searchable**
280:18
**searches**
144:15, 178:1
**second**
63:21, 70:9,
97:7, 161:6,
182:18, 192:5,
225:20, 239:20,
239:21, 253:8,
298:2, 305:17,
314:7, 364:16,
390:20
**section**
304:15, 399:5
**secure**
184:3, 252:15,
252:22

**secured**
74:6
**securing**
35:19, 182:19,
262:20, 262:21
**security**
17:16, 18:4,
21:1, 23:16,
24:12, 24:15,
24:18, 25:8,
25:21, 27:9,
43:8, 65:2,
65:3, 74:14,
282:14, 377:18,
402:12, 402:14
**seeing**
219:4, 254:18
**seek**
361:21
**seeker**
287:11, 288:7,
322:10, 322:19
**seekers**
238:19, 239:4
**seeking**
363:17
**seem**
191:9, 196:3
**seeming**
334:17
**seems**
89:1, 196:9
**seen**
53:3, 53:12,
54:22, 77:20,
131:8, 218:10,
219:9, 246:1,
332:12, 341:5,
352:3, 354:17,
358:3, 403:12
**segment**
23:14
**segregate**
160:9
**segueing**
50:1
**send**
113:1, 113:4,

**secured**
152:1, 171:13,
201:7, 207:14,
253:21, 258:15,
283:10, 285:14,
289:21, 341:8,
343:6, 346:10,
368:11, 368:14,
369:3, 369:8,
392:8, 397:16
**sending**
201:22, 400:17
**sends**
151:20
**sense**
41:7, 237:9,
248:13, 310:8
**sensitive**
11:15, 335:17
**sent**
141:16, 156:17,
206:22, 225:1,
269:14, 284:7,
285:10, 336:21,
366:22, 368:7,
387:9, 397:13,
400:16, 401:1,
402:11, 404:1,
404:10, 404:11
**sentence**
182:19, 222:12
**sep**
37:1
**separate**
20:22, 29:20,
32:20, 37:5,
37:9, 53:17,
74:4, 78:10,
124:12, 126:17,
195:21, 196:2,
325:22, 371:18

███████████
**september**
6:17, 18:7,
18:14, 18:15,
21:8, 21:14,
25:14, 28:16,
28:22, 170:19,

276:4, 313:19,
314:3, 314:22,
317:20, 318:3,
385:2, 385:7,
385:12
**serial**
267:21, 326:15
**serve**
21:16
**served**
67:22
**service**
135:18, 298:12,
319:21, 329:16
**serving**
318:18, 318:21
**set**
15:15, 37:10,
59:16, 85:19,
102:9, 114:6,
125:5, 126:14,
178:2, 306:3,
372:5, 399:5,
409:12
**sets**
146:16, 385:18
**setting**
42:8, 378:7
**settled**
79:9
**settlement**
81:19
**settlements**
228:17, 228:20
**setup**
329:20
**seven**
46:22, 56:4,
59:14, 62:1,
183:3, 183:7,
292:15, 331:6,
331:8
**seventy-something**
297:17
**several**
23:5, 30:2,
189:7, 203:1,
334:4, 358:20,

359:9
**severity**
103:21, 349:9
**shall**
82:19
**share**
75:20
**sharp**
259:21
**she'd**
334:9
**she'll**
321:13
**sheepish**
231:20
**sheet**
10:11, 153:19,
239:15, 239:17,
239:18, 240:1,
248:6, 287:5,
299:10, 304:9,
366:7
**sheets**
290:18
**shenandoah**
409:14
**sherman**
230:1
**shift**
327:6
**shifted**
28:18
**shifts**
316:16
**shipe**
44:19
**shoot**
339:2
**shoreman**
63:3
**shorman**
230:6
**short**
329:1
**shorthand**
129:15, 409:1
**should**
160:1, 171:5,

172:18, 214:9,
225:11, 322:19,
327:16, 336:9,
342:6, 381:22,
390:4
**shouldn't**
70:18
**show**
28:11, 52:9,
111:19, 111:22,
114:5, 115:21,
116:18, 130:15,
131:19, 140:8,
169:18, 205:22,
211:15, 232:9,
255:3, 277:2,
278:20, 279:16,
322:9, 394:9
**showed**
160:16
**showing**
176:14, 189:5,
254:15, 272:22
**shown**
386:12
**shows**
190:18, 204:13,
212:6, 328:18,
328:21
**sic**
69:10
**side**
44:8, 44:9,
44:10, 44:11,
44:12, 44:13,
44:16, 45:12,
45:15, 66:14,
68:10, 74:5,
74:6, 74:10,
74:11, 75:3,
75:7, 75:11,
76:3, 76:9,
76:10, 142:1,
160:18, 160:21,
161:1, 161:14,
163:5, 245:9,
250:20, 252:4,
301:22, 304:16,

309:15, 337:2,
386:13
**sign**
11:1, 11:3,
11:5, 11:22,
77:18, 77:21,
86:19, 267:17,
405:1
**signatory**
93:4
**signature**
54:7, 54:9,
85:14, 87:17,
92:15, 92:20,
94:3, 94:20,
96:3, 343:9
**signature-mig2k**
409:15
**signed**
17:9, 55:9,
78:9, 78:10,
87:1, 131:11,
132:6, 132:17,
182:15, 306:11
**significant**
248:10, 338:1
**significantly**
173:21, 177:16,
312:18
**signing**
133:2, 409:8
**signs**
16:17, 158:3
**silva**
321:10
**similar**
23:15, 189:1,
232:5, 281:2,
357:21
**similarly**
189:4, 193:17,
197:13
**simple**
268:22, 274:17
**simply**
187:5, 274:16,
334:7
**since**
25:14, 50:19,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    162

**68:20,** 69:13,
70:7, 92:11,
146:13, 162:9,
164:6, 208:2,
249:13, 252:5,
270:2, 333:8
**single**
159:3, 311:6,
311:14
**sir**
13:6, 14:3,
53:2, 91:4,
132:17, 182:12,
216:15, 348:10,
375:10, 380:22
**sit**
116:5, 162:6,
164:10, 165:8,
171:19, 173:14,
184:13, 187:5,
217:2, 224:15,
246:14, 333:11,
348:3, 369:10,
377:11
**sites**
178:17, 178:19
**sitting**
139:14, 141:6,
141:16, 152:17,
163:10, 166:21,
219:4, 219:7,
225:22, 255:18,
255:19, 270:16,
352:22, 353:2,
353:4, 354:11,
357:11
**situation**
26:9, 70:19,
107:12, 156:13,
156:19, 159:22,
218:11, 233:11,
236:7, 271:16,
318:13
**six**
16:12, 39:11,
40:1, 46:21,
46:22, 53:13,
53:19, 55:5,

**55:6,** 55:16,
55:17, 56:2,
59:7, 61:18,
64:5, 86:21,
87:21, 109:5,
109:20, 173:4,
231:22, 234:13,
234:20, 237:3,
252:6, 277:1,
316:3
**size**
260:10
**skills**
37:10
**skin**
271:21
**skipping**
183:18
**slap**
179:10
**slightly**
94:6
**slow**
141:8, 141:13
**small**
31:5, 61:19,
189:21
**smaller**
258:8, 258:9,
259:20
**smoothly**
26:14
**snide**
235:17
**so-and-so**
159:22
**society's**
262:22
**software**
151:14, 254:12,
254:14, 255:1,
259:4, 316:15
**solely**
249:10
**solsrud**
68:14, 69:12
**solved**
158:22

**some**
13:14, 20:9,
20:10, 20:11,
23:10, 31:4,
71:18, 79:18,
81:22, 82:8,
84:16, 97:7,
110:1, 124:10,
141:14, 141:15,
153:2, 178:15,
179:9, 179:10,
184:8, 186:21,
188:17, 203:4,
204:8, 222:17,
228:10, 228:15,
234:5, 242:2,
254:14, 259:21,
262:1, 262:13,
272:8, 279:16,
280:16, 302:19,
307:12, 311:6,
313:10, 323:22,
332:2, 332:5,
334:15, 337:8,
343:16, 345:22,
349:9, 357:2,
357:21, 361:5,
362:20, 362:22,
363:21, 367:20,
372:16, 378:9
**somebody**
34:14, 51:9,
56:16, 75:13,
106:13, 107:22,
108:1, 120:2,
125:14, 140:1,
140:2, 156:11,
156:13, 159:21,
167:14, 167:15,
175:6, 197:11,
203:7, 203:8,
213:5, 218:12,
233:9, 234:15,
235:2, 237:3,
241:11, 248:7,
249:5, 254:19,
258:14, 263:6,
270:22, 276:22,

