

# Transcript of David Sandoz

**Date:** March 5, 2020
**Case:** RLI Insurance Company -v- Nexus Services, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF VIRGINIA
 3             Harrisonburg Division
 4   ----------------------------X
 5   RLI INSURANCE COMPANY,        :
 6   Plaintiff,                    :
 7   - vs. -                       :  Case No.:
 8   NEXUS SERVICES, INC., et al., :  5:18-cv-00066-MFU
 9   Defendants.                   :
10   ----------------------------X
11
12
13      VIDEOTAPED DEPOSITION OF DAVID SANDOZ
14             East Peoria, Illinois
15             Thursday, March 5, 2020
16                  9:56 a.m.
17
18
19
20   Job No.:  290631
21   Pages:  1 - 355
22   Reported by:  Konni L. Stapf, RPR, CSR
```

**Page 2**

```
 1        Videotaped Deposition of DAVID SANDOZ
 2   held at the:
 3
 4
 5   EMBASSY SUITES BY HILTON
 6   EXECUTIVE BOARD ROOM
 7   100 Conference Center Drive
 8   East Peoria, Illinois  61611
 9   309.694.0200
10
11
12
13        Pursuant to notice, before Konni L.
14   Stapf, Registered Professional Reporter and
15   Certified Court Reporter in the states of Illinois,
16   Iowa, and Arizona.
17
18
19
20
21
22
```

**Page 3**

```
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       VIVIAN KATSANTONIS, ESQUIRE
 5       WATT, TIEDER, HOFFAR & FITZGERALD, LLP
 6       1765 Greensboro Station Place
 7       Suite 1000
 8       McLean, Virginia  22102
 9       703.749.1000
10
11   ON BEHALF OF THE DEFENDANTS:
12
13       JOHN M. SHOREMAN, ESQUIRE
14       MARIO WILLIAMS
15       MCFADDEN & SHOREMAN
16       1050 Connecticut Avenue, NW
17       Suite 1000
18       Washington, D.C. 20036
19       202.772.3188
20
21
22
```

**Page 4**

```
 1        A P P E A R A N C E S (Continued)
 2   ON BEHALF OF NONPARTY, DAVID SANDOZ:
 3
 4       JONATHAN LA PHILLIPS, ESQUIRE
 5       ATTORNEY AT LAW
 6       4541 North Prospect Road, Suite 300A
 7       Peoria Heights, IL  61616
 8       309.643.9016
 9       jon@jlaplaw.com
10
11   ALSO PRESENT:  Tim Coverstone, Videographer
12
13
14
15
16
17
18
19
20
21
22
```

Transcript of David Sandoz
Conducted on March 5, 2020

5

CONTENTS

1
2  EXAMINATION OF DAVID SANDOZ              PAGE
3  By Ms. Katsantonis            14, 342
4  By Mr. Shoreman               308
5       EXHIBITS
6  NUMBER   DESCRIPTION             PAGE
7  NO. 1   E-Mail from Rick Nagel to David    24
8       Sandoz, dated 5/1/15
9  NO. 2   E-mail chain. Top e-mail from      37
10      Travel Wizard to David Sandoz,
11      dated 5/18/15
12 NO. 3   E-mail from David Sandoz to RLI    43
13      staff, dated 6/5/15
14 NO. 4   E-mail chain. Top e-mail from      49
15      David Sandoz to Rick Nagel,
16      dated 6/11/15
17 NO. 5   E-mail chain. Top e-mail from      52
18      Mike Donovan to Rick Nagel,
19      dated 6/17/15
20 NO. 6   E-mail chain. Top e-mail from      54
21      Rick Nagel to Bart Davis,
22      dated 6/21/15

7

1       EXHIBITS (Continued)
2  NUMBER   DESCRIPTION             PAGE
3  NO. 15  E-mail from Dave Sandoz to Rick    96
4       Nagel, dated 12/19/15
5  NO. 16  Commercial surety general         105
6       indemnity agreement and collateral
7       Agreement and receipt, dated 1/20/16
8  NO. 17  E-mail from David Sandoz to        107
9       Mike Donovan, dated 1/20/16
10 NO. 18  Commercial surety general         110
11      indemnity agreement and collateral
12      agreement and receipt, dated 2/9/16
13 NO. 19  E-mail from David Sandoz to Mike   110
14      Donovan, dated 2/9/16
15 NO. 20  E-mail chain. Top e-mail from     111
16      Mike Donovan to David Sandoz and
17      Rick Nagel, dated 2/10/16
18 NO. 21  E-mail chain. Top e-mail from     118
19      Mike Donovan to Marco LiMandri,
20      dated 2/10/16
21
22

6

1       EXHIBITS (Continued)
2  NUMBER   DESCRIPTION             PAGE
3  NO. 7   E-mail chain. Top e-mail from      64
4       David Sandoz to Ira Sussman and
5       Kirk Austin, dated 6/26/15
6  NO. 8   E-mail chain. Top e-mail from      73
7       David Sandoz to Rick Nagel,
8       dated 6/26/15
9  NO. 9   Immigration bond form             79
10 NO. 10  E-mail chain. Top e-mail from      82
11      David Sandoz to Rick Nagel,
12      dated 6/26/16
13 NO. 11  E-mail chain. Top e-mail from      86
14      Rick Nagel to David Sandoz,
15      dated 8/21/15
16 NO. 12  E-mail from David Sandoz to        88
17      Chris Cornelius, dated 11/6/15
18 NO. 13  E-mail from Dena Mather to Bart    93
19      Davis, dated 11/9/15
20 NO. 14  E-mail chain. Top e-mail from      94
21      David Sandoz to Rick Nagel,
22      dated 11/25/15

8

1       EXHIBITS (Continued)
2  NUMBER   DESCRIPTION             PAGE
3  NO. 22  E-mail chain. Top e-mail from     121
4       David Sandoz to Greg Chilson,
5       dated 1/28/16
6  NO. 23  E-mail chain. Top e-mail from     131
7       David Sandoz to Rick Nagel,
8       dated 1/29/16
9  NO. 24  E-mail chain. Top e-mail from     136
10      David Sandoz to Erik Schneider,
11      dated 2/11/16
12 NO. 25  E-mail from Bonnie Heitman to     143
13      Laura Piispanen, dated 2/11/16
14 NO. 26  E-mail from David Sandoz to       143
15      Mike Donovan and Rick Nagel,
16      dated 2/15/16
17 NO. 27  E-mail from David Sandoz to Erik  145
18      Schneider, dated 3/23/16
19 NO. 28  E-mail chain. Top e-mail from     146
20      David Sandoz to Rick Nagel,
21      dated 3/28/16
22

**9**

E X H I B I T S (Continued)

NUMBER   DESCRIPTION                                      PAGE

NO. 29   E-mail chain.  Top e-mail from          156
         David Sandoz to Mike Donovan,
         dated 6/9/16

NO. 30   E-mail chain.  Top e-mail from          160
         David Sandoz to Greg Chilson,
         dated 4/18/16

NO. 31   E-mail chain.  Top e-mail from          161
         David Sandoz to Marco LiMandri,
         dated 5/10/16

NO. 32   E-mail from David Sandoz to Erik        178
         Schneider, dated 7/14/16

NO. 33   E-mail from Kellie Bane to Marco        179
         LiMandri, dated 7/14/16

NO. 34   E-mail from David Sandoz to Mike        180
         Donovan, dated 8/22/16

NO. 35   E-mail from Laura Piispanen to          182
         David Sandoz, dated 8/30/16

NO. 36   E-mail from David Sandoz to Mike        183
         Donovan, dated 9/10/16

**10**

E X H I B I T S (Continued)

NUMBER   DESCRIPTION                                      PAGE

NO. 37   E-mail from David Sandoz to Mike        185
         Donovan, dated 9/13/16

NO. 38   E-mail from David Sandoz to Mike        186
         Donovan, dated 9/28/16

NO. 39   E-mail from David Sandoz to Greg        190
         Chilson, dated 9/29/16

NO. 40   E-mail chain.  Top e-mail from          192
         David Sandoz to Greg Chilson,
         dated 9/30/16

NO. 41   E-mail from David Sandoz to Marco       194
         LiMandri, dated 10/19/16

NO. 42   E-mail from David Sandoz to Tracy       195
         Tucker, dated 10/26/16

NO. 43   E-mail from Greg Chilson to David       196
         Sandoz, dated 11/7/16

NO. 44   E-mail chain.  Top e-mail from          197
         David Sandoz to Mike Donovan,
         dated 11/9/16

NO. 45   E-mail from David Sandoz to Mike        198
         Donovan, dated 12/7/16

**11**

E X H I B I T S (Continued)

NUMBER   DESCRIPTION                                      PAGE

NO. 46   E-mail from David Sandoz to Mike        215
         Donovan, dated 12/1/16

NO. 47   E-mail chain.  Top e-mail from          218
         David Sandoz to Laura Piispanen,
         dated 12/21/16

NO. 48   E-mail from Erik Schneider to           220
         Laura Piispanen, dated 12/22/16

NO. 49   E-mail from David Sandoz to Erik        222
         Schneider, dated 12/29/16

NO. 50   E-mail from David Sandoz to Mike        227
         Donovan, dated 3/8/17

NO. 51   Letter from Ira Sussman to Mike         228
         Donovan, dated 3/3/17

NO. 52   E-mail from David Sandoz to Mike        232
         Donovan, dated 11/16/16

NO. 53   E-mail from David Sandoz to Mike        253
         Donovan, dated 1/3/19

NO. 54   E-mail from Mike Donovan to David       258
         Sandoz, dated 3/22/18

**12**

E X H I B I T S (Continued)

NUMBER   DESCRIPTION                                      PAGE

NO. 55   Declaration of David Sandoz,            266
         dated 11/26/18

NO. 56   Declaration of David Sandoz,            280
         dated 2/24/20

NO. 57   Agreement of Indemnity                  316

Transcript of David Sandoz
Conducted on March 5, 2020

13

1       THE VIDEOGRAPHER:  Here begins tape
2 number one in the videotaped deposition of David
3 Sandoz in the matter of RLI Insurance Company
4 versus Nexus Services, Incorporated, et al., in the
5 U.S. District Court for the Western District of
6 Virginia, Harrisonburg Division, Case No.
7 5:18-CV-00066-MFU.
8       Today's date is March 5, 2020, and the
9 time indicated on the video screen is 9:56 a.m.
10 Our videographer today, my name is Tim Coverstone
11 representing Planet Depos.  This video deposition
12 is taking place at 100 Conference Center Drive in
13 East Peoria, Illinois.
14       Would counsel, please, voice identify
15 themselves and state whom they represent.
16       MS. KATSANTONIS:  Vivian Katsantonis on
17 behalf of RLI Insurance Company.
18       MR. SHOREMAN:  John Shoreman on behalf
19 of defendants.
20       MR. PHILLIPS:  Jonathan Phillips on
21 behalf of nonparty deponent, David Sandoz.
22       THE VIDEOGRAPHER:  And our court

14

1 reporter today is Konni Stapf representing Planet
2 Depos.
3       Would the reporter, please, swear in
4 our witness.
5
6       DAVID SANDOZ,
7 a witness herein, having been first duly sworn to
8 speak the truth and nothing but the truth, was
9 examined and testified as follows:
10
11       EXAMINATION
12 BY MS. KATSANTONIS:
13   Q.   Good morning, Mr. Sandoz.
14   A.   Morning.
15   Q.   Thank you for appearing for your
16 deposition.  Have you been deposed before?
17   A.   Yes.
18   Q.   Okay.  So just -- I'm just going to --
19 you know, just ground rules.  I'm going to ask a
20 series of questions.  I'll try to complete my
21 question before you answer it.  And if I say
22 something inartfully, you know, please feel free to

15

1 ask me to clarify or restate the question.  And if
2 you want to take any breaks, that's fine.
3       The other thing is the court
4 reporter -- I know I tend to sometimes just nod or
5 say -- you know, instead of saying yes or no.  So
6 please try to state full answers, yes, no so that
7 the court reporter can pick that up.  Okay?
8   A.   Okay.
9   Q.   And is there any reason why you can't
10 testify fully today?
11   A.   No.
12   Q.   Okay.  Okay.  So you understand we're
13 here with regard to the litigation between RLI and
14 Nexus Services and Libre by Nexus and Homes by
15 Nexus?
16   A.   Yes.
17   Q.   And if I refer -- if I just say Nexus,
18 for purposes of this deposition, I'm just going to
19 be referring to all three of the entities.  Okay?
20 And if we need to parse it out, I'll do so.
21       Is that all right with you if I just
22 say Nexus?

16

1   A.   Yes.
2   Q.   And if there is any other
3 clarifications, just let me know.
4   A.   Okay.
5   Q.   Thank you.  All right.  So I just want
6 to get to some very general high level background.
7 I know you were with RLI for 25 years; is that
8 correct?
9   A.   Approximately.
10   Q.   Okay.  When did you start with RLI?
11   A.   August 1992.
12   Q.   Okay.  And as far as your background,
13 what was your -- what degrees do you hold?
14   A.   A degree in mathematics.
15   Q.   Okay.  All right.  Any other
16 certifications or professional qualifications?
17   A.   No.
18   Q.   And what year did you obtain your
19 degree?
20   A.   199 -- 1977, excuse me.
21   Q.   Okay.  And in between, just generally,
22 '77 and '92, before you started at RLI, what kind

Transcript of David Sandoz
Conducted on March 5, 2020

17

1 of work did you do?
2    **A.    I was in the surety business, in**
3 **miscellaneous sureties.**
4    Q.    All right.  And then in -- from 1992
5 until 2000 -- end of 2016 you worked at RLI, right?
6    **A.    Correct.**
7    Q.    Okay.  Did you have various roles and
8 responsibilities?
9    **A.    Yes.**
10    Q.    Okay.  And in the -- let's just say,
11 what was your title in 2016?
12    **A.    I believe it was vice president of**
13 **miscellaneous surety at that point.**
14    Q.    Okay.  All right.  And as vice
15 president of miscellaneous surety, what was your
16 role and responsibility?
17    **A.    I had responsibility for overall**
18 **profitability of that particular segment.**
19    Q.    And so does that mean you were
20 functioning in an underwriting capacity or
21 management of underwriters or what was the
22 capacity?

18

1    **A.    Both.**
2    Q.    And for how many years were you vice
3 president of miscellaneous surety, roughly?
4    **A.    How many years of?**
5    Q.    Were you in that position, vice
6 president of miscellaneous surety?
7    **A.    At RLI?**
8    Q.    Yes.
9    **A.    For the full time that I was there I**
10 **was involved in miscellaneous surety.**
11    Q.    All right.  And just generally
12 miscellaneous surety is -- how would you define
13 that?
14    **A.    It's a lot of small transactional type**
15 **business.  So more for individuals requiring bonds**
16 **or small businesses.**
17    Q.    So what would be the -- prior to Nexus,
18 what would be the range of the size bonds that you
19 dealt with?
20    **A.    In miscellaneous surety or in other**
21 **segments as well?**
22    Q.    Well, I think that you said that you

19

1 were only in miscellaneous surety at RLI.
2    **A.    No, I was not.  I said that I was in**
3 **miscellaneous surety for the full years that I was**
4 **there, but I also was involved in other segments of**
5 **surety for a period of time.**
6    Q.    Okay.  I'm sorry.  I misunderstood
7 that.
8        First, let's do miscellaneous surety.
9 In miscellaneous surety, what was the range size of
10 the bonds that you were dealing with, generally?
11    **A.    Typically, they were bonds up to maybe**
12 **$100,000, but we underwrote bonds larger than that.**
13    Q.    Okay.  And what was the other divisions
14 you said that you were involved in, other than
15 miscellaneous surety?
16    **A.    Contract surety.**
17    Q.    And how long were you doing contract
18 surety work?
19    **A.    I would have to estimate that.**
20    Q.    I'm not holding you to specifics.  I'm
21 just asking for estimates.
22    **A.    Approximately, from 1996 or '7 through,**

20

1 maybe, 2013 or 2014.
2    Q.    Okay.  And then what kind of contract
3 bonds were you dealing with; were they all
4 commercial bonds or construction bonds?
5    **A.    We did just a variety of construction**
6 **bonds.**
7    Q.    Okay.
8    **A.    Both commercial and some private.**
9    Q.    Okay.  So let's -- and in your role in
10 these bonding programs for all this time period,
11 just as a general, kind of, I just want to
12 understand the procedure.
13        So it was part of your responsibility
14 to, for lack of a better word, get new business?
15    **A.    Yes.**
16    Q.    And so in -- what was your general
17 process in getting new businesses?  I mean, as far
18 as -- if you were -- and I don't mean going to
19 identify clients.  Once you identified a client,
20 what were the kinds of things that you did to
21 determine whether to write a bond?
22    **A.    Most of what I did was in the**

Transcript of David Sandoz
Conducted on March 5, 2020

21

1  management oversight, so there were underwriters
2  that typically worked with the insurance agents and
3  the insurance agent's clients.
4      Q.    Okay.  And so is -- I'm just trying to
5  get your, what I think is your familiarity with --
6  as part of the underwriting process, is it true
7  that you would do things like, you know, review the
8  financials of a company and have them sign standard
9  indemnity agreements?
10     A.    Yes, for a portion of the business that
11 we wrote, yes.
12     Q.    So what do you mean for a portion?
13 There is another portion that you didn't look at
14 their financials or didn't get them to sign
15 indemnity agreements?
16     A.    Correct.
17     Q.    What portion would that be?
18     A.    Well, I can give you an example, like a
19 notary bond.
20     Q.    Okay.  That's great.  All right.  But
21 typically with contract and construction and some
22 of these other type of miscellaneous bonds, you

22

1  would certainly -- you were very familiar with
2  indemnity agreements.  Was that something that was
3  commonly required in order to issue bonds?
4      A.    For some types of bonds, yes.
5      Q.    For the majority of bonds?
6      A.    No, I can't answer that question.  I
7  can't give you an estimate of how many bonds --
8      Q.    I'm just trying to understand what are
9  the other categories that -- maybe it's my own
10 ignorance.  I deal mostly in construction
11 contracts.
12        So, you know, I'm just trying to figure
13 out what are some of the other areas.  You said
14 notary.  Is there anything else like that?
15     A.    Well, like, small municipal license and
16 permit bonds.  They were just underwritten without
17 much underwriting.
18        (Mr. Williams entered the deposition
19 room.)
20 BY MS. KATSANTONIS:
21     Q.    And so how -- with regard to Nexus, how
22 was your first introduction to Nexus, do you

23

1  recall?
2      A.    The general counsel of RLI apparently
3  had a phone call with -- or was dealing with a law
4  firm outside of RLI and that law firm -- somehow
5  the discussion must have led to that he was in --
6  that law firm was involved in some way with Nexus
7  and that general counsel at RLI asked if I would be
8  interested in considering that -- considering to
9  write immigration bonds and asked if I would be
10 willing to call that law firm and/or Nexus.  I
11 forget what -- I've forgotten.
12     Q.    Right.  And so you had a call with
13 Nexus, correct, to the best of your recollection,
14 about starting?
15     A.    Yes.
16     Q.    Right.  And -- and when you spoke with
17 Nexus, did you have an understanding as to who was
18 the surety issuing immigration bonds up until that
19 time before your involvement?
20     A.    You know, I don't recall.
21     Q.    Okay.  Do you know whether -- if you
22 don't recall, that's fine, do you know whether it

24

1  was IFIC?
2      A.    No, I don't.
3      Q.    Okay.  And I'm going to show you --
4        (Deposition Exhibit 1 marked
5          for identification.)
6        MS. KATSANTONIS:  I'm going to mark as
7  Exhibit 1.  I'm going to shift gears here.
8        MR. PHILLIPS:  Vivian, are you going to
9  want this back or can I mark this for him?
10       MS. KATSANTONIS:  No, you can have it.
11 BY MS. KATSANTONIS:
12     Q.    So Exhibit 1 is an e-mail from Rick
13 Nagel of Nexus to you, copying Mr. Donovan and
14 others, and it says, the following document is a
15 synopsis of our conference call including next
16 steps.
17        Do you recall this e-mail?
18     A.    No, I don't.
19     Q.    But to the best of your knowledge,
20 it's -- you don't have any reason to doubt the
21 authenticity of the document?
22     A.    No.

Transcript of David Sandoz
Conducted on March 5, 2020

---

**25**

1    Q.    Okay.  So this is a recap of
2  conversation and it's -- a memo at the bottom says,
3  prepared by Rick Nagel and approved by Mr. Donovan.
4    Do you see that?
5    **A.    Yes.**
6    Q.    Okay.  So the description of the call
7  talks about it's a second contact between Nexus and
8  RLI for the purpose of discussing Nexus programs
9  and products.
10    So generally, to the best of your
11  knowledge, do you recall having a conversation
12  where you were trying to learn about Nexus's
13  business in order to evaluate whether to issue
14  bonds?
15    **A.    I did have -- yeah, I did have**
16  **discussions with Nexus, correct.**
17    Q.    In an effort to evaluate their business
18  to make a determination whether to issue bonds?
19    **A.    Yes.**
20    Q.    Okay.  And so it says here in the
21  second paragraph that Mr. Donovan answered many
22  questions about the business structure and program

---

**26**

1  performance and provided information related to the
2  program's success.
3    And then it says, Mr. Donovan confirmed
4  that the program has, approximately, 2,174
5  participants.
6    Do you recall that?
7    **A.    No.**
8    Q.    But you have no reason to think that's
9  not accurate, correct, at this time?
10    **A.    Correct.**
11    Q.    And then it says, Mr. Donovan confirmed
12  that the program has a success rate (defined as
13  compelling respondent to appear in immigration
14  court) of 99.7 percent.
15    Do you recall that?
16    **A.    No.**
17    Q.    Okay.  You don't recall Nexus advising
18  you that their success rate was extremely low -- I
19  mean, extremely high success rate of having
20  immigrants appear in court?
21    **A.    I don't remember specifics about it.**
22  **But, yeah, if it was -- if it was an enormous**

---

**27**

1  **number of folks that didn't show up to their court**
2  **hearing, then I would have had a different opinion**
3  **about the program.**
4    Q.    Right.  But you recall generally that
5  they were -- Nexus was touting to you what
6  a -- that they had a much better rate than anybody
7  else because of the uniqueness of their program and
8  their services, right?
9    **A.    I believe so.**
10    Q.    And so here they define the success
11  rate as compelling a respondent to appear in
12  immigration court.
13    Do you see that?
14    **A.    In the parenthesis?**
15    Q.    Yes.
16    **A.    Yes.**
17    Q.    Right.  And is that consistent with
18  your understanding of how the bonds worked, if an
19  immigrant made it to his or her appearances, then
20  the liability could be removed and the bond would
21  be canceled?
22    **A.    You mean the full process?**

---

**28**

1    Q.    Yes.
2    **A.    Yes.  ICE has to release the immigrant**
3  **before the bond is terminated.**
4    Q.    Right.  But that -- you understood,
5  like, the bond obligation is for the immigrant to
6  appear when ICE asks them to appear, basically,
7  right, when they have to appear in court or be
8  delivered.
9    Did you understand that generally?
10    **A.    Yes.**
11    Q.    And so, you know, I guess that's what I
12  was just trying to confirm.  So Mr. Donovan says
13  the success rate is based on compelling respondents
14  to appear in immigration court, right?
15    **A.    Well, that's what the document says,**
16  **yes.**
17    Q.    Okay.  And that's consistent with your
18  understanding?
19    **A.    I believe so.**
20    Q.    Okay.  And then it says, Mr. Donovan
21  confirmed that over 25 percent -- 20 percent,
22  excuse me, of the bonds posted have been canceled,

---

Transcript of David Sandoz
Conducted on March 5, 2020

29

1 and in parenthesis, liability has been removed, and
2 that, approximately, 10 percent more are pending
3 confirmation.
4       So I guess, again, that's what you were
5 saying, right?  That if a bond is canceled, that
6 means that the surety liability has been removed,
7 there's no more exposure under the bond; is that
8 correct?
9     A.   Yes.
10    Q.   Okay.  All right.  In the second
11 paragraph there is a discussion about -- there is
12 some conversation about up front cash or letter of
13 credit.
14       Do you see that?
15    A.   The second paragraph --
16    Q.   Uh-huh.
17    A.   -- or the third?
18    Q.   I'm sorry.  You're right.  The third.
19 The one starting with Mr. Sandoz indicated.
20    A.   All right.
21    Q.   Okay.  Was it -- do you recall a
22 discussion about Nexus being required to post

30

1 collateral?
2     A.   Not the specifics.
3     Q.   Right.  But, generally, you recall that
4 RLI requested Nexus to post collateral, right?
5     A.   I believe I asked them to provide some
6 collateral until I understood the program better
7 and knew that it was functioning the way that it
8 was described.
9     Q.   Okay.  And is collateral something that
10 is typically required in bond situations in order
11 to protect RLI from potential exposure on its
12 bonds?
13    A.   In my area, collateral was very rare.
14    Q.   Okay.  But in -- I mean, this is one of
15 your first discussions with Nexus.  So in this
16 particular bond program, you immediately determined
17 that collateral would be necessary, right?
18    A.   I just asked for, and I don't remember
19 the -- all the specifics, but I asked them to
20 provide some collateral until I got comfortable
21 with the program because there was a lot of bonds
22 and not just a small number of bonds.

31

1     Q.   Right.  So in general I'm just trying
2 to understand, I mean, I think -- again, and I
3 apologize, because most of my experience is
4 construction, so sometimes that's where I think,
5 you know, based on my experience.  So I'm just
6 trying to understand here.
7       So collateral in general, as I
8 understand it, and you can correct me if I'm wrong,
9 and then I wonder if that's what you were thinking
10 for here, is posted so that -- to protect the
11 surety from their potential exposure on bonds they
12 are issuing or going to issue; is that right?
13    A.   In some cases, yes.
14    Q.   Okay.  And in this case would that be
15 why you wanted collateral?
16    A.   As explained, I just wanted to get a
17 little bit of collateral to make sure that -- that
18 there were some protection until I understood the
19 program better and it was working the way that I
20 thought it should work.
21    Q.   Right.  And I guess where I'm trying to
22 ask, and I know I think I'm being a little inartful

32

1 with it.  When you asked for collateral in advance,
2 it's for potential or future exposure, right?  Does
3 that make sense?
4       MR. WILLIAMS:  What do you mean by
5 potential exposure?  Are you asking -- I don't know
6 what you mean by potential exposure?
7 BY MS. KATSANTONIS:
8     Q.   Well, when you're asking for collateral
9 up front, you haven't -- you haven't incurred any
10 liability yet, right?
11    A.   At the time that I -- yes, what is the
12 date?  This is 2015.  Yes.
13    Q.   So you are asking for collateral to
14 protect against potential liability in the future
15 based on your exposure; is that right?
16    A.   Well, this -- in this instance it would
17 give me leverage.  If the program wasn't working,
18 then I had leverage, and I had -- so I did have
19 some collateral that they would eventually want
20 returned.  So it was for leverage.
21    Q.   And security so that if things didn't
22 go well and RLI would be required in the future to

Transcript of David Sandoz
Conducted on March 5, 2020

**33**

1 pay on a bond or something, you'd have some cash
2 available; is that right?
3    **A.    It could be used for that, yes.**
4    Q.    Right.  All right.  And then under next
5 steps, Nexus invited RLI to come to its campus to
6 observe its operations, meet our staff, and view
7 the technology that is being utilized to ensure we
8 are providing for the various needs of our clients
9 while ensuring the utmost attention is given to
10 mitigating our risk.
11        Do you see that?
12    **A.    Yes.**
13    Q.    And what was your understanding of the
14 technology that was being utilized by Nexus to
15 ensure they were providing for the various needs of
16 their clients?
17    **A.    At that time, I only remember the GPS**
18 **monitoring.**
19    Q.    Right.  And your understanding was that
20 RLI used GPS monitoring on the program participants
21 to ensure they complied with their bond obligations
22 to appear in court, those kind of things?

**34**

1    **A.    RLI didn't use any technology.**
2    Q.    I mean, I'm sorry.  I must have
3 misspoke.  I do that all the time.
4        I'm saying your understanding was that
5 Nexus was using the GPS system on its program
6 participants to ensure that they would make their
7 appearances in court; is that correct?
8    **A.    That was one tool they used, yes.**
9        MR. WILLIAMS:  Are you treating him as
10 a hostile witness?
11        MS. KATSANTONIS:  No.
12        MR. WILLIAMS:  Because you keep asking
13 leading questions.  And the way depositions work is
14 you are supposed to do the same way as in court.
15        So if he's not a hostile witness,
16 you've got to stop saying your understanding is
17 correct.  That's a leading question.
18        MS. KATSANTONIS:  Mr. Williams, I think
19 that's an improper --
20        MR. WILLIAMS:  It's completely proper.
21 That's what the rule says.
22        MS. KATSANTONIS:  We're not in court.

**35**

1        MR. WILLIAMS:  No, the rule says that.
2 Rule 30 to depositions say that.
3        MS. KATSANTONIS:  Our --
4        MR. WILLIAMS:  Rule 45 too.
5        MS. KATSANTONIS:  Mr. Williams, our
6 deposition is -- we're having fine communication.
7 I'm just trying to -- so that we can --
8        MR. WILLIAMS:  I just want to put that
9 on the record.  I just want to put that on record
10 because that's not what the rule allows for.
11        MS. KATSANTONIS:  This is a third-party
12 witness.
13        MR. WILLIAMS:  That point being.
14        MS. KATSANTONIS:  I'm not going to
15 argue with you and waste my time on the record.
16        MR. WILLIAMS:  All right.
17 BY MS. KATSANTONIS:
18    Q.    Anyway, with regard to -- did you
19 consider that -- that the GPS monitoring was an
20 important factor to mitigating risk?
21    **A.    Yes.**
22    Q.    And then you did, in fact, conduct a

**36**

1 site visit at Verona, right?
2        Do you recall that?
3    **A.    I have, yes, I've been to Verona, but I**
4 **don't know when the dates were or anything of that**
5 **nature.**
6    Q.    I have e-mails, if you want to see it,
7 and I have your travel itinerary.  You went on
8 June 3, 2015.
9        Do you want to see that?
10    **A.    No, I really don't.**
11        MR. PHILLIPS:  I would.
12        MS. KATSANTONIS:  Do you want to see
13 it?
14        MR. PHILLIPS:  Yes.
15        MR. WILLIAMS:  And I do want to read
16 this on the record, Rule 30.  The examination and
17 cross examination of deponent proceed as we would
18 at trial.
19        MS. KATSANTONIS:  That's right.
20        MR. WILLIAMS:  So it doesn't matter
21 that he's a nonparty deponent.  He's a deponent.
22 And you're asking cross examination and leading

Transcript of David Sandoz
Conducted on March 5, 2020

37

1  questions and that's not how --
2        MS. KATSANTONIS:  Mr. Williams, if you
3  want me to say that I'll treat him as a hostile
4  witness, I will.  But I'm not trying -- I'm trying
5  to have a pleasant discussion with Mr. Sandoz and
6  get through his deposition.
7        I'm going to mark this so you have a
8  copy, since your counsel asked for it.  I'm just
9  going to make sure it's on the record.
10       (Deposition Exhibit 2 marked
11         for identification.)
12 BY MS. KATSANTONIS:
13   Q.    And so there are previous e-mails with
14 you, Mr. Nagel -- was Mr. Nagel your primary
15 contact?
16       MR. PHILLIPS:  I'm sorry.  I would just
17 like a moment to actually review this.
18       MS. KATSANTONIS:  Sure.  No problem.
19 If you want, counsel, there are previous e-mails, I
20 just want to try to make the record go quicker,
21 where Mr. Sandoz is writing to Nexus saying --
22 talking about his plans to come out to the

38

1  headquarters to see how your operations work.
2        MR. PHILLIPS:  Understood.
3        (Mr. Williams left the deposition
4  room.)
5        MR. PHILLIPS:  I've had a chance to
6  review it.
7  BY MS. KATSANTONIS:
8    Q.    I guess you say you don't recall the
9  date, obviously, but you recall that you certainly
10 went out to Verona to witness and review Nexus's
11 operation, correct?
12   A.    Yes.
13   Q.    And do you -- and our records show that
14 it was June 3 or 4, 2015.  Do you -- do you recall
15 generally what did you review and, you know, what
16 you observed and what were the discussions?
17       MR. PHILLIPS:  I'm going to object to
18 the question because I'm -- not only compound, but
19 I can't tell whether, I'm actually looking over the
20 court reporter's shoulder here, whether you're
21 asking whether he recalls on June 4 or 3 what
22 occurred or that -- because he said he doesn't know

39

1  when he was there.  Or if you're asking when he's
2  been there at some time, which he has said, what
3  happened.
4        I want to make sure words aren't being
5  put in my client's mouth because if he remembers
6  something later, I don't want him to get in trouble
7  for saying it here.
8  BY MS. KATSANTONIS:
9    Q.    No, no.  I'm just trying to get the
10 best of your recollection, honestly.
11       Well, for purposes of these questions
12 right now, prior to RLI issuing any bonds, you
13 traveled to Verona to review Nexus's operations,
14 right?
15   A.    Yes.
16   Q.    Okay.  So -- and, you know, I will say
17 our records show at least two visits.  Is it true
18 that you don't recall or you can't recall the
19 difference in one visit versus the next?
20   A.    Yes, that would be true.
21   Q.    So I'm just trying to understand
22 what -- during the visit or visits generally your

40

1  recollection of what you reviewed and who attended
2  those meetings?
3    A.    Oh, gosh, I would have to guess at
4  that.
5    Q.    Okay.  Well, you know, you definitely
6  recall meeting in person prior to issuing bonds?
7    A.    Yes.
8    Q.    Mr. Donovan and Mr. Moore?
9    A.    I know Mr. Donovan and Rick was
10 probably in the meeting, but I don't remember who
11 all attended the meetings.  I'm sorry.
12   Q.    No, that's okay.  And just generally
13 did you just talk about the program and, you know,
14 Mr. Donovan or Mr. Nagel gave you information about
15 the program to help you understand it?
16       MR. PHILLIPS:  I'm going to object.
17 I'm not trying to make any argument, but I do
18 believe these are leading questions.
19       If you want to ask him what do you
20 remember about the meetings, I'm sure he'll tell
21 you.  But you're putting a lot of words in his
22 mouth.

Transcript of David Sandoz
Conducted on March 5, 2020

11 (41 to 44)

41

1          MS. KATSANTONIS: I'm honestly just
2 trying to help him along in the sense that he
3 doesn't remember specifics.
4 BY MS. KATSANTONIS:
5     Q.    So I'm just trying to say, you can
6 answer generally what you generally remember, like,
7 did they tell you about their program; did you --
8 you know, those kinds of things?
9     A.    Yeah, if you have specific questions,
10 maybe that would help me.
11    Q.    Well, did Nexus explain to you how
12 their program works?
13    A.    I believe so.
14    Q.    Okay.  And what do you recall about
15 your understanding of how the program worked?
16    A.    Well, I believe they -- do you mean
17 from the start of the process?
18    Q.    Yeah.  Again, I mean, how did you
19 understand that, you know, that they had a
20 successful program?  What are the things they told
21 you about their operations?
22          We talked -- one of the things that you

42

1 talked about was GPS.  They told you that they use
2 GPS monitoring on all the immigrants who were
3 program participants, right?
4     A.    Uh-huh.
5     Q.    I'm sorry.  Can you -- you have to say
6 yes for the record.
7     A.    Yes.  I'm sorry.
8     Q.    And then, you know, did they advise you
9 about any other services they provided?  In other
10 words, like that they had case workers in the field
11 who tracked the immigrants, those kind of things?
12    A.    Yes.
13          (Mr. Williams entered the deposition
14 room.)
15 BY MS. KATSANTONIS:
16    Q.    And did they show you their call center
17 and show you we have a call center that --
18          (Mr. Williams left the deposition
19 room.)
20    A.    I believe so.  I don't know which
21 meeting but yes, I've seen the call center.
22 BY MS. KATSANTONIS:

43

1     Q.    Right.  And did they show you the GPS
2 tracking monitor that they use and advise you that
3 they had their employees wear them to see how it
4 feels, that kind of thing as well?
5     A.    I seen the GPS attachment, yes, or
6 whatever it's called.
7     Q.    Right.  And at those meetings did you
8 talk about Nexus's financial condition?
9     A.    At some point we did.  I don't know if
10 it was out there or through the mail or how -- I
11 don't know -- I don't know if we discussed the
12 financials out there or if it was done through the
13 mail.
14    Q.    Right.
15    A.    Or phone calls.
16    Q.    And I apologize because if this was in
17 the record right now, it would help.
18          (Deposition Exhibit 3 marked
19              for identification.)
20 BY MS. KATSANTONIS:
21    Q.    So this is an e-mail, I've handed you
22 Exhibit 3 dated June 5, 2015, from you.

44

1          Who were the three people that you were
2 sending this to?
3     A.    They are internal staff at RLI in the
4 surety area.
5     Q.    Okay.  So in this -- to the --
6          MR. PHILLIPS: I'm sorry.  If I can
7 just have a moment to review it.
8          MS. KATSANTONIS: Sure.
9          MR. PHILLIPS: I apologize, I'm sure
10 you guys are familiar with the documents, but I'm a
11 third party.  The only other -- I guess while I'm
12 taking a quick look at this, I notice one of these
13 is subject to a protective order.  If someone needs
14 me or Mr. Sandoz to sign, I think it was the first
15 one, confidential, do not dissimilate.
16          MS. KATSANTONIS: Nexus stamped many of
17 their documents that.
18          MR. PHILLIPS: I'm not going to argue
19 about it.  I'm just saying if someone needs me to
20 sign something, I will.
21          MS. KATSANTONIS: Thank you.  We will
22 provide you with something.

Transcript of David Sandoz
Conducted on March 5, 2020

45

1      MR. PHILLIPS:  Okay.
2  BY MS. KATSANTONIS:
3    Q.    Have you had an opportunity to review
4  this?
5    **A.    No, I don't have my glasses, but I can
6  read it.**
7    Q.    You can use mine, if you'd like.
8    **A.    It's just going to — you're going to
9  have to give me a little bit of time.**
10   Q.    Do you want some reading glasses?
11   **A.    Well, I'll take —**
12   Q.    I'm going to need them back in a
13 minute, but you can have them briefly.  I know I
14 have a magnifying glass in my bag.
15   **A.    How about if we do that.**
16   Q.    Then you can just keep that through the
17 deposition.  Some of this writing is small.
18   **A.    Yeah.**
19   Q.    I just have a few quick questions on
20 this.
21   **A.    Okay.**
22   Q.    This is an e-mail that you wrote,

46

1  correct?
2    **A.    Correct.**
3    Q.    And it followed your trip out to Nexus
4  and it's based on information provided to you by
5  Nexus, right?
6    **A.    I presume, yes.**
7    Q.    Well, to the best of your knowledge,
8  correct?
9    **A.    Yes.**
10   Q.    And so is it correct that you
11 understood from Nexus that the average size of the
12 bonds were $10,000?
13   **A.    I believe so, yes.**
14   Q.    Okay.  And did you understand from
15 Nexus that they had a scoring system to select the
16 detainees they were willing to work with?
17   **A.    Yes.**
18   Q.    And that Nexus advised you that the
19 immigrants that they worked with were those that
20 had been in the country for a long time, had family
21 in the U.S., had a job making income, and had no
22 criminal background?

47

1    **A.    I believe that makes — that that made
2  up a good portion of their client base.**
3    Q.    Okay.  And that's what they had advised
4  you at the time, correct?
5      MR. PHILLIPS:  Objection; asked and
6  answered.  You can still answer it.
7  BY MS. KATSANTONIS:
8    Q.    He's making an objection for the
9  record.
10   **A.    I don't recall all the specifics of the
11 conversations.**
12   Q.    All right.  But you have no reason to
13 doubt what you wrote in your e-mail, correct?
14   **A.    Correct.**
15   Q.    All right.  And then under program
16 code, you stated we expected a 0 percent loss
17 ratio.
18      Do you see that?
19   **A.    Yes.**
20   Q.    And so was it your understanding that
21 RLI would expect a 0 percent loss because -- well,
22 first of all, that was your expectation, right,

48

1  that RLI would have a 0 percent loss; is that
2  correct?
3    **A.    On everything I wrote, that's true.**
4    Q.    But certainly here it was true?
5    **A.    Yes, Nexus was going to stand in front
6  of the surety.**
7    Q.    Okay.  And take care of any obligations
8  before RLI would have to, right?
9    **A.    Correct.**
10   Q.    Okay.  And with regard to
11 collateral --
12   **A.    Page 2?**
13   Q.    Yes.  With regard to collateral, you
14 understood that Nexus was going to indemnify RLI,
15 right?
16   **A.    Yes.**
17   Q.    And what was your understanding of
18 the -- their willingness to provide a bucket of
19 collateral?
20   **A.    At this point — at this point of this
21 letter, I don't recall.**
22   Q.    Okay.

Transcript of David Sandoz
Conducted on March 5, 2020

49

1    A.    It looks like that I asked for — I
2 asked for $500,000 or an ILOC.
3    Q.    And the ILOC, that's a letter of
4 credit?
5    A.    Yes.
6    Q.    Irrevocable letter of credit?
7    A.    Yes.
8         (Deposition Exhibit 4 marked
9         for identification.)
10        MR. PHILLIPS:  What number is this,
11 counsel?
12        MS. KATSANTONIS:  This is Exhibit 4.
13 BY MS. KATSANTONIS:
14    Q.    So in Exhibit 4, it's the bottom chain
15 starting with June 10, Dave Sandoz.
16        Do you see that, right here in the
17 middle of the page?
18    A.    Yes.  Okay.
19    Q.    And on June -- on or about June 10 you
20 provided Mr. Nagel of Nexus with some initial terms
21 to consider for RLI to agree to issue bonds.
22        Do you generally recall that?

50

1    A.    No, but is it in this document here?
2    Q.    Yes.  And just for expediency sake, I'm
3 not going to ask you about the -- and again, to the
4 best of your knowledge, this is an e-mail that you
5 wrote, right, you don't have any reason to dispute
6 that, right?
7    A.    Correct.
8    Q.    So looking at the second page of the
9 document?
10    A.    Okay.
11    Q.    So one of the areas you discussed was
12 commission and do you recall that you were talking
13 about kind of a sliding scale or additional
14 commission once the bond was released or canceled?
15    A.    I had forgotten that, but in reading it
16 now, you know, that's what I put down.  It's
17 accurate, I guess.
18    Q.    Do you remember that initially your
19 thought was that perhaps Nexus could serve as an
20 agent rather than having Big Marco as the agent for
21 these bonds?
22        MR. PHILLIPS:  Objection.

51

1    A.    I don't think Big Marco was involved at
2 this point.  I don't believe.  But —
3 BY MS. KATSANTONIS:
4    Q.    See, on the front page it says agency
5 set up.  It says we are ready to appoint you when
6 you are ready.
7        MR. PHILLIPS:  Is there a question
8 pending?
9        MS. KATSANTONIS:  Well, I'm just trying
10 to refresh his recollection.
11 BY MS. KATSANTONIS:
12    Q.    Do you recall initially you thought
13 that perhaps Nexus might be an agent?
14    A.    I believe so.
15    Q.    Okay.  So then looking at the last
16 paragraph --
17    A.    Of?
18    Q.    -- of the second page.
19    A.    Right.
20    Q.    Okay.  You advised Nexus that they
21 would be required to execute an indemnity agreement
22 to proceed, right?

52

1    A.    Correct.
2    Q.    And you also were requesting
3 collateral, right?
4    A.    Yes.
5    Q.    And you were also requesting financial
6 statements, including a P & L statement through May
7 of this year; is that correct?
8    A.    Correct.  That's what the document
9 says.
10    Q.    Okay.
11        (Deposition Exhibit 5 marked
12         for identification.)
13 BY MS. KATSANTONIS:
14    Q.    This is Exhibit 5 and the only thing
15 I'm going to ask you on this one is this appears to
16 be Mr. Donovan's response to some of the questions
17 that you asked.
18        And if you look at the bottom it says,
19 financials attached.  And then there is a three
20 year profit and loss projection statement.
21        Do you -- did you receive this document
22 from Nexus with regard to their financial

Transcript of David Sandoz
Conducted on March 5, 2020

53

1  condition?
2         MR. PHILLIPS: Objection. And I guess
3  just for my own information, do you mean the e-mail
4  that he's not part of or do you mean the second
5  page of -- that he received the second page of
6  this?
7         MS. KATSANTONIS: The second page. The
8  way it works, I think, is it's a response to his
9  e-mail.
10        MR. PHILLIPS: It might be. I'm just
11 asking.
12        MS. KATSANTONIS: You can see the
13 different font, you know, after -- but that's okay.
14 I'm not going to ask you questions about his answer
15 anyway.
16 BY MS. KATSANTONIS:
17    Q.    I just want to ask you, did Nexus
18 provide you with the financials, profit and loss
19 statement with regard to its financial condition?
20    **A.    I don't know if this is what they**
21 **provided. Is this what was in the e-mail? Is that**
22 **what you're --**

54

1     Q.    Right. Well, this was attached as his
2  three year financials that were provided to you and
3  I guess that's why --
4     **A.    For me to remember these numbers like**
5  **five years ago I think that --**
6     Q.    Right. I'm not asking you to remember
7  these. I think -- let me see if I can help you.
8  So let me mark this an exhibit too.
9         (Deposition Exhibit 6 marked
10            for identification.)
11 BY MS. KATSANTONIS:
12    Q.    And I'm only doing this to speed things
13 along, and if you have a problem, feel free to tell
14 me.
15        So this is an e-mail and I'm going to
16 be focusing on the middle e-mail that you wrote.
17 And one of things that you talk about is thank you
18 for the profit and loss, and you know --
19    **A.    Do you want me to turn to that page?**
20    Q.    Sure. And I'm going to give you a copy
21 as well, Jonathan. And I'm focusing on page 20 and
22 21.

55

1     A.    Is that this page?
2     Q.    You're on the right page.
3         MR. PHILLIPS: Is this being entered in
4  the record? Is this an exhibit?
5         MS. KATSANTONIS: Yes. It's Exhibit 6.
6  BY MS. KATSANTONIS:
7     Q.    It starts on the bottom of page 20,
8  which says, thanks, Rick, I'm out at a business
9  meeting and then goes to page 21.
10        So I'm looking at the end of 21, it
11 says, also thank you for sending the profit/loss.
12 I assume 2013 and '14 are actual results and 2015
13 is your best guess for the year.
14        Do you see that?
15    **A.    Yes.**
16    Q.    Okay. And you state that you still
17 need the 2014 balance sheet completed for the
18 records -- for your records, correct?
19    **A.    I'm still reading. That's what it**
20 **states, yes.**
21    Q.    And for you, it was important to
22 understand Nexus's financial condition in order to

56

1  make a determination to issue bonds, right?
2     **A.    That's -- yeah, that's part of the**
3  **underwriting process, yes.**
4     Q.    And is it true that you would or did
5  you rely on Nexus's representations as to its
6  financial condition in making a determination to
7  issue bonds?
8     **A.    I believe so.**
9     Q.    And in the paragraph right above it,
10 that starts with one big key for us?
11    **A.    Uh-huh -- yes.**
12    Q.    So I'm just trying to understand you
13 said, one big key for us is the full life cycle of
14 these bonds and getting them released by the
15 obligee.
16        Can you tell me what you meant by that?
17    **A.    Basically, I believe it's simply**
18 **getting proper cancelation of the bonds from the**
19 **obligee.**
20    Q.    And if they were released or canceled,
21 basically, you're saying --
22    **A.    We need that material to close our**

Transcript of David Sandoz
Conducted on March 5, 2020

15 (57 to 60)

57

1  file.
2      Q.    Right.  And it's important because
3  it -- it starts -- I'm looking for the right word,
4  it starts canceling or decreasing RLI's exposure as
5  the bonds get canceled out; is that right?
6          MR. PHILLIPS: Objection.
7  BY MS. KATSANTONIS:
8      Q.    You can use whatever words that you
9  want.  I'm just trying to understand it.
10     A.    Well, in any surety bond you issue the
11 bond and it goes through the length of the term
12 that it stays open and then at some point it's
13 canceled.  And as an underwriter, you want to get
14 the cancelation evidence to close your file and set
15 it off to the side.  That risk is no longer
16 enforced.  It's been released by the obligee.
17     Q.    Right.  And you want that, obviously,
18 canceled sooner than later, right, the sooner the
19 better for the surety?
20         MR. PHILLIPS: Objection.
21     A.    Not necessarily.
22 BY MS. KATSANTONIS:

58

1      Q.    Well, you don't want the exposure out
2  there too long, do you?
3          MR. PHILLIPS: Objection.  I'm going
4  to -- they are leading, but now it's getting
5  argumentative.
6  BY MS. KATSANTONIS:
7      Q.    I'm not trying to be argumentative.  I
8  apologize.  I'm just trying to understand.
9          Did you have an understanding that
10 generally the life cycle of these immigration bonds
11 was short?
12     A.    I don't know what the definition of
13 short is.  I mean, I've got — we've had bonds that
14 range anywhere from one day to several years that
15 we wrote in miscellaneous surety.
16     Q.    Okay.  We'll get to life cycle of the
17 bonds, but you also state here that -- that Nexus
18 would be required again to sign the indemnity
19 agreement and the collateral agreement, is that
20 right, those were going to be requirements before
21 you would issue the bonds?
22     A.    I believe so, yes.

59

1      Q.    Okay.  And then you mention the fact,
2  again, you assume that the board had approved your
3  request for 500,000 in collateral either -- and
4  that that would be provided either as a irrevocable
5  letter of credit or cash, right?
6      A.    I didn't -- no.  I just — the sentence
7  says I assume that and I meant the Nexus board.
8      Q.    Sure.
9      A.    I assume the Nexus board has approved,
10 but I don't know if I knew the answer at that
11 point.
12     Q.    Right.  When you were talking about the
13 key being that the bonds get released, you also
14 talk about that's why the -- we set the emphasis on
15 the commission on the backend.  Can you explain
16 what you meant?
17     A.    It's an incentive, yes.  I think we
18 made incentive on the backend that when the
19 program — I mean, when a bond got canceled, that
20 instead of paying all the commission up front, I
21 wanted to split it up so that — because Nexus was
22 involved in helping the underwriting process and

60

1  part of that underwriting process is closing out
2  risks.
3          And so if they helped in that process,
4  then I was putting some of the commission on the
5  backend.
6          MR. PHILLIPS: If I may, we're right at
7  an hour, and I'm about ready for a bathroom break.
8  I don't want to interrupt.
9          MS. KATSANTONIS: Do you want to do
10 that now or do you want me to finish the document?
11         MR. PHILLIPS: If you want to finish.
12         MS. KATSANTONIS: That's up to you.
13         MR. PHILLIPS: I'd rather go to the
14 bathroom.
15         MS. KATSANTONIS: All right.  We'll
16 take a break.  Thank you.
17         THE VIDEOGRAPHER: This is the
18 videographer.  We're going to go off the record at
19 10:56 a.m.
20         (Recess taken.)
21         THE VIDEOGRAPHER: This is the
22 videographer.  We're going back on the record at

Transcript of David Sandoz
Conducted on March 5, 2020

---

**61**

1  11:10 a.m.
2  BY MS. KATSANTONIS:
3      Q.    Okay.  Great we were looking at this
4  e-mail chain that I presented to you and we were --
5  one of the things we were talking about was the
6  collateral and I want to look at the page that's
7  marked page 20, so the page before that.
8          And do you recall on or about June 18
9  Nexus asked you to reduce the collateral to 250,000
10 at that time?
11     **A.    Yes, after reading the document, I**
12 **believe that's accurate, they did ask it to be**
13 **reduced.**
14     Q.    Right.  And your response -- I was
15 looking at your response, which is at the top of
16 the page, and I believe you advised that you did
17 not believe that you could go that low and that it
18 was your understanding that the overall bond
19 aggregate was going to be large and so that the
20 500,000 you were requesting would be a fraction of
21 the total exposure.
22         Can you tell me what you meant by that?

**62**

1      **A.    I may have had an estimate of the**
2  **number of bonds that we anticipated writing.  And**
3  **immigration bonds are not one of those one day**
4  **deals where you -- where they are closed**
5  **immediately.**
6          **So, yes, there could be an accumulation**
7  **of risk, and I must have estimated it at some**
8  **number and then compared it to the collateral**
9  **requirement.**
10     Q.    By total exposure, are you referencing
11 that risk but based on the value of the issued
12 bonds?
13     **A.    I believe so.**
14     Q.    And then you say, a year from the start
15 date as we start to see the program mature knowing
16 total exposure and how many bonds are released,
17 there is always room to negotiate.
18         By that were you meaning, you know, as
19 we see the rate at which bonds are canceled, and
20 you could re-evaluate collateral?
21         MR. PHILLIPS:  Objection.  You can
22 answer.

**63**

1      **A.    Well, again, it's basically -- as the**
2  **program develops, I could get a, you know, a better**
3  **sense of the program and how it's working and then**
4  **how much, if any, collateral I wanted to keep.**
5      Q.    Right.  And when you say total
6  exposure, that means -- does that mean, you can
7  tell me in your own words, but does that mean how
8  many -- the value of bonds that are out there that
9  have been issued by RLI?
10         MR. PHILLIPS:  Objection.  You can
11 answer.
12     **A.    I believe so.**
13 BY MS. KATSANTONIS:
14     Q.    Okay.  And one more question back here
15 when we were talking about the financial statements
16 on page 21.  And you were assuming that the 2013
17 and '14 were actual results.
18         Do you see that?
19     **A.    Yes.**
20     Q.    Did Nexus ever advise you otherwise?
21     **A.    I don't recall.**
22     Q.    To the best of your recollection, when

**64**

1  you were reviewing the financials, you had accurate
2  information?
3      **A.    I would assume.**
4          MR. PHILLIPS:  Objection.  You can
5  still answer.
6  BY MS. KATSANTONIS:
7      Q.    Okay.  And looking at the front page,
8  which is page 19, the bottom, do you recall that
9  Nexus advised that they would provide the 500,000
10 in collateral, however, they would do it in five
11 installments of 100,000 each over the course of
12 five months?
13     **A.    Yeah.  I didn't recall that, no.**
14     Q.    But you have no reason -- we'll look at
15 the collateral agreement, but you have no reason to
16 think otherwise, correct?
17     **A.    Yeah.  Correct.**
18         (Deposition Exhibit 7 marked
19           for identification.)
20         MR. PHILLIPS:  And this will be 7,
21 correct?
22         MS. KATSANTONIS:  Right.  Can I take

---

Transcript of David Sandoz
Conducted on March 5, 2020

---

65

1 that back?
2          MR. PHILLIPS:  I made a little mark on
3 it.
4          MS. KATSANTONIS:  Just so you know,
5 there are some attorney/client -- this was
6 inadvertently produced, so I've actually got a
7 redacted copy.
8          MR. PHILLIPS:  Okay.
9          MS. KATSANTONIS:  I noticed it last
10 night.
11          MR. PHILLIPS:  I guess so I don't
12 interrupt before your questions, I'd just like to
13 put on the record, if you're going to ask
14 e-mails -- or ask questions about a redacted set of
15 e-mails, it may make it more difficult for
16 Mr. Sandoz to answer.
17          MS. KATSANTONIS:  I'm just going to
18 represent to you on the record that the redacted
19 e-mails are all internal RLI e-mails that have --
20 it's irrelevant -- it's immaterial to what we're
21 talking about.  I just didn't want to waive the
22 attorney/client privilege.

---

66

1          MR. PHILLIPS:  I understand.  I'm just
2 letting you know because I just see that his name
3 does appear in those parts that are redacted as
4 being from him to Kirk Austin.  I don't know who
5 that is.
6 BY MS. KATSANTONIS:
7     Q.    He's an attorney at RLI, right,
8 Mr. Sandoz?
9     A.    Correct.
10    Q.    This is an e-mail that you prepared
11 talking about your understanding of the Nexus
12 program, is that right, based on the information
13 provided by -- to you by Nexus?
14    A.    I presume so.
15    Q.    Well, right.  You don't have any reason
16 to doubt this is your e-mail?
17    A.    No.
18    Q.    I'm just trying to make a record.
19 Sorry.
20          MR. SHOREMAN:  You can't use privilege
21 as both a shield and a sword here.  We have no idea
22 what this was in response to.  The question that

---

67

1 Mr. Austin was asking.  This is entirely improper.
2          MS. KATSANTONIS:  No.
3          MR. SHOREMAN:  You've redacted half of
4 the correspondence and asking him to testify about
5 his response to a conversation that's redacted.  If
6 he wants -- if you don't want to use it because
7 it's privilege, then don't use it.
8          MS. KATSANTONIS:  The bottom of the
9 e-mails, I'm going to put a representation on here,
10 you actually have an unredacted copy that we're
11 going to just call back.  There is nothing --
12          MR. SHOREMAN:  If it's privileged, it
13 will not be used by Nexus in this case.  You're
14 trying to say he can respond to a document that you
15 have entirely redacted.
16          MS. KATSANTONIS:  Mr. Shoreman,
17 obviously, the attorney/client privilege and
18 attorney work product privilege go to the extent
19 you're seeking legal advice.  Those portions have
20 been redacted.
21          To the extent Mr. Sandoz is relaying
22 factual information that is not seeking attorney

---

68

1 advise, it's not privileged.  That's why the top
2 portion of this e-mail is privileged.  I can
3 represent that the bottom portion has to do with
4 drafting documents and is not related at all to the
5 top portion.
6          MR. SHOREMAN:  Are you putting in the
7 record that Mr. Sandoz is responding to -- is not
8 responding to Mr. Austin in this document?  It
9 doesn't -- may I see that for a minute?  Doesn't
10 it -- this is actually between Mr. Sandoz and
11 Mr. Austin and the questions that Mr. Austin
12 obviously asked of Mr. Sandoz are entirely
13 redacted.
14          MS. KATSANTONIS:  You can re -- you can
15 question --
16          MR. SHOREMAN:  If the bottom half is
17 privileged, so is the top half.  So you have,
18 therefore, to waive your privilege to the entire
19 correspondence and possibly to all correspondence
20 between Mr. Austin, if you use it.  Which is fine.
21 Which is --
22          MS. KATSANTONIS:  I'm going to use it

---

Transcript of David Sandoz
Conducted on March 5, 2020

69

1 and you can present your opinion any way that you
2 want it. I'm quite confident on how the courts
3 view privilege and the question that he's
4 responding to is not redacted.
5          MR. SHOREMAN: They don't allow you to
6 use privilege as a shield and a sword.
7          MS. KATSANTONIS: Mr. Shoreman, I'm
8 going to continue. You can raise your objections
9 at the appropriate time.
10 BY MS. KATSANTONIS:
11    Q.    So looking at this document, you can
12 see that Mr. Sussman asked you whether the
13 detainees showed up for hearings and you respond.
14          MR. PHILLIPS: Objection.
15          MR. SHOREMAN: Objection.
16          MR. PHILLIPS: I'm just flying a flag.
17          MR. SHOREMAN: Let me state for the
18 record, you say Mr. Sussman asked him, then why is
19 it redacted? Because it appears that --
20          MS. KATSANTONIS: The question is not
21 redacted.
22          MR. SHOREMAN: You said Mr. Sussman

70

1 asked him.
2          MS. KATSANTONIS: That's what's on the
3 e-mail.
4          MR. PHILLIPS: Do we have another copy?
5          MS. KATSANTONIS: Not redacted.
6          MR. SHOREMAN: But he's responding to
7 Mr. Austin.
8          MS. KATSANTONIS: No, he's not.
9          MR. SHOREMAN: But Mr. Sussman's name
10 is on this.
11          MS. KATSANTONIS: Mr. Shoreman,
12 reserve -- Mr. Shoreman, you can reserve your
13 objections. You have a copy of the document in
14 your records.
15          MR. SHOREMAN: Your use of this is
16 improper. I have a copy of the document in my
17 records because you just said that you wanted it
18 back because it was inadvertently produced. So I
19 don't have a copy in my records. We had to give it
20 back to you.
21          MS. KATSANTONIS: We can in this one.
22 This is a privilege -- we are reserving our right

71

1 to privilege to the bottom of it. There is nothing
2 in there.
3          MR. SHOREMAN: Well, you can't do that.
4          MS. KATSANTONIS: Well, Mr. Shoreman
5 you can reserve your objections. I'm not --
6          MR. SHOREMAN: You can't give it to me
7 and then reserve your right to privilege.
8          MS. KATSANTONIS: You have it.
9          MR. WILLIAMS: Inadvertent disclosure.
10          MS. KATSANTONIS: I'm not going to
11 fight with you. You can use it -- you can say
12 whatever you want to the Court. I'm going to
13 continue my deposition.
14          MR. PHILLIPS: I'd just like to put on
15 the record that I did, in fact, hand the document
16 back to Mr. Katsantonis.
17          MS. KATSANTONIS: In any event, we're
18 not waiving our privilege, and we're looking at the
19 factual information at the top of this e-mail.
20 BY MS. KATSANTONIS:
21    Q.    And this is -- is this an accurate
22 statement of your understanding of the Nexus

72

1 program based on representations made to you by
2 Nexus?
3          MR. PHILLIPS: Objection. You can
4 answer.
5    **A.    Well, I don't recall the actual — the**
6 **actual data in here, but this is my e-mail, so I**
7 **presume that I gathered this from other parties in**
8 **the process.**
9 **BY MS. KATSANTONIS:**
10    Q.    Right. You have no reason to -- I
11 mean, to the best of your recollection, this was an
12 accurate reflection of information provided to you
13 by Nexus?
14          MR. PHILLIPS: Objection; asked and
15 answered. You can answer again.
16    **A.    I presume so.**
17 **BY MS. KATSANTONIS:**
18    Q.    Okay. And I guess when you say
19 presume, to the best of your knowledge, correct?
20    **A.    To the best of my knowledge, yes.**
21    Q.    Okay. And then one statement in here
22 says near the bottom it says your current agent has

Transcript of David Sandoz
Conducted on March 5, 2020

19 (73 to 76)

---

73

1 raved how well the program has run.
2        Do you know who the agent is you're
3 referencing there?  Was that Big Marco or someone
4 else?
5    **A.    I don't recall, but my guess would be**
6 **Marco.**
7    Q.    Okay.
8        (Deposition Exhibit 8 marked
9        for identification.)
10 BY MS. KATSANTONIS:
11    Q.    The document I provided --
12        MR. PHILLIPS:  I'm sorry.  Could I have
13 just a moment to review?
14        MS. KATSANTONIS:  Sure.
15 BY MS. KATSANTONIS:
16    Q.    This is a document dated June 26, 2015,
17 from you to Mr. Nagel at Nexus.  And is this your
18 e-mail?
19    **A.    Presumably, yes.**
20    Q.    And you keep saying presumably.  I
21 guess to the best of your understanding?
22    **A.    I'm sorry.**

---

74

1    Q.    You have no reason to doubt it?
2    **A.    Yes.  I'm sorry.  To the best of my**
3 **knowledge.**
4    Q.    Right.  If I hand you an e-mail that
5 you don't think is yours, tell me.
6    **A.    Okay.**
7        MR. PHILLIPS:  I'll object to that
8 instruction.
9        MS. KATSANTONIS:  Well, I'm not
10 trying -- you know, we can go --
11        MR. PHILLIPS:  I don't want it to be
12 that it's going to be assumed that he remembers
13 unless he physically says that he doesn't remember.
14        MS. KATSANTONIS:  I'm not trying to do
15 that.  I apologize.
16        MR. PHILLIPS:  Just for the record.
17 BY MS. KATSANTONIS:
18    Q.    So in June of 2015, you provided Nexus
19 with the standard surety indemnity agreement for
20 Nexus to complete prior to issuing any bonds on --
21 at its request, right?
22    **A.    Again, I believe so.**

---

75

1    Q.    Right.  And to the best of your
2 knowledge, is this a standard indemnity agreement
3 used by RLI?
4    **A.    Well, it was prepared by Ira or -- and**
5 **Kirk.  So I presume that they used an indemnity**
6 **agreement that RLI uses, yes.**
7    Q.    Well, have you reviewed other indemnity
8 agreements through your position at RLI?
9    **A.    Yes.**
10    Q.    Is it to the best of your knowledge, a
11 standard agreement?
12        MR. PHILLIPS:  Objection; asked and
13 answered.
14 BY MS. KATSANTONIS:
15    Q.    I mean, there was nothing unusual in
16 this agreement to your understanding, is there?
17    **A.    That I don't -- that I don't know.**
18 **This was not an unusual -- this was an unusual**
19 **program, so that's why I solicited help in**
20 **completing an indemnity agreement that the RLI**
21 **claim handlers were comfortable with.  And so they**
22 **structured this agreement for me to pass it along**

---

76

1 **to Nexus.**
2    Q.    Okay.  And in looking at it, you don't
3 know, one way or another, whether it is consistent
4 with standard indemnity agreements you've used on
5 behalf of RLI?
6    **A.    I would have to have all of them laid**
7 **out and time to review all of them.**
8    Q.    Well, you say it's standard.  That's
9 why I was asking.
10        MR. PHILLIPS:  Is there a question
11 pending?
12 BY MS. KATSANTONIS:
13    Q.    Well, I just -- you know, I was just
14 trying to understand.
15        Do you recall anything unique in the
16 drafting of this indemnity agreement?
17    **A.    Just the portion — well, one portion**
18 **is since Nexus was not a principal, that it had to**
19 **be structured a little different in that regard**
20 **because Nexus is the party that has agreed to**
21 **indemnify on behalf of the principal, so it had to**
22 **be structured a little bit differently.**

**77**

1    Q.    Did you see anything else different
2  other than the identification of the principal?
3    **A.    I don't recall.**
4    Q.    And what about in the collateral
5  agreement you say that's going to be executed as we
6  receive the agreed upon collateral.
7        Is this a document that you are
8  familiar with that was used?
9    **A.    To the best of my knowledge, this is**
10 **the collateral agreement that was drafted to use,**
11 **that RLI attorneys drafted for us to use, yes.**
12   Q.    Right.  And it's also called a
13 collateral agreement and receipt, right?  So is
14 that to your understanding typically used upon for
15 receipt of collateral?
16   **A.    It's to acknowledge receipt of**
17 **collateral.  If that's what you mean, yes.**
18   Q.    Yes.  And that's a separate agreement
19 than the indemnity agreement, right?
20   **A.    Correct.**
21   Q.    And then you listed here other
22 information that you would need from Nexus and

**78**

1  those are things that you would need before RLI
2  would issue bonds, right?
3    **A.    That's what the e-mail says.  So again,**
4  **I don't recall it, but that's what it says.**
5    Q.    Right.  And again, you know, you're
6  again asking for year-end financial statements,
7  correct?  You still wanted to understand Nexus's
8  financial condition?
9        MR. PHILLIPS:  Objection.  I think we
10 have two questions pending.
11       MS. KATSANTONIS:  Let me change that.
12 BY MS. KATSANTONIS:
13   Q.    You were still requiring additional
14 financial information, right?
15   **A.    I don't recall, but that's — that is**
16 **listed there.**
17   Q.    Right.  Right.  And that RLI would need
18 the installment of collateral and the executed
19 agreement, right?
20   **A.    The first installment — it says first**
21 **installment of collateral in the amount of**
22 **$100,000.  So that's what I'd indicated, yes.**

**79**

1    Q.    Right.  And you also asked for the bond
2  forms.
3        Did you review the immigration bond
4  form, do you recall that?
5    **A.    I don't recall having reviewed it, when**
6  **I reviewed it.  No.**
7    Q.    I'll just show you a copy.  We don't
8  have to mark it, but can you just tell me, do you
9  recall ever having reviewed a copy of this?
10   **A.    I believe I have, but I don't know at**
11 **what point.**
12       MS. KATSANTONIS:  And I'll just mark
13 that so we have it for the record.
14       (Deposition Exhibit 9 marked
15         for identification.)
16 BY MS. KATSANTONIS:
17   Q.    Take a minute or two on this.  And I
18 think we already talked about this, but if you look
19 under -- at page 5 of 6, for example, there are
20 different types of bonds.
21       Did you have an understanding that the
22 bond condition upon the delivery of an alien was

**80**

1  the primary type of bonds issued on behalf of or at
2  the request of Nexus?
3        (Mr. Williams entered the deposition
4  room.)
5    **A.    I believe so.**
6  **BY MS. KATSANTONIS:**
7    Q.    And did you have a general
8  understanding that the condition of the bond was?
9  I guess we already talked about that, for the alien
10 to appear in court or be delivered at DHS's
11 request?
12   **A.    Yes.**
13   Q.    And did you understand that if the bond
14 conditions weren't met, then the penal sum of the
15 bond could be forfeited as liquidated damages and
16 not as a penalty?
17       MR. PHILLIPS:  I'm going to object.
18 And I don't want to be accused of coaching but are
19 you asking him about this document because he said
20 that he didn't recall necessarily reviewing it or
21 are you asking about the general -- because we're
22 look at a document, right, and you're asking about

Transcript of David Sandoz
Conducted on March 5, 2020

21 (81 to 84)

81

1  his general stuff.  But I'm just concerned about
2  words being put in his mouth.
3         So if you could be clear like you have
4  him looking at it and then you're asking him about
5  language when he said that he didn't recall looking
6  at it.  And I -- again, I apologize for -- I don't
7  want to be accused of coaching, but I just want to
8  make sure it's clear.
9         MS. KATSANTONIS:  I'm with you.
10 BY MS. KATSANTONIS:
11     Q.    Did you have a general understanding
12 that if the principal -- if the bond obligations
13 were not complied with, which was to appear in
14 court or be delivered, then the bond amount could
15 be requested by DHS as liquidated damages or
16 whatever words that you want to use, penalty?
17     A.    Yes.
18     Q.    And do you recall at all that there
19 was -- as you're getting ready to set up the
20 program and receiving this information -- well,
21 sorry.  I'll get back to that.
22         This is supposed to be together.

82

1         (Deposition Exhibit 10 marked
2          for identification.)
3         MR. PHILLIPS:  This is one exhibit?
4         MS. KATSANTONIS:  It's one exhibit, you
5  can tell by the paginations that are at the very
6  bottom.  It was an attachment.
7  BY MS. KATSANTONIS:
8     Q.    So this is an e-mail chain dated
9  June 26.  And in response to -- you forwarded the
10 general agreement indemnity we were looking at in
11 the previous exhibit and Mr. Nagel forwarded to you
12 an e-mail response that said thanks for the
13 information.  I talked with Mike and we'll forward
14 the documents to you on Monday.  Please also read
15 the link below.  One of our local newspapers wrote
16 a comprehensive story on Nexus.
17         MR. PHILLIPS:  Objection.  You can
18 answer.
19     A.    I see it, yes.
20 BY MS. KATSANTONIS:
21     Q.    And then there is a newspaper
22 article -- a news article attached.  Did you review

83

1  this article at the time?
2     A.    I have no idea.
3         (Mr. Williams left the deposition
4  room.)
5     A.    I presume so, but I don't recall it at
6  all.
7  BY MS. KATSANTONIS:
8     Q.    Right.  You wrote nice to see the
9  coverage, Rick, impressive.
10    A.    Okay.
11    Q.    Does that refresh your recollection
12 that you reviewed it at the time?
13    A.    I don't remember the article at all,
14 no.
15    Q.    Well, in looking at the article, if you
16 look on page 30, at the top it says, at the heart
17 of the operation is a GPS tracking bracelet.
18         Do you see that?
19    A.    Yes.
20    Q.    And that's consistent with your
21 understanding -- what was advised to you by Nexus
22 that --

84

1         MR. PHILLIPS:  Objection.
2  BY MS. KATSANTONIS:
3     Q.    -- that the GPS tracking was a
4  significant part of their program?
5     A.    That was a part of the risk mitigation,
6  correct.
7     Q.    And did you understand if you're
8  looking at under the paragraph that's talking about
9  bracelets for freedom, it talks about the device is
10 worn at all times; was that your understanding?
11        MR. PHILLIPS:  I'm going to object.
12 He's already stated he doesn't even remember this
13 article.  If you want to ask him about what he
14 understands, please do.
15        But again I'm going to stress and --
16 that I fear words are being put in his mouth like
17 these -- whoever these reporter is words are now
18 being put in his mouth.
19 BY MS. KATSANTONIS:
20    Q.    Well, Nexus provided you this article
21 to review as part of your understanding of their
22 program, right?

85

1    MR. PHILLIPS: Objection; asked and
2 answered.
3    **A.    No, I don't know that.**
4 **MS. KATSANTONIS:**
5    Q.    Well, they asked you to review it,
6 didn't they?
7    **A.    Yes, I guess it appears so.**
8    Q.    And so -- and this would have been
9 something that you reviewed as further information
10 about Nexus in your underwriting process?
11    MR. PHILLIPS: Objection; asked and
12 answered.
13    **A.    I presume it would or is that the**
14 **wrong --**
15 **BY MS. KATSANTONIS:**
16    Q.    To the best of your knowledge?
17    **A.    To the best of my knowledge, yes.**
18    Q.    And then do you recall right after this
19 there was a little bit of a time lag in actually
20 setting up the program because Nexus advised you
21 they were swapping out their GPS systems?
22    MR. PHILLIPS: Objection.

86

1    **A.    I don't recall.**
2 **BY MS. KATSANTONIS:**
3    Q.    Okay.
4        (Deposition Exhibit 11 marked
5        for identification.)
6 BY MS. KATSANTONIS:
7    Q.    So --
8        MR. PHILLIPS: Sorry. I'll just need a
9 moment. I'd just like the record to reflect it
10 appears there is a chunk of a message missing on
11 the bottom half of this RLI 334704.
12        MS. KATSANTONIS: It's actually not
13 missing. It's a -- it's continued on the next
14 page. And I even have another version of this that
15 shows the same thing. I'll show you this next one.
16        MR. PHILLIPS: I'm not arguing. I'm
17 just saying for the record it appears that way.
18 It's certainly your deposition.
19        MS. KATSANTONIS: Well, let me swap out
20 the exhibit so there is no question. This is the
21 same thing.
22        MR. PHILLIPS: I'll give you that one

87

1 back.
2        MS. KATSANTONIS: Sure.
3 BY MS. KATSANTONIS:
4    Q.    So does that refresh your recollection
5 that there was a bit of a delay as Nexus advised
6 you that they were switching out their GPS
7 provider?
8        MR. PHILLIPS: Objection.
9    **A.    Where does it say that?  Is it on the**
10 **side?  I haven't read --**
11 **BY MS. KATSANTONIS:**
12    Q.    Sure. On August 21 it says, I
13 apologize for the delay. We recently changed out
14 our GPS provider and we're in the process of
15 changing out the old GPS bracelets, this could take
16 some time.
17        MR. SHOREMAN: Let me interject because
18 these documents are marked protective order.
19 Vivian, I will just accept your representation
20 that you will have Mr. Sandoz sign that protective
21 order?
22        MS. KATSANTONIS: Sure.

88

1        MR. SHOREMAN: Okay. Thank you.
2    **A.    I don't recall.**
3 **BY MS. KATSANTONIS:**
4    Q.    That's fine.
5        (Deposition Exhibit 12 marked
6        for identification.)
7 BY MS. KATSANTONIS:
8    Q.    This is an e-mail that you wrote to
9 Chris Cornelius, to the best of your knowledge; is
10 that correct?
11    **A.    Yes.**
12    Q.    Who's Chris Cornelius?
13    **A.    Chris Cornelius ran the miscellaneous**
14 **surety branch in Phoenix, Arizona.**
15    Q.    Okay. And so the top of this e-mail is
16 you, again, explaining your understanding of the
17 Nexus program; is that right?
18    **A.    I'm going to read it.  I'm sorry.  What**
19 **was the question again?**
20    Q.    That's okay. So this e-mail sets forth
21 at the time your understanding of the Nexus
22 program?

Transcript of David Sandoz
Conducted on March 5, 2020

89

1    A.    To the best of my knowledge.
2    Q.    Right.  And at that point in time,
3 you're referencing the screening.  Do you remember
4 we talked about earlier they had a scoring system,
5 do you remember that?
6    A.    Yes.
7    Q.    And to the best of your knowledge, do
8 you recall that they had a scoring system and they
9 would rate the risk of the immigrant as to, you
10 know, whether or not they would appear?
11    A.    Typically so, yes.
12    Q.    And then your understanding at that
13 time was that the program participants could not
14 have a criminal record and could not detained
15 because of a criminal act; is that right?
16    A.    That may be an error.  I believe they
17 could not have a criminal record.  I think that's
18 what the process that Nexus went through was to
19 ensure that they didn't have a previous criminal
20 record.
21    Q.    Okay.  And then you reference their
22 great track record of a fraction of 1 percent who

90

1 do not initially show up for court, which is with
2 the bond guarantees.
3         So you understood that the obligation
4 of the bond was for the principal to appear or be
5 delivered when required?
6         MR. PHILLIPS: Objection.  You can
7 answer.
8    A.    Yes.
9 BY MS. KATSANTONIS:
10    Q.    Okay.  And then you said when that
11 happens, they have the means to locate the party
12 and ensure they show up to the next court date or
13 they go back into detention.
14         What was your understanding of how
15 Nexus did that?
16    A.    How they did what?
17    Q.    What means did they have to locate --
18 are you referencing the GPS?  They could locate the
19 party and ensure they show up or they could go back
20 into detention.
21         MR. PHILLIPS: Objection.  You can
22 answer.

91

1    A.    Well, they did have GPS monitoring as
2 one means.  They also have their sponsors that they
3 could call.
4 BY MS. KATSANTONIS:
5    Q.    And did Nexus -- was it your
6 understanding that Nexus would continue to have the
7 program participants on GPS until a bond was
8 canceled?
9    A.    Not to my knowledge.
10    Q.    What was your understanding?
11    A.    They had the GPS monitoring in place
12 until they were confident that they, you know, knew
13 the individual was -- that they would be able to
14 locate the individual if the individual did not
15 show up to court or something of that nature where
16 they needed to get in contact with them.  No, the
17 GPS wasn't intended, I don't believe, to be in
18 place for the duration.
19    Q.    Of the bond?
20    A.    Of the bond, yes.
21    Q.    So did you have a certain point in time
22 where you thought, you know, length of time, was

92

1 there a specific length of time that you were aware
2 of?
3    A.    Not that I recall.  I left that to
4 their judgment.
5    Q.    Okay.  But it was your understanding it
6 would be in place long enough to ensure the
7 immigrants appearances?
8         MR. PHILLIPS: Objection.  You can
9 answer.
10 BY MS. KATSANTONIS:
11    Q.    Is that right?
12    A.    Can you repeat the question?
13    Q.    You believe that the GPS bracelets
14 would be worn by the immigrant long enough to
15 ensure the immigrants appearances in court?
16    A.    I was relying on Nexus, yes.
17    Q.    Okay.  And right.  You understood, and
18 I guess we've already talked about this, but that
19 Nexus would be taking on that obligation to ensure
20 that the immigrant either showed up in court or
21 were back in detention?
22    A.    Yes, that's part of the risk mitigation

Transcript of David Sandoz
Conducted on March 5, 2020

24 (93 to 96)



93

1  process.
2     Q.    Right.  Do you recall you also ordered
3  a D & B or Dun and Bradstreet of Nexus?
4     A.    No.
5     Q.    But if it's in the record, do you want
6  to see it?
7     A.    I don't know what reason for, but I
8  can.
9     Q.    You have no reason to doubt that you
10 requested a D & B?
11       MR. PHILLIPS:  Objection.  That's,
12 apparently, an improper question.
13       MS. KATSANTONIS:  Why is it improper?
14       MR. PHILLIPS:  He just told you he
15 doesn't recall and then you're -- either show it to
16 him to refresh his recollection --
17       MS. KATSANTONIS:  I'll show it to him.
18 I was just trying to be fast.  I apologize.
19       (Deposition Exhibit 13 marked
20         for identification.)
21 BY MS. KATSANTONIS:
22    Q.    Do you recall that you requested a Dun

94

1  and Bradstreet report?  Do you see in the middle it
2  says from Dave Sandoz on November 9, 2000 --
3     A.    No, I didn't recall that I had ordered
4  one.
5     Q.    Okay.  But, again, I guess you have no
6  reason to doubt that this is an accurate record?
7     A.    I have no reason to doubt, yes.
8       (Deposition Exhibit 14 marked
9         for identification.)
10 BY MS. KATSANTONIS:
11    Q.    So to the extent some of this gets
12 redundant, but I'm just trying to make sure the
13 timing here -- the time frame.
14       MR. PHILLIPS:  Just on the record, note
15 this one is also subject to protective order.
16       MS. KATSANTONIS:  Right.  Just so you
17 know, Nexus had a habit of stamping each and every
18 document, but we'll certainly --
19       MR. PHILLIPS:  I'm just putting it on
20 the record so my client doesn't get in trouble.
21 BY MS. KATSANTONIS:
22    Q.    This is an e-mail chain dated

95

1  November 25, 2015, between you and Mr. Nagel.  And
2  if you look at the bottom, you were providing
3  Mr. Nagel, once again, with items needed before we
4  start the program.
5       Do you see that?
6     A.    Yes.
7     Q.    And so looking at underwriting
8  information, at that point in time, you were again
9  advising Nexus you need the year-end financial
10 statement and the latest interim statement
11 available, correct?
12    A.    According to the e-mail, yes.
13    Q.    Right.  And that, again, you needed the
14 indemnity agreement executed and the first
15 installment of collateral, is that correct, to the
16 best of your recollection?
17       MR. PHILLIPS:  Objection.  I'll just
18 make this a running one.  We're way back into just
19 leading question after leading question.  So I'll
20 just make that a running objection going forward.
21 BY MS. KATSANTONIS:
22    Q.    Okay.  But to the best of your

96

1  knowledge, are these things you requested of Nexus
2  before you could start the program; meaning, before
3  you would -- RLI would issue bonds?
4     A.    Well, to the best of my knowledge.
5  This is what the e-mail says.
6     Q.    Right.  That's the information that you
7  were requesting, right?
8     A.    Yes.
9       (Deposition Exhibit 15 marked
10        for identification.)
11 BY MS. KATSANTONIS:
12    Q.    I just have a quick question on this
13 e-mail --
14       MR. PHILLIPS:  Hold on a minute,
15 please.
16       MS. KATSANTONIS:  Sure.
17       MR. PHILLIPS:  Thank you.
18 BY MS. KATSANTONIS:
19    Q.    Okay.  In this e-mail Rick Nagel is
20 advising you that he talked to Mike about Marco and
21 the in-house agency issue.  He told me Marco will
22 actually become an employee of Nexus.

Transcript of David Sandoz
Conducted on March 5, 2020

25 (97 to 100)

**Page 97**

1           Do you see that?
2      A.    Yes.
3      Q.    Did you have an understanding that Big
4  Marco was to become an employee of Nexus?
5      A.    I don't recall how things were going to
6  get set up on that end.
7      Q.    Okay.  Did you know -- I mean, was it
8  your understanding that Big Marco had worked with
9  Nexus prior to RLI coming into the picture?
10     A.    I don't recall, but I may have.
11     Q.    Well, you didn't know Big Marco until
12 the Nexus program, right?
13     A.    Correct.
14     Q.    I'm going to refer to Marco LiMandri or
15 Big Marco; is that okay?
16     A.    Yes, I don't believe that I knew him
17 prior.
18     Q.    Right.  And -- and I think that you
19 just testified, I just want it make sure, you do
20 not have an understanding of Marco's relationship
21 with Nexus at the time?
22          MR. PHILLIPS:  Objection.  We can have

**Page 98**

1  his answer read back, if you want.
2  BY MS. KATSANTONIS:
3      Q.    Well, do you have an understanding of
4  Marco's relationship at this time with Nexus?
5      A.    Not fully, but I don't know what -- I
6  don't know what they had planned to structure.  I
7  don't recall what they had planned to structure to
8  start the program with RLI.
9      Q.    Okay.  And you don't know whether or
10 not Big Marco was an employee of Nexus?
11     A.    I don't believe he ever was.
12     Q.    Okay.  And did you have an
13 understanding as to whether Nexus had any ownership
14 interest in Big Marco?
15     A.    I don't believe they did.
16     Q.    Did you know whether or not at this
17 time Nexus and Big Marco had a common interest in
18 any other entities?
19     A.    No.
20     Q.    And so what, if anything, was your
21 understanding of the relationship between Big Marco
22 and Nexus at this time?

**Page 99**

1      A.    I can't -- I don't recall.  You're
2  talking about this point in time?
3      Q.    Well --
4      A.    In 2015?
5      Q.    Well, during the bond, whether it was
6  at this time or up to before you retired from RLI,
7  in that time frame, did you have an understanding
8  of what the relationship was?
9           I'm not trying to pin you down to a
10 certain date or anything like that.  It may be that
11 the relationship changed.  I don't know.
12          So I'm asking, what your understanding
13 was during the time that you made the determination
14 or you were involved in making the determination to
15 issue bonds and as the program was being run, you
16 know, before your retirement?
17          MR. PHILLIPS:  Objection.  You can
18 answer.
19     A.    Can you rephrase the question?
20 BY MS. KATSANTONIS:
21     Q.    I'm just trying to understand, like,
22 did you think Big Marco and Nexus were separate

**Page 100**

1  entities, did you believe that -- or that there was
2  some sort of common ownership or interest, you
3  know, what did you understand the relationship to
4  be?
5           MR. PHILLIPS:  Objection.  You can
6  answer.
7      A.    Can you ask one question at a time?
8  You've got a lot of questions.
9  BY MS. KATSANTONIS:
10     Q.    Honestly, I'm not trying to put any
11 words in -- I want you to just explain to me what
12 you knew.
13          How did you view, you know -- when this
14 program was set up, it ended up that Big Marco was
15 a collabor -- right?
16     A.    Yes, Marco was the -- ultimately became
17 the posting agent for the immigration bonds.  Where
18 RLI appointed the Big Marco agency, I don't
19 remember the specific name.
20     Q.    Sure.
21     A.    But we appointed that agency to post
22 bonds on behalf of the Nexus program.

Transcript of David Sandoz
Conducted on March 5, 2020

26 (101 to 104)

---

101

1    Q.    Right.  And so my question is: So I
2  understand that role of Big Marco.  What did you
3  understand the relationship, if any, between Big
4  Marco and Nexus?
5    **A.    I don't -- I don't recall, but I don't**
6  **think there was any formal partnership or anything**
7  **with them.**
8    Q.    Okay.  And your answer begs the
9  question was there any informal relationship that
10 you're aware of?
11   **A.    Such as?**
12   Q.    Any sort of deal between them, any kind
13 of, you know, business agreement that you're aware
14 of?
15        MR. PHILLIPS:  Objection.  You can
16 answer.
17   **A.    Not that I'm aware of.**
18        MS. KATSANTONIS:  Let's change the
19 tape.
20        MR. PHILLIPS:  We're about an hour into
21 the lunch hour too, just so you're aware.  I don't
22 care.  I always check in about an hour.

---

102

1         THE VIDEOGRAPHER:  This is the
2  videographer.  We're at the conclusion of tape
3  number one.  We're going off the record at 12:05
4  p.m.
5         (Recess taken.)
6         THE VIDEOGRAPHER:  We're going back on
7  the record at 12:15 p.m. at the start of tape
8  number two.
9         MR. PHILLIPS:  And my apologies.  I
10 just want to make sure I've really laid the basis
11 for my objections concerning leading questions, so
12 I don't have to keep interrupting the flow of the
13 deposition here.
14        But Rule 30(c) does say that you have
15 to examine as if at trial and Federal Rule
16 11(6)(11)(c) says that you're not supposed to be
17 asking leading questions on the direct examination
18 of a witness, except as necessary to develop that
19 witness's testimony.
20        I'm only mentioning this because I
21 don't believe that Mr. Sandoz has in any way said
22 that he can't answer questions.  He says that he

---

103

1  can't recall.
2         Certainly, one can refresh his
3  recollection with the documents, but I do believe
4  that's -- I fear for my client that words may be
5  put in his mouth and may agree to something not
6  understanding it and it gets twisted around.
7         So with that said, I hope everyone can
8  agree that I don't need to consistently object to
9  leading questions, so I will not be making those
10 going forward with that said.  I appreciate the
11 indulgence.
12        MS. KATSANTONIS:  And the only point
13 that I will add to the record is that Mr. Sandoz
14 has provided affidavits on behalf of Nexus in this
15 litigation, and I think questioning -- the
16 questioning has been appropriate.
17        MR. PHILLIPS:  Are you treating my
18 client as an adverse witness, for the record?
19        MS. KATSANTONIS:  I believe that I'm
20 conducting this client's deposition in order to
21 facilitate the testimony.  I think it's
22 appropriate.

---

104

1         I think the witness could be considered
2  adverse.  I prefer to continue in the manner we
3  have been going and provide a testimony.
4         MR. PHILLIPS:  So just for clarity and
5  for my notes, Mr. Sandoz -- you are not currently
6  treating my client, Mr. Sandoz, as an adverse
7  witness at this time?
8         MS. KATSANTONIS:  I think Mr. Sandoz --
9         MR. PHILLIPS:  That's a yes or no
10 question.
11        MS. KATSANTONIS:  Well, you're not
12 disposing me.  But I do think Mr. Sandoz has
13 provided affidavits on behalf of Nexus in this
14 litigation, and I'm entitled to explore that as an
15 adverse witness, and I believe that the manner in
16 which we have proceeded has been appropriate.
17        MR. PHILLIPS:  Are you designating
18 Mr. Sandoz as an adverse witness?
19        MS. KATSANTONIS:  I'm not required to
20 do that.
21        MR. PHILLIPS:  Okay.  I'm just asking
22 if you're treating him as one.

---

Transcript of David Sandoz
Conducted on March 5, 2020                    27 (105 to 108)

---

105

1        MS. KATSANTONIS:  I'm saying that he
2  can be treated as an adverse witness based on the
3  fact that he has submitted affidavits in this case.
4  But I would like to proceed with my deposition.
5        MR. PHILLIPS:  Well with that, since
6  he's still not an adverse witness, then the leading
7  objection is just going to be continuously made.
8  Thank you.
9  BY MS. KATSANTONIS:
10     Q.    All right.  Mr. Sandoz, do you recall
11  that Nexus executed the general agreement of
12  indemnity prior to our RLI issuing bonds?
13     **A.    Yes.**
14     Q.    Okay.
15        (Deposition Exhibit 16 marked
16         for identification.)
17  BY MS. KATSANTONIS:
18     Q.    And this is a document Mr. Donovan
19  forwarded to RLI and it was a signed indemnity
20  agreement and included a 2015 financial overview.
21        MR. PHILLIPS:  Just is there anything
22  with Mr. Sandoz's name on here?

---

106

1        MS. KATSANTONIS:  I can tell you that
2  the way -- when these documents were produced in
3  discovery, Mr. Sandoz had retired, so the e-mails
4  automatically wrote Bart Davis when they were
5  Mr. Sandoz's e-mails after his retirement.
6        But this was at the time frame that
7  Mr. Sandoz was dealing and you'll see there is
8  subsequent correspondence from Mr. Sandoz that
9  confirms this.  I can put that in front of him
10  also.
11        MR. PHILLIPS:  I'm just asking, so I
12  don't wonder why you're talking about an e-mail.
13        MS. KATSANTONIS:  Right.
14  BY MS. KATSANTONIS:
15     Q.    Do you recall the issue that
16  Mr. Donovan had not signed and dated the last page
17  of the indemnity agreement?
18     **A.    I just want to clarify this.  It says**
19  **this is to Bart Davis and then it's dated**
20  **Wednesday, January 20.**
21        **Are you saying that that's actually**
22  **supposed to be my name or that it was?**

---

107

1     Q.    Right.  Here's what I'll do.  Let's
2  make this easy, so you're not concerned or worried.
3        I'm going to mark as Exhibit 17.
4  You'll see at the bottom it's -- the bottom of that
5  e-mail and then here's your response.
6        I'll provide that to you as well.
7        (Deposition Exhibit 17 marked
8         for identification.)
9  BY MS. KATSANTONIS:
10     Q.    And I guess if you want to look at
11  Exhibit 17, so Mr. Donovan in Exhibit 16 forwarded
12  a GIA, which is general indemnity agreement, but it
13  was not initialed and dated on the last page.  And
14  also provided a financial overview for 2015.
15        Do you see that?
16        (Mr. Williams left deposition room.)
17     **A.    Yes, I see the indemnity agreement**
18  **here.**
19  **BY MS. KATSANTONIS:**
20     Q.    And do you see how it wasn't dated or
21  initialed on the last page?
22     **A.    Yes.**

---

108

1     Q.    So let's look at your e-mail response,
2  which is Exhibit 17.  If you want to take a minute
3  to read the top e-mail and confirm for me that that
4  was an e-mail that you wrote.
5     **A.    I don't recall it, but I have no reason**
6  **to believe it's not my e-mail.**
7     Q.    So you're again seeking from Nexus
8  their -- these documents, their financial
9  statements, and the collateral agreement indicating
10  the five payments of 100,000 each, correct?
11        MR. PHILLIPS:  Objection.  You can
12  answer.
13     **A.    Yeah, that's what the document states.**
14  **BY MS. KATSANTONIS:**
15     Q.    Right.  And to the best of your
16  recollection, that's what you required before RLI
17  would issue bonds?
18     **A.    I believe so.**
19     Q.    I'm going to do these quickly.  So
20  there are a series of e-mails that I just want to
21  confirm.
22        All right.  So -- do you recall -- so I

---

Transcript of David Sandoz
Conducted on March 5, 2020

109

1  think that you testified that Nexus did provide
2  signed indemnity agreements to you.  I'm sorry.
3        MR. PHILLIPS:  Is there a question
4  pending?
5  BY MS. KATSANTONIS:
6    Q.   So this is February 9, and you recall
7  that you received a fully executed copy of the
8  indemnity agreement from Nexus on or about
9  February 9; is that right?
10   **A.   I don't recall, but the e-mail states,**
11 **you know, the e-mail -- if this was the attachment**
12 **in the e-mail then yes, then I received the**
13 **indemnity agreement.**
14   Q.   And do you know who's handwriting, who
15 filled out the collateral agreement?
16   **A.   No.**
17   Q.   Amount there?
18   **A.   No.**
19   Q.   But what was the collateral that you
20 were requesting from Nexus prior to issuing bonds?
21   **A.   Initially, it appears that it was**
22 **$500,000.  I don't know what we wound up.**

110

1    Q.   And you recall that Nexus did not pay
2  that 500,000, correct?
3    **A.   I believe we -- it was negotiated down,**
4  **but I don't recall if you've got some e-mails or**
5  **something.  I can review them.**
6    Q.   Okay.  And after -- I'm sorry.  I was
7  trying to be fast and now I'm mixing things up.
8        (Deposition Exhibits 18 and 19
9             marked for identification.)
10 BY MS. KATSANTONIS:
11   Q.   So again, prior to RLI issuing bonds,
12 you advised Nexus that you still needed the balance
13 sheet for 2015 as well as the first installment of
14 collateral, correct?
15   **A.   I don't recall, but that's what the**
16 **e-mail says, yes.**
17   Q.   Right.  And you have no reason to
18 dispute the accuracy of your e-mail?  I mean
19 that's --
20   **A.   I don't know.**
21   Q.   Right.  That's an accurate reflection,
22 to the best of your recollection, right?

111

1    **A.   Yes.**
2        MR. PHILLIPS:  Objection.
3        MS. KATSANTONIS:  Okay.
4        (Deposition Exhibit 20 marked
5             for identification.)
6  BY MS. KATSANTONIS:
7    Q.   I'm handing you what has been marked as
8  Exhibit 20.  So in response to your e-mail, Nexus
9  did provide you with a 2015 year-end balance,
10 correct, balance sheet?
11   **A.   According to this correspondence, yes.**
12   Q.   Did you assist Nexus in any way in
13 preparing this document?
14   **A.   No.**
15   Q.   And then Nexus also advised you that
16 they had processed the first installment of the
17 collateral, right?
18   **A.   According to the document, it says they**
19 **did, yes.**
20   Q.   Right.  And do you recall at this time
21 did you understand -- I mean that -- what was your
22 understanding they had processed the installment?

112

1    **A.   I don't recall.**
2    Q.   Did you believe that meant that it
3  was --
4        MR. PHILLIPS:  Objection.
5  BY MS. KATSANTONIS:
6    Q.   -- on its way, that a check had been
7  executed?
8    **A.   I don't know at the time.  I can't**
9  **recall back to 2016.**
10   Q.   Well, certainly the representation of
11 the first installment at that point -- excuse me.
12       Certainly, the representation that the
13 first installment had been processed at that point
14 gave you -- I mean, you believed that you were
15 proceeding under the agreements and you could start
16 executing bonds at Nexus's request?
17       MR. PHILLIPS:  Objection.  You can
18 answer, if you can.
19   **A.   Can you ask me that again in simpler**
20 **terms?**
21 BY MS. KATSANTONIS:
22   Q.   I'm just saying, you know, you had

Transcript of David Sandoz
Conducted on March 5, 2020

113

1  asked, look, before we can start, we need a balance
2  sheet and we need your collateral.  And then they
3  respond and say, here's our balance sheet and we've
4  processed the collateral.
5      So at that point in time, just at that
6  point in time, you thought Nexus had complied with
7  your requests before you would issue bonds?
8      MR. PHILLIPS:  Objection; asked and
9  answered.
10  **A.    Perhaps.**
11 **BY MS. KATSANTONIS:**
12     Q.    Well, they had met the requirements
13  that you had laid out at that time, you understood
14  that they had met the requirements you had laid out
15  prior to RLI issuing bonds?
16         MR. PHILLIPS:  Objection; asked and
17  answered.  Along with the carrying on objection
18  leading.
19     **A.    If I had more documents to review to**
20 **see what all transpired, but I've got a, you know,**
21 **just a snapshot here, and I don't know how to**
22 **answer the question.**

114

1  **BY MS. KATSANTONIS:**
2      Q.    Okay.  I'm just trying to -- I'm -- my
3  question really is just simple because, you know,
4  we saw all along you were asking for financial
5  statements, the executed indemnity agreement, the
6  collateral agreement, and collateral, right?
7         That's what we looked at all morning, a
8  series of e-mails, that's some of the things that
9  you were requiring before RLI was issued bonds?
10         MR. PHILLIPS:  Is there a question in
11 there?
12 BY MS. KATSANTONIS:
13     Q.    Is that correct?
14     **A.    Yes, there are documents in here where**
15 **I have asked for certain information, yes.**
16     Q.    Right.  And those were all things that
17  you were asking for prior to RLI issuing bonds,
18  right?
19     **A.    I believe so.**
20     Q.    Yeah.  So my question was just you then
21  asked for the financial statement and the
22  collateral and Nexus responded here's the financial

115

1  statement and the collateral has been processed.
2  And my question was based on those representations,
3  you believed that your requirements had been met
4  and RLI can start issuing bonds?
5         MR. PHILLIPS:  Objection; it's been
6  asked and answered; and this is very much what I
7  was concerned about you putting words in his mouth.
8  He said that he did not recall, and you just gave a
9  full explanation to get him to say yes, what you --
10 you literally used the words you understood at that
11 time, but he just said that he doesn't recall.  So
12 that's the issue.
13         MS. KATSANTONIS:  Well, I asked him --
14 no, it's not the issue because I asked him what he
15 understood by the collateral had been processed,
16 did you think it was on its way?  I asked in an
17 open manner.  And I'm just trying to get his
18 understanding of when he saw these documents.
19 BY MS. KATSANTONIS:
20     Q.    You then -- RLI started issuing bonds,
21 right, after receiving all of this information?
22         MR. PHILLIPS:  Same objections.

116

1      **A.    We issued bonds for them.**
2  **BY MS. KATSANTONIS:**
3      Q.    Right.  I'm just trying to get your
4  understanding.  You were diligent in requesting, I
5  need the balance sheet, and we should be able to
6  start tomorrow, if you can get that for the file.
7  If you can get that for the file.  So, to me, that
8  reflects that you weren't going to --
9      **A.    Where are you at?**
10     Q.    It was page 592 at the bottom.  It's a
11 February 9, 2016, e-mail.
12         MR. PHILLIPS:  So you're back on
13 Exhibit 19?
14         MS. KATSANTONIS:  Yes.  It starts with,
15 thanks, Mike.
16     **A.    If you're asking me if I called that**
17 **internal accountant, I don't recall.**
18 **BY MS. KATSANTONIS:**
19     Q.    No.  My question was really more
20 simple.  These were things that you stated that you
21 needed to have before you would start issuing
22 bonds, right?  If I can get that -- we should be

Transcript of David Sandoz
Conducted on March 5, 2020

117

1  able to start tomorrow, if I can get that, right?
2      I'm just trying to understand -- get an
3  understanding of these were requirements that you
4  were setting before issuing bonds.
5      MR. PHILLIPS:  Is there a question
6  pending?
7  BY MS. KATSANTONIS:
8      Q.   Is that correct?
9      **A.   It was part of the — yes, it was part**
10 **of the process of working with the Nexus program.**
11     Q.   Right.  And --
12     **A.   I don't recall whether all of the**
13 **information was sent.  I don't.**
14     Q.   Right.  And then we -- I showed you the
15 next e-mail where they do send a year-end 2015
16 balance.  And then they say Nexus advised that they
17 processed the first installment of collateral.
18     MR. PHILLIPS:  Is there a question
19 pending?
20 BY MS. KATSANTONIS:
21     Q.   So based on Nexus's e-mail, did you
22 believe that RLI could then start issuing bonds

118

1  because those conditions had been met?
2      MR. PHILLIPS:  Objection; asked and
3  answered.
4  BY MS. KATSANTONIS:
5      Q.   Do you recall?
6      **A.   Can you, please, repeat the question.**
7      Q.   I'm just trying to help refresh your
8  recollection, so I'll give you another document.
9          (Deposition Exhibit 21 marked
10          for identification.)
11     MR. SHOREMAN:  He said that he doesn't
12 know.
13     MR. PHILLIPS:  Is this 21?
14     MS. KATSANTONIS:  Yes.
15 BY MS. KATSANTONIS:
16     Q.   So Exhibit 21, the bottom of that is
17 Nexus providing the '15 -- the year-end '15 balance
18 sheet and saying we've processed the installment.
19 So your response is, yes, let's start tomorrow.
20 Thanks so much for gathering all of this, and I
21 look forward to working with you.
22     So my question is:  Does that refresh

119

1  your recollection that you required this
2  information prior to starting the bond program?
3      **A.   I don't recall.  Everything about the**
4  **collateral is -- I don't really know what we**
5  **decided on the collateral issue.  I don't recall**
6  **that.**
7      Q.   Okay.  Well, you saw the collateral
8  agreement they signed, the $500,000 in monthly
9  installments?
10     **A.   I saw the collateral agreement, right.**
11     Q.   And it provides for 500,000?
12     **A.   Yeah, somebody inserted 500,000 and I**
13 **don't know who.**
14     Q.   Right.  But to the best of your
15 recollection, at that point that's what was agreed
16 to?
17     MR. PHILLIPS:  Objection; asked and
18 answered.
19 BY MS. KATSANTONIS:
20     Q.   Between RLI and Nexus?
21     **A.   I don't know.  I don't know if that**
22 **was — it seems like that was negotiated**

120

1  **differently than $500,000 at some point in time.  I**
2  **don't recall when or what was done.**
3      Q.   Did you review any documents to prepare
4  for the deposition today?
5      **A.   No, you have them all.  I don't have**
6  **the RLI system.**
7      Q.   I'm going to see if we can't assist in
8  that regard.
9      MR. PHILLIPS:  How are you doing on
10 bathroom and food?
11     THE WITNESS:  I'm about ready if we
12 could take a break at some point here, it would be
13 very nice.
14     MS. KATSANTONIS:  Let's finish through
15 this, and then we'll be at a good stopping point.
16 BY MS. KATSANTONIS:
17     Q.   This is an e-mail dated January 28 from
18 you to Greg Chilson and it sets forth --
19 Mr. Chilson asks for details on the immigration
20 program and this is your response.
21     Do you want to take a moment to read
22 that?

121

1    A.    To go through all this, could I have a
2 bathroom break before I go through all of this?  Is
3 that acceptable?
4         MS. KATSANTONIS:  Yes.  Of course.
5         THE VIDEOGRAPHER:  This is the
6 videographer.  We're going off the record at
7 12:42 p.m.
8         (Recess taken.)
9         THE VIDEOGRAPHER:  This is the
10 videographer.  We're going back on the record at
11 12:58 p.m.
12 BY MS. KATSANTONIS:
13    Q.    I'm going to hand you what we've marked
14 as Exhibit 22.
15         (Deposition Exhibit 22 marked
16          for identification.)
17 BY MS. KATSANTONIS:
18    Q.    This is an e-mail dated January 28,
19 2016.  If you want to take a minute just to refresh
20 your recollection.
21    A.    Yes, I would have to.
22         MR. PHILLIPS:  So the record reflects,

122

1 what my client is reviewing is actually two
2 e-mails, it appears.  I can't tell if they are in
3 chain or not.  It might just be a copying error.
4         MS. KATSANTONIS:  The second page is
5 from Mr. Chilson to Mr. Sandoz and the front page
6 is his response.
7         MR. PHILLIPS:  Okay.
8 BY MS. KATSANTONIS:
9    Q.    Have you had an opportunity to review
10 this e-mail, Mr. Sandoz?
11    A.    Halfway through.
12    Q.    Okay.  Sorry.
13         (Discussion was had off the written
14 record.)
15         MS. KATSANTONIS:  Can we go off the
16 record.  I'm sorry.
17         THE VIDEOGRAPHER:  This is the
18 videographer.  We're going to go off the record at
19 1:02 p.m.
20         (Recess taken.)
21         THE VIDEOGRAPHER:  This is the
22 videographer.  We're going back on the record at

123

1 1:08 p.m.
2 BY MS. KATSANTONIS:
3    Q.    All right.  And Mr. Sandoz, I handed
4 you an e-mail that is from you to Mr. Chilson dated
5 January 28, 2016.  Is that your e-mail?
6    A.    I believe it is, yes.
7    Q.    Okay.  And was this e-mail summarizing,
8 again, your understanding of Nexus Services and the
9 information they provided to you prior to issuing
10 bonds?
11    A.    To the best of my knowledge, yes.
12    Q.    And did you understand that
13 Nexus -- that the -- you know, you talk about
14 here -- about the use of the GPS monitoring and
15 that the immigrant is also assigned to work with
16 one of their case officers through the process
17 until the surety is released.
18         Do you see that?
19    A.    Yes.
20    Q.    And generally that was part of your
21 understanding as to how Nexus ran their program to
22 ensure the appearance of the immigrants for their

124

1 court cases or as required by DHS?
2         MR. PHILLIPS:  Objection.  You can
3 answer.
4    A.    Yeah, this may be an error because
5 the -- probably wasn't worded very well.
6 They -- the part of their process is to have their
7 client wear the ankle bracelet and they have case
8 officers or folks at the office stay in contact
9 with them on a regular basis, which helps ensure
10 that they will go to the Court hearing and/or to
11 the detention office for a review.
12 BY MS. KATSANTONIS:
13    Q.    Right.  That was my question that
14 generally you understood that Nexus, part of their
15 service and part of the way they stay in front of
16 RLI was to have the immigrants wear GPS bracelets
17 and work with case workers to ensure their
18 appearance in court or pursuant to DHS requests; is
19 that right?
20         MR. PHILLIPS:  Objection; asked and
21 answered objection, leading.
22    A.    Yes.

Transcript of David Sandoz
Conducted on March 5, 2020

125

**1  BY MS. KATSANTONIS:**
2     Q.     And if the -- you have a sentence in
3  here that says this works in the vast majority of
4  cases and in the ones that don't, they locate the
5  individuals and get the agreement -- and get the
6  agreement to work or they have the authorities send
7  the party back to detention.
8            By they, did you mean Nexus, these are
9  things Nexus does in order to ensure compliance
10 with the bond requirements?
11           MR. PHILLIPS: Objection; compound.
12 You got two questions.
**13    A.     Can you break that down for me?**
**14 BY MS. KATSANTONIS:**
15     Q.     Well, in that sentence you talk about a
16 they person, right.  You say in the ones that
17 don't, which is, I assume from your e-mail, that's
18 the people who don't show up to their hearings, you
19 say they locate the individual or have the
20 authorities send the party back to detention.
21           So my question was: Is that Nexus who
22 would do that or cause that to occur?

126

**1     A.     I don't recall at the time that I wrote**
**2  this what that meant, but I do believe that they**
**3  have a department that does try to locate any of**
**4  the individuals that don't show up to their hearing**
**5  or to detention or they use an outside third party.**
**6  I don't really know the answer to that.**
7     Q.     Who do they use to ensure that -- it's
8  not that the immigrant gets delivered to detention,
9  is that what you're referencing?
**10    A.     Yeah, I'm not sure.  I was**
**11 probably -- I could have been confused on the**
**12 process as it relates to -- this could have been my**
**13 best guess at that time.**
14     Q.     As to how someone was delivered to
15 detention?
**16    A.     Correct.**
17     Q.     And then it was your understanding that
18 Nexus had written about four million in premiums in
19 2015 and the bond default was less than 50,000; is
20 that right?
**21    A.     Yes, that's what I wrote here.  And**
**22 again, I don't have any evidence of that.**

127

1     Q.     You mean that you don't --
**2     A.     I don't recall.**
3     Q.     That's to the best of your
4  understanding?
**5     A.     To the best of my understanding,**
**6  correct.**
7     Q.     Okay.  And then here it says, it talks
8  about they indemnify the surety and pay the loss
9  before the surety has to.  That was consistent, I
10 think, with your testimony earlier today, right;
11 that was your understanding?
12           MR. PHILLIPS: Objection.
**13    A.     They stand in front of the surety is**
**14 what I had indicated, I believe, yes.**
**15 BY MS. KATSANTONIS:**
16     Q.     Right.  So it was your understanding
17 that Nexus would take care of bond obligations
18 before the surety so that the surety would not
19 sustain a loss?
20           MR. PHILLIPS: Objection.
**21    A.     Yes, they stand in front of the surety**
**22 and to make sure that ultimately the surety does**

128

1  not have a loss.
**2  BY MS. KATSANTONIS:**
3     Q.     Okay.  And then does this -- and then
4  do you see here that the end of the sentence, does
5  that refresh your recollection that you were asking
6  or that you understood that you were getting
7  500,000 in cash to hold as collateral?
**8     A.     At that point in time, it must have**
**9  the -- that was likely the understanding, but I**
**10 somehow recall that that was negotiated down, as I**
**11 mentioned.  I don't really remember how it wound**
**12 up.**
13     Q.     All right.  And with regard to, I
14 guess, the sizes of the bonds, again, it was your
15 understanding the average size is about 10,000.
16 But most of them run -- must of the bonds run from
17 5- to 25,000?
**18    A.     That was my understanding, I believe.**
19     Q.     And then with regard to the length of
20 the bond, was it your understanding that the
21 average bond stays enforced for six months?
**22    A.     I don't recall that.  That really**

129

1  is — I don't believe that's accurate.
2     Q.    But that's what you advised RLI, other
3  management in RLI?
4     A.    Again, I don't remember at the time but
5  I know that through the process that — that
6  I — that I don't believe it's six months —
7        MR. PHILLIPS:  He's still answering.
8        MS. KATSANTONIS:  I'm sorry.
9  BY MS. KATSANTONIS:
10    Q.    I was just, I know that the -- I guess
11 that I'm, you know, jumping ahead.  Through the
12 process you understood that the bonds were actually
13 running longer, but prior to issuing bonds, do
14 you -- did you have an understanding that the
15 average bond stays enforced from, approximately --
16 for, approximately, six months?
17    A.    That word average may not be accurate.
18 I believe they, at the time, they were anywhere
19 from six months on upwards.
20    Q.    Okay.  And was this based on
21 information -- did you write this e-mail based on
22 information provided to you by Nexus?

130

1     A.    I don't recall, but I would assume that
2  through conversations that I gathered a lot of
3  background information on the program, yes.
4     Q.    From Nexus, right?
5     A.    From Nexus.
6     Q.    And then at the end you say our agent
7  is interested in working with the sureties to get
8  the cases and bonds closed out, and we have added
9  some money incentive for them to do so.
10       Do you see that?
11    A.    Yes.
12    Q.    And that's what we talked about
13 earlier, right, about paying a commission at the
14 end to incentivize the agent to decrease exposure
15 to RLI; is that right?
16    A.    Well, to release bonds that RLI has
17 issued.
18    Q.    Right.
19    A.    That is the surety on it, yes.
20    Q.    And with the release of the bonds that
21 means the sureties exposure would be decreased?
22    A.    As it relates to that one particular

131

1  bond, yes.
2     Q.    Okay.  Well, right but as a program as
3  a whole.  If you've issued a thousand bonds every
4  bond that's released decreases the sureties risk
5  exposure, right?
6     A.    At that particular point in time at
7  that particular day, yes.  But there are always new
8  ones that you're considering the next day
9  and there's new cancelations that you're getting in
10 the next day.
11    Q.    Yes.  That is true.  Okay.
12       (Deposition Exhibit 23 marked
13        for identification.)
14       MS. KATSANTONIS:  I was just trying to
15 get -- I was watching, he said until 1:30.  I was
16 trying to get to the February 10 when we issued,
17 you know, when the bonds were issued.  So it would
18 be a good stopping spot.
19       MR. PHILLIPS:  That's fine.
20 BY MS. KATSANTONIS:
21    Q.    And, unfortunately, I remember the
22 dates better than you do at this point.

132

1     A.    That could be.
2     Q.    So this was an e-mail that was -- we
3  looked at, if you look at the bottom of the e-mail
4  on the next page, we talked about that e-mail
5  earlier that these were some of the documents you
6  were requesting, the financial statements, the
7  indemnity agreement, and the collateral agreement
8  with the payment?
9     A.    Yes.
10    Q.    Okay.  And then you also then at the
11 bottom of this e-mail do you recall asking
12 Mr. Nagel to ensure Mr. Donovan provided the
13 additional documents so that the bond program could
14 get kicked off?
15       MR. PHILLIPS:  Objection.
16    A.    No, I don't remember the e-mail.
17 BY MS. KATSANTONIS:
18    Q.    Okay.  But this is your e-mail, to the
19 best of your recollection?
20    A.    This is — this appears to be an
21 e-mail.  I have no reason to doubt that its my
22 e-mail.

133

1    Q.    Right.  And at the end on the first
2 e-mail on the top, the last two sentences, and
3 that's what we had been looking at earlier today,
4 that you were asking for this additional
5 documentation and you advised Nexus as soon as you
6 have that data, then RLI would be prepared to start
7 issuing bonds, correct?
8    A.    The last two sentences were —
9    Q.    We are set to go Monday?
10    A.    Yes, if we could get the remaining
11 information.  I can't — I can't say with certainty
12 what all that information was.  It was to still be
13 provided.
14    Q.    Okay.  Well, I'm not going to have you
15 guess, obviously, but at the end of this e-mail it
16 gives the list of the GIA, the collateral, and the
17 financial statements.
18         To the best of your knowledge, this was
19 an accurate e-mail that you sent?
20    A.    This one here?  Or this last one?
21    Q.    Yes.
22    A.    To the best of my knowledge, it

134

1 was -- yeah, I have no reason to believe that it
2 was not my e-mail.
3    Q.    Okay.  And in the middle of this first
4 one, you talk about coordinating the process and
5 getting notifications to Nexus and you say, as we
6 understand you'll be handling them on the surety's
7 behalf.  Is that consistent with what we talked
8 about earlier, that Nexus would be standing in
9 front of the surety and handling any bonds notices?
10         MR. PHILLIPS: Objection.  You can
11 answer.
12    A.    No, I don't believe so.  This is -- I
13 think we were prepared -- we were setting up a
14 process where all parties were going to have a
15 joint e-mail, as I recall, where if Nexus got any
16 kind of a notice, then RLI would be notified of
17 that notice as well as Big Marco.  And if Big Marco
18 got one, we wanted to make sure that we put it in a
19 notification so RLI knew about it and Nexus knew
20 about it and the same with RLI.
21    Q.    All right.  And then in the middle it
22 says, we want to coordinate this process and get

135

1 these notifications in your hands right away, as we
2 understand you will be handling them on the
3 surety's behalf.
4         Do you see that?
5    A.    Yes.
6    Q.    So I guess that's what I was trying to
7 understand.
8         MR. PHILLIPS:  Is there a question
9 pending?
10 BY MS. KATSANTONIS:
11    Q.    Well, did you understand that Nexus
12 would be the party, as amongst the three of you,
13 the first party that would be responding to notices
14 and ensuring the bond requirements were complied
15 with?
16    A.    Yes.
17    Q.    And did you understand that Nexus was
18 going to assign someone specifically at Nexus to
19 coordinate with RLI with regard to notices received
20 on the bonds?
21    A.    Likely, yes.
22    Q.    Okay.  All right.  Let's do one more

136

1 document and then we can break for lunch.  Does
2 that work?
3    A.    Sure.
4         (Deposition Exhibit 24 marked
5         for identification.)
6 BY MS. KATSANTONIS:
7    Q.    So the back of this e-mail chain is, we
8 looked at a little bit earlier, which was Nexus
9 providing the balance sheet and advising that they
10 had processed the collateral.  That's on the second
11 page.
12         And then on the first page, at the
13 bottom, you have an e-mail that says, yes, let's
14 start tomorrow.  And it says I'll be in touch to
15 talk to the person that you assign or currently use
16 to handle court notices.  I don't know if that's
17 Erik or if you've assigned someone else?
18    A.    Yeah, that I don't know.  I don't
19 recall.
20    Q.    Right.  In reviewing this e-mail, do
21 you recall that Mr. Donovan did say that
22 Mr. Schneider would be the person to receive

Transcript of David Sandoz
Conducted on March 5, 2020

35 (137 to 140)

---

137

1 notices related to the bonds?

2    **A.    Gosh, I don't recall.**

3    Q.    But this e-mail at the top from you to

4 Mr. Schneider says, thanks, Erik, is there a good

5 time I can come out to talk with you and meet

6 Stephanie? I'll just take up an hour or so of your

7 time making sure I get examples of what you

8 typically get and learning a bit more about your

9 process.

10        Do you see that?

11    **A.    Are you talking about way up on the**

12 **top?**

13    Q.    Uh-huh.

14    **A.    I'm sorry.  I didn't read it.**

15        MR. PHILLIPS:  He just said that he

16 didn't read it.

17        MS. KATSANTONIS:  Oh, I'm sorry.

18    **A.    Yes.  Your question?**

19 **BY MS. KATSANTONIS:**

20    Q.    Do you recall generally right after

21 starting the program of issuing bonds that you

22 requested to meet with Nexus so you could

---

138

1 understand, kind of, better the notices and the

2 process and continue in reviewing the services

3 provided by Nexus?

4    **A.    I have no reason to believe that this**

5 **isn't my e-mail, correct.**

6    Q.    Okay.  All right.  And the last

7 document and we can -- only because it's a repeat.

8        MS. KATSANTONIS:  Oh, well, let's take

9 a break, and we can come back.  Does that work for

10 you?

11        THE WITNESS:  Yeah, that would be

12 great.

13        THE VIDEOGRAPHER:  This is the

14 videographer.  We're going off the record at

15 1:30 p.m.

16        (Recess taken.)

17        THE VIDEOGRAPHER:  All right.  This is

18 the videographer.  We're going back on the record

19 at 2:12 p.m.

20 BY MS. KATSANTONIS:

21    Q.    Okay.  Mr. Sandoz, do you recall as the

22 program kicked off and RLI started issuing bonds

---

139

1 that you sent this internal e-mail, looking at

2 Exhibit 25, around to some of the staff to explain

3 the new program?

4    **A.    I don't recall that.  This is an e-mail**

5 **that is from Bonnie Heitman to Laura Piispanen.**

6    Q.    But do you see how it says, subject,

7 ICE bonds from David Sandoz?

8    **A.    Yes.**

9    Q.    And then if you look back at Exhibit

10 22.

11    **A.    It's the exact same e-mail?**

12    Q.    Right.  So we already went through

13 Exhibit 22, so I won't go back through all of that

14 with you.

15        But let me just ask you generally, if

16 you can do it off Exhibit 22, does that make you

17 more comfortable?  The document, Exhibit 22, which

18 you sent to Mr. Chilson, that --

19        MR. PHILLIPS:  Objection.  He didn't

20 recall.  He just said he has no reason to dispute

21 it.

22        MS. KATSANTONIS:  Exhibit 22?

---

140

1        MR. PHILLIPS:  He said he didn't

2 recall, but he has no reason to dispute it.

3 BY MS. KATSANTONIS:

4    Q.    All right.  Well, looking at Exhibit

5 22, was this a document that you relayed on other

6 at RLI -- excuse me, is this a document in which

7 you relayed to others at RLI what you had learned

8 in your discussions with Nexus?

9    **A.    I don't recall.  This is an e-mail to**

10 **Greg Chilson.  I don't recall in presuming — and I**

11 **have no reason to believe that it's not my e-mail,**

12 **but I don't remember sending it anywhere else.**

13    Q.    Okay.  But do you -- you don't recall

14 having a conference call with any other RLI staff

15 to talk about the immigration program?

16    **A.    No, I don't recall it.**

17    Q.    When you sent this -- well, when you

18 sent this at least to Mr. Chilson, were you

19 relaying what you had learned from your

20 discussions -- were you relaying to others at RLI

21 what you learned from your discussions with Nexus?

22        MR. PHILLIPS:  Objection.

---

Transcript of David Sandoz
Conducted on March 5, 2020

36 (141 to 144)

141

1    A.    I think we talked about that, and I
2 indicated that I presume so, but there may be some
3 things that aren't stated accurately in there.
4 BY MS. KATSANTONIS:
5    Q.    Well, this is why I'm taking your
6 deposition now. If there is something that you
7 think is inaccurate, then I need you to tell me now
8 so that we're clear for when we proceed in court.
9        MR. PHILLIPS: Is there a question
10 pending or are you just mocking Mr. Sandoz?
11 BY MS. KATSANTONIS:
12    Q.    No, I'm asking him. We went through
13 this document, and I believe you already
14 testified --
15    A.    Can I go back to the testimony on this
16 particular document? I think I talked about the 6
17 months and the 12 or 18 – 24 month. I don't –
18    Q.    Okay. Other than those things that we
19 talked about, is there anything else that you
20 believe is inaccurate?
21    A.    I don't know how to answer that
22 question.

142

1    Q.    All right. Well, reading this -- I
2 mean, you talked about you don't have any reason to
3 doubt that that's an e-mail that you wrote,
4 correct?
5    A.    Correct.
6    Q.    And typically, when you wrote an e-mail
7 to -- what was Mr. Chilson's position?
8    A.    He had just the -- he had just taken
9 over, I believe, the head position of RLI surety.
10    Q.    Right. And when we had looked at that
11 e-mail of January 28, he'd asked you, if you look
12 at the second page of that, he'd asked you
13 specifically questions about the immigration bond
14 program, right?
15        MR. PHILLIPS: Objection.
16    A.    I see the e-mail of January 25.
17 BY MS. KATSANTONIS:
18    Q.    Right.
19    A.    Where he has asked some questions and I
20 have no reason to doubt that the e-mail
21 wasn't – that the e-mail was sent to me.
22    Q.    And that -- your e-mail was the

143

1 response to Mr. Chilson; is that correct?
2        MR. PHILLIPS: Objection; asked and
3 answered. He already said that he doesn't recall.
4    A.    Yeah, I don't recall, but again, this
5 is an e-mail from me to Greg that I have no reason
6 to doubt that it is my e-mail.
7 BY MS. KATSANTONIS:
8    Q.    Right. And if -- and it would be your
9 intention to convey accurate information to
10 Mr. Chilson?
11    A.    Yes.
12    Q.    Okay. And to the best of your
13 knowledge, when you wrote e-mails to Mr. Chilson,
14 you were conveying accurate information to him?
15        MR. PHILLIPS: Objection.
16    A.    Yes.
17 BY MS. KATSANTONIS:
18    Q.    Okay.
19        (Deposition Exhibits 25 & 26 marked
20         for identification.)
21 BY MS. KATSANTONIS:
22    Q.    I've marked 26, as Exhibit 26, an

144

1 e-mail from you to Mr. Donovan copying Mr. Nagel
2 advising that the program had been kicked off. And
3 you're discussing a contingency agreement with
4 regard to commissions; is that correct?
5        MR. PHILLIPS: Objection.
6    A.    The e-mail -- I have no reason to
7 believe that the e-mail is not mine, yes.
8 BY MS. KATSANTONIS:
9    Q.    Okay. So did you -- does this -- I'm
10 just trying to understand. We talked earlier about
11 what the relationship was between Big Marco and
12 Nexus.
13        Did you have an understanding that
14 there was some sort of ownership interest between
15 Big Marco and Nexus?
16        MR. PHILLIPS: Objection; asked and
17 answered.
18    A.    I don't know if there was a
19 relationship, formal relationship with them as
20 mentioned.
21 BY MS. KATSANTONIS:
22    Q.    Okay. Right before lunch we were

Transcript of David Sandoz
Conducted on March 5, 2020

145

1  talking about Mr. Schneider and you communicating
2  with him about notices.
3        Do you recall asking him to put
4  together a packet of documents summarizing how the
5  process works for Nexus?
6    **A.    No.**
7    Q.    But this is just --
8        (Deposition Exhibit 27 marked
9          for identification.)
10 BY MS. KATSANTONIS:
11   Q.    So I'm -- I understand that you don't
12 recall, so I'm just trying to show you documents to
13 ensure -- to authenticate the genuineness of them
14 and to the extent they somehow refresh your memory
15 about something and allowing you to just keep going
16 through them and authenticate them as well.
17       So looking at this document, March 23,
18 you're writing to Mr. Schneider about a meeting you
19 wanted to go out to Verona to continue to learn
20 more about the Nexus business, right?
21       MR. PHILLIPS:  Be sure to say yes or
22 no.

146

1  BY MS. KATSANTONIS:
2    Q.    In the beginning you say you're looking
3  at some dates in early May that you can come out.
4  And then you're also looking for a packet of
5  information summarizing -- from Mr. Schneider
6  summarizing, basically, their process, so you can
7  identify documents from the Court and better
8  understand the immigration bond process.
9        Do you recall that?
10   **A.    I do not.**
11   Q.    But as far as you're -- you know this
12 is your e-mail, correct?
13   **A.    I have no reason to believe it's not my**
14 **e-mail.**
15   Q.    Okay.
16       (Deposition Exhibit 28 marked
17          for identification.)
18 BY MS. KATSANTONIS:
19   Q.    We looked at earlier the program that
20 kicked off in about on or after February 10, do you
21 recall that in the e-mails that we were looking at?
22   **A.    I do not, but I believe that's the**

147

1  **approximate time frame.**
2    Q.    Okay.  I'm showing you a document
3  dated -- an e-mail chain.  At the bottom it starts
4  with March -- well the back page is started in
5  February, February 8, and the front of the chain is
6  dated March 28, 2016.
7        So I'm looking at -- if you look at
8  page 334767 at the bottom?
9    **A.    Okay.**
10   Q.    That was the e-mail at the very top
11 that we reviewed earlier today where Mr. Donovan
12 advised provided the 2015 balance sheet and advised
13 that Nexus had processed that first installment of
14 collateral.
15       Do you recall that we looked at that
16 earlier today?
17   **A.    Yes.**
18   Q.    So now I'm going to take you to the
19 very front page and near the bottom is your e-mail
20 to Mr. Nagel.
21       And you advise that you had not yet
22 received the first installment of collateral.  And

148

1  then you advise you had to receive it by March 31,
2  correct?
3    **A.    Reading the e-mail, that's what it says**
4  **and I have no reason to believe it's not my e-mail.**
5    Q.    Right.  So do you recall that there was
6  an issue that Nexus did not make the initial
7  collateral payment as originally agreed and was
8  delayed in making any payments?
9    **A.    I don't recall but like I was**
10 **mentioning earlier, I think we — my recollection**
11 **is we renegotiated that and that was maybe on my**
12 **part.**
13       **The collateral wasn't — I think we're**
14 **focusing on this collateral thing and the**
15 **collateral wasn't really the primary underwriting**
16 **vehicle that I was looking at in doing the program.**
17       **As I mentioned, I was looking to**
18 **receive some collateral as leverage and so having**
19 **that collateral at a specific time wasn't**
20 **really — I don't know how to word it.  But it**
21 **didn't — I apparently started the program before I**
22 **had the collateral.  I guess that's the point that**

Transcript of David Sandoz
Conducted on March 5, 2020

149

1  I was trying to make.
2      Q.    Right.  Well, Nexus had advised you
3  that they were sending it when you started the
4  program, right, in that e-mail we saw at the back
5  of the chain?
6          MR. PHILLIPS: Objection.
7      A.    Yeah, I don't know.  I don't recall.
8  BY MS. KATSANTONIS:
9      Q.    Okay.  And in your e-mail at the
10 bottom, you state that you needed Mr. Nagel's help
11 because you did not receive the collateral and that
12 it is -- it has to be here by March 31, right?
13         MR. PHILLIPS: Objection.
14 BY MS. KATSANTONIS:
15     Q.    That's what you advised Nexus, correct?
16         MR. PHILLIPS: Objection.
17     A.    That's what it says in the e-mail.  It
18 says this is a reminder.
19 BY MS. KATSANTONIS:
20     Q.    And do you recall that Nexus
21 asked -- they apologized for the delay and stated
22 they had an internal issue with the CFO and asked

150

1  if they could delay the payments making one on
2  April 15 and one on May 1.
3          Do you recall that?
4      A.    I don't recall it.
5      Q.    But is that accurate to the best of
6  your knowledge?
7          MR. PHILLIPS: Objection.  He just said
8  that he doesn't recall it.
9  BY MS. KATSANTONIS:
10     Q.    Well, it's his e-mail.  So you don't
11 have any reason to -- I mean --
12     A.    This is Rick Nagel's e-mail.
13     Q.    Do you recall that -- let me just
14 change the way that I say that.
15         Isn't it true, to the best of your
16 knowledge, that you were advised by Nexus that they
17 had delayed in making the payment and they asked
18 whether they could make the payment of collateral
19 on April 15 and May 1?
20         MR. PHILLIPS: Objection; asked and
21 answered.  Objection; leading.
22         MS. KATSANTONIS: I'm going to allow

151

1  you to have -- you can have -- as far as leading,
2  you can have a standing objection to that.
3          MR. PHILLIPS: Okay.  Objection; asked
4  and answered.
5      A.    I believe I answered that.  I don't
6  remember the circumstances.
7  BY MS. KATSANTONIS:
8      Q.    Right.  But you answered in your e-mail
9  I'll -- I don't know if you meant to say fend or
10 pend for April 15 installment and the May 1
11 installment, right?
12         MR. PHILLIPS: Objection.
13     A.    The e-mail -- I have no -- I don't have
14 any reason to believe it's not my e-mail and the
15 e-mail says --
16 BY MS. KATSANTONIS:
17     Q.    And to the best of your knowledge, it
18 accurately reflects the communications between you
19 and Nexus at this time?
20     A.    Yeah, I have no doubt that these
21 are -- well, I believe that the e-mail is mine and
22 I believe the e-mail below that is Rick Nagel's.

152

1      Q.    And to the best of your recollection,
2  you were asking for -- you're continuing to ask for
3  the collateral pursuant to that collateral
4  agreement that was executed by Nexus, right?
5          MR. PHILLIPS: Objection; asked and
6  answered.  Objection; leading.
7      A.    Can you ask me the question?
8  BY MS. KATSANTONIS:
9      Q.    Sure.  At this point in March we've
10 looked at the collateral agreement that they
11 executed at Nexus that said we're going to give you
12 $500,000, 100,000 every month, right?
13         So what I'm saying is as of March, you
14 still hadn't received that first installment of
15 collateral and you are continuing to require that
16 Nexus pay those collateral installment payments as
17 of March 28, 2016, correct?
18         MR. PHILLIPS: Objection; leading.
19     A.    Again, there is something in the
20 recollection that says that we renegotiated this
21 collateral, but I don't know.
22 BY MS. KATSANTONIS:

Transcript of David Sandoz
Conducted on March 5, 2020

153

1    Q.    Sure.  Later in time.
2    **A.    Well, I don't know when that was.  We**
3    **could have had phone calls on it.  I don't know.**
4    Q.    Well, you would have said that here in
5    the e-mail, right?
6          MR. PHILLIPS: Objection; leading.
7          THE COURT REPORTER: Wait.  Wait.  One
8    at a time.
9    **A.    Where does it say that I already said**
10   **that?**
11   BY MS. KATSANTONIS:
12   Q.    Well, there was a separate collateral
13   agreement, you wouldn't be looking here at the
14   bottom of, hey, I haven't received the first
15   installment, and I need it to be here.
16         And then there is discussion in your
17   e-mail about the first and second installment.  So
18   at this point in time, you are still attempting to
19   have Nexus comply with the initial collateral
20   agreement, right?
21         MR. PHILLIPS: Objection; leading.
22   Objection; argumentative.

154

1    **A.    I don't agree with that.  I don't – I**
2    **don't recollect what -- I don't have the**
3    **recollection to know exactly what took place on**
4    **these particular – in this particular time frame.**
5    BY MS. KATSANTONIS:
6    Q.    Right.  So the contemporaneous writing,
7    this e-mail, is the best understanding of what was
8    happening at the time, to your knowledge?
9    **A.    I don't know that.**
10   Q.    Well, you're not writing false e-mails
11   between you and Mr. Nagel, are you?
12   **A.    Well, you're suggesting that there has**
13   **been no negotiations otherwise, and I have some**
14   **recall that there was some renegotiating that was**
15   **done.**
16   Q.    Okay.
17   **A.    But I just don't know the time frame.**
18   Q.    If I tell you and I can show you, you
19   have an e-mail in June, months later, in which you
20   talk about a different amount of collateral because
21   you still didn't receive the collateral from Nexus;
22   does that refresh your recollection?

155

1          MR. PHILLIPS: Objection.  That's an
2    improper -- that's testimony not refreshing his
3    recollection by showing him a document, letting him
4    review it, taking it back and then asking are you
5    refreshed, yes or no, and then he gives his answer.
6          MS. KATSANTONIS: That's what I'm
7    asking him.
8          MR. PHILLIPS: But you didn't show him
9    the document.  You didn't go through the steps that
10   are appropriate, and we'll just have to take it
11   that a document exists.
12   BY MS. KATSANTONIS:
13   Q.    You did not review any documents before
14   your testimony today?
15   **A.    I don't have access to the RLI system,**
16   **so no.**
17         MR. PHILLIPS: I would like the record
18   to reflect that no documents were sent for Mr. --
19   RLI didn't send anything to Mr. Sandoz to ask him
20   to review before today's deposition, just so the
21   record reflects that.
22   **A.    Correct.**

156

1    BY MS. KATSANTONIS:
2    Q.    Did you meet with Nexus or anyone from
3    Nexus or any of Nexus counsel before today?
4    **A.    No, not related to this litigation.**
5    **No.**
6          (Deposition Exhibit 29 marked
7           for identification.)
8    BY MS. KATSANTONIS:
9    Q.    Okay.  I showed you an e-mail dated
10   June 9, 2016.  Does that refresh your recollection
11   of any change in collateral that you are -- that
12   you keep referring to?
13   **A.    Yes, I believe this – I have no reason**
14   **to not believe that this is my e-mail and this is**
15   **the -- this is perhaps the renegotiated, apparent**
16   **renegotiated collateral amount that I asked them**
17   **for.**
18   Q.    Okay.  So going back to the March 28
19   e-mail, as of March 28, 2016, isn't it true that
20   that point in time you had agreed with Nexus that
21   it would provide you 500,000 in collateral in five
22   installments and as of March 28, 2016, it

Transcript of David Sandoz
Conducted on March 5, 2020

157

1 is your position that that amount of collateral is
2 due and owing?
3     MR. PHILLIPS: Objection; leading.
4 Objection.
5     **A.   I don't recall. I don't know when we**
6 **had other discussions. Do you have anything that**
7 **shows —**
8 **BY MS. KATSANTONIS:**
9     Q.   I do not.
10     **A.   Other phone calls. Well, I'm sorry. I**
11 **don't know.**
12     Q.   No. I know that you don't know, but
13 I'm saying based on reading your own e-mail, did
14 you understand that as of March 28, 2016, you were
15 still requiring Nexus to provide you with
16 installments of $100,000 towards the 500,000
17 collateral?
18     MR. PHILLIPS: Objection; asked and
19 answered several times over. Objection; leading.
20     **A.   You're asking me to speculate.**
21 **BY MS. KATSANTONIS:**
22     Q.   I'm not asking you to speculate. I'm

158

1 looking at the plain language in your e-mail.
2     **A.   I didn't say in there anything about**
3 **sending $100,000 in collateral, so I don't know.**
4     Q.   Okay. Let me ask it this way: Were
5 you not in March 28 of 2016, requesting that Nexus
6 pay at least two installments of collateral?
7     MR. PHILLIPS: Objection. I'm sorry.
8 He's repeatedly said he doesn't know. If you just
9 want him to say this is his e-mail.
10     MS. KATSANTONIS: I'm asking what he's
11 asking for.
12 BY MS. KATSANTONIS:
13     Q.   Aren't you asking for two installments
14 of collateral in this e-mail?
15     MR. PHILLIPS: And he said he doesn't
16 even remember sending the e-mail. That's the
17 problem we're having here. He said -- you want to
18 authenticate them and he said what he can about it.
19 BY MS. KATSANTONIS:
20     Q.   In this e-mail, Mr. Sandoz, you're
21 asking Mr. Nagel for his help, right?
22     **A.   In the top of e-mail.**

159

1     Q.   The bottom e-mail.
2     **A.   Oh, the bottom e-mail?**
3     Q.   You say I need your help, right?
4     **A.   I had -- yes, apparently, I reached out**
5 **to Rick.**
6     Q.   Right.
7     **A.   In this e-mail.**
8     Q.   And you advised him that you had not
9 received the first installment of collateral,
10 correct?
11     **A.   Correct.**
12     Q.   And you advised him that you needed the
13 first installment by March 31, correct?
14     **A.   Correct, according to the e-mail.**
15     Q.   And then at the top of the e-mail you
16 advised that you would accept receipt of the first
17 installment on April 15 and a second installment on
18 May 1, correct?
19     MR. PHILLIPS: Are you talking about
20 the same e-mail or a different e-mail?
21     MS. KATSANTONIS: Same e-mail at the
22 top.

160

1     MR. PHILLIPS: That's a different
2 e-mail.
3     MS. KATSANTONIS: I'm sorry. Different
4 e-mail on March 28.
5     **A.   I can't say with certainty what**
6 **collateral I was asking for. I'm sorry. This is a**
7 **long time ago.**
8     MS. KATSANTONIS: Okay.
9     (Deposition Exhibit 30 marked
10     for identification.)
11 BY MS. KATSANTONIS:
12     Q.   April 18, 2016, from you to
13 Mr. Chilson. Is this your e-mail?
14     **A.   I have no reason to doubt that it is**
15 **someone else's.**
16     Q.   Okay. You have no reason to doubt it's
17 yours, correct?
18     **A.   Yes.**
19     Q.   And you advised Mr. Chilson that RLI
20 had obtained the indemnity from Nexus, correct?
21     **A.   Yes.**
22     Q.   And that -- that Nexus was going to

Transcript of David Sandoz
Conducted on March 5, 2020

41 (161 to 164)

161

1 build up a collateral fund by paying 100,000 per
2 month up to $500,000, correct?
3 **A.    It refers to buildup collateral fund,**
4 **yes.**
5 Q.    At 100,000 per month up to 500,000,
6 correct?
7 **A.    That's what the e-mail says, correct.**
8 Q.    Right.  And in addition at the end of
9 that e-mail you say, I've asked that they continue
10 to pay all losses or we will use the collateral,
11 right?
12 **A.    Yes.**
13 Q.    And that is your understanding that
14 Nexus pay all losses, correct?
15 **A.    Yes.**
16 Q.    And if the collateral is used, they,
17 being Nexus, will have to replenish it back to the
18 500,000, correct?
19 **A.    Yes.**
20        (Deposition Exhibit 31 marked
21           for identification.)
22 BY MS. KATSANTONIS:

162

1 Q.    Do you recall whether in May 2010 Nexus
2 requested fewer bonds be issued on RLI paper in the
3 May time frame?
4        MR. PHILLIPS:  I'm sorry.  Did you say
5 May of 2010?
6        MS. KATSANTONIS:  I'm sorry.  May 2016.
7 **A.    No, I don't recall.**
8 **BY MS. KATSANTONIS:**
9 Q.    Okay.  If you look at the bottom of
10 that e-mail, you were writing to Big Marco with
11 regard to ensuring that bonds be issued on the RLI
12 paper.
13        Do you recall that?
14 **A.    No, I don't.**
15 Q.    Okay.  And there is discussion in this
16 bottom e-mail about being a good partner with Nexus
17 and you say, and I'm looking near the bottom, it
18 says, your plan is to meet with Mr. Donovan and you
19 want to see what can be done to get things back on
20 a good track with everyone.
21        Do you recall what the issue was at
22 this time?

163

1 **A.    No.**
2 Q.    Did you understand at this time that
3 Nexus was using other sureties to issue bonds?
4 **A.    I don't recall.**
5 Q.    And do you have -- do you recall at
6 this time you still had not received any collateral
7 from Nexus, including the April 15 or May 1
8 installments?
9        MR. PHILLIPS:  Objection.
10 **A.    I don't recall.**
11 **BY MS. KATSANTONIS:**
12 Q.    Okay.  Then looking back at the June 9
13 e-mail, which I showed you, which is this, right?
14        MR. PHILLIPS:  Which exhibit?
15        MS. KATSANTONIS:  I don't know what
16 number it is.  What number is it?
17        THE WITNESS:  29.
18 BY MS. KATSANTONIS:
19 Q.    Can you tell me what you recall about
20 this e-mail summarizing the meeting that you had in
21 Verona?
22 **A.    I don't remember the meeting, but this**

164

1 **may have been when we negotiated the $250,000 in**
2 **collateral.  I don't recall.**
3 Q.    Why did you negotiate?
4        MR. PHILLIPS:  He hasn't finished
5 answering.
6 **A.    Whenever that meeting took place.  I**
7 **have no idea when it was.**
8 **BY MS. KATSANTONIS:**
9 Q.    Right.  Why did you renegotiate of
10 $250,000 collateral -- or the 500 -- excuse me.
11 Why did you renegotiated the 500,000 in collateral?
12 **A.    Well, I don't recall, but as I had**
13 **alluded to before this collateral was not the**
14 **critical component.  I was asking for some**
15 **collateral to use as leverage and whether that was**
16 **$50,000 or 150 or 250 or 500 or whatever the amount**
17 **was, that was at my discretion and apparently we**
18 **negotiated that at a lower level.**
19 Q.    After Nexus didn't pay it, right?
20 **A.    I don't know when it was done in the**
21 **process.**
22 Q.    And certainly Mr. Chilson had asked you

Transcript of David Sandoz
Conducted on March 5, 2020

42 (165 to 168)

---

165

1  about what the collateral amount was, right, prior
2  to June, that was one of the questions?
3      MR. PHILLIPS:  Is there a question
4  pending then?
5  BY MS. KATSANTONIS:
6      Q.    Is that correct that you reported to
7  Mr. Chilson that you had obtained 500,000 in
8  collateral?
9      **A.    That I had obtained, no.**
10     Q.    Well, you said we are going to build
11 up -- we're going to build up to a 500,000?
12     MR. PHILLIPS:  Objection.
13     **A.    This e-mail suggests that we were going**
14 **to do so, yes.**
15 BY MS. KATSANTONIS:
16     Q.    Right.  And when you say for leverage,
17 can you tell me again, what do you mean by
18 leverage?
19     **A.    I just wanted to have some collateral**
20 **so — to make sure that the program was running**
21 **right.**
22     **If it wasn't running right, then**

---

166

1  **Nexus — then I had collateral to use and I could**
2  **have discontinued the program and used that**
3  **collateral for whatever purpose.**
4      Q.    Doesn't RLI have the right to
5  discontinue writing bonds at any time for any
6  reason?
7      **A.    Can you be more specific?**
8      Q.    Well, under the indemnity agreement
9  doesn't Nexus have the -- doesn't RLI have the
10 absolute right in its sole discretion to stop
11 issuing bonds at any time?
12     MR. PHILLIPS:  Objection.
13     **A.    Are you asking for this particular**
14 **program or just in general?**
15 BY MS. KATSANTONIS:
16     Q.    Sure.  In this particular program.
17     **A.    They made the decision not to write**
18 **future immigration bonds at a certain point in**
19 **time.**
20     Q.    Okay.  But do you recall that under the
21 indemnity agreement they had the absolute right to
22 stop writing at any time.  They weren't required to

---

167

1  continue issuing bonds, right?
2      MR. PHILLIPS:  Objection.
3      **A.    Do you want me to review the indemnity**
4  **agreement?**
5  BY MS. KATSANTONIS:
6      Q.    Well, I want to get your understanding.
7  You don't think that R -- I mean, I'm just trying
8  to understand what you knew.
9      You knew that RLI could stop issuing
10 bonds at any point, right?
11     MR. PHILLIPS:  Objection; leading.
12     **A.    They made the decision not to, so they**
13 **must have — the — they must have understood that.**
14 BY MS. KATSANTONIS:
15     Q.    Okay.  And why don't you tell me
16 generally, and then we'll look at some more
17 documents, but what is your understanding of after
18 this program started and you started issuing -- RLI
19 started issuing bonds, which was in -- we're
20 looking at now we're in June of 2016 and you
21 retired at the end of the year, right?
22     **A.    Correct.**

---

168

1      Q.    Okay.  When was your retirement
2  effective?  Was it December 31 or was it in January
3  or do you know?
4      **A.    I'm going to say it was the first day**
5  **or two of 2017.  And I don't know the particular**
6  **reason for that.**
7      Q.    Okay.  So what happened?  So how the
8  program was running from -- you issued the bonds --
9  started issuing bonds in February, and then we saw
10 in the documents we didn't receive collateral from
11 Nexus, then what happened --
12     MR. PHILLIPS:  Objection.
13 BY MS. KATSANTONIS:
14     Q.    -- as part of the program?
15     **A.    Can you ask specific questions?**
16 **That — I mean you're just —**
17     Q.    Well, did you think the program was
18 running well when it started?
19     **A.    Yes.**
20     Q.    Okay.  And did you -- did there come a
21 point in time where RLI decided they didn't want to
22 continue writing bonds?

Transcript of David Sandoz
Conducted on March 5, 2020

43 (169 to 172)

**169**

1         MR. PHILLIPS:  Objection.
2    BY MS. KATSANTONIS:
3        Q.     For Nexus at Nexus's request?
4        **A.     Are you asking me did RLI decide to at**
5    **some point not to write bonds for them?**
6        Q.     Right.
7        **A.     Yes.**
8        Q.     And do you know when that time frame
9    was?
10       **A.     I would have to guess at it.**
11       Q.     Can you give me an idea of when you
12   thought it was?
13       **A.     My guess is around September, October,**
14   **November of 2016.**
15       Q.     Okay.  And what was your understanding
16   of why RLI decided not to continue issuing bonds?
17          MR. PHILLIPS:  Objection.
18       **A.     Again, I'm not sure I got the full, not**
19   **again, but I'm not sure that I got the full**
20   **explanation.  My recollection was I got a call from**
21   **Craig Kliethermes who indicated that they are not**
22   **interested in the program going forward.**

**170**

1    **BY MS. KATSANTONIS:**
2        Q.     And did he provide any details to you
3    in this conversation as to why RLI was not
4    interested in going forward?
5        **A.     I believe he didn't like the background**
6    **on the owner.**
7        Q.     Okay.
8        **A.     Now, we were going to have Mike come in**
9    **and explain that, but Craig did not even want to**
10   **consider that.**
11       Q.     Okay.  And the background was the
12   criminal background of Mr. Donovan?
13       **A.     Yes.**
14       Q.     And were there other issues discussed
15   as to why the program was not a good fit for RLI?
16       **A.     I don't recall.  It was a pretty brief**
17   **conversation, and I believe it was on a phone call**
18   **and I had hoped that that there was an opportunity**
19   **for Nexus to come in and, you know, sit down and**
20   **talk about the program with Craig and any others.**
21       Q.     Was one of the reasons also that you
22   were asking RLI to start underwriting bail bonds?

**171**

1         MR. PHILLIPS:  Objection.  Go ahead.
2        **A.     Yes, Mike did want to branch out into**
3    **bail bonds at some point.**
4    **BY MS. KATSANTONIS:**
5        Q.     Mike Donovan of Nexus?
6        **A.     Yes.**
7        Q.     And wasn't it around -- didn't you
8    start the process of RLI undertaking issuing bail
9    bonds and that was an issue that RLI relayed to you
10   that it did not want to do?
11          MR. PHILLIPS:  Objection.
12       **A.     I don't think right away they did**
13   **because I believe that they were fine with it**
14   **verbally, but it hadn't gone to all the parties**
15   **that it needed to.**
16          **So in the process of waiting for that,**
17   **there was some prep work done to be in a position**
18   **to write bail bonds but then ultimately, they made**
19   **a decision that they didn't want to be in the bail**
20   **bond business.**
21   **BY MS. KATSANTONIS:**
22       Q.     Did -- did -- who did you think needed

**172**

1    to approve doing a bail bond business?  Did you
2    have an understanding have that?  Was there anyone?
3        **A.     One particular person?**
4        Q.     Right.  Or is it just kind of a group
5    decision?
6        **A.     I don't know.  I even forgot who I**
7    **worked with.  It was probably Craig that I worked**
8    **with.**
9        Q.     Well, we'll go through some documents
10   and we can see a little bit more of that.
11   But -- going into the bail bond business was an
12   issue for RLI, right, they didn't want to do that?
13       **A.     Eventually they said no.**
14       Q.     Right.  And that was at the same time
15   they said we don't want to continue the immigration
16   or bail bond business, right?
17       **A.     I don't know the timing of that, no.**
18       Q.     Okay.  And were you also aware that RLI
19   had started receiving bond breach notices at that
20   time frame September, October, November?
21       **A.     My recollection is there were one or**
22   **two notices, but I don't really remember what they**

Transcript of David Sandoz
Conducted on March 5, 2020

44 (173 to 176)

173

1 were.
2    Q.    Okay.  And then were there talks, do
3 you recall there being discussions in that time
4 frame about RLI wanting to get out of the program
5 and have a new surety take over any immigration
6 business -- immigration bonds?  Sorry.
7    **A.    Somewhere in the course of the program,**
8 **yes, they were hoping that another surety would**
9 **step in.  I'm not sure.  I was hoping.  I don't**
10 **know about -- I shouldn't speak for RLI.  I was**
11 **hoping that we could get another surety company**
12 **lined up for the Nexus program.**
13    Q.    Okay.  Was there discussions about
14 another surety even taking over RLI's existing
15 bonds?
16    **A.    I believe that was after I left RLI.**
17 **I'm not sure.  But I believe it was.**
18    Q.    You don't recall having discussions
19 about having a surety replace RLI by taking over
20 the business, including existing bonds and
21 premiums?
22    **A.    Yes, I do but I just don't know the**

174

1 time frame.  I don't recall.
2    Q.    Okay.  All right.  And looking at this
3 June 9 e-mail that I presented you with?
4    **A.    Exhibit?**
5    MR. PHILLIPS:  Which exhibit?
6 BY MS. KATSANTONIS:
7    Q.    I think it was 22 you said.  No, I'm
8 not sure.  It's dated June 9 at the top.
9    MR. PHILLIPS:  29 perhaps?
10    **A.    Yes, 29.**
11 BY MS. KATSANTONIS:
12    Q.    Okay.  Do you recall why you had
13 discussions about -- is it about changing the
14 collateral amount?
15    MR. PHILLIPS:  Objection; asked and
16 answered.
17    **A.    Yeah, I've already answered that.**
18 BY MS. KATSANTONIS:
19    Q.    You don't remember why?  Okay.  In this
20 e-mail you advised that RLI could send you 50,000
21 by June 15 and 50,000 by July 15.
22    Do you see that?

175

1    **A.    You said RLI would send us?**
2    Q.    I'm sorry.  I misspoke.  Nexus.  Thank
3 you for correcting me.
4    In your e-mail, you talked about having
5 a reduced collateral of 250,000, right?
6    **A.    The e-mail indicates that, yes.**
7    Q.    All right.  And that Nexus would pay
8 50,000 by June 15 and another 50,000 by July 15,
9 right?
10    **A.    That's what the e-mail states, yes.**
11    Q.    Right.  And then you talk about using a
12 5 percent year-end contingency money to fund the
13 rest of the collateral.
14    Do you see that?
15    **A.    Yes, I see it.**
16    Q.    What did your -- what did you mean by
17 using the contingency money to fund the rest of the
18 collateral?
19    **A.    That is actually an error because that**
20 **was subject to if there was a merger or some sort**
21 **of partnership that -- that took place between**
22 **Marco and Nexus because that money was per an**

176

1 agreement with Big Marco.
2    Q.    And when you say that money, you mean
3 contingency money?
4    **A.    Yes.**
5    Q.    So that Big Marco could not be
6 providing collateral on behalf of Nexus, right,
7 absent some sort of relationship?
8    **A.    Well, I don't know.  I don't know how**
9 **to answer that question.**
10    Q.    Well, I'm saying the reason that you
11 said that was in error was because the contingency
12 monies would be owed to Big Marco, not to Nexus,
13 correct?
14    **A.    Right.**
15    Q.    And so Big Marco funds would not be
16 used or could not be used to provide collateral on
17 behalf of Nexus absent a separate agreement, right?
18    **A.    Yes.**
19    Q.    And at this point in time, there was no
20 agreement that you were aware of between Big Marco
21 and Nexus for Big Marco to pay Nexus's obligations
22 of collateral, right?

Transcript of David Sandoz
Conducted on March 5, 2020

45 (177 to 180)

177

1    **A.    I'm not aware of one.**
2    Q.    Right.  And at this point in time, Big
3 Marco did not agree to this -- to using his
4 contingency to pay any Nexus collateral, correct?
5    **A.    I'm not sure he was even aware of it.**
6 **I didn't copy him on this e-mail, I don't believe.**
7    Q.    All right.  And then you see at the top
8 it says I have -- this is from Mr. Donovan, he
9 says, I have numbers for you from our other
10 conversation.
11         Do you see that?
12   **A.    Yes.**
13   Q.    Was that about the bail bond business?
14   **A.    I don't recall.  I have no idea.**
15   Q.    Okay.  And we talked about and I don't
16 know if you need to see, but RLI started receiving
17 bond breach notices at least in as of July 2016, if
18 not sooner.
19         Do you recall that?
20         MR. PHILLIPS:  Objection.
21   **A.    No.**
22 **BY MS. KATSANTONIS:**

178

1    Q.    Okay.
2         (Deposition Exhibit 32 marked
3          for identification.)
4         MR. PHILLIPS:  Just for the record, I
5 would note this one also says protective order.
6         MS. KATSANTONIS:  Sure.
7 BY MS. KATSANTONIS:
8    Q.    And this -- and I don't have the
9 attachment and I apologize, but do you recall
10 providing Mr. Schneider with copies of bond
11 breaches in July of 2016?
12   **A.    No.**
13   Q.    Okay.  But you have no reason to doubt
14 that you were providing Mr. Schneider with copies
15 of bond breach notice?
16   **A.    I have no idea what this is suggesting.**
17        MR. PHILLIPS:  Objection.
18 BY MS. KATSANTONIS:
19   Q.    Do you want to --
20        MR. SHOREMAN:  Can we take a short
21 break, please?
22        MS. KATSANTONIS:  If you don't mind,

179

1 for time's sake, and I can do it on the record, but
2 if he wants to look at that, I'll give you that as
3 well.
4         MR. PHILLIPS:  So are we off the
5 record?
6         THE VIDEOGRAPHER:  This is the
7 videographer.  We're going off the record at 3:07
8 p.m. at the end of tape number two.
9         (Deposition Exhibit 33 marked
10          for identification.)
11        THE VIDEOGRAPHER:  This is the
12 videographer.  We're going back on the record at
13 3:11 p.m. at the start of tape number three.
14 BY MS. KATSANTONIS:
15   Q.    Okay.  I had provided you, Mr. Sandoz,
16 if you look at the subject line of what you're
17 sending to Mr. Schneider, it gives a bond number
18 and a name but I don't really need to read on the
19 record.
20        And if you look at the other document I
21 showed you, it's the same name.  I'm just not
22 reading the name for privacy purposes.  We could

180

1 say GMR?
2    **A.    Okay.  Yes.**
3    Q.    So does this refresh your recollection
4 that what you were providing Mr. Schneider was
5 copies of a bond breach notice for GMR?
6    **A.    It doesn't refresh my memory but it**
7 **appears, you know, I have no reason to believe that**
8 **this was not what was sent.**
9    Q.    Right.  Do you recall that -- and then
10 following this time frame, do you recall that in
11 August you were having discussions, you know, with
12 Mr. Donovan with regard to setting up the bail bond
13 program in August of 2016?
14   **A.    I don't recall the time frame.**
15        (Deposition Exhibit 34 marked
16          for identification.)
17 BY MS. KATSANTONIS:
18   Q.    Does this document refresh your
19 recollection?
20   **A.    I mean, I don't have any reason to**
21 **believe that this is not my e-mail.**
22   Q.    Okay.  Did you understand that the

Transcript of David Sandoz
Conducted on March 5, 2020

46 (181 to 184)

181

1  process for bond breaches was you received a bond
2  breach notice if the immigrant wasn't delivered or
3  appeared, then an invoice would be issued and a
4  payment would have to be made on the bond?
5      MR. PHILLIPS: Objection; leading.
6  **A.   I don't believe that's a -- that that's**
7  **the only options. I mean, I believe that -- so no,**
8  **the answer is no.**
9  BY MS. KATSANTONIS:
10     Q.   What is your understanding?
11  **A.   If you get a breach notice, there can**
12 **be certain things that have taken place that may**
13 **make the breach invalid so the principal would have**
14 **the right to correct that. It's not an immediate**
15 **default and the bond has to be paid.**
16     Q.   Did you have an understanding that once
17 an invoice is issued that that would have to be
18 paid?
19  **A.   A final invoice? I mean --**
20     Q.   Well, how do you define a final
21 invoice?
22  **A.   Well, how do you define an invoice?**

182

1      Q.   Well, I'll show you an invoice, and you
2  can tell me.
3  **A.   Okay.**
4      (Deposition Exhibit 35 marked
5       for identification.)
6      MR. PHILLIPS: I'm sorry. Just so I
7  know, are you saying the invoice on the third page?
8      MS. KATSANTONIS: Yes, you're right.
9  Thank you.
10 BY MS. KATSANTONIS:
11     Q.   So looking at that invoice, did you
12 understand that unless an -- that an invoice would
13 be required to be paid if presented to RLI?
14  **A.   Again, can I read through this**
15 **correspondence because is this correspondence**
16 **disputing the invoice?**
17     Q.   Well, I just want to have a general
18 understanding. I'm not trying to look at something
19 in particular. We can go through one. But do
20 you --
21     MR. PHILLIPS: For what it's worth, if
22 Mr. Sandoz needs to review the correspondence to

183

1  figure out what's going on to answer your question,
2  I think he should.
3      If you have a different question that
4  might fix the issue, if we're trying to move things
5  along.
6  BY MS. KATSANTONIS:
7      Q.   Well, yeah. Let's move on from that.
8  But you recall at this point in time an invoice had
9  been issued, right?
10  **A.   The correspondence shows an invoice,**
11 **yes, dated August 25.**
12     Q.   All right. And in September, you were
13 still having discussions about doing a bail bond
14 program with Nexus, correct?
15  **A.   In September. I don't know.**
16     (Deposition Exhibit 36 marked
17      for identification.)
18 BY MS. KATSANTONIS:
19     Q.   Well, I'm showing you this e-mail.
20 Does that refresh your recollection? And this is
21 September of -- 10th of 2016.
22  **A.   This reflects that we were working on**

184

1  **the bail bond program at that time.**
2      Q.   Right.
3  **A.   Is that your question?**
4      Q.   Yes.
5  **A.   Yes.**
6      Q.   In September. And was that going to be
7  called Empower? What was Empower, do you recall
8  that?
9  **A.   I believe Empower was the bail bond**
10 **program that Nexus named it.**
11     Q.   Right. And you met with Mr. Donovan
12 and Nexus in Orlando to discuss the bail bond
13 program?
14  **A.   I went to Orlando to -- they had an all**
15 **company meeting, but I believe that we did talk**
16 **about the bail bond program when we were down**
17 **there.**
18     Q.   Do you also recall in September that
19 Nexus was late in paying premiums for the bonds --
20 the immigration bonds that were issued.
21     Do you recall that issue?
22  **A.   No.**

185

1    (Deposition Exhibit 37 marked
2    for identification.)
3 BY MS. KATSANTONIS:
4    Q.    Is that an e-mail that you sent?
5    A.    **I have no reason to believe it's not an
6 e-mail that I sent.**
7    Q.    And does that reflect there are issues
8 with timely payment of premiums in September of
9 2016?
10    A.    **It appears to indicate that that is
11 paid through June.**
12    Q.    As of September, right?
13    A.    **The e-mail is September 13, yes.**
14    Q.    Right.  And it was important to ensure
15 that the premiums were received on time.  At this
16 point there was -- Nexus was late in paying
17 premiums to the best of your recollection?
18    MR. PHILLIPS:  Objection; compound.
19 BY MS. KATSANTONIS:
20    Q.    Is that correct?
21    A.    **It appears.  I don't know.**
22    (Deposition Exhibit 38 marked

186

1    for identification.)
2 BY MS. KATSANTONIS:
3    Q.    This is an e-mail dated September 28,
4 2016.  Do you recall sending this e-mail to
5 Mr. Donovan?
6    A.    **No.**
7    Q.    Okay.  And do you recall that around
8 the September 28 time frame that you had some
9 information regarding Mr. Donovan's background?
10    A.    **I don't recall the -- you're too
11 specific on the dates.  I don't know.**
12    Q.    I'm sorry.  But you have no reason to
13 doubt that this was your e-mail that you sent to
14 Mr. Donovan, correct?
15    A.    **I have no reason to believe it's not my
16 e-mail.**
17    Q.    And do you recall -- and I'm not trying
18 to tell you to -- but do you recall sending him an
19 e-mail with his criminal background and for him to
20 review?
21    A.    **You mean this e-mail here?**
22    Q.    Yes.

187

1    A.    **I don't recall sending it, no.**
2    Q.    Okay.
3    A.    **But I'm not arguing that it's my
4 e-mail.**
5    Q.    Do you -- did you -- do you know
6 whether or not Mr. Donovan provided a response to
7 that e-mail?
8    A.    **I do not.**
9    Q.    Okay.
10    A.    **I do believe that he was like I had
11 mentioned, that he wanted to come in and talk to
12 the -- Kliethermes and some of the others.  And I
13 believe it was about this.  And the discontinuation
14 of their decision not to write bail and to
15 immigration.**
16    Q.    Right.  Do you recall -- and I'm not
17 going to hold you to it, but you -- you talked to
18 Nexus and advised them that RLI was intending not
19 to continue to issue bonds and wanted to cease and
20 revert to their immigration bond program?
21    A.    **I believe I delivered that message,
22 yes.**

188

1    Q.    And you don't -- and did you advise
2 Nexus that RLI wanted a new surety to take over the
3 program and to also take over the existing bonds?
4    A.    **I don't recall, but I wanted to see if
5 I could help him transition the business.**
6    Q.    And why was that?
7    A.    **Because I -- I believed in the program
8 and it was in RLI's best interest that I find --
9 help him find another surety company.**
10    **So for financial reasons for RLI and I
11 liked the program.**
12    Q.    Why would it be in RLI's best interest?
13 I mean, they could stop writing the bonds any time,
14 right?
15    MR. PHILLIPS:  Objection; compound.
16 Which question do you want him to answer?
17 BY MS. KATSANTONIS:
18    Q.    Why would it be in RLI's best interest
19 to have another surety take over?
20    A.    **Well, if he doesn't have another
21 surety, he's not going to be able to help further
22 clients.**

Transcript of David Sandoz
Conducted on March 5, 2020

48 (189 to 192)

189

1    Q.    Okay.  I understand that.
2          (Deposition Exhibit 39 marked
3          for identification.)
4    BY MS. KATSANTONIS:
5    Q.    This is Exhibit 39.  So this is in
6    September and the subject is immigration and bail
7    programs.
8          And you advised Mr. Chilson, I have a
9    call in to Mike to let him know that we are no
10   longer a market for these product lines, right?
11   A.    Correct.
12   Q.    Okay.  And you advise that you wanted
13   to get together with Mr. Chilson to assist him with
14   the process to get a new surety for immigration and
15   a new bail program and wind our association with
16   these lines as soon as possible, right?
17   A.    That's what the e-mail indicates.
18   Q.    Okay.  So as of September, at least 29,
19   2016, to the -- as of September 29, 2016, you had
20   advised or you understood that RLI was going to
21   cease the immigration bond program, right?
22         MR. PHILLIPS:  Objection.

190

1    A.    It appears so.
2    BY MS. KATSANTONIS:
3    Q.    Okay.  And then you also discuss
4    that -- and you believe at or about this time you
5    advised Nexus of the same, correct?
6    A.    I believe so.  It suggests I have a
7    call in to Mike.  Maybe I hadn't relayed that
8    message yet.  A call in to Mike may mean that I
9    left him a message to call me.
10   Q.    Right but to the best of your
11   recollection, at or about this time you advised
12   Nexus that RLI was no longer going to continue with
13   the immigration bond program, correct?
14         MR. PHILLIPS:  Objection; leading.
15   A.    I believe at some point I did talk to
16   Mike about it.  I delivered that message.
17   BY MS. KATSANTONIS:
18   Q.    Right around this time frame?
19   A.    I don't know when.
20   Q.    But --
21   A.    I can't give you a date.  I don't know.
22   Q.    Right, but you have no reason to

191

1    believe that it wasn't at or around this time,
2    correct?
3          MR. PHILLIPS:  Objection; leading.
4          MR. SHOREMAN:  Objection.
5          MS. KATSANTONIS:  I have more
6    documents, guys.
7          MR. SHOREMAN:  Put them in front of
8    him.
9    BY MS. KATSANTONIS:
10   Q.    Anyway, you left -- you had put in a
11   call to Nexus to advise them of the same, correct?
12   A.    At some point I did.  I believe I did.
13   Q.    Right.  As of September 29 you had at
14   least put in the call to Nexus, correct?
15   A.    It appears so.
16   Q.    And, in fact, you say you and discussed
17   Tracy, so I think Mike is going to talk to him soon
18   if he hasn't already.
19         Do you see that?
20   A.    Yes.
21   Q.    Is Tracy, someone from Evergreen
22   Surety?

192

1    A.    I believe so.
2    Q.    Right.  And so you had already had
3    discussions with Nexus about transitioning your
4    business over to Evergreen?
5    A.    Perhaps.
6    Q.    All right.  Because it says if he
7    hasn't already, correct?
8    A.    That's what it says, yes.
9          MR. PHILLIPS:  Objection.
10         (Deposition Exhibit 40 marked
11         for identification.)
12   BY MS. KATSANTONIS:
13   Q.    And I'm showing you a document and the
14   e-mail from you is September 30, 2016.  Do you see
15   the second e-mail from you to Mr. Donovan.  And
16   it's ICE contact info and paperwork and you say, I
17   hope this information helps as the new surety takes
18   our place.
19         Do you see that?
20   A.    Yes.
21   Q.    So as of September 30, you had advised
22   Mr. Donovan at Nexus that -- of the intention for a

Transcript of David Sandoz
Conducted on March 5, 2020

193

1  new surety to take RLI's place, correct?
2      A.    **I'm not sure what this means. I don't**
3  **think I had another surety for him or anything. I**
4  **don't —**
5      Q.    Well, you say I hope this information
6  helps as the new surety takes our place?
7      A.    **Yeah, but I don't know if there was a**
8  **new surety. I don't think there was a new surety**
9  **that was going to take RLI's place.**
10     Q.    Well, we just talked about RLI was
11 going to stop being in the program, right, the day
12 before on the 29?
13     A.    **I'm just saying that I don't believe**
14 **that there was another surety in place to take the**
15 **program as of this time frame here.**
16     Q.    Okay. Well, do you know whether or not
17 RLI or Nexus was using other sureties at the same
18 time as RLI in issuing immigration bonds?
19     A.    **As indicated, I don't remember.**
20     Q.    Okay. But with regard to forwarding
21 Mr. Donovan the ICE contact information and
22 paperwork, do you recall whether it was to

194

1  facilitate a new surety going forward?
2      A.    **No.**
3          (Deposition Exhibit 41 marked
4           for identification.)
5  BY MS. KATSANTONIS:
6      Q.    This is an e-mail dated October 19,
7  2016, and the subject is monthly payment. And do
8  you recall as of October 19, Nexus was late in
9  making premium payments?
10     A.    **I do not recall.**
11     Q.    And this e-mail indicates that Nexus
12 still owed premium payments for bonds issued in
13 July, correct?
14     A.    **It indicates that in the e-mail.**
15     Q.    Right. And it says, in the middle,
16 payments need to be made in full by the first of
17 the each month as agreed or I have to suspend
18 issuance of future business by notification to ICE,
19 right?
20     A.    **I got to find that. I don't know**
21 **where.**
22     Q.    It's about the fifth line from the

195

1  bottom.
2      A.    **That's what the e-mail says.**
3      Q.    Okay. And do you --
4          (Deposition Exhibit 42 marked
5           for identification.)
6  BY MS. KATSANTONIS:
7      Q.    And do you recall having discussions
8  with Tracy Tucker at Evergreen to help transition
9  the immigration bond program to Tracy's operation?
10     A.    **I don't recall the discussion with him.**
11 **Looks like Greg Chilson called him.**
12     Q.    Right.
13         (Mr. Williams entered the deposition
14 room.)
15 BY MS. KATSANTONIS:
16     Q.    All right. So to the best of -- I
17 mean -- is this your e-mail?
18     A.    **I have no reason to believe it's not my**
19 **e-mail.**
20     Q.    Okay. And do you recall a discussion
21 with -- an internal discussion in RLI where it was
22 determined that additional collateral would be

196

1  required of Nexus?
2      A.    **No.**
3      Q.    And do you recall that there had been
4  further bond breach notices and past due notices by
5  November of 2016?
6      A.    **I don't — I only thought there was a**
7  **couple of them by the time that I left RLI so no, I**
8  **don't have any more knowledge on that.**
9          (Deposition Exhibit 43 marked
10          for identification.)
11 BY MS. KATSANTONIS:
12     Q.    I'll show you this. This is an e-mail
13 of November 7, 2016, and Mr. Chilson reaches out to
14 you and says, today's report reminded me to
15 schedule the collateral call and other
16 introductions with Mike.
17         Do you see that?
18     A.    **Yes.**
19         MR. PHILLIPS: I'm sorry. I just
20 wanted the record to reflect the second page is
21 illegible, if it matters.
22         MS. KATSANTONIS: You're right. It's

197

1  just listing bond principals.
2       MR. PHILLIPS:  I just want it on the
3  record.
4  BY MS. KATSANTONIS:
5       Q.    Do you recall -- so you don't recall
6  that there was a discussion about --
7       **A.    Correct.  I don't know if that ever**
8  **took place.**
9       (Deposition Exhibit 44 marked
10        for identification.)
11  BY MS. KATSANTONIS:
12       Q.    This is an e-mail dated November 9, but
13  the bottom e-mail is November 8.
14       On the November 8 e-mail to
15  Mr. Donovan, you asked him if he had availability
16  to join a conference call about the program
17  tomorrow, correct?
18       **A.    According to the e-mail, that's what it**
19  **says.**
20       Q.    This is your e-mail, correct?
21       **A.    I have no reason to believe it's not.**
22       Q.    Okay.  And you advised that the

198

1  conference call is related to transiting the
2  program to new surety and any progress made in that
3  regard and thoughts we have as the program winds
4  down, correct?
5       **A.    Correct.**
6       Q.    So -- so at this point in time in
7  November, clearly Nexus -- you had advised Nexus
8  that the bond program would need to be transitioned
9  to a new surety, right?
10       **A.    It appears so.**
11       (Deposition Exhibit 45 marked
12        for identification.)
13       MR. PHILLIPS:  Just for the record,
14  both 44 and 45 have the protective order language.
15  BY MS. KATSANTONIS:
16       Q.    Okay.  This is an e-mail dated
17  September 7 from you to Mr. Donovan and
18  Mr. Chilson's copied on.  The subject is a
19  conference call a few weeks ago.
20       Do you recall -- well, first of all, is
21  this your e-mail?
22       **A.    I have no reason to believe it's not my**

199

1  e-mail.
2       Q.    Okay.  If you want to a minute to read
3  it.
4       **A.    Please.**
5       MS. KATSANTONIS:  Is there some sort of
6  the privilege between the two of you?
7       MR. PHILLIPS:  No, not that I'm aware
8  of.
9       MS. KATSANTONIS:  Can I read that note?
10       MR. SHOREMAN:  No, you may not.
11       MS. KATSANTONIS:  Well, it's not a
12  privilege communication.
13       MR. SHOREMAN:  So ask for a discovery.
14       MS. KATSANTONIS:  Well, I'm going to
15  ask on the record if you're passing notes and it's
16  not a privileged communication, then I'm entitled
17  to read it.
18       MR. SHOREMAN:  No, you're not.
19       MS. KATSANTONIS:  I'm entitled to
20  review that noted unless you're asserting some sort
21  of privilege.
22       MR. SHOREMAN:  I am.  Personal

200

1  privilege.
2       MS. KATSANTONIS:  There is no personal
3  privilege.
4       MR. SHOREMAN:  Yes, there is.
5       MS. KATSANTONIS:  We're in the middle
6  of a deposition and counsel -- I want the record to
7  reflect that counsel for Mr. Sandoz passed a note
8  for counsel for Nexus --
9       MR. SHOREMAN:  Call the judge.
10       MS. KATSANTONIS:  Regarding
11  the deposition.
12       MR. SHOREMAN:  Call the judge.
13       MS. KATSANTONIS:  Are you --
14       MR. SHOREMAN:  I'm refusing to give you
15  that note.  It's of a personal nature.  Call the
16  judge.
17       MS. KATSANTONIS:  It's of a personal
18  nature, not related at all to any of this
19  deposition.
20       MR. SHOREMAN:  Call the judge.
21       MS. KATSANTONIS:  Do you want me -- are
22  you going to answer my question on the record?

201

1        MR. SHOREMAN: I'm saying I will not
2 give you that note.
3        MS. KATSANTONIS: Well, I'm asking you
4 does it have to do with the testimony that we're in
5 the middle of?
6        MR. SHOREMAN: I'm not going to answer
7 your questions.
8        MS. KATSANTONIS: So then it does. So
9 we'll -- well, during a break I will call the
10 judge.
11        MR. SHOREMAN: Good. What's his name?
12        MS. KATSANTONIS: And I would ask that
13 counsel not destroy the e-mail or the note.
14        MR. SHOREMAN: What's the name of the
15 judge that has jurisdiction?
16        MR. PHILLIPS: It could be any of five
17 of them.
18        MS. KATSANTONIS: I'll make sure that
19 the Western District of Virginia is aware of it.
20 BY MS. KATSANTONIS:
21    Q.    Mr. Sandoz, have you had a chance to
22 review this e-mail? Are you still reading it?

202

1    **A.    Yes, I got kind of distracted. I'm**
2 **sorry.**
3        MR. PHILLIPS: In the future, can we
4 get two copies of documents so my notes, as I'm
5 trying to put notes on the things that you hand us
6 and we have to share our exhibits over here,
7 because I see that you have extra ones in there.
8 So just in the future can we get one for me and one
9 for counsel?
10        MS. KATSANTONIS: Sure.
11 BY MS. KATSANTONIS:
12    Q.    Have you had a chance to review that?
13    **A.    I have. I may need to refer to it.**
14    Q.    And so does that e-mail refresh your
15 recollection that RLI requested additional
16 collateral?
17    **A.    I don't recall that, but that's what it**
18 **states in the e-mail.**
19    Q.    Okay. So is it true that other than
20 just reading this e-mail you don't recall any of
21 the substance of this e-mail at all?
22    **A.    Any of the substance of the e-mail?**

203

1    Q.    Well, let me ask it a different way.
2 Okay.
3        Do you have any recollection as to why
4 a collateral was being requested of a 1,250,000?
5    **A.    I believe — I can tell you that I did**
6 **not come up with that figure. I believe that was**
7 **something that I was anointed to pass along to**
8 **Nexus. I don't know who made that decision,**
9 **though. I don't.**
10    Q.    Okay. And looking at this e-mail, one
11 of the things it says at the beginning it talks
12 about transiting the program to another surety,
13 correct?
14    **A.    It talks about transitioning the**
15 **program to another surety.**
16    Q.    All right. And then it also talks
17 about when RLI additionally agreed to underwrite
18 the program, it believed that the bond term would
19 be shorter in length and that the company prefers
20 the business to be transactional short tail
21 obligations.
22        Do you see that?

204

1    **A.    Yes, and I believe that came from**
2 **across the street. Craig Kliethermes or**
3 **individuals.**
4    Q.    Or Mr. Chilson?
5    **A.    It could have been.**
6    Q.    Okay. So --
7    **A.    I doubt it because Greg writes very**
8 **long tail business and so I would suggest that it**
9 **was probably the home office.**
10    Q.    So basically, the home office
11 determination that it would prefer to bond short
12 tail obligations; is that what you're saying? I'm
13 just trying to understand.
14    **A.    I think any insurance company wants to**
15 **write -- I shouldn't say any, but a lot of**
16 **insurance companies want to write short -- as short**
17 **of tail obligations as possible.**
18    Q.    Okay.
19    **A.    It doesn't mean that longer tail**
20 **obligations are bad in any way.**
21    Q.    Okay. Do you recall -- all right. And
22 then it says, it talks about the 500,000 in

Transcript of David Sandoz
Conducted on March 5, 2020

---

205

1   collateral that was initially required and it is
2   RLI's position that since the length of the bonds
3   is longer, that there is more exposure, right?
4       **A.    Can we go over what does -- what is**
5   **you're definition of exposure? Because my**
6   **definition of exposure is when you have a breach,**
7   **there is exposure to RLI and, for example if you**
8   **write a $25,000 bond and you have a $25,000 breach**
9   **the exposure to RLI is $25,000 and we're**
10  **asking -- we were asking Nexus to stand in front of**
11  **that $25,000 exposure.**
12      Q.    Okay.  And so --
13      **A.    And I don't know if your definition may**
14  **be a lot different than that.  I'm just trying to**
15  **clarify.**
16      Q.    No.  I appreciate that.  What you're
17  saying is if there is a breach and it's for
18  $25,000 --
19      **A.    And it must be paid then that's the**
20  **exposure that RLI has where we asked Nexus to step**
21  **in front of and address.**
22      Q.    Well, I think here let's look at what

206

1   you're saying here because you actually define, I
2   think, you say what you mean by exposure here.
3           First of all you say it looks like the
4   average length of exposure runs more than one year.
5   As our records only show 19 bonds exonerated to
6   date.
7           Do you see that?
8       **A.    So a particular bond has $25,000 of**
9   **exposure.  It's not going to be more.  In some**
10  **cases it could be less.  Perhaps not in the**
11  **immigration program, but.**
12      Q.    Well, I'm talking about -- let's stick
13  to the immigration.
14          At this point, there's -- here's --
15  let's just read this part here.  You say, it looks
16  like the average length of exposure runs more than
17  one year as our records show only 19 bonds
18  exonerated to date.  So aren't you referencing how
19  many bonds are -- have been issued, that are out
20  there?
21      **A.    Well, yes.  But you realize that they**
22  **are spaced between when we started the program and**

207

1   **the date of this letter, right, they were not all**
2   **written a year ago.**
3       Q.    Right.
4       **A.    So yes, I mean they are bonds that are**
5   **written every month, and I don't know what those**
6   **numbers were and how they looked.**
7       Q.    Well, no.  You say it right here.  So
8   this is December 2016 and RLI was getting ready to
9   exit the program, right?  They were going to stop
10  issuing bonds, which they had the right to do,
11  right?
12      **A.    Which, yeah, in reading this indicates**
13  **that they planned to wind it down as of**
14  **February 28, 2017.**
15      Q.    Okay.  And it says here and I'm just
16  going to read a couple of sentence and we'll talk
17  about it.
18          It says, it looks like the average
19  length of exposure runs more than one year as our
20  records only showed 19 bonds exonerated to date.
21  Due to the length of the average bond -- excuse me.
22  Due to the length the average bond remains

208

1   enforced, we'll need more collateral than the
2   500,000 initially anticipated to remain on the
3   program through the first few months of 2017.  We
4   are going to need collateral amounting to 5 percent
5   of the total exposure RLI has outstanding at any
6   point in time which will be reviewed periodically.
7           RLI's current exposure is,
8   approximately, 25 million, so the collateral
9   requirement that must be met is 250.
10          Do you see that?
11      **A.    Yes, I was delivering this message.**
12      Q.    All right.  So with regard to the
13  exposure that's discussed in this e-mail, you're
14  talking about the amount of outstanding bonds that
15  RLI has issued at Nexus's behalf, correct, the
16  total penal sum of those outstanding bonds?
17      **A.    Collectively, you mean?**
18      Q.    Right.  The 25 million, that's what the
19  reference is, right?  It says RLI's current
20  exposure is approximately, 25 million, right?
21      **A.    Correct.**
22      Q.    And so that 25 million is referencing

---

209

1  the outstanding bonds that RLI has issued at the
2  request of Nexus, right?
3      **A.    It appears so, yes.**
4      Q.    And from the information that you
5  had -- well, first of all from the information that
6  you had only 19 bonds had been exonerated to date,
7  right?
8      **A.    Correct.**
9      Q.    Do you know how many bonds had been
10 issued?
11     **A.    I do not.**
12     Q.    Okay.
13     **A.    And I do believe that there are zero**
14 **that ran more than one year.  So again, I think**
15 **that I was trying to soften the message to Nexus**
16 **and deliver a message that I didn't agree with that**
17 **RLI wanted off the program so I was trying to -- I**
18 **was trying to deliver it as soft as I could.**
19     Q.    Well, RLI could stop writing bonds at
20 any time it wanted, right, we talked about that?
21         MR. PHILLIPS:  Objection.
22     **A.    I don't know I would have to look at**

210

1  **the indemnity agreement.**
2  **BY MS. KATSANTONIS:**
3      Q.    Well, I'm happy to show you that
4  provision in the indemnity agreement that we looked
5  at earlier.  But RLI -- at this point in time, had
6  you'd had discussions about replacing RLI existing
7  bonds as well with a new surety, right?
8      **A.    Can you -- I'm sorry.  Can you state**
9  **that one more time?**
10     Q.    At this point in time, hadn't you had
11 discussions about replacing RLI?
12     **A.    With Nexus?**
13     Q.    Well, replacing RLI with another surety
14 who would take over RLI's existing book of
15 business?
16     **A.    I don't know.  I probably don't -- I**
17 **don't believe that's accurate.  I think we were**
18 **trying to transition the program to another surety.**
19 **I'm not sure at this point in time whether we were**
20 **talking about the next surety taking all of RLI's**
21 **bonds.**
22     Q.    We'll look at that in a minute.

211

1      **A.    Okay.**
2      Q.    Here you say we're going to need 1.25
3  million for the 25 million exposure, right?
4      **A.    Yes.**
5      Q.    And then you keep -- you go on to say,
6  we know it takes time to replace the program.  And
7  we assume that's a more preferable route so the
8  goal is to have a new program moved to a better fit
9  for you by 2/28 and if the program is replaced by
10 that date, it is not necessary to provide the
11 collateral.  We will just hold back the contingency
12 cancelation money that you would earn if you
13 qualify for contingency.
14         What did you mean by that?
15     **A.    That's a good question.**
16     Q.    And if you keep reading it says, we'd
17 like to set up a conference call to discuss your
18 progress in replacing RLI and any help we can give
19 you.  We would also like to do anything we can to
20 help manage cancelation of bonds and you mention
21 you'd put folks to the task of getting exonerations
22 on our bonds and we would like to know the progress

212

1  that you've made thus far.
2          So I'm trying to understand, let's go
3  back to the first part that I read.  Can you advise
4  what you meant by, we know it takes time to replace
5  the program?
6      **A.    Okay.  Yes.**
7      Q.    Yeah.  Right.  And then you say, if the
8  program is replaced by the date, it is not
9  necessary to provide the collateral.  We will hold
10 back contingency cancelation money.
11     **A.    I would have to speculate what was**
12 **meant by that.  I don't know.  I know that we were**
13 **just trying to find him another home and I -- and**
14 **we were hoping that he could do that by 2/28/17**
15 **because if he didn't that left a hole where he**
16 **didn't have a surety.**
17         **Maybe he had other sureties.  I don't**
18 **know.  The fear on my part was that he didn't have**
19 **any other surety, so I was leaving him without.**
20     Q.    Right.  And certainly again, the
21 expectation here that you were advising, was that
22 RLI was going to need -- if it had 25 million in

Transcript of David Sandoz
Conducted on March 5, 2020

54 (213 to 216)

213

1 exposure it was going to require 1.25 million in
2 collateral at this time, right?
3     **A.   I believe that's what they wanted, yes,**
4 **from reading the e-mail.**
5     Q.   Right.  And -- okay.  And it says we
6 are going to need collateral amounting to 5 percent
7 of the total exposure RLI has outstanding at any
8 point in time, which will be reviewed periodically.
9     Do you see that, kind of in the middle
10 where they talk about the 5 percent?
11     **A.   Okay.**
12     Q.   Okay.  So was it your understanding
13 that the message is that as long as RLI had
14 outstanding exposure, they were going to require
15 collateral of at least 5 percent at any point in
16 time?
17     **A.   Well, it's confusing because then it**
18 **goes on to say that if the program is replaced by**
19 **2/28, that collateral would not be necessary.**
20     **So, I'm sorry, I'm unclear on what that**
21 **meant.  I don't know if RLI was going to waive the**
22 **collateral requirement after 2/28 or not.**

214

1     (Mr. Williams left the deposition
2 room.)
3 BY MS. KATSANTONIS:
4     Q.   Well, you don't talk about waiting, you
5 talk about holding back contingency cancelation
6 money.  That contingency money would be the Big
7 Marco money again, right?
8     **A.   Yes, which is in error.**
9     Q.   So that wouldn't make any sense, right?
10 I mean if RLI's book of business was taken over by
11 another surety, then that would make sense, right?
12     **A.   Can you explain that?**
13     Q.   Well, if somebody -- if another surety
14 took over RLI's existing bonds, then they wouldn't
15 require collateral because there would be no more
16 outstanding exposure, right?
17     MR. PHILLIPS:  Objection.  You can go
18 ahead and answer, though.
19     **A.   I know at some point we were — we**
20 **were — I thought that was after I had left RLI**
21 **that I was pursuing that for RLI.  I was trying to**
22 **help them.**

215

1 BY MS. KATSANTONIS:
2     Q.   Well, wasn't it while you were at RLI
3 that you were talking about forming a new surety
4 company?
5     **A.   I don't know the time frame in that.**
6 **That that was they -- that was a -- something that**
7 **Nexus was hopeful of and I was going to participate**
8 **in, yes.**
9     MS. KATSANTONIS:  I need more exhibit
10 labels.
11     MR. PHILLIPS:  Can we get two?
12     (Deposition Exhibit 46 marked
13       for identification.)
14     MS. KATSANTONIS:  Is that 46?
15     THE WITNESS:  Yes.
16 BY MS. KATSANTONIS:
17     Q.   All right.  So this is an e-mail from
18 you to Mr. Donovan.  Is this your e-mail?
19     **A.   I have no reason to believe it's not,**
20 **correct.**
21     Q.   And I'm not going to have you read the
22 whole thing at this point.  But is this an e-mail

216

1 about setting up a new insurance company to work
2 with Nexus?
3     **A.   Yes, this was another option, longer**
4 **term option, yes.**
5     Q.   So looking at the second page, this new
6 insurance company Nexus was going to be -- I'm
7 looking at the second bullet point.  At the last
8 sentence, it says, I believe it's a tremendous
9 advantage to have Mike, Nexus own a part of the
10 insurance company.
11     Do you see that?
12     **A.   Yes.**
13     Q.   So part of a new insurance company
14 would be with Mr. Donovan or Nexus owning a part of
15 it?
16     **A.   That was what was considered, the**
17 **thought on it, anyway.**
18     Q.   In November of 2016, right?
19     **A.   Correct.**
20     Q.   And the next -- the third bullet point
21 talks about RLI and it says, it talks about RLI
22 that they have one-third of Nexus's total surety

217

1 premiums that will eventually be moved to this new
2 operation.  And then it says that concern has been
3 lifted.
4         Do you see that?
5     A.   Yes.  Who wrote this?
6     Q.   You did.
7     A.   Okay.  I wrote it.
8     Q.   So do you recall having discussions
9 about starting a new insurance group that would
10 take over the RLI book of business, including its
11 existing bonds?
12     A.   Yes, that was a possibility that we
13 exploring.
14     Q.   At this time, right, the end of
15 November, 2016?
16     A.   Well, I'm not sure that we did much in
17 that short of time frame, but yes it was primarily
18 after I left RLI.
19     Q.   But as of November 30, 2016, at this
20 point there were those discussions, correct?
21     A.   Yes, I'm sure there were.
22         (Deposition Exhibit 47 marked

218

1         for identification.)
2 BY MS. KATSANTONIS:
3     Q.   Do you recall at the end of December
4 2016, before you left, that RLI was having concerns
5 because they were receiving past due notices on
6 invoices and DHS was threatening to refer RLI to
7 treasury if payments weren't made on bond breaches?
8         MR. PHILLIPS:  Objection.
9     A.   I don't recall that, no.
10 BY MS. KATSANTONIS:
11     Q.   Okay.  Well, this is e-mail chain
12 between you and Ms. Piispanen regarding -- if you
13 look at the top, you're talking about giving Nexus
14 a deadline to pay in.  If you look at the bottom,
15 there is discussion about contacting Mr. Schneider
16 and advising that Nexus has to pay by a certain
17 date because we don't want to jeopardize our
18 relationship with treasury.
19         Do you see that?
20     A.   Is it all in this first paragraph?
21     Q.   And at the bottom.
22     A.   I'm going to have to take some time to

219

1 read it.
2     Q.   Okay.
3     A.   Okay.  I've read it.
4     Q.   Okay.  So does that refresh your
5 recollection that there was an issue with RLI not
6 paying, excuse me, Nexus not paying bond breaches
7 and a concern of RLI that a relationship with
8 treasury was being jeopardized?
9     A.   Can you break that down?
10     Q.   Sure.  Was RLI concerned about Nexus
11 not getting in front of it such that bond breaches
12 had not been -- and invoices had not been paid?
13     A.   It appears that there was a dispute
14 on -- the way I'm reading this, it looks like Erik
15 didn't file the appeal on those two in question,
16 which would have given us all more time to pay them
17 out.  Apparently, they did what they should have.
18         It looks like Erik was suggesting that
19 these individuals did make their court appearances,
20 but the records didn't reflect -- didn't reflect so
21 and so there was an issue where Nexus made sure
22 that they showed up at the court appearances but

220

1 through some record keeping ICE didn't agree with
2 that is what I believe it reflects.
3     Q.   Sure.  But as a result there was going
4 to have to be a payment on the bond, right?
5     A.   I don't know.
6     Q.   Okay.  Let me show you this.  For this
7 one I'm just looking at your e-mail at the bottom?
8         (Deposition Exhibit 48 marked
9         for identification.)
10         MR. PHILLIPS:  Are we on 48 now?
11         MS. KATSANTONIS:  Yes.
12 BY MS. KATSANTONIS:
13     Q.   And there is an e-mail being exchanged
14 between Laura Piispanan and Erik Schneider and
15 you're copied on it and then you interject on
16 December 22 and you're trying to facilitate getting
17 the information.  And you say in the middle of it,
18 Mike will obviously not like paying out this or
19 another similar situation.  And you say at the
20 bottom, we can't have our relationship with the
21 treasury jeopardized so this has to get resolved
22 very quickly.

Transcript of David Sandoz
Conducted on March 5, 2020

221

1    A.    Who did I write this to?
2    Q.    Erik Schneider.
3          MR. PHILLIPS:  I have no doubt that's
4  what it is, but I'm just trying to read it and see
5  where it says -- it's just kind a weird.
6          MS. KATSANTONIS:  I know what you are
7  saying.  The lawyer was writing to Mr. Schneider
8  and then Mr. Sandoz forwarded his comment and then
9  it goes to the top chain that you see.
10   A.    I think are you asking about the
11 comment about Mike?
12 BY MS. KATSANTONIS:
13   Q.    No.  I'm asking if you recall that
14 there was concern -- that RLI was having concerns
15 at the end of December with regard to these bond
16 breaches and that it was impacting their
17 relationship with the government and treasury?
18   A.    I don't know if it was jeopardizing
19 their relationship with treasury.
20   Q.    But do you recall that there was
21 concerns?
22         MR. PHILLIPS:  I'm sorry.  He hasn't

222

1  finished his answer or maybe he did.
2          MS. KATSANTONIS:  I'm sorry.
3    A.    I forgot what I was going to say
4  anyway.
5  BY MS. KATSANTONIS:
6    Q.    I'm sorry.  Let me give you one more
7  e-mail and see, if that helps refresh your
8  recollection.
9          MR. PHILLIPS:  I just know, only
10 because I saw some names in here too, that 48 has
11 the protective order language that was on there.
12         (Deposition Exhibit 49 marked
13            for identification.)
14 BY MS. KATSANTONIS:
15   Q.    So looking at the bottom, December 29,
16 from you to Mr. Schneider and you're copying
17 Mr. Donovan, and you say, sorry, Erik, I have to
18 make sure everyone knows that our back is against
19 the wall and these three bonds have been called and
20 there is no more time to argue each case.
21         Do you see that?
22   A.    Yes.

223

1    Q.    And if you look at the second page
2  Laura had listed a series of things that Nexus had
3  not responded to providing documents or further
4  confirmation with regard to those three bond
5  appeals.
6          And you advise in your e-mail, Mike,
7  you have to let RLI know your intentions of paying
8  the amounts demanded with checks going out no later
9  than January 4, to clear these three bonds so RLI
10 is not in danger of losing their relationship, if
11 not more, with the federal government.
12         Do you see that?
13   A.    Yes.
14   Q.    Was that based on your understanding
15 that if RLI doesn't pay timely invoices, it could
16 be referred to treasury?
17   A.    Yeah, I've never been involved in that
18 process but that was -- I think that was relayed
19 from Ira or somebody that -- like Ira was heading
20 up that.
21   Q.    And that's Mr. Sussman, right?
22   A.    Mr. Sussman.  I'm sorry.  Yes.

224

1    Q.    And during working through this
2  program, did you have any concerns with how
3  Mr. Sussman performed his duties at RLI?
4    A.    I had a good experience with Ira.  I
5  didn't deal with him on immigration that I recall
6  to any degree.  But yes, I had a good experience
7  with Ira.
8    Q.    And so you said just speaking frankly
9  it won't be fun for anyone if RLI has to make these
10 payments early next week.  And then you say these
11 risks have -- so I guess my question is:  Are
12 these -- these are some of the bonds that you
13 recall that there were issues with prior to your
14 departure of RLI?
15   A.    Yes, I think the issue here was that
16 these folks did show up to their court hearing or
17 their meeting with ICE, but due to some paperwork,
18 ICE didn't -- wouldn't acknowledge that and so
19 there was frustration on Nexus's part that that,
20 you know -- that that paperwork couldn't be cleared
21 up.  I think they were trying to clear it up is my
22 recollection.

Transcript of David Sandoz
Conducted on March 5, 2020

225

1    Q.    Right, but you were basically at this
2  point in time, you realize that it had gotten far
3  beyond past due and that the DHS was threatening
4  steps against RLI including referral to treasury
5  which would be detrimental to RLI.
6    **A.    Do I have that correspondence that**
7  **suggests that?  I don't see it here.**
8    Q.    Well, you certainly talk about our back
9  is against the wall, right, and --
10   **A.    I'm probably relaying information from**
11 **Laura.**
12   Q.    From the claims side?
13   **A.    From the claims side.**
14   Q.    Okay.
15       MS. KATSANTONIS:  All right.  Let's
16 take a five-minute quick break.
17       Does that work for you?
18       THE WITNESS:  Yep.
19       THE VIDEOGRAPHER:  This is the
20 videographer.  We're going off the record at 4:21
21 p.m.
22       (Recess taken.)

226

1        THE VIDEOGRAPHER:  This is the
2  videographer.  We're back on the record at 4:46
3  p.m.
4  BY MS. KATSANTONIS:
5    Q.    Okay.  Great.  So right before our
6  break, we were talking about there was some bond
7  breach invoices that RLI was anxious that Nexus
8  pay, right?
9    **A.    Yes.**
10   Q.    Okay.  Did you -- were you involved
11 with following through to see whether Nexus
12 actually did or did not pay those invoices after
13 December of 2016?
14   **A.    Oh, my gosh.  This is December 29, and**
15 **I was probably had everything all wrapped up for my**
16 **career with RLI.  I don't know what day the 29th**
17 **was.**
18   Q.    When did you announce that you were
19 going to retire from RLI?
20   **A.    It would be a guess, again.  It was**
21 **probably around September or October, but I don't**
22 **know.  It seemed like I was there quite a while**

227

1  after I decided to retire.
2    Q.    And then did -- do you recall
3  Mr. Donovan advising you of RLI advising that they
4  were no longer issuing bonds?  Did he advise you of
5  that?
6    **A.    That Mike was no longer -- Nexus was no**
7  **longer issuing bonds?**
8    Q.    I'm sorry.  That RLI was no longer
9  issuing bonds at the request of Nexus?
10   **A.    You mean subsequent to the 2/28 date**
11 **are you referring to?**
12   Q.    Well, yeah, you knew that bonds would
13 not be issued from at least from February 28, 2017,
14 forward?
15       MR. PHILLIPS:  Objection.
16 BY MS. KATSANTONIS:
17   Q.    Right?
18   **A.    That's the day that's shown in the**
19 **e-mails.**
20   Q.    Okay.  Sorry about that.
21       (Deposition Exhibit 50 marked
22        for identification.)

228

1        MS. KATSANTONIS:  I'm looking for a
2  document.  Here we go.  I'm going to mark this
3  document too as Exhibit 51 that, I believe,
4  accompanied that document.
5        (Deposition Exhibit 51 marked
6         for identification.)
7  BY MS. KATSANTONIS:
8    Q.    This isn't -- I'm going to advise that
9  the attached letter to the bottom of the e-mail is
10 the second exhibit I gave the witness, Exhibit 51.
11   **A.    Do you want this one first?  Are we**
12 **looking at this one first?**
13   Q.    I guess my question is Exhibit 51,
14 which is the letter -- no, I'm sorry.  Yes,
15 Exhibit 51, do you recall receiving a copy of that
16 letter from Nexus?
17       So if you look at the bottom of 50,
18 Mr. Sussman is forwarding to Mr. Donovan a letter.
19 It says, please review the attached letter and
20 comply with the request.  And then you respond on
21 March -- and then on March 7 it looks like
22 Mr. Donovan forwarded you the letter.

Transcript of David Sandoz
Conducted on March 5, 2020

58 (229 to 232)

229

1     Do you see that in the middle of the
2  e-mail?
3     A.   Yes.  So I've got to read all of these
4  two things.
5     Q.   Well, you don't have to read the
6  letter.  Do you recall the letter, the March 3
7  letter?
8     A.   No, I do not.
9     Q.   And with regard to the e-mail that you
10 wrote, is that the e-mail that you wrote to
11 Mr. Donovan from your hotmail account?
12    A.   The one that's dated 3/8?
13    Q.   Yes.
14    A.   I don't know, but I would have no
15 reason to believe it's not.
16    Q.   Okay.
17    A.   Can I look at this one, though, and you
18 asked me a question on this one.  And I'm sorry, I
19 was referring to this one.
20    Q.   That's really what I really wanted to
21 ask you about is Exhibit 50.
22    A.   No, I don't remember this one.

230

1     Q.   You don't recall -- do you recall
2  before you left that RLI was voicing concerns that
3  Mr. Schneider had not been responsive or that Nexus
4  had not been responsive to RLI's request for
5  information about the status of bonds?
6     A.   No, I don't.
7     Q.   Okay.  And it says, have you had a
8  chance to talk to Erik and have the weekly meetings
9  been established -- have the weekly telephone
10 meetings RLI established with him stopped?
11    A.   Where are we at?  I'm sorry.
12    Q.   The very top of Exhibit 50.
13    A.   Okay.  So you're reading the first
14 e-mail?
15    Q.   Uh-huh, at the top.
16         You say Mike, have you had a chance to
17 talk to Erik and have the weekly telephone meetings
18 RLI established with him stopped?  These are the
19 issues that we wanted to discuss in weekly calls
20 and get updates from Erik on as well as any
21 follow-up data supporting resolution of any
22 defaults, demand for payment or other issues of

231

1  concern related to ICE demands.  Do you recall
2  that?
3     A.   No.  I'd left RLI by that time.
4     Q.   Right.
5     A.   No, I don't remember this.
6     Q.   Okay.  But you have no reason to doubt
7  that this isn't your e-mail?
8     A.   I have no reason to doubt it's not my
9  e-mail, correct.
10    Q.   All right.  And then after you left --
11 well, prior to your leaving RLI, we looked at that
12 e-mail earlier in November in which you were having
13 communications with Nexus about establishing a new
14 insurance company, right?
15    A.   Can you refer me to what e-mail you are
16 talking about?  But yes, there was an e-mail in
17 here somewhere.
18    Q.   Well, it was dated December 1.
19    A.   Are you going to ask me some questions
20 about that so I can -- I'll --
21    Q.   I will ask you about that.  I'm going
22 to ask you about another document first.

232

1         Did prior to your leaving -- is my mic
2  on?
3         MR. PHILLIPS:  No, your mic is not on.
4         MS. KATSANTONIS:  Sorry.
5         (Deposition Exhibit 52 marked
6          for identification.)
7  BY MS. KATSANTONIS:
8     Q.   So I've handed you a document dated
9  November 16, 2016, and these are communications
10 that you were having with Mr. Donovan at Nexus from
11 your hotmail account, correct?
12    A.   Correct.
13    Q.   And starting at -- strike that.
14         In looking at this e-mail you're having
15 discussions with investors about forming a new
16 insurance company to write immigration bonds,
17 right?
18    A.   Correct.
19    Q.   Okay.  And looking at, for example,
20 paragraph 4, you were advising Nexus that the
21 investors would want to do things the way -- to do
22 things that RLI is doing such as indemnity, and if

Transcript of David Sandoz
Conducted on March 5, 2020

59 (233 to 236)

---

233

1 you keep reading, premium and collateral, right?
2    **A.   I don't think that any of the investor**
3 **groups had indicated that. I don't think I talked**
4 **to them until after I left RLI.**
5    Q.   Well, this e-mail is, our attorney and
6 I just received some feedback from two parties of
7 the three we talked to. We talked to Scott Lang
8 and Carter Smith, both of City Capital Advisors,
9 and both have indicated the opportunity is very
10 intriguing, and we expect they'll want to go the
11 next step, right?
12    **A.   Yes. I just forgot the time frame.**
13    Q.   Okay. And Sy Peck was involved and
14 he's a friend of yours?
15    **A.   He's a lawyer in Chicago.**
16    Q.   Okay. And did you enlist Mr. Peck as a
17 potential investor?
18    **A.   No, he was the lawyer involved with**
19 **trying to help.**
20    Q.   Well, it says in the first paragraph
21 that Cy may be an investor himself.
22    Do you see that?

---

234

1    **A.   Well, that may have been said but he**
2 **was not. He apparently made a subsequent decision**
3 **not to be an investor.**
4    Q.   So can you just tell me generally about
5 what was this opportunity and what happened?
6    **A.   Do you have specific questions that you**
7 **want me to answer about it?**
8    Q.   I just want to know, so you proceeded
9 with having meetings with the investors and meeting
10 with Nexus with the investors, right?
11    **A.   I had some meetings with some possible**
12 **investor groups. I'm not sure if Mike Donovan was**
13 **there or not. He may have been, but I don't know.**
14 **I don't think so.**
15    Q.   Okay. And part of this new entity -- I
16 guess I'm trying to understand what were you trying
17 to create, was it an insurance company in which
18 investors, Mr. Donovan and Big Marco would all be a
19 part of?
20    **A.   No.**
21    Q.   So how would it work?
22    **A.   It was just an investor group, Nexus,**

---

235

1 and myself.
2    Q.   And so --
3    **A.   Marco was not -- the Marco agency was**
4 **not involved in it.**
5    Q.   Okay.
6    **A.   It might have been the agent that would**
7 **be the agent of record but I don't believe that we**
8 **ever intended Marco to be involved. I could be**
9 **wrong but I don't think so.**
10    Q.   Part of this was that -- well -- in
11 setting this new insurance company up part of it
12 was that Nexus would have significant ownership,
13 right?
14    **A.   That is what the idea started as, yes,**
15 **but eventually it was determined that Nexus could**
16 **not be an owner of the insurance company.**
17    Q.   Okay. And what was that based on?
18    **A.   I guess some advise from lawyers**
19 **indicating that due to the past situations with**
20 **Mike that he couldn't be an owner of an insurance**
21 **company.**
22    Q.   When did you first learn about

---

236

1 Mr. Donovan's criminal background?
2    **A.   I don't know. I would have to guess.**
3    Q.   All right. We saw earlier the e-mail
4 that had in September 2019 that listed some of the
5 history of Mr. Donovan. Was it at or around that
6 time?
7    **A.   No. 2019?**
8    Q.   I'm sorry. 2016. We saw the e-mail.
9    **A.   No, what date?**
10    Q.   I'm sorry. It was around September of
11 2016, September 28 of 2016 you were forwarding
12 Mr. Donovan a list of some of his -- was it at or
13 about that time?
14    **A.   No. Much earlier.**
15    Q.   Okay. What did you learn about
16 Mr. Donovan's background; what was your
17 understanding?
18    **A.   I don't recall all of the**
19 **circumstances, but I know that he did have felony**
20 **or two, as I recall.**
21    Q.   Okay. But you don't recall when you
22 learned that information?

237

1      A.    I believe it was through the process to
2  determine if we wanted to -- if I wanted to enter
3  into a business relationship with him.  So it would
4  have been -- when were those dates?  2000 -- the
5  end of 2015.
6      Q.    Did you disclose that information to
7  anyone at RLI?
8      A.    I don't know.
9      Q.    From the record it looks like RLI --
10 other people at RLI didn't know until September of
11 2016, right?
12     A.    I don't know that.  I know that -- that
13 the folks across the street, I believe, the folks
14 across the street did some -- their own research at
15 some point in time, which is probably around that
16 September 2016 time frame.
17     Q.    Okay.  And in looking at -- I'd given
18 you a December 1 document, and I'm sorry, I don't
19 remember the -- but it talked about our agent would
20 be Marco and Claire LiMandri who owns a bail bond
21 agency in San Diego?
22           MR. PHILLIPS:  Did you say December 1?

238

1           MS. KATSANTONIS:  Yes, the December 1,
2  e-mail.  Do you have that?
3      A.    Is it this one?
4  BY MS. KATSANTONIS:
5      Q.    Yes.  If you look at the second page at
6  the top.
7      A.    First paragraph?
8      Q.    Yes.
9      A.    Okay.  It states that the agent will be
10 Marco and Claire LiMandri.
11     Q.    Right.  And that Nexus will or already
12 has set up a partnership with Marco?
13     A.    It says Nexus will or has -- or already
14 has set up a partnership with Marco, which never,
15 to my knowledge, took place.
16     Q.    Okay.  So was an insurance company
17 formed?
18     A.    No.
19     Q.    What -- and why not, because of the
20 issue we just talked about?
21     A.    No.
22     Q.    Okay.  Did the investors not agree to

239

1  be a participant in forming an insurance company?
2      A.    No.
3      Q.    So what happened?
4           MR. PHILLIPS:  I'm sorry.  Just make
5  sure the record reflects that there was a
6  protective order entered in the Western District of
7  Virginia and (inaudible) to a protective order.  I
8  don't know that we're going to actually designate
9  but for that, I just want to make sure it's on the
10 record.
11          MS. KATSANTONIS:  Sure.
12     A.    There was the one that we decided
13 seemed to be the right fit for us was a group that
14 owned a small surety company that wrote bail bonds
15 out in California.
16          And they liked the program and so they
17 were going to be the surety company for the
18 business, but it was always contingent upon them
19 getting their treasury listing, which they didn't
20 have, and they -- we made the application for the
21 treasury listing and I don't remember the time
22 frame that they did that, but we waited several,

240

1  several months for the treasury listing and it
2  became, you know, likely that they were not going
3  to be able to get that listing.
4           And so there was -- we couldn't go
5  forward.
6  BY MS. KATSANTONIS:
7      Q.    And who was that group; what group was
8  that?
9      A.    It was Philadelphia -- the name of the
10 company -- the insurance company was Philadelphia
11 Reinsurance Corporation.
12     Q.    So was that different than there is
13 some e-mails that we've received from Nexus
14 involving City Capital.  And so that's -- and there
15 was a, for lack of a better word, I'm going to call
16 it an informational gathering visit at Nexus's
17 campus.  Is that different than Philadelphia
18 Reinsurance?
19     A.    Yes, City Capital was the investment
20 banker that was helping us look for that right
21 partner.
22     Q.    Okay.  And so City Capital was involved

Transcript of David Sandoz
Conducted on March 5, 2020

241

1  in helping locate Philadelphia Reinsurance?
2      A.    Correct.
3      Q.    But ultimately, that didn't happen?
4      A.    It didn't work out.
5      Q.    Right.  So RLI was -- after February of
6  2017, RLI was continuing to write bonds through
7  which sureties, to your knowledge?
8      A.    I don't know.  You didn't ask — well,
9  never mind.  You maybe want to repeat your
10 question.
11     Q.    Well, when RLI stopped issuing bonds,
12 do you know who -- I mean you were working with
13 Nexus to form a new insurance company, right?
14     A.    Yeah, but you refer to RLI.
15     Q.    I'm sorry.  Thank you.  I do that all
16 the time.  Nexus.
17           Do you know which companies were
18 issuing bonds on behalf of Nexus after RLI's
19 stopped issuing bonds?
20     A.    In what time frame?
21     Q.    After February of 2017?
22     A.    I do not know.

242

1      Q.    Which sureties do you know they wrote
2  with after February 2017?
3      A.    I helped them arrange a relationship
4  with Evergreen, and I don't know when that actually
5  started, but I believe it wasn't until 2018.  So I
6  don't know the -- I don't know who it was between
7  when RLI stopped in 2018 when Evergreen came in to
8  help.
9      Q.    What other -- well, what is your --
10 what is your involvement with Nexus today?
11     A.    I'm basically consulting with them to
12 try to make sure that they have a good home.
13     Q.    When you say a good home?
14     A.    A good home with a surety.
15     Q.    And do you have a consulting agreement
16 with them?
17     A.    With Nexus, no.
18     Q.    And are you -- have you received any
19 sort of renumeration from Nexus?
20     A.    No.
21     Q.    Have you been paid by Nexus in any --
22 or Mike Donovan or any of its principals or any of

243

1  its affiliated companies?
2      A.    Directly from them, no.
3      Q.    Not directly from them or any company
4  that Mike Donovan or any of the officers have an
5  interest in?
6      A.    No.
7      Q.    And what has been your involvement with
8  Nexus after February of 2017?
9      A.    Just what we discussed.  I've been
10 trying to find them a permanent home for their
11 surety business.
12     Q.    And are there any entities that you
13 have an interest in that Nexus, Libre, Homes, any
14 of their affiliated companies or any of the Nexus
15 officers also have an interest in?
16     A.    No.
17     Q.    And what work have you done since 2017?
18     A.    Work in the miscellaneous surety
19 industry.
20     Q.    For who?
21     A.    We've talked about the Nexus situation
22 and then I was also involved in and am involved in

244

1  an insurance agency called Deposit Choice.
2      Q.    And what does Deposit Choice do?
3      A.    Deposit Choice writes miscellaneous
4  surety business, primary related to multi-family
5  communities.
6      Q.    And does Deposit Choice or any of its
7  subsidiaries or other entities write immigration or
8  bail bonds?
9      A.    No.
10     Q.    Does Deposit Choice have any
11 relationship with Nexus or any entity that Nexus
12 has, any Nexus, Nexus officer affiliates, have any
13 interest in?
14     A.    No.
15     Q.    And let me get back to -- with regard
16 to City Capital, there was visits on the Nexus
17 campus site in which you and Nate Sandoz were
18 present at; is that right?
19     A.    I believe so.
20     Q.    And that was to review records of
21 Nexus?
22     A.    It was to familiarize City Capital with

Transcript of David Sandoz
Conducted on March 5, 2020

---

245

1  Nexus as they were the ones that were going to go
2  out and talk to the investor community to try to
3  start an insurance company.
4      Q.    Okay.  In your review of Nexus's
5  documents, did you have concern with Nexus's
6  financial documents?
7      A.    Can you be more specific on that?  Do
8  you have --
9      Q.    Well, have you looked at Nexus's
10 financial statements and do you have concern with
11 regard to the accuracy of the financial statements?
12         MR. PHILLIPS:  Objection.  You can
13 answer the best that you can.
14 BY MS. KATSANTONIS:
15     Q.    Do you have --
16     A.    I have reviewed Nexus's financial
17 statements and I know they don't have -- they
18 didn't, when they were smaller, had -- they didn't
19 have a high, in my opinion, a high-level
20 accountant.  And so I've encouraged them to start
21 using an accounting firm that is a little more high
22 level than what they had internally.  So yes, in

246

1  that regard, yes.
2      Q.    Do you own any interest at all in any
3  business or entity that Nexus has an interest in?
4      A.    I think you've asked me that a number
5  of times, and no.
6      Q.    So when you're acting as a consultant
7  to Nexus, you're doing it without any gain or
8  interest that you receive in return?
9         MR. PHILLIPS:  Objection.  Answer the
10 best that you can.
11     A.    I mean, specifically, what are you
12 asking?  You've asked me the one question a number
13 of times and I said no.
14 BY MS. KATSANTONIS:
15     Q.    Well, I just want to know if you in
16 consulting -- you're doing consulting work with
17 Nexus is what you said, right?
18     A.    I'm doing consulting work for -- I was
19 doing consulting work for Philadelphia Reinsurance
20 and so, yes.
21     Q.    When did -- when did the consulting
22 work with Philadelphia Reinsurance, if at all, did

247

1  it end or are you still doing that?
2      A.    No, it was 2019.
3      Q.    Okay.  What part?
4      A.    I don't know.  It was probably in the
5  first quarter or so of 2019.
6      Q.    Okay.  And so when you were doing that
7  consulting work for Philadelphia Reinsurance, were
8  you paid by Philadelphia Reinsurance or anybody
9  else?
10     A.    Yes, that was the consulting agreement.
11 It was with -- so Philadelphia Reinsurance was
12 paying for me to try to get Philadelphia
13 Reinsurance Corp. ready to handle immigration
14 business, but we could never get there.
15     Q.    Do you have any ownership interest in
16 any entity involved or related to the immigration
17 bond business?
18     A.    No.
19         MR. PHILLIPS:  Objection.
20 BY MS. KATSANTONIS:
21     Q.    So after the relationship with
22 Philadelphia Reinsurance, are you still performing

248

1  consulting work?
2      A.    Yes.
3      Q.    Okay.  For whom?
4      A.    For American Surety Company.
5      Q.    And is American Surety Company issuing
6  any immigration bonds or bail bonds?
7      A.    Yes.  They have been in that business
8  for a long time.
9      Q.    And what is -- do you have an ownership
10 interest in American Surety Company?
11     A.    No.
12     Q.    What is your -- what is your position
13 with American Surety Company?
14     A.    I'm not working for American Surety
15 Company.  I'm consulting with them.
16     Q.    Okay.  And do you have a consulting
17 agreement with them?
18     A.    I have an expense reimbursement
19 agreement with them, yes.
20     Q.    And is Nexus currently writing or is
21 Nexus currently serving as an indemnitor on
22 American Surety Company bonds?

---

Transcript of David Sandoz
Conducted on March 5, 2020

249

1     A.    Yes.

2     Q.    For immigration and bail bonds or --

3     A.    They are only in the immigration

4 business.

5     Q.    Okay.

6     A.    As far as it relates to a surety

7 company. I don't know if they are doing charitable

8 funding or not.

9     Q.    And when did American Surety Company

10 start issuing bonds on behalf of or at the request

11 of Nexus?

12     A.    It was, I believe it was in 2019 some

13 time.

14     Q.    Okay. And did you bring the Nexus book

15 of business to American Surety?

16     A.    Well, I don't know what you mean by

17 bring, but I contacted American to see if they were

18 interested in writing more immigration business and

19 subsequently, they went through the process of

20 reviewing the Nexus program and determined that it

21 was something they were interested in.

22     Q.    Okay. And so you contacted American on

250

1 behalf of Nexus to see if they would be willing to

2 issue immigration bonds?

3         MR. PHILLIPS: Objection.

4     A.    I don't know if it was on behalf of

5 Nexus. I contacted them to see if they would be

6 interested in writing more immigration business and

7 Nexus was obviously looking for a new home.

8 BY MS. KATSANTONIS:

9     Q.    Right. So you, basically, introduced

10 Nexus to American Surety Company or vice versa?

11     A.    Correct.

12     Q.    Okay.

13     A.    I assisted with that.

14     Q.    I feel like I've seen Deposit Choice

15 somewhere. Does Deposit Choice do anything related

16 to any of the Nexus entities or the Nexus officers?

17     A.    No.

18         MR. PHILLIPS: If we go off the record

19 for a second, I might be able to refresh your

20 recollection.

21         THE VIDEOGRAPHER: This is the

22 videographer. We're going to go off the record at

251

1 5:24 p.m.

2         (Recess taken.)

3         THE VIDEOGRAPHER: This is the

4 videographer. Going back on the record at 5:31

5 p.m. at the start of tape number four.

6         MR. PHILLIPS: Just for a

7 clarification, I believe Mr. Sandoz, in talking

8 about he or answering questions of you, about his

9 consulting, I believe that the clarification that's

10 appropriate is that Mr. Sandoz has an L.L.C. that

11 may, I believe, most likely to be the party that's

12 actually interacting with it, but it's an alter ego

13 situation.

14         MS. KATSANTONIS: Sure.

15 BY MS. KATSANTONIS:

16     Q.    And Mr. Sandoz, what's the name of the

17 L.L.C.?

18     A.    Red Sky Holdings, L.L.C.

19     Q.    And who are the L.L.C. members of Red

20 Sky Holdings?

21     A.    Right now, it's me, and I own 99

22 percent, and then Nathan, my son, owns 1 percent.

252

1     Q.    Okay. And other than you and your son,

2 has anyone else ever been a member of Red Sky

3 Holdings?

4     A.    I think when it was initially formed,

5 there was -- and I don't -- you know, I would have

6 to check on that, but there may have been one other

7 owner.

8     Q.    Who would that have been?

9     A.    It may have been Cindy Dohm. But Cindy

10 Dohm is with Deposit Choice and so -- but her full

11 effort is Deposit Choice. She never did anything

12 for Red Sky.

13     Q.    Okay.

14     A.    And that was prior to any expense

15 reimbursement payments being made. She's never had

16 any compensation at all in that Red Sky.

17     Q.    Okay. I apologize. I thought that I

18 had found this one document but I had not.

19         Do you -- now I really apologize

20 because I need to find this document but I'll find

21 it in a minute. I'll come back to that. I'll mark

22 this.

Transcript of David Sandoz
Conducted on March 5, 2020

253

1    We were talking about the financial
2 statements of Nexus.
3    (Deposition Exhibit 53 marked
4    for identification.)
5 BY MS. KATSANTONIS:
6    Q.    So this is an e-mail dated January 3,
7 2019, if you want to take a minute to review it.
8    A.    Sure.
9    Q.    So this is an e-mail dated January 3,
10 2019.  And it's from you to Mr. Donovan and you're
11 commenting upon the financial statements that
12 Mr. Donovan had provided to you.
13    Do you see that?
14    A.    Yes.
15    Q.    Okay.  And in January of 2019, I guess
16 at this point in time, did you believe that the
17 financial statements being provided to you by Nexus
18 were inaccurate?
19    A.    Yes, as I alluded to in one of the
20 other answers.  I don't think they had the real
21 experienced accounting team that they really should
22 have.

254

1    Q.    Okay.  And did -- do you know whether
2 or not -- do you have any personal knowledge of
3 whether or not Nexus was operating at a profit or
4 loss?
5    A.    I don't have any personal knowledge of
6 that, no.
7    Q.    Okay.  And at this point in time, were
8 you reviewing Nexus's financial status on behalf of
9 Philadelphia Reinsurance?
10    A.    What date is this?
11    Q.    January of 2019.
12    A.    I believe the program was with
13 Evergreen at the time of this e-mail.
14    Q.    Okay.  And did you have any business
15 relationship with Evergreen?
16    A.    Business relationship, yes.
17    Q.    What was your relationship with
18 Evergreen?
19    A.    Pre or post RLI?
20    Q.    Both.
21    A.    Pre RLI, it was more Greg Chilson's
22 relationship with Evergreen.  And then at the time

255

1 I was working there Deposit Choice wanted to split
2 their business up a little bit so they didn't have
3 all business with one company.
4    Q.    At the time you were where?
5    A.    When I was at RLI, I worked at Deposit
6 Choice for them as well and, the individual owner
7 there wanted to have a second surety company
8 because he didn't want all of his business with
9 RLI.
10    So I tried to find a friendly surety
11 company that wouldn't take the whole business away
12 from us at some point in time if that was hopefully
13 not possible.  But anyway, I was looking for a
14 friendly competitor and/or his
15 boss at the time Murray Di (phonetic) recommended
16 Evergreen because they have -- they share accounts
17 in some regard with Evergreen.
18    Q.    Okay.
19    A.    Evergreen helps them out, RLI helps
20 Evergreen out.
21    Q.    And then after you left RLI what has
22 been your relationship with Evergreen?

256

1    A.    Well, I eventually was associated with
2 Deposit Choice as mentioned, and you know, them --
3 they had part of their business with Evergreen and
4 then part of their business with RLI.
5    Q.    Okay.  And so in looking at this
6 e-mail, you were concerned that there was too
7 much -- too much funds loaned to the employees.
8    Do you see that in the second
9 paragraph?
10    A.    Right.  I just didn't know the
11 accuracy.  This whole statement didn't look
12 accurate and I don't -- I don't think that anybody
13 focused on the financial statement before it was
14 sent except the accountant and as I mentioned the
15 accountant just wasn't very skilled in completing
16 the financial statement as I -- that I had asked
17 for.
18    Q.    Well, did you expect Mr. Donovan to
19 review the statements before providing them to you?
20    A.    Did I expect him to?  Not necessarily.
21 You know I was just asking for the updated
22 financial statement and when I got it in, it didn't

Transcript of David Sandoz
Conducted on March 5, 2020

257

1 make sense.
2    Q.    Okay.  And it says, where is all the
3 cash and cash collateral from clients you've set
4 aside to pay bond forfeitures.
5       Do you see that?
6    A.    Yes.
7    Q.    So you were not seeing any of -- in the
8 financial statements, you weren't seeing any of the
9 cash collateral on the -- located as an asset on
10 the balance sheets?
11    A.    I don't have the financial statement in
12 front of me to analyze it.  All I can do is read
13 this e-mail.
14    Q.    All right.  And did you meet Greg
15 Solstren?
16    A.    Greg who?
17    Q.    Solstren.  I don't know.  I might be
18 saying his name wrong but he was going to be the
19 CFO.  You mentioned the name Greg in here?
20    A.    Me?
21    Q.    Yes.  I was wondering if you had met
22 him.

258

1    A.    I have met Greg, if he's the individual
2 that was from Atlanta.
3    Q.    I don't know where he's from.
4    A.    I don't know his last name, but I met
5 a -- I think that might be Greg --
6    Q.    He was going to be the CFO of Nexus?
7    A.    I believe so.
8    Q.    Right.  And do you know why he then did
9 not become the CFO of Nexus?
10    A.    No, I just know that he did -- he may
11 have been in that position for a period of time,
12 but I don't know the reason why he was -- he's not
13 still there.
14    Q.    Okay.
15       (Deposition Exhibit 54 marked
16       for identification.)
17 BY MS. KATSANTONIS:
18    Q.    Do you recognize this document?
19    A.    Yes.
20    Q.    Okay.  And this is a indemnification
21 agreement between Philadelphia Reinsurance -- well,
22 it's on behalf of -- it's executed by Nexus

259

1 Services in an effort to indemnify Philadelphia
2 Reinsurance Company, right?
3    A.    I believe so, yes.
4    Q.    And it's dated March of 2018.
5    A.    Yes.
6    Q.    Okay.  So what bonds did Philadelphia
7 Reinsurance issue on behalf of Nexus?
8    A.    None.  I don't believe there was any
9 because we didn't get the treasury listing or
10 Philadelphia didn't get the treasury listing.
11    Q.    So this was prepared and basically
12 trying to get everything set to start to issue
13 bonds?
14    A.    I believe so.
15    Q.    And who prepared the indemnity
16 agreement, do you know?
17    A.    I believe their attorney, which his
18 name escapes me, but I think I do remember.  I
19 think his name is Josh Little.  I don't remember
20 what firm he's with but I think he is the one that
21 may have completed the indemnity agreement.
22    Q.    Now, if you look at that indemnity

260

1 agreement and I'm going to focus you back
2 to -- oops.  I thought that I had a document out
3 there for you.  I think it was exhibit -- did you
4 put it an exhibit back in here that I pulled?  I'm
5 sorry.  Here it is.
6       I'm going to refer you back to Sandoz
7 18.  And I apologize for leaning over you.
8    A.    No problem.
9    Q.    But this is the indemnity agreement
10 that was executed by Nexus on behalf of RLI.
11    A.    Okay.
12    Q.    And do you -- were you aware that this
13 indemnity agreement for Philadelphia Reinsurance
14 Corporation is different than the one executed by
15 RLI?
16    A.    I may have, but it was prepared by
17 somebody other than me.
18    Q.    Do you know whether Nexus negotiated
19 and changed some of the terms of this indemnity
20 agreement?
21    A.    I do not.  I believe it was the
22 attorney for Philadelphia Re.

Transcript of David Sandoz
Conducted on March 5, 2020

261

1    Q.    Do you see, for example, in looking at
2  B on the second page?
3    **A.    Second page of which agreement?**
4    Q.    Of the Philadelphia.  Regarding claims
5  against surety?
6    **A.    Yes.**
7    Q.    It says, indemnitor shall have the
8  exclusive right for itself and the surety to
9  determine whether any claim or suit upon a bond
10  shall be paid, compromised, defended or appealed.
11       Do you see that?
12   **A.    Yes.**
13   Q.    That's different than the standard form
14  of indemnity agreement that you were aware of prior
15  to working with Philadelphia Reinsurance?
16   **A.    Okay.**
17   Q.    Do you know that?
18       MR. PHILLIPS:  Objection.
19   **A.    No.**
20 **BY MS. KATSANTONIS:**
21   Q.    Isn't it typically the surety who has
22  exclusive rights to determine whether any claim or

262

1  suit be paid, compromised, defended or appealed?
2       MR. PHILLIPS:  Objection.
3    **A.    That might be so.  Yes.**
4  **BY MS. KATSANTONIS:**
5    Q.    Okay.  And similarly, for example in
6  little three of this agreement it says, surety
7  shall have the foregoing rights if the indemnitor
8  has failed to assume or offered to assume the
9  defense of the surety.  That's different than the
10  standard for agreement, isn't it?
11   **A.    I don't know if there is a standard**
12 **form of agreement.  This is the agreement that the**
13 **legal staff at RLI presented.  This is the one that**
14 **Philadelphia Re presented.  And I'm not an attorney**
15 **so this is what they were comfortable with, this is**
16 **what RLI was comfortable with.**
17   Q.    Well, you were sending it to
18  Mr. -- well, I guess Mr. Donovan was sending it
19  back to you executed.  So did you not have
20  discussions regarding the terms of this indemnity
21  agreement with Nexus?
22   **A.    With Nexus, I perhaps did.**

263

1    Q.    And do you remember they were changing
2  the terms of the indemnity agreement from that
3  which they had with RLI?
4    **A.    They may have recommended changes, yes.**
5    Q.    Okay.  Well, you can see it looking at
6  the documents, they did change the terms, right?
7       MR. PHILLIPS:  Objection.
8  BY MS. KATSANTONIS:
9    Q.    I mean, we just looked at -- we looked
10  at B, for example.
11   **A.    I'm not sure.  I don't know who changed**
12 **them.  They may have suggested the changes, but I**
13 **don't know.**
14   Q.    All right.  And do you see on page 3
15  5 of the Philadelphia there is a confidentiality
16  provision that has been added to the indemnity
17  agreement?
18       MR. PHILLIPS:  Objection.
19   **A.    I don't know if it was added, but I**
20 **would have to review the two.**
21 BY MS. KATSANTONIS:
22   Q.    Well, in your years at RLI, do you

264

1  recall this kind of provision -- a confidentiality
2  provision like this being included in any indemnity
3  agreement?
4    **A.    I don't recall if there has been one**
5  **before or not.  I've been in the business for many**
6  **years.**
7    Q.    Okay.  And I don't have an extra copy
8  of this on me, so I'm just going to show it to you
9  and offer it to your counsel too and keep it for my
10  notes.
11       This is an e-mail dated February 28
12  from Mike Donovan to you, and it's when you were
13  having those visits on site.
14       And the only question I was going to
15  ask you is:  That the audit team had requested any
16  agreements between Nexus and Marco, and on -- in
17  the response here, Mr. Donovan says, I would have
18  to check with Marco to determine if our agreement
19  could be shared.
20       Do you see that?
21       MR. PHILLIPS:  Objection.  I haven't
22  seen the document.

Transcript of David Sandoz
Conducted on March 5, 2020

67 (265 to 268)

265

1     A.    I don't know what that's all about.
2 BY MS. KATSANTONIS:
3     Q.    That's what I was going to ask you. Do
4 you have any understanding?
5     A.    Not from just reading a little blurb
6 like that, no, I do not.
7     Q.    You've already testified you're unaware
8 of any agreement between Marco and Nexus?
9     A.    Correct.
10    Q.    Okay. Thank you.
11         MS. KATSANTONIS: I'm sorry, counsel.
12         MR. PHILLIPS: If you have notes on it,
13 I don't have to see it.
14         MS. KATSANTONIS: That's okay. It was
15 just this line right there. That's what I was
16 reading.
17         MR. PHILLIPS: That's fine.
18         MS. KATSANTONIS: Thank you.
19 BY MS. KATSANTONIS:
20    Q.    All right. Mr. Sandoz, you've
21 submitted two affidavits in this litigation, right?
22         MR. PHILLIPS: Objection.

266

1 Declarations.
2         MS. KATSANTONIS: I'm sorry.
3 Declarations.
4         (Deposition Exhibit 55 marked
5          for identification.)
6 BY MS. KATSANTONIS:
7     Q.    And who requested that you submit an
8 affidavit?
9     A.    I believe -- I don't know who the
10 parties were, but I believe they had phone
11 conversations with either Nexus and/or Nexus and
12 counsel where they wanted to ask me some questions
13 and I answered those questions. And they asked if
14 I would put my answers in this decla -- in a
15 declaration.
16    Q.    Who specifically was involved in the
17 discussion?
18    A.    I don't know. I would have to guess.
19    Q.    Well, Mr. Donovan, correct?
20    A.    I believe Mike was, yes.
21    Q.    And was it Ms. Donne Peters as counsel
22 for Nexus?

267

1     A.    I don't know. Likely, but I don't know
2 that for sure.
3     Q.    Okay. And did Nexus's counsel draft
4 this declaration?
5     A.    Yes.
6     Q.    And did Nexus's counsel tell you why
7 they wanted a declaration from you?
8     A.    I don't recall one.
9     Q.    At the time that you provided the
10 affidavit in November of 2018, you were -- were you
11 working with American Surety Company or
12 Philadelphia Reinsurance?
13    A.    When was the date of this?
14    Q.    November of 2018.
15    A.    That might have the -- I'm confused on
16 the time frame, but it might have been when we were
17 working with Evergreen.
18    Q.    Okay. And just so I'm not confused.
19 One of the sureties that we know issued bonds for
20 Nexus they refer to as AIA, is that -- do you know
21 who that is?
22    A.    Being in the industry, I've heard of

268

1 AIA. I think that they are -- yes, I've heard of
2 them.
3     Q.    Are they affiliated with American or
4 Deposit Choice or any entity that you've been
5 involved with?
6     A.    No, not to my knowledge.
7     Q.    And what about FSC?
8     A.    What's the question?
9     Q.    Do you know who FSC Surety is -- or did
10 I get it wrong is it FCS?
11    A.    Do I know them? I don't know them.
12 I've heard the name. I know the name.
13    Q.    Are you aware that immigration bonds
14 were issued at the request of Nexus by FCS?
15    A.    I believe so.
16    Q.    And did you have any involvement or
17 relationship with or did I get it wrong; is it FCS?
18    A.    No.
19    Q.    Okay. All right. So at the time of
20 this declaration in November of 2018, so this is
21 the end of 2018, you would have been working with
22 Philadelphia Reinsurance as well, right, because

Transcript of David Sandoz
Conducted on March 5, 2020

269

1  that didn't -- we looked at the indemnity agreement
2  dated March of 2018?
3       MR. PHILLIPS:  Objection.
4       A.    But this is November, right?  So no, I
5  don't believe -- I don't really remember.
6       MR. PHILLIPS:  He's trying to finish
7  his answer.
8       MS. KATSANTONIS:  You're right.  I'm
9  sorry.
10      A.    I really don't remember.  I mean I know
11  that we were trying to get the treasury listing at
12  Philadelphia RE.
13  BY MS. KATSANTONIS:
14      Q.    Through 2019 is what you testified to.
15      A.    Yes.  Okay.
16      Q.    So in March of 2018, we just saw the
17  executed indemnity agreement?
18      A.    Yes.
19      Q.    So wouldn't that mean that you were
20  still working with Philadelphia Reinsurance from --
21  for all of 2018 until sometime in 2019?
22      A.    That could be accurate, yes.

270

1       Q.    Right.
2       A.    Yes.
3       Q.    So with regard to this affidavit,
4  you -- I guess I'm confused by paragraph 6.
5       So Marco served as the immigration bond
6  agent for all bonds for RLI served surety?
7       A.    Correct.
8       Q.    All right.  Now, paragraph 7.
9       (Mr. Williams entered the deposition
10  room.)
11  BY MS. KATSANTONIS:
12      Q.    In paragraph 7 you say attached as
13  Exhibit B is a copy of discussions that occurred in
14  June regarding cash payments.
15      Why were you referencing this June
16  e-mail in your affidavit?
17      (Mr. Williams left the deposition
18  room.)
19      A.    I was probably asked a question related
20  to the collateral arrangements that we were making
21  with Nexus regarding the bonds that were placed
22  with RLI.

271

1  BY MS. KATSANTONIS:
2       Q.    Okay.  So what are you trying to relay,
3  what is your understanding?
4       A.    The understanding is that we -- as I
5  indicated earlier, that we were negotiating a
6  certain amount of collateral as leverage or
7  whatever you want to term it as, while we got
8  comfortable with the program.
9       Q.    Okay.  But we -- when we talked about
10  this e-mail earlier of June 2016, first of all,
11  Nexus was to provide RLI with $50,000 by June 15 of
12  2016 and 50,000 by July 15, 2016.  And do you know
13  if RLI -- if Nexus ever provided any of those cash
14  collateral?
15      A.    I don't recall how much collateral, if
16  any, that RLI received.
17      Q.    Right.  And then we talked about this
18  whole business of contingency funds and based on
19  your testimony earlier today, that could not have
20  been part of any collateral agreement because that
21  would involve Big Marco, right?
22      MR. PHILLIPS:  Objection.

272

1       A.    Unless there was some sort of an
2  agreement that Marco could make with Nexus to
3  perform risk mitigation services for them.  But
4  again, I don't know if that ever took place.
5       Q.    Right.  And when we talked about this
6  before, I mean, obviously it was your testimony
7  that the Big Marco -- it was your understanding
8  there was no agreement that Big Marco would pay any
9  of the collateral for Nexus, right?
10      MR. PHILLIPS:  Objection.  I believe
11  that misstates his testimony.
12      A.    I don't know if an agreement was
13  consummated or not.
14  BY MS. KATSANTONIS:
15      Q.    And you had no agreement or
16  understanding with Big Marco that big Marco would
17  pay any collateral on behalf of Nexus, right?
18      A.    Me?
19      Q.    RLI.
20      A.    RLI?  No, not that I'm aware of.
21      Q.    Right.  In paragraph 8 it says, it is
22  my understanding that if RLI suffered no losses on

Transcript of David Sandoz
Conducted on March 5, 2020

273

1 surety bonds, all cash collateral would be returned
2 to Nexus within a year.
3           Where is that understanding derived
4 from?
5      A.    I believe that once I got comfortable
6 with the program, that I intended to return the
7 collateral to Nexus, but I don't remember the --
8 all the circumstances related to that.  But at some
9 point that was my intention.
10     Q.    But that never happened, right?  I mean
11 it was never --
12     A.    I probably left RLI by that time.
13     Q.    Right.  And we've seen e-mails that
14 additional collateral was asked -- do you remember
15 you said that you were the messenger to provide --
16     A.    Yes.
17     Q.    So that would be contrary to your
18 statement that Nexus would be rebated their
19 collateral, right?
20     MR. PHILLIPS:  Objection.
21     A.    This is a statement that indicates that
22 if there were no losses sustained on the program at

274

1 the time that we were -- that I was working with
2 Nexus at RLI that that collateral would be returned
3 to them.  I may -- I don't remember all the
4 circumstances but that was kind of the gist of our
5 conversation with -- my conversation with Nexus.
6 BY MS. KATSANTONIS:
7      Q.    But did that -- do you understand
8 generally that the surety can ask for collateral at
9 any point in time in the relationship of the
10 surety?
11     MR. PHILLIPS:  Objection; asked and
12 answered.
13     MS. KATSANTONIS:  It hasn't been.
14 BY MS. KATSANTONIS:
15     Q.    Between the surety and the indemnitor?
16     A.    No, I don't think they can just say
17 they want collateral any time they want to ask for
18 collateral.
19     Q.    When can a surety ask for collateral?
20     A.    Well, if they are having -- if for
21 instance, Nexus is standing in front of the surety,
22 if Nexus defaults and doesn't pay breaches, and --

275

1 I mean, you have to get the parties together and
2 find out what happened and make sure that those
3 breaches are taken care of by the indemnitor.
4           But if there was several breaches
5 that -- if there was a pattern of several breaches
6 not being paid over a long period of time, then the
7 surety, my understanding, has to set a reserve and
8 then they have the right to collateralize that
9 reserve because that's their best estimate of what
10 the loss is going to be to the surety.
11          And to my knowledge, I don't think RLI
12 has put a big reserve up or I don't know of any
13 reserve that RLI has put up to trigger the
14 requirement for collateral.
15     Q.    Where is that requirement written or
16 made part of agreement that you have to put up a
17 reserve before you request collateral?
18     A.    It's just my understanding that that
19 that's the way that I believe RLI and other surety
20 companies handle claims.
21     Q.    Well, I'm not talking about claims,
22 we're talking about collateral?

276

1      A.    Well, you have to have claims to
2 require collateral, to request collateral.
3      Q.    Well, you requested $500,000 in
4 collateral at the beginning of the relationship,
5 you didn't have any claims?
6      A.    No, that was.
7      MR. PHILLIPS:  Objection; leading.
8 Objection; argumentative.
9 BY MS. KATSANTONIS:
10     Q.    I mean that's correct, right?
11     A.    That was to get comfortable with the
12 program.
13     Q.    So there are different rules to get
14 comfortable with the program versus claims; is that
15 what you're saying?
16     MR. PHILLIPS:  Objection; leading.
17     A.    I don't understand that question.
18 BY MS. KATSANTONIS:
19     Q.    Well, you asked for 500,000 at the
20 beginning of the relationship, right, in
21 collateral?
22     A.    Yes, I asked for an amount, yes and I

Transcript of David Sandoz
Conducted on March 5, 2020

277

1  don't -- if it was $500,000 then yes.
2      Q.      And did you post a reserve of $500,000?
3      A.      No.
4      Q.      Okay.  And so you don't have to post a
5  reserve before requesting collateral, right?
6          MR. PHILLIPS: Objection; leading.
7      A.      I don't know that.  In my work in
8  surety typically, you have to have a problem before
9  you ask for collateral.  You have to put up a
10 reserve and it has to be you have to give your best
11 guess of what the loss is going to be and you have
12 to ask for -- you have to ask for collateral to
13 protect that.
14 BY MS. KATSANTONIS:
15     Q.      But we just talked about at the
16 beginning of the relationship, you didn't have to
17 do that, right?
18         MR. PHILLIPS: Objection; asked and
19 answered.
20 BY MS. KATSANTONIS:
21     Q.      You didn't have to have claims and you
22 didn't have to set up a reserve when you asked for

278

1  500,000 in collateral?
2      A.      That was negotiated going into the
3  program.  It didn't have anything to do with having
4  problems on the -- on an account.
5      Q.      It has to do with the comfort level of
6  the surety with the program, right?
7          MR. PHILLIPS: Objection; leading.
8  BY MS. KATSANTONIS:
9      Q.      Is that right?
10     A.      It was -- as I explained, it was a new
11 program and I did ask for some collateral up front.
12     Q.      When you asked in June, attached here,
13 when you talked about potentially having 250,000 in
14 collateral, was there a claim that you were asking
15 for $250,000 in collateral for?
16     A.      You mean when I negotiated that down
17 from 500 to 250?
18     Q.      If that's how you want to state it,
19 that's fine.
20         When you negotiated $250,000 collateral
21 was there a claim or did you set a reserve?
22     A.      No, it was part of the getting

279

1  comfortable with the program and then my intention
2  was to if it worked the way that we anticipated it
3  working then I was going to return that.
4      Q.      Okay.  And then --
5      A.      It was leverage.
6      Q.      -- in December when you asked Nexus to
7  post a million and 250 in collateral, was that
8  based on a claim and was a reserve set?
9      A.      No, it was based on RLI asking me to do
10 that.
11     Q.      Okay.  So it wasn't based on -- and
12 there was no reserve set for that demand, right?
13     A.      I don't know.
14     Q.      Not to your knowledge?
15     A.      Not to my knowledge.
16     Q.      Did Nexus advise you that there was a
17 primary injunction hearing at the end of November
18 and that's why they wanted your declaration?
19     A.      Not that I recall.
20     Q.      Are you aware there was a preliminary
21 injunction hearing at the end of November 2018
22 based on RLI's contention that Nexus had failed to

280

1  make bond payments?
2      A.      I know there was a -- I know there were
3  problems but I don't know the extent of them, no.
4          (Deposition Exhibit 56 marked
5           for identification.)
6  BY MS. KATSANTONIS:
7      Q.      And then I'm going to show you a
8  declaration that is dated February 24, 2020.  Why
9  did you prepare this declaration?
10         MR. PHILLIPS: Objection.  So far as
11 this calls for any attorney/client privilege
12 communications, client should not answer it.
13         It's not about a discussion that we had
14 or seeking legal advice or information from me.
15 You can answer to that extent, but I'm advising you
16 not to answer insofar as attorney/client privilege
17 communication.
18 BY MS. KATSANTONIS:
19     Q.      So why did -- did you prepare this
20 declaration?
21     A.      I didn't prepare the declaration, no.
22 It's my interaction.

281

1    Q.    Did Nexus ask that you submit this
2 declaration?
3    A.    I had interactions with Nexus relating
4 to these questions or relating to this document,
5 yes.
6    Q.    Okay.  Who at Nexus did you speak with?
7    A.    I think it was just Mike Donovan.  I'm
8 not positive on that.
9    Q.    And what did Mike Donovan ask you to
10 do?
11    A.    He just asked some questions and asked
12 if I would be willing to give this input on the
13 questions that were asked in a declaration.
14    Q.    Okay.  And what questions did
15 Mr. Donovan ask you?
16    A.    I think it was more related to number 9
17 and perhaps number 10.
18    Q.    And do you recall specifically what he
19 asked you?
20    A.    No, I don't.
21    Q.    Do you recall generally what the
22 discussion was?

282

1    A.    Just asked how -- I think he -- he just
2 asked how the -- my understanding of how the
3 indemnity agreement works.
4    Q.    Okay.  And don't -- in your role isn't
5 it the claims side who deals with indemnity
6 agreements at RLI?
7    A.    In what regard?
8    Q.    In implementing them, interpreting
9 them, enforcing them?
10    A.    I think they designed them, yes.
11    Q.    And what role did you have in
12 implementing or enforcing terms of an indemnity
13 agreement?
14    A.    I don't -- the claim department handles
15 claims.
16    Q.    Right.  And, in fact, for Nexus's
17 indemnity agreement, you asked your claims
18 department to assist in preparing the indemnity
19 agreement, right?
20    A.    Yes.
21    Q.    Okay.  And when I asked you earlier
22 today about the terms of the indemnity agreement

283

1 you weren't familiar with many of the terms, right?
2    A.    I don't know that.  I wasn't familiar
3 with the terms, what do you mean by that?
4    Q.    Are you familiar I asked you if this
5 was a standard agreement, you didn't know, right?
6    A.    That doesn't have anything to do with
7 not understanding an indemnity agreement.  I said
8 that I would have to look at the indemnity
9 agreement and give you my thoughts on interpreting
10 them.
11    Q.    Okay.  And have you had occasions to
12 enforce or implement terms of an indemnity
13 agreement?
14    A.    Personally?  Claims are --
15    Q.    In your role with RLI?
16    A.    Claims are handled by the claim
17 department.  The underwriters are not handling the
18 claims.
19    Q.    Right.  So would it also be accurate
20 that the claims department would have a better
21 understanding of what the terms of the indemnity
22 agreement require?

284

1    A.    Require?  Can you explain what you mean
2 by require?
3    Q.    Well, the indemnity agreement isn't
4 something that you typically deal with, right, in
5 your day-to-day business -- in your role as vice
6 president of miscellaneous sureties the terms of an
7 indemnity agreement aren't something that you deal
8 with day-to-day, right?
9        MR. PHILLIPS:  Objection.  Go ahead.
10    A.    Well, in miscellaneous sureties we ask
11 for indemnity AOIs.
12 BY MS. KATSANTONIS:
13    Q.    Right.  But those aren't terms -- those
14 aren't agreements that you're working on, right;
15 you get them from the claims department, and you
16 pass it along, right?
17    A.    As if I didn't read them?
18    Q.    Well, do you not read them?
19    A.    Sure, I've read indemnity agreements
20 before.
21    Q.    Well, I asked you about the
22 Philadelphia Reinsurance indemnity agreement a few

285

1  minutes ago, right?
2  **A.    Yes.**
3     Q.    And you weren't familiar with those
4  terms, right?
5        MR. PHILLIPS: Objection.
6  **A.    Familiar with the terms?  What terms**
7  **were they?**
8  **BY MS. KATSANTONIS:**
9     Q.    I was asking you how those terms
10 differed from the RLI indemnity agreement and you
11 really didn't know, right?
12       MR. PHILLIPS: Objection.  That
13 certainly misstates his testimony.
14 **A.    Yeah, I think you've misstated it.**
15 **BY MS. KATSANTONIS:**
16    Q.    Well, do you know how the terms of the
17 Philadelphia Reinsurance indemnity agreement
18 differed from the RLI indemnity agreement?
19 **A.    I never had an opportunity to review**
20 **them side by side.  That's what I indicated to you.**
21 **I would have to review them side by side.**
22    Q.    And then you would pick out how they

286

1  differ.  But sitting here today, you don't recall
2  how they differ?
3  **A.    No.**
4     Q.    And why did you put paragraph five in
5  your declaration?
6        MR. PHILLIPS: Objection.  So far as
7  this question seeks the divulging of
8  attorney/client privileged information, I'm
9  instructing you not to answer.
10       If it's something that I told you that
11 you were giving in response to ask for legal advice
12 or information, if you have something that has
13 nothing to do with me giving you legal advice or
14 information that is still pertinent and answers the
15 question, you should certainly answer that portion
16 of it, though.
17 **A.    What is the question again?**
18 **BY MS. KATSANTONIS:**
19    Q.    Do you know why -- who prepared this
20 declaration?
21       MR. PHILLIPS: Objection.  Insofar as
22 this question calls for the divulging of

287

1  attorney/client information, don't answer it or
2  you'll waive it.  If there is something that you
3  can answer that doesn't involve that, you should
4  answer that portion of it.
5  **A.    I have nothing to say on it.**
6  **BY MS. KATSANTONIS:**
7     Q.    So it was not Nexus's counsel, or was
8  it Nexus's counsel who prepared this?
9        MR. SHOREMAN: Are you asking did
10 Nexus's lawyers write that agreement?
11       MS. KATSANTONIS: Who wrote the
12 declaration?
13       MR. PHILLIPS: We have two questions
14 pending.  I think the first one was who wrote it.
15 To that one, I object saying, you should be getting
16 the flavor of what's happening here, don't answer
17 insofar as it waives your attorney/client
18 privilege.  That is, any information I gave,
19 anything that's doing for you.
20       As the second question that's also
21 pending, whether or not Nexus -- whether it was
22 Nexus's client or Nexus's attorneys, obviously,

288

1  they are not your attorneys, so I have no objection
2  to that one being answered.  But I further object
3  that it is a compound question now.
4  **A.    So repeat the question.**
5  **BY MS. KATSANTONIS:**
6     Q.    Did Nexus's counsel assist in drafting
7  that declaration?
8  **A.    I don't believe so.**
9     Q.    The first declaration we saw that was
10 at the end of November 2018, that was drafted by
11 Nexus's counsel?
12 **A.    I believe so.**
13    Q.    Okay.  All right.  And with regard to
14 this declaration -- so paragraph nine, I think
15 talks about some of the things that we talked about
16 earlier today, right, that it was Nexus's
17 obligation to stand in front of RLI and pay all
18 bond breaches, right?
19 **A.    Correct.**
20    Q.    And if there were hitches in the
21 process of paying those breaches requiring RLI to
22 make the payment, Nexus would have to make

Transcript of David Sandoz
Conducted on March 5, 2020

73 (289 to 292)

289

1 immediate payment for the loss RLI suffered, right?
2  **A.    Correct.**
3   Q.   So at the end of the day, what you're
4 saying is the indemnity agreement to your
5 understanding provides that RLI should have no
6 financial loss, right?
7       MR. PHILLIPS: Objection; leading.
8  **A.    Nexus stands in front of the surety and**
9 **it's -- it was anticipated that Nexus would pay**
10 **breaches.**
11 BY MS. KATSANTONIS:
12   Q.   Such that?
13  **A.    That were due.**
14   Q.   Right.  Such that RLI would have no
15 financial loss, right?
16       MR. PHILLIPS: Objection; leading.
17  **A.    Yes, they would stand in front of the**
18 **surety as -- and be the first ones in line to pay**
19 **breaches.**
20 BY MS. KATSANTONIS:
21   Q.   Right.  I'm just reading your words,
22 right, that there would be no financial loss to

290

1 RLI, right; that's what was anticipated with the
2 indemnity agreement; is that correct?
3       MR. PHILLIPS: Objection; compound.
4 Objection; leading.
5  **A.    Can you rephrase that?**
6 BY MS. KATSANTONIS:
7   Q.   Yeah, I mean, you understood that the
8 way the indemnity agreement was to work was that --
9 such that there would be no financial loss to RLI,
10 right?
11       MR. PHILLIPS: Objection; leading.
12 Objection; it's been asked and answered, I think.
13 And it's also written down.
14       MS. KATSANTONIS: I'm reading his
15 words.
16       MR. PHILLIPS: Well, then he can just
17 agree because that's what he wrote.
18       MR. SHOREMAN: He doesn't have to
19 agree.  You're taking it out of context.
20 BY MS. KATSANTONIS:
21   Q.   Mr. Sandoz --
22       MR. WILLIAMS: He's -- asked and

291

1 answered.
2       MS. KATSANTONIS: You're not defending
3 him, Mr. Williams.
4  **A.    The gist of what I was writing is that**
5 **in the case of breaches where it's eventually**
6 **determined that the breach -- the breach has to be**
7 **paid to ICE, that Nexus would be in line first to**
8 **pay that breach.**
9 BY MS. KATSANTONIS:
10   Q.   Right.  And if Nexus didn't pay that
11 breach, you write, and RLI had to make payments
12 Nexus would be required to make immediate payment
13 to RLI for the loss RLI suffered in order to keep
14 RLI whole.  No financial loss to RLI, right?
15  **A.    That's what it states.**
16   Q.   Right.  So it's your understanding that
17 the indemnity agreement operates to ensure that RLI
18 doesn't suffer financial loss, right?
19       MR. PHILLIPS: Objection; leading.
20 BY MS. KATSANTONIS:
21   Q.   Is that your understanding of the
22 indemnity agreement?

292

1       MR. PHILLIPS: Objection.
2  **A.    It stands that the indemnity agreement**
3 **stands in for and help RLI by having Nexus stand in**
4 **front of losses that are -- that eventually have to**
5 **be paid.**
6 BY MS. KATSANTONIS:
7   Q.   And then also, to indemnify RLI if RLI
8 makes a payment, right, to pay RLI back?
9  **A.    Yes.**
10   Q.   Right?
11  **A.    Yes.**
12   Q.   And so those two mechanisms work to
13 ensure that RLI suffers no loss, right?
14       MR. PHILLIPS: Objection; leading.
15  **A.    Not necessarily.**
16 BY MS. KATSANTONIS:
17   Q.   How -- what do you mean by not
18 necessarily?
19  **A.    Well, if RLI has like -- I'll try to**
20 **think of an example, you'll have to give me a**
21 **little time.**
22   Q.   Sure.

Transcript of David Sandoz
Conducted on March 5, 2020

74 (293 to 296)

293

1     A.     There has been situations where there
2 has been claims where the surety has incurred some
3 expenses in investigating the claim and in not all
4 of those cases they have asked the indemnitor to
5 pay these expenses that have been incurred.
6          So what I was referring to here is
7 actual losses.  I mean there can be some financial
8 expenses on behalf of RLI that may not be required
9 to be paid back by Nexus, for example.
10    Q.     Well, RLI would make that decision not
11 to ask the indemnitor for those expenses, right?
12    A.     Yes.
13    Q.     But RLI under the indemnity agreement
14 would have the right to ask for all loss and
15 expenses under the terms of the indemnity
16 agreement, right?
17          MR. PHILLIPS:  Objection; leading.  And
18 just for my -- are you talking about an indemnity
19 agreement or the one at issue because I'm getting
20 lost on that?
21          MR. WILLIAMS:  You're badgering this
22 guy.  He keeps answering the same thing over and

294

1 over again.  You're trying to get him to say
2 the value of all --
3          MS. KATSANTONIS:  Mr. Williams, you're
4 not defending him.  And the deponent has submitted
5 a declaration saying that he understands the terms
6 of the indemnity agreement, so I want to explore
7 his knowledge of the terms of the indemnity
8 agreement.
9 BY MS. KATSANTONIS:
10    Q.     So do you have an understanding under
11 the indemnity agreement that the surety has the
12 right to recover losses including expenses of
13 whatever kind or nature?
14          MR. PHILLIPS:  Objection; leading.  And
15 by the indemnity agreement, do you mean the one
16 that is in this case that's not sitting in front of
17 my client so he can't review it?
18          MS. KATSANTONIS:  It's right in front
19 of him.  It's attached to --
20          MR. PHILLIPS:  Well, you have to
21 present it to him.
22          MS. KATSANTONIS:  I have.  It's

295

1 attached to his affidavit.
2          MR. WILLIAMS:  By losses, do you mean
3 claims?  Losses on claims?  What are you talking
4 about?
5          MS. KATSANTONIS:  Mr. Williams,
6 please -- Mr. Williams, you are not defending this
7 witness.
8          MR. WILLIAMS:  You're badgering him.
9          (Mr. Williams left the deposition
10 room.)
11 BY MS. KATSANTONIS:
12    Q.     Do you have an understanding that the
13 indemnity agreement provides that the surety can
14 require the indemnitor to pay upon demand all loss,
15 costs, damages, attorney fees and expenses of
16 whatever kind or nature?
17          MR. PHILLIPS:  Objection; leading.
18    A.     What part of the indemnity agreement
19 are you referring to?
20 BY MS. KATSANTONIS:
21    Q.     Paragraph 2(a)(1).
22    A.     I can't read that word there.  All

296

1 what?
2    Q.     All losses, costs, damages.  I have a
3 clearer version.
4          MR. PHILLIPS:  Obviously, I'm the one
5 that stuck that on there, and I didn't know it was
6 going to print so poorly.
7          MS. KATSANTONIS:  I have a clearer
8 version.  He's going to have to excuse the
9 highlighting.  But if you want to read, it's
10 easier.
11 BY MS. KATSANTONIS:
12    Q.     So 2(a)(1).
13    A.     So the question is in the event of a
14 claim —
15    Q.     Well, I'm asking you, doesn't the
16 surety indemnity agreement provide that the
17 indemnitor agrees to pay the surety upon demand all
18 losses, costs, damages, attorney fees and expenses
19 of whatever kind and nature which arise by reason
20 of or in consequence of the surety having executed
21 any bond.
22          Do you see that?

Transcript of David Sandoz
Conducted on March 5, 2020

75 (297 to 300)

297

1     A.    I can't read part of this one. So give
2  me examples of what you're trying to get at.
3     Q.    I'm not trying to get at anything. I'm
4  trying to understand your testimony. You submitted
5  a declaration as to your understanding of the
6  indemnity agreement.
7            And I was asking you --
8     A.    That's not my -- it was my
9  understanding of how the program was going to work.
10    Q.    Okay. Well, it purports to say what is
11 your understanding of the indemnity agreement, so
12 I'm trying to clarify that because the start of
13 paragraph 9 says, it is my understanding that the
14 commercial surety general indemnity agreement
15 protects RLI through requiring Nexus to pay and
16 then you go on there, right?
17    A.    My understanding is that the surety
18 can't just say I want a bunch of money for no
19 reason.
20    Q.    Okay. And I'm not asking you that. Do
21 you have any -- is it your contention that -- do
22 you have any -- are you contending that that

298

1  happened in this case?
2     A.    I don't know. That's what
3  I'm -- that's what I'm thinking that you're asking
4  me.
5     Q.    No. So I'm trying to get -- I'm trying
6  to understand, first of all, why you issued a
7  declaration, and second, what facts are you basing
8  if on. Okay? With regard -- let's just talk about
9  the second part.
10           Are you -- do you have any facts
11 regarding any collateral demands made by surety in
12 this case?
13    A.    Other than what we've read in the
14 documents, no.
15    Q.    Okay. So your declaration is not
16 intended to speak to any specific collateral demand
17 in this case, right?
18    A.    No, it's just generally how I interpret
19 when claims happen, what -- how they are typically
20 handled.
21    Q.    Why are you just offering an opinion in
22 a declaration for this case?

299

1            MR. PHILLIPS: Objection. Insofar as
2  this asks for attorney/client privileged
3  information, do not divulge that attorney/client
4  privileged information or you may waive the
5  attorney/client privilege.
6            Insofar as there is an answer that does
7  not involve that or a response, you should answer
8  that portion of the question.
9     A.    I want to protect the attorney/client
10 privilege.
11 BY MS. KATSANTONIS:
12    Q.    Okay. So I think that I understand.
13 Do you purport to have a full understanding of this
14 general agreement of indemnity between RLI and
15 Nexus?
16    A.    A general understanding?
17    Q.    Right.
18    A.    Or an attorney understanding?
19    Q.    I'm not asking an attorney
20 understanding, so are you -- by the declaration
21 you've proffered some testimony in regards to the
22 indemnity agreement.

300

1            So I guess what I'm asking is, is
2  your -- do you have a full understanding of all of
3  the terms of indemnity agreement between RLI and
4  Nexus?
5            MR. PHILLIPS: Objection.
6     A.    Can you ask me the question again?
7  BY MS. KATSANTONIS:
8     Q.    I'm trying to understand -- let me ask
9  you a couple of other questions. Did you
10 understand that under the terms of the indemnity
11 agreement, Nexus was required to pay RLI upon
12 demand any and all losses, costs, damages,
13 attorneys fees and expenses of whatever kind or
14 nature which arise as a consequence of RLI having
15 issued the bonds?
16           MR. PHILLIPS: Objection; asked and
17 answered. Objection; he's already said what his
18 understanding is and you just keep reading him the
19 same section of this agreement and asking if it's
20 his understanding that it says that.
21           MS. KATSANTONIS: No, I'm asking him
22 did he understand that.

Transcript of David Sandoz
Conducted on March 5, 2020

301

1    MR. PHILLIPS: Did he understand that
2 you read it?
3    MS. KATSANTONIS: No.
4    MR. PHILLIPS: We've been at this for
5 10 minutes. I'm sorry, but we have been at it for
6 10 minutes.
7 BY MS. KATSANTONIS:
8    Q.    Did you understand that the surety had
9 the right to demand Nexus to pay any and all costs,
10 expenses, attorney fees incurred because --
11 incurred by RLI as a result of having issued bonds
12 at the request of Nexus?
13    MR. PHILLIPS: Objection; asked and
14 answered.
15    A.    It's already answered.
16 BY MS. KATSANTONIS:
17    Q.    Well, what's the answer again; is it
18 yes or no?
19    MR. PHILLIPS: Objection; leading.
20    A.    It's not a yes or no answer.
21 BY MS. KATSANTONIS:
22    Q.    So that's what I'm trying to get. So

302

1 what is your understanding of what RLI is entitled
2 to from an indemnity standpoint from Nexus?
3    MR. PHILLIPS: Objection; asked and
4 answered. But you have to answer it again. So
5 please do.
6    A.    Okay. So my understanding and the way
7 that I explained it to Nexus was that they are
8 signing the indemnity agreement to stand in front
9 of the surety company when their are claims and
10 those claims result in having to pay the obligee an
11 amount of money.
12    And Nexus has to step in and I wanted
13 to make sure that Nexus understood that they had to
14 step in and pay for those claims before RLI.
15 BY MS. KATSANTONIS:
16    Q.    Right. And that if RLI had to pay any,
17 then Nexus would have to make immediate payment to
18 RLI for those payments, right?
19    MR. PHILLIPS: Objection; asked and
20 answered. Objection; leading.
21    A.    Right.
22 BY MS. KATSANTONIS:

303

1    Q.    And the purpose of all of that is to
2 ensure no financial loss to RLI, right?
3    A.    On claims. On claims that are
4 presented, yes.
5    Q.    And doesn't the indemnity agreement as
6 a whole provide that Nexus indemnify RLI for any
7 loss or expense?
8    MR. PHILLIPS: Objection.
9    A.    I don't know what you mean by any loss
10 or expense. You would have to go through a litany
11 of examples.
12 BY MS. KATSANTONIS:
13    Q.    So you don't -- well, I'm asking you
14 then, let me just ask you an open question. What
15 is your understanding of what paragraph 2(a)(1)
16 provides?
17    A.    I think I've already answered that. It
18 provides that if there is a loss to be paid on a
19 claim on a bond, that Nexus has to stand in front
20 of the surety and pay that claim.
21    And if they -- if there is some reason
22 that it didn't get paid there has to be some

304

1 negotiations between or discussions between the
2 surety and the indemnitor to explain that it is
3 their duty to pay that claim.
4    And if there is anything that slipped
5 through the cracks like that, they would have
6 to -- they would have to pay that loss.
7    Q.    Okay. Do you see in a -- 2(a)(1), in
8 2(a)(1) it talks about any, let's just go to
9 expense, of whatever kind or nature, which arrives
10 by reason of the surety having executed any bond,
11 right?
12    MR. PHILLIPS: Objection; leading.
13 Objection; asked and answered.
14    A.    I'd answer it in the same way. I mean,
15 I don't know how many times I can answer that
16 question.
17 BY MS. KATSANTONIS:
18    Q.    But it doesn't say anything about
19 claims in 2(a)(1), does it?
20    A.    Well, that's where you have
21 the -- that's where the surety has their problems.
22 If there is a claim, then the indemnifying party

Transcript of David Sandoz
Conducted on March 5, 2020

305

1 has to step in and take care of those claims.
2    Q.    Okay.  Well, for indemnity in 2(a)(1)
3 it doesn't say claims again, right, it's just
4 talking about any expense that the surety incurs by
5 reason of having executed the bond.  Do you know
6 what that language means?
7    A.    I already explained that to you.
8    Q.    So that's your understanding of that
9 language?
10    A.    Yes.
11    Q.    Okay.  All right.  Then in paragraph
12 10 --
13    A.    Of the indemnity agreement?
14    Q.    No, of your -- it is not my
15 understanding that the commercial general indemnity
16 agreement require -- would require Nexus to provide
17 RLI with full cash collateral for all outstanding
18 bond liability if one or more claims were
19 presented?
20    A.    Correct.
21    Q.    What are you stating there, give me an
22 example.

306

1    A.    The example, you can -- we can go back
2 to the documents where they had a couple of claims
3 in whatever it was, in 2016 at some point.
4        So they have those claims and when they
5 are -- if the claims are ultimately having to be
6 paid, it's determined that they have to be paid to
7 the obligee and in this case ICE, Nexus would step
8 in in front of the surety -- the indemnitor would
9 step in front of the surety to pay those claims.
10        (Mr. Williams entered the deposition
11 room.)
12    A.    It doesn't mean that if there is a
13 claim, that they would all of a sudden ask for an
14 extremely -- a lot of money outside of the claims
15 that were presented.  That doesn't make sense.
16    MR. PHILLIPS:  He was not finished.
17 BY MS. KATSANTONIS:
18    Q.    You say full cash collateral.  Are you
19 saying that, for example -- you say full cash
20 collateral for all outstanding bond liability.  Is
21 that sentence meant to say, for example,
22 that -- let me say it a different way.

307

1        Are you -- when you say full cash
2 collateral for all outstanding bond liability, are
3 you referencing the total amount, penal sum of
4 outstanding bonds?
5    A.    Yes.
6    Q.    Okay.
7    MS. KATSANTONIS:  I have nothing
8 further.
9    MR. PHILLIPS:  If I may, before we go
10 off the record, I just want to apologize for -- I
11 had colloquy, and I don't like doing that.  I
12 apologize.
13    MS. KATSANTONIS:  You were great.
14 Thank you.
15    THE VIDEOGRAPHER:  This is the
16 videographer.  We're going off the record at 6:49
17 p.m.
18        (Recess taken.)
19    THE VIDEOGRAPHER:  This is the
20 videographer.  We're going back on the record at
21 7:00 p.m.
22

308

1            EXAMINATION
2 BY MR. SHOREMAN:
3    Q.    Mr. Sandoz, thank you for being here
4 today.  I appreciate your contribution.  I'm John
5 Shoreman.  I represent the defendants in this
6 action.
7        Let me ask you Mr. Sandoz, have you and
8 I had any communication prior to today?
9    A.    No.
10    Q.    Have you ever had any communication
11 with my colleague, Mario Williams, prior to today?
12    A.    No.
13    Q.    You gave some testimony earlier about
14 the underwriting process in 2015.  The underwriting
15 of Nexus on behalf of RLI.  Who was responsible
16 for the underwriting process; who was in charge?
17    MS. KATSANTONIS:  Objection.
18    A.    From RLI?
19 BY MR. SHOREMAN:
20    Q.    From RLI.
21    A.    Me.
22    Q.    Did you have a letter of authority from

Transcript of David Sandoz
Conducted on March 5, 2020

309

1  RLI as an underwriter?
2      **A.    Yes.**
3      Q.    Does that letter of authority have a
4  financial cap?
5      **A.    It probably did, but I don't recall it.**
6      Q.    Was the underwriting that you performed
7  on the Nexus case, was that within your authority
8  at RLI?
9      **A.    I'm quite sure it was.**
10     Q.    As you sit here today, when I ask you a
11 question, did a lot of -- you had a lot of
12 communication with Nexus in 2015 and 2016 about the
13 underwriting process.  You had -- looked at their
14 financials.
15         Sitting here today, can you say -- is
16 there any information that was provided to you by
17 Nexus that you believe was misleading or deceitful
18 or false representation?
19     **A.    Not that I'm aware of.**
20     Q.    Now, you've given some testimony about
21 the indemnity agreement which you presented to
22 Nexus in the course of RLI undertaking of the

310

1  surety, issuance of bonds.  There was an exhibit
2  previously marked, I believe it's Exhibit 8.
3         Do you have that one?  It's the one
4  that has partial redactions?
5         MR. PHILLIPS:  That would be Exhibit 7.
6         MR. SHOREMAN:  Is that the one?
7         MS. KATSANTONIS:  What's the date of
8  the e-mail?
9         MR. PHILLIPS:  June 26, 2015.  It's the
10 one that you redacted.  You have the original
11 version.  The one you redacted for attorney/client
12 privilege.
13         MR. SHOREMAN:  Can you place that in
14 front of the deponent?
15         MR. PHILLIPS:  I'd like to reflect I'm
16 getting -- well, actually, he has one from the
17 court reporter.
18 BY MR. SHOREMAN:
19     Q.    I'm referring you to what has been
20 marked as Exhibit 7, Mr. Sandoz.  It appears that
21 you're responding to somebody named Kirk Austin.
22 Was Mr. Austin associated with the claims

311

1  department?
2         MS. KATSANTONIS:  Objection; asked and
3  answered.
4      **A.    Yes.  He worked with Ira Sussman.**
5  **BY MR. SHOREMAN:**
6      Q.    And was he involved in the drafting of
7  the indemnity agreement that was presented to
8  Nexus?
9      **A.    I'm not sure.  I presume so, but I'm**
10 **not real sure.**
11     Q.    Now, much of this document has been
12 redacted but your response to Mr. Sussman and
13 Mr. Austin appears on the top.  Were you responding
14 to their questions in relation to the drafting of
15 the indemnity agreement?
16     **A.    I'll have to read this again and see if**
17 **I can answer that.**
18     Q.    Sure.
19     **A.    I don't have the rest of the**
20 **agreement — the rest of the correspondence.  No, I**
21 **don't know.**
22     Q.    So you can't sit here today and tell me

312

1  why Mr. Austin needed this information from you?
2         MS. KATSANTONIS:  Objection;
3  mischaracterizes the document.  I mean you're --
4         MR. SHOREMAN:  Are you this man's
5  attorney?
6         MS. KATSANTONIS:  But you're --
7         MR. SHOREMAN:  Are you this man's
8  attorney?
9         MS. KATSANTONIS:  Your question assumes
10 facts not in the record.
11         MR. SHOREMAN:  Are you representing
12 Mr. Sandoz?
13         MS. KATSANTONIS:  You just asked him a
14 question --
15         MR. SHOREMAN:  Are you representing
16 Mr. Sandoz?
17         MS. KATSANTONIS:  Mr. Shoreman, no, but
18 I'm trying to make sure that you don't mislead with
19 the question.
20         MR. SHOREMAN:  Well, that's not your
21 responsibility.
22         MS. KATSANTONIS:  Well, I'm going say

Transcript of David Sandoz
Conducted on March 5, 2020

313

1 that your question -- I object. Your question
2 assumes facts not into evidence.
3          MR. SHOREMAN: I'm trying to -- it's
4 discovery. I'm trying to --
5          MS. KATSANTONIS: It's not discovery.
6 You asked in your question --
7          MR. SHOREMAN: You have no right to
8 interrupt this examination, Ms. Katsantonis.
9          MS. KATSANTONIS: Mr. Shoreman, you
10 asked about a question from Mr. Austin. There is
11 no question from Mr. Austin on this document.
12          MR. SHOREMAN: Because you redacted it
13 under a false claim of privilege.
14          MS. KATSANTONIS: I didn't. Okay.
15 BY MR. SHOREMAN:
16    Q.    All right. So were you -- putting
17 aside what's been marked as Exhibit 7, were you
18 ever asked whether the indemnity agreement should
19 contain a collateral security demand provision?
20    **A.    Asked by who?**
21          MS. KATSANTONIS: Objection.
22 BY MR. SHOREMAN:

314

1    Q.    By anyone at RLI?
2          MS. KATSANTONIS: Objection.
3    **A.    No.**
4          MR. SHOREMAN: You have no right to
5 object for this witness.
6          MS. KATSANTONIS: I can object to
7 anything that I want.
8          MR. WILLIAMS: You told me that I
9 couldn't.
10 BY MR. SHOREMAN:
11    Q.    Did you answer that?
12          MR. PHILLIPS: I believe, for what it's
13 worth, I believe that the deponent did answer the
14 question in there somewhere.
15          MR. SHOREMAN: I would like to have it
16 read back, please, so we can get a clear answer
17 without Ms. Katsantonis's objections.
18          (Discussion off the written record.)
19          (Requested portion of the record read
20 back.)
21 BY MR. SHOREMAN:
22    Q.    So do you have the question in mind,

315

1 Mr. Sandoz?
2    **A.    I believe so.**
3          MR. WILLIAMS: Ask it again.
4    **A.    No.**
5 BY MR. SHOREMAN:
6    Q.    Are you familiar with the term
7 collateral demand security?
8    **A.    I would have to have you explain that**
9 **terminology.**
10    Q.    Have you ever dealt with it in your
11 experience? Have you ever seen an indemnity
12 agreement that within the document itself allowed a
13 surety, RLI, to demand security, demand collateral
14 at its sole discretion as part of the relationship?
15          MS. KATSANTONIS: Objection; calls for
16 a legal conclusion. Lack of foundation.
17          MR. SHOREMAN: Read the question back,
18 and we'll ignore Vivian's interruption.
19    **A.    I'm not sure.**
20 BY MR. SHOREMAN:
21    Q.    Well, are you familiar with RLI surety
22 forms, have you made yourself familiar with --

316

1    **A.    The surety -- the indemnity agreement?**
2    Q.    Yes.
3    **A.    Yeah, I used to be many years ago when**
4 **I was working there, but yes.**
5    Q.    All right. Let me place before you
6 what were marked as -- let's just continue on with
7 this Exhibit 57. I don't have a copy of this but
8 I'll pass it to counsel to take a look at it.
9          (Deposition Exhibit 57 marked
10          for identification.)
11          MS. KATSANTONIS: I'm going to object
12 to this document. It's not complete and it's
13 certainly irrelevant.
14          MR. SHOREMAN: Well, I haven't asked
15 any questions yet. Do you mind putting it in front
16 of the witness?
17          MS. KATSANTONIS: Well, it's an
18 agreement of -- I'm just going to --
19          MR. SHOREMAN: Do you mind placing it
20 in front of the witness so I may ask a question?
21          MS. KATSANTONIS: I will. I'm going to
22 object. It's an agreement of indemnity not

Transcript of David Sandoz
Conducted on March 5, 2020

317

1  involved in this.
2       MR. SHOREMAN:  When I've asked the
3  question, you may place your objection on the
4  record.
5  BY MR. SHOREMAN:
6    Q.    Before the witness has been placed what
7  has been marked Exhibit 57.  It's the first page of
8  an indemnity agreement under the RLI logo.
9       Does that appear to be an RLI standard
10 indemnity form?
11      MS. KATSANTONIS:  Objection; lack of
12 foundation.  The witness has already testified he
13 doesn't know what a standard form is.  And
14 irrelevant.  And incomplete document.
15      MR. SHOREMAN:  Relevance is not really
16 an objection at this stage in the case,
17 Ms. Katsantonis, as you well know.
18      MS. KATSANTONIS:  Well, you're getting
19 into something that you have no --
20      MR. SHOREMAN:  Why are you arguing?
21      MS. KATSANTONIS:  Let's just ask him if
22 he even knows what this is.

318

1       MR. SHOREMAN:  I will place this before
2  the witness and you will interrupt.
3  BY MR. SHOREMAN:
4    Q.    But the question is:  Do you recognize
5  that, sir, as a standard indemnity agreement issued
6  by RLI?
7       MS. KATSANTONIS:  Objection.
8  BY MR. SHOREMAN:
9    Q.    A form of one.
10      MS. KATSANTONIS:  Objection; incomplete
11 and second objection, witness already testified he
12 didn't have an understanding as to what the
13 standard indemnity agreement was.
14      MR. SHOREMAN:  That is the most --
15      MR. PHILLIPS:  I'm sorry.  As the
16 person defending Mr. Sandoz, I'm not going to get
17 in between your guy's spat, but I want to make sure
18 that part of your objection appears to be taking a
19 statement he said -- about what was previously an
20 exhibit that the -- the agreement at issue in this
21 case and his testimony that he doesn't really know
22 that that's a standard one because it was -- I'm

319

1  not going to put words in his mouth.
2       But I think the way you're objecting is
3  that he -- your objection misstates the
4  testimony -- his testimony in that it suggests that
5  he doesn't have any idea about any agreements.  I
6  don't care what the end result is.  I just don't
7  want your objection to be changing what he said.
8       MS. KATSANTONIS:  I understand what you
9  said.  Sure.  I appreciate that.
10 BY MR. SHOREMAN:
11   Q.    What's been marked as Exhibit 57, can
12 you tell me if that is a standard form RLI
13 indemnity agreement, the first page of one?
14      MS. KATSANTONIS:  Same objection.
15   A.    It appears to be an RLI indemnity
16 agreement.
17 BY MR. SHOREMAN:
18   Q.    Will you just pass that back to me.
19 I'd like you to take a look --
20      MS. KATSANTONIS:  I'm going to want a
21 copy of that, Mr. Shoreman.
22      MR. SHOREMAN:  If you have a copier on,

320

1  you're welcome to it.  But it was introduced
2  into --
3       MS. KATSANTONIS:  Can you give me the
4  Bates stamp?
5       MR. SHOREMAN:  No, no.  This is mine.
6       MS. KATSANTONIS:  It's not Bates
7  stamped?  So it hasn't been produced in the
8  litigation.
9       MR. SHOREMAN:  It doesn't -- I'd ask
10 Mr. Chilson about it.
11      MR. WILLIAMS:  Yeah, he did.
12      MS. KATSANTONIS:  Well, again, it
13 hasn't been produced.
14      MR. SHOREMAN:  It's an exhibit to one
15 of your witness's depositions.
16      MS. KATSANTONIS:  All right.
17 BY MR. SHOREMAN:
18   Q.    I'd like you to refer to the second
19 paragraph of the section named second under
20 indemnity, second paragraph of section 7.
21      MS. KATSANTONIS:  Which section?  The
22 second paragraph?

Transcript of David Sandoz
Conducted on March 5, 2020

321

1     MR. SHOREMAN: Second paragraph under
2  the --
3     MR. PHILLIPS: Could you just point the
4  section out.
5     MS. KATSANTONIS: I think he's right
6  here up in the indemnity section.
7     MR. SHOREMAN: The second -- the second
8  paragraph below the paragraph --
9     THE WITNESS: Can I get the magnifying
10 glass?
11    MS. KATSANTONIS: Absolutely. I'm just
12 going to say I think it's improper to have the
13 witness testify to a document he's stated he
14 doesn't know anything about.
15    **A.   You're asking me to read the last**
16 **paragraph of that?**
17 **BY MR. SHOREMAN:**
18    Q.   That second paragraph of the second
19 section.
20    **A.   Okay.**
21    Q.   All right. Have you read it, sir?
22    **A.   Yes.**

322

1     Q.   How long have you been in the surety
2  business?
3     **A.   I was in the surety business around 40**
4  **years.**
5     Q.   The paragraph that you just read, does
6  that give the surety a right to demand collateral
7  from the obligor in an amount it chooses at its
8  sole discretion?
9     MS. KATSANTONIS: Objection; lack of
10 foundation and calls for legal conclusion.
11    MR. PHILLIPS: You can still answer,
12 David, as to your understanding.
13    MS. KATSANTONIS: If you have an
14 understanding of it.
15    MR. PHILLIPS: I'm sorry. Please don't
16 coach my witness. In fairness, that is the exact
17 kind of questions that you were asking and we
18 just -- I let it ride because we all kind of know
19 that it's just what his understanding as a surety
20 professional is.
21    I'm only talking this long because I
22 want to go home, and I'm fairly certain that at any

323

1  point we could.
2     MS. KATSANTONIS: Right. My objection
3  is more to the fact they haven't laid a foundation
4  that Mr. Sandoz has even reviewed this document
5  before today.
6     MR. SHOREMAN: All right.
7  BY MR. SHOREMAN:
8     Q.   Would you like the question read back?
9     **A.   Please.**
10    Q.   In your experience, your understanding,
11 with the paragraph that you just read, allow the
12 surety to demand the collateral in the amount that
13 it chooses at its sole discretion?
14    MS. KATSANTONIS: Objection; lack of
15 foundation. Calls for speculation.
16    MR. SHOREMAN: Please stop interrupting
17 this deposition.
18    MS. KATSANTONIS: I'm putting in my
19 objection.
20    MR. SHOREMAN: Your objection was put
21 in when the question was first asked.
22    MS. KATSANTONIS: You just asked a new

324

1  question.
2     MR. SHOREMAN: No, I didn't.
3     **A.   In my opinion, no. This is what I was**
4  **referring to when I was trying to -- trying to**
5  **explain my understanding of the indemnity agreement**
6  **where you have to have -- you have to have claims**
7  **that are presented and you have to put reserves up**
8  **for those claims in order to ask for collateral to**
9  **be protected. And I wasn't aware that in the Nexus**
10 **case where reserves had -- you know, substantial**
11 **reserves had been posted. They may have.**
12 **BY MR. SHOREMAN:**
13    Q.   So that paragraph that you just read
14 is -- is the basis for your prior answer that they
15 can set up a reserve?
16    **A.   Yes.**
17    Q.   Is that paragraph, to your knowledge,
18 is that paragraph in the Nexus indemnity agreement?
19    MS. KATSANTONIS: Objection. Again, I
20 think you misstated his testimony and --
21    MR. WILLIAMS: He asked a question.
22 BY MR. SHOREMAN:

Transcript of David Sandoz
Conducted on March 5, 2020

325

1    Q.    I'm asking if that paragraph appears in
2  the Nexus indemnity agreement?
3    **A.    Not that I'm aware of.**
4    Q.    Now, in your experience -- let's put
5  Exhibit 57 aside.  I'm no longer questioning you
6  about it.
7         This is about your knowledge of the
8  Nexus indemnity agreement and the rights -- your
9  understanding of the rights and obligations of the
10 parties.
11        Is it your understanding that absent
12 claims in the amount of 10 million dollars that RLI
13 may make a unilateral demand that Nexus pay 10
14 million dollars in collateral?
15        MS. KATSANTONIS:  Objection.  We're
16 here for -- this witness is here as a fact witness.
17 You're not to be eliciting opinions from him, which
18 is what you're doing and it's completely improper.
19 He's not here as an expert.
20 BY MR. SHOREMAN:
21    Q.    Please answer the question, Mr. Sandoz.
22 Ms. Katsantonis has no right to direct you not to

326

1  answer.  So please --
2         MS. KATSANTONIS:  I'm not directing him
3  not to answer.  I'm objecting.  Calls for a legal
4  conclusion, and you're seeking opinion testimony.
5         MR. SHOREMAN:  You've made your
6  objection.
7         MS. KATSANTONIS:  Which is improper.
8         MR. SHOREMAN:  You've made your
9  objection.
10   **A.    I would have to have the question read**
11 **back, as I'm getting confused.**
12        (Requested portion of the record read
13 back.)
14        MS. KATSANTONIS:  I'm going to object.
15        MR. PHILLIPS:  I'm sorry.  That
16 question was read back.  You already had your
17 objections.  That's the exact reading back.  You've
18 made your objections.  We're past time.
19        The question is read back.  You don't
20 get to object again.  That's the way -- you've
21 stated your objections, and it wasn't a new
22 question coming from Mr. Shoreman.  Let's wrap it

327

1  up.
2         MS. KATSANTONIS:  But that's not true,
3  and it's also calling for a hypothetical.
4         MR. PHILLIPS:  So you added a new
5  objection?
6         MS. KATSANTONIS:  Yes, and I think I'm
7  entitled to.  He hasn't answered yet.
8    **A.    It's becoming very confusing when I get**
9  **a question, and I can't focus on the question.**
10        MR. SHOREMAN:  Would you, please, read
11 back the question one more time, Madam Court
12 Reporter.
13        (Requested portion of the record read
14 back.)
15        MS. KATSANTONIS:  Objection; lack of
16 foundation.
17   **A.    I don't believe they can.**
18        MR. SHOREMAN:  All right.  We missed
19 that because you're interrupting.
20 BY MR. SHOREMAN:
21    Q.    Please repeat your answer.
22   **A.    I don't believe they can.**

328

1    Q.    All right.  Now, let's refer you to the
2  collateral agreement which was also entered as an
3  exhibit in this matter today.
4    **A.    I have no idea where that one is.**
5    Q.    It's the collateral agreement that you
6  negotiated at the inception of the relationship.
7         Do you recall that, sir, it was
8  $500,000 initially and then it was reduced?
9    **A.    Yes, but I don't know -- I would like**
10 **to refer to it if you're going to ask me questions**
11 **about it.**
12   Q.    All right.  It is an exhibit to this
13 deposition.
14        MS. KATSANTONIS:  What are you looking
15 for?
16        MR. PHILLIPS:  The collateral
17 agreement.  You asked questions about it.
18        MR. SHOREMAN:  It's the same.  There
19 are some highlights.  There is no writing on that.
20        MR. PHILLIPS:  I'll double check.
21        MR. SHOREMAN:  All right.  Well, just
22 hand that to him.  Ignore the writing.

Transcript of David Sandoz
Conducted on March 5, 2020

329

1  BY MR. SHOREMAN:
2      Q.   I placed before you what was previously
3  marked in this deposition as the collateral
4  agreement entered by RLI and Nexus.
5           Do you recognize that document, sir?
6      **A.   Yes, it's the one we looked at**
7  **previously.**
8      Q.   Under the terms -- to the best of your
9  understanding, under the terms of that agreement,
10 may RLI unilaterally demand an increase in the
11 amount of collateral stated in that agreement, an
12 increase?
13         MS. KATSANTONIS:  Objection; calls for
14 legal conclusion.
15     **A.   I don't believe that's the purpose of**
16 **this agreement.**
17 **BY MR. SHOREMAN:**
18     Q.   So the purpose you described in your
19 earlier testimony -- my question is:  Given that
20 that document -- given your experience with that
21 document, may RLI simply say we are increasing the
22 amount of collateral set forth in the collateral

330

1  agreement on its own unilateral decision?
2      **A.   To my knowledge, I don't believe so.**
3      Q.   Thank you, sir.
4           MR. PHILLIPS:  I'm trying to see if
5  this was possibly -- was Exhibit 16.  Never mind.
6  I don't see the writing on it.
7  BY MR. SHOREMAN:
8      Q.   So by mid 2016, RLI was involved with
9  the Nexus program, is that right, issuing bonds by
10 mid 2016?
11     **A.   Yes.**
12     Q.   And in your experience with the
13 program, how was it working at that time?
14     **A.   It was satisfactory, in my opinion.**
15     Q.   Do you know over the course of the
16 relationship between RLI and Nexus how much
17 premium, approximately, RLI earned issuing bonds at
18 the request of Nexus?
19     **A.   It would have to be a guess on my part.**
20     Q.   Please do.  Please guess.
21         MS. KATSANTONIS:  Objection.
22         MR. PHILLIPS:  Ms. Katsantonis, you're

331

1  not defending this deponent.  I've been trying to
2  be very cool letting it go, but we're well over
3  time.
4  BY MR. SHOREMAN:
5      Q.   Your best guess.
6      **A.   My best guess is between two million**
7  **and two and a half million dollars.**
8      Q.   There was some discussion concerning an
9  e-mail dated 12/7.  And I believe it was, it's an
10 exhibit in this matter, but it's the e-mail that we
11 discussed where you stated that you were asked to
12 relay to Nexus the proposal that they pay -- that
13 Nexus pays 1.25 million dollars by February 28 or
14 RLI would cease the program.
15         Do you recall that document?
16         MS. KATSANTONIS:  Objection.  I'm going
17 to object to your mischaracterization of the
18 e-mail.
19         MR. SHOREMAN:  Just put the document in
20 front of him.
21         MR. PHILLIPS:  It's document 45.
22         MR. WILLIAMS:  Didn't you say

332

1  objections aren't allowed for persons not
2  representing.  I think that she changed her mind.
3  BY MR. SHOREMAN:
4      Q.   All right.  Exhibit 45, Mr. Sandoz, you
5  read this document earlier.
6           Do you have it in mind?
7      **A.   I have it in front of me, yes.**
8      Q.   We heard the term in the course of this
9  deposition book of business.
10          What does that mean to you?
11     **A.   Can you -- is it in this document?**
12     Q.   No, it's not in this document, but it's
13 relevant to this document.  Do you have an
14 understanding of a book of business as it relates
15 to --
16     **A.   As it relates to?**
17     Q.   -- surety?
18     **A.   Surety.  When I refer to the**
19 **miscellaneous surety book of business, it's all of**
20 **the bonds that I'm — that were under my umbrella**
21 **that I was managing.**
22     Q.   Well, I think there is some confusion

Transcript of David Sandoz
Conducted on March 5, 2020

84 (333 to 336)

333

1  in regards to what was being asked of Nexus in
2  Exhibit 45.
3      (Mr. Williams left the deposition
4  room.)
5  BY MR. SHOREMAN:
6      Q.    Was it proposed that a new surety take
7  over all of the existing bonds that RLI was holding
8  and had received premium for or was it suggested
9  that unless Nexus put up 1.25 million dollars by
10 February 28, RLI would cease writing bonds?
11      MS. KATSANTONIS:  Objection.
12 Mischaracterizes the document.
13      A.    I believe RLI wanted to exit the
14 program at 2/28/17.  And as stated, I was in the
15 process of trying to help Nexus have another home
16 for this program.
17 BY MR. SHOREMAN:
18      Q.    Right.  When you say have another home,
19 do you mean a surety that would continue to write
20 bonds for them?
21      A.    Yes.
22      Q.    What about the existing bonds that RLI

334

1  had issued and was holding, was it suggested that
2  Nexus would have to pay 1.25 million dollars in
3  February as collateral against the bonds that RLI
4  was holding?
5      MS. KATSANTONIS:  Objection.
6  Mischaracterizes the document.
7      A.    I'm not sure.  I don't recall.
8  BY MR. SHOREMAN:
9      Q.    Well, do you see the last sentence, the
10 last two sentences where it says, we would also
11 like to do anything to help you manage the
12 cancelation of our bonds.  He mentions he would put
13 some folks on the task of getting exoneration on
14 our bonds and would like to know the progress made
15 thus far.
16      A.    The last two sentences of this memo
17 here?
18      Q.    Yes.  Exhibit 45.
19      A.    That's referring to having Nexus help
20 manage the cancelation of the immigration bonds.
21      Q.    Bonds that were held.  Would that be
22 bonds held by RLI?

335

1      A.    Yes.
2      Q.    And if you go up a bit to the sentence
3  that's beginning with we know it takes time to
4  replace the program and we assume that's the more
5  preferable route, so the goal we have set is to
6  have the program moved to a better fit for you by
7  2/28/17 and if the program is replaced by that
8  date, it is not necessary to provide the
9  collateral.  We would just hold back the
10 contingency cancelation money that you would earn
11 if you qualify for contingency.
12      So if the new surety was writing bonds
13 by 2/28 -- well, I'll take that back.  Up until
14 2/28/17, RLI continued to write bonds; is that
15 right?
16      A.    I believe so.
17      Q.    And are you -- are you aware that RLI
18 had a unilateral right to cease writing bonds any
19 time it chose?
20      A.    I believe they had the choice on
21 whether they wanted to continue the program.
22      Q.    So if, in fact, by 2/28 it was required

336

1  that a new surety take over the entire book of
2  business, take over all the bonds that were
3  actually issued by RLI, it says, if the program was
4  replaced by that date, it would not be necessary to
5  provide collateral.
6      Doesn't that suggest that what the
7  surety was actually doing was to write bonds going
8  forward from 2/28 rather than take over the
9  collateral, rather than take over all the bonds?
10 Why would you refer to -- and that's a necessity to
11 place collateral if the purpose of this proposal
12 was to remove all the bonds to a new surety?
13      MS. KATSANTONIS:  Objection.  The
14 witness already testified he was unsure as to that
15 language.
16      A.    I think what I stated is that — I hope
17 this is what I stated is that I was trying to
18 transition the business to another surety and I
19 know at some point in time, RLI — I had
20 discussions with RLI about transferring their book
21 of business to the new surety as well.
22 BY MR. SHOREMAN:

Transcript of David Sandoz
Conducted on March 5, 2020

85 (337 to 340)

---

337

1    Q.    You did and you stated that that was in
2 2017?
3    A.    I believe so.
4         MS. KATSANTONIS:  Objection.
5 BY MR. SHOREMAN:
6    Q.    Would this note of 12/7/2016 predate
7 those discussions concerning the movement of a book
8 of business?
9         MS. KATSANTONIS:  Objection; misstates
10 his testimony.
11        MR. PHILLIPS:  I'm sorry.
12 Ms. Katsantonis, he's my --
13 BY MR. SHOREMAN:
14    Q.    I'm sorry.  I didn't hear your response
15 over Ms. Katsantonis.
16    A.    Yes, I believe so.
17    Q.    And did, in fact, a new surety start
18 writing business for Nexus by 2/28/17, do you know?
19    A.    That, I don't know.
20    Q.    Did, in fact, Nexus pay 1.25 -- one
21 million, 250 thousand in collateral -- in
22 collateral by 2/28/17?

---

338

1         MS. KATSANTONIS:  Objection; lack of
2 foundation.
3    A.    I'm not sure.  I do not know.
4 BY MR. SHOREMAN:
5    Q.    Do you know if Nexus -- if RLI wrote a
6 single bond after 2/28/17?
7    A.    I don't believe so, but I don't know
8 for sure.
9    Q.    Did you receive an instruction in the
10 year 2016 to cease writing bonds for Nexus?
11    A.    Did I receive instructions?
12    Q.    Yes.  Were you told to cease writing
13 bonds for Nexus in the year 2016?
14        MS. KATSANTONIS:  Objection.
15    A.    There was a decision made to -- at some
16 point not continue to write immigration bonds for
17 the Nexus program.
18 BY MR. SHOREMAN:
19    Q.    And when did those discussions begin?
20    A.    That's -- I think Vivian asked that and
21 I'm not real sure, but I think it was in that
22 time -- I thought it was in the time frame of the

---

339

1 September, October, November, but --
2    Q.    If we take September as a date, that's
3 September, October, November, December, January,
4 February?
5    A.    Yes.
6    Q.    Six months before they actually stopped
7 writing bonds?
8    A.    Correct.
9    Q.    And at any time in that period they
10 could stop writing bonds; is that right?
11    A.    Yes.
12    Q.    Does the -- let me refer you to the
13 indemnity agreement again, which is Exhibit -- do
14 you have that?
15        MR. PHILLIPS:  That's right.  I guess
16 I'll mention that on the record.  Before it looks
17 like Exhibit 18 has the general surety --
18 commercial surety general indemnity agreement as
19 well as the collateral agreement and receipt which
20 you had given him before are both in Exhibit 18.
21 BY MR. SHOREMAN:
22    Q.    Do you have that before you,

---

340

1 Mr. Sandoz?
2    A.    I'm going to have to look for it.  I
3 went to 17 and 19, and I don't know where 18 is.
4        MR. PHILLIPS:  Anyone -- just to keep
5 things moving on -- doesn't have a problem with me
6 giving this to him?
7        MR. SHOREMAN:  No, that's fine.
8        MR. PHILLIPS:  Use this one, Dave.
9 BY MR. SHOREMAN:
10    Q.    Okay.  We had some discussion about
11 collateral rights associated with this -- with the
12 RLI -- with the Nexus indemnity agreement and other
13 form indemnity agreement.  Can you tell me just,
14 once again, does this -- the Nexus indemnity
15 agreement, does it permit RLI to demand collateral
16 for amounts above pending or actual claims made on
17 bonds?
18        MS. KATSANTONIS:  Objection; calls for
19 a legal conclusion and lack of foundation.
20        MR. PHILLIPS:  Before you answer,
21 David, this is -- before you answer.  I just want
22 to again state, this is my deposition to defend and

---

Transcript of David Sandoz
Conducted on March 5, 2020

341

1 these are the same questions that you were asking.
2 That's why I'm not objecting. I'm just letting it
3 go.
4 BY MR. SHOREMAN:
5     Q.    I don't know, did you answer that,
6 Mr. Sandoz?
7     **A.    I don't believe so.**
8     Q.    Okay. All right.
9         MR. SHOREMAN: Thank you. Mr. Sandoz,
10 I have no further questions.
11        MR. PHILLIPS: Before we get started,
12 number one, I think there is very little tape left;
13 number two, we are past time. But -- please let me
14 finish. That in mind and subject to whether Dave
15 wants to or not, if I recall correctly, you had all
16 of 10 minutes left out of your original 7 hours, so
17 I would expect that we're not going to use more
18 than 10 minutes going forward. I don't think we
19 have the tape for it. But that said, I think
20 that's a fair compromise on the situation.
21        If we go beyond that, if Dave tells me
22 he wants to terminate the deposition or he says he

342

1 wants to, then we'll terminate it because it's went
2 beyond the amount of time allowed by the rules.
3 And, again, I think the compromise is if you get 10
4 more minutes, that would have been your full 7
5 hours today.
6        MS. KATSANTONIS: All right. I
7 disagree because I believe counsel has added new
8 grounds and new issues. But in any event, I plan
9 on being brief, so let's just go for it, and we'll
10 see where we are.
11        THE VIDEOGRAPHER: We have three
12 minutes left on this disk.
13        This is the videographer. We're going
14 off the record at the end of disk number four at
15 7:38 p.m. We're off the record.
16        (Recess taken.)
17        THE VIDEOGRAPHER: This is the
18 videographer. We're going back on the record at
19 7:41 p.m. at the start of disk number five.
20
21            EXAMINATION
22 BY MS. KATSANTONIS:

343

1     Q.    Thank you. Mr. Sandoz, you were asked
2 a series of questions of -- one of them was about
3 the collateral agreement and receipt. And
4 Mr. Shoreman asked you about whether a surety can
5 ask for an increase in the collateral agreement.
6 You said no, but you also said that's not the
7 purpose of the agreement.
8        Can you explain what you meant by not
9 the purpose -- that's not the purpose of the
10 agreement?
11     **A.    I don't think that agreement addresses**
12 **the question asked.**
13     Q.    Right. So the agreement doesn't
14 address whether or not -- it's a receipt -- it's an
15 agreement and receipt, right, and it's meant to
16 memorialize the collateral that's being given at a
17 certain amount of time, correct?
18     **A.    I believe so.**
19        MR. PHILLIPS: Objection; leading.
20 BY MS. KATSANTONIS:
21     Q.    And so it's not meant to be a document
22 in which you discuss what other parameters of

344

1 collateral allow, correct?
2     **A.    Not that I recall.**
3     Q.    Okay. And then looking at -- you were
4 also asked a series of questions about the
5 indemnity agreement, and I put a clear copy in
6 front of you so you would have it.
7        And does the indemnity agreement
8 provide any obligations of the surety?
9     **A.    Such as what? Can you --**
10     Q.    Well, he asked you whether or not
11 surety can or can not ask for collateral under the
12 indemnity agreement, right?
13        MR. SHOREMAN: No. Objection; that's
14 not what I asked. I asked, did they ask for
15 collateral above and beyond pending or made claims.
16        MS. KATSANTONIS: No. Right.
17 BY MS. KATSANTONIS:
18     Q.    In his interpretation of the indemnity
19 agree -- he asked you to try to interpret the
20 indemnity agreement, so let me ask it this way.
21        First of all, does the surety sign the
22 indemnity agreement?

Transcript of David Sandoz
Conducted on March 5, 2020

345

1    A.    Nope.
2    Q.    Right.  And does the surety agreement
3  provide any obligations of the surety?  I mean,
4  doesn't the surety agreement set forth the rights
5  of the surety and the obligations of the
6  indemnitor?
7         MR. PHILLIPS:  Objection; compound.
8  BY MS. KATSANTONIS:
9    Q.    I'm just trying to help him along.
10   A.    Primarily.
11   Q.    Right.  So in looking at the indemnity
12 agreement, what do you understand exoneration to
13 mean?
14   A.    When a bond is exonerated, are you
15 talking about or in what context?
16   Q.    Well, looking at paragraph 3(D), it
17 says, surety shall have every right, defense, and
18 remedy allowed by law, including the rights of
19 exoneration and segregation.
20         Do you know what's meant by exoneration
21 in that sentence?
22   A.    I think if the surety -- if there is a

346

1  cancelation clause in the bond, they have
2  the -- they would have the right to cancel those
3  bonds and then the bond principal would have to
4  secure the bond from another party, from another
5  surety.
6    Q.    That's what you think exoneration means
7  there?
8         MR. PHILLIPS:  Objection; asked and
9  answered.
10 BY MS. KATSANTONIS:
11   Q.    Okay.  Well, I'm just trying --
12        MR. PHILLIPS:  You asked him what it
13 means, he told you what it means and you asked him
14 back are you sure?
15 BY MS. KATSANTONIS:
16   Q.    Okay.  The second sentence says
17 indemnitors will procure the discharge of surety
18 from any bond and all liability by reason thereof.
19        Do you have an understanding of what it
20 means to discharge the surety from liability?
21        MR. WILLIAMS:  Asked and answered.  He
22 just answered it.

347

1  BY MS. KATSANTONIS:
2    Q.    Is that what you were referencing, were
3  you merging the two sentences?
4    A.    Discharge is -- can you ask the
5  question again?  I'm trying to follow what
6  you're --
7    Q.    Well, there's two different sentences
8  so I had asked you about exoneration and you gave
9  me your understanding of exoneration.  So now I'm
10 asking you with regard to the second sentence.
11        Do you have an understanding of what it
12 is to procure the discharge of a surety from
13 liability?
14   A.    Well, the discharge of the surety
15 would -- in my understanding would be either the
16 replacement of the bond or cancelation of the bond.
17   Q.    Okay.  All right.  And with regard to
18 this indemnity agreement, is there any provision in
19 here that talks about how much collateral a surety
20 can ask for?
21   A.    I would have to read the whole
22 indemnity agreement.  Do we have time to do that?

348

1    Q.    Well, you answered a question that
2  counsel raised about whether or not surety could
3  ask for, I think that he said 10 million dollars,
4  and you said, I don't believe they can.
5    A.    And I don't believe they can.
6    Q.    And based on what?
7         MR. SHOREMAN:  You misstated my
8  question again.  I said could a surety ask for
9  collateral of 10 million dollars, if claims and
10 pending claims did not amount to 10 million
11 dollars.  That was my question.
12        MS. KATSANTONIS:  Well, okay.
13 BY MS. KATSANTONIS:
14   Q.    And I'm asking you what's the basis?
15   A.    My understanding is you can't.  In the
16 40 years that I've been in surety, I don't recall
17 any instances where the claims department has done
18 that.
19   Q.    But do you know whether or not the
20 claims department has ever done that?
21        MR. PHILLIPS:  Objection.  He gave you
22 everything that he had to say about it.

Transcript of David Sandoz
Conducted on March 5, 2020

349

1  BY MS. KATSANTONIS:
2      Q.    All right.  Sorry.  But you don't know
3  all of the claims that the claims department has
4  dealt with, right, that's not your department?
5      **A.    I review the claims that relate to my**
6  **department, yes.**
7      Q.    Well, you're not in the claims
8  department, right?
9      **A.    No.  The bonds that were written under**
10 **my -- under my division or under my department, I**
11 **have reviewed most of those, yes, during the course**
12 **of time.**
13     Q.    Okay.  When RLI asked for 500,000
14 in -- when you asked Nexus to post 500,000 in
15 collateral, were there $500,000 in claims at that
16 time?
17         MR. PHILLIPS:  Objection.  I think this
18 actually goes outside what Mr. Shoreman was asking.
19 I'm just putting it on the record.
20         MR. SHOREMAN:  I agree.  I was asking
21 about collateral under the indemnity agreement.
22 BY MS. KATSANTONIS:

350

1      Q.    When you asked for --
2          MR. SHOREMAN:  I made a point of
3  establishing these are two separate agreements.
4  BY MS. KATSANTONIS:
5      Q.    When you asked for 500,000 in
6  collateral, was there 500,000 in claims pending?
7      **A.    I think that I already answered that**
8  **many times.**
9      Q.    So the answer is no, right?
10         MR. PHILLIPS:  Objection; leading.
11 BY MS. KATSANTONIS:
12     Q.    Can you say yes or no?
13         MR. PHILLIPS:  I'm sorry.  I'm sorry.
14 Objection; leading.  You literally just said give
15 me a yes or no answer asking a leading question.
16         MS. KATSANTONIS:  I'm entitled to.
17 He's an adverse witness.
18         MR. PHILLIPS:  He is an adverse witness
19 now?
20         MS. KATSANTONIS:  Yes, he is.
21         MR. PHILLIPS:  Okay.
22         MR. WILLIAMS:  You didn't lay any

351

1  foundation for that.
2          MR. SHOREMAN:  If you have adverse
3  witness, I suggest that you end this witness.
4          MS. KATSANTONIS:  Excuse me.
5          MR. PHILLIPS:  Nope.  I'm sorry.  We're
6  at -- we're at 10 minutes.
7          MS. KATSANTONIS:  I'm not having this
8  discussion right now.
9  BY MS. KATSANTONIS:
10     Q.    When you revised your -- you said that
11 you renegotiated the collateral to 250,000 in June
12 of 2016, was there 250,000 in claims pending at
13 that point in time?
14     **A.    I don't believe so.**
15     Q.    Right.  And in December when you asked
16 for a million, 250 thousand in collateral, was
17 there a million, 250 thousand in claims pending at
18 that time?
19         MR. PHILLIPS:  Objection; misstates his
20 testimony.  Go ahead and answer as you understand
21 it.
22     **A.    Ask it again.**

352

1  BY MS. KATSANTONIS:
2      Q.    When RLI demanded a million, 250 in
3  collateral in December of 2016, was there a
4  million, 250 thousand in claims pending at the
5  time?
6      **A.    No.  And what I indicated is that was**
7  **a -- I was the delivery person to ask for that**
8  **amount.**
9      Q.    Well, you didn't think they were --
10 that RLI -- you wouldn't deliver a message that you
11 didn't think was consistent with RLI's rights under
12 the indemnity agreement, would you?
13     **A.    Perhaps.**
14     Q.    You believe that that request was
15 inconsistent with the rights under the indemnity
16 agreement?
17     **A.    Perhaps.**
18     Q.    Well, I mean, why perhaps?
19     **A.    It was a very unusual request, but I**
20 **was told to deliver that message to Nexus.**
21     Q.    Did you advise anyone that you thought
22 it was improper or -- not improper or unusual?

353

1      A.      I don't recall.

2      Q.      Okay.

3           MR. PHILLIPS:  Just -- we're at that

4  mark.  I now leave it to -- I've been running a

5  timer.  It's up to Dave whether he wants to

6  continue or not.

7           MS. KATSANTONIS:  I probably have less

8  than five minutes.

9           THE WITNESS:  Do you have one more

10 question because I'm not going to answer the same

11 questions over and over again.  If you've got one

12 more question --

13           MS. KATSANTONIS:  Just hold on, and

14 I'll tell you what I have, and you can make a

15 decision.  Okay?  Because I don't want anyone to be

16 rash.

17           THE WITNESS:  I mean, I really --

18           MS. KATSANTONIS:  I hear you.  Let me

19 ask you one more quick question.

20           THE WITNESS:  Are you going to ask one

21 question that follows with four more?  I'm sorry.

22 I'm absolutely exhausted.

354

1           MR. WILLIAMS:  It's over.  Let's go.

2           MR. PHILLIPS:  David, are you done?

3           THE WITNESS:  I believe I'm done.

4           MS. KATSANTONIS:  All right.  Thank you

5  very much, Mr. Sandoz.

6           THE VIDEOGRAPHER:  This is the

7  videographer.  We're at the conclusion of this

8  proceeding and going off the record.  It's

9  7:55 p.m.

10           (Off the video record.)

11           MS. KATSANTONIS:  Thank you.  I'll take

12 an etran.  Can I get it anytime tomorrow?

13           THE COURT REPORTER:  Of course.

14           MR. PHILLIPS:  Can I get a pdf, please.

15           MR. SHOREMAN:  I would like an etran as

16 well and tomorrow too.

17           (Proceeding concluded at 7:55 p.m.)

18

19

20

21

22

355

1  STATE OF ILLINOIS )
                    ) ss.
2  ROCK ISLAND COUNTY )

3

4      I, KONNI L. STAPF, a Certified Shorthand
   Reporter in and for the States of Illinois, Iowa,
5  and Arizona, do hereby certify that the facts as
   stated in the caption hereto are true; that the
6  witness named on the face sheet was by me sworn to
   testify to the truth and nothing but the truth
7  concerning the matters in controversy in this
   cause; that said witness was thereupon examined
8  under oath and the examination reduced to writing
   under my supervision, consisting of the foregoing
9  pages, and the computer-aided transcript is a true
   record of the testimony given by said witness and
10 all objections made.

11      I further certify that I am neither
   attorney or counsel for, nor related to or employed
12 by any of the parties to the action in which this
   deposition is taken; and, further, that I am not a
13 relative or employee of any attorney or counsel
   employed by the parties hereto or financially
14 interested in the action.

15      In witness whereof I have hereunto set my
16 hand this 6th day in March, 2020.

17

18

19     Konni L. Stapf

20 KONNI L. STAPF, CSR, RPR
   Registered Professional Reporter
20 Illinois CSR License No.
21     084-001144
   Iowa CSR License No. 1168
22 Arizona CSR

Transcript of David Sandoz
Conducted on March 5, 2020                                     90

| A |
|---|

**able**
91:13, 116:5,
117:1, 188:21,
240:3, 250:19
**above**
56:9, 340:16,
344:15
**absent**
176:7, 176:17,
325:11
**absolute**
166:10, 166:21
**absolutely**
321:11, 353:22
**accept**
87:19, 159:16
**acceptable**
121:3
**access**
155:15
**accompanied**
228:4
**according**
95:12, 111:11,
111:18, 159:14,
197:18
**account**
229:11, 232:11,
278:4
**accountant**
116:17, 245:20,
256:14, 256:15
**accounting**
245:21, 253:21
**accounts**
255:16
**accumulation**
62:6
**accuracy**
110:18, 245:11,
256:11
**accurate**
26:9, 50:17,
61:12, 64:1,
71:21, 72:12,
94:6, 110:21,

129:1, 129:17,
133:19, 143:9,
143:14, 150:5,
210:17, 256:12,
269:22, 283:19
**accurately**
141:3, 151:18
**accused**
80:18, 81:7
**acknowledge**
77:16, 224:18
**across**
204:2, 237:13,
237:14
**act**
89:15
**acting**
246:6
**action**
308:6, 355:21,
355:25
**actual**
55:12, 63:17,
72:5, 72:6,
293:7, 340:16
**actually**
37:17, 38:19,
65:6, 67:10,
68:10, 85:19,
86:12, 96:22,
106:21, 122:1,
129:12, 175:19,
206:1, 226:12,
239:8, 242:4,
251:12, 310:16,
336:3, 336:7,
339:6, 349:18
**add**
103:13
**added**
130:8, 263:16,
263:19, 327:4,
342:7
**addition**
161:8
**additional**
50:13, 78:13,
132:13, 133:4,

195:22, 202:15,
273:14
**additionally**
203:17
**address**
205:21, 343:14
**addresses**
343:11
**advance**
32:1
**advantage**
216:9
**adverse**
103:18, 104:2,
104:6, 104:15,
104:18, 105:2,
105:6, 350:17,
350:18, 351:2
**advice**
67:19, 280:14,
286:11, 286:13
**advise**
42:8, 43:2,
63:20, 68:1,
147:21, 148:1,
188:1, 189:12,
191:11, 212:3,
223:6, 227:4,
228:8, 235:18,
279:16, 352:21
**advised**
46:18, 47:3,
51:20, 61:16,
64:9, 83:21,
85:20, 87:5,
110:12, 111:15,
117:16, 129:2,
133:5, 147:12,
149:2, 149:15,
150:16, 159:8,
159:12, 159:16,
160:19, 174:20,
187:18, 189:8,
189:20, 190:5,
190:11, 192:21,
197:22, 198:7
**advising**
26:17, 95:9,

96:20, 136:9,
144:2, 212:21,
218:16, 227:3,
232:20, 280:15
**advisors**
233:8
**affidavit**
266:8, 267:10,
270:3, 270:16,
295:1
**affidavits**
103:14, 104:13,
105:3, 265:21
**affiliated**
243:1, 243:14,
268:3
**affiliates**
244:12
**after**
53:13, 61:11,
85:18, 95:19,
106:5, 110:6,
115:21, 137:20,
146:20, 164:19,
167:17, 173:16,
213:22, 214:20,
217:18, 226:12,
227:1, 231:10,
233:4, 241:5,
241:18, 241:21,
242:2, 243:8,
247:21, 255:21,
338:6
**again**
29:4, 31:2,
41:18, 50:3,
58:18, 59:2,
63:1, 72:15,
74:22, 78:3,
78:5, 78:6,
81:6, 84:15,
88:16, 88:19,
94:5, 95:3,
95:8, 95:13,
108:7, 110:11,
112:19, 123:8,
126:22, 128:14,
129:4, 143:4,

Transcript of David Sandoz
Conducted on March 5, 2020

91

152:19, 165:17, 169:18, 169:19, 182:14, 209:14, 212:20, 214:7, 226:20, 272:4, 286:17, 294:1, 300:6, 301:17, 302:4, 305:3, 311:16, 315:3, 320:12, 324:19, 326:20, 339:13, 340:14, 340:22, 342:3, 347:5, 348:8, 351:22, 353:11

**against**
32:14, 222:18, 225:4, 225:9, 261:5, 334:3

**agency**
51:4, 96:21, 100:18, 100:21, 235:3, 237:21, 244:1

**agent**
50:20, 51:13, 72:22, 73:2, 100:17, 130:6, 130:14, 235:6, 235:7, 237:19, 238:9, 270:6

**agent's**
21:3

**agents**
21:2

**aggregate**
61:19

**ago**
54:5, 160:7, 198:19, 207:2, 285:1, 316:3

**agree**
49:21, 103:5, 103:8, 154:1, 177:3, 209:16, 220:1, 238:22, 290:17, 290:19, 344:19, 349:20

**agreed**
76:20, 77:6, 119:15, 148:7, 156:20, 194:17, 203:17

**agreements**
21:9, 21:15, 22:2, 75:8, 76:4, 109:2, 112:15, 264:16, 282:6, 284:14, 284:19, 319:5, 350:3

**agrees**
296:17

**ahead**
129:11, 171:1, 214:18, 284:9, 351:20

**aia**
267:20, 268:1

**al**
1:8, 13:4

**alien**
79:22, 80:9

**allow**
69:5, 150:22, 323:11, 344:1

**allowed**
315:12, 332:1, 342:2, 345:18

**allowing**
145:15

**allows**
35:10

**alluded**
164:13, 253:19

**along**
41:2, 54:13, 75:22, 113:17, 114:4, 183:5, 203:7, 284:16, 345:9

**already**
79:18, 80:9, 84:12, 92:18, 139:12, 141:13, 143:3, 153:9,

174:17, 191:18, 192:2, 192:7, 238:11, 238:13, 265:7, 300:17, 301:15, 303:17, 305:7, 317:12, 318:11, 326:16, 336:14, 350:7

**also**
4:11, 19:4, 52:2, 52:5, 55:11, 58:17, 59:13, 77:12, 79:1, 82:14, 91:2, 93:2, 94:15, 106:10, 107:14, 111:15, 123:15, 132:10, 146:4, 170:21, 172:18, 178:5, 184:18, 188:3, 190:3, 203:16, 211:19, 243:15, 243:22, 283:19, 287:20, 290:13, 292:7, 327:3, 328:2, 334:10, 343:6, 344:4

**alter**
251:12

**always**
62:17, 101:22, 131:7, 239:18

**american**
248:4, 248:5, 248:10, 248:13, 248:14, 248:22, 249:9, 249:15, 249:17, 249:22, 250:10, 267:11, 268:3

**amongst**
135:12

**amount**
78:21, 81:14, 109:17, 154:20, 156:16, 157:1, 164:16, 165:1,

174:14, 208:14, 271:6, 276:22, 302:11, 307:3, 322:7, 323:12, 325:12, 329:11, 329:22, 342:2, 343:17, 348:10, 352:8

**amounting**
208:4, 213:6

**amounts**
223:8, 340:16

**analyze**
257:12

**ankle**
124:7

**announce**
226:18

**anointed**
203:7

**another**
21:13, 70:4, 76:3, 86:14, 118:8, 173:8, 173:11, 173:14, 175:8, 188:9, 188:19, 188:20, 193:3, 193:14, 203:12, 203:15, 210:13, 210:18, 212:13, 214:11, 214:13, 216:3, 220:19, 231:22, 333:15, 333:18, 336:18, 346:4

**answer**
14:21, 22:6, 41:6, 47:6, 53:14, 59:10, 62:22, 63:11, 64:5, 65:16, 72:4, 72:15, 82:18, 90:7, 90:22, 92:9, 98:1, 99:18, 100:6, 101:8, 101:16, 102:22, 108:12, 112:18,

Transcript of David Sandoz
Conducted on March 5, 2020

92

113:22, 124:3,
126:6, 134:11,
141:21, 155:5,
176:9, 181:8,
183:1, 188:16,
200:22, 201:6,
214:18, 222:1,
234:7, 245:13,
246:9, 269:7,
280:12, 280:15,
280:16, 286:9,
286:15, 287:1,
287:3, 287:4,
287:16, 299:6,
299:7, 301:17,
301:20, 302:4,
304:14, 304:15,
311:17, 314:11,
314:13, 314:16,
322:11, 324:14,
325:21, 326:1,
326:3, 327:21,
340:20, 340:21,
341:5, 350:9,
350:15, 351:20,
353:10
**answered**
25:21, 47:6,
72:15, 75:13,
85:2, 85:12,
113:9, 113:17,
115:6, 118:3,
119:18, 124:21,
143:3, 144:17,
150:21, 151:4,
151:5, 151:8,
152:6, 157:19,
174:16, 174:17,
266:13, 274:12,
277:19, 288:2,
290:12, 291:1,
300:17, 301:14,
301:15, 302:4,
302:20, 303:17,
304:13, 311:3,
327:7, 346:9,
346:21, 346:22,
348:1, 350:7

**answering**
129:7, 164:5,
251:8, 293:22
**answers**
15:6, 253:20,
266:14, 286:14
**anticipated**
62:2, 208:2,
279:2, 289:9,
290:1
**anxious**
226:7
**anybody**
27:6, 247:8,
256:12
**anyone**
156:2, 172:2,
224:9, 237:7,
252:2, 314:1,
340:4, 352:21,
353:15
**anything**
22:14, 36:4,
76:15, 77:1,
98:20, 99:10,
101:6, 105:21,
141:19, 155:19,
157:6, 158:2,
193:3, 211:19,
250:15, 252:11,
278:3, 283:6,
287:19, 297:3,
304:4, 304:18,
314:7, 321:14,
334:11
**anytime**
354:12
**anyway**
35:18, 53:15,
191:10, 216:17,
222:4, 255:13
**anywhere**
58:14, 129:18,
140:12
**aois**
284:11
**apologies**
102:9

**apologize**
31:3, 43:16,
44:9, 58:8,
74:15, 81:6,
87:13, 93:18,
178:9, 252:17,
252:19, 260:7,
307:10, 307:12
**apologized**
149:21
**apparent**
156:15
**apparently**
23:2, 93:12,
148:21, 159:4,
164:17, 219:17,
234:2
**appeal**
219:15
**appealed**
261:10, 262:1
**appeals**
223:5
**appear**
26:13, 26:20,
27:11, 28:6,
28:7, 28:14,
33:22, 66:3,
80:10, 81:13,
89:10, 90:4,
317:9
**appearance**
123:22, 124:18
**appearances**
27:19, 34:7,
92:7, 92:15,
219:19, 219:22
**appeared**
181:3
**appearing**
14:15
**appears**
52:15, 69:19,
85:7, 86:10,
86:17, 109:21,
122:2, 132:20,
180:7, 185:10,
185:21, 190:1,

191:15, 198:10,
209:3, 219:13,
310:20, 311:13,
318:18, 319:15,
325:1
**application**
239:20
**appoint**
51:5
**appointed**
100:18, 100:21
**appreciate**
103:10, 205:16,
308:4, 319:9
**appropriate**
69:9, 103:16,
103:22, 104:16,
155:10, 251:10
**approve**
172:1
**approved**
25:3, 59:2,
59:9
**approximate**
147:1
**approximately**
16:9, 19:22,
26:4, 29:2,
129:15, 129:16,
208:8, 208:20,
330:17
**april**
150:2, 150:19,
151:10, 159:17,
160:12, 163:7
**area**
30:13, 44:4
**areas**
22:13, 50:11
**aren't**
39:4, 141:3,
158:13, 206:18,
284:7, 284:13,
284:14, 332:1
**argue**
35:15, 44:18,
222:20
**arguing**
86:16, 187:3,

317:20
**argument**
40:17
**argumentative**
58:5, 58:7,
153:22, 276:8
**arise**
296:19, 300:14
**arizona**
2:16, 88:14,
355:7, 355:37
**around**
103:6, 139:2,
169:13, 171:7,
186:7, 190:18,
191:1, 226:21,
236:5, 236:10,
237:15, 322:3
**arrange**
242:3
**arrangements**
270:20
**arrives**
304:9
**article**
82:22, 83:1,
83:13, 83:15,
84:13, 84:20
**aside**
257:4, 313:17,
325:5
**asking**
19:21, 32:5,
32:8, 32:13,
34:12, 36:22,
38:21, 39:1,
53:11, 54:6,
67:1, 67:4,
76:9, 78:6,
80:19, 80:21,
80:22, 81:4,
99:12, 102:17,
104:21, 106:11,
114:4, 114:17,
116:16, 128:5,
132:11, 133:4,
141:12, 145:3,
152:2, 155:4,

155:7, 157:20,
157:22, 158:10,
158:11, 158:13,
158:21, 160:6,
164:14, 166:13,
169:4, 170:22,
201:3, 205:10,
221:10, 221:13,
246:12, 256:21,
278:14, 279:9,
285:9, 287:9,
296:15, 297:7,
297:20, 298:3,
299:19, 300:1,
300:19, 300:21,
303:13, 321:15,
322:17, 325:1,
341:1, 347:10,
348:14, 349:18,
349:20, 350:15
**asks**
28:6, 120:19,
299:2
**asserting**
199:20
**asset**
257:9
**assign**
135:18, 136:15
**assigned**
123:15, 136:17
**assist**
111:12, 120:7,
189:13, 282:18,
288:6
**assisted**
250:13
**associated**
256:1, 310:22,
340:11
**association**
189:15
**assume**
55:12, 59:2,
59:7, 59:9,
64:3, 125:17,
130:1, 211:7,
262:8, 335:4

**assumed**
74:12
**assumes**
312:9, 313:2
**assuming**
63:16
**atlanta**
258:2
**attached**
52:19, 54:1,
82:22, 228:9,
228:19, 270:12,
278:12, 294:19,
295:1
**attachment**
43:5, 82:6,
109:11, 178:9
**attempting**
153:18
**attended**
40:1, 40:11
**attention**
33:9
**attorney**
4:5, 65:5,
65:22, 66:7,
67:17, 67:18,
67:22, 233:5,
259:17, 260:22,
262:14, 280:11,
280:16, 286:8,
287:1, 287:17,
295:15, 296:18,
299:2, 299:3,
299:5, 299:9,
299:18, 299:19,
301:10, 310:11,
312:5, 312:8,
355:20, 355:23
**attorneys**
77:11, 287:22,
288:1, 300:13
**audit**
264:15
**august**
16:11, 87:12,
180:11, 180:13,
183:11

**austin**
6:5, 66:4,
67:1, 68:8,
68:11, 68:20,
70:7, 310:21,
310:22, 311:13,
312:1, 313:10,
313:11
**authenticate**
145:13, 145:16,
158:18
**authenticity**
24:21
**authorities**
125:6, 125:20
**authority**
308:22, 309:3,
309:7
**automatically**
106:4
**availability**
197:15
**available**
33:2, 95:11
**avenue**
3:16
**average**
46:11, 128:15,
128:21, 129:15,
129:17, 206:4,
206:16, 207:18,
207:21, 207:22
**aware**
92:1, 101:10,
101:13, 101:17,
101:21, 172:18,
176:20, 177:1,
177:5, 199:7,
201:19, 260:12,
261:14, 268:13,
272:20, 279:20,
309:19, 324:9,
325:3, 335:17
**away**
135:1, 171:12,
255:11

**B**

**back**
24:9, 45:12,

Transcript of David Sandoz
Conducted on March 5, 2020

94

60:22, 63:14,
65:1, 67:11,
70:18, 70:20,
71:16, 81:21,
87:1, 90:13,
90:19, 92:21,
95:18, 98:1,
102:6, 112:9,
116:12, 121:10,
122:22, 125:7,
125:20, 136:7,
138:9, 138:18,
139:9, 139:13,
141:15, 147:4,
149:4, 155:4,
156:18, 161:17,
162:19, 163:12,
179:12, 211:11,
212:3, 212:10,
214:5, 222:18,
225:8, 226:2,
244:15, 251:4,
252:21, 260:1,
260:4, 260:6,
262:19, 292:8,
293:9, 306:1,
307:20, 314:16,
314:20, 315:17,
319:18, 323:8,
326:11, 326:13,
326:16, 326:17,
326:19, 327:11,
327:14, 335:9,
335:13, 342:18,
346:14
**backend**
59:15, 59:18,
60:5
**background**
16:6, 16:12,
46:22, 130:3,
170:5, 170:11,
170:12, 186:9,
186:19, 236:1,
236:16
**bad**
204:20
**badgering**
293:21, 295:8

**bag**
45:14
**bail**
170:22, 171:3,
171:8, 171:18,
171:19, 172:1,
172:11, 172:16,
177:13, 180:12,
183:13, 184:1,
184:9, 184:12,
184:16, 187:14,
189:6, 189:15,
237:20, 239:14,
244:8, 248:6,
249:2
**balance**
55:17, 110:12,
111:9, 111:10,
113:1, 113:3,
116:5, 117:16,
118:17, 136:9,
147:12, 257:10
**bane**
9:14
**banker**
240:20
**bart**
5:21, 6:18,
106:4, 106:19
**base**
47:2
**based**
28:13, 31:5,
32:15, 46:4,
62:11, 66:12,
72:1, 105:2,
115:2, 117:21,
129:20, 129:21,
157:13, 223:14,
235:17, 271:18,
279:8, 279:9,
279:11, 279:22,
348:6
**basically**
28:6, 56:17,
56:21, 63:1,
146:6, 204:10,
225:1, 242:11,

250:9, 259:11
**basing**
298:7
**basis**
102:10, 124:9,
324:14, 348:14
**bates**
320:4, 320:6
**bathroom**
60:7, 60:14,
120:10, 121:2
**became**
100:16, 240:2
**because**
27:7, 30:21,
31:3, 34:12,
35:10, 38:18,
38:22, 39:5,
43:16, 47:21,
57:2, 59:21,
66:2, 67:6,
69:19, 70:17,
70:18, 76:20,
80:19, 80:21,
85:20, 87:17,
89:15, 102:20,
114:3, 115:14,
118:1, 124:4,
138:7, 149:11,
154:20, 171:13,
175:19, 175:22,
176:11, 182:15,
188:7, 192:6,
202:7, 204:7,
205:5, 206:1,
212:15, 213:17,
214:15, 218:5,
218:17, 222:10,
238:19, 252:20,
255:8, 255:16,
259:9, 268:22,
271:20, 275:9,
290:17, 293:19,
297:12, 301:10,
313:12, 318:22,
322:18, 322:21,
327:19, 342:1,
342:7, 353:10,

353:15
**become**
96:22, 97:4,
258:9
**becoming**
327:8
**been**
14:7, 14:16,
28:22, 29:1,
29:6, 36:3,
39:2, 46:20,
57:16, 63:9,
67:20, 85:8,
103:16, 104:3,
104:16, 111:7,
112:6, 112:13,
115:1, 115:3,
115:5, 115:15,
118:1, 126:11,
126:12, 133:3,
144:2, 154:13,
164:1, 183:9,
196:3, 204:5,
206:19, 209:6,
209:9, 217:2,
219:12, 222:19,
223:17, 230:3,
230:4, 230:9,
234:1, 234:13,
235:6, 237:4,
242:21, 243:7,
243:9, 248:7,
252:2, 252:6,
252:8, 252:9,
255:22, 258:11,
263:16, 264:4,
264:5, 267:16,
268:4, 268:21,
271:20, 274:13,
290:12, 293:1,
293:2, 293:5,
301:4, 301:5,
310:19, 311:11,
313:17, 317:6,
317:7, 319:11,
320:7, 320:13,
322:1, 324:11,
331:1, 342:4,

Transcript of David Sandoz
Conducted on March 5, 2020

95

348:16, 353:4
**before**
2:13, 14:16,
14:21, 16:22,
23:19, 28:3,
48:8, 58:20,
61:7, 65:12,
78:1, 95:3,
96:2, 99:6,
99:16, 108:16,
113:1, 113:7,
114:9, 116:21,
117:4, 121:2,
127:9, 127:18,
144:22, 148:21,
155:13, 155:20,
156:3, 164:13,
193:12, 218:4,
226:5, 230:2,
256:13, 256:19,
264:5, 272:6,
275:17, 277:5,
277:8, 284:20,
302:14, 307:9,
316:5, 317:6,
318:1, 323:5,
329:2, 339:6,
339:16, 339:20,
339:22, 340:20,
340:21, 341:11
**begin**
338:19
**beginning**
146:2, 203:11,
276:4, 276:20,
277:16, 335:3
**begins**
13:1
**begs**
101:8
**behalf**
3:3, 3:11, 4:2,
13:17, 13:18,
13:21, 76:5,
76:21, 80:1,
100:22, 103:14,
104:13, 134:7,
135:3, 176:6,

176:17, 208:15,
241:18, 249:10,
250:1, 250:4,
254:8, 258:22,
259:7, 260:10,
272:17, 293:8,
308:15
**being**
29:22, 31:22,
33:7, 33:14,
35:13, 39:4,
55:3, 59:13,
66:4, 81:2,
84:16, 84:18,
99:15, 161:17,
162:16, 173:3,
193:11, 203:4,
219:8, 220:13,
252:15, 253:17,
264:2, 267:22,
275:6, 288:2,
308:3, 333:1,
342:9, 343:16
**believed**
112:14, 115:3,
188:7, 203:18
**below**
82:15, 151:22,
321:8
**best**
23:13, 24:19,
25:10, 39:10,
46:7, 50:4,
55:13, 63:22,
72:11, 72:19,
72:20, 73:21,
74:2, 75:1,
75:10, 77:9,
85:16, 85:17,
88:9, 89:1,
89:7, 95:16,
95:22, 96:4,
108:15, 110:22,
119:14, 123:11,
126:13, 127:3,
127:5, 132:19,
133:18, 133:22,
143:12, 150:5,

150:15, 151:17,
152:1, 154:7,
185:17, 188:8,
188:12, 188:18,
190:10, 195:16,
245:13, 246:10,
275:9, 277:10,
329:8, 331:5,
331:6
**better**
20:14, 27:6,
30:6, 31:19,
57:19, 63:2,
131:22, 138:1,
146:7, 211:8,
240:15, 283:20,
335:6
**between**
15:13, 16:21,
25:7, 68:10,
68:20, 95:1,
98:21, 101:3,
101:12, 119:20,
144:11, 144:14,
151:18, 154:11,
175:21, 176:20,
199:6, 206:22,
218:12, 220:14,
242:6, 258:21,
264:16, 265:8,
274:15, 299:14,
300:3, 304:1,
318:17, 330:16,
331:6
**beyond**
225:3, 341:21,
342:2, 344:15
**big**
50:20, 51:1,
56:10, 56:13,
73:3, 97:3,
97:8, 97:11,
97:15, 98:10,
98:14, 98:17,
98:21, 99:22,
100:14, 100:18,
101:2, 101:3,
134:17, 144:11,

144:15, 162:10,
176:1, 176:5,
176:12, 176:15,
176:20, 176:21,
177:2, 214:6,
234:18, 271:21,
272:7, 272:8,
272:16, 275:12
**bit**
31:17, 45:9,
76:22, 85:19,
87:5, 136:8,
137:8, 172:10,
255:2, 335:2
**blurb**
265:5
**board**
2:6, 59:2,
59:7, 59:9
**bonding**
20:10
**bonnie**
8:12, 139:5
**book**
210:14, 214:10,
217:10, 249:14,
332:9, 332:14,
332:19, 336:1,
336:20, 337:7
**boss**
255:15
**both**
18:1, 20:8,
66:21, 198:14,
233:8, 233:9,
254:20, 339:20
**bottom**
25:2, 49:14,
52:18, 55:7,
64:8, 67:8,
68:3, 68:16,
71:1, 72:22,
82:6, 86:11,
95:2, 107:4,
116:10, 118:16,
132:3, 132:11,
136:13, 147:3,
147:8, 147:19,

Transcript of David Sandoz
Conducted on March 5, 2020

96

149:10, 153:14,
159:1, 159:2,
162:9, 162:16,
162:17, 195:1,
197:13, 218:14,
218:21, 220:7,
220:20, 222:15,
228:9, 228:17
**bracelet**
83:17, 124:7
**bracelets**
84:9, 87:15,
92:13, 124:16
**bradstreet**
93:3, 94:1
**branch**
88:14, 171:2
**breach**
172:19, 177:17,
178:15, 180:5,
181:2, 181:11,
181:13, 196:4,
205:6, 205:8,
205:17, 226:7,
291:6, 291:8,
291:11
**breaches**
178:11, 181:1,
218:7, 219:6,
219:11, 221:16,
274:22, 275:3,
275:4, 275:5,
288:18, 288:21,
289:10, 289:19,
291:5
**break**
60:7, 60:16,
120:12, 121:2,
125:13, 136:1,
138:9, 178:21,
201:9, 219:9,
225:16, 226:6
**breaks**
15:2
**brief**
170:16, 342:9
**briefly**
45:13

**bring**
249:14, 249:17
**bucket**
48:18
**build**
161:1, 165:10,
165:11
**buildup**
161:3
**bullet**
216:7, 216:20
**bunch**
297:18
**business**
17:2, 18:15,
20:14, 21:10,
25:13, 25:17,
25:22, 55:8,
101:13, 145:20,
171:20, 172:1,
172:11, 172:16,
173:6, 173:20,
177:13, 188:5,
192:4, 194:18,
203:20, 204:8,
210:15, 214:10,
217:10, 237:3,
239:18, 243:11,
244:4, 246:3,
247:14, 247:17,
248:7, 249:4,
249:15, 249:18,
250:6, 254:14,
254:16, 255:2,
255:3, 255:8,
255:11, 256:3,
256:4, 264:5,
271:18, 284:5,
322:2, 322:3,
332:9, 332:14,
332:19, 336:2,
336:18, 336:21,
337:8, 337:18
**businesses**
18:16, 20:17

---
**C**
---

**c**
102:14

**california**
239:15
**call**
23:3, 23:10,
23:12, 24:15,
25:6, 42:16,
42:17, 42:21,
67:11, 91:3,
140:14, 169:20,
170:17, 189:9,
190:7, 190:8,
190:9, 191:11,
191:14, 196:15,
197:16, 198:1,
198:19, 200:9,
200:12, 200:15,
200:20, 201:9,
211:17, 240:15
**called**
43:6, 77:12,
116:16, 184:7,
195:11, 222:19,
244:1
**calling**
327:3
**calls**
43:15, 153:3,
157:10, 230:19,
280:11, 286:22,
315:15, 322:10,
323:15, 326:3,
329:13, 340:18
**came**
204:1, 242:7
**campus**
33:5, 240:17,
244:17
**can't**
15:9, 22:6,
22:7, 38:19,
39:18, 66:20,
71:3, 71:6,
99:1, 102:22,
103:1, 112:8,
120:7, 122:2,
133:11, 160:5,
190:21, 220:20,
294:17, 295:22,

**california**
297:1, 297:18,
311:22, 327:9,
348:15
**cancel**
346:2
**cancelation**
56:18, 57:14,
211:12, 211:20,
212:10, 214:5,
334:12, 334:20,
335:10, 346:1,
347:16
**cancelations**
131:9
**canceled**
27:21, 28:22,
29:5, 50:14,
56:20, 57:5,
57:13, 57:18,
59:19, 62:19,
91:8
**canceling**
57:4
**cap**
309:4
**capacity**
17:20, 17:22
**capital**
233:8, 240:14,
240:19, 240:22,
244:16, 244:22
**caption**
355:8
**care**
48:7, 101:22,
127:17, 275:3,
305:1, 319:6
**career**
226:16
**carrying**
113:17
**carter**
233:8
**case**
1:7, 13:6,
31:14, 42:10,
67:13, 105:3,
123:16, 124:7,

Transcript of David Sandoz
Conducted on March 5, 2020

97

124:17, 222:20,
291:5, 294:16,
298:1, 298:12,
298:17, 298:22,
306:7, 309:7,
317:16, 318:21,
324:10
**cases**
31:13, 124:1,
125:4, 130:8,
206:10, 293:4
**cash**
29:12, 33:1,
59:5, 128:7,
257:3, 257:9,
270:14, 271:13,
273:1, 305:17,
306:18, 306:19,
307:1
**categories**
22:9
**cause**
125:22, 355:12
**cease**
187:19, 189:21,
331:14, 333:10,
335:18, 338:10,
338:12
**center**
2:7, 13:12,
42:16, 42:17,
42:21
**certain**
91:21, 99:10,
114:15, 166:18,
181:12, 218:16,
271:6, 322:22,
343:17
**certainly**
22:1, 38:9,
48:4, 86:18,
94:18, 103:2,
112:10, 112:12,
164:22, 212:20,
225:8, 285:13,
286:15, 316:13
**certainty**
133:11, 160:5

**certifications**
16:16
**certified**
2:15, 355:5
**certify**
355:7, 355:19
**cfo**
149:22, 257:19,
258:6, 258:9
**chain**
5:9, 5:14,
5:17, 5:20, 6:3,
6:6, 6:10, 6:13,
6:20, 7:15,
7:18, 8:3, 8:6,
8:9, 8:19, 9:3,
9:6, 9:9, 10:9,
10:18, 11:5,
49:14, 61:4,
82:8, 94:22,
122:3, 136:7,
147:3, 147:5,
149:5, 218:11,
221:9
**chance**
38:5, 201:21,
202:12, 230:8,
230:16
**change**
78:11, 101:18,
150:14, 156:11,
263:6
**changed**
87:13, 99:11,
260:19, 263:11,
332:2
**changes**
263:4, 263:12
**changing**
87:15, 174:13,
263:1, 319:7
**charge**
308:16
**charitable**
249:7
**check**
101:22, 112:6,
252:6, 264:18,

328:20
**checks**
223:8
**chicago**
233:15
**chilson**
8:4, 9:7, 10:8,
10:10, 10:16,
120:18, 120:19,
122:5, 123:4,
139:18, 140:10,
140:18, 143:1,
143:10, 143:13,
160:13, 160:19,
164:22, 165:7,
189:8, 189:13,
195:11, 196:13,
204:4, 255:14,
320:10
**chilson's**
142:7, 198:18,
254:21
**choice**
244:1, 244:2,
244:3, 244:6,
244:10, 250:14,
250:15, 252:10,
252:11, 255:1,
255:6, 256:2,
268:4, 335:20
**chooses**
322:7, 323:13
**chose**
335:19
**chris**
6:17, 88:9,
88:12, 88:13
**chunk**
86:10
**cindy**
252:9
**circumstances**
151:6, 236:19,
273:8, 274:4
**city**
233:8, 240:14,
240:19, 240:22,
244:16, 244:22

**claim**
75:21, 261:9,
261:22, 278:14,
278:21, 279:8,
282:14, 283:16,
293:3, 296:14,
303:19, 303:20,
304:3, 304:22,
306:13, 313:13
**claims**
225:12, 225:13,
261:4, 275:20,
275:21, 276:1,
276:5, 276:14,
277:21, 282:5,
282:15, 282:17,
283:14, 283:16,
283:18, 283:20,
284:15, 293:2,
295:3, 298:19,
302:9, 302:10,
302:14, 303:3,
304:19, 305:1,
305:3, 305:18,
306:2, 306:4,
306:5, 306:9,
306:14, 310:22,
324:6, 324:8,
325:12, 340:16,
344:15, 348:9,
348:10, 348:17,
348:20, 349:3,
349:5, 349:7,
349:15, 350:6,
351:12, 351:17,
352:4
**claire**
237:20, 238:10
**clarification**
251:7, 251:9
**clarifications**
16:3
**clarify**
15:1, 106:18,
205:15, 297:12
**clarity**
104:4
**clause**
346:1

Transcript of David Sandoz
Conducted on March 5, 2020

98

clear
81:3, 81:8,
141:8, 223:9,
224:21, 314:16,
344:5
cleared
224:20
clearer
296:3, 296:7
clearly
198:7
client
20:19, 47:2,
65:5, 65:22,
67:17, 94:20,
103:4, 103:18,
104:6, 122:1,
124:7, 280:11,
280:12, 280:16,
286:8, 287:1,
287:17, 287:22,
294:17, 299:2,
299:3, 299:5,
299:9, 310:11
client's
39:5, 103:20
clients
20:19, 21:3,
33:8, 33:16,
188:22, 257:3
close
56:22, 57:14
closed
62:4, 130:8
closing
60:1
coach
322:16
coaching
80:18, 81:7
code
47:16
collabor
100:15
collateralize
275:8
colleague
308:11

collectively
208:17
colloquy
307:11
com
4:9
come
33:5, 37:22,
137:5, 138:9,
146:3, 168:20,
170:8, 170:19,
187:11, 203:6,
252:21
comfort
278:5
comfortable
30:20, 75:21,
139:17, 262:15,
262:16, 271:8,
273:5, 276:11,
276:14, 279:1
coming
97:9, 326:22
comment
221:8, 221:11
commenting
253:11
commercial
7:5, 7:10,
20:4, 20:8,
297:14, 305:15,
339:18
commission
50:12, 50:14,
59:15, 59:20,
60:4, 130:13
commissions
144:4
common
98:17, 100:2
commonly
22:3
communicating
145:1
communication
35:6, 199:12,
199:16, 280:17,
308:8, 308:10,

309:12
communications
151:18, 231:13,
232:9, 280:12
communities
244:5
community
245:2
companies
204:16, 241:17,
243:1, 243:14,
275:20
company
1:5, 13:3,
13:17, 21:8,
173:11, 184:15,
188:9, 203:19,
204:14, 215:4,
216:1, 216:6,
216:10, 216:13,
231:14, 232:16,
234:17, 235:11,
235:16, 235:21,
238:16, 239:1,
239:14, 239:17,
240:10, 241:13,
243:3, 245:3,
248:4, 248:5,
248:10, 248:13,
248:15, 248:22,
249:7, 249:9,
250:10, 255:3,
255:7, 255:11,
259:2, 267:11,
302:9
compared
62:8
compelling
26:13, 27:11,
28:13
compensation
252:16
competitor
255:14
complete
14:20, 74:20,
316:12
completed
55:17, 259:21

completely
34:20, 325:18
completing
75:20, 256:15
compliance
125:9
complied
33:21, 81:13,
113:6, 135:14
comply
153:19, 228:20
component
164:14
compound
38:18, 125:11,
185:18, 188:15,
288:3, 290:3,
345:7
comprehensive
82:16
compromise
341:20, 342:3
compromised
261:10, 262:1
computer-aided
355:15
concern
217:2, 219:7,
221:14, 231:1,
245:5, 245:10
concerned
81:1, 107:2,
115:7, 219:10,
256:6
concerning
102:11, 331:8,
337:7, 355:11
concerns
218:4, 221:14,
221:21, 224:2,
230:2
concluded
354:17
conclusion
102:2, 315:16,
322:10, 326:4,
329:14, 340:19,
354:7

Transcript of David Sandoz
Conducted on March 5, 2020                                          99

condition
43:8, 53:1,
53:19, 55:22,
56:6, 78:8,
79:22, 80:8
conditions
80:14, 118:1
conduct
35:22
conducting
103:20
conference
2:7, 13:12,
24:15, 140:14,
197:16, 198:1,
198:19, 211:17
confident
69:2, 91:12
confidential
44:15
confidentiality
263:15, 264:1
confirm
28:12, 108:3,
108:21
confirmation
29:3, 223:4
confirmed
26:3, 26:11,
28:21
confirms
106:9
confused
126:11, 267:15,
267:18, 270:4,
326:11
confusing
213:17, 327:8
confusion
332:22
connecticut
3:16
consequence
296:20, 300:14
consider
35:19, 49:21,
170:10
considered
104:1, 216:16

considering
23:8, 131:8
consistent
27:17, 28:17,
76:3, 83:20,
127:9, 134:7,
352:11
consistently
103:8
consisting
355:14
construction
20:4, 20:5,
21:21, 22:10,
31:4
consultant
246:6
consulting
242:11, 242:15,
246:16, 246:18,
246:19, 246:21,
247:7, 247:10,
248:1, 248:15,
248:16, 251:9
consummated
272:13
contact
25:7, 37:15,
91:16, 124:8,
192:16, 193:21
contacted
249:17, 249:22,
250:5
contacting
218:15
contain
313:19
contemporaneous
154:6
contending
297:22
contention
279:22, 297:21
context
290:19, 345:15
contingency
144:3, 175:12,
175:17, 176:3,

176:11, 177:4,
211:11, 211:13,
212:10, 214:5,
214:6, 271:18,
335:10, 335:11
contingent
239:18
continue
69:8, 71:13,
91:6, 104:2,
138:2, 145:19,
161:9, 167:1,
168:22, 169:16,
172:15, 187:19,
190:12, 316:6,
333:19, 335:21,
338:16, 353:6
continued
4:1, 6:1, 7:1,
8:1, 9:1, 10:1,
11:1, 12:1,
86:13, 335:14
continuing
152:2, 152:15,
241:6
continuously
105:7
contract
19:16, 19:17,
20:2, 21:21
contracts
22:11
contrary
273:17
contribution
308:4
controversy
355:11
conversation
25:2, 25:11,
29:12, 67:5,
170:3, 170:17,
177:10, 274:5
conversations
47:11, 130:2,
266:11
convey
143:9

conveying
143:14
cool
331:2
coordinate
134:22, 135:19
coordinating
134:4
copied
198:18, 220:15
copier
319:22
copies
178:10, 178:14,
180:5, 202:4
copy
37:8, 54:20,
65:7, 67:10,
70:4, 70:13,
70:16, 70:19,
79:7, 79:9,
109:7, 177:6,
228:15, 264:7,
270:13, 316:7,
319:21, 344:5
copying
24:13, 122:3,
144:1, 222:16
cornelius
6:17, 88:9,
88:12, 88:13
corp
247:13
corporation
240:11, 260:14
correcting
175:3
correctly
341:15
correspondence
67:4, 68:19,
106:8, 111:11,
182:15, 182:22,
183:10, 225:6,
311:20
costs
295:15, 296:2,
296:18, 300:12,

301:9
**could**
27:20, 33:3,
50:19, 61:17,
62:6, 62:20,
63:2, 73:12,
80:15, 81:3,
81:14, 87:15,
89:13, 89:14,
89:17, 90:18,
90:19, 91:3,
96:2, 104:1,
112:15, 117:22,
120:12, 121:1,
126:11, 126:12,
132:1, 132:13,
133:10, 137:22,
150:1, 150:18,
153:3, 166:1,
167:9, 173:11,
174:20, 176:5,
176:16, 179:22,
188:5, 188:13,
201:16, 204:5,
206:10, 209:18,
209:19, 212:14,
223:15, 235:8,
235:15, 247:14,
264:19, 269:22,
271:19, 272:2,
321:3, 323:1,
339:10, 348:2,
348:8
**couldn't**
224:20, 235:20,
240:4, 314:9
**counsel**
13:14, 23:2,
23:7, 37:8,
37:19, 49:11,
156:3, 200:6,
200:7, 200:8,
201:13, 202:9,
264:9, 265:11,
266:12, 266:21,
267:3, 267:6,
287:7, 287:8,
288:6, 288:11,

316:8, 342:7,
348:2, 355:20,
355:23
**country**
46:20
**county**
355:3
**couple**
196:7, 207:16,
300:9, 306:2
**course**
64:11, 121:4,
173:7, 309:22,
330:15, 332:8,
349:11, 354:13
**court**
1:1, 2:15,
13:5, 13:22,
15:3, 15:7,
26:14, 26:20,
27:1, 27:12,
28:7, 28:14,
33:22, 34:7,
34:14, 34:22,
38:20, 71:12,
80:10, 81:14,
90:1, 90:12,
91:15, 92:15,
92:20, 124:1,
124:10, 124:18,
136:16, 141:8,
146:7, 153:7,
219:19, 219:22,
224:16, 310:17,
327:11, 354:13
**courts**
69:2
**coverage**
83:9
**coverstone**
4:11, 13:10
**cracks**
304:5
**craig**
169:21, 170:9,
170:20, 172:7,
204:2
**create**
234:17

**credit**
29:13, 49:4,
49:6, 59:5
**criminal**
46:22, 89:14,
89:15, 89:17,
89:19, 170:12,
186:19, 236:1
**critical**
164:14
**cross**
36:17, 36:22
**csr**
1:22, 355:32,
355:34, 355:36,
355:37
**current**
72:22, 208:7,
208:19
**currently**
104:5, 136:15,
248:20, 248:21
**cy**
233:21
**cycle**
56:13, 58:10,
58:16

| D |
| --- |

**damages**
80:15, 81:15,
295:15, 296:2,
296:18, 300:12
**danger**
223:10
**data**
72:6, 133:6,
230:21
**date**
13:8, 32:12,
38:9, 62:15,
90:12, 99:10,
190:21, 206:6,
206:18, 207:1,
207:20, 209:6,
211:10, 212:8,
218:17, 227:10,
236:9, 254:10,

267:13, 310:7,
335:8, 336:4,
339:2
**dated**
5:8, 5:11,
5:13, 5:16,
5:19, 5:22, 6:5,
6:8, 6:12, 6:15,
6:17, 6:19,
6:22, 7:4, 7:7,
7:9, 7:12, 7:14,
7:17, 7:20, 8:5,
8:8, 8:11, 8:13,
8:16, 8:18,
8:21, 9:5, 9:8,
9:11, 9:13,
9:15, 9:17,
9:19, 9:21,
10:4, 10:6,
10:8, 10:11,
10:13, 10:15,
10:17, 10:20,
10:22, 11:4,
11:7, 11:9,
11:11, 11:13,
11:15, 11:17,
11:19, 11:21,
12:4, 12:6,
43:22, 73:16,
82:8, 94:22,
106:16, 106:19,
107:13, 107:20,
120:17, 121:18,
123:4, 147:3,
147:6, 156:9,
174:8, 183:11,
186:3, 194:6,
197:12, 198:16,
229:12, 231:18,
232:8, 253:6,
253:9, 259:4,
264:11, 269:2,
280:8, 331:9
**dates**
36:4, 131:22,
146:3, 186:11,
237:4
**dave**
7:3, 49:15,

Transcript of David Sandoz
Conducted on March 5, 2020

101

94:2, 340:8,
341:14, 341:21,
353:5
**david**
1:13, 2:1, 4:2,
5:2, 5:7, 5:10,
5:12, 5:15, 6:4,
6:7, 6:11, 6:14,
6:16, 6:21, 7:8,
7:13, 7:16, 8:4,
8:7, 8:10, 8:14,
8:17, 8:20, 9:4,
9:7, 9:10, 9:12,
9:16, 9:19,
9:20, 10:3,
10:5, 10:7,
10:10, 10:12,
10:14, 10:16,
10:19, 10:21,
11:3, 11:6,
11:10, 11:12,
11:16, 11:18,
11:20, 12:3,
12:5, 13:2,
13:21, 14:6,
139:7, 322:12,
340:21, 354:2
**davis**
5:21, 6:19,
106:4, 106:19
**day**
58:14, 62:3,
131:7, 131:8,
131:10, 168:4,
193:11, 226:16,
227:18, 289:3,
355:28
**day-to-day**
284:5, 284:8
**deadline**
218:14
**deal**
22:10, 101:12,
224:5, 284:4,
284:7
**dealing**
19:10, 20:3,
23:3, 106:7

**deals**
62:4, 282:5
**dealt**
18:19, 315:10,
349:4
**deceitful**
309:17
**december**
168:2, 207:8,
218:3, 220:16,
221:15, 222:15,
226:13, 226:14,
231:18, 237:18,
237:22, 238:1,
279:6, 339:3,
351:15, 352:3
**decide**
169:4
**decided**
119:5, 168:21,
169:16, 227:1,
239:12
**decision**
166:17, 167:12,
171:19, 172:5,
187:14, 203:8,
234:2, 293:10,
330:1, 338:15,
353:15
**decla**
266:14
**declaration**
12:3, 12:5,
266:15, 267:4,
267:7, 268:20,
279:18, 280:8,
280:9, 280:20,
280:21, 281:2,
281:13, 286:5,
286:20, 287:12,
288:7, 288:9,
288:14, 294:5,
297:5, 298:7,
298:15, 298:22,
299:20
**declarations**
266:1, 266:3
**decrease**
130:14

**decreased**
130:21
**decreases**
131:4
**decreasing**
57:4
**default**
126:19, 181:15
**defaults**
230:22, 274:22
**defend**
340:22
**defendants**
1:9, 3:11,
13:19, 308:5
**defended**
261:10, 262:1
**defending**
291:2, 294:4,
295:6, 318:16,
331:1
**defense**
262:9, 345:17
**define**
18:12, 27:10,
181:20, 181:22,
206:1
**defined**
26:12
**definitely**
40:5
**definition**
58:12, 205:5,
205:6, 205:13
**degree**
16:14, 16:19,
224:6
**degrees**
16:13
**delay**
87:5, 87:13,
149:21, 150:1
**delayed**
148:8, 150:17
**deliver**
209:16, 209:18,
352:10, 352:20
**delivered**
28:8, 80:10,

81:14, 90:5,
126:8, 126:14,
181:2, 187:21,
190:16
**delivering**
208:11
**delivery**
79:22, 352:7
**demand**
230:22, 279:12,
295:14, 296:17,
298:16, 300:12,
301:9, 313:19,
315:7, 315:13,
322:6, 323:12,
325:13, 329:10,
340:15
**demanded**
223:8, 352:2
**demands**
231:1, 298:11
**dena**
6:18
**department**
126:3, 282:14,
282:18, 283:17,
283:20, 284:15,
311:1, 348:17,
348:20, 349:3,
349:4, 349:6,
349:8, 349:10
**departure**
224:14
**deponent**
13:21, 36:17,
36:21, 294:4,
310:14, 314:13,
331:1
**depos**
13:11, 14:2
**deposed**
14:16
**deposit**
244:1, 244:2,
244:3, 244:6,
244:10, 250:14,
250:15, 252:10,
252:11, 255:1,

Transcript of David Sandoz
Conducted on March 5, 2020

102

255:5, 256:2,
268:4
**deposition**
1:13, 2:1,
13:2, 13:11,
14:16, 15:18,
22:18, 24:4,
35:6, 37:6,
37:10, 38:3,
42:13, 42:18,
43:18, 45:17,
49:8, 52:11,
54:9, 64:18,
71:13, 73:8,
79:14, 80:3,
82:1, 83:3,
86:4, 86:18,
88:5, 93:19,
94:8, 96:9,
102:13, 103:20,
105:4, 105:15,
107:7, 107:16,
110:8, 111:4,
118:9, 120:4,
121:15, 131:12,
136:4, 141:6,
143:19, 145:8,
146:16, 155:20,
156:6, 160:9,
161:20, 178:2,
179:9, 180:15,
182:4, 183:16,
185:1, 185:22,
189:2, 192:10,
194:3, 195:4,
195:13, 196:9,
197:9, 198:11,
200:6, 200:11,
200:19, 214:1,
215:12, 217:22,
220:8, 222:12,
227:21, 228:5,
232:5, 253:3,
258:15, 266:4,
270:9, 270:17,
280:4, 295:9,
306:10, 316:9,
323:17, 328:13,

329:3, 332:9,
333:3, 340:22,
341:22, 355:22
**depositions**
34:13, 35:2,
320:15
**derived**
273:3
**described**
30:8, 329:18
**description**
5:6, 6:2, 7:2,
8:2, 9:2, 10:2,
11:2, 12:2, 25:6
**designate**
239:8
**designating**
104:17
**designed**
282:10
**destroy**
201:13
**details**
120:19, 170:2
**detained**
89:14
**detainees**
46:16, 69:13
**detention**
90:13, 90:20,
92:21, 124:11,
125:7, 125:20,
126:5, 126:8,
126:15
**determination**
25:18, 56:1,
56:6, 99:13,
99:14, 204:11
**determine**
20:21, 237:2,
261:9, 261:22,
264:18
**determined**
30:16, 195:22,
235:15, 249:20,
291:6, 306:6
**detrimental**
225:5

**develop**
102:18
**develops**
63:2
**device**
84:9
**dhs**
81:15, 124:1,
124:18, 218:6,
225:3
**dhs's**
80:10
**di**
255:15
**diego**
237:21
**differ**
286:1, 286:2
**differed**
285:10, 285:18
**difference**
39:19
**different**
27:2, 53:13,
76:19, 77:1,
79:20, 154:20,
159:20, 160:1,
160:3, 183:3,
203:1, 205:14,
240:12, 240:17,
260:14, 261:13,
262:9, 276:13,
306:22, 347:7
**differently**
76:22, 120:1
**difficult**
65:15
**diligent**
116:4
**direct**
102:17, 325:22
**directing**
326:2
**directly**
243:2, 243:3
**disagree**
342:7
**discharge**
346:17, 346:20,

**develop**
347:4, 347:12,
347:14
**disclose**
237:6
**disclosure**
71:9
**discontinuation**
187:13
**discontinue**
166:5
**discontinued**
166:2
**discovery**
106:3, 199:13,
313:4, 313:5
**discretion**
164:17, 166:10,
315:14, 322:8,
323:13
**discuss**
184:12, 190:3,
211:17, 230:19,
343:22
**discussed**
43:11, 50:11,
170:14, 191:16,
208:13, 243:9,
331:11
**discussing**
25:8, 144:3
**discussion**
23:5, 29:11,
29:22, 37:5,
122:13, 153:16,
162:15, 195:10,
195:20, 195:21,
197:6, 218:15,
266:17, 280:13,
281:22, 314:18,
331:8, 340:10,
351:8
**discussions**
25:16, 30:15,
38:16, 140:8,
140:20, 140:21,
157:6, 173:3,
173:13, 173:18,
174:13, 180:11,

Transcript of David Sandoz
Conducted on March 5, 2020

103

183:13, 192:3,
195:7, 210:6,
210:11, 217:8,
217:20, 232:15,
262:20, 270:13,
304:1, 336:20,
337:7, 338:19
**disk**
342:12, 342:14,
342:19
**disposing**
104:12
**dispute**
50:5, 110:18,
139:20, 140:2,
219:13
**disputing**
182:16
**dissimilate**
44:15
**distracted**
202:1
**district**
1:1, 1:2, 13:5,
201:19, 239:6
**division**
1:3, 13:6,
349:10
**divisions**
19:13
**divulge**
299:3
**divulging**
286:7, 286:22
**document**
24:14, 24:21,
28:15, 50:1,
50:9, 52:8,
52:21, 60:10,
61:11, 67:14,
68:8, 69:11,
70:13, 70:16,
71:15, 73:11,
73:16, 77:7,
80:19, 80:22,
94:18, 105:18,
108:13, 111:13,
111:18, 118:8,

136:1, 138:7,
139:17, 140:5,
140:6, 141:13,
141:16, 145:17,
147:2, 155:3,
155:9, 155:11,
179:20, 180:18,
192:13, 228:2,
228:3, 228:4,
231:22, 232:8,
237:18, 252:18,
252:20, 258:18,
260:2, 264:22,
281:4, 311:11,
312:3, 313:11,
315:12, 316:12,
317:14, 321:13,
323:4, 329:5,
329:20, 329:21,
331:15, 331:19,
331:21, 332:5,
332:11, 332:12,
332:13, 333:12,
334:6, 343:21
**documentation**
133:5
**documents**
44:10, 44:17,
68:4, 82:14,
87:18, 103:3,
106:2, 108:8,
113:19, 114:14,
115:18, 120:3,
132:5, 132:13,
145:4, 145:12,
146:7, 155:13,
155:18, 167:17,
168:10, 172:9,
191:6, 202:4,
223:3, 245:5,
245:6, 263:6,
298:14, 306:2
**dohm**
252:9, 252:10
**doing**
19:17, 54:12,
120:9, 148:16,
172:1, 183:13,

232:22, 246:7,
246:16, 246:18,
246:19, 247:1,
247:6, 249:7,
287:19, 307:11,
325:18, 336:7
**dollars**
325:12, 325:14,
331:7, 331:13,
333:9, 334:2,
348:3, 348:9,
348:11
**done**
43:12, 120:2,
154:15, 162:19,
164:20, 171:17,
243:17, 348:17,
348:20, 354:2,
354:3
**donne**
266:21
**donovan**
5:18, 7:9,
7:14, 7:16,
7:19, 8:15, 9:4,
9:17, 9:21,
10:4, 10:6,
10:19, 10:22,
11:4, 11:13,
11:15, 11:17,
11:19, 11:20,
24:13, 25:3,
25:21, 26:3,
26:11, 28:12,
28:20, 40:8,
40:9, 40:14,
105:18, 106:16,
107:11, 132:12,
136:21, 144:1,
147:11, 162:18,
170:12, 171:5,
177:8, 180:12,
184:11, 186:5,
186:14, 187:6,
192:15, 192:22,
193:21, 197:15,
198:17, 215:18,
216:14, 222:17,

227:3, 228:18,
228:22, 229:11,
232:10, 234:12,
234:18, 236:5,
236:12, 242:22,
243:4, 253:10,
253:12, 256:18,
262:18, 264:12,
264:17, 266:19,
281:7, 281:9,
281:15
**donovan's**
52:16, 186:9,
236:1, 236:16
**double**
328:20
**doubt**
24:20, 47:13,
66:16, 74:1,
93:9, 94:6,
94:7, 132:21,
142:3, 142:20,
143:6, 151:20,
160:14, 160:16,
178:13, 186:13,
204:7, 221:3,
231:6, 231:8
**down**
50:16, 99:9,
110:3, 125:13,
128:10, 170:19,
184:16, 198:4,
207:13, 219:9,
278:16, 290:13
**draft**
267:3
**drafted**
77:10, 77:11,
288:10
**drafting**
68:4, 76:16,
288:6, 311:6,
311:14
**drive**
2:7, 13:12
**due**
157:2, 196:4,
207:21, 207:22,

Transcript of David Sandoz
Conducted on March 5, 2020

104

218:5, 224:17,
225:3, 235:19,
289:13
**duly**
14:7
**dun**
93:3, 93:22
**duration**
91:18
**during**
39:22, 99:5,
99:13, 201:9,
224:1, 349:11
**duties**
224:3
**duty**
304:3

**E**

**e-mails**
36:6, 37:13,
37:19, 65:14,
65:15, 65:19,
67:9, 106:3,
106:5, 108:20,
110:4, 114:8,
122:2, 143:13,
146:21, 154:10,
227:19, 240:13,
273:13
**each**
64:11, 94:17,
108:10, 194:17,
222:20
**earlier**
89:4, 127:10,
130:13, 132:5,
133:3, 134:8,
136:8, 144:10,
146:19, 147:11,
147:16, 148:10,
210:5, 231:12,
236:3, 236:14,
271:5, 271:10,
271:19, 282:21,
288:16, 308:13,
329:19, 332:5
**early**
146:3, 224:10

**earn**
211:12, 335:10
**earned**
330:17
**easier**
296:10
**east**
1:14, 2:8,
13:13
**easy**
107:2
**effective**
168:2
**effort**
25:17, 252:11,
259:1
**ego**
251:12
**either**
59:3, 59:4,
92:20, 93:15,
266:11, 347:15
**eliciting**
325:17
**else**
22:14, 27:7,
73:4, 77:1,
136:17, 140:12,
141:19, 247:9,
252:2
**else's**
160:15
**embassy**
2:5
**emphasis**
59:14
**employed**
355:20, 355:24
**employee**
96:22, 97:4,
98:10, 355:23
**employees**
43:3, 256:7
**empower**
184:7, 184:9
**encouraged**
245:20
**end**
17:5, 55:10,

97:6, 128:4,
130:6, 130:14,
133:1, 133:15,
161:8, 167:21,
179:8, 217:14,
218:3, 221:15,
237:5, 247:1,
268:21, 279:17,
279:21, 288:10,
289:3, 319:6,
342:14, 351:3
**ended**
100:14
**enforce**
283:12
**enforced**
57:16, 128:21,
129:15, 208:1
**enforcing**
282:9, 282:12
**enlist**
233:16
**enormous**
26:22
**enough**
92:6, 92:14
**ensure**
33:7, 33:15,
33:21, 34:6,
89:19, 90:12,
90:19, 92:6,
92:15, 92:19,
123:22, 124:9,
124:17, 125:9,
126:7, 132:12,
145:13, 185:14,
291:17, 292:13,
303:2
**ensuring**
33:9, 135:14,
162:11
**enter**
237:2
**entered**
22:18, 42:13,
55:3, 80:3,
195:13, 239:6,
270:9, 306:10,

328:2, 329:4
**entire**
68:18, 336:1
**entirely**
67:1, 67:15,
68:12
**entities**
15:19, 98:18,
100:1, 243:12,
244:7, 250:16
**entitled**
104:14, 199:16,
199:19, 302:1,
327:7, 350:16
**entity**
234:15, 244:11,
246:3, 247:16,
268:4
**erik**
8:10, 8:17,
9:12, 11:8,
11:10, 136:17,
137:4, 219:14,
219:18, 220:14,
221:2, 222:17,
230:8, 230:17,
230:20
**error**
89:16, 122:3,
124:4, 175:19,
176:11, 214:8
**escapes**
259:18
**esquire**
3:4, 3:13, 4:4
**established**
230:9, 230:10,
230:18
**establishing**
231:13, 350:3
**estimate**
19:19, 22:7,
62:1, 275:9
**estimated**
62:7
**estimates**
19:21
**et**
1:8, 13:4

Transcript of David Sandoz
Conducted on March 5, 2020

105

etran
354:12, 354:15
evaluate
25:13, 25:17
even
84:12, 86:14,
158:16, 170:9,
172:6, 173:14,
177:5, 317:22,
323:4
event
71:17, 296:13,
342:8
eventually
32:19, 172:13,
217:1, 235:15,
256:1, 291:5,
292:4
ever
63:20, 79:9,
98:11, 197:7,
235:8, 252:2,
271:13, 272:4,
308:10, 313:18,
315:10, 315:11,
348:20
evergreen
191:21, 192:4,
195:8, 242:4,
242:7, 254:13,
254:15, 254:18,
254:22, 255:16,
255:17, 255:19,
255:20, 255:22,
256:3, 267:17
every
94:17, 131:3,
152:12, 207:5,
345:17
everyone
103:7, 162:20,
222:18
everything
48:3, 119:3,
226:15, 259:12,
348:22
evidence
57:14, 126:22,

313:2
exact
139:11, 322:16,
326:17
exactly
154:3
examination
5:2, 14:11,
36:16, 36:17,
36:22, 102:17,
308:1, 313:8,
342:21, 355:13
examine
102:15
examined
14:9, 355:12
example
21:18, 79:19,
205:7, 232:19,
261:1, 262:5,
263:10, 292:20,
293:9, 305:22,
306:1, 306:19,
306:21
examples
137:7, 297:2,
303:11
except
102:18, 256:14
exchanged
220:13
exclusive
261:8, 261:22
excuse
16:20, 28:22,
112:11, 140:6,
164:10, 207:21,
219:6, 296:8,
351:4
execute
51:21
executed
77:5, 78:18,
95:14, 105:11,
109:7, 112:7,
114:5, 152:4,
152:11, 258:22,
260:10, 260:14,

262:19, 269:17,
296:20, 304:10,
305:5
executing
112:16
executive
2:6
exhausted
353:22
exhibits
110:8, 143:19,
202:6
existing
173:14, 173:20,
188:3, 210:6,
210:14, 214:14,
217:11, 333:7,
333:22
exists
155:11
exit
207:9, 333:13
exonerated
206:5, 206:18,
207:20, 209:6,
345:14
exoneration
334:13, 345:12,
345:19, 345:20,
346:6, 347:8,
347:9
exonerations
211:21
expect
47:21, 233:10,
256:18, 256:20,
341:17
expectation
47:22, 212:21
expected
47:16
expediency
50:2
expense
248:18, 252:14,
303:7, 303:10,
304:9, 305:4
expenses
293:3, 293:5,

293:8, 293:11,
293:15, 294:12,
295:15, 296:18,
300:13, 301:10
experience
31:3, 31:5,
224:4, 224:6,
315:11, 323:10,
325:4, 329:20,
330:12
experienced
253:21
expert
325:19
explain
41:11, 59:15,
100:11, 139:2,
170:9, 214:12,
284:1, 304:2,
315:8, 324:5,
343:8
explained
31:16, 278:10,
302:7, 305:7
explaining
88:16
explanation
115:9, 169:20
explore
104:14, 294:6
exploring
217:13
exposure
29:7, 30:11,
31:11, 32:2,
32:5, 32:6,
32:15, 57:4,
58:1, 61:21,
62:10, 62:16,
63:6, 130:14,
130:21, 131:5,
205:3, 205:5,
205:6, 205:7,
205:9, 205:11,
205:20, 206:2,
206:4, 206:9,
206:16, 207:19,
208:5, 208:7,

Transcript of David Sandoz
Conducted on March 5, 2020

106

208:13, 208:20,
211:3, 213:1,
213:7, 213:14,
214:16
**extent**
67:18, 67:21,
94:11, 145:14,
280:3, 280:15
**extra**
202:7, 264:7
**extremely**
26:18, 26:19,
306:14

**F**

**face**
355:9
**facilitate**
103:21, 194:1,
220:16
**fact**
35:22, 59:1,
71:15, 105:3,
191:16, 282:16,
323:3, 325:16,
335:22, 337:17,
337:20
**factor**
35:20
**facts**
298:7, 298:10,
312:10, 313:2,
355:7
**factual**
67:22, 71:19
**failed**
262:8, 279:22
**fair**
341:20
**fairly**
322:22
**fairness**
322:16
**false**
154:10, 309:18,
313:13
**familiar**
22:1, 44:10,

77:8, 283:1,
283:2, 283:4,
285:3, 285:6,
315:6, 315:21,
315:22
**familiarity**
21:5
**familiarize**
244:22
**family**
46:20
**far**
16:12, 20:17,
146:11, 151:1,
212:1, 225:2,
249:6, 280:10,
286:6, 334:15
**fast**
93:18, 110:7
**fcs**
268:10, 268:14,
268:17
**fear**
84:16, 103:4,
212:18
**february**
109:6, 109:9,
116:11, 131:16,
146:20, 147:5,
168:9, 207:14,
227:13, 241:5,
241:21, 242:2,
243:8, 264:11,
280:8, 331:13,
333:10, 334:3,
339:4
**federal**
102:15, 223:11
**feedback**
233:6
**feel**
14:22, 54:13,
250:14
**feels**
43:4
**fees**
295:15, 296:18,
300:13, 301:10

**felony**
236:19
**fend**
151:9
**few**
45:19, 198:19,
208:3, 284:22
**fewer**
162:2
**field**
42:10
**fifth**
194:22
**fight**
71:11
**figure**
22:12, 183:1,
203:6
**file**
57:1, 57:14,
116:6, 116:7,
219:15
**filled**
109:15
**final**
181:19, 181:20
**financial**
43:8, 52:5,
52:22, 53:19,
55:22, 56:6,
63:15, 78:6,
78:8, 78:14,
95:9, 105:20,
107:14, 108:8,
114:4, 114:21,
114:22, 132:6,
133:17, 188:10,
245:6, 245:10,
245:11, 245:16,
253:1, 253:11,
253:17, 254:8,
256:13, 256:16,
256:22, 257:8,
257:11, 289:6,
289:15, 289:22,
290:9, 291:14,
291:18, 293:7,
303:2, 309:4

**financially**
355:24
**financials**
21:8, 21:14,
43:12, 52:19,
53:18, 54:2,
64:1, 309:14
**find**
188:8, 188:9,
194:20, 212:13,
243:10, 252:20,
255:10, 275:2
**fine**
15:2, 23:22,
35:6, 68:20,
88:4, 131:19,
171:13, 265:17,
278:19, 340:7
**finish**
60:10, 60:11,
120:14, 269:6,
341:14
**finished**
164:4, 222:1,
306:16
**firm**
23:4, 23:6,
23:10, 245:21,
259:20
**first**
14:7, 19:8,
22:22, 30:15,
44:14, 47:22,
78:20, 95:14,
110:13, 111:16,
112:11, 112:13,
117:17, 133:1,
134:3, 135:13,
136:12, 147:13,
147:22, 152:14,
153:14, 153:17,
159:9, 159:13,
159:16, 168:4,
194:16, 198:20,
206:3, 208:3,
209:5, 212:3,
218:20, 228:11,
228:12, 230:13,

Transcript of David Sandoz
Conducted on March 5, 2020

107

231:22, 233:20, 235:22, 238:7, 247:5, 271:10, 287:14, 288:9, 289:18, 291:7, 298:6, 317:7, 319:13, 323:21, 344:21
**fit**
170:15, 211:8, 239:13, 335:6
**fitzgerald**
3:5
**five**
54:5, 64:10, 64:12, 108:10, 156:21, 201:16, 286:4, 342:19, 353:8
**five-minute**
225:16
**fix**
183:4
**flag**
69:16
**flavor**
287:16
**flow**
102:12
**flying**
69:16
**focus**
260:1, 327:9
**focused**
256:13
**focusing**
54:16, 54:21, 148:14
**folks**
27:1, 124:8, 211:21, 224:16, 237:13, 334:13
**follow**
347:5
**follow-up**
230:21
**followed**
46:3

**following**
24:14, 180:10, 226:11
**follows**
14:9, 353:21
**font**
53:13
**food**
120:10
**foregoing**
262:7, 355:14
**forfeited**
80:15
**forfeitures**
257:4
**forget**
23:11
**forgot**
172:6, 222:3, 233:12
**forgotten**
23:11, 50:15
**form**
6:9, 79:4, 241:13, 261:13, 262:12, 317:10, 317:13, 318:9, 319:12, 340:13
**formal**
101:6, 144:19
**formed**
238:17, 252:4
**forming**
215:3, 232:15, 239:1
**forms**
79:2, 315:22
**forth**
88:20, 120:18, 329:22, 345:4
**forward**
82:13, 95:20, 103:10, 118:21, 169:22, 170:4, 194:1, 227:14, 240:5, 336:8, 341:18
**forwarded**
82:9, 82:11,

105:19, 107:11, 221:8, 228:22
**forwarding**
193:20, 228:18, 236:11
**found**
252:18
**foundation**
315:16, 317:12, 322:10, 323:3, 323:15, 327:16, 338:2, 340:19, 351:1
**four**
126:18, 251:5, 342:14, 353:21
**fraction**
61:20, 89:22
**frame**
94:13, 99:7, 106:6, 147:1, 154:4, 154:17, 162:3, 169:8, 172:20, 173:4, 174:1, 180:10, 180:14, 186:8, 190:18, 193:15, 215:5, 217:17, 233:12, 237:16, 239:22, 241:20, 267:16, 338:22
**frankly**
224:8
**free**
14:22, 54:13
**freedom**
84:9
**friend**
233:14
**friendly**
255:10, 255:14
**front**
29:12, 32:9, 48:5, 51:4, 59:20, 64:7, 106:9, 122:5, 124:15, 127:13, 127:21, 134:9,

147:5, 147:19, 191:7, 205:10, 205:21, 219:11, 257:12, 274:21, 278:11, 288:17, 289:8, 289:17, 292:4, 294:16, 294:18, 302:8, 303:19, 306:8, 306:9, 310:14, 316:15, 316:20, 331:20, 332:7, 344:6
**frustration**
224:19
**fsc**
268:7, 268:9
**full**
15:6, 18:9, 19:3, 27:22, 56:13, 115:9, 169:18, 169:19, 194:16, 252:10, 299:13, 300:2, 305:17, 306:18, 306:19, 307:1, 342:4
**fully**
15:10, 98:5, 109:7
**fun**
224:9
**functioning**
17:20, 30:7
**fund**
161:1, 161:3, 175:12, 175:17
**funding**
249:8
**funds**
176:15, 256:7, 271:18
**further**
85:9, 188:21, 196:4, 223:3, 288:2, 307:8, 341:10, 355:19, 355:22

Transcript of David Sandoz
Conducted on March 5, 2020                                         108

**future**
32:2, 32:14,
32:22, 166:18,
194:18, 202:3,
202:8

**G**

**gain**
246:7
**gathered**
72:7, 130:2
**gathering**
118:20, 240:16
**gave**
40:14, 112:14,
115:8, 228:10,
287:18, 308:13,
347:8, 348:21
**gears**
24:7
**general**
7:5, 7:10,
16:6, 20:11,
20:16, 23:2,
23:7, 31:1,
31:7, 80:7,
80:21, 81:1,
81:11, 82:10,
105:11, 107:12,
166:14, 182:17,
297:14, 299:14,
299:16, 305:15,
339:17, 339:18
**generally**
16:21, 18:11,
19:10, 25:10,
27:4, 28:9,
30:3, 38:15,
39:22, 40:12,
41:6, 49:22,
58:10, 123:20,
124:14, 137:20,
139:15, 167:16,
234:4, 274:8,
281:21, 298:18
**genuineness**
145:13
**getting**
20:17, 56:14,

56:18, 58:4,
81:19, 128:6,
131:9, 134:5,
207:8, 211:21,
219:11, 220:16,
239:19, 278:22,
287:15, 293:19,
310:16, 317:18,
326:11, 334:13
**gia**
107:12, 133:16
**gist**
274:4, 291:4
**give**
21:18, 22:7,
32:17, 45:9,
54:20, 70:19,
71:6, 86:22,
118:8, 152:11,
169:11, 179:2,
190:21, 200:14,
201:2, 211:18,
222:6, 277:10,
281:12, 283:9,
292:20, 297:1,
305:21, 320:3,
322:6, 350:14
**given**
33:9, 219:16,
237:17, 309:20,
329:19, 329:20,
339:20, 343:16,
355:16
**gives**
133:16, 155:5,
179:17
**giving**
218:13, 286:11,
286:13, 340:6
**glass**
45:14, 321:10
**glasses**
45:5, 45:10
**gmr**
180:1, 180:5
**go**
32:22, 37:20,
60:13, 60:18,

61:17, 67:18,
74:10, 90:13,
90:19, 121:1,
121:2, 122:15,
122:18, 124:10,
133:9, 139:13,
141:15, 145:19,
155:9, 171:1,
172:9, 182:19,
205:4, 211:5,
212:2, 214:17,
228:2, 233:10,
240:4, 245:1,
250:18, 250:22,
284:9, 297:16,
303:10, 304:8,
306:1, 307:9,
322:22, 331:2,
335:2, 341:3,
341:21, 342:9,
351:20, 354:1
**goal**
211:8, 335:5
**goes**
55:9, 57:11,
213:18, 221:9,
349:18
**gone**
171:14
**good**
14:13, 47:2,
120:15, 131:18,
137:4, 162:16,
162:20, 170:15,
201:11, 211:15,
224:4, 224:6,
242:12, 242:13,
242:14
**gosh**
40:3, 137:2,
226:14
**gotten**
225:2
**government**
221:17, 223:11
**gps**
33:17, 33:20,
34:5, 35:19,

42:1, 42:2,
43:1, 43:5,
83:17, 84:3,
85:21, 87:6,
87:14, 87:15,
90:18, 91:1,
91:7, 91:11,
91:17, 92:13,
123:14, 124:16
**great**
21:20, 61:3,
89:22, 138:12,
226:5, 307:13
**greensboro**
3:6
**greg**
8:4, 9:7, 10:7,
10:10, 10:16,
120:18, 140:10,
143:5, 195:11,
204:7, 254:21,
255:14, 257:14,
257:16, 257:19,
258:1, 258:5
**ground**
14:19
**grounds**
342:8
**group**
172:4, 217:9,
234:22, 239:13,
240:7
**groups**
233:3, 234:12
**guarantees**
90:2
**guess**
28:11, 29:4,
31:21, 38:8,
40:3, 44:11,
50:17, 53:2,
54:3, 55:13,
65:11, 72:18,
73:5, 73:21,
80:9, 85:7,
92:18, 94:5,
107:10, 126:13,
128:14, 129:10,

Transcript of David Sandoz
Conducted on March 5, 2020

109

133:15, 135:6,
148:22, 169:10,
169:13, 224:11,
226:20, 228:13,
234:16, 235:18,
236:2, 253:15,
262:18, 266:18,
270:4, 277:11,
300:1, 330:19,
330:20, 331:5,
331:6, 339:15
**guy**
293:22
**guy's**
318:17
**guys**
44:10, 191:6

**H**

**habit**
94:17
**half**
67:3, 68:16,
68:17, 86:11,
331:7
**halfway**
122:11
**hand**
71:15, 74:4,
121:13, 202:5,
328:22, 355:28
**handed**
43:21, 123:3,
232:8
**handing**
111:7
**handle**
136:16, 247:13,
275:20
**handled**
283:16, 298:20
**handlers**
75:21
**handles**
282:14
**handling**
134:6, 134:9,
135:2, 283:17

**hands**
135:1
**handwriting**
109:14
**happen**
241:3, 298:19
**happened**
39:3, 168:7,
168:11, 234:5,
239:3, 273:10,
275:2, 298:1
**happening**
154:8, 287:16
**happens**
90:11
**happy**
210:3
**harrisonburg**
1:3, 13:6
**he'll**
40:20
**head**
142:9
**heading**
223:19
**headquarters**
38:1
**hear**
337:14, 353:18
**heard**
267:22, 268:1,
268:12, 332:8
**hearing**
27:2, 124:10,
126:4, 224:16,
279:17, 279:21
**hearings**
69:13, 125:18
**heart**
83:16
**heights**
4:7
**heitman**
8:12, 139:5
**held**
2:2, 334:21,
334:22
**help**
40:15, 41:2,

41:10, 43:17,
54:7, 75:19,
118:7, 149:10,
158:21, 159:3,
188:5, 188:9,
188:21, 195:8,
211:18, 211:20,
214:22, 233:19,
242:8, 292:3,
333:15, 334:11,
334:19, 345:9
**helped**
60:3, 242:3
**helping**
59:22, 240:20,
241:1
**helps**
124:9, 192:17,
193:6, 222:7,
255:19
**here**
13:1, 15:13,
24:7, 25:20,
27:10, 31:6,
31:10, 38:20,
39:7, 48:4,
49:16, 50:1,
58:17, 63:14,
66:21, 67:9,
72:6, 72:21,
77:21, 94:13,
102:13, 105:22,
107:18, 113:21,
114:14, 120:12,
123:14, 125:3,
126:21, 127:7,
128:4, 133:20,
149:12, 153:4,
153:13, 153:15,
158:17, 186:21,
193:15, 202:6,
205:22, 206:1,
206:2, 206:15,
207:7, 207:15,
211:2, 212:21,
222:10, 224:15,
225:7, 228:2,
231:17, 257:19,

260:4, 260:5,
264:17, 278:12,
286:1, 287:16,
293:6, 308:3,
309:10, 309:15,
311:22, 321:6,
325:16, 325:19,
334:17, 347:19
**here's**
107:1, 107:5,
113:3, 114:22,
206:14
**hereby**
355:7
**herein**
14:7
**hereto**
355:8, 355:24
**hereunto**
355:27
**hey**
153:14
**high**
16:6, 26:19,
245:19, 245:21
**high-level**
245:19
**highlighting**
296:9
**highlights**
328:19
**hilton**
2:5
**himself**
233:21
**history**
236:5
**hitches**
288:20
**hoffar**
3:5
**hold**
16:13, 96:14,
128:7, 187:17,
211:11, 212:9,
335:9, 353:13
**holding**
19:20, 214:5,

333:7, 334:1,
334:4
**holdings**
251:18, 251:20,
252:3
**hole**
212:15
**home**
204:9, 204:10,
212:13, 242:12,
242:13, 242:14,
243:10, 250:7,
322:22, 333:15,
333:18
**homes**
15:14, 243:13
**honestly**
39:10, 41:1,
100:10
**hope**
103:7, 192:17,
193:5, 336:16
**hoped**
170:18
**hopeful**
215:7
**hopefully**
255:12
**hoping**
173:8, 173:9,
173:11, 212:14
**hostile**
34:10, 34:15,
37:3
**hotmail**
229:11, 232:11
**hour**
60:7, 101:20,
101:21, 101:22,
137:6
**hours**
341:16, 342:5
**however**
64:10
**hypothetical**
327:3

---
                 **I**
---

**ice**
28:2, 28:6,

139:7, 192:16,
193:21, 194:18,
220:1, 224:17,
224:18, 231:1,
291:7, 306:7
**idea**
66:21, 83:2,
164:7, 169:11,
177:14, 178:16,
235:14, 319:5,
328:4
**identification**
24:5, 37:11,
43:19, 49:9,
52:12, 54:10,
64:19, 73:9,
77:2, 79:15,
82:2, 86:5,
88:6, 93:20,
94:9, 96:10,
105:16, 107:8,
110:9, 111:5,
118:10, 121:16,
131:13, 136:5,
143:20, 145:9,
146:17, 156:7,
160:10, 161:21,
178:3, 179:10,
180:16, 182:5,
183:17, 185:2,
186:1, 189:3,
192:11, 194:4,
195:5, 196:10,
197:10, 198:12,
215:13, 218:1,
220:9, 222:13,
227:22, 228:6,
232:6, 253:4,
258:16, 266:5,
280:5, 316:10
**identified**
20:19
**identify**
13:14, 20:19,
146:7
**ific**
24:1
**ignorance**
22:10

**ignore**
315:18, 328:22
**il**
4:7
**illegible**
196:21
**illinois**
1:14, 2:8,
2:15, 13:13,
355:1, 355:6,
355:34
**iloc**
49:2, 49:3
**immaterial**
65:20
**immediate**
181:14, 289:1,
291:12, 302:17
**immediately**
30:16, 62:5
**immigrant**
27:19, 28:2,
28:5, 89:9,
92:14, 92:20,
123:15, 126:8,
181:2
**immigrants**
26:20, 42:2,
42:11, 46:19,
92:7, 92:15,
123:22, 124:16
**immigration**
6:9, 23:9,
23:18, 26:13,
27:12, 28:14,
58:10, 62:3,
79:3, 100:17,
120:19, 140:15,
142:13, 146:8,
166:18, 172:15,
173:5, 173:6,
184:20, 187:15,
187:20, 189:6,
189:14, 189:21,
190:13, 193:18,
195:9, 206:11,
206:13, 224:5,
232:16, 244:7,

247:13, 247:16,
248:6, 249:2,
249:3, 249:18,
250:2, 250:6,
268:13, 270:5,
334:20, 338:16
**impacting**
221:16
**implement**
283:12
**implementing**
282:8, 282:12
**important**
35:20, 55:21,
57:2, 185:14
**impressive**
83:9
**improper**
34:19, 67:1,
70:16, 93:12,
93:13, 155:2,
321:12, 325:18,
326:7, 352:22
**in-house**
96:21
**inaccurate**
141:7, 141:20,
253:18
**inadvertent**
71:9
**inadvertently**
65:6, 70:18
**inartful**
31:22
**inartfully**
14:22
**inc**
1:8
**incentive**
59:17, 59:18,
130:9
**incentivize**
130:14
**inception**
328:6
**included**
105:20, 264:2
**including**
24:15, 52:6,

Transcript of David Sandoz
Conducted on March 5, 2020                                      111

**indicates**
175:6, 189:17,
194:11, 194:14,
207:12, 273:21
**indicating**
108:9, 235:19
**individual**
91:13, 91:14,
125:19, 255:6,
258:1
**individuals**
18:15, 125:5,
126:4, 204:3,
219:19
**indulgence**
103:11
**industry**
243:19, 267:22
**info**
192:16
**informal**
101:9
**information**
26:1, 40:14,
46:4, 53:3,
64:2, 66:12,
67:22, 71:19,
72:12, 77:22,
78:14, 81:20,
82:13, 85:9,
95:8, 96:6,
114:15, 115:21,
117:13, 119:2,
123:9, 129:21,
129:22, 130:3,
133:11, 133:12,
143:9, 143:14,
146:5, 186:9,
192:17, 193:5,
193:21, 209:4,
209:5, 220:17,
225:10, 230:5,
236:22, 237:6,
280:14, 286:8,
286:12, 286:14,
287:1, 287:18,
299:3, 299:4,
309:16, 312:1

**informational**
240:16
**initial**
49:20, 148:6,
153:19
**initialed**
107:13, 107:21
**initially**
50:18, 51:12,
90:1, 109:21,
205:1, 208:2,
252:4, 328:8
**injunction**
279:17, 279:21
**input**
281:12
**inserted**
119:12
**insofar**
280:16, 286:21,
287:17, 299:1,
299:6
**installment**
78:18, 78:20,
78:21, 95:15,
110:13, 111:16,
111:22, 112:11,
112:13, 117:17,
118:18, 147:13,
147:22, 151:10,
151:11, 152:14,
152:16, 153:15,
153:17, 159:9,
159:13, 159:17
**installments**
64:11, 119:9,
156:22, 157:16,
158:6, 158:13,
163:8
**instance**
32:16, 274:21
**instances**
348:17
**instead**
15:5, 59:20
**instructing**
286:9
**instruction**
74:8, 338:9

**instructions**
338:11
**insurance**
1:5, 13:3,
13:17, 21:2,
21:3, 204:14,
204:16, 216:1,
216:6, 216:10,
216:13, 217:9,
231:14, 232:16,
234:17, 235:11,
235:16, 235:20,
238:16, 239:1,
240:10, 241:13,
244:1, 245:3
**intended**
91:17, 235:8,
273:6, 298:16
**intending**
187:18
**intention**
143:9, 192:22,
273:9, 279:1
**intentions**
223:7
**interacting**
251:12
**interaction**
280:22
**interactions**
281:3
**interest**
98:14, 98:17,
100:2, 144:14,
188:8, 188:12,
188:18, 243:5,
243:13, 243:15,
244:13, 246:2,
246:3, 246:8,
247:15, 248:10
**interested**
23:8, 130:7,
169:22, 170:4,
249:18, 249:21,
250:6, 355:25
**interim**
95:10
**interject**
87:17, 220:15

163:7, 173:20,
217:10, 225:4,
294:12, 345:18
**income**
46:21
**incomplete**
317:14, 318:10
**inconsistent**
352:15
**incorporated**
13:4
**increase**
329:10, 329:12,
343:5
**increasing**
329:21
**incurred**
32:9, 293:2,
293:5, 301:10,
301:11
**incurs**
305:4
**indemnification**
258:20
**indemnify**
48:14, 76:21,
127:8, 259:1,
292:7, 303:6
**indemnifying**
304:22
**indemnitor**
248:21, 261:7,
262:7, 274:15,
275:3, 293:4,
293:11, 295:14,
296:17, 304:2,
306:8, 345:6
**indemnitors**
346:17
**indicate**
185:10
**indicated**
13:9, 29:19,
78:22, 127:14,
141:2, 169:21,
193:19, 233:3,
233:9, 271:5,
285:20, 352:6

Transcript of David Sandoz
Conducted on March 5, 2020

112

**internal**
44:3, 65:19,
116:17, 139:1,
149:22, 195:21
**internally**
245:22
**interpret**
298:18, 344:19
**interpretation**
344:18
**interpreting**
282:8, 283:9
**interrupt**
60:8, 65:12,
313:8, 318:2
**interrupting**
102:12, 323:16,
327:19
**interruption**
315:18
**intriguing**
233:10
**introduced**
250:9, 320:1
**introduction**
22:22
**introductions**
196:16
**invalid**
181:13
**investigating**
293:3
**investment**
240:19
**investor**
233:2, 233:17,
233:21, 234:3,
234:12, 234:22,
245:2
**investors**
232:15, 232:21,
234:9, 234:10,
234:18, 238:22
**invited**
33:5
**invoice**
181:3, 181:17,
181:19, 181:21,

181:22, 182:1,
182:7, 182:11,
182:12, 182:16,
183:8, 183:10
**invoices**
218:6, 219:12,
223:15, 226:7,
226:12
**involve**
271:21, 287:3,
299:7
**involved**
18:10, 19:4,
19:14, 23:6,
51:1, 59:22,
99:14, 223:17,
226:10, 233:13,
233:18, 235:4,
235:8, 240:22,
243:22, 247:16,
266:16, 268:5,
311:6, 317:1,
330:8
**involvement**
23:19, 242:10,
243:7, 268:16
**involving**
240:14
**iowa**
2:16, 355:6,
355:36
**ira**
6:4, 11:14,
75:4, 223:19,
224:4, 224:7,
311:4
**irrelevant**
65:20, 316:13,
317:14
**irrevocable**
49:6, 59:4
**island**
355:3
**issuance**
194:18, 310:1
**issue**
22:3, 25:13,
25:18, 31:12,

49:21, 56:1,
56:7, 57:10,
58:21, 78:2,
96:3, 96:21,
99:15, 106:15,
108:17, 113:7,
115:12, 115:14,
119:5, 148:6,
149:22, 162:21,
163:3, 171:9,
172:12, 183:4,
184:21, 187:19,
219:5, 219:21,
224:15, 238:20,
250:2, 259:7,
259:12, 293:19,
318:20
**issued**
62:11, 63:9,
80:1, 114:9,
116:1, 130:17,
131:3, 131:16,
131:17, 162:2,
162:11, 168:8,
181:3, 181:17,
183:9, 184:20,
194:12, 206:19,
208:15, 209:1,
209:10, 227:13,
267:19, 268:14,
298:6, 300:15,
301:11, 318:5,
334:1, 336:3
**issues**
170:14, 185:7,
224:13, 230:19,
230:22, 342:8
**issuing**
23:18, 31:12,
39:12, 40:6,
74:20, 105:12,
109:20, 110:11,
113:15, 114:17,
115:4, 115:20,
116:21, 117:4,
117:22, 123:9,
129:13, 133:7,
137:21, 138:22,

166:11, 167:1,
167:9, 167:18,
167:19, 168:9,
169:16, 171:8,
193:18, 207:10,
227:4, 227:7,
227:9, 241:11,
241:18, 241:19,
248:5, 249:10,
330:9, 330:17
**items**
95:3
**itinerary**
36:7
**itself**
261:8, 315:12

**J**

**january**
106:20, 120:17,
121:18, 123:5,
142:11, 142:16,
168:2, 223:9,
253:6, 253:9,
253:15, 254:11,
339:3
**jeopardize**
218:17
**jeopardized**
219:8, 220:21
**jeopardizing**
221:18
**job**
1:20, 46:21
**john**
3:13, 13:18,
308:4
**join**
197:16
**joint**
134:15
**jon@jlaplaw**
4:9
**jonathan**
4:4, 13:20,
54:21
**josh**
259:19

Transcript of David Sandoz
Conducted on March 5, 2020

113

**judge**
200:9, 200:12, 200:16, 200:20, 201:10, 201:15
**judgment**
92:4
**july**
174:21, 175:8, 177:17, 178:11, 194:13, 271:12
**jumping**
129:11
**june**
36:8, 38:14, 38:21, 43:22, 49:15, 49:19, 61:8, 73:16, 74:18, 82:9, 154:19, 156:10, 163:12, 165:2, 167:20, 174:3, 174:8, 174:21, 175:8, 185:11, 270:14, 270:15, 271:10, 271:11, 278:12, 310:9, 351:11
**jurisdiction**
201:15

**K**

**katsantonis's**
314:17
**keep**
34:12, 45:16, 63:4, 73:20, 102:12, 145:15, 156:12, 211:5, 211:16, 233:1, 264:9, 291:13, 300:18, 340:4
**keeping**
220:1
**keeps**
293:22
**kellie**
9:14
**key**
56:10, 56:13,

59:13
**kicked**
132:14, 138:22, 144:2, 146:20
**kind**
16:22, 20:2, 20:11, 33:22, 42:11, 43:4, 50:13, 101:12, 134:16, 138:1, 172:4, 202:1, 213:9, 221:5, 264:1, 274:4, 294:13, 295:16, 296:19, 300:13, 304:9, 322:17, 322:18
**kinds**
20:20, 41:8
**kirk**
6:5, 66:4, 75:5, 310:21
**kliethermes**
169:21, 187:12, 204:2
**knew**
30:7, 59:10, 91:12, 97:16, 100:12, 134:19, 167:8, 167:9, 227:12
**knowing**
62:15
**knowledge**
24:19, 25:11, 46:7, 50:4, 72:19, 72:20, 74:3, 75:2, 75:10, 77:9, 85:16, 85:17, 88:9, 89:1, 89:7, 91:9, 96:1, 96:4, 123:11, 133:18, 133:22, 143:13, 150:6, 150:16, 151:17, 154:8, 196:8, 238:15,

241:7, 254:2, 254:5, 268:6, 275:11, 279:14, 279:15, 294:7, 324:17, 325:7, 330:2
**knows**
222:18, 317:22
**konni**
1:22, 2:13, 14:1, 355:5, 355:32

**L**

**la**
4:4
**labels**
215:10
**lack**
20:14, 240:15, 315:16, 317:11, 322:9, 323:14, 327:15, 338:1, 340:19
**lag**
85:19
**laid**
76:6, 102:10, 113:13, 113:14, 323:3
**lang**
233:7
**language**
81:5, 158:1, 198:14, 222:11, 305:6, 305:9, 336:15
**large**
61:19
**larger**
19:12
**last**
51:15, 65:9, 106:16, 107:13, 107:21, 133:2, 133:8, 133:20, 138:6, 216:7, 258:4, 321:15,

334:9, 334:10, 334:16
**late**
184:19, 185:16, 194:8
**later**
39:6, 57:18, 153:1, 154:19, 223:8
**latest**
95:10
**laura**
8:13, 9:18, 11:6, 11:9, 139:5, 220:14, 223:2, 225:11
**law**
4:5, 23:3, 23:4, 23:6, 23:10, 345:18
**lawyer**
221:7, 233:15, 233:18
**lawyers**
235:18, 287:10
**lay**
350:22
**leading**
34:13, 34:17, 36:22, 40:18, 58:4, 95:19, 102:11, 102:17, 103:9, 105:6, 113:18, 124:21, 150:21, 151:1, 152:6, 152:18, 153:6, 153:21, 157:3, 157:19, 167:11, 181:5, 190:14, 191:3, 276:7, 276:16, 277:6, 278:7, 289:7, 289:16, 290:4, 290:11, 291:19, 292:14, 293:17, 294:14, 295:17, 301:19, 302:20, 304:12,

Transcript of David Sandoz
Conducted on March 5, 2020

114

343:19, 350:10,
350:14, 350:15
**leaning**
260:7
**learn**
25:12, 145:19,
235:22, 236:15
**learned**
140:7, 140:19,
140:21, 236:22
**learning**
137:8
**least**
39:17, 140:18,
158:6, 177:17,
189:18, 191:14,
213:15, 227:13
**leave**
353:4
**leaving**
212:19, 231:11,
232:1
**led**
23:5
**left**
38:3, 42:18,
83:3, 92:3,
107:16, 173:16,
190:9, 191:10,
196:7, 212:15,
214:1, 214:20,
217:18, 218:4,
230:2, 231:3,
231:10, 233:4,
255:21, 270:17,
273:12, 295:9,
333:3, 341:12,
341:16, 342:12
**legal**
67:19, 262:13,
280:14, 286:11,
286:13, 315:16,
322:10, 326:3,
329:14, 340:19
**length**
57:11, 91:22,
92:1, 128:19,
203:19, 205:2,

206:4, 206:16,
207:19, 207:21,
207:22
**less**
126:19, 206:10,
353:7
**let's**
17:10, 19:8,
20:9, 101:18,
107:1, 108:1,
118:19, 120:14,
135:22, 136:13,
138:8, 183:5,
205:22, 206:12,
206:15, 212:2,
225:15, 298:8,
304:8, 316:6,
317:21, 325:4,
326:22, 328:1,
342:9, 354:1
**letter**
11:14, 29:12,
48:21, 49:3,
49:6, 59:5,
207:1, 228:9,
228:14, 228:16,
228:18, 228:19,
228:22, 229:6,
229:7, 308:22,
309:3
**letting**
66:2, 155:3,
331:2, 341:2
**level**
16:6, 164:18,
245:22, 278:5
**leverage**
32:17, 32:18,
32:20, 148:18,
164:15, 165:16,
165:18, 271:6,
279:5
**liability**
27:20, 29:1,
29:6, 32:10,
32:14, 305:18,
306:20, 307:2,
346:18, 346:20,

347:13
**libre**
15:11, 243:13
**license**
22:15, 355:34,
355:36
**life**
56:13, 58:10,
58:16
**lifted**
217:3
**liked**
188:11, 239:16
**likely**
128:9, 135:21,
240:2, 251:11,
267:1
**limandri**
7:19, 9:10,
9:15, 10:13,
97:14, 237:20,
238:10
**line**
179:16, 194:22,
265:15, 289:18,
291:7
**lined**
173:12
**lines**
189:10, 189:16
**link**
82:15
**liquidated**
80:15, 81:15
**list**
133:16, 236:12
**listed**
77:21, 78:16,
223:2, 236:4
**listing**
197:1, 239:19,
239:21, 240:1,
240:3, 259:9,
259:10, 269:11
**litany**
303:10
**literally**
115:10, 350:14

**litigation**
15:13, 103:15,
104:14, 156:4,
265:21, 320:8
**little**
31:17, 31:22,
45:9, 65:2,
76:19, 76:22,
85:19, 136:8,
172:10, 245:21,
255:2, 259:19,
262:6, 265:5,
292:21, 341:12
**llp**
3:5
**loaned**
256:7
**local**
82:15
**locate**
90:11, 90:17,
90:18, 91:14,
125:4, 125:19,
126:3, 241:1
**located**
257:9
**logo**
317:8
**long**
19:17, 46:20,
58:2, 92:6,
92:14, 160:7,
204:8, 213:13,
248:8, 275:6,
322:1, 322:21
**longer**
57:15, 129:13,
189:10, 190:12,
204:19, 205:3,
216:3, 227:4,
227:6, 227:7,
227:8, 325:5
**look**
21:13, 44:12,
52:18, 61:6,
64:14, 79:18,
80:22, 83:16,
95:2, 107:10,

Transcript of David Sandoz
Conducted on March 5, 2020                                          115

| | | | |
|---|---|---|---|
| 108:1, 113:1, | 256:5, 261:1, | 144:22 | 280:1, 288:22, |
| 118:21, 132:3, | 263:5, 328:14, | **M** | 291:11, 291:12, |
| 139:9, 142:11, | 344:3, 345:11, | **madam** | 293:10, 302:13, |
| 147:7, 162:9, | 345:16 | 327:11 | 302:17, 306:15, |
| 167:16, 179:2, | **looks** | **made** | 312:18, 318:17, |
| 179:16, 179:20, | 49:1, 195:11, | 27:19, 47:1, | 325:13, 353:14 |
| 182:18, 205:22, | 206:3, 206:15, | 59:18, 65:2, | **makes** |
| 209:22, 210:22, | 207:18, 219:14, | 72:1, 99:13, | 47:1, 292:8 |
| 218:13, 218:14, | 219:18, 228:21, | 105:7, 166:17, | **making** |
| 223:1, 228:17, | 237:9, 339:16 | 167:12, 171:18, | 46:21, 47:8, |
| 229:17, 238:5, | **losing** | 181:4, 194:16, | 56:6, 99:14, |
| 240:20, 256:11, | 223:10 | 198:2, 203:8, | 103:9, 137:7, |
| 259:22, 283:8, | **loss** | 212:1, 218:7, | 148:8, 150:1, |
| 316:8, 319:19, | 47:16, 47:21, | 219:21, 234:2, | 150:17, 194:9, |
| 340:2 | 48:1, 52:20, | 239:20, 252:15, | 270:20 |
| **looked** | 53:18, 54:18, | 275:16, 298:11, | **man's** |
| 114:7, 132:3, | 55:11, 127:8, | 315:22, 326:5, | 312:4, 312:7 |
| 136:8, 142:10, | 127:19, 128:1, | 326:8, 326:18, | **manage** |
| 146:19, 147:15, | 254:4, 275:10, | 334:14, 338:15, | 211:20, 334:11, |
| 152:10, 207:6, | 277:11, 289:1, | 340:16, 344:15, | 334:20 |
| 210:4, 231:11, | 289:6, 289:15, | 350:2, 355:17 | **management** |
| 245:9, 263:9, | 289:22, 290:9, | **magnifying** | 17:21, 21:1, |
| 269:1, 309:13, | 291:13, 291:14, | 45:14, 321:9 | 129:3 |
| 329:6 | 291:18, 292:13, | **mail** | **managing** |
| **looking** | 293:14, 295:14, | 43:10, 43:13 | 332:21 |
| 38:19, 50:8, | 303:2, 303:7, | **majority** | **manner** |
| 51:15, 55:10, | 303:9, 303:18, | 22:5, 125:3 | 104:2, 104:15, |
| 57:3, 61:3, | 304:6 | **make** | 115:17 |
| 61:15, 64:7, | **losses** | 25:18, 31:17, | **many** |
| 69:11, 71:18, | 161:10, 161:14, | 32:3, 34:6, | 18:2, 18:4, |
| 76:2, 81:4, | 272:22, 273:22, | 37:9, 37:20, | 22:7, 25:21, |
| 81:5, 82:10, | 292:4, 293:7, | 39:4, 40:17, | 44:16, 62:16, |
| 83:15, 84:8, | 294:12, 295:2, | 56:1, 65:15, | 63:8, 206:19, |
| 95:7, 133:3, | 295:3, 296:2, | 66:18, 81:8, | 209:9, 264:5, |
| 139:1, 140:4, | 296:18, 300:12 | 94:12, 95:18, | 283:1, 304:15, |
| 145:17, 146:2, | **lost** | 95:20, 97:19, | 316:3, 350:8 |
| 146:4, 146:21, | 293:20 | 102:10, 107:2, | **march** |
| 147:7, 148:16, | **lot** | 127:22, 134:18, | 1:15, 13:8, |
| 148:17, 153:13, | 18:14, 30:21, | 139:16, 148:6, | 145:17, 147:4, |
| 158:1, 162:17, | 40:21, 100:8, | 149:1, 150:18, | 147:6, 148:1, |
| 163:12, 167:20, | 130:2, 204:15, | 165:20, 181:13, | 149:12, 152:9, |
| 174:2, 182:11, | 205:14, 306:14, | 201:18, 214:9, | 152:13, 152:17, |
| 203:10, 216:5, | 309:11 | 214:11, 219:19, | 156:18, 156:19, |
| 216:7, 220:7, | **low** | 222:18, 224:9, | 156:22, 157:14, |
| 222:15, 228:1, | 26:18, 61:17 | 239:4, 239:9, | 158:5, 159:13, |
| 228:12, 232:14, | **lower** | 242:12, 257:1, | 160:4, 228:21, |
| 232:19, 237:17, | 164:18 | 272:2, 275:2, | 229:6, 259:4, |
| 250:7, 255:13, | **lunch** | | 269:2, 269:16, |
| | 101:21, 136:1, | | |

Transcript of David Sandoz
Conducted on March 5, 2020

116

355:28
**marco**
7:19, 9:10,
9:14, 10:12,
50:20, 51:1,
73:3, 73:6,
96:20, 96:21,
97:4, 97:8,
97:11, 97:14,
97:15, 98:10,
98:14, 98:17,
98:21, 99:22,
100:14, 100:16,
100:18, 101:2,
101:4, 134:17,
144:11, 144:15,
162:10, 175:22,
176:1, 176:5,
176:12, 176:15,
176:20, 176:21,
177:3, 214:7,
234:18, 235:3,
235:8, 237:20,
238:10, 238:12,
238:14, 264:16,
264:18, 265:8,
270:5, 271:21,
272:2, 272:7,
272:8, 272:16
**marco's**
97:20, 98:4
**mario**
3:14, 308:11
**mark**
24:6, 24:9,
37:7, 54:8,
65:2, 79:8,
79:12, 107:3,
228:2, 252:21,
353:4
**marked**
24:4, 37:10,
43:18, 49:8,
52:11, 54:9,
61:7, 64:18,
73:8, 79:14,
82:1, 86:4,
87:18, 88:5,

93:19, 94:8,
96:9, 105:15,
107:7, 110:9,
111:4, 111:7,
118:9, 121:13,
121:15, 131:12,
136:4, 143:19,
143:22, 145:8,
146:16, 156:6,
160:9, 161:20,
178:2, 179:9,
180:15, 182:4,
183:16, 185:1,
185:22, 189:2,
192:10, 194:3,
195:4, 196:9,
197:9, 198:11,
215:12, 217:22,
220:8, 222:12,
227:21, 228:5,
232:5, 253:3,
258:15, 266:4,
280:4, 310:2,
310:20, 313:17,
316:6, 316:9,
317:7, 319:11,
329:3
**market**
189:10
**material**
56:22
**mathematics**
16:14
**mather**
6:18
**matter**
13:3, 36:20,
328:3, 331:10
**matters**
196:21, 355:11
**mature**
62:15
**maybe**
19:11, 20:1,
22:9, 41:10,
148:11, 190:7,
212:17, 222:1,
241:9

**mcfadden**
3:15
**mclean**
3:8
**mean**
17:19, 20:17,
20:18, 21:12,
26:19, 27:22,
30:14, 31:2,
32:4, 32:6,
34:2, 41:16,
41:18, 53:3,
53:4, 58:13,
59:19, 63:6,
63:7, 72:11,
75:15, 77:17,
97:7, 110:18,
111:21, 112:14,
125:8, 127:1,
142:2, 150:11,
165:17, 167:7,
168:16, 175:16,
176:2, 180:20,
181:7, 181:19,
186:21, 188:13,
190:8, 195:17,
204:19, 206:2,
207:4, 208:17,
211:14, 214:10,
227:10, 241:12,
246:11, 249:16,
263:9, 269:10,
269:19, 272:6,
273:10, 275:1,
276:10, 278:16,
283:3, 284:1,
290:7, 292:17,
293:7, 294:15,
295:2, 303:9,
304:14, 306:12,
312:3, 332:10,
333:19, 345:3,
345:13, 352:18,
353:17
**meaning**
62:18, 96:2
**means**
29:6, 63:6,

90:11, 90:17,
91:2, 130:21,
193:2, 305:6,
346:6, 346:13,
346:20
**meant**
56:16, 59:7,
59:16, 61:22,
112:2, 126:2,
151:9, 212:4,
212:12, 213:21,
306:21, 343:8,
343:15, 343:21,
345:20
**mechanisms**
292:12
**meet**
33:6, 137:5,
137:22, 156:2,
162:18, 257:14
**meeting**
40:6, 40:10,
42:21, 55:9,
145:18, 163:20,
163:22, 164:6,
184:15, 224:17,
234:9
**meetings**
40:2, 40:11,
40:20, 43:7,
230:8, 230:10,
230:17, 234:9,
234:11
**member**
252:2
**members**
251:19
**memo**
25:2, 334:16
**memorialize**
343:16
**memory**
145:14, 180:6
**mention**
59:1, 211:20,
339:16
**mentioned**
128:11, 144:20,

148:17, 187:11,
256:2, 256:14,
257:19
**mentioning**
102:20, 148:10
**mentions**
334:12
**merger**
175:20
**merging**
347:3
**message**
86:10, 187:21,
190:8, 190:9,
190:16, 208:11,
209:15, 209:16,
213:13, 352:10,
352:20
**messenger**
273:15
**met**
80:14, 113:12,
113:14, 115:3,
118:1, 184:11,
208:9, 257:21,
258:1, 258:4
**mic**
232:1, 232:3
**mid**
330:8, 330:10
**middle**
49:17, 54:16,
94:1, 134:3,
134:21, 194:15,
200:5, 201:5,
213:9, 220:17,
229:1
**might**
51:13, 53:10,
122:3, 183:4,
235:6, 250:19,
257:17, 258:5,
262:3, 267:15,
267:16
**mike**
5:18, 7:9,
7:13, 7:16,
7:19, 8:15, 9:4,

9:16, 9:20,
10:3, 10:5,
10:19, 10:21,
11:3, 11:12,
11:14, 11:16,
11:18, 11:20,
82:13, 96:20,
116:15, 170:8,
171:2, 171:5,
189:9, 190:7,
190:8, 190:16,
191:17, 196:16,
216:9, 220:18,
221:11, 223:6,
227:6, 230:16,
234:12, 235:20,
242:22, 243:4,
264:12, 266:20,
281:7, 281:9
**million**
126:18, 208:8,
208:18, 208:20,
208:22, 211:3,
212:22, 213:1,
279:7, 325:12,
325:14, 331:6,
331:7, 331:13,
333:9, 334:2,
337:21, 348:3,
348:9, 348:10,
351:16, 351:17,
352:2, 352:4
**mind**
178:22, 241:9,
314:22, 316:15,
316:19, 330:5,
332:2, 332:6,
341:14
**mine**
45:7, 144:7,
151:21, 320:5
**minute**
45:13, 68:9,
79:17, 96:14,
108:2, 121:19,
199:2, 210:22,
252:21, 253:7
**minutes**
285:1, 301:5,

301:6, 341:16,
341:18, 342:4,
342:12, 351:6,
353:8
**miscellaneous**
17:3, 17:13,
17:15, 18:3,
18:6, 18:10,
18:12, 18:20,
19:1, 19:3,
19:8, 19:9,
19:15, 21:22,
58:15, 88:13,
243:18, 244:3,
284:6, 284:10,
332:19
**mischaracterizat-
ion**
331:17
**mischaracterizes**
312:3, 333:12,
334:6
**mislead**
312:18
**misleading**
309:17
**missed**
327:18
**missing**
86:10, 86:13
**misspoke**
34:3, 175:2
**misstated**
285:14, 324:20,
348:7
**misstates**
272:11, 285:13,
319:3, 337:9,
351:19
**misunderstood**
19:6
**mitigating**
33:10, 35:20
**mitigation**
84:5, 92:22,
272:3
**mixing**
110:7

**mocking**
141:10
**moment**
37:17, 44:7,
73:13, 86:9,
120:21
**monday**
82:14, 133:9
**money**
130:9, 175:12,
175:17, 175:22,
176:2, 176:3,
211:12, 212:10,
214:6, 214:7,
297:18, 302:11,
306:14, 335:10
**monies**
176:12
**monitor**
43:2
**monitoring**
33:18, 33:20,
35:19, 42:2,
91:1, 91:11,
123:14
**month**
141:17, 152:12,
161:2, 161:5,
194:17, 207:5
**monthly**
119:8, 156:22,
194:7
**months**
64:12, 128:21,
129:6, 129:16,
129:19, 141:17,
154:19, 208:3,
240:1, 339:6
**moore**
40:8
**more**
18:15, 29:2,
29:7, 63:14,
65:15, 113:19,
116:19, 135:22,
137:8, 139:17,
145:20, 166:7,
167:16, 172:10,

Transcript of David Sandoz
Conducted on March 5, 2020

118

191:5, 196:8,
205:3, 206:4,
206:9, 206:16,
207:19, 208:1,
209:14, 210:9,
211:7, 214:15,
215:9, 219:16,
222:6, 222:20,
223:11, 245:7,
245:21, 249:18,
250:6, 254:21,
281:16, 305:18,
323:3, 327:11,
335:4, 341:17,
342:4, 353:9,
353:12, 353:19,
353:21
**morning**
14:13, 14:14,
114:7
**most**
20:22, 31:3,
128:16, 251:11,
318:14, 349:11
**mostly**
22:10
**mouth**
39:5, 40:22,
81:2, 84:16,
84:18, 103:5,
115:7, 319:1
**move**
183:4, 183:7
**moved**
211:8, 217:1,
335:6
**movement**
337:7
**moving**
340:5
**much**
22:17, 27:6,
63:4, 115:6,
118:20, 217:16,
236:14, 256:7,
271:15, 311:11,
330:16, 347:19,
354:5

**multi-family**
244:4
**municipal**
22:15
**murray**
255:15
**must**
23:5, 34:2,
62:7, 128:8,
128:16, 167:13,
205:19, 208:9
**myself**
235:1

**N**

**nagel**
5:7, 5:15,
5:18, 5:21, 6:7,
6:11, 6:14,
6:21, 7:4, 7:17,
8:7, 8:15, 8:20,
24:13, 25:3,
37:14, 40:14,
49:20, 73:17,
82:11, 95:1,
95:3, 96:19,
132:12, 144:1,
147:20, 154:11,
158:21
**nagel's**
149:10, 150:12,
151:22
**name**
13:10, 66:2,
70:9, 100:19,
105:22, 106:22,
179:18, 179:21,
179:22, 201:11,
201:14, 240:9,
251:16, 257:18,
257:19, 258:4,
259:18, 259:19,
268:12
**named**
184:10, 310:21,
320:19, 355:9
**names**
222:10

**nate**
244:17
**nathan**
251:22
**nature**
36:5, 91:15,
200:15, 200:18,
294:13, 295:16,
296:19, 300:14,
304:9
**near**
72:22, 147:19,
162:17
**necessarily**
57:21, 80:20,
256:20, 292:15,
292:18
**necessary**
30:17, 102:18,
211:10, 212:9,
213:19, 335:8,
336:4
**necessity**
336:10
**need**
15:20, 45:12,
55:17, 56:22,
77:22, 78:1,
78:17, 86:8,
95:9, 103:8,
113:1, 113:2,
116:5, 141:7,
153:15, 159:3,
177:16, 179:18,
194:16, 198:8,
202:13, 208:1,
208:4, 211:2,
212:22, 213:6,
215:9, 252:20
**needed**
91:16, 95:3,
95:13, 110:12,
116:21, 149:10,
159:12, 171:15,
171:22, 312:1
**needs**
33:8, 33:15,
44:13, 44:19,

182:22
**negotiate**
62:17, 164:3
**negotiated**
110:3, 119:22,
128:10, 164:1,
164:18, 260:18,
278:2, 278:16,
278:20, 328:6
**negotiating**
271:5
**negotiations**
154:13, 304:1
**neither**
355:19
**never**
223:17, 238:14,
241:9, 247:14,
252:11, 252:15,
273:10, 273:11,
285:19, 330:5
**new**
20:14, 20:17,
131:7, 131:9,
139:3, 173:5,
188:2, 189:14,
189:15, 192:17,
193:1, 193:6,
193:8, 194:1,
198:2, 198:9,
210:7, 211:8,
215:3, 216:1,
216:5, 216:13,
217:1, 217:9,
231:13, 232:15,
234:15, 235:11,
241:13, 250:7,
278:10, 323:22,
326:21, 327:4,
333:6, 335:12,
336:1, 336:12,
336:21, 337:17,
342:7, 342:8
**news**
82:22
**newspaper**
82:21
**newspapers**
82:15

next
24:15, 33:4,
39:19, 86:13,
86:15, 90:12,
117:15, 131:8,
131:10, 132:4,
210:20, 216:20,
224:10, 233:11
nexus's
25:12, 38:10,
39:13, 43:8,
55:22, 56:5,
78:7, 112:16,
117:21, 169:3,
176:21, 208:15,
216:22, 224:19,
240:16, 245:4,
245:5, 245:9,
245:16, 254:8,
267:3, 267:6,
282:16, 287:7,
287:8, 287:10,
287:22, 288:6,
288:11, 288:16
nice
83:8, 120:13
night
65:10
nine
288:14
nod
15:4
none
259:8
nonparty
4:2, 13:21,
36:21
nope
345:1, 351:5
north
4:6
notary
21:19, 22:14
note
94:14, 178:5,
199:9, 200:7,
200:15, 201:2,
201:13, 337:6

noted
199:20
notes
104:5, 199:15,
202:4, 202:5,
264:10, 265:12
nothing
14:8, 67:11,
71:1, 75:15,
286:13, 287:5,
307:7, 355:10
notice
2:13, 44:12,
134:16, 134:17,
178:15, 180:5,
181:2, 181:11
noticed
65:9
notices
134:9, 135:13,
135:19, 136:16,
137:1, 138:1,
145:2, 172:19,
172:22, 177:17,
196:4, 218:5
notification
134:19, 194:18
notifications
134:5, 135:1
notified
134:16
november
94:2, 95:1,
169:14, 172:20,
196:5, 196:13,
197:12, 197:13,
197:14, 198:7,
216:18, 217:15,
217:19, 231:12,
232:9, 267:10,
267:14, 268:20,
269:4, 279:17,
279:21, 288:10,
339:1, 339:3
number
5:6, 6:2, 7:2,
8:2, 9:2, 10:2,
11:2, 12:2,

13:2, 27:1,
30:22, 49:10,
62:2, 62:8,
102:3, 102:8,
163:16, 179:8,
179:13, 179:17,
246:4, 246:12,
251:5, 281:16,
281:17, 341:12,
341:13, 342:14,
342:19
numbers
54:4, 177:9,
207:6
nw
3:16

O

oath
355:13
object
38:17, 40:16,
74:7, 80:17,
84:11, 103:8,
287:15, 288:2,
313:1, 314:5,
314:6, 316:11,
316:22, 326:14,
326:20, 331:17
objecting
319:2, 326:3,
341:2
objections
69:8, 70:13,
71:5, 102:11,
115:22, 314:17,
326:17, 326:18,
326:21, 332:1,
355:17
obligation
28:5, 90:3,
92:19, 288:17
obligations
33:21, 48:7,
81:12, 127:17,
176:21, 203:21,
204:12, 204:17,
204:20, 325:9,

344:8, 345:3,
345:5
obligee
56:15, 56:19,
57:16, 302:10,
306:7
obligor
322:7
observe
33:6
observed
38:16
obtain
16:18
obtained
160:20, 165:7,
165:9
obviously
38:9, 57:17,
67:17, 68:12,
133:15, 220:18,
250:7, 272:6,
287:22, 296:4
occasions
283:11
occur
125:22
occurred
38:22, 270:13
october
169:13, 172:20,
194:6, 194:8,
226:21, 339:1,
339:3
offer
264:9
offered
262:8
offering
298:21
office
124:8, 124:11,
204:9, 204:10
officer
244:12
officers
123:16, 124:8,
243:4, 243:15,

Transcript of David Sandoz
Conducted on March 5, 2020

120

250:16
**oh**
40:3, 137:17,
138:8, 159:2,
226:14
**old**
87:15
**once**
20:19, 50:14,
95:3, 181:16,
273:5, 340:14
**one-third**
216:22
**ones**
125:4, 125:16,
131:8, 202:7,
245:1, 289:18
**only**
19:1, 33:17,
38:18, 44:11,
52:14, 54:12,
102:20, 103:12,
138:7, 181:7,
196:6, 206:5,
206:17, 207:20,
209:6, 222:9,
249:3, 264:14,
322:21
**oops**
260:2
**open**
57:12, 115:17,
303:14
**operates**
291:17
**operating**
254:3
**operation**
38:11, 83:17,
195:9, 217:2
**operations**
33:6, 38:1,
39:13, 41:21
**opinion**
27:2, 69:1,
245:19, 298:21,
324:3, 326:4,
330:14

**opinions**
325:17
**opportunity**
45:3, 122:9,
170:18, 233:9,
234:5, 285:19
**option**
216:3, 216:4
**options**
181:7
**order**
22:3, 25:13,
30:10, 44:13,
55:22, 87:18,
87:21, 94:15,
103:20, 125:9,
178:5, 198:14,
222:11, 239:6,
239:7, 291:13,
324:8
**ordered**
93:2, 94:3
**original**
310:10, 341:16
**originally**
148:7
**orlando**
184:12, 184:14
**other**
15:3, 16:2,
16:15, 18:20,
19:4, 19:13,
19:14, 21:22,
22:9, 22:13,
42:9, 44:11,
72:7, 75:7,
77:2, 77:21,
98:18, 129:2,
140:5, 140:14,
141:18, 157:6,
157:10, 163:3,
170:14, 177:9,
179:20, 193:17,
196:15, 202:19,
212:17, 212:19,
230:22, 237:10,
242:9, 244:7,
252:1, 252:6,

253:20, 260:17,
275:19, 298:13,
300:9, 340:12,
343:22
**others**
24:14, 140:7,
140:20, 170:20,
187:12
**otherwise**
63:20, 64:16,
154:13
**out**
15:20, 22:13,
37:22, 38:10,
43:10, 43:12,
46:3, 55:8,
57:5, 58:1,
60:1, 63:8,
76:7, 85:21,
86:19, 87:6,
87:13, 87:15,
109:15, 113:13,
113:14, 130:8,
137:5, 145:19,
146:3, 159:4,
171:2, 173:4,
183:1, 196:13,
206:19, 219:17,
220:18, 223:8,
239:15, 241:4,
245:2, 255:19,
255:20, 260:2,
275:2, 285:22,
290:19, 321:4,
341:16
**outside**
23:4, 126:5,
306:14, 349:18
**outstanding**
208:5, 208:14,
208:16, 209:1,
213:7, 213:14,
214:16, 305:17,
306:20, 307:2,
307:4
**over**
28:21, 38:19,
64:11, 142:9,

157:19, 173:5,
173:14, 173:19,
188:2, 188:3,
188:19, 192:4,
202:6, 205:4,
210:14, 214:10,
214:14, 217:10,
260:7, 275:6,
293:22, 294:1,
330:15, 331:2,
333:7, 336:1,
336:2, 336:8,
336:9, 337:15,
353:11, 354:1
**overall**
17:17, 61:18
**oversight**
21:1
**overview**
105:20, 107:14
**owed**
176:12, 194:12
**owing**
157:2
**own**
22:9, 53:3,
63:7, 157:13,
216:9, 237:14,
246:2, 251:21,
330:1
**owned**
239:14
**owner**
170:6, 235:16,
235:20, 252:7,
255:6
**ownership**
98:13, 100:2,
144:14, 235:12,
247:15, 248:9
**owning**
216:14
**owns**
237:20, 251:22

**P**

**packet**
145:4, 146:4

Transcript of David Sandoz
Conducted on March 5, 2020

121

page
5:2, 5:6, 6:2,
7:2, 8:2, 9:2,
10:2, 11:2,
12:2, 48:12,
49:17, 50:8,
51:4, 51:18,
53:5, 53:7,
54:19, 54:21,
55:1, 55:2,
55:7, 55:9,
61:6, 61:7,
61:16, 63:16,
64:7, 64:8,
79:19, 83:16,
86:14, 106:16,
107:13, 107:21,
116:10, 122:4,
122:5, 132:4,
136:11, 136:12,
142:12, 147:4,
147:8, 147:19,
182:7, 196:20,
216:5, 223:1,
238:5, 261:2,
261:3, 263:14,
317:7, 319:13
pages
1:21, 355:15
paginations
82:5
paid
181:15, 181:18,
182:13, 185:11,
205:19, 219:12,
242:21, 247:8,
261:10, 262:1,
275:6, 291:7,
292:5, 293:9,
303:18, 303:22,
306:6
paper
162:2, 162:12
paperwork
192:16, 193:22,
224:17, 224:20
paragraph
25:21, 29:11,

29:15, 51:16,
56:9, 84:8,
218:20, 232:20,
233:20, 238:7,
256:9, 270:4,
270:8, 270:12,
272:21, 286:4,
288:14, 295:21,
297:13, 303:15,
305:11, 320:19,
320:20, 320:22,
321:1, 321:8,
321:16, 321:18,
322:5, 323:11,
324:13, 324:17,
324:18, 325:1,
345:16
parameters
343:22
parenthesis
27:14, 29:1
parse
15:20
part
20:13, 21:6,
53:4, 56:2,
60:1, 84:4,
84:5, 84:21,
92:22, 117:9,
123:20, 124:6,
124:14, 124:15,
148:12, 168:14,
206:15, 212:3,
212:18, 216:9,
216:13, 216:14,
224:19, 234:15,
234:19, 235:10,
235:11, 247:3,
256:3, 256:4,
271:20, 275:16,
278:22, 295:18,
297:1, 298:9,
315:14, 318:18,
330:19
partial
310:4
participant
239:1

participants
26:5, 33:20,
34:6, 42:3,
89:13, 91:7
participate
215:7
particular
17:18, 30:16,
130:22, 131:6,
131:7, 141:16,
154:4, 166:13,
166:16, 168:5,
172:3, 182:19,
206:8
parties
72:7, 134:14,
171:14, 233:6,
266:10, 275:1,
325:10, 355:21,
355:24
partner
162:16, 240:21
partnership
101:6, 175:21,
238:12, 238:14
parts
66:3
party
44:11, 76:20,
90:11, 90:19,
125:7, 125:20,
126:5, 135:12,
135:13, 251:11,
304:22, 346:4
pass
75:22, 203:7,
284:16, 316:8,
319:18
passed
200:7
passing
199:15
past
196:4, 218:5,
225:3, 235:19,
326:18, 341:13
pattern
275:5

pay
33:1, 110:1,
127:8, 152:16,
158:6, 161:10,
161:14, 164:19,
175:7, 176:21,
177:4, 218:14,
218:16, 219:16,
223:15, 226:8,
226:12, 257:4,
272:8, 272:17,
274:22, 288:17,
289:9, 289:18,
291:8, 291:10,
292:8, 293:5,
295:14, 296:17,
297:15, 300:11,
301:9, 302:10,
302:14, 302:16,
303:20, 304:3,
304:6, 306:9,
325:13, 331:12,
334:2, 337:20
paying
59:20, 130:13,
161:1, 184:19,
185:16, 219:6,
220:18, 223:7,
247:12, 288:21
payment
132:8, 148:7,
150:17, 150:18,
181:4, 185:8,
194:7, 220:4,
230:22, 288:22,
289:1, 291:12,
292:8, 302:17
payments
108:10, 148:8,
150:1, 152:16,
194:9, 194:12,
194:16, 218:7,
224:10, 252:15,
270:14, 280:1,
291:11, 302:18
pays
331:13
pdf
354:14

Transcript of David Sandoz
Conducted on March 5, 2020

122

peck
233:13, 233:16
penal
80:14, 208:16,
307:3
penalty
80:16, 81:16
pend
151:10
pending
29:2, 51:8,
76:11, 78:10,
109:4, 117:6,
117:19, 135:9,
141:10, 165:4,
287:14, 287:21,
340:16, 344:15,
348:10, 350:6,
351:12, 351:17,
352:4
people
44:1, 125:18,
237:10
peoria
1:14, 2:8, 4:7,
13:13
percent
26:14, 28:21,
29:2, 47:16,
47:21, 48:1,
89:22, 175:12,
208:4, 213:6,
213:10, 213:15,
251:22
perform
272:3
performance
26:1
performed
224:3, 309:6
performing
247:22
perhaps
50:19, 51:13,
113:10, 156:15,
174:9, 192:5,
206:10, 262:22,
281:17, 352:13,

352:17, 352:18
period
19:5, 20:10,
258:11, 275:6,
339:9
periodically
208:6, 213:8
permanent
243:10
permit
22:16, 340:15
person
40:6, 125:16,
136:15, 136:22,
172:3, 318:16,
352:7
personal
199:22, 200:2,
200:15, 200:17,
254:2, 254:5
personally
283:14
persons
332:1
pertinent
286:14
peters
266:21
philadelphia
240:9, 240:10,
240:17, 241:1,
246:19, 246:22,
247:7, 247:8,
247:11, 247:12,
247:22, 254:9,
258:21, 259:1,
259:6, 259:10,
260:13, 260:22,
261:4, 261:15,
262:14, 263:15,
267:12, 268:22,
269:12, 269:20,
284:22, 285:17
phoenix
88:14
phone
23:3, 43:15,
153:3, 157:10,

170:17, 266:10
phonetic
255:15
physically
74:13
pick
15:7, 285:22
picture
97:9
piispanan
220:14
piispanen
8:13, 9:18,
11:6, 11:9,
139:5, 218:12
pin
99:9
place
3:6, 13:12,
91:11, 91:18,
92:6, 154:3,
164:6, 175:21,
181:12, 192:18,
193:1, 193:6,
193:9, 193:14,
197:8, 238:15,
272:4, 310:13,
316:5, 317:3,
318:1, 336:11
placed
270:21, 317:6,
329:2
placing
316:19
plain
158:1
plaintiff
1:6, 3:3
plan
162:18, 342:8
planet
13:11, 14:1
planned
98:6, 98:7,
207:13
plans
37:22
pleasant
37:5

please
13:14, 14:3,
14:22, 15:6,
82:14, 84:14,
96:15, 118:6,
178:21, 199:4,
228:19, 295:6,
302:5, 314:16,
322:15, 323:9,
323:16, 325:21,
326:1, 327:10,
327:21, 330:20,
341:13, 354:14
point
17:13, 35:13,
43:9, 48:20,
51:2, 57:12,
59:11, 79:11,
89:2, 91:21,
95:8, 99:2,
103:12, 112:11,
112:13, 113:5,
113:6, 119:15,
120:1, 120:12,
120:15, 128:8,
131:6, 131:22,
148:22, 152:9,
153:18, 156:20,
166:18, 167:10,
168:21, 169:5,
171:3, 176:19,
177:2, 183:8,
185:16, 190:15,
191:12, 198:6,
206:14, 208:6,
210:5, 210:10,
210:19, 213:8,
213:15, 214:19,
215:22, 216:7,
216:20, 217:20,
225:2, 237:15,
253:16, 254:7,
255:12, 273:9,
274:9, 306:3,
321:3, 323:1,
336:19, 338:16,
350:2, 351:13
poorly
296:6

Transcript of David Sandoz
Conducted on March 5, 2020                                    123

portion
21:10, 21:12,
21:13, 21:17,
47:2, 68:2,
68:3, 68:5,
76:17, 286:15,
287:4, 299:8,
314:19, 326:12,
327:13
portions
67:19
position
18:5, 75:8,
142:7, 142:9,
157:1, 171:17,
205:2, 248:12,
258:11
positive
281:8
possibility
217:12
possible
189:16, 204:17,
234:11, 255:13
possibly
68:19, 330:5
post
29:22, 30:4,
100:21, 254:19,
277:2, 277:4,
279:7, 349:14
posted
28:22, 31:10,
324:11
posting
100:17
potential
30:11, 31:11,
32:2, 32:5,
32:6, 32:14,
233:17
potentially
278:13
pre
254:19, 254:21
predate
337:6
prefer
104:2, 204:11

preferable
211:7, 335:5
prefers
203:19
preliminary
279:20
premium
194:9, 194:12,
233:1, 330:17,
333:8
premiums
126:18, 173:21,
184:19, 185:8,
185:15, 185:17,
217:1
prep
171:17
prepare
120:3, 280:9,
280:19, 280:21
prepared
25:3, 66:10,
75:4, 133:6,
134:13, 259:11,
259:15, 260:16,
286:19, 287:8
preparing
111:13, 282:18
present
4:11, 69:1,
244:18, 294:21
presented
61:4, 174:3,
182:13, 262:13,
262:14, 303:4,
305:19, 306:15,
309:21, 311:7,
324:7
president
17:12, 17:15,
18:3, 18:6,
284:6
presumably
73:19, 73:20
presume
46:6, 66:14,
72:7, 72:16,
72:19, 75:5,

83:5, 85:13,
141:2, 311:9
presuming
140:10
pretty
170:16
previous
37:13, 37:19,
82:11, 89:19
previously
310:2, 318:19,
329:2, 329:7
primarily
217:17, 345:10
primary
37:14, 80:1,
148:15, 244:4,
279:17
principal
76:18, 76:21,
77:2, 81:12,
90:4, 181:13,
346:3
principals
197:1, 242:22
print
296:6
prior
18:17, 39:12,
40:6, 74:20,
97:9, 97:17,
105:12, 109:20,
110:11, 113:15,
114:17, 119:2,
123:9, 129:13,
165:1, 224:13,
231:11, 232:1,
252:14, 261:14,
308:8, 308:11,
324:14
privacy
179:22
private
20:8
privilege
65:22, 66:20,
67:7, 67:17,
67:18, 68:18,

69:3, 69:6,
70:22, 71:1,
71:7, 71:18,
199:6, 199:12,
199:21, 200:1,
200:3, 280:11,
280:16, 287:18,
299:5, 299:10,
310:12, 313:13
privileged
67:12, 68:1,
68:2, 68:17,
199:16, 286:8,
299:2, 299:4
probably
40:10, 124:5,
126:11, 172:7,
204:9, 210:16,
225:10, 226:15,
226:21, 237:15,
247:4, 270:19,
273:12, 309:5,
353:7
problem
37:18, 54:13,
158:17, 260:8,
277:8, 340:5
problems
278:4, 280:3,
304:21
procedure
20:12
proceed
36:17, 51:22,
105:4, 141:8
proceeded
104:16, 234:8
proceeding
112:15, 354:8,
354:17
process
20:17, 21:6,
27:22, 41:17,
56:3, 59:22,
60:1, 60:3,
72:8, 85:10,
87:14, 89:18,
93:1, 117:10,

Transcript of David Sandoz
Conducted on March 5, 2020

124

123:16, 124:6,
126:12, 129:5,
129:12, 134:4,
134:14, 134:22,
137:9, 138:2,
145:5, 146:6,
146:8, 164:21,
171:8, 171:16,
181:1, 189:14,
223:18, 237:1,
249:19, 288:21,
308:14, 308:16,
309:13, 333:15
**processed**
111:16, 111:22,
112:13, 113:4,
115:1, 115:15,
117:17, 118:18,
136:10, 147:13
**procure**
346:17, 347:12
**produced**
65:6, 70:18,
106:2, 320:7,
320:13
**product**
67:18, 189:10
**products**
25:9
**professional**
2:14, 16:16,
322:20, 355:33
**proffered**
299:21
**profit**
52:20, 53:18,
54:18, 55:11,
254:3
**profitability**
17:18
**program's**
26:2
**programs**
20:10, 25:8,
189:7
**progress**
198:2, 211:18,
211:22, 334:14

**projection**
52:20
**proper**
34:20, 56:18
**proposal**
331:12, 336:11
**proposed**
333:6
**prospect**
4:6
**protect**
30:11, 31:10,
32:14, 277:13,
299:9
**protected**
324:9
**protection**
31:18
**protective**
44:13, 87:18,
87:20, 94:15,
178:5, 198:14,
222:11, 239:6,
239:7
**protects**
297:15
**provide**
30:5, 30:20,
44:22, 48:18,
53:18, 64:9,
104:3, 107:6,
109:1, 111:9,
156:21, 157:15,
170:2, 176:16,
211:10, 212:9,
271:11, 273:15,
296:16, 303:6,
305:16, 335:8,
336:5, 344:8,
345:3
**provided**
26:1, 42:9,
46:4, 49:20,
53:21, 54:2,
59:4, 66:13,
72:12, 73:11,
74:18, 84:20,
103:14, 104:13,

107:14, 123:9,
129:22, 132:12,
133:13, 138:3,
147:12, 179:15,
187:6, 253:12,
253:17, 267:9,
271:13, 309:16
**provider**
87:7, 87:14
**provides**
119:11, 289:5,
295:13, 303:16,
303:18
**providing**
33:8, 33:15,
95:2, 118:17,
136:9, 176:6,
178:10, 178:14,
180:4, 223:3,
256:19
**provision**
210:4, 263:16,
264:1, 264:2,
313:19, 347:18
**pulled**
260:4
**purport**
299:13
**purports**
297:10
**purpose**
25:8, 166:3,
303:1, 329:15,
329:18, 336:11,
343:7, 343:9
**purposes**
15:18, 39:11,
179:22
**pursuant**
2:13, 124:18,
152:3
**pursuing**
214:21
**put**
35:8, 35:9,
39:5, 50:16,
65:13, 67:9,
71:14, 81:2,

84:16, 84:18,
100:10, 103:5,
106:9, 134:18,
145:3, 191:7,
191:10, 191:14,
202:5, 211:21,
260:4, 266:14,
275:12, 275:13,
275:16, 277:9,
286:4, 319:1,
323:20, 324:7,
325:4, 331:19,
333:9, 334:12,
344:5
**putting**
40:21, 60:4,
68:6, 94:19,
115:7, 313:16,
316:15, 323:18,
349:19

---

### Q

**qualifications**
16:16
**qualify**
211:13, 335:11
**quarter**
247:5
**questioning**
103:15, 103:16,
325:5
**questions**
14:20, 25:22,
34:13, 37:1,
39:11, 40:18,
41:9, 45:19,
52:16, 53:14,
65:12, 65:14,
68:11, 78:10,
100:8, 102:11,
102:17, 102:22,
103:9, 125:12,
142:13, 142:19,
165:2, 168:15,
201:7, 231:19,
234:6, 251:8,
266:12, 266:13,
281:4, 281:11,

Transcript of David Sandoz
Conducted on March 5, 2020

125

281:13, 281:14,
287:13, 300:9,
311:14, 316:15,
322:17, 328:10,
328:17, 341:1,
341:10, 343:2,
344:4, 353:11
**quick**
44:12, 45:19,
96:12, 225:16,
353:19
**quicker**
37:20
**quickly**
108:19, 220:22
**quite**
69:2, 226:22,
309:9

**R**

**raise**
69:8
**raised**
348:2
**ran**
88:13, 123:21,
209:14
**range**
18:18, 19:9,
58:14
**rare**
30:13
**rash**
353:16
**rate**
26:12, 26:18,
26:19, 27:6,
27:11, 28:13,
62:19, 89:9
**rather**
50:20, 60:13,
336:8, 336:9
**ratio**
47:17
**raved**
73:1
**re-evaluate**
62:20

**reached**
159:4
**reaches**
196:13
**read**
36:15, 45:6,
82:14, 87:10,
88:18, 98:1,
108:3, 120:21,
137:14, 137:16,
179:18, 182:14,
199:2, 199:9,
199:17, 206:15,
207:16, 212:3,
215:21, 219:1,
219:3, 221:4,
229:3, 229:5,
257:12, 284:17,
284:18, 284:19,
295:22, 296:9,
297:1, 298:13,
301:2, 311:16,
314:16, 314:19,
315:17, 321:15,
321:21, 322:5,
323:8, 323:11,
324:13, 326:10,
326:12, 326:16,
326:19, 327:10,
327:13, 332:5,
347:21
**reading**
45:10, 50:15,
55:19, 61:11,
142:1, 148:3,
157:13, 179:22,
201:22, 202:20,
207:12, 211:16,
213:4, 219:14,
230:13, 233:1,
265:5, 265:16,
289:21, 290:14,
300:18, 326:17
**ready**
51:5, 51:6,
60:7, 81:19,
120:11, 207:8,
247:13

**real**
253:20, 311:10,
338:21
**realize**
206:21, 225:2
**really**
36:10, 102:10,
114:3, 116:19,
119:4, 126:6,
128:11, 128:22,
148:15, 148:20,
172:22, 179:18,
229:20, 252:19,
253:21, 269:5,
269:10, 285:11,
317:15, 318:21,
353:17
**reason**
15:9, 24:20,
26:8, 47:12,
50:5, 64:14,
64:15, 66:15,
72:10, 74:1,
93:7, 93:9,
94:6, 94:7,
108:5, 110:17,
132:21, 134:1,
138:4, 139:20,
140:2, 140:11,
142:2, 142:20,
143:5, 144:6,
146:13, 148:4,
150:11, 151:14,
156:13, 160:14,
160:16, 166:6,
168:6, 176:10,
178:13, 180:7,
180:20, 185:5,
186:12, 186:15,
190:22, 195:18,
197:21, 198:22,
215:19, 229:15,
231:6, 231:8,
258:12, 296:19,
297:19, 303:21,
304:10, 305:5,
346:18
**reasons**
170:21, 188:10

**rebated**
273:18
**recalls**
38:21
**recap**
25:1
**receipt**
7:7, 7:12,
77:13, 77:15,
77:16, 159:16,
339:19, 343:3,
343:14, 343:15
**receive**
52:21, 77:6,
136:22, 148:1,
148:18, 149:11,
154:21, 168:10,
246:8, 338:9,
338:11
**received**
53:5, 109:7,
109:12, 135:19,
147:22, 152:14,
153:14, 159:9,
163:6, 181:1,
185:15, 233:6,
240:13, 242:18,
271:16, 333:8
**receiving**
81:20, 115:21,
172:19, 177:16,
218:5, 228:15
**recently**
87:13
**recess**
60:20, 102:5,
121:8, 122:20,
138:16, 225:22,
251:2, 307:18,
342:16
**recognize**
258:18, 318:4,
329:5
**recollect**
154:2
**recollection**
23:13, 39:10,
40:1, 51:10,

Transcript of David Sandoz
Conducted on March 5, 2020

126

63:22, 72:11,
83:11, 87:4,
93:16, 95:16,
103:3, 108:16,
110:22, 118:8,
119:1, 119:15,
121:20, 128:5,
132:19, 148:10,
152:1, 152:20,
154:3, 154:22,
155:3, 156:10,
169:20, 172:21,
180:3, 180:19,
183:20, 185:17,
190:11, 202:15,
203:3, 219:5,
222:8, 224:22,
250:20
**recommended**
255:15, 263:4
**record**
35:9, 35:15,
36:16, 37:9,
37:20, 42:6,
43:17, 47:9,
55:4, 60:18,
60:22, 65:13,
65:18, 66:18,
68:7, 69:18,
71:15, 74:16,
79:13, 86:9,
86:17, 89:14,
89:17, 89:20,
89:22, 93:5,
94:6, 94:14,
94:20, 102:3,
102:7, 103:13,
103:18, 121:6,
121:10, 121:22,
122:14, 122:16,
122:18, 122:22,
138:14, 138:18,
155:17, 155:21,
178:4, 179:1,
179:5, 179:7,
179:12, 179:19,
196:20, 197:3,
198:13, 199:15,

200:6, 200:22,
220:1, 225:20,
226:2, 235:7,
237:9, 239:5,
239:10, 250:18,
250:22, 251:4,
307:10, 307:16,
307:20, 312:10,
314:18, 314:19,
317:4, 326:12,
327:13, 339:16,
342:14, 342:15,
342:18, 349:19,
354:8, 354:10,
355:16
**records**
38:13, 39:17,
55:18, 70:14,
70:17, 70:19,
206:5, 206:17,
207:20, 219:20,
244:20
**recover**
294:12
**red**
251:18, 251:19,
252:2, 252:12,
252:16
**redacted**
65:7, 65:14,
65:18, 66:3,
67:3, 67:5,
67:15, 67:20,
68:13, 69:4,
69:19, 69:21,
70:5, 310:10,
310:11, 311:12,
313:12
**redactions**
310:4
**reduce**
61:9
**reduced**
61:13, 175:5,
328:8, 355:13
**redundant**
94:12
**refer**
15:17, 97:14,

202:13, 218:6,
231:15, 241:14,
260:6, 267:20,
320:18, 328:1,
328:10, 332:18,
336:10, 339:12
**reference**
89:21, 208:19
**referencing**
62:10, 73:3,
89:3, 90:18,
126:9, 206:18,
208:22, 270:15,
307:3, 347:2
**referral**
225:4
**referred**
223:16
**referring**
15:19, 156:12,
227:11, 229:19,
293:6, 295:19,
310:19, 324:4,
334:19
**refers**
161:3
**reflect**
86:9, 155:18,
185:7, 196:20,
200:7, 219:20,
310:15
**reflection**
72:12, 110:21
**reflects**
116:8, 121:22,
151:18, 155:21,
183:22, 220:2,
239:5
**refresh**
51:10, 83:11,
87:4, 93:16,
103:2, 118:7,
118:22, 121:19,
128:5, 145:14,
154:22, 156:10,
180:3, 180:6,
180:18, 183:20,
202:14, 219:4,

222:7, 250:19
**refreshed**
155:5
**refreshing**
155:2
**refusing**
200:14
**regard**
15:13, 22:21,
35:18, 48:10,
48:13, 52:22,
53:19, 76:19,
120:8, 128:13,
128:19, 135:19,
144:4, 162:11,
180:12, 193:20,
198:3, 208:12,
221:15, 223:4,
229:9, 244:15,
245:11, 246:1,
255:17, 270:3,
282:7, 288:13,
298:8, 347:10,
347:17
**regarding**
186:9, 200:10,
218:12, 261:4,
262:20, 270:14,
270:21, 298:11
**regards**
299:21, 333:1
**registered**
2:14, 355:33
**regular**
124:9
**reimbursement**
248:18, 252:15
**reinsurance**
240:11, 240:18,
241:1, 246:19,
246:22, 247:7,
247:8, 247:11,
247:13, 247:22,
254:9, 258:21,
259:2, 259:7,
260:13, 261:15,
267:12, 268:22,
269:20, 284:22,

**relate**
349:5
**related**
26:1, 68:4,
137:1, 156:4,
198:1, 200:18,
231:1, 244:4,
247:16, 250:15,
270:19, 273:8,
281:16, 355:20
**relates**
126:12, 130:22,
249:6, 332:14,
332:16
**relating**
281:3, 281:4
**relation**
311:14
**relationship**
97:20, 98:4,
98:21, 99:8,
99:11, 100:3,
101:3, 101:9,
144:11, 144:19,
176:7, 218:18,
219:7, 220:20,
221:17, 221:19,
223:10, 237:3,
242:3, 244:11,
247:21, 254:15,
254:16, 254:17,
254:22, 255:22,
268:17, 274:9,
276:4, 276:20,
277:16, 315:14,
328:6, 330:16
**relative**
355:23
**relay**
271:2, 331:12
**relayed**
140:5, 140:7,
171:9, 190:7,
223:18
**relaying**
67:21, 140:19,
140:20, 225:10

285:17

**release**
28:2, 130:16,
130:20
**released**
50:14, 56:14,
56:20, 57:16,
59:13, 62:16,
123:17, 131:4
**relevance**
317:15
**relevant**
332:13
**rely**
56:5
**relying**
92:16
**remain**
208:2
**remaining**
133:10
**remains**
207:22
**remedy**
345:18
**remember**
26:21, 30:18,
33:17, 40:10,
40:20, 41:3,
41:6, 50:18,
54:4, 54:6,
74:13, 83:13,
84:12, 89:3,
89:5, 100:19,
128:11, 129:4,
131:21, 132:16,
140:12, 151:6,
158:16, 163:22,
172:22, 174:19,
193:19, 229:22,
231:5, 237:19,
239:21, 259:18,
259:19, 263:1,
269:5, 269:10,
273:7, 273:14,
274:3
**remembers**
39:5, 74:12
**reminded**
196:14

**reminder**
149:18
**remove**
336:12
**removed**
27:20, 29:1,
29:6
**renegotiate**
164:9
**renegotiated**
148:11, 152:20,
156:15, 156:16,
164:11, 351:11
**renegotiating**
154:14
**renumeration**
242:19
**repeat**
92:12, 118:6,
138:7, 241:9,
288:4, 327:21
**repeatedly**
158:8
**rephrase**
99:19, 290:5
**replace**
173:19, 211:6,
212:4, 335:4
**replaced**
211:9, 212:8,
213:18, 335:7,
336:4
**replacement**
347:16
**replacing**
210:6, 210:11,
210:13, 211:18
**replenish**
161:17
**report**
94:1, 196:14
**reported**
1:22, 165:6
**reporter**
2:14, 2:15,
14:1, 14:3,
15:4, 15:7,
84:17, 153:7,

310:17, 327:12,
354:13, 355:6,
355:33
**reporter's**
38:20
**represent**
13:15, 65:18,
68:3, 308:5
**representation**
67:9, 87:19,
112:10, 112:12,
309:18
**representations**
56:5, 72:1,
115:2
**representing**
13:11, 14:1,
312:11, 312:15,
332:2
**request**
59:3, 74:21,
80:2, 80:11,
112:16, 169:3,
209:2, 227:9,
228:20, 230:4,
249:10, 268:14,
275:17, 276:2,
301:12, 330:18,
352:14, 352:19
**requested**
30:4, 81:15,
93:10, 93:22,
96:1, 137:22,
162:2, 202:15,
203:4, 264:15,
266:7, 276:3,
314:19, 326:12,
327:13
**requesting**
52:2, 52:5,
61:20, 96:7,
109:20, 116:4,
132:6, 158:5,
277:5
**requests**
113:7, 124:18
**require**
152:15, 213:1,

Transcript of David Sandoz
Conducted on March 5, 2020

128

213:14, 214:15,
276:2, 283:22,
284:1, 284:2,
295:14, 305:16
**required**
22:3, 29:22,
30:10, 32:22,
51:21, 58:18,
90:5, 104:19,
108:16, 119:1,
124:1, 166:22,
182:13, 196:1,
205:1, 291:12,
293:8, 300:11,
335:22
**requirement**
62:9, 208:9,
213:22, 275:14,
275:15
**requirements**
58:20, 113:12,
113:14, 115:3,
117:3, 125:10,
135:14
**requiring**
18:15, 78:13,
114:9, 157:15,
288:21, 297:15
**research**
237:14
**reserve**
70:12, 71:5,
71:7, 275:7,
275:9, 275:12,
275:13, 275:17,
277:2, 277:5,
277:10, 277:22,
278:21, 279:8,
279:12, 324:15
**reserves**
324:7, 324:10,
324:11
**reserving**
70:22
**resolution**
230:21
**resolved**
220:21

**respond**
67:14, 69:13,
113:3, 228:20
**responded**
114:22, 223:3
**respondent**
26:13, 27:1
**respondents**
28:13
**responding**
68:7, 68:8,
69:4, 70:6,
135:13, 310:21,
311:13
**response**
52:16, 53:8,
61:14, 61:15,
66:22, 67:5,
82:9, 82:12,
107:5, 108:1,
111:8, 118:19,
120:20, 122:6,
143:1, 187:6,
264:17, 286:11,
299:7, 311:12,
337:14
**responsibile**
308:15
**responsibilities**
17:8
**responsibility**
17:16, 17:17,
20:13, 312:21
**responsive**
230:3, 230:4
**rest**
175:13, 175:17,
311:19, 311:20
**restate**
15:1
**result**
220:3, 301:11,
302:10, 319:6
**results**
55:12, 63:17
**retire**
226:19, 227:1
**retired**
99:6, 106:3,

167:21
**retirement**
99:16, 106:5,
168:1
**return**
246:8, 273:6,
279:3
**returned**
32:20, 273:1,
274:2
**revert**
187:20
**review**
21:7, 37:17,
38:6, 38:10,
38:15, 39:13,
44:7, 45:3,
73:13, 76:7,
79:3, 82:22,
84:21, 85:5,
110:5, 113:19,
120:3, 122:9,
124:11, 155:4,
155:13, 155:20,
167:3, 182:22,
186:20, 199:20,
201:22, 202:12,
228:19, 244:20,
245:4, 253:7,
256:19, 263:20,
285:19, 285:21,
294:17, 349:5
**reviewed**
40:1, 75:7,
79:5, 79:6,
79:9, 83:12,
85:9, 147:11,
208:6, 213:8,
245:16, 323:4,
349:11
**reviewing**
64:1, 80:20,
122:1, 136:20,
138:2, 249:20,
254:8
**revised**
351:10
**rick**
5:7, 5:15,

5:18, 5:21, 6:7,
6:11, 6:14,
6:21, 7:3, 7:17,
8:7, 8:15, 8:20,
24:12, 25:3,
40:9, 55:8,
83:9, 96:19,
150:12, 151:22,
159:5
**ride**
322:18
**rights**
261:22, 262:7,
325:8, 325:9,
340:11, 345:4,
345:18, 352:11,
352:15
**risk**
33:10, 35:20,
57:15, 62:7,
62:11, 84:5,
89:9, 92:22,
131:4, 272:3
**risks**
60:2, 224:11
**rli's**
57:4, 173:14,
188:8, 188:12,
188:18, 193:1,
193:9, 205:2,
208:7, 208:19,
210:14, 210:20,
214:10, 214:14,
230:4, 241:18,
279:22, 352:11
**road**
4:6
**rock**
355:3
**role**
17:16, 20:9,
101:2, 282:4,
282:11, 283:15,
284:5
**roles**
17:7
**room**
2:6, 22:19,

Transcript of David Sandoz
Conducted on March 5, 2020

129

38:4, 42:14,
42:19, 62:17,
80:4, 83:4,
107:16, 195:14,
214:2, 270:10,
270:18, 295:10,
306:11, 333:4
**roughly**
18:3
**route**
211:7, 335:5
**rpr**
1:22, 355:32
**rule**
34:21, 35:1,
35:2, 35:4,
35:10, 36:16,
102:14, 102:15
**rules**
14:19, 276:13,
342:2
**run**
73:1, 99:15,
128:16
**running**
95:18, 95:20,
129:13, 165:20,
165:22, 168:8,
168:18, 353:4
**runs**
206:4, 206:16,
207:19

**S**

**said**
18:22, 19:2,
19:14, 22:13,
38:22, 39:2,
56:13, 69:22,
70:17, 80:19,
81:5, 82:12,
90:10, 102:21,
103:7, 103:10,
115:8, 115:11,
118:11, 131:15,
137:15, 139:20,
140:1, 143:3,
150:7, 152:11,

153:4, 153:9,
158:8, 158:15,
158:17, 158:18,
165:10, 172:13,
172:15, 174:7,
175:1, 176:11,
224:8, 234:1,
246:13, 246:17,
273:15, 283:7,
300:17, 318:19,
319:7, 319:9,
341:19, 343:6,
348:3, 348:4,
348:8, 350:14,
351:10, 355:12,
355:16
**sake**
50:2, 179:1
**same**
34:14, 86:15,
86:21, 115:22,
134:20, 139:11,
159:20, 159:21,
172:14, 179:21,
190:5, 191:11,
193:17, 293:22,
300:19, 304:14,
319:14, 328:18,
341:1, 353:10
**san**
237:21
**sandoz's**
105:22, 106:5
**satisfactory**
330:14
**saw**
114:4, 115:18,
119:7, 119:10,
149:4, 168:9,
222:10, 236:3,
236:8, 269:16,
288:9
**say**
14:21, 15:5,
15:17, 15:22,
17:10, 35:2,
37:3, 38:8,
39:16, 41:5,

42:5, 62:14,
63:5, 67:14,
69:18, 71:11,
72:18, 76:8,
77:5, 87:9,
102:14, 113:3,
115:9, 117:16,
125:16, 125:19,
130:6, 133:11,
134:5, 136:21,
145:21, 146:2,
150:14, 151:9,
153:9, 158:2,
158:9, 159:3,
160:5, 161:9,
162:4, 162:17,
165:16, 168:4,
176:2, 180:1,
191:16, 192:16,
193:5, 204:15,
206:2, 206:3,
206:15, 207:7,
211:2, 211:5,
212:7, 213:18,
220:17, 220:19,
222:3, 222:17,
224:10, 230:16,
237:22, 242:13,
270:12, 274:16,
287:5, 294:1,
297:10, 297:18,
304:18, 305:3,
306:18, 306:19,
306:21, 306:22,
307:1, 309:15,
312:22, 321:12,
329:21, 331:22,
333:18, 348:22,
350:12
**saying**
15:5, 29:5,
34:4, 34:16,
37:21, 39:7,
44:19, 56:21,
73:20, 86:17,
105:1, 106:21,
112:22, 118:18,
152:13, 157:13,

176:10, 182:7,
193:13, 201:1,
204:12, 205:17,
206:1, 221:7,
257:18, 276:15,
287:15, 289:4,
294:5, 306:19
**says**
24:14, 25:2,
25:20, 26:3,
26:11, 28:12,
28:15, 28:20,
34:21, 35:1,
51:4, 51:5,
52:9, 52:18,
55:8, 55:11,
59:7, 72:22,
74:13, 78:3,
78:4, 78:20,
83:16, 87:12,
94:2, 96:5,
102:16, 102:22,
106:18, 110:16,
111:18, 125:3,
127:7, 134:22,
136:13, 136:14,
137:4, 139:6,
148:3, 149:17,
149:18, 151:15,
152:20, 161:7,
162:18, 177:8,
177:9, 178:5,
192:6, 192:8,
194:15, 195:2,
196:14, 197:19,
203:11, 204:22,
207:15, 207:18,
208:19, 211:16,
213:5, 216:8,
216:21, 217:2,
221:5, 228:19,
230:7, 233:20,
238:13, 257:2,
261:7, 262:6,
264:17, 272:21,
297:13, 300:20,
334:10, 336:3,
341:22, 345:17,

Transcript of David Sandoz
Conducted on March 5, 2020

130

346:16
**scale**
50:13
**schedule**
196:15
**schneider**
8:10, 8:18,
9:13, 11:8,
11:11, 136:22,
137:4, 145:1,
145:18, 146:5,
178:10, 178:14,
179:17, 180:4,
218:15, 220:14,
221:2, 221:7,
222:16, 230:3
**scoring**
46:15, 89:4,
89:8
**scott**
233:7
**screen**
13:9
**screening**
89:3
**second**
25:7, 25:21,
29:10, 29:15,
50:8, 51:18,
53:4, 53:5,
53:7, 122:4,
136:10, 142:12,
153:17, 159:17,
192:15, 196:20,
216:5, 216:7,
223:1, 228:10,
238:5, 250:19,
255:7, 256:8,
261:2, 261:3,
287:20, 298:7,
298:9, 318:11,
320:18, 320:19,
320:20, 320:22,
321:1, 321:7,
321:18, 346:16,
347:10
**section**
300:19, 320:19,

320:20, 320:21,
321:4, 321:6,
321:19
**secure**
346:4
**security**
32:21, 313:19,
315:7, 315:13
**see**
25:4, 27:13,
29:14, 33:11,
36:6, 36:9,
36:12, 38:1,
43:3, 47:18,
49:16, 51:4,
53:12, 54:7,
55:14, 62:15,
62:19, 63:18,
66:2, 68:9,
69:12, 77:1,
82:19, 83:8,
83:18, 93:6,
94:1, 95:5,
97:1, 106:7,
107:4, 107:15,
107:17, 107:20,
113:20, 120:7,
123:18, 128:4,
130:10, 135:4,
137:10, 139:6,
142:16, 162:19,
172:10, 174:22,
175:14, 175:15,
177:7, 177:11,
177:16, 188:4,
191:19, 192:14,
192:19, 196:17,
202:7, 203:22,
206:7, 208:10,
213:9, 216:11,
217:4, 218:19,
221:4, 221:9,
222:7, 222:21,
223:12, 225:7,
226:11, 229:1,
233:22, 249:17,
250:1, 250:5,
253:13, 256:8,

257:5, 261:1,
261:11, 263:5,
263:14, 264:20,
265:13, 296:22,
304:7, 311:16,
330:4, 330:6,
334:9, 342:10
**seeing**
257:7, 257:8
**seeking**
67:19, 67:22,
108:7, 280:14,
326:4
**seeks**
286:7
**seemed**
226:22, 239:13
**seems**
119:22
**seen**
42:1, 43:5,
250:14, 264:22,
273:13, 315:11
**segment**
17:18
**segments**
18:21, 19:4
**segregation**
345:19
**select**
46:15
**send**
117:15, 125:6,
125:20, 155:19,
174:20, 175:1
**sending**
44:2, 55:11,
140:12, 149:3,
158:3, 158:16,
179:17, 186:4,
186:18, 187:1,
262:17, 262:18
**sense**
32:3, 41:2,
63:3, 214:9,
214:11, 257:1,
306:15
**sent**
117:13, 133:19,

139:1, 139:18,
140:17, 140:18,
142:21, 155:18,
180:8, 185:4,
185:6, 186:13,
256:14
**sentence**
59:6, 125:2,
125:15, 128:4,
207:16, 216:8,
306:21, 334:9,
335:2, 345:21,
346:16, 347:10
**sentences**
133:2, 133:8,
334:10, 334:16,
347:3, 347:7
**separate**
77:18, 99:22,
153:12, 176:17,
350:3
**september**
169:13, 172:20,
183:12, 183:15,
183:21, 184:6,
184:18, 185:8,
185:12, 185:13,
186:3, 186:8,
189:6, 189:18,
189:19, 191:13,
192:14, 192:21,
198:17, 226:21,
236:4, 236:10,
236:11, 237:10,
237:16, 339:1,
339:2, 339:3
**series**
14:20, 108:20,
114:8, 223:2,
343:2, 344:4
**serve**
50:19
**served**
270:5, 270:6
**service**
124:15
**services**
1:8, 13:4,

Transcript of David Sandoz
Conducted on March 5, 2020

131

15:14, 27:8,
42:9, 123:8,
138:2, 259:1,
272:3
**serving**
248:21
**set**
51:5, 57:14,
59:14, 65:14,
81:19, 97:6,
100:14, 133:9,
211:17, 238:12,
238:14, 257:3,
259:12, 275:7,
277:22, 278:21,
279:8, 279:12,
324:15, 329:22,
335:5, 345:4,
355:27
**sets**
88:20, 120:18
**setting**
85:20, 117:4,
134:13, 180:12,
216:1, 235:11
**several**
58:14, 157:19,
239:22, 240:1,
275:4, 275:5
**shall**
261:7, 261:10,
262:7, 345:17
**share**
202:6, 255:16
**shared**
264:19
**sheet**
55:17, 110:13,
111:10, 113:2,
113:3, 116:5,
118:18, 136:9,
147:12, 355:9
**sheets**
257:10
**shield**
66:21, 69:6
**shift**
24:7

**short**
58:11, 58:13,
178:20, 203:20,
204:11, 204:16,
217:17
**shorter**
203:19
**shorthand**
355:5
**should**
31:20, 116:5,
116:22, 183:2,
219:17, 253:21,
280:12, 286:15,
287:3, 287:15,
289:5, 299:7,
313:18
**shoulder**
38:20
**shouldn't**
173:10, 204:15
**show**
24:3, 27:1,
38:13, 39:17,
42:16, 42:17,
43:1, 79:7,
86:15, 90:1,
90:12, 90:19,
91:15, 93:15,
93:17, 125:18,
126:4, 145:12,
154:18, 155:8,
182:1, 196:12,
206:5, 206:17,
210:3, 220:6,
224:16, 264:8,
280:7
**showed**
69:13, 92:20,
117:14, 156:9,
163:13, 179:21,
207:20, 219:22
**showing**
147:2, 155:3,
183:19, 192:13
**shown**
227:18
**shows**
86:15, 157:7,

183:10
**side**
57:15, 87:10,
225:12, 225:13,
282:5, 285:20,
285:21
**sign**
21:8, 21:14,
44:14, 44:20,
58:18, 87:20,
344:21
**signature-mig2k**
355:30
**signed**
105:19, 106:16,
109:2, 119:8
**significant**
84:4, 235:12
**signing**
302:8
**similar**
220:19
**similarly**
262:5
**simple**
114:3, 116:20
**simpler**
112:19
**simply**
56:17, 329:21
**since**
37:8, 76:18,
105:5, 205:2,
243:17
**single**
338:6
**sir**
318:5, 321:21,
328:7, 329:5,
330:3
**sit**
170:19, 309:10,
311:22
**site**
36:1, 244:17,
264:13
**sitting**
286:1, 294:16,

309:15
**situation**
220:19, 243:21,
251:13, 341:20
**situations**
30:10, 235:19,
293:1
**six**
128:21, 129:6,
129:16, 129:19,
339:6
**size**
18:18, 19:9,
46:11, 128:15
**sizes**
128:14
**skilled**
256:15
**sky**
251:18, 251:20,
252:2, 252:12,
252:16
**sliding**
50:13
**slipped**
304:4
**small**
18:14, 18:16,
22:15, 30:22,
45:17, 239:14
**smaller**
245:18
**smith**
233:8
**snapshot**
113:21
**soft**
209:18
**soften**
209:15
**sole**
166:10, 315:14,
322:8, 323:13
**solicited**
75:19
**solstren**
257:15, 257:17
**some**
16:6, 20:8,

Transcript of David Sandoz
Conducted on March 5, 2020

132

21:21, 22:4,
22:13, 23:6,
29:12, 30:5,
30:20, 31:13,
31:18, 32:19,
33:1, 39:2,
43:9, 45:10,
45:17, 49:20,
52:16, 57:12,
60:4, 62:7,
65:5, 87:16,
94:11, 100:2,
110:4, 114:8,
120:1, 120:12,
130:9, 132:5,
139:2, 141:2,
142:19, 144:14,
146:3, 148:18,
154:13, 154:14,
164:14, 165:19,
167:16, 169:5,
171:3, 171:17,
172:9, 175:20,
176:7, 186:8,
187:12, 190:15,
191:12, 199:5,
199:20, 206:9,
214:19, 218:22,
220:1, 222:10,
224:12, 224:17,
226:6, 231:19,
233:6, 234:11,
235:18, 236:4,
236:12, 237:14,
237:15, 240:13,
249:12, 255:12,
255:17, 260:19,
266:12, 272:1,
273:8, 278:11,
281:11, 288:15,
293:2, 293:7,
299:21, 303:21,
303:22, 306:3,
308:13, 309:20,
328:19, 331:8,
332:22, 334:13,
336:19, 338:15,
340:10

somebody
119:12, 214:13,
223:19, 260:17,
310:21
somehow
23:4, 128:10,
145:14
someone
44:13, 44:19,
73:3, 126:14,
135:18, 136:17,
160:15, 191:21
something
14:22, 22:2,
30:9, 33:1,
39:6, 44:20,
44:22, 85:9,
91:15, 103:5,
110:5, 141:6,
145:15, 152:19,
182:18, 203:7,
215:6, 249:21,
284:4, 284:7,
286:10, 286:12,
287:2, 317:19
sometime
269:21
sometimes
15:4, 31:4
somewhere
173:7, 231:17,
250:15, 314:14
son
251:22, 252:1
soon
133:5, 189:16,
191:17
sooner
57:18, 177:18
sorry
19:6, 29:18,
34:2, 37:16,
40:11, 42:5,
42:7, 44:6,
66:19, 73:12,
73:22, 74:2,
81:21, 86:8,
88:18, 109:2,

110:6, 122:12,
122:16, 129:8,
137:14, 137:17,
157:10, 158:7,
160:3, 160:6,
162:4, 162:6,
173:6, 175:2,
182:6, 186:12,
196:19, 202:2,
210:8, 213:20,
221:22, 222:2,
222:6, 222:17,
223:22, 227:8,
227:20, 228:14,
229:18, 230:11,
232:4, 236:8,
236:10, 237:18,
239:4, 241:15,
260:5, 265:11,
266:2, 269:9,
301:5, 318:15,
322:15, 326:15,
337:11, 337:14,
349:2, 350:13,
351:5, 353:21
sort
100:2, 101:12,
144:14, 175:20,
176:7, 199:5,
199:20, 242:19,
272:1
spaced
206:22
spat
318:17
speak
14:8, 173:10,
281:6, 298:16
speaking
224:8
specific
41:9, 92:1,
100:19, 148:19,
166:7, 168:15,
186:11, 234:6,
245:7, 298:16
specifically
135:18, 142:13,

246:11, 266:16,
281:18
specifics
19:20, 26:21,
30:2, 30:19,
41:3, 47:10
speculate
157:20, 157:22,
212:11
speculation
323:15
speed
54:12
split
59:21, 255:1
spoke
23:16
sponsors
91:2
spot
131:18
ss
355:2
staff
5:13, 33:6,
44:3, 139:2,
140:14, 262:13
stage
317:16
stamp
320:4
stamped
44:16, 320:7
stamping
94:17
stand
48:5, 127:13,
127:21, 205:10,
288:17, 289:17,
292:3, 302:8,
303:19
standard
21:8, 74:19,
75:2, 75:11,
76:4, 76:8,
261:13, 262:10,
262:11, 283:5,
317:9, 317:13,

Transcript of David Sandoz
Conducted on March 5, 2020

133

318:5, 318:13,
318:22, 319:12
**standing**
134:8, 151:2,
274:21
**standpoint**
302:2
**stands**
289:8, 292:2,
292:3
**stapf**
1:22, 2:14,
14:1, 355:5,
355:32
**start**
16:10, 41:17,
62:14, 62:15,
95:4, 96:2,
98:8, 102:7,
112:15, 113:1,
115:4, 116:6,
116:21, 117:1,
117:22, 118:19,
133:6, 136:14,
170:22, 171:8,
179:13, 245:3,
245:20, 249:10,
251:5, 259:12,
297:12, 337:17,
342:19
**started**
16:22, 115:20,
138:22, 147:4,
148:21, 149:3,
167:18, 167:19,
168:9, 168:18,
172:19, 177:16,
206:22, 235:14,
242:5, 341:11
**starting**
23:14, 29:19,
49:15, 119:2,
137:21, 217:9,
232:13
**starts**
55:7, 56:10,
57:3, 57:4,
116:14, 147:3

**state**
13:15, 15:6,
55:16, 58:17,
69:17, 149:10,
210:8, 278:18,
340:22, 355:1
**stated**
47:16, 84:12,
116:20, 141:3,
149:21, 321:13,
326:21, 329:11,
331:11, 333:14,
336:16, 336:17,
337:1, 355:8
**statement**
52:6, 52:20,
53:19, 71:22,
72:21, 95:10,
114:21, 115:1,
256:11, 256:13,
256:16, 256:22,
257:11, 273:18,
273:21, 318:19
**statements**
52:6, 63:15,
78:6, 108:9,
114:5, 132:6,
133:17, 245:10,
245:11, 245:17,
253:2, 253:11,
253:17, 256:19,
257:8
**states**
1:1, 2:15,
55:20, 108:13,
109:10, 175:10,
202:18, 238:9,
291:15, 355:6
**stating**
305:21
**station**
3:6
**status**
230:5, 254:8
**stay**
124:8, 124:15
**stays**
57:12, 128:21,

129:15
**step**
173:9, 205:20,
233:11, 302:12,
302:14, 305:1,
306:7, 306:9
**stephanie**
137:6
**steps**
24:16, 33:5,
155:9, 225:4
**stick**
206:12
**still**
47:6, 55:16,
55:19, 64:5,
78:7, 78:13,
105:6, 110:12,
129:7, 133:12,
152:14, 153:18,
154:21, 157:15,
163:6, 183:13,
194:12, 201:22,
247:1, 247:22,
258:13, 269:20,
286:14, 322:11
**stop**
34:16, 166:10,
166:22, 167:9,
188:13, 193:11,
207:9, 209:19,
323:16, 339:10
**stopped**
230:10, 230:18,
241:11, 241:19,
242:7, 339:6
**stopping**
120:15, 131:18
**story**
82:16
**street**
204:2, 237:13,
237:14
**stress**
84:15
**strike**
232:13
**structure**
25:22, 98:6,

98:7
**structured**
75:22, 76:19,
76:22
**stuck**
296:5
**stuff**
81:1
**subject**
44:13, 94:15,
139:6, 175:20,
179:16, 189:6,
194:7, 198:18,
341:14
**submit**
266:7, 281:1
**submitted**
105:3, 265:21,
294:4, 297:4
**subsequent**
106:8, 227:10,
234:2
**subsequently**
249:19
**subsidiaries**
244:7
**substance**
202:21, 202:22
**substantial**
324:10
**success**
26:2, 26:12,
26:18, 26:19,
27:10, 28:13
**successful**
41:20
**sudden**
306:13
**suffer**
291:18
**suffered**
272:22, 289:1,
291:13
**suffers**
292:13
**suggest**
204:8, 336:6,
351:3

Transcript of David Sandoz
Conducted on March 5, 2020

134

suggested
263:12, 333:8,
334:1
suggesting
154:12, 178:16,
219:18
suggests
165:13, 190:6,
225:7, 319:4
suit
261:9, 262:1
suite
3:7, 3:17, 4:6
suites
2:5
sum
80:14, 208:16,
307:3
summarizing
123:7, 145:4,
146:5, 146:6,
163:20
supervision
355:14
supporting
230:21
supposed
34:14, 81:22,
102:16, 106:22
sure
31:17, 37:9,
37:18, 39:4,
40:20, 44:8,
44:9, 54:20,
59:8, 73:14,
81:8, 87:2,
87:12, 87:22,
94:12, 96:16,
97:19, 100:20,
102:10, 126:10,
127:22, 134:18,
136:3, 137:7,
145:21, 152:9,
153:1, 165:20,
166:16, 169:18,
169:19, 173:9,
173:17, 174:8,
177:5, 178:6,

193:2, 201:18,
202:10, 210:19,
217:16, 217:21,
219:10, 219:21,
220:3, 222:18,
234:12, 239:5,
239:9, 239:11,
242:12, 251:14,
253:8, 263:11,
267:2, 275:2,
284:19, 292:22,
302:13, 309:9,
311:9, 311:10,
311:18, 312:18,
315:19, 318:17,
319:9, 334:7,
338:3, 338:8,
338:21, 346:14
sureties
17:3, 130:7,
130:21, 131:4,
163:3, 193:17,
212:17, 241:7,
242:1, 267:19,
284:6, 284:10
surety's
134:6, 135:3
suspend
194:17
sussman
6:4, 11:14,
69:12, 69:18,
69:22, 223:21,
223:22, 224:3,
228:18, 311:4,
311:12
sussman's
70:9
sustain
127:19
sustained
273:22
swap
86:19
swapping
85:21
swear
14:3

switching
87:6
sword
66:21, 69:6
sworn
14:7, 355:9
sy
233:13
synopsis
24:15
system
34:5, 46:15,
89:4, 89:8,
120:6, 155:15
systems
85:21

**T**

tail
203:20, 204:8,
204:12, 204:17,
204:19
take
15:2, 45:11,
48:7, 60:16,
64:22, 79:17,
87:15, 108:2,
120:12, 120:21,
121:19, 127:17,
137:6, 138:8,
147:18, 155:10,
173:5, 178:20,
188:2, 188:3,
188:19, 193:1,
193:9, 193:14,
210:14, 217:10,
218:22, 225:16,
253:7, 255:11,
305:1, 316:8,
319:19, 333:6,
335:13, 336:1,
336:2, 336:8,
336:9, 339:2,
354:11
taken
60:20, 102:5,
121:8, 122:20,
138:16, 142:8,

181:12, 214:10,
225:22, 251:2,
275:3, 307:18,
342:16, 355:22
takes
192:17, 193:6,
211:6, 212:4,
335:3
taking
13:12, 44:12,
92:19, 141:5,
155:4, 173:14,
173:19, 210:20,
290:19, 318:18
talk
40:13, 43:8,
54:17, 59:14,
123:13, 125:15,
134:4, 136:15,
137:5, 140:15,
154:20, 170:20,
175:11, 184:15,
187:11, 190:15,
191:17, 207:16,
213:10, 214:4,
214:5, 225:8,
230:8, 230:17,
245:2, 298:8
talked
41:22, 42:1,
79:18, 80:9,
82:13, 89:4,
92:18, 96:20,
130:12, 132:4,
134:7, 141:1,
141:16, 141:19,
142:2, 144:10,
175:4, 177:15,
187:17, 193:10,
209:20, 233:3,
233:7, 237:19,
238:20, 243:21,
271:9, 271:17,
272:5, 277:15,
278:13, 288:15
talking
37:22, 50:12,
59:12, 61:5,

Transcript of David Sandoz
Conducted on March 5, 2020

135

63:15, 65:21,
66:11, 84:8,
99:2, 106:12,
137:11, 145:1,
159:19, 206:12,
208:14, 210:20,
215:3, 218:13,
226:6, 231:16,
251:7, 253:1,
275:21, 275:22,
293:18, 295:3,
305:4, 322:21,
345:15
**talks**
25:7, 84:9,
127:7, 173:2,
203:11, 203:14,
203:16, 204:22,
216:21, 288:15,
304:8, 347:19
**tape**
13:1, 101:19,
102:2, 102:7,
179:8, 179:13,
251:5, 341:12,
341:19
**task**
211:21, 334:13
**team**
253:21, 264:15
**technology**
33:7, 33:14,
34:1
**telephone**
230:9, 230:17
**tell**
38:19, 40:20,
41:7, 54:13,
56:16, 61:22,
63:7, 74:5,
79:8, 82:5,
106:1, 122:2,
141:7, 154:18,
163:19, 165:17,
167:15, 182:2,
186:18, 203:5,
234:4, 267:6,
311:22, 319:12,

340:13, 353:14
**tells**
341:21
**tend**
15:4
**term**
57:11, 203:18,
216:4, 271:7,
315:6, 332:8
**terminate**
341:22, 342:1
**terminated**
28:3
**terminology**
315:9
**terms**
49:20, 112:20,
260:19, 262:20,
263:2, 263:6,
282:12, 282:22,
283:1, 283:3,
283:12, 283:21,
284:6, 284:13,
285:4, 285:6,
285:9, 285:16,
293:15, 294:5,
294:7, 300:3,
300:10, 329:8,
329:9
**testified**
14:9, 97:19,
109:1, 141:14,
265:7, 269:14,
317:12, 318:11,
336:14
**testify**
15:10, 67:4,
321:13, 355:10
**testimony**
102:19, 103:21,
104:3, 127:10,
141:15, 155:2,
155:14, 201:4,
271:14, 272:6,
272:11, 285:13,
297:4, 299:21,
308:13, 309:20,
318:21, 319:4,

324:20, 326:4,
329:19, 337:10,
351:20, 355:16
**th**
183:21, 226:16
**thank**
14:15, 16:5,
44:21, 54:17,
55:11, 60:16,
88:1, 96:17,
105:8, 175:2,
182:9, 241:15,
265:10, 265:18,
307:14, 308:3,
330:3, 341:9,
343:1, 354:4,
354:11
**thanks**
55:8, 82:12,
116:15, 118:20,
137:4
**themselves**
13:15
**therefore**
68:18
**thereof**
346:18
**thereupon**
355:12
**thing**
15:3, 43:4,
52:14, 86:15,
86:21, 148:14,
215:22, 293:22
**things**
20:20, 21:7,
32:21, 33:22,
41:8, 41:20,
41:22, 42:11,
54:12, 54:17,
61:5, 78:1,
96:1, 97:5,
110:7, 114:8,
114:16, 116:20,
125:9, 141:3,
141:18, 162:19,
181:12, 183:4,
202:5, 203:11,

223:2, 229:4,
232:21, 232:22,
288:15, 340:5
**thinking**
31:9, 298:3
**third**
29:17, 29:18,
44:11, 126:5,
182:7, 216:20
**third-party**
35:11
**thought**
31:20, 50:19,
51:12, 91:22,
113:6, 169:12,
196:6, 214:20,
216:17, 252:17,
260:2, 338:22,
352:21
**thoughts**
198:3, 283:9
**thousand**
131:3, 337:21,
351:16, 351:17,
352:4
**threatening**
218:6, 225:3
**three**
15:19, 44:1,
52:19, 54:2,
135:12, 179:13,
222:19, 223:4,
223:9, 233:7,
262:6, 342:11
**through**
19:22, 37:6,
43:10, 43:12,
45:16, 52:6,
57:11, 75:8,
89:18, 120:14,
121:1, 121:2,
122:11, 123:16,
129:5, 129:11,
130:2, 139:12,
139:13, 141:12,
145:16, 155:9,
172:9, 182:14,
182:19, 185:11,

Transcript of David Sandoz
Conducted on March 5, 2020

136

208:3, 220:1,
224:1, 226:11,
237:1, 241:6,
249:19, 269:14,
297:15, 303:10,
304:5
**thursday**
1:15
**tieder**
3:5
**tim**
4:11, 13:10
**time's**
179:1
**timely**
185:8, 223:15
**timer**
353:5
**times**
84:10, 157:19,
246:5, 246:13,
304:15, 350:8
**timing**
94:13, 172:17
**title**
17:11
**today**
13:10, 14:1,
15:10, 120:4,
127:10, 133:3,
147:11, 147:16,
155:14, 156:3,
242:10, 271:19,
282:22, 286:1,
288:16, 308:4,
308:8, 308:11,
309:10, 309:15,
311:22, 323:5,
328:3, 342:5
**today's**
13:8, 155:20,
196:14
**together**
81:22, 145:4,
189:13, 275:1
**told**
41:20, 42:1,
93:14, 96:21,

286:10, 314:8,
338:12, 346:13,
352:20
**tomorrow**
116:6, 117:1,
118:19, 136:14,
197:17, 354:12,
354:16
**took**
154:3, 164:6,
175:21, 197:8,
214:14, 238:15,
272:4
**tool**
34:8
**top**
5:9, 5:14,
5:17, 5:20, 6:3,
6:6, 6:10, 6:13,
6:20, 7:15,
7:18, 8:3, 8:6,
8:9, 8:19, 9:3,
9:6, 9:9, 10:9,
10:18, 11:5,
61:15, 68:1,
68:5, 68:17,
71:19, 83:16,
88:15, 108:3,
133:2, 137:3,
137:12, 147:10,
158:22, 159:15,
159:22, 174:8,
177:7, 218:13,
221:9, 230:12,
230:15, 238:6,
311:13
**total**
61:21, 62:10,
62:16, 63:5,
208:5, 208:16,
213:7, 216:22,
307:3
**touch**
136:14
**touting**
27:5
**towards**
157:16

**track**
89:22, 162:20
**tracked**
42:11
**tracking**
43:2, 83:17,
84:3
**tracy**
10:14, 191:17,
191:21, 195:8
**tracy's**
195:9
**transactional**
18:14, 203:20
**transcript**
355:15
**transferring**
336:20
**transiting**
198:1, 203:12
**transition**
188:5, 195:8,
210:18, 336:18
**transitioned**
198:8
**transitioning**
192:3, 203:14
**transpired**
113:20
**travel**
5:10, 36:7
**traveled**
39:13
**treasury**
218:7, 218:18,
219:8, 220:21,
221:17, 221:19,
223:16, 225:4,
239:19, 239:21,
240:1, 259:9,
259:10, 269:11
**treat**
37:3
**treated**
105:2
**treating**
34:9, 103:17,
104:6, 104:22

**tremendous**
216:8
**trial**
36:18, 102:15
**tried**
255:10
**trigger**
275:13
**trip**
46:3
**trouble**
39:6, 94:20
**true**
21:6, 39:17,
39:20, 48:3,
48:4, 56:4,
131:11, 150:15,
156:19, 202:19,
327:2, 355:8,
355:15
**truth**
14:8, 355:10
**try**
14:20, 15:6,
37:20, 126:3,
242:12, 245:2,
247:12, 292:19,
344:19
**trying**
21:4, 22:8,
22:12, 25:12,
28:12, 31:1,
31:6, 31:21,
35:7, 37:4,
39:9, 39:21,
40:17, 41:2,
41:5, 51:9,
56:12, 57:9,
58:7, 58:8,
66:18, 67:14,
74:10, 74:14,
76:14, 93:18,
94:12, 99:9,
99:21, 100:10,
110:7, 114:2,
115:17, 116:3,
117:2, 118:7,
131:14, 131:16,

135:6, 144:10,
145:12, 149:1,
167:7, 182:18,
183:4, 186:17,
202:5, 204:13,
205:14, 209:15,
209:17, 209:18,
210:18, 212:2,
212:13, 214:21,
220:16, 221:4,
224:21, 233:19,
234:16, 243:10,
259:12, 269:6,
269:11, 271:2,
294:1, 297:2,
297:3, 297:4,
297:12, 298:5,
300:8, 301:22,
312:18, 313:3,
313:4, 324:4,
330:4, 331:1,
333:15, 336:17,
345:9, 346:11,
347:5
**tucker**
10:15, 195:8
**turn**
54:19
**twisted**
103:6
**two**
39:17, 78:10,
79:17, 102:8,
122:1, 125:12,
133:2, 133:8,
158:6, 158:13,
168:5, 172:22,
179:8, 199:6,
202:4, 215:11,
219:15, 229:4,
233:6, 236:20,
263:20, 265:21,
287:13, 292:12,
331:6, 331:7,
334:10, 334:16,
341:13, 347:3,
347:7, 350:3
**type**
18:14, 21:22,

80:1
**types**
22:4, 79:20
**typically**
19:11, 21:2,
21:21, 30:10,
77:14, 89:11,
137:8, 142:6,
261:21, 277:8,
284:4, 298:19

---
**U**
---

**uh-huh**
29:16, 42:4,
56:11, 137:13,
230:15
**ultimately**
100:16, 127:22,
171:18, 241:3,
306:5
**umbrella**
332:20
**unaware**
265:7
**unclear**
213:20
**under**
29:7, 33:4,
47:15, 79:19,
84:8, 112:15,
166:8, 166:20,
293:13, 293:15,
294:10, 300:10,
313:13, 317:8,
320:19, 321:1,
329:8, 329:9,
332:20, 344:11,
349:9, 349:10,
349:21, 352:11,
352:15, 355:13,
355:14
**understand**
15:12, 20:12,
22:8, 28:9,
31:2, 31:6,
31:8, 39:21,
40:15, 41:19,
46:14, 55:22,

56:12, 57:9,
58:8, 66:1,
76:14, 78:7,
80:13, 84:7,
99:21, 100:3,
101:2, 101:3,
111:21, 117:2,
123:12, 134:6,
135:2, 135:7,
135:11, 135:17,
138:1, 144:10,
145:11, 146:8,
157:14, 163:2,
167:8, 180:22,
182:12, 189:1,
204:13, 212:2,
234:16, 274:7,
276:17, 297:4,
298:6, 299:12,
300:8, 300:10,
300:22, 301:1,
301:8, 319:8,
345:12, 351:20
**understands**
84:14, 294:5
**understood**
28:4, 30:6,
31:18, 38:2,
46:11, 48:14,
90:3, 92:17,
113:13, 115:10,
115:15, 124:14,
128:6, 129:12,
167:13, 189:20,
290:7, 302:13
**undertaking**
171:8, 309:22
**underwrite**
203:17
**underwriter**
57:13, 309:1
**underwriters**
17:21, 21:1,
283:17
**underwriting**
17:20, 21:6,
22:17, 56:3,
59:22, 60:1,

85:10, 95:7,
148:15, 170:22,
308:14, 308:16,
309:6, 309:13
**underwritten**
22:16
**underwrote**
19:12
**unfortunately**
131:21
**unilateral**
325:13, 330:1,
335:18
**unilaterally**
329:10
**unique**
76:15
**uniqueness**
27:7
**united**
1:1
**unless**
74:13, 182:12,
199:20, 272:1,
333:9
**unredacted**
67:10
**unsure**
336:14
**until**
17:5, 23:18,
30:6, 30:20,
31:18, 91:7,
91:12, 97:11,
123:17, 131:15,
233:4, 237:10,
242:5, 269:21,
335:13
**unusual**
75:15, 75:18,
352:19, 352:22
**updated**
256:21
**updates**
230:20
**upwards**
129:19
**use**
34:1, 42:1,

Transcript of David Sandoz
Conducted on March 5, 2020

138

43:2, 45:7,
57:8, 66:20,
67:6, 67:7,
68:20, 68:22,
69:6, 70:15,
71:11, 77:10,
77:11, 81:16,
123:14, 126:5,
126:7, 136:15,
161:10, 164:15,
166:1, 340:8,
341:17
**uses**
75:6
**using**
34:5, 163:3,
175:11, 175:17,
177:3, 193:17,
245:21
**utilized**
33:7, 33:14
**utmost**
33:9

**V**

**value**
62:11, 63:8,
294:2
**variety**
20:5
**various**
17:7, 33:8,
33:15
**vast**
125:3
**vehicle**
148:16
**verbally**
171:14
**verona**
36:1, 36:3,
38:10, 39:13,
145:19, 163:21
**versa**
250:10
**version**
86:14, 296:3,
296:8, 310:11

**versus**
13:4, 39:19,
276:14
**vice**
17:12, 17:14,
18:2, 18:5,
250:10, 284:5
**video**
13:9, 13:11,
354:10
**videographer**
4:11, 13:1,
13:10, 13:22,
60:17, 60:18,
60:21, 60:22,
102:1, 102:2,
102:6, 121:5,
121:6, 121:9,
121:10, 122:17,
122:18, 122:21,
122:22, 138:13,
138:14, 138:17,
138:18, 179:6,
179:7, 179:11,
179:12, 225:19,
225:20, 226:1,
226:2, 250:21,
250:22, 251:3,
251:4, 307:15,
307:16, 307:19,
307:20, 342:11,
342:13, 342:17,
342:18, 354:6,
354:7
**videotaped**
1:13, 2:1, 13:2
**view**
33:6, 69:3,
100:13
**virginia**
1:2, 3:8, 13:6,
201:19, 239:7
**visit**
36:1, 39:19,
39:22, 240:16
**visits**
39:17, 39:22,
244:16, 264:13

**vivian**
3:4, 13:16,
24:8, 87:19,
338:20
**vivian's**
315:18
**voice**
13:14
**voicing**
230:2
**vs**
1:7

**W**

**wait**
153:7
**waited**
239:22
**waiting**
171:16, 214:4
**waive**
65:21, 68:18,
213:21, 287:2,
299:4
**waives**
287:17
**waiving**
71:18
**wall**
222:19, 225:9
**want**
15:2, 16:5,
20:11, 24:9,
32:19, 35:8,
35:9, 36:6,
36:9, 36:12,
36:15, 37:3,
37:19, 37:20,
39:4, 39:6,
40:19, 45:10,
53:17, 54:19,
57:9, 57:13,
57:17, 58:1,
60:8, 60:9,
60:10, 60:11,
61:6, 65:21,
67:6, 69:2,
71:12, 74:11,

**80:18, 81:7,**
81:16, 84:13,
93:5, 97:19,
98:1, 100:11,
102:10, 106:18,
107:10, 108:2,
108:20, 120:21,
121:19, 134:22,
158:9, 158:17,
162:19, 167:3,
167:6, 168:21,
170:9, 171:2,
171:10, 171:19,
172:12, 172:15,
178:19, 182:17,
188:16, 197:2,
199:2, 200:6,
200:21, 204:16,
218:17, 228:11,
232:21, 233:10,
234:7, 234:8,
239:9, 241:9,
246:15, 253:7,
255:8, 271:7,
274:17, 278:18,
294:6, 296:9,
297:18, 299:9,
307:10, 314:7,
318:17, 319:7,
319:20, 322:22,
340:21, 353:15
**wanted**
31:15, 31:16,
59:21, 63:4,
70:17, 78:7,
134:18, 145:19,
165:19, 187:11,
187:19, 188:2,
188:4, 189:12,
196:20, 209:17,
209:20, 213:3,
229:20, 230:19,
237:2, 255:1,
255:7, 266:12,
267:7, 279:18,
302:12, 333:13,
335:21
**wanting**
173:4

Transcript of David Sandoz
Conducted on March 5, 2020

139

**wants**
67:6, 179:2,
204:14, 341:15,
341:22, 342:1,
353:5
**washington**
3:18
**waste**
35:15
**watching**
131:15
**watt**
3:5
**way**
23:6, 30:7,
31:19, 34:13,
34:14, 53:8,
69:1, 76:3,
86:17, 95:18,
102:21, 106:2,
111:12, 112:6,
115:16, 124:15,
137:11, 150:14,
158:4, 203:1,
204:20, 219:14,
232:21, 275:19,
279:2, 290:8,
302:6, 304:14,
306:22, 319:2,
326:20, 344:20
**we'll**
58:16, 60:15,
64:14, 82:13,
94:18, 120:15,
155:10, 167:16,
172:9, 201:9,
207:16, 208:1,
210:22, 315:18,
342:1, 342:9
**we're**
15:12, 34:22,
35:6, 60:6,
60:18, 60:22,
65:20, 67:10,
71:17, 71:18,
80:21, 87:14,
95:18, 101:20,
102:2, 102:3,

102:6, 121:6,
121:10, 122:18,
122:22, 138:14,
138:18, 141:8,
148:13, 152:11,
158:17, 165:11,
167:19, 167:20,
179:7, 179:12,
183:4, 200:5,
201:4, 205:9,
211:2, 225:20,
226:2, 239:8,
250:22, 275:22,
307:16, 307:20,
325:15, 326:18,
331:2, 341:17,
342:13, 342:15,
342:18, 351:5,
351:6, 353:3,
354:7
**we've**
58:13, 92:18,
113:3, 118:18,
121:13, 152:9,
240:13, 243:21,
273:13, 298:13,
301:4
**wear**
43:3, 124:7,
124:16
**wednesday**
106:20
**week**
224:10
**weekly**
230:8, 230:9,
230:17, 230:19
**weeks**
198:19
**weird**
221:5
**welcome**
320:1
**went**
36:7, 38:10,
89:18, 139:12,
141:12, 184:14,
249:19, 340:3,

342:1
**weren't**
80:14, 116:8,
166:22, 218:7,
257:8, 283:1,
285:3
**western**
1:2, 13:5,
201:19, 239:6
**whatever**
43:6, 57:8,
71:12, 81:16,
164:16, 166:3,
271:7, 294:13,
295:16, 296:19,
300:13, 304:9,
306:3
**whenever**
164:6
**whereof**
355:27
**whether**
20:21, 23:21,
23:22, 25:13,
25:18, 38:19,
38:20, 38:21,
69:12, 76:3,
89:10, 98:9,
98:13, 98:16,
99:5, 117:12,
150:18, 162:1,
164:15, 187:6,
193:16, 193:22,
210:19, 226:11,
254:1, 254:3,
260:18, 261:9,
261:22, 287:21,
313:18, 335:21,
341:14, 343:4,
343:14, 344:10,
348:2, 348:19,
353:5
**whoever**
84:17
**whole**
131:3, 215:22,
255:11, 256:11,
271:18, 291:14,

303:6, 347:21
**williams**
3:14, 22:18,
32:4, 34:9,
34:12, 34:18,
34:20, 35:1,
35:4, 35:5,
35:8, 35:13,
35:16, 36:15,
36:20, 37:2,
38:3, 42:13,
42:18, 71:9,
80:3, 83:3,
107:16, 195:13,
214:1, 270:9,
270:17, 290:22,
291:3, 293:21,
294:3, 295:2,
295:5, 295:6,
295:8, 295:9,
306:10, 308:11,
314:8, 315:3,
320:11, 324:21,
331:22, 333:3,
346:21, 350:22,
354:1
**willing**
23:10, 46:16,
250:1, 281:12
**willingness**
48:18
**wind**
189:15, 207:13
**winds**
198:3
**within**
273:2, 309:7,
315:12
**without**
22:16, 212:19,
246:7, 314:17
**witness**
14:4, 14:7,
34:10, 34:15,
35:12, 37:4,
38:10, 102:18,
103:18, 104:1,
104:7, 104:15,

Transcript of David Sandoz
Conducted on March 5, 2020                                      140

104:18, 105:2,
105:6, 120:11,
138:11, 163:17,
215:15, 225:18,
228:10, 295:7,
314:5, 316:16,
316:20, 317:6,
317:12, 318:2,
318:11, 321:9,
321:13, 322:16,
325:16, 336:14,
350:17, 350:18,
351:3, 353:9,
353:17, 353:20,
354:3, 355:9,
355:12, 355:16,
355:27
**witness's**
102:19, 320:15
**wizard**
5:10
**wonder**
31:9, 106:12
**wondering**
257:21
**word**
20:14, 57:3,
129:17, 148:20,
240:15, 295:22
**worded**
124:5
**words**
39:4, 40:21,
42:10, 57:8,
63:7, 81:2,
81:16, 84:16,
84:17, 100:11,
103:4, 115:7,
115:10, 289:21,
290:15, 319:1
**work**
17:1, 19:18,
31:20, 34:13,
38:1, 46:16,
67:18, 123:15,
124:17, 125:6,
136:2, 138:9,
171:17, 216:1,

225:17, 234:21,
241:4, 243:17,
243:18, 246:16,
246:18, 246:19,
246:22, 247:7,
248:1, 277:7,
290:8, 292:12,
297:9
**worked**
17:5, 21:2,
27:18, 41:15,
46:19, 97:8,
172:7, 255:5,
279:2, 311:4
**workers**
42:10, 124:17
**working**
31:19, 32:17,
63:3, 117:10,
118:21, 130:7,
183:22, 224:1,
241:12, 248:14,
255:1, 261:15,
267:11, 267:17,
268:21, 269:20,
274:1, 279:3,
284:14, 316:4,
330:13
**works**
41:12, 53:8,
125:3, 145:5,
282:3
**worn**
84:10, 92:14
**worried**
107:2
**worth**
182:21, 314:13
**wouldn't**
153:13, 214:9,
214:14, 224:18,
255:11, 269:19,
352:10
**wound**
109:22, 128:11
**wrap**
326:22
**wrapped**
226:15

**write**
20:21, 23:9,
129:21, 166:17,
169:5, 171:18,
187:14, 204:15,
204:16, 205:8,
221:1, 232:16,
241:6, 244:7,
287:10, 291:11,
333:19, 335:14,
336:7, 338:16
**writes**
204:7, 244:3
**writing**
37:21, 45:17,
62:2, 145:18,
154:6, 154:10,
162:10, 166:5,
166:22, 168:22,
188:13, 209:19,
221:7, 248:20,
249:18, 250:6,
291:4, 328:19,
328:22, 330:6,
333:10, 335:12,
335:18, 337:18,
338:10, 338:12,
339:7, 339:10,
355:13
**written**
122:13, 126:18,
207:2, 207:5,
275:15, 290:13,
314:18, 349:9
**wrong**
31:8, 85:14,
235:9, 257:18,
268:10, 268:17
**wrote**
21:11, 45:22,
47:13, 48:3,
50:5, 54:16,
58:15, 82:15,
83:8, 88:8,
106:4, 108:4,
126:1, 126:21,
142:3, 142:6,
143:13, 217:5,

217:7, 229:10,
239:14, 242:1,
287:11, 287:14,
290:17, 338:5

## Y

**yeah**
25:15, 26:22,
41:9, 41:18,
45:18, 56:2,
64:13, 64:17,
108:13, 114:20,
119:12, 124:4,
126:10, 134:1,
136:18, 138:11,
143:4, 149:7,
151:20, 174:17,
183:7, 193:7,
207:12, 212:7,
223:17, 227:12,
241:14, 285:14,
290:7, 316:3,
320:11
**year**
16:18, 52:7,
52:20, 54:2,
55:13, 62:14,
167:21, 206:4,
206:17, 207:2,
207:19, 209:14,
273:2, 338:10,
338:13
**year-end**
78:6, 95:9,
111:9, 117:15,
118:17, 175:12
**years**
16:7, 18:2,
18:4, 19:3,
54:5, 58:14,
263:22, 264:6,
316:3, 322:4,
348:16
**yep**
225:18
**yourself**
315:22

## Z

**zero**
209:13

Transcript of David Sandoz
Conducted on March 5, 2020

141

| $ | 084 | 105 | 15 |
|---|---|---|---|
| **$10,000** | 355:35 | 7:5 | 5:11, 5:16, |
| 46:12 | **1** | **1050** | 5:19, 5:22, 6:5, |
| **$100,000** | 122:19, 123:1, | 3:16 | 6:8, 6:15, 6:22, |
| 19:12, 78:22, | 131:15, 138:15 | **107** | 7:3, 7:4, 8:16, |
| 157:16, 158:3 | **1,250,000** | 7:8 | 96:9, 102:7, |
| **$25,000** | 203:4 | **11** | 118:17, 150:2, |
| 205:8, 205:9, | **1.25** | 5:16, 6:13, | 150:19, 151:10, |
| 205:11, 205:18, | 211:2, 213:1, | 6:22, 8:11, | 159:17, 163:7, |
| 206:8 | 331:13, 333:9, | 8:13, 11:17, | 174:21, 175:8, |
| **$250,000** | 334:2, 337:20 | 12:4, 61:1, | 271:11, 271:12 |
| 164:1, 164:10, | **1/3/19** | 86:4, 102:16, | **150** |
| 278:15, 278:20 | 11:19 | 179:13 | 164:16 |
| **$50,000** | **1/6/15** | **110** | **156** |
| 164:16, 271:11 | 6:17 | 7:10, 7:13 | 9:3 |
| **$500,000** | **1/7/16** | **111** | **16** |
| 49:2, 109:22, | 10:17 | 7:15 | 6:12, 7:5, 7:7, |
| 119:8, 120:1, | **1/9/15** | **1168** | 7:9, 7:17, 7:20, |
| 152:12, 161:2, | 6:19 | 355:36 | 8:5, 8:8, 8:11, |
| 276:3, 277:1, | **1/9/16** | **118** | 8:13, 8:16, |
| 277:2, 328:8, | 10:20 | 7:18 | 8:18, 8:21, 9:8, |
| 349:15 | **10** | **12** | 9:11, 9:13, |
| **.** | 6:10, 7:17, | 6:16, 7:4, | 9:15, 9:17, |
| **.0200** | 7:20, 9:11, | 11:7, 11:9, | 9:19, 9:21, |
| 2:9 | 9:21, 10:13, | 11:11, 88:5, | 10:4, 10:6, |
| **.1000** | 10:15, 29:2, | 102:3, 102:7, | 10:8, 10:11, |
| 3:9 | 49:15, 49:19, | 121:7, 121:11, | 10:13, 10:15, |
| **.3188** | 60:19, 61:1, | 138:19, 141:17, | 11:7, 11:9, |
| 3:19 | 82:1, 131:16, | 331:9 | 11:11, 11:17, |
| **.9016** | 146:20, 183:21, | **121** | 105:15, 107:11, |
| 4:8 | 281:17, 301:5, | 8:3 | 232:9, 330:5 |
| **0** | 301:6, 305:12, | **13** | **160** |
| **00** | 325:12, 325:13, | 6:18, 10:4, | 9:6 |
| 307:21 | 341:16, 341:18, | 93:19, 185:13 | **161** |
| **00066** | 342:3, 348:3, | **131** | 9:9 |
| 1:8, 13:7 | 348:9, 348:10, | 8:6 | **17** |
| **004144** | 351:6 | **136** | 5:19, 7:8, |
| 355:35 | **10,000** | 8:9 | 107:3, 107:7, |
| **02** | 128:15 | **14** | 107:11, 108:2, |
| 122:19 | **100** | 5:3, 6:20, | 212:14, 333:14, |
| **05** | 2:7, 13:12 | 9:13, 9:15, | 335:7, 335:14, |
| 102:3 | **100,000** | 55:12, 63:17, | 337:18, 337:22, |
| **07** | 64:11, 108:10, | 94:8 | 338:6, 340:3 |
| 179:7 | 152:12, 161:1, | **143** | **1765** |
| **08** | 161:5 | 8:12, 8:14 | 3:6 |
| 123:1 | **1000** | **145** | **178** |
| | 3:7, 3:17 | 8:17 | 9:12 |
| | | **146** | **179** |
| | | 8:19 | 9:14 |

Transcript of David Sandoz
Conducted on March 5, 2020

142

**18**
1:8, 5:11,
7:10, 9:8,
11:21, 12:4,
13:7, 61:8,
110:8, 141:17,
160:12, 260:7,
339:17, 339:20,
340:3
**180**
9:16
**182**
9:18
**183**
9:20
**185**
10:3
**186**
10:5
**19**
7:4, 7:13,
10:13, 64:8,
110:8, 116:13,
194:6, 194:8,
206:5, 206:17,
207:20, 209:6,
340:3
**190**
10:7
**192**
10:9
**194**
10:12
**195**
10:14
**196**
10:16
**197**
10:18
**1977**
16:20
**198**
10:21
**199**
16:20
**1992**
16:11, 17:4
**1996**
19:22

**2**
138:19
**2(a)(1**
295:21, 296:12,
303:15, 304:7,
304:8, 304:19,
305:2
**2,174**
26:4
**2/1/16**
11:4
**2/7/16**
10:22
**2/7/2016**
337:6
**2/9/16**
7:12, 7:14
**20**
7:7, 7:9, 7:15,
12:6, 28:21,
54:21, 55:7,
61:7, 106:20,
111:4, 111:8,
232:9
**2000**
17:5, 94:2,
237:4
**20036**
3:18
**2010**
162:1, 162:5
**2013**
20:1, 55:12,
63:16
**2014**
20:1, 55:17
**2015**
32:12, 36:8,
38:14, 43:22,
55:12, 73:16,
74:18, 95:1,
99:4, 105:20,
107:14, 110:13,
111:9, 117:15,
126:19, 147:12,
237:5, 308:14,

309:12, 310:9
**2016**
17:5, 17:11,
112:9, 116:11,
121:19, 123:5,
147:6, 152:17,
156:10, 156:19,
156:22, 157:14,
158:5, 160:12,
162:6, 167:20,
169:14, 177:17,
178:11, 180:13,
183:21, 185:9,
186:4, 189:19,
192:14, 194:7,
196:5, 196:13,
207:8, 216:18,
217:15, 217:19,
218:4, 226:13,
232:9, 236:8,
236:11, 237:11,
237:16, 271:10,
271:12, 306:3,
309:12, 330:8,
330:10, 338:10,
338:13, 351:12,
352:3
**2017**
168:5, 207:14,
208:3, 227:13,
241:6, 241:21,
242:2, 243:8,
243:17, 337:2
**2018**
242:5, 242:7,
259:4, 267:10,
267:14, 268:20,
268:21, 269:2,
269:16, 269:21,
279:21, 288:10
**2019**
236:4, 236:7,
247:2, 247:5,
249:12, 253:7,
253:10, 253:15,
254:11, 269:14,
269:21
**202.772**
3:19

**2020**
1:15, 13:8,
280:8, 355:28
**21**
5:22, 6:15,
7:18, 11:7,
54:22, 55:9,
55:10, 63:16,
87:12, 118:9,
118:13, 118:16,
225:20
**215**
11:3
**218**
11:5
**22**
8:3, 9:17,
11:9, 11:21,
121:14, 121:15,
139:10, 139:13,
139:16, 139:17,
139:22, 140:5,
174:7, 220:16
**220**
11:8
**22102**
3:8
**222**
11:10
**227**
11:12
**228**
11:14
**23**
8:6, 8:18,
131:12, 145:17
**232**
11:16
**24**
5:7, 8:9, 12:6,
136:4, 141:17,
251:1, 280:8
**25**
6:22, 8:12,
16:7, 28:21,
95:1, 139:2,
142:16, 143:19,
183:11, 208:8,

Transcript of David Sandoz
Conducted on March 5, 2020

143

208:18, 208:20,
208:22, 211:3,
212:22
**25,000**
128:17
**250**
164:16, 208:9,
278:17, 279:7,
337:21, 351:16,
351:17, 352:2,
352:4
**250,000**
61:9, 175:5,
278:13, 351:11,
351:12
**253**
11:18
**258**
11:20
**26**
6:5, 6:8, 6:12,
8:14, 10:15,
12:4, 73:16,
82:9, 143:19,
143:22, 310:9
**266**
12:3
**27**
8:17, 145:8
**28**
8:5, 8:19,
8:21, 10:6,
120:17, 121:18,
123:5, 142:11,
146:16, 147:6,
152:17, 156:18,
156:19, 156:22,
157:14, 158:5,
160:4, 186:3,
186:8, 207:14,
211:9, 212:14,
213:19, 213:22,
227:10, 227:13,
236:11, 264:11,
331:13, 333:10,
333:14, 335:7,
335:13, 335:14,
335:22, 336:8,

337:18, 337:22,
338:6
**280**
12:5
**29**
8:8, 9:3, 10:8,
11:11, 156:6,
163:17, 174:9,
174:10, 189:18,
189:19, 191:13,
193:12, 222:15,
226:14, 226:16
**290631**
1:20

---
**3**
---

**3**
179:7, 179:13
**3 (d**
345:16
**3/3/17**
11:15
**3/8/17**
11:13
**30**
9:6, 9:19,
10:11, 35:2,
36:16, 83:16,
102:14, 131:15,
138:15, 160:9,
192:14, 192:21,
217:19
**300**
4:6
**308**
5:4
**309.643**
4:8
**309.694**
2:9
**31**
9:9, 148:1,
149:12, 159:13,
161:20, 168:2,
251:4
**316**
12:7
**32**
9:12, 178:2

**33**
9:14, 179:9
**334704**
86:11
**334767**
147:8
**34**
9:16, 180:15
**342**
5:3
**35**
9:18, 182:4
**355**
1:21
**36**
9:20, 183:16
**37**
5:9, 10:3,
185:1
**38**
10:5, 185:22,
342:15
**39**
10:7, 189:2,
189:5

---
**4**
---

**4**
225:20, 226:2
**40**
10:9, 192:10,
322:3, 348:16
**41**
10:12, 194:3,
342:19
**42**
10:14, 121:7,
195:4
**43**
5:12, 10:16,
196:9
**44**
10:18, 197:9,
198:14
**45**
10:21, 35:4,
198:11, 198:14,
331:21, 332:4,

333:2, 334:18
**4541**
4:6
**46**
11:3, 215:12,
215:14, 226:2
**47**
11:5, 217:22
**48**
11:8, 220:8,
220:10, 222:10
**49**
5:14, 11:10,
222:12, 307:16

---
**5**
---

**5**
128:17, 251:1,
251:4
**5/1/15**
5:8
**50**
11:12, 227:21,
228:17, 229:21,
230:12
**50,000**
126:19, 174:20,
174:21, 175:8,
271:12
**500**
164:10, 164:16,
278:17
**500,000**
59:3, 61:20,
64:9, 110:2,
119:11, 119:12,
128:7, 156:21,
157:16, 161:5,
161:18, 164:11,
165:7, 165:11,
204:22, 208:2,
276:19, 278:1,
349:13, 349:14,
350:5, 350:6
**51**
11:14, 228:3,
228:5, 228:10,
228:13, 228:15

Transcript of David Sandoz
Conducted on March 5, 2020

144

**52**
5:17, 11:16, 232:5
**53**
11:18, 253:3
**54**
5:20, 11:20, 258:15
**55**
12:3, 266:4, 354:9, 354:17
**56**
1:16, 12:5, 13:9, 60:19, 280:4
**57**
12:7, 316:7, 316:9, 317:7, 319:11, 325:5
**58**
121:11
**592**
116:10
**5:-cv--mfu**
1:8, 13:7

---
**6**
---
**6**
307:16
**6) () (c**
102:16
**6/5/15**
5:13
**6/9/16**
9:5
**61611**
2:8
**61616**
4:7
**64**
6:3
**6th**
355:28

---
**7**
---
**7**
19:22, 307:21, 342:15, 342:19,

354:9, 354:17
**703.749**
3:9
**73**
6:6
**77**
16:22
**79**
6:9

---
**8**
---
**82**
6:10
**86**
6:13
**88**
6:16

---
**9**
---
**9**
1:16, 13:9, 109:9
**92**
16:22
**93**
6:18
**94**
6:20
**96**
7:3
**99**
251:21
**99.7**
26:14