IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

|  |  |  |
|---|---|---|
| RLI INSURANCE COMPANY, | ) | Civil Action No. 5:18cv66 |
| Plaintiff, | ) | |
| Counterclaim Defendant, | ) | |
| | ) | By:    Michael F. Urbanski |
| v. | ) | Chief United States District Judge |
| | ) | |
| NEXUS SERVICES INC, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| Counterclaim Plaintiffs. | ) | |

## MEMORANDUM OPINION

On July 3, 2020, the court entered partial summary judgment for plaintiff RLI Insurance Company ("RLI") and granted specific performance of certain provisions of its Indemnity Agreement with defendant Nexus Services, Inc. ("Nexus").[1] Following the entry of summary judgment, the court convened an evidentiary hearing on September 21 and 22, 2020, for three purposes:

(1) To determine a reasonable amount of collateral security to be deposited by Nexus under ¶ 3.d. of its Indemnity Agreement with RLI;

(2) To determine a reasonable amount of RLI's "losses, costs, damages, attorneys' fees and expenses" under ¶ 2.a.(i) of the Indemnity Agreement; and

(3) To address cross-motions for sanctions.

---

[1] As reflected in footnote 1 of the July 3, 2020 Memorandum Opinion, Nexus refers collectively to defendants Nexus Services, Inc.; Libre by Nexus, Inc.; and Homes by Nexus, Inc.

After hearing evidence and argument over the two-day evidentiary hearing, it is clear to the court that there are no genuine issues of material fact in dispute on these issues and that RLI is entitled to specific performance of the Indemnity Agreement as follows.

## 1. Collateral Security.

Paragraph 3.d. of the Indemnity Agreement provides RLI with the right to request discharge of the immigration bonds on Nexus program participants, the performance of which Nexus agrees to indemnify. If such discharge is unattainable, the Indemnity Agreement requires Nexus, upon demand of RLI, to deposit collateral security "sufficient to cover all exposure under such Bond or Bonds." Indemnity Agreement at ¶ 3.d. Prior to the filing of this lawsuit, and throughout the course of this litigation, RLI has consistently demanded Nexus deposit collateral in the amount of $10,000,000, a remedy which the court found not to be warranted. See, e.g., RLI 2017 Demand Letter, ECF No. 1-6 at 2; Driscoll Dep., ECF No. 422-4 at 18; Mot. for Second Prelim. Inj., ECF No. 106; Supp. Brief to Mot. to Enforce, ECF No. 359 at 15; Mot. for Sum. J., ECF No. 423 at 14. In granting RLI summary judgment, the court withheld decision on the appropriate amount of collateral security owed by Nexus to RLI, finding RLI had not provided sufficiently detailed evidence to support its requested amount of $10,000,000. In its July 3, 2020 Memorandum Opinion, (hereinafter "July Opinion") the court stated:

> Under ¶ 3.d., RLI may require Nexus to deposit a reasonable amount of collateral security to cover RLI's exposure on the immigration bonds issued to Nexus program participants. RLI's right to require Nexus to deposit collateral security is not limited by claims made by DHS or the value of bonds as to which bonded principals have already failed to appear. Nor may it be whatever amount RLI demands. Rather, it must be reasonable. At a minimum, Nexus must deposit collateral with RLI for

2

> unpaid breached bonds, but it must also make provisions suitable to RLI to cover RLI's reasonably certain risk of future loss. RLI carries the burden of demonstrating the amount of this exposure in a detailed, itemized format and will be required to substantiate each alleged source of risk as well as the reasonable likelihood of future loss. In doing so, RLI may look beyond performance on bonds to information gleaned from Nexus's books and records such as its financial position and business operation, among other things.

July Op., ECF No. 488 at 38. The court ordered RLI to provide evidence sufficient to justify its requested amount at the evidentiary hearing on the matter. ECF No. 489.

At the evidentiary hearing, RLI offered the following evidence as to its reasonably certain risk of future loss. As to the 1,710 immigration bonds remaining outstanding, RLI faces risk in the amount of $20.71 million, the total penal sum. RLI originally issued 2,486 bonds to Nexus program participants with a total penal sum of $30.22 million.  Since the program began in 2016 and to date, 776 RLI bonds issued to Nexus program participants have been discharged, either through breach or cancellation.[2] Of these 776 discharged bonds, roughly 48 percent were breached. Applying this 48 percent historic breach rate to the outstanding 1,710 bonds, RLI argued that it faces $10 million in exposure and sought deposit in escrow of collateral in that amount. RLI also offered evidence that Nexus has historically been slow in paying RLI on breached bonds.[3] At the time RLI filed suit in March 2018, it had paid the government $83,872 for eight breached Nexus bonds. By late October 2018, the Department of Homeland Security, Immigration and Customs Enforcement ("DHS" or "ICE"), was

---

[2] A "breached bond" is a bond that was issued for an immigrant-principal who failed to comply with the terms of performance, which is generally appearing for immigration proceedings when summoned. A "canceled bond" is a bond for which performance is complete.

