RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1                          UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF VIRGINIA
2                            HARRISONBURG DIVISION

3  ***********************************************************

4  RLI INSURANCE COMPANY,     CIVIL CASE NO.: 5:18CV66
                             AUGUST 10, 2021, 9:44 A.M.
5                           MOTIONS HEARING
            Plaintiff,      VOLUME I OF I
6  vs.

7  NEXUS SERVICES, INC.,     Before:
                             HONORABLE MICHAEL F. URBANSKI
8                         UNITED STATES DISTRICT JUDGE
          Defendant.     WESTERN DISTRICT OF VIRGINIA
9  ***********************************************************

10  APPEARANCES:

11

12  For the Plaintiff:     VIVIAN KATSANTONIS, ESQUIRE
                           CHRISTOPHER M. HARRIS, ESQUIRE
13                       Watt, Tieder, Hoffar & Fitzgerald,
                       LLP
14                       1765 Greensboro Station Place
                       Suite 1000
15                       McLean, VA 20176

16  For the Defendant:     CAROL ANDERSON, ESQUIRE
                       Rock Spring Law Group, PLLC
17                       1050 30th Street NW
                       Washington, DC  20007
18
                       JULIANA JOHNSON, ESQUIRE
19                       McNutt Law Firm PLLC
                       1712 N IH 35
20                       San Marcos, TX  78666

21

22  Court Reporter:  Lisa M. Blair, RPR, RMR, CRR, FOCR
                 255 West Main Street, Suite 304
23                 Charlottesville, Virginia  22902
                 434.296.9284
24

  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY;
25  TRANSCRIPT PRODUCED BY COMPUTER.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1                         INDEX OF WITNESSES

2    WITNESSES ON BEHALF OF THE PLAINTIFF:              PAGE

3    DAVID GRYCZ

4     Direct Examination by Ms. Katsantonis            93
      Cross-Examination by Mr. Anderson               107
5     Redirect Examination by Ms. Katsantonis         120

6    RAYMOND PEROUTKA

7     Direct Examination by Ms. Katsantonis           122
      Cross-Examination by Mr. Anderson               125
8     Redirect Examination by Ms. Katsantonis         140
      Recross-Examination by Mr. Anderson             142
9

10   WITNESSES ON BEHALF OF THE DEFENDANT:

11   REBECCA WELLS

12    Direct Examination by Ms. Johnson               159
      Cross-Examination by Ms. Katsantonis            191
13    Redirect Examination by Ms. Johnson             220

14   MICHAEL DONOVAN

15    Direct Examination by Mr. Anderson              223
      Cross-Examination by Ms. Katsantonis            237
16

17

18

19

20

21

22

23

24

25

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1                          INDEX OF EXHIBITS

2    EXHIBITS ON BEHALF OF THE PLAINTIFF:

3           EXHIBIT:                Marked      Received

4           1                        102          102

5           2                        107          107

6           3                        212          212

7           4                        212          219

8           5                        253          253

9           6                        255          255

10

11   EXHIBITS ON BEHALF OF THE DEFENDANT:

12          EXHIBIT:                Marked      Received

13          1                        168          168

14

15

16

17

18

19

20

21

22

23

24

25

4

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  (Proceedings commenced, 9:44 a.m.)

2            THE COURT:  Ask the clerk to call the case.

3            THE CLERK:  Yes, Your Honor.  We have *RLI Insurance*

4  *versus Nexus Services, Inc.,* Civil Action Number 5:18CV66, for

5  a motions hearing.

6            THE COURT:  Okay.  Good morning.  Let me take care of

7  a housekeeping matter first.  First is, last week, because of

8  the spread of the delta variant of the coronavirus, the Court

9  entered a standing order requiring all persons entering federal

10 courthouses in the Western District, consistent with CDC

11 guidance, to wear masks.  I hated doing it.  I just hated doing

12 it, but that is what was consistent with CDC guidance, what was

13 consistent with what was coming out of the executive branch,

14 consistent with what our local health folks indicated.  And the

15 reason why I did it is because the CDC guidance recommended

16 masks for vaccinated and unvaccinated people indoors in areas

17 where the transmission rate on the CDC tracker was substantial

18 or high.  Virtually every county in the Western District of

19 Virginia is either substantial or high, even as of yesterday.

20 So what I'd like to do this morning is I will allow counsel,

21 while you're speaking, to remove your mask; otherwise, I'd like

22 everybody to -- and witnesses, to the extent we're going to

23 have any witnesses, may remove your mask while testifying.  But

24 other than that, I need everybody to keep your masks on, okay?

25 All right.  Sorry for that.  I wish we all were in a different

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  place, but we are where we are.

2          You know, when I set this hearing for today, August

3  the 10th, on the conference call we had in July, I was a little

4  bit dismayed by the fact that at the very last minute RLI had

5  filed a motion, and that we -- I think that was the motion

6  under Rule 66 that was filed on or about the 15th of -- I think

7  around the 15th of July.  I can't remember.  And then -- and so

8  we had to give everybody a chance to respond, and then we set

9  this in-person hearing today.  I think I was a little dismayed,

10  too, because neither Mr. Shoreman nor Mr. Williams appeared on

11  that hearing, and we have this outstanding motion for

12  substitution of counsel, which has got to be, I don't know --

13  well, it's at least the third, maybe the fourth motion for

14  substitution of counsel in this case.  And then this morning,

15  7:38 this morning, we get a new motion filed by Nexus seeking

16  sanctions against counsel for RLI.  I just don't know what the

17  parties expect of the Court.  When I have a hearing scheduled,

18  one would think that you all would give the Court the courtesy

19  of filing something so that I could have a chance to read it.

20  This morning at 7:38 when this thing was docketed, I was in the

21  car on Interstate 81.  And I have glanced through it, but I

22  certainly haven't had a chance to peruse it.

23          In any event, this morning's motion appears to be

24  more of the same.  Since this case began, it has been nothing

25  but misdirection and a shell game by Nexus Services, Inc.  They

6

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   have taken one position over another position, only to abandon

2   it.  They have hired one lawyer who would represent one thing,

3   only to abandon that lawyer; then hire another lawyer who would

4   represent one thing.  They have said over and over, Oh, we're

5   changing our financial system.  We're going to get our books

6   and records in order next month, or we're going to do this next

7   month, or we're going to do this next week.  We are now more

8   than three years into this litigation, and the representations

9   continue and continue and continue.  But I indicated last month

10  that this was truly -- the Court had -- with good reason, it

11  has been since October 23rd, 2020 that this Court entered an

12  order directing Nexus Services, Inc. to deposit the collateral

13  security required by the contract, and to make the additional

14  deposits of collateral security consistent with the contract

15  based on notices to deliver issued by the Department of

16  Homeland Security.  October 23rd, 2020.  Nexus sought to stay

17  that order pending appeal.  The Court denied it.  Nexus sought

18  to appeal that stay to the Fourth Circuit Court of Appeals, and

19  the Fourth Circuit Court of Appeals denied it.  A court order

20  was entered in this case based on the reasoning set out in my

21  order last October 23rd, 2020, to the best of my ability, based

22  on the legal positions of the parties and what I thought was

23  required.

24          And here we are, August the 10th, 2021, with Nexus

25  not having come anywhere near compliance with the Court's

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  order.  A court order is not a request; it's an order.  And I

2  have been very patient with Nexus.  Remember what happened last

3  fall?  We had motions hearings on the cross motions for summary

4  judgment in the summertime, maybe as late as into September.  I

5  lose track with the pandemic.  And even then Nexus says, Give

6  us a chance to work it out.  Give us a chance to work it out.

7  And I did.  I did.  I gave the parties a chance to work it out.

8  And I said, If you can't resolve this by October 23rd, I'm

9  going to enter a ruling.  And the Court did what the Court said

10  it was going to do and entered a ruling that day, having given

11  the parties every opportunity to try to make -- craft a

12  business solution here to a business problem.  That's what this

13  is, a business problem.  It didn't work.  I gave everybody a

14  chance.  Told you that I was going to enter a ruling then, and

15  I did.

16        I understand that this matter has been briefed at the

17  Fourth Circuit, but no argument has been set.  I checked as

18  late as yesterday.  And of course I can't undo what I did on

19  October 23rd, 2020.  The law doesn't allow me to do that.  But

20  what I can do is take those collateral steps, those steps

21  necessary to enforce the judgment.  And that's where we are

22  nine months later.  More promises.  More promises.

23        I even went the extra mile this spring in

24  reappointing Greg St. Ours, Special Master.  And the Court is

25  wholly in his debt for the work that he has done, because

8

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   throughout this case, this case has consisted of nothing but

2   RLI saying X and Nexus saying not X; RLI saying, We haven't

3   been paid and Nexus saying, Oh, we've paid them; RLI saying,

4   Oh, we haven't had full access to the books and records and

5   Nexus saying, Oh, we've given them to them.  During the course

6   of the litigation prior to the judgment, I had the magistrate

7   judge, Judge Hoppe, deeply involved in trying to assess the

8   status of compliance with the Court's preliminary injunction

9   orders.  Remember, I ordered things years ago in this case.

10  And there were motions for sanctions.  I maybe even granted

11  one.  And so I gave Nexus another opportunity to comply with

12  the Court's order by appointing a Special Master to allow the

13  Special Master to give me information as to the status of the

14  compliance with the court order.  And here we are.

15        This case has had a long history of accusations by

16  one counsel against another counsel, most recently an

17  accusation filed by Nexus Services against Mr. Harris and the

18  folks at RLI.  The history of this litigation from my

19  perspective reflects nothing but deception, misdirection,

20  hiding the ball, and a shell game on behalf of Nexus Services,

21  Inc. and its entities.  Remember when we first started?  Oh,

22  Nexus by Libre and Homes by Nexus had nothing to do with Nexus

23  Services, Inc.  You can't have access to those books and

24  records.  And I bought that for a while until Nexus admitted

25  that they are controlled by them.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1        We sit in the United States District Court for the

2   Western District of Virginia, Harrisonburg Division, on a

3   motion by RLI to appoint a receiver, or in the alternative to

4   appoint a third-party administrator under Rule 66 to ask Nexus

5   to do what I just can't believe it hasn't done; and that is for

6   nine months not complied with a federal court order.  So that's

7   the framework we have this morning.

8        This case is at the Court of Appeals.  Nexus is not

9   satisfied with the rulings of this Court.  And I understand.

10  Everybody has a right to appeal.  Its recourse is to ask the

11  Court of Appeals, as they have done, to overturn my ruling.

12  Its recourse is not to ignore the orders of this Court.  Our

13  country is founded on a rule of law, and the rule of law will

14  be enforced.

15       Okay.  With that background, the first thing that I

16  want to take up is there is a motion pending for substitution

17  of counsel by Nexus Services, Inc.  And I believe I have

18  Mr. Shoreman and Mr. Williams, who seek to be relieved as

19  counsel of record in this case.  And I'd like -- who are here

20  by Zoom.  And I'd like to hear from Mr. Williams and

21  Mr. Shoreman on their motion.  I would like to then hear from

22  counsel for Nexus, and then I will hear from counsel for RLI.

23  I am very reluctant to -- given the long litigation history in

24  this case, I am very reluctant to relieve Mr. Williams and

25  Mr. Shoreman of their obligations as counsel of record in this

10

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   case, particularly given that as of yesterday afternoon, the

2   Court determined they were still counsel of record for Nexus

3   Services, Inc. at the Fourth Circuit Court of Appeals.

4           So I'd like to hear what Mr. Williams and

5   Mr. Shoreman have to say.  The Court obviously doesn't consider

6   this motion in a vacuum.  It considers it in the fact that

7   we've had first McGuireWoods.  Then there was a firm out of --

8   another firm out of D.C. and Richmond that I now understand is

9   in huge litigation with Nexus Services, Inc.  Then there was

10  Mr. Kowalczuk.  And Mr. Williams has been along for a long

11  time.  Mr. Shoreman came in a little later on after Tony Troy

12  and his firm stepped out.  So with all that, I want to hear

13  what Mr. Williams and Mr. Shoreman have to say as to the need

14  for them to be allowed to withdraw, and then we'll take up the

15  other motions.

16          Mr. Williams, let's hear from you first.  Good

17  morning, sir.

18          MR. WILLIAMS:  Good morning, Honorable Judge

19  Urbanski.  The first thing I'd like to start off with --

20          THE COURT:  I'm sorry, Mr. Williams.

21          Thank you, Amanda.

22          There's something else I want to say.

23          MR. WILLIAMS:  Oh, okay.

24          THE COURT:  And that is this:  We have some people on

25  this call -- I have ordered Mr. Donovan, Mr. Moore, and

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   Mr. Anjin to be here in open court this morning, and they have

2   determined not to show up because they indicate they are not

3   feeling well.  I think there are also some people from RLI who

4   are listening in on this call from Illinois.  And there is a

5   new lawyer, Ms. Johnson from Texas, who wants to be admitted

6   into this case.

7           I just want to remind everyone who happens to be

8   listening in or appearing by -- listening in on the phone line

9   or on Zoom that it would be a violation of this Court's order

10  for anyone to record or broadcast these proceedings.  We have a

11  court reporter who is here taking down these proceedings, and

12  the court reporter will create the official record of these

13  proceedings.  The Judicial Conference of the United States

14  prohibits third parties from recording federal judicial

15  proceedings, and that's consistent with the local rules for the

16  United States District Court for the Western District of

17  Virginia.  When the pandemic started, I issued a standing order

18  last spring saying, look, we're all going to be here by Zoom

19  and we're going to be here by -- some folks listening in, but

20  no recordings may be made.  And so whether you're sitting in

21  this courtroom with your cell phone, or whether you are sitting

22  on Zoom, or whether you are listening in on the phone line, you

23  may not record or broadcast these proceedings.  It would be a

24  violation of this Court's order.  We can only have one official

25  transcript of this proceeding, and that's why we have an

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   official court reporter.  It's consistent with the Judicial

2   Conference of the United States policy.  It's consistent with

3   the standing orders of this Court.

4           In another case unrelated to this one, we had an

5   instance in our district where the media recorded a Western

6   District proceeding and played it on the air, to the dismay of

7   one of my colleagues who was the district judge in that case.

8   So let's not do that, okay?  No recordings.  It would violate

9   the court order.  Thank you for that.

10          Mr.  Williams, good morning to you, sir.  Nice to see

11  you again.  And I'd like to hear from you as to why you believe

12  it would be prudent for the Court to grant your motion to

13  withdraw, sir.

14          MR. WILLIAMS:  Good morning, Honorable Judge

15  Urbanski.  I want to apologize.  I sent an email to the Court

16  about the nonappearance on the last hearing.  That's my

17  responsibility.  For that, I should have made sure I showed up,

18  or at least confirm for the Court.  That being said, as in the

19  motion we said irreconcilable differences with Nexus has

20  occurred.

21          Can you hear me, Your Honor?

22          THE COURT:  Yes, I can hear you.  I'm looking at a

23  different screen so that I can hear you.

24          MR. WILLIAMS:  Okay.  So Nexus has secured new

25  counsel.  Counsel is extremely competent.  At this point in

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1 time, Your Honor, we don't even have any communication with

2 Mike Donovan or Richard Moore or Nexus -- representatives of

3 Nexus.  We typically communicate with them through their

4 current counsel.  And so we believe that letting us out of the

5 case --

6        THE REPORTER:  I'm sorry.

7        THE COURT:  Mr. Williams, hold on.  The court

8 reporter is indicating she's having an issue.  If you could

9 please talk as slow as you can.

10        MR. WILLIAMS:  Okay.  I'm sorry.  At this point I

11 don't believe that we can add anything to the representations

12 of Nexus as far as legal matters are concerned, because they're

13 fully handled by their current counsel; therefore, obviously,

14 we would like to be let out.  But Judge Urbanski, you're

15 obviously familiar.  If you don't think we should be let out,

16 then we'll stay in.

17        THE COURT:  Okay.  Mr. Williams, let me ask you this

18 question, if you will:  How is it consistent with your claim of

19 irreconcilable differences with Mr. -- with the folks at Nexus

20 that you remain counsel of record at the Fourth Circuit Court

21 of Appeals?

22        MR. WILLIAMS:  Well, actually, what we were waiting

23 for was for another substitution of counsel, and we were going

24 to file -- we are filing -- we are filing our withdrawal in

25 that matter, because now my understanding is that they have a

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   lawyer, Mr. Anderson, has appeared in the Fourth Circuit in

2   order for us to do a substitution of counsel for that also.

3            THE COURT:  I did note from looking at the Fourth

4   Circuit's docket yesterday that Mr. Anderson has noted his

5   appearance at the Fourth Circuit.

6            So you anticipate, Mr. Williams, that a substitution

7   of counsel motion is going to be made at the Fourth Circuit as

8   well?

9            MR. WILLIAMS:  Yes, Your Honor.  And it could be made

10  today.

11           THE COURT:  Okay.  I have to ask you this next

12  question.  Mr. Williams, I've dealt with you for years, right,

13  in this case and in other cases, correct?

14           MR. WILLIAMS:  Yes, Your Honor.

15           THE COURT:  I don't know the details of it, but in

16  considering this motion I've thought about it, and that is:  Is

17  your law firm somehow related to the defendants in this case?

18           MR. WILLIAMS:  No, Your Honor.  Your Honor, no, it's

19  not.  It should have been filed, but the law firm is no longer

20  NDH.  NDH has been dissolved.  The new law firm (inaudible) --

21  and that should have been filed on record with the Court.

22           THE COURT:  I'm sorry, I did not understand you.

23  Could you tell me what the new law firm was again, please?

24           MR. WILLIAMS:  HDR.  It's no longer NDH.  We have no

25  relationship with Nexus.

15

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    THE COURT:  Okay.  I appreciate you answering that

2  question, Mr. Williams.

3    All right.  Now, Mr. Williams, based on your

4  understanding and your dealings with these folks at Nexus, do

5  you see any disadvantage to Nexus by the Court allowing you to

6  withdraw in this case?

7    MR. WILLIAMS:  I do not, Your Honor.  I've spoken to

8  Mr. Anderson.  John Shoreman has spoken to him.  He is more

9  than capable of handling the matters for Nexus, absolutely more

10  than capable.  I don't know Mr. Okay.  I've talked to him a

11  couple of times, but I know that -- well, I can't speak on him.

12  I would just submit Mr. Anderson is extremely competent, that I

13  know is more than capable of handling this case.

14    THE COURT:  Are you able to tell me the nature of the

15  irreconcilable differences without -- without waiving

16  attorney-client privilege?

17    MR. WILLIAMS:  I actually don't believe I can, Your

18  Honor.  I think I would end up waiving the privilege.

19    THE COURT:  Okay.  All right.  Mr. Williams, the

20  Court obviously has high regard for you, and I've dealt with

21  you on many cases.  You have always been straight with the

22  Court, and I appreciate you appearing here today.  I understand

23  you've had some health issues.  I hope you're doing okay now.

24    MR. WILLIAMS:  I'm doing better.  A little slow

25  progress with recovery, but I'm doing much better.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1        THE COURT:  Mr. Shoreman, could I hear from you as to

2    your request to be relieved as counsel in this case, if you

3    will, sir.

4        MR. SHOREMAN:  Good morning, Your Honor.  Yes, I

5    would just echo what Mr. Williams said.  I think at this point

6    neither Mr. Williams nor myself can really be effective on

7    behalf of Nexus, as we really have no communication with the

8    principals.  All communications go through counsel.  So we're

9    not really in a position to make any representations on behalf

10   of Nexus.

11       Also, I've worked I think mostly with Mr. Anderson to

12   transition this case away.  I think he is more than capable of

13   handling the remaining issues in the case.  He's also -- as

14   Mr. Williams said, he's also filed in the Fourth Circuit.  And

15   both Mr. Williams and I will be withdrawing from that matter.

16   The Fourth Circuit advised us that it would be their preference

17   if a substitute counsel was in the case before our motion to

18   withdraw would be considered, and that was the delay.  I just

19   don't believe -- and again, we have stated irreconcilable

20   differences.  And I agree with Mr. Williams; it would be

21   inappropriate, prejudicial to our client to disclose those in

22   open court.  Of course, we could do that in camera, if Your

23   Honor was interested.

24       THE COURT:  Well, Mr. Shoreman, let me tell you,

25   we've spent a lot of time together on this case.  And I just

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    want you to know that the Court holds you in high regard.  And

2    I regret that you are moving to withdraw, because you have

3    conducted yourself appropriately, as far as I'm concerned,

4    throughout this litigation, and I have enjoyed working with

5    you.

6              MR. SHOREMAN:  Thank you very much, Your Honor.

7              THE COURT:  I'm sorry, sir?

8              MR. SHOREMAN:  I just wanted to thank the Court and

9    state that I very much have enjoyed appearing before you in

10   this matter.

11             THE COURT:  All right.  Let's hear from counsel for

12   Nexus Services, Inc. with regard to this motion.  And then I'm

13   going to want -- if counsel for Nexus Services, Inc. would

14   please examine your client for the sake of the record --

15   Mr. Donovan or Mr. Moore or Mr. Anjin, whoever is appropriate.

16   I just want on the record the client to as well indicate that

17   they want the Court to grant this motion.

18             Mr. Anderson?

19             MR. ANDERSON:  Thank you, Your Honor.

20             THE COURT:  Good morning, sir.

21             MR. ANDERSON:  Good morning, Your Honor.  Carl

22   Anderson for Nexus Services.

23             I would just reiterate from the communications I've

24   had with the principals at Nexus, I can state that there are

25   irreconcilable differences, none of which I am actually privy

M. Donovan - Direct

1   to, but this is what has been communicated to me by the

2   principals there.  That is why I was brought in to enter my

3   appearance here, as well as the Fourth Circuit Court of

4   Appeals, the appeal we have pending there.  And as I think I

5   relayed to you on the July 15th status hearing, that it was

6   just a matter of being admitted to the bar there and entering

7   my appearance is why there was a delay with that matter.

8           So with that, I would like to call Michael Donovan,

9   if the clerk would like to perhaps swear him in.

10          THE COURT:  Yes, absolutely.  Let's ask the clerk to

11  swear in Mr. Donovan, please.

12          THE CLERK:  Mr. Donovan, are you able to hear me

13  okay?

14          THE WITNESS:  I can hear you.

15          THE CLERK:  Okay.  Great.  If you could raise your

16  right hand for me, please.

17          (Whereupon, the witness was sworn.)

18          THE COURT:  All right.  Let me just ask before we

19  proceed, to assist the court reporter, for those folks who are

20  on the Zoom call who are not speaking -- and that would be

21  everybody but Mr. Donovan -- please mute your Zoom call.  I

22  think that will help improve the connection.

23          MICHAEL DONOVAN, DEFENSE WITNESS, SWORN:

24                  DIRECT EXAMINATION

25   BY MR. ANDERSON:

M. Donovan - Direct

1  Q    Good morning, Mike.  Thank you for -- you've heard what

2  John and Mario have said.  They've represented you and Nexus

3  Services for several years in this matter.  Do you dispute

4  anything that they have said here today?

5  A    No.  And, in fact, I appreciate and value John and Mario

6  tremendously.  They're fine lawyers, and they have done a great

7  job for us, and I appreciate them.  But no, I don't dispute

8  anything that they said today.

9  Q    And did you object or did you consent to their motions to

10 withdraw as counsel of record in this case?

11 A    I consented to the motions.  We had -- we've had a

12 significant revenue decline at the company -- as many companies

13 have -- after COVID.  And so the infrastructure we had built

14 legally, both to assist internally in issues and also to assist

15 third parties -- we revamped our budget -- was just way too

16 askew from where we were.  So the company has taken some hard

17 steps and some difficult steps to streamline what we're

18 spending to make it possible to do more with less.  And so,

19 that's what we've done.

20     I respect and admire Mario and John greatly, but did not

21 feel that -- you know, financially I felt like streamlining our

22 operations, hiring an outside general counsel was the right way

23 to go.  And that's what we did.  We hired Michael Song, and

24 he's been working to staff the cases.  There's certainly no

25 hard feelings with me and Mario and John.  I hope not.  I

M. Donovan - Direct

 1  respect the heck out of both of them.

 2          MR. ANDERSON:  Thank you, Michael.

 3          Your Honor, I don't have any further questions.

 4          THE WITNESS:  Mr. Anderson?

 5          MR. ANDERSON:  Yes, Mike?

 6          THE WITNESS:  I don't know if it's appropriate, but I

 7  just wanted to say I traveled to the court this morning -- I

 8  was on my way to the court this morning.  I take the Court's

 9  order for me to appear very seriously.  As I reported to you,

10  sir, Mr. Anderson, I had a 101.1 fever, and I was concerned

11  about the temperature check, and that's why I raised it to you.

12  But if Your Honor wishes, I'm happy to jump in the car and do

13  the Zoom on the way there and then be there, because I

14  certainly don't want to disrespect the Court.

15          THE COURT:  No, I don't want you to jump in the car

16  and come down here.  You know, the breakthrough with regard to

17  the delta variant is troubling.  That's why we're all wearing

18  masks here.  I'm sorry that you've got -- you're running a

19  fever this morning, Mr. Donovan.  I understand Mr. Moore and

20  Mr. Anjin are likewise not feeling well.  And so I'm happy to

21  accommodate you by Zoom, given the circumstances of this

22  pandemic.

23          Likewise, for example, when counsel for RLI asked if

24  their client could listen in on the public line, normally prior

25  to the pandemic we wouldn't have done that in federal court.

M. Donovan - Direct

1   It just wasn't done.  But given the circumstances of the

2   pandemic, I'm happy to allow it.  I have no trouble with those

3   who aren't feeling well -- such as you, Mr. Donovan, even

4   though you're ordered to appear here -- to appear via Zoom.

5   And I don't know; there may be some evidence that might be

6   necessary from you or from some of your colleagues.  But I hope

7   you feel better.  I have no concern with you appearing via

8   Zoom.

9           Okay.

10          THE WITNESS:  Thank you, Your Honor.  And if I could

11  just point out that Mr. Anjin, his daughter was a positive

12  COVID exposure last week.  At the time, although I had worked

13  with Mr. Anjin, I wasn't -- because I've already been -- I was

14  already COVID positive.  In fact, I got pneumonia and had a

15  very tough time of it.  So I thought, no worries, I've got the

16  vaccine, right?  Well, the doctors told me nature's vaccine

17  isn't so reliable.  And I was diagnosed with shingles -- which

18  is a horrible thing -- yesterday.  So I thought that the fever

19  might be associated with that, but my doctor this morning told

20  me that a fever with shingles is very rare, and that I should

21  go to the doctor and get tested immediately for COVID, which

22  I'm going to do after this hearing.

23          THE COURT:  Well, I hope you don't have it, and I

24  hope that you and Mr. Anjin's family and other folks who may be

25  suffering from this dreadful disease do well.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1      Okay.  Mr. Anderson, do you have anything else that

2 you want to say on this motion?

3      MR. ANDERSON:  No, Your Honor, just that we fully

4 support it.

5      THE COURT:  Let me see whether the folks from RLI

6 have anything they want to say about the motion of substitution

7 of counsel.

8      MS. KATSANTONIS:  Thank you, Your Honor.

9      Your Honor, the point that I would just add that the

10 Court brought up in the beginning is since the start of these

11 proceedings, it's been a shifting of counsel over and over and

12 over.  And that shifting has also resulted in a change of

13 representations, as well as delays.  So those are the main

14 focus of our concerns.  I will note that since these

15 enforcement proceedings, I will note that Mr. Shoreman has been

16 involved in the case since March of 2019 from our records, and

17 Mr. Williams since February of 2020.  They were both heavily

18 involved in these enforcement proceedings.  I will note that

19 there is representations, for example, in ECF 618 that was

20 filed regarding representations to the Court as to the extent

21 of Nexus's compliance with the court order.  And both

22 Mr. Williams and Mr. Shoreman were involved with the Special

23 Master proceedings.  And it was not until June 15th that they

24 moved to withdraw.

25      So those are kind of our concerns, Your Honor, at

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   this point in time.  So we would oppose the withdrawal.

2              THE COURT:  Mr. Anderson, anything you want to say

3   about the RLI response, sir?

4              MR. ANDERSON:  I guess I would just simply add, Your

5   Honor, that since coming on board, I believe I have brought

6   with the new representation a renewed focus to get Nexus into

7   compliance.  That's not to disparage the prior counsel in any

8   way.  I only state that to suggest that new life and new blood

9   and a new approach to taking Nexus -- which we're prepared to

10  show today -- to showcase how well they've been doing with the

11  compliance with the Special Master in working through that

12  process and getting Nexus back on the right track.  So while it

13  may be said that adding a new counsel may delay things, I think

14  the opposite is true.  And I believe not just the principals at

15  Nexus would say that, but I believe a renewed focus on the

16  compliance with the Special Master is what you're going to hear

17  today.

18             THE COURT:  Thank you, Mr. Anderson.

19             All right.  The Court is taking the motion for

20  substitution of counsel under advisement.  I am inclined to

21  grant it, and I will grant it once a motion for substitution of

22  counsel is made at the Fourth Circuit Court of Appeals.  Right

23  now it seems to me inconsistent that Mr. Williams and

24  Mr. Shoreman are -- remain counsel at the Court of Appeals

25  while maintaining to this Court they have irreconcilable

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    differences with the folks at Nexus.

2            So once -- I would like you, Mr. Anderson, to give me
3    a status update on the status of representation, whether a
4    motion of substitution is filed at the Fourth Circuit.  Once
5    that is filed, the Court will grant the motion to allow
6    Mr. Williams and Mr. Shoreman to be relieved as counsel of
7    record in this case for Nexus Services, although I'm -- you
8    know, I haven't been in this litigation business for 35-plus
9    years -- it always raises red flags and warning bells when
10   there's substitution after substitution after substitution.
11   And while I'm reluctant to do it, I do understand that from
12   time to time these things happen.  And I will -- once a
13   consistent motion has been made at the Fourth Circuit Court of
14   Appeals, I'll grant the motion to allow Mr. Shoreman and
15   Mr. Williams to be relieved as counsel of record in this case.

16           Now, with that, Mr. Anderson, there was a motion
17   filed this morning with regards to a new person, Ms. Johnson,
18   from Texas.  Would you like to say anything about that?

19           MR. ANDERSON:  Yes, Your Honor.  Thank you.  It's my
20   understanding that Ms. Johnson has been employed as an outside
21   counsel for Nexus Services for several years.  She has helped
22   them with any of their immigration bond work, and so she's
23   intimately familiar with their business practices.  And we
24   thought that, again, having somebody who has had a long history
25   with Nexus would be able to add some depth and robustness to

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    our legal team, and to get us into compliance so that we can

2    better understand what we need to do in order to prove those

3    things to you.

4              I don't want to take Ms. Johnson's thunder.  She

5    might be able to address the Court, if you so please.

6              THE COURT:  Ms. Johnson -- thank you, Mr. Anderson.

7              Ms. Johnson, what has your experience and practice of

8    law been?  It looks like your law firm does a lot of family law

9    work.

10             MS. JOHNSON:  It does, Your Honor, but I am primarily

11   focused on trial work, Your Honor.  I am the trial litigation

12   partner here.  I spend about 90 percent of my practice in the

13   courtroom.  Also, I focus a significant amount to the purposes

14   of immigration with regard to recouping funds on bond to the

15   Board of Immigration Appeals under I Form 290B.  That is not

16   something that I advertise, Your Honor.  It's something that I

17   have done for Nexus in the years that I've known Nexus.  And I

18   am intimately -- I'm intimately acquainted, Your Honor, with

19   how those processes work.  I can provide a unique perspective

20   to this Court with regards to a lot of the work for Nexus in

21   indemnifying securities and the relief that we seek with the

22   Department of Homeland Security and the Board of Immigration

23   Appeals.

24             THE COURT:  Thank you, Ms. Johnson.  Is there any

25   opposition to the motion to allow Ms. Johnson to appear *pro hac*

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  *vice* in this case?

2          MS. KATSANTONIS:  Your Honor, I would say to the

3  extent -- only to the extent it would delay proceedings, we

4  would object.  I have -- I just saw this motion this morning.

5  I understand -- I believe Ms. Johnson used to be a Nexus

6  employee, I believe.  I need to confirm that.  I haven't seen

7  the papers.  I don't know why the immigration issue would be

8  something we're going to address forthwith.  But, you know, our

9  biggest issue is getting the order, you know, for enforcement

10  in these proceedings and not having delays.

11          THE COURT:  Mr. Anderson, do you know whether

12  Ms. Johnson is going to be moving to be added as counsel of

13  record at the Fourth Circuit or not?

14          MR. ANDERSON:  Your Honor, I don't think there is any

15  current plans to have that.  I'll be the only counsel of

16  record.

17          THE COURT:  Okay.  Ms. Johnson, did you want to say

18  something else?  I saw you raise your hand.

19          MS. JOHNSON:  Yes, Your Honor.  Just in response to

20  opposing counsel, the knowledge that I have is very particular

21  to a lot of why we're here today.  My understanding of this

22  area of the law qualifies me uniquely for these purposes, as I

23  understand the nature of the invoices with the surety.  And I

24  understand also from Nexus's perspective -- and I can relate

25  such -- the relief that the Board of Immigration Appeals offers

27

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  during an indemnifier.  That has perhaps been overlooked and

2  has created an atmosphere of very robust litigation, Your

3  Honor.  And I believe that my presence will help to minimize

4  some of this, will help to streamline some of this, and will

5  help to bring a unique understanding to some of this, and how

6  we got in the position that we are, and how we can cure it.

7        THE COURT:  All right.  The Court will grant the

8  motion.  Welcome, Ms. Johnson, to -- as counsel of record for

9  Nexus Services in this case.

10       You know, I am reminded, though, as I see Ms. Johnson

11  and she talks about her experience with immigration work, I'm

12  reminded of an early hearing that we had in Roanoke in this

13  case back -- maybe a preliminary injunction hearing where we

14  heard testimony from another lawyer who was doing immigration

15  work from Nexus Services, Inc.  And that woman is

16  Ms. Sherman-Stoltz, who sat on the witness stand and testified

17  about these kind of matters, and sought to bring the Court some

18  knowledge with immigration work.  And, of course, now I am

19  presiding over a lawsuit between Nexus Services, Inc. and

20  Ms. Sherman-Stoltz over legal fees.

21       So I hope that isn't your experience, Ms. Johnson, in

22  this case.

23       MS. JOHNSON:  It is not, Your Honor.  I have known

24  Nexus for a number of years, and I've never found them to be

25  anything but genuine in my experience.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1          THE COURT:  Well, I hope that it doesn't come to

2   that.

3          All right.  We've gotten those two housekeeping

4   matters out of the way.  I think I want to hear from RLI on --

5   as to just exactly what you want the Court to do at this point.

6   And to the extent consistent with that, I would like to hear --

7   if you would like to present it, or if you want me to inquire

8   from the Special Master as to the status -- maybe what we ought

9   to do is hear from the Special Master first.  I've gotten his

10  four reports now that just came in as to the status of

11  compliance with the Court's orders, allow each side to ask him

12  questions, and then hear -- does either side have any other

13  evidence to put on other than the Special Master?

14          Ms. Katsantonis?

15          MS. KATSANTONIS:  Your Honor, to the extent -- to the

16  extent we're not in agreement with regard -- and again, I think

17  for the purposes of this hearing, it doesn't matter.  The

18  Special Master says there is about 100,000 that was paid over

19  the last ten months.  We have now some evidence of 107, to the

20  extent there is no dispute between the parties.  But we do have

21  Mr. Grycz here available from RLI who can testify exactly what

22  we've received, and to, you know, address any questions Nexus

23  may have as to what we have received.

24          And then we also have Mr. Peroutka here, who is

25  available with regard to -- Your Honor will recall Mr. Peroutka

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   from the previous hearings.  He participated in some of the

2   database reviews.  He certainly can testify with regard to the

3   inadequacy of the books and records productions, as well as the

4   inability to do his analysis of risk as required under the

5   order.

6            THE COURT:  Okay.  I'm happy to hear whatever

7   evidence that you want to put on.

8            Does Nexus anticipate putting on any evidence in this

9   case, Mr. Anderson?

10           MR. ANDERSON:  Yes, Your Honor.  We have our CFO,

11  Rebecca Wells, here.

12           THE COURT:  Okay.  Yeah, and I think I saw her name

13  mentioned maybe in one of Mr. St. Ours's reports, I think.

14           Okay.  What about the Court's suggestion to hear what

15  Mr. St. Ours has to say about the areas of compliance, give you

16  all a chance to ask him any questions, and then we can let him

17  go, and then hear what other evidence that you all want to

18  present.  Does that suit you all procedurally?

19           MR. ANDERSON:  Yes, Your Honor.

20           MS. KATSANTONIS:  Yes.

21           THE COURT:  Okay.  Mr. St. Ours, why don't you come

22  on up and be sworn, if you will, please.

23           (Whereupon, the witness was sworn.)

24           THE COURT:  Mr. St. Ours, would you -- I don't mind

25  you being at the -- you have a beard.  I didn't see it under

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  your mask.  It looks good on you, Mr. St. Ours.

2          SPECIAL MASTER:  Fourth time, and Debby has liked it

3  all four times.  This time she will not let me -- well, she

4  didn't want me to shave it off the other three times, but she's

5  made it pretty clear it stays.

6          THE COURT:  Well, it's nice to see you again,

7  Mr. St. Ours, this time with a beard.

8          Would you like to testify from the witness box or do

9  you prefer to be from the podium?  What would the parties

10 prefer?

11         Ms. Katsantonis?

12         MS. KATSANTONIS:  Your Honor, whatever Mr. St. Ours

13 is comfortable with.

14         THE COURT:  Mr. Anderson?

15         MR. ANDERSON:  That's just fine with us.

16         THE COURT:  Mr. St. Ours, does it suit you from right

17 there?

18         SPECIAL MASTER:  Yes, sir.

19         THE COURT:  What I'd like you to do is go over the

20 status of the compliance based on your work as Special Master

21 and give the Court an update.  I have read your four reports.

22 You don't need to go through them chapter and verse.  But if

23 you would, give me an overview, sir.

24         SPECIAL MASTER:  Yes, sir, Your Honor.

25         As to Section A -- A.1 and A.2 -- A.1 being the level

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   of security of 2.4 million, A.2 being the additional security,

2   and I believe as RLI accounts it, I think it's in the

3   neighborhood of 440,000.  It's in the report.  It's somewhere

4   in that report.  And then of course there is other payments

5   that have come in as well.  And that's noted --

6           THE COURT:  They said -- 442,500 is what their brief

7   said.

8           SPECIAL MASTER:  442,500.

9           MS. KATSANTONIS:  It's 447,500 as of today.

10          SPECIAL MASTER:  Thank you.  Hang on, Your Honor.  I

11  want to flip to that page.

12          THE COURT:  So let's start with the money aspect of

13  this, the collateral security, the 2.4 million that was

14  required to be deposited on December 1, and then the collateral

15  security required on an ongoing basis for the breach bonds for

16  which the government has issued a notice to deliver.

17          SPECIAL MASTER:  Yes.  The payments to date confirmed

18  are -- by RLI are $100,447 towards both of those obligations.

19  There is an additional 72,973 -- and that's been sent within

20  the last four days -- which are not confirmed by RLI.  And then

21  in addition, Your Honor, there is 44,092 -- let me step back a

22  minute.

23          I've learned of these payments because I'm copied on

24  an email that come not every day, but often days.  It just

25  says -- confirm an RLI claimed payment.  So that's where I get

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  these numbers, and I like to get them confirmed.  And I started

2  getting these back in -- I believe it predated the July 15 -- I

3  have them -- the July 15 hearing, they started coming in.  In

4  fact, it could have been June, but I don't think so.  I think

5  it started in July.

6       So those 44,920 [sic] -- actually, I see those were

7  on July 19, but they reflected payments that were earlier in

8  time.  They are simply not accounted for.  And my understanding

9  is, Your Honor, there was an attempt to make these payments.

10  These are payments that predate July 15.  But through whatever

11  means it was coming, it just -- RLI doesn't have them.  And I'm

12  not -- an effort to make a payment.  RLI doesn't have a

13  payment.

14       In addition, some $50,000 were paid.  And I think

15  that's worth noting, because I want to go back to something

16  before I leave Section A.  Those were -- and I learned this

17  Sunday night -- they were acknowledged by RLI, but they were

18  credited towards breach bonds, which is -- that's fine.  Wasn't

19  under Section A.  And that's part of that -- you'll see in

20  footnote 2 over the course of -- since February 16, 2021, in

21  addition to the amounts I have already stated to you, Your

22  Honor, Nexus has paid RLI $251,500.  That includes those

23  $50,000 in payments that were relatively recent, just in the

24  last couple -- just in -- I believe it was in early July.  So

25  we have -- I mean, I can account for -- as to Section A.1,

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   100,447 confirmed; 72,973 within the last four days that I do

2   not have confirmed; and 44,092 that were -- that for whatever

3   reason didn't get through.  And they are the original --

4   they're -- I shouldn't say the original, because there were

5   other payments like a 2,500 and a 2,000.

6          As an officer of the court, I want to express a

7   frustration -- and I think it would be a frustration.  I'm the

8   eyes and ears of the Court in this role.  Starting about two

9   weeks ago, here I've got this information of some 60,000,

10  100,000 of payments.  And I'm asking the parties, Hey, I want

11  to get my Section A report correct.  I did several emails.  I

12  reminded them on at least two of the phone calls.  I sent an

13  email out at midday on the 5th.  I've got a deadline of

14  August 6 to file this report.  And in that email I account for

15  60,000 -- some $60,000 here.  I should probably try to be -- I

16  believe I have it here.  I'm just -- I'm just trying to make an

17  accurate report.  It was about 60,000 in one category and the

18  other roughly -- I want to say about 90,000.  And that includes

19  that 50,000.  I want to know, Hey, what box do I put it in?

20  Did it come in?  Did it go through?  Was it not sent?  And then

21  I'm doing my report on the very next day.  I've got to get it

22  done.  I realized earlier on in the day I've got to split this

23  into three reports.  There's no way I can make the deadline,

24  but I'll get Section A out.  So I get it out, and that's fine.

25          Now, I want to go back.  It's August 1.  RLI files a

34

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   motion, a reply in support of a new request for appointment of

2   a third party, and represents that as of then it had received

3   $4,500 towards Section A.

4           THE COURT:  I thought it was like 4,250.

5           SPECIAL MASTER:  Pardon me?

6           THE COURT:  I thought it was 4,250.

7           SPECIAL MASTER:  I've got 4,500.

8           THE COURT:  Okay.  No, no, no.  4,500 they got on

9   May 27.  I got that.  Okay.  Go ahead.

10          SPECIAL MASTER:  And then another report is filed on

11  the -- I believe it was the 1st.  I have it here.  I'm sorry, I

12  can't put my finger on it right off.  The August one -- oh, it

13  says -- we've got the -- we have the 4,500 and now we have an

14  additional $9,282.60 on the August 1 report.

15          In the course of receiving an email -- I'll just cut

16  to the chase -- at 5:36 p.m. on the 6th -- this is after I

17  filed my part A -- that's fine -- my Section A -- I then get an

18  accounting from RLI.  I see a lot of numbers, and they don't

19  square up.  And at least I need an explanation.  Great.  I

20  realize I need to file an amended report.  The next morning I

21  send a detailed email, 12 questions.  I really take my time.

22  Sunday night -- and I realize it's a weekend -- Sunday night I

23  get a reply and the questions are answered; and hence, I

24  generate.  But I think it's noteworthy to the Court that in the

25  course of those emails I learn that RLI received more than

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  4,500 and another 9,000-some as of August 1.  Prior to the

2  15th, they had received $50,825.  Now, I didn't account for

3  what it received from that point through August 1.  But again,

4  you can see there's an additional 49,622.

5         So I'm just -- I guess can't help -- I put myself in

6  the chair of the Court.  And I'm just thinking -- by the way,

7  I'm not saying there's a misrepresentation.  You know, the

8  focus of the August 1 was payments only since July 15th.  But

9  here I got emails -- I want to know -- I don't care if the

10 first one was made on December 20, 2020; I want to know about

11 Section A.  And so -- but in other words, I'm not getting --

12 I'm not getting a response.  I'm not getting the whole story.

13 So --

14         THE COURT:  Who are you not getting the whole story

15 from?

16         SPECIAL MASTER:  Well, I'm not -- here I've got --

17 you know, I have this record of this 442,000.  Fine.  That's in

18 my report.  That's the kind of record I want.  There's an

19 accounting of what hasn't been paid that falls under A.2.  But

20 what I'm not getting is an up-to-date accounting of what's come

21 in under A.1 or A.2.  And that 442 is an A.2.  Okay, that's

22 fine.  It's -- RLI decided how to credit.  And then I also

23 learned -- I had been wanting to know:  What about these

24 $50,000?  And I learn in that Friday evening email, it's

25 finally acknowledged -- that's the first time it's

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  acknowledged -- and it is in the report that shows the

2  payments -- if you recall, there was an Exhibit 10 to the

3  August 1 -- August 1 filing.  So that would be I believe

4  709-10.  And I don't have it in front of me, but I believe it's

5  ECF 709-10.  And that has the 440-some thousand.  And then

6  there is also 709, I believe it's 11, and that shows the breach

7  bonds.  So now I'm learning that the last two items -- and by

8  the way, even Friday evening I don't know where to put the 50.

9  I just know that RLI has counted it towards breach bonds.  And

10  it's Sunday night I find out that the last two items on

11  709-11 -- they're a 20,000 and a 30,000 -- and by the way,

12  correctly credited.  Don't get me wrong.  Nobody did anything

13  wrong.  It's just a frustration.

14          So I digressed.  If it's okay with the Court, we'll

15  move on to Section C.1 and C.2.

16          THE COURT:  Do you have a clear sense for how much

17  money has been paid?

18          SPECIAL MASTER:  Well, I know that -- I have

19  confirmation of -- let me get my report.  I want to get it --

20  $100,447 as of Sunday night was acknowledged by RLI.  And I

21  believe, because the emails all look the same, that, okay, the

22  catching up has -- I presume that there will be an

23  acknowledgment of an additional sum that could be as much as

24  $72,973 for payments made on I believe the 6th -- maybe the

25  5th, the 6th, and the 9th, or at least reflected in the email.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  They may have been paid earlier.  I'm not sure about timing,

2  because these emails, they're just form emails.  They're coming

3  from whatever the platform is that's sending payments, okay?

4  And then again, I don't have -- I do not know what happened to

5  the 44,902 -- 44,092, which is at the last page of my report.

6           THE COURT:  All right.  Mr. St. Ours, your

7  frustration is well appreciated.  I've had it for three years

8  in this case, frustrated with really getting two very different

9  pictures of things from each side.  I get an A and a not A.  I

10  get a B and a not B.  One of the reasons I appointed the

11  Special Master was to help me cut through the frustration and

12  to get a clear picture of what has happened.  And I'm sorry

13  that you have experienced that frustration.  The Court

14  appreciates your diligent work.

15           SPECIAL MASTER:  Thank you.  Let's move to Section

16  C.1 and C.2.  As previously reported --

17           THE COURT:  This is information on bonded

18  individuals.  C.1 is folks for whom a notice to deliver was

19  issued, and C.2 was for RLI bonded individuals for whom a

20  notice to deliver was not issued.

21           SPECIAL MASTER:  And C1 also included Capsule.

22           THE COURT:  Right.

23           SPECIAL MASTER:  Because Capsule is what accounts for

24  both communications -- it opens up the -- it's the program

25  participant.  It's effectively the filing system for the

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  program participants.

2          THE COURT:  Right.  And you know, I think the

3  parties -- maybe Mr. Anderson won't appreciate this, but

4  certainly I know RLI's counsel does -- is this is a smaller set

5  of data than the magistrate judge had ordered on the

6  preliminary injunction by a wide margin, because the magistrate

7  judge had ordered production of non-RLI bonded folks.  And I

8  determined in my injunction order that no, I wanted the focus

9  to be on the RLI bonded folks.  So this is a much less

10  burdensome amount of information that had previously been

11  ordered.

12          Go ahead, sir.

13          SPECIAL MASTER:  As to Capsule's previously-reported

14  substantial components -- and RLI has acknowledged that -- Your

15  Honor, just as an aside, I believe there is -- that as I can

16  reconstruct, you know, it became an issue -- Capsule data was

17  produced daily, but it did not have tags and notes.  And as

18  near as I can tell, I don't think it was deliberate, and not

19  only a negligent oversight, I think it was my sense of -- and

20  Mr. Shoreman was involved at that time; Mr. Anderson was not --

21  was it was a -- I saw it as an issue -- or not an issue, but an

22  outside IT consultant working with Nexus -- and I could be

23  wrong in terms of what's being -- you know, you don't take a

24  native and just dump it to a shared drive.  There's a process.

25  And the tags and notes are an enhancement, or it's not quite

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   the same thing.  And I'll tell you, Ms. Katsantonis was very

2   good at bringing -- helping my understanding with tags, and I

3   believe Mr. Shoreman as well.  I remember Capsule from 2018.  I

4   think it was relatively new for him, and she was helpful.  On

5   the flip side, it's kind of too bad -- that was an instance it

6   was too bad that IT people weren't talking to one another,

7   because I think it would have been resolved quicker.  The

8   bottom line is we got there, and then it took a couple of phone

9   calls and an email to finally get an acknowledgment, but we got

10  it done.

11          The bond-related data, again, Your Honor, you framed

12  it correctly as to the difference between C.1 and C.2.  C1 is

13  weekly.  But Nexus made the election, hey, we're just going to

14  do all this as daily -- daily productions, daily availability.

15  As I note in the report, there is this RLI new master

16  spreadsheet which Nexus instituted, if my memory is correct, in

17  late fall, early winter of last year.  And my recollection is

18  that on one of the calls, Mr. Shoreman noted that Nexus was

19  doing this for its other -- in other words, it's just a part of

20  this.  The Court, you've heard it.  I've heard it.  There is

21  these changes in policies.  There is also upgrades in terms of

22  software.  This is distinct from that, but consolidation of

23  some form.  So, prior spreadsheets -- this is according to

24  Nexus -- bond spreadsheets and books were no longer used.

25          Now, the issue comes down to the RLI new master

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   spreadsheet has -- is the daily tool that Nexus works with.  I

2   don't think anybody disputes that.  That's been the

3   representation.  But yet there is other data that -- that was

4   captured in the prior records, and it's more if the data was

5   kept -- a given class of data -- for example, bond appeals,

6   where is that?  And so the question is:  My understanding is

7   what Nexus does -- has in terms of tracking its program

8   participants relative to bond compliance or bond breaches is

9   captured within a spreadsheet, but it's not everything that

10  they would keep -- keep track of as well.  And what immediately

11  pops in my head -- and it's noted in my report -- is bond

12  appeals.  And by the way, that's also in the second report,

13  Your Honor.  So my thinking is, is not to spend any more time

14  on that, but I think that's noteworthy.

15          I don't think the part -- I mean, RLI doesn't know,

16  but I don't understand that there is -- that anybody is having

17  heartburn over disputing that the new RLI master -- it's called

18  a new RLI master spreadsheet -- is, in fact, a tool that's

19  used.  I don't understand -- I don't think anybody is harping,

20  but I can't confirm that all data has been produced in that

21  regard.

22          Section C -- Your Honor, if you wish, I'll move on to

23  Section C, and that's principally financial databases.

24          THE COURT:  C.3.

25          SPECIAL MASTER:  C.3.  But it also covers records

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   that would not be within a database.  I note here -- I noticed

2   something about RLI early in Section A, something about Nexus

3   on the flip side.  I believe it was the July 15 hearing that we

4   heard about a database called Stampli and Melio.  And

5   apparently, if my memory is correct -- and I believe it was RLI

6   counsel indicated there had been a subpoena to -- it may have

7   been to the CPA firm, Fusion, but I'm not sure.  Anyway, they

8   saw a reference or records of these two; and hence, my memory,

9   it was brought up there.  And so that was -- that's something

10  that came to the top of my list.  We knew about Lightspeed,

11  NetSuite -- the migration to NetSuite -- QuickBooks, of course

12  Capsule.  And KPI is not a database.  That's a report.  That's

13  not a database.  And we knew about the other reports.

14        So counsel for Nexus, following July 15, provided a

15  description of the various databases either in use or tried but

16  stopped in the period from approximately October of 2020

17  forward.  And that list is in the special report part three.

18  And that's the starting point for this report.  And so -- and

19  we have QuickBooks and NetSuite ERP.  That's the successor.

20  ERP stands for Enterprise Resource Planning.  We have accounts

21  payable tools, and there is Melio.  We learned about another

22  database, Airbase, and then of course Stampli.  And, you know,

23  the importance of these is, for one thing, you find out money

24  that's going out, checks.  So that's the database.

25        And then you have the customer relations management,

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  CRM.  That's Capsule.  And again, they're migrating that to

2  NetSuite.  So Capsule is a CRM program, customer relations

3  management; hence, effectively customers.  And now they're

4  moving to NetSuite CRM.  And by the way, I appreciate the

5  listing.  It's just that my thinking was:  Where was this

6  listing late April or early May?  I can't help but think that,

7  Judge.  Again, I'm looking through the eyes of the Court.

8          And then in addition, point of sale, Lightspeed is

9  the point of sale.  And again, it's a transactional tool.  It's

10  a register of transactions is a great way to look at it.  And

11  they tried another one, American Spirit.  And American Spirit

12  in particular, Your Honor, for all that maybe other databases

13  might not have been identified, counsel for RLI identified --

14  we started getting the monthly productions in May.  So in other

15  words, things happened pretty quickly once the Court appoints,

16  and I have that first phone call or two.  And there are

17  shortcomings on the monthly reports -- May, June.  But what I'm

18  hearing is -- as to Lightspeed -- is there's this gap, and it's

19  a gap that basically runs from mid fall to I believe -- if my

20  memory is correct -- the end of February of 2021.  And so, it's

21  raised.  And so, now -- and then we learn in the course of

22  that, that another system was tried.  It just wasn't identified

23  by name.  And so, I want to say that was identified maybe first

24  in June, but it just wasn't identified, and we don't see a

25  database in the July production.  And so -- but then American

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    Spirit is identified expressly.  Don't get me wrong, Judge; a

2    different database used for new employees identified some time

3    back, and it might have been while Mr. Shoreman was still on

4    the calls.  It could have been that far back.  I'm not sure.

5    But it just wasn't -- it wasn't part of the July -- I believe

6    it was the July 6th monthly production.  It wasn't in there.

7             So anyway, we have American Spirit point of sale.  We

8    have Fluid Pay -- which rings up credit card transaction

9    information -- Lightspeed.  And then we have the migration from

10   Lightspeed to NetSuite POS, point of sale.  So we've got

11   NetSuite.  And my understanding is this takes a good bit of

12   work.  I heard this both on the phone calls, and then I confess

13   I do the same thing; I go on Google and just read up just so

14   I'm making sure I've got a place to organize what I'm hearing

15   on the phone calls.  So it takes time and it's a lot of data.

16   So I understood this is going to take time to do the

17   conversion, do the migration.  That's fine.

18             Now, here's where I'm going with this relative to

19   this report.  I made the election -- we had the July monthly

20   data to be produced provided by link on the evening of the 5th.

21   I felt like my hands were full in terms of just getting these

22   reports done and just trying to have them accurate.  So I --

23   and I don't have the technical knowledge to really make an

24   accounting of all the check boxes of this.  And it's -- Your

25   Honor, you can understand.  These monthly productions are

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   very -- in my mind, they're massive.  I mean, there's a lot in

2   Lightspeed.  There is a lot.  And then you're getting all these

3   paper records, too, invoices.

4          But here's how I believe, at least from my

5   perspective, that production is insufficient.  And here I am

6   relying upon a report from counsel for RLI.  And it does -- we

7   do have Lightspeed.  The principal folders are Lightspeed

8   production -- this is from -- Mr. Harris sent this Sunday

9   night, and I appreciate that he did.  And I realize -- I wasn't

10  expecting that on the 6th.  It comes in the night of the 5th.

11  There's a lot of work to do.  Nexus invoices, Nexus July bank

12  statements -- by the way, which had 15 bank statements, three

13  credit card statements -- and then the Nexus payroll.  What I

14  didn't see in this report -- and I never asked for it, Judge,

15  don't misunderstand me.  The order says what the order says.

16  But here we now knew about these other databases.  And what I

17  don't see in this report -- in fact, I'm seeing Stampli in and

18  of itself, Melio in and of itself, Fluid Pay in and of itself

19  were not placed into this file share.  Now, that's not to say

20  the information wasn't in there, because my understanding on

21  the bilateral reviews is that information that's in those

22  databases may not have been copied, but you don't have -- you

23  see the actual screens.  I don't know if that can be downloaded

24  or not.  In other words, there's a question in my mind:  Can it

25  be in a shared drive?  So I believe that when it comes to

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   Lightspeed and NetSuite, that the monthly productions have been
2   complete.  I don't know, but I believe -- in other words -- and
3   I don't know -- but I have a question of -- and Mr. Harris
4   noted -- well, at least I understood your email to note that
5   those databases per se were not part of the shared drive.  And
6   in my mind -- and again, I didn't ask for them on these
7   bilateral reviews or prior.  You know, the order says
8   "database."  I do have an understanding, though, that the
9   information, invoices -- I'm not sure about check registers, I
10  don't know, but things that you would find in there.

11          So I -- I have the concern, Your Honor, that those
12  databases that identify -- both the ones that are in current
13  use -- and to my understanding, that is Fluid Pay and Stampli.
14  And I believe that includes -- it also includes -- just a
15  minute, Your Honor -- Airbase.  Stampli, Airbase, and Fluid
16  Pay, I believe they're the ones that they're continuing with.
17  And part of that is the ability to synchronize to NetSuite.
18  And that's why the others were abandoned, the other one or two.
19  I just -- to me, it was an issue of these databases.  And I'm
20  not talking about native format.  But in the extent that there
21  is -- you get the database in full copied and put into a shared
22  drive and sent out monthly.

23          Now, in addition to that, Judge --

24          THE COURT:  Well, the order provides:  And any other
25  documents requested by RLI bearing on Nexus's financial

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  position.

2        This order was not intended to be limited to

3  QuickBooks, Lightspeed, NetSuite.  It says, "and other

4  financial databases."  I mean, they just can't change their

5  software or change the way that they're accounting for these

6  things and not provide it to RLI.  I mean, they -- this was --

7  this order was a snapshot in time, and it was intended to

8  provide RLI with any other documents requested by it bearing on

9  Nexus's financial position.

10        SPECIAL MASTER:  And so Your Honor, by the way, I --

11        THE COURT:  And by means of a Google shared drive or

12  other secure and compatible electronic means was just the means

13  by which it was to be shared with RLI.  So in other words, they

14  weren't putting them on Pony Express -- putting documents on

15  Pony Express and shipping them off to Chicago.  This order says

16  RLI gets whatever documents bearing on the financial position

17  of Nexus that RLI asks for.  That's what this order provides.

18        SPECIAL MASTER:  And Your Honor --

19        THE COURT:  So if they --

20        SPECIAL MASTER:  I don't know whether or not all

21  documents produced -- it would be difficult -- I don't know how

22  I could say that, because there's just so much.  But my focus

23  is on the word "databases."  And here we have Airbase, Stampli,

24  and -- I'm sorry, I can't -- Airbase, Stampli, and Fluid Pay.

25  And my understanding from counsel for RLI is those -- what I

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   saw -- and by the way, I think everybody appreciated -- and not

2   just counsel, but Mr. Peroutka is a good example.  He was

3   helpful on those bilateral calls.  I think he was helpful to

4   Mr. Anderson and me; and, for that matter, helpful to

5   Mr. Minnis and Mr. Harris particularly in those last two days,

6   because we really got pretty deep in them.  Ms. Katsantonis I

7   believe was on vacation, so she wasn't on the phone calls.

8          And -- but -- so it was -- and of course, I do not

9   believe that the order compelled a bilateral review.  I do not

10  believe that.  But Nexus did, in advance of July 15 -- and by

11  the way, timing doesn't matter to me.  RLI asked several times,

12  and I want to say it was the second phone call they asked, even

13  though I said I didn't think -- I was candid with Mr. Anderson.

14  I don't believe it's required, but I join in the request

15  because I think it would be helpful.  It's helpful for the

16  Court to know, do a verification.  And I believe that

17  verification did -- it did verify that it went -- can come to

18  Lightspeed.  And actually Lightspeed -- and I believe we also

19  looked at KPI, I believe -- that production had been made.  In

20  advance of the bilateral reviews, we learned about these other

21  databases.  We didn't look at them.  Now -- and here's -- this

22  is the other side of the report.  And in addition to -- so I

23  don't -- to my understanding, they -- the bases in and of

24  themselves weren't placed in the shared drive.  That does not

25  mean that documents or records of those documents were in the

48

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   shared drive.  I don't know or not -- that are on those

2   databases.  I don't know.  And by the way, Mr. Harris -- it's

3   late at night.  It's not like he gave me -- this is a page

4   and-a-half email.  And it was adequate for purposes of what I

5   need to say today.  And Mr. Anderson, by the way, was not

6   available.  And we did talk briefly a couple of times on

7   Sunday, but I just -- he was not available.

8           THE COURT:  This order is very clear to me.  It's

9   just very clear.  There is no ambiguity.  If -- at the time I

10  drafted the order, Nexus was using QuickBooks and Lightspeed

11  and NetSuite.  But if they were going to change to something

12  else, those documents had to be made available.  If they were

13  going to change to Stampli or Melio or Fluid Pay or Airbase,

14  those documents had to be made available, period.  End of

15  story.  This is not rocket science.  And they should have been

16  produced on a monthly basis, as required under Section C.2 of

17  the order.

18          SPECIAL MASTER:  Your Honor, I -- that's -- my

19  thinking concurs with that of the Court.

20          THE COURT:  Because when I wrote --

21          SPECIAL MASTER:  Again --

22          THE COURT:  I wrote this order, okay?  And when I

23  wrote this order, I went back through the transcript of the

24  hearing that took place in -- I don't know -- August or

25  September of last year, and tried to pick up every single

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  database or financial tool that Nexus was using at that time,

2  but it wasn't just limited to those.  If they wanted to move

3  their financial information under another shell, that shell had

4  to be provided.  If they wanted to move it to a third shell,

5  whether it's called Airbase or Fluid Pay or Melio or Stampli,

6  that had to be provided.  This isn't rocket science.  This is

7  clear.

8          SPECIAL MASTER:  By the way, nobody is making an

9  issue that they've made any changes because of this litigation

10 or this process.  In other words, this is an evolution.

11         THE COURT:  Sure.

12         SPECIAL MASTER:  We get that.

13         THE COURT:  And it was even true throughout this

14 litigation.  I've heard more times than I can count that we're

15 moving to a new software system, or we're moving to this, or

16 we're moving to that.  This order was designed to pick it all

17 up for one purpose:  So that on a monthly basis RLI, consistent

18 with its agreement with Nexus, would have a clear financial

19 picture of the financial stability of Nexus.  That's all this

20 is.  That's all this is.  And so you may be able to -- I mean,

21 there might be an issue about not using this name or that name

22 or this name.  This order is broad enough -- and any other

23 documents requested by RLI bearing on Nexus's financial

24 position -- it's broad enough to cover any of those things.

25 If -- I just want to be clear about that.  This is not rocket

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   science.  This is just -- and you know, I cut down -- I

2   deliberately -- and I say that in my opinion -- I deliberately

3   reduced the amount of data that Nexus had been producing under

4   the preliminary injunction.  I deliberately went to one -- they

5   used to have realtime access.  I went to one-month production

6   on this financial data because I expected there to be 2.4

7   million of collateral security paid, and then the additional

8   security paid on an ongoing basis once the notices to deliver

9   were issued.

10         So RLI's review of financial data and the financial

11   data that I was ordering was directly tied -- and I said that

12   in my opinion -- and I reduced the amount of financial data

13   necessary because I said, Well, they're going to have 2.4

14   million in collateral, so their risk is not as great because

15   they've got collateral.  But they didn't pay the collateral.

16   They didn't pay the collateral.  So those two are just tied

17   together.

18         SPECIAL MASTER:  By the way, Your Honor, my remarks

19   about the database -- these databases as to the August -- the

20   shared file on the evening of August 5, it's not in the report,

21   so it's oral.  And I -- in contrast to my remarks about Section

22   A, the fact that Mr. Harris got an email to me Sunday night or

23   late Sunday afternoon, that was fine.  I mean, I wanted

24   information.

25         And Mr. Anderson -- we talked a couple of times

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    Sunday, and I believe we talked on Friday for wholly different

2    reasons -- just wasn't there.  They were brief calls.  But I

3    hope, Mr. Anderson, the fact that it's not what I just said, I

4    don't want you to think you've been blindsided.  I'm just --

5    again, I'm trying to see and appreciate this through the

6    Court's eyes.  It's that simple.

7            Now, it's kind of -- this is kind of a "Tale of Two

8    Cities" in a way because it does not cover the whole report.

9    In the -- here we have the bilateral review was beyond the

10   scope of the order.  Nexus agreed to it.  We start off on the

11   21st at the user level, which is -- there is one higher level.

12   It's admin level.  And RLI expresses a concern, Hey, wait a

13   minute, how do we know we're not seeing something that admin

14   level can?  And then the concern back, the problem is -- and

15   since the July 15 order, not only was everything made

16   available, but the decision was made:  Hey, we'll let you view

17   our live control.  So Mr. Minnis -- I think he was here --

18   Mr. Minnis at RLI has full control and access to each of these

19   databases.  So Nexus even goes a step further.  Say, Well,

20   admin level, there can be changes.  But yet I asked again --

21   and Mr. Anderson then confirmed -- so starting on July 23, July

22   26, and July 30, we had admin level.  So everything that Nexus

23   sees -- and I don't know if it's any different or not, and

24   nobody on the phone call said that.  But here's where I want to

25   go.  We're now seeing -- and I can have an appreciation for --

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   in the course of the discussions -- for why RLI wanted

2   verification.  And it was a function of, hey -- it was

3   articulated very well.  In fact, Mr. Peroutka I thought said it

4   the best, but basically you see the words, the funds Nexus

5   receives each day from which sources and into which accounts --

6   in other words, they didn't see them in the monthly

7   productions -- and the funds Nexus disbursed each day to where

8   and from which accounts, and the revolving daily balances in

9   each and every bank account.  Well, it's not in these

10  databases, although the expectation, if I understood

11  correctly -- Mr. Anderson can comment on that -- that's

12  something that's part of the sophistication that NetSuite has.

13  And I may have misheard that as well.  So it's not a matter

14  that they didn't include something on this monthly; it just

15  wasn't in there.  And with Mr. Minnis navigating and with

16  senior counsel from RLI, as well as Mr. Peroutka -- and

17  Mr. Kass as well, but Mr. Peroutka was there the last two days.

18  And he was very good about questions and answers.  And then we

19  had Mr. Moore on, on the 30th, and we had two sessions, and we

20  took it as far as we could.  And then the decision was the

21  following Monday -- this past Monday -- I asked, hey, we need

22  to set aside Tuesday or the 4th, Wednesday -- I can't

23  remember -- for the bilateral review at admin level.  And the

24  decision was, hey, if we're not going to make anything -- more

25  information, there is no need.  And that came from Mr. Harris.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    And that's fine.  Okay.  We got it.

2           But here's -- we actually said this in an email:

3    Online bank portals.  Now, this is something that came up in

4    roughly mid or slightly later July.  And now we see the

5    importance of that.  What we learned -- and we learned this

6    through Mr. Anderson -- and Mr. Peroutka went in through these

7    and couldn't answer these three questions.  In fact, nothing

8    was being kept from the databases, because it's not in there.

9    And we learned that as part of its daily practice of setting

10   priorities for payables, Nexus will access the banking online

11   portals, and, if I understood correctly, the merchant account

12   portals.  Credit cards go through them.  And then he sets

13   priorities of what gets paid.

14          THE COURT:  Well, one thing that's not a priority is

15   paying the monies required by the Court's order.  That's not a

16   priority.  They're getting all this -- they got $14 million in

17   in revenue since October 23rd, and they're paying everybody

18   else but who the Court ordered them to pay.  That's the problem

19   here.

20          SPECIAL MASTER:  Well, I asked -- again, I made the

21   observation that -- and by the way, prior to July 15 -- and

22   this went back to June -- we don't see the transactional

23   histories.  And I didn't appreciate what that meant until

24   Mr. Harris and Mr. Peroutka on the calls identified receipts

25   coming in each day, where they're going, disbursements each day

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   to where, and daily cash balances.  And then all of a sudden I

2   understand, ah, that's what transactional history means and

3   transactions.  It's not in these databases, and so it's done

4   through these portals.  Well, I -- I made the observation:  I

5   do not believe that access to these portals is within the scope

6   of the order.  And I could be wrong, Your Honor.  That's your

7   call.  But I did ask, and Nexus --

8           THE COURT:  "Any other documents requested by RLI

9   bearing on Nexus's financial position" is intentionally

10  broad -- intentionally broad to cover whatever they need to see

11  to make sure that their position as the bonding company

12  is safe.  It's intentionally broad.

13          SPECIAL MASTER:  Well, I confess, Your Honor, I

14  wasn't sure if that would include -- it's not a book and

15  record, but it is access.  And to me, splitting the difference

16  was -- and this is back when we under the transactional

17  histories -- well, look, if you have access to what we used to

18  get in the mail with a bank statement -- you know, the check

19  details -- print them off and produce them.  And although I

20  wasn't -- I did not believe -- to my thinking, the order did

21  not encompass someone else's books and records.  But I do want

22  the Court to understand Nexus, until NetSuite is fully

23  populated and ready to go -- and for all I know, will continue

24  even after that -- that's for these money coming in, where it

25  goes, and daily cash balances on a daily basis, Nexus is going

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   to the outside.  And it has nothing to do with the process.

2   Apparently has been doing it that way for all I know from the

3   beginning.

4          So I -- and you'll see that's what's covered in items

5   1 and 2 of the report, as well as 3 -- 3.  And so it's this --

6   okay, so I think in closing as to the merchant account, what

7   can be accessed on a merchant account portal or an online bank

8   portal, I'll simply say whether within the scope of the order

9   or not, I do not believe that the -- that declining my request,

10  notwithstanding -- and my observation was I didn't think it was

11  in the order.  So if I'm wrong, I'm wrong.  I believe the

12  objections were in good faith in not doing it.  So I will say

13  this:  So if the correct interpretation is going forward,

14  that's what it is.

15         THE COURT:  "Any other documents."  Documents doesn't

16  just mean this piece of paper.  Any other financial

17  information, that's what the Court intended in this order.

18         SPECIAL MASTER:  Now, in addition, Your Honor, Item 4

19  speaks to we don't -- there are other things that one would

20  expect to find, but it's not in these databases.  And one of

21  the things is there are instances -- well, I shouldn't say --

22  they're in there -- transfers.  Among them, the example is

23  transfers to Richard Moore, who, as you know, is an officer of

24  the corporation.  But you don't have the backup documentation;

25  in other words, you don't know the why and the trigger.  And

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

 1  again, it's not in the books and records, or at least not in

 2  those produced.  And based on the bilateral review, it's not in

 3  there.  I mean, it's just -- so number 4.

 4          Number 5 is something that's -- it's:  What are the

 5  active bank accounts?  And Nexus has identified its active bank

 6  accounts, but it doesn't cover -- it covers -- and identified

 7  inactive closed accounts.  And it covers most of what RLI knows

 8  about bank accounts, but not all.  And so in number 5, RLI has

 9  raised -- has preserved, because I heard this I want to say

10  maybe not in the first two calls back in April, following the

11  May production.  So it would have been the early May production

12  I started hearing about the bank -- insufficient bank account

13  statements and credit card statements.

14          Now, there's another class of that that falls into

15  that has not been explained; and that is for those bank

16  accounts that have been produced, for a few of them, there are

17  not the records from every month from October 2020 forward.

18  And my feeling was, hey, even though it's this late in the

19  game, they were within the order.  And whether or not -- and

20  nobody said they're not useful.  Nobody said they're not

21  material.  I mean, my feeling was, hey, it's within the order.

22  And my understanding is, even to today, even for a few of those

23  bank accounts that have been reports -- I think it's two or

24  three, but counsel for RLI will cover that -- we don't have

25  statements for every month.  And that could be, again, not

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  finding them.  That could be an innocent situation.  And also,

2  getting into the shared file, because these are documents now,

3  we're not talking about databases that you just download.

4  You've got to scan and all this stuff.  In other words, I get

5  that.

6          Number 6 goes back to Stampli and Airbase.  And then

7  Melio, of course, was the historic.  I've already explained

8  where we are on that.  The other thing is RLI did not find in

9  the databases an accounting of those -- those very Section A

10  payments that I've noted to you, Judge.  A few of them, the ACH

11  payments -- it's not all, but it's a few of those -- an

12  accounting record of that did not appear.  Now, that may not be

13  the case as of August 5.  That's as of July 6.  And as the

14  Court knows, there were payments prior to July 6.  I already

15  went through that tortuous history.

16          I think that pretty much -- I don't think I have to

17  go into detail on items numbers 6, 7, and 8.  That's page 7 of

18  my report.  Number 9, I think it's just noteworthy on a factual

19  basis that at least as to what we saw on RLI, both NetSuite and

20  now Stampli -- and it doesn't surprise me they're the same

21  because one is feeding the other is my understanding, but we've

22  got disbursements from only three bank accounts.

23          The overstating liabilities, that's -- Judge,

24  that's -- that's not -- there is nothing nefarious about that.

25  My sense is, you know, Nexus is just -- it's -- they're just

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

 1   behind when it comes to historic financial accounting.  And

 2   here they've got an accountant firm that's trying to get caught

 3   up, and they're still doing -- and Judge, I'm not -- you know,

 4   I'm just simply making an observation.  And I realize they have

 5   limited resources.  You know, where are they going to put them?

 6   But the bottom line is -- but I want to go back to the fact

 7   that the monthly production did have 15 bank statements.  It's

 8   a 160-page PDF.  So these are PDFs.  So in other words, are

 9   they going to be able to find them all?  Are you going to be

10   able to find that January 30 for Comera [phonetic] at 6923?

11   You know, I mean -- but it's not in there.  By the way, that's

12   just -- I just made that up, but whatever.  Fifteen bank

13   statements and three credit card statements.

14       Oh, and by the way, my understanding is -- back to the

15   credit card statements, because I think this is worth noting --

16   the Airbase, you know, when it's fully robust and populated,

17   it's going to cover credit cards and all those sort of things.

18   It's just not -- it's not fully in line.

19       Returning to the report, item 10 speaks about the data in

20   Airbase.  I don't know if -- I don't know, when it comes to

21   Stampli and Airbase -- whether or not all the data has been

22   produced.  My understanding is data has been produced, and it's

23   a lot of data.  So that's -- you know, I don't know that I want

24   to say more about that.  I think the report, I kept it short.

25   It actually took a good bit of effort to get it this short.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   But I believe that -- I believe those ten items cover the Court

2   well.  And again, Your Honor, I appreciate the Court has shed

3   light particularly on online bank portals and merchant account

4   portals going forward relative to Section C of the order, not

5   Section A -- Section B, which, of course, is the judgment, but

6   Section C.3.

7       And so I -- and again, the first half of my report spoke

8   to what was produced on August 5.  I did not have the

9   opportunity to actually do it myself, but the report from

10  Mr. Harris was both encouraging, because it did not -- I'm not

11  hearing an issue about what has been produced relative to, for

12  the most part, documents and the principal databases, NetSuite

13  and Lightspeed.  And they are the principal databases.  But

14  again, it just -- I'm just thinking to myself, if Stampli can

15  be downloaded onto a shared drive -- and maybe it can't -- but

16  why wasn't it?  If Airbase can be downloaded on a shared drive,

17  why wasn't it?  And that's what pops into my head.  And Your

18  Honor, I do believe it's in the order, but in my mind it just

19  -- I was -- I didn't think that said, hey, make sure this is in

20  your production.  It just didn't cross my mind.

21      So I believe that's the extent of my report.

22          THE COURT:  Mr. St. Ours, let me ask you a question.

23  And I appreciate the incredible diligence in drilling down

24  you've done with regard to the books and records provisions,

25  both with regard to the data on the program participants and

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  with regard to the data on the financial status.  With regard

2  to the data on the program participants, do you believe that

3  Nexus has substantially complied in good faith with the Court's

4  order?

5          SPECIAL MASTER:  I believe so, but this next comment

6  is more a footnote.  I -- I do not have an understanding

7  that -- and I don't know what it would be or what Nexus would

8  have, but further information relative to -- that's part of,

9  but not necessarily keeping track of this individual, and hey,

10 are they going to show up at the next hearing, or are they

11 breach?  Where are they?  And that is to the extent there is a

12 record on appeals.  And I do not have an understanding that

13 that's been produced.  And I may be wrong about that, but I do

14 not have an understanding.  I will say RLI has raised the

15 question and I have not heard it answered.

16         THE COURT:  When you look at the breadth of the

17 production -- and you used the word monthly productions are

18 "massive," that was your word -- when you look at the breadth

19 of the production produced by Nexus pursuant to Section C.3, do

20 you have a view as to whether Nexus is in substantial

21 compliance with the Court's order?

22         SPECIAL MASTER:  I don't -- I think that Nexus, on

23 the May production, fell short in material ways.  I don't think

24 it was necessarily because of -- but I believe in June -- and

25 then particularly July with the fine tuning in terms of what

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   they have, they were in substantial compliance, except that,

2   Your Honor, I'm just -- again, I think about Stampli and

3   Airbase and Fluid Pay.  And then I think about, you know,

4   Melio, and I just -- I think about it.  I have reason to

5   believe that substantial data that may be on those databases

6   was produced on July 5 -- I mean, July 6.  I do not know.  But

7   Your Honor, the fact is, we did not have sufficient data that

8   we even knew the names of these databases on the July 6

9   production.

10          THE COURT:  Right.  It became much later that you

11  even learned the names of these databases.

12          SPECIAL MASTER:  Yes.

13          THE COURT:  All right.  Let me ask you this other

14  question that I want to ask you, Mr. St. Ours.  Let me put you

15  on the spot here.  RLI is asking me to appoint a third party

16  under Rule 66 or a receiver under Rule 70 to facilitate the --

17  and to actually do what the Court order says that Nexus is

18  supposed to do.  Put aside the books and records and the data,

19  okay?  Payment of the money.  Do you believe that the Court

20  should appoint a receiver or a third party to facilitate the

21  payments, given what has happened over the course of the last

22  month?

23          And if you don't want to answer that, if you just

24  want to duck it and say, That's your job, Judge, go right ahead

25  and do that.  But I'm asking you the question anyway.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    SPECIAL MASTER:  Your Honor, my answer may not be --

2    well, I think my answer is from the perspective of the Court.

3    There is a conflict between what was within my jurisdiction or

4    my appointment in Section A and C and Section B.  There's a 3.3

5    judgment of garnishment.  And because of that -- because of

6    that garnishment -- and, in fact, it's happened in a few

7    instances.  It's my understanding it's happened recently.  And

8    there's nothing wrong with that.  RLI has an absolute right.

9    But here is the rub, particularly when I hear about bank

10   statements, and that is I -- if disclosing bank statements

11   means they're all going to be emptied and we don't make

12   payroll, that's a problem, you know, or whatever bank is being

13   opened.

14       And so I -- I -- I see the merit of a receiver being

15   appointed to get where the Court wants Nexus to be relative to

16   the order, but on the flip side, I see that if that's going to

17   be the case, is -- you know, is a receiver to be doing what's

18   in the best interest of Nexus or what satisfies this order come

19   hell or high water?  And I -- but yet, I don't know -- I don't

20   know the extent that guardrails could be placed.  And I am not

21   one to say that whatever RLI chooses to do under Section B,

22   that it cannot do.  I don't know.  You know, I just -- so I --

23       THE COURT:  You know, you raise a good point.  You

24   raise a good point.

25       SPECIAL MASTER:  I see the point of a receiver, and

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  yet I see the inherent conflict.  And then, so now I get to the

2  conflict and I'm thinking, can the Court -- and I don't know --

3  put guardrails on the receiver?  I mean, the receiver has to

4  understand what his duty is.  And -- but then with RLI having

5  knowledge because the receiver is engaged by it for

6  garnishment, I just -- that's where I struggle.

7           THE COURT:  The conflict between A and B?

8           SPECIAL MASTER:  The conflict between A and B.

9           THE COURT:  That's a very astute observation and I

10  appreciate that.  I've given that some thought.

11           Okay.  All right.

12           SPECIAL MASTER:  You know, I wonder -- you know, I

13  know you have two very good magistrate judges.  And my sense is

14  that maybe there has been some frustration on their part in

15  this matter.  So I'm not asking to put something else on the

16  table, but whether or not the Court has the authority is part

17  of this -- I don't know.  Is this something Judge Ballou could

18  work out?  I don't know.  But I see that conflict, and I see it

19  as a conflict that would be -- that the receiver would face.

20  So that's...

21           THE COURT:  I appreciate that, Mr. St. Ours, and I

22  thank you for all of the work that you have done on behalf of

23  the Court to date.

24           Do counsel for either side wish to ask the Special

25  Master any questions.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1        Ms. Katsantonis?  I'm going to give you a chance to
2    argue and put on whatever evidence you want; but while
3    Mr. St. Ours is standing up, do you want to ask him any
4    questions?

5        MS. KATSANTONIS:  Your Honor, I want to thank
6    Mr. St. Ours for his efforts as well.  I don't really want to
7    be in the position of cross-examining Mr. St. Ours.  There is
8    certain questions such as, you know, this litany of payments on
9    the 44,000 that Mr. St. Ours said there was an intent to pay.
10   You know, I would have to almost -- you know, Nexus never
11   contends they paid these payments.  Nexus didn't give any
12   evidence of the payments.  It's just based on an email.  I
13   think I can explain it in my argument.

14       THE COURT:  Okay.  Then let's do that.

15       SPECIAL MASTER:  Yeah.  And Your Honor, I have these
16   emails.  And I -- and by the way, it was talked about on our
17   phone calls, but I did not make an effort to get into it,
18   because I thought, hey, time is going to pass.  And my
19   understanding was, hey, RLI is not taking this.  Hey, no, we
20   don't control.  You control.  I wasn't going to get into that.
21   I just -- my feeling was I just wanted the judge to know that
22   there is 44,000 -- by the way, I don't think anybody is
23   disputing at this point that they have been made.  It's just
24   that I did -- you know, part of why I wanted an accounting
25   included that, and it just wasn't there.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1           I think that's a fair question, Ms. Katsantonis.  I

2    appreciate that.

3           THE COURT:  Okay.  Well, she said she's going to

4    address it.

5           Mr. Anderson, do you want to ask any questions of

6    Mr. St. Ours?

7           MR. ANDERSON:  No.  I would just like to thank

8    Mr. St. Ours for his efforts in this case.

9           THE COURT:  Yeah, I would too.  All right.

10   Mr. St. Ours, thank you.

11          Counsel, let's talk for a minute.

12          SPECIAL MASTER:  Your Honor, do you want me to stay?

13          THE COURT:  What would you like to do?

14          SPECIAL MASTER:  I'm at the pleasure of the Court.  I

15   mean, I'm not planning to stay just for the heck of it.

16          THE COURT:  No, no, I understand.

17          What do counsel think?  Do you think the Special

18   Master should stay, or can he go back to his practice of law

19   this afternoon while we --

20          SPECIAL MASTER:  And I'm okay to stay if the parties

21   wish me to.

22          THE COURT:  Ms. Katsantonis, what's the view of RLI?

23          MS. KATSANTONIS:  Your Honor, I don't think there is

24   any reason that Mr. St. Ours can't return to his practice.

25          THE COURT:  Mr. Anderson?

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1          MR. ANDERSON:  I think, Your Honor, I would reserve

2    the right to have Mr. St. Ours remain here.

3          THE COURT:  Okay.  We'll do that.  He's going to get

4    paid, though.  He's getting paid while he's here.

5          MR. ANDERSON:  I don't believe there is any question

6    of that in Nexus's mind.

7          THE COURT:  All right.  Thank you.  Mr. St. Ours, if

8    you don't mind attending this hearing, I appreciate that.  One

9    of the parties has requested, so I'm happy to accommodate.

10          All right.  It's a quarter to 12.  We've been going

11   on now for two hours and 15 minutes or so.  What is the

12   parties' preference in terms of how you would like to proceed?

13   I think we do need a little bit of a facilities break.  Would

14   you all like to take a break for lunch now, or would you like

15   to just go forward and then take -- and just finish and then

16   have lunch after, which is fine with me?

17          What -- what about the folks from RLI, what's your

18   druthers?

19          MS. KATSANTONIS:  From our perspective, Your Honor,

20   I'd rather keep going.  Obviously, take a facilities break, but

21   I'd like to go ahead and proceed.

22          THE COURT:  Okay.  Mr. Anderson?

23          MR. ANDERSON:  I think a facilities break as well --

24          THE COURT:  Let's do that.  Let's take a recess until

25   noon, and then we will carry on.  We will stand in recess.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1              The folks who are on Zoom, we're just going to --

2    just like we did during that long evidentiary hearing we had

3    way back when, let's just stay present, put yourself on mute,

4    and we will return at 12.   Thank you all.

5              (Whereupon, a recess was taken.)

6              THE COURT:   Let's hear evidence the folks at RLI want

7    to present, and hear whatever evidence the folks from Nexus

8    want to present, and then we'll hear argument.

9              Ms. Katsantonis?

10             MS. KATSANTONIS:   Thank you, Your Honor.   With regard

11   to -- I thought it would be efficient for us to present to you

12   what we have learned, basically, and where we are with regard

13   to compliance with your order.   And in that regard, as the

14   Court has noted, it's been almost nine and-a-half months --

15   almost ten months since your order, and Nexus remains in clear

16   and indefensible contempt.   RLI filed its motion for order to

17   show cause back in December of 2020, almost eight months ago.

18   Since, the Court's convened two additional hearings, both in

19   March, which resulted in this appointment of the Special

20   Master, and the July 15th hearing.   And the Court also -- we've

21   had at least eight status conferences with the Special Master.

22   We've had four limited bilateral reviews, which were just to

23   show the systems, not to give us any records of some databases.

24             It's clear that the Court has given Nexus all

25   opportunities to comply, and the Court's admonishment of the

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  last 26 days, this was their last chance.  Even with that

2  admonishment, they have continued in clear defiance of the

3  court order.  And they have made no substantial progress since

4  the July 15th hearing, Your Honor.  In total, they were

5  required to post the $2.4 million in collateral on December 1st

6  and the additional security for bonds which the Department of

7  Homeland Security had issued a notice to deliver.  As of

8  yesterday, that's 447,500.  So the total collateral required to

9  post is $2,850,000.  From Nexus's records, we know that since

10 the issuance of the order as of the end of July, we believe

11 they have received in revenues approximately $16 million, Your

12 Honor.  And Nexus has paid, as of yesterday, a little over

13 $100,000.  So under the Special Master's report it was

14 $100,000.  We received one more payment as of yesterday --

15 $107,000 roughly.  So we're talking three and-a-half percent or

16 so of the order.

17          With regard to the books and records requirements,

18 Nexus has employed business-as-usual tactics, implementing the

19 shell game.  They have had a continuous shift in undisclosed

20 databases, accounting systems, accountants, and counsel.  They

21 have persisted in their refusal to disclose and produce records

22 from significant database systems and accounts actually used by

23 them on a daily basis.  And I'm going to go through that a

24 little bit more specifically.

25          THE COURT:  Hold on a second.  Mr. St. Ours, if it's

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   more comfortable for you, if you need to take notes or

2   something, you can sit up here where the probation officer

3   usually sits.

4               SPECIAL MASTER:  Thank you, Your Honor.

5               MS. KATSANTONIS:  Thank you, Your Honor.

6          So again, they have not produced their actual records

7   from significant databases and systems and accounts actually

8   used.

9          The Special Master mentioned the banking portals, the

10  merchant accounts.  We'll also talk a little bit about Stampli,

11  which pays accounts payables.  We're not getting all of the

12  information there as well.  They have refused to provide

13  transaction details.

14          I mean, it's really simple, Your Honor.  It's money

15  in and money out.  This is not complicated.  And we don't even

16  have to go back to the history -- 2018, '19, the changing.  We

17  need to know today, you know, what is in your accounts?  You

18  know, what is your financial status today?  Where is the money

19  coming in from?  They don't give us the source documents.

20  You're going to see they manually key in receivables into

21  Lightspeed -- manually, okay?  And so we want to see the

22  source, the merchant accounts that collect the credit card

23  statements and transfer the monies to the banks.  Where is that

24  documentation?

25               THE COURT:  If the money is coming in and the

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   question is the financial security of -- the financial

2   stability of Nexus, why do you care where it comes from?

3              MS. KATSANTONIS:  Well, Your Honor, you're going to

4   see that they've told us there's different -- you know, we were

5   looking for the Lightspeed records to see what the revenue

6   coming in was, right?  We saw the KPI record.  And so we saw

7   the KPI record and we said, Wait a minute, we see your

8   Lightspeed and the KPI record.  First of all, we kept saying

9   for months:  We don't have any historical Lightspeed data.

10  They didn't give us Lightspeed data from October -- from your

11  order through February.  And we said, Where is that data?  No

12  response for quite some time.  And then it was finally

13  disclosed -- and I have the date in here -- it was finally

14  disclosed let's say in June.  Oh, by the way, we didn't use

15  Lightspeed in October through February.  We used another

16  system, a virtual system.  They didn't disclose the name of

17  that either.  They didn't disclose the name of that until

18  after -- it was around July 6, I believe, and after we were

19  doing some reviews and even saw the name of it, American

20  Spirit.  So that's what we're dealing with, Your Honor.

21              And then the same with the disbursements.  You know,

22  we'll see in some of the bank account statements we presented

23  with the Court, you know, there's these disbursements.  We

24  don't have any transactional detail.  We don't have all the

25  records.  As the Court will remember, right, we looked at

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  Lightspeed and KPI.  We have an April 19th letter from Richard

2  Moore that says, I'm going to -- to the Special Master -- I'm

3  going to produce all bank statements.  May 5th, you get

4  everything.  I'll go into -- and I can show you in detail which

5  bank statements they did produce.  You know, they didn't

6  include statements for, you know, banks that we know they have.

7  But in any event, we got those bank statements, added it up,

8  and said, Wait a minute, this doesn't add up to all of the

9  revenues received in Lightspeed.  And only then, after then,

10 did they disclose, Oh, by the way, we have this TrustCo Bank,

11 which the vast majority of the Lightspeed funds were going

12 into.  Then after they do that in May, they then advise us, By

13 the way, we're going to stop using KPI, which is the indicater

14 which we could see the revenues and then match that.

15         So that's what we're dealing with, Your Honor, these

16 kind of shifting and transactional details.  And then, of

17 course, the old story you've heard over and over again of empty

18 promises, we're nearing completion, we're migrating our data,

19 we're reconciling.  That's what you're going to hear, I think,

20 from Ms. Wells:  It's very complex, we're still reconciling,

21 we're still migrating.  And they use that as a basis to

22 withhold records.  And even as Mr. St. Ours testified or

23 advised the Court, you know, NetSuite, for example, only

24 includes three bank accounts.  And they disavow the accuracy of

25 NetSuite.  Richard Moore's letter of August 4th says they're

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    not accurate.  All the records, they're not accurate.  That's

2    what's in his letter of August 4th to the Special Master.  It's

3    the same game.  It's just a lack of compliance with the order,

4    and they're in clear contempt, Your Honor, by any measure.

5    Without the appointment of a third-party administrator with a

6    financial accounting background to perform the specific

7    injunctive relief --

8            THE COURT:  What's the difference between appointing

9    a third-party administrator under Rule 66 versus a receiver for

10   the purposes of getting the collateral paid under Rule 70?

11   What is the practical difference between those two?

12           MS. KATSANTONIS:  Well, I guess -- I think it depends

13   on the -- as Mr. St. Ours referred to -- the guardrails you put

14   in place.  Under Rule 70, it's the specific acts.  Your order

15   is very clear, very specific with regard to exactly what needs

16   to be done, and it seems appropriate.

17           With regard to Rule 66, receivership, again, it

18   depends on what you -- what are the constraints you put on that

19   receiver.  So I would say, you know, from the case law, the

20   distinction, we saw the Courts using Rule 70 in the *Solis*

21   *versus Williams* case, for example, in order to grab funds and

22   replenish them to a 401(k) plan, I believe.  So it certainly

23   seems something that can be used in this instance.

24           You know, and I guess the Rule 70 appointment would

25   be one step less.  You know, they assert that they're concerned

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  with the receiver and whether that would push them towards

2  insolvency.  I think that Rule 70 would probably be more

3  appropriate in this instance.  But again, either way, whoever

4  is appointed, the goal is to keep Nexus in business, right, and

5  keep things moving forward, ensuring that the assets are being

6  used for the purpose in which --

7          THE COURT:  What would -- if I appointed someone

8  under 66, what would that person do?  What would you ask that

9  person to do?

10          MS. KATSANTONIS:  Well, I think the person would --

11  the main goal would be to -- and I'm going to show Your Honor.

12  You're going to see from a review we did of Stampli, which they

13  would not allow us -- and the Special Master can confirm --

14  they would not allow us to do a screenshot.  They would not

15  allow us to download any reports, but you could sort by payee.

16  So I did -- we did a sort.  And I'm going to show the Court, or

17  I'm going to explain to the Court how I saw potentially $1.7

18  million in the last six months going to unnecessary and

19  unrelated business expenses.  So that's just an example.  I'll

20  show you the specifics.

21          Okay.  So what I would ask the person to do is go in

22  there, get -- look at the banking portals first, right, get an

23  understanding, what is the actual cash in?  Has that been

24  reconciled?  What accounts have been paid out?  Get an

25  understanding of that.  And then ensuring the funds coming in

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   are being used for appropriate business purposes, payroll or

2   bond-breach payments, and that the assets aren't being

3   squandered and diverted for business -- for expenses completely

4   unrelated.

5          You're going to see, Your Honor, from our review they

6   spent --

7          THE COURT:  Is that within the scope of an

8   appointment under Rule 70?  I mean, is that -- and it's not

9   like I'm telling somebody to go and sign a deed, right?  You

10  want somebody to go and do an ongoing -- an ongoing financial

11  review and pay you-all monies under -- under the -- under the

12  provisions of the order that deal with the collateral.  I'm

13  trying to see how that's different, really, than -- in

14  practical terms -- from appointing a receiver with guardrails

15  that say, okay, you go in, you receive these funds and you pay

16  them pursuant to this court order to -- to RLI until its

17  collateral security provisions are -- those aspects of the

18  order are fully paid.

19         The other option I have that I've been thinking about

20  is just -- if the Court were to find they are in contempt -- is

21  just to impose a monetary sanction every day until they --

22  until they comply with the October 23 order.

23         MS. KATSANTONIS:  I think that they would --

24  depending on the amount of the monetary sanction, they would --

25  they would be happy with that.  They like to pay in interim

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   payments over a long period of time.  Delay, delay, delay.

2   That's what they've been doing.  So I don't think that that

3   would get -- or coerce the relief that we're entitled to.

4          And I think under Rule 70, Your Honor, you know, it

5   is specific to do the acts incidental.  With regard to the

6   Solis versus Williams case, right, there had to be a way that

7   the third party had to figure out and marshal assets to pay

8   back into the account.  So those are kind of incidental things.

9   I think you could be very specific.  They can reconcile the

10  accounts to determine the funds, identify and eliminate

11  unnecessary expenditures, and pay RLI from the funds that

12  remain.  And that's what we're asking for.

13         THE COURT:  You know, I'm really kind of surprised

14  we're here.  Last fall when we were talking about this, RLI was

15  after $10 million in collateral security.  That's what you

16  wanted.  You wanted $10 million in collateral security.  Well,

17  I didn't agree with that, and I imposed $2.4 million in

18  collateral security based on the analysis that I did, and then

19  on an ongoing basis the additional collateral security for the

20  individuals for whom the Department of Homeland Security -- or

21  whichever agency it is -- issues a notice to deliver.  I really

22  am shocked that this collateral security just hasn't been paid.

23  I just am absolutely flummoxed as to the -- why this money

24  hasn't been paid pursuant to the court order, and I'm

25  utterly -- I'm utterly mystified.  If you had told me before I

76

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

 1  entered the order on October 23rd that I'd be dealing with this

 2  in August of 2021, and they hadn't -- they hadn't complied with

 3  the court order, I would have been shocked.  And I continue to

 4  be shocked that the Court's clear order has not been followed.

 5  It just hasn't been followed.

 6          MS. KATSANTONIS:  And Your Honor, it's the same

 7  thing.  Your order said the 2.4 was the bare minimum necessary.

 8  And as the Court pointed out earlier this morning --

 9          THE COURT:  It wasn't like it was going into your

10  coffers as damages.  That is to be held as collateral security.

11          MS. KATSANTONIS:  And the bond-breach rate continues

12  above 40 percent that we talked about.  The reason we were

13  asking for the 10 million, we still have almost 20 million in

14  outstanding bonds, 19 million --

15          THE COURT:  Oh, I know what your argument was, and

16  you wanted 10 million, and I didn't give you 10 million.  I

17  entered 2.4, and they didn't pay that.

18          MS. KATSANTONIS:  And the scenario hasn't changed.

19  Where the Court would be extremely dismayed is to see that

20  they're paying a production company --

21          THE COURT:  I saw some of the exhibits.

22          MS. KATSANTONIS:  -- 221 -- from looking at a Stampli

23  screenshot, okay, we saw 221,000 for the first six months of

24  2021.  Then they've now given us 90,000 additional invoices for

25  July.  So at least 311,000 to Think Global, which is a

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   production company that they're doing reality TV shows, okay;

2   one, you know, related to the home life of Mr. Donovan and

3   Mr. Moore, and one related to -- and we have the video of it

4   here, Your Honor, as well, if the Court would like to see, but

5   we have those -- and then one called "The System" in which, you

6   know, we've seen some clips of that with, you know, protesters,

7   etc.  So they're doing these TV productions.

8           We also saw payments to Richard Moore.  It looks like

9   he then expenses it and pays Think Global.  And that looks like

10  almost 300,000 there.  We saw payments to Richard Moore in

11  round numbers, if you look at the bank account statements, of

12  about 105,000 just in the month of May.  There is transfers to

13  the closely-affiliated companies that we talked about, you

14  know, Fixify, which is an IT company, allegedly, but it's a

15  Nexus affiliate.  The invoices which we produced to the Court

16  at 709-1 -- and I'm looking at page 2 of 10 as an example --

17  I'm sorry, that's Fangistics.  That's another one.  But Fixify

18  is 709-2.  If you look at the invoice -- and even if you

19  compare it with Fangistics, 709-1, the invoices are almost

20  identical in form.  And at the top of both of them they have

21  370 Neff Avenue as the address.  And then the invoices are

22  going to hmunzner@entlest.com.  And so we pulled the corporate

23  records, Your Honor.  And those offices at Neff Avenue and

24  Entlest is a Richard Moore company.  And that is -- and we have

25  that with Fixify.  And let me just show you -- I have the -- at

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  709-3, page 18 of 19, is the State Corporation Commission

2  information on Entlest Brands, which provides the same address,

3  the 370 Neff Avenue, and provides the principal information

4  that Richard Moore is the president, and lists the same

5  address.  And so that goes for Fixify.  There is significant

6  funds going out, 361,000 we saw when we sorted on Stampli

7  January through June.

8          Again, they wouldn't let us do any screenshots, and

9  they won't -- they won't let us -- they won't produce these

10 kind of records from their data.  When Mr. St. Ours says, well,

11 they've given some documents from Stampli, they've given us

12 invoices that from our review they haven't given us all the

13 information that's in Stampli that talks about, you know, all

14 of the payor information, the payee information, when it's

15 scheduled to be paid, prioritized payables.  There's a slew.

16 So this is monies we think going towards insider companies,

17 okay?

18          There is also Executive Investigative Consultants.

19 When we did that sort, it was another $152,000.  That's Erik

20 Schneider's company.  The Court is very familiar with

21 Mr. Schneider.  And then there is unnecessary -- those are --

22 those are payments that we believe certainly are -- the Think

23 Global and some of these transfers appear to be unnecessary

24 business expenses.

25          We also have payments, for example, to

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   SKDKnickerbocker.  It's a public affairs political consulting

2   firm.  248,000 when we did the sort.  There was some funds to

3   WYE Communications, another -- I think it's like a social media

4   marketing company, 100,000.  Executive Services Concept for

5   Moore Security, 182,000.

6          So this was just in one short session with

7   Mr. St. Ours where we were on Stampli and we tried to sort by

8   some of the vendors and looked at some of these payments.  We

9   don't have the records.  They won't let us screenshot.  And

10  that -- to me, not only does it show they're not complying with

11  the books and records, but it goes to the point, Your Honor,

12  they have received almost $16 million from your order.  And

13  they are standing before the Court with 107 -- as of yesterday,

14  107,000 in payments and an additional 60-some I think they're

15  saying they paid yesterday, but with 16 million in revenue.

16  Meanwhile from those numbers I read to you, that's 1.7 million

17  that I saw from doing a review briefly.  So they're in clear

18  contempt, and we need to appoint a third party.

19          The other thing is Your Honor gave them every last

20  opportunity, last clear chance.  Let's have this last clear

21  chance; I'm going to give you every opportunity, 26 days.  The

22  same thing happened on summary judgment.

23          And first I want to apologize to Mr. St. Ours with

24  regard to any delay in receiving information, but there is a

25  reason for it.  And the reason is, many times Nexus is telling

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  Mr. St. Ours they're making payments, they're giving him

2  emails, but those aren't payments.  And we can show -- and

3  Mr. Grycz can testify -- as to what payments came in and didn't

4  come in, okay?  So, you know, unfortunately, you know, there is

5  things that Nexus said -- and that goes to I think it was

6  47,000 in Mr. St. Ours's report.  Those were never payments.

7  They're emails, and I can explain where those emails came from.

8          But it is true that since your order was issued in

9  October, that no collateral was paid until May, not on December

10  1st, not after we filed motions for contempt, not after your

11  hearing in March, not after you hired a Special Master in

12  April.  And they gave us 4,500 in May.  And remember in May

13  they're paying 150,000 to Richard Moore.  They're paying

14  100,000 or so to Fixify.  And they're making other large

15  payments, rather than paying their collateral obligations.  And

16  since the July -- and then July 1st through 14th, there was

17  another 46,000 that Mr. St. Ours verified.  And since July 15th

18  when we wrote in the brief that $9,282 was paid, that was true

19  when we wrote the brief to our knowledge on that Sunday.  It

20  was a payment dated July 22nd, 23rd, and 26.  And they added up

21  to 9,282.60.  On that Friday, there was another $7,000 check

22  that came in that we didn't learn about until Monday.  So that

23  was still, in the 16 days since your last clear chance, at most

24  we got $16,736.  That was their big effort.  And then in

25  August, now right before the hearing, all of a sudden we got

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   another 40,000.  And so that's what leads up to the 107,732.  I

2   do know that they yesterday said that they did make another

3   60-odd thousand payment.

4          And so that's the extent of any compliance.  They did

5   not pay the 20 percent.  What they did with the numbers that

6   Mr. St. Ours was a little bit confused by, by the emails, is

7   they tried to backdate at least one of the payments that they

8   had made before July 15th and say, oh, that was 20 percent for

9   July 1st.  So even under the best scenario, from July 15th when

10  you gave them the last clear chance, they paid 20 percent for

11  eight days in July:  July 4th, 5th, 6th, 7th, 8th, 10th, 11th

12  and 12th.  And those payments totaled $56,000.  The revenue for

13  the month of July is $1,347,740.  And this is the reported

14  revenue in Lightspeed, which leads to something else -- which,

15  you know, I don't want to get into -- but they say there's

16  another virtual terminal.  That shows over two million going in

17  and out every month.  And so do the bank statements show over

18  two million going in and out of the accounts every day.  We

19  need to see the records -- underlying records -- to see if

20  there is duplication, or why that's what's in the records.  But

21  even by the most conservative approach, if in July they

22  received $1,347,740, 20 percent would have been $269,548.

23          So they've squandered any efforts that the Court

24  provided them.  They have elected instead to pay substantial

25  sums on unrelated business expenses or payments to insiders and

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  affiliated entities, or payments that just are not necessary

2  when there is a pending court order.  So, I mean, to me, this

3  just screams for the necessity for the appointment of a third

4  party, whether until Rule 70 or under 68.  They are just not

5  going to comply.  It's the same thing as in the past, right?

6  Right before a hearing there would be some payment on

7  bond-breach invoices, and then they would go silent again.  I

8  mean, the fact that they only paid 4,500 in May, then they paid

9  nothing in June, and then, you know, started making some more

10  payments as the hearing approached, the July 15th is indicative

11  of the same pattern, Your Honor.  And, you know, clearly again

12  the appointment of a third party is warranted.

13          With regard to books and records, Your Honor, it's

14  even -- oh, yeah, the one thing -- there's one more point I

15  want to clarify.  And the Special Master I believe had this in

16  his report, and I did not review this motion for sanctions that

17  Mr. Anderson -- breathing new life into this case -- filed this

18  morning against RLI and its counsel, but I will say that there

19  was a contention about $50,000 in payments.  And Mr. St. Ours

20  wrote in his report there is this 50,000 -- I'm not sure.  We

21  didn't credit them for it, but this was the disputed payments.

22  These were payments that they paid, and by their own records --

23  which we can show the Court, unless they dispute it -- they

24  were for bond-breach invoices, 122, 126 days past Treasury

25  date.  When they enter those payments, they have to put in the

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

 1   system for which bond they're for, and they identified

 2   specifically which bond those payments were for.  And we also

 3   show it in our ECF -- the list -- 709-11.  We give them the

 4   credit for that $50,000 as bond-breach payments, invoices.

 5   It's not collateral and it shouldn't count as collateral.

 6   Nexus just throws numbers in to try to show compliance when

 7   nothing could be further from the truth, Your Honor.  So yes,

 8   it was ECF 709-11.  And if you look at the last two entries,

 9   those payments are noted in there based on the receipt of the

10   credit card payments.  And we have the underlying records that

11   show that's what they keyed in.  And Mr. Grycz can confirm that

12   as well, Your Honor.

13          So with regard to the books and records, Your Honor,

14   it's worse.  The situation is worse.  With regard to just --

15   I'll get into the financials in a minute.  With regard to the

16   important information about our bond principals, what

17   Mr. St. Ours notes is correct in the sense that with regard to

18   just the Capsule data, they've provided us their notes from

19   Capsule after -- and I want to remind the Court just really

20   briefly in a pleading before this Court, ECF 618, their

21   opposition to our plaintiff's motion on December 29th -- and

22   I'm looking at page 6, Your Honor -- this was one of the

23   pleadings I was referencing when Mr. Shoreman and Mr. Williams

24   were leading the charge.  They wrote, "Nexus has surpassed the

25   Court's requirements by providing RLI with constant and

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   instantaneous access to a shared drive.  As to daily access to

2   participants who have been issued an NTD, Nexus is currently

3   providing RLI to its Capsule-derived data."

4            That's what they said to the Court.  We followed that

5   up and said, We don't have access to Capsule.  We have a

6   December email saying you've never provided us.  Tell me where,

7   when, and how.  And guess what?  Nexus never answered.

8   December, January, February, March.  And I think the Special

9   Master can -- could verify that I don't believe we got -- we

10  first got access to Capsule on April -- or documents from

11  Capsule on April 28th, '21, not as misrepresented in the Court

12  pleading at ECF 618, despite numerous representations.

13           And as the Court knows, your order isn't just

14  Capsule.  They created a new bond-breach spreadsheet which just

15  lists mostly the information we've provided them, the

16  bond-breach dates, etc.  But the Court's order provides that

17  it's not just Capsule data, right, but it's -- you had a whole

18  list here.  Any and all documents, records related to the RLI

19  bond program participants.  Such information includes, but is

20  not limited to, Capsule data, records of bond payments.  Very

21  important.  That was based on Ms. Wellman's report that the

22  history of the bond payments is very important.  Tracking

23  records, bond-breach binders, and spreadsheets.  Again, the

24  Court was going back trying to encompass documents that had

25  been produced, and any other information sufficient to assess

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

 1   RLI's bond risk.  So we've asked for that, and it's not being

 2   provided, Your Honor.  We asked for them.

 3           We know that they can sort in the databases by tags.

 4   They had some tags that they say they've produced, but they can

 5   sort it.  So for example, they can sort by tags called "risk

 6   pool."  They have tags called "collateral bonds," and then they

 7   have tags called "payments."  They can sort and provide us with

 8   that information.  They haven't.  They have not provided, very

 9   importantly, the summary detail of bond principal payments.

10   They say, We've given it to you, because they gave us a

11   Lightspeed spreadsheet that shows every payment made every day,

12   $420, or in the Capsule files payments may be noted.  But there

13   is a way -- we saw their ability to sort and provide a summary

14   detail for each bond principal.  How much have they paid?  How

15   much was it -- how much -- was it collateral?  How much -- was

16   it a promise payment?  They have that information.  It hasn't

17   been provided.  And then importantly the appeals records.  The

18   evidence we've seen is that they are providing information to

19   the law firm for the appeals, they're paying for the appeals,

20   but they've given us no appeal records.  So that's just on the

21   bond principal data.

22           With regard to the financials, I already talked

23   about, Your Honor, the representation by Mr. Moore in April

24   that they provided us all bank statements, and yet they did

25   not.  They did not provide us with the TrustCo statements,

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  which we talked about, until after we showed that there was

2  inconsistencies in their records.

3            With regard to bank account statements, you know,

4  we've identified at least 25 active banks.  They haven't

5  provided us any statements for five of them.  For June

6  statements, for example, they only gave us 17 statements for 17

7  of the 25 accounts.  We've identified gaps in those statements

8  on accounts that they have no statements.  One was an account

9  ending in 9898 which Nexus produced statements for December and

10 March and June, but none of the in-between time:  October

11 through November, January, February, April, and May.  And as we

12 noted, they withheld check and detailing transfer information.

13           Same thing on the credit cards; we've identified 18

14 credit cards.  They've produced statements for only three of

15 the accounts.  Two of them it has produced only a single

16 statement, whereas there are at least 13 credit cards that we

17 haven't received statements.  So that's just with regard to the

18 credit card statements.

19           But more importantly, it's the hide-the-ball with the

20 databases.  And as the Court knows, we have a list of

21 communications with the Special Master asking about some of the

22 Lightspeed data and other databases that they failed to

23 disclose.  We asked for other financial databases.  We have a

24 detailed letter to that effect.  And to think, Your Honor,

25 you're sitting there every month and in how many sessions with

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  Mr. St. Ours -- there's eight before the review -- talking

2  about databases, and there's no disclosure that they had

3  stopped using Lightspeed.  Then there is no disclosure of Melio

4  and Stampli.  And Stampli is the one that I -- that we saw

5  during our review a lot of these disbursements until after --

6  right at the July 15th hearing where we found out, through

7  separate efforts, an email from Richard Moore talking about

8  Stampli and Melio.  They never disclosed it.  We're sitting

9  there every week practically with the Special Master, right,

10  and there is no disclosure of these accounts.  And after your

11  admonishment at the July 15th hearing, we discovered three new

12  databases.  They disclosed Fluid Pay, Airbase, and American

13  Spirit.

14         That is clearly fraudulent conduct, Your Honor.

15  Their failure to disclose these databases, their failure to

16  disclose the records of their contemporaneous financials is

17  improper.  And, you know, there's also -- we could go through

18  ad nauseam the back and forth, but we have letters from Richard

19  Moore refusing to give us -- no bilateral review of Lightspeed

20  and NetSuite, even though they say those are the systems they

21  use.  Again, we find out there's other systems.  It's been a

22  constant shell game.  They advise us of a virtual terminal, but

23  they didn't disclose it until on July 6 they tell us there is a

24  virtual terminal.  They don't disclose it till July 22nd.  I

25  believe it's because I saw the name American Spirit in one of

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   the bilateral reviews.  They used to use VersaCheck, Verified

2   Valid Deluxe eChecks.  They just say they're no longer in use.

3   We understand that they were in use the end of -- since your

4   order from October to December '20.  Didn't produce any records

5   from there.  They say, We don't use it anymore, so we have no

6   records -- which, Your Honor, if they're allegedly going

7   through reconciliation, I don't know how they don't have

8   transaction details for then the source documents of checks

9   they wrote during that time frame.  And, you know, we've got no

10  records at all from Melio and Fluid Pay; and limited documents

11  from these new databases, American Spirit, Stampli, and

12  Airbase.  You know, I can tell you I did one check just to see

13  if I have invoices, because they gave us a bunch of invoices.

14  One was WYE Communications.  I didn't see any invoices in the

15  documents that have been produced.  And then importantly, as

16  Mr. St. Ours brought out, they have failed to disclose the real

17  records from the systems they're using on a daily basis.

18  They -- they advise -- they use their online banking portals,

19  and yet have produced no records from them and have given us no

20  access to that to determine what funds they have.  And then

21  they look at their merchant accounts, and those are things that

22  we don't have access to.  And again, with these quick bilateral

23  reviews, it's important to note to the Court that they allowed

24  that for the Special Master to confirm compliance, that there

25  is these databases.  They didn't allow it for us to have

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    records, screenshots, or any of the information.  And based on

2    what I saw with regard to the 1.7 million we talked about

3    earlier, that's why.  We don't have the transaction details to

4    show how much they're spending, sort it by payee, and see where

5    the funds are going.

6          Importantly -- you know, again, as we said before,

7    bank statements and loan are insufficient.  We need access to

8    the check copies, the wire transfer, and ACH backup

9    information, credit and debit memos, all of that information

10   that shows you the source.  As Mr. St. Ours said, we saw a

11   bunch of payments to Richard Moore, but we can't say what they

12   were going, where they were going, and how they were going and

13   what the purpose was.

14         And as I advised earlier, Nexus admits the records

15   produced to date are inaccurate and should not be relied on.

16   That's the latest that we received I believe both from

17   Mr. Moore's August 4th email, and I believe from Ms. Wells's

18   affidavit.

19         And then the last point I just want to hit on briefly

20   is real estate records.  Again, Your Honor knows through the

21   history of this case we would look at balance sheets, profit

22   and loss statements that listed dozens of properties.  And they

23   all had values -- 245,000.  Now those values have disappeared

24   to zero, and they've given us no records of real estate

25   transactions.  We've asked for it.  They just -- their response

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   is we don't have real estate.  When Mr. Harris was looking

2   briefly on Melio -- and I believe we provided some

3   screenshots -- you could see payments for properties, specific

4   properties that were identified -- I think one was Windsong

5   Circle -- you could see some payments for homeowner association

6   fees and taxes related to properties that do appear to be being

7   paid by Nexus.  So again, we don't have the records.

8        There is no denial that they are in contempt, Your

9   Honor.  And, you know, one point not to be lost, obviously -- I

10  am sure the Court is aware -- but since the order of October

11  2020 till now, how much has RLI incurred in attorneys' fees and

12  costs, and for the time of the Special Master to collect the

13  amounts that have been received to date?  It's unconscionable.

14  And not only that, the liabilities on new notices to deliver

15  are accruing faster than the amount of monies we're getting

16  paid.

17        So it's just -- it's -- we're almost ten months

18  later, Your Honor.  We seek enforcement of the judgment under

19  Rule 70(a) or alternatively 66.  There is no doubt they failed

20  to perform the specific acts within the time specified by the

21  Court.  The Court has the power to appoint a third party to

22  perform the action required by the order.  RLI continues to be

23  prejudiced by it, not only by the continuing --

24        THE COURT:  How are you harmed?

25        MS. KATSANTONIS:  Not only by the continuing accrual

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  of costs, but, Your Honor, we were to be placed in a secured

2  position.  We're supposed to be secured.  And every day that

3  passes is to our extreme detriment.  There is other creditors

4  out there -- your Honor is presiding over some of those

5  proceedings -- and other APs approved.  We're to be placed in

6  collateral.  We still have a 19-plus million exposure.  We're

7  getting prejudiced every day.  And not to mention, again, the

8  clear -- it could not be more clear that they are taking assets

9  and using them for unrelated expenses.  And Think Global is but

10 one example.  So RLI is supposed to be placed in funds.  We're

11 losing our right as a secured creditor, which is what the

12 injunction order is for.

13      THE COURT:  What about the conflict that Mr. St. Ours

14 raises between appointing a receiver under Part A and then the

15 damages aspect under Part B of the order?

16      MS. KATSANTONIS:  I don't believe there is any

17 conflict, Your Honor, in the sense that any -- whoever you

18 appoint -- with regard to the books and records, RLI under the

19 indemnity agreement already knows, or is entitled to know, what

20 the books and records are.  So there is no prejudice there.

21      With regard to the enforcement actions, you know,

22 given the guardrails that the Court can impose, the person

23 appointed is purely going to take on the function of marshaling

24 assets, making sure that those funds are then provided for

25 collateral.  Any other proceedings are separate that RLI may be

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   doing with regard to its judgment.

2          THE COURT:  Is RLI taking steps to enforce its

3   judgment under Part B for the three-and-change million dollars

4   in attorneys' fees?

5          MS. KATSANTONIS:  We have outstanding motions with

6   regard to discovery.  With regard to garnishment, my

7   understanding is the last garnishment action taken was in May.

8          Mr. Paul is here and he can certainly address that.

9   Is that right?

10          MR. PAUL:  It was filed in May.

11          MS. KATSANTONIS:  So just like any other creditor

12   that might be --

13          THE COURT:  Do you know how much RLI has collected on

14   the judgment?

15          MS. KATSANTONIS:  Only about --

16          MR. PAUL:  It's just shy of $300,000, Your Honor.

17          THE COURT:  And you are?

18          MR. PAUL:  Dustin Paul, Vandeventer Black.  I'm

19   counsel of record for RLI as well.

20          MS. KATSANTONIS:  Mr. Paul is handling the judgment

21   aspect, Your Honor.  Our firm has not been involved

22   specifically in that aspect.

23          THE COURT:  Okay.  Thank you, Mr. Paul.

24          MS. KATSANTONIS:  And Your Honor, lastly, with regard

25   to the point of the appointment, we would also ask that

93

D. Grycz - Direct

1    sanctions be issued and that RLI be permitted -- that the Court

2    issue a money judgment for the costs incurred by RLI to enforce

3    the Court's order over the last almost ten months.  And we can

4    provide the Court with that in a separate pleading with the

5    accounting.

6          THE COURT:  Okay.  Did you want to put any evidence

7    on?

8          MS. KATSANTONIS:  So Your Honor, what might be

9    beneficial, but I don't know, is we can take a five-minute

10   break.  And if Mr. Anderson agrees with our accounting numbers,

11   we might be able to short circuit Mr. Grycz's testimony with

12   regard to what's been paid and not paid so that we're all on

13   the same page, or we can just put on Mr. Grycz and he can go

14   through what's been paid.

15         THE COURT:  I want to hear from the witness.

16         MS. KATSANTONIS:  Okay.  We'll do that then, Your

17   Honor.

18         (Whereupon, the witness was sworn.)

19         THE COURT:  Good afternoon.  Nice to see you again.

20         THE WITNESS:  Good afternoon, Judge.

21         THE COURT:  You may take your mask off while you're

22   testifying.

23         THE WITNESS:  Thank God.

24          DAVID GRYCZ, PLAINTIFF'S WITNESS, SWORN:

25                    DIRECT EXAMINATION

D. Grycz - Direct

1   BY MS. KATSANTONIS:

2   Q    Good afternoon, Mr. Grycz.

3   A    Good afternoon.

4        MS. KATSANTONIS:  Can you -- oh, I'm sorry, has the

5   witness been sworn in?  I missed it.

6        THE COURT:  He's been sworn.

7        MS. KATSANTONIS:  Thank you, Your Honor.

8   BY MS. KATSANTONIS:

9   Q    Can you remind the Court of your current title with RLI

10  and your current roles and responsibilities?

11  A    Sure.  I'm assistant vice president of claims at RLI.

12  Basically, I oversee a team of claim examiners handling surety

13  bond claims.  As part of that, we also pursue recovery against

14  indemnitors, both in terms of collateral or recovery on paid

15  losses.

16  Q    Has your role or involvement with this Nexus matter

17  changed since you last testified in September of 2020?

18  A    No.  It's been the same.  I'm basically charged with

19  participating in litigation, overseeing all the bond claims,

20  and attempting to get Nexus to comply with the indemnity

21  agreement and then the October order.

22  Q    Is there someone at RLI that you rely on regarding the

23  status of collateral payments received and delinquent invoice

24  payments?

25  A    Yes.  So I work very closely with Laura Piispanen.  She is

D. Grycz - Direct

1   a claim examiner IV working out of our Seattle office.  Laura

2   handles all the immigration bond claims, and has since the

3   beginning.  She tracks all the payments received by Nexus,

4   sends all the notices to deliver -- breach notices, etc. -- to

5   Nexus.  And she is very carefully tracking collateral payments,

6   as well as the claim recovery payments from Nexus.

7   Q    And when you say claim recovery payments, are you talking

8   about payments made on invoices?

9   A    Correct.  Yeah.  So I guess where we find ourselves,

10  there's two different payments.  We get payment in from Nexus

11  sometimes on a long-since-paid invoice, meaning RLI paid it,

12  and now a money order comes in, and now it's kind of a credit

13  card.  We view that as -- I mean, we already went out of pocket

14  the money.  So that's just claim recovery from a creditor,

15  what's typically called indemnification.

16       But under the order we started -- in May, we started to

17  get some collateral security payments.  And, you know, that's a

18  different category, and we're tracking both of those.

19  Q    Have you been able to confirm how much collateral security

20  RLI has actually received each month since October of 2020?

21  A    Yes.  With the -- with the only caveat -- and this is

22  where I think some of the confusion comes from -- if Nexus

23  makes a payment right before a court filing or right before a

24  court hearing, it takes our cash operations department maybe

25  one business day to get it posted from our bank, JP Morgan --

D. Grycz - Direct

1  JP Morgan Chase, and then it get reported to us.

2       So obviously, you know, I sense the friction on that

3  topic.  That happened with our reply brief due on August 1st,

4  which was a Sunday, and it seems to have just happened again

5  with payments made yesterday.  So I feel like we are good

6  through yesterday maybe lunchtime, but --

7  Q    And as of December 1st, how much collateral security had

8  Nexus provided to RLI -- December 1st, 2020?

9  A    None.

10 Q    And how about in January 2021?

11 A    None.

12 Q    And in February, March, and April 2021?

13 A    None for all three months.

14 Q    And when did Nexus first make a collateral security

15 deposit since the October 23rd order issued?

16 A    It was right before Memorial Day, like May 26 or May 27th,

17 we got in two money orders for -- I think they totaled $4,500.

18 Q    And --

19 A    I'm sorry, two sets of money orders.  They actually come

20 in very small thousand-dollar increments or $500 increments,

21 but between the two sets it was 4,500.

22 Q    And then how much collateral security did Nexus provide in

23 June of 2021?

24 A    June, nothing.

25 Q    And after the Court scheduled its July 15th status

D. Grycz - Direct

1    conference, did RLI notice any change with respect to

2    collateral security payments being made by Nexus?

3    A    Yes.  So once -- so this is kind of the history of the

4    case -- and I testified about this in September of last year --

5    once a hearing gets scheduled and all the parties are going to

6    report before the judge and have to face him, that's when

7    payments start trickling in a little bit more.  So we started

8    to see an uptick.  Once the July 15th hearing was put on the

9    books, we started to see a little bit of an uptick.

10   Q    And I'm going to show you an exhibit --

11              MS. KATSANTONIS:  Your Honor, would you like us to --

12   may I approach?

13              THE COURT:  Yes, please.

14    BY MS. KATSANTONIS:

15   Q    Mr. Grycz, can you look at this demonstrative exhibit and

16   explain what it is?

17   A    Yes.  So this is at my direction.  I asked counsel,

18   working with myself and Laura Piispanen, let's summarize

19   everything that's been received in collateral to be able to

20   show to the parties and to the Court.

21   Q    And does this summary accurately reflect all collateral

22   payments that RLI received since October 23rd as of yesterday

23   midday?

24   A    Yes; with the qualification that payments that came in

25   yesterday and maybe the sending bank swept it in in the

D. Grycz - Direct

1  afternoon or evening, that's not covered here.

2       So actually, just to clarify that, I got an email five

3  minutes before this hearing started saying some payments came

4  in from Nexus yesterday.  The hearing started.  I haven't had a

5  chance to go through it.  So that may be the fifty or 60,000

6  that was said to have been sent on August 9th.  It hit our cash

7  ops department in the morning.  This hearing started at 8:30

8  Central time.  I haven't had time to go through.

9  Q    You were saying that after the first initial $4,500

10 deposit in May -- late May -- Nexus didn't make any further

11 payments until the status hearing was noticed.

12      How much collateral security did Nexus then pay after

13 learning of the status hearing, but before the July 15th

14 hearing?

15 A    It's 46,325.

16 Q    And then, as you are aware, you were at the status call

17 with the Court on the 15th of July.  Nexus was provided a

18 last-chance, 26-day window.  What has RLI received since the

19 hearing in terms of collateral security deposit?

20 A    Well, so the hearing was on the 15th.  I thought, from

21 what I heard on the hearing, payments were going to start that

22 day.  That's what was represented.  The first payment was $18

23 on the 22nd, which was a week later.  The first I'd say not --

24 you know, a little bit bigger payment was on the 23rd.  It was

25 basically 16,736 during that -- you know, through the end of

D. Grycz - Direct

1 the month, and then an additional 40,171.20 up until yesterday

2 lunchtime.  So we're looking at, since the hearing -- the July

3 15th hearing -- $56,907.20.

4 Q    And so I want to just clear up an issue that arose.

5 Looking at the July 15th to July 31st, RLI contended in its

6 brief of August 1st that it received 9,282.60.  Can you

7 identify what those payments were?

8 A    Sure.  So that's a compilation of the July 22nd, the July

9 23rd, and the July 26th payments, which add up to that amount

10 that was in my declaration.  I believe Nexus said it sent 7,453

11 on that Friday, which I guess would have been July 30th.  As of

12 the time of my declaration and filing of the reply brief, which

13 was on August 1st, which was a Sunday, we had checked with our

14 treasury and cash ops department.  Hadn't seen that.  So I only

15 go with what comes into the company.  I don't trust these

16 payment confirm emails that we're getting bombarded with.  I

17 don't trust them.  I only trust what comes into my company.  So

18 sure enough, on the morning after we filed the reply brief at

19 11:59 p.m., we get confirmation that the 7,453 has arrived.  So

20 of course, we will credit.  We'll acknowledge that Nexus sent

21 that in.  But that's why my declaration that evening said

22 something differently.

23 Q    Has it been your experience when you receive these

24 payments that the date of payment indicated in a Nexus email is

25 not consistent with the date of RLI's receipt of payment?

D. Grycz - Direct

1   A    Correct.  A lot of times we see date of payment, July 2nd

2   or July 9th, but then I don't get the payment until a week

3   later.  So I don't mean to be disparaging, but that is very

4   common with people paying us back.  They backdate stuff to make

5   it look to say, ah-ha, I paid you on July 9th.  Then we get the

6   payment two or three weeks later.  That is incredibly common

7   when we get paid stuff.  So I just basically disregard the date

8   of payment in an email, and I just stick to when did it come

9   into my company?  It's just a safer way of kind of accounting

10  for this.

11  Q    Okay.  All right.  So as of yesterday afternoon, what is

12  the total amount of collateral that RLI has received since the

13  October 23rd hearing?

14  A    It's $107,732.20; again, with the caveat that once I

15  could, you know, have half an hour to look into it, I may be

16  able to confirm another 60,000 or so that our cash ops

17  department reported to us this morning five minutes before the

18  hearing started.

19  Q    And do you have an understanding of what the October 2020

20  order requires in terms of collateral?

21  A    Yes.  It requires two component parts that are different.

22  There is the lump sum collateral of $2.4 million, which my

23  understanding is the minimum -- the minimum that would protect

24  RLI not tied to any one bond.  It's for the whole immigration

25  bond program.  And then separately there is under A.2 what we

D. Grycz - Direct

1   would generally call claim collateral.  For every notice of

2   delivery we receive, within 48 hours Nexus is supposed to send

3   in the penal sum of the bond so we can hold it as collateral to

4   pay that claim if it materializes into needing a payment.

5        And what's very important for me to say is that it's an

6   "and."  It's not an "or."  So it's an "and."  So they're

7   supposed to give the lump sum and separately do the notice to

8   deliver.  I imagine the number would have been bigger had I

9   not -- the lump sum number would have probably been bigger had

10  we not been getting the individual claim collateral.  So I saw

11  talks in the reports or one of the Richard Moore letters that

12  he sends to the Special Master that there is this insinuation

13  that a payment can cover both, which is absolutely not the

14  case.

15  Q    And with your prior declarations you've attested to the

16  number and amount of new DHS notices to deliver that RLI has

17  forwarded to Nexus.  Has that number and amount changed since

18  your last declaration?

19  A    Yes, it has.

20        MS. KATSANTONIS:  Okay.  And then I'm going to show

21  you another demonstrative exhibit.

22        THE COURT:  Do you want to introduce this?

23        MS. KATSANTONIS:  Oh, I'm sorry, Your Honor.  Yes, I

24  would like to introduce the demonstrative exhibit of Mr. Grycz

25  as Exhibit 1.

102

D. Grycz - Direct


1           THE COURT:  Any objection?

2           MR. ANDERSON:  No objection.

3           THE COURT:  Received without objection.

4           (Plaintiff's Exhibit 1 marked and admitted.)

5    BY MS. KATSANTONIS:

6    Q     Mr. Grycz, can you identify this table?

7    A     Yeah, so once again at my direction I asked counsel to

8    work with myself and Laura -- Laura Piispanen -- to just

9    basically summarize every notice to deliver received since the

10   Court ended that October 23rd order by claim number, bond

11   number, the statement given to Nexus, and then the penal sum.

12   And that's basically a tally of that.

13   Q     And does this table accurately reflect the current number

14   and penal sum amounts of outstanding bonds for which a notice

15   to deliver has been issued by DHS and provided to Nexus since

16   October 23rd as of yesterday, August 9th?

17   A     It does.

18   Q     And what is the total penal sum amount of such bonds?

19   A     It's $447,500.

20   Q     Okay.  And we can see from this table that the amount has

21   grown over time, correct?

22   A     Yeah.  There wasn't that much in the first -- you know,

23   the month of the order or the month or two that followed, but

24   then it started to pick up.  We have several months with five

25   or six notices to deliver being received.  So it's growing.

103

D. Grycz - Direct

1  You know, I think, for whatever reason -- maybe COVID -- the

2  federal government was a little slow last fall.  But they're

3  back to -- DHS is back to business issuing these.

4  Q    So with the 2.4 million that the Court ordered to be paid

5  December 1st, with the addition of this 400 -- almost 450,000

6  in additional security for the outstanding bonds, is the total

7  approximately 2.85 million in collateral that you understand

8  Nexus has an obligation to pay under the court order?

9  A    Correct.

10 Q    And how does the amount of collateral received from Nexus

11 as of yesterday, including over the last 26 days, compare to

12 the outstanding ordered obligations as you understand them?

13 A    Well, I mean, it's a drop in the bucket.  It's -- it's --

14 even if I just for the sake of, you know, my testimony assume

15 that 60,000 came in yesterday -- which I could confirm later

16 today -- that's about $167,000 against over $2.85 million.

17 It's -- I don't know the math.  What is that, 4 or 5 percent?

18 It's just a drop in the bucket, and it's growing.  So it's *de*

19 *minimus.*  It's barely anything.

20 Q    And as you stated, the amount of outstanding NTDs

21 continues to grow, right?

22 A    Yes.

23 Q    And has RLI incurred any additional cost in obtaining,

24 whether it's 107, 167 in collateral payments received to date?

25 A    Yeah, we have to spend -- as I testified in September, I

D. Grycz - Direct

1   said we had to spend a small fortune -- over $3 million -- to

2   get them to comply over all those years with the injunction

3   orders and to get a judgment against them and then deal with

4   all the frivolous stuff, the bad faith counterclaim that I had

5   to fight, the alterego stuff that we had to fight, and

6   everything else.

7       I now have to spend another small fortune -- I think it's

8   at least $150,000 -- between what will be the Special Master's

9   bills and our attorneys' bills -- getting them to supply what

10  is, on their best day, maybe 167,000 in collateral.  So it's a

11  one-to-one.  I have to spend probably 150,000 to get 150,000 in

12  collateral.  I mean, that's not -- that's not how this is

13  supposed to work.

14  Q    And I just want to briefly touch on -- you've indicated in

15  your declaration that Nexus has continued its practice of just

16  paying delinquent invoices past the 120-day mark?

17  A    Yeah, that's basically what was happening.  You know,

18  what's happening now is a little bit of a mixture of I guess

19  the collateral and then some of these credit card payments that

20  we've gotten.  But for the several months it was just, oh,

21  we'll -- you know, here's a check or money order.  We'll pay

22  that invoice that RLI had long since already passed.  I of

23  course don't view that as collateral at all.  That's not

24  collateral.  That's not complying with the judge's order.

25  Q    And with regard to the $50,000 that Nexus has raised that

D. Grycz - Direct

1    it's paid recently on credit cards, do you have an

2    understanding of what those payments were for?

3    A     Yeah, they were for invoices that RLI had already paid.

4    And in fact, just to clarify this, because I guess there's -- I

5    haven't read it, but there's a sanctions motion -- Nexus

6    asked -- I forget the date -- Nexus asked RLI -- Vivian or the

7    Special Master -- can we pay collateral with a credit card?

8    And we thought about it and wrote back -- and Mr. Harris wrote

9    the letter and said, We -- RLI as a company -- we don't take

10   collateral payments by credit card.  You know, we take a lot of

11   collateral, and we're not going to let someone put a million

12   bucks on a credit card.  So we take payment in lots of other

13   ways, but we don't take payment by collateral; however, we have

14   a website where indemnitors who owe us money can pay us back

15   for a bond claim that we had to pay via credit card.  They go

16   to this website.  I can give you the URL, if you want it.  They

17   can go to a website that ends in claim recovery.  So if we had

18   to pay a $10,000 contractor's license bond claim for a

19   contractor, we go to the guy and say, You've got to pay us

20   back.  He says, Can I put it on my credit card?  We say, Okay.

21   So we do make a little concession.

22        So we told Nexus we're not taking collateral by credit

23   card; however, if you want to pay us for an invoice that we

24   paid, okay, fine.  Even though we had to eat the merchant fee,

25   we will -- we're willing to let you pay, but you have to enter

D. Grycz - Direct

1    a bond number and a claim number.  And Nexus did exactly that.

2    They went onto our website, they entered a bond number, they

3    entered a claim number, and they confirmed they were trying to

4    make payment on an invoice.  So I didn't think -- up until the

5    sanctions motion, I didn't think there was any dispute that

6    those -- I think it's 50,000 in credit card payments for stuff

7    that I paid in March or April and was paid by credit card in

8    July, I didn't think there was any dispute.  That's clearly not

9    collateral.  We're not counting that.  It's not on the chart,

10   and it's not collateral.

11   Q    And Mr. Grycz, when Nexus itself makes the payment,

12   doesn't Nexus earmark it for a specific invoice to say that

13   this is for payment of a bond-breach invoice?

14   A    Correct.  So if you go to -- it's

15   easypay.rlicorp.com/claim recovery.  I mean, it's right there

16   in the URL, claim recovery.  The first page, if you go to it

17   right now, it says claim number, bond number.  You will never

18   be able to move on from that screen unless you enter a claim

19   number and bond number.  It's purely for reimbursement, as the

20   title suggests, claim recovery.

21   Q    And so, when -- for those payments, RLI specifically paid

22   those towards a specific invoice, correct?

23   A    Correct.  We paid them in either March or April.  They

24   already paid.  So I just view it as Nexus --

25   Q    No; I mean Nexus paid them.  Nexus specifically identified

D. Grycz - Cross

1  they were paying for a specific invoice?

2  A    Correct.  Yeah, correct.

3         MS. KATSANTONIS:  I have nothing further of

4  Mr. Grycz.

5         THE COURT:  Okay.  Mr. Anderson, do you have any

6  questions you'd like to ask Mr. Grycz?

7         MR. ANDERSON:  Yes, Your Honor.

8         THE COURT:  Please.

9         Oh, I'm sorry.  Ms. Katsantonis, did you want to mark

10 this as Exhibit 2?

11        MS. KATSANTONIS:  I apologize, Your Honor.  Yes,

12 please.  I'd like to move for the entrance of that exhibit as

13 Exhibit 2.

14        THE COURT:  Mr. Anderson, any objection to that?

15        MR. ANDERSON:  No, Your Honor.

16        THE COURT:  Exhibit 2 will be received.

17        (Plaintiff's Exhibit 2 marked and admitted.)

18                     CROSS-EXAMINATION

19  BY MR. ANDERSON:

20 Q    Good afternoon.

21 A    Good afternoon.

22 Q    You referenced a letter that your counsel had sent to

23 Nexus regarding how and which they could pay RLI the collateral

24 payments?

25 A    Yes.

D. Grycz - Cross

1  Q     And I believe it was Mr. Harris that wrote that letter?

2  A     Yep, that's what I recall.

3  Q     And you basically delineated -- or your counsel delineated

4  two separate ways that Nexus can pay RLI for the payments.  One

5  would be for A.2 payments.  And it was a certain number of

6  ways, one being ACH, credit card, or -- and the other way --

7  and money order?

8  A     No, we're not accepting -- I don't think we're accepting

9  A.2 collateral by credit card.  I need to see the letter.

10 Q     But I think you just testified that at least the five

11 credit card payments for $10,000 each were being credited as

12 A.2 collateral payments?

13 A     No, that's not what I said.

14 Q     You did just say that they had a bond number, and the only

15 way to make those payments --

16 A     We had already made the payment.  That's not collateral.

17 To comply with the judge's order, within 48 hours of a notice

18 to deliver, you've got to pay the penal sum.  Just having us

19 pay the invoice and then having to wait three months for

20 Richard Moore to get out his credit card and make a payment --

21 Q     That is not my question.

22 A     Well, you said that's what I testified to.  I don't think

23 I said that.

24 Q     What I'm trying to establish is you've now provided Nexus

25 the way in which to make these payments?

                              109

                        D. Grycz - Cross


1  A    I disagree with now.  I disagree with now.  Making

2  collateral payments is not a difficult thing.  You can make a

3  check.  You can make a money order.  If Nexus would have said

4  to us on December 2nd, we're ready to make the $2.4 million

5  payment, give us your wire instructions, we do that every

6  single day.  So it wasn't this --

7  Q    Let me --

8  A    This narrative that we only paid -- we only told you how

9  to pay us in June is false.  It's a false narrative, and I

10  disagree with it.

11  Q    My question was really simple.  In the last two months,

12  we've been trying to find ways to pay you -- or Nexus has

13  been --

14           MS. KATSANTONIS:  I'm going to object to the

15  characterization.  That sounds like testimony.

16           THE COURT:  Overruled.  I'll let him ask his

17  question.  Go ahead, Mr. Anderson.

18   BY MR. ANDERSON:

19  Q    Nexus has tried to establish a way to pay 20 percent of

20  its daily and monthly revenues to RLI, and that was rejected.

21  So what we've come up with is the methods in which your counsel

22  directed us to make ACH payments.  Does that --

23  A    No, I disagree with everything you just said.

24  Q    Through your counsel, have you been instructed that we

25  tried to make a direct payment of our 20 percent revenues

D. Grycz - Cross

1  within the last 60 days?

2  A    I don't even know what -- what is tried to make a payment?

3  You put a check in the mail; or you say, I'm going to wire you

4  money.  I've never seen any company -- I've seen plumbers, who

5  we have a license bond for, be able to get money in our hands.

6  Q    I'll make it very simple.  We're talking about Lightspeed.

7  We're talking about all these databases, our merchant account.

8  We offered -- Nexus offered to RLI -- whether it was through

9  your counsel or through directly to you -- the ability to make

10 these payments directly out of our merchant account.  That

11 offer was rejected.  Are you familiar with that offer?

12 A    Not -- not quite in the sense that -- here's the deal:  I

13 don't know what this merchant account is.  I don't know what

14 the 20 percent --

15 Q    Well --

16 A    Can I -- do I get to answer your question?  Let me answer

17 your question.

18 Q    By all means.

19 A    I don't know what the 20 percent of gross daily receipts

20 or gross daily revenue would mean.  The term alters.  All I

21 know is that there is a court order from him saying 2.4

22 million --

23 Q    But that's not my question.

24 A    So you're basically unilaterally changing his order.

25 You're saying, I'm not going to comply with that guy's order,

111

D. Grycz - Cross

1  the judge's order.  What I'm going to do is the best we could

2  offer you is 20 percent of gross daily receipts.  I don't know

3  what that means.

4         THE COURT:  I think you need to answer his question.

5  Now, Mr. Anderson, would you like to restate your question,

6  please?

7         MR. ANDERSON:  Yes, sir.

8   BY MR. ANDERSON:

9  Q    Are you aware that Nexus has tried to pay directly to RLI

10 20 percent of its revenues out of its merchant account?

11 A    I am aware --

12        MS. KATSANTONIS:  Objection, Your Honor.  Assumes

13 facts not in evidence.

14        THE COURT:  This is cross-examination.  I overrule

15 the objection, and I think the witness needs to answer the

16 clearly-phrased question.

17        THE WITNESS:  Okay.  An offer was made about

18 something about paying out of a merchant account.  Yeah, some

19 offer like that was made.

20  BY MR. ANDERSON:

21 Q    And are you aware that it was 20 percent of the daily

22 revenue?

23 A    If you could show me the letter or email, I could confirm

24 it, but that sounds right.  Yeah, the 20 percent of gross daily

25 revenue, of course I've heard of that.  Yeah, of course I've

D. Grycz - Cross

1  heard of it, yeah.

2  Q    Out of the merchant account directly?

3  A    I don't know what the merchant account is, but I vaguely

4  recall hearing merchant account.

5           MS. KATSANTONIS:  Same objection, Your Honor.

6           THE COURT:  Overruled.

7   BY MR. ANDERSON:

8  Q    Subsequent to that, Nexus was told to make A.1 collateral

9  payments by ACH; are you aware of that?

10  A    I thought the letter said check, money order, ACH, or

11  wire.

12  Q    I'm talking just about A.1 payments now.  So it was told

13  only to make the A.1 payments by ACH?

14           MS. KATSANTONIS:  Objection.

15           THE WITNESS:  I don't remember hearing that.

16           How is this hard, to get money into our hands?  I

17  mean, this is insane that every other company we do business

18  with knows how to put a check in the mail or just send in a

19  wire.  That's been a problem in this litigation.  I think it

20  stems from Mr. Moore and Mr. Donovan.  They need to do

21  something, but they just first --

22   BY MR. ANDERSON:

23  Q    I'm going to reclaim my time and ask the questions.

24  A    Go ahead.

25  Q    What you're saying is that by -- the payments always come

D. Grycz - Cross

1    late.  And what I'm trying to ask is we've made -- we've made

2    offers in ways for us to make direct payments to you

3    immediately within 24 hours, but you don't --

4    A    Why do you need my permission?  Why do you need my

5    permission to send RLI money?  You don't need my permission to

6    do that.  You're under a court order.  Maybe just comply with

7    the court order.

8    Q    Sir, I'm asking the questions here.  We're trying to make

9    payments to you.  You testified that the payments don't come on

10   time.

11   A    Clearly, no, they don't.

12   Q    That's correct.  Basically, the way in which -- are you

13   familiar with how ACH payments are made?

14   A    I know of them generally.  I'm not an expert.  I'm not

15   going to pretend to be an expert on it.

16   Q    When an ACH is -- or when you're notified of an ACH, does

17   it immediately fall into RLI's accounts?

18   A    Truthfully, I don't know.  I assume -- I assume -- I

19   assume no, that there is -- there seems to be a lag time.  You

20   know, I think Nexus goes in and requests the ACH or makes it.

21   There's a little bit of a lag time before it goes from their

22   bank to JP Morgan, JP Morgan notifies us, our cash ops

23   department processes it.  It seems to be one business day,

24   about, but I'm not an expert on those payments.

25   Q    Do those -- are you aware if those payments are made on

114

D. Grycz - Cross

1  weekends?

2  A    I don't know.

3  Q    Would it be accurate that, based on Exhibit 1 at the

4  bottom, that these following payments from July 15th to July

5  31st should have posted to the RLI account before August 1?

6  A    The July 15th to July 31st?

7  Q    That's right, the total equaling $16,736.

8  A    Yeah, I think the date reflects the date we received it.

9  So yeah, I will admit we received those payments per those

10 dates.

11 Q    And you verified these in terms of a reply brief in

12 working with your counsel?

13 A    Okay.  So as I said, so are you asking do these payments

14 come in during those dates, or are you asking the process for

15 how we --

16 Q    When did you verify the 16,736?

17 A    Okay.  That would have been on Friday, and we said -- and

18 I said very clearly to our treasury department:  I have to sign

19 a declaration under penalty of perjury over the weekend.  So I

20 need to know what payments have come in from Nexus.  So we even

21 said, has a $7,453 payment been received from Nexus?  The

22 answer from the cash ops and treasury department was no.  So

23 that is why the declaration says it.  Now, it came in the

24 following morning, and of course that's why it's now on the

25 list.  It's now on the list.  I completely understand Nexus

D. Grycz - Cross

1  sent that.

2  Q    Are you also aware that Nexus has -- as it's been making

3  these payments -- has given RLI the authority or the discretion

4  to apply the daily payments it's been making by ACH to either

5  the A.1 collateral payment or to satisfy the A.1 collateral

6  payment, or the A.2?

7           MS. KATSANTONIS:  I'm going to object to the

8  mischaracterization of daily payment.

9           THE COURT:  Overruled.  Cross-examination.  Please

10  proceed.  Reask your question.

11   BY MR. ANDERSON:

12  Q    Are you aware that Nexus Services has provided RLI the

13  discretion to apply its ACH daily payments to either A.1

14  collateral requirements, or to make payments on A.1 or A.2?

15  A    Yes, I'm aware that Nexus has said that they will defer to

16  us on how to allocate or credit it, yes.

17           THE COURT:  You don't necessarily agree that they've

18  been making payments daily, though?

19           THE WITNESS:  Oh, yeah, they haven't been making

20  payments daily.  It's also very difficult -- it's a drop in the

21  bucket.  So, you know, what to do with this -- what to do with

22  this money?  Should we call it A.1 or A.2?  Well, how should I

23  credit Nexus?  I mean, it's on the list.  We're giving them

24  credit for at least 107,000 -- you know, I may be able to

25  confirm in the next couple of hours it's 167.  So you're

D. Grycz - Cross

1   getting credit.  How we're actually going to allocate it

2   between A.1 or A.2, we haven't even made a decision on that

3   yet, but it's on the list.  We'll give Nexus credit for it.

4   Q    If you were to get daily payments from a merchant account,

5   wouldn't those go to satisfy the daily receipts if, say, a

6   notice to deliver was issued and provided to Nexus, therefore

7   fulfilling the 48-hour period?

8   A    No, the daily receipts comment, I lost you.

9            MS. KATSANTONIS:  Objection.  Calls for speculation.

10           THE COURT:  Overrule the objection.  This is

11  cross-examination.  I will allow -- this witness is fully

12  capable of answering any questions that are posed.

13           Mr. Anderson, please repeat your question.

14   BY MR. ANDERSON:

15  Q    If RLI has the discretion to apply the A.1 or A.2 payments

16  based on that, won't that -- would RLI apply the A.2 payments

17  within the 24-hour period if it received an ACH payment

18  satisfying that amount?

19  A    We might, but the problem is this list.  The other

20  thing I --

21  Q    That's not answering my question.

22  A    Okay.  Well, you kind of gave me a hypothetical of what I

23  would do.  I might.  I might also pick one of the first notices

24  to deliver on this list.  You know, I may do that.  I may say

25  I'm not -- you know, so if a notice to deliver comes in on a

D. Grycz - Cross

1  Wednesday for -- by the way, we have never gotten -- we have
2  never gotten collateral close to the actual amount of the penal
3  sum.  I mean, that would be the smart thing to do.  A $10,000
4  notice to deliver comes in on Wednesday -- that was the order.
5  That was the order.  And instead Nexus says, We're not going to
6  follow -- we're not going to follow the order.  We're going to
7  do gross receipts 20 percent.  That's problematic.
8       Now, I'm struggling trying to determine what was Nexus's
9  intent by this.  So I might, if a $10,000 notice to deliver
10 came in on a Wednesday and I get an $8,000 ACH on a Thursday,
11 maybe we will credit that under A.2.  Maybe I'll pick the first
12 one on the list -- you know, the first one on the list.  I
13 don't know.  You know, candidly, we haven't decided what we're
14 going to do yet.
15 Q   Would RLI be willing to accept 20 percent payments from a
16 merchant account from daily receipts?
17 A   Is that a settlement offer?
18          MS. KATSANTONIS:  Objection, Your Honor.  This isn't
19 cross-examination.  This is -- this is Nexus trying to proffer
20 things so that they can try to spin some future attempts at
21 some de minimus requirements.  It's not cross-examination.
22          MR. ANDERSON:  Your Honor, with all due respect --
23          MS. KATSANTONIS:  It's a settlement offer.
24          MR. ANDERSON:  -- this goes to the heart of the
25 matter of today's receivership motion.

D. Grycz - Cross

1          THE COURT:  Overrule the objection.  I'll allow the

2     witness to answer.

3          THE WITNESS:  Would I accept 20 percent daily gross

4     receipts in lieu of the judge's order?  No.  No.  I'll just

5     say, Please follow the judge's order.  It's a binding order.

6     Why do I have to accept a settlement offer of -- it's so

7     confusing.  If you could just maybe give the notice to deliver

8     a penal sum -- you know, you can call it whatever you want

9     internally at Nexus.  To comply with the order, we're going to

10    do 20.  That's fine.  But all we really care about is what

11    money is coming in, you know.  So I'm not going to reject any

12    money and mail it back because it doesn't match a penal sum.

13    We haven't done that.  We have credited the 107,000, possibly

14    soon to be 167, but I don't know if you're making me an offer

15    or...

16    BY MR. ANDERSON:

17    Q    I think we can all agree -- and you just stated -- that

18    there is an outstanding order that Nexus needs to comply with.

19    Nexus is standing here today being accused of not complying

20    with it and now needs to go to a receiver.  A big key piece of

21    that would be to marshal the monthly assets and the monthly

22    receipts from Nexus.  And what you're stating here is that that

23    doesn't seem to matter, and they need to just satisfy the full

24    amount of the order.  But what I'm asking is if Nexus has

25    provided a method that would not require the receiver to be

D. Grycz - Cross

1  appointed by the Court, would you accept that method so that

2  we --

3  A    But the method only came about because I spent $160,000 in

4  legal fees to force you -- I had to force Nexus, scare them

5  with receivership.  That's not --

6  Q    That does not answer the question.

7  A    The question was so long-winded I got lost, but -- I'm

8  sorry.  I apologize.  Can you just reask it to me?

9  Q    The purpose of the hearing today is to determine whether

10 the appointment of a receiver is proper, correct?

11 A    Yes.

12 Q    And your testimony today is that it is; isn't that

13 correct?

14 A    Yes, to comply with the Court's order, because Nexus won't

15 do it on its own.  That's the problem.

16 Q    Were you present on the July 15th status hearing?

17 A    I watched the whole thing.

18 Q    And wasn't it proposed to the Court to make these type of

19 payments by directly directing the merchant account payments of

20 20 percent directly to RLI?

21 A    Did the Judge order that?

22 Q    No.  My question was:  Wasn't it offered to RLI at that

23 status hearing to directly make these payments?

24 A    Oh, yeah, I remember a lot of talk about -- and I was

25 honestly perplexed then -- a lot of talk about we set up a

                              120

                        D. Grycz - Redirect

1   system where we're going to make 20 percent daily gross

2   receipts.  I remember it being talked about, yes.

3   Q    And since that didn't happen, Nexus began making ACH

4   payments to RLI?

5   A    We received payments after the July 15th hearing.  I'm not

6   sure I agree with the first part, but we did receive payments

7   after the July 15th hearing.  I don't think that there's -- RLI

8   rejected the merchant account; therefore --

9   Q    I'm just asking since the July 15th hearing, you've been

10  receiving ACH payments?

11  A    Yeah, some partial ACH payments, yes.

12  Q    And you have reason to believe that more payments were

13  made today?

14  A    Yes.  I was notified right before the hearing started from

15  Laura.

16          MR. ANDERSON:  No further questions, Your Honor.

17          THE COURT:  Thank you, Mr. Anderson.

18          Is there any redirect of this witness,

19  Ms. Katsantonis?

20          MS. KATSANTONIS:  Just briefly, Your Honor.

21                      REDIRECT EXAMINATION

22   BY MS. KATSANTONIS:

23  Q    Mr. Grycz, looking at Exhibit 1, since the July 15th

24  hearing, did RLI make daily payments to -- excuse me, did Nexus

25  make daily payments to RLI of collateral?  Let's just look

D. Grycz - Redirect

1   between July 15th and 31st to start.

2   A    No.  The representation that was made during the hearing

3   was they were starting on the 15th.  And the first thing we get

4   is an $18 ACH on Thursday the 22nd.

5   Q    Right.  And then you only received three more payments,

6   right, in the next -- so a total of four payments from July

7   15th to the 31st, correct?

8   A    Yeah, correct.  You know, so the 27th, 28th, 29th are

9   missing.

10  Q    So Nexus was not making daily payments of its receipts to

11  RLI, correct?

12  A    Oh, yeah, yeah, correct.  Since the July 15th hearing, not

13  daily.

14  Q    And isn't it true that to the best of your knowledge, they

15  only made payments for about seven or eight days of alleged 20

16  percent payments?

17  A    That's correct.

18        MS. KATSANTONIS:  Nothing further, Your Honor.

19        THE COURT:  Okay.  Call your next witness.  Thank

20  you, Mr. Grycz.

21        THE WITNESS:  Thank you.

22        MS. KATSANTONIS:  Your Honor, I'd like to call

23  Mr. Peroutka.

24        THE COURT:  All right.

25        (Whereupon, the witness was sworn.)

R. Peroutka - Direct

1          THE COURT:  Good afternoon.  Nice to see you again.

2          THE WITNESS:  Good afternoon, Your Honor.

3          RAYMOND PEROUTKA, PLAINTIFF'S WITNESS, SWORN

4                    DIRECT EXAMINATION

5    BY MS. KATSANTONIS:

6    Q     Hi, Mr. Peroutka.  Again, for the Court, can you just

7    advise the Court of your current position?

8    A     I operate as a -- as a consultant to RLI.  I previously in

9    this matter have been qualified as an expert to give testimony

10   on these matters.

11   Q     You attended the last -- I think it was four bilateral

12   reviews of the new databases along with the Special Master; is

13   that correct?

14   A     I did that via Zoom, yes.

15   Q     And from the -- have you had an opportunity to review some

16   of the records produced by Nexus?

17   A     Yes, I have.

18   Q     Okay.  And from the records produced to date by Nexus,

19   have you been provided sufficient information to perform any

20   sort of risk analysis for RLI?

21   A     The records presented to me have been insufficient to do

22   that.

23   Q     Have you been provided records that accurately reflect

24   monies in and monies out for Nexus?

25   A     No.  I've seen a lot of records that purport to show money

R. Peroutka - Direct

1  in, money out.  Unfortunately, they are inconsistent and

2  incomplete, and so therefore not reliable for their purpose.

3  Q    And in order to ascertain, for example, Nexus's current

4  financial condition, would you need to review all of the

5  historical records of Nexus?

6  A    No.  Frankly, I've read the affidavit that was offered by

7  RLI asserting that.

8  Q    By Nexus, you mean?

9  A    Excuse me, Nexus, yes.  I'm sorry.  Ms. Wells, I believe,

10 offered the affidavit asserting that it would be necessary to

11 reconcile historic records dating back to 2018 or 2019 in order

12 to understand the current financial condition of the company,

13 and I take strong exception to that.  The company receives bank

14 statements on a monthly basis.  And we've seen a lot of those

15 bank statements.  Every corporation has the ability and the

16 obligation, really, to reconcile those account statements.

17      When I said the information that I had seen was inaccurate

18 and inconsistent, what I was referring to specifically, the

19 fact that the cash accounts -- and by ripple through, the rest

20 of the financial statements -- the cash accounts within the

21 general ledger system are just wrong.  I mean, they're showing

22 in some accounts significant negative million dollar plus

23 balances; in other accounts, positive million dollar plus

24 balances.  And yet if you look at the bank statements, you can

25 see that at no time subsequent to January of this year did the

R. Peroutka - Direct

1  aggregate bank statements for all the accounts ever show a

2  balance that was more than I think $280,000.  So the idea that

3  any individual account has more than a million dollar balance

4  at the end of the month is silly.  The suggestion that you have

5  multiple accounts with negative million dollar plus balances is

6  equally silly.  That just never happens.  I've reviewed the

7  bank statements.  That doesn't happen.  If you simply reconcile

8  the bank statements to the accounting records when you receive

9  them on a monthly basis, you can -- you can properly reconcile

10 and get accurate cash balances for July.  You could do it for

11 June.  You can do it for April and May.  You don't have to go

12 back to 2018 in order to determine what the accurate resources

13 available to the company in July of 2021 are.  That's just --

14 that's inaccurate.

15 Q    And is it true you haven't -- you were not provided

16 reviews of the banking portals of Nexus?

17 A    That's correct.

18 Q    And you were not provided a review of any of the merchant

19 accounts?

20 A    That's correct.

21 Q    And so, sitting here today, you have not been provided

22 accurate records in which to perform a risk analysis?

23 A    That's correct.

24 Q    And then lastly, you saw some bank account statements.  Is

25 it true that the records provided don't show all the

R. Peroutka - Cross

1  transaction details so that you can verify either the payments

2  or determine the purpose of the payments in the bank account

3  statements?

4  A    That's correct.  Bank statements that I've reviewed in

5  many instances show disbursements that are being made out of

6  the accounts with a notation that the transfer is being made in

7  many cases to Mr. Moore; but in satisfaction of what, we don't

8  know.

9       In other bank statements we see reference to specific

10  check numbers and dollar amounts.  We don't have copies of the

11  checks.  And so the ability to understand what obligations of

12  the corporation are being satisfied by these transfers to

13  insiders or transfers that are identified by check number only

14  is just beyond the scope of the records that have been made

15  available.

16  Q    And do you agree that the appointment of a third party

17  would benefit in effectuating the Court's order?

18  A    Absolutely.

19            MS. KATSANTONIS:  I have nothing further, Your Honor.

20            THE COURT:  Any cross-examination of Mr. Peroutka?

21            MR. ANDERSON:  Yes, Your Honor.

22            THE COURT:  All right.  Mr. Anderson?

23            THE WITNESS:  Good afternoon, Mr. Anderson.

24                        CROSS-EXAMINATION

25   BY MR. ANDERSON:

R. Peroutka - Cross

1  Q     Good afternoon, Ray.  It's nice to see you again -- or

2  hear you again.  You're always on Zoom.

3       I don't have the benefit of some of your background.  So

4  if I could just ask you a few questions.

5  A     I'm here to assist the Court.  Go ahead.

6  Q     Do you have a direct contract with RLI for your testimony

7  here today?

8  A     If I remember correctly -- it's been a couple of years

9  since I put together the engagement letter -- but I believe the

10  engagement letter specifies that I'm being engaged by Watt

11  Tieder on behalf of their client, RLI; and that the payment

12  obligations don't stop with Watt Tieder, they pass through to

13  RLI.

14  Q     So you have a direct contract, your belief, with the law

15  firm representing RLI?

16  A     I believe that's correct.

17  Q     And have you had any experience with other receiverships

18  for other matters of surety companies?

19  A     Yes; several in the past.

20  Q     So you've had several other matters where you've been an

21  expert in recommending a receivership?

22  A     I have been appointed by several courts as a receiver.  I

23  have served on several occasions as a consultant to individuals

24  who have been appointed as a receiver, and I've acted as a

25  consultant.  I have rehabilitated companies as a receiver.  So

R. Peroutka - Cross

1  I've performed a number of those functions, if that's helpful

2  to your question.

3  Q    I believe so.  Thank you.

4       And do you provide any consulting services or expert

5  services to other bond or surety companies?

6  A    Not at present.

7  Q    In the last 12 months?

8  A    I don't believe so in the last 12 months.

9  Q    In the last 24 months?

10      Let me ask you this -- I see you hesitating -- why don't

11  you just tell us the other -- I'll just short circuit.  What

12  are the names of the other bond companies you have provided

13  expert services to in the last five years?

14  A    During the last five years, Lincoln National is a company

15  that I've provided consulting services to.  And I say that for

16  the sake of completeness, because I think my engagement in that

17  matter ran to an owner of that company rather than directly to

18  the company.  And I am currently serving as a receiver for a

19  state licensed facility that does not involve bonding.  And I

20  have been -- I recently concluded a receivership with a company

21  that did construction work and they employed bonds.  But I was

22  not directly working for the bonding company that was involved

23  there.

24      So that's perhaps more information than you were asking

25  for, but I'm trying to be complete.

R. Peroutka - Cross

1   Q     Sure.  I understand.

2         Have you ever provided any consulting services for any

3   other immigration bond companies?

4   A     Immigration bonds, no.

5   Q     Going back to some of the other matters we reviewed over

6   the last few weeks during our bilateral reviews -- scratch

7   that.

8         In reviewing any of the documentation that Nexus has

9   provided in the last 90 days, have you reviewed any bank

10  accounts?

11  A     Yes.

12  Q     Or bank account statements?

13  A     Yes.

14  Q     And those are all in paper copy?

15  A     PDF.

16  Q     PDF.  Sorry, PDF copy.

17        But essentially the electronic form of the paper records?

18  A     Yes.

19  Q     And in those bank statements, have they had any of the

20  balances either in a monthly total or from daily balances?

21  A     I don't understand your question.

22  Q     Using a hypothetical TrustCo account statement from, say,

23  June as an example, when you reviewed that statement, would

24  that statement -- would that statement contain the monthly --

25  end-of-the-month balance?

R. Peroutka - Cross

1   A     Yes.

2   Q     And would it contain record -- state notations or the

3   numeric values for the daily balances throughout the statement?

4   A     Yes, as well as individual transaction amounts.

5   Q     But just it does contain the daily balances on the

6   statements?

7   A     You're pressing the limits of my knowledge.  I don't know

8   whether it has delineated subaccount balances on a daily basis.

9   If my memory is correct, some banks do that usually in a

10  subportion of the account where you'll see that kind of

11  information.

12  Q     Of the bank statements you reviewed in this case in the

13  last 90 days, they do contain the monthly balances?

14  A     Yes.

15  Q     And when we were reviewing the online databases during our

16  bilateral review -- namely, the NetSuite database -- we had the

17  highest level of admin access that was given or that you can

18  have to review that database, correct?

19  A     That's what I was told.

20  Q     But I believe -- do you recall verifying that level of

21  access when we were doing our bilateral review in NetSuite?

22  A     I don't.

23  Q     Okay.  In terms of a reconciliation taking place from the

24  bank account statements into NetSuite, do you recall that we

25  verified how that reconciliation was going during our bilateral

R. Peroutka - Cross

1  review?

2  A    I'm sorry, I don't understand your question.

3  Q    Well, you stated on direct that we couldn't verify during

4  our bilateral review in NetSuite the level of reconciliation?

5  A    Again, I don't think those are my words, because I don't

6  understand what you're saying.  I'm trying to work with you

7  here.

8  Q    I'll restate it.

9       You stated that when we reviewed the NetSuite database

10  during our bilateral review, there was a level of

11  reconciliation that hadn't taken place in there?

12  A    I've seen records that reflect a reconciliation of bank

13  accounts that come out of NetSuite.  NetSuite contains the

14  provision -- a process by which reconciliations can take place.

15  And that reconciliation is somewhat generic.  You and I receive

16  bank statements from our banks, and you look at the ending

17  balance of the account.  You look at and record checks that

18  have been written that have not been included in the statement,

19  and deposits that have been made that have not been recorded in

20  the statement, so that you can then take the ending cash

21  balance on the statement and turn it into an accurate

22  representation of the real balance of the account, including

23  outstanding checks that have written that haven't cleared, or

24  deposits that have been made that have not yet cleared the

25  bank.

R. Peroutka - Cross

1        NetSuite, like all accounting systems that I'm familiar

2   with, provide a mechanism to do that.  And I've seen the pages

3   where that reconciliation should be done within NetSuite.  The

4   problem is that when you -- when I reviewed those, they were

5   incompletely filled out such that the -- you can just see that

6   the reconciled balance is still a large

7   multimillion-dollar-plus negative balance or positive balance.

8   So clearly the reconciliation is not being performed, even

9   though I physically reviewed a page that provides the tool that

10  could be used in order to perform that reconciliation.

11       I know that's long-winded, but I hope it helps.

12  Q    I think so.  Maybe we'll get there in a moment.

13  A    Okay.  I'm still with you.

14  Q    I think when we first started our bilateral reviews you

15  said you were not an expert in NetSuite by any means?

16  A    I have not used NetSuite.  I don't hold myself out as

17  being an expert specifically in NetSuite, but I've used -- and

18  I believe I'm an expert in a number of those types of automated

19  accounting systems, and other courts have accepted my testimony

20  in the past in that regard.

21  Q    I'm not disputing your ability to testify to those

22  systems, but I specifically want to ask about NetSuite.

23  A    Go ahead.

24  Q    Are you familiar with how customized NetSuite needs to be

25  in order to even begin to do the reconciliation process?

R. Peroutka - Cross

1   A    You're asking a question that I want to answer accurately.

2   And if that question means the specific screens that need to be

3   filled out and how they're filled out in order to cause

4   NetSuite to perform a reconciliation, I would say to you that I

5   have not used NetSuite enough or reviewed it in our bilateral

6   review sufficiently to be able to walk you through the screens

7   that would be needed to, in an automated sense, perform the

8   reconciliation, which is different from my prior testimony,

9   which is I believe it is necessary to reconcile the accounts.

10  And by doing that, it's a simple process of identifying which

11  checks you've written during the month that are not on the bank

12  statement, and which deposits you've made that are not recorded

13  on the bank statement.  And if then you take those adjusting

14  entries and enter them into -- NetSuite is a general ledger

15  system -- enter them into the general ledger system, you can

16  satisfy yourself that the account balance is either correct or

17  it's incorrect.  And whether you do that and then create an

18  Excel spreadsheet adjustment to get you back to what your real

19  balance is, or whether you enter that adjusting entry into the

20  general ledger as an adjusting entry, either of those will

21  work.

22      So my answer to you is it's necessary to do a

23  reconciliation.  It's necessary to have a correct balance.  You

24  can do it on a current month basis without going back to 2018.

25  And if your question is that more detailed one of specifically

R. Peroutka - Cross

1   how do you make NetSuite do that for you on an automated basis,

2   I couldn't walk you through that specific set of procedures.

3   Q    Assuming once Nexus's NetSuite platform is fully built out

4   and customized so that it can do this reconciliation, would a

5   read-only access bilateral review each month help RLI

6   understand Nexus's financial position better?

7   A    Would it help to understand it better?  Yes.  Would it be

8   sufficient?  I doubt it.

9   Q    Why wouldn't it be sufficient to have that level of access

10  on a monthly basis?

11  A    Well, first of all, you're suggesting it be done on a

12  monthly basis.  And I believe that the financial condition of

13  Nexus is sufficiently volatile that doing it on a monthly basis

14  and giving you that snapshot would not be terribly helpful.  I

15  think you'd need to have ongoing access to it.

16       Secondly, doing that bilateral review, as you've

17  suggested, is expensive.  It's cumbersome.  And if what you're

18  suggesting instead is allow access to it on a daily basis so

19  that you can see what is clearing --

20  Q    The order does not allow online access currently.  It only

21  allows for us to provide the records.  And so what we're trying

22  to determine is what might be a sufficient level of access.

23  A    That was not a question, but I'm going to answer it

24  anyway.

25       That's your interpretation of the order, and I think I

134

R. Peroutka - Cross

 1  would disagree with it.  But I'm not acting as counsel in this

 2  regard, so I'll leave my comment at that.

 3  Q    When we were reviewing the other databases, I believe your

 4  direct testimony was that you didn't have access to the

 5  merchant accounts?

 6  A    That's correct.

 7  Q    But we did look at the American --

 8  A    Spirit?

 9  Q    Yeah, American Spirit account.  Wasn't that taking place

10  for the merchant account of the months in question that the --

11  A    We looked at the software as distinct from looking at the

12  individual transactions passing through the account in

13  sufficient detail.

14  Q    Hold on.  Maybe I'll restate.

15  A    Okay.

16  Q    The American Spirit platform is not one that Nexus

17  currently uses; isn't that correct?

18  A    That's my understanding.

19  Q    And so we have to do sort of a retrospective bilateral

20  review of that for those periods of time?

21  A    I think you're correct.

22  Q    So it is true that we did a bilateral review of that

23  particular merchant account for those -- for those months?

24  A    I want to be accurate in answering your question.  And the

25  problem I have is, as you're aware, we walked through those

R. Peroutka - Cross

1   without screenshots and --

2   Q    But --

3   A    -- you know --

4   Q    I know you, and your testimony just now, and counsel has

5   made a point of asking for screenshots, but that was not what

6   we did in the bilateral review, nor was it required in any

7   point in the order.

8        What I'm asking is:  When we were in those accounts, you

9   did have access to the merchant accounts and were able to

10  verify that the databases were accurate during the review?

11        MS. KATSANTONIS:  I'm just going to object to the

12  question and ask you to restate it, because you said merchant

13  accounts like there is a bunch of merchant accounts.  I'd say

14  that assumes facts not in evidence.

15   BY MR. ANDERSON:

16  Q    I was going to take one at a time, but we can be general.

17        When we did our bilateral review a few weeks ago, we

18  looked at several databases?

19  A    Yes.

20  Q    Do you recall those?

21  A    I think you'd have to prompt me.

22  Q    Okay.  Do you recall reviewing the American Spirit --

23  A    Yes.

24  Q    -- database?

25        The Fluid Pay database?

R. Peroutka - Cross

1   A     Yes.

2   Q     The -- and then the other -- those are the two primary

3   merchant account databases, correct?

4   A     Yes.

5   Q     And then do you remember reviewing the Lightspeed

6   database?

7   A     I believe so, yes.

8   Q     I'll prompt you.  We did.

9   A     Yes.

10  Q     It was on several different days.

11        And then the other ones were Stampli, Melio, and now

12  I'm -- Airbase?

13  A     Yes.

14  Q     So looking at the American Spirit, the Fluid Pay, and

15  Lightspeed account, those have the daily credit card

16  transactions contained in them, correct?

17  A     They did, to my knowledge, have the daily transactions

18  contained within them.  My hesitancy in just answering sure to

19  your question -- your original question -- is I recall going

20  through each of those.  The review -- and I think you'll agree

21  with me -- was focused on exploring those databases that were

22  provided to us online so that we could identify what

23  capabilities were contained within each of the menu offerings

24  on screen.  And we took --

25  Q     Actually --

R. Peroutka - Cross

1   A      If I can complete my answer, please.

2   Q      Sure.  Go ahead.

3   A      Thank you.

4          So that we could identify what capabilities were within

5   each of the menu offerings on the various screens and step

6   through them.

7          It was not for the purpose of diving into the system and

8   coming up with totals that then could be compared to other

9   records of the company, such as NetSuite, to satisfy ourselves

10  that everything was being recorded and compared favorably with

11  the recordation in other systems and with bank statements.

12         That's the quibble, if you will, that I have with your

13  question.  Sure, we spent a lot of time looking at these things

14  and it was completely inadequate in order to satisfy the

15  question:  Are they accurately recording the information?  And

16  so for that, I look at higher-level comparisons of the -- of

17  the agreement of totals within the subsystems and NetSuite as a

18  general ledger system combining them.

19  Q      But you don't have any reason, as you just stated, that

20  you couldn't go in there and determine whether it was

21  inaccurate information?

22  A      Well, the pesky cash balances that were millions of

23  dollars out.

24  Q      Well, let me be direct.  That was -- if you recall, that

25  was in a Stampli account or database?

R. Peroutka - Cross

1  A    No, no, no, I'm not referring to that.  But yes, there was

2  a Stampli account that was entered as I think a $136 million

3  charge.  It was wildly inaccurate and jumped off the page for

4  all of us.

5  Q    I'm talking about an invoice number instead of the actual

6  dollar amount.

7  A    Exactly.  No.  What I was referring to was when you take

8  those subsystems that report cash up into NetSuite, and then

9  you go and look at the cash balances that result from -- I

10 mean, these subsystems, they're daily.  They're individual

11 transactions.  They're thousands of transactions that then roll

12 up into the general ledger.  And you look at the cash balance

13 in the general ledger and it says that it's more than a million

14 dollar negative balance.  And you say, That ain't right.  That

15 can't be right.  I know it isn't right.  I've looked at the

16 bank statement.  So I know --

17 Q    Speaking of bank statements --

18 A    We can't talk over each other.

19     I know it can't be accurate because the end result is

20 wildly inaccurate.  That's my point.

21 Q    So speaking of bank statements, did you review any of the

22 bank statements to verify any of the information in any of

23 these databases that we reviewed during the bilateral review?

24 A    You asked me that before.  Yes, I did.

25 Q    So just to be clear, you did review to -- you reviewed the

R. Peroutka - Cross

1  bank statements, the paper bank statements or PDF bank

2  statements?

3  A    Yes.

4  Q    In relation to when we reviewed the information on the

5  databases during our bilateral review?

6  A    No.  The information we were looking at in the bilateral

7  review was primarily current information.  And the bank

8  statements that I reviewed were for -- I think I looked at

9  January through June of this current year, 2021.  So it's that

10 time period that I looked at that did not include July.

11 Q    So you didn't look -- you were not provided the documents

12 for the July production?

13 A    I don't think -- I certainly saw the July production.  I

14 don't think I looked at the bank statement portion.  I don't

15 recall looking at the bank statement portion of the July

16 production.  The July production, if I recall, was 950 pages.

17 I don't think I made my way through to the bank statements.  So

18 I confined my mismatched statements to January through June.

19      But I will point out that the July financial statements

20 that I did review show the same million-dollar-plus positive

21 and negative balances in those same accounts. I just didn't

22 have a chance to go and look and see whether the bank

23 statements compared favorably.

24 Q    Are you referring to the NetSuite account when you say the

25 million dollar and -- or which database are you referring to?

R. Peroutka - Redirect

1   A     The output doesn't -- the output that I reviewed in PDF

2   format has a heading which identifies it as the Nexus

3   consolidated financial statements.  And there are a couple of

4   other subsidiaries that are cash statement specific, and there

5   are chart-of-accounts specific pages.  They don't say NetSuite,

6   but it's my understanding that they come from NetSuite.  And

7   when we did our online bilateral review, one of the pages that

8   we stopped on was NetSuite, the balance sheet for NetSuite.

9   And it also had those same negative and positive

10  million-dollar-plus balances in various cash accounts.  So I

11  believe, for those reasons, that the records I'm looking at are

12  NetSuite records.

13          MR. ANDERSON:  No further questions, Your Honor.

14          THE COURT:  Thank you.  Any further questions for

15  this witness?

16          MS. KATSANTONIS:  Just two brief ones, Your Honor.

17                    REDIRECT EXAMINATION

18   BY MS. KATSANTONIS:

19  Q    One to just clarify the record.  Mr. Peroutka, with regard

20  to work performed in the last five years, have you performed

21  services for Allied World, Crum & Forster, and/or Zurich?

22  A    Yes.

23  Q    And with regard to the American Service database, you

24  testified that it showed transaction receipts, like $420, etc.,

25  right?

141

R. Peroutka - Redirect

1    A    Yes.

2    Q    But to your knowledge during your review, did that

3    database show receipt batching and then transfer of the funds

4    to a specific bank account?

5    A    No, I don't recall that.

6    Q    Isn't that what you would expect from a merchant account?

7    A    Yes.

8              MS. KATSANTONIS:  I have nothing further, Your Honor.

9              THE COURT:  Ms. Johnson, did you want to say

10   something?

11             MS. JOHNSON:  Yes, Your Honor.  I would like to

12   respectfully ask the Court to have a brief recess before we

13   rest on this witness.

14             THE COURT:  What other witnesses does RLI have here

15   today?

16             MS. KATSANTONIS:  That's it, Your Honor.

17             THE COURT:  Okay.  How about from Nexus?

18             MR. ANDERSON:  One to three, Your Honor.

19             THE COURT:  One to three?

20             MR. ANDERSON:  Two or three, Your Honor.

21             MS. KATSANTONIS:  May we ask for identification of

22   the witnesses, Your Honor?

23             THE COURT:  Well, Ms. Wells is going to testify,

24   right?

25             MR. ANDERSON:  Yes.

R. Peroutka - Recross

1          THE COURT:  And who else?

2          MR. ANDERSON:  Evan Anjin.

3          THE COURT:  He's still with us.

4          MR. ANDERSON:  And perhaps Michael Donovan.

5          THE COURT:  He has not been with us, but maybe he's

6    ailing.

7          MR. ANDERSON:  I think that's the reason for the

8    recess, which is why --

9          MS. KATSANTONIS:  Well, then, let's finish this

10   witness prior to a recess.

11         THE COURT:  The Court gets to decide these things.

12   And we're going to take a recess until 2:30, at which time we

13   will see if there is any additional examination for

14   Mr. Peroutka.

15         Mr. Peroutka, you're still on the witness stand.  And

16   while you're on the witness stand, we can't have you talking to

17   anyone about your testimony in this case, as you well know.

18         THE WITNESS:  I understand, Your Honor.

19         THE COURT:  Thank you.  We'll take a recess until

20   2:30.

21         (Whereupon, a recess was taken.)

22         THE COURT:  Are there any additional questions for

23   Mr. Peroutka?

24         MR. ANDERSON:  Yes, Your Honor.

25                      RECROSS-EXAMINATION

143

R. Peroutka - Recross

1  BY MR. ANDERSON:

2  Q    Hello again, Mr. Peroutka.  I believe you had stated you

3  had done some work for Crum & Forster?

4  A    Yes.

5  Q    Is that on the insurance side?

6  A    Crum & Forster, if I recall correctly -- this is a couple

7  of years back -- was sued by a -- by a hedge fund under a

8  theory that they had withheld pursuing claims against a

9  contractor and thereby induced -- I think the allegation was

10  induced the hedge fund to make a loan when otherwise they would

11  not have, which then caused them to lose a lot of money.  And

12  so the question became normal business practice for that

13  company.  That's the best I can recall.

14  Q    But you don't do any current work for them?

15  A    No, I don't believe so, no.

16  Q    And have you had any conversations in the last 24 months

17  with Ronald Frank, the CEO of Lexington National Insurance?

18  A    No, I don't think I've -- I don't think I've ever had a

19  conversation with him.  His counsel is an attorney in Maryland.

20  His name is Jeff Nusinov.  And I've worked for Mr. Nusinov in

21  that engagement.  I'm aware of Fred Frank, and, you know, the

22  court appearance bond business that they run, which is

23  underwritten by Lincoln National, but I don't recall ever

24  having a conversation with those individuals.

25  Q    But you have had -- I guess if I can just unpack that a

144

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    little bit, you've had conversations with the attorney that

2    works for Lexington National --

3    A    I'm sorry, finish your question.

4    Q    Or a law firm, perhaps, that works for Lexington National?

5    A    Yeah, it was not in-house counsel.  It was independent

6    counsel representing I think Fred Frank, not Lincoln National,

7    in the litigation.  It was largely a dispute between I think

8    two brothers who were wanting control and then ceased to be in

9    control of the -- of the Fred Frank bonding enterprise.

10           MR. ANDERSON:  Okay.  That's all, Your Honor.  Thank

11   you.

12           THE COURT:  Okay.  RLI has no other evidence,

13   correct?

14           MS. KATSANTONIS:  Your Honor, yes, we reserve the

15   right to call rebuttal witnesses, as may be necessary.

16           THE COURT:  That's fine.

17           Nexus, call your first witness.

18           MR. ANDERSON:  May I give an opening statement, Your

19   Honor?

20           THE COURT:  Oh, no, no, absolutely you can.  She did.

21   And I apologize for that.

22           MR. ANDERSON:  No, that's all right.

23           THE COURT:  Thanks, Mr. Anderson.  Thank you for

24   reminding me.

25           And Mr. Peroutka, you may stand down.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1           THE WITNESS:  I'm sorry, Your Honor.  I thought you

2    were done with me.

3           THE COURT:  It's good to see you again.

4           All right.  Mr. Anderson, let's hear what you have to

5    say.

6           MR. ANDERSON:  Thank you, Your Honor.

7           I think the question before the Court is really

8    simple here, and I believe we have painted an outline on July

9    15th.  And you're going to hear today that we're fulfilling

10   that promise, and we have a plan forward that will avoid any

11   further discussion of a receivership.

12          We told you that we were -- on the 15th of July when

13   we last were together -- that we were going to make 20 percent

14   of these payments directly to RLI.  Some of those payments have

15   been frustrated not necessarily because of RLI, but just

16   because of the way in which they wanted to be paid.  ACH

17   payments can't be made daily.  They don't occur on Saturdays or

18   Sundays and they don't occur on holidays, not to mention when

19   we did these bilateral reviews, we shut down our finance

20   department at Nexus to conduct those reviews.  So there wasn't

21   any implication or any evidence or any question as to whether

22   we had unfettered access while we were in there.  We had

23   granted the administrative level access, at RLI's request,

24   through the Special Master to conduct those reviews.  And so

25   while we were doing those reviews, several days were taken out

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   between the 15th and today's date.  So while there is some

2   disparity with the way in which some of the ACH payments make,

3   I believe they will track along the days that were closed and

4   the weekend dates.

5        Additionally, the way in which -- the merchant

6   accounts that Nexus uses, the way in which those payments to

7   them occur is they go into the merchant account, and then it

8   takes a day or two -- and if it's a weekend, it could be up to

9   three days -- to get into their account.  Then from that

10  account it takes several more days to begin the transfer on to

11  RLI.  So I know there was a discussion earlier, and we have

12  heard testimony to the effect that it's taken several days, and

13  the payments have not been quite as rapid.  Well, that's just

14  because of the nature of the ACH payments.  And that is why we

15  wanted to directly set up payments through this merchant

16  account where it goes directly to RLI.  And when we were

17  conducting these bilateral reviews with the Special Master and

18  RLI, we elaborated on how that process would work.

19       Additionally, when we were together on the 15th, we

20  had just, days before, given RLI the discretion to apply the

21  payments we were making through these ACH payments going

22  forward not to, you know, somehow satisfy the 1.4 -- or the

23  $2.4 million judgment, but they were going to get daily

24  payments.  What we didn't want was to establish sort of a

25  questionable -- whether it's going to go to A.2 or A.1

147

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  satisfaction.  That would be up to RLI.  I know we've heard

2  testimony that some of these payments were made months late.

3  That's not what we're here to decide right now.  What we're

4  deciding is how have we been able to make good on the payments

5  we had addressed to you on the 15th of July?  And we're

6  prepared to offer testimony that we're making good on those

7  payments.  We've actually -- based on our calculations, RLI

8  will be getting payments additionally this week, and those will

9  total over 20 percent.

10         Additionally, we've been making a lot of upgrades to

11  the Nexus accounting system; namely, the NetSuite account or

12  the NetSuite database.  And we've heard a lot of testimony to

13  this, but what needs to be understood not by the -- just by the

14  Court, but also by the plaintiffs in this case, is that in

15  about 30 to 60 days this is going to be a fully operational

16  system.  And what we were doing is previewing during these

17  bilateral reviews the ability to see where we were and where we

18  were going.  And we even discussed this, how long it had taken.

19  So we had -- are prepared to offer read-only access to those

20  databases.

21         Additionally, when it comes to Capsule, we are

22  offering -- we're transitioning to NetSuite 100 percent for the

23  CRM -- or the customer user interface -- where we monitor the

24  bond participants and we're replacing Capsule.  And we have

25  also offered to RLI to have -- as we are going to, to all our

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   surety companies with bond participants -- they're going to

2   have realtime access -- 24-hours-a-day, read-only access to

3   that information.  So really when it comes to C.1 and C.2,

4   they're going to have access to their own bond principals in

5   realtime.  What's taken a little bit of legwork and IT

6   workaround is to essentially migrate all that data over there.

7   And that's taken some time.

8         Additionally, we've been -- you heard from the

9   Special Master this morning that nothing nefarious has been

10  going on at Nexus based on his evaluation.  And when it comes

11  to producing the records, we've been producing thousands of

12  pages each month.  It's never to RLI's satisfaction.  And

13  that's why we took the extra step and did the bilateral

14  reviews, so that they could at least be assured that we're not

15  hiding anything.  And I believe the Special Master relayed that

16  this morning.  Additionally, once we've built out this

17  NetSuite, all these databases that we're talking about are

18  going to flow directly into the NetSuite account in which we're

19  prepared to conduct further reviews and provide an additional

20  level of access.

21        So we've fulfilled those three obligations, I

22  believe, since the 15th.  Now, it's going to take some time for

23  all those payments to be entered -- to show up in RLI's

24  account; however, they have been made, they're in process, and

25  they're going to be getting more payments today.  And we have

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   Ms. Wells today that will testify to exactly how much those

2   monies will include.

3          But the one telling thing from RLI's statements this

4   morning were -- in justifying this receivership was that one of

5   the jobs of the receiver is to come up with a final

6   distribution of assets.  That's really scary, because, Your

7   Honor, when I interpret that, and the executives at Nexus

8   interpret that, and the other business partners of Nexus hear

9   those words, they think that Nexus is going out of business;

10  that once this receiver is appointed, it's going to liquidate

11  all the assets of Nexus to fulfill these judgments.  Ever since

12  the order was imposed, Nexus has said it cannot satisfy this

13  lump sum judgment in A.1, and that any further satisfaction of

14  these amounts have to be taken out of the daily, if not

15  monthly, receipts.  And we've come up with a plan in which to

16  do that.  Twenty percent of topline revenue from a company is

17  devastating to their ability to continue doing what they have

18  been.

19         THE COURT:  Ms. Katsantonis says 20 percent is 1.4

20  million -- or that the revenues are 1.4 million, 20 percent of

21  which would be around 280,000.  But you haven't paid in

22  anything like that.

23         MR. ANDERSON:  I believe, based on Ms. Wells's

24  testimony, we're prepared to offer -- I have the number over

25  there -- upwards of 236,000 that will be coming into RLI

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   presently.  What seems to be lost in some of this is as the

2   credit card receipts come into the accounts, it then has to

3   be -- that's a merchant account.  Then it's transferred to

4   Nexus's account.  And then once they're in there, they can

5   validate that those then can be sent over.

6            THE COURT:  You know, I understand all that, and this

7   20 percent that cropped up the middle of last month.  But what

8   about the eight months before that when there was this judgment

9   and nothing happened?  And the only reason we're here and Nexus

10  is doing anything, consistent with the way they've operated

11  throughout this entire litigation, is only when there is a

12  hearing date is there any response from Nexus given, only when

13  it's -- I mean, I've seen it since day one.  The only time

14  anything happens is when the Court is about to enter an order.

15           So what about -- I mean, plainly they haven't paid

16  the judgments.  Plainly.  They've had plenty of money to do it,

17  if you believe what Ms. Katsantonis says, that they've had

18  revenues of $16 million between October 23rd and now.  Why

19  shouldn't the Court simply find Nexus in contempt and order a

20  receiver for the limited purpose of compliance with the Court's

21  order as regards the 2.4 million in collateral and the

22  additional collateral?  It's not like this order was a request.

23  It was an order.  And Nexus has done -- they come in here today

24  kicking and screaming about -- but they're dragged into court

25  here.  Until RLI pushed this issue, nothing was going to

151

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   happen.  And that's been the history of this litigation

2   throughout.  So, I mean, why shouldn't the Court simply find

3   contempt because the monies haven't been paid -- they're

4   plainly in contempt -- and secondly order a receiver -- a

5   limited receiver to collect the monies?

6          MR. ANDERSON:  I think that the behavior of Nexus in

7   the last 60 days --

8          THE COURT:  But what about the eight months before

9   that, Mr. Anderson?

10         MR. ANDERSON:  And I'm -- while not being involved in

11  the case at that point, it's my understanding that bank

12  accounts were being garnished, payroll was being missed, and

13  they couldn't sacrifice to do those things when they were being

14  frustrated.  A lot of the other problems were just manifesting

15  itself.  But we're here prepared today -- and I know there's

16  been talk that it's always before a hearing date.  Actually,

17  the last hearing date we had on July 15th, we were working out

18  how to make these payments well in advance -- even of you

19  noticing the status, we were in the process of working together

20  with the Special Master to come up with these solutions so that

21  we can further make better financial productions, as well as

22  begin to make these payments.

23         THE COURT:  Well, I understand needing to -- wanting

24  to make payroll.  I understand people have families and they

25  want to get paid.  I get that.  What about payments to reality

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1 TV shows?  What about all these Richard Moore related payments

2 that are in the hundreds of thousands of dollars?  I mean, it

3 just looks to me like Nexus has decided it's not paying the

4 judgment, and it wants to pay what it wants to pay.  And so,

5 why shouldn't that be -- why isn't that just *prima facie*

6 contempt of court?  They're just doing what they want to do.

7 They're ignoring the United States District Court for the

8 Western District of Virginia and doing what -- paying who they

9 want to.  So why shouldn't I just say:  This is easy, I hold

10 them in contempt; I appoint a receiver; what happens, happens?

11          MR. ANDERSON:  I think if you appoint a receiver,

12 Your Honor, the other sureties that Nexus has for their

13 outstanding bonds are all going to find that that is a trigger

14 to insolvency.  And as you know, RLI has not written a current

15 bond with Nexus since 2018 -- early 2018.  So this is -- this

16 is a historical business relationship.  It's not an

17 insignificant one.

18          THE COURT:  I understand.

19          MR. ANDERSON:  They hold the -- looking at a shares

20 perspective, a bond participant perspective, they hold the

21 fewest amount of outstanding bonds with Nexus.  And so their

22 bigger concern is that then DHS is going to --

23          THE COURT:  Why hasn't Nexus just gone to RLI and

24 said, Look, we can't pay the $2.4 million right now, but we'll

25 pay you $250,000 a month until we can get up to -- until we can

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  get up to 2.4?

2          MR. ANDERSON:  Your Honor, we have attempted several

3  times to do just that.

4          THE COURT:  Then why haven't you just paid some of

5  it?  It's easy just to pay some.  That shows some good faith.

6          MR. ANDERSON:  Your Honor, we're here to testify that

7  we paid over 20 percent since the 15th.

8          THE COURT:  The 15th of July.

9          MR. ANDERSON:  That's right.

10         THE COURT:  October, November, December, January,

11  February, March, April, May, June:  Big zero.  Well, not a big

12  zero; there was $4,000 paid.

13         MR. ANDERSON:  Yeah, but pragmatically -- I note your

14  frustration, Your Honor, but pragmatically going forward,

15  that's the situation we're in.

16         THE COURT:  It's not a matter of frustration.  It's a

17  matter of adherence to the rule of law.  And the adherence to

18  the rule of law, doesn't it, Mr. Anderson, call for the entry

19  of an order of contempt with some sanction?

20         MR. ANDERSON:  The practical reality going forward,

21  if you were to find that and make that judgment and appoint a

22  receiver, is that -- what is a receiver going to come in and

23  say, that it should be 15 percent of revenues?  It should be 18

24  percent?  It should be 22 percent?

25         THE COURT:  Well, the receiver would be charged with

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

 1  taking whatever assets are there and applying it to the

 2  judgment.

 3          MR. ANDERSON:  And I'm saying to you, Your Honor,

 4  that we're in the process of already doing that.  We're ready

 5  to make 20 percent payments.  We have been doing so.  And in

 6  terms of books and records, in the next 60 days this will be a

 7  fully -- or fully operational NetSuite database that they'll

 8  have access to.

 9          THE COURT:  You know, a year ago when we had the

10  evidentiary hearing in this case they were moving to a new

11  system that was going to be fully operational in 30 to 60 days

12  too.  I know your client has probably told you that, but I have

13  heard that before from this client, okay?  I have.  I mean,

14  it's always:  Yes, our numbers aren't accurate; our numbers

15  don't reflect reality; we're working on fixing them; we're

16  hiring Fusion; we're doing this; we're doing that.

17          It seems to me the time has come for the Court to

18  recognize that nine months have passed since this order has

19  been entered, Nexus has paid no attention to it, and that the

20  rule of law requires that the Court make a finding of contempt

21  and come up with an appropriate sanction.  And your response

22  is, We're trying, right?  That's your response.  We are now

23  trying, right?

24          MR. ANDERSON:  But I think that also is reflected in

25  the Special Master's report, that we're substantially compliant

155

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  on a number of the areas, and we're moving toward full

2  compliance in others.

3        THE COURT:  Well, on the Capsule data and the data

4  with regard to the participants, the program participants,

5  yeah, fairly compliant except for in the area of bond appeals.

6  On the issue of the financial books and records, I take

7  Mr. St. Ours at his word, massive monthly production, okay?

8  It's imperfect production based on what RLI wants, okay?

9        But that's not my focus here today, okay?  My focus

10  here today is this case has been -- from day one been about

11  collateral security.  And the collateral security was ordered

12  in October, and it hasn't been paid.  That's what this case is

13  about.  You could put books and records and all that other

14  stuff over there, okay?  I'm talking about -- I mean, one could

15  argue that you have substantially complied with the provisions

16  regarding the bond participant documents.  One could argue that

17  you've sort of complied with the books and records, or at least

18  made some effort toward it.  But it's the payment issue that

19  gives me the biggest problem and gives the Court the biggest

20  problem with Nexus simply looking at the court order and doing

21  nothing.

22        So I'll let you finish what you're going to have to

23  say and put on your evidence, but that's where I'm coming from.

24  It's the -- and I understand that appointing a receiver is an

25  extreme sanction, right?  I've only done it once before, okay?

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   I've only done it once before, and those people needed it.  And

2   I understand it's an extreme sanction.  You tell me why, and

3   you put on evidence why -- as to why I ought not to do that,

4   and I'll listen to what you have to say.

5            MR. ANDERSON:  I would just point out one further

6   thing.  And it was actually the question you posed to the

7   Special Master, Mr. St. Ours, which is there is this inherent

8   conflict between --

9            THE COURT:  There would be no conflict if part of

10  the -- if part of the order appointing the receiver, the Court

11  were to stay RLI's ability to collect the $3.3 million in

12  damages, stay collection efforts.  I could do that in order to

13  put the collateral first.  Then there would not be any

14  conflict.  I listened to what he had to say.

15           MR. ANDERSON:  Your Honor, I couldn't agree more with

16  your last statement.

17           THE COURT:  I'm sure they wouldn't like it.  But, you

18  know, look, you said something in your brief, okay?  And I

19  think about this all the time in -- sometimes in civil cases,

20  but always in criminal cases, right?  And that is when somebody

21  asks for something, is that really in their best interest,

22  right?  When the government asks for this kind of penalty, is

23  that really in society's best interest?

24           Here with RLI asking for a receivership, is that

25  going to explode your company and they're going to be in worse

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    shape?  I don't know.  But I hear what you have to say, that

2    they ought to be concerned about what they're asking for.  I

3    hear that.  And so I'll listen to what the -- the rest of what

4    you have to say.  I will hear your evidence.

5             But I am concerned about the abject failure by Nexus

6    to deposit the collateral.  I mean, we argued about this

7    collateral for, you know, a long time, right?  I mean,

8    Mr. Anderson, RLI has been after $10 million in collateral

9    security since about the time this suit was filed, maybe about

10   six months later they came after their $10 million.  Well, I

11   had always thought the $10 million was just a pie in the sky.

12   It wasn't grounded in reality.  So I tried to come up with a

13   figure that I thought was grounded in reality, and Nexus didn't

14   pay that.  I'm shocked that we're here.  I just wonder why the

15   commitment to the rule of law and the requirement the Court's

16   orders be followed doesn't require me -- I mean, really

17   handcuff me and require me to find contempt and order a third

18   party.  I don't think Rule 70 gets you there.  I don't think

19   Rule 70 is appropriate because it's -- it really is the same

20   thing.  It would be the appointment of a receiver for a limited

21   purpose.

22            So that's where I am.  So I'll listen to what you

23   have to say and I appreciate you being here.

24            MR. ANDERSON:  Your Honor, I did have a list of

25   things to go through.

158

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1          THE COURT:  Let's do it.

2          MR. ANDERSON:  All right.  In some of the

3   mischaracterizations I believe in terms of what's been produced

4   in some of the databases in Stampli and Melio, all the invoices

5   that were in those databases have been produced during the

6   reviews.

7          THE COURT:  I'm not concerned about the documents.

8   I'm not concerned about the databases.  I'm concerned about the

9   money.  It's the failure -- I mean, I think they have -- I

10  think what you've done in the bilateral review, what you've

11  done to identify these additional databases has demonstrated to

12  me that with regard to the books and records provision, and

13  with regard to the provision for the bond principals, sure,

14  compliance hasn't been perfect.  But I'm not going to order

15  contempt as regards those.  You have tried, okay?  It's the

16  money.  That's the issue.  That's the problem.  It's the

17  failure to provide collateral security.  And that's where I

18  am -- I'm hung up.  So let's hear what you have to say.

19         MR. ANDERSON:  Well, I think with that, Your Honor,

20  I'd like to call my first witness.

21         THE COURT:  Sure.

22         MR. ANDERSON:  Ms. Rebecca Wells.

23         THE COURT:  All right.

24         MR. ANDERSON:  And my esteemed colleague over the

25  Zoom call, Ms. Juliana Johnson, is going to conduct the direct.

R. Wells - Direct


1          THE COURT:  Great.  Come on up, Ms. Wells, and be

2    sworn.

3              REBECCA WELLS, DEFENSE WITNESS, SWORN

4                    DIRECT EXAMINATION

5    BY MS. JOHNSON:

6    Q    Ms. Wells, can you hear me?

7    A    I can hear you.

8    Q    Please state your name for the record.

9          THE WITNESS:  May I take off my mask?

10         THE COURT:  Yes.  Are you vaccinated?

11         THE WITNESS:  I am.

12         THE COURT:  Great.

13         THE WITNESS:  Rebecca Wells.

14    BY MS. JOHNSON:

15    Q    And how are you connected with this litigation?

16    A    I'm sorry, could you repeat that?

17    Q    And how are you connected with this litigation that we're

18    here for today?

19    A    I am the chief financial officer of Nexus Services.

20    Q    And what special certifications do you hold, Ms. Wells?

21    A    I'm a certified public accountant.

22    Q    And what qualifications did you need to have in order to

23    hold that title?

24    A    Well, in addition to studying accounting at Georgia State

25    University, I also had to study for over a year in order to

R. Wells - Direct

1    pass the CPA exam.  I also had to work in a practice with

2    another certified public accountant so that I could gain the

3    professional experience that I needed to in order to have that

4    credential.

5    Q    And you've been Nexus's chief financial officer for how

6    long?

7    A    I believe I'm in month four.

8    Q    Now, in coming onto Nexus as a chief financial officer,

9    are you aware of software changes?

10   A    I am keenly aware of software changes.

11        THE COURT:  Where were you before -- what did you do

12   before you were chief financial officer of Nexus Services?

13        THE WITNESS:  Well, I have worked in the accounting

14   and finance world for 20 years now.  I started out in banking

15   and finance.  And then it was after working in that sector for

16   about seven years that I made the decision to become a CPA.

17        When I worked in that sector, it was sort of the

18   beginning of my establishing my knowledge around databases,

19   information, and how databases work conjunctively within large

20   organizations -- in regulated organizations, I might add.

21        And then after that, and after -- after getting my

22   degree and passing the exam, I focused on business

23   implementation for small businesses.  And we focused primarily

24   on getting -- getting sufficient internal controls and systems

25   so that smaller businesses could run efficiently.

R. Wells - Direct

1           After -- I worked in that type of practice when I was

2  getting my professional experience that was required for a CPA,

3  and then I practiced on my own for eight years.  And it was

4  during the time that I practiced for eight years where I was

5  able to work on the engagement with Nexus on a contract basis.

6  And so I was keenly aware of some of the issues that they were

7  encountering and some of the challenges that they were

8  encountering both with dealing with the volume of data, with

9  the software available, as well as the expertise that they had.

10  And that isn't meant to be any sort of dig on anybody there.

11  Quite the opposite.  I recall from the very first day that I

12  had any interaction with upper management within that

13  organization, the tone was almost startling because they were

14  so quick to take any recommendations that I offered.  They

15  were -- I mean, I don't want to sound crude, but they were

16  quite hungry for any recommendations, any guidance, any

17  structure that I was able to offer up as a recommendation.  And

18  that has been the tone that I have experienced with them.

19           I worked on that engagement -- I'll back up a second.

20  I worked on that engagement for about a year before I moved on

21  to work on another large engagement.  That was the tone that I

22  experienced during that time.  That is the tone that I

23  experienced.  And then when this opportunity came up to help

24  them in this role, I jumped at the opportunity, because I knew

25  it wasn't going to be a struggle.  That was the tone that --

R. Wells - Direct

1   that was how they had presented themselves consistently over

2   two years.

3               THE COURT:  How long have you been employed by Nexus

4   Services?

5               THE WITNESS:  I'm in month four.

6               THE COURT:  Okay.  So you came on as chief financial

7   officer?

8               THE WITNESS:  As an employee, yes.

9               THE COURT:  As an employee?

10              THE WITNESS:  Yes.  I worked as a contractor to help

11   with some of their historic cleanup previously.

12              THE COURT:  Okay.  Go ahead, Ms. Johnson.

13   BY MS. JOHNSON:

14   Q    Now, with regards to this integration of software, what

15   software is Nexus currently -- (inaudible) --

16   A    I'm sorry, did you say what software are we currently

17   using?

18   Q    (Inaudible) -- yes.

19   A    I'm so sorry, that broke up.  Could you repeat that,

20   please?

21   Q    Yes, of course.

22        You stated earlier that Nexus is integrating its software.

23   Can you explain to the Court what integration -- what software

24   it is that we're integrating into?

25   A    Yes, I'd be happy to.  We are currently targeting NetSuite

R. Wells - Direct

1   as our ERP, which means that is going to be the foundation for

2   our financial reporting.  It's going to be the foundation for

3   our internal controls.  And then it's my understanding,

4   although I'm less closely managing the CRM element and the -- I

5   believe we're also doing the POS integration that is out of the

6   box from NetSuite.

7       In addition to the NetSuite family of products that we're

8   using and trying to update with our historic information, we're

9   also using -- we're using two AP processing softwares, because

10  they both have different capabilities that are going to give us

11  a lot of powerful controls over our finances.  And of course we

12  are going to be using the payment processor, I believe it's

13  Fluid Pay.  I believe --

14  Q    Okay.

15  A    Is that everything or am I missing something?  Those are

16  the ones that I'm most -- I'm most interested in for my

17  purposes.

18  Q    And did you have to receive any kind of specialized

19  training in order to facilitate the use of NetSuite?

20  A    Considerable training.  In addition to my years of

21  experience working with databases in large and small

22  organizations, those -- in those instances, it was always with

23  other software.  But when I came on with Nexus, I studied

24  for -- it was -- I want to say it was 50 plus hours of training

25  from NetSuite.

R. Wells - Direct

1  Q    And this integration was actually started quite some time

2  ago, approximately 2019 or 2020; is that correct?

3  A    I believe they did kick it off in 2020.  At that point in

4  time I had rolled off of the engagement, but I was -- I was

5  aware of it because of my relationship with my colleagues.

6  Q    So is the integration complete yet?

7  A    No.  It's far from it.

8  Q    When would the integration be complete?

9  A    Well, it's difficult to respond to hypotheticals,

10 especially when that response is associated with something like

11 software implementation; however, especially with the last

12 several months that I have been focusing primarily on this,

13 since -- at the point that I started really getting into that

14 part of our implementation -- let's see.  My guess had always

15 been that I would be able to get all of our historic

16 information -- assuming that a couple of variables that we've

17 had to delegate out externally, assuming that those variables

18 could be controlled for, my assumption had always been that we

19 would easily be able to get the historic financial information

20 into NetSuite beginning January 1, 2021 within two to three

21 months.

22 Q    Why hasn't that happened?

23 A    Well, a large part of that goes back to the amount of time

24 that it has taken to respond to all of the different actions,

25 motions, and communication regarding this particular matter.

R. Wells - Direct

1  Q     Are you referring to bilateral reviews?  What are you

2  referring to?

3  A     Well, yeah, I'm referring to bilateral reviews.  I'm

4  referring to just the small amount of communication that I have

5  been seeing as we have been transitioning many of these

6  financial responsibilities over to me.  And let's see, we've

7  got bilateral reviews.  We've got communication.  We also have

8  just figuring out the best system of controls that we can

9  implement internally so that we can be compliant with this

10 ruling.

11 Q     Now, we understand that there are certain court ordered

12 obligations in order to provide payments to RLI, correct?

13 A     That is correct.

14 Q     And are you familiar with the filing on August 1st, 2021,

15 that was filed by RLI?

16 A     I'm -- I was not directly a party to that filing, but I

17 have been made aware of it, yes.

18 Q     Are you aware of the amount that RLI claims that -- what

19 they received in collateral for a security payment from Nexus?

20 A     I believe it was approximately $9,000.

21 Q     Did you review that amount in relation to (inaudible) --

22 A     I'm sorry, could you repeat that question?

23 Q     Did you review that amount in relation to the payments

24 that Nexus has claimed?

25 A     I did.  I compared it to the amounts that we have claimed

R. Wells - Direct

1    to the amounts that I have seen exit our bank account, yes.

2    Q    And what did you discover?

3    A    What did I discover, is that what you asked?

4    Q    Uh-huh.  Yes, ma'am.

5    A    I discovered that during the time period that RLI

6    represented that we actually made substantially more payments

7    than $9,000.

8         I'm sorry, I apologize.  Could I please get some water?

9         (Pause.)

10   Q    What did you review -- determine that there was a material

11   inaccuracy in the amount that RLI had reported to receive

12   versus what Nexus had paid?

13   A    I'm sorry, could you repeat that?  The sound sort of went

14   out.

15   Q    What did you review to determine that there was an

16   inaccuracy with the amount that RLI reported to have received

17   versus what Nexus has stated they paid?

18   A    I reviewed our bank records, the bank records that were

19   produced by the bank directly.

20   Q    And in those review of bank records, is one of those banks

21   TrustCo?

22   A    Yes, it was.

23   Q    Did you write a declaration to this Court with regards to

24   this?

25   A    Yes, I did.

R. Wells - Direct

1  Q    Would you recognize that declaration if it was shown to
2  you?
3  A    Yes, I would.
4         MS. JOHNSON:  At this time I would like to have my
5  co-counsel, Mr. Anderson, show Ms. Wells the declaration,
6  including the exhibits that are attached.
7         THE WITNESS:  I wonder if the audio would be better
8  if I turned the speaker on?  Is that what that's for?
9         THE CLERK:  No, ma'am.
10        Ms. Johnson, when you move around, you fade in and
11 out.  So if you can stay closer to your speaker, that would
12 help.
13  BY MS. JOHNSON:
14 Q    Now, that document that you're holding in your hand,
15 Ms. Wells, is that your declaration?
16 A    Yes, it is.
17 Q    And if you look to the back, are those exhibits attached,
18 or are those the exhibits that you refer to in your
19 declaration?
20 A    Yes, those appear to be for the period ending July 31st.
21 Q    Is this a true and accurate reflection of the declaration
22 that you made?
23 A    Yes, it appears to be so.
24 Q    Has it been altered in any way?
25 A    I don't detect any alterations.

R. Wells - Direct

1          MS. JOHNSON:  At this time I'd like to offer as

2     Defense 1 Rebecca's signed RLI declaration.

3          THE COURT:  Any objection?

4          MS. KATSANTONIS:  No, Your Honor.

5          THE COURT:  Ms. Wells's declaration will be admitted

6     as Defendant's 1.  It will be received.

7          (Defendant's Exhibit 1 marked and admitted.)

8     BY MS. JOHNSON:

9     Q    Now, what did you actually discover was paid to RLI in

10    reviewing these TrustCo bank records?

11    A    Well, as I stated before, I discovered that I had -- I

12    discovered that we had paid considerably more than that $9,000.

13    Q    And what was that amount that was actually paid by Nexus?

14    A    I'm going to just check my notes just to make sure I get

15    the amount right, but it was $41,557.20.

16    Q    Okay.  Did you check any other accounts to show disparity

17    in payments of what RLI was claiming and what Nexus had paid?

18    A    I did not check accounts; however, I reviewed the credit

19    card payments advice that were produced by RLI's credit card

20    system, which I believe we referred to in earlier testimony.

21    Q    And is that what you refer to as Exhibit B in the back of

22    your declaration?

23    A    Yes, it is.

24    Q    And what is Exhibit B?

25    A    Excuse me?

169

R. Wells - Direct

1  Q    And what amounts does Exhibit B say?

2  A    Oh, those five payment advice or receipts total $50,000.

3  Q    So in total for the payments made to RLI with regards to

4  what they've claimed, the 9,000 -- the total amount that Nexus

5  has actually paid?

6  A    Well, the total amount as of July --

7  Q    Let me be clear.  As of the time that you noticed a

8  discrepancy from RLI's August 1st filing, we've stated that

9  there was 41,000 and change and then 50,000.  So what would

10  that total actually be?

11  A    I usually don't make a practice of doing math in my head,

12  but fortunately with the $50,000, it was $91,000 that had been

13  paid by them.

14        THE COURT:  Aren't those $50,000 in payments, though,

15  payments that related to bonds that were breached in the past?

16        THE WITNESS:  That is my understanding.

17        THE COURT:  Right.  And so that's not -- that is

18  not -- those are not payments that go to the collateral

19  obligations under the Court's order.  How much of the $41,000

20  or $42,000 figure you mentioned were for past breach bonds

21  versus payments of collateral?

22        THE WITNESS:  Well, it is -- as an employee of Nexus

23  Services, it is not my responsibility -- I would overstep if I

24  were to tell them how to apply those payments.

25        THE COURT:  No, I'm not asking that.  I'm asking you,

R. Wells - Direct

1  of the $42,000, how much is for past breach bonds versus

2  payments for collateral?

3          THE WITNESS:  That's a good question, and it probably

4  is a good opportunity to clarify the fact that those -- those

5  payments are payments that I confirmed after the fact.  I saw

6  that the payments left the bank account.  I did not initiate

7  those payments, but I observed that they --

8          THE COURT:  Okay.  So the answer to my question is

9  you don't know how much of that is for past breach bonds versus

10 the amount of collateral; is that right?

11         THE WITNESS:  That's correct.  I'm sorry I didn't

12 state it more concisely.

13         THE COURT:  How much money does Nexus Services bring

14 in on an income basis every month?

15         THE WITNESS:  Every month -- you know, I --

16         THE COURT:  You're the chief financial officer.

17         THE WITNESS:  You're right.  The amount of income

18 that we bring in on a monthly basis fluctuates considerably,

19 and it has drastically --

20         THE COURT:  How about during the four months that

21 you've been employed there?

22         THE WITNESS:  Over the last four months, I believe on

23 average it's been about 1.2 million.

24         THE COURT:  And --

25         THE WITNESS:  That's the number that I use to just

171

R. Wells - Direct

1    start implementing some controls.

2              THE COURT:  Okay.  Income of 1.2 million.  What kind

3    of expenses does Nexus Services have?

4              THE WITNESS:  To be honest, at this point, because we

5    are so focused on pulling that data together, I don't yet have

6    a conclusive way to be able to determine that.

7              THE COURT:  Okay.  So you don't know whether Nexus

8    Services is operating in the black or in the red?

9              THE WITNESS:  Unfortunately, right now it would be

10   very difficult for me to say that, yes.

11             THE COURT:  Okay.  Go ahead.

12    BY MS. JOHNSON:

13   Q    And is that difficulty in being able to determine how

14   Nexus is operating, is that directly related to the

15   implementation of NetSuite?

16   A    It is.  It's directly related to where we are in the

17   implementation of NetSuite.  It's also related to the large

18   quantity of transactions that we have.  Like, it's a massive

19   amount of data.  And that's the whole purpose of having

20   NetSuite in place, so that we can compile the data and make it

21   into usable -- be able to make effective business decisions

22   based on that info.

23   Q    Will NetSuite consolidate the historical data that Nexus

24   has with its other operating systems -- (inaudible).

25   A    I'm sorry, the last part that you said, would you please

R. Wells - Direct

1    repeat that?

2    Q    Would NetSuite consolidate the historical data of Nexus,

3    along with its current operation?

4    A    First of all, I do want to clarify when you use the word

5    "consolidate" the information, that does tread a little bit

6    into some accounting standards.  And especially in this

7    environment, I want to be very clear that the consolidation

8    used in this context refers to just pulling the data together

9    and summarizing it into a usable format.

10        And as far as pulling in the historical data, the

11   intention, once the system is fully operational, is to have

12   historical information -- detailed historical information in

13   the system effective January 1, 2021, and then summarize maybe

14   prior year historical information once that information is

15   ready.

16        Does that answer your question?

17   Q    Yes.

18        Are you aware of the 20 percent commitment?  Do you have

19   knowledge of that?

20   A    I have knowledge of the 20 percent payments, yes.

21   Q    And how do you have knowledge of that?  Do you have a hand

22   in determining that?

23   A    I don't have -- I have not yet determined that amount

24   myself, but I was able to go in after the fact and confirm the

25   20 percent compared to -- the 20 percent payments compared to

R. Wells - Direct

1   revenue.

2        Did that answer your question?

3   Q    In confirming those payments, are you saying

4   Nexus -- (inaudible) --

5   A    I'm sorry, could you please repeat that?

6   Q    Yes.  In confirming the 20 percent revenue, is it your

7   testimony that Nexus has made good on paying that 20 percent

8   revenue since July 15th?

9   A    Based on my calculations, if you look at the revenue

10  numbers from the date range with some variations, depending --

11  you know, trying to control for a lot of different

12  perspectives, it's my -- it has been my observation, and I've

13  been able to confirm that we have paid more than 20 percent

14  based on the last little over a month of revenue activity.

15            THE COURT:  What do you mean when you say trying to

16  control for a lot of different perspectives?  What does that

17  mean?

18            THE WITNESS:  Well, this could be my getting into

19  understanding both parties to this matter and trying to

20  understand the goals of both parties of this matter, and

21  because of the -- because of my understanding of the -- of the

22  motion on July 15th, from my perspective it was a little bit

23  unclear.  And it isn't to say that it was written unclearly.

24  It's just the way I interpreted it at the time when I was doing

25  this examination, it looked like there was some ambiguity as to

174

R. Wells - Direct

1  whether the remittance would be compared to the revenue as of

2  the beginning of July or the middle of July when reviewing that

3  20 percent.  I was able to find that -- in both cases that we

4  did exceed that 20 percent when compared to revenue for that

5  period alone.

6             THE COURT:  When you use the term "revenue," what are

7  you referring to?

8             THE WITNESS:  That's a really good distinction to

9  make.  When I'm looking at revenue, I'm looking at topline

10  remittance that we have received from our participants per day.

11             THE COURT:  When you say "we," who is "we"?

12             THE WITNESS:  Nexus Services, Inc.

13             THE COURT:  What about the subsidiaries, Nexus Libre

14  or Homes by Nexus?

15             THE WITNESS:  You know, for this -- I can see a lot

16  of room for different interpretations, but because the --

17  because this particular matter is so closely related to

18  participants and the inflows coming in from participants and

19  the -- and because those inflows do make up the bulk of all of

20  our subsidiaries' overall revenues, I've been focusing

21  primarily on that revenue.

22             THE COURT:  The revenue for Nexus Services, Inc.?

23             THE WITNESS:  I should clarify that.  It is

24  technically revenue from Libre.

25             THE COURT:  What about Homes?

R. Wells - Direct

1          THE WITNESS:  In 2021, it is my understanding that

2    Homes is essentially operated as a completely separate entity.

3    And that is a reflection of the willingness for Nexus and upper

4    management at Nexus to take the advice of structure --

5    recommendations from external parties when it makes sense.

6          THE COURT:  Okay.  So just so I can understand what

7    you're saying, revenue -- when you say the word "revenue,"

8    you're talking about dollars that come into Nexus Services,

9    Inc., correct?

10         THE WITNESS:  Through Libre, yes, because it is

11   associated specifically to the participant payments.

12         THE COURT:  All right.  Go ahead, Ms. Johnson.

13         MS. JOHNSON:  Thank you, Your Honor.

14    BY MS. JOHNSON:

15   Q    Now, what exactly has Nexus paid in total?

16   A    To date?

17   Q    Uh-huh.

18   A    I'm showing as of the last time I checked this -- I'm just

19   referring to my notes -- but from our perspective -- and this

20   doesn't account for delays with ACH.  I'm still unclear at this

21   point if that delay in ACH processing is more like a two-day or

22   a five-day.  When I was comparing some of the dates from the

23   previous testimonies, it looked like it could -- at this point

24   in time it appears as though it could be more like a five-day

25   delay, which I'm pretty shocked about.  But, you know, these

176

R. Wells - Direct

1  are strange times we're living in.  So it could be associated

2  with that.

3      But as of the last date that I checked, including that

4  $50,000 of payments that there's some discussion about the

5  application of, I'm showing that we have had $236,675.40 clear

6  our bank accounts.  And that also includes the receipts for the

7  credit card payments.

8          THE COURT:  Okay.  And is that -- just so I'm clear,

9  Ms. Johnson, that 236,675.40 that you just mentioned, that is

10  cleared to RLI?

11          THE WITNESS:  Clear in what sense, sir?

12          THE COURT:  You say it cleared our bank accounts to

13  RLI.  So is this money that you say Nexus has paid to RLI,

14  236,675.40, since July 15th?

15          THE WITNESS:  Since July 15th -- I believe that

16  particular dollar amount includes payments that were made

17  before July 15th.  That total, 236,000, includes the early July

18  payments.  And by clear, I want to be very clear on this, that

19  is -- those are funds that have left our bank account.  We no

20  longer have control over those funds.

21          THE COURT:  Okay.  And when does the start of that

22  period occur?

23          THE WITNESS:  The start of that payment period?

24          THE COURT:  Yeah, no, you say it's before -- excuse

25  me -- it's before July 15th.  So how far back does it go, do

177

R. Wells - Direct

1   you understand?

2          THE WITNESS:  That 236,000 that I referred to

3   includes payments from July 1 until -- July 1 -- I want to be

4   clear on that -- through -- the last one that I'm showing left

5   our account on August 6.  So payment dates through July 1 to

6   August 6.

7          THE COURT:  All right.  Thank you.  Go ahead,

8   Ms. Johnson.

9    BY MS. JOHNSON:

10  Q    And have there been any other payments that are currently

11  pending that may not have left the Nexus bank account yet, but

12  have been initiated?

13  A    Yes.  I didn't have time to check the status of this this

14  morning, but it is my understanding that today they are going

15  to be receiving -- I am just referring to my notes -- they

16  should be receiving $4,227.60 today.  And it's possible that

17  yesterday we at least had -- we should have -- like, I

18  anticipate being able to pull up the checking account today.

19  And I'm assuming that I will see a payment of $13,230 that had

20  been scheduled to go out on the 9th yesterday -- yeah,

21  yesterday.

22  Q    So another 18,000 roughly in payments pending?

23  A    Yes.

24  Q    Okay.  Now, with regards to some of the payments, Nexus

25  had claimed to do daily payments, correct?

178

R. Wells - Direct

1  A     That is correct.

2  Q     Okay.  So we have payments on -- do you have payments on

3  July 1st to RLI?

4  A     We do.  On our end, I am showing that we do have payments

5  that went out on July 1st.

6  Q     Do you happen to know how much that was for?

7  A     Would you please repeat that?

8  Q     Do you happen to know that amount?

9  A     The amount?

10  Q     Uh-huh.

11  A     That was $15,500.

12          MS. KATSANTONIS:  Your Honor, I'm sorry to interrupt,

13  but can we see what document she is looking at?

14          THE WITNESS:  They're my notes.

15          THE COURT:  Those are your notes?

16          THE WITNESS:  Yes, they are.

17          THE COURT:  Okay.  You can ask her on

18  cross-examination.

19          MS. KATSANTONIS:  Thank you, Your Honor.

20          THE COURT:  She's referred to them, so you can look

21  at them.

22          Go ahead, Ms. Johnson.

23   BY MS. JOHNSON:

24  Q     And on July 2nd, was there a payment made?

25  A     Yes, I believe there was.

R. Wells - Direct

1  Q     And, in fact, was there more than one payment made on July

2  2nd?

3  A     Yes.  From the records that I was able to confirm, there

4  had been one payment in the amount of $3,749.20 and another

5  payment in the amount of $5,575.80.

6  Q     Okay.  And then you have payments on July 7th?

7  A     Yes.

8  Q     Okay.  And what were those payments?

9  A     On July 7th, our records showed that there was a payment

10 in the amount of $11,661.60 and another for $4,836 -- I'm

11 sorry, $838.20.

12 Q     And then we have payments again on July 8th?

13 A     Yes, that's what I confirmed on our records.

14 Q     Okay.  And what about -- when was the next payment made

15 after July 8?

16 A     I'm sorry, would you please repeat that?

17 Q     When was the next payment made after July 8th?

18 A     When was it, or what was it, how much?

19 Q     When was it -- both.  I'll ask you one at a time, though.

20 When first?

21 A     I was able to confirm that two payments were made on July

22 8th; one in the amount of $4,133.60 and the other in the amount

23 of $18.

24 Q     Okay.  And what about July 15th, was there a payment made

25 then?

R. Wells - Direct

1    A    On July 15th?

2    Q    Uh-huh.

3    A    Yes.  I was able to confirm that one payment -- oh, yes,

4    one payment was made on July 15th in the amount of $10,000.

5    Q    And what about the next day?

6    A    On the next day I was able to confirm that one payment was

7    made also in the amount -- oh, actually, two payments were made

8    in the amount of $10,000 each.  So a total of $20,000.

9    Q    Okay.  And then we have a little bit of jump in days, and

10   we go to July 20th.  What was paid on July 20th?

11   A    On July 20th, I was able to confirm that we made a payment

12   in the amount of $5,000.

13   Q    And what about the 25th?

14   A    I'm sorry, you said the 21st?

15   Q    The 25th.

16   A    The 25th, I'm showing that on the 25th we made a payment

17   in the amount of $10,000.

18   Q    And then again how about the 27th, were there payments

19   made on the 27th?

20   A    There was also -- there were two payments made on the

21   27th, one in the amount of $7,453.40, and the other payment in

22   the amount of $10,000.

23   Q    And just a few more.  What about the 28th, were there

24   payments made on the 28th?

25   A    On the 28th, I was able to confirm that one payment was

R. Wells - Direct

1  made in the amount of -- I'm sorry, you said the 28th; is that

2  correct?

3  Q     Yes, ma'am.

4  A     $8,775.

5  Q     And the 29th?

6  A     On the 29th, I confirmed that $7,053.40 was made as just

7  one payment.

8  Q     And what about the 30th?

9  A     On the 30th, I was able to confirm that $8,992.80 was

10 paid.

11 Q     What about August 2nd, were there payments made on August

12 2nd?

13 A     Yes, there were two payments by my confirmation.  One was

14 in the amount of $4,279.60, and the second in the amount of

15 $3,785.20.

16 Q     What about August 3rd?

17 A     On August 3rd, I confirmed that $7,285.20 was made as a

18 payment, as well as an additional $4,000.

19 Q     And August 4th we have quite a few payments going out.  Do

20 you know those numbers?

21 A     Yes, fortunately.  The first payment was in the amount --

22 should I go down and list off the dollar amounts for those?

23 Q     You can either give an approximate total, or you can list

24 the amounts, whichever you're more comfortable with.

25 A     There was over $60,000 made in payments on August the 4th.

R. Wells - Direct

1  Q    Now, Ms. Wells, there are some dates that payments were

2  not made when we were walking through all of this.  What is the

3  explanation there for the few dates that payments were not

4  made?

5  A    Well, it is my understanding that the gaps in those dates

6  had a lot to do with frustration with the payment method, with

7  miscommunication about payment method, preferred payment

8  method, limits on credit card transactions where we were

9  attempting to make these payments.

10       I believe there was another matter.  Oh, there definitely

11  was an impact with the lags in payment due to some dates

12  coinciding with bilateral reviews.

13  Q    Would some of those dates be that time period between July

14  20th through the 25th?

15  A    I believe so.  It is my understanding that's the case.

16  Q    The 21st through the 24th, you lost the ability for

17  payment?

18  A    That is my understanding.

19  Q    Now, are you aware of caps -- caps put in place previously

20  by Nexus on money to be received -- not Nexus, but by RLI with

21  how much money could be received on a payment from Nexus?

22  A    I apologize, I did not understand the first part of what

23  you said.  Am I familiar with caps?

24  Q    Yes, the caps that RLI had in place prior with regards to

25  how much --

R. Wells - Direct

1   A    Oh, you're referring to the credit card caps, the limits

2   for our payment processing; is that right?

3   Q    Yes, ma'am.

4   A    Yes.  Yes.  And that's what I was referring to earlier.

5   Q    So what are those caps?

6   A    It's my understanding that we can't pay more than $10,000

7   by credit card.

8   Q    Is that why there is multiple payments made?

9   A    In a few of these cases, yes.

10  Q    So in essence we had to make multiple payments in order to

11  keep good on our 20 percent promise, right?

12  A    Yes, that's my understanding.

13  Q    On all of those amounts that you have stated, is that

14  consistent with the assertion from RLI that Nexus had only paid

15  9,283 -- August --

16  A    The numbers speak for themselves.

17          THE REPORTER:  I'm sorry, can you repeat that

18  question for me, please?  I couldn't hear it fully.

19   BY MS. JOHNSON:

20  Q    Do you have a problem working with the financial

21  accountant, Mr. -- and I don't want to misstate his name, Your

22  Honor; I don't want to butcher a name -- Mr. Peroutka?

23  A    I'm sorry, could you repeat the question?

24  Q    The forensic accountant, Mr. Peroutka, do you have a

25  problem working with him in order to make RLI -- (inaudible) --

R. Wells - Direct

1    A    I apologize.  The middle of the sentence that time.  Do I

2    have a problem with the forensic accountant?

3    Q    With working with the forensic accountant in order to

4    bring comfort to RLI?

5    A    Oh, absolutely not.  In fact, up to this point, I have

6    found while they're voluminous, all of the notes and comments

7    and feedback that I have been privy to from the bilateral

8    reviews and from the forensic accountant have -- have been

9    helpful while we are establishing some of the internal controls

10   that are going to ensure that we can produce accurate and

11   timely financial reports.

12   Q    And Ms. Wells, are you committed to getting things under

13   control with regards to Nexus -- (inaudible) -- compliance?

14   A    Absolutely.  It's my number one imperative first even

15   compared with the -- the pressing need to get our financial

16   systems up to date.  All models and budgets and forecasts that

17   I start begin with RLI and making sure that we -- we pay at a

18   minimum 20 percent on an ongoing basis.

19   Q    And so, this payment -- you know that the Judge has

20   concerns because every month there appears to be no compliance

21   with this Court's order.  But since you've been the chief

22   financial officer, have you seen an improvement in that?

23   A    Well, the numbers and the payment pattern speak for

24   themselves.

25   Q    Okay.  Now, do you have any solutions that you feel would

R. Wells - Direct

1    benefit this entire -- this entire issue?  Do you have any

2    solutions that would help for those payments to come in at a

3    better rate, taking into account the different payment modes

4    and everything that we talked about?

5    A    Well, yes.  One solution that I'm aware of is with getting

6    the merchant account so that it will automatically send 20

7    percent of our topline revenue on a daily basis directly to

8    RLI, which not only would cut out ACH lag -- which, like I said

9    earlier, I'm unclear at this point whether that's two days or

10   five days.  It sounds more like it's five days based on some of

11   the prior testimony.  But this would -- this would ensure that

12   RLI gets funding for this obligation at the same time that we

13   receive our operating capital.  Usually, you know, my

14   assumption is that this would operate much like any other

15   merchant account distribution that I've witnessed over my years

16   of practice.  And that looks like when we get the -- when we

17   get the criteria set up and the deposit amounts set up in the

18   merchant account, then as soon as we get funding, they're also

19   getting funding at the same exact time.  And it is also notable

20   that with this particular solution, it makes it so that we are

21   completely hands off with this funding.  This is something that

22   would be controlled by the merchant account after we set up

23   this -- this provision, this capability.

24   Q    And would this be something more effective and less

25   harmful to Nexus Services than appointing a receiver?

R. Wells - Direct

1  A   I would say so.  It definitely would not be without its

2  challenges, because 20 percent of our daily cash flow --

3  especially with some of the monthly business cycles that I have

4  been seeing that I'm going to have to be planning for -- you

5  know, it is definitely going to require some difficult

6  decisions.  But I believe that with those guidelines and with

7  the hands-off -- with the hands-off nature of this transaction

8  and this funding, it in a sense accomplishes something that's

9  very similar to even what the opposing counsel has recommended

10  earlier.  In fact, I recall earlier the opposing counsel -- and

11  I don't want to misrepresent or speak out of turn, but I seem

12  to recall the opposing counsel even recommending that we send

13  like 20 percent of net income.  And I don't know if -- you

14  know, if counsel was aware of the difference in that

15  terminology, but that suggestion would indicate that our

16  expenses are taken out of it.  We're recommending something

17  that's even more aggressive, and it will -- it's going to

18  create some challenges, but it's going to be something that we

19  can plan for a little bit better, something that's going to

20  give us the autonomy that we need to operate this business in a

21  way that has been successful despite so many challenges over

22  the years.

23  Q   And if we were to institute those direct transfers out,

24  approximately in your best guess as your position allows you

25  to, how long do you think it would take to satisfy the

187

R. Wells - Direct

1  judgment?

2  A     How long would it take for what?  I'm sorry.

3  Q     For there to be satisfaction of the judgment?

4  A     Well, let's just round off the judgment with legal fees.

5  You know, I've heard a few different numbers being thrown

6  around today depending on timing and counsel and all of that.

7  But let's just round it off at $3,000 -- no, let's add some

8  zeros to that -- $3 million for the overall judgment, then that

9  would just be -- you know, like, let's take this month's --

10  this prior month's activity as an example and let's say that's

11  going to be averaged out.  I don't have a calculator in front

12  of me.  And especially after a day like today, I'm not going to

13  do that in my head.  But if someone would be so kind as to

14  divide $3 million by, say, $240,000, that's how many months it

15  would take to satisfy this judgment.

16      But the beauty of this sort of plan is that as our

17  business grows -- which hopefully we are going to be more

18  empowered to do with a strategy like this -- that means that

19  that obligation would be paid off even sooner on top of the

20  fact that I believe all of us are extremely motivated to get

21  that obligation taken care of.  So to the extent possible,

22  which I feel fairly confident in it, my intention -- my hope is

23  to be able to satisfy that a lot sooner than what that

24  straight-line division timeline would suggest.

25  Q     These are all methods and solutions that have been

R. Wells - Direct

1  previously offered to RLI, right?

2  A    I have not been party to those conversations myself, but I

3  have -- I have been made aware of the fact that many different

4  solutions have been proposed to RLI.

5         MS. JOHNSON:  Pass the witness.

6         THE COURT:  Okay.  I have a couple of questions

7  before cross-examination.

8         How long is it going to take to implement this

9  merchant direct -- next week merchant direct transfer out plan

10 that you have?

11        THE WITNESS:  With respect -- I do want to be

12 extremely clear with our terminology, because I do know that

13 there has been a lot of discussion of different databases,

14 softwares, etc.  The merchant account at the time being is

15 Fluid Pay.  That is separate from NetSuite.  So I just -- I

16 want to be crystal clear on that.

17        THE COURT:  Let me ask you this --

18        THE WITNESS:  But the essence --

19        THE COURT:  The question is:  How long is it going to

20 take to implement the merchant account?

21        THE WITNESS:  It's my understanding that it could be

22 fully functional within five days.

23        THE COURT:  Okay.  That's my first question.

24        My second question is this:  You have talked about

25 that being a hands-off process, correct?

                            R. Wells - Direct


 1              THE WITNESS:  Yes.

 2              THE COURT:  The process now that has gone on for the

 3    last month, I would take it that would be a hands-on process,

 4    correct?

 5              THE WITNESS:  Would you repeat that?  I want to be

 6    clear.

 7              THE COURT:  Yeah, over the last month, how has -- who

 8    has made the decision -- how has the decision been made to pay

 9    the 20 percent?

10              THE WITNESS:  It's been directly administered

11    through -- like Richard Moore has administered that directly;

12    however, I was able to go in with third-party verification

13    through bank statements, through the credit card receipts, and

14    confirm that those amounts actually went out.

15              THE COURT:  Yeah, because your testimony was:  I was

16    able to confirm these amounts went out.  So you weren't

17    involved in the decision -- in the determination on a daily

18    basis to pay that 20 percent?

19              THE WITNESS:  At that point in time, and since we're

20    at month four of my on-boarding into this role and taking over

21    many of these responsibilities, I have not been administering

22    that.  It's been really a tricky dance and balance of

23    priorities with getting these things compliant, getting

24    historic information in the database so that -- I mean,

25    honestly without the historic information, it becomes difficult

R. Wells - Direct

1   for me to -- difficult, but not impossible, for me to create a

2   track record that empowers the organization.

3          THE COURT:  All right.  So Mr. Moore has been looking

4   at the figures and saying, Pay this amount?

5          THE WITNESS:  Yes.  And I do -- would you mind if I

6   add something to this?

7          THE COURT:  Sure.  Go ahead.

8          THE WITNESS:  My intention after our -- after we

9   implement this -- if we do implement something like this, if

10  the opposing party is agreeable, would be to not only oversee

11  that these payments are being made, tie it back to what our

12  daily revenue is, but also take a look at that on a monthly

13  basis and reconcile it back to what our actual amount is,

14  because this is -- this is an extremely important matter.  And

15  this is one that I am very motivated to see that is fulfilled.

16  And I -- if I don't monitor that, which I would be negligent

17  not to -- without monitoring the fact that these payments are

18  actually made at the appropriate amount, and checking in on

19  that on a monthly basis as a course of our routine procedures,

20  that isn't what we're going for.  I want more structure in

21  place for that.  So in addition to checking in on the monthly

22  amounts that would go out tying that back to revenue, my

23  intention is to go back and verify the amounts that go out on a

24  monthly basis to ensure that this does get implemented the way

25  it should be.

R. Wells - Cross

1          THE COURT:  When it's done in a hands-off basis,

2   would it be 20 -- let's say somebody pays $500, okay?  It comes

3   into your income.  Would that 20 percent immediately come out

4   of that 500, or is it like a daily total, or something like

5   that?

6          THE WITNESS:  I am not -- with my experience in

7   general with merchant accounts and with funding from merchant

8   accounts, it does happen on a daily basis.  And especially with

9   something like this and with the number of transactions and

10  revenue transactions that come through from our participants,

11  it would be -- RLI would -- they would not be happy with

12  getting a part transaction 20 percent.  It would be just a

13  nightmare.

14         THE COURT:  It would be lots of little amounts.

15  Okay.  All right.  Thank you for that, Ms. Wells.

16         Let's see what cross-examination Ms. Katsantonis

17  might have.

18         MS. KATSANTONIS:  Thank you.

19         THE COURT:  If you're vaccinated, you can take your

20  mask off while speaking.

21         MS. KATSANTONIS:  Oh, sorry.  I am vaccinated.

22                    CROSS-EXAMINATION

23  BY MS. KATSANTONIS:

24  Q    You became the CFO of Nexus in April; is that correct?

25  A    It was the very end of April, yes.

                              R. Wells - Cross

1   Q    Very end.

2        So you've only been there for May, June, and July?

3   A    Correct.

4   Q    So three months?

5   A    Going on -- working on four.

6   Q    And who was the CFO prior to you?

7   A    That role really was in a state of transition.  It is my

8   understanding that the majority of the CFO responsibilities

9   fell on Richard Moore.

10  Q    And doesn't Richard Moore -- isn't he the person at Nexus

11  who directs all disbursements?

12  A    At this point in time, because I haven't been able to

13  establish a system of controls and documentation that I feel

14  comfortable with, yes, he has been doing that up until now.

15  That is -- my anticipation is that that's going to be changing

16  within the next two weeks.

17  Q    Ms. Wells, do you still maintain any affiliation with

18  Fusion CPA?

19  A    Not in a substantive capacity.  There were some -- like I

20  said before, there was an engagement that I had worked on with

21  Fusion when I rolled off of my consulting -- my contracting on

22  Nexus before where I believe for the most part that is wrapped

23  up, but that's been within the last two weeks.  So I hesitate

24  to say that I'm not going to get any further questions on that

25  engagement.

R. Wells - Cross

1  Q    And what affiliation do you have with Wells Tarkington,

2  LLC?

3  A    That was a firm that I had started as my own practice.

4  Q    Is that firm still in existence?

5  A    No.  Those clients dissolved.  They no longer were my

6  clients.  One was at the beginning of the year; another -- I

7  believe it was within Q1 of 2021.

8  Q    When you were at Fusion CPA, you worked on reconciling

9  Nexus's historical financial records for 2017; is that correct?

10 A    Correct.

11 Q    So did you do any work on '18, '19, or '20?

12 A    No.  I rolled off of that engagement before we moved on to

13 those phases of that accounting.

14 Q    All right.  And so at the time you left, were the

15 reconciliation efforts for 2017 complete?

16 A    They were in a state that allowed us to prepare the --

17 well, someone else on the team -- I did not do it -- but

18 someone else was able to prepare the tax return.

19 Q    Prepare the -- pardon?

20 A    Tax return.

21 Q    Okay.  And did you issue a compilation, review, or audit

22 report with your work?

23 A    No, I didn't.

24 Q    Okay.  And your affidavit states, to the best of your

25 recollection, Nexus accepted the outside consultant

194

R. Wells - Cross

1    recommendations.  What were they?  What were the

2    recommendations?

3    A    Oh, there were so many.  The one that I thought of

4    anecdotally when I was preparing for today was on day one, it

5    was something as simple as -- it was the day that I met them

6    face to face for the first time.  I think I had had a few

7    conversations with upper management at that point, but I was

8    just trying to diagnose where things were in their books.  And

9    one of the first things that I look at for any organization is

10   if they have been able to utilize like a cutoff date which

11   makes it so that any prior period accounting information is

12   password protected.  And the moment I recommended that we go

13   ahead and implement that, they jumped on it.  And it's just --

14   you know, it's been everything from expense reports,

15   documentation.  The other example that we mentioned earlier had

16   to do with the properties.

17   Q    Okay.

18   A    Those are just a few.  I'm sure there's more.

19   Q    So with regard to your affidavit, you would say the

20   decision was made by Nexus to move to NetSuite around late 2019

21   or early 2020?

22   A    I believe, yeah, that timeline makes sense.

23   Q    Where did you get that information from?

24   A    Where did I get the information that they were moving?

25   Q    That Nexus made the decision to move to NetSuite around

R. Wells - Cross

1   late 2019 or early 2020?

2   A    In my communication with my colleagues about the

3   engagement, we discussed that.

4   Q    What engagement?

5   A    The accounting engagement.

6   Q    For now in April of -- now, your current position?

7   A    No.  The engagement that I worked on that you had

8   mentioned before when I was contracting with Nexus was for the

9   2017 accounting period.  When I was working on that portion of

10  the engagement, that decision had -- they had started exploring

11  that as a possible best solution.

12  Q    We're almost two years later than late 2019 when that

13  decision was made.  Why -- why hasn't the Nexus accounts

14  migrated to NetSuite in those two years?

15  A    Well, I often compare implementations to building a house.

16  I make that comparison regardless of the organization that I am

17  referring to.

18  Q    Is it your contention that today -- it's true that today

19  they have not migrated their systems over to NetSuite, correct?

20  A    Not in a complete sense, and not in any -- not in -- what

21  is in NetSuite is not complete.

22  Q    And, in fact, you stated the records are inaccurate and

23  can't be relied on, right -- the records in NetSuite?

24  A    Yes.  With any normal accounting disclosure the whole

25  purpose of providing any reporting from that system which had

                              196

                         R. Wells - Cross

1   been disclosed was not to rely on for any management or

2   accounting decisions, but rather to show transparency into

3   where things were with that migration.

4   Q    So consistent with your affidavit, the profit and loss

5   statements or balance sheets, any of that financial data in

6   NetSuite is inaccurate at this point in time, correct?

7   A    In its current state, it is absolutely inaccurate.

8   Q    And you state that there are -- with regard to any other

9   records, that there is records that have yet to go through your

10  quality assurance procedures, right?

11  A    Without knowing which records -- would you mind pointing

12  me to the paragraph in the affidavit?

13  Q    I'm at the bottom of paragraph 16 of your affidavit.

14  A    Would you please repeat your question?

15  Q    Yes.  So with regard to NetSuite, you assert that there

16  are records that have yet to go through your quality assurance

17  procedures that have not been entered into NetSuite, right?

18  A    That is correct.

19  Q    And are those records source documents?  Would you refer

20  to them as source documents?

21  A    Well, that's a multilayered question.

22  Q    There's records that exist that are going to be

23  implemented in NetSuite, correct?

24  A    That is correct.

25  Q    And they have not, correct?

197

R. Wells - Cross

1    A    As of today, no, they have not.

2    Q    And have those records been provided to RLI, to your

3    knowledge?

4    A    To my knowledge, I believe most of them have.

5    Q    Which documents?

6    A    Bank statements, the profit and loss and other reporting

7    that we pulled from NetSuite with the disclosure.  It's the

8    paranoid accountant in me.  I have to maintain the disclosure

9    that those are not --

10   Q    Accurate --

11   A    -- for the purpose of reliance.

12   Q    And you state in your affidavit further that current

13   financial records depend on accurate historical financial

14   records, right?

15   A    That is correct.

16   Q    And that you're still waiting compilation of

17   reconciliation, correct?

18   A    I want to be very clear with the language in that

19   question.

20   Q    I'm reading directly from your affidavit.

21   A    Which --

22   Q    Paragraph 11.

23   A    Okay.  There we are.  I'm just looking at the context for

24   the use of the word "compilation," because I think --

25   Q    You said, "We are still waiting compilation of

198

R. Wells - Cross

1    reconciliation?"

2    A    With due respect, that says, "awaiting completion of

3    reconciliation."

4    Q    You're saying you need reconciliation of cash accounts,

5    right?

6    A    For the accounts that had activity from 2020 into 2021.

7    Q    Well, can't you determine what your cash balance is now by

8    just looking at the online banking portals?

9    A    Yes.

10   Q    And, in fact, that's what Nexus does on a daily basis,

11   right?  They use their online banking portals to determine

12   their cash, as well, in addition --

13   A    It is not ideal, but yes.

14   Q    And you look at Lightspeed also, correct?

15   A    Yes.

16   Q    Okay.  And isn't it true that the Fluid Pay that you were

17   just talking about with the judge, with regard to paying 20

18   percent from Fluid Pay, that's just credit card transactions,

19   correct?

20   A    Let me back up a second.  That is credit card

21   transactions, but it's my observation at this point in time

22   that those credit card transactions represent at least 85

23   percent of the total topline revenue for our participants.  And

24   that additional percentage that isn't included in there, that

25   is information that would be captured in my additional review

R. Wells - Cross

1  on a monthly basis to make sure that we're complying with it.

2  Q    So it is true that it doesn't capture other revenue

3  sources, correct?

4  A    A very small amount of -- and it isn't revenue sources.

5  It is payment method, which are completely different things.

6  Q    Payment method by a bond principal, right, by cash?  Do

7  you have an understanding of where the revenue of Nexus is

8  derived?

9  A    Yes, I do.

10 Q    Where is it -- from what source does Nexus derive revenue?

11 A    The bulk of our revenue comes from program payments from

12 our participants.

13 Q    Where else does either Nexus Services Homes or Libre by

14 Nexus derive revenue?

15 A    The bulk of your --

16        MS. JOHNSON:  Objection to the question.  I'm going

17 to ask that the questions be asked individually.  These are

18 different organizations, and it could be confusing to the

19 witness.

20  BY MS. KATSANTONIS:

21 Q    What is your understanding of where the bulk of the

22 revenues come from for the Nexus entities?

23 A    For the Nexus entities as a whole?

24 Q    Uh-huh.

25 A    The bulk of the revenue for the group of organizations

R. Wells - Cross

1  comes from Libre.

2  Q     And where does Libre derive its revenue from?

3  A     From program payments from participants.

4  Q     And where does Homes derive revenue?

5  A     It is my understanding at this point in time that Homes is

6  not affiliated.  We have made -- we have made great efforts

7  to -- to move the operation's revenue --

8  Q     That's not my question.  My question is:  Where does

9  Homes -- from what source does Homes derive revenue?

10 A     I am the CFO for Nexus Services, Inc.  And as such, I can

11 speak to revenue from organizations that are under the umbrella

12 of Nexus Services, Inc.

13 Q     Do you know -- do you know what sources of --

14            MS. JOHNSON:  Objection.  Beyond the personal

15 knowledge of the witness.

16  BY MS. KATSANTONIS:

17 Q     Do you know --

18            THE COURT:  Overruled.  She can answer if she knows.

19  BY MS. KATSANTONIS:

20 Q     Do you know what the source of revenues are to Homes?  Do

21 you have a general understanding?

22 A     Not any -- not enough of an understanding to speak to in

23 this context.

24 Q     So you're part of Nexus, you're the CFO, but you have no

25 understanding as to how Homes generates any revenue?

R. Wells - Cross

1  A      As of 2021, the operations for Homes was moved outside of

2  the Nexus umbrella.

3  Q      Weren't you part of the team that recommended moving Homes

4  out of Nexus Services?

5  A      That recommendation came most directly from the tax team.

6  Q      At Fusion?

7  A      Correct.  But that operates as a separate engagement from

8  the one that I was most closely --

9  Q      Does Homes receive revenues from rent payments for

10 properties?

11 A      Because that is an organization that is not in the Nexus

12 umbrella for 2021, I cannot speak intelligently to that

13 question.

14 Q      Okay.  Do you have an understanding as to whether or not

15 Nexus -- so you said that Nexus gets the bulk of its revenue

16 from program participants of Libre, right?

17 A      From program payments from participants.

18 Q      What other sources of revenue does Nexus get?

19 A      At this point in time, because those program payments

20 represent such a massive amount like percentage of our overall

21 revenue, that is the portion of our revenue that has most of my

22 attention and that I'm most interested in.

23 Q      So do you know of any other sources of revenue?

24 A      Only peripherally, but not to any extent that I feel

25 comfortable speaking to today.

                          R. Wells - Cross

1  Q     Well, what do you peripherally know?

2  A     You know, with all of the fires that we have going on with

3  this particular matter with the implementation, this has the

4  bulk of my attention.  I know from my -- from my experience and

5  from looking at our overall cash flow and our planning, that

6  because the program payments constitute such a massive

7  percentage of our revenue, I know that any additional cash

8  flow, it at least is not significant enough for me to rely on

9  it for massive projections.  Yes, it's something that I'm going

10 to have to get into the details of, but --

11 Q    Is it your testimony, sitting here today, that you don't

12 have -- that you cannot list any other source of revenue for

13 Libre or Nexus?

14 A     That statement is not correct, no, ma'am.

15 Q     Okay.  So what other sources of revenue can you identify?

16          MS. JOHNSON:  Your Honor, I'm just going to lodge an

17 objection again for the record.  This has been asked and

18 answered.  She does not have knowledge of that.  The

19 corporations I believe opposing counsel is digging into are not

20 associated with Nexus.  As far as income goes, I believe she's

21 testified to her full knowledge of what the income is.

22          THE COURT:  I'll overrule.  She may answer the

23 question.

24          THE WITNESS:  Would you please repeat the question?

25 BY MS. KATSANTONIS:

R. Wells - Cross

1   Q     What other sources of revenue are you aware of?

2   A     I am not aware enough of any other sources of revenue to

3   be able to speak intelligently towards them, beyond the fact

4   that they are -- from my examination and my knowledge, they are

5   not material.

6   Q     Well, I just want to know what they are.  I understand you

7   don't feel you have a big understanding of them, but what do

8   you know is a revenue source just generally?

9   A     I have told you what I know.

10  Q     Your testimony is you know of no other revenue source to

11  Libre or Nexus?

12  A     That's not my testimony.  I am aware of the fact that

13  there are other sources of revenue.

14  Q     Okay.  Is it your testimony you don't know of what those

15  sources are whatsoever?

16  A     That's not my testimony.

17  Q     Okay.  So please identify what sources you are aware of.

18  A     I am not -- I don't have enough details about those

19  sources of revenue to be able to intelligently speak about them

20  at this point in time.

21  Q     I didn't ask you -- I just want to know what you know.

22  You told me it's inaccurate to say that you can't identify any

23  other sources.  I've only asked you to identify those sources.

24  A     I cannot speak to that at this point in time.

25  Q     So you're refusing to respond?

R. Wells - Cross

1    A    It isn't that I'm refusing.  I simply do not have the

2    information to be able to respond to this question.

3    Q    You just said that you did.  I said it's not accurate

4    testimony to say that you have no knowledge whatsoever of any

5    other source of revenue, and you said that's not accurate.

6    A    Because I have knowledge that there are other sources of

7    income.  I have not -- I have not found that they are material

8    enough to --

9    Q    Right.  I just want to know what those sources are that

10   you have any awareness of.

11   A    I cannot answer that question.  I simply don't have enough

12   details about that to answer that question.  I apologize.

13   Q    So you have no -- you understand there is other sources of

14   revenue coming into Nexus and Libre, correct?

15   A    I'm aware enough of them to look out for them when it

16   comes up in the implementation.

17   Q    Okay.  So what are they?  What are you looking out for?

18   A    What would -- you know, the big -- I'm trying to think of

19   something to make this as specific as possible.

20        I feel very confident in saying that the bulk of our

21   revenue from my examination so far that is 99 percent of our

22   revenue is represented in the Libre payments.  It is something

23   that I'm looking out for as I go through and complete the

24   implementation.  And by looking out for it, I'm referring

25   specifically to when we show that there is a deposit in an

R. Wells - Cross

1    account for a segment of the organization that does not

2    typically generate a lot of revenue, at that point in time I

3    would look into that particular detail when I cross that

4    bridge, but I'm already swimming upstream with --

5    Q    Have you come across those kind of positive balances?

6    A    Positive balances?

7    Q    Or positive payments that you're looking into -- you had

8    to look into?

9    A    A deposit?

10   Q    A deposit.

11   A    No, I haven't come across that yet.  I haven't been able

12   to get into the details of it that much yet.

13   Q    You talked about these credit card payments.  Where are

14   the credit card payments derived?  Where is the merchant

15   account?  What merchant account do you reference with the

16   collection of credit card payments?

17   A    I believe our merchant account is currently held through

18   Fluid Pay right now.

19   Q    And does Fluid Pay have records of a compilation of credit

20   card payments and then -- that would show, then, the transfer

21   to a bank?

22   A    I have not -- I have not reviewed the reports that show

23   that specific detail through Fluid Pay directly.  I have been

24   able to trace approximate daily activity from our participants

25   and tie them out approximately to deposits that we receive.

R. Wells - Cross

1  Q     And where do you get that source data from the participant

2  payments?

3  A     When I'm comparing those two numbers, I'm getting the

4  participant --

5  Q     Yeah, I'm trying to identify where you're getting the

6  participant payment numbers from.

7  A     I'm getting the participant payment numbers from

8  Lightspeed, and I'm comparing them to deposits that come

9  through our checking account.

10 Q     Let me ask you:  Have you seen -- are you aware that

11 payments were made by Nexus to Think Global?

12 A     I'm -- I am aware of them, yes.

13 Q     And is it your understanding that Think Global is a TV

14 production company?

15 A     That is my understanding.

16 Q     And is it your understanding that those payments are for

17 video production services for a TV series where the Nexus

18 principals appear in?

19 A     That is my understanding, yes.

20 Q     And did you hear my statement earlier that I saw at least

21 approximately 221,000 in payments for Think Global from January

22 through June of 2021?

23 A     Oh, I missed that portion.

24 Q     Does that sound about right as to how much money has been

25 spent on Think Global?

R. Wells - Cross

1   A    I do not know.

2   Q    Do you know that there are another 90,000 in invoices to

3   Think Global just for the month of July?

4   A    I wasn't aware of that specific number for that period,

5   no.

6   Q    And do you know that these TV shows are streaming on a

7   platform called Unleashed?

8   A    I am aware of that, yes.

9   Q    And do you know, where are the revenues from Unleashed

10  captured?

11  A    Do you know, I haven't gotten into that level of detail

12  for that particular segment.

13  Q    So it's your testimony you don't know where that --

14  A    That is correct.

15  Q    And isn't -- on that platform, isn't there also the sale

16  of cell phones for $149?

17  A    I am not aware of that.

18  Q    A month?  You're not aware of that?

19  A    No, ma'am.

20  Q    And you don't know where those revenues go either,

21  correct?

22  A    Correct.  I don't know.

23  Q    And is it also true -- have you also seen the statement --

24  significant payments to Fixify and Fangistics?

25  A    I'm aware of some of the payments to Fixify.  I'm not as

R. Wells - Cross

1  familiar -- what was the name of the other vendor that you --

2  Q    Fangistics.

3  A    Fangistics, I'm not as familiar with that particular

4  vendor, so I can't speak to that one.

5  Q    Are you aware of the company Entlest?

6  A    Not closely.

7  Q    Are you aware it's a Richard Moore company?

8  A    I am aware of that, yes.

9  Q    And are you aware that the Fixify and Fangistics payments

10  go to a member of Entlest?

11  A    I'm not privy to the details of how that entity was set

12  up.

13  Q    And what about Executive Investigative Consultants,

14  Mr. Schneider, are you aware of payments to Executive

15  Investigative Consultants?

16  A    Not in any level of detail.

17  Q    And are you aware that Mr. Schneider has user access to

18  Stampli in the Nexus database?

19  A    I'm trying to recall.  I'm not -- I'm not exactly sure

20  how -- you want to know if I'm aware that --

21  Q    Do you know whether Mr. Schneider has user access to

22  Stampli?

23  A    I don't know that off the top of my head.

24  Q    It's possible?

25  A    It is possible.

                               R. Wells - Cross


 1              MS. JOHNSON:  Objection.  Speculation.

 2    BY MS. KATSANTONIS:

 3   Q    And are you aware of payments to SKDKnickerbocker for

 4   $248,000?

 5   A    No, I'm not.

 6   Q    Do you know -- do you know what SKDKnickerbocker does?

 7   A    No, I don't.

 8   Q    And is it Mr. Moore who makes and approves all these

 9   payments?

10   A    Up until this point in time, yes, he has.

11   Q    All right.  Let's talk briefly about these 20 percent

12   payments you talked about.  I just want to briefly show you --

13              MS. KATSANTONIS:  Your Honor, I'll just go through

14   two or three of these, so we can be brief.

15              THE COURT:  Has Ms. Wells's declaration been

16   admitted?

17              MS. JOHNSON:  Yes, Your Honor.

18              THE COURT:  It has?

19              MS. KATSANTONIS:  I don't think they moved for it.

20              MS. JOHNSON:  I did move it.  I offered it as Defense

21   1, and there was no objection by counsel.

22              THE COURT:  Do you have a copy of it?

23              THE CLERK:  I do not.

24    BY MS. KATSANTONIS:

25   Q    Ms. Wells, I'm showing you an exhibit.  It's an email from

R. Wells - Cross

1  Nexus Services, Richard Moore, to Mr. Harris.  And it purports

2  to be a Nexus Services, Inc. payment confirmation; do you see

3  that?

4  A    I do see that.

5  Q    Have you seen this document before?

6  A    This looks familiar.  I believe I have.

7  Q    Is Mr. Moore the person who generates this payment

8  confirmation sheet?

9  A    He is the one who generates it.

10 Q    So on this payment confirmation sheet it says that the

11 date of payment is July 8th, 2021, correct?

12 A    That is what the date of payment says on this.

13 Q    Right.  But the confirmation sheet was not provided to

14 Nexus till July 22nd, correct -- I mean, RLI?

15 A    Would you please restate that?

16 Q    If you look at the top of the email, Nexus Services

17 provided this, quote, receipt to RLI on July 22nd, correct?

18 A    That is this date, yes.

19 Q    And it purports to say that a payment was made on July

20 8th, right?

21 A    That is what this says, yes.

22 Q    And it says the payment amount is $18, right?

23 A    That is the amount on here.

24 Q    And it purports to say it's towards the 20 percent for

25 July 4th, correct?

R. Wells - Cross

1  A    Yes, that is what this says.

2  Q    And you were testifying through some records.  Based on

3  your records, when is your understanding that the $18 payment

4  was made?

5  A    It isn't necessarily -- my confirmation was that payment

6  was made on July the 8th.

7  Q    Based on -- what information are you basing that on?

8  A    Let me see.  On this particular instance I'm going by

9  memory, but my recollection is that on this particular instance

10 that payment was confirmed as an ACH.

11 Q    You don't have any records to show that, correct?

12 A    I don't have records, no.  I just have notes.

13 Q    And I'm going to hand you what was previously marked as

14 Grycz Deposition Exhibit 1.

15      Do you see, according to RLI, they didn't receive that ACH

16 transfer till July 22nd, correct?

17 A    I do see that based on RLI's records that they didn't

18 receive it until July 22nd.

19 Q    Okay.  And the July 22nd date matches the top of

20 Mr. Moore's email when he sent the confirmation, correct?

21 A    It does match that date.

22 Q    Okay.  And you have no -- you have brought no evidence

23 with you or no contemporaneous record to show the payment was

24 made on July 8th, correct?

25 A    Correct.  Yeah.  No, I haven't.

R. Wells - Cross

1   Q    All right.  Let's look at another one.

2               THE COURT:  Did you want to mark that last one as an

3   exhibit?

4               MS. KATSANTONIS:  Yes, Your Honor.  I'm going to mark

5   all of them.  I don't know whether you want to do a compilation

6   exhibit or one each.

7               THE COURT:  Let's do them one at a time.  That would

8   be Exhibit 3, the last one?

9               MS. KATSANTONIS:  Yes, Your Honor.

10              THE COURT:  Any objection to that?

11              MR. ANDERSON:  No, Your Honor.

12              THE COURT:  That's Exhibit 3.

13              This next one is Exhibit 4, marked for identification

14  Exhibit 4.

15              (Plaintiff's Exhibit 3 marked and admitted.)

16              (Plaintiff's Exhibit 4 marked.)

17   BY MS. KATSANTONIS:

18  Q    Okay.  This is again a payment confirmation email

19  generated by Nexus, right, by Mr. Moore?

20  A    It appears to be so, yes.

21  Q    And on this one it says it's being forwarded to counsel

22  for RLI on August 2nd, correct?

23  A    Please forgive me.  I'm having a hard time with all of the

24  different names, because I see Chris Harris, and it is not my

25  understanding that Mr. Harris was counsel.

R. Wells - Cross

1      Okay.  I apologize.

2  Q    No problem.

3      But it's being forwarded to RLI on August 2nd?

4  A    It's being forwarded to Mr. Harris on August 2nd.

5  Q    And in this receipt confirmation email it says the date of

6  payment was July 7th, 2021, right?

7  A    That is the date on this.

8  Q    So almost a month earlier, correct?

9  A    That is correct.

10 Q    Okay.  And the amount is $8,775, right?

11 A    That is the amount that's on this confirmation.

12 Q    And based on Mr. Grycz's document -- I just handed you

13 that summary sheet -- he says that RLI received the $8,775 on

14 August 2nd, right?

15 A    That is correct.

16 Q    And that matches the date that the receipt was sent to

17 RLI, correct?

18 A    That is correct.

19 Q    So -- and you have no records of that payment being made

20 on July 7th, correct?

21 A    No.  My notes were that that payment had been sent out on

22 July 28.

23 Q    Right.  So your notes say that the payment was sent out on

24 July 28th, not July 7th as indicated in this, quote,

25 confirmation generated by Nexus?

R. Wells - Cross

1  A    I also want to add that particular payment should be

2  verifiable on my -- on the exhibit for my declaration.  And you

3  should be able to see that according to our -- our records

4  that -- yeah, it went out on July -- what was it?

5  Q    28th is what you show, right?

6  A    Correct.

7  Q    And not July 7th as set forth in this confirmation,

8  correct?

9  A    Correct.

10 Q    And in fact, the receipt by RLI of August 2nd, which

11 matches when Mr. Moore sent the confirmation, that seems kind

12 of accurate from what you've been seeing when you talked about

13 ACH payments hitting maybe later, five days later; wasn't that

14 your testimony?

15 A    That was my testimony, and that was a ballpark guess.  And

16 these are two anecdotal instances.

17 Q    I can go through each one.  Do you want me to go through

18 another one?  I'm happy to.  Should we do one more?  Let's look

19 at --

20        THE COURT:  Counsel, I don't know what the point is.

21 I think you've made your point.  Let's move on.  I get this,

22 okay?

23        MS. KATSANTONIS:  Thank you, Your Honor.

24        THE COURT:  It's not lost on me.  I remember the days

25 early on in the litigation when they would make payments on

R. Wells - Cross

1   bond breaches and the checks would bounce, or they would

2   backdate things.  I mean, I remember all this.

3           MS. KATSANTONIS:  Thank you, Your Honor.

4           THE COURT:  They're classic slow payers.  That's part

5   of this whole thing.  You made your point on this.

6           MS. KATSANTONIS:  Thank you, Your Honor.

7           THE COURT:  This isn't like this has just happened in

8   June or July, okay?  We've been dealing with this issue since

9   2018.  And the Court is well aware of all the shenanigans that

10  have gone on in the past.  And the Court entered an order, and

11  the order has not been complied with.  The question is:  What

12  should be done about that?  That's the question, okay?

13          So let's see what other questions you have for

14  Ms. Wells.

15          MS. KATSANTONIS:  Your Honor, thank you.

16   BY MS. KATSANTONIS:

17  Q   Ms. Wells, isn't it true that with regard to any of the

18  purported, quote, 20 percent of revenues paid by Nexus to RLI

19  since the hearing of July 15th encompassed only payments for

20  eight days?

21  A   I apologize, would you please repeat your question?  I

22  didn't understand it.

23  Q   The payments that were made by Nexus to RLI that purported

24  to be 20 percent of daily revenue from July 15th until now,

25  isn't it true that there were eight payments that were made?

R. Wells - Cross

1  A    I don't have that knowledge in that way offhand.

2  Q    For eight days; only for July 4th, 5th, 6th, 7th, 8, 10,

3  11, 12?

4  A    I'm confused with the way that I'm hearing this question.

5  Maybe I'm misinterpreting this, but it sounded before like you

6  had asked about what the payments were after the July 15th

7  hearing, and then you're talking about payments that were

8  received early in the month before the hearing.  So I'm a

9  little confused.

10 Q    Well, you testified that there was 200-plus thousand in

11 payments made from Nexus, right?

12 A    Between July 1 and August 6.

13 Q    And you have no knowledge -- or you can't testify as to

14 what portion of that amount was for past due invoices paid to

15 RLI versus for collateral payments; is that correct?

16 A    Well, I'm leaving it up to RLI to manage their

17 accounting --

18 Q    No, I know.

19 A    -- and to manage their payment application.

20 Q    With regard to the $50,000 -- the 10,000, 10,000, 10,000

21 credit card payments -- do you have an understanding that when

22 Nexus made those payments, they tied it to a specific bond for

23 payment?

24 A    I understand they did that in order to be able to utilize

25 their credit card to pay it.

R. Wells - Cross

1  Q    So my question to you is, out of the 236,000 you testified

2  to, do you know what amount of that was similarly for specific

3  bond-breach payments?

4  A    It's my understanding that the only amounts that could

5  potentially be processed as such could be that $50,000.  But

6  like I said, I am not -- I'm leaving it up to RLI to apply

7  those payments.

8  Q    And do you know what other portion of the funds could

9  be -- could have been paid by Nexus as designated by Mr. Moore

10  for bond-breach invoices?

11  A    No, I'm not aware of that.

12  Q    And you testified that you were surprised, or that it was

13  inaccurate -- RLI's statement in its brief that as of the time

14  it filed the brief it only had received $9,282.60 in payments

15  since July 15th, right?

16  A    I don't remember if I used the word "surprised," but I

17  think the point is that --

18  Q    And looking at -- well, we just saw, for example, the July

19  28th payment of $8,775 that you reported as being paid on July

20  28th.

21  A    Which payment are you referring to again?  I'm sorry.

22  Q    The $8,775, the exhibit I just put in front of you from

23  Mr. Moore.

24  A    What's your question about it?

25  Q    In making that testimony, you're including, for example,

218

R. Wells - Cross

1  the $8,775 as payments made in July, right?

2  A    Yes, because from our perspective those funds left our

3  account on the 28th of July.

4  Q    But you don't know -- you have no information to contest

5  the fact that RLI did not receive that payment until August

6  2nd, correct?

7  A    Well, let's see.  Any information that I have about how

8  long it takes to process an ACH is just general rule of thumb.

9  Q    Well, you have Mr. Moore's payment confirmation sheet.  It

10 wasn't forwarded to RLI till August 2nd, right?  It's right in

11 front of you.

12 A    Right.

13 Q    So you have no reason to dispute that RLI didn't receive

14 that payment until August 2nd, right?

15 A    No, but that is a side of the transaction that I am not

16 privy to.  I am privy to when the funds leave our account

17 and --

18 Q    And the same holds true with any other payment; you don't

19 know the date RLI received those payments, correct?

20 A    I am not in the RLI accounting department.  And so no, I

21 am not privy to that information.

22 Q    You testified that there were -- that there is difficulty

23 making payments when there were reviews of the data system?

24 A    By reviews are you referring to the bilateral reviews?

25 Q    Right.

R. Wells - Cross

1  A    That is correct.

2  Q    And didn't you testify that there were payments made on

3  July 30th?

4  A    Yes.

5  Q    And do you understand there was a bilateral review on July

6  30th?

7  A    I did not recollect that specific date off the top of my

8  head, but I'm --

9  Q    Okay.  And are you aware that RLI advised that there is a

10 $75,000 cap per transaction for credit card payment?

11 A    75,000?

12 Q    Right.

13 A    I am not aware of that advice from RLI, no.

14 Q    Where did you -- strike that.

15        MS. KATSANTONIS:  I have nothing further.

16        THE COURT:  Thank you, Ms. Katsantonis.  Do you want

17 to introduce this one as 4?

18        MS. KATSANTONIS:  Yes, Your Honor.

19        THE COURT:  It will be so received.

20        (Plaintiff's Exhibit 4 admitted.)

21        Ms. Johnson, do you have any follow-up for your

22 witness, Ms. Wells?

23        MS. JOHNSON:  Yes, I do, Your Honor.

24        THE COURT:  We'll do that.  Then we'll take a brief

25 facilities recess, and then we will see what other evidence the

R. Wells - Redirect

1  parties want to put on.  Go ahead.

2         MS. JOHNSON:  Thank you.

3                      REDIRECT EXAMINATION

4   BY MS. JOHNSON:

5  Q    Ms. Wells, is it true that just because payment is

6  initiated on a date, that it could be received on another date?

7  A    I'm sorry, I didn't understand the last part of your

8  question.  Would you please repeat that?

9  Q    Just because there is a receipt sent for a payment, does

10 that necessarily mean that that's the date the payment gets

11 out?

12 A    That is correct.  Up until this point, these receipts have

13 been created manually.  And anything that's created manually is

14 subject to error.

15 Q    Okay.  So would the July 7th, then -- I believe it was

16 what we were harping on -- was that an error?

17 A    Is the -- which one, the 8,775?

18 Q    Yes, ma'am.

19 A    I did not -- I'm reviewing this documentation after the

20 fact.  I can't speak to whether it was an error or not.

21 Q    You were asked a number of questions by opposing counsel

22 with regard to other entities not connected to Nexus.  Do you

23 have knowledge that, for example, Homes is not connected to

24 Nexus?

25 A    I do have knowledge that Homes is not.

R. Wells - Redirect

1  Q    Okay.  And what about this Executive Investigation

2  company, is that under Nexus's umbrella?

3  A    No, it is not.

4  Q    And what about Global -- there was reference as to

5  Global -- is that under Nexus's umbrella?

6  A    No, it is not.

7  Q    Is that something that can be classified as a public

8  relations firm?

9  A    Would you repeat that?

10  Q    What is Global classified?  Is it a public relations firm?

11  A    It's my understanding that Global is a production company.

12  Q    So is that a form of marketing?

13  A    No.  That has more to do with the production of media,

14  production in the terms of motion picture or --

15  Q    Okay.  But it's not connected with Nexus Services is the

16  point?

17  A    That's correct.  It is not.

18  Q    Okay.  Now, with regards to the payment solutions offered,

19  you're offering to the Court that a solution to this business

20  issue is to have direct payments go out with a hands-off

21  approach, correct?

22  A    Would you repeat that question?  There was some there that

23  cut out.  Sorry.

24  Q    So you were mentioning earlier a solution to this Court to

25  ensure consistent payment, correct?

222

R. Wells - Redirect

1   A     Correct.

2   Q     Okay.  And that would be -- because the Court is looking

3   for a solution today.  And that would be the daily transfers?

4   A     Would you repeat the last part of that, please?

5   Q     That would be the daily transfers?

6   A     The daily funding from the merchant account, yes.

7   Q     Okay.  Perfect.  Perfect.  Now, with regard to the overall

8   health of the company, would this be one solution which would

9   ensure the overall health of the company?

10  A     I'm sorry, would you repeat that question?  It cut out.

11  Q     Would this solution that's being offered from a financial

12  perspective on your end, would that preserve the health of

13  Nexus Service?

14  A     In a sense, yes, it would, to the extent that we would be

15  able to maintain the autonomy to make some of these business

16  and strategic decisions.

17            MS. JOHNSON:  I'll pass the witness.

18            THE COURT:  Okay.  Any additional questions for

19  Ms. Wells?

20            MS. KATSANTONIS:  No, Your Honor.

21            THE COURT:  Thank you, Ms. Wells.  Appreciate it.

22            We're going to take a ten-minute facilities recess.

23  Then we'll see what additional witnesses you have,

24  Mr. Anderson.  We'll stand in recess for about ten minutes.

25            (Whereupon, a recess was taken.)

M. Donovan - Direct

1          THE COURT:  Call your next witness.

2          MR. ANDERSON:  Thank you, Your Honor.  I believe he's

3   on the Zoom call; the defense would like to call Michael

4   Moore -- or excuse me, Michael Donovan.

5          THE CLERK:  Who are you calling?  I'm sorry.

6          MR. ANDERSON:  Michael Donovan.

7          THE CLERK:  I don't see his video on.  There you are.

8   His camera wasn't on yet.  There you are.

9          Do you want me to swear him in?

10          THE COURT:  Yes, swear him in, please.

11          MICHAEL DONOVAN, DEFENSE WITNESS, SWORN

12                    DIRECT EXAMINATION

13   BY MR. ANDERSON:

14   Q    Michael, you have heard a lot of testimony today.  And

15   you've testified in these matters here before.  The issue we're

16   here today to discuss is what we do going forward.

17       Why haven't you made payments up until most recently the

18   June and July dates?

19   A    Thank you.  And I wanted to start by apologizing to the

20   Court if there is any inference or -- (inaudible).

21          THE REPORTER:  I'm sorry, I'm having trouble hearing.

22          MR. ANDERSON:  Mike, if you could speak a little

23   clearer or perhaps closer to your microphone.

24          THE COURT:  And if the other two folks on the call

25   could please mute your Zoom; that way the connection with

M. Donovan - Direct

1    Mr. Donovan might be a little better, because I had a hard time

2    understanding what he said.

3              THE WITNESS:  I'm sorry, Your Honor.  Is this any

4    better?

5              THE COURT:  Yes.

6              THE WITNESS:  Okay.  Perfect.  First of all, I wanted

7    to apologize to the Court.  I don't want the Court to think

8    that I disrespected or that I have contempt for it.  I -- when

9    we got the judgment in this, we were in the middle of a

10   pandemic.  Our revenues had sharply -- not just because of the

11   pandemic, but because of the -- before that because of the

12   Trump Administration's immigration policies.  Our -- it's

13   important to note, Mr. Anderson, our monthly revenues were

14   $4 million.  So it is a significant amount less than that.

15   Most companies are not able to survive a revenue fall that

16   fast.

17             THE REPORTER:  I'm sorry, I'm having trouble hearing.

18   It's fading in and out.

19    BY MR. ANDERSON:

20   Q    Mike, as you're rocking back and forth --

21   A    I'm so sorry.

22   Q    -- you're coming in and out.  So if you could maybe lean

23   in.  I think we maybe missed the last 30 seconds of what you

24   said.

25   A    Sure.  It's an awkward way to sit.  Can you hear me?

M. Donovan - Direct

1  Q    Yes.

2  A    Perfect.  I think --

3           THE COURT:  The question was:  Why haven't you made

4  the payments before now?

5           THE WITNESS:  I understand.  So, Your Honor, when we

6  got the judgment, we did not have the money to make the 2.2

7  million.  And I told the lawyers that there was no way we could

8  do it.  We began to save money to start paying.  We wanted to

9  pay a portion of the collateral.  We also -- (inaudible).

10          THE COURT:  I'm sorry.  We can't understand what

11 you're saying.

12          THE WITNESS:  Okay.  So we wanted -- what we were

13 trying to do --

14          MR. ANDERSON:  Mike, do you have earbuds or an

15 earpiece you can put in?

16          THE WITNESS:  Yeah.  Can you give me just a minute?

17 I'm sorry.

18          THE COURT:  Sure.  Take your time.  This happens like

19 every Zoom call.

20          THE WITNESS:  I'm so sorry, Judge.  Seriously, I'm so

21 sorry.

22          THE COURT:  It's okay.

23          (Pause.)

24          THE WITNESS:  Mr. Anderson, I joined by phone.  I can

25 speak into my phone.  So if the Court will let me, I'll mute my

M. Donovan - Direct

1    mic.

2          MR. ANDERSON:  We'll give you a second to connect

3    through your phone.

4          THE WITNESS:  It's connecting.

5          THE CLERK:  Give me one second to admit you.  It's

6    going to be a huge echo.  So the second that I admit your

7    phone, make sure you mute, please.

8          THE WITNESS:  Thank you so much.

9          THE CLERK:  Can you hear me okay?

10          THE WITNESS:  I can hear you.  Can you hear me?

11          THE CLERK:  Yes.

12          THE WITNESS:  Okay.  So the question was, why haven't

13    we paid?  And as I was saying, we knew that we were going to

14    have an issue making the payment of the 2.2 million.  It was

15    Christmastime.  We had just had several staffing reductions.  I

16    was trying to put money aside for RLI to pay down the NTDs,

17    first of all, and then to do the collateral.  On Christmas

18    Eve -- a couple of weeks before Christmas we notified RLI that

19    we would be making payments.  RLI -- we sent -- I think we sent

20    RLI a copy of one of the checks and -- (inaudible).

21          THE REPORTER:  I'm sorry.

22          THE CLERK:  Mr. Donovan, I'm sorry.  So as you're

23    moving around and moving the phone, you're coming in and out on

24    your audio.  I'm so sorry, but it's hard for the court reporter

25    to get a good record.

M. Donovan - Direct

1          THE WITNESS:  No.  No.  I'm the one who is sorry, and

2   hopefully this is better.

3          THE CLERK:  Thank you.

4          THE WITNESS:  Thank you.

5          So on December 24th, we had two accounts.  That is

6   also a payroll day.  So that's the day we -- that's the payroll

7   we weren't able to make because RLI had capsized our accounts.

8             Now, in the middle of a pandemic and with all the

9   other litigation we have going on, going from four million to

10  one million a month is difficult.  But going from four million

11  to one million, and then having hundreds of thousands of

12  dollars seized after you've made the payments is impossible.

13  And so we -- we very nearly went out of business.  I mean, we

14  lost all of our operating money in an instant.  I'm happy and

15  proud of my team that we're still here.  And we are --

16  (inaudible) -- an opportunity to grow our business once again,

17  and we're doing that.  But there was a real low, and this

18  unfortunately coincides around that timing.

19             I am committed to -- I believe in the rule of law.  I

20  believe in civil rights.  I fight for them.  I believe in the

21  power of the federal courts.  I seek redress in them.  So I

22  obviously believe in following a court order.  And the most

23  important thing I can do right now is to get this paid.

24             So we hired a CFO who isn't just a new person, but

25  someone who had worked with us in the past.  And I said, I want

228

M. Donovan - Direct

1   you to take this all over, pick your systems, pull the systems,

2   and let's go.  We have an opportunity legitimately with a 20

3   percent revenue to finish this injunctive relief demand within

4   ten months.  I want to do that.  I want to comply with the

5   court order, just like I wanted to comply with the court order

6   when I brought FCS to the table.  And the judge may remember

7   RLI didn't like FCS because they weren't A+ rated, but they're

8   Treasury listed.  And as Magistrate Judge Ballou can attest

9   to -- he was on the call -- RLI never called them back.  So I

10  brought them a replacement surety.  They wouldn't deal with

11  that.

12         The one thing I would say that I hope the Court will

13  consider is if the Court is considering the appointment of a

14  receiver, to please consider first ordering RLI with perhaps

15  the Special Master or perhaps Magistrate Judge Ballou, to

16  actually go through the process of attempting to allow us to

17  replace the surety, because I have a surety company ready to

18  go.  And they -- they have -- and you heard it from Mr. Grycz

19  in the November/October hearing -- November hearing.  He had

20  concerns about whether FCS or American had a proper credit

21  rating with AM Best.  The government bases who it works on --

22  federal surety based on whether they're on the Treasury list.

23  And this company was.  So if the Court -- and this is why I'm

24  so concerned.  I get why the Court is mad at me.  If I were the

25  Court, I'd be mad at me too, because outside of understanding

M. Donovan - Direct

1  the specifics of what's going on, it does look disrespectful.

2  But I'm afraid the Court doesn't see the attempts that I have

3  made.  We brought a new surety to the table not once, but

4  twice, and they refused to work with them.  I offered them

5  deeds of trust on all of the properties that I own with my

6  partner and LLC.  I said, You know what?  You know, they wanted

7  all the information about the properties.  I said, Good.  I'll

8  give you more than information on the properties; I'll give you

9  deeds of trust on the properties.  And by the way, that's

10 almost $2 million.  And they said, No, they're worthless.

11 Well, they weren't worthless when you spent $50,000 of my money

12 to go after them.  I'm offering you a deed of trust.

13         So I'm just concerned.  I mean, I -- I'm prepared to

14 commit 20 percent of our topline revenue.  I'm prepared to give

15 Mr. Peroutka access to our CFO -- RLI access to our CFO, but

16 they have to be willing -- when we talk about frustrating

17 payments, that's just the beginning.  They frustrated our

18 attempt to provide an alternative surety.  They frustrated our

19 attempt to provide other types of collateral.  So if we're

20 really talking about a receiver, first we need to talk about

21 forcing RLI to allow us to replace them, because I would be

22 thrilled to replace RLI at this point, as you can imagine.

23         Long answer.  Sorry.

24  BY MR. ANDERSON:

25 Q    In terms of moving into if we -- if the judge were to

M. Donovan - Direct

1  order a receiver, you've stated in the past that you have other

2  sureties.  How would those other sureties react, primarily

3  focused on your other bond principals?

4  A    So we have -- with most sureties, we have a general

5  indemnity agreement like we did with RLI, like with American,

6  for example.  So one agreement covers all of our work.  But

7  with other sureties, like FCS, we have agreements per

8  individual.  And those bond agreements are specific in that

9  they have a solvency clause for the indemnitor.  And so if the

10 agent of the company believes that the indemnitor cannot stand

11 behind its bonds anymore, then they expressly reserve the right

12 to cancel the bond and remand the party.  I have reached out to

13 find out what a receivership would look like, and I -- you

14 know, I think at least one of the companies will consider it an

15 act of insolvency, and they will probably -- not probably; they

16 will take negative action against immigrants.  Will they be

17 able to lock up 10,000 immigrants?  No.  Probably not.  They'll

18 have to get the permission from the manager of the local

19 immigration office.  So maybe they get permission five out of

20 ten times, and 5,000 people get -- it's a terrifying thing.

21      And by the way -- and Mr. Anderson, it's important you

22 understand -- this argument is meaningless.  There is no

23 justification to violating a court order.  To come into this

24 Court and say, I have a right to violate a court order because

25 I'm helping these people is stupid.  That's not what I'm

M. Donovan - Direct

 1  saying.  What I am saying is that a unique series of

 2  circumstances -- some this Court is very aware of because the

 3  entire world is, and some not so much -- we went into an

 4  incredibly difficult time as a company, and we almost expired.

 5  We didn't.  We lived to find another day.  And you know why we

 6  lived to find another day?  Because of the client's --

 7  (inaudible).

 8          THE REPORTER:  I'm sorry, you need to slow down a

 9  little bit, and I'm having trouble hearing you.

10          THE WITNESS:  I'm so sorry.  So we knew that we

11  needed to find a solution, and I think we did.  We are in a

12  place now where our revenues are growing slowly, but they're

13  growing.  And I think that we are in a place where we can

14  finish.  We came into this court order within ten months.  I

15  would like to do it today.  And Judge, I promise you, as much

16  as I love coming to see you, I do not like this, and I would

17  pay it in a heartbeat, if I could, to avoid a hearing like

18  this.  I don't have that money together, but I do -- and I

19  think we've proven it -- 20 percent daily will get us there.

20  And if Your Honor could -- it's just -- it's -- you can't --

21  you can't send somebody a check, and then they seize the money

22  in your account, and then they cash your check, and they run to

23  the court and say you bounced a check.  Now, how am I supposed

24  to -- when you talk about difficulty in facilitating payments,

25  yes, we've had difficulty facilitating payments.  If the Court

M. Donovan - Direct

1    would lean on RLI to accept our 20 percent daily, then we will

2    no longer have any issue with payments, and RLI will no longer

3    have issue with payments.  And as our revenues grow, Judge, so

4    will those payments.  And it could be decidedly less than ten

5    months if our revenue continues to grow.  But based on a static

6    revenue, we should get it done in ten months.  And I think

7    that, given the circumstances that led to the first several

8    months of noncompliance, as I've explained -- and I apologize

9    for it -- right now we have an opportunity to accomplish this.

10   And the Court can help us because we need the help.

11          You know, when we -- the Court often says, Nexus is

12   hiding things; Nexus is obfuscating.  And I get that, because

13   this whole litigation started because I wouldn't give them

14   records, right?  I didn't give them records because I thought

15   they were going to leak the information.  I didn't think it was

16   going to be secure.  And specifically, I thought they were

17   going to go try to round up their bond principals.  They did

18   not do that.  And Your Honor predicted that they wouldn't do

19   it, and they didn't do it.  You were right.  But we have had

20   multiple issues with the protective order violations.  I

21   oftentimes think that I would have been better off if I had

22   just given it all to them and then sued them when they messed

23   up.  And so I do have regrets in this case, big ones.  But at

24   the end of the day, I have a judgment.  It's on appeal.  I'm

25   going to pay it.  If I win the appeal, they'll give me my money

M. Donovan - Direct

1   back.  And at this point I just want to be able to make the

2   payments without having to fight against the people I'm paying

3   to be able to pay them.

4   Q    Mike, let's get back on track in terms of the payment plan

5   going forward.  Can you explain that in better detail so the

6   Court understands what you're proposing?

7   A    Yeah.  So we have a merchant account deposit.  And that

8   merchant account deposit is the majority of our revenue.  I

9   think that Rebecca might have gotten -- and she was answering

10  some questions from opposing counsel.  She had talked about

11  program payments.  Program payments are the majority of our

12  revenue.  That's from Libre by Nexus.  We also have new client

13  payments.  That's a much smaller amount of revenue because the

14  number of new clients has been smaller.  There is a processing

15  fee payment.  These are all from Libre clients, but -- and it's

16  Libre revenue.  But they're listed differently.  So all of that

17  would be captured in the deposit.

18       And now to Ms. Katsantonis's point:  It is only stuff

19  that's run by credit card.  But we are -- you know, almost all

20  of our transactions are run by credit card.  And I'm happy to

21  have Ms. Wells total our cash and money order transactions on a

22  weekly basis and up the amount at the end of the week to match

23  the 20 percent, because I want to be -- that would add a little

24  bit of hands on, but it would still give 30 deposits a month

25  where they don't have to worry about it and they're getting the

M. Donovan - Direct

1  money.  And then the Court doesn't have to worry about

2  compliance, because the money is going to them on a daily

3  basis.  If we make more money, they get more money, and it's

4  automatic.  We can't even stop it, because once we give them

5  access to this account, we can't -- we would -- I would have to

6  change the percent, which RLI would know.  So if we had a high

7  revenue day, it's not like I could modify the numbers or any

8  other thing they might think I'll do.  So this is -- they might

9  not realize it; this is a fantastic solution for them if they

10 really want me to satisfy the judgment and their true goal

11 isn't receivership.  If they really want the judgment

12 satisfied, this is the way to do it.

13      And we've demonstrated we could get it done.  We

14 demonstrated -- I told my team, work -- make sure that we get

15 compliance.  And it felt like between July 15th and now we've

16 been fighting with RLI to be able to be compliant.  It's

17 frustrating.  The payment thing would be so easy.  I was

18 shocked when they wouldn't do it.  And I hope we can do it,

19 because I think that's the way to get it done.  And honestly,

20 it's more efficient than a receiver.  You're going to have

21 someone come in who doesn't know this business.  They're going

22 to have to learn this business.  They're going to have

23 sureties, rescinding contracts, and suing us.  And the chances

24 of our company surviving that are about as much as our company

25 surviving December.  We survived December, but I'm concerned.

M. Donovan - Direct

1    So I think that this is the right -- but I do believe the

2  daily deposit is the right way to go.  I think it's the best

3  way to be able to give RLI the confidence that they're going to

4  get the payments, and give the Court the confidence that this

5  order is going to be satisfied.

6  Q    Mike, earlier today we had discussed the topic of

7  garnishments.  To your knowledge, have there been any

8  additional garnishments made this month in particular?

9  A    Yeah, I was really surprised.  About 30 minutes ago I got

10  a service -- a notice of service of process for my registered

11  agent.  And RLI filed a garnishment last week which was just

12  served today.  I thought that was odd, because I believe they

13  testified that they haven't garnished since May, but I have a

14  garnishment for American Bank today.  That was served on me

15  today.

16  Q    Is there anything else you'd like to add to the

17  proceedings today?

18  A    Only that I would say that I have a great deal of respect

19  for this Court, and I particularly have a great deal of respect

20  for this -- for you, Judge Urbanski.  I remember a particular

21  civil rights case.  But you -- I think you're fair.  I think

22  that you're intense.  I think that you're serious.  I hope that

23  you understand I'm being serious, too.  I want to resolve this.

24  I want to get out of business with RLI, to be honest with you.

25  And I would ask you to help me do that.  Help me.  And look,

M. Donovan - Direct

1   Judge, give me 30 days and tell them they have to cooperate.

2       If I could just say this:  When we came up to the issue

3   of -- of the -- when we -- hold on one second, guys.  I need to

4   get a drink of water.  I'm sorry.

5       Sorry.  Okay.  So when we came up with the idea of getting

6   a new surety, I spoke to several sureties.  They told me that

7   RLI would have to identify the book of business, request that

8   the government authorize a transfer of that book of business,

9   and identify to the government the name of the surety that's

10  authorized for the transfer.  At that point the government then

11  begins to speak to the party that has nothing to do with those

12  bonds.

13      RLI demanded -- and Your Honor can go back to Judge Ballou

14  to confirm this -- RLI demanded that we -- or not we, that the

15  new surety contact ICE to get approval for the bond transfer.

16  Now, Your Honor, how could they do that?  They're not their

17  bonds.  They don't have any way of identifying the bonds, other

18  than the name of an indemnitor and the name of an insurance

19  company.  And no DHS person is going to give them -- is going

20  to do anything with that.

21      So what RLI needs to do is RLI needs to call and let the

22  government know that they've approved the transfer of this book

23  of business.  I will get the new surety to evaluate the book of

24  business.  And something tells me that any of the sureties we

25  work with would jump up and down for 20 percent of our daily

                          237

                    M. Donovan - Cross

 1   revenue, don't you think?  So I don't think I have a problem

 2   getting this done, and I have two sureties that are interested.

 3   But they are not going to commit until they can evaluate the

 4   book of business.  And when RLI refuses to even identify it,

 5   what do you think that does to a potential surety?  It doesn't

 6   give them confidence.  I had the president -- or the vice

 7   president of American Surety tell me that he couldn't do it

 8   anymore because he was concerned that after they transferred

 9   liability, notices might actually be -- accidentally be sent to

10   RLI.  And given the fact that they won't even identify the book

11   of business, he doesn't believe that they would share

12   information with him, and that created a risk concern.

13        They're actively working against my ability to do this,

14   Judge.  And I don't know if that's on accident or on purpose.

15   But I do think that every single person in this courtroom,

16   whether they know it or not, would be slightly better in life

17   if these two companies didn't do business together anymore.

18             MR. ANDERSON:  Well, on that note, Michael, I'll turn

19   it over to Ms. Katsantonis for cross-examination.

20                       CROSS-EXAMINATION

21    BY MS. KATSANTONIS:

22   Q    Good afternoon, Mr. Donovan.

23             THE COURT:  Mr. Anderson, I forgot to ask you -- you

24   took your mask off -- are you vaccinated as well?

25             MR. ANDERSON:  Yes, sir.

M. Donovan - Cross

1          THE COURT:  I've been meaning to ask everybody, and I

2  forgot.

3   BY MS. KATSANTONIS:

4  Q    Mr. Donovan, isn't it true that Nexus made no payments of

5  collateral on December 1st, 2020 to RLI?

6  A    Is it true that we did not make payments of collateral on

7  December 1st, 2020 to RLI; is that what you're asking?

8  Q    Right.  Isn't that true?

9  A    December -- I mean, I don't remember.  I don't have

10  encyclopedic knowledge of what happened in December, but I

11  could consult records.  I would have to.

12  Q    So do you -- is it your testimony that you don't know

13  whether or not Nexus made any payment to RLI for collateral in

14  December of 2020?

15  A    No.  Your question was on December 1st.

16  Q    Okay.  How about any time --

17  A    Your question was on December 1st.

18  Q    How about any time in December?

19  A    I know that we paid breaches, and we were beginning to

20  pay -- we had began the process of paying the NTDs.  We were

21  not at that point paying collateral, because we still had a

22  balance -- we had a balance in the NTDs, and I wanted to retire

23  that first.

24  Q    Are you talking -- when you say NTDs, you're talking

25  invoice payments for past due bond breaches?

M. Donovan - Cross

1    A    Those, as you know, we've always been paying.   In

2    December, I marked NTDs for payment.   These were part of the

3    order I guess under A.2 -- which, you know, has been further

4    delineated under A.2, which was the payment for collateral.

5    Q    What payments did you make in December of 2020

6    specifically?

7    A    Well, we told you that when we sent you the check -- when

8    we sent you the first check, you seized the money in the

9    account.   So I will -- and I'm not sure which -- which client

10   that was, but I can certainly find out and get it to you.   But

11   we sent you a check.   It may have been a breach -- it may have

12   been a breach -- it may have been an NTD.   I'm not sure.   But

13   we had planned to pay something on the order of like $180,000,

14   and we ended up having $300,000 taken out of our account.   And

15   one of the checks that we sent, you guys tried to cash.

16   Q    Mr. Donovan, have you seen the Special Master reports in

17   this case?

18   A    I have.

19   Q    And the Special Master reported in one of its earlier

20   reports that Nexus did not make any collateral payments until

21   May 27th of 2021 in the amount of $4,500.   Did you see that?

22   A    Yeah, that's right.

23   Q    And Nexus did not contest that report, correct?

24   A    No.

25   Q    And Nexus made no collateral payments in June, correct?

M. Donovan - Cross

1   A    I assume that's true.  I know that we began in earnest in

2   July.

3   Q    In January, February, March, April, May, June of 2021, was

4   Nexus making payments to Think Global?

5   A    We began -- I don't remember exactly when we began making

6   payments to Think Global.  But yes, we did coordinate with

7   Think Global to do some of our media work, PR work, all of our

8   social media PR, which is most of our PR.

9   Q    And was Nexus making payments to Fixify Solutions?

10  A    Yes.  They're our IT department.  You may remember

11  Mr. Billings.  He's helped you on several of the bilateral

12  reviews.

13  Q    And was Nexus making payments to Fangistics?

14  A    I believe we have made payments to Fangistics, yes.

15  Q    What about Executive Investigation Consultants?

16  A    Yes.  They provide security for our campus, and so yes, of

17  course.

18  Q    And SKDKnickerbocker, were payments being made to them as

19  well?

20  A    Yes.  Now, that is where Think Global replaced --

21  SKDKnickerbocker and WYE were replaced by Think Global.  And

22  Think Global is actually a lot cheaper.

23  Q    And you made payments to WYE Communication as well,

24  correct?

25  A    That's the sister company to SKDKnickerbocker.

M. Donovan - Cross

1   Q    And with regard to properties -- you just made some

2   testimony -- did you ever identify specifically any properties

3   to RLI as potential collateral?

4   A    Well, of course.  I mean, RLI has our property list.  I

5   referred to the property list.  I've produced it ad nauseam.

6   You have referenced it in your filings.

7   Q    Are you referencing the property list that's the

8   properties in your balance sheets?

9   A    I'm referencing the property subject to the motion in

10  the -- the motion for -- the other motion for sanctions where

11  you have defined a list of properties that you say we own and

12  that we say -- or you say Nexus owns.  I pointed out to counsel

13  we had pulled a response to an Augusta County tax subpoena in

14  2016, and we were able to find the documents about those

15  properties.  I had told you that they were owned by LSE.  I

16  didn't --

17  Q    Mr. Donovan --

18       (Unreportable crosstalk).

19  A    -- as I indicated, I offered them for collateral.

20  Q    Mr. Donovan, do you have any document or anything where

21  you advised RLI of which real estate properties you were

22  willing to post as collateral?

23  A    Those conversations were handled by my counsel, Carl

24  Anderson, and you should probably ask him.  But let me make it

25  clear:  Any property that I have an interest in,

M. Donovan - Cross

1  Ms. Katsantonis, I will happily give the value of its equity to

2  your client in a deed of trust until such time as this is done.

3  Q    Are the properties in your balance sheet all listed as a

4  zero value?

5  A    Well, they're zero value to Nexus when we became aware --

6  I mean, so we had always put them -- we have -- we rent our --

7  Q    Just yes or no.  Mr. Donovan, just yes or no, in your

8  records that you've produced, don't you assign a value of zero

9  in your balance sheets for all of those properties?

10 A    I am not sure; but if we do, it is probably because they

11 are owned by LSE.  So they are of zero value to Nexus is what

12 I'm guessing that means.

13 Q    Do you maintain copies of all the RLI bonds?

14 A    Paper copies?

15 Q    One way or another, do you have a copy of all the bonds

16 issued by RLI on behalf of Nexus program participants?

17 A    What we have is in Capsule, and you have access to that

18 data.

19 Q    So you do have copies of the bonds, correct?

20 A    Only ones that are in Capsule, and you have access to that

21 data.  There is no room where we keep copies of bonds.

22 Q    And you have records of bond breaches and the status of

23 the bonds, correct?

24 A    No.  So we streamlined the way we handled this.  You may

25 remember from my testimony and deposition that I lugged like 20

M. Donovan - Cross

1    binders with me.  And after that we decided that we would never

2    do that again, and that the last thing I ever wanted to see in

3    my office was a room full of binders.  So we keep it now in a

4    shared spreadsheet, and it's electronic so that people can

5    access it anywhere.  Our breach managers can get it.  It's

6    easier.

7    Q    So you maintain information with regard to which bonds are

8    RLI bonds and the status of those bonds that you could provide

9    to any potential substitute surety, right?

10   A    It's actually not that easy.  So --

11   Q    I just want to know:  Do you have the records?

12   A    No.  No, we do not, ma'am.  We do not fully.  Not enough

13   to be able to give the government confidence to be able to

14   authorize a new surety, take a book of business.  That would be

15   required to happen from the surety that is relinquishing the

16   business.  It is the only one that can identify the four

17   corners of that business.

18   Q    And where is that information derived from?

19   A    Other than common sense, it is -- I mean, how would --

20   Q    You haven't --

21        (Unreportable crosstalk).

22   A    -- how would they have the ability to identify for the

23   government a book of business they do not own?  All you have to

24   do --

25   Q    You haven't --

M. Donovan - Cross

1        (Unreportable crosstalk).

2   A    -- the government --

3        (Unreportable crosstalk).

4   Q    Mr. Donovan, you know which bonds RLI issued, right?  And

5   you haven't spoken to DHS either, correct?

6   A    I want you to -- Ms. Katsantonis, think about what you're

7   saying.  Do I know all the bonds that RLI posted?  First of

8   all, of course not.  Secondly, I already told you that the

9   records that we have are not consistent enough.  There are some

10  tags on Capsule that weren't entered.  So no, I do not have it,

11  Ms. Katsantonis.

12  Q    Mr. --

13  A    I don't understand why your client just won't do it.

14  Q    Mr. Donovan --

15  A    What's so hard about it?

16  Q    Isn't the only entity that can cancel a bond the

17  Department of Homeland Security?

18  A    Of course.

19  Q    So no other surety can cancel a bond, correct?

20  A    But your GIA says I can replace the surety, and you well

21  know that --

22  Q    Mr. Donovan, I'm asking you a direct and specific question

23  only.

24  A    And I answered it directly.

25  Q    And then in the last six months from July 15th to August

M. Donovan - Cross

1   9th, isn't it true that Nexus only made payments for eight days

2   allegedly of receipts, correct?

3   A    No.  We paid 20 percent of our revenue.  And that is -- we

4   can get that laid out for the Court.  I believe it's in a

5   motion that was filed this morning.  I know the Court hasn't

6   had a chance to look at that.  We can certainly -- I can have

7   Mr. Anderson (inaudible).

8   Q    My question is, you only -- to the extent you forwarded

9   any payments from July 15th, they were -- number one, you

10  didn't identify what the revenue was per day in those payments,

11  correct?

12  A    I think that the -- but you have access to that on a daily

13  basis.  I don't understand.

14  Q    Mr. Donovan, isn't it true that the only payments made

15  from July 15th until yesterday were for eight days:  July 4th,

16  5th, 6th, 7th, 8th, 10th, 11th and 12th, totaling 56,000, that

17  were marked as 20 percent of revenue?

18  A    No.  I think what is happening, I'm guessing that's when

19  you're receiving the payments.  But these are ACH payments.

20  And it's important to understand -- Judge, yes, we missed

21  dates.  RLI knew we were going to miss dates because we told

22  them that every time we did a bilateral review, we had to shut

23  the finance system down.  Then they asked for three of them.

24  We can't send them out on the weekends, as Mr. Anderson

25  explained.  We are at 5:30 in a hearing about taking a company

M. Donovan - Cross

1  that serves immigrants and putting it into receivership.  And

2  the question isn't:  Did you pay 20 percent, but did you pay it

3  often enough?  There is nothing that will ever satisfy RLI.  So

4  please --

5  Q    You're backdating the payments, right, Mr. Donovan?

6  A    No.  What do you mean, backdating the payments?

7  Q    You're backdating --

8  A    Why would I do that?

9  Q    -- for receipts on July --

10 A    I don't -- Ms. Katsantonis, if I paid you 20 percent of my

11 revenue yesterday, I'd show up and say I did what I was

12 supposed to do.

13 Q    My question --

14 A    I do --

15      (Unreportable crosstalk.)

16      THE REPORTER:  I can only take one person at a time.

17      THE COURT:  I think I have heard enough about when

18 the payments were made, and how many payments were made, and

19 all of that, okay?  I have heard -- that is sort of at this

20 point beside the point, and the Court doesn't -- I mean, I know

21 what payments have been made.  Mr. St. Ours talked to me about

22 it.  We heard Ms. Wells talk about it.  We heard Mr. Grycz talk

23 about it.  I know what things have been paid, so we don't need

24 to argue about when they've been made and whether they were

25 made on the day they said they were.  All that is beside the

M. Donovan - Cross

 1  point.

 2         The real point here is:  What's the appropriate

 3  remedy for Nexus's failure to pay the collateral security as

 4  ordered by the Court?  That's the question.  What's the

 5  appropriate remedy?  And RLI is saying it must be a receiver or

 6  appoint an independent third party.  And Nexus is saying, hold

 7  on, we are committed to paying 20 percent of our -- of our

 8  revenue.  And so, that's where we are.  That's what's relevant.

 9  So let's stick to something that's relevant, Ms. Katsantonis.

10         THE WITNESS:  Oh, I thought that was a question I was

11  going to be able to respond to.

12         THE COURT:  No, that's not a question.  That's the

13  issue I'm dealing with.

14         THE WITNESS:  Gotcha.  I have an idea.

15         THE COURT:  What's your idea, Mr. Donovan?

16         THE WITNESS:  I believe that Your Honor said -- when

17  we started this hearing you said, How do I not hold the party

18  in contempt?  And I've been really thinking about that.  You

19  know, the reality is, what happened to us in December -- and I

20  literally didn't know if I was going -- if Nexus was going to

21  survive until March, April.  So when all that happened -- I

22  mean, none of it matters.  At the end of the day, I think that

23  the Court can find that -- you could hold me in contempt.  You

24  could hold Nexus in contempt and you could assess us a fine and

25  you could give us -- give them the attorneys' fees they're

M. Donovan - Cross

1    already going to get anyway, which doesn't really make any

2    sense.  But at the end of the day, I don't have a problem with

3    acknowledging that we have made a significant failure before

4    the Court, because we have.  And I don't have a problem

5    apologizing profusely and taking responsibility for it, because

6    at the end of the day everything is my responsibility in this

7    organization.  But I know that we've got a way out.  I think

8    that it's the right way out.  I think if Your Honor believes

9    that this is contemptuous conduct and that there should be a

10   finding of contempt, I understand.  And I'm saddened by that,

11   and I totally get it.  If that's the case, I ask Your Honor's

12   contempt penalty to not put the lives of hundreds of thousands

13   of immigrants -- or tens of thousands of immigrants at risk;

14   and more importantly, not capsize a company that will do more

15   harm than good not just to Nexus, but also to RLI, because RLI

16   has been enjoying the fact that Nexus has stood in front of it

17   for bond breaches for a very long period of time.  And that's

18   going to stop happening if a receiver is appointed and there's

19   an insolvency determination.  That doesn't help them, nor does

20   it help us.

21          So I'm hopeful that the Court will take this apology

22   and also understand that I'm willing to be held accountable and

23   do whatever needs to be done.  But Judge, we've got a solution

24   here.  We've proven it.  Let's implement it and let's get this

25   judgment retired, and then please also make them give me the

M. Donovan - Cross

1    opportunity for a new surety.  Give me 30 days and make them

2    identify their book of business.  Your Honor, that's not an

3    unreasonable request.

4              THE COURT:  Ms. Katsantonis -- thank you,

5    Mr. Donovan.

6              Ms. Katsantonis, what other additional questions do

7    you have for Mr. Donovan?

8     BY MS. KATSANTONIS:

9    Q    Mr. Donovan, isn't it true that if you made no payments to

10   Think Global, it would not affect the immigration business?

11   A    That is actually not true, no.  Think Global does a lot of

12   video work related to the immigrant community.  If you go to

13   our website, all the video access there, which include the

14   immigrants that were saved from the Trump deportation machine

15   are there.  In fact, we've done a new advent of digital media,

16   and we've been using that on Facebook for marketing purposes.

17   So I do actually count the increase in revenue directly to our

18   working with Think Global.

19   Q    Where --

20   A    Also I will tell you --

21   Q    -- are the revenues in Think Global realized?

22   A    Right.  It's realized in new clients.

23   Q    In where?

24   A    New clients.  So the marketing dollars then reach people

25   who need help, and then they acquire the services of Nexus,

M. Donovan - Cross

1  providing a new client and creating new revenue opportunity.

2  Now, I never think about --

3  Q    Are there payments made for people to your Unleashed

4  streamline platform?  Aren't there payments made so that

5  somebody could view -- is it $10 a month?

6  A    So Unleashed Entertainment does have a subscription

7  service and --

8  Q    And where are those revenues recorded?

9  A    They're recorded in that company, and they're not a lot.

10 It's a very -- it's a -- it's a -- it's a company -- we

11 launched it -- the business guy that I was working with

12 launched it as a subscriber platform, but we're actually moving

13 into an advertising base platform, because subscription

14 platforms are just very difficult to manage.  And our work is

15 much more focused on our marketing efforts.  So we're doing --

16 like, for example, Nexus's function is about our clients.  We

17 did a show about a guy named Ed Love [phonetic] in New York who

18 was in juvenile solitary confinement.  We sued and got New York

19 to have to let him out.  So we did --

20 Q    Mr. Donovan, aren't the invoices for the system sent to

21 Libre by Nexus and to you personally?

22 A    That's right, yeah.  "The System" is the show that we did

23 the highlight on Ed Love.  We have --

24 Q    And then there's NJWeedman, that's another show that's

25 billed to you, Libre by Nexus, right?

M. Donovan - Cross

1   A    Yeah.

2        (Unreportable crosstalk.)

3        I'm sorry, ma'am.

4            THE REPORTER:  I'm sorry, I didn't hear the question.

5   I'm going to need you both to speak one at a time because I

6   can't get you both at the same time.

7    BY MS. KATSANTONIS:

8   Q    So NJWeedman, that's another show that's being billed to

9   you for the production costs, right?

10  A    That is a show involving Edward Forchion, a Nexus client,

11  yes.

12  Q    And it's being billed to Libre by Nexus, correct?

13  A    It is a marketing opportunity, and we will receive

14  incredible -- and listen --

15  Q    And being -- I just want yes or no -- is "Being Zach Cruz"

16  another --

17  A    A Nexus client, yes.

18  Q    No.  It's another show that's being billed to --

19  A    That's right.

20  Q    -- Libre by Nexus?  And that's --

21  A    It's a show about --

22           THE REPORTER:  I'm sorry, one at a time, please.

23   BY MS. KATSANTONIS:

24  Q    That's a reality show of your and Mr. Moore's home life,

25  correct?

M. Donovan - Cross

1  A    No.  That's a reality show about a Nexus client, who also

2  happens to live in our home.  But it's important to understand

3  that the -- our marketing -- if you look at our marketing, if

4  you Google us, the only positive thing you ever see are stories

5  about our clients.  So one of the things I've learned over the

6  years of doing this is that from a marketing perspective, tell

7  your clients' stories.  Other people want to hear them.

8  They'll identify with it, and --

9  Q    Thank you, Mr. Donovan.

10  A    Of course.  Yes.

11        MS. KATSANTONIS:  Mr. Anderson, I don't know the

12  quick way, but we have some copies of invoices from "The

13  System" to Libre by Nexus to Mike Donovan.  Do you want to

14  stipulate that these came out of your records?

15        MR. ANDERSON:  Subject to verification, I have no

16  problem with stipulating.

17        THE COURT:  Do you want to mark those as an exhibit

18  that's been stipulated to, Ms. Katsantonis?  I think it would

19  be Number 5.

20        MS. KATSANTONIS:  Yes, Your Honor.

21        THE COURT:  Okay.  And what -- just tell me what

22  these are, if you will.

23        MS. KATSANTONIS:  These are some -- just a handful of

24  invoices from Think Global, who is the media production for

25  these reality TV shows.  And they're being billed to Libre by

M. Donovan - Cross

1   Nexus, and Mr. Donovan is being paid by Nexus.

2            THE COURT:  Thank you for that.  All right.  Go

3   ahead.

4            (Plaintiff's Exhibit 5 marked and admitted.)

5            MS. KATSANTONIS:  I have nothing further, Your Honor.

6            THE COURT:  Okay.  Mr. Anderson, any further

7   examination of your client, sir?

8            MR. ANDERSON:  No redirect, Your Honor.

9            THE COURT:  Okay.  Do you have any additional

10  evidence, Mr. Anderson?

11           MR. ANDERSON:  No, Your Honor.

12           THE COURT:  Okay.  Thank you all.  Does RLI have any

13  additional evidence that you would like to submit today?

14           MS. KATSANTONIS:  Your Honor, another document to

15  stipulate is the KPI report that shows the revenues as reported

16  by Nexus.

17           THE COURT:  I'm happy to receive that, if you want to

18  mark it as Exhibit 6, if the defendants are going to stipulate

19  to that.  If you don't want to, you don't have to.  But if they

20  want to put the KPI document in for revenues, Mr. Donovan has

21  already testified to it -- well, Ms. Wells testified to it.

22           MR. ANDERSON:  She testified to the KPI, Your Honor.

23           THE COURT:  She testified to KPI, but she testified

24  as to what the monthly revenue was, 1.2 million.

25           MR. ANDERSON:  Well, this is --

M. Donovan - Cross

1          THE COURT:  I don't know what this is.  You tell me

2   what this is and whether you're willing to stipulate to it.

3          MS. KATSANTONIS:  I'll ask -- let me ask Mr. Donovan

4   a few questions in that regard.

5    BY MS. KATSANTONIS:

6   Q    Mr. Donovan, does Nexus generate Libre by Nexus, a KPI

7   report?

8   A    We used to.

9   Q    And in the productions to RLI, has Nexus produced KPI

10  reports?

11  A    We have produced KPI reports, yes, when we use them.

12  Q    And do the KPI reports reflect, for example, for January

13  2021 revenue of 1,789,899 for the month of June?

14  A    I'm not looking at it, but I would assume that's probably

15  true.

16  Q    And February, 1,344,396?

17  A    Sounds right.

18  Q    March, 1 --

19         (Unreportable crosstalk).

20  A    Yeah, it's in the --

21         THE REPORTER:  I'm sorry, can you repeat the number?

22   BY MS. KATSANTONIS:

23  Q    1,603,926.

24  A    Sounds like that averages out to Rebecca's number.

25  Q    Do you have any reason to dispute that Nexus has received

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

 1  revenues from October '20 to today of approximately 16 million?

 2  A    I don't know off the top of my head, but I don't have any

 3  reason to think that you're lying about that.

 4         MS. KATSANTONIS:  I'm going to move for the admission

 5  of the KPI report, Your Honor.

 6         THE COURT:  Mr. Anderson, any objection?

 7         MR. ANDERSON:  No objection.

 8         THE COURT:  It will be received without objection as

 9  Plaintiff's Exhibit 6.  Thank you, Ms. Katsantonis.

10         (Plaintiff's Exhibit 6 marked and admitted.)

11         MS. KATSANTONIS:  Thank you, Your Honor.

12         THE COURT:  Okay.  Any additional evidence from RLI?

13         MS. KATSANTONIS:  I have nothing else, Your Honor.

14         THE COURT:  Okay.  Mr. Anderson, anything else from

15  you?

16         MR. ANDERSON:  No, nothing.

17         THE COURT:  Okay.  I have something else.  I have one

18  question -- one question.  And it's for RLI.  And here's the

19  question -- and it's just as obvious as the nose on my face,

20  which is pretty obvious -- if they are willing to pay you 20

21  percent of their revenues on a going-forward basis, what more

22  could a receiver do, except perhaps pose some problem for the

23  continued existence of the business?  What more could a

24  receiver do than pay you 20 percent of revenues?

25         MS. KATSANTONIS:  Your Honor, they -- Nexus through

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   these proceedings has provided zero evidence of its inability

2   to comply with the order.  They're asking this Court to modify

3   its order.  And I'm going to tell you I have many reasons as to

4   why that's not sufficient.  But they are asking this Court to

5   modify this order.  They have received $16 million since this

6   order.  They have held records from us.  They changed the

7   databases.  That is important, Your Honor, their lack of

8   forthrightness with regard to the books and records, because

9   they're hiding their money and they're hiding information from

10  us, okay?  And it's important because I showed Your Honor just

11  in Stampli that we were only allowed to sit with the Special

12  Master for a few hours.  And I did a sort.  I saw, just trying

13  to pick a couple of them off the top, $1.7 million paid in

14  January through June for unnecessary expenses, or to affiliated

15  companies, or insiders.

16          So absolutely no is the answer to that, Your Honor.

17  They have not provided evidence.  They have said -- you have no

18  evidence in this record whatsoever of an inability to pay.

19  They do not dispute that they received revenues of $16 million.

20  They do not dispute that they've made payments to all of these

21  other entities -- Think Global, etc.

22          And it reminded me of a case that I had seen, which

23  was *SEC versus Bowler*.  It's a Fourth Circuit case, 1970, where

24  the Court remanded for the appointment of a receiver, "as

25  district court is vested with inherent equitable power to

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  appoint a trustee receiver, and should not have left culpable

2  parties in control."

3           And that really rang true to me.  And that's

4  exactly --

5           THE COURT:  What's the cite on that case?

6           MS. KATSANTONIS:  That is 427 F.2d 190, pages 197

7  through 198.  And we cited to it in ECF 647, page 5 of 18.

8           You know, so I thought of that.  And I also thought

9  of another case we cited which just says, "Federal courts

10  possess inherent authority derived from the constitution to

11  enforce their judgments.  This authority naturally arises as a

12  means of ensuring that the judicial power conferred on this

13  judiciary by Article III is not rendered inadequate or

14  incomplete by disregard of its orders."  And that is *Travelers*

15  *Insurance versus Hash Management* case, 173 F.R.D. 150.

16           That's where we are, Your Honor.  There is no excuse.

17  The law is that they have to comply with the order or they're

18  in contempt.  There is no dispute that they're in contempt.

19  And then they have to show that they made good faith in making

20  all reasonable efforts to comply.  It cannot be said that they

21  made all reasonable efforts to comply.  Just on the collateral

22  alone, the fact that we received a minor $4,500 on May 27th,

23  months after your order, goes straight to that issue.  The fact

24  that you had to go to these great lengths to extract the -- as

25  of yesterday, $107,000, meanwhile hundreds of thousands of

258

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  dollars are going to other unnecessary business expenses,

2  related companies, round number transfers to Richard Moore.

3  They are in contempt, and they need -- we need a receiver to be

4  appointed.  The time has come, Your Honor.  You gave them a

5  last-ditch opportunity.  And what that showed is they paid, you

6  know, I think it was $56,000 from July 15th of 20 percent

7  revenues.  They somehow, after all these meetings with the

8  Special Master where they don't disclose active databases that

9  they're making payments and check payments out of -- we have to

10 identify them on July 15th -- and then after your court's

11 order, they identified three more databases we had never even

12 heard of before.  They are in contempt.  And this Court's

13 orders should -- they should be admonished.  The court orders

14 should be followed and a receiver should be appointed.

15       I think we've provided the Court with plenty of case

16 law to substantiate that.  I'm happy to go through that, Your

17 Honor, but nothing we said --

18       THE COURT:  I understand I have the power to appoint

19 a receiver, okay?  I understand that.  But is it the best thing

20 to do in this case?

21       MS. KATSANTONIS:  Absolutely, Your Honor.  We cannot

22 stand by month after month and allow Nexus to continue to

23 squander what revenue it's getting.  We now know from today's

24 testimony that they're not even showing us all the books and

25 records of Homes and Homes' revenue.  What is this 20 percent?

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   We don't have any accounting of that.  We don't even have

2   confidence that we've got all of their -- they said for months

3   that Lightspeed is where the revenues are.  Then we said, Well,

4   there's missing reports.  And we kept asking the Special

5   Master, you know, there's these missing reports.  And the

6   Special Master said, Yeah, as a matter of fact, there is.  And

7   finally months later they're like, Oh, we weren't using

8   Lightspeed from, you know, October to February.  We had another

9   system.  But we're not using that anymore, American Spirit.

10  And they didn't even identify that virtual database until

11  July 6, I believe, okay?

12          So we have no confidence in what this amorphous 20

13  percent is.  Ms. Wells admitted that -- when she was talking

14  about it -- she was only talking about certain credit card

15  payments.  I'm not even sure where all of that is being managed

16  and collected.  And we don't think it's sufficient.  What's to

17  say they can't -- in their financial records, they show that

18  they make a 76 profit or more every month from those payments.

19  So, you know, we're not asking the Court to come in, and the

20  receiver not to pay their payroll or not to pay necessary

21  expenses.  We're just saying they cannot be in control anymore

22  to do business as usual, and go make payments for reality TV

23  shows, or for alleged security, or any other extraneous

24  payments that are unnecessary to the business.

25          And the Court has issued an order.  They provided no

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  evidence that they can't comply.  And to say that they can come

2  in with their settlement offer and modify this Court's order

3  with no evidence whatsoever -- in fact, an acknowledgment of at

4  least the revenue that they have shown us that they reported of

5  16 million.  And I will say from the virtual database it looked

6  like there was more revenue.  They're showing like two million

7  plus moving in and out of the accounts a month, and checks.

8          So we don't have any basis to trust in what a 20

9  percent would or wouldn't be, or whether that's adequate or

10  not.  It could be 40.  It could be 50.  Who knows, Your Honor?

11  So it's not an appropriate remedy, and we ask that the Court

12  appoint the receiver.

13          THE COURT:  Thank you, Ms. Katsantonis.

14          Mr. Anderson, anything you'd like to say in response,

15  sir?

16          MR. ANDERSON:  I believe Juliana Johnson would like

17  to address.

18          THE COURT:  I'm happy to hear from you.

19          MS. JOHNSON:  Thank you, Your Honor.  Can you hear me

20  okay?

21          THE COURT:  Yes.

22          MS. JOHNSON:  Okay.  And just to respond to opposing

23  counsel's closing remarks, no revenue at all whatsoever has

24  been squandered.  Rather, almost a quarter million from RLI --

25  since July of this year.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1            Virtual databases?  We're sitting here speculating on

2    revenue in virtual databases?  Virtual databases have no

3    checks, Your Honor.  This is just another method of which

4    RLI -- (inaudible) --

5            THE REPORTER:  I'm sorry, I missed what she said

6    after, "this is just another method of which RLI" -- and you

7    cut out.

8            THE COURT:  She said that's just another method of

9    what RLI, and then you cut out.  So could you start from there?

10            MS. JOHNSON:  It's just another method of what RLI

11    does not understand with regard to Nexus Services.  It is

12    another way to put something there that simply is not, Your

13    Honor.  Virtual databases have no -- (inaudible) -- getting new

14    software for payment processes is not done for nefarious

15    purposes.  They had to stop using Lightspeed because of the

16    seizure that took place in December because they lost their

17    credit card processor.  Did RLI acknowledge this?  No, because

18    we're on a witch hunt.  Accusations of hiding funds.  More like

19    RLI's bad faith and frustrating the many offers of payments to

20    make this right.

21            Mr. Donovan testified from the heart today.  He

22    testified on many business solutions that he has given, many

23    business solutions that have been offered time and time again

24    since this Court has made its ruling.  RLI is bent more on --

25    (inaudible) -- rather than a solution, Your Honor.  RLI has

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  failed to understand this company.  We've explained to them

2  time and time again.  RLI uses 1970 case law in a 2021

3  technology world that does not apply, because the implications

4  of a business demise in 1970 with regards to a public company

5  is not applicable to a company that survives on technology,

6  business partner relationships that survive on technology, and

7  is also a private company, Your Honor.

8          RLI again talks about (inaudible) -- but in cross

9  examination with Ms. Wells, she spent a significant amount of

10  the time going after a 1 percent *de minimus* revenue that

11  Ms. Wells could not even name, and ignores the 99 percent of

12  revenue that is Libre that goes right into NetSuite.  That

13  revenue --

14          THE REPORTER:  I'm sorry.

15          THE COURT:  That goes right into the?

16          MS. JOHNSON:  20 percent of the daily revenue that

17  Nexus has offered to pay to satisfy these judgments in as

18  little as ten months.

19          The issues are simple, Your Honor, today.  They're

20  very simple.  It's about compliance, and it's about whether or

21  not we should have a receiver.  We should not have a receiver.

22  The ramifications of having a receiver would destroy this

23  business.  It would cause insolvency clauses with other

24  sureties that Nexus has relationships with far larger than the

25  relationship it ever had with the historic -- (inaudible) --

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  thousands of immigrants -- (inaudible) -- and guess what?

2  Their bonds would be available for a large competitor.  Nexus

3  would be gone.  The people that Nexus employs would be gone,

4  because the insolvent clauses include that if Nexus goes into

5  receivership, this is what happens.

6        So we have to sit back and we have to ask ourselves:

7  Why has RLI balked on receiving so many payments, so many

8  different payment methods?  For example, it's like saying to

9  somebody that you've got to drive five miles today, and then

10 tomorrow saying you've got to drive five miles tomorrow, but in

11 the middle of that drive you set up roadblocks.  That is what

12 Nexus Services has been going through with RLI.  Nexus Services

13 wants a method in which to prove to this Court that it has

14 grown as a company, that it has accepted this Court's judgment.

15 But it still deserves to have its chance to fight for the very

16 thing that Nexus Services is based on; that is, human rights --

17 (inaudible) -- disregard to humanity (inaudible) on a

18 consistent basis.

19        Nexus has a new CFO.  She's a CPA.  This is complying

20 with all of -- *prima facie* -- on Nexus to grow up as a company

21 to be able to meet this Court's demands.  Nexus executives have

22 been loosening the reins to give Ms. Wells the authority to do

23 her thing, Your Honor.  Even Ms. Wells stated in her testimony

24 that Nexus has been overly compliant -- even excited -- acting

25 in ways that she hasn't seen anybody act with excitement to

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  take on whatever it is she suggests.  And in the four months

2  that she's been CFO, look at what's happened.  The payments

3  have been coming in, almost a quarter million.  Now, since

4  she's come into this role, things have cleared up a lot.  And

5  in looking at it from that angle, yes, we can talk about the

6  50,000 that's applied to bonds.  But here's one thing that we

7  keep leaving out:  Nexus gave discretion in good faith to RLI

8  to apply whatever money it received from Nexus however it

9  chooses.  I probably would have advised them differently than

10 that, but they are transparent.  They are wanting to fix this.

11       RLI wants to talk about things that Nexus didn't do.

12 Let's talk about what they did do, Your Honor.  They hired

13 Rebecca Wells, all her years of experience, attention to

14 detail.  That's good faith.  Surviving a company during a COVID

15 pandemic, that's good faith.  Having to do whatever they could

16 to keep their employees paid when bank accounts were seized to

17 the tune of over $300,000, when RLI knew there were checks

18 coming, and after these bank accounts were seized and payroll

19 was in danger with all these employees at Christmastime, they

20 went and ran to the Court and said it was contempt for cashing

21 checks they knew they couldn't cash because they already seized

22 the accounts.  That's shady.

23       Additionally, RLI maintains the bond from them.

24 Well, this is where my experience comes into play, Your Honor.

25 The appellant is the bondsman.  That file belongs to the

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1 bondsman.  BIA, through I Form 292, has created an avenue of

2 relief for invalid debts.  Invalid debt (inaudible) state that

3 if a notice to appear is not properly noticed, then anything

4 that comes after that -- and another case -- (inaudible) --

5 further exemplify that, that anything that comes after it,

6 including by revocation of a bond as invalid, the bondsman has

7 a duty to validate; otherwise, the bondsman doesn't stay in

8 business.  We can't turn over files that do not belong to us,

9 period.  The appellant is the bondsman.  And that has been

10 explained to RLI as well.  They don't understand the

11 immigration process.

12        Nexus has bent over backwards to work with RLI for

13 which OPC has (inaudible) -- that does not to me sound like a

14 company that's hiding something when they owe something.

15 They're giving their own resources to help come to a solution.

16        Second, I believe we offered a very profitable

17 solution:  20 percent of daily revenue, a hands-off approach.

18 Everybody has got a personal problem with either this executive

19 or that executive, or what this person said or what that person

20 said, or when an email was dated.  But if we had this hands-off

21 approach and we're willing to do this, and it offers us an

22 avenue for the company to not go into receivership and not lose

23 our sureties, then why wouldn't we do that?  Why wouldn't this

24 Court do that?  It is the most equitable solution that we could

25 come to.  There would be no more need for fighting.  It could

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   be set up rather quickly.  And the debts and the judgments,

2   they'd be paid off.

3          But when we offer these solutions to RLI, they're

4   turned down with a flat no.  Flat no.  Just like when we

5   offered the property to cover one of the judgments -- the mere

6   equity in that property could have covered it -- turned down.

7   Was told -- we were told that our property was worthless.

8          We're asking this Court today to adopt our proposed

9   solution to end this litigious nightmare, to not -- (inaudible)

10  -- but rather a proponent for a solution to this business.

11  With that, Your Honor, I close, and I respectfully ask that a

12  receiver not be appointed in this case, and that we be allowed

13  to do the direct payment in the manner that Ms. Wells

14  described.  And in this case we can come back in 60 days, Your

15  Honor, come back and see how it works.  It makes no difference

16  whether there is a contempt finding today or in 60 days.  The

17  result will still be the same.  What if we're onto something?

18  What if we can actually show that this solution works?  We save

19  immigrants from being remanded, we save unjust enrichment from

20  competitors -- which is what I think is the real motive here --

21  we save a company, and RLI gets their money.  It's a win-win,

22  Your Honor.  Thank you.

23          THE COURT:  Ms. Katsantonis, this is your motion, so

24  I'll give you the last word.

25          MS. KATSANTONIS:  Thank you, Your Honor.

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1          THE COURT:  Mr. Harris, would you like to say

2     something, Mr. Harris?

3          MR. HARRIS:  I would love to say something, but I

4     don't want to keep you all around.  I'll defer to

5     Ms. Katsantonis.

6          MS. KATSANTONIS:  When counsel was speaking, all I

7     could think of is:  Justice delayed is justice denied.  And

8     that's what's been happening and that's what continues to

9     happen.  That's what they're asking for.  Your Honor, they've

10    had their chance.  They had their opportunity.  You've given it

11    to them over and over again.  This 20 percent -- again, a

12    modification of your order -- no evidence whatsoever as to --

13         THE COURT:  I can't modify my order.

14         MS. KATSANTONIS:  I know, Your Honor.

15         THE COURT:  I can't.

16         MS. KATSANTONIS:  I know, Your Honor.

17         THE COURT:  It's on appeal to the Fourth Circuit.

18         MS. KATSANTONIS:  Exactly.

19         THE COURT:  I can't do it.  The question is whether

20    or not I hold them in contempt today, or 60 days from now, or

21    whenever.  I can't modify my order.

22         MS. KATSANTONIS:  Exactly.  And where were those good

23    faith efforts?  Where were those payments?  Nothing stopped

24    them January, February, March, April, May, June, July.  I

25    mean --

268

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1          THE COURT:  Those were kind of tough months, though,
2  January, February, and March.
3          MS. KATSANTONIS:  They were getting paid --
4          THE COURT:  That's the middle -- that's when the
5  pandemic was in its throes.
6          MS. KATSANTONIS:  They were getting 1.8 million in
7  January under the KPI.
8          THE COURT:  I'll look at the KPI.
9          MS. KATSANTONIS:  It was their highest revenue month,
10  actually, in January from the KPI report.  So it's -- I believe
11  it was 1.8 million.  It was higher than the rest of the months.
12          So we've seen the transfer of the monies going out to
13  other unrelated entities.  They cannot -- the fact that they
14  have the -- that they say that we would balk at receiving
15  payments is -- it's truly laughable.  They could have made
16  payments any number of way -- check, money order, wire
17  transfer.  They didn't do it.  They cannot be rewarded for
18  their contempt, Your Honor.
19          They provided no evidence of any negative
20  ramifications with the appointment of a receiver.  They have
21  presented no evidence to the Court with regard to that, and how
22  that would impact them.  We've seen this whole play before:
23  Oh, the new CFO is going to save the day.  You'll remember Greg
24  Solsrud, right?  That was during the preliminary injunction.
25  We've seen this playbook over and over again.  And truly, it is

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  unfair to RLI to continue down this road.  It truly is, Your

2  Honor.  It's been almost ten months since your order.  You've

3  seen what they've done.  Everybody admits as of yesterday they

4  paid $107,000.  Your Honor, I mean, alone this screams for the

5  appointment of a receiver.  And we know -- we don't have all

6  the records, but we know they've admitted -- Mr. Donovan

7  admitted the payments -- so did Ms. Wells -- to some of these

8  other entities during all of this time frame, hundreds of

9  thousands of dollars.  I saw $1.7 million.  Who knows what

10  other payments there are in there.

11        There's absolutely no evidence that they could not

12  comply with your order.  And they have provided no evidence

13  today, and they've -- all they're asking is for you to modify

14  their order.  And they provided no evidence as to the harm of

15  the receiver, whereas the harm is patently clear with regard to

16  RLI.  Thank you, Your Honor.

17        THE COURT:  Okay.  I guess, Mr. St. Ours, you weren't

18  needed after all this afternoon, but we're glad that you were

19  with us.

20        Does the Special Master have anything he wants to add

21  before we wrap up?

22        SPECIAL MASTER:  Well, one thing I want to -- a

23  couple of things I do want to comment on.

24        THE COURT:  Mr. St. Ours, go to the podium.

25        SPECIAL MASTER:  Just a couple of things.  Can you

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   hear me okay?

2          THE REPORTER:  Yes.

3          SPECIAL MASTER:  We heard an explanation as to why

4   there were no payments through April.  So it's not that there's

5   no excuse.  It's whether or not it's acceptable.  Okay.  And

6   again, this is -- again, it kind of shows -- I see an issue on

7   each side.  I'm appointed.  I believe the first conference call

8   was April 15.  And I -- and we weren't very far into it and I'm

9   thinking -- it's like what you said today:  Why don't you just

10  pay what you can while you can?  I mean, okay, you're still

11  not -- you're still not in compliance.  But on that call I'm

12  thinking, If they make a payment, where is it going to go?

13         So I didn't develop it.  But by the second call --

14  which I believe was like April 22, April 21 -- you know, in

15  other words -- but -- so to me, it was double pronged:  Pay

16  what you can; and RLI, I know you're not under -- the order

17  doesn't say you have to do this.  I can't tell you to do this.

18  But just would you, if they -- and there is no agreement --

19  would you just confirm that you'll put it towards collateral

20  security, not towards the second?  I articulated very clear --

21  and on the back of my notes -- and I see that we didn't get to

22  that point.  I get that confirmation back.  It's in my -- it's

23  in a letter that I wrote on May 18.  I can finally confirm that

24  far.  When I think back, there is the $4,500.  It was a $2,500

25  payment.  So now -- so here I've got RLI that I'm thinking,

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   they don't have to.  They have every right to garnish.  I can't

2   stop it.  What --

3         THE COURT:  Well, they can't garnish for the

4   collateral security, but they can garnish for the attorneys'

5   fees and the judgment, which was not stayed.

6         SPECIAL MASTER:  But now I don't have an explanation

7   why -- it's now late May.  A payment comes.  Another payment

8   comes.  But what I don't have an explanation is why there's no

9   payments in the month of June.  So you see, I see this on both

10  sides.  And, you know, that echoes forward even to today.  I

11  hear about the merchant account and I'm thinking, Well, why not

12  accept payment that way?

13        THE COURT:  I'm sorry, what did you say?

14        SPECIAL MASTER:  The merchant account, direct

15  payment, it just makes sense.  It doesn't mean they -- not give

16  up the 2.4 in receiver.  Don't misunderstand me.  I heard

17  Ms. Katsantonis, and I thought she articulated well.  But it's

18  almost -- here I'm listening to the testimony and I'm thinking,

19  My golly, I'm hearing -- now I'm beginning to understand why it

20  wasn't -- I knew it wasn't efficient.  By the way, I saw those

21  emails.  And I understood people do backdate.  But when I look

22  at the -- I don't know why -- it doesn't make sense to me -- it

23  would be nefarious -- because they do come -- the emails don't

24  come until after July 15.  So I don't fault Nexus for that.  I

25  can't explain why that's like that.  I've never seen these

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1    emails before.

2            The other thing is I -- I have difficulty hearing it

3    not once, but I believe three different times, 107,000 term.

4    Judge, I want to say what's in my report -- and I gave

5    Mr. Harris this -- so it kind of bugged me that I kept hearing

6    107 on closing argument.  I heard it a little earlier.  My --

7    this ultimate report was really very much -- it was belated.

8    And I actually wrote Mr. Harris this.  It's okay.  Better late

9    than never.  At least I've got some information.  And what's

10   remarkable was I'm hearing Ms. Wells testify the 50,000 is not

11   for collateral source, that it's part of the 236.  But the

12   numbers are so close to where I'm learning over the weekend the

13   only thing that I don't have verified is the 70,000.  But here

14   we had stuff come in.  And when you throw the 70,000 in, you --

15   and the 50, although the 50 is not collateral -- my report is

16   within I want to say -- and I heard about an additional four

17   grand that I just didn't have.  When I put all that together,

18   the numbers are within $9,000.  So it just kind of bugged me.

19   The 107,000, yes, I put that in.  That's the amount as of

20   Sunday night.  RLI needs to say that's all of it.  That's just

21   all that we can confirm right now.  And we've heard more.  And

22   it did not include the 50, which I understood.

23           So I'm just kind of -- I just -- I just felt the

24   need -- you know, we have an equitable remedy, Section A and

25   Section C.  The Court cannot modify it.  But when I think about

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1  that four plus weeks just not that they had to, but just to

2  get -- we will put it towards, and now the merchant account.

3        By the way, in no sense do I think -- I'm not saying

4  there is any unclean hands on the part of the parties.  I'm not

5  going to say that.  I don't think there was anything nefarious

6  on Nexus, although I am frustrated that even on August 5 we

7  don't see Stampli.  We may have data for Stampli, but we don't

8  see Stampli.  We don't see Airbase.  It's just -- what hits in

9  my head is not unclean hands.  Not unclean hands.  No way.

10 It's something that's much milder.  But still -- I don't know

11 if it's Emerson that would say it, but I can just hear that

12 voice booming, "One who seeks equity must do equity."  And that

13 doesn't mean the receiver is not appointed, because waiting to

14 hear back for four, four and a half weeks, yes, we will --

15 that's not a big thing in the picture, but it's still a little

16 equity.  And this merchant account testimony, I just don't --

17 unless there is something structurally that they can't accept

18 payment by way of this direct payment, it's just the little

19 things.

20        I would love for Mr. Peroutka -- I found him so

21 helpful -- and I don't know if ultimately it would work out,

22 because there may be -- the issues may continue.  There are

23 issues with Nexus.  But I found it helpful.  I think Mr. Harris

24 and -- again, Ms. Katsantonis, I want to say it was the

25 three -- the third, fourth, and fifth bilateral review

274

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   Ms. Katsantonis wasn't on.  But it was really we -- and when

2   Mr. Donovan was on the call, you know, they were actually

3   talking to one another.  And I don't know if that will

4   continue.  But the fact that Ms. Wells comes back and says, you

5   know, I did hear about what he said and it's helpful, I mean,

6   hats off to you.  And my hat is off to you for acknowledging

7   it.

8           So I just -- oh, one other thing I just wanted to

9   say.  Judge, I do not want the implication about a statement --

10  and this is not argument.  I took it as a statement.  I do not

11  want that implication.  We were only allowed to sit for a

12  couple of hours.  Judge, on the 21st we cut off for a reason,

13  but not because somebody said, "no more."  The 23rd, the 26th,

14  the 30th.  The 30th, we did cut off.  Mr. Moore had a conflict.

15  But we resumed.  And nobody cut off when we resumed that

16  afternoon.  And I tentatively scheduled resumption I believe it

17  was August 4.  In my head I'm thinking, What am I thinking?

18  How am I ever going to get this report done?  And I get it.  We

19  didn't do it not because there wasn't a willingness to talk

20  more.  If there needed to be a more thorough review, the

21  implication we were only allowed -- the implication we weren't

22  allowed to see everything -- yes, initially, no screenshots.

23  There was a point when Mr. Anderson apparently decided, and

24  that's when we started seeing screenshots.  There could have

25  been screenshots of others going back in time.  I don't know.

275

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   But at least at first, no screenshots.  But I don't want the

2   implication anybody cut this off.  And the reason we didn't do

3   it was Nexus was not going to agree -- they didn't have to,

4   it's not in the order, at least the way I interpreted it -- of

5   access to the bank, the online bank.  So it wasn't a matter

6   that somebody said, Uh-uh, no more in any of these databases.

7   It could have gone longer.  So I just -- I just don't want -- I

8   just don't want to have impressions where we don't need them.

9          For all that I've said, Judge, I'm afraid I took too

10  much of the Court's time just on my comments that don't go to

11  the essential issue of whether or not to appoint a receiver or

12  not.  And I apologize for that.

13          THE COURT:  Thank you, Mr. St. Ours.  I appreciate

14  that.

15          Okay.  Folks, it's 6:30.  We've been going since

16  around 9:30 this morning.  I have an order here, an order on

17  the motion that we've been working on.  And I'm not going to

18  present it today.  I want to think about what I've heard.

19          I want to thank the parties for coming here to

20  Harrisonburg today and spending this time with the Court

21  together again.  And I will get an order out soon.  We already

22  have a draft.  We've been thinking about it and working on it,

23  and I will get an order out on these -- on the motion -- on the

24  issue of the appointment of a receiver under 66 or a person to

25  perform specific acts under 70.  I thank you all for helping me

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1   try to understand these issues.  And with that, we stand

2   adjourned.

3   (Proceedings concluded, 6:29 p.m.)

RLI Insurance Co. v. Nexus Services, Inc., 5:18CV66, 8/10/21

1           C E R T I F I C A T E

2      I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3 the United States District Court for the Western District of

4 Virginia, appointed pursuant to the provisions of Title 28,

5 United States Code, Section 753, do hereby certify that the

6 foregoing is a correct transcript of the proceedings reported

7 by me using the stenotype reporting method in conjunction

8 with computer-aided transcription, and that same is a

9 true and correct transcript to the best of my ability and

10 understanding.

11      I further certify that the transcript fees and format

12 comply with those prescribed by the Court and the Judicial

13 Conference of the United States.

14      /s/ Lisa M. Blair                Date: August 20, 2021

15

16

17

18

19

20

21

22

23

24

25