**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 20-2253**

───────────────

RLI INSURANCE COMPANY,

Plaintiff - Appellee,

v.

NEXUS SERVICES, INC.; LIBRE BY NEXUS, INC.; HOMES BY NEXUS, INC.,

Defendants - Appellants.

───────────────

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.  Michael F. Urbanski, Chief District Judge.  (5:18-cv-00066-MFU-JCH)

───────────────

Argued:  October 28, 2021                                    Decided:  January 27, 2022

───────────────

Before GREGORY, Chief Judge, QUATTLEBAUM, Circuit Judge, and FLOYD, Senior Circuit Judge.

───────────────

Affirmed by published opinion.  Senior Judge Floyd wrote the opinion in which Judge Gregory joined.   Judge Quattlebaum wrote an opinion concurring in parts I, II, III, V, and VI and in the judgment.

───────────────

**ARGUED:**  Carl August Anderson, ROCK SPRING LAW GROUP, PLLC, Washington, D.C., for Appellants.  Vivian Katsantonis, WATT, TIEDER, HOFFAR & FITZGERALD, LLP, McLean, Virginia, for Appellee.  **ON BRIEF:**  Mario B. Williams, NDH LLC, Atlanta, Georgia; John M. Shoreman, MCFADDEN & SHOREMAN, Washington, D.C., for Appellants.

───────────────

FLOYD, Senior Circuit Judge:

This case concerns relatively straightforward obligations of a bond surety, RLI Insurance Company (RLI), and its indemnitor, Nexus Services, Inc. (Nexus), under a standard Commercial Surety General Indemnity Agreement (the Agreement).  Because surety is a zero-loss industry, the Agreement contains several clauses designed to keep RLI whole.  One obligates Nexus to provide collateral sufficient to cover all of RLI's exposure, and the parties task us with resolving what kinds of risk "exposure" means to capture.  What makes our task unique is that, unlike the familiar commercial or construction relationships that typically contemplate only a handful of guarantees, this Agreement involves nearly 2,500 bonds RLI issued to the U.S. government on behalf of individual immigrant detainees.  Nexus insists that we must nonetheless measure RLI's exposure on each bond individually and that RLI is not actually "exposed" to any risk—and Nexus correspondingly does not need to deposit collateral—until the parties have reason to believe that RLI will have to pay out that particular bond.  The first tangible evidence of that, Nexus continues, comes about when an immigrant fails to appear in court on the designated date, breaching the bond.  In short, Nexus suggests it should deposit collateral only up to the sum of the already-breached bonds.  RLI objects the Agreement is not so limited.  Although we do not know which particular immigrant will breach, we can be certain some will.  It follows that the Agreement must secure against aggregate risk—that is, the likelihood Nexus will be able to (timely) indemnify RLI for all future breached bonds. Because Nexus's financial condition, its willingness to indemnify RLI so far, and historical rate of bonds breached all bear on that likelihood, they should likewise inform

2

the collateral calculus.  The district court sided with RLI, and after reviewing the plain terms of the Agreement, we agree.  We also affirm the district court's calculation of the collateral amount as a sound exercise of its discretion to order equitable relief.

## I.

An immigration bond, much like a criminal bond, allows the release of a detained individual from custody based on a surety's contractual undertaking to the United States to either deliver the individual as demanded or forfeit the penal sum specified in the bond. Nexus runs the bonds program:  It screens the immigrants likely to keep their promise to appear in court and maintains contact with them throughout their release.  But Nexus lacks the Department of Treasury's commercial-surety certification, and so needs another surety to take on the liability to the government.  RLI agreed to perform that function in exchange for a set fee upfront, and Nexus agreed to indemnify RLI for all losses.  Specifically, Nexus agreed to pay upon demand:

> **2(a)(i)**  all losses, costs, damages, attorneys' fees and expenses of whatever kind or nature which arise by reason of, or in consequence of, the Surety having executed any Bond on behalf of the Principal, or in enforcing this agreement against any of the Indemnitor(s) . . . .

> **2(a)(ii)**  an amount sufficient to discharge any claim made against Surety on any Bond.  This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any Bond.

J.A. 53.  Nexus also agreed that:

> **3(c)**  [u]ntil Surety has been furnished with conclusive evidence of its discharge without loss from any Bonds, and until Surety has been otherwise fully indemnified . . . , Surety shall have the right of access to the books, records and accounts of the Indemnitor(s) . . . .

> **3(d)**  Surety shall have every right, defense, and remedy allowed by law
> including the rights of exoneration and subrogation.  Indemnitor(s)
> will, upon the request of the Surety, procure the discharge of Surety
> from any Bond and all liability by reason thereof.  If such discharge is
> unattainable, Indemnitor(s) will, if requested by Surety, either deposit
> collateral with Surety, acceptable to Surety, sufficient to cover all
> exposure under such Bonds or Bonds, or make provisions acceptable
> to Surety for the funding of the bonded obligations[ ].

