IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

RLI INSURANCE COMPANY,

    Plaintiff,

    v.

NEXUS SERVICES INC.,
LIBRE BY NEXUS INC.,
HOMES BY NEXUS INC.,

    Defendants.

Case No.: 5:18-CV-00066-MFU-JCH

## MEMORANDUM IN SUPPORT OF NEXUS SERVICES, INC.'S MOTION TO PARTIALLY VACATE, MODIFY, OR IN THE ALTERNATIVE ORDER CONTEMPT PURGED.

## INTRODUCTION

Coercive civil contempt by its very nature is purgeable by the contemnor.[1]

Again, foundationally were the contemnor denied the ability to purge the contempt,

and the contempt not compensatory, such would become criminal and various rights

---

[1] *See generally Intern'l Union of Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828-829 (1994) (holding in quintessential coercive contempt "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket.") (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911)) (internal quotation marks omitted); *id.* (noting that where contempt not compensatory can be "civil only if the contemnor is afforded an opportunity to purge.") (citing Penfield Co. of Cal. v. SEC, 330 U.S. 585, 590) (1947).

would be triggered.[2] Where the contemnor has purged the contumacious behavior that led to the holding of contempt a court *may* vacate the order holding the party in contempt or alternatively the contempt is purged by operation of law.[3] Due to the somewhat unusual structure of the most recent order Nexus Services, Inc., Libre by Nexus, Inc., Micheal Donovan, and Evan Ajin (collectively "Nexus Parties"), face contempt sanctions contingent on failure to accomplish certain tasks by June, 30 2023; Nexus Services, Inc., ("Nexus") requests various relief all of which would have the same practical effect and all of which would be appropriate, *i.e.*, purging the previously found contempt. Nexus requests the Court partially vacate portions of its Order (ECF

---

[2] For the purposes of the instant motion, Nexus assumes that the current contempt sanction is supposed to be coercive in nature, in other words the primary purpose of the sanctions to be imposed is to coerce Nexus to comply with the post-judgment discovery demands. It would be wholly nonsensical, given the sanctions, if it were to be considered compensatory.

If Nexus has no ability to further comply an imposition of any contempt sanction would be criminal in nature. *See, e.g.*, *Turner v. Rogers*, 564 U.S. 431, 442 (2011); *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 638 n.9 (1988); Shillitani v. U.S., 384 U.S. 364, 371 (1966).

Moreover, as most circuits recognize, if the contempt sanction loses its coercive nature, in other words if it will not remediate the wrong complained of than its imposition *becomes* criminal. *See In re* Grand Jury Investigation, 600 F.2d 420, 424-25 (3d Cir. 1979) (citing *Lambert v. Montana*, 545 F.2d 87, 89-90 (9th Cir. 1976)). *Accord In re* Crededio, 759 F.2d 589, 590 (7th Cir. 1985); *Simkin v. United States*, 715 F.2d 34, 36-37 (2d Cir. 1983).

[3] *See Matter of Dowell*, 82 B.R. 998, 1003 (W.D.Mo. 1987) (noting "it is appropriate for a court to vacate or set aside a civil contempt order when the contemnor has purged himself or herself of contempt" and collecting cases across district and circuit courts).

Doc. No. 848) (vacating previous contempt sanctions and ordering new sanctions) (hereinafter "June Order"), specifically those portions holding Nexus Parties in contempt and ordering further sanctions, and vacate its previous contempt order *in toto* (ECF Doc. No 797) ("Initial Order"); or Nexus Parties request that the Court modify its June Order to the same effect and vacate its Initial Order; or in the alternative simply issue a superseding order holding the contempt purged.

## FACTS

As an initial matter, Nexus has and continues to make *any and all documents* in its possession available to RLI for inspection and copying. *See* Lawrence Decl. at ¶¶ 17-19. Nexus cannot force RLI to inspect and copy what it has chosen to ignore.

### A. Introduction

Here, the Court's orders required Nexus Parties to: (1) "provide sworn and complete answers to RLI's post-judgment interrogatories"; and 2, "produce the documents requested by RLI in its request for production of documents and subpoenas." Nexus Parties have done this. *See generally* Lawrence Decl.; *see also* Ajin Affi.[4]

---

[4] The full annexes and sworn interrogatory responses are attached as Exhibit A to Mr. Lawrence's declaration; the responses are specific and sworn to. *See* Lawrence Decl., Ex. A (ECF Doc. No. 562-1). A copy of the responses to the requests for production of documents are attached to Mr. Lawrence's declaration as Exhibit B, and the same comply with the requirements of this Court's orders (and the orders incorporated by reference) which could be complied with. *See See* Lawrence Decl., Ex. B (ECF Doc. No. 562-2).

