IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| RLI INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>NEXUS SERVICES INC.,<br>LIBRE BY NEXUS INC.,<br>HOMES BY NEXUS INC.,<br><br>    Defendants. | Case No.: 5:18-CV-00066-MFU-JCH |

## **DEFENDANTS BRIEF ON SPECIAL MASTER'S REPORT AND PROPRIETY OF SUGGESTED RELIEF**

### **Introduction**

The District Court of D.C.[1] has noted that receivership is simply

inappropriate where there exist alternate more traditional remedies available:

> The most significant factor in the propriety of appointing a receiver is
> whether any other remedy is likely to be successful. *Id.* ("When more
> traditional remedies, such as contempt proceedings or injunctions, are
> inadequate under the circumstances a court acting within its equitable
> powers is justified, particularly in aid of an outstanding injunction, in
> implementing less common remedies, such as a receivership, so as to
> achieve compliance with a constitutional mandate.") *Newman v. Alabama,*

---

[1] Defendants rely heavily on the District Court of D.C. because it appears to have the most developed and robust
jurisprudence relating to the issue. *See, e.g.*, *RLI Ins. Co. v. Nexus Servs., Inc.*, No. 5:18-cv-00066, 2023 WL
3802002, at *8 (relying primarily on *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 36 (D.D.C.
2014) and *United States v. JK Peris, Inc.,* No. 6:12-CV-6628(MAT), 2018 WL 3949896, at *4 (W.D.N.Y. Aug. 16,
2018) (citing Latney's Funeral Home from the District Court of D.C.)

466 F.Supp. 628, 635 (M.D.Ala.1979) ("When the usual remedies are inadequate, a court is justified in resorting to a receivership, particularly when it acts in aid of an outstanding injunction."); *Bracco,* 462 F.Supp. at 456 (noting that a receiver is a "remedy of last resort; a receiver should not be appointed if a less drastic remedy exists"); *Petitpren,* 304 N.W.2d at 557 (finding a receiver appropriate only when "other approaches have failed to bring compliance with a court's orders, whether through intransigence or incompetence").

*Dixon v. Barry*, 967 F.Supp. 535, 550 (D.D.C. 1997)

The point here is, at its most basic assuming everything stated by the Special Master correct and *if* there were in fact contractual transactions that had "badges of fraud," or *if* there were in fact reason to pierce the corporate veil and sue the principles of Nexus personally, then there would be a traditional action available for money damages which would make the imposition of a receivership inappropriate. *See id.* In other words, were one to broaden the scope of the inquiry to address the existence of an action sounding in tort, and there were such an action because fraudulent transactions indeed did exist, then that is dispositive and no receiver should be appointed. If, however, the question relates to whether or not there was compliance with discovery and if the imposition of such a drastic remedy is the *only* available remedy available to ensure that discovery proceeds, then the Court faces a very different inquiry.

It is this problem, one of a scope of inquiry which seems to Nexus[2] to create a significant flaw in the Special Master's report (ECF Doc. No. 891) as well as his suggested appointment of a receiver to fully take control of the business. *Cf. RLI Ins. Co. v. Nexus Servs., Inc.*, No. 5:18-cv-00066, 2023 WL 3802002, at *11 (considering the appointment of a limited receiver to take possession of books in order to produce them).

## STATEMENT OF FACTS

First, it is important to note what has and has not occurred in this matter: RLI has not subpoenaed Subversivo, LLC ("Subversivo"); it has not inspected or copied Nexus' records; it has not conducted post-judgment depositions; and it has not brought an action for fraudulent transfer. *See generally* Lawrence Decl. at ¶¶ 2-3. Moreover, the Court appointed a special master, Paul Beers (the "Special Master") to determine whether or not Nexus had complied with various Court orders relating to discovery, not to determine whether or not a fraudulent transfer had occurred. *See generally* ECF Doc. No. 891.