**282:22,** 283:3,
286:7, 287:11,
305:5, 314:13,
315:2, 317:10,
325:3, 332:20,
333:5, 354:17
**somebody's**
120:11, 259:16,
265:19, 317:5
**somehow**
34:10, 93:14
**someone**
25:22, 27:6,
37:6, 43:1,
51:7, 81:17,
99:13, 105:18,
108:7, 108:9,
111:1, 126:7,
138:9, 155:11,
156:1, 156:16,
157:5, 159:13,
244:15, 249:9,
251:3, 251:22,
252:2, 263:3,
271:8, 271:20,
271:21, 272:16,
273:21, 277:4,
285:12, 289:21,
312:5, 314:1,
315:14, 345:22,
372:12
**someone's**
262:15, 283:8,
284:6, 323:1
**something**
25:3, 25:16,
36:9, 37:7,
39:20, 49:11,
52:4, 62:8,
88:5, 89:19,
107:5, 109:8,
110:21, 125:15,
127:15, 131:18,
132:7, 138:1,
138:18, 145:15,
150:11, 151:7,
152:21, 157:11,
159:16, 171:14,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020                                    163

184:16, 184:21,
187:5, 201:1,
201:7, 207:5,
216:17, 227:20,
227:21, 235:12,
236:13, 239:6,
245:6, 245:7,
251:1, 251:2,
251:9, 254:9,
254:15, 255:18,
261:19, 272:3,
272:13, 286:16,
291:9, 292:17,
316:7, 318:11,
323:13, 328:5,
330:19, 331:2,
336:21, 339:13,
352:14, 354:2,
372:9, 397:21
**sometimes**
26:12, 51:8,
65:3, 116:7,
117:7, 117:16,
117:17, 118:15,
118:16, 210:18,
235:20, 235:22,
241:8, 272:11,
284:5, 352:11,
360:1, 360:2
**somewhat**
278:1
**somewhere**
82:5, 83:4,
270:22, 294:20,
313:10
**sooner**
269:13, 408:8
**sorry**
20:15, 22:20,
25:11, 31:15,
33:8, 45:21,
51:5, 57:6,
57:9, 66:18,
68:3, 69:16,
69:19, 71:10,
72:12, 72:14,
76:14, 76:19,
84:1, 84:9,

90:5, 92:2,
92:4, 100:11,
104:8, 110:17,
111:13, 112:19,
122:12, 127:18,
137:21, 137:22,
140:14, 154:3,
157:2, 158:6,
158:7, 173:2,
183:3, 186:9,
188:22, 189:6,
189:20, 191:5,
192:4, 192:17,
193:4, 204:2,
206:3, 213:9,
213:10, 213:12,
225:4, 229:7,
239:3, 239:5,
247:22, 248:22,
255:15, 264:20,
268:15, 269:2,
289:14, 298:3,
298:4, 298:9,
298:22, 307:6,
308:4, 309:22,
316:2, 322:12,
322:13, 323:6,
323:12, 336:3,
337:15, 357:6,
364:17, 379:17,
392:5, 394:7,
395:10, 395:11,
401:11, 402:8
**sort**
123:20, 190:12,
241:21, 245:14,
361:12
**sorted**
199:15
**sounds**
22:2, 166:10,
293:5
**source**
178:1, 178:2,
229:2
**sources**
203:4
**soured**
370:7

**speak**
73:19, 97:21,
120:11, 134:9,
134:13, 174:7,
197:10, 246:8,
301:21, 350:5
**speaking**
13:21, 104:8,
131:22, 164:21,
234:4, 405:18,
405:19
**speaks**
95:13, 175:3
**special**
153:20
**specific**
50:20, 64:10,
87:13, 102:11,
134:4, 158:20,
172:3, 267:13,
287:15, 358:10,
371:19
**specifically**
79:3, 79:4,
79:6, 122:3,
127:14, 153:6,
153:18, 222:19,
278:18, 286:19,
332:3, 399:13
**specified**
386:13
**speculate**
354:13
**speculating**
354:6
**speculation**
52:2, 277:21,
355:3
**spell**
178:11
**spend**
320:22
**spent**
15:16, 292:5,
292:15
**split**
20:21, 34:10
**spoke**
46:13, 121:4,

121:5
**spoken**
27:9
**sponsor**
155:18, 252:1,
252:8, 289:12,
289:15
**sponsored**
229:8
**sponsors**
243:22, 248:1
**spread**
169:10
**spreadsheet**
4:18, 169:5,
169:8, 169:14,
170:2, 171:1,
189:9, 191:6,
357:20
**spreadsheets**
333:20, 357:19,
358:3
**st**
150:17, 409:22
**staff**
47:14, 120:1,
341:4
**staffing**
256:5
**stamped**
12:2
**stand**
145:15, 252:3
**standalone**
227:22
**standard**
218:4
**standards**
387:14
**standing**
106:4, 106:9,
106:10
**stands**
270:10
**start**
61:22, 115:18,
251:6, 294:14,
326:9, 398:12

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

164

**started**
22:7, 47:6,
47:11, 257:14,
258:21, 302:22,
351:10, 353:17,
364:12
**starting**
45:14, 95:15,
364:7, 371:2
**starts**
367:12, 367:13,
376:14, 389:19,
392:13, 396:22,
398:10
**state**
9:13, 13:6,
101:1, 101:6,
103:8, 179:7,
179:12, 179:13,
313:5, 407:19
**stated**
134:7
**statement**
173:14, 175:3,
177:21, 183:4,
274:17, 307:1,
358:16, 363:4,
378:7, 378:22,
407:13
**statements**
184:12, 184:14,
187:17, 188:2,
306:21
**states**
1:1, 9:5, 99:3,
100:16, 100:18,
103:8, 179:9,
179:10, 182:9,
377:20
**statewide**
182:10
**stating**
134:7, 292:21
**station**
3:6
**stats**
179:7
**status**
4:18, 171:8,

**254:13, 334:5,**
334:10, 391:15
**statute**
104:2
**statutes**
103:9, 179:8
**stay**
180:14, 233:5,
233:18, 235:9,
350:10
**stemmons**
372:13
**stenographically**
409:6
**step**
80:17, 397:7
**stephanie**
365:5, 365:7,
365:12, 379:21
**stepped**
28:18, 39:20,
381:7
**sticks**
370:6
**still**
29:2, 49:10,
66:22, 67:14,
70:16, 70:21,
71:22, 80:22,
92:14, 177:16,
192:20, 224:10,
238:13, 238:14,
258:13, 262:3,
265:15, 268:18,
269:4, 269:5,
269:8, 269:20,
272:9, 276:9,
276:17, 277:13,
318:10, 318:17,
321:22, 323:21,
342:20, 344:5,
392:8, 401:17
**stipulate**
89:13, 347:13,
347:17
**stl**
267:16, 268:5,
278:20, 282:2,

**325:7, 325:9,**
326:1, 326:8,
326:9
**stoltz**
230:1
**stop**
208:10, 220:16,
226:13, 271:8,
271:11, 310:9,
318:15, 321:20,
337:19, 343:22,
351:16, 351:18,
351:20, 353:18,
354:21, 367:22,
370:5, 370:17
**stopped**
309:2, 309:3,
310:6, 319:14,
319:16, 338:18,
350:3, 355:15,
367:2, 370:5
**stopping**
327:2, 352:4,
353:10
**stops**
93:20
**store**
262:18, 267:19
**stored**
280:19, 288:5,
289:4, 291:3,
291:4
**strap**
253:21, 254:1,
260:1, 260:14,
261:6, 317:7
**straps**
260:2
**strategic**
30:14
**strategies**
226:1, 226:19,
227:7, 230:15
**street**
2:6, 3:15,
9:11, 255:8,
372:15
**strike**
115:18, 157:2,

**267:10, 301:12,**
372:2, 384:3
**strive**
275:13
**strong**
179:8, 179:9
**structure**
18:1, 59:22,
60:9, 65:16,
67:17, 68:4,
71:17, 71:22
**struggling**
12:16

██████████

**stuff**
68:4, 71:18,
294:1, 403:11
**style**
52:19
**subject**
79:21, 82:14,
113:16, 382:20,
405:17, 406:8,
406:15
**submission**
182:15
**submit**
118:6, 126:5,
159:12, 341:6,
341:22, 342:2,
342:12, 346:2,
349:5, 366:7
**submitted**
159:4, 322:16,
340:22, 342:3,
342:6, 366:15,
366:19
**submitting**
369:11
**subsequently**
200:19
**subsidiary**
71:20, 71:21,
90:8
**substance**
295:6
**substantive**
189:4