[3] RLI asserted that as of the date of the evidentiary hearing, September 21, 2020, Nexus owed RLI $203,020, representing $47,020 in past due invoices and $156,000 for breached bonds. Nexus represented that the checks satisfying the past due invoices were in transit.

demanding that RLI pay $711,520 for 56 breached Nexus bonds. See Supp. Decl. of Laura Piispanen, ECF No. 102, ¶ 6 and Ex. E (October 23, 2018 letter to RLI from ICE attaching "Payment Schedule – RLI Insurance Co."); Test. of Ira Sussman, RLI Vice Pres. Surety Claims, at Prelim. Inj. Hr'g, ECF No. 43 at 44. By the time of the second preliminary injunction hearing, November 28, 2018, RLI had paid the government $226,666 in past due bond penalties for breached Nexus bonds and the government was pressing for payment of another $484,854 in past due bond penalties to forestall collection by the Department of Treasury. See Order, ECF No. 139 at 4. Despite the issuance of the second preliminary injunction, Nexus continued to delay paying RLI for breached bonds requiring RLI to petition the court for additional relief. See Orders, ECF Nos. 215 and 372. RLI argued that Nexus only pays for breached bonds when ordered to by the court, and that Nexus's historic intransigence is a significant risk factor requiring the deposit of collateral. Other risk factors included the unexpected longevity of outstanding bonds, multiple state attorney general and bureau of insurance investigations, Nexus's incomplete and inaccurate financial records, Nexus's pattern of bouncing checks,[4] and large financial claims leveled by creditors, including Nexus's former counsel and GPS location service providers, both of whom claim they remain unpaid for services rendered.

Nexus countered with evidence that it has paid RLI $2.6 million in bond premiums and that RLI has yet to suffer the first penny of exposure on bonds issued to Nexus program participants. Nexus conceded it has, at times, been slow in paying RLI for breached bonds in

---

[4] RLI identified one instance in which it received three checks that were returned for insufficient funds. Nexus contends it rectified the error by sending RLI cashier's checks by overnight mail for the total amount of the bounced checks.

accordance with the court's orders, but it argued that, at the end of the day, it has either paid DHS directly or reimbursed RLI the penal sum for all past due invoices to date. In all, Nexus has paid RLI approximately $4 million in breached bond payments. Nexus argued that RLI's calculation of the breached bond rate is misleading as it ignores the 1,710 outstanding bonds for which principals continue to perform. Nexus contended that RLI faces no risk on a performing bond, as they are bonds for which principals have demonstrated a history of compliance, and that consideration of these outstanding bonds yields a breach rate closer to 5 to 6 percent. Nexus added that RLI ignores the fact that the risk on these immigration bonds is individualized, as some asylum cases are weak and others are strong because they differ factually and are brought before various jurisdictions around the country, some of which are more receptive to these claims than others. Nexus countered with evidence that it was working to improve the accuracy of its financial records and was complying with various consent decrees and investigations. As to monitoring of Nexus program participants, Nexus argued that after three years in the system, these participants no longer needed GPS monitoring, and that Nexus was close to deploying a newly developed smart phone app to facilitate greater contact with its program participants.

RLI presented testimony from Josephine Waldman, an actuary with experience in the surety industry who testified as an expert witness. Waldman described her role as an actuary as looking at losses from past data and projecting future financial obligations. She analyzed data regarding 717 breached or canceled Nexus bonds for the period ending February 19, 2020

and identified four variables from the data predictive of breach.[5] Analyzing these variables and employing multiple methodologies, Waldman calculated a future breach risk to RLI on the outstanding bonds of in the range of $9.9 to $10.6 million.

David Grycz, RLI's Assistant Vice President of Claims, provided an overview of the RLI bonds for Nexus program participants. Grycz testified that 424 of the 2,486 RLI bonds issued have been canceled, amounting to an aggregate penal sum of $5,543,500. RLI has received breach notices on 393 bonds having an aggregate penal sum of $4,460,000. The 1,710 outstanding bonds have an aggregate penal sum of $20,914,950. Grycz testified that the historic breach rate has stayed steady at around 47 to 49 percent, as a percentage of breached bonds to the total number of breached and canceled bonds.[6] Applying this historic breach rate range to the amount of outstanding bonds yields an expected loss range of approximately $9.7 million to $10.1 million. Grycz disagreed with Nexus's assertion that RLI has suffered no loss:

> We have incurred losses multiple times over the course of this program. We have had to go out of pocket and pay money. Some of the examples that come to mind is March 2018 right before we filed suit, the November 2018 hearing we're out 266,000. They had let accumulate over 300,000 when we came and saw you in January 2020. They are routinely flouting the Court Orders and not paying on time and we have to chase, chase, chase.

---

[5] The court overrules Nexus's objection to the Waldman actuarial expert report. In her report, Waldman identified four characteristics of RLI bonded principals predictive of bond breach, including the bond amount, date of last Nexus contact, last payment, and country of origin of the program participant. Contrary to Nexus's assertion, ECF No. 532 at 1, Waldman's use of national origin as a data point in her actuarial analysis does not begin to resemble illegal discrimination based on national origin. The fact that actuarial expert Waldman analyzed historical data to identify factors predictive of Nexus program participant bond breach in no respect suggests that RLI made any of its underwriting decisions on the basis of national origin. Nor is there any other evidence in this record to support this assertion.

[6] This analysis does not take into account outstanding bonds.

Sept. 21, 2020 Evid. Hr'g Tr., ECF No. 545 at 97. Grycz testified that his company has had to pay a small fortune to get Nexus to honor its obligations under the Indemnity Agreement.