*Id.* at 54.  Illinois law governs the Agreement.  *Id.*

While the parties have always differed as to what the Agreement requires, they have never disputed the basic facts of how their relationship progressed.  *See RLI Ins. Co. v. Nexus Servs. Inc.*, 470 F. Supp. 3d 564, 571 (W.D. Va. 2020).  Between February 2016 and February 2017, RLI issued 2,486 immigration bonds totaling $30 million at Nexus's request.  From the start, RLI insisted on collateral, and Nexus agreed to deposit $500,000.  But it never did.  Over the course of the year, Nexus's performance only continued to deteriorate.  It repeatedly allowed several invoices from the government to become past due, forcing RLI to pay hundreds of thousands of dollars from its own pocket to avert referral to the Departments of Treasury and Justice.  At one point, the unpaid invoices totaled $709,789.37.  When RLI reached out to Nexus to resolve this crisis, Nexus refused to answer for weeks at a time, denied access to most of its financial records, misrepresented when checks were sent to the government, and failed to indemnify RLI until RLI brought several enforcement actions—which Nexus protracted by "cloak[ing] two of its affiliate companies" and obstructing discovery.  *RLI Ins. Co. v. Nexus Servs. Inc.*, No. 5:18CV66, 2020 WL 6262967, at *12 (W.D. Va. Oct. 23, 2020).

4

Nexus also misrepresented the risk RLI was undertaking.  During contract negotiations, it assured RLI that its proactive screening and tracking techniques would result in only about 2% of the bonds being breached.  By the start of this suit, however, immigrants had breached about 48% of the discharged bonds.[1]  Meanwhile, Nexus has been investigated by states, the federal government, and insurance companies.  And has had several liens placed on its assets for failing to satisfy creditors.  All of this led RLI to finally invoke ¶ 3(d) of the Agreement and request Nexus to discharge its liability on all outstanding bonds or deposit $10 million in collateral.  Nexus refused to do either, and RLI turned to the courts.  Nexus counterclaimed that RLI requested the $10 million in bad faith.

Before the district court, RLI argued it has absolute discretion to request any amount of collateral up to its then-current liability, $20 million.  Nexus countered that ¶ 3(d) secures only existing government claims or, at most, the penal value of the already-breached bonds, even if the government has yet to send a final claim.  The district court rejected all of those readings as inconsistent with the plain text of ¶ 3(d).  *RLI Ins.*, 470 F. Supp. 3d at 583–84.  The clause, it reasoned, mentions neither the sole discretion RLI seeks, nor the specific limitations Nexus proposes.  *Id.*  Rather, "exposure" encompasses all sources of risk.  Some of that risk stems from the number of bonds breached, yes; but that is not the only consideration.  Nexus's poor accounting and questionable financial

---

[1] Discharged bonds refer to finally resolved bonds.  Some bonds are resolved when an immigrant appears in court as directed, is granted legal status, or is deported—all of which result in the bond's cancellation.  Alternatively, RLI may resolve a bond by satisfying the government claim on a breached bond.  So RLI calculates the 48% rate as $\frac{breached\ bonds}{all\ discharged\ bonds}$.

health endanger RLI, too, and the amount of collateral must account for those shortcomings.  The court also rejected Nexus's bad-faith counterclaim, holding that RLI merely sought to enforce the Agreement as RLI understood it.

The court then held a separate evidentiary hearing to determine the amount of collateral that reasonably reflects RLI's anticipated losses, ultimately directing Nexus to deposit only $2.4 million.  And it awarded RLI $3.4 million for litigation costs as damages Nexus must indemnify under ¶ 2(a)(i).

Nexus now appeals.  It has walked back its most extreme position as to the meaning of "exposure"—that ¶ 3(d) encompasses only final claims—but maintains that collateral is appropriate only up to the value of the already-breached bonds.  Alternatively, Nexus contends it did not have to deposit collateral at all because RLI did not fulfill the condition precedent of requesting it in good faith.  Puzzlingly, Nexus does not appeal the district court's on-point finding that RLI acted in good faith; it asks instead that we take the district court's paring down of the collateral to $2.4 million to imply the court found RLI's original demand for $10 million "unreasonable as a matter of law."  Opening Br. 36.  Nexus finally disputes the district court's method of calculating the collateral and cursorily requests we reconsider the district court's costs determination.  RLI defends the district court's judgment; it does not argue for its original interpretation of "exposure" or seek a higher deposit.[2]  We take these arguments in turn.

_____

[2] Apart from requesting collateral, RLI sought several injunctions to compel Nexus to indemnify its payments on past-due bonds, pay for future invoices as they arise, and open its books and records for inspection.  Those requests led, in turn, to protracted discovery (Continued)

II.

We begin with the district court's ruling that "exposure" reaches all sources of risk, not just risk associated with a particular breached bond. Because this decision comes to us on summary judgment, we review de novo and draw all inferences in in the light most favorable to Nexus, *Denzler v. Questech, Inc.*, 80 F.3d 97, 101 (4th Cir. 1996).

To affirm, we must agree not only that the Agreement conveys the meaning espoused by the district court but that the Agreement does so unambiguously, for "questions of contractual ambiguity" in Illinois must be "given to the trier of fact." *Cont'l Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005) (citation omitted). We agree and affirm.

A.