RLI Insurance Company ("RLI") never requested to review documents made available to it—specifically, all of Nexus's records—despite an open offer for inspection and copying and five explicit offers to physically inspect and copy *any and all* of the documents and records in Nexus's possession. *See, e.g.*, Lawrence Decl. Exs. C-F (ECF Doc. Nos. 562-3, 4, 5, 6). Further, RLI's counsel has not expressed any concrete defect with Nexus's production as it relates to the Court's June Order—apart from its recent filing which points to the following flaws that: (1) Nexus has not responded with specificity and particularity to document requests;[5] (2) Nexus provided

---

[5] Judge Hoppe had ordered Nexus to provide specific information if it was going to choose not to produce by claiming it had previously produced any document. *See* ECF Doc. No. 665 at 1-2. Nexus chose to produce all responsive documents it had and where such were not produced in the most recent production reference it by Bates number, production date, and location.

In other words, Nexus did not seek to avoid production of documents by stating that such were previously produced but rather produced all documents.

Moreover, Judge Hoppe's later order required Nexus to *provide the Court* with signed declarations explaining what had been produced, and to *file them with the Court*, in order to assist the *Court* in making its determination as to whether or not Nexus remained in contempt within a certain period of time which had long past. *See* ECF Doc. No. 733.

To the extent that this was not mooted by the holding of contempt it would appear to have been superseded by the Court requiring RLI to provide notice of compliance or non-compliance. *See* ECF Doc. No. 848.

The later order entered by Judge Hoppe did not require any substantive content in the Responses or any requirements beyond what exist in the FRCP and under Judge Hoppe's previous order which specifically addressed form requirements for the

responses to interrogatories which RLI believes untrue; (3) various checks deposited into a Dupont Credit Union Account were not produced or reflected in the interrogatories; and (4) Nexus no longer can access accounts with merchants it cannot afford. *Compare ibid.*, *with* ECF Doc. No. 859 (hereinafter "Pl.'s Not.").

RLI complains of requirements that simply were not present in either Judge Hoppe's orders or this Court's most recent June Order.

As an illustrative example, much time is devoted to stating that the responses to the document production failed to attempt to specify where documents were located, *see* Pl.'s Not. at 2-4; the production of documents began with a boldface general response that stated:

> GENERAL RESPONSE: **Defendants have produced all responsive documents which are in their custody and control and will continue to produce any further responsive documents in compliance with the FRCP. Defendants will make their production electronically and by delivering a physical hard drive. Additionally, Defendant's shall make available for inspection all records in their possession and control and has ensured that counsel will be available at Defendants' offices on June 29, 2023 through June 30, 2023; Defendants further will make all records available for inspection at their offices on any date mutually agreed to by Defendants' counsel and RLI's counsel. Defendants' counsel agrees to make himself available on five days' notice on any day on which he does not have a previously-scheduled court appearance, deposition, or meeting which requires his physical presence.**
>
> **Defendants have reproduced all previous productions in "All Time RLI Production"; however, bates-stamped and searchable documents, with log**

production and responses. *See generally* ECF Doc. No. 733; *see also* ECF Doc. No. 665.

files, *etc.*, are contained in the "OCR & Bates RLI March Production 2023" ***all documents which are responsive have been placed in folders corresponding to each request.***

ECF Doc. No 562-2 (emphasis added; bold face original).

Each document, and again thousands of pages exist not to drown RLI in production but rather due to the breadth of the response, was placed into a folder corresponding to each numbered request, *i.e.*, every document responsive to request number one was placed in a folder of corresponding number:



Lawrence Decl. Ex. G (ECF Doc. No. 592-7).