---

[2] Defendants utilize the generic term "Nexus" throughout to refer to Nexus Services, Inc. (the holding company) and Libre by Nexus, Inc. (its operating arm, as is relevant to this action) throughout as Nexus for ease. Where necessary, the entities are individually referenced utilizing their full names.

The Special Master's report details three specific outstanding issues with discovery: first, that Nexus has failed to identify tenants of properties;[3] second that Nexus failed to identify what certain transfers made to Micheal Donovan and Richard Moore were reimbursing Mr. Donovan and Mr. Moore for; and third, that detailed information relating to expenses was not provided for the last 90 days.[4] *See generally* ECF Doc. No 891 at 1.

As to the first "failure," such was apparently in response to the Court's ordered supplementation to Interrogatory No. 8, which required Nexus to provide "A full summary of real estate owned or leased by Nexus or the entities on or after October 23, 2020." *Id.* at 3. Put simply, Nexus leased a single property and provided information relating to the property that it was leasing. *See* Lawrence Decl. Ex. A. It also provided information relating to properties it currently owns

---

[3] The vast majority of these properties have been foreclosed on and do not have tenants.

[4] Although, the Special master does not explicitly state so, the lack of "productivity" as it related to Zoho is that it lacks information relating to expenses incurred by Nexus, invoices paid by Nexus, and funds transferred by Nexus; Zoho did and does demonstrate all incoming revenue.

Again, although certainly idiosyncratic, Nexus has previously explained that all incoming revenue is transferred to Subversivo, which pays operating expenses for Nexus and then utilizes the remaining funds to repay a substantial loan made by Subversivo to Libre by Nexus, Inc. In other words, all incoming revenue is transferred to Subversivo, which is contractually obligated to ensure that Nexus' payroll is paid, that vendors are paid, and the remaining income is utilized to satisfy Libre by Nexus' obligations to Subversivo.

Given this information, and the contracts which govern this relationship, were RLI interested in pursuing various actions, whether those be in the realm of post-judgment discovery, or independent action against Subversivo, certainly they could. These actions, of course would not come with the added benefit of threatened incarceration or receivership, which makes the possibility of coerced personal payment less viable, and likewise would involve a legal playing field which would be fresh ground, lessening the procedural advantage present in this matter.

4

and had previously owned. *Id.* The supplement ordered by the Court did not

apparently order more than that, and Nexus, acting through an agent, swore to the

completeness and accuracy of the answer under penalty of perjury providing just

that. *See generally* ECF Doc. No. 874 at 14. To the extent that more specific

information is desired, or additional questions remain germane, a deposition is

certainly an available tool with significant flexibility to delve into specific aspects

of those properties or various other areas of interest involving real property.

   As to the second "failure" such was apparently in response to the Court's

ordered supplementation of Interrogatories No. 3 and 4 which required a "complete

accounting of loans transfers, and payments of any kind or nature to Moore,

Donovan, and Ajin." Nexus had previously answered the initial interrogatories by

referencing produced-documents which reflected various loans, transfers, and

payments to Moore, Donovan, and Ajin, demonstrating the accounts to which these

transfers were made. *See* ECF Doc. No. 862-2. In response to this, RLI subpoenaed

records from Dupont Credit Union for an account relating to Mr. Moore and Mr.

Donovan, an account which was made known through the previous document

production and interrogatory responses. *See, e.g.*, ECF Doc. No. 858.

Unfortunately, due to suboptimal record-keeping, Nexus had to respond to this

interrogatory by reviewing bank records—those already in the possession of RLI—

and deducing which payments made to a joint account utilized by Moore and

Donovan[5] were payments for payroll, which were reimbursements, and which were combined payments, *i.e.*, a single transfer that covered both payroll and reimbursed expenses. Again, while the state of records may certainly leave much to be desired, where there is no more specific information. *See* Lawrence Decl. at ¶ 4; *see also id.* Ex. B. Importantly, there remain available alternate methods of discovery which may allow or further information to be gleaned, *i.e.*, deposition or interrogatory questions which do not require specific references to date, or which request a demonstrative explanation of normal expenses reimbursed. Additionally, one could seek to learn about the record keeping processes or expense reimbursement process to try to determine whether and to what extent such records may exist.