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                165

| | | | |
|---|---|---|---|
| **substitute** 11:10, 379:3 | **summarize** 389:21 | 180:9, 185:16, 201:6 | 267:6 |
| **succeeded** 21:6 | **summarizing** 368:7 | **surety** 141:16, 155:9, | **swaps** 258:10 |
| **success** 173:10, 177:12 | **summary** 190:16, 192:3, | 155:20, 156:14, 156:18, 156:19, | **swear** 10:2 |
| **successful** 173:8, 173:16, | 292:8 | 157:5, 157:18, 157:20, 157:21, | **switch** 258:22, 259:12, 264:2, 264:15 |
| 180:1, 203:10, 207:18, 207:21, | **sums** 191:16 | 158:4, 158:8, 181:2, 181:16, | **switched** 258:6, 259:10, |
| 208:4, 209:7, 269:16, 357:6, | **super-lengthy** 280:17 | 183:3, 183:7, 183:21, 184:2, | 263:17 |
| 360:12 | **supervised** 247:1 | 184:16, 185:2, 185:6, 186:4, | **switchover** 258:3 |
| **successfully** 208:6, 356:21, | **supervises** 30:21, 31:1 | 186:6, 186:8, 186:12, 187:2, | **sworn** 10:3, 13:2 |
| 359:16, 359:21 | **supervising** 31:17 | 187:3, 187:9, 187:10, 188:7, | **syntax** 293:8, 342:22 |
| **successors** 307:7, 307:18, | **supervision** 119:1 | 188:10, 188:13, 214:10, 214:16, | **system** 102:11, 103:1, |
| 307:19 | **supervisor** 32:2, 198:11 | 221:13, 221:20, 242:8, 242:11, | 103:7, 103:13, 253:16, 256:20, |
| **such-and-such** 243:20 | **supervisors** 244:21, 300:5 | 258:2, 285:17, 285:20, 360:3, | 256:22, 311:6, 318:15 |
| **sudden** 406:15 | **supervisory** 30:18 | 373:11, 377:20, 377:21 | |
| **suggested** 401:14 | **supplied** 348:2 | **surety's** 152:8, 218:8, | **T** |
| **suggesting** 222:6 | **support** 4:14, 44:19, | 221:10 | **t** 5:1, 6:1, 7:1, |
| **suicidal** 125:9 | 52:6, 178:2, 182:7, 254:16, | **surprise** 17:8, 302:19 | 8:1 |
| **suit** 81:10, 81:13, | 335:9 | **surprised** 127:16, 197:2, | **tag** 119:3, 119:5, |
| 81:15, 81:16, 81:20, 81:21, | **supporting** 378:8 | 197:4, 197:5 | 139:22, 140:4, 261:13, 261:14, |
| 82:3, 82:4 | **supports** 337:11, 349:12 | **suspending** 403:2 | 311:19, 311:21, 312:6, 315:6, |
| **suite** 3:7, 3:16 | **suppose** 191:14 | **suspicion** 199:14 | 315:9, 315:12, 315:19 |
| **suited** 57:20 | **supposed** 74:15, 217:10, | **sussman** 332:15, 345:21 | **tag's** 315:9 |
| **suits** 82:7, 82:21, | 314:2, 334:4, 334:11, 362:1, | **sussman's** 352:10 | **tagged** 139:21, 148:10, |
| 83:2, 83:4, 229:2 | 362:3, 377:2, 390:14, 398:16 | **sustained** 163:20, 359:21 | 314:13 |
| **sum** 190:19, 191:4, | **supreme** 99:20 | **swap** 269:16 | **tags** 140:8, 140:10, |
| 191:19, 192:12, 192:22, 387:20, | **sureties** 29:10, 32:8, | **swapped** 257:16, 258:19, | 314:21, 315:2, 315:4, 315:11, |
| 387:21 | | | 315:13, 315:17 |
| **summ** 188:22 | | | **taintor** 99:21 |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

166

take
14:9, 14:10,
18:6, 40:4,
49:19, 53:6,
63:11, 70:9,
80:17, 83:14,
95:5, 107:10,
107:17, 110:5,
116:14, 117:5,
123:9, 125:9,
125:12, 128:8,
151:9, 154:5,
158:1, 158:10,
158:16, 161:13,
170:18, 180:12,
201:19, 228:6,
228:7, 235:15,
249:22, 330:17,
342:10, 365:13,
372:14, 372:16,
372:19
taken
13:12, 21:1,
25:14, 63:15,
69:6, 107:16,
154:14, 170:7,
174:9, 174:10,
250:5, 331:11,
409:3, 409:6
takes
235:16, 236:1,
236:8, 243:20,
400:4
taking
9:11, 97:10,
225:19, 239:12
talk
13:18, 37:22,
40:21, 59:21,
62:1, 62:12,
63:21, 71:5,
73:20, 121:5,
125:10, 126:1,
135:11, 135:20,
140:1, 143:14,
147:5, 147:6,
159:21, 207:6,
210:15, 217:1,

221:9, 221:10,
230:14, 233:4,
235:10, 241:10,
246:17, 246:20,
250:22, 268:13,
271:18, 272:7,
272:12, 274:11,
302:1, 312:2,
312:3, 312:10,
332:2, 365:12
talked
16:6, 32:21,
42:16, 45:19,
63:20, 66:13,
70:13, 82:22,
110:11, 153:21,
172:19, 207:16,
209:21, 217:7,
226:8, 226:18,
235:3, 276:22,
287:8, 300:11,
301:6, 332:21,
333:5, 339:18,
339:19, 368:6,
373:18, 387:10
talking
33:7, 57:12,
60:5, 60:16,
87:20, 89:14,
100:7, 111:3,
112:10, 131:12,
134:3, 134:4,
144:9, 153:8,
154:22, 158:7,
160:15, 160:21,
184:9, 189:2,
204:3, 216:20,
216:21, 217:5,
217:6, 217:14,
217:21, 218:4,
231:3, 236:17,
245:13, 303:12,
305:4, 305:6,
312:3, 316:20,
320:19, 322:12,
351:17, 354:19,
383:11, 395:14,
398:20

talks
56:5
tamper
253:21, 254:1,
317:7
tania
6:20, 79:1,
389:15, 390:15,
393:8, 396:4
target
24:15
task
314:1, 314:2,
314:4
tawanna
47:18, 48:6,
168:1
taylor
18:20, 19:22,
33:7, 34:6,
99:21, 170:14,
170:18, 170:22,
171:10, 172:9,
174:5
taylor's
46:9
td
324:3, 324:8,
324:16
td4
318:8, 323:14,
324:5
team
51:18, 52:5,
365:15, 398:22,
400:16
tech
126:11, 254:16
technical
12:16
technician
124:19, 126:2,
126:9
technicians
124:20, 125:21,
125:22
technology
92:16, 94:13,

96:7, 259:12
techs
126:16
tell
42:20, 42:22,
71:10, 87:3,
87:19, 89:2,
109:22, 114:16,
120:20, 125:10,
129:4, 134:15,
138:6, 139:10,
139:15, 142:2,
149:2, 149:5,
153:16, 159:12,
161:13, 168:15,
171:19, 187:9,
189:6, 195:4,
199:18, 221:2,
235:22, 248:19,
249:16, 249:18,
258:11, 261:17,
266:22, 270:16,
271:7, 279:9,
285:14, 287:20,
293:13, 303:13,
320:13, 320:21,
323:10, 323:16,
325:19, 326:16,
326:22, 330:15,
347:19, 349:11,
359:13
telling
37:6, 61:9,
61:10, 71:8,
164:15, 180:12,
188:11, 295:2,
338:9, 347:10,
353:19, 364:19,
398:22
tells
298:15, 315:7,
326:13
temp
77:4
temporary
4:16, 21:3,
182:8
ten
141:9, 141:14,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

167

142:17, 160:19,
161:5, 183:18,
183:19, 188:5,
208:20, 369:18,
369:19, 382:1,
408:5
**tenant**
64:22
**tenants**
45:9
**tend**
233:4, 233:5,
280:22, 281:6
**tendencies**
233:5
**term**
15:5, 15:9,
59:5, 59:14,
60:1, 60:6,
61:22, 62:4,
107:21, 108:11,
129:11, 129:15,
130:4, 210:1,
210:7, 262:22,
276:18, 297:9,
322:3, 340:14,
394:8
**terminated**
20:4, 26:1
**terminology**
219:20
**terms**
122:8, 123:4,
171:1, 182:21,
183:15, 192:21,
230:15, 269:1,
320:5, 320:6,
384:16, 385:18,
386:3
**testified**
13:3, 95:4,
129:17, 158:16,
210:12, 216:19,
231:11, 331:1
**testify**
14:16, 158:18,
158:19, 206:6,
331:1, 347:13,

363:9
**testifying**
132:4, 222:14,
332:4, 353:7
**testimony**
15:20, 16:1,
16:2, 16:3,
16:4, 80:12,
81:7, 82:8,
91:12, 94:10,
94:19, 113:17,
114:2, 130:12,
133:20, 155:6,
157:8, 187:14,
213:18, 213:21,
214:3, 214:5,
217:9, 217:13,
217:16, 217:19,
220:9, 222:5,
223:13, 263:19,
272:17, 273:7,
277:21, 322:7,
333:9, 333:13,
348:6, 352:9,
352:10, 353:22,
354:19, 358:15,
367:5, 409:5,
409:6
**texas**
81:19, 83:3,
83:6, 345:20
**text**
91:20, 377:14
**th**
3:16, 9:8,
329:2, 366:4,
371:1, 397:3,
399:2, 402:20,
403:9, 404:1,
404:2, 404:11,
409:13
**thank**
11:20, 12:18,
12:19, 127:18,
172:15, 223:16,
279:14, 389:9
**thanks**
365:11