Grycz identified the following risk factors associated with Nexus: (1) Nexus's historic failure to timely pay RLI for breached bonds, requiring RLI to "pay and chase;" (2) Nexus's unreliable and inconsistent financial records; (3) Nexus's history of bounced checks, reflecting the concerns of insolvency and that part of their business model is not to pay creditors; (4) Nexus's recent, and allegedly unrecorded in its financial records, real estate sell-off; (5) Nexus's ongoing investigations and enforcement actions by federal and state governments, including Virginia and California; (6) Nexus's abandonment of GPS monitoring of program participants; (7) Nexus's hefty historic breach rate; and (8) the long duration of Nexus program bonds. As to his calculated historic breach rate, Grycz disagreed with Nexus that the outstanding bonds should be considered. He testified: "That wouldn't make sense. It would be much lower and you would be including bonds for which there is no resolution yet. So the 1700 that are out there, there is no resolution yet. We have no clue what's going to happen." Id. at 112. Nexus responded that unlike already breached bonds, outstanding bonds reflect a low risk of breach because the principals have performed for years, which suggests a low likelihood of future breach.[7]

Raymond Peroutka, an expert forensic accountant, testified as to the abysmal state of Nexus's financial records. Peroutka testified that he has examined substantially all of the

_____

[7] Nexus asserted during the evidentiary hearing that most immigrants are asked to appear before immigration officials numerous times after they are released on bond but before their cases are resolved and the bond is canceled.

financial documents produced by Nexus in this case and provided multiple examples of erroneous, incomplete, and unreliable financial records kept by Nexus. Peroutka testified:

> The first opinion that I set forth in my initial report and confirmed again in my supplemental report is that the Nexus financial statements are unreliable, that they contain numerous and substantial errors that compromise their reliability. I've evaluated them for the purpose of understanding those errors and where possible making allowances for those errors, but they are – they are deeply flawed.

Id. at 125. For example, for the same period of October 2018, Nexus's books and records varied from exhibiting losses of up to $17 million to profits of $2 million depending on the source consulted. Peroutka stated:

> They are for the same time period and adjacent time periods all over the map with respect to the results of operations that they – that they show, as well as the composition of assets and liabilities that bookmark those results of operations during various periods of time.

Id. at 126.   RLI essentially concluded it could not conduct a meaningful risk assessment of Nexus's financial posture based on the erratic data provided, and that, in fact, the state of the financial records gave additional cause for concern.

Peroutka identified a few broad areas of Nexus's financial records which he found troubling:

> I've identified glaring inconsistencies between the asset values claimed on the Nexus balance sheets and the bank statement third-party documents that show what the actual balance in the account is.
>
> In other instances, there are recording of assets that clearly are not assets at all. There are also assets recorded that I know to have been removed from the balance sheet, -- removed -- better way of putting it, sold and not removed from the balance sheet.

> In other instances, I've got liabilities that appear on the balance sheet as negative liabilities masquerading as assets. To any accountant trained as I am in forensic accounting, these are problems that are easily identified, and that, as I said a few moments ago, compromised the reliability of the financial records and cry out for adjustment or allowances to be made for that.

Id. at 126-27. In all, Peroutka described substantial Nexus assets and liabilities not appropriately reflected on its books and records, noted a large payroll tax liability and the recent sale of several properties Nexus claimed to still carry on its books. Peroutka gave as an example the shareholder loan account, which he described as "an account of very questionable inclusion as an asset on the balance sheet." Id. at 131. He explained:

> These are disbursements that were made for luxury items: Bloomingdales; BMW, $45,000; Ferrari, $83,000; Mercedes-Benz, $44,000: Saks, Versace. These are all luxury items that have been purchased by the company and are being carried as a — as an asset, presumably as a receivable from some shareholder, I would infer from the caption on the account, but there's not a specific identification of who owes the money, if anybody owes the money. I think it's most properly included as an expense rather than an asset.

Id.

Peroutka identified some substantial Nexus debts, including $542,000 owed to Anthem Blue Cross and $467,000 to Attenti, a location monitoring firm. Buddi Solutions, a firm that also provided Nexus with GPS tracking services, sent a notice to terminate services to Nexus on May 19, 2020, claiming a balance due of $7,347,000. As to these liabilities, Peroutka stated that they are "in stark contrast to the account payable balance that Nexus is carrying on its QuickBooks and published financial statements." Id. at 134. With regard to its former counsel, Eckert Seamens, Nexus's records show a negative account payable of $1,037,000, indicating

that the law firm owes it more than a million dollars, in contrast to the lawsuit filed by Eckert Seamens against Nexus claiming Nexus owes it $1.4 million in fees and costs for services rendered, including those related to the instant action. Id. at 135.  Peroutka found Nexus's accounts payable report to be "dramatically understated." Id.

> For purposes of analysis, I – I said the negative 10 million that's associated with five pages of negative balance vendors is just unsupportable. And for the purposes of being as conservative as I know how to be, I said – I wrote those to zero for analysis purposes, and then I made adjustments to the ones I knew something about, such as Buddi and Attenti and Eckert Seamans. And the result is, instead of being a negative $6 million accounts payable, it's actually at least a positive $14 million balance in that account.

Id.

RLI also contends that Nexus's books and records do not reflect accurate liabilities because they do not account for expected sums owed on future breached bonds.

> With regard to bond breach liability, that's an account that should appear on the balance sheet because it is an amount – and you can argue as to what the correct amount is, but it's an amount that is likely of occurrence and susceptible to estimation. And so it – it needs to be recorded as a liability if it is likely to occur and can be reasonably estimated within a range, at least. And there are no liabilities that appear on the balance sheet for those bond breach liabilities.

Id. at 136.  In this regard, Peroutka discussed an internal Nexus memo that "identifies $4,358,000 of bond breach liability that should appear on its balance sheet, but it does not." Id.