In Illinois, as elsewhere, indemnity agreements are governed by the usual principles of contract interpretation. *Hanover Ins. Co v. Smith*, 538 N.E.2d 710, 796 (Ill. App. Ct. 1989), *aff'd*, 561 N.E.2d 14 (Ill. 1990). We thus begin by looking "to the language of [the] contract" because it provides "the best indication of the parties' intent." *Minn. Life Ins. Co. v. Kagan*, 724 F.3d 843, 849 (7th Cir. 2013) (quotation marks and emphasis omitted). Recall that ¶ 3(d) obligates Nexus, "upon the request of the Surety, [to] procure the discharge of Surety from any Bond and all liability by reason thereof." J.A. 54 ¶ 3(d). And if "such discharge is unattainable," Nexus must "either deposit collateral with Surety,

---

disputes and litigation over what companies should be considered Nexus's alter egos. The parties do not appeal the district court's decisions on any of those issues.

acceptable to Surety, sufficient to cover all exposure under such Bonds or Bonds or make provisions acceptable to Surety for the funding of the bonded obligations." *Id.* The clause does not define "exposure," but Black's Law Dictionary instructs the term refers to "[t]he amount of liability or other risk to which a person is subject." *Exposure*, Black's Law Dictionary (11th ed. 2019). Commonly understood, then, "exposure" broadly comprises all sources of risk that open RLI up to liability.

The surrounding text of ¶ 3(d) further confirms this common understanding. Again, ¶ 3(d) directs Nexus to secure collateral "sufficient to cover all exposure under such Bonds or Bonds." J.A. 54. We take "such Bonds" to refer to the bonds mentioned earlier in the provision—bonds that RLI specifically requested Nexus to discharge. The second, unqualified "Bonds" must then reference bonds generally as defined in ¶ 1 of the Agreement: "Any contractual obligation, and any modification(s) or amendment(s) thereto, undertaken by Surety for Principal, before or after the date of this Agreement and any renewal or extension of said obligation." *Id.* at 53. Read together, ¶¶ 1 and 3(d) thus mandate Nexus to provide collateral "sufficient to cover *all* exposure under" "*[a]ny* contractual obligation . . . undertaken by" RLI to the U.S. government. *Id.* at 53–54 (emphases added). That language is as broad as it can be. It does not limit exposure in time or scope. It does not condition the obligation on occurrence of any triggering event. It makes no mention whatever of breached bonds, non-appearance, or non-performance.

Our interpretation does not change if we focus only on "such Bonds," as Nexus asks us to do, because RLI indeed requested Nexus to discharge all outstanding bonds. Either

way, Nexus must still secure collateral "sufficient to cover all exposure under [all outstanding] Bonds." *Id.* at 54.

Had the parties intended to narrow the scope of exposure solely to breached bonds, they had many tools in their belt. They could have limited RLI to collateral *on a specific bond* and only *after* an immigrant fails to attend court. They could have tethered the *amount* of collateral to the penal sum of currently breached bonds. Or even condition collateral on receipt of some sort of notice from the Department of Homeland Security. *Compare Am. Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 301 (2d Cir. 1989) (discussing a "collateral security provision," which "provided that the triggering event would be . . . the making of a 'demand' by the United States against" a surety; *Hanover Ins. Co. v. Clark*, No. 05-C-2162, 2006 WL 2375428, at *6 (N.D. Ill. Aug. 15, 2006) (interpreting an agreement that required payments "as soon as liability exists or is asserted against the Surety"). The parties did none of that.

The neighboring provisions point in the same direction. As the district court observed, ¶ 2(a)(ii) already directs Nexus to pay "an amount sufficient to discharge any claim made against Surety on any Bond." *RLI Ins.*, 470 F. Supp. 3d at 585. Cabining ¶ 3(d) to breached bonds would "nullify" and "render . . . meaningless" that claim-based obligation in violation of the basic tenets of contractual interpretation. *See Smith v. Burkitt*, 795 N.E.2d 385, 389 (Ill. App. Ct. 2003). Nexus maintains that "claim" differs from "an initial determination that the bond has been breached" because "the bond obligor(s) . . . have the right to appeal" that determination. Opening Br. 24. But the district court did not mean to imply that every initial determination will necessarily result in a final claim. It

merely reasoned that, if Nexus provided collateral for each and every breached bond in the amount of the full penal sum upon *initial* notice, there would be nothing left for Nexus to pay when the final claim arrives.  So ¶ 3(d) must contemplate a different kind of risk.

Paragraph 2(a)(ii) helps elucidate the parties' intentions in yet another way. Because it calls for "an amount sufficient to discharge any claim," J.A. 53, it confirms the parties understood how to draft a provision that chains payments to a specific bond.  Had they intended to condition ¶ 3(d)'s "exposure" solely on breached bonds, they could have easily mirrored ¶ 2(a)(ii) to require collateral in the "amount sufficient to discharge any [breached Bond]."  Instead, Nexus agreed to deposit collateral "sufficient to cover all exposure."  *Id.* at 54.

That is also why Nexus agreed, in ¶ 3(c), to furnish RLI with books, records, and accounts "until [RLI] has been otherwise fully indemnified."  *Id.*  RLI would have no need for this extended financial information had ¶ 3(d) reached only breached bonds.  And ¶ 3(e) further decouples collateral from specific bonds by allowing RLI to use "all collateral deposited" as "security on any or all Bonds."  *Id.*  In the end, surety bonds are not insurance; they aim to prevent all loss, not allocate risk.  Absent any indication that the parties sought to narrow collateral obligations, ¶ 3(d) plainly and unambiguously reaches all risk, whether it stems from the number of bonds currently in breach, Nexus's historic unwillingness to pay, or Nexus's troubling financial records.