It is exceedingly clear where the documents are located, what request they are responsive to, and each is identified by bates label:



*Id.*

The point here is that the pages of responsive documents to request number one were served on RLI on June 29, 2023—the certificate of service demonstrates that, *see* Lawrence Decl. Ex. F (ECF Doc. No. 592-8)—the responsive documents to request number one were served on that date, in folder number one, and ran from bates number 0000001 to 0173495. *See* Lawrence Decl. at ¶¶ 12-13. There were thousands and thousands of pages *because* RLI requested "all bank or other statements for each of the

financial institutions listed in the interrogatories above for calendar years 2020 and 2021[,]" and Nexus provided them. *Id.*

Folder two contains approximately 500 pages of documents all responsive to request number two *because* RLI requested "any and all documentation showing distributions or other transfers of funds or other assets of any type made to members of the Company within calendar years 2018, 2019, 2020, and 2021."  *Id.* Each page is Bates stamped, each obviously responsive to request number two, and each obviously produced on June 29, 2023, when the documents were served. *See id.*

Folder three contains approximately 300 pages and so on and so forth. *Id.*

In all Nexus produced 319,899 pages of discovery in its most recent production all sorted into folders which clearly indicate what document is responsive to which request. *Id.*  Nexus was not relying on previous productions to avoid producing, nor refusing to produce, but stated that all responsive documents had been produced *because* that was the appropriate response, all responsive documents were produced and sorted into various folders clearly corresponding to each request, each obviously produced on June 29, 2023, the date of service, covering the bates numbers by which every file was labeled and sorted in the folders containing the responses. *See generally* Lawrence Decl.; *see also id.*, Ex. B.

A. *Discovery Controversies and Background*

Post-judgement discovery has been fraught. *See* Lawrence Decl. at ¶¶ 2-9.
Nexus has in the past failed to make full productions, failed to serve properly executed
discovery responses, and generally been unable to comply with its obligations under
the FRCP and Court Orders. *See generally* ECF Doc. No. 847. The blame for these
*past* failures falls at the feet of Nexus.[6] In the Court's most recent order relating to
these failures the Court ordered compliance with past obligations the order required
Nexus to:

> to comply with Judge Hoppe's Orders of May 27, 2021, and August 25, 2021, to
> provide sworn and complete answers to RLI's post-judgment interrogatories and
> produce the documents requested by RLI in its request for production of
> documents and subpoenas. Nexus and the Entities have until June 30, 2023, to
> comply with the Orders, serve the interrogatory answers, and produce the
> documents.

ECF Doc. No. 848 at 1-2.

Judge Hoppe in his May 27, 2021 order, required specific responses to post
judgment discovery requests and noted that:

> If Defendants take the position that they have already provided some or all of
> this discovery to Plaintiff, they must identify, for each interrogatory and request
> for production individually, what responsive information has previously been
> produced. Defendants must identify this prior discovery with specificity and
> particularity, noting what information and/or documents were produced, the
> specific prior discovery request(s) in response to which the information and/or
> documents were produced, the Bates numbers of previously produced
> documents, and the date of production, as applicable.

---

[6] Nexus believes that a multitude of factors complicated its attempts to previously
comply with its obligations, but recognize that the responsibility to comply with Court
orders ultimately rested on its shoulders.

ECF Doc. No. 665 at 1-2.

Likewise Judge Hoppe's order required certain action of the Nexus Entities if they attempted to avoid production due to past production:

> The Entities are DIRECTED to respond with specificity and particularity to Plaintiff's subpoenas within fourteen (14) days from the date of this Order. *If the Entities take the position that any or all of the information Plaintiff seeks has already been produced to Plaintiff, they must identify the prior discovery with specificity and particularity, as outlined in paragraph (1) of this Order.*

> *Id.* at 2.

It is this difference that led to differing styles of production, the entities relied partially on Nexus past-responses to avoid production and so specified by bates number and location the documents which they did not produce. Lawrence Decl., Ex. I (ECF Doc. No. 562-9).

Next, Judge Hoppe ordered, in order to assist the Court in determining to what extent Nexus had produced documents, additional evidence in the form of declarations after a hearing. *See* ECF Doc. No. 733 at 1. These were to be filed with the Court in order to allow the Court to determine what had and had not been produced. *Id.* It required filing within 7 days and became mooted by later determinations of contempt as well as the latest holding of contempt of this Court, had the Court ordered Nexus to file a notification or declaration rather than RLI Nexus certainly would have done so; however, the Court's latest order shifted that burden on RLI. *See id.*; *see also* ECF Doc. No. 848.

The later August 25, 2021, order of Judge Hoppe (ECF Doc. No. 733), critically, did not create new or positive obligations for Nexus vis-à-vis the form of discovery or what Nexus needed to produce to RLI—again the order required filings of declarations with the Court to allow the Court to determine contempt that was ultimately imposed. To the extent that RLI reads it as requiring Nexus to provide anything to RLI or respond beyond what was required of the FRCP, such would be beyond the plain language of that order. (Compare Pl.'s Not. at 2 (reading a requirement to respond in a certain manner), *with* ECF. Doc. No.733 (requiring *filing of declaration with court* in seven days to assist in determining whether to issue contempt order that ultimately issued).