Unfortunately, given the nature of the ordered supplementation, and primarily due to suboptimal record keeping, it was impossible to definitely identify what such reimbursements were for; by the timing, the amount and the existence of other payments it was possible to determine that certain payments were payroll payments or payroll payments which must have been combined with reimbursements, or if neither that such were reimbursement payments for expenses; however, beyond that it was impossible to make any more definite determination with certainty. Lawrence Decl. at ¶ 4. Nexus lacked records—

---

[5] There were no additional transfers to Mr. Ajin. Lawrence Decl. at ¶ 4.

whether those be receipts or formalized reimbursement requests—by which it would be possible to determine the nature of those payments with any more specificity. *Id*. at ¶ 5. The effort was painstaking and required "reconstruction" of transfers to try to best estimate what they may have been for and provided the best answer which could be given under penalty of perjury. *Id.* Nothing whatsoever would prevent RLI from examining any documents at their pleasure and copying the same. *Id.* at 4-5.

As to the final "failure," such does not clearly relate to any particular ordered-supplementation and does not clearly relate to a definite request for document production or interrogatory, but to apparent frustration at Nexus' records currently being in the hands of a third-party who has refused to provide Nexus records at its request and a conclusion that this act may have been the result of a fraudulent transfer. *See generally* ECF Doc. No. 891 at 5-6. Were this the case, various legal actions are available to recover money damages. Lawrence Decl. at ¶ 6.

Finally the Special Master does not find that Nexus in any way prevented RLI from inspecting and copying physical records, or digital records, nor did Nexus refuse RLI's attempts or requests to inspect and copy its records because RLI never attempted to inspect or copy records but rather insisted on production of

7

all records electronically a process that would have cost in excess of $66,000 per month, in storage and maintenance costs, for just historic emails, from the cheapest discovery platform Logikcull.[6] *See* Lawrence Decl. at ¶¶ 7-12; ECF Doc. No. 891.

Nor did the Special Master find that Nexus failed to provide the required authorizations. Nor did the Special Master find that Nexus failed to provide RLI with access to its record platforms which already existed online. ECF Doc. No. 891.

In essence the issue, that appears to drive the Special Master's report, is that Subversivo has refused to provide documents to that Nexus was not necessarily required to produce, either in response to the ordered supplemental interrogatories or ordered supplemental production. *See id.* Rather Nexus attempted to secure these records gratuitously—again, Nexus was ordered to supply authorizations, which it supplied; access to online platforms, which it supplied; access to its office for inspection and copying something which it most certainly never denied RLI, because RLI never attempted to exercise such a right; and to provide specific

---

[6] Logikcull charges $30 per gigabyte stored on its platform monthly. Were Nexus to even upload its email, which totals 2.29TB, that would come to approximately $69,000 per month for the time such was on the platform, a length of time that may be significantly greater than a single month. Were that to include both Nexus' and Libre by Nexus emails, that amount would come to approximately $80,000 per month. Were it to include all electronic data that number would be measured in the hundreds' of thousands. While RLI may not like the idea of physically going to Nexus' offices to conduct inspection and copying, electronic production of all records is simply cost-prohibitive and in any event not what was ordered.

supplemental responses which it indeed did provide. *See generally* ECF Doc. No. 874 at 15-16.