**theirs**
389:2
**themselves**
9:13, 189:11
**theoretically**
328:15
**thereabouts**
277:10
**thereafter**
409:7
**thereof**
387:7
**they'd**
151:9, 243:18
**thick**
260:5
**thing**
24:9, 98:11,
99:1, 123:20,
160:18, 167:4,
219:6, 226:9,
232:4, 240:11,
245:15, 253:2,
263:4, 293:8,
300:3, 361:12,
372:17, 390:3,
390:20
**things**
25:8, 33:22,
70:17, 103:9,
110:8, 123:12,
125:10, 132:12,
226:17, 231:21,
247:7, 271:22,
272:1, 274:5,
290:2, 291:2,
299:19, 305:4,
332:3, 332:6,
333:7, 336:8,
336:19, 337:1,
337:5, 349:5,
349:8, 368:8,
368:21, 369:4
**thinking**
80:22, 133:1,
142:15, 297:10
**thinks**
113:8

**third**
63:22, 186:21,
252:17, 253:10,
286:1, 329:19,
390:21, 395:21,
395:22
**thirty**
380:14
**thought**
94:14, 101:5,
108:14, 163:17,
191:12, 344:19,
349:14, 350:13,
357:4, 363:4,
405:15
**thousand**
329:3
**thousands**
62:2, 258:3
**threat**
272:8, 400:1
**threatening**
184:4, 271:18
**threats**
155:17
**three**
16:6, 20:21,
22:6, 22:12,
31:14, 39:10,
46:6, 83:5,
83:6, 83:7,
83:8, 85:6,
87:21, 96:22,
138:21, 139:1,
139:3, 154:17,
181:21, 197:14,
198:3, 207:20,
226:17, 235:18,
236:19, 252:3,
252:4, 252:7,
258:2, 258:6,
300:22, 316:3,
324:7, 329:3,
375:21, 390:22,
391:17, 391:20,
392:15, 394:2,
394:10, 394:18,
394:21, 398:15,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    168

398:20, 399:22,
400:20, 401:15
**three-month**
39:22
**through**
22:8, 23:10,
53:6, 53:13,
53:19, 55:5,
55:6, 55:16,
55:17, 56:2,
94:3, 97:5,
97:21, 122:14,
133:22, 163:18,
166:17, 167:4,
178:22, 188:18,
199:18, 204:2,
204:6, 224:12,
224:13, 226:21,
256:13, 259:5,
267:4, 271:10,
280:1, 283:8,
290:13, 300:8,
316:16, 317:1,
321:1, 404:4
**throughout**
323:17
**throw**
271:11
**thumb**
10:7, 12:4,
288:2, 294:1,
294:5, 295:1,
296:3, 297:15
**thumbnail**
235:6
**thursday**
1:14, 408:5
**ticket**
313:8
**tie**
370:16
**tieder**
3:5, 9:16
**till**
154:10
**tim**
44:19, 44:20,
44:22, 45:1,

64:9, 66:19,
68:4, 70:13,
93:5
**time-wise**
235:6
**timeframe**
12:11
**timely**
362:12, 362:16,
363:5, 363:13,
378:13, 386:21
**times**
109:2, 116:16,
139:6, 140:17,
140:18, 153:7,
156:21, 157:1,
157:3, 157:11,
158:12, 160:2,
202:11, 219:17,
220:1, 334:4,
349:3, 358:20,
359:5, 359:6,
359:8, 367:20
**tired**
72:14, 322:12,
337:9
**title**
17:12, 17:17,
18:6, 18:22,
22:17, 31:11,
36:15, 45:7,
45:10, 47:19,
64:10, 71:12,
124:17, 174:12,
228:1
**titled**
402:20
**titles**
64:17, 283:17
**today**
9:9, 9:22,
14:2, 14:16,
14:18, 63:3,
69:22, 84:5,
84:6, 84:11,
162:7, 164:11,
165:8, 172:20,
173:15, 184:13,

208:9, 224:15,
225:21, 226:14,
273:7, 288:10,
290:16, 296:20,
333:11, 346:14,
347:19, 348:7,
349:1, 349:16,
369:10, 377:11,
392:15, 397:5,
400:7, 402:13,
408:4
**today's**
9:8, 15:14
**together**
23:8, 26:1,
52:5, 53:17,
165:12, 165:13,
378:6
**token**
38:13
**told**
70:21, 131:3,
153:18, 207:12,
207:13, 218:14,
218:18, 228:15,
263:16, 274:6,
290:6, 292:10,
296:6, 296:15,
296:16, 339:8,
339:22, 349:17,
358:20, 391:2,
399:9
**tomorrow**
366:8, 400:18,
402:21
**tongue-in-cheek**
112:21
**tonight**
295:14
**took**
20:8, 20:12,
24:2, 28:5,
105:4, 170:14,
193:8, 277:6
**tool**
227:17, 271:5,
273:20
**toolbox**
26:16

**tools**
26:16, 136:7,
273:2, 273:6
**top**
52:17, 81:6,
91:16, 94:1,
96:2, 96:9,
146:4, 159:7,
160:6, 190:15,
280:22, 287:6,
304:4, 311:13,
311:16, 315:18,
328:11, 370:21,
389:16
**total**
138:11, 138:12,
141:5, 144:1,
144:3, 145:3,
162:3, 167:1,
168:13, 175:21,
176:13, 191:4,
192:6, 193:9,
258:5, 299:7,
300:14, 300:17,
353:1
**totalled**
191:4, 192:4
**totals**
198:3, 305:1
**touch**
389:21
**touched**
25:19, 155:6
**tour**
332:20
**towards**
118:16, 322:15,
333:17, 333:18
**town**
321:12, 401:9
**track**
144:12, 169:4,
214:14, 271:19,
272:21, 357:15,
357:16, 358:7
**tracked**
149:12, 149:14,
239:6

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider
Conducted on February 20, 2020                                    169

| | | | |
|---|---|---|---|
| **tracking** | **transportation** | 156:12, 212:9, | 58:10, 63:17, |
| 255:3, 257:1, | 29:5, 240:13 | 226:2, 226:5, | 84:14, 86:1, |
| 257:2, 268:7, | **travel** | 239:13, 262:9, | 96:22, 112:1, |
| 269:18, 305:18 | 20:10, 26:10, | 263:8, 264:14, | 126:15, 133:11, |
| **tracks** | 26:13, 29:7, | 264:16, 275:18, | 138:21, 139:3, |
| 121:8, 139:20, | 42:22, 294:20, | 275:20, 276:14, | 154:11, 161:19, |
| 169:1, 171:8, | 313:6 | 277:3, 321:13, | 165:12, 171:13, |
| 198:7 | **treasury** | 333:22, 348:5, | 173:17, 207:7, |
| **trained** | 388:12, 388:17 | 373:4 | 207:18, 207:20, |
| 274:4 | **treat** | **trying** | 256:7, 270:14, |
| **training** | 57:18, 136:4, | 22:14, 57:10, | 290:1, 301:2, |
| 46:7, 126:17, | 136:6 | 61:8, 69:14, | 303:2, 305:19, |
| 126:21, 272:14, | **treated** | 81:1, 125:19, | 316:3, 327:8, |
| 274:7, 274:11, | 41:3 | 145:10, 150:13, | 349:4, 359:10, |
| 283:9, 283:10, | **treating** | 168:8, 186:17, | 381:20, 383:17, |
| 283:12, 283:14, | 284:15, 406:20 | 187:22, 209:2, | 395:13, 395:14, |
| 285:10, 285:12 | **trial** | 214:7, 222:16, | 401:10, 403:21 |
| **trains** | 16:2, 16:4 | 234:1, 251:10, | **two-and-a-half** |
| 272:5, 272:6, | **tried** | 276:6, 291:6, | 42:3 |
| 272:7 | 103:2, 164:5, | 293:2, 293:15, | **two-way** |
| **transactions** | 264:2, 316:6, | 293:21, 294:22, | 253:3 |
| 65:21, 66:4 | 334:14 | 296:8, 320:10, | **type** |
| **transcript** | **trigger** | 321:21, 321:22, | 25:8, 121:10, |
| 4:10, 52:13, | 116:12 | 335:19, 346:12, | 189:20, 253:18, |
| 82:15, 82:19, | **triggers** | 408:10 | 266:22, 323:22, |
| 83:12, 182:2, | 373:10 | **tuned** | 326:1 |
| 188:20, 217:20, | **trouble** | 49:13 | **types** |
| 222:20, 279:20, | 189:22, 217:4, | **turn** | 126:15, 295:5 |
| 287:14, 297:2, | 276:21, 312:7 | 62:19, 92:10, | **typewriting** |
| 327:11, 364:2, | **troubleshoot** | 172:17, 172:22, | 409:7 |
| 367:9, 369:17, | 123:13 | 303:2, 371:11 | **typically** |
| 374:17, 375:8, | **true** | **turned** | 109:13, 323:5, |
| 376:11, 380:2, | 85:10, 85:20, | 204:7, 204:21, | 323:8, 323:9, |
| 380:18, 382:9, | 115:3, 173:14, | 224:13 | 324:18, 324:19, |
| 383:7, 384:5, | 180:22, 183:4, | **twenty** | 365:14, 392:2 |
| 385:4, 389:11, | 184:12, 184:14, | 389:8 | |
| 392:10, 393:15, | 226:14, 226:15, | **twenty-five** | **U** |
| 396:18, 398:7, | 233:11, 273:4, | 329:3 | **uh** |
| 400:10, 401:5, | 360:20, 409:4 | **twenty-four** | 74:1, 92:19, |
| 402:3, 403:17, | **trust** | 297:17 | 150:7, 154:1, |
| 405:12, 406:10, | 110:13, 232:3 | **twisting** | 294:16, 379:18 |
| 407:20, 408:15, | **truth** | 163:4 | **uh-huh** |
| 408:16, 408:18, | 187:17, 188:2 | **two** | 22:9, 36:5, |
| 409:4 | **truthfully** | 16:14, 18:12, | 54:6, 55:19, |
| **transfer** | 14:16 | 19:5, 19:10, | 56:7, 59:4, |
| 285:12, 285:14, | **truthfulness** | 21:2, 27:14, | 61:21, 70:15, |
| 388:10 | 55:21 | 28:9, 28:15, | 84:15, 84:18, |
| **transmitted** | **try** | 28:19, 53:17, | 85:9, 86:3, |
| 121:7 | 13:18, 72:11, | | |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