Peroutka noted that Nexus's "bank statements are replete with insufficient funds and

charges for bounced checks." Id. at 137. "But, literally, there are hundreds of thousands of dollars of charges that are being absorbed by Nexus from their various banks or bounced checks. They even go so far bouncing checks to the -- the IRS." Id. at 138.

Peroutka characterized the risk of nonpayment by Nexus on outstanding immigration bonds to be very high based both on the discrepancies in Nexus financial records and the troubling financial trends he could discern from his analysis of them. Peroutka testified that the financial statements are riddled with errors and, as such, deprive RLI of any ability to rely on them to make a reasonable assessment of Nexus's financial position. Peroutka described Nexus as a company that is in substantial financial difficulty today and will have further difficulty in the future, testifying that its cash flow has deteriorated, and that Nexus has many competing creditors.

On cross-examination, Peroutka agreed that with the exception of a recent bill for approximately $40,000, RLI was not out of pocket for bond breach penal sums for any Nexus program participants. Id. at 150. For its part, Nexus did not dispute that its books and records were a mess, stating instead that it was taking affirmative steps to bring them in order.

John Simanski, another RLI expert witness, testified based on his many years of experience in the surety industry calculating projected claims loss for St. Paul Surety and Travelers.[8] Simanski contrasted the nature of the surety business from the insurance industry, testifying that there is no expectation of loss in the surety business. "It's often said that it's a zero-loss business." Id. at 156. Simanski explained that because of this perspective, typically

---

[8] Nexus objected to the Simanski testimony as being cumulative of that of the actuarial expert Waldman. Upon consideration, the objection is overruled as the expert witnesses had different experience, expertise, and opinions.

no collateral is demanded at the outset of a surety relationship:  "[I]n some situations where you have maybe a less common line of business, a unique line of business, there might be a request for collateral. But you have to understand that in that situation it's not based on some projection of what the losses would be like collateral calculations would be later on in a claim situation. It's based on the fact that maybe you don't have exactly the comfort level with that line of business. You want a little bit of a cushion." Id. at 156-57.

Simanski emphasized that simply because losses have not yet been sustained on bond claims does not provide assurance that collateral may not be needed to cover a loss in the future. Simanski noted that based on his experience "what I see in this case fits the pattern of the vast majority of cases that lead to very large losses on the part of the surety." Id. at 158. He explained:

> It doesn't just all happen at once, usually. What happens is you start to receive claims and then you – you contact the account and say what's going on and the account usually has some explanation, a lot like this case, some excuse or another about why the claims aren't being paid. And they say they will take care of it, and at the beginning they may. Usually they do.
>
> And then you start to get more claims. And then maybe they don't satisfy those claims before you as a surety have to meet your good faith obligation to pay the claims. You cannot make the claimants wait forever. And at the same time, maybe they find a way to reimburse you.
>
> So in my experience at that point in time, yes, you have no loss. But that's true of many, many claims that I've been involved with at this juncture that have led to millions or tens of millions of dollars of loss. Because what happens is that you extend out your accountants for your forensics to do an investigation. And it's very similar to this case. What you find often is -- I think counsel for Nexus has said the books are a mess -- the books are a mess and they are inaccurate. And then you find that certain vendors aren't being paid. And there's issues maybe with the IRS.

> And for us in the surety business, that is a sure sign that what could be down the road is not just an increased rate of paying. You're going to go from zero loss to some 80 percent of the claims. What happens typically in these situations is that the principle (sic) or the indemnitors lose the ability to pay. And at that point the surety is stuck with the whole loss.
>
> \*       \*       \*
>
> So the fact that there is no loss at some point into time in the whole process, once you've seen that process play out and looked at from the back end, you know that is no insurance and many times has absolutely no bearing on the fact of how much collateral you need to protect you from what the losses could be in the future.

Id. at 158-60. On cross-examination, Simanski conceded, however, that his experience was mostly with larger bonds and that he did not have experience with immigration bonds or criminal bonds, which involved smaller bond values and many more principals. Id. at 160-62.

Nexus's Vice President of Operations and Corporate Secretary, Evan Ajin, testified as to the efforts Nexus is currently making to contact Nexus program participants to make sure that they are keeping up with their bond obligations. Ajin testified that participants are routinely contacted to ensure compliance.  In addition, over the last three months, attempts have been made to call each RLI bonded principal. Ajin agreed that Nexus's QuickBooks records were inaccurate, but that Nexus has retained Fusion, a CPA firm, to get its books into compliance. Ajin stated that the 2017 books would be completed by the end of September, the 2018 books would be completed by the end of October, and the 2019 books would be finished by year's end. Ajin testified that the California class action was being resolved based on 2021 revenue; the State of Washington Attorney General's investigation resulted in Nexus issuing debt relief to program participants in an amount around $15,000 to $20,000; and that

13

Nexus resolved the issue with the California Department of Insurance for $90,000. Ajin indicated that he was not aware of any money Nexus owed on other ongoing investigations. Ajin explained that DHS issuance of a Notice to Deliver triggered the involvement of Nexus's risk management department and instigated a vigorous process to investigate and resolve the situation with the principal. Ajin stated that because the remaining RLI bonded Nexus program participants have been on bond for three years or more, they have had multiple contacts with the immigration system, either in terms of docketed court appearances or Immigration and Customs Enforcement ("ICE") check-ins.