And that is exactly what other courts have concluded when interpreting similar contractual provisions on motions for summary judgment.  Of particular interest is *Safeco Ins. Co. of Am. v. M.E.S. Inc.*, No. 09-CV-3312, 2010 WL 3928606 (E.D.N.Y. Oct. 4,

2010), a case both parties urged the district court to consider because it involved a virtually identical indemnity agreement, obligating the indemnitor, "on request of Surety, [to] procure discharge of Surety from any Bond" and, "[i]f such discharge is unattainable," to "deposit collateral with Surety, acceptable to Surety, sufficient to cover all exposure under such bond or bonds." *Id.* at *2. As here, the *Safeco* agreement did not define "exposure." *Id.* But the court did not think that lack of definition "render[ed] the term ambiguous" because there was "no reasonable basis for a difference of opinion"; the agreement plainly entitled Safeco to "specific performance to enforce a collateral security provision" for all "losses under a bond that are uncertain but anticipated at some point in the future." *Id.* at *2–3. And when the *Safeco* court came back to ascertain the amount of collateral appropriate, it required the indemnitor to deposit $875,000 to cover projected legal and consulting fees based on the parties' history of protracted enforcement litigation—risk arising from the surety arrangement generally, not any bond in particular. *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, No. 09-CV-3312 ARR ALC, 2010 WL 4828103, at *9 (E.D.N.Y. Nov. 22, 2010), *aff'd sub nom. Safeco Ins. Co. of Am. v. Hirani/MES, JV*, 480 F. App'x 606 (2d Cir. 2012).

Reading ¶ 3(d) to condition collateral on an immigrant's non-appearance would also create an unwritten condition precedent to Nexus's obligations. But Illinois law generally disfavors conditions precedent and requires them to be expressly spelled out in the contract. *See Liu v. T&H Mach., Inc.*, 191 F.3d 790, 798 (7th Cir. 1999) ("A condition precedent must be stated expressly and unambiguously."); *Premier Elec. Const. Co. v. Am. Nat. Bank*

*of Chic.*, 658 N.E.2d 877, 885 (Ill. App. Ct. 1995) ("conditions precedent are not generally favored"). We decline to imply one here.

At bottom, the text and context of ¶ 3(d) agree that Nexus must deposit sufficient collateral to secure RLI against all anticipated losses, not just losses on the already-breached bonds.

## B.

Nexus acknowledges that, generally speaking, "exposure" encompasses anticipated losses, but insists that, in the immigration industry, losses become anticipated only when an immigrant fails to appear. Nexus accordingly urges us to consider trade-usage evidence in determining the scope of "exposure" under the Agreement. RLI strenuously objects, contending Illinois follows the four-corner contract interpretation principle. RLI is correct in that Illinois will not consider subjective evidence like "the testimony of the parties themselves as to what they believe the contract means" when a contract is unambiguous on its face. *AM Int'l, Inc. v. Graphic Mgmt. Assoc., Inc.*, 44 F.3d 572, 574–75 (7th Cir. 1995) (discussing Illinois law). But as Judge Posner prudently observed, "an ordinary reader of English would not know about . . . special trade usage, and so [could mistakenly] suppose the contract unambiguous." *Id.* There must therefore exist "a means by which the law allows these surfaces to be penetrated." *Id.* That is why "objective" evidence, like that "there was more than one ship called *Peerless*," "is admissible to demonstrate that apparently clear contract language means something different from what it seems to mean." *Id.*

12

That Illinois law permits us to look at trade usage, however, does not help Nexus here.  For one, the Agreement was RLI's first foray into immigration bonds, so we decline to ascribe to it any immigration-specific knowledge of "exposure."  More fundamentally, Nexus did not (and still does not) offer any evidence of trade usage.  Nexus leans on just one expert who testified that "[t]here is no risk of financial loss on *these* bonds absent a nonappearance notice."  J.A. 2523 (emphasis added).  Setting aside any admissibility issues—for the expert was a lawyer with only one prior surety contracts experience—that testimony merely reiterates Nexus's arguments about *this* Agreement and *these* bonds.  The expert does not survey, for example, how other industry agreements use the term "exposure" or what kinds of losses other agreements deem anticipated.  He does not offer any industry dictionaries or templates.  He does not cite any court cases.  Yet that is what Illinois law requires:  For a term to be "established as part of contract by custom and usage," it "must be well-settled and uniformly acted upon, and must be established by several witnesses"; "it must have existed for a sufficient length of time to become generally known."  *Gord Indus. Plastics, Inc. v. Aubrey Mfg., Inc.*, 469 N.E.2d 389, 392 (Ill. App. Ct. 1984) (citation omitted).[3]  The expert opinion therefore adds nothing for us to consider

---

[3] The expert opinion is wrong even on its terms.  Like Nexus, the expert believes collateral obligations reach only "bonds on which nonappearance notices have been received" because ¶ 3(d) "does not say all bonds, but expressly limits collateral security to exposure under 'such' bonds under which discharge is unattainable."  Opening Br. 15 (quoting J.A. 2523).  As explained, that reading ignores ¶ 3(d)'s plain text, which requires collateral "sufficient to cover all exposure under such Bonds *or Bonds*," meaning ¶ 3(d) encompasses all bonds RLI has issued on Nexus's behalf.  J.A. 54 (emphasis added); *see supra* pp. 8–9.

on top of the arguments Nexus already made about the structure and purpose of the Agreement.