The Court, however, in its June Order gave Nexus a final chance to comply by swearing to its interrogatory answers under penalty of perjury and producing responsive documents. ECF Doc. No. 848 at ¶¶ 5, 6.[7] In essence the civil contempt sanctions were contingent on failure to comply with the above terms.

B. *Production's Structure*

---

[7] Clearly it is a failure to provide "sworn and complete answers to interrogatories by the June 30, 2023" and a failure to "produce the documents requested and subpoenaed by RLI from Nexus and the Entities by the June 30, 2023" which triggers the sanctions of contempt. *See id.*

Nexus has produced sworn interrogatory responses. *See* Lawrence Decl., Ex. A. Those responses may not be the responses RLI wishes it was to receive, but such are complete and specific. *See id.* Further, those responses, in line with past orders, specify the bates numbers and location of documents previously produced or alternatively to the extent they incorporate newly produced documents specify their location within annexes which accompanied the interrogatories and were served concurrently therewith. *See id.*

Those annexes are lengthy, but they are lengthy specifically because RLI requested broad swaths of information that was not practical to provide in narrative or colloquial format—for instance there were thousands of transactions that were classified as loan transactions and thousands of transactions that were conducted on credit cards, certainly given the information sought it was significantly less burdensome to respond to those interrogatories by incorporating those records rather than writing thousands and thousands of sentences. *Id.*

Moving on to the actual production of documents, Nexus made document production in three manners: (1) it electronically delivered copies of documents; (2) it physically delivered a hard drive containing identical documents; and (3) *it made all documents available for inspection and copying on a rolling basis at Nexus's offices*. *See* Lawrence Decl. Exs. C, H. Additionally, it provided access to databases to allow to access records as they were kept in the normal course of business. *See* Ajin Aff. at ¶ 6.

Each document produced, which reasonably could be produced, was bates stamped and placed in a folder labeled with the specific document request to which it was responsive. *See generally* Lawrence Decl. As the responses note "*all documents which are responsive have been placed in folders corresponding to each request.*" *See* Lawrence Decl., Ex. B.

Additionally—and largely as a courtesy—Nexus provided past productions, again sorted into self-explanatory folders, which contained past production which apparently current counsel for RLI had never accessed.[8] Beyond all of this, again and again, Nexus stressed the availability of its records *carte blanche* for inspection and copying. *See* Lawrence Decl. at ¶¶ 17-19.

### 1. *Responses to Interrogatories*

Nexus's current responses to interrogatories provide concrete responses to RLI's requests signed under penalty of perjury. *See* Lawrence Decl. Ex. A. Those responses additionally incorporate the contents of certain documents either contained in a specific annex (all served concurrently with the interrogatory responses) or documents which are referenced by bates number, location, and date of production. *Id.*

There is nothing on the face of the interrogatories which demonstrates anything but compliance with the Court's requirements. *See id.*; *see also* June Order. The

---

[8] Egnyte allows administrators to view various metrics including who has and has not viewed content.

pertinent requirements mandated that the interrogatories be "sworn" and "complete." Each of these appears to be met. *Id.*

There was a substantive response to each question that provided the pertinent information to the best of the affiant's ability, most of those referenced thousands of pages of documents not because such was ideal, but rather because such was necessary due to the requests.[9] If you ask a party to identify every loan given, and due to an accounting quirk thousands of transactions are classified as loans it would be well-nigh impossible to translate those thousands of transactions into colloquial narrative.

Further, Nexus, in line with standard practice and the Federal Rules of Civil Procedure stated that it will produce all responsive documents that it later discovers and that all other responsive documents have been produced in folders corresponding to each document request. *See* Fed. R. Civ. Proc., Rule 34(b)(2)(B).  Nexus also specified who may have additional relevant information and the efforts it has undertaken to get the same information. *See* Lawrence Decl. Ex. B.

Most importantly, Nexus has not only produced all responsive documents but made *any and all documents* available for inspection and copying. This normally would be superfluous, but it alone complies with Nexus's obligations under Rule

---

[9] Had Nexus not incorporated the documents but rather attempted to specify thousands of specific transactions in narrative form, it is virtually guaranteed that there would be complaint that various transactions did not appear in that narrative and that choosing not to incorporate the document responses was yet more skullduggery on the part of Nexus.