Moreover, Nexus has undertook a process—one which it need not have taken—to subpoena the records and threaten legal action against Subversivo for specific performance and this was done to a company whom Nexus relies on to function. Lawrence Decl. at ¶¶ 13-14. This is by no means required by the Court order but done in order to demonstrate good faith and the sincere efforts it was exerting to comply with demands which quite frankly exceed the bounds of its obligations. *Ibid.*

RLI has most certainly not chosen to bring an action against Subversivo and most certainly has not bothered to subpoena Subversivo. *See generally* Lawrence Decl. at ¶ 6. Nor has it bothered to inspect Nexus' records or to copy them. *Id.* Nor has it undertaken the very natural process of deposing parties, depositions are of course significantly more flexible than court-ordered supplementation to interrogatories which require specific answers to questions without back-and-forth or follow-up questions, or even propounding more narrowly tailored sets of interrogatories or document requests. *Id.*

While the Special Master has determined that a certain contractual relationships had the traditional badges of fraud, such does not necessarily

determine whether or not the Court's discovery order has been complied with nor whether or not the appointment of a receiver is appropriate to ensure that Nexus complies with that discovery order—indeed, the appointment of a receiver seems suggested because the Special Master believes a fraudulent transfer may have occurred, not because he has applied a reasoned analysis based on precedent-supported factor analysis. *See generally* ECF Doc. No. 891.

Put simply, RLI has standard remedies available to it to gain access to the post-judgment discovery it wishes to gain access to such. Lawrence Decl. at ¶ 6. Moreover, much of that discovery simply was not the discovery which Nexus was ordered to supply or supplement. *Compare* ECF Doc. No. 891, *with* ECF Doc. No. 874 at 15-16. Finally, the Special Master's report appears to address a question which is none-too-particularly elucidating on whether or not this Court's discovery order has been complied with and whether or not the appointment of a receiver would assist in any further compliance with that discovery order. ECF Doc. No. 891

Nexus' counsel is painfully aware of why RLI does not wish to physically inspect and copy Nexus' records, such is a horrible process which takes a huge amount of effort for very, very little gain—indeed, the process is burdensome and frustrating. Likewise, Nexus' counsel is aware of why an independent action

against Subversivo is distasteful—he has begun the process of doing so and does not look forward to doing so. Lawrence Decl. at ¶ 15. All that said, there remain traditional remedies available to RLI to allow for it to get the records it seeks (or should it wish to do so file an independent action). *Id.* at ¶ 6. Moreover, it is unclear what if any failure exists as it related to the ordered supplementations, authorizations, and access provisions of the Court's Order. *See* ECF Doc. No. 891; *see also* ECF Doc. No. 874. While if a court should determine that a fraudulent transfer has occurred, such would be deeply troubling, such has not been determined because the first step in that process has not taken place, *i.e.*, a suit sounding in fraudulent transfer, and this case, currently, is confined to whether or not post-judgment discovery has been complied with and whether or not Nexus remains in contempt.

RLI still has options on the table and has simply chosen not to exercise them. Lawrence Decl. at ¶ 6. The most telling fact is that they have not taken part in the inspection and copying process, refused to participate in the stipulation

process for the same until importuned, and then insisted on the same being done

through electronic production[7] rather than inspection and copying. *Id.*

## **ARGUMENT**

"Appointing a receiver is an extraordinary equitable remedy, which should

be applied with caution." *Canada Life v. LaPeter*, 563 F.3d 837, 844 (9th Cir.

2009) (internal citations omitted). "Receivership is a remedy of last resort; a

receiver should not be appointed if a less drastic remedy exists." *Bracco v.

Lackner*, 462 F. Supp. 436, 456 (C.D. Cal. 1978). The party seeking the receiver

has the burden of showing that a receiver is necessary. *Sterling Sav. Bank v. Citadel

Dev. Co., Inc.*, 656 F. Supp. 2d 1248, 1262 (D. Or. 2009) (citing cases).

The appointment of a receiver is an extraordinary equitable remedy that is

only justified in extreme situations. *Aviation Supply Corp. v. R.S.B.I. Aerospace,

Inc.,* 999 F.2d 314, 316 (8th Cir. 1993). Courts have generally recognized that the

appointment of a receiver should be the remedy of last resort. *See Cobell v. Norton,*

226 F.Supp.2d 1, 146 (D.D.C. 2002), *vacated on other grounds*, 226 F.Supp.2d

175 (D.D.C. 2002); *Bracco v. Lackner,* 462 F.Supp. 436, 456 (D.C. Cal. 1978)

---

[7] Quite frankly, Nexus does not have the means to conduct such and the payment for the electronic storage of such records on a platform that would allow for removal of privileged information with any celerity would cost significantly more than their total cost of fulltime litigation counsel.