86:9, 89:4,
90:5, 92:12,
108:17, 110:19,
112:2, 146:11,
147:11, 172:21,
175:5, 189:19,
190:21, 191:15,
192:10, 199:17,
226:4, 232:7,
232:10, 233:1,
235:4, 236:5,
240:17, 244:2,
246:12, 248:9,
262:7, 264:5,
265:12, 273:17,
274:8, 275:1,
276:19, 283:7,
284:10, 285:9,
287:3, 298:22,
304:17, 305:22,
306:15, 310:11,
310:12, 312:14,
314:7, 338:16,
364:22, 373:9
**ultimate**
156:14, 214:11,
214:17, 215:9,
215:13, 237:9
**ultimately**
143:17, 144:6,
145:5, 155:7,
163:2, 186:1,
194:14, 232:2,
282:21
**um**
22:6, 24:18,
25:1, 25:20,
26:6, 28:14,
29:9, 29:13,
34:18, 37:16,
39:15, 44:19,
44:20, 45:4,
45:9, 46:8,
46:9, 46:21,
48:16, 55:17,
57:13, 70:2,
71:15, 80:20,
81:9, 104:18,

118:15, 138:2,
142:15, 144:6,
145:13, 145:14,
149:4, 157:16,
160:14, 169:17,
187:8, 191:10,
197:4, 198:17,
199:7, 200:17,
202:15, 218:10,
227:9, 235:8,
240:9, 253:22,
258:5, 258:8,
258:18, 260:4,
262:22, 269:8,
269:17, 270:5,
271:7, 274:5,
278:11, 280:2,
282:18, 283:8,
288:12, 288:17,
289:6, 291:11,
297:11, 308:2,
308:8, 314:1,
316:12, 322:11,
323:12, 332:15,
334:3, 335:10,
338:20, 350:9,
351:9, 351:18,
352:18, 352:22,
354:1, 358:17,
363:11, 366:21,
370:8, 392:7,
399:19
**unarmed**
24:19
**unassign**
318:14
**unassigned**
318:5, 319:19
**unavailable**
334:2
**unbelievably**
299:17
**uncomfortable**
259:10
**under**
11:17, 18:12,
25:12, 36:6,
38:5, 56:17,

65:13, 93:20,
99:2, 99:16,
108:7, 119:1,
119:12, 119:19,
120:2, 135:2,
135:5, 161:9,
227:11, 247:9,
247:12, 247:13,
255:12, 300:20,
302:15, 304:14,
305:19, 353:5,
353:9, 358:16,
359:13, 359:14,
362:3, 398:13,
402:22, 405:15,
407:10, 407:11
**understand**
13:22, 14:18,
15:2, 15:6,
15:10, 22:11,
35:16, 36:15,
49:6, 51:5,
51:6, 52:7,
55:20, 57:3,
57:11, 58:20,
59:6, 60:7,
69:20, 83:2,
84:7, 91:18,
100:12, 115:9,
131:3, 146:9,
150:5, 150:12,
150:13, 180:9,
181:15, 193:14,
193:20, 194:7,
194:9, 194:16,
212:13, 216:15,
216:20, 221:15,
228:18, 229:12,
229:16, 232:4,
234:3, 236:15,
242:11, 242:20,
246:11, 246:16,
246:17, 248:5,
249:3, 252:16,
273:11, 291:19,
292:1, 314:4,
319:1, 332:5,
338:20, 353:13,

353:15, 354:5,
359:14, 361:11,
368:8, 368:22,
369:4, 386:20,
404:15, 408:11,
408:13
**understanding**
10:15, 19:21,
56:19, 58:15,
58:16, 77:5,
90:12, 92:5,
103:14, 103:18,
103:22, 114:19,
129:10, 130:9,
135:4, 136:22,
138:14, 153:16,
166:9, 170:13,
245:3, 246:20,
266:6, 300:2,
300:11, 307:22,
312:22, 335:12,
335:13, 350:8,
350:9, 362:2,
371:22, 372:3,
378:19, 389:21,
390:19
**understands**
132:12, 195:5,
221:6
**understood**
14:8, 14:14,
108:12, 112:6,
113:18, 116:15,
297:11, 363:15,
365:18, 390:14,
391:8
**undertake**
211:14, 212:5
**undertaken**
376:4
**unemployed**
19:8, 301:2
**unfair**
164:17, 346:19,
348:4
**unheard**
173:10, 177:12,
177:19

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                                    171

| | | | |
|---|---|---|---|
| **unidentified** | **updated** | 340:14, 343:6, | **verbose** |
| 69:1 | 170:11, 170:21, | 365:16, 405:21, | 111:17 |
| **unit** | 171:9, 171:16, | 406:14 | **verbosely** |
| 253:21, 259:17, | 381:6 | **uses** | 337:16 |
| 259:22, 261:5, | **updating** | 119:16, 129:15, | **verifiable** |
| 261:7, 261:13, | 151:12 | 228:9, 255:15, | 252:7 |
| 261:19, 261:21, | **upfront** | 272:18, 272:20, | **verification** |
| 262:3, 269:17, | 305:3, 305:8 | 358:7 | 54:4, 54:16, |
| 323:14, 324:22, | **upgrade** | **using** | 55:9 |
| 325:1, 325:2, | 262:3 | 59:5, 59:14, | **verified** |
| 326:1 | ▇▇▇▇▇ | 61:22, 87:19, | 4:12, 53:1, |
| **united** | | 177:2, 185:10, | 55:6, 173:3 |
| 1:1, 9:5, | **upload** | 259:5, 261:4, | **verify** |
| 182:9, 377:20 | 88:7 | 297:9 | 254:17 |
| **units** | **uploaded** | **usually** | **verifying** |
| 326:8 | 289:20, 290:7, | 203:22, 204:5, | 55:18, 55:20, |
| **universe** | 291:3, 291:10, | 235:17 | 266:17, 266:18 |
| 144:19, 294:3, | 291:15, 292:2, | | **vermont** |
| 294:22, 295:2 | 293:18, 295:16, | | 204:6, 336:7, |
| **university** | 295:20, 296:3, | **V** | 336:22, 337:4 |
| 97:9 | 328:5 | | **vernacular** |
| **unless** | **uploading** | **vacuum** | 311:8 |
| 35:13, 271:13, | 89:19 | 214:8 | **verona** |
| 387:8 | **upper** | **vague** | 24:21, 30:8, |
| **unnaturally** | 402:16 | 361:8 | 30:11, 31:8, |
| 186:15 | **urbanksi** | **valid** | 33:5, 33:7, |
| **unnaturally-high** | 406:18 | 151:9, 161:22 | 35:2, 41:16, |
| 186:16 | **urbankski** | **validity** | 41:18, 43:1, |
| **unquote** | 218:9 | 387:7 | 43:2, 43:5, |
| 65:13, 90:9, | **urbanski** | **valuable** | 43:11, 46:18, |
| 91:10, 130:4 | 11:14, 405:20 | 272:1 | 47:10, 48:7, |
| **unreasonable** | **urbanski's** | **value** | 121:18, 124:2, |
| 185:2, 339:3 | 11:9 | 180:12, 299:5 | 256:6 |
| **unredacted** | **url** | **varies** | **version** |
| 11:8 | 178:4 | 179:6 | 88:11, 407:22 |
| **unring** | **use** | **variety** | **versions** |
| 351:8 | 15:5, 15:9, | 107:14, 112:13, | 405:11 |
| **until** | 50:18, 60:1, | 120:9 | **versus** |
| 14:11, 72:11, | 62:4, 75:10, | **various** | 9:4, 43:21, |
| 82:13, 252:14, | 128:16, 130:3, | 30:18, 30:22, | 83:19, 84:8, |
| 277:2, 305:18, | 151:14, 161:22, | 31:8, 31:20, | 99:21, 126:16, |
| 315:15, 334:2, | 199:8, 203:20, | 368:9 | 141:3, 141:22, |
| 404:11 | 218:2, 227:1, | **vary** | 144:3, 161:21, |
| **upcoming** | 227:4, 255:16, | 179:3, 179:7, | 162:15, 163:3, |
| 150:15 | 257:2, 259:5, | 313:4 | 163:6, 163:20, |
| **update** | 263:1, 273:2, | **vein** | 166:2, 182:11, |
| 7:13, 7:16, | 273:20, 298:19, | 130:20 | 232:14, 298:12, |
| 151:17 | 322:3, 327:1, | **vendor** | 326:4 |
| | | 25:2, 252:17 | |
| | | **verbal** | |
| | | 14:5, 14:7 | |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