Erik Schneider, Nexus's Vice President of Risk Management and Director of Investigations, testified that Nexus made efforts to contact its RLI-bonded program participants during the past few weeks and obtained declarations from 219 participants stating that they fully intended to appear when required at immigration proceedings and comply with the terms of their RLI bonds. Schneider stated that Nexus established contact with 351 other program participants but that they were fearful of signing an affidavit. Schneider testified that efforts to contact Nexus program participants bonded by RLI would continue. Schneider also testified as to efforts to switch program participants from GPS tracking to the smart phone application that Nexus is in the process of deploying. Finally, Schneider explained the substantial efforts made by Nexus to assist its program participants in complying with appearance requests from immigration authorities.

Micheal Donovan, Nexus's CEO, testified about the status of ongoing state and federal investigations into Nexus's business practices and efforts to resolve issues raised in those inquiries. Although Nexus no longer uses GPS tracking, it has developed a smart phone app

to track program participants. Donovan disagreed with RLI's claimed breach rate, asserting

that Nexus's global breach rate is around three per cent. Donovan explained:

> You have to understand, and I think this is really important for
> the Court, and quite frankly, for the plaintiff to understand. These
> are people. They are not buildings. They are people. And so
> people . . .  you can't predict – you can't have the same kind of
> predictive reasoning you can when you have multimillion dollar
> insurance contracts or insurance policies. Our breach rate is low
> because we engage clients, and our breach rate counts when we
> pay the breach, when we have to pay the breach.

Id. at 257.

As regards current Nexus program participants bonded by RLI, Donovan further

discounted Nexus's 48 percent breach rate by stating that breaches are more common at the

start of the immigration process, typically before the first master calendar hearing. As Nexus

program participants under RLI bonds have been performing for three years, Donovan

claimed that these persons were less likely to breach their bonds because they have already had

multiple contacts with ICE. He also claimed that the National Association of Pretrial Service

Agencies and other sureties in the immigration bond business also calculate breach rate as a

percentage of breached bonds over total number of issued bonds. Id. at 264.

To further support his contention that RLI's demand for collateral and assessment of

risk on the outstanding bonds was unreasonable, Donovan indicated that the RLI program

was much smaller than those of other sureties. Counsel for Nexus represented that Nexus had

14,157 active bonds, with a total outstanding penal sum of $170 million. Donovan stated that

no other surety demanded collateral in the amount sought by RLI even though liabilities for

other immigration bond sureties were much larger. At the hearing, Donovan provided

estimates of collateral held by other sureties. When RLI questioned these estimates, Donovan

indicated he would provide the court with accurate amounts of collateral held by other sureties. On October 14, 2020, Donovan provided a supplemental sworn declaration averring that Evergreen Surety was not holding any collateral from Nexus to secure its bond liability of $30 million; American Surety likewise held no collateral for its $43 million in bonds, although Donovan and Nexus's Richard Moore personally guaranteed those bonds; AIA Surety held $93,481.76 in cash collateral against a total liability of approximately $30 million; and that FCS Surety held $3 million in real estate collateral against a total liability exceeding $200 million in immigration bonds. ECF No. 575. At the hearing, Donovan stated that AIA Surety once maintained sizeable property liens but that those had since been removed.

At the end of the day, Donovan expressed frustration with RLI's demands, stating "the judge can see that we've done what we were supposed to do every step of the way, every month of the way. When you send us a demand, we investigate it, we send you the appeal documents if they are appealed, we pay you, and we continue to be in litigation. It doesn't make any sense." Id. at 302.

Considering the evidence and arguments presented at the evidentiary hearing, the court has a clear picture of the risk faced by RLI on its immigration bonds and the reasonable amount of collateral Nexus is required to deposit to address this risk. Over the course of the past four years, Nexus has proven itself to be an unreliable business partner with RLI. It has failed to provide RLI with an accurate picture of Nexus's financial status, first by refusing to provide access to books and records absent execution of a confidentiality agreement, a condition that was not bargained for at the time of contracting, and then by walling off access to the records of the related entities, Libre and Homes, denying they were alter egos for Nexus.

16

To this day, they fail to make available accurate financial records. By late October 2018, Nexus had become so delinquent in bond breach payments that ICE demanded that RLI pay $711,520 or face Treasury collection, see Piispanen Supp. Decl., ECF No. 102 at ¶ 6, compelling RLI to seek a second preliminary injunction order. While it is true that Nexus has paid RLI nearly $4 million for breached bonds and that RLI has not suffered any unreimbursed penal sum losses on breached bonds, it has strung RLI out over the past four years. Nexus's historic intransigence represents an ongoing financial risk to RLI. This financial risk is compounded by RLI's inability to obtain any realistic assessment of Nexus's financial condition as its books and records are anything but accurate. Additional risk to RLI stems from the myriad investigations into Nexus's business practices by various state attorney generals and bureaus of insurance, claims made by large creditors, its recent sell-off of real estate, and diminished cash flow.

In determining the amount of collateral to be deposited, the court is required to weigh the risk to RLI on the number of outstanding bonds with the fact that, to date, RLI has not experienced any loss on any breached bond. In considering the parties' arguments, the court is struck by the fact that absent court intervention, Nexus fell behind in breached bond payments to RLI in the fall of 2018 by more than $700,000. Since that time, Nexus's financial position has deteriorated.

As such, the court believes that a reasonable deposit of collateral security, reflective of both Nexus's prior arrearage, its faulty records, and its strained financial position, is $2.4 million to be held by RLI in escrow. This sum takes in to account the arguments made by both sides as to the risk facing RLI on outstanding bonds, including the performance by Nexus

program participants on these bonds to date. The $2.4 million figure is calculated as follows: $1.4 million for the risk associated with Nexus's historic failure to timely pay breached bonds,[9] $500,000 in collateral deposited for the risk associated with the murky glimpse of Nexus's financial position afforded RLI due to the lack of accurate and complete books and records, and $500,000 in collateral deposited for the risk associated with Nexus's struggling financial condition and involvement in ongoing regulatory investigations. The court believes that the amount of collateral security to be deposited in escrow with RLI to be the bare minimum necessary to meet Nexus's obligations under the Indemnity Agreement.