But even had we recognized some limited value in the expert opinion, Nexus gives the game away when it insists that "[g]eneral knowledge further confirms this trade interpretation of exposure." Opening Br. 16; *see id.* at 17, 33–34. By definition, trade-usage evidence can alter the interpretation of an agreement only when it "give[s] particular meaning to" or "qualif[ies] terms of an agreement." 810 Ill. Comp. Stat. § 5/1-303(d). But where the trade meaning does no work, where it merely recites what lay persons can already learn from the text, we have no reason to examine trade usage at all; we can determine whether an agreement is ambiguous on its face.

That Nexus does not muster any evidence of a different meaning in the trade is no surprise. Nexus props its argument—that there can be no risk to RLI until an immigrant defaults—on the unique structure of immigration bonds. Unlike in other industries, Nexus reasons, RLI does not deposit any money when it "issues" a bond, it merely promises to pay *if* the immigrant fails to appear. But that difference in structure does not translate into a difference of risk. Even though RLI's money is not tied up in a government account today, RLI must eventually pay for all breached bonds just the same.

If anything, the immigration context confirms the parties intended to evaluate risks more broadly. Unlike in a typical construction or commercial surety agreement, RLI here issued thousands of bonds. So while RLI cannot predict that a particular immigrant will breach a particular bond, there is no question *some* immigrants will default and RLI will have to pay those claims. Nexus's collateral must therefore secure against that future

14

aggregate loss. Consider a simple scenario where RLI issues ten bonds. A month in, two immigrants default and Nexus considers filing for bankruptcy. Fast forward another month, Nexus files for bankruptcy and four more immigrants default. On Nexus's view, RLI's only risk at the end of the first month flows from the two defaulted bonds. RLI can consequently request collateral only on those two bonds and must wait to request further collateral until the four other immigrants default. But by the time they do, RLI may receive nothing at all, or at best may need to wait months for bankruptcy proceedings to conclude. That defeats the very point of collateral: to secure RLI's obligations before it incurs them. Nexus itself appears to realize that exposure "is a function of total coverage." Opening Br. 17. Yet it fails to carry that principle to its logical conclusion: financial resources and ability to pay bear directly on RLI's exposure.

That Nexus must secure RLI against the loss on all outstanding bonds of course does not mean Nexus must deposit collateral totaling the penal sum on all those bonds. In that sense, Nexus is correct that we must measure collateral against some *anticipated* loss, and the district court appropriately rejected RLI's initial position that it could demand collateral up to $20 million. But we see no principled reason to hold that losses do not become anticipated until an immigrant fails to appear. We hold instead that "exposure" comprises all risks, such as Nexus's poor financial records and its historical failure to timely indemnify RLI.

III.

Apart from challenging the district court's interpretation of "exposure," Nexus also argues the district court erred in ordering Nexus to deposit collateral when RLI had not properly requested it.  *See* J.A. 54 (directing Nexus, in ¶ 3(d), to deposit collateral "if requested by Surety").  To be sure, Nexus does not contest that RLI asked it to pay—RLI's $10 million demand is the reason the parties have come before this Court.  Rather, Nexus maintains that RLI requested $10 million in bad faith and so did not fulfill a condition precedent to Nexus's collateral obligations.  As proof, Nexus observes the district court ruled the amount of collateral must be reasonable and then disallowed RLI's demand for $10 million as *un*reasonable, directing Nexus to deposit $2.4 million instead.

Unreasonableness is not "the test of good faith" in Illinois, *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992), and this case helps understand why.  After several rounds of briefing, and with the help of multiple experts, the district court concluded, in hindsight, that $10 million was unreasonably high.  But RLI did not have the benefit of that guidance when it made its initial request, for Nexus repeatedly refused to disclose its books, carry on a meaningful dialogue, or propose a lower amount.  In those circumstances, there was nothing sinister about requesting $10 million to secure a $20 million liability.  Indeed, while the district court disapproved of the precise figure RLI requested, it rejected Nexus's bad faith counterclaim because Nexus failed to show that RLI "both intended to and did actually attempt to contravene the purpose of the agreement"—especially "because any collateral requested merely represents funds held in trust for Nexus, and not for RLI's profit."  *RLI*

16

*Ins.*, 470 F. Supp. 3d at 592–93.  RLI, the district court concluded, merely sought to enforce the Agreement as it understood it.  *Id.*  And Nexus's failure to appeal the district court's good-faith ruling may alone foreclose this argument.

But Nexus also misapprehends the nature of this action.  This is not a breach-of-contract claim, where RLI seeks to collect damages for Nexus's failure to provide collateral and Nexus defends by demonstrating RLI did not fulfill the condition precedent.  This is a request for an equitable remedy.  The only consequence of RLI's unreasonable request is that the district court must adjust the collateral amount consistent with equitable principles, as the court did here.