34(b)(2)(B). RLI may choose not to inspect and copy documents in Nexus's, but Nexus has made the documents available to RLI and thereby complied with its discovery obligations under the FRCP. *Id.*

### 2. Current Document Production

The responses to the request for document production facially comply with the Court's requirements and the FRCP. *See* R. 34(b)(2)(B). Because Nexus was precluded from objecting to the document requests there were only two acceptable answers to the requests for production: that the documents had been produced and production would continue in line with FRCP mandates or that the documents were not in the possession and control of Nexus. *Id.* Nexus has done just that. *See* Lawrence Decl. Ex. B.

The responses are of course accompanied by an actual production of documents. *See generally* Lawrence Aff. Ex. G. This production of documents includes both historic past productions as well as the current production which clearly provides all responsive documents each responsive document placed in a subfolder corresponding to the request. *Id.*

There was no requirement for Nexus to identify and specify documents produced in its current production, but rather the order required: complete production and certain contingent requirements if Nexus were to attempt to avoid response by claiming that the documents had already been produced. *See* ECF Doc. No. 665, *see also* June Order.

Even if so, the only substantive difference to the responses were Nexus required to comply with RLI's desired interpretation would be that instead of noting in a general response that "*all documents which are responsive have been placed in folders corresponding to each request.*" Nexus would have repeated the same language 26 times and noted bates numbers which because of the organization was redundant and wholly unnecessary, *i.e.*, under the order inapplicable.

### 3. Service of Documents

The document production, responses to the requests for document production, and the responses to the interrogatories were electronically and physically served timely on RLI. *See* Lawrence Decl., Ex. H.

### C. Contents and Nature of Production

Nexus Produced a single folder which contains all discovery produced to RLI this folder is broken into three sub-folders "All Time RLI Production" (which contains all documents produced to RLI); "Docs Bates Stamp in Interrogatories" (all documents contained in Interrogatory Responses Bates stamped for convenience); and "Entity Production" (the production of the Nexus entities placed into the same location again for convenience). *See* Lawrence Decl., Ex. G.

Pertinently the "All Time RLI Production" folder contains the various iterations of productions made to RLI to which Nexus still has access, but most importantly has its current production which as noted in its Responses is labeled "OCR & Bates RLI

Production March 2023." *Id.* This folder contains 28 sub-folders, each corresponding to the 28 document requests. *Id.* In an extreme excess of caution, counsel requested that not only the number but the actual request be placed in the folder name to avoid any possible confusion. *Id.*

Each of these was provided to RLI both physically in the form of a hard drive and electronically in the form of a link to Egnyte. *See* Lawrence Decl. Exs. C, H. Defendants considered physically providing the documents to RLI but did not do so because it was believed that such would have been considered theatrical.

Those subfolders 1-28, are further broken down and include "content folders" which are often created utilizing e-discovery platforms, *e.g.*, a "TEXT" folder containing .txt files for eased searching and processing, a "NATIVE" folder containing the documents in native format, a "IMAGES" folder containing the documents converted into a .pdf, and a "DATA" folder containing relevant metadata for all files. *See generally* Lawrence Decl. Ex. G.

The documents in folders such as this are not necessarily meant for easy human consumption, but rather are used in order to allow for one to sort through very large volumes of e-discovery with the assistance of e-discovery platforms or a vendor. *See id.* at ¶¶ 26-27. If one were to ask if a check appears within 1,000,000 documents, even assuming checking a document takes 1 second, it would take approximately 12 days

working non-stop for 24 hours. If one assumed three seconds per document and normal human working hours that would take approximately 21-and-a-half-weeks.

It is difficult to imagine either any party could produce such a volume of documents without utilizing specialized discovery software nor could one reasonably attempt to review such without utilizing similar software.

D. *Compliance with Court's Order*

To the extent that the Court's order requires RLI's counsel to be fully satisfied with production, Nexus simply will not be able to comply with the same: the order would be impossible to ever comply with.

To the extent it required full production of documents, in line with the requirements of the FRCP, Nexus has done that and RLI has not demonstrated either an understanding or appreciation of what was actually required nor demonstrated non-compliance. This is especially true given that *all documents and records* have been made available to RLI's counsel for inspection and copying.