(finding that "a receiver should not be appointed if a less drastic remedy exists."). As a result, the most important factor for a court to consider when deciding whether to appoint a receiver is if *any* alternative possible remedy appears to exist. *Cobell*, 226 F.Supp.2d at 146 (citing *Dixon v. Barry,* 967 F.Supp. 535, 550 (D.D.C. 1997)); *Zone 1 Pension Fund v. Essex Mech., LLC*, No. 1-08-cv-1177, 2009 WL 3246959, at *1 (W.D. Mich. Oct. 6, 2009) ("Because receivership is a remedy of *last resort,* and should not be used unless less drastic approaches have failed or would be doomed to failure, a receiver should not be appointed where another safe, expedient, adequate and less drastic remedy exists.") (emphasis added)(internal citations and quotation marks omitted); *Granada Invs., Inc. v. DWG Corp.*, 823 F. Supp. 448, 460 n.2 (N.D. Ohio 1993) ("Receivership . . . is an extraordinary remedy that is to be used only as a matter of last resort.").[8]

The existence of an adequate legal remedy is a less drastic remedy which will prevent the appointment of receivership. *See Aviation Supply Corp.,* 999 F.2d at 316-17. Moreover, this continues to be the case even where waste or loss of

---

[8] Additionally, as an inherent power, such is to be exercised with extreme caution and only where the exercise of such is necessary because of a lack of any other adequate remedy.

Inherent powers are commonly defined as those powers "necessary to the exercise of all others." *United States v. Hudson,* 11 U.S. (7 Cranch) 32, 34 (1812). Because the powers are implied, the Supreme Court has repeatedly cautioned that they are to be invoked only when necessary and as a last resort. See Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980).

assets is alleged as long as there exists the possibility of bringing a cause of action for damages. *See Leighton v. One William St. Fund, Inc.,* 343 F.2d 565, 568 (2d Cir. 1965). The *Leighton* court determined:

> The court below was likewise correct in refusing to appoint a receiver for the Fund. Leighton's request, as in the preceding instance, was premised on claimed conflicts of interest concerning Lehman Brothers' relationship with the Fund and, additionally, on alleged waste of the Fund's assets by the defendant directors. Considering the extraordinary nature of the relief sought and the fact that any waste would be compensable in damages, and in view of the court's finding that there was no danger of irreparable injury, the ruling was proper.
> *Id.*

This goes hand and hand with more readily recognized legal principles—because the appointment of a receiver is so uncommon it is helpful to think of equitable relief more broadly. For instance, irreparable harm is an essential element of equitable relief, and there is no question that the appointment of a receiver is a form of equitable relief; in other words a receivership is only available where a legal remedy, such as monetary damages, is unavailable. *See Los Angeles Memorial Coliseum Commission v. Nat'l Football Leagu*e, 634 F.2d 1197, 1202 (9th Cir. 1980) ("the basis of [equitable] relief in the federal courts is irreparable harm and inadequacy of legal remedies"); *see also Leighton v. One William St. Fund, Inc.*, 343 F.2d 565, 568 (2nd Cir. 1965) (receiver inappropriate in light of fact that injury would be compensable in monetary damages). The United States Supreme Court has explained:

> Mere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90-92 (1974) (internal citations omitted).

Without beating the point to death, there are remedies available to RLI whether they be for the desired information from Subversivo, further discovery sought from Nexus, or an independent action for the purported fraudulent transfer. If and until RLI exhausts those remedies it may not elect to have a receiver appointed simply because they believe it will be more expeditious or save "time and energy" or be less irksome and costly—that is simply not how equitable relief works and certainly not this particular relief.