172

**vested**
232:18
**via**
152:11
**vice**
17:19, 17:20,
18:9, 20:7,
48:12, 48:14
**victor**
321:10
**video**
9:9, 9:10,
14:5, 405:5
**videographer**
3:21, 9:2, 9:9,
9:22, 63:13,
63:16, 69:4,
69:7, 154:12,
154:16, 250:3,
250:6, 279:10,
279:12, 326:18,
331:9, 331:12,
389:8, 398:4,
403:13, 405:2
**videotape**
28:11
**videotaped**
1:12, 2:1, 9:3,
63:17, 154:17,
250:7, 331:13,
405:3
**view**
255:9, 298:10
**villaran**
79:17
**violate**
80:10, 99:18
**violent**
247:17, 247:20,
248:8, 249:2,
249:7, 249:10,
249:11, 249:12,
300:21
**virginia**
1:2, 1:13, 2:7,
2:14, 3:8, 9:6,
9:12, 13:10,
43:11, 77:12,

83:4, 83:6,
83:9, 86:6,
90:8, 98:14,
98:20, 98:21,
100:13, 100:15,
372:14, 409:14,
409:18
**visit**
267:7, 267:9,
289:1, 365:19,
367:21
**visited**
128:1, 317:2
**visitors**
24:22
**vital**
20:13
**vivian**
3:4, 9:17,
153:16
**vocabulary**
342:7
**voice**
9:13
**void**
148:19, 362:3,
363:13
**voided**
151:7
**volume**
215:20, 337:9
**voluntary**
108:16
**vp**
20:9, 20:19,
24:8, 36:10,
36:11, 36:12,
36:13, 36:16,
40:10, 109:3,
116:3, 118:12,
120:4, 137:7,
137:11, 140:12,
140:15, 141:11,
142:4, 145:18,
149:16, 162:14,
162:22, 242:5,
245:11, 246:22,
247:1, 247:2,

247:12, 255:11,
320:13
**vs**
1:7

**W**

**w-2**
85:8, 97:1
**wait**
14:11, 35:14,
72:11, 321:9
**waiting**
233:2
**walk**
317:1
**wall**
124:15
**wanda**
48:1, 77:1,
84:16, 85:7,
86:8, 92:20,
95:17, 95:20,
96:13, 96:17,
97:1
**want**
11:22, 23:11,
28:2, 30:3,
30:6, 37:6,
38:11, 41:2,
50:6, 60:9,
63:11, 63:21,
69:17, 69:18,
70:9, 80:11,
82:10, 82:14,
88:9, 89:17,
90:21, 94:22,
95:3, 95:5,
97:4, 103:9,
103:20, 107:20,
129:21, 132:7,
140:2, 140:22,
142:6, 143:3,
143:21, 156:20,
158:5, 160:20,
171:19, 194:6,
197:16, 203:17,
208:10, 229:14,
229:15, 230:14,

238:1, 238:3,
244:3, 250:22,
259:17, 282:2,
287:13, 290:10,
292:22, 293:11,
294:3, 303:10,
304:13, 320:22,
330:17, 330:22,
332:4, 335:21,
336:6, 336:11,
336:19, 337:18,
340:8, 348:21,
349:11, 349:15,
350:6, 356:8,
363:3, 363:8,
363:20, 363:21,
368:20, 369:21,
373:4, 374:13,
377:13, 383:8,
396:21, 397:2,
406:19, 407:13,
408:7, 408:14
**wanted**
145:17, 154:20,
155:19, 199:13,
254:19, 262:2,
269:22, 294:12,
296:19, 330:18,
332:2, 337:13,
346:2, 346:9,
347:18, 350:16,
351:8, 353:5,
353:6, 353:7,
353:8, 353:9,
355:10, 389:21
**wanting**
136:5, 185:6,
309:14, 335:15,
353:11, 389:20
**wants**
35:21, 126:5,
235:16, 270:22,
354:12
**warning**
373:5
**warrant**
109:22, 113:21,
114:7, 114:8,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

173

114:16, 114:22,
115:6, 115:7,
115:10, 373:15,
373:20
**washington**
47:19, 48:6,
101:5
**washington's**
168:1
**waste**
28:2
**watched**
352:10
**watching**
352:9
**watt**
3:5, 9:15
**way**
13:20, 18:1,
25:19, 37:10,
62:12, 65:9,
74:22, 92:7,
110:15, 114:13,
144:18, 166:21,
173:18, 176:7,
176:9, 176:10,
186:22, 212:1,
219:2, 222:18,
222:19, 242:19,
243:2, 246:13,
254:7, 255:8,
273:1, 280:19,
295:14, 302:5,
408:9
**ways**
130:16, 275:14
**we'll**
12:6, 14:10,
92:10, 107:10,
116:6, 117:22,
128:11, 157:11,
217:3, 217:4,
229:9, 240:4,
268:17, 272:7,
291:13, 292:18,
293:10, 298:20,
358:5, 406:17
**we're**
14:18, 26:12,

42:8, 63:13,
69:4, 69:7,
69:20, 70:1,
79:5, 80:5,
84:5, 84:6,
84:7, 84:11,
92:13, 92:14,
110:6, 110:8,
110:14, 124:10,
133:17, 135:13,
143:9, 144:9,
147:6, 147:16,
154:12, 160:21,
193:10, 193:13,
233:4, 236:17,
257:17, 272:6,
272:7, 274:1,
287:13, 291:17,
292:21, 318:10,
321:15, 327:15,
334:11, 351:17,
369:21, 374:11,
405:3, 406:7,
406:13, 407:8,
407:12, 407:14
**we've**
83:18, 91:9,
130:15, 131:20,
133:18, 152:22,
153:21, 167:9,
189:17, 192:4,
192:6, 192:8,
197:22, 200:5,
207:17, 279:9,
279:12, 316:6,
326:18, 375:22,
391:17, 395:14,
398:20, 400:20
**wear**
261:21, 275:10,
275:13, 275:15,
276:6, 302:10,
305:18
**wearing**
263:4, 265:15,
265:19, 266:5,
266:12, 266:15,
266:19, 267:5,

268:12, 268:18,
270:18, 274:21,
276:10, 276:15,
276:17, 277:12,
277:13, 277:17,
277:18, 278:5,
278:13, 318:17,
318:20, 319:6,
323:11, 325:11
**week**
141:8, 141:9,
141:13, 236:1,
270:19, 283:12
**weekly**
152:7, 272:5,
272:9, 334:5,
334:12, 349:4
**weeks**
19:10, 112:1,
277:1, 401:10
**weighs**
260:10, 260:13
**well-trained**
226:21
**went**
199:7, 217:20,
259:19, 267:8,
315:12, 318:12,
324:6, 342:19
**weren't**
27:7, 259:6,
268:20, 268:21,
342:8, 350:12,
352:22, 353:7,
356:18
**western**
1:2, 9:6
**whatever**
35:20, 123:8,
156:10, 170:22,
171:4, 175:21,
186:18, 203:17,
219:5, 290:21,
295:20, 304:8,
313:8, 329:12,
348:3, 350:11
**when-did-you-sto-
p-beating-your-w-
ife**
220:17