This collateral deposit will be held by RLI in escrow to secure its exposure on the outstanding bonds. As an element of specific performance, Nexus is ordered to deposit the $2.4 million in collateral with RLI on or before December 1, 2020. Upon full performance of the contract, when RLI has been fully exonerated, any remaining sum maintained in escrow shall be returned to Nexus.

In addition, given Nexus's historic failure to timely meet its obligations under the indemnity agreement for breached bonds, as a further element of specific performance, on an ongoing basis, Nexus must deposit additional collateral with RLI in the amount of the penal sum on any bond as to which the government issues a Notice to Deliver. RLI is ordered to provide Nexus with a copy of each Notice to Deliver it receives on a Nexus program participant within forty-eight (48) hours of Nexus's receipt of the same. In addition, within

---

[9] The $1.4 million collateral deposit for late payments is grounded in Nexus's historic failure to timely pay RLI for bonds breached by Nexus program participants. By late October 2018, ICE demanded RLI to pay it $711,520 for breached bonds, compelling RLI to seek a second preliminary injunction to avoid referral of these debts to the Department of Treasury for collection, which RLI argued jeopardized its position as an approved federal surety. The court calculated the amount of collateral to be deposited based on Nexus's history of late payment to be just shy of twice the amount of Nexus's late October 2018 deficiency.

that same forty-eight (48) hour period, Nexus is ordered to deposit additional collateral security in the amount of the penal sum of any bond as to which the government has issued a Notice to Deliver. Nexus is ordered to deposit this additional collateral security with RLI on an ongoing basis to augment the $2.4 million referenced above.

**2.   "Losses, costs, damages, attorneys' fees and expenses."**

Despite its untimely performance of its obligations under the Indemnity Agreement, Nexus has either paid the government or reimbursed RLI for breached bonds to date. As such, RLI's losses under ¶ 2.a.(i) of the Indemnity Agreement largely consist of its attorneys' fees, special master's fees, expert witness's fees, and other expenses associated with this lawsuit. Consistent with paragraph 2.b.(iii) of the Indemnity Agreement, RLI has provided an itemized statement of its losses, sworn to by one of its officers, David Grycz, and has provided evidence of the amounts paid by RLI to date.[10] As the court held in its July Opinion, prima facie evidence provisions are valid and enforceable terms in indemnity agreements under Illinois law. Illinois courts have upheld prima facie evidence provisions of indemnity agreements. ECF No. 488 at 48-49; see, e.g., Amwest Surety Ins. Co. v. Szabo, No. 00 C 2716, 2003 WL 21789033, at *4-5 (N.D. Ill. July 23, 2003); U.S. Fidelity and Guar. Co. v. Klein Corp., 558 N.E.2d 1047, 1052 (Ill. App. Ct. 1989).

A party may establish the inaccuracy of prima facie evidence provision with "counter affidavits, or other evidence." U.S. Fidelity and Guar. Co., 558 N.E.2d at 1052. In its opposition to RLI's motion for summary judgment, Nexus did not challenge the accuracy of

---

[10] The sum claimed by RLI includes an estimate of unbilled time. As the court has not been able to examine invoices associated with this unbilled time, it is excluded from the damage award.

RLI's prima facie evidence other than to argue that the sworn officer declaration was insufficiently itemized. ECF No. 488 at 49-50. In the July Opinion, the court agreed with Nexus and ordered RLI to provide supplemental evidence of losses and damages incurred to be presented at the evidentiary hearing. Id. In advance of the hearing, RLI submitted the Supplemental Declaration of Grycz and the Declaration of Vivian Katsontonis, RLI's counsel, detailing RLI's fees, costs and expenses incurred as a result of Nexus's breach of the Indemnity Agreement. Both Grycz and Katsontonis testified at the evidentiary hearing, and RLI introduced detailed data supporting the costs and fees expended.

Nexus claimed that the legal bills submitted by RLI's counsel were overly redacted, preventing Nexus from raising an effective challenge. However, to challenge the prima facie evidence substantively, under the terms of the Indemnity Agreement, Nexus was required to demonstrate that the fees were either unreasonable or unrelated to enforcement of the terms of the contract. Nexus does not argue that the amounts claimed by RLI were unrelated to the bonds issued by RLI to program participants. Nor does Nexus challenge the hourly rates of RLI's counsel or argue that the overall amount RLI has spent on this litigation is overstated. Nexus makes no argument that RLI's legal fees are out of proportion to its own. Rather, Nexus rests exclusively on its argument that the invoices were unreasonably redacted.

In considering Nexus's lone argument, the court reviewed the invoices to evaluate the reasonableness of the redactions. The court reduced the amount of damages RLI claimed for any entry which, on its face and contextually, failed to provide sufficient information regarding the purpose of the charge to allow Nexus to mount a fair challenge. An entry was considered overly redacted if: (1) there was insufficient information provided by the entry description or

context provided by other entry descriptions to determine whether the expense was compensable under ¶ 2.a.(i) of the Indemnity Agreement; or (2) there was insufficient information in the description or context provided by other entry descriptions to determine whether the expense was reasonable. Additionally, the court considered inconsistencies in redaction. Finally, the court found entries to be over-redacted when the references appeared to concern public documents, unsealed filings in the instant action, public court documents in other suits involving either party, and documents provided by and to Nexus, as these entries plainly could not involve information protected by the attorney-client privilege or work product doctrine.