## IV.

That brings us to Nexus's objections over the process the district court used to arrive at $2.4 million.  Nexus contends the district court performed "an incredibly specific calculation" inappropriate for summary judgment and that "any determination of reasonableness" should instead "have been reserved for a trier of fact."  Opening Br. 37–38.  Nexus also resists the court's authority to impose any *reasonable* collateral when the Agreement called for an "objective" measure by tying collateral to RLI's exposure.  *Id.* at 31–32.

## A.

Here, too, Nexus confuses actions for breach of contract with requests for specific performance.  Because Nexus failed to provide *any* collateral, it breached the Agreement.

17

But RLI did not sue for damages flowing from that breach, such as compensation for some "certain" losses it suffered in paying past-due bonds out of its own pocket. *Safeco*, 2010 WL 3928606, at *3. Instead, RLI requested a specific-performance decree obligating Nexus to provide collateral going forward. In making that request, RLI had "no legal remedy," only "an equitable" one. *Am. Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 300 (2d Cir. 1989), *cited with approval in*, *Hanover*, 2006 WL 2375428, at *5; *accord Eakin v. Cont'l Ill. Nat. Bank & Tr. Co. of Chi.*, 121 F.R.D. 363, 366 (N.D. Ill. 1988) (explaining that collateral decrees comprise equitable remedies because "to date, there simply are no damages to award"), *aff'd*, 875 F.2d 114 (7th Cir. 1989); *cf. Com. Ins. Co. of Newark v. Pac.-Peru Constr. Corp.*, 558 F.2d 948, 954 (9th Cir. 1977) (holding specific performance "not available" when a plaintiff has "an adequate remedy at law").

Like any grant of specific performance, then, the district court's order to deposit collateral constitutes "a matter of sound judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances of a particular case." *Schwinder v. Austin Bank of Chi.*, 809 N.E.2d 180, 196 (Ill. App. Ct. 2004) (citation omitted). In that capacity, Illinois courts "balance the equities between the parties" and "may refuse to grant specific performance where the remedy would cause a peculiar hardship or inequitable result." *Id.* (citation omitted). Outside Illinois, courts, too, uniformly understand their "function" in such actions as "determin[ing], in light of the circumstances of the case and the supporting documentation submitted by the parties, whether [a surety]'s demand is a reasonable estimate of its anticipated losses." *Safeco*, 2010 WL 4828103, at *4; *accord Am. Motorists*, 876 F.2d at 303 ("leav[ing] to the district

18

court the question of how much collateral security [the indemnitor] is obligated to provide"); *Travelers Cas. & Sur. Co. of Am. v. Sw. Contracting, Inc.*, No. 4:05CV99-DJS, 2006 WL 276942, at *3 (E.D. Mo. Feb. 2, 2006) (granting specific performance where collateral sought was "reasonable and not excessive"); *U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 922 (E.D.N.Y. 1999) ("a collateral security clause is enforceable as long as the amount demanded by a surety is reasonable"); *U.S. Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579, 588 (M.D. Pa. 1998), *aff'd*, 185 F.3d 864 (3d Cir. 1999) (same, because "there is no windfall for the surety").  What courts do not do is assess "demand[s] for collateral security" "under the summary judgment standard." *Safeco*, 2010 WL 4828103, at *4.

Disputed facts and conflicting assessments of risk therefore do not defeat the district court's authority to order specific performance.  After all, "[i]f it were a prerequisite for the surety and indemnitors to agree upon all the material facts pertaining to future payments," "no surety would ever succeed in enforcing its interim right to collateral."  *Id.* (internal quotation marks and citation omitted).  And, if taken seriously, the logic of Nexus's argument would require us to send any factual disputes inherent in requests for injunctions or restraining orders to the jury.  We decline to so undermine the very foundation of the law-equity divide and instead hold that the district court correctly approached the task before it by scrutinizing the reasonableness of the collateral amount.

B.

Because the district court applied the principles of equity, we review its determination of the collateral amount for abuse of discretion. *Klein v. PepsiCo, Inc.*, 845 F.2d 76, 78 (4th Cir. 1988). Finding no abuse, we affirm.

After ruling on the contractual-interpretation question above, the district court dedicated a separate round of briefing to ascertaining the appropriate amount of collateral. It then held a two-day hearing, where both parties had an opportunity to present fact and expert witnesses. RLI called an actuary with experience in the surety industry, a forensic accountant, and a more general expert on surety and insurance contracts. The actuary identified four characteristics predictive of bond breach: bond amount, date of the immigrant's last contact with Nexus, the immigrant's last payment to Nexus, and the immigrant's country of origin. *RLI Ins.*, 2020 WL 6262967, at *3 & n.5. Based on those characteristics, she calculated a future breach risk to RLI on the outstanding bonds to constitute approximately $10 million—the amount RLI first requested as collateral. *Id.* The forensic accountant identified several areas of Nexus's financial records which caused him concern, such as multiple six- and seven-figure debts, hundreds of thousands of dollars in bounced checks, and repeated failures to conform financial records to standard industry practice—most troublingly, underreporting liabilities. *Id.* at *4–5. Building upon that testimony, RLI's industry expert explained that often times, when "the books are a mess and they are inaccurate," "that is a sure sign that . . . down the road, . . . the indemnitors lose their ability to pay." *Id.* at *6. That means even a zero-loss situation can quickly turn

20

USCA4 Appeal: 23-2253      Doc: 91        Filed: 04/24/2023      Pg: 21 of 37

into losses on "some 80 percent of the claims." *Id.* So the appropriate amount of collateral must account for "what the losses *could* be in the future." *Id.* at *7 (emphasis added).