RLI rather in its notice has expressed dissatisfaction, that Counsel for Nexus offered solutions, and that after those solutions were offered, it ceased expressing dissatisfaction. *See* ECF Doc. No. 859-7 (where no response followed Nexus counsel's offer). While Nexus understands to a certain extent the hesitancy of RLI to communicate with Nexus's counsel to attempt to resolve difficulties or inquiries it may have about the state of the document production, it is impossible for Nexus to respond

to those inquiries or address any perceived inability to access documents if RLI fails to present them or to take part in them. It does not appear as if any communication on its face expresses any intransigence on Nexus's part or anything bar alacrity. *See* Lawrence Decl. Exs. D-F.

A fair reading of these emails, and indeed how Nexus's counsel intended them to be received, was as very serious offers of solutions to problems to ensure that RLI was satisfied that it was actually receiving the records and documents requested— Nexus's counsel always interpreted the silence which followed proposed solutions to be equated with satisfaction. The communications when viewed with an objective eye appear to speak for themselves. *Ibid*.

Beyond this, the Interrogatory responses are signed under penalty of perjury and provide straightforward narrative responses coupled with incorporated documents to ensure veracity and completeness. Lawrence Decl. Ex. A. Beyond this, the only curiosity is noting that further information may be currently contained in documents now in possession of law enforcement. *Id.*

E. *State of Affairs at Nexus*

Put simply, Nexus was not and is not run in a manner similar to companies which earn high, or even medium, volumes of income. Nexus sustained mercurial growth followed by drastically decreased revenues and staffing. In the "boom years" Nexus attempted to adjust to the increased volume of transactions, record keeping, and

its rapid expansion, but did so in an *ad hoc* manner without concrete internal practices which would be established over time in a company. This led to a hodgepodge of different systems for recording transactions and interacting with clients, ultimately culminating with the use of a unified platform, Zoho.

In line with the above, throughout its years Nexus has run through a series of bookkeepers and accounting firms and continues the task of formalizing and "unifying" its historic accounts and books. This practice is demonstrative of the larger theme hinted above while Nexus (at one point) had mercurial growth and success, the operation remained in many ways a small business: it lacked substantive procedures and policies that would allow for easy or simple production and continues to lack middle management and administrative personnel which many may expect to exist given the historic revenues of the company.

The above has been worsened by the serried history of litigation, turnover in professional staffing, and lost or otherwise unavailable revenue: it has been increasingly difficult for Nexus to maintain professionals. Its production speaks to this difficulty, *see* Lawrence Decl. Ex. A at 15 (listing various amounts owed to current and past counsel), it is near impossible to maintain attorneys or accountants if one cannot timely pay them and with an inability to maintain banking relationships, or other standard business relationships, very few qualified parties are willing to initiate or maintain relationships with the company.

In spite of this clearly the instant production—apart from being technically compliant with the orders—represents a good faith effort to both work with RLI and to ensure that it has the records which it has requested.

Counsel's affidavit notes his own struggles in attempting to comply with document production requests and the somewhat chaotic state of records. Even with these challenges, Nexus managed to produce approximately 195 gigabytes of electronic records (in addition to providing records as they are normally kept in the course of business, *i.e.*, in the cloud on third-party servers) and provided access to the same. *See generally* Ajin Aff.; *see also* Lawrence Decl. Moreover, counsel cooperated with RLI's counsel and provided prompt response to all inquiries made—although, after proposing solutions to the purported issues those colloquies quickly came to an end, leaving Nexus's counsel to assume that the issues had been satisfactorily resolved. *See* Lawrence Aff. Exs. C-F.

Finally, it must be noted that Nexus is either extremely committed to play acting distress or it is in fact in financial straits. Its corporate campus was foreclosed on and other residential properties faced foreclosure that was only avoided after hurried negotiations and a hastily reached compromise with RLI's counsel. *See* Lawrence Decl. at ¶¶ 35-36. This represented an inability to put together approximately 180,000 to protect an equity stake of over 1,000,000. It could not do this.

*F.  Subversivo, David See, and Continued Payments to Third Party Providers*

Nexus processes transactions through Subversivo, which is a company that indeed was founded by a party who formerly held an executive level position at Nexus. *See* Lawrence Decl. at ¶¶ 31-33. This said, Mr. See is no longer an employee of Nexus, *id.*, and Subversivo, LLC, is not controlled by Nexus or its members. *Id.*

Without expending any efforts to utilize the "Books" application where Nexus's counsel informed RLI's counsel the pertinent records were located, and while apparently refusing to (a) accept training, (b) utilize the training and tutorial materials provided, (c) request the specific materials, (d) inspect or copy the materials directly, or (e) even state that all of the above were unsatisfactory or impossible, Counsel has concluded that no records of transactions exist and that the relationship is untoward— this is apparently supported primarily by the existence of an ill-updated Linked-in profile. *See* Lawrence Decl. Ex. D-F; *see also* Pl.'s Not.