In short, to the extent there exists outstanding discovery sought, RLI can seek it through normal discovery processes, or at least could exercise the options made available to it by this Court's order; again, RLI has not bothered to either subpoena Subversivo nor to inspect Nexus' records. These two remedies are available, are less drastic, and act as a hard bar to the appointment of a receiver.

Likewise, assuming that the receiver was to be appointed to address an alleged fraudulent transfer such is wholly inappropriate where RLI can simply bring an action sounding in tort. Whether or not RLI finds this desirable is quite

15

frankly up to RLI, but regardless of their choice the existence of that choice acts to bar receivership.

I.    **Because there Exist Less Drastic Remedies Available Receivership Is Inappropriate under Various Analyses.**

Moving forward, while there is no precise formula for appointing a receiver, the *Canada Life* court identified the following factors that federal courts consider to determine whether a receiver should be appointed:

> (1) "whether [the party] seeking the appointment has a valid claim"; (2) "whether there is fraudulent conduct or the probability of fraudulent conduct," by the defendant; (3) whether the property is in imminent danger of "being lost, concealed, injured, diminished in value, or squandered"; (4) whether legal remedies are inadequate; (5) whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment; (6) "the plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property"; and, (7) "whether [the] plaintiff's interests sought to be protected will in fact be well-served by receivership."

*Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009).[9]

Put simply, the Special Master simply did not consider these factors and the factors were not met. Were this a decision of a district court and the district court conducted no analysis of these factors in its decision to appoint a receiver, that

---

[9] These factors appear to be approved of or paralleled in similar forms by most courts and commentators. *See, e.g.*, *See Dixon*, 967 F.Supp. at 550; 12 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2983 (3d Ed. Apr. 2023 update); *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005).

alone would be a fatal flaw in the decision. *See Solis v. Matheson*, 563 F.3d 425, 438 (9th Cir. 2009) ("The district court was correct that it has authority to order a receivership, but only after evidence has been presented and findings made showing the necessity of a receivership.").

Moreover, the factors simply are not met in this case. For the reasons explicated above at length, it is clear that there exist alternative legal remedies available to RLI either to address ongoing discovery needs or the existence of a fraudulent transfer, should that be shown to exist. Although, that is the most important factor in determining whether to appoint a receiver and is alone dispositive, a receiver should not be appointed when such appointment would do more harm than good. *See, e.g., Waag v. Hamm,* 10 F.Supp.2d 1191, 1195 (D. Colo. 1998) (finding that receivership may do more harm than good where cost and expense of suggested receiver is likely significant.) Here, in the absolute best of cases, this would involve the hiring of additional legal or accounting personnel to repeat work which Nexus' staff and counsel have already undertaken and create further delay or expense. If RLI wishes to inspect and copy Nexus' records, it should do so. If RLI wishes to pursue discovery against third-parties utilizing the subpoena process it should do so. If RLI wishes to propound more discovery specifically tailored to address the "failures" laid out, it should do so. The same holds true with pursuing alternate independent actions sounding in tort. The only

thing that will occur should a receiver be appointed is additional expense and complication in undertaking the remedies which are very available to RLI.

Likewise, there is little risk of harm, or most certainly irreparable harm, that the appointment of a receiver would prevent. In essence, there are two potential "harms" identified. The first is ongoing displeasure with discovery. It, at this point, appears as if Nexus has in fact done what the Court has ordered it to do, including providing the necessary authorizations, allowing RLI to inspect and copy at Nexus offices, providing access to various online platforms, and providing specific supplementations. While RLI may believe that such did not provide the information that it now seeks, this does not mean that Nexus has violated the Court's order or failed to comply with the same. Why RLI, if it is so desperate for discovery has chosen to not exercise its powers to subpoena, notice depositions, propound additional requests, or to simply inspect and copy is a complete mystery.