**whereof**
409:12
**whether**
54:22, 61:10,
65:11, 65:19,
67:10, 82:13,
88:5, 91:13,
96:13, 100:14,
109:20, 119:1,
133:2, 145:11,
146:22, 147:13,
148:18, 149:2,
149:6, 150:8,
176:1, 183:14,
184:3, 184:8,
184:17, 186:13,
187:3, 211:1,
214:2, 214:11,
214:17, 218:4,
218:5, 218:6,
222:13, 224:16,
224:18, 225:17,
238:11, 242:14,
244:14, 244:16,
245:3, 249:16,
265:18, 274:1,
288:6, 316:18,
317:9, 341:11,
342:5, 346:7,
351:11, 355:10,
366:14, 366:19,
370:18, 372:1,
372:3, 378:19,
400:22
**whoever**
134:20, 157:19,
157:22, 286:6,
329:12
**whole**
65:6, 167:4,
179:20, 238:22,
292:6, 343:1,
345:3
**wholly**
229:17
**whoppers**
277:8
**wide**
120:9

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

174

widened
356:16
willful
117:21, 174:18
willfully
174:20, 175:6,
176:14
williams
229:21
willing
373:2
wing
74:4
wishes
99:19
withheld
10:18
within
73:15, 103:1,
103:13, 104:9,
109:3, 127:8,
129:16, 146:5,
150:8, 167:8,
167:10, 167:20,
183:20, 188:7,
236:18, 299:6,
327:16, 340:11,
361:20, 362:2,
362:17, 378:10,
378:11, 379:6,
386:13, 387:9,
387:16, 406:11
without
87:4, 111:12,
334:10
witness
4:2, 10:2,
10:3, 10:7,
10:22, 11:4,
11:22, 19:15,
50:5, 59:10,
59:11, 59:13,
79:20, 79:22,
80:9, 89:11,
89:18, 128:10,
129:13, 129:22,
132:3, 154:3,
154:6, 154:9,

164:15, 185:11,
221:5, 222:15,
308:22, 331:1,
332:4, 346:13,
347:22, 348:1,
348:4, 378:16,
404:22, 409:12
witnesses
274:12
won
228:10
wonderful
231:22
wondering
309:1, 354:19
woods
153:2
word
47:12, 128:16,
128:20, 150:14,
158:15, 218:1,
233:22, 263:1,
281:17, 281:19,
282:5
words
116:17, 161:12,
185:10, 216:12,
221:17, 290:10,
304:3, 322:4
work
30:8, 34:22,
38:21, 40:4,
45:14, 52:5,
53:6, 56:19,
57:3, 57:11,
66:20, 75:2,
75:4, 120:12,
120:13, 121:16,
124:18, 230:6,
274:12, 280:9,
295:17, 333:19,
335:3, 335:5,
345:19, 349:2,
383:10
worked
16:13, 16:14,
23:5, 23:7,
23:8, 27:14,

34:3, 39:10,
77:9, 77:15,
77:16, 119:12,
196:8, 229:19,
230:8, 345:5
working
15:16, 28:15,
41:11, 67:14,
73:13, 75:10,
104:14, 119:19,
124:13, 126:8,
244:8, 255:12,
256:3, 277:18,
318:16, 341:4,
342:11, 364:20
works
33:20, 45:9,
45:17, 71:15,
71:16, 71:19,
129:4, 195:20,
214:19, 230:11,
243:7, 253:16,
365:19
worn
261:5, 262:5
worried
245:6
worst
233:3
worth
136:7
would've
204:21, 284:18,
311:5, 351:21,
360:7, 369:20
wouldn't
34:2, 37:17,
45:8, 62:3,
65:7, 89:11,
102:7, 110:10,
112:7, 112:12,
132:22, 135:10,
138:18, 140:2,
144:8, 148:4,
160:9, 161:18,
161:19, 168:10,
197:17, 200:10,
204:20, 221:7,

221:8, 234:14,
251:5, 251:6,
251:12, 252:12,
252:13, 321:2,
322:3, 324:8,
325:14, 334:2,
340:5, 340:7,
349:5, 351:19,
366:17, 401:3
wrist
179:10, 260:20,
261:5, 261:16,
261:19, 324:22,
326:8
write
92:1, 99:12
writing
62:9, 172:2,
309:3, 310:7,
310:9, 339:21,
340:19, 340:22,
341:6, 353:10,
387:11
writings
304:7
written
14:6, 16:19,
16:22, 25:22,
149:15, 171:13,
276:1, 341:22,
358:6, 358:10,
378:7, 387:8
wrong
275:17, 345:2,
380:10, 394:14
wrote
55:22, 56:1,
56:9, 275:17,
338:13

**Y**

ya
76:22, 148:5,
221:19, 237:13,
241:4
yay
358:17, 359:6
year
21:18, 27:19,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020                    175

| | | | |
|---|---|---|---|
| 42:6, 97:7, 109:3, 146:1, 157:11, 162:9, 167:8, 167:9, 170:19, 195:15, 196:9, 202:14, 208:2, 234:14, 234:18, 237:4, 252:21, 263:4, 269:10, 276:8, 276:17, 314:9, 315:10, 338:14, 358:4, 359:8, 359:10, 360:21, 361:9, 366:6, 370:4, 389:2 | **Z** | **$8,788,000** 192:13 **$880** 305:1, 312:18, 329:20 | 000000297 7:20 000000318 7:22 000000327 7:22 000019658 8:5 000019661 8:5 |
| **years** 16:12, 18:13, 23:5, 27:15, 31:14, 42:3, 86:21, 97:13, 201:11, 217:1, 218:16, 218:17, 241:11, 241:12, 241:16, 249:13, 249:17, 252:6 | **zero** 271:20, 299:10, 299:16, 316:3 **zip** 10:8, 10:10, 10:12 | **0** | 0000330615 5:5 0000330617 5:5 0000330796 6:8 0000330810 6:8 0000330811 6:12 |
| | **$** | **00** 3:16 000000003 5:10 000000004 5:10 0000000073 6:19 000000015 5:14 000000017 5:14 000000018 5:18 000000020 5:18 000000031 5:22 000000043 5:22 000000079 6:19 000000103 6:22 000000106 6:22 000000144 7:5 000000147 7:5 000000189 7:11 000000284 7:14 000000285 7:14 000000287 7:17 000000294 7:17 000000296 7:20 | 0000330824 6:12 0000331027 6:16 0000331029 6:16 00066 1:8, 9:7 02115 182:11 0265071 4:20 0265091 4:20 0265126 4:22 0265150 4:22 0265155 5:3 0313254 409:20 0315022 6:4 0328814 7:8 0328871 7:8 |
| **yelling** 218:10 **yep** 41:8, 123:22, 287:7, 322:18 **yesterday** 42:19, 193:5, 249:19 **yesterday's** 195:12 **york** 52:18, 172:19 **young** 65:6 **younger** 201:12 **yourself** 126:12, 238:7, 292:18, 364:8, 364:21, 365:5, 367:14, 385:8, 393:7, 396:4 | **$1,005** 330:11 **$10** 332:7 **$1500** 241:14 **$17.22** 393:1 **$2,380** 312:16 **$20,000** 118:9, 118:10, 118:17 **$20,017.22** 393:4 **$21,434,950** 192:22 **$2500** 241:9 **$30,222,950** 191:5 **$375** 329:17 **$4,999** 240:20, 240:21 **$420** 304:18, 330:3 **$460** 304:21 **$5,000** 240:19, 241:2 **$675** 360:15 **$7,500** 312:13 **$7500** 305:20, 306:3, 306:4 | | |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER

Transcript of Erik Schneider

Conducted on February 20, 2020

176

**0331054**
5:8
**0331055**
5:8
**08**
331:10, 331:11

---

**1**

**1**
83:21, 154:9,
154:10, 154:13,
154:14
**1,769**
192:21, 265:11
**1.3**
173:10, 174:14,
175:19, 177:8,
180:2
**10**
3:16, 5:9,
7:12, 7:15,
54:3, 366:4,
369:16, 371:1,
374:14, 398:10,
399:2, 400:14,
402:20
**10,000**
241:5
**100**
266:4, 308:15
**1000**
3:7, 3:9, 3:16
**103**
46:4, 46:5,
46:7, 46:8
**11**
1:15, 5:4,
5:11, 9:9,
63:14, 63:15,
364:7, 364:11,
369:19, 370:1,
374:16, 374:20
**111**
46:2, 46:4,
46:8, 46:15,
74:1, 76:7,
76:16, 124:9
**113**
43:11

**115**
44:8, 46:4,
46:12, 68:8,
70:17, 76:16,
124:4
**1150**
3:18
**1175**
3:15
**12**
5:15, 7:10,
39:12, 50:19,
62:19, 62:21,
63:14, 63:15,
63:18, 69:5,
69:6, 69:8,
142:17, 150:17,
160:19, 161:5,
172:22, 173:7,
179:15, 184:1,
292:15, 327:21,
375:7, 375:11,
382:1
**120**
388:11
**125**
295:8
**13**
4:4, 5:19,
376:10, 376:14,
381:22
**14**
1:15, 6:3, 9:9,
22:7, 380:1,
380:5, 380:17,
380:19
**1400**
2:6, 9:11
**15**
6:5, 7:6, 7:9,
85:17, 88:2,
92:13, 92:19,
93:22, 94:12,
217:1, 366:7,
383:6, 383:16,
383:22, 385:12,
385:15, 386:9,
393:18, 395:17,