For the remaining entries, the court found that the invoices provided sufficient information to allow Nexus to raise a challenge, had it chosen to do so. Given that Nexus filed no objections to the prima facie evidence beyond the extent of the redactions, the court finds the remaining entries unchallenged and grants RLI damages under the Indemnity Agreement accordingly. The total amount of those entries is $274,773, and the court will subtract that amount from the damages claimed.[11] The court also notes that the exhibits provided only support attorney's fees billed before July 30, 2020. The court recognizes that litigation expenses continue to accrue, but will not award damages for the $235,817 of unbilled time as it has not reviewed those invoices.

---

[11] The court has prepared and will docket as Exhibit A to this Memorandum Opinion a spreadsheet identifying the entries it found to be overly redacted.

The court finds unnecessary a jury trial on the issue of damages for two reasons.[12] First, Illinois law supports the validity of a prima facie evidence provision in a contract, as found in the Indemnity Agreement. Indeed, Nexus acknowledged that "Illinois courts routinely uphold these provisions and require the defendant to bring forth countervailing facts to rebut this showing." Nexus's Resp. to RLI's Mot. for Partial Summ. J., ECF No. 456 at 14 (citing Safeco Ins. Co. v. Renn, No. 07 C 3024, 2011 WL 13258220, at *7 (N.D. Ill. Aug. 17, 2011). Illinois courts have upheld officer statements for reasonable losses incurred that appear to arise out of breach of the contract. See, e.g., U.S. Fidelity and Guar. Co., 558 N.E.2d at 1052 (finding plaintiff's damages ascertainable from prima facie evidence of "payments made under the belief that the surety was liable" produced at summary judgment); Szabo, 2003 WL 21789033, at *5 (rejecting defendant's argument that sworn officer statement is not sufficiently itemized when the statement presented sufficient evidence to determine the amount of plaintiff's losses and expenses incurred due to bond breach); Renn, 2011 WL 13258220, at *7 (finding a sworn itemized account including the bond number, payee, cost category, check date, amount of the check, and check number sufficient to establish losses incurred under the bonds at issue). At summary judgment, when a sworn statement is insufficient to attribute a surety's claimed losses to the breach at issue, the court finds the question of indemnification owed unresolved. Safeco Ins. Co. v. Siciliano, Inc., No. 06-3162, 2009 WL 212081, at *12 (C.D. Ill. Jan. 29, 2009)

---

[12] The court notes that Nexus did not renew its request for a jury trial in filing for summary judgment, at the hearing on summary judgment, or in filing supplemental briefs in advance of the evidentiary hearing. In fact, Nexus represented to Magistrate Judge Joel C. Hoppe during a February 7, 2020 hearing, ECF No. 399 at 94-95, and a February 11, 2020 hearing, ECF No. 413 at 39-40, that the parties were willing to stipulate that the issue of damages did not require a jury trial. Neither party requested a jury trial on the issue of damages following the court's summary judgment order and opinion. Regardless, the court raised this issue sua sponte and gave each party the opportunity to file supplemental briefing on the issue of whether a jury trial is required during the first day of the evidentiary hearing. Neither party opted to file supplemental briefing.

(finding the prima facie evidence sufficient to establish the fact of loss but not the amount recoverable against defendants for breached projects, despite defendant's lack of production of evidence challenging the claimed loss). Here, with the exception of the overly-redacted legal bill entries, there is no doubt the attorneys' fees and litigation costs sworn to in the Grycz officer statement, supported by volumes of cost and expense data, arose out of Nexus's breach of the Indemnity Agreement. Indeed, Nexus makes no argument to the contrary.

Second, Nexus fails to rebut Grycz's statement on the merits and thereby does not create a genuine issue of material fact. As Nexus raises no challenge to the damages claimed by RLI under ¶ 2.a.(i) of the Indemnity Agreement other than to complain that certain invoice entries were over-redacted, there is no factual dispute that would warrant a jury trial. See Hanover Ins. Co. v. Smith, 538 N.E.2d 710 (Ill. App. Ct. 1989), aff'd, 561 N.E.2d 14 (Ill. 1990) (denying a request for a jury trial on the issue of damages, finding that the defendant did not create a genuine issue of material fact in disputing the sufficiency of the prima facie evidence). The court is well aware of the myriad issues in this case supporting the large legal fees claimed. For example, Nexus sought to cloak two of its affiliated companies, Libre by Nexus and Homes by Nexus, from any review by RLI, arguing that they were not parties to the Indemnity Agreement and did not bear on the financial condition of Nexus Services. Although substantial legal fees were devoted to this issue, Nexus agreed nearly two years later that these two entities were corporate alter egos of Nexus Services. RLI also was required to spend an inordinate amount of legal fees to get Nexus to meaningfully comply with its obligation under ¶ 3.c. of the Indemnity Agreement to access Nexus's books, records, and accounts. Nexus's intractable resistance to providing RLI with access to its books and records proved so difficult that the

court was required to appoint a special master to try to sort it out. Even as of the date of the evidentiary hearing, Nexus's books and records remained inaccurate and its financial statements for 2017, 2018 and, 2019 were being reworked and restated by Fusion, its new CPA firm.  On the issue of Nexus's obligation under the contract to indemnify RLI, Nexus has consistently failed to timely meet its payment obligations, requiring RLI to repeatedly seek preliminary injunctive relief from the court.  Further, RLI was forced to spend substantial fees and expenses defending against a groundless counterclaim.