RLI also offered a factual witness, its Assistant Vice President of Claims. He began by outlining the basic facts about the bonds. RLI, he explained, has issued a total of 2,486 bonds on Nexus's behalf. *Id.* at *3. By the date of the hearing, 393 of those bonds had been breached, causing RLI to pay $4,460,000 to the U.S. government.[4] *Id.* Comparing that figure to the 424 bonds that have been cancelled—bonds for immigrants who appeared in court or have been deported, relieving RLI of liability—yields a historic breach rate of about 48%. *Id.* And 48% of the current outstanding bond amount again yields about $10 million. *Id.*

The same witness also reviewed Nexus's financial and operating documents and identified eight risk factors flowing from Nexus's financial decisions that affect its ability to pay, including Nexus's historic failure to timely indemnify RLI for breached bonds, its unreliable and inconsistent financial records, a recent—and unrecorded—real estate sell-off, and ongoing investigations and enforcement actions. *Id.*

Nexus called no expert witnesses during this evidentiary hearing. Its Vice President of Operations conceded that "its books and records were a mess" but proffered that Nexus "was taking affirmative steps to bringing them in order." *Id.* at *6. He also admitted to various investigations and lawsuits, offering only that there was no "money Nexus owed

---

[4] As discussed, the parties do not contest that Nexus eventually reimbursed RLI the full sum of the breached bonds.

on other ongoing investigations." *Id.* at *7. Nexus's Vice President of Risk Management testified that Nexus "made efforts to contact its RLI-bonded program participants during the past few weeks and obtained declarations from 219 participants stating that they fully intended to appear." *Id.* But Nexus's CEO conceded that Nexus no longer uses GPS monitoring because the GPS company terminated its services in light of Nexus's $7 million debt. *Id.* at *5. Nexus's only quarrel with RLI's testimony was the formula used to calculate the historic breach rate—and the end result of 48%. Rather than compare breached bonds to bonds cancelled so far, Nexus insisted that the court should compare breached bonds to all pending bonds because "RLI faces no risk" on "bonds for which principals have demonstrated a history of compliance." *Id.* at *3. That analysis would yield a breach rate of roughly 5%. *Id.*

The district court carefully considered this testimony in a 13-page opinion, ultimately ordering Nexus to deposit just $2.4 million, a quarter of RLI's originally-requested $10 million. *Id.* at *9. The court explained that it based that sum on the amount of outstanding bonds, Nexus's "historic failure to timely pay breached bonds," Nexus's continued refusal "[t]o this day . . . to make available accurate financial records," and Nexus's deteriorating financial condition, evidenced by "the myriad investigations into [its] business practices by various state attorneys general and bureaus of insurance, claims made by large creditors, its recent sell-off of real estate[,] and diminished cash flow." *Id*. We find no abuse in that detailed, well-reasoned order.

C.

Nexus tries one last argument.  It observes ¶ 3(d) does not leave collateral amount to RLI's sole discretion but ties collateral to RLI's "exposure."  That language, Nexus insists, invites "objective" assessments of collateral due, precluding the kind of open-ended reasonableness evaluations the court conducted below.  Opening Br. 32.  And because the only "objective" measure happens to be the penal sums on the bonds breached, the district court should have limited collateral to that amount.  As discussed, that is simply not how courts approach requests for collateral—courts uniformly apply a reasonableness standard, including in contracts identical to the one here that tie collateral to a surety's "exposure." *See Safeco*, 2010 WL 4828103, at *4; *see supra* pp. 17–19.  And with good reason:  RLI will not retain the $2.4 million "as its property" but will hold it "in trust" for Nexus.  *Am. Motorists*, 876 F.2d at 300.  If Nexus's "misgivings regarding the amount of money held in collateral prove to be correct, [it] will be entitled to have [its] money returned." *Hanover*, 2006 WL 2375428, at *6 (internal quotation marks omitted).

Cases that calculate damages for breach of contract are thus beside the point.  *See* Opening Br. 31 (citing *Boyd v. Tornier, Inc.*, No. 07-cv-0751-MJR, 2009 WL 1657900, at *7 (S.D. Ill. June 12, 2009), which refused to calculate quotas under a "reasonability" principle because the contract provided specific guidelines for quota calculations).  Same with cases that decline to imply a duty of good faith and fair dealing to override express contractual language.  *See id.* at 31–32 (citing *Fields v. Thompson Printing Co.*, 363 F.3d 259, 271 (3d Cir. 2004); *Paulus Sokolowski & Sartor, LLC v. Cont'l Cas. Co.*, No. Civ.A. 12-7172 MASTJ, 2013 WL 11084770, at *7 (D.N.J. Aug. 30, 2013)).  Those cases apply

to courts sitting in law, deciding damages for breach of contract on summary judgment. Sitting in equity, the court below was not only permitted but obligated to conduct a reasonableness inquiry, so as to ensure that its grant of specific performance would not "cause a peculiar hardship or inequitable result." *Schwinder*, 809 N.E.2d at 196 (citation omitted).