Nexus has been forced to utilize this unusual arrangement of services precisely because it can no longer bank and could not afford other platforms. *See* Lawrence Decl. at ¶ 34. Nexus was forced to cease operations or find a service provider to whom its responsibilities could be assigned, and it chose the latter to insure that Nexus indemnified bonds are not cancelled by various sureties. This same rationale explains transactions through accounts that were not held in Nexus's name. Messrs. Moore and Donovan, prior to the existence of the relationship with Subversivo did move funds through accounts held in their names, this was done to conduct business once banking

had become impossible. The account to which RLI refers was not in the name of Nexus, nor did nexus apply for the account, nor was it a signatory on the account and therefore it was not responsive to RLI's interrogatory. *See generally* Pl.'s Not.

Further the Interrogatory at issue appeared to seek information relating to compensation, *i.e.*, a transfer of value *to* a member. The transactions at issue were not to the benefit of members or ultimately to the member funds moved through third-party accounts to allow for banking and transactions to take place. While RLI may have a different reading of the interrogatory it propounded, such does not alter the fact that Nexus has complied with the Court's orders and does not mean that if there was in fact a misrepresentation that it was knowing.

### G. Relief Requested

What has been requested is a receivership in order to allow for the discovery of documents requested and the materials subpoenaed, it is wholly unclear how this will solve the current issues of which RLI complains of or how this will result in RLI finding itself in a different position. First, it appears that Nexus has produced the documents it was ordered to produce and additionally it appears that the entity has produced the records requested of it. *See generally* Lawrence Decl. *To the extent that such do not satisfy RLI, RLI has been countless time given access to any and all records which Nexus has control and possession over and simply has chosen not to exercise its ability to inspect and copy records*. *Id.* at ¶¶ 17-19.  Even the most

hospitable receiver can do no more than provide RLI the documents and say, "look around at everything and copy anything you want."

An independent receiver will no better be able to learn how to access records stored on Zoho, indeed all Nexus could do is offer the receiver the self-same training offered to RLI. *See* Lawrence Decl., Exs. D-F. A receiver cannot change what Nexus has sworn to and what they believed to be true. An independent receiver cannot change that RLI did not request records relating to the personal bank accounts or Messrs. Moore and Donovan or that RLI has chosen not to subpoena information relating to personal bank accounts until recently, which was not opposed by Nexus or Messrs. Moore and Donovan. Further, Nexus's counsel offered to assist in accessing the records in Subversivo's possession and RLI never accepted or expressed any interest in the offer. *See* Lawrence Decl. Ex. E.

Likewise, a receiver cannot undo past harms of non-payments or the fact that Nexus has left a string of different financial service providers who may continue to have records which RLI would like to access. If a receiver were appointed he or she would be in no better position to pay these countless companies only to be able to access records which may or may not exist.

Appointing a receiver would only result in the absolute best case of RLI being in the exact same position it was in today, with the exception that a receiver would be wholly unfamiliar with Nexus's record keeping practices and would need to redo the

various work already conducted by Nexus and Nexus's counsel. Further, in this scenario it is unclear what surety providers might do in relation to Nexus indemnified bonds should a receiver be appointed because the act itself could be held to violate other surety agreements Nexus has entered, some of which are nearly identical in language to the one at issue in this case. In other words, there is a huge risk to both Nexus's existence and much more importantly a risk to innocent third parties.

Finally, it is unclear that appointing a receiver could result in "greater" compliance given that it appears that Nexus has already complied with the orders and requests. *See generally* Lawrence Decl. Nexus has given its records to RLI and has made amply clear that RLI remains free to inspect or copy *any and all* documents which Nexus controls, RLI has chosen not to do so. *Id.* Nexus has offered to assist RLI in learning its systems of record keeping, and RLI has chosen not to take that offer. *Id.* Nexus offered to provide the records contained on Zoho if training did not make the records available and RLI provided no response leading counsel to believe that the records were no longer desired. *Id.* Nexus offered to assist in gaining access to records held by Subversivo, again RLI did not accept this offer. *Id.*

If a receiver is appointed and RLI simply refuses to accept the records and access that a receiver offers RLI they will stand in no better position, nor it seems would they be more satisfied that the Courts orders are complied with.