Moreover, to even assuming *arguendo* that a fraudulent transfer has occurred, there is no indication that such would be prevented by the appointment of a receiver—it is purported that it has already occurred—and there is no evidence that such would result in irreparable harm. If such were likely, presumably a suit would have already occurred against Subversivo, a preliminary injunction or TRO would have been requested, and Subversivo assets would be subject to various

orders preventing their transfer, disposition, *etc.* This of course has not occurred, which quite frankly make any claims of actual anxiety of irreparable harm incredible. RLI is aware of Subversivo because of discovery, they are aware of the contracts with the same because of discovery: if they wish to utilize that information to subpoena they can very well do so; if they seek to void various transactions, there is a clear path to do such.

Likewise, it is unclear that any party will in fact be well-served by the appointment of a receiver. No party has set forth what a receiver will accomplish that could not be accomplished through normal processes nor how such would occur in an efficient or cost-effective manner. Even assuming a receiver could retrieve records that Nexus' staff were unable to locate, and were to determine that such were responsive to either the Court's ordered supplementation, or discovery requests, why such would be more efficient than RLI simply doing the exact same thing or simply conducting discovery in the normal course of business remains a complete mystery.

Further, there is no particular evidence that the discovery sought is being destroyed, lost, or otherwise spoliated or irrevocably destroyed.

In essence, a single factor, assuming the report of the Special Master is correct in every respect is met, that would be the existence of indicia of fraud—

Nexus, of course does not believe that the transactions were fraudulent, but simply assumes this for the sake of argument. The possible existence of fraud simply is not adequate for the appointment of a receiver and no caselaw holds otherwise.

## II.   Efficient Remedies Are Available.

RLI may choose to continue post-judgment discovery. Were it to do so, it would likely be best served by noticing depositions, inspecting and copying records, pursuing third-party discovery, and propounding requests better suited to gain it the information it now desires. It may alternatively decide to pursue legal remedies which might be available to it in other jurisdictions against third-parties. At this point, however, RLI has been provided the vast majority of what it sought—it cannot be seriously contended that the legal performance of Nexus presently, in the litigation, is no better than what it was historically (Nexus fully admits that its performance in discovery responses prior to the entrance of current-counsel ran afoul of the FRCP and was legally insufficient) and it cannot be stated that the *discovery* failures reported by the Special Master represent willful noncompliance with the Court's order; Nexus was run idiosyncratically and such has led to no number of problems, but that represents poor choices made in the past rather than current disregard for its discovery obigations.

RLI is making a choice to request an extraordinary remedy in this court, solely because it appears more advantageous than pursuing other remedies; likewise it is choosing to litigate to death previous discovery requests rather than simply propounding new discovery better suited to what it now seeks—these are choices that have reasons, but they are not choices that either justify the appointment of a receiver or justify the use of post-judgment discovery to be utilized as a cudgel rather than to discover the extent and the location of the resources of Nexus.

## CONCLUSION

Nexus simply will not claim that its behavior throughout the entire course of this litigation has been blameless—such is not the case and most certainly it has been at fault in the past for discovery violations. That said, immediately after the entrance of its current counsel, Nexus has provided responses that *are* compliant with the FRCP—there are no longer unsigned responses or simply ignored orders and deadlines. Moreover, those responses (and ordered-actions) comply with the letter of court orders, again something which historically presented issue. Neither Nexus, nor current counsel, can erase past wrongs, or change Nexus' accomplished choices and practices, but neither can those accomplished wrongs be utilized to justify the appointment of a receiver where there is no demonstrated current-need and there exist a multitude of traditional remedies available given the current state of affairs.

Dated: March 25, 2023                    Respectfully submitted,


Cold Brook, NY                           /s/Zachary Lawrence

                                         Lawrence Law Firm PLLC
                                         166 Five Acres Lane
                                         Cold Brook, NY 13324
                                         202-468-9486
                                         zach@zlawpllc.com
                                         *Pro hac vice* (NY Bar No.: 5798202)
                                         *Attorney for Defendants*