**395:22, 396:4,**
396:7, 397:1,
397:3, 397:17
**15,000**
241:6
**16**
6:9, 7:3, 94:2,
169:19, 172:1,
357:22, 383:6,
383:16, 384:1,
403:2
**169569**
409:17
**17**
6:13, 331:11,
331:14, 384:4,
384:8, 401:8,
401:17
**1765**
3:6
**1769**
266:10
**18**
1:8, 6:17, 9:7,
53:11, 92:13,
92:19, 93:20,
93:22, 94:2,
94:13, 95:16,
96:22, 128:1,
182:11, 348:4,
385:3, 385:7
**1801**
372:15
**182**
4:14
**188**
4:17
**19**
4:18, 6:17,
6:20, 18:7,
170:19, 385:7,
389:10, 389:14
**1996**
386:15, 388:10
**1:-cv**
182:11
**1st**
111:20, 111:22,

**313:19, 314:3,**
403:4

---

**2**

**2**
154:15, 154:18
**2,486**
166:8, 166:11,
168:14, 189:14,
189:18, 190:17,
191:3
**20**
1:14, 7:3, 9:8,
53:13, 53:19,
55:5, 55:6,
55:17, 56:2,
173:4, 241:16,
392:9, 392:13,
401:8, 401:17,
403:2
**200**
206:17
**2014**
39:15
**2015**
257:7
**2016**
5:4, 6:17, 7:3,
7:6, 7:9, 21:21,
22:8, 24:3,
338:14, 364:7,
364:11, 366:5,
366:16, 367:14,
370:1, 371:1,
374:21, 375:12,
376:15, 377:3,
379:13, 380:5,
380:22, 384:9,
384:14, 385:7,
385:12, 385:15,
389:16, 391:21,
392:14, 393:18,
395:2, 395:7,
395:17, 395:22,
396:4, 396:7,
397:1, 397:18,
403:2
**2017**
7:12, 7:15,

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020

177

| | | | |
|---|---|---|---|
| 18:14, 21:14, 22:1, 128:1, 257:14, 258:21, 276:1, 276:4, 303:15, 303:20, 310:4, 313:20, 314:3, 316:7, 317:20, 318:4, 320:18, 329:16, 330:2, 330:10, 338:15, 354:22, 370:17, 398:11, 398:16, 399:2, 399:11, 400:14, 400:19, 401:1, 401:8, 401:17, 401:18, 402:7, 402:8, 402:12, 403:4, 403:9, 403:20, 404:1, 404:2, 404:6, 404:10, 404:11 | 396:17, 396:21 | **265133** | 404:1, 404:11 |
| **2018** | **22102** | 318:4 | **30,222** |
| 52:19, 54:4, 54:10, 170:8, 171:7, 196:12, 257:7, 272:18, 274:22, 276:8, 277:12, 277:16, 278:6, 278:7, 278:12 | 3:8 | **265136** | 191:4 |
|  | **22801** | 323:21 | **300** |
|  | 2:7, 9:12 | **265139** | 206:21 |
|  | **23** | 321:5, 321:8 | **30361** |
|  | 7:12, 63:15, 63:18, 367:14, 376:15, 398:6, 398:10 | **265148** | 3:17 |
|  |  | 322:12, 322:17 | **31** |
|  | **239** | **268** | 69:6, 69:8, 150:17, 409:22 |
|  | 3:18 | 206:11, 206:12, 206:15, 206:18 | **319** |
|  | **24** | **27** | 193:10, 195:5 |
|  | 7:3, 7:15, 53:13, 55:7, 119:17, 250:4, 250:5, 255:15, 385:1, 392:14, 400:9, 400:12, 409:13 | 8:3, 403:16, 403:19 | **323** |
|  |  | **279** | 139:1, 198:19, 198:22, 311:6, 340:11, 377:15 |
|  |  | 4:19 | **326** |
|  |  | **28** | 5:3 |
|  | **2400** | 69:5, 69:6, 329:2, 329:16, 380:5, 380:22 | **328818** |
| **2019** | 225:10, 292:5, 292:6, 294:13 |  | 394:16 |
| 18:15, 21:8, 28:16, 85:7, 85:17, 88:3, 327:21, 406:18 | **241** | **28822** | **328822** |
|  | 83:21 | 394:22 | 395:4 |
|  | **24477** | **288366** | **328839** |
|  | 13:10 | 1:20 | 395:15 |
|  | **24482** | **29** | **328856** |
| **2020** | 43:12 | 384:9 | 395:20 |
| 1:14, 4:18, 9:8, 409:14 | **25** | **290** | **33** |
|  | 7:18, 384:13, 385:1, 401:4, 401:7, 404:2 | 378:5 | 204:16, 279:13, 340:11, 361:20, 362:2, 362:17 |
| **2023** |  | **297** |  |
| 409:22 | **2521** | 4:21 | **340** |
| **21** | 2:8 | | 111:3, 111:7, 111:12, 111:14, 111:15, 111:19, 112:4, 112:5, 112:11, 112:12, 112:18, 113:9, 114:6, 203:16, 236:7, 311:1, 311:20, 371:15 |
| 7:6, 393:14, 393:17 | **26** | **3** |  |
| **22** | 7:21, 272:18, 402:2, 402:5 | **30** |  |
| 7:9, 301:8, 302:6, 302:14, 330:1, 330:10, | **265077** | 154:9, 154:10, 204:18, 226:1, 241:11, 249:13, 249:17, 304:19, 318:6, 332:4, 338:6, 346:13, 346:14, 346:15, 347:18, 348:3, 348:6, 352:8, 357:22, 378:10, 378:22, 379:6, 384:22, 386:3, 387:6, 387:9, 387:16, 402:7, 402:8, 403:9, |  |
|  | 303:4 |  | **3636** |
|  | **265080** |  | 93:20 |
|  | 305:13 |  | **364** |
|  | **265082** |  | 5:4 |
|  | 306:13 |  | **3643** |
|  | **265130** |  | 93:22 |
|  | 315:22 |  | **3644** |
|  | **265131** |  | 94:2 |
|  | 317:19 |  |  |

CONFIDENTIAL- PURSUANT TO PROTECTIVE ORDER
Transcript of Erik Schneider
Conducted on February 20, 2020                                    178

**367**
5:6
**369**
5:9
**37**
250:5, 250:8
**374**
5:11
**375**
5:15
**376**
5:19
**38**
163:16, 163:17,
163:19, 177:16,
193:18, 196:12
**380**
6:3
**383**
6:5, 6:9
**384**
6:13
**385**
6:17
**389**
6:20
**391**
161:7, 161:16,
162:16, 163:6,
163:19, 166:2,
168:14, 190:13,
192:8, 194:15,
198:19, 199:16,
200:19, 206:8,
207:1
**392**
7:3
**393**
7:6
**396**
7:9
**398**
7:12
**3m**
252:19, 253:8,
257:6, 257:20,
258:13, 258:22,
259:1, 259:4,

259:9, 259:10,
259:19, 260:11,
260:14, 264:3,
264:15, 267:5,
268:16, 268:18,
269:4, 269:14,
269:21, 269:22,
270:2, 270:6,
318:8, 323:16,
324:2, 324:13,
324:18, 326:5
**3ms**
259:20
**3rd**
85:7, 389:16,
391:20

| **4** |

**4**
250:4, 250:5,
250:8
**40**
141:8, 141:13,
141:21
**400**
7:15
**401**
7:18
**402**
7:21
**403**
8:3
**404**
3:18
**408**
79:21, 80:2
**409**
1:21
**433**
2:8
**44**
194:12, 195:5,
195:7, 196:1,
196:18, 197:3,
197:5
**47**
405:4
**47.9**
186:19

**499,000**
241:1

| **5** |

**5,000**
241:5, 241:20,
241:22, 258:5
**50**
110:7, 154:15,
154:18, 176:12,
176:21, 178:2,
178:20, 204:17,
205:17
**500,000**
127:15
**52**
4:12, 408:20
**540**
2:8
**55**
154:13, 154:14,
241:12
**56**
13:9, 194:14,
194:15
**5:-cv--mfu**
1:8, 9:7
**5th**
398:16, 399:10,
400:7, 400:19,
403:12, 404:10

| **6** |

**6**
331:10, 331:11,
331:14
**60**
110:7, 275:3,
275:4, 276:10,
276:16, 277:10,
277:11, 278:5,
278:8, 278:10,
278:12
**615**
369:20
**66**
204:17

| **7** |

**7**
405:4, 408:20

**7.3**
93:20
**7.4**
93:22
**70**
186:22, 260:13,
275:4
**703**
3:9
**717**
192:12, 193:8,
194:11, 195:5,
195:22
**73**
176:12, 176:13,
176:22, 178:3,
178:20
**749**
3:9
**7500**
241:6

| **8** |

**800,000**
171:15
**83**
4:13

| **9** |

**90**
205:18