With the exception of the legal fees which were so heavily redacted that the court is unable to determine whether the time charged falls withing the broad scope of ¶ 2.a.(i), it is clear that the other fees and expenses itemized by Grycz and supported by the detailed declaration of attorney Katsantonis, their testimony at the evidentiary hearing, and reams of exhibits, fall within the ample boundaries specified in the Indemnity Agreement and are recoverable by RLI as damages for Nexus's breach. While RLI alluded to a jury determination of this issue, there is nothing for a fact finder to determine as there is no genuine issue of material fact raised by Nexus as to the time and expense entries unencumbered by unreasonably heavy redactions.

Accordingly, pursuant to ¶ 2.a.(i) of the Indemnity Agreement, the court enters judgment for RLI in the amount of $3,331,197.55, representing "losses, costs, damages, attorneys' fees and expenses" which have arisen by reason of the execution of the RLI bonds for Nexus program participants and the enforcement of the Indemnity Agreement.  This amount represents the damages claimed by RLI, $3,841,787.55, reduced by $235,817 of unbilled time and $274,773 of overly redacted invoice entries.

24

**3. Injunction as to RLI's Access to Nexus's Books and Records.**

Finally, in an effort to provide further clarity on the nettlesome issue of Nexus's obligation to provide RLI access to its books and records under ¶ 3.c. of the Indemnity Agreement, the court amends the specific performance provision of its July Opinion as follows:

(1) With regard to books and records concerning bond breaches by Nexus program participants, Nexus is ordered to provide RLI, on a daily basis, access to copies of any and all records related to RLI-bonded Nexus program participants as to whom the government has issued a Notice to Deliver. Such information includes, but is not limited to, Capsule data, records of bond payments, tracking records, and the bond-breach binders and spreadsheets mentioned at the evidentiary hearing. This information is to be made available by means of a Google shared drive or other secure and compatible electronic means.

(2) With regard to Nexus program participants bonded by RLI for whom a Notice to Deliver has not been issued or whose bond remains unbreached, Nexus is required to provide RLI, on a weekly basis, access to copies of Capsule data and other information sufficient to assess RLI's bond risk by means of a Google shared drive or other secure and compatible electronic means. Nexus is not required to provide RLI with Capsule data or other information regarding Nexus program participants bonded by a surety other than RLI.

(3) With regard to access to Nexus's overall financial status, Nexus is ordered to provide RLI with access to Quickbooks, Lightspeed, NetSuite, and other financial

databases on a monthly basis, by means of a Google shared drive or other secure and compatible electronic means. Nexus also is ordered to make available to RLI, on a monthly basis, all of its bank account statements, credit card statements, accounts payable reports, accounts receivable reports, Key Performance Indicator ("KPI") reports, general ledger data (including receipts and disbursements, financial statements, balance sheets, and profit and loss statements), vendor invoices, records of real estate transactions, and any other documents requested RLI bearing on Nexus's financial position,[13] by means of a Google shared drive or other secure and compatible electronic means.

(4) Because of the deposit of collateral security ordered herein and RLI's ability to review data regarding breached bonds on a daily basis, data regarding unbreached bonds on a weekly basis, and Nexus's financial books and records on a monthly basis, the court no longer believes it necessary that RLI have online real-time access to any Nexus database.

## CONCLUSION

This memorandum opinion brings to a conclusion RLI's claim against Nexus for breach of the Indemnity Agreement.  The court summarizes its rulings as follows:

### A. Collateral Security.

1.    With regard to ¶ 3.d. of the Indemnity Agreement, Nexus is **ORDERED** to deposit with RLI $2.4 million on or before December 1, 2020, to be held by RLI as collateral security.

---

[13] Except as limited by ¶¶ 3(2) and (4) herein.

2.      Further, with regard to ¶¶ 2.a.(i) and 3.d. of the Indemnity Agreement, Nexus is **ORDERED** to pay RLI the penal sum for any breached bond as to which the government has issued a Notice to Deliver on an RLI bonded Nexus program participant. Nexus is **ORDERED** to pay RLI such additional security on an ongoing basis and within forty-eight (48) hours of its receipt of a Notice to Deliver from the government.

### B. Damages.

As damages for Nexus's breach of the Indemnity Agreement, it is **ADJUDGED** and **ORDERED** that Nexus pay RLI "losses, costs, damages, attorneys' fees and expenses" in the amount of $3,331,197.55.  The Clerk is **DIRECTED** to issue a **JUDGMENT** in that amount.

### C. Injunction as to RLI's Access to Nexus's Books and Records.

With regard to ¶ 3.c. of the Indemnity Agreement, until RLI has been provided conclusive evidence as to the discharge of all RLI bonds on Nexus program participants, Nexus is **ORDERED** to provide RLI with access to its books and records as set forth above.

This Memorandum Opinion and accompanying Order and Judgment conclude the court's consideration of the substantive claims at issue in this case. The only remaining issues are procedural in nature, including pending cross-motions for sanctions and associated motions, ECF Nos. 452, 498, 531, and 553, and RLI's motion for a protective order and associated motions, ECF Nos. 533, 560, and 565.  The court presently is considering these issues and will issue a Memorandum Opinion and Order addressing them as soon as possible.

An appropriate Order will be entered.

27

Entered: October 23, 2020

Michael F. Urbanski
Chief U.S. District Judge
2020.10.23 17:29:38 -04'00'

Michael F. Urbanski
Chief United States District Judge