That is presumably why RLI does not appeal the district court's winnowing of the collateral to $2.4 million, even though ¶ 3(d) directs Nexus to "deposit collateral with Surety, *acceptable to Surety*, sufficient to cover all exposure." J.A. 54 (emphasis added). Even sureties that contractually have "sole discretion" over the amount of the collateral must, at day's end, satisfy the courts "the sum demanded is reasonable." *BIB Constr. Co., Inc.*, *v. Fireman's Ins. Co. of Newark*, 214 A.D.2d 521, 523 (N.Y. App. Div. 1995). That is, a surety can sue for damages when an indemnitor breaches its contractual obligation to deposit the amount the parties have agreed to—here, an amount "acceptable to" RLI. J.A. 54. But, when it comes to specific performance, courts can no more order an indemnitor to deposit an unreasonable amount of collateral than order an employee to stay in a job she wishes to leave.

Even setting those foundational principles aside, Nexus's argument proves too much. That the Agreement anchors the collateral amount in RLI's "exposure" rather than allow RLI to singlehandedly name the price does suggest some objective evaluation of how much risk RLI faces. But it does not follow that the only objective measure of that risk is the value of breached bonds. Outside experts' evaluations, financial documents, and historic rate of default offer objective gauges, as well. Nothing in such a reasonableness

analysis requires—or allows—the court to take RLI at its word.  We accordingly decline Nexus's invitation to circumscribe the court's traditional equity function, affirm the district court's interpretation of the contract as a matter of law, and affirm its collateral decree as a sound exercise of discretion.

## V.

Nexus finally asks us to reconsider the district court's award of litigation costs "assuming that Nexus's interpretation of its obligations under the Indemnity Agreement prevails before this court, or if the District Court's summary judgment rulings are remanded for further proceedings."  Opening Br. 39.  Because we affirm, we have no need to reach this question.[5]

## VI.

For the foregoing reasons, the district court's judgment is

*AFFIRMED*.

---

[5] We clarify, however, that where an indemnitor expressly agrees to compensate for "all losses, costs, damages, attorneys' fees and expenses of whatever kind or nature which arise . . . in enforcing this agreement," J.A. 53, the award of costs and fees constitutes direct damages under the agreement, not fee shifting.  *E.g.*, *Lamp, Inc. v. Int'l Fid. Ins. Co.*, 493 N.E.2d 146, 149 (Ill. App. Ct. 1986).  So we would ask whether RLI incurred its costs and fees "in enforcing this agreement," J.A. 53—not whether RLI is entitled to them as a prevailing party.  *See Hanover Ins. Co. v. Smith*, 561 N.E.2d 14, 18 (Ill. 1990) (assessing whether a surety sustained attorney's fees "in consequence" of the execution of a bond agreement); *Fid. & Deposit Co. of Md. v. Rosenmutter*, 614 F. Supp. 348, 352 (N.D. Ill. 1985) (declining to indemnify litigation expenses where an action "was unnecessary to enforce the contract").

QUATTLEBAUM, Circuit Judge concurring:

I am pleased to join in sections I, II, III, V and VI of Judge Floyd's excellent opinion. I write separately only concerning section IV.

There, the majority concludes the district court did not err in examining the amount of collateral RLI requests from Nexus for "reasonableness." According to the majority, RLI sought equitable relief which the district court is afforded discretion to provide. I agree that, in equity, a court has discretion in fashioning an appropriate remedy. But that discretion does not include remedies that are inconsistent with the express terms of the contract. "Courts have traditionally analyzed the plain language of the indemnity agreement to determine a surety's right to obtain specific performance of collateral security." *Hanover Ins. Co. v. Clark*, No. 05 C 2162, 2006 WL 2375428, at *5 (N.D. Ill. Aug. 15, 2006).

Here, the express terms allowed RLI to seek collateral "acceptable to [RLI]." Given that language, I would not have imposed an objective standard of reasonableness. To me, that judicially modifies a term on which the parties agreed and reduced to writing. Words have meaning and, as I understand Illinois law, that meaning does not evaporate just because a party brings a claim in equity. *Butler v. Kent*, 655 N.E.2d 1120, 1127 (Ill. App. Ct. 1995) ("The province of a court in a specific performance action is to enforce the contract which the parties have made."); *Snyder v. Spaulding*, 57 Ill. 480, 484 (1870) ("Equity does not propose to relieve against the express contract of parties.").

For those reasons, I agree with Nexus that the district court erred in imposing a reasonableness standard to the amount of collateral RLI could request when the contract

permitted collateral "acceptable to [RLI]." However, despite my agreement with Nexus on this point, the relief Nexus seeks for this error—as ably explained by the majority in section II of its opinion—contravenes the plain language of the contract. Ironically, the party prejudiced by the district court's imposition of a non-contractual objective standard of reasonableness was RLI, not Nexus. But RLI did not appeal the district court's reasonableness inquiry and finding. Therefore, I concur in the majority's ultimate conclusion that Nexus' arguments on appeal must be rejected.