Nexus has given RLI the keys to its cabinets and offered to assist RLI in opening those cabinets, there is nothing beyond that which it can do.

## ARGUMENT

Because civil contempt is a remedial and by nature is intended to coerce the contemnor into compliance with court orders, the contemnor may purge his or her contempt through the affirmative act required by the court's order. *Hicks*, 485 U.S. at 631–32; *Buffington v. Baltimore Cnty. Md.*, 913 F.2d 113, 133–34 (4th Cir. 1990). A sanction imposed following compliance would be punitive, and thus, a remedy for criminal contempt. *See, supra,* n. 2 (collecting cases holding that where contempt loses its coercive puissance it becomes criminal and that where a contempt sanction cannot coerce compliance because compliance either exists or is impossible it becomes punitive). Here, Nexus parties have complied with the June Order and the Initial Order, this being the case, they have purged themselves of contempt and they request that the Court enter an order to that effect or alternatively enter an modify or partially vacate its June Order and Initial Order. This is proper and just given that they have done what they have been ordered to do. *See supra* n. 3 (citing to *Dowell*, 82 B.R. at 1003 (noting various courts utilizing different procedural methods for vacating contempt or otherwise holding contempt purged where contemnors comply with order).

Moreover, the initial remedies—the appointment of a receiver and incarceration were contingent on non-compliance and to be implemented to *coerce* compliance—

there is nothing that either incarceration or the appointment of a receiver could at this point accomplish that would result in coercing the effect sought. As discussed, appointing a receiver would not result in greater availability of documents or more full production or allow for RLI to gain possession of what simply does not exist or is not within Nexus's possession and control.

Most pertinently, Nexus has signed interrogatories under penalty of perjury—this is what was desired—and its interrogatories are not boilerplate but rather assert facts that are specific and meaningfully responsive. *See* Lawrence Decl. Ex. B. Equally relevant Nexus has produced volumes of records, which clearly correspond to the requests of RLI and Nexus has declared that those records are all that it has in its possession and control—it would be disingenuous for RLI to state that it did not know what records correspond to what response. *See generally id.*, Ex. B, G. Beyond this, and dispositive, Nexus has made its records available for inspection and copying and RLI chooses not to inspect or copy. *Id.* at ¶¶ 17-19. If RLI is unsatisfied with what Nexus has provided it has been offered the keys to the kingdom and may copy and inspect to its hearts content but has shown no interest in doing such.

This corresponds completely with its lack of interest in learning how to utilize Zoho, counsel offered to demonstrate or train—and never refused to provide alternate solutions should such not work—but after sending a training video no response was forthcoming expressing dissatisfaction. *See id.* Ex. E-F. These correspondence do not

speak to Nexus not wishing to comply, but rather to RLI not wishing to have to admit that Nexus has in fact complied. *Ibid.*

This is leading a horse to water where the horse simply does not wish to drink. Divorced from the long and drawn out battles, there would be no doubt that Nexus has complied and is doing its utmost to comply and that it cannot comply where such is impossible—Nexus swore to what it believed to be true and offered all of its records to RLI, it cannot be expected to have the knowledge of god and be omnipotent, nor to pay for services which it lacks funds to pay, nor to force RLI to look at what it does not wish to look at or learn what it does not wish to learn. If such is required compliance is impossible and the Court has no interest whatsoever in continuing. *See Rylander*, 460 U.S. at 757 ("Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action.").

## <u>CONCLUSION</u>

For the foregoing reasons, Nexus Parties request the Court partially vacate portions of its June Order (ECF Doc. No. 848), specifically those portions holding Nexus Parties in contempt and ordering further sanctions, and vacate its previous contempt Initial Order *in toto*; or in the alternative that the Court modify its June Order to the same effect and vacate its Initial Order; or in the alternative simply issue a superseding order holding the contempt purged and grant all such further relief the Court believes just and proper.

Dated: August 28, 2023                              Respectfully submitted,

Mexico City, Mexico                                 /s/Zachary Lawrence

                                                    Lawrence Law Firm PLLC
                                                    166 Five Acres Lane
                                                    Cold Brook, NY 13324
                                                    202-468-9486
                                                    zach@zlawpllc.com
                                                    *Pro hac vice* (NY Bar No.: 5798202)
                                                    *Attorney for Nexus Services, Inc.*